**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

**IN RE ST. JUDE MEDICAL, INC.**
**SILZONE HEART VALVE PRODUCTS LIABILITY LITIGATION**

**MDL DOCKET NO. 1396**

Report of Special Master's Findings on *In Camera* Review of
Documents Claimed Privileged by St. Jude Medical, Inc.

## I. Introduction

This memorandum precedes the *in camera* findings to provide an overview of the analysis respecting some of the related legal issues. Mr. Ladner and counsel for St. Jude Medical, Inc ("SJM") did a very capable job of enunciating SJM's positions tailored to the content of the documents to which they had access. Such positions supported the sustaining of privilege objections in a large number of the subject documents, and the undersigned would have trouble improving upon the rationale already expressed by SJM. Accordingly, the following largely relates to the analysis in respect to the occasions on which SJM.'s privilege objections were found not to be sustained, analysis of which plaintiffs could not have fully enunciated given their lack of knowledge of the documents' content.

Although many of the communications here were copied to Mr. Ladner, relatively few were directly to or from him or any lawyer, and relatively few were communications which expressly sought or rendered legal advice. Thus, the important issue concerning the purpose of the communication was often not readily apparent. In addition, there was no showing from the author or preparer of most of the documents, and thus his or her purpose was not the subject of firsthand evidence. The evidence apart from the documents themselves was limited to the affidavit of Mr. Ladner, which affidavit often made blanket claims similar to those made in respect to documents earlier ordered released by the Court.



FILED MAY 1 2 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

Accordingly, most of the determinations of these privilege claims required a somewhat difficult assessment of whether SJM sustained its burden of proving each element of the privilege–particularly its burden of proving the purpose (whether the communication was seeking or rendering legal advice or was prepared because of the prospect of litigation). Where the undersigned has sustained the objection, it can be assumed that a factual finding was made that "each element" necessary to the privilege was sustained by SJM either in its affidavit, privilege log, log of personnel titles and/or the content of the document (and surrounding related documents). Where the undersigned has overruled the objections, it can be assumed that a factual finding was made that SJM failed to sustain its burden of proving each of the elements of the subject privilege.

## II. Legal Advice v. Business Communications

The issues here arise in fertile ground for confounding privilege questions, as such issues do routinely in corporations conducting the business of developing, manufacturing and/or marketing products subject to continual governmental regulation and potential for product liability claims. Manufacturers and/or sellers of medical devices, pharmaceuticals, chemicals, foods, advertising, news broadcasts, securities, insurance products, accounting services and the like routinely employ regulatory, compliance, customer service, public and corporate relations and press personnel, as well as legal personnel. Such non-lawyer personnel have functions (in whole or part) involving regulatory, safety, compliance, efficacy, public relations, government relations, risk management, communication and press, compliance training and oversight, testing, peer reviews, etc. These activities, which generally are in respect to the day-to-day business obligations of such companies, often bring both legal and non-legal functions together such

that reasonable lawyers can have difficulty appreciating where privileged communications or materials end and non-privileged business communications begin.

And of course the obvious relevance concerning questions about time and nature of corporate knowledge and the use of that knowledge relative to the warning or welfare of consumers or product users from when a corporation first learns of a potential product problem, means that internal activities relative to public relations, customer relations, regulatory compliance and communications, dealing with customer complaints and the like are both important activities to explore in the search for truth, and are often the subject of understandable needs for legal guidance. As the documents here are generally internal communications during such a time period, the assessment of these privilege claims often pitted the relevance of SJM's business knowledge, when it had such knowledge and what it did with such knowledge relative to consumer or user safety, against the importance of SJM's decision makers and involved employees (those in the "client group") having confidential access to legal advice on the same issues as such advice was implicated in regulatory and at times corporate relations and communication activities.

Accordingly, this *in camera* review often worked in the tension between the case law guidance (I) that lawyer-client privilege findings, because of their absolute protections and attendant "adverse effect . . . on the disclosure of truth" are to be "strictly construed;" and (ii) that while such privilege protects communications for the purpose of seeking or rendering legal advice, the privilege can also protect communications even if such a legal purpose is mixed with other business purposes.[1/] See *In re*

[1/] It should be noted the somewhat different case law guidance in respect to the two privileges in this regard. While the relatively absolute lawyer-client privilege is said to protect communications with mixed purposes respecting legal and business discourse, the

*Bister Company*, 16 FRD 929, n.9 (8th Cir. 1994); *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596,602 (8th Cir. 1978); *Bituminous Casualty Corporation v. Tonka Corporation,* 140 FRAT 381, 386 (D.Minn. 1992). In Minnesota, see *Kahl v. Minnesota Wood Specialty, Inc.*, 277 N.W. 2d 395, 399 (Minn 1998)(the privilege is given strict application because it excludes truthful evidence). In short, many of the circumstances surrounding the documents here necessitated difficult discernment as to what writings genuinely warrant the protection of the privilege–so that the salutary purposes of the privilege are served without the privilege becoming a tool to inhibit important discovery of communications which came into being as a part of necessary business intercourse and which do not warrant such protection.[2/]

## III. An *In Camera* Review and the Purpose of the Communication

An *in camera* review to determine the existence of a privilege is largely a matter of making factual determinations, essentially determining whether the party with the burden of proof has sustained the burden of proving each factual element of the privilege. See Minnesota's leading case of *Brown v. St Paul City Ry Co*, 62 N.W. 2d 688 (1954):

"... whether a document or communication is privileged is a question of fact... when

---

qualified or less-absolute work-product privilege is said to protect those materials prepared "because" of the prospect of litigation rather than those documents which are prepared because of ordinary business needs. See discussion below.

2/ Business meetings with an attorney are privileged only to the extent of communications at the meeting which constituted requests for or provisions of legal advice. See *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 601 (8th Cir. 1978). Some of the documents involved here are documents merely setting meetings at which counsel may have been one of many invitees.

> upon a discovery motion a party litigant claims privilege, the burden rests on him to present facts establishing the privilege unless it appears from the face of the document itself that it is privileged." Id at 701.

In this regard, even though counsel's affidavit, as here, is generally uncontroverted by other affidavit submissions, this does not mean that there is no controverting evidence, as the very reason for the review is to test affidavit or privilege log assertions in support of the privilege against the factual evidence shown by the subject and surrounding documents. E.g. *Cuno, Incorporated v. Pall Corporation*, 121 FRAT 198, 202 (E.D. N.Y. 1988)(District Court doing *in camera* review assesses whether the content of documents "undercuts" affidavit assertions).

As the case law recognizes, the protections of the lawyer-client privilege is not afforded to all communications between lawyer and client. Further, while "committing" a communication to a lawyer can raise an inference that the client/author's reason for the communication was to obtain legal advice, this alone is not necessarily enough to establish the privilege. *In re Bister Company*, 16 FRAT 929, 938 (8th Cir. 1994). And of course where the lawyer is simply copied with the communication, the reasonableness of this inference is different than when the lawyer is the prime addressee, as when a non-lawyer is the prime addressee there is a reasonable assumption that the purpose of the communication is in respect to non-legal activities of the prime addressee and could be other than to obtain legal advice. While keeping a lawyer informed such that potential legal advice can be obtained is often a reason to copy a lawyer or invite a lawyer to a business or board meeting, such a purpose does not make the entire communication of the document nor the entire communications at a meeting privileged. See n. 2 below, and see *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987), which stated that there was no error in a special master's conclusion that "a business document is not made privileged by providing a

copy to counsel," and went on reference with approval comparable statements from other federal courts:

> ". . .legal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby insure confidentiality. Just as the minutes of business meetings attended by attorneys are not automatically privileged, business documents sent to corporate officers and employees, as well as the corporation's attorneys, do not become automatically privileged. Id at 403 (emphasis added)

And with respect to communications copied to keep counsel informed, the *Searle* court stated that this purpose was not, standing alone, enough:

> "Client communications intended to keep the attorney apprised of business matters may be privileged if they embody an implied request for legal advice based thereon." Id at 404 (emphasis added)

Thus, the law recognizes that if simply including a lawyer in a broad range of business communications could have been a company directive, then a different inference must be considered, namely that routing the communication to counsel may have been motivated more to give rise to future privilege claims than to seek legal advice.[3/] Accordingly, where (as here) there were so many documents copied to counsel but relatively few communications of legal matters either directly to or from such

---

3/ In assessing the factual question of whether a communication came into being for such a purpose, the seeming universality of copying counsel on so many documents in which no legal input was being sought, and the lack of virtually any documents in which counsel actually rendered legal advice, were both factors in the willingness to make any privilege-favoring inference as to communications where counsel was merely copied. (Moreover, the content of Document A-10--# 4050700059--as to the rationale of copying Silzone documents to SJM's in-house counsel raised a question as to any inference that documents transmitted to the SJM legal department were for the purpose of seek legal guidance. This Document A-10 was authored by SJM's Director of Regulatory Affairs, was claimed by Ladner to be an "agent" of the legal department, who was very involved in the Silzone issues and who claimed in A-10 to be passing along Ladner's directive.)

counsel, this *in camera* review required a document-by-document examination to discern whether SJM had proven that the purpose of the communication was such that it warranted, under case law guidance, privileged protection:

> ". . . mere assertion that the matter is confidential and privileged will not suffice. Unless the document discloses such privilege on its face, [the proponent of the privilege] must show by the circumstances that it is privileged." *Brown*, supra 701
>
> "The privilege applies only if [the communication] was for the purpose securing [legal advice]" *Diversified*, supra at 602.

