is simply the transmittal of legal advice from a lawyer. See discussion at pp. 9-12 supra.

Document D-6: This document is the same two emails dealt with in D-4 and D-5, the first of which is not privileged, the second of which is.

Document D-7 to D-9: Objections overruled, and these documents should be produced. These emails are not communications in which any lawyer is even copied and do not evidence any request for or rendition of legal advice. As there are no lawyers involved they plainly do not evidence any legal advice–nor even suggest on their face that there is any repetition of legal advice given by a lawyer. Further, there is some question whether all the persons involved have been shown to be members of the client group. While the emails deal in part with the business of regulation, their content evidences a preparation in the course of business, and not because of the anticipation of litigation. SJM's claim that these various non-lawyers were "delegated specific tasks . . . regarding the MDA" and thus were "agents" of counsel (although again something of a close call relative to Gerard but not as to Osborne), is not sufficient for reasons discussed at pp. 9-12 supra. Again, this claim would stretch the privilege which is to be narrowly construed, beyond reason, as lawyers could "deputize" business managers for unidentified "tasks" in a certain subject matter, and essentially keep from discovery all business documents relevant to such subject matter. And the claim that non-privileged documents "reflect" legal advice because a given issue was earlier the subject of legal advice, when the documents themselves do not expressly or implicitly show any request for or rendition of legal advice, would also stretch the privilege beyond its intended purpose--as general legal advice on a given area to a broad range of employees would allegedly be implicitly "reflected" in all documents subsequently produced. See discussion at p. 4 above. In short,

given the requirement that the privilege be strictly construed and the burden of proof requirements, the undersigned found that SJM did not meet its burden relative to these documents.

Document D-10 and D-11: Objections overruled, and these documents (which are essentially the same documents) should be produced. These are communications between non-lawyers simply copied to Ladner, and there is question as to whether all of those involved have been shown by SJM to be members of the "client group" under governing caselaw. And importantly the documents do not reflect any discernible request for or rendition of legal advice, either expressly or implicitly. Finally, the documents appear to have come into being to accommodate a business purpose, namely public relations and the like, rather than "because" of the prospect of litigation.

Document D-12: Objections overruled, and this document should be produced. (Same findings as D-10 to D-11)

Document D-13: Objections overruled, and this document should be produced, except for the handwritten notes on the document. Other than the handwritten notes, this is merely an email reminding the recipients of a conference call with no express or implicit request for or rendition of legal advice. Finally, the document appears to have come into being to accommodate a business purpose, namely to remind persons of a meeting, rather than "because" of the prospect of litigation.

Documents D-14 to D-17: Objections overruled, and these documents should be produced. This is a series (including duplicates) of email transmissions of a letter to the Society of Cardiothoracic Surgeons which are not even copied to counsel, do not contain any express or implicit request or rendition of legal advice, and do not reflect even implicitly that the drafts (after the first draft from counsel) came into

being as a means of communicating legal advice. And the purpose of the documents involve a business (rather than litigation) purpose associated with corporate relations and arranging an independent assessment of Silzone to be used publicly, and as such they were not prepared because of the prospect of litigation rather than the apparent business needs.

Documents D-18 to D-19: Objections overruled, and these documents should be produced. Document D-18 is a transmitting email and transmitted draft of a "Dr. Doctor" letter. The email is from a non-lawyer to a non-lawyer (about whom there has been no showing that all are in the "client group"), and expressly recites the want of any existing (as opposed to future) need for legal approval. The prominent purpose of the draft is business, related to public and customer relations, rather than the prospect of litigation. D-19 is a non-lawyer email with a response which is not expressly or implicitly legal in nature, and involves no lawyers.

Document D-20: Lawyer-client privilege objection sustained. This is a direct communication between lawyer Ladner and client Flory which implicitly is legal in nature.

Document D-21: Lawyer-client privilege objection sustained. This is a transmittal of draft to persons including Ladner seeking comment, and thus expressly or at least implicitly seeks legal input on the draft.

Document D-22: Objections overruled, and the document should be produced. This is an email between non-lawyers with the exception of copying to Ladner, its express purpose is in respect to press releases and public/media relations rather than because of the prospect of litigation, and there is no express or implicit request for or rendition of legal advice discernible in the content of the document. See

discussion at p. 4 supra. It is questionable whether all involved have been shown by SJM to be within the "client group."

Document D-23: Objections overruled, and the document should be produced. The prominent basis for claim of privilege is that the author was an "agent" of counsel and the document "reflects" counsel's strategy. As discussed in respect to "Agency" above, this general and conclusionary statement is not enough to render privileged the content of a document which reflects no request for or rendition of legal advice, but public relations strategy in a document authored by a non-lawyer. There is no showing that he was subject to the authority and control of counsel, or that the "sole purpose" of the document was in respect to any legal advice. See pp. 9-12 supra.

Document D-24: Lawyer-client privilege objection sustained. Communication from Gerard to Ladner sufficiently inferring both monitoring and a purpose of obtaining legal advice as warranted.

Document D-25: Lawyer-client privilege objection sustained. Same findings as respects D-24.

Document D-26: Objections overruled, and the document should be produced. This is a transmittal and transmitted draft of a memo from Holmberg to Guzik and Flory. The objection again claims that Holmberg was Ladner's agent in writing the memo claimed to have been prepared for Ladner's review and to enable counsel to give legal advice. But again the "agent" claim cannot be sustained, as the document is not provided for Ladner's review, but expressly for that of non-lawyers Guzik and Flory. The document has no express or even implicit legal nature for which Holmberg would be deputized, but rather its contents are of a nature which appears to be within the domain of Holmberg's non-legal function, namely development and its related technical subject matter. Finally, the document expressly belies that it

was put together for counsel, but for non-lawyer Gerard in regulatory affairs. See discussion at pp. 9-12 supra. (The claim here in built on a double agency assertion, as it would essentially mean that Holmberg should be regarded as a lawyer's agent because he prepared material for Gerard who should be regarded as a lawyer through agency–in short a claim which would allow virtually every document between non-lawyers to become communications with lawyers.) While it may be that this document if written and directed to counsel with a showing that it was to keep counsel advised as to technical issues which were important to counsel to provide legal input relative to regulatory or anticipated litigation matters (see D-27 to D-29) it would be protected. However, the document was not so written and directed. Finally, the document does not evidence a purpose respecting prospective litigation, but a purpose of informing a non-lawyer employee involved with regulatory matters the technical (non-legal) information relative to certain Silzone properties, etc.

Document D-27: Lawyer-client privilege objection sustained. This email transmittal and transmitted memo transmits a similar but not identical draft as in D-26–a transmission of three days earlier. And the problem of privilege could arguably be greater in that this email transmittal expressly negates any contemporary request for review by counsel. However, this draft is copied to counsel and the reference in the email is enough to infer a request (if needed) for legal review. Admittedly sustaining the objection here does not protect the earlier transmitted and very similar draft as the privilege objection as to D-26 was overruled. However, as to this earlier transmittal (D-26), SJM failed to sustain its burden of proving all the factual elements of the privilege.

Document D-28: Lawyer-client privilege objection sustained. A simple direct lawyer client privilege in which the facilitation of legal advice is inferred.

Document D-29: Lawyer-client privilege objection sustained. Same transmittal email and transmitted draft as in D-27.

Document D-30: Lawyer-client privilege objection sustained Essentially the same email and transmitted draft as in D-27 provided by Holmberg to Gerard as part of the email string involving counsel–at which time counsel is now involved in potential review of the draft.

Document D-31: Lawyer-client privilege objection sustained. This is an email requesting input, some of which is legal, from various persons, including Ladner.

