**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: | : MDL DOCKET NO. 1396 |
| ST. JUDE MEDICAL, INC., | : (Videotaped) |
| SILZONE HEART VALVE PRODUCTS | : Deposition of: |
| LIABILITY LITIGATION, | : DR. ROBERT W.M. |
| | : FRATER |
| | : |
| | : |
| | : |

\- - - - - - - - - - - - - -

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LINDA M. HOFFMANN, a Certified Shorthand Reporter and Notary Public, held at the office of REED SMITH, LLP, 599 Lexington Avenue, New York, New York, on Friday, May 14, 2004, commencing at 9:00 in the forenoon.

Page 10

Frater - direct
than that. It just occurred to me that there might be, given the number of articles, that some might be missing. I guess the question I have is that omission is just an accident, it's not an article that you're disavowing?
A. Do you have the date of that so I can get it into my CV?
Q. I believe -- yeah. I thought I had it. Bodner, Butchart, Bamford, Besselaar, Grunkemeier, and Frater, "Proposal for Reporting Thrombus Embolism and Bleeding After Heart Valve Replacement," in the Journal of Heart Valve Disease, 1994, March?
A. Okay. Good. I'll make sure that gets in.
Q. Okay. All of these -- all of these people; Bodner, Butchart, Bamford, Besselaar, Grunkemeier, these are all people who you've collaborated with in the past, sir?
A. On that article, yes.
Q. Okay. And all of them you consider your colleagues?
A. Yes.
Q. Okay. Out of curiosity, what was your

Page 11

Frater - direct
proposal for reporting thrombus embolism and bleeding, do you recall?
A. Well, the issue that was important was distinguishing thrombosis from embolism.
Q. Okay.
A. And that was the real importance of that particular paper. There have been many proposals, and I've been part of others, for judging when somebody has an embolism particularly; and if you lump them together, it basically doesn't provide clarity to the subject.
Q. Okay. So -- and when you lump the embolism and the thrombus together?
A. Yes.
Q. And what was the issue of adding the bleeding? Was that to include it and lump that together in there or no?
A. Bleeding is a complication of the use of anticoagulation for mechanical valves. If you just look at the thrombosis and embolism as a complication, you omit a secondary consequence of the tendency for mechanical valves to have thrombus and embolus. So it seems reasonable to add that at least as a risk that patients must

Page 12

Frater - direct
experience if they're going to use a mechanical valve.
Q. And was all this gathered so that one -- as a mechanism of analyzing the differences between valve types?
A. The experience of the patient is what the importance is to that.
Q. Agreed. But one of the things that one is looking like in determining the experience of the patient is that you're putting a valve, be it tissue or mechanical, in someone. Correct?
A. Yes.
Q. Okay. So this was a mechanism so that you could gather information into a format so that one may compare the experiences of a group of patients with one type of valve versus another, and then draw conclusions therefrom. Right?
A. That is one of the reasons, yes.
Q. And as a matter of fact, manufacturers use that, for example, your company would utilize that information. They would gather the rates of thrombus, embolism, explant, death, of various St. Jude valves for marketing purposes. Correct?
A. Well, yes.

Page 13

Frater - direct
Q. Okay. And that's important to know. If you've got a valve that has a better TE profile, thromboembolism profile than, say, a CarboMedics heart valve, that is something that the company wants to make known to surgeons, and that surgeons want to know. Correct?
A. Yes, and in fact, this was not written from a commercial part of view. This was an academic article.
Q. Um-hum. I understand that. But basically, you would agree that there is methodology from which one can compute the TE incidents rates, the paravalvular incidence rates, and explant rates. Things of that sort?
A. Yes.
Q. And once again, that is important information for a responsible company to know regarding their profits. Correct?
A. Yes.
Q. And would you agree that St. Jude knows those particular rates for its valves?
A. Yes.
Q. And that as Medical Director, that's information that you're -- that's known to you?

Page 14

Frater - direct
A. Yes.
Q. Okay. Now, I would like to get back t -- and I apologize we digressed somewhat -- to your curriculum vitae. I would like to get back to that.
Could you outline for us just briefly your education from medical school forward, sir.
A. I went to medical school at the University of Cape Town, starting in 1947, graduating in 1952. Internship at Groote Schurre Hospital, 1953. Research job in the Department of Surgery at the University of Cape Town, 1954. Went to London to do the basic science course for the Royal College of Surgeons Fellowship, and that was in '54. Did a job in London in the emergency room, which is a necessary job for the final taking of the Fellowship at the College of Surgeons.
Went to the Mayo Clinic. Spent six years in general and thoracic surgical training. Came back and did a tour of European cardiac surgical centers. That was a scholarship that I won, and took the final examination for the Royal College of Surgeons.

