**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC. SILZONE HEART VALVES PRODUCTS LIABILITY LITIGATION | : : : : : | MDL DOCKET NO. 1396 |

**JOINT STATUS CONFERENCE REPORT**

**JULY 15, 2005 STATUS CONFERENCE**

## I. STATUS OF 8TH CIRCUIT APPEAL

On June 20, 2005, the parties appeared before the 8th Circuit and presented argument. The parties are awaiting the Court's decision.

## II. STATUS OF DISCOVERY

Plaintiffs will be taking three (3) additional depositions over the next 30-45 days which should complete all generic fact depositions. There are two (2) issues still extant with respect to discovery. The first relates to compliance with Special Master Solum's decision relating to Answers to Interrogatories and the second relates to a matter previously presented to the Court concerning obtaining AVERT data in SAS format.

### A. Leaflet Mobility Interrogatories.

#### 1. PSC's Position

The PSC asks the Court to order SJM to forthwith fully and properly respond under oath to the PSC's Leaflet Mobility Interrogatories as directed by Special Master Solum in his Recommendation Report of May 16, 2005. The PSC also requests that the Court order SJM to reimburse the PSC for its share of the Special Master's fees relating to the Recommendation.

The PSC had asked SJM to provide by way of interrogatory answer specific information regarding leaflet mobility restriction, a clinical sign that a mechanical valve is not working properly which may be due to a thrombus or pannus overgrowth event. Specifically the PSC asked for:

(1) the leaflet opening standards and specification SJM maintains for its mechanical valves; and

(2) the incidence or prevalence rates of restricted leaflet mobility occurring in its mechanical valve product lines as determined by cinefluoroscopy (a moving picture x-ray procedure).

SJM's web site, SJM.com, indicates that such standards exist. On it SJM provides the medical profession with tables of purported standards or specifications for the opening angles that its mechanical valve's two leaflets (its "bi-leaflets") should open to when operating normally. These published standards or specifications, which according to the tables on SJM's website are the same over all of SJM's mechanical valve product lines, allows a doctor to determine via cineflorscopy if the valves leaflets are opening normally. What is looked for is to what extent the leaflets do not open parallel to each other and/or are not opening to the manufacturer's specifications. Such phenomenon, when observed, is called restricted leaflet mobility. Pannus (healing tissue) overgrowth and thrombus (clotted tissue), two adverse events which are associated with Silzone toxicity that are at issue in this litigation, can cause restricted leaflet mobility.

SJM, in the PSC's view, refused to satisfactorily provide sworn, responsive information to its restricted leaflet mobility interrogatories. Following several meet and confers attempts to resolve this dispute, the PSC presented the issues to Special Master Rick Solum. On May 16, 2005 Special Master Solum issued a Recommendation directing that SJM answer the interrogatories (as such had been clarified by the parties' meet and confer efforts) under oath by:

1. Specifically stat[ing] any leaflet motion or mobility specifications or standards (including any specifications or standards for hemodynamic performance) applicable to the subject valve. To the extent such specification(s) or standard(s) are found in the previously produced design drawings or specifications for the Master Series valve, then to such extent SJJVI may, in lieu of so answering the question, state specifically the Bates number of the page(s) and location or statements on such Bates numbered page(s) where such specification or standard appears.

2. Specifically identify[ing] any studies, reports, data or the like respecting leaflet motion restriction or impingement on cinefluoroscopy, to the extent such studies, reports, data, or the like are either: (i) known to SJM as of the date hereof; or (ii) are within SJM's possession or control as of the date hereof. The does not require SJM to identify such materials which could be known or could be possessed by virtue of literature searches or other research if such materials are within neither categories (i) or (ii) of the immediately preceding sentence.

SJM on or about July 5th served supplemental answers on the PSC's which in the PSC's view failed to satisfy Special Master Solum's recommendation. The supplemental answers were deficient in the following respects:

1. No standards (such as SJM lists in tabular form on its SJM.com website were provided and an examination of the documents cited by SJM as containing design specifications had absolutely nothing to do with leaflet opening or restriction standards or specifications. The PSC believes SJM response to the Special Master's Recommendation in this regard was so obviously deficient that it constitutes a sanctionable bad faith response.

