# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

IN RE: ST. JUDE MEDICAL, INC.,　　　:　　　MDL No. 01-1396 (JRT/FLN)
SILZONE HEART VALVES PRODUCTS　:
LIABILITY LITIGATION　　　　　　　:

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## RENEWED MOTION TO CERTIFY CONSUMER PROTECTION CLASS

## INTRODUCTION

Plaintiffs renew their request that the Court certify a class of all Silzone prosthetic heart valve patients in the United States who have not undergone an explant of their Silzone valve or developed a manifest and diagnosed injury from their Silzone implant of degree or severity that would permit individual personal injury law suits to be commenced in their State of residence.  For the reasons that follow, this case should be certified to proceed pursuant to the consumer protection laws of the state of Minnesota, where Defendant St. Jude Medical. Inc. ("SJM") is headquartered, where the alleged deceptive and abusive marketing conduct was conceived, implemented, directed and controlled, and to where, ultimately, the Silzone premiums flowed.

The State of Minnesota, its citizens, and its strong and reputable business community are injured when Minnesota corporations are permitted to engage in deceptive practices inside ***and outside*** the State.  While the Eighth Circuit expressed concern about whether Minnesota's consumer protection laws could apply to all non-resident victims, courts all over the country have permitted their consumer statutes to apply to non-residents when a domiciled corporation engaged in fraudulent and deceptive practices.

## STATEMENT OF FACTS

At the heart of this class action matter are allegations of a manufacturer's nationwide distribution of a dangerous, defective medical device that inflicted grievous

personal injury on hundreds of patients throughout the country[1] and put thousands more at continuing future risk of serious harm.  See generally Exh. 2, Declaration of Eric G. Butchart and "Interim Medical Report on the Follow-Up Requirements of Patients with St. Jude Silzone Prosthetic Heart Valves" prepared by Eric G. Butchart, FRCS, FETCS, FESC (hereinafter, "Butchart Report").  But it involves far more, as these allegations beg the critical and inextricably related questions of how and why such an intolerable state of affairs arose.  The answers to these questions, Plaintiffs have repeatedly and consistently maintained and documented throughout this litigation, implicate the conduct and decisions of SJM's managers and corporate officers at its St. Paul, Minnesota, headquarters who initiated, orchestrated, and implemented marketing and promotional programs and efforts directed towards surgeons and hospital formularies across the nation and throughout the world premised on suppression of the truth and on insupportable, deceptive, misleading, and outright false claims that SJM's premium-priced Silzone-coated valves were safe for human implantation and effective in preventing and reducing the incidence of prosthetic valve endocarditis ("PVE").

Hence, lying at the core of this matter, and thus every proposed class member's claim, is the central issue whether SJM's allegedly improper marketing and promotional conduct is also actionable under the quartet of consumer protection laws prohibiting deception in the sale and marketing of consumer products of Minnesota, the State where

---

[1] There are almost 400 hundred adverse event reports for the Master Series Valve with Silzone contained in SJM's FER Database as of July 5, 2005.  Exh. 1, SJM 0745309.xls; Declaration of Steven E. Angstreich.  Due to the nature of the file and its sensitive contents (patient medical information), a copy is not being supplied but is available for filing if the Court directs.

SJM incorporated and headquartered its international operations and from which all the pivotal decisions and activity of which Plaintiffs complain emanated.

The following paragraphs illustrate the evidence supporting Plaintiffs' allegations that SJM's omissions and representations are actionable and that a nationwide class under Minnesota's statutory consumer protection laws is appropriate.

### 1.    Silzone Was Neither Properly Tested Nor Proven Safe Prior to Market Release.

Unquestionably, the safety and efficacy profile of a life-sustaining medical device surgically implanted into a vital organ such as the heart is critical to the decision by physicians and patients to purchase and use it.   Knowing this, SJM has consistently represented in its marketing and promotional efforts that the Silzone valve had proven to be safe as well as effective.   As two 1999 toxicological reports on Silzone commissioned by the United Kingdom's Medical Device Agency ("MDA") establish, however, the facts are decidedly otherwise.   Copies of these two reports produced by SJM are supplied at Exhs. 3, 028308, and 4, 071486.   These reports, which SJM received in 1999, found that SJM had never adequately investigated the safety and efficacy of Silzone or its main active component, silver, for its intended long-term use in close proximity to and contact with cardiac tissue.   More specifically, SJM had never satisfactorily studied, evaluated, and characterized, *inter alia*, the levels of silver emanating from the Silzone valve, much less the effects and toxicity of same on cell growth and function as well as on clot and thrombus formation.   One of those reports concluded that fundamental aspects of the biological response to silver should have been clarified by pre-clinical testing before any

human implantation and that a "clinical investigation, capable of assessing these aspects of the biological response should have been carried out before marketing of the valve." See Exh. 3, 028308 and 028310.

### 2. Butchart's Investigations and Reports on the Detrimental Effects of Silzone.

Long before this litigation commenced, SJM turned to Mr. Eric Butchart, a Cardiff, Wales, cardiothoracic surgeon and world-renowned expert in embolic risk factors associated with artificial heart valves, to conduct its first and only study specifically designed to characterize the thromboembolic safety of the Silzone valve. In 1998, and roughly six months after Silzone was first sold in the United States, Mr. Butchart reported to SJM that his study had already implicated that valve in a statistically significant increase in thromboembolic events relative to SJM's Masters Series Valve without Silzone. In a report produced for Plaintiffs in this litigation, Mr. Butchart has determined that ***the Silzone valve is a "defective prosthesis" that has placed all of the 36,000 patients implanted with it worldwide at risk***.[2] Mr. Butchart specifically found that "subsequent clinical experience with the Silzone valve revealed that not only did it not reduce the risk of prosthetic endocarditis, but it also actually increased the risk of

---

[2] See Exh. 2, Butchart Report at 9. Mr. Butchart is not the only SJM consultant who has determined that the Silzone valve was defective. Long-time SJM consultant and biostatistician Dr. Gary Grunkemeier concluded, *inter alia*, that he was "convinced" that Silzone caused an increased incidence of explant as well as explant due to paravalvular leak. Exh. 5, Grunkemeier Dep. 33. Moreover, finding it inferior in that it proved at minimum to be unsafe in the short run and had never been shown to confer any clinical benefit, Dr. Grunkemeier testified that "it would have been better" had Silzone-coated valves never been introduced "to the marketplace." Id. at 246.

other complications, notably paravalvular leak ... probably caused by the direct toxic action of silver on living cells, interfering with the normal healing process." Exh. 2 at 6. He also identified a "clinically significant," highly increased "incidence of stroke and other categories of thromboembolism . . ., particularly in the mitral position" in SJM's AVERT study that was "in keeping with [his] own findings" in the research study he conducted as a SJM clinical investigator at SJM's request. Id. at 7. Other complications, including valve thrombosis, excessive tissue ingrowth (pannus), and culture-negative prosthetic endocarditis, Mr. Butchart notes, also appear to occur more frequently among patients with Silzone prostheses. Id. As a consequence of all the risks posed by the Silzone valve, Mr. Butchart has concluded that *all patients in whom it has been implanted "need and deserve enhanced monitoring at a higher level than that normally given to patients with other types of prosthetic valve in order to detect complications at an early stage before they give rise to serious symptoms or cause irrecoverable cardiac or other organ damage*." Id. at 7-8.

### 3.     Suppression of Data and Information

A deceptive omission or silence on which a defendant intends consumers to rely can constitute a violation of Minnesota's Prevention of Consumer Fraud Act ("MPCFA"). In its labeling, marketing, advertisements, and "Dear Doctor" letters, SJM, in violation of the MPCFA, suppressed a wide array of safety and efficacy data and information in violation of the MPCFA, including, but not limited to, the following:

- Critical safety information from its first animal study of implanted Silzone-coated valves, including the fact that one of only five animals implanted with such a valve died after suffering a paravalvular leak (resulting from a dehiscence) and a

clot that limited critical movement of a valve leaflet and after manifesting extensive areas of "significant" amounts of leaching silver in its heart tissue.[3] Exh. 6, 0030384; Exh. 7, 0489954-55; Exh. 8, 0124795 at 0124805-806; Exh. 9, Flory 11/12/02 Dep. 40; Exh. 10, Tweden 1/31/03 Dep. 101-2, 118-19, 135-36; Exh. 11, Runquist Dep. 222-23, 236-38; Exh. 12, Wilson Decl. 28-34; Exh. 13, Healy Decl. 76-79.

- Excess tissue growth and clotting that had interfered with valve functioning in one of only 6 sheep implanted with Silzone valves in SJM's second, longer term (ten-week) animal study of the Silzone valve.  Exh. 12, Wilson Decl. 44, 45, and 47.

- Data indicating that the animal with a Silzone valve which exhibited the most severe adverse effects in SJM's first animal study of a valve featuring a fully Silzone-coated sewing ring manifested the highest silver concentrations in adjacent cardiac tissue.  Exh. 12, Wilson Decl. 49; Exh. 10, Tweden 1/31/03 Dep. 265.

- From another Silzone study, the existence of a substantially elevated incidence of paravalvular leaks in sheep implanted with Silzone-coated Epic valves, some of which were severe and one of which proved fatal.  Exh. 12, Wilson Decl. 62-65.

- An increased incidence of paravalvular leak in sheep implanted with Silzone-coated Regent valves.  Exh. 11, Runquist Dep. 385.

- Important scientific literature documenting potential hazards of SJM's proposed use of silver for long-term use as an integral part of the Silzone coating of a mechanical heart valve sewing cuff, including, but not limited to, its effects on cells key to the healing process located immediately adjacent to the sewing cuff. as well as its long-term adverse inflammatory effects on surrounding tissue. Exh. 13, Healy Decl. 38-59.

- Multiple findings from standard laboratory tests that Silzone caused hemolysis or the destruction of red blood cells, a potentially life-threatening condition, including tests involving the Masters Series Valve with Silzone. Exh. 14, 0151372;  Exh. 15, 548923-33; Exh. 11, Runquist Dep. 303-05; 307-09; 311-13.

- Test results evidencing massive total silver losses averaging 22 percent from the sewing cuffs of Silzone valves implanted during a ten-week sheep study, with one

---

[3] The adverse findings in this suppressed experimental animal remarkably presaged the detrimental clinical problems that occurred with the Silzone coating following its market release.

sewing cuff losing 45 percent of its Silzone coating over that relatively short period.  Exh. 16, 128704; Exh. 13, Healy Decl. 85.

- Data from short-term *in vitro* washout studies revealing high and unabated rates of silver leaching from Silzone-coated fabric of the type used to manufacture Silzone valves.  Exh. 17, Pages 16-17 and 21 of 0705696; Exh. 18, 063542-063544; Exh. 13, Healy Decl. 83.

- Test results indicating silver corroding at an alarming rate likely sufficient to remove all of the silver during the life of a Silzone valve.  Exh. 19, 0064749; Exh. 10, Tweden 2/14/03 Dep. 664-66;  Exh. 13, Healy Decl. 82-83.

- Data showing unabated and progressive increases in silver concentrations accumulating over one year in heart tissue adjacent to Silzone-coated valves implanted in sheep.  Exh. 11, Runquist Dep. 365-377.

- The fact that SJM knew of no valid safe toxicity threshold that had been established for the effects of silver on valvular tissue.  Exh. 20, 0060082 at 0060088; Exh. 9, Flory 11/12/02 Dep. 87-88, 11/13/02 Dep. 428-29 and Exh. 10, Tweden 1/31/03 Dep. 261; Exh. 11, Runquist Dep. 194-95; Exh. 21, Langanki Dep. 297-99.

- Disturbing manufacturing and quality control data revealing enormous disparities in the amounts of silver, palladium, and titanium comprising the Silzone coating applied to the Dacron fabric used to manufacture Silzone valves.  Exh. 22, 679588-679589; Exh. 23, 029998-30000; Exh. 24, 087615.

- The fact that Silzone was placed on Dacron sewing ring fabric by a line of sight coating process capable of yielding blind spots bereft of silver.  Exh. 25, 030950; Exh. 24, 087615; Exh. 26, Holmberg 9/3/04 Dep. 86.

- Field experience report ("FER") data revealing persistent and markedly negative trends in adverse events, including explants, paravalvular leaks, endocarditis, and strokes and other thromboembolic events, in Silzone-coated relative to conventional cuffed valves.  Exh. 27, Guzik 10/15/02 Dep. 118-19, 197, 216-18, 248-52, 263-66, 293-96, 10/16/02 Dep. 312-14, 393-95, 430, 435, 436; Exh. 28, Denise Johnson 8/20/02 Dep. 343.

- In the context of its public responses to clinical trial findings from cardiothoracic surgeon Eric Butchart and his colleagues in Cardiff, Wales, implicating Silzone in a statistically significant increase in thromboembolic events, information that (1) Mr. Butchart performed this SJM-sponsored study at SJM's request, (2) this

7

constituted the only clinical study SJM commissioned specifically designed to investigate the thromboembolic safety of the Silzone valve, and (3) that outside peer review SJM arranged for and secured confirmed Mr. Butchart's findings. Exh. 29, 487918-487920; Exh. 30, 688076; Exh. 31, 070559; Exh. 32, 135439; Exh. 33, 299171; Exh. 34, 299176; Exh. 35, 252773-252775; Exh. 36, 327379; Exh. 37, 0024287; Exh. 27, Guzik 10/15/02 Dep. 84; Exh. 38, 0319505; Exh. 39, 0299393; Exh. 40, 0130317; Exh. 41, 0072540-0072554; Exh. 42, Schultz 10/20/05 Dep. 30-31.

- Data from the "Top Accounts" study SJM had undertaken that revealed an increased incidence of thromboembolic events associated with use of the Silzone valve in the hospitals participating in the study, particularly when implanted in the mitral position.  Exh. 43, 0539323-539327; Exh. 42, Schultz 10/20/2005 Dep. 234-35, 9/14/02 Dep. 438-39, 443-47; Exh. 5, Grunkemeier Dep. 166-171.

- Findings from a SJM-sponsored study at Toronto General Hospital implicating Silzone in a statistically significant increased incidence of paravalvular leak, reoperation, and explant relative to the Masters Series Valve without Silzone. Exh. 44, 319269 at 319270; Exh. 45, 538403-538405; Exh. 46, 538532.

