# Alabama

**ALABAMA**

| | Did SJM's conduct violate the consumer protection law? | Private cause of action? | Scienter requirement? | Individual Reliance? | Does the law prohibit material omissions? |
|---|---|---|---|---|---|
| MN | Yes | Yes | No | No | Yes |
| AL | Yes<br>Ala. Code §8-19-5(5); (7); (27) | Yes[1] | Yes[2] | No[3] | Yes[4] |

**Are there any true conflicts of substantive law?**

Yes. Alabama requires some knowledge of false or deceptive (scienter) conduct by defendant.

---

[1] Ala. Code §8-19-10.

[2] Strickland v. Kafko Manufacturing, Inc., 512 So.2d 714, 717 (1987); Sam v. Beaird, 685 So.2d 742, 744 (Ala. Ct. Appeals 1996) ("ADTPA is generally written to require some knowledge of false or deceptive conduct on the part of the wrongdoer"); §8-19-13 (Defense to action is person did not knowingly engage in violation).

[3] No state case law or statutory language regarding this issue. Ala. Code. §8-19-6 (due consideration and great weight shall be given where applicable to interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)); Federal Trade Commission v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000).

[4] Ala. Code. §8-19-6 (due consideration and great weight shall be given where applicable to interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)). Federal Trade Commission v. Accent Marketing, Inc., 2002 WL31257708 (S.D.Ala. 2002)("The FTC Act prohibits the use of unfair or deceptive acts or practices…A representation is deceptive if it contains a material claim or omission that is reasonably likely to mislead consumers acting reasonably under the circumstances to their detriment. A representation or omission is material if it is of the kind usually relied upon by a reasonably prudent person."). Also, misrepresentations by omission are prohibited in specific circumstances set forth in the statute (e.g. 8-19-5(12); (22)) which do not apply herein.

**Which state does the choice influencing factors favor?**

Minnesota.

Alabama does not have a strong interest in imposing a scienter requirement on plaintiffs. The defendant is not an Alabama company and the marketing misconduct emanated out of Minnesota by a Minnesota resident company. Alabama's Deceptive Trade Practice's Act ("ADTPA"), § 8-19-1 *et seq.,* Ala Code 1975, was enacted to "protect the interest of both the consuming public and the legitimate businessperson," § 8-19-2 Ala. Code 1975, and was "designed to punish persons that engage in deceptive trade practices," Sam v. Beaird, 685 So.2d 742, 744 (Ala. App. 1996). Moreover, because Ala. Code § 8-19-6 provides that, in construing section 8-19-5 consideration is accorded to the interpretations of the Federal Trade Commission ("FTC") and the federal courts relating to section 5(a)(1) the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a)(1), consideration must be given to the fact that "[t]he primary purpose of the FTC Act is to protect the public from unfair or deceptive practices by those engaged in trade or commerce." Accordingly application of Minnesota's consumer protection statutes which does not require proof of the defendant's scienter would not frustrate Alabama's governmental interests in requiring proof of scienter (presumably to restrain liability and protect legitimate business in Alabama).

Furthermore, Alabama has no interest in depriving its citizens of the benefits of Minnesota's consumer protections against a Minnesota corporation. See Downing v. Abercrombie & Fitch, 265 F.3d 994, 1006-07 (9th Cir. 2001) (dismissing as "pure fancy" the suggestion that Hawaii would wish to restrict its residents from recovery that others could obtain under California law); Mahne v. Ford Motor, 900 F.2d 83, 88 (6th Cir. 1990) (observing that Florida had no interest in having Florida statute of repose apply to a Florida accident involving a Florida plaintiff where such application "would not benefit the interest it was designed to protect," because it would instead serve to protect a foreign manufacturer in a foreign court at the expense of a Florida resident); Jackson v. Travelers Ins., 26 F. Supp. 2d 1153, 1162 (S.D. Iowa 1998); Magnant v. Medtronic, Inc., 818 F. Supp. 204, 207 (W.D. Mich. 1993) (Michigan's interest in protecting its own citizens did not weigh in favor of Michigan law where Minnesota law provided more protection); Fort Hammond Paper Co. v. William D. Witter, Inc., 1985 WL 1402, *8 (S.D.N.Y. 1985); Friends for All Children, Inc. v. Lockheed Aircraft Corp., 587 F. Supp. 180, 191 (D.D.C. 1984).

