eMachines contends that Annunziato's Song-Beverly Act claim must fail because he cannot meet the statute's requirements. The Court agrees.

1. *Place of Purchase*

[18] The Song-Beverly Act only governs goods sold at retail in California. Cal. Civ.Code § 1792. However, Annunziato resides in Massachusetts where he purchased the product over the internet. Hence Annunziato's Song-Beverly Act claim fails as a matter of law.

2. *Warranties as Basis of Each Purchase*

eMachines contends that the Song-Beverly Act only covers warranty statements "arising out of a sale to the consumer of a consumer good." Cal. Civ.Code § 1791.2(a)(1), and hence Annunziato's claim fails because Annunziato does not allege that the warranty statements played any causal role in his purchase, which is required in order to pursue an express warranty claim under the Song-Beverly Act. The Court need not address this issue at this time in view of Annunziato's failure to plead an in-state purchase.

The Motion is granted as to this claim. However, Annunziato is granted leave to add a potential class representative who can plead the requirements of Song-Beverly Act.

IV. *CONCLUSION*

For the forgoing reasons, the motion to dismiss is granted in part and denied in part. Annunziato shall have thirty-five days to replead.

FN1. It should noted that Proposition 64 also adopted other procedural safeguards. For example, a private plaintiff must also meet the requirements of a class action.

FN2. The Court need not reach eMachines' contention that Annunziato's claim for breach of the implied warranty of merchantability fails because it is allegedly coextensive in duration with the express warranty.

C.D.Cal.,2005.
Anunziato v. eMachines, Inc.
--- F.Supp.2d ----, 2005 WL 3263892 (C.D.Cal.)

Briefs and Other Related Documents (Back to top)

- 8:05cv00610 (Docket) (Jun. 22, 2005)

END OF DOCUMENT

Only the Westlaw citation is currently available.

United States District Court; S.D. New York.
FORT HOWARD PAPER COMPANY, Plaintiff,
v.
WILLIAM D. WITTER, INC. THOMSON McKINNON SECURITIES, INC. and CHARLES F. HUBER, Defendants.
CHARLES F. HUBER, II, Third Party Plaintiff,
v.
FORT HOWARD PAPER COMPANY and MARYLAND CUP CORPORATION, Third Party Defendants.
**No. 83 Civ. 6588 (JFK).**

May 17, 1985.

Sanford M. Litvack, Esq. Charles W. Gerdts, III, Esq. Valerie A. Cohen, Esq. Donovan, Leisure, Newton & Irvine New York, New York, for plaintiff and third party defendants.
James W. Nellen, II, Esq. Fort Howard Paper Co. Green Bay, Wisconsin, for plaintiff and third party defendants.
Elliot Paskoff, Esq. Townley & Updike New York, New York, for defendants and third party plaintiffs.

OPINION AND ORDER

JOHN F. KEENAN, United States District Judge:
***1** Plaintiff-third party defendants move for a determination whether, New York law is applicable and for what amounts to summary judgment. Defendant-third party plaintiffs contend that the law of states other than New York should control this action, thus precluding summary judgment. For the reasons stated below, third-party plaintiff's claims are dismissed.

BACKGROUND

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In its search of the record for material issues of fact, the Court must resolve all adbiguities in favor of the party opposing the motion. Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 115 (2d Cir. 1984). However, on choice of law questions, the facts should be considered in a light most favorable to the plaintiff. Intercontinental Planning, Ltd. v. Daystrom, Inc., 300 N.Y.S.2d 817, 824 (N.Y. 1969). Fort Howard and Maryland Cup, the proponents of summary judgment, apparently confident of their position with respect to the law applicable to this case, have offered virtually no factual discussion in their motion papers. Consequently, for purposes of this motion, there are no real factual disputes and the following factual presentation is substantially that offered by the defendants and third-party plaintiff.

Defendants William D. Witter, Inc. ('Witter') and Thomson McKinnon Securities, Inc. ('Thomson McKinnon') are New York corporations engaged in general securities work. Defendant-third party plaintiff Charles F. Huber ('Huber'), a Connecticut resident, was employed in New York as a Vice President of Thomson McKinnon specializing in mergers and acquisitions until May 1981. In June 1981, Huber joined Witter's New York office to work on mergers and acquisitions.

Plaintiff Fort Howard Paper Company ('Fort Howard') is a Wisconsin manufacturer of paper towels, toilet tissue, facial tissue and other disposable paper products. Its President and Chief Executive Officer is Paul J. Schierl, a resident of Green Bay, Wisconsin. Maryland Cup Corporation ('Maryland Cup') is a Maryland company that, like Fort Howard, manufactures primarily disposable sanitary paper products. Merrill Bank is its Chairman of the Board. In August 1983, Maryland Cup was acquired by, and became a whollyowned subsidiary of Fort Howard.

On October 31, 1979, Dean Porter, an employee of Thomson McKinnon in New York, wrote to Mark Harman, a former classmate employed by Fort Howard in Green Bay, Wisconsin. Porter informed Harman that Thomson McKinnon was involved in mergers and acquisitions, and offered to be of service to Fort Howard in procuring suitable merger candidates. Since Huber was in charge of mergers and acquisitions, Porter informed Huber of the letter.

On May 21, 1980, Arnold Janofsky, Assistant to the President of Fort Howard, responded to Porter's letter. The letter was sent to Thomson McKinnon's New York office. Janofsky expressed interest in working with Thomson McKinnon's mergers and acquisitions department. He described the type of company Fort Howard was interested in acquiring and stated: 'Should you be aware or become aware of any opportunities which fit our needs, we would appreciate it if you would contact us with available facts and information including your fee, if any.' (Janofsky letter, dated May 21, 1980, Defendant's Exhibit A).

***2** Operating from Thomson McKinnon's New York office, Huber, to whom the letter was referred, contacted Janofsky in Wisconsin. Huber said that he had two possible acquisitions in mind for Fort Howard and he would try to arrange a meeting between Fort Howard and the principals of each company. At Janofsky's request, Huber also agreed to collect information about the two companies and send it to Green Bay. Janofsky allegedly told Huber that Fort Howard would pay the customary finder's fee to Thomson McKinnon if a merger or acquisition ensued.

