**JUDGES:** Before Eich, C.J., Dykman and Vergeront, JJ.

**OPINIONBY:** EICH

**OPINION:**

EICH, C.J. HBN Partnership sued Perry Schappe and Hovde & Hovde, Inc. (H&H) for, among other things, rescission of a real estate purchase contract and damages, attorney fees and costs under the false advertising statute, based on allegations that Schappe and H&H failed to disclose fuel oil contamination on the purchased property. H&H brought a third-party action for contribution against the original owner of the property, Madison Area Technical College (MATC).

The trial court dismissed the false advertising claim, rescinded the contract and ordered Schappe to return the purchase price of the property to HBN, together with "restorative damages." And despite the parties' stipulation that the third-party issues would be tried at a later date, the court dismissed H&H's third-party complaint against MATC.

H&H and Schappe appeal the portion of the judgment rescinding [*2] the contract and H&H also appeals from the trial court's judgment dismissing its third-party action. HBN cross-appeals the dismissal of its claim for damages and attorney fees under the false advertising statute.

We reverse those portions of the judgments dismissing HBN's claim for damages and attorney fees and H&H's third-party complaint against MATC. In all other respects, we affirm.

**I. BACKGROUND**

The action arises out of HBN's purchase of a portion of a parking lot originally owned by MATC. In 1988, desiring to sell the property, MATC retained H&H, a real estate brokerage office, to find a purchaser. H&H initially offered the property to Dane County, but the county decided against the purchase after soil tests revealed the presence of fuel oil contamination on the property. H&H notified MATC of the county's findings and the college retained an engineering firm to investigate the subsoil conditions. The presence of fuel oil contamination was confirmed and MATC informed Glenn Hovde of H&H that it was "working on a procedure for dealing with the subsurface oil condition." During this time--in the spring of 1989--MATC received an offer to purchase the lot from another party, which [*3] was withdrawn when the existence of the soil contamination was disclosed.

HBN is a general partnership formed in 1990 by Jay Busse, Pamela Hamele and Nancy Nelson for the purpose of locating a site to build and operate a carwash. Jay Busse, whose father is a long-time professional and social acquaintance of Glenn Hovde, is HBN's managing partner.

During the summer of 1989, Busse informed Glenn Hovde that HBN was looking for property, and Hovde suggested that the MATC lot might meet their needs. Hovde told Busse that MATC had hired an engineering firm to explore possible fuel oil contamination on the property but that MATC would work the problem out with the Wisconsin Department of Natural Resources. n1 Busse expressed an interest in the lot.

n1 At trial, the parties strongly disputed the extent to which H&H informed Busse of the soil contamination.

At about the same time, Ray Hovde, a realtor employed by H&H, contacted Perry Schappe, a long-time acquaintance, about purchasing the MATC lot. In September 1989, Hovde [*4] drafted an option for Schappe to purchase the property for $ 200,000. n2

n2 Although Schappe was aware that there was a potential soil problem on the property, Ray Hovde informed him that "there was clearance from the DNR" and that DNR had inspected the lot and had given "the property a clean bill of health." The option contained a clause stating that MATC was to obtain "suitable resolution ... regarding soil contamination" from DNR and acknowledged that "Seller and Buyer have discussed such soil conditions."

Shortly thereafter, MATC was informed by DNR that "no further action" was required regarding the lot and the school's board of directors voted to accept Schappe's option. Schappe, however, did not wish to take the entire piece of property and entered into a listing contract with H&H to locate a purchaser for a portion of the lot. As a result, H&H was the exclusive listing broker for both MATC and Schappe in the transactions that form the basis of this lawsuit.

On December 21, 1989, DNR issued a letter stating [*5] that "further investigation" of the MATC property was not warranted. Schappe then had the lot rezoned and divided into two parcels--Lots "1" and "2"--to fit his own and HBN's needs.

On or about March 20, 1990, Busse and Mark Hamele submitted an offer to purchase Lot 2 from Schappe. The offer listed the buyers as "Jay A. Busse, Mark S. Hamele and/or assigns," and stated a purchase price of $ 105,000.

Schappe eventually accepted the offer and in July 1990 exercised his option to purchase the entire MATC lot. Both closings--for the MATC-Schappe sale and the Schappe-HBN sale--were held the same day, but in separate rooms. Although, as indicated, the offer to purchase Lot 2 was submitted by Jay Busse and Mark Hamele, the closing papers listed HBN as the purchaser. n3 At Schappe's request, MATC issued separate warranty deeds--one to Schappe for Lot 1 and one to HBN for Lot 2--and two separate closing statements were prepared and signed by the parties. One statement reflected MATC's sale of the entire parcel to Schappe for $ 200,000; the other, signed by Schappe as "Seller," reflected the sale of Lot 2 to HBN for $ 105,000.

n3 As the selling broker in both MATC's sale to Schappe and Schappe's sale to HBN, Glenn Hovde was entitled to a commission on both sales. Jay Busse, HBN's managing partner, is also a real estate broker and his company shared in the latter commission.

