thromboembolic event is not directly prosthesis-related. The recommendations made below apply equally to all patients with prosthetic heart valves, but are arguably more important in patients with Silzone valves in whom the thromboembolic risk is higher.

Many of the recommendations are not part of routine antithrombotic prophylaxis and are not included, for example, in the ACC/AHA Guidelines[55] or the latest recommendations of the American College of Chest Physicians (ACCP) for the antithrombotic management of patients with prosthetic heart valves.[64] They are, however, included in the latest European recommendations, published in the European Heart Journal.[56] In my view, patients with Silzone valves have been exposed to an additional thromboembolic risk as the result of their particular type of prosthesis and therefore deserve the best possible antithrombotic management in order to prevent the potentially devastating consequences of a cerebrovascular event. Some of the recommendations will therefore constitute a requirement for 'additional care' over and above that given to the average patient with a prosthetic heart valve. All the recommendations are based upon scientific evaluation of particular risk factors, although in many instances the preventive strategy proposed has not been tested in any prospective study and shown to be effective. The risk factors which have been shown to increase the risk of thromboembolism and the proposed strategy for risk reduction are shown in Table 5.

The pro-thrombotic effect of pulmonary infections requires more detailed explanation. It has been shown that the risk of valve thrombosis in general and the risk of thromboembolic events after mitral valve replacement is commoner in the winter months.[65,66] This is consistent with the increased incidence of stroke in the general population in the winter months in temperate climates and it is very likely that this seasonal effect is related to the increased prevalence of pulmonary infections in the winter months. During a pulmonary infection, raised serum fibrinogen levels and increased numbers of activated white cells and platelets streaming out of the pulmonary veins immediately

upstream from the prosthetic valve make thrombus deposition on the prosthesis more likely.[66] This means that extra vigilance is required at the time of pulmonary infections. All pulmonary infections should be treated promptly with antibiotics and, on general principles, there may be an advantage to having slightly higher intensity anticoagulation at this time, although there is no evidence to support this recommendation. In practice, many commonly used antibiotics interact with oral anticoagulants to increase the international normalised ratio (INR), the blood test used to measure anticoagulation intensity. It is particularly important at the time of a pulmonary infection not to over-react to a high INR and give vitamin K (the antidote to oral anticoagulants) as even small doses will often produce a precipitate fall in the INR to well below therapeutic levels, particularly dangerous at the time of a prothrombotic state. Once again, this recommendation applies to patients with all types of prosthetic heart valve but particular vigilance is necessary in the case of patients with Silzone valves with pulmonary infections, especially those with mitral prostheses, in whom TEE should be considered once the patient is well enough to tolerate the procedure.

**Anticoagulation Intensity and Self-Management**

With regard to the **optimum maintenance INR** for patients with the Silzone valve, a commonly asked question is whether these patients should be managed with a higher INR than that recommended for the standard St. Jude valve. The AVERT investigators recommend "*Maintenance of anticoagulation at the higher end of the therapeutic range and use of antiplatelet agents with Coumadin may be helpful in these patients.*"[13] The current guidelines of the ACC/AHA[55] and the ACCP[64] and the latest European recommendations published in 2005[56] recommend an INR of 2.5 for the standard St. Jude valve in the aortic position and an INR of 3.0 for the standard St. Jude valve in the mitral position. Although intuitively one might think that a more thrombogenic prosthesis should be maintained at a higher INR, as the current guidelines recommend in general terms, there is a price to pay for higher intensity anticoagulation, namely an increased risk of serious bleeding. The risk of bleeding with an INR of 4.5 or greater is 6 times higher than with an INR of

less than 4.5.[67] As described above, the incidence of serious bleeding in the AVERT study was much higher with the Silzone valve than the standard valve, possibly because these patients had been anticoagulated at a higher INR, as recommended by the investigators. In this context, it is worth remembering that intracerebral haemorrhage is a much more lethal complication than ischaemic stroke. The one year survival after intracerebral haemorrhage is only about 20%, whereas the one year survival after ischaemic stroke is about 80%.[68] Therefore, one must be very cautious about recommending higher intensity anticoagulation unless it is strictly necessary.

