**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **IN RE ST. JUDE MEDICAL, INC.** | : | |
| **SILZONE HEART VALVES** | : | |
| **PRODUCTS LIABILITY** | : | **MDL DOCKET NO. 1396** |
| **LITIGATION** | : | |

# DECLARATION OF ERIC G. BUTCHART

I, Eric G. Butchart being of legal age do set down and state the following:

1. I am a medical doctor trained as a cardio-thoracic surgeon. My credentials, honors and publications are set forth in the curriculum vitae attached to this declaration, which I confirm is current as of this document's date.

2. I have been jointly retained as a consultant and expert witness by the Plaintiffs' Steering Committee of MDL No. 1396 (*In Re St. Jude Medical, Inc. Silzone Heart Valves Product Liability Litigation*) ("**MDL**") and by the class counsel in the Canadian certified class action pending in the Ontario Superior Court of Justice styled *Andersen v. St. Jude Medical, Inc.*, Court file No. 00-CV-195906CP. ("**CNCA**")

3. Attached is my report that sets forth my expert opinions and the basis and reasons therefore regarding St. Jude's Silzone prosthetic products, the injuries and risks associated with same, the need for and the nature of enhanced medical surveillance required by those people in whom a Silzone product was implanted, and the need for and the nature of a sound, independent and valid epidemiologic study on Silzone patients in order to better safeguard their health and safety .

4. My attached *curriculum vitae* contains a listing of all the publications I have authored in the last ten years.

5. During the past four (4) years I have testified in the following trial.

Roger Bruce Webbley v. employers who had exposed him to asbestos, resulting in the development of malignant pleural mesothelioma (trial date September 15, 2003, in Neath County Court, Wales, UK). I testified on behalf of the Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Dated: 29th November, 2005

ERIC G. BUTCHART, FRCS, FETCS, FESC

# INTERIM MEDICAL REPORT

on the

# FOLLOW-UP REQUIREMENTS OF PATIENTS

# WITH ST. JUDE SILZONE PROSTHETIC HEART VALVES

prepared by

ERIC G BUTCHART FRCS, FETCS, FESC

at the request of

the Plaintiffs' Steering Committee of MDL No. 1396

and

the Plaintiff Class Counsel for the Canadian National Class
(Andersen v. St. Jude Medical)

Address for Correspondence:

Eric G Butchart
Ty Fryn-y-Coed
Pendoylan
Cowbridge
Wales. CF71 7UF
U.K.

e-mail: egbutchart@aol.com

## CONTENTS

| | |
|---|---|
| INTRODUCTION | 3 |
| Qualifications | 3 |
| Declaration of Interest | 3 |
| Documents Examined and Report Preparation | 5 |
| EXECUTIVE SUMMARY | 6 |
| BACKGROUND – Complications of Prosthetic Heart Valves | 11 |
| 1. Data Collection and Reporting Methods | 11 |
| 2. Patient Risk Factors | 14 |
| 3. Surgical Technique | 14 |
| 4. Postoperative Management | 15 |
| COMPLICATIONS OF ST. JUDE SILZONE VALVES | |
| 1. Valve Thrombosis | 16 |
| 2. Thromboembolism | 19 |
| 3. Tissue Overgrowth (Pannus) | 32 |
| 4. Paravalvular Leak | 37 |
| 5. Culture-negative Endocarditis | 42 |
| 6. Culture-positive Endocarditis | 43 |
| 7. All Valve-related Events | 45 |
| 8. Carcinogenic Effect of Silver | 46 |
| MANAGEMENT AND FOLLOW-UP OF PATIENTS WITH SILZONE VALVES | 48 |
| Intensity of Follow-up | 50 |
| Rationale for Transoesophageal Echocardiography | 51 |
| Risk/Benefit Ratio of Additional Investigations | 52 |
| Anticoagulation Management | 53 |
| Prevention of Valve Thrombosis and Thromboembolism | 54 |
| 1. Heightened Surveillance | 54 |
| 2. Risk Stratification | 56 |
| 3. Antithrombotic Management – Prevention | 58 |
| Anticoagulation Intensity and Self-Management | 60 |
| Anticoagulation Interruption | 64 |
| 4. Antithrombotic Management – Treatment | 65 |
| Identification and Monitoring of Paravalvular Leak | 67 |
| Identification and Monitoring of Excessive Pannus Formation | 72 |
| Prevention and Detection of Prosthetic Endocarditis | 73 |
| Monitoring for Tumour Development | 74 |

