# Exhibit 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

IN RE: ST. JUDE MEDICAL,
INC., SILZONE HEART VALVES MDL Docket No. 1396
PRODUCTS LIABILITY LIGATION,

VIDEOTAPED DEPOSITION
OF
GARY LEE GRUNKEMEIER, PH.D.
Taken on behalf of Plaintiffs

March 31, 2005
* * *

not sure about the cause of the event.
Q. Did you ever conclude in your own mind that it was more likely than not that Silzone caused an increased incidence of explant?
MR. KOHN: Objection to form.
MR. CROW: You can answer.
Q. BY MR. SIGELMAN: You can answer.
A. Yes.
Q. You did conclude that?
A. I'm convinced of that.
Q. All right. And are you convinced that it was the cause of explants due to paravalvular leak?
A. Wait. What was the thing I was convinced of? What was your statement?
Q. My question was did you ever conclude that it was more likely than not that Silzone caused an increased incidence of explant, and you said you were convinced of that.
A. Yeah. I'm -- yeah. Okay. Now, that's for explant. The second question is the same question for paravalvular leak?
Q. Major paravalvular leak.
A. Yes. Okay. Same question. Yes. I'm now convinced of that.
Q. And why are you convinced of those things?

because of the width of the confidence interval or something, they weren't necessarily contradictory. Just trying to stick to what was published statistically.

Q. So you'd -- but you will agree with me that that notion would be one way of reconciling what may appear to be contradictions?

MR. KOHN: Object to the form.

A. Well, maybe, but it seems that if the thromboembolism rate is high, it's either high or not, even if there are two phenomenon emanating from the same mechanism, the embolism rate should be not dissimilar in different populations nor the leak rate taken as single events. That was sort of the focus I think I had in that paper.

(Marked Deposition Exhibit No. 21.)

Q. BY MR. SIGELMAN: Dr. Grunkemeier, you've been handed Exhibit 21, which is a February 22, 2000, e-mail.

A. Uh-huh.

Q. And on the last page -- excuse me -- the third page of the exhibit, 325 are the last three digits, you have an e-mail to Monica Schultz.

Now, this is in this same time frame that we've been talking about, February of 2000.

A. Uh-huh.
Q. Does this refresh your recollection as to whether you reviewed report data from the top accounts study?
A. Which e-mail? The one on February 22 at 2:20 p.m.?
Q. Yes. You say, "Thanks for the report. I'd done much the same thing already and got the same results."
You are talking about the top account study, are you not?
A. Yeah. It looks like it.
Q. Then you say, "the TE and thrombosis rates don't look too good, especially the mitral position, in the range of Eric B's results," correct?
A. Uh-huh.
Q. So you are saying you saw these data and it showed a statistical problem or numerical problem of some sort in the mitral position, correct?
A. Yes.
Q. So you had this information at least by February of 2000, correct?
A. Yes.
Q. To your knowledge, did St. Jude ever publicize the results of the top account study that it sponsored?
A. Not that -- I don't know.

Q. Not that you know of, correct?
A. Not that I know of. Correct.
Q. And you didn't mention it, did you, in your contradictory reports article where you are talking about data from Mr. Butchart's study and data from AVERT?
A. No. That was just based on published peer reviewed reports.
Q. Well, did you ever ask St. Jude whether they would mind your making this public?
A. No. You mean publish their top survey data?
Q. Yes.
A. No, I didn't.
Q. Submit it for peer review?
A. No, I didn't. It was someone else's data. It wasn't mine.
Q. All right. You'll agree with me that it would have added additional information either corroborating or reinforcing some of the data from Mr. Butchart's study that might have been illuminating to the readership of your article?
MR. KOHN: Object to the form.
A. You know, I don't know the quality of that data or exactly how -- who it was collected by or how often or what it could be used for.

Q. BY MR. SIGELMAN: Did you ever suggest to St. Jude that it submit that data for publication and subject it to peer review?

A. Not that I recall.

Q. You didn't get an opportunity to peer review it, did you, for any length of time?

A. No.

Q. In fact, you were told not to work on it any longer, correct?

A. I don't know. I'm not even sure it was a study. I thought it was just their top implanters and some passive record collection they had. I didn't know it was an active prospective study exactly.

I don't know much about it. Didn't know it hardly existed until I heard them say it one day. I said, what's that? They said some data. I said, can I see it? I don't know -- it didn't go far, whatever it was.

Q. It didn't go far, but the data didn't look too good to you, did it?

A. I don't remember how many -- it was like ten patients per center or something. It wasn't very many patients. No. Apparently it didn't.

Q. You thought the data looked pretty bad for the mitral position in the range of --

A. In the range. Yeah.
Q. Then Monica Schultz says in response, "Yes. I know. Sadness." That's what she told you, right? See her response to your e-mail?
A. Okay. It's on the next page.
Q. Yeah.
A. Yes. I see.
Q. So she knew the data didn't look too good, didn't she?
A. Yes.
Q. And she expressed sadness about those data, correct?
A. Yes.
Q. She didn't say the data was no good, she said it was sad, and she knew that the data didn't look too good?
A. She did add one disclaimer here.
Q. Well, she added one disclaimer, which was the thromboses all occurred at one site, but the TEs were more evenly spread, though, correct?
A. Uh-huh. Yes.
Q. So ultimately she wasn't saying the data weren't informative or of no quality, correct?
A. Yes. Correct.
Q. She was expressing in fact some sadness about the

data, correct?
A. That was her word.
(Marked Deposition Exhibit No. 22.)
Q. BY MR. SIGELMAN: Dr. Grunkemeier, you've been handed what's been marked as Exhibit 22, Monica Schultz to you January 20 of 2000. She's giving you some of the top accounts data.
Did you review these data at the time?
A. Apparently.
Q. And you spoke with a Becky Peterson, Director of Cardiac Surgical Associates Research Foundation about sharing the survey database with you?
A. Is that what it says?
Q. Do you have a recollection of that?
A. No, I don't.
Q. By the way, do you know whether St. Jude was actually required to conduct this top accounts survey by the medical device agency in the United Kingdom?
A. No. I didn't know that. Is that a fact?
Q. No one told you that, correct?
A. Not that I recall.
Q. That in fact they were asked to conduct this survey because of concerns expressed about the safety of Silzone by the medical device regulators in the

Why did you say that the advantage of Silzone in mitigating endocarditis if present is probably small?

A. Just because of the data as it's coming in is not looking too good that it's achieving its objective of cutting the endocarditis rate in half. It doesn't look like it was going that way.

Q. All right. So basically what you had was a product that was inferior in that it was unsafe at least in the short run at the very minimum and didn't seem to be showing any evidence of conferring clinical benefit, right?

A. Right.

Q. This is a product that I presume you thought at the time should never be brought to the marketplace, shouldn't have been brought?

MR. KOHN: Object to the form.

A. Thought at what time?

Q. BY MR. SIGELMAN: Well, at the time at least that you wrote these comments, you were reflecting on the lack of evidence on effectiveness and that the evidence was coming in wasn't looking very good and that it was inferior, that is, unsafe at least in the short run. This is a product that would have been better off never coming to the marketplace?