# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

-------------------------
IN RE: : MDL DOCKET NO. 1396
ST. JUDE MEDICAL, INC., : (Videotaped)
SILZONE HEART VALVE PRODUCTS: Deposition of:
LIABILITY LITIGATION : JONAS RUNQUIST
-------------------------

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before, BARBARA J. CAREY, a Registered Professional Reporter and Notary Public of the State of Minnesota, held at the offices of HALLELAND & LEWIS, 220 South Sixth Street, Suite 600, Minneapolis, Minnesota on Wednesday, December 11, 2002, commencing at 9:08 a.m.

A I believe that's correct.
Q And did you all feel that you needed to have tests that would indicate a near 100 percent reduction of -- of microorganisms responsible for prosthetic valve endocarditis in order to have a convincing case for efficacy of the Silzone coating?
A I don't think that's necessarily true. Even a reduction in microorganisms has some potential benefit as well.
Q Some potential?
A Yes.
Q But it could present some potential problems, correct, if it's not 100 percent?
A Potentially. But again, the more organisms you kill, the more you're going to reduce the risk.
Q All right.

(Whereupon, Deposition Exhibit Number 13 was marked for identification.)

BY MR. SIGELMAN:
Q Now, Mr. Runquist, you've been handed Exhibit Number 13.
Do you recognize it, sir?
A I vaguely remember this document, yes.

Q All right. You received it from Mr. Holmberg, did you not?
A Yes, my name is -- is -- is on this.
Q Do you recall getting an E-mail in November of 1995 from Mr. Holmberg talking about difficulties, and see where he says that the antimicrobial efficacy testing was difficult to test?
A Yes.
Q And do you recall his telling you that the NAmSA test, the Dow Shake Flask Test, did not provide consistent results?
A Yes.
Q And that the coating doesn't elute; there's no zone of inhibition?
A Yes.
Q He saw that as a difficulty, did he not?
A As I recall, this was from the initial tests that we had tried to do. This Dow Corning Shaker Test that we attempted to do, we were attempting to do or repeat the same tests that Spire was doing, and initially, we had -- had tried a few of these tests as a part of the development process and were having some difficulty replicating it.
Again, these were some of our range-finding

tests that we were trying to do before we actually did the GLP studies.
Q Sir, wasn't this, in fact, testing from Spire that was being referenced?
Do you see, in the first paragraph, he's referencing a conference call that you had with Harry -- or he had with Harry Puryear of Sims Deltec and SJM staff?
A Yes.
Q And he was involved with Deltec's project which looked into the application of Spire's Spi-Argent coating technology?
A Yes, I do vaguely recall that conversation.
Q And wasn't this testing that wasn't, in fact, done by your company, but by someone else for Spire -- or at least if not for Spire, by someone else using Spire's Spi-Argent coating technology?
A I don't really recall.
Q Is it your testimony that your company was doing these in vitro studies as early as November of 1995?
A It looks that way from this document, that we were doing them that early. Again, that was -- these initial tests were done as a part of our range finding, and we were trying to replicate

the testing that had already been done, specifically with the organisms involved in prosthetic valve endocarditis.
Q All right. And -- and when you say you were trying to replicate it, at what point did your testing become relevant and valid?
MR. KOHN: Object to the form.
THE WITNESS: At the point that we understood how to do these tests.
BY MR. SIGELMAN:
Q Okay. And when was that?
A Again, there was some development period in -- in trying to figure out how to do these tests.
Q Okay. And when did that development period end?
A I don't recall exactly. It certainly was before the FDA submission went in. We had done a series of GLP tests repeating basically everything with those organisms, once we understood how to do the tests.
(Whereupon, Deposition Exhibit Number 14 was marked for identification.)
BY MR. SIGELMAN:
Q Sir, you've been handed what's been marked as Runquist 14.

A Yes.
Q It says, "Antibacterial Cuff." Do you recognize this document, sir?
A Oh, I -- I'm sure, again, I've probably seen this in the past. I don't recall it right offhand.
Q All right. See under Bench Top Efficacy Results -- do you see that, sir?
A Yes.
Q Do you recall a discussion in May of 1996 of inconsistent tests by Spire and other users of efficacy results?
A I vaguely recall.
Q Okay. Do you have recollection of a discussion at St. Jude that the test results for efficacy that were done either by or for Spire were inconsistent?
A I guess I don't specifically recall that, no.
Q You never told FDA that. Would that be fair?
A That's probably fair. It may be one of the reasons we decided to do all this ourselves rather than relying on --
Q All right.
A -- on their data.
Q All right. When you say you decided to do it yourself --

MR. SIGELMAN: Okay. Let's -- let's -- we got to change the tape.

VIDEOGRAPHER: We are going off the record. The time now is 11:14.

(Whereupon, a recess was taken.)

VIDEOGRAPHER: We are back on the record. This is Tape 2 of the continuing deposition of Jonas Runquist. Today's date is December 11, 2002. The time now is 11:17.

BY MR. SIGELMAN:

Q Mr. Runquist, when you say that you were doing testing, are you saying that the testing in vitro for the efficacy of the Silzone Valve was done by St. Jude personnel in the 1995, early, say, 1996 time frame?

A No, I recall that testing was -- I think that was all done by NAmSA, as I recall.

Q All right.

A And this Dow Corning Shaker Test was something new for them, as I recall, at the time, too, and they, like us, were trying to figure out how to do this properly.

Q And did NAmSA tell St. Jude, when it would convey results, that the results weren't relevant because they hadn't developed their method

adequately?
A I don't recall specifically.
Q All right. Well, who -- what -- who would have been involved in the decision as to whether the method had reached a stage of development sufficient to report the information to the FDA?
A The scientists that were involved. That would have been Dr. Tweden, Bill Holmberg.
Q But they weren't actually doing the testing. NAmSA was doing it, correct?
A I believe that's correct. There -- there was also a microbiologist that was involved in those as well.
Q All right. So you didn't make those judgments after all?
A Not necessarily, no.
Q All right.
A No, I didn't.
Q So -- so you may -- would it be a fair statement to say that you may not have even seen some of the testing that was done that wasn't submitted to the FDA?
A That's possibly true.
Q All right. Or are you saying that Dr. Tweden and others made determinations, passed the

information on to you, and said, You should consider not sending it to the FDA, or, We leave it to your discretion?
A They would have provided me relevant information. That's -- that's about all I can say. Again, as part of the product development process, there's a lot of range-finding tests that go on. A lot of the tests are not terribly well controlled. They're basically trying to figure out how to do the tests before we do them, quote-unquote, for real, before we do the final verification tests.
A lot of that kind of information I'm not necessarily privy to as the -- the regulatory person. The product development people are trying to figure things out before we -- we do the testing for real. So that -- that's a very normal type of process. So a lot of that early range-finding tests, you know, I'm simply not privy to.
Q Would you agree with me that most of the in vitro efficacy testing that was the subject of your PMA supplement submission in May of 1997 was done in 1996?
A I believe so.
Q All right. So sometime in 1996, the results were

sufficiently reliable to generate findings that
you felt could be submitted to the FDA?
A I believe that's true.
(Whereupon, Deposition Exhibit
Number 15 was marked for
identification.)
BY MR. SIGELMAN:
Q I'm going to hand you what the court reporter has
marked as Exhibit 15. This is the Dow Corning
Corporate Test Method dated April 10, 1996,
correct?
A Yes.
Q And it's testing Silzone-coated fabric against
control fabric, correct?
A It looks that way, yes.
Q And for the staphylococcus epidermidis, that's,
in fact, the most common bacteria, is it not,
responsible for prosthetic valve endocarditis?
A From my recollection, it's certainly one of them.
I don't know -- I can't remember if that was --
was the major organism or not.
Q That is an organism that's the subject of your
discussion in the PMA supplement with respect to
the New York direct contact test, correct?
A I believe so, yes.

