# Exhibit 13

believed to be toxic to tissue, i.e.- 1,200 p.p.b.[10] Instead, Dr. Tweden conducted a misguided study by using solutions that destroyed the concentration gradient, and potentially very high silver concentrations, as reported in her article, "Biocompatibility of Silver-Modified Polyester for Antimicrobial Protection of Prosthetic Valves," cited above. In that study, Dr. Tweden developed a cell compatibility assay that used mixed and diluted solutions derived from silver-coated fabric of the SJM Silzone heart valve. This solution extract eliminated any concentration gradient by the process of mixing and creating a solution with an average silver concentration much lower than the local (i.e. near the implant) concentration.[11] Subsequently, this extract was *diluted* and then used to challenge fibroblast viability and function. This dilution should not have been done. At 90% full strength, the concentration of silver in the extract was 1.2 p.p.m. (or 1200 p.p.b.), well above the level suggested by Dr. Tweden and Mr. Langanki, another SJM research scientist, as toxic. The concentration at full strength was not reported. Based on these data, one would expect the concentration of silver adjacent to the Silzone implant to be possibly

[10] Dr Tweden testified in particular on this point:

Q. Okay. And it would be fair to say that you don't know for a fact that the twelve hundred part per billion level that you estimated at the concentration that killed some fibroblast cells, whether the levels that were immediately adjacent to a sewing cuff in a local tissue concentration gradient environment were substantially higher than twelve hundred parts per billion? You don't know one way or another whether that's true, correct?
MR. GATTONI: Objection, form.
THE WITNESS: We did not -- we did not measure that. However, again, it's really the nature of the tissue ingrowth, the histology that showed us: Is there any abnormalities in tissue ingrowth that would have been influenced by that higher gradient?

Tweden, Katherine Day 2 (MDL) page 587-88

[11] Dr. Tweden testified that the study methodology used eliminated any local tissue concentration gradient that may have existed. Tweden Dep. at 586-87.

orders of magnitude higher than 1200 p.p.b. When the extract was exposed to cells at full strength (approximately 1300 p.p.b.), the authors observed lower cell density, less cell orientation, and more damaged membranes compared to exposure to the diluted extracts (i.e., < 85%). As the authors destroyed the concentration gradient, the mixed and diluted silver solution used had a silver concentration much lower than that in the region near the implant. As the investigators did not maintain the concentration gradient that would have exposed cells to much higher silver concentrations adjacent to implant, as was demonstrated by the Hemmerlein paper, the grossly toxic effects of silver were not observed. This shortcoming is an extremely important one distinguishing Hemmerlein from the SJM studies, and is one that anyone reviewing the safety of placing a silver coating permanently in heart tissue would want to be aware of and take into account.

50. Prior to putting Silzone valves into the marketplace, it was crucial for SJM to read the Hemmerlein paper and to understand the risks to human cells and, particularly, to fibroblasts, associated with elevated concentrations of silver adjacent to the silver-coated implant and to thereafter call it to the FDA's attention in their supplemental submissions.

51. SJM did not cite or provide the Hemmerlein paper in any of the updates to PMA #P810002 submitted to the FDA or, according to Mr. Runquist, to the FDA at any time in connection with the Silzone heart valve. (Runquist Dep. at 349.)

52. From the material I have reviewed, it is my opinion that SJM did not properly address the issues raised in the Hemmerlein paper. This is because, as discussed above, SJM approached the issue of silver toxicity in the wrong way. To assess the safety of their device, SJM examined the systemic distribution and toxicity of silver in blood and organs distant from the implant site. Although these data are necessary for examining whole animal toxicity and

safety, the critical issue to investigate is the local concentration of silver adjacent to the silver-coated fibers and the effect of this silver concentration not only on cell toxicity, but also on impaired or retarded cell function. Further, based on diffusion theory the silver concentration at the source (i.e., the implant) has to be higher than in remote sites. Thus, the measurement of silver concentrations in blood and distant organs represents the *lowest* amount of silver exposed to the body. The systemic concentration of silver in a solution or in tissue as a whole ("systemic toxicity") is only a small part of evaluating the safety of the Silzone heart valve. The real issue that SJM should have attended to, as evidenced by the Hemmerlein article, is the concentration of silver in the cells directly adjacent to the device, i.e "local toxicity or impairment of cell function,", a toxicology concept that SJM's Dr. Tweden was aware of.

