# Exhibit 27

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT

PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62-C9-02-7324

Heart Valve Litigation

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DONALD S. GUZIK

VOLUME I, Pages 1 - 282

October 15, 2002

(The following is the deposition of DONALD S. GUZIK, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, in the city of Minneapolis, state of Minnesota, commencing at approximately 8:55 o'clock a.m., October 15, 2002.)

Jude that there were certain statements that they were not allowed to make that would imply efficacy; correct?
A. Yes.
Q. And that if they made those statements they would be in violation of their approval; correct?
A. Yes.
(Plaintiffs' Exhibit 176 marked for identification.)
BY MR. O'FALLON:
Q. Plaintiffs' Exhibit 176 is a letter dated August 20th of 1998 from Kevin Johnson, territory manager for St. Jude Medical. It's Bates stamp numbered SJM1000227222 to 223. Correct?
A. Yes.
Q. Who is Kevin Johnson?
A. Kevin Johnson is a territory manager for the heart valve division.
Q. Okay. Do you know what territory he has?
A. No, I do not.
Q. This appears to be a letter to Dr. Santos in Laredo, Texas; correct?
A. Yes.
Q. Mr. Johnson says, "I want to thank you for the time you provided me on Wednesday of this week. It

is a rare occasion on a first meeting that so many topics can be discussed and I appreciate it - TSPV, the Rosengart and Wang articles and Silzone"; correct?
A. Yes.
Q. "One group of articles I did not present were papers on Silzone"; correct?
A. Yes.
Q. Now again he wasn't supposed to present any papers on Silzone unless they were solicited; correct?
A. That I -- I wouldn't know.
Q. Let's go back to Plaintiffs' Exhibit 54 real quick. And why don't you look at the second page of that document, Bates number 895SN, and the very last statement, the last sentence and then going over onto page 3. It says, "St. Jude may only provide this information in the form of reprints of journal articles or other scientific information in response to unsolicited requests"; correct?
A. Yes.
Q. So Mr. Johnson should not have been providing these papers unless they were solicited specifically by the surgeon; correct?
A. I believe that's what is -- what's meant here,

yes.
Q. And there doesn't appear to be any indication here that the surgeon actually solicited those papers; correct?
A. Not to my knowledge.
Q. Right. It then says, in the next paragraph, "As you may be aware, silver is a microbial-resistant agent that has been used for medicinal purposes for hundreds of years"; correct?
A. Yes.
Q. It says it is presently used on an array of implantable devices including orthopedic products, intravenous catheters and vascular grafts; correct?
A. Yes.
Q. It then says, "Silzone coating has been shown in vitro to kill a variety of microorganisms, including those commonly associated with prosthetic valve endocarditis"; correct?
A. Yes.
Q. "In fact, Silzone coating is more than 99% effective in reducing microbial attachment and colonization in vitro"; correct?
A. Yes.
Q. These are the exact kind of statements that the FDA said St. Jude could not make about this valve;

correct?
MR. STANLEY: Object to the form.
A. Yes. I -- I don't know what to answer on behalf of Kevin -- Kevin Johnson here.
Q. Okay. But it would appear to you, as someone in charge of regulatory compliance, that this particular letter violates the restrictions placed on St. Jude concerning the marketing of this valve; correct?
MR. STANLEY: Object to the form.
A. Once again I don't -- I don't know what Kevin's meeting -- without knowing all the facts of what Kevin's meeting was with Dr. Santos and what their conversations were and what he requested, and maybe this was part of their conversation all along and Dr. Santos was soliciting it. I don't know that.
Q. But it does appear that Mr. Johnson is making statements about the valve that are the exact kind of statements that the FDA says you cannot make about this valve; correct?
MR. STANLEY: Object to the form.
A. Well there's some statements in here that I believe that are -- are -- are true statements about catheters and other products that are commonly associated with antibacterial agents.
Q. It's the connection that's the violation,

correct, the attempt to connect -- to make a connection between Silzone and a reduction in endocarditis; correct?

MR. STANLEY: Object to the form.

A. Well he uses, once again, the "in vitro to kill a variety." I mean he even italicizes it in the letter to point out that it's in vitro.

Q. Right. And again if you look back at Exhibit 54 on the second page, one of the claims that the FDA has prohibited is, quote, a claim that the device is 99% effective, in vitro, in reducing microorganisms that are associated with prosthetic valve endocarditis; correct?

A. Yes, that's what it states.

Q. And so it appears that Mr. Johnson is using a prohibitive statement -- a prohibited statement in order to market this device; correct?

