# Exhibit 56

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC., | : | |
| SILZONE HEART VALVES PRODUCTS | : | |
| LIABILITY LITIGATION | : | MDL DOCKET NO. 1396 |

# DECLARATION OF DR. DAVID L. SACKETT

I, David L. Sackett, MD, OC, FRSC, FRCP, of the Province of Ontario, being of legal age declare and state:

1. I am a medical doctor and have been engaged in internal medicine clinical practice, teaching and research, with a major focus in determining the efficacy and safety of drugs and operations, since 1967. I obtained my medical degree from the University of Illinois, and my Master of Science in Epidemiology from Harvard University. I hold Fellowships in Internal Medicine from the Royal Colleges of Physicians of Canada, England and Scotland.

2. For 20 years I was an associate editor of the Journal of Chronic Diseases (later the Journal of Clinical Epidemiology), and have sat on the Editorial Boards of several scientific and medical journals, including the Journal, Clinical and Investigative Medicine. I was the founding co-editor of the journal "Evidence - Based Medicine". I have written a number of books, chapters in books, and journal articles in the area of clinical epidemiology and the evaluation of therapy.

3. I was the founding Chair of the Department of Clinical Epidemiology and Biostatistics at McMaster University in Hamilton, Ontario, in 1967, and the founding Chair of Clinical Epidemiology and the founding Director of the Centre for Evidence Based Medicine at the University of Oxford in Oxford, England, in 1994.

4. For my work in the evaluation of new operations and drugs I was elected to the Royal Society of Canada in 1992 and, in 2000, honored with induction into the Canadian Medical Hall of Fame. I was made an officer of the Order of Canada in 2001.

5. Attached as Tab 1 is a true and correct copy of my curriculum vitae. In my curriculum vitae, there are 141 entries that describe my experience in randomized controlled trials of both surgical and medical interventions, both as a principal investigator and as a chair/member of Data Safety and Monitoring Boards. To highlight just four recent examples:

- I was the principal epidemiological investigator in the Extracranial-Intracranial Bypass Trial that demonstrated the ineffectiveness of this surgical procedure.
- I was the principal epidemiological investigator in the North American Symptomatic Carotid Enderarterectomy Trial that demonstrated the efficacy of this surgical procedure.
- I currently chair the data safety and monitoring board of the HOPE and HOPE-TOO Trials into the prevention of cardiovascular events (over 9000 patients in 267 centres on 3 continents).
- I currently chair the data safety and monitoring board of the DREAM Trial into the prevention of diabetes.

6. I have studied the following four documents in detail:

(a) The June 28, 2001 affidavit of St Jude's Dr. Alan R. Flory, that was filed in the Canadian counterpart to the Multi-District Litigation class action suit in the United States, especially Exhibit "G" (Appendix A).

(b) "Extempore Analysis of the AVERT Study Data", dated March 10, 2000, authored by G. L. Grunkemeier (Medical Data Research Center, Portland, Oregon), and E. Kennard and R. Holubkov (AVERT Data Co-ordinating Center, University of Pittsburgh).

(c) "Schaff et al: Paravalvular leak and other events in Silzone coated mechanical valves: A report from the Artificial Valve Endocarditis Reduction Trial (AVERT)". Published abstract from the 37th annual meeting of the Society of Thoracic Surgeons (2001; 37:122-3).

(d) "Schaff HV, Carrel TP, Jamieson WRE, et al: Paravalvular leak and other events in Silzone-coated mechanical heart valves: a report from AVERT. Ann Thorac

Surg (2002;73:785-92).

7. In addition, I have examined various other case reports and case series of patients receiving Silzone and other heart valves. However, the highest quality scientific evidence on the efficacy and safety of the Silzone heart valve comes from the AVERT trial, and I have focused most of my attention on the documentation of this study in connection with my opinions that I express below.

8. I have agreed to serve as a forensic consultant to the MDL 1396 PSC on matters within my fields of expertise relating to the proposed class actions pending in the federal St. Jude Silzone MDL. All of the opinions that I express below are opinions that I hold within a reasonable degree of medical and scientific certainty in my fields of medicine and epidemiology.

