# Exhibit 59

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT

PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62 09-02-7324

Heart Valve Litigation

- - - - - - - - - - - - - - - - - -

DEPOSITION OF STEVEN J. HEALY

VOLUME I, PAGES 1 - 315

October 24, 2002

(The following is the deposition of STEVEN J. HEALY, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, Attorneys at Law, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota, commencing at approximately 8:57 o'clock a.m., October 24, 2002.)

Cameron to interpret their results.
Q. Paravalvular dehiscence is not the healing response that St. Jude expects with its valves; correct?
A. Paravalvular dehiscence is not -- correct, is not the response expected.
Q. Nor is it a response that St. Jude wants to see in its valves; correct?
MS. VAN STEENBURGH: Object to form.
A. That's correct.
Q. Why don't we put that little stack away.
Previously marked as Plaintiff's Exhibit 176 is a document Bates stamp numbered SJM1000227222 through 223. Do you recognize this document?
A. I just saw it for the first time within the last few days.
Q. Okay. This is a letter dated August 20th of 1998; correct?
A. That's correct, that's what it's dated.
Q. And it's from Kevin M. Johnson, a territory manager; correct?
A. Yes.
Q. And what territory was Mr. Johnson responsible for?
A. San Antonio, Texas.

Q. Just that one town?

A. And regions around there.

Q. Okay. Would that include all of Texas?

A. No. We had a rep in Houston and a rep in Dallas.

Q. Okay. And this is a letter he apparently sent to Dr. Arthur Santos on August 20th of 1998; correct?

A. That's what it appears, yes.

Q. It says, "I want to thank you for the time you provided me on Wednesday of this week. It is -- It is a rare occasion on a first meeting that so many topics can be discussed and I appreciate it - TSPV, the Rosengart and Wang articles and Silzone;" correct?

A. That's what it reads, yes.

Q. He says, "One group of articles I did not present were the papers on Silzone;" correct?

A. That's what it says, yes.

Q. He says, "It is my hope that we can discuss this in further detail on my next visit;" correct?

A. That's what he states, yes.

Q. He then states, "As you may be aware, silver is a microbial-resistant agent that has been used for medicinal purposes for hundreds of years;"

correct?
A. That's what it says.
Q. "It is presently used on a wide array of implantable devices including orthopedic products, intravenous catheters, and vascular graphs;" correct?
A. That's what it reads, correct.
Q. He then states, "Silzone coating has been shown in vitro to kill a variety of microorganisms, including those commonly associated with prosthetic valve endocarditis;" correct?
A. That's what it reads, correct.
Q. "In fact, Silzone coating is more than 99 percent effective in reducing microbial attachment and colonization in vitro;" correct?
A. That's what it reads, correct.
Q. That's one of the statements that St. Jude was told not to make; correct?
A. Told in the FDA approval letter?
Q. And subsequently the letters following up the FDA approval letter.
A. Can I just look to compare the language? I'm sorry.
Q. Sure. It's Plaintiff's Exhibit --
MR. WILSON: 175.
Q. -- 175.

A. That's correct.

Q. So it appears that in this particular letter Mr. Johnson has violated the FDA approval; correct?

MS. VAN STEENBURGH: Object to form.

A. It appears in this, you know, this sales rep's case, he did not go through the sign-off process and violated the FDA requirements.

(Plaintiff's Exhibit 224 was marked for identification.)

BY MR. O'FALLON:

Q. Plaintiff's Exhibit 224 is a document Bates stamp numbered SJM1000227253 through 54. This is another letter from Kevin Johnson; correct?

A. Yes, it appears to be.

Q. And this appears to be a form letter that he sends out; correct?

MS. VAN STEENBURGH: Object to form.

A. I'm not sure where it was sent. It's entitled "Dear Doctor."

Q. But it appears to be some kind of a form letter; correct?

A. I would -- I would imagine it was sent to multiple doctors if it was "Dear Doctor."

Q. Okay. And as you look at the fourth

paragraph of this --

By the way, the timing of this was apparently sometime around the Thanksgiving holiday; correct?

