# Exhibit 74

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT

PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62-C9-02-7324

Heart Valve Litigation

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ROY C. HOSEK

VOLUME II, Pages 300 - 403

October 30, 2002

(The following is the continuation of the deposition of ROY C. HOSEK, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, in the city of Minneapolis, state of Minnesota, commencing at approximately 8:57 o'clock a.m., October 30, 2002.)

information on possible conversations related to the valve.

Q. Okay. And I assume that the tape recording at the front is probably this sales script in audio form; correct?

A. I haven't heard it, I -- Maybe.

Q. Okay. In any event, these are exemplars of how to approach different physicians and attempt to sell the valve; correct?

A. I didn't have much to do with this or anything to do with this, actually, so I --

Q. Well is there any doubt --

A. -- I don't know specifically.

Q. I mean, looking at it, is there any doubt that's what this is? I mean these are question-and-answer scenarios; aren't they?

A. These are question-and-answer scenarios.

Q. Okay. And it says at the very beginning of the document, on page 1 of the document, "Welcome to the Sales Applications Tape for the SJM Masters Series valve with Silzone coating"; correct?

A. Correct.

Q. On this tape, you will hear several sales calls modeling techniques you can use to sell the Silzone valve"; correct?

A. Correct.

Q. You will hear three episodes, one by-appointment call on a physician currently using the SJM Masters Series valve, one by-appointment call on a physician using Carbomedics, and a short 'hall-stopper' call on a physician" concerning "the Masters Series"; correct?

A. "Considering the Masters Series," correct.

Q. Then it says, "At the end of these episodes, I'll review some of the key selling tools and techniques that will help you in your sales effort"; correct?

A. Correct.

Q. This is another tool, just as the various sales notes that you have done on the various articles are a sales tool; correct?

A. These -- These types of things would typically be another sales tool.

Q. Let's look on page 3. Looking at the beginning, this is a transcript between a Dr. Scott, and Melanie is supposed to be the sales representative here. Do you understand that?

A. Okay.

Q. The middle of that page Melanie says, "Agreed. Doctor, considering the high mortality among

prosthetic valve endocarditis patients and the high cost of treatment for survivors, would it be important to be able to significantly reduce the possibility of occurrence?" Dr. Scott says, "Of course. And, this Silzone coating can do that?" And Melanie answers, "Well, in vivo efficacy of the Silzone coating has yet to be proven, but as you can see in these photos, in vitro studies clearly demonstrate the efficacy of Silzone as an antimicrobial agent. Notice the difference in microbial attachment between a treated and...untreated...cuff? Papers done by Drs. Tweden, Razzouk and Bricault show that Silzone is up to 99% effective in reducing microorganisms on contact in vitro. Does that answer your question?"
Do you see that question and answer?
A. I do.
Q. Now that last statement, the "99% effective in reducing microorganisms" was a statement that St. Jude was eventually prohibited from making; correct?
A. After discussions with the FDA it was my understanding that -- that we were not to make this statement without prompting.
Q. And yet this sales script was still sitting in your office as of 2002 containing that exact

language; correct?
A. This sales script was sitting in my office.
Q. Right. And you never specifically told the representatives that they couldn't make that statement; correct?
A. I don't know about that specific statement, but we certainly gave them guidelines on what they could say and what they could not say.
Q. Plaintiffs' Exhibit 222 is the memo that I believe you're referring to as guidelines; correct?
A. This would have been a memo outlining guidelines, yes.
Q. Now nowhere in this particular document do you tell your sales staff that they can't use the sales script; do you?
A. We give them guidelines on what can and can't be used related to efficacy, and I would think this would fall into the efficacy category.
Q. At no point do you tell them they can't use the sales script that was handed out at the April 1998 launch meeting, do you?
A. This script would not be something that would be handed out to a surgeon, this would be something that would be discussed with them.
Q. At no point did you tell your salespeople that