# Exhibit 77

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
MDL DOCKET NO. 1396

IN RE: ST. JUDE MEDICAL, INC.,
SILZONE HEART VALVE PRODUCTS
LIABILITY LITIGATION

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF

TERRY L. SHEPHERD

VOLUME II

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DATE TAKEN: 01/28/05 REPORTED BY: CINDY M. TRATTLES

was perhaps in previous testimony. I may have been referred to it.

Q Well, looking at the second paragraph on the first page, the last sentence, it says, "To maintain its leadership status, St. Jude Medical needs to continually produce products that are perceived in the market as 'premium' products or next generation product." Do you agree with that?

A Yes.

Q And it says, "The SJM Masters series with Silzone valve should be positioned as our premium product." Do you agree with that?

A Yes.

Q And going on to the next page in this document, it states, "This product is intended to be positioned as a premium product, and differentiated between our Masters Series product lines. Premium products are considered to be possess higher value for the customers." Do you agree with those sentiments?

A Yes.

Q And then the last sentence, "One method of communicating a higher value in the customer's mind is to price the product at a higher level." Do you agree with that?

A Yes.

A That was the addition to the already high standard of quality of the St. Jude valve, yes.
Q For which a premium price was charged; correct?
A Correct.
Q And the notion that there was premium value to the product derives from the fact that you were communicating to people who were buying the product that this had some perhaps premium value; correct?
MR. STANLEY: Object to the form.
A It was up to them to decide whether or not the product had value commensurate with whatever additional price we were trying to charge.
Q (By Mr. Sigelman) And the value that was communicated to these people was the possibility that it might be effective in preventing or reducing endocarditis, otherwise there was no reason to put silver on there and charge more money for it?
A That was the potential that clinicians saw, yes.
Q So the premium pricing was tied to the notion that this product might be useful and effective in preventing or reducing the incidence of endocarditis; right?
A Well, you could come at that premium pricing from the two different sides of a commercial engagement. You have the clinician who has to decide whether or

not there is utility for him or her in that technology, potential utility in that technology and whether it's worth the additional price. From our standpoint it's not just a part of the marketing program to have a premium price because you want it to be your top product.

There is a huge cost associated with developing and deploying the technology. So for us there's a cost recovery aspect associated with premium pricing and value.

Q But the premium value that was thought by your marketing people to be communicated by the premium price was the idea that this product, because it was priced higher, was priced higher because it might be effective in preventing or reducing the incidence of endocarditis?

A I wouldn't say it quite that directly. I would say that it was our most advanced technology and part of that technology was that the technology on the sewing cuff prevented bacterial colonization and that might be important to them.

Q Okay. And that's why it was priced at a premium; correct?

MR. STANLEY: Object to the form.

Q (By Mr. Sigelman) Or that's why there would be

premium value attached to the premium pricing?
A Conceivably, yes.
Q Right. I mean if it had no possibility of doing anything with respect to endocarditis, there'd be no reason to put silver on there and no reason to charge a premium price; fair?
A I think that's correct. And 25 to 30% of the clinicians who decided to use that product wouldn't have used it.
Q All right. So the premium value from the premium pricing had everything to do with the idea that this might be effective in preventing or reducing endocarditis; right?
A You'd have to ask a clinician, but that might very well be the connection that he would draw to support the higher price.
Q But that's what St. Jude was thinking when they talked about communicating premium value?
A I don't think that's what any of those documents said. I think it said --
Q -- No, but I'm asking you.
A No, to me premium pricing was a reflection of the price that it was our most advanced technology and that advanced technology included not only the gold standard mechanical heart valve but a brand new

technology that in fact reduced the bacterial colonization rates in the prosthetic material and that might be of some value to them.

Q Okay. So it was your most advanced technology in the sense that it might have effectiveness in reducing or preventing the incidence of endocarditis?

A If you want to say it that way, that's fine. I mean I would not have drawn a direct connection to endocarditis because we hadn't proved it and they wouldn't believe me if I said it.

Q But you don't disagree with my statement?

A I don't disagree with your statement.

MR. SIGELMAN: Okay. We can take a break. We're out of tape.

THE VIDEO TECHNICIAN: We're going off the record. That will be the end of Tape 2 in the deposition of Terry Shepherd, Volume 2. The time is approximately 12:05 p.m.

(WHEREUPON, a brief recess was taken, after which the following transpired.)

THE VIDEO TECHNICIAN: We're back on the record. This is the continuation of the deposition of Terry Shepherd, volume 2, the beginning of Tape 3. The time is approximately 12:16 p.m.

