# Exhibit 95

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

IN RE: : MDL DOCKET NO. 1396
ST. JUDE MEDICAL, INC., : (Videotaped)
SILZONE HEART VALVE PRODUCTS : Deposition of:
LIABILITY LITIGATION, : DR. ROBERT W.M.
: FRATER
:
:
:

- - - - - - - - - - - - -

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LINDA M. HOFFMANN, a Certified Shorthand Reporter and Notary Public, held at the office of REED SMITH, LLP, 599 Lexington Avenue, New York, New York, on Friday, May 14, 2004, commencing at 9:00 in the forenoon.

by the peer reviewers. Correct?

A. Yes.

Q. And that's not an infrequent thing. Correct, sir?

A. Yes.

Q. And then those comments are dealt with or addressed by the authors, and then the editors make the decision whether the article will be published. Is that a fair statement on that?

A. Yes.

Q. Okay. In the articles that you wrote, the 230, for example, were any of those articles written by a medical company and given to you and you were asked to put your name to it?

A. No.

Q. Okay. All of the articles that your name is associated with actually are articles that you, through your labor, produced. Correct?

A. Yes.

Q. And if someone presented to your -- to you as a peer reviewer an article that was authored by a medical company, be it a pharmaceutical company or device company, but had some well-known doctor's name to it, would that be an article that you would feel merited being published?

A. Well, if one ever even knew that. I must confess, it's never even cropped up. All the articles I've ever been asked to review have been articles that have been written by generally academic surgeons or cardiologists, or whatever.

Q. Okay. Ghost writing of articles is not to be condoned in your view. Correct, sir?

A. Absolutely.

Q. Okay. Are you aware of any instances in which St. Jude had ghost written articles?

A. No, I am not.

Q. And you as Medical Director, if you found that out, you would disassociate yourself with that company?

A. Are you asking would I resign? Is that what you're asking me?

Q. Yes, let's start with that. Would you?

A. No. The answer, obviously, is, if, indeed, it became apparent that St. Jude was writing articles for doctors to put their names on, and I heard about it, I would instantly correct that. And the right approach clearly would be to tell the company that they're doing something wrong.

Q. Okay. Do you believe that a medical device company should have a hand in editing articles

that are submitted to peer-reviewed literature?

A. It is appropriate for a medical device company, if the author wishes -- if the author wishes -- to look at the data and confirm that they have got facts right. They might, for example, refer to the structure of a device, or the manufacturing of a device, and they may not have the necessary knowledge to know that properly, it would be proper for them to find out from the company and submit that to the company, and say are we correct in this.

But in terms of the data, the company, to my knowledge, is extraordinarily careful about not influencing writers who wish to write about their products; and indeed, most of the time there is no exchange. They may be aware that somebody is getting his material together, and they may, indeed, sometimes need to ask the company information. How many -- to check, for example, how many valves have been used by Hospital X. Do your numbers agree with ours? Things like that. But absolutely not ghostwritten. Absolutely not edited in the conventional sense of editing.

Q. Okay. And if a company was doing that, you as a peer reviewer would want to know that, and that would affect your decision whether to recommend

acceptance or rejection of that article?
A. If a company was writing an article for somebody and I knew that, I would say, well, this is not the appropriate way of presenting this material. If the company wishes to present to a medical journal data that they have obtained in their research work on a particular subject, there are instances in which a research department in a commercial company has presented information to the medical community. But it is done entirely openly. This is the research department of Bell, or whatever, talking about its inventions. That's fine.
Q. Would you agree with me that if a medical company's marketing department or clinical research department was having input into the article, it should be disclosed that the company's marketing department or the company's clinical personnel were authors and associated with that article? Correct?
A. If they made a contribution, they are entitled to have their name on the paper as an academic author, yes.
Q. Okay. Well --
A. But --
Q. -- entitlement is one thing. I'm saying

should it be disclosed?

A. It is necessarily disclosed. You cannot present an article to any journal without, in fact, signing a document that says exactly what your financial, your other connections are, what interests you have, in a commercial company. And obviously, if they were a scientist who works for a drug company or a device company, with a name on a paper, that is clearly designated in the article.

Q. In the course of the time that you were, and you still are a peer reviewer for a number of academic articles that you list on page five of your curriculum vitae, such as the Journal of Thoracic Cardiovascular Surgery. And once again, I'm referring to the actual numbered page at the top, sir. With the exception of the one journal that's gone out of business, are you -- do you -- have you had the occasion to review any articles in which St. Jude -- St. Jude's, a product of St. Jude is the topic, either directly or as part of the article?

A. No.

Q. And that is because it would be a conflict of interest as you as a peer reviewer to do so because you are Medical Director. Correct?

A. That is correct. In fact, going beyond