# EXHIBIT A

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.
William PECARINA and Kenneth Pecarina, minors, by their parents and next friends, Alan Pecarina and Jennifer Pecarina; and Alan Pecarina and Jennifer Pecarina, individually, Plaintiffs,
v.
TOKAI CORPORATION, a Japanese company, Scripto-Tokai Corporation, a Delaware corporation, JMP Mexico, also known as JMP Mexico, S.A. de C.V., also known as Tokai de Mexico, S.A., and Wal-Mart Stores, Inc., a Delaware corporation,
Defendants.
**No. CUV,01-1655 ADM/AJB.**

May 20, 2002.
William H. Manning, Esq., and Thomas K. Loughlin, Esq., Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiffs.

Gary J. Gordon, Esq., and John J. Wackman, Esq., Rider, Bennett, Egan & Arundel, L.L.P., Minneapolis, Minnesota, appeared for and on behalf of the Defendants.

MEMORANDUM OPINION AND ORDER

MONTGOMERY, District J.

I. INTRODUCTION

*1 On January 28, 2002, the undersigned United States District Judge heard various motions to dismiss by Defendants. Defendant Scripto-Tokai Corporation ("Scripto") and Defendant Wal-Mart Stores, Inc. ("Wal-Mart"), argued their Motion to Dismiss [Doc. No. 12] for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). Scripto and Wal-Mart seek dismissal of three of Plaintiffs' claims: (1) for alleged violations of the Consumer Products Safety Act, (2) for alleged violations of Minnesota's Consumer Fraud Act, False Advertising Act, and Uniform Deceptive Trade Practices Act, and (3) for common law fraud. Defendant Tokai Corporation ("Tokai") moves the Court to dismiss for lack of personal jurisdiction [Doc. No. 7], and in the alternative, joins Scripto and Wal-Mart's Motion to Dismiss. Defendants JMP Mexico, S.A. de C.V. ("JMP") and Tokai de Mexico, S.A. de C.V. ("Tokai Mexico") also join Scripto and Wal-Mart's Motion to Dismiss [Doc. Nos. 29, 30]. [FN1] Also before the Court is Plaintiffs' Motion in Opposition to Admission *Pro Hac Vice* [Doc. No. 27], for which the last submission was received on March 14, 2002. The final matter before the Court is Plaintiffs' Appeal of Magistrate Judge Arthur J. Boylan's Order of February 28, 2002 [Doc. No. 50].

FN1. Defendants Scripto, Wal-Mart, Tokai, JMP and Tokai Mexico will be collectively referred to as "Defendants."

II. BACKGROUND

On October 9, 2000, Plaintiff Jennifer Pecarina strapped her 17-month-old son, Kenneth, into his car seat while her four-year-old son, William, was in the bench seat behind Kenneth in the family van. She left the boys in the van briefly to attend to her dog. During her absence, William started a fire in the van with an Aim 'n Flame lighter, which had been inadvertently left in the van. The boys suffered second and third degree burns.

The Aim 'n Flame lighter used by William to start the fire is the non-child-resistant predecessor of the child-resistant Aim 'n Flame lighter currently manufactured and distributed. Plaintiffs filed this lawsuit against the interrelated companies that designed, manufactured, marketed, and distributed the Aim 'n Flame lighters: Scripto, Tokai, JMP, and Tokai Mexico. Plaintiffs also bring suit against Wal-Mart, the largest retailer of Aim 'n Flame lighters. Plaintiffs allege claims for (1) negligence, (2) strict products liability, (3) breach of warranty, (4) alleged violations of the post-sale duty to warn, (5) alleged violations of the Consumer Products Safety Act, (6) alleged violations of Minnesota's Consumer Fraud Act, False Advertising Act, Unlawful Trade Practices Act, and Uniform Deceptive Trade Practices Act, and (7) common law fraud. Three of these claims are the subject of Defendants' Motion to Dismiss. Before

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reaching the issues related to those claims, personal jurisdiction over Tokai will be addressed.

III. DISCUSSION

A. Tokai's Motion to Dismiss for Lack of Personal Jurisdiction

Constitutional due process requirements protect a potential defendant from the unfair exercise of personal jurisdiction. *See* Pennoyer v. Neff, 95 U.S. 714 (1877). "[P]ersonal jurisdiction over a nonresident defendant is proper only if the defendant has certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." ' *International Shoe v. Washington,* 326 U.S. 310, 316 (1945) (citation omitted). Tokai argues that this Court may not properly exercise personal jurisdiction over it because it is a Japanese corporation having no contacts with Minnesota.

***2** In the context of a challenge to personal jurisdiction on a motion to dismiss, Plaintiffs need only submit evidence that, when viewed in the light most favorable to Plaintiffs, establishes a prima facie case of personal jurisdiction. *See* *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.,* 89 F.3d 519, 522 (8th Cir.1996). All factual disputes must be resolved in Plaintiff's favor. *Id.* However, Plaintiff bears the ultimate burden at trial to establish personal jurisdiction by a preponderance of the evidence. *See* *Digi-Tel Holdings,* 89 F.3d at 522; *Aero Systems Eng'g., Inc. v. Opron, Inc.,* 21 F.Supp.2d 990, 995 (D.Minn.1998).

Generally, an assessment of personal jurisdiction involves two independent inquiries: (1) whether the applicable state long-arm statute, Minnesota Statute § 543.19, is satisfied, and (2) whether this Court's exercise of jurisdiction is consistent with the requisites of due process. *See* *Clune v. Alimak AB,* 233 F.3d 538, 541 (8th Cir.2000). The Eighth Circuit has recognized that Minnesota has interpreted its long-arm statute to be coextensive with the limits of due process. *See* *Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., Inc.,* 63 F.3d 694, 697 (8th Cir.1995); *see also* *Rostad v. On-Deck, Inc.,* 372 N.W.2d 717, 719 (Minn.1985). Thus, this discussion will focus on whether exercising personal jurisdiction over Tokai comports with federal due process. *See id.*

The due process clause requires that there be "minimum contacts" between a nonresident defendant and the forum state. Sufficient minimum contacts exist if Tokai's conduct and connection with Minnesota are such that it should reasonably anticipate being haled into court here, and if maintenance of this suit does not offend traditional notions of fair play and substantial justice. *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 612 (8th Cir.1994). The Eighth Circuit has held that a seller at the head of a distribution network satisfies the requisite foreseeability of due process where it "delivers its products into the stream of commerce with the expectation that [these products] will be purchased by consumers in the forum state." *Barone,* 25 F.3d at 613 (citations omitted); *accord* *Clune,* 233 F.3d at 544-45.

Tokai is a corporation existing under the laws of Japan, with its principal place of business in Tokyo. Tokai designed the Aim 'n Flame lighters; Scripto distributes the lighters in the United States. *See* Manning Aff., Ex. H, at 45- 48; Manning Aff., Ex. I, at 196. Scripto is a wholly owned subsidiary of Tokai acquired in 1984. *See id.,* Ex. H, at 12-13, 34. Scripto's president is appointed by Tokai and Tokai executives serve on Scripto's board of directors. In 1987, Tokai replaced Scripto's president with the former president of Tokai. *See id.,* Ex. F, at 24-25. A past president of Scripto, Kenji Iwagaki, testified that he was required to report to the president of Tokai. *See id.,* Ex. J, at 60-61.

***3** Together, Scripto and Tokai own JMP and Tokai Mexico. *See id.,* Ex. H, at 12-13. Scripto imports Aim 'n Flame lighters, some of which are manufactured in Mexico. *See id.,* Ex. F, at 45-46. Tokai also produces some of the component parts used in manufacturing the Aim 'n Flame lighters. *See* Kurata Decl. ¶ 4; Def. Mem. in Supp., at 6.

Plaintiffs have presented evidence indicating that Tokai was the head of a distribution network, controlling the network to deliver Tokai's products into the stream of commerce. Tokai supplied the lighters to Scripto for distribution. *See id.,* Ex. F, at 45-46. A vice-president at Scripto, Norman Merwise, testified that Tokai exercised ultimate authority over Scripto's marketing and distribution activities. *See* Manning Aff., Ex. K, at 47-49. Another vice-president at Scripto, Fred Ashley, stated, "[Scripto] is not a manufacturer. It's a distributor." *Id.,* Ex. I, at 196. Ashley also observed that "any of the design work or design changes [on the lighters] would come from Tokai Corporation ...." *Id.* at 197. Scripto was required to report product safety issues to Tokai. *See id.,* Ex. H, at 21-22. Tokai possessed the definitive authority to decide which products Scripto would distribute. *See id.,* Ex. H, at 34.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

When viewed in the light most favorable to Plaintiffs, the evidence supports their allegation that Tokai controlled the design, production and distribution of Aim 'n Flame lighters. As noted above, personal jurisdiction may be found where a seller uses a distribution network to deliver its products into the stream of commerce with the expectation that the products will be purchased by consumers in the forum state. *See* Clune, 233 F.3d at 544-45; *Barone*, 25 F.3d at 613. Plaintiffs have produced prima facie evidence supporting the exercise of personal jurisdiction over Tokai. The burden remains on Plaintiffs to establish personal jurisdiction by a preponderance of the evidence at trial.

The quantum of evidence presented by Plaintiffs distinguishes this case from *Savage v. Scripto-Tokai Corp.*, 147 F.Supp.2d 86 (D.Conn.2001), where the plaintiff's record evidence was insufficient to support the exercise of personal jurisdiction over Tokai. In finding no personal jurisdiction, however, *Savage* anticipated that evidence of Tokai's awareness of, or role in, the nationwide scope of Scripto's distribution of Aim 'n Flame lighters "could establish the degree of interconnection between a foreign parent and U.S. subsidiary sufficient to support the exercise of jurisdiction over the parent corporation." *Id.* at 93 n. 3. In this case, Plaintiffs have proffered sufficient evidence of Tokai's control over the design, production and distribution of the Aim 'n Flame lighters to establish the "interconnection" found to be lacking in *Savage.* Under the circumstances, the exercise of personal jurisdiction over Tokai is appropriate. *See Oswalt v. Scripto, Inc.*, 616 F.2d 191 (5th Cir.1980) (holding Tokai's predecessor corporation subject to personal jurisdiction in Texas, at a time when Scripto, the sole distributor, was still an independent company).

B. Defendants' Motion to Dismiss Specific Claims

***4** A complaint is properly dismissed under Fed.R.Civ.P. Rule 12(b)(6) for failure to state a claim where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Kaylor v. Fields*, 661 F.2d 1177, 1180-81 (8th Cir.1981) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). When examining the complaint, a court must accept all of the allegations contained therein and all inferences arising therefrom as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). It must be determined whether the well-pleaded allegations of fact, when construed in a light most favorable to the plaintiff, state a factual claim upon which relief can be granted on some legal theory. *See Penn v. Iowa State Bd. of Regents*, 999 F.2d 305, 307 (8th Cir.1993); *Dicken v. Ashcroft*, 972 F.2d 231, 233 (8th Cir.1992).

Defendants do not seek dismissal of the entire Complaint, but move to dismiss Plaintiffs' claims for: (1) alleged violations of the Consumer Products Safety Act, (2) alleged violations of Minnesota's Consumer Fraud Act, False Advertising Act, and Uniform Deceptive Trade Practices Act, and (3) common law fraud. These claims should only be dismissed if no set of facts can be proven in support of such claims that would entitle Defendants to relief. Conley, 355 U.S. at 45-46.

