# EXHIBIT E

C
United States District Court; D. Minnesota, Fourth Division.

**Hoyt Construction Co., Inc., Minnesota Exteriors, Inc., on behalf of themselves and all others similarly situated**
**v.**
**Alside, Inc., Alcan Aluminum Corp., Aluminum Co. of America, Bethlehem Steel Corp., Kaiser Aluminum and Chemical Corp., Kaiser Aluminum and Chemical Sales, Inc., Mastic Corp., Reynolds Metals Co., Revere Cooper & Brass, Inc., United States Steel Corp.**
**No. 4-75 Civ. 257**

Dated January 21, 1980

ALSOP, D. J.

**Memorandum Order**

***1** On August 24, 1978, this court entered its order denying the motion of the plaintiffs Hoyt Construction Company, Inc. (Hoyt) and Minnesota Exteriors, Inc. (Exteriors) for certification of this action as a class action and of themselves as representatives of a class of plaintiffs consisting of:

> All persons, firms, corporations or other entities in the United States (except defendants and their wholly-owned business entities) who purchased directly from one or more of the defendants exterior metal siding and related building products and accessories at any time after June 3, 1971, or aluminum coil therefor or therein at any time after November 9, 1971.

Thereafter, plaintiffs filed a motion to " Alter/Amend the Order of 8/24/78 per FRCP 59(e) and 60(b) or Renewed Class Action Motion Per Rule 23." This latter motion sought an order of the court certifying a class in this action described as follows:

> *Residential Applicator Class*
> All business entities in the United States (except the defendants and their whollyowned business entities) who purchased directly from one or more of the defendants after June 4, 1971, aluminum siding and related building products for application by them to residences.

It is perhaps noteworthy, if only to highlight the vicissitude of the problem, to indicate that the most recent is the plaintiffs' fifth offering of a class definition.

This court's order of August 24, 1978 sets forth in some detail those requirements of Rule 23 which, in the court's judgment, were not met under the showing made in support of the creation of a class as first described above.

In brief summary, the court's order of August 24, 1978 found the class action requirements lacking in a variety of areas, including the following:

*Typicality*

1. The court found differences between the legal and factual positions of Hoyt and Exteriors and the positions of the other members of the proposed class, particularly as regards the role of Hoyt and Exteriors as dealer applicators of residential aluminum siding in the Minneapolis/St. Paul area as compared to manufacturers or homeowners.

2. Some entities whom it would appear may have acted as co-conspirators would in fact be members of the class as proposed.

3. Under the then state of the law, the defendants may have had available a "consumer" defense to the claims of some class members, but not against others. See *Reiter v. Sonotone Corp.* [1978-1 TRADE CASES P 62,098], 579 F. 2d 1077 (8th Cir. 1978), rev'd [1979-1 TRADE CASES P 62,688], 99 S. Ct. 2326 (1979).

*Adequacy*

1. In some respects the interests of Hoyt and Exteriors did not extend as far as the interests of some members of the proposed class, at least as regards aluminum coil.

2. The interests of Hoyt and Exteriors were not coextensive with those of all members of the proposed class as regards the interests of siding manufacturers.

3. The interests of Hoyt and Exteriors were not coextensive with those of all members of the proposed class as regards end-users of the product.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***2** 4. Hoyt and Exteriors had only limited involvement in the agricultural and commercial siding markets.

5. The interests of Hoyt and Exteriors were inherently antagonistic to the interests of certain siding manufacturers whom the plaintiffs sought to have included in the class and were likewise antagonistic to end-users.

6. The interests of Hoyt and Exteriors were antagonistic to the interests of any wholesaler or applicator who may have been a victim of price discrimination.

*Predominance*

The court was of the view that the inclusions of persons and entities at various levels in the chain of distribution created a variety of individual questions and issues, and there were few common questions which related to all members of the class.

*Superiority*

Citing *Windham v. American Brands, Inc.* [1977-2 TRADE CASES P 61,670], 565 F. 2d 59 (4th Cir. 1977), cert. denied, 435 U. S. 968 (1978), the court concluded that class action treatment was not superior to other methods for the fair and efficient adjudication of the controversy.

[*Comparison of Class Definitions*]

A comparison of the class definition rejected by this court's order of August 24, 1978 and the class definition proposed by the motion now pending, when read against the backdrop of the court's rationale, makes it obvious that the plaintiffs have sought to so modify the class definition as to meet the objections the court found inherent in the class as originally proposed.

[*Poor Presentation of New Class*]

The difficulty the court has with this effort on behalf of the plaintiffs is that it is sought without any semblance of additional affidavits, evidence, or further proof with reference to the most recent class proposal. It is almost as if the plaintiffs are deserving of the establishment of a class and their designation as the class representatives, and the burden then shifts to the defendants to rebut what the plaintiffs treat as a virtual presumption of class entitlement. Superimposed upon this technical difficulty, is the dispute between the parties over the wisdom, significance, or effect of *Windham v. American Brands, Inc., supra*.

The most recent class definition sought does quite obviously overcome many of the objections that this court found to the creation of the class which was denied by the order of August 24, 1978. The difficulty comes in that without a meaningful presentation or dialogue as to the total impact of the class most recently defined and now sought, the court is ill equipped to judge the total impact of the creation of such class or its fulfillment of the requirements of Rule 23. Accordingly, the plaintiffs' most recent motion will be denied.

