# EXHIBIT J

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC. | : | |
| SILZONE® HEART VALVES PRODUCTS | : | MDL NO. 01-1396 (JRT/FLN) |
| LIABILITY LITIGATION | : | |

**DEFENDANT ST. JUDE MEDICAL, INC.'S DISCLOSURE STATEMENT FOR MELVIN D. CHEITLIN, M.D.**

Defendant St. Jude Medical, Inc. ("St. Jude Medical") serves its Disclosure Statement, and Witness Report of Dr. Melvin D. Cheitlin pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

I, Melvin D. Cheitlin, M.D., declare as follows:

## A. INTRODUCTION

1. I am a Master of the American College of Cardiology (ACC) and a Fellow of the American Heart Association (AHA). The opinions expressed below are based on my more than 40 years of training and experience as a cardiologist and my review of the relevant medical literature. This experience includes serving the chair of the committee responsible for developing and revising the ACC/AHA Practice Guidelines for the use of echocardiography.[1] I also served on the parent committee of the ACC/AHA Committee on the Management of Patients With Valvular Heart Disease when it published its guidelines for the monitoring and treatment of valvular heart disease (the Valve Guidelines). I also served as a reviewer of the

[1] Cheitlin, M.D., et al., ACC/AHA 2003 Guideline Update for the Clinical Application of Echocardiography: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (ACC/AHA/ASE Committee to Update the 1997 Guidelines for the Clinical Application of Echocardiography. Journal of the American College of Cardiology, *Circulation* 108(9):1146 (2003).

updated Valve Guidelines to be published later this year. As such, I have knowledge of the matters deposed to herein except when I have been informed by others, in which case I believe that information to be true.

2. I have reviewed the November 29, 2005 declaration of Dr. Eric G. Butchart and the November 17, 2005 declaration of Dr. Gregory John Wilson.

3. In this report, I will address certain issues related to the treatment and monitoring of patients implanted with St. Jude Medical Silzone coated mechanical heart valves, including the use of echocardiography and cinefluoroscopy to monitor these patients. More specifically, I intend to do the following in this declaration:

(a) describe in detail my education, training, and professional experience;

(b) state my opinions regarding the treatment and monitoring that is appropriate for all mechanical heart valve recipients, including those with St. Jude Medical Silzone valves, and

(c) discuss why I believe that much of the additional treatment and monitoring of patients with St. Jude Medical Silzone valves recommended by Dr. Butchart, particularly the recommendations regarding asymptomatic patients, are unwarranted and will not improve the care of patients implanted with Silzone valves in any material respect.

4. The opinions set forth below are based upon the medical literature, clinical trial data and other studies conducted regarding Silzone valves, and my training and experience as a physician and cardiologist. Attached hereto as Appendix 1 is a list of materials that were made available for my review. The opinions set forth in this Declaration are ones that I hold to a reasonable degree of medical and scientific certainty.

## B. SUMMARY OF MY OPINIONS

5. Based on my experience, training and background, it is my opinion that each patient with a Silzone valve is unique and his or her treatment requirements are neither factually similar nor typical. Patients implanted with Silzone valves, like all other mechanical valve recipients, have widely varied disease processes, histories, and health problems that make a patient-by-patient evaluation necessary for appropriate treatment and monitoring. Indeed, the appropriate medical management for patients with Silzone valves is dependent on individual factors that are largely unrelated to their Silzone valve. Consequently, patients with Silzone valves are faced with widely varying needs for medical treatment and follow-up care that are dictated by their unique and individual health and disease processes.

6. It is also my opinion that no special or extra medical monitoring beyond what is already indicated by a physician for his or her individual patients with mechanical valves is warranted for patients with Silzone valves. Patients with mechanical heart valves must be monitored for the rest of their lives - - no matter what type of valve they have in place. The risk from the complications known as paravalvular leak, thromboembolism, valve thrombosis, prosthetic valve endocarditis and bleeding events are faced by all patients with mechanical valves of all types and makes indefinite clinical monitoring necessary. The clinical data that I have reviewed does not indicate that Silzone has caused an increased long-term risk for patients currently implanted with the Silzone valve. Without such evidence, Silzone valve recipients do not require any additional or different monitoring and treatment than recipients of other types of mechanical heart valves.

7. Therefore, the additional monitoring for asymptomatic patients recommended by Dr. Butchart is not warranted or even beneficial for the treatment of patients with Silzone valves. In particular, the recommendation that asymptomatic patients with Silzone valves undergo

screening with laboratory studies such as transesophageal echocardiography and cinefluoroscopy is inappropriate and excessive. Further, many of Dr. Butchart's treatment and monitoring recommendations are not supported by valid scientific evidence or generally accepted in the medical and scientific communities, for either asymptomatic or symptomatic valve recipients. It is also my opinion that the recommendations given by St. Jude Medical for the treatment of patients with Silzone valves were appropriate at the time and remain so today.

## C. MY BACKGROUND AND QUALIFICATIONS

8. After receiving my medical degree in 1954 from Temple University, I was an intern, internal medicine resident, and Cardiovascular Fellow in the United States Army at Walter Reed Army Medical Center in Washington, D.C. I am board certified in internal medicine and cardiovascular disease, and am a Master of the American College of Cardiology and Fellow of the American Heart Association's Council on Clinical Cardiology. During my career, I have held numerous academic appointments and am currently Emeritus Professor of Medicine, University of California, San Francisco. I have had an active clinical practice throughout my career and served as Chief of Cardiology at Madigan Army Medical Center in Tacoma, Washington, Tripler Army Medical Center in Honolulu, Hawaii, Letterman Army Medical Center in San Francisco, California, Walter Reed Army Medical Center in Washington, D.C., and from 1992-97, San Francisco General Hospital. My experience has also included serving on the editorial boards of the Journal of the American College of Cardiology, the American Heart Journal, the Journal of Clinical and Basic Cardiology, and Preventive Cardiology. I served for 10 years as the Associate Editor of the Journal of the American College of Cardiology and have been associate editor of the journals Cardiology in Review, and Circulation. I am presently an Associate Editor of the Yearbook of Cardiology. A current copy of my Curriculum Vitae is attached as Exhibit A.

9. In my more than forty years of medical practice as a cardiologist, I have treated many thousands of patients suffering from various types of heart disease. Approximately 20 percent of my patients over the years have had some type of valve disease and about half of those patients required valve surgery. I have treated and followed thousands of patients with mechanical or biological (tissue) heart valves. From both my extensive clinical experience following patients with prosthetic heart valves, as well as having kept abreast of the medical literature analyzing the function and uses of various heart valves, I am familiar with the prosthetic heart valves sold by St. Jude Medical and those of other medical device companies.

