# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC., | : | |
| SILZONE HEART VALVES PRODUCTS | : | |
| LIABILITY LITIGATION | : | MDL DOCKET NO. 1396 |

**AFFIDAVIT OF MICHAEL J. REARDON, M.D.**

I, Michael J. Reardon, declare:

1. I have personal knowledge of the facts set forth below, except when I have been informed by others, in which case I have indicated the source of the information. If called as a witness, I could and would competently testify to the truth of the foregoing facts.

2. I have been a practicing cardiothoracic surgeon for over 20 years and as such, I am involved in all aspects of the treatment of patients with prosthetic heart valves, including St. Jude Medical mechanical heart valves with Silzone® coating. I am currently a Clinical Professor of Cardiothoracic Surgery at Weill Medical College and the President of the Medical Staff at The Methodist Hospital in Houston, Texas. I am also a Clinical Professor of Surgery at the M.D. Anderson Cancer Institute, Medical Director of the Cardiovascular Intensive Care Unit at The Methodist Hospital and Senior Staff member at The Methodist Hospital.

3. I implanted 21 St. Jude Medical mechanical heat valves with Silzone from June 23, 1998 to January 3, 2000. Prior to that time, it was my practice to use St. Jude Medical conventional mechanical heart valves. I switched to the Silzone technology because I felt that it had the potential to reduce the incidence of early endocarditis, although I understood at the time that no human studies had established Silzone's efficacy against endocarditis. Beginning in June 1998, I used Silzone valves exclusively until the Silzone valve was recalled in January 2000.

4. My recollection is that I first heard about the Silzone valve at a cardiology conference in Europe but I do not recall any of the details of what may or may not have been said about Silzone at the conference.

5. I do not recall ever seeing any advertisements for Silzone.

6. In 1998, the only foreign journal I subscribed to was the Journal of Heart Valve Disease. I do not recall seeing any Silzone valve advertisements in this journal.

7. I do not recall any documents that were provided to me by my St. Jude Medical sales representative, Peter Sloan, concerning Silzone.

8. At the time I first discussed the Silzone heart valve with Mr. Sloan, he advised me that the "concept" of Silzone was that it had the potential to reduce the incidence of endocarditis. I understood from my discussions with Mr. Sloan that there were no human studies that showed that Silzone was efficacious against endocarditis and that is why the AVERT trial was being conducted. Based on my

discussions and interactions with my colleagues, they were aware of these facts as well.

9. When I make a decision about whether to employ new heart valve technology, I do not rely upon company advertisements or oral statements made by company sales representatives concerning the product. Company representatives typically will explain why each new valve is a breakthrough in safety or technology. Experience teaches, however, that not all these new products are successful. When I make a decision about whether to employ a new technology, it is my practice to rely upon my clinical experience, my review of the available medical literature, including specialty journals, and my discussions with colleagues about their experiences. My decisions to use a particular make or model of prosthetic heart valve are made on a patient by patient basis based upon the unique medical facts of each case.

10. When I made my decision to use the Silzone heart valve, I did not rely upon any company advertisements or oral statements made by Mr. Sloan or any representative of St. Jude Medical. I did rely upon my clinical experience, my review of the available medical literature, including specialty journals and my discussions and interactions with colleagues about their experiences with the product. My practice was not to limit my use of Silzone heart valves to patients who were at high risk of developing endocarditis.

11. I do not recall that the Silzone heart valve was sold at a premium compared to the St Jude Medical conventional valve but would not be surprised to

learn that it was because it has been my experience that most new technology is sold at a premium. When new technology is sold at a premium, I do not automatically assume that it is conferring some extra benefit. With regard to the Silzone valve, I would not have drawn an inference about efficacy in reducing the risk of endocarditis based upon a premium price.

12. As indicated above, I am currently the President of the Medical Staff at The Methodist Hospital, which is where I perform most of my valve replacement surgeries. Large medical centers, such as Methodist Hospital, generally stock a number of different types of prosthetic heart valves. If a surgeon or a surgical group wants to start implanting a particular valve, they notify the purchasing arm of the hospital, which in turn negotiates the price of the valve directly with the manufacturer. I am not involved with the negotiations between the hospital and the manufacturer with regard to the price of the valve.

Executed this 2 day of February, 2006 at Houston, Texas.

[signature]

MICHAEL J. REARDON, M.D.

# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC. :
SILZONE HEART VALVES PRODUCTS :
LIABILITY LITIGATION : MDL DOCKET NO. 1396

**DECLARATION OF PAUL S. DAMUS, M.D.**

I, Paul S. Damus, M.D., declare:

1. I have personal knowledge of the facts set forth below, except when I have been informed by others, in which case I indicated the source of the information. If called as a witness, I could and would testify to the truth of the foregoing facts.

2. I have been a practicing cardiothoracic surgeon for over 30 years and am currently in private practice in Rosalyn, New York where I am also the Chief of Cardiothoracic Surgery at St. Francis Hospital. I received my medical degree in 1968 from the University of California, Los Angeles. I am board certified in General Surgery and Thoracic Surgery.

3. I implanted 132 St. Jude Medical mechanical heart valves with Silzone® from June 16, 1998 to June 12, 2000. Before that, it was my standard practice to use St. Jude Medical conventional mechanical heart valves, although I did use mechanical heart valves made by other manufacturers from time to time.

4. I first heard about the Silzone® valve from my St. Jude Medical sales representative whose name I cannot recall at this time. The sales representative did not make a formal presentation regarding the Silzone® technology as it is and was my practice not to allow such presentations. I do not recall receiving any written information about Silzone® from the

sales representative. I do recall being advised that (1) Silzone® offered the potential to reduce the incidence of endocarditis; (2) the efficacy of Silzone® against endocarditis had not yet been proven; (3) scientific studies were ongoing which would determine whether Silzone was efficacious against endocarditis; (4) the Silzone valve was already on the market in Europe; (5) the Silzone valve was the same in all respects as St. Jude Medical's conventional valve except for the sewing cuff and (6) the Silzone valve was FDA-approved. The St. Jude Medical sales representative never told me that there were human clinical studies that established the efficacy of Silzone against endocarditis.

5. In the last 10 years, I have not subscribed to any foreign medical journals. I have attended a few foreign cardiology conferences in the last 10 years but I do not recall ever hearing anything about the Silzone® valve at those conferences.

6. I vaguely recall seeing advertisements for the Silzone® valve in some medical journals. However, I did not review those advertisements and certainly did not rely on them when I made my decision to start using the Silzone® valve. I am generally very skeptical about new product technology and the representations made by product manufacturers, either through their sales people or in their advertisements.

7. I am not now, nor have I ever been directly involved in negotiating the price of a Silzone® valve with St. Jude Medical. I was not aware that the Silzone® valve was sold at a premium price. I do not consider the price of a product when making a determination as to whether it is efficacious or might convey some extra benefit.

8. Knowing what I know today about the Silzone® valve, I do not feel that St. Jude Medical made any misrepresentations to me about the safety or efficacy of the product.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of March, 2006 at Rosalyn, New York.

Paul S. Damus, M.D.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC. :
SILZONE HEART VALVES PRODUCTS : MDL DOCKET NO. 1396
LIABILITY LITIGATION :

## DECLARATION OF PAUL S. DAMUS, M.D.

I, Paul S. Damus, M.D., declare:

1. I have personal knowledge of the facts set forth below, except when I have been informed by others, in which case I indicated the source of the information. If called as a witness, I could and would testify to the truth of the foregoing facts.

2. I have been a practicing cardiothoracic surgeon for over 30 years and am currently in private practice in Rosalyn, New York where I am also the Chief of Cardiothoracic Surgery at St. Francis Hospital. I received my medical degree in 1968 from the University of California, Los Angeles. I am board certified in General Surgery and Thoracic Surgery.

3. I implanted 132 St. Jude Medical mechanical heart valves with Silzone® from June 16, 1998 to June 12, 2000. Before that, it was my standard practice to use St. Jude Medical conventional mechanical heart valves, although I did use mechanical heart valves made by other manufacturers from time to time.

