# EXHIBIT Y

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey.
VITANZA
v.
WYETH, INC.
Decided Jan. 24, 2006.

**Background:** Consumers who used hormone replacement drug brought class action against drug manufacturer, alleging violations of the New Jersey Consumer Fraud Act and the Products Liability Act and seeking a court-administered medical monitoring program to provide diagnostic tests to detect breast cancer. Manufacturer moved to dismiss.

**Holding:** The Superior Court, Law Division, Higbee, J., held that consumers failed to allege that they suffered from a manifest injury that would entitled them to medical monitoring.

Motion granted.

**Products Liability 313A ⚷0**

313A Products Liability
Consumers who used hormone replacement drug failed to allege a manifest injury that could be directly related to their drug exposure and to an increased risk of further injury as required to obtain medical monitoring in product liability action against drug manufacturer; the consumers were not presently suffering from breast cancer or any other ill effects that were allegedly caused by the drug.

Defendants' Motion to Dismiss with Prejudice.

Lauren E. Handler, for Defendants.
John E. Keefe, Jr., Jonathan Auerbach, Martin J. D'Urso, for Plaintiffs.HIGBEE, J.

*MEMORANDUM OF DECISION ON MOTION*

*Pursuant to Rule 1:6-2(f)*

***1** Having carefully reviewed the papers submitted and any response filed, I have ruled on the above Motion as follows:

Defendants Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. (collectively, "Wyeth") bring this motion to dismiss with prejudice the medical monitoring claims in Counts I, II, and III of Plaintiffs' first amended complaint. Wyeth contends that plaintiffs Diana Vitanza and Sandra Zonca have failed to allege the fundamental elements of a medical monitoring claim under New Jersey law. Plaintiffs oppose this motion.

Plaintiffs filed a complaint in this matter alleging that they have suffered an ascertainable loss as a result of consuming the drug Prempro® , manufactured by defendants. According to the first amended complaint, Plaintiffs seek class certification for medical monitoring with a proposed class that consists of:

all persons in New Jersey who have taken the drug Prempro® , who are not presently suffering from breast cancer, but who as a result of consuming the drug are at increased risk of developing breast cancer.

Plaintiff's First Amended Complaint P. 2, ¶ 1. Plaintiffs allege the following three causes of action against defendants: 1) violation of the New Jersey Consumer Fraud Act (CFA), *N.J.S.A.* 56:8-1 et seq. (Knowing Concealment, Suppression, or Omission of Material Facts); 2) violation of the New Jersey Products Liability Act (PLA), *N.J.S.A.* 2A:58C-1 et seq. (Failure to Warn); 3) violation of the New Jersey Products Liability Act (PLA), *N.J.S.A.* 2A:58C-1 et seq. (Defective Design).

Plaintiffs primarily seek to establish a court-administered medical monitoring program, funded by defendants, to provide medical diagnostic tests for each member of the proposed class to detect breast cancer. Amended Complaint, P. 2. Plaintiffs seek a medical monitoring program that would include: 1) Locating persons who use or used Prempro® and notifying them of the potential harm from Prempro® ; 2) An epidemiological or data analysis component to detect secular trends of adverse health effects related to the class members' use of Prempro® , including population-based studies of and for the benefit of the class and the establishment of an adverse health effects registry; 3) Gathering and forwarding to treating physicians information related

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the diagnosis and treatment of injuries that may result from the use of Prempro® ; and 4) Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Prempro® users. Amended Complaint, P. 41. Plaintiffs specifically refer to the non-invasive procedures of "high definition ultrasound imaging, digital mammography, computer assisted detection, and/or magnetic resonance imaging, consultation with dedicated breast imagers and breast specialist, and more frequent mammography." Amended Complaint, P. 2.

Plaintiffs Vitanza and Zonca both allege that they are at a significantly increased risk of breast cancer as a result of taking Prempro® . Each plaintiff was first prescribed and began taking Prempro® in the mid-1900s and continued to use it on a regular basis until July 2002 when they learned that Prempro® allegedly caused serious adverse side effects. Amended Complaint, P. 3. Neither plaintiff has been diagnosed with breast cancer caused by use of Prempro® . *Id.* Plaintiffs argue that medical monitoring is justified because Prempro® places women at higher risk for contracting breast cancer. Amended Complaint, P.2. According to plaintiffs, medical testing and procedures exist that

***2** "can provide early detection and warning of breast cancer resulting from the ingestion of Prempro® and can thereby mitigate the resulting harm by fostering early diagnosis and treatment where such harmful conditions exist among plaintiffs and members of the class they seek to represent. Medical monitoring is calculated to facilitate the early diagnosis and treatment of disease among plaintiffs and class members so affected and to thereby improve the prognosis and likelihood of an improved health outcome for those people."

*Id.*

Defendants bring this motion to dismiss Plaintiffs' complaint with prejudice claiming that under New Jersey law medical monitoring is only allowed in products liability actions where a plaintiff has suffered a manifest injury. Defendants also argue that medical monitoring is not a remedy recognized by the Products Liability Act. Finally, defendants allege that plaintiffs may not recover damages for medical monitoring under this Court's reasoning in *Sinclair v. Merck & Co., Inc.,* ATL-L-3771-04-MT, slip op. (Law.Div. May 19, 2005).

Plaintiffs oppose this motion arguing that medical monitoring is available in the context of dangerous drugs and for plaintiffs with latent injuries. Plaintiffs also argue that medical monitoring is an available remedy under the Products Liability Act.

*BACKGROUND*

Wyeth, Inc. (collectively "Wyeth") is a Delaware corporation with a principal place of business in New Jersey. Amended Complaint, P. 7. Wyeth Pharmaceuticals (collectively "Wyeth") is a Pennsylvania corporation with a principal place of business in Pennsylvania. Amended Complaint, P. 8. Wyeth manufactures, promotes and distributes three estrogen or hormone replacement drugs known as Premarin® , Prempro® , and Premphase® . Amended Complaint, P. 14. Use of these drugs is also referred to as hormone replacement therapy. Amended Complaint, P. 17. Premarin® is an unopposed conjugated estrogen prescription drug that was first manufactured and marketed by Wyeth in 1942. Amended Complaint, P. 16. Unopposed conjugated estrogen is taken alone and not in conjunction with progestin. Amended Complaint, P. 17. Premarin® was approved by the Food and Drug Administration ("FDA") to treat women suffering from severe menopausal symptoms. Amended Complaint, P. 16.

In December 1994, the FDA approved Wyeth's petition to market Prempro® . Amended Complaint, P. 19. At that time, Prempro® consisted of separate tablets of Premarin® (0.625 mg) and a medroxyprogesterone acetate ("MPA") called Cyrcin (2.5 mg). Amended Complaint, P. 19. Prempro® was to be prescribed for post-menopausal women with uteri for the treatment of moderate to severe vasomotor symptoms associated with menopause, vulvar and vaginal atrophy, and the prevention of osteoporosis. Amended Complaint, P. 19.

