Only the Westlaw citation is currently available.

Superior Court of New Jersey,
Appellate Division.
INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL # 68 WELFARE FUND, Plaintiff-Respondent,
v.
MERCK & CO., INC., Defendant-Appellant.

Argued Jan. 31, 2006.
Decided March 31, 2006.

SYNOPSIS
On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-3015-03.

Christopher G. Mirchie and John H. Beisner argued the cause for appellant (Dechert LLP, Attorneys; Diane P. Sullivan and Richard Jasaitis, III, on the brief).

Christopher A. Seeger argued the cause for respondent, International Union of Operating Engineers Local # 68 Welfare Fund (Seeger, Weiss, LLP, attorneys; Mr. Seeger and David R. Buchanan, on the brief).

Michael Dore argued the cause for respondent Pharmaceutical Research & Manufacturers of American (Lowenstein Sandler, attorneys; Mr. Dore and Rosemary E. Ramsay, of counsel and on the brief).

Porzio, Bromberg & Newman, attorneys for amicus curiae, Product Liability Advisory Council, Inc. (Hugh F. Young, Jr., of counsel; Anita Hotchkiss, Linda Pissott and Michael Rowan, on the brief).

Theodore M. Lieverman, of the Philadelphia Bar, admitted pro hac vice, argued the cause for amici curiae, AARP, American Federation of State, County & Municipal Employees, and Center For Medical Consumers, Central New York Citizens In Action, Citizen Action of New York, Commonwealth Care Al/alliance, Inc., Florida Chain, Gray Panthers of Sacramento, Health Care For All, Lynn Health Task Force, Medicare Rights Center, New Jersey Citizen Action, New Jersey PIRG Law & Policy Center, Pennsylvania Employees Benefit Trust Fund, Prescription Access Litigation Project, United Senior Action of Indiana, Elaine Kleinman, and Ronald Martin (Spector, Roseman & Kodroff; Hagens, Berman, Sobol, Shapiro; and Christopher M. Cosley, attorneys; Mr. Lieverman, Thomas M. Sobol, Steve W. Berman, Elizabeth A. Fegan and Christopher Cosley, on the brief).

Before Judges LEFELT, R.B. COLEMAN and SELTZER.

***1** The opinion of the court was delivered by

LEFELT, J.A.D.

Plaintiff, International Union of Operating Engineers Local # 68 Welfare Fund, is a joint union-employer Taft-Hartley trust fund, organized and operating in New Jersey as a third-party payor sponsoring a healthcare benefits plan, which provides

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prescription drug coverage to its members and is administered by Horizon Blue Cross/Blue Shield of New Jersey. Plaintiff accused the maker of the prescription drug Vioxx, Merck & Co., a New Jersey corporation, of misrepresenting the safety of Vioxx as well as concealing information relating to serious health risks associated with the drug thereby violating New Jersey's Consumer Fraud Act (the Act), *N.J.S.A.* 56:8-1 to -20. [FN1] Plaintiff claims that, had Merck not committed fraud in violation of the Act, it and all third-party payors in the United States would not have paid to cover the high cost of Vioxx (also known as rofecoxib) because its purported safety and cost-effectiveness would have been revealed as false. We granted leave to appeal after Judge Higbee certified a nationwide class of plaintiffs under *R.* 4:32-1, thereby allowing plaintiff to sue Merck in New Jersey on behalf of itself and all third-party payors in the fifty states and the District of Columbia who have paid any person or entity for the purchase of Vioxx since May 1, 1999, when Vioxx was approved by the Federal Food & Drug Administration (FDA) for "the relief of signs and systems of osteoarthritis [degenerative joint disease], management of acute pain in adults, and treatment of primary dysmenorrhea [difficult and painful menstruation]." [FN2] We affirm.

FN1. A corporation is a "person" entitled to sue under the Act. *N.J.S.A.* 56:8-1(d); *Dreier Co. v. Unitronix Corp.,* 218 *N.J.Super.* 260, 271-72 (App.Div.1986); *Hundred East Credit Corp. v. Eric Schuster Corp.,* 212 *N.J.Super.* 350, 355-59 (App.Div.), *certif. denied,* 107 *N.J.* 60 (1986) (corporations may sue as "consumers" under the Act). We are uncertain whether plaintiff Trust Fund is organized as a corporation. In any event, because the issue is outside the scope of our grant of Merck's motion seeking leave to appeal, we do not review Judge Higbee's prior decision concluding that third-party payors are consumers under the Act.

FN2. The Class Action Fairness Act, which became effective on February 18, 2005, applies only to civil actions commenced on or after that date. *Pub.L. No.* 109-2, § 9, 119 *Stat.* 4 (2005). Thus, the federal law does not apply to this complaint, which was filed on October 30, 2003. (The medical definitions bracketed in the quotation are from *Stedman's Medical Dictionary* 385, 895 (22nd Edition 1972)).

I.

Before we address the specific class action questions confronting us, we explain some of the basic facts, terms, and concepts necessary to understand the dispute. Plaintiff alleges that while attempting to market and sell Vioxx, Merck fraudulently misrepresented and suppressed material information regarding the drug and its comparative safety and efficacy as compared with traditional competitors. According to plaintiff, third-party payors across the nation were specifically targeted with this false marketing, advertising, and promotion in an attempt to justify the high cost that was being charged for the new drug. Plaintiff claimed that Vioxx was introduced "at a wholesale cost of approximately $72 for a 30-day supply. In contrast, traditional [competitor pain medications] wholesaled for $9.00 or less for the same 30-day supply."

Besides Taft-Hartley funds like plaintiff,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

third-party payors of health benefit plans can be health maintenance organizations (HMOs), self-insured employers, insurance companies, and governments on the federal, state, and local levels. The plaintiffs' class Judge Higbee approved consists of all "third-party non-government payors [in all States and the District of Columbia] who have paid any person or entity for the purchase of [Vioxx]."

