No. 04-3117

# In the United States Court of Appeals for the Eighth Circuit

In re: St. Jude Medical, Inc.,
Silzone® Heart Valves Products Liability Litigation

---

Lester Grovatt; Beatrice Bailey; Levy D. Redden; Bonnie L. Sliger; Joe W. Sanchez, on behalf of themselves and all others similarly situated,
Plaintiffs-Respondents,

v.

St. Jude Medical, Inc.,
Defendant-Petitioner.

---

APPELLEE'S OPPOSITION TO APPEAL

---

From an Order Granting Class Certification by the
United States District Court for the District of Minnesota
Multidistrict Litigation No. 01-1396 (JRT/FLN)
The Honorable John R. Tunheim

---

Charles S. Zimmerman
J. Gordon Rudd, Jr.
David M. Cialkowski
ZIMMERMAN REED P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

Steven E. Angstreich
Michael Coren
Carolyn C. Lindheim
LEVY, ANGSTREICH, FINNEY, BALDANTE,
RUBENSTEIN & COREN, P.C.
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

James T. Capretz
CAPRETZ & ASSOCIATES
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

Joe D. Jacobson
GREEN, SCHAAF & JACOBSON, P.C.
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

*Attorneys for Plaintiffs-Respondents*

## TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ........... 1

COUNTERSTATEMENT OF THE CASE AND FACTUAL BACKGROUND .... 2

STANDARD OF REVIEW .......... 4

ARGUMENT .......... 4

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION APPLYING MINNESOTA LAW TO THE MINNESOTA STATUTORY CONSUMER CLAIM; BECAUSE IT WAS REQUIRED TO DO SO. .......... 4

A. SJM's Aberrant Commerce Clause Argument Fails. .......... 6

B. SJM's Due Process Argument Fails. .......... 10

C. SJM's Full Faith and Credit Argument Fails. .......... 13

D. The Application of Minnesota Statutory Consumer Law Is *Required* by *Erie v. Tompkins* and Does Not Run Afoul of the Rules Enabling Act.... 15

ABSENT CLASS MEMBERS' PERSONAL INJURY CLAIMS WILL NOT BE PRECLUDED BECAUSE THE CIRCUMSTANCES EXEMPT APPLICATION OF *RES JUDICATA* FOR COLLATERAL LEGAL THEORIES LEFT UNADJUDICATED IN THIS CLASS ACTION. ........... 19

A. So-Called "Claim-Splitting" Is Permissible in Class Actions and Does Not Preclude Non-Certified Legal Theories from Being Pursued in a Later Action. .......... 21

B. Courts May Expressly "Reserve" Claims Against Which *Res Judicata* Will Not Apply in Later Actions .......... 24

C. Class Notice Can Advise People Who Wish to Pursue Personal Injuries to Seek Counsel and Opt Out. .......... 25

THE PLAINTIFFS' CIRCUMSTANCES ARE CHARACTER-ISTIC OF THE CONCISELY DEFINED PARAMETERS OF THEIR CLASSES AND THE LEGAL THEORIES INVOKED LEND THEMSELVES TO CLASS TREATMENT .......... 27

A. The Representative Plaintiffs-Appellees Have the Same Claims and Consumer Injuries as the Entire Class, and Proving SJM's Deceptive Conduct Inures to the Benefit of All Class Members. .............................. 27

B. The District Court Properly Acknowledged That the Consumer Protection Class Is Not a "Personal Injury" Class, and the Statutes' Relaxed Standards of Proof Will Permit the Court to Manage the Class Action Easily. .......................................................................................... 29

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION OR VIOLATE ANY CONTROLLING PRINCIPLES OF LAW IN ITS DECISION TO CERTIFY A MEDICAL MONITORING SUBCLASS IN SEVENTEEN JURISDICTIONS WHOSE LAWS ALLOW SUCH CAUSES OF ACTION ABSENT PROOF OF PRESENT PHYSICAL INJURY. ........ 36

A. The District Court Properly Performed an Analysis of State Laws Under the *Erie* Doctrine to Determine What States' Laws Permitted Medical Monitoring Relief to Exposed, But Asymptomatic, Tort Victims. ........... 36

B. The Medical Monitoring / Epidemiological Program Relief Is an Equitable, Not a Legal, Remedy, And the District Court Did Not Commit Any Error of Law or Abuse of Discretion in Certifying the Medical Monitoring Class under Rule 23(b)(2) as Well as 23(b)(3). ..................... 45

C. The District Court Did Not Abuse Its Discretion by Finding That the Seventeen State Medical Monitoring Class Was Manageable and That a Class-Wide Trial to Determine Entitlement for Such Health Program Would Be Fair and Efficient. ................................................................ 50

CONCLUSION ......................................................................................... 57

# TABLE OF AUTHORITIES

## Published Opinions

*Allstate Ins. Co. v. Hague,* 449 U.S. 302 (1981) .................................... 10, 11, 13

*Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576 (1st Cir. 1995)... 25

*Associated Indus. of Missouri v. Lohman*, 511 U.S. 641 (1994) ..............................7

*Avery v. State Farm*, 746 N.E.2d 1242 (Ill. App. Ct. 2001) ....................................9

*Baker by Thomas v. General Motors Corp.*, 522 U.S. 222 (1998) ......................... 14

*Baker Group, L.C. v. Burlington N. & Santa Fe Ry. Co.*, 228 F.3d 883 (8th Cir. 2000) ............................................................................................................. 21

*Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193 (N.D. Cal. 1987) ....... 47

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345 (E.D.N.Y. 2000) ....................................................................... 32

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) ...................................7

*Boughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir. 1995) ...................................... 48

*Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543 (D. N.J. 1998)...... 13, 17

*Brafford v. Susquehanna Corp.*, 586 F. Supp. 14 (D. Colo. 1984) ........................ 44

*Brown-Forman Distiller Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986).........................................................................................................7

*Bryson v. Pillsbury Co.*, 573 N.W.2d 718 (Minn. Ct. App. 1998) ................. 44, 45

*Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987) ............................9

*Coleman v. General Motors Acceptance Corp.*, 220 F. R. D. 64 (M.D. Tenn. 2004) ................................................................................................. 4, 24

*Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991) ........................ 44

*Craft v. Vanderbilt University*, 174 F.R.D. 396 (D. Tenn. 1996).......................... 46

*CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69 (1987)....................................8

*Day and Zimmermann v. Challoner*, 423 U.S. 3 (1975)................................... 16, 47

*DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171 (8th Cir. 1995) ............................. 28

*Diamond Multimedia Systems, Inc. v. Superior Court*, 968 P.2d 539 (Cal. 1999) ...8

*Doe v. City of Stamford*, 699 A.2d 52 (Conn. 1997) ............................................. 43

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ..........................................................7

*Erie Railroad Co. v. Tompkins*, 304 U.S. 78 (1938) ............................................. 38

*Ewing v. St. Louis-Clayton Orthopedic Group, Inc.*, 790 F.2d 682 (8th Cir. 1986) 16

*Fabricant v. Sears Roebuck*, 202 F. R. D. 310 (S.D. Fla. 2001) ............................ 25

*Fedders Corp. v. Taylor*, 473 F. Supp. 961 (D. Minn. 1979)................................. 17

*Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982).. 22

*First Colony Life Ins. Co. v. Berube*, 130 F.3d 827 (8th Cir. 1997)........................ 40

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984)........................................................................................................ 46

*Gibbs v. E.I. DuPont De Nemours & Co., Inc.*, 876 F. Supp. 475 (W.D.N.Y. 1995) ........................................................................................................ 46

*Glover v. Standard Federal Bank*, 283 F.3d 953 (8th Cir. 2002).........................................................................2

*Goasdone v. American Cyanamid Corp.*, 808 A2.d 159 (N.J. Super. Law Div. 2002)........................................................................................................ 55

*Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 14 (Minn. 2001) . 30

*Grove v. Principle Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101 (S.D. Iowa 1998).. 9, 13

*Haley v. Medtronic, Inc.* 169 F.R.D. 643 (C.D. Cal. 1996).................................. 55

*Hansen v. Mountain Fuel Supply*, 858 P.2d 970 (Utah 1993)................................ 48

*Healy v. Beer Institute*,
491 U.S. 324 (1989) ....................................................................................7

*In re Baycol Products Litig.*, 218 F.R.D. 197 (D. Minn. 2003) ............................ 52

*In re Bridgestone/Firestone Inc.*, 288 F.3d 1012 (7th Cir. 2002)............................ 12

*In re Computer Memories Securities Litig.*, 111 F.R.D. 675, 686 (N.D. Cal. 1986) 9

*In re Diet Drug Litig.*, MDL No. 1203, 1999 WL 673066 (E.D. Pa. 1999)........... 51

*In re Lutheran Brotherhood Variable Life Ins. Prods. Co. Sales Practices Litig.*,
201 F.R.D. 456 (D. Minn. 2001) ........................................................... 9, 30, 31

*In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990).......... 40, 43

*In re Potash Antitrust Litig.*, 159 F.R.D 682 (D. Minn. 1995)............................... 28

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283 (3rd Cir. 1998)
...................................................................................................... 28

*In re Universal Serv. Fund Telephone Billing Practices Litig.*,
219 F. R. D. 661 (D. Kan. 2004)................................................................... 26

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 287 (D. Del. 2002)...................9

*In re: Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997)......... 52

*Issacharoff, S., Preclusion Due Process and the Right to Opt Out of Class Action*,
77 Notre Dame L. Rev. 1057 (2002)............................................................. 49

*Karas v. American Family Ins. Co.*, 33 F.3d 995 (8th Cir. 1994) .......................... 39

*Katz v. Warner-Lambert Co.*, 9 F. Supp. 2d 363 (S.D.N.Y. 1998) ........................ 46

*Klipsch, Inc. v. WWR Tech.*, 127 F.3d 729 (8th Cir. 1997) ................................... 21

*Lobo Explor. Co. v. Amoco Prod. Co.*, 991 P.2d 1048 (Okla. Civ. App. 1999) .......9

*Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000) ............................................. 33, 35

*Lyon v. Caterpillar*, 194 F.R.D. 206 (E.D. Pa. 2000)........................................... 12

*Marshall v. Kirkland*, 602 F.2d 1282 (8th Cir. 1979)............................................ 25

*Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313 (D. Conn. 2002) ........................ 43, 55

*Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647 (Del. 1984) ............... 41

*Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex. App. – Texarkana 1995) ..... 23

*Montgomery v. New Piper Aircraft*, 209 F.R.D. 221 (S.D. Fla. 2002)......... 8, 10, 12

*Nevada v. Hall*, 440 U.S. 410 (1979)................................................................ 14

*Perez v. Metabolife*, 218 F.R.D. 262 (S.D. Fla. 2003) ........................................ 55

*Peterson v. U-Haul Co.*, 409 F.2d 1174 (8th Cir. 1969) ...................................... 39

*Plummer v. United States*, 580 F.2d 72 (3d Cir. 1978) ....................................... 42

