Case Number: MDL 1396

# EXHIBIT A

C
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey, Law Division.
SINCLAIR, et al
v.
MERCK & CO., INC.
**No. ATL-L-3771-04-MT.**

Return May 6, 2005.
May 19, 2005.

Defendant's Motion to Dismiss with Prejudice.

Diane P. Sullivan; John H. Beisner; Richard B. Goetz; Jeffrey M. Judd, for Defendants.
Esther Berezofsky; Elizabeth J. Cabraser; Wendy R. Fleishman; Richard S. Lewis, for Plaintiffs.

*MEMORANDUM OF DECISION ON MOTION*
*Pursuant to Rule 1:6-2(f)*

HIGBEE, J.
***1** Having carefully reviewed the papers submitted and any response filed, I have ruled on the above Motion as follows:

Defendant Merck & Co., Inc. ("Merck") brings this motion to dismiss Plaintiffs' first amended complaint with prejudice. Merck contends that plaintiffs Joseph Murray and Robbie L. Traylor have failed to allege the fundamental elements of a medical monitoring claim under New Jersey law. Plaintiffs oppose this motion.

BACKGROUND

Plaintiffs filed a complaint in this matter alleging that they have suffered an ascertainable loss as a result of consuming the drug VIOXX® , manufactured by Merck. According to the first amended complaint, Plaintiffs seek class certification for **medical monitoring** with a proposed class that consists of:

all persons residing within the United States who took Vioxx in any dose for a duration of at least six consecutive weeks at any time between May 20, 1999, when Vioxx was first approved by the United States Food and Drug Administration (the "FDA") for sale, and September 30, 2004, when Vioxx was withdrawn from the market, and who have not filed an action to recover damages for personal injuries cause by Vioxx. These individuals are at an increased risk for a serious unrecognized or latent injury as a result of ingesting Vioxx, and therefore require non-routine medical and diagnostic testing, which constitutes an ascertainable loss under New Jersey law. Plaintiff's First Amended Complaint P.2, ¶ 4.

Plaintiffs allege the following six causes of action against Merck: 1) negligence; 2) violation of the New Jersey Products Liability Act (PLA), N.J.S.A. 2A:58C-1 et seq.; 3) violation of the New Jersey **Consumer Fraud** Act (CFA), N.J.S.A. 56:8-2 et seq.; 4) breach of express and implied warranties; 5) **medical monitoring**; and 6) Punitive Damages Under common law and the PLA. Plaintiffs primarily seek to establish a court-administered Medical Screening Program, funded by Merck, to provide medical diagnostic tests for each member of the proposed class to detect unrecognized myocardial infarctions ("UMI") and other latent or unrecognized injuries. Plaintiffs also seek to have a follow-up Epidemiology Study of cardiovascular events in former VIOXX® users compared to a matched population of nonusers to further evaluate post-cessation risk. (Amended Complaint, P. 42-43).

Plaintiffs Murray and Traylor both allege that they are at a significantly increased risk of having suffered a UMI as a result of taking VIOXX® for a considerable period of time. Plaintiffs have *not* undergone an EKG since they started taking VIOXX® and do not know if they have suffered any myocardial infarction since ingesting VIOXX® . Plaintiffs allege that because they now have a substantially increased risk of having suffered a silent injury that can cause them even a more significant injury in the future, that this action for medical monitoring is justified. Plaintiffs assert in their amended complaint that they will not undergo an EKG or any other test to determine if they have had a UMI unless a court-supervised Medical Monitoring Program is implemented.

***2** Merck has brought this motion to dismiss Plaintiffs' complaint with prejudice claiming that under New Jersey law, medical monitoring is only allowed in products liability actions where a plaintiff has suffered a manifest injury. Additionally, Merck

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argues that because Plaintiffs have failed to state a claim for medical monitoring, all of their additional claims fail and their complaint must be dismissed with prejudice. Plaintiffs oppose this motion arguing that the amended complaint is sufficiently pled to survive a motion to dismiss for failure to state a claim. Further, Plaintiffs argue that New Jersey law does not require a plaintiff to have already suffered a manifest injury before medical monitoring can be available as a possible form of judicial relief.

