IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE ST. JUDE MEDICAL, INC., SILZONE® HEART VALVES PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1396 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' PATHOLOGY EXPERT GREGORY J. WILSON PURSUANT TO FEDERAL RULE OF EVIDENCE 702**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................................1

II. BACKGROUND ....................................................................................3

A. Dr. Wilson's Experience And Qualifications ....................................................3

B. Summary Of Dr. Wilson's Opinions And Objections Thereto ....................................5

III. FRE 702 MANDATES THE EXCLUSION OF OPINION EVIDENCE LIKE DR. WILSON'S ....................................7

A. FRE 702 Establishes The Guiding Principles For The Admission Of Expert Testimony ....................................7

B. Opinion #1: The Silzone® Coating Is Mechanically Unstable ....................................9

1. Dr. Wilson Is Not Qualified To Opine About The Mechanical Instability Of The Silzone® Coating ....................................11

2. Dr. Wilson Relies on Case Reports To Support His Opinion ....................................12

3. Dr. Wilson's Opinion Is Untested And Litigation-Driven ....................................13

C. Opinions #2: All Silzone® Patients Experience Frustrated Tissue Healing Caused By The Silzone® Coating ....................................14

1. Dr. Wilson Improperly Extrapolates From Case Reports And FDA Risk Reports To Opine That Silzone® Causes Frustrated Healing ....................................15

2. Dr. Wilson's Frustrated Healing Theory Lacks Factual Support, Is Incomplete, And Admittedly Is For Litigation Purposes Only ....................................17

3. Dr. Wilson Cites To Unreliable And Irrelevant Literature ....................................21

D. Opinion #3: Silver Is Toxic To Human Cells And Thereby Causes Adverse Medical Events, Including Frustrated Tissue Healing ....................................22

1. Dr. Wilson Is Not An Expert On Silver Toxicity ....................................23

2. Dr. Wilson's Methodology Is Incomplete And Scientifically Unsound ....................................23

E. Opinion #4: All Silzone® Patients Have A Greater Risk Of Experiencing Significant, Life-Threatening Complications And Thus Require Enhanced Clinical Monitoring ....................26

1. Dr. Wilson Is Not Qualified To Assess Patient Risks Or Recommend Clinical Monitoring ....................27

2. Dr. Wilson Lacks Foundation For His Risk Assessment And Clinical Monitoring Recommendation ....................28

F. Opinion #5: The Silzone® Coating Is A Defective Product ....................30

G. Opinion #6: An Independent And Valid Epidemiological Study On Silzone® Patients Is Needed ....................31

H. Opinion #7: St. Jude Medical Failed To Disclose Material Information About Its Animal Studies To The FDA, Thereby Misleading The FDA In Its Approval Of The Silzone® Valve ....................32

1. Dr. Wilson's Legal Opinion Regarding The Adequacy Of St. Jude Medical's Submissions To The FDA Is Prohibited By Federal Law ....................33

2. Legal Opinions From Purported Experts On Applicable Law Or Alleged Violations Of Law Are Neither Necessary Nor Admissible ....................33

3. Dr. Wilson Is Unqualified To Render An Opinion Regarding FDA Regulations ....................35

4. Dr. Wilson's Methodology In Criticizing St. Jude Medical's FDA Submissions Is Incomplete And Shoddy ....................35

IV. CONCLUSION ....................38

# I.

# INTRODUCTION

Consistent with Federal Rule of Evidence 702, Defendant St. Jude Medical ("St. Jude Medical") moves to exclude the entire testimony of Plaintiffs' generic pathology expert, Dr. Gregory J. Wilson. Under Rule 702 and the Supreme Court's trilogy on the admissibility of expert testimony -- *Kumho Tire Co. v. Carmichae*l, 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993) -- trial courts must act as gatekeepers to exclude unreliable expert testimony. An expert witness who (1) lacks the proper qualifications to opine on a specific subject matter, (2) has no foundation for his opinions, or (3) employs poor reasoning or methodology must be excluded under Rule 702.

Here, all of Dr. Wilson's opinions fall into at least one of these impermissible categories:

- ***First***, Dr. Wilson testifies well outside of his qualifications in pediatric pathology to offer opinions about a wide range of other subjects, including biomaterials, toxicology, biostatistics, epidemiology, patient care and monitoring, and the FDA.

- ***Second***, Dr. Wilson offers opinions based on incomplete information and without any testing of his own. For example, he admitted in

deposition that when he criticized St. Jude Medical's Pre-Market Approval ("PMA") submission in a sworn declaration that was filed in this Court in 2003, he did not have and therefore did not review all of the critical documents attached to this regulatory submission.

- ***Third***, Dr. Wilson extrapolates from a small number of case reports about individual Silzone® patients to render sweeping conclusions about all 36,000 Silzone® patients.

- ***Fourth***, for some of his opinions, Dr. Wilson simply relies on the opinions of other Plaintiffs' experts.

- ***Lastly***, and perhaps most egregiously, Dr. Wilson admits that his opinions and his underlying methodology have never been published or peer-reviewed and were developed strictly for this litigation.

For these reasons, Dr. Wilson's opinions are inadmissible and the Court should preclude him from testifying at trial.

## II.

## BACKGROUND

### A. Dr. Wilson's Experience And Qualifications

Dr. Wilson is a self-described "anatomic pathologist" who has practiced at The Hospital for Sick Children in Toronto, Canada for the past 25 years. *Declaration of Gregory J. Wilson ("Decl.")*, 5/13/03, ¶7, Exh. 1(f) to Affidavit of Tracy J. Van Steenburgh ("Van Steenburgh Aff."). Although he claims expertise in the field of cardiovascular pathology, [*Rule 26 Decl.*, ¶1, Exh. 1]; *Deposition of Gregory J. Wilson ("Wilson Depo.")*, 79:19-80:15, Exh. 2 to Van Steenburgh Aff.], his practice has been limited to children. *Depo.*, 80:23-24.

Critically, Dr. Wilson lacks independent experience with the type of medical device at issue in this litigation, a silver-coated mechanical heart valve implanted in adult patients. *Depo.*, 74:10-75:2, 394:13-395:3. Apart from the explanted Silzone® valves hand-selected by Plaintiffs' counsel and sent to him in this litigation, Dr. Wilson testified that he has not seen a single St. Jude Medical valve explanted from an adult patient in the last 25 years:

> Q: . . . Prior to being involved as a consultant, expert in this litigation for the Plaintiffs, had you ever seen an explanted St. Jude Medical valve from an adult?
>
> A: . . . I can certainly say **I have not seen one explanted from an adult, handled it, looked at it, evaluated it,**

> **prior to this litigation since after 1981** because I was on staff at the Hospital for Sick Children and only really dealing with pediatric cases.

