Court File No.: 00-CV-195906 CP

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

ERIK ANDERSEN, YVONNE ANDERSEN and SHARON FROST

Plaintiffs

- and -

ST. JUDE MEDICAL, INC., and
ST. JUDE MEDICAL CANADA, INC.

Defendants

A Proceeding Instituted Pursuant to the
Class Proceedings Act, 1992, S.O. 1992, c. 6

**AFFIDAVIT OF DR. GREGORY WILSON**

I, Dr. Gregory Wilson, of the City of Toronto, in the Province of Ontario, make oath and say as follows:

1. I am the deponent of an Affidavit sworn February 7, 2002, which has been filed by the solicitors for the Plaintiffs as part of the Plaintiffs' Responding Motion Record for the motion for certification in this action. I have knowledge of the matters deposed in this Affidavit, except where I have been informed by others, in which case I have indicated the source of the information and I believe it to be true.

2. I was cross-examined on my earlier Affidavit on April 30, 2002. No re-examination was conducted on that date because further cross-examination was anticipated and counsel for both parties had to travel to Vancouver for cross-examination of another witness.

3. I am advised by Mr. Raikes and I believe that counsel for the Defendants, Gordon McKee, indicated to him that no further cross-examination on my original Affidavit was required. Further, it was agreed between Mr. McKee and Mr. Raikes that any matters which would have been the subject of re-examination could be dealt with by way of a further Affidavit by me. Attached as **Exhibit "1"** is a copy of a letter dated May 6, 2002 from Mr. Raikes to Mr. McKee confirming these arrangements.

4. Subsequent to my cross-examination on April 30, 2002, the Defendants have delivered an Affidavit sworn by Dr. Fred Schoen (sworn May 7, 2002). I have reviewed that Affidavit.

5. In addition, I have received from Plaintiffs' counsel and have reviewed the transcript of a deposition of Dr. Jagdish Butany, a pathologist employed at the Toronto General Hospital, with respect to his observations and conclusions concerning the Silzone mechanical heart valve manufactured by the Defendants.

6. In this Affidavit, I intend to:

(a) address those matters which arise from my previous cross-examination which would have been the subject of re-examination;

(b) respond to the Affidavit of Dr. Schoen, which was not available to me prior to my cross-examination on April 30, 2002; and

(c) note and comment on portions of the transcript of Dr. Butany as it relates to the opinions which I previously expressed in my earlier Affidavit and my cross-examination.

**Biomaterials Award**

7. In May, 2000, at the time of the worldwide scientific meeting (Congress) of the International Union of Societies for Biomaterials Science and Engineering, which is held once every three years, I was elected as Fellow Biomaterials Science and Engineering (F.B.S.E.). This is a lifetime achievement award and is a designation which I may place after my name for the rest of my life.

8. Briefly, the process by which an individual receives this honour involves being nominated to the national council of one's country's biomaterials society. If approved at this level, one is put forward for consideration at the international level. If approved there, the F.B.S.E. is conferred at the next international congress. I was nominated for my work on the tissue reaction to (healing of) various biomaterials implanted in the body. This work includes, but is not limited to, the healing of prosthetic heart valve sewing rings.

**Healing of Tissue**

9. The principles of healing related to prosthetic heart valve sewing rings and knitted polyester are well established based on an extensive experience in experimental animal studies. This body of scientific knowledge came from studies that were performed primarily in the 1960s and 1970s. Although I used less technical language in my Affidavit sworn February 7, 2002 than is found in publications on this subject, my description of the healing processes conforms to these principles.

10. As mentioned, much of the information on heart valve healing comes from animal experimentation. This is not surprising given the location of the prosthetic device in the body. It is unethical and entirely impractical to conduct a controlled study where heart valves are removed at fixed time periods from human patients who are not exhibiting

adverse medical findings. As a result, much of the knowledge that we have gained medically with respect to tissue healing has been the result of animal experimentation.

