64. The photographs which I have provided and exhibited to my earlier Affidavit were taken using a microscope and high-resolution digital camera from microscopic sections sampling the sewing rings of the Silzone valves from Erik Andersen, Sharon Frost, D.J. and R.R.. I reviewed those sections through the microscope and from the images that were obtained by the photographs. I confirm that the photomicrographs taken are representative of the pathological findings which I observed from these sections, collectively, for each valve. These images are indeed representative of the microscopic pathological findings described for these Silzone valves in my Affidavit dated February 7, 2002.

65. On cross-examination, Mr. McKee asked me about medical records related to patients, W.S. and D.J. I have reviewed the medical records for patient, W.S., since my cross-examination on April 30, 2002. I confirm that the clinical information I provided in my February 7, 2002 Affidavit with respect to W.S. is correct.

66. With respect to the medical records of patient, D.J., the records which I reviewed in preparing my Affidavit covered the period January 1, 1994 through September 29, 2000. The St. Jude Silzone mechanical heart valve was implanted on January 6, 1999. These records do not include the in-hospital records of either the implantation of the valve or its removal, which occurred in October, 2000. Although the record of replacement of the Silzone valve of D.J. was not included in the records which I had, the evidence supporting the decision to replace the valve, that is, aortic regurgitation due to paravalvular leak, was amply documented. Further, I received the explanted Silzone valve from D.J., and thus, knew that it had been removed. Accordingly, the information contained in my Affidavit regarding D.J.'s medical history is accurate.

67. I did not interview any of the surgeons who performed the explanation procedures for the Silzone valves from Erik Andersen, Sharon Frost, D.J. or W.S. In my experience, to do so would have been most unusual. If I had been working at the institution at which

the prosthesis had been recently explanted, it is possible that I might have spoken with the surgeon. I occasionally do this within a few days of the explantation surgery at my hospital, The Hospital for Sick Children, in relation to devices/tissues removed from patients by the cardiac surgeons. I make a point of doing so if I am reporting infectious endocarditis.

68. However, in the cases of the Silzone valves I was examining, the Silzone valves had all been removed more than a year, and in one case, Mr. Andersen, about three years before I received them. I would not expect the surgeon or others present at the time of removal to have a reliable, detailed memory of the event.

69. During my cross-examination by Mr. McKee, I referred to three Silzone valves which I had received from two patients in the United States. These valves are not mentioned in my earlier Affidavit. One of the three valves was an explanted valve, which showed evidence of essentially no tissue ingrowth on the sewing ring, similar to my observations from the Silzone valves explanted from Erik Andersen, Sharon Frost, D.J. and W.S.

70. The other two Silzone valves from the United States were present in the aortic and mitral positions of the heart removed at autopsy and sent to me for examination, together with the medical records of the deceased, including a copy of the autopsy report. I performed a detailed clinicopathological correlation, ~~including examination~~ of ~~the~~ Silzone valves. I did find evidence of only minimal tissue coverage on both sides of the sewing rings for both the aortic and mitral Silzone valves, and no evidence of an infectious process to explain such poor healing.

71. My observations and review of the clinical information for these three valves is consistent with and further supports the opinions which I previously expressed in my Affidavit of February 7, 2002.

**Case Reports Versus Scientific Study**

72. In his Affidavit, Dr. Schoen suggests that the five valves examined by me (actually six, per my Affidavit of February 7, 2002, and now nine) are an insufficient number on which to base an opinion as to the effect of Silzone on tissue healing. He refers to the Tozzi article as an example of only one patient from which no general conclusion can be drawn.

73. With all due respect, in my opinion, Dr. Schoen has failed to consider the totality of the available evidence, including:

(a) The randomized clinical trial sponsored by the manufacturer (AVERT) did not reach full enrolment before being suspended, well short of the number of patients who were to be enrolled with Silzone and non-Silzone mechanical heart valves;

(b) Even before the enrolment in AVERT was suspended, there were reports of higher than usual rates of explantation of Silzone valves. The Toronto General Hospital stopped using the Silzone valve in January 1999, a year prior to the suspension of enrolment in AVERT as a result of the high number of explants;

(c) Dr. Butany, a pathologist at the Toronto General Hospital, reported to St. Jude his concerns with respect to the Silzone valve;

(d) The follow up to AVERT published in March, 2002, documents higher, statistically significant rates of explantation for Silzone valves;

(e) The authors of the AVERT follow up report indicated that the explanted valves in AVERT patients "exhibited poor tissue ingrowth and loosening of sutures" and that the silver-coating to the sewing cuff "inhibits normal

fibroblast response and incorporation of the fabric of the sewing ring into host tissue", at least for those patients who had Silzone valves explanted;

(f) The Defendant, St. Jude, withdrew its product from the market because of these problems; and,

(g) The only material difference between the conventional St. Jude mechanical heart valve and the St. Jude mechanical heart valve with Silzone sewing cuff is the silver-coating on the sewing cuff.

