Ann Thorac Surg
2002;73:785–92



interfering with function (proved by operation, autopsy, or clinical investigation), exclusive of infection.

All reported thromboembolic events and valve thrombosis were classified as to valve-relatedness [7] after adjudication by a committee of 9 independent physicians who reviewed available supporting documentation. This committee was blinded to the type of valve implanted (Silzone or non-Silzone).

BLEEDING. All reported bleeding events (causing death, stroke, operation, hospitalization, or transfusion, whether or not the patient was taking anticoagulant or antiplatelet drugs) are included, regardless of severity.

ENDOCARDITIS. Endocarditis was reported based on blood cultures, clinical signs, or histologic evidence at reoperation or autopsy. Thrombosis, embolus, and leak associated with active infection were considered as part of the endocarditis event. All reported incidents of suspected or confirmed endocarditis are included.

### Statistical Methods

Early and late complications were analyzed with conventional techniques. Both internal and external comparisons were conducted: Silzone valves were compared with the uncoated valves, and Silzone valves were compared with standardized complication rate values. For internal comparisons, all valve replacements (aortic, mitral, and double) contributed information. When external comparisons were made, the isolated aortic valve replacement and mitral valve replacement series were used, because the analysis of heart valve results is traditionally reported for isolated valve replacement. Specifically, the FDA's objective performance criteria (OPC), used for external comparison in this report (Appendix 2) [8], were developed from historical literature for isolated aortic and mitral valve replacement procedures, excluding double-valve procedures.

Not all analyses were performed for all complications. Emphasis was given to those complications for which enough events happened to support meaningful statistical analysis.

Per the AVERT study protocol, patient follow-up ended if all study valves were explanted. Therefore, rates of other reported events including survival must be interpreted as conditional on a patient being explant-free.

*For internal comparison,* the Kaplan–Meier event-free analysis method was used. Time zero was defined as the date of study valve implant, and patients were censored at time of death, explant of all study valves, or last contact (scheduled follow-up or report of an adverse event). The Kaplan–Meier analysis includes all events, early and late, but only the first of each type for each patient. These analyses are done individually by valve position, and as global comparisons between valve types, stratified by position. Comparisons ($p$ values) use the log rank statistic.

*For external comparison,* linearized rates (%/year) for events beyond 30 days were calculated. Linearized rates are calculated by taking the total number of late events divided by the sum of the late (longer than 30 days) follow-up years. Within the subset of patients receiving single study valves, these rates were then compared with the FDA OPC values.

*For general information,* simple percentages of patients with reported events during the first 30 days were calculated. This percentage is the number of patients who had an early event divided by the total number of patients.

The AVERT study currently has 804 years of patient follow-up time (396 Silzone, 408 conventional) and 878 valve-years of follow-up (437 Silzone, 441 conventional). To assist in evaluating the comparison, 95% confidence intervals were calculated for each linearized rate. If the OPC for a specific complication fell *within* the 95% confidence interval of the AVERT rate, then that rate was not considered to be significantly different from the OPC. In contrast, if the OPC value fell *below* the confidence interval of the AVERT rate, then the AVERT rate was significantly higher than the OPC.

## Results

### Patient Characteristics

Patients were on average 61 years old, and 41.1% were women. Five percent of patients had active, treated, or suspected endocarditis at the time of operation. Most study patients had New York Heart Association functional class II (40.9%) or III (42.4%) at the time of implant; 8.7% were class I, and 8% were class IV. History of myocardial infarction was reported in 8.9%, history of diabetes in 14.3%, and congestive heart failure within 2 weeks of operation in 22.6%. Coronary artery disease, defined as stenosis of at least 50% in a native vessel, was present in 33.2%.

Overall, 4.7% of patients had previous valve replacement operation, including 2.4% in the aortic position and 2.6% in the mitral position. Previous CABG was reported in 5.5% of patients. Among all patients, 15% had previously had one or more cardiac surgical procedures requiring cardiopulmonary bypass. Medical and surgical history was comparable between patients in the two treatment groups.

### Procedural and Valve Characteristics

Aortic valve replacement was performed in 59% of study patients, whereas 32% underwent mitral valve replacement, and 9% had double valve replacement. Minimally invasive procedures were used in a small number of patients (3.5%). Concomitant operation at the time of valve implant was common, with CABG performed in 26% of patients (19% of European and 32% of North American patients). Surgical repair of other valves occurred in 7% of patients.

Cardioplegia was used for myocardial protection in almost all patients (99.6%), and cold-blood cardioplegia was used in 63%. Antifibrinolytic drugs (aprotinin or tranexamic acid) were given to 68% of patients. Mean

Ann Thorac Surg
2002;73:785–92

*Table 2. Early Event Rates (Within 30 Days After Implant), and Late Event Rates by Position of Implanted Valve and Overall*

| | Early Events | | Late Events | |
|---|---|---|---|---|
| | No Silzone % | Silzone % | No Silzone %/year (95% CI) | Silzone %/year (95% CI) |
| Death | | | | |
| Aortic | 2.6 | 1.7 | 3.3 (1.5, 6.4) | 3.5 (1.7, 6.7) |
| Mitral | 4.5 | 4.8 | 3.8 (1.5, 8.4) | 6.0 (2.5, 12.4) |
| Double | 14.3 | 0.0[a] | 0.0 (0.0, 8.4) | 5.3 (1.1, 17.0) |
| Thromboembolic events | | | | |
| Aortic | 3.0 | 3.3 | 1.4 (0.4, 3.7) | 2.6 (1.1, 5.5) |
| Mitral | 0.7 | 0.8 | 3.8 (1.5, 8.4) | 9.0 (4.5, 16.5) |
| Double | 0.0 | 0.0 | 3.3 (0.4, 15.5) | 7.9 (2.2, 21.2) |
| Aortic and mitral | 2.2 | 2.5 | 2.3 (1.1, 4.4) | 4.6 (2.7, 7.4) |
| | | | (OPC = 3.0%/year) | |
| Transient ischemic attack | | | | |
| Aortic | 0.9 | 0.8 | 0.9 (0.2, 3.0) | 1.8 (0.6, 4.2) |
| Mitral | 0.0 | 0.0 | 3.1 (1.0, 7.3) | 3.0 (0.9, 8.0) |
| Double | 0.0 | 0.0 | 3.3 (0.4, 15.5) | 2.7 (0.3, 12.4) |
| RIND | | | | |
| Aortic | 0.9 | 0.8 | 0.0 (0.0, 1.2) | 0.4 (0.1, 2.1) |
| Mitral | 0.0 | 0.0 | 0.0 (0.0, 1.9) | 2.0 (0.4, 6.4) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 8.4) | 2.7 (0.3, 12.4) |
| Stroke | | | | |
| Aortic | 1.3 | 0.8 | 0.0 (0.0, 1.2) | 0.4 (0.1, 2.1) |
| Mitral | 0.7 | 0.8 | 0.8 (0.1, 3.6) | 3.0 (0.9, 8.0) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 8.4) | 2.7 (0.3, 12.4) |
| Valve thrombosis | | | | |
| Aortic | 0.0 | 0.0 | 0.0 (0.0, 1.2) | 0.0 (0.0, 1.1) |
| Mitral | 0.0 | 0.0 | 0.0 (0.0, 1.9) | 1.0 (0.1, 4.7) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 8.4) | 5.3 (1.1, 17.0) |
| Aortic and mitral | 0.0 | 0.0 | 0.0 (0.0, 0.7) | 0.3 (0.0, 1.4) |
| | | | (OPC = 0.8%/year) | |
| Any prosthetic valve leak | | | | |
| Aortic | 0.0 | 0.4 | 2.3 (0.9, 5.1) | 5.3 (2.9, 9.0) |
| Mitral | 0.0 | 0.8 | 3.8 (1.5, 8.4) | 8.0 (3.8, 15.1) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 8.4) | 5.3 (1.1, 17.0) |
| Aortic and mitral | 0.0 | 0.6 | 2.9 (1.5, 5.1) | 6.1 (3.9, 9.3) |
| | | | (OPC = 1.2%/year) | |
| Major prosthetic valve leak (prosthetic valve leak followed by repair, explant, or death) | | | | |
| Aortic | 0.0 | 0.4 | 0.9 (0.2, 3.0) | 3.5 (1.7, 6.7) |
| Mitral | 0.0 | 0.0 | 1.5 (0.3, 4.9) | 7.0 (3.1, 13.8) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 8.4) | 5.3 (1.1, 17.0) |
| Aortic and mitral | 0.0 | 0.3 | 1.2 (0.4, 2.8) | 4.6 (2.7, 7.4) |
| | | | (OPC = 0.6%/year) | |
| Bleeding event | | | | |
| Aortic | 4.7 | 1.7[a] | 1.4 (0.4, 3.7) | 3.5 (1.7, 6.7) |
| Mitral | 8.2 | 4.8 | 0.8 (0.1, 3.6) | 6.0 (2.5, 12.4) |
| Double | 8.6 | 2.5 | 0.0 (0.0, 8.4) | 7.9 (2.2, 21.2) |
| Aortic and mitral | 6.0 | 2.8[b] | 1.2 (0.4, 2.8) | 4.3 (2.5, 7.0) |
| | | | (OPC = 3.5%/year) | |
| Endocarditis* (for this outcome only, events occurring in the first 60 days post-implant are considered early events) | | | | |
| Aortic | 0.0 | 0.8 | 1.0 (0.2, 3.3) | 1.9 (0.7, 4.6) |
| Mitral | 3.0 | 0.0 | 3.3 (1.1, 7.9) | 3.3 (0.9, 8.9) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 9.1) | 0.0 (0.0, 7.2) |
| Aortic and mitral | 1.1 | 0.6 | 1.9 (0.8, 3.9) | 2.3 (1.1, 4.6) |
| | | | (OPC = 1.2%/year) | |
| Explant | | | | |
| Aortic | 0.0 | 0.0 | 0.5 (0.1, 2.2) | 3.5 (1.7, 6.7) |
| Mitral | 0.0 | 0.0 | 0.8 (0.1, 3.6) | 8.0 (3.8, 15.1) |
| Double | 0.0 | 0.0 | 0.0 (0.0, 8.4) | 7.9 (2.2, 21.2) |

[a] $p < 0.05$, [b] $p = 0.05$ for comparison of early event rates between no Silzone and Silzone patients.

CI = confidence intervals; OPC = objective performance criterion; RIND = reversible ischemic neurologic deficit.

Ann Thorac Surg
2002;73:785–92






*Fig 1. Kaplan–Meier curves showing freedom from reoperation for valve explant during the first 2 years postoperatively (Postop).*




*Fig 2. Kaplan–Meier curves showing freedom from major paravalvular leak for patients having aortic valve replacement (A) and mitral valve replacement (B). (Postop = postoperative.)*

cross-clamp time was 76 minutes, and mean bypass time was 106 minutes. Almost all valves replaced were native valves in both the aortic (97%) and mitral (94%) positions. Procedural and valve characteristics, including etiology of the replaced valve, were comparable in the Silzone and non-Silzone patients for each position.

### *Complications*

MORTALITY. Twenty-seven patients died early (less than 30 days) after operation for an overall mortality of 3.3%; mortality was 2.1% for patients having aortic valve replacement, 4.7% for patients having mitral valve replacement, and 6.7% for patients having double (aortic and mitral) valve replacement. As seen in Table 2, early mortality rates did not differ between the Silzone and non-Silzone groups. At the time of this analysis, 55 of the 807 patients were known to have died, including 26 Silzone patients and 29 receiving non-Silzone valves.

