Q Did you ever find the pannus -- especially when you had an excessive or pannus overgrowth situation with the Silzone valve, did you ever find that being rather friable, as you put it a little while ago?
A Well, I was referring to -- using the word "friable" for the thrombus --
Q Okay.
A -- rather than for the pannus.
What I did find with the pannus was, it was -- again, it may be a function of the time period since implant, but the pannus seemed softer than usual. But as I said earlier, we've seldom if ever seen valves explanted in that early window, and we've seldom seen pannus at that stage.
Q Did you entertain the possibility that a lack of tissue ingrowth in the sewing cuff of the Silzone valve was related in some way to the growth of excessive thrombus?
A No.
Q How about with regard to the pannus?
A Yes.
Q Was there any relationship between the lack of tissue ingrowth and the excessive pannus that you identified?
A Not sure I understood your question.



Q Did you see any physiological connection between the lack of tissue ingrowth and what you have repeatedly identified in your explant examinations of Silzone valves as pannus overgrowth?
MR. KOHN: Objection. Form, calls for speculation.
THE WITNESS: I'm still not sure I understand the question. Not trying to be difficult.
MR. SIGELMAN: Sure, I understand.
THE WITNESS: Just not sure what you're asking me.
MR. SIGELMAN: Q What do you think caused the pannus overgrowth?
MR. KOHN: Objection. Form.
THE WITNESS: I wish I knew.
MR. SIGELMAN: Q You don't have any idea?
A No.
Q And I'm not talking about a cellular level. I'm just talking about it at a physiological level.
A No idea whatsoever.
Q Now, did you see, in every explant case that you looked at, excessive tissue growth on the sewing cuff?
A No.
Q But you often saw tissue that peeled off



easily, correct?
A Yes, sir.
Q And to what did you attribute that?
A I presumed that this was, one, because the tissue was very young, hadn't been there for very long, hadn't grown into the interstices, hadn't matured, hadn't had much collagen; hence peeled off very easily.
Q And did you frequently see thrombus formation associated with implants?
MR. KOHN: Objection. Form.
MR. SIGELMAN: Excuse me. Let me strike the question.
Q Did you often see -- let me strike that.
Did you repeatedly see thrombus formation associated with explanted Silzone valves?
MR. KOHN: Objection. Form.
THE WITNESS: I saw it often enough, yes.
MR. SIGELMAN: Q Did you ever see thrombus formation associated with Silzone explanted valves that you regarded as causing a thromboembolic event?
MR. KOHN: Objection. Form, calls for --
THE WITNESS: Yes.
MR. KOHN: -- speculation.
MR. SIGELMAN: Q Okay. And what kinds of thromboembolic events did you conclude such thrombus



formation had caused?
MR. KOHN: Objection. Form.
THE WITNESS: I didn't need to conclude, primarily because the pathologist who had done the autopsy told me in writing that this patient had ischemic events or thrombo -- or TIA's or something of that sort.
MR. SIGELMAN: Q So sometimes they had strokes or mini strokes --
A Yes.
Q -- as we'd say?
Was there anyone who had a heart attack or myocardial infarction that you regarded as caused by thrombus formation on a Silzone valve which you examined after it was explanted?
A Not that I can recall, no.
Q How about pulmonary embolism?
A Not that I'm aware of. Pulmonary emboli would usually have come from the right side of the heart, from the right side of the circulation. So from a mitral or aortic valve it's highly unlikely that you'd get a pulmonary embolus.
Q Did anyone, in your mind -- let me strike that.
Did you ever conclude that anyone died as a consequence of thrombus formation from a Silzone valve?

Page 78

A Think I did.
Q Pardon me?
A I think I did.
Q And could this lack of tissue ingrowth phenomenon that we were talking about earlier lead to paravalvular leak?
MR. KOHN: Objection. Form.
THE WITNESS: Quite the opposite. If you had a paravalvular leak, you may not get pannus. There is no continuity between the tissue and the fabric.
MR. SIGELMAN: Q Okay. I'm not talking right now about the pannus. We were talking about the ingrowth into the sewing cuff.
A Okay.
Q Could that have a causal role in paravalvular leak?
A I suppose it could.
Q You did experience patients who, upon explant of their valve, you learned, had had paravalvular leak?
A Yes, sir.
Q And to what did you attribute the cause of the paravalvular leak?
MR. KOHN: Objection. Overbroad.
THE WITNESS: I couldn't ascribe a reason, at least no straight morphologic correlate.

Page 79

MR. SIGELMAN: Q Did any of those patients have little or no tissue ingrowth in their sewing cuff?
A The really early explants had very little tissue on the sewing cuff itself, and therefore, very little ingrowth.
Q All right. And these were cases involved with paravalvular leaks, correct?
A Yes, sir.
Q And what is a paravalvular leak?
A A leak occurring around the periphery of a prosthetic heart valve is a paravalvular or perivalvular leak.
Q What is dehiscence?
A Dehiscence is when the stitches that a surgeon put in open up.
Q Could lack of tissue ingrowth lead to dehiscence?
A Probably not. Considering that in the initial stages in every prosthetic heart valve, for several weeks, if not months, there's virtually no ingrowth, but those things do not dehisce.
Q Did you observe dehiscence in association with use of the Silzone valve?
A Yes, sir.
Q And to what did you attribute that?

Page 80

A I had to speculate, because there was really no way of being sure what had happened, but in most of those cases the surgeon told me that there was what looked like an abscess around the valve, and the stitches were sitting away from the myocardial tissues.
Q Normally when you have a well-functioning heart valve, how long should a mechanical heart valve last?
A Theoretically I believe it's supposed to last the same as a aircraft, 99 years. It's supposed to have a bathtub type of curve.
Q Do you still have possession of any of the valves that you examined upon explant?
A Yes, sir.
Q How many do you have?
A Over 20.
Q Did you keep the explanted Silzone valves from Toronto General Hospital?
A Yes, sir.
Q Why did you keep them?
A I've kept almost all of the valves that I've ever seen in my career, unless I've -- they were tissue valves and I've taken them apart, but most mechanical valves, we don't take any section. We keep them.
Q We talked earlier about your meeting with St. Jude. You think you recall a meeting, for example,

Page 81

in 1998. Whenever that first meeting was, was it your suggestion or theirs that you go to Minneapolis to meet with them?
A It's my recollection that it was my suggestion.
Q And why did you want to go to Minneapolis? Especially in November.
A January is actually worse than that.
MR. CAPRETZ: Worse in Toronto.
THE WITNESS: Yeah, worse in Toronto.
I was getting a little frustrated seeing the valves come out, unable to explain what was happening.
MR. SIGELMAN: Q Did you ever approach any regulatory authorities about your observations and concerns?
A I did try to call the Canadian authorities. I couldn't get through to them. After three tries, I abandoned it. But the thing is, it's usually the surgeon who's supposed to inform them. They are the ones who take the valve out. They are the ones who get my report. And they're the valve clinic, which should be doing the same thing.
Q Whom did you try to contact with the Canadian regulatory authority?
A I called the Health Protection Branch in Toronto and got nowhere.

Page 82

Q Did you ever have conversations at any time with anyone from the Health Protection Branch?
A Yes, sir, I did.
Q Concerning Silzone.
A Yeah. It was considerably later. I think it was --
Q When was your first contact?
A I think it was spring of '99, and then again in fall of '99.
Q And you had done pathology reports. Would you expect your pathology reports on explanted cases that go to St. Jude to be included in their investigative file on the case?
A I honestly don't know.
Q Okay. Do you think that those reports are important information that should be reviewed by those who have a concern in reviewing those reports?
A They should at least be informed about it, and I tried my best to do that.
Q Do you think regulatory authorities should be informed about what you found with respect to your pathology observations when they look at an explant case that was submitted to them by St. Jude?
MR. KOHN: Objection. Form.
THE WITNESS: I'm sorry?

Page 83

MR. SIGELMAN: Q Do you think that what you produced --
A Yep.
Q -- in pathology reports is important information for regulatory authorities to have on a case?
A Yes.
Q Now, what I think I'm going to do, just because I think it will be more efficient, is to hand you what I got a couple days ago from counsel, which are documents that you got together for this, and we'll just mark it as one big exhibit, and that way we won't have to subdivide it all the time, and we can just refer to pages.
Do you have it around here for yourself so --
MR. KOHN: There's an extra copy there.
MR. SIGELMAN: Yeah, because I just couldn't bring an extra copy. It was too --
THE WITNESS: Can we take a break, pit stop, just now?
MR. SIGELMAN: Sure. Remember what I told you.
THE WITNESS: Yeah.
MR. SIGELMAN: This is not the Spanish Inquisition.
THE WITNESS: All right.

Page 84

MR. SIGELMAN: So we can stop.
THE VIDEOGRAPHER: This marks the end of videotape 1 in the deposition of Dr. Jagdish Butany. The time is 10:10 a.m. We are off the record.
(Recess taken.)
(Whereupon, Deposition Exhibits 4 and 5, respectively, were marked for identification.)
THE VIDEOGRAPHER: This marks the beginning of videotape No. 2 in the deposition of Dr. Jagdish Butany. The time is 10:22 a.m. We are back on the record.
MR. SIGELMAN: Q Dr. Butany, a couple of housekeeping matters. First of all, you now have made available to us your curriculum vitae, which I understand is dated March 2002, and it's been marked as Exhibit No. 5. Is this the most recent CV that you have?
A Yes, sir.
Q And this appears to be your current CV, true --
A Yeah.
Q -- and accurate copy?
All right. And also I want to say that we discussed this before we began the deposition, but I just want it on the record. You are going to provide to us the actual photographs of the explanted valves for which we had received Xerox copies of photographs; is

Page 85

that correct?
A I will, sir.
Q All right. Thank you very much.
Now, if you could get out that big group of documents which we've marked as Exhibit No. 4 --
A Can I stop for a minute and say something?
Q Sure.
A You asked me a lot of questions about pannus.
Q Right.
A And I've tried to give you absolutely straight answers.
Q Sure.
A But I think what you may have been leading to is not what you said, and I'm going -- am I allowed to try and say what I think you wanted to ask me?
Q Well, you can. I mean, as I said at the beginning --
A The only thing it will do is cut things a little shorter.
Q Well, let me -- as I said to you at the beginning of the deposition, if something's unclear to you because I unartfully phrased it or because of my naivete as an attorney, you're perfectly free to ask me to rephrase the question, and I will certainly do so, and if you think I meant something other than perhaps it

Page 86

came out of my mouth, perhaps you could just say, "Well, is this what you meant," and if it's not what I meant, I will tell you, and if it is what I meant, sounds fine to me, then we could go forward. Okay?
A Okay. I did do that repeatedly, and it still wasn't the sort of question that I could --
Q Sure. Whatever you think you need to say --
A My --
Q -- in response to questions --
A -- aim is to try and save my time and yours.
Q No, I understand.
A You asked me the role of pannus and thrombus.
Q Right.
A And we said excess pannus and all sorts of things.
Q Right.
A Let me take it take a little further. When you get excess pannus, if you get excess pannus enough -- and the other part of the reason for saying this is, when you look at the photographs and look at the reports, what I'm saying now will come out of those later on in the day for sure. So when you have pannus growing excessively or exuberantly and growing enough that it overhangs the orifice of the valve, you're now creating an area where there's very little blood flow.

