Page 174

advised the Society of Thoracic Surgeons that you were disqualified from presenting these data at their upcoming meeting?
A No, sir.
Q No one at St. Jude ever told you that you were disqualified from presenting these data?
A No, sir.
Q Correct?
A No.
Q And you don't have a recollection of St. Jude getting this abstract, correct?
A I -- there's, unfortunately, so much that I can't recollect. I didn't ever think that things would go this way, and I didn't keep track, but it's -- I suppose it's possible that I did. I had decided I would keep them absolutely informed about everything I did, and I tried to do that.
Q And you don't know whether they made any attempt to ensure that your abstract was rejected, if in fact you did give it to them?
MR. KOHN: Asked and answered.
THE WITNESS: I don't know.
MR. SIGELMAN: Q All right. Now, were the data in this abstract made known to implanting cardiothoracic surgeons?

Page 175

A How do you mean? At my hospital?
Q Did it get publicized by you or anyone, to your knowledge, in --
A At my hospital, yes.
Q In your hospital?
A Yes.
Q Outside of those cardiothoracic surgeons who might be fortunate enough to practice in your hospital, were they ever informed of the information in this abstract, including the information that statistically the Silzone explants were more frequent than explants for conventional Silzone valves?
A There was a meeting later in the year, still in the first half of the year, at which there were surgeons from Edmonton, Canada, Quebec City, Canada, and from -- I'm not sure if there was one from London, Ontario. At that time we had all talked about the experience. That's about the time I came to know that the other hospital was having similar trouble to what we were.
Q When precisely is that?
A The meeting was in -- I think in April of --
Q Of --
A -- of '99.
Q April of 1999. But you said that --
A April of '99, yes.

Page 176

Q Okay. But you said that you wrote this abstract after that date.
A Fall of 19 -- yes.
Q So my question is, were the data in this abstract made known to surgeons outside of your hospital in Canada?
A The Sunnybrook Hospital surgeons did come to know about it in April, May, which is when they told me about their experience, which is why it's two hospitals' experience.
Q Outside -- and that was really my mistake. Outside of Sunnybrook Hospital, which is reflected in this --
A Yeah.
Q -- abstract, and outside of your hospital, were the data, including the statistics of this abstract, publicized or made known on cardiothoracic surgeons throughout Canada?
A No.
Q Were they, to your knowledge --
A Except that there was one surgeon from Edmonton present, one from Quebec City present at that April or May meeting.
Q All right. So other than those who might have been fortunate enough to be at a meeting that preceded

Page 177

your doing this abstract --
A Yeah.
Q -- there was no attempt made by you or St. Jude or anyone else to tell implanting physicians about the data in this paper, correct?
A No. But some of this data was certainly the data that I also presented in that London, in England --
Q Right.
A -- in 19 -- 2000, I think.
Q Right. But that was, in fact, data or study where you didn't talk about the Silzone valve, correct?
A No.
Q At least specifically.
A No. In 2000 I did.
Q In 2000.
A Yeah.
Q Okay. How about in 1999?
A No.
Q Okay. Maybe I'm getting confused. Now, to your knowledge, were the data that are in this abstract made known or publicized by St. Jude or anyone else to implanting surgeons in the United States of America?
A Not that I know of. They may have.
Q But you don't have any information on that, fair to say?

Page 178

A I got a call from one surgeon one evening asking me what was I talking about, and I presume somebody somewhere somehow, either from my hospital or from St. Jude or from any of the other people who had heard me speak about it, had talked to somebody else.
Q All right. Who is that?
A This is Dr. William Frater. Bob Frater. Robert Frater.
Q Bob Frater?
A Yeah.
Q And was he at that time affiliated with St. Jude?
A I didn't know it then.
Q Is he the medical director of St. Jude Medical?
A I didn't know it then.
Q Was he at that time?
A I know subsequently that he was.
Q Okay. Did he tell you, when he called you, that he was employed by St. Jude?
A No, he didn't.
Q Are you in any way upset that he didn't tell you that?
A Yes.
Q And why is that?
A I had a half-an-hour's conversation with him

Page 179

about the valve and my feelings. That was a long half hour.
Q And when in 1999 was it?
A Again, I can't recall the chronology, but it was an evening, and I think it was '99. Certainly it was well after January, February of '99. Maybe March or April.
Q Did Dr. Frater misrepresent his affiliation when he called you?
A No. He just called me as Robert Frater. I had met him before at other meetings, and he said, "This is Robert Frater," and he talked with me about it.
Q He's a cardiothoracic surgeon in New York City?
A Yes, sir.
Q And as you look back, did you ever find out how it is that he learned of your work, about which he called you?
A No, sir.
Q Did you suspect he learned it from St. Jude?
A No. He's a very senior cardiac surgeon, and all of the surgeons in my hospital are excellent surgeons, and they are certainly friends. Some of them sit on the same committees. Some of them chair the same meetings.
Q All right.

Page 180

A I presume that's how it came about.
Q But you would have wanted to know that Dr. Frater was affiliated with St. Jude; is that fair to say?
A I would have liked to have known, and I may not have said anything further.
Q And why might you not have said anything further?
A Well, clearly he has a bias, and so there wasn't much point in my saying what I said. Clearly I thought one way about it.
Q What do you mean he has a bias?
A Well, he's -- if he's employed or even partly compensated by St. Jude, clearly he would hold one point of view. He may have one point of view. May or may not have.
Q Aren't you being compensated by St. Jude right now?
A Yes.
Q All right.
A But --
MR. KOHN: Hopefully by you.
MR. SIGELMAN: Pardon me?
MR. KOHN: I thought you were paying for his time for the deposition.

Page 181

MR. SIGELMAN: Q Okay. I mean prior to the deposition. I mean now in the more general sense.
A Yes. I have the contractual agreement with them, yes.
Q Right. And is the bias to which you referred a bias in favor of the commercial interest of St. Jude?
A I'm being purely speculative, and I think maybe it's fair to a very senior colleague to say that he might be biased, so --
Q But nonetheless, because he's affiliated with St. Jude --
A My initial words --
Q -- you believe that he did have a bias?
A My initial words are that he might have one point of view, and I have another. Equally, as an implanting surgery who hadn't seen any explants, he would hold a different point of view.
Q All right. Now, did St. Jude Medical ever tell you whether they had passed on the findings in this abstract to any regulatory authority --
A No, sir.
Q -- in the world?
And I'm talking about Exhibit No. 13.
A No, sir. Not that I know of. Not that I can recall.

Q Now, if you would turn, Doctor, to page 0064.
Are you there, Doctor?
A Getting there.
Q And we're talking about in Exhibit No. 4.
A Yes, sir.
Q All right. Now, we mentioned --
A I'm sorry. You said 64?
Q Yeah.
A Yeah.
Q We mentioned Louann Carpenter, and you didn't have a recollection of her.
A Right. Yeah.
Q Would you agree with me that Exhibit 64 identifies her as being --
A Yes --
Q -- with St. Jude Medical, Inc.?
A Yes, it does.
Q St. Paul, Minnesota?
A Yeah. It does.
Q And would you agree with me that she apparently faxed you something --
A Yes.
Q -- on July 26th of 1999?
A Yes.
Q And that's in the general time frame, would you



agree with me, of this abstract, that was faxed, for example, at least one version of it, three days later, on July 29, 1999?
A Yes, sir.
Q And you weren't working on any abstract other than this one in July of 1999, were you?
A I --
Q Pardon me?
A Yeah, I think that's right.
Q So if there was any discussion of an abstract concerning Silzone, it would have been the abstract, versions of which we've just been looking at, including, for example, Exhibit 13, correct?
A I'm sorry. I didn't -- I missed that. I was --
Q I said if you were working -- or talking about any abstract in that time frame, it would have been one or more versions of the abstract that we looked at, for example, in Exhibit No. 13?
A It may have been, yes.
Q All right. And as you look at this, would you agree with me that this is your handwriting on this fax?
A Yes, it is.
Q Would you then agree with me that you received this fax on or about July 26th of 1999 from Louann



Carpenter of St. Jude Medical?
A Yes. I have to.
Q Okay. And does this refresh your recollection that in fact you did make one or more versions of the abstract that we've been talking about available to St. Jude?
A I guess I must have.
Q All right.
A Or somebody did it on my behalf, but it must have been with my okay.
Q Okay. And she talks about some of her concerns and/or criticisms and/or objections to what you've --
A Yeah.
Q -- written, right?
A Yeah.
Q She didn't like it, right?
MR. KOHN: Calls for speculation.
THE WITNESS: I presume she didn't.
MR. SIGELMAN: Q Okay. And in fact, she said in your conclusion you suggest that the SJM-S --
That's the Silzone valve, correct?
A Yeah.
Q -- may not be appropriate for redo surgery.
A Yeah.
Q And then she challenges that conclusion, right?



A Yeah.
Q And then she said, "It appears that there is a bias in gathering data to support a specific conclusion."
Did I read that correctly? That was in her summary?
A Yes. She certainly says that, yes.
Q That's at page 65 of the Exhibit No. 4?
A Yes.
Q So she thought you were biased, right?
A I guess if one looks at it that way, that's exactly what it looks like.
Q All right. Did you take this letter as being critical of your work?
A Yes.
Q And you wrote back to her, didn't you?
A I -- you've refreshed my memory, and I absolutely have to say yes. That is my handwriting.
Q Okay. And it's a handwriting on the second page of the fax you received from her.
A Yeah.
Q Correct?
A Yeah.
Q And I will represent -- well, no. Let me take that back.

