Page 270

Q And would it be fair to say that when Dr. Titus left your lab, you didn't know what his diagnoses were for each of these --
A That is correct.
Q -- valve explants?
And you see where it says in this memorandum, near the end of the first paragraph, "Although histopathology was not available on all valves, available histopathology slides were also examined by both pathologists"?
A Yes.
Q Were you examining every slide that he was looking at that day?
A Yes, I was.
Q Okay. And by "he," I mean Dr. Titus.
A Yep. Yep.
Q And then it goes on in the beginning of the next paragraph, "Based upon the valves examined, there were no distinctive differences between Silzone and conventional cuffed valves."
Did that reflect your opinion?
A I don't think so, but --
Q You did get this in May of 1999?
A I did get it.
Q What did you think when you read that?

Page 271

A I just put it aside, that's all.
Q What did you think, that's just rationalization on their part, or what?
A Honestly didn't think much more about it and put it aside.
Q Did you find it all disturbing that St. Jude had said that?
A I honestly didn't give it another thought, basically because there's a lot more supposed to follow, and that's when we were supposed to sit down and look at controls and then look at these and then decide these things.
Q Had you told St. Jude prior to this memo issuing that you certainly felt there were distinctive differences between Silzone and conventional valves based on your examination?
A Can't remember ever having said that. And I say again that three months post implant we seldom, if ever, see a prosthesis come out. So very few of us, if any of us, have any good idea of what the degree of pannus should be. We speculate and say yes, there should be pannus, yes, there should be some ingrowth, but none of us has really looked at them.
Q It goes on to say, "However, the frequency of explant and the number of apparent endocarditis explants

Page 272

seem to exceed expectations for this hospital."
That's certainly something you agreed with, right?
A This is -- this had all along been my single biggest contention, that the number of explants is far too many.
Q Then it says, "In discussing the explants, both pathologists agreed that it would be appropriate to attempt to characterize healing over time for the standard cuffed valve in order to more effectively assess these valves."
Do you recall that?
A Yes. I think I alluded to this a couple of minutes ago.
Q It goes on in the next paragraph, "Notes taken during the valve review are attached." And then it goes on, "In addition, Dr. Butany agreed to provide copies of surgical and histopathology reports for Dr. Titus' evaluation."
Did you do that?
A No, sir.
Q And is that because of confidentiality concerns?
A Absolutely.
Q As I understand your testimony earlier, they

Page 273

still could have gotten them from your institution?
A That's what I think.
Q All right. Then it goes on, "The following action items resulted from this session: One, Dr. Titus will review his valve archives to identify and evaluate standard cuffed valves explanted after comparable implantation periods."
All right. Did I read that correctly?
A Yes, sir.
Q And did he do that?
A I don't know.
Q Did he ever come back and report to you what he found, if anything, with regard to the healing characteristics of the standard St. Jude heart valve cuff versus the healing characteristics of the Silzone cuff --
A No, sir.
Q -- for comparable periods of time?
A No, sir.
Q Pardon me?
A No.
Q Had you agreed that that was something you were going to work together on and share?
A Yes.
Q Were you disappointed that they didn't come

back and give you that information?
A Yes.
Q Did you feel that the information was generally going just in one direction, from you to the company, and not vice versa?
A Certainly was frustrated.
Q Did you ever ask St. Jude about that?
A I must have.
Q And what did they say?
MR. KOHN: Object to the form.
THE WITNESS: Can't recall. Can't recall.
MR. SIGELMAN: Q Who did you ask?
A Any one of the gentlemen who I kept trying to talk with. Or not "trying to talk with." That I did talk with repeatedly.
Q So healing at this point in May of 1999 was an issue for you, correct?
A Yes.
Q And healing characteristics was an issue that had been raised with St. Jude?
A Yes.
Q And St. Jude, in fact, saw healing characteristics as an issue, correct?
A I presume so, yes.
Q And as you understood it and dealing with



Dr. Titus and St. Jude, there was an issue about whether the explants were related to the healing characteristics of the Silzone valve?
A I'm sure there must have been some discussion along that line, yes.
Q Well, that was the reason that --
A Yes.
Q -- there was at least some desire to see how the healing characteristics of the Silzone valve would compare historically with the healing characteristics of the conventional Silzone -- or excuse me -- conventional St. Jude sewing cuff, correct?
A Correct. That is correct.
Q So the issue is healing, to a great extent, right?
A Yep.
Q And did you feel at this time that there was a healing problem with the valve?
A I felt there was a problem with the valve, and one of the problems was the healing.
Q Did you feel that many of the things that you had identified histopathologically related to impaired healing?
A Certainly a different rate, degree type of healing.



Q Did you feel that the pannus overgrowth phenomenon in any way related to impaired healing?
A I can't be sure.
Q But it was something you entertained?
A Yes.
Q Did you feel that the lack of tissue ingrowth that had been observed was related to impaired healing?
A I'm not certain at all about that, because as I said, we'd never seen enough historic controls to be certain that there should be ingrowth or not at three months.
Q You're not certain, but you certainly entertained that as a concern and possibility, correct?
MR. KOHN: Object to the form.
MR. SIGELMAN: Q Is that correct?
A Yes, I did.
Q And the reason that you all wanted to compare the standard valve with the St. Jude valve was because you had a concern, is it fair to say, that the problem with lack of tissue ingrowth could be related to frustrated or impaired or nonexistent healing?
A Yes, it could.
Q And were you concerned that the development of thrombus on the St. Jude valve, the Silzone valve, could be the result of impaired healing?



A I'm not sure I'd say impaired healing. I'd certainly say a different form of reaction to it.
Q Okay. So there was a different form of reaction to impaired healing; namely, thrombus formation. You were concerned about that possibly being the case?
A I was concerned about the type of pannus growth occurring in reaction to the Silzone coated prosthesis fabric, and superimposed on that, the development of thrombus.
Q Okay. So in one way or another, in your mind you said the development of thrombus could ultimately be the result, in some way, of impaired healing?
A Or altered response.
Q Would it therefore follow that you had a concern that to the extent that people might have strokes that could be attributed to the Silzone valve, that those strokes could ultimately have their origin in impaired healing?
A Again, in the altered reaction to it, yes.
Q And similarly from myocardial infarctions that were caused by the break-off of an embolus or emboli, you had a concern, would it be fair to say, that the origin of that could be impaired or frustrated healing?
A If one could demonstrate that that thrombus had

come from the prosthesis, yes.
Q And had you raised that as a possibility with St. Jude?
A No, sir.
Q Was it your sense that if you could get a feel for how the healing characteristics of the St. Jude valve compared to the healing characteristics of the Silzone valve -- when I said the St. Jude valve, I mean the conventional valve -- that you might have a window on what went wrong with the Silzone valve?
A To some extent, yes.
Q And as I understand it, whether St. Jude, and more specifically Dr. Titus, looked into that issue, as he said he was going to, you have no idea?
A No, sir, I don't.
Q And if he did look into it and came to some conclusions, they didn't see fit to, for whatever reason, tell you about it; is that fair?
A Possibly, yes.
Q Did you ever get any information from Dr. Titus, in any way, shape or form, about healing in the Silzone valve after this meeting?
A Not that I can recall. Certainly not in writing.
Q Did you ever get any information from anyone at



St. Jude, in any way, shape or form after this meeting, about healing in the Silzone valve?
A I don't think so.
Q Did you ever ask them?
A I can't recall that I -- now, wait a minute. At the October meeting I must have asked, what's happened with the follow up from the May meeting? And I can't recall getting anything.
Q When you were asked to become a consultant to St. Jude after the recall --
A Yep.
Q -- did you ask them whether they had done any work on healing to try to find out what went wrong?
A I did.
Q Who did you ask?
A Think I asked counsel.
Q Okay. Other than -- and what did you ask counsel? He's not your lawyer, so what did you ask counsel?
MR. KOHN: You don't have to answer that.
MR. SIGELMAN: Q Well, is he your lawyer or not?
A No, sir.
Q Okay. What did you ask counsel?
MR. KOHN: Again, you don't have to answer it,



