Court File No. 00-CV-195906CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

ERIK ANDERSEN, YVONNE ANDERSEN and SHARON FROST

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and
ST. JUDE MEDICAL CANADA, INC.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

# AFFIDAVIT OF DR. GREGORY WILSON (sworn February 24, 2003)

I, Dr. Gregory Wilson, of the City of Toronto, in the Province of Ontario MAKE OATH AND SAY:

1. I am the deponent of affidavits sworn February 7, 2002 and June 3, 2002, which have been filed by the solicitors for the Plaintiffs. I have knowledge of the matters deposed in this affidavit, except where I have been informed by others, in which case I have indicated the source of the information and I believe it to be true.

2. In this affidavit, I intend to respond to the affidavits filed by Drs. Mizgala, Errett, Hirsh, Stiver and Schoen, all of which were sworn subsequent to my affidavit dated June 3, 2002. In particular, I will address:

a. The toxicity of silver and its effect at a cellular level on the healing process;

b. The issue of causation as it relates to individual patient factors;

c. The appropriateness of the term "pseudoendocarditis";

d. The application of the Duke criteria for a clinical diagnosis of infectious endocarditis;

e. Various inaccuracies in the Defendant experts' review of the medical records of the Silzone patients whose valves and/or records I have examined;

f. The need for heightened monitoring for Silzone valve patients; and,

g. Further evidence of the inadequate healing of Silzone valves based on photographs which I have reviewed of several additional explanted Silzone valves.

**TOXICITY OF SILVER**

3. In my affidavits of February 7, 2002 and June 3, 2002, I expressed the opinion that the Silzone coating "frustrates" the normal tissue healing process, meaning that Silzone has an adverse effect on healing. I did not express an opinion specifically on the toxicity of silver and did not develop an explanation for the pathological findings relating to the Silzone coated sewing ring. Those findings range from essentially no healing, that is minimal tissue on or in the sewing ring on one hand, to excessively thick pannus overgrowth with no observations of normal healing.

4. I have now had the benefit of reviewing the peer reviewed scientific publications relating to silver toxicity which will be exhibited to an affidavit of Brenda Hollingsworth, and which are exhibits to the affidavit of Dr. Kevin Healy. Based on the publications on silver toxicity to be presented in Ms. Hollingsworth's affidavit, and the scientific literature reviewed by Dr. Healey, his explanations and his opinions presented in his affidavit and my knowledge of cellular pathobiology relevant to the practice of anatomic pathology, it is my opinion that the adverse effects of the Silzone coating, including what I have referred to as "frustrated healing", are primarily due to silver toxicity. I find the scientific evidence compelling that silver is toxic to mammalian cells, including human cells.

5. The publication by Kraft, et al, "Striated Muscle Micro Vascular Response to Silver Implants: A Comparative In Vivo Study with Titanium and Stainless Steel", *J Biomed Mater Res.*, 49, 192-199, 2000 (see Hollingsworth affidavit), which I have read, is a study that is particularly relevant to prosthetic heart valve implantation because,

a. The implants were in a living animal (*in vivo*), rather than in the somewhat artificial situation of cell culture (*in vitro*), and were in direct contact with striated muscle and subcutaneous connective tissue. Heart muscle is very similar to striated (skeletal) muscle and subcutaneous connective tissue in skin is similar to annular connective tissue in the heart;

b. Very importantly, there was direct, microscopic observation of the toxic effects on the permeability, that is leakiness, of the blood vessels in the tissues;

c. Furthermore, the observations for many of the implants extended over 14 days; and,

d. The study compared silver coated implants with conventional implant materials: stainless steel and titanium.

6. In their Results section, where the authors present their observations without interpretation, they state (on page 195), "Massive edema of the tissue under investigation in the animals with silver samples made analysis later than 3 days in all but one animal impossible." It is noteworthy that leukocyte extravasation (white blood cells moving through the damaged walls of the blood vessels) reached a peak after 8 hours with stainless steel implants but "showed a notable recovery towards physiological levels." In contrast "leukocyte extravasation continuously rose through all observation periods in the silver-treated animals, interestingly again rising markedly between 24 hours and 3 days. Titanium-treated animals showed an insignificant, almost negligible, and only transient increase in extravasation of leukocytes."

7. It is clear from the Kraft study that silver in direct contact with tissues similar to those surrounding the sewing ring of a heart valve prosthesis is highly toxic.

8. In Dr. Healey's affidavit, he describes the paper by Hemmerlein et al "In Vitro Cytotoxicity of Silver-Impregnated Collagen Cuffs Designed to Decrease Infection in Tunneled Catheters" (*Radiology* 1997; 204:313-367) in detail. I have also read this paper. This is an in vitro study, which complements the Kraft in vivo study because the in vitro experimental methodology allows the observation of the halo of death around the silver-impregnated cuff. The observations of viable but unhealthy cells at greater distances from the surface of the cuff demonstrate the importance of the level of concentration of the silver being higher at the silver impregnated material surface and reducing with greater distance from the edge of the cuff, as explained by Dr. Healey.

9. In my own histological examination of Silzone sewing rings and adjacent tissue, I observed that particles of the silver coating separated from the sewing ring and may be found well away from the sewing ring in the tissue. These spalled silver particles spread the toxic effects of the silver beyond the sewing ring of the valve. Indeed, the combination of the toxicity of silver to the cells of mammals, including humans, and the spalling of particles of silver off the Silzone sewing rings provides a reasonable explanation for the extremes of essentially no tissue on some Silzone sewing rings versus excessive tissue build-up on others, as I explain in detail in paragraphs 110 to 115,inclusive, of this affidavit.

**CAUSATION – INDIVIDUAL PATIENT FACTORS**

10. The position generally taken by each of the defendants' experts is summarized by Dr. Jones (#4(g) of her January 27, 2003 affidavit) that: "The complications discussed throughout this affidavit, such as paravalvular leak, explant, endocarditis, thromboembolic events, bleeding, and death, occur in recipients of every type of mechanical heart valve. It is often impossible to know why one of these events occurred in a particular individual. As a result, an assessment of causation in a particular individual would require an in depth review of his or her medical history, as well as consideration of numerous issues related to that person's surgical and post-surgical treatment".

11. It is correct that the complications listed by Dr. Jones may occur in every type of mechanical heart valve. However, it does not logically follow that a particular design defect in a mechanical heart valve cannot cause, or materially contribute, to any or all of these complications. Furthermore, in stating that "it is often impossible to know why one of these events occurred in a particular individual", Dr. Jones is implicitly suggesting that the standard that should be applied to statements made by the plaintiffs' experts on issues of causation for individual patients, in particular Eric Andersen and Sharon Frost, as representatives of the class, is perfect knowledge. In my opinion, the medical issues are not unmanageably complex and it is possible to conclude with a high degree of probability that the Silzone valve has created harm in each of the patients referred to in the earlier affidavits. I reiterate that indeed, Silzone is harmful to all patients.

12. The recently filed affidavits of Drs. Mizgala, Errett, Hirsh and Stiver raise various issues relating to Eric Andersen, Sharon Frost, DJ, WS, and RR on the theme of individual patient factors in causation. These affiants deal with the evidence relating to these patients in a highly selective manner. Given the presumed expertise of these affiants, they deliberately ignore information, both factual and conceptual, which is well recognized as being part of the received wisdom of clinical and laboratory medicine and is not at all controversial.

**INFECTIOUS ENDOCARDITIS AND RESPONSE TO DR. STIVER**

13. The most important theme explored by the Defendants' experts on the issue of causation in individual patients who have had one or more Silzone valves implanted is infectious endocarditis as a cause for paravalvular leak. This is because infectious endocarditis is the only possible alternative explanation other than effects of the silver coating for the repeated finding of paravalvular leak combined with an almost complete absence of healing of the sewing ring of explanted Silzone heart valve prostheses. Other alternative causes are put forward, but as I shall explain, they simply do not apply to these patients.

14. For example, inadequate suture placement or suturing technique by the surgeon at implant might explain a case of paravalvular leak but, realistically, the leak would be quite localized and would not produce an essentially complete lack of healing around the entire circumference of the sewing ring. This is what I observed in the explanted Silzone valves from Eric Andersen, Sharon Frost and DJ whose Silzone valves were explanted due to paravalvular leak.

15. I agree that localized weakness of the annular tissues of the heart into which the prosthetic heart valve was implanted, relating to underlying disease responsible for the need for the prosthetic valve, might contribute to paravalvular leak. I note that surgeons who perform prosthetic valve operations are experienced with this potential problem which can be minimized by removal of the poor quality tissue before the prosthetic valve is implanted and the use of pledgeted sutures. Nevertheless, even if present as a risk factor for paravalvular leak, such poor quality annular tissue would not diffusely prevent the healing of the entire sewing ring.

