Court File No. 00-CV-195906CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

ERIK ANDERSEN, YVONNE ANDERSEN and SHARON FROST

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and
ST. JUDE MEDICAL CANADA, INC.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

# AFFIDAVIT OF DR. GREGORY WILSON (sworn April 15, 2003)

I, Dr. Gregory Wilson, of the City of Toronto, in the Province of Ontario, make oath and say as follows:

1. I am the deponent of Affidavits sworn February 7, 2002, June 3, 2002, and February 27, 2003 which have been filed by the solicitors for the Plaintiffs in this action. I have knowledge of the matters deposed in this Affidavit, except where I have been informed by others, in which case I have indicated the source of the information and I believe it to be true.

2. In this affidavit, I intend to respond to the affidavits of Dr. Flory sworn March 24, 2003, Dr. Rodricks sworn March 28, 2003, Dr. Jones sworn March 21, 2003, Dr. Errett sworn March 21, 2003, Dr. Stiver sworn March 24, 2003 and Dr. Hirsh sworn March 20, 2003, all of which were filed subsequent to my most recent affidavit dated February 27, 2003.

**RESPONSE TO DR. FLORY**

3. At paragraph 4 of his affidavit sworn March 24, 2003, Dr. Flory sets out a table listing Field Experience Reports (FERs) on 46 Silzone valves implanted in 42 different Canadian patients. Because patient, physician and hospital identities were redacted from the FER reports, it has not been possible, until now, to determine which of the hundreds of FERs relate to Canadian patients.

4. I have examined the documentation related to the FERs listed by Dr. Flory from RTS-049 to RTS-336 (39 of the 46 FERs listed). I do not have the documentation relating to the remaining 7 FERs from 2002 and 2003.

5. In the right hand column of the table, Dr. Flory sets out the "Final Complaint Code" for each valve listed, identifying one of four complications for each: thrombosis, thromboembolism, endocarditis, and paravalvular leaks. I agree with Dr. Flory that all of these complications are known complications of all mechanical heart valves regardless of manufacturer or design; however, this does not mean that Silzone did not cause or contribute to these complications.

6. The FERs and the classification of the complication is made by the Defendants internally. Furthermore, the table provided by Dr. Flory does not include important information on these Silzone valves in Canadian patients, and from my review, likely lists the wrong complication for several of these valves.

7. The complete FER documents provide important details that are absent from Dr. Flory's tabulation. For example, RTS-102 relates to a Winnipeg patient whose Silzone valve was

explanted for paravalvular leak (PVL) with nothing to suggest infectious endocarditis. The FER documentation indicates that there was no fever, blood cultures were negative and neither of two infectious disease consultants suggested infectious endocarditis as a possibility after consulting on the patient. At valve explant, the surgeon wrote: "the sewing cuff from one to five o'clock had no tissue left. The sutures were still there, the pledgets were still there, but no tissue." Given the complete lack of clinical evidence to suggest infection in this case, the profound lack of tissue ingrowth is very significant. The most plausible explanation for the surgeon's observations is silver toxicity. Indeed, other than infection, no other explanation seems reasonable.

8. Unfortunately, RTS-102 is the only case of the 39 Canadian FERs that I reviewed with detailed documentation of findings by the surgeon at explant. His observations are consistent with the findings of Dr. Butany, based on Dr. Butany's discussions with surgeons at Toronto General Hospital and his observation of Silzone valves. This level of detail is not provided on any of the 25 FERs for Toronto patients. I believe it likely that observations like that of the surgeon in Winnipeg were much more common than the FERs suggest.

9. Dr. Flory's table of FERs labels 14 of 46 FERs as "endocarditis", that is the complication is due to infectious endocarditis. I have reviewed the documentation available for 13 of the 14 FERs (the exception being RST-363) labelled "endocarditis" and find that only two of these had reasonably convincing evidence to support a conclusion of infection. There was blood culture evidence of staphylococci in RTS-071. In RTS-266, the FER records stated that pathology testing confirmed bacterial endocarditis although no evidence of that testing was provided. The patient had no fever and no elevated white blood cell count, but perhaps this was a case of

culture negative prosthetic valve infectious endocarditis. By contrast, RTS-056 involves a Silzone valve explanted after only 7 days. It is classified as endocarditis without explanation. Most of the FERs labelled as endocarditis do not justify a conclusion of infectious endocarditis based on the FER records available to me.

