JUL 1 0 2006
BY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC. }
SILZONE HEART VALVES } MDL DOCKET NO. 1396
PRODUCTS LIABILITY }
LITIGATION }

--------

--- This is the Deposition of Dr. Gregory J. Wilson, taken at the offices of Lerners LLP, 130 Adelaide Street West, Suite 2400, on the 21st day of June, 2006.

--------

CERTIFICATE OF REPORTER

CANADA )

PROVINCE OF ONTARIO )

I, Deana Santedicola, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand, using Computer Aided Realtime, to the best of my ability and thereafter reduced to written format under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and further that I am not related or any employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

______________________________

Deana Santedicola, RPR, CRR, CSR
Commissioner for taking
oaths in the Province of Ontario

Q. Understood, but you haven't backed away from or changed any of the opinions set forth here?

A. No, I have not backed away from any of these.

Q. Okay. In paragraph 214, you make the statement that the silver is you use the word "mechanically unstable" and starts to come off shortly following implantation.

Have you measured how much silver comes off the sewing cuff and over what duration?

A. No, I have not made quantitative measurements of that.

Q. You have not undertaken any tests on the Silzone fabric to determine the mechanism that causes it to come off?

A. No.

Q. And you have not undertaken any tests on the Silzone fabric to determine the quantity that comes off?

A. No, but if I may, I may say a little bit more on that, and that is that one of the things I have done is there was a single unimplanted Silzone valve which I examined simply using a dissecting microscope and took a number of photographs. They have been disclosed to you. And one of the things that was

evident from those photographs was that there is quite a bit of variability of the silver coating on the polyester fibers, so that on the outside of the sewing ring there is generally quite extensive coverage, mostly completely uniform, but extensive, giving the valve a silvery-gray appearance from the outside.

However, when one cuts into the surface of the sewing ring with a scalpel, it is evident that many of the fibers, particularly deeper in the sewing ring, are not coated with silver. This is before implantation.

So in other words, there is quite a variability in the coating of the fibers, and from the point of view of quantification of the amount of silver that comes off, that makes the problem technically more difficult for the pathologist because, in looking at an explanted valve at any particular follow-up, one sees fibers with silver, fibers without silver. Certainly I have seen silver in all of the explants I have looked at to date present outside, off, in other words, having left the surface of the fibers.

But looking at a given fiber, one cannot say whether a given fiber was not coated with silver in the first place or for that given fiber whether the silver had spalled off. There is certainly evidence

that the silver has spalled off collectively off numerous fibers, but in terms of any given fiber, one can't really say for sure.

So I mention that because it is a limitation in terms of being able to do the sort of studies that I think you were suggesting; you know, you were asking the question whether I might or might not have done those studies.

Q. Well, looking at it the other way, have you taken any of the tissue that was on the cuff and assessed the quantity of silver that was in that tissue?

A. No, I have not done any chemical measurements, physical measurements of silver in the tissue, no.

Q. Why not?

A. One way of responding to that is that I have not specifically been asked by Plaintiffs' counsel to do so.

Another aspect of the response would be that I'm not set up myself to do such measurements, although there are laboratories that will do silver analysis, and St. Jude in their animal studies made use of facilities that would do that.

I think that, from a histological perspective, it is very evident that silver has left the

surface of the fibers in terms of the black particulate material that I have seen in the tissues that is the same as the appearance of the material coating the fibers, so it has been very evident to me that silver has spalled off. And the overall quantification of the silver is something that I don't think I have considered to add substantial value scientifically to the valves that I have examined.

Q. Well, your opinion is that the silver that comes off the cuff is somehow toxic to cells; correct?

A. Yes.

Q. And isn't part of the definition of toxicity dependent upon the dose; in other words, whether a substance is toxic or not depends very much upon the dose?

A. Yes, I think that is fair to say.

Q. And so wouldn't it be important to know precisely the dose that gets deposited in the adjacent cells in order to determine whether in fact the substance is toxic?

A. That would be desirable. I have relied on quite an extensive literature on silver toxicity, which comes from both animal and human information, but not -- but you are correct, I have

not -- you know, I have not made those measurements on tissue samples from the valves I have looked at -- or sorry, arranged to have them made.

Q. And part of the reason you haven't done that is because you haven't been requested to do it?

A. Yes, that's correct.

Q. And you have no plans to do it?

A. Currently, no.

Q. Now, you are aware of the fact, Doctor, that silver is used currently in a variety of medical applications, such as burn ointments, for example; correct?

A. Yes, I'm aware of that.

Q. And apparently, it is put on burn patients without any adverse toxic effect; correct?

A. Oh, I'm not sure that I could say that, but I do agree that it has been in extensive use; I believe it is still in use for patients.

