biostatistics or clinical studies. That would be something that the experts in that field, including Plaintiffs' experts, might put their mind to.

And I'm not sure that that's such an easy question to answer, even for the experts, but again, that goes beyond my expertise.

Q. Okay. And then I assume you would similarly disagree with the statement in the conclusion section where the authors state:

"...our results indicate that
they [being the Silzone patients] now
have a risk profile similar to that of
patients with a standard SJM valve."

You would disagree with that?

A. Yes, I disagree with that as an affirmative statement. I think, based on the work published in this paper, that just is not known. So the simple answer is I do disagree with it.

Now, I might make another point. Partway through that paragraph there is a reference to the Silzone valves currently active in the study, and I'll read that, if I may, that second sentence:

"Based on the number of Silzone valves
currently active in this study (78%,
Fig. 6), we estimate that fewer than

only reason, but it is certainly, in itself, the statistical power issue is sufficient reason.

Q. Now, let's go back to your statement here in paragraph 217 that you feel the Silzone valve recipients are at greater risk. I may have asked you this before, but I want to be sure we have it covered. That is a view you have never published in any peer-reviewed literature, nor have you presented it at any scientific meeting; am I correct?

A. That's correct, but I guess I would add I am, after all, bound by the confidentiality order. But it is true, I have not presented or published it.

Q. Now, in paragraph 218 you make a comment about a need for a higher level of monitoring, and let me start off by asking you, first of all, you are not a clinician and you don't treat patients; is that correct?

A. That is correct.

Q. And you normally do not make recommendations to cardiologists or cardiac surgeons about how heart valve patients ought to be monitored; am I correct?

A. That is correct.

Q. So any statement you might make about monitoring is really outside your area of

expertise; am I correct?

A. Well, in terms of the specifics of exactly what the monitoring regime would be, I think that's true. But in terms of making the general statement that because of all of the information I have on Silzone -- and of course, the statement was made in June 2002, and I have written subsequent affidavits on the point -- but I certainly stand by the statement today, after all that I have put in up to November of 2005, I think that the patients clearly need and deserve a higher level of monitoring than other mechanical heart valve recipients would get because of the particular problems with Silzone.

I think it is reasonable for me to make such a statement, based on my knowledge of the basic science, my knowledge of the specifics in terms of the pathology, but I would not suggest the exact details of what the monitoring regime should be. I have read Dr. Butchart's report in November 2005. He spends or devotes a fair amount of space in that report, towards the end, to what the monitoring scheme would be. I found it persuasive, impressive. There were some things that he said there that I hadn't thought in detail about that seemed very reasonable to me. I would view him as an expert in the field, and I found what he said to be

reasonable and persuasive.

Q. Have you read any other views about what monitoring is needed for these patients besides that of Dr. Butchart?

A. I think that there has been some reference to that by Defence experts, but I must admit I have not reviewed what Defence experts have said on that subject since reading the affidavits or declarations from those Defence experts in the range of three to four years ago.

Q. Now, there is an organization in Canada called the Canadian Cardiovascular Society; am I right?

A. You are correct.

Q. Are you a member?

A. I am.

Q. And do you attend their meetings regularly?

A. I have not really been attending their meetings regularly.

Q. Why is that?

A. I think principally because of the load on my schedule of the research that I do. I do frequently attend the American Heart Association meetings which occur typically about ten days later, in early

A. I didn't until I think you are telling me that now. I certainly know them --

Q. Actually, they are not. They are primary panel members. I misspoke. Did you know Dr. Butany was a primary author?

A. No, I did not.

Q. Do you know Dr. Erik Jameson?

A. I do.

Q. Did you know he was a primary author?

A. I did not.

Q. Are you aware of the fact that no professional organization in Canada has recommended increased monitoring for Silzone valve patients?

A. Well, I wasn't specific -- I mean, it doesn't -- I should put it that it doesn't surprise me, but no, I mean, I wasn't aware. I guess to answer specifically the question, no, I wasn't aware of that.

Q. Okay. Were you aware that no professional organization in the United States has recommended increased monitoring for Silzone valve patients?

A. No, I wasn't aware of that.

Q. Are you aware that Dr. Butchart has not published any of his recommendations for increased

monitoring of Silzone valve patients in the peer-reviewed medical literature?

A. Yes, I'm sure that's true. As I say, I just read -- you know, his report was authored in November of 2005. Even if he had have submitted them, which I don't think he has, they wouldn't have been published by now.

But maybe more to the point, I think he is also bound by a confidentiality order of the court in this matter, so it is uncertain to me whether he would be free to either present or publish that material in the peer-reviewed literature.

Q. Now, you have not published your view that increased monitoring is needed for Silzone patients in the peer-reviewed literature; correct?

