IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE ST. JUDE MEDICAL, INC.,<br>SILZONE® HEART VALVES PRODUCTS<br>LIABILITY LITIGATION | MDL DOCKET NO. 1396 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' BIOMATERIALS EXPERT KEVIN E. HEALY PURSUANT TO FEDERAL RULE OF EVIDENCE 702**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....... 1

II. SUMMARY OF DR. HEALY'S BACKGROUND, OPINIONS, AND OBJECTIONS THERETO ....... 4

A. Dr. Healy's Experience And Qualifications ....... 4

III. IMPERMISSIBLE SCIENTIFIC OPINIONS ....... 7

A. Opinion #1: All Silzone® Patients Likely Suffered Tissue Damage Due To The Silzone® Valve And Therefore Are At Higher Risk Of Future Medical Complications ....... 7

1. There Is No Evidence That Silver Causes Tissue Damage ....... 8

2. There Is No Evidence That Silzone® Results In Any Adverse Medical Event ....... 12

3. Dr. Healy Is Not Qualified To Diagnose Purported Tissue Damage Suffered Or Likely Suffered By All Silzone® Patients ....... 14

B. Opinion #2: SJM Should Have Been Concerned By The Alarming Corrosion Rate Of The Silzone® Coating ....... 15

C. Opinion #3: The Silzone® Coating Was Not A Proper Or Suitable Biomaterial For Human Cardiac Implantation, And Silzone® Coated Prosthetic Heart Valve Products Were Defective ....... 18

D. Dr. Healy's Scientific Opinions Are Inadmissible Under Rule 702 and Daubert ....... 19

IV. IMPERMISSIBLE FDA OPINIONS ....... 26

A. Opinion #1: The Silzone® Valve Should Have Been Classified As A "Combination Product" Consisting Of A Drug And Device ....... 26

1. Dr. Healy's Legal Opinion Regarding The Proper Classification Of The Silzone® Valve Is Barred By Federal Law ....... 26

2. Legal Opinions From Purported Experts On Applicable Law Or Alleged Violations Of Law Are Neither Necessary Nor Admissible ....... 29

3. Dr. Healy's Methodology In Critiquing The FDA's Action Is Grossly Flawed....30

4. Dr. Healy Should Not Be Permitted To Speculate About the FDA's Or St. Jude's Motives Or To Give "Factual" Accounts....31

5. Dr. Healy Is Unqualified To Render An Opinion Regarding FDA Regulations....33

B. Opinions #2, #3, and #5: SJM Failed To Provide The FDA With Scientific Literature Suggesting That Silver Would Likely Impair Tissue Healing, As Well As Data Relating To The Sheep "KTMV-2"....34

1. Dr. Healy Is Neither Qualified Nor Has A Basis To Testify About SJM's Submissions To The FDA....35

2. Dr. Healy Cannot Show That Additional Articles Or More Information On KTMV-2 Was Relevant To Approval....36

3. Opinion #4: The 300 Parts Per Billion Value Relating To Potential Silver Toxicity Levels Is Not A Recognized Scientific Standard, Is Not Supported By The Literature Cited By SJM, And Was Therefore Misleading....40

V. CONCLUSION....44

# I.

# INTRODUCTION

Kevin E. Healy, Ph.D., plaintiffs' generic biomaterials expert, proffers unreliable and admittedly unsupported scientific, medical, and FDA opinions that violate Federal Rule of Evidence 702. In four long, unfocused declarations submitted over the last four years in the Canadian Silzone® class action and in this litigation, Dr. Healy asserts several opinions about the Silzone®-coated mechanical heart valve. His opinions fall into one of two categories: (1) "scientific" opinions concerning the effects of using silver as a medical device coating; and (2) criticisms regarding St. Jude Medical's ("SJM") regulatory submissions, particularly its Pre-Market Approval ("PMA") submission to the Food and Drug Administration ("FDA").

First, Dr. Healy proposes that Silzone® is defective because silver from the coating sets off a chain of events leading to a chronic inflammatory response, which increases the risk of medical problems in valve recipients. His other "scientific" opinions are all related or part of this hypothesis, which he admits is unproven and untestable.

During his deposition, Dr. Healy made several key admissions that render his opinions concerning the quality of the Silzone® coating or its effects untenable. For example, although it is fundamental to his theory, Dr. Healy (i) does not know if silver has actually come off the valve in any implant patient, (ii) does not know how much silver might cause a harmful effect if it did, (iii) does not know if any patient actually has

a CIR from silver, (iv) concedes there is no way to measure such a CIR, and (v) cannot give an estimate of the increased risk Silzone® patients might face because of the valve. In fact, knowing that he lacked facts to support his suppositions, Dr. Healy asked plaintiffs' counsel if he could test tissue from explanted Silzone® valves to determine if it actually contained silver. To date, he has not received their permission.

Second, Dr. Healy's regulatory criticisms center on the FDA's classification of the Silzone® heart valve as a medical device instead of as a combination drug and device product. Though he admits that the FDA has the authority and scientific experience to make this determination, he simply disagrees with them. Likewise, he disagrees with European Union's (i.e. TUV) regulatory classification of the Silzone® valve as a medical device. Dr. Healy's attempt to usurp the FDA's authority and become a one-man regulatory body for the world is improper and barred by law.

As part of SJM's PMA submission, the company included a literature search on silver toxicity. Dr. Healy criticizes SJM for not including an additional nine articles mostly concerning *in vitro* (laboratory) tests on the use of topical silver salts or other silver applications in medicine. Ironically, Dr. Healy previously submitted a declaration in which he argued that these types of articles are not relevant to evaluating the safety or efficiency of Silzone®. Thus, the nine articles in question admittedly do not meet the criteria for relevance that he himself has established. Most importantly for purposes of admission of this opinion, Dr. Healy admits that the FDA was aware of the

issues raised by the articles and had qualified persons to evaluate those issues, and he cannot rule out that the FDA actually did consider these articles, fundamentally undermining his opinion.

During the development of Silzone®, SJM performed animal studies in which sheep were implanted with the device. During one of the studies, a sheep ("KTMV-2") died most likely because the surgeon did not attach (suture) the valve properly. Dr. Healy admits that SJM told the FDA about KTMV-2, but suggests that it should have supplied additional information. However, during his deposition, Dr. Healy admitted that he does not know why KTMV-2 died and cannot attribute the cause of death to Silzone®. Thus, he cannot establish why additional information would be relevant.

Further, despite offering medical and toxicology opinions and interpreting regulatory rules and definitions, Dr. Healy admits to having no experience or training that would qualify him in these fields. Furthermore, he did not try to educate himself on the particular issues in this case and did not review the files, materials, and depositions related to the scientific and FDA issues he raises. In fact, Dr. Healy did not even read the full text of documents and depositions cited in his declarations and ultimately admits that they were cherry-picked for him by plaintiffs' counsel.

In short, none of Dr. Healy's opinions are supported with facts or data and

none have been shown to be scientifically reliable or even possible. Moreover, Dr. Healy lacks the proper qualifications to offer any of his opinions. SJM accordingly moves to have Dr. Healy precluded from testifying at trial.

## II.

## SUMMARY OF DR. HEALY'S BACKGROUND, OPINIONS, AND OBJECTIONS THERETO

### A. Dr. Healy's Experience And Qualifications

Dr. Healy is a professor of Bioengineering and Material Science. His opinions are contained in his Rule 26 Declaration and in the four declarations attached thereto. *Rule 26 Declaration of Kevin E. Healy, Ph.D.* (*"Rule 26 Decl."*), ¶¶3-4, Exh. 1 to Affidavit of Tracy J. Van Steenburgh ("Van Steenburgh Aff."). Although Dr. Healy has a background in medical devices, he lacks the necessary qualifications to offer his proposed testimony on the medical device at issue, a mechanical heart valve with Silzone® coated sewing cuff:

- Dr. Healy has never worked with any type of silver implant, let alone silver-coated medical devices such as the Silzone® valve. *Deposition of Kevin Healy ("Depo.")*, 100:5-15, Exh. 2 to Van Steenburgh Aff. Dr. Healy's first work experience with any silver-coated medical device was this litigation. *Id.* at 100:5-8.

