Court File No. 00-CV-195906CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

ERIK ANDERSEN, YVONNE ANDERSEN and SHARON FROST

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and
ST. JUDE MEDICAL CANADA, INC.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**AFFIDAVIT OF KEVIN E. HEALY, Ph.D.**
**(Sworn April 14, 2003)**

I, Kevin E. Healy, B.Sc., M.S. (Engineering), Ph.D. (Bioengineering), in the Town of Orinda, in the County of Contra Costa, in the State of California, MAKE OATH AND SAY:

1. I am an Associate Professor in the Departments of Bioengineering and Material Science and Engineering at the University of California at Berkeley. I have more than 18 years of experience relating to Bioengineering and Biomedical research. Specifically, my research interests include the design and synthesis of biomimetic materials that actively direct the behavior of mammalian cells to facilitate regeneration of tissues and organs.

2. I have knowledge of and experience in of the matters deposed in this affidavit, except where I have been informed by others, in which case I have indicated the source of the information, which I believe to be true.

3. I have reviewed the relevant portions of the sur-reply motion record of the defendants and my affidavit is sworn in reply.

4. In this affidavit, I intend to respond to some of the claims made by Joseph V. Rodricks in an affidavit sworn March 28, 2003. Specifically, I intend to:

a. Refute Dr. Rodricks' claim that SJM did not misrepresent that silver concentrations of 300 parts per billion ("p.p.b.") (ng/mL) was a recognized scientific benchmark of toxicity to humans;

b. Note that Dr. Rodricks continues to use a scientifically invalid 300 p.p.b. standard in his arguments;

c. Provide my opinion that SJM's Canadian regulatory submission for the Silzone valve was misleading, as data concerning the short-term animal study sheep identified as "KTMV-2" were not included in its analysis and were not submitted to the Canadian medical device regulators. These data were material to the consideration of the safety and efficacy of the Silzone coating;

d. Demonstrate that Dr. Rodricks' assessment of Dr. David Williams' opinion regarding silver toxicity is neither contemporary with current biomaterials literature nor with Dr. Williams' current opinions;

e. Demonstrate that Dr. Rodricks misunderstands the basic principles of biomaterials science in attempting to equate burn wound dressings and silver-coated short term use endotracheal tubes and urinary catheters with Silzone-coated cardiac devices with implant durations of two or more decades.

**SJM STAFF HAVE PORTRAYED THE SCENTIFICALLY INVALID SILVER TOXICITY CONCENTRATION OF 300 p.p.b. (ng/mL) AS A SCIENTIFIC STANDARD OR BENCHMARK FOR THE PURPOSES OF JUSTIFYING THE SAFETY OF SILZONE COATINGS**

5. SJM's representation that Silzone valves were safe was based, in large part, on SJM's representations that 300 p.p.b. of silver in the bloodstream was a toxicity benchmark recognized by the scientific community, and that SJM's animal and clinical data demonstrated that the silver levels in the blood following implantation of a Silzone valve did not exceed this 300 p.p.b. toxicity benchmark.

6. In paragraphs 7 through 9 of his affidavit sworn March 28, 2003, Dr. Rodricks attempts to defend the use of 300 p.p.b. as some nebulous measure for the toxicity of silver in humans. Dr. Rodricks states that nowhere to his knowledge did SJM staff or SJM make representations that 300 p.p.b. was used as a scientific standard or scientific benchmark for silver toxicity in humans. Dr. Rodricks is wrong, and clearly has not thoroughly reviewed either the manuscripts published by SJM staff, or the peer-reviewed manuscripts they cite. Dr. Rodricks mistakenly tries to defend the writings of Dr. Katherine Tweden, a SJM-employed scientist who conducted SJM's pre-market Silzone research, which represented, in company-sponsored journal articles and in the submissions to Canadian and U.S. regulators, that the Masters Series mechanical heart valve with Silzone was safe. To prove the safety of the Silzone valve, it was critical that SJM demonstrate that the amount of silver coming off the device was below a scientifically accepted level for silver toxicity. Silver toxicity data do not exist in the peer-reviewed publications cited by SJM staff and Dr. Rodricks.

