IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC., SILZONE HEART VALVES PRODUCTS LIABILITY LITIGATION : : : MDL DOCKET NO. 1396

**DECLARATION OF KEVIN E. HEALY, PH.D. UNDER 28 U.S.C. §1745**

I, Kevin E. Healy, Ph.D. (Bioengineering), being of legal age declares and states:

1. As described below, I am an Associate Professor in the Departments of Bioengineering and Material Science and Engineering at the University of California at Berkeley. I have more than 18 years of experience relating to bioengineering and biomedical research. Specifically, my research interests include the design and synthesis of biomimetic materials that actively direct the behavior of mammalian cells to facilitate regeneration of tissues and organs.

2. I have knowledge and experience of the matters stated in this declaration, except where I have been informed by others, in which case I have indicated the source of the information and I believe it to be true.

3. All opinions that I express in this declaration are held and offered by me within a reasonable degree of certainty within my field of expertise, bioengineering and biomedical research.

4. In this declaration, I will:

A. Further describe my background and qualifications;

B. Offer and explain my opinions on the mechanism of action of St. Jude Medical, Inc.'s ("SJM") Silzone™ coating;

C. Offer and explain my opinion that St. Jude Medical, Inc.'s ("SJM") Silzone™ sewing cuffed products were "combination products" compromised of a device (e.g.- a SJM's Master Series prosthetic heart valve) and a drug (*i.e.*- the silver coating put onto the cuff by means of Spire Corporation's ("**Spire**") SPI-ARGENT IBAD process) as such items are defined by regulatory definitions supplied to me by Plaintiffs' counsel;

D. Offer and explain my opinions that, by the 1990's, ample scientific literature existed suggesting that silver would likely impair tissue healing in patients with Silzone heart valves;

E. Offer and explain my opinion that a number of medical articles or scientific literature relating to the adverse toxicity and biomaterial unsuitability of silver that appear to not have been submitted to the FDA by SJM in connection with the Silzone coating Supplemental PMA were material to the consideration of the safety and efficacy of the Silzone Coating;

F. Offer and explain my opinions that the purported silver toxicity "standard" of 300 parts per billion ("p.p.b.") (ng/mL) proposed by SJM (i) is not a recognized scientific standard; (ii) is not supported by the literature cited by SJM or its witnesses; and (iii) that the definition of such standard is a material matter in determining the safety of silver as suitable biomaterial for implantation into a human's heart; and

G. Offer and explain my opinion that the information in SJM's possession concerning the short-term animal study sheep "KTMV-2," that was not submitted to the FDA after it had asked for all animal pathology information was material to the consideration of the safety and efficacy of the Silzone Coating; and

H. Offer and explain my opinion that an in vitro wash out study of silver coming off Silzone fabric and an in vivo study estimating the amount of silver retained after implantation should have raised concern regarding the degradation rate of the Silzone coating.

## I. BACKGROUND, QUALIFICATIONS AND DESCRIPTION OF MATERIALS REVIEWED

5. I obtained my Ph.D. in Bioengineering from the University of Pennsylvania in 1990 after obtaining a Bachelor of Science in Chemical Engineering from the University of

Rochester in 1983 and a Masters of Science in Engineering from the University of Pennsylvania in 1985.

6. I am currently an Associate Professor cross-appointed in both the Department of Bioengineering and the Department of Material Science and Engineering at the University of California at Berkeley. I was recently elected a Fellow of the American Institute of Medical and Biological Engineering. I am also one of only six Assistant Editors of the Journal of Biomedical Materials Research, the premier journal in the biomaterials field.

7. I have authored or co-authored more than 150 published articles, abstracts or book chapters which emphasize the relationship between materials and the tissues they contact. In particular, my research includes the design and synthesis of biomimetic materials that actively direct the behavior of mammalian cells to facilitate the regeneration of tissues and organs.

8. In addition, I have given more than 94 invited lectures in the fields of Biomedical Engineering and Biomaterials.

9. I have held numerous faculty appointments, including:

A. Assistant Professor in the Division of Biological Materials at Northwestern University in Chicago, Illinois from 1989 to 1995;

B. Assistant Professor in the Department of Biomedical Engineering at Northwestern University in Evanston, Illinois from 1990 to 1995; and

C. Associate Professor in the Division of Biological Materials at Northwestern University in Chicago, Illinois from 1995 to 1999.

10. I have also been named an inventor on three issued United States Patents relating to biomaterials, namely:

A. Bioabsorbable intravascular stents (U.S. Patent 5,670,161: Approved 4/97);

B. A novel method to fabricate porous bioabsorbable scaffolds useful for controlled delivery of protein-based drugs and tissue regeneration (U.S. Patent 5,723,508: Approved 3/3/98); and

C. Interfacial coatings for medical devices (U.S. Patent 5,863,650: Approved 1/26/99).

11. I have also given a short course to the FDA-CDRH entitled "Surface Engineering Strategies to Control Wound Healing Surrounding Medical Implants." [June 17, 2002]

12. I have attended multiple workshops presented by the FDA addressing medical device and drug distinction, assessment of combination device-drug products, and cross-agency review of combination products

13. My curriculum vitae is attached to this affidavit as Exhibit "A."

14. I have reviewed a large volume of materials provided to me by the MDL PSC counsel ("PSC counsel") that were produced in the SJM Silzone law suits in the Federal MDL and State Court, as well as materials developed in the prosecution of the Canadian Silzone litigation that were provided to me by the Canadian Plaintiffs' counsel. Among the materials I have examined are: SJM's PMA Supplement denoted as P810002-046 and its various amendments that were filed during 1997 and 1998; literature searches conducted by SJM personnel; the United Kingdom's Medical Agency Toxicological assessments on Silzone produced in discovery by SJM; the 1990 Toxicological Profile for Silver published by the U.S. Agency for Toxic Substance Disease Registry; the FDA's heart valve development guidance; the Food, Drug and Cosmetic Act's ("FDCA") definitions of "drug" and "device" provided to me by PSC counsel; the FDA's published rules and comments regarding the definition of a "combination product" provided to me by PSC counsel; the FDA's interagency or center agreements on Combination Drugs provided to me by PSC counsel; the ISO's guidelines on prosthetic heart development; SJM's marketing and research and Development department

documents describing the mechanism of action of its Silzone coating; SJM correspondence regarding the mechanism of action of Silzone; SJM's statements to the MDA regarding the issue of whether the Silzone coating was a drug or a device; SJM and Spire documents relating to leaching and corrosion of the silver coating; pathology and other internal SJM documents relating to the sheep known as KTMV-2 that was involved in one of SJM's animal studies; laboratory notebook excerpts of Messrs. Langangki and Ogle, Ms. B. Illingworth and Dr. Tweden; and various deposition excerpts from SJM and Spire employees provided to me by PSC counsel. I have also developed and reviewed materials from my own investigation, mainly scientific literature research. I have also attended lectures and scientific body meetings where Spire's SPI-ARGENT coatings were presented or discussed.

## II. A SILZONE™-COATED SJM HEART VALVE IS A *COMBINATION DEVICE*, SINCE SILVER IONS RELEASED FROM THE SILZONE CUFF ACT AND BEHAVE AS AN ANTIMICROBIAL DRUG AND THEREFORE ADJUNCTIVELY ASSIST THE VALVE'S UNMODIFIED INTENDED FUNCTION

15. It is my opinion that the Silzone sewing cuffed prosthetic products were combination products consisting of "drug" (*i.e.*- the Silzone silver coating) and a "device" (*e.g.*- the Master Series valve on which the Silzone coating was placed onto the sewing cuff)[1] as these terms are defined in FDA regulations that PSC counsel have provided to me, since the effectiveness of the silver coating to mitigate bacterial infection, and more specifically endocarditis, is dependent on the liberation of silver ions from the metallic SPI-ARGENT IBAD coating that SJM coated its Silzone product lines' sewing cuffs with. Without the release of silver ions from the coating, the Silzone coating on the device would not function as purported in

[1] The device could also be any of the other Silzone coated prosthesis products listed on SJM's web site such as its Regent Valve that was undergoing IDE implantations, the Epic valve, which was being sold in Canada and Europe (but not in the U.S.), the Tailor annuloplasty ring or the Sequin annuloplasty ring. For sake of brevity I refer only to the Master Series.

numerous SJM internal documents, advertisements, and pre-market approval (PMA #P810002 046) submissions to the FDA. This opinion is supported by the following facts, definitions, SJM documentation and SJM employee statements made during their depositions.

16. From materials provided to me by PSC counsel I understand and accept for the purposes of offering my opinion that the FDCA defines the term "*device*" to mean: "... an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is;

(a) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
(b) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
(c) intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes **through chemical action within or on the body of man** or other animals and which is **not dependent upon being metabolized** for the achievement of its primary intended purposes." (*emphasis added*) I will address each of these two emphasized phrases below as they will determine the controversy whether or not Silzone can be viewed as a device under this definition.

17. From materials provided to me by PSC counsel, I understand and accept for the purposes of offering my opinion that the FDCA defines a "*drug*" to mean:

(a) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and
(b) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and
(c) articles (other than food) intended to affect the structure or any function of the body of man or other animals.... (emphasis supplied)

18. From materials provided to me by PSC counsel I also understand and accept for the purposes of offering my opinion that "*combination product*" means, according to the rules and regulations of the FDA (21 CFR Part 3, Subpart A, Section 3.2 (e) (1)): "A product comprised of two or more regulated components, i.e., drug/device, biologic/device, drug/biologic, or drug/device/biologic, that are physically, chemically, or otherwise combined or mixed and produced as a single entity…."

