comes up, metal ion release. What is the toxicity or what is the -- you know, the response of tissue in the peri-implant region due to these orthopedic devices.

Q. Due to a slow release or a release at any rate of some type of metal ion?

A. Right. And/or a complex.

And some of this is associated with wear because you have an articulating surface on the metallic head, which is the femoral head of the implant, so it's not just simple corrosion or low level release. There's -- there's a wear process that accelerates that.

Q. Is your expertise in orthopedic devices?

A. My expertise is really in designing materials to control biological function at the cellular level.

Q. And what type of devices are involved in that?

A. Orthopedic, cardiovascular.

Q. So you've designed cardiovascular devices?

A. I have a patent on an intravascular stent. Multiple patents on an extravascular stent as well as coatings for stents.

Q. Since the first phone call with Mr. Coren, have you had subsequent phone calls with plaintiff's counsel?

Q. -- it was research you were doing or whether or not you were reviewing literature. Whether or not there's something else out there that I should be asking you questions on. Just usually a good way to figure it out.

A. I don't know.

Q. Okay. How about in 2004? How many hours would you say you spent on litigation in 2004?

A. It might be zero. I don't remember. Between five and zero, I would say.

Q. And in 2003?

A. I would say that's the majority of the time, between 2002 and 2003.

Q. Did you independently become interested in silver toxicity issues and go out and look in the literature outside of issues related to this litigation?

A. Yeah.

Q. And what did you look up?

A. Well, I'm not sure I can disclose that, but I was retained for another litigation with a silver based product.

Q. Um, okay. Without disclosing any information regarding that case, can you tell me what it is? What case is it?

A. It might be on my CV. The product was a

patent infringement on the form of silver used in a burn patient wound dressing.

Q. Okay. So what type of litigation experience do you have?

Have you been hired as a consultant for litigation matters besides the Silzone litigation?

A. Yes, but I don't remember -- maybe I did a declaration, but I was never deposed.

Q. Is this the first time you've been deposed?

A. Yes.

Q. What type of cases were your other consultancies?

A. Mostly patent infringement or device -- yeah, device patent infringement.

Q. Were there any product liability cases?

A. No.

Q. How many were there over the last four years?

A. How many other cases?

Q. Yes. How many other cases?

A. Maybe two or three.

Q. Okay. Have you talked to anyone in forming the opinions that you drafted into your reports?

A. Other than counsel?

Q. Yes, other than the plaintiff's counsel.
A. No, I don't think so.
Q. Okay. So you haven't discussed research on silver with any other independent researchers?
A. I think that's a different question. Well, barring this other case, research on silver -- no, I don't recall. I don't think so.
Q. Have you spoken to Dr. Butchart?
A. No.
Q. Do you know Dr. Butchart?
A. No.
Q. Have you haven't spoken to Dr. Wilson; is that correct?
A. No.
Q. Have you spoken to any other retained expert by plaintiffs --
A. No.
Q. -- in the Silzone litigation?
A. No.
Q. Have you spoken to anybody at the FDA?
A. On this?
Q. Concerning -- yes, concerning Silzone.
A. No.
Q. Have you reviewed the report of Dr. Factor?

Q. Okay. The same with the quote from Dr. -- excuse me -- Mr. Bricault, which is directly under the quote from Dr. Sioshansi?

A. Yes.

Q. Did you read the deposition of Dr. Bricault?

A. No, I did not.

Q. And plaintiff's counsel sent you the excerpt from the deposition?

A. That's what I recall, but it might have been not just these nine lines, whatever it is.

Q. Did you ask plaintiff's counsel to send you an excerpt of the deposition of Dr. Sioshansi?

A. I don't know. I could have asked for information regarding -- because I was -- I was interested in finding more about the process and the approval for the IBAD process.

So I don't know if I asked for a deposition or an excerpt from a deposition.

Q. Did you read the deposition of any employee of Spire?

A. Not the full deposition, no.

Q. And the only excerpts of the depositions of employees from Spire that you read are the excerpts that are contained in your report?

A. I think so, yes. Well, or -- or proceeding lines, but not -- you know, not extensively in addition to what you see here.

Q. Did you -- I also note a few pages back further I think there's a deposition excerpt from Diane Johnson.

A. Can you give me the exact page?

Q. Yes. Page 23.

A. Uh-huh.

Q. Did you read the deposition of Miss Johnson?

A. Not the whole deposition, no.

Q. Do you have the whole deposition in your possession?

A. I don't think so.

Q. Once again, how did you choose to include that particular excerpt to the deposition if you haven't read it?

A. Well, I think what -- the process that this went by was -- was as I was discovering this information, counsel said, well, here is an excerpt.

I don't know if -- I have to be careful, because I'm not sure how this went, but certainly the deposition segments were presented to me, and I judged whether I thought they were appropriate in the context of what I

was reviewing.

Q. So plaintiff's counsel chose the deposition excerpts and sent them to you?

A. Chose wouldn't be -- yes, they chose to send them to me for review, but not -- they didn't choose to say include this here in this document, for example. That did not happen.

Q. Okay. They selected out portions of the depositions and sent them to you?

A. Correct.

Q. Are there any portions of the depositions that they sent to you that you did not include in your report?

A. There's some by Tweden. I don't recall if I included -- included those. So the answer is yes. I'm sure there are some that I have not included.

Q. Besides the ones from Dr. Tweden, are there any other excerpts from depositions that you chose not to include in your reports?

A. There were some by a colleague of Tweden. Another woman.

Q. Barbara Illingworth, I-l-l-i-n-g-w-o-r-t-h.

Do you have those excerpts from Dr. Illingworth that you did not include?

find issues -- I'm sorry -- papers, publications, you know, documentation, that I relied upon.

