And it's clear that -- in my opinion, that it was so burdensome for them to come up with all of these testings, or I should say -- or complete all of the testing listed under the request of Mr. Ferguson, that they abandoned the project.

Q. And how did you confirm that?

A. Because from this letter -- this is the recommendation that I -- I assume in terms of this -- this course of action, this device never made it to the market.

Q. How did you confirm the reasons for them abandoning the project?

A. I did not confirm. I just -- I -- I interpreted this letter to then -- then make the assumption that that was the rational.

Q. Will you look at the first page of the letter dated January 28th, which is the second page of Exhibit No. 7? Read the first paragraph there.

A. We have reviewed your --

MR. CAPRETZ: You don't have to read it out loud.

MR. JEFFREY:

Q. I didn't mean out loud.

A. Oh, okay. Okay.

Q. You see the fifth line from the bottom, if

previously.

Q. Or if that's not available, send us some more information, correct?

A. Correct.

Q. But at no place in this paragraph or anywhere else in this letter does it suggest that an individual NDA for this particular product would be required?

A. It doesn't stated it overtly, but by suggesting more specific, it would mean that they would have to evaluate that material to make the decision.

Q. And, indeed, that material was evaluated, wasn't it?

A. I don't know.

Q. By the time the Silzone PMA was filed, wasn't additional information including the information they asked for here completed?

A. Well, no, because I already mentioned to you that I don't have -- I did not review the 24,000 pages of one application and the 7,500 pages of the other application to compare whether they made a submission that was consistent with one another.

Q. So you don't know?

A. No.

Q. I just want to confirm you didn't call

anybody at Spire and confirm why they withdrew their PMA, did you?

A. No, I did not.

Q. You didn't see any documentation outside of the one-page memorandum which is the first page of Exhibit 7 that referred to a withdrawal of their PMA?

A. Correct.

Q. You saw no documentation of any sort concerning a further evaluation after February 4th, 1994 concerning the reasons for withdrawing a PMA?

A. Can you repeat that last question.

MR. KOHN: You said PMA, you meant 510(k).

MR. JEFFREY: You're right.

THE WITNESS: Okay.

MR. JEFFREY:

Q. You saw no documentation after February 4th, 1994 concerning Spire's reasons for withdrawing its 510(k)?

A. Correct, yeah.

MR. JEFFREY: Okay. Why don't we break for today?

MR. CAPRETZ: Okay.

MR. JEFFREY: Off the record.

(Whereupon, Volume I of the deposition was concluded at 4:54 p.m.)

IN AND FOR THE IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC., )
)
SILZONE HEART VALVES PRODUCTS ) MDL NO. 01-1396
)
LIABILITY LITIGATION ) (JRT/FLN)
)
______________________________)

ORIGINAL

DEPOSITION OF KEVIN E. HEALY, Ph.D.

Volume II

Friday, May 19, 2006

Reported by ELIZABETH J. WOOD

CSR License No. 5134

A. Correct.

Q. Is AVERT the best information that we have concerning the medical condition of the recipients of the Silzone heart valve?

A. I think so in the public domain mainly because of the sample size.

The other studies that I have seen and reported that looked at Silzone have, I think, patient populations 100 and maybe 60 or 70.

Q. So there is no study that would provide better information than the AVERT publications?

MR. CAPRETZ: Object as to form.

THE WITNESS: No, but I think this calls then into question why you would just recommend increased monitoring to -- to determine if we had a wider patient population if there really is a statistically significant difference between the Silzone-coated valve and the noncoated valve.

MR. JEFFREY:

Q. Why you would recommend --

A. Yes.

Q. Oh, I see.

A. To collect the data to improve the sample size of something like AVERT.

Q. Okay. So it would be your recommendation

to increase the sample size of the number of patients that are being monitored?

A. Correct. And reported.

Q. Okay. Do you have anything else to say about the paper?

A. No, not at this time. No.

Q. Okay. Does it indicate that there is an increased risk of paravalvular leak for those who have had the valve for over thirty months?

A. No, because the study ended at thirty months and so it doesn't project out significantly.

Q. We were talking about a short-term and a long-term incidence among the patient population.

A. I agree, yes.

Q. And is it your opinion that the short-term period in which observations of paravalvular leaks took place -- let me rephrase that.

Is the thirty-month time frame what you accept as the short-term period of time in which a greater incidence of paravalvular leaks were taking place?

A. I would -- short-term could -- could encompass anything from a couple of weeks to a couple of years, yes.

Q. So about thirty months?

A. That would be acceptable, yes.

response?

A. Can you repeat that, please?

Q. Sure.

Can you say to a reasonable degree of medical certainty that a particular recipient of a Silzone heart valve that is today asymptomatic and has no PVL by echocardiogram will develop a PVL in the future?

MR. CAPRETZ: Wait. I object to the form. Counsel, you said reasonable medical certainty. You know, the witness is not a medical doctor.

MR. JEFFREY: That's okay if he can't say that.

THE WITNESS: Yeah, I think I would -- from the clinical standpoint, I would defer to a clinical colleague.

From a biomaterials standpoint, I think I can suggest that -- or it is my opinion that the patient that is not presenting any type of, you know, paravalvular leak at this point still may not present a paravalvular leak in the future.

It does not mean they have identical and ideal tissue response to the material.

Q. Okay. So if a person is asymptomatic today, has no PVL by echocardiogram, you couldn't say that that person is going to develop a PVL in the future

to a reasonable scientific certainty?

