IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE ST. JUDE MEDICAL, INC.,<br>SILZONE HEART VALVES PRODUCTS<br>LIABILITY LITIGATION | MDL DOCKET NO. 1396 |

# **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' EXPERT ERIC G. BUTCHART PURSUANT TO FEDERAL RULE OF EVIDENCE 702**

# Table of Contents


Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 4

A. Dr. Butchart's Experience And Qualifications ..... 4

B. Summary Of Dr. Butchart's Opinions And Objections Thereto ..... 5

III. FRE 702 MANDATES THE EXCLUSION OF FAULTY OPINIONS LIKE DR. BUTCHART'S ..... 6

A. FRE 702 Establishes The Guiding Principles Regarding The Admission Of Expert Testimony ..... 6

B. Opinion #1: Silzone Has A Toxic Effect On Tissues And On Blood Components, Causing A Higher Incidence Of Medical Complications ..... 9

1. Dr. Butchart Is Not Qualified To Opine That Silzone Is Toxic To Tissues And Blood Components ..... 10

2. Dr. Butchart's Theory Concerning The Toxic Effect Of Silzone Is Based On Speculation And Unsound Methodology ..... 13

a. Dr. Butchart's Theory Is A Hypothesis That Has Not Been Tested Or Proven ..... 14

b. Dr. Butchart's Theory Is Based On An Improper Extrapolation And Incomplete Information ..... 16

c. Dr. Butchart's Reliance On Dr. Goodman's Platelet Study Is Misplaced ..... 18

d. Dr. Butchart Cites To Literature That Does Not Support His Theory And Is Irrelevant ..... 20

C. Opinion #2: Silzone Causes A Higher Incidence Of Wide-Ranging Complications, Thereby Rendering The Silzone Valve Defective ..... 22

1. Dr. Butchart Is Not Even Remotely Qualified To Opine On Statistics Relating To Complication Rates Or Epidemiology ..... 23

2. Dr. Butchart Employs Unscientific And Unreliable Methodology To Analyze Clinical Trial Results For The Silzone Valve ..... 25

3. Dr. Butchart Relies On Incomplete And Unreliable Data To Support His Opinion Regarding Complication Rates And Product Defect ....................... 27

4. Dr. Butchart's Opinion Regarding The Existence Of A Defect Is Not Helpful To The Jury ........................................................................ 34

D. Opinion #3: All Silzone Patients Require Additional Clinical Monitoring Beyond That Ordinarily Received By Mechanical Heart Valve Recipients ............... 35

1. Dr. Butchart's Monitoring Protocol Is Speculative and Lacks General Acceptance In The Medical Community ........................................................ 36

2. Dr. Butchart Is Not Qualified To Recommend The Treatment Appropriate For All Silzone Valve Recipients .................................................. 38

3. Dr. Butchart Does Not Have Evidence That Silzone Valve Recipients Are At An Increased Risk For All Of The Complications For Which He Is Recommending Monitoring ................................................................... 38

a. There Is No Evidence Of A Long-Term Increased Risk Of Paravalvular Leak........................................................................................ 39

b. There Is No Evidence Of An Increased Incidence Of Thromboembolism In Silzone Aortic Valve Recipients ................................ 39

c. There Is No Evidence Of An Increased Risk Of Pannus Causing Interference With Silzone Valve Leaflet Movement .................................... 40

E. Opinion #4: A Large Independent Epidemiological Study Of Silzone Patients Is Necessary ........................................................................... 41

1. Dr. Butchart Is Not Qualified To Recommend An Epidemiological Study

2. Dr. Butchart's Proposed Epidemiological Study Lacks Independent Reliability And Is Strictly For Litigation ......................................................... 42

F. The PSC Has Failed To Provide Key Information And Documents Underlying Dr. Butchart's Opinions........................................................ 44

IV. CONCLUSION ......................................................................................... 44

# I.

# INTRODUCTION

This is a classic case of an expert biting off more than his qualifications or evidence allow him to chew. In an expert report spanning more than 100 pages, Dr. Butchart -- a cardiovascular and thoracic surgeon who practices in the United Kingdom -- offers expansive opinions, ranging from the alleged toxicity of Silzone on tissues and blood components, *to* the statistical incidence of complications among Silzone patients, *to* the appropriate legal remedies for all Silzone patients. These opinions do not satisfy the test of admissibility under Federal Rule of Evidence 702.

Under Rule 702 and the Supreme Court's trilogy on the admissibility of expert testimony -- *Kumho Tire Co. v. Carmichae*l, 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993) -- trial courts must act as gatekeepers to exclude unreliable expert testimony. *Kumho*, 526 U.S. at 141. Where (1) the expert testifies outside his qualifications [Fed. R. Evid. 702], (2) there is simply too great an analytical gap between the data and the opinion proffered (foundation) [*Joiner*, 522 U.S. at 146], or (3) the reasoning or methodology underlying the testimony is not scientifically valid (reliability) [*Kumho*, 526 U.S. at 153], the trial court must exclude the opinion. Here, Dr. Butchart's opinions must be excluded because they fall in each of these impermissible categories.

***First***, Dr. Butchart cannot reliably opine that the Silzone valve is toxic to

tissues and blood components when, by his own admission, he is not an expert in the subjects that underlie this opinion, including toxicology, pathology, hematology, and biomaterials science. Moreover, Dr. Butchart has not tested this opinion and he lacks reliable scientific support for it. All he relies on are two outdated articles that do not evaluate Silzone and do not support his claims, speculative observations from two explanted Silzone valves, and one study that is neither published nor peer-reviewed.

***Second***, Dr. Butchart should not be permitted to opine that the Silzone coating causes a higher incidence of complications and is therefore defective. While he relies heavily on statistics to support this opinion, he is not an epidemiologist or a biostatistician and, in fact, could not answer basic questions about the statistical methodology that underlies his opinion during his deposition. Worse yet, Dr. Butchart has failed to consider all relevant data for his opinion, including the latest data from the AVERT study and control group data from his own CERF study. Absent consideration of these data, Dr. Butchart's opinion is incomplete. In addition, Dr. Butchart relies on studies and information having questionable reliability, including case series and adverse event reports. However, the law is clear that such information is inadequate to establish causation.

***Third***, Dr. Butchart's opinion that all Silzone patients require enhanced clinical monitoring flies in the face of sound scientific and medical science and is thus wholly unsupported. Dr. Butchart's proposed clinical monitoring program not only lacks

general acceptance in the medical community, four years ago he admitted that further testing was needed of his experimental risk scoring system (the core of his proposed monitoring program) before it would be ready for implementation in clinical practice. Because Dr. Butchart never did that testing, not one doctor or medical association has accepted or implemented his recommendations as there is no foundation for it. Furthermore, even Dr. Butchart must recognize that there is no clear purpose for his recommendations when, as he himself admits, the data is insufficient to conclude to a reasonable degree of medical probability that Silzone patients face a higher, long-term risk of certain complications included in the proposed program.

***Lastly***, Dr. Butchart lacks the qualifications for his opinion that a large independent epidemiological study of Silzone patients is necessary. As a fundamental matter, he is not an epidemiologist and he lacks knowledge about the basic elements of his proposed study, including the number of subjects that would be necessary to obtain useful information from such a study. Dr. Butchart admits that his recommendation was developed solely for this litigation. In fact, apart from this litigation, he has not recommended or even mentioned it to others, and no medical association or group has ever expressed interest in doing such a study.

Each of Dr. Butchart's opinions is severely flawed for multiple reasons. Accordingly, St. Jude Medical ("SJM") moves to have Dr. Butchart precluded from testifying at trial.

