normal leaflet travel angle?

A. On serial examination, that degree of loss of movement persists or gets worse, then I think that is consistent with pannus formation.

Q. How many exams or cinefluoroscopy exams need to be conducted before you can find consistent loss of normal leaflet travel angle, in your opinion?

A. Well, I would say at least two.

Q. Have you conducted two cinefluoroscopy exams? Individuals that you found restricted leaflet movement in your CERF patients.

A. No, not yet. They are currently being assessed in that way.

Q. But you, nevertheless, have the opinion that you found suspicious findings of --

A. Yes.

Q. -- restricted leaflet movement, even though you don't have a

consistent finding yet; is that correct?

A. That is true, yeah.

Q. And then you say in your report that, "A synchronous closure of the two leaflets in the mitral position is not uncommon and not necessarily pathological," correct?

A. Yes.

Q. Why do you restrict that statement to mitral valves?

A. Because asynchronous closure in the aortic position does not happen or should not happen.

Q. So is asynchronous closure of the two leaflets in the mitral position any evidence of pathological finding?

A. Not necessarily, no. I think it would need to be supported by echo findings also.

Q. And, again, you haven't found any restricted leaflet movement in your mitral valve -- your Silzone mitral valve patients yet, have you?

A. No, that's true, but as I mentioned yesterday, in some of the -- when you read the cinefluoroscopy reports, you will see that some of them in some cases it was not possible to get sufficiently good imagine to measure the angles accurately.

Q. Well, a poor cinefluoroscopy report is not evidence of restricted leaflet movement, is it?

A. No, but it leaves the door open by saying that it may exist in some patients, and we haven't found it.

Q. But it doesn't establish there's a higher risk, does it?

A. Not on the data that we have. On the data that we have it seems to be more of a problem in the aortic position than in the mitral position.

Q. Do you have any evidence that the, quote, unquote, problem you found in the Silzone aortic valve recipients is greater than what exists in the non-standard ~~population of~~ aortic

valve recipients?

A. Non-standard?

Q. I'm sorry, let me try that again. Do you have any evidence that the quote, unquote problem you found in the aortic Silzone valve recipients is any greater than the standard population of aortic valve recipients?

MR. COREN: Form, objection. You can respond.

A. As I mentioned yesterday, we are planning to study those patients, the standard valves in exactly the same way in order to compare them. But we're still waiting for the very laborious process of R & D and ethics approval to be completed, but we will do it.

Q. What evidence do you have, Dr. Butchart, that much of the Silzone related pannus originates in thrombus? On page 34 your statement. I do note that I see the 44 percent for Dr. Wilson, you are correct there.

A. Yes. Well, I've written

is due to pannus. That's why I quoted the paper. So it's a demonstration of the value of cinefluoroscopy, even in asymptomatic patients in demonstrating pannus in some of them, which is why I have suggested that cinefluoroscopy is used in the evaluation of Silzone patients. So I don't think we should, you know, draw too much from the absolute numbers of the Japanese paper. It's there really to illustrate how cinefluoroscopy can be useful in demonstrating pannus.

Q. Do you have any evidence that your findings of restricted leaflet movement are greater than the population of non-Silzone valve recipients?

A. As I say, we have not had the opportunity yet to compare with our own patients in the Cardiff Embolic Risk Factor study, but we will do that.

Q. I'm not restricting my question to your patients. Do you have any evidence that the findings that you

found of restricted leaflet movement in your patients is greater than the population of non-Silzone valve recipients?

MR. COREN: Objection to form.

A. There are -- I don't believe there are any papers that have systematically -- well, I know because I've looked for them, that there are no papers that have systematically looked at the cinefluoroscopy findings in asymptomatic patients, other than this Japanese study.

Q. Do you have any evidence that the restricted leaflet movement you found in your study was caused by the Silzone coating on those valves?

A. I think -- no, no direct evidence, no. But I think one can infer from the -- what we know of the thrombogenic nature of the silver coated surface this may well be causing either thrombus or pannus.

prevent or a study that was looking actually at -- a set up to look at the rate of endocarditis with Silzone valves, and the authors didn't even comment upon it. I find that very odd.

