A proposed expert should be able to demonstrate an understanding of the discipline of toxicology, including statistics, toxicological research methods, and disease processes. A physician without particular training or experience in toxicology is unlikely to have sufficient background to evaluate the strengths and weaknesses of toxicological research.[41] Most practicing physicians have little knowledge of environmental and occupational medicine. Generally, physicians are quite knowledgeable about identification of effects and their treatment. The cause of these effects, particularly if they are unrelated to the treatment of the disease, is generally of little concern to the practicing physician. Subspecialty physicians may have particular knowledge of a cause-and-effect relationship (e.g., pulmonary physicians have knowledge of the relationship between asbestos exposure and asbestosis),[42] but most physicians have little training in chemical toxicology and lack an understanding of exposure assessment and dose–response relationships. An exception is a physician who is certified in medical toxicology by the American Board of Medical Toxicology, based on substantial training in toxicology and successful completion of rigorous examinations.

Some physicians who are occupational health specialists also have training in toxicology. Knowledge of toxicology is particularly strong among those who work in the chemical, petrochemical, and pharmaceutical industries, in which surveillance of workers exposed to chemicals is a major responsibility. Of the occupational physicians practicing today, only about 1,000 have successfully completed the board examination in occupational medicine, which contains some questions about chemical toxicology.[43]

41. *See* Mary Sue Henifin et al., Reference Guide on Medical Testimony, § II, in this manual.

42. *See, e.g.*, Moore v. Ashland Chem., Inc., 126 F.3d 679, 701 (5th Cir. 1997) (treating physician's opinion admissible as to causation of reactive airway disease); McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (treating physician's opinion admissible as to effect of fumes from hot-melt glue on throat, where physician was board certified in otolaryngology and based his opinion on medical history and treatment, pathological studies, differential etiology, and scientific literature); Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir. 1995) (treating physician's opinion admissible as to causation of liver failure by mixture of alcohol and acetaminophen, based on medical history, physical examination, lab and pathology data, and scientific literature—the same methodologies used daily in the diagnosis of patients).

Treating physicians also become involved in considering cause-and-effect relationships when they are asked whether a patient can return to a situation in which an exposure has occurred. The answer is obvious if the cause-and-effect relationship is clearly known. However, this relationship is often uncertain, and the physician must consider the appropriate advice. In such situations, the physician will tend to give advice as if the causality was established, both because it is appropriate caution and because of fears concerning medicolegal issues.

43. Clinical ecologists, another group of physicians, have offered opinions regarding multiple-chemical hypersensitivity and immune-system responses to chemical exposures. These physicians generally have a background in the field of allergy, not toxicology, and their theoretical approach is derived in part from classic concepts of allergic responses and immunology. This theoretical approach has often led clinical ecologists to find cause-and-effect relationships or low-dose effects that are not generally accepted by toxicologists. Clinical ecologists often belong to the American Academy of Environmental Medicine.

## B. Has the Proposed Expert Been Certified by the American Board of Toxicology, Inc., or Does He or She Belong to a Professional Organization, Such As the Academy of Toxicological Sciences or the Society of Toxicology?

As of January 1999, 1,631 individuals from twenty-one countries had received board certification from the American Board of Toxicology, Inc. To sit for the examination, which has a pass rate of less than 75%, the candidate must be involved full-time in the practice of toxicology, including designing and managing toxicological experiments or interpreting results and translating them to identify and solve human and animal health problems. To become certified, the candidate must pass all three parts of the examination within two years. Diplomates must be recertified through examination every five years.

The Academy of Toxicological Sciences (ATS) was formed to provide credentials in toxicology through peer review only. It does not administer examinations for certification.

The Society of Toxicology (SOT), the major professional organization for the field of toxicology, was founded in 1961 and has grown dramatically in recent years; it currently has 4,672 members.[44] It has reasonably strict criteria for membership. Qualified people must have conducted and published original research in some phase of toxicology (excluding graduate work) or be generally recognized as expert in some phase of toxicology and be approved by a majority vote of the board of directors. Many environmental toxicologists who meet these qualifications belong to SOT.

