**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| IN RE: ST. JUDE MEDICAL, INC., SILZONE HEART VALVES PRODUCTS LIABILITY LITIGATION | : : : | MDL No. 01-1396 (JRT/FLN) |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ST. JUDE MEDICAL, INC. 'S MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' EXPERT, ERIC G. BUTCHART, M.D., FRCS, FETCS, FESC

## I. Introductory Statement

St. Jude Medical, Inc. ("SJM") attacks Mr. Eric G. Butchart, one of the world's leading cardiothoracic surgeons and a distinguished expert in the fields of heart valve disease, prosthetic heart valves, the thrombogenicity of prosthetic heart valves and the care, management and treatment of patients following heart valve surgery. Although Mr. Butchart has previously served SJM in the past as a consultant, lecturer and clinical researcher on matters relating to the design, safety and clinical use of its prosthetic heart valves — including being commissioned by SJM to conduct the only clinical trial on Silzone specifically designed from the outset to study Silzone's thrombogenicity — SJM now stands before this Court and suggests that his opinions on Silzone coating's defective nature, its dangers and its risks must be prevented from presentation to the jury under *Daubert* because: (1) he is not competent; and/or (2) his opinions are not founded, are

speculative or are outside of mainstream medicine. Nothing could be further from the truth.

As will be shown below, SJM's attacks are unfounded and premature. They are no more than SJM's continued misguided attack on and character assassination of an investigator who found SJM's product to be defective and had the integrity to report those findings and stand up and publicly speak the truth about Silzone's dangers and unsuitability to the medical community and to the United Kingdom's Medical Device Agency ("MDA").[1] Notably the MDA not only listened to what Mr. Butchart had to say about Silzone, but accepted and acted upon it by issuing a Medical Advisory in November,. (Terry, S. Dep. 228-229; Franssen-Brader D. 213) Importantly, in making its claims under *Daubert* and F. R. E. Rule 702, SJM grossly distorts or ignores the facts, many of which come from the mouths or writings of its own management. For these and the reasons that follow, SJM's motion to preclude Mr. Butchart's opinions at trial should be denied.

## II. Law and Argument

### A. Governing Standards.

The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), set forth the standard for admission of expert testimony under Rule 702 of the Federal Rules of Evidence which governs the admissibility of expert testimony. Rule 702 states:

---

[1] Now known as the Medicines and Healthcare Products Regulatory Agency.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule must be read in the context of the “liberal thrust” of the Federal Rules of Evidence and must be interpreted consistently with the “general approach of relaxing the traditional barriers to ‘opinion’ testimony.” *Daubert*, 509 U.S. at 588.

The Eight Circuit ‘s recent decision in *Synergetics, Inc. v. Hurst*, 2007 U.S. App. LEXIS 2470, 11-12 (8th Cir. 2007) reiterates the key principles and standards that have developed following *Daubert*:

> "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (internal citations and quotations omitted)). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Peitzmeier v. Hennessy Indus., Inc.*, Free. Ch. 1020, 97 F.3d 293, 296, Freem. Ch. 1020 (8th Cir. 1996), *cert. denied*, 520 U.S. 1196, 117 S. Ct. 1552, 137 L. Ed. 2d 701 (1997). An expert's opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner*, 259 F.3d at 929-30. … [S]o long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony. See *Daubert*, 509 U.S. at 596 HN4("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *EFCO Corp. v.*

> *Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000) (no abuse of discretion in allowing plaintiff's expert witness to testify as to damages where defendant's expert, who disputed plaintiff's expert's methodology, also testified; jury left with ultimate decision as to which damages theory was more sound).

Thus, this Court is not tasked with the responsibility of weighing and determining the scientific controversy or debate over Silzone's toxicity and pathology that lies at the heart of this case. Rather, all it is asked to do is determine whether the scientific opinion or testimony of the expert called upon to assist the jury in this mission are based on good grounds tied to scientific method. *Bonner v. ISP Technologies,* 259 F.3d 924, 929 (8th Cir. 2001). Unless there is too great a gap in inferences and extrapolations between scientific principle or data and the expert's opinion, the testimony should be admitted. *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997). Any "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick, M.D.,* 150 F.3d 912, 915 (8th Cir.1998) (citation omitted).

Applying these principles here, we first note that the attack on Mr. Butchart's opinions relating to medical monitoring or for an epidemiological study is premature. These opinions go to the relief that this Court may permit the class to receive. They are not a subject area that is part of Mr. Butchart's generic expert presentation that will be presented in the individual injury cases which is the issue we understand the Court is considering presently. For that reason, plaintiffs are not responding *in seriatim* at this time to the challenges relating to his opinions on the

medical monitoring and epidemiological programs since those programs will not be within the relief requested by individual injured plaintiffs.[2]