Therefore, where the Ladner affidavit provided non-specific statements that, for instance, a document "reflects" or "embodies" legal advice, but where the undersigned[4] could not detect as much as a clause appearing to even implicitly have the purpose of seeking or rendering legal input, the evidence necessary to sustain SJM's privilege claim was often not sufficient. And in general this is not because of the failure to believe the affiant (whose statements were often somewhat subjective conclusions rather than specific facts), but because often the ultimate test is the document itself--whether the <u>document was or was not a communication</u> seeking or rendering--for the purpose of obtaining or providing--legal advice. See e.g. *F.C. Cycles Int'l Inc. v. "Fila Sport, S.p.A.*, 184 FRAT 64 (D. Md. 1998):

> "Communications between corporate counsel and company personnel are privileged so long as the information is relayed for the purpose of obtaining legal advice. It is the <u>content of the communication that determines</u> whether

---

[4] Unhappily, the undersigned is old, and thus labors under 35 years of lawyering or judging, ruling on hundreds of privileged claims, and lots of advising and defending corporate clients, giving CLEs, and/or teaching law school relative to privilege protections.

the privilege applies." Id at. 515 (emphasis **in original)** [5]

## IV "Reflecting" Legal Advice

SJM contends that many of the documents "reflect" or "embody" legal advice. But the issue is whether the document is a communication for the purpose of obtaining or providing legal advice. The distinction is important. Assume that a corporate client seeks counsel of an employment lawyer in the drafting of an employment policy to be confidentially distributed to certain managerial employees. Counsel and the HR manager have a number of discussions in which counsel makes various suggestions as to what the wording of the policy and the like. The final document may "reflect" or "embody" legal advice in that the words were influenced by lawyer input, but the final draft is not a communication providing or for the purpose of rendering legal advice. Thus the communications subject to protection are the conversations between lawyer and the HR manager and any drafts or the like which accommodate such communications. However, the final employment policy is not a communication seeking or rendering legal advice, even though it is the product of, and arguably can be said to "reflect" or "embody" such advice. On the other hand, some documents which are not communications of legal advice can be

---

[5] Were it otherwise, there would be no reason for *in camera* reviews, as the decision would be based solely on the assertion that the document had a legal purpose. For example, a corporation could essentially assure that all documents would be protected from future legal proceedings by the expedient of adopting a policy that all documents during a key period be transmitted to counsel to keep him or her informed so that legal advice could be given when warranted. Such a policy would enable a truthful claim that the transmission of the communication as respects the lawyer was for the "purpose" of obtaining legal advice–no matter how clear from the document that it would have come into being to accommodate ordinary business intercourse regardless of whether the author was or was not seeking legal advice by way of the particular communication. Again, the particular communication must at least contain an implicit request for legal advice. See *Searle,* supra.

privileged as an actual reflection or embodiment of legal advice, as for example where in this example the HR manager provides a memo to the CEO which says:

> "Enclosed is the final policy which has a restrictive covenant for a geographical location which our counsel advices is sufficiently narrow to be found reasonable."

Here the enclosed policy is not a privileged communication even though it can be claimed to "reflect" legal advice, while the above message (which is not even between lawyer and client--but two non-lawyer members of the company's client group) seems protected as actually "reflects" or "embodies" legal advice--it states or repeats what the legal advice was.

This issue was expressly dealt with in *Cuno, Incorporated*, supra at 204. The court was asked to protect as attorney client privileged material reflecting decisions made by the company on the ground that the decisions reflect legal advice because the decisions were based on legal input. The court said:

> More importantly, however, Cuno cites no authority for the novel proposition it advances here; namely that a decision of a company to proceed with or forego a certain course of action is itself privileged where that decision is in whole or part based upon legal advice on the apparent theory that the decision itself <u>reflects</u> the advice. Under Cuno's theory any inquiry into a decision made by a company would be privileged where the decision was based upon legal advice. This is plainly an unwarranted extension of the privilege. It is not the decision itself that is privileged, but the confidential communications to and from the attorney that resulted in that decision. See *United States v. Freeman*, 619 F.2d 1112, 1119-20 (5th Cir. 1980)(an attorney's recommendations to proceed with a transaction does not cloak <u>incidents of the transaction itself</u> in secrecy)(emphasis added)

These distinctions become important in various privilege objections here. For instance, apparently because the decision to recall was (understandably) based in part on legal advice, SJM seemingly contends that a host of non-lawyer communications respecting incidents of the recall–such as its

implementation–are privileged because such communications "reflect" legal advice and are therefore privileged. For reasons discussed as to various related documents below, this claim was often overruled.

## V. **Burden of Proof**

The party claiming the protection of privileges, or course, is the person with the burden of establishing "each of the elements" the law requires before the objection is judicially sustained. See *Bituminous Casualty Corporation*, supra at 386 ("the party asserting the privilege must show that each of these elements has been satisfied"). And the Minnesota Supreme Court in *Brown* concluded that this burden is on the party asserting the privilege unless the document "itself" shows that it is a privileged communication. Here, as discussed above, the privileged nature of most of the documents is not plainly or even implicitly apparent from the documents' content, requiring that an *in camera* review insist on a showing that each element of the privilege exists.[6/]

[6/] That the burden of proof must be enforced in an *in camera* review is not only required by the law, it is particularly important as a matter of fairness. An *in camera* review is one of the few proceedings in our civil judicial system in which both parties are not on equal footing in advancing their claims–in having the right to be heard. This, of course, is because the party against whom the privilege is claimed does not know the content of the document from which important arguments can be made. While admittedly our rules of procedure require that the party objecting on the ground of privilege must provide his adversary with information sufficient for an assessment of the privilege, there is a significant limitation on this obligation–namely that inherent in the words "without revealing information itself privileged." FRCP 26(b)5. Predictably, for those claiming privilege, these words turn into "without revealing information itself claimed privileged." Whether a communication should be found to not contain an express or implicit request for or rendition of legal advice is difficult to argue without knowing the words of the communication. Thus, it is important that *in camera* reviewers carefully apply the burden of proof requirement to documents about which a privilege is not apparent on their face.

**A. Proof that the Document is a Communication Requesting or Rendering Legal Advice:** Minnesota law of privilege–the law to be applied in federal court cases where jurisdiction is founded on diversity, protects communications requesting or rendering legal advice. See *Brown*, supra. Most of the documents reviewed here were neither written by nor addressed to (other than one of many per communications entirely between non-lawyers. Thus, the inference that a document from client to lawyer or from lawyer to client was to request or render legal advice did not obtain in many of the documents.[7/] And many of the documents were not even copied to a lawyer.

**B. Proof of Intended/Actual Confidentiality between Lawyer and Client:** Some of the documents are from and/or sent/copied to various persons who have not been shown to be within the "client group."[8/] There has been no affidavit proof by any such persons. And with respect to most of the documents, the Ladner affidavit fails to show how such persons are within the "client group" in accordance with each of the factors provided in the caselaw. The undersigned did receive a log

---

7/ As discussed above, "mere delivery of a document to a lawyer does not create a privilege." *Brown,* supra at 700. And a "communication is not privileged simply because one of the parties to it is a lawyer." *Diversified* supra, at 612.