Document D-32: Objections overruled and the document should be produced. This document is an email string involving largely non-lawyers (only one of the emails is copied to Ladner), and one email involving a person outside of SJM. With respect to some of the involved parties, there is a question whether SJM has sustained its burden that they are members of the client group with a need to know or necessary to the communicative process between client and counsel as discussed at p. 7 above. More importantly, this email string is simply bringing attention to a newspaper article, reciting a conversation Goodband had with a non-party hospital, and expressing views as to how to deal with such information from a press and public relations standpoint. There is no express or implicit request for legal advice, and the purpose (concern as to publicity and public/customer relations) was a business concern rather than one to accommodate the prospect of litigation. While Ladner's affidavit claims another "agent" is involved (namely Gove), Gove's role appears to be the business (and non-legal) role for which he was employed

("corporate relations"), and there is no evidence that he reported to legal as opposed to business line supervision, or the like. The fact that he (as claimed by Ladner) was asked to do that which was in his domain in any event, does not mean that he becomes a lawyer with whom communications (whether or not requesting or rendering legal advice) is privileged. See discussion at pp 9-12 supra. And this email string does not evidence any implicit or express request for or rendition of legal advice. While the January 28, 8:32 am email could arguably be an attempt by its author to keep counsel informed to get legal advice as to the subject matter given it is copied to Ladner, there is nothing in the content to evidence even an implicit embodiment of a request for legal advice, no evidence from the author, and no evidence that Ladner ever in fact gave any advice relative to the subject matter. Rather, the email appears to be entirely related to public/corporate relations issues. Again, merely copying counsel on a broad range of business communications with a claim that the copying is to keep counsel informed is not enough, lest every business document in a business would be privileged by the expedient of in house counsel asking a large number of business persons to copy him or her so that they can "keep informed" when the prominent purpose is otherwise. The caselaw requires that the document about which a "keep informed" claim is made must at least implicitly seek legal advice. See p. 4, supra.

Document D-33: Lawyer-client privilege objection sustained. This is an email string discussing and requesting the need for legal input from Ladner.

Document D-34: Lawyer-client privilege objection sustained. This is an email string expressly involving legal input. It is of some interest (but far from determinative), that the important email message here recites in the "subject" space that the content is attorney client. Many other emails make no such

recitation.

Document D-35: Lawyer-client privilege objection sustained. Email string (largely repeated in Documents 36 and 37) expressly involving request for and expression of legal input from Ladner. In respect to these communications, the documents evidence that Goodband is inferred to be within the client group as to this communication, even though her title and function do not, alone, do so.

Document D-36: Lawyer-client privilege objection sustained. Same findings as in respect to Document 35.

Document D-37: Lawyer-client privilege objection sustained. Same findings as in respect to Document 35.

Documents D-38 to 43: Lawyer-client privilege objection sustained. These documents are in respect to engaging outside experts in anticipation of litigation, involve lawyer and regulatory involvement anticipating regulatory litigation (Ladner and Gerard) and appear to fit the tests of *In re Bieter,* 16 F.3d. 929 (8th Cir 1994).

Documents D-44 to 50: Objections overruled with the exception of email dated August 24, 1999 at 19:39 which seems to reflect advice obtained by SJM from Ladner at a meeting he attended on that date.[15/] The other emails relate to the Butchart situation, and they are business related in respect to media, press and corporate relations. While these documents claim protection even when there is no lawyer at all

---

[15/] Sustaining this objection gives SJM the benefit of an inference, as there is nothing in this document which reflects any express legal advice or concern relative to litigation (beyond that which is inherent generally in all public relations work). The inference favored SJM only because the email expressly indicated it was referencing a meeting in which Ladner was in attendance.

involved on the basis of Gove being counsel's "agent", there is no evidence that he is doing anything other than his business function of "Corporate Relations", no evidence of any reporting of anything with a legal overtone and no evidence that he is being supervised by counsel in respect to these communications. Again, if in house counsel could deputize the corporate relations staff (to "prepare drafts of media statements" and to "coordinate . . . responses from public and the media"–that which is their business (non-legal) function anyway), then we would easily create a new "corporate relations" privilege. As stated in the "Agency" discussion above, the issue is whether the document or communication would have come into being as a business matter anyway, and plainly these communications relative to facilitating SJM's corporate relations would have. The documents (with the exception of the email about which the privilege was sustained) do not even copy counsel, generally evidence no expression as to confidentiality, contain no express or detectable request for or rendition of legal advice, and are documents that would have been created for corporate relations whether or not Gove was "deputized" and whether anyone had any legal concerns. As to the work-product privilege, again while in all businesses there are ongoing concerns about what may be said in the media as to issues about which legal issues could come about, this does not mean that the documents were prepared "because" of the prospect of litigation rather than customer and public relations and the like. (SJM has indicated that Document 47 has been produced.)[16/]

---

[16/] Corporate, press and public relations, of course, is by definition a business activity the function of which is to enhance the image or view of the corporation which customarily involves attempts to minimize negative impacts on such an image. These functions generally exist whether there is litigation on the horizon or not, and at SJM these functions were performed by full time employees, not persons engaged only when litigation was anticipated.

Document D-51 and 54: Objections overruled and the documents should be produced. The burden of proof failures are largely the same as those in respect to 44 to 50. (SJM has indicated that Document 53 has been produced.)

Document D-55 to 59: Objection sustained on work product and not lawyer-client privilege grounds. Even though there is no evidence of any lawyering in respect to the content of this document and no lawyer is even involved in the communications, there is an express showing as to these emails (unlike many of the earlier ones dealing with corporate relations issues generally) that the subject outside public relations firm was, at least in significant part, engaged with respect to the anticipation of litigation. SJM has been given the benefit of the inference relative to mixed purpose here, as it is difficult to detect in the content of these communications any concern about the prospect of litigation, as opposed to the overriding efforts relative to customer relationships, corporate image, etc. However, Document 55 seems to show that corporate and public relations within SJM is generally not for litigation, but for other expressly identified business purposes, and the evidence seems sufficient to find that the engagement of the outside firm may not have occurred for business reasons independent of the prospect of litigation.

Document D-60, 61 and 62: Lawyer-client privilege objection sustained. These are transcripts/notes of a telephone conference of September 9, 1999 in which both Ladner and Gerard are on the call, and in fact are asked for and provide legal advice. Gerard, who answers to the legal department and has a regulatory function assisting counsel in respect to regulatory advice, has been shown to be counsel's agent for the purpose of this conference in which Ladner was present. While the conference call dealt largely with public/corporate/press relations respecting the MDA and related

concerns, it also dealt (albeit more modestly) with legal issues and such issues were somewhat entangled in this particular conference in which counsel (Ladner) and his subordinate (Gerard) had a legal participation. Accordingly, while a close call, the undersigned finds that this conference has been shown to be subject to lawyer-client privilege protection.

As to work-product, the underlying conversation is not "material prepared" (see discussion at pp. 15 supra) and there is no firsthand evidence as to why the notes were prepared. It would appear that the notes were not prepared "because" of the prospect of litigation, indeed if the prospect of litigation was driving any decision respecting preparation of this confidential meeting one would think that the decision would have been to not prepare any memorial. In any event, the document memorializes business discussions necessary to deal with public and corporate relations, customer (physicial and patient) relations, press issues, and the like. The materials were not prepared "because" of the prospect of litigation as opposed to business needs.

Documents D-63 and 64: Lawyer-client privilege objection sustained. These are duplicate documents summarizing an August 28, 1999 telephone conference. While the summary memorializes a discussion with business (communications and corporate relations) issues, this conversation was so entangled with discussions with Ladner which had arguable mixed business and legal attributes, that the burden of showing that both the summary and the underlying conversation is a communication in which legal or mixed legal/business advice was requested and/or rendered has been met.

As to work-product, similar findings as to Document 62.

Document D-65: Objections overruled and the document should be produced subject to a redaction. This is a summary of a conference call on September 1, 1999 in which there were no lawyers on the call, although Gerard was a participant. The underlying conversation was a business discussion of press/corporate relations and communications issues with persons involved in such activities as part of their job. There were no legal issues (express or implied) evidenced in the discussion with one possible exception involving the second paragraph under item 2, starting with the words "RG asked . . . " While this is hardly a traditional legal conversation, it has been adequately shown that Gerard was attending this meeting at the behest of counsel and that this communication could reflect and pass on the sentiments of the legal department. For this reason, this paragraph may be redacted.

As to work-product, similar findings as to Document 62.

Note: Admittedly this summary seems to indicate that these kinds of communication planning meetings can go on without counsel (Ladner not being involved), and thus somewhat cuts against the above rulings as to Documents 60 to 64. However, Mr. Gerard was involved in this conference call such that the relationship between these conferences and the legal department was apparent. But more importantly, a somewhat determinative fact for the undersigned in these admittedly close factual findings was that in the meetings evidenced by Documents 60-64, Ladner was in attendance and there were expressions of clear legal issues in the dialogue.

Document D-66 and 67: Lawyer-client privilege objection sustained. These are duplicates of a summary of another conference call on September 9, 1999 in which the preparer set out the participants' comments. While Ladner (but not Gerard) was on the call, the summary does not reveal that anyone

asked him any questions nor that he made any comments. However, given the conference call of the same date on the same issues (see discussion relative to Documents 60 to 62 above), there is an implication that the communications seek Ladner's legal input in addition to his presence being their to merely keep him informed. See discussion of *Searle* above. Another close call, but the undersigned finds that SJM has sustained its burden with respect to this document.