Page 15

Frater - direct
Q. Okay. And you're --
A. Sorry. That's all right.
Q. No, no.
A. That pretty well finishes it.
Q. Okay. Just for the completeness sake. When you say Cape Town, you mean Cape Town, South Africa. Correct, sir?
A. There is no other Cape Town.
Q. Okay. Are you Board Certified in the United States, sir?
A. Yes.
Q. Okay. And you're boarded in which field, sir?
A. General surgery and thoracic surgery.
Q. Okay. And over the course of your career, you spent most of your time following your -- your last training was at the Mayo Clinic. Correct?
A. That is correct.
Q. Okay. And following the Mayo Clinic, at that time you had the privilege of working a bit with Walter Lillehei?
A. No.
Q. No? I'm sorry. I was under the

Page 16

Frater - direct
impression --
A. C. Walton Lillehei is a very great friend of mine. But he was at the University of Minnesota, I trained at the Mayo Clinic, which was 90 miles away, under John Kirklin.
Q. It was during the time that you were at the Mayo that you became acquainted with Dr. Lillehei?
A. That is correct.
Q. Okay. And eventually, is it fair to say he was one of your mentors?
A. Not really a mentor, because I -- a mentor to me is somebody you work with for months, years, something like that. He was just somebody I knew, and we exchanged views from the very earliest days.
Q. Okay. Fair enough.
In the -- in your curriculum vitae, you indicate that you have won several honors. You know, could you explain those to us.
A. I'm not sure what you're referring to.
Q. Okay. On page one, the numbered page one. You'll see under there awards and honors.
A. Well, all right.

Page 17

Frater - direct
Q. Okay? For example, the Mayo Foundation Distinguished Alumnus Award. Do you recall what that was for?
A. Well, I dare say they're the ones who know what it was for. They told me they'd awarded it to me in 2001, and I was happy to accept their approval, shall we say.
Q. Okay. Out of all of the awards and honors listed, is there any one in particular that you're most proud of?
A. Perhaps the Bronx Museum of the Arts Humanitarian Award.
Q. Okay. But is that for your work in medicine or is that for work --
A. It's for my work in medicine.
Q. Okay. Now, for the greater portion of your career, you spent your surgical career, you spent that at which institution?
A. At Albert Einstein College of Medicine and Montefiore Medical Center.
Q. Are those -- I'm not familiar with the structure of those. Are they related in any manner?
A. They have a lousy marriage.

**EXHIBIT B**

# Proposal for Reporting Thrombosis, Embolism and Bleeding After Heart Valve Replacement

Endre Bodnar, Eric G. Butchart, John Bamford, Antonius M. P. H. Besselaar, Gary L. Grunkemeier, Robert W. M. Frater

The Journal of Heart Valve Disease 1994;3:120-123

Scientific analysis requires a comprehensive set of relevant, unambiguous definitions to describe all attributes of a chosen subject. Meaningful reporting calls for uniformity and consistency in the interpretation and use of those definitions in presenting or discussing experiences, clinical or experimental findings.

These fundamental requirements were recognized by the joint Ad Hoc Committee of the American Association for Thoracic Surgery (AATS) and The Society of Thoracic Surgeons (STS) when the Committee's official Guidelines were formulated for reporting events after heart valve replacement (1,2). These Guidelines created clarity in many aspects of a profoundly complex subject, and became generally accepted and adopted. However, recent advances in the understanding and management of thrombosis, embolism and bleeding (TEB) made it increasingly obvious that the relevant section of the above Guidelines would need further elaboration.

An Ad Hoc Working Group was therefore formed from a group of experts (3), sponsored subsequently by The Journal of Heart Valve Disease with the aim of (a) identifying problematic areas and (b) making recommendations on an extended set of definitions and reporting requirements regarding thrombosis, embolism and anticoagulant related bleeding in order to enhance both scientific accuracy and the comparability of reported data. The conclusions and recommendations of this Working Group are presented in the following.