2. No incidence and prevalence data or specific reference to articles containing same is provided. Rather SJM simply attached a marketing brochure entitled "Over 1001 articles". This publication is an alphabetical bibliography of 1022 articles relating to SJM's mechanical valves that SJM's claims, according to its brochure's introduction, "critically assessed [its] valve inside and out…." Despite it apparent knowledge of the contents of these articles, its supplemental answers nowhere specifies which of the 1,022

articles referenced in bibliography are responsive. SJM's supplemental response, in the PSC's view, does not comply with the letter or spirit of the Special Master's Recommendation .

2. SJM's Position

SJM submits that it has fully and properly responded under oath to the PSC's Leaflet Mobility Interrogatories.

As a preliminary matter, SJM had steadfastly maintained from the day it was served with these interrogatories that the PSC is engaged in a fishing expedition. As this Court is well aware, the focus of this litigation has always been on the Silzone sewing cuff. SJM is at a loss to understand how the request for identification of "leaflet mobility specifications or standards," as that term has been defined and redefined by the PSC, could possibly be calculated to lead to the discovery of admissible evidence regarding whether the Silzone valve is associated with an increased incidence of pannus overgrowth or thromboembolic events. Simply saying that the information is relevant is not enough.

In addition, the Court should be aware that there has been a great deal of back and forth between the parties with regard to these interrogatories as SJM has endeavored to understand exactly what the PSC is looking for and why. These exchanges resulted in substantial modifications to the original interrogatories. In fact, Mr. Solum commented in his order that the PSC's requests have been somewhat of a "moving target", making it difficult, if not impossible, for SJM to provide responses which were satisfactory to the PSC. SJM urges this Court to review all of the briefing that was submitted to Special Master Solum so that his order can be interpreted in context. With this background in mind, SJM's response to the PSC's most recent requests follows.

First, the PSC is mistaken in its claim that SJM is refusing to produce internal "leaflet mobility specifications or standards" applicable to its bi-leaflet valves. While SJM's website provides data from two published medical articles regarding the hemodynamic performance of its bi-leaflet valves and information for clinicians on the use of cinefluoroscopy in evaluating valve performance, the PSC has cleverly, but without justification, chosen to characterize this information as SJM's internal standards and/or specifications for leaflet mobility. But this information does not constitute internal standards and/or specifications for leaflet mobility. In fact, no such internal standards or specifications exist; rather, internal standards and specifications exist for the design components of the product (e.g. requirements for the dimensions of the components) which ensure that the leaflets will have proper mobility. The data contained on the website **is simply information from published studies** which SJM passes on to clinicians regarding the hemodynamic performance of a SJM bi-leaflet valve built to SJM's internal design specifications.

The second issue is whether SJM should be compelled to identify and/or produce published medical literature which is equally available to the PSC. It is hornbook law that the duty to make reasonable efforts to obtain requested information does not apply to information equally available to the propounding party. The law is also clear that discovery proceedings should not be used to cast upon defendant the burden of establishing plaintiff's case when plaintiff can at least as readily establish the requested facts. United Cigar-Whelan Stores Corp. v. Phillip Morris, Inc. (1957) 21 F.R.D. 107 (D.C.N.Y.). Here, SJM has already responded that it does not have any internal studies or documents responsive to the PSC's requests. Notwithstanding SJM's responses, the PSC wants SJM to undertake a literature search to determine if any responsive documents exist in the public domain. But clearly the PSC is in the

best position to review the published medical literature and determine what might be relevant to their theories, especially in this instance when SJM has no idea what the theory is. SJM is not obligated to undertake efforts to prove plaintiffs' case by gathering and reviewing published literature which is equally available to the PSC and then guessing about what might be relevant. Notably, the PSC does not represent that it or its experts are unable to obtain this publicly available information on its own through medical literature searches. SJM has attempted to assist the PSC in their search by providing a bibliography of the articles which discuss SJM mechanical heart valves. The PSC is in a much better position than SJM to review the bibliography and select the articles that may be relevant to its theories, whatever they may be. .