- Data received in early 1999 and thereafter from Dr. Jagdish Butany, a Toronto, Canada, pathologist, showing a significantly greater incidence of explant with the Silzone valve.  Exh. 47, Butany Dep. 108-111, 163-64, 245.[4]

- Numerous reports from the field as well as from the AVERT study of little or no tissue ingrowth on and in Silzone valves explanted due to paravalvular leak or thrombosis.  Exh. 42, Schultz 10/20/05 Dep. 32-33, 67-75, 77-79, 121-122; Exh. 48, 665770; Exh. 49, 538327; Exh. 50, 687055; Exh. 51, 540138; Exh. 52, 539445; Exh. 53, 539454; Exh. 54, 538612.

- The fact that at the time of recall of the Silzone valve SJM's  "main concern" was reports of lack of tissue ingrowth.  Exh. 55, 541242; Exh. 42, Schultz 10/20/05 Dep. 141-42.

- The fact that due to the small number of subjects in AVERT, that study has long lacked the statistical power needed to exonerate Silzone as an ongoing risk factor or cause of paravalvular leak, thromboembolic events, or explants, including explants due to paravalvular leak or thromboembolic events.  Exh. 56, Sackett 4/22/02 Decl., 2/27/03 Aff. in Anderson, and 4/16/03 Aff. in Anderson; Exh. 57,

---

[4] Dr. Butany first advised SJM's management of the problems in the healing response associated with the Silzone cuff at a meeting in early November 1998 at SJM's St. Paul Headquarters (Butany Dep. 57-58).

Goldsmith 2/25/03 Aff. in <u>Anderson</u>.

- The results of a number of *in vitro* or laboratory bench tests indicating that Silzone was not effective in fighting the kinds of bacterial and fungal infections that cause endocarditis.  Exh. 11, Runquist Dep. 120-28, 128-32, 132-36; 136-40; 141-47; 148-150, 155, 157-58, 166; Exh. 10, Tweden 12/14/03 Dep. 539-543, 551-53, 560-62.[5]

- Study findings that Silzone was not effective in fighting bacteria when implanted in animals, including sheep, guinea pigs, and rabbits.  Exh. 58, Illingworth 10/25/02 Dep. 166-67, 179-80, 183-84, and 225; Exh. 59, Healy 10/24/02 Dep. 253-56, 256-61; Exh. 11, Runquist Dep. 181-83.

In addition to the foregoing omissions or suppressions, SJM violated Minnesota's Prevention of Consumer Fraud Act ("MPCFA") by misrepresenting or deceptively or misleadingly representing the safety and efficacy of Silzone with the intent that others rely on such misrepresentations.  Such misrepresentations include, but are not limited to, claims that:

- Silzone did not interfere with tissue ingrowth and/or may indeed promote better tissue healing.  Exh. 60, 032296 at 032298; Exh. 61, 0032099 at 003212-231.

- SJM's initial animal studies of Silzone-coated valves revealed excellent or superior healing response, a claim unsupported by the purported evidence upon which it was based.  Exh. 62, 032298; Exh. 61, 0032099 at 0032121; Exh. 12, Wilson Decl. 35, 36, 37, 38, 39, 53-56.

- A noted consulting pathologist had concluded that something other than the Silzone valve–namely, a long suture tail–had caused or contributed to troubling excess tissue growth and clotting that had interfered with valve functioning in one of only 6 sheep implanted with Silzone valves in SJM's later longer term (ten-week) animal study of the Silzone valve;[6]

---

[5] SJM's labeling for the Silzone valve told physicians that the Silzone coating has been shown in-vitro to reduce attachment and colonization of microorganisms frequently associated with endocarditis.  Exh. 98, 0702249.   Other SJM advertisements, publications, and materials made similar representations.

[6] In actuality, that consultant refused SJM permission publicly to attribute that comment to him.  Exh. 12, Wilson Decl. 47; Exh. 63, 0030377; Exh. 64, 0028757; Exh. 11,

- The Silzone coating was permanent, firmly adherent, and minimally or non-leaching. Exh. 65, 032296; Exh. 61, 0032099 at 0032117; Exh. 66, 0032118; Exh. 67, 0032181.[7]

- The sewing cuff fabric of the Silzone valve was uniformly coated with Silzone. Exh. 65, 032296; Exh. 61, 0032099 at 0032117, Exh. 71, 0032123 and 0032133.

- 300 parts per billion of silver in blood was a valid and scientifically accepted threshold level for silver toxicity in humans. Exh. 61, 0032099 at 0032119, Exh. 71, 0032132, Exh. 72, 0032223 and 0032226; Exh. 13, Healy Decl. 64-75.[8]

- SJM's labeling statement to physicians that the Silzone coating has been shown in-vitro to reduce attachment and colonization of microorganisms frequently associated with endocarditis. Exh. 98, 0702249.

- Silzone was 99 percent effective in reducing bacterial colonization. Exh. 73, 032300; Exh. 61, 0032099 at 0032120 and 0032180; Exh. 27, Guzik 10/15/02 Dep. 47-52 and 52-56; Exh. 59, Healy 10/24/02 Dep. 211-16, 216-221 and 222-28; Exh. 74, Hosek 10/30/02 Dep. 304-07; Exh. 10, Tweden 2/14/03 Dep. 572-73.

- Silzone was effective in preventing and reducing, and/or had been shown to have clinical efficacy in preventing and reducing, the incidence of prosthetic valve endocarditis [this was explicitly as well as implicitly represented in marketing,

---

Runquist Dep. 291-96.

[7] Internal research data and clinical pathology from explanted valves revealed it was not. Exh. 68, 0064749; Exh. 69, Bricault Dep. 172-73, Exh. 13, Healy Decl. 37, 81-85; Exh. 12, Wilson Decl. 34. Moreover, SJM's management was aware that the silver was coming off the cuff fabric and staining SJM's valve assemblers' work gloves. See Exh. 70, Peri Dep. 15; Exh. 26, Holmberg 3/19/02 Dep. 75-76. Nevertheless, SJM's marketing department's scripted Q & A responses stated: "Since the silver is permanently impregnated into the sewing cuff fabric, it does not wear off with handling or use." Exh. 65, 032296 at 032297.

[8] It was not a valid threshold appropriately derived from experimentation or other data and was not a threshold promulgated or accepted by any agency or authority that sets such standards.

promotion, and/or advertising.  Exh. 61, 0032099 at 0321114; Exh. 75, 125076; Exh. 76, Joseph E. Graham Aff.[9]

- A study in guinea pigs published by Illingworth, et al., strongly supported the efficacy of Silzone in preventing or reducing the incidence of prosthetic valve endocarditis.  Exh. 77, Shepherd 1/28/05 Dep. 568-583.

- SJM "Dear Doctor" letters representing that cardiothoracic surgeon Eric Butchart's reports of data reflecting an unusually high rate of thromboembolic events associated with use of the Silzone valve was in direct contrast to the data that SJM had received from multiple other Silzone coating studies.  Exh. 78, 0024287; Exh. 79, 487918 and 487919-487920; Exh. 27, Guzik 10/16/02 Dep. 346.

- SJM representations to physicians that the rates of various complications reported with Silzone valves were similar to those reported with other SJM mechanical valve offerings.  Exh. 80, 197150-197153; Exh. 27, Guzik 10/15/02 Dep. 243-45.

Defendant also violated Minnesota's Uniform Deceptive Trade Practices Act

("MDTPA"), Minn. Stat. § 325D.44, subds. 1(5), (7), and (13), which, *inter alia*, defines

a "deceptive trade practice" to include commercial representations that goods "have

sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they

do not have" or "are of a particular standard, quality, or grade or that goods are of a

particular style or model, if they are of another."  Under MDTPA, a person also "engages

in a deceptive trade practice when, in the course of business, vocation, or occupation, the

person . . . engages in any other conduct which similarly creates a likelihood of confusion

or misunderstanding."  In addition to many of the misrepresentations recited above,

violations of the MDTPA include, but are not limited to:

---

[9] The Silzone product launch manual reveals that SJM's sales force was being trained to present American surgeons with scripted information that, by design, created the inference and led doctors to the conclusion that Silzone was effective in reducing the risk of endocarditis.  Exh. 61, 0032099 at 0032114.

- SJM's representations to physicians that the Silzone coating was comprised of elemental silver when, in fact, it was a combination of silver/palladium/titanium, ostensibly to increase adherence to the substrate;[10]

- SJM's decision to charge a premium price for Silzone-coated valves for the purpose of misleadingly communicating the unproven idea that Silzone had been shown to confer benefits (i.e., might be effective in reducing or preventing the incidence of endocarditis) that merited the increased price.  Exh. 82, 0033339 at 0033341-0033344; Exh. 83, Spadaro Dep. 41-43; Exh. 59, Healy  8/31/04 Dep. 159, 164-65; Exh. 77, Shepherd 1/28/05 Dep. 468, 470-73.[11]

- SJM's claims in advertisements and other marketing materials that the Silzone had demonstrated excellent clinical performance, notwithstanding that adverse event rates for Silzone-coated valves were significantly higher than for non-Silzone coated valves, and a growing number of hospitals and surgeons were refusing to further implant Silzone-coated valves them because of the adverse events they were encountering with them.  Exh. 85, 0702255; Exh. 37, 0024287; Exh. 27, Guzik 10/15/02 Dep. 232-34, 10/16/02 Dep. 316-17.

- SJM's assertions that the safety and efficacy of the Silzone valve had been rigorously tested when the contrary was true, and SJM had even been criticized in toxicology assessment reports commissioned by the United Kingdom Medical Device Agency for deficiencies in its preclinical and clinical testing of the valve. See Exh. 61, 0032099 at 0032137 *et seq*; Exh. 3, 028308. at 028310.

- SJM's ghostwriting of favorable journal articles to be used for marketing purposes.  Exh. 86, 664548; Exh. 87, 487684; Exh. 88, 538901; Exh. 89, 096350; Exh. 90, 686867; Exh. 91, 687721; Exh. 92, 687060;  Exh. 93, 687766; Exh. 94, 687838; Exh. 59, Healy 8/31/04 Dep. 375-380; Exh. 95, Frater Dep. 22-26.

## SUMMARY OF ARGUMENT

---

[10] Significantly, SJM had learned from Spire that a significant amount of the palladium, an element capable of inducing allergic reactions, was found to leach in a washout study of the Silzone coating.  Exh. 26, Holmberg 3/19/02 Dep. at 100-01; Exh. 81, 063488 at 63493; 0628258; Exh. 10, Tweden 2/14/03 Dep. 679-81; Exh. 42, Schultz 10/20/05 Dep. 176-180.

[11] In an April 8, 1998, internal e-mail string among SJM Regional Sales Directors, one Regional Director, Mark R. Sportsman, explained his confidence that customers would pay the $300.00 premium: "Customers that are sold on the benefit of Silzone will pay the premium." Exh. 84, 0197554.  The benefit Mr. Sportsman referred to was inhibiting the incidence of endocarditis.  Exh. 83, Spadaro Dep. 47-48.

The Constitution does not prohibit the Court from applying Minnesota law to every class member.  Minnesota's procedural and remedial rules in consumer protection cases apply regardless of conflict.  Minnesota substantive law applies in every instance where there is no true conflict in substantive laws.  The choice-influencing factors favor Minnesota law over the law of those jurisdictions whose substantive law truly conflicts with Minnesota's consumer protection regime.



**Flow Chart Applying Minnesota's Conflict of Law
and Choice of Law Rules**

## ARGUMENT

**I.**   **APPLICATION OF MINNESOTA LAW TO ALL OF THE MINNESOTA STATUTORY CONSUMER CLAIMS IS CONSTITUTIONAL.**

The Eighth Circuit panel's Constitutional concern on remand involves the application of the Due Process and Full Faith and Credit Clauses to choice-of-law analysis.[12]   The panel opinion refers to the Constitutional issue collectively as a "Due Process and Full Faith and Credit" issue, and these two concepts do in fact collapse into a single Due Process question, as the Full Faith and Credit Clause does not contribute anything to narrow the Due Process choice-of-law test.   See Allstate Ins. Co. v. Hague, 449 U.S. 302, 308 & n.10, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981) (noting that Full Faith and Credit essentially turns on the same issues as Due Process contacts for choice-of-law purposes).[13]

The panel's concern, in short, was that the choice-of-law evaluation be "sufficient," "individualized," and not "cursory."   In re: St. Jude Medical, Inc., Silzone Heart Valve Prod. Liab. Litig. ("In re SJM"), 425 F.3d 1116, 1119-20 (8th Cir. 2005).   As noted by the panel, the Supreme Court has stated the Due Process test for choice-of-law

---

[12] The panel did not express any opinion on SJM's primary Constitutional argument on appeal, which was asserted under the Commerce Clause.

[13] Moreover, Full Faith and Credit is an even lesser concern with respect to a choice of statutory law. Franchise Tax Bd. of California v. Hyatt, 538 U.S 488, 494, 498 (2003); Sun Oil v. Wortman, 486 U.S. 717, 722 (1988).  The Full Faith and Credit Clause never requires a forum state to "substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." Hyatt at 496; Baker by Thomas v. General Motors Corp., 522 U.S. 222, 232-33; Sun Oil v. Wortman, 486 U.S. 717, 722 (1988).  A forum state is likewise never required to apply another state's law in abrogation of its own public policy. Nevada v. Hall, 440 U.S. 410, 422 (1979).

as requiring that the state whose law is ultimately chosen to be applied to a claim must be among those states with "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor unfair." Allstate, 449 U.S. at 312-13.  The Supreme Court has also explained that the "significant contact" must exist for each claim in a class action case; the rules do not change merely because there are a large number of diverse plaintiffs.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 822-23, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985).[14]  Under the Supreme Court's standard, Minnesota meets the "significant contact" Due Process test for each statutory consumer claim in the present case, just as if each plaintiff were suing separately and individually.

### A.    Minnesota Has Sufficient Contacts with Each Statutory Consumer Claim to Meet the Due Process Test for Application of Minnesota Law.