On the other hand, the governmental interests of Minnesota in applying its statutory consumer protection laws that do not require proof of defendant's scienter to a situation involving one of its own resident companies charged with committing misconduct arising and occurring predominantly in Minnesota, and that relates to an industry important to Minnesota's economy and citizens well being, would be greatly frustrated by applying Alabama's law. Minnesota's has a far greater interest in applying

its laws to: (1) deter deceptive and unfair advertising and marketing practices by its resident manufacturers and merchants; (2) remedy any misleading and abusive marketing practices by its resident manufacturers and merchants that occurred, especially where, as here, issues of consumer health and safety are implicated; *see e.g.*- State by Humphrey v. Alpine Air Prods., Inc., 500 N.W.2d 788, 790 (Minn.1993)(misrepresenting ozone emitted by indoor air cleaner as being safe to consumer's health); Kociemba v. G.D. Searle & Co., 680 F.Supp. 1293, 1304-1305 (D.Minn.,1988) (misrepresentation of safety of intrauterine device product ) and (3) provide compensation to consumers abused and harmed by its resident manufacturers and merchants misconduct committed, occurring or directed from Minnesota. Minnesota courts have long recognized that Minnesota has a strong interest in both compensating tort victims and promoting responsibility for corporations committing wrongful acts, particularly if the wrongdoer is a Minnesota corporation. Jacobson v. Universal Underwriters Ins. Group, 645 N.W.2d 741 (Minn. 2002); Boatwright v. Budak 625 N.W.2d 483, 489(2001); Bigelow v. Halloran, 313 N.W.2d 10 (Minn. 1981). This interest in fully compensating tort victims is not limited to Minnesota residents. See Jacobson 645 N.W.2d 741 (holding that a nonresident should be fully compensated); Gimmestad v. Gimmestad, 451 N.W.2d 662, 666 (Minn. App. 1990) (*same*). Under these circumstances, Minnesota's governmental interests in applying its consumer protection law override Alabama's interests.

Furthermore, Minnesota's interests in conforming the behavior of a Minnesota corporation to the strictures of Minnesota law, and in preserving national consumer confidence in Minnesota corporations, are strong. See CTS v. Dynamic Corp, 481 U.S. 69, 93 (1987); State by Humphrey v. Philip Morris, 551 N.W.2d 490, 495 (Minn. 1996) (noting Minnesota's policy of encouraging aggressive prosecution of statutory consumer law violations); Ferris Baker Watts v. Deutsche Bank, 2004 WL 2501563, *6-8; Simon v. Phillip Morris, 124 F. Supp. 2d 46, 72 (E.D.N.Y. 2000); Boyes v. Greenwich Boat Works, 27 F. Supp. 543, 547. (D.N.J. 1998).

# ALABAMA STATUTE

Code of Alabama Currentness (Refs & Annos)
Title 8. Commercial Law and Consumer Protection. (Refs & Annos)
Chapter 19. Deceptive Trade Practices. (Refs & Annos)

**→§ 8-19-1. Short title.**

This chapter shall be known and may be cited as the "Deceptive Trade Practices Act."

**→§ 8-19-2. Legislative intent.**

The public health, welfare and interest require a strong and effective consumer protection program to protect the interest of both the consuming public and the legitimate businessperson.

**→§ 8-19-3. Definitions.**

As used in this chapter, the following words and phrases shall have the meanings hereinafter ascribed to them:

(2) CONSUMER. Any natural person who buys goods or services for personal, family or household use.

***

(4) KNOW, KNOWING, KNOWINGLY, KNOWLEDGE, and KNEW. Either actual awareness or such awareness as a reasonable person should have considering all the surrounding circumstances.

***

(8) TRADE or COMMERCE. Includes but is not limited to the advertising, buying, offering for sale, sale or distribution or performance of any service or goods, and any other article, commodity or thing of value wherever situated and shall include any trade or commerce affecting the people of this state.