On June 3, 1980, Huber, from his New York office, telephoned Janofsky at Fort Howard's Green Bay office. Huber informed Janofsky that he believed Maryland Cup would be a suitable acquisition for Fort Howard. Janofsky expressed interest in Maryland Cup and instructed Huber to provide Fort Howard with more information about Maryland Cup. At the conclusion of the conversation, Huber suggested that he visit Fort Howard's Green Bay office within the next few weeks.

Huber, still working out of New York, telephoned Maryland Cup's Chairman of the Board, Merrill Bank, on Cape Cod and scheduled a meeting for July 4 at Bank's Cape Cod residence. Huber informed Janofsky of the meeting. After a brief delay, Huber met with Merrill Bank on Cape Cod July 11. At the meeting, Huber told Bank he worked at Thomson McKinnon in mergers and acquisitions. He then said he was involved with a company interested in merging with or acquiring a company like

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Maryland Cup. Huber, however, said he was not authorized to disclose the prospective acquiror's identity. Huber next discussed the concept of an acquisition or merger of Maryland Cup by a company with Fort Howard's industrial needs, without mentioning Fort Howard by name.

Bank expressed great enthusiasm, prompting Huber to reveal that the company he was involved with was Fort Howard. Bank urged Huber to set up a meeting with Paul Schierl, Fort Howard's President. Bank promised Huber that he would be protected with respect to a finder's fee.

Huber was concerned about his position with Fort Howard because Fort Howard had not authorized him to disclose its identity in his communications with Maryland Cup. Bank assured Huber that Bank would not disclose the merger discussions to Maryland Cup personnel until after Huber had arranged a face-to-face meeting between Bank and Schierl.

In their discussion, Bank and Huber also allegedly discussed the amount of Huber's fee and the manner of its calculation. Huber said his fee should be calculated on the basis of one percent of the value of the merger transaction, rather than upon the standard Lehman formula, because the transaction was too large for the Lehman formula. Bank reiterated his request that Huber arrange a meeting with Paul Schierl, and promised that if Fort Howard did not pay Huber's fee, Maryland Cup would pay it.

On July 18, 1980, Huber, again working from his New York office, telephoned Janofsky at Fort Howard. Janofsky was no longer with Fort Howard so Huber was referred to Walter Charles, a Senior Vice President of Fort Howard, who was taking Janofsky's calls. Huber said he had been discussing the possibility of a Fort Howard-Maryland Cup merger with Janofsky. Huber told Charles that he had met with Merrill Bank and identified Fort Howard as a prospective acquiror, and that Bank wanted to meet with Paul Schierl.

***3** Huber allegedly told Charles that if the merger or acquisition took place, Fort Howard was to pay Huber one percent of the value of the transaction. Huber told Charles that Merrill Bank had offered to protect Huber with respect to the fee, but Huber emphasized that he still considered himself to be working for Fort Howard and he expected his fee of one percent to be paid by Fort Howard. Charles allegedly responded that that was 'fine.'

On October 27, 1980, Huber wrote to Gerald Korb, an Assistant Vice President of Finance at Fort Howard, who had succeeded Charles on the Maryland Cup transaction, describing the fee agreement that Huber claimed had been reached between himself and representatives of both Maryland Cup and Fort Howard. A copy of that letter was sent to Merrill Bank, though none was furnished to the Court.

Throughout the early part of September 1980, Huber, operating from New York, made numerous contacts with personnel at Fort Howard and Maryland Cup in an effort to arrange a meeting between Merrill Bank and Paul Schierl. A September meeting in Baltimore and a proposed October 22nd meeting in Chicago fell through. Ultimately, however, the two principals met on October 21, 1980 in Chicago. In an internal memorandum prepared subsequent to the meeting, Schierl indicated that Bank felt Huber 'would be entitled to some sort of finder's fee' if any deal was consummated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At the meeting, however, Bank and Schierl agreed to 'cool' their relationship with Huber (Memorandum dated Oct. 28, 1980, Defendants' Exhibit A).

Subsequent to the October 21st meeting, Huber, still working out of New York, made numerous telephone calls to Fort Howard to find out what had transpired at the meeting. Huber, aware of the need for a writing if he were to enforce the finder's fee agreement (See Plaintiffs' Reply Brief, Exhibit A), asked Korb for written confirmation of their agreement. Korb allegedly informed Huber that Fort Howard would pay his fee, and told Huber to stop worrying about it. Huber accepted Korb's reassurances.

Huber continued to speak with Korb and Merrill Bank in an effort to keep abreast of developments. While Bank continued to inform Huber of the progress of the negotiations, Korb told Huber that the negotiations were dead. Concerned about Korb's statement, Huber wrote to Paul Schierl asking for an invitation to Green Bay to discuss the merger.

On December 29, 1980, Huber called Schierl and explained his confusion over the inconsistencies between Bank's and Korb's accounts of the negotiations. Schierl reassured Huber that the negotiations were proceeding on course. Huber then asked Schierl whether he intended to give Huber a fee letter. Schierl explained that secrecy was necessary, and said that to obtain a fee letter, he would have to disclose the negotiations to the Fort Howard Board of Directors. Such a disclosure, in a merger of such magnitude, would imperil the negotiations according to Schierl. Schierl told Huber that he did not wish to go to the Fort Howard Board of Directors at that point. However, Schierl reaffirmed his promise to pay Huber his finder's fee and asked Huber to continue funneling information to Fort Howard.

***4** On February 23, 1981, Huber visited Fort Howard's Green Bay offices. Huber first met with Timothy Twomey of Fort Howard; Schierl later joined them. The three discussed Huber's suggestion that a negotiating team be formed. Schierl instructed Huber to continue his efforts to move the merger negotiations along, asking him to keep a low profile while continuing to provide information to Fort Howard. Huber was specifically instructed to ascertain who was actually in control at Maryland Cup and whether Merrill Bank spoke for the Shapiro-family-controlled Maryland Cup. Schierl and Twomey then took Huber on a plant tour of Fort Howard. Huber was told that Twomey would be his contact at Fort Howard in the future.