[*6]

As HBN began excavating the property for construction of the carwash, the City of Madison undertook an analysis to determine whether the subsoil was adequate to support the proposed building's footings. When the analysis revealed substantial fuel oil contamination, HBN sued to rescind the purchase contract and for other relief. Specifically, HBN (1) sued Schappe for rescission of the purchase contract for Lot 2 based on its and H&H's failure to adequately disclose the soil contamination problems on the property, (2) sued H&H for damages--on theories of negligent, intentional and strict-liability misrepresentation--for failing to disclose the soil contamination, and (3) sought recovery of damages, attorney fees and costs from H&H under the "false advertising" statute, *§ 100.18, STATS.*, which prohibits the use of "untrue, deceptive or misleading" statements relating to the purchase or sale of, among other things, real estate. As indicated, H&H filed a third-party complaint against MATC for indemnification and contribution.

On the first day of trial, HBN abandoned its misrepresentation damage claims and the case proceeded on the rescission and false advertis-

ing causes of action. In addition, [*7] the defendants stipulated that any claims between them would not be considered during the trial but would continue under the court's jurisdiction for trial at a later date, if necessary.

The trial court, concluding that H&H and Schappe were negligent in failing to adequately disclose the soil contamination to HBN, granted HBN's claim for rescission and ordered Schappe to return to HBN the Lot 2 purchase price, together with "restorative damages" in the amount of $ 66,310.37. The court also dismissed HBN's claim under the false advertising statute, concluding that the statute applied only to intentional misrepresentations. Finally, despite the parties' stipulation to postpone such issues, the court dismissed Hovde's third-party complaint against MATC and ordered costs against Hovde.

H&H and Schappe both appeal the portion of the judgment rescinding HBN's purchase of the property and ordering restorative damages, and HBN cross-appeals the dismissal of its claim under the false advertising statute. H&H also challenges the court's dismissal of its third-party claim against MATC. We consider each party's claims separately.

II. H&H'S APPEAL

H&H argues that rescission was improperly granted [*8] because: (1) Wisconsin does not recognize a cause of action for misrepresentation by negligent failure to disclose facts; (2) the trial court's finding that HBN was not sufficiently advised of the soil conditions was clearly erroneous; (3) HBN was negligent as a matter of law in relying on H&H's representations; and (4) there was insufficient evidence to establish that the contamination had a material adverse effect on the property. Finally, H&H claims there was a lack of evidence to support the court's award of restorative damages to HBN and that the trial court erred in dismissing H&H's complaint against MATC.

A. Rescission

[HN1]
Rescission is an equitable remedy which is properly tried to the trial court. ***Little v. Roundy's, Inc.***, *152 Wis.2d 715, 722, 449 N.W.2d 78, 81-82 (Ct. App. 1989)*. The effect of rescinding a contract is to restore the parties to the position they would have occupied had no contract ever been made. ***Schnuth v. Harrison***, *44 Wis.2d 326, 339, 171 N.W.2d 370, 377 (1969)*. And while misrepresentation of varying degrees has been held to be grounds for rescission, ***id.*** *at 337, 171 N.W.2d at 376,* [*9] one seeking to rescind a contract must make "some showing of prejudice, damage or detriment." ***Tam v. Luk***, *154 Wis.2d 282, 288, 453 N.W.2d 158, 161 (Ct. App. 1990)*.

*1. Negligent Failure to Disclose*

Citing cases for the proposition that "Wisconsin does not recognize a cause of action for negligent failure to disclose in a commercial transaction," H&H argues first that the trial court erred as a matter of law in rescinding HBN's purchase contract based on H&H's unintentional failure to adequately disclose the extent to which the property was contaminated. n4

n4 HBN claims that this issue is inappropriate for review because H&H did not raise it at trial. Generally, we do not address issues raised for the first time on appeal. ***Evjen v. Evjen***, *171 Wis.2d 677, 688, 492 N.W.2d 361, 365 (Ct. App. 1992)*. We may address such issues in our discretion, however, and because the record is adequate and the parties have argued the points at length in their briefs, we will consider them. *See* ***County of Columbia v. Bylewski***, *94 Wis.2d 153, 171-72, 288 N.W.2d 129, 139 (1980)*.

[*10]

The cited case, however, ***Stevenson v. Barwineck***, *8 Wis.2d 557, 99 N.W.2d 690 (1959)*, is inapposite as it was an action for

money damages for misrepresentation. n5 And whatever the rule may be in tort actions, established principles of contract law allow contracts to be avoided based on an unintentional misrepresentation or failure to disclose.

n5 In the other case cited by H&H, ***Green Spring Farms v. Spring Green Farms***, *172 Wis.2d 28, 40, 492 N.W.2d 392, 397 (Ct. App. 1992),* we did not consider the claim based on negligent misrepresentation because we determined that a claim was stated on grounds of "intentional failure to disclose."