All patients with Silzone valves are now more than five and a half years post-implantation. If they have suffered no thromboembolic events to date with conventionally managed anticoagulation at the recommended INR levels for the St. Jude standard valve, if there is no evidence of thrombus on the sewing ring on transoesophageal echocardiography, no limitation of leaflet movement on cinefluoroscopy, and if they have no risk factors for thromboembolism, it is probably safe to continue with the INR levels recommended for the St. Jude standard valve and with conventionally managed anticoagulation, although the frequency of INR measurement should ideally be increased to every 1 – 2 weeks (depending on stability of the INR) in order to ensure less variability in anticoagulation intensity. More frequent INR measurement is much less of an imposition with anticoagulation self-management as described below.

In patients who have suffered one or more thromboembolic events since the time of implantation despite good quality anticoagulation control at the INR level recommended for the St. Jude standard valve, it would be appropriate to increase the target INR by at least 0.5 in the first instance (see 'Protocol D' in Appendix 2) although, as indicated above, these patients should undergo full risk assessment, using the tests in Table 4 and where appropriate have risk modification as outlined in Table 5. Anticoagulation self-measurement and self-management should also be considered, as discussed below. Patients found to have thrombus on the sewing ring on transoesophageal

echocardiography should be managed as detailed in the next section of the report.

Patients who have not yet suffered any thromboembolism but whose risk profile indicates that they are at higher risk present a more difficult problem. Although risk factor modification may be possible in the case of some risk factors, this will not be the case for all and the question arises as to whether these patients should be managed with higher intensity anticoagulation. Part of the benefit of higher intensity anticoagulation in preventing thromboembolic events comes from the fact that higher **target** INRs usually result in fewer **achieved** INRs falling to dangerously low levels, as it has been shown that many thromboembolic events occur when the INR is below the target range.[69] A safer means of ensuring that the INR remains therapeutic is to control the INR level more accurately. It has been shown by several studies that patient self-measurement and self-management of the INR results in much tighter INR control with fewer values outside the target range.[70] Some studies have also demonstrated fewer thromboembolic and bleeding events in self-managed patients. **Thus, in patients at higher risk of thromboembolic events, I believe it is reasonable to recommend that self-management should be employed in those patients who are able to undertake this for themselves**. Self-management requires a certain degree of educational sophistication and not all patients are capable of measuring and managing their own anticoagulation. This applies particularly to elderly patients. However, if the patient is unable or unwilling to self-manage their anticoagulation, sometimes a family member or close friend can do this on their behalf. A period of training, assessment and quality assurance is required and additional costs are involved in purchasing the measurement device and the disposable items required at the time of each test.

Particular mention should be made of normal or elevated levels of Factor VII in patients who appear to have a 'therapeutic' INR. This recently discovered risk factor was first reported from the CERFS.[30] In the Cardiff Late Review, 5 of 40 Silzone patients were identified with this risk factor (usually Factor VII levels

are extremely low during oral anticoagulation with vitamin K antagonist drugs such as warfarin). One patient had suffered a serious thromboembolic event, two patients had sewing ring thrombus identified on their mitral prostheses, both eventually requiring reoperation, and two patients had significant leaflet restriction on cinefluoroscopy (Appendix 1).

Simply increasing the INR in patients whose Factor VII levels seem 'resistant' to warfarin may not be effective. As Factor VII levels are also related to dietary fat intake, dietary restriction of fat coupled with statin therapy should be tried first. If Factor VII levels remain high despite an optimum INR, if thrombotic complications persist, and if the patient is unsuitable for, or unwilling to undergo reoperation, it may be necessary to consider alternative antithrombotic drugs.[71] However, the whole phenomenon of Factor VII 'resistance' to warfarin requires further investigation before precise guidance can be offered. A research study is currently being planned. The importance of the phenomenon is that these patients appear to be at higher risk of thromboembolism and require particularly close supervision.