| | |
|---|---|
| **LONG-TERM INDEPENDENT DATA COLLECTION** | **76** |
| **PATIENT AND PHYSICIAN INFORMATION BOOKLETS** | **80** |
| **CONCLUSION** | **82** |
| **REFERENCES** | **83** |
| **TABLES** | **92** |
| **APPENDIX 1 – Cardiff Late Review 2004** | **102** |
| **APPENDIX 2 – Management Algorithms** | **107** |
| **APPENDIX 3 – Additional documents scrutinised** | **116** |

## INTRODUCTION

### Qualifications:

I am the Senior Consultant Cardiothoracic Surgeon at the University Hospital of Wales, Cardiff, United Kingdom, where I have been in consultant practice for the last 26 years. During that time I have had a particular interest in heart valve surgery and in particular have carried out research into the mechanisms of thromboembolism after heart valve replacement. I have contributed extensively to the literature on this subject, including editing a book devoted to the problems of thrombosis, embolism and bleeding after valve surgery. My detailed curriculum vitae is attached, including details of all publications.

Between 1992 and the beginning of 1998, I was the European Surgical Editor of the Journal of Heart Valve Disease and I am currently an Associate Editor of HEART (formerly the British Heart Journal).

I am a past Chairman of the European Society of Cardiology Working Group on Valvular Heart Disease (2000 – 2002). I have recently chaired a European Society of Cardiology Committee producing Recommendations on the Management of Patients after Heart Valve Surgery, (to be published in print in the European Heart Journal later this year and currently available on-line on their website). I have edited a book on the same subject scheduled for publication in early 2006. I have also been a member of a recent World Health Organisation Guidelines Committee on the Management of Patients with Rheumatic Heart Disease.

I have personal experience of the St. Jude Silzone valve, having both implanted and explanted these prostheses during the course of a research study (vide infra).

### Declaration of Interest:

Much of my early research work into thromboembolism was based on one type of prosthesis (the Medtronic Hall Valve) in order to keep one variable constant and analyse the other factors associated with thromboembolism. I received no payment from

Medtronic for performing this research. Medtronic provided funding only to the department of Medical Computing and Statistics at the University Hospital of Wales for the purposes of data collection and analysis. A later research study (the Cardiff Embolic Risk Factor Study – vide infra) was supported by the British Heart Foundation, a registered charity in the UK. Supplementary support was provided by Medtronic, St. Jude Medical, Aortec and Edwards Lifesciences. Again, I received no direct financial benefit, the funding being used for the salaries of research fellows and for data collection and analysis. St. Jude Medical contributed in particular to the enrolment of patients with Silzone valves into the Cardiff Embolic Risk Factor Study. These additional patients were enrolled towards the end of the Cardiff Embolic Risk Factor Study at the request of St. Jude Medical, who wished to obtain detailed data on the thrombogenicity of their new prosthesis. They approved the protocol of the extended study, including the consecutive nature of the enrolment, i.e. Silzone patients enrolled after enrolment of the standard valve had ceased (necessitated by delayed European approval of the Silzone prosthesis).

In common with almost all cardiothoracic surgeons in the United Kingdom, I have received financial support from various companies to attend international meetings over the years, but this has not influenced my clinical practice in any way. The valve companies from which I have received such support have included Medtronic, St. Jude Medical, Edwards Lifesciences, Carbomedics, Caledonian Medical (Aortec) and Medical Carbon (On-X).

For the last few years, I have been a member of a Data Safety Monitoring Committee for the Medtronic Advantage bileaflet valve. This involves careful and critical scrutiny of data collected during initial trials of this new prosthesis. The Data Safety Monitoring Committee has the power to advise cessation of implantation should complication rates appear to be excessive.

I am not and have never been an employee or advisory board member of any valve manufacturing company, nor am I a stockholder in any valve manufacturing company. I believe that the report I have provided is wholly objective and is formulated with the interests of patients as the only priority.