Q And that must have been one of the organisms that showed a near 100 percent reduction in the Dow Corning Shaker Test because it wasn't the streptococcus pyrogenes -- or pyogenes, is that how you pronounce it?
A Pyrogenes, I believe that's how it's pronounced.
Q Okay. There's an R left out?
A Yeah.
Q Pyrogenes, which only demonstrated a 37.5 percent reduction, right?
A That's correct.
Q All right. Now, going to Exhibit Number 15, you'll agree with me that in one test, the staphylococcus epidermidis for silver-coated fabric showed only a 47.37 percent reduction?
A In this particular test, that certainly looks like the case.
Q All right.
A Again, this looks like some of the early range-finding tests that were done --
Q When you say --
A -- with -- with NAmSA.
Q When you say it looks like it, there's nothing on this document that says early range finding, correct?

A No. No, there isn't.
Q And there's nothing on this document that says that the results are unreliable, correct?
A No, there isn't.
Q All right. And you'll agree with me that with respect to the streptococcus pyrogenes bacteria for the silver-coated fabric, that the reduction was only 76.43 percent, correct?
A In this initial test, that -- that appears to be the case.
Q And candida albicans, that's a fungus, right?
A I believe so.
Q All right. For Silzone or the silver-coated fabric, it was 89.23 percent, correct?
A That's what it says here.
Q Now, were these results submitted to the FDA at any time, sir?
A These do not look like they were submitted to the FDA.
Q All right.
A Now, again, these were some of the early tests that -- that were done as part of developing this test.
Q Do you know for a fact that these results weren't reliable, sir?

A Do I know for a fact they were not reliable?
Q Yes.
A For a fact, probably not.
Q All right.
A And you know, again, I'm relying on -- on the people that were developing this test. Connie Roos, she was the -- the microbiologist that was involved with this. She was working with -- with NAmSA at this point in time to develop this test.
Q All right. And do you recall whether you saw this document in 1996 or 1997 for the purpose of determining whether the FDA should know about it?
A I don't recall if I specifically saw this document or not.
Q All right. And you'll agree with me, sir, that if the information in this document is accurate, that what you told the FDA in May of 1997 in the PMA supplement was not true?
MR. KOHN: Object to the form.
THE WITNESS: That's not necessarily true. Again, this early test was a part of the development process of trying to figure out how to do this test, and they evidently saw something wrong with the way they were doing these tests and repeated them, and

then they performed them per GLP, and that's the information that FDA was provided. They felt comfortable enough with the test at that point in time that they decided, Okay, we have this figured out. This -- this has -- has been done correctly.

BY MR. SIGELMAN:

Q All right. So you're saying that clearly, by -- by the time you submitted your PMA supplement, they developed the test, right?

A Sure, at least to the point where they were comfortable with it.

Q Now, sir --

(Whereupon, Deposition Exhibit Number 16 was marked for identification.)

BY MR. SIGELMAN:

Q Mr. Runquist, the court reporter has handed you Exhibit 16. Have you ever seen this document, to your recollection, sir?

A I probably have, yes.

MR. KOHN: Can you just give me a date, Dan, please?

BY MR. SIGELMAN:

Q It's July 25, 1997, correct?

A That's correct.
Q That's after the submission of the PMA supplement, correct?
A It appears that way.
Q So you will agree with me that we're at a point in time where NAmSA has refined the test, whenever that was, such that the data would be reliable, correct?
A Potentially. I'm not exactly sure what this was done for, if this was specifically the Master Series Valve with Silzone or if it was done for some other reason or if they were continuing trying to refine this test.
Q Well, when you say further refine this test, this is a test done after you had submitted the PMA supplement, correct?
A From the date, that certainly appears to be the case.
Q And you testified a few minutes ago that most of the work upon which you were basing the PMA supplement was done in 1996, correct?
A Well, again, from my memory, so --
Q Okay. So you'll agree with me that clearly, by this time, they developed a reliable test, otherwise you shouldn't be relying on it in the

PMA supplement in May 1997?
A It was as reliable as they could get it, put it that way.
Q Okay. All right. So there's no issue about reliability of these data with respect to method development, right?
A Again, from my recollection. I don't know exactly why they did these tests.
Q Was there or was there not an issue with respect to the reliability because they were still developing a method two months or more after you submitted your PMA supplement?
A I guess I'm not sure how to answer that question.
Q That's because there wasn't an issue, right?
A From my recollection, there was not an issue.
Q All right.
A Again, the data that was submitted to FDA for these particular tests, there was a development process that we -- you know, it took us a while before we became comfortable with them, and once we were comfortable with them, we ran the tests, and that's what we submitted to FDA. And I do know there was some additional work done after the submission went in for, you know, other products, and again, I don't know if they were

done to make the people that were involved with
this more comfortable with the test.
Q All right. Well, in any event, you're
speculating, correct?
A Sure.
Q All right. Let's go to Exhibit 16. For
streptococcus bovis, the percent reduction was
61.67 percent, correct?
MR. KOHN: Are we still on 16?
MR. SIGELMAN: Yes.
MR. KOHN: Okay.
THE WITNESS: Yes, that's what
it says here.
BY MR. SIGELMAN:
Q And for aspergillus niger, the percentage
reduction was only 23.53 percent, correct?
A That's what it says, yes.
Q And you had the opportunity, had you wanted, to
submit an update or some kind of supplemental
submission to the FDA to reflect additional data
pertinent to safety or effectiveness of Silzone,
correct?
A Sure.
Q Okay. And did you ever submit any document to
the FDA prior to the approval of the Silzone

Heart Valve to reflect some of the data that we
just went over in Exhibit Number 16?
A I don't recall that I submitted this to -- to FDA
after the submission went in, but again, I don't
know the nature of this -- this particular test
and why it was done.
Q I didn't ask you that, sir.
I'm asking, did you tell the FDA, for
example, that in a test done by NAmSA of the Dow
Corning Corporate Method, that aspergillus niger
was only reduced by Silzone coating by
23.5 percent?
A I don't recall specifically telling them that,
no.
Q All right.
A But again, I do not know the nature of this
document and why it was done.
MR. SIGELMAN: Move to strike as
nonresponsive; that is, your last sentence. I
didn't ask you whether you knew the nature of it.
(Whereupon, Deposition Exhibit
Number 17 was marked for
identification.)
BY MR. SIGELMAN:
Q Sir, I'm going to hand you what's been marked as

Exhibit Number 17.
You know Constance Roos, right?
A Yes, I do remember Connie Roos.
Q Sheila Kelly?
A Yes.
Q Fonda Burley was a colleague of yours, correct, in regulatory affairs?
A That's correct.
Q "Subject, Silzone antimicrobial testing," correct?
A That's correct.
Q This is dated August 5, 1998, correct?
A That's correct.
Q This is months, even, after the approval of the Silzone Heart Valve, correct?
A Yes.
Q And this E-mail attaches a memo, does it not?
A Yes, it does.
Q And the memo's from Connie Roos to Sheila Kelly. Have you ever seen this memo, sir?
A I'm sure I have, yes.
Q All right. And you saw it when you were at St. Jude?
A I must have, yes.
Q Okay. Why do you say you must have?