53. There are other articles that were readily available and crucial for SJM to review. In 1989, Ellender and Ham examined the effect of silver-loaded ion exchange resin beads implanted into loose rat connective tissue in "Connective Tissue Responses to Some Heavy Metals. III Silver and Dietary Supplements of Ascorbic Acid. Histology and Ultrastructure" (Br. J. Exp. Path 1989; 70:21-39) (the "First Ellender and Ham paper"). This study is particularly noteworthy as the authors developed the exchange resin beads to act as vehicles that delivered a predicable amount of silver to the local tissue without the complicating influences arising from systemic toxicity or local foreign anions (negatively charged ions). They noted the following effects within the area proximal to the silver-releasing beads:

(a) the initial lesions showed dead tissue and subsequent tissue organization was "delayed and disordered";
(b) fibroblasts and macrophages had their internal organelles altered;
(c) the extracellular matrix (ECM) contained poorly-oriented collagen fibers and other matrix components were altered;
(d) the silver delayed tissue repair; and

(e) morphological changes within fibroblast and macrophages were maintained even when attempts were made to ameliorate the effect of silver.

54. There was also a second Ellender and Ham article published in 1989 entitled "Silver Wire Implant of 40 Years' Duration: Influence on Local Tissues" (L. Oral Implantology, 1989, Vol. XV/No. 1:47-51) ("Second Ellender article"). The Second Ellender article was one that SJM AB Cuff team clearly was aware of and discussed internally. It appears to have been the only article addressing the long term effects of implanted silver that SJM was aware of. In Dr. Tweden's literature review of December 7, 1996 to the AB cuff project file entitled "Literature Review on Silver Toxicity and Endocarditis," she fairly summarizes the Ellender and Ham article with the following bulleted statements (0030966.tif):

- "Silver wire implant of 40 years' duration influence on local tissues."
- "Silver wire used for surgical fixation of the frontal bone for 40 years."
- "Tissue response evaluated."
- "Tissue blackened around wire two millimeters, around a knot up to six millimeters."
- "Vessels walls in Haversian system filled with silver particles."
- "Chronic inflammatory response."
- "Heavy levels of silver around vessels and collagen."
- "Silver has affinity for DNA."
- "The toxicity of silver cationic is attributed to its ability to form stable complexes with structural and functional proteins and thereby disrupt life processes."
- "This group believes silver disrupts primarily the biosynthesis of connecting tissue matrix."
- "Conclusions, metallic silver is not a biocompatible material, and caution should be used when used directly as an implant in dental practice."

This article was discussed at an internal AB Cuff team meeting on October 24, 1996. (0124795.TIF; Tweden Dep. 331-35) The article clearly raised the fact that when silver is used as a long-term implant material, as contemplated by SJM, it generates a long-term chronic inflammatory response. It should have been obvious to any professional trained in biomaterials science and engineering, that caution should be exercised when employing silver as a long-term implant given its questionable biological performance and associated negative local tissue

response. Yet despite this paper's obvious materiality to the issue of biocompatibility, it was, according to Mr. Runquist, never cited or provided by SJM to the FDA. (Runquist Dep. at 320-25)

55. Another relevant manuscript addressing the toxicity of silver-containing antimicrobial agents on human fibroblasts is McCauley *et al.* (Journal of Surgical Research 1989, Vol. 46: 267-274) which demonstrated that dose-dependent concentrations of silver sulfadiazine in the range of 13 to 56 p.p.m. were sufficient to significantly reduce cell proliferation and protein production. These observations supported observations of delayed wound healing, a process dependent on fibroblast proliferation and collagen deposition, in burn patients treated with topical antimicrobial agents containing silver sulfadiazine. This negative article, according to Mr. Runquist, likewise was not submitted to the FDA (Runquist, 326-27).

56. There was also a material article in existence by Holinger, a toxicologist, ("Toxicological Aspects of Topical Silver Pharmaceuticals," Critical Views in Toxicology 26(2):255-260 (1996)), in which he addresses the negative effect of silver on wound healing and his recommendation that extensive testing be performed before silver was used as, among other things, a biomaterial. This article also was not provided to the FDA for consideration in evaluating the safety of Silzone. (Runquist, 336-38.) I will further address this article in the next section in my discussion of material scientific literature addressing the safety of silver that was not submitted to the FDA in post market submissions (that is, after March 24, 1998).