A. Once again, without knowing what Kevin was trying to say here, I mean he says, "In fact, Silzone coating is more than 99% effective in reducing microbial attachment and colonization in vitro," and then it's footnoted to -- to go back to a study that looks like it was done by Katherine Tweden, et cetera, so it --

Q. Well actually in looking at that particular

statement, another claim that's prohibited by the FDA, again if you look at 54, is a claim that the device is resistant to bacterial attachment and colonization; correct?
A. Yes.
Q. So he's made a number of statements here that appear to violate the FDA regulations; correct?
MR. STANLEY: Object to the form.
A. Once again I can't speak on behalf of Mr. Johnson and/or I'm not that familiar with the regulatory labeling requirements as -- you know, somebody like Al could potentially answer that question much better than I could.
Q. But as you appear today this does appear to violate the FDA's approval; correct?
A. Appears, yeah.
(Plaintiffs' Exhibit 177 marked for identification.)
BY MR. O'FALLON:
Q. Plaintiffs' Exhibit 177 is a document Bates stamp numbered SJM0880197061 to 062. This appears to be a letter dated January 14th of 1999 from Richard Briscoe. Do you know who Richard Briscoe is?
A. I've heard the name before.
Q. Okay. This particular document identifies him

as a senior territory sales manager; correct?
A. Yes.
Q. With the St. Jude Medical Heart Valve Division.
A. Yes.
Q. And this particular document is dated January 14th of 1999; correct?
A. Yes, it is.
Q. It appears to be a letter from Mr. Briscoe of St. Jude to Wilson Strong, a physician in Cedar Rapids, Iowa; correct?
A. Yes.
Q. And he states, "I want to thank you for taking the time at the end of your patient clinic to meet with me last week. I appreciated your positive comments regarding the St. Jude Medical Mechanical Heart Valve, and your long-term support. Your comments about never experiencing the need to rotate due to potential obstruction of the leaflets" is "also encouraging"; correct?
A. Yes.
Q. At the next paragraph he also says, I appreciate the opportunity to introduce the Silzone coating which is currently available only with our Masters Series mechanical valves (rotatable); correct?
A. Yes.

Q. He then says, "For the past thirty years there has been a gap in heart valve design, and one which" is a significant -- and "one which a significant effort has been expanded to bridge"; correct?

A. Yes.

Q. "Most of the effort has centered on the coating, and impregnation of antibiotics into the sewing cuffs, in addition to the use of antibiotics in flushing out the implantation site"; correct?

A. Yes.

Q. It says, "These efforts in large part have gone by the wayside due to the transitory effect of the antibiotics, and to concerns regarding increased resistance"; correct?

A. Yes.

Q. He then says, "Silver is a proven, effective antimicrobial agent which has been used on a wide array of implantable devices"; correct?

A. Yes.

Q. "Silver is impregnated into each individual strand of fabric on the valve's sewing cuff using a patented ion beam assisted deposition process...developed by the Spire Corporation"; correct?

A. Yes.

Q. "This process produces exceptionally high quality, ultra-adherent coatings"; correct?
A. Yes.
Q. "It also produces a permanent, minimally leaching coating when applied to the SJM Masters Series sewing cuff"; correct?
A. Yes.
Q. "Silzone...has been shown in vitro to kill a variety of microorganisms, including those commonly associated with prosthetic valve endocarditis"; correct?
A. Yes.
Q. It says, "It is more than 99% effective in reducing microbial attachment and colonization in vitro;" --
A. Yes.
Q. -- correct?
Again, those last statements are statements prohibited by the FDA; correct?
MR. STANLEY: Object to the form.
A. The statement once again is going back to an asterisk to -- to reference a study, --
Q. Yeah. But again --
A. -- it's the same statement.
Q. -- it was that statement that was prohibited by

the FDA during the approval process; correct?

A. Yes, even though once again I'm not an expert in answering that, but it appears that way.

Q. And wouldn't you agree with me that the overall effect of this particular letter is to suggest that Silzone will be effective in reducing the incidence of endocarditis?

A. I wouldn't necessarily agree with that. I think what it -- what it's saying is that the endocarditis -- what he was trying to say here is endocarditis is a serious complication associated with heart valve implants.

Q. But isn't it also trying to suggest that the Silzone valve is effective in reducing that endocarditis?

A. I don't know if he's suggesting that. I think he's saying that in vitro there has been indications that it does warrant it -- warrant it away from or fight against it almost like an antibacterial application.

Q. But again these are the exact same statements that Mr. Briscoe uses in the letter that the FDA believes implies efficacy; correct?

MR. STANLEY: Object to the form.

A. I don't know what Mr. Briscoe's, once again his

Q. This is the only study that St. Jude commissioned that actually looked at thrombosis rates; correct?
A. To my knowledge, yes.
Q. And you were aware of this study in June of 1998; correct?
A. Yes.
Q. And again, clinical studies and the results from clinical studies, I believe you testified, those are the kind of results you are particularly concerned about; correct?
A. Yes.
Q. And that would certainly apply to your own studies that you've actually commissioned and help set up; right?
A. Yes, it would.
(Plaintiffs' Exhibit 178 marked for identification.)
BY MR. O'FALLON:
Q. Plaintiffs' Exhibit 178 is a document Bates stamp numbered SJM0320070559NK. Have you seen this document previously?
A. I believe, yes, I have, at one time.
Q. Okay. Do you think you saw it at about the time it was sent, which here was stated as Tuesday,

A. Yes. Whether it was one or several it causes me a concern. The thing about it is in a conventional side of the valve is you would not expect a surgeon to report those to you, seeing that it's a known complication that's out there that's in existence.

Now under a clinical study such as the AVERT one can then do a direct comparison to the two and say, well, let's take a look at what's happening here, because you're controlling that arm and you're reporting everything, you're not just getting anecdotal information.

Q. But you had other doctors who were doing clinical studies that were equally concerned about the increased incidence of endocarditis; correct?