9. Exhibit "G" (Appendix A) to the Flory Affidavit presents data from the AVERT trial. The data is this document reveals that the Silzone valve, when compared with other valves, does more harm than good to the patients who receive it.

10. The table in Exhibit "G" (Appendix "A") reveals that 8 of 398 (2.01%) of Silzone patients, but only 1 of 394 (0.25%) of patients with "conventional" cuffs went on to "explant for paravalvular leak" (PVL).

11. This difference is not the result of an unexpected low rate of major paravalvular leak in the control group (their rate of 0.25% is not statically significantly lower than the 0.6% reported in the "Objective Performance Criteria" (OPC) on page 10 of Dr. Flory's affidavit (one-sided Fisher's Exact probability = 0.50), but is due to a unexpected high rate of major PVL in the Silzone group.

12. These results mean that patients receiving Silzone valves were about 8 times as likely to require explants for PVL as patients receiving the control valves, and that for about every 60 Silzone valves implanted, one more explant for PVL would be required.

13. If the investigators had no prior hypothesis that the Silzone valves might necessitate more explants for PVL (a two-tailed situation), the Fisher's Exact Probability that this difference was merely due to chance is a statistically significant 0.038. But if the investigators did have a prior hunch that the Silzone valves might cause more explants for PVL (a one-tailed situation), the Fisher's Exact Probability that this difference was merely due to chance is an even more statistically significant 0.02.

14. The next document of relevance is the *Extempore Analysis of the AVERT Study Data*. This document provides information on the design, execution and analysis of the AVERT randomized trial protocol. It contains an extremely important admission (albeit in complex statistical jargon) that the study was too small to rule out "serious problems". This means that although the higher stroke rate found in the Silzone patient arm of the study was not "statistically significant", this absence of "statistical" proof of addition harm does **not** provide proof of the absence of serious additional harm from the Silzone valve (beyond the clear-cut harm due to the need for explant for PVL).

15. By way of example, the AVERT protocol states that the study was designed to detect a halving of the early prosthetic valve endocarditis (PVE) from 1.0% to 0.5%. Table 1 of the Extempore report lists 12 cases of early PVE, only one of whom had endocarditis at entry. One can estimate the degree of serious harm that might be caused by the Silzone valve by calculating the 95% confidence interval around the rates shown in Table 1. The results are disturbing:

- The observed early PVE rate for aortic valves (2/200) is compatible with a rate as high as 4% (8 times the rate claimed for the Silzone valve in the protocol);
- The observed early PVE rate for mitral valves (0/111) is compatible with a rate as high as 3% (6 times the rate claimed for the Silzone valve in the protocol);
- The observed early PVE rate for double valves (0/40) is compatible with a rate as high as 7% (14 times the rate claimed for the Silzone valve in the protocol).

16. The next document of relevance for the Court to know of and appreciate is the published abstract on AVERT study I cite above. The key evidence in this abstract appears in its Table, re-produced here, which provides both actual numbers for the various bad outcomes, and the "Kaplan-Meier" rates for them (that is, rates that are corrected for differing

lengths of follow-up):

| | Silzone valves (n=402) | | | Conventional valves (n=405) | | | P-value (from log rank test) |
|---|---|---|---|---|---|---|---|
| | Events | 3 mo rate | 1 yr rate | Events | 3 mo rate | 1 yr rate | |
| Death | 22 | 3.9% | 6.2% | 26 | 4.9% | 7.8% | 0.62 |
| Major paravalvular leakage (PVL) | 12 | 1.1% | 3.4% | 4 | 0.5% | 1.3% | 0.06 |
| Explant (for any cause) | 16 | 1.1% | 5.2% | 2 | 0% | 0.8% | 0.001 |
| Stroke | 10 | 2.1% | 3.2% | 5 | 1.4% | 1.4% | 0.18 |

17. It should be noted that no details of the specific statistical analytic steps taken in generating this table were provided in this abstract. If it were generated in the usual statistical way, the 3 month and 1 year rates relate to time since randomization/operation, and the P values from the log-rank test include only 1 year data, and no events that occurred later. This is significant because this abstract also notes that explants due to PVL occurred up to 646 days post-operatively, well beyond the one year follow-up.