A. It says "Thanksgiving Holiday." Do you know what year?

Q. I do not.

A. Okay.

Q. It would either be the Thanksgiving holiday of 1998 or 1999; correct?

A. I'm just looking -- reading the letter.

It would have been, because it says we received approval, so it would be one of those two years.

Q. Okay. And again, in the fourth paragraph he makes the same statement that "In fact, Silzone coating is more than 99 percent effective in reducing microbial attachment and colonization in vitro;" correct?

A. That's correct.

Q. And again that's a statement that's prohibited by the FDA; correct?

A. As -- yes. You know, again, I think in these isolated cases we had somebody that wasn't following the company procedure.

Q. Plaintiff's Exhibit 177 is a document Bates stamp numbered SJM0880197061 through 062. Have you seen this document previously?
A. Just within the last few days.
Q. This is a letter dated January 14th of 1999; correct?
A. That's the date, yes.
Q. And it's sent by St. Jude employee Richard V. Briscoe; correct?
A. That's correct.
Q. He's a senior territory sales manager; correct?
A. That's correct.
Q. And what region is he the sales manager for?
A. He was based in St. Louis.
Q. What was his area?
A. Missouri, part of Iowa, and basically that was it. Maybe a little bit of southern Illinois.
Q. Okay. And where was the --
What's the Midwest sales region, what does that include?
A. It's changed a number of times. At this time it's probably Minneapolis to Texas, kind of a --
Q. How about in January of 1999, the timeframe

of this letter?

A. I meant at -- in January, at this time. I meant in January of '99.

Q. Okay. Thanks.

A. Sure.

Q. I'm sorry, I misunderstood.

Again, this is a letter sent to Wilson Strong in Cedar Rapids, Iowa; correct?

A. That's correct.

Q. And obviously he's a doctor; correct?

A. Yes.

Q. Mr. Briscoe states, "I want to thank you for taking the time at the end of your patient clinic to meet with me last week;" correct?

A. That's what it reads, yes.

Q. "I appreciated your positive comments regarding the St. Jude Medical Mechanical Heart Valve, and your long-term support;" correct?

A. That's correct.

Q. In the second paragraph he states, "I appreciated the opportunity to introduce the Silzone coating which is currently available only with our Masters Series Mechanical Valves (Rotatable);" correct?

A. That's correct, that's what it reads.

Q. He states, "Most of the effort" --
Or he said, "For the past thirty years there has been a gap in heart valve design, and one which is a significant -- and one which a significant effort has been expended to bridge;" correct?
A. That's what it reads, yes.
Q. It says, "Most of the effort has centered on the coating, and impregnation of antibiotics into the sewing cuffs, in addition to the use of antibiotics in flushing out the implantations site;" correct?
A. That's what it reads, yes.
Q. He then states, "These efforts in large part have gone by the wayside due to the transitory effect of the antibiotics, and to concerns regarding increased resistance;" correct?
A. That's what it reads, yes.
Q. He then states, "Silver is a proven, effective antimicrobial agent which has been used on a wide array of implantable devices;" correct?
A. That's what it reads, yes.
Q. He also states at the end, "It is more than 99 percent effective in reducing microbial attachment and colonization in vitro;" correct?
A. That's what it reads, with the asterisk as

well, yes.

Q. And that's a prohibited statement; correct?

A. Again, I think that's --

Yes, it is a prohibited statement, and this is another case where a sales rep did not follow the sign-off procedures.

Q. Well it actually went a little farther than that; didn't it? Because this is then sent to the Midwest region; isn't it?

MS. VAN STEENBURGH: Object to form.

Q. See the handwriting at the top dated 3-10 of '99?

A. Yes.

Q. It says "To: Midwest Region;" correct?

A. That's what it reads, yes.

Q. Says, "Please find below an excellent letter Rick has composed and is receiving excellent feedback from;" correct?

A. That's what it reads, yes.

Q. "Please read and I would urge you to contact Rich and ask him to E-mail a copy for your use;" correct?

A. That's what it reads, yes.

Q. "As you know, follow-up such as this is in response to questions and requests for more

information following your discussions with customers;" correct?