MR. STANLEY: Object to the form.
A Could you repeat the question?
Q (By Mr. Sigelman) I'll -- you don't know of anything that the MDA did as you reflect on a valve that St. Jude removed from the market for safety reasons that constituted screwing you?
MR. STANLEY: Object to the form.
A I don't know that anything that they would do, period, that I would construe as screwing us.
Q (By Mr. Sigelman) You know Barbara Illingworth; don't you?
A I do.
Q Who is she?
A She was a scientist in our research organization, primarily the tissue research organization as I recall, but did some general research work across tissue, mechanical and other product areas as well.
Q And she did some work on Silzone; correct?
A I believe she did.
Q And she published some work that you read; right?
A I believe she did, yes.
Q She published a guinea pig study, for example, that you read. Do you remember that?
A I recall that, yes.
Q It was published in the Journal of Heart Valve

Disease; correct?
A I don't recall where it was published, but I wouldn't dispute that.
Q That's Dr. Bodner's journal; correct?
A I know what the journal is. I'm not familiar with the exact publication.
Q By the way, do you know if Dr. Bodner has a financial interest in that journal?
A I believe he does. I'm not sure. He's the editor and the founder, so I presume he probably has some financial interest.
Q Do you remember that guinea pig study at all?
A Vaguely.
Q All right. What do you vaguely remember about it?
A I vaguely remember that it was a small experiment that was thought up by our own research organization, not a well-developed, clinically or scientifically accepted predetermined model by any stretch of the imagination and that it was a study where we were casting about to see what kind of animal study, in vitro study might be helpful in assessing the efficacy or the activity of Silzone-coated material. And I believe it was a subcu study. It was a, you know, implant the material below the skin of the guinea pig.

I'm probably going way beyond what my expert capabilities would really support, but something to that effect. I know it was kind of a homegrown experiment to help us figure out exactly what model might be helpful to assess this technology.

Q And do you recall that it was a study that looked at inflammation as a proxy for infection?

A I don't recall specifics.

Q Well, we'll look at in a minute and see if we're at least talking about the same thing.

(WHEREUPON, Deposition Exhibit Number 23 was marked for identification by the court reporter.)

Q (By Mr. Sigelman) Here's an E-mail that was sent from Ms. Illingworth to Bill Mirsch and I will represent that you're not on the copy list. Have you ever seen this E-mail?

A I haven't.

Q Okay. And I'm going to ask you about it because apparently it refers to you. It says, "Just a 'heads up'; Terry read the Guinea pig paper". And by the way for the record, this is Page 666310. It's dated July 21, 1998.

So let me start over. "Just a 'heads

up'. Terry read the guinea pig paper I sent to the Journal of Heart Valve Disease. His comment was he wished the data were more convincing (so do we all)." Did I read that correctly?

A Yes, you did.

Q And do you have at least some vague recollection of reading the paper and informing Ms. Illingworth that you wished the data were more convincing?

A I don't. I don't doubt that it existed. I mean it says so here, but I don't recall that.

Q I mean you don't doubt that you read the paper and you were somewhat disappointed, the data weren't as convincing as you had hoped?

A I'm sure that's correct.

Q Now, for the record...

(WHEREUPON, Deposition Exhibit Number 24 was marked for identification by the court reporter.)

Q (By Mr. Sigelman) Mr. Shepherd, I've handed you what's been marked Exhibit 24 and it starts out Research Database Article, In Vivo Efficacy of Silver-Coated Silzone Infection-Resistant Polyester Fabric against a Biofilm-Producing Bacteria, Staphylococcus epidermidis, Illingworth, et al, Journal of Heart Valve Disease, September 1998,

which is basically a month or two -- a couple months after the last exhibit that we looked at. And it says, "Sales note and mini abstract written by: Roy Hosek". And if you go in to this document and the page number -- it begins at 191790.

And if you go to Page 191794, the article begins. This is the paper, is it not, that you read because to my knowledge this is the only guinea pig study that I'm aware of that Ms. Illingworth published?

A I think it must be that paper and relate to that study then, yes.

Q And so it's this paper that you wished were more convincing; correct?

A It must be.

Q And if you look, for example, at Page 528 of the paper in the upper right or Bates page 191796, in the first full paragraph in the right-hand column it says, "In the present study, infection was assessed indirectly by the degree and character of the inflammatory response as determined by histopathology and by quantification of the necrotic area. I read that correctly; right?

A I believe so.

Q So infection was only measured indirectly; correct?