1. Consumer Products Safety Act

Plaintiffs allege that Defendants violated the Consumer Products Safety Act (the "CPSA"), and that they are entitled to seek relief for the violation pursuant to 15 U.S.C. § 2072. Section 2072(a) of the CPSA provides a private cause of action for persons injured as a result of a violation of "a consumer product safety rule, or any other rule or order issued by the Commission," in limited circumstances. 15 U.S.C. § 2072(a). In *Drake v. Honeywell,* the Eighth Circuit held that there is no private cause of action for a violation of the CPSA itself. 797 F.2d 603, 606 (8th Cir.1986). The *Drake* court also held that alleged violations of interpretive rules, specifically the product hazard reporting rules at 16 C.F.R. Part 1115, are not actionable. *Id.* Plaintiffs' purported cause of action under the CPSA is precluded by *Drake.* A "private cause of action cannot arise from an injury resulting from noncompliance with the product hazard reporting rules issued by the Commission." *Id.* at 609. Plaintiffs' contentions that a cause of action under the CPSA is authorized in this case is unsupported by any legal authority and Plaintiffs' attempts to circumvent Eighth Circuit precedent are unpersuasive.

Moreover, the February 26, 1996, letter from the Commission to Scripto is not an "order" that can support a private cause of action under 15 U.S.C. § 2072. The letter states that the Commission is "requesting" that Scripto provide information regarding child-play fires pursuant to 16 C.F.R. Part 1115.13(d) and "requests" a response within 10 days. Wackman Aff., Ex. 1. The letter neither mandated that Scripto's response be made under oath nor informed Scripto of its right to challenge "orders" issued by the Commission. *See id.* The absence of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such topics from the letter indicates that the Commission was not issuing an "order." *See* 16 C.F.R. Part 1118.8 (responses to "orders" must be made under oath); 16 C.F.R. Part 1118.9 (procedures to challenge an "order"). Plaintiffs' claim under the CPSA is dismissed.

2. Consumer Fraud Act, False Advertising Act, and Uniform Deceptive Trade Practices Act

***5** Defendants seek dismissal of Plaintiffs' claims under Minnesota's Consumer Fraud Act, Minn.Stat. § 325F.69, and False Advertising Act, Minn.Stat. § 325F.67. [FN2] Neither the Consumer Fraud Act nor the False Advertising Act provide a private right of action to individual consumers. In limited circumstances, however, private remedies may be available to individuals through the Private Attorney General Act ("Private AG Act"), Minn.Stat. § 8.31. The Private AG Act offers "an incentive for defrauded consumers to bring claims in lieu of the attorney general." *Ly v. Nystrom,* 615 N.W.2d 302, 311 (Minn.2000). Plaintiffs' Consumer Fraud Act and False Advertising Act claims will survive dismissal only if they may be brought pursuant to the Private AG Act, since there is no individual, private cause of action provided by those Acts.

FN2. Defendants do not seek dismissal of Plaintiffs' claim pursuant to the Unlawful Trade Practices Act, Minn.Stat. § 325D.15. *See* Def. Mem., at 6, n. 4.

Because the Private AG Act gives private citizens the right to act as a "private" attorney general, the role and duties of the attorney general concerning the enforcement of fraudulent business practice laws define the limits of a private claimant under the statute. *Id.* at 313. Minnesota law requires its attorney general to appear for the state in civil lawsuits "whenever, in the attorney general's opinion, the interests of the state require it." Minn.Stat. § 8.01. Accordingly, "the purpose of any statute granting private citizens authority to bring a lawsuit in lieu of the attorney general, is the protection of public rights and the preservation of the interests of the state." *Ly,* 615 N.W.2d at 313. For Plaintiffs to state their claims under the Private AG Act, the public interest must be demonstrated. *Id.*

Plaintiffs fail to demonstrate that their cause of action benefits the public. Plaintiffs contend proof of a transaction between a large manufacturer and retailer and members of the consuming public, and the fraud and false advertising perpetrated on the consuming public brings this case within the Private AG Act. [FN3] However, the essence of Plaintiffs' lawsuit is personal injury, involving allegations of negligence and products liability. Plaintiffs seek damages for past and future medical expenses, pain and suffering, wage loss, and emotional distress. *See* Compl. ¶ 56. Such damages do not benefit the public. The redress is to compensate Plaintiffs for their injuries. The rationale underlying the *Ly v. Nystrom* decision applies here; Plaintiffs may not craft their products liability suit to bring it within the ambit of the Private AG Act. Because the claims are not brought for the benefit of the public, Plaintiffs' claims under the Consumer Fraud Act and the False Advertising Act are dismissed.

FN3. Plaintiffs note the public will benefit because they intend to seek an injunction prohibiting further sale or distribution of Aim 'n Flame lighters. *See* Pl. Mem., at 29, n. 8. However, Scripto, the exclusive distributor in the United States, has not distributed or sold non-child-resistant Aim 'n Flame lighters for several years. *See* Def. Reply Mem., at 10, n. 5.

Defendants move to dismiss Plaintiffs' claim under the Uniform Deceptive Trade Practices Act because Plaintiffs lack standing to seek injunctive relief based on their past injury. *See* Def. Mem., at 9-10. Plaintiffs concede that this claim should be dismissed. *See* Pl. Mem., at 25, n. 7. Plaintiffs' Uniform Deceptive Trade Practices Act claim is dismissed.

3. Fraud

***6** Defendants seek dismissal of Plaintiffs' claim for fraud. To establish a claim for fraud under Minnesota law, a plaintiff must prove that: (1) defendant made a false representation about a past or present fact; (2) the false representation was material and susceptible of knowledge; (3) defendant knew the representation was false or made the representation without knowing whether it was true or false; (4) defendant intended that the plaintiff rely on the representation; (5) plaintiff reasonably relied on the representation; and (6) plaintiff suffered damages due to the representation. *Masepohl v. American Tobacco Co.,* 974 F.Supp. 1245, 1250 (D.Minn.1245) (citing *M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 289 (Minn.1992)).

Allegations of fraud must be stated with particularity. *See* Fed.R.Civ.P. 9(b); *Tuttle v. Lorillard Tobacco Co.,* 118 F.Supp.2d 954, 963

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D.Minn.2000). Conclusory allegations of fraudulent conduct are insufficient. *See* Commercial Prop. Invs., Inc. v. Quality Inns Int'l, 61 F.3d 639, 644 (8th Cir.1995). Plaintiffs must state the "who, what, when, where, and how: the first paragraph of any newspaper story." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549-50 (8th Cir.1997). Plaintiffs fail to specifically identify the underlying facts of fraudulent conduct with the particularity required by Rule 9(b).

Plaintiffs admit that their common law fraud claim is limited to the allegations of paragraph 53(a) of the Complaint and concede that the Complaint fails to plead reliance with the particularity required by Fed.R.Civ.P. 9(b). *See* Pl. Mem., at 33. Furthermore, the Complaint does not plead falsity with sufficient particularity. Conclusory allegations of fraud are insufficient. Plaintiffs' claim for fraud as stated in the Complaint is dismissed. Plaintiffs are granted leave to amend their Complaint and plead fraud with the particularity required by Rule 9(b).

C. Plaintiffs' Motion in Opposition to Admission *Pro Hac Vice*

On January 22, 2002, Defendants filed the standard approved form petitions for admission *pro hac vice* of Mark Suzumoto, Esq., and Keith Sipprelle, Esq., in this case. Suzumoto and Sipprelle are members of Van Etten, Suzumoto & Becket, L.L.P., a law firm based in Santa Monica, California. On January 25, 2002, Plaintiffs filed a Motion in Opposition to Admission *Pro Hac Vice* of Suzumoto and Sipprelle, with a memorandum and exhibits [Doc. No. 27]. On February 19, 2002, Defendants filed a memorandum in support of the Motions for Admission *Pro Hac Vice* [Doc. No. 42]. Three days later, Plaintiffs filed a reply memorandum opposing the admission *pro hac vice* of Suzumoto and Sipprelle [Doc. No. 46]. Both parties then sent correspondence to the Court regarding this flurry of filings. Pursuant to a letter from the Court permitting it, Defendants submitted a further response memorandum in support of the motions for admission *pro hac vice* on March 14, 2002 [Doc. No. 48].

*7 Opposing the Motions for Admission *Pro Hac Vice*, Plaintiffs allege that Suzumoto and Sipprelle will not meet the standards of integrity and candor required of officers of this Court. Suzumoto and Sipprelle are the longstanding general counsel for Scripto. Plaintiffs cite many cases in which courts have issued orders to compel discovery after Scripto improperly withheld documents. *See Flock, et al. v. Scripto-Tokai Corp., et al.*, No. 00-CV-3794 (S.D.Tex.2000); *Savage, et al. v. Scripto-Tokai Corp., et al.*, No. 00-CV-1158 (D.Conn.2000); *Powell, et al. v. Wal-Mart Stores, et al.*, No. 99-CV-570 (S.D.Ala.1999); *Bartholic, et al. v. Scripto-Tokai Corp., et al.*, No. 98-CV-681 (D.Colo.1998); *Efting, et al. v. Tokai Corp., et al.*, No. 98-CV-260 (W.D.Mo.1998); *Smith v. Scripto-Tokai Corp., et al.*, No. 99-CV-1707 (W.D.Pa.1999). Plaintiffs argue that Scripto's history of discovery abuse indicates that Suzumoto and Sipprelle will fail to measure up to the standards of integrity and candor expected of attorneys in this jurisdiction.

The Local Rules provide that "[a]ny attorney residing outside of this state and admitted to practice before and then in good standing in another United States District Court" may be permitted to appear and participate as an attorney in the pending proceeding. D. Minn. LR 83.5(d). Plaintiffs have failed to produce evidence indicating that Suzumoto and Sipprelle are not admitted to practice or not in good standing in another United States District Court. Suzumoto and Sipprelle have associated with local counsel, Gary J. Gordon and John J. Wackman of Rider, Bennett, Egan & Arundel, L.L.P., as required by Local Rule 83.5(d). Suzumoto and Sipprelle have met the prerequisites for this Court to grant their Motions for Admission *Pro Hac Vice.*

Plaintiffs have raised no concerns about the choice or integrity of the local counsel. *See* Pl. Mem., at 9, n. 4. While the Motions for Admission *Pro Hac Vice* of Suzumoto and Sipprelle will be granted, the local counsel for Defendants, Rider, Bennett, Egan & Arundel, L.L.P., will be required to oversee all discovery and supervise all discovery responses. Plaintiffs have alerted the Court to the history of Suzumoto and Sipprelle, and their conduct will be monitored to assure that zealous advocacy does not fall to the level of sanctionable discovery abuse. *See* Fed.R.Civ.P. 26(g); Fed.R.Civ.P. 37(a) & (c). Additionally, if the anticipation becomes a likelihood that Suzumoto will appear as a fact witness, then he may not remain as trial counsel.

D. Plaintiffs' Appeal of Judge Boylan's Order

In ruling on an appeal from a non-dispositive matter decided by a magistrate judge, a district court must affirm an order by a magistrate judge unless it is "clearly erroneous or contrary to law ." 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); D. Minn. LR 72 .1(b)(2). This standard of review is extremely deferential. *See Reko v. Creative Promotions, Inc.*, 70 F.Supp.2d 1005, 1007 (D.Minn.1999); *Banbury v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Omnitron Int'l., Inc.*, 818 F.Supp. 276, 279 (D.Minn.1993). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Chakales v. Comm'r of Internal Revenue*, 79 F.3d 726, 728 (8th Cir.1996) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

***8** Judge Boylan issued a Confidentiality Order on February 28, 2002, placing reasonable limitations on Plaintiffs' dissemination of Defendants' commercial information to third parties. Liberal discovery "is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). Because of liberal discovery and the potential for abuse, district courts have broad discretion "to decide when a protective order is appropriate and what degree of protection is required." *Id.* at 36. The Federal Rules of Civil Procedure provide for the protection of a "trade secret or other confidential research, development, or commercial information." Fed.R.Civ.P. 26(c)(7). Pursuant to Rule 26(c), a court may fashion "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c).