Whether the court's conclusion results from an "inexperienced" court's response to what plaintiffs characterize as defendants' "In Terrorem Tactics" or instead from the failure of plaintiffs' counsel to fulfill their responsibilities by clearly establishing the prerequisites of Rule 23 is of no real import. What is of significance is the possibility that there may yet exist a group of individual claimants deserving of an impartial adjudication of a justiciable controversy in a fashion that does comport with Rule 23.

***3** Upon the foregoing,

It Is Ordered That the plaintiff's motion for an order certifying the following described class and designating the plaintiffs the class representatives thereof be and the same hereby is in all things denied:

> All persons, firms, corporations or other entities in the United States (except defendants and their wholly-owned business entities) who purchased directly from one or more of the defendants exterior metal siding and related building products and accessories at any time after June 3, 1971, or aluminum coil therefor or therein at any time after November 9, 1971.

Not Reported in F.Supp., 1980 WL 1807 (D.Minn.), 1980-1 Trade Cases P 63,221

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

**H**
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
ROWLETTE & ASSOCIATES, Appellant,
v.
CALPHALON CORPORATION, a Ohio corporation, and Brian Schlichter, Respondents.
**No. C8-99-1667.**

April 18, 2000.

Marcy S. Wallace, Cox, Goudy, McNulty & Wallace, P.L.L.P., Minneapolis, MN, and Richard L. Hendrickson, Bloomington, MN, for appellant.

Paul James Robbennolt, Dorsey & Whitney, LLP, Minneapolis, MN, for respondent.

Considered and decided by TOUSSAINT, Chief Judge, HARTEN, Judge, and FOLEY, Judge.[FN*]

FN* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

TOUSSAINT.

*1 Appellant Rowlette & Associates (Rowlette), challenges the district court's determination that Ohio Law governs the parties' agreement and subsequent dismissal of Rowlette's claims under Minn.Stat. § § 325E.37; 181.145 (1998). Rowlette also contends the district court improperly: (1) granted summary judgment on its claims for breach of contract and tortious interference with contract and prospective economic advantage; and (2) ruled on respondent's summary-judgment motion before additional discovery was complete. Because we conclude Ohio law governs the parties' agreement, we affirm the district court's dismissal of appellant's statutory claims. Because there are no genuine issues of material fact with regard to appellant's common law breach of contract or tortious interference with existing contracts and prospective business advantage claims, we affirm the district court's grant of summary judgment. Because the district court did not abuse its discretion in refusing to defer ruling on respondent's summary-judgment motion to allow additional discovery, we affirm.

FACTS

Respondent Calphalon, an Ohio corporation with its principal place of business in that state, is a cookware manufacturer. Calphalon assigned manufacturer's representatives to regional territories to develop its business and promote the sale of its cookware products. Rowlette, a closely-held Minnesota Corporation, served as a Calphalon representative for the territory encompassing the states of Minnesota, North Dakota, South Dakota, Iowa, and Nebraska. While the parities' original business relationship allowed unilateral termination upon 30 days written notice, on January 5, 1996, Calphalon informed Rowlette that it intended to adopt formal agreements to govern its business relations with all manufacturer's representatives.

Calphalon's 1996 manufacturer's representative agreement stated:

> The term of this Agreement shall be one (1) year from date hereof and shall be renewable only in writing at the end of each year for additional year. Representative understands that the company may elect not to renew this Agreement at its option and for whatever reasons it determines warrants such non-renewal, with or without cause. The Company is not required to give Representative any advance notice of its intention not to renew this Agreement at the expiration of any given one year period.

Another provision stated, "This Agreement shall be interpreted under the laws of the State of Ohio." Rowlette did not attempt to negotiate any terms of the contract. The first agreement between Calphalon and Rowlette governed the parties' business relationship from February 1, 1996 to January 31, 1997. An almost identical agreement, signed in January 1997, governed the relationship from February 1, 1997 to January 31, 1998.

However, on August 21, 1997, Calphalon orally informed Rowlette of its intention to discontinue its use of manufacturer's representatives and take its sales "in-house." Therefore, Jeff Cooley, Calphalon's President, told Jerry Rowlette that Rowlette's

manufacturer's representative contract would not be renewed for 1998. On December 18, 1997, Rowlette received written "official notice" of Calphalon's intent not to renew the contract for February 1, 1998 through January 31, 1999.

***2** In late 1997, Calphalon representatives began preliminary discussions with Target Stores, a division of Dayton Hudson Corporation, for sale of Calphalon products in its stores. Actual negotiations commenced in March 1998, after Rowlette was informed "its contract would not be renewed." In June 1998, Calphalon contracted to sell its products in Target stores. In addition, Target was not a customer assigned to Rowlette during his tenure as a Calphalon manufacturer's representative, even though it is a subsidiary of Dayton Hudson, and Rowlette never represented Calphalon with regard to the products to be sold at Target.

In February 1998, Calphalon notified Rowlette that commissions would be delayed until March 20, 1998. Despite its demands for payment, Rowlette did not receive any commissions until checks were issued on April 21st and 28th. Calphalon denied Rowlette's request to solicit new lines at and prior to an annual trade show in Chicago in January 1998. Instead, Calphalon requested that Rowlette spend time "transitioning" customers to Calphalon because its accounts were being taken in-house.