10. Because I have treated thousands of prosthetic heart valve recipients over the years, I have expertise in the area of patient care and follow-up after valve replacement surgery. As a Master of the American College of Cardiology (ACC) and a Fellow of the American Heart Association (AHA), I have participated on committees responsible for drafting guidelines on the treatment and care of valvular heart disease including the follow-up care needed by patients after heart valve replacement surgery. Of particular importance to my opinions in this case is my membership on the parent committee of the ACC/AHA Task Force on Practice Guidelines from 1995-99 (the "Valve Task Force") and my service as chair of the ACC/AHA Committee to Revise the 1990 Echocardiography Guidelines from 1995 to the present.

11. As a member of the parent committee of the Valve Task Force, I reviewed the draft of the valvular disease guidelines prepared by committee members. These guidelines were published in 1998 as the ACC/AHA Guidelines for the Management of Patients With Valvular Heart Disease (the "Valve Guidelines").[2] I also served as a reviewer of the revised and updated Valve Guidelines to be published later this year. The Valve Guidelines provide physicians with guidance on how to follow patients with valvular heart disease. This guidance includes detailed

---

[2] Bonow, R.O., et al., ACC/AHA Guidelines for the Management of Patients With Valvular Heart Disease. A report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Management of Patients with Valvular Heart Disease). *Journal of the American College of Cardiology*, 32:1486-1582 (1998) (the "Valve Guidelines").

descriptions of the various valve conditions and discussion of the treatment of valvular heart disease in patients before and after prosthetic valve replacement.

12. As Chair of the 1997 and 2003 ACC/AHA Committees to Revise the Echocardiography Guidelines, I oversaw the analysis, drafting, and revising of the 1997 and 2003 ACC/AHA updates guidelines for the use of echocardiography (the "Echocardiography Guidelines").[3] The Echocardiography Guidelines were based on a review of approximately 3000 published scientific papers and the collective clinical experience of the Committee. As part of its ongoing responsibilities, the Committee continues to evaluate echocardiography techniques.

13. The Valve Guidelines and the Echocardiography Guidelines are important to my opinions in this case because they cover treatment recommendations for the complications that are alleged for Silzone valve recipients, including paravalvular leak and prosthetic valve endocarditis. These guidelines describe the possible symptoms related to paravalvular leak and the frequency and type of diagnostic testing that is appropriate for individual patients based on the physician's judgment and what is known from years of research and clinical experience.

## D. THE FUNCTIONING OF A HEALTHY HEART AND THE DAMAGE CAUSED BY VALVULAR HEART DISEASE

14. The heart contains four chambers: two atria (the upper chambers); and two ventricles (the lower pumping chambers). It is also divided into two sides, right and left. Hence, there is a right atrium, right ventricle, left atrium, and left ventricle.

15. Blood circulates to the heart from the body, low in oxygen, and enters the right

---

[3] Cheitlin, M.D., et al., ACC/AHA 2003 Guideline Update for the Clinical Application of Echocardiography: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (ACC/AHA/ASE Committee to Update the 1997 Guidelines for the Clinical Application of Echocardiography. Journal of the American College of Cardiology, *Circulation* 108(9):1146 (2003); Cheitlin, M.D., et al., ACC/AHA Guidelines for the Clinical Application of Echocardiography: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines. *Journal of the American College of Cardiology*, 95:1686-1744 (1997) (the "Echocardiography Guidelines").

side of the heart. From there, it flows to the lungs to get rid of carbon dioxide and pick up oxygen. Oxygen-rich blood then returns to the left side of the heart where it is pumped to the rest of the body. To facilitate this delivery process, a healthy heart has four "native" heart valves that function like one-way doors to keep the blood flowing in one direction. There is a valve between each atrium and ventricle and each ventricle and the artery that carries the blood away from the heart.

16. Each of the native valves in a healthy heart has leaflets attached to the base of the valve. The leaflets open to allow blood to flow through, and they close to prevent the backwards flow of blood. Opening and closing of the valves is controlled by blood pressure changes within each heart chamber. In the closed position, the outer edges of healthy valve leaflets meet to form a tight seal and do not allow blood to flow backwards through the valve.

17. There are a many causes of heart valve disease, including congenital defects, rheumatic fever, endocarditis, and calcification of the annulus, each of which causes a different type of damage to native heart valves. The consequences of damage to the native valve caused by valvular heart disease can be categorized as two general types: valve stenosis and regurgitation. A stenotic valve has a narrowed orifice that obstructs the forward movement of blood, resulting in a higher pressure in the chamber pushing the blood through the valve. Regurgitation is the backward movement of blood through a damaged valve that does not completely close. Consequently, blood that was pumped into a chamber or artery leaks back in the wrong direction, causing a backward flow of blood.

18. Valvular heart disease ultimately causes the heart to work harder to pump the same amount of blood throughout the body. With stenosis, the heart is working harder to pump through a valve that is obstructing the blood flow. With regurgitation, the heart is working harder because it is pumping the same blood over and over again. With either stenosis or regurgitation, in time, the overworked heart enlarges, and begins to fail, causing symptoms that

can include shortness of breath, light headedness, chest pain, fatigue, pounding heartbeat, a fluttering feeling in the chest, or fluid retention. Once valvular heart disease is diagnosed, the physician will instruct the patient on his or her treatment and monitoring needs based on the individual patient's medical history, physical findings, and unique risk factors.

## E. MECHANICAL HEART VALVES IMPROVE HEART FUNCTION FOR PATIENTS SUFFERING FROM VALVULAR HEART DISEASE, BUT ALL MECHANICAL HEART VALVE PATIENTS ARE SUBJECT TO WELL-RECOGNIZED RISKS

19. Prior to the 1970's there were few treatment options available for patients with valvular heart disease. Since that time, however, there have been many new developments that have increased the number of treatment alternatives and dramatically improved the lives of those patients. One of the most important treatment options for patients with serious and life threatening valvular heart disease is the surgical replacement of a damaged or diseased native valve with a prosthetic heart valve.

20. Physicians treating patients with diseased or damaged native heart valves have two types prosthetic valves available. The first, not at issue here, is a biological or tissue valve created from human or animal tissue. The second, is a mechanical valve, such as the St. Jude Medical Silzone valve.

21. The Silzone valve is a conventional St. Jude Medical mechanical heart valve that also includes a thin coating of silver on the Dacron sewing cuff around the valve. The sewing cuff is the ring of fabric around the outside of a prosthetic valve that is used to sew the valve into the patient's heart tissue. It is my understanding that St. Jude Medical added Silzone to the sewing cuffs of its valves with the goal of decreasing the serious and well documented occurrence of prosthetic valve endocarditis.