4. I first heard about the Silzone® valve from my St. Jude Medical sales representative whose name I cannot recall at this time. The sales representative did not make a formal presentation regarding the Silzone® technology as it is and was my practice not to allow such presentations. I do not recall receiving any written information about Silzone® from the



sales representative. I do recall being advised that (1) Silzone® offered the potential to reduce the incidence of endocarditis; (2) the efficacy of Silzone® against endocarditis had not yet been proven; (3) scientific studies were ongoing which would determine whether Silzone was efficacious against endocarditis; (4) the Silzone valve was already on the market in Europe; (5) the Silzone valve was the same in all respects as St. Jude Medical's conventional valve except for the sewing cuff and (6) the Silzone valve was FDA-approved. The St. Jude Medical sales representative never told me that there were human clinical studies that established the efficacy of Silzone against endocarditis.

5. In the last 10 years, I have not subscribed to any foreign medical journals. I have attended a few foreign cardiology conferences in the last 10 years but I do not recall ever hearing anything about the Silzone® valve at those conferences.

6. I vaguely recall seeing advertisements for the Silzone® valve in some medical journals. However, I did not review those advertisements and certainly did not rely on them when I made my decision to start using the Silzone® valve. I am generally very skeptical about new product technology and the representations made by product manufacturers, either through their sales people or in their advertisements.

7. I am not now, nor have I ever been directly involved in negotiating the price of a Silzone® valve with St. Jude Medical. I was not aware that the Silzone® valve was sold at a premium price. I do not consider the price of a product when making a determination as to whether it is efficacious or might convey some extra benefit.



8. Knowing what I know today about the Silzone® valve, I do not feel that St. Jude Medical made any misrepresentations to me about the safety or efficacy of the product.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of March, 2006 at Rosalyn, New York.

Paul S. Damus, M.D.

# EXHIBIT T

IN RE ST. JUDE MEDICAL, INC.,
HEART VALVES PRODUCTS MDL DOCKET NO.: 1396
LIABILITY LITIGATION

DEPOSITION OF BONNIE LEE SLIGER
MARCH 29, 2002

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC.,

HEART VALVES PRODUCTS LIABILITY LITIGATION

MDL DOCKET NO.: 1396

DEPOSITION OF BONNIE LEE SLIGER, taken on behalf of the Defendant at the Law Offices of Green, Schaaf & Jacobson, P.C., 7733 Forsyth Boulevard, Suite 700, St. Louis, Missouri, on the 29th day of March, 2002 before Nancy N. Abdallah, a Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public.

Q. And what did you ask him?
A. How long the valve replacement would last. And there is a couple more questions, but I can't remember them right now.
Q. What did Dr. Graham tell you as far as how long the valve was going to last?
A. He said the silicone valve would last a lifetime.
MR. SILVA: I think she meant to say Silzone.
MR. BICKHAM: That's a different lawsuit.
Q. (By Mr. Bickham) What, specifically, did Dr. Graham tell you about the Silzone-coated heart valves?
A. He said that it was a lot better than the one that they had before because your body would accept it without infections and they had a lot of good reports on it.
Q. Did he tell you anything else about the Silzone?
A. That's all I can remember.
Q. Did you ever discuss with Dr. Graham St. Jude Medical and the St. Jude Medical valve itself? Let me ask you a different question.

STATE OF MISSOURI

SS

COUNTY OF ST. LOUIS

I, Nancy N. Abdallah, a Certified Shorthand Reporter in and for the State of Missouri, duly commissioned, qualified and authorized to administer oaths and to certify to depositions, do hereby certify that pursuant to notice/agreement in the civil cause now pending and undetermined in the United States District Court for the District of Minnesota, to be used in the trial of said cause in said court, I was attended at the Law Offices of Green, Schaaf & Jacobson, P.C., 7733 Forsyth Boulevard, Suite 700, St. Louis, Missouri, by the aforesaid witness; and by the aforesaid attorneys; on this 29th day of March, 2002.

The said witness, being of sound mind and being by me first carefully examined and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid, thereupon testified as is shown in the foregoing transcript, said testimony by me reported in shorthand and caused to be transcribed into typewriting; and that the foregoing pages correctly set forth the testimony of the aforementioned

# EXHIBIT U

A P E A R A N C E S

FOR THE PLAINTIFFS:

CAPRETZ & ASSOCIATES
Attorneys at Law
5000 Birch Street, Suite 2500
Newport Beach, California 92660
BY: TONY D. JENSEN, ESQ.
- and -
IEYOUB & WYBLE, L.L.C.
Attorneys at Law
8280 YMCA Plaza
One Oak Square, Suite 10A
Baton Rouge, Louisiana 70810
BY: CAPRICE IEYOUB, Ph.D., ESQ.

FOR THE DEFENDANTS:

CROSBY, HEAFEY, ROACH & MAY
Attorneys at Law
1999 Harrison Street
Oakland, California 94604-2084
BY: J. DAVID BICKHAM, ESQ.

* * * * *

A. Not that I recall.
Q. Did you receive any written materials from any source before the surgery?
MR. JENSEN:
Written materials concerning --
MR. BICKHAM:
Concerning the surgery, the procedure, heart valves, anything associated with the procedure.
A. Possibly, but I don't recall.
BY MR. BICKHAM:
Q. Did you do any research into this kind of surgery before it was done.
A. No, sir.
Q. It didn't sound like you had much time. Did anyone else do any research into this type of surgery before it was done; did anyone do this on your behalf?
A. Not to my knowledge.
Q. Did you discuss the fact with Dr. Sheely that you were going to receive a Silzone-coated heart valve?
A. No, sir.
Q. Did you discuss the fact that you were going to receive a Silzone-coated heart valve

with anyone before the surgery?
A. No, sir.
Q. Had you ever heard of Silzone before the surgery?
A. No, sir.
Q. So then I take it that you didn't discuss any risks that may have been associated with the Silzone-coated heart valve?
A. No, sir, I did not.
Q. And did you discuss with anyone any benefits that may have been associated with the Silzone-coated heart valve?
A. No, sir.
Q. Before you had your heart valve replacement surgery, did you discuss with Dr. Sheely the risk of perivalvular leak?
A. No, sir.
Q. Do you understand what perivalvular leak is?
A. My understanding it's what I have right now.
Q. And what is your understanding?
A. My understanding is my valve is leaking right now.
Q. Well, just so we're on the same page,

C E R T I F I C A T I O N

I, the undersigned reporter, do hereby certify that the above and foregoing one hundred fifty-six (156) pages are a true and correct transcription of the stenomask tape of the deposition of LEVY DONALD REDDEN, taken down by me and transcribed under my supervision, to the best of my ability and understanding, at the time and place hereinbefore noted, in the above-entitled cause.

I further certify that the witness was duly sworn by me in my capacity as a Certified Court Reporter pursuant to LSA-R.S. 37:2551 et seq., in and for the state of Louisiana; that I am not of counsel nor related to any of the counsel of any of the parties, nor in the employ of any of the parties, and that I have no interest in the outcome of this action.

I further certify that my license is in good standing as a court reporter in and for the state of Louisiana.

LYNDA D. HABIG, CCR (#95081)

R E P O R T E R ' S P A G E

I, Lynda D. Habig, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript; and that any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."

LYNDA D. HABIG, CCR (#95081)

# EXHIBIT V

H

United States District Court,
D. Minnesota.
Gloria TUTTLE, as Trustee for the next-of-kin of Bill Tuttle, a.k.a. William R. Tuttle, deceased, Plaintiff,
v.
LORILLARD TOBACCO COMPANY; National Tobacco Company, L.P.; The Pinkerton Tobacco Company; and the Smokeless Tobacco Council; Defendants.
**No. Civ.99-1550(PAM/JGL).**

March 3, 2003.

MEMORANDUM AND ORDER

MAGNUSON, J.