In November 1995, the FDA approved the marketing of Prempro® (Premarin 0.625 mg/MPA 2.5 mg) in single-tablet form. Amended Complaint, P. 20. In January 1998, the FDA approved the marketing of Prempro® as 0.625 mg of Premarin® and 5 mg of MPA in single tablet form. Amended Complaint, P. 20.

***3** There are an estimated 50 million post-menopausal women in the United States. Amended Complaint, P. 21. Until July 2002, about six million American women took Prempro® . Amended Complaint, P. 23. Prempro® was and may still be the best selling hormone replacement therapy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

combination drug sold in the United States. Amended Complaint, P. 24. Prempro® has not been withdrawn from the market by the FDA.

In 1993, the National Institutes of Health and the National Heart, Lung and Blood Institute commenced the "Women's Health Initiative Clinical Trial and Observational Study." ("WHI"). Part of the study was designed to examine the effects of conjugated estrogen and progestin on the prevention of heart disease and hip factors along with risks associated with breast and colon cancer. Amended Complaint, P. 67. In 2002, an independent data and safety monitoring board reviewing the WHI data results concluded that the risk of breast cancer, increased risk of coronary heart disease, stroke and pulmonary embolism outweighed the benefits of reduced risk of fractures and colon cancer. Amended Complaint, P. 68-72.

According to some studies, combination estrogen and progestin therapy increases breast tissue density to a much greater degree than estrogen replacement therapy alone. Amended Complaint, P. 102-107. Increased breast tissue density allegedly impairs the accuracy of standard mammography. Amended Complaint, P. 105. Thus, women with increased breast tissue density allegedly must have access to enhanced screening technologies to detect breast cancer at an early stage. Amended Complaint, P. 106.

*ANALYSIS*

*R.* 4:6-2(e) allows a party to bring a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. Such a motion is based on the pleadings and if matters outside the pleadings are considered, the motion is to be treated as one for summary judgment. *R.* 4:5-2 provides that a pleading that asserts a claim for relief must contain a statement of the facts that the claim is based upon showing that the pleader is entitled to relief and a demand for judgment for the relief being sought. *R.* 4:5-7 provides that "[e]ach allegation of a pleading shall be simple, concise and direct, and no technical forms of pleading are required. Additionally, all pleadings shall be liberally construed in the interests of justice.

On a motion under *R.* 4:6-2(e), the complaint is to be thoroughly and liberally searched in order to determine if a cause of action can be garnered from the document, even if it is contained in an obscure statement, and an opportunity to amend should be given if necessary. *Printing Mart v. Sharp Electronics,* 116 *N.J.* 739, 746, 563 A.2d 31 (1989). This is especially so if the litigation is in its early stages with further discovery yet to be taken. *Id.* On a motion to dismiss, the plaintiff is accorded every reasonable inference and the motion "should be granted only in rare instances and ordinarily without prejudice. As such, 'if a generous reading of the allegations merely suggests a cause of action, the complaint will withstand the motion." ' *Smith v. SBC Communications Inc.,* 178 *N.J.* 265, 282, 839 A.2d 850 (2004) (*quoting F.G. v. MacDonell,* 150 *N.J.* 550, 556, 696 A.2d 697 (1997)).

***4** At this stage there is no dispute about the factual allegations being made or the appropriateness of class certification. The sole issue in this motion is whether New Jersey law allows medical monitoring as a form of relief to be extended to this type of case.

The New Jersey Supreme Court has decided, and the parties in this case rely on, three main cases on the issue of whether medical monitoring is a proper form of relief under New Jersey Law. These cases are *Ayers v. Township of Jackson,* 106 *N.J.* 557, 525 A.2d 287 (1987), *Mauro v. Raymark Industries, Inc.,* 116 *N.J.* 126, 561 A.2d 257 (1989), and *Theer v. Phillip Carey Co.,* 133 *N.J.* 610, 628 A.2d 724 (1993). The defendants also rely on this Court's opinion in *Sinclair v. Merck & Co., Inc.,* ATL-L-3771-04-MT, slip op. (Law Div. May 29, 2005).

*Ayers v. Township of Jackson,* 106 *N.J.* 557, 525 A.2d 287 (1987), was an environmental exposure or toxic tort case. [FN1] In *Ayers,* the plaintiffs brought a class action against Jackson Township under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1-1 to 12-3. The plaintiffs sought damages for contamination to their well water from toxic pollutants that leached into the local aquifer from a landfill established and operated by defendant.

FN1. Black's Law Dictionary defines a toxic tort as "A civil wrong arising from exposure to a toxic substance, such as asbestos, radiation, or hazardous waste. A toxic tort can be remedied by a civil lawsuit (usu. A class action) or by administrative action." (8th ed.2004). New Jersey law does not define "toxic tort" but does provide similar definitions for "environmental tort action ." *See N.J.S.A.* 2A:15-5.3(f); *N.J.S.A.* 2A:58C-1(b)(4).

The Court granted a medical monitoring remedy to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs. The Court noted that medical monitoring is equitable, consistent with established legal principles and in accord with a public health interest in monitoring victims of toxic exposure. *Ayers, supra* 106 *N.J.* at 603-4, 525 A.2d 287. Additionally, the Court found that allowing a remedy of medical monitoring and exposing polluters to significantly higher liability could have the benefit of preventing or limiting future illnesses. *Id.*

The Court specifically cited three policy reasons for granting medical monitoring. The Court wrote that medical monitoring was warranted because 1) the judiciary was the only avenue for recourse because of the lack of governmental response to compensating victims of toxic exposure. *Id.* at 581, 525 A.2d 287; 2) plaintiffs have difficulty in proving negligence in mass exposure tort cases because the "plaintiff bears the burden of establishing that the likelihood or severity of damage outweighs the cost defendant would incur for implementing precautionary measures." *Id.* at 584, 525 A.2d 287; and 3) plaintiffs have difficulty proving causation "because of the long latency period of illnesses caused by carcinogens or other toxic chemicals." *Id.* at 585, 525 A.2d 287. The Court recognized that toxic exposure cases are unique because in other types of tort cases causation is usually more "direct, immediate and observable." *Id .* at 586, 525 A.2d 287.

The Court ultimately held that:

the cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

***5** *Id.* at 606, 525 A.2d 287.

*Mauro v. Raymark Industries, Inc.*, 116 *N.J.* 126, 561 A.2d 257 (1989), was a case involving asbestos exposure. The plaintiff brought a claim against asbestos manufacturers for exposure through his employment as a repairman/plumber/steamfitter at a psychiatric hospital. The plaintiff developed bilateral thickening of both chest walls and calcification of his diaphragm prior to bringing the suit. Plaintiff alleged that he suffered a manifest injury and medical monitoring was the appropriate remedy for the increased possibility that he would contract lung cancer.