As with most health care plans that provide prescription drug benefits, plaintiff's plan utilizes a drug "formulary," which lists prescription and non-prescription drugs and the extent to which they are covered under the plan. For instance, a drug listed on the formulary may be paid for in full or partially by the plan while drugs not listed must be paid for entirely by the patient.

***2** To place drugs on the formulary, third-party payors rely upon the services of prescription benefit managers, or PBMs. According to plaintiff's expert, "roughly 95% of all patients with drug coverage receive benefits administered through [PBMs]. PBMs manage approximately 70% of the 3 billion prescriptions filed in the United States each year[.]" In particular, in 2002, 65% of the prescriptions that were handled by PBMs were processed by four dominant companies: Merck-Medco (22%), Advance PCS (18%), Walgreen's Health Initiatives (13%), and Express Scripts (12%)."

The PBMs use pharmacy and therapeutics committees (P & T Committees) to develop and maintain the formulary of approved drugs. The P & T Committees consist of actively practicing physicians, pharmacists, and other healthcare professionals. Although the P & T Committees may operate in different fashion and perhaps even consider some different information, the overriding goals are to evaluate a drug's effectiveness, safety, and cost.

Merck's expert pointed out that different drug prescription plans often provide different levels of coverage and benefits for the same drug. For example, when disclosures occurred regarding potential cardiovascular risks associated with Vioxx, some plans moved Vioxx from the tier it shared with Celebrex, a competitor of Vioxx, to a higher tier, thus increasing the patient co-pay for Vioxx, and discouraging its use. Other plans recommended additional restrictions such as requiring prior authorization and still others made no changes following the disclosure of the cardiovascular risks associated with Vioxx.

In any event, Merck voluntarily withdrew Vioxx from the market on September 30, 2004. The company's decision was effective immediately and ostensibly based, at least in part, on a three-year clinical trial that disclosed "an increased risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking Vioxx compared to those taking [a] placebo." Thus, this appeal involves the time period from May 1999, when the drug was introduced, until it was withdrawn at the end of September 2004.

II.

Basically, the issue framed for review by Merck's interlocutory appeal is whether Judge Higbee properly certified a nationwide class in this matter and correctly found that the common issues among all members of the class predominated and that resolution of the entire consumer fraud dispute was subject to New Jersey's Act.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Preliminarily, before we detail the principles governing class actions in New Jersey, we note that our review standard focuses on whether the judge has abused her discretion. *Muise v. GPU, Inc.,* 371 *N.J.Super.* 13, 29-30 (App.Div.2004). Thus, for example, Judge Higbee's decisions certifying the nationwide class of plaintiffs and finding that common issues of law and fact predominate are reviewed on this basis. *See In re Cadillac V8-6-4 Class Action,* 93 *N.J.* 412, 436-39 (1983). The judge's legal decisions, however, including her choice of New Jersey law to govern the entire class, is reviewed de novo. *See Manalapan Realty v. Tp. Comm.,* 140 *N.J.* 366, 378 (1995).

***3** As another preliminary matter, we note, as did the motion judge, that class certification should generally not be denied based on the complaint's merits. *Olive v. Graceland Sales Corp.,* 61 *N.J.* 182, 189 (1972). In fact, plaintiff's allegations must be considered to be true and accorded "every favorable view." *Delgozzo v. Kenny,* 266 *N.J.Super.* 169, 181 (App.Div.1992) (quoting *Blackie v. Barrack,* 524 *F.2d* 891, 901 n. 17 (9th Cir .1975), *cert. denied,* 429 *U.S.* 816, 97 *S.Ct.* 57, 50 *L. Ed.*2d 75 (1976), and *Riley v. New Rapids Carpet Center,* 61 *N.J.* 218, 223 (1972)). The question is not whether plaintiff can prevail on its claims, but whether the prosecution and defense of these claims are best addressed on a class-wide basis. *Riley, supra,* 61 *N.J.* at 226-28. Thus, in reviewing Judge Higbee's decision, we assume that plaintiff will be able to prove the serious and extensive allegations of fraud allegedly perpetrated by Merck.

Under New Jersey's class action rules, there are four general prerequisites to such an action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class," and finally, "(4) the representative parties will fairly and adequately protect the interests of the class." *R.* 4:32-1(a).

Besides satisfying the general prerequisites, the class action applicant must also meet an additional requirement. *See R.* 4:32-1(b)(1),(2) and (3). Here, the additional requirement at issue is whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *R.* 4:32- 1(b)(3).

There is no challenge in this appeal to Judge Higbee's finding that the trial of this matter presents common questions of law and fact. These common questions include, for example, whether Merck committed consumer fraud; whether Merck concealed or suppressed material information concerning Vioxx's safety and efficacy; whether Merck engaged in deceptive or misleading promotional campaigns designed to induce P & T Committees to place Vioxx on their formularies and have third-party payors pay for the drug; and whether, as a result of Merck's misrepresentations and omissions, third-party payors were damaged.

In fact, Merck and the amici curiae supporting its position, including Pharmaceutical Research & Manufacturers of America and Product Liability Advisory Council, Inc., do not challenge, on appeal, Judge Higbee's determination that the proposed class meets any of the general prerequisites to a class action under *R.* 4:32-1(a). They do not contest numerosity of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parties, common questions of law or fact, typicality of the claims or defenses, or adequate representation of the class by plaintiff. *Ibid.*

***4** Instead Merck, supported by the amici, challenges only whether the trial judge correctly found that common questions predominate and that a class action would be superior to other methods of adjudicating this controversy. *R.* 4:32- 1(b)(3). In support of its position, Merck argues that the consumer fraud laws of the various third-party payors' home states must be applied to evaluate their claims of fraud against Merck and that each third-party payor must separately establish causation and ascertainable loss. According to Merck, therefore, the common questions do not predominate over questions affecting each individual third-party payor, certification of the class must be reversed, and regular trial procedures utilized to dispose of each third-party payor's claims. *See Saldana v. City of Camden,* 252 *N.J.Super.* 188, 196-97 (App.Div.1991).