*Pomianowski v. Merle Norman Cosmetics, Inc.*, 507 F. Supp. 435 (D. Ohio 1980) ........................................................................................................ 33

*Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 25 Cal. Rptr. 2d 550, 863 P.2d 795 (1993) ............................................................................................ 48

*Richards v. United States*, 369 U.S. 1 (1962)...................................................... 11

*Shutts v. Phillips Petroleum*, 472 U.S. 797 (1985).................................... 11, 15, 16

*Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210 (8th Cir. 2001) .......... 21

*Southern Union Co. v. Missouri Public Service Comm'n*, 289 F.3d 503 (8th Cir. 2002)..............................................................................................................7

*State v. Alpine Air Products, Inc.*, 500 N.W.2d 788 (Minn. 1993) ........................ 33

*Sullivan v. Chase Inv. Serv.*, 79 F.R.D. 246 (N.D. Cal. 1978) .............................. 24

*Sun Oil v. Wortman*, 486 U.S. 717 (1988)........................................................... 14

*Trimble v. Asarco, Inc.*, 232 F.3d 946 (8th Cir. 2000) ..................................... 39, 40

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)........................... 55

*Wells v. Simonds Abrasive Co.*, 345 U.S. 514 (1953) .......................................... 17

*Werlein v. United States*, 746 F. Supp. 887 (D. Minn. 1990)................................ 47

*Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145 (Cal. App. 2001) .............9

*West v. AT&T Co.*, 311 U.S. 223 (1940) ........................................................ passim

*Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) ......................... 47

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ................... 48

## Statutes

Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1) (2001) .................... 34

Minn. Stat. § 325D.44, subd. 1(5)............................................................... 32

Minn. Stat. § 336.1-105(1).......................................................................... 17

Minn. Stat. § 8.31, subd. 3a ........................................................................ 19

## Unpublished Opinions

*Gasperoni v. Metabolife Int'l Inc.*, 2000 WL 33365948, *4 (E.D. Mich. Sept. 27, 2000) ................................................................................................ 26

*In re: Inter-op Hip Prosthesis Liab. Litig.*, MDL No. 1401, 204 F.R.D. 330 (N.D. Ohio 2001) ...................................................................................... 51

*Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618, No. 97,469, 2003 WL 437160 (Okla. Feb. 25, 2003)..........................................................................5

## Other Authority

National Consumer Law Center, *Unfair and Deceptive Acts and Practices* § 1.1 (2001 5th ed. & Supp. 2003) ......................................................... 34

Restatement (Second) Conflict of Laws § 6 cmt. A (1971) ................................. 17

Restatement (Second) Judgments § 26(1)(B) ...................................................... 25

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

The District Court below certified this consumer fraud and medical monitoring class action in the wake of a Minnesota corporation's defective manufacture and fraudulent marketing of a heart valve. Over 11,000 United States citizens were implanted with this medical device, and this class action should go forward in order to ensure the twin goals of protecting health care consumers and fostering fair competition among honest businesses. Appellees seek economic damages and the creation of a medical monitoring/epidemiological study. The medical monitoring class applies the law of only 17 states. These rulings followed multiple briefing and arguments. The Court fully analyzed all issues and its rulings are consistent with federal and state court decisions. They do not violate or implicate the United States Constitution's Commerce Clause, Due Process and Full Faith and Credit Clauses or violate the *Erie* Doctrine.

Rather, SJM, a Minnesota corporation which designed, manufactured, marketed and directed the world wide sale of its defective heart valve from its offices in Minnesota, has been called upon to answer to those consumers in whom its defective product was implanted under the consumer fraud laws of its home state. Such application is not a denial of due process and the district court's rulings did not violate Rule 23's requirements or offend the *Erie* Doctrine.

Appellees join in the request for oral argument and request thirty (30) minutes.

**COUNTERSTATEMENT OF THE CASE AND FACTUAL BACKGROUND**

SJM's statement of the case and factual background is, for the most part, irrelevant to the issue before this Court, that is, whether the district court abused its discretion in certifying the consumer fraud and medical monitoring classes. *Glover v. Standard Federal Bank*, 283 F.3d 953 (8th Cir. 2002), *cert. denied*, 537 U.S. 943 (2002). These assertions are disputed. The District Court was not required to accept SJM's disputed factual assertions as true in determining whether to certify the classes. The following corrects SJM's spin on material facts.

Endocarditis, a bacterial infection of the heart tissue, is a rare but serious known complication of heart valve replacement surgery. SJM theorized that the application of a layer of elemental silver to the sewing cuff of its artificial heart valves might have the ability to suppress bacterial colonization and the resulting infection. SJM has been unable to clinically prove this theory either before or since marketing its Silzone valve.

In 1997 SJM submitted a Pre-Market Approval ("PMA") Supplement to the FDA for permission to add a silver coating to the sewing cuffs of its flagship Master Series mechanical heart valve. The submission asserted that the silver coating (Silzone) was safe and that the Master Series valve was effective as a

mechanical heart valve. No assertion was made as to the effectiveness of Silzone in preventing endocarditis.

Despite no proof of Silzone's efficacy in humans, the FDA granted the PMA Supplement for Silzone, but imposed certain conditions upon its marketing. One of those conditions was that SJM not make any claim in its labeling or otherwise that the Silzone coating was effective in combating endocarditis. In April 1998 SJM began marketing Silzone valves in the U.S., and it charged a premium of $300 above the price of the non-Silzone valve.

SJM sought to have the plaintiffs' claims barred by federal preemption based on the grant of the PMA Supplement authority by the FDA. Plaintiffs opposed this motion by presenting evidence that SJM in fact published labeling implying that Silzone was effective in combating endocarditis contrary to the FDA's labeling requirement. The evidence presented by plaintiffs also showed that SJM had failed to report to the FDA all of its study data, excluding data that was inconsistent with its claims of safety for the Silzone valves. The District Court reviewed this evidence and denied SJM's preemption motion.

SJM's assertion that its own AVERT post-marketing efficacy study showed no longer term statistically significant difference in the incidence of paravalvular leakage between recipients of Silzone and non-Silzone heart valves is misleading. Plaintiffs' experts demonstrated to the District Court that the AVERT study was

underpowered – that is, had too few participants – to support a valid hypothesis of no increase in paravalvular leakage. (AA03659-63, AA03670.) SJM neglects to mention that it researched and considered hundreds of possible factors after the recall to explain the difference in the incidence of paravalvular leakage explants found by AVERT, including patient's age, sex, health history, implanting surgeon, and many others, and determined that the only factor that correlated to the difference in incidence was the presence of the Silzone coating. (AA03641-42.)

## STANDARD OF REVIEW

District courts have broad discretion in determining whether to certify a class, how to define the class, and how to manage a class action. Extraordinary review of the District Court's Rule 23 determination is limited to whether the court below abused its discretion. *Coleman v. Watt*, 40 F.3d 255 (8th Cir. 1994).

## ARGUMENT

### I.

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION APPLYING MINNESOTA LAW TO THE MINNESOTA STATUTORY CONSUMER CLAIM; BECAUSE IT WAS REQUIRED TO DO SO.

SJM's arguments in Sections VI.A.1 and A.2 assert that the Constitution does not allow a state to enact laws regulating a domestic corporation in its dealings with the larger world. As reflected by the dearth of case law support in

SJM's brief, this is quite wrong. States regulate their domestic national corporations routinely – not least by creating them in the first place – by providing statutory causes of action to customers and shareholders, regardless of where they reside. The uncontroverted applicability of Delaware corporation law to the rights of shareholders of the many U.S. firms nominally incorporated in Delaware is a familiar example, and state consumer protection laws constitute no exception.[1]

---

[1] *See, e.g., Cange v. Stotler and Co.*, 913 F.2d 1204 (7th Cir. 1990); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) (recognizing non-Delaware residents could sue as part of national class under Delaware's Consumer Fraud statute in light of allegation that defendant's deceptive conduct "arose, was directed and emanated from Delaware"); *Man Roland, Inc. v. Quantum Color Corp.*, 57 F. Supp. 2d 568, 574-75 (N.D. Ill. 1999) ; *Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 882-83 (N.D. Iowa 1999) (forum law applied where it was location of defendant's headquarters and "a substantial portion of the fraudulent conduct"); *Boyes v. Greenwich Boat Works*, Inc., 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *Grove v. Principle Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1106 (S.D. Iowa 1998) (Iowa law applied to nationwide class to address a fraudulent scheme orchestrated in Iowa); *Lony v. E.I. Dupont De Nemours & Co.*, 821 F. Supp. 956, 961-62 (D. Del. 1993); *Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618, No. 97,469, 2003 WL 437160 (Okla. Feb. 25, 2003) (Michigan law applied to nationwide class because "Michigan is where the decisions concerning the design, manufacture, and distribution of the minivans were made"); *National Western Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 300-301 (Tex. App. 2002) (Texas law applied to nationwide class where defendant's principal place of business was Texas); *Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145, 159 (Cal. App. 2001) (California law applied to nationwide class because California had significant contacts with practices emanating from California); *Avery v. State Farm*, 746 N.E.2d 1242, 1254-55 (Ill. App. Ct. 2001) (Illinois law applied to nationwide class in light of Illinois-based and -centered practice); *Lobo Explor. Co. v. Amoco Prod. Co.*, 991 P.2d 1048, 1053-54 (Okla. Civ. App. 1999) (applying Oklahoma law applied to nationwide class where defendant failed to show that any state has an interest in applying its own consumer protection law so as to outweigh Oklahoma's interest in

Despite the absence of legal support, and the consumer statutes and cases arrayed against it from all over the country, SJM tries to invoke three different constitutional clauses against Minnesota's ordinary regulation of the Minnesota-based activities of a Minnesota company. Predictably, none applies.

**A. SJM's Aberrant Commerce Clause Argument Fails.**

Although Minnesota in corporation law indisputably governs the rights of SJM's shareholders in the fifty states (and SJM presumably would not claim that such "extraterritorial" application of Minnesota statutes violates the Commerce Clause), SJM asserts that the Commerce Clause prohibits Minnesota from enacting laws affording "any person" protection from fraudulent practices emanating from within Minnesota by a Minnesota corporation. SJM describes the Commerce Clause as the "most basic" reason to invalidate such laws (Appellant's Brief at 22), but it ultimately references only brief dicta from one magistrate judge's opinion that invokes the Commerce Clause in this context, and ignores the panoply cases finding state consumer protection statutes applicable to out-of-state plaintiffs. *See supra* note 1.

---

protecting nonresidents from fraud by Oklahoma corporation); *Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436, 439 (Fla. Dist. Ct. App. 1999) (Florida consumer protection law applied to national class action against Florida corporate defendant).