## ANALYSIS

*R.* 4:6-2(e) allows a party to bring a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. Such a motion is based on the pleadings and if matters outside the pleadings are considered, the motion is to be treated as one for summary judgment. *R.* 4:5-2 provides that a pleading that asserts a claim for relief must contain a statement of the facts that the claim is based upon showing that the pleader is entitled to relief and a demand for judgment for the relief being sought. *R.* 4:5-7 provides that "[e]ach allegation of a pleading shall be simple, concise and direct, and no technical forms of pleading are required. Additionally, all pleadings shall be liberally construed in the interests of justice.

On a motion under *R.* 4:6-2(e), the complaint is to be thoroughly and liberally searched in order to determine if a cause of action can be garnered from the document, even if it is contained in an obscure statement, and an opportunity to amend should be given if necessary. *Printing Mart v. Sharp Electronics*, 116 *N.J.* 739, 746 (1989). This is especially so if the litigation is in its early stages with further discovery yet to be taken. *Id.* On a motion to dismiss, the plaintiff is accorded every reasonable inference and the motion "should be granted only in rare instances and ordinarily without prejudice. As such, 'if a generous reading of the allegations merely suggests a cause of action, the complaint will withstand the motion." ' *Smith v. SBC Communications Inc.*, 178 *N.J.* 265, 282 (2004) (*quoting* *F.G. v. MacDonell*, 150 *N.J.* 550, 556 (1997)).

At this stage there is no dispute about the factual allegations being made or the appropriateness of class certification. The sole issue in this motion is whether New Jersey law allows medical monitoring as a form of relief to be extended to this type of case.

The parties base the crux of their arguments on three main cases: *Ayers v. Township of Jackson*, 106 *N.J.* 557 (1987); *Mauro v. Raymark Industries, Inc.*, 116 *N.J.* 126 (1989); and *Theer v. Phillip Carey Co.*, 133 *N.J.* 610 (1993). The court will analyze each of these cases in turn.

### *Ayers v. Township of Jackson*

***3** The plaintiffs in *Ayers* brought a class action lawsuit against Jackson Township under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1-1 to 12-3. The plaintiffs sought damages for contamination to their well water from toxic pollutants that had leached into the local aquifer from a landfill established and operated by the defendant. A jury had determined that the defendant was at fault for the damages and found, *inter alia*, that the Township was obligated to establish a medical surveillance program. In evaluating the merits of the medical surveillance claim and distinguishing such claim from a claim of damages based upon enhanced risk, the New Jersey Supreme Court noted that:

the claim for medical surveillance does not seek compensation for an unquantifiable injury, but rather seeks specific monetary damages measured by the cost of periodic medical examinations. The invasion for which redress is sought is the fact that plaintiffs have been advised to spend money for medical tests, a cost they would not have incurred absent their exposure to toxic chemicals.

*Ayers, supra*, 106 *N.J.* at 591.

The Court went through numerous policy rationales both for and against allowing judicially imposed medical surveillance in "toxic tort" cases. [FN1] The Court found that due to a lack of governmental response to compensating victims of toxic exposure, the judiciary was the only avenue for recourse. *Id.* at 581. The Court also found that in mass exposure tort cases, plaintiffs often have difficulty proving negligence because the plaintiffs bear the burden of establishing that the likelihood and severity of the damage outweighs the cost the defendant would incur for implementing precautionary measures. *Id.* at 584. The Court further found that the most difficult problem plaintiffs' face in toxic tort litigation is attempting to prove causation "because of the long latency period of illnesses caused by carcinogens or other toxic chemicals." *Id.* at 585. In observing this problem, the Court noted that in most tort cases, a cause is more "direct, immediate and observable" than the latency period of cancer causing agents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

involved in toxic torts. *Id.* at 586. Thus, because of the proof-problems plaintiffs have establishing toxic tort liability, it is particularly important to determine the extent to which recovery could be had for "post-exposure, pre-symptom injuries." *Id.* 587.