*Id*. at 394:13-395:3 (emphasis added). In fact, Dr. Wilson testified that he has not seen any mechanical heart valve explanted from an adult patient since the 1970s:

> Q: Have you seen explanted mechanical heart valves from adults from any manufacturer besides St. Jude Medical?
>
> A: Well, in terms of recent experience, no. If one looks back to my earlier experience as a resident, as a research fellow working with Dr. Silver, this would be in the 1970s, I certainly was seeing valves from other manufacturers, but that is then.
>
> In terms of recent years, no. And just by way of rather obvious explanation, I would say I am a cardiovascular pathologist at a children's hospital, and so you have phrased the questions in adults, and of course **I have seen explants in children, from children of mechanical heart valves but not from adults, other than, as you have asked me, from the St. Jude Silzone valves that have been sent to me by Plaintiffs' counsel for examination.**

*Id*. at 74:10-75:2 (emphasis added). As Dr. Wilson explained, his primary experience has been with a "modest number" of bioprosthetic heart valves explanted from children. *Id.* at 75:3-15. Thus, Dr. Wilson has no experience with the normal tissue reaction of an adult-implanted heart valve or any basis for determining if histological sections of such valves are typical or abnormal.

Tellingly, Dr. Wilson has not done any research or testing on any type of silver-coated implantable devices, and he not written a single scientific article in this area, published or otherwise. *Wilson C.V.*, 11/17/05, Exh. 1(a) to Van Steenburgh Aff.; *Depo.*, 451:4-12. And although he claims experience in the "development and improvement of cardiovascular prosthetic devices," including prosthetic heart valves, the vast majority of his research has focused not on mechanical valves but rather on biological heart valves developed from acellular matrix. *Decl.*, 5/13/03, ¶9, Exh. 1(f); *see, e.g.*, *Wilson C.V.*, p.2-3, Exh. 1(a); *Depo.*, 162:20-163:23. Thus, his experience is not relevant here.

## B. Summary Of Dr. Wilson's Opinions And Objections Thereto

Despite his lack of experience with mechanical heart valves and silver-coated implantable devices and the fact that his experience is limited to pathology in children, Dr. Wilson makes numerous sweeping opinions about the Silzone® valve. Moreover, many of his opinions fall outside the field of pathology into areas such as toxicology, epidemiology or clinical medicine -- fields in which Dr Wilson has no training or experience by his own admission. The following chart summarizes his primary opinions and St. Jude Medical's objections to them.

| No. | Type Of Opinion | Opinion | Objections |
|---|---|---|---|
| 1 | Biomaterials Opinion | The Silzone® coating is mechanically unstable. *Affidavit of Dr. Gregory J. Wilson ("Aff."),* 2/7/02, ¶214, Exh. 1(b). | § Outside area of expertise/not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 2 | Clinical Diagnosis Opinion | All Silzone® patients experience a frustrated tissue healing process due to the Silzone® coating. *Aff.*, 2/7/02, ¶¶215-216, Exh. 1(b). | § Lacks foundation<br>§ Unreliable |
| 3 | Toxicity Opinion | Silver is toxic to human cells, thereby causing the adverse effects of the Silzone® coating, including frustrated healing. *Aff.*, 2/24/03, ¶¶3-4, Exh. 1(d). | § Outside area of expertise/not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 4 | Statistical and Clinical Diagnosis Opinion | All Silzone® patients have a greater risk of experiencing significant, life-threatening complications and thus require enhanced clinical monitoring. *Aff.*, 2/7/02, ¶¶217-218, Exh. 1(b) | § Outside area of expertise/not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 5 | Legal Opinion | The Silzone® coating is a defective product. *Rule 26 Decl.*, ¶4, Exh. 1. | § Outside area of expertise/not qualified<br>§ Lacks foundation |
| 6 | Epidemiological Opinion | A sound, independent, and valid epidemiological study on Silzone® patients is needed. *Rule 26 Decl.*, ¶4, Exh. 1, Exh. 1. | § Outside area of expertise/not qualified<br>§ Lacks foundation |
| 7 | FDA Regulatory/Legal Opinion | St. Jude Medical failed to disclose material information about its animal studies to the FDA, thereby misleading the FDA in its approval of the Silzone® valve. *Decl.*, 5/13/03, ¶5, Exh. 1(f). | § Irrelevant<br>§ Not qualified<br>§ Unreliable<br>§ Lacks foundation |

Except for opinions 5 and 6, these opinions were offered in affidavits that

Dr. Wilson submitted more than 4 years ago in the Canadian Silzone® class action and in this MDL. *Rule 26 Decl.*, ¶3, Exh. 1. In his Rule 26 Declaration, Dr. Wilson merely attached these prior declarations and reaffirmed them, but he made no attempt to update any of his opinions or to explain why they remain unchanged today. *Id.* at ¶¶3-4.

## III.

## FRE 702 MANDATES THE EXCLUSION OF OPINION EVIDENCE LIKE DR. WILSON'S

### A. FRE 702 Establishes The Guiding Principles For The Admission Of Expert Testimony

To begin with, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education" to offer the opinion. Fed. R. Evid. 702. When expert testimony exceeds one's area of expertise, that testimony must be excluded. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715-16 (8th Cir. 2001)(hydrologist prohibited from testifying about required standard of care for warehouseman); *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991)(excluding experts who had general accounting knowledge but not specific expertise in the areas they were attempting to opine).; *Hammes v. Yamaha Motor Corp. U.S.A.*, 2006 WL 1195907 at *6-8 (D. Minn.)(barring a motorcycle mechanic from testifying about an alleged design defect of a motorcycle throttle because he was not qualified in motorcycle design or design-testing, and was not an engineer); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2005)(refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an

expert in one subject may not be qualified to testify beyond that expertise).

Next, expert testimony must be supported by sufficient facts or data. *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)(distinguishing between expert opinion evidence based on "good grounds" and "subjective speculation that masquerades as scientific knowledge"). Neither *Daubert I* nor the Federal Rules of Evidence requires the Court to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. The Court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *J.B. Hunt Transp., Inc. v. General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001)(quoting *Joiner*, 522 U.S. at 146); *Smith v. Cangieter*, 462 F.3d 920, 923-25 (8th Cir. Mo.)(excluding mechanical engineer's opinion that a four-wheel drive system was unsafe at highway speeds because the opinion was not supported by accident data or peer-reviewed articles, not tested by the expert or anyone else, and not subjected to scrutiny by the scientific community). Expert testimony that is "mere speculation and pure conjecture … is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt*, 243 F.3d at 444.

Finally, expert testimony must be both relevant and reliable. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591-93; *Blue Dane Simmental Corp. v. American Simmental Ass'n.*, 178 F.3d 1035, 1040 (8th Cir. 1999). Factors bearing on this analysis include: whether the methodology can be and has been tested; whether it has been subjected to

peer review and publication; the known or potential rate of error or the existence of standards; and whether the methodology used has been generally accepted. *Daubert*, 509 U.S. at 593-94; *Smith*, 462 F.3d at 923. Expert testimony that lacks testing or fails to consider the relevant facts and data is unreliable. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (toxicologist's failure to examine plaintiff, inquire about other toxic exposures, and exclude confounding factors for the alleged injury rendered her opinion on medical causation unreliable and thus inadmissible).

Ultimately, the party offering the expert testimony bears the burden of demonstrating that the testimony is reliable and, therefore, admissible. *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996). The Court must act as a "gatekeeper" by separating expert opinion evidence based on "good grounds" from "subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp*., 252 F.3d 986, 989 (8th Cir. 2001).