11. Healing of the sewing cuff occurs faster in animals than humans. Nevertheless, humans are capable of complete healing of the sewing ring, including complete coverage of the entire sewing ring by a thin layer of well organized tissue covered by endothelial cells which form the blood contacting surface. I have personally observed numerous instances of such complete healing in animals. I have also observed complete healing of the sewing ring in humans, albeit on fewer occasions. I have also seen many instances of substantial, if not perfect, sewing ring healing in prosthetic heart valves in humans. I believe that it is generally accepted that such healing can and does normally take place. These principles are reflected in a chapter on heart valve prostheses and vascular prostheses which I co-authored with Dr. Malcolm Silver, which are found in the 1983 (Chapter 34) and 1991 (Chapter 40) editions of the textbook, *Cardiovascular Pathology*, published by Churchill Livingstone.

12. In describing the normal sequence of healing reactions, I took into consideration statements in peer-reviewed literature that refer to healing in humans being slower than in animals. I also took into consideration the reported experience with healing of vascular grafts conducted of knitted polyester fabric (the same type of construction as in most heart valve sewing rings) both in animals and in humans. For example, it is well known that tubular structures made of knitted polyester fabric (a particular type of vascular graft) used to replace large segments of the abdominal aorta and/or iliac arteries in humans heal by pannus ingrowth from each end of the graft with native arterial tissue. This healing includes endothelization, but is usually limited to a distance of 10 to 15 millimetres from each end of the graft in humans, even many months after implantation. As Dr. Silver and I pointed out in Chapter 40 of the 1991 edition of the textbook, *Cardiovascular Pathology*, this limitation does not prevent the complete pannus coverage and endothelization of heart valve prosthesis knitted polyester sewing rings. There is no doubt

that sewing rings of heart valve prosthesis can heal completely, as indicated in that chapter.

13. My description of the usual time frame for sewing ring healing was based on a combination of the available knowledge from both animals and humans. I note that Dr. Schoen wrote in paragraph 21 of his Affidavit that the surface of a sewing cuff may be covered by endothelial cells in many cases by three months. In my description of the healing process, which Dr. Schoen does not contradict, I indicate that the pannus first covers the sewing ring before endothelial cells grow to cover the blood contacting surface of the pannus. Thus, it appears to me from my review of his Affidavit that the principal difference between Dr. Schoen and me in regard to endothelization is that I described it as complete by three months in most cases, whereas Dr. Schoen refers to many cases.

14. Dr. Schoen makes a distinction between surface endothelization and deep healing into the interstices of the fabric cuff. He states the latter requires longer than three months and may be incomplete or absent despite the passage of many months in some patients. If, by deep healing, he means healing into the deepest interstices between the polyester fibres, at the greatest distances from the sewing ring surface on which the pannus forms, I agree with his statement. This could well be true in a substantial percentage of patients, not just in some patients as he states. However, in stating that healing is usually complete within three months, it was not my intent to imply that tissue ingrowth included every one of the interstices of the sewing ring or the deepest interstices in general. Rather, I was describing the full sequence of healing reaction, including growth of pannus onto the sewing ring, including endothelization of the pannus, as well as tissue ingrowth into many interstices of the sewing ring to anchor the pannus. I stated that this occurs in most patients, not all. Since Dr. Schoen appears to only take issue with deep healing into the sewing cuff as taking longer than three months in some patients, it appears that he and I do not really have a substantial disagreement on this matter.

15. To provide perspective, the sewing rings of the Silzone valves I examined with implant durations of 60 days (Erik Andersen), 129 days (Sharon Frost) and 1.75 years (D.J.) all showed virtually no pannus formation and almost no organized tissue ingrowth into even the surface layers of the sewing ring.