74. The Tozzi paper, even though just a single case report, integrated the clinical and pathological findings from a Silzone valve and was published in peer-reviewed literature. The Tozzi paper is consistent with the March, 2002 publication from the AVERT study which alludes to "loosening of sutures". I note that Dr. Schoen has chosen not to comment upon the March, 2002 AVERT follow up report.

75. I acknowledge that I did not have access to the controls (non-Silzone conventional mechanical valve explants) to which Dr. Schoen refers in his Affidavit at paragraph 35. I note, however, that I did not rely exclusively upon my observations from the Silzone valves explanted from the five patients described in my Affidavit in arriving at my opinion.

76. Moreover, substantially more information has emerged since February 7, 2002, in particular from the publication of additional information from the AVERT study in March, 2002 and from a deposition of Dr. Butany, a pathologist at Toronto General Hospital, taken April 26, 2002, which is referred to below. I believe that Dr. Schoen is incorrect in characterizing my response to a question from Mr. McKee regarding the value of case reports, by which I understood him to mean a single patient such as the Tozzi paper. As mentioned, I described six Silzone valves, not one, in my Affidavit of February 7, 2002 and have also since examined three more Silzone valves. I have also reviewed the Tozzi paper, the Butchart and Ionescu study and since my Affidavit was

sworn have had the benefit of reading the AVERT, March 2002, report and the deposition of Dr. Butany, all of which support the opinions which I provided in my Affidavit dated February 7, 2002.

77. The AVERT study was a randomized, prospective clinical trial intended to involve 4,400 patients from multiple centres receiving the St. Jude mechanical heart valve with and without Silzone-coated sewing cuffs. Nevertheless, the study had to be suspended well before full enrolment. AVERT found a significantly greater prevalence of paravalvular leak with Silzone, which is the basis for which further patient enrolment was terminated and the Silzone valve withdrawn from the market.

78. As set out below, Dr. Butany, of the Toronto General Hospital, undertook a retrospective comparison of non-Silzone conventional St. Jude mechanical heart valves (essentially the same valve except for the sewing ring) explanted at the Toronto General Hospital. This study, while not a prospective randomized study, approaches the ideal of use of controls and randomization, as stated in paragraph 35 of Dr. Schoen's Affidavit, in that, as I understand it, the explants of both Silzone and non-Silzone valves were considered over a defined period of times with the number of valve implants in each group known. It was concluded that the Silzone valve was a statistically significant independent predictor of paravalvular leak and re-operation.

79. As a practical matter, a valid scientific approach to Silzone valves is to carefully examine each Silzone valve available at explant or autopsy, correlate the pathological findings with the clinical information for each patient, and build on this experience, Silzone valve explant after Silzone valve explant, looking for consistent patterns of pathological findings. Where available, explanted non-Silzone mechanical heart valve prostheses should also be taken into consideration, as was done by Dr. Butany. With progressively more Silzone valves at various implant durations to examine, the possibility that an abnormal pattern of gross and microscopic findings is due to chance alone, or

could reasonably also occur in non-Silzone valves, decreases. Dr. Butany examined 22 Silzone valves, some of which are the same valves that I examined. Dr. Butany observed the same problems with respect to tissue healing and thrombus formation. He reached substantially the same conclusions that I reached regarding the Silzone valve.

80. Attached as **Exhibit "4"** to this my Affidavit is a copy of the transcript of a deposition of Dr. J. Butany, a pathologist at the Toronto General Hospital, who has considerable experience with the Silzone valve. Four of the six Silzone valves that I examined for my Affidavit of February 7, 2002 came to me from Dr. Butany.