*Table 3. Description of Explants due to Paravalvular Leak*

| Patient | Valve Received | Position | Time to Explant (Days) | Time From Diagnosis of Paravalvular Leak to Explant (Days) |
|---|---|---|---|---|
| 1 | Silzone | Mitral | 77 | 2 |
| 2 | Silzone | Aortic | 78 | 10 |
| 3 | Silzone | Mitral | 89 | 7 |
| 4 | Non-Silzone | Mitral | 101 | 4 |
| 5 | Silzone | Mitral | 112 | <1 |
| 6 | Silzone | Aortic | 133 | 1 |
| 7 | Silzone | Mitral | 168 | 14 |
| 8 | Silzone | Double | 175 | 105 |
| 9 | Silzone | Double | 190 | 8 |
| 10 | Silzone | Aortic | 276 | 5 |
| 11 | Silzone | Aortic | 286 | 16 |
| 12 | Non-Silzone | Aortic | 342 | 140 |
| 13 | Silzone | Aortic | 386 | 4 |
| 14 | Silzone | Aortic | 401 | 34 |
| 15 | Silzone | Mitral | 518 | 42 |
| 16 | Silzone | Mitral | 646 | 36 |

Two-year Kaplan–Meier survival rates were 89.0% for Silzone patients and 91.5% for non-Silzone subjects; all-cause mortality did not differ ($p = 0.74$ for log rank test comparing survival experience during the first 2 years of follow-up).

EXPLANT. As of November 30, 2000, 19 Silzone patients had had explants of at least one study valve, compared with only 2 patients with non-Silzone prostheses. At 2 years of follow-up, the freedom from explant rate was 90.1% in the Silzone patients compared with 99.4% in the non-Silzone group ($p = 0.0002$, log rank test). Figure 1 illustrates 2-year rates of freedom from reoperation for valve explant; rates were significantly lower for patients receiving valves in the mitral position (75.6% Silzone versus 99.2% conventional, $p = 0.005$) and for patients having aortic valve replacement (94.1% Silzone versus 99.4% conventional, $p = 0.026$). It is important to note that four valves were explanted after the 1-year time point.

Sixteen of the 19 explants were because of paravalvular leakage (14 Silzone, 2 non-Silzone). Table 3 shows the number of days from implant until explant for these patients, as well as the number of days from initial diagnosis of PV leak until explant. Explants occurred throughout the




*Fig 3. Kaplan–Meier curves showing freedom from thromboembolism during the first 2 years postoperatively (Postop).*

Ann Thorac Surg
2002;73:785–92




*Fig 4. Linearized rates of thromboembolism (A) and stroke (B). Risks of thromboembolism were higher for patients in the Silzone group compared with the non-Silzone valve, but these differences were largely due to transient events because the risks of stroke were low.*

course of follow-up, and many valves developing PV leak were explanted within several weeks of diagnosis.

MAJOR PARAVALVULAR LEAK. Major PV leak, defined as a PV leak that resulted in explant, required reoperation, or was implicated in a death, occurred in 18 Silzone and 4 non-Silzone patients during follow-up. Freedom from major PV leak 2 years postoperatively was significantly lower in Silzone patients compared with those with conventional valves (91.1% versus 98.9%, $p = 0.0025$), and this finding was true for both valve positions (Fig 2). Of note, among Silzone patients, the confidence limits for rates of major PV leak and any PV leak did not include the OPC rates. Although this was also the case for any PV leak in the conventional arm, major PV leak rates among patients receiving conventional valves were consistent with the OPC.

THROMBOEMBOLIC EVENTS. A total of 26 valve-related TE (stroke, TIA, reversible ischemic neurologic deficits, peripheral embolism, and myocardial infarction) were reported in 22 Silzone patients, compared with 17 events in 17 non-Silzone patients. Both early and late event rates were higher among Silzone patients (Table 2). Cumulative freedom from TE 2 years postoperatively was 91.2% for Silzone patients and 93.4% for non-Silzone patients (Fig 3), and comparison of freedom from event curves did not reveal a significant difference ($p = .032$ by log rank test). There was no significant difference in freedom from TE rates by valve type within the aortic or the mitral position.

Of note, among all patients receiving single Silzone study valves (aortic or mitral), the 95% confidence interval for late TE rate included the OPC of 3.0% for this outcome. This was also the case for aortic Silzone valves considered separately, whereas the 95% confidence limit for TE rate among patients receiving Silzone valves in the mitral position did not include the OPC (Fig 4).

STROKE. Stroke was reported in 7 Silzone patients and 5 non-Silzone patients during follow-up. At 2 years, rates of freedom from stroke were 98.1% among Silzone patients and 98.7% among non-Silzone patients ($p = 0.55$ for log rank test comparing freedom from event curves).

BLEEDING. Early and late bleeding complications were similar for the two groups of patients.

ENDOCARDITIS. A total of 19 cases of suspected PVE were reported, including 9 in Silzone patients and 10 in non-Silzone patients. Reported suspected endocarditis rates do not differ between the two study groups at this time; reported endocarditis events will be adjudicated at a future date.

## Comment

These results confirm and extend the interim analysis of AVERT that led to discontinuation of enrollment and voluntary withdrawal of the Silzone valve because of an unacceptably high risk of explant due to major paravalvular leak. The increased risk of major PV leak was observed for patients with aortic valve replacement, mitral valve replacement, and double valve replacement.

The mechanism responsible for development of PV leak in patients receiving the Silzone prosthesis is unclear. In previous isolated reports of reoperation in




*Fig 5. Analysis of cumulative hazard of major paravalvular leak suggests a constant risk of 4.6% during the first 2 years after the operation. (CI = confidence interval; Postop = postoperative.)*

Silzone valves, PV leaks were thought to be due to culture-negative endocarditis (B. Goldman, personal communication, May 1999), but in patients in the present study who had explants of Silzone valves, clinical findings did not suggest infection. In addition, none of the patients having late operation for PV leakage had active or recent endocarditis at the time of entry into the study. Explanted valves in AVERT patients exhibited poor tissue ingrowth and loosening of sutures. Thus, it appears that the Silzone coating inhibits normal fibroblast response and incorporation of the fabric of the sewing ring into host tissue in some patients.

Previous in vitro biocompatibility studies [2] showed no evidence of silver toxicity to cultured fibroblasts until concentrations reached high levels (1,200 ppm), and in animal studies (ovine model), tissue ingrowth was said to be comparable in portions of sewing rings coated with Silzone compared with uncoated portions. Nevertheless, this same study noted that pannus formation was thinner over the Silzone portion of the sewing ring, suggesting that the altered surface of the polyester sewing ring did have some biologic effect.

Although patients with allergy to silver were excluded from the study, it is possible that impaired healing of the Silzone sewing ring is idiosyncratic. Further follow-up of patients in the AVERT trial will be crucial to establish late risks of PV leakage and thromboembolism, and these data may give some information on mechanism. It is unclear whether patients who have normally functioning prostheses without leak and without thromboembolic episodes after 1 year are at higher risk for these events subsequently. As seen in Table 3, 4 patients with Silzone prostheses had reoperation after the first postoperative year, and preliminary hazard analysis suggests that risk of major PV risk is constant at 4.6% through the first 2 years postoperatively (Fig 5).

Ionescu and associates [5] first called attention to the potential problem of increased thromboembolic risk with the Silzone prostheses. Among their 72 patients with Silzone valves, linearized risk of thromboembolism was 17 times higher than in a comparative (nonrandomized) group who had St. Jude valves with the standard sewing ring. In the AVERT trial, linearized rates of thromboembolic complications were higher in patients with Silzone prostheses compared with standard valves, but the excess number of events were largely multiple transient neurologic deficits. Kaplan–Meier estimates of freedom from thromboembolism showed no significant difference in risk of thromboembolism or stroke for Silzone versus non-Silzone valves. It is possible that the same mechanism of impaired healing of the sewing ring that leads to PV leakage also leads to increased exposure of thrombogenic surface in some patients.

A limitation of this report is that at present, follow-up after 1 year is relatively limited. Therefore, whereas the data represent the best possible estimates of 2-year outcome, it is possible that findings after the 1-year time point, including the constant risk of major PV leak, may change when 2-year follow-up is complete.

Continued follow-up of these patients in the AVERT trial will be critically important in guiding management of the 36,000 patients with Silzone prostheses. Paravalvular leakage in patients with Silzone valves does not appear to lead to catastrophic failure, and careful follow-up of these patients with clinical examinations and serial Doppler echocardiograms should give clinicians and patients sufficient information to plan for elective reoperation if severe PV leakage develops. The AVERT trial has been amended to include serial echocardiography of all study patients, in both the Silzone and conventional arms, during follow-up.

Management of thromboembolic complications is more problematic. Although our data do not suggest that risk of thromboembolism in patients with Silzone prostheses is significantly greater than for those with standard sewing rings, it does appear that some patients experience the troublesome occurrence of multiple transient neurologic deficits, perhaps related to platelet emboli. Maintenance of anticoagulation at the higher end of the therapeutic range and use of antiplatelet agents with Coumadin may be helpful in these patients.

## Addendum

As of December 5, 2001 follow-up on Silzone patients in the study had increased to 686 valve-years and included 277 patients reporting 2-year follow-up. No additional instances of valve repair or explant due to PV leak have been reported.

## References

1. Tweden KS, Cameron DJ, Razzouk AJ, et al. Silver modification of polyethylene terephthalate textiles for antimicrobial protection. Am Soc Artif Intern Organs 1997;43:M475–81.
2. Tweden KS, Cameron JD, Rozzouk AJ, et al. Biocompatibility of silver-modified polyester for antimicrobial protection of prosthetic valves. J Heart Valve Dis 1997;6:553–61.
3. Illingworth BL, Tweden K, Schroeder RF, Cameron JD. In vivo efficacy of silver-coated (Silzone) infection-resistant polyester fabric against a biofilm-producing bacteria, *Staphylococcus epidermidis*. J Heart Valve Dis 1998;7:524–30.
4. Schaff H, Carrel T, Steckelberg JM, Grunkemeier GL, Holubkov R. Artificial Valve Endocarditis Reduction Trial (AVERT): protocol of a multicenter randomized trial. J Heart Valve Dis 1999;8:131–9.
5. Ionescu AA, Fraser AG, Butchart EG. High incidence of embolism after St. Jude Silzone prosthetic valve implantation. Circulation 1999;100(Suppl 1):I524.
6. Durack DT, Lukes AS, Bright DK. New criteria for diagnosis of infective endocarditis: utilization of specific echocardiographic findings. Am J Med 1994;96:200–9.
7. Edmunds LH Jr, Clark RE, Cohn LH, Grunkemeier GL, Miller DC, Weisel RD. Guidelines for reporting morbidity and mortality after cardiac valvular operations. Ann Thorac Surg 1996;62:932–5.
8. Division of Cardiovascular, Respiratory, and Neurological Devices, Center for Devices, and Radiological Health, Food, and Drug Administration. Draft Replacement Heart Valve Guidance, Version 4.1. 1994. www.fda.gov/cdrh/ode/3751.html.