Page 87

Blood stagnates, and thrombus can and does form in those areas. This creates the perfect nidus for thrombus to start forming. Once you start forming thrombus, it's only going to grow. It will seldom go away. Yes, it could stop growing, but here it's sitting in an area where there's no living cells near it, and it's not going to organize very easily, so it will keep growing.
Q All right.
A I presumed that this is what you were getting at.
Q Right.
A If it wasn't, you would have come to it, and I've tried to short-circuit that and give you the answer now.
Q No, that's what I was talking about. And by the way, when this thrombus keeps growing, or the pannus keeps growing, that can be become a nidus for infection, can't it?
A It could.
Q So that you could perhaps have more endocarditis, not less?
A Certainly.
Q All right.
A In a theoretical manner, absolutely.
Q With a Silzone valve.

Page 88

A With any valve.
Q All right. And did you ever see any data that suggested that the Silzone valve in fact is associated with a higher incidence of endocarditis?
A Yes, sir.
Q And we're talking here about infective endocarditis, correct?
A The answer --
Q That was what I meant in my question.
A I'm sorry.
Q I will get to the other --
A That answer's a little more difficult.
Q No, I understand, but I'm now just talking about infective endocarditis; that is, bacteria-induced endocarditis. Have you seen data that would support the proposition that the Silzone valve increases the incidence of infective endocarditis?
A I think the world trial showed a slight increase. Mostly what's happened is, there is a significant -- or there is an increase in the clinical diagnosis of infective endocarditis, but by and large you're not able to grow any bugs in those patients.
Q Right, right.
A So technically it's not an infective endocarditis.

Page 89

Q It's a sterile endocarditis?
A It's a sterile endocarditis.
Q Or a pseudo endocarditis, correct?
A Sure.
Q It looks like endocarditis in terms of its inflammatory pattern --
A Yeah.
Q -- but once you look through the bacteria, through culturing, you can't find evidence of infection.
A Yeah.
Q And that was something that was peculiarly associated frequently in your mind with this valve, fair?
MR. KOHN: Objection. Form.
MR. SIGELMAN: Q Is that fair to say?
MR. KOHN: Objection. Form.
THE WITNESS: The -- no, you can get a sterile endocarditis with any valve.
MR. SIGELMAN: Q Did you feel you'd seen it more with the Silzone valve?
MR. KOHN: Objection. Form, no foundation.
THE WITNESS: Yes, sir.
MR. SIGELMAN: Q All right. Now, looking at Exhibit No. 4, does this appear to you -- let you look at it, and I'm not asking you to go through every page,

but does this appear to you to be the group of documents that you made available to us from your files in the last couple of days? Just generally.
A Yes, it does.
Q And if you would turn -- we're going to use the Bates numbers that counsel was good enough to put on this -- to pages 0006 through 8. Is this the -- do these pages, at least part of these pages, contain the listing of the cases that you initially saw of explants with the Silzone valve back in 1998?
A Yes, sir.
Q Was this document -- for example, 0006 -- generated by you in 1998?
A Yes, sir.
Q That's Sheet A, correct?
A Yes, sir.
Q And you saw a case of dehiscence rocking, correct?
A Yes, sir.
Q And a case of paravalvular leak?
A Yes, sir.
Q And another case where there was a major disability, but there was nothing seen on the echo that's recorded, at least, correct?
A Yes, sir.



Q And then a case of dehiscence paravalvular leak?
A Yes, sir.
Q The next case, is that right?
A Yes, sir.
Q And the fifth case was dehiscence rocking?
A Yes, sir.
Q Correct?
The next one was dehiscence rocking?
A Yes, sir.
MR. KOHN: I think you're -- are you on the next page, Counsel?
MR. SIGELMAN: No. I'm still on the very bottom of this page.
MR. KOHN: Okay.
MR. SIGELMAN: Q And what's the last entry that's written? Because it's cut off a little bit.
A Mass on valve ring, dash, thrombus.
Q Okay. So a thrombus case. And what's the third page that we're looking at here, 0008? Can you just tell me what that's all about. That recounts eight cases?
A Yes, sir.
Q So there's one more case, correct, than we looked at at 0006?



A They're actually the same eight cases, and in this one I've listed one other valve under 6.
Q All right.
A I think what I -- the other one that I listed is the native valve that must have been explant -- removed when the prosthetic valve was put in.
Q All right. And by the time you met with St. Jude in 1999, the first time, had you still had just eight cases?
A I think it was eight cases, yes.
Q All right. Now, if you could turn, Dr. Butany, to page 0024. We're still in Exhibit No. 4. Can you tell me what this sheet is? 24.
A 24 is a fax cover sheet.
Q And to Dr. Roy Hosek, correct?
A I listed Mr. Roy Hosek, but yes.
Q And he's with St. Jude?
A Yes, sir.
Q And am I correct, when I look at this, in assuming that this was faxed to him on January 20th of 1999?
A Yes, sir.
Q And were you providing him a draft of an abstract that you had done?
A Yes, sir. Yes, sir, I was.



Q All right. And you also indicated that you're going to fax D-2 --
Is that draft two?
A Yes, sir.
Q -- if ready, before noon tomorrow.
A Yeah.
Q Did you do that?
A I don't think so.
Q So there was just draft No. 1?
A Yeah.
Q Now, if you would turn to the previous page, which is 00023, is that draft one that you sent to Mr. Hosek in January of 1999?
A I think so, yes.
Q All right. Were you -- why were you sending this to him?
A I think you have to remember that I'm one -- I was a lone voice saying that there was something wrong with this valve. I could not afford to not be sure of what I was saying. I had decided that I would keep St. Jude informed about everything that I saw or heard or did with this valve, and I did.
Q Why did you decide that?
A They knew -- I presume they knew things that I didn't, and I had very little knowledge about the

Page 94

Silzone valve before I first spoke to our surgeon, and even subsequently, in the first few weeks and months, I knew relatively little about it.
Q St. Jude was the manufacturer of the valve, correct?
A Yes, sir.
Q They sold the valve, correct?
A Yes, sir.
Q Do you know whether they sold it at a premium price?
A I -- oh, sorry. In the documents there is some mention of that. I believe that in Ontario there was no premium price.
Q Did you view St. Jude, at the time that you were sending this information, as a disinterested observer?
A No, sir.
Q Did you regard them as having a commercial interest in this valve?
A Of course.
Q Were you intending to send this abstract for publication?
A Yes, sir.
Q Where were you going to submit it?
A This was to a meeting on valve disease to be

Page 95

held in London in June of '99.
Q All right. And was there a publication in which you wanted this abstract to appear?
A I would have loved to have that happen, but I think it only came out in the conference proceedings.
Q And were you planning to write a manuscript based on this abstract?
A I was.
Q And at the time had you entertained where you wanted to send that manuscript for publication?
A Not really, because we didn't get around to it.
Q And did you ultimately send this abstract or a subsequent revision of it?
A Yes, sir, I did.
Q To -- for publication somewhere?
A Yes, sir.
Q And when did you do that?
A I think it was in January. Again, the time length -- unfortunately, I thought it was November. I presume it is January.
Q Okay. But in January of 1999 you would have sent an abstract that reflects the data that you're discussing, at least in part, at page 000 -- excuse me -- 0023 --
A Yes, sir.

Page 96

Q -- to be published?
A Yes, sir.
Q Had you sent it to anyone other than St. Jude before you submitted it for publication?
A No, sir. Other than my colleagues who are listed, no, nobody else.
Q No one else saw this?
A No, sir.
Q Now, on January 20th of 1999 when you sent it to Mr. Hosek, were you scheduled to be in Minneapolis very soon?
A Yes, sir, I was.
Q Were you scheduled to be there the very next day?
A It was either the next day or very soon after that.
Q All right. And as I understand it, from your previous testimony, page 0023 was actually written by you in November of 1998?
A That's my recollection, but I can't seem to find anything that would substantiate that.
Q Did any of your co-authors on this abstract assist in any way in either collecting data for it or writing the abstract --
A Sure.