And did you fax her back, then, and send that handwritten note to her?
A Yes.
Q And would you please read for the record, because it is your handwriting, what you wrote? On July 27th by the way; is that correct?
A Yeah. Do I have to?
Q Pardon me?
A Do I have to?
Q Yes, please.
A I almost feel like crying, so stop.
Q Sure. I mean --
MR. KELLOGG: Take five.
MR. SIGELMAN: You want to take five minutes?
THE WITNESS: Yeah.
MR. SIGELMAN: Sure.
THE VIDEOGRAPHER: We are off the record. The time is 12:50.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:54.
MR. SIGELMAN: Q Doctor, we're back on the record. I know it's difficult, but we have to get the discovery from you, and I would ask that you would read your own handwriting out loud so that we can know



exactly what you wrote back to this employee at St. Jude.
A I'll try.
"Dear Miss Carpenter, thanks for your reply. Please note, there's absolutely no bias whatsoever."
Q All right.
A Excuse me.
Q Let me read it for you, then. You continue, "I have literally bent over backwards, perhaps excessively, to be fair to the valve and to you." Is that correct?
A Yes.
Q Is that what you wrote? And what did you mean when you said you bent over backwards to be fair to the valve and to the company?
A Give me a couple more minutes.
Q Sure.
A What I'm trying to say is that I, from day one, had tried to keep them posted. Shit. Let me take this off.
Q Sure.
A Second bloody life -- day in my adult life that I'm breaking down.
Q That's okay, Doctor.
A You don't write that. Oh, my God, she is writing.



Okay. I'm trying again. From day one, I tried to keep them posted of how many valves I saw or what each valve showed. Went out of my way to be accessible, went out of my way to show them the data, show them the abstracts before they were finally submitted, and clearly I was extremely upset at this letter.
Q Why were you upset?
A My response says exactly why -- damn -- why I was upset. It's because I had been, I thought, absolutely aboveboard, gathered the data to the best extent possible with nothing held back.
Q Do you think that St. Jude wasn't being aboveboard with you?
A I don't know.
Q Is that why you're upset?
A I'm upset that -- I was upset then, I guess I'm upset now, that somebody could think that I was biased against them for that matter, if that's what she was alluding to. There is another way of looking at it: Maybe she means that my data gathering was biased, that I hadn't gotten all the data. It's certainly possible that's what she meant, but I felt then and I feel now that I was being accused.
Q Of being unfair?
A Yeah.



Q Do you think they were unfair to you?
A I guess, other than in this instance, probably not, but it's possible that I'm misconstruing what she meant and I'm reacting overly harshly, harshly to myself and to them.
Q What did you mean, Dr. Butany, when you said that you perhaps excessively literally bent over backwards to be fair to St. Jude?
A I would normally not show abstracts to a company or let them comment on the thing. I was concerned that I was still the only person with this sort of feeling, that maybe I was unfairly maligning the company, and that's why I bent over backwards repeatedly to make sure that that wasn't happening, and that's what -- I think that's what I meant.
Q And as you look back, you thought you might have excessive -- you might have been trying to help them out too much?
A Not help them out too much as much as to really help them more than virtually anybody else would, and perhaps people would take -- sometimes would take objection to my helping them that much.
Q At that time when you got that letter, did you feel betrayed?
A I don't know what I felt.

Page 190

Q Well, did you feel at all betrayed by them?
A No. I felt terrible, and I don't know that I felt -- would go that far. It still remains a fact that the president and every one of them was, individually at least, more than a gentleman to me.
Q All right. Did you feel that their commercial interest had overcome their interest in looking at your data objectively?
A No, I really couldn't say that. I had always felt that they were being aboveboard with me. This made me -- clearly made me wonder.
Q Wonder whether you were --
A Would you rephrase your question?
Q Yeah. Well, you said it clearly made you wonder, this letter. Made you wonder whether they were being totally aboveboard?
A Yeah. I suppose -- I'm sorry. I'm not thinking straight just now.
Q Yeah? Well, you said "yeah." I cut you off. Yeah. What were you going to say?
A That probably was the feeling, but I hasten to say that I don't know if I'm thinking straight now or not, but certainly I was extremely upset, and my written words are strictly there. I normally do not fax things or write things and send them out right away.

Page 191

Q Right.
A Must have sat on it for a while and then sent it.
Q You felt like you were being scientific, correct?
A I felt I was being fair.
Q You felt that the data showed a problem?
A Yeah.
Q And you were fairly revealing that?
A I certainly felt that. However, the point remained all along that nobody else, to my knowledge, other than the second hospital in Toronto, was seeing the same thing. All the other surgeons who were there in April, at that time none of them said that they were having a similar problem. The surgeons at other thoracic cardiac hospitals in the city said "We haven't got a single case that's gotten into trouble." And I don't know if you take my word for it, but it's a lousy feeling to feel that you're seeing things that no one else is. Maybe you're overcalling. Maybe these surgeons at my hospital other than Dr. David aren't as good as they'd like to be. Maybe that's the problem.
Q But you thought you were being fair, yourself, at the time, correct?
A Absolutely.

Page 192

Q And that you were reporting things that had been scientifically demonstrated, correct?
A Pathology is a very exact science. I either see it or I don't see it.
Q Right. And --
A Sorry.
Q Sorry. And as events unfolded over a long period of time, over several months, you were vindicated, weren't you?
A I was vindicated. All along anybody in my shoes would have the fear, what if I'm not?
Q But the fact is that ultimately the world learned that St. Jude took this valve off the market, correct?
A Yes, sir.
Q And they learned they did that purportedly because it caused an unacceptably high rate of explants, correct?
A Yes, you're right.
Q And they did that because that high rate of explants was supposedly demonstrated statistically in a study, correct?
A Yes, sir.
Q And many months, in fact, over a year before, you had shown the same basic thing, right?

Page 193

MR. KOHN: Object to the form.
THE WITNESS: I had shown similar things.
MR. SIGELMAN: Q Right. And St. Jude had information from you, from your work, showing that, correct?
A They had -- yes, they had the information that I had. Unfortunately, the -- there's so many sides to the coin. It's still partial information. For some of the instances, especially the thrombus formation, you want to know what the patient's INR was, and I couldn't get my hands on that. Before the patient comes into hospital, especially the weeks, months before that, not just the day he came to hospital, you want to know what his INR was. To make this ironclad, you have to have that information, and I clearly couldn't get that information.
Q But you did have a data set that was never made public, to your knowledge, by St. Jude, correct? From one person, correct?
A I had made it known to them that this is the data set I had.
Q Right. And they didn't do anything to tell physicians that there was at least two data sets now from Canada showing basically the same problem with explants?

A I'm not sure that's true. If one looks at the binder, after our April meeting, I think Mr. Flory had written to the FDA and to others about it.
Q Okay. Did they write any explanting physicians, to your knowledge, saying that in two different data sets from Toronto it has been statistically demonstrated to a high degree of statistical significance that the Silzone valve was associated with a high rate of explant compared to the conventional St. Jude valve?
A Not to my knowledge.
Q All right. Now, there had been publicity from the United Kingdom's regulatory authority about the experience, say, of one physician in England, right?
A Yeah.
Q And the world of implanting physicians learned of that, didn't they? Correct?
A Yes, at some stage.
Q We're talking about Mr. Buchart's patients, correct?
A Yes.
Q And he reported that the valve had been associated statistically in his study with an unacceptably high or an exceptionally high rate of thromboembolic events, such as stroke, right?



A Either TIA or stroke.
Q And the world of implanting physicians at least got to consider that information in deciding whether they wanted to use the valve, correct?
A Yes, sir.
Q And supposedly, did you ever hear, St. Jude said there was nothing to corroborate that evidence, correct?
A I believe so, yes.
Q But that evidence was made known, right?
A Later on, yes.
Q But yours wasn't, was it?
A You're right.
Q And as you look back, given that there was someone saying that there was a statistically significant association between the use of the valve and thromboembolic events, do you believe that if they'd also heard in two different data sets with which you were involved in Toronto that there had also been a statistically significant association with explants, that physicians would be asking more and more questions about whether to use the valve?
A Yes, sir.
Q You wouldn't have been at least totally alone, would you, in terms of raising questions about the



safety of the valve?
A I think you're right.
Q You go on in this handwritten document to say, "I have no axes to grind."
Did I read that correctly?
A Yes, sir.
Q "My response to your questions are attached. The abstract is again modified to reflect our concerns."
A My concerns.
Q Your concerns.
A Yes.
Q All right.
"Hope this helps. Perhaps we should meet sometime and discuss this face-to-face. I believe I'm not the SOB you may have been led to believe I am. Sincerely, Jagdish Butany."
Correct? Did I read that correctly?
A Yes.
Q So would you agree with me, by the way, that the reason that you were alone was because St. Jude suppressed your results?
MR. KOHN: Object to the form.
THE WITNESS: I don't know.
MR. SIGELMAN: Q You don't know. Did St. Jude do anything to make you alone?



A Not that I know of.
Q We've looked at some documents already today. Did they do anything that you thought was behind your back, that betrayed your trust?
A Can't be sure.
Q Pardon me?
A I can't be sure.
Q Well, for example, you shared with them that earlier abstract where you took out all the Silzone information, correct?
A Yeah.
Q And then they used that against you, didn't they?
A Yeah.
Q Do you feel betrayed by that?
A I feel chastised for sure.
Q Pardon me?
A Yes, I do.
Q All right. Now, you said you believe I'm not the SOB. What does SOB stand for?
A Short of breath.
Q Short -- I was afraid you'd say that. Does it refer to anything else?
A It could in lay language, in colloquial language, I guess.

Q Son of a bitch?
A Yeah.
Q Okay. And at the time you wrote this, who did you believe may have led Ms. Carpenter to believe that you were an SOB?
A I don't -- I have absolutely no idea. Can't even begin to guess.
Q But did you suspect that there were people at St. Jude who thought you were a son of a bitch?
A I guess there must have been. Right in the beginning I made some comment to that effect.
Q Did anyone ever say anything to you that indicated to you that they had heard something very adverse about you from St. Jude?
A No.
Q As you sit here today and you look at --
A Can we just talk something else for a few minutes, give me a chance to get --
Q I'm almost done with this.
A -- my equanimity back?
Q Okay. You want to just -- you mean take a break?
A Stop for a few minutes.
Q Oh, sure, sure. No problem.
A Can we talk about your children and mine?