Dr. Butany, or you can talk to your lawyer.
MR. SIGELMAN: Well, it's not privileged, because he --
MR. KELLOGG: That's a violation.
MR. SIGELMAN: Yeah, it's a violation of Southern Carolina law, number one. Number two, he's not your lawyer, so there's no privilege between the two of you.
MR. KOHN: I'll give you the same advice. You can answer it if you want, but I'm advising you you don't have to.
THE WITNESS: Can I say that I cannot answer the question?
MR. SIGELMAN: Q Well, you can, but I'm just saying to you, Doctor, that under American law, if he's not your lawyer, your communications with him are not privileged. And of course, under South Carolina law, he's not authorized to advise you not to answer a question unless it's a subject of privilege. I think South Carolina counsel will corroborate that here. I've studied the subject.
So I'm asking you, what was said to you?
A My question was, is there any tissue available that we could conduct studies on? And the answer was no, there was no Silzone coated tissue available. I



don't mean tissue. I mean fabric.
Q Do you find that plausible, that the manufacturer has absolutely no Silzone fabric available to it at this time?
A I have to take what I'm given.
Q All right. I'm just asking, do you find that plausible?
A I -- I'd be speculating, and I don't think it appropriate to speculate.
Q All right. Did you tell them that you have some Silzone fabric available that you could give them?
A I didn't have any unused fabric.
Q Okay. Do you think that used fabric could be used to study the subject?
A Wouldn't be the same thing.
Q What do you envision would be studied with unused fabric?
A You would do tissue cultures. You would look at the damage to the tissues in which you are culturing this material and see if nothing happened, something happened, what happened.
Q Do you think, in light of what you told St. Jude, just what you told them, that they should have done that themselves well before this product came off the market?

A Again I'm going to speculate.
Q No. I'm asking you if you felt they should do it, not whether they did do it.
A I think they should have.
Q Do you believe that that's what a responsible manufacturer would do?
A I presume so, yes.
Q And if they didn't do it, do you think that that would be responsible?
A I hate to even entertain that thought.
Q Why? Because it's so irresponsible?
A No. Because they've all along been an extremely responsible company.
Q You think that they've been extremely responsible in the Silzone matter?
A I -- till this morning I certainly thought so.
Q Do you think so now?
A I'm a little more wary about what I feel now.
Q Do you feel they let -- do you feel they let you hang out to dry?
A No.
Q You don't?
A No. I feel terrible, but I don't think they went anywhere near as far as that.
Q Well, they took information from you and didn't



give you information back, correct?
A Yeah.
Q They went behind your back to try to get people to change your behavior, correct?
A I presume.
Q They didn't like some of the things you put in your abstract, and you ultimately, for whatever reason, took them out, correct?
A Yep.
Q And there were things that were unflattering to the Silzone, correct?
A Mm-hmm.
Q And then they went, after that, to regulatory authorities and said, "See, Butany's contradicting himself, because in his abstract he doesn't say anything bad about the Silzone valve," correct?
A True.
Q And you don't feel they let you hang out to dry?
A I don't have an answer to that.
Q You said you felt isolated.
A Yes.
Q What did they do to make you feel less isolated?
A They at least listened to me and never shut the



door in my face and said, "Butany, get lost."
Q Do you think they might have had an interest in listening to you to find out what you were up to? Did that ever occur to you?
A It didn't, but now that you put it this way, it could be.
Q Isn't one of the things that you could do is find out what your enemies or your adversaries or opponents are up to?
A True.
Q And you allowed them to do that, right?
A I all along considered them colleagues rather than adversaries, that I was going to be able to work, that we were going to have the same interests in mind.
Q Are you talking about the colleagues that called you an SOB?
A No. I used the word "SOB," not they.
Q The colleagues who were disappointed in you?
A Yeah.
Q The colleagues who thought you were giving them bad news?
A But clearly, anytime I told them about a valve gone bad, it was -- it would be bad news for them.
Q The colleagues who waited until May 1999 to say this is getting serious? Those colleagues?



A Yes.
Q And you don't feel they let you down?
A I said I feel disappointed. I feel heartbroken.
Q Today.
A Today.
Q Did you ever research the literature for the effects of silver on healing?
A To some extent, yes.
Q And what did you find?
A That in some situations, it works pretty well and nothing happens; in others, it can delay healing.
Q When you say in some situations, what are you referring to?
A I can't remember the tissues, but again, it's some time ago since I wrote the first paper that we submitted, and that's my recollection of it from that time.
Q Is there any literature on the adverse effects on fibroblasts of silver?
A Not that I can recall. Fibroblasts are usually pretty hardy creatures, and usually nothing much happens to them. At least they don't get suppressed.
Q So as far as you know, there's no literature that addresses whether silver can be toxic to

Page 286

fibroblasts?
A As far as I can -- as far as I'm aware, no.
Q And if silver were toxic to fibroblasts, could that have ultimately a detrimental effect on healing characteristics?
A Yes.
Q How so?
A It would prevent them from multiplying. It would -- it could prevent them from multiplying. It could prevent them from growing and growing on the cuff and into the cuff.
Q Could it prevent the development of strong -- tensile strong collagen in the pannus?
A It could.
Q Could it contribute to friable pannus?
A It -- yes, I suppose it could.
Q Could it contribute to that peeling off that we've been talking about?
A It could.
Q Could it contribute to the phenomenon that you talked about earlier where it's very easy just to pull the valve out, and the stitches don't hold the valve, and the whole thing just kind of comes right out?
A It could.
Q Could it contribute to dehiscence?

Page 287

A Yes.
Q Could it contribute to paravalvular leak?
A Yes.
Q Could it contribute to thrombus development?
A Indirectly, yes.
Q Could it contribute to stroke?
A From the thrombus, yes.
Q Could it contribute to myocardial infarction?
A If a thromboembolus did it.
Q Could it contribute to death?
A Yes.
MR. KOHN: And everything you just asked calls for speculation, Counsel.
MR. SIGELMAN: You've waived your objections under South Carolina rules because they weren't made at the time of the question. That's fine.
Now --
MR. KOHN: I'll let a judge rule on that.
MR. SIGELMAN: Well, that's fine.
MR. KOHN: Thank you for your --
MR. SIGELMAN: Obviously, form objections have to be made at the time. You can't have a omnibus, ex post facto objection.
Q Now, does Toronto General Hospital do any oral pathology?

Page 288

A Yes.
Q Have you seen silver amalgam effects?
A No.
Q Do you know anything about the autoimmune effects of silver?
A I can't recall in any great detail.
Q Do you know how the autoimmune effects of silver would clinically manifest themselves grossly?
A No, I can't remember that I do.
Q Could an allergy to silver manifest a severe life-threatening acute disseminated intravascular coagulation or DIC?
MR. KOHN: Objection. Form.
THE WITNESS: Not that I'm aware of.
MR. SIGELMAN: Q Have you ever heard of any patients with Silzone valves dying intraoperatively of DIC?
A No. I think we've had patients who developed coagulopathies after the fact, but I'm not so sure that I know of it occurring inoperatively.
Q How can allergy to silver from a cardiac valve implant be ascertained?
MR. KOHN: Objection. Form, lacks foundation.
MR. SIGELMAN: Q If you know, sir.
A I don't know, sir.

Page 289

Q Do you know what kinds of tests are done or could be done?
MR. KOHN: Objection to form.
THE WITNESS: I'd be speculating. I don't know for sure.
MR. SIGELMAN: Q You ever heard of the patch test, for example?
A Not with regard to silver, no.
Q Have you heard of the patch test with regard to anything else?
A Yeah. Tuberculosis tests and that sort of thing. You have patch tests for that.
Q And then the document that we've been looking at -- which is exhibit number what?
A 21.
Q 21. Says, "If appropriate" -- and I'm reading from the bottom of the first page -- "St. Jude will sponsor another joint meeting between Drs. Titus and Butany in St. Paul to review these cases together."
Did I read that correctly?
A Yes, sir.
Q Did that happen?
A No, sir.
Q Why not?
A I don't know.