16. The combination of paravalvular leak with essentially absent healing of the sewing ring could occur, without needing to invoke the alternative explanations of infectious endocarditis or silver toxicity to tissue, if the individual receiving the prosthetic valve implant had an underlying medical condition which resulted in a profound effect on wound healing generally. However, with the possible exception of some rare inherited diseases not present in Eric Andersen, Sharon Frost, DJ, WS, or RR, the only condition which could account for such a severe generalized inadequacy of healing is severe malnutrition. None of these Silzone valve recipients suffered from such malnutrition.

17. Thus, on careful examination of the realistic range of alternative explanations, infectious endocarditis is the only reasonable alternative explanation, other than causation due to adverse effects of Silzone, which might account for the combination of paravalvular leak with diffusely poor healing in those Silzone valves explanted due to paravalvular leak in the cases of Eric Andersen, Sharon Frost and DJ. (For RR and WS

the issue was not paravalvular leak but, rather, thrombotic and thromboembolic complications, an important but separate issue which I address later in this affidavit. Sharon Frost had both paravalvular leak and a thromboembolic stroke and, thus, is also appropriately discussed later in this affidavit in relation to the thrombosis issue.)

18. Therefore, for Eric Andersen, Sharon Frost and DJ it is important to address the possibility that each had infectious endocarditis in relation to paravalvular leak of their respective Silzone valve prostheses. Dr. Stiver, in his January 16, 2003 affidavit, has addressed the infectious endocarditis issue, and commented on the term "pseudoendocarditis" introduced by Dr. Tyers in his February 22, 2002 affidavit.

**PSEUDOENDOCARDITIS**

19. Dr. Stiver states in paragraph 7 of his affidavit that "pseudoendocarditis" is a term Dr. Tyers "has coined on his own" and is "not an illness or condition recognized in the medical community generally, or in the field of infectious diseases specifically." Furthermore, Dr. Stiver states in the same paragraph that Dr. Tyers "does not define the specific characteristics of "pseudoendocarditis", but it appears to involve the tissue destruction and vegetations typically seen with PVE, but without the more common signs or symptoms of infection".

20. It appears to me that when the experts for the defendants use the term "endocarditis", what is meant is really infectious endocarditis. More particularly, when "endocarditis" is used in relation to a prosthetic heart valve, these experts are referring to prosthetic valve infectious endocarditis. This is a widely accepted short form use of diagnostic terminology by clinicians. The reason is that, for practical purposes, it has come to be accepted that there is really just one form of endocarditis with a prosthetic heart valve and that is infectious endocarditis. When the experts for the defendant use this simplified terminology, the implicit effect is to preclude a cause for the inflammation, which is a response to injury, other than infection. The toxicity of silver is another cause. Therefore, in this affidavit I use the precise terms infectious endocarditis,

and prosthetic valve infectious endocarditis, not merely endocarditis, unless I am quoting the experts for the defendant.

21. I believe the term "pseudoendocarditis" is very useful in reference to Silzone in that it focuses attention on a new phenomenon in the clinical arena: a heart valve sewing ring which is manufactured in such a way that the sewing ring is toxic to the heart tissue into which it is implanted (which is the same tissue involved in prosthetic valve infectious endocarditis) and presents a new clinical problem.

22. There are some semantics relating to the term "pseudoendocarditis" which should be addressed. Dr. Stiver, in paragraph 7 of his affidavit complains that Dr. Tyers does not define the specific characteristics of "pseudoendocarditis". "Pseudo-", of course, means false. It is a well-recognized prefix in medical diagnostic terminology (e.g. pseudogout, pseudohypoparathyroidism, pseudodementia, pseudofractures, pseudohermaphroditism, pseudoathetosis, pseudohookworm, etc.). Implicit in this terminology is that the pseudo-condition masquerades as the correct diagnosis and, thus, must be recognized so that the correct diagnosis is made and, moreover, the correct treatment is provided. In this respect, Dr. Tyers' newly coined term "pseudoendocarditis" is an extension of a tradition in medical diagnostics, recognizing that an unrelated condition can present clinically like another and be confused with it. The "endocarditis" in "pseudoendocarditis" is problematic in that, strictly speaking, "endocarditis" refers simply to inflammation of the endocardial lining of the heart. By convention, the "endo" in "endocarditis" refers to not just the endocardium but also to the heart's valves and even, by extension from valvular tissue or endocardium that is the muscle of the heart, that is the myocardium. There are disease states, notably active rheumatic valvular heart disease, in which there can be an intense inflammation. Dr. Stiver appears to recognize this in the first sentence in paragraph 5 of his affidavit. However, if the inflammation of the myocardium does not arise by direct extension from the endocardium, the term "myocarditis" is used.

23. By common usage clinically, the term "endocarditis", linked to a prosthetic heart valve, has come to denote infectious endocarditis in which the inflammation relates to the

effects of one or more particular micro-organisms, which can be bacteria or fungi, but are usually bacteria, as recognized by Dr. Stiver in last sentence of paragraph 5 of his affidavit. Thus, the most precise terminology which Dr. Tyers might use for "pseudoendocarditis" is "prosthetic valve pseudoinfectious endocarditis". Using this terminology, it is clear that the "pseudo" refers to infectious and not to endocarditis. While prosthetic valve pseudoinfectious endocarditis is the more precise term, and is my preference, Dr. Tyers' "pseudoendocarditis" rolls off the tongue more easily and captures the essence of the situation.

24. Prior to the Silzone valve, there was a reasonable expectation among clinicians caring for patients with prosthetic heart valves that the sewing rings of these implanted prosthetic devices would not be toxic to the surrounding tissue or the blood in contact with the valve. "Toxic" refers not only to the extreme of causing cell necrosis, but also includes sublethal damage to the cells such as to adversely affect cellular function. Dr. Healy also makes this point in paragraph 48 of his affidavit.

25. Two major cell types involved in interaction with the prosthetic valve sewing ring are connective tissue cells (of which fibroblasts are the key component) and white blood cells (of which macrophages, derived from circulating mononuclear leukocytes, are included). They are vital to healing the sewing ring to provide good incorporation of the sewing ring into the surrounding tissue of the native valve annulus (a connective tissue structure present in the heart which surrounds the heart valve). The annular tissue may be trimmed by the surgeon ("annuloplasty") but is almost never completely removed. If these cells, fibroblasts and macrophages in particular, are sublethally damaged or rendered necrotic by toxicity of the sewing ring material, then poor healing results.

26. Prosthetic valve infectious endocarditis also produces damage and necrosis to the tissues surrounding the sewing ring. If this tissue injury occurs as the result of sewing ring toxicity rather than infection, then the sewing ring toxicity masquerades as infectious endocarditis in respect to the effects of that cell injury/necrosis. These effects can include poor healing of the sewing ring with little pannus formation on the surface of the

sewing ring and little anchoring of that pannus to the sewing ring because of poor ingrowth of the connective tissue cells into the sewing ring.

27. In the extreme, the toxic damage to the surrounding tissue combined with poor healing of that damage can cause paravalvular leak because the cells which must accomplish that healing are in close proximity to the sewing ring and are also damaged. The poorly healed surfaces of the sewing ring are prothrombogenic and, furthermore, to the extent healing continues to be inhibited in the near vicinity of the sewing ring by toxic effects, organization and endothelialization of the thrombus to produce well healed, endothelial cell covered pannus is prevented. Necrotic tissue is itself prothrombogenic. Thus, the tissue damage and further adverse effects on healing caused by infection can alternatively be caused by toxicity of the prosthetic valve sewing ring.

28. While toxic damage to paravalvular tissue may mimic prosthetic valve infectious endocarditis in relation to the development of paravalvular leaks and thrombus build-up on the sewing ring and adjacent tissues, the infectious agent is not present, unless there is a subsequent secondary infection of necrotic tissue or adherent thrombus. I shall address the secondary infection later in this affidavit. For purposes of clarity, the reader should assume that no secondary infection takes place unless stated otherwise.

29. If there is no infection, there are no infectious micro-organisms to be found in relation to prosthetic valve involvement. This is the situation pertaining to all of the Silzone valves referred to in my affidavit of February 7, 2002, that is, each of the six explanted Silzone valves, one each from Eric Andersen, Sharon Frost, DJ, and WS and two from RR. Absolutely no evidence of bacterial or fungal infection has been found in relation to these Silzone valves, including on examination of these valves by other pathologists as well as my subsequent examination. It is true that the lack of demonstration of an infectious agent does not eliminate with absolute certainty the possibility of infection. However, in my opinion, it is fair to conclude that the probability of infection in each of these explanted Silzone valves was very low, based on several considerations which follow.

**THE DUKE CRITERIA**

30. The most widely recognized practical approach to the clinical diagnosis of infectious endocarditis, also known as "infective endocarditis", is the use of the Duke criteria. These criteria were first developed a decade ago and were well presented by Arnold J Bayer et al in the paper "Evaluation of New Clinical Criteria for the Diagnosis of Infective Endocarditis" in the American Journal of Medicine 96:211-219, 1994. Tables II and III from that paper, which present the Duke criteria and the definitions of terms used in these diagnostic criteria, respectively, are attached in **Exhibit "A"** hereto. The Duke criteria are well accepted, as indicated by their presentation in the chapter on infectious endocarditis in Harrison's Principles of Internal Medicine, 15th Edition, 2001, volume 1, pages 809 to 816 by A.W. Karchmer. Harrison's textbook is widely regarded as the "bible" of internal medicine.