10. Further, RTS-239 is labelled as "endocarditis" but probably should have been placed in the thromboembolism category. The FER documentation reveals two strokes and that the valve remained implanted. Thus, the evaluation of these patients is not as thorough and accurate as a reading of the table might suggest.

11. I also note that the tabulated data does not identify deaths. Sadly, the patients having RTS-071, RTS-265 and RTS-325 (who appears to be Earl Burnett) died.

12. I believe that disclosure of the identities of all individuals in Canada who received Silzone valves would provide far more complete information to better evaluate the clinical impact of Silzone. The information contained in the FERs is of utility, but like AVERT, provides information only with respect to a limited number of patients.

**RESPONSE TO DR. RODRICKS**

13. At paragraphs 4 and 5 of his affidavit sworn March 28, 2003, Dr. Rodricks refers to St. Jude Medical's in vivo testing in sheep of Silzone coated heart valves. Exhibits "A" and "B" to his affidavit are peer-reviewed published articles by Tweden et al. (1997) and Langanki et al. (1998), reporting those studies. Dr. Rodricks states that no undesirable inflammatory responses

were observed and that the fibrous response to the Silzone coated sewing cuff was similar to the non-Silzone valves studied.

14. I have examined the documentation disclosed by St. Jude Medical for the individual sheep in these studies, read the publications (exhibits "A" and "B") referred to by Rodricks, and the transcript of the deposition of Katherine Tweden in the parallel U.S. litigation regarding the sheep studies. The publications cited by Dr. Rodricks provide an incomplete and misleading reporting of the sheep studies, the highlights of which I will summarize in the following six paragraphs.

15. The Tweden paper referred to by Dr. Rodricks reports on 4 sheep from a 4 to 5 week study in which St. Jude's Masters Series mechanical valves sewing rings were coated with Silzone around half of the circumference of the sewing ring (180 degrees out of 360 degrees), and on 9 sheep from a 10 week sheep study, wherein 6 sheep received valves with Silzone coated sewing rings and 3 received non-Silzone coated sewing rings (controls). In fact, the 4-5 week study involved 7 sheep, not 4 as reported.

16. The valves in the 4 sheep reported in the paper had polyester sewing cuffs as did the 9 valves in the 10 week study. Of the 3 sheep in the 4-5 week study not reported, the reason given by St. Jude to the U.S. FDA for not including two of them was that the cuffs were of a different material, ePTFE (commonly referred to as Teflon), not polyester (commonly known as Dacron). However, the remaining sheep, the 5th sheep, identified as KTMV-2, had a valve with a polyester cuff like the other 4 sheep reported in the Tweden paper. This sheep died unexpectedly between 7 and 10 days after surgery. Autopsy revealed a dehiscence causing a paravalvular leak which, in my opinion, on reviewing the photographs of the leak, was sufficient to have caused, or

materially contributed to, the death of this animal. Dr. Tweden has testified that the dehiscence giving rise to this leak likely caused the death. Furthermore, in addition to the paravalvular leak, there was thrombus limiting the mobility of the leaflet of the valve as noted in the pathology report. Dr. Tweden testified that this could have caused the death of KTMV-2. Photographs of this valve pathology showing the paravalvular leak and thrombus were attached as exhibit 44 to the affidavit of Brenda Hollingsworth dated February 25, 2003. In my opinion, both the paravalvular leak and thrombus contributed to the death and together were sufficient to have caused the death. This death in July of 1996 and the pathology findings were not disclosed in Tweden's paper nor were they disclosed to Canadian regulatory authorities.

17. There is no indication in the pathology report that the dehiscence in KTMV-2 related to the half of the perimeter of the sewing ring not coated with Silzone. The pathologist, Dr. Cameron, who examined the silver coated sewing cuff from KTMV-2 did find, as stated in his pathology report, that there was "extensive areas of black particulate material in the reactive fibrous tissue but not in the immediate region of the synthetic fibers." The gross description in his pathology report noted "extensive tissue fragmentation was encountered" when "an attempt was made to remove tissue in the region of the sewing cuff". These observations suggest that silver particles had detached from the sewing ring because the silver coating on the surface of the polyester fibers is black. The phrase "tissue fragmentation" raises questions about toxic damage from silver.

18. The record of St. Jude's AB (anti-bacterial) Cuff Project Team meeting of October 24, 1996, which Tweden is listed as having attended, indicates that "extensive areas of black

particulate material" in the pathology report were considered as silver particles that separated from the cuff. None of this information was reported in the Tweden paper.