There is quite an important distinction, though, between silver being placed on the surface of the skin and silver going into the sewing ring of a heart valve prosthesis that is applied directly to the surrounding heart tissue. If there is a toxic effect of silver in the form of a silver cream in the context of treating a burn patient, the tissue that it affects tends

study is I think very likely underpowered to answer questions about relative prevalence or incidence of various complications in the two, the Silzone and control arm of the study, looking at longer term follow-up.

Q. Now, you are not a biostatistician; correct?

A. I am not.

Q. And you are not an epidemiologist?

A. I am not.

Q. And Dr. Grunkemeier is in fact one of the leading biostatisticians in the world in the area of heart valve pathology?

A. Yes, that is my perception.

Q. And on the issue of whether the AVERT study is underpowered or not, would you defer to Dr. Grunkemeier on that issue?

A. No, not at all.

Q. Why is that?

A. Because I have recently reviewed the affidavits that have been -- or the affidavit that has been put in by Dr. Sackett, in fact more than one, an affidavit and another updated report by him.

I have reviewed the analysis of the AVERT study by Dr. Butchart in his recent report in November.

Both those individuals, who I think are very expert -- Dr. Sackett, I think a world-respected authority in biostatistics and epidemiology, and I think Dr. Butchart, who is a cardiothoracic surgeon, who has a great experience in running clinical trials and in particular has taken a strong interest in the Silzone valve and has examined the AVERT study in great detail. I have been persuaded, very impressed favorably by their analysis, the opinions they have expressed. And I am persuaded by what they have said, that, as I understand it, the recent publication by Grunkemeier of the AVERT follow-up, going out to five, six years, I believe, does not have any -- does not provide information on the statistical power.

My recent reading of his paper, which I did specifically from that perspective, indicated to me there was no reporting of statistical power, nor I think was there reporting of enough detailed information from the study so that other experts like Dr. Sackett or Dr. Butchart could in fact calculate statistical power, which --

Q. Why don't you give us --

A. -- to me is -- sorry to interrupt, but to me is rather concerning, given Dr. Grunkemeier's expertise in this area.

In the paper that he published, which part of the title is "The Silzone Effect", he makes some reference to statistical issues of statistical power versus statistical significance. He is clearly very well aware of these issues.

Dr. Sackett opined in I think his first affidavit, in which he was very critical of the analysis that Dr. Jones made of the AVERT data, that these issues are the sort of issues that are taken up in a first year biostatistics course. And I, although it was many years ago, did a course in statistics, and I do remember those general issues of statistical power versus the finding of statistical significance are certainly presented.

So I don't want to go on and on, but for those reasons I have expressed, I would not accept the, if you will, negative results, that is, of the recent publication by Grunkemeier indicating that there was not a difference between the Silzone arm and the control arm as being persuasive.

I think the language that Dr. Sackett used in his affidavit or one of his reports was that -- and it wasn't in relation to that paper which hadn't been published yet, it was an earlier paper -- that appropriate language would be to say that the results were indeterminate.

Q. Well, what is your definition of statistical power, Doctor?

A. I don't think I could give you a precise definition myself, but it really relates to the numbers -- in practical terms, in terms of a study on Silzone valves in patients, it really relates to the number of implanted valves, in essence -- with the exception of some double implants where a patient receives an aortic and a mitral valve -- the numbers of patients in the respective groups that receive the valve. And if the numbers of implants, numbers of patients are limited, then the statistical power is lower. I can't quote from memory the formulas involved and so on, but that I think captures the general concept.

Q. And you don't know whether your definition is consistent with the definition that is found in statistical textbooks or, for that matter, used by people like Dr. Grunkemeier; correct?

MR. BERMUDEZ: Well, let me just object. He didn't give you a definition. He gave you an explanation.

MR. KOHN: Counsel, the only objection you can give at an MDL deposition is the word "objection".

MR. BERMUDEZ: No, it is not. I am

allowed to state the basis for my objection.

MR. KOHN: I'm telling you what the rule is. I can show you the pre-trial order that says it.

MR. BERMUDEZ: Well, go ahead.

THE WITNESS: Although I can't give you a precise definition of statistical power, I think I have a good sense of generally what it is. I have read carefully the affidavits, declarations, reports of the experts for the Plaintiffs, Dr. Butchart and Dr. Sackett on these issues, and I'm very persuaded by what they have said. They have much greater expertise in this area, that I think I have been able to understand well the points they have made, and I think they are correct.

BY MR. KOHN:

Q. Let's go back to silver toxicity, if we could. You have already told us you haven't done any tests to determine the amount of silver that was in any of the annular tissue in any of the specimens that you have looked at thus far; correct?

A. That is correct.

Q. And to the extent that you observed silver in the histological slides, you don't know at what point in time that silver came off the cuff, correct, in relation to when the valve was implanted?

A. Not in the sense of being able to look at the silver and say exactly when it came off. I have already said that I can't even say exactly what fiber a given fragment of silver came off. But the valves that I have looked at have been implanted for various durations, and I found silver had left the fibers in explants of as early as I believe 60 days with Mr. Andersen, 129 days with Sharon Frost, longer durations for other patients I have looked at.