A. That is correct.

Q. And you haven't presented that at any scientific meeting?

A. That is correct.

Q. And you haven't even informally told any of your colleagues that that is your opinion; am I correct?

A. Yes, but I might add that the colleagues, the doctors who I rub shoulders with on a regular basis, work at the Hospital For Sick Children in

Toronto, my immediate colleagues in cardiology, cardiovascular surgery. To my knowledge, I don't believe any Silzone valves were implanted in children at our hospital. I'm not sure that -- I'm doubtful that -- I'm not certain, but I guess what I am trying to say is I doubt that very many Silzone valves were implanted in children, period.

Q. Do you know what monitoring is recommended by any professional organization in Canada for mechanical heart valve recipients? Are you familiar with what monitoring has been recommended?

A. Not in detail, no. But the point I have made in relation to monitoring is that there needs to be a greater scrutiny, a greater degree of monitoring for Silzone above and beyond what is currently done.

Q. Well, if you don't know what currently is recommended, how can you possibly say that more is needed?

A. That is a fair point, but my perception is that, for example, in the area of two-dimensional echocardiography, that although patients with conventional heart valves may receive esophageal echos, that it is not a particularly common practice; I don't think it is really routine.

And so that for -- I'm giving you an

example -- patients who have Silzone valves, particularly in the mitral position where it is difficult to visualize the valve through a transthoracic echocardiogram, I think that they particularly would benefit from transesophageal echocardiography, not necessarily in every case. Again, Dr. Butchart has dealt with this in his report in November 2005, but I just use that as an example I think of something that, at the time I formed this opinion, and I haven't changed it since then, that it seemed to me to be fairly obvious that there were additional monitoring that should be done on Silzone patients above and beyond what is normally done on a conventional heart valve or mechanical heart valve recipients.

But you know, I acknowledge I don't know the detailed protocols that are in the documents you refer to, but I don't think that has prevented me from having a very reasonable concern that Silzone patients, because of the distinct differences in this valve from the conventional St. Jude valve and from other valves that do not have a silver-containing sewing cuff, the pathology is so striking in the Silzone recipients, the valves that I have seen, it seems to me to be rather, I think, apparent that those patients should have a higher degree of scrutiny in terms of monitoring.

Q. You are talking about the 15

here.

I believe it is in tab "D" as in "David".

A. Yes, I agree, Mr. Kohn. I have found my way to that same tab, because I do remember that it came up in my February 2003 affidavit.

Q. Okay. And if we could, just to shortcut this a little bit, at paragraph 94 in that, on page 32, you set forth your grading system for characterizing the healing?

A. Yes, that's correct.

Q. And then in Exhibit "C" to this affidavit you provided us with some of the photographs of the valves that you looked at; is that correct?

A. Yes, that's correct. I believe I provided examples of all the different grades, and then I provided a table indicating various -- 54 in total, I believe -- of the Silzone valves that have been returned to St. Jude. And of course, I was using the photographs taken at St. Jude and applied my grading system to them. So that is correct.

Q. All right. Now, starting with your grading system, this is something you came up with for purposes of the litigation; is that right?

A. That's correct.

Q. And it is not something that you have published in the peer-reviewed literature?

A. That is correct. Again, I mean, I don't think a grading system such as this is something that one would publish on its own. It is not the sort of thing that you would base a publication on, but in addition to that, I, as I have indicated before, my perception is that, in general, I am constrained from publishing my evaluations, my opinions, in this matter because of the court's confidentiality order that I am bound by, certainly in relation to this level of specificity in terms of the St. Jude valve.

Q. Well, what you have done here, if I'm understanding it correctly, is to compare these 54 pictures of explanted valves to a standard of normal, which is coverage of the sewing ring by a uniform pannus or diffuse coverage of the sewing ring by a uniform pannus; is that correct?

A. Well, I think that is implicit in this grading scheme that that's the ideal that I would be in effect comparing with, but the system itself is -- it is based on to what extent the individual valve, both sides of the sewing ring, deviate from that.

And so I don't want to make points of distinction that are too fine, but I mean, the grading

valves. I'm getting a little ahead of what you are questioning, perhaps --

MR. BERMUDEZ: Just answer his question.

THE WITNESS: Okay. Maybe you could just rephrase your question again, please?

MR. KOHN: Well, we may have the reporter read it back.

THE REPORTER: "Question: Well, you would agree, though, that the healing that you observed in these 54 valves occurs with any mechanical valve explanted for an adverse event; is that correct?"

THE WITNESS: I think the range of observations I described in those 54 valves, taking any particular valve, I think you could see those findings on a non-Silzone valve. So it is possible to see what I saw on gross examination on any one of those valves on a non-Silzone valve. That is possible.

BY MR. KOHN:

Q. All right, and then just to move forward, if we go to -- one second.

Well, before I get there, let me back up for a second.

You have not seen any of the medical records on the patients from whom the 54 valves were explanted; am I correct?

A. Not the patient records. I have seen summaries on those valves, the field experience reports of St. Jude, and those reports, to a considerably variable degree, have some clinical information in them.

Q. Right, some have fairly complete and some have none at all?

A. That's right, some have none at all. I wouldn't characterize any of them as being fairly complete, but there is certainly more -- some of them do have considerably more clinical information in them than others. There is quite a variation.