- He has never performed any experiments analyzing silver in the body and has never discussed silver-related research with any independent scientist. *Id.* at 100:16-18, 110:3-7.

- Dr. Healy admits that he is not a medical doctor, clinician, epidemiologist, toxicologist, or pathologist. *Id.* at 12:14-13:3, 24:20-25:9.

- Although he describes himself as an expert in material design, Dr. Healy's work in this area has involved only two types of medical devices – orthopedics and stents – *not* mechanical heart valves. *Id.* at 101:12-22.

- He has never worked for the FDA or for any regulatory affairs department of a medical device manufacturer. *Id.* at 149:22-150:7.

- Despite serving as plaintiffs' expert for several years, Dr. Healy has not looked at or examined a single Silzone® valve.

Thus, nothing in his background qualifies Dr. Healy to testify concerning the effects of the silver coating on Silzone® valve recipients or on the quality of SJM's regulatory submissions.

Nevertheless, Dr. Healy makes numerous sweeping opinions about the Silzone® mechanical heart valve, ranging from the clinical impact of Silzone® on patients to the interpretation and application of FDA regulations on the Silzone® valve. The following chart summarizes the types of opinions Dr. Healy offers, what those opinions are, and SJM's objections to them. Each of these opinions and their deficiencies are discussed in detail below.

| No. | Type Of Opinion | Opinion | Objections |
|---|---|---|---|
| | | **SCIENTIFIC AND MEDICAL OPINIONS** | |
| 1 | Clinical Diagnosis Opinion | Silzone® patients all likely suffered tissue damage due to the Silzone® valve and thus are at a higher risk for future medical complications. *Affidavit of Kevin Healy ("Aff.")*, 2/20/03, ¶¶56-60, Exh. 1(c) to Van Steenburgh Aff. | § Outside area of expertise/not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 2 | Biomaterials Opinion | SJM should have been concerned about the alarming degradation or corrosion rate of the Silzone® coating. *Decl.*, 5/13/03, ¶4(H), Exh. 1(e) to Van Steenburgh Aff. | § Lacks foundation<br>§ Unreliable |
| 3 | Biomaterials and Legal Opinion | The Silzone® coating was not a proper or suitable biomaterial for human cardiac implantation, and Silzone® coated prosthetic heart valve products were defective. *Rule 26 Decl.*, ¶4. | § Outside area of expertise/not qualified<br>§ Lacks foundation<br>§ Unreliable |
| | | **FDA OPINIONS** | |
| 1 | Regulatory and Legal Opinion | The FDA should have classified the Silzone® valve as a "combination product" consisting of a "drug" and "device." *Decl.*, 5/13/03, ¶4(C), Exh. 1(e). | § Irrelevant<br>§ Outside area of expertise/not qualified<br>§ Unreliable |
| 2 | Regulatory and Legal Opinion | SJM failed to provide the FDA with scientific literature suggesting that silver would likely impair tissue healing. *Decl.*, 5/13/03, ¶4(D), Exh. 1(e). | § Irrelevant<br>§ Outside area of expertise/not qualified<br>§ Unreliable |
| 3 | Regulatory and Legal Opinion | After receiving approval for the Silzone® valve, SJM failed to provide the FDA with additional negative scientific literature suggesting the potential toxicity and biomaterial unsuitability of silver. *Decl.*, 5/13/03, ¶4(E), Exh. 1(e). | § Irrelevant<br>§ Outside area of expertise/not qualified<br>§ Lacks Foundation<br>§ Unreliable |
| 4 | Regulatory, Legal, and Toxicity Opinion | The 300 parts per billion value relating to potential silver toxicity levels is not a recognized scientific standard, is not supported by the literature cited by SJM, and was therefore misleading. *Decl.*, 5/13/03, | § Irrelevant<br>§ Outside area of expertise/not qualified |

| No. | Type Of Opinion | Opinion | Objections |
|---|---|---|---|
| | | ¶4(F), Exh. 1(e). | § Lacks Foundation<br>§ Unreliable |
| 5 | Regulatory and Legal Opinion | SJM failed to disclose information about the short-term animal study sheep "KTMV-2" to the FDA, thereby hampering the FDA's review of the Silzone® valve. *Decl.*, 5/13/03, ¶4(G), Exh. 1(e). | § Irrelevant<br>§ Outside area of expertise/not qualified<br>§ Lacks Foundation<br>§ Unreliable |

## III.

## IMPERMISSIBLE SCIENTIFIC OPINIONS

### A. Opinion #1: All Silzone® Patients Likely Suffered Tissue Damage Due To The Silzone® Valve And Therefore Are At Higher Risk Of Future Medical Complications

Dr. Healy opines that "all Silzone® valve patients have likely suffered local tissue damage." *Aff.*, 2/20/03, ¶¶56-60, Exh. 1(c). This opinion is based on a series of scientific and medical assumptions that must all be shown to be true in order for the theory to have any reliability. Dr. Healy argues that all of the silver coating leaches off Silzone® valves and created a concentration gradient, which he defines as an area of tissue around the valve with high quantities of silver. This concentration gradient, in theory, causes a chronic inflammatory response ("CIR") in the exposed tissue. Because of this CIR, Dr. Healy theorizes that all Silzone® valve recipients have a higher risk of experiencing medical problems, including paravalvular leak or thromboembolic events. *Aff.*, 2/20/03, ¶56, Exh. 1(c); *Depo.*, 5:1-12. This theoretical problem with silver leaching

also underlies Dr. Healy's opinion that the device may be "defective." In deposition, however, he admitted to having no evidence that any of the hypothetical steps in his proposed sequence actually takes place.

### 1. There Is No Evidence That Silver Causes Tissue Damage

Dr. Healy's theoretical series of events leading to his opinion that all Silzone® patients have tissue damage begins with the hypothesis that all of the silver is being released (i.e. leaches) from the valve. *Aff. 2/20/03*, ¶¶56-60, Exh. 1(c); *Depo.*, 376:8-15. Dr. Healy admits he has no information to support this first fundamental assumption: he has done no calculations to determine how fast silver might come off the valve, and cannot predict overall mass loss. *Depo.*, 381:13-382:13. He cannot give an estimate for when or if silver will leach off the valve. *Id.* at 382:14-25.

Since the Silzone® valves have now been implanted for more than 5 years, Dr. Healy was asked whether he had any information on whether silver had been leaching during that time period and when in the future he believed it might come off the implanted valves. However, neither Dr. Healy nor anyone else has done any experiments to determine the amount of silver coming off the valve in the 5 years after implantation. *Depo.*, 377:8-16. He did not know when the silver would leach off, or whether that might happen in one year or ten years. *Id.* at 130:11-131:1. In fact, he has no information at all on how long the silver will remain on the valve. *Id.* at 132:1-19.

Dr. Healy thought that "black particulate" seen in the tissue of animals that were implanted with Silzone® valves might be a sign that silver was "spalling" (i.e. flaking) off the device. *Depo.,* 81:23-82:11. But he has not determined if the particulates were actually silver or whether they came from the coating. *Id.* at 81:23-83:9. Dr. Healy noted there was an easy test to run to determine if silver is present in tissue adjacent to explanted Silzone® valves. *Id.* at 83:13-85:15. Realizing that there was no evidence of silver coming off the device, he asked plaintiffs' counsel 3 or 4 years ago for permission to test tissue samples to determine if silver was present. To date, however, he has not been given their go ahead to conduct this assay. Thus, Dr. Healy has yet to perform any test that confirms that silver is actually present in the tissue. *Id.* at 85:7-25, 89:2-92:7.