7. SJM's assessment of safety was based mainly on reference to this purported 300 p.p.b. standard, found in Dr. Tweden's paper entitled "Biocompatibility of Silver-Modified Polyester for Antimicrobial Protection of Prosthetic Valves" (Journal of Heart Valve Disease 1997, Vol. 6: 553-561)["Tweden et al 1997"]. On page 557 she states, "The antimicrobial benefits of silver have long been established; however, devices and medications that contain silver must be carefully designed so as to avoid silver toxicity syndrome. This syndrome has been reported to occur at levels as low as 300 p.p.b. and presents argyria (blue skin pigmentation) and leucopenia, and toxicity to the kidney, liver and neurologic tissues (7)." Here Dr. Tweden is clearly attempting to establish a level at which silver toxicity occurs in humans for purposes of defending the safety of the Silzone valve. The nomenclature one uses to describe this criterion is irrelevant. What is pertinent is that this value of 300 p.p.b. is not supported by the scientific literature Dr. Tweden cites, that is, reference (7).

8. Reference (7) is a scientific article by Wan *et al.* entitled "Determination of Silver in Blood, Urine, and Tissues of Volunteers and Burn Patients" (Clinical Chemistry 1991, Vol. 37, No. 10: 1683-1687) (the "Wan paper"), which is repeatedly cited by SJM staff to support the proposition that 300 p.p.b. is a standard representing the lowest concentration reported to produce silver toxicity in humans. In contrast to statements in Dr. Rodricks' affidavit, Dr.

Tweden did not correctly cite the Wan paper as the Wan paper does **not** address silver toxicity. Rather, the study sought to examine methods for determining the levels of silver in burn patients who were treated with silver sulfadiazine (SSD) cream. The toxicity of silver was not addressed either as a specific aim, goal, objective or hypothesis of the work presented. Thus, citing this paper for the purpose of identifying a systemic silver concentration to compare to SJM's own silver concentration data was misleading.

9. Dr. Rodricks also mistakenly claims that Dr. Tweden correctly cited references cited in the Wan paper. A paper by Deitch *et al.* (The Journal of Trauma 1989, Vol. 29 (4):430-434) (the "Deitch paper") references a paper by Boosalis *et al.* (Surgery 1987, Vol. 101: 40-43) (the "Boosalis paper") as the source for the 300 p.p.b. toxicity level of silver. The Deitch paper states at page 443, "Blood silver levels were detected in 40% of the patients, but the levels (range 5-248 ng/mL) were well below the levels associated with toxicity (>300 ng/mL) (1)." [Note: ng/mL and p.p.b. are equivalent units.] Thus, the basis for SJM's claims for the 300 p.p.b. toxicity level of silver squarely rests on the Boosalis paper. The Wan paper thoroughly criticized the methods and detection limits of the Boosalis paper, which cited silver concentrations in control patients as 200 p.p.b., calling into question the legitimacy of the work. With these criticisms and SJM's own silver concentration measurements, a credible scientist could not use data determined from the Boosalis paper with any confidence. In spite of the flaws with the Boosalis paper, the authors **did not** determine the toxicity of silver in humans; they only measured silver in serum and urine of burn patients exposed to silver sulfadiazine. In other words, the Boosalis paper does not even mention the so-called 300 p.p.b. standard. This benchmark used to justify the safety of the Silzone valve appears to have been cultivated by SJM scientists and mistakenly supported by Dr. Rodricks.

10. Dr. Tweden was not the only SJM scientist to exploit the benchmark of 300 p.p.b. silver as a toxic dose. Another SJM scientist, Mr. Daniel Langanki, also cites 300 p.p.b. as a threshold for toxic silver levels, in another company-sponsored paper entitled "Evaluation of a Novel Bioprosthetic Heart Valve Incorporating Anticalcification and Antimicrobial Technology in a Sheep Model" (The Journal of Heart Valve Disease 1998, Vol. 7: 633-638). Mr. Langanki stated in the abstract of that paper, "Blood concentrations of silver reached a maximum of 40 p.p.b. within 10 days of SJM Epic value implantation, and were well below toxic levels (300 p.p.b.)."

Furthermore, in the results section on page 636 Mr. Langanki states, "Silver concentration in the blood of sheep given the SJM Epic valve never approached the lowest reported toxic level for silver (300 p.p.b.)(4,5)" Mr. Langanki was clearly attempting to validate the safety of the Silzone heart valve by stating that 300 p.p.b. was an accepted toxic level. The source for the 300 p.p.b. data, references 4 and 5, were the aforementioned Wan paper and Deitch paper. Neither the Wan paper nor the Deitch paper measured the purported 300 p.p.b. toxicity level of silver.