19. To act as either an antimicrobial drug or agent, silver ions must be released from the Silzone coating to work and must do so "through chemical action within or on the body of man." The mechanism of action of the released silver ions on bacteria and mammalian cells is not entirely clear. However, scientifically sound and accepted studies by Modak and Fox (Modak, K., and Fox, C., 1973, "Binding of silver sulfadiazine in the cellular components of pseudomonas aeroginosa," Biochem. Pharm. 22:2392-2404) and Hidalgo and Domínguez (Hidalgo, E., and Domínguez, C., 1998, "Study of cytotoxicity mechanisms of silver nitrate in human dermal fibroblasts," Toxicology Letter: 98; 169-179) have shown that silver ions can enter internal compartments (i.e., nucleus) of either bacteria or mammalian cells and bind to DNA, thereby affecting replication. In my opinion, this is a scientifically acceptable, sound and valid explanation. Based on this, my opinion is that the Silzone coating, since it releases silver ions, can only achieve its intended purported purpose (i.e., reduction of endocarditis) through chemical action within the body of man.

20. Further supporting my opinion are statements appearing in SJM's marketing documents and the testimony of its research and development employees describing the underlying science associated with both the bacteriostatic (inhibiting the growth or proliferation

of bacteria) and bactericidal (killing bacteria) effects of silver ions released from the Silzone coating.

(a) One such document was presented to me as 0677151.tif, a prepared set of questions and answers. It reads in part:

> Q. How is the silver activated/how does the silver work?
> A: The exact antimicrobial mechanisms of silver are not entirely understood. The general clinical explanation for the biochemical interaction of silver in the body is as follows: After implantation, the silver in the valve's sewing cuff interacts with the bloodstream, an electrolytic solution. This causes the silver to change chemical states. The silver molecule ionizes and releases an electron into the bloodstream. The remaining silver ion is positively charged and attractive to microorganisms. It binds with the microorganism's DNA, preventing reproduction. In this way, silver is bacteriostatic (blocks the growth and multiplication of bacteria). The silver ion also binds with sulfydyl groups preventing the organism from getting proteins necessary for its survival. This activity is bactericidal (kills bacteria on contact)."

(b) Another SJM marketing document entitled Sales Representative Fact Sheet on Silzone™ Technology (0024396.tif), the following description of Silzone's mechanism of action is given:

> Our in vitro studies show that silver works by both contact inhibition and by slow release of oxidized silver compounds (bactericidal and bacterialstatic activity) depending on the microorganism involved. We do believe that oxidized silver compounds are responsible for the majority of this activity.

(c) Dr. Katherine Tweden has testified that the silver in Silzone works through ionization chemically released in the body as demonstrated by the excerpts:

> Q. All right. Do you recognize the
> Exhibit beginning at 33956?
> A. Yes, uh-huh.
> Q. Okay. And that's an article you
> co-authored with Barbara Illingworth, Richard
> Schroeder and Dr. Cameron entitled: In Vivo
> Efficacy of Silver-Coated (Silzone)

Infection-Resistant Polyester Fabric Against a Biofilm-Producing Bacteria, Staphylococcus epidermidis, correct?
A. Yes, uh-huh.
Q. And if you go to page 33959, which is page 523 of the article you co-authored --
A. 523?
Q. 959 are the last three digits, or 527 is the page number of the article.
Are you there?
A. Yes.
Q. And if you go to the right column near the end of the page, it says that: The metallic silver coating is a source of ionic silver which is a broad-spectrum antimicrobial.
Correct?
A. I see that sentence.
Q. And: The basis for this antimicrobial activity is the ionic silver's ability to combine with sulfhydryl, amino, phosphate and carb --
A. Carboxylate.
Q. Yeah. I knew how to pronounce that one time.
A. Uh-huh.
Q. -- carboxylate groups of proteins, thus causing denaturation of enzymes essential for the bacterial cells.
Did I read that correctly?
A. Yes.
Q. And would it be fair to say that what you're writing here in part is that the ions are responsible for the antibacterial action of Silzone, is that correct?
A. Yes.

* * *

page 493
Q. In any event, let's move on.
page 494
And would you agree with me that it's the silver ions that cause any toxicity from metallic silver?
A. That's my understanding.
Q. So as far as you're concerned, metallic silver in and of itself is not toxic?
A. It's difficult to make that assertion because, as I had said earlier, silver in an

> aqueous environment is going to ionize, metallic
> silver, so it will release silver ions to varying
> extents and will -- they will have their effect.
> So I can't, you know, look at it as silver metal
> itself as not toxic.

21. It is my opinion that the effectiveness of Silzone coating to minimize infection is dependent upon being metabolized for the achievement of its primary intended purpose — the elimination of bacteria and fungi in and around the heart prosthesis that cause endocarditis. It is also my opinion that the effectiveness of Silzone silver ions to minimize infection is dependent on affecting the metabolism of the target bacteria. My reasons for this conclusion follow.

22. I have been advised by PSC counsel that neither the FDCA nor FDA administrative rules define the term "metabolize" or its root, "metabolism".

23. In the absence of a statutory or administrative definition of "metabolism" or "metabolize" I turn to scientific authoritative sources for a definition. A fair, reasonable and scientifically valid and fitting definition of "metabolism" is the one developed by the World Health Organization ("WHO") that is published in the Toxicological Glossary available on the Internet at www.sis.nlm.nih.gov/-Glossary/m.html.

24. The WHO defines "metabolism" as the "[s]um total of all physical and chemical processes that take place within an organism; in a narrower sense, the physical and chemical changes that take place in a given substance within an organism. It includes the uptake and distribution within the body of chemical compounds, the changes (biotransformation) undergone by such substances, and the elimination of the compounds and of their metabolites. (Source: World Health Organization "Glossary of Terms on Chemical Safety for Use in IPCS Publications", World Health Organization, Geneva (1989).) I accept and will use this definition.

25. There is no doubt that silver ions released from the Silzone coating undergo "chemical changes that take place in a given substance within a given organism" and this process comes within the WHO's definition of "metabolization." As Dr. Tweden described in her testimony quoted above, the fluids and cells of the body chemically cause a transformation of the Silzone silver coating on the cuff, which in turn generates the source of the silver ions that have the active effect on the target bacteria and fungi the Silzone is intended to eliminate or reduce.

26. Additionally, the mechanism of action clearly is a metabolic process at the cellular level, whether that is on the bacteria it is targeting or fibroblasts and heart tissue it is negatively impacting. Hidalgo and Dominguez (Hidalgo, E., and Domínguez, C., 1998, "Study of cytotoxicity mechanisms of silver nitrate in human dermal fibroblasts," Toxicology Letter 98; 169-179) have shown that silver can enter internal compartments (i.e., nucleus) of either bacteria or mammalian cells and bind to DNA, thereby affecting replication. Furthermore, silver ions within biological solutions, such as blood that contain the protein albumin and halide-ions, will quickly loose their effectiveness due to complex formation with albumin and forming insoluble silver salt crystals. This statement is supported by work published by Schierholz et al. (1999, "Silver coating of medical devices for catheter-associated infections," The American Journal of Medicine: 107; 101-102). Thus, binding to DNA and complexing with proteins and forming insoluble salts all fall under the domain of chemical reactions and it is my opinion that all of these reactions occur with varying degrees within the body.

27. Further supporting my opinion in this regard are internal SJM documents and published literature by SJM employees (Illingworth, BL et al., Journal of Heart Valve Disease 1998; 7:524-530) that likewise considered the silver released from the Silzone coating to have a

metabolic effect despite the position that SJM took with the FDA in its PMA Supplement.[2] For example, William Mirsch, a SJM marketing manager, responded to an inquiry from a physician regarding the mechanism of action of the Silzone coating by stating, "We believe that the silver's efficacy is derived from silver ion interaction with microbial proteins, particularly the energy *metabolic* pathways. Silver ions can combine with and denature cell proteins on the bacterial cell membrane, as well as extra cellular enzymes released by pathogenic organisms…." (0201931.tif) An internal SJM Power Point presentation on developing Silzone states, "Ag+ [silver ion] denatures enzymes essential to cellular metabolism." (0687214.tif) A paper published by Barbara Illingworth (Illingworth, BL et al., Journal of Heart Valve Disease 1998; 7:524-530), a SJM employee, stated, "The metallic silver coating is a source of ionic silver which is a broad-spectrum antimicrobial. The basis for this antimicrobial activity is the ionic silver's ability to combine with sulfhydryl, amino, phosphate and carboxylate groups of proteins, thus causing denaturation of enzymes essential for the bacterial cells (16)." The reference cited (#16) is a text entitled "Goodman and Gilman's The Pharmacological Basis of Therapeutics," (7th Ed.

[2] SJM Supplemental PMA of May 14, 1997 at page 3, 003250.tif states SJM's basis for claiming the silver coating was a device, one that as I describe herein was scientifically invalid:

**Drug I Device Distinction**

The SPI-ARGENT coating is applied to materials such as polyester via a mechanism that literally impregnates the silver into the substrate. The result is a highly uniform silver coating that is tightly bound. ***Metallic silver applied with the IBAD process has demonstrated outstanding adhesion and extremely low leaching rates. Silver has been shown to ionize slowly resulting in no toxicity in humans.*** The antimicrobial properties of silver are specifically attributed to silver ions and evidence suggests that direct contact of the microorganism with the silver surface is necessary for inhibition. Silver applied to a substrate via the IBAD process has only local effects on microbial activity and has no effect systemically. Traditionally, antimicrobial drugs are administered orally, intravenously or subcutaneously. High systemic concentrations of the drug are typically required to eliminate the infection.

***The antimicrobial properties of the SPI-ARGENT coating are not dependent upon the metabolization of silver.*** Per the Federal Food Drug and Cosmetic Act, drugs are clearly differentiated from devices as drugs must be metabolized by the body to be effective. As a result, silver applied to a medical device via the IBAD process is not a drug as it only inhibits antimicrobial activity locally and metabolization is not required for effectiveness. (Emphasis supplied.)