So in this case, I feel it's pretty close; but I can't guarantee that there aren't things like single letters or -- or other things.

There's also, of course, the literature search of the papers. A great deal -- a number of papers that I read, but I did not cite. And I didn't feel it was appropriate to -- to add those. I think I mentioned, you know, papers from the literature search.

Q. Let's break it down then.

Are there any other deposition transcripts that you reviewed, but that aren't on the list?

A. Not that I'm aware of since this date, which is -- when did I send this? This is probably -- I don't know, three weeks ago. That's right.

Q. Did you read the entire deposition of Dr. Tweden?

A. Um, a good portion of that one.

Q. Not all of it?

A. I can't recall what all of it is, but I'm sure if it went for a few hours, I probably didn't read all of it; but I read -- I'm sure I read about thirty or forty pages of it.

Q. Thirty or forty pages of the Tweden

deposition?

A. I think so, yeah.

Q. Do you know whether or not it came in more than one volume?

A. I think it was in multiple volumes and I'm not sure I had -- you know, I read all of them.

Q. So in total you read about thirty pages of the deposition of Dr. Tweden?

A. Yes.

Q. Okay. And how about Jonas Runquist? Did you read the entire deposition of Jonas Runquist?

A. No.

Q. What portion did you read?

A. I don't recall the exact portion. I think it's related to what I cite in this -- in this declaration. It may have even been more in there. So a small section of that deposition.

Q. And the section that we're referring to is the section you quoted in your report?

A. That's right.

Q. And the rest of the deposition, you didn't read?

A. Um, I think I need to be careful to say that it's not just that I read the quote and that's all I read. I would say I read the context of how the quote

was developed and then used that quote if I thought it supported my discussion.

Q. Some material before the quote and some after?

A. Correct.

Q. Okay. But not the entire package?

A. No.

Q. Okay. Is there a reason that you didn't read the entire deposition of Mr. Runquist?

A. I'm not really sure -- um, I don't know really what you mean by that in the sense -- would I -- if this whole deposition was provided to me, would I have read the whole thing? Probably would have scanned it to look for relevant topics.

But I think sections of it were pointed out to me to look for relevance to -- to the documentation and the particular point in this case that I was trying to make.

Q. I see. So plaintiff's counsel pointed you to a particular section of the deposition, which is the section that you quoted in your report, and you reviewed that section, plus a little bit before and after?

A. Possibly. And then if I felt that -- I guess -- let me rephrase that.

If I felt that the context of the -- you know,

what was -- what was said in that portion was of importance, then I -- then I would ask for more information -- and relevant, and it might even be in the deposition. And I believe at times I did ask for, you know, the -- the complete or near complete deposition for somebody like Tweden and so forth, if I thought it was important.

Q. Okay. And you have the total and complete deposition of Dr. Tweden, right, in your possession?

A. I can't verify that. I have what I have. I don't know what that is.

Q. Okay. Did you read the entire deposition of anyone in regard to this case?

A. The most complete reading I probably did was for Tweden and Illingworth.

Q. So did you read the deposition of Dan Langangki?

A. Again, in part, yes.

Q. And what part did you read?

A. Well, obviously, the part that I -- I'm sure the part that I cited, again, in the deposition -- in the declaration, excuse me, and that one I probably read a little more extensively, because it was some of his -- his comments and his work that I was interested in with respect to silver concentrations and so forth.

Q. So you thought that his work was relevant in some way?

A. Yeah, uh-huh.

Q. So can you give me an estimate of how much of his deposition you read?

A. Well, I don't know what the whole deposition page number would be, but I could give you an idea of what I thought I read in terms of what I recall. Maybe ten, fifteen pages.

Q. And how about Matt Ogle did you read the deposition of Mr. Ogle?

A. Again, a portion of it.

Q. And is that the portion that you quoted in your report?

A. Yes.

Q. Besides the portion that you quoted in your report, did you read any other portions of the deposition?

A. I think about the same way as -- the same number of pages maybe as Illingworth and so forth. Somewhere around ten and twenty pages, I think.

Q. Okay. Are there any other deposition excerpts that are not listed on this list that you have in your possession?

A. Not that I recall.

Q. Okay. Are there any other deposition excerpts that are not listed on this page that you reviewed?

A. No, not that I recall.

Q. So you did not review the deposition of Bill Holmberg?

A. That I don't know. I might have.

Q. Does his name sound familiar?

A. I have a letter that I reviewed from Holmberg to Piran -- sorry for mispronouncing the name. Dr. Sioshansi.

Q. Yes, I see that. That's No. 8?

A. That's No. 8, right. I don't know if I -- I don't recall reviewing his -- Holmberg's deposition.

And if I did, and it was not in my declaration, then I probably didn't feel that there was material within that that -- that I felt supported some of the arguments I was trying to make.

Q. So you're looking for material to support your arguments and selecting out these various deposition portions?

A. Yes, of course.

Q. Do you know who Mr. Holmberg was?

A. I don't recall. I thought he was director of R and D. I thought he was parallel to Dr. Tweden or

her senior.

Q. Is it your understanding that he was involved in the development of the Silzone valve?

A. It is, and it's my understanding that he was particularly concerned about the -- in that letter, he was particularly concerned about the rate that the silver was coming off, and the -- he was concerned in the rate and he was looking for -- matter of fact, in one part of the letter, it even says we may have to stop the project completely if this isn't resolved.

I think that letter -- I mean, I deal with corporate -- corporate -- I used to do development, as I said, for other major corporations, and if I received that letter as a scientist developing technology for them, I would be very alarmed.

And I think to write that letter is also a situation where you're alarmed about the condition, maybe even how it was represented to you -- how the silver would behave once it was applied to the Dacron cuff.