A. I would defer probably to a clinical expert on that analysis. A clinical projection.

Q. And you couldn't give that opinion?

A. I feel that my opinion is probably better served within the local interaction between the material and the tissue.

Q. Can you give an estimate of the number of Silzone valve recipients that are asymptomatic today, have no PVL by echocardiogram, that will develop a paravalvular leak in the future?

A. No, I could not, because you don't have the -- at least you don't have the statistical basis to even I think -- figure out which patients over the whole population are -- are asymptomatic.

Q. And going back to the chronic inflammatory response, have any of the AVERT investigators observed a chronic inflammatory response in any of the Silzone heart valve recipients that they have been monitoring?

MR. CAPRETZ: Object to the form.

THE WITNESS: I don't know the AVERT investigator team in total, so I would not answer that question just based on I don't know of all of the AVERT investigators.

I do know of some investigators that possibly

long-term inflammatory response to the material, we use or I use in my deposition or I should say -- sorry -- my declaration, I used what I would say comparable information based on the lack of or -- or comparable information in the literature based on the lack of information from using the Silzone valve or Silzone cuff as a material.

Q. So is the answer to my question yes?

A. Why don't you rephrase your question?

Q. Is it fair to say at this point that the theory that there's a low grade chronic inflammatory response in all of the Silzone valve recipients is a theory but it has not been proven?

A. It's not been proven and the theory is a loose term. I would suggest you could say it is a hypothesis, that's true, and one would argue then for further testing.

Q. Okay. I just wanted to clarify one more thing. In regards to the chronic low grade inflammatory response, do you believe that this gives rise to some type of thrombus?

A. No. As we discussed yesterday, thrombus is -- is partially -- thrombus is a more complex question, because there's material related issues and the material obviously has to be exposed to the flowing

blood.

And if there's a chronic inflammatory response, it's possible that you can have material exposed over a longer duration that normally would have been covered by tissue in-growth. So if the tissue in-growth is retarded or delayed, it's possible that you could lead to more thrombogenic events or thromboembolism.

Again, as I say in my opinion, to make that a statistically significant conclusion may be difficult because the base material itself, PET, is also highly thrombogenic or essentially under the right conditions thrombogenic.

Q. Okay. And the chronic inflammatory response, do you believe it's related to endocarditis?

A. No, I don't.

Q. Okay. If, indeed, all of the Silzone valve recipients have some low grade chronic inflammatory response, then why six or seven years after the implant do we see only a very small percentage of them having a major PVL or explant?

A. Where is the data for six or seven years out?

Q. Are you aware that St. Jude Medical withdrew the Silzone valve?

A. Yes.

published, but it was probably inclusive only in the first year or maybe the first two years of the study.

MR. JEFFREY:

Q. Right. I'm just referring to the date of publication.

A. Yeah, okay.

Q. And in addition to that, as we were discussing it, you said, well, you would look at the later AVERT data, and you've just referred us to this particular paper?

A. That's correct.

Q. In addition to that, you said there was some in vitro tests; is that correct?

A. Correct.

Q. So I want to ask you about the in vitro tests.

A. Sure.

Q. Are these the same in vitro tests that were submitted by St. Jude to the FDA?

A. Some of them were. Some of them were in my declaration in vitro tests that I define as useful in what I said -- when you don't have -- as I -- in my opinion, I did not have access or -- or it was not produced by St. Jude, adequate study and analysis of the effectiveness, or I should say, the effect of silver

ions released from the cuff material on normal mammalian cells.

As such, I used comparable, to the best of my ability, and also finding in the literature publications that we -- meaning me, and basically felt it was comparable with respect to the Silzone-coated cuff.

Q. What in vitro tests are we talking about then?

A. There was a series -- if I go to my -- um, declaration, Exhibit 4 -- um, so there's a series of papers by --

Q. Could you tell us what page you are on?

A. Yes, 21. A page by Hemmerlein, H-e-m-m-e-r-l-i-n-e -- I'm sorry -- start again. H-e-m-m-e-r-l-e-i-n, 1997. One by Ellender and Ham, 1989. One by Trerotola, 1998. One by Watah, W-a-t-a-h, 1991. One by McCauley, 1989. One by Hidalgo and Dominguez, 1988. And then one by Ortiz and Lesdesma-Montes, 1997. And then one we discussed yesterday, Sudmann, 1985 and 1994.

Q. In what way do these in vitro tests impact your opinion?

A. In general they show two things. Either a level of influence of cell death or toxicity associated with silver ions or silver released from a cuff like

material and/or other types of devices that would release silver ions, and the effectiveness of that release on the function and the cellular activity of mammalian cells, mostly fibroblasts. In some cases not.

One or two are also -- that's not here, would be the studies by -- further studies by Craft and other in vivo studies. What we refer to as a second paper -- I want to look -- excuse me. I'm looking for a page. A second Ellender paper, which is reported on in this declaration, which involves the response to a silver wire that was implanted for over forty years that led to a low level chronic inflammatory response.

Q. In which of these papers was the term chronic inflammatory response used?

A. The last one, Ellender.

Q. Was it used in any of the others?

A. Um, no, because not all of them are in vivo. A lot of those papers were in vitro. And as I said, I cited those papers to put it in context.

I cited those papers prior to Dr. Tweden's -- go back to the page we were on -- Dr. Tweden's April 1, 1997 review of the literature that was part of, as I defined, supplement 46 to the PMA.