## II.

## BACKGROUND

### A. Dr. Butchart's Experience And Qualifications

Dr. Butchart is a "medical doctor trained as a cardio-thoracic surgeon" who practices in the United Kingdom only. *Rule 26 Declaration of Eric G. Butchart ("Rule 26 Decl.")*, 11/29/05, p.1:¶1, Exh. 1 to Affidavit of Tracy J. Van Steenburgh ("Van Steenburgh Aff."); *Interim Medical Report on the Follow-Up Requirements of Patients with St. Jude Silzone Prosthetic Heart Valves ("Report")*, 11/29/05, p.3, Exh. 1(a) to Van Steenburgh Decl. He is not licensed to practice in the U.S. or Canada. *Deposition of Eric G. Butchart ("Depo.")*, 23:24-24:4, Exh. 2 to Van Steenburgh Decl. His main research interest includes heart valve surgery, particularly thromboembolism after heart valve replacement. *Report*, p.3. Dr. Butchart has no formal training in pathology, hematology, biomaterials science, toxicology, statistics, or epidemiology, and he expressly denies expertise in any of these subjects. *Depo.*, 19:17-20:1, 20:2-15, 21:7-20, 22:2-8, 22:19-23:9, 652:3-9.

While he claims "personal experience [with] the St. Jude Silzone valve, having both implanted and explanted these prostheses during the course of a research study," Dr. Butchart's experience is limited. In fact, he testified in deposition that he has only implanted 16-25 Silzone valves in his entire career, and explanted only three. *Depo.*, 26:15-27:18; 29:4-6.

### B. Summary Of Dr. Butchart's Opinions And Objections Thereto

Despite his admitted lack of expertise in numerous fields central to his opinions, including toxicology, pathology, hematology, biomaterials science, statistics, and epidemiology, and despite the fact that his qualifications are limited to cardiovascular and thoracic surgery, Dr. Butchart makes numerous sweeping opinions about the Silzone mechanical heart valve. The following chart summarizes Dr. Butchart's primary opinions and St. Jude Medical's objections to them.

| No. | Type Of Opinion | Opinion | Objections |
|---|---|---|---|
| 1 | Toxicology Pathology, Hematology, Biomaterials, and Metallurgy Opinion | Silzone has a direct, toxic effect on tissues and on blood components, causing a higher incidence of medical complications among Silzone valve patients. *Report*, pp. 6:¶2, 7:¶8, 15-16. | § Not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 2 | Statistics, Epidemiology, and Legal Opinion | Silzone causes a higher incidence of complications, thereby rendering the Silzone valve defective. These complications include: valve thrombosis, thromboembolism, tissue overgrowth (pannus), paravalvular leak, endocarditis, and possibly cancer. *Report*, pp. 15-47. | § Not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 3 | Clinical Opinion | All Silzone patients require additional clinical monitoring beyond that ordinarily received by mechanical heart valve recipients. *Report*, pp. 7-9: ¶¶9-11. | § Not qualified<br>§ Lacks foundation<br>§ Unreliable |
| 4 | Epidemiology Opinion | A large, independent epidemiological study of Silzone patients is necessary since St. Jude Medical's AVERT study "cannot be regarded as independent and is seriously flawed." *Report*, p. | § Not qualified<br>§ Unreliable<br>§ Lacks foundation |

| No. | Type Of Opinion | Opinion | Objections |
|---|---|---|---|
| | | 9: ¶¶12-13. | |

## III.

## FRE 702 MANDATES THE EXCLUSION OF FAULTY OPINIONS LIKE DR. BUTCHART'S

### A. FRE 702 Establishes The Guiding Principles Regarding The Admission Of Expert Testimony

Rule 702 of the Federal Rules of Evidence sets forth the basic guidelines for admitting expert testimony. The witness must be "qualified as an expert by knowledge, skill, experience, training, or education" to offer the opinion. Fed. R. Evid. 702. Expert testimony is admissible only when "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993)(*Daubert*). Finally, the testimony must constitute "scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue," something lacking when the opinion is irrelevant to the case. Fed. R. Evid. 702.

It is an abuse of discretion to admit testimony that exceeds a witness's expertise. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d

706, 715-16 (8th Cir. 2001)(hydrologist prohibited from testifying about required standard of care for warehouseman); *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991)(excluding experts who had general accounting knowledge but not specific expertise in the areas covering their opinions). Such testimony lacks foundation and is properly excluded as unreliable under Rule 702. *Weisgram v. Marley Co*., 169 F.3d 514, 516-18 (8th Cir. 1999).

Courts also must undertake a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 591-93. In other words, the Court must look to both the relevancy *and* the reliability of the expert testimony. *Blue Dane Simmental Corp. v. American Simmental Ass'n.*, 178 F.3d 1035, 1040 (8th Cir. 1999). Factors bearing on this analysis include: whether the methodology can be and has been tested; whether it has been subjected to peer review and publication; the known or potential rate of error or the existence of standards; and whether the methodology used has been generally accepted. *Daubert*, 509 U.S. at 593-94; *Peitzmeier v. Hennessey Industries, Inc.*, 97 F.3d 293, 297 (8th Cir. 1996). An expert's failure to review the relevant facts and data renders his opinion inadmissible conjecture and speculation. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (toxicologist's failure to examine plaintiff, inquire about other toxic exposures, and exclude confounding factors rendered her causation opinion unreliable and inadmissible); *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*,

408 F.3d 410, 416 (8th Cir. 2005)("an expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported").[1]

The party offering the expert testimony bears the burden of demonstrating that the expert testimony is reliable and admissible. *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996). The Court must act as a "gatekeeper" by separating expert opinion evidence based on "good grounds" from "subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp*., 252 F.3d 986, 989 (8th Cir. 2001). Neither *Daubert* nor Rule 702 requires the Court to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. The Court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *J.B. Hunt Transp., Inc. v. General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001)(quoting *Joiner*, 522 U.S. at 146.

As explained more fully below, Dr. Butchart's opinions fly in the face of the basic requirements for admissibility under the Federal Rules of Evidence and *Daubert* and its progeny. Accordingly, his opinions should be excluded in their entirety.

---

1 *See also Weisgram*, 169 F.3d at 520 (overruling district court because expert's testimony had "no reasonable factual basis" and thus was "pure conjecture"); *Carlson v. C.H. Robinson Worldwide, Inc.*, No. Civ. 02-3780/Civ. 02-4261, 2005 WL 758601 at *4 (D. Minn. Mar. 30, 2005)(narrow and abbreviated examination of documents "fails to establish a reliable factual basis for [his] conclusions or that [his] conclusions are the product of reliable principles or methods").

### B. Opinion #1: Silzone Has A Toxic Effect On Tissues And Blood Components, Causing A Higher Incidence Of Medical Complications

Dr. Butchart speculates that the Silzone-coated valve has a direct, toxic effect on tissues and blood components, leading to a higher incidence of complications among Silzone patients, including valve thrombosis, thromboembolism, tissue overgrowth (pannus), paravalvular leak, endocarditis, and possibly cancer. *Report*, 11/29/05, pp. 6:¶2, 7:¶8, 15-16; *Depo.*, 165:12-166:3. He proposes two possible mechanisms by which Silzone might cause damage to tissue and blood components: (1) he claims that Silzone is toxic to adherent blood platelets, which might interfere with platelet adhesion, [*Report*, pp.15, 17-18; *Depo.*, 176:13-23], and (2) he argues that Silzone is toxic to red blood cells, thus leading to the depletion of intracellular glutathione, [*Report*, pp. 17-18 *; Depo.*, 176:13-23]. To support his theories, Dr. Butchart relies on the following sources of information: (1) two articles dating back more than 30 years; (2) his observations from ***two*** explanted Silzone valves; and (3) an abstract of Dr. Steven L. Goodman that was neither peer-reviewed nor published. *Depo.*, 165:12-167:21, 173:22-174:10.

For several reasons, Dr. Butchart's opinion does not even come close to satisfying the Rule 702 test for admissibility.