Q. Because the rates were identical, doesn't that suggest to you that some other agent besides Silzone was impacting the result?

A. I don't know. I mean, you know, given the concerns that we talked about yesterday about data collection and so on in the study, I think it, you know, again rates as the same type of concerns.

Q. Doctor, moving on to the section on carcinogenic effect of silver. Is it your opinion, to a reasonable medical probability that Silzone has caused an increased risk of cancer in recipients of Silzone coated valves?

A. I don't know if there is enough evidence to say that on the

present -- in the present state of our knowledge. One case has been reported in the literature, and I don't think that's enough to say that Silzone increases the risk of cancer. Although --

Q. Neither is one rat study sufficient?

A. I think the -- the literature on carcinogenicity of silver, as I've said in the report, the reports in the literature are conflicting.

Q. So there are rat studies in the literature that don't show carcinogenicity associated with silver, correct?

A. But others have, yes.

Q. You haven't performed any studies personally to test this theory, have you?

A. No, I haven't.

Q. What are the quote, unquote clear implications from the rat study involving colloidal silver in that

single case report involving Silzone valve recipients?

A. Well, what I've said is that I don't think that this is an indication, per se, for echocardiography. But if the patient is having transesophageal echocardiography for another reason, then the echocardiographer should be alert to the possibility that he, you know, should be looking for evidence of tumor also. That's all I've said. And I think that's perfectly reasonable.

Q. Does merely the temporal and physical relationship to Silzone establish a reasonable degree of medical probability that Silzone cause, contributed to the occurrence of the tumor in that case report?

A. I think it raises, I would say, a high degree of suspicion, because Rhabdomyosarcoma, and I'll spell that for you, R-h-a-b-d-o-m-y-o-s-a-r-c-o-m-a, of the

left atrium is an extremely rare tumor. And because it happened in this patient 12 months after the implantation with a Silzone valve, it was immediately adjacent to the valve, one has to be suspicious. That's all I'm saying.

Q. But that suspicion doesn't rise to the level of a reasonable degree of medical probability that that tumor was caused by Silzone, does it?

A. I think it's a certainly, a possibility. I wouldn't go further than that.

Q. So the answer to my question is no?

A. I would say it's a possibility, not probability.

Q. Doctor, we get to the management of Silzone valve recipients. I'd like you to take a look at table 5. Actually, I meant table 6A through 6C.

A. Yes.

Q. Could you tell me what these tables represent?

there's nothing really -- I would submit, there's nothing contentious in these protocols. These are the kind of questions, you know, that you would ask before going on to the next box in any patient that you are concerned about. So there's nothing kind of, you know, particularly new or controversial in any of these proposals. Those are things -- these proposals are those that I think that any reasonable cardiologist would agree with, because they're based on, you know, evidence from the literature.

Q. Are you aware of any other cardiologist, besides Dr. Fraser who's using, even broadly speaking, the protocols that you have attached to your report as Appendix 2 which manage patients with Silzone valves?

A. Nobody else has seen them.

Q. You haven't recommended these protocols to anyone else besides Dr. Fraser?

A. No, because he is the

cardiologist who is following these patients.

Q. And he was the cardiologist involved in the CERF study as well?

A. Exactly, yeah.

Q. And the Cardiff Late Review?

A. Yes.

Q. So is there anyone who was not involved in the CERF study who is using the protocols that you have attached as Appendix 2 to your report treat patients with Silzone valves?

MR. COREN: Objection as to form. You can answer.

A. No, because, you know, as I said, these are patients who are being followed by Dr. Fraser.

Q. Doctor, and these have published. Doctor, if you could refer to page 48 of your report, under the second to last paragraph, you state that in that paragraph, "However, therapeutic recommendations in this report, some

based on limited available data and untested in any long-term studies, are for general guidance only." Which of the recommendations that you have in your report are based on limited available data?

MR. COREN: Objection as to form.

A. That sentence really applies to the management of anticoagulation and the management of risk factors as outlined in -- let's see.