Physician toxicologists can join the American College of Medical Toxicology and the American Academy of Clinical Toxicologists. Other organizations in the field are the American College of Toxicology, which has less stringent criteria for membership; the International Society of Regulatory Toxicology and Pharmacology; and the Society of Occupational and Environmental Health. The last two organizations require only the payment of dues for membership.

In 1991, the Council on Scientific Affairs of the American Medical Association concluded that until "accurate, reproducible, and well-controlled studies are available, . . . multiple chemical sensitivity should not be considered a recognized clinical syndrome." Council on Scientific Affairs, American Med. Ass'n, Council Report on Clinical Ecology 6 (1991). In *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994), the court considered the admissibility of an expert opinion based on clinical ecology theories. The court ruled the opinion inadmissible, finding that it was "hypothetical" and based on anecdotal evidence as opposed to scientific research. *See also* Coffin v. Orkin Exterminating Co., 20 F. Supp. 2d 107, 110 (D. Me. 1998); Frank v. New York, 972 F. Supp. 130, 132 n.2 (N.D.N.Y 1997). *But see* Elam v. Alcolac, Inc., 765 S.W.2d 42, 86 (Mo. Ct. App. 1988) (expert opinion based on clinical ecology theories admissible), *cert. denied*, 493 U.S. 817 (1989).

44. There are currently fifteen specialty sections of SOT that represent the different types of research needed to understand the wide range of toxic effects associated with chemical exposures. These sections include mechanisms, molecular biology, inhalation toxicology, metals, neurotoxicology, carcinogenesis, risk assessment, and immunotoxicology.

Case 0:01-md-01396-JRT-FLN Document 482 Filed 02/14/2007 Page 3 of 3



## C. *What Other Criteria Does the Proposed Expert Meet?*

The success of academic scientists in toxicology, as in other biomedical sciences, usually is measured by the following types of criteria: the quality and number of peer-reviewed publications, the ability to compete for research grants, service on scientific advisory panels, and university appointments.

Publication of articles in peer-reviewed journals indicates an expertise in toxicology. The number of articles, their topics, and whether the individual is the principal author are important factors in determining the expertise of a toxicologist.[45]

Most research grants from government agencies and private foundations are highly competitive. Successful competition for funding and publication of the research findings indicate competence in an area.

Selection for local, national, and international regulatory advisory panels usually implies recognition in the field. Examples of such panels are the National Institutes of Health Toxicology Study Section and panels convened by the EPA, the FDA, the World Health Organization (WHO), and the IARC. Recognized industrial organizations, including the American Petroleum Institute, Electric Power Research Institute, and Chemical Industry Institute of Toxicology, and public interest groups, such as the Environmental Defense Fund and the Natural Resources Defense Council, employ toxicologists directly and as consultants and enlist academic toxicologists to serve on advisory panels. Because of a growing interest in environmental issues, the demand for scientific advice has outgrown the supply of available toxicologists. It is thus common for reputable toxicologists to serve on advisory panels.

Finally, a university appointment in toxicology, risk assessment, or a related field signifies an expertise in that area, particularly if the university has a graduate education program in that area.

45. Examples of reputable, peer-reviewed journals are the *Journal of Toxicology and Environmental Health*; *Toxicological Sciences*; *Toxicology and Applied Pharmacology*; *Science*; *British Journal of Industrial Medicine*; *Clinical Toxicology*; *Archives of Environmental Health*; *Journal of Occupational Medicine*; *Annual Review of Pharmacology and Toxicology*; *Teratogenesis, Carcinogenesis and Mutagenesis*; *Fundamental and Applied Toxicology*; *Inhalation Toxicology*; *Biochemical Pharmacology*; *Toxicology Letters*; *Environmental Research*; *Environmental Health Perspectives*; and *American Journal of Industrial Medicine*.