[2] To be clear, however, the PSC is able and prepared to defend at the appropriate time Mr. Butchart's qualifications and the sufficiency of the basis for his opinions on the ongoing and current need of those still implanted for enhanced monitoring and a proper, independent epidemiological study. Mr. Butchart is highly qualified on these topics. He is an editor and a chapter author of a recently published medical textbook entitled "*Heart Valve Disease: A Guide to Patient Management After Surgery* (2006). (Butchart Rpt. at 3) The other contributors to this text are leading experts on heart disease drawn from throughout the United States and Europe. Mr. Butchart also has served as Chairman of the European Society of Cardiology Working Group on Valvular Heart Disease (2000 – 2002), and later he was appointed and served as Chairman of a European Society of Cardiology Committee producing recommendations on the management of patients after heart valve surgery. The recommendations of this committee were published in the European Heart Journal in 2005. (Id.)The recommendations are akin to the guidelines published jointly by the American Heart Association and American Cardiology Association which Mr. Butchart references in his report. As to the basis for his opinions, while SJM takes issue with the use of a risk scoring system it helped fund the development of as part of its co-sponsorship of the Cardiff Embolic Risk Study (CERFS), nonetheless this risk scoring system has been published in the highly distinguished, peer reviewed medical journal *Circulation*. Thus CERFS risk scoring system was viewed by its editorial board as having sufficient scientific and medical merit to warrant its publication. On questioning by SJM, Mr. Butchart testified that he has received favorable comments on the usefulness and importance of the publication. (Butchart Dep at 77-78) Moreover, being a doctor who practices what he preaches, Butchart has successfully used the CERFS risk scoring system on the Silzone patient cohort in CERFS when they were brought back to the University of Wales Hospital for assessment and monitoring as a safety precaution due to the increased risks associated with Silzone (Id. at 76-77; 226-27, 310). And as to SJM's misguided claim that Butchart's present opinions here do not match what he has published, we quote here the conclusion from his 2003 article in *HEART* on Silzone: "Intensive follow up of patients who have received this valve is recommended with a low threshold for undertaking transesophageal echocardiography, particularly in patients with mitral prostheses." SJM's efforts to say otherwise, Butchart's published statements are not in conflict with his present opinions.

Turning now to his credentials to render his generic opinions, it is true that Mr. Butchart practices medicine and surgery only in the United Kingdom. How a geographic limitation on his practice has any relevance to the issue of whether his opinions are admissible is mystifying. This case does not involve the standards for cardiothoracic surgery in a particular geographic area or whether a particular cardiothoracic surgeon did or did not negligently commit surgical error in the implantation or explantation of the valve. Rather, the medico-legal questions concern: (1) is Silzone a dangerous and/or defective product?; and (2) did SJM engage in false and fraudulent marketing of a known, adulterated and defective combination product, its Silzone cuffed prosthetic heart valves? The last time anyone looked, citizens of the United Kingdom have the same organs and circulatory systems as citizens of the United States. The risks and perils of Silzone to United Kingdom citizens are not unique. Thus, Mr. Butchart's license to practice in the United States or in Canada is of no moment to the opinions he proffers.[3]

[3] The investigation following SJM's January 21, 2000 Silzone recall confirms these points. In statements SJM issued at the time of the recall, it explained that 200 variables were looked at such as medical center characteristics, operation characteristics, valve size, *etc*., in an attempt to identify patient characteristics that could explain the problems found in its international, multi-center AVERT study. SJM reported that none were found other than Silzone. (See Flory MDL Class Certification Deposition at 97; Frater MDL Dep. at 185.) Dr. Robert W.M. Frater, SJM's medical director, testified during his MDL deposition that a possible and reasonable conclusion from this analytical effort was that the silver cuff was affecting the Silzone group in AVERT. (Frater MDL Deposition at 185.) Oddly, SJM denies this same possible, logical and reasonable conclusion here when Dr.

In addition to being an accomplished cardiothoracic surgeon, Mr. Butchart is also a renowned clinical researcher and an internationally recognized expert on prosthetic heart valves and, in particular, the thrombogenicity of prosthetic heart valves, (Terry S. MDL Dep at 227-28[4]; Flory A. CNCA Dep, at 63; Grunkemeier Dep. at 81; 0665077.tif[5]) His additional professional interests led him over the years to extensively read the literature in a number of medical/scientific fields as it pertained to heart valve surgery and prosthetic heart valves, as well as attend lectures on these areas and consult with other experts in the fields. This study, which spanned 28 years, has resulted in his acquiring substantial knowledge in the fields of toxicology, as it pertains to heart valves; biomaterials, as it pertains to heart valves (acquiring sufficient knowledge in this area to be able to edit a book chapter on the topic that is part of published medical textbook); hematology as it relates to heart valves (here too gaining sufficient expertise to serve as an editor, as well as a contributor of two chapters, of a published medical textbook that

---

Butchart or any of Plaintiffs' other expert expresses it and then logically and reasonably extends its implications to other Silzone patients.

[4] SJM's Chief Executive Officer throughout the material time of this case, Terry Shepherd, describes Mr. Butchart as being "a premiere surgeon, very widely respected surgeon, particularly in the area of thromboembolic complications associated with heart valves, and he is at an academic center doing many studies all the time. " (Terry Dep. at 227-28.)