8/ While the governing case law would seem to imply that those in a corporation's "client group" would be somewhat few in number, as those in the client group are limited to persons who are directed by the employer (often inferred–see *In re Bister*, supra at 939) to communicate with counsel for the purpose of the employer securing legal advice as to a subject within the scope of the employee's corporate duties and having a reason to know. See *Diversified*, supra at 609. However, when applying these criteria to medical device and other companies with regulated business or products, it is understandable that both the frequency of lawyer involvement and the number of persons with whom the lawyer necessarily must deal to genuinely communicate with the "client," may be greater than would be the case in a business with little or no regulatory, compliance or day-to-day product liability issues. (Here SJM had many persons involved in regulatory and compliance activities, where many corporations have no such personnel, making the likely size of the client group at SJM predictably larger than less regulated companies.)

providing an identification of various personnel which provided the person's title. While this identification log alone failed to directly show all the necessary requisites, the titles along with the surrounding circumstances and content of the subject document were often (but not always) sufficient to create an inference of the legal requisites as to many employees being within the client group as to many of the subject matters in the communications. Also, in most instances where there was a deficiency in the proof respecting membership in the client group, this was not the main basis for overruling a lawyer-client privilege objection, as the determination was generally based on insufficient proof of the purpose of the document.[9]

Another issue frequently encountered in the review as respects the client group was the distinction between persons who are members of the client group for purposes of seeking or receiving the advice of counsel, compared to those in a group in which the product of the advice of counsel is needed. For instance, in respect to the legal advice relative to drafting a recall procedure, the persons who are necessary for SJM to communicate with legal counsel as to what the procedure should be and who have a related need to know, are not necessarily the same persons to whom SJM would distribute the recall procedure for implementation. Accordingly, the claim of lawyer-client privilege in respect to the distribution of a procedure to all those within SJM who would be involved in implementation, was not the same the claim of privilege in respect to drafts of the procedure being transmitted between counsel and

---

[9] For example, depending upon the surrounding circumstances and documents, the title "Director of Clinical and Regulatory Affairs" inferentially placed Mr. Flory in the "client group" in respect to the activities involving SJM's legal advice as to Silzone, while without more other titles may not have so placed other persons involved in a particular communication.

perhaps a more limited group of managers making the decisions as to what the procedure should say.

**VI. Drafts:**

While *Kobluk* was a key privilege decision in Minnesota, it stands simply for the predictable proposition that where drafts with comments thereon, or redlined drafts, iterations of drafts, or even un-marked drafts, accommodate communications (are communicative) between counsel and client to facilitate the rendition or seeking of legal input relative to the content of or changes to a document, such drafts are communications which can be afforded lawyer-client protections, much the same as if lawyer and client discussed changes, deletions or additions to a draft in a private telephone conversation or meeting. Obviously such communications (particularly in this day of faxes, word processing edit capabilities and emailed documents) can be efficiently accommodated by redlined or marked drafts, or even a comparison between successive iterations of drafts, without any express request for or rendition of related legal advice.

Thus the undersigned read Mr. Ladner's affidavit and each draft about which there has been a claim of privilege, all to ask as to each whether SJM has proven the factual predicate that the document "came into existence as a communication" between lawyer and client–whether the "draft was created as an implicit request for, or as a means of rendering, legal advice." *Kobluc v. University of Minnesota,* 574 N.W. 2d 436, 442-444 (1998). In short, the draft had to manifest, at least implicitly, that it was a means by which legal advice was requested or rendered. Arguably *Kobluk* also requires a showing that the communication accommodated by the draft is "legal in nature." Id. However, where the draft was directly to or from counsel, the undersigned inferred that the communication was legal in nature, even if

legal input was not expressly apparent on the face of the draft or expressly sought in the transmittal. But such an inference could not be inferred where drafts were not directly to or from counsel, and as to such drafts the undersigned examined the draft to determine whether it came into existence as a means of communicating a request or rendition of legal advice. Obviously, then, as to drafts transmitted between non-lawyers with no lawyer in the transmission or nothing more than a showing that the draft was copied to a lawyer, and about which there was no showing that the draft is communicative in accordance with the *Kobluc* elements, the undersigned was generally not able to find that SJM had sustained its burden as to this element of a lawyer-client privilege.[10]

## VII. The "Agent" Claim:

In respect to many documents in which counsel is neither the addressee, addressor nor at times even copied, SJM claims that various non-lawyer business managers (virtually all of whom were (i) not within the SJM legal department, (ii) not persons reporting to any lawyer; but (iii) were business managers reporting up through business non-legal business lines at SJM), were "agents" of counsel–providing SJM

---

[10] Mr. Ladner's affidavit, in respect to many drafts and documents, states a conclusion that the draft or document "reflects a request" for legal advice. However, a great number of transmitted drafts were neither to nor from counsel and the content did not manifest either an express or even an implicit request for such advice, as there was no redlining, no comments, no edits, no iterations of drafts to show changes, etc. And often the draft and/or transmittal expressly reflected rationales for the document "coming into being" other than a request for or rendition of legal input. It may be that as to some drafts there could have been an understanding that all Silzone related drafts should be routed to the legal department by copying Ladner, and that Ladner thereupon could provide whatever legal input he thought warranted, thus supporting Ladner's "reflects a request" claim. But the issue is not what Ladner could have had the opportunity to do relative to the totality of the many drafts (no matter how un-legal in nature) which were copied to him, but whether a particular draft, redlines, comments or the like came into being as an express or even implied means of communicating a request for or provision of legal advice. See discussion of *Searle*, above.

a claim that such "agents" communications to other non-lawyers at SJM should be protected as a lawyer-client privileged communication. Of course, there is caselaw, generally involving paralegals, legal secretaries, translators, private investigators and the like, which supports the notion that persons acting at the behest of lawyers facilitating lawyering communications or needs, can be agents of the lawyer, and that communications from or to such agents can be regarded as communications of or to a lawyer. However, in most instances the undersigned had problems with the attempt to utilize this extension of the lawyer-client privilege to many of the non-lawyer to non-lawyer communications at issue here.

First, none of the claimed "agents" made any showing (by affidavit or otherwise) that they made or received any specific communication because they were asked to do so by counsel, that the content of any particular writing was dictated by any lawyer, that the writing would not have come about as a natural product of the "agent's" non-legal responsibilities at SJM whether they had been deputized or not, or that they regarded themselves as the lawyers's "agent" when they made or received any particular communication. In most of the communications about which this "agent" claim was made, the agent was doing what his or her non-legal job function ordinarily entailed–that is to say that the communication appeared to have been authored as part of the author's ordinary business activities irrespective of any legal provocation. And with the exception of Gerard, the claimed "agents" were neither in the legal department nor reported to legal, but reported up through business lines. Of some note is the fact that rather than copying their alleged overseeing lawyer, the "agents" often failed to even copy any lawyer--instead copying non-lawyer business persons. In short, the universality of this claim was often so undercut by the documents about which the claim was made, that it could not be universally accepted.

Second, there is no legal support for the notion that the mere claim of a lawyer that he or she asked a business manager to do non-specified tasks or to create what appeared to be prominently documents with business as opposed to legal content, would give rise to the lawyer-client privilege protection. If fact, what little law there is relative to extending this notion beyond persons typically assisting lawyers, would not support the extension sought by SJM here. It is one thing for a lawyer to ask his or her paralegal or assistant in a law firm or legal department, or a translator, to write a letter to a client telling the client, for example, that he will have to sign his will in front of two witnesses, in which case the non-lawyer subordinate to the lawyer is simply a facilitator of the lawyer's communication acting under the direction of and as an extension of counsel. It is different for a company's in-house lawyer to ask the company's advertising manager to send advertising related letters to other non-lawyer business persons involved in the advertising function–letters which would come about whether so asked by the lawyer or not, and thereby create essentially an "advertising privilege" in respect to business documents having no inkling of legal advice, having no indication that counsel played a role in the content or words, and having no lawyer recipient or sender. If privilege protection was so easily created by the expedient of lawyers deputizing a host of business persons and asking them to create or receive documents, the privilege would be expanded well beyond its salutary purpose, largely eliminating discovery of related corporate documents. Such a liberal expansion is directly contrary to controlling legal authority that the privilege is to be strictly construed so as to not give rise to an unwarranted suppression of truthful evidence.