As to work-product, the underlying conversation is not "material produced," and there is no firsthand evidence as to why the notes were prepared. It would appear that the notes were not prepared "because" of the prospect of litigation, indeed if the prospect of litigation was driving any decision respecting preparation of this confidential meeting one would think that the decision would have been to not prepare any memorial. In any event, the document memorializes business discussions necessary to deal with public and corporate relations, customer (physician and patient) relations, press issues, and the like. The materials were not prepared "because" of the prospect of litigation as opposed to business needs.

Document D-68: Objection overruled and this document should be produced with the exception of a handwritten notation on Bates . . . 263. This is a fax memo from non-lawyer Chase to non-lawyer Spadaro, which includes the MDA Advice Notice transmittal along with a related SJM communications plan. The MDA authored material is obviously not privileged, and the balance of the SJM material is in respect to business needs related to a communications plan, press coverage and inquiries, etc. There is no lawyer involvement in the document, and no express or implied request or rendition of legal advice. There are handwritten notes on Bates . . . 263 which is the last handwritten bullet point starting "Jim, . . . " which

can be redacted.

As to work-product, the underlying conversation is not "material produced," and there is no firsthand evidence as to why the notes were prepared. It would appear that the notes were not prepared "because" of the prospect of litigation, indeed if the prospect of litigation was driving any decision respecting preparation of this confidential meeting one would think that the decision would have been to not prepare any memorial. In any event, the document memorializes business discussions necessary to deal with public and corporate relations, customer (physician and patient) relations, press issues, and the like. The materials were not prepared "because" of the prospect of litigation as opposed to business needs.

Document D-69, 70 and 71: Objections overruled, and these documents should be produced: These are handwritten notes of a November 16th, 17th and 23rd, 1999 conference calls which did not include any lawyers. The subject matter continues to involve the communications/corporate relation issues involving the MDA advice, dealing with the fact that the MDA advice being on a website, opinion leaders and the like, and some content was conversations outside SJM. There is no reference (even implicit) of any request for or rendition of legal advice, and again there was no lawyer on the call. The final document is an email (in which Ladner is a recipient) simply setting the next conference call. The prominent rationale for the conference calls and/or the documents coming into being evidenced on their face was to discuss or memorialize communications as to corporate relations, communications planning, shaping public and customer and physician relations/opinions and the like.

As to work-product, the underlying conversation is not "material produced," and there is no firsthand evidence as to why the notes were prepared. It would appear that the notes were not prepared "because" of the prospect of litigation, indeed if the prospect of litigation was driving any decision respecting preparation of this confidential meeting one would think that the decision would have been to not prepare any memorial. In any event, the document memorializes business discussions necessary to deal with public and corporate relations, customer (physician and patient) relations, press issues, and the like. The materials were not prepared "because" of the prospect of litigation as opposed to business needs.

Document D-71: Objections overruled, and this document should be produced. This is simply an email advising the addressees (including lawyer Ladner) of a conference call on December 8th, 1999. While this appears from the timing and addressees to be another communications plan/corporate relations call involving the issues in the above documents, whether the call is or is not privileged is not before the undersigned. This document simply advises persons that there will be a call. The handwritten notes are not privileged.

As to work-product, the underlying conversation is not "material produced," and there is no firsthand evidence as to why the notes were prepared. It would appear that the notes were not prepared "because" of the prospect of litigation, indeed if the prospect of litigation was driving any decision respecting preparation of this confidential meeting one would think that the decision would have been to not prepare any memorial. In any event, the document memorializes business discussions necessary to deal with public and corporate relations, customer (physician and patient) relations, press issues, and the like.

The materials were not prepared "because" of the prospect of litigation as opposed to business needs.

Document D-72: Document was not in the set. Would SJM please fax to me within the next 10 days. Thanks.

**Introductory Note re Lawyer-Client Privilege Claims as to Recall Documents:** The following group of documents, virtually all of which are stamped "PRIVILEGED," appear to be documents about which SJM makes a blanket claim to protect what are mostly business communications. In addition to the apparent automatic legend, SJM makes a conclusionary claim as to most of these documents that they "reflect" legal input and that they were created at a time when litigation was anticipated. The undersigned has both sustained and overruled these objections, depending upon a review of the document, the surrounding documents and the affidavit statements of Ladner. In this regard, the undersigned concluded (and would have even without a sworn statement), that a company making a decision to initiate and conduct a product recall (particularly where legal liabilities for personal injuries could be influenced thereby) would have a need for related legal advice. On the other hand, the undersigned, in examining all of the documents, also appreciated that a recall involves a host of non-legal business concerns and issues, such as inventory, warehousing, instructions, mailings, refundings, physician relations and support, patient relations and support, communications plans, public and corporate relations, and the like. And the undersigned appreciated that many recall issues would involve mixed issues–issues in which business and legal considerations were understandably and necessarily entangled. See discussion at pp 3-5 supra.

Of course, the fact that a recall would have a legal dimension does not mean that every document having anything to do with all incidents of a recall is protected by a privilege. For instance, if in a medical

device company a non-lawyer product manager sent a memo to a non-lawyer marketing manager that the former believed that the recall should have come a year sooner because the company had evidence of its need, and no lawyer was involved in this communication, without more this highly relevant communication would not and should not enjoy any privilege protection. This notwithstanding the fact that company counsel could honorably state that the communication "reflected" legal advice because at some earlier time the lawyer was involved in a confidential communication with company personnel when his or her comparable view was communicated. And this notwithstanding the fact that company counsel could honorably state that he asked these non-lawyers to be his or her "agent" in respect to the recall. Were it otherwise, counsel to a corporation could assure that all communications regardless of how business and non-legal in nature, were protected by simply deputizing all the key business people (involved in the business aspects of a recall whether deputized or not) and/or claiming that since legal input was involved in many aspects of the recall decision, that essentially every utterance relative to the implementation or other business incidents of a recall is either from a lawyer's "agent" or "reflects" legal advice. Obviously such protection would go beyond the purpose of the privilege–to allow lawyer and client to confidentially give and seek legal advice without fear of it being later revealed, and would immunize from truth seeking essentially all of the business discussions, action items, decision concerning implementation and the like relative to a recall–necessarily important areas of discovery as to whether a manufacturer was or was not negligent in respect to either the sale or correction of harmful attributes of a product, had failed to correctly represent the product's safety or had moved timely to cure any problems and reduce any danger.

Accordingly, in examining the question of attorney-client privilege relative to the recall documents, the undersigned was deferential to the privilege claim when the document was a communication directly from or directly to a lawyer, or expressly manifested a communication made by a lawyer, notwithstanding at times (most of the time) there was difficulty in discerning the clear legal (as opposed to business) nature of the communication. This is because of a recognition by the undersigned and the caselaw that counsel, particularly in-house counsel, is customarily involved in giving input into issues which have mixed (business and legal) considerations and that these mixed purpose communications may enjoy lawyer-client privilege protection. However, as to documents which did not so constitute direct communications to or from counsel (often not even showing counsel as a copied person), and did not manifest even an implicit request for or rendition of legal advice, the non-specific claim that the communication simply "reflected" legal input or that the communication was communication from or to a business person acting as counsel's "agent" (when the activity was inherently within the business person's function whether so deputized or not), the factual elements of privilege often were found undercut by the document and were not proven. See discussions at pp. 4-12 supra.

**Introductory Note Relative to Work-Product Privilege Claims Respecting Recall Documents:** The undersigned, again even without affidavit support, concluded that virtually all documents (or even conversations without any related document being "prepared") respecting a product recall of an implanted medical device took place at such time as the preparer or communicator could have anticipated litigation. How could it be otherwise? And the undersigned appreciates that an affidavit so concluding would be true. However, the law does not provide, therefore, that every document which in any way has

as its subject matter a product recall is afforded work-product protection. The issue, as stated by the 8th Circuit in *Searle*, is whether the document was prepared "because" of the prospect of litigation rather than the necessities of the business. See discussion at pp 13-15 supra. Accordingly, the universally repeated and blanket affidavit claim that a document was prepared in anticipation of litigation was not determinative, and the undersigned examined each document to determine whether it came into being because of the prospect of litigation or in fulfillment of business considerations. Plainly many of the below documents would have come into being regardless of litigation prospects, as they accommodated a number of business needs and considerations attendant a recall. As in the example above, an email between two business persons stating the evidence on which they conclude that a recall came later than the company's knowledge of the danger, could easily be claimed to have been prepared at a time when such persons had a concern about prospective litigation. But obviously such an email would not be afforded work product protection. Indeed, it would likely be the last thing a party would want to prepare "because" of prospective litigation.