## Thromboembolism versus thrombosis and/or embolism

### Problem

The current use of this word in general, and regretfully by the above Guidelines in particular is incorrect and potentially misleading, because it is applied as a summary term to include both *thrombosis and embolism*, whereas the meaning of this word is *embolism caused by a thrombus (blood clot)*. Furthermore, valve thrombosis and embolism are widely different pathologic entities with dissimilar consequences, which warrant different methods of treatment.

### Recommendations

In order to avoid ambiguity, thrombosis and embolism should be reported separately as follows:

**Valve thrombosis can be obstructive or non-obstructive.**

*Obstructive valve thrombosis* should be defined as accumulation of thrombus on a replacement valve with (potentially) catastrophic hemodynamic or embolic consequences, as opposed to

*Non-obstructive valve thrombosis* as an incidental finding, without (potentially) catastrophic hemodynamic consequences (thrombus on a sewing ring, on the outflow aspect of a bioprosthesis, etc.), whether discovered by echocardiography, during reoperation or at autopsy.

*The diagnosis of valve thrombosis* should be accepted not only if it was confirmed by autopsy or reoperation, but also by echocardiographic evidence in conjunction with thrombolytic therapy, i.e. if there are clinical symptoms of valve thrombosis present and a mass can be visualized by echocardiography and after thrombolytic treatment this mass, together with the clinical symptoms disappears, the diagnosis of thrombotic occlusion should be considered as confirmed.

For all cases of obstructive valve thrombosis confirmed by surgical re-intervention, autopsy or echocardiography, the prothrombin time should be specified in terms of International Normalized Ratio (INR) (vide infra).

For statistical purposes the primary assessment should include all instances of valve thrombosis in calculating eventfree proportions, hazard functions or linearized rates. The latter, however, should be accepted only as of approximating value unless the constant nature of the event is proven.

Further details can and should be given after this primary assessment by stratifying the patient population according to anticoagulant status. A caveat should be introduced here: If only those events are entered into the statistics where the patients were known to be within the therapeutic INR range, the corresponding patient population (number at risk) should be decreased accordingly from the total number to only

Address for correspondence:
Endre Bodnar MD, The Journal of Heart Valve Disease, 9 West End Court, West End Avenue, Pinner, Middlesex, HA5 1BP, United Kingdom

© Copyright by ICR Publishers 1994

those in whom the anticoagulant status was known.

If the INR data contained in available patient files are limited to those who actually suffered valve thrombosis, this fact should be clearly stated in reports, and the stratified statistics qualified accordingly.

## Embolism

### Problems

There are at least five problematic areas in the current practice of defining and reporting embolism:

1. It must be acknowledged that not all cerebral events, whether ischemic or hemorrhagic, originate from the prosthesis or because of its presence or because of anticoagulation. The assumption that in the presence of a replacement valve all 'embolic' events are valve related is incorrect, the present requirement that they should be reported as such is potentially misleading, and the entire concept as it stands is unsafe because it might undermine the impetus for treating or eliminating additional risk factors.

2. The terms "transient vs. permanent and minor vs. major" are ambiguous. The simplest example is a massive femoral embolism which is operated successfully and the patient's recovery is full. It was a "transient" event but it could hardly be called "minor". Can the same event be "transient" and "major"? How would this femoral embolism rank in severity when put side by side with a range of cerebral emboli or vice verse? Was this embolism "potentially permanent"?

3. The definitions of cerebrovascular events according to the Guidelines do not correspond with those used to define similar events in neurology or in other fields of cardiology. Therefore, comparison in broad terms is impossible.

4. Traditionally, unless a CT scan was done within 14 days following a cerebrovascular event, it was impossible to differentiate with certainty whether the event was primarily caused by occlusion (ischemia) or hemorrhage. As a consequence, the allocation of an event to bleeding or occlusion was often arbitrary or based only on clinical judgement and, in either case, may have provoked controversy. The widespread use of CT and/or MRI often allows this distinction to be made now.

If any progress is to be made in furthering our understanding of pathogenetic mechanisms of cerebral events in patients with prosthetic valves, it is essential that all reasonable efforts are made to distinguish between ischemic and hemorrhagic events. In the vast majority of cases this is possible using a combination of CT and MRI features. Authors should therefore be encouraged to report cerebral events as either ischemic or hemorrhagic (hemorrhagic transformation counts as ischemic), stating the methods they have used to distinguish between them.