SJM believes that it has fully and completely responded to the leaflet mobility interrogatories and requests that the PSC's request be denied in its entirety.

PSC Rebuttal:

The Special Master considered and rejected SJM's arguments. SJM did not appeal the recommendation. In directing that SJM respond as set forth above, he found that the discovery was relevant, a conclusion easily supported by the fact that pannus overgrowth and thrombus (two of the adverse events associated with higher rates in Silzone implants that are in controversy in this case) can cause restricted leaflet mobility to occur.

Like the PSC, the Special Master was also not convinced that there are no internal standards in light of what SJM published on its on its web site on this subject. There at SJM.Com it states:

One method of evaluating prosthetic heart valves is to review their hemodynamic features:

Fluid flow patterns through a valve
Pressure gradients across a valve
Regurgitant characteristics

This evaluation can be done through echocardiography (ECHO), transesophageal echocardiography, and cinefluoroscopy.

Included here are normal valve characteristics seen on Doppler and cinefluoroscopic examination, as well as pressure gradients and regurgitation measurements.

* * *

Cinefluoroscopy provides the best view of leaflet opening and closure, and it is particularly useful in cases of high aortic or mitral gradients or unusual regurgitant flow patterns observed with Doppler ECHO or catheterization. A normally functioning valve shows up as an appearance and then a disappearance of two parallel lines. If only one or if neither line fails to appear or disappear, valve leaflet motion may be restricted.

Table 5 (below) lists the approximate normal angles between leaflets on St. Jude Medical standard valves. Deviation from the angles listed in the table or differences between the open and closed angle of one leaflet relative to the other may indicate restricted leaflet motion.

**Table 5**

| Valve Size (mm) | Open | Closed |
|---|---|---|
| 19 to 25 mm | 10° | 120° |
| 27 to 33 mm | 10° | 130° |

It would be a violation of FDA misbranding regulations to publish such information and standards without a basis.

As to the burden of identifying incidence and prevalence rates the special Master took into account in ordering SJM to specifically identify medical articles that the burden was not equal upon the parties. SJM as a manufacturer of a medical product is under a legal duty to be an expert on its products. Plaintiffs are not. Under this legal duty SJM is required to keep abreast of scientific and medical literature, knowledge and developments that touch upon its products. *Schenebeck v. Sterling Drugs, Inc.*, 423 F.2d 919 (8th Cir. 1970); *Ericson v. Baxter Health Care, Inc.*, 151 F. Supp. 952 (N.D. Ill 2001). SJM also has medical affairs, clinical study and marketing departments and professional staff that monitors, summarizes, classifies and archives these articles.

**B. AVERT Data Set Format Dispute**

**1. PSC's Position**

The PSC asks for the Court's guidance whether the following discovery dispute should be presented to Special Master Solum in the first instance or directly the Court. The AVERT study is central to SJM's defense in this litigation. The University of Pittsburgh has