The Eighth Circuit's immediate choice-of-law concern was that it could not evaluate the Due Process contacts between Minnesota and each of the statutory consumer claims because it did not have before it a detailed enumeration of "the contacts between Minnesota and each class member's claims."  In re SJM, 425 F.3d at 1120.  It voiced

---

[14] Shutts did not change the Due Process sufficient-contacts test described in Allstate; rather, it applied the test in an extreme scenario in which the Kansas forum had little connection to the Delaware- and Oklahoma-domiciled defendant or its corporate activities relating to nationwide contract-based claims.  Without any global contacts between the forum and each claim through the common defendant, it was necessary to look for more individualized, non-global contacts between the forum and each claim separately to meet the contacts requirement for application of forum law to each claim. The mere fact that the plaintiffs formed a class that picked a Kansas courthouse could not be bootstrapped into a global aggregate "contact" between Kansas and their claims as a stand-in for the weakly-connected defendant.

suspicion as to whether Minnesota had sufficient contacts with each claim, but observed that application of Minnesota law to all the claims "ultimately may be proper" once the contacts were elucidated.[15]  Id.  The Eighth Circuit did not address, nor apparently have readily available in the record before it, evidence or substantial argument regarding Minnesota's contacts with the claims.[16]  The present section responds to that gap.

The Due Process choice-of-law "significant contact" test is a threshold, not a comparison.  It does not determine which state's law must or should apply to a claim, but rather merely which states' laws the Constitution permits to be in the running, by virtue of having at least a minimum quantum of "significant contact" with the claim.[17]  Consequently, for any claim, more than one jurisdiction's law could simultaneously be Constitutional to apply.  See, e.g., Hyatt, 538 U.S. at 496; Shutts, 472 U.S. at 823; Allstate, 449 U.S. at 307-08.  This initial Constitutional vetting thus creates only "modest

---

[15] In its briefing to the Eighth Circuit, SJM likewise observed that it had "not argued that the Constitution demands the application of a particular state's law" (SJM Reply at 8), but rather only that a more detailed examination was required.

[16] This Court previously addressed the Due Process issue succinctly.  (Memorandum Opinion and Order on Motion for Class Certification, Mar. 27, 2003, p.38, n.22.)  The Eighth Circuit panel opinion did not reference that discussion.

[17] This analysis of threshold Due Process "significant contact" supporting the candidacy of a state's law in a subsequent choice-of-law analysis should not be confused with the comparison of candidate states' laws for "true conflicts" (which determines whether and to what extent further choice-of-law inquiry may be relevant and necessary), nor with a comparative "most significant contacts" analysis, which is sometimes an aspect of, or a label for, the ultimate judicial choice-of-law analysis in several states.  The Eighth Circuit's remand opinion appears sometimes to use the terms "choice-of-law analysis" and "conflicts-of-law analysis" interchangeably.  See, e.g., In re SJM, 425 F.3d at 1120 (referring to the need for a thorough "conflicts-of-law analysis" because Shutts requires an individualized "choice-of-law analysis").

restrictions" on the forum state's autonomy to choose the law to apply to a claim.  Shutts
at 818.[18]  See also Richman & Reynolds, Understanding Conflict of Laws, § 97[a][4] (3d
ed. 2002) ( "[T]his test can be satisfied by very minimal contacts.").

In contrast with the extreme facts of Shutts, and in keeping with the Supreme
Court's Due Process test articulated in Shutts and Allstate, every claim in the present case
bears more than a "significant contact" with the state of Minnesota by virtue of the
corporate and physical domicile and claims-related activities of Defendant SJM.  These
demonstrable and admitted contacts with the forum surpass those cited in numerous cases
as sufficient to meet the Due Process contact threshold.

Several groups of significant contacts with the state of Minnesota are equally
shared by each plaintiff's statutory consumer claim against SJM.   They can be
enumerated and analyzed together as follows.

- SJM is incorporated, **and** headquartered, **and** has its principal place of business in
Minnesota.   As a corporation chartered by the state of Minnesota, SJM is a
creature of Minnesota law, which law governs its existence, its corporate structure,
and the rights of its shareholders throughout the country.   Moreover, and unlike
the numerous corporations nominally incorporated in Delaware but lacking more
tangible contacts with that state, SJM is headquartered and has its principal place
of business in Minnesota.  SJM's corporate and physical domiciles alone comprise
"substantial contacts" with Minnesota that give rise to "significant state interests"
in all of the claims against SJM, including Minnesota's interest in regulating, and
insuring its statutes are obeyed by, one of its domestic corporations, and that all
persons doing business with Minnesota firms may rely on their integrity and
compliance with local law.  See, e.g., CTS Corp. v. Dynamics Corp. of America,

---

[18] Cases decided on more narrow, state-based choice-of-law principles thus tend not to be
edifying on the Due Process analysis.  See, e.g., In re Bridgestone/Firestone Inc., 288
F.3d 1012, 1016 (7th Cir. 2002) (applying Indiana's lex loci delecti choice-of-law
principle); Montgomery v. New Piper Aircraft, 209 F.R.D. 221, 228-31 (S.D. Fla. 2002)
(applying Florida choice-of-law and standing principles).

481 U.S. 69, 93, 107 S. Ct. 1637, 95 L. Ed 2d 67 (1987); Simon v. Philip Morris Inc., 124 F. Supp. 2d 46, 72 (E.D.N.Y. 2000); Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 543, 547 (D. N.J. 1988). Consequently, these robust domiciliary contacts by themselves meet the Due Process "significant contacts" test. See, e.g., Ferris, Baker Watts, Inc. v. Deutsche Bank Securities, Nos. 02-3682, 02-4845, 2004 WL 2501563, *5 (D. Minn. 2004) (application of New Jersey RICO Act to claims of non-New Jersey plaintiffs Constitutionally supported by significant aggregation of contacts based on New Jersey domiciles of some of the defendants) (Exh. 96).

- Virtually all of the corporate acts implicated by each claim occurred in Minnesota. Unsurprisingly, in light of its locus of control and operations, the corporate acts supporting each of the statutory consumer claims against SJM occurred within and emanate from Minnesota almost exclusively. As set forth in detail above, each of the statutory consumer claims is grounded on numerous false representations and material omissions by SJM regarding the core safety and efficacy of its Silzone heart valves through global advertising, marketing, and product labeling. As SJM has conceded, "all marketing and distribution efforts [for the Silzone heart valves] were based in Minnesota," and "all labels, warnings and instructions were drafted in Minnesota." Exh. 97, SJM transfer motion memorandum, p. 10. See Simon, 124 F. Supp. 2d at 70 (finding sufficient Due Process contacts through defendants' activities in forum state, emphasizing that activities "relate to the alleged conspiracy that led to plaintiff's damages"). Each statutory consumer protection claim implicates these Minnesota activities, swelling Minnesota's contacts even beyond the substantial connection arising from SJM's corporate and physical domiciles.

- The Silzone heart valves were substantially created and manufactured in Minnesota. Minnesota has additional significant contacts to all the Silzone heart valve statutory consumer claims through the manufacture of the defective valves themselves, and the related FDA and other regulatory affairs managed and controlled from the St. Paul headquarters. Indeed, according to SJM, its "Silzone-coated valves were designed, researched, developed, engineered, manufactured, tested, [and] quality-controlled in Minnesota." Exh. 97 at 10. This is notably an even broader description of contacts via manufacturing than have constituted "significant contacts" in other cases. See, e.g., In re Benedictin Litigation, 857 F.2d 290, 304-05 (6th Cir. 1988) (applying the law of the state of drug manufacture to the claims of plaintiffs domiciled elsewhere); In re Air Crash Disaster at Mannheim, Germany on 9/11/82, 769 F.2d 115, 120 n.7 (3d Cir. 1982) (applying law of the state of helicopter manufacture, though plaintiffs were domiciled and accident occurred elsewhere, in light of state's interest in governing manufacturing liability within its borders); Calenstolpe v. Merck & Co., Inc., 638 F. Supp. 901, 910 (S.D.N.Y. 1986) (applying law of the place of vaccine's

"development and manufacture" to claims by foreign plaintiffs).

- <u>SJM invited heart valve purchasers and recipients to solicit more product information from Minnesota</u>.  SJM's Minnesota base of operation was never a secret.  In its marketing, SJM flagged its Minnesota location and invited Silzone valve-related inquiries to its Minnesota headquarters through a Minneapolis telephone number in journal advertisements worldwide.  <u>See</u>, <u>e.g.</u>, Exh. 98, 0702249.  <u>Cf.</u> <u>In re Activision Securities Litigation</u>, 621 F. Supp. 415, 430-31 (N.D. Cal. 1985) (finding significant contacts based in part on fact that geographically diverse securities purchasers "directed" their acceptances at the forum state).  <u>See</u> <u>also</u> <u>Northwest Airlines, Inc. v. Astraea Aviation Services, Inc.</u>, 111 F.3d 1386, 1390 (8th Cir. 1997) (finding "[p]hone calls into a state" to be a "relevant contact" between party and forum in jurisdictional analysis).

The weight of such Minnesota contacts – each of which applies to every statutory claim – comfortably surpasses the threshold of "significance" for Due Process purposes.  As just described, several of these categories of contacts have been sufficient ***by themselves*** to support Due Process-compliant contacts in other cases.   Accordingly, the cumulative combination of the contacts based on domicile and activities directly implicated by the claims, as well as the design and manufacture of the Silzone valves, exceeds any criterion of "significant contact" with each claim.   <u>See</u>, <u>e.g.</u>, <u>Northwest Airlines</u>, 111 F.3d at 1394 (Due Process contacts established with each of two different states, based on respective headquarters of plaintiff and defendant, and publication or republication of statements in each of states); <u>Bunnion v. Consolidated Rail Corp.</u>, 1998 WL 372644, *9 (E.D. Pa. 1998) (Due Process contacts established by defendant's incorporation and principal place of business in forum state, along with some claims-related activity in state) (Exh. 99); <u>Grace v. Perception Technology Corp.</u>, 128 F.R.D. 165, 171 (D. Mass. 1989) (Due Process contacts test met through defendants' domiciles and misrepresentations emanating from the forum state); <u>In re ORFA Sec. Litig.</u>, 654 F.

Supp. 1449, 1455, 1463 (D. N.J. 1987) (applying New Jersey law to national class where Utah-chartered defendant's principal place of business was New Jersey and "many of the acts complained of" originated there); Gruber v. Price Waterhouse, 117 F.R.D. 75, 82 (E.D. Pa. 1987) (finding selection of forum law Constitutional where defendant maintained its principal place of business in the forum and performed some professional duties there).

By meeting the "significant contacts" test, these Minnesota contacts and corresponding state interests by definition satisfy the Due Process concern that a choice-of-law selection should not be "arbitrary or unfair."  Moreover, to the extent that any of the plaintiffs would have had occasion to give thought to choice-of-law issues at the time of receiving a Silzone heart valve, it is reasonable to surmise that such plaintiffs would have expected a plainly Minnesota-based corporation to be subject to the requirements of Minnesota statutes – particularly ones affording cumulative protections to "any person" wronged by the Minnesota company, "in addition to" any other legal rights the person might have.[19]   Minn. Stat. § 8.31, subd. 3a.   Finally, of course, SJM cannot (and presumably does not) claim that application of Minnesota statutes to its conduct of business as a Minnesota corporation based in Minnesota could ever be arbitrary or unfair.

---

[19] The Eighth Circuit has observed that in typical tort cases, the parties will not have had **any** pre-existing expectation of what law(s) might apply to unanticipated events. Nesladek v. Ford Motor Co., 46 F.3d 734, 738 (8th Cir. 1995).  By contrast, Shutts involved purely contract-based claims which more commonly implicate expectations about what law might govern disputes.  Notably, when SJM did enter into inventory or consignment contracts with hospitals and clinics for Silzone valves, it normally selected Minnesota law to apply to the contracts as a matter of course.  Exh. 1, Declaration of Steven E. Angstreich.

See, e.g., Allstate, 449 U.S. at 317-18 (noting that even a defendant's mere business presence in Minnesota is sufficient to bar claims of unfair surprise at the application of Minnesota law); In re ORFA Securities Litigation, 654 F. Supp. at 1463-64 ("Defendants chose to use New Jersey as their principle place of business and cannot claim surprise at being held to the state's legal standards.").[20]

**B.   The Supreme Court's "Anti-Bootstrapping" Admonition Underscores the Constitutionality of Applying Minnesota Statutory Law to Each Claim in the Class Context.**

The foregoing comprises the longstanding Supreme Court Due Process threshold contacts analysis, beyond which choice-of-law becomes a matter for individual states to implement – legislatively or judicially – as each sees fit.   A federal district court's remaining duty (assuming the existence of "true conflicts" among relevant states' laws) is simply to select from among the Constitutional candidates the same law as would a state court of the forum.  Felder v. Casey, 487 U.S. 131, 150 (1988) (outcome of litigation of a state-court claim in federal court should be the same as if tried in state court); Allstate, 449 U.S. at 307; Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975); Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941); Northwest Airlines, 111 F.3d at 1393-94.

There remains, however, an additional issue noted in Shutts (and indirectly in the Eighth Circuit panel's reference to an "individualized" choice-of-law inquiry, 425 F.3d at

---

[20] For the numerous claims involving residents of other states, or valve implantations performed in other states, Plaintiffs assume *arguendo* that such other states also meet the Due Process threshold of minimally sufficient significant contacts so as to be includable in the menu of Constitutionally-permissible choices of law for the relevant claims.

1120) that is instructive on the Constitutionality of applying Minnesota statutory law to the statutory consumer claims.   The Supreme Court expressed that, while each state enjoys autonomy selecting (from among the Constitutionally permissible alternatives) the law to apply to any claim, a court *should not modify or tilt the Due Process contact test of a state's choice of law merely because the case before the court is a class action*.   See Shutts at 821-22.   This "bootstrapping" concern typically arises where a court, likely in the interest of convenience, allows the collective posture of a class case to tilt the scales toward forum law, when many of the claims would not have received identical treatment if presented individually.