**→§ 8-19-5. Unlawful trade practices.**

The following deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:

***

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

***

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

***

(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

**➡§ 8-19-6. Interpretation.**

It is the intent of the legislature that in construing Section 8-19-5, due consideration and great weight shall be given where applicable to interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

**➡§ 8-19-10. Private right of action.**

(a) Any person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer, and any person who commits one or more of the acts or practices declared unlawful in subdivisions (19) and (20) of Section 8-19-5 and thereby causes monetary damage to another person, shall be liable to each consumer or other person for:

(1) Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or

(2) Up to three times any actual damages, in the court's discretion. In making its determination under this subsection, the court shall consider, among other relevant factors, the amount of actual damages awarded, the frequency of the unlawful acts or practices, the number of persons adversely affected thereby and the extent to which the unlawful acts or practices were committed intentionally; and

(3) In the case of any successful action or counterclaim to enforce the foregoing liability or in which injunctive relief is obtained, the costs of the action or counterclaim, together with a reasonable attorney's fee. On a finding by the court that an action or counterclaim under this section was frivolous or brought in bad faith or for the purpose of harassment, the court shall award to the defendant (or counterclaim-defendant) reasonable attorney's fees and costs.

***

(e) At least 15 days prior to the filing of any action under this section, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be communicated to any prospective respondent by placing in the United States mail or otherwise. Any person receiving such a demand for relief who, within 15 days of the delivering of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent

action, file the written tender and an affidavit concerning this rejection. If the court finds that the relief tendered was sufficient to compensate the petitioner for his actual damages, the court shall not award any additional damages or attorney's fees or costs to the petitioner. The demand requirements of this subsection shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. All written tenders of settlement such as described in this subsection shall be presumed to be offered without prejudice in compromise of a disputed matter.

(f) A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class; provided, however, that the office of the Attorney General or district attorney shall have the authority to bring action in a representative capacity on behalf of any named person or persons. In any such action brought by the office of the Attorney General or a district attorney the court shall not award minimum damages or treble damages, but recovery shall be limited to actual damages suffered by the person or persons, plus reasonable attorney's fees and costs.

***

**➞§ 8-19-13. Defense.**

Any person against whom any civil action or proceeding is brought pursuant to this chapter shall have a defense to such action or proceeding upon a showing by a preponderance of the evidence presented that such person did not knowingly commit any act or knowingly engage in any activity which constitutes a violation of any provision of this chapter.

Briefs and Other Related Documents

United States District Court, S.D. Alabama Southern Division.
FEDERAL TRADE COMMISSION, et al., Plaintiffs,
v.
ACCENT MARKETING, INC., et al., Defendants.
**No. Civ.A. 02-405-CB-M.**

July 1, 2002.

ORDER

BUTLER, Chief J.
***1** On June 11, 2002, this court granted the Motion of the Federal Trade Commission ("FTC") for a Temporary Restraining Order ("TRO") without notice to the defendants, pursuant to Fed.R.Civ.P. 65(b). That TRO provided, in pertinent part, that a hearing would be held on June 21, 2002, at which defendants could show cause why the court should not enter a preliminary injunction. FN1

FN1. Despite reference to the hearing as defendant's opportunity to 'show cause,' the court notes that the burden of proof remains on the FTC to justify issuance of the preliminary injunction. However, the court considers all evidence previously submitted in support of the TRO, which the court had previously found to form a sufficient factual showing to allow entry of injunctive relief.

On June 21, 2002, this court held a hearing on the preliminary injunction at which the FTC and all defendants were represented and offered evidence. At the conclusion of the hearing, the court ordered that the TRO would remain in effect until the court entered its order either granting a preliminary injunction or dissolving the TRO. The court allowed the parties an opportunity to file supplemental briefs. Defendants Accent Marketing, John Nolan White and Monarch Vending, as well as plaintiff FTC filed post-hearing briefs within the time allowed.