Throughout 1981, Huber spoke with Twomey in an effort to ascertain the progress of the negotiations. Huber continually volunteered Thomson McKinnon's services to assist in the merger, but was told that nothing was needed. Fort Howard instructed Huber to prepare a 'pro forma' of numbers involving Fort Howard and Maryland Cup. Thomson McKinnon prepared the 'pro forma' at its Chicago offices and sent it to Fort Howard in Green Bay. After receiving the 'pro forma,' Twomey told Huber that no further analysis was necessary.

In written memoranda to the file, Twomey continually documented Huber's willingness to travel to Green Bay to discuss the negotiations and Twomey's own evasive responses. In one such memorandum, dated May 18, 1981, Twomey states:
Throughout the whole conversation, I did nothing more than listen to [Huber's] attempts to get a conversation started, which would have involved revealing some of the things going on that we do not care to discuss . . .. Charlie then returned to

the subject of our negotiations with Maryland Cup, and he bemoaned the fact that our relationship with him has not been committed in writing in any way. He did say, however, that he felt comfortable, he had done this in the past, and has only been burned once.

(Defendants' Exhibit A).

In May 1981, Huber called Twomey from New York to advise him that Huber was leaving, Thomson McKinnon to join Witter. In response to Huber's suggestion that he draft a letter outlining the arrangements Thomson McKinnon and Witter had made with respect to sharing Huber's fee from the Fort Howard-Maryland Cup merger, Twomey said he did not know if such a letter would be appropriate.

The following day, Huber informed Paul Schierl by letter that Huber was leaving Thomson McKinnon to join Witter. That letter (Huber letter, dated May 29, 1981, Defendants' Exhibit A) stated in pertinent part as follows:

As you might guess, I have been questioned as to the absence of a Fort Howard fee letter. I explained that you did not want to write such a letter before taking the matter to your Board.

On June 1, 1981, Timothy Twomey sent a letter (Defendant's Exhibit A) to Thomson McKinnon in New York, with a copy sent to Huber at Witter, stating that Maryland Cup 'has not agreed to retain either Mr. Huber or your corporation as a finder, investment banker or otherwise in connection with the proposed acquisition with Maryland Cup.'

***5** After receiving Twomey's letter, Huber, from New York, called Twomey to question him about it, stating that Witter wanted assurances that Huber was acknowledged as the finder in the Fort Howard-Maryland Cup merger. Twomey reassured Huber that the reason for the letter was to ensure that no one at Thomson McKinnon took Huber's place in the Fort Howard-Maryland Cup negotiations after Huber's departure. Huber said he felt it necessary to go to Green Bay with Mr. Witter to confirm that understanding, and Twomey agreed to the visit.

In a letter to Paul Schierl dated June 7, 1981 (Defendants' Exhibit A), Huber reaffirmed his faith in Fort Howard's 'sense of fairness.' Responding by letter dated June 16, 1981 (Defendants' Exhibit A), Schierl said that he would be in touch with Huber. In August 1981, Mr. Huber and Mr. Witter visited Schierl at Fort Howard's Green Bay offices.

Discussions between Fort Howard and Maryland Cup ceased in late 1981, apparently because the Maryland Cup Board of Directors believed Fort Howard's offer was inadequate. On March 9, 1982, Huber called Twomey from New York and asked if Fort Howard was still interested in Maryland Cup. Twomey said that 'in fact, there has been no conversation since that period of time and that it was essentially a dead issue.' Huber asked Twomey if he would like Huber to speak with Merrill Bank on Cape Cod. Twomey said that if anything was needed, Fort Howard would talk to Huber about it.

Huber heard nothing further about the Fort Howard-Maryland Cup negotiations until August 1983 when he was informed that the merger between Fort Howard and Maryland

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cup was about to be consummated. On August 18, 1983, Huber's counsel informed Fort Howard that Huber expected to be compensated as the finder in the merger transaction. After settlement negotiations reached an impasse, Fort Howard instituted this lawsuit for a declaratory judgment. In hopes of recovering a finder's fee, Huber counterclaimed against Fort Howard and Maryland Cup under the following theories: (1) breach of contract, (2) quantum meruit, (3) fraud, and (4) promissory estoppel.

## DISCUSSION

### *A. Contract Claims*

#### *1. Choice of Law*

In a diversity action, a federal court is bound to apply the choice-of-law rule of the forum state in determining which state's laws apply. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941). New York courts apply the law of the forum 'most intimately concerned with the outcome of [the] particular litigation.' Auten v. Auten, 308 N.Y. 155, 161 (1954); accord Schultz v. Boy Scouts of America, Inc., N.Y.L.J., May 6, 1985, at 17, cols. 3-4 (N.Y. April 30, 1985). The seminal New York Court of Appeals case of Intercontinental Planning, Ltd. v. Daystrom, Inc., 300 N.Y.S.2d 817 (N.Y. 1969) is controlling authority and compels application of New York law to Huber's breach of contract claim.

In Daystrom, a New York finder sued a New Jersey principal, Daystrom, claiming that plaintiff was entitled to a finder's fee on the basis of an alleged oral modification of a written agreement. The terms of the written agreement provided for compensation of the finder in the event that only one particular merger with Daystrom took place. Although that particular merger did not occur, Daystrom eventually merged with a different company. In his lawsuit, the finder claimed that the written agreement had been orally modified by Daystrom's President to cover the merger that was eventually consummated. 300 N.Y.S.2d at 820-21. The issue before the New York Court of Appeals was whether to apply the law of New York, whose Statute of Frauds barred recovery, or the law of New Jersey, whose law did not necessarily bar recovery. Id. 823-24.

***6** The court held that the law of the jurisdiction having the greatest interest in the litigation will apply to a controversy, Id. at 825. To make that determination in this case, the Court must weigh (1) the contacts between the litigation and those jurisdictions considered to be a reasonable source controlling law, and (2) the policy interests of those jurisdictions in applying their law. Daystrom, 300 N.Y.S.2d at 825.