In ***First Nat'l Bank & Trust Co. v. Notte,*** *97 Wis.2d 207, 219, 221, 293 N.W.2d 530, 536-37, 537 (1980),* for example, the supreme court recognized that "[HN2] misrepresentation can form the basis for contract rescission, *even if that misrepresentation* [*11] *was innocently made*," and that "nondisclosure can form the basis for a misrepresentation sufficient to allow the avoidance of a contract obligation under general principles of contract law." (Emphasis added.) n6

n6 We have recognized that even in tort actions for negligent misrepresentation, where there is a duty to disclose a fact, failure to disclose it is "equivalent to a representation of the nonexistence of the fact." ***Grube v. Daun***, *173 Wis.2d 30, 56, 496 N.W.2d 106, 115 (Ct. App. 1992).* And we noted in ***Grube*** that *WIS. ADM. CODE § RL 24.07* places a duty on real estate brokers to disclose adverse material facts to purchasers. ***Grube***, *173 Wis.2d at 52, 496 N.W.2d at 113.*

Nor are we persuaded by H&H's argument, quoting 12 SAMUEL WILLISTON, CONTRACTS § 1512, at 471 (Walter H.E. Jaeger ed., 3d ed. 1970), that we should reverse for reasons of public policy because actions for negligent misrepresentation must [*12] be strictly limited, for "to hold every [person] liable for the consequences of words carelessly spoken would be to impose a degree of liability beyond what is reasonable." n7 The Williston statement was, as H&H points out, quoted in ***Ollerman v. O'Rourke Co.,*** *94 Wis.2d 17, 50, 288 N.W.2d 95, 111 (1980),* a case in which the supreme court abandoned the traditional common-law doctrine of *caveat emptor* and recognized a cause of action for the intentional failure to disclose material facts where a duty to disclose lies. n8 ***Id.*** *at 41-42, 288 N.W.2d at 106-07.* ***First Nat'l Bank & Trust***, however, made it clear that innocent misrepresentations--including, as we have noted, nondisclosure of information--can form the basis for rescission of a contract.

n7 H&H also argues that imposing liability for negligent misrepresentation in commercial transactions "would place too unreasonable a burden upon the negligent tortfeasor because it would essentially make the seller the buyer's insurer in an arm's length commercial transaction," and would "open the way for fraudulent claims."
[*13]

n8 ***Ollerman***, like ***Stevenson***, was an action in tort for damages, and is thus of little precedential value in cases such as this, where the claim is for rescission--an equitable remedy. *See, e.g.,* ***Whipp v. Iverson***, *43 Wis.2d 166, 171, 168 N.W.2d 201, 204 (1969),* where the supreme court noted that claims for rescission are distinguishable from claims seeking damages in tort: "Certainly what is grounds for damages in deceit is grounds for rescission, but rescission is not re-

stricted to deceit. Equity recognizes that an honest misrepresentation is a ground for rescission."

We are satisfied that rescission will lie for negligent, as well as intentional, failure to disclose in appropriate circumstances.

> [HN3]
> The most innocent misrepresentation may result in unforeseen liability to a likewise innocent [party]. In circumstances such as these, where both parties, the misrepresenter and the [other party] are innocent of any wrongdoing there is a dilemma as to the proper treatment to be accorded each. But between two innocent parties, [*14] the party making the misrepresentation will bear the loss. There is a basic inequity of allowing one party to benefit from his own misstatements or misrepresentations, however honestly he believed them to be at the time made.

***First Nat'l Bank & Trust***, *97 Wis.2d at 221, 293 N.W.2d at 537.*

We thus turn to H&H's individual challenges to the trial court's decision.

*2. Inadequate Disclosure of the Soil Contamination*

H&H next challenges the trial court's finding that H&H failed to adequately disclose information as to the nature and extent of the soil problems at the MATC site. [HN4] We will overturn a trial court's factual findings only if they are clearly erroneous. *Section 805.17(2), STATS.*; ***Novelly Oil Co. v. Mathy Constr. Co.***, *147 Wis.2d 613, 617-18, 433 N.W.2d 628, 630 (Ct. App. 1988).* "[We] will examine the record not for evidence to support a finding which the trial court did not make but for facts to support the finding the trial court did make." ***Town of Mt. Pleasant v. Werlein***, *119 Wis.2d 90, 95, 349 N.W.2d 102, 105 (Ct. App. 1984).* [*15] Matters of witness credibility are to be determined by the trier of fact and that determination will not be disturbed where more than one reasonable inference can be drawn from the credible evidence. ***In re Estate of Dejmal***, *95 Wis.2d 141, 151, 289 N.W.2d 813, 818 (1980).* We defer to the trial court's credibility determinations because it has the opportunity to observe the demeanor of the witnesses and to gauge the persuasiveness of their testimony. ***Id.*** *at 152, 289 N.W.2d at 818.*

H&H claims that the following evidence establishes that the trial court's finding is erroneous: (1) Glenn Hovde's statements to Busse that a potential purchaser had detected the presence of fuel oil on the lot, that MATC had hired an engineering firm to inspect the property and that the contamination issue would be resolved by MATC and DNR; (2) Ray Hovde's statements to Busse about the soil contamination contingency in Schappe's offer and his suggestion that Busse include a similar contingency in the HBN offer; (3) Busse's knowledge of the "closure letter" from DNR, which H&H maintains should have alerted [*16] him to the fact that there still might be low-level contamination on the property; and (4) Busse's failure to inform his partners of DNR's involvement with the property, which H&H says leads to only one reasonable inference: that Busse knew of the problem and intentionally failed to disclose it to his partners.