Another question which often arises is whether an **antiplatelet drug** should be prescribed in addition to anticoagulant therapy for Silzone patients, as recommended by the AVERT investigators.[13] Whilst there is a theoretical mechanism whereby antiplatelet drugs may reduce the adherence of platelets to the sewing ring, in practice the use of antiplatelet drugs in combination with oral anticoagulants increases the risk of bleeding. This is particularly the case with aspirin. In addition their benefit in reducing long-term thromboembolic events in combination with anticoagulation after valve replacement is far from proven. Therefore, in general terms, it is better to reserve antiplatelet drugs for specific indications where they may be of benefit, such as in concomitant vascular disease and perhaps for recurrent embolism , after full investigation for possible sources, as recommended by recent European recommendations,[56] rather than simply prescribing them for all patients with prosthetic heart valves even if the valve appears more thrombogenic, as in the case of the Silzone valve.

**Anticoagulation Interruption**

Although there are no data specifically addressing this issue, it is possible that patients with Silzone prostheses may be at higher risk of valve thrombosis and thromboembolism following any period of anticoagulation interruption, such as that required for another operative procedure or following major trauma. This applies particularly to patients with mitral prostheses and to those with prothrombotic risk factors such as atrial fibrillation, left atrial enlargement and impaired left ventricular function. Anticoagulation interruption is not necessary for all surgical procedures, particularly those which do not involve large raw surfaces. In patients with Silzone prostheses, there should be a higher threshold for discontinuing warfarin. Echocardiography (TTE for aortic patients and TTE and TEE for mitral patients) should be performed prior to any planned surgical procedure in which anticoagulation interruption is considered essential, to ensure that there is no thrombus on the prosthesis already which might increase in size or embolise following anticoagulation interruption. For procedures necessitating temporary discontinuation of warfarin, it is common practice to stop warfarin a few days in advance and switch the patient to heparin, sometimes given in the form of low molecular weight heparin (LMWH) subcutaneously at home prior to hospital admission. In Silzone patients, this practice is likely to involve higher thromboembolic risk and it would therefore be safer to admit the patient to hospital in order to give the heparin intravenously and monitor its anticoagulant effect with regular blood tests. The period of complete anticoagulation interruption (i.e. including heparin interruption) should be as brief as possible. Heparin therapy should be maintained until a therapeutic INR with warfarin is re-established.

Similar recommendations apply to patients who become pregnant. They should not be switched to subcutaneous heparin at any stage of pregnancy as this carries a higher risk of valve thrombosis with all prostheses during pregnancy[56] and one would anticipate that the risk would be even higher with the Silzone valve.

4. **Antithrombotic Management – Treatment**

Two specific problems need to be examined in this category, valve thrombosis and recurrent thromboembolism. Valve thrombosis discovered as an incidental finding on routine TEE which is confined to the sewing ring and not associated with excess pannus and which has not given rise to any thromboembolism must nevertheless be taken seriously as a potential embolic source. In practice, small thrombi may be difficult to distinguish from localised pannus.[72] Several options are available if there is definite thrombus on the sewing ring. The simplest is to slowly increase the intensity of the anticoagulation to an INR of about 4.0 in the hope that the thrombus will undergo spontaneous thrombolysis. This is usually a gradual process and may take some weeks. The choice of this option would depend to a large extent on whether the INR had previously been sub-therapeutic or not, i.e. it would be a more logical strategy in a patient whose INR had previously been low. If the INR has previously been well controlled in the therapeutic range, another option is to use intravenous anticoagulants, either heparin or hirudin, the latter being more successful in inactivating thrombin which is bound within thrombus. This treatment requires monitoring with serial TEE and increases the risk of serious bleeding. Another option is thrombolytic therapy but the therapy itself also carries a risk of serious bleeding of about 5% and a risk of embolism of about 20%;[73,74] it is therefore probably not justified in asymptomatic non-obstructive thrombus on the sewing ring.

Re-operation for sewing ring thrombus should be considered under the following circumstances:

1. Very large thrombus (> 1 cm in diameter), particularly if it is mobile, as the risk of embolism is high.

2. Thrombus which fails to disperse with increased intensity of oral anticoagulation, supplemented by heparin.

3. Thrombus which increases in size during serial TEE monitoring or begins to extend onto the mechanism of the prosthesis.