**Documents Examined and Report Preparation**

This report is based upon my own experience with the St. Jude Silzone valve, on my own research work into the mechanisms of thromboembolism after heart valve replacement and upon relevant articles from the medical literature, which are quoted at the end of this report. I have also had access to documents provided to me by Messrs. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, PC in the USA and Messrs. Lerners in Canada, listed in Appendix 3.

For ease of reference, figures and illustrations appear at the appropriate place in the text. Tables, which are referred to in numerous places in the text, appear at the end of the report. The report concludes with three appendices. Appendix 1 provides details of the late review of Silzone patients in Cardiff. Appendix 2 contains management algorithms. Appendix 3 contains the list of additional relevant documents mentioned above.

In preparing this report, I have been cognisant of the principle that my primary duty is to the Court and not to the persons from whom I have received instructions. The report is confined to those areas in which I have particular expertise and I believe it to be honest, truthful, fair and objective. My opinions are stated within a reasonable degree of medical certainty. I reserve the right to supplement my report with further information as it becomes available and to supplement my opinion accordingly.

**EXECUTIVE SUMMARY**

1. In 1997, St. Jude Medical introduced a modification of their bileaflet mechanical prosthetic heart valve which incorporated a metallic silver coating on the sewing ring, to which they gave the trade name 'Silzone'. This modification was developed in the hope that the antimicrobial properties of silver would reduce the risk of prosthetic endocarditis, a serious complication of prosthetic heart valves with a high mortality rate.

2. Unfortunately subsequent clinical experience with the Silzone valve revealed that not only did it not reduce the risk of prosthetic endocarditis, but it also actually increased the risk of other complications, notably paravalvular leak. This complication was probably caused by the direct toxic action of silver on living cells, interfering with the normal healing process. It was a high incidence of explantation for this complication which led to the manufacturers voluntarily withdrawing the prosthesis from the market in January 2000.

3. By using accepted Guidelines and by examining large numbers of literature reports, it is possible to establish 'acceptable' ranges of linearised rates for various complications within which a newly introduced prosthesis should perform if it is to be approved for clinical use. This principle underlines the system of Objective Performance Criteria (OPC) applied by the FDA.

4. Interpretation of data on complication rates for the Silzone valve has been frustrated by the lack of any large independent published series. Several small series exist but the only series with larger numbers of patients is the AVERT study, a randomised trial comparing Silzone to the standard St. Jude valve, organised and funded by St. Jude. The company has been so closely involved with every stage of this trial that it cannot be regarded as independent. Moreover, concerns about the accuracy of data collection cast further doubt on the validity of the results, as explained in detail in this report.

5. Nevertheless, even relying on data from St. Jude's own AVERT study, substantial differences in complication rates exist between the Silzone valve and the standard St. Jude valve. Following aortic valve replacement (AVR), the incidence of all valve-related complications (as reported by the AVERT investigators in 2002) was 11.9%/year for the Silzone valve and 4.7%/year for the standard valve. Following mitral valve replacement (MVR), the respective complication rates were 26.3%/year versus 9.4%/year, an even larger difference.

6. In the analysis of valve-related complications reported by the AVERT investigators in 2002, there was a significantly higher incidence of paravalvular leak among Silzone valve patients. The incidence of stroke and other categories of thromboembolism was also higher, particularly in the mitral position, but the differences failed to reach conventional statistical significance, except in the case of reversible ischaemic neurological deficit (RIND). Nevertheless, in my opinion, the large differences in thromboembolism are clinically significant and the incidence of thromboembolism after MVR (9%/year) is so high that the Silzone valve would almost certainly not have received FDA approval if these figures had been submitted in pursuit of approval of a new prosthesis. The high incidence of thromboembolism among patients with the Silzone prosthesis in the AVERT study is in keeping with my own findings in a research study in Cardiff, as explained in detail in this report.

7. Other complications which appear to be more frequent among patients with Silzone prostheses are valve thrombosis, excessive tissue ingrowth (pannus), and culture-negative prosthetic endocarditis.

8. The higher incidence of valve-related complications in comparison to the standard St. Jude valve indicates that the silver coating applied to the sewing ring (the only difference from the standard valve) is the cause. The causal mechanisms are discussed in detail in the report.