A Again, I was involved with most things Silzone at
that time.
Q All right.
A So I -- I probably did see this at some time.
Q Okay. Do you -- do you have a recollection of
reading then that -- that in the Dow Corning
Shaker Flask Test, that in general, the results
indicate that Silzone does not effectively reduce
the bacterial or fungal populations using this
test method?
A You know, again, with these particular tests, I
remember they were having a very difficult time
performing these correctly and performing them
consistently, and they were constantly trying to
do them and perfect them.
Q Sir, would you please answer my question? We're
talking about a document written in August 1998.
MR. SIGELMAN: I move to strike
that as nonresponsive.
BY MR. SIGELMAN:
Q Do you recall the --
MR. KOHN: Well, I object to the
form of the question. He answered your question.
Every time -- every time he answers a question
and you don't like his answer, you move to strike

and ask the same question again, which I -- I think is improper.

MR. SIGELMAN: We can move -- we can move to strike, and we'll let --

MR. KOHN: You can move to strike without having to say it on the record. You can move to strike any time you want.

BY MR. SIGELMAN:

Q My question is, do you recall reading in August 1998 that in general, the results indicate that Silzone does not effectively reduce the bacterial or fungal populations using this test method?

A I do recall something to that effect, yes.

Q All right. And you'll agree with me that on this particular document, there's no discussion as to whether there were difficulties in doing the test adequately, such that that result was produced?

A It doesn't say that in the document.

Q All right.

A But again, they were having some trouble replicating these tests from one time to the next.

Q All right.

A They're difficult tests to do.

Q All right.

A And they're not an easy thing to do.
Q Did you ever tell FDA that your company had difficulty replicating the tests one test to another?
A I don't recall that we specifically told them that, no.
Q In fact, what you told the FDA is, you had a near 100 percent reduction in all organisms tested, except for one organism, correct?
A In the GLP tests that we performed at the time, that's a true statement.
Q And did you ever tell the FDA at any time that the results of the Dow Corning Shaker Flask Test indicate that Silzone does not effectively reduce the bacterial or fungal populations using this test method?
A I don't recall that we did.
Q All right.
A However --
Q Thank you.
MR. KOHN: Let him finish his answer, Dan. Come on.
THE WITNESS: I guess I'd like to finish.
MR. SIGELMAN: I wasn't asking

for an explanation. Sir, I don't mind if you want to do this, but, you know, your counsel has an opportunity to ask you questions at the end, and you can answer a question that wasn't put to you.

MR. KOHN: He can answer the questions as he sees fit, Dan.

MR. SIGELMAN: Okay.

MR. KOHN: Come on. Let's --

MR. SIGELMAN: You can answer the question as you see fit. However, sir, I would like you just to answer my question. If you want to answer a question that wasn't asked, then counsel can ask you the question subsequently. He has that opportunity at the end of the deposition, if he wants to avail himself.

(Whereupon, Deposition Exhibit Number 18 was marked for identification.)

BY MR. SIGELMAN:

Q Sir, I've handed you Exhibit 18, and it's the New York State or New York S63 Test for bacteriostatic activity, correct?

A Correct.

Q And the test organism is aspergillus niger,

correct?
A What is the date on this document?
Q It's -- well, the test article was received on 5/30/97.
Do you see that, sir?
A Yep. And I have a fax date, it looks like, of June 12th, '97.
Q Right. So this is after the submission of the PMA supplement, correct?
A That's correct.
Q And at this time, in the five replicates for the Spire-coated Dacron fabric, will you agree with me that the first replicate was only a 72.22 percent reduction, correct?
A That's what it says here.
Q That's not a near 100 percent reduction for this test, correct?
A No, it's not. But again, I -- I don't know the nature of this and how the testing was done and if it was the same as what we had done previously.
Q All right. I'm just asking you, though, it wasn't near 100 percent reduction, correct?
A Not according to this test, no.
Q Okay. And the second replicate was 77.78 percent

reduction, correct?
A That's what it says.
Q Not a near 100 percent reduction, correct?
A No.
Q The third replicate was 77.78 percent, once again, correct?
A That's correct.
Q Not, again, near 100 percent reduction, right?
A That's correct.
Q And the fourth replicate was 52.78 percent, correct?
A That's what it says.
Q And then not -- also is substantially below 100 percent, right?
A Sure.
Q And then if you see over in the right, it says, "Bill, this is a copy of the results from A. niger testing. Typically, the results are somewhat inconsistent between replicates."
Did I read that correctly?
A That's correct.
Q Now, this is subsequent to the submission of the PMA supplement.
Did you, at any time, advise FDA subsequent to the submission of that supplement of these

test findings with respect to the New York test?
A No, I did not. Again, I do not know the nature of -- of this particular document.
If there had been evidence that these were, in fact, the true numbers versus what we would have submitted, FDA would have, in fact, been informed.
Q And you know for a fact that these numbers were generated by NAmSA.
Is that what you're telling me, sir?
A Yes.
Q You know for a fact that -- that this was generated at the time you worked for the company?
A That's correct.
Q You're telling me that you can recall and know for a fact that you reviewed this document, is that correct?
A I probably did.
Q Okay. And you're telling me that you -- you know for a fact that this document was not relevant or reliable, and therefore, you didn't submit it.
Is that what you're telling me, sir?
MR. KOHN: Object to -- object to the form.
THE WITNESS: I can't say that.

I don't --

BY MR. SIGELMAN:

Q Okay.

A Again, I don't know where this document came from and the reason they were doing the test.

I do know for a fact that they were having trouble with this test, getting it to be consistent from one to the next, and if -- at some time after we had done the original GLP test for this study, if they had figured out the test, you know, if they had run the test multiple times and these were, in fact, the true numbers, we would have notified FDA. But it seems like they were getting inconsistent results for some reason after the original tests were done.

Q So you -- you're telling me that the reliability of the testing was still in doubt after the submission of the supplement?

A In certain cases, it seemed to be.

Q All right. Did you tell FDA, with respect to the results that you felt were good for the efficacy of the Silzone, that the reliability of the test results were in question?

A No.

Q So in other words, they were -- weren't in

question when you had good results, but they were
in question when you had bad.
Is that what you're telling me, sir?
A You know, again, if there was some question -- if
they had, again, repeated these tests several
times and were comfortable that these were, in
fact, the numbers for a reduction of these
particular organisms, FDA would have been
notified.
Q All right. But -- but you never told FDA when
you submitted the data supposedly from these
tests that the reliability of the test itself is
still in question, correct?
A That's correct.
Q All right.
A Again -- you know, again, they were still in the
process of trying to develop these tests.
Q But you didn't tell FDA that, right?
A Not specifically, no.
Q You didn't tell FDA that they might look with
some skepticism on the numbers you gave them
because the tests still hadn't become reliable?
A Not specifically, no.
Q And as I understand your testimony, questions of
reliability didn't pertain to those tests that

you felt made the efficacy look good?
A Again, I was submitting documents to FDA. I was submitting documents to the FDA that were determined by the people that were doing these tests, in addition, Connie Roos, Dr. Tweden, and a few others, to be, in fact, reliable.
Q All right.
A Tests that were done outside of, you know, the scope of what we were trying to do, you know, if they were done in some type of range-finding test, I did not submit those to FDA.
Q All right.
A I was relying on these individuals to tell me what was reliable and what was not.
Q Okay. You don't know for a fact whether the tests on Exhibit 18 were part of a range-finding test, do you, sir?
A I don't really know. Again, I don't know the nature of why this was done.
Q Okay. Okay. You're speculating. You don't know for a fact that these were unreliable results, correct?
A I don't know if they were or they were not.
Q All right. Thank you. Sir, let's go on to the next exhibit.