57. Literature on the cytotoxicity of dental restorative materials containing silver particles that had been clearly established in human dental soft tissue is another area of existing medical literature that appears to have not been provided to the FDA reviewers by SJM so far as it was negative to using silver as a long term implant. In a paper by Garcés-Ortíz and Ledesma-

Montes (Garcés-Ortíz, M., and Ledesma-Montes, C., 1997 "Cytotoxicity of ketac silver cement," J. of Endodontics; 23(6); 371-373) (the "Garcés-Ortíz" paper) healthy human premolars were filled with glass ionomer cement containing silver particles. Upon scheduled extraction of 15, 30, and 60 days, the health of dental soft tissue (i.e., dental pulp) was evaluated. Of significance was the severe necrotic layer of tissue adjacent to the silver-containing restoration and in some case abscess formation was evident. This study is highly significant for this case, as it clearly demonstrated in human patients (over sixty studied) that materials containing silver in contact with fibroblast-like tissue (i.e., odontoblasts) can basically kill cells in the local vicinity, which obviously ties in well with the observations of Hemmerlein and the concept of a toxic concentration gradient surrounding the Silzone cuff.

58. Perhaps the most compelling article suggesting silver was not a good choice for a long-term implant came from multiple papers by Sudmann et al addressing the biocompatibility and concentration of silver distributed both systemically and locally after a total hip replacement using silver particle-impregnated bone cement. Acta Orthopaedica Scandinavica **56**(6): 534-534. and Sudmann, Vik et al. 1994 "Systemic and Local Silver Accumulation after Total Hip-Replacement Using Silver-Impregnated Bone-Cement." Medical Progress through Technology **20**(3-4): 179-184.) [The Sudmann papers]. A 76 year old woman received a total hip implant that was anchored in place by silver particle-impregnated bone cement. (Sudmann, Vik et al. 1985; "Muscle Paralysis in a Patient with Total Hip-Prosthesis and Silver-Impregnated Antibacterial Bone-Cement. The metallic silver was added to the bone cement as a prophylaxis against deep infection. The patient developed serious neurological deficits 5 years after insertion of the implant. Due to loosening, the implant was removed with the associated silver-impregnated bone cement. Two months after removal of the implant, improvement was

observed in the patient's neurological deficits; however, general neuropathy with axonal damage to both motor and sensory nerves existed 24 months post removal of the prosthesis. Silver measured in the joint capsule and in the blood demonstrated elevated levels of 1000 times the level of normal blood concentration (103 p.p.b.) and 60 times (~6 to 2 p.p.b.), respectively. The Sudmann papers point out that:

A. There were clear differences in local vs. systemic silver concentrations;
B. The local concentration of silver was 15 times greater than the systemic concentration, supporting the concept of a concentration gradient as stated earlier;
C. Significant neurological deficits occur with local silver concentrations ~ 100 p.p.b.;
D. Their observations are consistent with the aforementioned *in vivo* experiments on silver toxicity.

The Sudmann papers concluded that the neurological toxicity was not only affected by the systemic levels of silver, but most importantly by the high local silver concentration in the joint cavity.

59. In summary, there existed in the medical literature a number of significant articles that indicted that silver was not a safe long term biomedical implant material. These articles were not provided by SJM to the FDA in its PMA submission. In contrast, SJM portrayed silver to be a benign and safe material with minimal downside risk. Articles such as I set out above, in my opinion, were absolutely necessary material for the FDA to have reviewed prior to passing on the safety and efficacy of the Silzone coating. SJM, however, did not submit or cite this contrary literature to the FDA in connection with the Supplemental PMA application or update. To not have found this literature and submit this literature to the FDA in connection with the Supplemental PMA application fell well below the professional standards of care of the biomaterial development community, as the testimony of SJM's own employees and forensic consultant confirm.

## IV. AFTER THE FDA SUPPLEMENTAL APPROVAL LETTER OF MARCH 24, 1998, THERE WAS ADDITIONAL NEGATIVE SCIENTIFIC LITERATURE SUGGESTING THAT SILVER HAD THE POTENTIAL TO IMPAIR TISSUE HEALING IN PATIENTS WITH SILZONE™ HEART VALVES THAT SJM KNEW ABOUT OR SHOULD HAVE KNOWN ABOUT WHICH WAS NOT PRESENTED TO THE FDA IN SJM's POST MARKET FDA SUBMISSIONS.

60. SJM"s head of Regulatory Affairs, Dr. Alan Flory, testified that SJM had a duty to submit to the FDA post approval literature reports that could impact upon FDA's assessment of safety and effectiveness." (Flory Dep. 110-1) There was, in my opinion, critical literature that SJM knew or had reason to know of that met this standard.