A. Out of a controlled environment, yes.

Q. Yeah. For instance, Dr. David at Toronto General was reporting increased incidence of endocarditis with the Silzone valves; correct?

A. Yes.

Q. So you weren't just having these anecdotal reports kind of coming in out of nowhere, you were having people that you were paid to research your valves telling you they were having problems with the valves; correct?

A. Yes, that would be correct.

Q. Right. And when you looked at your FER experience with endocarditis, for instance, that FER experience confirmed what those researchers were telling you; didn't it?
A. In an apples-to-orange comparison, yes, it would.
Q. Isn't it true that an increased risk of paravalvular leak also leads to an increased risk of endocarditis?
A. An increase in paravalvular leak?
Q. Right.
A. Not -- Not to my knowledge. As a matter of fact I've heard quite the reverse or contrary to it, that -- that endocarditis will lead to paravalvular leak or they're almost hand in hand.
Q. Well endocarditis certainly leads to paravalvular leak. You've never heard the notion, though, that a paravalvular leak increases the risk of endocarditis?
A. No, I have not.
Q. You haven't heard that it increases that risk due to a disruption in the flow of blood?
A. That -- Could you repeat the question?
Q. Well you understand that a paravalvular leak basically causes a disruption in the flow of blood

Q. The reason it didn't go through its maturity is because this device was pulled off the market because it was a bad valve; right?

A. Well the rea --

MR. STANLEY: Object to the form.

A. The reason it was pulled off the market was because it appeared to have a higher incident rate of paravalvular leak resulting from -- potentially resulting from endocarditis in explant.

Q. Well that's what the -- that's what the AVERT study found.

A. Yes.

Q. Your own internal analysis of your own FERs showed that not only did it have an increased rate of explant due to paravalvular leak, it also had an increased rate of explant due to endocarditis; correct?

A. As reported, yes.

Q. And again, if you've got an increased rate of endocarditis in a valve that's intended to prevent endocarditis, you've got a problem; right?

MR. STANLEY: Object to the form.

A. Not necessarily. Once again, if you have an increase of endocarditis in a device that was designed to prevent endocarditis one may expect to

A. Well you keep saying "expect." I guess my expectations, I wouldn't expect, you know, to see anything in -- in -- you know, you hope to see no explants.
Q. Well certainly --
But your job is to track the incident rates and to look at the FERs; right? That's your job.
A. Yes, part of my job.
Q. And so it's your job to take notice of things like increased incident rates with a valve; correct?
A. Yes, and I believe I do.
Q. And it's your job to then investigate that and to see what the cause of that is; correct?
A. Yes.
Q. And here we've seen that you have increased rates of endocarditis with the Silzone valve; correct?
A. Based on the numbers, yes, correct.
Q. Increased rates of thrombus with the Silzone valve; correct?
A. Right.
Q. And increased rates of paravalvular leak with the Silzone valve; correct?
A. Yes.
Q. And frankly, increased rates of explant with the

Silzone valve; correct?
A. In the populations that we're looking at, yes, --
Q. Okay.
A. -- from the way it's been reported. But once again keeping in mind it's very anecdotal reporting.
Q. And you've also seen increased rates in your clinical studies; correct?
A. "Clinical studies."
Q. Correct? Mr. Butchart.
A. Yes. In Mr. Butchart, yes.
Q. Right.
MR. STANLEY: Can we take a break?
MR. O'FALLON: Sure.
(Recess taken from 2:12 to 2:26 p.m.)
BY MR. O'FALLON:
Q. I'd like to turn now to the events that came to St. Jude from Dr. Butany and Toronto General. My -- When did you first learn of those particular events?
A. Boy, I'd be speculating at best when -- when I became involved in it.
Q. The -- The testimony by Dr. Butany was that he thought he had got in contact with St. Jude sometime late in '98, early '99. Is that --
A. I'd say it's pretty close. Sometime in early

'99 is what I would have guessed.
Q. And at that point thereafter your group undertook an analysis of the various events; correct?
A. Well we -- we made an attempt to get -- do an analysis of the various events.
Q. Now Toronto General was also the hospital where Dr. Tirone David was conducting a study on behalf of St. Jude; correct?
A. Yes.
Q. And his particular study was looking at not only St. Jude valves, but I believe Carbomedics valves; is that right?
A. I believe so.
Q. And he was do doing a relatively long-term follow-up of the two heart valves; correct?
A. I'm not real familiar with what he was -- what the clinical study was all about.
Q. Okay. And the original reports that came in to St. Jude were of problems with pannus overgrowth and endocarditis; correct?
A. I believe it was --
There's some conflicting stories. But some of it was pannus overgrowth, and thrombus, and endocarditis primarily, yes.
Q. I'd like to just show you, and I'm trying to

do a detailed analysis of your FERs?
A. Not to my knowledge, no.
Q. Okay. When you got this memo did you go back to Roy and say, Roy, I don't frankly understand what you're talking about?
A. No.
Q. You never said to him, Roy, that's certainly not what we're seeing in the FER department?
A. No. I wouldn't -- No, I did not go back and talk to him about it, no.
Q. In the next paragraph he says, "I suggested that patient selection biases are likely occurring because" the most -- because "in most geographies the valve is sold at a premium, and some centers are reserving it for active endocarditis patients." Of course we know like, for instance, at Rigshopitalet all four of those events occurred in people who had no preexisting endocarditis; correct?
A. Yeah, and that's one particular case.
Q. He said, "Then discussed some of Barb Illingworth's work in an attempt to decrease expectations." Did you know that the company was actively trying to decrease expectations about the Silzone efficacy in May 20th of 1999?
A. Other than this statement, no.