18. Conventional statistical significance is anything less than or equal to 0.05. By this convention Silzone valve patients were statistically significantly worse off than conventional valve recipients in terms of major PVL and the need for explant. That is, the chance that this difference in explant rates occurred merely by chance (rather than because of faults in the Silzone valve) is tiny, about 1 in a 1000.

19. Of greater importance to clinicians and patients is the clinical significance of these statistically significant results. A current standard measure of clinical significance is the "number needed to be treated" with a Silzone valve to cause one more bad outcome (in statistical terms, it is the inverse of the absolute risk increase). Applying this method to these

results we learn that for every 48 patients who receive a Silzone (rather than a conventional) valve, one more of them will suffer the serious complication of a major paravalvular leak. Worse still, for every 23 patients who receive a Silzone (rather than a conventional) valve, one more of them will suffer the catastrophic complication of having to undergo another major heart operation for removal of that Silzone valve.

20. The last document of relevance from an epidemiological point of view is the recent (March 2002) AVERT published report in the Annals of Thoracic Surgery by Schaff et al. This new report extends the follow-up of study patients and, as a result, provides even firmer evidence on the safety of the Silzone valve than was available from the earlier documents. Its primary focus is paravalvular leak.

21. The additional follow-up data on valve failure in the AVERT study show that the Silzone valve is even more harmful than was apparent from the earlier reports. I quote from the new paper: "At 2 years of follow-up, the freedom from explant rate was 90.1% in the Silzone patients compared with 99.4% in the non-Silzone group." The paper goes on to say that this degree of difference could arise by the mere play of chance in only 1 of 5000 studies of similar design and duration. Translated into plain words: At two years of follow-up, 9.9% of Silzone valve patients had to have at least one of their valves replaced, compared to 0.6% of non-Silzone valve patients. This means that **<u>Silzone valve patients were 9.9/0.6 or over 16 times as likely to require valve replacement as non-Silzone valve patients</u>**. Put another way, <u>for every 11 patients who received a Silzone valve, 1 more of them had to undergo valve replacement</u>.

22. This is the most serious example of harm from a surgical procedure that I have examined in the last 35 years.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: April 22, 2002

DR. DAVID L. SACKETT

Court File No. 00-CV-195906CP

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

B E T W E E N:

ERIK ANDERSEN, YVONNE ANDERSEN and SHARON FROST

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and
ST. JUDE CANADA, INC.

Defendants

Proceeding Under the *Class Proceedings Act,* 1992

**AFFIDAVIT OF DR. DAVID L. SACKETT**
**(SWORN FEBRUARY 27, 2003)**

I, David L. Sackett, MD, OC, FRSC, FRCP, of R.R. #1, Markdale, in the Province of Ontario, MAKE OATH AND SAY:

**INTRODUCTION**

1. I previously swore an affidavit in this matter on December 3 2001. As mentioned in that affidavit, I have been engaged in internal medicine clinical practice, teaching, and research, with a major focus in determining the efficacy and safety of drugs and operations, since 1967. As such, I have knowledge of the matters to which I have deposed in this affidavit, except when I have been informed by others, in which case I have disclosed the source of the information and I believe it to be true.

2. In this affidavit, I intend to:

(a) refer briefly to my background and qualifications (which are described in more detail in my previous affidavit);

(b) review the opinions that I expressed in my previous affidavit based on the data that were then available regarding the artificial valve endocarditis reduction trial ("AVERT"), a study sponsored by St. Jude Medical, Inc. in light of addition data

that have been released since then and the analyses of others, including particularly Dr. Judith K. Jones, who swore an affidavit in this matter on behalf of St. Jude Medical, Inc. and St. Jude Medical Canada, Inc. on January 27 2003.

(c) provide a summary of my opinions.