A. That's what it reads, yes.

Q. "Good luck and thank you Rich for your excellent effort;" correct?

A. "...Rick for your excellent effort." Yes, that's what it reads.

Q. And who signed that?

A. I believe that's Mark, as in Mark Sportsman.

Q. And who is Mark Sportsman?

A. He was our Midwest region director.

Q. So it appears that there's a pretty widespread violation of the FDA's mandate against making these types of statements implying efficacy of your valves; correct?

MS. VAN STEENBURGH: Object to form.

A. It appears that a few people in this region were not following the procedure and having any communication reviewed and signed off on.

Q. Well looks like they think it's such a good idea they're all going to do it; doesn't it?

MS. VAN STEENBURGH: Object to form.

A. There were, I think, seven or eight people in the Midwest region at that time, and this was from

the region director to the other -- we've reviewed two people -- the other five in that region.

Q. And again, that region extends from Minnesota down to Texas; right?

A. That's correct.

Q. Total of how many states?

A. I'm guessing 10, 12 states.

Q. Minnesota, the Dakotas, Iowa, Missouri, Illinois?

A. I think Illinois was in the Midwest, yes.

Q. Texas; right?

A. Yeah.

Q. Oklahoma?

A. Yeah.

Q. Kansas?

A. Yeah.

Q. Any others? Indiana?

A. I don't -- I think Indiana was in the East.

Q. Nebraska?

A. Nebraska was in the Midwest, yeah.

Q. Kansas?

A. Yeah. I think we said Kansas.

MS. VAN STEENBURGH: Already had that.

A. Yeah.

Q. I said Oklahoma?

A. Yes.
Q. Any further west?
A. No. That was the Western region.
Q. Okay. So the Western region would start at what, about Colorado, New Mexico?
A. Colorado.
Q. Montana?
A. Yeah. Even part of West Texas was the Western region.
(Plaintiff's Exhibit 225 was marked for identification.)
BY MR. O'FALLON:
Q. Plaintiff's Exhibit 225 is a letter dated September 2nd, 1998 to Dr. Michael Rosenbloom from yourself; correct?
A. Yes.
Q. And at this time you're the vice-president of worldwide sales and marketing; correct?
A. That's correct.
Q. It says, "It was called to my attention recently by Pepe Lescano that you have implanted your first SJM Masters Series Valve with Silzone;" correct?
A. That's what it reads, yes.
Q. It says, "At the time of your implant, you

would have been the first surgeon in the state of Florida to implant the valve;" correct?

A. That's what it reads, yes.

Q. It says, "We appreciate the confidence that you have placed in St. Jude Medical, and in the Silzone valve by choosing to implant the valve in your patient;" correct?

A. That's what it reads, correct.

Q. You then state, "As you may be aware, silver is a microbial-resistant agent that has been used for medicinal purposes for hundreds of years;" correct?

A. Yes, that's what it reads.

Q. "It is presently used on a wide array of implantable devices including orthopedic products, intravenous catheters, and vascular grafts;" correct?

A. That's what it reads, correct.

Q. You then state, "Silzone coating has been shown in vitro to kill a variety of microorganisms, including those commonly associated with prosthetic valve endocarditis;" correct?

A. That's what it reads, yes.

Q. "In fact, Silzone coating is more than 99 percent effective in reducing microbial attachment

and colonization in vitro;" correct?

A. That's what it reads, yes.

Q. And again that's a statement that violates the FDA approval for this particular Silzone device; correct?

A. Yeah. I think what happened with this letter is somebody within our group wrote it for me to acknowledge Dr. Rosenbloom's first implant at the request of our sales rep, and I signed it.

Q. Well this certainly is a letter that went through the proper channels then; correct?

A. It came out of our marketing group, yes.

Q. And it was signed by you at that time as the vice-president of worldwide sales and marketing; correct?

A. That's correct.

MS. VAN STEENBURGH: Do we have a signed copy?