A It would appear so, yes.
Q By inflammatory response. And, "The assumption is made that the degree of acute inflammation is proportional to the number of viable microorganisms present in the infected field." I read that correctly; right?
A Yes.
Q "Currently there is no other reliable method to quantify bacteria involved in infections of foreign bodies with complex structures." I read that correctly; right?
A Yes, yes.
Q Would that have been part of the reasons why you had concluded when you read the paper that you wished it was more convincing, because it really wasn't looking directly at microorganism counts but had to settle on looking indirectly at degree and character of inflammatory response?
A I think my response that I wish it would have been more conclusion wouldn't have been nearly that detailed from a scientific standpoint. I probably would have heard Barb say something to the effect that the results were equivocal or that they weren't uniform or that they were complicated by other factors or whatever and I would have been

disappointed.
Q So you were reflecting then what you had been made to understand by the scientists on whom relied that this was not the most convincing, compelling data in the world that Silzone would be effective against staphylococcus epidermidis in a whole animal, correct, in a living animal?
A Yeah, that's probably true; yes.
Q Now, given what you've just testified to, that it wasn't that convincing and your scientists were saying that and that's what you were picking up on, I'd like you to look at the sales note that begins this publication. And, by the way, Roy Hosek, what was his position in the company?
A I believe he was in the marketing organization. I believe he was perhaps a product manager.
Q And he wrote up these sales notes from time to time, did he not, based on the literature?
A Several people did in the marketing organization, yes.
Q Including him?
A Yes.
Q And your marketing people would use these to go out and market Silzone and Silzone valves; right?
MR. STANLEY: I'll object to the form.

A Basically -- not necessarily. I mean what these sales notes were designed to do was to take a very very complex scientific article and publications on a variety of topics, our own products, competitive products, new technologies, old technologies and so forth and pick from that complex clinical study and publication information that was usable as kind of a synopsis for sales professionals in the field as they responded to questions or comments from clinicians and that they might use in clarifying a situation or a question for the clinician.

Q (By Mr. Sigelman) So the purpose of this sales note was to give information to the salesforce that in some context or another they might be using with physicians; correct?

A Or just to understand better themselves kind of what it all means. I mean you read an article of this level of detailed scientific and you say: Well, what does that all mean and kind of boil that down for me, just if for no other reason so that I fully understand it myself. And that's typically what the salesmen would be doing.

Q Certainly. But also the information would be given to them so that if need be, they could present something to the physician; right?

A Correct.
Q And they would being relying on people like Dr. Hosek to give them the information they needed; correct?
A That's correct.
Q In fact, Dr. Hosek had a scientific background; did he not?
A I believe he was a veterinarian, yes.
Q But he was in marketing; correct?
A Yes.
Q All right. Now, let's see what Dr. Hosek writes to the salesforce about this study that didn't have that compelling or convincing data. If you go to the third page of the summary, he says, "The attached article", and he's referring to the Illingworth article, "gives strong efficacy support for the Silzone technology." Do you see that, sir?
A I see it, yes.
Q And if you go to the sales note on the next page.
MR. STANLEY: You mean on the previous page? Oh, okay.
Q (By Mr. Sigelman) Let me just look here for a second. He says in the Sales Note on the next page, "This paper provides strong support for the efficacy of Silzone in an animal model". Do you see that?

A Yes.
Q Now, nowhere in any of his sales notes does Dr. Hosek tell the salesforce that the data, the efficacy data in this study wasn't very convincing; does he?
A I would have to read the whole thing to know whether he said that or not.
Q Well, you'll agree with me, won't you, sir, that the statement that the attached article gives strong efficacy support for the Silzone technology is -- misrepresents a conclusion that the data aren't very convincing; correct?
MR. STANLEY: Object to the form.
A It would suggest that the data is more positive than I recall it being.
Q (By Mr. Sigelman) Right. And, in fact, your scientists apparently according to your testimony were telling you that these weren't very compelling or convincing data but your salesforce was being told that it was strong efficacy support for the Silzone technology; isn't that correct?
A Well, your quote of what he says here is correct and your characterization that I was being told that they weren't very convincing is correct. But there are nuances to that. I mean it may well be that

what he's dealing with here is a particular aspect of the study that might have been more well constructed or shown better data or in some way led him to draw that conclusion.

Q Well, you can read it for yourself. Is he confining that statement to a particular aspect? He's talking generally about the article; isn't he?

A He may be.

Q Well --

A -- It's not clear.

Q Well --

A -- It says "provides strong support", which may be some aspect of the paper as opposed --

Q -- You're a very intelligent man. You've been in the field for a long time. I would say that you're probably more intelligent than most of the people on the salesforce. You could read that for yourself just like the lay people who sell the products. Is there anything that you can see in that summary that confines it to some aspect as opposed to the entire attached article?