Defendants have sufficiently demonstrated good cause for protecting their commercially sensitive and confidential information. *See* Ashley Aff. ¶ ¶ 3-7. Because Judge Boylan's Order does not preclude Plaintiffs from discovering Defendants' sensitive information or using it to prepare for trial, Plaintiffs will not be unduly prejudiced by the Confidentiality Order. A review of this situation does not create a definite and firm conviction that a mistake has been committed. The Order is not "clearly erroneous or contrary to law," and it is affirmed.

IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that:

(1) Defendant Tokai's Motion to Dismiss for lack of personal jurisdiction [Doc. No. 7] is DENIED;

(2) Defendants' Motion to Dismiss specific causes of action [Doc. Nos. 12, 29, 30] is GRANTED; Plaintiffs' Consumer Products Safety Act claim, Consumer Fraud Act claim, False Advertising Act claim, Uniform Deceptive Trade Practices Act claim, and fraud claim are DISMISSED. Plaintiffs are granted leave to amend their Complaint and plead fraud with the particularity required by Rule 9(b).

(3) Plaintiffs' Motion in Opposition to Admission *Pro Hac Vice* [Doc. No. 27] is DENIED; The Motions for Admission *Pro Hac Vice* are GRANTED; Local counsel for Defendants, Rider, Bennett, Egan & Arundel, L.L.P., is ordered to oversee all discovery in this matter and supervise all discovery responses.

(4) Plaintiffs' Appeal of Judge Boylan's Order of February 28, 2002 [Doc. No. 50] is DENIED and the Order is AFFIRMED.

Not Reported in F.Supp.2d, 2002 WL 1023153 (D.Minn.)

**Motions, Pleadings and Filings (Back to top)**

• 0:01CV01655 (Docket) (Sep. 07, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
Virginia R. SCALLY, Appellant,
v.
NORWEST MORTGAGE, INC., et al., Respondents,
Donald MYHRE, Respondent.
**No. C4-02-2181.**

Sept. 2, 2003.

Hennepin County District Court, File No. CT0115068.

Donald Chance Mark, Jr., Shannon M. McDonough, Erik F. Hansen, Fafinsky Mark & Johnson, P.A., Eden Prairie, MN, for appellant.

Charles F. Webber, Aaron D. Van Oort, Faegre & Benson, LLP, Minneapolis, MN, for respondents Norwest Mortgage, Inc. and Wells Fargo Home Mortgage, Inc.

Donald Myhre, Maple Grove, MN, pro se respondent.

Considered and decided by HALBROOKS, Presiding Judge, SHUMAKER, Judge, and ANDERSON, Judge.

## UNPUBLISHED OPINION

HALBROOKS, Judge.

*1 Appellant argues that the district court abused its discretion by concluding that appellant failed to meet the heightened burden of proving promissory estoppel in cases related to the statute of frauds and that the district court erred by (1) dismissing appellant's consumer-fraud-act claim; (2) denying appellant's motion for default judgment; and (3) denying appellant's motion to amend her complaint to assert a punitive-damages claim. Because there are remaining material issues of fact, we reverse and remand the district court's issuance of summary judgment on the issue of promissory estoppel. Because the district court denied appellant's motion to amend the complaint to assert punitive damages based on its summary-judgment decision, without determining the punitive-damages claim on the merits, we reverse and remand that issue as well. Because the district court denied appellant's motion for default judgment against respondent Myhre based on the summary-judgment decision that we reverse in part, we also reverse on the default-judgment issue and reinstate appellant's claims of promissory estoppel against Myhre. We affirm summary judgment on the other issues and the dismissal of appellant's consumer-fraud-act claim.

## FACTS

In May 1998, appellant Virginia Scally began working with respondent Donald Myhre, a loan officer at respondent Norwest Mortgage, Inc. [FN1] Scally wanted to refinance her home and consolidate her credit-card debt with an existing home-equity loan. She was familiar with the lending process, having obtained four previous loans secured by mortgages.

> FN1. Norwest Bank merged with Wells Fargo Bank. Norwest and Wells Fargo also merged their separate home mortgage divisions. Both will be referred to as "Wells Fargo."

Scally first met with Myhre on May 4, 1998 and signed a uniform residential-loan application and a general loan acknowledgement. Her application stated that she was applying for a loan of $60,000 at an interest rate of 7.25%. A loan application Scally later completed on September 28, 1999 quoted a rate of 6.5%. The general loan acknowledgement that Scally signed indicated that she elected to "float" her interest rate rather than lock it in at a fixed rate. Scally conceded that she did not sign a written agreement that locked in a rate with Wells Fargo. But Scally claims that Myhre orally promised her a consolidated loan at an interest rate of 6%.

In order to qualify for a loan with Wells Fargo, an applicant's home must be appraised at a value that is high enough to support the amount of the requested loan. Scally's home was appraised for 10% less than her requested loan amount, thereby disqualifying Scally for a loan. Myhre testified that, upon learning

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Scally did not qualify, he could not bring himself to tell her. Rather than denying Scally's loan application, Myhre informed her that the appraisal had come in too low and that he would attempt to get a higher one. From May 1998 until September 1999, nearly one and one-half years later, Myhre repeatedly scheduled and then postponed meetings with Scally to sign final loan documents. Myhre later testified that he postponed the meetings in an attempt to gain enough time to make it possible to give her the loan. He stated that he attempted to obtain a more favorable appraisal for Scally's home by contacting additional appraisers over the course of the next 18 months.

***2** Scally testified that Myhre told her at their first meeting to stop making payments on her mortgage and home-equity loans so that she would not "mess up the totals" on her new loans. While Myhre testified that he did not recall telling Scally to cease making payments, it is undisputed that she stopped making them. As a consequence, Scally began to receive nonpayment notices from her mortgage company. According to Scally, Myhre told her not to worry about the notices. But in August 1999, a sheriff served Scally with notice of a foreclosure action against her home. Scally then contacted Myhre, who ultimately paid more than $4,400 of his own money in an effort to bring Scally's accounts up to date.

Myhre and Scally had another meeting in September 1999. At that time, Scally signed a number of papers that she testified she did not read, but that she believed to be closing papers. In reality, the documents Scally signed were for a new loan application. Myhre later characterized the meeting as a "dry closing," a meeting where the loan applicant signs all the papers that are ready at that time so that the closing can take place later, once all the loan requirements are fulfilled. Myhre stated that he explained to Scally that the meeting was a dry closing, but she testified that she remembered nothing about that.

Wells Fargo learned about Scally's circumstances in November 1999 when Scally contacted Kevin Greene, a branch manager for Wells Fargo and Myhre's supervisor. Scally called Greene when she encountered problems with her credit rating while attempting to buy a car. Greene investigated Scally's claims and found that Scally had no loan with Wells Fargo. There was no file set up for Scally and her loan application was inactive.

Wells Fargo apologized to Scally and, on her behalf, paid $1,714.49 (the remainder of Scally's outstanding mortgage payments) and $1,863.70 (the amount outstanding on her home-equity loan). In addition, the bank gave Scally a letter to provide to her creditors that explained that Scally was not to blame for the tardy loan payments on her credit history. John Roti, Wells Fargo area manager, later testified that the letter, if presented by Scally, would be sufficient to correct her credit rating for any damage attributable to Scally's failure to make timely loan payments. Wells Fargo also agreed to waive the standard loan-origination fee if Scally wanted to re-apply for a loan.

Myhre acknowledged that he was struggling with alcoholism throughout his dealings with Scally, and in April 1999, he entered treatment. Myhre, who had a history of poor reviews and evaluations with Wells Fargo aside from this issue, was suspended immediately after Scally called Greene in November 1999 and fired in December 1999.

According to Scally, she had difficulty with her credit after her experience with Myhre and Wells Fargo. Scally applied for two types of credit in 1999--a lease on a new Jaguar and a credit card. Scally stated that the terms of the vehicle lease were less favorable because of her poor credit rating and that she was denied the credit card. In 2000, Scally claimed that she was denied a credit card and a loan through Bank of America. In 2001, she claimed to have been denied a refinancing loan from a mortgage company in Virginia. But Scally conceded that she never showed any potential creditors the letter that Wells Fargo prepared on her behalf.

***3** Scally sued Wells Fargo and Myhre, asserting claims for (1) breach of contract, (2) promissory estoppel, (3) breach of good faith and fair dealing, (4) fraud and misrepresentation, (5) negligent misrepresentation, (6) intentional interference with credit expectancy, (7) defamation, (8) violation of Minnesota's Deceptive Trade Practices Act, (9) violation of the Minnesota Prevention of Consumer Fraud Act, and (10) negligent supervision. Wells Fargo moved for summary judgment, and Scally filed a motion to amend her complaint to assert a claim of punitive damages. The district court held a hearing on Wells Fargo's summary-judgment motion on August 7, 2002 and on Scally's motion to amend the complaint the following day. On September 4, 2002, Scally submitted the affidavit of Xavier Saavedra to the court. Xavier Saavedra is a loan officer at Greater Acceptance Mortgage Co. (GAMC). His affidavit stated that Scally's mortgage application to GAMC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was denied based on her credit history that reflected a foreclosure on a residential property and nine missed mortgage payments.

The district court refused to consider the submission, finding it to be untimely. The district court subsequently granted Wells Fargo's motion for summary judgment and denied Scally's motion to amend her complaint to assert a claim of punitive damages.

In its order granting summary judgment, the court found that Scally conceded that summary judgment was appropriate on count 1 (breach of contract) and count 3 (breach of duty of good faith and fair dealing). The court concluded that Minn.Stat. § 513.33 (2002), the Minnesota credit-agreement statute of frauds, barred the first six counts of Scally's complaint. The court also held that Minnesota does not recognize a claim for intentional interference with credit expectancy and found no reason for a good-faith extension of the law. The court held that Scally's claims for fraud, misrepresentation, and negligent misrepresentation were barred because Myhre intended to perform on his representations and because documents in the record contradicted Scally's statements. The court dismissed Scally's claim for defamation on the grounds that Wells Fargo had not published the allegations and because the allegations were true. The court concluded that the claim brought under the Minnesota Prevention of Consumer Fraud Act failed because the suit would not benefit the public. Finally, the court held that, because Scally faced no ongoing injury, her claim under the Deceptive Trade Practices Act also failed.

Following the district court's rulings on Wells Fargo's motion, Scally's claims against Myhre remained. On September 16, 2002, Myhre failed to attend a pretrial conference. In response, Scally brought a motion for default judgment against Myhre. The court denied the default judgment and dismissed Scally's claims against Myhre with prejudice on the same bases on which the court had granted Wells Fargo's motion for summary judgment.

*4 Following Scally's appeal to this court, Wells Fargo moved to strike the affidavit of Xavier Saavedra from Scally's appendix and brief on the ground that it is outside the record.

## DECISION

### I. Standard of Review

On an appeal from summary judgment, this court asks two questions: (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its interpretation of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). No genuine issue of material fact exists where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997). The nonmoving party must do more than rest on mere averments; a genuine issue for trial must be established by substantial evidence. *Id.* at 69-71. "On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom [summary] judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). But this court need not defer to the district court's decision on a pure question of law. *Frost-Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.2000).