Rowlette commenced the present action against Calphalon and one of its sales managers, Brian Schlichter, on July 9, 1998. [FN1] Rowlette's complaint alleged Calphalon: (1) violated Minn.Stat. § 325E.37 (1998), which requires manufacturers to provide 90-day written notice of an intention not to renew a representation contract and only allows contract termination for cause; (2) violated Minn.Stat. § 181.145 (1998), which requires prompt payment of commissions upon demand after contract termination and imposing substantial penalty payments for delay; (3) breached the parties' manufacturer representative contract; and (4) tortiously interfered with existing contracts and prospective economic advantage.

FN1. In May 1998, Calphalon brought an action in Federal District Court for the Northern District of Ohio seeking a declaratory judgment that the 1997 manufacturer's representative agreement was governed by Ohio law and that Calphalon did not owe Rowlette any commissions. The court dismissed Calphalon's action on September 28, 1998 for lack of personal jurisdiction and denied Calphalon's motion for reconsideration on November 20, 1998. Calphalon appealed the dismissal to the Sixth Circuit Court of Appeals.

Because Calphalon claimed serious difficulties in locating and reviewing documents, Rowlette moved to compel discovery in the present case on February 26, 1999. On April 12, 1999, the district court ordered: (1) Calphalon to respond to Rowlette's discovery requests fully and completely without objection within 30 days; and (2) that all dispositive motions should be heard "as soon as discovery allows," but no later than June 30, 1999. Although the deadline for court-ordered discovery was May 13, Calphalon moved for summary judgment on March 30, 1999. Despite Rowlette's requests for additional discovery and protest to the April 27 hearing date, the district court granted Calphalon's motion for summary judgment on all counts in the complaint. This appeal followed.

DECISION

I.

*A. Existence of Choice-of-Law Provision*

The parties' agreement provided that it was to be "interpreted under the laws of the State of Ohio." The district court concluded that "the contractual language constitutes a choice-of-law provision * * *." Because the choice-of-law provision reads "interpreted under" not "governed by" Ohio law, appellant contends the provision is not an effective choice of law. Instead, appellant argues the provision is limited to construction of the agreement and, as a matter of law, means "construed in accordance with." Appellant's interpretation of the choice-of-law provision is an excessively narrow semantic argument.

*B. Enforcement of Choice-of-Law Provisions*

***3** Minnesota courts traditionally enforce contractual choice-of-law provisions made "in good faith and without an intent to evade the law." *Hagstrom v. American Circuit Breaker Corp.,* 518 N.W.2d 46, 48 (Minn.App.1994) (quoting *Combined Ins. Co. of Am. v. Bode,* 247 Minn. 458, 464, 77 N.W.2d 533, 536 (Minn.1956), *review denied* (Minn. Aug. 24, 1994). *See also Milbank Mut. Ins. Co. v. United States Fidelity & Guar. Co.,* 332 N.W.2d 160, 163 (Minn.1983) (applying "choice-influencing-considerations" methodology to enforce the parties'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

choice of law); Milliken and Co. v. Eagle Packaging Co., Inc., 295 N.W.2d 377, 380-n1 (Minn.1980) (enforcing choice of law where parties agreed that the law of another state shall govern their agreement). Appellant argues respondent added the choice-of-law provision in bad faith with intent to evade the law because: (1) the parties had done business without a choice-of-law clause for a number of years; (2) respondent chose to insert the clause into its agreements shortly before taking all its sales in-house; and (3) the clause antedated the enactment of Minn.Stat. § 325E.37 in 1980 and Minn.Stat. § 181.145 in 1984. There is no evidence respondent acted in bad faith with intent to evade the law or appellant failed to understand that the parties, by their agreement, were choosing Ohio law.

To determine whether a choice of law is necessary, a court must first determine whether there is an actual conflict between the legal rules of the two states. Jepson v. General Cas. Co., 513 N.W.2d 467, 469 (Minn.1994). Where choosing one state's law is "outcome determinative," an actual conflict of law exists. *Id.;* Myers v. Government Emp. Ins. Co., 302 Minn. 359, 363, 225 N.W.2d 238, 241 (1974). Minn.Stat. § 181.145 (1998) requires the prompt payment of commissions. Although the Ohio statute in effect at the time had a similar requirement, corporations like Calphalon were exempted because they held their principal place of business in Ohio. *See* Ohio Rev.Code 1335.11(A)(2)(B)(1998). While Minn.Stat. § 325E.37 (1998) governs notice requirements for the termination of manufacturer's representatives, no Ohio statute protects manufacturer's representatives. Therefore, applying Ohio law is "outcome determinative" and an actual conflict exists. Once it is determined an actual conflict exists, a court must ensure each state has sufficient contacts with the parties or transaction to constitutionally apply its law. Jepson, 513 N.W.2d at 469.

> [F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.

Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13, 101 S.Ct. 633, 640 (1981). In addition to being the forum state, Minnesota is Rowlette's state of incorporation and the state where many of Rowlette's actions as a Calphalon manufacturer's representative occurred. Calphalon is incorporated in Ohio and has its principal place of business in that state. Because both states have significant contacts with the parties and their agreement, the application of either state's law would be neither arbitrary nor fundamentally unfair.

*4 The next step in choice-of-law analysis is to consider certain choice-influencing factors. Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co, 604 N.W.2d 91, 94 (Minn.2000). The relevant factors are:

> (1) [p]redictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.

*Id.;* Jepson, 513 N.W.2d at 470; Milkovich v. Saari, 295 Minn. 155, 161, 203 N.W.2d 408, 412 (1973)).