22. Mechanical heart valves generally improve both the quality of life and extend the lifespan of patients with damaged or malfunctioning native valves. The mechanical valve provides a wider opening through which blood can flow for the patient suffering from a stenotic native valve, and conversely, a tighter seal to reduce backwards flow for those suffering from a regurgitant native valve.

23. Nevertheless, technology has not yet advanced to the point where any mechanical valve performs as well as a healthy native valve. The ACC/AHH Valve Guidelines acknowledge that patients who have received either a mechanical or biological valve continue to have a serious heart disease and have, in effect, "exchanged native valve disease for prosthetic valve disease."[4]

24. Consequently, *all* patients with mechanical valves, regardless of manufacturer, are subject to certain well-known, but serious risks associated with valve replacement surgery. These well-know risks include the same complications claimed by plaintiffs' experts in this case, including, most significantly, paravalvular leak, endocarditis, and thromboembolic events.

25. One of the most prevalent complications related to heart valve replacement is paravalvular leak, which is a leak that occurs near the sewing cuff around the outside of the valve where it is sutured into the patient's tissue. These leaks are usually minor, causing no symptoms and requiring no treatment beyond the regular physical examinations necessary for all prosthetic valve patients. Clinically significant paravalvular leak in the minority of cases can be serious enough to cause symptoms and even require reoperation. Often however, even clinically significant paravalvular leak does not progress to a leak serious enough to require replacement of the prosthetic valve.

26. Likewise, a significant risk faced by all prosthetic valve patients is an infection of the tissue in the heart known as prosthetic valve endocarditis. As a result of the damage to the

[4] The Valve Guidelines at p. 1562.

heart tissue and the formation of vegetations (infected thrombus), prosthetic valve endocarditis can cause neurological consequences (such as stroke), embolization, and paravalvular leaks (caused by weakening and tearing of the tissue into which the valve is sewn), and heart failure. This risk can be serious, leading to the need for another replacement surgery, and even fatal. If untreated, the infection is uniformly fatal. Even with aggressive treatment, mortality rates can range from 25 to 60 percent.

27. Another complication of valve replacement surgery is thromboembolism (the blockage of a blood vessel by a clot that has released into the blood stream). This is a risk that arises anytime a foreign surface, such as a mechanical valve, is placed in the blood stream. Foreign bodies serve as a potential breeding ground for both thrombus (clots) and infection. Thromboembolism can cause damage ranging from the very minor to the catastrophic and fatal. For this risk, all patients receiving mechanical heart valves require anti-coagulation therapy.

28. All of these potential complications exist regardless of the type of mechanical valve implanted. The likelihood of their occurrence after surgery depends on each patient's medical history, concomitant disease processes, physical condition, and other factors. Regardless of these individual factors, however, all recipients of mechanical valves - - Silzone or otherwise - - face a lifetime of increased monitoring and treatment because of the potential complications and risks which may arise from implantation.

## F. THE MONITORING NECESSARY FOR ALL PATIENTS IMPLANTED WITH MECHANICAL VALVES IS BASED ON INDIVIDUAL FACTORS

29. Patients implanted with mechanical heart valves continue to have the potential for very serious and life threatening underlying disease. While a mechanical valve will improve the function of a damaged native valve, it does not cure valvular heart disease and does not address any residual secondary effects to the heart and other organs caused by valvular heart disease.

Also, many patients with valve disease have multiple valves involved. Often only one valve is responsible for the patient's symptoms and is replaced, leaving the less damaged native valve which may progress to cause future problems. Furthermore, despite many technological advances, there remain significant risks associated with all mechanical heart valves.

30. This combination of residual valvular heart disease problems and the inherent risks in heart valve replacement means that every patient who receives a mechanical heart valve, regardless of manufacturer, needs a lifetime of heightened medical monitoring and treatment. There is, however, nothing uniform about the type of treatment and monitoring mechanical heart valve recipients need. The appropriate course of post-valve replacement care for each patient is a decision that must be made by each patient's physician and based on each patient's individual circumstances.

31. The nature of a heart valve recipient's medical care depends initially on his or her unique individual medical history, concomitant diseases, and the cardiac illness that led to valve replacement. The degree of any residual consequences of valvular heart disease that persist after valve replacement surgery, along with other unique health problems that affect the patient's health and heart function, are major factors on which treatment and monitoring decisions must be made. These individual factors - - many of which have nothing to do with the mechanical valve itself - - have a significant impact on the risks inherent with mechanical valves. Accordingly, every mechanical valve patient's treatment and monitoring program must be designed to address the unique set of risks posed by each individual's combination of health problems.

32. For example, three important health problems related to the circulatory system that frequently influence the type of monitoring and treatment needed by a patient with a mechanical heart valve are (1) decreased ventricular function (2) coronary artery disease, and (3) atrial fibrillation. If ventricular function is compromised, a patient may require more frequent medical care and may require different drugs to assist in his or her care. Mechanical heart valve

patients with coronary disease (which is present in 10 to 50 percent of patients depending on gender and age) also face different potential problems (including heart attacks and sudden death) and have additional risk factors that need to be controlled and monitored in different ways. Patients with atrial fibrillation require careful follow-up to see that both anticoagulation and heart rate are properly controlled. There are also numerous other health problems unrelated to the circulatory system that must, nevertheless, be taken into account when prescribing monitoring and treatment for a heart valve recipient, including diabetes, renal dysfunction, and others.

33. Another example of the diverse treatment needs of mechanical valve patients is their need for anticoagulation therapy. All recipients of mechanical heart valves (no matter what type) face a lifetime of anticoagulation treatment to control the risk of blood clot formation (thrombus) on the valve and the release of those clots into the blood stream.

34. As part of anticoagulation therapy, patients are given warfarin. It is essential that patients are prescribed the proper dosage of warfarin to prevent both clot formation (as a result of a dosage that is too low) and internal bleeding (from a dosage that is too high). Each patient's dosage of warfarin varies based on unique patient factors, including the patient's ability to comply with taking medication, concomitant diseases, diet, alcohol consumption, and other medications. Each mechanical heart valve recipient needs one-on-one counseling and monitoring to address these various factors to arrive at the proper warfarin dosage. Some patients must be measured as frequently as once a day (during critical times), others once a week, and still others, who have remained consistently stable, may be measured once a month.