***1** This matter is before the Court on seven separate Motions for Summary Judgment filed by Defendants. For the reasons that follow, the Court finds that no genuine issues of material fact remain to be resolved and that Defendants are entitled to summary judgment as a matter of law.

BACKGROUND

On September 21, 1999, Plaintiff Gloria Tuttle, [FN1] Trustee for the next-of-kin of William R. Tuttle, brought suit in Anoka County under the Minnesota wrongful death statute alleging negligence, strict liability, breach of warranty, common law fraud, consumer fraud, unlawful trade practices, deceptive trade practices, and false advertising by all named Defendants. Defendants include Lorillard Tobacco Company ("Lorillard"); National Tobacco Company ("National"); The Pinkerton Tobacco Company ("Pinkerton"); and the Smokeless Tobacco Council ("STC"). Defendants removed the case to this Court on October 13, 1999.

FN1. Mrs. Tuttle has remarried and is now known as Gloria Tuttle Fischer.

Plaintiff alleges that Mr. Tuttle wrongfully died of cancer because of Defendants' negligent, misleading, and fraudulent conduct with respect to the manufacture and marketing of smokeless tobacco. The case has been before the Court twice on Motions to Dismiss. The Court initially dismissed Plaintiff's fraud claims, but allowed Plaintiff to replead those claims. On December 19, 2000, Plaintiff filed her Second Amended Complaint. She raises seven claims:

Count I: negligent design, "compound[ing]," testing, inspecting, packaging, labeling, warning, distributing, marketing, examining, maintaining and preparing for use, and selling smokeless tobacco;

Count II: common law fraud in representing the health effects and addictive nature of smokeless tobacco;

Count III: Prevention of Consumer Fraud Act;

Count IV: Unlawful Trade Practices Act;

Count VI [there is no Count V]: Deceptive Trade Practices Act;

Count VII: False Advertising Act;

Count VIII: common law conspiracy.

Defendants again moved to dismiss the fraud claims. The Court denied the motion as to the fraud claims, but dismissed Plaintiff's claim under the Minnesota Deceptive Trade Practices Act, Minn.Stat. § § 325D.43 (2d Am. Compl. Count VI). Defendants now seek summary judgment on the six remaining counts in the Second Amended Complaint . [FN2]

FN2. Plaintiff filed a consolidated opposition memoranda as to three of the instant Motions. This memoranda contained 96 pages of facts and 40 pages of argument. The Local Rules allow each party only 35 pages total for summary judgment memoranda. Plaintiff did not seek leave of Court to exceed the page limits. The Court will not strike the offending memoranda, but did limit Plaintiff's presentation at the hearing on this matter because of her egregious violation of the Local Rules.

DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

***2** The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank,* 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Krenik v. Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995).

A. Pinkerton's Motion

Pinkerton seeks summary judgment on all of Plaintiff's claims because Pinkerton contends that Plaintiff has failed to show that Pinkerton's product was a substantial factor in Mr. Tuttle's injury. Pinkerton manufactures Red Man chewing tobacco. It is not disputed that Mr. Tuttle's "brand" of tobacco was Beech-Nut. [FN3] According to Pinkerton, because the experts agree that cancer may be caused only by extended and prolonged use of chewing tobacco and because the evidence is that Mr. Tuttle used Red Man sporadically, Red Man cannot be a substantial cause of Mr. Tuttle's cancer.

FN3. As discussed more fully below with respect to National's Motion, Beech-Nut was manufactured by Lorillard until April 1988 and by National thereafter.

Under Minnesota law, Pinkerton may be liable for Mr. Tuttle's injuries only if Plaintiff can prove that Pinkerton's product "was a substantial factor in bringing about the injury." *Flom v. Flom,* 291 N.W.2d 914, 917 (Minn.1980). Thus, Pinkerton may prevail on its Motion if it can show that, viewing the evidence in the light most favorable to Plaintiff, no reasonable jury would conclude that Pinkerton's product was a substantial cause of Mr. Tuttle's injuries.

The evidence is overwhelming that the brand of tobacco Mr. Tuttle preferred was Beech-Nut. Mr. Tuttle himself never mentioned Red Man. Mr. Tuttle's son testified that Mr. Tuttle occasionally chewed Red Man when he wasn't able to buy Beech-Nut, but the only specific instances he recalled were on hunting trips when Mr. Tuttle would sometimes chew his son's Red Man. Plaintiff did not ever see Mr. Tuttle chew Red Man, but claimed that he told her that he chewed Red Man when he couldn't get Beech-Nut.

Given the evidence, a jury could not conclude that Mr. Tuttle's occasional uses of Red Man were a substantial cause of the oral cancer that led to his death. At the most, the evidence shows that Mr. Tuttle used Red Man a few times over the almost 40 years that he chewed tobacco. This evidence is insufficient as a matter of law to establish that Red Man was a substantial cause in bringing about Mr. Tuttle's death. Plaintiff's claims against Pinkerton are dismissed.

B. Lorillard's Motion

Lorillard separately seeks summary judgment on Plaintiff's common law and statutory fraud claims. According to Lorillard, the statements which form the basis for Plaintiff's fraud claims were made by STC, not Lorillard. Because Lorillard was not a member of STC it cannot be held liable based on STC's statements. Plaintiff's three-sentence response to Lorillard's Motion contends that Lorillard has conceded that STC spoke on its behalf. (Pl.'s Opp'n Mem. at 40.) The testimony cited, however, does not support Plaintiff's argument. Because the only statements that could give rise to a fraud claim against Lorillard were made by STC, and because Plaintiff has offered no evidence that STC spoke for Lorillard or that STC was Lorillard's agent for any purpose, Plaintiff's fraud claims against Lorillard fail.

C. National's Motion

***3** National raises several grounds for dismissal of Plaintiff's claims against it. Only one of those grounds merits discussion here. National's remaining contentions are subsumed in the analysis of the other Motion discussed below.

As with Pinkerton's Motion, National contends that summary judgment is appropriate because Plaintiff has failed to show that a product manufactured by National substantially caused Mr. Tuttle's cancer and subsequent death. The evidence shows that Mr. Tuttle

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

used almost exclusively Beech-Nut brand tobacco. Beech-Nut was manufactured by Lorillard until 1988, when National purchased Lorillard's smokeless tobacco unit. Mr. Tuttle quit chewing tobacco after learning of his cancer in October 1993. According to National, the Court should find as a matter of law that Mr. Tuttle's use of National's product for five years cannot have caused the cancer that led to his death.

National relies in large part on the testimony of Plaintiff's expert witnesses. These witnesses all state that cancer strikes only long-term users of smokeless tobacco in general. One witness specifies that, in his opinion, a smokeless tobacco user would have to chew tobacco for more than 20 years before mouth cancer would occur. National asserts that Plaintiff's evidence therefore is insufficient to establish that National's product caused Mr. Tuttle's cancer.

Unlike the situation described above with reference to Pinkerton's Motion, here there is ample evidence that Mr. Tuttle used National's product on an ongoing basis. The Court cannot say as a matter of law that using chewing tobacco for five years is not a substantial cause of mouth cancer. Plaintiff's expert witnesses testified that long-term use of smokeless tobacco may lead to mouth cancer. None of these experts stated that five years of chewing tobacco would be insufficient in every case to cause cancer. National's arguments go to its fault in Mr. Tuttle's death compared to the other Defendants' fault. It has not shown that it is entitled to summary judgment on this point.

D. STC's Motion

STC contends that Plaintiff's negligence claim against STC fails because there is no evidence that STC assumed a duty to Mr. Tuttle. There is no dispute that the existence of a duty is an essential element of a negligence claim. Tuttle v. Lorillard Tobacco Co., 118 F.Supp.2d 954, 964 (D.Minn.2000) ("*Tuttle* I"). Plaintiff argues that STC voluntarily assumed a duty to speak to the purchasing public about the health effects of smokeless tobacco, and it is the alleged breach of this duty that gives rise to her negligence claim. However, Plaintiff cites no cases in support of her theory that a trade association that does not manufacture a product or promulgate standards for the use of a product has assumed a duty with regard to statements about that product. It appears that Plaintiff bases the existence of the required duty on her fraud claims. (*See* Pl.'s Mem. in Opp'n at 13.) In other words, because STC could be liable for fraud if it made material misrepresentations, it has some "duty" not to make those misrepresentations. She offers no support for this theory.