The Court granted a medical monitoring remedy to plaintiff after distinguishing a claim for enhanced risk from a claim for medical monitoring. *Mauro, supra,* 116 *N.J.* at 138, 561 A.2d 257. The Court reasoned that the plaintiff could obtain medical surveillance damages on the basis that plaintiff's existing injury may lead to the development of a future injury. *Id.* The Court specifically stated that "[e]xposure to toxic chemicals may sustain a claim for medical surveillance damages under the criteria set forth in *Ayers* ." *Id.*

*Theer v. Phillip Carey Co.*, 133 *N.J.* 610, 628 A.2d 724 (1993), was another case involving asbestos exposure. The plaintiff brought a claim against asbestos manufacturers for exposure in the course of handling her deceased husband's work cloths. Plaintiff's husband died of lung cancer allegedly caused by asbestos. Plaintiff claimed that she was at risk of contracting an asbestos-related disease and was entitled to medical monitoring.

The Supreme Court, in explaining its previous rulings in *Ayers* and *Mauro,* wrote that the medical monitoring in *Ayers* was tailored for the unique damages resulting from "exposure to toxic chemicals" and that remedy was "not easily invoked." 133 *N.J.* at 627, 628 A.2d 724. The Court also noted that *Mauro* extended *Ayers* to product-liability actions in limited context.

The Court did not grant a medical monitoring remedy to plaintiff in this case. The Court wrote that:

"medical surveillance damages may be awarded only if a plaintiff reasonably shows that medical surveillance is required because the exposure caused a distinctive increased risk of future injury, and would require a course of medical monitoring independent of any other that the plaintiff would otherwise have to undergo."

*Id.* at 627, 628 A.2d 724. According to the Court, medical monitoring was not available to plaintiff because her exposure to asbestos was minimal and indirect and her chronic smoking made it too difficult to determine the need and cause for future medical surveillance. The Court concluded that:medical surveillance damages are not available for plaintiffs who have not experienced direct and hence discrete exposure to a toxic substance and who have not suffered an injury or condition resulting from that exposure and whose risk of cancer cannot be limited

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and related specifically and tangibly to that exposure.

***6** *Id.* at 628, 628 A.2d 724.

The parties repeatedly cite *Sinclair v. Merck & Co., Inc.* in their briefs. In *Sinclair,* the plaintiffs sought medical surveillance in the form of medical diagnostic tests to detect unrecognized myocardial infarctions ("UMI") and other latent or unrecognized injuries. They also sought a follow-up Epidemiology Study of cardiovascular events in former VIOXX users compared to a matched population of nonusers to further evaluate post-cessation risk. *Sinclair, supra* slip op. at 2.

This Court applied the facts of *Sinclair* to the precedent established in *Ayers, Mauro,* and *Theer* and held that medical monitoring was not an appropriate remedy. This Court ultimately ruled that the injuries alleged in *Sinclair* were more "direct, immediate and observable" than the latency period of cancer causing agents involved in toxic torts. *Id.* at 12, 628 A.2d 724. The Court wrote that the plaintiffs in *Sinclair* would not suffer the same causation issues and lack of alternative remedies as with the victims of a toxic tort. *Id.* at 13-14, 628 A.2d 724. The Court also ruled that the need to deter polluters and provide relief to victims with no legislative remedy also was not present. *Id.*

Defendants rely heavily on *Sinclair* in their briefs but the instant case is distinguishable from *Sinclair* in at least one way. In *Sinclair,* plaintiffs sought medical monitoring in the form of tests to determine if they already experienced a UMI. This Court noted that the UMIs would have already occurred and would "not display 'the long latency period typical of illnesses caused by chemical pollutants ...' *Ayers, supra,* 106 *N.J.* at 582, 525 A.2d 287 ." *Id.* at 12, 525 A.2d 287. In the instant case, plaintiffs are seeking medical monitoring for breast cancer which does have has "the long latency period typical of illnesses caused by chemical pollutants ..." *Id.*

*FINDINGS*

Under the New Jersey Supreme Court precedent established in *Ayers, Mauro,* and *Theer,* medical surveillance is an appropriate remedy where a plaintiff suffers a manifest injury from exposure to a toxic substance or where a reasonable fact finder can determine that there is a direct correlation between the exposure and any future medical costs. The significance of *Theer* as it relates to *Ayers* and *Mauro* is that it asserts again that medical monitoring is a unique type of relief. It continues to limit the extend the New Jersey Supreme Court is willing to extend medical monitoring relief.

In *Ayers,* the New Jersey Supreme Court allowed medical monitoring as a form of relief in environmental tort actions but noted that there were numerous arguments against allowing such a judicially created remedy. *Ayers, supra,* 106 *N.J.* at 581-582, 525 A.2d 287. *Mauro* expanded the *Ayers* holding in that medical monitoring could now be provided to plaintiffs who were exposed to asbestos products. *Theer* acknowledged this expansion but clearly indicated that medical monitoring was a difficult remedy to invoke and should only be applied in a product-liability context in very limited circumstances. *Theer, supra,* 133 *N.J.* at 627, 628 A.2d 724. This holding is consistent with the cautious approach that the Court took in *Ayers.*

***7** Plaintiffs in this case are asking this Court to find that medical monitoring should apply to a pure product liability action where there is no present symptom of injury. However, the New Jersey Supreme Court has yet to apply a medical monitoring remedy to a pure products liability action where the Product Liability Act applies.

Under the Products Liability Act, a "product liability action" is "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory of the underlying claim, except actions for harm caused by a breach of an express warranty." *N.J.S.A.* 2A:58C-1(b)(3). The New Jersey Products Liability Act does not apply to environmental tort actions. *N.J.S.A.* 2A:58C-6. The Products Liability Act defines an "environmental tort action" as "a civil action seeking damages for harm where the cause of the harm is exposure to toxic chemicals or substances, but does not mean actions involving drugs or products intended for personal consumption or use." *N.J.S.A.* 2A:58C-1(b)(4). [FN2] Therefore, the Products Liability Act applies to Prempro® and the Products Liability Act limits compensation to harms as defined by *N.J.S.A.* 2A:58C-1(b)(2). *N.J.S.A.* 2A:58C-1(b)(2) defines "harm" as meaning "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." Costs of medical surveillance or enhanced risk of injury are notably not included in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the definition of harm nor is even significant possibility of potential physical illness.

FN2. Similarly, New Jersey's comparative law statute defines "environmental tort action" as "a civil action seeking damages for personal injuries or death where the cause of the damages is the negligent manufacture, use, disposal, handling, storage or treatment of hazardous or toxic substances." *N.J.S.A.* 2A:15-5.3.

It is important to note that both *Mauro* and *Theer* involved asbestos-related claims. New Jersey courts have found that asbestos exposure constitutes an environmental tort action as defined by the PLA and *N.J.S.A.* 2A:15-5.3. *See Ripa v. Owens-Corning Fiberglas Corp.*, 282 *N.J.Super.* 373, 399, 660 A.2d 521 (App.Div.) *certif.. denied* 142 *N.J.* 518 (1995); *Stevenson v. Keene Corp.*, 254 *N.J.Super.* 310, 312, 603 A.2d 521 (App.Div.1992) *aff'd by* 131 *N.J.* 393, 620 A.2d 1047 (1993) (affirming the finding of the trial judge that "the exception to the amendments for 'environmental tort actions', provided in *N.J.S.A.* 2A:15-5.3(d), includes asbestos torts"). Thus, while the New Jersey Supreme Court has indicated that medical monitoring may be necessary in asbestos actions, it has not extended the remedy to pure product-liability actions under the PLA.