Plaintiff, along with the American Association of Retired Persons and other amici, strongly disagree with Merck's position and contend that the common issues do predominate and that a class action is the preferred method of resolving this dispute. Amici further argue that Merck seeks to "defeat class certification" solely to "make it less likely that class members will be able to effectively and efficiently challenge [Merck's] conduct in any court."

We explain our disagreement with Merck's position by first addressing in Part III, whether individual causation or ascertainable loss proof requirements override the predominance of the common questions of law and fact that all parties agree are present. We then address in Part IV whether the trial court correctly held that the New Jersey Consumer Fraud Act shall apply to all claims of the entire nationwide class.

III.

New Jersey's Act was enacted "to protect [the consumer] against fraudulent and unconscionable practices in the sale of consumer goods and services." *Marascio v. Campanella,* 298 *N.J.Super.* 491, 500 (App.Div.1997). The Act imposes liability upon any person who uses "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission [.]" *N.J.S.A.* 56:8-2.

Unlawful practices under the Act "fall into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 17 (1994). If the alleged violation is an affirmative act, it is not necessary to prove that the defendant intended to commit the unlawful act. *Id.* at 17-18; *see Fenwick v. Kay Am. Jeep, Inc.,* 72 *N.J.* 373, 378 (1977) (concluding that intent is not required when defendant affirmatively omits information required to be disclosed by regulation). If the alleged violation involves an omission, as contrasted with an affirmative act, then the plaintiff must show that the defendant acted with knowledge and intended to commit the deception. *Cox, supra,* 138 *N.J.* at 18. While not involved in this case, any violation of a regulation does not require a showing of intent as the violation constitutes strict liability. *Ibid.* "The capacity to mislead is the prime ingredient of all types of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consumer fraud." *Id.* at 17 (citing *Fenwick, supra,* 72 *N.J.* at 378).

***5** The Act is intended to be applied liberally, *Lemelledo v. Beneficial Mgmt. Corp. of Am.,* 150 *N.J.* 255, 268 (1997), and "has three main purposes: to compensate the victim ...; to punish the wrongdoer through the award of treble damages ...; and, by way of the counsel provision, to attract competent counsel to counteract the community scourge of fraud[.]" *Lettenmaier v. Lube Conn.,* 162 *N.J.* 134, 139 (1999) (internal citations omitted). Thus, the Act seeks "not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices." *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 12 (2004) (citing *Cox, supra,* 138 *N.J.* at 21). "The available legislative history demonstrates that the Act was intended to be one of the strongest consumer protection laws in the nation." *New Mea Const. Corp. v.. Harper,* 203 *N.J.Super.* 486, 501-02 (App.Div.1985) (citing *Skeer v. EMK Motors, Inc.,* 187 *N.J.Super.* 465, 471-73 (App.Div.1982) (internal quotations omitted)).

Furthermore, we prefer that consumer fraud class actions "be liberally allowed where consumers are attempting to redress a common grievance under circumstances that would make individual actions uneconomical to pursue." *Varacallo v. Mass. Mut. Life Ins. Co.,* 332 *N.J.Super.* 31, 45 (App.Div.2000). The purpose of class certification is to "save time and money for the parties and the public and to promote consistent decisions for people with similar claims." *In re Cadillac, supra,* 93 *N.J.* at 430-31 (citing *Fed.R.Civ.P.* 23 Advisory Committee Note, 39 *F.R.D.* 98, 102-03 (1966)). There is also "little doubt that the New Jersey Legislature intended its Consumer Fraud Statute to apply to sales made by New Jersey sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside New Jersey." *Boyes v. Greenwich Boat Works, Inc.,* 27 *F.Supp.*2d 543, 547 (D.N.J.1998).

The Act permits recovery, however, only by persons, whether or not New Jersey residents, who suffer "any ascertainable loss." *N.J.S.A.* 56:8-19. "As a prerequisite to the right to bring a private action," under the Act, "a plaintiff must be able to demonstrate that 'he or she suffered an 'ascertainable loss ... as a result of the unlawful conduct.' " *Theidemann v. Mercedes-Benz,* 183 *N.J.* 234, 246 (2005) (internal citations and quotations omitted)).

Here, Merck claims that Judge Higbee erred in certifying the class action because each plaintiff "would have to establish that Merck's alleged misrepresentations and omissions caused individual doctors to prescribe Vioxx and individual P & T Committees to include Vioxx on health plan formularies." The class action litigation format is inferior to individual lawsuits, according to Merck, because all of the P & T Committees relied on differing factors in reaching their conclusions on formulary placement.

***6** To establish consumer fraud in this case, plaintiff must prove either that Merck affirmatively misrepresented a fact material to the placement of Vioxx on a formulary or that Merck omitted a material fact knowing and intending that others would rely on the omission to place the drug on their formularies. *See Fenwick, supra,* 72 *N.J.* at 377. Proof of actual reliance upon the fraud by P & T Committees or third-party payors would not be necessary. The Act permits a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

private civil action by "[a]ny person who suffers any ascertainable loss ... as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act [.]" *N.J.S.A.* 56:8-19.

While common law fraud "requires proof of reliance[,] consumer fraud requires only proof of a causal nexus between the [misrepresentation or] concealment of the material fact [by a defendant] and the loss," suffered by "any person." *Varacallo, supra,* 332 *N.J.Super.* at 43; *N.J.S.A.* 56:8-2; *see also Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 607-08 (1997). It is not necessary to prove that each class member specifically relied upon Merck's omissions or misrepresentations. *See Union Ink Co. v. AT & T Corp.,* 352 *N.J.Super.* 617, 646 (App.Div.), *certif. denied,* 174 *N.J.* 547 (2002).

Plaintiff must prove only that its ascertainable loss was "attributable to conduct made unlawful by the [Act]." *Thiedemann, supra,* 183 *N.J.* at 246 (citing *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 472-73 (1988) (citing *Daaleman v. Elizabethtown Gas Co.,* 77 *N.J.* 267, 271 (1978))); *N.J.S.A.* 56:8-19. It is not necessary that the wrongful conduct be the sole cause of the loss, but merely that it be a cause. *Varacallo, supra,* 332 *N.J.Super.* at 48.