SJM cites four cases to support its Commerce Clause theory: *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 571-72 (1996); *Healy v. Beer Institute*, 491 U.S. 324 (1989); *Brown-Forman Distiller Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582-83 (1986); and *Edgar v. MITE Corp.*, 457 U.S. 624, 644-45 (1982) (plurality op.). *Gore*, of course, involved punitive damages based on the world-wide activities of a defendant domiciled in Germany rather than the forum state, and in any event is cited only for the proposition that "only Congress can enact a policy for the entire nation." (Appellant's Brief at 24.) This Court has specifically recognized that *Healy* and *Brown-Forman* involved "*per se*" Commerce Clause violations that are limited to statutes that "patently discriminate against interstate trade." *Southern Union Co. v. Missouri Public Service Comm'n*, 289 F.3d 503, 508 (8th Cir. 2002), (quoting *Associated Indus. of Missouri v. Lohman*, 511 U.S. 641, 647 (1994)). SJM's complaint is that Minnesota's consumer protection statutes are being applied equally to in-state and out-of-state plaintiffs against a domestic Minnesota corporation, so clearly there is no issue of discrimination against interstate trade. Finally, the Supreme Court specifically noted that the *Edgar* decision not only hinged on the subjection of corporations to "inconsistent regulations,"[2] but on the application of an Illinois statute to *foreign*

---

[2] As a Minnesota corporation headquartered in Minnesota, SJM cannot claim that existing Minnesota law constitutes a new or inconsistent burden on its operations.

corporations acting *entirely* outside of the state. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 88, 93 (1987). By contrast, the Indiana statute in *CTS* was valid under the Commerce Clause because it applied "only to corporations incorporated in Indiana," which has "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing." *Id.* at 93.

Yet from these four authorities addressing economic protectionism and interstate discrimination – none of which is implicated in the present case – SJM leaps to the supposition that the Commerce Clause prohibits "a nationwide class action applying one state's consumer laws." (Appellant's Brief at 23.) SJM cites exactly one "example": the opinion of the magistrate judge in *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228-31 (S.D. Fla. 2002). But *Montgomery* was decided on Florida choice-of-law principles; its brief dictum on the Commerce Clause was superfluous, and rested solely on a Florida state precedent declaring that it was "the effect on trade" that must occur within the state, rather than "the actions giving rise to the effect on trade," to avoid invalidation under the Commerce Clause. *Id.* at 228. But the Florida state case misstated the constitutional test: cases hold that conduct emanating from within the state by a state-chartered corporation may be regulated by the state consistent with the Commerce Clause. *See, e.g., CTS*, 481 U.S. at 93-94; *Diamond Multimedia Systems, Inc. v. Superior Court*, 968 P.2d 539, 556-57 (Cal. 1999). Moreover, the

facts as found in *Montgomery* apparently satisfied neither test; the airplane engine at issue was manufactured and installed – and the allegedly false representations about it were issued – by a company neither incorporated nor headquartered nor even present in Florida. 209 F.R.D. at 228.[3] By contrast, SJM's activities in Minnesota – where its products are manufactured and to where all of its profits flow – are the only activities at issue here.

Indeed, SJM's Commerce Clause theory is belied by the many examples of nationwide class actions certified under a single state's law, statutory and otherwise. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 287 (D. Del. 2002); *In re Lutheran Brotherhood Variable Life Ins. Prods. Co. Sales Practices Litig.*, 201 F.R.D. 456 (D. Minn. 2001); *Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145, 159 (Cal. App. 2001); *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987); *In re Computer Memories Securities Litig.*, 111 F.R.D. 675, 686 (N.D. Cal. 1986); *Grove v. Principle Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1106 (S.D. Iowa 1998); *Avery v. State Farm*, 746 N.E.2d 1242, 1254-55 (Ill. App. Ct. 2001); *Lobo Explor. Co. v. Amoco Prod. Co.*, 991 P.2d 1048, 1053-54 (Okla. Civ. App. 1999). Moreover, if SJM's aberrant Commerce

---

[3] Furthermore, other Florida cases make clear that Florida's consumer statutes indeed do apply to out-of-state plaintiffs, including class action plaintiffs. *See Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So.2d 1256 (Fla. 3d DCA 2000); *Renaissance Cruises, Inc. v. Glassman*, 738 So. 2d 436 (Fla. 4th DCA 1999).

Clause argument were correct, it would apply not merely to class actions, but also equally to the even more numerous and routine instances in which an out-of-state plaintiff sues a corporation headquartered or chartered in the forum state under the forum state's applicable statutes. *See, e.g., supra* note 1. Even if *Montgomery* were not already distinguishable based on the absence of forum contacts and in-state effects, its *dicta* could not match up against the overwhelming body of contrary case law.[4]

**B. SJM's Due Process Argument Fails.**

SJM could not possibly claim that subjecting a Minnesota corporation to Minnesota statutes violates Due Process, or is in any way unfair. *Cf. Allstate Ins. Co. v. Hague,* 449 U.S. 302 317-18 (1981) , (noting that even a defendant's mere business presence in Minnesota is sufficient to bar claims of unfair surprise at the application of Minnesota law). Rather, SJM asserts that it seeks to insure fairness to the Plaintiffs, although it does not address their opt-out rights, nor the salient

---

[4] SJM does not even attempt to argue alternatively that Minnesota's consumer statutes fail the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). If it had, it would not succeed. As demonstrated, the so-called extraterritorial application of Minnesota's consumer protection statutes does not discriminate against interstate commerce, nor even burden commerce at all, given that SJM must comply with its home-state law anyway. Minnesota clearly has strong interests in regulating and insuring that its statutes are obeyed by the corporations it charters, and that all persons doing business with its firms may rely on their integrity and compliance with the laws of the jurisdiction from which they operate. *See, e.g., CTS*, 481 U.S. at 93; *In re Simon II Litig.*, 211 F.R.D. 86, 176 (E.D.N.Y. 2002); *Boyes*, 27 F. Supp. at 547.

fact that no individual plaintiff will have the wherewithal to obtain medical monitoring and establish an epidemiological research program on an individual basis.

It seems reasonable to expect that a Minnesota chartered and headquartered corporation would be subject to the corporation and consumer protection laws of Minnesota in its dealings and that Minnesota law would apply to permitted Minnesota statutory claims. The only Due Process issue in the application of Minnesota law here is whether Minnesota has sufficient contacts with the case to not render the application of Minnesota law "arbitrary or unfair." *See Shutts v. Phillips Petroleum*, 472 U.S. 797, 821-22 (1985) . SJM's suggestion that a "proper" choice-of-law analysis is a separate and additional Due Process issue is wrong. The Constitution speaks to which selections of law are *permissible*; it does not demand a particular choice among permissible alternatives.[5] *See Allstate*, 449 U.S. at 307; *Richards v. United States*, 369 U.S. 1, 15 (1962).

With Due Process contacts and choice-of-law properly disentangled, SJM is hard pressed to argue that Minnesota does not possess sufficient Due Process minimum contacts with Plaintiffs' claims here. Indeed, the District Court

---

[5] The latter is an *Erie* issue, which is presented by Section VI.A.3 of SJM's opening brief and is therefore addressed below, which points out why Minnesota statutes properly – indeed, must – govern the Minnesota statutory claims under *Erie*.

expressly found that Minnesota has a significant interest in this litigation such that application of Minnesota law is neither arbitrary nor fundamentally unfair. (AA04139.) It also contradicts SJM's prior judicial admissions that Minnesota has the most significant contacts with the subject matter of the case. (ADD001-45.)

Instead, SJM cites again to *Montgomery* which, as addressed above, was decided by the magistrate judge on state-law choice-of-law principles, before issuing brief *dicta* on the federal constitution. Moreover, *Montgomery* specifically found that Florida had insignificant contacts with the claims, since all the activities and decisions at issue occurred outside of Florida, by a company with no presence in Florida. 209 F.R.D. at 228.

SJM also invokes two additional cases in its Due Process argument: *In re Bridgestone/Firestone Inc.*, 288 F.3d 1012 (7th Cir. 2002) and *Lyon v. Caterpillar*, 194 F.R.D. 206 (E.D. Pa. 2000). *Bridgestone* did not address Due Process minimum contacts or any other constitutional issue; it merely addressed the selection of law under Indiana's applicable choice-of-law procedure.[6] *Lyon* merely illustrates the absence of significant contacts with the forum where "the only

---

[6] Again, choice of law under *Erie R.R. v. Tompkins*, 304 U.S. 78 (1938) and *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941), is addressed below. Notably, for comparison purposes in such analysis, *Bridgestone* did not involve a statute declaring Indiana's intent to welcome suits by "any person" under the statute, and its default choice-of-law principle (unlike Minnesota's) was *lex loci delecti* (place of injury). *Bridgestone*, 288 F.3d at 1016.

contact the parties have with [the forum] is that some of the putative class members may reside [there]." 194 F.R.D. at 213. If the defendant in *Lyon* had been incorporated, headquartered, and acting in the forum state – as in the present case – its Due Process contacts analysis would have come out differently. *See, e.g.*, *Grove v. Principle Mut. Life Ins. Co.,* 14 F. Supp. 2d 1101, 1106 (S.D. Iowa 1998); *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D. N.J. 1998).

By contrast, as cited above, many cases have applied one state's law to national class actions. Minnesota's contacts with this case exceed those that passed constitutional muster in most of those cases. The District Court did not abuse its discretion in finding Minnesota law to comport with Due Process.

**C. SJM's Full Faith and Credit Argument Fails.**

SJM's Full Faith and Credit argument is not really separate from its failed Due Process argument, and in any event fails along with it. *Cf. Allstate,* 449 U.S. at 308 (Full Faith and Credit no longer requires weighing state interests and essentially turns on the same issues as Due Process contacts). The Full Faith and Credit clause requires recognition of sister state court judgments but does not require Minnesota to confer upon its domestic corporations – which owe their very existence to Minnesota statutory law – immunity from Minnesota statutes out of inflated deference to unspecified foreign statutes that may or may not in any way

conflict.[7] In interstate disputes, a court may lawfully choose to apply the single law of any of two or more different states, even if they yield different results. *See Hyatt*, 538 U.S. at 496. So long as minimally sufficient contacts are present comporting with Due Process, the Full Faith and Credit clause never requires a state to "substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Id.*; *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 232-33 (1998); *Sun Oil v. Wortman*, 486 U.S. 717, 722 (1988). A forum state is likewise never required to apply another state's law in abrogation of the forum state's own public policy. *Nevada v. Hall*, 440 U.S. 410, 422 (1979). Minnesota, like other states, is competent to legislate corporation and consumer protection laws regulating domestic corporations, and its public policy regarding statutory consumer protection of out-of-state plaintiffs who buy and use products or services from Minnesota corporations is codified in the statutes themselves: they are afforded to "any person."

---

[7] *See Hyatt*, 538 U.S. at 494, 498 (noting that Full Faith and Credit is necessarily less exacting with respect to choice of law, and the conundrum presented by elevating one state's law over another). Indeed, SJM's argument otherwise equally suggests that the home states of each of the Plaintiffs would also have to deny their citizens the right to sue SJM out of exaggerated deference to Minnesota's laws, thus leaving SJM immune to consumer suits by anyone, anywhere.

## D. The Application of Minnesota Statutory Consumer Law Is *Required* by *Erie v. Tompkins* and Does Not Run Afoul of the Rules Enabling Act.