FN1. Black's Law Dictionary defines a toxic tort as "A civil wrong arising from exposure to a toxic substance, such as asbestos, radiation, or hazardous waste. A toxic tort can be remedied by a civil lawsuit (usu. A class action) or by administrative action." (8th ed.2004). New Jersey law does not define "toxic tort" but does provide similar definitions for "environmental tort action ." *See* N.J.S.A. 2A:15-5.3(f); N.J.S.A. 2A:58C-1(b)(4).

The Court ultimately held that:

the cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

***4** *Id.* at 606.

In reaching this decision, the Court noted that allowing plaintiffs to recover for reasonable and necessary medical expenses is equitable and consistent with established legal principles and with a public health interest of monitoring victims of toxic exposure. *Id.* at 603-604. Additionally, the Court found that allowing a remedy of medical monitoring and exposing polluters to significantly higher liability could have the benefit of preventing or limiting future illnesses. *Id.* Thus, at least in the realm of hazardous waste exposure, or toxic torts, medical monitoring is available to plaintiffs as a remedy provided that the necessary facts are present.

*Mauro v. Raymark Industries, Inc.*

*Mauro* involved a claim against asbestos manufacturers brought by a man who was exposed to asbestos containing materials through the course of his employment as a repairman and a plumber/steamfitter at a Psychiatric Hospital. The plaintiff's exposure to asbestos came from removing old insulation materials such as pipe covering and cement that contained asbestos. The plaintiff had developed bilateral thickening of both chest walls and calcification of the diaphragm. These injuries were discovered when the plaintiff had participated in tests conducted by the New Jersey Department of Health. Having already suffered a manifest injury, the plaintiff sought medical monitoring for the increased probability that he would contract lung cancer.

In its opinion, the Court had to differentiate between a claim for enhanced risk and a claim for medical monitoring. The Court explained that enhanced risk "is a claim for damages based on a prospective injury, conceptually analogous to the claim of a personal-injury plaintiff with a damaged knee to recover damages for the prospective onset of an arthritic condition that may result from the knee injury." *Mauro, supra,* 116 *N.J.* at 138. The Court further noted that in this situation, a plaintiff could possibly recover for medical monitoring but could not likely recover for enhanced risk unless the risk was more probable than not to occur.

The Court found that under New Jersey case law, a plaintiff could obtain medical surveillance damages on the basis that an existing injury may lead to the development of a future injury. *Id.* The Court specifically stated that "[e]xposure to toxic chemicals may sustain a claim for medical surveillance damages under the criteria set forth in *Ayers ...* "

*Theer v. Phillip Carey Co.*

The plaintiff in *Theer* was the wife of a deceased asbestos worker who brought an action against the manufacturers of asbestos products. The plaintiff's husband died of lung cancer allegedly caused by his exposure to asbestos. The plaintiff's husband had worked directly with asbestos for over twenty-nine years. The plaintiff had been exposed FN2 to asbestos in the course of handling the decedent's work clothes and claimed that as a result, she was at risk of contracting an asbestos-related disease and entitled to medical monitoring. The New Jersey Supreme Court had to decide the issue of "whether, in the asbestos context, a plaintiff, in the absence of any manifest asbestos-related condition, can recover as compensatory damages the cost of future medical surveillance to monitor his or her health necessitated the indirect exposure to asbestos." *Theer, supra* 133 *N.J.* at 614.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. The Court referred to the plaintiff's exposure as "indirect." It was indirect in that the plaintiff was exposed to residual asbestos on her husband's clothes and she was not working directly with asbestos containing materials. Asbestos is a solid, naturally-occurring mineral that is only hazardous to human health if it enters the body. Thus, the plaintiff's exposure to asbestos was direct but was exposure to significantly smaller concentrations of asbestos than her husband had experienced. However, because the case was deemed to be a products liability case, the Court properly termed her exposure as "indirect," because she had no direct exposure to the products that contained asbestos.