As explained more fully below, Dr. Wilson's opinions violate these basic principles for admissibility under the Federal Rules of Evidence and *Daubert* and its progeny. Accordingly, his opinions must be excluded in their entirety.

## B. Opinion #1: The Silzone® Coating Is Mechanically Unstable

After examining explanted Silzone® valves from four plaintiffs in the Canadian Silzone® litigation, Dr. Wilson claims that he observed a "black flake-like

substance" that "seem[ed] to be related to the silver coating placed on the polyester fibers of the sewing ring." *Aff.*, 2/7/02, ¶¶4(d)-(f), 43-49, Exh. 1(b). However, without any further testing and based solely on these few observations, Dr. Wilson opines that the Silzone® coating is "unstable, is not tightly adherent to the sewing ring," comes off the sewing ring soon after implantation, and thereby "likely plays a significant role in the frustration of the normal healing process." *Id.* at ¶¶49, 76, 90, 103, 129, 214-217. For several reasons, Dr. Wilson's opinion does not even come close to satisfying Rule 702.[1]

---

1 In offering this opinion, Dr. Wilson ignores the fact that St. Jude Medical acknowledged in its PMA regulatory submission that there is some release of silver with the Silzone® coating. *See, e.g., St. Jude Medical® Mechanical Heart Valve SJM® Masters Series with Silzone, Supplement to PMA #P810002 ("PMA Supplement"), 5/14/97*, p.3, ("silver has been shown to ionize slowly"), p.5 ("low leaching rates," "minimal leaching of silver"), p.12-13 ("minute levels of silver are leached from the sewing cuff"), Exh. 3 to Van Steenburgh Aff. These same statements were made in St. Jude Medical's regulatory submissions to Canada and Europe. *See St. Jude Medical® Mechanical Heart Valve SJM® Masters Series with Silzone, Supplementary Notice of Compliance (NC), Canadian Health Protection Branch (HPB), 5/23/97*; *St. Jude Medical® Mechanical Heart Valve SJM® Masters Series with Silzone, Design Dossier Supplement, 5/21/97*, Exh. 4 to Van Steenburgh Aff. This is a well-known characteristic of the Silzone® coating, which has been published in the literature for years. *K. Tweden, J.D. Cameron, et al., Biocompatibility of Silver-Modified Polyester for Antimicrobial Protection of Prosthetic Valves,* J. Heart Valve Disease, 6:553-561 (1997)(discussing silver release levels based on *in vivo* and *in vitro* testing); *K. Tweden, J.D. Cameron, et al., Silver Modification of Polyethylene Terephthalate Textiles for Antimicrobial Protection, ASAIO J.*, 43: M475-M481 (1997)(same), Exh. 5 Van Steenburgh Aff. Regulatory agencies in the U.S., Canada, and Europe thus were fully aware that some degree of silver release into adjacent tissue and into the bloodstream was an inherent characteristic of the Silzone® coating and did not conclude that the coating was "mechanically unstable."

### 1. Dr. Wilson Is Not Qualified To Opine About The Mechanical Instability Of The Silzone® Coating

Dr. Wilson is not a biomaterials expert. *Rule 26 Decl.*, Exh. 1*; Aff./Decl.*, 2/7/02, 6/3/02, 2/24/03, 4/15/03, 5/13/03, Exh. 1(b)-1(f). He has no formal training in material science, has never taught a formal course on material science, and has published only a "few" biomaterials-related articles involving mechanical heart valves. *Depo.*, 158:15-25, 160:23-162:13, 163:24-164:5. While he claims to have significant experience in "material science as it relates to implantable devices," none of this work has involved the study of silver-coated devices, whether from a biomaterials standpoint or otherwise. *Id*. at 158:15-25, 451:4-8; *Wilson C.V.*, Exh. 1(a). Indeed, Dr. Wilson admits that silver-coated implantable devices are not one of his research interests:

> Q: And the use of silver in implantable devices has not been one of your research interests; is that correct?
>
> A: Yeah, I think that's true. That's true.

*Depo*., 451:4-8. Apart from this litigation, Dr. Wilson has no experience whatsoever with any type of silver-coated device. *Depo*., 74:10-75:2, 394:13-395:3; *Wilson C.V.*, Exh. 1(a). Nor is there anything in his C.V. suggesting that he has the bioengineering, biomechanical, or biomaterials background needed to evaluate whether a mechanical device is functioning properly or is unstable. *Wilson C.V.*, Exh. 1(a).

Furthermore, Dr. Wilson is unaware of the basic facts necessary to

corroborate his biomaterials opinion. He does not know the quantity of silver released from the valve, or at what point in time such release occurs after implantation. *Depo.*, 23:9-12, 35:22-37:3. Further, he does not know and has not even attempted to measure the quantity of silver present in adjacent tissue. *Id.* at 25:9-14, 35:16-21. Notably, Dr. Wilson admits that he lacks the infrastructure to conduct such testing. *Id.* at 25:9:26:8 ("I'm not set up myself to do such measurements.").

Absent practical experiences with silver-coated devices, no knowledge of the relevant facts, and no infrastructure to even acquire such knowledge, Dr. Wilson is simply not qualified to opine and conclude that the Silzone® coating is mechanically unstable. This opinion must therefore be excluded.

### 2. Dr. Wilson Relies on Case Reports To Support His Opinion

Dr. Wilson's alleged observations of black particulate matter in four Silzone® valves are nothing more than mere case reports. *Wilson Aff.*, 2/7/02, ¶48, Exh. 1(b). All of the valves were explanted from plaintiffs in the Canadian litigation and, consequently, were pre-selected and lacked scientific controls. *Id.* at ¶4(d)-(f). It is well-settled that such case reports are unreliable and cannot constitute scientific knowledge upon which an expert opinion can be based. *Glastetter*, 252 F.3d at 989-90 (case reports are not scientifically valid proof of causation); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000)(same).

### 3. Dr. Wilson's Opinion Is Untested And Litigation-Driven

Dr. Wilson has done no testing to support his opinion that the Silzone® coating is unstable and comes off all Silzone® valves: he has not measured the quantity, timing, or duration of silver that purportedly comes off the Silzone® valve, and he has not performed any testing to determine the mechanism of silver release. *Depo.*, 23:5-25:14, 35:16-37:9. Moreover, Dr. Wilson has failed to do any testing to determine the presence and quantity of silver in the tissue of the four Silzone® valves allegedly containing the black particulate matter. *Id*. In fact, his opinion that the black particulate is silver is pure speculation.

By his own admission, Dr. Wilson has not performed any testing because Plaintiffs' counsel has not asked him to:

> Q: Well, looking at it the other way, have you taken any of the tissue that was on the cuff and assessed the quantity of silver that was in that tissue?
>
> A: No, I have not done any chemical measurements, physical measurements of silver in the tissue, no.
>
> Q: Why not?
>
> A: One way of responding to that is that I have not specifically been asked by Plaintiffs' counsel to do so.
>
> Another aspect of the response would be that I'm not set up myself to do such measurements . . . .

*Depo.*, 25:9-26:8. And although other laboratories could have performed this testing, he made no attempt at all to have the testing done. *Id.* Under these circumstances, Dr. Wilson's methodology, such as it is, cannot be deemed scientifically reliable.