16. Attached as **Exhibit "2"** to this Affidavit is an investigation report dated 15 September, 1998, reporting on an explanted Silzone valve authored by Paula Bethel, a St. Jude Medical Inc. employee. Ms. Bethel quotes Dr. Lillehei, M.D., PhD., St. Jude Medical Heart Valve Division, Director of Affairs, as indicating that tissue ingrowth is expected to be present in approximately six weeks, but has been known to take as long as six months in some patients. This statement does not substantially contradict my description of sewing ring healing.

17. My description of the time frame for tissue healing to occur was intended to reflect the normal situation. I concur with Dr. Schoen that there is some variability in healing time frames, but the process that I have described in my Affidavit sworn February 7, 2002, is normally well underway and usually complete within three months.

**Factors Affecting Healing**

18. During my cross-examination, Mr. McKee put to me various factors relating to healing which he suggested could impair or delay healing. In his Affidavit, Dr. Schoen has cited some of these same factors.

19. I confirm my evidence on my cross-examination that in extreme cases, diet (severe malnutrition) and alcohol consumption (chronically high alcohol consumption for which malnutrition is likely an associated factor) can affect wound healing generally. However, the patients whose Silzone valves I examined did not have these problems. None had Marfan's Syndrome, a rare inherited disease. If I apply the same standard to Dr. Schoen's statements as the Defendants seek to apply to my Affidavit, there exists no reference in

peer-reviewed literature that any of the conditions which Dr. Schoen asserts to influence the rate and degree of healing have been demonstrated to do so for sewing rings of heart valve prostheses. In any event, I note that Dr. Schoen indicated only that these factors "may" impact the extent of tissue ingrowth into the sewing cuff following valve implant surgery, not that they did so in relation to the valves which I examined.

20. In addition, I note that the factors relating to healing that were put to me by Mr. McKee in my cross-examination were not explicitly controlled for in the design of AVERT, with the possible exception of infection, specifically pre-existing infectious endocarditis. I believe it is likely that the reason these factors were not controlled for is that although age, nutritional status and alcohol consumption may affect prosthetic valve healing at the extremes, they are not considered to be important enough factors in the vast majority of actual heart valve prosthesis recipients to control for in the study. As for medication, anticoagulants can have an effect, but would be used in all patients in the study.

21. With respect to infectious endocarditis being present immediately prior to Silzone valve implant, it was disclosed in the March, 2002 report of AVERT that "five percent of patients had active, treated or suspected endocarditis at the time of operation". As there were 807 patients in the study, this is approximately 40 patients. Since the patients were randomized at entry to the study, it is fair to assume that approximately half of these patients should have received Silzone valves. In this fashion, pre-existing infection, while not eliminated, was controlled for.

22. Therefore, the randomized clinical trial sponsored by the Defendant does not appear to have expressly considered the factors mentioned by Mr. McKee or Dr. Schoen. Enrolment was terminated early in AVERT and immediately thereafter, the Defendants issued a worldwide recall of the Silzone valve.

23. In his Affidavit, Dr. Schoen indicates that he has observed a lack of tissue ingrowth and excessive pannus and/or thrombus formation on other non-Silzone valves. It is not my opinion that these conditions relating to healing are unique to the Silzone valve; rather, it is my opinion that the higher than normal prevalence of lack of tissue ingrowth and excessive pannus and/or thrombus formation is connected to the Silzone coating on the sewing cuff, the only feature different from the conventional St. Jude mechanical heart valve.

24. Dr. Schoen cites the Fung article (Exhibit W to my Affidavit of February 7, 2002) at paragraph 38 of his Affidavit and concludes that that article contradicts my opinion that the Silzone coating frustrates the normal tissue healing response.

25. I believe that Dr. Schoen has taken my reference to the Fung article out of context. I cited the Fung study in my February 7, 2002 Affidavit for the purpose of demonstrating that with a similar, if not identical, coating process to Silzone, silver deposited on a polymeric material implanted in the body, detached from the implant surface and deposited in the surrounding tissue. This study was published before Silzone valves were implanted in animals and before regulatory approval for clinical implants. I believe that from the Fung study, the Defendant knew or should have known the potential for the Silzone coating to detach and accumulate in the surrounding tissue. I did not represent in my Affidavit or in my evidence on cross-examination that this study with silver-coated silicone rubber catheters implanted subcutaneously and intramuscularly in pigs was, in itself, predictive of any particular healing response to silver-coated polyester fibres in heart valve sewing rings in the heart.