81. Dr. Butany co-authored an abstract with is marked as Exhibit "Y" to my Affidavit sworn February 7, 2002. I inferred from that abstract that Dr. Butany had serious concerns about the Silzone valve. Dr. Butany's deposition transcript provides further information, under oath, with respect to Dr. Butany's observations of explanted Silzone valves, his conclusions with respect to the impact of the Silzone valve on healing, and the steps which he took at Toronto General Hospital to encourage the cardiac surgeons to stop implanting the Silzone valves.

82. In his deposition, Dr. Butany testified that:

(a) Dr. Butany sent a personal communication to Dr. Fredrick Schoen, which is quoted in a chapter authored by Dr. Schoen on heart valve substitutes in the third edition of the textbook, Cardiovascular Pathology, by Silver, Gottlieb and Schoen, published in 2001 (page 632 of that text) that the silver coating of the St. Jude Silzone valve "also seemed to impede healing (page 27);

(b) Dr. Butany confirmed that the Silzone valve appears to impede healing (also page 27);

(c) Dr. Butany indicated that he believed that there was something wrong with the fabric which comprises the sewing cuff of the Silzone valve (page 37);

(d) Dr. Butany confirmed that cardiovascular surgeons at the Toronto General Hospital discontinued implantation of the St. Jude Silzone valve in early 1999 largely because he "kept telling the surgeons that there were far too many of these valves being explanted, and showing them the valves" (pages 42, 43);

(e) Dr. Butany noticed a trend towards explantation that seemed higher than usual with the Silzone valve by the summer of 1998. By then, four Silzone valves had been explanted (page 54);

(f) Dr. Butany provided to the Defendant, St. Jude Medical Inc., a tabulated record of the eight valves at a meeting of the St. Jude Medical head office in Minneapolis, Minnesota in November of 1998, with an abstract describing his study of these valves (page 61);

(g) Dr. Butany indicated that, in the past, he seldom took a section of a sewing cuff because it wasn't necessary. Since the Silzone valve problem started, he began taking sections of Silzone sewing cuffs (pages 62, 63);

(h) He began to take these sections "because there was far too much tissue growing on the sewing cuff in some of the valves" (page 63);

(i) With respect to the Silzone valves, Dr. Butany encountered situations where he observed little or no ingrowth into the sewing cuff, but there was still a considerable amount of overgrowth of tissue. When asked "and did you find, when you [examined] explanted Silzone valves, that often the pannus largely appeared to consist of thrombus-like material?", Dr. Butany responded "No. There's invariably a combination of the two. You have

pannus, usually excessive amounts of it, and thrombus associated with it." (page 73);

(j) Dr. Butany confirmed that he entertained the possibility that the lack of tissue ingrowth in the sewing cuff of the Silzone valve was related in some way to the growth of excessive pannus (page 74). He said he does not know the cause of the pannus overgrowth (page 75);

(k) Dr. Butany confirmed that he observed thrombus formation associated with Silzone explanted valves that he regarded as causing a thrombo-embolic event (page 76). He testified that he thought that he had concluded that someone had died as a consequence of thrombus formation from a Silzone valve (pages 77-78);

(l) With respect to patients whose Silzone valves were removed for paravalvular leak, Dr. Butany testified that the early explants had very little tissue on the sewing cuff itself, and therefore, very little ingrowth (page 79). Dr. Butany testified that he had been informed by the surgeons who removed valves where there was dehiscence of the stitches that "there was what looked like an abscess around the valve and the stitches were sitting away from myocardial tissues" (page 80);

(m) Dr. Butany had over 20 explanted Silzone valves in his possession;

(n) Dr. Butany confirmed that thrombus can become a nidus for infection and agreed that more endocarditis, not less, could result. He stated this is true of any valve where there is thrombus which grows on the pannus (pages 87, 88);

(o) Dr. Butany did a comparison of the Silzone valve explants over an 18-month period, compared to a three-year period for the conventional St. Jude mechanic valve. He indicated that there were 22 explants from 309 Silzone

implants (7.1 percent) versus eight explants from 522 conventional implants (1.5 percent). He stated this difference was statistically significant (page 161);

(p) With respect to his statement that "we believe that thrombus is associated with the pannus in an etiologic manner". Dr. Butany agreed that by etiologic, he meant causal (pages 168-169);

(q) Dr. Butany agreed that he wrote for publication that the Silzone valve was an independent predictor of endocarditis (having previously agreed that by endocarditis, he meant sterile endocarditis in which no mirco-organism is identified), an independent predictor of paravalvular leak and an independent predictor of re-operation (page 214);