Ann Thorac Surg
2002;73:785–92

## Appendix 1. Principal Investigators and Participating Centers in the Artificial Valve Endocarditis Reduction Trial

| Institution | Investigators |
|---|---|
| North America | |
| Mayo Clinic, Rochester, Minnesota | Hartzell Schaff, MD |
| Texas Heart Institute, Houston, Texas | Denton Cooley, MD |
| Brigham & Women's Hospital, Boston, Massachusetts | Sari Aranki, MD |
| Providence Health System, Portland, Oregon (St. Vincent's and Providence Hospitals) | Hugh Gately, MD<br>E. Charles Douville, MD |
| LDS Hospital, Salt Lake City, Utah | Kent Jones, MD |
| Vancouver General and St. Paul's Hospital, Vancouver, Canada | W. R. Eric Jamieson, MD |
| University of Alberta, Alberta, Canada | Arvind Joshal, MD |
| Massachusetts General Hospital, Boston, Massachusetts | David Torchiana, MD |
| Florida Hospital, Orlando, Florida | Patterson Moseley, MD |
| New York Presbyterian Hospital, New York, New York | Leonard Gerardi, MD |
| Europe | |
| Hôpital Regional Sion, Sion, Switzerland | Frank Stumpe, MD |
| Deutsches Herzzentrum, Berlin, Germany | Roland Hetzer, MD |
| Inselspital Bern, Bern, Switzerland | Thierry P. Carrel, MD,<br>Lars Englberger, MD |
| CHU Nord, Nantes, France | Daniel Duveau, MD |
| St. Antonius ZKH, Nieuwegein, The Netherlands | Wim Jan van Boven, MD |
| San Raffaele Hospital, Milan, Italy | Ottavio Alfieri, MD |
| Hospital Doce de Octobre, Madrid, Spain | Juán Josè Rufilanchas, MD |

## Appendix 2. Complications for Evaluating Mechanical Heart Valves, and Objective Performance Criteria (OPC) Values for Event Rates (%/Year)

| Definitions of Morbidity From Guidelines for Reporting[a] | OPC[b] |
|---|---|
| Nonstructural Dysfunction: entrapment by pannus or suture, *paravalvular leak*, inappropriate sizing, hemolytic anemia; as determined by reoperation, autopsy, or clinical investigation. | 1.2 (all paravalvular leak); 0.6 (major paravalvular leak) |
| Valve Thrombosis: thrombosis proved by operation, autopsy, or clinical investigation. *Excludes* infection. | 0.8 |
| Thromboembolism: neurological deficit or peripheral arterial embolus that occurs *after* the immediate perioperative period. *Excludes* septic and hemorrhagic emboli. | 3.0 |
| Bleeding that causes death, stroke, operation, hospitalization, or transfusion, whether or not the patient is taking anticoagulant or antiplatelet drugs. | 3.5 |
| Valvular Endocarditis: based on blood cultures, clinical signs, and/or histological evidence at reoperation or autopsy. *Includes* thrombosis, embolus, or leak associated with active infection. | 1.2 |

[a] See Edmunds and associates [7]. [b] See Reference 8.

## DISCUSSION

DR IRVING L. KRON (Charlottesville, VA): Doctor Schaff, let's say a perivalvular leak is detected in a Silzone valve. Will it act differently? Does one replace it right away? Does it worsen rapidly? How do you follow these patients?

DR SCHAFF: At the present time we cannot answer that, but the AVERT trial has been modified to answer that question by introducing regular Doppler echocardiograms at 6-month and yearly intervals. We do not have any evidence of catastrophic failures. So I think that identifying a perivalvular leak should be managed much the same way that we do other non-Silzone valves.

DR PAUL KURLANSKY (Miami Beach, FL): You demonstrated a relatively constant risk hazard over time for the incidence of major perivalvular leak. I was wondering if you could indicate what was the earliest appearance of paravalvular leak in the AVERT study? Also, is there any report on the pathology of what was actually discovered at the time of surgery? Were there broken sutures, was there a torn cuff? Was there tissue disruption? Was there some other finding, or was there a whole variety of different findings?

DR SCHAFF: We are less secure in the conclusion that there is a constant hazard, although that is what it looks like at the present time. The earliest explant was about 1 month. The pathology findings are interesting, because when anecdotal reports of perivalvular leak came to the company, the surgeons who reported those thought it was culture-negative endocarditis. The valves that had been explanted in AVERT with the limited information that we have do not show any particular characteristic finding. There is not an undue amount of inflammation and not a lot of cellular infiltration that would suggest an allergic reaction. It is more bland perivalvular leakage without vegetations or inflammation.

**THIS IS EXHIBIT "4" TO THE AFFIDAVIT OF**

**DR. GREGORY WILSON**

**SWORN before me, this 3rd day of June, 2002.**

Gloria Tsang

**A Commissioner, etc.**

GLORIA TSANG, a
Commissioner, etc., Province of Ontario,
while a student-at-law.
Expires December 13, 2004.

STATE OF SOUTH CAROLINA
COUNTY OF GREENVILLE
IN THE COURT OF COMMON PLEAS

| | | |
|---|---|---|
| DAVID MICHAEL BRIDGES and BONNIE BRIDGES, his spouse, | ) | |
| Plaintiffs, | ) | No. 2001-CP-23-4773 |
| vs. | ) | |
| ST. JUDE MEDICAL, INC., et al., | ) | |
| Defendants. | ) | |
| JANICE SPAIN as personal representative of SARA YVONNE PAIGE, deceased, | ) | |
| Plaintiff, | ) | No. 2001-CP-23-4970 |
| vs. | ) | |
| ST. JUDE MEDICAL, INC., et al., | ) | |
| Defendants. | ) | |

DEPOSITION OF
JAGDISH BUTANY, MBBS, MS, FRCPC

VOLUME I (Pages 1 - 344)

April 26, 2002

REPORTED BY: SANDRA MacNEIL, CSR 9013 JOB #01-119412

APPEARANCES OF COUNSEL

KELLOGG & SIGELMAN, 1742 N Street, N.W., Washington, D.C., 20036, (202) 223-9880, and P.O. Box 941668, Atlanta, Georgia, 31141, (770) 220-2465, represented by DANIEL W. SIGELMAN and EDWARD H. KELLOGG, JR., Attorneys at Law, appeared as counsel on behalf of Plaintiffs.

GENEST MURRAY, 130 Adelaide Street West, Suite 700, Toronto, Ontario M5H 4C1, Canada, (416) 368-8600, represented by JAMES M. NEWLAND, Attorney at Law, appeared as lead counsel for Plaintiffs in Canadian class action: Andersen vs. St. Jude Medical.

CAPRETZ & ASSOCIATES, 5000 Birch Street, Suite 2500, Newport Beach, California, 92660, (949) 724-3000, represented by JAMES T. CAPRETZ, Attorney at Law, appeared as co-lead Plaintiffs' counsel in MDL action: St. Jude Medical, Inc. Silzone Heart Valves Products Liability, Docket No. 1396, U.S. District Court, District of Minnesota.

CROSBY, HEAFEY, ROACH & MAY, 1999 Harrison Street, Oakland, California, 94612, (510) 763-2000, represented by STEVEN M. KOHN, Attorney at Law, appeared as counsel on behalf of Defendant St. Jude Medical, Inc.

///



APPEARANCES (Continued)

NELSON, MULLINS, RILEY & SCARBOROUGH, 104 South Main Street, Suite 900, Greenville, South Carolina, 29601, (864) 250-2297, represented by WILLIAM S. BROWN, Attorney at Law, appeared on behalf of St. Jude Medical, Inc.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, 999 Peachtree Street, N.E., Suite 2700, Atlanta, Georgia, 30309, (404) 876-2700, represented by RACHEL A. FUERST, Attorney at Law, appeared on behalf of St. Jude Medical, Inc.

ALSO PRESENT: TRUDI AEMETT, Videographer



INDEX

INDEX OF EXAMINATIONS

EXAMINATION BY MR. SIGELMAN ............... 9

EXHIBITS MARKED FOR IDENTIFICATION

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Plaintiffs' Motion for Issuance of Letters Rogatory and Appointment of Commissioner for Taking of Deposition in a Foreign Country, and attached documents; 16 pages. | 16 |
| 2 | Document entitled "Prosthetic Heart Valves with Silver Coated Sewing Cuff Fabric: Early Morphologic Features in Two Patients" 17 pages. | 26 |
| 3 | Excerpt from Cardiovascular Pathology, 4 pages. | 27 |
| 4 | Multiple documents, beginning with Dr. Jagdish Butany Legend; 202 pages. | 84 |
| 5 | Curriculum vitae of Jagdish Butany; 42 pages. | 84 |
| 6 | Multiple documents, beginning with Explant Analysis of 84 Mechanical Heart Valve Prostheses (HVP); 5 pages. | 99 |
| 7 | St. Jude Medical, Tentative Schedule, Dr. Jagdish Butany Visit, Jan. 22, 1999; 1 page. | 123 |
| 8 | 28 January 1999 e-mail to Bill Mirsch, et al. from Roy Hosek, and attached documents; 3 pages. | 124 |



EXHIBITS MARKED FOR IDENTIFICATION

| Exhibit No. | Description | Page |
|---|---|---|
| 9 | July 15, 1999 letter to Hazel Randall from Alan R. Flory; 8 pages. | 134 |
| 10 | June 7, 1999 fax to Dr. Butany from Al Flory; 2 pages. | 145 |
| 11 | June 8, 1999 fax to Dr. Flory from Dr. Butany; 3 pages. | 146 |
| 12 | Multiple documents, beginning with "An Early Comparison of the St. Jude Medical Standard (SJM) and Silzone Treated (SJM-S) Valves: Results from Two Hospitals" 7 pages. | 154 |
| 13 | July 29, 1999 fax; 2 pages. | 162 |
| 14 | Article entitled "Paravalvular Leak and Other Events in Silzone-Coated Mechanical Heart Valves: A Report from AVERT" 8 pages. | 204 |
| 15 | Document entitled "Silzone Coated Sewing Rings Increase Risk of Prosthetic Valve Dehiscence and Pannus Formation" 1 page. | 206 |
| 16 | Multiple documents, beginning with Silzone Papers; 163 pages. | 206 |
| 17 | February 18, 1999 memorandum to Al Flory, Steve Healy, Terry Shepherd, from Monica Schultz; 1 page. | 225 |
| 18 | May 6, 1999 e-mail to Alan Flory from Roy Hosek; 1 page. | 231 |
| 19 | May 7, 1999 fax to Dr. Tirone David from Al Flory, Steve Healy; 2 pages. | 248 |
| 20 | May 19, 1999 document entitled "Silzone Valve Review: Drs. Titus and Butany" 4 pages. | 253 |

EXHIBITS MARKED FOR IDENTIFICATION

| Exhibit No. | Description | Page |
|---|---|---|
| 21 | May 25, 1999 memorandum to Dr. Butany, Dr. Titus, Roy Hosek, from Al Flory; 2 pages. | 268 |
| 22 | Document entitled Questions for Dr. Butany and Dr. Titus; 2 pages. | 292 |
| 23 | May 25, 1999 e-mail to Judy Cameron from Al Flory; 2 pages. | 297 |
| 24 | May 25, 1999 fax to Dr. Jack Titus from Al Flory; 1 page. | 301 |
| 25 | Document entitled "Meeting with Dr. Titus" 1 page. | 303 |
| 26 | May 20, 1999 document entitled "Silzone Review - Toronto, Ontario, Meeting Minutes" 11 pages. | 308 |
| 27 | November 11, 1999 letter re Mechanical Valve Randomized Controlled Trial: Interim Report; 15 pages. | 329 |