Page 97

Q -- or analyzing data?
A Sure.
Q Okay. And who was involved in the actual drafting of the manuscript other than yourself?
A The second author, the third author.
Q Can you say the names?
A Dr. Al-Radi, Dr. Leask. Sorry. At that time he was Mr. Lease. And Mr. -- Dr. DeSesa.
Q Dr. Scully?
A Dr. Scully and Dr. David reviewed the abstract. They weren't involved in the actual tabulate -- collecting of data or writing of the abstract.
Q Is it "Dr." or "Mr." Al-Radi?
A Doctor.
Q And is he the Saudi Arabian gentlemen --
A Yes, he is.
Q -- to whom you referred?
Now, in this abstract, can you read what you've written in your hand down near the bottom of the page where it starts out "the SJM-S"? That stands for the Silzone valve, doesn't it?
A Yes, sir.
Q St. Jude Medical, slash, Silzone?
Can you read out loud what you've written?
A Sure. "Early in its usage, the SJM-S appears

to have a somewhat higher incidence of IE/PV leak."
Q Okay. What did IE stand for there?
A Infective endocarditis.
Q And PV leak?
A Paravalvular or perivalvular leak.
Q What did you mean when you wrote that in hand?
A The conclusions up to then did not reflect this, which was one of the findings in the table above that, and I wanted to add that in the conclusions.
Q All right. Now, if you will look at Exhibit No. 4 -- I may violate a principle that I started out telling you, and that is that I may have you pull some records out of that and make it a separate exhibit.
It seems to me, and please correct me if I'm wrong, that pages 3 through 4 --
I'm going to leave out all the zeros.
A Okay.
Q -- 5, 21 and 22, 23 and 26, those pages all involve various versions of the abstract for this particular submission to publication; am I correct?
And if there are any others, please correct me with respect to this particular enterprise.
A I think you're right.
Q Okay. So if you would be kind enough to pull out pages 3 and 4, 5, 21 and 22, 23 and 26. And I'm



going to ask you now to do something once you do that, which is -- because I was confused by it in the terms of the order in which I got these documents and they were Bates stamped. It seemed to me that one -- maybe the very first draft that we looked at, which was page 23, was really toward the end of that sequence. They're out of order. So I'm going to ask you to put them, to the best of your knowledge and recollection, in chronological order, first draft through the last draft, and once you do that, we will mark that as an exhibit.
A Okay. I think I --
Q Okay. If you would tell me the sequence -- let me get my pen so that I can record this. Just hand it to the court reporter, and she'll staple it or clip it and make it an exhibit for us.
Are you confident, reasonably confident, as you sit here, of the chronological order of those abstracts?
A No, but --
Q Okay. You can qualify to the extent that you need as -- once we clip it.
A I'm reasonably but not absolutely.
Q Okay.
(Whereupon, Deposition Exhibit 6 was marked for identification.)
MR. SIGELMAN: If the court reporter would hand



that to me.
Okay, great.
MR. KOHN: Would you mind ticking off the pages so we're sure we're in the same order?
MR. SIGELMAN: Sure. Page 3, 4, and it's hard -- I can't tell --
THE WITNESS: The number's on the side.
MR. SIGELMAN: 5. And I can't see this one. I can't find your Bates page for this one. This is probably 23, and 26.
Q Now, I thought we discussed before that page 23 was actually draft No. 1 that you sent to Mr. Hosek; isn't that correct?
A I don't think that it -- let me try and -- because that's the one we sent to him. That's not necessarily --
Q Okay. Are you saying that that's not the first one?
A I don't think so.
Q Okay. Great.
A I think --
Q So they are in sequential order, then?
A I think they are. Well, the first one always is the longest possible draft. You put almost everything in, and then you try to fit into the



guidelines of the meeting that you're sending it to, and you have to trim it and trim it and trim it.
Q All right. And with respect to page 4, which is a different format from all of the other pages --
A Yeah.
Q That was generated around the time that you did the very first draft?
A I think so.
Q All right. So -- and that was some statistical analysis, correct?
A Yeah.
Q Who did that statistical analysis?
A My fellow.
Q Who is that?
A Richard Leask.
Q Okay. Is he a biostatistician?
A No. He's an engineer.
Q He has a statistical background?
A I believe so, yes.
Q Do you have a statistical background?
A No.
Q Now, in some of these drafts, like for example, draft number -- page 3, you say that a new finding is the role of tissue overgrowth or pannus in 30 percent HVP --

That's heart valve prosthesis, correct?
A Yeah.
Q -- significant enough to cause prothesis dysfunction and possibly promote thrombosis and infective endocarditis.
A Yeah.
Q Did I read that correctly?
A Yes.
Q And in that exhibit, you have a listing for Silzone that goes across on the table.
A Yes, sir.
Q And you have four cases of infective endocarditis for it, right?
A Yes.
Q And four cases of paravalvular leak?
A Yes, sir.
Q Seven cases of mild pannus, and two significant pannus, correct?
A Yes, sir.
Q One case of mild thrombus, and one of significant thrombus, correct?
A Yes, sir.
Q And right above that you have the St. Jude Medical standard, conventional valve, correct?
A Yes, sir.



Q And was there a denominator, a number of implants that was on this particular document that somehow has just gotten erased or -- not erased, but obscured in some way?
A No. We didn't have the figures at that time.
Q All right. And when you say a new finding, that was new for you, this --
A Yes.
Q -- overgrowth of pannus?
A Yes, sir.
Q You hadn't seen that before?
A I had seen that before, but with mechanical valves, and seldom if ever saw this much tissue overgrowth.
Q And was that particularly the case in your mind at the time you wrote this abstract with the Silzone valve?
A Yes, sir.
Q And you said it was significant enough to cause prosthesis dysfunction. What did you mean?
A Means that it's stopped the prosthesis from functioning normally.
Q All right. And possibly promote thrombosis and infective endocarditis, correct?
A Right.



Q And you're quite confident that this particular document was generated a considerable period of time, at least in terms of days or weeks, before you sent the abstract to Mr. Hosek that we saw?
A No, I'm not --
Q Not a hundred percent sure.
A It would have been before I sent it to him, because this is an earlier draft, I think.
Q And is it your recollection, at least to the best of your recollection, that you made available to Mr. Hosek or someone else at St. Jude Medical an earlier abstract prior to January 20th of 1999?
A I have the vague feeling that I did, and I've said this all morning, but I have no record of that.
Q All right. Now, going on to page 4, this is the statistical analysis of Mr. Leask, correct?
A I believe so, yes.
Q And that was done at your instruction or direction?
A Yes, sir.
Q You told him that you were interested in looking at whether there were any statistically observable trends comparing what you'd seen for the Silzone valve versus what might be the case for the St. Jude standard valve?



A Yeah. Yes, sir.
Q And did you actually write the language there that's used once you got the statistics done?
A I'm not sure which one of us wrote it, but we certainly would have read it together and rewritten it together.
Q Okay. And you'll agree with me that it starts off saying, "To evaluate the perceived disproportionate number of St. Jude Medical-Silver" --
A Mechanical heart valves.
Q -- "mechanical heart valves explanted between its introduction at the Toronto" -- I guess that's your hospital system there, right?
A Yeah. At that time it was called The Toronto Hospital.
Q Right. And the dates that were going to be analyzed was from July 1 of 1997 through roughly December 31 of 1998?
A Yes, sir.
Q And you wanted to look at two 1.5 year periods to use to compare the experience that had been recorded with the Silzone valve with the experience for the conventional St. Jude valve?
A Yes, sir.
Q So your historical control period would be two

Page 106

1.5 year periods for the St. Jude conventional valve, correct?
A Yes, sir.
Q You were going to use a historical control; is that right?
A Yes, sir.
Q And you said that the number of implants, explants that fell within the time period of June 1994 through December of 1995 and between January 1996 and July of 1997 were compared with the number of St. Jude Silzone explants using the two-tailed Fisher's exact test, correct?
A Yes, sir.
Q And a two-tailed Fisher's exact test is a statistical test that can be used for analyzing data, correct?
A Yes, sir.
Q And if you go down, you have a table that's reflecting those two time periods or intervals for the St. Jude conventional valve, correct?
A Yes, sir.
Q And then you have a column or a row that goes across for the St. Jude silver valve, correct?
A Yes.
Q And the experience period captured there is

Page 107

July 1997 through December of 1998, correct?
A Yes, sir.
Q And you had, for 241 Silzone valves, a total of 14 valves explanted during this period, correct?
A Can I just add that the number 241 was given to me by either our valve clinic or St. Jude. It really -- wasn't 241. 241 was -- ultimately turned out the number of valves that they actually gave to Toronto General Hospital but not the number implanted.
Q Okay.
A The number implanted was less.
Q 229, something like that?
A It was 176 that were actually implanted.
Q Okay. And there were a total of 14 valves that were explanted?
A Yeah.
Q Did that include double explants, or is that patients?
A It includes -- I think it includes valves and often the case that we saw at autopsy.
Q So did it include, to your recollection, double explants --
A Yes.
Q -- of both of the mitral and aortic valve?
A Yes, sir.

Page 108

Q And then you had a column for number of explanted during the period of more than one month being seven; is that correct?
A Yes, sir.
Q And then down below that, it says all explanted valves -- says the St. Jude Medical-Silver valve had significantly more explanted valves in its 1.5 year employment than the St. Jude Medical --
That was probably the conventional valve it's comparing there?
A Yes, sir.
Q -- for similar time periods; is that correct?
A Yes.
Q And you had a statistical "P" value for each of the two time periods that were used for the historical control for the conventional valve, correct?
A Yes, sir.
Q And one "P" value was "P" equals 0.181, correct?
A 0.0181.
Q Right. 0.0181.
A Yeah.
Q All right. And that's highly statistically significant, correct?
A It is statistically significant, yes.

Page 109

Q And what does it mean, just in lay terms, that you had a statistically significant result for that period?
A It means that this, the -- this could not have occurred by chance alone. That's my understanding.
Q When you say "this" could not have occurred, what is "this"?
A The number of SJM-Silver valves being explanted in this period as compared to the two 18-month periods that go before that.
Q All right.
A Couldn't just be a -- it's unlikely to be a chance occurrence. It is significant. Anything that's less than 0.05 is significant. If your "P" value is greater than that, then it's almost -- most likely a reflection of a couple of things. One, that the numbers you're dealing with are too small, or the numbers that you're comparing are inappropriate -- and I couldn't explain how they're inappropriate -- or that it may still be a chance occurrence.
Q All right. And then you had a "P" value for the second one-and-a-half-year interval of data applicable to the St. Jude conventional valve, correct?
A Yes, sir.
Q And your "P" value there was 0.0162.

Page 110

A Yes, sir.
Q Was that statistically significant?
A Yes, sir.
Q And what would that mean?
A The same as before.
Q When -- could you just explain that?
A That this is unlikely to be a chance occurrence.
Q All right. So for both of the 1.5 year periods where you were comparing the explant rate for the Silzone valve versus the St. Jude conventional valve, you had statistically significant results; that is, it was statistically significantly more frequent to have an explant of the St. Jude Silzone valve than an explant of the conventional valve without the silver coating, correct?
A Yes.
Q And as you recall, it may well have been that you generated this particular finding in 1998; is that correct?
A It may be, yes.
Q And at some point you shared this statistical finding with St. Jude; is that fair?
A I think so, yes.
Q All right.