Q Sure. I thought you wanted to go on and have different interrogation --
THE VIDEOGRAPHER: We are off the record. The time is 1:03.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 1:13.
MR. SIGELMAN: Q Doctor, we're back on the record. Would you agree with me that based on what we've looked at, St. Jude knew about the abstract, right?
A Yes, sir.
Q And they knew that you were planning to submit it to the Society of Thoracic Surgeons, correct?
A Yes, sir.
Q And they indicated that there's no way they could publish it and that you could present it, because you'd already presented these data before, correct? That's what they said in the memo that we looked at?
A That was an internal memo.
Q Right.
A Yeah, right.
Q And obviously, you have testified that's not true. These data have not been presented before.
A I didn't think this data had, at least in this



format, been presented before, but I could be wrong.
Q And you have no idea whether St. Jude then contacted the Society and said don't publish it?
A Absolutely. I have no idea at all. For the record, I don't think they could. It -- we are at least reasonably honorable persons, and I don't think any one person could twist anybody's arms that badly.
Q You don't know whether St. Jude contacted the Society and said this ought not to be published because these data have already been presented before?
A No, I don't know that, and that's a well taken point that I didn't think of.
Q If St. Jude did do that, that would have been a misrepresentation of the facts as you see them, correct?
A The way I see them, but I guess some of the data certainly would have been a repetition.
Q All right. Do you believe, based on the work that you'd done up to this point, that you had put St. Jude on notice to look at their data, from whatever source, to try to determine whether they could see a pattern of increased frequency of explant for the Silzone valve compared to other valves?
A Yes, I had.
Q Did you ever ask them whether they had looked at their data to see whether anyone else had had a



similar experience?
A Repeatedly.
Q Did you ever ask them whether they had analyzed their mandatory device reporting data --
A No.
Q -- to see whether there had been any kind of pattern, statistical or otherwise, associated with the occurrence of explant and the use of the Silzone valve?
A No, but the question didn't arise. They said all along there had never been another valve explanted anywhere else that they were aware of.
Q No valve ever explanted?
A They hadn't had any reports of a similar occurrence at another site.
Q How long did they tell you that, up to what point?
A I think even in end October of '99. At that time Sunnybrook and us were the only ones seeing them. There were isolated instances from other places, but this was my recollection now.
Q Up to the end of '99?
A October of '99.
Q October '99. Based on what you know now --
A Yeah.
Q -- was it true that up to as late of October

1999, no other physician had been reporting explants with the Silzone valve to St. Jude?
MR. KOHN: Lacks foundation.
MR. SIGELMAN: Q I'm asking you if you know.
A I don't know. I'm sorry. Could you ask the question again?
Q Well, let me -- had you spoken to anyone outside St. Jude that led you to believe that other physicians in fact did have explants?
A No. The answer is no. Keeping in mind that they did know that Sunnybrook Hospital had that problem.
Q Right. You know there had been explants associated with the AVERT study, correct?
A I do now, from the publications that have come out of AVERT.
Q Do you have any idea when those explants occurred?
A When I look at the last paper, I can see that the explants occurred at multiple periods, multiple points in time post implant.
Q Do you know whether St. Jude had access to the data from AVERT as the study continued forward?
A At at least two points in time, they did.
Q Only two points?
A I said at least.



Q Okay. Were there any explants that occurred, for example, in the AVERT study that occurred prior to October of 1999?
A I cannot recall, but we could easily find out by looking it up in one of the papers that I gave you in that whole bunch. The last paper from Dr. Schaff's, Hartzell Schaff's group, does give a chronological listing of explants. That's one that came out last month.
Q Okay. Let's see if we can look at that paper. I may have brought that paper.
A No, I -- it's in the pile that I gave you.
Q It's in that stack. Okay.
A It's in this pile.
Q Okay. In fact, I may --
A Shall I look it up for you?
Q -- if you don't mind, mark that as an exhibit, even if I have those papers.
A As long as I can get it back.
Q Sure. And I'm sure that Steve could facilitate that.
Right, Steve?
MR. KOHN: Anything's possible.
MR. SIGELMAN: Anything's possible.
MR. KELLOGG: For a resourceful guy like you,



anything's possible.
THE WITNESS: You don't have that in front of you. If anybody else did, we probably would be able to find it a lot faster.
MR. SIGELMAN: Does anybody else have -- I have it in my hotel room. I don't have it here.
THE WITNESS: I have it here. Here it is. "Paravalvular Leak and Other Events."
MR. SIGELMAN: Can we mark that?
THE WITNESS: Of course.
(Whereupon, Deposition Exhibit 14 was marked for identification.)
MR. SIGELMAN: Q What's the number on that, Doctor?
A Exhibit 14.
Q Okay. And is there a table in the Schaff paper that gives the date of explant?
A I think there is. Okay. I'm sorry. It's not a table that -- I'm sorry. It's not a table that says which time of the year or date in the year, but it says how many days post implant the valves were explanted. That goes from day 77 to day 646.
Q All right. Let me just ask this. If there were other physicians, for example, people who participated in the AVERT study who reported explants



prior to October of 1999 with the Silzone valve, then you weren't alone, were you?
A No. But you still got to keep one thing in mind, and I don't know if I said this earlier. Each surgeon takes out one valve, and to him it's one valve out of the 20, 30, or 40 that he put in -- puts in, and taking out one valve out of a set of 20 or 30 is not that big a deal. These things do happen. It's only when you see the cluster that you begin to wonder what's going on.
Q But if physicians, for example, had learned of you clusters and your statistics, they might be more sensitive to the significance or potential significance of an explant of a Silzone valve, correct?
A Yeah.
Q Right?
A Absolutely.
Q And they weren't notified of your findings so that they could have their antenna up, correct?
A They weren't officially notified, yes.
Q They weren't even unofficially notified by St. Jude, to your knowledge, right? To your knowledge.
A Absolutely, you're right. But people do talk amongst themselves, and I'm sure people would have talked about this, too.

Page 206

Q All right. Now --
A Or I presume so, anyway.
Q Sure. Let me hand you what's going to be marked as Exhibit No. 15.
A Can I put this back?
Q Sure. And if you don't mind -- yeah, put that back in, yeah. I think we might want to mark all those papers, not because we don't necessarily have them, but because they're your papers.
A Okay.
Q And make all of that one exhibit and call that Exhibit No. 16, because we're marking that next one 15.
A The one inside is No. 14, the one we --
Q Yes. Yeah, the 14 will be in 16, I guess.
(Whereupon, Deposition Exhibits 15 and 16, respectively, were marked for identification.)
MR. SIGELMAN: Q I presume, Doctor, that you recognize what's been marked as Exhibit No. 15.
A Yes.
Q This is an abstract that you presented on or about June 16 of 2001 in London at the Society of Heart Valve Disease?
A Yeah.
Q Did you have any slides that you used for this presentation?

Page 207

A Yes, sir, I did.
Q Did you have a lot of slides?
A I had a fair number of slides.
Q All right. Did you have slides for the two previous --
A Yes.
Q Let me strike that.
A The one previous.
Q Let me strike that. For the one previous presentation.
A Yes, I did.
Q How many slides did you have for that?
A Would be at least 14 or so slides, of which eight or so would be text and the rest illustrative, or some balance thereof.
Q And how many slides did you have for this presentation?
A Should be roughly the same. The time allowed I think was eight minutes, and four minutes for discussion.
Q And did you produce those slides, the --
A Can I --
Q -- slides associated with this, today?
A Yes, I think I did.
Q Okay. But not for the first presentation?

Page 208

A I think I did.
Q Okay. So you have it for both?
A I believe I do. If I don't, I should.
Q All right.
A I should be able to bring them.
Q Can you check with your files back in Toronto just to make sure that there are no slides that you haven't provided?
A I will. Can I say one thing, though?
Q Right.
A This is not the same as the abstract that I sent to the STS.
Q No, I understand. This is study No. 3, or abstract -- abstract No. 2.
A This is No. 2.
Q Right.
A It is not the same as the --
Q But it's the third abstract.
A -- one for STS.
Q Right. We're on to a new set of data, correct?
A What I'm pointing out is that abstract No. 44 is not the same as the one that went as No. 3 to STS.
Q Right. I agree.
A Earlier I couldn't be certain about that when you asked me that question.

Page 209

Q All right.
A I'm sorry. You asked me something else?
Q And are there documents in Exhibit No. 4 related to this abstract?
A There should be.
Q I think page 29, for example, right? Not 29. I have the wrong one. Page 29 does relate to it.
A This would be -- I think this would be one.
Q What page is that, sir?
A This is 28.
Q All right. And page 29?
A These are some of the slides that I -- yes, it is.
Q The slides from pages 29 through 35, did they all go with this particular presentation and abstract?
A Yes, they did.
Q And --
A I think they did.
Q Do you have any drafts of this abstract?
A No, I don't.
Q Why is that?
A Most of these are done on a computer, and after that, you'd throw it away, and although I usually do the initial one handwritten, I give it to my secretary, get her to put it in the computer, and then by and large

Page 210

throw away the handwritten stuff.
Q Did you share drafts of this abstract with St. Jude?
A Considering what I've been saying so far, I think I must have.
Q All right. So they knew that you were going to present this before you indeed presented it?
A They must have. I'm sorry that I can't recall absolutely, but I did try and run everything to them once at least.
Q Do you know whether St. Jude talked to Dr. Bodnar before you presented these data?
A No.
Q Pardon me?
A No, sir, I have no idea.
Q And tell me, what did Dr. Bodnar do to, to use your term, castigate you in front of 200 people?
A 200. 400 people.
Q 400 people.
A Whatever the number was.
Q What specifically did he say?
A He said -- I think I said that once already -- that if he'd known that I wanted to make a change in the abstract, or if he'd known the figures as they are here, he didn't think they would stand statistical scrutiny,