Q Was it appropriate, in your opinion?
A Nope.
Q No. Was it appropriate to have such a meeting?
A Yes, it was.
Q Do you think it was inappropriate not to have a meeting?
MR. KOHN: Calls for speculation.
MR. SIGELMAN: Q In your feeling.
MR. KOHN: No foundation.
THE WITNESS: It was wrong not to have the meeting.
MR. SIGELMAN: Q Why is that?
A We agreed to look at tissues in a particular manner, and we didn't.
Q Have you been to St. Paul or the St. Jude Medical headquarters since January of 1999 other than for a meeting with the Robins, Kaplan, Miller & Ciresi lawyers?
A No, I haven't, as far as I can -- even at that visit, I didn't go to St. Paul.
Q Oh, did they come to you? Where did you go? Did you come to California?
A I went to Minneapolis, went straight to the lawyers, and then on the way back met Roy in the St. Jude's lawyers' offices.



Q You know, this litigation stuff can be pretty good when you run out of travel funds, right, sir?
MR. KELLOGG: We aught to have the next deposition, you know, like in Puerto Rico or --
THE WITNESS: No. Hawaii would be a lot better.
MR. KELLOGG: Hawaii or Maui.
MR. SIGELMAN: You know, if we could get away with it under the Hague convention, I would suggest Paris, but --
MR. KOHN: Too early in the year.
THE WITNESS: Don't have enough time for that.
MR. SIGELMAN: Q And do you see the last sentence in this document, which is exhibit number -- once again, number 20? 21?
A 21.
Q Says "Dr. Titus will discuss any additional information he receives concerning explanted Silzone valves with Dr. Butany."
Did that happen?
A No, sir.
Q Do you know whether Dr. Titus obtained additional information concerning explanted Silzone valves after this meeting?
A No, I don't think I know.



Q Okay. If he did, he certainly didn't share it with you, right?
A Yep.
Q But you were told by this memo, by Dr. Flory specifically on May 25, 1999, that if he did obtain additional information, it would be shared with you, correct?
A Yes, sir.
I hate to do this, but can we take a five-minute break again?
MR. SIGELMAN: Sure. No problem at all. It gets to be long, and you are in the hot seat, so --
THE VIDEOGRAPHER: We are off the record. The time is 3:13.
(Recess taken.)
(Whereupon, Deposition Exhibit 22 was marked for identification.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:23.
MR. KOHN: Counsel's had an off-the-record discussion along with Dr. Butany about how much longer we're going to go today and continuing in the deposition, and I think the following has been agreed on: that Dr. Butany is getting tired, that he will continue as long as he feels he's able to continue, that



in the event he feels he needs to stop for the day, that we'll do so, and that we'll work with counsel to resume the deposition. We've already agreed to Washington, D.C. And to the extent counsel needs more time, we'll work it out.
MR. SIGELMAN: All right. In fact, counsel just said, right before we went on the record, that if we need two more days, given that this day was truncated from what we expected -- and I also indicated on the record that until the day before yesterday it had been represented to me that we were going to have two days consecutively, today and tomorrow in San Francisco, and I learned the day before yesterday that may not be the case, and learned today that in fact Dr. Butany has an airplane back tonight, so that it was impossible. That counsel said if I need two more days in Washington, D.C., if that's what eventuates because today gets truncated, we can have two more days. And I would suggest that those two more days, if they happen to be two more days, and hopefully even then it will just be one more day, would be consecutively, and so that we don't have to maximize the inconvenience of all concerned.
MR. CAPRETZ: On the record, as far as the MDL is concerned, this deposition was originally

Page 294

cross-noticed by the defendant to be a deposition of Dr. Butany in both actions. That was withdrawn, and we've just indicated to counsel that we will need a future date after the completion of the state court deposition.
MR. SIGELMAN: All right. Have we marked that exhibit?
MR. KOHN: 22.
MR. SIGELMAN: Q You've been handed, Dr. Butany, Exhibit 22. It says "Questions for Dr. Butany and Dr. Titus." And do you see where it says "Dr. Butany has talked about the pannus on Silzone valves being different from other prosthetic valves"?
Did I read that correctly?
A Yes, sir.
Q Have you seen this document before?
A Not sure.
Q Do you recognize --
A If it's --
Q -- this document to be something generated by someone at St. Jude?
A Well, there's a SJM number at the bottom of it.
Q And I presume that you would agree that you had talked to St. Jude about the pannus and the Silzone valves being different from other prosthetic valves?

Page 295

A Yes.
Q And what did you tell St. Jude about that?
A I thought it was more exuberant a growth than I thought would be usual, that it seemed to be more -- I think the word I used was plumb and juicy, rather than the firm, hard, flat pannus that one usually sees, that there seemed to be too much of it, and -- I'm summarizing what I just said. Too much of it, and it seemed to be heaped up and extending right up to the edge of the valve ring.
Q All right. If you go down to point No. 3, says "Two of the endocarditis cases occurred several months following implant."
A Yep.
Q And under that "A" it says "Both cases were culture negative."
Do you recall those two cases?
A They certainly were cases which were culture negative. In fact, as we said earlier, all the cases were culture negative.
Q And these were to be questions for you and Dr. Titus, at least on the face of the document, correct?
A Yes.
Q And the question is, "Is it common to have

Page 296

endocarditis that is culture negative?"
Your answer, sir, if it was a question for Dr. Butany?
A It's not uncommon, but to see a run of several cases being negative is unusual.
Q Then there's a question, "We have not had unusually high reported instances of pannus overgrowth" -- I'm reading point No. 6 -- "or endomyocarditis from other sites worldwide. Is there anything unique about the Toronto General Hospital patients that should be evaluated, e.g., valve selection criteria, referral patterns, et cetera."
Your answer?
A I don't -- I'm not sure there was anything unusual, except that there were more repeat surgeries than most centers would have. But this was always the case. All through the years we've done a lot more repeat and redo surgery than most other centers.
Q Was there anything about the patient mix that you can think of that would account for pannus overgrowth or endocarditis?
A No, sir. Except in a couple of cases where there was endocarditis for which the prosthesis was put in, and in those cases we do know that the incidence of repeat endocarditis is higher.

Page 297

Q All right. The next question for Dr. Butany and Dr. Titus, at least in this document, No. 7, is, "If patients have an allergic reaction to Silzone, is there anything specific to look for in histopathology?"
Were you asked that?
A I don't think I was asked that. I have no recollection of the document, but it's entirely possible that I've forgotten. But --
Q What is your answer to that question?
A Yes, there are things you can look for. The one big thing that is different when you have a drug toxicity is the mix of inflammatory cells. You get neutrophils present. These are cells that come in when you have an allergic reaction, and we didn't have those. To any significant degree, anyway.
Q Point No. 5. This last sentence of that point says, "For instance, there seems to be a preponderance of mitral valves reported; is this expected or should we be evaluating any specific features of the valve?"
Was that expected?
A Not when they started out.
Q Let's go on to the next one.
(Whereupon, Deposition Exhibit 23 was marked for identification.)
MR. SIGELMAN: Q Dr. Butany, Exhibit No. 23

Page 298

is a memo from Dr. Flory to Judy Cameron. Do you know Judy Cameron?
A She's the one we saw one of the communications from earlier or --
Q I don't know. Do you know her?
A Not that I can recall. I'm lousy with names, so --
Q Do you know Douglas Cameron?
A I know a Doug Cameron at my hospital, but that's --
Q That's at your hospital, okay.
May 25, 1999 memorandum. Have you seen this before?
A Think I may have seen it in the binder.
Q All right. And it's talking about meeting between you and Dr. Titus, correct?
A Yes, sir.
Q And Dr. Flory says, "I will also summarize the meeting between Dr. Butany and Dr. Titus. The meeting really did not uncover any new information but did serve to point out that we don't have good understanding of how the healing process proceed in the standard St. Jude cuff."
Did it --
A Yes, sir.