31. It is important to recognize that the Duke criteria give precedence to pathologic criteria(Exhibit A, Table II), preferably the identification of micro-organisms in a vegetation (including, vegetation that has embolized), or in an intracardiac abscess, but histology clearly showing active endocarditis is acceptable (see Exhibit A, Table II). No such evidence of infectious endocarditis was found for any of the Silzone valves described in my affidavit of February 7, 2002 by either the pathologists who originally examined these valves or on my subsequent examination.

32. In the absence of pathology, clinical criteria are considered, using the specific definitions listed in Table III presented in Exhibit A. Documentation of two major criteria, or one major and three minor criteria, or of five minor criteria allows a clinical diagnosis of what is known as "definite" infective endocarditis by the Duke Criteria. Table II in Appendix A also indicates that the diagnosis of infective endocarditis may be rejected. This can be done if there is no pathologic evidence of infective endocarditis at surgery or autopsy. It is impossible to reject many cases of possible infectious endocarditis by the Duke Criteria because of the limitation that antibiotic therapy must be of 4 days or less. The use of antibiotics may prevent the successful identification of the

infected micro-organism, but inflammation would be visible. Thus, when the explant pathology shows no evidence of either an infective agent or inflammation, then the possibility of missing infectious endocarditis is very small.

33. There are just two major clinical criteria, and both must be positive to make the clinical diagnosis of infectious endocarditis by the Duke criteria. The first relates to blood culture(s). The second relates to endocardial involvement.

34. For blood cultures, there is the problem of false positives from skin contaminants and there has been discussion about which bacteria to include. However, the important issue for the explanted Silzone valves described in my February 7, 2002 affidavit is that all blood cultures obtained from these patients were negative for growth of any microorganisms. In "Diagnostic methods current best practices and guidelines for isolation of bacteria and fungi in infective endocarditis" by LM Towns and LB Reller, Infection Disease Clinics of North America 16(2):363-76, the authors indicate that in the vast majority of patients with infectious endocarditis, blood cultures are positive quoting figures between 78% and 95% from previous studies. Attached hereto and marked as **Exhibit "B"** to this my affidavit is a true copy of the article by Towns and Reller.

35. Regarding endocardial involvement, it is echocardiography which provides most of the information. In this regard, it is noteworthy that any of the following are enough to meet this major criterion: a) oscillating intracardiac mass on the valve or supporting structures (e.g. – a vegetation); or b) an abscess, meaning an abnormal echocardiographic area in the region of the valve annulus; or c) new partial dehiscence of a prosthetic valve; or d) new valvular regurgitation. Thus a new leak in a prosthetic heart valve is clearly enough to satisfy the criterion of endocardial involvement.

36. Regarding minor criteria, presented in Exhibit A (Table II), it is important to note that they indicate a recognition of the non-specificity of many common signs and symptoms associated with infectious endocarditis. Thus, of the 14 signs and symptoms listed by Dr. Stiver in paragraph 15 of his affidavit, only three are included in the Duke minor clinical criteria: fever, new heart murmur and new skin, fingernail and retinal

lesions. To be precise, under the Duke criteria, the new heart murmur must specifically relate to valvular regurgitation and the new skin, fingernail and retinal lesions are specifically those which suggest septic microemboli at those sites. Although he used terminology loosely, I believe it was Dr. Stiver's intent to refer to these specific features, which he surely is familiar with, based on his 30-year experience with infectious diseases.

**APPLICATION OF DUKE CRITERIA**

37. I have re-reviewed the clinical records of Eric Andersen, Sharon Frost and WS, each of whom was suspected clinically of having infectious endocarditis at the time the Silzone valve each had implanted was removed, addressing the question: Would any of these patients be diagnosed clinically with infectious endocarditis by the Duke criteria? The case of DJ was not clinically suspicious for infectious endocarditis when he had his Silzone valve replaced but I have also included him in the re-review. I have not included RR in this section because it has not been suggested that he had infectious endocarditis.

38. For Eric Andersen and Sharon Frost, the presence of paravalvular leak was sufficient to satisfy the endocardial involvement major clinical criterion. Neither had blood cultures positive for an infectious agent so that the other major criterion was not satisfied. To make the clinical diagnosis of infectious endocarditis by the Duke Criteria the additional presence of three minor criteria for each individual is required. For Mr. Andersen, only one of the minor criteria was satisfied, that is fever. The echocardiogram appears again under minor criteria in Appendix A, Table II but it is clear that it is not to be counted twice if it provides one of the major criteria. Thus, Eric Andersen did not satisfy the Duke criteria for the clinical diagnosis of infectious endocarditis.

39. For Ms. Frost, in addition to the one major criterion of endocardial involvement from the presence of paravalvular leak, there was the presence of arterial embolism, which caused her stroke. This event satisfies one minor criterion. However, she did not satisfy any of the other Duke minor criteria. In particular, her clinical progress notes in August, 1998 at St. Michael's Hospital in Toronto leading up to removal of her Silzone

valve in August 20, 1998 make repeated references to her having no fever. The only suspicious symptom was diaphoresis (sweating), but she also had this symptom prior to her Silzone valve implant. It may have related to menopause. She had no chills. Sweating combined with chills might have been more suspicious, but was not present. The detailed note on her record on August 11, 1998 indicates no splinter hemorrhages, no Janeway lesions, no Osler nodes and no clubbing, features referred to in the Duke minor criteria. The note on her medical record for August 13, 1998 indicates the masses on her valve on echocardiography "could be vegetations or thrombus". Thus, Sharon Frost also did not satisfy the Duke criterion for the clinical diagnosis of infectious endocarditis.

40. While neither Andersen nor Frost satisfied the Duke clinical criteria for infectious endocarditis, there is the possibility of so-called "culture negative infectious endocarditis" often abbreviated, as Dr. Stiver has done, as simply "culture negative endocarditis." On review of Sharon Frost's medical records, on August 15, the note states: "Questionable story of PVE, not sure why she would have culture-negative endocarditis. Could be sterile thrombus." At the end of the note, there was the statement "Review causes of culture-negative endocarditis."

41. In paragraphs 11 to 14 of his affidavit, Dr. Stiver develops the theme that a series of negative blood cultures do not necessarily rule out infectious endocarditis but may "indicate that the patient has culture-negative endocarditis." I disagree with his use of the word "indicate"; it would be appropriate to use the phrase "be consistent with."

42. What Dr. Stiver does not indicate is that while the issue of culture negative endocarditis can be a substantial problem in decision making on clinical data alone, and was clearly a concern for the doctors looking after Sharon Frost as expressed in the notes quoted above on her medical record, it is not such a problem when the pathologist can examine the heart valve. There are characteristic histological features associated with the difficult to culture infective agents of culture negative endocarditis, but these histological features were not seen in Andersen and Frost. The Duke criteria (Table II, Exhibit A) do not require culture of the organism; histological features of clear-cut endocarditis are

sufficient, and are usually seen with hard to culture bacteria. Occasional cases of culture negative endocarditis can be missed by the pathologist, but these are few.

43. I am not surprised that both Mr. Andersen and Ms. Frost were treated with antibiotics, as if they had infectious endocarditis, shortly before their Silzone valves were explanted. I do not criticize their doctors for doing so. The risk of death from allowing a case of suspected infectious endocarditis to go untreated is much greater than the risk of complications related to the use of antibiotics when infectious endocarditis is not actually present. This is particularly true for prosthetic heart valves. It is defensible clinically to assume that a new para-valvular leak in a prosthetic valve occurring several weeks, rather than just a few days after surgery when suturing problems would be more likely, was due to an infection even if the Duke criteria were not satisfied. With the Silzone valve, the appropriate criteria for the clinical diagnosis of infectious endocarditis are more problematic.

44. As I indicated in paragraph 187 of my February 7, 2002 affidavit, inadequate healing of the Silzone valve sewing ring makes it more likely than conventional mechanical heart valves to develop infection. This is because either necrotic tissue or thrombus provides a good culture medium in which bacteria can grow. Thus, the presence of infective endocarditis in a Silzone valve does not disqualify the valve from consideration of Silzone as the originating or underlying cause of harm to the patient as Dr. Stiver and other experts for the defendants implicitly suggest. Rather, it should correctly be considered to be likely a further adverse sequela of Silzone implantation.

**INFECTIOUS ENDOCARDITIS – DR. MIZGALA**

45. Dr. Henry Mizgala in his affidavit of January 18, 2003 states in relation to WS that "it appears from her medical records that her Silzone valve was replaced because she had active infective endocarditis". He then states that neither Dr. Tyers nor I "acknowledges the evidence in W.S' records that she had infective endocarditis and this may have been the cause of the thrombus, rather than the Silzone coating."