19. In the 10 week sheep study, one of the six Silzone valves (identified as SJII-8) was remarkable for substantial pannus overgrowth and thrombus sufficient to immobilize one of the two leaflets of the valve occluder mechanism. The pathology photograph of this valve, showing pannus overgrowth and thrombus, was attached as exhibit 49A to the affidavit of Brenda Hollingsworth, dated February 25 2003. This is a severe device-related complication, and one which has the potential to be fatal. It is remarkably similar to Dr. Butany's observations of excessive amounts of pannus and associated thrombus on Silzone valves explanted from patients at Toronto General Hospital. He testified on his deposition that he "seldom if ever saw this much tissue overgrowth." The pannus build-up on this Silzone valve was disclosed in the Tweden paper but was attributed to excessively long suture tails. The specimen had been sent to Dr. Schoen for gross examination and according to Dr. Schoen's letter of March 10, 1997 to Tweden on this subject, "the relationship between the sutures and pannus is uncertain". Dr. Schoen's examination of this valve was not referred to in the Tweden paper.

20. The Langanki paper (Rodricks exhibit "B") reports on a different type of Silzone valve, one which was fortunately never implanted in humans. This was the Epic valve, a valve with leaflets made from a chemically processed pig aortic valve, not carbon as used in St. Jude's mechanical heart valves. The valve, when not Silzone coated, was known as Biocor. Both non-Silzone coated Biocor valves (controls) and Epic valves (Biocor valves with the sewing ring coated with Silzone) were implanted in sheep. Six of the 18 Epic valves implanted developed paravalvular leaks and 1 sheep (# 1597) died at nearly 1 year follow-up due almost certainly to

paravalvular leakage (based primarily on the necropsy findings of massive, bloody pulmonary edema). By contrast, of the controls, 2 developed paravalvular leaks, neither severe. These facts recorded in the necropsy reports from the sheep were not disclosed in the Langanki paper, which makes no mention of any paravalvular leaks.

21. In my opinion, this disturbingly high prevalence of paravalvular leaks, in sheep implanted with Epic valves, was material to an assessment of the safety of the Masters Series valve with Silzone which, like the Epic valve, had a Silzone sewing ring. Regarding paravalvular leaks, it is the sewing ring which matters, not the material from which the valve leaflets are made. Furthermore, I have checked the necropsy records of the Epic valves with paravalvular leaks and there was no evidence of significant leakage through the tissue leaflets of these valves, in particular in sheep 1597, which died on July 19, 1998.

22. By the autumn of 1998, all the Epic necropsy results I have reviewed were available to St. Jude. The company was then aware of clinical problems with the Silzone coated Master Series valves, particularly through Dr. Butany who had had at least one face to face meeting with company personnel in the autumn of 1998, concerning his pathology observations on multiple clinical cases with Silzone valves removed due primarily to paravalvular leaks. I presume that Dr. Rodricks has simply not been fully informed by St. Jude about the sheep studies upon which he relies in his affidavit.

**RESPONSE TO DR. JONES**

23. At paragraph 28 of her affidavit sworn March 21, 2003, she indicates that a new statistical analysis of AVERT data presented at the January 31, 2003 AVERT investigators'

meeting identify hypertension as an individual patient risk factor and three surgical factors (urgent surgery, Heartport surgical technique and simple, interrupted sutures without pledgets) for the risk of major paravalvular leak. At paragraph 29, she asserts that these factors are "individual risk factors for major paravalvular leak" and "must be taken into consideration in determining the cause of such major paravalvular leak in any particular Silzone valve recipient".

24. This recent retrospective statistical analysis of the AVERT data, which Dr. Jones attempts to use to deflect attention away from Silzone as a central, underlying causative factor for major paravalvular leak in AVERT, in fact provides further support for damage to the paravalvular tissue by Silzone causing paravalvular leak.

25. High blood pressure causes increased force to be exerted on the value and its sewing ring, tending to dislodge the sewing ring from the surrounding tissue. On this point, Dr. Jones and I agree. The higher pressure difference of hypertension tends to take the sutures passed through the sewing ring into the heart tissue and tear the sutures out of the tissue. The sewing ring and sutures are stronger than the tissue. The tissue is the "weakest link".