So that in a cumulative sense, in terms of looking at explants of various durations and seeing silver coming off, I believe the shortest explanted valve -- the shortest implant duration I have looked at I think is about 60 days, and there is certainly silver readily apparent having come off the fibers within that time.

So I think I have -- I can say something in general about silver coming off the fibers early. And I think, taking R.R. as an example, that was a patient who had very extensive pannus buildup on both his mitral and aortic Silzone valves, and that was at 2 and a half years. And there had obviously been a lot of silver that had spalled off the fibers that had accumulated, much of it in macrophages, in giant cells, accumulated in the pannus.

So without quantifying it, I have been able to have a sense of the general temporal profile of silver coming off.

Q. How much silver needs to come off the cuff in order for it to have a toxic effect on the annular tissue?

A. I can't -- I don't have the answer to that question. I can't say exactly how much has to come off.

Q. And over how long a period of time does it have to come off before it has a toxic effect?

A. Well, again, I think it is apparent from the clinical information we have from valves that were examined by Dr. Butany, that he testified to at his deposition in April 2002, of the valves that were explanted in AVERT in the context of paravalvular leak, that silver -- that in terms of the duration involved in those patients with -- certainly I think in those patients with Silzone valve explants for paravalvular leak, or at least in the substantial majority of them, silver had exerted a toxic effect in that time frame, and many of those patients had valves explanted within a few months of implantation.

So I think it is fair to say that silver can exert substantial toxic effects on the annular

A. My purpose was to look at the distribution of Silzone on the fibers. I have mentioned that I had looked at that same valve under a dissecting microscope, and I have disclosed those photographs, that I found quite a variability in the amount of silver coating the fibers, particularly in the deeper regions of the cuff. And so taking the histological section was to compare the appearance of the fibers, and the silver coating on them specifically, under the light microscope with what I had seen under the dissecting microscope.

Q. Let me see if I can recap some of this. When you submitted your original report back in November of 2005, at that point in time you had looked at something like a total of nine explanted valves; is that correct?

A. Well, you referred to November 2005, but I think as of my second affidavit in June 2002, I had referred to six valves from five patients that were discussed in some detail in my February 7th, 2002 affidavit, and then I also referred in June 2002 to three additional valves that I have had occasion to see. Since then, there have been more. I had referred earlier to images that I have provided on seven valves.

Q. Now, I'm just trying to get to the approximate total and I think, if I add the numbers up

correctly, that we are somewhere in the neighbourhood of 14 to 15 valves total that you have examined, explanted valves; is that correct?

MR. BERMUDEZ: As of which date?

BY MR. KOHN:

Q. As of now, today.

A. Well, yes in the sense of providing either gross or microscopic images. I have received more valves than that, but I have not analyzed them in the sense of reaching the point where I have had gross images or microscopic images to provide.

I might add too that, just based on gross examination, I have examined photographs that were disclosed by St. Jude on an additional, if I remember correctly, I think 54 explanted Silzone valves, but that is just gross examination --

Q. Correct.

A. -- not having the valve myself to do my own gross photos, microscopic sections, examine clinical information for the particular patient involved.

Q. All right, I'm addressing your attention, though, to the approximate 15 that you have looked at. Have you seen complete medical records on all of these 15 patients?

A. No.

Q. On how many, if any, have you seen complete medical records?

A. I think I can say that I have seen complete records -- and by that, by "complete" I mean a record that includes events shortly before the Silzone valve was implanted and there is a reasonable summary of the patient's situation on getting the Silzone valve, obviously not going back to birth, but, you know, a reasonable account of this patient's clinical status shortly before and at the time of receiving the Silzone valve and then subsequent follow-up of the valve to the point where the valve was explanted or the patient came to autopsy with a valve.

So I think I can say that for the five Canadian patients, on whom I looked at six valves for the affidavits, which were reported and commented upon in my affidavits. I can say that for one additional patient, the one that has been mentioned where I had written a letter, expressed an opinion, and where in that case I had done an extensive evaluation of the medical records.

And there was one additional patient, actually, on which I saw two valves. Of these three valves, in addition to the six valves from the Canadian patients, there was one patient who had two valves in and I had quite a thorough examination of that patient's

records, although I don't think I could say I had seen, you know, all of the patient's records in that case. The other valves, I have not yet had an opportunity to do a detailed review of those patient records.

Q. Do you have the records in your possession on those other ones?

A. By and large, no. I have some clinical information on them but not detailed records on most of them.

Q. So of the approximate 15 valves you have looked at, you have seen records on about half; is that right?

A. Yes, I think that's a fair summary.

MR. BERMUDEZ: Complete records, right?

BY MR. KOHN:

Q. Any records.

A. Just to clarify, yes, I have seen, you know, complete, extensive records on about half.

Q. Okay. And on any of the 15 valves, approximately 15 valves that you have seen, have you gotten any information on what happened to the valve from the time it was explanted until it reached your hands?