Q. Now, on pages 8 through 10 of his most recent declaration in Exhibit 2, Dr. Schoen describes in a fair amount of detail paragraph by paragraph some of what he feels to be more plausible causes for the adverse events on these explanted valves. Have you read that?

A. I have read that.

Q. And have you also reviewed the underlying literature or records that Dr. Schoen is referring to?

A. I have not done that yet on these

So it is unclear to me whether this was at autopsy versus an explant.

A. Okay, I'm not sure that it is a terribly critical distinction. Coming from Dr. Schaff, who is a surgeon, and referring to Dr. McGoon, who is a surgeon, I think I probably reasonably expect that it is explanted at surgery.

But my point simply is that it is possible to find examples of valves that have very substantial pathology, in this case essentially no healing, even at very long follow-up.

Q. Right.

A. And so I view this as, if you will, if I may call it sort of a rhetorical flourish by Dr. Schoen. He puts this in, a very long follow-up, nice example.

But in terms of the point he is trying to make, I mean, this isn't necessarily the rule by any means. And you know, I think that the vast majority of valves, that is, mechanical valves with Dacron sewing rings, polyester fiber sewing rings that are put in, heal reasonably well in the human patients who receive them.

Q. Well, a minute ago you said the real question is the prevalence that you would see something like this.

A. Yeah, I think that is a very good point. That really practical issue is the relative prevalence of this, comparing Silzone with non-Silzone valves, "this" referring to inadequate healing of the sewing ring but, in more general, referring to other aspects, including excessive pannus buildup, the amount of thrombus on the sewing ring, thrombo-embolism that may occur from that thrombus, and so on and so forth.

Q. And really, the only way to get at prevalence is through a control group; isn't that right?

A. In terms of really making a firm determination, I think that's true, that you would have to be able to compare Silzone with non-Silzone valves.

Q. And one of the reasons why you are unable to extrapolate a prevalence from your 15 valves that you have looked at is that you don't have a control group; is that correct?

A. Well, I personally don't have a control group, but in my affidavits one of the areas that I touched upon and examined in some detail was Dr. Butany's experience with the Silzone valve at the Toronto General Hospital and the comparisons he made. And this is recorded in his deposition of I think it was April 26, 2002, that I cited in considerable detail in my affidavit of early June, I think June 3rd, early June of

2002, and in fact, his deposition was one of the exhibits to that affidavit and where he was questioned -- in fact, you were present at that deposition, Mr. Kohn, if I remember correctly.

And so there was quite a bit of information that came out of that in terms of the comparisons that Dr. Butany had made in relation to the Silzone valve, experienced at the Toronto General Hospital, I think including another hospital in Toronto, Sunnybrook as well, I believe, another adult hospital.

And so he had controls and he had a numerator, the number of explanted Silzone valves which, if I remember correctly, were about 20, there was about 22; and I think the denominator, the number of patients who received Silzone valves, was a little over 300. I think there were 309 that did not receive Silzone, and then you add 22 to that, so I think you get somewhere in around 330 for that group, if you will. And then he made comparisons to controls, which were not a prospective randomized study but were still reasonably contemporary controls, that is, otherwise identical St. Jude conventional valves that didn't have the Silzone coating that had been implanted in Toronto, I think at the Toronto General and Sunnybrook, over to one-and-a-half-year intervals.

And when you combine those two, you get I think it was 8 of the controls that had to be explanted, and he looked at the pathology on those and compared with the 22 Silzone; and I think the denominator was, well, 509 plus 8, I guess it was -- in any event, a little over 500.

Anyway, when you -- not when you, but when he did the statistics on that, comparing about 22 out of a little over 300 in Silzone with 8 over somewhat over 500 with the controls, he found that the prevalence of explantation of the Silzone valves -- of course, they could be explanted for a variety of causes -- was significantly different from the controls, and the "p" value, if I remember correctly, was about 1 in .0001; in other words, 1 in 10,000 that that would be just by chance alone.

So there is controls there, and it is an absolutely striking comparison.

Q. That is an abstract you are talking about?

A. That was an abstract, correct.

Q. So it wasn't published in the peer-reviewed literature?

A. No, it was submitted to the Society For Thoracic Surgery, and it was not accepted for

presentation at their meeting, but that doesn't take away from the validity of the study that he did. The fact that that -- that particular association, when they have their scientific meetings -- and I know this because, albeit many years earlier, I actually had an abstract accepted at that meeting and got up at the podium and presented a paper, and I don't think things have changed since then in this respect. And that is that numerous abstracts go in, and that society makes a choice of a relatively small number, a relatively small percentage of those for presentation.

So the fact that an abstract wouldn't be accepted is not a -- that doesn't reflect poorly, necessarily at all poorly, on the science behind the abstract or the validity of the study. But it is true, it didn't happen to get on at that meeting.

Q. You didn't happen to attend the London meeting where Dr. Butany presented his abstract, did you?

A. No, I did not, but I know from what he stated in his deposition that there was some -- that one of the attendees of the meeting, in fact, who was involved in organizing the meeting, did not respond very positively to his abstract.