Dr. Healy's next assumption is that once the silver comes off the Silzone® valve it forms a silver concentration gradient in the adjacent tissue and that the amount of silver in this region can cause cell damage. *Depo.,* 388:15-389:7. Dr. Healy also lacks information supporting this assumption. He does not know the quantity of silver within such a gradient, and he has never attempted to measure it. *Id.* at 364:7-365:4, 367:7-368:3. In fact, he did not know the amount of silver that was applied to the valve in the first place, and so did not even know the potential amount of silver that might be deposited. *Id.* at 273:20-274:9. Not only is there no information concerning how much silver might be in his hypothetical concentration gradient, but Dr. Healy explained that there is no way to obtain such data. *Id.* at 366:24-367:6. Thus, Dr. Healy admitted that there is no feasible methodology to measure the concentration gradient in Silzone®

patients:

> Q: That was going to be my second question, whether there is some type of experimental methodology that could be used to establish a silver concentration gradient in a Silzone valve recipient?
>
> A: Not a human recipient.
>
> Q: Okay. Obviously then that hasn't been done?
>
> A: I hope not.

*Id.* at 366:24-367:6. Hence, Dr. Healy has not and cannot establish that his proposed concentration gradient exists in plaintiffs.

Dr. Healy, likewise, lacks evidence to support his assumption that the proposed build-up of silver causes a CIR in Silzone® patients. His theory is that Silzone® recipients have a low-grade CIR to the silver contained within his hypothetical concentration gradient, which in turn may develop into a clinical problem. *Depo.*, 37:10-38:18. But as he explained, the only way to confirm if a person has such a CIR is to do a biopsy of the tissue in question. *Id.* at 35:9-36:13. Dr. Healy has no knowledge of such a biopsy being performed on any Silzone® recipient. *Id.* at 36:15-25. Thus, since the only way to determine that the recipients have a CIR is a biopsy and that has not been done, then he cannot confirm that any of them actually have that condition:

> Q: So in order to determine whether or not they actually had

such a chronic inflammatory response ongoing within
their body, would you, Doctor, have to do a biopsy?

A: I think for absolute confirmation, yes.

Q: Well, is there anything you could do less of absolute? …

A: Not at this time.

*Id.* at 35:9-36:13. Likewise:

Q: And since today, as we sit here, you have no knowledge
of the results of any such biopsy or examination of a
patient's tissue, you have no confirmation that indeed any
of the people who presently today have a Silzone® valve
implanted have the chronic inflammatory response that
you suggest; is that correct?

A: Correct in how you phrased the question currently… .

*Id.* at 39:8-20. Further, according to Dr. Healy, such testing would be virtually impossible and, in fact, would not be recommended by him. *Id.* at 38:19-39:7.

Hence, Dr. Healy confirmed that his theory —that silver from the valve has caused damage in surrounding tissue—is only an untested and untestable hypothesis. He admitted:

Q: So at this point when you're talking about all Silzone®
valve recipients having likely suffered a local tissue –
excuse me – having suffered local tissue damage, this is in
the way of a hypothesis; is that correct?

> A: It has – well, so the word hypothesis is – is true. It's hypothetical… .

*Depo.*, 79:18-80:13. Likewise:

> Q: Is it fair to say at this point that the theory that there's a low grade chronic inflammatory response in all of the Silzone® valve recipients is a theory but it has not been proven?
>
> A: It's not been proven and the theory is a loose term. I would suggest you could say it is a hypothesis, that's true, and one would argue then for further testing.

*Id.* at 247:10-17.

Tellingly, Dr. Healy has never conducted that further testing, and has never published or even attempted to publish his hypothesis or presented it at any scientific meetings, and he has no plans to do so. *Depo.*, 95:16-25. He has not considered publication of this "abstract" idea because it would first require additional work to "connect the dots" *Id.* at 96:1-97:12.

### 2. There Is No Evidence That Silzone® Results In Any Adverse Medical Event

Dr. Healy has no evidence that Silzone® might give rise to potential medical problems such as paravalvular leaks ("PVL"), thromboembolic events, or a higher risk of any complication. He conceded: (1) he has not reviewed medical records of any of the Silzone® recipients, [*Depo*., 7:17-8:5]; (2) he knows nothing of the

recipients' medical conditions, [*Id.* at 5:18-6:2, 6:16-25, 7:17-8:5]; (3) he has not seen any pathology on recipients tissue, [*Id.* at 14:3-12]; (4) he does not know what the risk factors are for recipients, [*Id.* at 15:22-16:4]; (5) he does not know what percentage of the current Silzone® valve recipients are manifesting symptoms due to silver exposure, [*Id.* at 27:23-28:19]; and (6) he does not know what percentage of presently asymptomatic Silzone® patients will manifest symptoms in the future, [*Id.* at 30:2-31:8]. In fact, according to Dr. Healy, it is "anybody's guess" when or if a Silzone® patient will experience complications due to the Silzone® coating. *Id.* at 30:2-18.

In regard to specific ailments, Dr. Healy admitted that he could not give an estimate of the number of Silzone® recipients who will develop a PVL in the future, and that he is not personally qualified to make such predictions based on standard medical tests such as echocardiograms. *Depo.*, 243:8-15. Regarding a risk of increased thrombosis (i.e. excess clotting) in comparison to other coatings, Dr. Healy now admits that there is **no such risk**. *Id.* at 53:14-59:21. He noted that all materials are to some extent thrombogenic and that medical science has not yet invented a material that is not. *Id.* at 17:19-20:19. Moreover, Dr. Healy does not expect there to be a statistically significant difference between Silzone® and uncoated valves in regards to thrombus. *Id.* at 53:14-55:2. He explained that this is because the main factor in clotting is flow dynamics not the surface material. *Id.* at 17:19-19:11. In addition, he acknowledged that the low-grade chronic inflammatory response (which he has postulated but not proven) would also **not cause excess thrombus**. *Id.* at 247:18-248:12.

### 3. Dr. Healy Is Not Qualified To Diagnose Purported Tissue Damage Suffered Or Likely Suffered By All Silzone® Patients

Dr. Healy is not qualified to offer an opinion about the existence of tissue damage among Silzone® patients, the possible medical consequences of such damage, or silver toxicity issues. His own CV, affidavits, and deposition testimony compel this conclusion. Dr. Healy is not a medical doctor, clinician, epidemiologist, or toxicologist. *Depo.*, 24:20-25:9. Nowhere in his affidavits or 28-page CV, [Exh. 1(a) to Van Steenburgh Aff.], does he claim or demonstrate that he has any education, training, experience or expertise in these fields. Moreover, Dr. Healy has never worked with any type of silver implant or analyzed silver levels in the body. *Id.* at 100:5-18. He has not sought out or spoken with any independent researcher about silver outside of the litigation context. *Id.* at 108:14-109:2, 110:3-7. Dr. Healy admittedly knows nothing about any Silzone® valve recipient's medical condition, and he has not reviewed individualized information of any Silzone® patient, including medical histories, histologies, pathologies, or biopsies. *Id.* at 5:18-6:2, 7:17-8:5, 14:3-12, 26:19-27:1, 36:15-25. He has not done any testing whatsoever to determine silver levels in Silzone® patients and he has no knowledge of any such testing done by anyone else. *Id.* at 8:10-18, 14:13-19. Nor does he know at what level silver might be toxic. *Id.* at 360:17-20, 361:8-19.

Dr. Healy's own testimony makes clear that he is not qualified to opine on clinical matters, including the risk of future complications:

Q: Okay. So if a person is asymptomatic today, has no PVL by echocardiogram, you couldn't say that that person is going to develop a PVL in the future to a reasonable scientific certainty?

A: I would defer probably to a clinical expert on that analysis. A clinical projection.

Q: And you couldn't give that opinion?

A: I feel that my opinion is probably better served within the local interaction between the material and the tissue.

*Depo.*, 242:23-243:7; *see also* 25:10-26:13. Indeed, although he has opined that Silzone® causes an increased risk to patients, Dr. Healy admitted that he was not qualified to provide such a prognosis. *Id.* at 25:10-26:13.

### B. Opinion #2: SJM Should Have Been Concerned By The Alarming Corrosion Rate Of The Silzone® Coating

Dr. Healy opines that the Silzone® coating was not inert and had poor corrosion resistance. *Decl.*, 5/13/03, ¶81, Exh. 1(e). However, as previously discussed Dr. Healy's theory that significant amounts of silver have leached off the valve is unsupported, and he has no facts demonstrating such silver loss. Instead, Dr. Healy relies on selected excerpts from laboratory notebooks and preliminary experimental results that he did not investigate, confirm, or understand. These include a notebook entry by Dr. Katherine Tweden and a memo from Bill Holmberg dated August 21, 1996. *Id.* at ¶¶81, 82, 83, 85. But none of these references support his position either.