11. An objective scientist would conclude that the 300 p.p.b. value represented by SJM and its internal scientists to the medical device regulators and the medical community as a "recognized" silver concentration to produce toxicity in humans is not substantiated by the scientific literature cited either by SJM or by consultants in this litigation on its behalf. The level at which systemic silver concentrations are considered toxic in humans is undetermined and it is a materially false misrepresentation of scientific fact to portray 300 p.p.b. in regulatory applications, published literature and product labeling and advertisements as the toxic threshold.

12. In spite of what Dr. Rodricks states, Dr. Tweden and SJM represented that the Silzone valve was safe, relying in part on the deception that 300 p.p.b. was a scientifically valid benchmark for silver toxicity in humans. It is not scientifically valid and is not a recognized benchmark. Using it as such in its pre-market testing leads to the erroneous conclusion that Silzone was safe.

13. As I stated in my original affidavit, I conclude that the 300 p.p.b. value represented by SJM and its internal scientists as the "recognized" silver concentration to produce toxicity in humans is not substantiated by the scientific literature cited either by SJM or consultants on its behalf. Dr. Rodricks' attempt to defend the 300 p.p.b. level as a toxicity benchmark for humans perpetuates SJM's original misrepresentation. The level at which systemic silver concentrations will be considered toxic in humans is undetermined.

**DR. RODRICKS CONTINUES TO USE THIS SCIENTIFICALLY INVALID CONCENTRATION OF 300 p.p.b. TO JUSTIFY THE SAFETY OF SILZONE VALVES**

14. In paragraph 8 of his affidavit Dr. Rodricks continues to use the 300 p.p.b. concentration of silver as if it were a scientifically accepted standard. Dr. Rodricks criticized peer-reviewed

publications that I cited in my affidavit of February 23, 2003 (paragraphs 24 & 25), representing the cytotoxicity of silver as having values "much higher than 300 p.p.b." One paper I cite, Wataha *et al.* entitled "The *in vitro* effects of metal cations on eukaryotic cell metabolism" (Journal of Biomedical Materials Research 1991, Vol. 25: 1133-1149) (the "Wataha paper") measured the effect of cations such as silver and palladium ions on four parameters of toxicity in a fibroblast cell line. For one parameter of cytotoxicity, the concentration of 50% reduction in protein production, a concentration of 0.67 p.p.m. or 670 p.p.b. for silver ions was observed. Another paper I cited was by Steffensen *et al.* entitled "Cytotoxicity and Accumulation of Hg, Ag, Cd, Cu, Pb and Zn in Human Peripheral T and B Lymphocytes and Monocytes *in vitro*" (Gen. Pharmac. 1994, Vol. 25(8): 1621-1633) (the "Steffensen paper") which also identified $LC_{50}$ (the heavy metal concentration that gave 50% cell death) values for silver ions. $LC_{50}$ concentrations for cytotoxicity of silver ions on primary human T lymphocytes, B lymphocytes and monocytes after 24 exposures were 5.5 p.p.m., 58.9 p.p.m. and 4.96 p.p.m., respectively. In their studies, Steffensen *et al.* concluded that the cytotoxic potential of silver was similar to mercury and greater than lead.

15. In paragraph 8, Dr. Rodricks criticizes my use of different units to report silver concentration as misleading. I clearly defined in my affidavit the p.p.m. unit, as above, and used the p.p.m. values in the context of the original citation. As long as I define the units, this is a valid practice. Dr. Tweden does the same in her Tweden *et al* 1997 paper.

16. In paragraph 8 of his affidavit Dr. Rodricks takes my citations out of context. I originally cited the Wataha and Steffensen papers as studies that directly addressed silver cytotoxicity in mammalian cells to give an example of appropriate scientific studies establishing toxic levels of silver in vitro. These peer-reviewed papers contrast the erroneous use of the Wan, Deitch, Boosalis papers to generate fictitious data on silver toxicity that SJM subsequently used in its regulatory filings. Although the values reported in the studies I cited are above 300 p.p.b., this is a meaningless metric, as it is not scientifically substantiated. Dr. Rodricks continues to attempt to use this 300 p.p.b. standard in his affidavit to point out the difference between various studies and to imply it is a standard for safety. As I have pointed out, this is not the case. By continuing to use the 300 p.p.b. concentration as a value to judge other scientific data for toxicity, Dr. Rodrick propagates the same errors and misrepresentations of the SJM staff.