Macmillan, New York, 1980:966-981), establishing the source of the information and its contents as addressing how agents (e.g., silver) enter into reactions within the body. Furthermore, the paper states that "Elevated concentrations of ionic silver in the immediate vicinity of the implanted device should discourage microbial colonization." The mechanism of action defined by Mr. Mirsch and Ms. Illingworth et al. in their writings includes intraorganism metabolism of silver ions and supports, again, the conclusion that the Silzone coating can only work through chemical action within or on the body of man and through means of metabolism.

28. Consequently, it is my opinion that the Silzone-coated cuff does not meet the definition of a device.

29. I now turn to whether the silver coating placed on the cuff satisfies the FDCA definition of a drug. In my opinion, based on its chemical nature and properties it does.

30. As I have stated previously, the sole purpose of the silver coating was not to strengthen or reinforce the sewing cuff, but to prevent or mitigate prosthetic valve endocarditis. In particular, the purpose of the silver was to provide a source of silver ions for use in the diagnosis, cure, mitigation, treatment, or prevention of disease by destroying or reducing bacteria. Thus, one can draw no other reasonable conclusion except that the Silzone coating achieves its purported effectiveness through silver ions that act as a drug. Analytically, it is no different from other pharmaceutical silver complexes, such as silver sulfadiazine, that is used in the management of burn wound sepsis. The use of silver sulfadiazine for the use of burn wound sepsis is considered a drug by the FDA.

31. Supporting my view in this regard is an internal SJM document that describes silver an antibiotic or antimicrobial drug not unlike penicillin in the following passage:

> … Silver ion was one of the first antibiotics (antimicrobials) discovered. It has potent activity against a wide variety of

> microbes, including Gram positive and Gram negative bacteria and fungi. However, silver is sparingly soluble in the body and so fell into disuse **as more soluble antibiotics were discovered (penicillin, etc.)**. But **silver ion remains today the antibiotic of choice** for many infections where topical application is possible (e.g., infections of the surface of the eye and the skin). The low solubility of silver ion also makes it an ideal candidate for the prevention of infections of implanted medical devices. The surface of a device coated with metallic silver will generate silver ion. Elevated concentrations of ionic silver in the immediate vicinity of the device should discourage microbial attachment and colonization. Silver ion at a greater distance is bound by serum proteins, transported to the liver and secreted in the bile, thus preventing systemic toxicity. Preliminary results for infection resistance of silver coated medical devices are encouraging.

(0024409.tif)

32. I now turn to the question whether SJM's Master Series valve with Silzone is a combination product as defined by the FDA regulations and by FDA guidance documents. As I indicated above, it is my opinion that it is. My initial reason for this conclusion is that it is clearly a combination of a drug (the Silzone coating) and a device (the long standing approved Master Series St. Jude Valve). PMA Supplement, No. P810002-S46 was filed by SJM in order to obtain FDA pre market approval for the addition of Spire's IBAD silver coating to SJM's already approved Dacron valve Master Series cuff. Hence, it fair and proper to look at and evaluate the silver coating separately from the valve or its sewing cuff as it added a completely new purported function, a medical treatment for endocarditis prevention.

33. Supporting my opinion in this regard is the FDA's interagency guidance on combination products. I have reviewed the U.S. FDA Intercenter Agreement between The Center for Drug Evaluation and Research (CDER) and The Center for Devices and Radiological Health (CDRH). This document according to its contents "provides details concerning the status, market approval authority, special label/regulatory considerations, investigational options, and intercenter consultations for the categories of products specified." In Section VIII of this

document general criteria are given to CDRH and CDER to apply in reaching a decision on which Center will take the lead and regulate a combination product seeking approval. I have also attended multiple workshops conducted by FDA employees addressing these issues. This guidance offers examples of a combination of a device incorporating a drug component with the resulting combination product having the primary intended purpose of fulfilling a device function (and hence falling under CDRH's administratively ascribed jurisdiction to oversee approval) and include:

- bone cement containing antimicrobial agent;
- skin closure or bandage with antimicrobial agent;
- tissue graft with antimicrobial agent;
- urinary and vascular catheter coated/impregnated with antimicrobial agent;
- percutaneous cuff (e.g., for catheter or orthopaedic pin) coated/impregnated with antimicrobial agent; and
- wound dressing with antimicrobial agent.

Thus the FDA according to its internal guidance document considers each of these examples to be a combination product. In almost all of these examples silver ions have been employed as an antimicrobial agent.

34. Further supporting my opinion is the finding of the United Kingdom's Medical Devices Agency (MDA). The MDA, after a series of communications with SJM regarding problems with the Silzone-coated prosthetic heart valve, had the Silzone product dossier (a document similar to a PMA application) reviewed by a toxicologist. The MDA's toxicology reviewer concluded, after evaluating the information in the dossier, that the Silzone coating added onto a Master Series cuff constituted a combination product because "silver coating of the sewing cuff act adjunctively to assist the valve's function." (307616.TIF; 0071486.tif) In that same report the MDA's reviewer concluded that for the SJM heart valve with the Silzone coating the "local cellular and haematological effects are not clear, and have not been thoroughly investigated." (This issue is addressed in detail below in this declaration.) Following that, on

December 10, 1999 the MDA notified SJM, as well as Germany's TUV, the European Union regulatory body that had granted SJM its CE approval mark, that the MDA officially viewed the Silzone coated valve as being a combination product that required a "consultation with a drug regulatory body … before being CE marked." (0071079.TIF) The MDA expressed its concern to the TUV that Silzone had not undergone a review by a drug regulatory body prior to receiving the CE mark.

35. In reaching my conclusion that the Silzone coating is a combination device-drug product, I have also considered SJM's statement of positions to the FDA and the MDA on why the silver coating was not a drug. I reject them for two reasons: (a) the reasoning or basis supporting SJM's position is not scientifically valid; and (b) from the internal documents and deposition testimony on the subject that I have reviewed, SJM's position is suspect and biased. I have set forth above the reasons why I reject SJM's scientific conclusions that Silzone is not a drug and does not depend upon metabolism to work. It is and it does as I have explained. I will now address the second reason, SJM's bias and goal directed orientation.

36. Before SJM sought PMA approval of Silzone process, its application vendor, Spire, had sought approval of a product called SPI–Cuff. In a letter dated January 28, 1994 from Philip J. Phillips, Acting Deputy Director of CDRH, in response to the Spire's Section 510 (k) application for SPI-Cuff, raised issues that would imply he considered the silver coating to behave adjunctively as a drug. In his evaluation of the SPI-Cuff application, a subcutaneous intravascular catheter with significant equivalence to the Silzone coating, he asked for "dose range testing to determine concentration and analysis of effectiveness versus toxicity." He also requested information on pharmacology as well as references for a new drug application or over the counter drug monograph for the antimicrobial agent for this intended use. Spire did not

follow through with this application, presumably due to the potential requirement to file a new drug application to CDER as delineated in a February 4 letter from Douglas E. Ferguson to Spire management, including Dr. Sioshansi. (SP 003675) [3]

37. During the development stage of the Silzone project, SJM was aware that Spire did not proceed with the 510(k) approval process and the reasons why.[4] In order to avoid the same pitfall when applying for PMA approval, SJM represented to the FDA that the Silzone coating was non or minimally leaching, did not create a zone of inhibition, and did not work by metabolism. SJM's representations were clearly goal oriented in that it was seeking to avoid

---

[3] When a Spire's employee, Dr. Piran Sioshansi was examined in this case, he testified as to this application:

> Q. [By Mr. Angstreich] Okay. It says, "Despite our insistence that the silver is not meant to be therapeutic," where was that statement? Or where did it appear?
>
> A. FDA is accustomed to evaluate biomaterials that set a zone of inhibition that act like a drug that leach, and to a large extent, we were educating them that this was a different type of a coating. When applied to a cuff, it does not set a zone of inhibition it. Does not provide leaching. It does not act like a drug. And apparently, we had not been able to convince them that that was the case, and I think that's the message in the last paragraph that Doug is communicating.

(Sioshansi Dep. at 72-73)

[4] Mr. RAYMOND J. BRICAULT, of Spire has testified:

> Q. [By Mr. Angstreich] And to the best of your recollection, did you advise St. Jude, or inform St. Jude -- maybe advise is the wrong word because you're just a coating company, you wouldn't be doing advising -- but maybe inform St. Jude that your Spi-Cuff created or raised an issue about whether or not a new drug application was necessary because the FDA thought that the silver was intended to be therapeutic?
>
> A. I have every confidence that we would have discussed that with them.

Bricault Dep. at 70- 71

I also note that in a January 25, 1996 fax from William Holmberg, St. Jude's Silzone Project Manger, to a Mr. Oliver, a Spire employee, SJM actively sought out information about what the FDA's concerns were when it turned down Spire's SPI-CUFF 510K application in order to help SJM better prepare its FDA submission.. (Sp 002911.tif)

confronting the issue of whether the Silver was a drug which could have prompted additional testing. The testing would have required a significantly sized pre-market clinical trial that Spire, and apparently SJM as well, did not want to fund, take the risk associated with, or wait for the completion of in order to obtain pre-market approval.[5] An internal document (0034073.TIF) authored by one of SJM's research and development scientists familiar with Silzone and members of the AB Cuff team, Ms. Illingworth, directly reveals St. Jude's goal orientation in this regard. In this internal memorandum discussing the fact that Silzone's mechanism of action was more due to ionization than contact inhibition she states: "We believe that oxidized silver compounds are responsible for the majority [of] Silzone's bacterialstatic and bacterialcidal activity. Hbwever, Katherine [Tweden] has emphasized its contact inhibition and non leaching characteristics for Regulatory[sic] reasons." The company, according to its internal memorandum, was also well aware from the outset of the Silzone development process that silver applied by the Spire IBAD (SPI-ARGENT) process was far more than "minimally leaching" and that such fact could negatively implicate obtaining regulatory approval.[6] Mr.