Q. So you thought this letter was a significant event?

A. Oh, yeah, I really did.

Q. But did you do anything in regard to reviewing what Mr. Holmberg said about the letter in his

deposition?

A. I do recall doing that, but I don't -- three, four years ago. So I don't -- off the top of my head, I can't -- I'd have to go back and look at all that and --

Q. Do you recall --

A. -- recreate that process.

Q. Do you recall that Mr. Holmberg said that the matter was resolved?

A. That's okay. If it's resolved, that's true; but I think the point I was trying to make is that it was a clear indication from -- from the St. Jude team that the silver was being liberated from this -- from this device.

And I believe in the sections I cite some of that -- some of those comments -- I'm referring to silver being liberated and it's the liberated silver that really is the active component of this device, purportedly, you know.

Q. I see.

A. Antibacterial capacity of the device.

Q. Well, if the matter concerning the amount of silver that was being liberated from the valve was resolved, then the concern over this letter would be lessened, wouldn't you agree?

A. Depends what you mean by resolved.

Resolved -- I don't think I ever saw a corrosion rate, which is what I was looking for and I really had to dig.

There are other notes I think from notebooks that I documented here that I was able to -- to have access to, and it's that -- that rate of release that's critical.

Q. Since we started talking about this, maybe we should just take a moment now -- the letter we've been talking about I believe you describe on page 43 of your report, which is Exhibit No. 4.

A. That's correct.

Q. The letter of August 21st, 1996 from project engineer William R. Holmberg to Dr. Piran Sioshansi?

A. Correct.

Q. What is your understanding of where in the process that letter fell?

MR. CAPRETZ: Object to the form.

THE WITNESS: You mean at what stage? Well, I'm not really sure what you're asking.

I can answer that, but I'm not sure where your -- if you mean like what percentage of the development phase that -- like if we would have to

categorize phasing, Phase I, Phase II -- I would say it fell in -- in prototype testing and evaluation.

MR. JEFFREY:

Q. So this isn't the final test of a final valve that is ready to be released?

A. But it's pretty close, but it's not, I mean, because one way they could have looked at this -- they could have put the Silzone coating on coupons of polyester, the PET, Dacron. Those are all trade names for the same thing or names for the same thing.

So if they were just looking at evaluating corrosion rate, they didn't have to go right to the valve. They have got this -- as I understand it, this is coating on the valve itself; is that correct?

Q. So do you have any knowledge of whether or not this situation was resolved?

A. Resolved I think is a relative term, because, you know, what he's -- what he's saying is -- you know, all of the silver could come off in one year under the current conditions.

I never -- in my studies or in my review, I never found a target in which what kinds of release rate of the silver they had actually wanted, so resolve to me would mean they have a target design value and then they -- they met that target.

So I guess the direct answer to your question is, no, I don't have any idea if they resolved the -- the issue.

Q. Do you have any idea whether or not the estimate listed here of 200 to 400 angstroms per year of silver being corroded from the valve turned out to be correct?

A. I don't know if it was correct. I remember trying to calculate that from some of their release studies, but it's too nebulous -- I mean, you couldn't make that calculation. I decided that it was -- it would be too many assumptions in trying to go backwards like that.

Q. Do you know whether or not further corrosion studies were done after the August 21st, 1996 letter?

A. Not off the top of my head, no.

Q. So you don't know whether or not the further corrosion studies showed a lesser rate of corrosion than the 200 to 400 angstroms per year listed in the letter?

MR. CAPRETZ: Object to the form.

THE WITNESS: Remember, the letter is saying, if we don't get this under control, we're going to -- everything is going to be off in one year, right?

Okay. All right.

So, no, I don't know if -- if additional corrosion studies were -- I don't recall that -- if there were additional corrosion studies and what the result of those studies would be.

MR. JEFFREY:

Q. Do you know what Dr. Sioshansi's response was to Mr. Holmberg's letter?

A. I recall -- I thought I recalled looking at a response, but I don't recall the contents.

Q. So is it fair to say that today as we sit here, you don't know whether or not the silver would leach off in a year?

A. I don't think I know, but -- but based on what I reviewed, I don't think anybody knows.

Q. Okay. And you don't know whether or not the silver would leach off in ten years?

A. Well, I think you can -- you know, if you then went back about -- looked at blood serum levels, you can make some conservative estimates of what the daily delivery in serum might be and you could make some calculations; however, that doesn't really get at your question, which is, you'd have to do an in vitro study that is somewhat incomplete because you have an artificial environment in which to be -- the silver is

being liberated.

Q. You said do blood serum levels --

A. You know --

Q. Just let me finish the question.

You said you could do blood serum levels referring --

A. You could measure blood serum levels. I'm trying to verify what you're saying, yes.

Q. Were you referring to some type of clinical trial?

A. No. No, I was referring to an animal experiment in trying to track where the silver is going; but from that data set, you might be able to get an idea of what is being liberated in a daily basis, however, it does not take into account, as I stated before, or earlier in this deposition, that doesn't take into account where -- well, how much silver is accumulating locally.

So I think back to your question, how could we assess in a year how much of the silver has come off or is all of the silver coming off in a year, and this would have to be done with further in vitro testing, which, as I understood it in terms of the literature that I reviewed and the notebooks that I reviewed, those studies were not conducted.

Q. So you have no information to give us based upon studies that were done that could tell us how long the silver will remain on the valve?

A. No. I did look at studies -- release studies and notes of, you know, Tweden and the team that was working on this; and what I found that closely supported that was this -- this documentation.

Q. This documentation being the --

A. Being the letter.

Q. The August 21st, 1996 letter?

A. Correct.

Q. The same letter that we don't know whether or not the situation was resolved and we don't know whether or not that is the actual rate of corrosion?