Q. And --

A. And I define these as omitted material

publications prior to consideration of using the silver releasing device as a mechanism to control wound healing.

Q. So these are articles that you believe that St. Jude should have included in one of their submissions and given to the FDA?

A. I believe that, as well as if -- if Dr. Tweden had read them, she might have made different conclusions on whether to proceed with this actual approach of using silver as an antimicrobial or antifungal agent with respect to trying to control endocarditis.

Q. But you haven't confirmed with Dr. Tweden with -- excuse me -- you haven't confirmed with Dr. Tweden whether or not the reading of these articles would have changed her opinion?

A. I have not.

Q. None of these articles that you've cited involve a test of Silzone, correct?

A. No, that -- that unfortunately was never published.

Q. And none of these published studies refer to an in vitro or in vivo study involving the Silzone material itself?

A. Correct.

THE REPORTER: Exhibit 8.

MR. JEFFREY: I'd like to have marked as Exhibit No. 8, a letter report of Dr. Healy's of August 8, 2002 with an attachment.

(Whereupon, Defendants' Exhibit No. 8 was marked for identification.)

MR. JEFFREY:

Q. At the top of Exhibit No. 8, it reads Bioengineered Materials, Inc., and gives, I believe, Dr. Healy's address. It's dated August 8, 2002 and it's directed to Michael Coren.

Why don't you take -- would you take a minute to read that?

A. I'm familiar with it, but --

Q. Doctor, did you write this letter?

A. Yes, I did. The context of writing this letter was I was asked by Mr. Coren if I could comment on the affidavit and declaration of Dr. Rodericks, Joseph V. Rodericks.

Q. What aspects of Dr. Rodericks' declaration were you commenting on?

A. I reviewed the whole documentation, or I should say, the whole document and I don't recall at this time whether there are one or two. I think there was just one at this point. And I was commenting on his

opinion of a number of issues.

One was related to the use of silver and its potential toxicity and another one was I think related to whether it might not have been a consideration whether this was a drug or not; but mostly responding to issues of Dr. Rodericks' affidavit with respect to the toxicity and maybe the effectiveness of silver.

Q. Did Dr. Rodericks discuss various articles in which silver had been used in some -- for some medical condition, correct?

A. Correct.

Q. And you're evaluating those particular articles and say that these aren't relevant to the evaluation of Silzone?

A. Can you point out where I say that?

Q. Well, I'm asking you the question if that's what you're saying here.

A. No.

Q. What are you saying then?

A. Do you want me to read this whole letter? I'd like a more specific question. It's pretty vague. I don't know what --

Q. If you look at the first paragraph --

A. Yes.

Q. -- on line -- line four, there's a

sentence that begins, at your request I am specifically addressing your question to me whether Dr. Rodericks' documentation reflects an unbiased and fair and balanced assessment of the current understanding of the interaction of the silver-coated prosthesis implanted within the human body and its safety for purposes of determining class certification.

Were you looking at the medical literature that Dr. Rodericks cited?

A. I looked at some.

MR. CAPRETZ: Object to form.

THE WITNESS: Yes.

MR. JEFFREY:

Q. Okay. And whether or not that medical literature was applicable to an evaluation of the Silzone material?

A. Correct. I was looking at the -- in this review, it should be noted that it was undertaken under a very short time frame, and so I was asked to give my rapid and initial opinion with respect to Dr. Rodericks.

From that standpoint, I was reviewing his estimate or his assertion of silver being nontoxic as a basis of his claim largely because it's used in a number of different products, and he provided a list yet -- I don't know if it was marked as an exhibit -- Exhibit 6,

as a part of the -- um, the Exhibit 3 from his declaration. Or it was Exhibit 3 to his declaration.

Q. Just to avoid confusion, I believe that that's a somewhat later list, so --

A. I'm sorry.

Q. -- I believe that the list he compiled in this most recent affidavit is an update, so to speak, of what he was speaking about here in 2002.

But if you look at the last sentence there in the first paragraph --

A. Yes.

Q. -- I believe that Dr. Rodericks' statements are biased and reflect selective presentation of the literature.

A. Correct.

Q. I make the following four points to support my statement.

A. Correct.

Q. So, once again, you're looking at the literature and materials that Dr. Rodericks selected in his evaluation of the Silzone material?

A. Correct.

Q. Okay. Can you look at the paragraph labeled No. 1 on the first page here and read the sentence that is in bold?

A. A central tenant --

MR. CAPRETZ: You need not read it out loud.

MR. JEFFREY:

Q. Yes, please, out loud.

MR. CAPRETZ: You want it out loud?

THE WITNESS: A central tenant of biomaterial science and engineering is that the experimental device must be tested in vivo at the same or very similar anatomical site within the body as it is ultimately intended to be used.

MR. JEFFREY:

Q. Why did you put that in bold?

A. Because a lot of what Dr. Rodericks was citing were cases of using silver as a topical agent largely being released as a drug from -- from molecules like silver sulfadiazine, for example, or other colloidal silver systems.

And my argument here was that one material, a specific material, can be used in an application such as a vascular graft. One can use polytetrafluoroethylene, PTEF, and have an acceptable clinical result.

But if one uses the same material as a -- essentially a surface for an articulating joint, then you could have -- and you will have a chronic

inflammatory response to the particulate, as we observed -- when I say we, I mean the community, as in the temporomandibular joint replacement, TMJ.

Q. So in evaluating a particular material, you want to take a look at the use of that particular material at the site that it's actually going to be used in the body?