### 1. Dr. Butchart Is Not Qualified To Opine That Silzone Is Toxic To Tissues And Blood Components

At the bare minimum, a proffered expert must have expertise in the specific field in which he will testify. Fed. R. Evid. 702; *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2005)(refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise); *Sutera v. The Perrier Group of America, Inc.*, 986 F. Supp. 655, 660 (D. Mass. 1997) ("'[A] scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease.'")(*quoting Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995)). An expert witness who fails to demonstrate by a "preponderance of the evidence" that he possesses the appropriate qualifications to render his opinion is unreliable and must be precluded from testifying as to this opinion. *Marmo*, 457 F.3d at 757-58.

In order for an expert witness to qualify on toxicology issues, he should have an advanced degree in toxicology or related disciplines (e.g., pharmacology, biochemistry, environmental health or industrial hygiene), be board certified in toxicology, belong to a professional organization such as the Academy of Toxicological Sciences or the Society of Toxicology, have published peer-reviewed articles on toxicology, have competed for and received research grants in toxicology, have served on scientific toxicology advisory panels, or have university appointments in toxicology or a related field in a university graduate toxicology program. *Reference Manual On*

*Scientific Evidence*, Federal Judicial Center 2000 (2nd Ed.), pp. 415-418, Exh. 3 to Van Steenburgh Aff. Absent formal training or education, the witness may demonstrate his expertise through a strong familiarity of toxicology issues, beyond merely reviewing the literature. *Sutera*, 986 F. Supp. at 667 (precluding oncologist and hematologist from opining on the link between benzene and leukemia because, despite reviewing of the literature, the witness had very limited familiarity with this subject). Where a witness admits that he lacks expertise on a particular subject, he cannot be deemed qualified under Rule 702. *Jones v. Lincoln Electric Co.*, 188 F.3d 789, 723-724 (7th Cir. 1999) (metallurgist who admitted that he was not a toxicologist and that toxicology issues were outside of his expertise was not qualified to testify as to the toxicity of manganese).

Here, Dr. Butchart lacks all of the requisite qualifications to opine on the alleged toxic effect of Silzone on tissues and blood components. He has no advanced degree, no formal training, no professional memberships, no publications, and no university appointments in any of the relevant fields. *Depo.*, 17:2-18:11, 19:17-20:15, 21:21-22:13, 22:19-23:9; *see also Curriculum Vitae of Eric G. Butchart ("Butchart C.V.")*, 11/05, Exh. 1(b) to Van Steenburgh Aff. Furthermore, Dr. Butchart admittedly has done nothing to acquire extensive knowledge or experience in these subjects. At most, he has read some literature, talked to other experts, and attended medical conferences:

> Q: And when you say you've made yourself familiar with aspects of those disciplines, does that include anything

other than review of the literature?

A: It includes, you know, talking to other experts in – in those particular fields.

Q: Anything else?

A: Well, I attend, of course, many medical conferences and I listen to other experts talking. I read the literature.

Q: Anything else?

A: No.

*Id.* at 23:10-23. Thus, although he claims to be "familiar" with the "basics" of toxicology, pathology, hematology, biomaterials science, and metallurgy as they relate to thromboembolism after heart valve surgery, nothing in his C.V. or deposition testimony demonstrates expertise in these areas by a preponderance of the evidence. *Id.* at 17:2-18:11, 19:17-20:15, 21:21-22:13, 22:19-23:9; *see also Butchart C.V.*, 11/05.

Most significantly, Dr. Butchart ***admits*** that he is not an expert in toxicology, pathology, hematology, biomaterials science, or metallurgy -- the principle subjects underlying this opinion. *Depo.*, 21:21-22:8; 19:17-20:1; 20:2-15; 22:14-18; 23:3-9. Given his admitted lack of expertise in these necessary disciplines, it would be an abuse of discretion to allow Dr. Butchart to offer the opinion that Silzone is toxic to tissues and blood components. *Jones*, 188 F.3d at 723-724 (barring toxicology opinion by metallurgist who admitted he was not a toxicologist); *Everett v. Georgia-Pacific*

*Corp.*, 949 F. Supp. 856, 857 (S.D. Ga. 1996)(barring medical doctor and surgeon who lacked specialized knowledge and training in toxicology from giving expert testimony as to the alleged toxic cause of plaintiff's medical condition); *Sutera,* 986 F. Supp. at 660 (barring physician with no expertise in epidemiology, toxicology, biostatistics, or risk assessment from opining on general causation).

### 2. Dr. Butchart's Theory Concerning The Toxic Effect Of Silzone Is Based On Speculation And Unsound Methodology

The reliability of expert testimony is a basic prerequisite for admissibility. *Daubert*, 509 U.S. at 592-93; *Marmo*, 457 F.3d at 757-58; *Blue Dane*, 178 F.3d at 1040. Expert testimony must be based on scientifically valid reasoning or methodology. *Daubert*, 509 U.S. at 592-93. Failure to test the opinion, to consider relevant facts, or to subject it to peer review and publication weigh against a finding of reliability. *Daubert*, 509 U.S. at 593-94; *Peitzmeier*, 97 F.3d at 297. Furthermore, expert testimony that is "mere speculation and pure conjecture … is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt*, 243 F.3d at 444; *Hernandez v. Flor*, Civ. Act. No. 01-183, 2002 U.S. Dist. LEXIS 23208 at *38 (D. Minn.)(fire expert barred from testifying that if decedent "had only one minute more[,] he probably could have escaped" because such testimony lacked scientific basis and was therefore speculative and conclusory).

### a. Dr. Butchart's Theory Is A Hypothesis That Has Not Been Tested Or Proven

Here, Dr. Butchart candidly admits that his theory regarding Silzone's supposed toxic effect on tissue and blood components is merely a "hypothesis" that has not been proven:

> Q: Now, you also mentioned two different possible mechanisms by which Silzone might cause the damage to tissue and blood components. One is platelet adhesion and one is depletion of intracellular glutathione.
>
> . . .
>
> Q: Do you have an opinion as to whether either of those mechanisms are, in fact, the mechanisms by which Silzone might cause these reactions to a reasonable medical probability?
>
> A: I think the – which I've put there is a hypothesis based upon my own findings, based on the findings of Dr. Goodman and based upon the paper that I reference in the literature about silver toxicity to red cells.
>
> Q: So at this point that hypothesis hasn't been proven or disproven?
>
> A: I think it would be very difficult to prove it except perhaps by, you know, more animal experiments.

*Depo.*, 176:13 – 177:16.

Admittedly, Dr. Butchart has not done any testing whatsoever to prove his toxicity hypothesis:

Q: Have you done any testing to confirm your opinion that Silzone has a direct affect [sic] on tissues and on blood components?

A: What did you mean by testing?

Q: Any type of testing to confirm that.

A: You mean laboratory work or –

Q: Laboratory work, any type of testing.

A: No.

*Id.* at 173:9-21. Furthermore, Dr. Butchart lacks data to corroborate his opinion. For example, although he argues that Silzone is toxic to tissues and blood components, Dr. Butchart has no knowledge of silver levels in the Silzone sewing ring or in adjacent human tissue. *Id.* at. 256:24-258:5. Indeed, Dr. Butchart admits that he is uncertain about whether silver is present in human tissue in the first place and how it would get there:

Q: Do you have any understanding as to what the concentration of silver might be in the tissues adjacent to the cuff in a Silzone valve, in an implanted Silzone valve?

A: We know from some of the sheep experiments that silver did leach out into the –into the tissues of the sewing ring of the – of the annulus – of the patient's annulus. In some cases very rapidly. And it varied from one animal to another. ***Presumably the same sort of thing happens in patients, but we don't know that for certain.***

*Id.* at 257:16-258:5 (emphasis added).