Q. That would be your risk scoring system?

A. Using the risk scoring system. So it refers really to table 4 and table 5. Now, in table 5, I think there is -- there would be general agreement with the vast majority of these modifiable risk factors, because this is all, you know, well established in medical factors, things like systemic hypertension, good blood pressure control, because good blood pressure

control has been shown to reduce the incidence of stroke. Diabetes, the complications of diabetes are less if there is good diabetic control. So I don't think there's anything particularly contentious about those.

Q. I would agree with that, Doctor. We'll get to table 5 in a moment. I'd like to go through your article first that you base that on. First I just wanted to clarify or at least get your testimony as far as what you were referring to as far as the therapeutic recommendation in this report that were based on limited available data and untested in any long-term studies. That's the risk scoring system.

A. That is basically the risk scoring system, yeah.

Q. Okay, Doctor. If you could refer to page 59, the intensity of follow-up section. It says, "It is important to stress that Silzone valve

patients" --

A. Can I just check that we are both on the same page.

Q. Did I say --

A. 59?

Q. I misspoke, 50.

A. 50.

Q. Thank you.

A. 50, right.

Q. Page 50 under intensity of follow-up. It says in your report, "It is important to stress that Silzone valve patients should be followed up by cardiologists with particular expertise in heart valve disease." Correct?

A. Correct.

Q. Under this recommendation you, since you're not a cardiologist, would be an appropriate physician to follow a Silzone valve patient, correct?

A. Sorry, are you asking me I would be or --

Q. Correct.

A. Well, I'm a surgeon. So

normally these patients would be followed up by cardiologists.

Q. So you, under this recommendation, you would not be an appropriate person to be following patients with Silzone valves, correct?

A. That is correct, because they need, as well as the routine history and physical examination, they need echocardiography and cinefluoroscopy, which is normally done by cardiologists.

Q. And, Doctor, in the section on rationale for transesophageal echocardiography, page 51, in that last sentence you recommend that transesophageal echocardiography should always be performed and interpreted by an operator with experience in the echo evaluation of prosthetic valves, correct?

A. Correct.

Q. Is there something about TEE that motivated you to make that

explanation, Doctor, is it correct to say that in the CERF study the results did not indicate that smoking was an independent risk factor for thromboembolism?

MR. COREN: Objection as to form.

A. Yes, and I've given you an explanation why which for some reason you don't want to hear it. I don't know.

Q. I just want to get the answer first. Continuing with page II-73. "However, the scoring system proposed here needs to be tested further in other large prosthetic valve databases before introduction to clinical practice." Do you agree with that statement, Doctor?

A. Yes.

Q. Has the risk scoring system proposed in this publication been tested further in other large prosthetic valve databases yet?

A. No, it has not.

Q. And moving further down in that paragraph or the next paragraph. "Common sense dictates that cerebrovascular events, the most common manifestation of thromboembolism were likely to be multi-factorial in their etiology and related not only to the presence of a prosthetic valve and antithrombotic management, but also to factors associated with arthrosclerosis, inherent diverse mechanisms of hypercoagulability and preexisting intracardiac flow conditions." Do you still agree with that statement?

A. Yes.

Q. The last sentence. "In the case of risk factors that are amenable to modification, further prospective studies are required to test the hypothesis that amelioration or abolition of these factors will reduce the incidence of thromboembolism." Do you agree with that statement?

speculating, though, that there is a higher risk for Silzone valve recipients as compared non-Silzone valve recipients?

A. No, I think it's logical to conclude that if a valve is more thrombogenic for whatever reason and anticoagulation is discontinued, again, for whatever reason, that that is going to pose an additional risk to that patient. I think that's perfectly logical. And although I've prefaced the statement by saying there are no data specifically addressing that issue, I don't think that takes away the logic of the statement.

Q. Doctor, would you take a look at page 67 under the identification monitoring of paravalvular leak section.

A. Yes.

Q. About midway through that paragraph you state that, "Although the problem of silver-induced toxic necrosis and paravalvular leak may be

predominantly an early complication of the first few postoperative months, the lack of independent long-term follow-up data and the incompleteness and poor quality of echocardiogram data in the AVERT study reported in 2004 provide no confidence that this is the case."