[5] Dr. Roy Hosek, a corporate level marketing manger with responsibility for Silzone heart valve products, stated in an October 1998 e-mail relating to Silzone: "Our consensus is that we should ask Butchart for his ideas regarding an appropriate study to investigate thrombosis. After all, he is an expert on the subject as well as a surgeon." 0665077.TIF

delves into this field entitled "*Current Issues in Heart Valve Disease: Thrombosis, Embolism and Bleeding*"[6]); regulatory requirements relating to heart valves; statistics, and epidemiology (Butchart Dep. at 15-24; Butchart C.V.)[7] He has also served as an associate editor of the medical journal *Heart,* and presently is a member of the editorial board of the *Journal of Thoracic and Cardiovascular Surgery*, the preeminent American journal in this specialty. (Butchart CV; Butchart Dep. at 13.) Mr. Butchart's expertise and his standing in the field of

---

[6] He has also authored a 72 page chapter entitled "*Thrombogenesis and its Management*" (with 502 references) that was published in the "*Textbook of Acquired Heart Valve Disease*"). (Butchart C.V. at p 11.)

[7] It merits observing here that SJM's motion either ignores or belittles the basic sciences training medical doctors and surgeons receive in medical school. According to the *Reference Manual On Scientific Evidence (Second)* at 447, training during medical school is far broader than simply learning how to listen to a patient's chest, administer an injection, set a bone, and cut and sew:

> "The courses in medical school are generally similar from school to school, and they focus on basic medical sciences (e.g., microbiology, pharmacology, and pathology) as well as clinical training in medical diagnosis and treatment (e.g., internal medicine, cardiology, pulmonology, surgery, psychiatry, dermatology). **All medical curricula include some basic training in epidemiology and biostatistics.** There is relatively little structured study of public health, occupational medicine, and toxicology in a traditional curriculum, although a number of medical schools offer joint degree programs leading to a Master of Public Health degree (M.P.H.), with enhanced training in epidemiology, toxicology, and other aspects of public health. **Furthermore, it is not uncommon for physicians to undertake further study and become proficient in epidemiological research in their particular fields. Most physicians have substantial training and experience in pharmacology, a subject closely related to toxicology that concerns the effects of therapeutic drugs**."

(Emphasis added and footnote omitted) As the record bears out, Mr. Butchart is one of those physicians who went on and became proficient in these fields.

complications following prosthetic valve implantation have recently been again recognized by his peers in the form of his being invited to be member of a joint AATS/STS/EACTS committee tasked to revise the reporting guidelines following valve surgery (the "*Edmunds criteria*"), last revised in 1996.[8]

Quite clearly, this is not a situation where an expert may have read a few articles or a book chapter and then purports to be an expert in a field far removed from his daily professional activities. Rather, this is an expert who, beyond all peradventure, has devoted his professional life to acquiring and then meaningfully applying that knowledge to help advance the state of both medical knowledge and the art of designing prosthetic heart valves. Indeed, the Court need go no further than look at SJM's management's own actions in seeking Mr. Butchart out in 1993 to come to America and meet and consult with it regarding its then ongoing research and development of a cell adhesion peptide coating technology known internally at SJM as "Telios", a sewing cuff coating treatment SJM had under research and development prior to moving on to develop Silzone.[9] Obviously, SJM felt Mr. Butchart was knowledgeable, experienced and skilled enough regarding the evaluation of biomaterials and sewing cuff treatments, as well their

[8] See Declaration of Gordon Rudd, Exh. 1. (Hereinafter "Rudd Decl.") The initials stand for, respectively, the American Association for Thoracic Surgery, the Society of Thoracic Surgeons and the European Association Cardio-thoracic Surgery.

[9] Rudd Decl. Exhibit "2". Telios was later abandoned because of the need to conduct a large premarket clinical study to prove its safety and efficacy. ( Tweeden Dep at 710-15)

possible effects on healing and thrombogenecity, to solicit his expertise on the development of their products.

What may perhaps be the most outrageous comment in SJM's submission is its oblique reference to "the course of a research study" on page 4 of its brief without identifying that the referenced research study was a clinical study SJM commissioned Mr. Butchart to conduct specifically to determine if Silzone, was less thrombogenic than SJM's conventional cuff. (Schultz MDL Dep at 25-26; 0070554.tif) . One can only wonder, after reading SJM's argument, why on earth it chose Mr. Butchart to conduct the study having such limited knowledge, experience or methodology skills as it now contends, or why an American company would go to a cardiothoracic surgeon who only practices in the United Kingdom and is not licensed in Canada or the United States?