A couple of cases in which the extension of the "agency" doctrine was at the margins, are instructive. In *Carter v. Cornell University*, 173 F.R.D. 92 (S.D.N.Y. 1997), the court dealt with the question of whether factual inquiry interviews were subject to a lawyer-client privilege when the interviewer was not a lawyer or even a hired investigator, but a business person employed by the client. In *Carter*, defense counsel in an employment discrimination lawsuit specifically requested defendant's human resources manager to conduct interviews (a typical lawyering activity) of certain potential witness and provide the written results of the interviews to counsel so as to inform the lawyer of information necessary to counsel's provision of a legal defense. Not surprisingly, the privilege was sustained as the communications were somewhat akin to client employee interviews by a lawyer's paralegal, which interviews would obviously implicate lawyer-client communications. However, the analysis of the court respecting the use of client employees for such a purpose is important. The court expressly concluded that the information which the interviewer obtained in respect to her ordinary functioning in human resources was not protected and was discoverable, and that the protection shielded only the information she received in respect to inquiries having their "sole purpose" the assisting of counsel in rendering legal services--only as to information "for the exclusive use of counsel in rendering legal advice." Id at 94, and n.3. In addition, the court expressly concluded that if the communications are in respect to business matters as opposed to "legal advice", there is no privilege. Id.

And in *Cuno, Incorporated v. Pall Corporation*, 121 F.R.D. 198 (E.D. N.Y.), the court was faced with the issue of lawyer-client privilege in respect to patent agents. Even in such a routine lawyer "agency" situation, the court noted that the privilege obtained only in respect to communications where

the agent was "acting under the authority and control of counsel." Where the agent was not involved in communications for the purpose of communicating legal advice, however, the communications were not privileged. Id at 204. Additionally, in *Cuno* the court was asked to protect as lawyer-client communications certain notes of a meeting which the lawyer asked the corporate client's employee to take. The court found that the mere request by a lawyer that a client employee take notes of a meeting was not sufficient to implicate the lawyer-client privilege. Id at 205.

Based on the caselaw guidance dealing with extensions of the agency concept in particular, and the law of lawyer-client privilege and its narrow construction generally, the undersigned studied each document and the surrounding documents about which privilege was claimed to exist because a business person was acting as the lawyer's agent, examined the Ladner affidavit with respect to each such document, assessed who received the document, and examined the SJM submission as to the job function of each business person involved, all to make the following assessments and ultimate factual finding as to whether each element of the privilege had been sustained by the evidence provided by SJM:

1. Was the person claimed to have been a lawyer's agent a person with a full time independent business function, working outside the legal department and reporting to non-lawyer business line management, and did the subject document demonstrate that in respect to the creation of the document the person was or was not acting under the authority and control of counsel? The more this analysis showed that in respect to the creation of the document the person was acting in respect to his or her regular business function at SJM and not under the specific authority and control of counsel, the more skeptical was the undersigned that the document was created for the purpose (let alone the "sole purpose") of

assisting in counsel's rendition of legal guidance to (as opposed to accommodating business needs of) SJM.[11]

2. Did the document (either expressly or by implication in the document and surrounding related documents) evidence why the document came into being, and was the evidence that the document was authored by the or sent to the "agent" for a business or legal purpose. The more the "agent's" creation or receipt of the document appeared to be motivated by business as opposed to legal needs or purposes, the more skeptical was the undersigned that the non-lawyer was conveying a lawyer's communications or receiving the client's communications as the lawyer's agent or for the purpose of assisting in the rendition of legal advice.

3. Did the document evidence a content which appeared to be the content of what one would expect would be written or received by the non-lawyer in his or her ordinary business function, or did it appear to be a communication (expressly or even implicitly) which seemed legal in nature–on behalf or

---

11/ The communications involving Gerard raised difficult issues. Gerard is not a lawyer, and there is no "regulatory manager privilege." However, the Ladner affidavit indicated that he worked in the legal department and reported to SJM's counsel. It is obvious in reading his writings that he knows a great deal about the regulatory/legal issues, undoubtedly well beyond the knowledge of most lawyers. However obviously capable Gerard was and regardless of how much SJM may have sought advice from him which was of the nature sought from a lawyer, the privilege nonetheless extends only to communications with lawyers except when the agency elements are met. Here the undersigned found that the agency elements could be inferred when the communications were overseen by counsel as when counsel was at the meeting about which the communication related, or was copied or a participant to the communicative document involved, such that Gerard's communications could be said to be a communication of counsel overseeing and participating in the same. However when no counsel was involved, and when the prominent purpose did not appear to be the furtherance legal services but functions which would have come about whether Gerard was acting at the behest of counsel or not, then there was nothing more than a very legal savvy non-lawyer communication and other elements of a privilege needed to be sustained.

seeking advice from a lawyer. The more of the former, the more skeptical was the undersigned that the particular writing was written by the "agent" to communicate the legal expertise, knowledge or skill of counsel as opposed to the business expertise, knowledge or skill of the business manager.

4. Did the Ladner affidavit in respect to the subject document state that Ladner asked the alleged agent to write any specific communication and/or to be a recipient of any specific client information, and if so does the document show that any such communication or information was legal in nature or implicitly necessary for the rendition of legal services? Or (as in almost all cases) did the Ladner affidavit merely provide a conclusionary claim that the non-lawyer business manager was asked by the legal department to act as counsel's agent and that therefore a wide range of documents created by or transmitted to such person "reflects" communications with counsel. The more of the latter, the more skeptical was the undersigned that the document contained requests for or rendition of legal advice.

After doing the above analysis, the undersigned made a factual determination as to whether SJM sustained its burden of proving that document was (or in any manner could be considered to be) a communication on behalf of or to counsel by reason of such communication being created or received by the "agent." Where the undersigned has overruled an SJM's privilege objection based on the agency claim, it is because the undersigned, after engaging in the above process, made a finding that SJM failed to sustain its burden of proving the factual predicates that the subject document was a communication between lawyer and client seeking or rendering--for the purpose of--legal advice. This was often the case with most persons claimed to be the lawyer's agent, the main exception being Mr. Gerard.

**VIII. Work-Product:**

The undersigned had some concerns about the blanket nature of SJM's claims of work product privilege similar to those respecting the lawyer-client privilege. Of course, documents can be prepared in anticipation of litigation by non-lawyers, as the protection is afforded to materials prepared by parties in anticipation of litigation. Indeed, work product protection is afforded materials prepared by non-lawyers in anticipation of litigation which materials were never even transmitted to a lawyer. Of course, the original rationale of the rule arising from the Supreme Court's decision in *Hickman v. Taylor* was to protect the secrecy of a party's (generally its attorney's) mental impressions, strategies, analysis and preparations for litigation, and accordingly documents prepared in anticipation of litigation revealing legal strategies. Materials revealing such impressions, while generally not the materials over which the privilege claims are made here, are subject to near-absolute protection. *Bituminous Casualty Corporation*, supra at 388. However, for materials which do not reveal such strategies and impressions to be subject to work-product protections, the materials must be found "in light of the nature of the document" to have been "prepared or obtained because of the prospect for litigation." Id.at 390. (emphasis in original) And materials "assembled in the ordinary course of business . . . or for other non-litigation purposes" are not protected. Id. and FRCP 26(b)(3) advisory committee's notes. In Minnesota, documents prepared even for business purposes which are related to potential litigation are not necessarily work-product protected. In *Brown*, supra, even though the litigation was in respect to injuries associated with streetcar injuries, the Supreme Court concluded that accident records and reports were not work product:

> ". . . for all that appears from the record, the report was prepared pursuant to an established routine, and it may well be that it was used for many purposes

> other than that of preparing for litigation. It may have been used to keep a record of the accident experience of the employee, a traffic hazard, working conditions of equipment, or for many other purposes which we need not enumerate." Id at 702.

And in *Searle*, supra, general litigation reserves for outstanding legal claims (as opposed to specific reserves for a given case), while even prepared by the legal department in respect to subject liabilities, were not protected by the work-product privilege as they were prepared (would have come about) for various budget, insurance, reserve analysis, controlling costs and other business reasons. (Here very few of the materials about which the work-product claim is universally claimed were prepared by the SJM legal department or anyone engaged thereby.) In short, documents which "would have been created whether or not litigation was anticipated, are not protected by work-product immunity." *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 221 (S.D.N.Y. 2001).