Document E-1: Lawyer-client privilege objection sustained. Ladner's affidavit states that these are handwritten notes of meetings he had with SJM personnel in which legal advice was given, and the documents do not dispute that the communications were legal in nature. Thus, the undersigned finds that the claim that the communication was subject to the lawyer-client privilege has been proven.

Document E-2: Objections overruled and the document should be produced. This is a memo from a non-lawyer to several non-lawyers, some of whom have not been shown to be in the "client group." Furthermore, there is no lawyer involved in the memo, and the memo does not expressly or implicitly

disclose any request for or rendition of legal advice, or any such purpose. On the contrary, it evidences on its face clear business purposes involving inventory, instruction manuals and other business requirements associated with a recall. Accordingly, it is not a lawyer-client communication and it was not created "because" of the prospect of litigation rather than to accommodate various business needs.

Document E-3: Objections overruled and this document should be produced. This is a memo, blind copied to Ladner, which is neither written by nor directed to counsel, and it contains no express nor implied request for or rendition of legal advice, instead demonstrating a purpose other than the provision of legal advice–namely to simply schedule meetings. SJM's claim that the memo was written by President of SJM's Heart Valve Division (Healy) at Ladner's direction does not transform it into a privileged communication for the purpose of legal advice. See discussion at pp. 9-12 above. Thus, the undersigned finds that the claim of attorney-client privilege has not been proven. Since the document evidences on its face a purpose other than the prospect of litigation, SJM has failed to sustain its burden of showing the document to be protected by the work-product privilege.

Document E-4: Objection overruled, and the document should be produced. There is no affidavit evidence presented about this document, and it fails on its face to show elements of either privilege. Accordingly, the undersigned finds that neither privilege has been proven.

Document E-5: Lawyer-client privilege objection sustained. Ladner's affidavit recites that these notes memorialize a meeting he had with Holmberg. While it would be better if the undersigned had firsthand evidence of this fact from Holmberg, it is assumed that Ladner is able to identify the document and the content as being the subject of such a meeting. While the content of the document neither disputes or

confirms that the purpose of the memorialized communication was the rendition of legal advice, notes of a meeting of a SJM manager with counsel, and with no other business personnel present, along with Ladner's affidavit uncontradicted by the document itself, is enough to infer that the communication would have been prominently in respect to legal advice. The undersigned finds that the elements of the attorney client privilege were proven.

Document E-6: Lawyer-client privilege objection sustained. SJM has sustained its burden of proving the elements of the lawyer-client privilege, as this document memorializes a confidential meeting in which Ladner is shown to have participated with Flory (a member of the client group) in respect to making a recall determination, which determination would necessarily involve legal as well as other business input. Accordingly, given the mixed purpose of the underlying communication and the other elements shown, the undersigned finds that the elements of the lawyer-client privilege were proven.

Document E-7 and E-8: Lawyer-client privilege objection sustained. These are the same handwritten notes claimed to be of a meeting in which O'Malley gave advice and input relative to the recall decision. While it would have been better for O'Malley to have given proof that he was an attending participant rather than Ladner's "information and belief" affidavit, the notes on their face do reflect O'Malley's participation. The elements of the lawyer-client privilege have been proven.

Document E-9 and E-10: Objections overruled, and the documents should be produced. These handwritten notes of Goodband are notes of telephone conferences about which there is no evidence (affidavit or in the document) involved any lawyer or any express or implicit request for or rendition of legal advice. The affidavit statement is mere conclusion that the notes "reflect" legal advice. However, as

discussed above, since counsel was obviously involved in the recall decision, any conversation between non-lawyers in respect to the subject matter of initiating a recall could arguably "reflect" legal input. These notes fail to manifest any express or implicit legal input or purpose detectable by the undersigned, but rather their content discusses various business issues associated with the recall. The telephone communication underlying the notes is not "materials prepared" in anticipation of litigation, as they are not materials but mere conversations, and in any event were conversations with a business purpose. See pp. 15 supra. And while we have no first hand evidence from the preparer of the notes, it is clear form the document that the written notes were not prepared "because" of the prospect of litigation, but to memorialize the telephone conferences respecting various business issues. Finally, the preparer of the notes has given no evidence as to why they were prepared. The elements of a work- product privilege were not proven.

Document E-11 to E-14: Lawyer-client privilege objection sustained, for reasons discussed in the Ladner affidavit. These documents reflect the content of direct communications with Ladner, or are communications directly to him. While there is an argument that they are business related in respect to the needs of surgeons for patient testing and other support by SJM (the communications about which topics may or may not be the subject of privileged protections), the fact that Ladner is directly involved in the communications satisfies the undersigned that the communications are at least mixed business/legal purposes, and that the lawyer-client privilege has therefore been proven. The purpose of these documents were to either to memorialize a conversation or constituted a communication for the prominent purpose of dealing with SJM's response to surgeon/patient needs, rather than prospective litigation, and thus the factual basis for SJM's claim that the documents were protected by the work-product privilege has not been

sustained.

Document E-15: Objection overruled, and the document should be produced. This is an agenda prepared by Chase calling for a meeting, and reflects an agenda to discuss business issues associated with the recall, the clear business nature of which are evident from the document. The fact that Ladner is listed as one of the potential attendees does not even make the meeting about which the agenda relates necessarily privileged, and certainly does not mean that the typed agenda itself is privileged. See discussion at pp. 2-4 supra. There is no evidence that this agenda (as opposed to the prospective meeting) had a purpose of seeking or receiving legal advice, but merely the purpose of creating an agenda for a meeting which may or may not ultimately consist of communications which would enjoy privileged protection (depending upon the nature of the communication and the persons involved). Given the agenda purpose of this document, it is clear that the mere agenda was not prepared "because" of prospective litigation (although there may be an argument that elements of the ultimate meeting involved discussions anticipating litigation). And the claim that a simple agenda was prepared by a non-lawyer at Ladner's direction does not make it a communication from a lawyer–let alone a communication rendering legal advice. Further, absent a specific showing that Chase put into the document legal advice from Ladner, its non-privileged nature is not changed. Again, Ladners's claim that the document "reflects" legal advice relative to recall could essentially be made about any document having recall as its subject matter since legal input went into the recall decision, and this claim does not transform the purpose of this communication as one seeking or rendering legal advice which is not apparent from the document. In short, the undersigned finds that the factual basis for either privilege has not been proven.

Document E-16, E-17 and E-18: Objection overruled, and the documents should be produced. This is a January 13, 2000 email transmitting an action item list respecting a host of essentially business to-do items associated with the recall. While some (but very few) of the action items involve items to be done by Ladner, the items are business items which would be attendant a recall, such as shipping, inventory, printings, mailings, quality assurance, clinical needs, etc. There is no express or implicit request for or rendition of legal advice detectable in the document. The claim that the document was produced by Chase as "an agent of the legal department" is inadequate to transform the document into a privileged communication as discussed above. Similarly, the document was prepared for the obvious purpose of coordinating all the business needs of a recall, rather than "because" of the prospect of litigation. In short, the undersigned finds that the factual basis for either privilege has not been proven.

Document E-19: Objection overruled, and the document should be produced. This is a simply a transmittal from non-lawyer Chase to non-lawyer King (with no lawyers in the communication) of a grid of responsibilities for a communications plan, with none of the responsibilities including legal personnel, but rather business personnel. There is no express or implicit purpose respecting legal advice detectable in the content of the document, nor any indication that it was prepared because of the prospect of litigation rather than because of obvious business needs. The agency claim relative to non-lawyer marketing manager Chase is not sufficient for reasons recited above.

Document E-20, 21 and 22: Objection overruled and these documents should be produced. These are essentially reiterations/revisions of the same action plan documents as E-16 to E-19, and the objections are overruled on the basis of the same findings.

Document E-23: Objection overruled and this document should be produced. This is a timelined communication plan of a similar nature as E-19, it does not evidence any lawyer involvement in the communication, and the content of the document does not expressly or implicitly reveal any detectable request for or rendition of legal advice, nor any indication that it was prepared because of the "prospect" of litigation rather than because of obvious business needs. The agency claim relative to non-lawyer marketing manager Chase is not sufficient for reasons recited above.