5. Stating the level of anticoagulation in reports on thrombosis and embolism has not been set as a compulsory requirement by the Guidelines, and it is omitted in the vast majority of such publications. This makes statements on 'embolic' incidences meaningless.

As a result of problems 1. - 5., the vast majority of data contained in the medical literature addressing thrombosis and/or embolism after heart valve replacement cannot - and should not - be used for scientifically valid comparisons (4,5).

### Recommendations

1. An unambiguous, detailed statement on anticoagulation should be included in all articles and presentations reporting on thrombosis embolism and bleeding (vide infra, Anticoagulation).

2. Embolism should be categorized by localization as

(a) Pulmonary;
(b) Cerebral;
(c) Systemic (non-cerebral).

3. Bleeding should be categorized by localization as

(a) Intracranial including intracerebral and extracerebral i.e. subarachnoid, subdural and extradural hemorrhage;
(b) Systemic (non-intracranial).

4. "*Cerebrovascular accident*" should be introduced as a term to include both cerebral embolism and intracranial bleeding in statistical assessments to avoid the potential diagnostic bias mentioned above, unless safe and generally adopted methods of differential diagnosis between occlusive (ischemic) and hemorrhagic cerebral lesions make such a distinction feasible. This differentiation ought to become standard clinical practice as is the case in many institutions already. The duration of symptoms of a cerebrovascular accident (CVA) should be defined as one of the following three:

(a) Transient Ischemic Attack (TIA);
(b) Reversible Ischemic Neurological Deficit (RIND) or 'minor stroke';
(c) Major stroke.

(a) TIA includes only focal neurologic symptoms of vascular origin lasting for less than 24 hours. It is the duration of symptoms rather than the presence or absence of morphologic consequences which determines the classification.

(b) RIND or minor stroke includes only neurologic symptoms of vascular origin lasting for longer than 24 hours but resolve completely within three weeks. Only the symptoms but not necessarily asymptomatic signs, for example an extensor plantar response, should

J Heart Valve Dis
Vol. 3. No. 2
March 1994

resolve within the three-week period.

(c) Major stroke is the sudden onset of a focal neurologic defect of vascular origin, the symptoms of which last longer than 21 days or lead to prior death.

These definitions can readily accommodate any type of intracranial ischemia or bleeding without ambiguity and would provide for comparison with neurologic or other cardiologic series.

5. Systemic (non-cerebral) embolism is the sudden, symptomatic occlusion of an artery, and it should be defined as

(a) Minor, if the symptoms resolve completely without medical or surgical intervention;

(b) Major, if there are permanent consequences or they were avoided only by medical or surgical intervention (see the above example of a femoral embolism);

(c) Fatal, if the outcome is death either as the direct consequence of the embolism or that of any of the potential complications within 30 days or during the same course of hospitalization.

6. Systemic (not intracranial) hemorrhage should be reported according to the same three criteria as systemic embolism.

7. It appears that TEB complications would be best defined by four statements:

(a) Valve thrombosis
(b) CVA, specified whenever possible as occlusive (ischemic) or hemorrhagic in origin, in terms of TIA, RIND (minor stroke), major stroke;
(c) Systemic (non-cerebral) embolism;
(d) Systemic (non-cerebral) bleeding.

As an overall statement, freedom from a) through d) could also be calculated.

8. Patient related recognized risk factors for ischemic cerebral events are atrial fibrillation, left atrial thrombus, spontaneous left atrial echo contrast, concomitant coronary heart disease, arteriosclerosis, congestive heart failure, smoking, diabetes, hypertension, hyperlipidemia, prior stroke or TIA and hypercoagulative hematologic disorders; for hemorrhagic events they include prior bleeding, hypertension, blood coagulation defects and vasculopathies causing bleeding.

With our current knowledge it is impossible to quantitate the effect of the above risk factors on the rate of thrombosis, embolism and bleeding after heart valve replacement. Nonetheless, at least three approximations are recommended to be made:

A) The proportion of patients with additional risk factors within the cohort under investigation should be assessed and reported;

B) Whenever the size of the patient population permits it, it should be stratified by risk factors, at least into four groups, i.e. those with and without any additional risk factors for ischemic or hemorrhagic events;

C) With a large enough set of data multiple regression should be completed to denote the statistical significance of each risk factor, including model and type of the replacement valve itself.