entered all the AVERT data subject to its myriad analyses into SAS format. SAS is a widely used FDA validated database and statistical analysis software program. The PSC has asked that the AVERT data set be produced to it in its native SAS format. Selected portions of the data set, when produced from time to time has been furnished in the form of unverified, unauthenticated copies of the data in Excel spreadsheets created by conversion of the SAS data to comma separated columns. Both SJM, who owns the AVERT data, and the University of Pittsburgh who created and maintains the data set and who has been subpoenaed for all AVERT documents in its possession, custody or control, refuse to produce the data set in native SAS format because of the alleged possibility that the data base's comment fields contain personal patient or health care information. Plaintiff has asked that Dr. Gary Grunkemeier, a Portland, Oregon biostatistician, who was subpoenaed and deposed on AVERT related work he had performed, produced to the PSC an exact copy of the AVERT SAS data set that the University of Pittsburgh provided to him at his request in or about November 2004. Dr. Grunkemeier testified that he requested this data to conduct his own personal research on Silzone and that none of this work was done pursuant to any consulting agreement he has had with SJM. He likewise, presumably at SJM's direction is now refusing to produce an exact copy of the AVERT data set he received in SAS format even though it, like numerous other documents he has produced, was subject to a subpoena served on him by the PSC. For reasons of completeness, auditing, authenticity, validity, scientific process replication and consistency, the PSC believes that this critical data set in its original format must be produced to it. The PSC has stated both to the University of Pittsburgh and SJM, its willingness to have the data set sent directly to their biostatisticians who will maintain custody and control as well as access to it to resolve any even arguable patient

privacy concern. Unfortunately, both the University of Pittsburgh and SJM have refused that suggestion.

This issue was previously brought to the Court's attention but we had hoped to be able to resolve it without either the Court's or the Special Master's intercession.

2. SJM's Position

The AVERT data files contain patient private information protected under both 21 C.F.R. Section 20.63 and HIPPA. For this reason, when SJM has produced the AVERT data to its experts or to the PSC, all patient private information has been redacted. The data has been produced in Excel rather than SAS because SJM cannot do the redactions in the SAS format. Neither SJM's attorneys nor its experts have reviewed the AVERT data in the SAS format.

The PSC served the University of Pittsburgh with a subpoena for AVERT documents in the late spring of 2002. The University of Pittsburgh retained the Pittsburgh law firm of Grogan Graffam to respond to the subpoena. That firm arranged with the PSC for a phased production of documents and the first production took place in July 2002. Following a series of productions in 2002, in June 2004, at the request of the PSC, counsel for the University of Pittsburgh agreed to update the production without the need for an additional subpoena. Shortly thereafter, the PSC for the first time asked counsel for the University to produce the AVERT database in unredacted SAS format rather than the redacted Excel format which had been produced previously. Counsel for the University advised the PSC that because of patient privacy issues pursuant to 21 C.F.R. Section 20.63 and HIPPA, the unredacted database would not be produced. See 21 C.F.R. Section 20.63(a)("The names or other information which would identify patients or research subjects in any medical or similar report, test, study, or other research project shall be deleted before the record is made available for public disclosure."). Although the attorneys for the

University asked the PSC to provide authority supporting its request to produce private patient information, no such authority was provided.

In November 2004 counsel for the University sent a proposal to the PSC indicating that the AVERT database could be produced in SAS format, with patient private information redacted. No response to this proposal was received and there were no further communications regarding the SAS format until approximately April 2005 when the PSC once again renewed its request for unredacted SAS data. In response, on April 18, 2005, Jeannine Bertig, an attorney at the Grogan Graffam firm, wrote to the PSC as follows:

> "In regard to the SAS data, I again refer you to the proposal set forth in my November 15, 2004 letter. In that letter, I proposed that we provide you with a copy of the relevant SAS data that has the patient privacy related information removed. We would produce the data in SD2 format. To the extent that there is any patient private data in the "notes" fields that is interspersed with potentially relevant data, we could not alter the database to remove all data in the field, import the data from the field along with the corresponding patient identifier to Excel, redact that patient private data, and produce an image of the redacted field with the patient identifiers, The copy of the database that we would produce would not otherwise be altered. Please advise if you want us to commence the same."

Dr Grunkemeier, a biostatistician who was one of the authors of the AVERT protocol and who has worked with the AVERT investigators and with the epidemiologists at the University of Pittsburgh from time to time on AVERT related issues, is also subject to the provisions to 21 C.F.R. Section 20.63 and HIPPA. For this reason, his attorney has advised the PSC that he will not produce patient private information.

In summary, despite being requested to do so, the PSC has provided no authority for their request for patient private information nor have they indicated why their experts need it.