Although the present case does not directly implicate this kind of bootstrapping (because, unlike the Shutts suit in Kansas against a defendant domiciled in Delaware and Oklahoma, this is not a case of claims with "little or no relationship to the forum," 472 U.S. at 821-22, and the Court here has addressed the claims' forum contacts individually), the Supreme Court's reasoning remains relevant because the Silzone heart valve case flips the bootstrapping concern.   Here, it is *Defendant SJM* that argues for a different choice of law than would apply in an individual consumer case.   This is easy to illustrate.   If an individual class member – say one from Missouri – came to Minnesota to sue SJM under a Minnesota statute that expressly provides a cause of action to "any person" defrauded by a Minnesota corporation, there would be little question that a Minnesota court would apply the Minnesota statute to the claim. This follows most immediately from the fact that the Minnesota legislature expressly contemplated and

provided that such a plaintiff may sue a Minnesota corporation under the statute.[21]   If a

forum state legislature grants an out-of-state plaintiff standing to sue under a particular

statute, then so long as the forum bears at least a significant Due Process contact with the

claim (to insure that standing does not preempt Due Process), the legislature has plainly

directed that such statutory law be applied to that claim (for it would of course make no

---

[21] See generally exh. 100, Brief of Amicus Curiae the State of Minnesota in Support of
Affirming the District Court and in Support of Respondents Grovatt, et al. (confirming
Minnesota's position that "any person" means what it says). See also Pfizer, Inc. v.
Government of India, 434 U.S. 309, 311-313, 320 (1978) (interpreting the term "any
person" in the Clayton Act to enable even foreign nations to rely on protections of the
Act); Milleneum Communications & Fulfillment, Inc. v. Office of the Att'y General, 761
So. 2d 1256, 1260-62 (Fla. Dist. Ct. App. 2000) (holding that Florida consumer statutes
referring to "any person" and "consumer" without geographical or residential restrictions
applied to transactions between Florida corporations and out-of-state consumers); Lony
v. E.I. du Pont de Nemours & Co., Inc., 821 F. Supp. 956, 961 (D. Del. 1993) (holding
that consumer fraud statute protecting "consumers," without any further qualification,
provides standing to out-of-state consumers); Brown v. Market Development, Inc., 322
N.E.2d 367, 372 (Ohio Ct. Common Pleas 1974) ("In a highly complex and mobile
society, the components of which are intertwined and interdependent, a state may validly
prohibit acts within its borders where the damages resulting from those acts are much
more clearly located in another state."); Pacamor Bearings, Inc., Minebea Co., Ltd., 918
F. Supp. 491, 504 (D.N.H. 1996) (in case brought by one corporation against another,
New Hampshire defendants could not exclude evidence of sales to out-of-state customers
under New Hampshire's consumer protection act because, as long as "offending conduct"
of developing fraudulent sales material occurs within state, defendants violated statute);
Rio Grande Oil Co. v. State, 539 S.W.2d 917, 921 (Tex. Civ. App. 1976) (despite
absence of any Texas purchasers, defendant was liable to out-of-state purchasers under
Texas Consumer Protection Act where defendant was Texas corporation, made sales calls
from Texas, mailed sales information from Texas, and maintained business bank
accounts in Texas); State v. Pickrell, 667 P.2d 1304, 1312 (Ariz. 1983) (attorney general
of Arizona could sue on behalf of out-of-state residents under Arizona statute authorizing
"any person injured" to sue); State v. New Womyn, Inc., 679 N.W.2d 593 (Iowa 2004)
(Iowa's consumer fraud act, which permits attorney general to obtain restitution for "any
person," provides recovery to nonresidents); Taha v. Thompson, 463 S.E.2d 553, 555,
557-58 (N.C. Ct. App. 1995) (Egyptian citizen owner of a restaurant in North Carolina
alleged sufficient facts to support jury finding of deceptive trade practices against a North
Carolina lessor).

sense to say a plaintiff may maintain a claim under a statute without the statute applying

to the claim), and forum courts must follow that edict.  (Moreover, even if the local court

improbably ignored its legislature's plain statement, the same result would follow from

any analysis of government interests, upon realization that Missouri would have no

interest in trailing one of its citizens to Minnesota and attempting to deny him personal

rights granted him by the Minnesota legislature arising from his dealings with a

Minnesota corporation.[22])  In such an individual case, there would be no basis for a

Minnesota trial court  to re-write the plaintiff's complaint to discard the Minnesota statute

(in abrogation of its legislature's express conferral of a right of action) and substitute one

or more Missouri statutes of the court's (rather than the plaintiff's) choosing.   It is

difficult even to imagine a Minnesota corporate defendant raising such an argument.  See,

e.g., Garner v. Healy, 184 F.R.D. 598, 604 (N.D. Ill. 1999) ("Defendants have not

provided this Court with any case law that would prohibit the application of the Ohio or

Connecticut consumer fraud statutes to non-resident consumers" where defendants

conducted operations in Ohio and Connecticut).

And indeed, Due Process choice-of-law contact considerations as explained by the

Supreme Court in Allstate and Shutts are not different in class versus individual actions;

to the contrary, they are explicitly the same.  That is the meaning of a "claim-by-claim"

or "individualized" approach – there is no special aggregate class analysis that may

properly yield a different Due Process result for a group of claims than would be obtained

---

[22] See, e.g., Downing v. Abercrombie & Fitch, 265 F.3d 994, 1006-07 (9th Cir. 2001) (dismissing as "pure fancy" the suggestion that Hawaii would wish to block its residents from a recovery available in California under California law).

for each claim considered individually.  Once any significant contacts between Minnesota
and each of the claims have been enumerated in detail, Minnesota has met the threshold
Due Process test for applying its law to the claims, and this result cannot be revised,
slanted, or obscured by plaintiffs' status as a putative class.

II.     **CHOOSING CHOICE OF LAW RULES:  BECAUSE THIS COURT SITS
        IN THE DISTRICT OF MINNESOTA, IT MUST APPLY MINNESOTA'S
        CONFLICT OF LAW RULES.**

        Once the Court has determined which laws it may constitutionally apply, the Court
determines which law will actually apply.  In this case, the proper mechanisms come
from Minnesota.  "Federal courts sitting in diversity apply the forum state's conflict of
laws rules."  Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir. 1995).

        A.      **Minnesota Procedures and Remedies Laws Apply.**

        Minnesota's conflict of law rules dictate that when a conflict of law issue arises, a
court must first decide whether the question involves substantive law or procedural or
remedial law.  Schumacher v. Schumacher, 676 N.W.2d 685, 690 (Minn. Ct. App. 2004).
If the law in question involves procedures or remedies, the law of the forum applies, and
the issue is resolved.  Davis v. Furlong, 328 N.W.2d 150, 153 (Minn. 1983) (matters of
procedure and remedies are governed by law of forum); Gate City Federal Savings &
Loan Ass'n. v. O'Connor, 410 N.W.2d 448, 450 (Minn. Ct. App. 1987), rev. denied (Oct.
21, 1987) (same); Danielson v. National Supply Company, 670 N.W.2d 1, 5-6 (Minn. Ct.
App. 2003) (same).  In this case, the analysis ends here with regard to the parts of
consumer protection laws related to procedures and remedies, even if such laws grossly
conflict in other jurisdictions.

**B.      Minnesota's Substantive Law Applies Save Only for True Conflicts.**

If the law at issue involves substantive laws, then the court determines whether the competing states' substantive laws truly conflict.  If there is no significant difference, there is no conflict.  The analysis ends, and the law of the forum applies.  See, e.g., Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 29 (Minn. 1996); Davis by Davis v. Outboard Marine Corp., 415 N.W.2d 719, 723 (Minn. App. 1987) (forum applies own law where there is "no significant distinction" between laws of two states.), rev. denied (Jan. 28, 1988).

**C.      Conflicting Law Does Not Apply Where Five Factors Favor Application of Minnesota's Substantive Law.**

If a true conflict of substantive laws exists, Minnesota courts resolve the conflict in accordance with the "choice-influencing considerations" methodology of Professor Robert Leflar.  Milkovich v. Saari, 203 N.W.2d 408, 412-416 (1973) (adopting choice-of-law methodology proposed by Professor Robert Leflar in his article, "Choice-Influencing Considerations in Conflicts Law," 41 N.Y.U.L. Rev. 267, 279).  These considerations include: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.  Boatwright v. Budak, 625 N.W.2d 483, 489 (Minn. Ct. App. 2001), rev. denied (July 24, 2001) (citing Jepson, 513 N.W.2d at 470, and Milkovich, 203 N.W.2d at 412).  Minnesota has a strong and longstanding governmental interest in compensating consumer victims and curtailing the deceptive acts of its own corporations.

III.   **MINNESOTA REQUIRES APPLICATION OF MINNESOTA LAW TO PROCEDURAL AND REMEDIAL ISSUES WITHOUT REGARD TO WHETHER SUCH LAWS CONFLICT WITH OTHER JURISDICTIONS THAT HAVE CONTACTS.**

Minnesota follows "[t]he almost universal rule that matters of procedure and remedies [are] governed by the law of the forum state."   Danielson, 670 N.W.2d at 5 (citing Davis, 328 N.W.2d at 153 (Minn. 1983)).   See, e.g., Zaretsky v. Molecular Biosystems, Inc., 464 N.W.2d 546, 548 (Minn. Ct. App. 1990) (quoting Anderson v. State Farm Mut. Auto. Ins. Co., 222 Minn. 428, 432, 24 N.W.2d 836, 839 (1946)) ("The court of the forum, subject only to the limitations of the federal constitution …, determines whether a given question involves one of substance or of remedy."); Gate City Federal Savings and Loan Assoc. v. O'Connor, 410 N.W.2d 448, 450 (Minn. Ct. App. 1987), rev. denied (Oct. 21, 1987) (matters involving procedure and remedies are governed by law of forum state.); Ferris, Baker Watts, 2004 WL 2501563 at *1, 4 (Exh. 96) (if law is procedural, law of forum state applies and no further choice of law analysis is needed); Florida State Board of Administration v. Law Engineering and Environmental Services, Inc., 262 F. Supp. 2d. 1004, 1011 (D. Minn. 2003) (well settled in Minnesota that matters of procedure and remedies are governed by forum state).   It is error to apply Leflar's five factor test to conflicts of procedures or remedies.   Davis, 328 N.W.2d at 153.

The law of the forum also determines whether a question is one of substance or procedures or remedies.   Gate City, 410 N.W.2d at 450 (citing Anderson v. State Farm Mut. Auto. Ins. Co., 222 Minn. 428, 432, 24 N.W.2d 836, 839 (1946)).   Under Minnesota

law, "[i]t has long been recognized that substantive law is that part of law which creates, defines and regulates rights, as opposed to 'adjective or remedial' law, which prescribes the method of enforcing the rights or obtaining redress for their invasion." Zaretsky, 464 N.W.2d at 548 (quoting Meagher v. Kalvi, 251 Minn. 477, 488, 88 N.W.2d 871, 879-80 (1958)); Schumacher, 676 N.W.2d at 690.  Thus, a statute is procedural "[w]hen it neither creates a new cause of action nor deprives defendant of any defense on the merits." Stern v. Dill, 442 N.W.2d 322, 324 (Minn. 1989); see also Florida State Board of Administration, 262 F. Supp. 2d at 1011 (statute of limitations is procedural matter in Minnesota because it relates to remedy); Diversified Business Investments Inc., v. Fisher, 1991 WL 162984 *1, 4 (Minn. Ct. App., Aug 27, 1991) (Exh. 101) (statutory condition requiring pleading and proving existence of brokers license in order to collect a broker commission relates to remedy to enforce payment, not to right to commission, and is therefore procedural/remedial).

In the present case, the demarcation between the substantive parts of consumer laws and the procedures and remedies attendant to those laws is obvious.  "[S]ubstantive law is that part of the law which creates, defines, and regulates rights." Schumacher, 676 N.W.2d at 690 (quoting Meagher, 88 N.W.2d at 879-80).  A substantive part of the law is one that "directly impacts on the accrual of a cause of action in the first instance." Ferris, Baker Watts, 2004 WL 2501563 at *4 (Exh. 96) (quoting Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir.1995)).  The substantive question involved with regard to the issue of consumer protection is what conduct is prohibited under the statutes and whether plaintiffs have standing to bring an action.

Procedural law "prescribes [the] method of enforcing the rights," while the law of remedies refers to "obtaining redress for their invasion." Zaretsky, 464 N.W.2d at 548 (quoting Meagher, 88 N.W.2d at 879-80). The former category includes filing and notice requirements. The latter includes statutes of limitation,[23] injunctions, damages, damages multipliers, limits on damages, restitution, and prospective equitable relief.

In Minnesota, private prosecution of consumer protection statutes does not require that notice be sent to any state agency, they do not require plaintiffs to draft "cease and desist" letters to a defendant prior to filing suit, and they do not require plaintiffs to file complaints with a state agency or to proceed first before such agency. Other jurisdictions' procedural law that requires such steps is irrelevant and no conflict analysis need be performed. Additionally, the remedies permitted by Minnesota's consumer statutes include damages and any equitable relief the Court deems proper. Minn. Stat. § 8.31, subd. 3a. However, Minnesota's consumer laws do not require nominal damages or judicial multiplication of damages, do not include the possibility of punitive damages, and do not cap damages. The provisions of jurisdictions, such as New Jersey, that require trebling of damages would not apply, nor would any rule that proscribes or limits damages in consumer fraud cases.

## IV.   BECAUSE ONLY TRUE CONFLICTS OF SUBSTANTIVE LAW REQUIRE A CHOICE OF LAW ANALYSIS, THIS COURT MUST APPLY MINNESOTA LAW TO ACTIVITIES THAT BOTH MINNESOTA AND ANOTHER STATE'S CONSUMER LAW PROHIBIT.

---

[23] Unless another state's limitations law prohibits a cause of action entirely (such as some statutes of repose) as in Nesladek, Minnesota's statute of limitations applies. Florida State Board, 262 F. Supp. 2d. at 1011 (applying Minnesota law because "[s]tatute of limitations is a procedural matter in Minnesota because it relates to remedy").

Not only does this Court automatically apply the procedure and remedy rules of Minnesota's consumer laws to every case, but it also applies Minnesota's substantive law where it does not truly conflict with another state's substantive law.  See, e.g., Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 29 (Minn. 1996); Davis by Davis v. Outboard Marine Corp., 415 N.W.2d 719, 723 (Minn. App. 1987) (forum applies own law where there is "no significant distinction" between laws of two states.), rev. denied (Jan. 28, 1988).  By any measure, the central focus cannot be on dogmatic variations in language but on what conduct each statute prohibits.  If both Minnesota and another state prohibit the same *conduct* at question in the subject case, no one can argue that the statues differ in substance, regardless of potential idiosyncratic differences.