*Preliminary Injunction Standard*

Ordinarily, a party seeking a preliminary injunction must demonstrate that (1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party, and (4) if issued, the injunction would not disserve the public interest. See *Horton v. City of St. Augustine, Fla.,* 272 F.3d 1318, 1326 (11th Cir.2001)

The FTC argues that the court need only address factors 1), 3) and 4), above. FN2 *The agency cites FTC v. University Health, Inc .,* 938 F.2d 1206, 1217 (11th Cir.1991) for the proposition that irreparable injury is presumed in statutory enforcement actions. The court finds that this authority, though stated in an antitrust action in relation to a proposed merger, is nonetheless applicable in this case. However, the court also notes that plaintiff has demonstrated irreparable injury in this action. FN3

FN2. The FTC states that the court need only address the likelihood of success and balancing of the equities. That last phrase is sometimes used to include the balance between the movant's interests and those of both the party to be enjoined and of the public. In the absence of citation to authority deleting the requirement to satisfy the fourth element, the court presumes that the agency uses that phrase to refer to both steps.

FN3. *Inter alia,* the court notes that the FTC's purpose in bringing this suit is to prevent further fraud and to preserve the assets of the defendants for repayment to the defrauded customers. The court also notes evidence that defendant John Nolan White withdrew the entire balance of a bank account belonging to Accent Marketing after service of the TRO-which contained provisions for an asset freeze appointment of a receiver-upon the corporation.

*Likelihood of Success*

The FTC Act prohibits the use of "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C.A. § § 45(a). A representation is deceptive if it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contains a material claim or omission that is likely to mislead consumers acting reasonably under the circumstances, to their detriment. See *FTC v. World Travel Vacation Brokers,* 861 F.2d 10220, 1029 (7th Cir.1988); *FTC v. Atlantex Assocs.,* 1987 WL 20384, 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59, 252 (S.D.Fla.1987), *aff'd,* 872 F.2d 966 (11th Cir.1989). A representation or omission is material if it is of the kind usually relied upon by a reasonably prudent person. See *FTC v. Slimamerica,* 77 F.Supp.2d 1263, 1272 (S.D.Fla.1999).
Naturally a lawyer in reading in printed lecture would note the failure of express or direct representation. It is doubtless true that a civil action for deceit or a criminal proceeding for obtaining money by false pretenses would not likely be sustained by a court. But the test of falsity in connection with this particular Act is different from that-it is the net impression which the advertisement is likely to make upon the general public. Charles of the Ritz Distributors Corporation v. Federal Trade Commission, 2d Cir., 143 F.2d 676. In determining the question of falsity, the advertisements must be considered in their entirety and as they would be read or understood by those to whom they appeal. Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165.

***2** *Federal Trade Commission v. National Health Aids,* 108 F.Supp. 340 (D.Md.1952).

The agency cites authority holding that it need not demonstrate that every reasonable consumer would be misled, nor indeed that any consumer was actually misled. *FTC v. Wilcox,* 926 F.Supp. 1091, 1099 (S.D.Fla.1995). It offers authority holding that it need not prove actual reliance of each consumer, but instead that reliance is to be presumed from proof that the representations were material and widely disseminated, and that consumers purchased the products or services. *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605-06 (9th Cir.1993). Defendants do not contest these matters, and the court finds the agency's citations correctly state the burden upon the FTC. Nonetheless, the agency did produce evidence and testimony of actual reliance and of the materiality of the deceptive representations to their decision to purchase the business opportunity.

The FTC has promulgated regulations establishing certain minimum disclosure requirements specifically designed for franchising and business opportunity ventures. 16 C.F.R. § 436.1, et seq. The FTC has offered evidence that defendant failed to make several such mandatory disclosures. The agency's evidence also tended to proved that defendant's earnings representations were unreasonable and not based upon valid data. Defendants have failed to offer substantial evidence in rebuttal. FN4 The failure to make the mandatory disclosures renders several of the defendants' representations, including particularly its representations concerning earnings and potential earnings, unfair and deceptive. 16 C.F.R. § 436.2.

FN4. The inclusion of a single-page spreadsheet purporting to show annual earnings for a company called Gumusements, Inc. is insufficient to comply with these required disclosures. See e.g. 16 C.F.R. § 436.1(b), (c), (d) and (e). The evidence also indicates that Gumusements was the company which invented and produced the vending machines defendant marketed to its customers. The company was not similarly situated to those customers, and its spreadsheet of dubious relevance to their situation. The FTC thus may be able to demonstrate at the trial on the merits that the inclusion of the spreadsheet was an additional deceptive act.