##### *a. Contacts*

In Daystrom, the New York Court of Appeals found sufficient contacts [FN1] with New York where (1) plaintiff was a New York corporation and its finder's business was centered in New York; (2) plaintiff's representation of defendant corporation

derived from a New York meeting that resulted from plaintiff's advertising in a New York newspaper; (3) letters and telephone calls emanated from plaintiff's New York office, as well as Daystrom's New Jersey office, that lead to execution of the finder's agreement; and (4) it was 'clear that the services for which plaintiff claim[ed] compensation were substantially rendered in New York.' 300 N.Y.S.2d at 827.

Similarly, the instant dispute has sufficient contacts with New York to give New York a substantial interest in applying its law: (1) defendants, in this declaratory judgment action, are based in New York and conduct business from New York; (2) defendants' representation of Fort Howard and Maryland Cup is traceable to a letter sent by Dean Porter, an employee of Thomson McKinnon in New York, to Fort Howard in Wisconsin; (3) letters and telephone calls emanated from Huber's New York office that led to execution of the alleged finder's agreement; and (4) it is clear that the services for which Huber claims compensation were substantially rendered in New York.

In fact, Huber only left New York three times during the entire relevant period, the July 11, 1980 meeting with Merrill Bank on Cape Cod and the February 23, 1981 and August 1981 visits to Fort Howard's offices in Wisconsin. All three meetings were arranged from Huber's New York office.

The promises sought to be enforced in the instant case were made in Wisconsin and Massachusetts. Nonetheless, New York law was applied in Daystrom despite the fact that the alleged oral agreement sought to be enforced occurred in New Jersey. Id. at 821 n.5.

Defendants contend that Wisconsin law should apply to the alleged contract between Fort Howard and Huber. They point to the following contacts: (1) Thomson McKinnon's unsolicited offer made in New York to act as a finder for Fort Howard, which Fort Howard accepted in Wisconsin; (2) Huber's numerous contacts directed to Wisconsin; and (3) the occurrence of the merger in Wisconsin.

As to the import of the situs of the merger, the Court finds that to be of no moment. The Court's concern is with the agreement involving Huber's right to a finder's fee, not with the eventual merger. As the Court of Appeals said in Daystrom, '[t]he place of the actual merger negotiations between the principals is of no significance.' Id. at 827 n.8. Huber, from New York, did inject himself into Wisconsin. There are, however, doubts as to the situs of any alleged negotiations or agreements. In this day of long distance communication, it is often difficult to pinpoint where certain negotiations and agreements take place. Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263, 1268 (8th Cir.), cert. denied, 421 U.S. 999 (1975); but see id. (law of receiver's forum state should control); Greenberg v. R.S.P. Realty Corp., 253 N.Y.S.2d 344, 345 (2d Dep't 1964) (same). In any event, Wisconsin probably has sufficient contacts with this litigation to warrant a look at Wisconsin's interest in enforcing its law.

*7 Defendants also contend that Maryland law should govern the alleged contract between Maryland Cup and Huber. The contract involved a Maryland corporation, Maryland Cup, and a Maryland-licensed broker-dealer, Thomson McKinnon. The fact that the third-party defendant, Maryland Cup, is a Maryland corporation in no way compels application of Maryland law. Nor does the fact that Thomson McKinnon is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

licensed in Maryland. Thomson McKinnon is licensed in several states; it cannot simply choose the law of one of those states to apply as suits it in a particular case.

Maryland's contacts appear insufficient to warrant application of Maryland law. The contract between Huber and Maryland Cup was allegedly entered into during Huber's meeting with Merrill Bank in Hyannis, Massachusetts. Huber never even went to Maryland in connection with this finder's fee agreement. However, the Court will review Maryland's interest in enforcing an oral finder's fee agreement, it closely resembling that of Wisconsin, in the following section.

*2. Competing State Interests*

Through the enactment of General Obligations Law § 5-701(a)(10), New York has expressed a strong public policy in regulating and monitoring the activities of finders who operate in or from this State, and in encouraging the use of New York finders by nonresident principals. The New York Court of Appeals has recognized the strength of that policy and has held that it gives New York a substantial interest in disputes involving New York finders attempting to enforce oral contracts. 300 N.Y.S.2d at 826-27.

To determine New York's interest in applying its Statute of frauds in Daystrom, the Court of Appeals reviewed the legislative history of § 5-701(a)(10) and found that the statute was expressly intended to reduce the 'substantial number' of 'unfounded and multiple claims for commissions' asserted by finders. at 826 (quoting The Law Revision Commission's Report to the New York State Legislature). The Court of Appeals went on to conclude that the underlying policy and purpose of the statute was to protect principals from precisely the type of claim asserted by the finder in Daystrom, and Huber in the instant case-a claim for a multimillion dollar fee unsupported by a signed writing. Id. This protection, the court held further, was deliberately intended to extend to foreign principals in order to encourage them to use New York finders and to take advantage of the State's position as an international clearing house and market place. Id. at 826-27.

The court held that New Jersey, on the other hand, had no interest in having its Statute of Frauds applied to allow recovery in the action. Id. at 828. The court reasoned that the two interests underlying New Jersey's Statute of Frauds: (1) the prevention of perjury in its courts, and (2) the protection of its principals from being sued on promises that are unsupported by documentary evidence-would not be furthered by applying New Jersey's law in that case. Id. That conclusion applies in the instant matter as well.

***8** In this case, Wisconsin, like New Jersey in Daystrom, has no interest to be furthered in preventing perjury in its courts because the action is pending in New York. Similarly, Wisconsin has no interest in having its law applied to protect its principals because New York's law is more protective of their interests. See Daystrom, 300 N.Y.S.2d at 828. Finally, Wisconsin certainly has no interest in protecting a nonresident's alleged expectation of compensation. See Hunter v. Greene, 572 F. Supp. 49, 53 (S.D.N.Y. 1983), aff'd in part and rev'd in part, 734 F.2d 896 (2d Cir. 1984); see also O'Keeffe v. Bry, 456 F. Supp. 822, 828 (S.D.N.Y. 1978). Although Thomson McKinnon is a Maryland resident, the interests of Maryland

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are virtually identical to those of Wisconsin.