As HBN points out, however, much of the testimony concerning the extent of H&H's disclosure of the contamination to Busse was sharply disputed at trial, n9 and while the trial court found that H&H had disclosed that fuel oil had been detected on the property and that MATC would resolve any concerns with DNR, it also found that H&H had failed to disclose

either the specific investigations into the contamination issue or the warranty language in the Schappe offer to purchase concerning oil contamination, and made no written disclosure of the contamination to Busse.

n9 HBN notes, for example, that although there was testimony that Ray Hovde had given the DNR letter to Busse for his review, Busse denied ever having received the letter. Moreover, despite Hovde's testimony that he advised Busse of the contamination disclosure language in the Schappe option to purchase, Busse denied that Hovde read him the language.

[*17]

After hearing six days of conflicting testimony, the court determined that "Busse's testimony that the issue of soil contamination was not properly discussed or disclosed is credible and reliable based on the undisputed corroborative evidence." The court also found that not only did H&H never make any affirmative disclosure of the contamination to Busse, the firm repeatedly assured HBN that any potential contamination issue either was being or had been resolved by DNR.

The trial court heard extensive and often sharply conflicting testimony on the subject, weighed and evaluated the evidence and the credibility of the witnesses as it alone is empowered to do, and made detailed findings of fact based on the record. Our own review of the record indicates that those findings are not clearly erroneous and we decline H&H's invitation to retry the case on appeal.

*3. HBN's Reliance*

H&H next argues that rescission was inappropriate because HBN was negligent as a matter of law in relying on Schappe's and H&H's alleged misrepresentations. We disagree.

H&H, urging us to review the trial court's determination of this issue de novo, cites ***Ritchie v. Clappier**, 109 Wis.2d 399, 406, 326 N.W.2d 131, 134 (Ct. App. 1982),* [*18] for the proposition that "*if the facts are undisputed*, whether the party claiming fraud was justified in relying on a misrepresentation is a question of law." (Emphasis added.) As before, however, the facts relating to Busse's reliance on H&H's representations were hotly disputed at trial. As a result, the reasonableness of Busse's reliance on those representations is more properly considered a mixed question of fact and law, ***Bank of Sun Prairie v. Esser**, 151 Wis.2d 11, 24-25, 442 N.W.2d 560, 565 (Ct. App. 1989), aff'd in part, rev'd in part on other grounds, 155 Wis.2d 724, 456 N.W.2d 585 (1990),* which is subject to a more deferential standard of review.

On this record, whether HBN's reliance on H&H's representations was reasonable is a determination that is so intertwined with the "pure" factual findings supporting it, we "should give weight to the trial court's decision, although [it] is not controlling." ***Wassenaar v. Panos**, 111 Wis.2d 518, 525, 331 N.W.2d 357, 361 (1983). See also **Chmill v. Friendly Ford-Mercury**, 144 Wis.2d 796, 803, 424 N.W.2d 747, 750 (Ct. App. 1988)* [*19] (such a standard is appropriate because the determination "requires a value judgment heavily dependent upon interpretation and analysis of underlying facts").

We first reject H&H's summary argument that we should refuse to come to HBN's aid because Busse and his partners rushed "blindly" into the transaction, "closing their eyes" to the obvious. This is not a case, like ***Horicon State Bank v. Kant Lumber Co.**, 165 Wis.2d 543, 546, 478 N.W.2d 26, 27 (Ct. App. 1991),* where the polluted condition of the subject property was plainly visible on the site. It is much more akin to the situation in ***Ollerman***, where the contamination was an undisclosed "latent" defect that was not discoverable through mere obser-

vation. ***Ollerman***, *94 Wis.2d at 39-40, 288 N.W.2d at 107.*

The heart of H&H's position is that because Busse knew that DNR had investigated the property, he was negligent in failing to contact the agency himself to inquire further about the condition of the property. H&H, pointing to our statement in ***Ritchie*** that "'whether the falsity of a statement could have been discovered [*20] through ordinary care is to be determined in light of the intelligence and experience of the misled individual,'" ***Ritchie***, *109 Wis.2d at 405, 326 N.W.2d at 134* (quoted source omitted), states that Busse is himself a real estate broker and, as such, should have known that DNR's involvement meant there was a potential for contamination at the site. And while H&H offered expert testimony that DNR involvement should have led a reasonably competent broker to infer a potential for contamination, the trial court found that H&H represented to HBN that the property was suitable. Additionally, Busse testified that his experience as a broker was limited to residential transactions.