In making a decision about re-operation, operative risk factors for the individual patient must be taken into account. The prosthesis should be removed and replaced with another type of prosthesis.

The same recommendation should be made in the case of a patient who presents with obstructive valve thrombosis, i.e. re-operation with replacement of the Silzone prosthesis. Thrombolysis is sometimes performed nowadays for obstructive valve thrombosis, as an alternative to re-operation, but in the case of the Silzone prosthesis, it is likely that the prosthesis itself is the underlying cause and, providing that there are no contra-indications to surgery, the prosthesis should be removed. Thrombolysis is usually unsuccessful or only partly successful in the presence of pannus or chronic long-standing thrombus. The risk of complications increases in proportion to the size of the thrombus.[74] Successful treatment is less likely in mitral prostheses in comparison to aortic prostheses.[73,74] Thrombolysis may, however, be useful in patients who present in extremis with no local facilities for cardiac surgery or in situations where the risk of re-operation is prohibitively high.

In patients who present with recurrent thromboembolism which can be unequivocally attributed to the prosthesis itself, re-operation should also be seriously considered bearing in mind other operative risk factors. However, before proceeding to re-operation, it is important to establish that the prosthesis itself is indeed the source **<u>and the cause</u>** of the recurrent embolism, i.e. the sewing ring thrombus is not simply the result of subtherapeutic anticoagulation. If thrombus is present on the sewing ring of the prosthesis, there is little doubt that it is the source, but if the sewing ring looks normal on TEE, the decision is much more difficult. A normal TEE appearance on a particular day does not of course exclude the possibility that a thrombus may have been present previously which has subsequently

embolised. Nevertheless in patients who present with recurrent thromboembolism and an apparently normal prosthetic valve, it is important to search for alternative sources of embolism, as described earlier in this report and also to search for modifiable risk factors (Table 5). All efforts should also be made to ensure that the patient's anticoagulation control is as good as possible, using a slightly higher INR as described above and using patient self-measurement and management if the patient can cope with this. If, after treating all modifiable risk factors, optimising anticoagulation intensity and management and, if necessary, adding an antiplatelet drug, and if there are no other possible sources of embolism (e.g. carotid or aortic atheroma, left atrial or left ventricular thrombus, etc.) then serious consideration should be given to replacing the Silzone prosthesis with another prosthetic type, if repeated thromboembolism persists. This decision will be somewhat easier to make if TEE whilst not demonstrating thrombus, demonstrates either excessive pannus formation or a paravalvular leak as other indications for replacing the prosthesis (vide infra).

## Identification and Monitoring of Paravalvular Leak

An unacceptably high incidence of explantation for paravalvular leak was the stated reason that further enrolment into the AVERT study was terminated and the Silzone valve withdrawn from the market in January 2000.[13] The known toxicity of silver and the appearances of sterile annular tissue necrosis seen at re-operation both point towards silver toxicity as the principal cause for paravalvular leak, even if in some patients it is aggravated by other factors such as hypertension. Although the problem of silver-induced toxic necrosis and paravalvular leak may be predominantly an early complication of the first few postoperative months, the lack of independent long-term follow-up data and the incompleteness and poor quality of echocardiographic data in the AVERT study reported in 2004[36] provide no confidence that this is the case. Indeed there are many instances of 'late' paravalvular leak reported to St. Jude in Field Experience Reports (Appendix 3).

Both of the AVERT publications (in 2002[13] and 2004[36]) dealing with the problem of paravalvular leak have stressed the need for serial echocardiography to determine

whether the hazard function of paravalvular leak will remain constant or decline with time. Tozzi et al in their publication about PVL in association with Silzone valves concluded "*We believe that patients enrolled in the AVERT study need special surveillance for early detection of potential inflammatory reactions to the silver-coated sewing ring.*"[35] Whilst it is possible that properly conducted large independent long-term follow-up studies may show that there is no excess risk of paravalvular leak with the Silzone valve beyond the first few years, there are a number of reasons why this cannot be assumed at this stage:

1) St. Jude's own chronic sheep experiments show that silver continues to leach out of the sewing ring into the annular tissues with a concentration in tissue steadily increasing at least up to twelve months after implantation, when the experiments were terminated (Appendix 3), i.e. no steady state was ever reached. Furthermore, in these experiments, the silver content of annular tissue varied considerably from animal to animal.