9. Approximately 36,000 patients worldwide have thus received a defective prosthesis which exposes them to higher risk. These patients therefore need and deserve

enhanced monitoring at a higher level than that normally given to patients with other types of prosthetic valve in order to detect complications at an early stage before they give rise to serious symptoms or cause irrecoverable cardiac or other organ damage.

10. All living patients with a Silzone prosthesis are now more than 5½ years post-implantation. It has been argued, based on data from the AVERT database, that the risk of complications will decline with the passage of time and the decreased number of patients exposed, as the result of explantations and deaths from prosthesis-related complications, and that as a consequence there is no necessity for enhanced monitoring of Silzone patients. However, there are major concerns about completeness of follow-up and the accuracy of data acquisition in the AVERT study, as detailed in this report. Furthermore, data from follow-up of Silzone patients in Cardiff (provided in Appendix 1 and several tables) has shown that the risk of thromboembolism remains higher than expected for a standard St. Jude valve even after 7 years. More intense surveillance using transoesophageal echocardiography (TEE) has revealed asymptomatic sewing ring thrombus in approximately 30% of MVR patients and cinefluoroscopy has revealed abnormal leaflet motion of the Silzone prosthesis in approximately 27% of AVR patients, raising concern about pannus and/or small thrombi interfering with leaflet movement.

11. Enhanced monitoring, as recommended in this report, has three components:

    1. **Enhanced surveillance**, comprising detailed risk factor assessment to identify patients at higher risk, and the use of additional investigations, such as TEE and cinefluoroscopy to detect complications which are sometimes subtle and not readily detected by transthoracic echocardiography (TTE) alone.

    2. **Preventive measures**, to reduce the risk of complications. These measures include more sophisticated anticoagulation management and

the treatment of risk factors known to increase the risk of thromboembolism.

3. **Management of identified complications**. Algorithms are provided at the end of this report, and discussed in detail in the text, recommending management strategies for each type of complication, although it is emphasised that any change in therapy must be undertaken at the discretion and direction of the patient's own informed cardiologist and cardiac surgeon who are best placed to determine the risks and benefits of each course of action for the individual patient.

12. A very large number of patients (approximately 36,000 worldwide) have been placed at risk by receiving a defective prosthesis. Only a very small minority of these patients (approximately 2%) have been studied and reported in the medical literature. The largest study, St. Jude's own AVERT study, cannot be regarded as independent and is seriously flawed as described above and detailed in this report. There is therefore a need for a large independent epidemiological study of patients with Silzone prostheses, using the investigative techniques described in this report, to characterise better the risk of various complications and provide guidance for future management. In addition, all patients dying with a Silzone valve in situ should ideally undergo post-mortem examination by a cardiac pathologist, to detect complications which may have been missed in life.

13. A properly designed and implemented epidemiological study is also necessary to determine the long-term effects of implanted silver on human tissue, not only for the benefit and protection of patients with Silzone valves, but also for the benefit of other patients who may receive a silver coated medical product in the future, should manufacturers employ or consider employing silver on their products.

14. A patient information booklet should be provided for all patients with a Silzone prosthesis, informing them of the specific risks to which they are exposed and how these can be reduced. A better understanding of possible complications and how to

prevent them by a combination of prophylactic measures and heightened monitoring should provide reassurance to patients rather than alarming them.

15. A more detailed and scientific guide should also be developed and made available to physicians caring for Silzone patients.

**BACKGROUND:**

**Complications of Prosthetic Heart Valves**

If a patient's own heart valve becomes narrowed, leaks or becomes infected (endocarditis) and an operation is necessary because of symptoms and/or an adverse effect on cardiac function, the choice is between surgical repair or replacement with a prosthetic device. Prosthetic heart valves have been in use now for more than 40 years and considerable information has accrued about the various complications which can occur and about their expected frequency.[1]

The complications which can occur after valve replacement include valve thrombosis (both obstructive and non-obstructive), thromboembolism, haemolysis, endocarditis, paravalvular leak, mechanical failure, impingement of the occluder (on intracardiac structures, tissue ingrowth or suture material), and anticoagulant related bleeding. Review of the literature shows that the reported incidence of these complications varies considerably and that there is as much variation within any one type of prosthesis as there is between one prosthesis and another.[1] The reason for this variation is due to several factors, all of which underline the necessity for caution in interpreting complication rates in the literature:

1. **Data Collection and Reporting Methods**

Both the definition of complications and the method used for collecting the data can have a major impact on the reported rate; for example, definitions of 'major' and 'minor' thromboembolic events and prospective versus retrospective data collection. It has been shown that retrospective data collection (for example, with a questionnaire sent to patients at the end of a ten year period) can seriously underestimate the true incidence of complications, because patients tend to forget relatively minor events such as transient ischaemic attacks (TIAs) and some bleeding episodes.

Although there are alternative methods (vide infra), the frequency of the various complications is most often expressed as an annual incidence, or

linearised rate of events per 100 patient years or %/yr. In order for these linearised rates to be meaningful, it is necessary that events are documented accurately in a sufficiently large number of patients over a sufficiently long follow-up period. The FDA, for example, requires a minimum of 400 follow-up years in each valve position in submissions for approval of new prosthetic devices,[2] and the requirements of the International Organization for Standardization (ISO) are the same.[3]

It is important to appreciate that there are caveats associated with linearised event rates, when comparing one prosthesis with another or comparing it against objective performance criteria (OPC). The published guidelines for reporting complications after heart valve replacement require that a simple percentage is given for the first 30 days ('early' events), and that linearised rates are used from 31 days onwards for 'late' events.[4] The use of linearised rates implies that the hazard of the complication is constant over time, whereas, with many complications, this is not the case. It has been shown for example that the hazard function curve for thromboembolism and bleeding has a high early peak, gradually falling to a more stable long-term rate, i.e. these complications are more frequent in the early postoperative months. Hence, linearised rates from a small series with short follow-up are not comparable to linearised rates from a larger series with long follow-up. Also, and this has relevance for the Silzone valve, complications which occur predominantly in the first few months will fall into two rather arbitrary categories ('early' events and 'late' events), thereby appearing to diminish the frequency of the complication in both categories. Furthermore, if a complication is predominantly an early hazard in the first few months, the longer the follow-up is continued after patient enrolment has ceased, the greater will be the diluting effect of additional follow-up years in reducing the event rate and the greater will be the difficulty of demonstrating a significant difference between the prosthesis under investigation and other prostheses, even though clinically significant differences may exist. A further problem with linearised rates is that patients who have multiple events because of their own particular risk factors

may contribute excessively to the calculated event rate applied to the prosthesis.

Event rates represent the influence not only of the thrombogenicity of the prosthesis but also of the patient's own risk factors, surgical techniques and postoperative management, as discussed below. Nevertheless, event rates as reported in the medical literature for patients with prosthetic valves fall between certain limits (Table 1) and event rates associated with a particular type of prosthesis which exceed those limits, and which exceed OPCs based upon average event rates, raise concern that the prosthesis itself is contributing excessively to the increased complication rate.

The method of reporting complications can also have an effect. Because the incidence of complications can vary between the aortic and mitral positions, the guidelines for reporting complications after heart valve replacement, developed by the cardiothoracic surgical societies, recommend separate reporting of complications for the different valve positions.[4] Amalgamation of data from the two valve positions can disguise a particularly high event rate in one valve position by diluting it with data from the other, especially if the high event rate occurs predominantly in the mitral position, as most series have fewer mitral valve replacements than aortic valve replacements. This applies particularly to analyses of Silzone valve performance by Grunkemeier and Wu (literature review)[5] and by Holubkov et al (unpublished abstract based on AVERT data on thromboembolism), as discussed in detail below. On the other hand, if complication rates appear higher after mitral valve replacement, it is logical to amalgamate mitral and double valve data on the basis that any adverse effect associated with mitral valve replacement will also occur in the double valves.

Complications which occur simultaneously or in close temporal proximity (e.g. valve thrombosis and thromboembolism or valve thrombosis and endocarditis) are usually reported as one complication or the other, but not both. This can lead to underestimates of severity. Similarly, if events are reported using

actuarial methods (Kaplan-Meier) rather than linearised rates, censoring occurs after the first event, i.e. in that individual patient's experience, any further events in the category being reported are excluded from analysis. This can lead to a more optimistic view of outcome, as the total burden of events may be underestimated.