(Whereupon, Deposition Exhibit Number 19 was marked for identification.)

BY MR. SIGELMAN:

Q Sir, this is a document on efficacy testing. Do you see that, sir?

A Yes.

Q There's the Dow Corning Shake Flask Test that's listed, correct?

A Yes.

Q That quantitates the level of bacteriostatic activity in solution, correct?

A That's correct.

Q There's the NYS63 Test, correct?

A Yes.

Q That quantitatively evaluates bacterial reduction by direct contact, right?

A That's correct.

Q And then there's a third efficacy test, is there not, sir?

A That's correct.

Q And that's the Parallel Streak Test, correct?

A Yes.

Q And that's a qualitative test commonly used by clinical personnel, correct?

A That's what it says.
Q And --
A I don't recall exactly what that test is.
Q All right. And did your company submit Silzone-coated fabric to all three tests?
A I don't recall if we did or not.
Q All right.
MR. KOHN: What's the date of this document?
MR. SIGELMAN: I don't know, sir.
THE WITNESS: It doesn't have a date on it. We submitted all the information we had at the time that submission went in.
BY MR. SIGELMAN:
Q All right.
A And they may have been, after that point in time, continually trying to develop tests to evaluate the efficacy of the Silzone.
Q If you had done Parallel Streak Testing, you would have provided the results to the FDA?
A Well, I think it depends. I just don't recall what exactly -- what -- what was done here and why it was done.
Q All right. But if you'd -- you had done Parallel

Streak Testing, you wouldn't have withheld the
results from the FDA, correct?
A It depends on the nature of why the tests were
done.
Q You never told the FDA that you did tests other
than the Dow Corning Shake Flask Test or the
NYS63 Test?
A Yes, that's true.
Q All right. Now, if you look under Parallel
Streak, do you see the second paragraph under
that?
It says, "We had variable results, which I
believe can be interpreted as stating that silver
is more effective" -- I believe there's a word
left out, but -- "in or on silver -- certain
strains of an organism," correct?
A That's what it says, yes.
Q Okay. Does that refresh your recollection as to
whether the Parallel Streak Test was, in fact,
performed on Silzone fabric?
A It apparently was performed on Silzone fabric.
Again, I don't know when this document was
written.
Q All right.
A This may have been a test they were trying to

Q And you never submitted those kinds of findings to the FDA, did you, at any time?
A No. Again, the information that got submitted to FDA -- and I -- I want to make this perfectly clear -- was information that was deemed, quote-unquote, reliable by the scientific staff that was working on -- on these particular tests.
Q All right. And do you know for a fact that those data aren't reliable?
A If they were not submitted to FDA, I guess I would say that, yeah.
Q You're speculating, though.
You don't know for a fact that they were not reliable, correct?
MR. KOHN: Object to the form.
THE WITNESS: Well, I guess I don't know for a fact, no.
BY MR. SIGELMAN:
Q Okay. And you'll agree with me that they were considerably less favorable than what you told the FDA?
A Sure.
Q All right. By the way, do you know whether NAmSA advertises that it does the Parallel Streak Test?
A I don't know if they do or not.

A No.
Q All right. Let's move on to the next document.
(Whereupon, Deposition Exhibit Number 22 was marked for identification.)
BY MR. SIGELMAN:
Q Sir, this is the document marked Runquist 22, and it's an Antibacterial Activity Assessment, again, using the Parallel Streak Test for Spire-coated fabric, all right?
Are you with me, sir?
A Yes.
Q And you see for treated -- and -- and by the way, you'll agree that the test article was received well after approval of -- excuse me, well after submission of the PMA supplement?
A What -- what is the date on this document?
Q Well, it was received on December 19, 1997, correct?
A I'm looking for a date here still. Yes, okay.
Q And for example, for candida albicans, once again, the treated sample showed not only no zone of inhibition, but no inhibition whatsoever?
A That's what it says here.
Q And to your knowledge, you never told FDA about

these test results, correct?
A No. Again, if the information was relevant to the Master Series Mechanical Heart Valve with Silzone, it would have been submitted. Again, I don't know the nature of this test or why they did it and how it relates to what we were doing.
Q All right. Let's move to the next document, sir.
(Whereupon, Deposition Exhibit Number 23 was marked for identification.)
BY MR. SIGELMAN:
Q Mr. Runquist, Exhibit Number 23, it's a summary of Silzone efficacy testing to December 3, 1996. Have you seen this document before, sir?
A I don't recall specifically if I have or not.
Q Now, if you look at this, it has two tests or test periods that were done for the Dow Corning Shake Flask Test, correct?
A Yes.
Q And only two, correct?
A Yes.
Q And the first group of tests were done using the Dow Corning Test on May 24, 1996, correct?
A That's correct.
Q And some of the results were fairly close to

A I don't recall.
Q And with respect to the Parallel Streak Test, you see testing on May 21, 1996, streptococcus pyrogenes, no zone, no inhibition, correct?
A That's what it says.
Q For treated?
A Yes.
Q And the same for candida albicans; no zone, no inhibition?
A Yes.
Q And you don't know for a fact as you sit here today that that was an unreliable test, do you, sir?
A No, I don't.
Q All right. And you do know for a fact that you didn't tell FDA about that, correct?
A I didn't.
Q All right.
A And, you know, again, the reason I didn't tell the FDA about that is because there was -- if this had been deemed reliable data and the scientific staff came to me and said, Hey, wait a minute, this is, in fact, reliable data, and we're comfortable with the way we're doing this test, and there are not issues, FDA would have

A I don't recall if I've seen this or not.
Q It's a March 24, 1998 memo from Barb Illingworth to Rich Schroeder, Bob Alan, and Bill Holmberg, correct?
A That's what it says, yes.
Q Do you see in the -- you'll agree with me, won't you, sir, that efficacy in vitro is one thing, but demonstrating it in whole animals or live human beings is quite another?
A Sure.
Q And if possible, it's better to try to demonstrate efficacy in a living organism than it is in a Petri dish or in a laboratory in an in vitro study?
A Absolutely.
Q If you go to the second page, sir, do you see where it talks about guinea pig experiments?
A Yes.
Q And do you see it for staphylococcus epidermidis underneath that?
A Yes. Uh-huh.
Q And you see under that, it says, "Silzone versus Dacron"? Do you see that?
A Yes. Yep.
Q Do you see where an experiment is being recounted

where there was no difference in the organisms extracted, about 500 per fabric sample?

A That's what it says.

Q Were you aware of that, sir, that a study had been done in guinea pigs showing that?

A I recall that they were trying to develop an animal model, and again, they were doing that for the exact reason you had indicated. It's a whole lot better to try -- try to doing something in a living organism versus in a Petri dish. And I believe -- and I may be speculating a little bit here, but I -- I know they were trying to develop a -- an animal model, and I think that's what this was a part of. They were never able to successfully develop a model or validate or verify the model.