61. One such article is by Hidalgo and Dominguez (Hidalgo, E., and Domínguez, C., 1998, "Study of cytotoxicity mechanisms of silver nitrate in human dermal fibroblasts," Toxicology Letter: 98; 169-179) which showed that silver can enter internal compartments (i.e., nucleus) of either bacteria or mammalian cells and bind to DNA, thereby affecting replication. Furthermore, their study pointed to the clear destruction of a fibroblast cell population exposed to the antiseptic $AgNO_3$. They also showed the silver ions from the $AgNO_3$ greatly inhibited fibroblast proliferation and that the inhibition of DNA synthesis was the primary event associated with the fibroblast toxicity. Even though proteins in serum helped attenuate the toxicity of silver ions, the effect on DNA was not insubstantial and at the lowest concentrations tested 0.44 p.p.m. DNA synthesis was depressed by approximately 60%. A study such as this demonstrating severe inhibition of DNA synthesis, by silver ions, on mammalian fibroblasts should have been reported to the FDA.

62. Another paper in this regard is by Trerotola S.O. in "Tunnelled Hemodialysis Catheters: Use Of A Silver-Coated Catheter for Prevention of Infection - A Randomized Clinical Trial" (Radiology 1998: 207: 491-496) (the "Trerotola paper"). This article was published in May 1999, which was shortly after the FDA issued its approval letter, but, as I have been advised

by the PSC, before the valves were widely marketed in the United States. In this article the authors analyzed the literature addressing prospective randomized clinical studies of implanted catheters in blood-contacting environments (probably the most relevant model to evaluate the Silzone coating other than valve implantation itself) and showed no clinical efficacy of the silver coating on tunnelled hemodialysis catheters in reducing infection, compared to the control group. Although within this article there are a number of references addressing both the efficacy and lack of efficacy of various forms of silver coated catheters on reducing infection were cited (references 7,8,9,10,11 in the Trerotola paper), these citations involved less relevant experimental models due to either their short duration of implantation or the lack of the blood-contacting environment. Trerotola concluded that silver coating of tunnelled hemodialysis catheters "did not confer any clinical benefit," and, in fact, "their use was associated with a trend toward increased infection and colonization rates compared with uncoated catheters." Trerotola also found that some patients react to this coating, which raised concern about its safety in a larger population. It was also noted by the authors of this study that the coating they evaluated was being discontinued due to difficulties with the coating process, according to the manufacturer. I understand that this pertinent and negative article was not provided to the FDA by SJM.

63. Among the documents SJM produced in discovery (but not provided to the FDA), was a January 22, 1999 literature review by a SJM employee, Dr. Wenda C. Carlyle, Ph.D. (0070711.tif; 0070712.tif), that summarized then current literature dealing with how a silver coating might alter blood biocompatibility or implant healing. The review was prepared as part of SJM's response to adverse clinical reports about the valve's safety raised to SJM by a British heart surgeon, Mr. Eric Butchart, who was implanting the Silzone valves as part of a clinical

study commission by SJM. (Runquist, 334-5) One concern that Dr. Carlyle addressed in her report was that the silver might retard healing and result in more paravalvular leaks. Dr. Carlyle's report then goes on to cite and discuss the 1996 Hollinger article I referenced above and how it described many studies that showed that silver sulfadiazine could retard wound healing. As I mentioned above, the Hollinger paper was published in 1996 and was not reported to FDA as part of the Supplement PMA review. (Runquist, 336-8) Assuming SJM had missed this important article in its researching the toxicity of silver, which it should not have if the research was properly performed (as demonstrated by the fact that SJM's Dr. Carlyle was able to find it for her report), beyond any doubt the article should have been promptly brought to the FDA's attention along with Mr. Butchart's significant concerns.

## V. THE PURPORTED SILVER TOXICITY STANDARD OF 300 P.P.B. (NG/ML) IS NOT A RECOGNIZED SCIENTIFIC STANDARD AND IS NOT SUPPORTED BY THE LITERATURE CITED BY SJM OR ITS WITNESSES. IT WAS MISLEADING, THEREFORE, TO SUGGEST THAT IT WAS A VALID THRESHOLD.

64. In my opinion, the purported silver toxicity standard of 300 p.p.b. advanced by SJM to the FDA and medical community is not a recognized scientific standard and is not supported by the scientific literature cited by SJM or its witnesses.

65. SJM recognized that knowing the toxic threshold level of silver was an important and basic piece of information to have in order to evaluate the safety of Silzone. (Holmberg dep. at 48-49.)