Q. Okay. "Outcomes:" It says, "We sense we were successful in showing SJM corporate interest in their concerns. However, they remain skeptical about the cuff pending further data review. They will stop implanting Silzone cuffs, including the Regent valve, until they are convinced of its safety." Correct?
A. Yes.
Q. At this point in time how many institutions, as of May 20th of 1999, did you have that were refusing to implant the valve due to safety concerns?
A. I -- I don't recall that number.
Q. Okay. Toronto General; right?
A. Yes.
Q. Hopital Laval?
A. I don't know.
Q. Well this is Hopital Laval.
A. Okay.
Q. Rigshopitalet in Denmark?
A. Yes.
Q. Mr. Butchart's institution in Wales; correct?
A. I believe so.
Q. And the -- the surgeons in Belfast; right?
A. Yes.
Q. And again those are not individual surgeons, those are entire institutions; correct?

A. To the best of my knowledge.

Q. Okay. So you have five rather large institutions by May 20th of 1999 that are no longer implanting the Silzone valve due to safety concerns; correct?

A. Well I don't -- and I would be, you know, I would be speculating if it was just safety concerns or just being conservative to wait for further outcome of the AVERT study and other studies that were going on.

Q. Well all those hospitals that I've mentioned to you have had adverse events that they were concerned about associated with Silzone valves; right?

A. Yes.

Q. And what Hopital Laval specifically told you, their surgeons, that they will stop implanting Silzone cuffs, including the Regent valve, until they are convinced of its safety; correct?

A. Yes, that's correct.

Q. So that seems to be, with them, a safety issue; right?

A. Yes.

Q. Now in order to respond to these concerns you called a Silzone Summit in Toronto; correct? The company did.

correct? Dr. Errett was at St. Michael's; correct?
A. Okay. Yes.
Q. And Dr. Errett in fact reported four paravalvular leaks with the Regent valves with Silzone; correct?
A. I believe so, yes.
Q. So saying that St. Michael's had reported no events would be a false statement; correct?
A. Yes.
(Plaintiffs' Exhibit 189 marked for identification.)
BY MR. O'FALLON:
Q. Plaintiffs' Exhibit 189 is a document Bates stamp numbered SJM0880197150 through 153. Have you seen this previously?
A. I don't believe so.
Q. Up in the "to" line it not only goes to the sales force, but it also says "St. Paul Marketing, Clinical, Regulatory," and "Development." Would that -- Would that have usually have included your area, or is that referring to Mr. Flory's area?
A. Mr. Flory's area.
Q. Okay. This is entitled "SILZONE UPDATE"; correct?
A. Yes.

Q. And it's from Roy Hosek and it's dated May 11th of 1999; correct?
A. Yes.
Q. On the next page it's -- again it's called the Silzone update at the top; right?
A. Yes.
Q. And then there's a section entitled B, "FIELD SURVEILLANCE"; correct?
A. Yes.
Q. There's a bullet point under there called the "Field Experience Reporting... - the routine St. Jude Medical field surveillance system"; correct?
A. Yes.
Q. It says, "The rates of the various complications (as per...Edmund's guideline) reported with the 28,000 Silzone valves have been similar to those reported with other SJM mechanical valve offerings, taking into account the early life cycle stage of the Silzone products"; correct?
A. Yes.
Q. That's not true; is it?
A. Well once again whatever Roy's thinking here, I think he's trying to talk about the early life cycle of a product being a higher rate of reporting and follow-up, and I'm speculating that, at best.

Q. But that statement, as written, is an incorrect statement; correct?
A. Yeah possibly, yes.
Q. Certainly; correct? I mean you knew that the rates were different with the Silzone valves than the standard valves; correct?
A. I -- Yeah, looking at the data you would say that, yes.
Q. And so Mr. Hosek, for whatever reason, is making a statement about the Field Experience Reporting with the Silzone valves that's incorrect.
A. Yeah. Not knowing what he was thinking, but it's not how I would write it.
Q. He says, "Both endocarditis and non-endocarditis, (such as TE) complications are monitored"; correct?
A. Yes.
Q. He then talks about selection bias and he says, "In light of its premium price, we are aware that a number of surgeons have reserved the use of the Silzone coated cuff" for most -- "for only the most severe cases." Again you've got no documentation that supports that; correct?
A. I do not, no.
Q. As far as the early life cycle, I mean you've

Q. Okay. For 1997 for the Masters Series with polyester cuff there were a total of one event reported that year, and 26,950 valves reported; correct?
A. Yes.
Q. And then for 1998, as we've gone over before, a total of 30,000 valves with three adverse events; correct?
A. Correct.
Q. So it looks like for the Masters Series valve the reporting was, if anything, a little greater in the later years than the earlier years; correct?
A. For the Edmund's criteria of what was being reported, yes, that's true.
Q. Okay. Going back to Plaintiffs' Exhibit 189, do you know what the purpose of this kind of a Silzone update was; why this was put out?
A. No, I don't.