**BACKGROUND AND QUALIFICATIONS**

2. My background and qualifications are set forth fully in my previous affidavit and in the *curriculum vitae* that was attached as Exhibit "A" to my previous affidavit. In brief summary, I obtained my MD degree from the University of Illinois, and my Master of Science in Epidemiology from Harvard University. I hold Fellowships in Internal Medicine from the Royal Colleges of Physicians of Canada, England and Scotland. I have been engaged in internal medicine practice, teaching, and research since 1967. During that time, a major focus of my research has been in determining the efficacy and safety of drugs and operations.

3. I was the founding Chair of the Department of Clinical Epidemiology and Biostatistics at McMaster University in Hamilton, Ontario, in 1967, and the founding Chair of Clinical Epidemiology and the founding Director of the Centre for Evidence Based Medicine at the University of Oxford in Oxford, England, in 1994.

4. My experience in radomized controlled trials of both surgical and medical interventions, both as a Principal Investigator and as a Chair or Member of Data Safety and Monitoring Boards, are set out in detail in my *curriculum vitae*.

5. For my work in the evaluation of new operations and drugs I was elected to the Royal Society of Canada in 1992 and, in 2000, was honoured with induction into the Canadian Medical Hall of Fame. I was made an office of the Order of Canada in 2001.

6. The following updates my background and qualifications since I swore my previous affidavits:

(1) Named a "Canadian Medical Hero" by the Pan American Health Association.

(2) Named to the National Working Committee on Placebos of Health Canada and the Canadian Institutes for Health Research.

(3) Named to the RCT Training Committee of the Canadian Institutes for Health Research.

(4) Named to the Task Force on Clinical Research of the Royal College of Physicians and Surgeons of Canada.

(5) Named to the international PraCTiHC Consortium, created by the European Economic Community, to assist low-income countries carry out randomized trials of affordable health interventions.

## THE ESSENCE OF THE SILZONE PROBLEM

7. The question before us is: "Does the Silzone valve cause paravalvular leak (PVL)?"

8. Both sides of this liability litigation agree that the best prediction of the true answer to this question comes from a randomized clinical trial (RCT).

9. The AVERT study is such an RCT. Although it was large enough to show that the Silzone valve causes PVL, it is too small to show whether the Silzone valve is causing continuing PVL damage or other serious harm (as shown below).

10. The way that an RCT such as AVERT predicts the true answer to this question can be shown in the following table:

| | | The true answer | |
|---|---|---|---|
| | | The Silzone valve does cause PVL | The Silzone valve does not cause PVL |
| Prediction of the answer from the AVERT trial | The Silzone valve does cause PVL | Right<br>a | Wrong<br>b |
| | The Silzone valve does not cause PVL | c<br>Wrong | d<br>Right |

11. In this case, we are interested only in the top row of this table:

"Is a prediction that the Silzone valve causes PVL right or wrong?"

| | | The true answer | |
|---|---|---|---|
| | | The Silzone valve does cause PVL | The Silzone valve does not cause PVL |
| Prediction of the answer from the AVERT trial | The Silzone valve does cause PVL | a | b |

12. The statistical analysis of an RCT provides key information for both cells of this top row.

<table>
<tr><td></td><td></td><td colspan="2">The true answer</td></tr>
<tr><td></td><td></td><td>The Silzone valve does cause PVL</td><td>The Silzone valve does not cause PVL</td></tr>
<tr><td>Prediction of the answer from the AVERT trial</td><td>The Silzone valve does cause PVL</td><td>POWER tells us our ability to find this out if it is true.<br><br>(MUST EQUAL OR EXCEED 80%)</td><td>95% confidence intervals tell us whether we can exclude the Silzone valve as a probable cause (MUST EXCLUDE ANY IMPORTANT DAMAGE)</td></tr>
<tr><td colspan="3">POWER tells us our chances of finding that the Silzone valve causes PVL if it truly does. The AVERT investigators decided to require a POWER of 80% or more before they would be willing to accept any conclusion that the Silzone valve does not cause PVL. (80% power is usual in RCTs, and Professor Goldsmith's declaration employs this value).</td><td></td></tr>
<tr><td colspan="3">The 95% confidence interval tells us that whether we can confidently exclude clinically important PVL rates (Professor Jones' declaration repeatedly fails to understand this point).</td><td></td></tr>
</table>

13. There is agreement on both sides that the Silzone valve causes PVL. This was the conclusion of the AVERT DSMB (who stopped the trial), the AVERT investigators (who published that result 26 months later), and both sides of this litigation.