MR. O'FALLON: No.

MS. VAN STEENBURGH: Oh.

Q. And so --

A. Do we know that Dr. Rosenbloom ever received this?

Q. I have no way of knowing that.

A. Okay. Because I'm just wondering if it was

changed before it was sent to him.

Q. Well I get the documents as they're produced to me and, --

A. Yeah.

Q. -- to say the least, I haven't contacted that doctor and doubt that if I did he'd have a copy.

A. Yeah, he probably wouldn't.

Q. This would, however, suggest that it was St. Jude policy to make statements that were prohibited by the FDA's letter; correct?

MS. VAN STEENBURGH: Object to form.

A. Again, I think there may have been isolated cases where it wasn't in total compliance, but in all our literature we endeavored to stay within our agreement.

Q. Well we've now seen a number of examples where you specifically violated the agreement; correct?

MS. VAN STEENBURGH: Object to form.

A. We've seen -- we've seen three examples.

Q. Including an apparent dictate to the entire Midwest region; correct?

MS. VAN STEENBURGH: Object to form.

A. From a region manager, yes.

Q. Did you keep a chron file of all the

letters you sent out?

A. I'm sorry, a what file?

Q. A chronology -- a chronological file. Did you keep a file of all the letters you sent out to physicians?

A. I kept a -- typically kept a day file.

Q. Would that include all the correspondence you sent out?

A. It would typically, yeah.

Q. Do you know whether that was produced in this litigation?

A. I have no idea.

Excuse me. The day file?

Q. Yeah, the entire --

All of the correspondence you sent out.

A. I turned over everything I had that had anything to do with Silzone.

Q. If I were looking for kind of your files containing all your letters --

I presume you kept copies of signed letters as well; right?

A. Yeah, I'm sure we, you know --

Q. Although typically sometimes I assume you put a letter in the file that you may not have the signed version of, but it's still there to document

that it went out; right?
A. Typically, I'm not sure --
I mean I had secretaries that supported. I'm not sure what they kept. Typically they would make a copy of a signed letter, if I remember correctly, and put that in the day file.
Q. Unless somehow it might have gone out before --
They maybe just forgot to make the copy?
A. That's possible.
MS. VAN STEENBURGH: Object to form.
Q. Okay. You would agree that the letter that we have marked as Plaintiff's Exhibit 225 does in fact violate the FDA approval; correct?
A. I would agree --
MS. VAN STEENBURGH: Object to form.
A. -- that the language is inconsistent with the final language agreed upon with the FDA.
Q. And actually contains language prohibited by St. Jude's agreement with the FDA concerning the marketing of the Silzone valve; correct?
A. It contains a phrase that was prohibited, along with the disclaimer that was agreed to.
Q. And again, the reason that the FDA prohibited these particular statements was that they

were concerned there that St. Jude was trying to imply that the Silzone valve would be effective in reducing the incidence of endocarditis; correct?

A. They were concerned --

Yes, that was their language.

Q. If you'll go back to the June 15th of 1998 letter, you also include the statement, "Silzone coating has been shown in vitro to kill a variety of microorganisms, including those commonly associated would prosthetic valve endocarditis;" correct?

A. That's correct.

Q. Now that particular sentence, if you use it, is supposed to be followed by the specific language "No clinical studies..." Correct?

A. That's the entire paragraph, yes.

Q. And those two sentences were supposed to appear back to back so as to put that in perspective; correct?

MS. VAN STEENBURGH: Object to form.

A. They appeared in the letter as separate, with the second part bolded down below.

Q. But according to the FDA letter, they're supposed to be included together; correct?

MS. VAN STEENBURGH: Object to form.