A Not in that one sentence, no. It's a generally positive sentence, as you say.

Q Well, that's the summary. The summary is three sentences; correct?

MR. STANLEY: Where are you now?
Q (By Mr. Sigelman) I'm looking right now, for example --
MR. STANLEY: -- On 792?
MR. SIGELMAN: Yeah, 792.
Q (By Mr. Sigelman) The summary of the entire article is three sentences; correct?
MR. STANLEY: He's talking about up here (indicating).
THE WITNESS: Oh, not the sales notes.
Q (By Mr. Sigelman) The overall summary of the study?
A Yes.
Q There's nothing that qualifies the endorsement that the attached article gives strong efficacy support for the Silzone technology in that summary; correct?
A I'm sorry, restate -- say your question again.
Q There's nothing that qualifies the statement that the attached article gives strong efficacy support for the Silzone technology; correct?
A That's no qualifying statement in that particular sentence, that's correct.
Q Or in the whole summary?
A Well, I don't know. I'd have to read the whole summary.
MR. STANLEY: He's talking about the

three sentences. That's what he's trying to focus you on.
A Yeah, that's correct.
Q (By Mr. Sigelman) And I'm going to give you a little time because we have some time. Just read the entire page and up to the next Sales Note through Conclusion and tell me if there's anything that lets the salesforce know that the data in this study aren't very convincing.
A Okay, I've read it.
Q Yes. Okay. Is there anything in the note that Dr. Hosek authored that conveys to the salesforce that the data in the study weren't particularly convincing?
A No, I didn't find anything.
Q All right. Do you approve of such marketing?
A I wouldn't have approved this individual piece of marketing any more than any other marketing piece and I wouldn't necessary --
Q -- No, would you approve of it?
A If I had read the article, which I apparently did at one point in time, and was a scientific expert and then read this, I would find it incomplete.
Q All right. You would not find this to be honest marketing on the part of your company; correct?

MR. STANLEY: Object to the form.
A Well, this again is information provided in internally. It's not marketing to clinicians; but, again, I find it incomplete communication.
Q (By Mr. Sigelman) It's misleading; isn't it?
MR. STANLEY: Object to the form.
A I don't know that I would characterize it as misleading. I would characterize it as just incomplete. I didn't find anything in here that was inaccurate. I simply didn't find anything in here that looked -- that showed any equivocal results in the study.
Q (By Mr. Sigelman) You don't find it inaccurate to say without telling the reader that the data aren't very convincing that the attached article gives strong efficacy support for the Silzone technology, you don't find that inaccurate?
A That may be too strong a statement, yes.
Q That's inaccurate?
A I don't know that it's accurate. I would characterize it as simply too strong.
Q It misrepresents the facts; doesn't it?
A Well, the conclusion of the article itself is that these results suggest the possibility of a reduced incidence of PVE in humans implanted with prosthetic

valves, et cetera, et cetera. So short of the multi-center study which was ultimately conducted as AVERT, the paper itself reached that conclusion. So I think he was maybe putting that in stronger terms, perhaps inappropriately stronger terms, but more incomplete than anything else.

Q Does it or does it not misrepresent the facts?

MR. STANLEY: Object to the form.

A I can't say one way or another. It overstates the case.

Q (By Mr. Sigelman) You don't condone misleading or giving misinformation to the salesforce; correct?

A I wouldn't have said it this way. I would have been more complete in my assessment.

Q So my question is you wouldn't condone providing misleading information to the salesforce; correct?

A Of course not.

Q Because that information might be conveyed to physicians; correct?

A Correct, correct.

Q And that's not what you want your company to be doing?

A That's correct.

Q And does this violate the policies and standards of your company?

MR. STANLEY: Object to the form.
A I don't know that it violates the policy as much as it simply overstates and is incomplete in terms of its characterization of a paper.
Q (By Mr. Sigelman) All right. Now, if you could wind back the clock, would you have done anything differently with Silzone?
MR. STANLEY: Object to the form.
A I can't wind back the clock. And is your question targeted at the full scope of Silzone over the course of years?
Q (By Mr. Sigelman) Yeah. I mean here we are with a product that came off the market with a highly statistically significant adverse event or set of adverse events or sets of adverse events associated with its use and I'm asking: If you could go back -- everything we've gone through today, you were very enthusiastic about the technology. You were thinking about applying it way beyond heart valves and way beyond the heart valve division. Would you have done anything differently if you could?
MR. STANLEY: Object to the form.
A You know, I don't think knowing what I knew at the time, at every step along the way from the first