### II. Promissory Estoppel

Scally is attempting to enforce Myhre's alleged oral promise that she had a mortgage agreement at an interest rate of 6% and that, as a result of the agreement, she should stop payments on existing loans. In the order granting summary judgment, the district court concluded that Minn.Stat. § 513.33 (2002), the Minnesota credit-agreement statute of frauds, barred the first six counts of Scally's complaint. Scally contends that the doctrine of promissory estoppel precludes application of the statute of frauds to Myhre's promise and argues that the district court incorrectly concluded that she failed to meet her burden of proof on the issue of promissory estoppel. We agree. "Granting equitable relief is within the sound discretion of the trial court. Only a clear abuse of that discretion will result in reversal." *Nadeau v. County of Ramsey,* 277 N.W.2d 520, 524 (Minn.1979).

The Minnesota credit-agreement statute of frauds mandates that, in order to maintain an action on a credit agreement, the agreement must be signed by both parties, express consideration, and establish the relevant terms and conditions. Minn.Stat. § 513.33, subd. 2. A credit agreement is defined as "an agreement to lend or forebear repayment of money ..., to otherwise extend credit...." Minn.Stat. § 513.33, subd. 1(1). But "[a]n agreement may be taken outside the statute of frauds by equitable or promissory estoppel." *Norwest Bank, N.A. v. Midwestern Mach. Co.,* 481 N.W.2d 875, 880 (Minn.App.1992) (citing *Berg v. Calstrom,* 347 N.W.2d 809, 812 (Minn.1984)), *review denied*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Minn. May 15, 1992). There is no dispute that final loan documents were never signed. But that does not end our inquiry, given the oral representations that Myhre allegedly made to Scally.

***5** Generally, in order to invoke the doctrine of promissory estoppel, a plaintiff must prove the existence of (1) a clear promise, (2) reasonable reliance that the defendant should have expected and (3) injustice if the promise is not enforced. *Ruud v. Great Plains Supply, Inc.,* 526 N.W.2d 369, 372 (Minn.1995). The reasonableness of a promisee's reliance on a promise is a question of fact for the jury. *Norwest Bank,* 481 N.W.2d at 880.

In *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 283-84, 230 N.W.2d 588, 593-94 (1975), the Minnesota Supreme Court set forth certain principles regarding whether and when the doctrine of promissory estoppel can defeat the statute of frauds.

> The Restatement rule is that promissory estoppel will defeat the statute of frauds only when the promise relied upon is a promise to reduce the contract to writing.... Some jurisdictions adopt the slightly less restrictive view ... and permit promissory estoppel where the detrimental reliance is of such character and magnitude that refusal to enforce the contract would permit one party to perpetrate a fraud. A mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct, however, is not such a fraud as will justify disregarding the statute.

*Id.* (citations omitted).

In support of her claim, Scally cites *Norwest Bank,* where a customer alleged that Norwest Bank promised to extend an indefinite $5 million credit line to his company as an inducement to get the customer to sign a buy-sell agreement. 481 N.W.2d at 880. The district court in *Norwest Bank* found that the customer's claim was barred by Minn.Stat. § 513.33 because the agreement was not in writing. *Id.* This court reversed, holding that promissory estoppel may take an agreement outside of the statute of frauds. *Id.* This court concluded that, where there were affidavits by the customer and his lawyer asserting the promise and evidence that the customer attempted to use the promised "credit line," there was a jury question as to the factual basis of the claims and as to whether the customer's reliance was reasonable. *Id.*

Scally argues that she has alleged sufficient disputed material facts on the elements of both promise and reliance to avoid summary judgment. We agree. Scally provided the court with an affidavit asserting that she was promised and relied on the promise of a mortgage at the rate of 6% when she stopped making payments on her then-existing mortgage and loan. There is also evidence that Scally eventually went to Myhre's supervisor and told him that she was waiting for loan coupons that she had never received. The terms of the promise and whether or not Scally's reliance on the promise was reasonable are for a jury's determination.

The issue of whether Scally will suffer an injustice if the promise is not enforced is a closer question on this record. While Scally alleges an adverse effect on her credit rating as a result of her dealings with Myhre, the record contains her allegations only. It is undisputed that (1) the payments made by Myhre and Wells Fargo made Scally "whole" with respect to arrearages, and (2) she has never used the credit letter that Wells Fargo prepared as a means of clearing her credit history and, therefore, does not know what, if any, salutary effect it will have. But, as with the first two factors, we conclude that there are genuine issues of material fact on this issue as well. We, therefore, reverse the district court's conclusion that Scally was not entitled to a trial to determine whether the doctrine of promissory estoppel defeats the statute of frauds in this matter and remand for trial on this issue.

### III. Equitable Estoppel

***6** Scally asserts that this case presents the precise type of injustice that equitable estoppel is designed to prevent and that the district court improperly failed to address the issue. But the issue of equitable estoppel was never properly raised and this court will not review an issue not brought before the district court. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (stating that appellate courts will generally not consider matters not argued and considered in the district court).

### IV. Consumer Fraud Act Claim

Scally contends that the district court erred in concluding that she has no cause of action under the Minnesota Prevention of Consumer Fraud Act (CFA) because Scally has failed to show that her case would benefit the public. The CFA defines consumer fraud in part as

> [t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is enjoinable as provided herein.

Minn.Stat. § 325F.69, subd. 1 (2002). Under the private attorney general statute,

[i]n addition to the remedies otherwise provided by law, any person injured by a violation of any of the laws referred to in subdivision 1 [which includes the Consumer Fraud Act] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigations and reasonable attorney's fees, and receive other equitable relief as determined by the court.

Minn.Stat. § 8.31, subd. 3a (2002).

In *Ly v. Nystrom,* 615 N.W.2d 302 (Minn.2000), the buyer of a restaurant brought a CFA claim against the seller after the seller misrepresented monthly profits and the condition of the restaurant and its inventory. The supreme court held the CFA may afford coverage to a one-on-one transaction, but that the private attorney general statute "applies only to those claimants who demonstrate that their cause of action benefits the public." *Id.* at 314. Scally argues that under *Ly,* the lack of a resulting public benefit does not preclude a consumer from asserting a claim under the CFA. Instead, she asserts that a consumer may not be awarded attorney's fees on CFA claims unless the cause of action was of benefit to the public.

The United States District Court, District of Minnesota, recently examined the language and reasoning set forth in *Ly* and recognized that a "public benefit requirement ... was announced in *Ly v. Nystrom.*" *Behrens v. United Vaccines, Inc.,* 228 F.Supp.2d 965, 971 (D.Minn.2002). The federal district court also explained that "the Private AG Statute was the measure that instilled authority, in individual consumers, to bring actions under the CFA." *Id.* at 968. In its analysis, the *Behrens* court specifically relied on the idea that the parties' "CFA claim is not an action that could properly have been pursued by the Minnesota Attorney General, and consequently, [the parties] may not pursue the claim in the Attorney General's stead." *Id.* at 972.

*7 We conclude that the private attorney general statute cannot be used as a vehicle to litigate a CFA claim unless the cause of action benefits the public. Therefore, the district court properly considered whether a public benefit would accrue. A public benefit has been found where the fraudulent misrepresentations about a sports-medicine-technician program was advertised to the public at large, and the misleading ads would have continued, but for the lawsuit. *Collins v. Minn. Sch. of Business, Inc.,* 636 N.W.2d 816, 821 (Minn.App.2001). In contrast, in *Ly* there was no public benefit where the "fraudulent misrepresentation, while evincing reprehensible conduct was made only to appellant." *Ly,* 615 N.W .2d at 314.

This case is similar to *Ly* because appellant engaged in a one-on-one interaction with Myhre. There is no evidence that Wells Fargo knew of Myhre's treatment of Scally until she contacted Myhre's supervisor at the bank. Scally contends that a successful prosecution would deter lenders from defrauding their customers and, that if Wells Fargo would better supervise its loan officers, it would benefit the public. But, as argued by Wells Fargo, Myhre has been terminated and he is no longer in any position to harm the public. Scally's argument is not persuasive because the "metaphysical potential" for a public benefit does not support a claim under the private attorney general statute. *Behrens,* 228 F.Supp.2d at 971. We affirm the district court on the dismissal of this claim.

**V. Default Judgment**

Scally argues that the district court abused its discretion by refusing to grant default judgment against Myhre and by dismissing on its own motion the claims against Myhre. A default judgment may be entered against a party for failure to plead or otherwise defend within the timeline established by law. Minn. R. Civ. P. 55.01. "[D]enial of a motion for a default judgment is proper when four requirements are met: defendant has a reasonable defense on the merits; defendant has a reasonable excuse for his failure to answer; defendant acted with due diligence after notice of the entry of judgment; and no substantial prejudice will result to other parties." *Coller v. Guardian Angels Roman Catholic Church of Chaska,* 294 N.W.2d 712, 715 (Minn.1980) (citations omitted). The standard for a decision to grant or vacate a default judgment is the same. *Guillaume & Assocs., Inc. v. Don-John Co.,* 371 N.W.2d 15, 18 (Minn.App.1985). The district court has discretion in ruling on a motion to vacate a default judgment, and its decision will not be reversed absent an abuse of that discretion. *Foerster v. Folland,* 498 N.W.2d 459, 460 (Minn.1993); *Guillaume,* 371 N.W.2d at 18. The record is viewed in the light most favorable to the district court's decision. *Imperial Premium Fin., Inc. v. GK Cab Co.,* 603 N.W.2d 853, 857 (Minn.App.2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The district court made findings of fact that Myhre was served with a summons and complaint on September 21, 2001, but that he did not answer or appear. But the court denied Scally's motion for default and dismissed the complaint in its entirety with prejudice stating "[a]lthough Defendant Myhre did not join in Defendants' motion for summary judgment, it is appropriate that the complaint be dismissed for the same reasons and based upon the same facts as set forth in the September 13, 2002 Order [granting summary judgment to Wells Fargo]." Scally contends that dismissal of her claim against Myhre was improper because it, like the grant of summary judgment to Wells Fargo, was erroneously based on the conclusion Scally had failed to show issues of material fact concerning the application of the doctrine of promissory estoppel. We agree, and we reverse and remand for trial the promissory estoppel claim against Myhre.

**VI. Punitive Damages**

***8** When reviewing a trial court's pretrial order denying a motion to amend pleadings to assert a punitive-damages claim, the reviewing court makes an independent assessment of whether the evidence is sufficient to present a fact question to the jury. *Swanlund v. Shimano Indus. Corp.,* 459 N.W.2d 151, 155 (Minn.App.1990), *review denied* (Minn. Oct. 5, 1990). "[I]f the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages." Minn.Stat. § 549.191 (2002); *Shetka v. Kueppers, Kueppers, Von Feldt & Salmen,* 454 N.W.2d 916, 918 n. 1 (Minn.1990). Here, the district court denied Scally's motion for punitive damages because Wells Fargo prevailed on summary judgment. Because we reverse the grant of summary judgment on the promissory-estoppel issue, we remand this claim to the district court for a decision on the merits.

**VII. Motion to Strike**

Although Scally submitted a letter explaining the delay in filing Saavedra's affidavit, the district court was within its discretion in declaring that the submission of the affidavit was untimely. Scally does not now argue that the district court abused its discretion in finding her affidavit to be untimely, but instead contends that Minn. R.App. P.110.01 places the affidavit properly before the appellate court. "The general rule is that an appellate court must decide an appeal based solely upon the evidence actually presented to the trial court and shown by the record on appeal." *Western World Ins. Co. v. Anothen, Inc.,* 391 N.W.2d 70, 73 (Minn.App.1986). Therefore, because the affidavit was not part of the record on appeal, Scally's claim is without merit, and the motion to strike is granted.