*1. Predictability of Results*

> The first factor, predictability of results, represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping.

Nodak, 604 N.W.2d at 94 (citing Robert A. Leflar, *Choice-Influencing Considerations in Conflicts Law,* 41 N.Y.U.L.Rev. 267, 282-83 (1966)). Predictability also preserves the parties' contractual expectations by enhancing certainty as to which state's law will govern future contract-based disputes. *Id.* While appellant contends it was never notified of respondent's intention to have Ohio laws govern the parties' agreement, the choice-of-law provision was aimed at preserving contractual expectations and providing effective notice that Ohio law would apply. The predictability factor favors Ohio law.

*2. Maintenance of Interstate Order*

With regard to the second factor, the primary consideration is whether the application of the forum's law would manifest disrespect for the other state's law or impede the interstate movement of people and goods. Nodak, 604 N.W.2d at 95; *see also* Robert A. Leflar, *American Conflicts Law* § 104, at 207, 208 (3rd ed.1977). Although the forum state has an identifiable interest, this factor "requires deference to a sister state's legal rules when that state has a substantial concern with the problem." Leflar, *American Conflicts Law* § 104, at 208 (explaining that deference to the state with a greater interest in the litigation involves examining the contacts between the transaction and the states). Additionally, in an attempt to maintain a coherent legal system, "courts of different states [should] strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." Nodak, 604 N.W.2d at 95 (quoting Jepson, 513 N.W.2d at 471).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In 1994, this court addressed whether a contractual choice-of-law provision, which directly conflicts with a specific Minnesota statute, is enforceable. Hagstrom, 518 N.W.2d at 48-49. In that case, the appellant argued the choice-of-law provision should not be enforced because it violates Minnesota's public policy interest of providing greater remedies as embodied in Minn.Stat. § 325E.37. In response to a similar challenge, the Minnesota legislature amended the Minnesota Franchise Act to void choice-of-law provisions that waive compliance with the Act. *Id.* At 48; *see* 1989 Minn.Laws ch. § 2. Because Minn.Stat. § 325E.37 does not have a provision limiting choice of law provisions and Minnesota has a longstanding policy of enforcing contractual choice-of-law provisions, this court upheld the parties' choice of law. Hagstrom, 518 N.W.2d at 48-49 (holding Minnesota's remedial policy interest does not override its traditional enforcement of choice-of-law provisions).

***5** Minnesota statutory law addresses the termination of manufacturer's representatives and payment of commissions. *See* Minn.Stat. § § 325E.37; 181.145. While these statutes demonstrate Minnesota's policy in favor of providing remedies, neither statute precludes parties from choosing another state's law to govern their agreements. Minnesota has also consistently enforced contractual choice-of-law provisions. Furthermore, Ohio chose not to address manufacturer's representative agreements and explicitly excludes corporations like Calphalon from its statute dealing with the payment of commissions. Although Minnesota has an interest in protecting manufacturer's representatives, we cannot conclude those interests are more significant than its long-standing policy of enforcing contractual choice of law provisions. *See* Hagstrom, 518 N.W.2d at 48-49. Because the agreement clearly selected Ohio law, this factor favors Ohio law.

*3. Simplification of the Judicial Task*

Simplification of the judicial task has not been given much weight in this court's precedent. *Nodak,* 604 N.W.2d at 95. *See* *Jepson,* 513 N.W.2d at 472 (stating this "is not a significant factor * * * because the law of either state could be applied without difficulty"). "[T]his factor is primarily concerned with the clarity of conflicting laws." *Nodak,* 604 N.W .2d at 95. Because there is no challenge to the practicality of applying or clarity for interpreting Minnesota or Ohio law, this factor favors neither state's law.

*4. Interest of the Forum*

This factor is aimed at determining "which choice of law most advances a significant interest of the forum." *Id.* (quoting *Jepson,* 513 N.W.2d at 472). Appellant contends Minnesota enacted the statutes at issue in this case to protect small regional businesses headquartered in Minnesota, such as Rowlette & Associates. Appellant also argues the Minnesota legislature intended the statutes to prevent national corporations, with superior bargaining power, from coercing smaller concerns into unfair contracts that allow the abrupt termination of business relationships and withholding of commissions.

Each state has a significant state interest in having its law applied. While Minnesota expressed its governmental interests in enacting statutes with regard to the termination of manufacturer's representative agreements and the payment of commissions, Ohio has chosen not to address those issues or expressly exclude certain entities from such statutes. Despite its interest in protecting manufacturer's representatives, Minnesota has a long-standing policy of enforcing contractual choice of law provisions. *See* Hagstrom, 518 N.W.2d at 48-49 (explaining that statutory policy interests do not override Minnesota's historical enforcement of contractual choice of law provisions). Because the parties, by their agreement, clearly selected Ohio law, this factor favors Ohio law.

*5. Better Rule of Law*

***6** In *Nodak,* the Minnesota Supreme Court explained that the better rule factor has not been an important consideration in nearly 20 years. 604 N.W.2d at 96. Therefore, it is unnecessary to address it here. Because applying Ohio law: (1) preserves the parties' justified contractual expectations; (2) helps maintain interstate order; and (3) advances Minnesota's strong policy of enforcing contractual choice-of-law provisions, the district court correctly applied Ohio law.

II.