35. As a result of all of these individualized factors, there is a wide variation in the frequency of treatment prescribed by physicians for prosthetic valve recipients. Some physicians, based on their knowledge of an individual patient and that patient's clinical signs and symptoms, will see their patients as little as once a year or as much as every month (or more). I

have patients who I see at different times and with different frequency based on both clinical factors and patient factors. My reasons are sometimes quite individual - - some of which are related to continued symptoms, patient compliance with medications, and development of new physical findings.

36. The ACC/AHA Guidelines referenced above (the Valve Guidelines and Echocardiography Guidelines) recognize that individual patient care decisions should be made by a physician and that treatment decisions must be made on an individual basis taking into account any indications that a particular patient warrants additional or different treatment. The Valve Guidelines emphasize that "many factors ultimately determine the most appropriate treatment of individual patients with valvular heart disease in individual communities. These factors include the availability of diagnostic equipment and expert diagnosticians, the expertise of interventional cardiologists and surgeons, and notably the wishes of well-informed patients. Therefore, deviation from these guidelines may be appropriate in some circumstances."[5] Likewise, the Valve Guidelines stress that the decision regarding the amount of treatment a patient with a mechanical valve should receive is an individual determination, noting that the "interval between routine follow-up visits depends on the patient's needs."[6]

37. Simply because a group of patients received the same type of mechanical valve, such as the Silzone valve at issue here, does not create a situation where uniform monitoring and treatment plans would be appropriate. As discussed above, many of the individualized factors that determine an appropriate course of monitoring and treatment have nothing to do with the valve itself. Similarly, the Valve Guidelines acknowledge that there are many factors independent of the mechanical valve that significantly influence the need for treatment and monitoring, including ventricular dysfunction, progression of other valve disease, pulmonary hypertension, and other cardiac diseases.

---

[5] The Valve Guidelines at p. 1490.
[6] The Valve Guidelines at p. 1562.

38. A physician caring for a patient with a mechanical valve must treat the patient - - not the valve. Accordingly, the appropriate type and frequency of post-valve replacement medical care and follow-up will vary for each mechanical heart valve patient. Therefore, it is only on an individual basis that physicians who know the individual patient and their medical history can develop a plan to care for patients with mechanical heart valves. Broad generalizations as to the type of care that patients with mechanical valves will need are simply not useful or appropriate, and a common monitoring plan is neither warranted nor manageable for patients with mechanical heart valves, Silzone or otherwise.

## G. THE MONITORING RECOMMENDATIONS IN THE ACC/AHA VALVE GUIDELINES ARE APPROPRIATE FOR PATIENTS WITH SILZONE VALVES

39. Patients implanted with Silzone mechanical valves face the same complications as those with non-Silzone valves, and are subject to the same need for lifetime medical monitoring. There are no alleged medical problems claimed to be caused by the Silzone valve that fall outside of the known risks and complications associated with every mechanical heart valve - - including the risks of paravalvular leak, prosthetic valve endocarditis, valve thrombosis, and thromboembolism. This is confirmed by the Echocardiography Guidelines, which note that all prosthetic valve patients are at risk for "valve degeneration, development of regurgitation or stenotic lesions, thrombosis, and endocarditis."[7] Therefore, all patients with mechanical valves, regardless of manufacturer and regardless of any alleged cause, are subject to and monitored for the possible onset of signs and symptoms associated with these conditions.

40. As described above regarding my background, the American College of Cardiology (ACC) and American Heart Association (AHA) have created task forces to evaluate and update guidelines for the care and treatment of patients with valvular heart disease (the "Valve Guidelines"), which include recommendations for the use of echocardiography. In the

[7] The Echocardiography Guidelines.

immediate follow-up period of treatment for patients with mechanical heart valves, the Valve Guidelines recommend that the first post-operative visit should occur three to four weeks after discharge from the hospital. The Valve Guidelines further indicate that initial follow-up should include a history and physical examination, ECG [electrocardiogram], chest x-ray, echocardiography, complete blood count, serum chemistries, and "INR, if indicated."[8]

41. Echocardiography is a diagnostic tool that allows the physician to obtain an image of the heart and visualize the flow of blood through the use of Doppler technology. The picture produced by Doppler echocardiography can be used to detect the presence and source of any leakage. The Valve Guidelines provide that the use of echocardiography is "an essential component of the first postoperative visit because it allows an assessment of the effects and results of surgery as well as serving as a baseline for comparison should complications and/or deterioration occur later."[9]

### 1. Follow-Up In Asymptomatic Patients

42. After the initial follow-up evaluation, the recommendations in the Valve Guidelines regarding the monitoring of asymptomatic patients, i.e., those without signs or symptoms of complications, vary. Generally, asymptomatic patients need to be followed with yearly physician visits that include a complete history and thorough physical examination. Additionally, electrocardiograms and chest x-rays may be valuable in individual patients and other tests that are often performed include hemoglobin, hematocrit, and Lactic Acid Dehydrogenase studies. In addition, the regulation of the patient's anticoagulation therapy "should be closely supervised by an experienced health care professional."[10]

---

[8] The Valve Guidelines at p. 1562.

[9] *Id.*

[10] The Valve Guidelines at p. 1562.

43. There is some split among physicians as to the frequency of echocardiography in asymptomatic patients after their first post-operative visit. "The majority [of the committee] recommended no further echocardiographic testing after the initial postoperative evaluation in patients with mechanical valves who are stable and who have no symptoms or clinical evidence of LV dysfunction, prosthetic valve dysfunction, or dysfunction of other heart valves in keeping with the ACC/AHA Guidelines for the Clinical Application of Echocardiography."[11] A minority of the committee would perform yearly echocardiograms.

44. The Valve Guidelines also provide that transthoracic echocardiography is generally appropriate for the echocardiography monitoring of asymptomatic patients with mechanical valves. Routine cinefluoroscopy is not recommended and is considered to be a Class III type of diagnostic test that is not useful and in some cases may be harmful."[12] MRI and CT brain scans are not included in the recommended follow-up of mechanical valve patients.

45. For these reasons, Dr. Butchart's characterization of the "norm" for follow-up of asymptomatic patients with mechanical valves as annual physician visits without echocardiography would be accurate for many patients with mechanical valves. Nevertheless, there are also many asymptomatic patients with mechanical valves who have and are undergoing more extensive monitoring, based on the individual factors described above. As discussed, the normal monitoring that is appropriate for mechanical valve recipients, including patients with Silzone valves must be based on the individual patient.