*4 As noted in *Tuttle* I, the usual rule is that:

> [t]rade associations are not ordinarily found to have assumed a duty to the purchasing public unless they have some measure of control over their manufacturing members or some direct involvement in the development or marketing the product. *See* Evenson v. Osmose Wood Preserving, Inc., 760 F.Supp. 1345, 1349 (S.D.Ind.1990) (holding that the defendant trade association, which did not manufacture, sell, distribute, design, test, conduct safety research on, or set standards for the product, could not be held to have owed a duty to the plaintiff); Harmon v. National Automotive Parts Ass'n, 720 F.Supp. 79, 82 (N.D.Miss.1989) (finding that absent direct involvement in the development and marketing of a product, a trade association does not have a duty to the purchasers of that product).

Tuttle I, 118 F.Supp.2d at 964. Plaintiff does not argue that, under the rule set forth in *Tuttle* I, STC can be liable in negligence. Rather, she contends that the sheer volume of alleged misstatements about the health effects of smokeless tobacco made by STC itself gives rise to a duty. Absent proof that STC was responsible for manufacturing, selling, designing, setting standards, or the like, however, regardless of the number of alleged misstatements, STC did not have a duty to Mr. Tuttle. Without such a duty, STC cannot be liable to Plaintiff in negligence. Plaintiff's negligence claim against STC fails.

STC also contends that summary judgment is appropriate on Plaintiff's statutory fraud claims. As discussed below, however, the Court determines that these claims fail and thus will not address this portion of STC's Motion.

E. Statute of Limitations

All Defendants seek summary judgment on Plaintiff's claims for negligence, [FN4] common-law fraud, and conspiracy (2d Am. Compl. Counts I, II, VII). There is no dispute that a six-year statute of limitations applies to these claims. Defendants contend that Mr. Tuttle knew of his injury prior to September 22, 1993, or more than six years before this lawsuit was filed, and thus that these claims are untimely.

FN4. Plaintiff concedes to the dismissal of her negligent manufacture claim, including

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

her claims of failure to properly package, maintain, prepare for use, and compound.

Mr. Tuttle was diagnosed with cancer on October 11, 1993. He first visited his physician on October 6, 1993, complaining of a lump the size of a golf ball in his cheek, protruding into his mouth. According to Defendants, Mr. Tuttle told his physicians that he had noticed the growth in his mouth at least five months before he sought medical assistance. Indeed, one physician stated that it would have been impossible for Mr. Tuttle not to have noticed the tumor many months prior to the cancer diagnosis. Mr. Tuttle's treating physician believed that the tumor first manifested itself in early 1993.

Plaintiff argues that there is little evidence that Mr. Tuttle knew that there was anything wrong with him until immediately before he sought treatment. According to Plaintiff, unless a jury could conclude as a matter of law that Mr. Tuttle knew he had cancer prior to September 1993, there is no statute of limitations problem with the claims.

***5** The triggering event for statute of limitations purposes is not necessarily the cancer diagnosis. *See* *Klempka v. G.D. Searle & Co.*, 963 F.2d 168, 170 (8th Cir.1992). The statute of limitations begins to run when a plaintiff is aware of an injury and the likely cause of that injury. *Id.* The mere fact that Tuttle may not have known earlier than October 1993 that he had cancer is not determinative. What matters is whether he knew that something was wrong, i.e., there was a "cognizable physical manifestation of the disease or injury," and that smokeless tobacco was the likely culprit. *Hildebrandt v. Allied Corp.*, 839 F.2d 396, 398 (8th Cir.1987) (citing *Karjala v. Johns-Manville Prods. Corp.*, 523 F.2d 155, 160-61 (8th Cir.1975)).

There is little dispute that, if Mr. Tuttle was aware that something was wrong in his mouth, he was also aware that chewing tobacco was the likely cause. Since 1987, the Food & Drug Administration ("FDA") has required smokeless tobacco manufacturers to include warnings on all packages of smokeless tobacco. These warnings included statements that smokeless tobacco may cause mouth cancer. The difficulty lies in determining what Mr. Tuttle knew and when he knew it.

Because Mr. Tuttle is deceased, he cannot testify as to his knowledge. Thus, the Court must rely on the contemporaneous observations of Mr. Tuttle's physicians and others who knew Mr. Tuttle. The evidence compels the conclusion that Mr. Tuttle was aware of the lump in his cheek before September 21, 1993. Thus, Plaintiff's negligence, common law fraud, and conspiracy claims are not timely and must be dismissed.

F. Minnesota Consumer Protection Statutes

Defendants seek summary judgment on Plaintiffs' claims under the Minnesota Prevention of Consumer Fraud Act, Minn.Stat. § 325F.69 (2d Am. Compl. Count III), Unlawful Trade Practices Act, Minn.Stat. § 325D.13 (Count IV), and False Advertising Act, Minn.Stat. § 325F.67 (Count VII). According to Defendants, Plaintiff has not brought this lawsuit to benefit the public and these claims must be dismissed.

Neither the Consumer Fraud Act nor the False Advertising Act provides for a private right of action. Thus, an individual may bring claims under these statutes only through the Private Attorney General Statute. Minn.Stat. § 8.31. The Minnesota Supreme Court recently addressed the requirements for an individual bringing claims under the Private Attorney General Statute. *Ly v. Nystrom*, 615 N.W.2d 302 (Minn.2000). In *Ly*, the court held that the Private Attorney General Statute applies only to those who can demonstrate that their claims benefit the public. *Id.* at 314. As the court stated, "the legislature could not have intended to sweep every private dispute based on fraud, and falling within the Consumer Fraud Act, into a statute where attorney fees and additional costs and expenses would be awarded." *Id.* The *Ly* court did not, however, set forth any standard for determining when a cause of action benefits the public. *See* Nancy E. Brasel, *Ad Hoc Deceptions in Private Disputes: When Does a Private Plaintiff Confer a Public Benefit Under Minnesota's Private Attorney General Statute?*, 29 Wm. Mitchell L.Rev. 321, 329 (2002).

***6** Two cases from this District have addressed the impact of *Ly*. In both of those cases, the court held that the plaintiff could not maintain claims under the Consumer Fraud Act or False Advertising Act because the cause of action did not benefit the public. *Pecarina v. Tokai Corp.*, No. 01-1655, 2002 WL 1023153 (D.Minn. May 20, 2002) (Montgomery, J.); *Behrens v. United Vaccines, Inc.*, 228 F.Supp.2d 965 (D.Minn.2002) (Erickson, M.J.).

In *Pecarina*, Judge Montgomery noted that the *Ly* court's holding rested on the determination that the Private Attorney General Statute could not confer a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

broader cause of action than that given to the attorney general. Because the role of the attorney general in enforcing consumer protection laws is limited to situations where the interests of the state require bringing suit, an individual suing under the Private Attorney General statute must likewise show that the lawsuit is in the interest of the public. *Pecarina,* 2002 WL 1023153, at *5 (citing *Ly,* 615 N.W.2d at 313). Although the claims in *Pecarina* centered on an allegedly defective lighter that was mass-produced and mass-marketed, the lawsuit was a personal injury lawsuit and the plaintiffs sought only compensation for medical expenses, pain and suffering, and similar damages. Judge Montgomery found that the "such damages do not benefit the public" and that therefore the lawsuit conferred no benefit on the public. *Id.* She thus dismissed the Consumer Fraud Act and False Advertising Act Claims. *Id.*

As in *Pecarina,* Plaintiff's damages here are limited to those under the Wrongful Death Act, namely damages "in reference to the pecuniary loss resulting from the death." Minn.Stat. § 573.02, subd. 1. Moreover, the statute specifies that any damages recovered "shall be for the exclusive benefit of the surviving spouse and next of kin." *Id.* Plaintiff argues that the lawsuit will benefit the public because the allegedly deceitful and fraudulent misrepresentations about smokeless tobacco were made to every Minnesota consumer of smokeless tobacco, not just to Mr. Tuttle. (Pl .'s Opp'n Mem. at 6.) Moreover, she contends that a finding that a lawsuit seeking only compensatory damages is by definition not a benefit to the public will preclude any plaintiff in a wrongful death action from attempting enforcement of Minnesota's consumer protection statutes. According to Plaintiff, because a wrongful death plaintiff may only seek compensatory damages and may not request injunctive or other forms of relief, under *Pecarina'* s reasoning, such lawsuits can never be for the public benefit. *See* Minn.Stat. § 573.02.