Plaintiffs' amended complaint also alleges, *inter alia,* that Wyeth violated the Consumer Fraud Act and that as a result of these violations, Plaintiffs "have been significantly exposed to toxic chemicals and thereby suffer an increased risk of breast cancer, heart attack, stroke and blood clots, serious latent diseases, making the periodic examination of such persons both reasonably and medically necessary." (Am.Compl.¶ 151). The Consumer Fraud Act is intended to prohibit:

***8** the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby ... *N.J.S.A.* 56:8-2

The Consumer Fraud Act only allows for recovery of economic damages. *See Gennari v. Weichert Co. Realtors*, 148 *N.J.* 581, 612-613, 691 A.2d 349 (1997) (stating reluctance to interpret the Consumer Fraud Act as allowing non-economic damages without a clear expression of intent by the legislature). *N.J.S.A.* 56:8-19 provides that an action may be brought under the Consumer Fraud Act by "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act ..."

The New Jersey Supreme Court has explained that medical monitoring constitutes economic damages. Medical monitoring is a remedy that provides "specific monetary damages measured by the cost of periodic medical examinations." *Ayers, supra,* 106 *N.J.* at 591, 525 A.2d 287. Additionally, the Third Circuit has stated "[t]he medical monitoring claim is a claim for monetary damages. Plaintiffs are asking for money because, allegedly, their exposure to PCBs requires them to bear the costs associated with increased medical surveillance. This is an economic injury ..." *In re Paoli R.R. Yard PCB Litig. v. Southeastern Pa Trans. Auth.*, 916 F.2d 829, 861 (3d Cir.1990) (finding that medical monitoring is allowed under Pennsylvania law if there is a "reasonable need" for medical surveillance). There is no case granting medical monitoring under the CFA.

Under *Ayers,* plaintiffs can recover for medical monitoring provided they can prove such surveillance is reasonable and necessary based upon (1) "the significance and extent of exposure to chemicals"; (2) "the toxicity of the chemicals"; (3) "the seriousness of the diseases for which individuals are at risk"; (4) "the relative increase in the chance of onset of disease in those exposed"; and (5) "the value of early diagnosis." *Id.* At 606. This test was derived specifically for environmental tort actions, not for a production liability consumer fraud case. What is clear is that medical monitoring is to be applied sparingly.

This Court finds that medical monitoring is not an appropriate cause of action or remedy for the injuries alleged in this matter. FN3 The main reasons that prompted the New Jersey Supreme Court to allow medical monitoring in *Ayers* was that the nature of environmental tort actions made proving and establishing causation extremely difficult for plaintiffs and also, the lack of a governmental response to providing compensation for victims of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

toxic exposure forced a need for a judicial remedy. Ayers, supra, 106 N.J. at 581-586, 525 A.2d 287. None of these reasons are present in this particular matter. This proposed class action is one of many types of action against Wyeth where injured plaintiffs may receive compensation.

FN3. It is important to note that if only the *Ayers* test were to be applied here, the motion would have to be denied. Accepting the pleadings as true, every element of the *Ayers* test would be satisfied and thus the claim would be appropriate. In determining that medical monitoring is not available in this particular case, this Court finds that *Ayers,* as clarified by *Theer,* holds that medical monitoring as a cause of action or remedy should be limited rather than expanded.

***9** Prempro® was approved by the Federal Drug Administration and numerous tests have been performed on the drug prior and subsequent to its release in the market. Millions of documents have been produced in relation to Prempro® litigation, and many of these documents contain the information on the science and pharmacological effects of the drug. Additionally, Plaintiffs will have their own doctors who prescribed Prempro® , to testify as witnesses, to the health of the individual plaintiff before and after taking the drug. The Plaintiffs in this litigation will know exactly how long they took Prempro® and the dosage. They also know the chemical composition. In a toxic waste site case, the plaintiffs frequently don't know how long they've been exposed to the chemicals, the level of their exposure or even all the chemicals they were exposed to and may never prove causation. Medical monitoring was designed to fill this gap which doesn't exist here.

Plaintiffs were prescribed Prempro® by their physicians before taking it. Prempro® is still on the market and still has FDA approval for sale. The plaintiffs would not have the same causation issues and the lack of alternative relief suffered by victims of a toxic tort. The need to deter polluters and provide relief to victims who have no legislative remedy isn't present here.

Plaintiffs in this case seek medical monitoring for cancer and cancer is the type of latent disease that medical monitoring is designed for as a remedy under *Ayers.* However, plaintiff's claim is a product liability claim. Under *Mauro* and *Theer,* a plaintiff must allege a manifest injury that can be directly related to their exposure and an increased risk of further injury to obtain medical monitoring in a product liability action. In the instant case, plaintiffs have not alleged a manifest injury and specifically state that they are seeking medical monitoring for women who are not presently suffering from breast cancer. The facts of this case fall beyond the bounds of the precedent established in *Ayers* and its progeny.

The Supreme Court of New Jersey has allowed a cause of action for medical monitoring in only limited types of cases. Medical monitoring is a remedy that "is not easily invoked" and this Court declines to find the New Jersey Supreme Court would extend medical monitoring to the proposed class in this particular situation.

This court is very aware of the fact that medical monitoring is an important and unique type of claim and remedy. It is judicially created relief that is and was appropriate for certain cases. The Supreme Court has found it applicable to both traditional environmental claims and asbestos claims. There is no specific Supreme Court case finding it appropriate in a products liability/consumer fraud action.

The motion to dismiss all claims for medical monitoring is granted.

*XXXX* Order is attached.

N.J.Super.,2006.
Vitanza v. Wyeth, Inc.
Not Reported in A.2d, 2006 WL 462470 (N.J.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT X

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
In re FACTOR VIII OR IX CONCENTRATE BLOOD PRODUCTS LITIGATION
**No. 93 C 7452, MDL 986.**

March 1, 2005.

Elizabeth Joan Cabraser, Lieff, Cabraser & Heimann, San Francisco, CA, for Plaintiffs.

Richard L. Berkman, Dechert, Price & Rhoads, David S. Shrager, Shrager, McDaid, Loftus, Flum & Spivey, Philadelphia, PA, Douglas F. Fuson, Sidley Austin Brown & Wood LLP, Pamela L. Gellen, Chicago, IL, Duncan Barr, O'Connor, Cohn, Dillon and Barr, San Francisco, CA, Ross M. Goodman, Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, FL, David I. Bell, Knapp, Petersen & Clarke, P.A., Glendale, CA, Jack I. Redhair, Chandler Tullar Udall & Redhair, Tucson, AZ, Dianne M. Nast, Roda & Nast, P.C., Lancaster, PA, Claudia A. Hunter, Hunter & Associates, P.C., Boston, MA, Debra Ann Thomas, Debra A. Thomas PC, Glen Ellyn, IL, for Defendant.