As Judge Higbee explained, plaintiff alleged "that Merck has engaged in a long-term, widespread, uniform pattern of deception to cover up known adverse side effects of Vioxx in order to gain a profit" by obtaining a favorable position on drug formularies. Among the various means employed to accomplish this goal, plaintiff alleges that defendant avoided studies revealing the negative side effects of Vioxx, engaged in "heavy-handed negotiating tactics with the FDA in order to get approval for Vioxx, and even us[ed] threats and intimidation tactics to silence[ ] critics in the medical profession." It was these allegations, according to the judge, that "suggest[ed] the elements of fraud pervaded every aspect of Merck's actions in developing and marketing Vioxx."

Plaintiff argues that Merck's fraud induced P & T Committees to place Vioxx on healthcare plans' formularies, thereby encouraging physicians to prescribe the medication for patients, which resulted eventually in the ultimate payment for the prescribed drug by plaintiff third-party payors. Although the causal chain appears somewhat elongated, we cannot say that the alleged fraud was not a cause of the third-party payors' loss.

***7** Because P & T Committees commonly consider information supplied by drug-makers, no P & T Committee could have been completely isolated from Merck's extensive development and marketing efforts. Assuming plaintiff can prove the alleged fraud, it would be unlikely for Vioxx to have received the same treatment by P & T committees absent the wrongful conduct. Even for "open" formularies, which automatically include any FDA-approved drug, the P & T Committee must still choose the drug's placement on the formulary or whether to impose any prescription preconditions to establish the extent to which the plan would cover the cost of the drug.

Once Vioxx was placed on a drug formulary and assigned to a tier, as Judge Higbee noted, "the third-party payor would be contractually obligated to pay for the drug if a plan participant received a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prescription for it." Thus, even though other causes for the third-party loss may be germane, the fraudulently induced placement of the drug on the formulary was at least one of the causes for the loss.

Under these circumstances, plaintiff may establish a sufficient nexus between the alleged fraud and ascertainable loss by showing via expert proof that, for example, Merck's overarching scheme of omissions and misrepresentations about Vioxx allowed the company to achieve more favorable placement on the formularies than it otherwise might have. Alternatively, plaintiff could present expert proof that absent Merck's misconduct, Vioxx would not have been on the market at all. Therefore, it would not be necessary to prove causation individually.

Merck further claims Judge Higbee "erred in concluding that each individual class member's 'ascertainable loss' attributable to Merck's conduct could be established through common, class-wide proof." Ascertainable loss means "either out-of-pocket loss or a ... loss in value[.]" *Thiedemann, supra,* 183 *N.J.* at 248. Ascertainable loss "has been broadly defined as more than a monetary loss" and encompasses situations where "a consumer receives less than what was promised." *Union Ink Co., supra,* 352 *N.J.Super.* at 646 (citing *Miller v. Am. Fam. Publishers,* 284 *N.J.Super.* 67, 89-91 (1995)).

Here, it is alleged that Merck represented to doctors, patients, third-party payors, and health care plans alike, that Vioxx was not only safe, but superior to other available pain-killers because of its improved gastrointestinal protection. In reality, Vioxx was not appreciably better than other, less expensive, competitors and actually posed significant additional cardiovascular risks. Plaintiff thus suffered a "loss in value" when, on behalf of its participants, it paid for a drug with serious health risks that Merck did not disclose, rather than choosing, based on full and truthful information, to select competitors' products instead.

In short, when third-party payors paid for Vioxx, they got something less valuable than what was paid for and what had been promised. This loss is not dependent on any injury to individual patients who were prescribed Vioxx and also is not a disguised "fraud-on-the-market" theory, as argued by Merck. *Compare N.J. Citizen Action v. Schering-Plough Corp.,* 367 *N.J.Super.* 8, 16 (App.Div.), *certif. denied,* 178 *N.J.* 249 (2003).

***8** Although the amounts of loss may differ among putative class members, plaintiff can prove ascertainable loss by classwide expert opinion. Individual variations in the amount of ascertainable loss would not render a class action inferior to individual lawsuits because common questions of liability and the fact of ascertainable loss predominate. *Muise, supra,* 371 *N.J.Super.* at 46; *Delgozzo, supra,* 266 *N.J.Super.* at 190.

Such complications as average manufacturer price, wholesale acquisition cost, rebates and other benefits such as dispensing fees, stocking discounts, and buy back programs, which were raised by amici, may be considered, if necessary, in the remedy portion of the trial. Damages "may be determined on a classwide, or aggregate, basis ... where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *In re*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*NASDAQ Market-Makers Antitrust Litig.,* 169 *F.R.D.* 493, 526 (S.D.N.Y.1996). Once aggregate damages are ascertained, a mechanism can easily be established to calculate whatever damages are due individual class members. *See e.g., In re Visa Check/MasterMoney Antitrust Litig.,* 280 *F.3d* 124, 141 (2d Cir.2001) (collecting cases that describe management tools available to address individualized damages issues that might arise in a class action).

Therefore the common issues of law and fact relating to whether Merck committed consumer fraud remain predominant despite plaintiff's need to prove causation and ascertainable loss. *See Varacallo, supra,* 332 *N.J.Super.* at 42 (finding predominance requires an analysis of plaintiff's underlying theory of liability and the "predictable defenses to the legal claims"); *Saldana, supra,* 252 *N.J.Super.* at 197. We remain convinced that the "common nucleus of operative facts" predominates over questions affecting only individual members of the class. *Varacallo, supra,* 332 *N.J.Super.* at 42 (citing *In re Cadillac, supra,* 93 *N.J.* at 431 (quoting 7A *Wright & Miller, Federal Practice & Procedure* § 1778 at 53 (1972))). And we move on to decide which state's law must be applied to this dispute.

IV.