Depleted of novel constitutional arguments, SJM retreats in Section VI.A.3 to more attacks on the District Court, but these are equally ineffective.[8] As discussed, Minnesota statutory law routinely applies to the statutory claims of in-state and out-of-state plaintiffs against a Minnesota corporation acting from Minnesota. This leaves SJM to argue only that Minnesota actually never intended that its consumer statutes would protect out-of-state consumers in these circumstances at all. This demonstrably false assertion is the linchpin of both SJM's *Erie* argument (because *Klaxon* requires application of the forum state's choice of law) and its cursory Rules Enabling Act argument (because if Minnesota did not mean to accord foreign plaintiffs the right to sue Minnesota corporations, then class plaintiffs might be receiving new rights). Because their shared premise is easily shown to be untrue, both arguments fail from their inception.

The District Court was not merely constitutionally *permitted* to find that Minnesota law governs Plaintiffs' statutory consumer claims; it was *required* to do

[8] The organization of Section VI.A of SJM's Opening Brief seems confusing, but to the extent that SJM's Due Process argument in Section VI.A.2 also mixes in assertions about the "proper analysis" of choice of law (in addition to the familiar significant contacts Due Process analysis under *Shutts*), it seems merely to preview the *Erie* choice-of-law issue that it announces in the heading for Section VI.A.3. *See supra* note 6.

so under the rule of *Erie* because that is the law Minnesota applies to the claims. Under *Erie,* a district court must apply the substantive law that a state court would apply to the action. *Day and Zimmermann v. Challoner*, 423 U.S. 3, 4 (1975); *Klaxon*, 313 U.S. at 496. The choice-of-law analysis proceeds claim-by-claim; different claims in the complaint – such as tort claims versus statutory claims – may be governed by different states' laws. *See Ewing v. St. Louis-Clayton Orthopedic Group, Inc.*, 790 F.2d 682, 686 (8th Cir. 1986).[9]

SJM argues as though Minnesota were perpetually obliged to base all of its choice-of-law decisions on a "most significant contacts" analysis, of the type the District Court conservatively applied to the tort claims in the case. It offers no support for this assumption and is clearly wrong. "The states are free to adopt such

---

[9] SJM's Opening Brief makes an oblique argument in Section VI.A.2 to suggest that a court must perform a separate choice-of-law analysis for every single class plaintiff *individually*. If that were true there would be no significant national class actions ever certified in the United States. SJM's nominal basis for the erroneous proposition seems to be dictum from *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996), which quoted selectively from *Shutts* to the effect that the forum state's contacts must be to the claims asserted by each member of the plaintiff class. That is true, inasmuch as the claims asserted by each class member are contained in the master complaint, but does not suggest that there are other individual phantom claims that must be examined separately from the complaint; by definition in a class action, there are not. SJM's suggestion to perform more than 11,000 separate choice-of-law analyses is not the law in the federal courts of the United States, and *Shutts* elsewhere describes the Due Process test without the seized-upon "each class member" language. 472 U.S. at 818. Moreover, for Due Process purposes, SJM's extensive connections with Minnesota alone are more than sufficient.

rules of conflicts of laws as they choose." *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 516 (1953). Sometimes Minnesota, like most other states, explicitly announces a different choice of law calculus in a statute. *See*, *e.g.*, Minn. Stat. § 336.1-105(1) and cmt. 3 (setting forth the forum-favored choice of law applicable to claims arising under the Minnesota's enactment of the Uniform Commercial Code); *Fedders Corp. v. Taylor*, 473 F. Supp. 961, 971, n.3 (D. Minn. 1979) (applying Minnesota law in U.C.C. action by foreign plaintiffs against domestic corporation). So long as the minimally-required Due Process contacts are present, courts routinely apply local statutes in the manner intended by the state legislature, regardless of what the state's default choice-of-law principles might otherwise suggest. *See* Restatement (Second) Conflict of Laws § 6 cmt. A (1971); *Boyes*, 27 F. Supp. 2d at 547. In short, SJM's assertion that the District Court "decided that the statutory claims were different from tort and warranty claims" (Appellant's Brief at 17) is essentially correct – they *are* different here because Minnesota's choice of law is codified in the extension of rights to "any person," rather than the product of a multi-factor analysis. The District Court thus correctly performed Minnesota's applicable choice-of-law analysis on the statutory claim.

SJM's only remaining response is that the Minnesota statutes' "any person" language grants out-of-state plaintiffs ***standing*** to sue under them – but then somehow does not allow the plaintiffs to rely on the substantive protections of the

statutes under which they are rightfully suing. (Appellant's Brief at 26-27.) This is wholly unsupported. The result is that the District Court correctly applied Minnesota law to the Minnesota statutory claim because that is the law Minnesota has explicitly declared applied to the claim.

This is also exactly why SJM's brief argument (Section VI.A.3) that the consumer class violates the Rule Enabling Act fails: the class creates no new rights because each Plaintiff already individually possessed the right to rely on the protections of the Minnesota statutes affording claims to "any person" harmed by a Minnesota corporation.[10] This is clear from the face of the statutes, and is again confirmed by the courts.[11]

The application of Minnesota statutory consumer law to Plaintiffs' circumstances is permitted by the Constitution in light of Minnesota's plainly significant connections with the case. Such application is in fact required under *Erie* because it is the law that Minnesota specifically chose to effectuate the

---

[10] *Cf. Pfizer, Inc. v. Government of India*, 434 U.S. 309 (1978) (interpreting the term "any person" in the Clayton Act to enable even foreign nations to rely on protections of the Act).

[11] The reasoning of *Erie* prohibits a court from bypassing the forum state's stated choice of law in favor of any other analysis, but SJM has not even made a case that its preferred "most significant contacts" analysis would yield a different result. As discussed above, Minnesota has a paramount interest in insuring that its statutes are obeyed by the corporations it charters, and that all persons doing business those corporations may rely on their integrity and compliance with the laws of Minnesota. Indeed, SJM has judicially admitted that Minnesota has the most significant contacts with the subject matter of the case. (ADD001-45.)

consumer protections it confers on all who purchase products or services emanating from Minnesota-chartered and -headquartered corporations acting from within the state. The District Court was thus manifestly correct in its choice of law for the statutory consumer claim, and thus did not abuse its discretion in certifying the statutory consumer class.

## II.

## ABSENT CLASS MEMBERS' PERSONAL INJURY CLAIMS WILL NOT BE PRECLUDED BECAUSE THE CIRCUMSTANCES EXEMPT APPLICATION OF *RES JUDICATA* FOR COLLATERAL LEGAL THEORIES LEFT UNADJUDICATED IN THIS CLASS ACTION.

SJM's present appeal implicitly argues that the District Court abused its discretion in certifying the statutory consumer claims while declining class status to personal injury claims. SJM asserts that certifying a class action is an all-or-nothing proposition. This position would reverse decades of class action practice. Congress constructed Rule 23 to enable the Court to try some issues with common proof without prejudicing the ability of absent class members to pursue additional relief based on individual theories of recovery.

Courts have properly recognized obvious exceptions to claims-splitting prohibitions, all of which applied to proceedings below. The first exception applies automatically under the present circumstances: the District Court properly certified a class under Minn. Stat. § 8.31, subd. 3a, the Private Remedies section of

Minnesota's Attorney General statute ("Private AG statute"), and has decided not to certify personal injury actions, a dichotomy that Rule 23 expressly allows.

The second exception allows courts expressly to "reserve" the rights of absent class members to bring individual cases under other theories that arise from the same transactions or occurrences giving rise to claims in the class action.

The first two exceptions derive from the Restatement (Second) of Judgments and from Rule 23 itself. The Restatement provides, in pertinent part:

> § 26. Exceptions To The General Rule Concerning Splitting
>
> (1) When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
>
> ***
>
> (b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or
>
> (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief[.]

Subsection (c) applies to class actions in which the Court has decided to certify classes pertaining to only some legal theories, while indicating that other non-certified legal theories will have to be adjudicated individually. Subsection (b) outlines the Court's discretion in expressly reserving the right of individuals to

pursue non-certified claims (here, personal injury claims) in a separate action. The Eighth Circuit has unflaggingly applied section 26 of the Restatement (Second) of Judgments to overrule *res judicata* defenses. *Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1214 (8th Cir. 2001); *Baker Group, L.C. v. Burlington N. & Santa Fe Ry. Co.*, 228 F.3d 883, 887 (8th Cir. 2000); *Klipsch, Inc. v. WWR Tech.*, 127 F.3d 729, 734-35 (8th Cir. 1997).

## A. So-Called "Claim-Splitting" Is Permissible in Class Actions and Does Not Preclude Non-Certified Legal Theories from Being Pursued in a Later Action.

SJM posits that a consumer class action cannot be maintained where there also may be claims by absent class members for personal injury against the same defendant because absent class members would, theoretically, have the obligation to bring their personal injury claims along with their statutory consumer claims. However, if the rule advocated by SJM were to prevail, the class mechanism becomes a useless relic.

Citing *Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999), SJM asserts that the continued certification of the consumer fraud claims would make Plaintiffs inadequate because a judgment on consumer fraud would have a *res judicata* effect upon their personal injury claims and those of the rest of the class. That case dealt with potential *res judicata* effects on non-class certified personal injury claims of a certified medical monitoring claim. However, the

District Court, through its grant of class certification for certain legal theories and its denial to others, properly declined to apply *Thompson* to the circumstances of this case.

Like few other courts, the Court in *Thompson* was unwilling to maintain class proceedings, citing *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982), a case where a trial court refused to certify any class where some claims would be adjudicated but others would not. However, the United States Supreme Court's opinion in *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S. Ct. 2794 (1984), rejected the holding and rationale articulated in *Feinstein.*

Therein the Supreme Court held that the general rule invoking *res judicata* had no application to former Title VII class plaintiffs because the alternate theories seeking relief from individual discriminatory acts required different elements of proof. *Id.* at 878-80, 104 S. Ct. at 2800-02. *Res judicata*, therefore, did not bar the plaintiffs from bringing their individual claims against the employer in separate actions. *Id.* In so holding, the Supreme Court determined that a court's choice to use the class device in order to address common questions under Rule 23 supersedes other procedural requirements of individual actions. Rule 23 thus trumps blind application of *res judicata* principles.

Courts routinely segregate legal theories of relief, certifying some and not others. The Advisory Committee Notes to Rule 23 contemplate even further segregation, indicating that some ***elements*** of a legal theory, such as liability, may be proven using the class device, while the elements of damages would be proven individually ("For example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims."). Certainly the ability of the District Court to certify subclasses, as it has done in the instant action, demonstrates that SJM's all-theories-or-none result is indefensible.