***5** The plaintiff had suffered serious problems, including pneumonia in her right lung and she had to have a rounded atlectasis removed from her right lung. She had smoked a pack of cigarettes a day for thirty-six years. A jury concluded that her existing injuries were not asbestos-related and the trial court did not allow the jury to reach her claims for the costs of medical surveillance based on the increased risk of cancer. *Id.* at 616. The Appellate Division had remanded the matter with instructions that the jury was to determine if the medical surveillance sought was more than what she would have required for her existing, unrelated injuries. *Id.* at 625.

In reviewing the medical monitoring issue, the New Jersey Supreme Court stated that medical monitoring relief provided for in the *Ayers* decision was tailored for the unique damages that result from "exposure to toxic chemicals" and that such a remedy "is not easily invoked." *Id.* at 627. The Court also noted that the *Mauro* decision extended *Ayers* to product-liability actions in a limited context. The Court reversed the Appellate Division and found that medical monitoring was not available to the plaintiff because her exposure to the asbestos was minimal and indirect and because her chronic smoking made it too difficult to determine the need and cause for future medical surveillance. The Court concluded that:

medical surveillance damages are not available for plaintiffs who have not experienced direct and hence discrete exposure to a toxic substance and who have not suffered an injury or condition resulting from that exposure and whose risk of cancer cannot be limited and related specifically and tangibly to that exposure. *Id.* at 628.

Thus, the language in *Theer* indicates that the court intends to limit the availability of medical monitoring types of cases where it is a needed and appropriate form of equitable judicial relief.

FINDINGS

The significance of *Theer* as it relates to *Ayers* and *Mauro* is that it limits the extent to which the New Jersey Supreme Court is willing to extend medical monitoring relief. In *Ayers,* the New Jersey Supreme Court allowed medical monitoring as a form of relief in environmental tort actions but in doing so, the Court noted that there were numerous arguments against allowing such a judicially created remedy. *Ayers, supra,* 106 *N.J.* at 581-582. *Mauro,* allowed medical monitoring for a man who was exposed to asbestos in the workplace and developed asbestos related injuries. This expanded the *Ayers* holding in that medical monitoring could now be provided to people who were exposed to hazardous products. *Theer* acknowledged this expansion, but clearly indicated that medical monitoring was a difficult remedy to invoke and should only be applied to a product-liability context in very limited circumstances. *Theer, supra,* 133 *N.J.* at 627. This is consistent with the cautious approach that the Court took in *Ayers.*

***6** It is important to note that both *Mauro* and *Theer* involved asbestos-related claims. There appears to be some uncertainty as to whether asbestos-related claims constitute products liability actions or environmental tort actions. *N.J.S.A.* 2A:58C-1(b)(3) defines "product liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory of the underlying claim, except actions for harm caused by a breach of an express warranty." The PLA does not apply to any environmental tort action. *N.J.S.A.* 2A:58C-6. The PLA defines an "environmental tort action" as "a civil action seeking damages for harm where the cause of the harm is exposure to toxic chemicals or substances, but does not mean actions involving drugs or products intended for personal consumption or use ." *N.J.S.A.* 2A:58C-1(b)(4). FN3 Therefore, the PLA applies to VIOXX® and the PLA limits compensation to harms as defined by *N.J.S.A.* 2A:58C-1(b)(2). FN4

FN3. Similarly, New Jersey's comparative law statute defines "environmental tort action" as "a civil action seeking damages

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for personal injuries or death where the cause of the damages is the negligent manufacture, use, disposal, handling, storage or treatment of hazardous or toxic substances." N.J.S.A. 2A:15-5.3.

FN4. *N.J.S.A.* 2A:58C-1(b)(2) defines "harm" as meaning "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." Costs of medical surveillance or enhanced risk of injury are notably not included in the definition of harm.