### C. Opinions #2: All Silzone® Patients Experience Frustrated Tissue Healing Caused By The Silzone® Coating

Dr. Wilson opines that the Silzone® coating frustrates the normal tissue healing process following implantation of the Silzone® valve. *Aff.*, 2/7/02, ¶¶38-39, Exh. 1(b). In doing so, Dr. Wilson defines normal healing as "a thin, strong pannus coating, into and on the sewing ring, with a thrombo-resistant endothelial cell covering over the pannus." *Id*. at ¶215. He then opines that all Silzone® patients experience abnormal healing, including partial or complete attenuation of the tissue healing process, pannus overgrowth, or little tissue ingrowth into the sewing ring. *Id*. at ¶¶39, 215. To support his opinion, Dr. Wilson relies on the following sources of information: (1) approximately 14-15 explanted Silzone® valves, which he examined grossly and microscopically; (2) 54 additional explanted Silzone® valves, which he examined by photograph only; (3) Dr. Butany's observations of healing complications in 22 explanted Silzone® valves; (4) FDA "risk reports"; and (5) scientific literature purportedly describing the poor healing characteristics of the Silzone® valve. *Depo.*, 47:11-48:16; *Aff., 2/7/02*, ¶¶36-147, 148-183, 184-186, Exh. 1(b); *Wilson Aff.*, 6/3/02, ¶83, Exh. 1(c); *Wilson Aff.*, 2/24/03, ¶¶97-99, Exh. 1(d). None these sources satisfy Rule 702.

### 1. Dr. Wilson Improperly Extrapolates From Case Reports And FDA Risk Reports To Opine That Silzone® Causes Frustrated Healing

As explained above, scientifically valid conclusions concerning medical causation cannot be derived from case reports or series. *Glastetter*, 252 F.3d at 989-90 (case reports are not scientifically valid proof of causation); *Turner*, 229 F.3d at 1209 (same). Here, Dr. Wilson attempts to do just that by concluding that Silzone® causes abnormal healing based on his limited observations of explanted Silzone® valves. As with all case reports, this methodology suffers from serious flaws. Specifically, Dr. Wilson's study of Silzone® valves represents only a small fraction of the approximately 36,000 Silzone® valves that have been implanted. Indeed, Dr. Wilson handled and examined no more than 14 to 15 Silzone® valves. *Depo.*, 47:24-48:20. For the remaining 54 Silzone® valves, he saw photographs only. *Id.*

Moreover, his study was not randomized, but rather selectively involved Silzone® valves that were explanted for adverse events.[2] In fact, 6 of the 14 to 15 valves examined by Dr. Wilson belonged to plaintiffs in the Canadian Silzone® litigation. *Aff.*, 2/7/02, ¶4(d)-(f), Exh. 1(b). When valves are explanted for adverse events as here, even he acknowledged that normal tissue healing would be rare. *Depo.*, 82:13-83:7. Worse yet, Dr. Wilson's study also lacked a control group, something that he admits is essential

[2] Adverse events are medical complications, including valve dehiscence (or paravalvular leak), thrombus, thromboembolism, hemolysis, infections, poor hemodynamic performance, or heart failure, among others.

to compare his observations of abnormal healing and to make a "firm determination" about the prevalence of this condition among Silzone® patients. *Id.* at 144:23-147:18.

Likewise, Dr. Wilson improperly relies on the observations of another Canadian pathologist, Dr. Butany. However, Dr. Butany's case series of Silzone® explants did not have randomized controls. *Depo.*, 149:21-150:4. In addition, Dr. Butany's findings were presented in an abstract only, and were not published in peer-reviewed literature. *Id.* at 147:19-148:16.

Dr. Wilson's reliance on FDA "risk reports" is equally problematic.[3] Indeed, he acknowledged in a prior declaration that these reports contain limited useful information:

> Unfortunately, many of the reports do not provide much useful information relating to the tissue present on or in the Silzone sewing ring. Even for those reports in which the Silzone valve was received by St. Jude Medical and was examined by a pathologist, I would in most instances need to review at a minimum gross photographs of the returned Silzone valves and the microscopy of the sections taken from the sewing rings before arriving at an opinion for each explanted Silzone valve.

*Aff.*, 2/7/02, ¶184, Exh. 1(b). Thus, he admits, meaningful conclusions about the

3 "Risk reports" are medical device reports (MDRs) mandated by the FDA of all medical device manufacturers for complaints of device malfunctions, serious injuries, or deaths associated with medical devices.

Silzone® valve cannot be derived from FDA "risk reports." Furthermore, Dr. Wilson also does not indicate whether he has made any attempt at all to retrieve photographs, microscopies, or explanted Silzone valves for any of the reports he purportedly reviewed. Absent the very information which he admits is essential before he can render an opinion, Dr. Wilson is in no position to even suggest that these "risk reports" support his frustrated healing theory. His methodology is lacking and unreliable. *Carlson v. C.H. Robinson Worldwide, Inc.*, No. Civ. 02-3780/Civ. 02-4261, 2005 WL 758601 at *4 (D. Minn. Mar. 30, 2005)(narrow and abbreviated examination of documents "fails to establish a reliable factual basis for [his] conclusions or that [his] conclusions are the product of reliable principles or methods").

### 2. Dr. Wilson's Frustrated Healing Theory Lacks Factual Support, Is Incomplete, And Admittedly Is For Litigation Purposes Only

As a preliminary matter, Dr. Wilson proffers a definition for normal healing that is not based on peer-reviewed literature. *Depo.*, 81:4-82:3. Rather, he relies only on a textbook chapter that he co-authored over 20 years ago and on no more than 6 explanted valves that he examined from autopsy. *Id.* Significantly, Dr. Wilson admits that he has never seen normal healing of a heart valve explanted from an adult patient due to an adverse event, the situation alleged by plaintiffs here. *Id.* at 83:10-17. As explained above, his primary experience has been with valves explanted from children or at autopsy. *Id.* at 74:10-75:2; 75:3-15; 394:13-395:3. In fact, apart from this litigation, Dr. Wilson has not seen a St. Jude Medical valve or any other mechanical heart valve

explanted from an adult in the last 25 years. *Id*. at 394:13-395:3; 74:10-75:2. Thus, Dr. Wilson's proposed standard for tissue healing to which he compares the Silzone® valve is unsupported and unreliable.

Indeed, despite Dr. Wilson's heavy reliance on the case series of Dr. Butany to support his frustrated healing theory, Dr. Butany himself admitted in his deposition that he does not know what "normal" healing is and that any such standard is speculative:

> Q: And it says, "Good surface fibrin with normal tissue response over most of sample." Is that something with which you agree with respect to that particular valve?
>
> A: I agree that there is tissue response, but **none of us has a definite idea of what they should be and should not be at three months.**

*Deposition of Dr. Jagdish Butany*, 4/26/02, 261:13-19 (emphasis added), Exh. 6 to Van Steenburgh Aff. Likewise:

> Q: Had you told St. Jude prior to this memo issuing that you certainly felt there were distinctive differences between Silzone and conventional valves based on your examination?
>
> A: Can't remember ever having said that. And I say again that three months post implant we seldom, if ever, see a prosthesis come out. **So very few of us, if any of us, have any good idea of what the degree of pannus should be. We speculate and say yes, there should**

> **be pannus, yes, there should be some ingrowth, but none of us has really looked at them.**

*Id.* at 271: 13-23 (emphasis added).