26. It is worth noting that the implanted material in the Fung study was silicone rubber, which tends to provoke an intense inflammatory reaction. A careful reading of the Fung study suggests the silver coating actually reduced the overall inflammatory

response to the silicone rubber implants, despite the fact that some of the silver coating separated from the surface over time. However, a major difference between the Fung study with silicone rubber catheters (cylindrical in shape, of a few millimetres in diameter) and the sewing ring of a heart valve prosthesis is the surface area. The total surface area coated with silver on the polyester fibres of a heart valve sewing ring is enormously greater than on a peritoneal dialysis catheter, because there are so many individual polyester fibres even though each fibre individually has less surface area than a dialysis catheter.

27. Thus, the amount of silver which could come loose from the surface of the polyester fibres making up the sewing ring is proportionately greater than a dialysis catheter based on exposed surface area. As Dr. Schoen is knowledgeable in biomaterials research, I am surprised that Dr. Schoen would not have recognized that the widely varying polymer surface areas between the two devices is significant.

28. Further, the article itself specifically provides at page 398,

> "If a sufficiently large amount of silver is released into connective tissue, severe tissue disruption and even necrosis can be induced (12). This potential concern is of particular relevance for percutaneous catheters designed for long-term use, where a relatively long subcutaneous tunnel is often employed. The relatively large tissue – catheter contact area and the intended long indwelling time may accentuate even minor adverse tissue effects."

Thus, the study highlighted the risks of using silver on adjacent tissue, particularly over a long period of time.

29. Further, at page 404, the authors noted that "further long-term evaluations are needed, however, to study the potential for adverse effects on tissue fixation of the catheter, systemic toxicity…". The Fung study cannot be interpreted as an endorsement of the use of silver-coated prostheses generally. It highlights the need for greater study and the risk of damage to adjacent tissue.

**Culture Negative Endocarditis**

30. The term "culture negative endocarditis" refers to a situation in which an infectious micro-organism, usually but not always a strain of bacteria, causes endocarditis but is not detected on microbiological testing. In the clinical context, this means samples of blood sent for culture are negative (i.e., no micro-organism grows).

31. The recognized "gold standard", i.e., for diagnosis of infectious endocarditis is pathological examination of the suspected site of the infection, which could be either tissue removed from the heart or the relevant tissue at autopsy. In the special case of a prosthetic heart valve, attention focuses on the sewing ring of the valve and tissue growing on and in the sewing ring and potentially tissue contiguous with the prosthesis.

32. Special stains (e.g. Gram stain) for bacteria may fail to show bacteria actually present, particularly with antibiotic use in a patient before pathological examination of the valve prosthesis. However, infectious endocarditis, including culture negative endocarditis, produces a combination of inflammation and tissue destruction. This is well-accepted and described in the chapter entitled "Valvular Heart Disease – Conditions Causing Regurgitation" by Malcolm Silver and Meredith Silver in the 2001 edition of the textbook Cardiovascular Pathology. I did not observe this in any of the Silzone valves I have examined to date. In particular, in the case of Mr. Andersen, I did not observe evidence of either inflammation or tissue destruction on or in the sewing ring of the explanted Silzone valve. Further, the aortic valve tissue (which was immediately

contiguous with the sewing ring of the Silzone valve in the mitral position) removed from Mr. Andersen and examined by Dr. J. Butany, also showed no evidence of inflammation or tissue destruction as described by Dr. Butany in his report on the mitral valve and aortic leaflet (see Exhibit "B" to my Affidavit sworn February 7, 2002). In his report, Dr. Butany mentioned suspicion of infectious endocarditis, but found no confirmatory evidence of infectious endocarditis on either the Silzone valve or the aortic valve tissue.