(r) Dr. Butany disagreed with a statement that his eight Silzone valve explants should be presented as anecdotal reports without formal controls. He testified that when looked at with the data referred to above concerning explants in conventional St. Jude mechanical heart valves, the pathology was not anecdotal, emphasizing his comparison with the non-Silzone St. Jude mechanical valve explants. He indicated that his concerns were legitimate, that the data was hard data and should be heeded (pages 251 – 252);

(s) Dr. Butany agreed that he considered the possibility that silver was responsible for the amount of necrosis that the surgeons were reporting and could easily have been leaching into the surrounding tissues leading to tissue damage (page 266);

(t) He confirmed that his comparison of the Silzone valves with conventional mechanical valves was done because there was a concern that the problem could be related to frustrated or impaired or non-existent healing of the

Silzone valves. He was concerned about the type of pannus growth occurring in reaction to the Silzone-coated prosthesis fabric and superimposed on that, the development of thrombus (pages 276 – 277);

(u) Dr. Butany believed that the pannus on the Silzone valves was more exuberant than was usual. He told St. Jude that the pannus was "plum (sic) and juicy, rather than firm, hard, flat pannus that one usually sees and that there seemed to be too much of it." He advised them that the pannus seemed to be heaped up and extended to the edge of the valve ring (page 295);

(v) With respect to macrophages and the formation of giant cells, Dr. Butany testified that lysosomes are packets of enzymes in the inflammatory cells. If the silver had the effect of breaking the lysosomes, the lysosomes would, depending on their nature and type, begin to digest the tissues in which they were released. He indicated that necrotic tissue is among the best attractants or key attractants for inflammatory cells, so this would result in a further dose of inflammatory reaction (page 321).

83. I conclude from the above that:

(a) Dr. Butany's observations of the valves in his possession are in large measure the same or very similar to the observations which I made with respect to the valves which I examined prior to my Affidavit sworn February 7, 2002;

(b) Dr. Butany shares many of the same concerns that I have with respect to the efficacy of the Silzone valve and the effect which the Silzone coating appears to have on the healing process;

(c) Dr. Butany shared his concerns with St. Jude, and,

(d) Dr. Butany, was instrumental in limiting the number of implants of the Silzone valve at Toronto General Hospital, thereby preventing further morbidity and mortality.

84. The evidence provided by Dr. Butany in his deposition is consistent with the Tozzi article, the Butchart/Ionescu study, the AVERT results and my own observations of nine Silzone valves. In my opinion, it is appropriate to conclude that the Silzone impairs (I have used the term "frustrates" to refer to this impairment) the normal tissue healing process in some fashion, which results in a higher rate of explantation, and greater risk to patients in whom the valve has been implanted. There is sufficient information available to draw that conclusion at this stage, regardless of whether the exact cause has been peer-reviewed to date.

85. At paragraph 187 of my Affidavit dated February 7, 2002, I referred to complications of thrombo-embolism and infection. In his deposition, Dr. Butany acknowledged that thrombo-embolic events had occurred in relation to Silzone valves he had received. With respect to infection, Dr. Butany agreed that thrombus can be a nidus for infection, which I also indicated in my February 7, 2002 Affidavit (paragraphs 193, 194). The basis for my opinion that Silzone valves are more likely than non-Silzone valves to develop infection is that they are more likely to have excessive thrombus build up, and the thrombus, in turn, can be a nidus for infection.

86. I note that Dr. Butany has examined approximately 22 Silzone valves. He has had the opportunity to compare those valves with conventional St. Jude mechanical heart valves. His observations regarding healing problems for Silzone valves, including dehiscence, excessive pannus and thrombus formation are in the context of a substantially larger number of Silzone valves than I have, as yet, had the opportunity to examine. Furthermore, he examined the explanted Silzone valves available to him with reference to suitable controls. He is in a position to make a fair comparison of the proportion of each valve (Silzone versus non-Silzone St. Jude mechanical valve prostheses) explanted.