STATE OF SOUTH CAROLINA
COUNTY OF GREENVILLE
IN THE COURT OF COMMON PLEAS

DAVID MICHAEL BRIDGES and )
BONNIE BRIDGES, his spouse, )
)
Plaintiffs, )
vs. )
) No. 2001-CP-4773
ST. JUDE MEDICAL, INC., et al., )
)
Defendants. )
)
)
JANICE SPAIN as personal )
representative of SARA YVONNE )
PAIGE, deceased, )
)
Plaintiff, )
)
vs. )
) No. 2001-CP-23-4970
ST. JUDE MEDICAL, INC., )
et al., )
Defendants. )
)

BE IT REMEMBERED that, pursuant to Notice, and on Friday, April 26, 2002, commencing at 8:42 a.m. thereof, at Two Embarcadero Center, 20th Floor, San Francisco, California, before me, SANDRA M. MacNEIL, a Certified Shorthand Reporter, personally appeared

JAGDISH BUTANY, MBBS, MS, FRCPC

called as a witness by the Plaintiffs, who, having been first duly sworn, was examined and testified as follows:



SAN FRANCISCO, CALIFORNIA; FRIDAY, APRIL 26, 2002
8:42 A.M.
--oOo--

THE VIDEOGRAPHER: Good morning. This marks the beginning of videotape 1 in the deposition of Dr. Jagdish Butany in the matter of David Michael and Bonnie Bridges, his wife, versus St. Jude Medical Incorporated, et al., in the State of South Carolina, County of Greenville, Court of Common Pleas, Case No. 2001-CP-23-4773, and Janice Spain, as personal representative of Sara Yvonne Paige, deceased, versus St. Jude Medical Incorporated, et al., Case No. 2001-CP-23-4970.

Today's date is April 26, 2002. The time on the video monitor is 8:42 a.m. The video operator today is Trudi Aemett, a notary public contracted by Video Solutions, a LegaLink company, San Francisco, California. This deposition is taking place at 2 Embarcadero Center, and was noticed by Kellogg & Sigelman for the plaintiffs.

Counsel, please voice identify yourselves and state whom you represent.

MR. SIGELMAN: My name is Daniel Sigelman, and I represent the plaintiffs.



MR. KELLOGG: Ed Kellogg, plaintiffs.
MR. CAPRETZ: James Capretz.
MR. NEWLAND: James Newland.
MR. BROWN: William Brown for St. Jude.
MR. KOHN: I'm Steven Kohn representing St. Jude Medical.
THE VIDEOGRAPHER: Would the reporter please swear in the witness.

(Whereupon, the witness, JAGDISH BUTANY, was duly sworn.)

EXAMINATION BY MR. SIGELMAN

MR. SIGELMAN: Q Would you please state your full name for the record, sir.
A My name is Jagdish Butany, B-u-t-a-n-y.
Q What's your current address, sir, residential?
A My residential address is 7 Mossgrove, M-o-s-s-g-r-o-v-e, Trail, Toronto, Ontario, M -- I'm sorry -- M2L 2W2, Canada.
Q Have you ever given a deposition in an America case?
A Yes, sir, I have.
Q How many times?
A Three -- I think at least three times.
Q What kinds of cases were they?

A They were litigation, medical-legal litigation, of course. I was for the plaintiff the first time, the defense the second time, and the defense again for the third time, I think.
Q So you're familiar somewhat with the type of proceeding that we're going to embark on at this time?
A Reasonably. I think it keeps changing every time, but --
Q Sure.
A -- yes.
Q Let me just say a couple things. First of all, we're doing this deposition under Rules of Procedure of South Carolina, and there are certain specific rules, one of which is that if you need clarification --
A Yeah.
Q -- because the question's unclear to you, you have to ask me for that. You don't ask your attorney.
A Okay.
Q You have to ask me. That's a specific rule. Obviously, you're not to be coached in any way by your attorney. There's a specific rule in California procedure -- excuse me -- in South Carolina for that.
Let me say that if you have any reason to want to take a break today, please speak up, and we'll certainly accommodate you. This isn't supposed to be an



inquisition. And try to audiblize your answers --
A Sure.
Q -- to the best of your ability, because even though this is being taken by video, if you answer with a nod of the head --
A Okay.
Q -- or an "uh-huh" or "uh-uh," we may not accurately reflect your true testimony on the transcript.
Could you briefly recount for me your educational and professional background by year.
A Sure. I'll give these to you roughly by year. I'm a physician. I trained in -- at the University of Mysore. Got my initial medical degree there. It's called the bachelor of medicine and the bachelor of surgery, unlike the M.D. that it's called here, in parts of the world. After that I went to New Delhi, where at the All India Institute of Medical Sciences I got my master's in general surgery. After that I migrated to Canada and trained to do a fellowship in pathology.
Q When was that?
A This was 1975 to 1979, which is -- the exam at the end of which is conducted by the Royal College of Physicians and Surgeons of Canada and is the equivalent of the American boards. Following that I worked for a



year at a hospital in Toronto, the Women's College Hospital, and then went to the National Institute of Health at Bethesda where I worked for a year with Dr. Victor -- the late Dr. Victor J. Ferrans in the Ultrastructure branch of the Heart, Lung and Blood Institute, and spent some time in between with Dr. William Roberts, who was the head of the pathology branch of the Heart, Lung and Blood Institute at the same institution.
Q What year was that?
A This was 1971. Sorry, that's not '71. It's '81. I came back and worked again at Women's College Hospital. In about four months I was approached by the Toronto General Hospital to come and work for them, but I had signed a contract with Women's College Hospital, and I said you guys got to sort it out. July 1 onwards of 1982 I worked half time at Toronto General doing cardiovascular pathology and half time at Women's College Hospital doing everyday pathology.
Q What was the kind of pathology you were doing at Toronto General?
A Cardiovascular.
Q Okay.
A In January of 1984 I moved to Toronto General Hospital full time. All of this time I was affiliated



with the University of Toronto, Department of Pathology, also. Since then I've continued to work at Toronto General Hospital and remained faculty at the University of Toronto.
Q Do you do pathology at any hospital other than Toronto General Hospital?
A I do pathology at the -- now at the University Health Network, which encompasses three hospitals, the Toronto General Hospital, the Toronto Western Hospital, and the Princess Margaret Hospital. I remain a consultant at Women's College Hospital, which is now merged with another hospital, so it's called the Sunnybrook and Women's College Health Sciences Center. These are the hospitals that I work at.
Q And do you hold yourself out as a cardiac pathologist?
A I don't hold myself out as anything, in the sense that I don't advertise, I don't tell anyone I'm this, that, or the other, but yes, I do predominantly cardiovascular pathology and have done that for the last 20 years.
Q Do you do other kinds of pathology besides cardiovascular pathology?
A Very little. I do run the autopsy service at the Toronto General, or the University Health Network,

which means I do my share of regular autopsies. That's about the only time I see noncardiac pathology, but --
Q Do you have -- I'm sorry.
A Sorry. Keeping in mind that any patient who has cardiac disease also has other disease, so when we do an autopsy on a postoperative cardiac death, they end up having all sorts of other pathologies, too.
Q Do you have a background at all in device regulation?
A No, I don't.
Q How about in in vitro research?
A I'm not sure I understand what you mean if I have a background in it.
Q Have you done in vitro studies?
A I have done the studies on the pathology of implants after they were explanted. Device manufacturers have asked me to look at devices after they were explanted, and sometimes been involved in the lead-up to the animal implants and what should they do with the device once it's explanted.
Q Have you done any in vivo studies in animals other than human beings?
A Maybe you should clarify one thing before we go much further. I meant to do that right in the beginning, and I'm sorry I forgot. In your application



you list me as a surgeon, I think. I'm not. I'm a pathologist.
Q If that was done, that certainly would have been an inadvertent error.
A Oh, okay. But so long as we're clear that I'm a pathologist.
Q Sure. Right.
A And I don't do much in vivo work, neither human nor animal. I do the ex vivo work.
Q Okay. Have you done animal pathology work?
A For cardiovascular devices, yes.
Q So you've done studies where you've looked at histopathology slides of cardiac tissue of animals?
A I have, yes, sir.
Q Do you still do that?
A Yes, sir.
Q Are you represented today by counsel?
A No, sir. I did have a counsel look at the correspondence that you'd sent me in Toronto, and she had, I gather, corresponded with you, but other than that, I don't have counsel here.
Q All right. Mr. Kohn is here. He's not your lawyer; is that correct? As such.
A Technically I gather he's not. I wish he was, but I gather he isn't. I feel undefended if I need a



defense.
Q I'm sure Mr. Kohn would not be adverse to your subsidizing him additionally to what he's already getting from St. Jude, but -- don't know if he probably could do that under the current circumstances --
A Off the record, I don't think I could match St. Jude.
Q And do you have with you the document that was served on you asking you to bring certain documents here to the deposition?
A I think I do.
Q I think I'll make that an exhibit, if I might.
A I think this is it.
MR. SIGELMAN: Let's make this an exhibit. Mark it as Exhibit No. 1.
(Whereupon, Deposition Exhibit 1 was marked for identification.)
MR. SIGELMAN: Q Dr. Butany, I've handed you what the court reporter has marked as Exhibit No. 1. That is, in fact, the document that you received notifying you that you were being asked to give a deposition in these cases, correct?
A I believe so. I think, in fact, that I got it from Steve.
Q All right.



A At the top it does say that it was faxed to me by CHRM.
Q Okay. And there is attached to that document some letters rogatory asking you to bring certain documents here today, correct?
A Yes, sir.
Q And have you brought each and every document that is encompassed by those requests?
A To the extent I could humanely remember and find, yes, I did.
Q Is there anything that you know of that is responsive to that request for documents that you have not brought here today?
A No, sir.
Q All right. Have you, for example, submitted any articles for publication in a manuscript and -- for articles, concerning in any way the Silzone heart valve?
A Yes, sir.
Q All right. Did you bring those today?
A We sent it to you, faxed it to you yesterday, I believe.
Q I do not have that. Obviously, you realize I was coming from Washington, D.C. Are there documents that were made available to me yesterday at my office by fax --

MR. KOHN: We've got copies over here.
MR. SIGELMAN: Okay.
MR. KOHN: There's one article that --
THE WITNESS: I apologize for that, but this paper is not yet published. It will be published in July in the Canadian Journal of Cardiology, and I thought I'd bring my final oration of the paper with me, and I pulled that out yesterday morning and had it faxed over to Steve and -- Mr. Kohn, and he, I gather, did try to send it.
MR. SIGELMAN: Sure.
THE WITNESS: But if there's a fault, it's mine. I'm sure --
MR. SIGELMAN: Q No, I'm just asking. I'm not here to attack you --
A No.
Q -- by any means, sir. I'm just trying to ascertain what we have and haven't received --
A Sure.
Q -- that may be responsive to the subpoena.
A Sure. But it is -- your subpoena actually says that I should bring them here.
Q No, I understand. I'm just asking. Let me see this document. And you just mentioned that you thought you had sent us the final version. May I infer from



that that there are versions other than the final version that you have in your possession?
A I don't have them in my -- unfortunate thing today is that most things are done on a computer, and you keep on erasing things and reworking them and that sort of thing. So this is the version that was made after the final corrections requested by the reviewers of our initial submission.
Q All right. Do you have any prior drafts, either in hard copy or in a previously-made computer file?
A Not with me, and I doubt that I have them in my office anymore.
Q Could you check and see?
A I could do it, certainly.
Q And you mentioned --
A May I just write --
Q Sure. And you said this is the final version after you've received comments from peer reviewers.
A Yes.
Q I presume you have in writing comments from various peer reviewers for abstracts and/or manuscripts that you've submitted for publication, fair?
A No. One doesn't get peer reviews, comments, for abstracts. You only get them for papers.