Page 111

A Not sure -- I'm not sure, pardon me, --
Q You're not sure.
A -- that we actually gave this particular sheet, but we gave a version of the abstract to them.
Q Okay. Did you tell St. Jude that -- whether you gave them the sheet or not, either in late 1998 or very early 1999, that you'd done some statistical analysis which showed that indeed the rate of explants for the St. Jude Silzone valve was statistically significantly more frequent than the rate of explants for conventional St. Jude valves without the silver coating?
A I'm not sure I verbalized it.
Q You're not sure.
A No.
Q Why wouldn't you have told them that?
A The reason would be that I think I showed it to them in writing in the abstract.
Q Okay. So let me just get this straight. Either you showed it to them in writing or you told them, but one way or another you let them know that there was this statistical association?
A I believe so, yes.
Q I mean, you wanted to involve them --
A Absolutely.

Page 112

Q -- and keep them fully apprised.
And you didn't have any interest in not telling them, right?
A I agree.
Q Now, let's go forward to the next page, which is 0005. It's your recollection, Dr. Butany, that this came after the last abstract version we looked at?
A I think so.
Q All right.
A I'm not absolutely sure.
Q And when you worked on this abstract, were you still convinced that the data showed a problem with the Silzone valve relative to the St. Jude conventional valve?
A Yes.
Q So nothing that you did here in any way meant that you were not convinced in your own mind that there was a problem peculiar to the Silzone valve, at least in terms of statistical frequency?
A I'm not sure I -- I think I get the drift of your question, but I'm not absolutely sure --
Q I'd like to rephrase the question.
A I think that was it.
Q You made some changes --
A Yes, sir.

Page 113

Q -- with respect to the abstract, that are reflected in 0005, correct?
A Yeah.
Q But whatever those changes may be, you were still convinced that there was a particularly serious problem with the Silzone valve that was reflected in the statistical data.
MR. KOHN: Object to the form.
MR. SIGELMAN: Q Correct?
A Yes, sir.
Q All right. Now, would you agree with me that as you look at 0005, in the table of data for the entries for the Silzone valve, they've been crossed out?
A Yep.
Q Who crossed them out?
A Me.
Q Why?
A Trying to think back, almost three years, and -- okay, I think I know. We wanted to see how the paper would look if the two sets were added together, the St. Jude standard and the St. Jude Silzone.
Q Let me ask you this. Couldn't you have added those together and not crossed out the Silzone line? Couldn't you have had a separate line for the conventional valve and the Silzone valve and still kept

Page 114

the data that showed the particular problem, as you saw it, with the Silzone valve?
A I think there was something about the length of the paper and something that one of my co-authors said that the St. Jude should be lumped together.
Q When you talk about the length of the paper, are you saying that adding one line to a table of data would have made the abstract unacceptably long?
A Occasional adding one word can make it long. So it's possible that Dr. -- I'm just speculating. My second speculation was that -- I think it was one of my colleagues' suggestion, that the St. Jude standard and the St. Jude Silzone be lumped together.
Q You earlier testified you saw it as one of your obligations to protect patients, correct?
A Yeah.
Q And you felt quite strongly there was a problem with this Silzone valve, correct?
A Yes.
Q And you were going to provide an abstract talking about data that would at least include, either by explicit reference or implicitly, experience with the Silzone valve, right?
A Yeah.
Q And you had an opportunity with this abstract

Page 115

to inform the world about what your concerns were, correct?
A Yes, sir.
Q So when your colleague suggested that, did you say "Over my dead body"?
A No, sir, I didn't.
Q You didn't think it was important to tell the world what you had concluded and what your statistics had borne out, in your mind?
A I did think it was important. That's why in the footnote we said the SJM-Std includes 229 SJM Silzone valves.
Q What document are you looking at here?
A I'm sorry. I've gone on to the next one.
Q Okay, well --
A 026.
Q Okay. That's the final version, isn't it?
A Yes, sir.
Q That's the final version that got published, correct?
A Yeah.
Q Let's go to that, then, Doctor. That's the only mention of Silzone, isn't it, in that whole abstract?
A Yes, sir.

Page 116

Q And all that says, would you agree with me, is that you have 1,520 St. Jude valves, and of that 1,520 S. Jude valves, 229 are Silzone valves, correct?
A But it -- yes, it does say that.
Q Okay.
A But it also says the other things in that same row, that the incidence of infective endocarditis was more than the others, that the incidence of paravalvular leak was more than the other valves. And same thing, all down that line.
Q I'm not following you.
A If you follow that same line, SJM-Std --
Q Right.
A -- down, when we broke down our data --
Q Right.
A It's reflected under IE, PV, pannus and thrombus.
Q Right.
A In all of those lines, it's reflected that the St. Jude group of valves --
Q Right.
A -- functioned worse than the other valves.
Q The whole group?
A Yes, sir.
Q Okay. But you'll agree with me that there's

Page 117

something in this abstract that says to the reader that the group of valves that we call the Silzone valves performed worse than any of the valves, including the other St. Jude valves?
A You're right, in writing it doesn't.
Q All right. So those special concerns that you had that were unique to the St. Jude Silzone valve are no longer in the abstract, correct?
A They're there, but they're blended into the SJM standard valves.
Q You knew they were there --
A Yeah.
Q -- but the reader didn't know, did he?
A I agree. The reader would not --
Q Okay. And since you felt it was your obligation to inform patients and protect patients or -- let me rephrase that.
Since it was your obligation, you testified earlier, to protect patients --
A Yeah.
Q -- and since you felt very strongly that there was a particular problem with the Silzone valve, you didn't protect patients in this particular abstract, because you didn't tell anybody that there was a problem with the Silzone valve that didn't occur even with the

Page 118

other St. Jude valves.
A I guess you could put it that way, but the other way to put it, if that was not my intent, I wouldn't have written the abstract.
Q But let's go back, then. What was the last page that we looked at before this one? Was it page 5? You see, not only you crossed out the line in the table for the St. Jude valve, but you also crossed out the line in the explanatory section, did you not, that says "Early in its usage, the St. Jude Medical Silzone valve appears to have a somewhat higher incidence of infectious endocarditis, paravalvular leak"? Is that correct? You crossed that out. See that toward the bottom?
A Yeah.
Q So you didn't alert the reader to that line in your analysis, did you?
A Let me just read that again, please.
Q Sure.
A I'm not sure I struck it out.
Q Well, it doesn't appear in 26, does it? It's gone.
A It appears in a different way. It's a little more general. "We believe that the presence of significant pannus promotes thrombosis and in late cases

Page 119

promotes infective endocarditis. No one mode of failure seems peculiar to particular model of HVP," heart valve prosthesis.
Given that there are so many valves, when one looks at the numbers, on the face of it, it seems that there's a large number, but in reality, it may or may not be significant.
Q When you say it may or may not be significant, you'll agree with me that at page 26 and what you just read, the word "Silzone" doesn't appear, right?
A Yes, sir.
Q Okay. You agree?
A Yes, sir.
Q Okay. And you didn't tell --
A Other than the fact in the footnote, 229 SJM Silzone.
Q Well, that just tells you that there were some Silzone patients, correct?
A Yes, sir.
Q It says nothing about their experience compared to anybody else, right?
A Yeah.
Q So you'll agree with me that there's nothing in page 26 that captures what you had before that specifically said you had a bigger problem with Silzone

Page 120

for infectious endocarditis and paravalvular leak. That's just been totally removed from the abstract.
A It has been removed, yes.
Q All right. And when you said that maybe the numbers were too small and -- that's what you use statistics for, isn't it?
A Yes.
Q And statistical significance could take into consideration the fact that your sample size is too small, right?
A Yes.
Q And so if you say that something is statistically significant, it would have taken into account the sample size, right?
A Yes.
Q So the fact that it was statistically significant would indicate, would you agree with me, that the sample size was certainly sufficient to see whether it was attributable to chance or not, according to the science of statistics?
A Yes, I think you're right.
Q All right. So that's not really in issue, is it?
A The significance and the statistical significances were based on the smaller number of

Page 121

valves, on the two St. Jude Silver 241s. Once we added them together, the denominator was something that we initially didn't know about, and I think later on the same significance wasn't there, but I could be mistaken.
Q All right. You'll agree with me that what we saw at page 4, which was that statistics, that -- those statistics that we went through, none of that made it to the final manuscript, did it?
A True.
Q Yeah. For example, the reader of this manuscript wasn't told that you had found with your statistician that the Silzone valve had significantly more explanted valves in it's 1.5 year employment than the St. Jude conventional valve. They couldn't find that out from what you provided them, could they?
A No, sir.
Q All right.
A Not unless they asked me or I stood up and told them that.
Q And you still feel you were protecting patients?
A Definitely.
Q All right. Now, and St. Jude did see those earlier versions, at least one or more of them, didn't they, where you were talking about special problems or

Page 122

particular differences between the Silzone valve and the other valves, including the St. Jude conventional?
A Yeah.
Q Do you think they were pleased that you took out the references that were rather unflattering to the Silzone valve?
A I don't know what would be in their mind, but if I were them, I probably would be.
Q Why would you be if you were -- why did you say that?
A If I were the manufacturer of a valve and somebody didn't come out and say it, then I would be happier that way than if they did come out and say it, I suppose.
Q Did anyone at St. Jude at least suggest any changes in your abstract when you met with them?
A No, sir.
Q They never suggested that you take those kinds of references out?
A No, sir.
Q All right. Did you discuss your abstract when you went to Minneapolis on January 22 and -- 21 and 22?
A I don't believe we discussed it when I was there.
Q Okay.

Page 123

A What did happen was, I wasn't able to get in touch with Dr. David, who was the senior author and the one who probably had implanted more of those valves than anyone else, and I was going to Fed Ex it to him, but St. Jude agreed to have it taken over when one of their people was going to the same meeting that Dr. David was at.
Q All right. You'll see, by the way, that in Exhibit No. 4, at page 18, there's an e-mail to you from Dickey Franssen-Brader of St. Jude, correct?
A Sorry. Yes, sir.
Q Just for the record, it indicates, doesn't it, that they've arranged a car which will pick you up from the airport on January 21, 1999?
A Yep.
Q So that does establish, doesn't it, that you were to be in Minneapolis the day after you let Mr. Hosek have your abstract that we looked at?
A Yes, sir.
Q And I'm going to hand you what the court reporter will mark as -- what is it, No. 6? No. 7?
(Whereupon, Deposition Exhibit 7 was marked for identification.)
MR. SIGELMAN: Q Dr. Butany, you've been handed what the court reporter marked as Exhibit No. 7.