Page 211

and he wouldn't have accepted it, at least not for presentation in the big hall.
Q And why did he say that wouldn't withstand statistical scrutiny?
A He thought there wasn't as good a statistical significance in endocarditis as I said here.
Q All right.
A Endocarditis being equal to 0.003.
Q All right.
A He didn't think that would be the case.
Q All right. If 0.003 were the correct figure, that would be highly statistically significant, correct?
A Yes, sir.
Q That would mean that the association between the occurrence of endocarditis and Silzone valve was likely not due to chance, correct?
A Yeah.
Q And that was your conclusion, correct?
A Yes, it was.
Q And I presume that you believed and still believe that the statistics that were used there were valid.
A Yes, I did.
Q All right. Did Dr. Bodnar criticize the statistics with respect to paravalvular leak where you

Page 212

said that the "P" value was 0.001?
A No, sir, he didn't.
Q That also is highly statistically significant, correct?
A Yes, sir.
Q Which means that the chances that the occurrence of paravalvular leak with use of the Silzone valve as attributable to chance are very low, correct?
A Yes.
Q Not a chance association in all likelihood, right?
A You're right.
Q And reoperation, was that statistically significant with the use of the Silzone valve?
A Borderline significance.
Q It was under 0.5, correct?
A .05. Anything less than .05.
Q Excuse me. I meant .05, not -- I misspoke.
A It's .04, so it's really borderline.
Q Right. But still within what most statisticians would agree is statistical significance?
A Technically, yes, they probably would, but they'd put in a caveat of some sort, I think.
Q And was this particular data set based on the data that were part of Dr. David's Carbomedics, St. Jude

Page 213

study that was sponsored by Carbomedics and St. Jude?
A Some of it certainly was. Some of it certainly had to have been, because the -- under Conclusion where you see Silzone coated valves had over 25 percent adverse event rate, this is data that had come out of that study.
Q Out of that randomized study, correct?
A That's right.
Q And then there were some data that weren't from the randomized study that were included in this particular abstract, correct?
A The morphological data may or may not have been included. Ultimately they must have been included.
Q All right. And the cases of endocarditis were generally culture negative; is that correct?
A That is correct.
Q In other words, you couldn't actually identify bacteria responsible for the endocarditis, right?
A You're right.
Q Be called sterile endocarditis or pseudo endocarditis, correct?
A Sterile endocarditis, right.
Q All right. And when was this analysis first performed?
A The usual is six months before a meeting, as I

said earlier, so it would probably have been December, January of '99 or 2000. January of 2000, December of '99, somewhere around about that.
Q So maybe a year and a half or so before you presented it?
A No. Six months before.
Q You said 2000.
A I'm sorry. I'm sorry. Six months before it was presented. It was June of 2001 when it was presented, so it would be six months before that.
Q All right. And you wrote that the Silzone valve was an independent predictor of endocarditis, correct?
A Yes.
Q And it was an independent predictor of paravalvular leak.
A Yeah.
Q Correct?
A Yep.
Q And it was an independent predictor of reoperation, correct?
A Mm-hmm.
Q And what is reoperation, just so that we're all talking on the same page?
A Means that the valve is likely to fail and the



patient will have to have the valve taken out and get another round of surgery.
Q So in the context in which you used this, is reoperation synonymous with explant, or is it more embracive than just explant?
A Explant and reimplant of another valve.
Q Okay. So you found a statistically significant association once again between the use of the Silzone valve and explant of the valve?
A I'm sorry. Could you repeat that?
Q Once again there was a statistically significant association between explant of the Silzone valve and use of it?
A Yes, sir.
Q And the endocarditis that was reported was associated with massive valvular dehiscence, correct?
A Yes, sir.
Q And what, in plain English, does that mean?
A Means -- it's fairly common to get a minor paravalvular leak. In fact, many cardiologists, echocardiographers especially, will tell you that a minor paravalvular leak in the early postoperative period is not an uncommon finding. The numbers they quote are very high. But to get a hole that's more than two or three millimeters in diameter is pretty large,



and some of these were encompassing more than a third of the circumference of the prosthesis. That is large.
Q And to your knowledge, was a transcript made of the proceeding where you presented this information?
A I -- I'm not sure, but I think it was.
Q Do you have access to, or possession of, such a transcript?
A No, I don't.
Q Was a transcript made of the presentation you made in London in June of 1999?
A Not that I know of.
Q And what leads you to believe that there was a transcript done of the proceedings?
A The '01 meeting was fully electronic. You had to hand your stuff in the day before, and they put it on their computers, and I think there were video cameras on a lot of the time.
Q And Dr. Bodnar said that had he known what you would present, he wouldn't have allowed it? Is that what he essentially said?
A He said that he didn't think the statistics were appropriate and that he would not have accepted it.
Q And you only were required to submit it a day before the presentation?
A No. The -- we're talking about the abstract.



Q Yes.
A That's six months in advance.
Q Okay. Well, why didn't he know about the abstract before you presented it?
A I don't know.
Q All right. And --
A I don't know if I'm forgetting something in the chronology here.
Q Okay. What is that?
A Something about the numbers and the endocarditis set that I called Dr. Bodnar and told him, look, the numbers, there may have been one more counted and -- rather than the number that I have said here, and I think that's what his comment was based on.
Q You left out one?
A There may have been one more included than there should have been.
Q Oh. With respect to endocarditis?
A Yeah.
Q But not with respect to --
A Anything else.
Q -- paravalvular leak?
A Right.
Q And he never specifically leveled any criticism about the other adverse events besides endocarditis?

A That is correct. He only talked about the endocarditis.

Q And Exhibit No. 2, which is your manuscript, which I still haven't really had a chance to read --

A Yep.

Q Are the data in that manuscript from the same data set that is the subject of the June 2001 presentation which has been marked as Exhibit 15?

A No. Probably from the original set.

Q From the original set that you presented in June of 1999?

A Probably. They're from the earlier cases.

Q All right. Is there any overlap in the patients between the two data sets?

A There is a continuum.

Q All right. And what role did the other authors listed on the paper have in terms of either the drafting or preparation of the abstract or the presentation of it?

A In the presentation, none of them had a role. I presented it myself. The pulling the data together I did with Richard Leask, my fellow. Joan Ivanov went over the stats for us. And Tirone, we ran the paper past him -- abstract past him before we submitted it.

Q All right. And with respect to the overall



study, the Carbomedics study versus the St. Jude study in general, we've established Dr. David as the principal investigator for that study, correct?

A Yeah. You've told me that.

Q Do you know if he often is sponsored to go to various functions by St. Jude?

A I don't know.

Q And as you understand it, did this study start as a more general study to compare St. Jude valves in general with Carbomedics valves?

A No. As I said earlier, I wasn't even aware that the study had started when I ultimately became aware of it.

Q Do you have any idea, based on what you've learned, when the overall Carbomedics, St. Jude study initially began?

A I think it began two years prior to -- or a year and a half prior to the introduction of the Silzone, but I'm not absolutely sure.

Q And that Carbomedics, St. Jude study was a prospective study, correct?

A It was a prospective study.

Q And it was designed to be randomized, correct?

A It was.

Q Are you familiar with the protocol for that



study?

A No, sir. I haven't seen it.

Q All right. That was going to be my next question. Was there a protocol amendment that specifically addressed Silzone?

A Not that I know of. I really don't know anything much more about it.

Q Are you familiar at all with the results of analysis of the St. Jude, Carbomedics sponsored trial in which Dr. David is the principal investigator?

A It depends on to what extent you mean that. I'm aware of some of the data, those presented at the Quebec City meeting by St. Jude representatives. That was my first exposure to them. And subsequently I saw a small amount of that data when I worked with Joan Ivanov on the stats to look at to write this abstract here, the '01 valve meeting abstract. I haven't seen the rest of the -- I can't recall having seen the rest of the data.

Q But would it be fair to say that the data set for that study as it pertains to Silzone, while there may be some overlap with some of the data sets you use, is a distinctive data set?

A Yes.

Q It's distinct from any of the data sets that we've looked at that are the subject of these abstracts?



MR. KOHN: Calls for speculation.

MR. SIGELMAN: Q If you know, obviously.

A I don't firsthand.

Q You don't know firsthand?

A No. This must be part of that -- sorry. The valves that I've seen would be part of that.

Q Yeah. Exhibit No. 15 would include data from the prospective randomized trial headed by Dr. David, and in addition, some other data involving patients, correct?

A This includes a small amount of the data. Where it says the 25 percent adverse event rate, those sort of things were things that I didn't otherwise know.

Q Do you know whether the patients who have participated in the prospective randomized trial were informed that they were in part of a study?

A I wouldn't know. It would have to have been done with informed consent, so they must have been informed.

Q Why do you say that?

A The ethics committees at our hospital do not normal -- do not allow trials such as that to go without ethics committee approvals.

Q Does Toronto General Hospital continue to follow up on the experience of patients implanted with

Silzone valves?
A I believe so.
Q What do they do for follow up?
A I'm not a cardiologist or a cardiac surgeon. The only reason I know about it is what was discussed at the April meeting in Toronto where they agreed they would be called back, followed up, at least by echocardiograms. That's the only firsthand knowledge I have of it.
Q When was this meeting?
A April of '99.
Q All right. And did St. Jude, to your knowledge, act as a sponsor of a patient survey undertaken at Toronto General Hospital?
A This is the one I was referring to when I said they agreed at the April meeting that they would follow up on all Silzone -- all patients with Silzone valves.
Q The Toronto General Hospital patients were the subject of Exhibit No. 15, which is the abstract you've presented in June 2001?
A Yes.
Q Were some of those patients from a patient survey conducted by Toronto General Hospital and paid for by St. Jude?
A They must have been.