Page 299

Q -- point that out?
A Yes. The fact that we agreed that we should look at other valves and try and set up a time frame in which changes occur.
Q All right. And then it goes on, "As a result, Dr. Titus is going back to his files to see if he can characterize healing in early explants of the standard valve."
So that's reinforcing, isn't it, or reiterating what we talked about earlier?
A That's correct.
Q And then it goes on, "Once this is completed, probably late summer, the two pathologists will work together to come up with a final assessment."
Was that your understanding of what was going to happen?
A Yes.
Q Did it happen?
A No. No, sir.
Q Why not?
MR. KOHN: Asked and answered.
MR. SIGELMAN: Q Pardon me?
A I don't know.
Q And looking underneath that, there's another e-mail from Judy Cameron to Denise Johnson. Dr. Flory

Page 300

as well. You see that?
A Yes.
Q Who's Dr. Freeland?
A He's the head of the Health Protection Branch, the Medical Device Branch of the Canadian Ministry of Health.
Q And have you spoken with him before?
A Yes, sir.
Q And when did you speak to Dr. Bill Freeland?
A Last time I spoke to him I think was September, or maybe before that I'd spoken to him in May.
Q What did you tell him?
A I told him that I had seen this many valves, and this was my feeling about the valve.
Q All right. And you see where, underneath that, you had another memorandum from Pat Robinson. You know who Pat Robinson is?
A No. I keep seeing here that I'm supposed to have spoken to Dr. Freeland in May. I know I did try, but I'm not sure that I was able to speak to him in May. I know I did speak to him later in the year, but I think this was the time when I kept trying and didn't get very far.
Q As you look at this memo, it says, "Because the Silzone valve issue is of concern to us," in

Page 301

parenthesis, "Dr. Butany spoke to Dr. Freeland too."
A Yeah.
Q "Could you contact Jerry Holatko by e-mail or phone," and it gives a number, "with an update on the meeting with Dr. Butany."
Who's Jerry Holatko, if you know?
A I have no idea.
Q Do you recall that anything that St. Jude said to you indicating that their concern about the Silzone valve issue was attributable at least in part to the fact that they thought you had spoken to Dr. Bill Freeland of the Canadian regulatory authority as well?
A No, sir.
Q Did they ever tell you that they were concerned because you'd spoken about your concerns to a chief Canadian medical device regulator?
A No, sir.
Q Let's go on to the next one.
(Whereupon, Deposition Exhibit 24 was marked for identification.)
MR. SIGELMAN: Q Have you seen Exhibit No. 24 before?
MR. KOHN: You got a copy of it? Thanks.
MR. SIGELMAN: Q Have you seen this exhibit before, Doctor?

A I'm not sure, but I may have seen it in the binder if it was in that.
Q Okay. It was a May 25, 1999 letter from Dr. Flory to Dr. Titus?
A Yeah.
Q And you'll agree with me that on its face Dr. Flory thanks Dr. Titus again for taking time to meet with you?
A Yep.
Q And he says, "We believe the meeting went well. It should go a long way toward establishing a better working relationship with Toronto General Hospital."
Did you feel that your working relationship needed improvement?
A No, I didn't.
Q And then he says, "I've attached a draft copy of meeting minutes for your review."
We've looked at some of the meeting minutes --
A Yes, sir.
Q -- before, right?
And so he's asking him to look, at least on the face of it, at these meeting minutes. You see that?
A Yes, sir.
Q And then he says, "These will not be distributed until you have a chance to look them over



and comment on anything that should be changed."
Did I read that correctly?
A Yes, sir.
Q And we looked at those meeting minutes before. They didn't indicate that this was just Dr. Titus's views, correct?
A Right.
Q Let me ask you this. Did they send you the meeting minutes as well for your review, to make sure that you thought they accurately reflected what was going on?
A I don't believe they did. I did get, as I said earlier, a copy of the minutes.
Q And then it goes on, "Dr. Butany and I talked again Thursday evening. He is interested in getting together with you" -- Dr. Titus -- "later this summer to review any new Silzone cases and relevant standard valve explants. This time he will come to St. Paul."
And I gather, from everything we've been saying today, that didn't happen?
A Right.
Q All right.
(Whereupon, Deposition Exhibit 25 was marked for identification.)
MR. SIGELMAN: Q Doctor, you've been handed



what the court reporter has marked as Exhibit 25.
A Yes, sir.
Q And it says "Meeting with Dr. Titus. Issue: Dr. Butany has proposed organizing a pathology summit to evaluate the healing characteristics of Silzone valves."
Is that correct? Did you do that?
A I said we should get together and look at the -- all the pathology, yes.
Q When did you propose a pathology summit?
A I don't know that I used the word "summit," but the intention is that more than one of us should look at the tissues and try and come up with some understanding of what was happening.
Q When did you propose such a meeting?
A Definitely at the time of the meeting in Toronto when they came and looked at my valves, when Dr. Titus came and looked at my valves.
Q All right. And it says, referring to you, "He proposed to bring all available specimens from Canada with Dr. Titus to provide all available specimens from St. Jude Medical."
A Yes.
Q And then it goes on, "Dr. Butany and Dr. Titus would jointly evaluate each case and identify if any unusual or noteworthy pathology."



A Yes.
Q Did I read that correctly?
A Yes, sir.
Q And how was your proposal received?
A It was accepted.
Q All right. And did that happen?
A No, sir.
Q And why did you want to evaluate the, quote, "healing characteristics" of Silzone valves in this summit or meeting or get-together?
A Because we didn't have enough of an understanding of how things were occurring, whether we were seeing what's an absolutely normal response or we are seeing something that was totally different from the response that one would anticipate or that was occurring with the St. Jude standard valves.
Q Has St. Jude ever referred valves to you for your diagnostic expertise?
A No, sir.
Q Have you asked them to do that, ever?
A Try to think of it. Think I suggested that all valves that were explanted in Canada should be seen by me, and those that were explanted anywhere else, the United States or anywhere else, be seen by Dr. Titus.
Q Since you've become their consultant, have you

asked them to send you some valves for your diagnostic expertise?

A I know I've asked them if they'd had anymore valves. I can't remember specifically saying, "Look, let me see them."

Q To your knowledge, does St. Jude Medical have some valves that you've never looked at that are used explanted valves?

A Not that they've told me officially.

Q Have you ever asked them to send you -- since you say they told you they can't get new valves, unused, send you some used explanted valves?

A No.

Q By the way, with respect to their inability to get unused Silzone valves, wasn't there a recall of this valve?

A Yeah.

Q And was it your understanding that hundreds, if not thousands, of unused valves were to be sent back to St. Jude?

MR. KOHN: Object to the form.

MR. SIGELMAN: Q Have any information on that?

A I have no idea what happened to those, but I presume there was a recall, and they should have come



back.

Q Have you read anything from St. Jude indicating that they were asking distributors to send back valves that had never been used?

A Not sure. Maybe there's some mention in the document, but I'm not sure.

Q If that were the case, would you think it unlikely that they don't have any unused valves?

MR. KOHN: Calls for speculation.

MR. SIGELMAN: Q Pardon me?

A Could you repeat the question?

Q Subject to the objection, if there was a recall notice and a request that unused valves be sent back to St. Jude from the distributors, do you think it unlikely that St. Jude was in possession of no unused valves?

A It's difficult to imagine that there would be no unused valves.

THE REPORTER: Excuse me.

THE VIDEOGRAPHER: We are off the record. The time is 3:42.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:42.

MR. SIGELMAN: Q Do you have any information that would lead you to the conclusion that St. Jude was



getting valves back, Silzone valves, and remanufacturing them without Silzone?

A No, sir.

Q Now, you all met in your lab --

A Yes, sir.

Q -- on May 19.

Did you meet the next day with anybody concerning the Silzone valve?

A Yes, sir.

Q And with whom did you meet and where did you meet?

A We met at the -- I think it was the McClean estate at Sunnybrook Hospital, and there were four surgeons, I believe, and staff from St. Jude, and myself.

Q All right.

(Whereupon, Deposition Exhibit 26 was marked for identification.)