46. When I submitted my affidavit of February 7, 2002, I had only recently received the explanted Silzone valve from WS and had not, by that time, performed a histological examination of that specimen (see 144 from my Feb. 7/02 affidavit). However, Dr. Butany's pathology report on this specimen, provided as Exhibit S to that affidavit, indicated inflammatory cells in the thrombus but no microorganisms on special stains. Thus, there was no histological proof of infectious endocarditis. White blood cells from the blood stream can deposit in thrombus along with other cells such as red blood cells and platelets.

47. I have since performed a histological examination of the Silzone valve from WS, including multiple sections through the thrombus and sewing ring, applying special stains for micro-organisms, and find no evidence of infection. As has been explained in detail earlier in this affidavit, pathology is the "gold standard" for evaluation of the possible presence of infective endocarditis.

48. Dr. Mizgala was not aware of my further examination of the Silzone valve from WS on submitting his January 18, 2003 affidavit. However, assuming that he made a thorough, unbiased review of the medical records of WS, he surely would have been aware of the lack of medical evidence to support the clinical diagnosis of infectious endocarditis and, indeed, important findings in these records strongly suggesting WS did not, in fact, have infectious endocarditis.

49. On my review of the medical records of WS, I found the following:

a. WS did not have a fever, her temperatures ranging from 36.1°C to 36.8°C, all slightly below 37°C which is considered normal temperature, on February 8, 9, 10 and 11th (pre-operatively). Although one may have a fever and not have infectious endocarditis, it is unusual to have infectious endocarditis and yet not have a fever;

b. The pre-operative white blood count (WBC) was well within the normal range and did not have an increase in neutrophilic or other granulocytes, which, if present, would suggest an infection. It is common with a bacterial endocarditis, the most common form

of infectious endocarditis, to have an increased WBC often with a prominent increase in neutrophilic granulocytes above the normal range. This did not occur in WS;

c. The Infectious Disease Consult Note on February 11, 1999 (p 266 of the medical record) stated, after the available clinical information were considered; "We need to assume she has an endocartitis, although it certainly sounds as though it was awfully clinically indolent prior to presentation". In a teaching hospital such as the Toronto General Hospital, where WS was treated, this consultation note would have been written by a senior resident or clinical fellow on the Infectious Disease Service. Clearly, the tone of the note expresses skepticism regarding the clinical diagnosis of infectious endocarditis;

d. The Infectious Disease (I.D.) staff notes (p 262 of the record), also written on February 11, 1999, expresses considerable doubt regarding a diagnosis of infectious endocarditis. The staff note is from a senior infectious disease consultant on staff at the teaching hospital, not a member of the house staff in training. It states "likely has non-bacterial thrombotic lesions. She had no constitutional symptoms". This infectious disease specialist recommends routine prophylaxis (referring to antibiotics given routinely in relation to the valve replacement surgery) and recommends the clot, referring to thrombus present on the prosthetic valve at explant, be sent for culture;

e. A Cardiology Service progress postoperative note of February 12, 1999 (p 267 of the record) states "intraop findings consistent with purulent mass." This would seem to suggest infective endocarditis. However, the operative note (page 265) written by the staff surgeon, Dr. Van Arsdell, who performed the surgery, makes no mention of this observation and it is extremely unlikely that the person on the Cardiology Service who wrote the note attended the operation. The cardiology note also states "vege culture pending";

f. On February 15, 1999 (a follow-up note in the records from the Infectious Disease Service fellow (p 277) states that blood cultures have been negative since February 9th and that there is no "further growth/info on valve" and no fungal elements seen. It is

noteworthy that no blood culture results or culture results from thrombus on the valve are on the chart. However, it is the job of the Infectious Disease Service fellow to check these results in a timely fashion by going to or telephoning the microbiology laboratory. Given the importance of the results, it is reasonable to assume that this individual has performed his/her duties with fidelity and the information recorded on the progress note is true.

50. There is another consideration from review of the medical records. WS had a stroke involving dysarthria, left facial droop, left arm and left leg weakness, unresolved within 48 hours except for the facial droop, with the stroke confirmed in the right basal ganglia area of the brain by computerized tomographic (CT) scan. Such a stroke, given the gross findings of extensive thrombus on the Silzone valve at explantation and the rapid resolution of some of the affects of the stroke, was surely thromboembolic from the Silzone valve. This stroke occurred about two weeks prior to the admission to hospital, resulting in Silzone valve replacement at a time when she was not on antibiotics, which were only started immediately prior to surgery. If she had infected thrombus on the Silzone valve, then embolization of this material would have carried it to the brain and likely other organs. It is important to recognize that thromboemboli detaching from a heart valve prosthesis may be carried in the bloodstream somewhat randomly to multiple organs but deposits at many sites may be clinically silent, at least initially. If the thrombi had been infected, the putative septic embolization should have set in motion infection in the brain and other sites resulting in the "constitutional symptoms" within the two weeks from the stroke to this hospital admission, which the Infectious Disease Service staff physician noted were completely absent (see para. 49d above).

51. In summary, a review of the medical records of WS clearly indicates there was no objective evidence, clinical, microbiological or pathological to indicate an infected Silzone valve. Rather, the evidence is to the contrary, indicating when taken in total that the Silzone valve was very likely not infected.

52. Dr. Mizgala comments on DJ in paragraphs 13, 14 and 15 of his January 18, 2003 affidavit. I agree with his statements that DJ was diagnosed with infective endocarditis at the time of his Silzone valve implantation surgery and was treated with antibiotics for months afterwards. More importantly, the clinical diagnosis of infective endocarditis of the native aortic valve, replaced by the Silzone valve, which I reported in my February 7, 2002 affidavit was correct, unlike the situation for Eric Andersen, Sharon Frost and WS for whom antibiotics were given as if there was infectious endocarditis when the medical evidence, in totality, indicated infection was extremely unlikely.

53. Dr. Mizgala further states in his paragraphs 13 and 14 that DJ's implanting surgeon found an abscess on the native valve ring at the time of the Silzone valve implant and that the abscess was seen again on echocardiography before explantation. He states that "its presence is one indication that DJ had a residual active infection" and infers from this that "any inhibition of tissue ingrowth noted by Dr. Wilson may have been the result of this persistent infection." Dr. Gunstensen, in his surgical note on Silzone valve implantation on January 6, 1999 states that "there was a shallow abscess cavity in relationship to the upper part of the septum."

54. I agree there was an abscess cavity in the vicinity of the native aortic valve, if not directly on the native valve ring. On the echocardiogram of April 20, 2000, about 15 months after the Silzone implant, the report states (page 109-110 of the medical record) there was "a small echolucent area surrounding the posterior aspect of the aortic annulus". The aortic root regurgitation arises "predominantly from the posterior and medial aspect of the aortic annulus." The small echolucent area on the echocardiogram in April, 2000 is not necessarily an indication of residual active infection as Dr. Mizgala suggests. The echolucency relates to tissue different in composition to the surrounding myocardium.

55. With a major course of antibiotics after the Silzone valve replacement in January, 1999, it is most likely that any residual necrotic tissue of the original abscess cavity has been sequestrated, that is walled off by surrounding scar tissue. The notion that this

sealed off, small remnant of the abscess could be responsible for the essentially complete lack of pannus coverage and healing around the full circumference of the sewing ring of DJ's Silzone valve is preposterous. Other than the paravalvular leak, DJ had no findings to suggest an active infectious endocarditis on the hospital admission to remove his Silzone valve, which was explanted in October, 2000.

56. The paravalvular leak, as indicated in the echocardiogram report of April, 2000, involved both the posterior and medial aspect of the annulus, a much more extensive region than the small posterior echolucent area Dr. Mizgala refers to as an active abscess. One must look to other factors than residual infection to account for both the extent of the paravalvular leak and the diffuse lack of healing in the Silzone valve sewing ring at explantation with no pathological evidence whatsoever of infectious endocarditis.

**THROMBOSIS/THROMBOEMBOLISM – DR. HIRSH**

57. In my affidavit of February 7, 2002 I stated that the Silzone valve implanted in Sharon Frost was removed due to a paravalvular leak and thromboembolism from the valve causing a stroke. I further stated within paragraphs 108 to 120, inclusive, that RR, who died with Silzone valves present in both the aortic and mitral positions, had excessive pannus build-up covered with thrombus on the sewing rings of both Silzone valves and that the death of RR was suspicious for coronary artery thromboembolism from either of the Silzone valves. Also, I indicated in paragraph 143 that WS during the time she had a Silzone valve implanted in the mitral position had suffered a thromboembolic stroke.