26. If the tissue is damaged by silver toxicity, the presence of hypertension may be enough to make the critical difference between sutures barely holding and actually tearing out. If the tissue is healthy, hypertension is much less likely the cause the sutures to pull out, other things being equal.

27. Pre-existing disease (i.e. damaged tissue) around a portion of the sewing ring could also contribute to paravalvular leak, but AVERT was designed to control for this factor between Silzone and non-Silzone valves. Dr. Jones does not draw the reader's attention to the fact that

the substantial majority, almost all, of the cases of paravalvular leak occurred in the Silzone valves. Thus the statistical analysis for hypertension and indeed all four factors, for the practical purposes, relates to the Silzone valves. According to Dr. Jones' analysis, the statistical evidence is that hypertension caused Silzone valves to dehisce ("tear out", develop a paravalvular leak), not non-Silzone valves.

28. The same logic applies to simple interrupted sutures without pledgets. Interrupted sutures pass only once through the tissue. If the one suture tears through the tissue, there is a hole between the sewing ring and the tissue which forms the paravalvular leak. Pledgets are flat, pad-like structures through which sutures are placed, separating the suture material from the tissue and acting to spread the load (force) of the suture over a much larger area than presented by the suture alone. The pledget prevents the suture from slicing through weak tissue. In the absence of a pledget, a heart valve suture can slice through necrotic tissue like a knife through butter. Increased risk of paravalvular leak is to be expected from a combination of silver toxicity weakening tissue and the use of interrupted sutures without pledgets. Again, the lack of pledgets was a problem for paravalvular leak with Silzone valves, not non-Silzone controls because so few controls had paravalvular leaks.

29. Urgent surgery and the use of the Heartport surgical technique, the latter limiting accessibility and visibility in placing the prosthetic valve, are more subtle factors. Both could be associated with less accurate placement of sutures and a greater possibility of a suture tearing out of the tissue in a situation of weakness or necrotic tissue.

30. Where the healing process has been frustrated by silver toxicity, such as occurs with Silzone valves, the risk of weakened or necrotic tissue increases, and there is greater risk to patients from the long term effects of the pressure associated with the heart's constant beating.

**RESPONSE TO DR. ERRETT**

31. At paragraph 10 of his affidavit sworn March 21, 2003, Dr. Errett indicates that Silzone valves shown in photographs comprising exhibits "C", "I" and "T" to my February 7, 2002 affidavit were not removed by the surgical technique of "circumferential excision". Dr. Errett implies that these exhibits demonstrate that the sutures were cut as part of what he calls the "preferred process" of removing the valve.

32. Dr. Tyers referred to the photograph in exhibit "C" and indicated that the "bite" in the sewing ring shown on that photograph could only be explained by the histological section taken by Dr. Butany, which is described in his pathology report on this valve (see exhibit "B" to my February 7, 2002 affidavit). Dr. Errett indicates that Dr. Tyers is speculating that this piece was cut out by a pathologist and that there is no record of that being the case. I confirm that the "bite" referred to by Dr. Tyers corresponds with Dr. Butany's pathology report which indicates that he took a segment for histological examination.

33. With respect to exhibit "I" to my affidavit of February 7, 2002, the small amount of sewing ring missing can be explained by either tissue sampled for histological examination, partial excision of some sewing ring in a circumferential excision in which the scalpel blade trimmed off some of the sewing ring fabric, or a combination of both.

34. As for exhibit "T" to my affidavit of February 7, 2002, it shows "only a partial sewing cuff" as Dr. Errett states, in the trivial sense that some of the sewing ring in one location has been excised for histological section, again by Dr. Butany whose pathology report on this valve, including the description of this histological section, is presented in exhibit "S" of my February 7, 2002 affidavit.

35. In my opinion, the Silzone valves shown in exhibits "C", "I" and "T" were removed by circumferential excision, not Dr. Errett's preferred technique. More importantly, the paucity of tissue seen on the sewing rings of these valves does, indeed, indicate poor healing and is not the result of the process of valve removal as suggested by Dr. Errett.

**RESPONSE TO DR. STIVER**

36. As I pointed out in paragraph 23 of my February 27, 2003 affidavit, the term PVE, that is prosthetic valve endocarditis, has come to denote prosthetic valve infectious endocarditis. Dr. Stiver does not disagree. I note that Dr. Stiver does not attempt to rebut the logic of, or provide any contrary empirical evidence to my detailed explanation, in paragraphs 19 through 29 of my February 27, 2003 affidavit, of how Silzone can cause a condition that masquerades as prosthetic valve infectious endocarditis. Rather, he merely reiterates what is contained in his January 16, 2003 affidavit without further support or justification.