A. Not detailed information in terms of exactly how the valve was handled, which I think was where your question was going to.

referring to all of the papers that he referred to, I referred to his affidavit and then I added one particular paper, a paper by Kraft and others, relating to the effect of silver implant materials directly into subcutaneous tissue and skeletal muscle, not identical to cardiac muscle, obviously, and the heart, but quite similar, and pointed out really extremely severe toxic effects of silver being placed against those tissues. And I go through in considerable detail that paper and refer to it in that affidavit.

Q. I don't think you understood my question. My question was really focussed on your opinion in this case that the silver you have observed in these nine explants had a toxic effect that led to the explants. Has that opinion been published in the peer-reviewed literature?

A. No.

Q. And it has not been published with respect to the Silzone heart valve by any other researcher as far as you know; is that correct?

A. I think -- no. In other words, I think the statement you have made is correct; I don't believe it has been published by any other researcher.

Q. And that opinion that the silver particles lead to explant in the Silzone mechanical heart

paper of March 2002; they make their own statements. And that's in the peer-reviewed literature, and they state that silver toxicity, in their considered opinion, was and is a very important factor in the adverse experience with the Silzone.

Q. All right, so you have now cited the Ionescu paper of 2003 and the AVERT paper from 2002 as you believe supporting your opinion that the silver particles are toxic to cells; is that correct?

A. Yes.

Q. Is there anything else?

A. Well, there is a paper that Dr. Butany published in the Canadian Journal of Cardiology which makes reference to the Silzone valves and makes some reference to silver, to the issue of silver toxicity.

Q. Now, there is a difference between making a reference to it and hypothesizing that it might be happening to your very emphatic statement that that in fact is the cause; correct?

A. Yes, there is a difference.

MR. KOHN: All right, let's take a break.

-- RECESSED AT 10:50 A.M.

-- RESUMED AT 11:03 A.M.

information was presented in those papers, and specifically the histology photographs.

So I would just, unless you want to pursue this in more detail, refer to the responses that I gave in detail in that U.S. declaration of May 2003.

BY MR. KOHN:

Q. Okay. You have not reviewed any of the internal documents that were produced in the litigation by the FDA, have you?

A. I believe I have seen some of that documentation. It is quite some time ago, so I think the answer is yes, but I can't -- I wouldn't claim that I have seen all of it.

Q. No, it wasn't listed on the voluminous list of materials that were provided by your counsel as something that you had referred to, relied on or considered. There were something in the neighbourhood of five or six binders full of internal FDA documents that the FDA produced, and I didn't see that on your list anywhere. Do you recall seeing such materials?

MR. BERMUDEZ: Well, let me just clarify a little bit that the list that you were provided, as I think was made clear in the e-mails that we have exchanged, were materials that were specifically referenced in the affidavits and declarations that

Dr. Wilson was provided, and we provided supplemental material after that.

MR. KOHN: Okay.

MR. BERMUDEZ: Go ahead.

BY MR. KOHN:

Q. So can you answer my question, did you see four or five large binders full of documents that were produced by the FDA?

A. No.

Q. You have never worked at the FDA?

A. No.

Q. You have never consulted or assisted a medical device manufacturer in connection with a PMA or a PMA Supplement for a mechanical heart valve that went to the FDA?

A. Not for a mechanical heart valve. I have done so for manufacturers for other products, but not specifically for a mechanical heart valve.

Q. And who was the lead reviewer at the FDA for the Masters Series heart valve?

A. You know, I'm just trying to -- I know the pathologist, but I'm just blocking out his name for a moment.

And I did see some -- the document I can recall seeing was I believe an internal document

A. You know, when I was looking at the limited amount of material I had that was made available to me, it was the spring of 2003. It is now three years later, and I can't remember the names, and it is not something I looked at in terms of the preparations I made in the last few weeks for this deposition.

Q. Have you reviewed any PMAs or PMA supplements by any manufacturer, other than the Masters Series that you looked for St. Jude, for a mechanical heart valve?

A. No, not for a mechanical heart valve.

Q. Do you consider yourself an expert on FDA regulations relating to mechanical heart valves?

A. Not specifically, but I have made myself somewhat familiar with international standards in the field, ISO standards, so-called AMI standards. And so I think I have some familiarity with the regulatory environment for heart valves, but I don't present myself as an expert.

I have reviewed the declaration by Dr. Parisian, the Plaintiffs' expert, that was provided in, if I remember correctly, around the spring of 2003. In fact, I saw a draft of her declaration and then subsequently reviewed the final form of her declaration,

and she went into great detail about the regulations. I learned a few -- I learned a number of things that I wasn't aware of by reading her declaration.

So in that sense, I made myself more familiar with the regulations by reading what she as an expert had written on the subject.