Q. Okay. In fact, there was a fair

amount of criticism by a number of people of his abstract at that meeting, wasn't there?

A. I don't know about that. I just know what he testified to at his deposition.

Q. And Dr. Butany's abstract contained a very short, cryptic paragraph talking about healing?

A. Well, I wouldn't refer to it as cryptic. It was short. The nature of an abstract is that you have to be very brief. There is generally a word limit for these; you have to compress a lot, often typically a lot of material into a very small space.

Q. So if we wanted to be critical of Dr. Butany's abstract, we would say, on the one hand, it was quite brief in its methods and methodology; correct?

A. Well, I wouldn't be critical because of the brevity, because that's the nature of an abstract. I don't know the exact word limit imposed for that meeting, but it is typically somewhere between 250 and 350 words. That is the nature of abstracts; you have to be very, very brief.

Q. It didn't have contemporaneous controls?

A. Well, it was not a randomized control study, but the controls were reasonably contemporaneous. I mean, in practical terms, without

having a randomized prospective study, I think that, given the available data he had, I think he -- I think the data was good; and by that I mean the patients that were chosen were chosen reasonably and there were --

Q. Well, what do you know about the way the patients were chosen at Toronto General Hospital in this study?

A. Well, my understanding is that Dr. Butany used, for both the control group and the Silzone group, patients who were -- I believe it was all the patients who received these valves, and they received them from one particular date to another date, so that, you know, there wasn't sort of -- there wasn't a selection bias, that he was just choosing some and not others. I think it was, if you will, an all-comers, if you know what I mean, study, all the patients who received the control valve. And there was two particular periods he chose; they were earlier, but not a lot earlier. They were I think as close to the present that he was operating in as he could and I think subsumed basically the previous three years and --

Q. To what extent --

A. And -- sorry to interrupt -- again, the Silzone valves I believe were simply, you know, all of the patients at I believe it was Sunnybrook and the

Toronto General Hospital who received the valves over the same -- over a particular period.

Now, I don't know the exact details on those patients, but I think it is reasonable to think that over a period of some few years that the mix of patients -- and we are talking about hundreds of patients that those two institutions would receive, both in Toronto -- would be quite similar, individual variation, but over a few years. It is not a study of 10 or 20 or 30 patients. There is hundreds of patients in each of those groups.

In fact, I'm sorry, to go on so long, but you were mentioning that the AVERT study is the largest control study that has been done; it turns out there was about 400 patients at the time of termination of that study with the Silzone valves. Well, the particular group that had Silzone in it that Dr. Butany was looking at was around the 320 mark, as large as AVERT, but for one institution -- I should say two institutions in Toronto, I mean, those are institutions that do a lot of valve surgery. Toronto is a very major centre, not just in Canada but in North America; it is a big experience with the Silzone valve.

Q. To what extent were patients given the Silzone valve at Toronto General because they had an

active endocarditis at the time of implant?

A. I don't know those specific figures.

Q. That would make a difference in the potential outcome of the study if in fact doctors were giving the Silzone valve to higher risk patients, would it not?

A. If indeed there was a -- if indeed the Silzone valves were specifically being given to patients who had or were thought to have infectious endocarditis compared with the controls, that could be a bias.

Q. Okay, and --

A. Sorry to interrupt, but I don't know that that's what was actually happening, but I would acknowledge that that would be a factor that would need to be taken into account.

Q. Okay. You don't know whether Dr. Butany is currently of the view that Silzone valve patients are at higher risk for adverse events; am I correct?

A. You are correct, I don't know that.

Q. And you indicated that the Butany abstract had something like 300 patients in it; is that right?

MR. KOHN: Okay, sure.
-- RECESSED AT 2:27 P.M.
-- RESUMED AT 2:42 P.M.
BY MR. KOHN:
Q. Okay, Dr. Wilson, let's go over a few background questions, if we could.
What training do you have in toxicology?
A. I have no formal training in toxicology.
Q. And you don't do surgery?
A. I do not do surgery.
Q. You don't have training in surgery?
A. I do not.
Q. Do you have any training in material science, any formal training?
A. Well, not formal training, but I have had quite an experience in material science as it relates to implantable devices placed in the body by material science, and I have been recognized by the International Society for Biomaterials with a lifetime achievement award in that field, which was mentioned in some detail in I think it was my June 2002 affidavit; I actually made detailed reference to it. I believe the award was conferred on me in the year 2000, so --

after my name for the rest of my life."

Q. Do you attend the annual meetings of the Biomaterials Society?

A. Yes, I have not made every meeting, but I'm a frequent attender of that meeting, yes. Again, when you refer to "Biomaterials Society", that is generally the American meetings, usually held in an American city.

There is also a Canadian Biomaterials Society, and again, I haven't attended all the meetings, but that is a much smaller group, but I have attended those meetings frequently as well.