First, Dr. Healy speculates that a notebook entry by Dr. Tweden meant that "[e]nhanced liberation of silver ions from the Silzone® coating was a design goal." *Decl.*, 5/13/03, ¶81, Exh. 1(e). Presumably, he infers that SJM intended for significant silver to leach from the valve. In deposition, however, Dr. Healy admitted that he was not a "mind reader" and did not know what Dr. Tweden was referring to in her notebook entry. *Depo.*, 386:21-387:8. Dr. Healy did not recall trying to confirm his interpretation by reading Dr. Tweden's deposition and, in fact, acknowledged that he reviewed only 30-40 pages of the deposition despite criticizing her work. *Id*. at 119:17-120:2, 388:10-14.

Dr. Tweden herself explains that her notebook entry meant something else entirely and that Dr. Healy's supposition about its meaning is thus unsupported. Dr. Tweden was exploring ideas about how ionization of silver could be increased over the current model, if that should become desirable because experiments had revealed that silver ionization was occurring at a low rate. *Declaration of Katherine Tweden*, ¶7, Exh. 3 to Van Steenburgh Aff. The idea was never implemented and, thus, these notebook entries cited by Dr. Healy are irrelevant to the Silzone® coating as actually implemented.

Second, Dr. Healy points to an early August 21, 1996 memo (written when the coating was under development) in which Mr. Holmberg questioned whether too much silver was being released. Although Dr. Healy assumes that SJM then did nothing further about the issue, he also admits he does not know what eventually happened.

> Q: So do you have any knowledge of whether or not this situation was resolved?
>
> A: . . . **[T]he direct answer to your question is, no, I don't have any idea if they resolved the – the issue.**
>
> Q: Do you have any idea whether or not the estimate listed here of 200 to 400 angstroms per year of silver being corroded from the valve turned out to be correct?
>
> A: I don't know if it was correct. . . .
>
> Q: Do you know whether or not further corrosion studies were done after the August 21st, 1996 letter?
>
> A: Not off the top of my head, no.
>
> Q: So you don't know whether or not the further corrosion studies showed a lesser rate of corrosion than the 200 to 400 angstroms per year listed in the letter?
>
> A: . . . So, no, I don't know if – if additional corrosion studies were – I don't recall that – if there were additional corrosion studies and what the result of those studies would be.

*Depo.*, 128:15-130:5. As with Dr. Tweden's notebook entry, Dr. Healy can not recall ever reviewing Mr. Holmberg's deposition to obtain more information about the substance of the memo. *Id.* at 124:5-18, 125:24-126:5. Mr. Holmberg, meanwhile, has indicated the question of silver release arose because of a miscalculation and, upon further testing, the leaching rate of the coating turned out to be acceptable. *Deposition of William Holmberg*, 118:2-119:9, Exh. 4.

Dr. Healy's opinion about corrosion rates thus are based on demonstrably false premises about the facts. Such testimony is without foundation, irrelevant, and

inadmissible.

### C. Opinion #3: The Silzone® Coating Was Not A Proper Or Suitable Biomaterial For Human Cardiac Implantation, And Silzone® Coated Prosthetic Heart Valve Products Were Defective

In one line of his Rule 26 Declaration, Dr. Healy opined "within a reasonable degree of scientific certainty" that "the Silzone® coating was not a proper or suitable biomaterial for human cardiac implantation, and that Silzone® coated prosthetic heart valve products were defective." [1] *Rule 26 Decl.*, ¶4. He did not set forth any explanation or reasoning, does not describe his methodology, and does not identify any specific facts or data underlying his opinion. *Id.* Instead, Dr. Healy merely adopts and refers to his prior affidavits to purportedly support his opinion. *Id.* The only "defect" described in those affidavits or in his deposition testimony is the theory that silver from Silzone® forms a silver concentration gradient that causes a CIR. Dr. Healy clarified in deposition that his opinion concerning a "defect" is essentially a restatement of that opinion listed here as #1. *Depo.*, 187:6-17. As discussed, this opinion is hypothetical and lacks factual support.

In addition, Dr. Healy is simply not qualified to opine about the existence

---

[1] In addition to the opinion's other problems, the only product at issue in this case is SJM's Silzone® coated mechanical heart valve. Since the suitability of other Silzone® coated products is not a "fact in issue," Dr. Healy's opinion about other products is irrelevant and also inadmissible. Fed. R. Evid. 702.

of a "defect." He has never examined or tested a Silzone® valve. He has never designed prosthetic heart valves, has no relevant experience with any type of silver-coated implant, and has not done any experiments analyzing how silver operates in the body.

*Depo.*, 100:5-18, 101:12-22. Moreover, as noted above, Dr. Healy has not reviewed the medical histories of any Silzone® valve recipient and has no specific knowledge about the clinical impact of the Silzone® coating on patients. *Id.* at 5:18-6:2, 6:16-25, 7:17-8:5. Nor has he personally examined any pathologies, histologies, or biopsies of any Silzone® valve recipients. *Id.* at 14:3-12, 26:19-27:1, 36:15-25. Tellingly, Dr. Healy has never consulted on any product liability cases and has no experience whatsoever in opining about product-related defects. *Id*. at 109:12-17. Thus, Dr. Healy not only lacks the proper qualifications to offer an opinion about the defectiveness of the Silzone® valve, the opinion itself is devoid of methodology and lacks foundation.

### D. Dr. Healy's Scientific Opinions Are Inadmissible Under Rule 702 and *Daubert*

Under Rule 702 and the U.S. Supreme Court's trilogy of decisions on the admissibility of expert testimony – (*Kumho Tire Co. v. Carmichae*l, 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993)) -- trial courts must act as gatekeepers to exclude unreliable expert testimony. *Kumho*, 526 U.S. at 141. To begin with, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education" to offer the opinion. Fed. R. Evid. 702. When an expert's testimony exceeds his area of expertise, that testimony

must be excluded. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715-16 (8th Cir. 2001); *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2005)(refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise).

Applying these principles in *Hammes v. Yamaha Motor Corp. U.S.A.*, 2006 WL 1195907 at *6-8 (D. Minn.), this Court barred a mechanic from testifying about an alleged design defect of a motorcycle throttle because he was not qualified in motorcycle product design or design-testing, and was not an engineer. *Id.* In contrast, the Court permitted a mechanical engineer to testify on the design defect issue given his background as "a Safety Specialist, a Product Safety Specialist, a Manufacturing Technology Specialist, a Design Engineer, and an independent safety consultant." Recognizing that this witness need not be experienced in motorcycle design since rotors were "used in many mechanical devices," the Court concluded that his general experience and study of rotors sufficiently qualified him to opine on whether or not the throttle/rotor was properly designed. *Id.* at 3.

Here, Dr. Healy is not remotely qualified to offer his scientific and medical opinions about the Silzone® valve. The specific medical device at issue in this litigation is a mechanical heart valve with a silver-coated sewing cuff. Unlike the specific product

at issue in *Hammes* (i.e. motorcycle throttle/rotor), the Silzone® valve is a specialized type of medical device. Although Dr. Healy is a professor of Bioengineering and Material Science and has experience with other types of medical devices, his limited background and experience with silver and with mechanical heart valves preclude him from testifying about the Silzone valve®. Specifically, Dr. Healy has never worked with any type of silver implant prior to this litigation, [*Depo.*, 100:5-15], and his experience in material design is limited to orthopedics and stents, *not* mechanical heart valves. *Id.* at 101:12-22. He has not done any silver testing, [*Id.* at 100:16-18, 110:3-7], and he has not looked at or examined a single Silzone® valve.