17. In paragraph 8 of his affidavit, Dr. Rodricks should have compared the 670 p.p.b. silver concentration in the Wataha paper to concentrations of silver liberated from Silzone cuffs as measured by Dr. Tweden and reported in the Tweden *et al* 1997 paper. In that study, Dr. Tweden developed a cell compatibility assay that used mixed and diluted solutions derived from silver-coated fabric of the SJM Silzone heart valve. This solution extract eliminated any concentration gradient by the process of mixing and creating a solution with an average silver concentration much lower than the local (i.e. near the implant) concentration.[Note: please see my previous affidavit regarding the critical nature of this concentration gradient.] Subsequently, this extract was **diluted** and then used to challenge fibroblast viability and function. This dilution should not have been done. At 90% full strength, the concentration of silver in the extract was 1200 p.p.b. (or 1.2 p.p.m.), well above the 670 p.p.b. silver concentration identified in the Wataha paper for cytoxicity. Assuming a linear dilution, a full strength solution would contain 1333 p.p.b. silver, again well above the concentrations defined by the Wataha paper as cytotoxic. In Dr. Tweden's study, when their extract was exposed to cells at full strength (approximately 1333 p.p.b.), the authors observed lower cell density, less cell orientation, and more damaged membranes compared to exposure to the diluted extracts (i.e., < 85%).

18. In paragraph 9 of his affidavit, Dr. Rodricks states that silver levels (13,000 to 56,000 p.p.b.) measured in the 1989 McCauley paper "are far in excess of any silver levels reported with Silzone-coated heart valves." The critical word here is **reported**. SJM only measured silver systemically and never reported a credible concentration of silver immediately adjacent to the implant. Based on the concept of a concentration gradient, one would expect the concentration of silver adjacent to the Silzone implant to be possibly orders of magnitude higher than 1333 p.p.b., certainly surpassing the toxicity levels defined in the Wataha and Steffensen papers and conceivably approaching those cited by the McCauley paper. Therefore, a **local** rather than a **systemic** cytotoxic response would result, which would be consistent with the paravalvular leak observed clinically.

19. One would be able to study silver concentration gradients by analysing the tissue which was immediately adjacent to the Silzone implants in the sheep studies. Regrettably, I understand that SJM has disposed of the sheep hearts in the two SJM premarket sheep studies making such analysis now impossible.

20. Thus, in spite of Dr. Rodricks' focus on the systemic toxicity of silver, the more relevant inquiry is the adverse, toxic effect of silver on the tissue repair process, particularly in those cells immediately adjacent to the SJM Silzone cuff, where a "halo of death" around the Silzone implant is created. This issue was addressed fully in my previous affidavit.

**THE IN VIVO TESTING OF SJM HEART VALVES CONTAINING SILZONE COATINGS WAS BIASED, AS SJM DID NOT FULLY DISCLOSE TO THE REGULATORS DATA IT HAD IN ITS POSSESSION CONCERNING THE SHORT-TERM ANIMAL STUDY SHEEP IDENTIFIED AS "KTMV-2"**

21. Dr. Rodricks makes repeated reference (paragraphs 4 and 5) in his affidavit to SJM's animal testing, which included implantation of the Silzone-coated heart valve in sheep. He states that, "St. Jude Medical's testing included *in vivo* animal testing in sheep that provided an opportunity to evaluate degradation and wear, along with any subsequent undesirable inflammatory responses, none of which were observed." I strongly disagree. First, SJM's tests were too short to determine any long-term effects of wear particles or degradation of the coating. Second, SJM did not fully disclose data in its possession concerning the short-term animal study sheep "KTMV-2". These data were not submitted to the Canadian medical device regulator. Nor were they submitted to the FDA, even after the FDA asked SJM for all animal pathology information. This omission of data was essential to a full consideration of the safety and efficacy of the Silzone coating.

22. The interpretation by Dr. Rodricks of the conclusions reached by SJM regarding their in vivo studies was adversely affected, as SJM specifically excluded one sheep (KTMV-2) from the study data without any scientific justification. Elimination of KTMV-2 amounted to elimination of 20% of the data set, since pathology of only 4 of 5 sheep were reported. This is a clear misrepresentation of the data and leads to erroneous conclusions regarding the safety of the Silzone coating.