---

[5] Prior to Silzone, SJM also considered another treatment for its sewing cuffs in a project that SJM's AB-Cuff team called "TELIOS." According to Dr. Tweden, one of the reason that the TELIOS project was dropped was because an "enormously large study that would need to be undertaken ... to get market adoption." (Tweden Dep. at 713-714) In a set of preparatory Q & A's for the May 14, 1997 American Association of Thoracic Surgeons meeting, SJM internally recognized and addressed the drug - device issue in instructing its employees how they should answer inquiries about Silzone at the convention. One of these was: "...If coating leaches off the valve, it is considered a drug by the US FDA. Full clinical trials are then required for approval. Our Silzone coating is unique in that it is non-leaching and not considered a drug. Leaching leads to silver toxicity. The non-leaching Silzone coating is expected to be completely non-toxic (LIMRA results to confirm this)." (0033269.TIF)

[6] Mr. Runquist testified at his deposition:

Q And you were assuring the FDA of this, correct?
A At this – at this point in time, this was the
best of our knowledge.
Q And – and was there any regulatory significance
attached to the fact that the silver coating does
not set a zone of inhibition?
A There was, actually. The mode of action with --
with Silzone, again, the organism has to come in

*Footnote continued on next page*

Runquist, who prepared and signed the FDA submissions admitted at his deposition that what Ms. Illingworth described happened is exactly what he did on behalf of SJM — the FDA application emphasized Silzone's contact inhibition and non leaching characteristics.[7]

38. Likewise, in dealing with the MDA when it raised the combination product issue in 1999, SJM did not adequately define the role of silver in their Silzone coated prosthetic heart

---

direct contact with material, and by being
minimally leaching, it doesn't spread out into --
it -- it gets down to the drug device
distinction, so --
Q Please explain what you mean.
A Because the metallic coating does not leach out
or has minimal leaching, that basically
distinguishes it froma drug.
Q All right. So if it had more than minimal
leaching, then it might be a drug?
A It has a potential to.

Runquist, dep. at page 39. I also rely on the November 14, 1995 e-mail of Roos to Holmberg on a Spire meeting produced as 0679921.tif. According to this e-mail, SJM was aware that IBAD silver coating had been shown to continue to leach into the blood stream "for quite a while" after implantation. She suggests this period of time needs to be confirmed. She also notes that this could be a problem because carcinogenicity and chronic toxicity testing have not been initiated. Subsequently, on August 21, 1996 Mr. Holmberg wrote Spire to express SJMs concern about the amount of leaching and corrosion they were finding in their studies of the coating.( 0064749.tif) Based on SJM's internal data, as well as my own understating of the coating, there is no fair and scientifically valid way that the Silzone could have been be accurately represented to the FDA or the medical community as non or minimally leaching.

[7] Mr. Runquist testified at his deposition:

Q All right. And did you see where she says,
"However, Katherine has emphasized its contact
inhibition and non leaching characteristics for
regulatory reasons."
Is that correct, sir?
A I don't know if that's necessarily correct.
Q What would be the regulatory reasons for
emphasizing contact inhibition and nonleaching
characteristics?
A Again, I don't know where that statement came
from.
Q Well, if you don't know where that statement came
from, you'll agree with me that that's exactly
what you did with the FDA; you emphasized the
contacted inhibition and the nonleaching
characteristics of the Silzone?
A Sure.

Runquist, dep. at 177-78

valves when responding to the MDA. SJM, through Donald S. Guzik, responded to the MDA on December 12, 1999 with a letter stating SJM's position on the issue of whether the Silzone-coated prosthetic heart valve was a combination product: "In our opinion based on our review of the literature and consultation with experts, the metallic silver coating of the sewing cuff acts physically as a repellent and thus protects against colonization by and adhesion of microorganisms." He also stated on behalf of SJM that, "[i]f there is any literature evidence that silver could be acting by 'pharmacological means,' it relates only to the function of silver ions. There is no literature evidence silver metal (as opposed to ions) has a bactericidal effect or that in interferes with the physiological or pharmacological functions of bacteria." Yet at that time it was clear from a paper by Dr. Tweden, the laboratory notebooks and poster presentation of Matt Ogle, and other SJM internal documents that silver was being liberated from the Silzone coating in significant amounts. Other than the coating spalling off, the only other way for the silver to come off the coating is through corrosion, which would require release of silver ions and concomitant electrons. SJM represented the Silzone coating to the MDA, as it did to the FDA, as behaving as an inert metal in the body in the aforementioned letter, which is scientifically unsound and contradicted by their own experiments demonstrating silver release in vitro (Tweden et al., ASAIO Journal 1997; 43: M475-M481) and into the blood stream and accumulation at distant organs within experimental animals. (Tweden et al., Journal of Heart Valve Disease 1997; 6:553-561 and Langanki et al., Journal of Heart Valve Disease 1998; 7:633-638) Based on these data one would have to conclude that the purported effectiveness of the Silzone coating was, at least in part, due to the release of silver ions and their complexed products (i.e., proteins or salts), and therefore the device is a combination product.

## III. PRIOR TO MARCH 24, 1998, AMPLE SCIENTIFIC LITERATURE EXISTED SUGGESTING THAT SILVER HAD THE POTENTIAL TO IMPAIR TISSUE HEALING IN PATIENTS WITH SILZONE™ HEART VALVES. SJM, HOWEVER, DID NOT ADEQUATELY PRESENT THIS LITERATURE TO THE FDA IN ITS SUPPLEMENTAL PREMARKET SUBMISSION AND AMENDMENTS TO THE SUPPLEMENTAL PREMARKET SUBMISSION.

39. A literature search of a publicly-accessible scientific database (Pub-Med) that I conducted revealed that up to the end of 1997, the year in which SJM filed its Supplemental PMA and began selling Silzone™ valves in Canada and Europe, no less than 556 articles dealing with silver toxicity and 14 articles dealing with silver-coated surgical devices were available for SJM's review.

40. This scientific literature indicated that serious complications could likely result from the silver-containing Silzone™ coating.

41. Dr. Katherine Tweden on April 1, 1997 prepared a review of the current literature that was presented in SJM's Supplement 46 to PMA #P810002 which omitted several material publications that clearly pointed toward the potential for local silver concentrations adjacent to the Silzone cuff to cause mammalian cell death or impairment of normal cell function. Specifically, Dr. Tweden did not cite the Hemmerlein (1997), Ellender and Ham (1989), Trerotola (1998), Wataha (1991), McCauley (1989), Hidalgo and Domínguez (1998), Garcés-Ortíz and Ledesma-Montes (1997), Sudmann (1985 & 1994) and potentially others as well. The materiality of each these papers is addressed below in greater detail; however, it is clear that SJM misrepresented the current literature dealing with silver toxicity to mammalian cells in their Supplemental PMA filing with the FDA. [8]

[8] SJM's Mr. Runquist stated during his deposition that St. Jude had a regulatory and ethical duty to perform a thorough scientific literature review. (Runquist Dep. at 65-66) The submission of articles and a bibliography is a subject that is also discussed in the FDA Heart Valve Guidance, which states: "Bibliography of all published reports not submitted under CFR 21 814.20(b)(6), whether adverse or supportive, that concerned the safety and

*Footnote continued on next page*

42. One paper with remarkable relevance to the SJM-Silzone case, was published by Hemmerlein *et al.*, "*In Vitro* Cytotoxicity of Silver-impregnated Collagen Cuffs Designed to Decrease Infection in Tunneled Catheters" (Radiology 1997; 204: 363-367) (the "Hemmerlein paper").

43. The Hemmerlein paper addressed the clinical observations and concerns that tunneled catheters did not anchor well to the surrounding tissue when silver was present as a purported antimicrobial agent. These clinical observations led the authors to hypothesize that some type of silver-mediated process caused decreased fibroblast ingrowth into the collagen cuff (the region for tissue ingrowth and bonding) resulting in the weak anchorage (loose-fit) of the catheter. It is critically important that fibroblasts not be impaired as they are important participants in, and integral to, tissue healing.

44. The Hemmerlein paper is a critically relevant one to the SJM-Silzone safety issue because there is remarkable similarity between the implants studied by Hemmerlein *et al.* and the Silzone device. This article came out in August 1997 and in December 1999 SJM filed an amendment with a substantial amount of attached literature addressing toxicological issues (mainly articles supportive of Silzone's safety) that did not include this one or mention its existence. As its employees and consultant, Ms. Johnson, acknowledge, SJM had a duty to inform the FDA of adverse literature known or knowable to it. (Johnson, Diane Dep. 125-6;

effectiveness of the device must be included." One of St. Jude's forensic witnesses, Ms. Diane Johnson, explained that published reports, whether they are adverse to the safety or supportive of the safety of the device, that concern safety or, for that matter, are adverse or supportive of the effectiveness of the device, must be included. (Johnson, Diane Dep. 125-26.) Dr. Tweden and Mr. Runquist at their respective depositions acknowledged that Dr. Tweden was responsible for researching and authoring the literature reviews that SJM submitted to the FDA, and that Mr. Runquist relied upon her for that function. (Tweden Dep. at 335-41.) Dr. Tweden also explained that she had asked a librarian to run a computer search on key words such "silver toxicity," "silver use in medical devices," and so on. (Tweden, 324)

186-67[9]) Given the importance of this critical article to the safety issues that were before the FDA, it certainly should have been provided to the FDA for its consideration for the reasons that I will explain.