MR. CAPRETZ: Object to the form.

THE WITNESS: Yeah, I think that's still accurate. Right. We don't know, which is unfortunate, because the company should have done accurate tests to verify that.

MR. JEFFREY:

Q. Okay. Let's go back to where we were.

I noticed that you have made several -- stated several opinions regarding St. Jude's valve and how it should be categorized, and in particular, you give the opinion that the St. Jude's valve should have been a

Q. And what paragraph is this?

A. This is starting paragraph -- title paragraph 76, page 40.

Q. Okay. And in what way did the documents -- the internal FDA documents affect your statement that St. Jude did not fully disclose information regarding KTMV-2?

A. If I could take a moment to look at this -- because I haven't looked at this part in a while.

Q. Sure.

A. Okay. In this first part I'm commenting that just elimination of the data I thought was -- was surprising, even if there's an explanation for it.

So apparently the data was not presented until the premarket -- the PMA supplement to file. So that was dated December 1997. And that was -- as I said, that was seven months after the original FDA request for more information.

Q. Now, are we referring to paragraph 78?

A. That's correct.

Q. And are we referring to the quote, the animal designated as KTMV-2 was an early death and the cause of death was unknown?

A. That's correct.

Q. That's a statement from St. Jude Medical's submission to the FDA, correct?
A. Yes, that's correct.
Q. And they are informing them in that sentence that the sheep KTMV-2 had died?
A. Correct.
Q. So the FDA knew prior to approval that KTMV-2 had died?
A. Correct. The approval comes after this date, correct; however, they did not provide that data in the first -- under the first request. That was one concern.
Q. Okay. We're actually going to get to this later.
A. Okay. All right.
Q. I was focusing on what other information that you have concerning FDA internal communications which exists --
MR. CAPRETZ: Is there a question?
MR. JEFFREY:
Q. -- and what portions of your report did they impact.
A. The portions of my report that any -- any material I reviewed -- um, had an impact in the declaration are defined under the major themes I focused

on, which were the area of my expertise, which is biomaterials and potentially delivery of silver off the surface of the biomaterial.

Q. Okay. What is the volume of FDA materials that is not on your list? Are we talking a hundred documents? A thousand?

A. No, no. Twenty, thirty pages. Single pages. Maybe excerpts from -- from master documents.

MR. JEFFREY: Jim, are you going to be sending those along to us?

MR. CAPRETZ: I'm sure we can.

MR. JEFFREY:

Q. Where did you obtain these FDA documents?

A. Counsel.

Q. So you didn't independently go and obtain them?

A. No.

Q. Okay. Did you notice at the bottom -- were there any numbers on them?

A. They had an MDL number, I believe. Right? That's what you're looking for; is that right? Is it an MDL number?

Q. Right. Generally I think they are called Bates numbers.

A. Yes, right. Thank you. That's the name I

was looking for. Yes. There was a Bates number associated with it.

Q. Now, did you receive all of these materials in hard copy form or were they electronic?

A. A lot of them were electronic. That's why it's hard for me to recall. So I print out the sections I want, so when I look at what I have, I'm looking at the printed out portion that I might have highlighted; but it may have come from a much bigger document in a PDF file.

Q. Did you review all of those documents?

A. All of what? Everything that I received electronically?

Q. Yes.

A. Review, no. Scanned and make -- determined whether I should review it or whether I thought it was -- I mean, I think in fairness, you know, I don't think it's fair that -- that indiscriminately I just say I want to review the so-called what -- what did you say, 24,000 pages from the submission?

This would not be a reasonable, you know, billing expense as a consultant. I would want to be focused on the areas that would be related to my area of expertise.

Q. Well, don't you think you might want to

review those 24,000 pages to see if there was any discussion regarding whether or not the St. Jude Silzone valve was considered to be a combination product by the agency?

A. Well, as an expert, I felt I didn't need the FDA -- FDA's opinion on this. I felt that first I wanted to make an independent assessment of what I thought was -- was an issue here.

And in my mind it was perfectly clear that silver comes off this and silver in this case is acting as a drug independent -- if the FDA said it's not, then they are wrong. That's my opinion.

Q. Well, what is the agency charged with with regards to determining the category of a product?

MR. CAPRETZ: Object to the form.

MR. JEFFREY:

Q. Isn't it the FDA's authority to determine whether or not something is a drug or device or a combination product?

A. I'm sure it is, but they have personnel that -- that I think -- if given certain material, could be swayed either -- you know, in different directions.

I think -- I think the -- the part with silver that is a little bit confusing, and may be to a reviewer, would be that it is a metal. It is a

simple -- it's not a complex drug. It's an ion.

So it looks like -- well, it's not really much going on, but the whole activity of this device is based on liberation of this -- of this ion.

Without the liberation of the ion, there is no, you know, antimicrobial activity. So if you don't have their liberation, you don't have the effect.

I also went on in this -- I think in this document, if you want to discuss that part, dealing with the -- with my opinion was with respect to what defines a drug.

And when I did my own assessment independent of FDA, independent of counsel, whatever, definitions for a drug, and in this case entering into a chemical reaction, my impression -- my impression was silver works by engaging with molecular -- let's call it macromolecular components of the cell, be it DNA or the cell wall, to basically inhibit the function of the cell, either in the mammalian cell or a bacterial cell.