A. Yes, and there is no replacement for using the exact material or device in that site as it would operate, meaning operate being serviced and function.

Q. So you would want to put it in the anatomical site and you would want to actually investigate the ultimate function that it's going to serve --

A. Correct.

Q. -- so it will undergo the same physical stresses and physiological conditions that it would when it's actually going to be used in a human being later on down the line?

A. Correct, with the caveat, it needs to be said, that even if it works in an animal model, even a large animal model, there's still a -- why we have clinical trials. Why one does not necessarily in -- one cannot make the assumption if it works in an animal model, of course, it will work in a human.

Q. Okay. But the animal model -- I notice you -- excuse me. Let me start again.

I notice you use the word in vivo.

A. Correct.

Q. Are you referring to animal tests being preferable to the in vitro test that Dr. Rodericks was talking about?

A. Well, no, not preferable. What I was referring to is there's -- there's a process in biomaterial science. One is conceptualizing an idea, testing that idea, possibly in a series of in vitro experiments and possibly initially these in vitro experiments may not even involve cells.

For example, the Silzone strategy should have been one to categorize the release kinetics and then test essentially the released agents from the Silzone cuff on cells to see their effectiveness and then ultimately, yes, the true litmus test is starting to move the experiments in vivo.

And in in vivo, for clarification, that's inside an animal as opposed to outside an animal's system.

In vivo had a broad spectrum of potential experimental protocols. It can be in vivo in a rat for simple biocompatibility assay, for example.

Implanting the silver cuff in the pouch or

muscle inside a rat to look at biocompatibility.

I'm not aware of any studies such like that that were conducted by St. Jude.

And then, ultimately, which they did do, but very limited studies with a very small number of animals, response of the tissue and/or the valves performance in service in a sheep model. And that's the rationale for this.

And I make the same argument with respect to -- there is no better performance test to -- we use the word performance test with respect to the device, than putting it in the same anatomical location, as you were saying, under the same stresses, physiologic environments, and really what we call cellular microenvironments now.

In the last decade we've learned a great deal about how a cellular microenvironment affects its behavior.

Q. You brought the sheep studies that St. Jude ran using the Silzone valve?

A. Correct.

Q. Were they in the same anatomical position that the heart valve would be used?

A. Yes, they were.

MR. CAPRETZ: Object to the form.

silver coating on the St. Jude device turned into a combination device, a drug delivery system, and the prior -- call it prior approvals of the valve, which is largely mechanical approval, if you want to call it that, approval for its mechanical function, are relevant to the tissue response.

MR. JEFFREY:

Q. You are using sheep in your current studies, right?

A. Correct.

Q. Is that because --

A. Now, I have to clarify. I work with clinicians and the clinicians, of course, do all of the sheep experiments. And a very competent group of scientists at UCSF.

Q. Well, there's a specialized group and they know how to actually run a sheep model study?

A. Correct.

Q. So you hand it off to them because that's their expertise, right?

A. Not necessarily. I mean, I'm PI on the grant, so I'm the lead investigator on the grant. So I design and discuss with them the design and the experiments.

I discuss what we think are appropriate power

analysis for trying to arrive at statistical differences in the results.

Q. Why do you use a sheep model?

A. Sheep model is used in this particular experiment because it deals with cardiovascular therapy and the sheep model is well understood with respect to its cardiovascular mechanics.

We also have complex -- what we called finite element modeling analysis, sometimes we use it -- FEA as the acronym, to look at stresses and forces in the sheep, to then predict cardiac metrics such as ejection fraction and other aspects of how the heart is functioning.

And we can use a computational model system to predict those effects as a function of our treatment before even conducting the experiments.

Q. And the sheep model is the recommended model for heart valves by the FDA, correct?

A. That you would have to refer to another expert.

Q. How many sheep should St. Jude have used?

A. I don't know. I would suggest that it would be nice thing to see a power analysis. What they were trying to prove and where their power analysis -- I've never seen a power analysis in any of their

documentation.

Q. Didn't they use the number of sheep recommended by the FDA guidelines?

A. I'm not aware of that. And if it were, how could the FDA make a broad blanket, let's say, a -- broad coverage of what the number of sheep would be when you don't know the experimental variance in what you're predicting?

Q. Didn't St. Jude discuss with the FDA the number of sheep they should use in their study?

MR. CAPRETZ: Object to form.

THE WITNESS: Again, we're going back and moving it out of my expertise, but my -- my general impression of the FDA, you know, with -- with all due respect to their staff and the quality of the folks working there, they are incredibly understaffed and -- and in some ways, you know, maybe they were not as rigorous in looking at this as they should have been.

MR. JEFFREY:

Q. Maybe, but you don't know?

A. I don't know. And it's sort of out of the area of expertise that I would suggest that I have for this case.

Q. Could you look at paragraph 3 on page 2?

A. Yes.

differential amount of ways.

Q. Are you criticizing Dr. Rodericks for referring to articles that investigated devices that used a silver salt as opposed to a silver metal?

MR. CAPRETZ: Objection to form.

THE WITNESS: So one comment I had was that if we were looking at comparable papers, this Trerotola paper, I found that I thought that was very similar to the -- quite similar to the IBAD process; but I think your question is -- is -- is with respect to Dr. Rodericks use of essentially risk factors, I believe he said, which glutathione would be one of them, and how these proteins might be involved in the process of possibly leading to paravalvular leakage -- so my opinion there was that was hypothetical and there was no correlation to the risk factors they looked at.