Further adding to his speculation, Dr. Butchart claims that residual silver left after a Silzone valve is explanted may impair the healing of the replacement prosthetic valve. *Depo*., 610:7-16. Yet again, however, he admits that this theory is not based on any evidence and is only hypothetical:

Q: What evidence do you have to support that statement?

A: **I don't have any evidence to support it.** It's a hypothesis based on the fact that if silver remains within necrotic material after the valve has been explanted, that may compromise the integrity of another prosthesis that is implanted.

*Id*. at 610:17-611:1 (emphasis).

#### b. Dr. Butchart's Theory Is Based On An Improper Extrapolation And Incomplete Information

To support his theory, Dr. Butchart extrapolates from his observations of ***two*** explanted Silzone valves to reach a general conclusion about the Silzone valve. *Depo.*, 166:4-167:17. Specifically, he observed that thrombus on both explanted valves

that "was only loosely attached and could be simply wiped off the sewing ring . . . ." *Report*, p.17. Based on these limited observations, Dr. Butchart concludes that Silzone is toxic to blood components and thereby increases the risk of thrombus complications. *Depo.*, 166:4-167:17.

Dr. Butchart's methodology in analyzing these two valves, and the conclusions he derives from it, is significantly flawed. The two valves he examined represent only 0.0056% of the 36,000 Silzone valves implanted in patients, hardly a representative sample. Although he acknowledges that individual patient factors may well affect tissue healing and thrombus development, [*Report*, p.35], Dr. Butchart's theory completely discounts whether individual factors were present in his two non-typical observations. Such extrapolations are not scientifically valid. *Schudel v. GE***,** 120 F.3d 991, 997 (9th Cir. 1997)(finding it was not "scientifically acceptable to draw general conclusions about the neurotoxicity of [certain chemicals] from studies of other chemicals; indeed, the testimony indicated small differences in molecular structure often have significant consequences.").

Moreover, Dr. Butchart admits that he has not done any testing to confirm that his two observations of loose thrombus attachment were in fact caused by the toxic effects of Silzone. *Id.* at 173:9-21. Dr. Butchart is at best equivocal about the exact cause of the loose thrombus attachment, hypothesizing only that it "may" be explained by the toxic effect of Silzone on adherent blood platelets. *Report*, p.18.

Lastly, Dr. Butchart did not consider or rule out all possible alternative causes of the loose thrombus. He did not provide detailed medical histories for the two valve patients. *Report*, p.17. Although he acknowledges that one of the two Silzone patients had endocarditis and recognizes it as an alternative cause, he assumes "endocarditis was probably a secondary event to the thrombosis." *Depo.*, 170:6-171:2 ("I think what had happened is that because of the excessive amount of thrombus on the valve that it increased the risk of infection."). This type of tentative and unsupported opinion is inadmissible under *Daubert* and Rule 702's prohibition against "unsubstantiated conclusions." *National Bank of Commerce v. Associated Milk Producers*, Inc., 22 F. Supp. 2d 942, 960 (E.D. Ark. 1998)("A causation expert must provide more than unsubstantiated conclusions.").

### c. Dr. Butchart's Reliance On Dr. Goodman's Platelet Study Is Misplaced

Dr. Butchart relies on an "experimental" study by Dr. Goodman on platelet interactions with Silzone, but that study contradicts his opinion. *Report*, p.17; *see also Depo.*, 173:22-174:10. Claiming that the Goodman study showed "a severe toxic effect" on adherent blood platelets, Dr. Butchart speculates that this mechanism "may explain the loose attachment of thrombus on the Silzone coated sewing ring," thereby causing thromboembolic complications. *Report*, p.18; *see also Depo.*, 271: 6-272:13. But these statements are directly contrary to the observations and conclusions of the study in which Dr. Goodman himself explained: "Hence, silver coating may not only reduce infection by

virtue of its bacterial toxicity, but may also reduce infection by **initiating a more rapid healing of the sewing ring.** This would then reduce the fabric surface area for bacterial adhesion and colonization. **Of course, more rapid healing may also have benefits with respect to device thrombogenicity."** *Platelet Interaction with Silver Treated Sewing Rings of Mechanical Heart Valves: Potential Effects on Tissue Ingrowth and Healing, 24th Annual Meeting of the Society for Biomaterials, April 22-26, 1998, p. 207,* Exh. 4 to Van Steenburgh Aff.

Aside from his mistaken reference to the Goodman study, Dr. Butchart admits that his theory is hypothetical, unproven, and has never been published in peer-reviewed literature:

Q: Are you aware of any evidence that would confirm that hypothesis?

A: You mean other than Dr. Goodman's paper?

Q: Yes.

A: No, because I don't think anybody else has done the same experiments that he did, to the best of my knowledge.

Q: And, again, that's not a peer review publication?

A: No, it wasn't. It was never published. I don't know whether it was peer reviewed or not.

*Id.* at 272:21-273:13; *see also Depo.*, 271:24-272:3.

Dr. Butchart's reliance on the unpublished and untested hypothesis of Dr. Goodman underscores his poor methodology and renders the opinion unreliable. *J.B. Hunt*, 243 F.3d at 444 (excluding proposed expert testimony "derivative" of another's inadmissible testimony); *In re TMI Litigation*, 193 F.3d 613, 714-16 (3d Cir. 1999) (expert's "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under Daubert").

#### d. Dr. Butchart Cites To Literature That Does Not Support His Theory And Is Irrelevant

Having no evidence to support his theory, Dr. Butchart improperly relies on two outdated articles by Sawyer and Lee that did not involve the Silzone material or the design of heart valve relevant here, but rather involved "experimental" work on metal heart valves during "the early years of heart valve replacement." *Report*, p.18, *Depo.*, 167:18-21.[2] Both articles involved the use of an outdated, discontinued "ball and cage" heart valve design known for causing thrombus, but Dr. Butchart claims the articles

[2] These articles include: (1) *Sawyer, P.N., et al., "Development and In Vivo Evaluation of Metals for Heart Valve Prostheses," Trans. Am. Soc. Artif. Intern. Organs*, 13:124-30 (1967)("Sawyer article"); and (2) *Lee, M.E., et al., "Etiology of Thrombus Formation on Prosthetic Metal Heart Valves," J. Thorac. Cardiovasc. Surg.*, 63:809-19 (1972)("Lee article"), attached as Exh. 5 to Van Steenburgh Aff.

"showed that heart valves constructed from silver were more thrombogenic." *Report*, p.18; *see also Depo.*, 165:12-167:17.

However, the Sawyer article never concluded that silver is more thrombogenic than other metals. To the contrary, this preliminary study on various materials (including silver, gold and platinum, aluminum, magnesium, stainless steel, copper, and cobalt) gave silver a relatively good rating. *Sawyer, P.N., et al., "Development and In Vivo Evaluation of Metals for Heart Valve Prostheses," Trans. Am. Soc. Artif. Intern. Organs*, 13:128. The article explained that silver "did **not** rapidly and invariably thrombose as had been expected." *Id.* at 126. In comparison, the authors focused on magnesium and its alloys, which they concluded "do not represent useful metals or alloys for construction and long term implantation as cardiac or vascular prostheses." *Id.* at 128. Thus, not only does Dr. Butchart misstate the conclusions of this article, but he concocts his own conclusions about silver that are unsupported by it.

Likewise, the Lee article not only failed to conclude that silver was "unsuitable for prosthetic valve construction," as Dr. Butchart claims, but it did not present any comparison data about silver at all. *Lee, M.E., et al., "Etiology of Thrombus Formation on Prosthetic Metal Heart Valves," J. Thorac. Cardiovasc. Surg.*, 63:809-19. The study instead presented results on aluminum, stellite-21, N-155 (a ferrous-nickel alloy), copper, stainless steel 304 and 309, inconel, hastalloy B, and titanium. *Id.* at 813-817. Silver is not mentioned in the discussion or conclusion sections of the paper. *Id.* at

817-818. Hence, the conclusions of the study are again misstated.