I understand that you don't have a lot of faith in that data, but can you say, to a reasonable degree of medical probability that there is an increased long-term risk of paravalvular leak posed by the Silzone coating on Silzone valves?

A. I don't think it's possible to say that without actually studying these patients further. That's the whole point, really. It's the whole point of why they need more monitoring. So far I've had inadequate monitoring, and I don't think it's possible to make a definitive statement about their long-term risk.

Q. On page 69 in the middle of

paragraph. "As it is possible that any residual silver could impair the healing of a subsequently implanted prosthesis."

A. I'm sorry?

Q. Page 71.

A. Yes.

Q. You make the statement at the very first sentence of the last paragraph, second to last paragraph, sorry.

A. Yes.

Q. "As it is possible that any residual silver could impair the healing of a subsequently implanted prosthesis." Do you see that?

A. Yes.

Q. What evidence do you have to support that statement?

A. I don't have any evidence to support it. It's a hypothesis based on the fact that if silver remains within necrotic material after the valve has been explanted, that may compromise the integrity of another prosthesis that

is implanted. It's really the same kind of logic that applies to endocarditis. When you're operating on a patient with prosthetic endocarditis, it's very important to remove all the necrotic material, which in the case of endocarditis can contain organisms, in order to try and prevent those organisms getting on to the new valve, and I would submit that the same applies in the case of a Silzone valve. If the necrosis is caused by silver, then all of that necrotic material should be removed, as I've said, together with every fiber of the Silzone coating to make sure that as little silver as possible remains in the annulus. I think that's, you know, that's only common sense, really, applying the same kind of principle as one would apply to dealing with endocarditis.

Q. Well, do you have any understanding as to the level of silver that would be necessary to cause a toxic

right to point out that in the specific instance of eosinophilia is the only risk score. I think, you know, one would have to apply common sense and say, well, that is not a sufficient indication to increase the INR. If on the other hand the risk score was, let's say, five and part of that was due to atrial fibrillation and very poor LV function, then I think it would be perfectly reasonable to increase the INR because the small increase risk of bleeding would be offset by the benefit gained from increasing the anticoagulation. So, what I'm saying is that, you know, this protocol has to be interpreted with a degree of common sense I think. And maybe I should modify it further just to take into account what you've been saying.

Q. Do you have any understanding as to the number of doctors that would accept this type of monitoring and treatment protocol if it

was widely disseminated?

MR. COREN: Objection as to form.

A. I don't know. I think -- I don't honestly. I think it's as complicated as it appears. It's the kind of decision that most cardiologists would take into account when they're dealing with any patient. It's simply a means of trying put it down on paper, the decision process. For example, the patient does appear to anticoagulation interruption. You know, that's something that then I think people would consider necessary to take into account.

Q. Let's go to Protocol G, and that is for a patient who has a low risk score zero or one and has a finding --

A. G, sorry.

Q. G.

A. G as the Protocol for PVL.

Q. Right. The Protocol G is designated for the patient with a zero or a one low risk score with a finding

in a best position to decide the risks and benefits of any change in treatment. So all this is -- are if you like kind of the broad brush strokes of guidelines and individual patients, the cardiologist and cardiac surgeon looking after that patient must make their own mind up about it.

Q. Doctor, do you have any understanding as to whether any professional or medical association would be inclined to accept this series of protocols that you have proposed here as a basis for treating Silzone valve recipients?

MR. COREN: Objection to form.

A. I don't know.

Q. Do you have any understanding as to whether any medical association or professional association would be inclined to accept this protocol for treating any recipient of a mechanical valve?

standard St. Jude valve."

A. Yes.

Q. You said many times today that you're not a statistician, correct?

A. Correct.

Q. Are you qualified to perform a statistical power analysis of the AVERT study?

A. No, I'm not.

Q. What is the basis for this statement concerning the statistical power of the AVERT study?

A. Because I think you don't have to be a statistician to know that if you wish to prove conclusively that there is no difference between two in this case, two types of prostheses that you need a huge amount of follow-up or a few -- huge amount of follow-up years in each arm of the study in order to do that. And the AVERT study simply doesn't have that.