Also left unanswered is why SJM invited Mr. Butchart to its United States headquarters in November, 1998 to review the alarming results of his clinical studies and then purport to work with him on an investigation into Silzone's safety to get to the bottom of the matter? (0665077.tif) Or why it was that SJM's marketing department was laying in plans for a published article by Butchart to trumpet his study's findings on Silzone if they had proven Silzone less thrombogenetic than its conventional cuffed product.[10]

[10] In SJM's USA product launch materials they identify as part of the publication strategy supporting Silzone a 1999 time frame article by Butchart on "TE complications/comparison with uncoated valves". (0125095.tif at 108)

SJM's current effort is no more than a continuation of its efforts since 1999 to discredit Butchart and the Cardiff and Embolic Risk Factors Study (CERFS) results it had co-sponsored once this clinical research study showed that Silzone was dangerous and harmful. This effort started after Butchart reported his findings to the United Kingdom's Medical Device Agency, as he was obligated to do. Thereafter, SJM turned on him, going so far as to seek out others in the United Kingdom to attack the validity of his findings, but was unable to locate one expert who could or would stand up to challenge the integrity and validity of his work. (Schultz MDL Dep. at 29-30; 0027270.tif; 0072535.tif ; 0071153.tif;).

The number of Silzone valves Mr. Butchart personally implanted or explanted is irrelevant, a red-herring, and intellectually dishonest. This is not a surgical error case but, rather, one involving the product itself. Quite clearly, before SJM went to Mr. Butchart to conduct the study, SJM did not question him on how many Silzone coated valves (or any other valve) he had implanted or explanted. By comparison, SJM's pathology expert, Dr. Fredrick Schoen, has examined a total of twelve (12) Silzone valves, and all but a few were in connection his work as an expert in this litigation. (Schoen, F. Dep. at 49-51)

SJM's challenge also ignores the totality of the evidence that Mr. Butchart considered, such as the pathology work and opinions of Dr. Gregory Wilson, the biomaterial work and opinions of Dr. Kevin Healy, the scientific and medical literature he has read and the reported operative findings by seasoned surgeons,

including those performing clinical studies for SJM, about unusual healing or necrotic looking annular tissue that had been encountered with the Silzone coating. (See e.g. – 0027348.tif (reporting annulus looked as it had had been enzymatically digested); 0564510.tif (reporting erosion/necrosis of tissue that had been in contact with the sewing cuff).) On a *Daubert* challenge the totality of the information relied upon by an expert must be looked at, not pieces in isolation. *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242 (D. Wash. 2003) [11]

Turning to SJM's substantive attack on Mr. Butchart's opinions regarding silver's detrimental toxic effect on heart tissue and blood components, SJM does not challenge Butchart here on grounds of relevance. Nor can it as they clearly

---

[11] As Judge Rothstein explains in *PPA*:

> Defendants isolate these sources, rather than considering the whole. Non-epidemiological sources are frequently utilized by experts in rendering scientific opinions and, under Daubert, should be considered by the court in assessing the reliability of those opinions. See, e.g., Kennedy, 161 F.3d at 1228-31 (finding trial court abused its discretion by excluding expert testimony based on, inter alia, peer-reviewed articles, clinical trials and product studies conducted by the manufacturer, and a state health department's review of reported cases of adverse reactions); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124-25 (9th Cir. 1994) (upholding trial court's admission of expert testimony based on, inter alia, clinical experience and studies, medical literature, and general scientific knowledge about drug's properties established by animal studies and biophysical data).

In re Phenylpropanolamine Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1242 (D. Wash. 2003).

are.[12] Rather it claims his opinions are not trustworthy science because, in SJM's view, they are speculative, not proven or are based on improper extrapolation and incomplete information. These assertions are based upon SJM's either ignorance of what Mr. Butchart is saying or its blatant attempt to reinterpret his opinions to suit its present agenda.

SJM's motion fails to actually state what Mr. Butchart's opinions are on "tissue and blood" toxicity of silver that it challenges. The deposition testimony it quotes in edited form (page 14) relates to a passage from page 18 of Mr. Butchart's report addressing the topic of valve thrombosis. There, his opinion reads:

> The unpublished experimental work of Goodman et al, using platelet-rich plasma rather than whole blood, showed a severe toxic effect of Silzone on adherent platelets in contact with silver with less cohesion of subsequently deposited platelets (Appendix 3). The normal function of platelets in stabilising thrombus in fast moving blood by aggregation (clumping together), release of factor XIII, and clot retraction mediated by platelet actomyosin is dependent on platelets functioning as living cells. It is likely that 'dead' platelets will be unable to deploy binding sites for the proteins von Willebrand factor and fibrinogen which normally cause platelets to adhere to each other. This, and the loss of other complex mechanisms which lead to stabilisation and clot retraction, may explain the loose attachment of thrombus to the Silzone coated sewing ring. Silver is also known to be toxic to red cells which become enmeshed in the clot, causing depletion of intracellular glutathione which in turn leads to the red cells themselves becoming prothrombotic through phospholipid exposure.[12] Thus a clot, once

---

[12] As Ms. Sheila Kelly, a SJM research engineer states in an internal e-mail discussing a research funding request to clinically study Silzone-platelet interaction: [P]latelets do play a major role in thrombosis." (0630602.tif)