Here, given the regulatory inquiries and the potential for claims respecting Silzone, the undersigned did not have any trouble with the notion that SJM would have anticipated litigation even before any was formally commenced. However, any company (particularly those in the medical device field) making and distributing products about which liabilities could attach, have a somewhat continuous concern about regulatory and product liability proceedings. And those companies whose products are subject to causing potential harm and are subject to regulatory involvement, are likely to have employees whose day-to-day function is devoted to public and corporate relations, press communications, customer relations, regulatory activities and the like–functions which are simply required activities of the business. Thus, since it cannot be that every document created by any such company from the time a potential product problem appears will enjoy work-product protection simply because civil or regulatory activities are anticipated, there must

be some discernment as to the reason the document has been "prepared" and whether the document was prepared "because" of prospective litigation or "because" of other business necessities.

Very few of the subject documents reviewed here reveal mental impressions of a legal nature, and many failed to reveal express (or to this reviewer's perception, implicit) considerations associated with future litigation. Many revealed that the document came into being prominently to satisfy or accommodate a business need or purpose, and would have come into being whether litigation was anticipated or not. Thus, once again the undersigned, being mindful of the burden of proof, felt obliged to test the seemingly blanket work-product assertion directed at essentially all the documents created during this time frame, regardless of the degree to which they appeared to be provoked by business activities or needs. In the end, the test is that enunciated by Write and Miller and adopted by the 8th Circuit in a case with significant parallels to the case here, namely *Simon v. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987)[12]:

> *Our determination of whether the documents were prepared in anticipation of litigation is clearly a factual determination . . . the test should be whether, in light of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation. (emphasis added)*

Where the undersigned has overruled the work product privilege, it should be assumed that burden of proving the factual predicate was not met–generally because there was no evidence from the one who "prepared" the document (or from anyone) as to the specific litigation related reason for

---

[12] *Searle* was a case in which, like here, the District Court appointed a special master for discovery purposes, and was a case, like here, where the defendant was a regulated medical device company in litigation involving the safety and efficacy of a product.

preparing the specific document, there were rarely any specifics to show how the document was prepared in anticipation of litigation rather than in the regular course of business, and importantly the document itself generally showed that it came into being because of business needs or reasons, rather than because of the prospect of litigation.[13] Such business needs related to marketing, corporate and public relations and image/goodwill, customer (patient or physician) relations or support, incidents of the recall (costs, inventory, warehousing, monitoring, follow-up), press and media relations, regulatory reporting, etc.[14]

As discussed in respect to some of the determinations below, the undersigned has not had before him the question of whether any work-product privilege can be overcome by showing a substantial need. In that regard, it is unlikely that such a showing has been made here, as the privilege only protects the tangible material, and not the underlying facts which are subject to discovery. *Onwuka v. Federal Express Corporation*, 178 F.R.D. 508, 512-513 (D. Minn. 1997)(Judge Tunheim). In Minnesota, see *Leninger v. Swadner*, 279 Minn. 251, 258, ___ NW2d ____ (Minn. 1968). Accordingly, since the underlying facts (other than attorney-client communications or work product mental impressions) are discoverable, absent a showing (as to important information not available otherwise) that a deposition witness no longer recalls such facts, is fabricating his or her testimony or the like, plaintiffs' showing of substantial need appears difficult at this time.

---

13/ Generally the document itself seemed to demonstrate that it would have been created to accommodate business needs whether or not there was a prospect of litigation, and was created by a business manager whose function was associated with the subject of the document.

14/ Illustrative of the repeated and non-specific claim is: "*At the time* of the meetings, St; Jude Medical was considering whether to implement a Silzone recall . . . . Accordingly, these meetings and telephone conferences took place in anticipation of litigation. . . . " (emphasis added)

## IX. Rationale for the *In Camera* Findings

Where SJM's objections to the production of a document on privileged grounds are overruled below, the undersigned has provided reasons which are more fully explained the above discussion which is incorporated into the below rationale. Any overruling of objections should thus assume the above discussion, and the following:

A. After a review of the Ladner affidavit, the entire content of the subject document, the surrounding related documents, the log of employee identifications respecting all those involved in the document and the surrounding circumstances as described in the Ladner affidavit and the document and related documents, that SJM had not sustained its burden of proof that the document, expressly or implicitly, a communication requesting or rendering legal advice.

B: After a review of the Ladner affidavit, the entire content of the subject document, the surrounding related documents, the log of employee identifications respecting all those involved in the document and the surrounding circumstances as described in the Ladner affidavit and the document and related documents, that SJM had not sustained its burden of proof that the communication was intended to be or was a confidential communication limited to the "client group" under the prevailing and authoritative caselaw.

C: After a review of the Ladner affidavit, the entire content of the subject documents, the surrounding related documents, the log of employee identifications respecting all those involved in the document and the surrounding circumstances as described in the Ladner affidavit and the document and

related documents, that SJM had not sustained its burden of proof that the document was prepared because of SJM's prospect of litigation rather than for business reasons.

D: As to drafts, after a review of the Ladner affidavit, the entire content of the subject documents, the surrounding related documents, the log of employee identifications respecting all those involved in the document and the surrounding circumstances as described in the Ladner affidavit and the document and related documents, that SJM had not sustained its burden of proof that the draft came into being as a confidential communication between client and counsel expressly or implicitly seeking or rendering legal advice or views relative to the content or editing of the draft.

E: After a review of the Ladner affidavit, the entire content of the subject documents, the surrounding related documents, the log of employee identifications respecting all those involved in the document and the surrounding circumstances as described in the Ladner affidavit and the document and related documents, that SJM had not sustained its burden of proof that the document was authored by or provided to a person genuinely acting as an agent--in behalf--of a lawyer in the creation of or receipt of the communication such that it was a communication for the purpose of seeking or rendering–for the purpose of--legal advice.

**FINDINGS UPON *IN CAMERA* REVIEW**

Note: In many instances Mr. Ladner states his belief that the final document about which there are drafts subject to this review have been produced. Such production has been assumed here.

Document A-1: Lawyer-client privilege objection sustained as to this draft. There is first hand evidence that this redlined draft letter reflects changes made by Mr. Ladner transmitted to Mr. Hosek, and

the redlining appears to convey legal considerations respecting FDA regulatory considerations.

Document A-2: Lawyer-client privilege objection sustained as to this draft. There is first hand evidence that this redlined draft letter reflects changes made by Mr. Ladner transmitted to Mr. Hosek, and the redlining appears to convey legal considerations respecting FDA regulatory considerations.

Document A-3: Lawyer-client privilege objection sustained as to this draft, but final document from Roy Hosek to St Paul Marketing and others dated June 25, 2002 (appears to be misdated and is really the July 31, 1998 document of which Documents 1 and 2 above are drafts), must be produced, if not already produced. There is first hand evidence that this redlined draft letter reflects changes made by Mr. Ladner transmitted to Mr. Hosek, and the redlining appears to convey legal considerations respecting FDA regulatory considerations.

Document A-4: Objections overruled and the document should be produced. This is an email from a non-lawyer to other non-lawyers and Mr. Ladner, which email merely sets a meeting. While the meeting in which Mr. Ladner's presence was requested may have been a meeting in which legal advice was sought or rendered and some or all of the <u>communications in such meeting</u> may or may not be protected, <u>this email communication</u> is not a communication (expressly or implicitly) seeking or rendering legal advice, but simply seeks a meeting with a number of persons including Mr. Ladner. There is no evidence that is email was prepared because of the prospect of litigation as opposed to the purpose of setting a meeting;.

Document A-5: Lawyer-client privilege objection is sustained. This document consists of two emails, one dated March 29, 2000 from Burly to Flory asking for a transmission of legal advice which

Flory was to obtain from Ladner. The other email dated April 6, 2000 appears to be Flory's answer to Burly's March 29th email and contains Ladner's legal advice. While these emails are between non-lawyers, they involve the communication of requests for and rendition of legal advice from Ladner channeled through these two SJM employees who appear to be in the client group with a need to know relative to their position in the organization and involvement in regulatory affairs concerning the subject matter of the document.

Document A-6: Lawyer-client privilege objection sustained, given Ladner's affidavit that he prepared and delivered the document for discussion with SJM employees, however the sustaining of this objection was a close call. While Ladner's affidavit characterizes this document as a draft which he reviewed and revised for further discussion, there is nothing on the face of the document or in Ladner's affidavit which shows that this document or any part thereof came into being to facilitate a request for or rendition of legal advice. It is not marked up, there are no comments thereon, there is no redlining, and no showing of any proposed changes or the like. There are no other drafts with which to compare this document to show any changes from a prior draft or that either client or counsel was suggesting any views as to the document. And there is nothing to show that any changes proposed or suggested were in any way "legal" as opposed to grammatical "in nature." See *Kobluk* at 443 (substance of advice communicated in draft is "legal in nature.") However, the undersigned found that SJM sustained its burden that each element of the lawyer-client privilege was met in accordance with *Kobluk* discussed above because of the sworn assertion of Ladner as to his own preparation and communicative purpose in the draft. (As will be noted below, drafts about which Ladner's affidavit states only that the draft "reflects"

legal advice or the request therefore do not, without more, merit a finding that the burden of proof of "each element" of the privilege has been met.)