Document E-24, 25 and 26: Lawyer-client privilege objection sustained. These documents, like the several above, reflect business planning relative to the recall and do not evidence any detectable request for or rendition of legal advice. However, the communications are copied to, and set out responsibilities for, Ladner, and accordingly inferentially reflect a purpose of rendering legal services. It is a close call, but the business/legal content nod goes to SJM.

Document E-27 to E-31: Objections overruled, and the documents should be produced. These are transmittals of the final Communications Plan from non-lawyer Chase to a host of non-lawyer personnel (not all of whom have been shown to be in the client group for purposes of this legal advice–as opposed to the purpose of implementing the mechanics of a communications plan), with a copy to Loldner. The document does not expressly or implicitly seek or render any legal advice, and was not prepared "because" of the prospect of litigation, as opposed to necessary business communications and customer/corporate relations purposes.

Document E-32: Objections overruled, and the document should be produced. This document is between non-lawyers with no lawyer in the communication, and it is a communication relative to necessary

business/mechanical items associated with corporate communications. Its purpose is not in respect to legal advice or the prospect of litigation, but rather necessary business communication issues which would exist and have to be accommodated regardless of any such prospect. There is no express or implicit request for or rendition of legal advice, and the agency claim relative to Ms. Franssen-Brader involves a business manager in marketing (as in Chase), a department logically involved in the subject communications. As there is no showing that this kind of activity would not be performed by marketing managers irrespective of law department provocation, and the activity seems not to be for the "sole purpose" of assisting in the rendition of legal services, the agency claim fails for reasons described at pp. 9-12 above. (Interestingly, again the agency claim seems overworked, as if the claim was availing, we would have a claimed lawyer-client communication in which there was no client, as both recipient Franssen-Brader and author Chase are claimed to be lawyer "agents".)

Document E-33: Objections overruled and the document should be produced. This is an email between non-lawyers without even a copy to counsel, and manifests business action items, with no express or implied purpose respecting legal advice. The document was not prepared "because" of the prospect of litigation rather than business needs.

Document E-34: Objections overruled, and the document should be produced. This is an email between a non-lawyer corporate relations manager to a non-lawyer media relations person, without even a copy to counsel. The document does not evidence any express or implied request for or rendition of legal advice, or any legal advice purpose, but rather a press/communication/corporate relations purpose. The lawyer-client privilege is claimed to exist because non-lawyer Gove whose business function is corporate

relations is acting as "agent" of counsel, even though in this document he is communicating as to business issues in his business domain of corporate relations, and is not communicating anything of a legal nature. See discussion at pp 9-12 supra. SJM claims that because of this claimed agency, the communications plan is transformed into legal advice through agent Gove so that any communication in respect to it is privileged, which again would stretch the privilege beyond recognition if business managers were deputized to create documents within their business domain and such documents (wholly related to business needs existing independent of legal considerations) then became legal advice. The document was not shown to have been prepared "because" of litigation rather than obvious business needs.

Document E-35 to E-38: Objections overruled subject to redaction, and these documents should be produced. These are emails from non-lawyer Guzik to various non-lawyer SJM employees and to Ladner, all of which are expressly dealing with the schedule for sending the "Dr. Doctor" letters. None of these documents expressly or implicitly involve a request for or rendition of legal advice, and there is not showing of any legal involvement of :Ladner. (As discussed above and in *Searle*, merely transmitting a communication to a lawyer, even if to keep him informed, is not enough unless it is evident that the communication at least implicitly seeks legal advice. See p. 4, supra. These documents do not do so.) The purpose of these communications are business, namely the mailing of the subject letters to physicians, rather than the prospect of litigation or the rendition of legal advice. Nonetheless, SJM may redact the 4th, 5th and last (16th) entry of each document, as such entries arguably constitute the request of SJM for Ladner to perform certain tasks (albeit tasks that do not appear to be legal in nature), and thus there is an inference that this part of the communication is a mixed business/legal communication for legal services.

Document E-39: Objections overruled, and the document should be produced. These are emails which are from non-lawyers to non-lawyers, with no lawyer even being copied, and not all the persons involved have been shown to be within a client group in respect to any related legal advice (as opposed to media or press relationships). But more importantly, the content of these emails do not expressly or implicitly relate to any legal issues and plainly did not come about "because" of the prospect of litigation as opposed to business needs (answering questions of the press relative to the recall, corporate and press relations, marketing, etc). If these emails would have involved a lawyer the undersigned would have been of the view that the possibility of mixed purposes (press relationships and legal advice) were sufficiently entangled that a lawyer-client communication could be found. However, there was no lawyer involvement and the only claim is that the legal department made corporate relations manager Gove its "agent" and that Gove in turn delegated this agency to non-lawyer Osborne. This double-agency claim is even more remote, as we have an alleged lawyer's agent appointing another as a lawyer's agent, both alleged "agents" are engaged in communications in their ordinary business domain, there is no showing that they are under the authority or control of counsel relative to this communication, no showing that there is any specific aspect of the communication that was directed by counsel, or that the purpose of the communication was to assist counsel in the provision of legal services–that the communication would not have occurred but for the request of counsel. See discussion at pp 9-12 supra.

Document E-40 to E-50: Lawyer-client privilege objection sustained as to Documents E-40 to E-44, and E-46 to E-49; and all objections are overruled as to Documents E-45 and E-50 which documents should be produced subject to redactions as discussed below. These are transmittal emails transmitting

iterations/drafts of SJM's plan to direct SJM staff in the implementation of the recall. The documents about which the objections (lawyer-client privilege) is sustained are drafts in which a number of SJM personnel are involved in commenting, including Ladner. They came into being, at least in part, as a means of communicating request for review and/or comment by legal counsel, and are privileged even though some not copied to or from a counsel. (Ladner's affidavit indicates that all redlined drafts contain his input). However, E-45 and E-50 (email transmissions of the same document) are not transmitted drafts but transmitted final plans to direct SJM staff in the implementation of the recall. These final documents delivered to countless persons (none of which are lawyers and not all of whom have been shown to be within a client group), and essentially direct mechanical and business procedures to implement the recall. They show no comments, redlines or the like, expressly indicate they are final and transmitted drafts, and accommodate communications as to recall business issues such as inventory, shipment, warehousing, communicating to physicians and customers, retrieval of devices from hospitals, customer service, record keeping, monitoring, etc. The only arguable legal advice which is being forwarded in the final plan is in paragraph 2.2.6 which may be redacted. SJM again contends that legal advice is "reflected" in even the final plan. As discussed above, many final documents (contracts, public filings, reports from HR to client employees, personnel handbooks, corporate policies, codes of ethics, reports to regulators, letters to adversaries, etc) which went through drafts in which lawyers have had input will "reflect" such input, but that does not make every such document (even those going only to client personnel) protected as lawyer-client communications which expressly or implicitly seek or provide legal advice. See discussion at pp 5-7 supra. The overruled documents were not prepared because of the prospect of litigation rather than the

here-discussed business needs associated with the recall.

Document E-51 to 60: Lawyer-client privilege objection sustained. These are various transmittals and drafts which, upon a review of all the documents, are iterations of drafts in which SJM appears to seek review or comment from Ladner, which review or comment is inferred to be legal, or at least mixed legal/business, in nature.

Document E-61 and E-62: Lawyer-client privilege objection sustained. These are emails directly to Ladner seeking advice. While the sought advice does not on the face of the documents appear to be legal in nature, the undersigned again presumes that direct requests of counsel for advice infers that the advice sought is either legal in nature or mixed business/legal, and thus the nod again goes to SJM.

Document E-63: Lawyer-client privilege objection sustained. This is an email transmittal and redlined draft of a "Dear Doctor" letter which expressly seeks review by Ladner, and thus both documents are communications seeking the advice of counsel.