9. Anticoagulation should be stated in terms of

- Drugs used, including antiplatelet drugs if any;
- Method and frequency of hematologic control;
- Target INR and actual INR achieved (6).

The latter is best expressed by stating the mean INR during the follow up for the entire patient population and the proportion of patients who were found, on the average, below or above the target INR range.

It should be stressed that a statement on the level of INR at the time of an event may be controversial. The best example is a case where oral anticoagulation was stopped for any reason and restarted subsequently. If this patient suffers a valve thrombosis weeks or months later, the INR may well be within therapeutic range at the time of the event, but the acceptance of "valve thrombosis with therapeutic INR level" would be grossly misleading. Individual interpretation is clearly necessary in such cases.

These proposals are not presented as guidelines, but the Ad Hoc Working Group sincerely hopes that they will serve as a basis for modifying the existing set of guidelines. This could be achieved either by the relevant Societies on either side of the Atlantic and the Pacific, or by the relevant, leading periodicals adopting the same set of reporting guidelines by consensus. The need to reconsider our approach to sudden death after heart valve replacement has also become obvious recently (7). The Journal of Heart Valve Disease will endeavour to help and promote this long overdue intellectual process.

**References:**

1. Edmunds H Jr, Clark RE, Cohn LH, Miller DC, Weisel RD. Guidelines for reporting mortality and morbidity after cardiac valvular operations. J Thorac Cardiovasc Surg 1988;96:351-353
2. Edmunds LH Jr, Clark RE, Cohn LH, Miller DC, Weisel RD. Guidelines for reporting mortality and morbidity after cardiac valvular operations. Ann Thorac Surg 1988;46:257-259
3. Butchart EG, Bodnar E (eds). Current Issues in Heart Valve Disease: Thrombosis Embolism and Bleeding. 1st edition, Lomdom, ICR Publishers, 1992
4. Grunkemeier GL, London MR. Reliability of comparative data from different sources. In Butchart EG, Bodnar E (eds). Current Issues in Heart Valve Disease: Thrombosis Embolism and Bleeding. 1st edition,

ty addi-
events;
: regres-
ical sig-
nd type

of

any;
trol;

iean INR
pulation
d, on the

e level of
rsial. The
ation was
uently. If
weeks or
ierapeutic
ptance of
el" would
etation is

elines, but
that they
ting set of
ie relevant
Pacific, or
the same
ie need to
after heart
ecently (7).
leavour to
ial process.

DC, Weisel
l morbidity
Cardiovasc

Miller DC,
ortality and
s. Ann Tho-

ies in Heart
d Bleeding.
2
of compar-
art EG, Bod-
lve Disease:
1st edition,



Lomdom, ICR Publishers, 1992:464-475

5. Bodnar E. A critical assessment of thrombosis and embolism reporting methods. In Butchart EG, Bodnar E (eds). Current Issues in Heart Valve Disease: Thrombosis Embolism and Bleeding. 1st edition, Lomdom, ICR Publishers, 1992:476-484
6. van den Besselaar AMHP. Recommended method for reporting therapeutic control of oral anticoagulant therapy. Thrombosis and Haemostasis 1990;63:316-317
7. Butchart EG. Editorial: The significance of sudden and unwitnessed death after heart valve replacement. J Heart Valve Dis 1994;3:1-4

# SECOND ANNUAL ROSS COLLOQUIUM

(Preceding the 1994 AATS meeting)

*Date:* Sunday, April 24, 1994
*Time:* 15.00 - 18.30
*Venue:* New York Hilton, New York

## PROGRAM:

- **Ross Registry update**
- **Aortic roof replacement with pulmonary autograft - trends**
- **Infective endocarditis and the pulmonary autograft**
- **Technical misadventures**
- **Echocardiographic assessment of aortic root growth and dilation**

Attendance is free. The meeting will be of particular interest for surgeons currently performing or interested in performing the Ross procedure (pulmonary autograft insertion). For further information regarding active participation and/or attendance contact.

James H. Oury MD
Cardiovascular and Thoracic Surgery
554 West Broadway
Missoula, MT 59802, USA
Tel: (406) 728-4558
Fax: (406) 728-4768