A.      **All Consumer Protection Regimes Share a Common Chord:  the Model Acts Promulgated by None Other Than the Federal Trade Commission.**

Part of the analysis of substantive law must begin with statutory language itself.  And there is no more practical place to start than with all state consumer protection regimes' antecedents.   Consumer protection law in the United States has become a creature of statute.  By the early 1980s, every state and the District of Columbia had enacted consumer protection legislation, based upon model acts promulgated by the Federal Trade Commission ("FTC") and the National Conference of Commissioners on Uniform State Laws ("Uniform State Law Commission") – originally referred to as "little" or "baby FTC acts."  Like Minnesota's quartet of consumer protection acts, these remedial statutes broadly prohibit unfair or deceptive acts and practices that harm

consumers.  Ly v. Nystrom, 615 N.W.2d 302, 308 (Minn. 2000) (observing that by early 1980s every state and jurisdiction in United States had enacted consumer protection laws similar to Minnesota's consumer fraud laws); Jonathan Sheldon et al., Unfair and Deceptive Acts and Practices §§1.1; 3.4.2.2 and Appendix "A" (listing statutes) (6th Ed. 2005) ("Sheldon"); Anthony P. Dunbar, Comment, Consumer Protection: The Practical Effectiveness of State Deceptive Trade Practices Legislation, 59 Tul. L. Rev. 427 (1984) ("Dunbar").

These state consumer protection statutes – or "UDAP" statutes as they have come to be generically known[24] – were legislative responses to two persistent consumer protection problems. The first was a lack of sufficient resources at the two federal agencies responsible for protecting consumers from deceptive, and at times dangerous, unfair trade or marketing practices:  the FTC and the Food & Drug Administration.  Prior to UDAP enactments, these two agencies were tasked with investigating and prosecuting all localized marketing misconduct.  Given the size of the United States, its diverse, dispersed population, and the expansive nature and prevalence of marketplace mischief, neither of these federal agencies could effectively police and remedy all of the instances of abusive or misleading consumer marketing practices that occur throughout the nation. William A. Lovett, State Deceptive Trade Practice Legislation, 46 Tul. L. Rev. 724, 729 & n.10, 736-37 (1972). ("Lovett"); FTC Press Release (July 7, 1966) (Exh. 102).

The second problem was the ineffectiveness of traditional state common law and

---

[24] "UDAP" is an acronym for "Unfair or Deceptive Acts or Practices" statutes.   Sheldon at §1.1.

civil code remedies (e.g., actions for fraud, deceit, redhibition, or warranty) in protecting and affording remedies to consumers mistreated or injured by unfair, deceptive or sharp sales practices.  Lovett at 724-725; Seth W. Goren, A Pothole on the Road to Recovery: Reliance and Private Class Actions Under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 107 Dick. L. Rev. 1 (2002) ("Goren").  As explained by one commentator:

> This development in the law [i.e.- the enactment of state consumer protection laws] illustrates, and is a response to,  widespread consumer dissatisfaction with their treatment in the marketplace. The discontent is rooted in the fundamental problem that, from the standpoint of individual consumers, our commercial law has too often provided unreliable and uneconomic access to justice. Whereas the established commercial law has provided an acceptable regime of contracts and remedies for businessmen, consumers have suffered from inadequate remedies and prohibitive costs in obtaining access to comparable commercial justice. In most consumer controversies the risks and expenses of investigation, counsel, and litigation far outweigh the likely recoveries that could reasonably have been anticipated with traditional actions for warranty, misrepresentation, or fraud. Further, the courts would not normally award attorney's fees to successful plaintiffs, except perhaps in extreme cases where overwhelming evidence of fraud was presented. Therefore, on the basis of sensible estimates about the likely returns from such litigation, both the individual consumer victims and their legal counsel usually reached the same conclusion: under the traditional rules of the game, it was less expensive to suffer most deceptive trade practices than to remedy them through legal action.

Lovett at 725.[25]

---

[25]   A stark catalog of the many and formidable pitfalls confronting an aggrieved consumer under the common law is provided in a 1967 historical review of the subject:
> A deceived buyer might bring an action for deceit against a seller who had falsely advertised a product.  Legal pitfalls and requirements of proof, however, were sufficient to dissuade all but the most persistent or most seriously injured consumer. The purchaser willing to seek recovery of the nominal sum usually involved was likely to be told by the court that scienter had not been adequately proved, that his reliance on the misrepresentation was unreasonable because he should have examined the goods or obtained the counsel of impartial and reliable persons, that

Thus between the mid 1960s and 1981, every State and the District of Columbia had enacted a remedial statute that outlaws deceptive and abusive marketing and advertising misconduct and provides state enforcement mechanisms. Id.; Goren. See also Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2, 12 (Minn. 2001) ("In passing consumer fraud statutes, the legislature clearly intended to make it easier to sue for consumer fraud than it had been to sue for fraud at common law. The legislature's intent is evidenced by the elimination of elements of common law fraud, such as proof of damages or reliance on misrepresentations") (quoting State by Humphrey v. Alpine Air Prods., Inc., 500 N.W.2d 788, 790 (Minn. 1993)). These UDAP laws were the outgrowth of a national movement led by the FTC to enact at the state level what were for a time called "little FTC acts." Lovett at 730; Sheldon at §§ 1.1; 3.4.2.2; Dunbar at 428. See also Exh. 102, FTC Press release; Exh. 103, Model Bill; Exh. 104, FTC Fact Sheet; and Exh. 105, 1970 Suggested State Legislation: Unfair Trade Practices and Consumer Protection Act.

Virtually every UDAP law in the nation traces its origin to the FTC Act, 15 U.S.C. § 45(a)-(m) or one of two contemporaneous model consumer acts that were developed and promulgated in the 1960s. Sheldon § 3.4.2.2; Dunbar at 488. The leading model was the "Unfair Trade Practices and Consumer Protection Act," or "UTPCPA," which was authored by the FTC in conjunction with the Committee on Suggested State Legislation

---

the representations concerned matters of opinion and thus--as "puffing"--should have been treated with skepticism,  or that in any case he had not sufficiently demonstrated that his purchase was induced by the advertisement.
Note, Developments in the Law – Deceptive Advertising (Part III-History of Legal Controls),  80 Harv. L. Rev. 1016, 1016 -17 (1967) (citations omitted.)

of the Council of State Governments.  See Exh. 102, FTC Press release; Exh. 103, Model

Bill; Exh. 104, FTC Fact Sheet; and Exh. 105, 1970 Suggested State Legislation: Unfair

Trade Practices and Consumer Protection Act.  Although this model's final form allowed

state legislatures to select among three alternatives when defining prohibited conduct and

activities, there is not any real difference between the three versions for present analytical

purposes.  All three UTPCPA "versions" or alternatives in one fashion or another prohibit

deceptive acts and practices aimed towards consumers, including those of the type that

are at issue here.[26]  The UTPCPA serves as the model for a majority of the UDAP laws

that were enacted.  Depending upon how one classifies the various UDAP statutes, the

FTC Act and the FTC's UTPCPA served as the basis for as many as 44 states consumer

---

[26] The difference between the three UTPCPA versions turns on how broadly or how specifically a state legislature wanted to define prohibited marketing conduct.  See Committee on Suggested State Legislation of the Council of State Governments, 1970 Suggested State Legislation:  Unfair Trade Practices and Consumer Protection Act, 2-3 (1970) (Exh. 105); Sheldon at 3.4.2.2.; Lovett at 730.  Alternative Form No. 1, the broadest form, prohibited the use of "**unfair methods of competition and unfair or deceptive acts or practices**" which, if used in interstate commerce, are prohibited by § 5(a)(l) of the Federal Trade Commission Act , 15 U.S.C. 45(a) (1). The use of this form thus prohibited both antitrust violations as well as deceptive and unfair trade practices.  Alternative No. 2, which was phrased so as to not include antitrust violations within its scope, declares unlawful "**false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.**" Alternative No. 3 prohibits the twelve specific types of deceptive practice enumerated in the Uniform Deceptive Trade Practices Act as promulgated by the National Conference of Commissioners on Uniform Laws in 1964, but with an added thirteenth prohibition, a second so called "catch all," which read: "**any other act or practice which is unfair or deceptive to the consumer**." Thus, common to all three FTC models is the prohibition of deceptive acts and practices.  Lovett at 730, 732-34.  The differences are not relevant in this case.

protection laws.  See Exh. 104, FTC Fact Sheet.[27]

The second model consumer protection act was authored by the National Conference of Commissioners on Uniform State Laws, and was called the Uniform Deceptive Trade Practices Act or "UDTPA" for short.  See Exh. 106, Uniform Deceptive Trade Practices Act: 1966 Revision; Sheldon at § 3.4.2.4. Dunbar at 428-29.  There were two versions of the UDTPA promulgated, one in 1964 and a revised one in 1966.  Despite the existence of two versions, there is, like the UTPCPA, no material difference between the two as to proscribed conduct.  Both identically outlaw twelve specific acts of trade and market misconduct, including a catch-all provision, namely:  "engages in any other conduct which similarly creates likelihood of confusion or of misunderstanding."  A total of thirteen states have adopted or patterned their UDAP law on one of the UDTPA models.  See Sheldon at 3.4.4.4; Exh. 110, Legal Information Institute, listing states enacting a version of the UDTPA.  Minnesota is one, having adopted the 1966 version as the Minnesota Deceptive Trade Practices Act, Minn. Stat. §325D.44.

Thus, while State consumer-protection laws may vary in general, as Judge Easterbrook for the Seventh Circuit commented in In re Bridgestone/Firestone, Inc., 288

---

[27] Some commentators' counts of the states adopting the UTPCPA is lower than the FTC's.  For example, Sheldon et al. and Dunbar put the number of states that have patterned their laws on FTC § 5 or the UTPCPA at around 26.  Sheldon at 3.4.2.2; Dunbar at 427-28.  The disparity may be due to how one classifies the UDAPs that list specific instances of prohibited misconduct based on FTC Alternative No. 3 and also incorporated the list provided in the Uniform Deceptive Trade Practices Act with an additional catchall.

F.3d 1012, 1018 (7th Cir. 2002),[28] their substance is strikingly similar and without any

material difference in this case.  This is not surprising given the common genesis and

impetus for their existence.  All of them in one fashion or another outlaw misleading and

deceptive conduct, advertisements or representations relating to a consumer product

similar to Minnesota's consumer protection statutes.  See Comparison Tables supplied

Tab __ of Plaintiffs' Appendix.  In fact, the differences between various states' consumer

protection laws have been characterized by the Ninth Circuit as "idiosyncratic" at best,

and "not sufficiently substantive" to predominate over common claims in a class action

as contemplated by Shutts, 472 U. S. 797.  Hanlon v. Chrysler Corp., 150 F.3d 1011,

1023 (9th Cir. 1988).  See also In re Pharm. Indus. Average Wholesale Price Litig., 230

F.R.D. 61, 85 (D. Mass. 2005) (permitting national UDAP class action certification to

proceed on behalf of class of 40 million Medicare Part B beneficiaries who made co-

payments where "[d]efendants point to no state where the intentional, fraudulent acts

alleged would be permitted under the consumer protection statute.").  In short, not a

single jurisdiction permits the misconduct and deceptions evidenced by St. Jude's

marketing and promotion of its now withdrawn Silzone heart valve product lines.

   **B.    Minnesota's Substantive, Boilerplate Consumer Laws Prohibit the
          Conduct Alleged in This Action.**

   Like all jurisdictions, Minnesota's consumer laws prohibit a broad panoply of

conduct that is likely to injure or confuse consumers.  The elements of Minnesota's

---

[28] But see Garner v. Healy, 184 F.R.D. 598, 602-03 (N.D. Ill. 1999) (distinguishing
Seventh Circuit mass tort cases from deceptive marketing practice cases, in which "there
are no 'subsidiary concepts' such as duty of care, foreseeability or medical/scientific
causation lurking in the background here").

consumer protection statutes forbid the acts described in the Statement of Facts, *supra*. Universally, so do the laws of other jurisdictions.   Minnesota's laws forbid both affirmative misrepresentations (commissions), and material omissions.

### 1.    Elements of an Action under Minnesota Law

A plaintiff may establish that the defendant has violated Minnesota's Prevention of Consumer Fraud Act ("MPCFA"), which requires an injured party to show:

1. an act, use, or employment by defendant of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice[29]; and

2. defendant's intent that others rely on the statements or practices in connection with a sale.

Minn. Stat. § 325F.69, subd. 1.  In addition to affirmative representations, a plaintiff may satisfy the wrongful act requirement by proving a deceptive omission, or deceptive silence, as a violation.  Cashman v. Allied Prod. Corp., 761 F.2d 1250, 1255 (8th Cir. 1985); Hatch v. Fleet Mortgage Corp., 158 F. Supp. 2d 962, 967 (D. Minn. 2001) (MPCFA and MDTPA support omissions as violations).

A plaintiff need not prove that the defendant intended the statement to mislead or the practice to be deceptive,[30] but only that the defendant intends consumers to rely on the statements in connection with the sale.  Church of the Nativity of Our Lord v. WatPro, Inc., 474 N.W.2d 605, 612 (Minn. App. 1991), aff'd, 491 N.W.2d 1 (Minn.

---

[29] "Deceptive practices" are defined in Minn. Stat. § 325D.44, discussed *infra*.

[30] Some courts have used the incorrect phrase "intentional misrepresentation" to describe an element of Minnesota's consumer fraud statute.  However, the mistake is likely the result of attempting to use shorthand, and in those cases the issue of whether a misrepresentation was intentional was neither adjudicated nor discussed.

1992); <u>Cashman</u>, 761 F.2d at 1255; <u>Prof'l Fin. Mgmt.</u>, 703 F. Supp. at 1397.  Under §

325F.69, subd. 1, "The defendant must intend that its conduct be relied on, but reliance

by the victim is not necessary for the violation to occur."  <u>Group Health</u>, 621 N.W.2d at

12.