At the hearing, the FTC offered the testimony of one of its investigators, who detailed the results of her investigation; three individuals who had purchased various business opportunities from defendants; and the temporary receiver, who addressed the financial posture of the corporate defendants. The agency introduced additional documentary evidence through these witnesses. The three consumers addressed their dealings with the defendants and their employees, as well as describing their experiences in pursuing the vending machine venture they purchased from the defendants.

The most compelling testimony, however, came from a witness called by the defendants, Mr. J.C. McIntosh. The FTC had offered documentary evidence that the defendants provided 'references' to prospective customers, but that these references were paid by the defendants and acted as salespersons for Accent. Defendants called Mr. J.C. McIntosh, one of these references. He testified that he presently had 42 vending machines which he purchased from Accent, and-in general terms FN5-stated that he was making a sufficient income. FN6 In response to questions by the court, Mr. McIntosh admitted that he was paid for acting as a reference. He testified that he received regular weekly payments of $600 from Accent regardless of the number of calls received or the

amount of time spent on each call. This represents an annual income in excess of $30,000.00. FN7 Though he characterized these payments as reimbursement for his time spent in answering such calls, FN8 the court finds that the FTC has established a substantial likelihood that, in the trial on the merits, they will succeed in establishing that the failure to disclose such a material, ongoing relationship with Accent was an unfair or deceptive trade practice.

FN5. In the transcript of a call by an FTC investigator, Mr. McIntosh explained that his reticence to disclose his income from the vending machines arose from his desire to avoid tax liability on the cash income he received. He argued persuasively that the cash nature of the business made it attractive particularly for that reason. PX 26, p13 (transcript page 12).

FN6. As noted below, McIntosh paid a fraction of what the customers were paying per machine, and purchased them without being restricted to minimum multi-machine purchases. His expenses, and thus his profits, were thus entirely different from those of the customers whom he purported to advise. Even his general claims of a comfortable income were thus inapplicable to the potential customers and thus misleading, particularly in connection with the earnings claims made by Accent.

FN7. McIntosh also stated that he had received machines as bonuses, and was reimbursed for expenses, such as phone bills. It appears from the documentary evidence that the other 'references' were paid as well, though it s not clear whether or not they were all paid on the same basis or in the same amount. From the checks made out to one such other reference, it appears that she may have been paid on the basis of numbers of potential customers she talked to and/or the number of customers who thereafter purchased the business opportunity.

FN8. Defendants used a limited number of such 'references,' apparently less than a dozen, and provided each potential customer with 2 or 3 references. Given the number of customer calls shown in the documents seized by the FTC, each 'reference' would have been used often. Also, Mr. McIntosh, one of the references, indicated to the FTC investigator that he had begun answering such calls for Accent recently, informally and on an occasional basis. "Oh, they [Accent] called me here three or four weeks ago and asked me if I'd mind taking a call every now and then. I told them, not at all, because they've been very decent to me." PX 26, p 14 (transcript page 13). Mr. McIntosh certainly did not disclose his relationship to Accent, and apparently spoke as he did to disguise and minimize that relationship.

***3** Mr. McIntosh also testified that he had prior experience in vending machines, and had not purchased the 'business opportunity' offered by Accent, but instead had arranged a side deal to purchase the machines for a fraction of the price charged to Accent's ordinary customers. The FTC provided the court with transcripts of telephone calls made by FTC investigators posing as prospective customers. One of these is a transcript of a call to Mr. McIntosh. In that call, McIntosh states that he had originally purchased a route from Accent, and thereafter used their expansion program. (See PX 26 pp. 5, 16.) He told the investigator that Accent provided him his first 20 locations (*Id.* at p. 10) but testified at trial that he had prior experience with vending machines and had not purchased a route or used their location assistance.