This is not a close case. New York's legislature and highest court have expressed, in unequivocal terms, the State's strong public policy in regulating and monitoring the activities of New York-based finders and in encouraging the use of those finders by nonresident principals. To those ends, New York requires a writing as a precondition to enforcement of a finders fee agreement by a New York finder. The Court does not accept the notion that New York's strong policy in this regard could be outweighed by the rather amorphous policies of Wisconsin or Maryland designed to prevent injustice.

Having found New York's contacts to be substantial and its interest in enforcing its public policy to eclipse those of Wisconsin or Maryland, the Court rules that New York law should apply to Huber's contract claims.

*2. Substantive Claims*

The Court next assesses the vitality of Huber's contract claims under New York's strict Statute of Frauds. The threshold question is whether there exist memoranda sufficient to meet the writing requirement of the Statute of Frauds. In making this determination, the Court may properly consider correspondence between plaintiff and defendants, along with plaintiff's internal memoranda. See, e.g., Blye v. Colonial Corp., N.Y.L.J., July 13, 1984, at 1, col. 6 (1st Dep't June 21, 1984); Shapiro v. Dictaphone Corp., 411 N.Y.S.2d 669, 672 (2d Dep't 1978); Allison Capital Corp. v. Brennand-Paige Indust. Inc., N.Y.L.J., Aug. 26, 1984, at 7 (Sup. Ct. N.Y. Cty.).

To withstand a challenge under the Statute of Frauds, there must be a writing, signed by the party to be charged, which contains, either expressly or by reasonable implication, all the material terms of the agreement. Morris Cohon & Co. v. Russell, 297 N.Y.S.2d 947, 953 (N.Y. 1969); J. Calamari & J. Perillo, Contracts § 19-29 (2d ed. 1977). New York courts have been liberal in finding a sufficient writing. In Blye, for example, the First Department enforced a writing, signed by a defendant, that discussed a licensing agreement for a certain apparel line and compensation terms. Defendant described it as 'the understanding we have reached.' N.Y.L.J., July 13, 1984, at 3, col. 1. The only element that the writing lacked was a firm agreement as to the amount of plaintiff's compensation. Id. In Shapiro, the Second Department enforced a contract evidenced by plaintiff's letters apprising defendant that plaintiff expected to be compensated and by defendant's letters repeatedly urging plaintiff to perform services as a broker and assuring plaintiff that the specifics would be worked out later. In addition, defendant's internal memoranda indicated that plaintiff's services were actually used by plaintiff. 411 N.Y.S.2d at 672. In Niedenhoffer, Cross & Zeckhauser, Inc. v. Holiday Inns, Inc., No. 77 Civ. 5242, Slip op. at 15-16 (S.D.N.Y. Mar. 25, 1980), on the other hand, several letters and memoranda written by defendant, which indicated that plaintiff was in fact defendant's broker, were found insufficient because they lacked all the material elements of a contract including compensation.

***9** The writings offered by defendants in this case fail to satisfy the requirements of the Statute of Frauds. The first, and most important, writing is the letter from Arnold Janofsky, Assistant to the President of Fort Howard, to Dean Porter of Thomson McKinnon. It was a response to Porter's letter offering to make Thomson

McKinnon's services available to Fort Howard. The letter apprised Thomson McKinnon of Fort Howard's desired acquisition criteria with the hope that Thomson McKinnon 'might be aware of an interesting situation which we could discuss.' After outlining the desired company, Janofsky wrote: 'Should you be be aware of any opportunities which fit our needs, we would appreciate it if you would contact us with available facts and information including your fee, if any.' (Defendants' Exhibit A) (emphasis added). This is obviously an invitation to negotiate. Calamari & Perillo, supra, § 2-7. Defendant did not promise to pay a fee; indeed, defendant's letter indicates that it did not even know if a fee would be required. The Court finds that no reasonable person could find to the contrary.

The second document offered by defendants is an internal Fort Howard memorandum, authored by Schierl and dated October 28, 1980. The memorandum indicates that Bank, Maryland Cup's President, thought 'Huber would be entitled to some sort of a finder's fee.' However, the memorandum further reveals that Fort Howard was led to Maryland Cup by persons other than Huber and that it planned to 'cool' its relationship with Huber.

The third document is also an internal Fort Howard memorandum, authored by Twomey, dated May 18, 1981. The memorandum indicates that Huber was trying to take an active role in the Fort Howard-Maryland Cup negotiations and that Huber 'bemoaned' the fact that his relationship with Fort Howard had 'not been committed in (sic) writing. . . .' The fourth document was a letter from Huber to Paul Schierl, dated May 29, 1981, informing Schierl that Huber had left Thomson McKinnon and joined William D. Witter, Inc. Huber explained that Witter had questioned him about the absence of a Fort Howard fee letter. The fifth document is a letter from Fort Howard to Thomson McKinnon, dated June 1, 1, 1981, disclaiming the existence of any finder's fee agreement with Huber and Thomson McKinnon. In document number six, another letter from Huber to Schierl, dated June 4, 1980, Huber said he was not 'disturbed' by Fort Howard's June 1 letter disclaiming liability and added that he had 'complete confidence in [Schierl's] sense of fairness.' (Defendants' Exhibit A). FN2

These writings simply do not add up to a contract. While Huber surely offered to act as a finder for Fort Howard, nowhere is there evidence of Fort Howard's acceptance of that offer. The closest defendants come in that regard is Janofsky's letter of May 21, 1980, inviting Thomson McKinnon to look into interesting prospects for Fort Howard. But the letter clearly says that if interesting prospects arise, Thomson McKinnon should call to discuss them and its 'fee, if any.' All the other documents simply paint a picture of Huber, a man without a written contract who has given over his only information of value, i.e. the identity of Fort Howard and Maryland Cup to each other, struggling to make himself worth employing.