It also is true that [HN5] a party's reliance on another's representations may be considered reasonable and justifiable where "'the relationship between the parties'" would justify such reliance. ***Ritchie***, *109 Wis.2d at 405-06, 326 N.W.2d at 134* (quoting ***Williams v. Rank & Son Buick, Inc.***, *44 Wis.2d 239, 246, 170 N.W.2d 807, 811-12 (1969)); see also* ***Esser***, *151 Wis.2d at 25-26, 442 N.W.2d at 565.* [*21] In this case, the trial court found a relationship of trust and confidence between Busse and Glenn Hovde. The court also considered Busse's relative inexperience in the area, noting that he was "wet behind the ears" with respect to commercial transactions. In contrast, the court found that H&H was an "exceptionally experienced, well known, two generation company, selling as well as developing real estate." Finally, the court noted that H&H's representation to Busse concerning the DNR letter was couched in language indicating that soil conditions on the site were suitable for carwash purposes and that no further action was required at the site. H&H has not satisfied us that HBN's reliance on the representations was negligent as a matter of law. n10

> n10 Nor are we persuaded, as H&H argues, that HBN's removal of the soil-condition contingency from the offer operated to waive any right to avoid the purchase because of adverse soil conditions. Busse testified that he agreed to remove the soil condition contingency from the offer on Glenn Hovde's insistence after Hovde told him that the contingency was holding up the sale.

[*22]

*4. Adverse Effect*

H&H next argues that rescission should not have been ordered because HBN failed to show that the contamination had a material adverse effect on the value of the property. As noted above, we stated in ***Tam v. Luk*** that [HN6] while a showing of actual pecuniary loss is not necessary to establish a claim for rescission based on a seller's misrepresentation of the status of the property, "there must be some showing of prejudice, damage or detriment to the buyer." ***Tam***, 154 *Wis.2d at 288, 453 N.W.2d at 161.* "'The proposition that a purchaser cannot rescind unless the thing of which he [or she] claims is of practical consequence from some point of view is not difficult to maintain.'" ***Id.*** *at 289, 453 N.W.2d at 161* (quoted source omitted).

Pointing to the testimony of several experts, including DNR personnel, that the contamination did not place restrictions on the property or cause a decline in its value, H&H argues that rescission was inappropriate.

First, as we noted above, the City of Madison "red-flagged" the excavation of the prop-

erty at substantial expense to HBN, [*23] and DNR subsequently reopened its investigation into the property and ordered that a restriction be placed in any deed to the property requiring the fact of contamination to be publicly disclosed in any sale. We note, too, that at least two potential purchasers lost interest in the property when they learned of the contamination; and there was testimony that HBN, had it been advised of the problem, would not have purchased the property in the first place. The inference is plain that the value of the property for most purposes would be diminished as a result of the subsoil contamination. We see no error in the court's ruling.

**B. Restorative Damages**

H&H next challenges the trial court's award of restorative damages in the amount of $ 66,310.37 to HBN. The sum includes interest and financing costs, real estate taxes, permits, and a variety of expenses for trucking, concrete, excavating, electrical, plumbing, site testing, and similar matters. H&H claims that the evidence at trial did not establish that any such damages were incurred by HBN or that, if incurred, they were the result of any failure to disclose on H&H's and Schappe's part. [HN7] It is well settled that a trial court may [*24] award restorative damages in a rescission action. ***Head & Seemann, Inc. v. Gregg***, *104 Wis.2d 156, 167, 311 N.W.2d 667, 672 (Ct. App. 1981), aff'd and remanded, 107 Wis.2d 126, 318 N.W.2d 381 (1982).* [HN8] Rescission is an equitable remedy and the nature and scope of the relief ordered in such cases are committed to the discretion of the trial court. ***Mulder v. Mittelstadt***, *120 Wis.2d 103, 115, 352 N.W.2d 223, 229 (Ct. App. 1984);* ***Mueller v. Michels***, *184 Wis. 324, 340-41, 199 N.W. 380, 382 (1924).*

H&H argues first that to the extent the listed expenses were incurred, they were incurred not by HBN but by a separate corporation, North Side Power Wash, Inc., and that there was no evidence as to the nature of the relationship, if any, between HBN and North Side or HBN's responsibility for the payments made by North Side.

HBN witnesses testified, however, that North Side was a corporation set up by the HBN partnership "as a vehicle through which to conduct the partnership business" and that the Small [*25] Business Administration treated the two as one for financing purposes. There was also evidence that all expenses incurred by North Side were the responsibility of the HBN partnership. We reject H&H's "separate entity" argument.

H&H also argues that certain of the expenses are not compensable because some were incurred prior to "any contract between HBN and the seller" and other expenses, such as those for soil testing, were related not to the purchase but to HBN's prosecution of the rescission action.

As to the first, HBN points out that an initial offer was submitted by Busse and Hamele in December 1989 and Schappe counter-offered on January 11, 1990. The trial court, while acknowledging that the counter-offer was not immediately accepted and that the partnership in fact submitted a new offer several weeks later, found that the parties "continued to proceed in good faith toward the required rezoning of the property from the City of Madison necessary to build and operate a car wash." As a result, the court found that expenses in the days immediately prior to the formal finalization of the contract were sufficiently related to the purchase to be included in the restorative damage [*26] award. Given the equitable nature of the action and the discretionary nature of the remedy, we see no error in the court's inclusion of the claimed "pre-acceptance" expenses in the award.