2) Data from the use of silver in other applications shows that a chronic inflammatory response persists for many years.[40]

3) Currently available data from the AVERT study[36] on the prevalence of paravalvular leak must be considered unreliable because one fifth of patients have not been studied with echocardiography and those that have been studied have only had TTE, with a high proportion of poor or inadequate image quality, as discussed on page 40. Also, most patients only had a single examination.

4) Neither clinical examination nor TTE are completely reliable methods of diagnosing or quantifying paravalvular leak. TTE echo-Doppler techniques usually indicate the diagnosis in moderate or severe aortic regurgitation and in severe mitral regurgitation, but it is well known that substantial paravalvular leaks can exist which create no audible murmurs and that paravalvular leaks can sometimes go undetected by TTE in both valve positions, but particularly in the mitral position where acoustic shadowing from the prosthesis often makes even a large paravalvular leak difficult or impossible to detect. In

patients with aortic valve replacement, TEE is complimentary to TTE in quantifying the severity of regurgitation, in differentiating between transvalvular and paravalvular regurgitation, and in identifying paravalvular abscesses in suspected prosthetic endocarditis.[58]

5) It is known that small asymptomatic paravalvular leaks can increase in size with time, particularly in the mitral position[39] and one would anticipate that this is even more likely in the case of silver induced toxic necrosis.

For all of these reasons, it is recommended that all patients with Silzone valves undergo transoesophageal echocardiography (TEE) in conjunction with TTE, if TEE has not previously been performed since the operation, even if the patient appears to be asymptomatic or minimally symptomatic. TEE is considered to be "*the 'gold standard' for the non-invasive assessment of prosthetic valves and paraprosthetic anatomy*"[58] but should be used in conjunction with TTE as the two investigations complement one another, particularly in double valve replacement where acoustic shadowing from a mitral prosthesis may interfere with assessment of aortic regurgitation in the left ventricular outflow tract. All patients should also have regular blood tests to detect haemolysis (LDH, haptoglobin and reticulocyte count) as this is a common consequence of paravalvular leak. Increasing haemolysis over time is strongly suggestive of paravalvular leak and itself is an indication for TEE.

If detailed echocardiography studies involving both TTE and TEE have been performed previously, much will depend on when they were performed and the findings at that time. If TTE and TEE were performed within the first few months and were either normal or showed a small paraprosthetic leak, both TTE and TEE should be repeated, given that the silver concentration in the annular tissues may go on increasing at least for the first twelve months and given that a small paraprosthetic leak may become larger with time.

Any paraprosthetic leak, however minor, detected on previous echocardiography, at whatever time interval after operation, requires further echocardiography to assess whether there has been further progression in size. TTE may suffice for aortic prostheses, but mitral prostheses will require TEE for monitoring.

If previous good quality echocardiography including TEE has been performed after the first twelve months and has been completely normal, then there is probably no need to repeat it, providing that there is no other indication for echocardiography, for example, to detect sewing ring thrombus, as detailed above.

If one or more small paraprosthetic jets are detected on echocardiography at a first examination more than five years after implantation, and the patient is asymptomatic with no haematological or biochemical evidence of excessive haemolysis, no action is required other than continued close follow-up. This should include clinical examination and blood tests for haemolysis at six month intervals and at least one or two further echo examinations at yearly intervals to exclude progression of the paravalvular leak. If there has been no further progression in small paraprosthetic jets over a two year period and no increase in the indices of haemolysis, it is probably safe to return the patient to routine follow-up (see Protocol G in Appendix 2).