The rate of complications which are diagnosed primarily by investigations (e.g. paravalvular leak, valve thrombosis) will be influenced by the quality and frequency of those investigations. This applies particularly to echocardiography and cinefluoroscopy (vide infra).

Lastly, the completeness of follow-up will have an impact on event rates. Series with less than 95% completeness of follow-up are likely to provide biased estimates, the bias increasing with diminishing completeness. This is because patients lost to follow-up may include patients who have died from prosthesis-related complications. The reporting guidelines stipulate that follow-up completeness should be 95% or better.[4]

2. **Patient Risk Factors**

Thromboembolism in particular is heavily influenced by the patient's own risk factors, and their compliance with anticoagulation management, as discussed in detail later in this report. The risk of paravalvular leak is higher if the patient's valve annulus is calcified, particularly if there is inadequate decalcification prior to prosthesis implantation.

3. **Surgical Technique**

Annulus preparation (particularly adequacy of decalcification), suture technique and prosthesis sizing have a major impact on complications such as paravalvular leak and occluder impingement. Surgical technique can also have an impact on excessive tissue ingrowth (pannus) and thrombosis consequent upon this. For example, pledgets placed in a sub-annular position

which encroach upon the valve orifice may predispose to pannus formation which can narrow the orifice and eventually interfere with occluder movement.

4. **Postoperative Management**

The two major areas of postoperative management which can influence outcome are anticoagulation management and endocarditis prophylaxis.

The ranges of reported event rates of currently available mechanical valves are shown in Table 1. It can be seen that there is huge variation, due to the factors mentioned above.

## COMPLICATIONS OF ST. JUDE SILZONE VALVES

Silzone was the trade mark used by St. Jude Medical for the metallic silver coating applied to the sewing ring of the St. Jude bileaflet mechanical prosthesis. The Silzone valve was developed in the hope that it would both reduce the incidence of prosthetic endocarditis and accelerate healing of the sewing ring by more rapid tissue covering.[6,7] However, these two goals were to some extent almost mutually exclusive, as a more rapid covering of the sewing ring would then isolate silver from contact with bacteria circulating in the blood, confining any possible bactericidal effect to the very early postoperative period only.

In fact, St. Jude's own research showed that the bactericidal effect of Silzone was inconsistent, that silver leached out of the fabric into the blood and annular tissues in a variable manner and that the silver coating had a toxic effect on adherent platelets which had an adverse effect on the cohesion of subsequent layers of platelets (Appendix 3). It was also clear from the research work of other scientists carried out in the late 1980s and the 1990s that silver was toxic to fibroblasts and thereby had the potential to interfere with normal healing processes.[8-10] Experimental work in hamsters, published in 2000 after the Silzone valve was recalled, also showed a profound effect of silver on the microvasculature of muscle tissue leading to gross oedema and white blood cell extravasation,[11] which if replicated in human tissues would interfere with normal healing.

It is important to state at the outset that the complications reported with the St. Jude Silzone valve are not unique to this prosthesis, but, in comparison to other prostheses, the qualitative and quantitative differences in specific complications, which in my opinion probably stem from the direct effect of metallic silver on tissues and on blood components, mean that the Silzone valve must be regarded as a defective implant product. These complications include valve thrombosis, thromboembolism, excessive tissue overgrowth (pannus), paravalvular leak, so-called 'culture-negative prosthetic endocarditis', and culture-positive prosthetic endocarditis. Also of concern is the possibility of a carcinogenic effect of silver. Each complication will be discussed in general terms, highlighting differences in the case of the Silzone valve.

1. **Valve Thrombosis**

There are two gradations of valve thrombosis, non-obstructive and obstructive. Non-obstructive valve thrombosis means the accumulation of excessive thrombus on the sewing ring which does not interfere with occluder movement. It only becomes evident on transoesophageal echocardiography, either as an incidental finding or as part of the investigation of a thromboembolic event. It often progresses to become obstructive valve thrombosis which, as its name implies, means thrombus which narrows the orifice of the prosthesis and/or interferes, however slightly, with the normal movement of the occluder mechanism. This may cause incomplete opening or incomplete closure or both, and usually causes progressive symptoms. In extreme cases, the prosthesis may become almost totally obstructed, causing acute cardiac failure.