Q Well, I'm not asking you to speculate, however, sir.

Do you know whether your company actually published guinea pig data for efficacy?

A I don't recall if they published data in the guinea pig.

Q You don't recall?

A No.

Q Did your company ever publish guinea pig data

showing there was no difference in the organisms
that were eliminated or reduced or affected as
between Silzone and a non-Silzone Dacron fabric?
A I don't recall that we did that, no.
Q Did you ever tell the FDA that in a study done by
St. Jude scientists, no difference in the number
of organisms had been shown in a comparison
between Silzone and non-Silzone Dacron fabric as
relates to staphylococcus epidermidis?
A No, we didn't specifically tell FDA that. Again,
this -- this effort was part of trying to develop
a valid model for evaluating Silzone. This --
we're back to the range-finding tests again.
Q You're sure of that?
A I'm -- yes, I am.
Q And you're confident that these data would never
have -- no data in the guinea pig, for example,
would have achieved sufficient reliability to be
published by a St. Jude scientist?
A That was my understanding.
Q All right. Barb Illingworth, for example, never
published guinea pig data. Is that what you're
telling me, sir?
A I don't -- I don't recall that she did.
Q All right.

is at this point in time -- some kidney and
neurological problems.
Q All right.
A So again, those were some manifestations of -- of
toxicity.
Q All right. And this was toxicity in the blood,
correct? Correct?
A I -- I believe so, yes.
Q And serum?
A Yeah.
Q All right. Now, of course, parts of the body
other than serum would get silver if it leached,
correct?
A Conceivably.
Q Okay. For example, tissue, correct?
A Sure.
Q What was the lowest toxic dose for tissue?
A I don't really know. I believe it was still that
-- we were still using that 300 parts per billion
value.
Q Do you know for a fact whether the 300 parts per
billion pertained to blood or serum as opposed to
tissue?
A I -- I just don't recall.
Q Would that be important?

A Conceivably, yes.
Q All right. Because you could have a lower level of toxicity, for example, in tissues, perhaps, in the circulation, correct?
A That's conceivable.
Q All right. Now, did your company, prior to the submission of the PMA supplement, ever try to ascertain what the toxic threshold would be for various tissues?
A I recall there was some work done there.
Q All right.
A I just, again, don't recall exactly.
Q Okay. Did you report any toxicity threshold for any tissue that might get silver as a consequence of the Silzone coating?
A I do remember there were some tests that were done in tissue, yes.
Q Do you remember tests that came up with a toxic threshold level for toxicity to tissue?
A That came up to the -- our toxic threshold?
Q That came up with a level that said that up to so many parts per billion or parts per million, you will not have toxicity to human or animal tissue?
A I -- I guess I don't recall specifically.
Q Okay. And you certainly didn't present any such

Q Would -- would that meet GLP requirements?
A I'd -- I'd have to go back and look through regulation. Probably not.
Q All right.
A I -- I don't know.
Q And then you see down where it says, KTMV-2 C1?
Do you understand C1 to be a section for the coded part of the valve?
A Yes, that's coated and uncoated.
Q And the specimen consists of cardiac muscle, clot-embedded synthetic material, and reactive fibrous tissue, correct?
A That's correct.
Q "Extensive areas of black particulate matter are present in the reactive fibrous tissue, but not in the immediate region of the synthetic fibers," correct?
A That's correct.
Q What was that black material, sir?
A That material was evidently some silver that had migrated from the sewing cuff.
Q So the silver was of sufficient quantity at this relatively early stage in the study for this animal that it was observable?
A It was observable in the section.

Q All right.
A Again, we're talking about very, very small particles here.
Q There -- but there was observable silver in the tissue?
A In the sections, yes.
Q And to your knowledge, what efforts were made by your company to measure the amount of the silver observed?
A In this particular case, I -- I don't know if they actually specifically measured the amount of silver that was there.
Q Was it of any concern that there was this silver in the tissue that was of sufficient quantity at this early stage to be observable?
A In this particular animal, it was certainly discussed in some detail.
Q Was there concern?
A No, not necessarily.
Q When you say "not necessarily," was there some concern?
A No. Because this -- this was the -- the same type of reaction that we had seen in the animals that had survived the entire length of the study.
Q You saw extensive areas of black particulate

weren't you, sir?
A That's correct.
Q And you would participate in their deliberations and look at the documents that were generated as a consequence, correct?
A Yes, I did.
Q And if you look at Exhibit Number 29, it has your name on it, and this is the AB cuff Design Review, October 24, 1996, correct?
A That's correct.
Q And if you go to page 30285 --
A Of Exhibit 29 or 30?
Q Yes, yes, Exhibit 29.
A What was the number, again?
Q 30285?
A 30285. Okay.
Q And under Histology -- do you see that, sir?
A Yes.
Q And this is animal studies for the AB cuff -- AB stands for antibacterial?
A Yes, it does.
Q And it says, "No extracellular silver identified at 30 days," correct?
A That's what it says, correct.
Q It says, "10-day specimen, see silver

particulates at cardiac tissue interface for
coated specimen," correct?
A That's what it says.
Q Was that referring to the animal that we just
discussed?
A It -- it may have. I don't really know exactly
what this is referring to.
Q Do you know of any other animal for which a
10-day specimen was available?
A No, I guess not.
Q All of the animals went to 30 days, except this
animal, correct?
A I believe that's true.
Q And if you go to page 30288, it references a
10-day early death, doesn't it, in this animal
study?
A 30288. Sorry. I think I'm on the wrong page.
30288?
Q Yes.
A Duration -- yes. Yes, it does.
Q All right. So the project team was discussing,
in October of 1996, the fact that an animal had
died in that study and that there had been silver
particulates found at the cardiac tissue
interface for the coated specimen, correct?

A That's correct.
Q And by the way, in the pages that we've looked at from this document, there's no mention, is there, of any surgical error that -- that caused or contributed to the animal's death?
A Again, I'd have to go back and look at all of these pages, but that -- that could be true.
Q All right.
MR. SIGELMAN: I, unfortunately, only have one of these, so I'm going to have this marked. I'm going to read from it and then show it to you.
(Whereupon, Deposition Exhibit Number 31 was marked for identification.)
BY MR. SIGELMAN:
Q And it has my highlighting on it so you'll know what exactly you should be looking at.
Sir, do you recall getting what's been marked as Exhibit 31? I'll first show it to you, and then you can hand it back.
A I do remember something about this document, yes.
Q All right.
A Vaguely.
Q Okay. Exhibit 31 is a letter from William

inflow aspect appears to be a consequence of the pannus," correct?
A That's correct.
Q So you had excessive pannus and thrombus, correct?
A That's what it says.
Q Those aren't normal findings, correct?
A Again, this -- this is something that -- you know, I'm not an expert in this area.
Dr. Tweden, I think, could help answer a lot of these questions.
Q Okay. To the extent that you know, because you've been expressing what was and wasn't significant today --
A Sure.
Q -- what was and wasn't reliable, what was and wasn't caused by the valve, is that an abnormal finding; having thrombus and excessive pannus on the inflow aspect of the orifice?
A The thrombus, I can't really address. But the pannus, having excessive pannus is not normal.
Q And then he goes on, "Two rather prominent green suture knots are directly adjacent to the pivot guards, and other sutures around the orifice in the area of the incorporated hemileaflet are