66. I understand that SJM and Dr. Katherine Tweden, who conducted SJM's pre-market Silzone research, represented, in company-sponsored journal articles and in the submissions to the FDA and other regulatory bodies, that the Masters Series mechanical heart valve with Silzone was safe. (Runquist Dep. at 193-94; Tweden at 306–12.) SJM's

representation that Silzone valves were safe was based, in large part, on SJM's representations that 300 p.p.b. of silver in the bloodstream was a toxicity benchmark recognized by the scientific community and that SJM's animal and clinical data demonstrated that the silver levels in the blood following implantation of a Silzone valve did not exceed this 300 p.p.b. toxicity benchmark. (Tweden Dep at 276-81)

67. SJM neither performed *in vitro* or *in vivo* toxicology studies to assess and determine the toxic threshold of silver in blood or in tissue (Flory dep at 305- 06; Tweden Dep. 317-18.), nor consulted with a toxicologist to determine the threshold level. (Tweden Dep. 317-18) SJM's purported standard was not based on any government agency or safety organization data or standard. (Tweden at 304-312) Dr. Tweden at her deposition explained that the reason that SJM did not do animal testing to determine the toxic threshold was "because we saw excellent tissue ingrowth at a short duration and at long duration and no issues with toxicity." (Tweden Dep. at 316) Even if this were true, which is, of course a subject of dispute, this is not, in my opinion, a scientifically valid reason to have not done a proper study determining the toxic threshold, especially, as here, when dealing with a biomedical material that is going to be placed into a human being's heart for decades. Each of these was a remarkable failure on the part of SJM.

68. During her deposition Dr. Tweden explained how she determined the 300 p.p.b. benchmark. What she did was use a literature search and based on her reading and interpretation of three medical journal articles from that search, one by Dietch, one by Boosalsis and one by Wan, which I will discuss below, she concluded that 300 p.p.b in blood was a safe level

benchmark. (Tweden Dep. at 281-316). Notably, there was no threshold determined for silver in tissue. (060082.tif at p. 7 [12]; Flory Dep. at 87-88, Runquist Dep. at 194-95, Tweden Dep. at 225)

69. A main published reference to this purported standard is found in Dr. Tweden's paper entitled "Biocompatibility of Silver-Modified Polyester for Antimicrobial Protection of Prosthetic Valves" (Journal of Heart Valve Disease 1997, Vol. 6: 553-561). In this paper, Dr. Tweden did not cite the Deitch article as a principle support as she did during her deposition, (Tweden Dep. at 281-316), but instead cited a scientific article by Wan *et al.* entitled "Determination of Silver in Blood, Urine, and Tissues of Volunteers and Burn Patients" (Clinical Chemistry 1991, Vol. 37, No. 10: 1683-1687) (the "Wan paper"), for the proposition that 300 p.p.b. is a standard representing the lowest concentration reported to produce silver toxicity in humans. For the reasons that follow, it is my opinion that the Wan paper does not support a scientific standard of 300 p.p.b. for silver toxicity to humans.

70. The Wan paper did not set out to test silver toxicity. Rather, the study sought to examine methods for determining the levels of silver in burn patients who were treated with silver sulfadiazine (SSD) cream. The toxicity of silver was not addressed as a specific aim, goal, objective or hypothesis of the work presented.

71. In previous submission to this Court SJM, through one of its witnesses indirectly relied upon Wan in citing a textbook, *Tietz Textbook of Clinical Chemistry, 3rd edition*, Burtis C.A. and E.R. Ashwood, eds., Philadelphia: W.B. Saunders 1999; p. 995, for the proposition that the 300 p.p.b. standard is a recognized value that represents the lowest concentration reported to

[12] The referenced document is a January 1998 final report by Danny Langanki and Matt Ogle entitled "SJM EPIC Silver Washout Study," the purpose of which study was to determine *in vitro* the extent of leaching and potential migration of silver into the bioprosthesis tissue component of the Epic valve. In this the report Langanki and Ogle recognize that there was no threshold established for annular tissue levels, stating: "The release into the tissue ... showed trace concentrations. Since there is no known reported toxicity levels for valvular tissue, comparison cannot be directly determined."

produce silver toxicity in humans. This reference pertains to a chapter in a textbook entitled "Toxic Metals" by Thomas P. Moyer Ph.D. In this chapter, a short section addressing silver toxicity focuses on systemic toxicity (toxicity throughout the entire body) and a syndrome known as argyria (a blue-gray discoloring of the skin). The only reference cited in Dr. Moyer's chapter is the Wan article which, as I explained above, does not support the so-called silver toxicity standard. In fact, Dr. Moyer never states that the 300 p.p.b. silver concentrations measured in the Wan paper were toxic levels. He merely states that typical silver levels observed in unaffected patients ranged up to 300 p.p.b. Any inference made by Dr. Tweden and SJM that this statement represents a recognized scientific standard based on Wan's publication for silver toxicity is erroneous and not scientifically valid.