(Plaintiffs' Exhibit 190 marked for identification.)

BY MR. O'FALLON:
Q. Plaintiffs' Exhibit 190 is a document Bates stamp numbered SJM0570130127NK through 150NK. Have you seen this document previously?
A. Yes, I have.

Q. And what is this document?
A. This was a correspondence sent to Hazel Randall from myself which was an update of what we had in our FER files at that time.
Q. Okay. And you report to Ms. Randall at this point that there are 51 events reported worldwide; correct?
A. Yes.
Q. Of these events, 36 have been evaluated and closed, and 15 events are still pending final investigation and closeout; correct?
A. That's correct.
Q. Let's look at the next page. This is actually a Summary of SJM Silzone Events reported as of May 20th of 1990; correct?
A. Yes.
Q. And you state that the Silzone events received to date are 68; correct?
A. Yes.
Q. Now does that mean 68 open files, 68 patients or 68 valves?
A. I believe that would mean 68 events.
Q. Okay. And of those events, 51 of those have been reported to the authorities; correct?
A. Yes.

Q. And 36 are closed and 15 are pending; right?
A. Correct.
Q. Now as -- as -- of the 36 that are closed, it looks like 14 of those are infection; right?
A. Yes.
Q. And this particular -- is this --
These numbers on the closing code, are those a final code or is that -- I mean a lot of these events have more than one code; right?
A. Yes.
Q. Are these the final codes, or are these --
A. I believe they are the final code, primary code.
Q. Okay. So you've got -- of the 36 you've got 14 incidences of endocarditis; correct? That's infection.
A. Yes.
Q. Four instances of thrombus; correct?
A. Yes.
Q. Four instances of PV leak; correct?
A. Yes.
Q. And a total of eight thromboembolic events; correct?
A. Yes.
Q. So you've got a total of 14 incidences of endocarditis; correct? At this time.

A. Which column are you on?
Q. Oh I'm sorry, you know what, I just asked that question.
You've got a total of 12 events that involve either thrombus or thromboembolic events; correct?
A. Yes.
Q. Okay. You would agree that as of May 20th of 1999 your incident rate for endocarditis with the Silzone valve was greater by many times than the incident rate you would normally expect to see with the regular Masters Series valve; correct?
A. I would -- I would say that they are greater.
Q. You would also agree that the incidence of thrombus and thromboembolic event with the Silzone valves is much greater than you would expect to see with the Masters Series valve; correct?
A. I'd have to look at the numbers for the mechanical --
Q. Okay.
A. -- to correlate.
Q. Going back to the Masters Series --
Going back to that incident report, I believe the number of thrombus that you reported with the Masters Series valve in 30,000 valves for 1998 was two; correct?

A. Yes.
Q. So 12 would be a six times increase; correct?
A. Yes. In this report, yes.
Q. Paravalvular leak is hard to compare because you didn't report paravalvular leak to the FDA; correct?
MR. STANLEY: Object to the form.
A. I believe that they --
I believe in the past there's a statement in -- in the introduction of this that defines paravalvular leak not being reported, if I remember correctly.
Q. Okay. Okay. And of course the numbers we've just looked at, those are -- those are closed FERs; that is, ones where you've made your final determination; correct?
A. Yes.
Q. Here it looks like you've got another, in addition to the 14 cases of endocarditis in closed files you've got another 24 cases of endocarditis in open status; correct?
A. Yes, that's correct.
Q. And another eight cases of thrombus in the open status; correct?
A. Yes.
Q. And another seven cases of PV leak; correct?
A. Yes.

Q. "This is an increase of 6 reportable events since the prior report..."; correct?

A. Yes.

Q. And that prior report is the one we've looked at here today, the May 20th report; correct?

A. Yes.

Q. Did you --

Did you identify which of these events are from AVERT?

A. I recall Denise having to go through and identify them, yes. Whether or not it's in this report, I don't recall. I think there was -- once again some of the -- the AVERT study it was difficult to ascertain the information just because it was basically sealed and controlled outside of St. Jude. We were not at liberty to get it, but I know she requested it from Monica.

Q. Okay. And again the information you submitted on June 29th or June 30th of 1999 to Hazel Randall continued to show an increased number of events associated with Silzone valves as opposed to what you would have expected from the Masters Series valve; correct?

A. She wasn't asking us to compare them.

Q. No, but I'm asking that.

A. Yeah, there wa --
Most likely, you know, there was a difference, yes.
Q. And the increased events were continuing at this time; correct?
MR. STANLEY: Object to the form.
Q. You previously testified that there was an increase in the number of events over what would be expected if you looked at the Masters Series valve as reported in that May 20th, 1999 letter; correct?
A. Comparing the two to each other?
Q. Yes.
A. Yes.
Q. And that trend continues here in June of '99 as well; correct?
A. Without seeing the data I couldn't answer that. I would be guessing.
Q. Okay. Well why don't we look at -- at the -- basically the same data that we looked at in the May 20th, 1999 letter, and that starts on page 1115. Are you there?
A. Yes.
Q. Okay. You've got 14 closed FER files that report endocarditis; correct?
A. Infection, yes.