14. At issue is whether the Silzone valve continues to cause PVL beyond two years after implantation, and whether it causes other, additional damage to patients who receive it.

15. The trial investigators have themselves recently declared that the Silzone valve may still be causing PVL beyond two years after implantation. This declaration appears in a presentation from the trial's Coordinating Centre (Dr. Elizabeth Kennard) at the AVERT Investigators' Meeting in San Diego on 31 January 2003 [Exhibit A: PowerPoint Cover slide #1 and slide #18]. To quote from her slide:

> " Risk of paravalvular/explant continues to be ...significantly higher in patients implanted with the Silzone valve."

> " At this time cannot rule out continued increased risk of Silzone valve."

The investigators also suggested the need for continued surveillance:

> "Additional follow-up data will allow evaluation of long term risk."

16. I agree with the investigators' statement of the need for continuing close follow-up and monitoring of patients who received Silzone valves in the AVERT trial.

17. However, the simple truth is that we cannot tell from the current follow-up whether the Silzone valve is safe or dangerous beyond two years after implantation. The power necessary to show a clinically significant increased risk is simply not present. Similarly, the 95% confidence intervals around the reported continuing risk of the Silzone valve are extremely wide, and continue to include the possibility of clinically important harm.

18. The rate of PVL from the Silzone valve was so high that the AVERT trial could demonstrate it with high power (and with a 95% confidence interval that ruled out its innocence)

after admitting less than one-fifth of its target number of patients. However, less frequent forms of harm from the Silzone valve (thromboembolism, endocarditis) would require the full sized trial. As a result, the trial is far, far too small to be able to tell us whether the Silzone valve also causes these other forms of damage.

19. Dr. Jones's recurring, fundamental error is to misunderstand or misrepresent the meaning of an indeterminate result. By "indeterminate result", I mean an excess risk from the Silzone valve whose P-value is greater than [>] 0.05 and whose 95% confidence interval includes zero. The true meaning of an indeterminate result is clear from its name: it cannot tell us whether or not an excess risk exists.

20. As shown in the earlier tables, the only way to show that the Silzone valve is not causing increased harm is to ignore P-values and to examine the power of the conclusion that it is harmless. If the power of the "negative" result is 80% or higher (the value selected by the AVERT investigators), we would acquit the Silzone valve.

21. Dr. Jones compares the PVL rates of 11.3% for the Silzone valve vs. 8.7% for the conventional valve. She finds that this difference is not "statistically significant," and insists therefore that the Silzone valve is innocent. Her fundamental error is revealed when we look at the power of her conclusion. As shown in Professor Goldsmith's analysis, the power for her conclusion is only 15%. This is vastly less than the 80% that is required before the AVERT investigators (or any statistician I've met) would declare the Silzone valve innocent.

22. The error of Dr. Jones's interpretation is taught in elementary courses in biostatistics, and is exposed in standard texts (e.g., page 89 of Curtis Meinert's RCT textbook[i], page 170 in Douglas Altman's statistics textbook[ii]). Indeed, experts in RCTs have found that the vast

majority of RCTs reported as "negative" had powers that were too low to rule out benefits and harms of 25%, and have called for a "ban" on the use of Dr. Jones's "negative" description of RCT results in serious medical journals[iii].

23. Indeed, the defendants have themselves acknowledged the inadequacy of the AVERT trial to detect serious problems. St. Jude Medical, Inc.'s website (www.sjm.com) under the heading "AVERT White Paper Study" contains the following explicit admission:

> " The power for AVERT to detect serious problems is weak due to the small number of patients at longer time periods and the limited baseline and follow-up information."

24. Finally, Dr. Jones's comments about echocardiography and pathology involve subject matter and expertise far beyond her competency.