A. In the FDA letter it lists them in one

Q. The organism was Staph epi 10 to the sixth on the fabric; correct?
A. Correct.
Q. It said, "All samples sterile, but histology showed more inflammation had occurred in the Dacron then the Silzone samples;" correct?
A. That's what it reads, correct.
Q. Is it your understanding that inflammation is an indication of infection?
A. I'm -- you know, again, I'm not going to interpret the scientific results.
Q. In any event, it doesn't appear that there was a whole lot of difference between the Silzone sample and the Dacron sample in this particular model; correct?
A. I would again refer to Barb Illingworth or Bill Holmberg.
Q. Well I'm asking you.
A. I can only speculate what it would mean, and I --
MS. VAN STEENBURGH: We don't want you to do that.
A. I don't know.
Q. Well at some point your department is going to use Ms. Illingworth's published data to go out and

sell the valves, so did you ever see this information?

MS. VAN STEENBURGH: What, Exhibit 52?

A. I never saw this -- I never saw this before.

Q. Okay. Did you know about this information?

A. Know about? No.

Q. No. So you didn't know that there were two rabbit subdermal studies that didn't show any significant difference between Silzone and Dacron fabric?

A. I don't believe I did, no.

MR. O'FALLON: I want to go off the record.

(Discussion off the record.)

BY MR. O'FALLON:

Q. Mr. Healy, we were referring to Plaintiff's Exhibit 52, and in particular, first of all, the rabbit studies. Let's look on the next page of this document, SJM0140035979.

Let me see -- can I see your copy?

A. Sure.

(Discussion off the record.)

BY MR. O'FALLON:

Q. The second page of Plaintiff's Exhibit 52 discusses guinea pig experiments; correct?

A. That's what it says, yes.
Q. Were you aware that guinea pig experiments were in fact done on the Silzone fabric?
A. No, I was not.
Q. Says, "For each microorganism, two experiments were done; one for 14 days with Dacron samples only, explanted every other day to determine the natural course of the experiment;" correct?
A. That's what it says, yes.
Q. "Then a second experiment was performed with all Dacron and Silzone samples explanted at the optimum time to determine the difference between Dacron and Silzone. Analysis is by organisms extracted and histology of samples." Correct?
A. That's what it says, yes.
Q. The first organism is Staphylococcus epidermidis; correct?
A. Yes, that's what it says.
Q. It says, "Time course of the (Dacron) infection experiment:
"Decrease from 10 to the" --
A. Sixth looks like.
Q. -- "sixth power to 500 organisms by day 3. For fourteen days there was no further decrease;" correct?

A. That's what it shows, yes.
Q. "Silzone verse Dacron:
"All explanted at 3 days.
"No difference in organisms extracted (about 500 per fabric sample)." Correct?
A. Yes, that's what it says.
Q. "Histology shows significantly less inflammatory response;" correct?
A. That's what it shows, yes.
Q. So it looks like there's about the same number of organisms on the untreated as the Silzone fabric; correct?
A. It says no difference in organisms. Again, I would, you know, talk to Barb Illingworth. She's going to be able to explain a lot more about this.
Q. Then there was another experiment with Pseudomonas aeruginosa; correct?
A. That's what it refers to, yes. I can't pronounce it, but yes.
Q. I don't think I can either.
Again the "Time course of the (Dacron) infection experiment," it shows a "Decrease from 10 to the sixth to 10 to the fourth organisms by day 3;" correct?
A. That's what it reads, yes.

Q. "For fourteen days there was no further decrease;" correct?

A. That's what it reads, yes.

Q. In the Silzone versus Dacron, there was significantly fewer organisms on Silzone than Dacron samples; correct?

A. That's what it reads, yes.

Q. And it appears that they actually measured those organisms; correct?

A. It gives numbers, yes.

Q. Then there's a test about future work. "We will at short time intervals for all microorganisms in the future; 1 or 3 days (might do 14 day chronic infection studies in the future)." Correct?

A. That's what it reads, yes.

Q. At the bottom it says, "Will do S. epidermidis (1 day explants) redo Pseudomonas aeruginosa at 3 days; then pick two other causative bacteria;" correct?