**Affirmed in part, reversed in part, and remanded; motion to strike granted.**

Not Reported in N.W.2d, 2003 WL 22039526 (Minn.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Only the Westlaw citation is currently available.

United States District Court,
W.D. Texas,
El Paso Division.
Marvin NORWOOD et al., Plaintiffs,
v.
RAYTHEON COMPANY et al., Defendants.
**No. EP-04-CA-127-PRM.**

Jan. 17, 2006.

**Background:** Radar operators, mechanics, and technicians, and non-profit advocacy group, brought action against designers, manufacturers, and marketers of radar equipment alleging negligence. Defendants brought motion to dismiss plaintiffs who were exposed to radiation but were not yet affected with illness or injury caused by such exposure.

**Holding:** The District Court, Martinez, J., held that State Supreme Court of Texas would not recognize cause of action for medical monitoring.
Motion granted.

**[1] Federal Courts 382.1**

170Bk382.1 Most Cited Cases

**[1] Federal Courts 390**
170Bk390 Most Cited Cases
When deciding an issue of state law, a federal court is bound to apply the law as interpreted by the state's highest court; however, if the state's highest court has not spoken on the particular issue, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide.

**[2] Federal Courts 383**
170Bk383 Most Cited Cases

**[2] Federal Courts 391**
170Bk391 Most Cited Cases
When considering the decisions of intermediate state appellate courts, if the state's highest court has not spoken on the particular issue, a federal court is bound by the intermediate appellate court's decision unless convinced by other persuasive data that the highest court would decide otherwise.

**[3] Federal Courts 390**
170Bk390 Most Cited Cases

**[3] Federal Courts 391**
170Bk391 Most Cited Cases
When deciding an issue of state law, if the state's highest court has not spoken on the particular issue, a federal court may look to analogous decisions, considered dicta, scholarly works and other reliable data, which includes looking to the decisions of other jurisdictions; however, a federal court should not expand state law beyond its presently existing boundaries.

**[4] Damages 43**
115k43 Most Cited Cases
As predicted by federal district court in Texas, State Supreme Court of Texas would not recognize cause of action for medical monitoring if presented with such claim, since State Supreme Court already had rejected analogous mental anguish claim on similar policy considerations of difficulties for judges and juries, unpredictable liability, and multiplicity of suits, recognition of claim would have constituted radical extension of currently existing Texas law, and federal Circuit precedent disfavored creation of cause of action that previously had not been recognized in forum state.
Steven M. Klepper, James P. Ulwick, Kramon & Graham, P.A., Baltimore, MD, Neil F. Mara, Jonathan Auerbach, Berger & Montague, P.C., Philadelphia, PA, Enrique Moreno, Attorney at Law, El Paso, TX, Melissa H. Maxman, Kelly D. Eckel, Bronwyn L. Roberts, Alice B. Burkin, James A. Plaisted, for Plaintiffs.

Michael Dierkes, Kirkland, Ellis, Chicago, IL, Carole A. Cheney, Joel Blanchet, Kevin T. Van Wart, Mark N. Osborn, Kemp, Smith, Duncan & Hammond, El Paso, TX, J. Wylie Donald, Charles F. Rysavy, McCarter & English, LLP, Newark, NJ, Joanna Shally, Heather Lamberg Kafele, Shearman & Sterling, New York, NY, Heather Lamberg Kafele, Thomas S. Martin, Shearman & Sterling, Raymond B. Biagini, McKenna Long & Aldridge LLP, Shawn D. Bryant, William J. Cople, III, Joe G. Hollingsworth, Donald W. Fowler, Spriggs & Hollingsworth, Washington, DC, Mitzi T. Shannon, Kemp, Smith, Duncan & Hammond, P.C., El Paso, TX, for Defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ALL MEDICAL MONITORING CLAIMS AND DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS ALL CLAIMS ASSERTED BY THE BUND ZUR UNTERSTUTZUNG*

PHILIP R. MARTINEZ, J.

***1** On this day, the Court considered: (1) Defendants Raytheon Company, Lucent Technologies Inc., General Electric Corporation, Honeywell International, Inc., ITT Industries, Inc., and ITT-Gilfillan, Inc.'s (collectively "Defendants"): (a) "Motion to Dismiss All Medical Monitoring Claims" and (b) "Motion to Dismiss All Claims Asserted by the Bund Zur Unterstutzung," collectively filed [FN1] on May 4, 2004; (2) Plaintiffs' "Consolidated Opposition to: (a) Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1); (b) Defendants' Motion to Dismiss All Claims Asserted by the Bund and All Medical Monitoring Claims; (c) Defendants' Joint Motion to Dismiss the Fraudulent Concealment (Count XI) and Civil Conspiracy (Count XII) Claims in Plaintiffs' Second Amended Complaint; and (d) Joint Motion of ITT and Honeywell to Dismiss Putative Liability Joint Issues Certification Class Action for Failure to State a Claim" ("Response"), filed on June 8, 2004; and (3) Defendants' "Reply in Support of Their Motion to Dismiss all Claims Asserted by the Bund and All Medical Monitoring Claims" ("Reply"), filed on June 18, 2004 in the above-captioned cause.

After due consideration, the Court is of the opinion that Defendants' Motion to Dismiss All Medical Monitoring Claims should be granted and that Defendants' Motion to Dismiss All Claims Asserted by the Bund Zur Unterstutzung should be denied as moot for the reasons set forth below. [FN2]

I. FACTUAL BACKGROUND

This case concerns the allegedly negligent conduct of Defendants in designing, manufacturing, and marketing radar equipment. [FN3] Plaintiffs, currently seeking class certification, consist of thirteen individual-named plaintiffs allegedly exposed to radars, and the Bund, which alleges to be "a non-profit advocacy group that seeks to educate and advocate on behalf of its members which include radar operators, mechanics, and technicians." Pls.' Second Am. Original Pet., at 5, ¶ 14.

Plaintiffs allege that Defendants, comprised of several designers, manufacturers, and marketers of radar equipment, (1) did not adequately shield transmitter tubes in their radars, thereby emitting dangerous amounts of x-ray radiation and (2) failed to adequately warn Plaintiffs of health risks associated with radiation exposure. *Id.* at 13, ¶ ¶ 46, 52-56. Plaintiffs attempt to certify two separate classes. Plaintiffs the Bund, Hans-Joerg Nimschke, Heinz Liehmann, Joseph Schraml, Ulf Waldvogel, and Henry Hofmann ("Medical Monitoring Plaintiffs") seek to certify a class ("the Medical Monitoring Class") consisting of radar operators, mechanics, and technicians exposed to radiation "but *not yet affected* with an illness or injury caused by such exposure." *Id* . at 3, ¶ 6 (emphasis added). In contrast to the Medical Monitoring Class, Plaintiffs Graciela Neutzler, individually and as next friend of minor children Vanessa Priscilla Neutzler and Chantal Alexa Neutzler, and as executrix of the estate of her husband Stephan Neutzler, Joan Fridriksson, individually and on behalf of all other statutory death beneficiaries, and as executrix of the estate of her husband Thor Fridriksson, Klaus Schneider, Daniel Duncan, Jack Cooper, Henning Schimm, Christa Schimm, Miriam Schimm, Harald Schwankl, and Erwin Bast seek the certification of a class ("the Liability Issue Certification Class") consisting of "[a]ll radar technicians, operators, and/or mechanics who have suffered and/or are suffering certain illnesses, injuries and/or death as a direct and proximate result of exposure" to radiation caused by Defendants' "design, manufacture and distribution of Radar Devices pursuant to Texas law." *Id.* at 4, ¶ 8.

***2** Medical Monitoring Plaintiffs seek relief in the form of "a fund to be administered by the Court to finance the performance of such medical monitoring and surveillance services as are deemed reasonably and medically necessary to protect Medical Monitoring Plaintiffs from an increased risk of harm and disease." *Id.* at 3, ¶ 6. The requested medical monitoring services would include "preventative screening, care and treatment of conditions resulting from the use of Defendants' Radar Devices, direct medical consultation and independent scientific studies to quantify the adverse health offects, both physical and emotional, of exposure to ionizing radiation, to take preventative action, and to obtain early detection and diagnosis of disease, and care for any disease and/or injury determined to be associated with the use of Defendants' Radar Devices." *Id.* at 55-56, ¶ 289.

On May 4, 2004, Defendants collectively filed their (1) Motion to Dismiss all Medical Monitoring Claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and (2) Motion to Dismiss All Claims Asserted by the Bund pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendants' Motion to Dismiss All Medical Monitoring Claims argues that Texas does not recognize medical monitoring as an independent cause of action. Defendants' Motion to Dismiss All Claims Asserted by the Bund argues that the Bund does not have associational standing to assert any claims. The Court will discuss each motion in turn.

II. DISCUSSION

*A. Motion to Dismiss All Medical Monitoring Claims*

*1. 12(b)(6) Standard*

Rule 12(b)(6) permits the dismissal of all or part of a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) motion may be used to challenge the entire complaint or only part of a pleading, such as a single count or a claim for relief." *Doe v. Sabine Parish School Bd.,* 24 F.Supp.2d 655, 658 (W.D.La.1998). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Defendants argue that Plaintiffs' medical monitoring claims are not legally cognizable under Texas law. This issue is dispositive of Plaintiffs' medical monitoring claims. Therefore, a motion to dismiss pursuant to Rule 12(b)(6) is the proper mechanism to test the viability of Plaintiffs' medical monitoring claims.

*2. Application*

[1][2] Whether the Court should recognize Plaintiffs' medical monitoring claims is an issue of Texas state law. [FN4] When deciding an issue of state law, a federal court is "bound to apply the law as interpreted by the state's highest Court." *Barfield v. Madison County, Miss.,* 212 F.3d 269, 272 (5th Cir.2000). However, "[i]f the state's highest court has not spoken on the particular issue, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Id.* (internal quotation omitted); *see also* *Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.,* 419 F.3d 310, 323 (5th Cir.2005) (making an "Erie guess" on an issue of Texas law previously undecided by any Texas court). In this respect, "[i]n matters of [state] substantive law, [a federal court's] relationship to the [state's highest court] is all but identical to that of a [state] intermediate appellate court." *Rhynes v. Branick Mfg. Corp.,* 629 F.2d 409, 410 (5th Cir.1980). Additionally, when considering the decisions of intermediate state appellate courts, a federal court is bound by the intermediate appellate court's decision "unless convinced by other persuasive data that the highest court would decide otherwise." *Barfield,* 212 F.3d at 272 (internal quotation omitted). Also, a state trial court's decision must be "attributed some weight." *Comm'r of Internal Revenue v. Estate of Herman H. Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (internal quotation omitted).

***3** [3] In addition to state precedent, a federal court may look to "analogous decisions, considered dicta, scholarly works and other reliable data." *Hollis v. Hill,* 232 F.3d 460, 465 (5th Cir.2000). This includes looking to the decisions of other jurisdictions. *Id.* at 469 (looking to the law of other jurisdictions because Nevada had not addressed the relevant issue). However, a federal court should not "expand state law beyond its presently existing boundaries." *Barfield,* 212 F.3d at 272. Furthermore, as compared to a state intermediate court in the same position, a federal court within the Fifth Circuit predicting what a state's highest court would decide should be less willing to make a "substantive innovation." [FN5] *Rhynes,* 629 F.2d at 410. If no state appellate decision has approved of a theory of recovery or defense, even in dicta, a federal court "will not create innovative theories of recovery or defense under local law." *Cimino v. Raymark Indus.,* 151 F.3d 297, 314 (5th Cir.1998) (internal quotation omitted) (refusing to adopt the theories of alternative liability, concert of action, enterprise liability, or market share liability where no Texas appellate decision had approved of the theories, "even in dicta").