[S]ummary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and either party is entitled to judgment "as a matter of law."

*W.J.L. v. Bugge,* 573 N.W.2d 677, 680 (Minn.1998)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(quoting Minn.R.Civ.P. 56.03). On an appeal from a grant of summary judgment, this court must determine whether there are any genuine issues of material fact and whether the district court erred in applying the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990).

However, a reviewing court "must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). No genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986)). To resist summary judgment, the nonmoving party "must do more than rest on mere averments." *Id.* at 71. A genuine issue for trial "must be established by substantial evidence." *Id.* at 69-70 (quoting *Murphy v. Country House, Inc.,* 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976)).

*A. Breach-of-Contract Claim*

The district court dismissed appellant's breach of contract claims because the parties' agreement allowed respondent to elect not to renew the agreement for any reason and without providing notice. While not required to do so, respondent provided oral notice on August 21, 1997 and written notice on December 18, 1997, of its intention not to renew Rowlette's contract for 1998. Because the district court focused solely on respondent's failure to renew the agreement for 1998, appellant contends the court overlooked other breach of contract theories. Specifically, appellant argues respondent breached the parties' agreement by: (1) wrongfully taking the Dayton Hudson account in-house in 1997; (2) failing to pay appellant all its earned commissions; and (3) negotiating a direct agreement with Target during the term of the parties' 1997 Agreement.

With regard to its breach of contract claim, appellant's memorandum in opposition to summary judgment stated:

> Calphalon asserts that it did not breach its contract with Rowlette, applying Ohio law. It provides no case or statutory citation for its assertion. The question of whether Rowlette's 1997 Agreement was breached by Defendants' actions is a fact question for the trier of fact after considering all the evidence submitted by the parties. Depositions have yet to be taken in this case; Calphalon's attempt to dispose of this claim by summary judgment is premature and predicated on misplaced reliance upon Ohio law.

*7 Appellant did not reference a contract provision or allege specific conduct constituting a breach of the contract. Appellant only contends: (1) the occurrence of a breach is a fact question; (2) "summary judgment [was] premature" because depositions have yet to be taken; and (3) summary judgment was erroneously predicated on Ohio law.

To resist summary judgment, the nonmoving party cannot "rest on mere averments" and must establish a genuine issue for trial by substantial evidence. *DLH, Inc.,* 566 N.W.2d at 69-71. Here, appellant has not gone beyond its pleadings and the evidence presented to the district court does not raise a genuine issue of material fact. On appeal, Rowlette argues the facts supporting its statutory claims are incorporated by reference to support its common law breach of contract claims.

While appellant argues the complaint presents evidence that respondent breached the parties' agreement by taking the Dayton Hudson account in-house, the complaint only states that appellant "re-alleges paragraphs 1 through 33 of its Complaint as fully set forth herein." The only specific allegation concerning Dayton Hudson was the claim that respondent violated Minn.Stat. § 325E.37, subd. 2 (1998) by terminating appellant's representation of Dayton Hudson. Additionally, appellant contends Rowlette's affidavit, submitted in opposition to respondent's summary-judgment motion, supports its breach of contract claim for wrongfully taking the Dayton Hudson account in house. Rowlette's affidavit does not allege breach of contract. It merely states Rowlette was the exclusive representative for the entire Dayton Hudson Corporation in the territory until respondent took the account in-house.

Similarly, appellant argues re-alleging each paragraph of the complaint regarding Counts I-III and Rowlette's affidavit provide sufficient evidence that respondent breached the contract by failing to pay appellant all earned commissions. The complaint does not allege that failing to pay commissions violated the contract. The complaint only discusses such conduct as a violation of Minn.Stat. § 181.145 (1998). Furthermore, Rowlette's affidavit does not allege that respondent's nonpayment of commissions breached the contract.

Appellant also argues Rowlette's affidavit supports its claim that respondent breached the agreement by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negotiating with Target during the term of the agreement. Rowlette's affidavit only states that he became aware of respondent's negotiations with Target after the expiration of the 1997 representative agreement. *See* Gutwein v. Edwards, 419 N.W.2d 809, 812 (Minn.App.1988) (explaining that affidavits "must contain more than unsupported conclusionary facts and unwarranted opinions or legal conclusions"). The other evidence showed: (1) the contract did not prohibit respondent from negotiating or contracting with Target; (2) discussions with Target in late 1997 were "preliminary discussions" and formal discussions did not begin until March 1998, after appellant's contract expired; and (3) respondent did not enter an agreement with Target until June 1998.

***8** While the district court's dismissal of appellant's breach of contract claim only discussed respondent's failure to renew the 1997 manufacturer's representative agreement, the pleadings, affidavits, and other materials did not apprise the court or respondent of appellant's other breach of contract theories. Respondent, as the party moving for summary judgment, has the burden of demonstrating that no genuine issue of material fact exists. *Ritter v. M.A. Mortenson Co.*, 352 N.W.2d 110, 113 (Minn.App.1984). However, because appellant's complaint only alleged generally that respondent breached the contract, respondent had no reason to anticipate or refute by affidavit or evidence any of appellant's three alternative breach of contract theories. Appellant cannot be allowed to create factual disputes on appeal. *See* *Midway Nat'l Bank v. Bollmeier*, 474 N.W.2d 335, 339 (Minn.1991) (refusing to consider issues raised by a losing party for the first time on appeal).