**2. Follow-Up In Symptomatic Patients**

46. For any patient with a mechanical valve who has developed signs of symptoms of a complication, the degree and type of the monitoring and treatment is much different than for asymptomatic patients. Some degree of additional monitoring and treatment, tailored to the

[11] *Id.*

[12] The Valve Guidelines at p. 1490 and 1563.

specific needs of the patient, should be considered for all mechanical valve recipients who develop signs or symptoms of complications. For example, the Valve Guidelines recommend that "[a]ny patient who does not improve after surgery or who later shows deterioration of functional capacity should undergo appropriate testing, including 2-D and Doppler echocardiography and, if necessary, transesophageal echocardiography and cardiac catheterization with angiography to determine the cause."[13]

47. Indeed, there are many laboratory studies that would be appropriate after a patient has experienced signs or symptoms of a complication. Echocardiography would be indicated for any patient for whom a regurgitant murmur has been detected indicating paravalvular leak. An MRI or CT scan would be appropriate to determine the extent and location of brain damage experienced by a patient who has suffered a stroke. Cinefluoroscopy may provide useful information regarding any restricted valve leaflet movement if there are signs or symptoms of valve dysfunction.

48. It is important to distinguish the use of these laboratory studies to evaluate a patient with signs or symptoms of complications, from the use of these studies to screen for findings that have not caused any such signs or symptoms. While they may be appropriate in the symptomatic patient, they are not suitable as screening tests for patients who are asymptomatic.

## H. THE CLINICAL DATA CONCERNING COMPLICATION RATES IN PATIENT WITH SILZONE VALVES DO NOT WARRANT ANY CHANGE IN THE TREATMENT AND MONITORING OF PATIENTS WITH SILZONE VALVES

49. Although the alleged increased long-term risk of complications with the Silzone valve would not warrant any change in the monitoring and treatment for Silzone valve recipients, I have not seen any valid scientific evidence indicating an increased risk of complications with

[13] The Valve Guidelines at p. 1563.

the Silzone valve as compared to non-Silzone valve recipients. The clinical data from AVERT, the Cardiff Embolic Risk Factor Study, and the Cardiff Late Review, on which Dr. Butchart has focused, do not provide any such evidence.

### 1. The Artificial Valve Endocarditis Reduction Trial (AVERT)

50. It is my understanding that in order to evaluate the efficacy of Silzone in preventing prosthetic valve endocarditis, St. Jude Medical sponsored a randomized clinical trial known as the Artificial Valve Endocarditis Reduction Trial ("AVERT"). In January 2000, the AVERT investigators reported a small but statistically significant increased incidence of paravalvular leak serious enough to require explantation (removal) of the valve in the patient population with Silzone valves as compared to the patients with conventional valves.

51. Based on the information I have been provided regarding the latest data from AVERT, however, there is no evidence of a long-term increased risk of any complications for Silzone valve recipients as compared to those with non-Silzone valves, including major paravalvular leak (paravalvular leak leading explant, reoperation, or death). Likewise, the data from the AVERT echocardiography study has not demonstrated any statistically significant difference between Silzone and non-Silzone valves in the rates of paravalvular leak diagnosed by echocardiography.

52. From this data it seems that the reports of an increased rate of major paravalvular leak pertain to an early risk, and that there is no evidence that patients with Silzone valves who did not experience major paravalvular leak in the early period after implantation are at any greater risk than those with non-Silzone valves. As the patients with Silzone valves have all been implanted with their Silzone valves for more than six years, there is no evidence in AVERT that they are currently at any higher risk of complications from Silzone.

## 2. The Cardiff Embolic Risk Factor Study (CERFS)

53. In 2003, Dr. Butchart and other authors published the results of the Cardiff Embolic Risk Factor Study (CERFS) conducted at the University Hospital of Wales.[14] In contrast to AVERT, this study was not randomized, used a historical control group of patients implanted with non-Silzone valves, and provided data from a single center. CERFS also includes a much smaller number of Silzone valve patients than AVERT. CERFS, therefore, does not provide data that is as reliable as that from AVERT for use in assessing risk and causation with the Silzone valve.

54. The CERFS investigators reported a statistically significant increase in early major thromboembolic events (three events that occurred within three months of implantation), but no significant increases in major paravalvular leak, minor paravalvular leak, minor thromboembolic events, major bleeding events, endocarditis, or death in these patients. Regardless of the reliability of the data, as the authors reported only an early statistically significant increase in major thromboembolic risk, the CERFS data do not provide any scientific evidence of a long-term increased risk for any complications in Silzone valve recipients compared to patients whose valves are not coated with Silzone.

## 3. The Cardiff Late Review

55. It appears from the Declaration of Dr. Butchart that his Cardiff Late Review is the result of Dr. Butchart's attempt in 2004 to evaluate all 83 patients implanted with a Silzone valve at the University Hospital of Wales, some of whom were also included in CERFS. The unpublished Cardiff Late Review is merely a case series (by physicians who were not blinded to the presence of the patient's Silzone valve) concerning the patients Dr. Butchart was able to

[14] Ionescu, A., et al., *Incidence of embolism and paravalvular leak after St. Jude Silzone valve implantation: experience from the Cardiff Embolic Risk Factor Study* Heart, 89:1055-1061 (2003).

evaluate (without a control group), along with a retrospective analysis of some of the patients who were deceased at the time of this survey. The Cardiff Late Review data do not provide scientifically valid evidence for basing any conclusions regarding the risk of complications that may be faced by patients currently implanted with a Silzone valve. Again, the data from the Cardiff Late Review is not comparable to that in AVERT and it would be unreasonable to rely on that data rather than the data from AVERT.

56. It is also difficult to place significance on the results from the Cardiff Late Review survey because all of the relevant data regarding these patients do not appear to have been provided with Dr. Butchart's Declaration. I do note, however, that the results of the transesophageal echocardiography on these Silzone valve recipients found a low prevalence of minor paravalvular leak (5.8 percent in all patients and none in the mitral and double valve recipients). The Cardiff Late Review therefore does not provide valid scientific evidence of an increased risk of any long-term complications due to Silzone in patients implanted with the Silzone valve.

## I. DR. BUTCHART'S PROPOSED MONITORING AND TREATMENT PLAN WOULD NOT BE APPROPRIATE FOR ALL SILZONE VALVE RECIPIENTS

57. As Silzone valve recipients are already monitored by their individual physicians for potential heart valve-related complications, there is no reason to treat patients with Silzone valves any differently for any claimed risk of these complications. There is nothing about the Silzone valve which changes the treatment needed for these very diverse patients. Consequently, no special or different type of medical monitoring is warranted for those with Silzone valves.