Plaintiff's contention that her lawsuit has a public benefit because of the mass marketing of Defendants' smokeless tobacco is unavailing. There is no dispute that the statements about which Plaintiff complains were made at the latest in the 1970s and 1980s. In 1987, as noted above, the FDA required Defendants to include warning on all packages of smokeless tobacco and, since that time, packages have stated, among other things, that using smokeless tobacco may cause mouth cancer. To the extent that Plaintiff wants to warn the public of the dangers of smokeless tobacco, the FDA-required warnings already accomplish that purpose. As Magistrate Judge Erickson noted, this sort of "metaphysical potential" of benefit to the public from success in a consumer protection action is not sufficient to satisfy *Ly'* s public benefit requirement. *Behrens,* 228 F.Supp.2d at 971.

*7 The Court is similarly unpersuaded by Plaintiff's argument that, under Defendants' reading of *Ly* and *Pecarina,* no wrongful death plaintiff will be able to enforce the consumer protection laws. The *Ly* court made clear that the legislature only intended to create private consumer protection actions that benefitted the public. A finding that wrongful death actions cannot confer that public benefit does not eviscerate the consumer protection laws, nor does it deprive Plaintiff of any available cause of action. Minnesota's consumer protection statutes may be enforced in any case seeking not only personal benefit, but also benefit to the public. Plaintiff has other causes of action to recover the compensation she seeks for the alleged wrongful death of her husband. In this case, as in *Pecarina,* there is no public benefit and Plaintiff's claims under the Consumer Fraud Act and False Advertising Act must be dismissed.

At the hearing, Plaintiff presented the Court with a recent decision of the Minnesota Supreme Court, *Collins v. Minnesota School of Business, Inc.,* 655 N.W.2d 320 (Minn.2003), that she contends shows that *Pecarina* was wrongly decided. According to Plaintiff, *Collins* stands for the proposition that claims brought under the consumer protection statutes against misrepresentations made to the public at large are by definition for the benefit of the public. The holding of *Collins* is not as broad as Plaintiff contends, nor is the decision particularly on point. *Collins* involved a lawsuit by students against misrepresentations made by their school in advertising to the public. That lawsuit was not brought under the wrongful death or other limiting statute. Unlike in *Collins,* the authority that gives rise to Plaintiff's lawsuit in this case specifically provides that any recovery is for the exclusive benefit of the surviving spouse and heirs. Minn.Stat. § 573.02, subd. 1. Thus, although there is no doubt that the misrepresentations at issue here were made to the public at large, that fact is beside the point. Plaintiff's claims are not for the public benefit because the Minnesota legislature has determined that wrongful death claims are not for the public benefit. Under the holding of *Ly,* Plaintiff's Consumer Fraud Act and False Advertising Act claims fail.

In addition, Plaintiff's claim under the Unlawful Trade Practices Act fails because it is not timely. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court previously noted that Plaintiff's consumer protection claims depend on the purchase of the product within the limitations period. (July 5, 2001, Order at 8.) In that Order, the Court refused to dismiss Plaintiff's consumer protection claims because the parties had not yet engaged in discovery on the issue of Mr. Tuttle's tobacco purchases. However, even assuming that Plaintiff can prove that Mr. Tuttle purchased smokeless tobacco between September 21, 1993, and October 11, 1993, she has no cause of action under the Unlawful Trade Practices Act unless those purchases were a substantial cause of Mr. Tuttle's injury. *See* Minn.Stat. § 325D.15 ("Any person damaged ... by reason of a violation of [the Unlawful Trade Practices Act] shall be entitled to sue...."); *Flom v. Flom,* 291 N.W.2d 914, 917 (Minn.1980) (requiring that the alleged tort be a "substantial cause" in bringing about the injury). Regardless of whether "Defendants' allegedly misleading statements could have contributed to [Mr.] Tuttle's decision to continue purchasing and using smokeless tobacco within [the limitations] period," (July 5, 2001, Order at 8), those statements are not actionable unless the purchases within the limitations period caused Mr. Tuttle's injury. As discussed above, the evidence shows that Mr. Tuttle had a cognizable manifestation of his injury long before Sept. 21, 1993. Any purchases of smokeless tobacco after that time did not substantially cause his injury. Plaintiff's Unlawful Trade Practices Act claim is untimely.

G. Common Law Fraud and Conspiracy

***8** Although the Court has determined that Plaintiff's common law fraud and conspiracy claims are untimely, for the sake of comprehensiveness the Court will address Defendants' alternative contention that those claims fail on their merits. In particular, Defendants assert that Plaintiff has failed to show that Mr. Tuttle heard any of the allegedly fraudulent statements or that he acted in reliance on those statements. If Plaintiff's common law fraud claim is dismissed, Defendants assert that her conspiracy claim also fails.

In the most recent Order in this case, the Court noted that Plaintiff's fraud claim would depend on her ability to prove that Mr. Tuttle relied on any of the allegedly fraudulent statements made by Defendants. Despite Plaintiff's recent affidavit, the "evidence" to which Plaintiff points does not support her burden to establish the reliance required by Minnesota law. In order to show reliance, Plaintiff must show "that [Mr.] Tuttle was aware of the allegedly fraudulent statements and that he relied on those statements to his detriment by continuing to use smokeless tobacco." (July 5, 2001, Order at 5.) In Plaintiff's deposition, she testified that she did not discuss any statements about the health risks of smokeless tobacco with Mr. Tuttle. She now claims that the Court should infer that Mr. Tuttle saw or read Defendants' statements about the health risks of smokeless tobacco because: (1) Mr. Tuttle tried to get Plaintiff to stop smoking based on information about the health risks of smoking; and (2) Mr. Tuttle continued to use smokeless tobacco. This inferential leap is too great.

In addition, Plaintiff now claims that Mr. Tuttle wanted to spread the word about smokeless tobacco because he was "deceived by the tobacco companies." (Pl.Aff.¶ 6.) The implication of this statement is that Mr. Tuttle read or heard Defendants' alleged misrepresentations and continued to use smokeless tobacco in reliance on those misrepresentations. There is no evidence of this in the record aside from Plaintiff's affidavit statement quoted above. While the Court must view the evidence in the light most favorable to Plaintiff, it is not required to adopt Plaintiff's characterizations of that evidence nor is it required to make illogical inferences from the evidence. The record is devoid of evidence of reliance. Plaintiff's common law fraud claim fails.

Plaintiff's fraud claim is the only intentional tort on which her claim of conspiracy can rest. Because the fraud claim fails, the conspiracy claim likewise fails. *Senart v. Mobay Chem. Corp.,* 597 F.Supp. 502, 505 (D.Minn.1984) (MacLaughlin, J.) (noting that civil conspiracy cannot stand alone but must be based on criminal act or intentional tort).

CONCLUSION

Pinkerton's separate Motion is granted in its entirety because there is no evidence that Pinkerton's product was a substantial cause of Mr. Tuttle's injuries. Likewise, Lorillard's separate Motion is granted because there is no evidence that the allegedly fraudulent statements made by STC can be attributed to Lorillard. STC's separate Motion is granted in part because there is no evidence that STC had a duty to Mr. Tuttle. National's separate Motion is denied to the extent that National challenges whether its product caused Mr. Tuttle's injury.