*MEMORANDUM OPINION*
*(Ruling on Motion for Class Certification)*

GRADY, J.

***1** The court has under advisement the motion of the "second generation" of plaintiffs in this multidistrict litigation to certify a class pursuant to Fed.R.Civ.P. 23(c)(4)(A) for the trial of particular issues the resolution of which plaintiffs believe will facilitate the further handling of the litigation. [FN1]

FN1. The second generation of plaintiffs are residents of foreign countries (mostly in Europe and South America) who claim to have contracted HIV and/or the Hepatitis C virus ("HCV") from the use of defendants' factor concentrates distributed in plaintiffs' home countries. Unlike the first generation claims, which centered on ordinary negligence, the second generation claims are based upon an allegation that, after defendants knew their factor concentrates could transmit viruses, and that heat treatment would substantially reduce the risk of viral contamination, they nonetheless sold untreated product on the foreign markets. Thus, the gravamen of the second generation claims is not negligence but fraud and other intentional misconduct. The cases were filed in several federal districts and transferred here as part of the original MDL-986, designated "Second Generation."

To understand the questions presented, it is necessary to refer to the proceedings in the "first generation" cases, which are no longer pending. [FN2] We assume familiarity with our opinion certifying a negligence class, *Wadleigh v. Rhone-Poulenc Rorer, Inc.*, 157 F.R.D. 410 (N.D.Ill.1994), and the opinion of the Seventh Circuit issuing a writ of mandamus to decertify the class, *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir.1995) ( *"R.P.R."* ). The ultimate question presented by the present motion is whether the particular issues proposed by the plaintiffs can properly be certified for trial in light of the Seventh Circuit's ruling, which, of course, is the law of the case.

FN2. Those cases were ultimately settled, and the settlement was affirmed. *In Re Factor VIII or IX Concentrate Blood Prod. Litig.*, 159 F.3d 1016 (7th Cir.1998).

There were three reasons why the Court of Appeals found our class certification of the negligence issue to have been an abuse of discretion. The first reason was the Court's "concern with forcing these defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability, when it is entirely feasible to allow a final, authoritative determination of their liability ... to emerge from a decentralized process of multiple trials" *R.P.R.*, 51 F.3d at 1299. The Court referred with apparent approval to the fact that "Judge Friendly, who was not given to hyperbole, called settlements induced by a small probability of an immense judgment in a class action 'blackmail

settlements." ' *Id.* at 1298.

The core of our certification ruling in the first generation cases was our belief that "the definition of ordinary negligence is substantially identical in all jurisdictions." *Wadleigh,* 157 F.R.D. at 419. Therefore, a class trial of the negligence issue (excluding issues of proximate cause and damages) would be dispositive of the negligence claim if defendants prevailed and useable collaterally in other jurisdictions in the event of a plaintiffs' verdict. We noted that if for any reason the verdict of the jury would not be useable for collateral purposes in a particular jurisdiction, "that would not detract from the efficiency of using the verdict in those cases and jurisdictions where it would be entitled to collateral effect." *Id.* at 426.

The Court of Appeals disagreed, giving as a second reason for its mandamus order its finding that in fact the definition of ordinary negligence differed substantially from jurisdiction to jurisdiction, so that a class verdict on the issue would be of little use in any event. *R.P.R.,* 51 F.3d at 1300-1302. The Court remarked that, in place of individual trials, "the district judge proposes to substitute a single trial before a single jury instructed in accordance with no actual law of any jurisdiction--a jury that will receive a kind of Esperanto instruction, merging the negligence standards of the 50 states and the District of Columbia." *Id.* at 1300.

***2** The third concern of the Court was what it saw as a Seventh Amendment problem, in that subsequent juries addressing the issues of comparative negligence and proximate cause would have to reexamine the negligence finding of the class jury. "Both issues overlap the issue of the defendants' negligence." *Id.* at 1303. As the Court explained, "the right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them ... and not reexamined by another finder of fact." *Id.*

Plaintiffs have drafted some specific questions they believe can be submitted to a Rule 23(c)(4)(A) class jury without violating *R.P.R.* Before examining those questions, we will deal with a threshold matter raised by the defendants concerning the proper use of Rule 23(c)(4)(A). They contend that before "particular issues" can be certified under Rule 23(c)(4)(A), there must first be a determination that the class meets the requirements of Rule 23(b)(3), including predominance of common questions of law or fact over questions affecting only individual members of the class. Defendants rely on the *Castano* footnote, [FN3] and we concede that the footnote has gained a following. But we are not persuaded by it. *Castano* is not an interpretation of Rule 23(c)(4)(A) but a simple rejection of its language that "an *action* may be brought or maintained as a *class action* with respect to *particular issues....*" Fed.R.Civ.P. 23(c)(4)(A) (emphasis added). We agree with the interpretation found in such authorities as 7A Charles Alan Wright & Anthony R. Miller, *Federal Practice and Procedure* § 1778 at 546 (3d. ed.2004) which commented that "[e]ven though a court decides that the common questions do not predominate for purposes of Rule 23(b)(3) ... the court always should consider the possibility of determining particular issues on a representative basis as permitted by Rule 23(c)(4)(A) ... whenever that might prove efficient and economical." *See also Gunnells v. Healthplan Servs., Inc.* 348 F.3d 417, 439-40 (4th Cir.2003); *Chiang v. Veneman,* 385 F.3d 256, 267 (3d Cir.2004); *Robinson v. Metro-North Commuter Railroad Co.,* 267 F.3d 147, 167 n. 12 (2d Cir.2001); *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996); *In re Tetracycline Cases,* 107 F.R.D. 719, 726-27 (W.D.Mo.1985); *Emig v. Am. Tobacco Co.,* 184 F.R.D. 379, 395 (D.Kan.1998).

FN3. *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n. 21 (5th Cir.1996).

Plaintiffs argue that a single determination of certain material facts affecting liability would be superior to hundreds of individual trials in which the same factual issues would be presented over and over again to a series of separate juries. We agree with this as a general proposition, but we must recognize that it is the same argument the Court of Appeals rejected in *R.P.R.* Plaintiffs realize the problem, but are confident their plan would not run afoul of *R.P.R.* We asked them to draft, in support of their motion, a list of ten questions that would be strictly factual, would not involve any legal component and would, if decided by a jury, materially advance the litigation.

***3** Plaintiffs filed a brief that included their proposed ten questions; defendants filed a response, criticizing each of the questions; plaintiffs filed a reply containing another set of the ten questions they thought were responsive to defendants' criticisms; defendants filed a surreply and finally, plaintiffs filed an additional response.

When plaintiffs submitted their revised set of ten questions, they did not withdraw the original set.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

They left it up to the court to decide which, in each instance, is the better question.