When considering a nationwide class, one of the major concerns in the predominance determination is "which state's law should apply to each member of the class." *Fink v. Ricoh Corp.,* 365 *N.J.Super.* 520, 568 (Law Div.2003). "[V]ariations in state law may overwhelm common issues and preclude a finding of predominance." *Carroll v. Cellco P'ship,* 313 *N.J.Super.* 488, 496 (App.Div .1998) (citation omitted). In effect, by having to instruct the jury on the law of numerous states, the class action is often rendered unmanageable, and certification defeated. *Id.* at 496-97 (discussing cases involving state law variances that presented insurmountable obstacles to class certification).

***9** To determine which law applies in a multi-state dispute, we "employ a flexible 'governmental interest' analysis to determine which state has the greatest interest in governing the specific issue that arises in the underlying litigation." *Erny v. Estate of Merola,* 171 *N.J.* 86, 94 (2002) (citing *Fu v. Fu,* 160 *N.J.* 108, 117-18 (1999)). The broad common issue arising in this litigation is whether Merck committed consumer fraud in marketing and advertising Vioxx, which caused loss to third-party payors.

The first step in applying the governmental interest test to this issue is "to determine whether there is an actual conflict between the laws of the states involved." *Erny, supra,* 171 *N.J.* at 100 (citing *Gantes v. Kason Corp.,* 145 *N.J.* 478, 484 (1996) and *Veazey v. Doremus,* 103 *N.J.* at 244, 248 (1986)). If a conflict exists regarding a pertinent issue, the second step is to "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Veazey, supra,* 103 *N.J.* at 248. It is "the qualitative, not the quantitative, nature of a state's contacts [that] ultimately determines whether its law should apply." *Ibid.* We will usually apply a particular State's law when doing so "will advance the policies that the law was intended to promote." *Pfizer v. Employers Ins. of Wausau,* 154 *N.J.* 187, 198 (1998).

When applying the first step of the governmental interest test, Judge Higbee analyzed the consumer fraud laws of every state and the District of Columbia and found

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that "there are sufficient variations between the laws of the varying states and [New Jersey's Act] to constitute an actual conflict." This determination is eminently correct. *See Fink, supra,* 365 *N.J.Super.* at 570- 84.

Indeed, both parties concede that a conflict exists. For example, New Jersey allows and often encourages private class actions for consumer fraud while several other states prohibit private class action consumer fraud suits. *E.g., Miss.Code Ann.* § 75-24-15(4); *S.C.Code Ann.* § 39-5-140(a); *Ala.Code* § 8-19-10(f). Our law finds actionable fraud in connection with the sale of goods or services for commercial or business uses, whereas some states "confine their consumer fraud statute remedies to items purchased 'primarily for personal, family or household purposes.' " *Fink, supra,* 365 *N.J.Super.* at 572 (citing *Mo. Ann. Stat.* § 407.025(1); 73 *P.S.* § 201-9.2; *Miss.Code Ann.* § 75-24-15(4)). Some states require proof that the defendant willfully or knowingly made false representations "with specific intent to deceive," while New Jersey does not requires such a showing. *Fink, supra,* 365 *N.J.Super.* at 576. Furthermore, variations exist in the award of damages, especially the decision or ability of a court to award punitive or treble damages. *Id.* at 579-84.

***10** Because there are conflicts present, we proceed to the second step and "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contact to the litigation and to the parties." *Veazey, supra,* 103 *N.J.* at 248; *see Restatement (Second) of Conflict of Laws* § 6(2)(c) (1971). Notably, if the state's contacts with the litigation "are not related to the policies underlying its law, then that state does not possess an interest in having its law apply ." *Veazey, supra,* 103 *N.J.* at 248.

In performing the governmental-interest analysis in tort actions, which include consumer fraud cases, *see Holmin v. TRW, Inc.,* 330 *N.J.Super.* 30, 35 (App.Div.2000), we generally consider the contacts set forth in § 145 of the Restatement (Second) Conflict of Laws. *Erny, supra,* 171 *N.J.* at 102-03; *Fu, supra,* 160 *N.J.* at 122. These contacts are the place of injury; where the conduct causing injury occurred; the domicile, residence, nationality, place of incorporation, and place of business of the parties; and where the relationship, if any, between the parties is centered. *Erny, supra,* 171 *N.J.* at 102-03 (citing *Fu, supra,* 160 *N.J.* at 125 (citing *Restatement, supra,* § 145(2))).

When dealing with fraud and misrepresentations, the Restatement provides additional guidance. *Restatement, supra,* § 148. This provision informs that "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," as is the case here, there are several relevant contacts to determine which state "has the most significant relationship to the occurrence and the parties." *Id.* § 148(2)(a)-(f). The Restatement enumerates six contacts. The first four include, in pertinent part: "(a) the place ... where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the ... place of incorporation and place of business of the parties." *Ibid.* The remaining two contacts enumerated in the Restatement are: "(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." *Ibid.*

Comment j to § 148 of the Restatement provides the "general approach" that if a plaintiff acts in reliance upon a defendant's representations in a particular state, that state's law will usually apply "with respect to most issues," if certain other conditions are met. For example, if, in addition to relying on a defendant's representations, the plaintiff received the defendant's representations, or is domiciled or has its principal place of business there, or "this state is the place where the plaintiff was to render at least the great bulk of his performance under his contract with the defendant," then that state "will usually be the state of applicable law." *Id.* § 148 comment j.

***11** Merck argues that each of the significant relevant contacts referenced in the *Restatement's* § 148(2)(a)-(f), pertaining to misrepresentation, except for Merck's place of incorporation and initiation of the alleged fraud, occurred in the state where each prospective plaintiff third-party payor conducts business. Thus, Merck asserts that New Jersey cannot possibly be the State with the strongest interests over this litigation.

The choice of law analysis, however, is not a simple tabulation of contacts and "[n]o definite rules as to the selection of the applicable law can be stated." *Ibid.* As the Restatement points out "any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." *Restatement, supra,* § 6 comment c. Our analysis must be geared toward determining how the contacts relate to and affect the governmental policies underlying each state's statute. *Erny, supra,* 171 *N.J.* at 103 (citing *Fu, supra,* 160 *N.J.* at 119).