In holding out Rule 23(c)(4) as providing a clear exception to claim-splitting arguments, courts have rejected defendant's attempts at raising the specter of full *res judicata* application to partially adjudicated claims in order to scuttle class certification in its entirety. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 432 and 441 (4th Cir. 2003) (Rule 23(c)(4) allows court to segregate and separately certify some causes of action without certifying others, and reading Rule 23 to require all-or-nothing approach due to *res judicata* concerns would make (c)(4) superfluous and meaningless; "a class action, 'of course, is one of the recognized exceptions to the rule against claim-splitting.'"); *see also Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex. App. – Texarkana 1995), reh'g overruled

(Dec. 5, 1995) (court determined that, based on court's discretion in maintenance of large suits, class action rules giving courts flexibility in structuring action take precedence over claim-splitting concerns, and thus legal theories not litigated in class actions are not precluded in subsequent individual suits); *Sullivan v. Chase Inv. Serv.*, 79 F.R.D. 246, 265 (N.D. Cal. 1978) ("What defendants have characterized as "splitting" causes of action is perfectly appropriate under Rule 23."); *Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64 (M.D. Tenn. 2004) (Trial by Jury Clause of constitution not violated where purported claims-splitting by plaintiffs pursuing injunctive relief, but not damages, did not forego pursuit of "live claims" "timely and properly demanded").

It would be incongruous to disallow a class action based on the theory that a collateral, procedural mechanism requires an all-theories-or-none approach, when Congress has expressly created a mechanism to segregate theories that courts can adjudicate with common proof.

### B. Courts May Expressly "Reserve" Claims Against Which *Res Judicata* Will Not Apply in Later Actions.

"Claim-splitting" is permissible where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action." Restatement 2d Judgments § 26(1)(b). Where such language is ***expressly*** included in an order, courts have declined to apply *res judicata* to the unlitigated theories of relief,

notwithstanding that the theories may otherwise require pursuit. *See Marshall v. Kirkland*, 602 F.2d 1282, 1298 (8th Cir. 1979) (where court adjudicated class claim "without prejudice to the right of the other members of this or any other class to initiate a new action if they see fit," court held that remaining legal theories were ripe for pursuit in later action); *see also Fabricant v. Sears Roebuck*, 202 F. R. D. 310, 319-20 (S.D. Fla. 2001) (in case where TILA claim allowed both statutory and actual damages, but where actual damages would require individualized proof of reliance, court yet certified the a statutory damages class under TILA and reserved actual damages claim because Restatement (Second) Judgments § 26(1) allows courts to reserve claims for later litigation); *Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576 (1st Cir. 1995) ("Under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action."). Thus, upon final judgment, the District Court may, in an order, expressly reserve the potential personal injury theories of absent class members.

### C. Class Notice Can Advise People Who Wish to Pursue Personal Injuries to Seek Counsel and Opt Out.

Finally, even if, *arguendo*, the class action device itself did not already moot the issue of "claim-splitting" or that an express reservation may not bar the effects

of *res judicata* on class members with personal injuries, class notification procedures may be employed to protect those who do not wish to be married to the class judgment. Courts recognize that a properly drafted class notice can allow single issue class actions to proceed while affording absent class members due process protections from any potential adverse *res judicata* effects. *See In re Universal Serv. Fund Telephone Billing Practices Litig.*, 219 F. R. D. 661 (D. Kan. 2004); *see also Gasperoni v. Metabolife Int'l Inc.*, 2000 WL 33365948, *4 (E.D. Mich. Sept. 27, 2000) .

Here, Appellees' proposed language for the class notice covered this ground. SJM's attorneys studied the proposed language and even made additions to it. The present language represents both parties' input. Persons with personal injuries are informed that they are not members of the class. Furthermore, the proposed notice informs those who are class members of the opportunity and procedure to exclude themselves from the class judgment.

Clearly, SJM's claim-splitting concerns lack substance. The classes comprise individuals in the (1) medical monitoring class who do not yet have ripe personal injury claims and (2) consumer protection class, who have paid for the device and may be entitled to economic damages for the cost of explant or other procedures due to Silzone complications. The only issue presented in these classes that has the potential to overlap with personal injury claims is the explant cost. But

if the Court allows the jury to consider explant costs for the Consumer Statutes Class, then such reimbursements, as an element of damages, may be offset in subsequently tried, individual personal injury cases without any prejudice to the parties.

In sum, the Court may rely on Rule 23's exception to "claim-splitting" concerns, carve out an appropriate, express reservation in an order, or rely on the well-crafted class notice, which duly informs personal injury victims that their personal injury claim is not recoverable in the class action and informs all class members of their opt-out rights. There is absolutely no reason, therefore, to decertify the consumer protection class.

## III.

## THE PLAINTIFFS' CIRCUMSTANCES ARE CHARACTERISTIC OF THE CONCISELY DEFINED PARAMETERS OF THEIR CLASSES AND THE LEGAL THEORIES INVOKED LEND THEMSELVES TO CLASS TREATMENT.

### A. The Representative Plaintiffs-Appellees Have the Same Claims and Consumer Injuries as the Entire Class, and Proving SJM's Deceptive Conduct Inures to the Benefit of All Class Members.

In the middle of its brief, SJM sketches an oblique attack on the "typicality"[12] of Appellees Ms. Sliger, Mr. Sanchez, and Mr. Redden to represent

[12] SJM improperly conflates elements of "adequacy" and "typicality," but its brief solely attacks typicality issues. Nowhere does SJM challenge named plaintiffs'

the class. Yet, this is an attack based solely on Rule 23 buzzwords with no legal backing.

The Rule 23(a) typicality requirement is satisfied when the claims of named plaintiffs emanate from the same legal theory as the claims of the class members. *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995); *In re Potash Antitrust Litig.*, 159 F.R.D 682, 690 (D. Minn. 1995). The typicality inquiry purposes "to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998).

The relevance of SJM's argument on this point is difficult to comprehend, given that SJM attacks both Ms. Sliger and Mr. Sanchez on the basis that they are not fit to represent an "injury class" on the one hand, while on the other hand SJM attacks Mr. Redden's representation of an "uninjured class" because of purported medical idiosyncrasies. Neither of these "classes" exists, however, and SJM wastes five pages of its appeal creating a straw man.

While rejecting injury classes, the District Court certified a narrow, but overarching, consumer fraud class, comprised of all implantees, ***regardless of***

---

abilities or willingness to participate or their counsel's competence – the elements of adequacy.

***personal injury***, because Appellees alleged that Silzone was better than other heart valves, charged a premium price, and caused many doctors to administer, and patients to undergo, implants of Silzone valves based on an untested and now proven ineffective theory. These are consumer injuries, not personal ones. Each named plaintiff has typical claims and injuries of the entire consumer protection class – each paid for and was implanted with a Silzone valve that was fraudulently marketed. Therefore, Appellees' pursuit of their own goals of proving deceptive conduct will work to benefit the entire class. This is the hallmark of typicality.

**B. The District Court Properly Acknowledged That the Consumer Protection Class Is Not a "Personal Injury" Class, and the Statutes' Relaxed Standards of Proof Will Permit the Court to Manage the Class Action Easily.**

SJM argues by implication what it cannot through case law or relevant, established fact: that the District Court certified a multi-state negligence / product liability class action. Specifically, SJM's doublespeak includes its abundant use of the term "personal injury" to describe the claims brought by the certified consumer class. The reason for this use of code is clear – the District Court expressly rejected certification of the "personal injury" class under theories of negligence and product liability. Not surprisingly, the three pages of single-spaced, footnoted string citations decrying the class action device for use under common law theories of causation do absolutely nothing to address the only relevant inquiry before this

Court – whether Appellees' claims under Minnesota's consumer fraud statute are certifiable. The District Court properly viewed the consumer fraud damages as seeking much narrower relief than personal injury claims would allow. *See* AA04294 ("The only portion of Class I's complaint that seeks monetary damages is the claim for restitution under Minnesota's consumer protection laws. … [T]his count seeks a refund of money paid for Silzone products and certain consequential damages ….").

SJM again employs buzzwords designed to mislead: "personal injury" and "unmanageable." But these ploys failed the test of the District Court's discretion as they must fail after this Court's review for an abuse of that discretion. The law is clear: in a private damages case under Minnesota's consumer protection statutes, the District Court must ultimately determine whether Plaintiffs can demonstrate a legal nexus between the harm and the deception without requiring individualized inquiries of each person alleged to have been deceived. *Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 14-15 (Minn. 2001). In *Lutheran Brotherhood*, 201 F.R.D. at 464, the court determined that plaintiffs "alleged essentially the same type of widespread fraud" as in *Group Health*, where plaintiffs, on behalf of a class, averred that defendant "marketed and sold" insurance policies using misleading illustrations that lead consumers to believe that their obligation to pay premiums would expire. *Id.* at 462. With regard to the

defendant's claim that the case would be unmanageable, the court held, "Class certification on the statutory fraud issue will not be unmanageable, but rather, is a superior method of proceeding in this litigation." *Id.* at 464.

As in *Group Health* and *Lutheran Brotherhood*, Appellees in the present case have alleged that SJM used false and misleading information and advertisements to induce implant patients and their doctors to use the Silzone coated heart valves. AA00007-08. Appellees presented these claims as common questions among Class members. AA00023-24.

SJM denies these authorities by claiming that the consumer fraud class is a foil for the decertified "personal injury" class; however, there are thousands in the consumer fraud class who do not have any personal injuries. Appellees seek only the medical and transactional costs associated with SJM's deceptive conduct: the cost of the premium-priced device, the cost of any explant surgery, lost wages resulting from any explant surgery, medical monitoring, and an epidemiological study. These are objective, economic costs and not typical personal injury damages.

Recouping medical costs is a standard recovery under UDAP regimes and requires no individualized proof of causation. *Group Health*, 621 N.W.2d at 14. The sole damages claimed in that action were ***medical costs*** associated with smoking-related illnesses. *Id.* at 4-5. Likewise, in *Blue Cross and Blue Shield of*

*New Jersey, Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 353 (E.D.N.Y. 2000), a health insurer sued a tobacco company to recover tobacco-related ***health care outlays*** made by the insurer on behalf of plan members. Because, like Minnesota's statute, New York's consumer protection statute does not require individualized proof of causation in the form of reliance, the court held the action was properly pled (even where the insurer's fraud claims at common law failed). *Id.* at 386.

As such, Appellees' claims do not hinge on product liability theories. The broad policy of UDAP statutes includes remediation and disclosure of unsafe products as well as worthless ones. For instance, Minnesota's DTPA specifically forbids any "represent[ation] that goods or services have ... characteristics, ingredients, uses, benefits, or quantities that they do not have." Minn. Stat. § 325D.44, subd. 1(5). That section also forbids any "represent[ation] that goods or services are of a particular standard, quality, or grade, ... if they are of another." *Id.* at subd. 1(7). Misrepresenting the efficacy and safety of a product or causing illness because of a deception is clearly the type of conduct the legislature intended to remediate. *See* AA04299 ("In this case, the Court finds that plaintiffs have pleaded and presented evidence that their damages stem at least in part from SJM's marketing material that, according to plaintiffs, claimed that Silzone effectively prevented endocarditis."). While the ends of a product liability case are relief from injuries caused by the dangerousness of the product, the ends of a consumer

protection case are relief from deceptive conduct in marketing and securing sales with misrepresentations and material omissions. *Pomianowski v. Merle Norman Cosmetics, Inc.*, 507 F. Supp. 435, 437 (D. Ohio 1980). It does not stand to reason that consumer products cannot be subject to broad consumer protection laws merely because a common law theory may also abide.