New Jersey courts have found that asbestos exposure constitutes an environmental tort action as defined by the PLA and *N.J.S.A.* 2A:15-5.3. *See Ripa v. Owens-Corning Fiberglas Corp.,* 282 *N.J.Super.* 373, 399 (App.Div.) *certif. denied* 142 *N.J.* 518 (1995); *Stevenson v. Keene Corp.,* 254 *N.J.Super.* 310, 312 (App.Div.1992) *aff'd by* 131 *N.J.* 393 (1993) (affirming the finding of the trial judge that "the exception to the amendments for 'environmental tort actions', provided in *N.J.S.A.* 2A:15-5.3(d), includes asbestos torts"). Thus, while the New Jersey Supreme Court has indicated that medical monitoring may be necessary in asbestos products-liability actions, it has yet to apply a medical monitoring remedy to a pure products liability action where the PLA applies. In the matter at hand, Plaintiffs are asking this Court to do just that-to find that medical monitoring should apply to a pure products liability action.

Plaintiffs' amended complaint alleges, *inter alia,* that Merck violated the CFA and that as a result of these violations, Plaintiffs are "at a significantly increased risk of an unrecognized or latent injury, and must undergo non-routine medical screening procedures that constitute economic damages and ascertainable loss." (Am.Compl.¶ 132). The CFA is intended to prohibit:

the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby ... *N.J.S.A.* 56:8-2

The CFA only allows for recovery of economic damages. *See Gennari v. Weichert Co. Realtors,* 148 *N.J.* 581, 612-613 (1997) (stating reluctance to interpret the CFA as allowing non-economic damages without a clear expression of intent by the legislature). *N.J.S.A.* 56:8-19 provides that an action may be brought under the CFA by "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act ..." The New Jersey Supreme Court has explained that medical monitoring is a remedy that provides "specific monetary damages measured by the cost of periodic medical examinations." *Ayers, supra,* 106 *N.J.* at 591. Additionally, the Third Circuit has stated "[t]he medical monitoring claim is a claim for monetary damages. Plaintiffs are asking for money because, allegedly, their exposure to PCBs requires them to bear the costs associated with increased medical surveillance. This is an economic injury ..." *In re Paoli R.R. Yard PCB Litig. v. Southeastern Pa Trans. Auth.,* 916 F.2d 829, 861 (3d Cir.1990) (finding that medical monitoring is allowed under Pennsylvania law if there is a "reasonable need" for medical surveillance). Thus, medical monitoring is an available remedy under the CFA, although the difficulties in obtaining such relief, especially for class actions, may preclude the courts ability to grant such relief. *See Carroll v. Cellco Partnership,* 313 *N.J.Super.* 488, 511 (App.Div.1998).

*7 Another important distinction between the matter at hand and *Ayers* and its progeny is that the injuries Plaintiffs allege they are at an increased risk of suffering are of an entirely different nature than the illnesses that the plaintiffs were at risk for in the cases where medical monitoring has normally been allowed. Here, Plaintiffs are seeking to have EKGs performed to determine if they already have experienced a UMI or any other already existing but unrecognized injury. Normally medical surveillance has been used in order to detect symptoms of a latent disease, such as cancer, which develops slowly. The alleged injuries that VIOXX causes are more "direct, immediate and observable" than the latency period of cancer causing agents involved in toxic torts. *Ayers, supra,* 106 *N.J.* at 586 (distinguishing the cause of illnesses associated with toxic torts from the cause of damages found in most tort cases). The silent UMIs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for which plaintiffs seek testing would have already occurred and would not display "the long latency period typical of illnesses caused by chemical pollutants ..." *Ayers, supra,* 106 *N.J.* at 582.

Under *Ayers* plaintiffs can recover for medical monitoring provided they can prove such surveillance is reasonable and necessary based upon (1) "the significance and extent of exposure to chemicals"; (2) "the toxicity of the chemicals"; (3) "the seriousness of the diseases for which individuals are at risk"; (4) "the relative increase in the chance of onset of disease in those exposed"; [FN5] and (5) "the value of early diagnosis." *Id.* At 606. This test was derived specifically for environmental tort actions.

FN5. Plaintiffs proposed class is very broad, including any individual in the United States or New Jersey who took the drug consecutively for a period of six weeks during the years of 1999 through 2004. Plaintiffs themselves project the number of potential claimants in the class to be approximately 5,106,000 and they project 60,000 have actually suffered silent MIs.