Furthermore, Dr. Wilson does not know how many Silzone® patients have abnormal healing, and can only speculate that "substantial numbers" have "significant problems." *Depo.*, 84:10-85:20. Indeed, his own study of Silzone® valves lacked a control group to compare his healing observations. *Id*. at 145:23-146:22. Without controls and without basic information about the prevalence of abnormal healing among Silzone® patients, Dr. Wilson has no factual basis whatsoever for concluding that all Silzone® patients experience "frustrated" or "abnormal" healing.

Critically, Dr. Wilson lacks important medical information about Silzone® patients who he claims experienced frustrated healing. For example, he does not know whether any of the patients described by Dr. Butany had active endocarditis at the time of implantation, a fact that he agreed could well bias the outcome of Dr. Butany's conclusions. *Depo.*, 151:24-152:17. Likewise, of the 14 to 15 explanted Silzone® valves that Dr. Wilson examined, he testified that he has seen medical records for only half of them. *Id*. at 48:21-50:18. Nor has he seen medical records for any of the 54 Silzone® valves that he observed by photograph. *Id.* at 138:22-139:14. While he claims to have seen some clinical information on these valves, Dr. Wilson acknowledged that the information was never complete and varied in amount from patient to patient. *Id.* Dr.

Wilson did not examine any histology and, in fact, concedes in his declaration that "more analysis of these valves is desirable, including detailed histological examination and clinicopathological correlation with the available clinical information." *Aff.*, 2/24/03, ¶99, Exh. 1(d). Thus, as Dr. Wilson admits, his analysis of these explanted Silzone® valves is incomplete.

Ultimately, Dr. Wilson has no independent corroboration for his opinion that Silzone® patients have frustrated healing. He has not performed any testing, and he has not attempted to publish this opinion or subject it to peer review. *Depo.*, 85:21-86:9. Nor does he know of any other researcher or scientist who has published the opinion that Silzone® patients have frustrated healing. *Id.* at 87:20-88:3.

Perhaps most problematic of all, Dr. Wilson admits that this opinion is strictly for litigation:

> A: Well, that is not my – my view is that – and I stand by this – that I think that every patient who has received a Silzone valve has had some degree of impaired healing on account of the Silzone.
>
> Q: Okay, and just so we are clear on that, that is not a view that you have ever published?
>
> A: Correct, I have not published it.
>
> Q: Not a view you have ever presented at any scientific meeting?

A: Correct.

Q: **It is strictly a view that you have developed and presented in this litigation?**

A: **Correct.**

*Depo.*, 98:20-99:10 (emphasis added). Likewise, he admits, the grading system that he used to assess the healing characteristics of the 54 Silzone® valves was unpublished and devised for solely for purposes of this litigation. *Id.* at 133:22-134:3. Such testimony cannot be deemed reliable. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001)(impetus for opinion weighs in admissibility evaluation); *Wagner v. Hesston Corp.*, 2005 WL 1540135 (D. Minn. June 30, 2005 at *6 (expert testing conducted in the context of litigation increases unreliability of expert opinions).

### 3. Dr. Wilson Cites To Unreliable And Irrelevant Literature

Although Dr.Wilson cites several articles purportedly to support his opinion, all of these articles lack sufficient indicia of reliability. For instance, the Tozzi article concerned one case report of a Silzone® valve patient. *Aff.*, 2/7/02, ¶167, Exh. 1(b). Likewise, as explained above, Dr. Butany's abstract involved a non-randomized, retrospective case series of 22 explanted Silzone® valves that was not published in peer-reviewed literature. *Aff.*, 6/3/02, ¶78, Exh. 1(c); *Depo.*, 147:19-148:16.

With respect to the Fung article, Dr. Wilson claims that the article is

relevant because he was told that it involved silver-coated catheters that used a "very similar if not identical" coating process as the Silzone® valve. *Aff.*, 2/7/02, ¶¶158-162, Exh. 1(b). However, Dr. Wilson admitted in deposition that this was speculative and that he did not know if the processes were in fact similar. *Depo.*, 439:18-22. Additionally, he admitted that the substrates used for each device were different. *Id.* at 439:23-440:18. Given these fundamental defects in his analysis, any conclusions derived by Dr. Wilson from this article cannot be deemed reliable.

Lastly, despite significant flaws with the Ionescu and Butchart abstracts, Dr. Wilson relies on them to support his opinion. Specifically, the underlying Cardiff study involved a non-randomized study of 83 Silzone® patients from a single hospital, which Dr. Wilson acknowledged was substantially "underpowered." *Depo.*, 108:20-109:14, 430:2-17. Although he does not know any specific details about the administration of this study, Dr. Wilson nevertheless accepts its validity for no other reason than because Dr. Butchart was involved. *Id.* at 428:2-20.

### D. Opinion #3: Silver Is Toxic To Human Cells And Thereby Causes Adverse Medical Events, Including Frustrated Tissue Healing

Based primarily on the opinions of other Plaintiffs' experts, Dr. Wilson opines that silver is toxic to human cells. *Aff.*, 2/24/03, ¶¶3-4, 112, Exh. 1(d). Given Dr. Wilson's lack of qualifications to opine on toxicity issues and his lack of independent scientific support, this opinion must be excluded.

### 1. Dr. Wilson Is Not An Expert On Silver Toxicity

Dr. Wilson is not a toxicologist. *Rule 26 Decl.*, Exh. 1; *Wilson C.V.*, Exh. 1(a); *Depo.*, 158:7-10. He does not have an advanced degree in toxicology or related disciplines (e.g., pharmacology, biochemistry, environmental health or industrial hygiene), is not board certified in toxicology, does not belong to a professional organization, such as the Academy of Toxicological Sciences or the Society of Toxicology, has not published peer-reviewed articles on toxicology, has not competed for and received research grants in toxicology, has not served on scientific toxicology advisory panels or had any university appointments in toxicology, or a related field, in a university graduate toxicology program. *Reference Manual On Scientific Evidence*, Federal Judicial Center 2000 (2nd Ed.) at 415-418 (setting forth the various ways an expert can be qualified to render toxicology opinions), Exh. 7 to Van Steenburgh Aff.; *Wilson C.V.*, Exh. 1(a); *Depo.*, 450:25-451:13. Clearly, Dr. Wilson is not qualified to opine on silver toxicity issues.