33. It is also useful to consider the peer-reviewed, published case report by Tozzi et al. (see Exhibit "X" to my Affidavit sworn February 7, 2002) which described the explantation of a Silzone valve from the mitral position where "the mitral annulus was ulcerated and there were multiple erosions of the myocardial tissues in contact with the prosthetic valve" with no histological evidence of infection.

34. Similarly, in the update on the AVERT study published in the Annals of Thoracic Surgery in March, 2002, which is attached as **Exhibit "3"** to this Affidavit, the authors of the study collectively state at page 791 that "in patients in the present study who had explants of Silzone valves, clinical findings did not suggest infection. In addition, none of the patients having late operation for PV leakage had active or recent endocarditis at the time of entry into the study." This peer-reviewed publication noted (page 791) that the explanted valves in AVERT patients exhibited "poor tissue ingrowth and loosening of the sutures."

35. Thus, it seems clear from the clinical experience in AVERT, which includes 19 explanted Silzone valves (compared with only two non-Silzone prostheses) that infectious endocarditis, whether culture negative or not, is not the cause of the paravalvular leak in all or almost all of the 19 Silzone valves explanted, the reason enrolment in the AVERT trial was terminated.

36. In his Affidavit, Dr. Schoen indicates that it is not possible to rule out endocarditis as a cause of tissue destruction or inadequate healing simply because inflammation

cannot be detected in the section examined or because cultures are negative for bacteria. He indicates that this is because the amount, quality and location of cardiac tissue obtained and sent to the pathologist after explant is highly variable and may not necessarily be representative of areas that may have been affected by infection.

37. I agree with Dr. Schoen's statement regarding the sampling of cardiac tissue outside a prosthetic heart valve at the time of its removal. Sometimes, it may be inadequately sampled to establish the presence of infection in that cardiac tissue. However, it is well accepted that infective endocarditis, associated with a mechanical heart valve prosthesis, whether culture positive or negative, involves the micro-organisms being present within the sewing ring of the prosthesis. With the entire explanted heart valve prosthesis available for examination, it is possible to determine if infection involved a sewing ring.

38. For the valves from Erik Andersen, Sharon Frost and D.J., which I examined grossly and microscopically, valve prosthesis removal occurred in the context of a substantial paravalvular leak which, if due to infection, would most certainly have involved micro-organisms within the interstices of the sewing ring and some combination of inflammation and tissue destruction within the tissue growing into the sewing ring. Even if the micro-organisms went undetected on special stains, it is my opinion that the inflammation/necrosis should have been evident in the sections of the explanted Silzone valves I examined.

39. I agree with Dr. Schoen that the endothelial layer is fragile and some or even most of it might be inadvertently removed before the explanted prosthetic valve reaches the pathologist. However, well healed pannus contains a substantial proportion of collagen and is well anchored to the sewing ring, because of ingrowth into substantial numbers of the interstices. It is possible that small fragments of well-healed pannus could be dislodged from the valve sewing ring before the specimen is received by the pathologist.

I agree with Dr. Schoen that pieces of pannus may be removed in the operating room and sent directly to the microbiology laboratory for bacterial or fungal culture. However, such pieces of pannus are small, typically a few millimetres in greatest dimension and never more than a small percentage of the entire pannus. The reason for this is that on culture in the microbiology laboratory, any micro-organisms present in the pannus proliferate, increasing many times over (often millions of times). Thus, only small samples suffice.

40. Further, surgeons know the importance of having the pathologist determine whether there is a true infectious endocarditis by examining for inflammation, tissue necrosis and staining from micro-organisms. For these reasons, the amount of tissue sent for microbiology can be expected to be small compared to that sent to the pathologist. Since the surgeon must make an incision around the outside of the sewing ring to remove the prosthesis, any tissue which had grown into or onto the sewing ring should be largely intact.