87. Dr. Butany was also able to obtain some extremely useful clinicopathological correlated information in that he was able to speak directly with the surgeons who performed the explants, shortly after explantation. His comments that "the surgeons said that they could literally lift the valve out" (page 234) and "that virtually every one of these abscess-like situations was sterile" (page 266, referring to tissue necrosis that the surgeons saw around the Silzone valves) address the extraordinary tissue response to Silzone valves. Dr. Butany's evidence that if a prosthetic heart valve had just lifted out of the annulus with sutures still intact, he would have expected that there must have been infective endocarditis, is significant. Until the Silzone valve was being implanted in patients, Dr. Butany would have been correct in that statement. For practical purposes, only an infection could cause this adverse tissue response. However, Dr. Butany agrees that there is no evidence of an infection causing these dehiscences with Silzone valves. When he refers to no link to infection, he is referring to his analysis of many cases, not one particular case, including comparison with conventional St. Jude mechanical heart valves. It is, of course, possible for a Silzone valve to develop an infection involving the sewing ring, as might occur for any prosthetic mechanical heart valve; however, when several cases of Silzone heart valve removals for dehiscence are examined and no evidence of infection is found, as Dr. Butany indicates, confidence increases with each such explant that infection is not the cause for the dehiscence problem.

88. If the term "endocarditis" is used in the clinical sense, it is important to remember that dehiscence of a prosthetic heart valve has been viewed clinically as almost always being due to infective endocarditis, whether culture positive or negative. On this basis, patients with prosthetic valve dehiscence are usually placed rapidly on antibiotics, because delay may prove fatal. This is important in considering Dr. Butany's statement referred to in paragraph 82 (q) above that the Silzone valve was an independent predictor of endocarditis. The context for his statement that the Silzone valve was an independent predictor of endocarditis is the clinical diagnosis, not the pathological diagnosis, of infectious endocarditis.

89. The Butany deposition, including the comparison by Dr. Butany of Silzone versus non-Silzone valves, the Tozzi peer-reviewed article, the AVERT study reports and the nine Silzone valves which I personally examined reveal a significant problem with the Silzone valve and support the opinions which I have expressed in my Affidavit of February 7, 2002 and in this Affidavit.

90. At the time that I prepared and swore my Affidavit dated February 7, 2002, I was careful not to express an opinion as to the mechanism of failure, i.e. why the Silzone valve causes the problems which are indicated at paragraph 187 of my Affidavit dated February 7, 2002. Although Dr. Schoen has variously referred to my "theories" or "hypotheses", the fact is that a reasonable conclusion can be drawn as to the effect of the Silzone valve on healing and the risk which it poses for patients who have had the valve implanted. At its essence, I described observations of profoundly abnormal healing in all six Silzone valves I had had an opportunity to examine from Canadian recipients, and from basic principles, pointed out the adverse consequences which could be reasonably expected to occur more commonly in Silzone valves. Novel theories were not required and I deliberately avoided them in my Affidavit. As for the cause of this effect, I believe that the opinions which I have put forward are reasonable explanations, again based on the evidence available and the application of basic principles.

91. This Affidavit is sworn in response to the Defendant's motion to strike the Affidavit of Gregory Wilson dated February 7, 2002, and in support of the motion for certification, and for no improper purpose.

| | | |
|---|---|---|
| **SWORN** before me at the | ) | |
| City of Toronto, in the | ) | |
| Province of Ontario, | ) | Gregory J Wilson |
| this 3rd day of June, 2002 | ) | Dr. Gregory Wilson |
| Gloria Tsang | ) | |
| A Commissioner, etc. | | |

GLORIA TSANG, a
Commissioner, ...
while a studen...
Expires Decemb...

**THIS IS EXHIBIT "1" TO THE AFFIDAVIT OF**

**DR. GREGORY WILSON**

**SWORN before me, this 3rd day of June, 2002.**

Gloria Tsang

**A Commissioner, etc.**

GLORIA TSANG, a
Commissioner, etc., Province of Ontario,
while a student-at-law.
Expires December 13, 2004.