Q All right.
A So for draft -- for abstracts they either reject or accept, and that's about all one hears from that. But for papers submitted, yes, one does get reviewers' comments.
Q And did you bring with you today any peer review comments you had with respect to this manuscript?
A No, sir, I didn't.
Q And is this the only manuscript that you have submitted for publication concerning Silzone?
A It is the only manuscript I've submitted with regard to Silzone.
Q Could you make available to me the peer review comments that you've received --
A I will do that.
Q -- with respect to the manuscript --
A I hope I can find them, and I shall --
Q Surely. Because when we say everything, you know, we would like to get everything, if possible.
A Sure.
Q And in what journal will this particular paper be published?
A It will be published in the Canadian Journal of Cardiology, and I hope -- at least I've been told -- it will come out in July.



Q Was there any other journal to which you submitted the paper prior to that time?
A No, sir.
Q So that was the first attempt?
A Yes, sir.
Q And when did you submit your initial manuscript for the paper?
A I think it was October of last year. I think.
Q October of 2001?
A That's correct. Either that or November. Somewhere there.
Q Do you have rejection letters in your possession concerning abstracts that you've submitted for publication concerning in any way the Silzone heart valve?
A I'm not sure. Those things stink. I don't think I kept those. But the abstracts that were reject --
Q Those things stink?
A I'm sorry.
Q No, that's fine. I just wanted to see --
A The letters are heartbreaking.
Q Right.
A You put in hours and hours and hours of work --

Page 22

Q Sure, I understand.
A -- and it is turned down.
But the abstracts that were rejected are amongst the papers that I did send you.
Q I understand. And how many rejections have you received for abstracts that you've prepared for Silzone?
A One.
Q Okay. And was that from the Society of Thoracic Surgeons?
A Yes.
Q And who was the person, if you can recall, who advised you that the abstract would not be accepted?
A I can't remember, but I can find that out if it's important.
Q Was it your intention with respect to that abstract, if it were published in a proceeding of the Society of Thoracic Surgeons, to ultimately to submit it to the Annuals of Thoracic Surgery?
A Yes, sir.
Q That is the journal, is it not, that publishes manuscripts for that particular society?
A Yes, sir.
Q Who's the editor of that journal?
A I don't remember. I think -- Tirone David is on the editorial board, I believe. He's on the

Page 23

editorial board of most of the major cardiovascular surgical journals, and I presume he's on that. But I just want to make a comment. When they accept a paper, it's mandatory to submit the -- sorry. When they accept an abstract, it's usually mandatory to submit the paper to them.
Q All right. Is there anything else that you can think of as you sit here today -- be as expansive as you can in your thought process -- that you haven't brought here that is technically requested in this subpoena?
A Technically --
Q Yes.
A There's nothing that I haven't brought here. As far as, God as my witness, as I can find.
Q Sure.
A However, if I expand on that, I have another paper in process now, but it's not submitted. It's near the final stages, but it's not ready to be shipped out. It hasn't been shipped out to anyone. Not rejected by nyone, not accepted by anyone. That's the only thing at I have ongoing about Silzone.
) And that concerns Silzone?
Yes, sir.
And what is the basic thesis of that particular

Page 24

A That's a summation of my experience with all the Silzone valves explanted at Toronto General, either surgically or at autopsy, and I'm trying to put together the pathology of that and submit it.
Q I would ask that you would submit that paper to us. And let me tell you, Doctor, that I appreciate the sensitivity of that, and I know that, given your academic interest in the subject matter, that you would be understandably nervous about it, and we will do everything we can not to in any way compromise your ability to --
A Sure.
Q -- get it published.
We just want to look at it. And as you know, we've signed an undertaking to keep confidential matters that you have provided us with to the extent that they don't impinge on our ability to prosecute the cases, and you may be -- you may have been advised that we also have an order in this case that restricts the distribution of materials that have been made subject to a confidentiality order, and we agreed at one point that your materials would be deemed subject to that confidentiality order.
So I would ask that you submit that, and it's not our intent to --

Page 25

MR. KOHN: Let me just make a statement about that.
MR. SIGELMAN: -- do anything malicious or mischievous with respect to that.
MR. KOHN: I appreciate your representation, Counsel, and I'm certainly not representing Dr. Butany, but in fairness to him, let me just say that the same undertaking that you so graciously agreed to abide by has not been agreed to by other counsel, including counsel who are here today. So I think -- I would advise Dr. Butany to speak to his lawyer about your request before agreeing to do anything.
MR. SIGELMAN: Well, as you doubtless know, this deposition's being taken and it was noticed by us, and I'm asking him to produce it to us at this point. It hasn't been made part of a record, to my knowledge. It will be sent to us, and we're requesting because it's in fact requested by the subpoena, and it was our understanding that he was going to fully comply with the subpoena. So I'm just asking that he do that.
THE WITNESS: Can I -- my understanding is I complied absolutely. This is something that's not been submitted. It's still a work in progress. And that's why I didn't think it was critical to submit it.
MR. SIGELMAN: Q Well, I understand that.

Page 26

But actually, to the extent that we may not have captured it, and we probably didn't, in one of the first eight of our requests in the letters rogatory, the last one's a rather catch-all one, and I'm sure that if we didn't get it in the first eight, it would have been encompassed by number nine.

In any event, would the court reporter please mark the manuscript that Dr. Butany has given me as Exhibit No. 2. I may be reading that over the lunch period.

(Whereupon, Deposition Exhibit 2 was marked for identification.)

THE WITNESS: Can I interrupt you for one minute?

MR. SIGELMAN: Q Sure.

A Amongst the things, there's one other thing that I didn't give you.

Q Yes.

A Didn't send it to Steve in time. I brought it with me. Is a page from the book Cardiovascular Pathology, edited by Silver, Gotlieb, Ben Schoen, in which there's a chapter on pathology of heart valve substitutes, and there's a quote from me by Dr. Schoen. I've underlined that, and I'm showing it to you now, that this is a verbal conversation with

Page 27

Dr. Schoen, which he has quoted here.

Q That's Frederick Schoen, correct?

A That is correct.

Q Of Harvard?

A Frederick Schoen.

Q Right. And you reportedly told him that the coating, the silver coating of the St. Jude Silzone valve, apparently -- and I'm quoting now from his chapter, quote, "also seemed to impede healing (personal communication, J. Butany, Toronto), but this association has not been verified and the potential mechanism is not certain. Nevertheless, the particular model was withdrawn from the market in 2000."

And when did you have that conversation with Dr. Schoen?

A This is many months ago.

MR. SIGELMAN: All right. Let's make that Exhibit No. 3.

(Whereupon, Deposition Exhibit 3 was marked for identification.)

MR. SIGELMAN: Q Is it still your view that Silzone valve appears to impede healing?

MR. KOHN: Objection. Form.

THE WITNESS: Amongst other things, yes, it

Page 28

MR. SIGELMAN: Q All right. And do you believe, as you look back at your entire involvement, that that played a significant role in the explants that you experienced as a pathologist with respect to that valve?

MR. KOHN: Objection. Form.

THE WITNESS: I do believe that, yes.

MR. SIGELMAN: Q All right. Now, it's been represented to me, Doctor, that you have been provided by St. Jude Medical with certain internal documents from St. Jude files concerning Silzone; is that correct?

A I was given -- sent a binder by Steve, the sort of binder that you see there. By and large it -- before that, I may have had the odd communication, but I did not at any time receive any -- any confidential documents or any documents that were not already public knowledge. The sort of the brochures that are handed out to all surgeons or all comers at meetings, that's about the only thing I had before that.

Q And when did you get these documents?

A This one?

Q Yes. This big binder that's probably about five inches thick, looks like.

A Two weeks ago.

Q All right. And part of that time --

Page 29

A Two weeks -- I'm sorry. I may have missed the date.

Q Yes.

A But it's certainly before this --

Q Deposition.

A -- deposition.

Q And did you request them?

A Yes. I had a talk with Steve, and I said I'm trying to go over the chronology of events. They are now getting fairly old in my memory. And Steve said he would -- Mr. Kohn said he would send me all the documents that he had that were likely to be of help to me.

Q Did you learn anything that you didn't know when you read these documents?

A Some things, yes.

Q Like what did you learn that you didn't know before?

A Pardon the facetiousness. That perhaps I was son of a bitch to some people, and perhaps I was a good guy to some others. But that's being facetious, and you can take that off the record if you wish. But there were some things that I did not know about the events that transpired between my initial conversations and the final taking the valve off the market.

Q To whom were you a son of a bitch?
A To some of the colleagues there, I guess. It's not written down, and those are verbal comments.
Q Who were some of the colleagues whom you thought -- who you thought thought you were a son of a bitch?
A Gosh. This is a personal comment on the side, and as I said, let's take this off the record --
Q Sure.
A -- and said nobody would put in writing that sort of thing anyhow.
Q But based on your reading the documents, who qualified as people who thought that of you?
A It wasn't the regular staff at SJM. I have to say that. They were the most cooperative people that I could have asked for. No one ever was ungracious to me. Rather surprisingly, it was somebody who was peripherally involved with them who was -- who either said that tongue in cheek or meant it. I don't know which.
Q Who was that?
A This was one of the Canadian representatives.
Q Who is named?
A I can't remember his name now. If it comes back, I can give it to you later. But it was at a



dinner, and I'm sure it was meant to be taken in a jocular way. It just stuck to me that anybody would say the sort of thing to me. Clearly I suspected that they would think that, but nobody would say it to me to my face.
Q What did they say exactly to you?
A It's two years, and I really don't remember the exact words, but the gist is, Butany, you SOB.
Q All right.
A Or at least we think you're an SOB.
Q Naturally.
A If I was in their shoes, I'd probably the same -- think the same thing of Butany.
Q Was there anything in those documents that you found uncomfortable or distasteful?
A No, sir.
Q Was there anything in the handling of you by St. Jude that you found discomforting or distasteful?
A No. I could have wished for a lot of things, but there was nothing there that was in the least bit distasteful.
Q Did St. Jude do anything as reflected in those documents that you didn't know about before?
A Some of the communications with the British authorities were ones that I wasn't familiar with.