Page 124

Have you ever seen this document before?
A I think so.
Q And will you agree with me it's a tentative schedule for your visit to St. Jude on January 22, 1999?
A Yes, sir.
Q And that's in fact when you were there.
A Yes.
Q Correct?
A Yep.
Q So you sent them the abstract before you got there, and not a word was mentioned about the abstract in the day and a half or so that you were with St. Jude?
A Well, I said that I was still working on it, and we did, I think, change it, and then I had a version with me when I went there.
Q All right.
A As far as I can remember, we didn't discuss the abstract.
Q You don't think so. All right. Now, let's go on to the next exhibit, which the court reporter will mark as Exhibit No. 8.
A Where can I put this one?
Q Just put it down.
(Whereupon, Deposition Exhibit 8 was marked for identification.)

Page 125

MR. SIGELMAN: Q Let me hand it to you, and I will tell you that, for the record, it's a memorandum from Roy Hosek to a group of people at St. Jude, and he's, obviously, with St. Jude, and it's dated January 28, 1999.
By that time, you had left Minneapolis and you were probably back in Toronto, right?
A Yep.
Q You'd had your visit.
A Yep.
Q And the subject matter of his memorandum is Dr. Butany visit, correct?
A Yep.
Q And have you seen this before, this particular document?
A I hadn't till I got the binder --
Q All right.
A -- some days ago.
Q Did this refresh your recollection in any way that you may well have discussed your abstract when you were there?
A No, sir.
Q Well, the subject matter is your visit, right?
A Yep.
Q But you'll agree with me that when you actually

Page 126

look at the memorandum, it doesn't talk about your visit at all, does it?
A No.
Q So when they're talking about your visit, what they're really talking about is your abstract, aren't they?
A In this communication, I guess, yes.
Q Right. And Mr. Hosek starts out, "Good news from Dr. Butany."
Was it good news, Doctor? Did you send him some good news?
A I don't believe I did.
Q You don't believe you did.
A Well, in any case, I'm still reasonably certainly that we didn't discuss the abstract while I was there. But as I mentioned, I did send the abstract through their hands, and I think it was Al Flory, to Dr. David in an envelope that I had enclosed. They were going to meet with him the next day or on Saturday of that week, and I had sent it to Dr. David, asking for his opinion on the abstract since his name was on it as the senior author.
Q All right. But in any event -- let me ask you this. Have you ever sent St. Jude an abstract where you said something unflattering about the St. Jude valve,

Page 127

and they said they didn't like that, they wanted you to change it?
A No. They haven't ever said anything like that at all.
Q They never said it at all?
A My recollection is they've never said that to me.
Q Okay. That's fine. Now -- and the "good news from Dr. Butany" is the attached revised abstract, isn't it?
A Yep.
Q And if you look at the next page that's attached to this document, it's the abstract of the data that we've been talking about, correct?
A Yes, sir.
Q And this abstract is the same abstract as page 26, isn't it, that we've looked at?
A I think so.
Q Without the unflattering references to Silzone valve, correct?
A By and large.
Q Did you know that when you sent this abstract that it would be greeted, or was greeted, by St. Jude as good news from you?
A I didn't know that there was this document at

Page 128

that time.
Q All right. When you looked at it recently, did you realize that St. Jude said, "Wow, great news from Dr. Butany?"
A Yes, sir.
Q Did that disturb you at all? Was this great news from you?
A No, sir.
Q Was it bad news for patients getting the Silzone valve?
A It depends on how one looks at it. My intent was to make people aware, my colleagues and people aware, that this valve was not functioning well, and I think I did my best to try and do that. One, with my own colleagues, two, with the manufacturer, and then when I sent the abstract.
Q But you failed to do that in the abstract, didn't you?
A Well, the abstract could have been stronger, I agree.
Q Right. As you look back at this whole saga, do you regret that?
A Yes.
Q I mean, this valve came off the market in 2000, didn't it, because it was associated with too many

Page 129

explants, according to some data?
A Yeah.
Q And to your knowledge, prior to 2000, was there anything ever publicized in the world that was statistical data of any sort that said that the Silzone valve was associated with an excessive number of explants?
A Not with regard to explants, but with clinical events. I believe Dr. Buchart's work in Cardiff, England said more or less the same thing but not with regard to paravalvular leaks.
Q Does it disturb you that you never let the world know more than a year earlier that you had generated some of the same kinds of data?
A I think it depends on how you look at it. I felt I was doing the best I could, constantly communicating with the manufacturer, "Look, this is my concern. Is there anybody else in the world having the same trouble?" If I'm told, "No, you're the only one seeing them," I have to imagine that my surgeons should be the ones who should take notice and do something about it. And I gather they did.
Q Do you know whether the data that you generated that we looked at, for example, on page 0004, was ever shared by St. Jude with any regulatory authority

anywhere in the world?
A I don't know if they did or not.
Q Do you know if the Canadian government ever got that data?
A I don't think they did.
Q Do you know if the United States Food and Drug Administration ever got that data?
A Not to my knowledge.
Q Do you know whether the Medical Device Agency in London, England got that data?
A I believe they did, a little bit later.
Q A little bit later. Do you know whether surgeons, cardiothoracic surgeons, who are thinking about what kind of valves to implant in Canada got that data, other than your colleagues at Toronto?
A In -- at about in the first half of that year, some of them did.
Q All right.
A Even earlier than that, some of them did, yes.
Q Do you know whether cardiac -- cardiothoracic surgeons in Greenville, South Carolina who were implanting Silzone valves in my clients got that data?
A I can't remember if it was Greenville, but when I presented the data in London, there was a surgeon from the southern United States who came up to me and said,



"Look, I'm glad you brought this up. I've had a similar case," and that was it.
Q Okay.
A But the point -- the other point is, the surgeon himself didn't do anything further about it.
Q But the southern United States is a big area, right?
A I know. I agree. That's why I said I'm not sure if it was from --
Q And we're not talking about January of 1999, we're talking about June of 1999, one person who happened to be fortuitously in London to hear you, correct?
A No. There were a lot of people from the United States there and from other countries. This is one person who took the time to come and talk to me. At the same time there were any number of people who threw verbal rocks at me.
Q Who threw verbal rocks at you?
A There were people in the audience who stood up and questioned my data and said this is not what we are seeing.
Q Sure.
A The same thing happened in Canada.
Q All right. And by the way, with respect to the



memo about "Good news from Dr. Butany" --
A Yep.
Q -- do you know who Terry Shepherd is?
A No sir.
Q He got a copy. Do you see that? Do you know if Terry Shepherd is a physician?
A Where is Terry -- no, I have no idea who Terry Shepherd is.
Q Do you know whether he's a businessman?
A I don't know.
Q Do you know whether he was a high-level executive who was basically responsible for commercial issues at St. Jude?
A I have no recollection of who he is.
Q Do you think your memo was good news for those who were interested in the commercial fortunes of St. Jude?
A I presume it must have been.
Q Now -- by the way, Terry Shepherd wasn't at your meeting, was he?
A I can't remember if he was or not. In the -- I don't know if he was there or not there at all.
Q You were in the wet lab --
A Yes, sir.
Q -- weren't you, there?



So you were doing some medical work there.
A I had taken the valves with me, and I showed them every one of the valves. I had eight valves with me.
Q All right. Now, you mentioned a little while ago that in the abstract, ultimately it said no one mode of failure seems peculiar to a particular model of heart valve prosthesis. And that statement ended up in your final abstract, correct?
A Yes, sir.
Q And an abstract that you intended originally to use to talk about problems with Silzone, among other things, correct?
A Amongst other things.
Q Do you know whether ultimately St. Jude used that sentence with regulators to say that you'd contradicted yourself when you talked about the Silzone valve having problems later, because, actually, if you look at your manuscript, you don't mention the Silzone valve, and in fact you say no one mode of failure seems peculiar to a particular model of heart valve prosthesis?
MR. KOHN: Object to the form. No foundation.
MR. SIGELMAN: Q Have you seen anything that they argued --

Page 134

A No, sir.
Q -- that you were contradicting yourself?
A No, sir.
Q Let me hand you what will be marked as Exhibit No. 9.
(Whereupon, Deposition Exhibit 9 was marked for identification.)
MR. SIGELMAN: Q Dr. Butany, I've handed you Exhibit No. 9, which is a letter -- you know Hazel Randall, don't you?
A Yes, sir, I do.
Q She's a senior cardiovascular implant specialist with the Medical Devices Agency, the Food and Drug Administration equivalent, we would say, in the States, in the United Kingdom.
A Yes, sir.
Q And this is from Alan Flory of St. Jude. You certainly know Dr. Flory.
A Yes, sir.
Q If you go to the third page of this letter, they're talking about Toronto General's experience, and in fact, your name is up near the top.
A Yeah.
Q Page --
A 3.

Page 135

Q And do you see down below where it says "The statement," quote, "'showing signs of valve thrombus, excessive pannus and/or infective endocarditis,'" end quote, "contradicts Dr. Butany's own conclusion"?
Did I read that correctly?
A That's what it says there.
Q Okay. And then it goes on to say, "Specifically, in his abstract presented at the World Symposium on Heart Valve Disease" --
That's the abstract we were just looking at, right?
A Yes, sir.
Q -- "the day after our meeting at the Medical Device Agency, Dr. Butany states that," quote, "'No one mode of failure seems peculiar to a particular model of heart valve prosthesis,'" unquote.
Did I read that correctly?
A Yes, sir, you did.
Q And they said a copy of the abstract is attached, correct?
A Yes, sir.
Q And the last page, which is the attachment, is exactly the same abstract, although in the published form --
A Yes, sir.