Q All right. So as I understand it -- please correct me if I'm wrong -- the patients who are part of Exhibit No. 15 come from two sources: One, a perspective randomized trial headed by Dr. Tirone David and paid for in part by St. Jude, and a patient survey that was done through telephone contact that was paid for by St. Jude. Is that your understanding?
MR. KOHN: I'm going to interpose an objection here. It's compound, and it calls for speculation.
MR. SIGELMAN: Q And I'm only asking if you know.
A No. I don't know anything about the process of that study.
Q Do you know whether the patient survey study was actually conducted by the marketing staff of St. Jude Medical, Inc.?
A I know from the binder that they did come and go and talk to the staff at the department of cardiac surgery about the follow-up.
Q Was that a marketing study?
A I don't think so. I didn't think so, anyhow.
Q Were there scientific staff from St. Jude who were making these contacts with the patients, or were they marketing people?
A Probably marketing, but I have no real way of



knowing.
Q By the way, have you ever heard the St. Jude Medical Fellow Symposium?
A No.
Q How about the St. Jude Medical Institute?
A No.
Q If you know, and only if you know, as I understand, was the telephone survey study started because of safety concerns that were raised by the prospective randomized trial headed by Dr. David?
MR. KOHN: Lack of foundation.
THE WITNESS: No idea.
MR. SIGELMAN: You don't know.
Q What is randomization, by the way?
A If -- the simplest way to put it is, if you had a box full of marbles and you started blindly pulling out one at a time and putting one in your left-hand pocket and the other in your right-hand pocket, that's taking the marbles in a randomized matter. You don't know which color you'll get in which pocket. So in a trial, you don't know which patient will get which valve.
Q And why is that done, Doctor?
A To avoid any bias whatsoever.
Q And that's an important thing to do?



A Yes, it is.
Q Now, in the randomized trial that was conducted at your hospital -- and I'm only asking if you know -- had the incidence of stroke in St. Jude Medical valves increased during the past year, by February of 1999?
A I didn't really know.
Q Okay. Let me hand you an exhibit.
(Whereupon, Deposition Exhibit 17 was marked for identification.)
MR. SIGELMAN: Q Handed you what the court reporter's now marked as Exhibit No. 17, and it's an internal memorandum from Monica Schultz. Do you know her, by the way, or --
A Mm-hmm. Yes, sir.
Q She's a St. Jude employee?
A Yeah.
Q Correct?
A Yes.
Q She handles post market studies --
A Yeah.
Q -- for St. Jude's?
A I don't know exactly what she handles, but yes, I do know Monica.
Q And you'll agree with me that on its face, it's a February 18, 1999 memorandum?

Page 226

A Yes.
Q Do you see where it says the "incidence of stroke in SJM valves has increased during the past year in the randomized trial"?
A Yes.
Q You see that? And they're talking about Dr. David's experience with Silzone coated valves.
A Yes.
Q And would it be fair to say that this is the first time you've ever heard that?
A Yes, sir.
Q All right. And then it goes on, "He" -- Referring to Dr. David, correct?
A Yep.
Q -- "has identified five TE's."
Do you recognize TE's as an abbreviation for thromboembolic events?
A I do.
Q "He has identified five TE's in Silzone coated valves. All were implanted in the mitral position. All these valves were outside of the randomized trial. He stated that all patients were complex cases and quite ill."
I read that correctly, right?
A Yes, you did.

Page 227

Q Did you know that there had been five thromboembolic events in patients receiving the Silzone coated valve in your hospital who were not part of the randomized trial by February 18 of 1999?
A Not really.
Q By February 1999, based on everything that you know now, had anyone, to your knowledge, ever reported from some location besides Toronto that the Silzone valve had been statistically associated with an increased incidence of stroke?
MR. KOHN: Overbroad.
THE WITNESS: No, sir.
MR. SIGELMAN: Q Do you know when Dr. Buchart first made known his concerns about that subject to St. Jude?
A No, sir.
Q By the way, do you know whether there was anyone who was apprised -- when I say anyone, implanting surgeons in your area or in Canada or in the United States -- that there had been a number of strokes occurring in Silzone patients in your hospital prior to February of 1999? Or I should -- let me rephrase that. Five thromboembolic events. I shouldn't have said strokes.
A Not that I know of.

Page 228

Q And by the way, a stroke is a thromboembolic event, correct?
A Yes.
Q If it's an ischemic stroke, at least?
A Sure.
Q It's hemorrhagic stroke, it probably isn't a thromboembolic event.
A Right.
Q Correct?
Do you have any reason to question the competence of any of the cardiothoracic surgeons who have practiced, say, over the last ten years at Toronto General Hospital?
A No, sir.
Q Is there any reason that you can think of why Toronto General Hospital surgeons would have worse surgical outcomes than other surgeons? And when I say surgeons, I mean cardiothoracic surgeons.
A I can think of a couple.
Q Okay.
A We do see the second time done case and the third and the fourth and the fifth time done cases, which virtually no surgeon anywhere would touch. First time, almost any surgeon would take. A second time, very few. And a third and beyond, hardly anyone, other

Page 229

than Dr. David and a very few others across the world.
Q But there are other cardiothoracic surgical centers in Canada who have similar kinds of patient diagnoses, correct?
A There must be, yes.
Q Did your hospital review board, to your knowledge, ever question the clinical competence of any of the cardiothoracic surgeons?
A Not that I know of.
Q Did you know Mr. or Dr. Buchart by this time?
A Yes.
Q When did you meet him?
A In June, in London, at the MDA.
Q Had you talked with him prior to that time?
A We had tried, not connected. Ultimately I think we did talk just before the London meeting.
Q When did you first learn of his reported adverse experiences with the Silzone valve?
A I'm not sure. I think it was Miss Hazel Randall from the MDA who told me about it. That's what I think.
Q What's your best recollection of when you were first told that?
A May of '99. April or May. That's what I think.

Q Did you ever have opportunity to review any of the histopathology slides from any patients in Mr. or Dr. Buchart's study in the United Kingdom?
A No, sir. I don't think there were any -- other than one case, I don't think any of his patients were reoperated.
Q Did you know in early May of 1999 that Mr. or Dr. Hosek at St. Jude Medical was disappointed with you?
A No, sir. You're going to make me cry again. Let me take that back. Only taking back what I said.
Q What?
A That you're going to make me cry again, that's all.
Q I'm not here to make you cry.
A No, no.
Q I'm here to --
A It's the words. It's not you.
Q -- conduct the discovery on behalf of some people who we believe were injured by the Silzone valve.
A It's the words that will make me break --
Q Sure.
A -- but not other things.
Q I understand. And it's unfortunate, but we may have to go through a few more things.
Would the court reporter please mark the next



exhibit.
(Whereupon, Deposition Exhibit 18 was marked for identification.)
MR. SIGELMAN: Q Doctor, I've handed you what's been marked as Exhibit No. 18; is that correct?
A Yes, sir.
Q And have you had an opportunity in the last couple weeks to see this particular memorandum? It's called Butany -- Butany, excuse me, phone notes. That's the subject matter of this e-mail from Dr. Hosek.
A Yep, I have.
Q All right. And would you agree with me that, according to this e-mail, Dr. Hosek is telling Dr. Flory, also of St. Jude, "Al, as discussed, I had a disappointing discussion with Dr. J. Butany this morning"?
Do you recall the discussion he's talking about?
A I don't, but when I read it, I recall that we must have talked about this.
Q All right. And he's then says, "I think it's time to get Dr. David involved."
Did you know that they were talking about getting Dr. David involved?
A No.



Q So if they were doing that, they didn't tell you, did they?
A Probably -- why am I saying "probably"? No, they didn't.
Q At that time Dr. David was on the payroll of the company, at least insofar as he was a clinical investigator, in fact, the principal clinical investigator for them at your hospital, correct?
A Yes, sir.
Q Right?
A That's what you've told me.
Q Okay. And let's go on to find out more about his disappointing discussion with you.
A Yes, sir.
Q He says you reported, apparently, that you have seen and analyzed, quote, "way more than eight Silzone cases."
Do you recall saying something like that to Dr. Hosek?
A Easily must have, yes.
Q Okay. And what do you interpret "way more than eight Silzone cases" to mean in the context of your recollection of your discussion with Dr. Hosek in May of 1999?
A Probably more than 15.



Q But by cases, Silzone cases, what do you -- what do you understand that to mean?
A I mean that many heart -- Silzone coated heart valve prostheses, SJM heart valve prostheses.
Q Explants?
A Explants.
Q Okay. So there were way more than eight by this time, right?
A Yep.
Q And to your knowledge, did St. Jude tell regulatory authorities or implanting physicians that you had reported to them that you had seen way more than eight cases?
A I'm not sure of the time frame, but somewhere in the binder there is mention at about this time -- this is May something or the other -- that at about this time they did talk to both the Canadian authorities and the FDA about the valves that we had seen.
Q All right. And do you have recollection of Dr. David coming to you sometime around this period to speak with you --
A No, he didn't.
Q -- about the analysis of Silzone cardiac cell specimens?
A No, I don't. He didn't come and hold my ear or

berate me or anything.
Q And according to this memo, says, "Little or no histopath done on annular tissue. Valves just, quote, lifted out, unquote, of the annulus with sutures still intact. Did not even have to cut the sutures in most cases."
Do you have any recollection of saying something like that to Dr. Hosek?
A The "most" is an exaggeration, but in some of the cases certainly the surgeons said that they literally could have lifted the valve out.
Q And you have some recollection of telling Dr. Hosek that at that time?
A Yes.
Q And he found that disappointing.
A Well, I cannot interpret what he thought or didn't think. He says he was disappointed with the conversation he had with me.
Q Right. He didn't -- did you interpret that to mean, as you look at this document, that he didn't like hearing that that's what was being reported from the surgeons?
MR. KOHN: Calls for speculation.
THE WITNESS: I'm sorry. I think it was -- he may just have been disappointed that the whole thing