MR. SIGELMAN: Q You've been handed, Dr. Butany, what's been marked as Exhibit 26. Is this a memorandum of the minutes of the meeting to which you just referred on May 20, 1999 at Sunnybrook?

A Looks like it, yes.

Q And was this a meeting that, as far as you knew, was being sponsored, financially and otherwise, by



St. Jude?

A Yes, sir.

Q And in addition to a number of St. Jude employees, there were representatives, surgeons and other physicians, from Canadian hospitals?

A Yes, sir.

Q And who were they?

A If I may look at the list.

Q Sure.

A Dr. Bauset from Laval, Quebec City, Dr. David from Toronto General, Dr. Fremes from Sunnybrook, Dr. Goldman from Sunnybrook, Dr. Koshal from Edmonton.

Q And on that first page, do you have a recollection of Dr. Roy Hosek making a presentation on in vitro and animal studies?

A Yes, sir.

Q And questions were raised, according to this memorandum, correct?

A Yes, sir.

Q And they sent this memorandum to you, correct? Because I believe you produced it.

A Probably, yes.

Q All right. And do you have a recollection of someone asking was tissue ingrowth characterized in the

animal studies?
A Yes, sir. I see it here. That's about all I can --
Q Do you have a recollection of who may have posed that?
A No. It probably was me, but again, I'm not absolutely clear who it was.
Q When you say it was you, why would you have raised that question?
A Because of my concern about tissue growth on and in Silzone valves --
Q Did you --
A -- explanted.
Q Excuse me for cutting you off.
A It's all right.
Q Did you think that animal studies might be relevant to the question of whether there was adequate tissue ingrowth on the Silzone valve?
A Usually, but not always. Animal studies are relevant.
Q Okay. And do you have any recollection of what Dr. Hosek said in response to such a question?
A I believe he said that there -- animal studies were done and that there were -- my recollection, that he didn't think there was anything different between the



tissue growth here and in other instances.
Q Sure. And have you ever asked about animal studies and tissue ingrowth of anyone at St. Jude at any time other than at this meeting, to the best of your recollection?
A I think I asked them the night before, too, and Dr. Titus was with me, if they'd looked at the tissue cuff, the sewing cuff, during the animal studies.
Q All right. What specifically in animal studies would you have been interested in finding out relative to the healing characteristics and/or tissue ingrowth of the Silzone valve?
A I'd have been interested in comparing and contrasting it with what we saw in humans.
Q What kinds of events in animals would have given you concern?
A One, similar events of sterile infective endocarditis or any infective endocarditis; two, excessive tissue growth; three, no ingrowth into the sewing cuff; four, thrombus formation in and around the tissue overgrowth.
Q How about, for example, dehiscence in an animal?
A Sure. Once you get an infective endocarditis with a prosthesis, you will get dehiscence.



Q What about, for example, dehiscence killing an animal? Would that have been of interest to you?
A Sure.
Q Would that have been something important to you?
A Sure.
Q What about, for example, the deposition of black particulate matter in association with, say, dehiscence in an animal that caused the animal's death?
A Certainly.
Q If such a thing had happened, what would the black particulate matter signify to you?
A Well, one of --
MR. KOHN: Calls for speculation.
MR. SIGELMAN: Q Pardon?
A I am speculating. One of the things possible is, is it elemental silver?
Q All right. And the next question is, "What has been published on histopathology studies?"
Do you recall that being asked?
A I'm sorry.
Q Do you recall the question being asked, what has been published on histopathology studies?
A No, I don't recall, but I do remember talking about it -- don't know with who it was -- that nobody



had seen any published data about the rate of progression of tissue growth into and onto the sewing cuff.
Q And the next question was, "Was silver found in the annular tissue?"
Was that something that you were interested in?
A Yes.
Q Did you ask that question?
A It's possible.
Q Had you seen data published by St. Jude relative to plasma levels of silver in animals and/or humans?
A Yes. Sorry. In animals, yes.
Q All right. Are plasma levels or blood levels of silver an adequate measure of the silver load in various tissue?
MR. KOHN: No foundation.
MR. SIGELMAN: Q If you know, sir.
MR. KOHN: Objection.
THE WITNESS: I don't know.
MR. SIGELMAN: Q Have you ever looked into the literature at that question of the extrap -- the ability to extrapolate from blood levels to tissue levels, the --
A No, sir, I haven't.

Page 314

Q -- silver?
Pardon me?
A I haven't, no, sir.
Q And why were you concerned about whether silver had been found in the annular tissue?
MR. KOHN: Objection. No foundation.
THE WITNESS: Because --
MR. SIGELMAN: Q You were concerned with that, right?
A Yes.
Q Why?
A Because of my concern that it could be the silver, metallic silver, being toxic to the cardiac muscle fibers in the region of the annulus of the mitral valve.
Q All right. And you'd asked that at various times, or one or more times, of St. Jude?
A I think I had.
Q And what did they tell you?
MR. KOHN: Objection. Form.
THE WITNESS: Don't think anyone had an answer, that I can recall.
MR. SIGELMAN: Q Did they tell you that they had vigorously investigated the question?
MR. KOHN: Objection. Form.

Page 315

THE WITNESS: Not that I can recall, no.
MR. SIGELMAN: Q In light of what you had reported to them --
A Yep.
Q -- did you have an opinion at the time as to whether it would be important for St. Jude to investigate whether and to what degree silver migrated to and infiltrated the annular tissue?
MR. KOHN: Objection. Form.
THE WITNESS: It was one of the speculative reasons for thinking that the sterile abscesses that were occurring were probably related to silver, and so, yes, it was important to try and follow that.
MR. SIGELMAN: Q And do you believe a responsible manufacturer would have looked into that question?
A I would hope so.
Q Do you think that prior to putting this valve, the Silzone valve, in the American market, a responsible manufacturer would not only look at how much silver was in the blood but would also try to ascertain how much silver got into tissues proximal to the implantation of the Silzone valve?
MR. KOHN: Objection. Lacks foundation. He's already said he's not a regulatory expert.

Page 316

THE WITNESS: I really would be speculating.
MR. SIGELMAN: Q Okay. I'm asking you as a clinician. Do you think that would be a responsible thing for them to do?
MR. KOHN: Same objection.
THE WITNESS: Given the state of the knowledge at that time, it probably is not something that would occur to most people to do.
MR. SIGELMAN: Q Would it, as a clinician, be something that would occur to you to do --
A Now --
Q -- if you had a problem with explants of the valve and reports of dehiscence and paravalvular leak?
A At this stage, yes, having seen so many valves with this sort of problem.
Q Okay. At what stage for you, time wise, would you think it was initially important to investigate that question in the history of this whole affair?
A Sometime in spring or winter of '99, January onwards, about the time when we were getting a set of valves that we were concerned about.
Q So as a clinician, you think the responsible thing for a manufacturer to do would be around January of 1999 to look into that question if they hadn't done so already?

Page 317

MR. KOHN: Objection. Form, misstates his testimony.
THE WITNESS: I guess it would be, yes.
MR. SIGELMAN: Q All right. And it goes on to say, "Histology was done for valves explanted at one year in animal studies. Silver was evident in some macrophage" --
A I'm sorry. Which number is that?
Q Right under No. 3.
A Okay.
Q Okay. "Silver was evident in some macrophages in the annular tissue. However, cellular ingrowth in the area appeared normal with no dehiscence or toxicity evident."
Did I read all that correctly?
A Yes, sir.
Q What do you know about this one-year study in animals?
A I don't know anything about it.
Q Did they give you the data for that?
A Not that I can recall. Other than what it says here, I don't think anything much more was said than the fact that the rest of the animals, the tissue growth was what one would anticipate. Nobody thought there was anything different or abnormal about the tissue growth.