58. Among affiants Frank Mizgala, Lee Errett, Grant Stiver, Judith Jones and Jack Hirsh, only Dr. Hirsh directly addresses thrombosis issues. Dr. Hirsh makes statements based on reviewing the medical records of Earl Burnett, DJ, WS and RR but does not make any statements about either Eric Andersen or Sharon Frost in his January 20, 2003 affidavit, although in paragraph 38 of his affidavit of June 25, 2001 he indicated that he has reviewed the medical records of both Andersen and Frost. Presumably he has

nothing to add regarding Andersen and Frost, the two representative patients in this class action.

59. Dr. Hirsh's comments in paragraph 39 of his June 29, 2001 affidavit regarding Eric Andersen relate to risk factors for thrombosis and are not relevant to the actual complication Mr. Andersen suffered, paravalvular leak necessitating Silzone valve explantation.

60. Dr. Hirsh stated in paragraph 39 that Mr. Andersen had endocarditis, by which he clearly meant infective endocarditis in Andersen, because he refers to the possibility of an "embolic event from a vegetation." In my February 7, 2002 affidavit I indicated that there was, despite the clinical diagnosis of infectious endocarditis, no objective proof of such infection clinically, such as a blood culture positive for growth of a microorganism and the pathology report from Dr. Jagdish Butany on the explanted Silzone valve and adjacent tissue removed at surgery showed no evidence of endocarditis or any infection. I presume that Dr. Hirsh relied on the clinical diagnosis and did not see or ignored Dr. Butany's surgical pathology report from the Silzone valve explantation procedure performed on July 27, 1998.

61. Dr. Hirsh's comments in paragraph 40 of his June 25, 2001 affidavit regarding Sharon Frost included that, "At the time she had a thromboembolic event after her first valve implant, she also had endocarditis and vegetations which may well have caused her stroke." As I indicate in my February 7, 2002 affidavit, her first valve implant was a Silzone valve. When he states that vegetations may well have caused her stroke, he is referring to the vegetation breaking off and embolizing to the brain as he has described this possibility earlier in paragraph 22 in his June 25, 2001 affidavit. In paragraph 22, he distinguishes a vegetation from a thrombus by the "additional inflammatory component caused by the infection" in the vegetation (his #22) adding that "Accordingly it can be very difficult to determine if a growth on the valve is a vegetation or a thrombus." I agree that this is true based on echocardiographic observation available to the clinician, and even direct gross observation by the cardiac surgeon. In fact, the key distinction

between an infective vegetation, which is clearly what he is referring to in his use of the term "vegetation", is the presence of the infective agent although it is true that infective vegetations often include inflammation when examined under the microscope.

62. The term "vegetation" refers to material adherent to the endocardium, the lining of a blood vessel, the surface of a natural heart valve or a prosthetic heart valve. This term "vegetation" was coined because of the variable gross morphology of these structures some of which reminded pathologists of vegetables, for example cauliflower like structures. The term "vegetation", in clinical parlance, has become synonomous for infected thrombus but, in fact, the infectious etiology can only be confirmed on microscopic examination using special stains for infective agents or on microbiological culture. On echocardiography, for example, a "vegetation" cannot be distinguished from a "thrombus".

63. Dr. Hirsh, in his June 25, 2001 affidavit indicates he is aware of this problem. However, he implies infectious endocarditis has caused Sharon Frost's stroke. In my February 7, 2002 affidavit I make clear that on microscopic examination of the explanted Silzone valve from Sharon Frost there is no evidence of infection.

64. Dr. Hirsh states in his June 25, 2001 affidavit that "With respect to Sharon Frost's medical records, there is no evidence of thrombus formation on the valve." His statement does not take into account the pathological examination of the valve, which as my February 7, 2002 affidavit indicates (see my exhibit F), showed almost no tissue whatsoever on the surface of the sewing ring. A thrombus, whether infected or not, on the sewing ring of a prosthetic heart valve, can break off and embolize. After this occurs, there may be either less thrombus or essentially no thrombus remaining. Thus, the lack of thrombus on the sewing ring of Sharon Frost's Silzone valve at explant, is entirely consistent with previous thromboembolism from that sewing ring.

65. In his January 20, 2003 affidavit Dr. Hirsh refers to his review of the medical records of WS. It is noteworthy that he does not dispute or question my statement in paragraph 143 of my February 7, 2002 affidavit that WS had a thromboembolic stroke

while implanted with a Silzone valve. He only questions whether or not her INR levels were below the therapeutic range around the time of the thromboembolic stroke. Dr. Hirsh states that "the records do not provide a complete history of WS' INR levels at the relevant time periods" so that he can only raise the possibility of low INR as contributed to the process of thrombus build up on the Silzone valve.

66. For RR, Dr. Hirsh in his January 20, 2003 affidavit also raises the question of RR's INR levels, pointing out that they were substantially below the therapeutic range in November and December, 1998. RR received his two Silzone valves on November 9 of 1998 and died 2.5 years later on April 21, 2001. Dr. Hirsh does not discuss RR's state of anticoagulation after December 1998.

67. With respect to INR levels and medical anticoagulation therapy, the following should be noted:

a. All mechanical heart valve recipients need anticoagulation therapy;

b. INRs, the accepted blood test to monitor prosthetic heart valve anticoagulation, vary over time in patients, and may vary considerably due to factors unrelated to the choice of heart valve prosthesis; this is why INR is monitored frequently (at least monthly if not biweekly) and anticoagulant drug dosage adjusted accordingly;

c. While subtherapeutic INRs may be an independent risk factor for prosthetic valve thrombosis, after healing of the sewing ring, the major risk of new thrombus formation comes from the non-tissue covered components of the mechanical valve (i.e. the occluder mechanism);

d. Lack of healing of the sewing ring creates a situation where thrombus can much more easily build up on the sewing ring than if it is well healed; and ,

e. Thus, because the use of a Silzone sewing ring causes or contributes materially to poor healing of the sewing ring, low INR levels may exacerbate thrombus build-up on the sewing ring with the possibility of embolization, but it is the Silzone which is the

underlying cause of increased prosthetic valve sewing ring thrombosis and thromboembolism.

68. Dr. Hirsh also comments on the possibility of coronary embolism in the case of RR. He states that the records on RR "reveal significant information that is inconsistent with the conclusion that RR suffered from a coronary embolism." This is not correct. Dr. Hirsh raises the issue of two episodes of recurrent transient ischemic chest pain pre-operatively in March/April 2001 stating it is "highly unlikely that two emboli would hit the same place twice and cause these two episodes." The issue of coronary thromboembolism causing or contributing to the death of RR is whether or not this occurred post-operatively, not pre-operatively. Pre-operative coronary embolism is a red herring. In my affidavit of February 7, 2002 I never suggested coronary thromboembolism was the reason for RR's ischemic chest pain prior to cardiac surgery in April, 2001.

69. Dr. Hirsh states that an angiogram on April 19, 2001 revealed marked narrowing at the origin of the left main coronary artery completely unrelated to the presence of a mechanical valve and that the autopsy report does not detail a careful dissection of the coronary artery, which would be required to review whether there was evidence of a coronary embolism. In fact, there is no report of the angiogram of April 19, 2001 on the medical record of RR other than a brief note from the Cardiology Service on April 19, 2001 (page 245 of the medical record) indicating "70% LM", referring presumably to a reduction in lumen area of 70% relating to the left main coronary artery. The note later on April 19, 2001 by the cardiac surgeon, Dr. Scully, (page 248 of the clinical record) refers to "tight L main stenosis and signif prox RCA" on the April 9 cardiac catheterization and states that he plans to "review cath when CD located". Dr. Scully is referring to substantial ("tight"," signif") narrowing at or very close to the origin of both the main right and main left coronary arteries.

70. Dr. Butany's histological sections through the left main coronary artery, blocks H-9 to H-12, described in his preliminary autopsy report, Exhibit L of my February 7,

2002 affidavit, and which I have examined directly through my microscope, indicate mild coronary atherosclerosis which does not account for the narrowing referred to on the angiogram. Dr. Butany comments on this in the histology section of his report stating:

*"The patient's coronary artery symptoms are difficult to explain. There was a significant amount of pannus seen on the HVP [heart valve prosthesis] cuff. This is mature. A quite narrow rim of thrombus was seen on the prosthesis, junction of fabric/pannus and the valve ring. At both sites a small amount of thrombus was seen on the outer aspect of the prosthesis hingeguard. I am not certain if there is any embolism from this. Certainly there is no significant native coronary artery disease to explain this."*

71. Dr. Tyers, in his February 22, 2003 affidavit, notes that excessive pannus on the Silzone prosthetic arotic valve sewing ring could obstruct one or more coronary arteries because the coronary arteries can be just a few millimeters above the prosthetic valve annulus once it is seated in the aortic root. Dr. Tyers raises the possibility that the narrowing of the left coronary ostium (entrance) was due to excessive pannus which retracted following Mr. Andersen's death.