37. With respect to marantic endocarditis, that is, non-bacterial thrombotic endocarditis, Dr. Stiver describes this condition as caused by certain cancers, kidney failure and other disorders in paragraphs 18 to 20 of his January 16, 2003 affidavit. Dr. Stiver, Dr. Tyers and I agree that marantic endocarditis is not associated with prosthetic heart valves, Silzone or otherwise. I find

it curious that Dr. Stiver in paragraph 3 of his March 24, 2003 affidavit is now attributing it to Silzone valves.

38. Dr. Stiver and I agree that an individual Silzone or non-Silzone valve could have unrecognized, that is culture negative, prosthetic valve infectious endocarditis; however, as I have explained in detail in my previous affidavits, the likelihood of missing prosthetic valve infectious endocarditis is low when the explanted heart valve is available for pathological examination. I have re-reviewed the clinical records of Erik Anderson, Sharon Frost, and WS and the pathology on the explanted Silzone valves of these patients, and applied the Duke Criteria to them, which confirms my opinion that for each of these individuals, there was a very low chance that the Silzone valve was involved by infectious endocarditis. I note that Dr. Stiver does not dispute the appropriateness of that investigation or the results which I found for these patients.

39. The fact that these patients did not meet the Duke Criteria for infectious endocarditis and did not have any evidence of infection on examination of the explanted valve by two pathologists, including my examination which involved examining additional histological sections, makes infectious endocarditis in any of these cases very unlikely and the probability that both Erik Anderson's and Sharon Frost's Silzone valves were infected essentially zero.

**RESPONSE TO DR. HIRSH**

40. Dr. Hirsh continues to rely to an extraordinary degree on the AVERT data, although he does acknowledge that there is an issue with respect to the "power" of the AVERT data as presented in paragraph 89 of my February 27, 2003 affidavit, and as explained in the affidavits of

Dr. Goldsmith and Dr. Sackett. I note that Dr. Hirsh does not respond to Dr. Tyers' criticisms that the methology of AVERT was not specifically designed for thromboembolism and does not attribute any adverse events to a patient beyond the first one. When all three of these considerations (underpowered, not designed specifically for thromboembolism, and the lack of counting of adverse events beyond the first event) are taken into account, the AVERT study has limited value to estimate the real harm done to the over 2,200 patients in Canada implanted with Silzone valves.

41. I agree with Dr. Hirsh that low INR levels may increase the risk of thromboembolism and stroke in patients with all types of prosthetic heart valves. The important issue is, however, the increased risk of thromboembolism and stroke, beyond that of a normal mechanical heart valve, caused by Silzone. Dr. Hirsh continues to ignore the Toronto General Hospital experience and the published results from the Butchard/Ionescu study, both of which demonstrate serious concerns regarding increased thromboembolic events due to Silzone.

42. Dr. Hirsh insists that RR's pre-operative (predating his coronary artery surgery in 2001 but postdating Silzone valve implantation years earlier) episodes of ischemic chest pain "are not a red herring but demonstrate that there was already a likely mechanism in RR for myocardial ischemic attack before the Silzone valve was implanted." With respect, Dr. Hirsh is confused. In paragraph 68 of my February 27, 2003 affidavit, to which he refers, I stated that the notion of a pre-operative (relating to the coronary bypass surgery of April, 2001) coronary embolism was the red herring. I did not state that the pre-operative (relating to the April, 2001 surgery) ischemic chest pain was the red herring.

43. When Dr. Hirsh states that the pannus described in paragraphs 69 to 72 of my February 27, 2003 affidavit could not be the cause of the two ischemic events prior to implant of the valve, he further demonstrates his confusion. The ischemic chest pain occurred in the months leading up to the April, 2001 coronary artery surgery, long after the two Silzone valves, (not just "the valve" as Dr. Hirsh asserts), were implanted on November 9, 1998. RR did not have chest pain or hospital admission on November 5, 1998, just prior to replacement of both his aortic and mitral valves with Silzone valves. It appears that Dr. Hirsh attributes the April, 2001 surgery to the implantation of the Silzone valve; in fact, it was coronary bypass surgery. The pannus on the Silzone valve in the aortic valve position could indeed have caused the events of ischemic chest pain by blocking the inlet of a coronary artery from the aorta (coronary ostial obstruction), as I explained in detail in paragraphs 69-73 of my February 27, 2003 affidavit.