Q. Well, except for whatever information you learned from Susan Parisian's affidavit, what other sources of information do you have regarding FDA regulations?

A. Well, I have --

Q. With respect to mechanical heart valves now.

A. I don't think I really have material specific to the FDA on mechanical heart valves. I have -- I know I'm repeating myself a bit, but I have ISO standards. I certainly am very familiar with good laboratory practice regulations, but I realize those aren't specific to mechanical heart valves.

Q. Right.

A. And what Dr. Parisian reviewed in her declaration.

Q. What is the Heart Valve Guidance? Is that a document you are familiar with?

A. I'm aware of it. I haven't

implanted, but in terms of what is currently on the market being actively sold now, no others come immediately to mind.

Q. Have you seen explanted CarboMedics valves from adults?

A. Not from adults, no.

Q. Have you seen explanted Medtronic valves from adults?

A. I have not, no.

Q. Have you seen explanted mechanical heart valves from adults from any manufacturer besides St. Jude Medical?

A. Well, in terms of recent experience, no. If one looks back to my earlier experience as a resident, as a research fellow working with Dr. Silver, this would be in the 1970s, I certainly was seeing valves from other manufacturers, but that is then.

In terms of recent years, no. And just by way of rather obvious explanation, I would say I am a cardiovascular pathologist at a children's hospital, and so you have phrased the questions in adults, and of course I have seen explants in children, from children, of mechanical heart valves but not from adults, other than, as you have asked me, from the St. Jude Silzone

valves that have been sent to me by Plaintiffs' counsel for examination.

Q. Okay. Are you able to estimate for us the number of explanted mechanical heart valves you have seen from children?

A. Very roughly, not a large number because most of the valves that go into children are bioprosthetic heart valves. It would be perhaps a couple of valves a year. It might be three or four in one year; it might only be one in another. There might even be a year that would go by, a twelve-month period, where I wouldn't see any explants.

So it is a modest number, even over the 25 years that I have worked as a pathologist at the Hospital For Sick Children.

Q. So I don't know how many years that has been, but would the number of explanted mechanical heart valves from children, would it be fewer than 20 over your entire career?

A. Probably more, but certainly I would say definitely fewer than 50, but it might be somewhat more than 20.

Q. And were any of those explants because of thrombus formation?

A. Yes, there have been some because

valves you have looked at?
A. Well, I think excessive pannus buildup.
Q. Okay. Now, let me see if I can put numbers next to each one of these, if it is possible.
I understand you might have to estimate it, but of the 14 or 15, how many were paravalvular leaks?
A. It is a bit -- of course, the portion -- the nine valves that I have referred to in my affidavits I have detailed information on. Of the others, an additional seven, and I'm trying to be helpful here --
Q. Right.
A. -- there would be I would say one with thrombus, extensive thrombus buildup. I would say most of the others would be explants for paravalvular leak.
Q. Okay. Would it be fair to say that throughout your career your area of specialty has been in the area of -- as it relates to mechanical valves now -- juveniles or minors and not adults?
A. Well, I think in terms of my actual practice of pathology, it is really related to children. However, in terms of expertise, I think that I have a

significant and important knowledge base in issues relating to prosthetic heart valves in general.

My co-authorship with Dr. Silver in the key chapter on prosthetic heart valves in both the 1983 edition and 1991 edition of the textbook "Cardiovascular Pathology" I think indicates a substantial knowledge base in the field.

So that I wouldn't accept that I am -- but again, I realize I should be thinking carefully about the specific question that you have asked. Clearly, my practice has related to prosthetic heart valves in children rather than adults, but I think in terms of expertise I feel quite comfortable in the prosthetic heart valve area regarding cardiovascular pathology that relates to adults.

Q. Doctor, let's go back to page 37 of the affidavit we were talking about earlier, if we could, and that again is the one dated February 7, 2002.

A. Yes, I am with you, sir.

Q. In paragraph 215 you state:

"The normal situation for healing with a mechanical heart valve is a thin, strong pannus coating, into and on the sewing ring, with a thrombo-resistant endothelial cell covering over the

pannus."

Did I read that correctly?

A. You did.

Q. And what is the basis for your statement that that is the normal situation?

A. The basis is that we know that the mechanical heart valves implanted into humans are quite -- the human is quite capable of doing a complete healing of the sewing ring of the valve, including a thin pannus covering and including endothelialization of that. In fact, there is at least one example of this given in the chapter that I wrote with Malcolm Silver back in the first edition of the textbook "Cardiovascular Pathology" I have mentioned. And I have seen this at autopsy, in valves that come to autopsy examination.

Generally, a valve explanted, it comes out for a good reason. Surgeons won't remove the valve unless there is significant pathology, so that I'm not suggesting that valves that are explanted for cause have normal healing, but I think that there is every reason to expect that humans can heal the valve normally and completely. There is evidence of this from autopsies.