Q. And when did you last attend the American association meeting?

A. Probably -- I'm having a little trouble remembering, but I mean, not in the last four or five years, but I think it may have been perhaps 2001. I'm not absolutely sure of that.

Q. And when did you last attend the Canadian biomaterials group?

A. It would have been I think probably about -- maybe about 2003.

Q. Now, how many peer-reviewed articles do you have listed on your curriculum vitae, approximately?

A. Oh, I know it is in excess of 160.

Q. And how many of those have been published in Biomaterials Society journals?

A. Well, if you mean broadly, if you mean -- well, the subject content being in the biomaterials field, there would be several. I haven't made a count of that, but most of these would have been published in surgical journals or -- I know, for example, the transactions of the American Society For Artificial Internal Organs, which is not the Biomaterials Society, so I'm making that distinction.

Q. Right.

A. There would be several. I haven't made an exact count.

Q. So fewer than five articles out of the 160 would be on biomaterials topics?

A. Sorry, did you say --

Q. I'm asking whether it would be fewer than five articles of the total 160, or thereabouts, that you have published are in the area of biomaterials?

A. No, it would be more.

Q. More? More than 10?

A. I think more than 10, yes.

Q. More than 15?

A. I think so.

Q. And do any of those relate to mechanical heart valves?

A. Yes, there are a few on mechanical heart valves, and I know I have provided these to you. For example, there is a paper in the Journal of Thoracic and Cardiovascular Surgery in 1988 based on the Bjork Shiley valve; in fact, Dr. Bjork, the developer of that valve, was I believe the lead author on that article, looking at a change in the coating, actually using a porous metal coating, for components in that valve, and it was quite an extensive study in goats. And so that is an example.

Q. And what was your role in that publication?

A. My role was as the pathologist who looked at the valve explants from those animals.

Q. From the goats?

A. Yes.

Q. Okay. And have you looked at any other mechanical valve explants from animals other than the goat study for the Bjork Shiley valve?

A. I have looked at some -- in terms of a functioning valve prosthesis, it would only relate to the Bjork Shiley valve or modifications thereof.

There was some earlier work that was involved using Starr Edwards valves, really just using the valve cages; it wasn't a functioning valve. And that was to look at the healing properties, again, relating to these porous metal surfaces. It was a paper published in the American Society for Artifical Internal Organs transactions in 1976 as another example.

But in terms of a functioning prosthesis that was used in man, at least in, if you will, the control form of the valve, the non-modified form, as a mechanical valve prosthesis it would only be the Bjork Shiley valve.

I have done some other work having to do with bioprosthetic heart valves, but they are distinct from mechanical valves. In fact, much of the work that I did later on after the '80s, going into the '90s, in the context of prosthetic heart valves was really in bioprosthetic heart valves. There was a paper that was published, if I remember correctly, in I think it was the Annals of Thoracic Surgery in 1995 that deals with, again, an experimental study of animal implants but for a bioprosthetic -- for a bioprosthesis rather than a mechanical valve.

Q. You have never taught material science?

A. I have given some lectures at the University of Toronto, but I have not taught a formal course in biomaterials science. I have given some lectures to students in biomedical engineering at the University of Toronto but not taught a formal course.

Q. Let's finish up our discussion of the 54 valves that you have looked at, the pictures that you have looked at. We didn't quite finish that; I think we got side-tracked on some other things.

As you pointed out, I think, Dr. Schoen has looked at similar explants of conventional valves and, trying to use your rating system, has shown examples in conventional, in other words, non-Silzone valves, of the same kind of healing that you observed in the Silzone valves; correct?

A. That's correct.

Q. And have you had the opportunity to look over the chart in Exhibit "E" of Dr. Schoen's --

A. Yes, I have.

Q. And similarly, the pictures are attached, starting with SJ-403?

A. Yes, and I have looked at those photographs.

Q. Okay, so let's try a global question, and then I'll get specific.

There is a total of 25 valves for which there are photographs; correct?

A. That's correct. I counted 25 earlier before coming here today when I looked at the pictures.

Q. And did you have an opportunity to look at the pictures?

A. I did.

Q. And compare them to the rating that Dr. Schoen assigned to each?

A. I looked at the photos. I didn't check them methodically against the grades that he assigned, but I think that they do cover the range of grades that I reported. And I'm not taking issue with the grades assigned by Dr. Schoen, but I haven't actually checked them in detail.

Q. Okay, well, just for example, let's take a look at SJ-403, which was explanted at five months. He gave it a -- it is the picture behind that tab. Would you agree that this shows minimal healing?

A. It does, and I think it does correspond with what I call Grade A, yes.

Q. Okay. So using your definition of normal, this would be abnormal?

A. Correct.

Q. And are you able to tell us why in an explant of five months the abnormal healing occurred?

A. In this particular valve, no, I can't say that.

Q. Okay. And then looking at the next one, which is one that was SJ-262, taken out at seven months, the picture is not as good, it is more difficult to see, but would you agree that this shows abnormal healing?

A. I do.

Q. Okay. And then we go to HP-138 and that was taken out at 22 months. Would you agree the healing there is also abnormal?