Nor has Dr. Healy done anything to acquire the knowledge necessary to offer his opinions. For example, despite testifying about defects in the Silzone® material, Dr. Healy did not fully read the depositions of the Spire employees who manufactured the material. *Depo.*, 115:1-116:3. He criticizes SJM's project manager Bill Holmberg, but he never read Mr. Holmberg's deposition. *Id*. at 124:5-18. Likewise, Dr. Healy read only small portions of the testimony of SJM employees Katherine Tweden, [*Id*. at 119:17-120:9], Jonas Runquist, [*Id*. at 120:10-121:7], Dan Langangki, [*Id.* at 122:16-123:9], and Matt Ogle, [*Id.* at 123:10-21], all of whom he singles out in his declarations and considers to be key players in the development and design of the Silzone® valve.

Finally, although he opines about the medical effects and potential risks of

Silzone®, Dr. Healy concedes that he is not qualified to opine on medical or clinical matters. *Depo.*, 242:23-243:7. He is not a medical doctor, clinician, epidemiologist, toxicologist, or pathologist, [*Id.* at 12:19, 24:20-25:9], and he did not read the AVERT data, which he concedes is the best available information on Silzone® medical risks. *Id.* at 79:9-17, 238:2-239:3, 28:17-29:8, 42:13-19, 43:6-24. Dr. Healy admittedly knows nothing about the medical condition of Silzone® patients, including whether or not they suffer from tissue damage, because he did not review individualized medical information or medical records of a single Silzone® patient. *Id.* at 5:18-6:2, 7:17-8:5, 14:3-12, 26:19-27:1, 36:15-25.

Given his deficient qualifications, Dr. Healy is in no position to offer opinions about the Silzone® valve. In accordance with Rule 702, this Court should preclude him from testifying at trial.

Next, expert testimony must be supported by sufficient facts or data. *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)(distinguishing between expert opinion evidence based on "good grounds" and "subjective speculation that masquerades as scientific knowledge"). Neither *Daubert I* nor the Federal Rules of Evidence requires the Court to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. The Court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *J.B. Hunt Transp., Inc. v. General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001)(quoting *Joiner*, 522 U.S.

at 146).

Here, Dr. Healy admits that his most central "scientific" propositions have not been subjected to scientific testing and thus lack factual support. For example, Dr. Healy testified that he has no facts or data to corroborate his assumptions that silver leaches from the Silzone® valve, [*Depo.*, 130:11-131:1, 132:1-19, 381:13-382:25], is present in the adjacent tissue [*Id.* at 81:23-83:9], forms a silver concentration gradient, [*Id.* at 364:7-365:4, 366:15-368:3], causes a chronic inflammatory response in Silzone® patients, [*Id.* at 35:9-36:25, 38:5-18], and actually exposes Silzone® patients to adverse medical events [*Id.* at 5:18-8:5, 30:2-18]. Indeed, when pushed to prove up his chronic inflammatory response theory, Dr. Healy admitted that it is merely a "hypothesis" at this point and requires "further testing." *Id.* at 247:10-17. By his own admission, then, Dr. Healy's opinions are speculative and nothing more than unproven hypotheses. As such, they do not come close to satisfying Rule 702's standard for admissibility. *Smith v. Cangieter*, 462 F.3d 920, 923-25 (8th Cir. 2006)(opinion that was not supported by accident data or peer-reviewed articles, not tested by the expert or anyone else, and not subjected to scrutiny by the scientific community is inadmissible). *J.B. Hunt*, 243 F.3d at 444 ("mere speculation and pure conjecture … is not competent proof and contributes nothing to a legally sufficient evidentiary basis.").

Finally, expert testimony must be both relevant and reliable. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591-93; *Blue Dane Simmental Corp. v. American Simmental*

*Ass'n.*, 178 F.3d 1035, 1040 (8th Cir. 1999). Factors bearing on this analysis include: whether the methodology can be and has been tested; whether it has been subjected to peer review and publication; the known or potential rate of error or the existence of standards; and whether the methodology used has been generally accepted. *Daubert*, 509 U.S. at 593-94; *Smith*, 462 F.3d at 923. Expert testimony that lacks testing or fails to consider the relevant facts and data is unreliable. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (barring expert testimony because toxicologist failed to examine plaintiff, inquire about other toxic exposures, and exclude confounding factors for the alleged injury). Ultimately, the party offering the expert testimony bears the burden of demonstrating that the testimony is reliable and admissible. *United States v. Williams,* 95 F.3d 723, 729 (8th Cir. 1996). The Court must act as a "gatekeeper" by separating expert opinion evidence based on "good grounds" from "subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp*., 252 F.3d 986, 989 (8th Cir. 2001).

Here, Dr. Healy's methodology lacks all indicia of reliability. Throughout his deposition, Dr. Healy repeatedly admits that he did not perform any testing to support his opinions. [*Depo.*, 81:23-83:9, 85:7-22, 89:2-92:7, 95:16-25, 364:7-365:4, 367:7-368:3, 377:8-16, 381:13-382:25]. With regard to his chronic inflammatory response theory, one his most fundamental opinions, Dr. Healy concedes that this theory is hypothetical and cannot be tested since it requires biopsies to be performed, which he does not recommend. *Id.* at 35:9-39:20, 247:10-17.

Dr. Healy did not review medical records for any Silzone® patient, [*Depo.*, 5:18-6:2, 7:17-8:5, 14:3-12, 26:19-27:1, 36:15-25], yet he opines that all 36,000 Silzone® patients have likely suffered local tissue damage. *Aff., 2/20/03*, ¶¶56-60, Exh. 1(c). Even four years after he first offered this opinion, Dr. Healy still has not examined the tissue of any explanted Silzone® valve to assess whether tissue damage has actually occurred. *Depo.*, 85:7-25, 89:2-92:7. Lastly, although he has not reviewed complete deposition transcripts, Dr. Healy admits that he nevertheless speculated about the content of Katherine Tweden and Bill Holmberg's writings and drew "scientific" conclusions about the Silzone® valve based his speculation. *Id.* at 124:5-18, 125:24-126:5, 127:14-130:5, 386:21-387:8, 119:17-120:9, 388:10-14.

Given these deficiencies in his methodology, Dr. Healy's opinions cannot be deemed reliable and trustworthy. *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005)("an expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported"); *Hammes*, 2006 WL 1195907 at *4 (testimony based on a "review of all file and discovery documents and two physical examinations of the motorcycle" is scientifically reliable); *Carlson v. C.H. Robinson Worldwide, Inc.*, No. Civ. 02-3780/Civ. 02-4261, 2005 WL 758601 at *4 (D. Minn. Mar. 30, 2005)(narrow and abbreviated examination of documents "fails to establish a reliable factual basis for [his] conclusions or that [his] conclusions are the product of reliable principles or methods").

# IV.

# IMPERMISSIBLE FDA OPINIONS

## A. Opinion #1: The Silzone® Valve Should Have Been Classified As A "Combination Product" Consisting Of A Drug And Device

Dr. Healy opined that the Silzone® valve is not a medical device but a combination product that consists of a drug and device. *Decl.*, 5/13/03, ¶15, Exh. 1(e). He criticizes SJM for not filing the Silzone® valve as a combination product (as opposed to a medical device) and suggests that its regulatory submission or PMA and the information supporting it was therefore inadequate. Dr. Healy admits it was the FDA that classified the Silzone® valve, [*Depo.*, 146:22-147:13, 154:5-18, 180:1-182:5], but he believes that the FDA was "wrong" in classifying it as a device. *Id.* at 141:25-142:12, 146:22-25, 147:10-13. Not only does this opinion fail to meet the Rule 702 requirements for admissibility, but Dr. Healy's attempt to substitute his judgment for FDA is not a proper subject of expert testimony in the first place.

### 1. Dr. Healy's Legal Opinion Regarding The Proper Classification Of The Silzone® Valve Is Barred By Federal Law

Federal law forbids state-law claims predicated on allegations that a manufacturer provided false or inadequate disclosures to the FDA. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 353 (2001). Courts thus exclude evidence suggesting the FDA was misled. *Bouchard v. American Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002)( "[e]vidence will be excluded outright when it is

offered only to show that the FDA was misled, or that information was intentionally concealed from the FDA"); *Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 36-37 (D.D.C. 2003) ("what was told to the FDA cannot support a tort claim"; such evidence "would be nothing more than an invitation for the jury to speculate about what . . . the FDA . . . might do if the facts were different"); *Garcia v. Wyeth-Ayerst Laboratories*, 385 F.3d 961, 966 (6th Cir. 2004) ("'*Buckman* teaches that state tort remedies requiring proof of fraud committed against the FDA are foreclosed.'").