23. The FDA, according to the PMA supplementary filings, was first advised that this sheep even existed as a member of the short-term study in an Amendment to the PMA supplement dated December 1997, filed seven (7) months after the original submission, responding to an FDA request for more information. In this submission SJM stated: "The animal designated as

KTMV-2 was an early death and the cause of death was unknown." SJM did not provide the FDA with the pathology report by Dr. D. Cameron, who examined that sheep's heart. Dr. D. Cameron summarized his pathology of KTMV-2 by identifying a perivalvular dehiscence, a blood clot encasement of the synthetic material, fibrous tissue covering but not extending into the cuff fabric (i.e., **no tissue ingrowth**), and observation of black particulate material (presumably silver, see below).

24. In my opinion, the black particulate material could be due to silver spalling off the Dacron fabric. St Jude's Jonas Runquist, who was responsible for SJM regulatory affairs, and Dr. Tweden, both of whom were familiar with the study, testified that the particles were silver that had come off the cuff. (Runquist Depoisition at 222-24; Tweden Deposition at 100-01.)

<u>Runquist Deposition</u>

"Q "Extensive areas of black particulate matter are
present in the reactive fibrous tissue, but not
in the immediate region of the synthetic fibers,"
correct?
A That's correct.
Q What was that black material, sir?
A That material was evidently some silver that had
migrated from the sewing cuff.
Q So the silver was of sufficient quantity at this
relatively early stage in the study for this
animal that it was observable?
A It was observable in the section.

223

Q All right.
A Again, we're talking about very, very small
particles here.
Q There -- but there was observable silver in the
tissue?
A In the sections, yes.
Q And to your knowledge, what efforts were made by
your company to measure the amount of the silver
observed?
A In this particular case, I -- I don't know if
they actually specifically measured the amount of
silver that was there.
Q Was it of any concern that there was this silver

in the tissue that was of sufficient quantity at this early stage to be observable?
A In this particular animal, it was certainly discussed in some detail.
Q Was there concern?
A No, not necessarily.
Q When you say "not necessarily," was there some concern?
A No. Because this -- this was the -- the same type of reaction that we had seen in the animals that had survived the entire length of the study.
Q You saw extensive areas of black particulate

224

matter?
A There was some black particulate matter in -- in virtually every section that was done.

Tweden Deposition

100

Q. All right. If you go down to -- do you see where it says KTMV-2 C1?
That's a coated section, correct?
A. That's correct.
Q. It says the specimen consists of cardiac muscle, clot-embedded synthetic material, and reactive fibrous tissue?
A. Yes.
Q. Clot-embedded synthetic material, was that a thrombus?
A. As I said earlier, in, you know, the first ten to eleven days post implant, the way -- the beginning stages of healing of the cuff is it's invested with clot. Polyester in and of itself is a relatively thrombogenic material, and you get an investment of clot, you get the cells from the patient's annulus then, flammatory cells, coming in to reorganize that clot, and then fibroblast. So when he says that clot-embedded synthetic material, yes, that is thrombus within -- among the polyester fibrils --
Q. All right.

A. -- and that's completely expected.

101

Q. All right. And there were extensive areas of black particulate matter, is that correct?
A. That's what he writes, yes.
Q. Okay. What was that?
A. That is the silver.
Q. All right. So the silver was seen in extensive areas of black particulate matter, correct?
A. The silver has a black look to it because it reacts with sulfides -- sulfurs in the body.

25. I have reviewed the affidavit of Dr. Gregory John Wilson dated February 7, 2002 and associated exhibits in which he describes SJM heart valve implants retrieved from patients that displayed impaired healing within the cuff and variable pannus overgrowth. From Dr. Wilson's exhibits, it is clear in some cases that the silver came off of the polyester fibers, which represents not only a potential hazard from the newly-increased surface area of silver exposed to the tissue (an increase in surface area will lead to an increase in silver ions released), but also represents a particle that monocytes and macrophages will attempt to engulf (a process called phagocytosis) and can lead to a persistent inflammatory response.