45. First, both the Hemmerlein catheters and the SJM Silzone coated valve sewing cuffs were porous or high specific surface devices that were designed to promote cell and tissue ingrowth, typically fibroblast cells, during the wound healing process, as a method to anchor the implant in place during clinical service. Second, the fact that silver was released from a porous material in an uncomplexed form has greater relevance than analysis of studies employing silver-containing topical creams, i.e. silver sulfadiazine (SSD) cream, in which silver is already complexed with another material and would not enter into the same reactions with proteins and anions in the local environment. Third, the cells used in the Hemmerlein paper are human fibroblasts, which are very important participants in tissue healing and regeneration, and their

---

[9] Ms. Johnson, Diane (MDL) Dep. at 186-87:

Q And St. Jude was required, was it not, by regulation to
periodically update its pending PMA supplement with any
new safety data and effectiveness information learned
about Silzone from ongoing or completed studies that
could reasonably affect an evaluation of the safety or
effectiveness of that device?
A Yes, they were. I believe that's why they contacted the
agency when they received information from the U.K.
experience.

* * *

Q If they found out something that was significant and
pertinent to the safety of Silzone that was in an in
vitro study, they would be required to update the PMA
supplement prior to approval with that information,
correct?
A To the extent that it was pertinent, absolutely.
Q And the same would go to literature, correct, that would
be pertinent to safety?
A To the extent that it met the definition of known to the
sponsor or reasonably known to the sponsor, yes.

role is critical in establishing a mechanically-anchored implant in the soft tissue adjacent to a catheter or heart valve.

46. Hemmerlein concluded that a silver-mediated "cytotoxic" (a term meaning a detrimental or deadly effect on cells) process occurs *in vivo* directly adjacent to the silver-impregnated collagen cuff. This silver-mediated cytotoxic process arguably explains the reduced subcutaneous anchorage (loosening) and increased inadvertent removal of catheters that are seen clinically. Furthermore, the authors went on to state that these cytotoxic effects would likely cause a reduction of fibroblast ingrowth into the adjacent cuff, which would result in the loss of a mechanical barrier and an increased risk of infection.

47. Another critical finding of the Hemmerlein paper was the striking observation that cell layers exposed to the silver-containing cuff for 72 hours had a cell-free halo surrounding the implant. In other words, where there were cells present initially, there became a zone surrounding the implant of dead cells. Importantly, the cell-free zone surrounding the silver-impregnated implant appeared oval in shape. This shape likely reflects a "concentration gradient" caused by the unequal diffusion of a toxic substance (silver) into the medium and mild fluid motion (convection) during the experiment. "Diffusion is the process by which matter is transported from one part of a system to another as a result of random molecular motions" (Crank, J., "The Mathematics of Diffusion, 2nd Ed." Oxford Science Publication, Oxford, 1975). In this case, diffusion refers to movement of silver ions, or silver complexed with proteins from the source of the silver, *i.e.* the implant, toward the surroundings, *i.e.* fibroblasts and soft tissue. Basic diffusion theory, as explained in the Crank article, states that at the implant surface (the source of the silver) the concentration would be the highest and the silver concentration would decrease as the distance from the implant increased. This decrease in silver concentration from

its source is called a "concentration gradient" and is a fundamental concept in many fields of science, including biomaterials. Thus, in the Hemmerlein paper, silver toxicity was observed as a halo of cell death close to the implant. At farther distances from the implant, cells were alive but appeared "unhealthy" due to the decreased concentration of silver according to diffusion theory.

48. SJM scientists should have been aware of diffusion theory and that the highest concentration of silver exposed to patients with the SJM Silzone heart valves would have been immediately adjacent to the silver-coated fibers of the sewing cuff. SJM scientists should have performed experiments where the concentration of silver immediately adjacent to the silver-coated fibers was measured both *in vitro* and *in vivo*. Furthermore, the pannus overgrowth (i.e., the tissue growing over the cuff) would act as a barrier to diffusion, and confine the silver released from the implant beneath the pannus. Under these conditions, the concentration of silver within the cuff will be considerably higher than that measured in blood or distant organs. Limited tissue ingrowth or its absence into the cuff would be expected.

49. SJM scientists did not conduct the aforementioned studies or one that fairly approximated them or their significant findings. At her deposition, Dr. Tweden acknowledged she was aware of the concept of local tissue gradient, understood that there was a local tissue concentration gradient effect associated with the Silzone coating, and acknowledged that the silver levels were highest at the tissue interface next to the cuff. Nevertheless, SJM did not actually measure the tissue silver levels from the animal subjects at the cuff–tissue interface to determine the nature and degree of the tissue concentration gradient. (Tweden Dep. at 479-80, 491-2,490-92, 520-521, 576-579, 591-593.) SJM did not effectively study whether the tissue levels at the silver-tissue interface ever exceeded levels that Dr. Tweden and her cohorts at SJM

believed to be toxic to tissue, i.e.- 1,200 p.p.b.[10] Instead, Dr. Tweden conducted a misguided study by using solutions that destroyed the concentration gradient, and potentially very high silver concentrations, as reported in her article, "Biocompatibility of Silver-Modified Polyester for Antimicrobial Protection of Prosthetic Valves," cited above. In that study, Dr. Tweden developed a cell compatibility assay that used mixed and diluted solutions derived from silver-coated fabric of the SJM Silzone heart valve. This solution extract eliminated any concentration gradient by the process of mixing and creating a solution with an average silver concentration much lower than the local (i.e. near the implant) concentration.[11] Subsequently, this extract was *diluted* and then used to challenge fibroblast viability and function. This dilution should not have been done. At 90% full strength, the concentration of silver in the extract was 1.2 p.p.m. (or 1200 p.p.b.), well above the level suggested by Dr. Tweden and Mr. Langanki, another SJM research scientist, as toxic. The concentration at full strength was not reported. Based on these data, one would expect the concentration of silver adjacent to the Silzone implant to be possibly

[10] Dr Tweden testified in particularon this point:

Q. Okay. And it would be fair to say that
you don't know for a fact that the twelve hundred
part per billion level that you estimated at the
concentration that killed some fibroblast cells,
whether the levels that were immediately adjacent
to a sewing cuff in a local tissue concentration
gradient environment were substantially higher
than twelve hundred parts per billion?
You don't know one way or another
whether that's true, correct?
MR. GATTONI: Objection, form.
THE WITNESS: We did not -- we did not
measure that. However, again, it's really the
nature of the tissue ingrowth, the histology that
showed us: Is there any abnormalities in tissue
ingrowth that would have been influenced by that
higher gradient?

Tweden, Katherine Day 2 (MDL) page 587-88

[11] Dr. Tweden testified that the study methodology used eliminated any local tissue concentration gradient that may have existed. Tweden Dep. at 586-87.

orders of magnitude higher than 1200 p.p.b. When the extract was exposed to cells at full strength (approximately 1300 p.p.b.), the authors observed lower cell density, less cell orientation, and more damaged membranes compared to exposure to the diluted extracts (i.e., < 85%). As the authors destroyed the concentration gradient, the mixed and diluted silver solution used had a silver concentration much lower than that in the region near the implant. As the investigators did not maintain the concentration gradient that would have exposed cells to much higher silver concentrations adjacent to implant, as was demonstrated by the Hemmerlein paper, the grossly toxic effects of silver were not observed. This shortcoming is an extremely important one distinguishing Hemmerlein from the SJM studies, and is one that anyone reviewing the safety of placing a silver coating permanently in heart tissue would want to be aware of and take into account.

50. Prior to putting Silzone valves into the marketplace, it was crucial for SJM to read the Hemmerlein paper and to understand the risks to human cells and, particularly, to fibroblasts, associated with elevated concentrations of silver adjacent to the silver-coated implant and to thereafter call it to the FDA's attention in their supplemental submissions.

51. SJM did not cite or provide the Hemmerlein paper in any of the updates to PMA #P810002 submitted to the FDA or, according to Mr. Runquist, to the FDA at any time in connection with the Silzone heart valve. (Runquist Dep. at 349.)

52. From the material I have reviewed, it is my opinion that SJM did not properly address the issues raised in the Hemmerlein paper. This is because, as discussed above, SJM approached the issue of silver toxicity in the wrong way. To assess the safety of their device, SJM examined the systemic distribution and toxicity of silver in blood and organs distant from the implant site. Although these data are necessary for examining whole animal toxicity and

safety, the critical issue to investigate is the local concentration of silver adjacent to the silver-coated fibers and the effect of this silver concentration not only on cell toxicity, but also on impaired or retarded cell function. Further, based on diffusion theory the silver concentration at the source (i.e., the implant) has to be higher than in remote sites. Thus, the measurement of silver concentrations in blood and distant organs represents the *lowest* amount of silver exposed to the body. The systemic concentration of silver in a solution or in tissue as a whole ("systemic toxicity") is only a small part of evaluating the safety of the Silzone heart valve. The real issue that SJM should have attended to, as evidenced by the Hemmerlein article, is the concentration of silver in the cells directly adjacent to the device, i.e "local toxicity or impairment of cell function,", a toxicology concept that SJM's Dr. Tweden was aware of.

53. There are other articles that were readily available and crucial for SJM to review. In 1989, Ellender and Ham examined the effect of silver-loaded ion exchange resin beads implanted into loose rat connective tissue in "Connective Tissue Responses to Some Heavy Metals. III Silver and Dietary Supplements of Ascorbic Acid. Histology and Ultrastructure" (Br. J. Exp. Path 1989; 70:21-39) (the "First Ellender and Ham paper"). This study is particularly noteworthy as the authors developed the exchange resin beads to act as vehicles that delivered a predicable amount of silver to the local tissue without the complicating influences arising from systemic toxicity or local foreign anions (negatively charged ions). They noted the following effects within the area proximal to the silver-releasing beads:

(a) the initial lesions showed dead tissue and subsequent tissue organization was "delayed and disordered";
(b) fibroblasts and macrophages had their internal organelles altered;
(c) the extracellular matrix (ECM) contained poorly-oriented collagen fibers and other matrix components were altered;
(d) the silver delayed tissue repair; and

(e) morphological changes within fibroblast and macrophages were maintained even when attempts were made to ameliorate the effect of silver.