Q. Who are the people at the FDA that made the decision that they were going to approve Silzone as a medical device?

A. You mean their names?

Q. Yes.

A. I don't know.

Q. What were their positions?
A. I don't know.
Q. What department were they in?
A. I don't know.
Q. What was the basis of their decision?
A. I don't know.
Q. Were there any meetings concerning that decision?
A. I'm sure there were.
Q. What was discussed at those meetings?
A. How would I know that?
Q. Well, by looking at the 24,000 pages of the FDA documents perhaps.
A. I didn't.
Q. Okay. So you don't know whether or not there were any meetings to discuss whether or not the Silzone valve should have been evaluated as a combination product?
A. Sorry. One more time? Can you repeat?
Q. You don't know whether or not there were any meetings internally at the FDA to discuss whether the Silzone valve should have been evaluated as a combination product?
A. I do not.
Q. Okay. And you don't know what criteria

the FDA used to evaluate the Silzone valve?

A. I do not.

MR. CAPRETZ: Objection. Object to the form.

MR. JEFFREY:

Q. Do you know?

A. I don't know.

Q. Do you know whether or not they considered the issue of -- that silver ions were being released from the cuff in their consideration that the Silzone valve should be evaluated as a device?

A. I'm sorry, can you repeat the beginning of that?

Q. Yes. You were describing a moment ago that this --

A. Just repeat that question. I just -- go ahead.

Q. All right. Let me just put it in perspective.

A moment ago you were discussing that the Silzone valve works by releasing silver ions and this is a little bit different than in other valves, correct?

A. Correct.

MR. CAPRETZ: Objection to the form.

MR. JEFFREY:

Q. Okay. And now I'm asking you whether or not you have any knowledge of whether that issue was discussed internally at the FDA?

A. The answer is no. No, I do not.

Q. What did you do to investigate whether or not the FDA considered the release of ions from the cuff in their determination that the Silzone valve should be evaluated as a device?

A. The FDA's analysis was only secondary to my own as an independent consultant. I wanted to make my own decision as an expert in biomaterials, who are often called in to make -- advise and recommend to the FDA what to do with these cases.

I have students that work in the FDA. So we're the ones that train these folks.

The issue is, you know, could I convince myself either way. Is this a drug or is it a device?

And if I would use a litmus test, if I was teaching my class about this device, I would say it would certainly be in the category of drug delivery devices.

Q. So you disagree with the determination that the FDA made regarding how to classify the Silzone valve?

A. Absolutely.

Q. Okay. You recognize that the FDA did approve the Silzone valve as a device?
A. I recognize that. That's wholly adequate.
Q. I didn't get the last part?
A. That's wholly adequate. It is a device, that's correct, and it should be approved as a device; however, in the context of the Silzone as it is being added to the device and releasing a drug, then it should be in my opinion a combination product.
Q. So if you were at the FDA, you might have made a different decision about how to classify the Silzone valve?
A. Absolutely.
Q. But in regards to the decisions that were actually made, you have no knowledge regarding who made them at the FDA or on what basis they made those decisions?
A. On or the process by which they were made. If it was a unanimous decision, a split vote, I have no idea.
Q. If you turn to page 5e, please, paragraph 15.
A. Okay.
Q. And in paragraph 15, you refer to the definitions of drug and the definitions of device, do

you not?

A. I don't think -- Exhibit 4?

Q. Yes -- excuse me. You're talking about the regulations concerning combination products; is that correct?

A. That's correct.

Q. Okay. And where did you get these regulations from?

A. The regulations -- I could have pulled -- I don't recall how I got them. I could have pulled or they could have been provided by -- in conversation -- it could have been that I'd like to see, you know, these regulations, and they said, okay, we'll send them to you, with counsel.

Q. Look at line 4 paragraph 15.

A. 15. So they provided me with these.

Q. So the PSC provided you with the FDA regulations concerning combination products?

A. That's right.

Q. Okay.

A. But that -- I think that's a matter of convenience. I think I had, you know -- I have some of this documentation in my own possession. I mean, some of these own -- these regulations in my possession.

Q. Who is the PSC?

A. Well, plaintiff's counsel, right?
Q. Just for clarity. PSC means the plaintiff's steering committee?
A. I knew the plaintiff part.
Q. Had you read these before?
A. I read -- yeah, these in part. Part of my job is to educate -- not completely in my courses, but in one or two lectures in my courses, we address FDA approval and tackle some controversial implants like the silicon breast implant, for example.
Q. And have you read these regulations since the time that you prepared this report, Exhibit No. 4?
A. I have not reread them, no.
Q. So these are not regulations that you use in the everyday course of your work?
A. Well, that wouldn't be fair to characterize it that way. It's regulations that we can -- that we have available, a good deal of understanding on -- on what they are and how we could use those to guide sort of product distinction. And if we need more detail, we can go back to refer to them.
Q. Have you ever worked at the FDA?
A. Personally, no.
Q. Okay. Have you ever worked in a regulatory affairs department of a medical device

manufacturer?

A. Let me also state I have not worked at the FDA, but I was invited to give them a full day tutorial on just this topic, surfaces and surface interaction with soft tissue -- not soft tissue, with materials.

I believe that if you have my CV, it's listed as one of the lectures that I gave.

Q. So you gave them a lecture?

A. More than a lecture. When I refer to a lecture, I would say that's an hour. There was, I believe, a couple of hours as a tutorial, a workshop to educate, you know, their staff.

Q. Okay. And --

A. And, by the way, I've also done that at other major companies.

Q. All right. Let me see what the topic of this was. You gave a tutorial to the FDA, correct?

A. Yes.

Q. This is a two-hour tutorial?

A. I think more. It was more like a three -- maybe three hours.

Q. Three-hour tutorial. What was the subject matter of the tutorial?

A. I can give you the exact title if we find my Exhibit 2. Does that have my CV? It would have

been -- the general topic was surface science in bio -- surface science in biomaterials.