And I believe my comment was -- if these were later on, I know I made a comment that if these proteins were important, why didn't they look at them initially when they were discussing the risk factors?

Q. Did you have any criticism of Dr. Rodericks' selection of the medical literature because it included investigations of materials containing silver salts as opposed to metals?

A. I don't think those are the preferred

examples, yes. I don't think those are the preferred examples of comparable materials to choose from to show effectiveness or non-effectiveness of silver.

Q. And is that because a silver salt contained medical device will be released at a different rate than silver ions released from a metal?

A. It's possibly due to that. It's also due to the form in which -- in which a lot of these topical agents are used and in the way that they are used.

In other words, they are used on burn patients, and it is applied as a topical cream, which has very little relevance to in vivo or implantation -- excuse me, a device that's implanted and having cells grow into that device.

Q. Now, you say --

A. I would add there's a lot of other additives to these creams so it's not just silver. So there's a lot of -- um, you know, we use the word complexing agents as well as various excipients to help stabilize the complex, and so this is much different than a device.

So just suggesting all of these creams and topical agents are equivalent, I don't think is correct.

Q. So silver might chelate with a bunch of proteins and in addition to those proteins in one of

patient in one week?

A. I've read that, but I don't recall.

Q. I'm just sort of surprised by your estimate, because it would seem to me that that would have to be applied repeatedly, correct?

A. What would have to be applied?

Q. Burn treatment medication.

A. In some of the -- I think that's correct, but it's only used in a shorter duration; but, again, the clinical use of the material is a little bit out of my expertise.

Q. Okay. And you haven't actually done the calculation to determine whether or not the ultimate amount of silver contained in a treatment regimen for a burn patient is more or less than the amount of silver that is actually contained in a Silzone valve?

A. I have not done that calculation in part because we don't know what the total mass of silver in the Silzone valve is.

Q. Do you have any estimate of what the total mass of silver is in the Silzone valve?

A. We have a estimate of what the thickness of the coating may be. We could then try to calculate that, because it's very difficult because it is a porous device, meaning the cuff is very porous, so it's very

hard to get an estimate of that.

Q. Okay. And so far you don't have an estimate of that?

A. I don't, and I haven't seen that in St. Jude's publications, which I would assume would be a very important aspect because that would define the ultimate load to the patient with respect to the amount of silver that they theoretically could receive over the lifetime of the implant.

Q. Doctor, you also mention here the article by Tretotola, T-r-e-t-o-t-o-l-a.

MR. CAPRETZ: Was there a question? You just asked if he's seen that article.

MR. JEFFREY:

Q. Yeah. Do you see it mentioned there in the last sentence of paragraph 3?

A. Yes.

Q. You do?

A. Yes.

Q. My question is this, in that article, was there any indication that any of the patients suffered from a chronic inflammatory response?

A. I don't know. I'd have to review that.

Q. Okay. I think I have it, actually.

A. Actually, I have my copy of it. I should

have my notes on it.

Q. Do you have a copy with notes that you want to use as the exhibit?

A. I just know this one had very poor reproduction. Maybe yours is better. I'm sorry, is there a question I need to respond to?

Q. I was asking if you wanted to use your copy with the notes on it.

A. Oh.

MR. CAPRETZ: And he asked the question.

MR. JEFFREY: We can go off the record for this.

(Whereupon, Defendants' Exhibit No. 9 was marked for identification.)

MR. JEFFREY:

Q. Okay. Doctor, why did you think this article was significant?

A. Because, based on my reading of the article, that the treatment of this cuff had a similar process to the cuff or collar on the heart valve --

Q. What --

A. -- in the Silzone case.

Q. What do you mean by a similar process?

A. Well, these -- so it says the process of catheter surface treatment -- on page 492 under

materials and methods. So it is one, two, three, four, five -- so fifth line from the bottom. I'll read it. It says the process of catheter surface treatment has been described elsewhere, reference 18. In brief, silver is applied to the catheter surface by using a process called ion beam-assisted deposition. That's the IBAD process.

This process results in a uniform deposition of silver that has minimal leaching. The coating covered the outside surface of the catheter only.

Then the other part of the sentence is not important.

So from that reading, I assume that it was similar to the process that -- and that's the only information that's given in the paper -- very similar process that's used for the Silzone cuff, because of the same company producing it.

And if we go to reference 18, the reference 18 is by Dr. Shioshani, and it reads the process for surface treatment of catheters, artificial organs, 1994.

Q. This particular study does -- involves a silver-coated catheter, correct?

A. Correct.

Q. That's a different device than a Silzone heart valve, correct?

A. Correct.
Q. It is used in a different anatomical position, correct?
A. Correct.
Q. Um, anywhere in this article does it mention that the patient suffers from a chronic inflammatory response?
MR. CAPRETZ: He never had an opportunity to read it. If you want him to read it -- do you want to read the entire article?
THE WITNESS: I'll take the time to read the entire article. But the point that your -- first the question that you're making -- or you're -- or you're addressing, has to be understood from the standpoint of, again, we're trying to look for comparable systems because of the lack of data provided by St. Jude for the questions that you're asking.
I'm just going to do a bathroom break.
MR. JEFFREY: Sure.
(Whereupon, a brief recess was taken from 10:27 a.m. to 10:33 a.m.)
MR. JEFFREY:
Q. Could you answer that question, the last pending question?
A. So to clarify Counsel said or --

Are you saying that the catheter article refers to the Spire letter and the Spire memorandum with the attached letter from the FDA that is Exhibit 7?