Moreover, plaintiffs' own biomaterials expert Dr. Kevin E. Healy has testified that **there is no risk of thrombosis** (i.e. excess clotting) associated with the Silzone coating when compared to other materials. *Deposition of Kevin E. Healy*, 53:14-59:21, Exh. 6 to Van Steenburgh Aff. Dr. Healy explained that all materials are to some extent thrombogenic and that medical science has not yet invented a material that is not. *Id.* at 53:14-55:2. He further explained that it would be impossible to measure a statistically significant difference between patients using Silzone and those implanted with another coating [*Id.* at 53:14-55:2], because the main factor in clotting is flow dynamics, not the surface material, [*Id.* at 17:19-19:11]. Thus, according to their own expert, these articles would be irrelevant since Silzone is not a factor in causing any thrombus, and the devices studied (ball and cage design) would create an entirely different flow dynamic from the bi-leaflet SJM heart valves. Dr. Butchart's attempt to use irrelevant materials confirms the dangers of allowing non-qualified persons to opine about complicated toxicological and biomaterials issues which they do not understand.

### C. Opinion #2: Silzone Causes A Higher Incidence Of Wide-Ranging Complications, Thereby Rendering The Silzone Valve Defective

Dr. Butchart opines that "substantial differences" exist in the complication rates between the Silzone valve and the standard SJM valve. *Report*, p.7:¶¶5-8. Likewise, he opines that the Silzone valve is qualitatively and quantitatively different in

specific complications from other heart valves, including thromboembolism, valve thrombosis, paravalvular leak, excessive tissue ingrowth or pannus, endocarditis, and possibly cancer. *Id.* at p.7: ¶¶2, 6, 7; p.16. To support his opinion, Dr. Butchart offers statistical analyses from the AVERT study, St. Jude Medical's Top Accounts Study, and his own studies known as the Cardiff Embolic Risk Factor Study (CERFS) and the Cardiff Late Review. *Id*. at p.7:¶¶5, 6. Indeed, his report is replete with statistical references, calculations, and tables. *See, e.g., Report,* p.8: ¶10; pp.20-32, 38-40, 42-43, 45-46; Tables 1, 2, 3, 7; Appendix 1. Based on these statistics, Dr. Butchart concludes that the Silzone valve is "defective," opining that "[a]pproximately 36,000 patients worldwide have thus received a defective prosthesis which exposes them to higher risk." *Id.* at 7: ¶9; p.16.

As explained below, however, Dr. Butchart is simply not qualified to testify about statistical and epidemiological subjects. Furthermore, his opinions are based on incomplete and unreliable information. Therefore, Dr. Butchart's opinions regarding complication rates and product defect must be barred.

### 1. Dr. Butchart Is Not Even Remotely Qualified To Opine On Statistics Relating To Complication Rates Or Epidemiology

Dr. Butchart's report, C.V., and deposition testimony make clear that he is not a statistician and is not competent to render expert opinions on statistical and epidemiological matters. As Dr. Butchart puts it, he is "a medical doctor trained as a

cardio-thoracic surgeon." *Report*, p.1: ¶1. He confirmed his lack of statistical expertise during his deposition, wherein he repeatedly punted on questions to the statisticians. *Depo.*, 33:13-35:1; 36:14-24; 126:23-127:11; 276:23-277:5. For example:

> Q: But it appears to be the case that Defendant's Exhibits Number 3 through 7 is an Excel spreadsheet that sets forth the data collected for the Cardiff Embolic Risk Factor study, correct?
>
> A: Correct. As far as I can tell. I did not supply this directly. So this I assume was supplied in the statistical documents that were supplied.
>
> Q: Okay. We weren't supplied with a key to the column headings here. So I was hoping you could shed some light on that.
>
> A: I cannot. And I'll tell you why not. This – the analysis was done by two statisticians working with us, Nicola Payne and Gary Grunkemeier. And the – we left the statistical analysis entirely to them. So the column headings they would clearly understand much more than I would, I'm afraid.
>
> . . .
>
> Q: Do you have any understanding as to what would indicate a positive finding in any of these columns?
>
> A: I cannot help you there. I'm sorry. As I say, we left the statistical analysis entirely to the statistician.

*Id.* at 33:13-35:1.

Likewise, when asked about the quantitative significance of the very data that he claims demonstrates the heightened risk of major thromboembolic events with Silzone valves, Dr. Butchart acknowledged that he was incapable of answering:

> Q: Referring to the last page of Defendant's Exhibit Number 12. Can you tell me if there's a significantly, significant difference between the categories one through four on the bottom?
>
> A: I can't tell you that. As I said, I would have to ask the statistician, but I think the purpose of creating these graphs was to draw a distinction between the graph above for all non-Silzone valves and the graph below for all Silzone valves, and I think you can see the curves look very different. **Whether they're statistically different, I can't tell you.**

*Id.* at 79:9-80:2 (emphasis added).

Absent knowledge of the relevant statistics that underlie his opinions, Rule 702 forbids Dr. Butchart from masquerading as an "expert" in complication rates and from opining that the Silzone valve is defective based on these rates. *Wheeling*, 254 F.3d at 715-16; *Garnac*, 932 F.2d at 1566, *Sutera*, 986 F. Supp. at 660.

### 2. Dr. Butchart Employs Unscientific And Unreliable Methodology To Analyze Clinical Trial Results For The Silzone Valve

It is well-settled that a scientist following appropriate and accepted methodology in analyzing clinical trial results must determine whether any observed

differences between two groups are statistically significant, i.e. that the differences are real as opposed to merely random occurrences. *Good v. Fluour Daniel Corp.*, 222 F. Supp. 2d 1236, 1243 (E.D. Wash. 2002)("In the absence of a statistically significant difference upon which to opine, [the expert's] opinion must be excluded under *Daubert*."); *Miller v. Pfizer,* 196 F. Supp. 2d 1062, 1080 (D. Kan. 2002)(barring expert testimony regarding causal relationship between drug and suicide because "studies [did not] yield results that are statistically significant regarding the causal relationship"). Failure to heed this fundamental principle renders expert testimony unreliable and it must be excluded under Rule 702. *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003)(an expert must employ the "intellectual rigor" required of a professional in his field).

Dr. Butchart disregards this fundamental principle of statistical analysis. He admits that the differences in thromboembolism between Silzone patients and standard valve recipients in the AVERT study following mitral valve replacement were **not statistically significant**. *Report*, p.23. Nevertheless, he attempts to salvage a hopeless position by asserting that "the differences in thromboembolism in the AVERT study are <u>clinically</u> significant if not statistically significant. . . ." *Id*. While he feels that the combined number of thromboembolic events in the Silzone patients should not be dismissed as being of minor importance, he also admits that those combined events (i.e. thrombosis, thomboembolic, and bleeding rates for double valve recipients and mitral valve recipients) were "never tested for statistical significance in the AVERT analysis."

*Report,* p.23 and 24. Thus, while Dr. Butchart would like to conclude that the thromboembolic events in Silzone recipients are highly significant, [*Report*, p.24], there is no scientifically accepted proof for this conclusion. Dr. Butchart's method of analyzing clinical trial results -- which ignores whether his preferred conclusions can be supported by statistically significant data -- is misleading, scientifically unreliable, and neither generally accepted in the medical and scientific communities, nor authorized under Rule 702 and *Daubert*. *Murphy*, 245 F. Supp. at 478; *Good*, 222 F. Supp. 2d at 1243; *Miller*, 196 F. Supp. 2d at 1080 . Consequently, his analysis and the causation opinions on which they are based fall short of the "intellectual rigor" required by Rule 702 and must be excluded. *Group Health Plan,* 344 F.3d at 760.