Q. Is the AVERT study large enough to do a legitimate statistical

analysis, Doctor, when you agree to determine whether Silzone has any impact on the incidence of endocarditis versus the comparison of that versus AVERT rates between Silzone and standard valve?

A. I think, as I said before, it's very difficult to prove that there is no difference, unless you employ a very long degree of a very long amount of follow-up, a lot of follow-up years. I can't tell you exactly how many that is because I'm not a statistician.

Q. Have you done any power calculations for the proposed study that you include in your report here, page 76 and 77?

A. No. What I have said there is that it would involve statisticians to do that, statistical advice will be necessary to determine the correct methodology and to try to identify the number of patients required for such a comparison.

Q. How many subjects would be necessary for the study, Doctor?

A. How many...

Q. Patients.

A. I don't know. The statistician would need to determine that.

Q. How long would the follow-up need to be?

A. The same thing. I mean that's, you know, this is why I've said statistical advice is necessary.

Q. That's outside of your expertise?

A. Exactly.

Q. Do you have any understanding as to how such a study would address the bias issues that would be raised by conducting this study in a population of patients who were involved in litigation?

A. What I'm suggesting is that this perhaps should take place after litigation is concluded.

A. I think that there is based on our own data and what data we can glean from the AVERT study points towards an increased risk.

Q. To a reasonable medical probability you believe that that data --

A. Yes, I do.

Q. -- supports a finding of long-term increased risk for Silzone valve patients?

A. I do.

Q. Of what type of complications?

A. Thromboembolism and valve thrombosis in particular.

Q. Anything else?

A. As far as paravalvular leak is concerned, I think there's insufficient data, and this is another reason why it's necessary to try and obtain further data on other patients. I mean, so far out of 36,000 patients who have received a Silzone valve only

about two percent of these patients have actually been studied in any systematic way. So 98 percent have not been studied at all. I think it would be very useful to obtain data on those other patients.

Q. What percentage of patients have been tested in or subject of a clinical trial for the Medtronic Hall valve?

A. I can't tell you that. I'm sure it's a lot more than two percent.

Q. Is it your opinion to a reasonable degree of medical probability that patients with Silzone coated aortic valves are subject to an increased risk of thromboembolic and thrombosis complications as a result of the Silzone coating?

A. Yes.

Q. And that's based on what data?

A. It's based on our own data from the Cardiff Late Review.

Foundation and the Heart Research Fund for wales that supported the CERF study, correct?

A. Correct.

Q. Has any association expressed an interest in funding the type of study that you are recommending here for the Silzone valve recipients?

A. Nobody has been approached to do it.

Q. Have you recommended it to any association fund of such a study for Silzone valve recipients?

A. No, I haven't.

Q. So you've only recommended it in the context of litigation, correct?

A. No, it's not in the context of litigation. It's -- although, I can see that you're interpreting it in that way.

Q. That's what this report is, Doctor. It's a report that was filed in litigation, correct?

A. Yes, but --

Q. You showed it to anyone else?

A. It deals with issues in broader terms.

Q. Have you recommended --

A. If the -- if the data that have been supplied --

Q. On the basis --

A. -- or if the data that we have already on the St. Jude valve are inadequate because of, you know, relatively small numbers of patients that have been studied, I think it's reasonable to try and supplement that with larger studies.

Q. Doctor, again, I'm not asking you for the explanation and the reason. Have you recommended this long-term independent data collection study that's referenced on page 76 and 77 of your report filed in this litigation in the context of any other situation besides litigation?

A. You mean with regard to the Silzone valve?
Q. Yes.
A. No.
Q. Have you mentioned this type of study, this long-term independent data collection study that you recommend here, have you even mentioned it anyone else outside of the context of this litigation?
A. No. As I said before, when I prepared this report it was prepared in confidence, but that's -- it's an interesting question, and it could be done as an independent, totally independent study, actually.
Q. Doctor, do you have any particular feelings about St. Jude medical as a company?
A. No.
Q. What was you first contact with St. Jude Medical?
A. 1993.
Q. And what was that? What