> initiated by platelet adherence may be amplified by the prothrombotic effect of silver-damaged red cells. Excessive thrombus on the sewing ring readily embolises and can spread onto the mechanism of the valve and interfere with occluder movement.[13]

It is difficult to fathom how SJM can claim, in good faith, that this opinion is not based on rational scientific data, principles, studies and literature or extrapolation therefrom. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,156 (1998). The precedent following *Daubert* holds that a scientific expert may testify as to the biological plausibility of a particular hypothesis that a substance contributed to a particular injury. *See In re Ephedra Litig. (MDL No. 1598),* 393 F.Supp.2d 181, 190 (SD NY 2005). "Although the gaps between such data and definite evidence of causality are real and subject to challenge before the jury, they are not so great as to require the opinion to be excluded from evidence. Inconclusive science is not the same as junk science." *Id*. at 194. *See also, General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). ("Trained experts commonly extrapolate from existing data"; inference and extrapolation can be sufficiently reliable steps to warrant admissibility so long as the gaps between data and opinion are not too great.)

---

[13] Mr. Butchart's footnote 12 refers to the article: Garner M, Reglinski J, Smith EW, Stewart MJ, *The interaction of colloidal metals with erythrocytes*. *J Inorg Biochem* 1994;**56**:283-90.

There was no need for Mr. Butchart to do *in vitro* or in *vivo* testing to confirm his opinions as SJM contends. Under both *Daubert* and good scientific methods, he can use, rely upon and interpret SJM's own studies and data, such as Goodman's on platelets or SJM's animal studies on silver loss and tissue levels, as well as those of other scientists, whether published or not.[14] Contrary to SJM's argument, neither Mr. Butchart nor any other scientist is bound by a report author's conclusion and can, consistent with both science and *Daubert,* read and interpret the data and findings and permissibly come to conclusions that are different from those of the author. Under *Daubert* "[t]he focus, of course, must be

[14] There is no requirement "that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness *Bonner v. Isp Techs*., 259 F.3d 924, 929 (8th Cir. 2001) (*quoting Heller v. Shaw Indus*., 167 F.3d 146, 155 (3d Cir. 1999). In *Bonner* an expert's testimony was held allowable where a District Court found the expert's reliance on temporal connection, animal studies, studies of chemicals with similar structures, study of drug at issue and its manner of acting on nerve pathways reliable methodology.

SJM's internal e-mail evidences that its research and development management had decided that Dr. Steven Goodman's last work on Silzone-platelet interaction, the unpublished one Mr. Butchart references, would be the last one sponsored by SJM on the subject of Silzone-platelet interaction in order to avoid creating additional evidence of Silzone's toxicity to blood components despite this mechanism being called into play by Butchart's findings in CERFS. In a December 1, 1999 e-mail between Ms. Kelly and Ms. Monica Shultz, respectively a Silzone research and development person and a clinical research manager overseeing Silzone research for SJM, Ms. Kelly candidly reminded Ms. Shultz: "last we discussed the Goodman [sic], I think we decided to stay away from this issue." (0630602.tif at 0603 ) Notably Goodman's earlier research was published (along with SJM's Dr. Tweeden as a co-author) in abstract form when it could be spun by SJM as showing beneficial healing, but when a subsequent study could possibly cast concern on Silzone's safety, such as the later Goodman manuscript (which was co-authored by SJM's Avrom M. Brendzel), that research never sees the light of day until discovered in this case.

solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharma*., 509 U.S. at 595.

In similar fashion, Mr. Butchart's reading of published biomaterial articles by Sawyer and Lee as they relate to the thrombogenecity potential of silver as an implant material does not make his opinions inadmissible. Scientific methodology allows one to read and rely upon other scientists' data. SJM's dismissive arguments regarding these two biomaterial articles are no more than goal directed selective reading or a downright disregard for their contents, data and implications.[15] Likewise a fair reading of Dr. Kevin Healy's testimony shows that SJM simply reads him wrong and out of context or disregards his firm opinion that silver was not, and is not, a suitable biomaterial to put on a sewing cuff that comes

---

[15] Without belaboring the matter, the earlier Sawyer article (he is also a co-author of the Lee article) experimentally involved the implantation of aortic valves made of silver in two calves. One of the two implants thrombosed within a few days (the article contains a legend photograph at the end showing the degree of thrombosis) and the other, according to the article's table of results, did not; but that non-thrombosed valve was only observed up to eight days. Hence Sawyer's assay had a 50% valve thrombosis rate; hardly a comforting endorsement of silver's suitability as a biomaterial for a heart implant product. Notably Sawyer does not conclude that silver was suitable for heart valve construction.