Document A-7: Lawyer-client objection sustained: This February 9, 2001 email from Flory to Ladner and Schultz reflects a communication concerning legal advice, and Flory and Schultz appear to be within the client group. The positions of Flory as Director of Clinical Regulatory Affairs, and Schultz as Post Approval and Outcome Studies Supervisor appear to be such that these employees would be necessarily involved in communicating with counsel to accommodate SJM's discussion of the subject matter of the document, with a need to know.

Document B-1: Objections overruled and these documents should be produced. This is a March 26, 1999 transmittal email from Ms. Declercq, a manager in Clinical Affairs in Europe to a product manager in Spain with copies to Begona Pabon, a division manager for the Cardiac Surgery Division in Spain, to Ms. Declercq's administrative assistant Arthur Rubenstein and Mr. Ladner, and the transmitted draft agreement for the Avert program to be signed by one Professor Rufilanchas. Nowhere does the email, even implicitly, ask for any comments or views of counsel, nor even imply a request for or rendition of such comments or views, but expressly shows that the purpose of the communication was to ask the recipients to send the draft agreement on for review by the opposing contracting party (Professor Rufilanchas) for his ok and ultimate signing. In short, it is a transmission and draft for the purpose of forwarding such draft (apparently now in execution form as far as SJM is concerned) to SJM's contracting party--one plainly not a part of any client group. There is no showing of an intention that either the transmitted draft be kept confidential, and SJM has not met the burden of proof that all the recipients to

the email are within the client group or that there is any express or implied request for or rendition of legal advice. While SJM argues that the drafts were prepared "by agents of the legal department," without more there is no showing that these non-legal department employees were deputized in a way that they were necessary communicants of attorney client material. See discussion of agency above. SJM also argues that the draft reflects legal advice. It is likely that all drafts of the final form of any agreement "reflect" some legal advice of a lawyer, but that does not make them privileged, as the test is whether they came into being for or were used as the means of communicating advice from lawyer to client. See *Kobluk* discussion above. Here the draft agreement is in sufficiently final form from SJM's point of view that it is being transmitted for the express purpose of review by the opposing contracting party–hardly a client to whom the lawyer's legal advice (even if discernible in the draft) is being confidentially provided. As to work product privilege, there is nothing on the face of the document or in Ladner's affidavit (other than conclusionary statements that the email or draft agreement "was created in anticipation of litigation") to show that in fact the documents were created because of the prospect of litigation. Mr. Ladner of course did not create the document, and we have no showing from Ms. Declercq who created the email as to why she prepared it. Importantly, this transmission was prepared for the express purpose of getting an agreement reviewed and signed by Professor Rufilasnchas to facilitate the business purposes associated with the clinical and efficacy related study, rather than "because" of the prospect of litigation.

Note: These clinical and safety studies, much like crash tests in assessing the safety of a new car design, are not work-product simply because a safety study may prevent a harmful product coming onto or continuing in the marketplace and thereby reduce potential future legal claims, nor because if the study

has positive results it could be used to the manufacturer's advantage as evidence in future legal proceedings. Rather, they are fundamental business necessities of a manufacturer marketing products with harmful potentials. As the "mixed purpose" rationale is not at work in the work-product privilege as it is in the lawyer-client privilege (see n. 1 above), factual findings have to be made as to which was the cause of the materials being prepared. Here all the indications are that these activities came about for the express and obvious reasons reflected in the documents, namely clinical assessments relative to safety and efficacy. The preparation of related documents, absent a showing otherwise, are inferred to have been motivated in the furtherance of such activities.

Document B-2: Lawyer-client privilege objection sustained. This is a July 8, 1999 email transmittal and transmitted draft agreement from Kari Schmidt, secretary to General Counsel O'Malley to Arthur Rubenstein, Assistant to Ms. Declercq. There is no indication on the face of the documents (and no comparison with other drafts of the same agreement) which would allow the undersigned to appreciate whether the document came into being or was a means of communicating legal advice relative to the document's content. However, as it apparently is coming directly from counsel to one who appears to be in the client group (a heart valve clinical manager), through their assistants, it is presumed to contain revisions or views of counsel to client as to the content of the agreement, and will be regarded as privileged. See discussion of "Drafts" above.

Document B-3: Lawyer-client privilege objection sustained. This draft agreement expressly reflects a request for comment by Hallie Finucane, a SJM lawyer in SJM's legal department.

Document B-4: Lawyer-client privilege objection sustained. This draft agreement expressly reflects a request for comment by Hallie Finucane, a SJM lawyer in SJM's legal department.

Document B-5: Objections overruled, and these documents should be produced. This is an August 24th email transmittal and transmitted draft agreement from a non-lawyer employee whose prominent duties at SJM are not in the legal department or domain (Clinical Programs Outcome Studies Supervisor) to a non-lawyer employee whose prominent duties at SJM are not in the legal department or domain (Clinical Affairs manager), in which the former is indicating some non-legal changes to the draft. (While the undersigned has concluded that Ms. Schultz for many purposes is in the "client group", this does not mean that she is essentially a lawyer such that communications to or from her are regarded as communication to or from a lawyer, rather than to or from a client.) While Mr. Ladner is copied, there is no indication (express or implied) that any of the input came from him, nor any showing (express or implied) that any legal advice is being sought. Even if one was to assume that there had been an adequate showing that Ms. DeClercq was within the client group, the mere copying of a draft between the two to Mr. Ladner is not a sufficient showing of "each element" of the privilege, and is not a showing that the draft was a communication of legal advice. And there is an inadequate showing that the documents were prepared because of the prospect of litigation rather than for other business reasons obvious from the face of the documents.

Document B-6: Lawyer-client privilege objection sustained, with the assumption that the final agreement (Amendment No 1 to the Investigator Fee Agreement for the SJM Artificial Valve Endocarditis Reduction Trial) has been produced. This email transmittal and transmitted draft expressly and implicitly

are communications between Mr. Ladner and inferred members of the client group.

Document B-7: Lawyer-client privilege objection sustained. This is a draft letter relative to one's participation in the AVERT study, and expressly seeks review by a SJM lawyer. Again, the undersigned assumes the final letter to Professor Alfieri has been produced.

Document B-8: Objections overruled, subject to a redaction. This is an email from non-lawyer Schultz to Ladner, Flory and Attorney Porter setting a meeting. While the email indicates that there is a legal purpose for the meeting, this does not mean that an email calling for a meeting, or the content that a meeting was to be held and the date and participants of a proposed meeting (absent a showing that some portion of the document manifested a request for or rendition of legal advice), are privileged information. Whether the content of the meeting is privileged depends, of course, on the communications at the meeting. This email came into being merely to set up a meeting, and not <u>because</u> of the prospect of litigation. SJM is permitted to redact the single line after the word "purpose."

Document B-9: Objections overruled and this document string should be produced. This is an email string in which a non-lawyer Brandt asks non-lawyer Schultz whether a non-lawyer Tina King can come to a meeting, and Schultz's answer. There is no showing that Tina King is among the "client group" and there is no implied let alone express request for or rendition of legal advice in the email string content. Importantly, non-lawyer Schultz is apparently making the call as to whether two other participants can come to the meeting, making it questionable whether all or some the subject meeting is privileged or simply a business meeting in which Ladner was present. The degree to which communications at such a meeting are or are not privileged is not before the undersigned except as it bears on the confidential privileged

nature to this particular email string setting the meeting, and any related privileged questions would have to be determined on the basis of the particular communications/discussions at the meeting. As to work product, this email came into being merely to set up a meeting, and not because of the prospect of litigation.

Document B-10: Objections overruled in part and lawyer-client privilege objection sustained in part: This is an email string transmitting a letter (in French) of Philippe Bourdet relative to a white paper. The letter (#4050-700061) is not privileged. It has not been shown to be a communication between lawyer and client, it has not been shown to be a draft which came into being or constituted a communication seeking or rendering legal advice, and was not prepared because of the anticipation of litigation, but to respond to French regulatory authorities as part of SJM's regulatory responsibilities. The letter does not look like a draft, is signed and evidences no commentary, edits, changes or efforts relative to legal input. And the email of April 26, 2000 on the top of # 059 acknowledges that the subject letter did not involve SJM legal.