Document E-64 to E-74, E-80 and E-84 to E-85: Attorney-client privilege objections overruled, work-product privilege objections sustained. These are communications between non-lawyers at SJM (generally Gove who is manager of corporate relations) and representatives of two <u>outside</u> public relations consulting firms engaged by SJM. The Ladner affidavit indicates that these firms were engaged because of the prospect of litigation, and this contention is not undercut by the documents themselves. A number of issues are raised by these materials. As to attorney-client privilege, once again we have the claim that these are communications with counsel because Mr. Gove was the legal department's agent communicating with the public relations firms which were the arguably the "client" under caselaw which allows the equating of

outside consultants with the client if the client needed to engage the outside consultant to accommodate communications of the client to the lawyer–such as a client's hiring of a forensic accountant to assess a company's accounting records and provide counsel information in respect to claims of financial misstatements, etc. The question of whether an outside public relations consultant was necessary to enable communications with counsel is not clear here, as SJM had its own public relations staff and none of the content of these documents appear to contain information about which an outside expert is necessary to inform in-house counsel. And perhaps making this even more clear is the fact that the outside firms did not in fact here inform any lawyer of the public relations issues, but rather informed SJM's corporate relations and marketing personnel. Thus, it was doubtful that the public relations firms were necessarily the "client" for purposes of communicating with counsel. Further, the attorney-client privilege would fail, as none of these documents contain communications with a lawyer, but are communications between SJM's corporate relations/marketing personnel and the consultants relating to the business of public relations, non-lawyer communications which would be the expected when a corporation hires public relations consultants in any event. The fact that SJM here claims that Gove and others were "agents" of the legal department when they were simply doing that which SJM hired them to do–relate to outside PR consultants, when they have not been shown to have been under the specific authority or control of the legal department, and when the subject communications are not legal in nature but deal with press inquiry, public relations and the like, does not transform Gove into a lawyer. The documents are devoid of any express or implicit requests for or rendition of legal advice, are not communications involving any lawyers, and Gove is not simply passing on or receiving information for counsel, but is acting very much as one would expect him to act as manager of

corporate relations.

As to the work-product privilege, however, the matter is different. Gove need not be a lawyer and the consultants need not be clients to protect materials prepared for or by them, as the issue is whether the materials were prepared by a "party," here SJM. And they were. So the only remaining issue is whether they were prepared in anticipation of litigation. The undersigned has often concluded that SJM's blanket claim in this regard was not sustained by the evidence as to many documents which on their face were not prepared because of the prospect of litigation but rather to accommodate clear business needs by SJM business managers employed for the on-going business purpose of marketing, customer relations, press inquiries, public relations, SJM goodwill, regulatory requirements, and the like. Here, however, the outcome is otherwise, for a number of reasons. First, the Ladner affidavit claims that the outside PR firms were hired because of the prospect of litigation. The documents do not undercut this assertion. Such a claim of course cannot and has not been made with respect to those various SJM corporate relations and marketing managers who of course were hired as full time SJM employees to accommodate the day-to-day corporate relations business needs and not for the purpose of a prospective litigation. Because of these differences, the undersigned was obligated under the caselaw guidance to determine whether the communications involving such SJM employees were prepared "because" of the prospects of litigation rather than other business needs which would have existed in any event. As indicated herein, in most instances the subject documents made clear that the latter was the case. But with respect to outside consultants who apparently were hired for the purpose of prospective litigation, the undersigned would have to disbelieve Ladner's affidavit to examine each document to see whether business motivations prevailed

over prospects of litigation in the document's preparation. While it is true that the subject documents could support an argument that the work of the consultants was in respect to SJM's goodwill, customer relations and the like, it is equally true that the subject documents support the Ladner affidavit that the consultant's engagement and thus its preparation of documents was because of the prospect of litigation. Indeed, some of the documents expressly reference the work associated with potential litigation. And finally, if all that was needed was routine business public relations, SJM seemingly would not have needed outside consultants as it had inside staff in this area. Thus, the undersigned found on the basis of the Ladner affidavit and the content of the documents that these outside consultant documents came into being because of the prospect of litigation, and that the elements of the work-product privilege were proven.

Documents E-75 to E-79: Objections overruled and these documents should be produced with the exception of the email of January 28, 2000 at 8:32 am addressed directly to (among others) Mr. Ladner–about which the lawyer-client privilege objection is sustained. These overruled documents are communications which are neither from nor to any lawyer, and do not expressly or implicitly contain any request for or rendition of legal advice, or any such purpose. (Again, the agency claim in respect to Gove does not transform him into a lawyer for these purposes, nor does it make his utterances legal advice without some showing that he was passing on specific legal advice at the behest of counsel–a showing not made and undercut by the documents which show his utterances to be business corporate relations communications expected given his work for SJM as its corporate relations manager.) The one email about which the objection is sustained is to Ladner (not merely copied) and is not incompatible with the claim that it was a communication to him to advice him of an issue which had obvious legal implications and therefore

about which his advice was implicitly being sought. Additional evidence on this topic is contained in other documents in this series showing that in fact Ladner engaged outside counsel on this precise issue. See Document 81 to 83 discussion below.

As to work product, unlike documents E-64 to E-74, these documents do not involve any outside consultant, and were provoked within SJM's corporate relations and related personnel by an Irish news inquiry/article relative to Silzone. While there is a reference to the need to consult with one of the outside PR consultants, nothing in the documentation evidences any input from any outside consultant, and the undersigned finds upon a close review that the documents did not come into being because of the prospect of litigation rather than to accommodate SJM's understandable business need to react to a press article about Silzone. Again, to protect all communications within SJM relative to public relations and press/media matters involving Silzone through a claim of work-product would essentially protect from truth finding all communications which would have occurred regardless of the prospect of litigation, as there was bound to be obvious customer relations, marketing, advertising, corporate relations, press coverage and related business issues associated with corporate image issues resulting from many activities surrounding the product.

Documents E-81 to 83: Lawyer-client privilege objection sustained, for the same reasons that the January 28th, 8:32 am email was sustained as discussed in respect to documents 75 to 79 above, and for the added reason that document 83 confirms that the earlier emails to Ladner were seeking legal assistance as evidenced by the engagement of outside counsel on the same issue. In short, the elements of attorney client privilege were found to have been proven by inference, notwithstanding that the content of the subject

documents do not evidence any express request for or rendition of legal advice

Document E-86 to 89: Objections overruled, and the documents should be produced. These are email transmittals transmitting follow-up procedures and questionnaire. Document 86 is an email from non-lawyer Gerard to non-lawyer Karwoski-Hetrick (about whom there has been no showing is within the client group under the prevailing tests), with copies to non-lawyer Guzik and Ladner. This email is dated May 26, 2000, and it expressly disclaims a need for legal review or approval of the enclosed document. Nothing in the content of document E-86 expressly or implicitly seeks or renders legal advice. And the document was not created because of the prospect of litigation, but rather to accommodate the express purpose in the materials–namely recall follow-up, reconciliation and random verification to assure the recall has been complete–tasks accommodating the business need associated with any recall irrespective of prospective litigation.

Documents E-87 and E-88 are transmissions of the Recall Follow-up draft dated July 21, 2000, well after the draft apparently no longer needed legal input (see discussion as to E-86 above), and which was not even copied to any lawyers, but to a significant number of persons (not all of whom have been shown to be in the client group relative to legal advice--as opposed to recall follow-up procedures). There is no evidence in the content of either of these documents that they came into being to accommodate the seeking or rendering of legal advice. And the documents were not created because of the prospect of litigation, but rather to accommodate the express purpose in the materials–namely recall follow-up, reconciliation and random verification to assure the recall has been complete–tasks accommodating the business requirements associated with any recall irrespective of any prospective litigation. SJM contends

that these documents "embody" requests or rendition of legal advice. As discussed above, while these documents may have words which were the result of legal advice (as do a wide variety of non-privileged documents in corporate life), this does not mean that these documents are communications seeking or rendering legal advice, which the content of the documents demonstrate they are not. See pp 5-7 supra.

Document E-89 and 90: Lawyer-client privilege objection sustained. These documents taken together along with Ladner's affidavit sufficiently evidence legal input from Ladner relative to recall instructions.

Document F-1 to F-7: Lawyer-client privilege objection sustained. These documents (largely handwritten notes and a couple of memos) were written by non-lawyer Vetter, who is SJM's director of finance. The Ladner affidavit indicates that Vetter was asked by legal to prepare the materials for legal to enable legal to provide advice in respect to SJM's public financial filings and that the materials were in fact used by Ladner and O'Malley to provide such advice. The documents, while not legal in nature, do not refute this assertion, and financial (non-legal) information and how it is disclosed or presented in SEC filings implicates legal input. Accordingly, the documents constitute communications provided by client (Vetter is inferentially shown to be within the client group for this subject matter) to counsel for the purpose of SJM obtaining legal advice.