Alternatively or concomitantly, a plaintiff may establish a violation of violated

Minnesota's Uniform Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. §

325D.44, subds. 1(5), (7), and (13), which states:

> Subdivision 1.  A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> * * *
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
>
> * * *
>
> (7) represents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;
>
> * * *
>
> or (13) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

"Conduct prohibited by the statutes" is susceptible to broad interpretation by the Court.

<u>See</u> <u>Group Health</u>, 621 N.W.2d at 13 (it was "the intent of the legislature to make

statutory misrepresentation in sales actions less burdensome than common law fraud

actions"); <u>see also</u> <u>Meyer v. Dygert</u>, 156 F. Supp. 2d 1081, 1086 (D. Minn. 2001) ("The

law is clear that the Act was intended to be broader the common law fraud cause of

action, and that it is remedial in nature and should thus be liberally construed.").  The

scope of the MPCFA is broader than that of common law fraud.  LeSage v. Norwest Bank Calhoun-Isles, N.A., 409 N.W.2d 536, 539 (Minn. Ct. App. 1987).  The MPCFA is remedial in nature and should be "liberally construed in favor of protecting consumers." State v. Alpine Air Prods., Inc., 490 N.W.2d 888, 892 (Minn. Ct. App.), aff'd, 500 N.W.2d 788 (Minn. 1993).

## 2. Omissions Are Violations

In Minnesota, a party has an obligation to disclose a particular fact under certain circumstances.  Minnesota law has long recognized the principle that, when fraud is accomplished by omission or "half-truth," the "reliance" element of causation is replaced with a plaintiff's burden to demonstrate that there was a "duty to disclose."  Simonsen v. BTH Prop., 410 N.W.2d 458, 461 (Minn. 1987) (court found that it was "natural conclusion" that ad for six-unit building meant six legally rentable units, but where seller of building omitted fact that it was zoned for five units only).  The supreme court of this State has held:

> As a general rule, one party to a transaction has no duty to disclose material facts to the other.  However, *special circumstances* may dictate otherwise.  For example:
>
> (a) One who speaks must say enough to prevent his words from misleading the other party.  Newell v. Randall, 32 Minn. 171, 19 N.W. 972 (1884).
>
> (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party.  [Marsh] v. Webber, 13 Minn. 99 (109) (1868).
>
> (c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts.  See, e.g., Wells-Dickey Trust Co. v. Lien, 164 Minn. 307, 204 N.W. 950 (1925).  (Emphasis supplied.)

Richfield Bank and Trust Co. v. Sjogrem, 244 N.W.2d 648, 650 (Minn. 1976) (quoting

Klein v. First Edina Nat. Bank, 293 Minn. 418, 421, 196 N.W. 2d 619, 622 (1972)).

Those same standards apply today.  M.H. v. Caritas Family Serv., 488 N.W.2d 282, 288

(Minn. 1992).  Additionally, where one party "has *special knowledge* of material facts to

which the other party does not have access may have a duty to disclose these facts to the

other party."  Simonsen v. BTH Prop., 410 N.W.2d 458, 461 (Minn. 1987).

These rules have been expressly applied to omissions alleged in Minnesota

consumer protection cases.  In Fleet Mortgage Corp., *supra*, the attorney general alleged

that defendant mortgage company failed to disclose its "data sharing" and "pre-acquired

account telemarketing" practices to its customers.  Fleet Mortgage first argued that

because data sharing and pre-acquired account telemarketing were not listed in the

statutes, the attorney general failed to state a cause of action.  The court rejected Fleet

Mortgage's argument, stating that the pleadings were sufficient to support a claim that the

mortgage company had created a likelihood of confusion or of misunderstanding.  158 F.

Supp. 2d at 966.  Fleet Mortgage then argued that the failure to disclose could only be

actionable if there were a "duty to disclose" imposed by law.  The court rejected this

argument as well, holding that proof of such a duty is "not required for liability under

more broadly drafted consumer protection statutes."  Id. at 967; see also Prof'l Fin.

Mgmt., Ltd., 703 F. Supp. 1388 (D. Minn. 1989) (citing Cashman v. Allied Products

Corp., 761 F.2d 1250, 1255 (8th Cir. 1985)) ("The actionable misrepresentation or

omission [in Minnesota consumer fraud cases] may occur through silence 'if there is a

relationship of trust or confidence, ... or an unequal access to information.'").

### 3.    Causation

"Any person injured by a violation" of any of the laws the attorney general is charged to investigate and enforce "may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."[31]   Minn. Stat. § 8.31, subd. 3a ("Private AG Act").   Thus, plaintiffs seeking damages must demonstrate injury, whereas those seeking only an injunction need not prove any harm at all.

### a.    Not Required in Injunction Cases

A plaintiff's claims for relief may be, in part, injunctive in nature, and where a plaintiff seeks injunctive relief under Minnesota's consumer statutes, questions of liability turn entirely upon the conduct of the Defendant.   This means that a plaintiff's claims for injunctive relief under the consumer statutes require absolutely no showing of individual or groups reliance, displacing the call for not only direct individual reliance evidence, but also for any circumstantial evidence of reliance.

Section 325F.69 allows injunctive relief for misrepresentations and false, misleading statements "whether or not any person has in fact been misled, deceived, or

---

[31] Although Minn. Stat. § 325D.44 is not expressly enumerated in Minn. Stat. § 8.31, subd. 1, "Investigate offenses against the provisions of certain designated sections; assist in enforcement," subdivision 1 expressly states that the application of certain statutory sections is "not exclusive[]," and that "[t]he attorney general shall investigate violations of the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade."   Courts have adjudicated claims brought by the attorney general under § 325D.44 via the empowerment of § 8.31.   See, e.g., Fleet Mortgage, 158 F. Supp. 2d at 967.   There is thus no reasonable basis to argue that a private plaintiff could not sue for damages under § 8.31, subd. 3a.

damaged thereby." And Section 325D.44 provides for injunctive relief where a Defendant misrepresents the quality of goods or creates a likelihood of confusion or misunderstanding, 325D.44, Subd. 1(7) and (13), regardless of whether there is any actual confusion or misunderstanding, 325D.44, Subd. 2.

The clear mandate from the legislature to relax the requirements necessary to prove a consumer fraud violation in Minnesota requires courts applying those statutes to completely ignore any reliance element where consumers seek injunctive relief. See Fogie v. Rent-A-Center, Inc., 867 F. Supp. 1398, 1403 (D. Minn. 1993) ("For injunctive relief, the class only needs to establish that the material omission had a capacity to deceive.") (citing Minn. Stat. §§ 325D.45 and 325F.69, subd. 1.).

### b. Causation in Misrepresentation Cases

In Group Health, the Minnesota Supreme Court held that, although there is a reliance "component" to the causation element when proving a compensable injury under the MPCFA, a plaintiff may establish some causal-nexus, through indirect or circumstantial evidence, in order to satisfy the requirements of the Private AG Act. See 621 N.W.2d at 14 ("[W]e reject the view expressed in two federal court decisions that our misrepresentation in sales laws require proof of individual reliance in all actions seeking damages.") Instead, the court held that the legislature relaxed the Plaintiffs' burden of showing individual proof in order to demonstrate causation related to the alleged deception.

### i. Minnesota Has Adopted Lanham Act Causation Standards, None of Which Requires Proof of Individual Reliance.

The court in Group Health also indicated that proper methods of proving causation of injury under the consumer statutes could be found in cases interpreting Lanham Act, 15 U.S.C. § 1125(a).  Id. at 15 n. 11.  Specifically, the court cited PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266 (2d Cir. 1987), as one of the "cases that in our view reflect appropriate sensitivity to the remedial goals of the statute that are paralleled in the statutes at issue here."  621 N.W.2d at 15 n. 11.  In PPX, a company receiving royalties on records featuring Jimi Hendrix sued Audiofidelity for marketing several records purporting to feature Hendrix performances.  After the trial court determined that PPX was not entitled to damages because it did not produce "evidence of actual consumer confusion," the Second Circuit reversed the decision, holding that, "If a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or consumer of the product."  The court further commented:

> The jury's conclusion that consumers actually were deceived by Audiofidelity's misrepresentations is supported by the false advertising contained on the record albums and the fact that Audiofidelity successfully sold the albums on the market.
>
> * * *
>
> Indeed, that no consumers have complained merely is testament to the efficacy of Audiofidelity's fraud.

Id. at 272-73.  In PPX, the court noted that the harm caused by improper labeling was self-evident, and because "a customer has no way of hearing the record prior to purchase," "[t]he only possible conclusion to be derived from Audiofidelity's conduct was that consumers actually were deceived by the misrepresentations."  Id. at 272.  See

Stutman v. Chemical Bank, 731 N.E.2d 608 (N.Y. 2000) (material omission satisfies causation requirement in consumer fraud cases for damages).

But even if this Court were to determine that further evidence of causation is necessary, a number of considerations are available to assist the Court in determining how to follow the relaxed causation standard established by the Private AG Act.  The "causal nexus" between the misrepresentation or deceptive practice and the plaintiff's alleged injury "may be established by other direct or circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct."  Group Health, 621 N.W.2d at 14. The supreme court provided guidance by suggesting that lower courts adopt the rationale of decisions interpreting the Lanham Act, "15 U.S.C. § 1125(a), a federal statute that, like the state laws at issue here, provides a private remedy for false or deceptive advertising. The federal courts have adopted a variety of approaches to this issue in Lanham Act, cases that in our view reflect appropriate sensitivity to the remedial goals of the statute that are paralleled in the statutes at issue here."  Id. at 15.

The Lanham Act permits courts to instruct the jury that, where there is evidence of a deliberate or egregious deception or blatant falsity, there is a presumption of actual confusion, which shifts the burden to the defendant to prove there are no damages. Group Health, 621 N.W.2d at 15 n. 11.  Courts may also consider evidence of consumer studies that report whether consumers are actually affected by certain misrepresentations or omissions.  Id.  The legal nexus requirement may be satisfied where a defendant's systematic deceptive conduct increased the market price.  Id. at 14.

### ii.      Admissions by Defendant

In "direct sales" consumer fraud cases, "there can be no question" that documents presented to the consumer by the defendant demonstrate the defendant's intent for the consumer to rely on the statements and representations made in those documents. In re Lutheran Brotherhood Var. Ins. Prod. Co., Sales Practices Litig., No. 99-MD-1309 (PAM/JGL), 2004 WL 909741, *5 (D. Minn. April 28, 2004) (Exh. 107). Concomitantly, when the defendant's records show that its statements or omissions are generally causing consumers to purchase its products at the prices imposed, causation is established. See id. ("Lutheran Brotherhood cannot formulate illustrations seeking to convince customers to buy products, observe that those illustrations are indeed convincing customers to buy, and then argue that the record contains no evidence of reliance.").    In this case, in an internal e-mail string among SJM Regional Sales Directors, one Regional Director, Mark R. Sportsman, explained his confidence that customers would pay the $300.00 premium: "Customers that are sold on the benefit of Silzone will pay the premium." Exh. 84, 0197554.  The benefit Mr. Sportsman referred to was inhibiting the incidence of endocarditis.  Exh. 83, Spadaro Dep. 47-48.  No variables remain as to why customers bought the valve – the purported benefits of Silzone.

### iii.      Law based on FTC Act

Most states, including Minnesota, patterned their statutes after the language in Section 5(a)(1) of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1), which provides in relevant part that "unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."  Because the FTC Act provides no individual

consumer standing, state legislatures, including Minnesota's, enacted legislation affording FTC-Act-protections to consumers. Uniformity of interpretation among these "baby FTC acts" has become the hallmark of consumer protection nationwide.

The supreme court has recognized Minnesota's adoption of both the spirit and letter of these broad provisions:

> By 1981, every state in the United States had statutes providing for consumer protection enforcement by a state agency – commonly, as in Minnesota, the state attorney general – with broad enforcement authority. Minnesota's Consumer Fraud Act was adopted in 1963 to achieve the same purpose[.]

Ly v. Nystrom, 615 N.W.2d 302, 308 (Minn. 2000) (citation and footnote omitted). By incorporating the FTC Act's broad and expansive prohibition against unfair or deceptive practices affecting commerce, Minnesota and other states enacted laws with potent private and state remedies providing wide-spread redress for marketplace abuses. The similarities between the statutes allow Minnesota courts to rely on decisional law from other states. For example, Minnesota's supreme court has expressly relied upon Illinois case law interpreting Illinois's Consumer Fraud Act in support of its holdings with regard to Minnesota's consumer protection statutes. Ly, 615 N.W.2d at 312.

### c.    Causation in Omissions Cases

In Minnesota, causation is established in a consumer fraud action where an omission is deemed "material." Fleet Mortgage, 158 F. Supp. 2d at 966-67; see also Yost v. Millhouse, 373 N.W.2d 826, 830 (Minn. Ct. App. 1985) ("A statement of fact is material if it would *naturally affect* the conduct of the party addressed."). Thus, Minnesota law is in harmony with other jurisdictions that find causation to be

demonstrated when an omission supporting a deceptive practice claim is "material."  In this case, SJM omitted myriad material facts, including, but not limited to, 1) animal studies that revealed evidence of paravalvular leak and silver leaching, 2) findings that Silzone caused hemolysis, 3) evidence that the silver coating wore away after a short period of time, 4) reports from the field and the AVERT study of little or no necessary tissue ingrowth on the Silzone valves, 5) reports of a statistically significant increase in Silzone explants, and 6) evidence that Silzone was not effective in fighting bacteria in animal studies (the only basis for its premium pricing and sales).

This outcome reflects the principle venerably recognized in Minnesota fraud cases that, "where representations are made by a party who is presumed to know their truth, *reliance thereon will be presumed*."  Anderson v. Donahue, 116 Minn. 380, 384, 133 N.W. 975, 976 (1911) (emphasis added).  Essentially, when the deceptive conduct complained of involves a material omission, an objective standard replaces subjective reliance-type standards.