The evidence concerning defendant's promises of location assistance was less clear. It was unquestionably shown that defendant's customers experienced considerable problems with the location assistance companies, but the evidence of defendants' knowledge of or responsibility for such problems was more equivocal. Nonetheless, it appeared that defendants promised location assistance without assuring that such assistance-provided by companies they recommended FN9-was adequate, and complied with defendant's representations. Further, there is the matter of the failure to disclose the relationship between defendant Accent and defendant Monarch, one of the locator services to which defendant Accent referred its customers. FN10 Also, some but not all of Accent's advertisements appear to represent that the customers would be buying existing routes and/or pre-selected locations, but are only later informed that they will need to seek the assistance of locator services-at an additional fee. Defendants represented to potential customers that the locators had already performed a "site study" of the area and had already

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

gained permission of businesses to place the machines. FN11 Finally, many of the customers' complaints concerning location assistance companies addressed defendant Monarch, which was owned by defendant John Nolan White, and which conducted its business from the same offices as defendant Accent.

FN9. Accent not only recommended particular locator services, but very strongly recommended that their customers utilize such a service.

FN10. In a taped conversation with an FTC investigator, one of Accent's telemarketers stated that Monarch was a completely separate company.

FN11. They also began telling customers that they needed to decide quickly because the opportunities were sold on a first-come, first-served basis. There was no indication, however, that there was any limit on the number of customers defendant would accept in a given area, and the printed materials expressly stated that defendant did not sell protected routes or areas.

Based upon the documentary evidence submitted by the parties and upon the testimony adduced at the hearing, the court finds that the plaintiff FTC has established that it has a substantial likelihood of success on the merits. The FTC's evidence tends to show that the corporate defendants have engaged in numerous unfair and deceptive practices; as to the individuals, the evidence is sufficient to demonstrate that they both had knowledge of and control over such unfair and deceptive practices, and indeed that each of them participated in those practices directly. See *FTC v. Wolf,* 1996 U.S. Dist. LEXIS 1760 at *23-24 (S.D.Fla.).

*Balancing of the Equities*

As noted above, the evidence tends to show that defendants were guilty of false and deceptive practices, and that they deceived and thereby injured numerous consumers. The FTC seeks the instant injunction to preserve the defendants' assets for redress of such injured parties, and also to prevent further injury to other consumers through continued fraud. The unfair and deceptive practices of which the FTC has offered evidence permeate the defendants' business dealings, so that it is impracticable to craft restrictions sufficiently broad to prevent further such practices and resultant injury to the public, while nonetheless allowing defendants to continue business operations in any form. Further, the court finds that there is a substantial risk of dissipation of assets if the asset freeze is lifted.

***4** It appears that defendants have not complied with several requirements of the TRO entered by this court, including preparation and presentation of sworn financial statements. Further, as noted above, there is evidence which tends to show that, after service of the TRO on the corporation, John Nolan White withdrew the balance of an account belonging to defendant Accent, totaling more than $25,000, and that, despite the TRO's freeze on business and personal assets, has not turned over or accounted for such funds. The court cannot rely upon defendants to comply with the terms of any injunction which would allow them access to the assets of the corporate defendants or which would allow them to resume business under detailed restrictions.

The court recognizes that the appointment of a receiver and the freeze of assets effectively puts the defendants out of business, at least for the duration of the preliminary injunction. However, as the the FTC has demonstrated a likelihood that it will ultimately prove that the practices of that business are contrary to law and detrimental to the public, FN12 the court finds that the equities, both public and private, weigh in favor of issuance of the preliminary injunction.

FN12. As the FTC notes in its brief, the typical customer initially invests approximately $10,000 on the business opportunities offered by defendants, and that initial investment can be as high as $36,000 or more. Defendants' records indicate sales revenue of approximately $18 million over the last two years.

*Conclusion*

For the reasons set forth above, it is hereby ordered that a Preliminary Injunction shall issue by separate order.

S.D.Ala.,2002.
Federal Trade Com'n v. Accent Marketing, Inc.
Not Reported in F.Supp.2d, 2002 WL 31257708 (S.D.Ala.), 2002-2 Trade Cases P 73,780

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Briefs and Other Related Documents (Back to top)

- 1:02cv00405 (Docket) (Jun. 04, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.