***10** The policy articulated in Daystrom, which provides predictability in a principal's obligations to a finder, was intended to encourage foreign principals to use New York finders. 300 N.Y.S.2d at 826-27. As a New York finder, Huber is a likely beneficiary of this policy. To reap the benefits of the policy, Huber needed only to be certain that his agreements complied with the Statute of Frauds. Id. at 827. Huber's knowledge of this requirement is clear from his anguish over not having a writing from Fort Howard. (Fort Howard Internal Memorandum, dated May 18, 1981, Defendants' Exhibit A). In fact, in a September 4, 1980 letter advising a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fort Howard official, Huber wrote:
In this instance, I doubt that there is any real liability since another purported finder was not representing a client and you did not sign any document. Under New York law there is zero liability on your part.

(Plaintiff's Reply Brief, Exhibit A).

It is undisputed that there is no writing to support the alleged breach of contract claim against Maryland Cup.

Absent a sufficient writing, Huber's contract claims against Fort Howard and Maryland Cup are barred under New York's Statute of Frauds.

*B. Quantum Meruit*

The Statute of Frauds notwithstanding, Huber asserts claims for 'unjust enrichment,' a quasi-contractual claim for restitution. FN3 Huber seeks to recover the reasonable value of his services.

Under the New York Statute of Frauds, however, the absence of an effective writing 'is generally fatal to an action for a finder's fee, whether based on a theory of express contract, implied in fact contract or quasi contract.' Philo Smith & Co. v. USLIFE Corp., 554 F.2d 34, 35 (2d Cir. 1977) (per curiam); but see L. Fatato, Inc. v. Miller Brewing Co., 582 F. Supp. 1377, 1379 (E.D.N.Y. 1984) (a contract unenforceable under the Statute of Frauds may give rise to recovery based on an implied or quasi-contract); Shapiro, 411 N.Y.S.2d at 672-73 (same); Calamari & Perillo, supra, § 19-40 (same). In Minichiello v. Royal Business Funds Corp., 277 N.Y.S.2d 268 (N.Y. 1966), cert. denied, 389 U.S. 820 (1967), the New York Court of Appeals engaged in a thorough review of the legislative history of the Statute of Frauds and ruled that (1) the Statute applied to finders; and (2) finders unable to recover on a contract claim, due to lack of a sufficient writing, could not recover in quantum meruit. Id. at 271-72; see Lee v. St. Joe Paper Co., 371 F.2d 797, 799-800 (2d Cir.), cert. denied, 389 U.S. 821 (1967); Soper v. Simmons Int'l, Ltd., No. 84 Civ. 70, Slip op. at 7 (S.D.N.Y. May 30, 1984); Gibbons, Green & Rice, Ltd. v. White Motor Corp., No. 77 Civ. 2629, Slip op. at 16-17 (S.D.N.Y. July 27, 1978); Philo Smith, 420 F. Supp. 1266, 1271 (S.D.N.Y. 1976), aff'd per curiam, 554 F.2d 34 (2d Cir. 1977); Denny v. American Tobacco Co., 308 F. Supp. 219, 222-23 (N.D. Cal. 1970) (applying N.Y. law); Klein v. Smigel, 354 N.Y.S.2d 117, 120-21 (1st Dep't 1974), aff'd mem., 370 N.Y.S.2d 897 (N.Y. 1975); Daystrom, 290 N.Y.S.2d 206, 206 (1st Dep't 1968) (per curiam); aff'd, 300 N.Y.S.2d 817 (N.Y. 1969). The New York Court of Appeals said:
***11** '. . . to allow recovery for the reasonable value of these services is to substantially defeat the writing requirement. We should not ascribe to the Legislature such a paradoxical purpose.'

277 N.Y.S.2d at 271-72.

Accordingly, Huber's quantum meruit claims against Fort Howard and Maryland Cup are dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*C. Fraud*

Huber also asserts claims of fraudulent misrepresentation against Maryland Cup and Fort Howard. Huber alleges that Merrill Bank, Maryland Cup's President, promised to pay Huber's finder's fee (if Fort Howard failed to pay it) in return for Huber's disclosure of the prospective acquiror. Huber contends that he relied on Bank's deliberate misrepresentation in undertaking further efforts toward negotiating the merger, not seeking other suitable acquisitions for Fort Howard, and not seeking further protection of his fee arrangements. Huber also alleges that Paul Schierl, Fort Howard's President, fraudulently misepresented that the could not issue a fee letter to Huber but that Fort Howard would pay Huber's fee. Such a fee letter, Schierl said, would require disclosure to his Board of Directors, thus compromising merger negotiations. In reliance on Schierl's statement, Huber alleges that he continued his efforts promoting the merger.

The law of torts and the law of contracts protect different interests. Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 898 (2d Cir. 1980). The law of contracts is grounded on the policy that persons should be held to their promises and the law of torts is based on the policy that, irrespective of an agreement, infliction of specific kinds of harms should be disapproved. Id. at 898-99. The law of fraud protects against injury inflicted on those who rely to their detriment on the deliberately dishonest statements of another. Id. at 899; see Soper, Slip op. at 6.

The fact that a party is barred, by the Statute of Frauds, from pursuing a breach of contract claim, therefore, does not necessarily bar an action seeking to impose tort liability on the breaching party. Id; e.g., Shapiro, 411 N.Y.S.2d at 672. Indeed, the Statute of Frauds was never intended to immunize fraudulent conduct. Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 176 N.Y.S.2d 259, 263 (N.Y. 1958). At the same time, however, it would 'be incongruous and subversive of the legislative intent to permit a plaintiff in a finder's fee case to avoid the Statute of Frauds by relabeling his claims a . . . 'misrepresentation." Daystrom, 290 N.Y.S.2d at 206; see Soper, Slip op. at 5-6; Gibbons, Slip op. at 22; Niederhoffer, Slip op. at 29; Atlanthus Corp. v. Travelers Insurance Co., 460 N.Y.S.2d 549, 551 (1st Dep't 1983); Rogoff v. San Juan Racing Ass'n, Inc., 431 N.Y.S.2d 16, 18 (1st Dep't 1980), aff'd, 444 N.Y.S.2d 911 (N.Y. 1981).