We think the same is true with respect to the soil testing costs, for there was testimony that such expenses were incurred in evaluating the soil contamination and providing informa-

tion requested by DNR. [HN9] It is well established that reasonable expenditures in reliance on the contract are recoverable as awards of restitution in rescission cases, ***Gregg**, 104 Wis.2d at 167, 311 N.W.2d at 672,* and H&H has not persuaded us that the trial court erred in framing the damage award in this case.

**C. Dismissal of H&H's Third-Party Complaint**

As indicated, at the beginning of the trial, the claims among the defendants, including H&H's indemnification claim against MATC, were reserved for resolution after trial of the principal claims. The judgment submitted to the court for signature after trial, however, included provisions dismissing H&H's cross-claim against MATC and awarded costs to MATC on the dismissal.

H&H argues that the trial court's action was [*27] improper in that it denied the company its day in court. MATC has not appeared in this court to challenge H&H's argument. We are, therefore, constrained to reverse on this issue. *See **State ex rel. Sahagian v. Young**, 141 Wis.2d 495, 500, 415 N.W.2d 568, 570 (Ct. App. 1987)* (propositions in an appellant's brief that are not refuted by respondents are taken as confessed). n11

n11 We appreciate the fact that, as H&H acknowledges in its brief, the core issues in its claim against MATC are "disclosure issues" relating to the degree to which MATC disclosed to H&H its knowledge of soil conditions at the site, and that the trial court, in its findings of fact, expressly found that "MATC made a full, complete and timely disclosure of all information in its possession" on the subject.

H&H argues in its brief, however, that because of the stipulation to delay consideration of those issues, they were not fully aired in the trial court. The court's findings tend to belie such an assertion, but, as we have noted, without any brief or argument from MATC contradicting or refuting H&H's contentions in this regard, we have little choice but to sustain them and reverse and remand on this issue--even though it may result in some duplication of judicial effort in the case.

[*28]

**III. HBN'S CROSS-APPEAL**

In addition to seeking rescission and restorative damages, HBN sought to recover damages and attorney fees from H&H based on H&H's claimed violation of *§ 100.18(1), STATS.*, the false advertising statute.

*Section 100.18, STATS.*, was enacted "to protect the public from all untrue, deceptive or misleading representations made in sales promotions, including representations made in face-to-face sales where no media is involved." *Grube, 173 Wis.2d at 57, 496 N.W.2d at 116.* The statute provides:

> [HN10]
> No ... agent ... with intent to sell ... real estate ... or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase ... of any real estate ... shall make ... an advertisement, announcement, statement or representation of any kind to the public relating to such ... purchase [or] sale ... of such real estate ... or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact

> which is untrue, deceptive or misleading.

Section 100.18(1). Any person suffering pecuniary [*29] loss due to a violation of the statute may sue for such loss, costs and reasonable attorney fees. Section 100.18(11)(b)2.

The trial court ruled against HBN, stating in a single sentence that *§ 100.18, STATS.*, does not apply to H&H's negligent failure to disclose because, according to the court, "a specific intent is a condition of liability" under the statute. We assume the court read the statute as requiring an intent to defraud--that it applies only to intentional misrepresentations. We disagree. n12

> n12 The construction and interpretation of statues present questions of law on review, which we review de novo. ***Midwest Steel Co. v. DNR**, 167 Wis.2d 160, 164, 482 N.W.2d 377, 378 (Ct. App. 1992).*

The plain language of the statute, quoted above, imposes two requirements for liability: (1) making an untrue, deceptive or misleading statement with respect to the purchase or sale of real estate; and (2) making the statement with the "intent to sell," or to induce the sale [*30] of, the property. The trial court's reading of the statute would add a second level of intent: that the statement also be made with the specific intent to defraud. We do not see the plain statutory language as permitting such a result.

> [HN11]
> The aim of all statutory interpretation is to discern the intent of the legislature. In ascertaining a statute's meaning, our first inquiry is to the plain language of the statute. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent to the case at hand and not look beyond the statutory language to ascertain its meaning.

***Doe v. American Nat'l Red Cross**, 176 Wis.2d 610, 616, 500 N.W.2d 264, 266 (1993)* (citations omitted). We also presume that [HN12] the legislature, in adopting a statute, "chose its terms carefully and precisely to express its meaning." ***Ball v. District No. 4, Area Bd.**, 117 Wis.2d 529, 539, 345 N.W.2d 389, 394 (1984).*

In ***State v. Stepniewski**, 105 Wis.2d 261, 269, 314 N.W.2d 98, 101 (1982),* the supreme [*31] court recognized that in a variety of statutes regulating different types of conduct, "the legislature has shown its awareness of the use of [the word] intentional ...." The ***Stepniewski*** court also recognized that the absence of a requirement of *mens rea*, or intent, in a related statute in *ch. 100, STATS.*, does not raise due process implications. ***Id.** at 269, 314 N.W.2d at 102.* This was so, said the court, because of the statute's underlying purpose, which is to protect the public by imposing "a high standard of care" on contractors--persons who "hold themselves out to the public as persons having an expertise" in their field and who "[seek] out, by advertising and referrals, those persons in ... need of help and [who,] for the most part [are] uninformed as to the law and [the] practices [of the construction trade]." ***Id.** at 277, 314 N.W.2d at 105.* The same may be said, with at least equal force, with respect to sellers of real estate regulated by *§ 100.18, STATS.*

We conclude, therefore, that *§ 100.18(1), STATS.*, by its plain terms, does not require that the advertisement or [*32] statement be made with the specific intent to defraud or to mislead, but applies with equal force to representations that are negligently made. Because the trial

court ruled the statute inapplicable as a matter of law, it never considered whether application of the statute is warranted by the facts of the case--including whether there was evidence of a violation of the statutory mandate which resulted in "pecuniary loss" to HBN. We thus reverse on this issue and remand to the trial court to determine whether, on the record made--or, in the court's discretion, on a supplemented record--the statutory conditions for liability are met in this case.