If echocardiography performed for the first time five or more years after implantation reveals a significant paravalvular leak, producing moderate or severe regurgitation, consideration should be given to re-operation to remove and replace the Silzone prosthesis. In making a decision about re-operation, several factors will need to be taken into consideration:

1. The patient's symptomatic status. If the paraprosthetic regurgitation is associated with deterioration in exercise tolerance and increased shortness of breath, there is a strong indication for re-operation. A careful history is important under these circumstances. Many patients who claim to be asymptomatic will reveal, on direct questioning, that they are taking more medication than previously (e.g. diuretics, ACE-inhibitors, etc.) and/or that they have adjusted their lifestyle to reduce their amount of activity. It is very unusual for patients with moderate to severe paraprosthetic regurgitation to be genuinely asymptomatic. If this is the case, the decision about re-operation will need to be made on other criteria (vide infra).

2. Evidence of progressive left ventricular dysfunction due to paraprosthetic regurgitation on serial echocardiography is also a strong indication for re-operation even if the patient is asymptomatic or minimally symptomatic, in order to prevent further, and eventually irrecoverable, deterioration in left ventricular function.

3. Haemolysis associated with paravalvular regurgitation severe enough to cause anaemia, which does not respond to iron therapy and erythropoetin and requires repeated blood transfusions, is also a strong indication for re-operation.

4. In making a decision about re-operation, it is also necessary to take into account the patient's risk factors for re-operation, for example, age and significant co-morbidities. If the patient is elderly, has pre-existing impairment of left ventricular function prior to developing paravalvular leak, significant arterial disease (aortic, coronary or carotid) or significant renal dysfunction, then re-operation will carry a much higher risk and the risks and benefits will need to be weighed carefully in the balance. There may be some patients whose age and risk factors together would add up to a risk score which would be prohibitively high, making re-operation unwise. These issues would require careful discussion with the patient.

If re-operation is necessary, it is very important that all necrotic material is removed from the annulus, together with every fibre of the Silzone coated sewing ring fabric in order to ensure that as little silver as possible remains in the annulus, as it is possible that any residual silver could impair the healing of a subsequently implanted prosthesis. For documentary purposes, it would also be useful to send removed annular tissue for silver analysis. Close follow-up of patients undergoing re-operation will also be required in order to detect further paravalvular leak. The same principles of TEE follow-up should be applied as in patients who still have a Silzone prosthesis, as detailed above.

The assessment of prosthetic heart valves by both TTE and TEE (the two techniques often provide complementary information) requires considerable experience as some

abnormalities are relatively subtle and difficult to detect. It has been shown that there is considerable inter-observer variability in the interpretation of some echocardiographic findings.[75] Therefore all TEE follow-up examinations of Silzone patients should be conducted by operators skilled in the echocardiographic assessment of prosthetic heart valves. If serial echocardiography is required, the examination should be performed in the same laboratory each time, preferably by the same operator.

**Identification and Monitoring of Excessive Pannus Formation**

In some patients with Silzone valves, the local response to the presence of silver seems to be excessive pannus formation. This excessive pannus may eventually interfere with the mechanism of the prosthesis, limiting full leaflet movement, resulting in either incomplete opening or incomplete closure or both. If this process affects only one leaflet of the prosthesis, it may not cause symptoms. Therefore another purpose of a baseline echocardiography (TTE and TEE) and cinefluoroscopy in all patients who have not had these investigations performed previously is to detect excessive pannus formation. As with the complications mentioned above, TTE and TEE are complementary. It should be noted that it is often difficult or even impossible in some cases to distinguish between pannus and thrombus, even with TEE, particularly as the two may co-exist.

Cinefluoroscopy is a very useful adjunct to the investigation of suspected prosthesis obstruction whether by pannus, thrombus or a combination of the two. It involves radiological screening of the prosthesis with the X-ray beam orientated to place the prosthesis in profile, so as to accurately measure the opening and closing angles of the radio-opaque leaflets (Fig. 5). Subtle degrees of incomplete opening or incomplete closure can be detected using this technique, which makes it very useful for serial follow-up. The combination of incomplete leaflet excursion on cinefluoroscopy and TTE Doppler detection of a high transprosthetic gradient provide sufficient information to diagnose prosthetic obstruction but TEE is often necessary also to provide qualitative data on the extent of pannus and/or thrombus and to quantify any associated regurgitation, particularly in the mitral position.