In discussing non-obstructive valve thrombosis, it is important to appreciate that the normal 'healing' of the sewing ring involves initially the deposition of a coating of plasma proteins, composed mainly of albumin, within seconds of contact with the blood, followed by the deposition of a very thin layer of thrombus which subsequently becomes organised by the ingrowth of cells called fibroblasts which lay down fibrous tissue. This tissue usually eventually grows into and covers the fabric of the sewing ring, helping to anchor it to the

body's own tissues. Eventually a thin layer of endothelium may cover the surface. Gross or persistent thrombus is abnormal.

In my own experience of two explanted thrombosed Silzone valves, the thrombus covering the sewing ring in the first few months was of a different nature to that covering the sewing ring of other prostheses that I have explanted, in that it had no firm attachment to the sewing ring, which had no endothelial covering and no evidence of cellular ingrowth into the fabric on microscopy. Chronic thrombus on a sewing ring is usually firmly attached and can often only be dislodged completely with some difficulty. In the two Silzone valves that I have explanted for valve thrombosis (one case was also complicated by endocarditis), the thrombus was only loosely attached and could be simply wiped off the sewing ring in the same way that one would be able to wipe thrombus off a glass surface or indeed a metal surface (Fig. 1). It appeared that blood was reacting to the Silzone-coated fabric as a metal surface rather than a fabric surface (vide infra).



*Fig. 1.* The left-hand photograph shows a thrombosed Silzone mitral prosthesis in situ two months after implantation. It was explanted after the patient suffered a stroke. The right-hand photograph shows the explanted prosthesis. After removing the thrombus, the Silzone surface looks the same as it did at implantation with no tissue covering or ingrowth. The thrombus, which was readily wiped off the surface of the silver coating, lies alongside the prosthesis.

The unpublished experimental work of Goodman et al, using platelet-rich plasma rather than whole blood, showed a severe toxic effect of Silzone on adherent platelets in contact with silver with less cohesion of subsequently

deposited platelets (Appendix 3). The normal function of platelets in stabilising thrombus in fast moving blood by aggregation (clumping together), release of factor XIII, and clot retraction mediated by platelet actomyosin is dependent on platelets functioning as living cells. It is likely that 'dead' platelets will be unable to deploy binding sites for the proteins von Willebrand factor and fibrinogen which normally cause platelets to adhere to each other. This, and the loss of other complex mechanisms which lead to stabilisation and clot retraction, may explain the loose attachment of thrombus to the Silzone coated sewing ring. Silver is also known to be toxic to red cells which become enmeshed in the clot, causing depletion of intracellular glutathione which in turn leads to the red cells themselves becoming prothrombotic through phospholipid exposure.[12] Thus a clot, once initiated by platelet adherence may be amplified by the prothrombotic effect of silver-damaged red cells. Excessive thrombus on the sewing ring readily embolises and can spread onto the mechanism of the valve and interfere with occluder movement.

Rates of Silzone valve thrombosis in the AVERT study,[13] the CERFS[14] and St. Jude's own Top Accounts Study (Appendix 3) have been much higher than valve thrombosis rates for the standard St. Jude valve in these studies and in the literature, particularly in the mitral position (Tables 2 and 3).

The only difference between the Silzone valve and the standard St. Jude valve is the silver coating on the sewing ring. The higher rate of valve thrombosis with the Silzone valve and the associated higher rate of thromboembolism strongly implicate the silver coating as the cause of the problem. This is in keeping with experimental work performed over 35 years ago. In the late 1960s, in the early years of heart valve replacement, many different metals were evaluated as possible construction materials for prosthetic valves, using metal cages (replicating the Starr-Edwards caged ball valve design) implanted in the aortic annulus of calves. All of the noble metals, including silver, were found to be more thrombogenic than other metals tested and were rejected from further evaluation as being unsuitable for prosthetic heart valve construction.[15,16] Furthermore, at about the same time it was shown that in