covered by neointima," correct?
A Correct.
Q Then he goes on, "While the relationship between the sutures and the pannus is uncertain, no other cause for excessive tissue in -- overgrowth is apparent," correct?
A That's what he says.
Q Okay. He doesn't say, does he, that the sutures probably -- or excuse me.
He doesn't conclude that the sutures caused the tissue overgrowth, correct?
A He doesn't quite come out and say it, but he does imply it.
Q Well, he doesn't say it, does he?
A No.
Q He doesn't say, I conclude that this is the cause, correct?
A That's correct.
Q He said it was uncertain, correct?
A That's correct.
Q And yet, months earlier, you told the FDA that he had concluded that, correct?
A I guess so, yes.
Q All right. And if you look at this letter, at least based on this letter, that's not a true

statement, is it, sir? That's not his definite conclusion.
A You're right. He doesn't come right out and conclude that.
Q All right.
A But again, the analysis that was done by St. Jude in combination with Dr. Schoen, that was the conclusion of this particular incident.
Q Well -- but you told -- you told FDA that Dr. Schoen's conclusion was that the suture tails caused the pannus overgrowth. That's not what he said.
A Well, not exactly, no.
Q All right.
A But again, this was provided to FDA. They had an opportunity to look at this.
Q It -- it was provided months after you told the FDA that, correct?
A They hadn't approved the device at that point.
(Whereupon, Deposition Exhibit Number 37 was marked for identification.)
BY MR. SIGELMAN:
Q Mr. Runquist, you've been handed what's been marked as Exhibit 37.

Do you recognize this document? Have you ever seen it?
A I don't know if I have seen this or not.
Q Okay. It's a --
A I certainly have not seen it recently.
Q It's an E-mail dated July 29, 1997 from Bill Holmberg to Fred Schoen at Harvard, correct?
A Okay.
Q And in the third paragraph, it's talking about Dr. Tweden.
"Katherine is preparing a manuscript for publication in the journal of heart valve disease," correct?
A Correct.
Q And this animal work is part of the manuscript, right?
A Correct.
Q "She would like to state that the cause of the overgrowth is uncertain."
They're talking about the same animal, correct?
A It appears that way.
Q "But the long suture tails and knots are a probable cause," correct?
A That's what it says.

Q "And she would like to mention in the manuscript that you have reviewed this specimen," correct?
A That's what it says.
Q "Katherine is no longer with St. Jude Medical, but would like to know if it would be okay to use your name in the manuscript regarding this," correct?
A That's what it says.
Q So on its face, they're asking Dr. Schoen if he would lend his name to a conclusion that the long suture tails and knots are a probable cause of the pannus overgrowth in Animal Number 8, correct?
A That's what it says.
Q And does Dr. Schoen say that he would agree to that?
A I don't know. Do you have --
Q Well, if you look down at the bottom, you see the reply by Dr. Schoen?
He says, "I prefer not to be quoted word for word, but it is acceptable to mention in an acknowledgment that the 'gross specimens' was or were reviewed by Dr. Frederick J. Schoen, Brigham & Women's Hospital in Harvard Medical School, Boston," correct?

A That's correct.
Q He doesn't say that he would agree to lend his name to a conclusion that the cause of the overgrowth, while being uncertain, is probably attributable to the long suture tails and knots, isn't that correct?
A That's what he infers, yes.
Q Okay. And to your knowledge, did your company, in 1997 when you were in regulatory affairs, tell FDA that Dr. Schoen wouldn't even lend his name to a conclusion that the suture tails were a probable cause?
A No.
Q All right.
A We did not. We supplied, again, FDA with this letter.
Q Right. And you didn't -- you didn't supply them with this E-mail or at least tell FDA what Dr. Schoen had apparently said in the E-mail?
A No.
MR. KOHN: Let's take a break after this next one, Dan.
MR. SIGELMAN: Sure.
MR. KOHN: It's been over -- well over an hour.

Q All right.
A If the scientific staff had done these tests and said, Hey, wait a minute, we have a hemolysis problem here, they would have notified me.
Q But you don't even know of any issue raised about hemolysis and Silzone after approval of this device, correct?
A I -- I don't recollect it -- recollect any.
Q All right. So it would be fair to say that you, as the regulatory person with day-to-day contact with FDA, never told anything to FDA about hemolysis and Silzone, correct?
A No, that's correct. Again, this was done with a completely different valve.
Q I understand. Let's go on and see what further elucidation we might have of whether Silzone, as opposed to some part of a Silzone containing product, was responsible for hemolytic findings in an in vitro study.
(Whereupon, Deposition Exhibit Number 40 was marked for identification.)
BY MR. SIGELMAN:
Q Mr. Runquist, you've been handed what's been marked as Exhibit Number 40. It's a November 18,

1998 memo from Constance Shay?
A Correct.
Q Did you know her?
A I did, yes.
Q And who is she?
A She was the microbiologist at the time.
Q All right. Summary of hemolysis testing to date?
A Correct.
Q Were you -- were you aware of any such summary being amassed?
A I may have been. I just don't recall specifically.
Q And you see a lot of -- a lot of products that were tested, correct, that are listed?
A Correct.
Q If you go to the second page of the document, do you see, under the first table, she writes, "In order to determine if the base fabrics or sterilization conditions were causing an increased hemolytic level, a design of experiments was conducted," correct?
A Correct.
Q "The results indicated that the silver coating was definitively the cause of hemolysis, and the method of sterilization used on the fabric did

not significantly affect the level of hemolysis," correct?
A Let me read this one more time here.
Q Sure.
A Okay.
Q Did you know that?
A Again, I just don't recall specifically.
Q Is that something that you should at least have been told about to determine whether, as someone responsible for communicating with the FDA, you needed to talk to them?
A Conceivably, yes.
Q All right.
A But again, I'm looking at this here. All the tests that were done with nontissue valve-related devices all had a very low hemolysis.
Q Well, but they're -- they did identify Silzone as a cause of hemolysis definitively in this document, correct?
MR. KOHN: Object to the form.
THE WITNESS: That's what it says.
MR. SIGELMAN: All right. Let's go on to the next document.
(Whereupon, Deposition Exhibit

employer, St. Jude Medical. It says, "The initial failure of the hemolysis test for the Epic covered stent has been traced to the silver coating."

Did I read that correctly?

A That's evidently based on whoever did the testing. That's correct.

Q It says, "Component testing of all covered stent materials was conducted that isolated the cause of hemolysis to the Spire-coated fabric," correct?

A That's what it says.

Q It says, "Further testing of coated and uncoated barred and Meadox fabrics isolated the cause of the hemolysis failures to the coating itself," correct?

A That's what this document says.

Q And it said, "All previous product validations which incorporated the Spire coating have passed hemolysis testing. However, recent testing of clinical devices pulled from stores have resulted in some failures of the hemolysis test."

Did anyone tell you that, sir?

A Again, I -- I don't recall this document at all.

Q It goes on, "The individual coated fabric

component had not been previously tested by SJM for hemolysis."

That's correct, right?

A No, we were relying on -- on Spire data for that.

Q And in fact, it says, "Regulatory submissions incorporated data from Spire indicating the coating was nonhemolytic and data from SJM indicating the complete finished device was nonhemolytic," correct?

A That's correct.