72. Turning now to the Dietch article (The Journal of Trauma 1989, Vol. 29 (4):430-434) (the "Deitch paper") I note that another SJM scientist, Mr. Danny Langanki, also cites 300 p.p.b. as a threshold for toxic silver levels, in another company-sponsored published paper entitled "Evaluation of a Novel Bioprosthetic Heart Valve Incorporating Anticalcification and Antimicrobial Technology in a Sheep Model" (The Journal of Heart Valve Disease 1998, Vol. 7: 633-638). Mr. Langanki cites, as did Dr. Tweden, both the Wan paper and the Deitch paper for this proposition. As I explained above the Wan paper did not measure the purported 300 p.p.b. toxicity level of silver. Neither did the Deitch paper, a point conceded by Dr. Tweden during her deposition. (Tweden Dep. at 281-89). The Deitch paper instead references a paper by Boosalis *et al.* (Surgery 1987, Vol. 101: 40-43) (the "Boosalis paper") as the source for the 300 p.p.b. toxicity level of silver. (Another point conceded by Dr. Tweden at her deposition. (*Id.*)) Interestingly, the Wan paper thoroughly criticized the methods and detection limits of the Boosalis paper, calling into question the legitimacy of the work. In any event, the authors of the

Boosalis paper likewise did not determine the toxicity of silver in humans; they only measured silver in serum and urine of burn patients exposed to silver sulfadiazine. In other words, the Boosalis paper does not even mention the so-called 300 p.p.b. standard, which is understandable as the authors neither intended nor set out to establish one. Additionally, Figure 1 of the Boosalis paper, which Dr. Tweden cited at her deposition as supporting her conclusion (Tweden Dep. At 291-92), does not provide appropriate data and information on which one can validly draw a scientifically valid conclusion that 300 p.p.b. of silver in blood is a safe toxic threshold.

73. Ms. Diane Johnson, SJM's consulting witnesses on FDA review matters has testified that as an FDA reviewer she would expect that when a sponsor talks about a toxicity threshold, that there would be some kind of study data that would point to such a threshold. (Diane Johnson Dep. at 151) As a biomaterial scientist I agree. In this case, however, SJM's representation that 300 p.p.b. of silver in blood was a toxic threshold had no valid and fitting data supporting it.

74. I conclude that the 300 p.p.b. value represented by SJM and its internal scientists to the FDA and the medical community as a "recognized" silver concentration to produce toxicity in humans is not substantiated by the scientific literature cited either by SJM or by consultants in this litigation on its behalf. The level at which systemic silver concentrations will be considered toxic in humans is undetermined and it is a material misrepresentation of scientific fact to portray 300 p.p.b. in regulatory applications, published literature and product labeling and advertisements as the toxic threshold.

75. Dr. Tweden and SJM represented that the Silzone valve was safe, relying in part on the belief that 300 p.p.b. was a scientific and valid benchmark for toxicity to humans. It is not

scientifically valid and is not a recognized benchmark. Using it as such in its pre-market testing leads to the erroneous conclusion that Silzone was safe.

## VI. THE FDA WAS HAMPERED IN ITS REVIEW OF SJM HEART VALVES CONTAINING SILZONE COATINGS SINCE SJM DID NOT FULLY DISCLOSE TO THE FDA DATA IT HAD IN ITS POSSESSION CONCERNING THE SHORT-TERM ANIMAL STUDY SHEEP "KTMV-2"

76. In my opinion, information in SJM's possession concerning the short-term animal study sheep "KTMV-2," that was not submitted to the FDA, even after it had asked SJM for all animal pathology information, was an omission of data necessary to the consideration of the safety and efficacy of the Silzone coating.

77. Since SJM specifically excluded one sheep (KTMV-2) from the study data without any scientific justification, the conclusions reached by SJM and presented to the FDA were adversely affected. Elimination of KTMV-2 amounted to elimination of 20% of the data set, since pathology of only 4 of 5 sheep were reported. This is a clear misrepresentation of the data and supports the aforementioned claims that SJM was biased in presenting information to the FDA.