Q. And again that's an increase over what you would expect in comparison with the Masters Series valve; correct?
A. Well "an increase," once again I wasn't sitting down comparing them at this point. What I was doing was gathering just the information for Hazel.
Q. I know, but as we sit here today having looked at the documents you've looked at and the various incident rates reported to the FDA for the Masters Series valve, you can now say that there was an increased rate of reports of infection in the FER system as of June 30th of 1999 with the Silzone valve; correct?
A. As -- As received in the FER system, yes.
Q. Okay. And that's consistent with what you saw a month earlier on May 20th of 1999; correct?
A. Yes.
Q. In addition, at this point you also have 27 additional cases of endocarditis in the open category; correct?
A. Yes, we do.
Q. So as of June 30th of 1999 you've got a total of 41 cases that involve endocarditis with the Silzone valve; correct?
A. Well endocarditis or some type of infection,

yes.
Q. Well the infection that you'd be talking about here is an infection of the valve, which is endocarditis; right?
A. Yes.
Q. Okay. You've got, between the closed and open files, 14 cases of thrombus now reported with the Silzone valve; correct?
A. Yes.
Q. Eight cases of thromboembolic event; correct?
A. Yes.
Q. A total of 22 cases of either thrombus or thromboembolic event; correct?
A. Yes.
Q. And again that's a substantial increase over what you would have expected based on your previous experience with the Masters Series valve; correct?
A. Well it's an increase.
Q. And at this point you've got 12 cases of paravalvular leak; correct?
A. Yes.
Q. And paravalvular leak would mean paravalvular leak without any indication of endocarditis; correct? As a primary code?
A. Yes. If it's a primary code, yes.

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT

PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62-C9-02-7324

Heart Valve Litigation

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DONALD S. GUZIK

VOLUME II, Pages 283 - 464

October 16, 2002

(The following is the continuation of the deposition of DONALD S. GUZIK, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, in the city of Minneapolis, state of Minnesota, commencing at approximately 8:07 o'clock a.m., October 16, 2002.)

A. Well he had -- Steve had left the company for a number of years to work for another medical company and then came back.

Q. Oh, okay.

Let me hand you what's previously been marked as Plaintiffs' Exhibit 68. This is a letter dated July 15th of 1999 to Hazel Randall, and it's from Al Flory and it's cc'd to both yourself and Steve Healy; correct?

A. Yes.

Q. And again this is -- this is addressing the appropriateness of the warning letter that the MDA wants to send out; correct?

A. Yes, it is.

Q. Okay. Let's look at the -- under "A, General Comments, 1, Appropriateness of the Letter." It says, "As your letter correctly points out, the Silzone valve has been available in developed countries since 1997, with more than 30,000 valve implants worldwide"; correct?

A. Yes.

Q. He then states, quote, throughout this time, the field experience (complaint) rates for this valve have been comparable to those for our other products; correct?

A. Yes.
Q. That's a false statement; right?
A. Well I wouldn't exactly -- Yeah, I would say there's a difference. There was a notable difference.
Q. There was a notable difference between --
A. Right.
Q. -- the Silzone events and the non-Silzone valve events; correct?
A. Correct.
Q. So this is a lie.
A. Well not necess --
MR. STANLEY: Object to the form.
A. Not necessarily. Once again, not knowing what -- the thought process of what Al was saying here, seeing that he's the one that wrote the document, --
Q. Right, but you're the person who's in charge of Field Experience Reports, and you knew as much about the rates of field experiences as anyone; right?
A. Right.
Q. And this is not a correct statement based on what you knew as the head of the division responsible for the Field Experience Reports; correct?
A. No, I would say that the events, even though they were low in numbers and appeared higher than the

conventional valve, were explainable, and that's probably what he's trying to articulate.
Q. But that's not what he says, he says they're comparable and that's not true; correct?
A. Well "comparable" being that the information that comes in, it's at the discretion of physicians to send in medical complications or events.
Q. He's suggesting to Hazel Randall at the MDA that the rates are the same, that the adverse event rates are the same for the Silzone valve and the non-Silzone valves, and that's not a true statement; is it?
MR. STANLEY: Object to the form.
A. Well once again I don't know what Al -- how he came to that statement.
Q. Yeah. I'm not asking you whether you know what Al says. You know as you're sitting here today that that is not a true statement; correct?
A. Well once again, not -- I wouldn't say it -- exactly that it's not a true statement based upon the fact, once again, of products at the discretion of the physicians being reported and being explainable events.
Q. But you know yourself that the event rates were not comparable, they were higher in the Silzone

valves than the non-Silzone valves.
A. From comparing numbers to numbers, yes.
Q. Let's look on page 2. It says, "Appropriateness of Portraying Anecdotal Information as an Organized Clinical Trial," and here he's talking about the reports of Dr. Butany. I mean, didn't Dr. Butany do a retrospective analysis of the Silzone valves implanted?
A. Once again I don't do the clinical aspects of it so --
Q. But wasn't that your understanding what Dr. Butany did?
A. Dr. --
My understanding of what Dr. Butany did was he had -- he's a pathologist, he was doing some studies from competitive valves comparing those to the standard St. Jude valves, and later had some Silzone product that he was also comparing, and he gathered those from throughout Canada.
Q. Right. And the study he was participating in was actually a randomized study; wasn't it?
A. That I don't know.
Q. Dr. David's study was a randomized study. Do you know that?
A. Yes.