25. The foregoing scientific considerations inevitably lead to the following conclusions:

- The Silzone valve clearly causes harm in the form of PVL, with all its severe health consequences.
- Because of low statistical power and wide 95% confidence intervals, we do not know whether the Silzone valve causes other forms of harm, or whether it continues to cause PVL harm after this initial damage.
- Patients who have received Silzone valves should continue to receive close follow-up to detect and treat further PVL and other complications as soon as they occur.
- On medical ethical grounds, I believe that it is necessary to inform patients who have received Silzone valves of these increased and unknown risks of present and future complications.

25. I repeat my request for the names and contact information for the AVERT DSMB.

26. I suggest that it be determined how much time elapsed between stopping the trial in January 2000 and notifying the AVERT trial patients of this decision and its implications for their health.

27. Finally, I suggest that an explanation be sought for why a study stopped for harm in January 2000 was not presented at a scientific meeting for 1 year and not published for over 2 years.

SWORN BEFORE ME at the ~~City~~ Town of Flesherton, this 27th of February, 2003. )

A Commissioner, etc. )

DAVID L. SACKETT

---

[i] Meinert CL: Clinical Trials; Design, Conduct, and Analysis. New York: Oxford University Press, 1986.

[ii] Altman DG: Practical Statistics for Medical Research. London: Chapman & Hall, 1991.

[iii] Chalmers I. Proposal to outlaw the term 'negative trial'. Br Med J 1985;290:1002.

Court File No. 00-CV-195906CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

ERIK ANDERSEN, YVONNE ANDERSEN and SHARON FROST

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and
ST. JUDE MEDICAL CANADA, INC.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**AFFIDAVIT OF DR. DAVID L. SACKETT**
**(Sworn April 16, 2003)**

I, David L. Sackett, MD, OC, FRSC, FRCP, of R.R. #1, Markdale, in the Province of Ontario, MAKE OATH AND SAY:

**INTRODUCTION**

1. As I explained in detail in my affidavits sworn December 1, 2001 and February 24, 2003, respectively, I have been engaged in internal medicine clinical practice, teaching and research, with a major focus in determining the efficacy and safety of drugs and operations, since 1967.

2. As such, I have knowledge the matters deposed in this affidavit, except where I have been informed by others, in which case I have indicated the source of the information, which I believe to be true.

3. I have reviewed the affidavit of Dr. Judith K. Jones sworn March 21, 2003 and this affidavit is sworn in reply.

4. I state at the outset that, in several paragraphs of her affidavit, Dr. Jones claims that I have "conceded" some point regarding the AVERT data. Each of her claims in this regard is false. I have conceded no point to Dr. Jones regarding the AVERT data.

**DR JONES DISGREGARDS THE FINDINGS OF PRINCIPAL AVERT INVESTIGATORS**

5. In her affidavit sworn March 21, 2003, Dr. Jones attaches as Exhibit "A" a principal artificial valve endocarditis reduction trial ("AVERT") investigator's slide presentation by Dr. Elizabeth Kennard (at para. 13), dated January 31, 2003. Dr. Jones references and emphasizes only part of the information contained in the slide found at page 18 of Exhibit "A" of her affidavit: "Risk of **paravalvular/explant** continues to be **relatively low but** significantly higher in patients implanted with the Silzone valve". [Emphasis supplied by Dr. Jones.] I pause here to note that Dr. Jones misquoted that sentence by omitting the word "leak" following the word "paravalvular".

6. Dr. Jones emphasized only a certain portion of the slide found at page 18 of Exhibit "A". In order to understand Dr. Kennard's concerns with the Silzone valve, it is imperative to highlight the rest of the sentence and, indeed, the rest of the relevant information on the slide. Specifically, Dr. Jones failed to highlight the remaining portion of the sentence as follows: "Risk of paravalvular leak/explant continues to be relatively low **but significantly higher in patients implanted with the Silzone valve**". [Emphasis added.] Further, Dr. Kennard states on the same slide: "**at this time cannot rule out continued increased risk of Silzone valve. Additional follow-up data will allow evaluation of long term risk**". [Emphasis added.]