A. That's what it reads, yes.

Q. "Before deciding which organisms will consult with Connie and Sheila Kelly to determine bacteria with best in vitro data;" correct?

A. That's what it reads, yes.

Q. Who is Sheila Kelly?

A. She used to work in the R&D group.
Q. Is she a scientist?
A. I'm not sure what she was to tell you the truth. I think she started off as a technician or -- I'm not sure.
Q. Okay. Then the third page of this document, Bates number SJM0140035979, mitral valve replacement in sheep, says, "The organism, Staphylococcus epidermidis, was chosen because it is the most common causative agent of prosthetic valve endocarditis;" correct?
A. That's what it reads, yes.
Q. "We inoculated 10 to the sixth power;" right?
A. That's what it says, yes.
Q. "This is much greater than would contaminate a valve in an operating room, but that amount only causes an infection only 1 percent of the time and it can take 1 year for this organism to grow to the extent that the infection is noticed (the infections are assumed to have started in the hospital because the organisms isolated are resistant to Methicillin, which is a strong indication of a nosocomial infection)." Correct?
A. That's what it reads, yes.

Q. "We must have an infection with a time course of a few weeks;" correct?

A. That's what it reads, yes.

Q. It says, "The first two samples were explanted at 2 weeks;" correct?

A. That's what it reads, yes.

Q. "Jack Titus and Doug Cameron examined the valves visually (and independently) and claimed that the infection seemed to be resolving;" correct?

A. That's what it says, yes.

Q. "Both suggested I use a shorter explantation data;" correct?

A. That's what it says, yes.

Q. "There was some interest at the time in implanting as many samples as reasonable before the new year, so the expenses could be accrued in the 1997 budget;" correct?

A. That's what it says, yes.

Q. "Therefore we implanted two Silzone and two Dacron valves inoculated with 10 to the sixth Staph. epi for 7 days;" correct?

A. That's what it reads, yes.

Q. "But, when the histology slides of the first two, 14 day implants came back both pathologists said that they had vastly underestimated

the extent of the infection - clear ring abscesses had formed in both valves;" correct?

A. That's what it says, yes.

Q. "Subsequently, the results for the four 7 day explants showed inflammation in all four valves but at an earlier stage;" correct?

A. That's what it reads, yes.

Q. "There was no difference among the samples;" correct?

A. That's what it reads, yes.

Q. It next says, "We next explanted two Silzone valves for 14 days to see if the infection would be resolved;" correct?

A. That's what it says, yes.

Q. "It was not; again there was no difference between Silzone and Dacron;" correct?

A. That's what it reads, yes.

Q. Under "Future Work" she states, quote, "The work to date indicates that Silzone is not effective in fighting infections in prosthetic mitral valves, or that it is effective and we have not yet determined the optimum conditions to demonstrate efficacy;" correct?

A. That's what it reads, yes.

Q. So as of this date in March of 1998, your

animal data was not showing that Silzone was effective in fighting prosthetic valve endocarditis; correct?

MS. VAN STEENBURGH: Object to form.

A. Again, I think I would discuss this with Barb. But it, you know, appears that all these studies are trying to find the correct animal model to use.

Q. Did you ever turn this data over to the FDA?

A. I don't know if it was ever turned over or not.

Q. Do you believe it should have been?

A. I don't know. I'm sure we would have turned over everything that was appropriate.

Q. Do you think it was appropriate for the animal studies documented in this particular memo to have been turned over to the FDA?

MS. VAN STEENBURGH: Object to form.

A. I think again --

I don't know if it ever was or wasn't, number one, because I am not familiar where the work ended up; number two, you know, it appears to be continuing work trying to find a good model to show efficacy in animals, because there wasn't one.