*a. Texas Precedent*

The Court begins its inquiry by examining Texas precedent. All parties agree that the Texas Supreme Court has not addressed whether to adopt medical monitoring as a cause of action. Pls.' Resp., at 21; Defs.' Mot. to Dismiss, at 12. [FN6] As evidence that the Texas Supreme Court would allow medical monitoring claims if confronted with the issue, Plaintiffs first point to a Texas appellate decision, *Crofton v. Amoco Chems. Co.,* No. 01-01-00526-CV, 2003 WL 21297588 (Tex. App--Houston [1st Dist.] May 30, 2003, pet. denied) (unpublished), in which the court, in Plaintiffs' words, "assumed the existence of a cause of action" for medical monitoring. Pls.' Resp., at 22. However, in *Crofton* the appellate court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

merely upheld the trial court's decision granting a no evidence summary judgment against plaintiffs on their medical monitoring claims. Crofton, 2003 WL 21297588, at *6. Whether Texas recognizes medical monitoring as a cause of action was not at issue. Next, Plaintiffs point to a Texas trial court decision, Pls.' Resp., Ex. B, *Earthman v. Am. Home Prods.,* No. 97-10-03790 (9th Dist. Ct., Montgomery County, Tex., October 14, 1998) (unpublished) (hereinafter *"Earthman"* ), in which the court, in Plaintiffs' words, "recognized medical monitoring and went so far as to grant class certification for a medical monitoring class." Pls.' Resp., at 22. However, the *Earthman* court merely issued a two-page order certifying a class on behalf of "all Texas residents who have ingested ... the diet drugs Pondimin ... or Redux .... [excluding] all such persons who have filed individual personal injury suits related to these drugs ... with respect to the following cause(s) of action: ... and that seek relief in the form of an injunction creating a medical screening program for Class Members." Pls.' Resp .', Ex. B, *Earthman,* at 1-2. The *Earthman* court, contrary to Plaintiffs' suggestion, did not specifically address whether medical monitoring claims are cognizable in Texas. In fact, the Court is not aware of a single instance where a Texas court has considered and evaluated the validity of medical monitoring claims as a cause of action.

*b. Analogous Texas Case Law--Temple-Inland Forest Products Corp. v. Carter*

***4** [4] Because Texas courts have not directly and specifically addressed medical monitoring claims, the Court will look to other reliable sources in making its "Erie guess." In Temple-Inland Forest Products Corp. v. Carter, 993 S.W.2d 88 (Tex.1999), the Texas Supreme Court considered a legal issue analogous to deciding whether to accept medical monitoring claims. In *Temple-Inland,* the Texas Supreme Court rejected a claim for mental anguish damages resulting from exposure to asbestos fibers in the absence of present physical injuries. 993 S.W.2d at 93. In rejecting mental anguish claims in the absence of present physical injuries, the court cited three policy considerations. First, mental anguish claims in the absence of present physical injury "make it very difficult for judges and juries to evaluate which exposure claims are serious and which are not." *Id.* Second, the difficulty in assessing the seriousness of mental anguish claims in the absence of present physical injury leads to unpredictable liability, "with some claims resulting in significant recovery while virtually indistinguishable claims are denied altogether." *Id.* Third, allowing such suits could lead to the proliferation of claims, resulting in suits "caused by exposure that has not resulted in disease [competing] with suits for manifest diseases for the legal system's limited resources." *Id.*

Medical monitoring claims and the mental anguish claims rejected in *Temple-Inland* are arguably similar in nature. First, both types of claims seek to establish liability and damages in the absence of a present physical injury. *See* Temple-Inland, 993 S.W.2d at 90 (noting that the plaintiffs sought recovery despite not presently suffering from asbestos-related diseases); Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424, 439, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (rejecting medical monitoring claims because they would allow for recovery of medical monitoring costs for a "plaintiff without symptoms or disease"); Wood v. Wyeth-Ayerst Labs., Div. of Am. Home Prods., 82 S.W.3d 849, 856 (Ky.2002) (noting that medical monitoring causes of action "do not require a showing of present physical injury"). Second, both types of claims rely, at least in part, on the arguably increased risk of suffering an injury in the future. An increased risk of suffering an injury or contracting a disease in the future is typically an element of a medical monitoring cause of action. Metro-North, 521 U.S. at 450 (listing as a typical requirement of a medical monitoring cause of action that "as a proximate result of the exposure, the plaintiff suffers a significantly increased risk of contracting a serious latent disease") (citing In re Paoll R. Yard PCB Litigation, 916 F.2d 829, 852 (3d Cir.1990)). [FN7] Like plaintiffs asserting medical monitoring claims, the plaintiffs in *Temple-Inland* relied on an increased risk of injury in the future. 993 S.W.2d at 90. Although the plaintiffs had not yet manifested a disease, the plaintiffs presented evidence of an increased risk of developing a disease as a result of asbestos exposure to support their mental anguish claims. *Id.* Furthermore, the court framed the question whether to award mental anguish damages as whether the plaintiffs could recover "for their increased risk and reasonable fear of possibly developing asbestos-related diseases that they do not currently have and may never have." *Id.* at 92.

***5** Because mental anguish and medical monitoring claims are similar in nature, all three policy considerations the *Temple-Inland* court cited in rejecting mental anguish claims are equally applicable to Plaintiffs' medical monitoring claims. In fact, the U.S. Supreme Court cited difficulties for judges and juries, unpredictable liability, and a multiplicity of suits when rejecting both mental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

anguish [FN8] claims and medical monitoring claims as remedies for violations of the Federal Employer's Liability Act ("FELA"). [FN9] *Metro-North,* 521 U.S. at 438-44. [FN10]

Based on the *Temple-Inland* decision, the Texas Supreme Court appears likely to reject medical monitoring claims. Like the *Metro-North* Court, the Texas Supreme Court appears disposed to rely on the same policy considerations in rejecting medical monitoring claims that it relied on in rejecting mental anguish claims in the absence of a present physical injury. [FN11] In fact, it is likely that the Texas Supreme Court would again cite the *Metro-North* decision itself to reject medical monitoring as a cause of action, in the same way it relied on *Metro-North* to reject mental anguish claims. [FN12]

*c. Medical Monitoring Claims in Other Jurisdictions*

In addition to looking at analogous case law within Texas, the Court can look to other jurisdictions to aid its prediction. American courts generally allow medical monitoring expenses as a remedy when a present physical injury has resulted from a defendant's negligence. *See* *Metro-North,* 521 U.S. at 438 (noting that "a plaintiff injured through negligence can recover related reasonable medical expenses as an element of damages"). However, medical monitoring as an independent cause of action in the absence of a present physical injury is neither universally rejected nor accepted. *Id.* at 440. Several states have adopted medical monitoring as a cause of action. *See, e.g.,* *Petito v. A.H. Robins Co.,* 750 So.2d 103, 105 (Fla.Dist.Ct.App.1999) (deciding that it is "proper for a court of equity to create and supervise a fund for the purpose of monitoring the condition of plaintiffs when it has been shown that such monitoring is reasonably necessary"); *Burns v. Jaquays Min. Corp.,* 156 Ariz. 375, 752 P.2d 28, 33 (Ariz.Ct.App.1997) (holding that "plaintiffs should be entitled to such regular medical testing and evaluation as is reasonably necessary and consistent with contemporary scientific principles applied by physicians experienced in the diagnosis and treatment of" asbestos-related injuries); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 1006, 25 Cal.Rptr.2d 550, 863 P.2d 795 (Cal.1993) (concluding that "a reasonably certain need for medical monitoring is an item of damage for which compensation should be allowed"); *Ayers v. Jackson Tp.,* 106 N.J. 557, 525 A.2d 287, 312 (N.J.1987) (determining that "the cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary"). However, it appears that *Pellto* constitutes the only state decision adopting medical monitoring as a cause of action since the U.S. Supreme Court's decision in *Metro-North.* The majority of states considering medical monitoring as a cause of action since *Metro-North* have rejected the claims. *See* *Wood,* 82 S.W.3d at 858-59 (relying on *Metro-North* in rejecting medical monitoring claims); *Hinton v. Monsanto Co.,* 813 So.2d 827, 830-32 (Ala.2001) (citing the policy reasons discussed by the *Metro-North* Court in rejecting medical monitoring claims); *Badillo v. Am. Brands, Inc.,* 117 Nev. 34, 16 P.3d 435, 440 (Nev.2001) (rejecting medical monitoring claims because: (1) they implicate complex problems of causality and proof, (2) the elements of medical monitoring are not uniform between jurisdictions, and (3) creating a new cause of action is generally a legislative function). [FN13]

***6** It light of the foregoing, it appears likely that the Texas Supreme Court would follow the recent trend of rejecting medical monitoring as a cause of action. This is particularly true in light of the *Temple-Inland* court's reliance on *Metro-North* in an analogous context. *See supra* Part II(A)(2)(b) (explaining the *Temple-Inland* court's reliance on *Metro-North* in rejecting mental anguish claims in the absence of present physical injuries). [FN14]

*d. Making a Substantive Innovation of Texas Law*

The Court's conclusion not to recognize medical monitoring as a cause of action is bolstered by its determination that doing so would constitute an improper "substantive innovation" of state law. *Rhynes,* 629 F.2d at 410. In fact, it appears that the Fifth Circuit has never expanded state law by recognizing a completely new cause of action. For example, in *Barfield,* the Fifth Circuit refused to expand Mississippi law to include a "tort type indemnification claim by a public entity against a public employee for acts in the course and scope of employment." 212 F.3d at 273. The *Barfield* court relied primarily on the fact that no Mississippi case had yet recognized this type of indemnity. *Id.* Additionally, the court's decision was bolstered by countervailing considerations "suggested by Mississippi statutory law and the substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

questions of federal preemption" that would be implicated by expanding law in the manner suggested by the claimant. *Id.*

Similarly, in *Rhynes,* the Fifth Circuit refused to adopt the "product line rule," which holds that "one who acquires a manufacturing business and continues to manufacture a line of its products assumes by force of law strict liability for defects in units of that line manufactured by its predecessors." 629 F.3d at 410. The plaintiff in *Rhynes* sought support for the product line rule from the fact that three states followed the rule and that one Texas Supreme Court justice stated in a concurrence that strict liability against a manufacturer of a faulty product should be extended to the maximum. *Id.* The court found these arguments "meager" in light of the fact that adopting the product line rule would represent "at least a radical extension of Texas product liability theory, and at most a shift to a new additional basis for liability." *Id.*

Plaintiffs offer no example of the Fifth Circuit recognizing a new state cause of action. Plaintiffs argue that in *Hollis,* the Fifth Circuit "predicted that the Nevada Supreme Court would adopt a new *cause of action* for breach of fiduciary duty." Pls.' Resp ., at 27 (emphasis added). However, the *Hollis* court did not create a new cause of action. Hollis, 232 F.3d at 469. It merely expanded the scope of the existing cause of action of breach of fiduciary duty to include a claim by a shareholder in a closely-held-corporation for a breach of duty owed to it by the other shareholders. *Id.* at 469. The *Hollis* court predicted that the Nevada Supreme Court would construe the breach of fiduciary duty cause of action to include such a claim if confronted with the issue, in accordance with the majority of other jurisdictions. *Id.* at 470.