*B. Tortious Interference with Existing Contracts Claim*

To state a claim for tortious interference with contract, appellant must establish: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages. *Furlev Sales & Assoc., Inc., v. North Am. Automotive Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn.1982). A successful claim requires proof of all five elements. *St. Jude Med., Inc. v. Medtronic, Inc.*, 536 N.W.2d 24, 30 n. 6 (Minn.App.1995), *review denied* (Minn. Oct. 27, 1995). Summary judgment is appropriate where the plaintiff fails to establish one element of the claim. *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 127 (Minn.App.1998).

While Rowlette argues its "business relationships" with other manufacturers and retailers constitute existing contracts, there is no evidence appellant's previous relationships with unnamed manufacturers were contractual relationships. Rowlette also contends Calphalon breached the contract by bringing the Dayton Hudson account in house and by negotiating directly with Target. To the extent Rowlette contends Calphalon's conduct breached the parties' contract, a party's breach of it's own contract is not actionable as tortious interference with contractual relations. *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 901 (Minn .1982). Rowlette cannot contend Calphalon's conduct breached its contract with Dayton Hudson or Target because there was no such contract. Rowlette was merely Calphalon's exclusive representative to Dayton Hudson in the territory. Moreover, the Rowlette-Calphalon contract prohibited appellant from selling Calphalon Products for its own account without respondent's consent. Because appellant failed to show the existence of a contract, its tortious interference claim must be dismissed. *See* *Hansen v. Phillips Beverage Co.*, 487 N.W.2d 925, 927 (Minn.App.1992) (affirming summary judgment on tortious interference with contract claim because no contract existed).

***9** Even if appellant's "business relationships" constituted existing contracts, there is no evidence Calphalon intentionally procured the breach of any contracts. On November 18, 1993, Calphalon sent a letter asking all Calphalon representatives to reduce their vendor lines to five by May 1, 1994. Rowlette argues Calphalon's request that it voluntarily discontinue its representation of 14 unnamed manufacturers satisfies the requirement that respondent intentionally procured the breach of existing contracts. Because the agreement permitted Calphalon to request that its representatives commit more fully to Calphalon's business, we cannot conclude the letter was an intentional procurement of the breach of the parties' contract. Rowlette also failed to establish the third element. *See* *Sterling Capital Advisors*, 575 N.W.2d at 127 (granting summary judgment on tortious interference claim because no breach occurred).

*C. Tortious Interference with Prospective Business Relations*

Because appellant failed to: (1) prove respondent intentionally committed a wrongful act improperly interfering with a prospective relationship, and (2)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allege interference with a specific contractual relationship, the district court dismissed appellant's tortious interference claim.

> A cause of action for interference with prospective business relations lies when one intentionally and improperly interferes with another's prospective business relation by (1) inducing a third person not to enter into or to continue the prospective relation, or (2) preventing the other from continuing the prospective relationship.

*Hough Transit, Ltd. v. National Farmers Org.*, 472 N.W.2d 358, 361 (Minn.App.1991) (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632-33 (Minn.1982)).

Rowlette's affidavit explains that respondent barred appellant from soliciting new "competitive" lines at an annual trade show in Chicago in January 1998. While respondent instructed appellant not to solicit new lines at the trade show, there is no evidence respondent intentionally interfered with any prospective business relations. *See Hunt v. Univ. of Minnesota*, 465 N.W.2d 88, 95 (Minn.App.1991) (requiring proof that "defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship"). Appellant did not specifically reference any manufacturer by name as a prospective business relation. "[T]he mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law." *International Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1405 (8th Cir.1993). To survive summary judgment, appellant must demonstrate that respondent influenced a prospective customer's decision to enter into a contract. *Sports & Travel Marketing, Inc. v. Chicago Cutlery Co.*, 811 F.Supp. 1372, 1382 (D.Minn.1993). Because appellant merely alleged that it had "missed an entire year's opportunity to obtain new, significant lines," there is no evidence that respondent affected any prospective contracts.

*D. Claims against Co-Defendant Schlichter*

***10** Appellant also sued Brian Schlichter individually for tortious interference with existing contracts and prospective business advantage. An employee of a corporation is "shielded from personal liability for interference with contracts if [he] merely cause[s] the corporation not to perform the contract." *Furley*, 325 N.W.2d at 26 (citations omitted); *see also Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505-06 (Minn.1991) (explaining that a corporate employee is not liable for tortious contract interference unless acting outside the scope of his or her duties). Because there is no evidence Schlichter acted outside the scope of his duties or Calphalon's interests, appellant's claim is unsuccessful as a matter of law.

III.

Appellant contends the district court erroneously refused to defer ruling on respondent's summary-judgment motion until additional discovery was completed. A court has considerable discretion in setting the procedural calendar of a case and may continue a summary judgment motion to allow additional discovery where the non-moving party is unable to present facts essential to its opposition to the motion. *See* Minn.R.Civ.P. 56.06; *Port Authority v. Harstad*, 531 N.W.2d 496, 501 (Minn.App.1995), *review denied* (Minn. June 14, 1995). While "continuances should be liberally granted," a court must consider whether the party seeking additional discovery: (1) was diligent in its discovery requests prior to the summary judgment motion; and (2) has a good-faith belief material facts will be discovered. *Bixler by Bixler v. J.C. Penney Co.*,, 376 N.W.2d 209, 216 (Minn.1985).