58. I have reviewed the Declaration of Dr. Butchart and his proposed monitoring and treatment protocol for patients with Silzone mechanical heart valves. Based on my training and

experience, I believe that this monitoring and treatment protocol is neither warranted nor helpful for the treatment of Silzone valve recipients. Without evidence of an increased risk of complications caused by Silzone, there is no need for any change in the type and frequency of monitoring and treatment as advocated by Dr. Butchart. In addition, the increased monitoring urged by Dr. Butchart beyond that recommended for all mechanical valve recipients simply would not provide useful information for the treating physicians of patients with Silzone valves, either asymptomatic or symptomatic.

59. Laboratory studies such as echocardiography, MRI, CT, and cinefluoroscopy should not be used to screen for findings in mechanical valve recipients without signs or symptoms of a complication. It is likewise inappropriate to recommend additional laboratory tests or other monitoring based solely on positive findings from such laboratory studies. Further, a mechanical valve recipient should not be considered symptomatic simply because of positive findings on such laboratory studies. Nevertheless, Dr. Butchart has inappropriately recommended a cascade of additional monitoring and treatment for asymptomatic Silzone valve recipients based largely on laboratory studies that have uncertain clinical significance as far as indicated therapy is concerned.

60. Similarly, the more intensive monitoring and treatment recommended by Dr. Butchart for symptomatic patients with Silzone valves would not be appropriate solely due to the presence of the Silzone valve. While the monitoring and treatment protocol proposed by Dr. Butchart is elaborate, it nevertheless, does not provide for all of the many variables that must be taken into account in treating and monitoring of symptomatic patients with mechanical valves.

61. Dr. Butchart's monitoring and treatment protocol, for either asymptomatic or symptomatic patients, has not been accepted in the medical or scientific communities. Importantly, Dr. Butchart's risk scoring system on which his protocol is based has not been validated and includes risk factors for which there is no scientific evidence establishing that they

increase the risk of thromboembolic events in patients with mechanical heart valves, or patients with Silzone valves. Further, Dr. Butchart admits that many of his recommendations aimed at prevention of antithrombotic complications have "not been tested in any prospective study and shown to be effective." Declaration of Dr. Butchart at p. 59. In the absence of validation and demonstrated beneficial effect, it would not be appropriate to implement any such speculative measures for patients with Silzone valves, or any other group of patients with mechanical valves. Indeed, it is my opinion that, in general, Dr. Butchart's monitoring and treatment protocol would not be followed by cardiologists in the United States.

### 1. Echocardiography To Detect Paravalvular Leak

62. A substantial component of Dr. Butchart's monitoring protocol is the recommendation that many patients with Silzone valves, even if asymptomatic, should undergo serial transesophageal echocardiography, as well as transthoracic echocardiography. It is, however, my opinion that repeat echocardiography of patients with mechanical valves, Silzone or otherwise, after the first postoperative visit, without signs or symptoms is not useful or effective and in some cases may be harmful. Similarly, the Echocardiography Guidelines note that "[r]outine reevaluation of patients with valve replacements without suspicion of valvular dysfunction and unchanged clinical signs and symptoms" is a procedure for which there is either a general agreement or evidence that it "is not useful and in some cases may be harmful."[15] There is simply no medical research or literature that shows that repeat echocardiography testing in the absence of signs or symptoms is useful in treating patients with mechanical valves.

63. The Echocardiography Guidelines also caution that "[i]ndiscriminate use of echocardiography or its use for single 'screening' is not indicated for two principal reasons. First, the cost of echocardiography is not trivial. Second, the current Doppler echocardiographic techniques reveal details of structure and function such as filamentous strands on valves, valvular

[15] The Echocardiography Guidelines.

prolapse, and jet velocities representing minimal and at times transient valvular insufficiency that could generate unnecessary further testing or inappropriate and potentially detrimental therapy."[16]

64. Based on my clinical experience and review of the medical literature, a significant paravalvular leak large enough to consider altering treatment is accompanied almost always by clinical signs and/or symptoms. Signs of paravalvular leak that can be found on physical examination include detection of a murmur with a stethoscope, new findings of increased cardiac activity, cardiac enlargement, and development of extra heart sounds. Symptoms of paravalvular leak include shortness of breath with exercise or even at rest, inability to lie flat or waking at night short of breath, onset of easy fatigability, exercise intolerance, and ankle swelling. While it is correct that in very rare circumstances the clinical signs of a significant paravalvular leak, such as a murmur, can be missed on physical examination, in those instances, such a patient would nevertheless have symptoms indicating the presence of a severe paravalvular leak. Accordingly, as the occasional difficulty in detecting a murmur on physical examination is compensated for by the presence of symptoms, this difficulty does not warrant any heightened monitoring of patients with Silzone valves.

65. Paravalvular leak, both in those with Silzone valves and those with any other type of mechanical valve, occurs for various reasons and is not a condition for which there are diagnostic tests to help identify early warnings or signs that will detect the potential for development of a leak serious enough to lead to removal of the valve. In addition, it is well-recognized that trivial amounts of paravalvular leak occur in a high percentage of all mechanical valve patients. In fact, medical literature reports that small leaks are not uncommon, ranging from 10 percent to 53 percent depending on the study, but larger leaks are far less common.[17]

[16] The Echocardiography Guidelines.

[17] Rallidis, L.S., et al., Natural History of Early Aortic Paraprosthetic Regurgitation: A Five Year Follow-up, *American Heart Journal*, 138 (2 Pt 1):351-7 (1999); Panidis, I.P., et al., Normal and Abnormal Prosthetic Valve Function as Assessed By Doppler Echocardiography, *Journal of the American College of Cardiology*, 8:317-26 (1986).

This common trivial paravalvular leakage does not cause symptoms and does not affect blood flow or the function of the heart. Likewise, this trivial leakage does not require any monitoring or treatment different from the patient with a prosthetic valve without a trivial leak.