***9** Plaintiff's negligence, common-law fraud, conspiracy, and Unlawful Trade Practices Act claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were brought outside the statute of limitations and must be dismissed. Plaintiff's Consumer Fraud Act and False Advertising Act claims fail because Plaintiff's lawsuit will not benefit the public. Alternatively, all of Plaintiff's fraud claims, both common-law and statutory, fail because Plaintiff cannot show the essential element of reliance, and because her conspiracy claim depends on her fraud claim, the conspiracy claim likewise fails. The Court therefore dismisses all of Plaintiff's claims with prejudice.

Accordingly, for the foregoing reasons, and upon all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendant The Pinkerton Tobacco Company's Motion for Summary Judgment (Clerk Doc. No. 147) is GRANTED;
2. Defendant Lorillard Tobacco Company's Motion for Summary Judgment on Plaintiff's Common Law Fraud and Statutory Fraud Claims (Clerk Doc. No. 154) is GRANTED; and
3. Defendant National Tobacco Company's Motion for Summary Judgment (Clerk Doc. No. 156) is DENIED AS MOOT.
4. Defendant Smokeless Tobacco Council's Motion for Summary Judgment on Plaintiff's Negligence and Statutory Fraud Claims (Clerk Doc. No. 152) is GRANTED in part and DENIED AS MOOT in part;
5. All Defendants' Motion for Summary Judgment on Counts I, II, and VIII Based on Statute of Limitations (Clerk Doc. No. 143) is GRANTED;
6. All Defendants' Motion for Summary Judgment on Plaintiffs' Claims under Minnesota Consumer Protection Statutes (Clerk Doc. No. 145) is GRANTED;
7. All Defendants' Motion for Summary Judgment on Plaintiff's Common Law Fraud and Conspiracy Claims (Clerk Doc. No. 149) is GRANTED;

LET JUDGMENT BE ENTERED ACCORDINGLY.

Not Reported in F.Supp.2d, 2003 WL 1571584 (D.Minn.), Prod.Liab.Rep. (CCH) P 16,626

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT W

LEXSEE 2003 U.S. DIST. LEXIS 16187

**Timothy Gamradt and Carla Gamradt v. Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America**

**02-CV-816 (JMR/RLE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

***2003 U.S. Dist. LEXIS 16187; CCH Prod. Liab. Rep. P16,741***

**September 2, 2003, Decided**

**SUBSEQUENT HISTORY:** Affirmed in part and reversed in part by, Remanded by *Gamradt v. Fed. Labs., Inc., 380 F.3d 416, 2004 U.S. App. LEXIS 17995 (8th Cir. Minn., 2004)*

**DISPOSITION:** [*1] Motion for summary judgment granted.

**COUNSEL:** For TIMOTHY GAMRADT, CARLA GAMRADT, plaintiffs: Andrew Peter Engebretson, Engebretson Law Office, Duluth, MN.

For DEFENSE TECHNOLOGY CORPORATION OF AMERICA, defendant: Charles Bennett Bateman, Downs Reyelts Leighton Bateman & Hylden, Duluth, MN.

**JUDGES:** JAMES M. ROSENBAUM, United States Chief District Judge.

**OPINIONBY:** JAMES M. ROSENBAUM

**OPINION:**

ORDER

Plaintiff Timothy Gamradt worked as a prison guard for the United States Bureau of Prisons ("BOP"). Mr. Gamradt was injured on the job, during a training drill. He and his wife, Carla, bring this lawsuit seeking damages for those injuries.

Plaintiffs originally brought suit against three defendants: Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America. By stipulation of the parties, Federal Laboratories, Inc., and Mace Securities International have been dismissed. Defense Technology Corporation of America, the remaining defendant, moves for summary judgment. While plaintiffs prevail on a number of issues, defendant's summary judgment motion is granted.

I. Background

A. A Question of Names

This litigation involves [*2] two entities with confusingly similar names. The first is defendant Defense Technology Corporation of America ("DTC"), a Delaware corporation. It is a subsidiary of Armor Holdings, Inc., and does business in Casper, Wyoming. The second company is Defense Technology Corporation of America of Casper, Wyoming, ("DTC-Wyoming"), a Wyoming corporation. In 1996, DTC-Wyoming sold its assets to DTC. n1 Prior to its acquisition, DTC-Wyoming manufactured law enforcement security equipment, including black smoke grenades.

n1 The terms and circumstances of this acquisition are of some interest here, and are considered below.

B. Facts

For purposes of summary judgment, all facts are construed in favor of plaintiffs.

On June 2, 1998, Mr. Gamradt participated in a simulated hostage situation drill at the Federal Prison Camp in Duluth, Minnesota. During this drill, guards were equipped with various security tools, including two types of grenades: the first was a "flash bang" grenade which releases a flash of light accompanied [*3] by a loud noise; the second was a "black smoke" grenade which discharges a thick smoke-like substance designed to conceal approaching guards. During the drill, when the team member carrying the flash bang grenade went down, another guard lit a black smoke grenade. The smoke grenade missed its intended target, discharging its smoke cloud within a prison stairway. Plaintiff was in the hallway when the smoke was released and claims injury from the grenade's discharge. During the drill, none of the guards - including plaintiff - wore a gas mask or any other respiratory protection device.

Following the drill, Mr. Gamradt asked the BOP for information about the grenade. The BOP could not identify the grenade's precise manufacturer, but informed him that grenades were purchased from two suppliers -- DTC-Wyoming, and Federal Laboratories, Inc.

In order to resolve this matter, the Court must consider the purchase agreement between DTC and DTC-Wyoming. The purchase agreement contains a choice of law provision which requires the application of New York law. The purchase agreement specifies the assets and liabilities transferred, and provides that DTC would assume an enumerated list of DTC-Wyoming's [*4] liabilities. See Asset Purchase Agreement at 7; Schedule § 2.1(a)(ii). The purchase agreement further requires DTC-Wyoming to indemnify the purchaser, DTC, for any product-liability suits arising out of its prior dealings. DTC funded its acquisition using a combination of cash and shares of Armor Holdings, Inc.

II. Discussion

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See *Anderson, 477 U.S. at 248-49*; see also *Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992)*. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement [*5] is that there be no genuine issue of material fact." *Anderson, 477 U.S. at 247-48*. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. See *Celotex, 477 U.S. at 322*.

A. Choice of Law

Plaintiffs wish to invoke the purchase agreement's New York choice of law provision. As a result, the Court must first determine whether that provision governs here.

As a general rule, this Court, sitting in diversity, applies the substantive law of Minnesota, its forum state. Minnesota honors choice of law clauses. See *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997)* (citing *Hagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 47 (Minn. Ct. App. 1994)*). Under Minnesota law, a choice of law provision governs all contract and closely related tort claims between the contracting par-

ties. See *Northwest Airlines, 111 F.3d at 1392*. Plaintiffs here were clearly not parties to the purchase agreement or in privity [*6] with the contracting parties. Because this contract merely relates to certain of its signatories' potential liabilities in third-party tort suits, the contract's choice of law provision does not apply. See *T.H.S. Northstar Assocs. v. W.R. Grace & Co., 840 F. Supp. 676, 678 (D. Minn. 1993)* (finding contract's choice of law provision does not control dispute over whether that contract constituted a merger).

The Court finds the purchase agreement requires that New York law be applied in any dispute between its signatories. But this is not such a dispute; this case is simply a tort claim by a third-party arising out of incidents occurring in Minnesota. Accordingly, Minnesota law governs here.

B. Successor Liability

Having decided Minnesota law applies, the Court now turns to DTC's first ground for summary judgment. Defendant DTC argues that, because DTC-Wyoming manufactured and sold the smoke grenade in question, DTC-Wyoming - not defendant DTC - is liable.