The parties are in agreement that for a Rule 23(c)(4)(A) class to be certified, there must first be compliance with the basic requirements of Rule 23(a)--numerosity, commonality, typicality and adequacy of representation. *See* Fed.R.Civ.P. 23(a). Defendants do not argue numerosity, but they contest every other element of Rule 23(a), contending that there are no questions of law or fact common to the class, that the claims of the representative parties are not typical of the putative class and that the representative parties will not adequately protect the interests of the class. Plaintiffs dispute each of defendants' contentions and argue that the class clearly meets each of the Rule 23(a) requirements.

Even if plaintiffs are correct as to their compliance with Rule 23(a), the ultimate question on their certification motion is whether their proposed Rule 23(c)(4)(A) class would pass muster under *R.P.R.* We therefore proceed to that question and defer the matter of Rule 23(a) compliance.

*Discussion*

These are the particular issue questions plaintiffs have submitted.

*Question # 1*

*By what date did Defendant ____ know that HT factor concentrate products were significantly less likely to transmit AIDS than non-HT products?*

*[Original Version] By what date did Defendant know that heat-treated (HT) factor concentrate products were significantly safer than non-HT products with respect to the risk of transmission of [the agent that causes] AIDS?*

Both versions of the question suffer from the fact that "significantly" calls for a determination according to some legal standard, probably a negligence standard. It would bring into play concepts of foreseeability and causation as well as legal duty. For instance, what if the jury were to find that HT concentrate was 1% less likely to transmit the virus? Would this be "significantly less likely?" Would HT concentrate be "significantly safer than non-HT products?" The jury would have to be told what standard determines "significance" of a risk, and that is a matter which would vary with the jurisdiction.

Neither version of question number one is usable as submitted. They each contain too much "legal overlay," a phrase used by plaintiffs in one of their briefs which seems an apt description of the problem.

*Question # 2*

*By what date could Defendant ____ have developed and used a treatment process to make its factor concentrate products significantly less likely to transmit viruses?*

***4** *[Original version] By what date could Defendant ________ have developed and used a heat-treatment process in the manufacture of factor concentrate products that was effective in reducing the risk of transmitting viral infectious agents?*

Both versions of this question ask what defendant "could" have done, another question that could only be answered by reference to some legal standard, probably ordinary care. What if defendant could have developed the process only by having extraordinary foresight as to the need for it and using extraordinary ingenuity in developing it? Is that what is meant by "could?" Or does "could" imply a more forgiving standard? The jury would have to be told something about the degree of care the law requires, and this would hinge on the issue of foreseeability. This "legal overlay" would vary from state to state, according to the holding of *R.P.R.*, and the question is therefore unsatisfactory.

It is true that the original version of the question did not use "significantly less likely," but rather, referred to a process that was "effective in reducing the risk." But what does "effective" mean? Reducing the risk by 10%? Or would it have to be by more than 50%? The word would have to be defined, or, better yet, a more concrete question would have to be devised. The same problem affects the word "reducing." Reducing by how much?

Question number 2 is not usable.

*Question # 3*

*By what date could Defendant ___ have developed and used a Solvent Detergent (SD) process to make its factor concentrate products significantly less likely to transmit HCV?*

*[Original version] By what date could Defendant _______ have developed and used a Solvent Detergent (SD) process in the manufacture of its factor concentrate products that was effective in reducing the risk of transmitting viral infectious agents?*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The problems are identical to those we found in questions 1 and 2, and question 3 is therefore not useable.

*Question # 4*
*By what date did Defendant ____ know that a SD process could be used to manufacture factor concentrate products that were significantly less likely to transmit lipid viruses, including HCV?*

*[Original version] By what date did Defendant ________ know that SD processes significantly reduced or eliminated the risk of the transmission of lipid viruses, including HCV, in factor concentrate products?*

The same legal overlay problems prevent the use of this question.

*Question # 5*
*Did Defendant ___ manufacture factor concentrate products from pooled plasma obtained from donors who this Defendant knew were significantly more likely to have a viral infection than the general population of potential available donors?*

*If yes,*

*a. During what inclusive dates were these factor concentrate products sold?*

*b. Did Defendant __________ know that such donors' plasma was significantly more likely to transmit infections to patients who used its factor concentrate products?*

```
Yes ______    No ______
```

***5** *c. Should Defendant ___ have known that such donors' plasma was significantly more likely to transmit infections to patients who used its factor concentrate products?*

*[Original version] Did Defendant __________*

*manufacture factor concentrate products from pooled plasma obtained from donors that this Defendant knew were at significantly greater risk for viral infections than the general population of potential available donors?*

```
Yes ______    No ______
```

*If yes,*

*a. during what inclusive dates were the products made from such pooled plasma sold? and*

*b. did Defendant __________ know that such donors' plasma significantly increased the risk of transmitting infections to patients who used its factor concentrates?*

```
Yes ______    No ______
```

*c. should Defendant ____ have known that such donors' plasma significantly increased the risk of transmitting infections to patients who used its factor concentrates?*

Again, the word "significantly" pervades this question and would require the court to instruct the jury in an "Esperanto" fashion that would violate *R.P.R.*

*Question # 6*
*Did Defendant ___ accurately inform people with hemophilia and their treaters about the dangers of factor concentrate products manufactured from donor pools that included high risk groups?*

*[Original version] Did Defendant __________ adequately inform or warn the medical communities in the United States and elsewhere about the relative safety of factor concentrate manufactured from donor pools that included high risk groups?*

The original version, asking whether the defendant "adequately" informed or warned could be answered only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with reference to what would constitute "adequate," a legal question that could vary from jurisdiction to jurisdiction.

The revised version substitutes "accurately," but we agree with defendants that the question is too vague to be useful. Information could be accurate in some respects but inaccurate, (for instance, incomplete) in others, and the legal significance of the inaccuracies would usually depend upon whether they related to material matters. Simply asking whether something was not "accurate" does not do the job. The inquiry would have to be phrased in terms of whether the defendant gave notice of matters as to which, under the law of a particular jurisdiction, it was obliged to give notice (assuming it had the necessary information itself).

This question is not useable.

*Question # 7*

*By what date did Defendant ____________ have reasonable evidence of an association between the use of factor concentrate products and AIDS in persons with hemophilia who used such products?*

*a. Did Defendant _________ fail accurately to inform people with hemophilia and their treaters of the association between the use of factor concentrate products and AIDS after the date specified in the answer to the previous question?*

Yes ______ No ______

***6** *b. If yes, during what inclusive dates did Defendant __________ fail accurately to inform people with hemophilia and their treaters of the association between the use of factor concentrate products and AIDS?*

*[Original version] By what date did Defendant _________ have reasonable evidence of an association between infusion of blood factor concentrates and diagnosis of AIDS in persons with hemophilia who used such products?*

*a. Did Defendant _________ fail to adequately warn of the risk of AIDS after the date specified in the answer to the previous question?*

Yes ______ No ______

*b. If yes, during what inclusive dates did Defendant ___________ fail to adequately warn of the risk of AIDS?*

We see a number of problems in both versions of this question. "Reasonable evidence" would be "reasonable" only with reference to some duty of inquiry, which could vary among jurisdictions. Some definition of "reasonable" would have to be given in order for the question to be answered.