As Merck argues, plaintiff's principal place of business is a contact "of substantial significance when the loss is pecuniary in its nature." *Restatement, supra,* § 148 comment i. This is so because the state of the victim's residence will bear the social consequences of the victim's loss. *Ibid.; see Fu,* 160 *N.J.* at 131. However, "the place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to persons or to tangible things." *Restatement, supra,* § 148 comment c.

"[W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." *Id.* § 145 comment e. With such a law, seeking to deter or punish misconduct, "the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship." *Id.* § 145 comment c. "The place where the defendant made his false representations ... is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or tangible things." *Id.* § 148 comment c.

New Jersey's contacts with this dispute are both extensive and weighty. Besides having the plaintiff class representative organized and operating in New Jersey, Merck is a New Jersey corporation with its corporate home located in this state. Vioxx was primarily developed in New Jersey. Scientific research, studies, and presentations relating to the safety of Vioxx

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and its clinical studies were conducted in this State. The ultimate decision-making power regarding Vioxx's marketing and development was exercised in New Jersey.

The fraud allegedly was conceived of and executed from New Jersey. Merck's senior-level committee in charge of overseeing the "broad development of [its] products," including Vioxx, and providing "a final sign-off on plans and activities related to the product," met in New Jersey. This group is allegedly connected to deliberate suppression and/or misrepresentation of damaging information concerning Vioxx. In addition, a board of scientific advisors expressed its concerns to Merck in New Jersey. Manipulation of clinical studies allegedly took place in New Jersey as well. It was this manipulation that aimed to spur sales of the drug and, in part, hide its risks. Thus, the claimed misrepresentations and omissions in the marketing and advertising of the drug all emanated largely from New Jersey.

***12** By contrast, the contacts each prospective member of the plaintiffs' class has had with this litigation relate to receipt of the alleged fraudulent communications and the resulting economic loss. Merck undoubtedly sent representatives and various communications from New Jersey, and perhaps elsewhere, to the states of various third-party payors. However, once Vioxx was added to the various formularies, the third-party payors had no choice but to pay for any Vioxx prescription in accordance with their formularies. The prescription process was controlled by health care providers who are not part of this litigation. Plaintiff, on behalf of the class, is claiming only economic loss resulting from Merck's alleged fraud. There are no out-of-state-resident-plaintiffs who had Vioxx prescribed and suffered some adverse physical or mental consequence. There are no disabled plaintiffs who may become dependent on any state's welfare system or other safety net program.

New Jersey's interests in this litigation, in our opinion, far outweigh the interests of all other states. All consumer fraud laws in the nation are designed to protect consumers to some degree. "Their differences do not represent competing or conflicting resolutions of a particular policy issue. Rather [the laws] reflect a legislative determination to attack the same evil." *Boyes, supra,* 27 *F.Supp.*2d at 548.

This litigation seeks to place no obligations on any other state's businesses. Instead, third-party payors from other states may be compensated for losses suffered allegedly because of Merck's fraud. No state has an interest in denying its own citizens recovery while protecting a foreign New Jersey corporation when the conduct at issue took place, to a significant degree, in New Jersey. "Application of New Jersey law will not undermine [other states'] interest[s] in compensating [their] injured residents because that interest is not actually implicated or compromised by allowing a [consumer fraud] action brought by [non-residents of New Jersey] to proceed against" a New Jersey corporation. *Gantes, supra,* 145 *N.J.* at 497-98. In short, Merck has not established how denying a putative plaintiff relief against a New Jersey corporation would further the concerns of any given state's consumer protection law.

Merck cites *Heindel v. Pfizer Inc.,* 381 *F.Supp.*2d 364 (D.N.J.2004), as apposite and reaching the exact opposite conclusion we come to herein. In *Heindel,* plaintiffs brought a consumer class action, along with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

several other claims, "on behalf of the purchasers and users of Celebrex and Vioxx, claiming that they [were] entitled to recover economic damages they sustained due to Defendants' 'unconscionable marketing conduct.' " *Id.* at 367. Many of plaintiffs' fraud and class action claims, which sought application of New Jersey law to the entire class, were similar to those advanced herein. The federal judge in *Heindel,* however, rejected plaintiffs' argument and found that Pennsylvania law applied. [FN3]

FN3. Interestingly, in *Heindel,* unlike this matter, Merck established that its "employees stationed in Pennsylvania had responsibility for much of the interaction with the FDA regarding Vioxx"; the Merck department of research "responsible for collecting adverse events and reporting them to the FDA is also" in Pennsylvania; the national headquarters of the Merck division which marketed Vioxx was in that state and it was in "charge of training its U.S.-based professional representatives" responsible for advertising Vioxx; and a Merck committee "responsible for the drafting and editing" of a Vioxx circular was "comprised of employees located in both Pennsylvania and New Jersey." *Heindel, supra,* 381 *F.Supp.*2d at 376-77.

***13** *Heindel* is distinguishable from the instant dispute. In *Heindel,* plaintiffs' physicians had prescribed Vioxx to plaintiffs who purchased, paid for, and ingested the drug in Pennsylvania. Physician involvement was particularly significant because Pennsylvania had adopted the learned intermediary doctrine, which limits the liability of prescription drug manufacturers and "reflects the determination by the Pennsylvania courts to preserve the primacy of the physician's role in making treatment decisions for Pennsylvania patients." *Id.* at 378. In the instant case, Merck has not demonstrated that another state applies an equally weighty doctrine as Pennsylvania's learned intermediary doctrine to the purchases made by third-party payors, who obviously have not ingested the drug.

In further support of its position, Merck cites products liability and personal injury cases that found New Jersey's deterrent interests to have been outweighed by the compensation interest of the putative class members' home states. *E.g., Deemer v. Silk City Textile Mach. Co.,* 193 *N.J.Super.* 643, 649 (App.Div.1984).