Injunctive relief and awards of damages related to product defects serves to remedy unlawful conduct because they act as a deterrent to dishonest business practices. The Minnesota Supreme Court has repeatedly recognized Minnesota's consumer protection statutes as broad, remedial laws that exist to equalize the imbalance of bargaining power between consumers and sophisticated sellers. *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000) (Minnesota legislature adopted MCFA for same purpose as other states had been enacting similar statutes since 1950's: "to prohibit deceptive practices and to address the unequal bargaining power often present in consumer transactions"); *State v. Alpine Air Products, Inc.*, 500 N.W.2d 788, 790 (Minn. 1993) ("In passing consumer fraud statutes, the legislature clearly intended to make it easier to sue for consumer fraud than it had been to sue for fraud at common law. The legislature's intent is evidenced by the ***elimination*** of elements of common law fraud, such as proof of damages or reliance on misrepresentations.") (emphasis in original). That Court has specifically held that the remedial aspects of the statutes, and therefore their broad

application in consumer transactions, do no fall away when a private citizen sues for damages under the Private AG Statute. *Group Health*, 621 N.W.2d at 12-13 (in recognizing that Minnesota legislature expanded connection between conduct and injury necessary to permit suit, Court expressly held that elimination of reliance from fraud cause of action applies to both injunctive ***and damages*** cases). By all accounts, the thousands of Silzone implants demonstrate that SJM's marketing of Silzone as being safe and more efficacious at fighting infection, its suppression of data indicating that Silzone was ***worse*** at fighting infection, and Silzone's premium pricing constitute the precise type of deceptive conduct Minnesota's consumer statutes are designed to remedy.

All fifty states and the District of Columbia have enacted consumer protection statutes with broad applicability to most consumer transactions, designed to protect consumers from unfair, deceptive and abusive business practices in the marketplace. National Consumer Law Center, *Unfair and Deceptive Acts and Practices* § 1.1 (2001 5th ed. & Supp. 2003). Most states, including Minnesota, patterned their statutes after the language in Section 5(a)(1) of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1) (2001), which provides in relevant part that "unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." This Court has recognized Minnesota's adoption of both the spirit and letter of these broad provisions:

> By 1981, every state in the United States had statutes providing for consumer protection enforcement by a state agency – commonly, as in Minnesota, the state attorney general – with broad enforcement authority. Minnesota's Consumer Fraud Act was adopted in 1963 to achieve the same purpose[.]

*Ly*, 615 N.W.2d at 308 (citation and footnote omitted). By incorporating the FTC Act's broad and expansive prohibition against unfair or deceptive practices affecting commerce, Minnesota and other states enacted laws with potent private and state remedies providing wide-spread redress for marketplace abuses. Because Minnesota's consumer protection statutes are designed to prevent and to cease deceptive conduct, Appellees' alleged damages, limited though they are to pecuniary losses, serve the important purpose of protecting the citizenry by deterring harmful business practices.

When viewed in light of the consumer protection statutes' remedial goals and allowance for common and circumstantial proof of harm resulting from deception, it is clear the District Court properly exercised its discretion in certifying a consumer protection class.

# IV.

# THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION OR VIOLATE ANY CONTROLLING PRINCIPLES OF LAW IN ITS DECISION TO CERTIFY A MEDICAL MONITORING SUBCLASS IN SEVENTEEN JURISDICTIONS WHOSE LAWS ALLOW SUCH CAUSES OF ACTION ABSENT PROOF OF PRESENT PHYSICAL INJURY.

## A. The District Court Properly Performed an Analysis of State Laws Under the *Erie* Doctrine to Determine What States' Laws Permitted Medical Monitoring Relief to Exposed, But Asymptomatic, Tort Victims.

In addition to certifying a nationwide class under Minnesota's consumer fraud laws, the District Court concluded that the pivotal and overarching questions of (i) whether Silzone was defective, and (ii) whether its defective nature presented a grave, latent and continuing danger to those in which it remained, warranted the certification of a separate medical monitoring / epidemiological program subclass under Rules 23 (A), 23(b)(2) and 23(b)(3). This subclass – which trains on the product as opposed to SJM's marketing misconduct – offers Silzone victims an alternative legal basis for creating the medical monitoring program sought.[13] After very careful and deliberate consideration of both the claims and the parties' well briefed positions on the scope and manageability of such a class, the District Court determined that an appropriate and manageable class could, and should, be defined

[13] Should the nationwide class prevail, the subclass would become subsumed by that as there is need for only one program.

by limiting it to only asymptomatic Silzone implantees from jurisdictions whose law permits medical monitoring relief as a stand alone cause of action without requiring proof of a current injury. (AA04303, AA06152, AA06834.) By limiting the subclass in this fashion, the Court reduced the number of possible conflict of law issues that could arise and also avoided, to the extent possible, the need for lengthy efforts to prove the extent and causation of an individual's injuries. (AA06152.) Thereafter, to determine which states fell within this class definition the District Court, with the assistance of the parties, surveyed the medical monitoring laws of the various states in which implantees resided or in which implantation had occurred. Based on that survey it concluded that seventeen states' law substantially satisfied both criteria.[14] (AA06157-60, AA06836-38.)

SJM now claims that the District Court erred: (1) by undertaking an *Erie* analysis for states where no high court decision had determined that state's law on medical monitoring; and (2), to the extent the District Court's *Erie* analysis was

---

[14] Originally fourteen states were included in the class. (AA06158-60.) However, on subsequent briefing the Court added Illinois to the original subclass (finding it had miscategorized this state); deleted Tennessee from the original subclass (after Plaintiff agreed that the status of its law was questionable); and added three more states, albeit as a separate subclass, Connecticut, Delaware, and Minnesota. These three states were added after it was determined that the quantum of injury required under their substantive law to satisfy the "injury" element was so slight (*i.e.*, "subcellular or subclinical" injury sufficed) that a medical monitoring cause of action under their laws was indistinguishable from that of the original class of states. (AA06836.) Hence, the total number of states in the two medical monitoring subclasses, stands at seventeen.

proper, for guessing wrong (in SJM's view) when it determined that Colorado's, Connecticut's, Delaware's and Minnesota's laws would allow medical monitoring under the circumstances presented.[15] SJM's challenges of Judge Tunheim's decisions are completely unfounded and misplaced and do not warrant reversal.

SJM's first assignment of error is an incorrect and unfair characterization of what the District Court actually did. SJM accuses Judge Tunheim of writing new law for states whose law was undecided. A fair reading of the Court's opinion against the record that was before it establishes clearly that its analysis was performed fully, consonant with a District Court's duties and obligations under *Erie*. Judge Tunheim looked first to the law of the states as expressed by their highest court or legislature, and where none existed, he then predicted the law of a state based upon all presently available state and federal trial and appellate opinions concerning the jurisdiction's view on the subject. Such analysis using such data is exactly what long standing law requires a district court to do. *Id.*; *West v. AT&T Co.*, 311 U.S. 223, 237 (1940); *Trimble v. Asarco, Inc.*, 232 F.3d

[15] SJM cites the District Court's prediction of these four states' law as allowing a medical monitoring claim without requiring proof of a present injury or requiring only proof of subclinical or subcellular injury as examples of the District Court's alleged error. (Appellant's Brief at 46-47.) In fairness, if there were other similar predictions of state law that SJM contends were wrongly decided by Judge Tunheim, then SJM should have made them known to this Court at this time. Since no other states are specifically complained about, SJM cannot later be heard to challenge the propriety of the District Court's determination of any other state's laws.

946, 963 (8th Cir. 2000); *Karas v. American Family Ins. Co.*, 33 F.3d 995 (8th Cir. 1994); *Peterson v. U-Haul Co.*, 409 F.2d 1174, 1177 (8th Cir. 1969).

The District Court also did not create new law nor did it push undecided states into vanguard positions on medical monitoring. An examination of the three opinions on certification shows that Judge Tunheim conservatively and appropriately predicted what the law of the undecided states was based on available and credible data.[16] While declining to follow SJM's suggestion that it abstain or "await a determination" by a state's highest court, it did what was incumbent upon it as a District Court presiding over a diversity jurisdiction matter, it predicted state law when and where it had sufficient precedent upon which to base its decision. (AA06837-38.) *West v. AT&T Co.*, *supra*; *Peterson v. U-Haul Co.*, 409 F.2d 1174, 1177 (8th Cir. 1969). Although this Court has recognized that predicting state law where the clues are sparse can be "a hazardous and unsatisfactory method of deciding litigation," *Peterson*, 409 F.2d at 1177, it still instructed trial courts that a "federal court must make an objective effort to rule the issues according to state law." *Id.* Thus, this Court affirmed a district court's prediction of South Dakota law (regarding an anti-assignment provision) based on

[16] Describing the District's Court's application of *Erie* in this matter as "conservatively performed" is more than amply borne out by the fact that, where it felt there was insufficient evidence or data on which to predict an "undecided" state's law, consistent with this Court's decision in *Trimble*, 232 F.3d at 963, the state was not included in the medical monitoring class. (AA06164-66.)

generic principles of statutory interpretation and parallel authority from other jurisdictions without citation to any South Dakota state cases. *First Colony Life Ins. Co. v. Berube*, 130 F.3d 827 (8th Cir. 1997).

With respect to this Court's decision in *Trimble*, on which SJM relies heavily, a fair reading does not stand for the proposition that the District Court below acted improperly or abused its discretion in finding under *Erie* that medical monitoring existed as part of the substantive law of a particular state or what was the nature or quantum of proof needed to support a claim. Therein this Court affirmed a trial court's finding under *Erie* that it was unlikely Nebraska would recognize a medical monitoring remedy absent proof of some physical injury. *Id.* at 963. While the decision cautions a district court not to unduly extend state law when there was no clear case law or statutory guideposts available, the Court did not direct that a district court abstain from its duty under *Erie* to make a finding. Nor did it hold that a district court under *Erie* could not find in a proper case that an undecided state would allow a cause of action absent proof of a present injury. Moreover, where there were sufficient and appropriate guideposts, the federal judiciary has repeatedly predicted state law under *Erie*, as evidenced by one of the seminal decisions in this area, *In re Paoli Railroad Yard PCB Litig.*, 916 F.2d 829 (3d Cir.1990) (predicting Pennsylvania law).

Since both the Supreme Court and this Circuit are clear that *Erie* requires a district court to predict applicable state law when necessary and possible, and that all available data may and should be considered in the analysis, which in this case was done, the District Court did not err in conducting an *Erie* analysis and predicting pertinent state law.