As the U.S. Court of Appeals Third Circuit stated in *In re Paoli R.R. Yard PCB Litigation, ("Paoli II" ),* "we are not certain as to the import of *Theer."* 35 *F.3d* 717, 787 (3d Cir.1994). Plaintiffs argue that *Theer* bars only indirect exposure claims from medical monitoring relief. Defendants claim *Theer* bars medical monitoring in all product liability claims unless the plaintiff can demonstrate a manifest injury. We do know for certain, *Theer* bans medical monitoring in cases involving both a products liability action and indirect exposure where there are significant other potential contributing factors to the injury. What is also clear is that medical monitoring is to be applied sparingly.

This Court finds that medical monitoring is not an appropriate remedy for the injuries alleged in this matter. [FN6] The main reasons that prompted the New Jersey Supreme Court to allow medical monitoring in *Ayers* was that the nature of environmental tort actions made proving and establishing causation extremely difficult for plaintiffs and also, the lack of a governmental response to providing compensation for victims of toxic exposure forced a need for a judicial remedy. *Ayers, supra,* 106 *N.J.* at 581-586. None of these reasons are present in this particular matter. This proposed class action is one of many types of action against Merck where injured plaintiffs may receive compensation.

FN6. It is important to note that if only the *Ayers* test were to be applied here, the motion would have to be denied. Accepting the pleadings as true, every element of the *Ayers* test would be satisfied and thus the claim would be appropriate. In determining that medical monitoring is not available in this particular case, the Court is ruling that *Ayers,* as clarified by *Theer,* was not meant to extend to all products liability actions and should be limited rather than expanded.

***8** VIOXX® was approved by the Federal Drug Administration and numerous tests have been performed on the drug prior and subsequent to its release in the market. Millions of documents have been produced in relation to VIOXX® litigation, and many of these documents contain the information on the science and pharmacological effects of the drug. Additionally, Plaintiffs will have their own doctors who prescribed VIOXX® , to testify as witnesses, to the health of the individual plaintiff before and after taking the drug. The Plaintiffs in this litigation will know exactly how long they took VIOXX® and the dosage. They also know the chemical composition. In a toxic waste site case, the plaintiffs frequently don't know how long they've been exposed to the chemicals, the level of their exposure or even all the chemicals they were exposed to.

Plaintiffs were prescribed VIOXX® by their physicians before taking it. When Merck pulled VIOXX® off the market, the individuals who were taking the drug were no longer able to access it. The withdrawal of VIOXX® also received widespread media coverage on a national scale. The reasons for the withdrawal were also widely publicized. Thus, most individuals who took VIOXX® , even those who had stopped taking it prior to the withdrawal, have likely been made aware of the risks that the drug may pose. Either way the plaintiffs would not have the same causation issues and the lack of alternative relief suffered by victims of a toxic tort. The need to deter polluters and provide relief to victims who have no legislative remedy isn't present here.

The Supreme Court of New Jersey has allowed a cause of action for medical monitoring in only limited types of cases. Because the matter at hand is so significantly different from *Ayers* and its progeny and because medical monitoring is a remedy that "is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not easily invoked," this Court declines to find the New Jersey Supreme Court would extend medical monitoring to the proposed class in this particular situation. *Theer, supra* 133 *N.J.* at 627.

As Plaintiffs have not alleged any manifest injury and medical monitoring is the requested form of relief, plaintiffs' amended complaint must be dismissed as to all claims based on negligence, PLA, CFA, breach of warranties. Plaintiffs have alleged a punitive damages claim, but such claim cannot stand-alone. Consequently Plaintiffs' complaint will be dismissed.

Defendant's motion to dismiss Plaintiff's complaint with prejudice is GRANTED.

*XXXX* Order is attached.

This decision will be posted on the judiciary website and can be viewed at http://www.judiciary.state.nj.us/decisions.htm for a period of six weeks from the motion return period.

N.J.Super.L.,2005.
Sinclair v. Merck & Co., Inc.
Not Reported in A.2d, 2005 WL 1278364 (N.J.Super.L.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.