### 2. Dr. Wilson's Methodology Is Incomplete And Scientifically Unsound

Fundamentally, Dr. Wilson lacks basic facts to support his opinion that Silzone® is toxic in the first place. Specifically, he has not performed any testing of silver levels in tissue. *Depo.*, 25:9-14. Consequently, Dr. Wilson has no knowledge of the dose or amount of silver that is required for it to be toxic. *Id*. at 37:4-9. Indeed, Dr. Wilson admits that dosage is central to the definition of toxicity and "desirable" to any

analysis of silver toxicity. *Id.* at 26:13-22. Despite its importance, Dr. Wilson testified that he has made no attempt whatsoever to obtain dosage information:

> Q: And isn't part of the definition of toxicity dependent upon the dose; in other words, whether a substance is toxic or not depends very much upon the dose?
>
> A: Yes, I think that is fair to say.
>
> Q: And so wouldn't it be important to know precisely the dose that gets deposited in the adjacent cells in order to determine whether in fact the substance is toxic?
>
> A: That would be desirable. I have relied on quite an extensive literature on silver toxicity, which comes from both animal and human information, but not – but you are correct, I have not – you know, I have not made those measurements on tissue samples from the valves I have looked at – or sorry, arranged to have them made.

*Id.* at 26:13-27:3. The absence of basic data to support Dr. Wilson's toxicity opinion, and his complete failure to acquire this data, renders his opinion unreliable. *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994)(where an opinion utterly lacks foundation, it is speculative and conjectural and, therefore, inadmissible).

Notably, Dr. Wilson has no plans to obtain any dosage information unless instructed by Plaintiffs' counsel. *Depo.*, 27:4-8. In fact, Dr. Wilson admits that his only reason for not measuring silver levels is because Plaintiffs' counsel has not asked him to do so. *Id.* As his own testimony demonstrates, Dr. Wilson's methodology is driven by

this litigation and, as such, his opinion regarding silver toxicity are not reliable. *Wagner*, 2005 WL 1540135 at *6 (expert testing conducted in the context of litigation increases unreliability of expert opinions).

Furthermore, neither Dr. Wilson nor any other researcher has subjected this opinion to peer review or publication. *Depo.*, 56:11-23. Although he claims that articles from the AVERT study, Cardiff study, and Dr. Butany support his opinion, Dr. Wilson admitted in his deposition that none of these articles definitively concluded that Silzone® is toxic and causes adverse events. *Id.* at 58:6-21. Rather, they simply hypothesized or referenced the issue of silver toxicity. *Id.*

At the end of the day, Dr. Wilson cannot conclude with scientific certainty that silver toxicity of the Silzone® valve causes frustrated healing. In fact, he admits that his own observations of abnormal healing are not unique to the Silzone® valve:

> Q: Well, you would agree, though, that the healing that you observed in these 54 valves occurs with any mechanical valve explanted for an adverse event; is that correct?
>
> A: I think the range of observations I described in those 54 valves, taking any particular valve, I think you could see those findings on a non-Silzone valve. So it is possible to see what I saw on gross examination on any one of those valves on a non-Silzone valve. That is possible.

*Depo.*, 138:9-20. Although he attempts to limit his opinion by claiming that Silzone®

has a "higher than normal prevalence" of healing problems, in doing so, he acknowledges that these problems also occur with non-Silzone® valves. *Aff.*, 6/3/02, ¶23, Exh. 1(c); *Depo.*, 164:24-169:14, 171:11-172:5.

Having no factual support for his opinion, Dr. Wilson's improperly attempts to borrow the opinions of Plaintiffs' expert, Dr. Kevin E. Healy, to support his own. Other than read his affidavit and the attached literature, Dr. Wilson took no steps to verify Dr. Healy's opinions. *Aff.*, 2/24/03, ¶4, Exh. 1(d). In fact, Dr. Wilson never conducted an independent literature search regarding silver toxicity. *Id.* Dr. Wilson's empty reliance on other experts is neither "scientific, technical or other specialized knowledge" nor sound scientific methodology. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-14 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *In re TMI Litigation*, 193 F.3d 613, 714-16 (3d Cir. 1999) ("failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under Daubert"). Accordingly, Dr. Wilson's opinion should be excluded for lack of independent reliability.

### E. Opinion #4: All Silzone® Patients Have A Greater Risk Of Experiencing Significant, Life-Threatening Complications And Thus Require Enhanced Clinical Monitoring

As a result of his frustrated healing theory, Dr. Wilson opines that all

28,000 patients currently implanted with the Silzone® valve are "likely at greater risk of experiencing significant, life-threatening complications," including paravalvular leak, thromboembolism, thrombus, endocarditis, excessive pannus build-up, and possibly cancer. *Aff.*, 2/7/02, ¶¶187, 217, Exh. 1(b); *Depo.*, 99:22-100:13, 101:3-102:4. Thus, he believes that all Silzone® patients require a higher level of clinical monitoring than required for non-Silzone® patients. *Aff.*, 2/7/02, ¶218, Exh. 1(b).

### 1. Dr. Wilson Is Not Qualified To Assess Patient Risks Or Recommend Clinical Monitoring

Dr. Wilson has no qualifications whatsoever to opine that Silzone® patients have an increased risk of complications than non-Silzone® patients. Critically, Dr. Wilson is not a biostatistician, has no statistical training, and has no practical experience in the field of statistics. *Rule 26 Decl.*, ¶1, Exh. 1; *Wilson C.V.*, Exh. 1(a); *Depo.*, 31:5-7. Moreover, apart from this litigation, he has no practical experience with Silzone® valves or any other mechanical heart valve implanted in adults. *Depo.*, 74:10-75:2, 394:13-395:3.

Nor is Dr. Wilson qualified to recommend any type of clinical monitoring to Silzone® patients. Most significantly, Dr. Wilson is not a clinician and does not treat patients. *Depo.*, 119:13-18. Indeed, he testified that he does not normally discuss monitoring with cardiologists, let alone recommend it. *Id.* at 119:19-23. Dr. Wilson cannot specify what monitoring is needed for Silzone® patients because he admits this is

outside of his expertise. *Id.* at 119:24-121:1. Rather, Dr. Wilson defers to another Plaintiffs' expert for all details about clinical monitoring, describing him as "the expert in this field." *Id.* at 102:25-103:13. Tellingly, Dr. Wilson does not even know what monitoring is currently recommended by any professional health organization in Canada for mechanical heart valve patients. *Id.* at 125:8-15. Without this knowledge, Dr. Wilson agrees that he cannot fairly recommend that more monitoring is needed. *Id.* at 125:16-126:24. Other than read the report of Plaintiffs' expert, Dr. Eric G. Butchart, Dr. Wilson has done nothing else to acquire knowledge about his clinical monitoring recommendation. *Id.* at 119:24-121:10.

### 2. Dr. Wilson Lacks Foundation For His Risk Assessment And Clinical Monitoring Recommendation

Dr. Wilson's opinion regarding the increased risks of the Silzone® valve is completely devoid of details and support. As a fundamental matter, he even cannot quantify the risk for any of complications identified in his opinion and admits that doing so would be speculative:

> Q: All right. So for you to tell us any degree of increased risk that you would attribute to any of these complications for the Silzone population, you would have to speculate, sitting here today, correct, in order to quantify it?
>
> A: I think that's true. As explained in my affidavits, I think there is a very sound biological basis for the very reasonable expectation that those complications are

> going to be greater, in fact, I mean, I think have been greater already, although I don't have the data on it, and I think are likely to continue to be greater in the future based on, you know, all that is currently known abut Silzone to date.
>
> But in terms of giving – in terms of really responding to the specifics of your question, no, I can't give precise estimates.

*Depo.*, 104:19-105:9.