41. Each of the four explanted Silzone valves I examined after surgical explantation, reported in my Affidavit of February 7, 2002, showed almost no tissue on the surface of the sewing ring, with the exception of thrombus, and the three I examined microscopically showed only minimal tissue within the interstices of the sewing ring. It would truly be extraordinary for there to have been a pannus covering each and every one of these valves which was completely removed around the circumference of the valve, on both sides of the sewing ring, by the surgeon or operating room personnel, while leaving thrombus adherent to portions of the sewing ring surface. For the pannus to separate and yet leave the thrombus (which, if present, is present on the surface of the pannus) seems impossible.

42. If pannus formation on the sewing ring was of poor quality, that is, soft (friable), and poorly anchored to the sewing ring because of minimal tissue ingrowth into the interstices of the sewing ring, then it is plausible that substantial portions of such poor

pannus could separate on handling of the valve prosthesis in the operating room. Even under these circumstances, however, it is highly improbable that so little tissue would be present on both sides of the sewing ring as I observed and photographically documented in these valves. Moreover, if such friable pannus did come off so easily it would be a further confirmation of the poor healing of the Silzone valve, if this occurred.

43. The above-mentioned four explanted Silzone valves were explanted because there was sufficient paravalvular leak that valve removal was considered necessary. Surgeons are generally reluctant to remove a valve prosthesis unless it is clear that the patients well-being is seriously threatened. In each case, there were substantial paravalvular leaks.

44. Surgeons sew in heart valve prosthesis using many separate sutures with individual ties (known as interrupted sutures) around the circumference of the sewing ring. Thus, if any one of these sutures came out because of poor surgical technique (e.g. a poorly tied knot) there would be a minimal, if any, paravalvular leak. To develop a substantial paravalvular leak requiring valve replacement, several sutures must come out of the tissue.

45. For the four explanted Silzone valves I described in my February 7, 2002 Affidavit, the paravalvular leaks clearly developed by multiple sutures for each patient tearing through the tissue around the annulus of the valve in which they were placed. This had to have occurred due to weakness of the tissue immediately adjacent to the sewing ring so that the sutures could tear through this tissue. There are really only two credible causes for such large paravalvular leaks in these Silzone valves, and indeed in Silzone valves in general. One is infectious endocarditis, usually of bacterial origin, and the other is abnormal healing/tissue weakness caused in some way by the effects of the silver coating of the Silzone valve. For the reasons I have already indicated in my Affidavit of February 7, 2002 and my evidence on cross-examination and the statements I have made

above on the topic of culture negative infectious endocarditis, I believe the latter is the case.

46. By Dr. Schoen's own admission, in paragraph 23 of his Affidavit, culture negative endocarditis represents about ten percent of cases of infectious endocarditis. While culture negative endocarditis could possibly cause the removal of a Silzone valve, it seems to me highly unlikely that culture negative endocarditis could be seen as responsible for more than a small percentage of explanted Silzone valves and the lack of proper tissue healing which I observed, which is noted in the AVERT report from March, 2002 (which draws attention to the lack of clinical findings to suggest infection in any of the 19 Silzone valve explants, as noted in paragraph 33 of this Affidavit), and which Dr. Butany observed.

**Foreign Body Response**

47. I agree with Dr. Schoen that the foreign body giant cell response directly around/adjacent to the polyester fibres of the sewing ring does not require the presence of silver. Certainly, I did not indicate in my Affidavit of February 7, 2002 that the macrophages and multinucleated giant cells directly surrounding the polyester fibres represented a response to the silver coating; in fact, I indicated that many of the polyester fibres seen in the sections of the explanted sewing rings I examined lacked a silver coating.