CohenHighley
LAWYERS

REPLY TO:
London Office
One London Place
255 Queens Ave., 11th Floor
London, ON N6A 5R8
T (519) 672 9330 F (519) 672.5960

Toronto Office
ING Tower
181 University Ave., Suite 2200
Toronto, ON M5H 3M7
T (416) 601-4819 F (416) 363 7875

Sarnia Office
313A 265 North Front St
Sarnia, ON N7T 7X1
T (519) 344 2020
F (519) 672.5960

lawyers@cohenhighley.com
www.cohenhighley.com

Hans W Cohen
(1946-2000)

Frank A Highley
Paul G Vogel**
D Fletcher Dawson*
J Brian Phillips
Paul R Searcy
Russell M Raikes
Michael E. McGarry***
Joseph J M Hoffer
Vicki J Edgar
Angelo C D'Ascanio
Dawn J Kershaw-Halligan
Robyn L Marttila
Pheroze J K Jeejeebhoy
Ian D. D Sneddon
Sandra C Carnegie
Mark T Poland
Lucy Lee
John C. Peters
Jennifer J. Quick

Counsel
Professor
Gerald H L Fridman
Q.C. FRSC
John W. McInnis**

*Certified by the Law Society as a Specialist in Criminal Litigation

**Certified by the Law Society as a Specialist in Civil Litigation

***Certified by the Law Society as a Specialist in Family Law

May 6, 2002

By Fax Transmission

Mr. S. Gordon McKee
Blake Cassels & Graydon LLP
Commerce Court West
2800 - 199 Bay Street
Stn. Commerce Court,
Toronto, Ontario M5L 1A9

Dear Sir:

<u>RE: ANDERSEN v ST. JUDE MEDICAL, INC. et al</u>

Further to our telephone conversation of this afternoon and the voicemail messages which we have exchanged, I confirm your advice that you do not require any further cross-examination of either Dr. Wilson or Dr. Tyers on the Affidavits filed for the certification motion.

I have advised you that I had planned to re-examine both witnesses. Dr. Wilson was scheduled for further cross-examination and re-examination for tomorrow at 9:30 a.m. at Network Reporting.

You suggested and I now agree that for the sake of convenience I will file further Affidavit evidence from each of Dr. Wilson and Dr. Tyers in lieu of re-examination and in response to your motion to strike. You will retain your right to cross-examine on those Affidavits the same as you would if re-examination were conducted. Hopefully, no further cross-examination will be necessary and the motion can proceed as scheduled on May 15, 2002. If further cross-examination is necessary, we will conduct it in the most convenient manner possible with a view to the shortest possible adjournment. I believe you mentioned a week as a possible time frame.

Based on the foregoing, I consent to not proceeding with the re-examination of Dr. Wilson tomorrow. I look forward to receiving your motion record for the motion to strike. We will serve and file our responding materials as soon as possible thereafter.

Finally, I confirm that no adverse submissions will be made about the decision to file Affidavit evidence as opposed to re-examination. We are agreed that this is to be done in this fashion as a matter of convenience to both parties and to the experts.

I trust the foregoing accurately reflects our discussion. Would you please notify Network that the re-examination is not proceeding tomorrow. I will contact Dr. Wilson for that purpose.

Yours truly,

COHEN HIGHLEY LLP

Russell M. Raikes

RMR*rb

cc: J. Newland
G. MacKenzie
J. Makins

*Direct Email Address: raikes@cohenhighley.com*

**THIS IS EXHIBIT "2" TO THE AFFIDAVIT OF**

**DR. GREGORY WILSON**

**SWORN before me, this 3rd day of June, 2002.**

Gloria Tsang

**A Commissioner, etc.**

GLORIA TSANG, a
Commissioner, etc., Province of Ontario,
while a student-at-law.
Expires December 13, 2004.

**THIS IS EXHIBIT "3" TO THE AFFIDAVIT OF**

**DR. GREGORY WILSON**

**SWORN before me, this 3rd day of June, 2002.**

Gloria Tsang

**A Commissioner, etc.**

GLORIA TSANG, a
Commissioner, etc., Province of Ontario,
while a student-at-law.
Expires December 13, 2004.

# Paravalvular Leak and Other Events in Silzone-Coated Mechanical Heart Valves: A Report From AVERT

Hartzell V. Schaff, MD, Thierry P. Carrel, MD, W. R. Eric Jamieson, MD, Kent W. Jones, MD, Juán José Rufilanchas, MD, Denton A. Cooley, MD, Roland Hetzer, MD, Frank Stumpe, MD, Daniel Duveau, MD, Patterson Moseley, MD, Wim Jan van Boven, MD, Gary L. Grunkemeier, PhD, Elizabeth D. Kennard, PhD, and Richard Holubkov, PhD

Division of Cardiovascular Surgery, Mayo Clinic, Rochester, Minnesota, and the AVERT Coordinating Center, University of Pittsburgh, Pittsburgh, Pennsylvania

*Background.* The Artificial Valve Endocarditis Reduction Trial (AVERT) was designed to compare endocarditis rates in Silzone versus conventional valves. Recruitment ended January 21, 2000, because of higher rates of paravalvular leakage in patients receiving the Silzone prosthesis. The present analysis determined late event rates that might be used in the management of approximately 36,000 patients who have received the Silzone prosthesis.