Q Did they ever misrepresent, in your view, what you had done vis-a-vis them to third parties?
A Not that I can recall.
Q Did they ever make you out, did you feel, as being uncooperative with them?
A Yes.
Q Did you feel you weren't being cooperative with them?
A I know I was being cooperative. I'm not sure if that was the question and this is the answer or not.
Q You know you were being cooperative?
A Absolutely.
Q All right. Did you ever see anything where St. Jude was telling other people -- for example, regulatory authorities in various countries -- that you weren't being cooperative?
A I'll tell you what I think they said and let you decide that. At several stages they said that Butany has still not given us copies of the pathology reports, and that is what I think was unfair to me.
Q All right. That was unfair?
A Yeah.
Q That wasn't true?
A Literally speaking, it was absolutely right, because I didn't give them the pathology reports. I



couldn't. There's patient confidentiality. And they were -- they were constantly talking to Tirone David, the chief of cardiac surgery, and perhaps others, and they could have gotten their reports from them.
Q You did share some of the reports with Dr. Titus, did you not?
A Yes, sir, I did.
Q Dr. Titus being a pathologist in St. Paul, Minnesota who did work for St. Jude, correct?
A That is correct. Let me clarify that. I showed him all the valves I had at that time. We went over the valves together, and I let him take whatever time he wanted to look at those valves. We looked at some of the histology sections I had from those valves.
Q All right. And I gather from your testimony a minute ago, had they wanted to get the pathology reports that they claim they couldn't get to other people, they could have obtained them from Tirone David?
MR. KOHN: Objection. Form, calls for speculation.
THE WITNESS: As far as I'm concerned, they couldn't or shouldn't have gotten from me, because I could not possibly give away reports that had patient data on them. And since this was -- these cases were largely part of a study, they should have been able to

get them from others. I'm not sure if they necessarily would have ended up with them at that stage, but they certainly should have been able to or could have asked for them.

MR. SIGELMAN: Q Tirone David is who?

A Dr. David is the head of cardiac surgery at Toronto General Hospital.

Q Now, I understand that you are a consultant at this time for St. Jude with respect to the Silzone valve; is that correct?

A Yes, sir.

Q And have you received and/or generated any documents in connection with your role as a consultant?

A No, sir.

Q Not one piece of paper?

A Not that I can remember.

Q Are you doing any work for St. Jude as their consultant?

A No, sir.

Q Have you ever done any work for St. Jude as their consultant?

MR. KOHN: I'm going to interpose an objection here, Counsel. Anything that he's done for St. Jude as a consultant is confidential, and I'm going to advise Dr. Butany he doesn't have to respond to your questions.



It's up to him whether he wants to or not.

MR. SIGELMAN: Q As I understand it -- I'm ust asking generally. I'm not asking --

A Sure.

Q -- the nature of the work.

You haven't done any work, to your knowledge, or St. Jude concerning the Silzone valve as a consultant?

A No, sir, I haven't.

Q What is your understanding -- let me strike that.

Are you being reimbursed by St. Jude for being consultant on the Silzone valve?

A Theoretically, yes. Up to $7,500 per year. But we basically use that money up for expenses for this rt of meeting or any other meeting that may be ecessary.

Q What's your understanding as to why you are a onsultant to St. Jude for the Silzone valve?

A Can I be -- can I go a little broader than ving you a straight answer? I will give you straight, of course.

Q You can answer however -- you can answer wever you want.

A Okay.



Q Whether it's responsive or not will be my judgment and perhaps the court's.

A May be a little wider, that's all.

Okay. My concern was -- let me back up. The St. Jude valve is a phenomenal valve, the St. Jude standard valve. St. Jude Silzone coated valve, mechanical parts of it are still tremendous for that, pretty well the same as the other one. I had absolutely no desire to see this valve go off the market. On the other hand, I wanted to see why I was seeing these valves come out, why were they failing, and they were the only people who could possibly help to do that. When we -- when I agreed to be a consultant with them, this was the understanding, that we would review all explants and try and decide how and why the valve was failing.

Q All right. And did you do that?

A I haven't been able to.

Q Why not?

A I haven't been able to get my hands on any of St. Jude's valves, nor is there any fabric available to do any further testing with.

Q Why haven't you been able to get your hands on any of St. Jude's valves?

MR. KOHN: Let me just interpose an objection



here, Counsel. Dr. Butany does not have to answer any questions about his consulting with St. Jude.

MR. SIGELMAN: Q Doctor?

A I'm sorry. Since I became a consultant for them, I believe I shouldn't be answering any questions about this, but I have basically already given you an answer.

Q You regard anything concerning the consulting agreement as confidential; is that correct?

A Anything that I did after the consulting agreement, I think is what I regard as confidential.

Q You know that St. Jude is being sued by a number of people who say they were injured by the Silzone valve?

A I believe so, yes.

Q And you believe that that valve should be off the market?

A I believe I do.

Q Pardon?

A I do, yes, sir.

Q You think there was something wrong with that valve, fair?

A I think there was something wrong with the fabric.

Q All right.

A Not the valve itself.
Q Let me ask you this, sir. Do you feel that you are involved with St. Jude in helping them defend against lawsuits brought against St. Jude?
A No, I'm not.
Q Then I'm going to submit to you that under a U.S. law there's no basis for your not telling me anything about that consulting arrangement, because it's not privileged under our law.
A But as far as the consulting arrangement is concerned, I've already told you mostly everything.
Q So my question then is, why hasn't St. Jude given you valves so you could find out what was wrong with the Silzone valve?
MR. KOHN: Calls for speculation. Objection.
THE WITNESS: I really don't know.
MR. SIGELMAN: Q You don't --
A They haven't told me why they can't, but they said they couldn't give them to me.
Q You asked them, right?
A Yes, I did.
Q And they just didn't give it to you. Did they --
A Correct.
Q -- ever tell you that they didn't want to give



it to you because it could expose them in litigation?
A No, sir.
Q They just wouldn't give it to you?
A They said there was litigation pending against -- with regard to those valves, and they couldn't share them with me.
Q Okay. But originally the agreement was that you were going to work with St. Jude to try to find out what went wrong with this valve, correct?
A Yes, sir.
Q And you haven't been allowed to do that, because you haven't been able to get hold of the valve?
A You're right.
Q And St. Jude does have valves that they could give you. It's a question of whether they were willing to do it or not, fair?
MR. KOHN: Objection. Form.
THE WITNESS: I don't know whether they have ...em or not, but I haven't been able to get them.
MR. SIGELMAN: Q Did you ever ask for any ...s that were not involved in lawsuits or litigation?
A No. I just asked for valves, that's all.
Q You didn't care whether they were the subject ...uit or not, correct?
Y...u're right.



Q Your concern was, for example, whether they were the subject of an explant?
A You're right.
Q Have you ever discussed the Silzone valve at grand rounds?
A Yes.
Q How many times?
A Once for sure. Perhaps twice.
Q Did -- oh, I'm sorry.
A I'm sorry.
Q Let me also say -- I sometimes say this at the beginning of depositions. I have a tendency sometimes to think someone's finished their answer --
A Okay.
Q -- and I'll cut them off.
And I'll try not to do that. And obviously, if I'm still asking a question, you'll make the same effort not to cut me off.
A Sure.
Q And I apologize when that does happen.
Did you write anything with respect to what you presented at grand rounds?
A No, sir, I didn't. Let me continue that answer and say that virtually all the slides I used at that round were the slides that I used in London.



Q And as I understand it, the compensation you've received by -- received from St. Jude with respect to your consulting has more or less been used up, or much of it, meeting with lawyers who represent people who have sued St. Jude; is that fair?
A By and large, yes.
Q So the money that you've received has been used in some context relative to litigation brought against St. Jude, correct?
A I think so, yes.
Q And none of that money has been used, at least to your knowledge, to find out what went wrong with the Silzone valve?
MR. KOHN: Objection. Form.
MR. SIGELMAN: Q Pardon?
A Not yet.
Q Have you worked with St. Jude prior to your involvement with this Silzone valve?
A Yes, sir.
Q Have you ever been a clinical investigator for St. Jude?
A No, sir.
Q What kinds of work, consulting or otherwise, have you done with St. Jude, other than what we just discussed with regard to the consulting arrangement that

you currently have concerning the Silzone valve?
A Many years ago Dr. David was devising a new type of valve, and the -- he -- his partners were St. Jude, and this was the Toronto -- what ultimately became the Toronto stentless porcine bioprothesis. I was involved in doing the pathology on those animal explants. That was the -- by and large the extent of my involvement with St. Jude prior to the Silzone valves.
Q And Dr. David was the principal investigator of that valve?
A I believe so, yes.
Q All right. And you would receive some compensation as a part of the grant that he received as the principal investigator, fair?
A No. I think I billed St. Jude directly for any time I spent looking at those animal tissues.
Q And when was this?
A Think it started in 1987 and finished in 1989 or '90.
Q Toronto General Hospital, did it ever discontinue implantation of the St. Jude Silzone valve?
A Yes, sir, it did.
Q When did it do that?
A I'm not absolutely sure when. I think it's in the first quarter of 1999.



Q All right. Why did it do that?
A It may be presumptions of me to say this, but I think it was largely because I kept telling the surgeons that there were far too many of these valves being explanted, and showing them the valves. And I believe that was it.
Q And did you agree with the decision to discontinue implantation of the device?
A Yes, sir.
Q When you have met with opposing lawyers -- and that's happened twice, is that correct, outside of a deposition context?
A I met once in Los Angeles with Mr. Capretz and others. I met once in --
Q With some lawyers from Minneapolis, maybe?
A Yes, of course. That was a deposition.
Q That was a deposition?
A Yes.
Q So you gave a Silzone deposition?
A Yes, I did.
MR. KOHN: No, it wasn't a deposition.
THE WITNESS: No? I'm sorry.
MR. KOHN: It was --
MR. SIGELMAN: It was an interview.
MR. KOHN: -- an interview.



MR. SIGELMAN: Q Were you reimbursed for your time?
A Yes, sir, I was.
Q And that was over and beyond whatever you got as a consultant; is that correct?
A I did not get anything at any time saying this is your consultancy fee.
Q Is there a record, to your knowledge, that you've seen, of those meetings?
A No. I haven't seen it, no, sir.
Q Were there any notes taken that you have seen from the --
A From the -- pardon me. I'm sorry to interrupt.
Q Any notes that were taken of those meetings?
A The Los Angeles meeting, I don't think I received any copies of any notes taken by anyone. The Minneapolis meeting, can't -- my memory fails me. I can't remember if there were any notes that I got.
Q All right. And --
A Could I ask Mr. Kohn if there were any notes that I --
Q No, that's fine. I'm just taking your testimony.
A I can't remember.
Q That's fine. You can only do what you can



remember.
A Sure.
Q Did you do any preparatory work before you had those interviews?
A Yes.
Q What did you do to prepare?
A I tried to go over my own papers, whatever I had, the cases that I'd seen, pulled out the valves, looked at them again, and tried to see what the literature was about the Silzone valve.
Q Were you reimbursed for that time?
A Probably.
Q By St. Jude?
A Yes.
Q And how much time have you spent preparing for this deposition other than looking for records responsive to the subpoena?
A Lots.
Q When you say "lots," how much?
A Days.
Q Why have you done that? Why haven't you just come in and tell us what you can remember?
A I could do that, but my biggest thing was to get together all the cases that you wanted.
Q Right.