Page 136

Q -- that we've been looking at.
So would you agree with me that ultimately they used this abstract as a device to say you were contradicting yourself when you went after the Silzone valve?
A Yes, sir.
Q So you started out, would you agree with me, wanting to write about the Silzone valve and to alert the world that there were problems with it that you weren't seeing with other heart valves?
A Yes, sir.
Q And ultimately St. Jude used your manuscript, as it was published to the world, as a basis to say you were contradicting yourself when you said there was a problem with the Silzone valve, correct?
A In this paper, yes. Can I add something?
Q Sure.
A This is dated July the 15th. As you would see from that binder, in June, on the 10th or 11th, we had a meeting in Hazel Randall's office at the MDA. I presented to her and the group of people that she had with her, along with Dr. Brian -- Dr. Buchart, all of the data that I had from my valves. Well, not my valves.
Q Sure.

Page 137

A The valves that I had seen at our hospital. And the comparative data from the others. We talked about it, and this was a two-hour meeting at which we discussed all of this. The meeting with St. Jude followed immediately after this first meeting. So that Ms. Randall certainly knew exactly what my feelings were.
Q Right.
A Now, the unfortunate thing is that on paper, the same feeling doesn't come through, in that particular abstract.
Q Right. And up to that point that was the only thing you'd published --
A Yes, sir.
Q -- on the whole matter, right?
So if someone wanted to go to the literature of surgeons to find out what Dr. Butany thought about it, the only thing they would get is a document that St. Jude was using as a basis for saying you'd contradicted yourself when you went after the St. Jude valve in some of your informal or formal discussions with people.
A I think my straight answer to that has to be yes.
Q All right.

A But can I again expand a little bit?
Q Sure. Sure, Doctor.
A It looks -- in the way you put it, that's exactly what it looks like. I think you ought to keep in mind that I'm a lone voice in a huge world. There are a handful of pathologists who look at valves. I'm one of them. At least at The Toronto General Hospital, I was then one of three or four. Nobody else was seeing the same things I was. Nobody else was complaining about the same things that I was. I'm repeatedly told by surgeons in my country and by St. Jude that nobody else has seen any of this. It's difficult, then, to stand up and wave the flag and say, "I don't care if you shoot me, this is what I'm going to say." People don't easily buy that.
Q But in a scientific world, what you do, don't you, is put out your data, especially if you have statistical data --
A Right.
Q -- and let scientists judge for themselves?
A Provided somebody would be willing to publish it, and provided your co-authors, who have to be the surgeons who put in the valve, not just myself, are accepting of the conclusions and the presentation of the data.



Q But you'll agree with me that you can't publish it if you don't submit it in an abstract, right?
A Well, it can't be rejected unless you submit it.
Q And tell me what co-authors with whom you are working said over their dead body will they have anything unflattering to say about Silzone in the final abstract.
A No. Nobody went to that extreme.
Q All right.
A But they did suggest, look, let's put the data this way.
Q Let's not rock the boat with St. Jude?
A Well, I wasn't there when he got the abstract in his hand, and I don't know what he said or --
Q Who's "he"?
A Dr. David. I cannot say what his feelings 'ere.
Q Dr. David, by the way, was a clinical estigator for St. Jude at the time who was being pensated for his work as a clinical investigator, ct?
I didn't know it then. I believe so, yes.
And he would have some concerns about izing his relationship with St. Jude, correct?



MR. KOHN: Object to the form. Calls for speculation.
MR. SIGELMAN: Q Did he ever express that to you?
A No, sir.
Q Did Dr. David say, "Under no circumstances will I be party to publishing an abstract that says something bad about the St. Jude valve"?
A No, sir.
Q And he saw the statistics, correct?
A He saw that version of the valve -- abstract.
Q Did he tell you that those statistics were wrong?
A No, sir.
Q Did he ever in any way criticize the statistical analysis that was done?
A I mentioned we didn't have a verbal conversation, we weren't face-to-face, but he did make those suggestions.
Q Could you have submitted the manuscript without Dr. David's name on it, since you had other explanting surgeons? Excuse me. Other implanting surgeons.
A One could submit it, but the chances of it being accepted would have been -- they may have been the same, they may not have been the same. I think they



wouldn't have been the same.
Q Dr. David had concerns, didn't he, about the St. Jude valve?
MR. KOHN: Object to the form.
MR. SIGELMAN: Let me strike that.
Q Did Dr. David have concerns as well with the St. Jude valve?
MR. KOHN: Object to the form, vague as to time.
MR. SIGELMAN: Q Say in early 1999.
A He must have.
Q How do you -- why do you say that?
A Well, I had mentioned to the group that this is what I was seeing. I can't presume -- I can't really say what he had or didn't have.
Q In fact, isn't that around the time they stopped using it?
A Yes, sir. As, unfortunately, I didn't find out until a little bit later that they had stopped using it, but they stopped.
Q Did they have to get Dr. David's approval to stop using it?
A Definitely.
Q Okay. And so he endorsed that idea, correct?
A He must have.

Page 142

Q So he wasn't a great supporter of the Silzone valve in early 1999.
A In hindsight, certainly not.
Q But you didn't even know that.
A At that time, I didn't know it.
Q How is it that you -- I know you're not an implanting surgeon, but you had taken such an interest in it. You were probably the major cardiovascular pathologist in the whole area around there.
A Yeah.
Q How is it that you didn't know that the Silzone valve was no longer being implanted at your very hospital?
A I don't know.
Q Were they keeping you out of the loop for some reason on that?
A I hope not.
Q Do you have your suspicions?
A No, I don't have any suspicions. They are all extremely honorable people. I don't think they'd keep me --
Q Sure. I don't mean to in any way impune Dr. David's honor, and certainly not yours, Doctor.
The World Symposium, there was someone who was heading that World Symposium, who was kind of in charge

Page 143

of it?
A Dr. Bodnar.
Q Did you ever have any encounters with Dr. Bodnar with respect to your views of the Silzone valve?
A Not at that time.
Q Did you subsequently?
A Yes.
Q When?
A The time I presented a second paper on Silzone.
Q In June of 2001, in London, at the --
A Yes, sir.
Q -- heart valve -- Heart Valve Disease Society meeting?
A Yes, sir.
Q And what did Dr. Bodnar do at that time?
A Dr. Bodnar castigated me in front of I don't know how many hundred people.
Q Why did he do that?
A He -- what happened was, after I'd submitted the abstract, I asked for one very minor change, and he said, after I -- after I or before I presented my paper, if he'd known that I was making this change, he would not have accepted my paper, and he would not have let me present it, or words to that effect.

Page 144

Q And why is that?
A I don't know.
Q Did you have any reason to believe that he had a special relationship with St. Jude?
A No, sir, I didn't have any reason to believe that.
Q Do you now?
A Well, if somebody throws a rock at me and I get hurt, I'm going to wonder why did he do that.
Q Right.
A Maybe he doesn't like me or maybe he likes the rock to be on my face.
Q We talked earlier about the Society for Thoracic Surgeons --
A Yes, sir.
Q -- or Society of Thoracic Surgeons, and their journal, the Annals of Thoracic Surgery.
A Yeah.
Q Is Dr. Bodnar the editor of that journal?
A No. I think he's the editor of the Journal of Heart Valve Disease.
Q All right. But not of the Annals?
A No.
Q Has he ever been editor of the Annuals?
A I don't know. I don't think so, but I don't

Page 145

know.
Q All right. Now, let me hand you the next exhibit.
(Whereupon, Deposition Exhibit 10 was marked for identification.)
MR. SIGELMAN: Q Doctor, I've handed you what the court reporter's marked as Exhibit 10. Have you seen this either recently or anytime in the past? I presume you have.
A I presume I must have.
Q This is Dr. Flory and Dr. Hosek writing you on or about June 7th of 1999, correct?
A Yeah.
Q And they say "We've prepared a follow-up letter concerning your London talk."
A Yeah.
Q That's the World Symposium?
A Yes, sir.
Q And that's where you presented the abstract we've been dealing with.
A Yes, sir.
Q Is that correct?
And prior to that time, or actually, a day later or so, you responded by sending something to Al Flory, did you not? And I'm going to let the court

Page 146

reporter mark that and hand it to you.
(Whereupon, Deposition Exhibit 11 was marked for identification.)
MR. SIGELMAN: Q Dr. Butany, Exhibit No. 11 is a fax that you apparently sent to Mr. Flory on June 8th of 1999, the next day.
A Yes, sir.
Q In regards to the World Symposium that was coming up, right?
A Yes, sir.
Q And you said, "Thanks for your letter. Here is the text slide that I am trying to get made," is that correct?
A Yes, sir.
Q And then there's a text slide that follows; is that right?
A Yeah.
Q And it talks about the randomized study at Toronto General Hospital.
A Yes, sir.
Q Correct?
A Yep.
Q And it does discuss St. Jude Silzone valves being explanted.
A Yes, sir.

Page 147

Q And if you go on to the next page, have you ever seen this handwritten note that was done apparently at St. Jude?
A No, sir, I hadn't.
Q All right. Would you agree with me that this handwritten note says, "Total BS, i.e., randomized and competitor, what should we do?"
A I hadn't seen that.
Q All right. Was your statement that there was a randomized study that involved, at least in part, the Silzone valve at Toronto General Hospital, total BS?
A Let me say first that for a long time I didn't know there was a study like this, till we were coming up to the time of the presentations, when I met my co-author and met all the surgeons again, and said -- they said, "Did you know that we have a study going like this?" And at the same time, or somewhere in this first six months of 1999, Mr. Al Flory had told me that we have a randomized study going and that the surgeons were not really following the guidelines, so that the Silzone valve may be getting a bad name, or a worse name than it should have.
I'm sorry. I forgot your question.
Q Who said this to you?
A Mr. Flory.

Page 148

Q Mr. Flory. But did Dr. David, for example, who was the principal investigator of that study, agree that it was total BS to call it a randomized study?
A I'm sorry. I'd be putting words in his mouth. He never said that to me.
Q Do you think it was total BS?
A At that time I didn't even know there was such a study, but I was told about it. A randomized study cannot be BS. Maybe they use -- maybe he means the use of that word is BS. I don't know. But certainly I didn't know that anyone had said this sort of thing about what I had written.
Q Based on what you found out about the study, would the use of the term "randomized" be total BS?
MR. KOHN: Object to the form, no foundation.
THE WITNESS: No. No randomized study is BS. The AVERT study itself is a randomized study.
MR. SIGELMAN: Q And the study you were referring to, was that a study involving comparison of St. Jude valves generally, including, but not limited to, Silzone valves and Carbomedics heart valves?
A It was meant to be the St. Jude standard and the Carbomedics, but later on it wasn't.
Q But then it got to involve the St. Jude Silzone as well, correct?