didn't go away and that it was getting worse.
MR. SIGELMAN: Q When you heard from implanting surgeons that valves just lifted out of the annulus with the sutures still intact and you didn't even have to cut the sutures in most cases, what did that signal to you as a pathologist?
A One, that there must have been infected endocarditis; two, that there must have been a paravalvular leak; and three, that the stitches must have cut through.
Q Did that signal to you anything about the degree of ingrowth, tissue ingrowth into the cuff?
A The conclusion would be that there had been very little ingrowth.
Q All right. And do you have any recollection around this time or subsequent to May 6th of 1999 St. Jude putting out anything to implanting physicians in Canada or the United States, or anywhere else for that matter, that there had been reports that valves just lifted out of the annulus with the sutures still intact or that you didn't even have to cut the sutures in most cases --
A No.
Q -- or that surgeons were reporting that there was no tissue ingrowth into the Dacron polyester cuff of



the Silzone heart valve?
A No, sir, I don't know of any such communications.
Q Do you know of any such communications made by St. Jude at any time prior to the recall of the Silzone valve in January of 2000?
A As I said, at about this time there is documentation there that they did communicate a list of all of our cases to the Canadian and the U.S. authorities.
Q Right. But my question is, do you recall any public announcement to implanting physicians, who have to decide whether to use the valve, that there had been reports that the valve just lifted out of the annulus with the sutures still intact, you didn't even have to cut the sutures in most cases, and that explanting surgeons were reporting little or no tissue ingrowth into the Dacron polyester cuff of the Silzone heart valve?
A No. Not aware of any of it. It's unusual. Unless one takes a section of that tissue, you can't tell whether there's been tissue ingrowth or not. So a surgeon taking a prosthesis out may speculate but really wouldn't know if there had or had not been. Nevertheless, given that the valve was floating in the



bloodstream, there couldn't be tissue ingrowth.
Q Right. But would it be fair to say that you don't know whether any pathologist, either at St. Jude or who were paid by St. Jude, in fact did such histopathological analysis and found little or no ingrowth well before you had this conversation in May of 1999 with Dr. Hosek? Is that fair to say?
A Yes. I have no idea of any such thing.
Q And if they did, you're still not aware that St. Jude ever told implanting surgeons about those findings; is that fair?
A I have no idea of St. Jude telling anyone about this.
Q All right. Up to and including the day that the valve was recalled on January 21 of 2000, correct?
A No. I did say repeatedly that the book shows -- the binder shows that they did talk to the Canadian and to the U.S. authorities.
Q Right. But not to implanting surgeons?
A Not that I'm aware of.
Q By the way, in Canada you have somewhat of a socialized medical system, correct?
A Yes, sir.
Q And do you get reimbursed or do hospitals get reimbursed extra for doing explant analysis, or are they

Page 238

paid by the case?
A No. It comes out of the pot.
Q Okay. So there would be an economic disincentive then, as I gather, to do histopathological analyses of explanted valves?
A I guess on a technicality you'd be right, but no one's ever told me don't take --
Q Sure.
A -- 10 sections, don't take 50 sections.
Q Do you think that that affects the number of histopathology readings that go on in Canada for explanted valves?
A I don't think so.
Q That -- it just is kind of expensive to do.
A Well, it is, but at the same time, it's coming out of the globe. You've got the technicians, you've got the equipment, you've got the materials. It doesn't really add too much to the cost of that.
Q It goes on to say, "Another center reported to Butany" --
I'm reading again from the memo, which is what exhibit number again?
A 18.
Q 18.
-- four explants with similar characteristics

Page 239

to those seen by Butany."
What center reported that to you?
A The Sunnybrook Health -- Sunnybrook and Women's Health Science Center.
Q And he has "to Butany" with an exclamation point. See that?
A I don't see the exclamation mark.
Q Within the parenthesis.
A You're looking at the fourth asterisk?
Q Another -- yes. "Another center."
A "Another center" -- yeah, that's right. "To Butany," yeah.
Q And then he says, "Also, TG explanted one of their valves for a total of five."
Did I read that correctly?
A That is correct. I didn't see that, but that number is absolutely right.
Q Well, you see it's the next sentence.
A Yep.
Q So did that disappoint Dr. Hosek, do you recall, when you talked to him? Did you find that he was disappointed to hear all that?
A I presume he must have been.
Q And then he goes on -- I'm looking at the next dot underneath that.

Page 240

A Yep.
Q Says -- or bullet. "New report to Butany from another center earlier today. Died a month ago, several months after implant. Huge thrombus on autopsy, attached to the inflow edge of the fabric of the sewing cuff. Heart and valve and thrombus tissue is in transit to Butany," exclamation point.
Were you telling him about someone who died from a -- or died in association with a thrombus that was found on autopsy?
A Yes, sir.
Q Was that part of the disappointing news that you conveyed to him that day?
A It was news that I conveyed to him that day, yes.
Q All right. Was that the cause of death, the thrombus?
A The effects of the thrombus and/or the thrombus itself.
Q What did that patient die of?
A He -- they only sent me a very small part of the heart. The heart pathologist there did the autopsy and made his report, but there really was a huge thrombus sitting on the prosthesis.
Q Did the patient have a stroke or a myocardial

Page 241

infarction?
A He'd had at least TIA's, is my recollection.
Q TIA?
A Transient ischemic attacks. And had atrial fibrillation when he came in the day of the death.
Q All right. Was it your conclusion that he had died as a consequence of the Silzone heart valve?
A I couldn't make that conclusion, because I didn't see the rest of the autopsy, and I couldn't exclude any other event.
Q All right. And then it goes on, "Has cut the sewing ring and examined tissue ingrowth on eight cuffs. Has seen bugs on only one."
Bugs, did you tell him that?
A Yeah.
Q Was bugs synonymous with bacteria or infection, infective agents?
A Microorganisms, yes.
Q Right. So would it be fair to say that you thought that some of these patients, from their presentation, had suffered endocarditis?
A Yes, sir.
Q Of an infective etiology or origin?
A Yes, sir.
Q And then you went in and you didn't see any

Page 242

evidence from cultures or otherwise that in fact they'd been infected with a bacteria that caused the endocarditis?
A Yes, sir.
Can we take a five-minute, if you don't mind?
Q Sure.
A I just want to go around the corner.
Q No problem.
A Thanks.
THE VIDEOGRAPHER: This marks the end of videotape No. 3 in the deposition of Dr. Jagdish Butany. The time is 2:05 p.m. We are off the record.
(Recess taken.)
THE VIDEOGRAPHER: This marks the beginning of videotape No. 4 in the deposition of Dr. Jagdish Butany. The time is 2:15 p.m. We are back on the record.
MR. SIGELMAN: Q Dr. Butany, at the time that we are dealing with this Exhibit No. 18, the abstract with which you were involved, if any, was the abstract that we looked at a while ago that was sent to the Society of Thoracic Surgeons, which you called abstract No. 3, correct?
A The --
Q At that time period.
A No.

Page 243

Q Right?
A No.
Q What -- oh, it was --
A Only the first abstract had been submitted.
Q All right.
A And was due to be presented in June.
Q And you had submitted that before May 6th of 1999?
A Long before that.
Q All right. And you weren't involved in any other abstract at that time?
A No.
Q All right. So let's look at Exhibit No. 18, and I have a question that relates to the last paragraph, the last bullet. Says, "New abstract has been written."
What abstract was he talking about there?
A I don't know what he's talking about.
Q And then it says, "Will fax to me by tomorrow a.m."
What abstract are you talking --
A Are you sure this is '99 or --
Q Well, that's what --
A Will not submit to -- oh, okay. There was one that I wanted to submit to the Southern Thoracic

Page 244

Society. I wrote it and then decided I couldn't afford to go to -- I think it was San Antonio or someplace in the south, and just didn't do anything further with it.
Q Okay. And did you bring that abstract here today?
A Yes, it is, in the lot that we looked at earlier when we were looking at all the abstracts.
Q Okay. If you can point to that particular abstract so that we know to what he was referring.
A It says on top "Southern Thoracic Society," and then "not submitted."
MR. KOHN: Is it here?
MR. SIGELMAN: Q You're not talking about the one that said "not accepted"?
A No. "Not submitted." It says --
MR. KOHN: No. 42.
MR. SIGELMAN: Page 42? 0042? Is that -- thanks, Steve.
THE WITNESS: Yeah, I've put it somewhere else. I go from 41 to 42.
MR. SIGELMAN: That's 44.
THE WITNESS: Yeah.
MR. SIGELMAN: Q Okay. This has the same title as the abstract that we looked at before --
A Yeah.

Page 245

Q -- that you were going to send to the Society of Thoracic Surgeons, correct?
A Yes, sir. Yep.
Q So this particular abstract at page 0042 of Exhibit No. 4 was the one that you were working on at the time that you spoke with --
A Yes.
Q -- Dr. Hosek on or about May 6th of 1999?
A Yes, sir. I think this would be the one. That's the only time I would have said that I couldn't afford to go to the meeting.
Q Okay. And in this abstract you indicate that the Silzone explants --
A Significantly more than SJM in the preceding two 18-month periods.
Q And that's with respect to what? Explant?
A Yes. SJM being the SJM standard valves.
Q All right. And again, you said that it may not be appropriate for redo valve surgery?
A Yes.
Q And do you have any reason to believe that you didn't fax that particular abstract to Dr. Hosek --
A No.
Q -- in May of 1999?
A I may have. I can't be sure.

Page 246

Q Would you agree with me that what you have to say here, which is based on the experience of --
A One institution.
Q -- one institution -- let me strike that. This is just based on your hospital and --
A Yes.
Q -- not Sunnybrook?
A That's correct. Yeah.
Q And why did you send that, once again, to the good folks at St. Jude?
MR. KOHN: He didn't say he did, Counsel.
THE WITNESS: I'm not absolutely sure that I did. I may have. I probably had. As I said repeatedly, I tried to send them everything.
MR. SIGELMAN: Q Right. And do you see in the very bottom of the memorandum from Dr. Hosek, which is Exhibit No. 18 --
A Yep.
Q -- he said, "Let's talk as a group again soon. This is getting serious"?
A Yep.
Q You see that?
A Yes, sir.
Q Did he tell you, when you were talking to him, this is getting serious?