Page 318

Q You earlier testified today that you do, from time to time, do histopathology examinations of animal tissue, correct?
A Yes, sir.
Q Have you looked at any histopathology for any animal studies of Silzone?
A No, sir.
Q Did you ever ask the company to do that?
A No, sir.
Q Were you curious about doing that?
A Yes.
Q Had St. Jude given you the opportunity to review slides from various animal studies where the animals had been implanted with Silzone valves, would you have welcomed the opportunity to examine it for yourself?
A I would.
Q Does it make sense to you that animal results would be radically different from clinical experience in terms of what you were seeing with the Silzone valve?
MR. KOHN: Object to the form. No foundation.
THE WITNESS: No.
MR. SIGELMAN: Q What does it mean if silver was evident in some macrophages in the annular tissue?
A It would mean that some of the silver had

Page 319

leached from the fabric of the sewing cuff, gotten into the serum and fibrin that settles on the sewing cuff and the macrophages coming in would have engulfed it or phagocytosed it.
Q All right. And could that create any problems?
MR. KOHN: Objection. Form.
THE WITNESS: I really have no way of knowing what it could have done.
MR. SIGELMAN: Q Could that signal inflammation being present?
MR. KOHN: Objection. Form, speculation.
THE WITNESS: It signals a reaction, not necessarily an inflammatory one.
MR. SIGELMAN: Q Do macrophages usually trigger inflammation?
A They're part of the inflammatory process, and they usually come later, after the initial three or four stages have appeared.
Q And do they make a granulomatous reaction, such as a chronic inflammatory response?
A They can.
Q Would that be a concern?
A If there were granulomas, yes.
Q Now, I know you were at this meeting, and a few other clinicians from Canada, but to your knowledge, did

Page 320

St. Jude Medical, Inc. ever publicize, put out any paper, make any public statement to the world that they had done one or more animal studies which identified silver in the annular tissue?
A Not to my knowledge, no.
Q What role do macrophages play in triggering the body's response to foreign material?
A They're about the last stage of the response. The body tries to get rid of any foreign material that there is either in the bloodstream or in the tissues of any kind. First you get the polymorphonuclear leukocytes. If they are aren't able to digest it, then come the lymphocytes. Then come the macrophages. The macrophages are larger cells. If one macrophage can't phagocytose or engulf the foreign material, it calls its -- to put it crudely, calls its brothers and sisters. They get together, form a giant cell, and then engulf the material, or try to engulf it. This way they isolate the material from the host's tissues.
Q Do they attract inflammatory cells?
A It's usually the other way. They are attracted when the inflammatory cells have been attracted.
Q If silver actually had an effect on lysosomes --
A Yep.

Page 321

Q -- what effect would that have on triggering an inflammatory response?
MR. KOHN: Objection. Form.
THE WITNESS: The lysosomes are little packets of enzymes in the inflammatory cells. So if the silver could make those lysosomes break, the lysosomes would, depending on their type and nature, begin to digest the tissues in which they were released. And necrotic tissue is amongst the best attractants or key attractants for inflammatory cells, so you would get a further dose of inflammatory reaction.
MR. SIGELMAN: Q How would you define the term "toxicity"?
A Anything that causes an untoward reaction.
Q Was toxicity observed in the tissues of animals implanted with the Silzone valve?
MR. KOHN: Objection. Lacks foundation.
THE WITNESS: To the best of my knowledge, no.
MR. SIGELMAN: Q What would you look for in animals to see whether or not silver exerted toxic effects on adjacent tissues?
A I'd look for evidence of tissue necrosis. You'd look for evidence of muscle fibers dying and scar tissue being laid down in their place, and then the aggregation of the material, whatever it was, that had

incited that.
Q How about the aggregation of granulomatous material, for example?
A It could be. But there are metals which are -- which can damage, and those that will not do much damage but yet incite a inflammatory reaction.
Q What kinds of studies would you believe, based on your clinical knowledge and your overall training, would need to be done, say in animals, to evaluate the effect of silver on cell killing and inflammation?
MR. KOHN: Objection. Form.
THE WITNESS: I haven't thought of it in any great detail, but culture studies would be one of them. Or you could do further studies, implant the material in the subcutaneous tissues and see what the reaction was.
MR. SIGELMAN: Q To your knowledge, has there ever been an approved or recognized method for determining silver-bodied burden?
A Not that I can recall.
Q Do you know how silver is transported in the body?
A No.
Q Do you know how it's cleared?
A No.
Q Is it bound by protein, do you know?



A Almost -- most things are, and presumably this would be one of the methods, but the other method would be for macrophages to engulf it.
Q What is argyria?
A Argyria?
Q Argyria.
A Is silver toxicity, or the presence of silver in the body.
Q What is argyria neuropathy?
A Just going by the words, it means a nerve damage or neuropathy induced by the presence of silver, presumably in nerve cells, nerve fibers, and neurons.
Q Does silver have an effect on neurological tissues, such as glial cells?
MR. KOHN: Object to the form.
MR. SIGELMAN: Q Do you know?
A Not that I am aware of.
Q Are you aware of any studies on the adverse effects of silver on the neurological system, particularly glial cells?
A No, sir, I'm not.
Q Are you aware of any studies sponsored by St. Jude to determine the effects of permanent silver implants on humans?
A No, sir, I'm not.



Q If animal studies of Silzone valves, for example, showed chronic foreign body granulomatous inflammatory reaction, sometimes characterized by giant cells, proximal to synthetic silver-coated fibers, would you interpret that as a sign of potential toxicity?
MR. KOHN: Objection. Form, lacks foundation.
THE WITNESS: I'd be more inclined to say yes if I -- if you told me that the macrophages or the granuloma contained foreign material, the foreign material being silver. In the absence of that, I'm not quite so certain of my answer.
MR. SIGELMAN: Q Okay. Could be? Depends on --
A Sure.
Q -- whether there was silver contained there? Correct? Is that right?
A Yes, sir.
Q Going on in this document, the May 20, 1999 meeting minutes, it states, quote, "Dr. Butany stated that he did send an annular tissue sample to a metallurgist and is awaiting report."
Did you do that?
A I tried to get a engineer at the University of Toronto to do it for me and had no luck whatsoever.
Q Why not?



A I don't know. The guy was either too busy or didn't have the technical manpower to help, or, like everyone else, too many other things took priority.
Q Did you tell St. Jude who that was?
A I don't think so.
Q Did you ever try to get another metallurgist to do that?
A Not at that time, no.
Q And moving on to the second page of the memo, it says "Discussion, All Attendees."
See that toward the bottom?
A Sorry.
Q See that? Says under "Discussion, All Attendees," says "Cases of pannus overgrowth and dehiscence have been reported by Hopital Laval, Toronto General Hospital in Sunnybrook."
Did I read that correctly?
MR. KOHN: Next page.
THE WITNESS: Discussion of this, of -- yes, sir.
MR. SIGELMAN: Q So by that time, you weren't alone, were you?
A No.
Q All right. So your cases weren't isolated to you and your hospital?

Page 326

A The -- no, they weren't. The Sunnybrook and my hospitals, I did know around about that time. The Laval, this was news.
Q All right. It goes on. "Dr. Bauset stated concern regarding the appearance of the annular tissue when valves explanted."
I read that correctly, right?
A Yes, sir.
Q Did he do that?
A Sorry. Do what?
Q Did he state his concern regarding the appearance of the annular tissues when valves were explanted?
A I guess he must have, since it's in writing. I can't recall.
Q What was his concern, if you can recall, either at this meeting or other times, about the appearance of the annular tissue when the valves were explanted?
A I really have no recollection of what Dr. Bauset said or says said at that time or any other.
Q All right. And then it goes on. The bottom bullet says, "Al Flory stated that Dr. Titus had reviewed explants with Dr. Butany and had seen nothing unusual but will arrange for Dr. Butany to work with Dr. Titus on this issue more closely."