72. Dr. Butany indicates in his detailed report that he attempted to determine if the pannus blocked the entrance of the left coronary ostium and could find no evidence of this. However, I know that such an examination of the enclosed confines of the aortic root at autopsy, or following fixation of the heart in formalin, which is when I believe Dr. Butany probably did this examination, likely at the same time he was cutting his tissue blocks from the aortic root and heart to send for histology, is difficult. The "retraction", or shifting of positions of tissues, by just a few millimeters, is possible. Thus, it is possible that the left main coronary artery narrowing could have been at its inlet due to obstruction from the sewing ring pannus including surface thrombus. It is not necessarily true, as Dr. Hirsh asserts, that the narrowing at the origin of the left main coronary artery was necessarily unrelated to the mechanical valve.

73. The Silzone valves from RR demonstrated substantial pathology and this pathology, inclusive of substantial pannus overgrowth to 6 mm in thickness with surface thrombus, is sufficient to cause coronary artery obstruction and/or thromboembolism, including to one or more coronary arteries, in a similarly affected patient if not in RR.

**RESPONSE TO DR. MIZGALA REGARDING RR**

74. In paragraph 18 of his January 18, 2003 affidavit, Dr. Mizgala states that although in preliminary autopsy report Dr. Butany opined that RR died from an acute myocardial infarction, in RR's Death Certificate, myocardial infarction is not stated as a cause of death. What Dr. Mizgala has not indicated is that the Death Certificate is completed and signed after death but before the autopsy is performed. Thus, the autopsy findings supercede the information entered on the Death Certificate which is only clinical guesswork as to why the individual died.

75. Dr. Mizgala further states in paragraph 18 that I opine that RR died as the result of a coronary embolism. In my February 7, 2002 affidavit, I agreed that Dr. Butany's concern about the possibility of coronary thromboembolism was "very plausible".

**MONITORING**

76. In my affidavit of February 7, 2002, I stated in paragraph 218 that all Silzone valve patients will require a higher level of monitoring than that required for other mechanical heart valve patients, in order to protect them from Silzone valve related morbidity and mortality. The rationale for this statement is that inadequate healing, which I have observed in all Silzone valves available to date for my examination, and which is not surprising based on the peer-reviewed published knowledge on the toxic effects of silver on tissue, makes the Silzone valve more likely than a conventional mechanical heart valve to develop the following complications:

a. dehiscence and paravalvular leak;

b. excess thrombus build-up on the sewing ring;

c. thromboembolism resulting from (b);

d. infection for which (b) is one predisposing factor; and,

e. abnormal, excessively thick pannus formation, for which (b) is one predisposing factor.

77. Drs. Jones, Mizgala and Hirsh in their affidavits of January, 2002 address the monitoring issue from their particular perspectives which are quite different than my perspective as a pathologist.

78. Dr. Mizgala states that he continues to be in favour of any type of monitoring that would result in better treatment for Silzone patients but argues that complications associated with Silzone valves are not unique to Silzone but are among the known risks and complications associated with all prosthetic valves. Furthermore, he states that only Silzone valve recipients with clinical signs and symptoms of complications need additional or more complex monitoring.

79. With respect, the issue is not that the complications of Silzone valves are unique in the sense of never occurring with conventional mechanical heart valve prostheses, but rather the likelihood of such complications occurring more often with Silzone valves. Dr. Mizgala's suggestion that additional monitoring is only justified after clinical signs and symptoms of complications develop, that is after complications occur is inappropriate and, indeed, perverse since the purpose of monitoring is to prevent complications.

80. I am not a clinician and do not recommend a specific monitoring regimen. However, as Chairman of the Morbidity and Mortality Committee of the Hospital for Sick Children since 1999, I have experience working with expert clinicians in reviewing numerous cases of morbidity and mortality, the examination of some of which results in changes in procedures and guidelines for patient care based on the combined expertise of multiple experts. In my opinion, an expert committee is needed to advise clinicians entrusted with the care of Silzone valve recipients and in so doing, to develop guidelines appropriate for their care, including monitoring.

81. Dr. Hirsh focuses in particular on monitoring for thrombosis and thromboembolism. He states in paragraph 20 of his January 20, 2003 affidavit that transesophageal echocardiography should not be undertaken in the absence of good scientific evidence of increased risk of thromboembolism or stroke in Silzone patients. I am very concerned that Dr. Hirsh virtually ignores the Toronto General Hospital experience and the published results from the Butchart/Ionescu study which demonstrate serious concerns regarding increased thromboembolic events.

82. The logic that thrombus build-up on the valve predisposes to thromboembolism is obvious. The practical issue is not, in my opinion, whether or not to use diagnostic procedures such as echocardiography, including the more invasive trans-esophageal technique, to monitor individuals with Silzone valves, but rather the risk-reward tradeoffs in how frequently to do these tests on Silzone patients, an appropriate task for a committee of experts.

83. Dr. Hirsh in paragraph 23 takes the position that the single most important factor in ensuring protection against thromboembolism in patients with prosthetic valves is to maintain anti-coagulation therapy at appropriate INR levels. This does not address the importance of identifying patients by echocardiography who have thrombus build-up on the prosthetic valve which is a clear and present danger to valve mechanical function, the risk of thromboembolism or other complications such as obstruction to a coronary artery ostium (inflow site).

84. The Silzone valve presents a special situation for INR monitoring. The incomplete healing of the Silzone sewing ring may persist for years. This translates into the sewing ring, poorly covered with tissue and not endothelialized, being persistently prothrombogenic. Logically, the toxicity of the silver is maintained so long as it remains on or around the sewing ring. Although some of the silver coating does separate from the sewing ring, as I have demonstrated in the case of the two Silzone valves from RR at 2.5 years after implantation, one can reasonably expect some of the silver coating to remain on the sewing ring for many years.

85. Persistent poor healing of the sewing ring, with the attendant propensity for increased sewing ring thrombosis and thromboembolism, provides a justification for particularly vigilant, frequent INR monitoring in Silzone valve recipients. When INR levels occasionally dip below therapeutic levels in a conventional mechanical valve prosthesis recipient a few years or longer following implantation, this may be of little consequence because most likely the sewing ring is completely healed. For the Silzone valve recipient it is more likely to result in an incapacitating or fatal complication. Silzone valve recipients, in my opinion, need to have more aggressive than normal INR monitoring. I do not believe such extra INR monitoring would expose these patients to any significant additional risk.

86. There is uncertainty because of the lack of previous experience with this type of problem in a heart valve prosthesis. This is a new situation in the field of medicine. In addressing this uncertainty, it is important to note the limitations of current monitoring technologies.

87. The spatial resolution of echocardiography, including transesophageal echocardiography, is inadequate to distinguish an unhealed or poorly healed, non-endothelialized sewing ring with minimal tissue as contrasted with a well-healed complete pannus coverage of about 1 mm thickness. For the foreseeable future, this distinction will only be possible by direct visualization of the sewing ring at open-heart surgery, by which time the valve is being removed. The implication is that for each Silzone recipient, even if asymptomatic with no heart valve prosthesis related complications and "normal" echocardiographic studies, it will not be possible to say with confidence that the sewing ring has healed. Continued aggressive INR monitoring, and whatever schedule of repeated echocardiography is reasonable to balance procedure risks with those of thrombotic valve obstruction and thromboembolism, will need to continue, probably indefinitely. This is the additional burden Silzone valve recipients and their caregivers will bear until each Silzone valve is explanted or the recipient dies.

88. Dr. Jones, who focuses on analyzing AVERT, emphasizes in paragraph 4(d) of her affidavit, that if a particular complication has not reached the arbitrary level of statistical significance (likelihood of chance) of less than 5% in the comparison of the Silzone valves with the otherwise identical non-silver coated control valves, then this lack of a "consistent increase in complications experienced by patients with Silzone valves "is strong evidence that there is no common mechanism causing harm to all Silzone valve recipients." Using this same logic, she goes on to state that increased monitoring for Silzone valve recipients is unnecessary in paragraph 4(f). This logic is flawed. Put succinctly, absence of evidence is not evidence of absence.

89. The reason AVERT may not provide "statistically significant evidence", as Jones defines that the term, for a greater prevalence of a particular complication in the Silzone group compared with the control group, is that the numbers of patients enrolled in the study is too small. This situation is described by the phrase "statistically underpowered." AVERT was originally designed, that is statistically powered, to distinguish a difference in prevalence for the complication of prosthetic valve infectious endocarditis between Silzone and otherwise identical non-Silzone valves. The study design for this complication required over 4,400 patients but only 807 patients were enrolled when further enrollment was cancelled in January 2000, due to the high prevalence of paravalvular leak in the Silzone group. The remaining patients in AVERT may not be sufficient to produce statistically significant evidence for some complications, the prevalence of which are higher for Silzone valves.

90. The Defendants' experts rely on AVERT, emphasizing its scientific soundness as an example of a randomized prospective controlled clinical study, relegating my observations on the pathology of individual explanted Silzone valves, and my clinicopathological correlation of these findings to the status of case reports, lowest on the scale of scientific rigor below cohort and case-control studies, surveys, case series and case reports (see Jones, paragraph 20).