44. At paragraph 9 of his affidavit, Dr. Hirsh indicates that conclusions cannot be drawn from my examination of individual explanted Silzone valves because I have not examined control (non-Silzone) valves for comparison purposes. He also asserts that I have not examined the valves in a blinded manner (i.e. I do not know whether the valve sewing ring is Silzone coated at the time I record my observations), so that there is potential bias.

45. Dealing firstly with blinding, even if controls were available to me for examination, it would be impossible for me to be blinded for most cases on gross (naked eye) examination, the exception being where there is complete coverage of the sewing ring by pannus. In all cases, it would be impossible to remain blinded on microscopic examination because of the distinctive black colour of the silver coating of the sewing ring, evident on any area not covered by tissue and evident on the surface of the polyester fibers of the sewing ring when viewed under the

microscope. There are numerous situations in scientific studies in which it is impractical to blind observers. This problem can be addressed by adopting grading systems or making measurements which reduce bias, and comparing between observers. This is the approach I adopted with my simple A, B, C, D, grading system (other grading variants could have been used) set up before the valves were examined. Both an assistant and I graded the valves. Differences were minor, occurring at the borderlines of grades, hence my designation of AB, BC categories.

46. With respect to the issue of lack of controls, Dr. Hirsh ignores Dr. Butany's study of Silzone valves explanted at the Toronto General Hospital, which he did compare to controls (non-Silzone coated mechanical heart valves by St. Jude). Dr. Butany found differences between Silzone and the controls, and the concerns that he raised led to a cessation of Silzone implants at his hospital (TGH) over a year before Silzone was taken off the market by the defendants.

47. In addition, AVERT also included controls, and the authors stated that the explanted Silzone valves showed poor tissue ingrowth and loosening of the sutures (see paragraph 102 of my February 27, 2003 affidavit). Furthermore, Dr. Hirsh ignores the value of combining pathological examination of multiple explanted valves, clinicopathological correlation and further interpretation in light of peer reviewed literature on silver toxicity and well-established biological science. Together, this is a powerful combination.

48. The 54 explanted Silzone valves in exhibit "C" to my February 27, 2003 affidavit, demonstrate impressive healing abnormalities in addition to the 6 Silzone valves described in my February 7, 2002 affidavit and the 22 explanted Silzone valves examined by Dr. Butany (2 of which overlap with my 6) and the brief descriptions of explanted Silzone valves in the AVERT publication of March, 2002. The peer reviewed literature on silver toxicity reviewed by Dr.

Healy and me in our February 2003 affidavits indicates silver implants in fibroconnective tissue environments, similar to the annular tissue into which the mechanical heart valve prosthesis is placed, clearly damages, even kills, the surrounding tissue. The combination of all of this information from different sources, which includes some comparison with controls, provides compelling evidence that Silzone adversely affects the tissue it contacts and is responsible for, or materially contributes to, the healing abnormalities seen in the explanted Silzone valves and to clinical complications including paravalvular leaks, obstruction of leaflet motion and thromboembolism.

49. This affidavit is sworn in response to the affidavits of Dr. Flory sworn March 24, 2003, Dr. Rodricks sworn March 28, 2003, Dr. Jones sworn March 21, 2003, Dr. Errett sworn March 21, 2003, Dr. Stiver sworn March 24, 2003 and Dr. Hirsh sworn March 20, 2003, all of which were filed subsequent to my most recent affidavit dated February 27, 2003, and for no improper purpose.

| | | |
|---|---|---|
| SWORN before me at the | ) | Gregory J Wilson |
| City of Toronto, in the | ) | Dr. Gregory Wilson |
| Province of Ontario, | ) | |
| this 15th day of April, 2003. | ) | |

A Commissioner, etc.
(James M. Newland)

ANDERSEN et al Plaintiffs and St. Jude Medical, Inc. et al Defendants

Court File No: 00-CV-195906 CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

**AFFIDAVIT OF DR. GREGORY WILSON**
**Sworn April 15, 2003**

**Genest Murray**
130 Adelaide Street West, Suite 700
Toronto, Ontario
M5H 4C1

James M. Newland, LSUC#: 23502890
Tel: 416-360-2890
Fax: 416-360-2625

Solicitors for the Plaintiffs