Q. How many valves explanted and presented to you from autopsy have you seen in your career where you have observed what you perceive to be

normal healing in an adult?

A. Well, it would be a small -- it would be a handful, a small number, four or five, six.

Q. Do you have any pictures to show us of what normal looks like?

A. Not with me today, but I have referred to the chapter that Dr. Silver and I wrote in the first edition of the textbook "Cardiovascular Pathology" published in 1983 by Churchill Livingstone, and I'm not certain of this, but I think probably the photographic material is probably in the second edition as well.

Q. A minute ago you said you wouldn't expect to see normal, as you have described it here in paragraph 215, in any valve that was explanted for an adverse event; correct?

A. Well, I wouldn't say in any valve. I think it depends on -- it would depend on the adverse event. What I was trying to convey is that one frequently wouldn't see normal healing in a valve that was explanted for an adverse event.

Clearly, when you have the whole valve in your hands, you see the sewing ring. There could be, for example, a thrombus on a portion of the sewing ring or there could be a thrombus on the occluder mechanism of

the valve, in the case of the St. Jude made of pyrolytic carbon, so that you may see significant pathology but it isn't necessarily related to the healing of the sewing ring. And even if you see some pathology relating to healing of the sewing ring, there may still be quite substantial healing of portions, even large portions of the sewing ring.

So that I would clarify my answer using that type of example.

Q. Well, isn't it a fact, Doctor, that as you have defined normal in paragraph 215, you have never seen that in any valve that was explanted from an adult for an adverse event?

A. I think that's fair, particularly because, of course, I have characterized normal and all of its aspects in terms of a completely normal complete healing response. I think what you have said is fair.

Q. Let's stay on 215 for a minute. Would you agree with me that there is probably 28,000 people around the world who currently have a Silzone heart valve?

A. Yes, and I think I would say that based in fact on Grunkemeier's estimate of that. I took some interest in that in -- this is Exhibit 4 I'm referring to.

Q. Right.

A. I knew that approximately 36,000 Silzone valves had been implanted before the recall, and until seeing this article, I hadn't really given too much thought to how many patients had died or had had their valves explanted.

And I really don't know how Dr. Grunkemeier and colleagues arrived at this estimate of 28,000. It seems reasonable to me.

Q. Now, without guessing or speculating, can you tell us how many of those 28,000 people have had normal healing in their heart valve, as you have defined it in paragraph 215?

A. Now, you have phrased your question "without guessing or speculating". I think that based on what is known about the toxicity of silver, what is known from the AVERT study, what is known from Dr. Butany's evaluation of both Silzone and non-Silzone valves at the Toronto General Hospital, that I would expect that substantial numbers of those patients would have abnormal healing, would have impaired healing of their Silzone valves, but I could not give a precise estimate. But I think that it is likely that substantial numbers of those patients have significant problems with the healing of their Silzone heart valves.

Q. All right. Now, when you use the word "substantial", let's try and get a range or a number attached to that. How many of the 28,000 do you believe have substantial healing problems?

A. And I presume your question is predicated on of course the 28,000 being at, what, five years or more after implantation?

Q. Sure, they are all at least five years; a lot of them are six or seven years.

A. Right. I can't give a precise estimate.

Q. Any estimate you would give would be speculative; correct?

A. Well, in terms of coming up with a particular percentage or a certain number, absolute number --

Q. Right.

A. -- yes, but I don't think speculative in the sense of what reasonable expectations would be based on all that we know about Silzone.

Q. Now, you have not published anywhere in the peer-reviewed literature the opinion that a substantial number of the 28,000 Silzone valve recipients alive today have impaired healing; am I correct?

A. You are correct.

Q. And you have not tested that theory in any way; is that correct?

A. If you mean by -- I think you mean by testing it, because you are talking about patients, it would have to involve a study on patients?

Q. Correct.

A. No, I have not performed a study on patients.

Q. There really would be no way to do that, would there, short of actually doing biopsies or explants of the valves?

A. I think that in terms of -- I think there could be information that would come from clinical study of the patients that would be helpful in that respect, obviously not as good as data that would come from direct examination of the valves at either explant or unfortunately at autopsy in some instances, but I think there is clinical information that could come that could be helpful in respect to, for example, echocardiographic examination of patients.

But in terms of speaking as a cardiovascular pathologist, clearly one would want to have explanted valves or hearts from autopsies with the valves to build up a larger experience and with a valve

particularly at long follow-up, at follow-ups of five years or more.

Q. No other researcher or scientist has published in the world's peer-reviewed literature the opinion that a substantial number of Silzone valve recipients today have impaired healing of their heart valve; correct?

A. Well, again, I think that the Cardiff thrombo-embolism study, the paper that appeared in 2003, I think that that paper at least alerts the reader to the strong possibility that there could be continuing major problems for Silzone valve recipients.