A. I agree.

Q. If you could go to RT-593?

A. I'm having a little trouble locating --

Q. It is the very last photograph actually, explanted at 15 months.

A. Yes, I see that.

Q. How would you characterize the healing there?

A. That is abnormal.

Q. In what way?

A. And there is I think excessive

pannus buildup on the sewing ring and not uniformly around but certainly excessive. And there is also thrombus and some thrombus that extends into the orifice of the valve, and it would seem apparent that it is at least partially blocking the occluder mechanism.

Q. All right, and so would you characterize this as abnormal?

A. Yes.

Q. And do you have any opinion as to why there was an excessive amount of pannus that developed in this individual, at least by 15 months?

A. I don't think I -- because I have only this gross photograph to view, I have not reviewed the Field Experience Report that companies it. There might be some information there that might be relevant, but I have not done that. I would say that I cannot say.

What I can say is that this is not a Silzone valve and, to the extent that Silzone contributes to excessive pannus buildup and/or contributes to thrombus formation, thrombus on the sewing ring that can extend to involve the occluder, you know, it hasn't been caused by Silzone.

My point being that, you know, I have expressed the opinion in my affidavits already that I think Silzone does make a significant contribution to

this type of abnormal healing response, but nowhere in my affidavits have I stated or suggested that a specific amount of pannus buildup or thrombus, whether limited to the sewing ring or extending into the lumen of the valve, is something that cannot be observed with the non-Silzone heart valves.

In fact, in response to this issue being brought up earlier by Dr. Schoen as a general issue, you know, I have responded that you can see these things with non-Silzone valves. And I believe somewhere -- I was having a little trouble locating it a couple of minutes ago, but in Dr. Schoen's February 2006 declaration, he I believe states or infers that I am -- and basically puts words in my mouth, so to speak -- that I am treating Silzone as being unique in respect to the findings on the 54 valves. But in fact, that is not what I had presented in my February 2003 affidavit on this point. Rather, I presented these as numerous additional instances of the patterns of abnormal healing that I was seeing in the smaller set of valves that I had looked at in detail from the -- predominantly from the Canadian patients.

So I do want to make this clear, that, you know, I have not stated that the findings that Dr. Schoen illustrates here are unique to Silzone.

Q. Okay. In fact, if you look at this collection of 25 photos, isn't this pretty convincing evidence that the exact same kind of healing response that you observed in Silzone happens in conventional valves?

A. No, I wouldn't agree with that wording. I think that the gross appearances that you see, this type of photograph of the whole valve, you can see similar findings on the Silzone or non-Silzone valve. I would agree that you could have a photograph of a valve or a couple of photographs of a valve and not know whether it is Silzone or not and look at it and not know from those gross photographs one way or the other whether it is Silzone or not Silzone.

But these are just gross photographs. If one looks at the histology, then I think one will see differences between the Silzone and non-Silzone valves. And again, by extension to some of the points that I think we were dealing with earlier, it does come back to what is the relative prevalence of these sorts of abnormal -- the relative prevalence of these gross findings on the valves between the two types of Silzone and non-Silzone. And I think the histology of the Silzone valves gives very useful information in terms of ways in which the silver can contribute to adverse

does impede healing, frustrates healing, a term that I used in my first affidavit in February 2002, and that we know the toxicology of silver.

When you put it all together, the Silzone is making a significant contribution to impaired, adverse healing on the valves, the Silzone valves that are implanted in patients, and that is something that is then, if you will, superimposed on top of, in addition to, potential adverse healing responses that one would see without the Silzone.

Q. And so if we see the kinds of findings that we have observed in these 25 valves described by Dr. Schoen that are not Silzone, without looking at clinical information, you are not able to tell us why these abnormal findings occur; am I right?

A. Not specifically. I mean, excessive pannus buildup on a conventional valve, we know that thrombus that forms on the sewing ring can be, over time, reasonably expected to be organized into pannus. So in a general sense, I would expect that excessive pannus buildup on a conventional valve, that it is quite likely that earlier thrombus deposition has played a role in that.

So there is some generalities one can state about the conventional valves, but in terms of

specifically attributing, say in the case of RT-593 that we have just been looking at, just what has happened, why it has happened in a clinical valve explant, you know, I'm not able to say just based on the gross photograph or photographs.

Q. Okay. Now, one of the studies you have referred to several times is a study in I believe it was hamsters, is that right, called Kraft?

A. That's correct. Kraft is the first author of that study.

Q. And that is a study that you have read and are familiar with?

A. Yes.

Q. And that was a study of at least three different biomaterials; correct?

A. Yes, my recollection is that included stainless steel, titanium and silver.

Q. And have you ever done hamster studies?

A. No, I have not done hamster studies, no.

Q. Have you ever done implant studies in animals using either silver or titanium or stainless steel, the materials that were used in the Kraft study?

A. Well, I have been involved in

the logic is obvious that one would interpret that two samples were taken, as I have explained in paragraph 55.