Here, Dr. Healy's attempt to re-define the Silzone® valve as a "combination product" runs counter to the reality of the FDA's regulation of the valve as a medical device and violates *Buckman* and its progeny. Dr. Healy admits the FDA had the authority to classify Silzone® as a device, that it did so, and that it could have classified it as a drug instead, if the Agency thought it appropriate. *Depo.*, 154:5-18. However, Dr. Healy directly contravenes the FDA's jurisdiction in classifying this product:

> Q: So you disagree with the determination that the FDA made regarding how to classify the Silzone® valve?
>
> A: Absolutely.
>
> Q: Okay. You recognize that the FDA did approve the Silzone® valve as a device?
>
> A: I recognize that. That's wholly adequate.

. . .

> A: That's wholly adequate. It is a device, that's correct, and it should be approved as a device; however, in the context of the Silzone® as it is being added to the device and releasing a drug, then it should be in my opinion a combination product.
>
> Q: So if you were at the FDA, you might have made a different decision about how to classify the Silzone® valve?
>
> A: Absolutely.

*Id.* at 146:22-147:13, *see also* 154:5-18, 180:1-182:5. Dr. Healy not only disagrees with the FDA, but also with the European Union's (i.e. TUV) regulatory determination, which also classified the valve as a device. *Id*. at 156:3-159:15.

Such criticisms and second-guessing are precisely what *Buckman* and its progeny proscribe. *Buckman*, 531 U.S. at 349 ("[t]he FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions"); *Bouchard*, 213 F. Supp. 2d at 812. Thus, for this reason, Dr. Healy's opinion that the Silzone® valve is a "combination product" should be excluded in its entirety.

### 2. Legal Opinions From Purported Experts On Applicable Law Or Alleged Violations Of Law Are Neither Necessary Nor Admissible

The FDA's decision to approve the Silzone® valve as a medical device, and its decisions about whether SJM's regulatory submission was adequate, are all governed by federal statutes and FDA regulations. *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 799 (8th Cir. 2001) (*en banc*) (PMA process imposes specific requirements controlled by the FDA). Thus, courts have routinely excluded the testimony of experts who proffer opinions on agency laws and regulations. *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841-42 (8th Cir. 2003)(holding that expert opinion as to whether FAA regulations had been contravened was inadmissible legal opinion).[2] Fundamentally, the courts – not purported experts – decide what the law is, and expert testimony on such legal questions is both unnecessary and improper. Fed. R. Evid. 702; *Estes v. Moore*, 993 F.2d 161, 163-164 (8th Cir. 1993) (expert testimony that was merely statement of legal conclusion was not proper opinion testimony).

Despite these well-settled legal principles, Dr. Healy's declaration contains several pages' worth of legal interpretations and conclusions about FDA regulations concerning the classification of a medical device, [*Decl.*, 5/13/03, ¶¶15-38, Exh. 1(e)],

2 *See also Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (expert whose testimony consisted only of his views concerning the reasonableness of a police officer's conduct under the Fourth Amendment was an inadmissible legal conclusion)*; Purnell v. United States*, 1987 WL 13790 *3 (E.D.Pa. July 8, 1987), *aff'd*, 853 F.2d 920 (3d Cir. Pa. 1988)(excluding proffered FDA expert testimony as to applicability and interpretation of various statutes and regulations).

and Dr. Healy admitted that he was unconcerned with the Agency's review because he was substituting his own judgment for the FDA's, [*Depo.*, 146:5-25]. This Court should exclude such testimony.

### 3. Dr. Healy's Methodology In Critiquing The FDA's Action Is Grossly Flawed

Dr. Healy's methodology in developing his regulatory legal opinions is highly suspect. Notably, the PSC gave him the excerpts of FDA regulations and definitions upon which he bases his opinions. *Decl.*, 5/13/03, ¶15, Exh. 1(e). Also, rather than review entire depositions, he chose to review only the few pages of testimony hand-picked by the PSC, [*Depo.*, 117:2-10, 119:17-122:7, 122:12-123:21], and the few FDA-related documents given to him by the PSC. *Id.* at 140:4-141:24. He has never attempted to talk to anyone at the FDA about the Silzone® valve and has not read the extensive FDA file subpoenaed by plaintiffs. *Id.* at 110:20-23. In fact, when asked why he did not review the approximately 24,000 pages of documents subpoenaed by plaintiffs, he explained that he did not need the FDA's opinion on the regulatory issues. *Id.* at 141:25-142:12, *see also* 143:20-144:14, 144:20-145:2, 145:18-146:25. This biased, abbreviated review undermines Dr. Healy's opinion. *Carlson*, 2005 WL 758601 at *4 (narrow and abbreviated examination of documents is unreliable and fails to satisfy Rule 702). Dr. Healy attempts to provide unnecessary and improper legal opinions, and he seeks to serve as plaintiffs counsel's mouthpiece providing arguments without facts.

### 4. Dr. Healy Should Not Be Permitted To Speculate About the FDA's Or St. Jude's Motives Or To Give "Factual" Accounts

Personal opinions and conjecture about a company's motivations or state of mind have no grounding in any "specialized knowledge" and therefore are inadmissible as expert testimony. Fed. R. Evid. 702; *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)("[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony").

Here, Dr. Healy argues at length that SJM's submission of a PMA Supplement – a process used for medical devices, not combination products – was "suspect and biased" and he speculates about the company's "goal directed" motives for doing so. *Decl.*, 5/13/03, ¶35, Exh. 1(e). He begins by speculating that Spire Corporation (which made the Silzone® coating) did not follow through on applying for medical device approval for a product known as SPI-Cuff, "presumably due to the potential requirement to file a new drug application . . . ." *Id.* at ¶36. However, Dr. Healy never looked at the Spire submission and, as he himself admits, he simply assumed this was the reason without any investigation. *Depo.*, 212:5-10, 214:9-21, 216:6-217:15, 225:25-226:19. Dr. Healy then claims, without supplying any verification or details, that SJM was "aware that Spire did not proceed with the 510(k) approval and the reasons why." *Decl.*, 5/13/03, ¶37, Exh. 1(e). He goes on to argue that SJM nevertheless represented the Silzone® valve to the FDA as a medical device only because "it was seeking to avoid confronting the issue of whether the Silzone® valve was a drug which

could have prompted additional testing." *Id.* Compounding his speculation, Dr. Healy suggests that the company was "well aware from the outset of the Silzone® development process that silver . . . was far more 'minimally leaching' and that such fact could negatively implicate obtaining regulatory approval." *Id.*

All of these statements should be excluded because they lack foundation and are pure speculation regarding motives and decisions about which Dr. Healy has no knowledge, first-hand or otherwise. These statements do not require an expert's "specialized" knowledge. Indeed, jurors are not only perfectly capable of interpreting the facts, that is their role. Thus, because Dr. Healy is neither needed nor permitted to opine on matters within the jury's competence, all of his opinions in this vein should be excluded including statements about SJM's motives or biases. *Rottlund Company Inc. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006) ("courts must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion")(citing *Robertson v. Norton Co*., 148 F.3d 905, 908 (8th Cir. 1998); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541 (precluding experts from making arguments at trial and interpreting the evidence); *United States v. Willis*, 322 F.2d 548, 551 (3d Cir. 1963) ("expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility")(internal quotations omitted).

### 5. Dr. Healy Is Unqualified To Render An Opinion Regarding FDA Regulations

Even assuming Dr. Healy could give an opinion about the propriety of the FDA's classification of the Silzone® valve as a medical device, he is simply not qualified to do so. Dr. Healy is not in the FDA. He also is not a regulatory lawyer, and has never worked for the FDA or for any regulatory affairs department of a medical device company. *Depo.*, 149:24-150:7. With the exception of this litigation, he has never been paid to interpret federal regulations and he has never interacted with or been involved in any formal way with the FDA regarding the classification of products as drugs or devices. *Id.* at 154:19-156:2. Dr. Healy's only connection to the governing Agency is that he may have reviewed the federal regulations the PSC gave him, attended some non-specific FDA workshops addressing the drug/device distinction, and gave a tutorial to FDA employees regarding "surface science in biomaterials," which did not discuss the criteria for categorizing products as a drug or device. *Id.* at 148:17-149:10, 150:16-153:15; *see also Decl.*, 5/13/03, ¶¶11, 12, Exh. 1(e).