**DR. RODRICKS' ASSESSMENT OF DR. DAVID WILLIAMS' OPINION REGARDING SILVER TOXICITY IS NOT CONTEMPORARY**

26. In paragraph 10 of his affidavit, Dr. Rodricks tries to refute the findings of Kraft *et al.* in a paper entitled "Striated muscle microvascular response to silver implants: A comparative *in vivo* study with titanium and stainless steel" (J. Biomedical Materials Research 2000, Vol.49:192-199) (the "Kraft paper") by first suggesting that the silver used in the Kraft paper was either not sterilized or cleaned properly and was inferior to the Silzone coating. This is pure speculation. In this paragraph he contradicts his earlier statement in paragraph 5 where he states, "Although it is widely recognized that other types of testing can provide useful overall safety information, in vivo testing-at the same or very similar site within the body as it is ultimately intended to be implanted- certainly can provide some of the most useful safety information." I

would agree and add that studies addressing material biocompatibility have the greatest relevance when materials in similar form are compared, ie bulk metallic implants. In my opinion, the Kraft paper fulfills these criteria and is clearly relevant to this case.

27. Dr. Rodricks demonstrates in his affidavit that he is neither contemporary with the current biomaterials literature nor with Dr. Williams' current opinions. In paragraph 11 of his affidavit, Dr. Rodricks tries to further discredit the Kraft paper by suggesting a paper by the "world-renowned biomaterials scientist" David William, Williams et al. (1989), determined that the toxic reaction to silver was mild. The cited work is a review chapter written in 1989 whereas current opinions expressed by Dr. Williams center on making implant materials as "inert" as possible. Dr. Williams has recently expressed this concept in a recent publication entitled, "Reassessing Bioactive Surfaces"(D.F. Williams, *Medical Devices Technology*, June 2002). Dr. Williams currently believes that "Mechanical heart valves rely on materials and design that give optimal haemodynamic performance and blood compatibility with mechanical durability; these features are achieved by using corrosion-resistant materials and inert carbon." Furthermore, Dr. Williams states in that article, "Almost always, in the context of implantable devices, we can conclude that the optimal choice of materials is predicated on the combination of the most inert materials with those that provide the better mechanical or physical functionality."

28. Inertness of a material relates to that material's ability to withstand chemical and biological attack within the body. The more inert the material, the less prone it is to corrosion. The Silzone coating was not inert as Dr. Rodricks would have one believe. In fact one could consider it a poorly corrosion-resistant material in the context of inertness, as is was a design goal of SJM's Dr. Tweden who believed that enhanced liberation of silver ions from the Silzone coating would improve the efficacy in its bactericidal or bacterialstatic properties.[See the SJM4080704942 MDL quote from Dr. Tweden's notebook dated March 18, 1997 "Solution- The advantage of the corrosion already happening by inserting a metal that is more noble than silver in the mix. The idea is that corrosion (or silver ionization) would be greater. e.g., palladium, gold, platinum, etc. are all noble to silver."]

29. Further evidence of SJM's concern over the corrosion of the Silzone coating and its lack of inertness is found in a letter dated August 21, 1996 from their project engineer William R.

Holmberg to Dr. Piran Sioshansi, a Vice President (Biomaterials) for the Spire Corporation. Mr. Holmberg states that "The corrosion rate, when coupled with other valve components, of silver is estimated at 200-400 Angstroms per year. With the silver corroding at these rates, it is likely during the life of the device that **all of the silver could be removed.**"[Emphasis added.] Clearly, the Silzone coating is not an inert device. In fact, for its effectiveness, one has to consider it a bioactive device to deliver an appropriate rate of silver. The Silzone coating does not fit Dr. Williams' current theory regarding optimal biomaterials.

**DR. RODERICKS MISUNDERSTANDS THE BASIC PRINCIPLES OF BIOMATERIALS SCIENCE**

30. Dr. Rodricks' lack of understanding of the biomaterials field is evident in his affidavit because: first, he cites outdated concepts by Dr. Williams; second, he does not understand the fundamentals of materials science regarding the amount of silver liberated from the Silzone coatings; and, finally, he repeatedly relies on short term implants to support the safety of silver in medical devices.

31. In paragraph 13 of his affidavit Dr. Rodricks states in reference to the R. Williams et al. (1989) paper (cited as Exhibit "C") that "Williams and colleagues conducted laboratory investigations of the local tissue response to silver and silver compounds (including titanium). The authors noted that the toxic reaction was "mild" and the cellular response to implanted silver was "minimal." Here Dr. Rodricks commits a fundamental error in biomaterials science by not considering the aforementioned corrosion associated with the galvanic couple of silver with primer layers for the IBAD coating process (i.e., Pd and Ti). If Mr. Holmberg is correct in his estimated corrosion rates, "200-400 Angstroms per year", then the Silzone coating could be completely removed in ~ 7.5 to 15 years, well within the lifetime of the implant. According to data from SJM3910681165MDL "Product Technology-silver treatment," this could lead to 50 mg of silver liberated from the coating. Given the concentration gradient expected based on sound scientific theory, one can expect the **local** silver concentration to far exceed the cytotoxic concentrations defined in the papers by Wataha, Steffensen, and McCauley. The fact that Dr. Rodericks' analysis fails to assess the difference between a solid piece of silver and the Silzone coating reflects his lack of understanding of when materials science plays a central role in

evaluating the compatibility of medical devices. Responses to solid silver implants defined by Williams (1989) and Kraft represent the best case scenario for a solid silver implant and not an **actively corroding silver coating.**