54. There was also a second Ellender and Ham article published in 1989 entitled "Silver Wire Implant of 40 Years' Duration: Influence on Local Tissues" (L. Oral Implantology, 1989, Vol. XV/No. 1:47-51) ("Second Ellender article"). The Second Ellender article was one that SJM AB Cuff team clearly was aware of and discussed internally. It appears to have been the only article addressing the long term effects of implanted silver that SJM was aware of. In Dr. Tweden's literature review of December 7, 1996 to the AB cuff project file entitled "Literature Review on Silver Toxicity and Endocarditis," she fairly summarizes the Ellender and Ham article with the following bulleted statements (0030966.tif):

- "Silver wire implant of 40 years' duration influence on local tissues."
- "Silver wire used for surgical fixation of the frontal bone for 40 years."
- "Tissue response evaluated."
- "Tissue blackened around wire two millimeters, around a knot up to six millimeters."
- "Vessels walls in Haversian system filled with silver particles."
- "Chronic inflammatory response."
- "Heavy levels of silver around vessels and collagen."
- "Silver has affinity for DNA."
- "The toxicity of silver cationic is attributed to its ability to form stable complexes with structural and functional proteins and thereby disrupt life processes."
- "This group believes silver disrupts primarily the biosynthesis of connecting tissue matrix."
- "Conclusions, metallic silver is not a biocompatible material, and caution should be used when used directly as an implant in dental practice."

This article was discussed at an internal AB Cuff team meeting on October 24, 1996. (0124795.TIF; Tweden Dep. 331-35) The article clearly raised the fact that when silver is used as a long-term implant material, as contemplated by SJM, it generates a long-term chronic inflammatory response. It should have been obvious to any professional trained in biomaterials science and engineering, that caution should be exercised when employing silver as a long-term implant given its questionable biological performance and associated negative local tissue

response. Yet despite this paper's obvious materiality to the issue of biocompatibility, it was, according to Mr. Runquist, never cited or provided by SJM to the FDA. (Runquist Dep. at 320-25)

55. Another relevant manuscript addressing the toxicity of silver-containing antimicrobial agents on human fibroblasts is McCauley *et al.* (Journal of Surgical Research 1989, Vol. 46: 267-274) which demonstrated that dose-dependent concentrations of silver sulfadiazine in the range of 13 to 56 p.p.m. were sufficient to significantly reduce cell proliferation and protein production. These observations supported observations of delayed wound healing, a process dependent on fibroblast proliferation and collagen deposition, in burn patients treated with topical antimicrobial agents containing silver sulfadiazine. This negative article, according to Mr. Runquist, likewise was not submitted to the FDA (Runquist, 326-27).

56. There was also a material article in existence by Holinger, a toxicologist, ("Toxicological Aspects of Topical Silver Pharmaceuticals," Critical Views in Toxicology 26(2):255-260 (1996)), in which he addresses the negative effect of silver on wound healing and his recommendation that extensive testing be performed before silver was used as, among other things, a biomaterial. This article also was not provided to the FDA for consideration in evaluating the safety of Silzone. (Runquist, 336-38.) I will further address this article in the next section in my discussion of material scientific literature addressing the safety of silver that was not submitted to the FDA in post market submissions (that is, after March 24, 1998).

57. Literature on the cytotoxicity of dental restorative materials containing silver particles that had been clearly established in human dental soft tissue is another area of existing medical literature that appears to have not been provided to the FDA reviewers by SJM so far as it was negative to using silver as a long term implant. In a paper by Garcés-Ortíz and Ledesma-

Montes (Garcés-Ortiz, M., and Ledesma-Montes, C., 1997 "Cytotoxicity of ketac silver cement," J. of Endodontics; 23(6); 371-373) (the "Garcés-Ortíz" paper) healthy human premolars were filled with glass ionomer cement containing silver particles. Upon scheduled extraction of 15, 30, and 60 days, the health of dental soft tissue (i.e., dental pulp) was evaluated. Of significance was the severe necrotic layer of tissue adjacent to the silver-containing restoration and in some case abscess formation was evident. This study is highly significant for this case, as it clearly demonstrated in human patients (over sixty studied) that materials containing silver in contact with fibroblast-like tissue (i.e., odontoblasts) can basically kill cells in the local vicinity, which obviously ties in well with the observations of Hemmerlein and the concept of a toxic concentration gradient surrounding the Silzone cuff.

58. Perhaps the most compelling article suggesting silver was not a good choice for a long-term implant came from multiple papers by Sudmann et al addressing the biocompatibility and concentration of silver distributed both systemically and locally after a total hip replacement using silver particle-impregnated bone cement. Acta Orthopaedica Scandinavica **56**(6): 534-534. and Sudmann, Vik et al. 1994 "Systemic and Local Silver Accumulation after Total Hip-Replacement Using Silver-Impregnated Bone-Cement." Medical Progress through Technology **20**(3-4): 179-184.) [The Sudmann papers]. A 76 year old woman received a total hip implant that was anchored in place by silver particle-impregnated bone cement. (Sudmann, Vik et al. 1985; "Muscle Paralysis in a Patient with Total Hip-Prosthesis and Silver-Impregnated Antibacterial Bone-Cement. The metallic silver was added to the bone cement as a prophylaxis against deep infection. The patient developed serious neurological deficits 5 years after insertion of the implant. Due to loosening, the implant was removed with the associated silver-impregnated bone cement. Two months after removal of the implant, improvement was

observed in the patient's neurological deficits; however, general neuropathy with axonal damage to both motor and sensory nerves existed 24 months post removal of the prosthesis. Silver measured in the joint capsule and in the blood demonstrated elevated levels of 1000 times the level of normal blood concentration (103 p.p.b.) and 60 times (~6 to 2 p.p.b.), respectively. The Sudmann papers point out that:

A. There were clear differences in local vs. systemic silver concentrations;
B. The local concentration of silver was 15 times greater than the systemic concentration, supporting the concept of a concentration gradient as stated earlier;
C. Significant neurological deficits occur with local silver concentrations ~ 100 p.p.b.;
D. Their observations are consistent with the aforementioned *in vivo* experiments on silver toxicity.

The Sudmann papers concluded that the neurological toxicity was not only affected by the systemic levels of silver, but most importantly by the high local silver concentration in the joint cavity.

59. In summary, there existed in the medical literature a number of significant articles that indicted that silver was not a safe long term biomedical implant material. These articles were not provided by SJM to the FDA in its PMA submission. In contrast, SJM portrayed silver to be a benign and safe material with minimal downside risk. Articles such as I set out above, in my opinion, were absolutely necessary material for the FDA to have reviewed prior to passing on the safety and efficacy of the Silzone coating. SJM, however, did not submit or cite this contrary literature to the FDA in connection with the Supplemental PMA application or update. To not have found this literature and submit this literature to the FDA in connection with the Supplemental PMA application fell well below the professional standards of care of the biomaterial development community, as the testimony of SJM's own employees and forensic consultant confirm.

**IV. AFTER THE FDA SUPPLEMENTAL APPROVAL LETTER OF MARCH 24, 1998, THERE WAS ADDITIONAL NEGATIVE SCIENTIFIC LITERATURE SUGGESTING THAT SILVER HAD THE POTENTIAL TO IMPAIR TISSUE HEALING IN PATIENTS WITH SILZONE™ HEART VALVES THAT SJM KNEW ABOUT OR SHOULD HAVE KNOWN ABOUT WHICH WAS NOT PRESENTED TO THE FDA IN SJM's POST MARKET FDA SUBMISSIONS.**

60. SJM"s head of Regulatory Affairs, Dr. Alan Flory, testified that SJM had a duty to submit to the FDA post approval literature reports that could impact upon FDA's assessment of safety and effectiveness." (Flory Dep. 110-1) There was, in my opinion, critical literature that SJM knew or had reason to know of that met this standard.

61. One such article is by Hidalgo and Dominguez (Hidalgo, E., and Domínguez, C., 1998, "Study of cytotoxicity mechanisms of silver nitrate in human dermal fibroblasts," Toxicology Letter: 98; 169-179) which showed that silver can enter internal compartments (i.e., nucleus) of either bacteria or mammalian cells and bind to DNA, thereby affecting replication. Furthermore, their study pointed to the clear destruction of a fibroblast cell population exposed to the antiseptic $AgNO_3$. They also showed the silver ions from the $AgNO_3$ greatly inhibited fibroblast proliferation and that the inhibition of DNA synthesis was the primary event associated with the fibroblast toxicity. Even though proteins in serum helped attenuate the toxicity of silver ions, the effect on DNA was not insubstantial and at the lowest concentrations tested 0.44 p.p.m. DNA synthesis was depressed by approximately 60%. A study such as this demonstrating severe inhibition of DNA synthesis, by silver ions, on mammalian fibroblasts should have been reported to the FDA.

62. Another paper in this regard is by Trerotola S.O. in "Tunnelled Hemodialysis Catheters: Use Of A Silver-Coated Catheter for Prevention of Infection - A Randomized Clinical Trial" (Radiology 1998: 207: 491-496) (the "Trerotola paper"). This article was published in May 1999, which was shortly after the FDA issued its approval letter, but, as I have been advised

by the PSC, before the valves were widely marketed in the United States. In this article the authors analyzed the literature addressing prospective randomized clinical studies of implanted catheters in blood-contacting environments (probably the most relevant model to evaluate the Silzone coating other than valve implantation itself) and showed no clinical efficacy of the silver coating on tunnelled hemodialysis catheters in reducing infection, compared to the control group. Although within this article there are a number of references addressing both the efficacy and lack of efficacy of various forms of silver coated catheters on reducing infection were cited (references 7,8,9,10,11 in the Trerotola paper), these citations involved less relevant experimental models due to either their short duration of implantation or the lack of the blood-contacting environment. Trerotola concluded that silver coating of tunnelled hemodialysis catheters "did not confer any clinical benefit," and, in fact, "their use was associated with a trend toward increased infection and colonization rates compared with uncoated catheters." Trerotola also found that some patients react to this coating, which raised concern about its safety in a larger population. It was also noted by the authors of this study that the coating they evaluated was being discontinued due to difficulties with the coating process, according to the manufacturer. I understand that this pertinent and negative article was not provided to the FDA by SJM.