Q. Are you still looking for that?

A. Yes. I'm sorry.

Q. That's I was just wondering.

A. There's over a hundred of these and I'm trying to maybe go too fast and try to find it in a certain time frame.

Well, the CV here is from this -- that's odd. This ends in 2001.

Q. This has been since 2001?

A. Or -- or it was earlier? I'll check my -- not to waste more time. I will -- I can find out and -- and, through Jim, point it out to you.

But it was a workshop and the title of that workshop was largely focused on surface -- I was one in a series of four scientists or so the FDA brought in over a period of -- um, um, maybe three weeks or so to discuss -- somewhat these issues, surface science related issues to biomaterials, um, and in my particular lecture, mine was focused on designing materials to affect biological response.

Q. So you talked about the science of it?

A. Yeah.

Q. Did you talk about the criteria that the

FDA should use in categorizing a product as a drug or a device?

A. I don't recall that exact content.

Q. Did it come up in the discussion?

A. Yeah, I think so. Especially because -- um, this idea of putting biological coating on a device is really -- fits into this -- into this cross center type of analysis.

So now the material is acting or has drug-like qualities, because you've modified the chemistry to -- in this case, to incorporate some molecule that the surrounding tissue will interact with.

Q. I see. Who attended from the FDA?

A. Maybe thirty employees.

Q. Did you make any suggestions regarding how to classify drugs versus devices?

A. In the context of surface modified materials, yes.

Q. What were those suggestions?

A. That materials containing biological modifications like this need to be considered drugs and devices -- device first and secondary cross agency review with -- as a drug.

Q. Do you know whether or not they adopted your recommendations?

A. The point -- I think the point for them was education on what's coming next.

You know, they -- they kind of were comfortable with the current state of devices they were seeing from companies, but what was in the research pipeline that they might have to see and evaluate. And whether they adopted and made recommendations, I don't know.

Q. So the gist of your speech was on the science part of it, the type of products that they can see coming down the pike which may have new characteristics that they hadn't really dealt with before?

A. Certainly would have these -- certainly would lie in this gray area of whether it is a device or a drug or a combination device.

Q. Do you have any special expertise in the analysis of federal regulations?

A. You mean am I documented in some way?

Q. Yes. Qualified in any way.

A. Well, qualified, sure, as a biomaterial scientist. A person that invents devices, has patents in the area, teaches students in the area.

Q. And that qualifies you to interpret FDA regulations, for example?

A. Well, it certainly qualifies us -- I think

we are uniquely qualified to really assess -- you know, whether it is an FDA documentation, but really assess at the scientific level whether we think something is a device or a drug or a combination.

Q. So let me understand. It's the agency that has the ability to categorize something as a drug or device, correct?

A. Correct.

Q. And in the case of the Silzone valve, they categorized that as a device, correct?

A. Correct.

Q. They had the ability when they received the Silzone PMA to classify it as a drug if they thought it appropriate, correct?

A. Correct.

Q. And they didn't do so, correct?

A. That's my understanding, but I don't agree with that decision.

Q. Have you ever received compensation for the interpretation of federal regulations?

A. Not that I recall.

Q. Besides from the workshop that we discussed, have you had any other interaction with the FDA concerning the classification of products as drugs or devices?

A. Um, it depends how you define interaction. In the form of a discussion at meetings with representatives to the FDA? Sure. Even possibly discussing some of our own work that I was retained as an expert to develop a device in the cardiovascular space.

Q. So were your meetings with the FDA confined to products you were developing yourself?

A. Yes. And off-line discussion as often happens at scientific meetings between -- somebody might ask you a question. Not a specific, but more a general, what do you think of XY&Z?

Q. You're on no formal committees that the FDA has formed to determine whether or not products should be considered a drug or a device?

A. No.

Q. Were you at any of the interagency meetings in which decisions were made concerning whether or not products should be classified as a drug or a device?

A. No.

Q. Do you have any information concerning such meetings, interagency meetings, at which -- whether products should be classified as a drug or a device were discussed?

A. Other than the -- the product meeting the guidelines, no.
Q. Do you know what the TUV is?
A. No. I mean, I -- please refresh my memory.
Q. TUV is a regulatory agency that approves drugs inside Europe. Does that refresh your memory?
A. Yeah, yeah, yeah.
Q. Do you have any knowledge of the evaluation process that the TUV undergoes to determine whether or not a particular product is a drug or a device?
A. Much less so on the European regulatory issues.
Q. Do you know anybody at the TUV?
A. No.
Q. Have you ever discussed their process of evaluation --
A. No.
Q. -- with anyone?
A. No.
Q. Do you know who in the TUV reviewed the Silzone valve?
A. I remember reading some of the documentation from them.

Q. Have you seen the TUV submission?

A. Again, parts of it, I probably have. Parts of it provided by counsel.

Q. Is that also missing from your list, which is Exhibit No. 1?

A. If it's not there, then it's missing, yes.

Q. What volume of documents were provided to you concerning the submission to the TUV?

A. I don't know off the top of my head. I would say, you know, again, probably electronic format, and then I printed out from the PDF file what I thought was appropriate.

Q. Can you recall actually reviewing documents related to the TUV submission?

A. I can, because I do recognize or I did recognize the acronym when you mentioned it.

Q. Do you know whether or not the issue was discussed as to whether or not the Silzone valve should be considered a drug or a device?

A. I'm sure it was considered, yes.

Q. You're sure it was considered? Did you review something that indicated that to you?

A. Well, I can't recall reading that, I guess my answer should have been. It should have been

considered. Whether I recall reading that is another matter.

Q. Do you know whether the TUV evaluated that issue?

A. Not -- I don't recall that.

Q. Okay. Do you know what criteria they used in making the decision concerning whether something should be a device or a drug?