A. What I believe, and I haven't checked the facts on this, but my impression is that the -- these are -- these are the same materials we're talking about.

Q. It's not the same device, though, right?

A. I believe so. It is a catheter -- it's -- yes. It is a catheter coating for an in-dwelling catheter at the percutaneous connection.

Q. So it's your impression that the product described in Exhibit No. 7 is the same product being discussed in the Trerotola article?

A. From my review of these at the meeting, yes.

Q. Okay. Doctor, can you go back to Exhibit No. 4? Exhibit No. 4 is one of your declarations.

A. Yes, I have it.

MR. CAPRETZ: Is that February -- I didn't mark each of these. Which was the date of his declaration?

THE WITNESS: It's this one. I think it's the May 2003. May 13, 2003.

MR. CAPRETZ: Okay.

MR. JEFFREY:

Q. Could you turn to page 21? We were discussing the various in vitro studies that you believe St. Jude should have sent to the FDA.
Yes?
A. Yes.
Q. So my first question is, do you know whether or not the FDA actually had any of these studies listed?
A. Um, from the -- the answer would be no, based on -- no, I don't think they had them based on Dr. Tweden's letter -- I'm sorry -- Dr. Tweden's preparation of the supplement to the PMA, which listed the references she reviewed and did not include these.
Q. Okay. But did you know one way or another, whether independently the FDA had reviewed these scientific articles?
A. My -- well, I would -- I guess I can't ask you a question, but the rhetorical question is, why would the FDA have these if they weren't brought to their attention by Dr. Tweden in her assessment of the literature review for the product in the PMA?
Q. So do you know one way or another whether or not they did review these?
A. I do not know, and I don't assume -- I would assume they did not because they were not included

in the supplemental application.

Q. So you assume it because St. Jude didn't actually cite the articles and send it to them?

A. Correct.

Q. And there is no other reason that you assume that they didn't have these articles?

A. Well, the fact that they are not mentioned in any other documentation through the PMA, at least the sections that I've read in the PMA related to the biomaterials aspect of the device.

Q. But then again, you didn't review the FDA internal documentation, correct?

A. I definitely have not done that, yes.

Q. Nor spoken to anybody at the FDA regarding the materials they reviewed in their evaluation of the Silzone valve?

A. Correct. I have not spoken to the FDA.

Q. In regards to the first article here that is referred to, Hemmerlein 1997, is the Hemmerlein article involving a heart valve?

A. No, it is not.

Q. Does the Hemmerlein article involve the use of Silzone?

A. No, it does not.

Q. Does the Hemmerlein article involve an in

vivo study?

A. I would like to -- I have that article with me, but if you're going to present it as an exhibit, I would like to look at that.

Q. Would you like to take a look at it?

A. Yes, I would; but my recollection is -- yeah, it does not include an in vivo study.

Q. What exhibit are we on?

(Whereupon, Defendants' Exhibit No. 10 was marked for identification.)

THE WITNESS: Thank you.

MR. JEFFREY:

Q. Okay?

A. Okay.

Q. The Hemmerlein article did not involve a study relating to the same or similar anatomical position as a heart valve, did it?

A. No, it did not.

Q. And it wasn't involving an in vivo test, was it?

A. No, it did not.

Q. The Hemmerlein study does not involve using the same form of silver that was used in the Silzone valve?

A. Correct.

A. And preclinical trials, too, which would mean usually animal experimentation.

Q. Okay. Can you take a look at exhibit number -- first, could you look at your declaration, which is No. 4. Exhibit No. 4. And look at page 2, paragraph F.

A. Yeah.

Q. Have you had a chance to look at it?

A. Yes, sir.

Q. Is it your opinion that St. Jude represented to the FDA that the 300 parts per billion was a standard?

A. I'm sorry. I didn't hear the first part. Is it my --

Q. Opinion that St. Jude represented to the FDA that the 300 parts per billion silver level was a scientific standard?

A. Yes, it is my opinion.

Q. Could you take a look at Exhibit No. 5, which is the St. Jude PMA supplement? And in particular, to page 16. I'm referring to the bottom page 16 of 22.

You note at the top there's a section that says assessment of toxicity?

A. Correct.

Q. And bullet No. 2 in that section says the longest -- excuse me -- the lowest silver toxicity level in humans is reported to be at or above 0.3e PPM, parts per million, or 300 PPB. Do you see that?

A. I see.

Q. I see that mentioned of 300 parts per billion level, but I don't see any reference to a standard in that section, do you?

A. Not in this section as a standard, but by implication, it is suggesting that this is a level of the lowest reported in humans, which is in my declaration, so I discount as an accepted level being scientifically tested and verified as a silver toxicity level that this statement in itself is inappropriate.

Q. What do you understand the word reported to mean?

MR. CAPRETZ: You mean in the context of this --

THE WITNESS: In the context of this --

MR. CAPRETZ: -- presentation?

MR. JEFFREY:

Q. Yes.

In the context of the phrase which is contained in bullet No. 2 on page 16 of 22 of the PMA supplement.

A. In that context, I view the word reported

to mean that it was scientifically investigated, published, under peer review, and then reported in the literature to be at the level cited on that line, which is 300 parts per billion.

Q. Do you believe that is incorrect, that the value of 300 parts per billion was not included in published literature?

A. It was not included in the published literature as defining the toxicity level of silver.

Q. Does it anywhere in here say that the 300 parts per billion that was reported defined the toxicity level of silver?

A. I just want to clarify. 300 parts per billion, correct?

Q. Correct.

A. Okay. You said million.

When I read the sentence, it says the lowest silver toxicity levels in humans is reported to be at or above point 3 parts per million or 300 parts per billion.