### 3. Dr. Butchart Relies On Incomplete And Unreliable Data To Support His Opinion Regarding Complication Rates And Product Defect

To satisfy Rule 702's basic requirements for admissibility, the Court must find that Dr. Butchart's testimony is based on "good grounds" and scientifically valid principles. *Glastetter*, 252 F.3d at 989. Here, the Court should exclude Dr. Butchart's testimony regarding complication rates and product defect because it also is based on unsound data and, therefore, lacks the "good grounds" necessary for admissibility.

Dr. Butchart relies on outdated data from the AVERT study to show higher complication rates with the Silzone valve, but ignores other relevant AVERT data. *Depo.*, 130:9-132:17. Specifically, in his report, Dr. Butchart failed to consider or even

mention the most recent AVERT data showing no difference in complication rates between Silzone and non-Silzone valves:

> Q: Have you taken a look at the recent data from AVERT?
>
> A: I have, yes.
>
> . . .
>
> Q: Is there a reason why you didn't refer to that data or used those rates in your report?
>
> A: Yeah, because it wasn't available to me at the time I wrote the report.
>
> Q: It wasn't available or hadn't been provided to you by plaintiff's attorney?
>
> A: Had not be [sic] provided to me, at that time.

*Id.* at 130:9-131:10. Consequently, Dr. Butchart's opinions regarding Silzone complication rates are misleading and incomplete since they are based solely on AVERT data from over five years ago. *Id.* at 131:11-132:1. When, as here, expert testimony fails to consider all relevant facts and data, it is unreliable and should be excluded. *Marmo,* 457 F.3d 748, 758 (toxicologist's failure to examine plaintiff, inquire about other toxic exposures, and exclude confounding factors rendered her opinion on medical causation unreliable and inadmissible).

Dr. Butchart also has failed to calculate and consider the complication rates of standard SJM valves in his CERF study, even though he has had this control group data available for comparative purposes. *Depo.*, 297:24-298:22. Ironically, Dr. Butchart himself admits that these control group complication rates are critical to evaluating the Silzone valve:

> Q: Well, do you consider the standard St. Jude Medical valves to be an appropriate control group to compare the adverse event rates with the Silzone valve?
>
> A: Yes, because essentially [the] only [difference] between the two prosthesis is that one had a silver coating and the other didn't. The valve mechanism was identical.
>
> Q: So in your view, would the standard valve adverse event rate and the CERF study be an important consideration in the evaluation of the risk posed by the Silzone valve?
>
> A: Yes.

*Id.* at 186:19-187:10. But rather than heed his own recommendation for thorough scientific evaluation, Dr. Butchart failed to review the standard valve complication rates available to him from the CERF study, and used a literature average instead. *Id.* at 297:1-298:22, 298:23-299:9.[3] His intentional failure to analyze directly relevant comparison

[3] Furthermore, this is contrary to Dr. Butchart's opinions expressed outside the context of this litigation, where he has been critical of the practice of using thromboembolic event rates reported in the literature as a measure of prosthesis performance due to the

data at this stage in the litigation is both telling and inexcusable. *Group Health Plan*, 344 F.3d at 760 (requiring an expert to employ the "intellectual rigor" required of a professional in his field).

Furthermore, Dr. Butchart also improperly draws conclusions about the Silzone valve based on unreliable case studies. For example, Dr. Butchart relies on data from the CERF Study, and subsequently from the Cardiff Late Review, to opine that the Silzone valve has a higher risk of thromboembolism. *Report*, p.7:¶6; *Report*, Appendix 1; *Depo.*, 48:11-49:12. However, the CERF study was a small, non-randomized study involving 83 Silzone patients from a single hospital. *Report*, Appendix 1; *Depo*., 187:11-14. Significantly, Dr. Butchart himself admits that studies such as this are less scientifically reliable than randomized studies:

> Q: Well, Doctor, would you agree that a randomized study is a more scientifically reliable method of evaluating causation than the method used in the CERF study?
>
> A: Well, I think most people would accept that a randomized study is a better way of comparing one, whatever it is, with another, yes.

*Depo.*, 187:24-188:10. Likewise, Dr. Butchart's Cardiff Late Review, on which he relies

significant impact of patient-specific variables on the rate of thromboembolism. *Butchart, E., et al., A New Scoring System to Determine Thromboembolic Risk After Heart Valve Replacement, Circulation* 108 (Supl.II):68, 73 (2003), Exh. 7 to Van Steenburgh Aff.

heavily for his opinion that Silzone valve recipients are subject to an increased risk of a variety of complications, is merely a case series of Silzone valve recipients that was not randomized, has no control group, and (unlike the AVERT study) includes an analysis of echocardiograms by reviewers who were not blinded to valve type. *Depo.*, 48:11-49:12, 348:14-22. Thus, the results of Dr. Butchart's Cardiff Late Review have not been submitted for peer review and have been published in abstract form only. *Id*. at 226:14-227:10. Dr. Butchart's reliance on case series to support his opinion violates Rule 702. *Glastetter*, 252 F.3d at 989-90 (scientifically valid conclusions concerning medical causation cannot be derived from case reports or series); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000)(same).

Additionally, Dr. Butchart relies on St. Jude Medical's Field Experience Reports (FERs), claiming that they "confirm a high level of concern about thromboembolism in their Silzone prosthesis." *Report*, p.27. However, FERs are merely anecdotal case reports of adverse experiences, and it is well-settled that such reports are not reliable evidence of causation because they are unconfirmed, lacking in complete information, and subject to reporting and other biases. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005)(reversing a jury verdict because expert testimony was based upon adverse experience reports and other unreliable evidence); *Nelson v. American Home Prods. Corp.*, 92 F. Supp. 2d 954, 969 (W.D. Mo. 2000)(an adverse experience report "may be sufficient for formulation of a hypothesis that can later be tested and confirmed, but it is not proof of causation in the courtroom or in the

scientific community").

Dr. Butchart also cites one report of cancer associated with a Silzone valve, concluding that it is "a matter of great concern . . . [with] clear implications for future surveillance and data collection" and suggesting some casual link to cancer. *Repor*t, p.47. Again, case reports – let alone a single case report – establish nothing about causation and cannot support an entirely speculative suggestion about cancer. *Nelson*, 92 F. Supp. 2d at 969 (an adverse experience report "it is not proof of causation in the courtroom or in the scientific community"); *Glastetter*, 252 F.3d at 989-90 (case reports are not scientifically valid proof of causation); *Turner,* 229 F.3d at 1209 (same). Even as he makes this suggestion, Dr. Butchart admits that this evidence is insufficient to allow him to opine that Silzone increases the risk of cancer. *Depo.*, pp. 455:16-458:17. Dr. Butchart should not be allowed to testify regarding any purported increased risk of cancer with the Silzone valve or any testing needed to monitor for cancer.[4]

Finally, Dr. Butchart opines that St. Jude Medical's Top Accounts Study showed "a higher than expected thromboembolic rate in the mitral position . . . ." *Repor*t, p.27.[5] However, his reliance on this study is misplaced because it was not controlled, not

---

4 Dr. Butchart's opinion also is irrelevant to this litigation, since none of the plaintiffs have claimed that they developed or fear developing cancer as a result of their Silzone valve.

5 The Top Accounts Study was an observational study of patients implanted with the

randomized study, not prospective, and its findings have never been published. *Id.* As Dr. Butchart himself admits, the most scientifically reliable studies are controlled and randomized. *Depo.*, 186:19-187:10, 187:24-188:10. Notably, most of the participating centers reported low rates of thromboembolic events and thrombosis, with some variation among the centers. *Top Accounts Survey Summary*. Under such circumstances, sound statistical and epidemiological methodology would require a site-by-site analysis to account for variations in procedures and protocols, properly assess the significance of the rates, and determine whether pooling the data is appropriate. *Deposition of Gary L. Grunkemeier, Ph.D.*, 298:10-299:3, Exh. 9 to Van Steenburgh Aff.[6] Dr. Butchart did not perform any such analysis. *Report*, p.27.