With respect to the later Lee *et al* article, while it does not mention silver in the discussion or conclusions sections, that is not surprising as these investigators had apparently already moved on from considering silver and other noble metals as a suitable biomaterial according to a statement in the articles' beginning. There the authors state:

> "5. The more noble metals, such as copper, gold, silver, and platinum, which develop a positive interfacial potential in blood, almost invariably cause thrombosis."

into contact with heart tissue. (Healy K. Dep at 54-59).[16] Moreover, the Sawyer study involved aortic valves which involve high dynamic flows and thrombus, nonetheless, developed on one of the two silver valves studied in this short term assay. Finally on this topic, Mr. Butchart's opinions on the probable mechanism of actions were developed outside the context of this litigation and have been, in large part, published in his 2003 peer reviewed medical journal article on Silzone in *Heart* Moreover, his entire report was also peer reviewed by a German cardiologist, Dr. Gohlke-Barwolf, another factor SJM was aware of but neglects to mention to the Court. (Butchart Dep. at 89-90)

SJM challenges Mr. Butchart's opinions that Silzone causes a higher incidence of complications. However, his methodology in reaching that conclusion is unquestionably based on valid and appropriate data and scientific methodology used in the field of evaluating prosthetic valve safety. His training, education and experience makes him more than competent to understand, interpret and comment on clinical studies in order to assist the fact finder in this complex area. In that he has (a) planned and conducted clinical studies that have been published, including investigations for SJM; (b)has served as a member of a Data Management Safety Board responsible for searching clinical study data and

[16] In no way did Dr. Kevin Healy retreat from his opinion that silver is a thrombogenic material during his deposition as SJM implies. He stated there, for example: "We can go back to the materials argument, which we know the materials are thrombogenic…," (Healy Dep at 54., and "[o]ne is, you know, what one would safely say, that silver is probably more thrombogenic than PET, which is your Dacron coating.

information for trends to protect patient safety (Butchart Dep. at 90-91), and (c) has served as editor or member of the editorial boards of some of the world's leading medical journals, it is simply untenable for SJM to maintain he lacks competence to understand, interpret, explain and evaluate clinical studies, adverse event data and case reports and series.

SJM's citation to Mr. Butchart's references during his deposition, to others he has worked with on a project, such a biostatistician, when asked to explain minute details on a study's dataset fields or when asked if he could impromptu calculate whether a particular figure's results were statistically significant where the "*P*" value or confidence interval was not included, hardly negates his competence to interpret the results and implications of pertinent studies. Nor does that implicate upon his ability to harmonize, criticize or contrast the results among various studies as he does in his report.

Responding to SJM's claim that Mr. Butchart's increased incident rate opinions are not scientific because he bases them, in part, on the clinical significance of the AVERT study showing a higher complication rate in Silzone for thromboembolism, albeit a result which did not reach "statistical significance" employing a conventional significance or "*P*" value level of $\leq .05$, SJM ignores the fact that clinical significance is also an accepted and important element of medical science. To the extent SJM is insisting that the conventional significance *P* value level of $\leq .05$ is a prerequisite for admissibility, that is simply wrong as a matter of

law and science.[17] Both judicial precedents after *Daubert*, and mainstream scientific commentary on this subject recognize, as Mr. Butchart also explained during his deposition,[18] that a *P* value of ≤.05 is neither sacrosanct nor the *sine qua non* for determining clinical or scientific validity of observations or study results. *Kadas v. MCI Systemhouse Corp*., 255 F.3d 359, 362 (7th Cir. 2001) (Posner,J) (Observing that the 5 percent test (.05) is arbitrary and under *Daubert* standards is not a *per se* determinative factor; a trial court with expert assistance can determine whether a particular significance level, in the context of a particular study in a particular case, is such to make the study worth the consideration of judge or jury); *Cook v. Rockwell Int'l Corp.*, 2006 U.S. Dist. LEXIS 89121, 75-81 (D. Colo. 2006) (Recognizing the considerable dispute in the scientific community about the necessity or even relevance of statistical significance testing to epidemiological studies and holding "statistical significance or insignificance of [expert's] results may affect the weight given to his testimony, but does not determine its admissibility under Rule 702"); *In re Ephedra Litig. (MDL No.*

---

[17] There is an over breadth problem with SJM's argument on this point that merits noting. The heading of its argument here makes a very broad, sweeping claim that its ensuing argument does not remotely even begin to address on an equally universal level given the scope of Mr. Butchart's opinions. SJM's heading reads: "2. Dr.[sic] Butchart Employs Unscientific And Unreliable Methodology to Analyze Clinical Trial Results For the Silzone Valve". (Page 25) The argument that follows, however, addresses only Mr. Butchart's analysis of thromboembolism results from the 2002 published AVERT article. It does not address, for example, his opinions on the significant PVL or PVE problems the Silzone valve has.

[18] Butchart Dep. at 142-149.