As to the April 10, 2000 email (lower half of #059) transmitting the letter, this email is from non-lawyer Bertrand Bachet, a marketing manager about whom there has been no showing meets the tests of being within the "client group" to non-lawyer Roland Gerard who (given his function) is presumed to be within the client group given his regulatory managerial position, Ladner, non-lawyer Sylovie Boffi who may be in the client group as a regulatory manager (although there has been no real showing in this regard), and non-lawyer Philippe Bourdet, a business unit director about which there has been no showing although who may be the author of the subject letter. This email contains no request for or rendition of legal advice,

implicitly or expressly, but merely contains transmittal language and reveals a date that the white paper was already delivered. And of course this email was not prepared because of prospective litigation as opposed to the obvious purpose of transmitting the letter. Thus, #061 and the bottom email of April 10, 2000 on #059 should be produced.

As to the April 26, 2000 email on the top half of #059, the lawyer-client privilege objection is sustained, as the email contains a repeat of advice provided by Ladner.

Document B-11: Lawyer-client privilege objection sustained. This is an email from Flory (a member of the client group) to Schultz and Ladner alone, addressed directly to Ladner. While the document contains technical material relative to the White Paper, it is providing data and questions relative to the yet to be submitted document on which the client is either asking for Ladner's input or is keeping him specifically informed about a matter about which it implicitly appears he is having input as a lawyer. This document is qualitatively different than some documents about which these intentions are not shown and some documents which appear to be solely business purpose documents merely copied to a lawyer without embodying any even implicit request for legal advice. See discussion at p. 4, supra.

Document B-12: Lawyer-client privilege objection sustained. This is an email string from September 17 to September 19, 2001. While none are authored by a lawyer, and none are sent directly to a lawyer, attorneys Ladner and Porter are copied, and Gerard (part of the legal department) is a key participant. There is enough about these communication and their content to infer that counsel is being copied with an implicit request for legal advice. While the contents do not reflect any legal advice coming from a lawyer and indeed requests the advice of a non-lawyer as to a request form German authorities, the

question is ultimately answered by non-lawyer Schultz and Ladner has given an affidavit saying the Schultz email contains his legal advice.

Document B-13; Document B-14; Document B-15; Document B-17; and Document B-18: Lawyer-client privilege objections sustained. These documents are drafts which evidence on their face the request for and rendition of comments (by way of changes and redlining) by counsel relative to the drafts' content.

Document B-16: Objection overruled, and the document should be produced. This is a draft letter of October 20, 1999, from non-lawyer Declercq to non-lawyer and non-SJM employee Sara Sorrell from Medpass (an organization collecting AVERT data). While Mr. Ladner states that it was prepared by non-lawyer Declercq "at the direction of the legal department" and "reflects" legal advice, there is no express or even implicit legal advice apparent on the draft, the letter was to go to one outside of SJM, and there is nothing in the draft which indicates it came into being to accommodate any confidential communication (or any communication) of legal advice.

As to the work product privilege, the Ladner affidavit reflects a somewhat curious claim as to why this draft should be protected–stating "after the recall was initiated, it was apparent that the substance of these letters would be requested and explored as part of litigation. *Therefore*, this document was prepared . . . in anticipation of such litigation." (emphasis added) Of course the test for work product privilege cannot be whether the subject materials were anticipated to be the subject of discovery–as then all business documents which could be discovered in litigation would be protected by the expedient of all employees being informed that "all documents you prepare from this point forward may be the subject of

discovery," essentially eliminating discovery against well-counseled companies. Rather, the test is whether the document was prepared by a party "because" of then anticipated litigation, or whether it was prepared for business purposes even though the preparer could assume there would be litigation about the subject of the content. The former is subject to the qualified privilege, the latter is not. See discussion of *Searle* above. Here the document fails on its face to be prepared for litigation, as opposed to being prepared to transmit to a non-party letters which discuss what SJM was doing in respect to the AVERT clinical/efficacy findings, and to provide some related explanation to a non-party relative to such topics. Admittedly the work-product privilege is not waived by disclosure to a third party which is not the litigation adversary, however the claim is weakened in that the purpose of the privilege–to protect a party's legal strategy, legal analysis, etc, is somewhat belied by such sharing. Here, this sharing (or prospect of sharing by way of this draft) makes apparent that which is clear on the face of the document–that the content is not SJM's strategy or analysis relating to defending itself in anticipated litigation, but rather its business determinations and/or obligations relative to this data.

Document B-19: Objections overruled, and the document should be produced. This is an email transmission and a transmitted draft paragraph from non-lawyer Schultz to non-lawyer Declercq relative to a draft of echocardiography shipping procedures. While Ladner states that it was an email which "reflects" a request for legal advice, the document fails to do so. In fact, the email not only fails (even implicitly) to reflect any request for or rendition of legal advice, it expressly reflects non-author input before finalization <u>to be reviewed by a non-lawyer</u> (Schultz) and not by any lawyer. And the transmitted redlined draft does not appear to contain any edits "legal" but grammatical "in nature." See discussion of *Kobluk*

above.

Document B-20 and B-26: Objections overruled except for email from attorney Robin Lachner to Veronique and Gwen on Bates #1710385262 and 2350529146 to 147. All other emails in B-20 and B-26 should be produced, as they are business related communications between non-lawyers involving payment methodologies to investigators in the echocardiography study and do not reveal any implied or express request for or rendition of legal advice. The work product claim is without merit, as the document was prepared because of business purposes.

Document B-21: Objections overruled, and this document should be produced. This is an email from non-lawyer and business person Declercq to non-lawyer and business person Schultz, which is merely copied to attorney Ladner and other non-lawyers. It does not implicitly or expressly seek or render legal advice, and the claim of confidential privilege is belied by the content, which is business related respecting the AVERT study and the echocardiography study sites. Indeed, the email closes with comments undercutting any legal as opposed to business input, with no mention of even a discussion to occur with a lawyer. This is not a communication seeking or rendering legal advice. As in Document 20, the work product claim is without merit.

Document B-22: Same document as B-21. Same ruling.

Document B-23: Lawyer-client privily objection sustained as to 029 to 035, and overruled as to 036 to 039 which pages should be produced. This is an email string and draft of a letter to Biomedical Systems Europe, and the emails expressly reveal requests for and the provision of legal advice relative to the draft. However, 036 to 039 appears to be outside the email string and looks like the final June 13,

2002 draft of this letter to Ms. Jacobs. There is no indication in the exhibit (no comments, redlining or the like) and no specific showing in the affidavit that it came into being to accommodate communications with counsel. As in so many documents, the fact that litigation may have been anticipated when a document was produced, without more, does not give rise to the work product privilege. There is no specific showing that the document was "prepared in anticipation"– prepared because of the prospect of litigation, rather than to accommodate business needs. This apparent final draft was prepared for the purpose of communicating to a non-SJM party (Biomedical) to outline various business/technical issues relative to the cooperative study.

Document B-24 and Document B-27: Objections overruled and this document should be produced. These are email strings between non-lawyers transmitting a draft letter from non-lawyer Declercq to a third party (Association of Cardiology) dealing with the payment process for persons consulting with SJM on the study. While an attorney is in the string and had some involvement in earlier drafts, there is no indication that this draft came into being to accommodate the request for or provision of legal advice, there is nothing of a "legal nature" in the reflected changes made and transmitted between non-lawyers, and indeed the email string itself identifies the changes as correcting some names, email addresses and "cosmetic changes." While the Ladner affidavit treats these documents in the group with B-13 et al discussed above, B-24 and B-27 are qualitatively different as the parties to the instant documentation expressly regard the edits as non-legal in nature and they plainly were not made by counsel. Any work product claim is without merit for reasons given above and in the introductory memorandum.

Document B-25: Lawyer-client privilege objection sustained. This email, while between non-lawyers, copies attorney Lackner and expressly recites legal advice relative to changes in a letter.

Document B-28 and Document B-29: Lawyer-client privilege objection sustained. This is an email string transmitting a draft prepared for client by counsel for final comments, and is a communication between Ladner and his client under *Kobluk*. Those in the string are within the client group in respect to the purposes of such communications.