**Note re French, Dutch and Australian Regulatory (Series G) Documents:** The undersigned has found that SJM's burden relative to proving the elements of the work product privilege were met. The documents in this series and in earlier series associated with how to deal with regulatory authorities were difficult proof calls, as the documents plainly were not textbook examples of documents prepared in

anticipation of litigation, were largely devoid of any express reference to potential litigation, and did not constitute materials which would be used in any such litigation. Further, the documents expressly accommodated to some degree a business purpose of dealing with regulators. However, earlier documents with some degree of regulatory subject matter had such clear additional and often prominent public relations, customer relations, press and communications, marketing and/or other business considerations that they did not reveal SJM's strategic ideas or plans respecting regulatory activity which activity was often a close cousin to potential civil litigation. Thus, while many of the earlier documents were found not to have been prepared "because" of prospective litigation rather than to accommodate other non-litigation business needs and concerns, the content of many documents in this series evidenced (albeit at times only slightly) sufficient legal/adversary focus as to move the undersigned to find that they were prepared "because" of the prospect of litigation and likely would not have been prepared otherwise.

Document G-1 and G-2: Lawyer-client privilege objection sustained. These documents (email transmittals and draft of a proposed letter to EU authorities, are between non-lawyers with no lawyer in the transmissions. However, Gerard is in the transmissions, and again the evidence is that he was director of regulatory affairs and reported to SJM's legal department. As such, the "agency" claim with respect to Gerard (depending upon the activity) has more persuasiveness than such claim in respect to non-legal related business personnel doing their ordinary non-legal business work. See discussion at pp. 9-12 supra. But more importantly, the Ladner affidavit indicates that the draft was a product of the legal department's input and was being circulated for comment including comment. The draft is of a document the final of which would go to regulatory authority, and is a document about which the desire of SJM to have legal

input is sufficiently likely that it is inferred.

Document G-3 to G-6: Lawyer-client privilege objection sustained: These are email transmissions of a draft letter to EEA authorities in which both Ladner and Gerard are in the transmissions and where comment is being sought on the draft. The draft is of a document the final of which would go to regulatory authority, and is a document about which the desire of SJM to have legal input is sufficiently likely that its purpose is inferred.

Document G-7 to G-9, G-11 to G-22 and G-24: Lawyer-client objection overruled; work product objections sustained. There is little in these emails to suggest any are communications seeking or providing legal advice, many do not involve any lawyer in the transmission and there is little to indicate that Gerard is acting specifically at the direction or with involvement of counsel. The documents came about not for the purpose of seeking or giving legal advice, but as communications exchanging information and ideas as to how to deal with potential regulatory disputes with French, Australian or Dutch regulatory authorities. Many of the emails were prompted by or surround a memo concerning Dr or Professor Duveau marked "PRIVILEGED" from Gerard to Holmberg, which is a memo claimed by Ladner to be issued at Ladner's request, which memo anticipates litigation and expressly seeks action motivated by the prospect of regulatory disputes. The emails appear to be communications which would not have come about for reasons other than the anticipation of disputes with the subject regulators, and manifest communications relative to the resolution thereof.

Document G-10 and G-23: Lawyer-client privilege objection sustained as to the email from Flory to Ladner and others dated 5-9-2000 at 4:27 pm. Objection overruled as to the email to Flory from non-

SJM employee Mitrangas dated May 9, 2000 at the bottom half of Bates 6966 and top half of 6777, which email should be produced The first email is an email of non-lawyer (client group member) Flory to Ladner seeking legal advice. The second email cannot in any way be regarded as a lawyer-client communication as there is no client (Matrangas is a SJM distributor and not employee), and even if Matrangas was proven to be within the client group (which has not been shown), the email is not a communication to any lawyer but to a business manager Flory. The email does not seek legal advice, but business advice relative to the prospect of a registry for patient notification. The claim that Flory for purposes of this email was a lawyer's "agent" (a curious claim when as to the same-date email from Flory to Ladner, Flory was the client), is not sustained for the reasons discussed at pp. 9-12 supra. And the fact that Flory seeks legal advice about the pre-existing Matrangas email does not render the pre-existing Matrangas email privileged. As to work product, even if Matrangas was a party (which has not been shown), there is no evidence to support the claim that Matrangas prepared the email "because" of litigation, and in fact the document shows that Matrangas prepared the email for business reasons and needs expressly stated in the email.

Document G-25 and 26: Lawyer-client privilege objection sustained. These are communications from, and describing the capability of, an Australian law firm to potential client SJM, and such pre-hiring communications can be privileged.

Document H-1 to H-5: Lawyer-client privilege objection sustained. These are communications in which counsel is involved for the purpose of providing IP or contract advice relative to the Spire contract. It is assumed that the final agreements and termination letter between SJM to Spire which are the subject of these drafts have been produced.

Documents I-1 to I-3: Lawyer-client privilege objections sustained. These are communications between lawyer and client for the purpose of seeking or rendering legal advice from the SJM's legal department and/or communications which reveal lawyer client advice. (While this ruling may appear at odds with other rulings in respect to documents merely setting meetings, here the meeting was so clearly devoted to legal advice, and the email calling the meeting revealed something of the subject of the advice.)

Document I-4: Objection overruled and the document should be produced except that the handwritten notations may be redacted. This 2/10/00 email to a wide variety of persons sets a meeting to allow marketing and sales personnel to get updated on the status of the recall. Importantly the email merely sets a meeting and provides an agenda. It is not a communication which seeks or renders legal advice. However, based on the Ladner affidavit that the handnotes reflect legal input provided at the subject meeting, and the fact that the document recites that one of the five agenda items will be a "legal update", the undersigned finds that these handwritten notes are a memorial of legal input given at the meeting.

Document I-5: Objection overruled, and this email should be produced. The only basis for the lawyer-client privilege claim is that the author Gove was an "agent" of the legal department. However, as in many instance above, the content of this document shows Gove as corporate relations manager doing nothing different than one of the non-legal activities he was employed to do, namely dealing with newspaper articles, etc. The fact that Gove urged the recipients of the memo to consult with legal as to certain topics which a reporter might ask does not turn the document into legal advice, as Gove is not a lawyer. Obviously any resultant consultation with Ladner on this topic is likely privileged, but this communication is

not one in which legal advice is sought or rendered. Finally, it came into being not because of the prospect of litigation, but for the obvious business purpose of informing the addressees that a newspaper was going to be doing an article.

Document I-6 to I-10: Objections overruled, and the documents should be produced. These emails do not involve any lawyers, there is no request for or rendition of legal advice even implicitly detectable, and the emails deal with communications, website and hotline issues. The fact that the Ladner affidavit claims that the hotline idea was sponsored by the legal department does not make non-legal communications about the subject matter privileged any more than the fact that a lawyer had an idea for a corporate reorganization would make every communication between non-lawyers on the incidents of the reorganization subject to privilege protection. See discussion at pp 5-7 supra. (While Gerard is addressed or copied on a couple of these emails, he is not a lawyer and there is no evidence that the subject issues implicate any request or rendition by him of regulatory legal advice at the request and/or supervision of SJM counsel.)

Document I-11: Objection overruled for the same reasons as I-6 to I-10 and the document should be produced, except that the email from Carpenter to Keers dated 2/9/2000 at 6:29 am is privileged, not because Carpenter is an "agent" of the legal department generally, but because it has been shown that in this particular communication she passes on (is a conduit) for Ladner's legal advice.

Document I-12: Objection overruled and the document should be produced subject to redaction. This is an email string including a message from a husband relative to his patient/wife, which should be produced. This email is a communication from a non-SJM person neither a client nor a lawyer. While the

Ladner affidavit claims that Document I-12 reflects legal advice, this husband's email (preexisting any request for legal advice about it) is itself a communication totally devoid of any element of lawyer-client communications or material prepared by SJM in anticipation of litigation. However, the balance of the email string from Keers to Ladner largely focusing on the request for legal advice from Ladner re the husband's email is protected by the lawyer-client privilege and may be redacted.

Document I-13: Lawyer-client privilege objection sustained as to the email from Ajamil to Healy with a copy to Ladner as a request for legal advice. All objections are overruled as to email from Kuper to Ajamil which should be produced, as it is an email which is not a communication involving any lawyer and is devoid of even an implicit request for legal advice, but rather is communicating business information as to patient health and cost issues. Further, there is no showing that Kuper is in the client group. The fact that preexisting emails between non-lawyers or from patients to SJM ultimately were presented to Ladner or other SJM lawyers for advice does not mean that these preexisting or otherwise existing documents are or become communications seeking legal advice, or that they were prepared by SJM "because" of the prospect of litigation rather than the obvious purpose to communicate patient information to or within SJM.