The substantive law of Minnesota as reviewed above demonstrates that Minnesota's consumer laws proscribe a broad array of conduct.  Only those jurisdictions whose laws create a true conflict require further analysis.  "A conflict of law exists if choosing the law of one state over the law of another state would be 'outcome determinative.'"  Schumacher v. Schumacher, 676 N.W.2d 685, 689 (Minn. Ct. App. 2004) (quoting Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co., 590 N.W.2d 670, 672 (Minn. Ct. App. 1999) (where Minnesota law precluded a claim while North Dakota law allowed one, choice between two would be outcome determinative)).

Based on the "outcome determinative" standard (precluding versus allowing claims), Plaintiffs have categorized the laws of every potentially relevant jurisdiction into five outcome determinative inquiries:

1)   Did SJM's conduct violate the consumer protection law?

2)   Is there a private cause of action?

3)   Is there a scienter element requiring at least knowledge by defendant of the deceitfulness of its conduct?

4)   Does the statute require proof of individualized reliance?

5)   Does the law prohibit material omissions?

With respect to each jurisdiction, Plaintiffs have answered each of the outcome determinative questions.  See Appendix of Individual Jurisdictions, attached hereto.  The following jurisdictions have no outcome determinative conflicts with Minnesota law: Alaska, California, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Missouri, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, and West Virginia.  Id.   The Court should find that these jurisdictions do not create a true conflict of substantive law, and in so doing apply the law of Minnesota with respect to each class member from those jurisdictions.

**V.   BECAUSE MINNESOTA'S GOVERNMENTAL INTERESTS IN POLICING THE CONDUCT OF ITS DOMICILE CORPORATION IS SUPERIOR TO ANY OTHER STATE'S INTEREST IN COMPENSATING VICTIMS, THIS COURT SHOULD APPLY MINNESOTA LAW WHEREVER A WHERE TRUE CONFLICT PERSISTS.**

Plaintiffs have also identified any jurisdiction whose legislature or courts have created a potential conflict with regard to *any* of the five questions posed above.  The following jurisdictions have, arguably, outcome determinative conflicts of substantive law:  Alabama, Arizona, Arkansas, Colorado, Georgia, Indiana, Iowa, Maryland, Nevada, New Mexico, Oklahoma, Pennsylvania, South Dakota, Texas, Virginia, Wisconsin, and Wyoming.  See Appendix of Individual Jurisdictions, attached hereto.

For those substantive areas where a true conflict exists between Minnesota's law and another state's law, this Court should resolve the conflict based on the Leflar analysis adopted by the Minnesota Supreme Court in Milkovich v. Saari, 203 N.W.2d 408, 412-416 (Minn. 1973).  Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir. 1995).  The Leflar analysis requires the court to weigh Minnesota's interests versus the other states' interests in the area where a true conflict exists using five flexible criteria.  They are: 1) predictability of results, 2) maintenance of interstate and international order, 3) simplification of the judicial task, 4) advancement of Minnesota's governmental interest, and 5) application of the better rule of law.  Milkovich, 203 N.W.2d at 412.

## A.    Predictability of Results

This element addresses "whether the choice of law was predictable *before* the time of the transaction or event giving rise to the cause of action."  Danielson v. National Supply Co., 670 N.W.2d 1, 7 (Minn. Ct. App. 2003) (emphasis in original).  This factor applies "primarily when parties desire *advance* notice of which state law will govern in *future* disputes."  Id. (emphasis in original).  Because the occurrence of many torts is unpredictable, parties have no expectation that a particular state's laws will apply to their

claim so some courts have been reluctant to apply this element.  See, e.g., Boatwright v. Budak, 625 N.W.2d 483, 489 (Minn. App. 2001); Danielson, 670 N.W.2d at 6 ("The law of Minnesota is not clear on whether the court must consider all five [elements] in a tort case.").  On the other hand, because commercial contractual disputes are predictable and parties frequently include provisions within the contracts expressing a desire for a certain state's law, the predictability of results is an important interest in contractual disputes. Ferris, Baker Watts, 2004 WL 2501563 at * 6 (Exh. 96).

No Minnesota case has dealt with the issue of whether its consumer protection laws are more similar to tort actions or contractual actions for purposes of Leflar conflicts of law analysis.  The few courts that have considered similar mixed areas of law have found that "[f]or purposes of choice of law analysis, however, bad faith and unfair trade practices claims properly should be characterized as contract, not tort claims."  Pen Coal Corp., 903 F. Supp. 980, 983 (S.D. W.Va. 1995).  As the Minnesota Supreme Court instructed: "While prior opinions may be helpful to a court's deliberations, the court's obligation is to be true to the method rather than to seek superficial factual analogies between the cases and import wholesale the choice of law analysis contained therein." Jepson v. General Casualty Co. 513 N.W.2d 467, 470 (Minn. 1994); see also Lommen v. City of East Grand Forks, 522 N.W.2d 148, 150 (Minn. App. 1994) (auto accident case analyzed not as tort case but as one implicating governmental immunity).

In this case, there are some aspects that sound in tort and other aspects that sound in contract.  The parties' expectations, however, all point towards the application of Minnesota law.  As with traditional torts like automobile accidents, slip and falls etc., the

plaintiff had no expectation that the Silzone cuff would fail because of the omissions and commissions by St. Jude.  They reasonably expected that their artificial valves would operate properly with the inherent risk of failure that attend all medical procedures. Thus, for the tort-like aspect of their claims against St. Jude, the Eighth Circuit noted that "there is no indication out-of-state parties had any idea that Minnesota law could control potential claims when they received their Silzone-coated valves." In re. SJM, 425 F.3d at 1120 (internal quotations and brackets omitted).  The Eighth Circuit, however, could have just as properly noted that for the tort-like aspects of their claims against St. Jude, the out-of-state parties had no idea that ***any particular state's*** law could control their potential claims.

The contract-like aspects of their claims, however, are different.  While it is doubtful that many of the patients had first-hand knowledge of the omissions and misrepresentations that St. Jude was making concerning the Silzone heart valve, their doctors were certainly aware of the claims when deciding which of the many options of artificial heart valves to implant.  The doctors were exposed to St. Jude's claims in the advertisements that St. Jude was disseminating and in the medical literature that St. Jude was sponsoring.  The doctors surely knew of St. Jude's contacts with Minnesota outlined above in the constitutional analysis.  In fact, the vast majority of the sales contracts signed between the doctors and St. Jude contained a choice of law or forum selection clause that indicated that any contract disputes between them would be litigated in Minnesota under Minnesota law.  Thus, the reasonable expectation of consumers and St. Jude was that Minnesota law would apply to disputes concerning the Silzone valves.

There is no indication that any relevant actor, i.e., patients, doctors or SJM, reasonably expected that another state's law would apply. To the extent that there were expectations, they overwhelmingly point to Minnesota.

### B.     Maintenance of Interstate and International Order

This element is "primarily concerned with whether the application of Minnesota law would show manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." Jepson, 513 N.W.2d at 471. In more concrete terms, this element seeks to ensure that Minnesota has sufficient contacts with and interest in the facts and issues being litigated. Danielson, 670 N.W.2d at 8; see also, Hughes v. Wal-Mart Stores, Inc., 250 F.3d 618, 620 (8th Cir. 2001) ("[This] factor is generally not implicated if the state whose law is to be applied has sufficient contacts with and interest in the facts and issues being litigated." (internal quotation omitted)). It also seeks "to minimize forum shopping designed to influence choice of law." Lommen, 522 N.W.2d at 151. Applying Minnesota law does not offend either of these concerns.

Minnesota contacts to this case are addressed in the constitutionality portion (Section I) of this brief. For that reason, it is no wonder that courts simply view this concern as a reiteration of the constitutionally sufficient contacts test. Stenzel v. State Farm, 379 N.W.2d 674, 676 (Minn. App. 1986). Given the grave weight of contacts SJM (and thus each class member) has to Minnesota, SJM cannot reasonably object to the notion that this factor favors application of Minnesota law.

The concern with forum shopping is no more difficult to rejoin. The Court obtained jurisdiction of this case pursuant to the multi-district litigation jurisdictional

grant in 28 U.S.C. § 1407.   All claims, in whichever federal court they were initially

filed, were consolidated in this case for resolution, *at the insistence of SJM* in its motion

to transfer.  Its motion read:

> Here, St. Jude Medical's Silzone-coated valves were designed, researched,
> developed, engineered, manufactured, tested, quality-controlled in Minnesota; and
> all labels, warnings and instructions were drafted in Minnesota by witnesses in
> Minnesota.   Likewise, all marketing and distribution efforts were based in
> Minnesota.  All of these facts point strongly towards transfer to Minnesota.

Exh. 97 at 10. (citations omitted).  SJM also stated,

> *[T]he only connection* this case has to [a New Jersey court] is that plaintiff …
> resides in New Jersey.  *That is not enough* to maintain venue, where, as here, the
> defendant is based in Minnesota, the evidence is based in Minnesota, and
> essentially identical litigation is proceeding in Minnesota.

Id. at 14.  If the plaintiff's residential contact to her or his home state is "not enough to

maintain venue," how could it be enough to apply its law in the face of Minnesota's

overwhelming contacts?   Also, St. Jude cannot seriously contend that plaintiffs were

forum shopping when this case was transferred to this Court on St. Jude's motion.

Application of Minnesota law here reduces forum shopping because the

influencing factor is Defendant's domicile, principle place of business, and locus of

planning and executing the deceptive marketing campaigns.   See Ferris, Baker Watts,

2004 WL 2501563 at *6-7 (court determined applying New Jersey RICO act would both

avoid forum shopping and demonstrate apt consideration for New Jersey's public policy,

as much of illegal activity occurred in and was coordinated through New Jersey) (Exh.

96).

**C.**    **Simplification of the Judicial Task**

This factor concerns this Court's ability to discern and apply the law of a state other than Minnesota.  Lommen, 522 N.W.2d at 152.  Unless dealing with complex issues of international law, this factor is rarely important.  This is especially true of federal courts, which regularly apply the law of states other than the one in which they sit.  Miller v. Pilgrim's Pride Corp, 366 F.3d 672, 674 (8th Cir. 2004).  Applying Minnesota or another state's law in this case poses no foreseeable problem therefore this factor is neutral.

### D.    Advancement of Minnesota's Governmental Interest

The governmental interest factor requires courts to determine which law most effectively advances a "significant interest of the forum state."  This requirement assures that "Minnesota courts are not called upon to apply rules of law inconsistent with Minnesota's concept of fairness and equity."  Medtronic, Inc., 630 N.W.2d at 455 (citing Board of Regents of Univ. of Minn. v. Royal Ins. Co. of Am., 503 N.W.2d 486, 490-91 (Minn. Ct. App. 1993), aff'd in part, rev'd in part, 517 N.W.2d 888 (Minn. 1994)).

Minnesota has a policy interest in deterring Minnesota manufacturers illegal conduct emanating from within its borders.  Fluck v. Jacobson Machine Works, Inc., 1999 WL 153789 at * 3 (Minnesota's policy interest of deterring manufacturers from placing a defective product into stream of commerce from within its borders is sufficient to apply Minnesota law to injury that occurred in Colorado) (Exh. 108).

Courts in other jurisdictions have determined that the governmental interest a state has in policing the conduct of its corporations outside the state weighs in favor of applying consumer statutes to local defendants nationwide.  See Diamond Multimedia

Sys., Inc. v. Superior Court, 968 P.2d 539, 557 (Cal. 1999) ("California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices.   California business depends on a national investment market to support our industry.   The California remedy for market manipulation helps to ensure that the flow of out-of-state capital necessary to the growth of California business will continue."); Financial Software Sys., Inc. v. First Union Nat'l Bank, 1999 WL 1241088, *11 (E.D. Pa. 1999) (Exh. 109) (for purposes of choosing deceptive trade practices law, interest of defendant's home state "to punish and deter unethical conduct by [local] businesses" outweighs interest of plaintiff's state, which did not provide remedy to victims like plaintiff).  Arizona's supreme court held:

> Indeed, it would appear that the state has a legitimate interest in redressing the wrongs committed from within Arizona.  There is a moral imperative to provide redress for those injured.   Further, when out-of-state investors are swindled by Arizona enterprises, the reputations and businesses of the majority of honest business people within the state are harmed.  That this state is willing to provide aid in redressing these wrongs is evidence that the state is serious in its fight to eradicate organized crime.  This evidence may instill confidence in non-residents seeking to invest in the legitimate businesses of this state.

Pickrell, 667 P.2d at 1312.   Other states' courts have determined that the state itself suffers an injury when its corporations commit deceptive trade practices – even when the victims of those frauds reside outside the state.  See Rio Grande Oil, 539 S.W.2d at 921 ("A state is damaged if its citizens are permitted to engage in fraudulent practices even though those injured are outside its borders.").

Even when challenged by dormant commerce clause arguments, local defendants have failed to convince courts that other states have a greater interest in not having the

resident state's consumer protection laws apply. <u>See</u> <u>Brown</u>, 322 N.E.2d at 374 (consumer protection statutes do not impose undue burden on interstate commerce when applied to victims in other states; regulation is not of "clean" commerce, but of commerce "infected with deceptive or unconscionable practices"); <u>Diamond Multimedia Sys.</u>, 968 P.2d at 556 (California defendant could not evade liability vis-à-vis out-of-state class members for manipulative conduct prohibited by California statute; application of statute to out-of-state class members did not burden interstate commerce under U.S. Const., art. I, § 8, where defendant's manipulative conduct occurred in California; even potential burden on interstate commerce was not constitutionally impermissible because California "has a clear and substantial interest in preventing fraudulent practices in this state which may have an effect both in California and throughout the country").

Because the governmental interests served by consumer law provisions stand independently, Plaintiffs have provided separate analyses of this factor for every jurisdiction that has created any true conflict of substantive law. <u>See</u> Appendix of Individual Jurisdictions, attached hereto. In each case, this Court should conclude that Minnesota's governmental interests outweigh the jurisdiction whose law conflicts.