In order to separate real fraud claims from contract claims disguised as fraud claims, courts must look to the type of injury alleged. In Channel Master, for example, a manufacturer of aluminum asserted a claim against a supplier of aluminum-ingot contending that the defendant-supplier had falsely represented its intention to provide the plaintiff's future aluminum requirements. 176 N.Y.S.2d at 261. There was no written memorialization of this representation and the Statute of Frauds precluded a contractual cause of action. Yet, in affirming denial of defendant's motion to dismiss, the Court of Appeals held:

***12** . . . [o]ne who fraudulently misrepresents himself as intending to perform an agreement is subject to liability in tort whether the agreement is enforcible or not . . .. The present action is in tort, not contract, depending not upon agreement between the parties, but rather upon deliberate misrepresentation of fact, relied on by the plaintiff to his detriment. In other words, the 'legal relations' binding the parties are created by the utterance of a falsehood 'within a fraudulent intent' and by reliance thereon . . . and the cause of action is entirely 'independent of contractual relations between the parties.'

Id. at 263. Significantly, the plaintiff in Channel Master sought damages incurred in reliance on defendant's misrepresentation: 'the plaintiff refrained from securing commitments for future supplies from others.' Id. at 261. The complaint neither asserted a breach of contract nor attempted to enforce any promise made by defendants. Id. at 263. Thus, the fraud claim was actionable because the injury alleged was the detriment actually suffered by plaintiff rather than the value of what defendant promised. Soper, Slip op. at 6; see Bailey v. Diamond Int'l Corp., 367 N.Y.S.2d 107, 111 (3d Dep't 1975) (plaintiff made various purchases and lost 'large sums of money' in reliance on defendant's allegedly fraudulent misrepresentation); Steinberg v. Universal Machinenfabrik GMBH, 264 N.Y.S.2d 757, 760 (2d Dep't 1965) (plaintiffs 'expended a large sum of money in reliance' on defendant's allegedly fraudulent promise to make plaintiffs its exclusive sales agents), aff'd, 277 N.Y.S.2d 142 (N.Y. 1966).

On the other hand, if the only interest at stake is that of holding a party to a promise, the party seeking relief 'may not transmogrify the contract claim into one for tort.' Hargrave, 636 F.2d at 899; see, e.g., Rogoff, 431 N.Y.S.2d at 18; Roberts v. Champion Int'l Inc., 382 N.Y.S.2d 790, 791 (1st Dep't 1976). In Soper, for example, the finder specifically alleged that the principals had fraudulently misrepresented their intention to pay him a finder's fee and that he had performed his part of the agreement in reliance on their representations. Nonetheless, plaintiffs fraud claim was dismissed because it sought as damages their commission based on an oral finder's fee agreement unenforceable under the Statute of Frauds. Slip op. at 7.

In the instant case, Huber seeks only his commission, along with punitive damages (Amended Answer and Counterclaims ¶ ¶ 53, 86). The fact that Huber allegedly relied on Fort Howard's and Maryland Cup's misrepresentations in undertaking further efforts to facilitate the merger does not change the basic contractual nature of Huber's claims.

Defendants contend that since Bank's alleged misrepresentation occurred in Massachusetts and Schierl's occurred in Wisconsin, the law of those states should apply to the fraud claims under New York's choice of law rules calling for application of the law of the jurisdiction where the injury occurred. See Cousins v. Instrument Flyers, Inc., 405 N.Y.S.2d 441, 442 (N.Y. 1978) (per curiam) ('lex loci delicti remains the general rule in tort cases to be displaced only in extraordinary circumstances'); Beasock v. Dioguardi Enterprises, Inc., 472 N.Y.S.2d 798, 800 (4th Dep't 1984) (same). Were this the case, the measure of damages sought would arguably not be a proper focus for determining the viability of Huber's fraud claims. Under New York law, the measure of damages for fraud is governed by the 'out-of-pocket' rule. E.g., Dress Shirt Sales v. Hotel Martinique Associates, 239 N.Y.S.2d 660, 663 (N.Y. 1963). This rule 'looks to the loss that the plaintiff has suffered in the transaction, and gives him the difference between the value of what he has parted with and the value of what he has received.' Prosser and Keeton on the Law of Torts, § 110, at 767 (5th ed. 1984). The rule has been interpreted to permit recovery only for a plaintiff's "reliance interest,'-i.e. the costs incurred . . . in preparation or in performance or in passing up other business opportunities.' Soper, Slip op. at 6. Wisconsin and Massachusetts, however, allow a plaintiff to recover the 'benefit of the bargain' on a fraud claim. Rokowsky v. Gordon, 501 F. Supp. 1114, 1123 (D. Mass. 1980); Harweger v. Wilcox, 114 N.W.2d

818, 822-23 (Wis. 1962); Anderson v. Tri-State Home Improvement Co., 67 N.W.2d 853, 858-60 (Wis. 1955). The loss-of-the-bargain measure of damages has been defined as equal to the 'benefit of the bargain which the plaintiffs would have had if the representation had been true.' Rokowsky, 501 F. Supp. at 1123; see Prosser & Keeton, supra, § 110, at 768. Thus, under the law of Wisconsin or Massachusetts, in contrast to that of New York, a plaintiff, barred from asserting a contract claim by the Statute of Frauds, could seek to recover his finder's fee under a claim of fraud.

***13** The Court rejects defendants' argument for two reasons. First, while the fraudulent statements were made in Massachusetts and Wisconsin, virtually all the injury was sustained in New York. Huber detrimentally relied on the alleged misrepresentations when he undertook various activities, while in his New York office, designed to consummate the merger. Thus, the Court is of the view that New York law is applicable under lex loci delicti. Second, the New York Court of Appeals recently handed down the schultz decision, rejecting strict adherence to the lex loci delicti test and reaffirming the propriety of governmental interest analysis in tort cases. N.Y.L.J., May 6, 1985, at 17, cols. 3-4. In view of Daystrom, New York's interest in applying its law clearly outweighs the interests of Wisconsin or Massachusetts.