**IV. SCHAPPE'S APPEAL**

In his separate appeal, Schappe argues principally that MATC is the only party against whom rescission may be ordered and that the trial court erred in including him in the judgment because: (1) the only "contract" to which he was a party was the March 20, 1990, offer to purchase, and that document was signed by Jay Busse and Mark Hamele, not by HBN; (2) even so, once MATC delivered the deed to HBN, the offer "merged" in the deed and thus the deed became the conveyance to which rescission must relate; and (3) the trial [*33] court's judgment cannot be based on any alleged assignment of the offer from Busse and Hamele to HBN because there is no written assignment in the record, as required by the statute of frauds, *§ 706.02(1)(e), STATS.* He also argues that the judgment is improper because it fails to restore the "pre-contract *status quo*" and because the result is inequitable. We reject each argument.

A. Lack of a Contract

As we have noted above, although H&H, on Schappe's behalf, negotiated the sale of the property with Jay Busse (and Mark Hamele), the deed for Lot 2 was issued directly from MATC to HBN. The trial court found that Schappe was the seller of the lot and granted rescission against him.

We agree with HBN that the core of Schappe's argument is the fact that the offer to purchase which formed the basis of the transaction was signed: "Jay A. Busse, Mark S. Hamele and/or assigns;" and he urges a variety of conclusions from that fact, and from the additional fact that MATC, not Schappe, actually gave the deed to HBN.

It is undisputed, however, that Schappe retained H&H to find a buyer for a portion of the larger package of land he was purchasing from MATC, and that after H&H found a buyer--Busse [*34] and HBN n13 --Schappe rezoned and divided the property, set the price to be paid for the "carwash" lot and conditioned the sale to HBN not only on the rezoning and property division, but upon his own successful closing with MATC. MATC, of course, had no contract with HBN or any of its partners or agents, and closed its sale to Schappe separately from Schappe's closing with HBN.

> n13 As the selling broker for both MATC and Schappe, H&H received an 8% commission from MATC on the total purchase price of the lot and, in addition, a 10% commission from Schappe on the HBN sub-sale, thus providing additional evidence to support the trial court's finding that Schappe, through his listed broker, H&H, was the *de facto* seller in the HBN transaction.

In its findings of fact the trial court determined that the closing statement signed by Schappe--which, as we have indicated, listed him as the seller of the property--"reflected [his] transaction with the HBN Partnership for Lot 2." Specifically, the court found that:

> 99. [*35] Perry Schappe purchased and owned all of the Commercial Avenue property by virtue of his option to purchase, and sold Lot 2 to HBN.

> 100. MATC had no contract with HBN for the sale of Lot 2. The contract for the sale of Lot 2 was solely and exclusively between ... Schappe ... and HBN.

> 101. The only reason MATC transferred the deed to Lot 2 to HBN was to convenience ... Schappe. MATC had no financial or other interest in how the property was divided and obtained no financial or other benefit by transferring the deed for Lot 2 to HBN.

We will not overturn a trial court's findings of fact unless they are clearly erroneous. *Section 805.17(2), STATS.* Schappe has not persuaded us to invalidate the court's findings that he, not MATC, was the *de facto* seller of Lot 2 to HBN. n14

n14 We also reject Schappe's argument, based on application of the statute of frauds, *§ 706.02, STATS.*, which requires documents transferring an interest in real estate to be in writing, that there could only be a contract between him and HBN if Busse and Hamele had assigned their accepted offer to the partnership in a written document.

First, [HN13] a statute of frauds defense is waived if not raised in the pleadings, ***Hine v. Vilter****, 88 Wis.2d 645, 650, 277 N.W.2d 772, 774 (1979),* and Schappe never raised the issue until after trial. Second, Schappe undertook to conclude the transaction with the partnership, not Busse and Hamele individually. Indeed, as part of the overall transaction he assigned his option to purchase the lot from MATC to Pamela Hamele, Busse and Nancy Nelson--who comprised the HBN Partnership--as "assignees of said Offer to Purchase" as it pertained to the right to purchase Lot 2. And, as indicated, he signed a transaction closing document listing himself as seller and HBN as the purchaser.

"[HN14] A party may, by his or her conduct, be estopped from asserting the statute of frauds." ***Wyss v. Albee****, 183 Wis.2d 245, 257, 515 N.W.2d 517, 522 (Ct. App. 1994).* We think this is such a case. We agree with HBN that Schappe, having concluded the transaction in the manner we have discussed, cannot now invoke the statute of frauds to argue that he never had a contract to sell the land to HBN in the first place.