If investigation detects excessive pannus formation on the sewing ring which is not associated with any other complication (i.e. there is no associated thrombus and no paravalvular leak) and the pannus formation is not interfering with normal leaflet excursion or narrowing the orifice, no action is required other than optimisation of anticoagulation management (as above) and regular follow-up with further cinefluoroscopy and TEE. Excessive pannus formation has a tendency to increase in extent and is also a predisposing factor for thrombus formation. There are no guidelines as to how frequently investigation should be performed under this circumstance, but given the progressive nature of pannus and the associated risk of thrombosis, cinefluoroscopy and TTE Doppler should be performed at least every six months if the patient remains asymptomatic and more frequently if there is a change in symptoms, with TEE reserved for deterioration in cinefluoroscopy appearances and Doppler-derived valve area calculations.

As with other complications mentioned above, if comprehensive investigation with cinefluoroscopy, TTE and TEE shows no evidence of excess pannus formation when performed for the first time after the first five years and there are no other indications for enhanced follow-up, the patient can be returned to routine follow-up.

If cinefluoroscopy and TEE reveals excess pannus which is interfering with the normal excursion of one or both leaflets (i.e. $\geq 10^{\circ}$ loss of movement in association with increased Doppler gradients and reduced valve area), or if it is complicated by thrombus formation, there is a strong indication for re-operation to prevent progressive obstruction of the prosthesis (see Protocol E in Appendix 2).

**Prevention and Detection of Prosthetic Endocarditis**

In addition to sterile silver-induced toxic necrosis leading to paravalvular leak, and cases reported as 'culture-negative endocarditis' which may have the same aetiology, the AVERT data[13] and St. Jude's own Field Experience Reports (Appendix 3) suggest that patients with Silzone valves may be more susceptible to true (culture-positive) prosthetic endocarditis, possibly as the result of the mechanisms described on pages 44 and 45.

Whilst all patients with prosthetic valves should have full prophylactic antibiotic cover for interventional procedures which could introduce bacteria into the blood stream (including, for example, dental procedures),[76] this is particularly important for patients with Silzone valves. There is no evidence that patients undergoing TEE require antibiotic prophylaxis and the AHA Recommendations on Prevention of Bacterial Endocarditis regard antibiotic cover as optional for this procedure **in high risk patients**.[77]

In all patients with prosthetic valves, the possibility of prosthetic endocarditis should always be considered if the patient develops unexplained fever and general malaise which persists for more than a few days, particularly if accompanied by new cardiovascular symptoms. Risk factors for prosthetic endocarditis include diabetes, renal dysfunction, cardiac failure, poor anticoagulation control, double valve replacement, and a previous history of endocarditis. Blood cultures and blood tests for inflammatory markers should be taken prior to any antibiotic treatment. TEE is required to make the diagnosis as it is two to three times more sensitive than TTE in detecting the features of prosthetic endocarditis.[78] It should be considered even when blood cultures are negative if other diagnostic criteria are present (Duke criteria).[79] Because Silzone valves appear more susceptible to endocarditis, a lower threshold should be adopted for recommending TEE in all doubtful cases.

## Monitoring for Tumour Development

In view of the possible carcinogenic effect of silver referred to earlier in this report, there is a case for considering regular echocardiography for this indication also. However, given that only one case has been reported in the literature, the risk of tumour development is almost certainly extremely low and it is difficult to be prescriptive about the frequency of echocardiography which would be necessary. Indeed, it could be argued that the risk is so low and the likelihood of surgical cure so remote that it is unnecessary to alarm the patient by suggesting regular echocardiographic screening, if there are no other indications for it. In practice, many patients will require TEE screening for other reasons, as described in previous sections of this report. During those examinations, vigilance for tumour development should also be maintained. As discussed in the following section of this report on long-term independent data collection, post-mortem examinations should be