Q And in fact, that's what, indeed, did happen; you relied on regulatory submissions incorporating data from Spire, correct?

A That's correct.

Q "But recent results from recent testing of the Silzone MHV" -- that's mechanical heart valve? --

A That's correct.

Q -- "have shown an increase in hemolysis level from the original validation," correct?

A That's what it says.

Q Did you know that?

A Again, I -- I don't recall.

Q That's not unique to the Epic Valve, is it, sir?

A That's -- according to this document, that's true.

Q They're talking about the Master Series Valve
that was pulled from the shelf, correct?
A Again, I --
MR. KOHN: Object to the form.
THE WITNESS: I do not know
where this document came from. I don't know what
date it was written. I don't know who did the
testing. I don't know much about this document
at all. I don't know, again, if this was a
preliminary test someone was doing, if they were
trying to develop a test for doing hemolysis.
Again, I really don't know much about the origin
of this document at all.
BY MR. SIGELMAN:
Q All right. What was being done in Japan for
which you had contact with Koizumi?
A I just don't remember to be honest. I -- I think
they were having some issues with hemolysis
testing they were doing as well.
Q You do recall that now?
A Well, vaguely.
Q Okay. And were they -- was that with respect to
the Master Series Valve?
A I believe so, yes.
Q All right. So now you recall that. You didn't

marketing in Japan, it was with respect to the Master Series Valve with Silzone, correct?
A I believe that's correct.
Q Okay. If you go to the second page, it says, "Regulatory concerns, Epic Canadian submission," correct?
A That's what it says.
Q All right. Then it says, "Japanese Silzone MHV hemolysis failure," correct?
A That's what it says.
Q And that's consistent with what you just said, which was there was a failure of the hemolysis test for the Master Series Valve with Silzone in connection with Japan, correct?
A That's what this says.
Q And did you hear of any testing of actual Silzone Valves pulled from stores that failed the hemolysis test?
A I just don't recall to be honest with you.
Q Okay. And when you were dealing with these issues with Japan, would it be fair to say you never brought FDA into the discussion at all to say that you had either preliminary or less than preliminary evidence of hemolysis failures with the Master Series Valve with Silzone?

A No, that's correct. We didn't tell FDA about that at the time. Again, we do not submit things to FDA that are preliminary.
Q What I --
A We submit things to FDA that are conclusive and scientifically valid.
Q Okay. Well, with respect to the Silzone and just the Silzone that was in an Epic Valve, that had been definitively, according to the documents that we've looked at, isolated as the cause of hemolysis failure, correct?
A Accord --
MR. KOHN: Object to the form.
BY MR. SIGELMAN:
Q Pardon me?
A According to those documents.
Q All right.
A Again, I don't know the source of those documents and who was working on them.
Q Sure. All right. But -- but just for the record, you've never submitted anything, to your knowledge, subsequent to the initial submission of the PMA supplement for Silzone -- and I'm now speaking of submissions to FDA -- concerning any failure of hemolysis testing and in vitro tests

for any Silzone product, including the Master Series Valve with Silzone?
A That's correct.
Q All right.
A If we would have had conclusive evidence from the testing that was done that the Silzone coating was, in fact, causing hemolysis, that would have been sent to FDA.
Q Do you know for a fact that the evidence wasn't conclusive?
A For a fact sitting here today?
Q Right.
A No.
Q All right. Thank you. Let's go back, if we could for a minute, to the Exhibit Number 12, and I would like, if possible, sir, for you to go to page 3499.
A Where is that in the document, approximately?
Q It -- well, I have a somewhat abridged version, but I would say it's probably past the middle.
A Okay.
Q And the previous page says Attachment 14, correct?
A That's correct.
Q Could you pull out pages 3498 through 3500 and

toxicity in humans as compared to mouse fibroblasts, correct?
A That's what it says.
Q All right. So what you were telling Lisa Kennel was that your toxic threshold for fibroblasts was 1.2 parts per million of silver, correct?
A That's what it says.
Q And in lay terms, cell death did not occur below 1.2 parts per million of silver?
A That's what it says. Again, this document, I would like to spend some time reviewing.
Q Sure.
A It's been an awful long time since I've looked at this.
Q Sure. Please do. We have plenty of time.
MR. KOHN: No problem.
THE WITNESS: Yeah. Again, I'm having a difficult time just remembering exactly what we did here.
BY MR. SIGELMAN:
Q All right. But in any event, you were telling her that cell death occurred at 1.2 parts per million and above and essentially not below that level in this study, correct?
A That's what it says.

Q That was the threshold, correct?
A That's what it says, correct.
Q All right. Now, what is the threshold for annular tissue in terms of toxicity of silver to fibroblasts?
A I can't really answer that question. I don't know.
Q You -- you didn't tell anything to Lisa Kennel about that, is that correct?
A No, we didn't.
Q And I know you have somewhat of a scientific background, correct? At least --
A Sure.
Q -- through osmosis you studied science, correct?
A Sure.
Q What is 60 milligrams divided by 1 gram in terms of parts per billion or parts per million? Can you --
A You're testing my math. 60 divided by 1?
Q Yeah. Here, please. You can --
A Yeah.
Q I don't want to -- I want you to have time, too, so this is not the College Bowl.
A What am I doing now? What are the numbers?
Q 60 milligrams over 1 gram.

A Okay. That's 1,000 milligrams, I believe.
Q So what would that translate to in terms of, say, parts per billion or parts per million?
A I don't really know, and I'm reluctant to even try to do this, okay?
Q All right. Is that correct?
A That's correct.
Q Because you just don't feel you have the competence?
A That's correct.
Q All right. Would it be 60 parts per million, sir?
A Again, I -- I'd need to think about this a bit.
Q All right. If it were 60 parts per million, would that be a level that would be toxic if we were basing it on the human fibroblast study that was featured in Dr. Tweden's article?
MR. KOHN: Object to the form.
THE WITNESS: I'm not sure.
BY MR. SIGELMAN:
Q You don't know?
A No.
Q It might be; it might not?
A Again, I -- I hesitate to even try to answer that right now.

Q Okay. Well, if the toxic threshold is 1.2 parts per million for silver toxicity of fibroblasts and you had 60 parts per million, would it follow that 60 parts per million would be toxic to fibroblasts?
A Again, I'm going to try not to answer that question. This is getting beyond my expertise.
(Whereupon, Deposition Exhibit Number 57 was marked for identification.)
BY MR. SIGELMAN:
Q I've handed you, sir, what's been marked as Exhibit 57. It's a poster entitled "Systemic Silver Evaluation, A Study of Silzone Heart Valves."
Have you seen this before, sir?
A I believe I have seen this.
Q All right. And I'll let you look at it as much as you need to. I'm really just -- I'm going to ask you about something on the second page only, but --
A Okay.
Q I don't want to deprive you of the opportunity of reviewing the document if you feel it's necessary.

You know these gentlemen, do you not, who authored it?
A Yes, I do. I don't know Anees Razzouk personally or the other gentleman.
Q You know Matt Ogle?
A I know Matt Ogle.
Q Doug Cameron?
A I know Doug Cameron.
Q Richard Bianco?
A I know of Richard Bianco. I do not know him personally.
Q Do you know Ross Lirtzmann?
A I do not.
Q Do you know Richard Schroeder?
A I do.
Q And Bill Mirsch?
A Yes, I do.
Q And Mirsch, Schroeder, Ogle, they were all St. Jude employees, correct?
A Yes, at the time.
Q And the others were not St. Jude employees?
A That's true. Lirtzmann, I have no idea who he is.
Q I believe he was with Biosurge in Winter, California.