78. The FDA, according to the PMA supplement filings, was first advised that this sheep even existed as a member of the short-term study in an Amendment to the PMA supplement dated December 1997, filed seven (7) months after the original submission responding to an FDA request for more information. In this submission SJM stated: "The animal designated as KTMV-2 was an early death and the cause of death was unknown." SJM did not provide FDA with the pathology report by Dr. D. Cameron, who examined that sheep's heart. Dr. D. Cameron summarized his pathology of KTMV-2 by identifying a paravalvular dehiscence, a blood clot encasement of the synthetic material, fibrous tissue covering but not

extending into the cuff fabric (i.e., no tissue ingrowth), and observation of black particulate material (presumably silver, see below) .

79. In my opinion, the black particulate material could be due to silver spalling off the Dacron fabric. Both Mr. Runquist and Dr. Tweden, who were familiar with the study, testified that the particles were silver that had come off the cuff. (Runquist Dep. at 222-23; Tweden Dep. at 100-01.) I have reviewed the Affidavit of Dr. Gregory John Wilson dated February 7, 2002 and associated exhibits in which he describes SJM heart valve implants retrieved from patients that displayed impaired healing within the cuff and variable pannus overgrowth. From Dr. Wilson's exhibits, it is clear in some cases that the silver came off of the polyester fibers, which represents not only a potential hazard from the newly-increased surface area of silver exposed to the tissue (an increase in surface area will lead to an increase in silver ions released), it now represents a particle that monocytes and macrophages will attempt to engulf (a process called phagocytosis) and lead to a persistent inflammatory response.

80. Furthermore, the pathological observations of Cameron of clot encasing the Silzone fabric in KTMV-2 is consistent with the experiments performed by S. Goodman that SJM sponsored. The blood compatibility of the Silzone coating has not been thoroughly investigated and preliminary studies by Goodman et al, (Goodman, S.L., "Platelet Interaction with Silver Treated Sewing Rings of Mechanical Heart Valves: Potential Effect on Tissue Ingrowth and Healing," Trans. Soc. Biomaterials: 24th Annual Meeting of the Soc of Biomaterials, (April 1998, 207) ("the Goodman abstract,") (0023891.tif) would imply that it is thrombogenic. In experiments conducted by S. Goodman and SJM staff and reported in the Goodman abstract, Silzone cuff fabric was exposed to human platelets and observed using electron microscopy. They observed that platelet interaction with the Silzone cuff fabric was

"quite different to that on the untreated polyester fabric." After a 45-minute exposure of human platelets to the Silzone fabric, "almost all platelet membranes were disrupted such that their cytoskeleton was exposed. On the control polyester fabric, the level of disruption was much less and the extent of platelet aggregation was also much greater." On the Silzone fabric, between 30-50% of the surface was covered by adherent platelets, where the control polyester fabric had less than 25% platelet coverage. Although the Goodman abstract makes a claim that the combination of extensive platelet coverage and membrane disruption could lead to improved wound healing, this opinion contradicts what is currently known regarding blood materials interactions, which would associate greater platelet coverage of the surface and disruption of the membrane as an indication of platelet activation where they release their pro-coagulation intracellular contents.

## VII. SJM'S *IN VITRO* WASH OUT STUDY OF SILVER COMING OFF SILZONE FABRIC AND ITS *IN VIVO* STUDY ESTIMATING THE AMOUNT OF SILVER RETAINED AFTER IMPLANTATION PROVIDE ALARMING DATA ON THE DEGRADATION RATE OF THE SILZONE COATING.

81. The Silzone coating was not inert as SJM would have one believe by its claims relating to leaching. In fact, its corrosion-resistance was poor. Enhanced liberation of silver ions from the Silzone coating was a design goal of SJM's Dr. Tweden, who believed increased ionization would improve the bactericidal and/or bacteriostatic efficacy of Silzone. (0704942.tif). The "[s]olution" to the problem of slight ionization, she observed in her laboratory notebook on March 18, 1997, resided in the "corrosion already happening by inserting a metal that is more noble than silver in the mix. The idea is that corrosion (or silver ionization) would be greater. e.g., palladium, gold, platinum, etc. are all noble to silver."(Ibid.)