Q. Okay. So going back, this statement, clinical data collected thus far shows Silzone valve performance to be similar to the SJM conventional cuffed mechanical valve. That's not a correct statement; is it?

MR. STANLEY: Object to the form.

A. Not knowing what they meant, you know, whether or not it's correct or not, reading it for the context here today, it doesn't appear to be --

Q. Correct.

A. -- correct.

Q. Okay. And just so we're...

It doesn't appear to be a correct statement.

A. Right.

Q. Thanks.

And finally, the last statement is, "The AVERT trial will confirm the effectiveness of the Silzone coating in reducing prosthetic valve endocarditis." And again that's a untrue statement at this point in time; correct?

A. At this -- At this point in time, yes.

Q. As of the date of this memo, January 12th of 1999, there was no information from the AVERT study that indicated that Silzone was effective in reducing prosthetic valve endocarditis; correct?

A. "July" 12th, 1999.
Q. I'm sorry, you're right.
A. Yes.
Q. Okay. So to say that the AVERT trial will confirm the effectiveness of the Silzone coating simply is -- is incorrect; right?
A. It's unknown --
Q. Right.
A. -- at this point.
Q. And finally the last statement, "After approximately 30,000 valves there simply has not," and underlined has not, "been the evidence to suggest that the Silzone valve causes an increase in valve related complications." And again based on the data that you had under your control and under your supervision, that's not a correct statement; correct?
A. There -- There's a difference in the numbers even though it's extremely low.
Q. Well "extremely low," we had 50-some events as of this date with the Silzone valves, and you reported for the previous year some three events in 30,000 Masters Series valves; correct?
A. When you're comparing that to the annual report complication rates.
Q. It's greatly increased; correct?

A. There's a difference.
Q. Well how big would that difference have to be before you'd agree with me that it's a great increase?
MR. STANLEY: Object to the form.
A. It doesn't --
As I talked about yesterday, whether -- to me for my job and the employees of St. Jude, it doesn't matter how many or how great. One is substantially enough. I mean in either arm makes me concerned.
Q. Well let's assume our numbers are three per 30,000 in the Masters Series valves and 51 per 30,000 in the Silzone valves. How would you characterize that increase in adverse event rates between those two valves?
A. I would say -- I would say there's a difference and that it needs to be looked at.
Q. Just doing my rough math, that's about a 17 times difference; correct?
A. Yes.
Q. Wouldn't you consider a 17 times increase to be a substantial increase?
A. Yes, I would.
Q. Okay.
(Plaintiffs' Exhibit 196 marked for

after 30,000 implants, the St. Jude heart -- Silzone heart valve is performing just like your standard valves?

MR. STANLEY: Object to the form.

A. I think that what it's saying is after 30,000 implants that it's -- it continues the tradition of excellent performance, just like it says.

Q. Excellent clinical performance; right?

A. Yes.

Q. In fact you know from your experience with its clinical performance in terms of both the clinical studies and the FER, that it's not continuing that tradition of excellent clinical performance; correct?

A. Right, it's questionable.

(Plaintiffs' Exhibit 197 marked for identification.)

BY MR. O'FALLON:

Q. Plaintiffs' Exhibit 197 is a document Bates stamp numbered SJM0920205738NK through 40NK. This is a group of e-mails, and I'm not sure that you're on any of these and so I'm -- Oh, you are on some of them. What this talks about is bypassing Hazel Randall and going over her head; correct?

MR. STANLEY: Object to the form.

A. It's -- Well it's talking about talking about

taking it to an Alan Kent.
Q. Was that ever done?
A. I don't know.
Q. Who is Roger Osborne who's in the top e-mail?
A. Roger Osborne I believe is a sales rep in the United Kingdom.
Q. Okay. What he writes to Al and Dickey, and "Dickey" is Dickey Franssen-Brader; correct?
A. That's correct.
Q. He says, "I am aware you did not copy me on the latest elements to the Silzone Saga, and appreciate you may feel I have little to contribute. However, I cannot agree more with the comments of Roland Gerard. Alan Kent is a very reasonable and open minded chap"; correct?
A. Yes.
Q. He then says, "It does appear that US side has and is consistently underestimating Hazell Randell and her abilities"; correct?
A. Yes.
Q. "I really do believe the time to by-pass her has arrived - that time was actually 2nd July when the 2nd draft was received"; correct?
A. Yes.
Q. And that second draft is something we've had a

I mean as you interpret that is that including the AVERT data?
A. I don't -- I don't know what studies Steve is referring to here.
Q. Okay. Now the AVERT data wasn't available to St. Jude; right? Isn't that what you told the MDA?
A. Yes, I guess that -- once again it -- there was certain windows where Al, I believe, could get information, but you couldn't ask or request for it, and I'm not familiar with that.
Q. Okay. And just to clarify, the next sentence says, "The most prominent of these studies is the AVERT study"; correct?
A. Yes.
Q. The first part of this letter discusses Mr. Butchart's study; correct?
A. Yes.
Q. At no point in this letter does Mr. Healy convey to the medical community that Mr. Butchart's study was a St. Jude-sponsored study; correct?
A. No, it doesn't appear so.
Q. At no point in this letter does Mr. Healy tell the medical community that Mr. Butchart's study was in fact one specifically requested by St. Jude for purposes of comparing thromboembolic rates in St.