7. Therefore, the scientists who are carrying out the AVERT trial and who, indeed, know the intricacies of its conduct and findings better than either of me or Dr. Jones, are calling for additional follow-up of AVERT patients. Dr. Jones' outright dismissal of the recommendations of frontline AVERT investigators is indefensible.

**DR. JONES REPEATEDLY VIOLATES VALID STATISTICAL PRACTICE AND MISREPRESENTS THE RESULTS OF THE AVERT STUDY**

8. "Good statistical practice" standards for the reporting of clinical trials like AVERT have been established by an international group of leading experts in clinical trials (including trialists, statisticians, epidemiologists and biomedical editors). These are reported at Begg C.B., Cho MK,

Eastwood S., *et al.*, "Improving the quality of reporting of randomized controlled trials: the CONSORT statement" (JAMA 1996;276:637-9). This document is attached as **Exhibit "A"**.

9. The recommendations of these leaders in scientific research are called "CONsolidated Standards Of Reporting Trials" ("CONSORT"). CONSORT has been widely published and supported by major medical journals, the International Committee of Medical Journal Editors and the World Association of Medical Editors.

10. "Good statistical practice" from CONSORT in reporting the results of trials like AVERT are very specific and include: "for each primary and secondary outcome, a summary of results for each group and the estimated effect size and its precision (e.g. 95% confidence intervals)". By consistently failing to show 95% confidence intervals in each and every figure Dr. Jones submits in Exhibits B through J of her affidavit, Dr. Jones violates the "good statistical practices" of the international CONSORT group. Her figures would not be accepted for publication by any serious medical journal.

11. Further, the most authoritative international sources of valid information on the effects of treatment are the systematic reviews of randomized clinical trials carried out by the Cochrane Collaboration. This international voluntary organization has 15 centres in North and South America, Europe, Africa, Australia and Asia, has identified over 250,000 randomized trials and has completed over 1,000 systematic reviews of the effects of health care.

12. A major cause for concern for the Cochrane Collaboration has been the misrepresentation of the results of randomized trials in which very small numbers of control and experimental patients show little differences in outcomes. Occasionally, these trials are mistakenly reported (whether through ignorance or deliberate misrepresentation) as showing "no difference in the effects of treatment". Indeed, this is the contention of Dr. Jones regarding the AVERT trial.

13. Dr. Jones' kind of misrepresentation, that the AVERT study evidences no difference in the effects of treatment as between the Silzone recipients and the conventional heart valve recipients despite the small size of the study sample, has been repeatedly condemned by senior trialists. For example, the founder of the Cochrane Collaboration and one of his colleagues recently wrote in a major medical journal: "It is never correct to claim that treatments have no

effect or that there is no difference in the effects of treatments. It is impossible to prove a negative effect or that two treatments have the same effect" (Alderson P., Chalmers I., "Survey of claims of no effect in abstracts of Cochrane reviews" (BMJ 2003; 326:475), attached as **Exhibit "B"**).

14. In other words, Dr. Jones continues to misrepresent the results of the AVERT trial, in violation of both the CONSORT standards and the standards of valid medical evidence.

**CONTINUED FOLLOW-UP OF SILZONE VALVE RECIPIENTS IS NECESSARY TO MONITOR FUTURE HARM**

15. In this vein, Dr. Jones repeatedly misrepresents the **absence of proof** of later harm as equivalent to the **proof of absence** of later harm.

16. In summary, the Silzone valve was clearly extremely harmful in the short run. Due to the small numbers of long-term patients and the wide confidence intervals for their continuing application rates, we simply cannot yet discern from the AVERT trial whether the Silzone valve is also harmful in the long run. Given the severity of these complications and the previous dangerous track record of the Silzone valve, the continued, complete follow-up of all the patients in the AVERT trial, under the scrutiny of an independent review body whose members have no financial ties to St. Jude Medical, Inc., is essential to determine the magnitude of future harm.

SWORN BEFORE ME at the Municipality of Grey Highlands, County of Grey this 16th day of April, 2003.

A Commissioner, etc.

DR. DAVID L. SACKETT