# Exhibit 59

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

--------------------------

| | | |
|---|---|---|
| IN RE: | : | MDL DOCKET NO. 1396 |
| ST. JUDE MEDICAL, INC., | : | (Videotaped) |
| SILZONE HEART VALVE PRODUCTS | : | Deposition of: |
| LIABILITY LITIGATION | : | STEVEN HEALY |
| | : | Volume II |

--------------------------

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before, BARBARA J. CAREY, a Registered Professional Reporter and Notary Public of the State of Minnesota, held at the offices of HALLELAND & LEWIS, 220 South Sixth Street, Suite 600, Minneapolis, Minnesota, on Tuesday, August 31, 2004, commencing at 8:25 a.m.

to see whether this was worth the candle to put
on the marketplace, and R&D, to see whether it
was safe and effective?
A Yeah. I mean, there was one project, but yeah,
they were kind of a cross-functional group
looking at it.
Q Yeah. A multi-discipline group had to be
assembled, the AB Cuff Team, correct?
A Correct.
Q And AB stood for antibiotic cuff -- or
antibacterial cuff? Excuse me.
A Yeah. I believe so, yeah.
Q Okay. Now, I'm going to give you -- and this
one's not in the book, okay? And I do
apologize. I only have one copy of it, and I'll
hand it to you. And I'll dictate into the
record that this is SJM 0130033341 through 43,
and if you could take a quick look at this.
And my first question's going to be to you,
have you ever seen the document before?
A I don't recall seeing it, but I think that's my
handwriting on it. So yes, I think I did.
Q Okay. And thank you. Because that was going to
be my next question.
A I thought I'd save you a question.

valve, and even the Master Series -- that you had difficulty getting France not only to raise the price, but not reduce the price?
A I don't call -- recall France specifically, but that's not an uncommon challenge in the European markets.
Q And one of the things that Silzone would enable the company to do is to come in with a new product and have at least the opportunity to get France to pay a higher number or a higher price than what they were previously paying St. Jude?
A We -- we could have an opportunity for an added feature and getting a premium price opportunity for them.
Q Okay. And then the last bullet point, the one that you added, was premium pricing?
A That's correct.
Q Okay. And why did -- why did Silzone have a premium price?
A It had a small premium. I think, in the U.S., it was 3 to 5 percent on average. It was a -- it was a unique feature to the product. It was, you know, classic marketing. When you can offer something that nobody else can offer that the customer perceives as a value, they're willing

to pay, in this case, you know, 1 or $200 more for it.
Q Okay. Well, actually, wasn't it -- in the United States, the target was 300?
A I don't recall what the target was. I think we ended up, on the average, getting about 150 to $200 more for it, which was, again, in the order of 3 to 4 percent.
Q At your prior deposition, you had indicated the number was about 250 in the United States. Does that strike a bell?
A Well, it's in that range.
Q Okay. In connection with Silzone, the company more put the market out -- the marketing research, to see if this product would be accepted, and if so, under what circumstances and conditions, correct?
A Correct. I recall we did research.
Q Okay. And one of the research -- methods of research you did is, is you had the Scientific Advisory Board, correct?
A Yes.
Q And the Scientific Advisory Board was a marketing function, was it not?
A It was organized by marketing and --

A Yes.
Q Okay. Now -- so by converse, if they didn't do it, it would be wrong?
MR. STANLEY: Object to the form.
THE WITNESS: I would say that you needed -- for Master Series with Silzone, while it was on the market, you needed to -- if that finding was discovered, you needed to make the FDA aware.
BY MR. COREN:
Q Now, let's take a look at H 276, which corresponds to H -- SJM 0440096350.
A H 2 --
Q Yeah, H 276.
A I'm sorry. What's the H number?
Q H 276. 276.
A Okay. Thank you. Okay.
Q Okay. Do you recognize this to be a draft of the Brutel Riviere article that was ultimately published in the Journal of Heart Valve?
A It appears to be that.
Q Okay. And do you have a -- if we could take a look, pardon me, at the header, do you see where it says, "F --" for the F drive "--Monica\papers\Brutelpaper.doc"?