*7 In this case, Plaintiffs do not ask the Court merely to construe the scope of a traditional tort, but to create an entirely new cause of action. The Fifth Circuit has never taken such a step, and the Court would consider it a radical extension of Texas substantive law. *See* Wood, 82 S.W.3d at 858 (referring to medical monitoring claims as "a complex and sweeping change to traditional tort law"); Badillo, 16 P.3d at 438 (stating that "[m]edical monitoring is a novel, non-traditional tort and remedy"). Therefore, the Court declines Plaintiffs' invitation to create a cause of action for medical monitoring in Texas.

In summation, Texas courts have not had occasion to address medical monitoring as a cause of action. In addition, although some jurisdictions have recognized a medical monitoring tort, Texas appears unlikely to adopt medical monitoring as a cause of action if confronted with the issue. Furthermore, even if it were convinced that the Texas Supreme Court would be likely to adopt medical monitoring as a cause of action, the Court is mindful of the Fifth Circuit's reluctance to create a cause of action not currently recognized in the forum state. *See supra* pp. 13-15 (explaining that the Fifth Circuit has never expanded state law by creating a new cause of action). Therefore, the Court is of the opinion that Plaintiffs' medical monitoring claims should be dismissed.

*B. Motion to Dismiss All Claims Asserted by the Bund*

The Bund is suing "on behalf of its membership as representative plaintiff of the Medical Monitoring Class in order to obtain prospective injunctive relief in the form of monitoring and surveillance services." Pls.' Second Am. Original Pet., at 6, ¶ 14. The Bund does not purport to represent the interests of plaintiffs already affected with illness or injury. *Id.* at 3, ¶ 6. Therefore, a dismissal of Plaintiffs' medical monitoring claims has the effect of dismissing the Bund as a party to the suit. Thus, Defendants' Motion to Dismiss All Claims Asserted by the Bund Zur Unterstutzung based on a lack of associational standing should be denied as moot.

III. CONCLUSION

The Texas Supreme Court has not decided whether to allow medical monitoring as a cause of action. The Court predicts that the Texas Supreme Court is not likely to adopt medical monitoring if confronted with the issue. Furthermore, the Court's decision not to allow Plaintiffs' medical monitoring claims is bolstered by the fact that recognizing medical monitoring as an independent tort would represent a radical extension of currently existing Texas law. Finally, the Court's dismissal of Plaintiffs' medical monitoring claims effectively dismisses the Bund as a party to the suit, rendering moot Defendant's challenge to the standing of the Bund.

Accordingly, IT IS ORDERED that Defendants' Motion to Dismiss All Medical Monitoring Claims is GRANTED.

IT IS FURTHER ORDERED that Plaintiff Bund Zur Unterstutzung Radargeschädigter E.V. is DISMISSED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***8** IT IS FINALLY ORDERED that Defendants' Motion to Dismiss All Claims Asserted by the Bund Zur Unterstutzung is DENIED AS MOOT.

FN1. Defendants filed a single motion entitled "Defendants' Motion and Memorandum in Support Thereof to Dismiss All Claims Asserted by the Bund Zur Unterstutzung and All Medical Monitoring Claims in *Bund Zur Unterstutzung Radargeschädigter E.V. v. Raytheon, et al."* ("Motion to Dismiss"). The Court separates the Motion to Dismiss into two separate motions for the sake of clarity. Also, the Court notes that the named plaintiff in the above-captioned cause has been changed from Bund Zur Unterstutzung Radargeschädigter E.V. ("the Bund") to Marvin Norwood.

FN2. At this time, the Court chooses only to address the issues discussed in this Order.

FN3. "Radar (radio detection and ranging) operates by generating and transmitting electromagnetic energy into space and detecting the echo returned from reflecting objects or targets." Pls.' Second Am. Original Pet., at 11, ¶ 36.

FN4. All parties assume for purposes of Defendants' Motion to Dismiss that Plaintiffs' claims are governed by Texas substantive law. Defs.' Mot. to Dismiss, at 10. Accordingly, the Court limits its consideration to issues of Texas substantive law as well.

FN5. It is possible that other circuits take a more liberal approach to deciding novel questions of state law. *See Torres v. Goodyear,* 867 F.2d 1234, 1238 n. 1 (9th Cir.1989) (contrasting the Ninth Circuit's approach to the "posture of restraint" assumed by the Fifth Circuit "when it comes to deciding novel questions of state law").

FN6. Texas Rule of Appellate Procedure 58 ("Rule 58") establishes a procedure for "[t]he Supreme Court of Texas [to] answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." Tex.R.App. P. 58. However, the certification procedure established by Rule 58 is not available to this Court as a federal trial court.

FN7. The *Paoli* court determined that a medical monitoring cause of action requires a plaintiff to show the following:
(1) [the][p]laintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant;
(2) [a]s a proximate result of exposure, [the] plaintiff suffers a significantly increased risk of contracting a serious latent disease;
(3) [t]hat increased risk makes periodic diagnostic medical examinations reasonably necessary; [and]
(4) [m]onitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.
These factors would, of course, be proven by competent expert testimony.
916 F.2d at 852 (predicting Pennsylvania law).

FN8. The *Metro-North* Court used the term "emotional distress" rather than "mental anguish." However, the two terms appear functionally equivalent.

FN9. Buckley, the plaintiff in *Metro-North,* was a railroad worker alleging negligent exposure to asbestos. 521 U.S. at 427. Buckley sued both for mental anguish damages and for medical monitoring costs despite the fact he had not manifested any symptoms of a disease. In rejecting Buckley's claim for mental anguish damages, the Court cited the following reasons: "(a) special difficult[y] for judges and juries in separating valid, important claims from those that are invalid, or trivial; (b) a threat of unlimited and unpredictable liability; and (c) the potential for a flood of comparatively unimportant, or trivial, claims." *Id.* at 433 (internal quotations and citations omitted). Similarly, in rejecting Buckley's medical monitoring claims, the Court cited "special difficulties for judges and juries," "uncertainty as to the amount of liability," and a potential for a "flood of less important cases." *Id.* at 441-42 (internal quotations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN10. The *Metro-North* decision attempted to find "support in the common law" when deciding whether to allow mental anguish and medical monitoring claims. 521 U.S. at 444. As a result, state courts deciding whether to adopt medical monitoring as a cause of action have found the *Metro-North* decision persuasive. *See, e.g.,* Wood, 82 S.W.3d at 857 (recognizing that "[a]lthough *Metro-North* had to do with a federal worker's compensation statute, the Court was clearly speaking to the more general issue of medical monitoring").

FN11. *See supra* note 9 (noting that the *Metro-North* Court cited difficulties for judges and judes, unpredictable liability, and a potential flood of claims in rejecting both emotional distress and medical monitoring claims).

FN12. Plaintiffs argue that *Metro-North* is inapplicable because whereas the *Metro-North* plaintiffs were seeking a lump-sum payment, Plaintiffs seek injunctive relief in the form of a court-monitored fund. Pls.' Resp., at 30. However, the Court finds the policy concerns cited by the *Temple-Inland* and *Metro-North* decisions applicable to a medical-monitoring fund. *See supra* pp. 8-10 (discussing the policy considerations relied on by the *Temple-Inland* and *Metro-North* decisions); *see also* Wood, 82 S.W.3d at 857 (relying on *Metro-North* in rejecting "monitoring funds" and noting that allowing the claims would "impair [the defendant's] ability to fully compensate victims who emerge years later with actual injuries that require immediate attention"). Furthermore, Texas has not recognized any form of medical monitoring as a cause of action, and for the Court to adopt it in any form would constitute an extension of current Texas law. *See infra* Part II(A)(2)(d) (explaining that the Fifth Circuit has never recognized a new state cause of action).

FN13. *See supra* note 10 (explaining why state courts considering whether to adopt medical monitoring as a cause of action have found *Metro-North* persuasive).

FN14. Even assuming that the majority of states allow medical monitoring as a cause of action, the Court disagrees with Plaintiffs' contention that this is a sufficient reason for a federal court to recognize a new state cause of action. Plaintiffs point out that the Fifth Circuit stated that "absent evidence to the contrary, we presume that [the state] courts would adopt the prevailing rule if called upon to do so." Pls.' Resp., at 25 (citing *Hensley v. E.R. Carpenter Co.,* 633 F.2d 1106, 1109 (5th Cir.1980)). However, the *Hensley* court was not creating a new cause of action; it was deciding whether Mississippi would likely decide that "an unjustified reduction in rank conferred by an employment contract can constitute a breach of that contract." *Hensley,* 633 F.2d at 1109. The *Hensley* Court was merely determining the proper scope of a traditional breach of contract cause of action, based on the law in other jurisdictions and analogous decisions in Mississippi. *Id.*

--- F.Supp.2d ----, 2006 WL 267335 (W.D.Tex.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

**H**

**Motions, Pleadings and Filings**

United States District Court,
D. Minnesota.
Loren ZUTZ, Deb Zutz, and, Ron Zutz, d/b/a Zutz Farms, Plaintiffs,
v.
CASE CORPORATION, Defendant.
**No. Civ.02-1776(PAM/RLE).**

Nov. 21, 2003.

Jonathan C. Miesen, Eric A. Bartsch, DeAnne M. Hilgers, Lindquist & Vennum, Mpls, MN, for Plaintiffs.

Daniel A. Haws, Murnane, Conlin, White & Brandt, St Paul, MN, for Defendant.

MEMORANDUM AND ORDER

MAGNUSON, J.

***1** This matter is before the Court on Defendant's two separate Motions for Partial Summary Judgment. For the reasons that follow, the Court denies the Motions in part and grants the Motions in part.

BACKGROUND

This case arises from the sale of a farm implement manufactured by Defendant Case Corporation ("Case"). Plaintiffs Loren, Deb, and Ron Zutz own and operate a family farm in northwestern Minnesota. In April 1998, they signed a rental agreement with the option to purchase a Concord Air Drill from Evergreen Implement Company ("Evergreen"), a farm equipment dealer located in Warren, Minnesota. At the time of the events giving rise to this lawsuit, Evergreen was licensed to sell Case equipment. Plaintiffs allege that both the dealer and the promotional materials for the air drill warranted that the air drill was appropriate for use on fields treated with pre-emergent herbicides. Plaintiffs exercised their option to purchase the air drill in July 1998.

In 1998, Plaintiffs applied pre-emergent herbicides to their fields as usual. They then planted almost 1800 acres of soybeans and more than 600 acres of sunflowers using the Concord Air Drill. When the plants began to grow, however, Plaintiffs noticed that one row contained healthy plants but a lot of weeds, while the next row contained no weeds and unhealthy plants. Plaintiffs' yield for both crops on the acreage in which they used the Concord Air Drill was significantly less than the yield in previous years. Plaintiffs hired an agronomist to study the problem and contacted Case. Plaintiffs' experience with poor yields in fields using the Concord Air Drill was repeated in 1999. In the winter of 2000, Plaintiffs traded in their original Concord Air Drill for a larger model. However, using this model resulted in similar poor yields during the 2000 growing season. Plaintiffs contend that it was not until their agronomist performed dye tests on the air drill in 2000 that they discovered that the air drill was responsible for the poor yields.

Although neither party explains exactly how the Concord Air Drill works, it apparently mixes soil, seed, fertilizer, and herbicide before depositing the seed into the field. Plaintiffs contend that the disk levelers that trail the air drill to smooth the soil after the seed is planted did not work correctly, resulting in the mis-distribution of soil that had been previously treated with pre-emergent herbicide. Thus, while some rows received sufficient fertilizer but insufficient herbicide, other rows received too much fertilizer but the right amount of herbicide. Plaintiffs complained to Case, and Plaintiffs contend that Case acknowledged that other farmers had experienced similar problems with the air drill. Case did not offer to replace or fix the air drill, however, and Plaintiffs ultimately purchased another piece of equipment, a harrow packer, to change the way the air drill distributed the soil. Plaintiffs' use of the harrow packer with the air drill resulted in normal yields.