*A. Diligence*

On February 26, 1999, Rowlette moved to compel Calphalon to answer all interrogatories and provide all requested documents. The district court issued an order on April 12, 1999, compelling respondent to respond to appellant's discovery requests fully and completely without objection within 30 days. Appellant argued it had not taken depositions because it could not meaningfully depose the necessary persons before discovery requests had been produced and reviewed. Because the record shows Rowlette diligently sought discovery, the propriety of the district court's ruling turns on whether appellant's additional discovery requests were good-faith attempts to uncover material facts.

*B. Good-Faith Belief*

Minnesota courts routinely refuse to continue a summary judgment motion to allow additional discovery when the party is merely conducting a "fishing expedition" or fails to specify what evidence is sought. *See, e.g., Bolton v. Department of Human Servs.*, 527 N.W.2d 149, 153 (Minn.App.1995) (denying continuance because plaintiff merely claimed supportive evidence was available), *rev'd on other grounds*, 540 N.W.2d 523 (Minn.1995); *Holmes v. Winners Entertainment, Inc.*, 531 N.W.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

502, 505-06 (Minn.App.1995) (denying continuance because "[t]here [was] little likelihood that additional discovery would supply evidence to support [plaintiff's] claim"). Granting summary judgment before discovery is completed is proper where additional discovery would neither aid the district court in determining whether material fact issues existed nor change the ultimate result. *McCormick v. Custom Pools, Inc.*, 376 N.W.2d 471, 477 (Minn.App.1985), *review denied* (Minn. Dec. 30, 1985). A district court's refusal to grant a continuance for further discovery will not be overturned absent an abuse of discretion. *Cherne Contracting Corp. v. Wausau Ins. Cos.*, 572 N.W.2d 339, 346 (Minn.App.1997), *review denied* (Minn. Feb. 19, 1998).

***11** Here, Rowlette failed to specify what evidence sought and how additional discovery would uncover relevant facts to prevent summary judgment. Because the parties chose Ohio law to govern their agreement, additional discovery will not aid the court in determining the applicable law or change the result. Similarly, additional discovery would not aid the court in determining whether fact issues exist regarding appellant's alternative theories of breach. Moreover, the district court dismissed the tortious interference claims because appellant had not specified any existing or prospective contracts with which respondent had interfered. Because appellant had access to the only existing contract and to information regarding any alleged interference with prospective contracts, additional discovery was not warranted. Because Rowlette did not specify what evidence it sought and no evidence could support plaintiff's lawsuit, the district court did not abuse its discretion in granting summary judgment without additional discovery.

The district court properly concluded the parties chose Ohio law to govern their business relations. Summary judgment was appropriate because the district court: (1) properly concluded there were no genuine issues of material fact with regard to appellant's common law breach of contract or tortious interference with existing contracts claims; and (2) did not abuse its discretion ruling on respondent's summary judgment motion without additional discovery.

Affirmed.

Not Reported in N.W.2d, 2000 WL 385502 (Minn.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Case Type: Personal Injury
(Product Liability)

---

Gordon Dodds and Marietta Dodds,
Plaintiffs,

v.

St. Jude Medical, Inc.,
Defendant.

Court File C3-04-10616

**ORDER**

---

Janet Zaharko and Richard Zaharko,

Plaintiffs,

v.

St. Jude Medical, Inc.,

Defendant.

Court File C3-04-1619

---

The above referenced matter came on for a hearing before the undersigned on July 22, 2005 on the motion of Canadian Plaintiff's Regarding Applicable Law on Non-Pecuniary Loss Damages. J.Gordon Rudd, Jr., Esq. appeared on behalf of Plaintiffs Gordon Dodds, Marietta Dodds, Janet Zaharko and Richard Zaharko. Tracy Van Steenburgh, Esq. appeared on behalf of the Defendant St. Jude Medical, Inc.

Based on all the files and records herein, including the arguments of counsel,

**IT IS HEREBY ORDERD:**

1. Canadian Plaintiff's Motion for an order that Minnesota law will govern Plaintiffs' claims seeking non-pecuniary loss damages is **DENIED.**

2. The attached memorandum is made apart of this order.

Date: 10-20-05

Kathleen Gearin
District Court Judge

**Memorandum**

The first step a court must take in analyzing a choice of law issue is to determine whether the choice of one forum's law over the choice of the other forum's law creates an actual conflict. The plaintiffs are residents and citizens of Canada. Canada has a non-pecuniary damages cap. This cap is $100,000 in "1978" Canadian dollars. That would mean a cap of approximately $300,000 in Canadian dollars today because the law requires that the cap be adjusted for inflation. Minnesota law does not set a limit on these damages. Neither side disputes the conclusion that an actual conflict exists between these forums.

The next step is to determine whether the conflicting laws are substantive or procedural. The law of the forum, in this case Minnesota, is applied on procedural issues. The Supreme Court case of **Davis v. Furlong**, 328 N.W. 2d 150, reiterates the rule that in Minnesota procedural matters are governed by the law of the forum. The court quoted Professor Leflar regarding the rationale for this long-settled precedent:

> It is traditional that a forum court always applies its own procedural rules and practices, regardless of the procedure that might be employed if the case were tried at the place where the cause of action arose. Practical necessity requires that this be done. Procedure has to do with the available judicial machinery and its mode of operation, and it would be unthinkable for New York, in the trial of a set of facts arising from Louisiana, or California, or Ontario, to have to set up judicial machinery such as exists in the other legal entity, and operate it in the other state's fashion. If that were done, New York lawyers and judges would have to learn an entirely new set of procedural rules for each new extrastate case they try. That would delay the conduct of judicial business and impair judicial efficiency in other ways as well.