66. In addition, there is no reliable medical evidence establishing that minor paravalvular leaks pose any significant risk that those leaks will develop into larger and problematic leaks in the absence of signs or symptoms. Furthermore, there is no means of predicting when or if an insignificant leak will progress into one that is significant. Indeed, prior to the occurrence of a clinical sign or symptom, it is not possible to predict if a small leak will progress in any meaningful way.[18]

67. Consequently, early detection of a small paravalvular leak by echocardiogram alone does not provide useful information on which to predict whether such a leak will progress into one that is significant. Although it is possible that a small paravalvular leak might not cause a murmur loud enough to be heard on physical examination, such a finding in an asymptomatic patient does not provide any reason for changing the monitoring or treatment of a mechanical valve recipient, regardless of whether they have a Silzone valve. Any monitoring program intended to detect such small paravalvular leaks in an asymptomatic population of mechanical valve recipients would simply not provide any useful information on which to base treatment decisions for these patients. Obviously, if the results of a particular test (whether positive or negative) will not influence the treatment given to a patient, the test is unnecessary

### 2. Echocardiography to Diagnose Prosthetic Valve Endocarditis

68. Likewise, there is no routine screening or monitoring for prosthetic valve endocarditis that would benefit patients with Silzone valves in any material respect. Infective endocarditis is a clinical syndrome that is diagnosed primarily by clinical evaluation of the

[18] Miller, Daniel L., et al., Reoperation for Aortic Valve Periprosthetic Leak, *Journal of Heart Valve Disease*, 4:160-165 (1995).

patient's history, physical examination, and results of basic tests such as white blood count and blood cultures. Endocarditis first presents as fever and/or chills of unknown cause. Therefore, the most effective form of screening and monitoring for prosthetic valve endocarditis is to educate patients concerning the importance of these symptoms and to encourage them to report them to their physicians. This form of monitoring is effective because infective endocarditis does not occur in the absence of fever and/or other symptoms and signs. If a patient with a mechanical valve presents with unexplained fever and/or chills, or develops new valvular regurgitation murmurs, then endocarditis is a possible diagnosis. In the absence of these signs and symptoms, echocardiography is not indicated. When endocarditis is suspected a negative transthoracic or even transesophageal echocardiogram cannot absolutely rule out prosthetic valve endocarditis. Similarly, an echocardiogram indicating a shadow that is interpreted as a "vegetation" does not confirm the diagnosis of prosthetic valve endocarditis in the absence of relevant clinical findings.

69. Therefore, in my opinion, using echocardiography to screen for endocarditis in patients without signs or symptoms of possible endocarditis is not an effective diagnostic tool for any mechanical heart valve recipient. Infective endocarditis is not a clinical syndrome detected by screening and monitoring procedures in patients, either with or without prosthetic heart valves.

### 3. Echocardiography and Cinefluoroscopy to Detect Restricted Valve Leaflet Movement

70. Dr. Butchart provides no valid scientific evidence that Silzone causes excessive tissue overgrowth or pannus in Silzone valve recipients. To the contrary, Dr. Butchart points only to anecdotal reports of findings on valves explanted with Silzone valves (primarily his own and Dr. Wilson's) without any findings in a comparable group of patients with non-Silzone

valves that would serve as a legitimate control group to analyze causation. Likewise, he speculates repeatedly as to possible mechanisms by which the Silzone valve may cause tissue overgrowth, but provides no evidence that any of those speculative mechanisms are actually occurring in patients with Silzone valves.

71. Furthermore, there is no evidence that Silzone is causing the alleged increased interference with valve leaflets that Dr. Butchart seeks to justify the additional monitoring with serial cinefluoroscopy and echocardiography for patients with Silzone valves. In support of this additional monitoring, Dr. Butchart points to the Cardiff Late Review cinefluoroscopy results that showed 27.3 percent of the aortic Silzone valves demonstrated loss of at least five percent movement in at least one leaflet. Dr. Butchart did not discuss the much lower cinefluoroscopy findings in his mitral and double valve patients with Silzone valves (0.0% mitral and 16.7% double valve). Further, Dr. Butchart does not provide any support that his definition of what should be considered significant impairment of leaflet movement is appropriate.

72. Importantly, Dr. Butchart asserts that the cinefluoroscopy findings in his Silzone aortic valve recipients are significant, despite the fact that they are lower than the percentage reported in the Japanese study he cited regarding St. Jude Medical non-Silzone valves.[19] The study by Aoyagi, et al., reported 29.6 percent of patients had positive findings of leaflet impairment on cinefluoroscopy, and also required a greater degree of impingement than did Dr. Butchart for a positive finding. Dr. Butchart's finding that only 27.3 percent of his Silzone patients had a lesser degree of impaired movement does not provide any valid scientific support for his call for additional monitoring of Silzone valve recipients with cinefluoroscopy and transesophageal echocardiography.

73. Furthermore, simply finding a degree of leaflet movement impairment by cinefluoroscopy or echocardiography without signs or symptoms would not warrant any change

[19] Aoyagi, S. et al., Obstruction of St Jude Medical valves in the aortic position: significance of a combination of cineradiography and echocardiography. Journal of Thoracic and Cardiovascular Surgery. 120(1):142-7 (2000).

in a patient's treatment or monitoring. Without signs or symptoms indicating that the findings are causing the patient any problems, not even additional cinefluoroscopy would be appropriate. Consequently, it is my opinion that the additional cinefluoroscopy and transesophageal echocardiography monitoring urged by Dr. Butchart is not warranted for Silzone valve recipients.

### 4. Echocardiography To Find Valve Thrombosis

74. Dr. Butchart also recommends that Silzone valve recipients undergo echocardiography to detect the presence of thrombosis on their valves. Again, the use of echocardiography to screen for a finding such as thrombus on a patient's valve when that patient is not experiencing any signs or symptoms is not appropriate. Likewise, additional or serial echocardiography is not warranted in the event of echocardiographic findings of valve thrombosis in the absence of signs or symptoms. Without signs or symptoms, there is no change in the monitoring or treatment of the patient that would be warranted even if such thrombus were found on the valve. The patient would simply be monitored to ensure proper anti-coagulation therapy.

### 5. Echocardiography To Detect Tumors

75. In support of his theory that Silzone may increase the risk of tumors, the only clinical evidence Dr. Butchart cites to is the case report of Dr. Grubitzsch concerning one of his patients with a Silzone valve who also developed a tumor.[20] This case report is not scientifically valid evidence to support Dr. Butchart's highly speculative theory that Silzone causes cancer. In the absence of valid evidence of an increased risk of cancer, this unsupported theory does not justify the use of echocardiography to screen for tumor development in Silzone valve recipients.

---

[20] Grubitzsch, H., et al., Sarcoma associated with silver coated mechanical heart valve prosthesis. *Annals of Thoracic Surgery* 72:1739-40 (2001).

### 6. Dr. Butchart's Recommendations Concerning Transesophageal Echocardiography Are Excessive and Inappropriate

76. The most common type of echocardiography, known as transthoracic echocardiography, is done by placing a transducer (which creates the sound/picture waves) on the patient's chest. However, since sound does not travel through air in the lungs and is blocked by the metal in prosthetic valves, a better picture can be obtained by placing the transducer down the esophagus so that the lungs are not in the way. This is a technique knows as transesophageal echocardiography. A transesophageal echocardiogram requires local anesthesia and sedation and is a much more invasive procedure. It also carries a minor risk of damage to the pharynx, esophageal tear, and infection (endocarditis). The additional difficulty and risk of a transesophageal echocardiogram is not warranted when, as discussed above, the information provided by the transesophageal echocardiogram is not helpful for the physician is determining appropriate treatment for the Silzone valve recipient.