Minnesota follows the traditional approach to successor liability: when, as here, one corporation sells or otherwise transfers assets to another, the receiving corporation is liable for the actions of the transferor [*7] corporation only to the extent provided by contract or by law. See *Minn. Stat. § 302A.661*; *Niccum v. Hydra Tool Corp., 438 N.W.2d 96, 98 (Minn. 1989)* (citing *J.F. Anderson Lumber Co. v. Myers, 296 Minn. 33, 206 N.W.2d 365, 368-69 (1973)*). A successor corporation currently engaged in the manufacture and sale of a product is not generally liable for products manufactured and sold before a change in corporate ownership. See *Niccum, 438 N.W.2d at 99-100*.

Having stated the general rule, the Court also notes that Minnesota recognizes four exceptions to the general rule for successor liability. The Minnesota Supreme Court has noted the following four circumstances where the exception applies:

> 1. Where the purchaser expressly or impliedly agrees to assume such debts.
>
> 2. Where the transaction amounts to a consolidation or merger of the corporation ("de facto merger").
>
> 3. Where the purchasing corporation is merely a continuation of the selling corporation.
>
> 4. Where the transaction is entered into fraudulently in order to escape liabilities such as debts.

*Id. at 98*. The question before the [*8] Court, then, is whether any of these exceptions apply.

The first exception recognizes corporate successor liability when the merging company expressly or impliedly agrees to assume the second company's existing liabilities, debts, or obligations. Here, the purchase agreement expressly waives tort liability for DTC and requires DTC-Wyoming to indemnify these claims. This exception does not apply.

The second exception, applied to consolidation or merger, includes an equitable exception to the bar against successor liability in the case of a de facto merger. DTC argues *Minn. Stat. § 302A.661, Subd. 4*, limiting transferee liability, is the sole method of imposing successor liability and that Minnesota does not recognize de facto merger.

Minnesota's courts, however, have held otherwise. While recognizing the exception, those courts have not precisely delineated its contours. In a number of unpublished opinions, Minne-

sota's Court of Appeals has provided guidance to those situations where de facto merger occurs. In doing so, they have applied a multi-factor analysis. The analysis asks:

> 1. Whether there is a continuation of the enterprise of the seller corporation, so that there [*9] is a continuity of management, personnel, physical location, assets and general business operation.
>
> 2. Whether there is a continuity of shareholders which results from the purchasing corporation paying for the acquiring asset with shares of its own stock, this stock ultimately coming to be held by the shareholders of the corporation so that they become a constituent part of the purchasing corporation.
>
> 3. Whether the seller corporation ceases its ordinary business operation, liquidates, and dissolves as soon as legally and practically possible.
>
> 4. Whether the purchasing corporation assumed the obligation of the seller ordinarily necessary for the continuation of normal business operations of the seller corporation.

See *Fine v. Schwinn Cycling Fitness, Inc., 2000 Minn. App. LEXIS 1292 *6-7 (Minn. Ct. App. Dec. 26, 2000)* (unpublished) (explaining multi-factor de facto merger test); see also *State v. Gopher Oil Co., 1995 Minn. App. LEXIS 1425, *6-9 (Minn. Ct. App. Nov. 21, 1995)* (unpublished) (citing *Sylvester Bros. Dev. v. Burlington Northern R.R., 772 F. Supp. 443, 447-48 (D. Minn. 1990))* (adopting the four factor [*10] analysis); *Costello v. Unipress Corp., 1996 Minn. App. LEXIS 291, *3-4 (Minn. Ct. App. March 12, 1996)* (unpublished); *New York Life Ins. Co. v. Landmark Dev. Corp., 1993 Minn. App. LEXIS 522, *7-9 (Minn. Ct. App. May 11, 1993)* (unpublished) (finding that a question of material fact exists when individual elements weigh in favor of each party); see also *Minn. Mining & Mfg. Co. v. Rynne, 661 F.2d 722, 724 (8th Cir. 1981)*; *Soo Line R.R. Co. v. B.J. Carney & Co., 797 F. Supp. 1472, 1483 (D. Minn. 1992)*. n2

> n2 While the opinions of the Minnesota Court of Appeals do not necessarily bind this Court, see *Angostura Int'l Ltd. v. Melemed, 25 F. Supp. 2d 1008, 1011 n.4 (D. Minn. 1998)* (citing *Haugen v. Total Petroleum, Inc., 971 F.2d 124, 126 (8th Cir. 1992)*, steadfast application of these principles suggests a persuasive and coherent position. This Court feels it appropriate to apply this de facto merger analysis.

Given [*11] the Minnesota Supreme Court's recognition of the de facto merger exception, and the Court of Appeals' frequent delineation of this analysis, this Court considers it likely the Minnesota Supreme Court would accept the de facto merger analysis. See, e.g., *Cieslukowski v. Norton Motors Int'l, Inc., 2002 U.S. Dist. Lexis 17229, *23-24 (D. Minn. Sept. 10, 2002)*; *T.H.S. Northstar Assocs., 840 F. Supp. at 678 (D. Minn. 1993)* (applying the four-element test).

Under this analysis, when analyzing a de facto merger, no single factor is dispositive. See *New York Life Ins. Co., 1993 Minn. App. Lexis 522, *3-4*. To prove a de facto merger, however, it is clear that a continuity of shareholders -- accomplished through a stock purchase -- is required. *Sylvester Bros., 772 F. Supp. at 448*. Here, DTC argues that in its acquisition of DTC-Wyoming's assets, DTC-Wyoming received only a minority share

and not a controlling interest in the successor. Given this fact, DTC claims the de facto merger exception is inapplicable as a matter of law. The Court rejects this argument. The rule does not require predecessor shareholders to maintain a controlling [*12] share; merely that they receive an equity interest. See *id.*

DTC also claims that, partially funding the acquisition of DTC-Wyoming with Armor Holdings, Inc.'s, shares, as opposed to DTC stock, bars a finding of de facto merger. The record presented to the Court, however, does not outline the business structure or parent/subsidiary relationship between Armor Holdings, Inc., and DTC. Given this ambiguity, the Court finds a question of fact exists as to the required continuity of shareholders. The existence of this fact question precludes summary judgment.

A continuation of management, personnel, physical location, and assets and operations demonstrates a de facto merger. See *T.H.S. Northstar Assocs., 840 F. Supp. at 679* (assuming the obligations necessary to continue another's business indicates a de facto merger). It is undisputed that, following the sale, DTC continued to sell and manufacture black smoke grenades, and that DTC retained DTC-Wyoming's telephone number, employees, and physical location as part of its business operation. It purchased DTC-Wyoming's good will, customer lists, accounts receivable, patents, trademarks, inventory, raw materials, finished [*13] goods, plant, property, equipment, and software. For purposes of summary judgment, a fact question remains regarding whether DTC continued the business following the acquisition of DTC-Wyoming.

The third factor asks whether the seller continued to operate following the merger. The Superior Court of Massachusetts, in *Farago v. Def-Tec. Corp., 2000 Mass. Super. LEXIS 441, *20 n.5, (Mass. Sept. 1, 2000)*, found DTC acted as the successor corporation to DTC-Wyoming. Certainly, that case turns on its own facts, but the determination of a sister court is illuminating.

DTC argues the purchase agreement's terms required DTC-Wyoming to continue to exist for three years after the sale in order to address product liability claims. The record, however, does not address whether DTC-Wyoming continued to do business thereafter. In Farago, the Massachusetts court found DTC-Wyoming continued to operation as XM Corporation, an international distributor of pepper spray products for Armor Holdings, Inc. Here, given DTC-Wyoming's sale of its assets to DTC, its agreement not to compete for five years thereafter, and the lack of evidence showing it has resumed business in grenade sales, [*14] the Court finds there is a fact question as to whether DTC-Wyoming ceased to operate following the sale of its assets.

Similarly, the Court considers whether DTC continued DTC-Wyoming's existing operations and filled its commitments. Following the sale of DTC-Wyoming's assets, DTC assumed control of the plant and continued to produce DTC-Wyoming products. Given these facts, a jury could find DTC continued DTC-Wyoming's business following the sale.