Secondly, what is meant by an "association?" [FN4] Again, the word would have to be defined, and the definition would involve the substantive law of some jurisdiction.

FN4. We recall the position of the tobacco companies years ago that the statistics on smoking and cancer showed merely an "association," not a causal relationship.

The original question uses the word "adequately," and the subparts of the revised question use the word "accurately," both of which are problematic as we have indicated above.

Question number 7 is not useable.

*Question # 8*

*Did Defendant _________ make statements that it knew were false, or fail to disclose important information that it knew was true, concerning the likelihood of viral transmission by untreated factor concentrate products manufactured by Defendants in comparison to any of the following alternative treatments:*

HT factor concentrate products Yes ______ No ______

SD-treated factor concentrate products Yes ________ No

cryoprecipitate Yes ______ ______ No ______

factor concentrate products made with plasma from non-U.S. sources Yes ________ No ______

*If the answer is "yes" to any of the above, during what inclusive dates did such false statements and/or failures to disclose occur?*

*[Original version] Did Defendant ________ misrepresent or conceal the risk of viral transmission by untreated concentrate products manufactured by Defendants in comparison to any of the following alternative treatments: [see list of treatments in Supplemental Memorandum]*

The revised version is too vague to be suitable for a special interrogatory. Reference to "statements," without describing the specific statements alleged by plaintiffs to have been false, and "important information," without specifying the information, would leave the jury adrift and deprive its answer to the question of any collateral value. There would be no way of knowing what "information" or which "statements" were the basis of the verdict.

***7** The original version is actually somewhat better, in that it identifies the information allegedly misrepresented or concealed. However, it is still unsatisfactory in that it fails to define the "risk" that is contemplated by the question. For the question to be material, the risk would have to be great enough to trigger a legal duty, and how great is that? We think the jury would have to be told what they are looking for in terms of the quantum of risk, and that would involve a matter of substantive law.

Question number 8 is not useful.

Question # 9

*(No revisions)*

*Did Defendant ________ agree with any other defendant to act together to:*

*a. keep untreated concentrated blood products on the market after Defendant ________ knew of the risk that such products transmitted HIV?*

Yes ______ No ______

b. avoid recalls of such products? Yes ______ No ______

*c. engage in "delaying tactics" with regard to implementation of steps to reduce the risk of HIV contamination of the products?*

Yes ______ No ______

d. refuse to warn of the risk of transmission of HIV by concentrated blood products? Yes ______ No ______

*e. If the answer is "yes" to any of the above,*

*When did Defendant ________ make this agreement?*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*During what inclusive dates did Defendant _________ engage in this conduct?*

The introductory phrase, "[d]id the defendant _______________ agree with any other defendant" has the surface appearance of simplicity, but it is not so simple. The question is addressed to the issue of conspiracy, and what is meant by an "agreement" under the law of conspiracy would have to be defined for the jury in order for their answers to the question to be meaningful. Express agreement is not required in any jurisdiction we are aware of, and a conspiracy is ordinarily proved by circumstantial evidence. The jury would have to be given the law on this point in order to understand the question. Defendants argue that the law of conspiracy differs from jurisdiction to jurisdiction, and, while we are not persuaded by their argument, we were similarly unpersuaded about their argument concerning "negligence" ten years ago. We think it likely that the Seventh Circuit would find a particular issue question addressed to whether the defendants "agreed" to something to be a question that would not lead to a collaterally useful answer.

The subparts of the question use some of the words and phrases we have found troublesome in the preceding questions: "knew of the risk;" "reduce the risk;" "warn of the risk."

Question number 9 is not useable.

*Question # 10*

*Did Defendant _________ continue to ship untreated factor concentrate products:*

a. after it was able to produce HT-treated factor concentrate products? Yes _____ No _____

***8** *If yes, during what inclusive dates? __________*

b. after it was able to produce SD-treated factor concentrate products? Yes _________ No _____

*If yes, during what inclusive dates? _____________*

*c. after it began to sell HT-treated factor concentrate products anywhere in the world?*

Yes _____ No _____

*If yes, during what inclusive dates? _____________*

*d. after it began to sell SD-treated factor concentrate products anywhere in the world?*

Yes _____ No _____

*e. after it started to ship HT- or SD-treated factor concentrate products to each foreign country?*

*If yes, for how long? _____________*

*Did Defendant _________ continue to ship untreated factor concentrate:*

*a. after it was able to produce HT- or SD-treated factor concentrate?*

Yes _____ No _____

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*If yes, for how long?* ____________

*b. after it began to sell HT- or SD-treated factor concentrate anywhere in the world?*

Yes _____ No _____

*If yes, for how long?* ____________

*c. after it started to ship HT- or SD-treated factor concentrate to each foreign country?*

Yes _____ No _____

*If yes, for how long?* ____________

*[Original version]*

*d. If the answer to any of the above is "yes", did the conduct of Defendant* ____________

*i. show an indifference to or a reckless disregard of the health or safety of others?*

Yes _____ No _____

*ii. involve repeated actions?*

Yes ________ No ________

*iii. involve intentional trickery, malice, or deceit?*

Yes ________ No ________

We agree with defendants that subparagraph (d) of the original version implicates substantive legal questions and would therefore be impermissible under *R.P.R.* Plaintiffs acknowledge there may be merit to the argument and their revised version omits subparagraph (d).

What we have left, however, seems unlikely to be a question that would materially advance the litigation. The various subdivisions have to do with whether a defendant sold non-treated concentrate after it was "able" to produce, or in fact did produce, treated concentrate and whether it continued to ship untreated concentrate after it began selling treated concentrate. These questions are certainly material to plaintiffs' case, in that they relate directly to their allegation that defendants "dumped" untreated concentrate, but we doubt that the questions, standing alone, are concerned with matters that are truly in dispute. It is hard to believe that there will be a factual disagreement about when each defendant began manufacturing treated concentrate and when it ceased shipping untreated concentrate. We realize this is a subject of the ongoing MDL discovery, but we anticipate that the result will be substantial agreement.

***9** In any event, submitting question 10 to a Rule 23(c)(4)(A) jury would not yield an answer to the major question of what the defendant *knew* at the times in question when it was distributing untreated and treated concentrate. A jury determination that a defendant shipped untreated concentrate after it was "able" to produce treated concentrate, or in fact shipped treated concentrate, would not establish that defendant knew the distribution of untreated concentrate was a dangerous practice. A subsequent jury would have to undertake that inquiry quite apart from any determination of the class jury in regard to dates. What would be needed, in order to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

flesh out question 10 and make it useful collaterally, would be a companion question about what the defendant knew at the times in question. A class jury's answer to that question, spliced to their answers to the timing questions, could have a major impact on the case. If the answers indicated that a defendant began treating its concentrate in an effort to avoid HIV contamination, but nonetheless continued to sell untreated concentrate derived from the same kinds of sources, those findings would obviously be relevant to the determinations of a subsequent jury. On the other hand, should the findings of the class jury favor the defendant on these issues, the defendant would be in a position to argue for a judgment in its favor as to all members of the class.