Our Supreme Court, however, has found to the contrary. In *Gantes, supra,* 145 *N.J.* at 478, the decedent, a Georgia resident, "was killed at work when she was struck in the head by a moving part of a shaker machine" manufactured by a New Jersey corporation with its principal place of business in New Jersey. *Id* . at 482. Her survivors brought a wrongful death action that would have been timely under New Jersey's statute of limitations. However, it was barred under Georgia's statute of repose and dismissed on this ground by the trial court. We affirmed, but, after applying the governmental-interest test, the Supreme Court reversed holding that New Jersey's statute of limitations applied.

The court noted that Georgia's statue of repose was enacted to counter the problems associated with open-ended liability by "serv[ing] the dual purposes of stabilizing insurance underwriting and eliminating stale

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims." *Id.* at 486. However, these policy concerns were not implicated because Georgia was found to have "no contacts with the defendant manufacturer or with this lawsuit." *Id.* at 494. As such, there was no "governmental interest that must be protected by applying its statute of repose to foreclose this suit in New Jersey." *Ibid.* Moreover, the plaintiff's status as a Georgia domiciliary "[did] not implicate the policies of its [law], which is intended only to unburden Georgia courts and to shield Georgia manufacturers." *Id.* at 496.

Instead, "New Jersey's policy in deterring tortious conduct of manufacturers" constituted a "substantial interest to be weighed against Georgia's interest in compensation of its resident plaintiffs." *Ibid.* Failure to apply Georgia's statute of repose, would "not undermine Georgia's interest in compensating its injured residents because that interest is not actually implicated or compromised by allowing a products-liability action brought by Georgia residents to proceed against a non-Georgia manufacturer." *Id.* at 497-98.

***14** It has been questioned whether *Deemer,* which found our deterrent interests outweighed by other states' compensation interests, has any continuing precedential value after *Gantes. See* Eugene Scoles et al., *Conflict of Laws* 920 (4th ed.2004). In any event, we have recently followed *Gantes* in another products liability action.

In *Rowe v. Hoffman-La Roche Inc.,* --- *N.J.Super.* ---- (App.Div.2006) (slip op. at 1-30), a Michigan resident sued a New Jersey drug company for failing to warn of the "dangers and adverse health risks associated with Accutane," a drug designed to treat acne. The drug company claimed a Michigan statute, finding the warning adequate as a matter of law, required dismissal of the plaintiff's suit. We held applicable New Jersey's law, which provides only a rebuttable presumption that the warning was adequate. In that case, in the face of an argument similar to Merck's in this case, we noted that "the Michigan Legislature may have intended to create a more hospitable commercial atmosphere, to encourage drug manufacturers to locate in that state, thereby creating jobs and related economic benefits." (Slip op. at 23 n. 5). We found that Michigan's interests were "not impeded by a ruling that rejects application of Michigan's statute to [a New Jersey based company]." *Ibid.* Instead, this state's "strong governmental interest in deterring the manufacture of unsafe products within its borders, substantially outweighs the countervailing Michigan contacts and governmental interests." *Id* . at 30.

Just as our product liability cases have a "strong interest in deterrence," *Gantes, supra,* 145 *N.J.* at 490, it can be argued that our Consumer Fraud Act has at least as strong or perhaps an even stronger deterrence goal. *See Furst, supra,* 182 *N.J.* at 11-12; *Lettenmaier, supra,* 162 *N.J.* at 139; *Cox, supra,* 138 *N.J.* at 21.

"The legislature enacted the CFA in 1960 to address rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants." *Thiedemann, supra,* 183 *N.J.* at 245 (citing *Furst, supra,* 182 *N.J.* at 11) (citing *Cox, supra,* 139 *N.J.* at 21)). The Act, "in allowing for private suits in addition to actions instituted by the Attorney General, contemplates that consumers will act as 'private attorneys general.' " *Lemelledo, supra,* 150 *N.J.* at 268 (noting the "strong and sweeping legislative remedial purpose apparent in the CFA.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Act punishes wrongdoers with mandatory "treble damages." *Lettenmaier, supra,* 162 *N.J.* at 139 (citing *Roberts v. Cowgill,* 316 *N.J.Super.* 33, 45 (App.Div.1998)). Unlike punitive damages in tort actions, which can only be awarded upon proofs establishing that a defendant's conduct was malicious or wanton and willful, *see N.J.S.A.* 2A:15-5.12 and *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49 (1984), any ascertainable loss under the Act is trebled. Obviously, the trebling of damages is not designed to fairly compensate an injured party. Instead, the Act reflects a very strong policy to deter wrongdoing, *Cox, supra,* 138 *N.J.* at 21, and encourage "truth and fair dealing in the market place." *Feinberg v. Red Bank Volvo, Inc.,* 331 *N.J.Super.* 506, 512 (App.Div.2000). The Act also awards attorney's fees, filing fees, and costs. *See generally Skeer, supra,* 187 *N.J.Super.* at 469-73. These awards are additional evidence of the strong deterrent goal present in the Act. *Cox, supra,* 138 *N.J.* at 21; *Grubbs v. Knoll,* 376 *N.J.Super.* 420, 449 (App.Div.2005).