SJM's second argument based on *Erie* is incorrect and unsupported. SMJ claims the Court wrongly guessed the laws of Delaware, Colorado, Connecticut and Minnesota. The District Court, however, correctly predicted under *Erie* that these four states' laws would permit medical monitoring claims based on proof of either the fact of toxic exposure alone or upon subclinical or subcellular damage. (AA06836-38.)

To start, SJM glaringly misportrays what Judge Tunheim actually held regarding Delaware law. While it is true the Delaware Supreme Court in *Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647, 651 (Del. 1984), dismissed a claim for medical monitoring, it did so principally because the plaintiffs before it (the spouses of asbestos workers) had neither: (1) been clearly exposed to toxic substance (asbestos); nor (2) alleged that they had sustained a physical injury as a result.[17] At the same time, however, the Delaware court

[17] Rather, they sought medical monitoring for mental distress they developed due to *possible* exposure to asbestos while laundering their husbands' clothes.

implicitly endorsed medical monitoring where a physical injury involved subclinical infection rather than clinically active disease by distinguishing the case of *Plummer v. U.S.*, 580 F.2d 72 (3d Cir. 1978). There the "plaintiffs' claims for mental distress following exposure to a fellow prisoner with active tuberculosis were permitted because scientific skin tests corroborated that tubercle bacilli had infected plaintiffs' bodies. Therefore, unlike the plaintiffs' in the [*Mergenthaler*] case, those plaintiffs [in *Plummer*] were able to show a physical injury." *Id.* at 651.[18] It is this later point from *Mergenthaler* – that under Delaware law a subclinical injury could suffice to support a medical monitoring claim – that caught the court's attention and supported its ultimate finding that under Delaware law the alleged subcellular damage that all Silzone patients suffered from the highly toxic effect silver ions or particles emanating from the Silzone cuff had on heart muscle and healing tissue with which it came in contact satisfied the "injury" requirement under Delaware law. This, in turn, permitted Delaware Silzone victims to be part of the medical monitoring class, albeit as part of a separate subclass. (AA06836.) For SJM to claim that the District Court erred by including Delaware in the

---

[18] In *dicta* appearing in another Delaware case, *United States v. Anderson*, 669 A.2d 73 (Del. 1995), a case Defendant did not cite, the Delaware court addressing state law questions certified to it by a district court observed that a requirement of a present physical injury would prevent "plaintiffs from claiming that exposure to toxic substances, for instance, has created an increased risk of harm not yet manifested in a physical disease." *Id.* at 77.

monitoring class, when the Delaware high court "has expressly rejected the defining premise of the medical monitoring class," unfairly and harshly mischaracterizes Judge Tunheim's actual holding.

Connecticut's highest court spoke about medical monitoring in the case of *Doe v. City of Stamford*, 699 A.2d 52 (Conn. 1997). There the court approved medical monitoring in a worker's compensation case brought by a policeman potentially exposed to two diseases (HIV and tuberculosis) in the course of his duties, although he showed no evidence of having contracted either. In allowing medical monitoring in such circumstances, the court's opinion cited favorably to the Third Circuit's decision in *In re Paoli Railroad Yard PCB Litig.*, *supra*, setting forth elements of a medical monitoring claim without present clinical injury. *Stamford*, 699 A.2d at 55 n.8. *See Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 323 (D. Conn. 2002) (noting the Connecticut Supreme Court's favorable citation to the *Paoli* elements). The weight and reasoning of these authorities strongly supported the prediction that the Connecticut Supreme Court would recognize the medical monitoring claims of the Silzone plaintiffs. SJM also misperceives the weight required to be given under *Erie* that the holding in *Stamford* has not been "extended" beyond the worker's compensation context.

SJM's faults the court's decision regarding Colorado because only Colorado federal court decisions were used to predict Colorado's view of medical

monitoring. *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991); *Brafford v. Susquehanna Corp.*, 586 F. Supp. 14 (D. Colo. 1984). SJM neither provides any substantive reasoning why the District Court could not rely on these decisions; nor can it. In fact, the federal court in *Cook* undertook a careful analysis to arrive at its conclusion on Colorado law in performing its predictive duty under *Erie*. The court in *Brafford* exercised similar care and cogency in finding radiation exposure could support a finding of present injury and an award of future damages. *Brafford's* cautionary suggestion that it be "narrowly read" does not diminish the analysis one iota.

Finally, as to Minnesota law, SJM again misportrays the District Court's determination. Contrary to SJM's assertions, the court did not include Minnesota Silzone victims in the medical monitoring class based on a finding under *Erie* that Minnesota law allowed a stand alone medical monitoring claim absent proof of physical injury. (Appellants' Brief at 47.) Rather, similar to Delaware, Minnesota law allows medical monitoring based upon subcellular injury in a toxic exposure situation as is present here. *Bryson v. Pillsbury Co.*, 573 N.W.2d 718, 720-21 (Minn. Ct. App. 1998) (holding chromosomal damage due to toxic substance exposure constituted an injury). In the District Court's words:

> As applied in the instant case, the proof of the alleged subcellular injury [from the Silzone] will be uniform across the class. Therefore the inclusion of individuals whose valves were implanted in Minnesota does not raise

> individual issues of injury, and comports with the decision of the Minnesota Court of Appeals in *Bryson*.

(AA06837.) Based on this, the court held that asymptomatic Minnesota implantees could proceed as a subclass of the medical monitoring class along with Delaware and Ohio implantees. (Id. at 10.)

In sum, the District Court did not commit error in performing an *Erie* analysis or in its performance of the analysis determining the inclusion of states within the medical monitoring class. Class certification should be affirmed.

**B. The Medical Monitoring / Epidemiological Program Relief Is an Equitable, Not a Legal, Remedy, And the District Court Did Not Commit Any Error of Law or Abuse of Discretion in Certifying the Medical Monitoring Class under Rule 23(b)(2) as Well as 23(b)(3).**

SJM further contends that the District Court erred in certifying the Medical Monitoring class under Rule 23(b)(2) and by so doing so violated class members' due process rights and the text of Rule 23(b)(2). Its arguments are seriously flawed. They stem from a mistaken premise: that the relief sought is legal and not equitable. They are also based upon a misrepresentation of the decisional law of medical monitoring. The arguments also ignore numerous existing cases that specifically recognize that medical monitoring is or can be an equitable remedy when prospective surveillance and epidemiological analysis and investigation is the primary aim. Furthermore, it is clear that the District Court did not violate any class member's due process right or disregard the text of Rule 23(b)(2). The issue

of notice and opt-out has not yet been addressed in the court below, and notably it was SJM that objected to providing the class with notice of class pendency and opportunity to opt-out.[19] The grounds set forth in the text of Rule 23(b)(2) are established by the fact that the medical monitoring program here is an equitable remedy.

Where the remedy sought for people exposed to a hazardous substance or a defective medical product is a prospective program of medical screening, medical surveillance, or epidemiological/scientific research, numerous courts recognize such relief to be properly characterized as equitable as opposed to legal. *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 828-31 (D.C. Cir. 1984) (upholding a district court's preliminary injunction compelling the defendants to pay money to the court to create a medical monitoring fund); *Katz v. Warner-Lambert Co.*, 9 F. Supp. 2d 363, 364 (S.D.N.Y. 1998) ("A claim for medical monitoring and research fund is injunctive in nature."); *Craft v. Vanderbilt University*, 174 F.R.D. 396, 406-07 (D. Tenn. 1996) (action seeking injunction to provide medical monitoring held to satisfy Rule 23(b)(2)); *Gibbs v. E.I. DuPont De Nemours & Co., Inc.*, 876 F. Supp. 475, 481 (W.D.N.Y. 1995) ("A court-administered fund which goes beyond payment of the costs of monitoring an

[19] Since the medical monitoring class was certified under both Rules 23(b)(2) and (b)(3), notice was required and the District Court ordered the parties to meet and confer on the form of notice. (AA06838-39.)

individual plaintiff's health to establish pooled resources for the early detection and advances in treatment of the disease is injunctive in nature rather than 'predominantly money damages' and therefore is properly certified under Rule 23(b)(2)"); *Day v. NLO*, 851 F. Supp. 869, 886 (S.D. Ohio 1994) ("[t]he use of the Courts injunctive powers to oversee and direct medical surveillance is vastly superior to a lump sum monetary payment... A court supervised fund will also assure that the medical monitoring damages will be used to compensate for medical examinations and tests actually administered"); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 708, 712 (D. Ariz. 1993) (certifying class for court-supervised medical monitoring program to detect disease when damages sought were for medical monitoring costs incurred, rather than other compensatory and punitive damages); *Werlein v. United States*, 746 F. Supp. 887, 895 (D. Minn. 1990) (observing that where number of persons are exposed to toxin about which little is known, and it is necessary to gather and share information regarding diagnosis and treatment through screening, court would consider framing medical monitoring and information sharing program as injunctive relief); *Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193, 203-05 (N.D. Cal. 1987) (acknowledging plaintiffs' right to seek medical monitoring injunction because the exposure creating need for surveillance was "the very essence of irreparable harm"); *In re West Virginia Rezulin Litig.*, 585 S.E.2d 52, 70-71 (W. Va. 2003)

(holding that under Rule 23(b)(2) after liability has been established, court may exercise its equitable powers to establish and administer court-supervised medical monitoring program to oversee and direct medical surveillance, and provide for medical examinations and testing of members of class); *Hansen v. Mountain Fuel Supply*, 858 P.2d 970, 982 (Utah 1993) (use of court-supervised fund to administer medical monitoring "is a highly appropriate use of the Court's equitable powers"); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 25 Cal. Rptr. 2d 550, 863 P.2d 795, 825 (1993) (holding that court-supervised funds for medical monitoring for mass-exposure toxic torts cases best serve public health interests).

Indeed, several of the cases relied upon by SJM recognize that medical monitoring can be equitable relief depending on the nature of the relief requested and the structure sought to deliver that relief. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) (question on whether medical monitoring claim is equitable or legal remedy turns on what is primarily sought); *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995) (although certification of medical monitoring class under Rule 23(b)(2) is legally permissible, district court did not abuse its discretion in refusing to certify such a class where relief sought was primarily money damages).

Here there is no doubt that the relief sought is an equitable remedy in the form of a Court-created and -supervised, prospective medical screening,

surveillance, and epidemiology research program. This is what Plaintiffs prayed for in the Consolidated Class Action Complaint and moved for in their class certification motion. This is also what the Court recognized was sought and what provided the basis for certification under Rule 23(b)(2). (AA04285, AA04307-10, AA06151-52.) In the District Court's words:

> The monitoring class seeks equitable relief in the form of a medical monitoring program that would watch for side effects associated with defective heart valves. This would include an epidemiology program to collect data and study the effects of the Silzone valves. As envisioned by plaintiffs this monitoring program would be paid for by a trust account funded by St. Jude.