To date, no professional organization in the United States or Canada has recommended increased monitoring for Silzone® patients. *Depo.*, 123:12-23. Moreover, no one has published this opinion, including Dr. Wilson. *Id.* at 123:24-124:16. Dr. Wilson has not presented the opinion at any scientific meeting or even informally told any of his colleagues about it. *Id.* at 124:17-125:7. All Dr. Wilson can point to in order to justify the need for clinical monitoring is his knowledge of "basic science" and pathology, and the report of another Plaintiffs' expert. *Id.* at 119:24-121:10. These sources, however, are insufficient to support a clinical opinion that will affect all Silzone® patients, particularly when a recent peer-reviewed study has concluded that the risk of complications for those currently implanted with Silzone® valves is no different from non-Silzone® valve recipients.[4]

---

[4] "The additional risks of the Silzone valve, compared to Control, diminish over time and disappear by 4 years after implant. The minimum time after implant of the patients

### F. Opinion #5: The Silzone® Coating Is A Defective Product

In one line of his Rule 26 Declaration, Dr. Wilson opines "within a reasonable degree of medical and scientific certainty" that the Silzone® coating is a defective product. *Rule 26 Decl.*, ¶4, Exh. 1. Rather than explain this opinion, Dr. Wilson merely adopts his prior affidavits and concludes that these affidavits, along with published articles from the AVERT study and Dr. Butchart and his own examination of Silzone® specimens, all support his opinion. *Id.* Without any explanation about his factual basis and methodology, however, Dr. Wilson should not be permitted to opine that the Silzone® valve is defective. *J.B. Hunt*, 243 F.3d at 444; *Smith*, 462 F.3d at 923-25.

Furthermore, Dr. Wilson is simply not qualified to opine about the existence of a defect. He is a pathologist whose patient population is children. *Wilson C.V.*, Exh. 1(a); *Aff.*, 2/7/02, ¶1, Exh. 1(b); *Depo.*, 75:10-76:2. He has never designed prosthetic heart valves and has no relevant experience with any type of silver-coated implant, let alone silver-coated mechanical heart valves. *Wilson C.V.*, Exh. 1(a). Except for the few Silzone® valves that he has examined in this litigation, he has not seen any mechanical heart valve explanted from an adult patient in decades and he admits that

---

currently alive with Silzone is now well beyond 5 years; thus, these current patients now have a risk profile similar to that of patients with a standard St. Jude valve." Gary L. Grunkemeier et al., *Time-Related Risk of the St. Jude Silzone Heart Valve*, 30 European J. Cardio-Thoracic Surgery 20, 26 (2006), Exh. 8 to Van Steenburgh Aff.

silver-coated implantable devices are not one of his research interests. *Depo.*, at 451:4-8. As such, Dr. Wilson should be barred from giving this opinion. *Garnac*, 932 F.2d at 1566 (experts with general accounting knowledge but lacking specific expertise for their opinions are not qualified); *Hammes*, 2006 WL 1195907 at *6-8 (motorcycle mechanic who was not qualified in motorcycle design or design-testing and was not an engineer may not testify that the motorcycle was defectively designed).

### G. Opinion #6: An Independent And Valid Epidemiological Study On Silzone® Patients Is Needed

As above, Dr. Wilson opines in a conclusory fashion that a "sound, independent and valid epidemiological study on Silzone patients [is needed] to better safeguard their health and safety." *Rule 26 Decl.*, ¶4, Exh. 1. Once again, he provides no specific details as to why such a study is needed or how it should be carried out, except to suggest in his deposition that the AVERT study was underpowered and indeterminate. *Rule 26 Decl.*, ¶4, Exh. 1; *Depo.*, 31:14-33:25. Because this opinion utterly lacks explanation and support, it constitutes improper *ipse dixit* and must be excluded. *J.B. Hunt*, 243 F.3d at 444; *Smith*, 462 F.3d at 923-25.

Even if this opinion was supported, which it is not, Dr. Wilson is hardly qualified to recommend an epidemiological study of any kind. He is not a biostatistician, epidemiologist, or expert in clinical studies. *Depo.*, 31:5-9, 109:15-110:6. Indeed, when asked to explain why he believes the AVERT study was underpowered, Dr. Wilson

deferred to other Plaintiffs' experts. *Id.* at 31:14-32:21. He could not give a precise definition of statistical power, [*Id.* at 34:1-35:14, 109:15-110:6], and he eventually conceded that he did not know how many Silzone patients would be required to have sufficient power for a valid epidemiological study. *Id.* at 109:15-110:6. As he put it, "[t]hat would be something that the experts in that field, including Plaintiffs' experts, might put their mind to . . . but again, that goes beyond my expertise." *Id.* at 110:1-6.

### H. Opinion #7: St. Jude Medical Failed To Disclose Material Information About Its Animal Studies To The FDA, Thereby Misleading The FDA In Its Approval Of The Silzone® Valve

Dr. Wilson criticizes St. Jude Medical's conduct of its sheep studies and the Epic study, opining that certain information was relevant to the FDA's evaluation of valve safety. *Decl.*, 5/13/03, ¶¶15-41, Exh. 1(f). He then opines that St. Jude Medical withheld this information from the FDA and that such conduct was a "material omission relevant to the safety of the Silzone coating," was "exceedingly misleading," "misleading at best and blatantly false at worst," "inaccurate, incomplete, and untruthful," and "materially false and misleading." *Id.* at ¶¶31, 36, 41, 46, 69. Dr. Wilson concludes that the FDA would have acted differently in approving the Silzone® valve had it been aware of these alleged misrepresentations. *Id.* at ¶¶25-26, 29, 49. As explained below, Dr. Wilson's opinions are fundamentally flawed because as legal interpretations of FDA requirements they are improper subjects of expert testimony, he is not qualified to render them, and his methodology is faulty and unreliable. Therefore, these opinions should be stricken.

### 1. Dr. Wilson's Legal Opinion Regarding The Adequacy Of St. Jude Medical's Submissions To The FDA Is Prohibited By Federal Law

Federal law forbids state-law claims predicated on allegations that a manufacturer provided false or inadequate disclosures to the FDA. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 353 (2001). Courts thus exclude evidence designed to impugn a company's submissions to the FDA. *Bouchard v. American Home Prods. Corp*., 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002)( "[e]vidence will be excluded outright when it is offered only to show that the FDA was misled, or that information was intentionally concealed from the FDA"); *Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 36-37 (D.D.C. 2003) ("what was told to the FDA cannot support a tort claim"; such evidence "would be nothing more than an invitation for the jury to speculate about what . . . the FDA . . . might do if the facts were different"). Therefore, consistent with *Buckman* and its progeny, Dr. Wilson's criticisms of St. Jude Medical's submissions to the FDA must be excluded.