48. However, during my cross-examination by Mr. McKee regarding a foreign body macrophage/giant cell response to silver particles, I pointed out to him that the black particulate material that detached from the surface of the fibres did provoke a macrophage/foreign body giant cell response with the ingestion of this particulate material into these cells independent of the response to the polyester fibres. Thus, when the silver flakes off into the surrounding tissue, it triggers a foreign body/giant cell

response to those particles in addition to any response which might ordinarily take place to the sewing ring fibres themselves.

49. I observed this reaction to the black particulate material in the explanted Silzone sewing rings, which I examined microscopically. The reaction was apparent because much of the cellular response to the detached surface coating was well separated from the polyester fibres in the pannus overgrowth, and therefore not in response to the polyester fibres, particularly in the Silzone valves examined from R.R..

50. It is not my view at this time that the silver particles generate a "unique" foreign body giant cell response in the sense that the silver has a particular effect on how macrophages/giant cells function after the ingestion of the silver, although this is an interesting possibility. However, it is clear to me that the silver coating particulates detached from the polyester fibres do result in an additional foreign body response separate from the polyester fibres.

51. I did not indicate in my Affidavit of February 7, 2002 that this separate foreign body response to the separated silver coating was responsible for specifically frustrating healing or causing harm to cardiac tissue; however, on consideration, I believe that it could be a contributing factor to both frustrated healing and harm to cardiac tissue. Macrophages, when stimulated as they are by a foreign material that they attempt to ingest (either a polyester fibre or surface coating separated from that polyester fibre) release chemicals, which stimulate the proliferation of mesenchymal cells such as fibroblasts, the cells which secrete the protein collagen which, together with these cells, is a key contributor to the bulk of the pannus. Thus, there is very likely a link between the separation of the silver coating and excessive pannus build up mediated through macrophages/multinucleated giant cells.

52. It is not surprising that there have been almost no reports in peer-reviewed literature of Silzone valves as a specific source of silver particles. There are few

cardiovascular pathologists with an extensive experience with the Silzone valve explants. Many explanted Silzone valves, which I understand exceed 160, have been returned to the Defendant, but I am unaware of any analysis of those valves directed at understanding the mechanism by which the Silzone coating has contributed to these explants. Certainly, the Defendant has not published any literature which contains detailed pathological analysis of the explanted Silzone valves and the reasons for the explantation of these valves.

53. I believe it is well accepted in the medical/scientific community that silver is capable, at certain concentrations, and in some conditions, of being detrimental to healing; see, for example, the reference above to the Fung article. There are peer-reviewed scientific publications which indicate that silver can be detrimental to fibroblasts in cell culture. The authors of the most recent publication on AVERT in March, 2002 indicate that the explanted Silzone valves "exhibited poor tissue ingrowth and loosening of sutures" and attribute this to the Silzone coating inhibiting normal fibroblast response and incorporation of the fabric of the sewing ring into host tissue.

54. I agree with Dr. Schoen to the extent that he indicates in paragraph 26 of his Affidavit that the foreign body response associated directly with the polyester fibres of the sewing ring is not necessarily associated with inadequate healing. However, the foreign body response to the silver coating that has separated from the polyester fibres, because these separate particulates induce an additional foreign body response, which Dr. Schoen appears to ignore, is a different matter for the reasons I have indicated above.

55. The opinions which I have expressed in my Affidavit and during my cross-examination are based upon my detailed pathological examination of the explanted Silzone valves which I had in my possession, my review of available literature, to the extent that it pertains specifically to Silzone, and literature which pertains to the use of silver, as well as my training and education as a pathologist. There is no peer-reviewed

report which, for example, conclusively approves of my opinion that the foreign body giant cell response to the black particulate material separating from the polyester fibres contributes to frustrated healing in Silzone valves. However, neither is there any peer-reviewed literature which specifically rejects that opinion or which indicates as a matter of scientific certainty that that response is not reasonable.

56. I believe that the opinions which I have expressed, based on my experience and expertise as a pathologist are a reasonable interpretation of the data available to me. Certainly, I have seen no indication that St. Jude is taking steps to ensure that the answer to this issue is found and presented for peer-review.