*Methods.* A total of 807 patients in 19 centers in North America and Europe were randomized. Mean age was 61 ± 11 years; 41% were women. Operations included aortic valve replacement in 59%, mitral valve replacement in 32%, and aortic and mitral valve replacements in 9%; 41% had concomitant operations (26% coronary artery bypass grafting).

*Results.* Major paravalvular leakage (followed by repair, explant, or mortality) occurred in 18 of 403 patients receiving Silzone valves and 4 of 404 patients without Silzone valves (2-year event-free rates: 91.1% versus 98.9% conventional, $p < 0.003$). Similarly, 2-year freedom from any explant was lower in the Silzone arm (19 versus 2 events; 90.1% versus 99.4%, $p = 0.0002$). Rates of mortality and stroke were similar during follow-up.

*Conclusions.* Continued follow-up of AVERT supports the conclusion that the Silzone prosthesis has increased risk of paravalvular leakage requiring reoperation. Overall survival is similar in the two groups.

(Ann Thorac Surg 2002;73:785–92)
© 2002 by The Society of Thoracic Surgeons 35

The Artificial Valve Endocarditis Reduction Trial (AVERT) was designed to evaluate the efficacy of the Silzone (St. Jude Medical, Inc, Minneapolis, MN) silver-coated sewing ring to reduce prosthetic valve endocarditis (PVE), based on studies documenting the safety and efficacy of silver for antimicrobial protection [1–3]. This randomized clinical trial, the protocol for which has been published previously [4], began recruitment of patients in July 1998, with the original goal of randomizing 4,400 patients at the 12 North American and 7 European centers (Appendix 1).

A Data and Safety Monitoring Board (DSMB) of independent experts was convened to review thromboembolic events (TE) in AVERT patients, after a report from a single, non-AVERT center of increased incidence of TE among patients receiving Silzone-coated valves [5]. The DSMB met in April and November 1999 and, after each meeting, unanimously recommended continuation of AVERT based on a finding of no significant differences in TE rates between the Silzone and conventional treatment arms.

Late in 1999 and during the first two weeks of January 2000, the AVERT Coordinating Center received reports of several study patients in the Silzone arm of the trial who developed paravalvular leak leading to valve explant. The DSMB reviewed supporting documentation, convened on January 21, 2000, and advised suspension of patient enrollment because of a higher incidence of explant due to paravalvular leak in the Silzone study arm. The manufacturer (St. Jude Medical, Inc) voluntarily withdrew all Silzone products from the market on the same day.

The AVERT study continues to follow the 807 randomized patients to assess long-term outcomes and quantify any increased risk of adverse events of Silzone prostheses relative to conventional valves. This information is critical for the surgical community, as an estimated 36,000 patients worldwide have received Silzone mechanical valves. The analysis of the trial presented in this report includes all events reported to the AVERT Coordinating Center as of November 30, 2000.

Presented at the Thirty-seventh Annual Meeting of The Society of Thoracic Surgeons, New Orleans, LA, Jan 29–31, 2001.

Address reprint requests to Dr Schaff, Mayo Clinic, 200 First Street SW, Rochester, MN 55905; e-mail: schaff@mayo.edu.

© 2002 by The Society of Thoracic Surgeons 35
Published by Elsevier Science Inc

0003-4975/02/$22.00
PII S0003-4975(01)03442-7

Ann Thorac Surg
2002;73:785–92

*Table 1. AVERT Inclusion and Exclusion Criteria*

Inclusion Criteria
1. Need for isolated mitral, isolated aortic, or double (aortic and mitral) valve replacements (concomitant CABG and/or repair of other valve(s) are permitted)
2. Suitability for SJM mechanical heart valve(s) with either conventional or Silzone cuff
3. Signed informed consent form

Exclusion Criteria
1. Medical condition contraindicating implantation of valve with Silzone coating
2. Previously implanted prosthetic valve(s), other than the valve(s) to be replaced
3. Need for tricuspid valve replacement
4. Patient already enrolled in AVERT cannot be re-randomized if requires subsequent replacement

AVERT = Artificial Valve Endocarditis Reduction Trial; CABG = coronary artery bypass grafting; SJM = St. Jude Medical.