Page 46

A To pull all those valves from my collection of valves and then get their reports and then go over them again and photograph them, or get them photographed, which is more accurate. Took a lot of time.
Q Right. But were you asked to do that by representatives of St. Jude?
A No.
Q Are you being reimbursed for that preparatory time other than just getting the records together that we've agreed to reimburse you for?
A I was hoping you would reimburse me.
Q Right. So we're reimbursing you for that entire period?
A I hope so, yes.
Q I just want to get on the record. And how many hours did you spend doing that? For the record, now. What's your best estimate?
A My fellow spent two weeks, but the reason we wouldn't ask anyone to compensate for that is because that will be the basis of further publications. So now the material is all together and we know where it is. We have the reports in one stack. The writing it up after this will not be anywhere near as difficult as it's been so far. So the fellow's time is -- that I would bill for, or at least I would like to bill for, is

Page 47

the 20 hours or thereabouts that I mentioned earlier. My own time, I haven't tried to tabulate and see how much it was.
Q And I gather from what you said that our request here has facilitated your writing additional manuscript for possible publication; is that correct?
A To the extent that I've now got all the reports in one stack, yes.
Q Would you do me a favor? If there are any royalties on that, would you keep us in mind?
A I will certainly keep you in mind.
Q All right. Thanks. Now --
A If you would keep in mind that all -- most books, 99 percent of books run at a loss, and somebody has to compensate for that loss.
Q Oh, I don't want to get into the losses now.
And did you meet with counsel to discuss this deposition?
A I did, yes, sir.
Q How much time did you spend with counsel?
A Yesterday afternoon.
Q All afternoon. What did you discuss with counsel?
A Basically went over the chronology of the events. I started out by asking if I had complied with

Page 48

the request and sent you everything that I thought I should have, and we agreed yes, and then we talked about how the events had transpired.
Q Do you have a contract, a consulting contract, that you have executed with St. Jude concerning your consulting role?
A Yes, sir, I do.
Q I'm going to ask, because I don't believe it's privileged, based on what you've responded today or how you've responded, that you produce that document.
A Can I ask my lawyer and get her --
Q Sure, that's fine. But it's my understanding that you're not involved in work product as that's defined under U.S. law, and therefore, there would be no confidentiality basis for withholding that document today. It would be responsive to the subpoena. So I'm asking that you do that. Now, if your attorney wants to discuss it --
A Sure
Q -- I'd be happy to discuss it.
Your attorney is in Toronto?
A Yes, sir.
Q And what is the attorney's name?
A Ms. Bonnie Tough.
Q All right. Are you aware of any studies that

Page 49

are currently ongoing concerning the Silzone valve by anyone, be it St. Jude or anyone else?
A I'm aware of one for sure.
Q And what is that?
A That's the AVERT trial.
Q All right. Besides the AVERT trial.
A No, I'm not. On the other hand, any surgeon who explants the valve is likely to want to write about his experience, especially if there's a significant number. So I'm sure there must be a large number ongoing, but I'm not aware of them.
Q Have you been asked to look at any tissue from explanted Silzone valves since the January 2000 recall of that valve?
A I'm not absolutely sure if the valves that I was asked to look at by others were prior to or after. I don't think there were many that -- let me take that back. Yes, I'm sure there are at least a couple that came after that from one of the city hospitals. This doesn't mean -- I don't think you're referring to valves that are explanted at my own hospital.
Q Right.
A Okay.
Q By the way, when the manuscript that we marked as Exhibit No. 2 went through it's various versions or

iterations, did you share them each time or most of the time with St. Jude?
A I shared them once. I don't think I shared them at each stage. I showed them to St. Jude once.
Q Who did you show it to?
A Mr. Kohn.
Q Okay. But anyone else who works directly for St. Jude other than outside counsel?
A I did not.
Q Has St. Jude ever compensated you for attending meetings?
A No, sir. I'm sorry. Let me take that back.
Q Aside from going to St. Jude.
A That's right. Other than the -- at meetings with regard to the Silzone valve, no. At meetings since the valve came out, no.
Q Are you aware of any studies that were undertaken subsequent to the recall of the Silzone valve to investigate either the physiological or cellular mechanism for the increased incidence of explantation reportedly associated with use of that valve?
A There are several in the literature.
Q Are there such investigations in the literature of which you are aware that occurred after the recall?
A Yes.



Q What investigations are you referring to? And I'm talking about studies now, not just anecdotal reports.
A I think there are some with regard to the role of the silver coating. There are some with regard to the entire prosthesis, some which came from the AVERT. And other than that, the sort of things that I said surgeons write about.
Q When you say there are some with respect to the silver coating, which ones are you referring to?
A The first ones were by Miss Tweden and -- there are at least two of those.
Q I'm saying since the recall --
A I can't recall.
Q -- in January of 2000.
A I cannot recall having seen any in print. Others -- let me try and pull out what I do have. Do you mind if I --
Q Sure. Oh, you brought some more material.
A Yes.
Q You have some papers --
A This is what I have to read to work on my next paper, and these are --
Q These are documents concerning Silzone that you didn't otherwise --



A No. These are papers that are available in medical journals that I have been pulling out for myself.
Q The Tweden paper, or some of her papers, preceded --
A Yes.
Q -- did it not, by yours, the recall of the valve?
A Yeah. Yeah. The first I think was 1997.
Q Could I just -- let me just look at those papers, if you don't mind, sir. We could probably expedite that, because I do have a lot of these published papers, and --
A I'm sure --
Q I'm not sure I --
A -- these and more. Let me just --
Q Okay. I may look at these at a break so we don't take up time. Do you mind if I just leave these right here for right now?
A It's okay.
Q When, to the best of your recollection, was the St. Jude Silzone valve introduced for marketing and use in Canada?
A Fall of '97.
Q All right. And when did you first learn of the



existence of that valve?
A February of '98.
Q What happened in February of 1998 that caused you to learn of its existence?
A There was a valve explanted at my hospital that I looked at. Looked at the X-ray and found it didn't resemble a St. Jude standard valve but looked like a St. Jude valve. So I remember going up to see one of my surgeons, the one who'd explanted the valve -- it was late in the evening one day -- and asked him, "Look, this is the X-ray. What is this valve?" And he told me that it was a new version of the St. Jude bileaflet valve.
Q And how did it not resemble your standard or conventional St. Jude valve?
A Two ways. One, the St. Jude standard does not have a radio-opaque ring, and this one did. The fabric covering the fabric of the sewing cuff in the standard valve is white, whereas this is a silvery gray.
Q All right. And when you saw this valve, did you ask anybody what it was?
A Not at that time, no. But the surgeon did explain to me what the difference was.
Q Who was the surgeon at that time?
A Dr. Christopher Feindel.

Q And he told you it was a Silzone valve?
A It was a new St. Jude Medical valve, and that this is how it differed from the standard valve.
Q And there was a time, was there, when you became concerned about the safety of the Silzone valve relative to other artificial heart valves?
A It isn't so much that I was concerned about the safety. At that time my biggest concern, my only concern was, I was seeing these valves explanted, whereas with the St. Jude standard, we seldom if ever saw an early explant.
Q Would it be fair to say that you began to identify or notice a trend towards explantation that seemed higher than usual with the Silzone valve?
A Yes, sir.
Q And when did that trend become evident to you?
A Summer of '98.
Q By that time, how many explanted Silzone valves had you been involved with as a pathologist?
A I think it was about four.
Q Were they all at Toronto General?
A Yes, sir.
Q And after about the fourth explant, would it be fair to say, that's when you started asking questions about what's going on with this valve?



A I think so.
Q And what did you do at that time when these questions started surfacing?
A I initially talked to my surgical colleagues and asked them if there was anything different that they were noticing, and they said no, and I mentioned to them that I've now seen four come out early. And it's in the form of corridor chats or chats in the conference room and you're there for some other reason.
Q Who are some of the surgeons with whom you had these discussions?
A Virtually every one of the surgeons at Toronto General.
Q Including Dr. David?
A Yes. I don't think I met him about it at that time, not specifically, because at that time none of the valves was his patient -- from his patients.
Q Had you previously had explanted specimens for a new device that gave you some kind of safety concern?
A No.
Q Prior to this valve.
A No.
Q Was this situation unique for you as a pathologist?
A Yes.



Q Did you feel at that time some kind of obligation to do whatever you could do, if necessary, to protect patients?
A Yes.
Q How about other hospitals?
A I didn't at that time.
Q What did you try to do at that time to protect patients?
A I kept talking to our surgeons and asking them why I was seeing more of these valves come out. Then in fall of the same year I started talking to St. Jude and asked them does anyone else report to them that they're having this diff -- I've told them I've seen "X" number of valves, and I think it was five or four at that time, and the answer was no, that nobody else had any such problem.
Q You said you first started talking to St. Jude. What did you do? Did you call them up on the phone?
A Yes, sir.
Q And who did you call up on the phone?
A There are two people I think I called. One was Roy Hosek, and the other is a young lady who I had a working relationship with regard to the stentless valve. I can't remember her name, but she'd left St. Jude and gone to some other company since then. In any case, she



had told me that she wasn't involved with mechanical valves, she was only involved with the stentless valve. So I did definitely talk to Roy.
Q So did you talk to that lady first, or did you talk to Dr. Hosek first?
A I can't remember. It probably would be more or less the same time, but in any case, her answer was she didn't deal with mechanical valves.
Q And what month was this in 1998?
A It's hard for me to pin down a month. It's definitely October/November. It may have been September.
Q And did you meet at all with anyone from St. Jude in the year 1998 about the Silzone valve?
A I think I did. I unfortunately have diffi -- I don't have a record of that. I'm having difficulty finding any log of that. I am reasonably sure that we met in November, in the first week or early second week of November, at Minneapolis.
Q All right.
A For sure we met in January of '99.
Q Right.
A I thought we'd met twice. It's I guess possible that I'm totally, totally mistaken.
Q Well, I'm having the same difficulty, because I

was under the impression that you may have met in November 1998, and so far I haven't seen any records of it.
A I'm -- for whatever reason, November '98 sticks in my mind, that it was on or about the 7th, 8th of November, just before the American Heart Association meeting of that year.
Q All right. And whose suggestion was it to meet in November of 1998?
A Me and Roy Hosek. I said, look, guys, I've got this many valves, and once again, has anybody else been having this difficulty? They said no.
Q And with whom did you meet at St. Jude's headquarters in Minneapolis in November of 1998?
A Again, it's difficult for me to recall exactly. I believe I met Roy, Al Flory, and I think Steve Healy, also, and some of the others. My -- I could be mistaken about it. I unfortunately have no paper trail of it.
Q Certainly. And at some point you decided to record in writing some of your findings and conclusions, fair?
A Yes, sir.
Q And when was the very first time that you did that with respect to the explants that you had seen with the Silzone valve?



A Fall of '98.
Q Okay. When you say fall of 1998, what would be your best recollection of what month in the fall of 1998 you did that?
A I could easily go back and check, but I think it's -- for sure August, September.
Q August or September of 1998. When you say you could go back and check that, here comes my next inevitable question.
A I knew it would come.
Q What is it you would check?
A There was a resident, cardiac surgery resident from Saudi Arabia, who came and worked with me at that time, and I gave him the assignment to pull out or start pulling out all the valves that I'd seen for the three -- the 18 months prior to that, prior to the implantation of the Silzone valves, which is why I'm pretty sure I can work out the dates.
Q You would have to converse with that gentleman?
A Either him or talk to the program director and see when they'd sent him to me.
Q All right. There's nothing in writing that you could consult that would refresh your recollection and more precisely identify the time?
A Not here, no, but that would be an absolutely



precise way of knowing when he came and worked with me.
Q Now, what was it that you wrote, an abstract?
A The abstract came later.
Q Okay.
A The initial thing was just to pull the data and see what had happened prior to that, was I mistaken in thinking that early explants of St. Jude standard were extremely rare or not.
Q And what did you -- do you still have whatever it is you wrote down?
A We wrote an abstract after that.
Q Okay.
A And when -- I do have the abstract --
Q Right.
A -- and that abstract is with you.
Q Do you still have the original document that you generated that was pre-abstract?
A No. The handwritten version, we didn't really keep it. The paper stacks become unmanageable, and don't keep them anymore.
Q Right. Now, was there a point at which in 1998 you shared this abstract, or whatever it was that you had generated in writing prior to the abstract, with St. Jude?
A I shared both with St. Jude.