Page 149

A Yeah.
Q And there had been an ongoing study, prior to the marketing of the Silzone valve, for which Dr. David was the principal investigator, paid for by both Carbomedics and by St. Jude, correct?
A I don't know who paid him or who didn't pay him.
Q All right. But you learned there was this ongoing study --
A Yes, sir.
Q -- and then Silzone was eventually folded into the study?
A Yeah.
Q Fair? All right.
Now, is it fair to say that prior to the recall of the Silzone valve in January of 2000, you personally, Dr. Butany, never published in the literature a single abstract or paper stating that the explant experience or the endocarditis experience or the paravalvular leak experience or the thrombotic experience with the Silzone valve was more frequent than with other heart valves?
A That is correct. Can I again add to that? I've said this before.
Q Sure.
A You have to keep in mind that not even my

Page 150

senior colleagues were absolutely convinced of this. Dr. David kept telling me repeatedly, "Look, Jack, in all of the valves that I've explant" -- that he'd implanted, he hadn't had a single valve go sour on him, go wrong on him, whereas all the other valves were implanted by all the other surgeons. So that kept putting me in a bind. Is it the surgeon's fault? Is it the valve's fault? The fact that we were the only institution that seemed to be seeing this certainly didn't help give me any confidence whatsoever.
Q In say late 1998 or in the 1998 time frame, was your hospital the only hospital that was experiencing what it perceived to be problems with the St. Jude valve?
A That's what I was told.
Q All right. That's what you were told, but do you know anything differently now?
A For 1998?
Q Yes.
A I think there must have been a hospital having trouble, but they didn't themselves realize it.
Q Was there any surgeon, for example, or pathologist, either one, whom you know who began to identify what he perceived to be a higher incidence of serious adverse events associated with the Silzone valve

Page 151

in, say, the 1998 time frame?
A I don't think I knew in '98. I think it was spring of '99 that I came to know Dr. --
Q Came to know what?
A Dr. Buchart was having some similar problems.
Q Mr. Buchart --
A That's right.
Q -- in the United Kingdom?
A That's right.
Q And you came to know that in 1999. When did Mr. Buchart begin to identify what he perceived to be a particularly acute problem with the adverse events associated with the Silzone valve?
A I don't know. I think it was in the weeks or months prior to that.
Q All right.
A It may have been at about the same time that I started seeing them come out, but I don't know.
Q And at that time do you know if Dr. Buchart noticed anything unusual in his mind about some of the tissue that had been histopathologically examined --
A No, sir.
Q -- from explanted valves?
A He didn't have a single explant at that time. I think later on he had one explant, and I suggested to

Page 152

him that he let me look at it, but he said he couldn't get it, or words to that effect.
Q So to the best of your knowledge, in 1998 he had no explants that were analyzed by himself and/or St. Jude and/or someone else on St. Jude's behalf?
A Right.
Q All right. Are you sure of that?
A Reasonably. This is my recollection, anyway.
Q Do you have any recollection that Dr. Buchart eventually entertained, as a possible mechanism for thromboembolic events that he felt had been statistically demonstrated to be associated with the use of the Silzone valve, the lack of tissue ingrowth?
A No, I don't know that.
Q Have you ever heard him talk about concerns that there had been little or no tissue ingrowth in some of the explanted valves from people who had serious thromboembolic events, such as stroke?
A I don't think so. He didn't have any explants, except the one which I believe was later on.
Q All right. Now, there's another draft of an abstract that you've prepared, correct?
A Yes.
Q Let's look at that one. And what I want you to do is to look at the following pages, and let's pull

Page 153

them out, and if you see any other pages that correspond to that particular version of the abstract in question, please advise so that we are as complete and accurate as we can be, but if you can pull out of Exhibit No. 4 pages 27, 36, 37, 38, 39 --
A One minute.
Q 27, 36 through 39, and 41 and 42. And for the record, I'm speaking --
A And 42, did you say?
Q Yes. I'm speaking of draft abstracts for a document that I believe you entitled "An Early Comparison of the St. Jude Medical Standard and Silzone Treated Valves: Results from two Hospitals." And tell me if the sequence of those pages is in chronological order, and if not, please put them in order, and also whether there's any other page associated with that particular abstract that's not included in those pages so that we're as complete as possible.
Did I get all the pages first?
A I -- you seem to have the relevant ones, anyway.
Q Okay. Great.
A I think this is the order in which they should be.
Q All right. So you'll agree with me that

there's a little bit out of sequencing with respect to the Bates numbers?
A Yeah.
Q Okay.
A Well, that's my fault.
Q Right, sure.
A That's the way I sent them to --
Q No problem. I'm not -- again, I'm not attacking in any way.
A All right.
Q I just want to make sure that we are accurate and --
MR. KOHN: Could you just tick off the order that they should be in?
MR. SIGELMAN: Sure. Pages 27 --
MR. KOHN: Right.
MR. SIGELMAN: -- 37, 38, 39, 36, 42, 35.
MR. KOHN: Thanks.
MR. SIGELMAN: If the court reporter would mark that now, staple it and mark it.
(Whereupon, Deposition Exhibit 12 was marked for identification.)
MR. SIGELMAN: Q I'm going to hand you what the court reporter has marked as Exhibit 12, Dr. Butany, and that is, as you best recall it, the chronological



order of the various drafts, correct?
A Yes, sir.
Q And if you look at the first page of Exhibit No. 4, back on the very first one where you have a legend, 0001.
A Yes, sir.
Q You have abstract No. 3. Abstract submitted, not accepted. Is this abstract No. 3?
A It's actually abstract No. 4 which was not -- sorry. Abstract 3 was not accepted. You're right. This is --
Q Well, at least according to your legend --
A This is No. 2.
Q It should have actually been abstract No. 2, but is this the one that wasn't accepted?
A No. No, I'm sorry. Abstract No. 2 was accepted.
Q Yes, I understand. But abstract No. 2 actually came after abstract No. 3, didn't it? Chronologically, in terms of your work.
A Actually, I think they are about the same time.
Q Okay. But in any event, this is what you labeled abstract No. 3, the abstract submitted but not accepted?
A Yeah.



Q Correct? This is the one you got a rejection of?
A Yeah.
Q You don't have the rejection letter anymore?
A No.
Q And as far as you're concerned, Dr. Bodnar had nothing to do with rejecting this?
A No, he didn't.
Q Do you know if anyone did in particular?
A No.
Q In fact, I think one of your documents says at the top, "rejected," doesn't it?
A Yeah, it does.
Q Which page is that?
A Think it's -- next page. No. One page beyond that.
Q All right.
A It's actually page 38. "Abstract 3 not accepted."
Q All right. And was this paper or abstract done for a meeting in the year 2000 of the Society of Thoracic Surgeons?
A Yes, sir.
Q Where was that meeting held?
A I didn't attend it, so --



Q Because they didn't accept the paper?
A Right.
Q Do you know roughly what time of year it was to occur?
A STS is usually the end of January, I think.
Q So January of 2000?
A I think so.
Q And did you share this abstract with St. Jude before you got your rejection?
A I'm not sure --
Q All right.
A -- whether I did or did not.
Q Other than the people involved in writing the abstract with you --
A Yeah.
Q -- did you share it with anyone other than St. Jude and other than the society to whom you eventually sent it?
A I don't think so.
Q And did all of the authors who are listed on the abstract participate in the work involved in the abstract?
A No. By and large the work was done by the first two.
Q You and --

Page 158

A Dr. Leask.
Q Dr. Leask, the --
A Engineer.
Q -- engineer who has a statistical background?
A Yep.
Q All right. And this particular abstract involved adverse experiences reported from two hospitals, correct?
A Yes, sir.
Q The hospitals being what?
A Toronto General Hospital and the Sunnybrook Hospital.
Q All right.
A Or Sunnybrook Health Sciences Center, Sunnybrook and Women's College Medical Center, SBK.
Q All right. Now, when did you do the initial draft of this abstract? When did you actually write it?
A I wish I could remember when I'd written it. I don't.
Q What's your best estimate, as you reflect back, on when you drafted the initial version of this abstract?
A It would have to be at least six months prior to the meeting.
Q So we're talking maybe middle of --

Page 159

A At least four to six months, is the usual time lag between a meeting and the abstract deadlines.
Q And if the meeting occurred in January or so of 2000, then you in all likelihood drafted the initial version of this abstract sometime in the middle of the year 1999, maybe a month or two later?
A Yeah, I think it was after we came back from the London meeting.
Q All right. So July, August of 1999 --
A Yeah.
Q -- you drafted it?
And you talk about Silzone in some of these drafts. Like for example, let's look at page 37. You say, for example, at page 37, one of these drafts --
A Sorry. Haven't pulled it out yet. 38, 37.
Q Which is your second version.
A Yeah.
Q Correct?
You say, after Conclusions, "In this early study, the number of Silzone valves explanted within the 18 month period is significantly greater than the SJM" -- that's the conventional St. Jude valve -- "in the two preceding 18 month periods"?
A Yes, sir.
Q You again were using one-and-a-half-year

Page 160

historical control periods, two of them?
A Yes, sir.
Q So you were reporting on what you thought might be a distinction from a somewhat different body of data between the Silzone valve and the St. Jude conventional valve, correct?
A Silzone valve and the St. Jude standard valve.
Q Right.
A Yes.
Q Is that correct?
And some of the data in this particular abstract are different from the data in the previous abstract, right?
A I think so.
Q And for example --
A Yes, they definitely are. Yes.
Q Right. And in fact, in this particular abstract, how many explants did you have total for the two groups of conventional valves for the two time periods, in other words, for the entire three-year period, which would include, I believe, 522 patients with conventional valves; is that correct?
A Yes, sir.
Q And of those 522, how many had significant pannus?