Page 247

A No, sir, not that I can recall. But then, after -- give you a caveat. It's difficult to recall a lot of things.
Q All right. Did you think it had gotten serious long before this?
A Yes.
Q Was it serious to you in November 1998 or thereabouts when you say you wrote your first abstract?
A Yes.
Q Did, from everything that you could tell, Dr. Hosek not think it was serious when he met with you in January of 1999?
A No. They -- everyone certainly listened to me and paid attention to the valves I showed.
Q Did they tell you in January 1999 this is getting serious?
A No.
Q Did they tell you or did Dr. Hosek or anybody from St. Jude tell you in May of 1999 that they were disappointed with you because you had reported what you reported to him and that this is getting serious?
A No, sir.
Q Now, I'm going to give you another document, which the court reporter will mark.
///

Page 248

(Whereupon, Deposition Exhibit 19 was marked for identification.)
MR. SIGELMAN: Q Doctor, the court reporter has handed you what she has kindly marked as Exhibit No. 19, and it's dated May 7, 1999. You'll agree with me that on its face that was one day after Exhibit No. 18?
A Sorry. May -- yeah.
Q And do you remember in Exhibit No. 18 Dr. Hosek said, "I think it is time to get Dr. David involved"?
A Yep.
Q Right?
And he didn't tell you, when you talked to him, he was going to get Dr. David involved, did he?
A That's right, he didn't.
Q But we go to Exhibit No. 19. Did you know in May of 1999 that Steve Healy and Al Flory of St. Jude Medical, Inc. wrote a letter that was faxed to Dr. David?
A No, sir, I didn't.
Q As you look at this, and assuming that indeed Dr. David was so faxed, and given your conversation with Dr. Hosek the previous day, do you feel that St. Jude was going around you, kind of, not telling you what they were up to?

Page 249

A I suppose it would look that way.
Q Does it appear to you, assuming that Dr. David received this, that they were trying to pressure Dr. David into getting involved in helping them out with you?
MR. KOHN: Calls for speculation.
THE WITNESS: I don't know if I would go --
MR. SIGELMAN: Q I'm asking for your understanding.
A I don't know. It seems to me they wanted to talk to Dr. David. That's all I can say.
Q All right. And in this memo, or this letter to Dr. David, they complain about you, don't they, that you're not providing surgical pathology reports to them for explanted valves?
A That is correct.
Q And did Dr. David ever talk to you about that?
A No, sir.
Q And do you see where he says that this is putting them at a disadvantage?
A Yes, sir.
Q Had you put St. Jude, as far as you could see, at a disadvantage in May of 1999?
A No, sir.
Q Were you being unfair to St. Jude?

A No.
Q Did they tell you they were going to go to Dr. David to try to get from you -- and I'm quoting from the letter to Dr. David -- quote, "more complete disclosure of the information required for our evaluation"?
A No, sir.
Q Ultimately did St. Jude medical get your pathology reports for explanted valves?
MR. KOHN: Calls for speculation.
THE WITNESS: Not from me, they didn't.
MR. SIGELMAN: Q Did they from anybody else?
A I don't know. You got to remember one thing, that I showed them every single valve I had, if not in November of '98, then in January of '99. All the eight valves that I had at that time, I showed them. Showed them the pathology -- showed them the valves, showed them the fact that it is a Silzone valve, and showed them the pathology that I saw in that prosthesis. The report would only be one which had patient data on it and would only be my written version of my comments. The gist of what I saw and what I had told the surgeons was in the material in my hands and in what I said about it at that time in the wet lab.
Q You see down at the bottom of the first page of



Exhibit No. 19, Steve Healy and Dr. Flory state to Dr. David, referring to your reports to them, "These cases should be presented for what they are: anecdotal reports without formal controls."
Did they tell you this at this time?
A They did tell me that these were isolated cases, isolated cases that I had in my hands. And my response is, as a pathologist, that's all I'll ever have. I won't get randomized cases in my hands. I'll only get the ones that get explanted.
Q But you had done statistical analysis, correct?
A Yes, we had.
Q Did you think what you had given them was merely anecdotal reports without formal controls of any type?
A No. The anecdotal part is what one can say about my eight valves in my hand. Okay, you've got eight valves, Butany, what's the big deal now? These have been explanted, you don't know anything much more about them. That's the only part that may be anecdotal. Once you get the rest of the data, I don't think it's anecdotal. The pathology that you see there is not anecdotal.
Q They go on to tell Dr. David, "Unfortunately it has been difficult to convince Dr. Butany that these are



legitimate concerns."
Did I read that correctly?
A Yes.
Q Your response?
A My concerns were legitimate, that this data is hard data and should be paid heed to.
Did I understand your question appropriately?
Q Yes, I believe you did.
Who is Dr. Titus?
A Jack -- Dr. Jack Titus is a pathologist who's in Minneapolis and is a terrific cardiovascular pathologist, and has been for a very long time.
Q And has he been working for St. Jude?
A I believe so.
Q And when did you first meet Dr. Titus?
A Long ago.
Q Long ago. When you say "long ago," what's your best estimate?
A 10, 12 --
Q All right.
A -- 14, 15 years ago. 14 years at least.
Q When did you first have contact with Dr. Titus concerning the Silzone valve?
A I think it was the day he came over to Toronto to see the valves. Think it was the 19th of May.



Q All right. He met with you in your office later in the afternoon with some other gentleman?
A Yes, sir.
Q Correct? On May 19, 1999?
A Yes, sir.
Q Let's look at the next exhibit.
(Whereupon, Deposition Exhibit 20 was marked for identification.)
MR. SIGELMAN: Q Dr. Butany, the court reporter has now given you what she's marked No. 20. I presume you've seen this document before?
A Yes, sir.
Q Did you ever see this document before two weeks ago?
A I don't think so.
Q All right. So would it be fair to say that you didn't write this document?
A Definitely.
Q You weren't involved in the preparation of this document?
A That is correct.
Q You weren't consulted about the wording that was used in this document?
A No. That is, to the best of my recollection.
Q Sure. Now, did Dr. Titus consult with you

Page 254

regarding the interpretation of cardiac valve explants?
A Again, I'm not absolutely sure of what we did discuss and we didn't. Let me tell you what happened that evening, if that is what you're going to ask me.
Q Go ahead.
A Okay. Dr. Titus came over, and I took him over to my -- the lab, which is in the autopsy room, and showed him every one of the valves that I had. I left them with him and I hung around, but I didn't stand and look over his shoulder unless he asked me for some explanation or the other.
Q All right.
A He did occasionally ask me about clinical details about particular cases, and that's the gist of -- that's the long and short of the conversations we had then.
Q Okay. So you didn't give your interpretation. He gives his interpretation, you debate it, you discuss it, and you try to come either to a consensus interpretation or you say we agree to disagree?
A We didn't even go to that formal extent. Dr. Titus looked at the valves and decided what he had to decide about them.
Q Okay. Did he write things down at the time?
A I'm not sure he wrote things down, but one of

Page 255

the group did write some things down.
Q All right. And would it be fair to say that you didn't know in each and every case what he was either dictating or what was being written down or whether he dictated, what was going on?
A He didn't dictate, and certainly I wasn't looking over the shoulder of what -- whoever was writing things down.
Q All right. When somebody was writing things down, as you recall it, were they writing things down that Dr. Titus was saying?
A By and large, yes.
Q All right. And you weren't hearing that, generally?
A If I was, I can't recall the words.
Q So when you left, you had no idea whether he rendered conclusions that you would agree or disagree with?
A Some of the conclusions I do know, because after that we went and looked at the histology.
Q Right.
A And we agreed that there was no ingrowth or there was pannus on the surface or that we hadn't seen valves in the same time frame, and one would have to go and look at things retrospectively to be able to come to

Page 256

any definite conclusion.
Q It would be fair to say that at this point you were sharing explanted valves, at least, with St. Jude, right?
A Definitely.
Q You weren't keeping that information from them, right?
A No. Absolutely not.
Q And do you have any recollection of disagreeing with any histopathological conclusion of Dr. Titus with respect to any particular explanted valve?
A I'm not sure that I remember having vocally disagreed with him or his asking me if I absolutely agreed with what he said or didn't say.
Q All right.
A But by and large, the lesions that one sees on the prosthesis are straightforward lesions.
Q All right.
A You cannot call something that's white black.
Q All right. And -- but these -- these -- the Silzone valve review -- and they say Drs. Titus and Butany at the top of this document. What's written here isn't what you stated, correct?
A I -- the review was conducted, in the presence of Butany, by Dr. Titus. I gave them the valves and

Page 257

they looked at them. Yes, I was there for some of the time. Other time I wasn't there. I had a lot of other valves, but I only showed them the -- I think I only showed them the eight valves that -- or whatever valves that were there that belonged to Toronto General. I didn't show them the outside valves at that time.
Q As you sit here today, on occasions when Dr. Titus writes "normal tissue response, no unusual findings," do you know for a fact that you would necessarily agree with each time that he said that?
A I don't think I would.
Q You don't think you would. And why is that?
A The presence of tissue response to a prosthesis is to some extent unavoidable and normal, but there are nuances and there are variances from what you would expect to see at four weeks or six weeks or eight weeks, and I thought that some of those were much more than one would expect.
Q So --
A And Jack probably did not think so.
Q So would it be fair to say that this document may in fact not only not reflect what you believe, but in some instances may actually -- if we were trying to wonder what you would believe, would misrepresent what you believed if it purported to represent what you

believed?
A Probably, yes.
Q So this document in no way speaks for your interpretation with respect to each and every one of the valves that are the subject --
A I think what --
Q Pardon me?
A Looking at it now, that's what I think.
Q And do you know whether -- have you seen any documents recently for the month of May 1999 that reflect in fact what you believe with respect to each valve for which Dr. Titus rendered, purportedly, a histopathological conclusion?
A I don't think so. I'm not absolutely sure I got the question. I haven't seen any document which lists Jack Titus's histopathology findings on these prostheses, other than what's here. Was that the gist of the question?
Q Yes.
A No?
MR. KOHN: No. I think you misunderstood his question.
THE WITNESS: I'm sorry. I misunderstood the question, then.
MR. SIGELMAN: Q Have you seen any document



for the month May 1999 that reflects what you thought with respect to each of these 12 valves as opposed to just what Dr. Titus thought?
A No, I haven't seen anything that summarize it, summerizes my findings, other than in the abstracts that we've looked at.
Q And would you agree with me that there's nothing in Exhibit No. 20 that says that what is appearing on this document under Silzone valve review, naming not only Dr. Titus but you as well, reflects only what Dr. Titus believes?
A That's what I think.
Q Right. But --
A I had no say in what was written, when it was written.
Q Right. And there's nothing on the document that says this is just Dr. Titus's view --
A Right.
Q -- and not yours?
A Right.
Q Now, valve No. 4 on this, you see where it says "Valve was explanted due to thrombus formation"?
A Yes.
Q Do you recall what valve that was from Thunder Bay, Ontario?