Page 327

Did I read that correctly?
A You did read it correctly.
Q And that was stated to a group of people --
A Yes, sir.
Q -- not just to you, right?
A Yes, sir.
Q And you didn't agree, I take it, that nothing was unusual in the explants that Dr. Titus reviewed in your presence?
A I don't agree that there was nothing unusual about them.
Q Right. And despite this statement that they were going to arrange with you to work with Dr. Titus on this issue more closely, that never happened, right?
A That is correct.
Q Did any of your colleagues ask you about that after this?
A No, sir.
Q And the next page says, "Explants have occurred at higher rate than expected but not seen consistently. This raises questions regarding valve versus patient-related factors."
I read that right, right?
A Yes, sir.
Q Did you conclude that questions about

Page 328

patient-related factors accounted for the fact that explants have occurred at a higher rate than expected?
A It's one of the possibilities.
Q Did you conclude that it explained it, in your mind?
MR. KOHN: Objection. Form.
THE WITNESS: I'm sorry. Could you repeat that, please?
MR. SIGELMAN: Q Did you ever become persuaded that that's what accounted for the higher rate of explants?
A No. As I said, I think it's one possibility.
Q Did you think it was likely?
A It remains a possibility.
Q All right. Are there patient-related factors that you feel account for the number of explants that necessitated the recall of the Silzone heart valve?
MR. KOHN: Objection. Form, speculation.
THE WITNESS: I don't know. I have no idea.
MR. SIGELMAN: Q Okay. Nothing you can tell me at all --
A No, sir.
Q -- off the top of your head here?
I think that we're going to have to change the tape. I've been given that signal.

Page 329

THE VIDEOGRAPHER: This marks the end of videotape No. 4 in the deposition of Dr. Jagdish Butany. The time is 4:06 p.m. We are off the record.
(Recess taken.)
(Whereupon, Deposition Exhibit 27 was marked for identification.)
THE VIDEOGRAPHER: This marks the beginning of videotape No. 5 in the deposition of Dr. Jagdish Butany. The time is 4:13 p.m. We are back on the record.
MR. SIGELMAN: Q Dr. Butany, we're back on the record. You've been handed what the court reporter has marked as Exhibit No. 27. It's a November 11, 1999 memorandum to Dr. Tirone David, Debbie Christie-Hrybinsky, and Monica Schultz of St. Jude from Joan Ivanov. You know all these people?
A I'm not sure I know a Debbie Christie. I probably do. Yeah, I do. Of course, certainly. Debbie Christie, but I didn't realize she had a hyphenated name.
Q All right. And we talked a little bit, just in passing, about the randomized study and that you learned about it.
A Yes, sir.
Q At some point you mentioned there was a meeting in October 19 --

A '99.
Q -- 99 about it.
And that was being conducted around you, at least, if you weren't always involved with it, correct?
A Yes, sir.
Q And you actually generated some data for some -- one or more of your abstracts that came from, in part, that study, correct?
A Yes, sir.
Q And when we say "that study," we're talking about the Carbomedics, St. Jude study, a piece of which eventually included the Silzone valve.
A Yes, sir.
Q Correct?
And do you recall any of the findings from the randomized portion of the study for which Dr. Tirone David was the clinical investigator at your hospital?
A Not firsthand, no.
Q All right. If you would go, sir, to the second page of the document.
A Yes, sir.
Q Actually, the third page. There was a period called the Silzone era and the non-Silzone era. Do you recall that?
MR. KOHN: Let me interpose an objection.



There's no foundation that he's seen this document before or knows anything about it or was involved in the study, Counsel. So I think you need to lay a little foundation.
MR. SIGELMAN: Q Have you seen anything written up about this study?
A No, sir.
Q You were presented with information about it?
A Yes, sir.
Q Were you presented with information that they looked at 18-month freedom from, for example, valve-related mortality and morbidity in the non-Silzone era and then the Silzone era; that is, an 18-month period before Silzone was used in the hospital and then 18-month period after it was used?
A I presume so, but I do not have a direct recollection of that.
Q Do you have a recollection, looking at point No. 7, that this study, paid for and sponsored by St. Jude, concluded that there was a statistically significant -- "P" equals 0.008 -- difference between the Silzone model and the conventional St. Jude model for freedom from paravalvular leak, Table 5?
A Yes, sir.
Q Did you ever hear that?



A I think so.
Q Okay. So you had heard, when you were at your hospital, that in a study that was completely sponsored by St. Jude and Carbomedics, that --
A Sorry. I'm sorry. I think I heard it at Quebec City at the Canadian Cardiovascular Society meeting at the end of October, not at my hospital.
Q All right. If you would go to Table 5. Let's just go there. And before we do, I should ask -- let's go to that second page first that we were looking at, which is page 2 of this whole document.
You see at the top it says, "In the analysis of time-related outcomes, Table 4, only freedom from thromboembolic events for all sites combined and the mitral valve site approached statistical significance."
A Yes, sir.
Q "Figure 5 depicts thromboembolic events for the Carbomedics group. Figure 6 depicts thromboembolic events for the St. Jude group. It appears that the Carbomedics group has a biphasic hazard of thromboembolic events, early increased hazard of thromboembolic events, followed by a period of reduced hazard, up to three years, and then a second period of increased hazard."
I read that correct, right?



A Yes.
Q "This biphasic hazards pattern has been reported by Blackstone, et al. The St. Jude group, however, appears to have a sustained period of increased hazard, up to three years."
Did I read that correctly?
A Yes, you did.
Q Did you hear about that in Quebec City?
A I cannot recall it being worded this way.
Q All right. And going on, let's go on and look at figure -- or Table 5, that is.
A Yes, sir.
Q Do you have that in front of you?
A I do.
Q Did you hear in Quebec City that in a study sponsored by St. Jude that was conducted at your institution, a prospective study, as a matter of fact, that for paravalvular leak, it showed a statistically significant association with the Silzone valve at a "P" value of 0.008?
MR. KOHN: Objection. Form.
MR. SIGELMAN: Q Did you remember that?
A No. Can I help things along?
Q Sure.
A My recollection is not very detailed, but the

Page 334

biggest thing I remember was starting out by saying that the Toronto General Hospital has a 25-percent incident rate, that if you wanted to see incidence with this valve you came to Toronto General Hospital. The other aspect that I recall is that I felt to some extent vindicated, that I wasn't the only one at my institution saying that this was a problem.
Q Okay.
A The other things I remember were that other institutions still said that they had absolutely, absolutely no problems with the valve.
Q I understand that. But do you recall being told that they had found a highly statistically significant association between the use of the Silzone valve in this prospective randomized trial --
MR. KOHN: Objection. Form.
MR. SIGELMAN: Q -- with paravalvular leak when they compared the conventional St. Jude valve with the Silzone valve?
MR. KOHN: Object to form.
THE WITNESS: To be honest, I don't have a recollection, but I'm seeing it here, and if this -- these are what they showed us there, then that is correct.
MR. SIGELMAN: Q And do you have a

Page 335

recollection, again looking at Table 5, that in this study, looking at the incidence of reoperation or explant, once again there was a statistically significant association between the use of the Silzone valve and reoperation with a "P" value of 0.006?
A Yes, sir.
Q Do you have a recollection of that?
A No. Same answer, though.
Q And in this table, you'll agree that the comparison is between the Silzone valve and the conventional St. Jude value, correct?
A Yes, sir. That is correct.
Q And do you have a recollection that for thrombosis there was a near statistically significant association with a "P" value of 0.09 between use of the Silzone valve and the incidence of thrombosis?
A I don't think -- oh, sorry. Yes, you're right.
Q Is that correct?
A Yes. It's -- it's not really significant. Anything above .05 is usually not.
Q I said near statistical significant.
A Probably, yes.
Q And again, while not apparently statistically significant, for conventional St. Jude valves, the freedom from mortality and morbidity was 84 percent,

Page 336

plus or minus 3, and for Silzone it was 68 percent, plus or minus 16; is that correct?
MR. KOHN: Are you asking him to confirm what the page says or --
MR. SIGELMAN: Yeah.
MR. KOHN: -- what he remembers?
MR. SIGELMAN: Q Do you have recollection of something of that sort?
A No, I don't have a recollection.
Q Now, let me ask you, sir. To your knowledge, were physicians, implanting physicians in Canada or the United States, told after this point that in this particular study, paid for by St. Jude, there had been identified a statistically significant association between the use of the Silzone valve and the phenomenon of explantation as well as the occurrence of paravalvular leak?
MR. KOHN: Objection. Form.
THE WITNESS: To my knowledge, no.
MR. SIGELMAN: Q And these were similar conclusions to what you had come to over a year and a half before, correct?
MR. KOHN: Objection. Form.
THE WITNESS: Not quite a year and a half, but a year at least, around about that. Although the