91. The pathological examination of individual explanted Silzone valves is, in fact, much more valuable than the above epidemiological study ranking implies, because of the opportunity to impute mechanism in relation to causality, especially when combining the pathology findings with what is known of silver toxicity from the published, peer reviewed scientific literature. Obviously, examination of larger numbers of explanted Silzone valves adds to the value of the pathology from just a few valves.

92. Since my last affidavit, I have completed the examination of photographs of the gross (naked eye examination, without histology) appearance of at least one and usually both sides of over 70 explanted Silzone valves and this examination has not caused me to change any of the opinions I expressed in my February 7, 2002 and June 3, 2002 affidavits. Later in this affidavit, responding to Dr. Schoen, I provide further details on these examinations.

**REPSONSES TO DR. SCHOEN'S JUNE 19, 2002 AFFIDAVIT INCLUDING EXAMINATION OF ADDITIONAL EXPLANTED SILZONE HEART VALVES**

93. In his affidavit of June 19, 2002 Dr. Schoen states that I "cannot meaningfully compare the handful of Silzone explants" I have examined to "normally healed sewing rings." Clearly, the availability of only 6 Silzone valves from 5 Canadian patients for my examinations presented in my February 7, 2002 affidavit was a limitation. However, I was able to examine 3 additional valves prior to the filing of my affidavit of June 3, 2002, and since then to perform a limited examination of over 70 additional explanted Silzone valves. These valves were explanted between July, 1998 and October, 2001, and returned to St. Jude Medical Inc. for examination. Photographs of both sides of these valves were taken at St. Jude Medical Inc. and provided as part of the production of documents by the defendants. I have not been provided any of these valves and, therefore, have not had the opportunity to perform a histological analysis on any of them. Neither have I had an opportunity to view any histology slides from any samples obtained from these valves at St. Jude Medical Inc.. Nevertheless, the gross photographic images of these valves do provide considerable information on healing.

94. Upon examining the gross photographic images of these explanted Silzone valves, I developed a simple grading system for tissue coverage. Grade A consists of no tissue, or almost no tissue coverage of one side of the sewing ring. Grade B consists of patchy, thin pannus covering less than 67% by area of one side of the sewing ring, with at least 33% of the fabric by area showing no or essentially no tissue coverage. Grade AB is borderline between grades A and B. Grade C consists of excessively thick pannus, which may include thrombus, but limited to less than 67% of the area of one side of the sewing ring. Grade BC is borderline between grades B and C. Grade D consists of excessively thick pannus, which may include thrombus, covering more than 67% of the area of one side of the sewing ring. The grades B+, C+ and D+ indicate that the pannus/thrombus on the sewing ring projects beyond the sewing ring into the orifice of the prosthesis through which blood flows.

95. This classification system does not include normal, diffuse coverage of the sewing ring by thin, fairly uniform pannus because I observed not a single instance of what could reasonably be considered normal healing pannus coverage of the sewing rings of these valves.

96. The same grading system was used for each side of the sewing ring. If different grades were determined for the two sides of a valve, they were recorded separately. Most of the explanted valves showed the same or similar grade of coverage on both sides of the sewing ring. Occasional images were not graded (NG) for technical reasons.

97. I have limited presentation of the results in this affidavit to 54 Silzone valve explants of four months or more duration of implantation, that is, beyond the implant duration by which, in my opinion, most prosthetic valve sewing rings should show normal, diffuse coverage of the sewing ring by a fairly uniform pannus. **Exhibit "C"** tabulates the grading results for these 54 valves and the photographs in Exhibit "C" show the sample appearances of the sewing ring for each of the grades: A, AB, B, B+, BC, C, C+, D and D+.

98. Referring to Exhibit "C", none of the 54 explanted Silzone valves showed normal tissue coverage of the sewing ring or even coverage approaching normal. In category A, with essentially no tissue coverage on at least one side of the valve, there were 16 valves with 5 valves at over 12 months duration. Even allowing for the possibility that normal healing might take more than four months in some patients, these findings are strikingly abnormal. About half of the explants were in categories A, AB or B with the remainder divided among C, C+, D and D+, with about 25% of the total of 54 valves in categories C+, D and D+ combined.

99. These findings reflect that Silzone valve explants divide between valves with virtually no pannus and those with excessive pannus/thrombus formation. While more analysis of these valves is desirable, including detailed histological examination and clinicopathological correlation with the available clinical information, it is clear that the tissue response seen in these explanted Silzone valves is profoundly abnormal. Although my examination of the 9 Silzone valves presented in my affidavits of February 7, 2002 and June 3, 2002 represented a modest sample, it is noteworthy that the range of gross findings in that sample is similar to the range of gross findings in these 54 Silzone valve explants.

100. Dr. Schoen states that superficial healing of the sewing ring occurs readily but deep healing is more difficult and may be incomplete at long postoperative intervals. He states that these are not distinguished by me. I did make the distinction between superficial and deep healing in describing the normal healing process in my February 7, 2002 affidavit. When one examines numerous explanted Silzone valves showing essentially no pannus formation whatsoever, at follow-ups over a year, this distinction does not seem of critical importance. Indeed, there are 5 such examples at over one year follow-up presented in Exhibit "C".

101. Dr. Schoen states that I have provided no statistical or epidemiological data for the prevalence of lack of tissue ingrowth, excessive pannus and/or thrombus formation on Silzone valves and mechanical valves in general and, in the absence of such data, my

opinion is at best an unproven hypothesis. He further emphasizes that I have not used controls in my analysis. In my review, the healing abnormalities in Silzone valves requiring explantation are so consistently impressive, and generally cannot be explained by infection, that the approach of pathological examination coupled with clinicopathological correlation and reference to the peer-reviewed literature on silver toxicity is of much greater value than Dr. Schoen is willing to acknowledge. The totality of evidence indicates a very high probability that Silzone has been injurious to the individuals receiving these valve prostheses.

102. With respect to the issue of using controls, for a pathological analysis, the most obvious setting for this is AVERT. My understanding is that there is a pathology protocol is embedded in the study design of AVERT, although I do not believe its details have been published. Given the paucity of pathological information contained in the AVERT reports, the limited information that is provided in the comment section of the most recent AVERT report published in March, 2002 is noteworthy. In that published update, the authors wrote:

*"The mechanism responsible for development of PV leaking in patients receiving the Silzone prosthesis is unclear. In previous isolated reports of reoperation in Silzone valves, PV leaks were thought to be due to culture – negative endocarditis (B. Goldman, personal communication, May, 1999), but in patients in the present study who had explants of Silzone valves clinical findings did not suggest infection. In addition, none of the patients having late operation for PV leakage had active or recent endocarditis at the time of entry into the study. Explanted valves in AVERT patients exhibited poor tissue ingrowth and loosening of sutures.* ***Thus, it appears that the Silzone coating inhibits normal fibroblast response and incorporation of the fabric of the sewing ring into host tissue in some patients."*** *(emphasis added).*

103. Dr. Schoen adds in paragraph 9 of his June 19, 2002 affidavit that the authors of the March 2002 article on AVERT state on page 790 of the article that "The mechanism

responsible for development of PV leak in patients receiving the Silzone prostheses is unclear" and that they suggest on page 791 that impaired healing of the sewing ring "may be idiosyncratic." These quotes by Dr. Schoen highlight what I strongly suspect are differing viewpoints among members of the group of authors.

104. I accept Dr. Schoen's definition of idiosyncratic as "peculiar to certain individuals", but emphasize that the context for idiosyncratic, from the drug literature, is that of a rare individual with some unique or nearly unique non-understood characteristic(s) leading to a drug reaction. With Silzone, silver is effectively the drug. Based on what is known about the toxicity of silver, the notion that the adverse effects of Silzone represent only an unexplained, peculiar reaction in "certain individuals" is not credible. This is grasping at straws or, more specifically, at a straw. Some individuals are immunologically sensitized to silver and mount an allergic response to it. This is a well-recognized, specific response, the etiology of which is generally understood and does not qualify as an idiosyncratic reaction. The same is true for the cytotoxicity of silver; it does not qualify as idiosyncratic.

105. Dr. Schoen in paragraphs 6 and 7 of his June 19, 2002 affidavit refers to paragraph 45 of my June 3, 2002 affidavit in which I emphasized that there were really only two causes of paravalvular leak in Silzone valve patients: infectious endocarditis and abnormal healing or tissue weakness caused by the Silzone coating. He then asserted that there are many other known causes for paravalvular leak in all mechanical valve patients and that paravalvular leak occurs in all mechanical valve patients for reasons that are largely unknown. Although he refers to "many other known causes", the only example he cites, unrelated to infection, is surgical difficulties in suturing technique relating to annular tissue damaged prior to surgery.