Q. There is a difference in science between a probability and a possibility; correct?

A. I'm sorry?

Q. There is a difference in science between the use of the word "probability" and "possibility"; correct?

A. Yes.

Q. What I asked was, there has been no peer-reviewed publication of the world's literature by any scientist or physician stating that a substantial number of the current Silzone valve recipients, the 28,000 people we have been talking about, have impaired healing; am I correct?

A. Yeah, worded in that way, as a simple declarative statement of fact, I would have to agree with you.

Q. Okay. Let's look at the reciprocal side of this issue, which is if you are right in saying that there is a substantial number, even though you are not able to put a number on it, of the 28,000 who have impaired healing, are you able to tell me how many of the 28,000 have perfectly normal healing?

A. No, I think that it is -- as you say, it is the flip side or the inverse side of the same question. I think I would have to respond in the same way. I can't give you a specific number.

I would say, though, again, in general, that the -- well, again, I think I just have to answer that I can't -- the reason for my hesitation in responding is that, knowing the toxicity of silver, knowing the valves that I have seen and, in particular, the issue of excessive pannus buildup which, looking at the patient R.R. in particular as an example, in his explanted valves a lot of silver that spalled off the silver fibers is present in macrophages, in giant cells. It is well known from the scientific literature that those cell types, that is, the monocyte, macrophage, giant cell, that sequence of cells are very important in

more follow-up.

Q. Well, wouldn't the 28,000 be included in the "all" in paragraph -- when you use the term "all", didn't you mean everyone who has ever received a Silzone valve?

A. I think, yes, clearly in paragraph 216, but the question you have asked, as I have understood it, relates to the 28,000 that are alive, remain with Silzone valves, with several years having passed.

Q. Right.

A. So it gets into the issue of, given what I believe is an impaired healing response to Silzone at the time the valve goes in, for months afterwards, you know, when five, six years pass, the question comes up about whether the patient may have been able to overcome to some extent the impaired healing with Silzone, so --

Q. Or alternatively, never had it in the first place?

A. Well, that is not my -- my view is that -- and I stand by this -- that I think that every patient who has received a Silzone valve has had some degree of impaired healing on account of the Silzone.

Q. Okay, and just so we are clear on that, that is not a view that you have ever published?

A. Correct, I have not published it.

Q. Not a view you have ever presented at any scientific meeting?

A. Correct.

Q. Not a view you have presented to any regulatory body?

A. Correct.

Q. It is strictly a view that you have developed and presented in this litigation?

A. Correct.

MR. KOHN: Okay, let's stop for lunch.

-- RECESSED AT 12:04 P.M.

-- RESUMED AT 1:03 P.M.

BY MR. KOHN:

Q. Before we stopped for lunch, we were talking about page 37. I just want to finish up the summary of your opinions from the February 7th, 2002 affidavit, if you could turn to that for just a minute.

Tell me when you get there. It is in tab "B".

A. I'm on that page now.

Q. All right. Now, addressing your attention to paragraph 217, if we can, you state here that:

"All Silzone valve patients, because of

[what you have categorized as] this frustrated healing process, are likely at greater risk of experiencing significant, life-threatening complications."

Did I read that correctly?

A. You did.

Q. And is it still your opinion today that all Silzone valve patients, and by "all" I'm including the 28,000 referred to in the Grunkemeier paper, are likely at greater risk of experiencing significant life-threatening complications?

A. It is still my opinion, yes.

Q. I want to focus now on what you mean by the term "greater risk". What do you mean by that?

A. I mean greater risk than patients who would be receiving an otherwise identical prosthesis, the conventional St. Jude valve, as distinct from the Silzone valve.

Q. So thinking about the 28,000 who are discussed in the Grunkemeier paper who have had the valve in for six or more years, it is your testimony that those 28,000 people are at greater risk of complication than a similar subset of 28,000 who had a different kind

of valve; is that correct?

A. Yes.

Q. Now, among those life-threatening complications, do you include paravalvular leak?

A. Yes.

Q. Thrombo-embolism?

A. Yes.

Q. Thrombus?

A. Yes.

Q. Endocarditis?

A. Yes.

Q. Any other complication that I haven't mentioned?

A. Well, complications that would relate to excessive pannus buildup, and that could include problems with the occluder mechanism of the valve producing immobility of one or both leaflets, either partial or varying degrees of immobility, so that would be another one.

I think there is a concern, a legitimate concern, about the possibility of cancer in terms of there has been one case report of a sarcoma in a patient with a Silzone valve. I'm not suggesting that -- I'm only specifying this to indicate that I think that there is a concern. I'm not predicting that there will

be a greater prevalence of cancer, specifically sarcoma, in Silzone patients, but I think it is an area of concern and an area that would benefit from having a monitoring class for these patients.

Q. Now, let me try to understand, and let's take the development of thrombus as the first example.

How much greater is the risk for the 28,000 Silzone recipients identified in the Grunkemeier paper for developing thrombus as compared to any other mechanical valve patient who has had a mechanical valve in place for the same period of time, a non-Silzone valve, that is?