Q. Okay. Have you ever shown this language to, say, five independent pathologists and asked them if they thought this meant one sample versus two?

A. No, I have not done that.

Q. So the only person who has come up with the two-sample interpretation is yourself, is that correct, as far as you know?

A. As far as I know, yes.

Q. All right. Who was the pathologist at the FDA who reviewed the Silzone submission?

A. Again, I have just forgotten his name. I know of this pathologist. For some reason I'm just blocking out his name. I'll try to recall it for tomorrow.

Q. Now, one of your criticisms of St. Jude is that they somehow didn't provide sufficient information to the FDA about the excess pannus on animal number 8 in the long-term study; am I right?

A. You are correct.

Q. Okay, and that was the animal that St. Jude was concerned enough about it to send it to Dr. Schoen for an independent assessment; correct?

A. Perhaps I should go back. I'm

perhaps a little tired here at the end of the day. The first question you asked me on the subject, could it be just read back to me?

Q. Sure.

THE REPORTER: "Question: Now, one of your criticisms of St. Jude is that they somehow didn't provide sufficient information to the FDA about the excess pannus on animal number 8 in the long-term study; am I right?"

THE WITNESS: Yes, I think so, and the reason I asked for it to be read back was the wording of it. It was communicated to the FDA that there was excess pannus. It was -- what I was and am critical of is the way in which this information was presented.

BY MR. KOHN:

Q. Okay, so the FDA was told there was excess pannus; that's correct, isn't it?

A. Yes.

Q. They didn't conceal that fact from the FDA?

A. That's correct.

Q. In fact, they even sent the histology from that animal to Dr. Schoen for an opinion?

A. I don't believe they sent the

JUL 1 0 2006
BY:



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC. }
SILZONE HEART VALVES } MDL DOCKET NO. 1396
PRODUCTS LIABILITY }
LITIGATION }

--------

--- This is the Continued Deposition of Dr. Gregory J. Wilson, taken at the offices of Lerners LLP, 130 Adelaide Street West, Suite 2400, on the 22nd day of June, 2006.

--------

DISK ENCLOSED

level, the concentration in the annular tissue for SJMII-8, one with a very thick pannus, was several times higher than the next highest and --

Q. Let me re-ask the question, Doctor. All I'm asking is one simple thing. Anywhere in the PMA submission, whether it was in the summary or in the appendices, was the silver concentration level for animal number 8 of the annular tissue submitted to the FDA; yes or no?

MR. BERMUDEZ: Do you want him to do this by memory, or do you want to show him the documents?

MR. KOHN: I'm asking the question, Counsel. If he wants to refer to the document, you can give it to him.

MR. BERMUDEZ: Do you want to see the document or not?

THE WITNESS: Well, I think I would. And let me just say that I have seen the summary that went to the FDA; I think it was 19 pages, just from memory. I have seen a lot of the data from the study. I have not seen the -- I have certainly not seen all of the appended material that went to the FDA, so --

BY MR. KOHN:

Q. Why didn't you ask for it? You have had five years to ask for it. Why didn't you ask

for it? Wouldn't that have been informative to have the entire PMA submission so you could make an informed judgment about what St. Jude Medical did or didn't submit to the FDA?

A. Yeah, I think with the advantage of hindsight now, it would have been advantageous in terms of me answering this specific question.

Q. So when you filled out all these affidavits and you made all these criticisms of St. Jude Medical about its deficient submissions, you had never even seen the complete submission; am I correct?

A. Not all the appended material, no.

Q. So you are operating on incomplete information, are you not?

A. In respect to seeing all of the material appended, I would have to say that's correct.

Q. Okay.

A. However, what I do not know is whether that particular concentration in that particular valve, annulus, was actually submitted to the FDA. Can I see the document?

Q. It is up to your counsel. I'm not here to give you anything, Doctor. I'm here to ask you what you reviewed and what your opinions are, and if you haven't seen it, I'm sorry, but that's the way it is.

don't think is the really substantive issue.

I think the substantive issue, and I said so in my declaration, is that St. Jude didn't disclose this in a fulsome, proper way to the FDA and draw attention to it.

I think it is well known that the FDA reviewers receive a lot of submissions; they are very busy dealing with them. The submissions tend to have large amounts -- and I am talking generally from numerous medical device companies -- large amounts of supplementary material in the form of appendices. And I think that the FDA does expect companies to be honest and forthright and to bring attention to any problematic issues in their animal studies in the summary they provide for the FDA, not to bury, so to speak, a bit of awkward -- maybe more than awkward, a bit of adverse but potentially extremely important adverse data somewhere in the voluminous appendices at the back of an application.

Q. Did the reviewers at the FDA read the appendices, Doctor?

A. I do not know that.

Q. How much time did the reviewers at the FDA spend reviewing the PMA Supplement?

A. I can't -- I don't know that in this particular case.

Q. How many FDA reviewers looked at the PMA Supplement for the Silzone valve?

A. I don't know that.

Q. How many other submissions were competing with the St. Jude Medical Silzone submission at the time they reviewed the submission, Doctor?