Notably, it was the Plaintiffs Steering Committee (PSC) who gave Dr. Healy the federal regulations that he used to form his opinions. *Depo.*, 148:17-149:10. Dr. Healy testified that he had only "some" of the regulations in his possession and had read them "in part", but has not looked at them since signing his declaration in 2003. *Id.* at 148:17-149:13.

The Federal Rules require at minimum that an expert have the specialized and relevant experience to opine on a specific topic. Fed. R. Evid. 702; *Wheeling*, 254 F.3d at 715-16, *Garnac*, 932 F.2d at 1566. Here, Dr. Healy has no experience to speak with any reliable authority on how the FDA reviews PMA Supplements or how it interprets and applies the statutory definitions of "drug," "device," and "combination product" to any product, including mechanical heart valves. Consequently, Dr. Healy's opinion should be barred for lack of qualification.

### B. Opinions #2, #3, and #5: SJM Failed To Provide The FDA With Scientific Literature Suggesting That Silver Would Likely Impair Tissue Healing, As Well As Data Relating To The Sheep "KTMV-2"

Dr. Healy opines that SJM omitted from its FDA submissions material publications that "clearly pointed" to the potential for local silver concentrations adjacent to the Silzone® cuff to cause cell death or impairment. Decl., 5/13/03, ¶41, Exh. 1(e). Likewise, he opines that SJM failed to disclose sufficient information concerning a sheep ("KTMV-2") which died during a Silzone® animal study. *Id.* at ¶76. Characterizing the information as "material" and "necessary" to the FDA's evaluation of the safety and efficacy of the Silzone® valve, Dr. Healy concludes that SJM should have disclosed the scientific literature to the FDA and that the omission of the KTMV-2 data was "a clear misrepresentation." *Id.* at ¶¶41, 59, 63, 77. Notably Dr. Healy's opinions are directed to the amount of information provided on these subjects, not whether they were addressed, since he acknowledges that SJM did inform the FDA about the death of KTMV-2 and supplied literature on the potential toxicity of silver.

As previously discussed, plaintiffs may not assert claims based upon the inadequacy of the information supplied to the FDA, or on alleged flaws in the FDA's review or approval. *Buckman,* 531 U.S. at 349-50 (adequacy of submissions to be evaluated by the FDA alone, not jurors). Moreover, evidence that the FDA was mislead or that information was concealed from the Agency is simply inadmissible. *Bouchard,* 213 F. Supp. 2d at 812. In addition, Dr. Healy's statements amount to no more than inadmissible legal conclusions concerning a discipline in which he is not professionally involved. *Estes,* 993 F. 2d at 163-164. Hence, his opinions concerning whether additional articles or more information on KTMV-2 should have been submitted and whether its omission was misleading to the FDA are not proper subjects of expert testimony and should be excluded.

### 1. Dr. Healy Is Neither Qualified Nor Has A Basis To Testify About SJM's Submissions To The FDA

As explained above, Dr. Healy is not an expert on FDA regulations or the FDA review process for device or drug applications. Furthermore, he has no experience working for the FDA in connection with the approval of medical devices or for any FDA-regulated device company in any regulatory capacity. *Depo.*, 149:22-150:7.

Furthermore, Dr. Healy's opinions are unsupported speculation, and he has not attempted to discover whether the FDA thought KTMV-2 and the additional articles were important. For example, plaintiffs' counsel subpoenaed the FDA's records on the

Silzone® valve. Of the approximately 24,000 pages of FDA materials produced, he has looked at only a few pages (20-30 pages). *Depo.*, 140:4-142:12. He has never contacted the Agency to confirm his ideas. He admittedly does not know who reviewed the PMA, what department they were in, what criteria the FDA used in their analysis, or the reasons for approving the valve. *Id.* at 143:20-145:2, 145:8-146:21.

Dr. Healy speculates that SJM should have provided FDA with nine additional scientific articles. He believes this literature would have provided further information to the Agency on the potential toxicity of silver salts used in medicine. However, he does not actually know if the FDA already had the studies in question or whether they reviewed them. *Depo.*, 288:16-290:13. He acknowledges that at the time the PMA was filed, the FDA had qualified persons able to evaluate the activity of silver in the body, [*Id.* at 180:5-181:22], that silver was already a well-known antimicrobial, and that the FDA knew that silver ions were active agents which were coming off the device. *Id.* at 178:22-181:16. But Dr. Healy still speculates, without confirmation, that the articles in question, which concerned subjects of which the FDA was already aware and which were in the public domain, may have been missed by the expert FDA reviewers.

### 2. Dr. Healy Cannot Show That Additional Articles Or More Information On KTMV-2 Was Relevant To Approval

Dr. Healy has given two contradictory opinions concerning what scientific

literature is appropriate for evaluating the ionization of silver or potential toxic effects of the Silzone® coating. On August 8, 2002, Dr. Healy submitted an opinion criticizing defense toxicology expert Dr. Joseph Rodricks' citation to several articles in his analysis of the effects of silver used in medicine. *Healy Opinion Letter ("Letter")*, 8/8/02, Exh. 1(b) to Van Steenburgh Aff.; *Depo.*, 256:2-19; *Declaration of Joseph V. Rodricks ("Rodricks Decl.")*, ¶10, Exh. 5 to Van Steenburgh Aff. In his letter, Dr. Healy opined that the scientific literature reviewed by Dr. Rodricks' was not applicable to an evaluation of the Silzone® valve. *Letter*, 8/8/02, p. 1, ¶1, Exh. 1(b); *Depo.*, 257:8-259:22.

In rejecting the scientific articles analyzed by Dr. Rodricks as inappropriate, Dr. Healy established his own criteria for determining what scientific studies were relevant to an evaluation for Silzone®. *Letter*, 8/8/02, pp. 1-2, ¶1, Exh. 1(b); *Depo.*, 259:23-263:24; *Rodricks Decl.*, ¶10. According to Dr. Healy, "[a] central tenant of biomaterial science and engineering is that the experimental device must be tested in vivo at the same or very similar anatomical site within the body as it is ultimately intended to be used." *Letter*, 8/8/02, pp. 1-2, ¶1, Exh. 1(b); *Depo.*, 259:23-261:3. Dr. Healy concluded the articles referenced by Dr. Rodricks "can be discounted with respect to proving safety and efficacy" because they referred to use of silver as a topical agent or in urinary catheters. *Letter*, 8/8/02, p. 2, ¶1, Exh. 1(b); *Depo.*, 259:23-263:18.

Dr. Healy goes on to refine his criteria by stating that "[t]he form of silver

being exposed to the body is critical," [*Letter*, 8/8/02, p. 2, ¶3, Exh. 1(b)], and criticizes Dr. Rodricks for citing studies that use forms of silver (such as silver salts) different from the metallic silver in Silzone®, which "I don't think is correct." *Letter*, 8/8/02, p. 2, ¶3, Exh. 1(b); *Depo.*, 269:21-270:23.

Hence, according to Dr. Healy, only those studies/articles dealing with the same type of metal silver as Silzone® and conducted in animals (in vivo) in a heart are relevant. *Letter*, 8/8/02, p. 2, ¶3, Exh. 1(b); *Rodricks Decl.*, ¶10.

Dr. Healy devotes a significant portion of his later declaration to summarizing nine articles that he believes should have been included in SJM's summary of the literature attached to the PMA. *Decl.*, 5/13/03, ¶¶39-59, Exh. 1(e)*; Depo.*, 251:4-252:20. Yet, he admits that none of the articles he now champions meet the criteria for evaluating the safety and efficacy of Silzone® that he so meticulously laid out in 2002. *Rodricks Decl.*, ¶11.