32. Dr. Rodricks is still relying on silver-coated **short-term** use endotracheal tubes and urinary catheters to support **long-term** Silzone-coated cardiac devices with implant durations of two or more decades. Due to their limited implantation time and the previously-addressed issues of corrosion, studies such as those performed by Bambauer cannot be used to assess the long-term biocompatibility of silver-based implants.

33. Despite my comments in the preceding paragraph, I wish to respond to paragraph 12 of Dr. Rodricks' affidavit where he criticizes the presentation of the Trerotola et al. paper (1998) and suggests I focus my discussion on this single reference. This is incorrect. In the preceding paragraph of my previous affidavit (#47), I cite the work of Dr. D. Riley, who conducted the largest randomized **prospective** study (at that time) of the antibacterial activity of silver-coated catheters in a study entitled, "A Large Randomized Clinical Trial of a Silver-Impregnated Urinary Catheter: Lack of Efficacy and Staphylococcal Superinfection" (The American Journal of Medicine, Vol. 98:349-356). In that study, Riley *et al.* observed that bacteriuria (the presence of bacteria in the urine) development was not statistically significant between patients receiving control catheters (i.e., no silver coating) and those receiving the silver-coated catheter when patients receive antibiotics. In addition, in some cases, male patients receiving the silver-coated catheter had statistically **higher** bacteriuria rates compared to control patients when they did not receive antibiotics. Thus, the **clinical** antibacterial activity of silver-coated catheters and other medical devices is doubtful.

34. The clinical studies performed by Dr. Bambauer and cited in paragraph 12 of Dr. Rodricks' affidavit are largely company-sponsored studies with a small study population, 135 patients, compared to 1,309 patients in the Riley study. I find greater confidence in the data from the independent prospective randomized clinical trial with 1,309 patients. One of Dr. Bambauer's co-authors, Dr. Sioshansi, was a Spire Vice President "scientist". I brought up the catheter studies in my previous affidavit only to address my disapproval of their use to justify the safety of the Silzone coating, and therefore declined to provide a comprehensive review. It is

obvious that there are multiple studies refuting the observations of the Spire-sponsored Bambauer studies.

35. Dr. Rodricks has repeatedly stated (paragraph 13 of his current affidavit and paragraphs 8 and 9 of his affidavit of June 25, 2001) that the proteins metallothionein and glutathione could be individual patient factors potentially responsible for the failures associated with the SJM Silzone heart valves. Again this is pure speculation and demonstrates complete neglect of the facts obvious to a biomaterials scientist. When one conducts a scientific study (i.e., AVERT) and observes a statistically significant difference in the number of paravalvular explant events occurring between the Silzone (experimental group) and conventional cuff valve arms (control group), then the only conclusion that one can draw is that the difference between the groups in the study (i.e. experimental vs. control) was the silver coating on the Silzone valve and, therefore, the silver coating is the cause of the paravalvular leak. Any other conclusion ignores the scientific facts.

36. What is open to question is the mechanism causing the paravalvular leak; however, if metallothionein and glutathione were such important factors as Dr. Rodricks suggests, then why did not SJM test patients for elevation of these molecules? Furthermore, if there is such patient-to-patient variability in the response to the Silzone coating, and SJM was not able to logically determine risk factors after assaying over "200 variables" then, in my opinion, the Silzone coating was not safe for human implantation.

Subscribed and
SWORN BEFORE ME at the Town of Orinda, in the County of Contra Costa, in the State of California, in the United States of America on

April 14 , 2003.

Samuel C. Vaughn
Notary Public

Kevin E. Healy
KEVIN E. HEALY, Ph.D.

SAMUEL C. VAUGHN
COMM. # 1247289
NOTARY PUBLIC-CALIFORNIA
CONTRA COSTA COUNTY
COMM. EXP. DEC. 26, 2003