63. Among the documents SJM produced in discovery (but not provided to the FDA), was a January 22, 1999 literature review by a SJM employee, Dr. Wenda C. Carlyle, Ph.D. (0070711.tif; 0070712.tif), that summarized then current literature dealing with how a silver coating might alter blood biocompatibility or implant healing. The review was prepared as part of SJM's response to adverse clinical reports about the valve's safety raised to SJM by a British heart surgeon, Mr. Eric Butchart, who was implanting the Silzone valves as part of a clinical

study commission by SJM. (Runquist, 334-5) One concern that Dr. Carlyle addressed in her report was that the silver might retard healing and result in more paravalvular leaks. Dr. Carlyle's report then goes on to cite and discuss the 1996 Hollinger article I referenced above and how it described many studies that showed that silver sulfadiazine could retard wound healing. As I mentioned above, the Hollinger paper was published in 1996 and was not reported to FDA as part of the Supplement PMA review. (Runquist, 336-8) Assuming SJM had missed this important article in its researching the toxicity of silver, which it should not have if the research was properly performed (as demonstrated by the fact that SJM's Dr. Carlyle was able to find it for her report), beyond any doubt the article should have been promptly brought to the FDA's attention along with Mr. Butchart's significant concerns.

**V. THE PURPORTED SILVER TOXICITY STANDARD OF 300 P.P.B. (NG/ML) IS NOT A RECOGNIZED SCIENTIFIC STANDARD AND IS NOT SUPPORTED BY THE LITERATURE CITED BY SJM OR ITS WITNESSES. IT WAS MISLEADING, THEREFORE, TO SUGGEST THAT IT WAS A VALID THRESHOLD.**

64. In my opinion, the purported silver toxicity standard of 300 p.p.b. advanced by SJM to the FDA and medical community is not a recognized scientific standard and is not supported by the scientific literature cited by SJM or its witnesses.

65. SJM recognized that knowing the toxic threshold level of silver was an important and basic piece of information to have in order to evaluate the safety of Silzone. (Holmberg dep. at 48-49.)

66. I understand that SJM and Dr. Katherine Tweden, who conducted SJM's pre-market Silzone research, represented, in company-sponsored journal articles and in the submissions to the FDA and other regulatory bodies, that the Masters Series mechanical heart valve with Silzone was safe. (Runquist Dep. at 193-94; Tweden at 306–12.) SJM's

representation that Silzone valves were safe was based, in large part, on SJM's representations that 300 p.p.b. of silver in the bloodstream was a toxicity benchmark recognized by the scientific community and that SJM's animal and clinical data demonstrated that the silver levels in the blood following implantation of a Silzone valve did not exceed this 300 p.p.b. toxicity benchmark. (Tweden Dep at 276-81)

67. SJM neither performed *in vitro* or *in vivo* toxicology studies to assess and determine the toxic threshold of silver in blood or in tissue (Flory dep at 305- 06; Tweden Dep. 317-18.), nor consulted with a toxicologist to determine the threshold level. (Tweden Dep. 317-18) SJM's purported standard was not based on any government agency or safety organization data or standard. (Tweden at 304-312) Dr. Tweden at her deposition explained that the reason that SJM did not do animal testing to determine the toxic threshold was "because we saw excellent tissue ingrowth at a short duration and at long duration and no issues with toxicity." (Tweden Dep. at 316) Even if this were true, which is, of course a subject of dispute, this is not, in my opinion, a scientifically valid reason to have not done a proper study determining the toxic threshold, especially, as here, when dealing with a biomedical material that is going to be placed into a human being's heart for decades. Each of these was a remarkable failure on the part of SJM.

68. During her deposition Dr. Tweden explained how she determined the 300 p.p.b. benchmark. What she did was use a literature search and based on her reading and interpretation of three medical journal articles from that search, one by Dietch, one by Boosalsis and one by Wan, which I will discuss below, she concluded that 300 p.p.b in blood was a safe level

benchmark. (Tweden Dep. at 281-316). Notably, there was no threshold determined for silver in tissue. (060082.tif at p. 7 [12]; Flory Dep. at 87-88, Runquist Dep. at 194-95, Tweden Dep. at 225)

69. A main published reference to this purported standard is found in Dr. Tweden's paper entitled "Biocompatibility of Silver-Modified Polyester for Antimicrobial Protection of Prosthetic Valves" (Journal of Heart Valve Disease 1997, Vol. 6: 553-561). In this paper, Dr. Tweden did not cite the Deitch article as a principle support as she did during her deposition, (Tweden Dep. at 281-316), but instead cited a scientific article by Wan *et al.* entitled "Determination of Silver in Blood, Urine, and Tissues of Volunteers and Burn Patients" (Clinical Chemistry 1991, Vol. 37, No. 10: 1683-1687) (the "Wan paper"), for the proposition that 300 p.p.b. is a standard representing the lowest concentration reported to produce silver toxicity in humans. For the reasons that follow, it is my opinion that the Wan paper does not support a scientific standard of 300 p.p.b. for silver toxicity to humans.

70. The Wan paper did not set out to test silver toxicity. Rather, the study sought to examine methods for determining the levels of silver in burn patients who were treated with silver sulfadiazine (SSD) cream. The toxicity of silver was not addressed as a specific aim, goal, objective or hypothesis of the work presented.

71. In previous submission to this Court SJM, through one of its witnesses indirectly relied upon Wan in citing a textbook, *Tietz Textbook of Clinical Chemistry, 3rd edition*, Burtis C.A. and E.R. Ashwood, eds., Philadelphia: W.B. Saunders 1999; p. 995, for the proposition that the 300 p.p.b. standard is a recognized value that represents the lowest concentration reported to

[12] The referenced document is a January 1998 final report by Danny Langanki and Matt Ogle entitled "SJM EPIC Silver Washout Study," the purpose of which study was to determine *in vitro* the extent of leaching and potential migration of silver into the bioprosthesis tissue component of the Epic valve. In this the report Langanki and Ogle recognize that there was no threshold established for annular tissue levels, stating: "The release into the tissue ... showed trace concentrations. Since there is no known reported toxicity levels for valvular tissue, comparison cannot be directly determined."

produce silver toxicity in humans. This reference pertains to a chapter in a textbook entitled "Toxic Metals" by Thomas P. Moyer Ph.D. In this chapter, a short section addressing silver toxicity focuses on systemic toxicity (toxicity throughout the entire body) and a syndrome known as argyria (a blue-gray discoloring of the skin). The only reference cited in Dr. Moyer's chapter is the Wan article which, as I explained above, does not support the so-called silver toxicity standard. In fact, Dr. Moyer never states that the 300 p.p.b. silver concentrations measured in the Wan paper were toxic levels. He merely states that typical silver levels observed in unaffected patients ranged up to 300 p.p.b. Any inference made by Dr. Tweden and SJM that this statement represents a recognized scientific standard based on Wan's publication for silver toxicity is erroneous and not scientifically valid.

72. Turning now to the Dietch article (The Journal of Trauma 1989, Vol. 29 (4):430-434) (the "Deitch paper") I note that another SJM scientist, Mr. Danny Langanki, also cites 300 p.p.b. as a threshold for toxic silver levels, in another company-sponsored published paper entitled "Evaluation of a Novel Bioprosthetic Heart Valve Incorporating Anticalcification and Antimicrobial Technology in a Sheep Model" (The Journal of Heart Valve Disease 1998, Vol. 7: 633-638). Mr. Langanki cites, as did Dr. Tweden, both the Wan paper and the Deitch paper for this proposition. As I explained above the Wan paper did not measure the purported 300 p.p.b. toxicity level of silver. Neither did the Deitch paper, a point conceded by Dr. Tweden during her deposition. (Tweden Dep. at 281-89). The Deitch paper instead references a paper by Boosalis *et al.* (Surgery 1987, Vol. 101: 40-43) (the "Boosalis paper") as the source for the 300 p.p.b. toxicity level of silver. (Another point conceded by Dr. Tweden at her deposition. (*Id.*)) Interestingly, the Wan paper thoroughly criticized he methods and detection limits of the Boosalis paper, calling into question the legitimacy of the work. In any event, the authors of the

Boosalis paper likewise did not determine the toxicity of silver in humans; they only measured silver in serum and urine of burn patients exposed to silver sulfadiazine. In other words, the Boosalis paper does not even mention the so-called 300 p.p.b. standard, which is understandable as the authors neither intended nor set out to establish one. Additionally, Figure 1 of the Boosalis paper, which Dr. Tweden cited at her deposition as supporting her conclusion (Tweden Dep. At 291-92), does not provide appropriate data and information on which one can validly draw a scientifically valid conclusion that 300 p.p.b. of silver in blood is a safe toxic threshold.

73. Ms. Diane Johnson, SJM's consulting witnesses on FDA review matters has testified that as an FDA reviewer she would expect that when a sponsor talks about a toxicity threshold, that there would be some kind of study data that would point to such a threshold. (Diane Johnson Dep. at 151) As a biomaterial scientist I agree. In this case, however, SJM's representation that 300 p.p.b. of silver in blood was a toxic threshold had no valid and fitting data supporting it.

74. I conclude that the 300 p.p.b. value represented by SJM and its internal scientists to the FDA and the medical community as a "recognized" silver concentration to produce toxicity in humans is not substantiated by the scientific literature cited either by SJM or by consultants in this litigation on its behalf. The level at which systemic silver concentrations will be considered toxic in humans is undetermined and it is a material misrepresentation of scientific fact to portray 300 p.p.b. in regulatory applications, published literature and product labeling and advertisements as the toxic threshold.