A. I don't know off the top of my head, no.

Q. Are you aware that the TUV approved the Silzone valve as a device?

A. No -- well, probably when I was reviewing this material, yes; but you refreshed my memory. Now, that this is the first time I'm -- I feel like the first time I'm hearing that.

Q. So you also disagree with the TUV's decision --

A. I would --

Q. -- to class the St. Jude Silzone valve as a device?

A. Yeah. Somehow your -- your lending experts in these agencies and the real experts in the biomaterials field lies in the universities. So you can use your support for these agencies, but they do get -- if it's not myself, it's other biomaterials academics

where they get a lot of their students and, hence -- or students and hence their employees; and, also, they rely on us heavily for recommendations and also education.

Q. Do you also agree that the TUV has the authority to make the classification of a particular product as a device or a drug?

A. Absolutely, sure. Governmental agencies have to have that authority.

Q. You just happen to disagree with that decision?

A. I disagree. And it doesn't mean they are staffed with the most competent folks on the planet to make the decision.

Q. Do you know any of their staff?

A. I don't know any of their staff.

Q. So they could be the most competent people on the planet?

MR. CAPRETZ: Argumentative. I object to the form.

I need to take a -- maybe it is a good time. I need to take a break. And I've got to have fax access because I'm transmitting some confidential information. Can I maybe receive it and respond to it?

(Whereupon, a brief recess was taken from 2:49 p.m. to 3:10 p.m.)

Q. So I just want to talk about these things one at a time.

Is there any misrepresentation on the part of St. Jude in your mind because of the way -- because of whether or not they told the FDA that the silver ions were coming off the cuff?

MR. CAPRETZ: Object as to form.

THE WITNESS: Well, I think if you're asking me, did they mislead the FDA by stating it in this fashion, probably not.

Could they have been more explicit? This is a big part of their whole device. What, it takes up a paragraph and a half? Really?

I mean, I think that's under-representing the component -- especially the materials component of their device.

Q. And you think the problem may be with the word metabolism?

A. The word metabolism and using that word, both by St. Jude and the FDA, in terms of their definition of a drug I think is -- is a cause for confusion and maybe concern.

Q. So there's some confusion with the actual definition that the FDA uses themselves?

A. I think the FDA could have done a better

job, that's true. It could have done a better job of really defining what a drug is.

Q. Do you think that St. Jude was trying to deceive or misrepresent the application to the FDA by using the word metabolism in there?

A. I would not necessarily accuse them of trying to purposefully deceive the FDA, but they certainly were not completely forthright in terms of describing in detail -- there's one line here talking about silver -- matter of fact, they even -- if I read it again, it says silver has been shown to ionize slowly resulting in no toxicity to humans. It's a very vague, faint statement.

Do they mean slowly off of materials coated with the SPI-ARGENT process or the IBAD process?

This has really -- it says resulted in no toxicity to humans. Have they done those tests?

I think that's a general statement that's placed in here in the context and when one reads it, it gives the reader the impression like they have done these studies.

Q. They should have supplied more information, you're saying?

A. I think so, yes, or a better description of what is going on in the process.

Q. Anything else that they should have done with that paragraph?

A. Well, the actual mechanism of activity of silver ions is still somewhat unknown. I mean, there are ideas, hypotheses, on how it is effective, and I think that would have been useful in the discussion. Just a short paragraph or two, why is this device working?

If they -- other than simply saying there leading the FDA -- if you will, in their decision, they are telling you, it's not dependent on metabolic or metabolism of silver. It's not dependent on the metabolism of silver. What is it dependent on? In other words, how would it have any effect?

Q. Well, silver -- silver isn't absorbed into any tissues and utilized in a cellular function, is it?

A. You mean it is a co-factor for enzymes and so forth?

One would probably say your statement is correct. I don't -- in -- in mammalian systems, to my knowledge, that's correct.

Q. So there's no cellular mechanism that's involved in ionizing silver, is there?

A. The ionization of the silver is going to be an electrochemical process and it's possible that --

oversight or a gross oversight, yeah.

Q. Is it a misrepresentation?

A. I think in part, yes.

Q. What's the misrepresentation?

A. Well, if I understood your question, it was just having it approved or trying to get it approved as a device only.

Q. Correct. Where is the misrepresentation there?

A. Because the active component of this is the silver and the release of silver, which is only active as -- in this case, as an ionic form that's affecting the cell behavior.

Q. And if you supply that information to the FDA, but you file the submission under a 510(k), is there any misrepresentation there?

A. Well, it goes back to what we read in the last exhibit, Exhibit 5. It depends how it's worded to the FDA, which may not pick up on or may not pick up on the aspect that silver is active -- is active as the active component and acts like a drug in these devices.

Q. Well, there seems to be quite a number of pages here of --

A. I see that.

Q. -- products that have been approved under

510-(k) in the last four or five years.

Do you believe that the FDA is unaware of the activity of silver ions?

A. No. I think that -- that they are in some of these -- they are grandfathered in in some ways approving these devices, because they have already approved them under a device capacity, if that's true.

In other words, if I -- in 2001, they approved this first one. Ecryderm silver antimicrobial wound care gel, first one on page 2.

If I come along in 2003, I'm going to point to this device and say this is how this was reviewed, so I want to also be included.

So I guess this falls into the category of perpetuating a mistake, what I feel is a mistake.

Q. I see. But is that a misrepresentation?

A. Well, by whom?

Q. By the company.

A. As I said, what I -- would I consider it a gross oversight or a misrepresentation? I think that's a matter of nomenclature.

I think in an ethical disclosure of the activity, the discussion that is warranted in these applications is how is silver active? How does it really come off the device?