Q. But nowhere in here -- excuse me -- nowhere in here does St. Jude represent the 300 parts per million as a scientific standard, correct?

A. Well, in this -- in this section, no.

Q. Can you find in any other section in this

lowest level of toxicity comes from multiple sources, including Exhibit 11, including the deposition of Dr. Tweden.

Q. Okay. And in the deposition of Dr. Tweden, did she use the word benchmark or is that your word?

A. I would have to check to verify that.

Q. Okay. Do you recall Dr. Tweden ever using the phrase that the 300 parts per billion was an established scientific standard?

A. I think I -- I think I do. And I think in their internal documents from St. Jude that I might have reviewed.

Q. Can you point those out to me?

A. On this sheet?

Q. Uh-huh.

A. So I think it's under like laboratory notebook excerpts of, you know, Langanki, Ogle and then Illingworth and Tweden. So No. 21.

Q. So back to our search. Can you find another place in the St. Jude Medical PMA where St. Jude refers to the 300 parts per billion level as a scientific standard?

A. I'm going to need a moment to look through the whole document.

(Whereupon, Defendants' Exhibit No. 12 was marked for identification.)

THE WITNESS: So on page 13 when -- um, this is page 13 of Exhibit No. 5.

When they did a leachability -- I think that's the word they used -- leachability study -- I'm not sure I would use that word -- um, when they used -- conducted a metal ion release study of the Silzone valve, they said there is a study for two 17-millimeter valves with Silzone and two 17-millimeter valves without Silzone in a certain volume -- I'm sorry, I went back to page 12. This is now page 12 I'm reading from.

I'm just trying -- I'm trying to provide -- provide the context for the comment, which is then placing these cuffs in a -- um, solution of bovine serum for seven days under rotation, presumably, again, to disturb the concentration gradient, to demonstrate sort of an amount of release of silver from the device, and then they measured the silver in that solution.

And the control values on table one on the following table are all below 25 parts per billion, which is their detection limit in that technique; but by day seven in one sample we had 384 parts per billion of silver from their coating on obviously an actual implant. If it's not the full implant, it may just be

the cuff.

No, they're valves. So these were two valves. And in the second sample, 219 parts per billion.

They then go on to do a calculation taking the 385 parts per billion and they do this in terms of body weight. I think erroneously saying if all of this was distributed throughout the body, then it ultimately leads to the following last sentence on the first paragraph of page 13, which is, this value is several orders of magnitude lower than the reported minimum toxicity levels in humans of .3 parts per million which is equivalent to 300 parts per billion.

By placing this data set in that context, by inference they are saying it's below a toxicity level, and they are using that as a standard to benchmark this data set.

Q. Don't they report that toxicity level as a --

A. It says see section three, assessment of toxicity, which -- which -- which is further -- which is what you asked me to first read on page 16.

Q. Right. My question was, don't they refer to that level as lower than reported minimum toxic levels in humans of 0.3 PPM, parts per million?

A. That's right.

Q. So, once again, they're referring this to the literature reference, correct?

A. They are referring it to literature reference -- yes. Some basis of the literature.

Q. Okay. They don't use the term scientific standard here, do they?

A. No, they do not.

Q. Do they use the term standard here at all?

A. No, but it is obviously implied that it is a benchmark or it is a metric in which they are comparing the toxicity level to. It's obvious.

You can't -- without -- without that last statement, the rest of this data set is meaningless, because you have to have a reference or place that concentration in a reference.

Without really doing a toxicity test, which would have been required, in my opinion, if you went to CDER and this was a cross agency agreement -- if so was being treated with a drug, you would have had to do much more rigorous testing to show there is some benchmark or there is a toxicity level in which you need to compare this to.

Q. If a benchmark hasn't been established, that is to say, a benchmark which is considered an established scientific standard, what's wrong with

solution with increased complexity.

You also have cellular components that can release oxidizing agents which are fairly well-known with respect to the initial wound healing response that would then accelerate this process.

Q. Okay. Can you take a look at the next exhibit? Exhibit No. 12, which is attachment No. 14 to the PMA supplement. Have you seen this before?

A. Yes. This is a document I have seen before, yes.

MR. CAPRETZ: Do you have -- do I have a copy of that?

MR. JEFFREY: I was holding out on you.

MR. CAPRETZ: Okay. Thank you.

MR. JEFFREY:

Q. Have you had a chance to look it over?

A. Hold on, please. Just one minute. Okay.

Q. Does this clarify for you where the 300 parts per billion value that was stated in the PMA supplement came from?

A. It does. And in some ways this is -- this is I think further supporting the position of -- of Dr. Tweden, and by extension, St. Jude Medical, that the 300 parts per billion was used as a level to measure the toxicity level or the amount of silver that was being

liberated from their device.

Q. And where did they get the 300 parts per billion, can you tell me?

A. In this document, which, again, we identify as Exhibit No. 12, the second bullet point reads, silver toxicity in humans is seen at levels greater than 0.3 PPM equals 300 PPB.

Then further down on the document in the -- I guess that's the third paragraph, starting with the words the most conservative level reported for silver toxicity is 300 parts per billion.

Two references are made there. One is the -- the reference three is the Wan reference and reference four is the Deitch, D-e-i-t-c-h.