In sum, *Daubert* requires federal courts to act as gatekeepers so that the jury will not be mislead by invalid opinions based on faulty science. *Kumho*, 526 U.S. at 141; *Glastetter*, 252 F.3d at 989. Dr. Butchart's "data" is scientifically unreliable and does not support his opinion. Therefore, this testimony should not be allowed.

---

Silzone valve at various institutions worldwide. Originally, ten centers were asked to participate. Eight centers agreed, and seven actually provided data. Approximately 50 patients per center were surveyed. *Top Accounts Survey Summary*, Exh. 8 to Van Steenburgh Aff.

[6] Dr. Butchart regards Dr. Grunkemeier as an "internationally recognized" biostatistician. *Depo.*, 348:23-349:14.

### 4. Dr. Butchart's Opinion Regarding The Existence Of A Defect Is Not Helpful To The Jury

Where an expert opines on an ultimate issue in the case, the Eighth Circuit holds that "courts must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion." *Rottlund Company Inc. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006) (citing *Robertson v. Norton Co*., 148 F.3d 905, 908 (8th Cir. 1998) (excluding expert testimony because it "added nothing helpful to the jury's consideration of [ultimate] issues); *see also United States v. Cruz*, 981 F. 2d 659, 663 (2d Cir. 1992) (finding that expert testimony was not admissible both because it was not helpful to the jury and because its sole purpose was to bolster the government's allegations).

Here, Dr. Butchart relies on speculation -- and nothing else -- to opine that the Silzone valve is defective. As explained above, Dr. Butchart has explanted only three Silzone valves in his career and zero non-Silzone SJM valves. *Depo.*, 29:4-6; 30:3-5. Given the approximately 36,000 patients who received a Silzone valve, his experience with three Silzone valves is insufficient to reliably conclude that all Silzone valves are defective. Moreover, as explained above, Dr. Butchart is not a statistician and is not qualified to opine about complication rates for Silzone and non-Silzone valves, and his conclusions about complication rates are unreliable because they are based on incomplete and scientifically unsound information. *Id.* at 652:3-9. In light of these significant problems, Dr. Butchart's opinion that the Silzone valve is defective is not helpful to the

jury and must therefore be excluded. *Rottlund*, 452 F.3d at 732; *National Bank of Commerce*, 22 F. Supp. 2d at 960 ("A causation expert must provide more than unsubstantiated conclusions.").

### D. Opinion #3: All Silzone Patients Require Additional Clinical Monitoring Beyond That Ordinarily Received By Mechanical Heart Valve Recipients

In Dr. Butchart's only published statement concerning Silzone valve risks, he claimed an early (three month) risk of thromboembolic events in patients with Silzone mitral valves, but no increased risk of paravalvular leak or any other complications. *Ionescu, A., et al., Incidence of Embolism and Paravalvular Leak After St. Jude Silzone Valve Implantation: Experience from the Cardiff Embolic Risk Factor Study, Heart*, 89:1055-1061 (2003), Exh. 10 to Van Steenburgh Aff. Further, he admitted that there was no evidence of any long-term risk of thromboembolic events associated with the Silzone valve in the CERF study. *Id*. at 1059. Now that he is involved as a litigation expert for the Plaintiffs, however, Dr. Butchart is advocating an elaborate and intensive monitoring scheme that assumes Silzone valves cause a wide variety of complications, including those he previously disclaimed, like paravalvular leak and long-term thromboembolic risk. *Report*, pp. 48-75.

At the heart of Dr. Butchart's monitoring program is an experimental risk scoring system that he recently developed to prospectively assess thromboembolic risk from mechanical heart valves. *Butchart, E., et al., A New Scoring System to Determine*

*Thromboembolic Risk After Heart Valve Replacement, Circulation,* 108 (Supl.II):68 (2003). Dr. Butchart developed his risk scoring system as part of his single, small, non-randomized clinical trial, the CERF study. *Id.* at II:71-73. In that study, he examined the relationship between suspected thromboembolic risk factors and the occurrence of thromboembolic events after valve implantation. *Id.* Dr. Butchart believes his scoring system can predict which patients are at an increased risk of thromboembolism. *Report*, Appendix 1. He then devised a complex medical monitoring protocol that provides for heightened testing and treatment for Silzone valve recipients corresponding to risk scores. *Id.* at Appendices 1 and 2.

As explained below, Dr. Butchart's risk scoring system and the protocols on which it is based have not been subjected to any long-term testing and have not been tested at all outside of the CERF study. Thus, there is no evidence that they are reliable or generally accepted in the medical community, and their use on Silzone valve patients to determine appropriate medical treatment is contrary to sound scientific and medical practice.

### 1. Dr. Butchart's Monitoring Protocol Is Speculative and Lacks General Acceptance In The Medical Community

Significantly, before Dr. Butchart became a litigation expert in this case, he cautioned that the new risk scoring system he proposed "needs to be tested further in other large prosthetic valve databases before introduction into clinical practice."

*Butchart, E., et al., A New Scoring System to Determine Thromboembolic Risk After Heart Valve Replacement, Circulation,* 108 (Supl.II):73; *Depo.*, 555:12-556:2. Yet, Dr. Butchart's risk scoring system has not been subjected to testing or validation by anyone else. *Depo.*, 77:6-21. Likewise, it has not been subjected to any long-term testing, even by Dr. Butchart. *Id*. at 493:19-495:20.

Indeed, Dr. Butchart's untested risk scoring system includes risk factors for which there is no scientific evidence establishing that they increase the risk of thromboembolic events in patients with mechanical heart valves, or patients with Silzone valves. *Supra*, p.36.

Given Dr. Butchart himself admitted his risk scoring system was not supported enough to use in clinical practice, it is not surprising that Dr. Butchart's monitoring and treatment protocol has not been accepted in the medical or scientific communities. Dr. Butchart himself admits that he cannot tout his risk scoring system as having acceptance in the medical community as a valid means of evaluating risks for heart valve patients. *Depo.*, 77:22-78:15. Dr. Butchart is unaware of any doctors outside of his own CERF study who have accepted and are using his protocols, [*Id.* at 492:14-493:18; 633:21-634:15], and he knows of no medical association that has accepted his proposed protocols for the monitoring and treatment of Silzone patients, [*Id.* at 643:9-18]. This supports its exclusion under Daubert. *Daubert*, 509 U.S. at 593-94; *Peitzmeier*, 97 F.3d at 297 (excluding expert testimony of a design defect absent proof of general

acceptance of the expert's theory or methodology).

### 2. Dr. Butchart Is Not Qualified To Recommend The Treatment Appropriate For All Silzone Valve Recipients

According to Dr. Butchart's monitoring protocol, patients with Silzone valves should be followed by cardiologists. *Depo.*, 496:10-16. Since Dr. Butchart is not a cardiologist, he himself would not be an appropriate person to follow the monitoring and treatment of Silzone valve recipients. *Id.* at 497:3-12. Accordingly, it would be absurd to allow Dr. Butchart, who is not qualified to follow the treatment and monitoring of Silzone valve recipients, to nevertheless dictate the treatment and monitoring that is appropriate for those patients.

### 3. Dr. Butchart Does Not Have Evidence That Silzone Valve Recipients Are At An Increased Risk For All Of The Complications For Which He Is Recommending Monitoring

Dr. Butchart's monitoring protocol proposes heightened and sometimes invasive medical testing and/or treatment for all Silzone valve recipients and for a wide variety of potential complications. *Report*, Appendices 2. Yet, not even Dr. Butchart is of the opinion that all Silzone valve recipients are at a higher risk of experiencing all of those potential complications. Accordingly, not only is the validity of Dr. Butchart's monitoring protocols speculative, the supposed justification for his monitoring protocol -- an increased risk of complications -- is based on speculation as well.