*1598),* 393 F.Supp.2d 181, 193 (SD NY 2005) (Plaintiff need only prove causation is more probable than not, not probable under <.05 convention of statistical significance); G. Greenstein, *Clinical Versus Statistical Significance as They Relate to the Efficacy of Periodontal Therapy,* 134 J. Amer. Dentistry Assoc. 583, 584-85 (2003). (Rudd Decl. Exh. 52) As Dr. Greenstein explains in his JADA article:

> It [, the .05 level,] initially was recommended by Fisher, who noted that measures of 1.96 standard deviations on either side of the mean of a Gaussian curve would include 95 percent of the data. He concluded that the outmost 5 percent of the data were unusual and significant in their divergence. This standard was selected because it was convenient, and it has become entrenched as scientific dogma. Fisher subsequently wrote that this fixed level of significance was "absurdly academic" and that it should be flexible based on the evidence. For example, if a large clinical effect is detected that has a *P* value of .06 or .07 (not statistically significant if the α level was set at .05), it is not prudent to ignore a potentially clinically significant finding. The reason for this failure probably could be attributed to inadequate planning for how big a sample size was needed to detect a statistically significant difference of a clinically relevant difference with a reasonably high probability.[19]

SJM's issue about the lack of statistical significance testing for the analytical composite rate of thromboembolism and bleed ("TEB") that Mr. Butchart mentions in his report is but another trumped up "defect" by SJM that is

[19] The lack of power to detect a statistically significant difference between the Silzone and conventional cuff cohorts in AVERT is a major flaw in AVERT; a flaw that is the proverbial elephant in the living room that SJM ignores every time it turns to AVERT to support its claim that there is no problem with Silzone. Simply stated, there are not enough patients enrolled and being studied to enable AVERT to be able to exonerate the valve given its track record. "In science, as in life, where there is smoke, fire can be inferred, subject to debate and further testing." *Brasher v. Sandoz Pharm.*, 160 F.Supp.2d 1291, 1296 (N.D. Ala. 2001)

of no real moment on the admissibility of Mr. Butchart's opinion. The general rule is that the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker,* 414 F.3d 936, 941 (8th Cir.2005) (citation omitted). SJM's argument that Mr. Butchart should have considered, for his November 2005 report, 2005 AVERT data that was not available until Grunkemeier *et al* published it in 2006 is absurd. Further, SJM fails to inform the Court that Mr. Butchart testified that he eventually read and considered that 2005 AVERT data and that AVERT's statistician, Dr. Grunkemeier, found the increased TEB rate in the Silzone group was statistically significant as foretold in Mr. Butchart's report. (Butchart Dep. at 329) In Mr. Butchart's words:

> The reason I raised it in my report was because of the very high rate of bleeding amongst Silzone patients in the AVERT study. Otherwise, I wouldn't have even mentioned it. But, it is very striking when you combine these events, there's a huge difference between Silzone and the standard valve, and indeed in Gary Grunkemeier most recent publication he confirms that that is indeed significant.

(*Id.*) Hence, there is adequate and scientifically sufficient evidence supporting Butchart's opinions on T/E and TEB rates in AVERT to ground his opinions and pass muster under *Daubert*.

As to SJM's argument that Butchart should have considered the 2005 data in his November 2005 report, this too, at best, goes to the weight and not the

admissibility of Butchart's opinions." *Larson, supra.* Moreover given the serious concerns that exist about the validity of AVERT's dataset due to the *post hoc* addition of a case adjudication program that was not part of the original published AVERT protocol, the changes to the definition of "Major PVL" over the years, and the haphazard patient follow up, Butchart Dep. 132 – 140, it simply does not lie well for SJM to criticize Butchart for basing his report largely on AVERT's data and analysis as published in peer reviewed literature.

SJM's claim that Mr. Butchart should have used complication rates from the CERFS study as the comparator to the Late CERFS Review (in which the Silzone cohort in CERFS was brought back for monitoring because of concern for their safety) and not on literature based rates is likewise inadequate grounds to exclude his opinions. Using literature based complication rate for SJM's conventional cuffed valve is a scientifically and medically valid comparator. Indeed, SJM uses them for marketing purposes to convince surgeons of the superiority of its bi-leaflet valve. Whether a different comparator should have been used, as SJM claims, therefore goes only to the weight not the admissibility of Mr. Butchart's opinion. *Larson, supra.* Moreover, Butchart's reasons for not using the historic CERFS complication rates are hardly sinister or telling as SJM claims. As he explained when asked:

> Q. Wouldn't that be a better comparison than a literature average, the actual controls that you used in the publication, and it's exhibit number?

> A. I'm not just comparing our own data. I'm comparing the AVERT data to the literature average. And I'm comparing the top account study to the literature average. That's why I've used that for consistency.
>
> Q. And is it your opinion that the literature average is a better comparator than the data from the standard valve in the CERF study?
>
> A. Well, it represents a much larger patient population, obviously. It's -- it's what, you know, most people would expect from the standard St. Jude valve.