Document B-30: Lawyer-client and work product privilege objections sustained provisionally: This is an email from non-lawyer Holmberg to non-lawyer Schultz transmitting an Excel File summarizing various studies. While Ladner's affidavit states that this was a compilation sought by outside attorney Kohn, and the transmitting email (#547) so indicates, there is no evidence as to whether this particular Excel summary (of what on their face are often public and published studies) was prepared specifically for Kohn as a vehicle to communicate with him and also prepared because of litigation, as opposed to being a pre-existing summary which SJM simply regarded as a document responsive to what Kohn requested. This objection is sustained only if SJM, within ten days from the date hereof, provides to the undersigned and plaintiffs' counsel a first hand affidavit that this summary was not pre-existing the request by Mr. Kohn but prepared at his request. If such is not the case and the compilation was preexisting, then the objections thereto are overruled, and it should be produced.

Document B-31: Objections overruled, and the document should be produced: This is a September 28, 2001 email transmission from non-lawyer Clark to non-lawyers Williamson (a SJM biostatistician) and Flory, as well as attorney Porter. There is no showing that either Clark (associate

marketing manager) or Williamson are within the "client group". The transmitted document is a clinical evaluation of the safety and efficacy of the SJM Regent valve which evaluation commenced in 1998. There is no evidence in these documents of any express or even implicit request for or rendition of legal advice. While attorney Porter is copied, and while Ladner's affidavit again recites that the email "reflects" Clark's "request for legal review", the email does not so express and the only implication in this regard is simply the fact that a lawyer (Porter) was copied. There simply is no express or implicit request for legal advice, nothing on the evaluation which manifests matters legal in nature (the evaluation consisting of results of clinical studies at hospital sites), and no showing in any other documents that there was any legal input into this document. (Indeed, the transmitting email undercuts any privilege claim, as it states that the evaluation was non-lawyer Clark's compilation of existing facts to give the graphics people.) Without more, the mere copying of a document to a lawyer does not render it privileged. (See discussion at p. 4 supra.) And there is no indication that this study was prepared because of the prospect of litigation rather than direction to the marketing department as a clinical report update.

Document B-32: Objections overruled and this document should be produced. This is an email from non-lawyer Declercq to non-lawyer Kurowska copied to other non-lawyers and attorney Ladner. The email references protocols previously provided to a third party. While attorney Ladner's affidavit states that the email "reflects" the authors "request for my legal advice", the email does not do so, expressly or implicitly. Instead, it simply is an email in which the non-lawyer author tells other non-lawyers that agreements will be prepared by counsel. It was not prepared "because" of the prospect of litigation rather than obvious other reasons. Also, there is inadequate showing that all on the email were within the

client group under the governing legal doctrines.

Document B-33: Lawyer-client privilege objection sustained as to 533 to 534 (the email from Declercq to Ladner), as this is an express request for legal review. As to the email from non-lawyer Alfieri to non-lawyer Declerqc dated September 6, 1998, the objections are overruled and the email should be produced. There is no expression or implication that Alfieri (a clinical monitor about which there has been no showing is in the client group under the governing legal doctrines) is in any way seeking legal advice or was seeking to keep this email confidential. The fact that this email was thereafter forwarded to Mr. Ladner does not make it any more privileged than any preexisting document being put into the hands of a lawyer. While it may be that Declerqc provided the Alfieri email to Ladner to keep him advised of its content to facilitate legal monitoring by Ladner, the issue is not the email from Declerqc (about which the undersigned sustains the privilege), but whether the Alfieri email was a confidential communication to counsel. Again, there is no express or even implied indication or showing that the Alfieri email was meant to be such a communication. The work product privilege objection is overruled for reasons discussed above.

Document B-34: Objections overruled and the document should be produced. This is an email string between and among non-lawyers other than the copying of Mr. Ladner. The first email is from a non-lawyer Jorna to non-lawyers Chase (probably within the client group as Worldwide Marketing Director) and Franssen-Brader with copies to non-lawyer Louann Carpenter and non-lawyer Crijns suggesting that a third party has proposed a clinical study. There is questions as to whether all such persons have been shown to be in the client group relative to this subject matter and the need to know.

But more importantly, this email (not even copied to any lawyer or person in the legal department) is devoid of any express or implicit request for legal advice as to such a study. The second email is from non-lawyer Carpenter to non-lawyer Schultz relative to discussing the issue, with no lawyer in the communication and no evidence of any legal issue. And the third email is from non-lawyer Schultz to non-lawyer Jorna. And while indicating that Schultz is "working with" Ladner, it merely expresses technical and non-legal reasons relative the suggested study.

The Schultz email is devoid of any express or implied request for or rendition of legal advice, and is also copied to one or two non-lawyers. Ladner's affidavit once again contains only the claim that the email "reflects" his legal advice which was "incorporated into (non-lawyer) Schultz's email". The document undercuts this conclusionary and oft-repeated claim. While it is conceivable that the decision to not go forward with the study in question was in some degree based on considerations or views which Mr. Ladner communicated to Ms. Schultz (which underlying communication may or may not be privileged), that does not mean that the subsequent communication from Schultz to a non-lawyer which contains no apparent legal rationale is privileged. It would be like saying that if a lawyer advises and explains to the VP of Marketing why the legal risks of a certain advertisement are too significant to go forward (a privileged communication), that an email from such VP to the employee proposing the ad that the ad was not going to go forward (without expressing or repeating the legal advice) is likewise privileged. See discussion at pp 5-6 supra. Here non-lawyer Schultz's informing the non-lawyer proposer of the study inform him only that the study will not be done, there is no showing of a reason to know the legal rationale, and the document in question does not reveal any legal rationale, but rather business and

technical rationales. As to the essentially universal claim of work product, there is no showing that these documents to consider and reject the preparation of a study were done because of the prospect of litigation, and it appears that they would have been prepared for the obvious business (efficacy, safety, etc) reasons in any event. See discussion at p. 13-14 supra.

Document B-35: Objections overruled, subject to redaction. This is a transmittal memo from non-lawyer Reimink (whose name is not even on SJM's log) to 13 persons (not all of whom have been shown to be in the "client group"), asking for comments from the group (who apparently were at the meeting), none of whom were lawyers. As to the transmitted document, SJM may redact the last three lines of the first paragraph as reflecting Ms. Finucane's IP legal advice. Further, the second to the last line in the document (starting "Matt:. . . . ") can be redacted.

Document B-36: Lawyer-client privilege objection sustained. Express legal advice is the subject of this email directly to SJM's IP counsel relative to IP issues.

Document B-37: Lawyer-client privilege objection sustained. Express inquiry for IP legal advice with attorney Finucane.

Document B-38: Lawyer-client privilege objection sustained. Same reasoning as B-37.

**Note:** Documents C-1 to C-3 (These documents discussed in the Ladner affidavit were not in the binders presented to the undersigned, and the C-1 to C-3 documents in such binders were in fact the serial numbers corresponding to the D-1 to D-3 documents as discussed in the Ladner affidavit and dealt with below.

Document D-1: Lawyer-client privilege objection sustained. On its face, this is communication from SJM directly to outside counsel re outside counsel's representation on IP matters.

Document D-2: Lawyer-client privilege objection sustained. This too is a direct communication from SJM's outside legal counsel to SJM containing legal advice.

Document D-3: Lawyer-client privilege objection sustained. Same findings as C-2 above.

Document D-4: Lawyer-client privilege objection sustained. This email of Mr. Gerard (who as Director of Regulatory Affairs Europe and appears to be in the client group relative to this subject matter) to Flory and Guzik (also by their positions appear to be in the client group as to this subject matter) and General Counsel O'Malley is on its face a discussion legal in nature in which the embodiment of a request for legal input is inferred.

Document D-5: Objections overruled (except for the email of July 20 which is the same document as D-4 and may be redacted). These two emails are between non-lawyers without even a copy to a lawyer, and they contain no express or implied request or rendition of legal advice. The emails were prepared in respect to regulatory matters as part of SJM's ongoing business activities associated with regulatory inquiry, and they accommodate and constitute discourse as to the subject matter rather than having been prepared because of the prospective litigation. (As discussed above, the business of SJM is significantly involved with regulatory operations on a day-to-day basis, as evidenced by the many non-lawyer permanent employees devoted to regulatory matters.)

The agency question here was a close call, as Gerard was in and reported to counsel. However, as to the documents where counsel is not even copied, there is no indication or inference that his discourse