Document I-14: Objection overruled, and the document should be produced. This power point presentation explains SJM's medical reimbursement program. It is devoid of any implicit request for or rendition of legal advice. There is no proof as to scope of the audience (except Ladner's information and belief that it was not shown "outside the company"), and no showing of the names of those who received or that all who were part of its audience were within the client group with a need to know any claimed related legal advice (as opposed to a need to know how the MERP worked). Indeed, even Ladner's information

and belief is that it was presented to those involved in implementing the plan, which is not the test–the test being those with a need to know and those necessarily involved in communicating requests for or receipt of legal advice, not such involvement with the subsequent business program. As noted earlier, the fact that legal had input into the program does not of course make privileged every subsequent communication as to the subject or incidents of the program to facilitate non-lawyer SJM employees' related implementation. See pp 5-7 supra. And the want of a work-product privilege is all but admitted when Ladner states "Although MERP was created as an aid to Silzone patients, it is fair to say that it, and the related PowerPoint were created in anticipation of litigation as the company was facing litigation at the time it was implemented." As discussed above, every document created at the time litigation was anticipated does not come into being "because" of the prospect of litigation rather than to accommodate business needs, and this powerpoint plainly came into being (was "prepared") as a communication device to instruct those who would implement this reimbursement program and to aid patients. Unless SJM is claiming that the reason they did the MERP was for litigation purposes (and not the expressed aid to patient and related customer/physician relations purposes), this plan cannot be said to be prepared because of the prospect of litigation. But even if MERP was designed as part of a strategy to benefit SJM's litigation position, mitigate patient damage or the like, the communication to simply explains how to implement such a program and was prepared for an obvious business purpose which dominates over any prospect of litigation motive.

Document I-15: Lawyer-client privilege objection sustained. While this email transmission and draft is not with any lawyer, it is a chain expressly designed as a transmission to get to counsel for legal input.

Document I-16: Lawyer-client privilege objection sustained. This is a communication between client and counsel for the purpose of legal advice.

Document I-17: Objections overruled, and this document should be produced. These emails involving a patient and non-lawyer/non-client are not to or from any lawyer and do not reveal that they are a request for or rendition of legal advice. While one may argue that the preparation of a proposed response to this patient by a non-lawyer could be work-product, the undersigned does not find that the emails came into being because of the prospect of litigation, but rather would have come into being because of the obvious business need for SJM to answer an inquiry of its customer-patient regardless of whether there was or was not a prospect of litigation. (A product-related communication to a customer to whom a response is required as a matter of business necessity is not the same as a communication to a party threatening suit, the latter of which may be created prominently because of prospective litigation with such party and would not come into being otherwise, the former of which is created to meet a business need and would seemingly come into being even without any concern about the customer suing–a concern which here was not the subject of any customer expression. In short, it is a close call, but the undersigned found–particularly given the lack of any lawyer involvement--that SJM did not prove that the document was prepared because of the prospect of litigation as opposed to the business need of customer response.)

Document I-18: Lawyer-client privilege objection sustained. While SJM characterizes this document with I-6 and I-7 about which the undersigned has overruled objections, this document is qualitatively different on its face, as it corroborates by its content the passage of legal advice claimed to be involved in the strategy of dealing with patient requests.

Document I-19: Objection overruled and the document should be produced, as there is no lawyer involvement in these documents which came into being for reasons obvious on their face which are not the seeking or giving of legal advice or because of the prospect of litigation. Nonetheless, SJM may redact the three sentences in the middle of Bates 7469 starting with "I asked" and ending with "weeks ago", all of which recite input inferred to be legal in nature from Ladner.

Document I-20 and I-21: Lawyer-client privilege objection sustained, assuming that these drafts were produced by outside counsel–which is unclear from the Ladner affidavit which merely states that "an initial draft version of these letters were prepared" by outside counsel. It is unclear who prepared the two drafts Document I-20 and I-21 and whether these were submitted to SJM's legal department for review. A follow-up affidavit within 10 days from the date of this report so indicating is a condition to the privileged being sustained–otherwise the privilege objection is overruled.

Document I-22 and I-23: Lawyer-client privilege objection sustained. These emails involve requests for and provision of information from SJM's outside legal counsel. While the content of the emails relate to certain costs and do not appear to be legal in nature, the undersigned will infer some mixed legal/business nature of the communication given the fact that the communication is directly with outside counsel. See discussion at pp 2-5 supra.

Document I-24: Objections overruled, and this document should be produced. These emails involve no lawyers in the transmission, and while there is a reference to future inquiry with Ladner, these emails are not communications which either seek or render legal advice.

Document I-25: Objections overruled, and this document should be produced. This email, while copied to Ladner, neither expressly nor implicitly seeks legal advice. Its business purpose is obvious from its content.

Document I-26: Lawyer-client privilege objection sustained with the exception of the emails from and to Micah Backer, as such emails are from and to a person unrelated (and apparently unknown) to SJM, which emails should be produced.

Document I-27: Objection overruled. See discussion at I-17 above.

Document I-28: Lawyer-client privilege objection sustained. This is a direct communication to Ladner with legal content and both evidences and/or infers a request for legal input.

Document I-29: Lawyer-client privilege objection sustained as to the two communications in which Ladner is asked for advice as to an anonymous letter related to a claimed patient death, and in which SJM asks for outside legal counsel relative to this issue. The preexisting letter subject to this inquiry (Bates 0817) is to a non-lawyer SJM employee (Goodband) from a person outside SJM who is unrelated (and apparently unknown) to SJM and is plainly not a lawyer-client communication and just as plainly was not even prepared by SJM, let alone prepared because of SJM's prospect of litigation. This letter should be produced.

Document I-30: Lawyer-client objection sustained, as this email exchange is between Ladner and client, and is a request for and rendition of legal input from Ladner.

Document I-31 and 32: Lawyer-client privilege objection sustained, as this email string constitutes transmissions of communications in which legal advice is sought or given form or by Ladner.

Document I-33 and I-34: Lawyer-client privilege objection sustained, as this is an email transmittal to Ladner's assistant, and the evidence is that the data was directly sought by Ladner. However, the transmitted document is a printout of explants recorded in a SJM database. Such information, if prepared in response to Ladner's request, may in this form be privileged. If the data contained in these documents were preexisting in such form and did not come into being for purposes of communicating the data to Ladner, the attachments should be produced. In any event, this ruling does not mean that the underlying data in SJM's database is privileged just because it was printed out and supplied to Ladner at his request. If (as it appears) the underlying electronically stored data was preexisting historical business record or data, it is not protected by the lawyer-client privilege. Whether the raw electronic data is work-product turns on whether it was gathered and electronically stored "because" of the prospect of litigation rather than for business record keeping reasons.

Document I-35: Lawyer-client objection sustained. This is a transmittal of a draft directly to Ladner for comment, and constitutes a communication seeking legal advice.

Document I-36: Objection overruled, and the document should be produced. This is an email transmittal between non-lawyer Daul to non-lawyer Schultz with a copy to Ladner and a copy to non-lawyer Denise Johnson. There is insufficient evidence to show that non-lawyers Daul and Johnson are within the client group in accordance with the caselaw and not enough information as to Johnson to allow an inference relative to this subject matter and need to know. (In I-33 Denise Johnson was also not shown to have been in the client group, but there was an inference that since she supplied the data, she was necessary to its supply. But as to this document, she is a recipient of the data. As to Daul, he is inferred to be within

the client group as to this document for the same reason.) But more importantly, the transmittal appears to be business data on implants in Canada, is not legal in nature, and the document does not indicate any request or rendering of legal advice. While the Ladner affidavit recites that the material was sought by him, neither he nor his assistant (as in I-33 and I-34) are the direct recipients, while non-lawyer Schultz is. Since the claim is that this material was being sought by Ladner for "my ongoing work in defending" potential claims, there is no showing as to why non-lawyer Schultz was the direct recipient with Ladner merely copied, nor any showing that non-lawyer Schultz as respects the defense of claims is in the client group–necessary for the communication with a need to know. In any event, as was the case with respect to I-33 and I-34, the underlying business data transmitted in I-36 (while if sought may have been in a particular form which did not preexist) is nonetheless a computer printout of a compilation of electronically stored (preexisting) data. If it preexisted in the form transmitted in I-36 it is not subject to the lawyer-client privilege. If not, the raw electronic data (as opposed to the printout in I-36) seemingly would not be subject to the lawyer-client privilege. Whether the raw electronic data is work-product turns on whether it was gathered and electronically stored "because" of the prospect of litigation rather than for business record keeping reasons.

Submitted to the Court and Parties
this 11th Day of May, 2004.

Richard B. Solum

Richard B. Solum
Special Master