### E.    Better Rule of Law

The better rule of law has not been used as a determinative factor in the choice of law analysis for some time. <u>See</u> <u>Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.</u>, 604 N.W.2d 91, 96-97 (Minn. 2000) (Minnesota Supreme Court has not placed any emphasis on factor in 20 years, and court refused to reach it). In 2003, the Minnesota Court of Appeals analyzed this factor in a case involving the statute of limitations

applicable to a tort claim where the injury occurred to a part time resident of Minnesota while he was in Arizona operating a ladder purchased in Texas. Danielson, 670 N.W.2d at 1. The defendant owned a store in Minnesota. Id. The Court of Appeals found that the issue in dispute, the statute of limitations, related to a remedy, and applied the law of the forum state, Minnesota. Nonetheless, the court went forward to conduct the five factor choice of law analysis. Id. at 9. The court found that Minnesota's policy of compensating tort victims and holding parties responsible for the products they make and sell was a stronger interest, and thus the better law. Id. In essence, the court merged the governmental interest and better law analysis, and applied Minnesota law due to the prevailing Minnesota interest in compensating victims and holding parties responsible for tortuous actions. Thus, even under Danielson's unnecessary, tertiary treatment of this element, Minnesota law should apply because Silzone valves were invented, created, and marketed from within Minnesota.

When the Court duly weighs all five factors, there is no question that the Leflar analysis leaves one conclusion: Minnesota law should apply to all class members in this case, regardless of where they or their doctors live. The most important factor – the advancement of governmental interests – points to the application of Minnesota law in every case. To the extent a jurisdiction has more stringent liability standards for their consumer protection statutes, one can fairly say that such jurisdiction favors a less remedial and more strictly compensatory consumer fraud policy **with regard to its local defendants**. But the decision to foster local corporate settlement and growth, a policy not at issue in this case, has nothing to do with whether a state prefers to allow foreign

corporations to more easily engage in deceptive practices with respect to its citizens. No state has such a policy, nor would anyone believe that it would be possible. Given Minnesota's much larger interest in monitoring and policing the conduct of its local corporations, the Court should weight this factor heavily and find that the substantive provisions of Minnesota's consumer protection laws, like the procedural and remedies provisions, apply across the board.

## CONCLUSION

Based on the foregoing points and authorities, Plaintiffs respectfully request that this Court grant their renewed motion for class certification of the consumer protection class, applying Minnesota consumer protection law to all class members claims.

Respectfully submitted,

**ZIMMERMAN REED, P.L.L.P.**

Dated: January 10, 2006

s/David M. Cialkowski
CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
(612) 341-0400

**LEVY, ANGSTREICH, FINNEY,
BALDANTE, RUBENSTEIN & COREN, P.C.**
STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

**CAPRETZ & ASSOCIATES**
JAMES T. CAPRETZ
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA  92660
(949) 724-3000

**GREEN, SCHAAF & JACOBSON, P.C.**
JOE D. JACOBSON
7733 Forsyth, Suite 700
St. Louis, MO  63105
(314) 862-6800

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C**
DANIEL W. SIGELMAN
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005
Ph.  (202) 408-4600

Counsel for Plaintiffs

# TABLE OF AUTHORITIES

**Cases**

[Marsh] v. Webber, 13 Minn. 99 (109) (1868) ................................................................. 40

Allstate Ins. Co. v. Hague, 449 U.S. 302, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981) ............. passim

Anderson v. Donahue, 116 Minn. 380, 384, 133 N.W. 975 (1911) ............................................. 48

Anderson v. State Farm Mut. Auto. Ins. Co., 222 Minn. 428, 24 N.W.2d 836 (1946) ........... 8, 28

Board of Regents of Univ. of Minn. v. Royal Ins. Co. of Am., 503 N.W.2d 486 (Minn. Ct. App. 1993) ................................................................................................................................. 55

Boatwright v. Budak, 625 N.W.2d 483 (Minn. Ct. App. 2001) .......................................... 27, 51

Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 543 (D. N.J. 1988) ..................................... 19

Brown v. Market Development, Inc., 322 N.E.2d 367 (Ohio Ct. Common Pleas 1974) ....... 24, 57

Bunnion v. Consolidated Rail Corp., 1998 WL 372644 (E.D. Pa. 1998) ................................... 20

Calenstolpe v. Merck & Co., Inc., 638 F. Supp. 901 (S.D.N.Y. 1986) ..................................... 19

Cashman v. Allied Prod. Corp., 761 F.2d 1250 (8th Cir. 1985) .......................................... 38, 39

Cashman v. Allied Products Corp., 761 F.2d 1250 (8th Cir. 1985) ........................................... 41

Church of the Nativity of Our Lord v. WatPro, Inc., 474 N.W.2d 605 (Minn. App. 1991) ......... 38

CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed 2d 67 (1987) ................................................................................................................................. 19

Danielson v. National Supply Company, 670 N.W.2d 1 (Minn. Ct. App. 2003) .................. passim

Davis v. Furlong, 328 N.W.2d 150 (Minn. 1983) ...................................................... 26, 27, 28, 31

Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3 (1975) ....................................................... 22

Diamond Multimedia Sys., Inc. v. Superior Court, 968 P.2d 539 (Cal. 1999) ...................... 56, 57

Diversified Business Investments Inc., v. Fisher, 1991 WL 162984 (Minn. Ct. App., Aug 27, 1991) ................................................................................................................................. 29

Downing v. Abercrombie & Fitch, 265 F.3d 994 (9th Cir. 2001) ............................................. 25

Federal Savings and Loan Assoc. v. O'Connor, 410 N.W.2d 448 (Minn. Ct. App. 1987) .... 26, 28

Felder v. Casey, 487 U.S. 131  (1988) ...................................................................................... 22

Ferris, Baker Watts, Inc. v. Deutsche Bank Securities, Nos. 02-3682, 02-4845, 2004 WL 2501563 (D. Minn. 2004) ............................................................................................... passim

Financial Software Sys., Inc. v. First Union Nat'l Bank, 1999 WL 1241088 (E.D. Pa. 1999) .... 56

Florida State Board of Administration v. Law Engineering and Environmental Services, Inc., 262 F. Supp. 2d 1004 (D. Minn. 2003) .................................................................... 28, 29, 30, 49

Fluck v. Jacobson Machine Works, Inc., 1999 WL 153789 ...................................................... 55

Fogie v. Rent-A-Center, Inc., 867 F. Supp. 1398 (D. Minn. 1993) ........................................... 43

Garner v. Healy, 184 F.R.D. 598 (N.D. Ill. 1999) ............................................................... 25, 37

Gate City Federal Savings & Loan Ass'n. v. O'Connor, 410 N.W.2d 448 (Minn. Ct. App. 1987) ................................................................................................................................. 26, 28

Grace v. Perception Technology Corp., 128 F.R.D. 165 (D. Mass. 1989) ................................. 20

Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2 (Minn. 2001) ......................... passim

Gruber v. Price Waterhouse, 117 F.R.D. 75 (E.D. Pa. 1987) .................................................... 21

Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1988) ........................................................ 37

Hatch v. Fleet Mortgage Corp., 158 F. Supp. 2d 962 (D. Minn. 2001) ..................................... 38

Hughes v. Wal-Mart Stores, Inc., 250 F.3d 618 (8th Cir. 2001) ............................................... 53

In re Activision Securities Litigation, 621 F. Supp. 415 (N.D. Cal. 1985) ................................. 20

In re Air Crash Disaster at Mannheim, Germany on 9/11/82, 769 F.2d 115 (3d Cir. 1982) ........ 19
In re Benedictin Litigation, 857 F.2d 290 (6th Cir. 1988) ................................................. 19
In re Bridgestone/Firestone, Inc.,  288 F.3d 1012 (7th Cir. 2002) .................................. 37
In re Lutheran Brotherhood Var. Ins. Prod. Co., Sales Practices Litig., No. 99-MD-1309
  (PAM/JGL), 2004 WL 909741 (D. Minn. April 28, 2004) ..................................... 46
In re ORFA Sec. Litig., 654 F. Supp. 1449 (D. N.J. 1987) ...................................... 21, 22
In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61 (D. Mass. 2005) ............... 37
In re. SJM, 425 F.3d at 1120 ................................................................................... 52
In re: St. Jude Medical, Inc., Silzone Heart Valve Prod. Liab. Litig., 425 F.3d 1116 (8th Cir.
  2005) .................................................................................................... 15, 16
Jepson v. General Casualty Co. 513 N.W.2d 467 (Minn. 1994) ................................. 27, 51, 53
Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941) .................................... 22
Klein v. First Edina Nat. Bank, 293 Minn. 418, 196 N.W. 2d 619 (1972) ..................... 41
LeSage v. Norwest Bank Calhoun-Isles, N.A., 409 N.W.2d 536 (Minn. Ct. App. 1987) ........... 40
Lommen v. City of East Grand Forks, 522 N.W.2d 148 (Minn. App. 1994) ................. 51, 53, 55
Lony v. E.I. du Pont de Nemours & Co., Inc., 821 F. Supp. 956 (D. Del. 1993) ...................... 24
Ly v. Nystrom, 615 N.W.2d 302, (Minn. 2000) ...................................................... 32, 47
M.H. v. Caritas Family Serv., 488 N.W.2d 282 (Minn. 1992) ...................................... 41
Meagher v. Kalvi, 251 Minn. 477, 488, 88 N.W.2d 871 (1958) .............................. 29, 30
Medtronic, Inc., 630 N.W.2d at 455 ....................................................................... 55
Meyer v. Dygert, 156 F. Supp. 2d 1081 (D. Minn. 2001) .............................................. 39
Milkovich v. Saari, 203 N.W.2d 408 (1973) ...................................................... 27, 50
Milleneum Communications & Fulfillment, Inc. v. Office of the Att'y General, 761 So. 2d 1256
  (Fla. Dist. Ct. App. 2000) ......................................................................... 24
Miller v. Pilgrim's Pride Corp, 366 F.3d 672 (8th Cir. 2004) ...................................... 55
Nesladek v. Ford Motor Co., 46 F.3d 734 (8th Cir. 1995) ...................................... passim
Newell v. Randall, 32 Minn. 171, 19 N.W. 972 (1884) ............................................ 40
Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co., 590 N.W.2d 670 (Minn. Ct. App. 1999)
  ....................................................................................................... 48, 57
Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386 (8th Cir. 1997). 20, 22
Pen Coal Corp., 903 F. Supp. 980 (S.D. W.Va. 1995) ............................................ 51
Pfizer, Inc. v. Government of India, 434 U.S. 309 (1978) ........................................... 24
Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985).. passim
PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266 (2d Cir. 1987) .................... 44
Prof'l Fin. Mgmt., Ltd., 703 F. Supp. 1388 (D. Minn. 1989) ................................. 39, 41
Richfield Bank and Trust Co. v. Sjogrem, 244 N.W.2d 648 (Minn. 1976) ...................... 41
Richie v. Paramount Pictures Corp., 544 N.W.2d 21 (Minn. 1996) ......................... 27, 31
Rio Grande Oil Co. v. State, 539 S.W.2d 917 (Tex. Civ. App. 1976) ....................... 24, 56
Schumacher v. Schumacher, 676 N.W.2d 685 (Minn. Ct. App. 2004) ................... 26, 29, 48
Simon v. Philip Morris Inc., 124 F. Supp. 2d 46 (E.D.N.Y. 2000) ............................ 19
Simonsen v. BTH Prop., 410 N.W.2d 458 (Minn. 1987) ...................................... 40, 41
State by Humphrey v. Alpine Air Prods., Inc., 500 N.W.2d 788 (Minn. 1993) .................. 34
State v. Alpine Air Prods., Inc., 490 N.W.2d 888 (Minn. Ct. App.); 500 N.W.2d 788 (Minn.
  1993) ............................................................................................... 34, 40
State v. New Womyn, Inc., 679 N.W.2d 593 (Iowa 2004) ...................................... 24
State v. Pickrell, 667 P.2d 1304 (Ariz. 1983) ................................................... 24, 56

Stenzel v. State Farm, 379 N.W.2d 674 (Minn. App. 1986) ......................................................... 53
Stern v. Dill, 442 N.W.2d 322 (Minn. 1989)................................................................................ 29
Stutman v. Chemical Bank, 731 N.E.2d 608 (N.Y. 2000) ........................................................... 45
Taha v. Thompson, 463 S.E.2d 553 (N.C. Ct. App. 1995)........................................................... 24
Wells-Dickey Trust Co. v. Lien, 164 Minn. 307, 204 N.W. 950 (1925)..................................... 40
Yost v. Millhouse, 373 N.W.2d 826 (Minn. Ct. App. 1985) ........................................................ 47
Zaretsky  v. Molecular Biosystems, Inc., 464 N.W.2d 546 (Minn. Ct. App. 1990)......... 28, 29, 30

**Statutes**

15 U.S.C. § 1125(a) ............................................................................................................... 44, 45
Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1) ..................................................... 46
Minn Stat. § 8.31.......................................................................................................................... 21
Minn. Stat. § 325F.69 ...................................................................................................... 38, 39, 43
Minn. Stat. § 8.31.................................................................................................................... 30, 42
Minn. Stat. §§ 325D.45................................................................................................................ 43
Minnesota Deceptive Trade Practices Act, Minn. Stat. §325D.44 .............................................. 36

**Other Authorities**

Anthony P. Dunbar, Comment, Consumer Protection: The Practical Effectiveness of State
    Deceptive Trade Practices Legislation, 59 Tul. L. Rev. 427 (1984) ............................ 32, 34, 36
Committee on Suggested State Legislation of the Council of State Governments, 1970 Suggested
    State Legislation:  Unfair Trade Practices and Consumer Protection Act, 2 (1970) .......... 34, 35
Developments in the Law – Deceptive Advertising (Part III-History of Legal Controls),  80 Harv.
    L. Rev. 1016 (1967) .............................................................................................................. 34
Jonathan Sheldon et al., Unfair and Deceptive Acts and Practices  (6th Ed. 2005) ... 32, 34, 35, 36
Richman & Reynolds, Understanding Conflict of Laws, § 97[a][4] (3d ed. 2002)...................... 18
Robert Leflar, "Choice-Influencing Considerations in Conflicts Law," 41 N.Y.U.L. Rev. 267,
    279) .......................................................................................................................................... 27
Seth W. Goren, A Pothole on the Road to Recovery: Reliance and Private Class Actions Under
    Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 107 Dick. L. Rev. 1
    (2002)................................................................................................................................... 33, 34
William A. Lovett, State Deceptive Trade Practice Legislation, 46 Tul. L. Rev. 724 (1972)..... 32,
    33, 34, 35