For the foregoing reasons, Huber's fraud claims are dismissed.

*D. Promissory Estoppel*

Huber further seeks to avoid the obstacle posed by the Statute of Frauds by asserting promissory estoppel claims against Fort Howard and Maryland Cup. Huber asserts that Schierl and Bank promised to pay him, Huber reasonably relied on these promises to his detriment and the promises were unfulfilled.

The doctrine of promisory estoppel is applied when one party has changed its position in reliance on representations of another party. Chromalloy American Corp. v. Universal Housing Systems of America, Inc., 495 F. Supp. 544, 551 (S.D.N.Y. 1980), aff'd mem., 697 F.2d 289 (2d Cir. 1982). In New York, FN4 the scope of the doctrine is very limited. See Buddman Distributors, Inc. v. Labatt Importers, Inc., 458 N.Y.S.2d 395, 396-97 (4th Dep't 1982) (limited to 'unconscionable injury'); Healy v. Brotman, 409 N.Y.S.2d 72, 75 (Sup. Ct. Suffolk Cty. 1978) (limited to charitable subscriptions, marriage settlement and promises to insure by gratuitous agents or gratuitous bailees). In order to establish estoppel, a party must prove that defendant made an oral representation contemporaneous with or subsequent to the written agreement; that defendant anticipated plaintiff's reliance on the representation; that plaintiff in fact relied, and that such reliance was reasonable; that plaintiff engaged in acts 'unequivocally referrable' to the oral promise; and finally that a substantial injury or especial harm resulted. Chromalloy American, 495 F. Supp. at 551; Niederhoffer, Slip op. at 16; Philo Smith, 420 F. Supp. at 1271-74.

In Philo Smith, the Second Circuit, affirming dismissal of a claim that defendant should be estopped from asserting the Statute of Frauds, held:
The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court found that some unfairness would otherwise result. For this reason, the doctrine of promissory estoppel is properly reserved for that limited class of cases where 'the circumstances are such as to render it unconscionable to deny' the promise upon which the plaintiff has relied.

***14** 554 F.2d at 36 (quoting 3 Williston on Contracts § 533A, at 801 (3d ed. 1960)); see Chromalloy American, 495 F. Supp. at 551. In further describing the limited scope of the doctrine, as evidenced by the requirement of substantial injury, the Second Circuit quoted the landmark New York Court of Appeals case of Woolley v. Stewart, 222 N.Y. 347 (1918):A party to [an oral] agreement [within the statute] may legally and rightfully refuse to recognize or perform it. The breach of a void agreement is not a fraud or a wrong in law. . . . He may, however, withdraw himself from the policy and defense of the statute, or waive its protection, by inducing or permitting without remonstrance another party to the agreement to do acts, pursuant to and in reliance upon the agreement, to such an extent and so substantial in quality as to irremediably alter his situation and make the interposition of the statute against performance a fraud. In such a case a court of equity acts upon the principle that not to give effect to those acts would be to allow the party permitting them to use the statute as an instrument defending deception and injustice.

Id. at 350-51 (citations omitted).

The proof in this case does not meet the above-quoted standard. The only substantial injury suffered by defendants was the loss of the fee allegedly promised by Fort Howard and Maryland Cup. This, however, is not the type of injury contemplated by New York law, for it is exclusively a result of the non-performance of a void or unenforceable agreement. Philo Smith, 554 F.2d at 36.

Huber's promissory estoppel claims fail for other reasons as well. Defendants have failed to allege the existence of a written agreement prior to or contemporaneous with the oral promises. See Niedenhoffer, Slip op. at 16; Philo Smith, 420 F. Supp. at 1271. In addition, it is difficult to believe that Huber's reliance on the statements of Schierl and Bank was reasonable in view of Huber's knowledge of New York's strict Statute of Frauds. See supra p. 22.

Accordingly, Huber's promissory estoppel claims are dismissed.

## CONCLUSION

Defendants' breach of contract claims, being unsupported by a writing sufficient to commemorate the alleged finder's fee agreements, are barred by the Statute of Frauds. Defendants' claims for recovery based on quantum meruit, fraud and promissory estoppel are simply contract claims in disguise and, as such, are also barred by the Statute of Frauds.

In reaching a similar decision recently, Judge Sand noted 'that application to (sic) the Statute of Frauds in individual cases may sometimes produce harsh, and even apparently unjust, results . . . [but] it is not for this Court to re-examine the considered policy determinations of the New York legislature.' Soper, Slip op. at 7. Like Judge Sand, this Court is constrained to grant third-party defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion for summary judgment.

This declaratory judgment having been rendered and defendants' claims having been dismissed, this case is closed.

***15** SO ORDERED.

FN1 If a state has only an insignificant contact with the parties and the occurrence or transaction in question, it will offend due process to apply that state's law. Allstate Insurance Co. v. Hague, 449 U.S. 302, 310-11 (1981); see, e.g., John Hancock Mutual Life Ins. Co. v. Yates, 299 U.S. 178, 179, 182-83 (1936) (post-occurrence change of address to the forum state insufficient contact); Home Insurance Co. v. Dick, 281 U.S. 397, 410 (1930) (nominal residence in forum state insufficient contact). For application of a state's law to be constitutionally permissible, the 'State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.' Hague, 449 U.S. 313.

FN2 The final document, a letter from Schierl to Huber, dated June 16, 1981, does not mention the finder's fee issue; it is merely a letter of congratulations on Huber's move to Witter.

FN3 Since these claims are in the nature of claims on a contract, New York law applies to them for the same reasons New York law applied to Huber's contract claims.

FN4 For the reasons articulated in the interest analysis undertaken above, see supra pp. 13-18, New York law applies to defendants' promissory estoppel claims.

Fort Howard Paper Company v. William D. Witter, Inc.
Not Reported in F.Supp., 1985 WL 1402 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.