[*36]

**B. Merger**

Schappe argues that if HBN has a valid claim for rescission, it must be based on the deed between MATC and HBN and not on any contract to which he was a party. Citing ***Miles v. Mackle Bros. Div. Deltona Corp.****, 73 Wis.2d 84, 87-89, 242 N.W.2d 247, 249-50 (1976),* he maintains that "where a deed is executed and delivered, any contract of sale merges with the deed and becomes void, making rescission of the contract a legal nullity which cannot support a restitution award." As a result, he argues that whatever contract of sale may have existed between himself and HBN or its partners or agents prior to the closing, that contract "merged" in the deed that was eventually given by MATC and thus became a nullity. It is yet another variation of Schappe's basic position on the appeal that there is no contract between him and HBN to rescind.

***Miles***, however, was not a rescission action. The deed at issue in that case contained provisions for payment of real estate taxes that differed from those stated in the purchase contract, and the court held that the deed effectively "amended the prior contract" on that point. ***Miles,** 73 Wis.2d at 88, 242 N.W.2d at 250.* [*37] We do not see ***Miles***--or Schappe's argument based on the case--as compelling the conclusion that MATC's deed "annuls" all past negotiations, representations and agreements between Schappe and HBN. We have upheld the trial court's finding that Schappe was in fact the seller in the HBN transaction.

**C. The Pre-Contract Status Quo**

After finding that the facts warranted rescission in favor of HBN, the trial court ordered MATC to deliver the warranty deed for Lot 2 to Schappe and ordered HBN to return to Schappe its own quit-claim deed to the parcel. As noted, the court also ordered Schappe to pay HBN the purchase price of the lot along with restorative damages as recounted above.

Pointing out that the purpose of rescission is to return the parties, as nearly as possible, to the status existing at the time the contract was formed, Schappe argues that the trial court's remedy violated that rule because it "imposed a state of affairs that never existed: Schappe owning Lot 2 and disgorging money that it never received." He claims that if HBN is entitled to rescission, it must return the deed to MATC and look to MATC, not to Schappe, for return of the purchase price. Again, like [*38] his many other arguments, this one is based on Schappe's assertion--which we have rejected--that he was not a party to any contract or sale of the property to HBN.

Schappe claims that because he exercised his option to purchase the entire parcel from MATC only after MATC had drafted the deed for Lot 2 to HBN at the closing, he never really owned Lot 2. As we have indicated throughout this opinion, however, we believe the trial court could appropriately determine on this record that Schappe in fact sold Lot 2 to HBN. Indeed, the record indicates that he exercised his option on the entire parcel approximately one month *before* the closing. And we reject his assertion that, despite having done so, he never "assumed any obligations under the option" until he delivered it to MATC at the closing--after MATC's attorneys had drafted the deed conveying Lot 2 to HBN.

Schappe offers no legal authority to support the proposition he advances. Moreover, the fact that HBN--at Schappe's request--paid the $ 105,000 purchase price for Lot 2 directly to MATC, does not warrant the result he urges upon us. The record establishes that the price for Schappe's purchase of the entire lot was $ 200,000, [*39] and that HBN simply paid $ 105,000 of that amount (the price negotiated for Lot 2) to MATC. The net result is that Schappe will have purchased the entire MATC lot at the agreed-upon price. And the fact that his intent to resell a portion of the lot to a third party was frustrated as a result of his broker's actions in the course of the resale does not make the result either unfair or legally improper.

**D. The Equities**

Finally, Schappe, pointing out that rescission is an equitable remedy, argues that he should not be made a party to any rescission judgment because, "of all the parties involved in this dispute, [he] is the most innocent." He claims that he knew less about the condition of the property than anyone--including HBN--that he made no representations himself, and that he is inexperienced in real estate matters. For those reasons, he asks us to reverse, claiming that the result is inequitable.

As HBN points out, however, [HN15] a principal is responsible for the representations--or misrepresentations--of an authorized agent. ***Pollack v. Reserve Life Ins. Co.,*** *15 Wis.2d 336, 341, 112 N.W.2d 907, 910 (1962).* And, as

we have noted [*40] above, [HN16] even innocent misrepresentations will support rescission of a contract. ***Whipp**, 43 Wis.2d at 171, 168 N.W.2d at 204*. Schappe has not satisfied us that either the judgment or the remedy it embodies should be overturned as inequitable.

We thus affirm on all issues save HBN's right to seek damages, costs and fees under *§ 100.18(1), STATS.*, and the dismissal of H&H's cross-claim against MATC. And because HBN has prevailed on all issues of substance on both the appeal and cross-appeal, n15 it is entitled to costs in each proceeding.

n15 As indicated, we reverse the dismissal of H&H's cross-claim not on the merits, but for lack of any appearance in opposition to H&H's brief argument on the point.

*By the Court*.--Judgment affirmed in part; reversed in part and cause remanded with directions.

Not recommended for publication in the official reports.