A Again, all of this was work that was being done by the research and development group.

Q All right, sir. Going on to the second page, do you see where there's a table "Bioprosthetic Valve Evaluation"?

A Yes.

Q And it gives you silver levels in the host tissue. Do you see that, sir?

A Yes.

Q Were you aware that there were evaluations of silver levels in host tissue going out to 52 weeks in animals?

A I vaguely had some recollection of this. I -- I think it was only one animal that went out that far. I don't recall they did --

Q What -- what study was that, sir?

A I just don't recall. This may -- this looks like it -- it says, "Bioprosthetic Valve Evaluation," so it was a tissue valve. This may have been Epic. I'm not exactly sure.

Q All right. Do you have any recollection of telling FDA what the silver levels were in host tissue going out to 12 weeks, 20 weeks, and 52 weeks in an animal study?

A No.

Q Is it your best recollection that the last time you told FDA about any silver levels in annular or host tissue was in the PMA supplement that you submitted to the FDA for the Master Series Valve with Silzone in 1997?
A That's correct. I don't remember. I don't believe there was anything submitted in one of the amendments after that period of time.
Q All right. And do you recall telling FDA in the PMA supplement, and repeating this on other occasions, that when you looked at silver levels in serum or blood, that you would get an initial spike or peak, it would reach a plateau, and steadily decline to background levels?
A That's correct. One of the things that we did provide in the PMA supplement was some of the initial human implants that -- that were done with the Silzone Valve in the Netherlands, and as a part of that study, we did measure serum concentrations of silver. So that information was provided to FDA.
Q And it would be difficult, from an ethical standpoint, to measure silver levels in annular tissue of human beings, correct?
A That is -- that is certainly correct.

Q So you would probably want to rely on animal
data, if you were looking at that issue,
correct --
A Correct.
Q -- in a scientific, methodical fashion?
A Sure.
Q And you also looked at and reported on the rising
and declining silver levels in systemic
circulation or blood or serum --
A Serum.
Q -- in animal studies, correct?
A That's correct.
Q And the last time you did that was in 1997, but
you repeatedly talked about that to the FDA,
correct?
A And we also did that in humans.
Q All right. And -- and one of the things that you
were telling the FDA is that the levels don't
steadily increase, but in fact, they decrease to
background eventually, correct?
A In the serum, that's correct.
Q Now, if you look at these data, would you agree
with me that as you go from 0 weeks to 12 weeks
to 20 weeks to 52 weeks, you have accumulations
of and increases in the levels of silver in the

host or annular tissue?
A I need to study this a little bit.
Q Sure, please do.
A You know, I just haven't looked at this in an awful long time.
Q Well, let's look at it together.
Do you see where it says, "Host tissue, milligrams of silver over grams"?
A Yes.
Q At 0 weeks, obviously not applicable, correct?
A Correct.
Q So you see where it says, "N/A"?
A Yes.
Q And at 12 weeks, it says, "0.027 milligrams of silver per gram, plus or minus 0.004," right?
A Correct.
Q And then you go out 8 more weeks so that we're at 20 weeks, and it's increased, hasn't it?
A Looking at 20 weeks, it says -- is that 207 or 20 --
Q No, I'm looking at the Host Tissue on the right.
A Host Tissue. It goes -- I'm having a hard time reading this document.
Q Okay.
A It did not copy well.

Q Okay. It's 0.041, plus or minus 0.001, correct?
A That's correct.
Q So it's increased from .027 to .041 with some deviation?
A I do not have a feeling -- I do not have a sense, I should say, how sensitive the instrumentation they were using for this. I -- I just don't know.
Q Well, this was what's in the poster that you see here, correct?
A That's correct.
Q And you've never seen these data before, correct?
A Well, I probably have seen it, but it's -- it's been an awful long time since I've looked at this.
Q And then at 52 weeks, it's risen even more from .041 to .062, plus or minus 0.002, correct?
A That's correct. But again, I do not have a sense for how big of a change that is, and is that within the -- the level of the instrumentation?
Q All right. Let me ask you this, sir: Those levels are far in excess of what you see, for example, in the liver and kidney.
A Okay.
Q You see where liver and kidney levels are?

A Yep.
Q You'll agree with that, right?
A Sure.
Q Because at that level, you're at micrograms per gram, correct?
A Correct.
Q So based on these data at least, in the annular tissue where it was studied by your company, you had accumulations of silver and, in fact, increased levels of silver in the heart or annular host tissue, correct?
A That's what this says.
Q All right.
A Again, I do not have a sense for how big or how small those numbers are.
Q Well, I understand that. But -- and you repeatedly told FDA about the increases, the plateau, and the decreases in blood levels of silver, correct?
A That's correct.
Q Did you ever tell FDA what your company had found with respect to the accumulation of and increases in silver levels in annular tissue in animals?
A Not to my recollection. Beyond what we told them in the original PMA, I don't believe we told them

anything more than that.
Q And as I understand it, you don't know whether .062 milligrams of silver per gram, which is the level that was averaged for 52 weeks, translates to 52 parts per million?
A Again, I -- I haven't looked at this in a long time, and I just don't feel like I'm in a position to make comments on it.
Q And at the time that you did look at it, did you ask anybody whether these were reliable data?
A I don't recall.
Q Do you think that people in your company would put out a poster with these data if they thought it weren't reliable?
A Probably not. But they wouldn't have put a poster -- I don't think they would have actually have put this poster out if they would have been concerned about it from a safety standpoint, either.
Q Right. Let me ask you this, sir: Did your company ever put this out?
A I don't know. To be honest with you, I don't really know.
Q Do you know if this poster was published?
A I don't know.

Q Do you know whether a shorter version of this poster was published without those data?
A I don't really know. I have no idea.
Q And would it be fair to say that you don't know whether .041 or .027 or .062 milligrams of silver per gram is toxic to fibroblasts in the host tissue area?
A I certainly don't have a sense for that at all.
Q And what would have been the context in which you would have reviewed these data? You said you think you saw these data before?
A I may have. I just -- again, I don't recall.
Q Now, you talked about the Regent study a minute ago in animals, correct?
A Yes.
Q With respect to the Epic study, were there any abnormalities found in any animal study of the Epic Valve?
A Not that I recall. I did not thoroughly review the Epic study.
Q All right. If there were abnormalities, you certainly didn't pass them on to the FDA at any time, correct?
MR. KOHN: Object to the form.
THE WITNESS: I wasn't aware of

perivalvular leaks in two animals, correct?
A That's what it says.
Q And those are both Regent animals, correct?
A That's correct.
Q So in this study, you had four sheep with perivalvular leaks, correct?
A That's what it --
Q Two of whom -- or two of which had multiple leaks.
A That's what it says.
Q All right. And is it your testimony that that's normal in sheep, 4 out of 9?
A I don't really know. Again, no one seemed terribly concerned about it at the time.
Q Well --
A And this information, again, was submitted and provided to the FDA.
Q Well, it was submitted months later as part of an IDE, was it not?
A That is correct. But again, if this had raised concern for whatever reason, that's something that we would have submitted to the FDA.
Q Well, if it had raised concern with people at St. Jude, is that what you're saying?
A Sure.