82. The goal of enhanced silver delivery not only reinforces its role as a drug, but also raises the issue of too much corrosion leading to toxicity of local tissue. Evidence of SJM's concern over the corrosion of the Silzone coating is found in a letter dated August 21, 1996, from SJM's project engineer William R. Holmberg to Dr. Prian Sioshansi, a Vice President (Biomaterials) for the Spire Corporation. Mr. Holmberg states that "The corrosion rate, when coupled with other valve components, of silver is estimated at 200-400 Angstroms per year. With the silver corroding at these rates, **it *is likely* during the life of the device that all of the silver could be removed**" (0064749.TIF. Emphasis added.) If Mr. Holmberg is correct in his estimated corrosion rates, "200-400 Angstroms per year", then the Silzone coating could be completely removed in ~ 7.5 to 15 years, well within the lifetime of the implant. According to data from "Product Technology-silver treatment," (0681147.tif at 0681165), this could lead to the liberation of 50 mg of silver from the coating. Given the expected concentration gradient based on sound scientific theory, one can expect the ***local*** silver concentration to far exceed the cytotoxic concentrations defined in the papers by Wataha, Steffensen, and McCauley.

83. However, the corrosion rate defined by Mr. Holmberg is likely an underestimate. The notebook of Dan Langanki (No. 394, pgs. 16-22, 0705696.TIF) indicated that test Silzone-coated fabric placed in bovine serum lost 12% of its silver coating over a 7-day period, amounting to approximately 1.7% of the coating per day. SJM did not report these data to the FDA in its PMA Supplement. SJM did report data from another leaching study in its PMA Supplement section devoted to "Leachability Studies" at pages 12 and 13 of the Supplement. (003259-60.tif) In this study, under similar test conditions, Silzone-coated valves had much lower corrosion rates; however, the coating lost was still 2% over the 7-day period. In one series, over 392 p.p.b. of silver was released into the test solution by 3 days. In this test, a small valve

size was used (17 mm), so the values of silver released represent least case scenario. The low sample number, only two, and short duration of the study would prevent any reasonable conclusions regarding whether the corrosion rate was decreasing or, as SJM claimed, had reached a steady state. To conclude that saturation had occurred, SJM would have needed a sufficient sample size (e.g., 5 valves) for statistical analysis and have extended the duration of the study well beyond one week. A corrosion rate of 0.29% per day is calculated from the valve leaching study. Based on the lower valve corrosion rates, all the coating would be gone in 350 days. SJM neither presented the fabric leaching study data to the FDA, nor did it analyze the differences it found between the fabric and valve studies, potentially indicating large variability in the corrosion properties of the Silzone coating.

84. In their analysis of the leaching studies, SJM suggested in their PMA Supplement that the concentration of silver liberated from the Silzone coating would be diluted within the 3500 ml volume of "serum" of a 70 kg man. This analysis is erroneous, since it is based on the assumption that all the silver released is delivered into the bloodstream. As stated earlier, in my opinion the appropriate issue to consider is the local silver concentration in tissue. That a concentration gradient will develop indicates systemic distribution of silver will not occur as SJM proposed.

85. SJM also analyzed the amount of silver loss from the Silzone-coated valves in its premarket 10-week ("long term") sheep implant study (PMA Suppl. Attachment 16, pg. 12, 0003243.TIF at 0003530). This analysis was very important, as it represents the only investigation that SJM, to my knowledge, undertook of aggregate loss of silver from Silzone valve sewing cuffs under actual conditions of use following implantation in living animals. Data on pg. 98 of Mr. M. Ogle's notebook # 407 (0128594.TIF) indicates an average among the six

sheep implanted with Silzone valves of approximately 22% of the silver coating was lost during the 10 week study, with up to an alarming 45 percent of the Silzone coating lost in one animal. This average amounts to a corrosion rate of 0.31 % of the Silzone coating loss per day of implantation, which means that the coating could be completely removed within 318 days, assuming a linear release rate. [13] In its PMA Supplement, SJM did not report these data, yet data from the same study and even from the same table in Mr. Ogle's notebook data were used to support the safety and efficacy of the Silzone coating (PMA Suppl. Attachment 16, pg. 12; 0003243.TIF at 0003530). Based on the information available to me, given the massive amount of silver released from these Silzone coated valves, SJM's statement that the results were "inconclusive" is scientifically invalid.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 13, 2003

Kevin Healy, Ph.D.

---

[13] Based on accepted corrosion science principles and given the galvanic coupling that is involved in the Silzone coating, a linear release rate is a fair analysis assumption for this system. It is also consistent with the *in vivo* data .