Q. The only difference between the Masters Series valve and the Silzone valve is silver; right?
A. Yes.
Q. So you could reasonably infer that if there is any difference between the event rate with the Masters valve and the Silzone valve it's due to the silver; right?
A. You could infer that.
Q. I mean that's the only difference. That's hardly an apples-and-oranges comparison.
A. Well once again I think the -- the statement, you're asking me if this is a falsified statement here, I'm saying no. The statement's looking at the Silzone within the Silzone population, and that's what it says here, 32,000 implants of the Silzone comparing that to Mr. Butchart's Silzone population, we're not seeing what he's claiming to see. That's what I believe is being said here.
Q. You're not seeing as high a rate as he's seeing, but you're still seeing an increased rate; correct?
A. Yes, when comparing that, once again, to the -- to the old study, yes.
Q. Aren't you suggesting here that you're not seeing an increased rate of thromboembolism as does Mr. Butchart?

MR. STANLEY: Object to the form.
A. No, I think what we are saying here is that -- is what I just alluded to is that there's been 32,000 implants of the Silzone, the outlier is Mr. Butchart, he has a higher incident rate, granted.
Q. He's not an outlier. Your entire FER experience would indicate that you're having more thromboembolic events with Silzone valves as compared to your Masters Series valve.
A. When comparing it to the Masters Series valve.
Q. Correct?
A. But --
That's correct, but I don't believe that's what's being said here.
Q. Okay.
A. That's my opinion.
Q. Look at page 582. In the third paragraph you state, "It is interesting to point out that in its November 15 Advisory Notice, the MDA states that" there "will be some time before the AVERT study yields adequate data considering the fact that there are approximately 700 patients currently enrolled in the study and monitored closely"; correct?
A. Yes.
Q. It also states, "In addition, it is interesting

that MDA does not question the validity of the statistical method used by Mr. Butchart even though the linearized method he used was publicly criticized during a recent AHA congress"; correct?
A. Yes.
Q. It wasn't criticized by your expert reviewers from the United Kingdom; was it?
A. I don't know because I wasn't involved.
Q. Well then how did you make that statement?
A. The sta -- This statement -- I --
This statement was not necessarily made by me. I may have been the author of this, but as you can see, Al Flory, Dr. Frater, everyone else had the input to this. I didn't draft this myself.
Q. Well don't you have an obligation to make sure whatever documents you sign are accurate?
A. The documents that I sign are accurate because I -- once again as I stated earlier, I trust and believe that the -- the morals and ethics of Dr. Flory and his professionalism I trust immensely.
Q. So you defer to Dr. Flory in making all these various statements in this document.
A. Dr. Flory was more involved with the clinical studies, involved with -- with the institutions that were carrying out the studies and providing the

recognize this document?
A. Yes, I do.
Q. And could you just identify it for me?
A. This was a -- it was requested by Joe Edwin, who was the district FDA inspector, when he came into his visit if we could provide him with a couple charts.
Q. Okay. And specifically what he was asking for is an analysis of explants due to endocarditis and explants due to paravalvular leak comparing St. Jude's Silzone valve with their conventional valve; correct?
A. Yes, he was.
Q. And this is information based on an analysis of the FER database which is under your control; correct?
A. Yes, it is.
Q. Did you actually put together this analysis?
A. No, I did not.
Q. Who did?
A. It -- I believe the information was gathered primarily by Denise Johnson and provided to Sharla -- I'm trying to think of her last name, our statistician.
Q. Okay. Rushmeyer?
A. No.

Q. The explant rate for Silzone valves with paravalvular leak is, at a bare minimum, seven times higher than the explant rate for conventional valves due to paravalvular leak; correct?
A. It -- Yes, it's -- there's a difference. However, keeping in mind that the numbers are extremely low.
Q. But --
A. But --
Q. But an extremely high increase in rate; correct?
A. There's a difference in what was reported, yes.
Q. So basically your internal analysis of your FER system confirmed what was being seen in the AVERT study; correct?
A. Yes, it would.
Q. It also confirmed the experience that they were having at Toronto General with the increased explants due to prosthetic valve endocarditis; correct?
A. Well yeah, looking at if you were comparing the two to each other. Once again keeping in mind that these -- the data reporting in the conventional part of the arm as well as the Silzone part of the arm is not as controlled as an AVERT study would be, but they do -- you know, they show a difference, yes.
Q. And both the information received in the

conventional arm and the information in the Silzone arm are subject to that same condition, i.e., they're both voluntary reporting; correct?

A. Yes, they are.

Q. The -- The table here in Exhibit 210 concerning explants due to endocarditis also confirms what was seen in March of 1999 at Rigshopitalet; that is, an increase in explants due to endocarditis in the Silzone valves; correct?

A. Well part of the Rigs data is -- or the data that was gathered from Toronto General and everyone else is -- is part of this FER, you know, contributing to the rate so...

Q. But your broader experience in the FER confirms what you were also being told and seeing in the various --

A. Yes, --

Q. -- studies.

A. -- there was a difference based on what we were seeing.

(Plaintiffs' Exhibit 211 marked for identification.)

BY MR. O'FALLON:

Q. Plaintiffs' Exhibit 211 is a document Bates numbered SJM 1730389793SN through 820SN. Do you