A That's correct.
Q Okay. And above that, the header says, "Confidential - Property of St. Jude Medical, Inc."?
A That's correct.
Q Okay. So this was a confidential paper that the company was preparing for Dr. Brutel for publication?
A Apparently, yes.
Q Okay. Do you have any understanding why Dr. Brutel is not writing his own paper, Sir?
A I do not.
Q Okay. So the company was ghostwriting this paper for him?
A It appears that Monica was writing the paper for him.
Q Okay. And in your opinion, that's a proper thing to do; for the company to write for their researchers the articles for peer review publication?
A I'd say that was atypical of what occurred. There were some investigators that -- that were in private practice or heads of universities that didn't have the time to write them and would ask us to -- to support them.

Q Okay. And it was important to get that article out, so the company undertook that -- that effort to write the paper, correct?
A It was important to get that data out, yes.
Q Okay. And from -- it's important for two purposes, in your opinion: One, from the -- getting the information out to the medical profession; also, for marketing, correct?
A To support the technology, yes.
Q Okay. And also to support the marketing, correct?
A Yeah, that's what I meant; to support the marketing.
Q Okay. Okay. Now, let's take a look at H 041, which is SJM 2380547156 through 57.
Okay. Okay. Now, in fairness to you, Sir, this was not a memo that was written to you, okay? It's dated August 30, 1999. This is when the company has their hands full dealing with the MDA, the advisory notice. The company is receiving, you know, information, you know, regarding some problems with the valve. So just to give you some context of what was going on.
And this was from Barbara Illingworth, who is in R&D?

A Okay. I'm looking at the wrong one. You're in what?
Q This is from Barbara Illingworth.
MR. STANLEY: What are you telling him to read?
MR. COREN: I'm looking at H 041.
MR. STANLEY: 041.
THE WITNESS: 041, okay. H 410. We're both dyslexic. You were looking at a different piece of paper than I was.
BY MR. COREN:
Q I apologize.
A Okay.
Q Okay. And you'll see that this is an August 30, 1999 memo, "Weekly project update," from Ms. Illingworth in the R&D department to Laxmi Peri, correct?
A Correct.
Q And Mr. Peri, do you know what department he was in, by any chance?
A He was in R&D.
Q Okay. And let's turn to the second page, okay, and you're going to see Silzone Paper, okay? And it says, "Dick Bianco, co-author, U of M, finally completed his review of the paper."

Does that indicate to you that at this time, Ms. Illingworth is authoring the paper for Dr. Bianco as well?
A I'm not sure.
Q Okay. Ms. Illingworth continues, "His comments were that the paper was very well written and would promptly be published with little or no revision. He also suggested strongly that we submit the paper to the Journal of Heart Valve Disease, as he was currently reviewing two anti-Silzone papers submitted to that journal. I discussed this matter with Steve Healy."
Do you recall that discussion, Sir?
A I -- I do not.
Q Okay. Now, it continues, "He called Endre --" E-N-D-R-E "-- Bodnar (editor of the JHVD and a friend of his.)"
Is that an accurate statement, Sir?
A We were friendly, yes.
Q Okay. And that you called him?
A I -- I don't recall. But that's what she says, yes.
Q Okay. And to tell him that the paper that Ms. Illingworth was referring to was being mailed to him and was asking to be included with

the other two papers, whereupon she indicates she is now in the process of reformatting the paper, rewriting the paper to match the format of the JHVD and mailed it out to Dr. Bodnar on Friday.

Does this indicate to you that, once again, your staff is ghostwriting an article for an outside consultant regarding work that's being done for St. Jude?

A It -- it appears that way. I would ask Monica, or in this case, Barb Illingworth.

Q Okay. By the way, does it cause you any concern that Dr. Bianco is peer-reviewing articles for the Journal of Heart Valve Disease regarding Silzone when he is a consultant to St. Jude?

A I'm not sure that that's what I took away from here. He's a co-author of the article.

Q Okay. "He also suggested that we submit the paper to the Journal of Heart Valve Disease --" Dr. Bodnar's journal --

A Right.

Q "-- as he was currently reviewing two anti-Silzone papers submitted to that journal."

Does that indicate to you that Dr. Bianco, a consultant of St. Jude, was in the process of