***2** Plaintiffs brought this suit in June 2002. In their Complaint, they raise claims for breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, fraud and negligent misrepresentation, and a violation of the Minnesota Prevention of Consumer Fraud Act ("CFA"), Minn.Stat. § 325F.69. Case's first Motion for Partial Summary Judgment seeks to dismiss Plaintiffs' fraud claim and seeks summary judgment against the CFA claim. Case's second Motion for Partial Summary Judgment seeks summary judgment against Plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

breach of warranty claims.

DISCUSSION

A. Standards of Review

1. *Motion to Dismiss*

For the purposes of a motion to dismiss, the Court takes all facts alleged in the Complaint as true. *See* Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir.1990). The Court must construe the allegations in the Complaint and all reasonable inferences arising from the Complaint favorably to Plaintiffs. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.1986). A motion to dismiss will be granted only if "it appears beyond doubt that the Plaintiff can prove no set of facts which would entitle him to relief." *Id.; see also* Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

2. *Motion for Summary Judgment*

Rule 56(c) provides that such a motion for summary judgment shall be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. *Enter, Bank v. Magna Bank,* 92 F.3d 740, 747 (8th Cir.1996).

The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik v. County of LeSueur,* 47 F.3d 953, 957 (8th Cir.1995).

A. First Motion for Partial Summary Judgment

Case's first Motion is both a Motion to Dismiss under Rule 12(b)(6) and a Motion for Partial Summary Judgment under Rule 56. Case contends that Plaintiffs' fraud claim does not sufficiently set out the elements of a fraud claim and is not pled with the particularity required by Rule 9(b). Case asserts that if the fraud claim is dismissed, the negligent misrepresentation claim likewise fails, although Case offers no support for this proposition. Case also argues that Plaintiffs' CFA claim is not brought for the public benefit and pursuant to the Minnesota Supreme Court's ruling in *Ly v. Nystrom,* 615 N.W.2d 302 (Minn.2000), must be dismissed. At the hearing, Case for the first time argued that even if Plaintiffs' fraud claim survives, the negligent misrepresentation claim is barred by Minnesota law.

1. *Fraud*

***3** Count IV of the Complaint alleges that statements by Case and by Case's authorized dealer that the Concord Air Drill was compatible with pre-emergent herbicide treatments constituted fraud. In order to prove fraud, Plaintiffs must establish that Case or its representative made a false representation or omission of a material fact with knowledge of the falsity of the representation and with the intent to induce reliance, that the representation or omission in fact induced reliance, and that Plaintiffs were damaged. *Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 532 (Minn.1986). Case asserts that Plaintiffs have not sufficiently pled the elements of a fraud claim and have not pled the alleged fraud with sufficient particularity.

The Complaint sets forth the statements on which Plaintiffs base their fraud claim. First, Plaintiffs contend that at the time they purchased the air drill, Case's authorized dealer "represented and warranted that application of pre-emergent herbicides was compatible with use of the Concord Air Drill for seeding." (Compl.¶ 9.) Plaintiffs also quote from Case's promotional materials: "seed and/or fertilizer are distributed uniformly across the air till drill by the manifold system." (*Id.* ¶ 10.) Another representative of Case allegedly told Loren Zutz that there would be " 'no problem' in applying pre-emergent herbicide prior to using the [air drill] for seeding." (*Id.* ¶ 11.)

Although Plaintiffs are undoubtedly required to plead fraud with more particularity than that required for other claims, Plaintiffs' Complaint sufficiently sets out the elements of the fraud claim. Indeed, although Case argues that Plaintiffs have failed to plead every element of their fraud claim, Case offers no support for this argument and does not point to any portion of the Complaint to illustrate the alleged deficiencies. Case's Motion on this point is denied.

2. *Consumer Fraud Act*

Case contends that Plaintiffs' claim under the CFA must be dismissed because it is not brought for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public benefit. The Minnesota Supreme Court has held that, because an individual may bring an action for violations of the CFA only through the Private Attorney General Statute, Minn.Stat. § 8.31, individuals pressing CFA claims must demonstrate that those claims benefit the public. *Ly*, 615 N.W.2d at 314. Case argues that because Plaintiffs' CFA claim arises out of a one-on-one transaction, Plaintiffs cannot show a public benefit and their CFA claim must be dismissed. *See also* *Pecarina v. Tokai Corp.,* No. 01- 1655, 2002 WL 1023153 (D.Minn. May 20, 2002) (Montgomery, J.) (dismissing CFA claims for failure to demonstrate public benefit in products liability action against cigarette lighter manufacturer).

In response, Plaintiffs contend that their CFA claim is more akin to the claim brought in *Collins v. Minnesota School of Business, Inc.,* 655 N.W.2d 320 (Minn.2003). In that case, a group of students sued their school for alleged misrepresentations made in advertising to the public. The Minnesota Supreme Court determined that the *Collins* plaintiffs had demonstrated that the suit would benefit the public. *Id.* at 320.

***4** This case falls between the facts of *Ly* and the facts of *Collins.* Plaintiffs' claim involves a product that is still on the market, unlike the products in *Pecarina* and *Behrens v. United Vaccines, Inc.,* 228 F.Supp.2d 965 (D.Minn.2002) (Erickson, M.J.). Plaintiffs' claim does not arise out of advertising to the general public, as did the claims in *Collins.* However, as Plaintiffs point out, some of the statements alleged to violate the CFA are found in promotional materials for the air drill, and thus are publicly available.

To determine whether a lawsuit is brought for the public benefit the Court must examine not only the form of the alleged misrepresentation, but also the relief sought by the plaintiff. *See Tuttle v. Lorillard Tobacco Co.,* Civ. No. 99-1550, 2003 WL 1571584, *6-7 (D.Minn. Mar.3, 2003) (Magnuson, J.). Here, as in *Tuttle,* Plaintiffs seek only compensatory damages. Where recovery is sought for the exclusive benefit of the plaintiff, there is no public benefit. Therefore, under the holding in *Ly,* summary judgment is appropriate on Plaintiffs' CFA claim.

3. *Negligent Misrepresentation*

Finally, as noted above, Case contends that Plaintiffs' claim for negligent misrepresentation fails as a matter of law. According to Case, Minnesota law bars tort claims that arise out of commercial transactions, with the exception of claims for intentional or reckless misrepresentation. In support of this argument, Case cites sections 604.10 and 604.101 of the Minnesota Statutes.

Section 604.10 codifies Minnesota's economic loss doctrine. This section provides that a buyer of goods may recover in tort as well as contract for economic loss that is due to damage to property other than the goods. *Id.* § 604.10(a). This section does not support Case's argument. However, in 2000, the Minnesota legislature amended the economic loss doctrine to provide that "[a] buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless the misrepresentation was made intentionally or recklessly." *Id.* § 604.101, subd. 4. Plaintiffs' negligent misrepresentation claim must be dismissed.

B. Second Motion for Partial Summary Judgment

Case's second Motion asks the Court to grant summary judgment against Plaintiffs' three breach of warranty claims. Case contends that Plaintiffs' warranty claims are barred by the four-year statute of limitations and by the express warranties contained in Case's warranty, which specifically disclaimed any implied warranties of fitness for a particular purpose or merchantability and excluded liability for consequential damages. Moreover, Case argues that the parol evidence rule bars Plaintiffs' claims to the extent that those claims are based on oral representations that contradict the clear warranties in Case's warranty. Finally, Case asserts that Plaintiffs are estopped from claiming damages because they continued to use the air drill after they knew that it was not performing properly.

***5** Plaintiffs deny ever receiving any of Case's warranties. There is no dispute that the documents Plaintiffs signed at the time of the purchase were not Case documents but rather were John Deere documents. These documents purported to limit express and implied warranties, but did so on behalf of John Deere and its affiliates. Case is not a John Deere affiliate. However, Plaintiffs made several repair claims under Case's warranties and therefore Plaintiffs were aware of the existence of warranties.

1. *Statute of Limitations*

Minnesota's four-year statute of limitations for breach of contract governs this action. Minn.Stat. § 336.2-725(1). A claim for breach of warranty accrues

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at the time of the tender of delivery. *Id.* § 336.2-725(2). Case contends that tender of delivery of the Concord Air Drill was in April 1998, when Plaintiffs rented the air drill from Evergreen. Plaintiffs argue that their cause of action for breach of warranty did not accrue until July 1998, the date of the purchase agreement for the air drill. If the cause of action accrued in April 1998, Plaintiffs' claims are untimely because Plaintiffs did not file this lawsuit until June 2002.

The statute of limitations argument turns on whether the rental agreement actually constituted a purchase for the purposes of the Uniform Commercial Code ("UCC"), thus triggering the UCC's statute of limitations. In the rental agreement, Plaintiffs agreed to a rental payment of $12,000, with the option to purchase the air drill for an additional payment of approximately $73,000. The agreement specifically provided that the initial rental payment would be applied to the purchase price, should Plaintiffs exercise the option to purchase. Moreover, Loren Zutz testified that he decided to first lease the air drill rather than purchase it because of tax issues. The Evergreen salesman also testified that Plaintiffs always intended to purchase the air drill, and that he prepared a purchase order at the same time as he prepared the rental agreement.

The Court must look beyond the manner in which the parties characterize the transaction to determine their "real intention." *Nat'l Car & Locomotive Builder v. Cyclone Steam Snow-Plow Co.*, 49 Minn. 125, 51 N.W. 657, 658 (Minn.1892). That intention is evidenced not only by the written agreement itself but also by oral evidence. *Id.* In *National Car,* the court refused to adopt the defendant's characterization of the transaction as a lease, because the totality of the evidence showed that the parties used a lease transaction solely to enable the defendant to avoid its obligations under a separate contract. *Id.* The court found that the lease was in fact a sale and that the defendant could not avoid its obligations under the separate contract. *Id.*

Here, as in *National Car,* the name the parties put on the transaction is not controlling. Although the agreement Plaintiffs signed in April 1998 was a rental agreement, Plaintiffs admit that they intended to purchase the air drill at that time and only used the lease mechanism to obtain tax advantages. (L. Zutz Dep. (Haws Aff. Ex. 4) at 227 ("Basically there [were] some tax advantages"), 230 ("We rented this machine with the intention to buy, okay?").) It was clearly Plaintiffs' intent in April 1998 to purchase the air drill. The Court finds that the "real intention" of the parties was that the April 1998 transaction was a sale of the air drill. The statute of limitations began to run on that day, and Plaintiffs' claims for breaches of warranty are therefore untimely.

CONCLUSION

***6** Plaintiffs have pled their claim for fraud with sufficient particularity and Case's Motion to Dismiss the fraud claim is denied. Plaintiffs failed to show that their Consumer Fraud Act claim was for the public benefit and that claim must be dismissed. Plaintiffs' negligent misrepresentation claim fails as a matter of law, and the breach of warranty claims are barred by the statute of limitations.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's first Motion for Partial Summary Judgment (Clerk Doc. No. 9) is GRANTED in part and DENIED in part; and
2. Defendant's second Motion for Partial Summary Judgment (Clerk Doc. No. 21) is GRANTED.

Not Reported in F.Supp.2d, 2003 WL 22848943 (D.Minn.), 52 UCC Rep.Serv.2d 56

**Motions, Pleadings and Filings** (Back to top)

• 0:02CV01776 (Docket) (Jul. 17, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.