R. Leflar, **American Conflicts Law** 121 at 239 (3rd edition 1977).

The plaintiffs argue in their responsive brief that the cap is neither substantive nor procedural. This distinction was difficult for the court to grasp as the cases cited contain the phrase "matters of procedure and remedies…" and then go on to discuss only what constitutes procedural law. The Minnesota case of **Alpha Real Estate v. Delta Dental,** 664 N.W.2d 303 (Minn. 2003) contains the following definitions of procedural and substantive from **Black's Law Dictionary** (7th ed. 1999): Substantive law is: "The part of law that creates, defines, and regulates the rights, duties, and powers of the parties." (Page 1443). Procedural is defined as: "The rules that define the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves. (Page 1221). A damages cap limits the amount of damages a plaintiff may collect if successful in a lawsuit. Put another way, in Canada a plaintiff has a right to only a limited amount of non-pecuniary damages. In Minnesota, the plaintiff has a right to unlimited non-pecuniary damages. This court believes that the relevant damages laws are substantive rather than procedural.

Because the court rules that the laws of the two states regarding damages are substantive rather than procedural, the court needs to evaluate whether the application of either state's law would violate due process. Both sides have significant contacts with plaintiffs' claims. Defendant's effort to minimize the contacts falls short. SJM manufactured the product in Minnesota and has its headquarters in Minnesota. A significant part of the marketing decisions and promotions were done in Minnesota. The plaintiffs reside in Canada, the implantation took place in Canada, the treatment, medical care, and purchase of the valve happened in Canada. The plaintiff admits that the contacts of both sides "…easily satisfy the constitutional requirements for the application of either

Canadian or Minnesota." (Page 12 of plaintiff's initial memorandum). That is the better argument.

This court's ruling that applying either Minnesota law or Canadian law on non-pecuniary damages would not violate due process does not end the inquiry. Under Minnesota conflict of laws rules first adopted in **Milkovich v. Saari,** 203 N.W. 2d 408 (1973), the court must next apply the five choice-influencing considerations proposed in Professor Leflar's writings. The first three factors are predictability of results, maintenance of interstate and international order, and simplification of the judicial task. The plaintiff argues that these factors do not come into play in tort cases. They cite **Jepson v. General Cas. Co. of Wisconsin,** 513 N.W. 2d 467 (Minn. 1994), in support of that argument. This ignores the fact that the Supreme Court overturned the trial court and the Court of Appeals court and considered the first two factors to be most important in that particular lawsuit. The court said:

> Were the only choice-influencing consideration in this case our governmental interest, we might side with Jepson. On the facts of this case, however, our choice of law is influenced more by our analysis of predictability and maintenance of interstate order than it is by our governmental interest in compensating a tort victim. (**Jepson** at 472).

The Eighth Circuit Court of Appeals also rejected the premise that only the last two factors apply in Minnesota tort cases. It held: "We reject Nesladek's contention that Minnesota law *per se* precludes the application of any of the five Leflar factors in tort cases." **Nesladek v. Ford Motor Co.** 46 F3d 734 (8th Cir. 1995 at 739). It further states that courts should be concerned with forum shopping when determining the relevance of the maintenance of interstate order factor. That is an important issue in this case. This

court has already ruled that foreign citizens may sue this Minnesota manufacturer in this state given the contacts here and the particular circumstances involved. It is aware that these same citizens have remedies available in their own countries justice systems. Minnesota courts are becoming increasingly concerned about forum shopping because it frustrates the maintenance of interstate order and manifests disrespect for foreign jurisdictions. **Reed v. University of North Dakota,** 543 N.W. 2d 106 (Minn. App. 1996); **Schumacher v. Schumacher,** 676 N.W. 2d 685 (Minn. App. 2004).

The fact that the plaintiffs are Canadian citizens weighs in favor of the court choosing Canada's law regarding amount of damages rather than Minnesota's. That fact alone would not be determinative if another factor weighed heavily in favor of Minnesota law being applied. It is, however, an extremely important factor and cannot be ignored. Almost all of the case law cited involves conflicts between citizens of different states. Most of it involves car accidents and automobile insurance contracts. This case is between a citizen of a state and a citizen of a foreign country. Comity plays a significant role in a choice of law determination when the parties are from separate countries rather than from two states within the same country.

While this is a tort case, it is distinguishable from a random, unplanned accident. SJM made the decision to market its products in Canada and thereby became subject to Canadian law in many respects. SJM had the right to expect that they will be held to the standards of the country in which they market and sell their product.

This court is not prepared to rule that either the Canadian damages law or the Minnesota law is superior to the other. Good public policy arguments can be made in support of both. Canada has decided that the choice to have a cap on damages is best for

its citizens. The State of Minnesota deems that no limitation on damages is best for its citizens. As stated by the New Hampshire Supreme Court regarding an auto insurance conflict of laws between that state and Ontario:

> After careful consideration, we cannot conclude that New Hampshire damages law is "wiser, sounder, or better calculated to serve the total ends of justice" in the controversy before us than the competing law of Ontario.

**Lessard v. Clarke**, 143 N.H. 555, 736 A.2d 1226.

**K.G.**