77. For those reasons, the monitoring program recommended by Dr. Butchart, particularly the excessive use of transesophageal echocardiography, is unnecessary and would not materially benefit patients with Silzone valves. Indeed, such a program would entail unnecessary testing would create additional health risks to patients. These risks are unwarranted in the absence of clinical sign or symptoms not warranted simply because a patient has been implanted with a Silzone valve.

## J. ST. JUDE MEDICAL'S RECOMMENDATIONS FOR TREATMENT AND MONITORING OF PATIENTS WITH SILZONE VALVES REMAIN APPROPRIATE

78. It is my understanding that after the early reports in AVERT of increased incidence of paravalvular leak leading to explant in patients with Silzone valves, AVERT was suspended and St. Jude Medical recalled the unimplanted inventory of its Silzone valves. I have also been made aware that following St. Jude Medical's voluntarily recall of its Silzone valve field inventory, St. Jude Medical recommended that patients with Silzone valves should be monitored in a manner consistent with all patients with mechanical heart valves. In particular, St. Jude Medical recommended that there was no need to obtain an echocardiogram in the absence of symptoms and with no murmurs or valvular insufficiency.

79. It is my opinion that these recommendations were appropriate under the circumstances and consistent with both the Valve Guidelines and my own practice, and that they remain so today.

## K. COMPENSATION

80. I charge $650 an hour for deposition and trial testimony. I have received $14,543.75 for my consultation in this matter.

## L. OTHER EXPERT TESTIMONY

81. To the best of my knowledge, I have provided deposition testimony in the following cases during the past four years:

- *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine Products Liability Litigation* (August 5, 2005);

- *Gleeson v. Stephani* (July, 27, 2005);
- *Hampton v. George* (April 22, 2005); and
- *Susan Shaw v. [Uncertain as to Defendants]* (March 21, 2002).

During that period, I also testified at trial in the *Susan Shaw* case on April 26, 2002 and in *Fromm v. Hershey Medical Center* on June 10, 2005.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February __, 2006.

By Mel D. Cheitlin M.D.

Melvin D. Cheitlin, M.D.

# EXHIBIT A

# CURRICULUM VITAE
## MELVIN D. CHEITLIN, M.D.
## EMERITUS PROFESSOR OF MEDICINE, UNIVERSITY OF CALIFORNIA, SAN FRANCISCO

**BORN** Wilmington, Delaware, March 25, 1929 (SSN 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).

**EDUCATION:** Temple University, Philadelphia, PA: B.A. 1950; M.D. 1954.
U.S. Army, Walter Reed General Hospital, Washington, D.C.:
Intern 1954-55; Medical Service, Resident 1956-58;
Cardiovascular Service, Resident 1959-60.
Medical Field Service School, Fort Sam Houston, TX: Jun-Dec 1955.

**CERTIFICATION:** American Board of Internal Medicine: Diplomate, 1961.

American Board of Cardiovascular Disease: Diplomate, 1965.

American Heart Association, Council on Clinical Cardiology: Fellow, 1966.

**ACADEMIC & RESEARCH POSITION:** U.S. Army Walter Reed Institute of Research, Washington, D.C.: Research Fellow, Radioisotope Laboratory, June 1959.

U.S. Army Madigan General Hospital, Tacoma, Washington:
Chief, Cardiovascular Service, 1960-64.

University of Washington, Tacoma, Washington:
Clinical Instructor, Department of Medicine, 1963-64.

U.S. Army Tripler Medical Center, Honolulu, Hawaii:
Chief, Cardiovascular Service, 1964-68.

The Queen's Hospital, Honolulu, Hawaii:
Teaching Consultant, Department of Medicine, 1965-68.

University of Hawaii Medical School, Honolulu, Hawaii:
Clinical Assistant Professor, Department of Medicine, 1967-68.

U.S. Army Letterman General Hospital, San Francisco, California:
Chief, Cardiovascular Service, 1968-71.

University of California, San Francisco, School of Medicine, San Francisco, California: Assistant Clinical Professor of Medicine, 1969-71.

Georgetown University School of Medicine, Washington, D.C.:
Clinical Associate Professor, Department of Medicine, 1971-74.

U.S. Army, Walter Reed Army Medical Center:
Chief, Cardiovascular Service, 1971-74.

U.S. Army, Consultant to the Surgeon General for
Cardiovascular Disease, 1971-74.

U.S. Army, Armed Forces Institute of Pathology, Washington,
D.C.: Research Scientist, 1973-present.

University of California, San Francisco, School of Medicine,
San Francisco, California: Clinical Professor of Medicine, 1974-78.
Professor of Medicine In Residence, 1978-97.
Professor of Medicine In Residence, Senate Emeritus WOS, 1997-present.

San Francisco General Hospital, San Francisco, California:
Vice Chairperson, Department of Medicine, 1978-79.
Acting Chief, Medical Service, 1978-80.
Associate Chief, Cardiology Division, Medical Service, 1974-91.
Chief, Cardiology Division, Medical Service, 1992-97.

**UNIVERSITY SERVICE, UCSF:**

Medical School Admissions Committee, 1977.
Cardiovascular Section of Annual UCSF Internal Medicine Refresher Course, Chairman, 1977.
Ad Hoc Peer Review Committees, 1983-present.
Ad Hoc Search Committees, 1986-present.
Academic Senate, Committee on University Extension &
Continuing Education, 1981-82; 1984-85.
Department of Medicine, Intern Selection Committee, 1986-present.
Department of Medicine, Cardiology Fellowship Program,
Selection Committee, 1986-present.
Co-Program Director, 1993-present.
Department of Medicine, Committee for Selection of the
Annual Sampson Lectureship, Chairman 1987-present.
Academic Senate, Committee on Academic Personnel, 1987-89.
Academic Senate, School of Medicine, Faculty Council, 1988-93;
Chairman, 1990-93.
Committee on Curriculum and Educational Policy, 1990-present.
Advisory Committee to the Clinical Study Center at SFGH, 1991-92.
Advisory Committee to the General Clinical Research Center,
San Francisco General Hospital, Chairman, 1992-97.
Department of Medicine Fellowship Task Force, 1996.
Ad Hoc Subcommittee for Review of Chairman of Dept. of Medicine, 1995.
Search Committee for Chief of Division of Cardiology, Moffitt/Long Hospitals,
1995
Chair of the Committee to Update the Criteria for Appointment, Merit Increases,
And Promotion For Faculty in All Series Jan 2000 – April 2001