Plaintiffs ask the Court to apply the fourth exception, claiming the merger took place for fraudulent purposes. They argue this exception applies because DTC-Wyoming's business was losing money at the time of the sale. The Court finds, as a matter of law, that this fact - which is the only basis upon which plaintiffs seek to invoke the fraud exception - standing alone, cannot support allegations of wrongful or fraudulent purposes.

This case is easily distinguished from those situations where the Minnesota courts found improper transfer. In Huray, a successor company operated with the same directors, officers and employees as the predecessor company, and did not pay sufficient consideration for the assets purchased. See

*Huray v. Fournier NC Programming, Inc., 2003 Minn. App. LEXIS 620,* [*15] **17 (Minn. Ct. App. May 20, 2003)* (unpublished) (finding inadequate consideration evidence of fraud). The present transaction involved substantial payment to DTC-Wyoming's shareholders. There is similarly no evidence before the Court that this transaction was structured to avoid existing liability to the predecessor's creditors. *Id. at *10 n.4* (structuring to evade debts is fraudulent). Here, there is no evidence of a sham sale which created an identical corporation.

The Court cannot find fraud simply because a successful company acquired a faltering competitor. Ongoing companies, which have real business, real customers, and real assets, occasionally lose money. The fact that they lose money certainly affects whether a target is a desirable acquisition, but does not make the transaction a fraud. Here, there are simply no grounds upon which this Court could find this transaction anything but an arm's length transaction.

C. Was Any Duty Owed?

Even if plaintiffs prevail at trial on the issue of successor liability, their victory will be pyrrhic. Plaintiffs claim DTC failed to warn of risks associated with the use of the smoke grenade. The Court finds, as a matter of law, that [*16] there is not a duty to warn here.

In order to establish a prima facie case of failure to warn, a plaintiff must show: (1) there was a duty to warn about the risk in question; (2) the warnings given, if any, were inadequate; and (3) the lack of an adequate warning caused the plaintiff's injury. See *Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987)*. The existence of a duty to warn is a question of law. *Id.*

In Minnesota, a manufacturer has a duty to warn users of its products of any product-related dangers of which the manufacturer has actual or constructive knowledge. See *Mozes v. Medtronic, Inc., 14 F. Supp.2d 1124, 1129 (D. Minn. 1998)*. Although a manufacturer has a duty to warn of reasonably foreseeable dangers, there is no duty to warn if "the user knows or should know of potential danger." *Holowaty v. McDonald's Corp., 10 F. Supp. 2d 1078, 1084 (D. Minn. 1998)* (quoting *Minneapolis Soc. of Fine Arts v. Parker Klein Assoc. Architects, 354 N.W.2d 816, 821 (Minn. 1984)*, overruled an other grounds in *Hapka v. Paquin Farms, 458 N.W.2d 683 (Minn. 1990))*. Therefore, where the alleged danger is open [*17] and obvious, Minnesota courts do not require a warning. As one court explained, "there is certainly no usual duty to warn the purchaser that a knife or an axe will cut, a match will take fire, dynamite will explode, or a hammer will mash a finger." *Peppin v. W.H. Brady Co., 372 N.W.2d 369, 375 (Minn. Ct. App. 1985)*; see also *Hoeg v. Shore-Master, 1994 Minn. App. LEXIS 1074, 1994 WL 593919 *1 (Minn. Ct. App. 1994)* (unpublished) (no duty to warn of elastic properties of a spring); *Mix v. MTD Prods., Inc., 393 N.W.2d 18, 19 (Minn. Ct. App. 1986)* (no duty to warn of danger involved in reaching hand under running lawn mover); *Peppin, 372 N.W.2d at 375* (no duty to warn that aluminum conducts electricity).

The Court considers it significant that neither side has found a case suggesting a duty to warn for anti-riot explosive devices. The Court's research has been similarly unproductive. This strongly suggests the dangers posed by "civilian" versions of weapons designed for military use are open and obvious.

Because the dangers associated with a knife, axe, match and dynamite are obvious, Minnesota courts have determined there is no basis on which to [*18] assume that a warning would make the product safer. The Court finds that, as with the dangers attendant to a knife, axe or stick of dynamite, the dangers associated with a black smoke grenade are open and obvious.

The fact that an intentionally detonated smoke grenade would explode and discharge smoke was open and obvious. There is no evidence suggesting the condition and effect of the black smoke grenade were not visible or obvious to Mr. Gamradt or his colleagues during the training exercise. As plaintiffs' own brief states, "everyone of normal intelligence can understand that this smoke should not be dispensed in an enclosed area." Pl. Memo. at 19. Notice is not required of what one knows or reasonably should be expected to know -- i.e., that the smoke emitted from a black smoke grenade may be hazardous and should not be inhaled. DTC did not owe a duty to warn of the dangers associated with the black smoke grenade. n3

> N3 As the Court has explained, there is no duty to warn about an obvious hazard; here, the black smoke grenade. Because there was no duty, and no evidence of defendant's ignored evidence that a warning would necessary, there is no basis for finding an actual defect.

[*19]

Alternatively, the Court finds DTC was not compelled to warn, even if it is ultimately deemed a successor corporation. The law defines those successor corporations which have a duty to warn consumers about a predecessor's products. *Niccum, 438 N.W.2d at 100*. The considerations relevant to imposing this obligation include whether the successor:

> (1) assumed its predecessor's service contracts; (2) contracted to perform or actually performed service of the product at issue; (3) knew of defects in the product at issue; and (4) knew the location or the owner of the product at issue.

See id. Otherwise stated, if a successor has no knowledge of defects and no knowledge of the location of a product, there is no entity to warn and nothing to warn against.

While plaintiffs have asserted DTC had an ongoing duty to warn, they have introduced no evidence to support their position. In the absence of such evidence, there is no need for a trial on the point. See *Fed. R. Civ. P. 56(e)*. Beyond mere allegations, plaintiffs have not shown DTC knew of any actual defect -- or, indeed, that there was one -- in the particular black smoke grenade. Plaintiffs have [*20] similarly failed to provide any evidence showing DTC knew of the location of the black smoke grenade at issue or had any other ongoing relationship with plaintiff's employer. See *Costello, 1996 Minn. App. LEXIS 291, *6-7*. Finding no proof of failure to warn, DTC's motion for summary judgment on this point is granted.

D. Proof of Duty

Finally, DTC argues summary judgment is appropriate because plaintiffs have not designated an expert to testify about failure to warn. While it is true no such expert has been designated, the absence of an expert does not compel summary judgment. This is because there is a legal difference between causation - where expert testimony can be necessary - and duty. Whether a duty to warn existed is a legal question for the Court. See *Balder 399 N.W.2d at 81*. No specific type of evidence is needed for its proof. On the question of whether there is a legal duty:

> The court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability.

> On the other [*21] hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

See id. The Court understands plaintiffs' medical experts are prepared to testify that black smoke was detrimental to Mr. Gambradt's lungs. This is sufficient testimony on causation for purposes of summary judgment. Where, as here, there was an arguably clear link to the release of the smoke and plaintiff's injury, the Court cannot grant summary judgment.

III. Conclusion

Construed in a light most favorable to plaintiffs, the Court finds there was no duty to warn of dangers inherent in the use of black smoke grenades. The absence of a duty is fatal to a tort claim, because a breach of a legal duty is a central element. Accordingly, DTC's motion for summary judgment [Docket No. 26] is granted.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 2, 2003

JAMES M. ROSENBAUM

United States Chief District Judge

1248H0

********** Print Completed **********

Time of Request: March 07, 2006 06:41 PM EST

Print Number: 1862:87578092
Number of Lines: 267
Number of Pages:

Send To: CASEPULL, REED
REED SMITH - CUI
2 EMBARCADERO CTR STE 2000
SAN FRANCISCO, CA 94111-3922