We think it would be possible to draft such a "knowledge" question to go along with portions of question 10, and thereby create useful issues for a class jury that would not violate either the Esperanto or Seventh Amendment aspects of *R.P.R.* There is a passage in *R.P.R.* that we find instructive in this regard. In discussing the desirability of individual trials as opposed to a class trial of particular issues, the Court stated:

> If in the course of individual litigations by HIV-positive hemophiliacs juries render special verdicts that contain findings *which do not depend on the differing state standards of negligence*--for example a finding concerning the date at which one or more of the defendants learned of the danger of HIV contamination of the blood supply--these findings may be given collateral estoppel effect in other lawsuits, at least in states that allow "offensive" use of collateral estoppel. In that way the essential purpose of the class action crafted by Judge Grady will be accomplished.

*R.P.R.* 51 F.3d at 1302 (emphasis added). The Court was not proposing the exact phrasing of an acceptable special verdict, but neither did it indicate any unease about the language it used. It had no trouble with "learned" or "danger," and we think the remarks of the Court are a basis for confidence that a suitable question concerning knowledge--that would not depend upon the different laws of different jurisdictions--could be drafted. We have suggested "know," whereas the quoted passage from *R.P.R.* uses "learned." We think the two are interchangeable, but, to be on the safe side, a special verdict could be drafted using the exact language of *R.P.R.*, inquiring as to when a defendant "learned of the danger of HIV contamination." We will not take the time to draft such a verdict, however, because there is a larger problem that overhangs this discussion.

* * *

***10** Assuming that a slightly reworked question number 10, combined with a strictly factual question concerning defendants' knowledge, could be submitted to a class jury without violating the Esperanto and Seventh Amendment aspects of *R.P.R.*, we would have a special verdict with potential class-wide significance, regardless of which way the jury answered the questions. But that very potential brings us to the first reason given by the majority in *R.P.R.* for its mandamus order--the undue pressure the class trial would bring upon the defendants to settle the individual claims.

It is true that the Court emphasized the "great likelihood that the plaintiffs' claims, despite their human appeal, lack legal merit. This is the inference from the defendants' having won 92.3 percent (12/13) of the cases to have gone to judgment." *Id.* at 1299. The Court indicated that this was part of the reason for its refusal to allow a class jury:

> This jury, jury number fourteen, may disagree with twelve of the previous thirteen juries--and hurl the industry into bankruptcy. That kind of thing can happen in our system of civil justice (it is not likely to happen, because the industry is likely is settle--whether or not it really is liable) without violating anyone's legal rights.

*Id.* at 1300. In this passage, the Court is saying that the Rule 23(c)(4)(A) certification itself would force the settlement even before the class trial were held. The mere prospect of a plaintiffs' verdict in the Rule 23(c)(4)(A) trial would exert the influence.

The final question, then, is whether there could be a Rule 23(c)(4)(A) certification in this case that would not violate the "undue pressure" holding of *R.P.R.* We think the answer is probably no. It is true that, unlike the first generation negligence cases, there has been no series of defense victories in individual cases that would indicate a weakness in plaintiffs' position. As far as we know, there has been no verdict of any kind in the second generation cases. But we do not read *R.P.R.* as limited to the situation where the proposed plaintiff class has a weak position on the merits of the litigation. In fact, the logic of the "undue pressure" argument is even stronger where plaintiffs have a strong case on liability: the prospect of a plaintiffs' verdict in the (c)(4)(A) trial would be greater, and therefore the pressure on defendants to settle rather than go to trial would be stronger.

It is our duty to apply *R.P.R.* as we understand it. The result is that we must deny the certification motion on the ground that, under *R.P.R.*, certification would place undue settlement pressure on the defendants. [FN5]

> FN5. Pursuant to the new Rule 23(f), plaintiffs have the opportunity to seek leave to appeal this ruling. *See* Fed.R.Civ.P. 23(f).

*CONCLUSION*

Plaintiffs' Motion to Certify a Class Pursuant to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fed.R.Civ.P. 23(b)(3) and 23(c)(4)(A) for the Trial of Certain Particular Issues is denied.

**Motions, Pleadings and Filings (Back to top)**

- 2005 WL 2611124 (Trial Pleading) Answer of Defendant Bayer Corporation to Complaint for Damages and Injunctive Relief (Aug. 04, 2005)

- 2005 WL 2610743 (Trial Pleading) Answer of Defendant Bayer Corporation to Complaint for Damages and Injunctive Relief (Aug. 03, 2005)

- 2005 WL 1129481 (Trial Pleading) Complaint for Damages and Injunctive Relief (1) Fraudulent Omission and Concealment (2) Strict Products Liability (3) Breach of Implied Warranty (4) Negligence (5) Negligence Per Se (6) Wrongful Death and Survival Action (Apr. 25, 2005)

- 2005 WL 1129482 (Trial Pleading) Complaint for Damages and Injunctive Relief (1) Fraudulent Omission and Concealment (2) Strict Products Liability (3) Breach of Implied Warranty (4) Negligence (5) Negligence Per Se (Apr. 25, 2005)

- 2005 WL 1129477 (Trial Pleading) Complaint for Damages and Injunctive Relief (1) Fraudulent Omission and Concealment (2) Strict Products Liability (3) Breach of Implied Warranty (4) Negligence (5) Negligence Per Se (6) Wrongful Death and Survival Action (Apr. 22, 2005)

- 2005 WL 1129478 (Trial Pleading) Complaint for Damages and Injunctive Relief (1) Fraudulent Omission and Concealment (2) Strict Products Liability (3) Breach of Implied Warranty (4) Negligence (5) Negligence Per Se (6) Wrongful Death and Survival Action (Apr. 22, 2005)

- 2005 WL 1129479 (Trial Pleading) Complaint for Damages and Injunctive Relief (1) Fraudulent Omission and Concealment (2) Strict Products Liability (3) Breach of Implied Warranty (4) Negligence (5) Negligence Per Se (Apr. 22, 2005)

- 2005 WL 1129480 (Trial Pleading) Complaint for Damages and Injunctive Relief (1) Fraudulent Omission and Concealment (2) Strict Products Liability (3) Breach of Implied Warranty (4) Negligence (5) Negligence Per Se (Apr. 22, 2005)

- 2005 WL 694898 (Trial Pleading) Complaint for Damages and Injunctive Relief (Feb. 11, 2005)

- 2005 WL 694815 (Trial Pleading) Complaint for Damages and Injunctive Relief (Feb. 04, 2005)

- 1:93cv07452 (Docket) (Dec. 07, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.