***15** Despite New Jersey's strong interest in preventing deception by its corperations, Merck relies upon several out-of-state cases to assert that Judge Higbee's ruling "contradict[s] an extraordinary wide body of law rejecting efforts to certify nationwide classes by finding the law of a single state applicable to all class members' claims." We either do not find these cases analogous or disagree that their conclusions should be applied to this litigation. *E.g., In the Matter of: Bridgestone/Firestone Inc., Tires Prods. Liab. Litig.,* 288 *F.3d* 1012, 1016 (7th Cir.2002) (rejecting nationwide products liability class action brought on behalf of owners of tires or cars manufactured by defendants because Indiana was "a *lex loci delicti* state [that] in all but exceptional cases applies the law of the place where the harm occurred" in contrast to states like New Jersey that apply the governmental interest test); *In re Rezulin Prods. Liab. Litig.,* 210 *F.R.D.* 61, 64, 70-72 (S.D.N.Y.2002) (rejecting New Jersey law for a nationwide class of products liability plaintiffs who allegedly would not have taken Rezulin had the defendants adequately disclosed its risks because each state has important interests in ensuring that its citizens are compensated for injuries, that product sale standards are complied with, and that physician and pharmacist conduct are regulated); *In re Consol. Parlodel Litig.,* 22 *F.Supp.*2d 320, 324 (D.N.J.1998) (rejecting New Jersey law for sixteen plaintiffs from a variety of states who brought multiple products liability actions alleging that they were injured as a result of taking a drug manufactured by the defendant because the critical issues "rest[ed] upon testimony and other evidence from each Plaintiff's treating physicians" located in the home states of each plaintiff); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 *F.R.D.* 332, 348 (D.N.J.1997) (rejecting Michigan's law for a products liability class action involving approximately 23 million vehicles that were manufactured and distributed by defendant Ford Motor Co. because of the interest each state has in "protecting its consumers from in-state injuries caused by foreign corporations" and in determining the scope of recovery for its citizens); *Avery v. State Farm Mut. Auto Ins. Co.,* 216 *Ill.*2d 100, 187, 835 *N.E.*2d 801, 854 (2005) (rejecting plaintiff policyholders' nationwide class action, which alleged that defendant insurance company's claims practices violated Illinois consumer fraud law, because "the overwhelming majority of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circumstances relating to the disputed transactions ... occurred outside of Illinois for the out-of-state plaintiffs.").

It is true, as alleged by Merck, that certification of a nationwide class action with application of one state's law to all claims is rare. *See* 52 *Am. J. Comp. L.* 919, 988-990, *Choice of Law in the American Courts in 2004: Eighteenth Annual Survey.* Merck's claim that Judge Higbee's action is totally unprecedented, however, is overstated.

***16** In *Wershba v. Apple Computer, Inc.,* 91 *Cal.App.* 4th 224, 110 *Cal.Rptr.*2d 145 (Ct.App.), *pet. denied,* 2001 *Cal.* LEXIS 8019 (Cal. Nov. 14, 2001), for example, a class action similar to the one advanced here was certified. Like New Jersey, the California court found its "consumer protection laws [ ] among the strongest in the country." *Id.* at 242. Because the claimed fraud emanated from California, that state's " 'more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.' " *Id.* at 243 (quoting *Clothesrigger, Inc. v. GTE Corp. et. al.,* 191 *Cal.App.*3d 605, 612- 16, 236 *Cal.Rptr.* 605, 607-11 (Ct.App.1987) (noting that the trial court "erred in stating that California has no interest in providing nonresident plaintiffs greater protection than their home states provide.")).

In *Clark v. TAP Pharmaceutical Prods., Inc.,* 343 *Ill.App.*3d 538, 798 *N.E.*2d 123 (Ct.App.2003), as another example, plaintiff claimed that "as a result of the defendants' fraudulent marketing and sales scheme, he, along with thousands of individuals and entities who paid copayment or deductible amounts for beneficiaries under Medicare, overpaid for the prescription drug Lupron, which is used to treat prostate cancer." *Id.* at 542. The Illinois appellate court affirmed certification of a nationwide class of " '[a]ll individuals or non-ERISA third-party payor entities in the United States who paid any portion of the 20% co-payment or deductible amount for beneficiaries under the Medicare Part B for Lupron during the period 1993 through the present[.]' " *Id.* at 543.

The court noted that "[t]he practical effect of applying Illinois law to the present case is to control conduct within the boundaries of Illinois, namely, the reporting by the defendants, headquartered in Illinois, of a deceptively inflated price for Lupron to uniformly defraud Medicare and its beneficiaries." *Id.* at 546-7; *see also, e.g., Perry v. Household Retail Servs ., Inc.,* 953 *F.Supp.* 1378, 1382-83 (M.D.Ala.1996)(holding that Illinois Consumer Fraud Act applied to all non-Illinois members of the class "because Illinois had a substantial interest in seeing that companies operating in the state operate lawfully"); *In re Badger Mountain Irrigation Dist. Sec. Litig.,* 143 *F.R.D.* 693, 699-700 (W.D.Wash.1992) (applying Washington law to claims of nonresident plaintiffs was appropriate due to strong state policy, defendant's contacts with state, and ability of unnamed class members to opt out).

V.

Accordingly, we agree with Judge Higbee that, based upon the evidence she had before her, New Jersey law may properly be applied to the entire plaintiff class, as this state has the most significant relationship to the alleged fraud and the parties. Furthermore, the judge did not abuse her discretion in certifying the nationwide class of third-party payors who paid for Vioxx, in accordance with the drug's placement on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their formularies, between May 1999 and 2004. In addition, the judge correctly rejected the contention that fifty statewide classes or a multitude of individual actions on the same issue involving thousands of third-party payors would be a superior method of adjudicating this claim.

***17** Given the confluence of New Jersey contacts and interest, choosing New Jersey as the site for this nationwide class action is not unconstitutionally "arbitrary or unfair." *Phillips Petroleum Co. v. Shutts,* 472 *U.S.* 797, 821- 822, 105 *S.Ct.* 2965, 2979, 86 *L. Ed.*2d 628, 648 (1985). This State's strong interest is present across the entire class, and the common proofs offered on behalf of all members of the class will predominate at trial with respect to the consumer fraud issues. *See In re NASDAQ, supra,* 169 *F.R.D.* at 517.

Though undoubtedly presenting complex management problems, a class action in this matter, would be a relatively inexpensive solution to "accomplish the greatest possible good for the greatest possible number of" third-party payors who have common problems and complaints with Merck. *Kugler v. Romain,* 58 *N.J.* 522, 538 (1971). Such litigation would promote "efficient judicial administration, ... save time and money for the parties and the public[,] and [ ] promote consistent decisions for [third party payors] with similar claims." *In re Cadillac, supra,* 93 *N.J.* at 430 (citing *Fed.R.Civ.P.* 23 The Advisory Committee Note, 39 *F.R.D.* 98, 102-03 (1966)).

Affirmed.

--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.