(AA06151-52.) That SJM will ultimately have to pay for the program does not convert the remedy from an equitable one to one for damages. The harm inflicted by SJM's defective Silzone valve to the thousands in which it was implanted is a public health problem which needs to be remedied by relief in a epidemiological and public health oriented manner. *Issacharoff, S., Preclusion Due Process and the Right to Opt Out of Class Action,* 77 Notre Dame L. Rev. 1057 (2002); Studdert, D. M, *et al*, *Medial Monitoring for Pharmaceutical Injuries: Tort Law for the Public's Health?,* 289 J. Am. Med. Assoc. 889 (2003). Despite SJM's assertions, the program sought here for the class falls squarely within the authorities that view such programs as an equitable remedy.

In view of the foregoing, the District Court's decision to view the medical monitoring program at issue here as primarily an equitable remedy was proper, well supported by the facts and fully consistent with applicable case law. As all of SJM's arguments hinge on the fact that Rule 23(b)(2) was not a proper basis to certify the class, they all fail.

SJM's *jus tertii* argument on notice and opt-out rights begs credulity. It was SJM that objected to Plaintiffs providing notice and opt-out rights. Also, this argument is premature since the District Court has not ruled upon the notice. For the foregoing reasons, this Court should find the District Court properly certified the medical monitoring class under Rule 23(b)(2).

**C. The District Court Did Not Abuse Its Discretion by Finding That the Seventeen State Medical Monitoring Class Was Manageable and That a Class-Wide Trial to Determine Entitlement for Such Health Program Would Be Fair and Efficient.**

SJM finally challenges that the certified medical monitoring class is not cohesive and hence is unmanageable and inefficient. This challenge was a central theme in SJM's all out effort below to defeat class certification. It was raised three times to the District Court and rejected each time. Rather, the Court determined that the class was cohesive (each asymptomatic class member having an interest in obtaining the medical monitoring and epidemiological program and not monetary relief), was manageable (as the real focus of the case was on the Silzone's sewing

cuff's alleged defect and SJM's conduct, the issues of causation were not overarching, and the law of the seventeen states was substantially the same) and was efficient (as the tremendous costs associated with successfully proving a claim for monitoring made it a negative value claim that could not be addressed but for a class action).[20] (AA04294-95, AA04297, AA04311-16, AA06151-55, AA06833-38.) SJM's arguments to the contrary notwithstanding, the District Court did not commit an abuse of discretion in so ruling.

SJM first claims that there is no medical consensus that medical monitoring over and above normal examinations that prosthetic heart valve patients require is warranted. This is a merits issue that is completely inappropriate for SJM to assert in challenge to the District Court's certification. However, it is sufficient to note that the court below had before it evidence that the United Kingdom's Medical Device Agency (an agency akin to our FDA) had issued an medical advisory calling for additional monitoring in addition to Plaintiffs' medical experts' view that monitoring and evaluation over and above the examinations that prosthetic

---

[20] A "negative value" claim is one in which the costs of enforcement exceeds its expected individual recovery. They are viewed as archetypical claims for class certification. Judge Tunheim's view that medical monitoring is a negative value claim is one shared by other courts. *In re Diet Drug Litig.*, MDL No. 1203, 1999 WL 673066 (E.D. Pa. 1999); *In re: Inter-op Hip Prosthesis Liab. Litig.*, MDL No. 1401, 204 F.R.D. 330 (N.D. Ohio 2001).

heart valve patients ordinarily require was needed. (AA04294-95, AA04305, AA06834.)

Next SJM contends that the diverse legal issues and individual issues of proof of a multi-state medical monitoring claim makes the case unmanageable. The District Court, after careful and deliberate review of both the record and the laws of the seventeen states, fairly and properly concluded otherwise:

> In conclusion, at this time, the Court will consider Delaware, Minnesota, and Ohio plaintiffs to present a subclass of the medical monitoring class. However, this distinction may be more formalistic than practical, as the Court anticipates little or no difference in the required proof for this subclass and the subclass of states including Arizona, Colorado, Connecticut, District of Columbia, Florida, Illinois, Kansas, Montana, New Jersey, New York, Pennsylvania, Texas, Utah, and West Virginia.

(AA06838.). *Accord In re Baycol Products Litig.,* 218 F.R.D. 197, 211 (D. Minn. 2003) ("Of the states that do recognize medical monitoring as an independent cause of action, the elements of such a claim appear to be the same"); *In re: Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997) (finding law of medical monitoring similar enough that national class action with subclasses for "stand alone" and "damage remedy" states was feasible and manageable). This conclusion is amply borne out by a fair examination of the law of these states. While they may have some different elements triggering culpability, their focus is on the increased risk to the cohort that the hazardous exposure caused and what to do about it in order to protect them. Since this case involves one product, one

manufacturer, one defect (the toxic silver coating), a relatively discrete and short period of time that the product was on the market and no product identification issues (Silzone valve implantees can be identified by SJM's and hospital records), this case is manageable from both a legal and factual proof basis.

Addressing SJM's third and final point, that individual issues predominate, this claim in its many repetitions likewise was correctly rejected by the District Court in its decision to certify a medical monitoring class for states with stand-alone medical monitoring causes of action and those requiring only a minimal quantum of proof of injury (*i.e.*, those that recognize "subcellular" damage as an injury). (AA04296-97, AA04305, AA04308, AA06152-53, AA06836-38.) While it is true the class is composed of individuals with different medical histories and different surgeons, such facts simply beg the issue: what are the core issues of the case and how do they impact on the Court's ability to manage the case as class action?[21] Here the District Court concluded that the host of individual issues that SJM conjured up and paraded before it did not defeat class certification because

---

[21] As aptly stated in *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D. Ohio 1991):

> Clearly, people and parcels of real property, like snowflakes, necessarily have different and unique characteristics. The important question is to what extent those differences, when compared to the nature and extent of the shared characteristics of the named Plaintiffs' and the class members' claims, will defeat the Court's ability to achieve a considerable efficiency through collective adjudication of those claims.

*Id.* at 65.

they did not go to the core issues of the case, namely: Was Silzone a defective medical product due to its cytotoxic propensity? Was the product put on the market without adequate testing or warning about its toxic properties? Did it cause an increased incidence of paravalvular leakage? Did it cause an increased incidence of thromboembolic events? Did it cause an excess of "sterile" or "pseudo" prosthetic valve endocarditis"? (AA04284, AA04294-97, AA04305-06, AA06152, AA06836-37.) These issues are not affected by individualized issues even if such individual patient-surgeon issues really existed, a fact question that was directly called into doubt during the certification proceedings by the following deposition testimony of SJM's Vice President in charge of regulatory and clinical affairs, Dr. Alan Flory:

> We tried to identify patient characteristics, center characteristics, operative characteristics, valve size. We looked at essentially 200 variables or more to try and figure out can we explain this, and we couldn't.[22]

Finally, as to SJM's citation to cases that have rejected certification of medical monitoring claims in both single and multiple state situations, SJM's argument ignores the principle that courts look at every proposed class action individually because they rise or fall so far as certification based on their own circumstances. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229-31 (9th Cir.

---

[22] AA05843; *see also* AA01460.

1996) (holding that a court should proceed on a case-by-case basis and consider the appropriateness of class action treatment under the particular circumstances presented); *Haley v. Medtronic, Inc.* 169 F.R.D. 643, 652 (C.D. Cal. 1996), (same). SJM's argument also ignores case law that expressly recognizes that medical monitoring claims can be resolved on a class action basis. *See*, *e.g.*, *Lockheed Martin Corp. v. Superior Court*, 63 P.3d 913 (Cal. 2003); *In re West Virginia Rezulin Litig.*, 585 S.E.2d 52 (W. Va. 2003). With these principles in mind, the cases SJM principally cites, *Perez v. Metabolife*, 218 F.R.D. 262 (S.D. Fla. 2003); *Lockheed Martin Corp. v. Superior Court*, *supra*, and *Goasdone v. American Cyanamid Corp.*, 808 A2.d 159 (N.J. Super. Law Div. 2002), as well as the ones in its footnote, are distinguishable. All involved facts and circumstances greatly unlike the case at hand which explains the different result.

*Perez* involved an over-the-counter dietary supplement that contained ephedra as an ingredient. Class certification of both Florida and multi-state medical monitoring class was refused when the court found that dose, duration, product identification and, for the most part, the existence *vel non* of the transient acute injuries involved were core issues. That is hardly the case here where the Court below specifically found that dose, duration, and product identification were not core issues. Likewise both *Lockheed* and *Goasdone* involved environmental exposures, as opposed to the surgical implantation of a device that contained an

allegedly toxic silver coating. *Lockheed* and *Goasdone,* unlike Silzone, presented extremely challenging core issues of exposure pathways, dose, duration, and identification of who was the responsible party given the lengthy time frames of environmental exposure involved in those cases. And in each of these cases, unlike here, causation was viewed as an overarching fact issue. (AA06152.) The District Court's finding is therefore not inconsistent with this precedent given that the record here demonstrated the existence of a higher incidence of distinct problems with the Silzone cuff, uncovered during SJM sponsored post marketing studies, when compared to its identical conventional cuffed (non-silver-coated) version which was on the market at the same time.

Finally, what SJM and the cases it relies upon fail to take into account is the fact that medical monitoring in a mass tort situation needs to address a group-based or epidemiological injury. What matters, therefore, is that all members of the medical monitoring class allege an exposure to a substance that has resulted in an increased risk of complications common to all Silzone patients. This risk is expressed as a probability of future harm and it does not differ from class member to class member. Such "probable harm" is precisely what medical monitoring claims address and why they do so most appropriately on a class-wide basis. Here, over 11,000 Americans have been put at risk of suffering a stroke, a heart attack or death if the Silzone coating's silver toxicity causes their implanted valve to fail to

properly heal or causes a thrombus to form; adverse events that have already led to a number of Silzone patients having to undergo repeat surgery or suffering a premature death. A medical monitoring program can detect these problems and either prevent or mitigate the harm they cause. Each class member is no differently situated for purposes of medical monitoring than any other. For these reasons the District Court did not commit a reversible abuse of discretion in determining that the medical monitoring class was cohesive, manageable and an efficient use of judicial resources.

## CONCLUSION

For the foregoing reasons and those upon which the District Court's orders are premised, this Court should dismiss the appeal, affirming the orders certifying the consumer protection class under Minnesota's consumer fraud laws and the 17 state medical monitoring class.

Respectfully submitted,

ZIMMERMAN REED, P.L.L.P.

DATED: November 22, 2004 BY:______________________________

CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

LEVY, ANGSTREICH, FINNEY,
BALDANTE, RUBENSTEIN
& COREN, P.C.
STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

CAPRETZ & ASSOCIATES
JAMES T. CAPRETZ
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

GREEN, SCHAAF & JACOBSON, P.C.
JOE D. JACOBSON
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

Counsel for Plaintiffs-Respondents

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to Federal Rule of Appellate Procedure 32(a)(7)(B) for a brief using a proportional serif font of 14-point typeface or larger. The length of this brief is 13,927 words, and it was prepared using Microsoft Word 2002.

ZIMMERMAN REED, P.L.L.P.

DATED: November 22, 2004 BY:____________________________

CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400