### 2. Legal Opinions From Purported Experts On Applicable Law Or Alleged Violations Of Law Are Neither Necessary Nor Admissible

The FDA's decision to approve the Silzone® valve is governed by federal statutes and FDA regulations. *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 799 (8th Cir. 2001) (*en banc*) (PMA process imposes specific requirements controlled by the FDA). Thus, courts have routinely excluded the testimony of experts who proffer opinions on agency laws and regulations. *Southern Pine Helicopters, Inc. v. Phoenix Aviation*

*Managers, Inc.*, 320 F.3d 838, 841-42 (8th Cir. 2003)(holding that expert opinion as to whether FAA regulations had been contravened was inadmissible legal opinion).[5] Fundamentally, the courts – not purported experts – decide what the law is, and expert testimony on such legal questions is both unnecessary and improper. Fed. R. Evid. 702; *Estes v. Moore*, 993 F.2d 161, 163-164 (8th Cir. 1993)(expert testimony that was merely statement of legal conclusion was not proper opinion testimony).

Despite these well-settled legal principles, Dr. Wilson prepared an entire declaration containing legal conclusions about St. Jude Medical's submissions to the FDA. *Decl.*, 5/13/03, Exh. 1(f). For example:

> Based on the foregoing, it is my opinion, to a reasonable degree of medical and scientific certainty within my fields of expertise, that SJM presented to the FDA and the medical profession a materially false and misleading view of the safety and efficacy of the Masters Series valve with Silzone.

*Id.* at ¶69. By opining that St. Jude Medical misled and lied to the FDA or that FDA would have acted differently had the company submitted certain information about its animal studies and the Epic Study, Dr. Wilson attempts to supplant the FDA's judgment

---

5 *See also Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (expert whose testimony consisted only of his views concerning the reasonableness of a police officer's conduct under the Fourth Amendment was an inadmissible legal conclusion)*; Purnell v. United States*, 1987 WL 13790 *3 (E.D.Pa. July 8, 1987), *aff'd*, 853 F.2d 920 (3d Cir. Pa. 1988)(excluding proffered FDA expert testimony as to applicability and interpretation of various statutes and regulations).

for his own. Such opinions are nothing more than legal conclusions appropriate only for the FDA and must therefore be excluded. *Buckman*, 531 U.S. at 353 (forbidding state-law claims predicated on allegations that a manufacturer provided false or inadequate disclosures to the FDA).

### 3. Dr. Wilson Is Unqualified To Render An Opinion Regarding FDA Regulations

Even assuming Dr. Wilson could give an opinion about the adequacy of St. Jude Medical's submissions to the FDA, he is simply not qualified to do so. As Dr. Wilson admits, he is not an expert on FDA regulations pertaining to mechanical heart valves. *Depo.*, 69:13-70:6. He has never worked for the FDA or advised any company on its submission to the FDA regarding a mechanical heart valve. *Id.* at 67:10-18. Other than seeing limited portions of St. Jude Medical's regulatory submission, he has never reviewed a pre-market approval regulatory submission for any mechanical heart valve. *Id.* at 69:7-12. Thus, Dr. Wilson has little to no experience to speak with any reliable authority on the FDA's review and approval of company submissions involving mechanical heart valves. Consequently, his opinion should be barred.

### 4. Dr. Wilson's Methodology In Criticizing St. Jude Medical's FDA Submissions Is Incomplete And Shoddy

Dr. Wilson's methodology also lacks reliability. Specifically, he has not reviewed any of the documents produced by the FDA in this litigation. *Depo.*, 66:7-67:9.

Thus, with respect to St. Jude Medical's regulatory submissions, he does not know what documents the FDA looked at or did not look at, how long they FDA reviewed the submissions, or how many FDA reviewers were involved. *Id.* at 280:19-282:3.

Perhaps most egregious of all, when he rendered his opinions criticizing the company's PMA submission, Dr. Wilson admitted that his analysis was incomplete because he did not review all of the PMA attachments, the heart of St. Jude Medical's submission:[6]

> A: . . . I have not seen the – I have certainly not seen all of the appended material that went to the FDA, so --
>
> Q: Why didn't you ask for it? You have had five years to ask for it. Why didn't you ask for it? Wouldn't that have been informative to have the entire PMA submission so you could make an informed judgment about what St. Jude Medical did or didn't submit to the FDA?
>
> A: Yeah, I think with the advantage of hindsight now, it

---

6 These attachments included the following categories of documentation: (1) Infective Endocarditis Literature Review; (2) Mechanism of Silver Antimicrobial Properties; (3) Ion Beam Assisted Deposition; (4) Spire Corp. Safety and Efficacy Summary; (5) Spire Corp. Biocompatibility Data of Spi-Argent; (6) Spire Corp. Antimicrobial Effectiveness Tests; (7) Spi-Argent Technical Package; (8) Scientific Papers – Dr. R. Bambauer; (9) Physical Data; (10) Corrosion Report – Components; (11) Corrosion Report – Assembled Valve; (12) Good Lab Practices (GLP) *in-vitro* Efficacy Tests; (13) Biological Safety Tests; (14) Literature Review on Silver Toxicity; (15) Short Term Animal Study; (16) Long Term Animal Study; (17) Package Labels; and (18) Physicians' Manual, Exh. 3, p.5.

would have been advantageous in terms of me answering this specific question.

Q: So when you filled out all these affidavits and you made all these criticisms of St. Jude Medical about its deficient submissions, you had never even seen the complete submission; am I correct?

A: Not all the appended material, no.

Q: So you are operating on incomplete information, are you not?

A: In respect to seeing all of the material appended, I would have to say that's correct.

*Depo.,* at 276:20-277:16.

Likewise, when he criticized St. Jude Medical for failing to provide information about one sheep identified as "KTMV-2" in a short-term animal study and hypothesized that its death may have been caused by silver toxicity from the Silzone® valve, Dr. Wilson admitted that he did not review all relevant materials that may have provided an alternative explanation for the sheep's death:

Q: In arriving at the opinion that St. Jude Medical potentially gave false or incomplete information to the FDA, even though you had photographs documenting the presence of bacteria, you hadn't looked into them and you hadn't tumbled to that fact: isn't that correct?

A: That is correct. It is only recently that we did that analysis.

*Depo.*, at 314:4-11. In fact, Dr. Wilson admitted that he did not know then (and still does not know today) the cause of KTMV-2's death:

> Q: I understand that's your position, Doctor. To this day, to this day, your opinion that the death of KTMV-2 was possibly caused by silver toxicity is still unproven; isn't that right?
>
> A: That's true. . . .

*Id.* at 316:21-317:6. And despite also criticizing St. Jude Medical for allegedly failing to provide excess pannus information regarding another sheep-study animal to the FDA, Dr. Wilson conceded in deposition that he was wrong. *Id.* at 247:17-248:22.

As with all of his opinions, Dr. Wilson's attempt to testify based on incomplete information and unproven hypotheses is unacceptable under Rule 702 and must be stricken.

## IV.
## CONCLUSION

Because the opinions of Dr. Wilson do not have any indicia of evidentiary reliability, they are inadmissible as a matter of law and should not be considered by a jury in this case.

DATED: February 14, 2007.

HALLELAND LEWIS NILAN & JOHNSON P.A.

By: s/ Tracy J. Van Steenburgh
Tracy J. Van Steenburgh Reg. No. 132767
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, Minnesota 55402-4501
(612) 338-1838

REED SMITH LLP
Steven M. Kohn
1999 Harrison Street, Suite 2400
Oakland, CA 94612

Attorneys for Defendant St. Jude Medical, Inc.