**Embolization of Silver**

57. The microscopic evidence which I have obtained shows the silver coating coming off the polyester fibres, and in three of the five valves I examined microscopically, only minimal tissue covered the sewing ring. In the absence of a tissue barrier to contain the particulate material, it is reasonable to conclude that some of it would pass into the bloodstream and embolize, unless somehow the particulate debris is restrained in some fashion from passing out into the flowing blood passing by the valve at five litres per minute (resting cardiac output) or greater. By comparing the microscopic findings on the explanted Silzone valve from D.J. at 1.75 years implant duration with the Silzone valves from R.R. at 2.5 years implant duration obtained at autopsy, I observed substantially more particulate debris separated from the surface of the polyester fibres in the thick pannus that had formed in the sewing rings of R.R. In contrast, there was very much less of this material on microscopy of the sewing ring of D.J., which had minimal tissue present, even though also implanted for a considerable duration.

58. In my opinion, these findings provide direct support for the assertion that pannus, if present, reduces the amount of silver particles entering the bloodstream. Simply put,

the silver coating comes off and, if no tissue barrier is present to prevent it being carried into the bloodstream, the particles must pass and do pass into the bloodstream.

59. Dr. Schoen states in his Affidavit in paragraph 32, that "there is no evidence that such particles are capable of becoming an obstruction to circulation" and "to prove harm it would be necessary to show that the size of such particles is large enough to interfere with blood flow in a major vein or artery and such particles would be observed in distant organs". With respect, this statement is incorrect. The deposition of these particles in much smaller arterial branches or in the microcirculation could cause harm, particularly in the brain where some very small regions in the brain serve very important functions. These particles which I observed are large enough to block such vessels and definitely most of the particles are much too large to pass unobstructed through the microcirculation of any organ.

**Clinicopathological Assessment**

60. During my cross-examination, I referred to the process of clinicopathological assessment. Such an assessment involves the following:

(a) A detailed pathological examination of the explanted valves available to me, using well-established and accepted pathology techniques and principles;

(b) A detailed review of the medical records available to me from the patients whose valves I have examined;

(c) A detailed review of any existing pathology reports with respect to those same valves;

(d) A review of available scientific literature relating specifically to the Silzone valve and more broadly to the use of silver in prosthetic devices; and

(e) A review of available studies and case reports with respect to the Silzone valve.

61. In undertaking the clinicopathological assessment of the valves which are referred to in my earlier Affidavit, I used only well-established, standard investigative techniques employed by pathologists in order to arrive at the opinions which I have expressed. No new scientific techniques were used.

62. In reaching my opinion on whether or not the silver coating on the Silzone valves contributes significantly to poor healing, and increases the risk of various complications relating to poor healing, I specifically noted the consistency with which poor healing is found on Silzone valves explanted for valve replacement, or observed at autopsy, the severity of those findings compared to what one would reasonably expect to observe in normally healing sewing rings of heart valve prostheses in patients, and the relevant clinical information on each patient so that special factors may be considered, including, but not limited to, those which Dr. Schoen refers in his Affidavit. This process of "weighing the medical evidence" from all sources is known as clinicopathological correlation. It is the process which I go through each time I, as a pathologist, complete an autopsy report and express my opinion as to the cause of death.

63. While clinicopathological correlation is routinely applied by pathologists, and clinicians, in individual cases, the same methodology can be extended to analyze a group of patients in which there is a common factor, such as the implantation of a particular heart valve prosthesis design. Thus, it is the correlation among the clinical and pathological findings in the aggregate which allows formation of reasonable inferences which lead to conclusions. This is the process which I applied in constructing my Affidavit of February 7, 2002 and which I have extended in the present Affidavit based on additional information available on Silzone valve explants. On the basis of all of the information now available to me, the opinions I reached in my February 7, 2002 Affidavit remain unchanged.