## Material and Methods

### Study Protocol

Details of the hypothesis, study design, and sample size determination have been presented previously [4]. Briefly, the AVERT trial was developed to determine whether Silzone coating of prosthetic valve sewing rings reduces the risk of PVE. The study assumed that for uncoated prostheses, the rate of early PVE (less than 60 days) is 1%, and the subsequent risk of late PVE is 0.5% per year. To detect a 50% reduction in risk of PVE (80% power, $p < 0.05$), the trial would have to randomize approximately 4,400 patients. Diagnosis of PVE was to be determined by the Duke criteria [6] using a computer algorithm. Table 1 shows inclusion and exclusion criteria for AVERT. Patients requiring replacement of the aortic or the mitral valve were eligible for the study, and the major exclusion criteria were patients with other existing prosthetic valves not requiring replacement and patients requiring replacement of valves in the tricuspid position. Concomitant surgical procedures, including coronary artery bypass grafting (CABG) and repair of native valves, were permitted by protocol at the time of study valve implant; also, patients having reoperation for valve replacement were included.

Randomization was performed intraoperatively and was stratified by clinical site and by endocarditis status at time of operation (patients with active, treated, or suspected endocarditis were randomized using a separate sequence of envelopes); this latter stratification was due to the sharply higher risk of patients presenting with endocarditis developing a subsequent endocarditis episode.

Base line patient information and details of the operative procedure were collected at the time of operation. After dismissal, patients were to be contacted 3 months after the implantation and annually for administration of a brief questionnaire regarding vital status and freedom from events possibly associated with endocarditis. After the initial DSMB meeting in January 1999, a 6-month contact point was added, and the questionnaire was expanded to include additional questions regarding the occurrence of possible TEs. The study coordinators administered these questionnaires during a clinic visit or by telephone if possible, and by mail otherwise. By protocol, the Coordinating Center was to be notified of all known adverse events within 24 hours of their occurrence or of their knowledge by the clinical coordinator.

### Patient Population

At the time AVERT recruitment was stopped on January 21, 2000, a total of 807 patients had been randomized, including 446 at North American centers and 361 at European sites. Design of the AVERT study recognized that the intraoperative randomization scheme would lead to occasional deviations from the randomization assignment. Of 402 patients randomized to Silzone, 395 (98.2%) received Silzone valves, whereas 6 received other mechanical valves, and 1 received a bioprosthetic valve. Of the 405 patients randomized to conventional valves, 394 (97.3%) received St. Jude Medical (SJM) conventional valves per protocol, whereas 8 received Silzone valves, and 3 received non-SJM valves or bioprostheses. As this report focuses on potential differences in outcome between the Silzone-coated and non-Silzone-coated valves, patients were classified in the primary analyses according to whether at least one Silzone valve was implanted during the index procedure. Therefore, all 404 patients not receiving an SJM Silzone valve were classified as "non-Silzone."

At the time of the database freeze on November 30, 2000, the mean follow-up time for study patients (defined as number of days from valve implant to last study contact, whether because of routine follow-up or reported event) was 364 days, and median follow-up time was 367 days.

### Study Definitions

Mortality included death due to all causes. Other complications reported include the categories of morbidity identified by the STS/AATS Guidelines for Reporting Morbidity and Mortality after Cardiac Valvular Operations [7]: structural dysfunction, nonstructural dysfunction, thrombosis, embolism, bleeding, and endocarditis.

STRUCTURAL AND NONSTRUCTURAL DYSFUNCTION. No cases of structural dysfunction (study valve dysfunction or deterioration exclusive of infection or thrombosis) were reported. Nonstructural dysfunction was defined as entrapment by pannus or suture, paravalvular (PV) leak, inappropriate sizing, hemolytic anemia, as determined by reoperation, autopsy, or clinical investigation. "Major PV leak" was defined in this report as a PV leak that led to valve repair, valve explant, or mortality.

EMBOLIC EVENTS AND THROMBOSIS. Thromboembolic events included frank stroke, transient ischemic attacks (TIA), reversible ischemic neurologic deficits, arterial embolization, and embolic myocardial infarction. Valve thrombosis, listed separately, was defined as thrombus attached to or near the study valve, occluding blood flow or