Q All right.
A I showed them a tabulated record of the eight valves that I took to St. Jude and showed them, and at the same time had the abstract that I had prepared with me.
Q All right. So when was it that you initially gave St. Jude the eight valve recounting or list or description that you just alluded to?
A The difficulty is still of dates. I think, like for whatever reason, that it was November, but it definitely was January. The abstract, I didn't give it to them at that time.
Q Did they get an abstract in 1998?
A It depends on whether or not there was a meeting in '98 or not.
Q All right.
A Certainly in '99, January, they more than likely saw it.
Q All right. Did they have an abstract from you prior to any meeting in January of 1999?
A I'm not sure. I can't remember.
Q And the listing that you've alluded to, that's something you've produced, fair? Is that something you still have?
A Yes. It's in the records that you have.

Page 62

Q Right. Okay. Is there a difference between overgrowth and ingrowth?
A I'm not sure quite what you mean. Ingrowth is a sort of thing when you -- I'm sorry. I do realize what you're talking about now. Yes, there is.
Q What is the difference?
A Overgrowth means it's too much growth. And if I were to extrapolate, trying to think of what you mean, I would say that tissue that grows onto the sewing cuff of the valve is called the tissue overgrowth, but in some instances there's no growth at all, and so presumably then you could say, well, whatever happens is overgrowth. Ingrowth is when -- the fabric is not a sheet of plastic. It's made of threads. Ingrowth is when tissue grows in between the threads.
Q Could you have overgrowth on a heart valve and no ingrowth?
A I wouldn't have thought it likely, but I now know you can.
Q How do you now know that?
A I've looked at enough valves -- let me back up. In the past we seldom took a section of the sewing cuff. Just wasn't necessary. Since the St. Jude valve problem started, I did start taking sections of that.
Q When you say the St. Jude problem, you mean the

Page 63

Silzone problem?
A That's right.
Q And why were you taking sections from the sewing cuff of the St. Jude Silzone valve, unlike what you used to do in the past?
A Because there was far too much tissue growing on the sewing cuff in some of the valves.
Q All right. And did you ever encounter situations where you had little or no ingrowth into the sewing cuff, and still you had considerable amount of overgrowth of tissue?
A Yes, sir.
Q There would be situations where you would identify an overgrown or excessive pannus, for example, and you had lack of endothelial development or ingrowth on the -- in or on the sewing cuff?
A Let's leave endothelium out of it.
Q Okay.
A The endothelium doesn't grow in. If it does, it's a very protective thing, and it's extremely good for the patient. The pannus itself is primarily tissue that is derived from cells that we'd call myofibroblasts, cells that have the features of smooth muscle, and of fibroblasts. They mature and become fibroblasts and lay down collagen. So those are the

Page 64

cells you would see. You're -- I'm sorry. Would you repeat the question?
Q My question was simply, could you have excessive pannus, or pannus overgrowth --
A Yep.
Q -- and still have a lack of tissue ingrowth?
A I -- the straight answer is, yes. The longer answer is, I didn't think it was possible, but I know now that it is.
Q When you say you know now that it is, you saw that very phenomenon with the Silzone valve?
A I've seen it with the Silzone, but I've also seen it with other valves which have been in for many years longer than that.
Q What is the first time that you can recall that you noticed the concurrence of pannus overgrowth with little or no tissue ingrowth with the Silzone valve?
A Late in '98.
Q All right. Did you report that particular observation to St. Jude in your context with them in 1998?
A I'm not sure.
Q All right.
A We talked about the excessive growth for sure.
Q The pannus?

Page 65

A Yeah. When -- this was later. When Dr. Titus came down and we looked at some of the slides, I'm sure we must have talked about it, but I cannot recall for sure.
Q At what point are you reasonably certain, as you sit here today, that you did inform St. Jude that you had noticed a lack of tissue ingrowth often accompanied by excessive pannus in explanted Silzone valves?
A Really can't remember. Must have -- we must have talked about it at some time since we discussed what was happening, why the valves looked the way they did.
Q And the lack of tissue ingrowth, did that become a recurrent finding for you when you looked at explanted Silzone valves?
A Yes. As I said, you can see the same thing in valves that have been in for many years. So many have.
Q Did you feel, based on your experience, that that phenomenon appeared to occur far more frequently with the Silzone valve?
MR. KOHN: Objection. Form, lack of foundation.
THE WITNESS: It's a little difficult to say, since we hadn't been looking at the sewing cuff from

other valves till then.
MR. SIGELMAN: Q All right. How about since that time?
A We occasionally look at them, and yes, there seems to be less ingrowth, but what has to --
Q With the Silzone valve?
A Yes. But I have to moderate that statement, or at least add that we haven't been looking at -- sorry. We don't get enough other valves explanted in that same time frame to be absolutely certain that that's what happens.
Q Now, as a pathologist, what characteristics do you look for to see histologically whether there's good tissue ingrowth?
A You look for the presence of fibroblasts and collagen between the threads of the PET, which is used to make the sewing cuff.
Q You look for a fibrosotic reaction into the interstices of the --
A Fabric.
Q -- Dacron polyester fabric of the sewing cuff?
A That is correct.
Q And is increased surface area of the sewing cuff an important thing to facilitate tissue ingrowth?
A Not sure. If you want me to expand on that,



increasing the surface area often is good. The fibroblasts have to grow for a much longer distance. The harm they can do, therefore, will either occur much later or not occur, because the -- to put it crudely, the fibroblasts seem to run out of steam after a while.
Q What is endothelialization?
A The growth of endothelium onto a surface or a tissue.
Q Is the growth of endothelium a normal process for implanted medical devices?
A It depends on the device.
Q For a heart valve.
A On heart valves, no. You seldom see it. It's at least seldom been reported.
Q What factors can alter normal endothelialization?
MR. KOHN: Objection. Vague.
THE WITNESS: I guess the type of material that you're asking the endothelial cells to grow on. The endothelial cells, I believe, need a scaffold to grow on. They won't grow on a piece of paper or a piece of Dacron. They need something else to be there first before they can grow on it.
MR. SIGELMAN: Q And how do platelets interact with endothelial surfaces?



A If you have a normal, intact, endothelial surface, platelets are very friendly to the surface and they don't interact, which is what you want. On the other hand, if the endothelial cells are dysfunctional or if there are no endothelial cells, then you have the layer that comes under the endothelial cells, the basement membrane, being exposed. Platelets will be seriously attracted to them and will come and stick to them and keep on sticking to them.
Q Could that lead to clotting disturbances?
A It could lead to thrombus formation, yes.
Q What is a thrombus?
A A thrombus is a mass of elements from the flowing blood.
Q And what does it consist of?
A Consists of varying degrees of mixes, of platelets, fibrin, red blood cells, white blood cells.
Q And how can a valve be associated with the production of thrombus?
A A mechanical valve is a -- is a foreign material and has rough surfaces and smooth surfaces. The manufacturer tries to make the surfaces as smooth as possible so that platelets will not stick. If a person is adequately anticoagulated, by and large this should not happen. He should not form thrombus on that



surface. Have I answered the question?
Q And did you find that the endothelial tissue on some of the St. Jude Silzone valves was not as smooth as you had seen with other explanted heart valves?
A No. I'd like to suggest again that we leave the endothelial cells out and stick with pannus, because most of these surfaces don't have endothelial cells. They may have the periphery where they meet the heart's endocardium on the atrial side or the ventricular side, but by and large the rest of the surface often doesn't have endothelial cells.
Q Even the pannus doesn't have --
A Even the pannus.
Q -- endothelial cells?
A Initially -- initially, at least, it doesn't.
Q But once you have collagen development, will you get endothelial cells on the pannus?
A You should.
Q And a normal pannus would have a smooth endothelial surface, would it not?
A By and large, I think you're right.
Q That would be blood contacting surface, correct?
A That's correct.
Q Okay. And if you don't have a smooth

endothelial surface on a well-formed, well-developed collagen-rich --
A Yep.
Q -- pannus, can that create a situs for thrombus formation?
A Technically, yes.
Q Okay.
A But one has to keep in mind that usual collagen is much less thrombogenic than the collagen of the -- of the tissue of the basement membrane, which is the layer under the endothelial cells.
Q In your experience, did you find often that you didn't get smooth, full development of endothelial tissue on mature pannuses?
A Sorry.
MR. KOHN: Objection. Form.
MR. SIGELMAN: Q With Silzone valves.
A I haven't seen enough mature coll -- mature pannus yet, so I really couldn't answer the question. The other thing is, it's difficult to do immunohistochemistry on these materials, especially when they have synthetic fabrics in them. So I haven't been able to demonstrate it yet.
Q And with respect to thrombus formation, can excessive thrombus formation pose any clinical risk for



a patient?
A I'm not a clinician, but on a morphologic basis, finding thrombus there certainly is a potential if not an absolutely real harmful situation for the patient.
Q How so?
A Thrombuses are friable.
Q Thrombuses --
A Fragile.
Q What's "friable" mean?
A It can break easily.
Q Peel off rather easily?
A It can peel off, or even the pressure of flowing blood can make it disintegrate, break up into pieces and dislodge and go and lodge somewhere else. Depending where it goes and lodges, it causes the next stage of damage.
Q Those pieces are called emboli?
A Emboli. Thromboemboli.
Q They, for example, could lodge in a blood vessel in the heart, correct?
A Certainly.
Q And there could be situations, would you agree, that they could cause a myocardial infarction? Correct?
A Certainly.



Q They could cut off blood supply to a critical area of the heart?
A Absolutely.
Q And could they lodge, for example, in the brain?
A Sure.
Q What could happen if that occurs?
A Cause an infarct of the brain, otherwise called a stroke.
Q And when you have these dislodging pieces of tissue, these emboli, causing those kinds of clots or obstructions and those kinds of problems, is one term for them, collectively, thromboembolic events?
A Yes.
Q All right. So if we talk about thromboembolic events today, we'll be talking about that phenomenon?
A Yes, sir.
Q And can thrombus formation, if it gets out of hand, interfere with the normal functioning and mechanisms of the heart valve itself, such as the leaflets?
A Yes.
Q And what can it do in that regard?
A Depends on where the thrombus forms. If the thrombus forms at the hinge areas, it will slowly



restrict movement of the leaflets. Leaflets move this way. At the hinge they have a little flange which sticks into the valve ring, and thrombus forms there. You can imagine that it would slowly and gradually prevent full opening and full closure. So depending on its size, the limitation of movement would be progressive.
Q It's my understanding that when you have good endothelial development on, say, a pannus, that eventually that provides a thrombo-resistant surface; is that right?
A You're right, yes.
Q In other words, it prevents or resists the formation of thrombus.
A Yes, sir.
Q And did you find, when you explanted Silzone valves, that often the pannus largely appeared to consist of thrombus-like material?
A May I fix my --
Q Surely.
A No. There's almost invariably a combination of the two.
Q Okay.
A You have pannus, usually excessive amounts of it, and thrombus associated with it.