Page 161

A None.
Q All right. And for the St. Jude valve, you had a total of 309 patients, correct?
A Yes, sir.
Q And how many had significant pannus?
A Six.
Q And for the total of 522 conventional St. Jude valve patients in the three-year period in question, how many total explants did you have?
A Eight.
Q And for the St. Jude Silzone valve, which was a much smaller number, only 309 patients, for, I believe a year-and-a-half period? Is that what's covered for Silzone?
A Roughly, yes.
Q Not a three-year period. How many total explants did you have?
A 22.
Q And statistics were done on that, weren't they?
A Yes, sir.
Q And that difference was statistically significant once again, right?
A Yes, sir.
Q And what did you do to protect patients here?
A I did write this abstract, and I did submit it.

Q And did you decide to send it to St. Jude?
A I don't think so. By now they had seen all of my data, and -- I'm reasonably confident I didn't send it to them, but I may have. I don't think I did, though.
Q Do you think that had you sent it to St. Jude, that they would not have liked this abstract?
MR. KOHN: Calls for speculation.
MR. SIGELMAN: Q Pardon me?
A It is speculating, and I don't know.
Q Okay.
A Maybe they -- they probably wouldn't have liked it. I don't think they would have liked it.
Q It's speculation because you didn't send it to them.
A It's speculation because I think I didn't send it to them, and I certainly don't remember any conversation.
Q It's not good news for St. Jude, is it?
A You're right.
Q All right. Now, let me hand you the next exhibit, sir.
(Whereupon, Deposition Exhibit 13 was marked for identification.)
MR. SIGELMAN: Q I'm going to hand you what's



marked as Exhibit 13, and will you agree with me that this is a version of this same abstract, now put on the form for the Society of Thoracic Surgeons?
A Yes.
Q And do you see Joan Ivanov, statistician, written in hand down below?
A Yeah.
Q She was a nurse who also acted as an epidemiologist at Toronto General Hospital?
A Yes.
Q And this was faxed, wasn't it?
A Yes.
Q And it was faxed from pathology in your hospital, correct?
A Yep.
Q Is that your fax number up there?
A Yeah, it is.
Q Do you think you faxed this to somebody?
A Probably to Joan Ivanov.
Q To Joan Ivanov.
A I think.
Q It's cut off, but up there at the top it says 29-99, but we don't know what month, right?
A 29 dash -- yeah.
Q Okay. So it was faxed to somebody on the 29th



of some month in 1999.
A Yep.
Q Right?
A Yep.
Q Let's go to the next page, which is the next consecutively marked Bates page. You see at the top there's a fax legend --
A Yep.
Q -- where someone received it?
A Yep.
Q And what's the date?
A July 29, 1999.
Q Okay. It says underneath that "fax" what?
A Louann Carpenter.
Q Okay. And who is Louann Carpenter?
A I don't know.
Q Louann Carpenter, do you know, is an employee of St. Jude?
A I can't recollect that she is.
Q Do you know where the number 651 area code is?
A I presume it's Minneapolis.
Q You think so?
A I don't think -- I don't know so, but I presume so.
Q Would you agree with me that the document that



I've handed you says "Confidential or proprietary, subject to protective order"?
A Yes.
Q Do you see that SJM at the Bates number?
A Yep.
Q All right. Let me give you back the document that we previously marked. By the way, SJM is the initial for St. Jude.
A Yes, sir.
Q And I will represent to you, sir, that this document was in St. Jude's files and produced to us.
A Yes, sir.
Q I'm going to hand you back Exhibit No. 7.
A Yep.
Q And that was the itinerary for your trip to Minneapolis. Can you tell me what the area code is for the St. Jude telephone number up at the top there?
A 615.
Q All right. Does this remind you at all now, as you look back, that you sent this from pathology on July 29, 1999 in your hospital to someone at St. Jude and somehow it got to Louann Carpenter at St. Jude?
A I --
MR. KOHN: Calls for speculation.
MR. SIGELMAN: Q Does that call for

Page 166

speculation, Doctor?
A I'm not sure I sent it, and I -- I know I had Joan go over all the cases, do all the stats for us, that we had a very rough time getting her to do it, basically, because she wasn't well, but that's all my recollection.
Q Do you know anybody else who was using your fax machine, pathology, to send abstracts like this to St. Jude?
A No, I don't think so.
Q Do you know anybody else who's in the 615 area code other than employees of St. Jude?
A I guess Medtronic has their offices there, and so does -- and so do lots of other companies.
Q Well, if you had sent this to Medtronic, do you think that you'd hear back from Medtronic about it?
A Yes.
Q And by the way, do you know if Medtronic is in the 615 area code? Is that the only area code in Minneapolis?
A I think there's a new one that came up afterwards.
Q There's a 952, isn't there?
A I presume.
Q Is there a 612 as well?

Page 167

A I don't know. Should I?
Q I have a brother that lives in Minneapolis. I used to live out in that area.
All right. Now, let's go to Butany 00027.
A Is this mine or --
Q You can just put that down right there. Go to 27.
A Page 27?
Q Yes.
A Okay. Okay.
Q You see under Conclusions it says, "Significant pannus was seen only in the St. Jude Silzone valves"?
A Just one minute. I'm sorry. I wasn't able to find my -- 27?
Q Yes.
MR. KOHN: Yes, 27.
THE WITNESS: Yep.
MR. SIGELMAN: Q Says "Significant pannus was seen only in the St. Jude Silzone valves and may represent a potential problem."
A Yeah.
Q Did you write that?
A I think so.
Q You agreed with that, right?

Page 168

A Yes.
Q And you said, "We believe that thrombus is associated with the pannus in an etiologic manner."
What does "etiologic manner" mean?
A It's exactly what I took time, after we broke last time, to try and explain to you, that when pannus grows beyond the valve orifice and overhangs the valve orifice, that overhanging area provides a nidus in which thrombus can be initiated, and that is the etiology of that thrombus.
Q Okay. And etiologic means it causes it, just in kind of lay terms, right?
A Yes.
Q So basically, would it be fair to say in lay terms what you are saying is that pannus here with the St. Jude valve can cause thrombus? You know, in lay terms.
A There are other things. If the person was not complying to their medications --
Q Sure.
A -- that would make it even worse.
But just that overhang does increase their chances of getting a thrombus.
Q But just for the jury's benefit --
A Sure.

Page 169

Q -- etiologic means causal?
A Causative. Yeah.
Q And "An increase number of early failures in patients" -- I'm reading -- "with repeat surgery, suggest that the Silzone valve may not be as appropriate" -- or I think it's "appropriate" and then maybe there's an "as" written in -- "for redo valve surgery." And I think you put in the word "mitral valve" surgery, correct?
A Yes. Yes, sir.
Q So would it be fair to say that you were telling people to reconsider whether even to implant these valves?
A No. For redo valves. Redo mitral valve surgery.
Q Okay. Just for redo?
A Well, that's what I'm saying here.
Q Not for the initial implant?
A No.
Q All right. And if you go to page 36, which is the STS form, abstract version. In that --
A I'm sorry. I haven't found it yet.
Yeah, sorry. That's the -- this version.
Q Right. Right. And kind of two-thirds of the way down the page, you say the major reason for explant

was infectious endocarditis, correct?
A Yep.
Q And then you say that the Silzone explants were significantly more frequent, right? Did I read that correctly?
A Where are we? Just below the table?
Q Yeah, right below the table. See where it says "SJM-S explants were significantly more frequent"? See that, where you wrote that?
A I'm sure it's there, but I just haven't seen it yet.
Q And you said "P" equals 0.0043. That's highly statistically significant again, correct, using the two-sided Fisher statistical test?
A Am I looking at the wrong page?
Q It's page 36. 0036.
A Yeah. Sorry. Yes.
Q Do you see that?
A Yes, I do.
Q And "All dysfunctional SJM-S were from the mitral site."
A Yes.
Q You tended to see more problems in the mitral site that the aortic, correct?
A I saw problems only in the mitral site.



Q And why is that, do you believe?
MR. KOHN: Calls for speculation, no foundation.
THE WITNESS: I'd have to speculate. We have no --
MR. SIGELMAN: Q Is there more stasis in the mitral area than there would be in the aortic area?
A Probably not.
Q Probably not.
A Because you will get stasis in the sinus part of the valve just above the prosthesis, and of course you will get stasis in the left atrium. Normally you shouldn't get much, but if you had a diseased valve, yes you would. Once you put a prosthesis in, yes, again, you'll get some stasis.
Q All right.
A There's probably other reasons for it.
Q We're going to have to change the tape.
A Can you also stop to break?
Q Sure. We'll have lunch now.
THE VIDEOGRAPHER: This marks the end of videotape No. 2 in the deposition of Dr. Jagdish Butany. Time is 12:03 p.m. We are off the record.
(Whereupon, at 12:03 p.m., a lunch recess was taken.)



AFTERNOON SESSION - 12:35 P.M.
--oOo--

THE VIDEOGRAPHER: This marks the beginning of videotape No. 3 in the deposition of Dr. Jagdish Butany. The time is 12:35 p.m. We are back on the record.

EXAMINATION BY MR. SIGELMAN

MR. SIGELMAN: Q Dr. Butany, we're back on the record. If you could look once again at Exhibit No. 13, that has the abstract in the Society of Thoracic Surgeons form.
A Yes.
Q And appended to that is this page with the name Louann Carpenter written in hand at the top with the area code for St. Paul, Minnesota, right?
A Yep.
Q And if you look down near the bottom of the second page of this exhibit, do you see where someone has written, "Note that this paper was presented in London. This disqualifies it from presentation at the STS" --
A Yeah.
Q -- or the Society of Thoracic Surgeons. Was this particular paper, which is the



abstract, that exact paper, presented in London?
A No.
Q Pardon me?
A No.
Q That's not a true statement, is it?
A I don't think it's true at all.
Q Had it been presented in London, would you have been disqualified from presenting it to the STS?
A I didn't know that there was any such disqualification.
Q Is that the Ingelfinger rule? Have you ever heard ever that?
A I haven't heard of that, no.
Q Pardon me?
A No, I haven't.
Q All right. But in any event, the data that are in this abstract are different from the data set in the previous abstract that you presented, at least in part, in London, in June of 1999, correct?
A 1999?
Q Yes.
A Distinct --
Q Different data set, correct?
A Yes.
Q Now, do you know whether anyone at St. Jude