A Yes.
Q And was, in fact, thrombus formation the cause of the explant?
A No. This patient died. This is the one we talked about earlier.
Q Okay. And No. 6, for example, it says "Pannus surrounding inflow edge."
Is that an example of one of these overgrown pannuses that we've been talking about?
A The pannus surrounding inflow edge I think suggests that there was a paravalvular leak, which is why you have pannus going around the edge of the sewing cuff.
Q And it says after that, "not firmly adherent."
Do you recall any pannus that wasn't firmly adherent?
A Sure. I think we said right in the beginning that a lot of the pannus was not firmly adherent, and we concluded from that that there wasn't much ingrowth at this time.
Q All right. And with respect to No. 6, it said, "Dr. Butany agreed to sample pannus tissue for histopathology."
Did you do that?
A Yes.



Q And what were the results?
A There was pannus there, and it didn't seem to be growing into the fabric. But again, it's one month post implant. You don't expect too much ingrowth.
Q And No. 7 says mitral for endocarditis and significant paravalvular leak, and it also indicates, doesn't it, that the tissue had been cultured but was negative?
A Yes, it does.
Q So this is one of those examples of sterile endocarditis?
A Yes.
Q And it says "Good surface fibrin with normal tissue response over most of sample."
Is that something with which you agree with respect to that particular valve?
A I agree that there is tissue response, but none of us has a definite idea of what they should be and should not be at three months.
Q All right.
A That was one of the things that we distinctly agreed on, and we distinctly agreed that we would follow up on.
Q All right. And then it says, "However, fibrous tissue response in margins of sample."

Page 262

Did you see anything that you would have characterized on that valve as fibrous tissue response on the margins of the sample?
A Yes.
Q What did that mean to you, if anything?
A It means, again, there must have been or should have been a paravalvular leak.
Q By the way, what's the microscopic difference between fibrin, fibrous tissue, and thrombus?
A A lot of difference. Fibrin is just fibrin threads. It's a protein which helps a clot or a thrombus to form, and it forms a mesh into which the other parts of the thrombus get trapped. A thrombus is, as I explained earlier, a combination of several of the elements of flowing blood, from platelets to fibrin to red cells and white cells. The fibrous tissue itself, again, as we talked about it earlier, is -- when it's young, is predominantly fibroblasts laying down material which is called mucopolysaccharides, which will gradually mature and give rise to collagen.
Q Grossly, how do fibrin and thrombus differ?
A Fibrin looks -- it depends -- I mean, you start by saying it depends on the age of the fibrin mass and of the thrombus. Fibrin looks pale pink. A thrombus, as it grows older, becomes firmer; firmer because the

Page 263

platelets break down, the fibrin threads become much more compact, and the cells that are trapped in them disintegrate, and the macrophages start coming in from the bottom and try to get rid of them. So thrombus is usually a dark brown in color, or reddish-brown or reddish-black, depending on whether it's in a vein or an artery.
Q All right.
A So that's fibrin, that's thrombus.
Q Can endocarditis grossly produce tissue destruction or necrosis?
A Yes.
Q Was that your conclusion with respect to any of the Silzone explanted valves that you examined?
A Certainly that was one of the possibilities.
Q Number 10 case, you recall it, of endocarditis and paravalvular leak?
A No, I don't recall it offhand, but it would be one of the valves that I had that day.
Q Do you see under histopathology where they say -- where it's written by someone other than you, "Fibrous tissue on surface and into interstices of cuff. Foreign body giant cell and macrophage activity indicative of normal tissue response"?
A Yep, I do.

Page 264

Q Do you agree with that?
A I agree that, yes, it can and does occur.
Q All right. Can foreign body giant cell and macrophage activity indicate an abnormal tissue response?
A It could, but the synthetic fabric of the sewing cuff is always foreign material, regardless of the type. You can get a -- can and do get a macrophage giant cell, multinuclear giant cell reaction to it. Usually nominal.
Q But sometimes abnormal?
A Sometimes when you have an infection, sometimes when you have an allergic reaction, you get more of them.
Q If you get a heavy concentration of foreign body giant cells and macrophage activity, would that be a signal to consider an abnormal inflammatory response?
A It certainly would be a signal to consider something as different here than the anticipated.
Q Perhaps an immunogenic or allergic reaction?
A Possibly.
Q Or some other kind of chronic inflammatory reaction?
A Possibly.
Q Did you ever consider some type of chronic

Page 265

inflammatory reaction, whether or not immune mediated, as a possible etiology for some of the problems you were seeing with respect to the explanted Silzone heart valves?
A No, sir.
Q And why is that?
A In most of the cases there wasn't a significant reaction, and there's nothing to suggest a immune-based reaction. For -- in an immune-mediated reaction, not only would you get the macrophages and giant cells, but you'd get lymphocytes and significant numbers of plasma cells, which by and large which we didn't see. At least that's my recollection now.
Q Let's take out the concept of immune mediated and just restrict it to chronic inflammatory reaction of some sort.
A Yeah.
Q In fact, let's say that it was a chronic inflammatory reaction that was not immunologically based. Did you ever consider some type of chronic inflammatory reaction as causal of the explant problem you were seeing?
A Yes, I did.
Q And why is that?
A The amount of necrosis that the surgeons were

saying they saw, the fact that it was occurring predominantly in the mitral site, the fact that virtually every one of these abscess-like situations was sterile made me think of a possible alternative.
Q Can chemicals induce chronic inflammatory responses?
A Chemicals can induce inflammatory reactions.
Q Did you ever consider whether silver, in either ionic or some other form, could have induced a chronic inflammatory response that caused the explants of these valves?
A Yes, I did.
Q And what made you think about silver as a causal agent?
A Silver is known to cause allergic reactions in people working in mines, people working with silver, women wearing silver jewelry, and since you've got silver coating the surface of this fabric, it could easily be leaching into the surrounding tissues and leading to tissue damage.
Q Did you grossly see any evidence of migrating silver ions?
A No.
Q Did you ever see any evidence of blackness in any of the tissues that you looked at?



A Not really.
Q You never saw black tissue of any sort?
A I saw dark brown, I saw some black, but there's no way to tell that it's silver or iron itself.
Q Did you ever see any particulate matter?
A The granular or particulate matter I think was predominantly iron. I didn't see much black material. It's not easy to tell whether it is, say, metal or not a metal.
Q Did you ever see any granulomatous tissue?
A Not that I recall.
Q Had you seen granulomatous tissue, what, if anything, would that signal to you?
A It would suggest a chronic granulomatous or chronic inflammatory reaction and the possibility of an infection.
Q If there were granulomatous tissue --
A Yeah.
Q -- would you see that as an abnormal tissue response?
A Yes, I would.
Q Would you see that as an abnormal tissue response whether we're talking about human heart tissue or, say, animal heart tissue?
MR. KOHN: Vague. Objection, vague.



MR. SIGELMAN: Q Pardon me?
A I would think it abnormal in any situation.
Q Do you know whether there had been reports of granulomatous tissue responses to implantation of Silzone valves?
A No, sir.
Q Had there been, would that be something you'd want to know?
A Sure.
Q Why is that?
A It suggests that there's something of a more chronic nature happening or perhaps there is an infection occurring. Granulomas can be of different kinds, and you'd like to know which type of granuloma it was before you decided anything.
Q Let's go on. Going to hand you the next exhibit.
(Whereupon, Deposition Exhibit 21 was marked for identification.)
MR. SIGELMAN: Q You've been handed what's been marked as Exhibit 21, and before we talk about Exhibit 1, can you tell me to the best of your recollection who attended this meeting on May 19 with you and Dr. Titus?
A I think Al Flory and Roy Hosek. That's my



recollection, but I could be wrong.
Q All right. And I think you're absolutely correct. Do you see where -- I believe that's reflected. Maybe it's not reflected right there.
MR. KELLOGG: It's in there.
MR. SIGELMAN: Yeah. In this document?
THE WITNESS: It says from Al Flory to the three of us.
MR. SIGELMAN: Q Right. This document, have you seen it before, May 25, 1999, memorandum from Dr. Flory --
Obviously, to you.
A Mm-hmm.
Q So I think you have seen it.
A Yeah.
Q -- Dr. Titus and Dr. Hosek?
A Yeah.
Q All right. You did receive this --
A I think I did.
Q -- in May of 1999?
A I believe -- May or June I did receive it, yes.
Q And how many Silzone autopsies have you done?
A I can't really remember.
Q What's your best estimate? Six?
A Possibly five, six. Probably.