Page 337

numbers that I had were significantly smaller than these.
MR. SIGELMAN: Q And I take it that until this valve was recalled from world markets, you're aware of no publicity by St. Jude of these findings; is that correct?
A I'm not, but then I'm not in the mailing list of St. Jude for valve products.
Q Do you know whether these findings, these specific findings, were given to the Data Safety Monitoring Board of the AVERT study which ultimately recommended termination of enrollment of the AVERT study?
A I have no idea, no, sir.
Q Is it your understanding that it was the termination of the AVERT study, as recommended by the Data Safety Monitoring Board, that immediately led to the recall worldwide of the Silzone heart valve?
MR. KOHN: Objection. Form, no foundation.
THE WITNESS: Yes, sir, it is.
MR. SIGELMAN: Q That's your understanding, correct?
A I believe so, yes.
Q Do you know whether these specific data, all of them, in particular the statistically significant

Page 338

association with reoperation or explant and the statistically significant association with paravalvular leak, were made known to Canadian regulators before the recall of the Silzone valve?
A I have no idea.
Q Do you know whether such findings were made known to the United States Food and Drug Administration before the recall of the valve?
A I have no idea.
Q When the Silzone valve was recalled from the worldwide market because of what St. Jude said was a statistically significant association with explant in the AVERT study, particularly or most often -- let me rephrase that. Let me strike that.
To your knowledge, did St. Jude, when they announced the recall of the Silzone valve, state that they were doing this because of a statistically significant association in the AVERT study with the adverse event of explantation?
A Yes, sir.
Q And do you recall that they emphasized paravalvular leak as --
A I'm sorry. They -- I thought they emphasized paravalvular leak rather than explantation, that the one would lead to the other.

Page 339

Q So they emphasized statistical associations that involved in one way or another --
A Yeah.
Q -- explantation and particularly paravalvular leak; is that your understanding?
A That is right.
Q And would you agree with me that at least a couple months before then --
A Yeah.
Q -- similar statistical associations came out of a study paid for by St. Jude?
MR. KOHN: Objection. Form.
MR. SIGELMAN: Q In your very hospital.
A Yes. You've given me the papers, and certainly, yes.
Q And you have some general recollection of that, independent of these papers, when you were at a meeting with Dr. David, or whoever from your hospital, and others, correct?
A Yes, sir.
Q And let me ask you. To your knowledge, did St. Jude ever tell the world that the AVERT study wasn't the only body of statistical data that implicated this valve in the occurrence of paravalvular leak and explantation?

Page 340

A To my knowledge, no.
Q Do you have any opinion as to whether the company should have done that?
MR. KOHN: Objection. Form.
THE WITNESS: Yes.
MR. SIGELMAN: Q You think they should have?
A Yes.
Q And why is that?
A Any good corporate citizen should.
Q Do you think that not doing that is not an act of good corporate citizenship?
A That's what I think.
Q All right. And let's go to the front page of this document, sir. Do you see where it says "Confidential: Please do not circulate"?
A Yes, sir. Yeah.
Q And to your knowledge, these data were not circulated, correct?
A To the best of my knowledge, yes. They were not circulated, but I am reasonably sure some of these were shown in a Power Point presentation at Quebec City.
Q Was St. Jude at that Power Point presentation?
A It was organized by St. Jude.
Q All right. For a handful of people?
A There was a handful of people there. I think

Page 341

they'd invited far more people than that, but only a very small handful showed up.
Q You think that the -- and I meant by your definition now. Do you think that the St. Jude Silzone valve was a defective product?
MR. KOHN: Objection. Form. Calls for speculation, calls for legal conclusion.
THE WITNESS: From events that transpired after the valve was used, certainly seems to have been not the best sort of thing to put into human beings.
MR. SIGELMAN: All right. I think that we've completed our examination today, and as I understand it, we will be dealing with counsel in the very near future to accommodate your arrival in my part of the world, and we look forward to continuing, and it would be my hope -- I can't guarantee it, but it would be my hope that we'd only go another day. I think if we move with some rapidity that we can probably do that, but depending, of course, on when we begin the deposition --
THE WITNESS: Sure.
MR. SIGELMAN: -- and when we end it.
MR. KOHN: We're going to ask you for a reasonable time estimate on how much time you need, because obviously, we're going to need some time to examine Dr. Butany. So we can talk about that off the

record, but --
MR. SIGELMAN: Sure.
MR. KOHN: -- I just want to make that clear.
MR. SIGELMAN: Well, I don't know, but --
MR. KOHN: You can think about it. You don't have to --
MR. SIGELMAN: It would be comparable to today in time.
MR. CAPRETZ: Counsel, would you put on the record -- I may have missed the date of that last report that you were referring to.
MR. SIGELMAN: November 11, 1999.
Q And I think we established this, but you're going to furnish the consulting contract, correct, that you have?
A I said I would ask my lawyer --
Q Oh, that's correct, right.
A -- and see what she would say.
Q Okay. And like I said, if your lawyer has any legal questions in terms of American law --
A She will contact you.
Q -- I would happy to advise her --
A Sure.
Q -- about what at least I think American law requires.



A Sure.
MR. SIGELMAN: We're done. Thank you.
THE VIDEOGRAPHER: Here marks the end of videotape No. 5 in the deposition of Dr. Jagdish Butany. The original videotapes will be retained by Video Solutions at 50 First Street, San Francisco, California. We are going off the record. The time is 4:30 p.m.

(Whereby, proceedings adjourned at 4:30 p.m.)

--oOo--

I declare under penalty of perjury the foregoing is true and correct. Subscribed at ____________________, ____________________, this ______ day of ____________________, 20____.

____________________

JAGDISH BUTANY, MBBS, MS, FRCPC



## CERTIFICATE OF REPORTER

I, SANDRA M. MACNEIL, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: ____________________

____________________
SANDRA M. MACNEIL, CSR 9013



May 9, 2002

Jagdish Butany, MBBS, MS, FRCPC
c/o CROSBY, HEAFEY, ROACH & MAY
Steven M. Kohn, Esq.
1999 Harrison Street
Oakland, California 94612

Re: BRIDGES vs. ST. JUDE MEDICAL

Dear Dr. Butany:

Please be advised that the original transcript of your deposition taken April 26, 2002 in the above-entitled matter is available for reading and signing. The original transcript will be held at the offices of Combs & Greenley, 601 Van Ness Avenue, Suite 2052, San Francisco, CA 94102 (415) 359-2040, for thirty (30) days in accordance with California Code of Civil Procedure Section 2025(q) (1):

> "For 30 days following this notice the deponent, either in person or by a signed letter to the deposition officer, may change the form or the substance of the answer to any question, and may either approve the transcript of the deposition by signing it, or refuse to approve the transcript by not signing it."

If you are represented by counsel in this matter, you may wish to ask your attorney how to proceed. If you are not represented by counsel and wish to review your transcript, please contact our office for a mutually convenient appointment to review your deposition.

Thank you for your cooperation in this matter.

Sincerely yours,

SANDRA M. MACNEIL, CSR 9013

cc: Daniel W. Sigelman, Esq.
Edward H. Kellogg, Jr., Esq.
James T. Capretz, Esq.
James Newland, Esq.
William S. Brown, Esq.
Rachel A. Fuerst, Esq.

Andersen, et al
Plaintiff
and
St. Jude Medical, et al
Defendant

Court File No. 00-CV-195906CP

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

**Affidavit of Dr. Gregory Wilson**
**(sworn May 31, 2002)**

**Genest Murray**
130 Adelaide Street West, Suite 700
Toronto, Ontario
M5H 4C1

James M. Newland LSUC#235028
Tel: 416-360-2890
Fax: 416-360-2625

Solicitors for the Plaintiffs