106. I admit that if clause 45 of my June 3, 2002 affidavit is read in isolation, the situation is oversimplified. However, I had discussed the possibility of suturing problems in my February 7, 2002 affidavit and have considered the possibility of suturing problems as a possible explanation for some cases of paravalvular leak in Silzone valves in the

present affidavit in paragraph 14. Such local suturing problems cannot explain the diffusely very poor healing of many Silzone valve explants nor the thrombosis with excessive pannus overgrowth in many others. In referring to the "many other factors that can cause paravalvular leak," Dr. Schoen does not distinguish reasonably common from rare conditions, nor infectious from non-infectious conditions, nor the severity of paravalvular leak.

107. The so-called paravalvular leak he refers to as occurring in all mechanical heart valves is not of clinical significance and may not be a true paravalvular leak. There is some leakage through the occluder mechanism of mechanical heart valves on closure and because of the swirling motion of the blood involved it can be confused with a true paravalvular leak on echocardiography. The fact is that new enrollment in AVERT was terminated and Silzone prostheses were withdrawn from the market for repeated examples of clinically significant paravalvular leaks in Silzone valves requiring valve replacement.

108. Dr. Schoen's comments on foreign body response in paragraph 8 of his June 19, 2002 affidavit are an example of his attempts to make a relatively simple matter unnecessarily complex. I stated in paragraphs 50 and 51 of my June 3, 2002 affidavit that silver particles cause an additional foreign body response to that of the polyester fibers of the sewing ring. I said this with the assurance that since the additional foreign body response I referred to was to silver particles that had separated from, that is spalled off, the sewing ring. The foreign body response was outside and physically separate from the sewing ring. Because it is physically separate, it is, therefore, an additional response to that of the sewing ring. The foreign body macrophage/multinucleated giant cell response to the sewing ring is within the interstices of the sewing ring and, at most, one or two cells thick along the outer surface of the sewing ring.

109. The approach Dr. Schoen adopts is to state that I have not demonstrated that the silver particles I observed had caused "a response greater than the response that occurs in all mechanical valves from the Dacron sewing cuff material." With respect, this is not

the issue. The issue is the added foreign body response to the silver which separates from the sewing cuff which is obvious. This is an important issue.

110. When silver particles separate from, that is, spall off, the coated surface and move out into the surrounding tissue, they each carry the potential for toxic effects. As more silver particles separate, the combined surface area of all the silver particles increases resulting in greater toxic exposure to the adjacent tissue. Silver particles present at greater distances into the adjacent tissue carry the toxicity further from the implant, affecting more tissue.

111. I have demonstrated in the case of RR, in my affidavit of February 7, 2002 (see photomicrographs in Exhibit M) that the spalled silver can be present at a significant distance from the sewing ring. With the engulfment of spalled silver particles in macrophages and multinucleated foreign body giant cells, one might reasonably expect a reduction in cell death from the silver. This is because while the silver particles are sequestered in these scavenger cells other cells are not being damaged by the silver. However, macrophages stimulated in the process of phagocytosing foreign material (phagocytosis means literally being eaten by a cell) secrete substances that stimulate fibroblasts to proliferate and secrete collagen, that is to form pannus. Thus, the spalling of silver particles, their ingestion into macrophages and multi-nucleated giant cells (which form when macrophages coalesce to form one larger cell containing the cell nuclei from the individual macrophages), and the subsequent promotion of fibroblast proliferation with collagen production provides a reasonable explanation for why pannus (which consists mainly of fibroblasts and the collagen they produce) can build up to such a great extent on some Silzone sewing rings.

112. In summary,the toxicity of the silver reasonably explains the dual phenomena of Silzone sewing rings with no tissue, yet also no evidence of infection, even after many months of implantation, contrasted with other Silzone sewing rings of similar duration of implantation with a heavy pannus overgrowth. The lack of tissue coverage arises from the direct toxic effect of the silver at a level causing cell death. The excessive tissue

coverage develops after the spalled silver particles are ingested in macrophages stimulating fibroblast proliferation and collagen production by these cells which builds up the pannus.

113. One possible factor which may tip the balance between these extremes may be the extent which new thrombus forms on the essentially bare Silzone sewing ring. This new thrombus contains red cells, platelets and coagulation proteins, especially fibrin which binds the deposited elements from the bloodstream to the surface of the implant. In addition, the new thrombus contains white blood cells from the bloodstream, which includes so-called monocytes, which develop into macrophages within the thrombus. The thrombus goes through a process of organization which depends critically on these cells. This process occurs for thrombus on any implant. This is the process by which normal pannus forms.

114. What is different in the case of Silzone is that once the flow surface of the sewing ring is covered by even a thin layer of thrombus, the spalled silver particles no longer pass into the bloodstream, embolizing to other organs, but are "captured" on the sewing ring surface and are ingested by the macrophages, contributing, as previously described (para 111-112) to excess pannus overgrowth beyond that normally involved with organization of thrombus.

115. The explanation I have just presented is a theory which provides a plausible and, in my opinion, highly probable explanation for the wide range of pathology findings in the Silzone valve explants. It depends on the existence of cytotoxicity from the Silzone coating, for which there is clear evidence; and on well established biological principles and knowledge.

116. The role of sewing ring thrombus in "seeding" the subsequent development of excessive pannus suggests that limiting thrombus formation of Silzone sewing rings would be all the more important. It is probable that not just anticoagulant therapy but also anti-platelet therapy, for which more effective drug treatment is now available, will likely be important for Silzone valve patients. This would require additional monitoring

because anti-platelet therapy is not used routinely in patients with conventional mechanical heart valve prostheses.

117. Dr. Schoen comments in paragraph 10 of his June 19, 2002 affidavit on my explanation of the concept of clinicopathological correlation presented in paragraphs 60 to 63 of my June 3, 2002 affidavit. His position amounts to a reiteration of his comments elsewhere that I can only form hypotheses from my observations on the explanted Silzone valves, have not used controls, and cannot reach scientifically sound conclusions. As I have indicated above, the combination of clinicopathological correlation and the conceptual and factual knowledge base from the fields of toxicology, biomaterials science and pathology provide a potent analytical methodology by which, in my opinion, a scientifically sound, highly probable explanation of how the Silzone heart valves cause the harm to patients receiving them can be provided.

118. In paragraph 11 and 12 in his June 19, 2002 affidavit Dr. Schoen attempts to rebut my characterization of Dr. Butany's deposition testimony in paragraphs 76 through 89 of my June 3, 2002 affidavit. He reiterates his objection to basing opinions on case reports, ignoring the large numbers of explanted Silzone valves with which Dr. Butany had experience, at least 22. Dr. Schoen ignores the fact, presented in paragraph 78 of my June 3, 2002 affidavit, that Dr. Butany did make use of controls, and based on an examination of many more explanted valves than were available to me, prior to writing my June 3, 2002 affidavit, reached substantially the same conclusions that I reached regarding the Silzone valve.

119. In paragraph 12, Dr. Schoen states that I selectively quoted Dr. Butany's opinion on Silzone in Dr. Schoen's textbook in paragraph 82(a) of my June 3, 2002 affidavit. My purpose was to present Dr. Butany's viewpoint not Dr. Schoen's comment on it in Dr. Schoen's textbook chapter.

**RESPONSE TO DR. ERRETT**

120. In paragraph 14 of his affidavit sworn January 20, 2003, Dr. Errett alludes to factors that can affect patient healing. None of the factors which he alludes to are relevant to Eric Andersen, Sharon Frost, DJ, WS or RR. These factors, if present, would only potentially add to the harm caused by the Silzone coating of the sewing ring.

121. Dr. Errett has not provided sufficient information for me to comment upon his experience or observations in a clinical context with respect non Silzone valves or a time frame for the valves which he explanted and observed. Similarly, he has not provided a pathology report with respect to the explanted valve referred to in paragraph 16 of his affidavit. I would expect that a detailed pathological examination would be appropriate given what is known to date about the Silzone valves.

122. I have read the affidavit of Dr. Frank Tyers sworn February 22, 2003 and agree with his comments and response to paragraphs 12, 13, 17 and 24-30 of Dr. Errett's affidavit sworn January 20, 2003. In addition, in regard to paragraphs 24-30 of Dr. Errett's affidavit relating to the photographs as exhibits to my February 7, 2002 affidavit, I refer to paragraphs 39 to 42, inclusive, of my June 3, 2002 affidavit in which I discussed the issue of tissue removal from prosthetic heart at explantation.

123. In paragraphs 8-10 of his affidavit, Dr. Errett indicates that DJ was at high risk for endocarditis, by which he means infectious endocarditis. As I have indicated above in this affidavit, DJ did not actually have infectious endocarditis of his Silzone valve. He did not have a clinical suspicion of, or a pathological diagnosis of, infectious endocarditis of his Silzone valve at explant. Likewise, there is no evidence from DJ's records of a serious nutrition problem.

**CONCLUSION**

124. In summary, it is my opinion that:

a. The adverse effects of the Silzone coating, including what I have previously referred to as "frustrated healing" are primarily due to silver toxicity;