A. Yeah, I can't provide a quantification for that risk.

Q. So all you are able to say at this point is that the risk is greater, but you are not able to give any kind of a number in terms of increased prevalence or incidence; is that correct?

A. That's correct, and I would -- I think to answer that question what is needed is to have a monitoring class for these patients and really find out just how much greater the risk really is by direct observations on the patients.

Q. And assuming such a monitoring

program would be established, how long would it take to answer that question as to whether there is or isn't a greater risk and, if there is, how much greater it is?

A. I don't think I can give a precise answer to that. I know that Dr. Butchart, in his report in November 2005 which I have read in detail, does address monitoring issues. I don't think he -- I don't recall that he provided that degree of specifics, and he is obviously an expert in the field and has considered it in detail.

So I don't think it is, if I may say so, really reasonable to expect that I would be able to give such a specific answer to the question.

Q. So you are not able to tell me how long a period of time you would have to monitor these patients to answer the question; correct?

A. Correct.

Q. And is it also true for the other complications we discussed, that is, paravalvular leak, thrombo-embolism, endocarditis, cancer, or any other complication with a Silzone valve, you wouldn't be able to quantify whatever the increased risk is as set forth in paragraph 217 of your affidavit?

A. Yeah, as we speak today, no, I don't have the data on which to be able to make

quantitative estimates for any of those factors.

Q. Okay, so the number, in terms of increased risk, let's say, for thrombus, the increased risk could be anywhere from a fraction of 1 percent to some higher percentage? You wouldn't be able to give us any range; is that correct?

A. Well, I think the practical issue is whether the incidence, and taking all the patients into account over a period of time, the prevalence of those complications is greater than with a similar prosthesis, namely, the St. Jude valve design without the Silzone on it. There clearly will be complications in each of those categories with the -- I'll put cancer aside -- but the complications you have mentioned other than cancer with the existing or with the conventional non-Silzone St. Jude valve, but the practical issue is whether the incidence and prevalence of those complications will be greater with Silzone.

Q. All right. So for you to tell us any degree of increased risk that you would attribute to any of these complications for the Silzone population, you would have to speculate, sitting here today, correct, in order to quantify it?

A. I think that's true. As explained in my affidavits, I think there is a very sound

biological basis for the very reasonable expectation that those complications are going to be greater, in fact, I mean, I think have been greater already, although I don't have the data on it, and I think are likely to continue to be greater in the future based on, you know, all that is currently known about Silzone to date.

But in terms of giving -- in terms of really responding to the specifics of your question, no, I can't give precise estimates.

Q. All right. Could you turn to the Grunkemeier paper, which is what, is it Exhibit 4; am I correct?

A. You are correct.

Q. And if I could go to page 26 of the paper, paragraph 5, there is a paragraph entitled "Conclusions"; do you see that?

A. I do.

Q. All right, now, let me read the conclusions. The first sentence reads:

"The excess risks of major paravalvular leak and of TEB in the mitral position due to Silzone diminish over time and disappear by 4 years after implant."

Did I read that correctly?

A. You did.

So to me, I find that troubling that we don't have -- that that information is not available and specifically not available, as far as I know, to experts for the Plaintiffs or other experts.

Q. You are not aware of the fact that the entire AVERT database has been provided on a periodic basis to the Plaintiffs' experts? The same data set that Dr. Grunkemeier had has been given to the Plaintiffs' experts every six months; you are not aware of that?

A. I wasn't aware every six months. When you do mention it, I do have some recollection that there has been some disclosure of the AVERT database to Plaintiffs' experts, but I'm not aware of the details of that.

Q. Okay, well, I --

A. I'm going on the -- sorry to interrupt, but I'm going on what Dr. Butchart summarizes in his report in terms of numerous deficiencies that he refers to in relation to the AVERT study.

Q. Speaking of power, how many patients are in Dr. Butchart's study, Silzone patients?

A. I don't know the exact number. It has been disclosed in the publication in 2003. I don't have it committed to memory, but it is less; it is certainly substantially less.

Q. It is substantially less than in this peer-reviewed paper, isn't it?

A. I agree.

Q. Okay.

A. Butchart's paper is also peer-reviewed, but I agree, a smaller number of patients in the Cardiff study than in AVERT.

Q. So if you want to be critical of lacking power, you would be much more critical of Dr. Butchart's study than you would of AVERT, wouldn't you?

A. Well, I wouldn't put it as more critical, but I think that the same issue applies to any epidemiological study.

Q. So how many patients would it take to satisfy you that you had, to use your category, right or wrong, sufficient power to provide a result that would satisfy you that the risk profile for Silzone valve patients is no different than conventional valve patients?

A. You know, that is an interesting question. I don't know that number. I mean, the simple answer is I don't know that number. To give you my thought process, I'm thinking about, well, you know, how would one obtain that number? I'm not an expert in