A. I don't have that information.

Q. Over how many months did the FDA -- how many months did the FDA spend from the time the document, the PMA submission, was given to the FDA before they decided to give approval?

A. Well, the FDA -- the submission I think went in in May of '97, if I remember correctly, and the disapproval letter was sent I think it was December 15th, '97. There was then a very rapid response from St. Jude December 19th, and then I think the approval occurred fairly early in the new year of '98 -- well, I think it was actually March 24th of '98.

But in terms of how long the FDA had the file, that is not an indication; it is not as if they are working on that 24 hours a day during the time --

Q. You don't know how much they worked on it, do you, Doctor?

A. No, I don't, but the way your question was worded I thought might be taken to suggest

that the FDA was in some way continuously working multiple periods of time on this over a period of several --

Q. Well, for all you know, they may well have been; isn't that right? You have no idea?

A. Well, I wouldn't say I have no idea. I have enough knowledge about how the FDA works in general --

Q. Well, let's explore that. Why don't you tell me how many PMA submissions they reviewed between May of '97 and the time they approved the Silzone valve in March 1998, how many?

A. Well, I can't -- and if you are talking about -- I can't give you that level of detail.

Q. Okay, but we can agree on one thing, can we not. The FDA had the PMA submission for ten months before they approved it; isn't that correct?

A. Yes, I think that's approximately right.

Q. Well, fair enough, thanks.

Now, you are acquainted with Dr. Steven Factor.

A. I am.

Q. And you have read his submission in this litigation?

That was really the focus of my attention on that case --
Q. I understand.
A. -- on KTMV-2.
Q. In arriving at the opinion that St. Jude Medical potentially gave false or incomplete information to the FDA, even though you had photographs documenting the presence of bacteria, you hadn't looked into them and you hadn't tumbled to that fact; isn't that correct?
A. That is correct. It is only recently that we did that analysis.
Q. It wasn't until you got Dr. Factor's report that pointed that out very directly that you discover it for the first time; isn't that right?
A. Yes, that is true, but I would make what I think is a very important distinction, and that is that these bacteria are postmortem growth of bacteria. This --
Q. Well, we'll get to that in a minute, whether they are postmortem or not. The fact of the matter is, Doctor, when you submitted this affidavit being critical of St. Jude Medical, you had no idea there was bacteria present in those photomicrographs, even though you had them in your possession; am I correct?

I won't read that.
So my focus in this declaration is on what St. Jude knew versus what they actually disclosed to the FDA and --
Q. Now, you knew this document was going to be submitted to a U.S. court; isn't that right?
A. Yes.
Q. And in here you were expressing certain opinions about why this animal might have died; isn't that right?
A. I was raising a reasonable possibility that --
Q. You were postulating hypotheses? A reasonable possibility is a hypothesis until it is proven; isn't that right?
A. That seems a reasonable statement, but I'm emphasizing what I have said earlier, that given the toxicity of silver, given the findings in this particular sheep, there should have been a thorough investigation done.
Q. I understand that's your position, Doctor. To this day, to this day, your opinion that the death of KTMV-2 was possibly caused by silver toxicity is still unproven; isn't that right?
A. That's true. I certainly would

accept that, and the wording I chose in the declaration only raised it as a possibility but one that, given -- I won't repeat it all again -- but, given what St. Jude knew, should definitely have been pursued and should have been reported forthrightly and brought to the attention of the FDA.

Q. Okay. Now, we can also agree that all of the other animals in the short-term study survived to the term of the study; is that correct?

A. That's correct, they survived to the four- to five-week, roughly one-month, term.

Q. And there wasn't any evidence of any toxic effect of silver in any of the other animals in that study; isn't that correct?

A. Well, the healing was reasonably well developed. I think it is -- yeah, I think there wasn't any obvious indication at four to five weeks of toxicity of silver.

Q. And the same thing is true in the long-term study; there was no obvious indication of any toxic effect of silver on any of the animals in the long-term study?

A. Well, the long-term study you are referring to is the 10-week study?

Q. The 10-week study.

same valve?

BY MR. KOHN:

Q. Right.

A. I think yes, but I think here, I think looking at the pivot guards on the valve, I think this does look to me to be a St. Jude valve.

Q. Okay. By the way, yesterday when we were talking about your experience with explanted valves, and we talked about Medtronic and CarboMedics, and you indicated to me that you had never seen an explanted valve of one of those manufacturers from an adult, as I recall your testimony.

Let me ask you the same question with respect to the St. Jude Medical valve. Prior to being involved as a consultant, expert in this litigation for the Plaintiffs, had you ever seen an explanted St. Jude Medical valve from an adult?

A. My hesitation is this. The valve was introduced in the late '70s, and I was just completing -- if I had have seen it, it would have been in the context of my residency training with Dr. Silver, which was completed in terms of my stay with him in '79/'80. So I can't recall.

I can certainly ~~say I have~~ not seen one explanted from an adult, handled it, looked at it,