Dr. Healy explained that most of these articles relate to *in vitro* studies. *Depo.*, 251:7-254:3. None of the studies involve metallic silver like the Silzone® material, [*Id.* at 254:4-25; *Rodricks Decl.*, ¶11], and most involve medical use of silver salts, which Dr. Healy previously said is "incorrect" for evaluating Silzone®. Exh. 1(e)*Rodricks Decl.*, ¶11all of the studies involve non-cardiac medical uses. *See, e.g.*, *Decl.*, 5/13/03, ¶42, Exh. 1(e) (catheters, Hemmerlein), ¶53 (resin beads, Ellender and

Ham), ¶54 (oral silver wire, Ellender and Ham), ¶7 (dental restoration materials, Garcés-Ortiz and Ledesma-Montes) and ¶8 (bone cement, Sudman). The major study that Dr. Healy discussed was Hemmerlein. *Id*. at ¶42-52. Yet, he explained that Hemmerlein did not involve a Silzone® type material, did not involve studying the effects at the same anatomical position as the SJM valve, and was not an *in vivo* test. *Depo*., 290:18-291:25.

The only study that even arguably could relate to the Silzone® coating is the Tretotola 1998 study. *Decl.*, 5/13/03, ¶21, Exh. 1(e). Yet, this study also did not meet his established criteria since it admittedly involved a different type of device used at a different anatomical position than the Silzone® valve. *Depo*., 274:10-23, 275:13-277:4. Notably, the Tretotola article was not published until after SJM submitted its PMA to the FDA in May 14, 1997 [Exh. 6 to Van Steenburgh Aff.]. Thus, even if relevant, the SJM literature search performed in April 1, 1997 could not have been included in the PMA submission.

Thus, none of the studies meet Dr. Healy's own criteria for being relevant to evaluating the safety and efficacy of Silzone®. Accordingly, Dr. Healy has no basis for opining that they should have been submitted to the FDA.

The same problems exist for Dr. Healy's opinion regarding the sheep-study animal, KTMV-2. First, despite the statements in his declaration, he now admits that **SJM did inform the FDA that KTMV-2 had died**, and that the Agency knew of this fact prior to approval. *Depo*., 138:4-139:12. Dr. Healy admits that he does not know

why KTMV-2 died, and cannot correlate its death with complications related to Silzone®. *Id.* at 391:11-394:22. Furthermore, he admittedly can only speculate regarding what the FDA considered or should have considered with respect to SJM's sheep studies, explaining that these issues were outside of his expertise. *Id.* at 266:17-267:23. Dr. Healy does not have any objections to the sheep study generally and has used similar studies for his own projects. *Id*. at 265:8-266:16. Thus, Dr. Healy cannot demonstrate why his opinion on KTMV-2 is relevant.

Dr. Healy's reliance on scientific articles that do not "fit" the facts at issue by his own definition, and his speculative and cursory analysis of those studies and of the KTMV-2 issue, renders this opinion unreliable and thus inadmissible. *Blue Dane*, 178 F.3d at 1040 (expert testimony must be both relevant and reliable); *Carlson*, 2005 WL 758601 at *4 (expert opinion based on narrow and abbreviated examination of documents is unreliable).

### 3. Opinion #4: The 300 Parts Per Billion Value Relating To Potential Silver Toxicity Levels Is Not A Recognized Scientific Standard, Is Not Supported By The Literature Cited By SJM, And Was Therefore Misleading

In his declaration, Dr. Healy opines that SJM should not have presented in its PMA submission a level of 300 parts per billion (ppb) of silver as a scientific standard for safety, because it was not "recognized' or "supported" by the literature. *Decl.*, 5/13/03, ¶¶64, 74, Exh. 1(e). He concludes that to do so was a material misrepresentation

of scientific fact. *Id*. at ¶74. However, when presented with the PMA and the literature in deposition, he retreated from his accusations. For example, Dr. Healy conceded that nowhere in the PMA does it say that the 300 ppb was a scientific standard:

> Q: Okay. They don't use the term scientific standard here, do they?
>
> A: No, they do not.
>
> Q: Do they use the term standard here at all?
>
> A: No . . . .

*Depo.*, 350:5-22, *see also* 339:19-340:14, 341:21-24, 347:20-350:7, 355:19-22.

Dr. Healy likewise admitted that the 300 ppb value was derived from the scientific literature by Dr. Tweden. *Depo.*, 354:18-360:5. Indeed, the "Literature Review on Silver Toxicity," which was Attachment 14 to the PMA, [Exh. 6 to Van Steenburgh Aff.], specifically identifies the 300 ppb level as coming from identified literature articles. Further, the level was not said to be safe but rather the "most conservative level reported for silver toxicity," and that toxicity was seen at higher levels.

Furthermore, Dr. Healy admits that "[t]he level at which systemic silver concentrations will be considered toxic in humans is undetermined." *Decl.*, 5/13/03, ¶74, Exh. 1(e). Indeed, when asked in deposition if it can be said that the 300 ppb value is or is not a silver toxicity level, he unequivocally responded no:

Q: So at this point we cannot say that the 300 parts per billion is or is not a silver toxicity level?

A: Correct.

*Depo*., 360:17-20, 361:8-19. Moreover, Dr. Healy has never investigated silver toxicity levels in humans and is unaware of any literature that establishes such levels. *Id.* at 360:6-20. Thus, Dr. Healy has no idea whether the 300 ppb value is correct or not, and he has no basis for criticizing it.

Dr. Healy has not only failed to accurately characterize SJM's conduct and PMA submission but now admits he has no factual basis for raising the 300 ppb issue. Because the basic facts underlying his opinion are wrong, the opinion itself cannot be trusted and must therefore be excluded. *Weisgram v. Marley Co*., 169 F.3d 514, 520 (8th Cir. 1999) (expert opinion with no reasonable factual basis is pure conjecture and thus inadmissible); *Carlson*, 2005 WL 758601 at *4 (failure to apply the correct test renders expert's conclusions unreliable). In addition, Dr. Healy's lack of information concerning whether the statements were true confirms that they are utter speculation and there is no foundation for the opinion, which also mandates exclusion. *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994) (an opinion that utterly lacks foundation is speculative and conjectural and, therefore, inadmissible).

Furthermore, as previously explained, Dr. Healy is not permitted to render legal opinions about SJM's conduct, including whether the company misled or

misrepresented itself to the FDA and the medical community. Such opinions are regulatory and legal in nature, and not appropriate subjects for expert testimony. *Bouchard*, 213 F. Supp. 2d at 812 (excluding evidence "offered only to show that the FDA was misled, or that information was intentionally concealed from the FDA"); *Estes*, 993 F.2d at 163-64 (expert testimony that was merely statement of legal conclusion was not proper opinion testimony.

Finally, Dr. Healy is not a toxicologist. *Depo.*, 25:8-9. Nor does he have an advanced degree in toxicology or related discipline (e.g., pharmacology, biochemistry, environmental health or industrial hygiene), and he is not board certified in toxicology, does not belong to a professional organization, such as the Academy of Toxicological Sciences or the Society of Toxicology, has not published peer-reviewed articles on toxicology, has not competed for and received research grants in toxicology, has not served on scientific toxicology advisory panels or had any university appointments in toxicology, or a related field, in a university graduate toxicology program. *Reference Manual On Scientific Evidence*, Federal Judicial Center 2000 (2nd Ed.) at 415-418 (setting forth the various ways an expert can be qualified to render toxicology opinions), Exh. 7 to Van Steenburgh Aff. Hence, Dr. Healy is in no way qualified to opine on what silver toxicity issues should have been presented to the FDA.

## V.

## CONCLUSION

Because the opinions of Dr. Healy lack any indicia of evidentiary reliability, they are inadmissible as a matter of law and should not be considered by this Court.

DATED: February 14, 2007.

HALLELAND LEWIS NILAN & JOHNSON P.A.

By: ___________________________________
Tracy J. Van Steenburgh Reg. No. 141173
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, Minnesota 55402-4501
(612) 338-1838

REED SMITH LLP
Steven M. Kohn
1999 Harrison Street, Suite 2400
Oakland, CA 94612

Attorneys for Defendant St. Jude Medical, Inc.