75. Dr. Tweden and SJM represented that the Silzone valve was safe, relying in part on the belief that 300 p.p.b. was a scientific and valid benchmark for toxicity to humans. It is not

scientifically valid and is not a recognized benchmark. Using it as such in its pre-market testing leads to the erroneous conclusion that Silzone was safe.

## VI. THE FDA WAS HAMPERED IN ITS REVIEW OF SJM HEART VALVES CONTAINING SILZONE COATINGS SINCE SJM DID NOT FULLY DISCLOSE TO THE FDA DATA IT HAD IN ITS POSSESSION CONCERNING THE SHORT-TERM ANIMAL STUDY SHEEP "KTMV-2"

76. In my opinion, information in SJM's possession concerning the short-term animal study sheep "KTMV-2," that was not submitted to the FDA, even after it had asked SJM for all animal pathology information, was an omission of data necessary to the consideration of the safety and efficacy of the Silzone coating.

77. Since SJM specifically excluded one sheep (KTMV-2) from the study data without any scientific justification, the conclusions reached by SJM and presented to the FDA were adversely affected. Elimination of KTMV-2 amounted to elimination of 20% of the data set, since pathology of only 4 of 5 sheep were reported. This is a clear misrepresentation of the data and supports the aforementioned claims that SJM was biased in presenting information to the FDA.

78. The FDA, according to the PMA supplement filings, was first advised that this sheep even existed as a member of the short-term study in an Amendment to the PMA supplement dated December 1997, filed seven (7) months after the original submission responding to an FDA request for more information. In this submission SJM stated: "The animal designated as KTMV-2 was an early death and the cause of death was unknown." SJM did not provide FDA with the pathology report by Dr. D. Cameron, who examined that sheep's heart. Dr. D. Cameron summarized his pathology of KTMV-2 by identifying a paravalvular dehiscence, a blood clot encasement of the synthetic material, fibrous tissue covering but not

extending into the cuff fabric (i.e., no tissue ingrowth), and observation of black particulate material (presumably silver, see below) .

79. In my opinion, the black particulate material could be due to silver spalling off the Dacron fabric. Both Mr. Runquist and Dr. Tweden, who were familiar with the study, testified that the particles were silver that had come off the cuff. (Runquist Dep. at 222-23; Tweden Dep. at 100-01.) I have reviewed the Affidavit of Dr. Gregory John Wilson dated February 7, 2002 and associated exhibits in which he describes SJM heart valve implants retrieved from patients that displayed impaired healing within the cuff and variable pannus overgrowth. From Dr. Wilson's exhibits, it is clear in some cases that the silver came off of the polyester fibers, which represents not only a potential hazard from the newly-increased surface area of silver exposed to the tissue (an increase in surface area will lead to an increase in silver ions released), it now represents a particle that monocytes and macrophages will attempt to engulf (a process called phagocytosis) and lead to a persistent inflammatory response.

80. Furthermore, the pathological observations of Cameron of clot encasing the Silzone fabric in KTMV-2 is consistent with the experiments performed by S. Goodman that SJM sponsored. The blood compatibility of the Silzone coating has not been thoroughly investigated and preliminary studies by Goodman et al, (Goodman, S.L., "Platelet Interaction with Silver Treated Sewing Rings of Mechanical Heart Valves: Potential Effect on Tissue Ingrowth and Healing," Trans. Soc. Biomaterials: 24th Annual Meeting of the Soc. of Biomaterials, (April 1998, 207) ("the Goodman abstract,") (0023891.tif) would imply that it is thrombogenic. In experiments conducted by S. Goodman and SJM staff and reported in the Goodman abstract, Silzone cuff fabric was exposed to human platelets and observed using electron microscopy. They observed that platelet interaction with the Silzone cuff fabric was

"quite different to that on the untreated polyester fabric." After a 45-minute exposure of human platelets to the Silzone fabric, "almost all platelet membranes were disrupted such that their cytoskeleton was exposed. On the control polyester fabric, the level of disruption was much less and the extent of platelet aggregation was also much greater." On the Silzone fabric, between 30-50% of the surface was covered by adherent platelets, where the control polyester fabric had less than 25% platelet coverage. Although the Goodman abstract makes a claim that the combination of extensive platelet coverage and membrane disruption could lead to improved wound healing, this opinion contradicts what is currently known regarding blood materials interactions, which would associate greater platelet coverage of the surface and disruption of the membrane as an indication of platelet activation where they release their pro-coagulation intracellular contents.

## VII. SJM'S *IN VITRO* WASH OUT STUDY OF SILVER COMING OFF SILZONE FABRIC AND ITS *IN VIVO* STUDY ESTIMATING THE AMOUNT OF SILVER RETAINED AFTER IMPLANTATION PROVIDE ALARMING DATA ON THE DEGRADATION RATE OF THE SILZONE COATING.

81. The Silzone coating was not inert as SJM would have one believe by its claims relating to leaching. In fact, its corrosion-resistance was poor. Enhanced liberation of silver ions from the Silzone coating was a design goal of SJM's Dr. Twedèn, who believed increased ionization would improve the bactericidal and/or bacteriostatic efficacy of Silzone. (0704942.tif). The "[s]olution" to the problem of slight ionization, she observed in her laboratory notebook on March 18, 1997, resided in the "corrosion already happening by inserting a metal that is more noble than silver in the mix. The idea is that corrosion (or silver ionization) would be greater. e.g., palladium, gold, platinum, etc. are all noble to silver."(Ibid.)

82. The goal of enhanced silver delivery not only reinforces its role as a drug, but also raises the issue of too much corrosion leading to toxicity of local tissue. Evidence of SJM's concern over the corrosion of the Silzone coating is found in a letter dated August 21, 1996, from SJM's project engineer William R. Holmberg to Dr. Prian Sioshansi, a Vice President (Biomaterials) for the Spire Corporation. Mr. Holmberg states that "The corrosion rate, when coupled with other valve components, of silver is estimated at 200-400 Angstroms per year. With the silver corroding at these rates, **it *is likely* during the life of the device that all of the silver could be removed.**" (0064749.TIF. Emphasis added.) If Mr. Holmberg is correct in his estimated corrosion rates, "200-400 Angstroms per year", then the Silzone coating could be completely removed in ~ 7.5 to 15 years, well within the lifetime of the implant. According to data from "Product Technology-silver treatment," (0681147.tif at 0681165), this could lead to the liberation of 50 mg of silver from the coating. Given the expected concentration gradient based on sound scientific theory, one can expect the ***local*** silver concentration to far exceed the cytotoxic concentrations defined in the papers by Wataha, Steffensen, and McCauley.

83. However, the corrosion rate defined by Mr. Holmberg is likely an underestimate. The notebook of Dan Langanki (No. 394, pgs. 16-22, 0705696.TIF) indicated that test Silzone-coated fabric placed in bovine serum lost 12% of its silver coating over a 7-day period, amounting to approximately 1.7% of the coating per day. SJM did not report these data to the FDA in its PMA Supplement. SJM did report data from another leaching study in its PMA Supplement section devoted to "Leachability Studies" at pages 12 and 13 of the Supplement. (003259-60.tif) In this study, under similar test conditions, Silzone-coated valves had much lower corrosion rates; however, the coating lost was still 2% over the 7-day period. In one series, over 392 p.p.b. of silver was released into the test solution by 3 days. In this test, a small valve

size was used (17 mm), so the values of silver released represent least case scenario. The low sample number, only two, and short duration of the study would prevent any reasonable conclusions regarding whether the corrosion rate was decreasing or, as SJM claimed, had reached a steady state. To conclude that saturation had occurred, SJM would have needed a sufficient sample size (e.g., 5 valves) for statistical analysis and have extended the duration of the study well beyond one week. A corrosion rate of 0.29% per day is calculated from the valve leaching study. Based on the lower valve corrosion rates, all the coating would be gone in 350 days. SJM neither presented the fabric leaching study data to the FDA, nor did it analyze the differences it found between the fabric and valve studies, potentially indicating large variability in the corrosion properties of the Silzone coating.

84. In their analysis of the leaching studies, SJM suggested in their PMA Supplement that the concentration of silver liberated from the Silzone coating would be diluted within the 3500 ml volume of "serum" of a 70 kg man. This analysis is erroneous, since it is based on the assumption that all the silver released is delivered into the bloodstream. As stated earlier, in my opinion the appropriate issue to consider is the local silver concentration in tissue. That a concentration gradient will develop indicates systemic distribution of silver will not occur as SJM proposed.

85. SJM also analyzed the amount of silver loss from the Silzone-coated valves in its premarket 10-week ("long term") sheep implant study (PMA Suppl. Attachment 16, pg. 12, 0003243.TIF at 0003530). This analysis was very important, as it represents the only investigation that SJM, to my knowledge, undertook of aggregate loss of silver from Silzone valve sewing cuffs under actual conditions of use following implantation in living animals. Data on pg. 98 of Mr. M. Ogle's notebook # 407 (0128594.TIF) indicates an average among the six

sheep implanted with Silzone valves of approximately 22% of the silver coating was lost during the 10 week study, with up to an alarming 45 percent of the Silzone coating lost in one animal. This average amounts to a corrosion rate of 0.31 % of the Silzone coating loss per day of implantation, which means that the coating could be completely removed within 318 days, assuming a linear release rate. [13] In its PMA Supplement, SJM did not report these data, yet data from the same study and even from the same table in Mr. Ogle's notebook data were used to support the safety and efficacy of the Silzone coating (PMA Suppl. Attachment 16, pg. 12; 0003243.TIF at 0003530). Based on the information available to me, given the massive amount of silver released from these Silzone coated valves, SJM's statement that the results were "inconclusive" is scientifically invalid.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 13, 2003

Kevin Healy, Ph.D.

[13] Based on accepted corrosion science principles and given the galvanic coupling that is involved in the Silzone coating, a linear release rate is a fair analysis assumption for this system. It is also consistent with the *in vivo* data.