Q. So are you assuming that the FDA is not aware that silver ions are active?

A. I'm aware that -- I believe they are aware that silver ions are active.

Q. And don't the FDA have experts in material science on their staff?

A. They do.

Q. In fact, you gave a lecture to some of them, correct?

A. I did.

Q. So aren't they qualified to make the decision regarding whether something is a drug or a device based upon the activity of silver?

A. As I said before, I think silver is in this -- it is a very gray area for -- for them to make the decision in the sense that it is an ion, so it doesn't fall into the classic perception of what is drug is, which is a drug, is a -- is something that maybe has many more atoms in it and it has a larger molecular structure and people review this kind of documentation and saying it's just an ion; however, it does fall into the category of affecting cell behavior as a drug would, so whether it is an ion nickel element, or I should say, an ionic form of an element, or whether it is a large macromolecule drug like insulin, they still are having

an effect on the local cellular population.

Q. And aren't the people at the FDA qualified to make that call?

A. They should be qualified to make the call. I just happen to disagree with their decision on these.

Q. Well, at the time the Silzone PMA supplement was filed, silver was already a well-known antimicrobial, wasn't it?

A. That's true.

Q. Weren't they qualified at that time to make the decision about whether or not silver should be classified as a device or a drug?

A. I think we're running in circles here. It's the same answer. Yes, they should have been. Whether they really were and whether I agree with that opinion, I think is where we're -- we differ.

Q. Right. I just asked you whether or not they're -- well, let me ask you the question again then.

When St. Jude filed their PMA supplement, they had qualified people on the staff that could have evaluated the activity of silver, couldn't they?

A. I believe so, yes.

Q. And they're qualified to make the call concerning whether or not something is a drug or device at the time St. Jude filed their PMA supplement,

correct?

A. Correct.

Q. And they made their call and you just happen to disagree with it?

A. That's true.

Q. Well, wasn't it reasonable for St. Jude Medical to at least try to use a silver coating on their heart valve?

A. Was it reasonable to assume -- okay. So then the -- what begs the question there is why not just use something, like what we were just citing, why use this IBAD process? Why not use -- let's go back to Actisorb.

Q. Okay. Let's go back a step.

A. Because Actisorb is very similar to your Silzone cuff, this device.

Q. All right. So let's break it down in parts then.

It was reasonable in general for St. Jude Medical to consider applying silver as an antimicrobial to its medical device?

A. It depends on what form. If they applied it in the form of a complex -- silver in a complexed molecule like some of these other products, then I would say yes.

useful in terms of making a device.

For example, there are clinically developed microspheres for -- in preclinical trials, phase II or phase III of delivery of drugs, even large molecules -- larger macromolecules.

Q. So you think St. Jude should not have actually used the IBAD process?

A. I don't think it was a good choice, no.

Q. And the reason for that is because you believe that there's some damage to the tissue in the immediate area surrounding the cuff?

A. Correct.

Q. Okay. And we've talked about this damage in the immediate area surrounding the cuff. Are you talking about the chronic inflammatory response we discussed earlier today?

A. That's correct.

Q. Okay. Are you talking about any other type of damage in the immediate area surrounding the cuff?

A. Well, if you use other -- again, case studies of high levels of silver surrounding materials, then you could start to see neurological damage, not only -- not only would we see inflammatory response, but you could see neurological damage to the local

A. Yeah. In a sense, yes.

Q. In a sense? In what sense is it not your opinion?

A. It's my opinion.

Q. Okay. So did you look at the Spire submission?

A. I did not look at the Spire submission. I looked at their documentation you just presented me in the same way, which is this response from CDER and then the internal memo by Ferguson.

Q. So you didn't look at the Spire submission and you wouldn't know whether or not it was adequate then?

A. In this case, the response from CDER to me raised the same questions I would raise for this device, and I would trust this review based on my own independent assessment of this device from seeing this as one of the devices that was presented that I was talking about earlier by Dr. Sioshansi at the Surfaces and Biomaterials Foundation meeting having questionable scientific methodology.

Q. What was questionable about their scientific methodology?

A. No error bars. Hundred percent effectiveness. Zero percent effectiveness with any of

A. There is a presentation I recall. It does not mean that that was what they used for submission, but this is a presentation I recall him making at this meeting.

Q. Do you know whether or not they did any subsequent testing?

A. I'm sure they followed up with different testing, yes.

Q. You're not -- well, in this case, we also obtained documents from Spire and they were about 7,500 pages of documents.

Did you review that file?

A. No, I did not.

Q. Is the only document that you have seen from Spire the one-page memorandum that is a part of Exhibit 7?

A. In concert with the response, yes. The -- I have to -- that's not the only Spire document I think I have seen, but in context with the response to the letter by Mr. Ferguson, yes, that's the only documentation I have seen.

Q. What other Spire documentation have you seen?

A. Certainly in the -- I have seen in the -- um, in the PMA, there's a description of the IBAD

A. Correct.

Q. You don't know whether or not Spire ran sheep tests like St. Jude did, correct?

A. I'm not sure why they would; but, correct, I don't know.

Q. Okay. So you -- you are not in a position to compare the Spire submission to the St. Jude submission; is that correct?

A. No, that's not true.

MR. CAPRETZ: Object.

THE WITNESS: That's not true, because the similarities in the process and the point in which I'm making in paragraph 36 is -- you're trying to take it out of context.

The point that I'm making is that this document is being reviewed by CDER which is evaluating the device as a drug, which is basically the same device as the Silzone cuff. Basically, the functional equivalent of this is the same company that's manufacturing the silver coating by putting it on a different device; but it's clear from the review from CDER, is that their response -- in other words, their ability to try to convince them that this is not a drug was not successful. That's the methodology or rationale for providing this documentation.