Q. So is it your understanding that St. Jude is saying that they obtained the 300 parts per billion level from the literature?

A. Correct.

Q. Anywhere in this paper do they say that it's an established scientific standard?

A. They do not explicitly say it's an established scientific standard.

Q. Is it your understanding that this was -- this document, Exhibit No. 12, was also attached to the PMA supplement submitted to the FDA?

A. I believe so.
Q. Okay.
A. Yes.
Q. Okay. And if you look at paragraph two, the first sentence reads, the most conservative level reported for silver toxicity is 300 PPB. Do you see that?
A. Yes.
Q. So, once again, they are saying this is, the level that someone out in the literature published, correct?
MR. CAPRETZ: Object as to form.
THE WITNESS: No, because that's the problem. That's the whole problem with all of this, is that those people really didn't publish this 300 PPB level.
If you read those publications, yes, that's -- they cite that; but that's not what those publications were trying to assess.
What I believe this number is is a propagation of error through the scientific literature, which can happen if one does not read the data or interpret the data and basically make their own conclusions about where the level of toxicity is.
In my opinion, the level of toxicity of silver

has yet to be established.

Q. Okay. And your criticism is that the articles No. 3 and 4, with the first authors being Wan and Deitch, do not actually conduct an experiment to establish the 300 parts per billion level, but merely report the 300 parts per billion level as something that was observed somewhere else?

A. They are using it -- again, you can call it standard. I can call it benchmark; but they are using it as -- as -- we'll call it a scientific data point for the level of toxicity.

If you put it in that phrase, then that's the data point. If you use it to support your argument to say that the material we're making is nontoxic, you have to compare it to something. You have to have a reference point. So by doing so, I call that a benchmark. You can call it a standard.

You can use other words, other nomenclature, to describe it; but what you are doing is you need an absolute reference point to make valid your argument that your material is not toxic. Without it, you cannot make that argument.

So if they are not explicitly stating that they have a material that is basically releasing less material -- less silver, in this case, than some

Q. -- you can't find the paper in which the original person actually did the study who said, hey, this is the 300 parts per billion because I did these particular scientific investigations to establish it?

A. Correct.

Q. Okay. So I guess this leads us to the question I've been trying to get to for a couple of days here, so now I might as well ask it.

Have you done any investigations or anyone on your behalf to establish what the silver toxicity level is in humans?

A. No, I have not.

Q. Okay. And I take it there's nothing in the literature that you have found that establishes a silver toxicity level?

A. Not that I could find.

Q. So at this point we cannot say that the 300 parts per billion is or is not a silver toxicity level?

A. Correct.

MR. CAPRETZ: You mean, of course, with scientific certainty? Because I think it's implied in here by researcher Tweden, right, that the most conservative reported level -- isn't that implied by that 300 PPB?

I mean, you're asking him as a scientist, with reasonable scientific certainty; is that the question?

MR. JEFFREY: That's correct.

MR. CAPRETZ: Okay.

THE WITNESS: So repeat the question. I'm concerned here.

MR. JEFFREY:

Q. I didn't include with reasonable degree of scientific certainty.

So within a reasonable degree of scientific certainty, you can't tell me today what the silver toxicity level is?

A. Correct.

Q. And within a reasonable degree of scientific certainty, you can't tell me today whether the 300 parts per billion level that was cited is a reasonable level for silver toxicity or not?

MR. CAPRETZ: Objection to the form.

THE WITNESS: Correct, yes.

MR. JEFFREY:

Q. Okay. Well, is it also true that we cannot say within a reasonable degree of scientific certainty what the level of silver concentration is that will affect tissue in-growth around a sewing cuff?

A. Certainly we have in vitro data that tells

designed effect you're testing for in vivo; however, you did point out that it's -- yes, it's very confusing sometimes.

And it's why we've had some -- as a field, some very slow progress in the design of materials that really can control wound healing.

Q. Okay. Now, in determining the level that silver's coming off the cuff might be causing some type of toxic effect or detrimental effect on the growth of the tissue, you have mentioned that we should take into consideration this concentration gradient, correct?

A. Correct.

Q. Have you measured a concentration gradient in any Silzone heart valve recipient?

A. I have not measured the concentration gradient. I do recall Ogle, in the poster that is defined here, did try to make measurements in the peri-implant zone.

I also tried to calculate from their notebooks -- I felt I was unsuccessful in understanding exactly where the tissue was being sampled, but I believe -- um, either Dr. Langanki and possibly Dr. Ogle were making those measurements -- trying to make those measurements.

In the poster I referred to -- if that is an

exhibit and we have that available -- I don't know if you have that available.

It was presented at the Society for Biomaterials meeting so it's -- so it's No. 3 on this list.

Q. No. 3 that one Ogle, et al., systemic silver evaluation, a study of Silzone heart valve?

A. 1999, yes. That I remember after fifty-two weeks the concentration in the tissue surrounding the device was around sixty micrograms I believe per gram and it was increasing over time.

Q. Okay.

A. Where the -- I believe -- I have to look at this again to -- to -- to give you a very accurate sort of statement.

I believe at the same time the solution level of silver had peaked and stabilized, which -- which the only conclusion then in terms of a mass balance -- right. You have mass coming off this material. Has to go somewhere. It also does not support this assessment in this documentation, page 13 of 22, that ninety percent of the silver absorbed is excreted from the body.

I'm not sure where she gets this or this documentation -- this literature reference indicates. They don't give the reference. That ninety percent of