### a. There Is No Evidence Of A Long-Term Increased Risk Of Paravalvular Leak

In the case of paravalvular leak, for example, Dr. Butchart admits that it is currently impossible to conclude with reasonable medical probability that the Silzone valve poses a long-term risk:

> Q: . . . I understand that you don't have a lot of faith in that data, but can you say, to a reasonable degree of medical probability that there is an increased long-term risk of paravalvular leak posed by the Silzone coating on Silzone valves?
>
> A: I don't think it's possible to say that without actually studying these patients further. That's the whole point, really. It's the whole point of why they need more monitoring. So far I've had inadequate monitoring, and I don't think it's possible to make a definitive statement about their long-term risk.

*Depo.*, 605:21-606:23, 668:17-669:6.

### b. There Is No Evidence Of An Increased Incidence Of Thromboembolism In Silzone Aortic Valve Recipients

Likewise, Dr. Butchart has not concluded that aortic Silzone valve recipients in particular have an increased risk of thromboembolic complications:

> Q: You can't say for certain that there's a reasonable medical probability that Silzone has increased the risk of complications in aortic Silzone valve recipients?

> A: As I've explained this, I don't think that there are enough data to evaluate that properly. There's not enough statistical even in the AVERT study to answer that question, which is one of the reasons why I believe that more data collection is necessary.

*Depo.*, 347:24-348:13. Thus, without admittedly any evidence that an increased risk of these complications exist in the first place, Dr. Butchart's recommended clinical monitoring program lacks the requisite medical or scientific support to satisfy Rule 702.

### c. There Is No Evidence Of An Increased Risk Of Pannus Causing Interference With Silzone Valve Leaflet Movement

Further, in one of the more egregious examples of overreaching by Dr. Butchart, he recommends serial cinefluoroscopy and echocardiography for patients with Silzone valves in order to assess the supposed risk of interference with valve leaflet movement caused by pannus overgrowth. Yet, Dr. Butchart can point to absolutely no evidence that Silzone causes impaired leaflet movement from excessive tissue overgrowth or pannus.

Dr. Butchart admits that in order to find evidence of restricted leaflet movement, there must be a consistent loss of leaflet movement evidenced by "at least two" cinefluoroscopy exams. *Depo*, 360:13-362:12. But Dr. Butchart also admits that he has not found restricted leaflet movement with two cinefluoroscopy exams in any patients. *Id.* at 362:13-363:2.

Even if a single cinefluoroscopy exam showing restricted leaflet movement

were sufficient to indicate an actual complication, Dr. Butchart has no evidence that the frequency of these findings is any greater in Silzone valve recipients. *Depo.*, 364:20-365:17, 377:14-21. Most significantly, he has not conducted any cinefluoroscopy exams on his own standard St. Jude Medical valve recipients. *Id*. Moreover, he cites to no peer-reviewed literature showing a higher incidence of restricted leaflet movement for Silzone patients than non-Silzone patients. Consequently, nothing supports Dr. Butchart's opinion that monitoring for pannus overgrowth is needed.

Dr. Butchart's elaborate monitoring program recommended must, at a minimum, be supported by a legitimate increased risk for each of the complications that the program would address. That, however, is lacking here. Accordingly, Dr. Butchart should not be allowed to heap speculation upon speculation in advocating for an untested monitoring protocol to address unsubstantiated risks. *Glastetter*, 252 F.3d at 989 (precluding expert opinion evidence based on "subjective speculation").

### E. Opinion #4: A Large Independent Epidemiological Study Of Silzone Patients Is Necessary

Dr. Butchart opines that a large independent epidemiological study of Silzone patients is necessary to better characterize the risk of valve-related complications, to provide guidance for future patient management, and to determine the long-term effects of silver on human tissue, "not only for the benefit and protection of patients with Silzone valves, but also for the benefit of other patients who may receive a silver coated medical product in the future." *Report*, p.9: ¶¶12-13. Dr. Butchart is not qualified to

render epidemiological opinions, and his proposed epidemiological study is both unsupported and motivated by litigation.

### 1. Dr. Butchart Is Not Qualified To Opine On the Need For An Epidemiological Study

Dr. Butchart is neither an epidemiologist nor a statistician. *Report*, p.1:¶1. He has not received any formal training in epidemiology and, apart from being "familiar" with aspects of epidemiology that relate to heart valve disease and replacement, he does not purport to be an expert in this field. *Depo.*, 21:7-20. Notably, Dr. Butchart has not done any power calculations for his proposed study, and he does not know the number of subjects needed for the study or the length of patient follow-up. *Id.* at 657:14-658:15. Rather, Dr. Butchart defers these basic questions to a statistician because, as he concedes, they are outside of his expertise. *Id.* at 33:13-35:1, 36:14-24, 60:21-62:3, 79:9-80:2, 126:23-127:11, 276:23-277:5.

### 2. Dr. Butchart's Proposed Epidemiological Study Lacks Independent Reliability And Is Strictly For Litigation

Dr. Butchart admits that he has not recommended this epidemiological study to anyone outside of the litigation context:

> Q: Doctor, again, I'm not asking you for the explanation and the reason. Have you recommended this long-term independent data collection study that's referenced on page 76 and 77 of your report filed in this litigation in the context of any other situation

besides litigation?

A: You mean with regard to the Silzone valve?

Q: Yes.

A: No.

*Depo.*, 672:17-673:4. Likewise, he has not even mentioned the study to anyone outside of the litigation:

Q: Have you mentioned this type of study, this long-term independent data collection study that you recommend here, have you even mentioned it to anyone else outside of the context of this litigation?

A: No. . . .

*Id*. at 673:5-16.

No medical association has expressed interest in the study, and Dr. Butchart has not sought any funding for it. *Depo.*, 671:5-14. As Dr. Butchart's own testimony makes clear, the proposed epidemiological study has been developed solely for litigation. *Id.* at 671:15-673:16. Accordingly, this opinion must be excluded because it lacks independent reliability and is purely litigation driven. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001)(impetus for opinion weighs in admissibility evaluation); *Wagner v. Hesston Corp.*, 2005 WL 1540135 (D. Minn. June 30, 2005 at *6 (expert testing conducted in the context of litigation increases unreliability of expert opinions).

### F. The PSC Has Failed To Provide Key Information And Documents Underlying Dr. Butchart's Opinions

Despite St. Jude Medical's requests, the Plaintiffs' Steering Committee ("PSC") has not produced critical information and documents on which Dr. Butchart relies for his opinions. *Letter from St. Jude Medical*, Exh. 11 to Van Steenburgh Aff. Among other things, this information includes "complete multivariate statistical analysis relied upon by Mr. Butchart in opining that Silzone is a risk factor for embolic events." *Id.* To date, the PSC has not provided this or any of the other information requested, and it has not specified when or what information it has or will provide, other than a key for the CERF study database. *Email Correspondence from PSC*, Exh. 12 to Van Steenburgh Aff. Absent this information, the Court cannot meaningfully perform its gatekeeper function in determining the admissibility of Dr. Butchart's opinions. Thus, the Court should bar Dr. Butchart from proffering these opinions on the grounds that his supporting data is incomplete and lacks factual support.

## IV.
## CONCLUSION

Because the opinions of Dr. Butchart lack any indicia of evidentiary reliability, they are inadmissible as a matter of law and should not be considered by this Court.

DATED: February 14, 2007.

HALLELAND LEWIS NILAN &
JOHNSON, P.A.

By s/ Tracy J. Van Steenburgh
Tracy J. Van Steenburgh, # 141173
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402-4501
Telephone: (612) 338-1838

REED SMITH LLP
Steven M. Kohn
1999 Harrison Street, Suite 2400
Oakland, CA 94612

Attorneys for Defendant St. Jude Medical, Inc.