(Butchart, Dep. at 299-300)

With regard to the other studies Mr. Butchart relies upon that SJM presently challenges, *i.e.* - CERFS, Late Cardiff Review, the Top Accounts Study and SJM's Adverse Event (FER) Database, each of these are valid scientific sources of data and information that can be relied upon to establish generic causation. Randomized clinical studies or trials ("RCT") are not the only data, materials and evidence routinely used by scientists or doctors. Case law frequently recognizes that scientists can and do routinely rely upon *in vitro* (*i.e.* - test tube) studies, animal studies, case reports, case series and toxicological or pharmacological comparisons to make or infer valid conclusions. Hence an opinion based upon these can pass muster under *Daubert.*[20]

[20] See *Bonner v. Isp Techs.*, 259 F.3d 924, 929 (8th Cir. 2001) (No requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness; ); *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 972, 975 (6th Cir. 1994) (ordering trial based on witness who relied on case reports and his own research in rendering opinion on PPA as cause of intracranial bleeding and fall); *Cella v. United States,*

Furthermore, CERFS and Late Cardiff Review are not case series as SJM characterizes them. CERFS was a prospective, clinical research study specifically designed to gather information on thromboembolic events and possible factors that cause such events. (Flory CNCA Dep. 62-67, Guzik Minn. Dep 77- 84) It was executed and analyzed according to a protocol and its data peered reviewed on SJM's instigation after the surgeons in the CERFS study, to SJM's chagrin, encountered serious thromboembolism problems with the Silzone valve that caused them to stop implanting them. The Late Cardiff Review is essentially a continuation of CERFS necessitated by the increased risk Silzone presented the members of its Silzone cohort. (Butchart. at 76-77; 226-27, 310).[21]

The Top Accounts study, although unpublished due to SJM's management's decision to not publish it, was a study the MDA required SJM to

---

998 F.2d 418, 426 (7th Cir. 1993), *overruled on other grounds*, *Mars v. United States*, 25 F.3d 1383 (7th Cir. Ill. 1994) (Holding in claim under Jones Act, medical opinion on cause of polymyositis based in part on case reports admissible); *In re Ephedra*, 393 F. Supp. 2d 181, 194 (S.D.N.Y. 2005) (admitting expert opinion relying on case series and adverse event report studies); *In re PPA*, 289 F. Supp. 2d at 1242 (admitting expert testimony based on case reports, case series, and adverse drug reaction reports); *Miller v. Pfizer Inc*., 196 F. Supp. 2d 1062, 1072-1073 (D. Kan. 2002) (RCTs and large-scale epidemiological studies not essential to the formation of an expert opinion as to causation.); *Brasher v. Sandoz Pharm*., 160 F.Supp.2d 1291, 1296 (N.D. Ala. 2001) (Scientists routinely use animal studies, case reports, and pharmacological comparisons of similar classes of drugs to infer conclusions).

[21] The remainder of the CERFS participants are now being invited back for evaluations identical to that given the Late Cardiff Review in order to further validate CERFS risk scoring system. When completed this will allow a direct comparison of the Silzone and conventional SJM groups in CERFS.

perform. (Flory MDL 2002 Dep at 340.) Like AVERT it used questionnaires to probe implanted Silzone patients for thromboembolic events and generate data which SJM had analyzed and submitted to the MDA. SJM also privately sent the data to Dr. Grunkemeier, the biostatistician who helped design AVERT and worked on CERFS. In an e-mail to SJM's clinical study manager, Monica Schultz, he stated that Top Accounts' data on T/E and thrombosis rates were high, especially in the mitral valve position and were similar to CERFS' findings. (0539323.tif; Grunkemeier Dep. 166-171).

In short, all of these studies are credible and valid scientific studies that may properly be considered by an expert such as Mr. Butchart in accordance with the precedent referenced in the text and margin above.

SJM's remaining issues may be quickly addressed. Mr. Butchart certainly has the expertise and informational basis to opine that the recalled Silzone valve is a defective, dangerous medical product and explain to a jury how and why. As a surgeon, clinical investigator and teacher who has used and studied these valves, his opinion and expertise on this topic certainly would be helpful to the jury. As to supposed key information that has been requested by SJM and not yet produced, this is a discovery issue and not a Daubert issues. In any event Plaintiff has responded to SJM's counsel's letter with information and their position on why some items requested can not and will not be produced because of confidentially issues. The parties have been working out their differences. While this may or may

not end this dispute, again this is a discovery dispute and not grounds for exclusion of Mr. Butchart's opinions under *Daubert*.[22]

## III. Conclusion

For all of the forging reasons SJM's Motion to exclude all or part of Mr. Butchart's expert opinions should be denied.

Respectfully submitted,

Dated: March 19, 2007

**ZIMMERMAN REED, P.L.L.P.**

s/J. Gordon Rudd, Jr.
CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

**LEVY, ANGSTREICH, FINNEY, BALDANTE, RUBENSTEIN & COREN, P.C.**
STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

**CAPRETZ & ASSOCIATES**
JAMES T. CAPRETZ
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

[22] To not protract this discovery dispute here the PSC is not submitting at this time the responses and additional information it has sent SJM. If the Court desires same, the PSC stands ready to submit them to the Court.

**GREEN, SCHAAF & JACOBSON, P.C.**
JOE D. JACOBSON
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C**
DANIEL W. SIGELMAN
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Ph. (202) 408-4600

Counsel for Plaintiffs