**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| IN RE: ST. JUDE MEDICAL, INC., SILZONE HEART VALVES PRODUCTS LIABILITY LITIGATION | : : : | MDL No. 01-1396 (JRT/FLN) |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ST. JUDE MEDICAL, INC.'S MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' BIOMATERIALS EXPERT KEVIN E. HEALY

## I. INTRODUCTION AND SUMMARY

This heart valve litigation concerns human tissue damage and resulting medical risks and complications caused by the metallic silver coating on the Dacron sewing cuff of the St. Jude Medical ("SJM") Masters Series Heart Valve with Silzone®. The silver ionizes in the body over time, leaching into adjacent tissue and blood. Some of the silver metal has also been shown simply to flake off into the immediately adjacent tissues as well.

Dr. Kevin E. Healy, professor in the Departments of Bioengineering and Material Science and Engineering at the University of California at Berkeley, is one of relatively few people in the United States with particular expertise in the interaction of ionizing metals on permanently implanted medical devices with human blood and tissue. He holds patents relating to intravascular and extravascular stents and stent coatings, and has specific experience in the design and synthesis of biomimetic materials that actively direct the behavior of mammalian cells. In this case, and in the *Andersen* class action against SJM in

Canada, he has provided several professional opinions regarding how Silzone® works in the body and likely creates a high silver concentration in tissue adjacent to the heart valve implant site. He has also opined regarding SJM's adherence to scientific standards in reporting on relevant scientific literature, silver safety levels, and study results.

SJM has moved to exclude Dr. Healy from testifying in this case. It takes a shotgun approach. SJM variously complains that although Dr. Healy specializes in biomedical properties of metals in the body, he is not a specialist in silver; and that although he is very experienced with long-term implanted medical devices in contact with blood and tissue, they are not heart valves. SJM faults Dr. Healy for not performing impossible tests on living people, or on explanted animal test valves that SJM has destroyed. It also faults him for not reading 24,000 pages of FDA discovery documents, or the "full" deposition transcripts of various people -- though it points to <u>nothing</u> material (or otherwise) that Dr. Healy "missed" as a result. It complains that Dr. Healy is not a toxicologist like one of its own experts, Dr. Rodricks, even though Dr. Healy's opinions pertain to local conditions at the interface between metal and human cells (where the Silzone® problems occur), not systemic silver levels throughout the body, as he has explained in some detail in addressing Dr. Rodricks's disclosed opinions.[1] SJM also floats some plainly incorrect fact assertions, including that Dr. Healy has never examined a Silzone®

[1] SJM has disclosed its own biomaterials expert, Dr. Williams, although its Motion is silent about him.

heart valve, and that he lacks evidence that the black particulate matter repeatedly found in peri-valvular tissue is really silver, or that silver leaches from the valve cuff at all, or that Silzone® is associated with any medical problems (despite its worldwide recall due to its association with medical problems). SJM even re-raises arguments about "fraud on the FDA" and combination products that this Court already resolved more than three years ago in its Order denying SJM's motion for summary judgment.

SJM casts a wide net, but there is not much rhyme or reason to its attack on Dr. Healy. His credentials, unusually germane experience, and detailed written opinions largely speak for themselves. Plaintiffs simply respond below to all of SJM's disparate arguments against Dr. Healy.[2]

## II. GOVERNING STANDARDS

The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), set forth the standard for admission of expert testimony under Rule 702 of the Federal Rules of Evidence which governs the admissibility of expert testimony. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training,

[2] SJM's Motion contains an "Introduction" (pp. 1-4) that contains a citation-free series of misstatements, mischaracterizations, and unsupported scientific assertions by counsel. Not all of the statements actually show up again in the body of the Motion. To the extent that SJM actually attempts to advance (rather than retreat from) any of these statements in the Motion text, Plaintiffs respond to them below as subsequently raised therein.

> or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule must be read in the context of the "liberal thrust" of the Federal Rules of Evidence and must be interpreted consistently with the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588.

The Eight Circuit 's recent decision in *Synergetics, Inc. v. Hurst*, 2007 U.S. App. LEXIS 2470, 11-12 (8th Cir. 2007), reiterates the key principles and standards that have developed following *Daubert*:

> "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (internal citations and quotations omitted)). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 296 (8th Cir. 1996), *cert. denied*, 520 U.S. 1196, 117 S. Ct. 1552, 137 L. Ed. 2d 701 (1997). An expert's opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner*, 259 F.3d at 929-30. … [S]o long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000) (no abuse of discretion in allowing plaintiff's expert witness to testify as to damages where defendant's expert, who disputed plaintiff's expert's methodology, also testified; jury left with ultimate decision as to which damages theory was more sound).

Hence this Court is not tasked with the responsibility of weighing and determining scientific controversy or debate. Rather all it is asked to do is determine whether the scientific opinion or testimony is based on good grounds tied to scientific method or standards. *Bonner v. ISP Technologies,* 259 F.3d 924, 929 (8th Cir. 2001). As long as there is not too great a gap in inferences and extrapolations between scientific principle or data and the opinion, the testimony should be admitted. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 , (1997). Any "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick, M.D.,* 150 F.3d 912, 915 (8th Cir.1998) (citation omitted).

## III. DR. HEALY IS QUALIFIED BY EDUCATION, TRAINING, KNOWLEDGE, AND EXPERIENCE TO TESTIFY AS AN EXPERT

Dr. Healy is a full professor at the University of California at Berkeley in both the Department of Bioengineering and the Department of Material Science and Engineering. His Curriculum Vitae is Exhibit 1(a) to SJM's Motion. A particular research interest has been "the design and synthesis of biomimetic materials that actively direct the behavior of mammalian cells" (Healy Decl., ¶1; Mtn. Exh. 1), or "control biological function on a cellular level." (Healy Dep. at 99.) His doctoral thesis involved the release in biologic environments of implant metals including titanium, cobalt, chromium, molidium, and nickel. (*Id*.) He has worked extensively with implanted orthopedic joints in which the "same metal ion release question comes up" as is at issue with Silzone®. (*Id*.) He holds patents on

intravascular and extravascular stents and coatings for stents. (*Id*.) His training in biomaterials, surface, and polymer science, combined with his work with long-term implanted medical devices and exposure to medical and biological sciences provides him rare expertise at the interface between ionizing metal and human blood and tissue. (Motion Exh. 1, ¶1.)

Prior to this litigation, Dr. Healy was familiar with SJM, Silzone®, and the Spire Corporation's "IBAD" method of Silzone® application. (Healy Dep. at 99, 101-05.) He once presented next to SJM's Katherine Tweden at a biomaterials meeting. (Id. at 99.) In the *Andersen* Silzone® class action in Ontario, Canada, Justice Cullity accepted Dr. Healy's expert testimony in the Canadian plaintiffs' successful class certification motion.[3] This Court likewise found Dr. Healy qualified by education, training, and experience to testify as an expert at summary judgment. (Jan. 5, 2004 Mem. Op. and Order Denying Defendant's Motion for Summary Judgment at 36.) Dr. Healy was subsequently retained as an expert in another silver-related litigation. (Healy Dep. at 108.)

In Section II of the Motion attacking Dr. Healy's overall qualifications as an expert, SJM sets out six short bullet points of criticism. (Motion at 4-5.)[4]

---

[3] Oct. 9, 2003 Endorsement, Superior Court of Justice – Ontario, No. 00-CV-195906CP, at 12 (declining, on a motion, "to choose between the opinions of the well-qualified experts," Drs. Healy and Rodricks).

[4] The Motion substantially repeats these hit-and-run points at pages 14, 19, 20-22, 33-34, 35-36, and 43.

None contains any legal or scientific standards from which to evaluate the relevance of the criticisms, but here are commensurately brief responses to each:

**(1)** SJM asserts Dr. Healy is incompetent to testify because he hasn't "worked with any type of silver implant, let alone silver-coated medical devices such as the Silzone® valve," and his introduction to silver-coated medical devices "was this litigation." This is a remarkably disingenuous criticism, considering that Silzone® is a long-discontinued, proprietary, patented material owned by SJM, and one is hard pressed even to find another example of a "silver-coated medical device" that any independent scientist would have had occasion to "work with."[5] The Silzone® heart valve is a long-term implanted medical device with an ionizing metal coating that interacts with biological tissue. Dr. Healy's expertise and work in this regard was just recounted. There is unlikely to be anyone anywhere whose specialty fields and experience better match up with the subject matter of this litigation; certainly SJM cites no basis to require more (if such were even possible), and none of its own experts possess experience and training as tailored to this case as Dr. Healy's. A corporation cannot market a new kind of dangerous product with insufficient testing, and then argue that no

[5] In an exhibit to his litigation report, SJM's Dr. Rodricks lists numerous topical creams and dressings, two dental materials, and three temporary urinary catheters in a 2001-2005 list of "silver-containing medical devices" -- but not a single long-term implanted medical device, much less a heart valve. (Rodricks Disclosure Statement, 2/13/06, Exh. 3.)

expert has sufficient knowledge to criticize it because it is new and untested.[6]

**(2)** SJM complains that Dr. Healy has not performed experiments on silver interactions with human tissues, and has not "discussed" silver-related research with any "independent scientist." This criticism is also disingenuous. Dr. Healy is an independent scientist, and no expert (obviously) can perform dangerous human subjects experiments to satisfy scientific curiosity.[7] As it happened, SJM's worldwide distribution of the Silzone® heart valve was the experiment, conducted on more than 36,000 subjects around the world, including the United States, Canada, and "the Guinea Pig continent of Europe." (0224973.tif.) The resulting published adverse event rates speak for themselves. The best available scientific evidence concerns interactions of silver and similar metals (including Silzone®) with mammalian (including human) blood and tissue, as reflected in relevant literature, animal studies, and histology of human

[6] *Cf. Bonner*, 259 F.3d at 928 (noting that early victims of a new toxic tort should not be barred from court simply because relevant medical literature was not yet complete).

[7] In deposition, SJM counsel insistently and repeatedly asked Dr. Healy if he had biopsied or examined pathology of current, live heart valve patients, and Dr. Healy patiently and repeatedly pointed out that one generally cannot perform invasive experiments on live human beings. (Healy Dep. at 14, 26-27, 38-39, 366, 377.) Dr. Healy was able, however, to examine some histological data from explanted valves. (*Id*. at 12, 39-40.)

explants. Dr. Healy has discussed these at length in his declarations and deposition.

**(3)** SJM points out that Dr. Healy, as a biomaterials and bioengineering expert, is not "a medical doctor, clinician, epidemiologist, toxicologist, or pathologist." That is of course correct (and expected, and true of SJM's asserted biomaterials expert Dr. Williams, as well), but the Motion does not explain why it is of interest. Dr. Healy is testifying about the properties and effects of a metal biomaterial engineered as a coating on a medical device for long-term implantation. His training and experience in this area are beyond challenge. He has even written in some detail about the differences between biomaterials science and toxicology as specifically relates to this case. Plaintiffs have disclosed other experts with extensive training and experience in the other areas that SJM identifies (although curiously, in its concurrently-filed motions challenging those experts, SJM complains that <u>they</u> are not expert in <u>Dr. Healy's</u> fields).[8]

---

[8] *See, e.g.*, Wilson Motion at 11 ("Dr. Wilson is not a biomaterials expert."); Butchart Motion at 2, 4, 5, 12 (complaining, *inter alia*, that Dr. Butchart, while concededly a medical doctor, cardiac surgeon, and clinician experienced with the Silzone® valve and supervisor of an SJM-sponsored study of it, is neither a pathologist like Dr. Wilson nor a biomaterials scientist like Dr. Healy). For reasons set forth in the PSC's responses to the motions directed at Butchart and Wilson, plaintiffs strongly disagree that they are not experts in biomaterials. Nevertheless, there is certainly a musical-chairs aspect to SJM's approach, as the undisputed expertise of each witness shows up as a purported deficiency in the others. Of course, it is permissible (and usually necessary) to use more than one expert to present testimony in a complex case. There will rarely be one person who knows everything, and no expert is required single-handedly to prove a

**(4)** SJM complains that even though Dr. Healy is an expert in biomaterials and bioengineering with a strong background in metal-tissue interactions and implanted medical devices, the various devices he has studied, worked with, and invented were not heart valves. Again, SJM does not demonstrate what should be made of this. The criticism is particularly hard to fathom, given that Dr. Healy is not testifying about the mechanical properties of the Silzone® valve, but rather its metallic cuff's biomaterial properties in the body in contact with blood and soft tissue.[9] And SJM is apparently the only company that has ever sold heart valves with metal-coated cuffs.

---

plaintiff's case, or even an element of the case. *Cf. Bonner*, 259 F.3d at 949; *Adams v Ameritech Services, Inc.*, 231 F.3d 414, 425 (7th Cir. 2000); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 564-65 (11th Cir. 1998). All of SJM's own experts would be disqualified if such universality of expertise were required, for example.

[9] *Cf. Hammes v. Yamaha Motor Corp. U.S.A., Inc.*, 2006 WL 1195907, *3 (D. Minn. 2006) (mechanical engineer without experience pertaining to motorcycles could nonetheless offer opinion that motorcycle was improperly designed, based on his experience with rotors in other devices):

> While Berke does not have experience with motorcycle design in general, he does have specific experience with rotors, which are used in many mechanical devices. It is not necessary to ride a motorcycle or to work in the motorcycle industry to understand the rotor. Berke derives his opinion from general engineering principles of rotor design of which he is well studied. The weakness in Berke's opinion and expertise go to the weight to be given his testimony, not its admissibility. [Citation omitted.] Accordingly, the Court finds that Berke is qualified to render an opinion as to whether the motorcycle was properly designed.

*Id*.

**(5)** SJM also criticizes Dr. Healy on the basis that his full professorship at the University of California is different than working for the FDA, or in the "regulatory affairs department of a medical device manufacturer." Again, this is an allegation easy to concede but hard to know what to do with. It is difficult to picture SJM as alternatively sanguine about the certification of an expert based on his or her employment by a competitor. And although he has advised the FDA and has former students who work at the FDA (Healy Dep. at 146), any testimony by Dr. Healy regarding SJM's disclosures of scientific assertions, literature, or study results (to the FDA or anyone else) pertains to the scientific accuracy or significance of SJM's representations or omissions; these call for knowledge of standards of scientific research and procedure, or familiarity with the relevant scientific literature. They do not depend on what any particular medical device corporation may or may not have done in the past, nor on what it is like to work at the FDA, or of how the FDA or medical device companies operate.

**(6)** SJM asserts that Dr. Healy has not "looked at" or examined a Silzone® heart valve. The assertion contains no record citation, and it happens not to be true.[10] But more to the point, SJM omits to suggest how any further examination would reasonably inform any of Dr. Healy's biomaterial or

---

[10] Among other things, Dr. Healy has retained a Silzone® heart valve in his Berkeley office for close to a year.

scientific disclosure testimony. Moreover, Dr. Healy has also, among other things, examined numerous histology slides – a standard data collection mode of his field – to inform his analysis of the interaction of Silzone® with living tissue, as well as photographs and the reports of Plaintiffs' pathologist, Dr. Wilson.

## IV. THE EIGHT OPINIONS OF DR. HEALY THAT SJM ATTACKS ARE ADMISSIBLE

SJM's Motion identifies eight opinions of Dr. Healy and categorizes them broadly as three "Scientific" opinions and five "FDA" opinions. (Motion at 6-7.) In reality, all of these opinions are "scientific," as they pertain either to how Silzone® works in the body or to scientific standards for evaluating related literature and accurately describing study results. For the sake of organizational convenience, however, Plaintiffs will maintain this three/five division in response.[11]

---

[11] SJM's Motion does not number its 8 opinions sequentially "1 to 8," but rather "1 to 3" and "1 to 5" within each of its two asserted categories, respectively. To depart from this division in response would inconveniently require renumbering and/or re-labeling the opinions and would be confusing. Plaintiffs do, however, refer to the first category (accurately) as "Scientific Opinions" (which conforms to the Motion's heading for its section III), rather than "Scientific and Medical Opinions" as suggested by SJM's chart.

## A. <u>The Three "Scientific Opinions" That SJM Describes Are Admissible</u>

### 1. Recurring Arguments Pertaining to the Scientific Opinions.

SJM's Motion takes a shotgun approach to each of the three "Scientific Opinions" it identifies. Several recurring issues are usefully addressed at the outset because SJM's Motion alludes to them repeatedly with respect to the opinions.

#### a. <u>SJM's Characterization of Dr. Healy's opinions</u>

SJM's Motion describes three "Scientific Opinions" of Dr. Healy. All are precisely within Dr. Healy's main fields, but SJM's page six chart tries to characterize them differently. SJM's description of Dr. Healy's Scientific Opinion #1 (regarding "tissue damage") is very similar to SJM's description of Eric Butchart's Opinion #1 (regarding "toxic effect on tissues") in its concurrently filed motion against Butchart -- except that SJM calls Dr. Healy's opinion a "Clinical Diagnosis Opinion," while Butchart (a clinician, among other things) is claimed to be rendering <u>not</u> a clinical opinion but rather an opinion involving "Biomaterials"

and "Metallurgy." (Compare Motion at 6 with Butchart Motion at 5.) These are, of course, empty semantic maneuvers.

SJM concedes Healy's Scientific Opinion #2 as a biomaterials opinion, but it calls Scientific Opinion #3 a biomaterials "and Legal" opinion, presumably because legal consequences may follow from a finding that Silzone® is unsuitable for use in contact with human heart tissue, rendering Silzone® valves defective. But the whole premise of expert testimony is that it may have legal relevance to the case, and experts are permitted to opine even on ultimate issues that follow logically from the components of their testimony. *See, e.g., supra* note 9. Again, it is the substance and not the labels that will matter. Plaintiffs merely suggest here that context shows SJM's opinion labeling to be arbitrary, inconsistent, and self-serving.

**b. <u>SJM's Assault on Dr. Healy's Field</u>**

SJM repeatedly implies that Dr. Healy, an expert by training and experience in biomaterials and biomedical engineering, is in the "wrong field" to opine in this case.

SJM is especially enthusiastic instead about toxicology, and has a toxicologist in its stable, Dr. Rodericks, albeit one with much less biomaterials experience. SJM's Motion even includes pages from the *Scientific Evidence Reference Manual (2d)* regarding toxicologists. This is fine, but it is off point with respect to Dr.

Healy, a biomaterial scientist and bioengineer, even assuming the *Manual* sets the standard for admitting testimony by toxicologists.[12]

There is of course no presumptive requirement that plaintiff and defense experts be in identical fields in the first place. *See Robinson v. GEICO General Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). And as observed above, SJM's assertions of the "proper field" seem to change based on which expert it is attacking. *See supra* notes 1 & 8. As it happens, Dr. Healy has written specifically about relevant differences between biomaterial science and toxicology as fields in the context of this case, including pointing out how Dr. Rodricks's toxicological focus on systemic levels of silver throughout the body largely misses the issue. (Motion Exh. 1(b) at 1-2; Exh. 1(d) at ¶¶ 18-20, 30-32, 35. See also Healy Dep. at 9, 11, 14, 304-06, 349, 433-34, 439.) Systemic metal levels diffused throughout the body are largely irrelevant to understanding what is happening at the site of implantation, which is where the Silzone® problems (leakages, thrombus, poor tissue ingrowth, shedding silver particulates, inflammation) have occurred.[13]

---

[12] In actuality, the Eighth Circuit has recently observed that the *Reference Manual* is not law, and does not guide judges on what evidence is admissible or establish minimum standards for scientific testimony. *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 915 (8th Cir. 2005).

[13] Even if there were any conceivable argument Dr. Healy was in the "wrong specialty" by training and experience (though clearly possessing unassailable scientific credentials), such an attack would go the weight of his testimony, not its admissibility. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (noting that expertise in a specialized area directly related to the

And indeed, at issue in this case is a permanently implanted medical device coated with a metallic substance that directly interfaces with human blood and tissue. By any measure, a jury can receive relevant and helpful information from a highly credentialed scientist with substantial academic and practical experience and expertise in precisely this interaction. *Cf. Larson v. Kempker*, 414 F.3d 936, 942 (8th Cir. 2005) (reversing exclusion of chemist from testifying about "deleterious health effects" of second-hand smoke); *Kudabeck v. Kroger Co*., 338 F.3d 856, 860-63 (8th Cir. 2003) (chiropractor allowed to opine that grocery store fall triggered degenerative disc disease); *Hammes v. Yamaha Motor Corp. U.S.A., Inc.*, 2006 WL 1195907, *3 (D. Minn. 2006) (mechanical engineer without experience pertaining to motorcycles could nonetheless offer opinion that motorcycle was improperly designed, based on his experience with rotors in other devices). Even if a toxicologist could potentially be such a person (despite lacking the relevant focus on localized metal/tissue interaction), a biomaterials/biomedical engineering expert with extensive implanted medical device and metals experience clearly is. And Dr. Healy is particularly well-qualified in these regards.

---

issue in question is generally not required as long as expert is within the "reasonable confines of his subject area," and that that "a lack of specialization does not affect the admissibility of [the expert's] opinion, but only its weight"); *Stagl v. Delta Air Lines*, 117 F.3d 76, 81-82 (2d Cir. 1997) (rejecting contention that specific expertise is required when expert had general expertise in the relevant field).

Plaintiffs invite the Court's attention to these facts whenever SJM asserts or implies that Dr. Healy is in the "wrong field."

### c. SJM's Attack on Dr. Healy's Opinions as Mere "Hypotheses"

SJM's Motion frequently refers to Dr. Healy's opinions as "hypotheses" or "hypothetical," with an overt implication that a hypothesis must be inadmissible. Plaintiffs respond to the various substantive assertions below, but note here that all of science proceeds on hypotheses; "arguably, there are no certainties in science." *Daubert*, 509 U.S. at 590. But the standard of proof in a civil case remains a preponderance of evidence, not certainty, and the standard for admission of testimony by a qualified expert is reliable helpfulness to a jury. An expert's opinion does not need to resolve an ultimate issue of fact or prove a plaintiff's case. *See Bonner*, 259 F.3d at 949; *Adams v Ameritech Services, Inc.*, 231 F.3d 414, 425 (7th Cir. 2000); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 564-65 (11th Cir. 1998); *Johnson v.Zimmer, Inc.*, 2004 WL 742038, *5 (D. Minn. 2004). It can be, and often is, just a piece of the puzzle. 158 F.3d at 564-65. Even expert testimony that simply explains relevant general principles without application to facts of the case can be useful in this regard. Fed. R. Evid. 702 Advisory Committee Notes.

The upshot here is that experts properly testify about hypotheses. *See United States v. Ruiz*, 412 F.3d 871, 882 (8th Cir. 2005) (chemist could testify that

chemical composition of some methamphetamine made it "possible" that it came from same manufacturing source as another batch); *United States v. Edwards*, 159 F.3d 1117, 1123-24 (8th Cir. 1998) (holding that expert could testify that the known evidence was "consistent with [his] hypothesis" regarding cause of explosion, and noting that "no more plausible explanation was put forth"); *Stutzman v. CRST, Inc*., 997 F.2d 291, 296 (7th Cir. 1993) (expert could testify that aggravation of congenital back problem by automobile accident was possible, even if not probable; lack of certainty went to weight of evidence, not admissibility); *In re Ephedra*, 393 F. Supp. 2d at 190 (scientific expert may testify as to the biological plausibility of a particular hypothesis that a substance contributed to a particular injury). And given Dr. Healy's reliance on the best available evidence, and SJM's admitted inability to find any plausible alternative explanations for the Silzone® valve problems, the "hypothesis" critique is especially weak in this case.

#### d. SJM's Complaint that Dr. Healy Developed Silzone® Opinions for Litigation Rather Than Publication, and That He Does Not Routinely Testify in Court

Even SJM treats these litigation-related criticisms as only minor points, but it raises each of them enough times within the Motion to warrant response. SJM complains that Dr. Healy got introduced to and involved with silver-coated heart valves "through litigation," rather than through prior independent research and

scientific interest in them, and also complains (somewhat to the opposite effect) that Dr. Healy is not involved in a lot of court cases.

To a certain extent, SJM's premises are simply wrong. Prior to litigation, Dr. Healy was already familiar with SJM, Silzone®, and the Spire Corporation's "IBAD" method of Silzone® application. (Healy Dep. at 99, 101-05.) But beyond this, as the Seventh Circuit recently observed, "there is a first time in court for every expert," and it is not necessary that the expert be "a professional witness." *United States v. Parra*, 402 F.3d 752, 758-89 (7th Cir. 2005). And of course, Dr. Healy was additionally approved to submit opinion evidence regarding the Silzone® heart valve for motions in both this Court and the *Andersen* class action in Canada. He has also subsequently been retained as a biomaterials expert in another silver product case. (Healy Depo., p. 108.)

Regarding the formation of his Silzone® opinions "for litigation," the foundation of Dr. Healy's scientific opinions is substantially his non-litigation knowledge of and experience with the interactions of a wide range of metals with human blood and tissues. Furthermore, formulation of opinions for litigation is common for experts and simply is not a large admissibility factor. *See, e.g.*, *Lauzon v. Senco Products*, 270 F.3d 681, 693 (8th Cir. 2001) (reversing for abuse of discretion for barring testimony by engineer that pneumatic nailer was inherently dangerous, even though his introduction to pneumatic nailers had been through litigation). This is the more true in cases where it is unrealistic to find a

contingent of available experts with previous knowledge and specific experience with a unique product. Likewise, peer-reviewed publication is of diminished importance for propositions that are "too particular, too new, or of too limited interest to be published." *Daubert*, 509 U.S. at 593*; see also White v. Ford Motor Co*., 312 F.3d 998, 1008 (9th Cir. 2002) (sustaining finding that parking brake design was not of sufficient interest to scientific community to generate any peer reviewed literature). To put it mildly, there has not been a plethora of silver-sprayed products for permanent human implantation available for study, and Silzone® itself has always been a proprietary and unique product of SJM. As noted by Dr. Healy (who is, not incidentally, subject to a protective order covering many of the documents he may view in this case), he would have had little access or reason to study or publish on Silzone® before this case arose. (Healy Dep. at 246.)

**e. SJM's Attacks on the Fact Bases of Dr. Healy's Opinions**

SJM's Motion repeatedly attacks Dr. Healy's opinions for lacking foundational facts, despite the evidence supporting each of them. These attacks do not address the admissibility of Dr. Healy's testimony. Moreover, for the purposes of Rule 702, foundational "facts or data" include "hypothetical facts" supported by evidence. Fed. R. Evid. 702 Advisory Committee Notes. The Court is not called upon to resolve disputed facts. *Id.*

The Eighth Circuit has been consistently clear on these points, noting "time and again" that attacks on the factual basis for an expert's testimony go to the weight and not the admissibility of the expert's opinion. *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120-21 (8th Cir. 2006). *See Synergetics, Inc. v. Hurst*, __ F.3d __, 2007 U.S. App. LEXIS 2470 (8th Cir. 2007) (disagreement with expert's assumptions and methodology does not warrant exclusion of testimony); *Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (assertion of unsupported factual assumptions went to weight, not admissibility); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005) (array of criticisms, including failure "to perform elementary tests of reliability," went to factual basis for statistician's opinion which, "even post-*Daubert*," goes to weight and not admissibility); *Bonner*, 259 F.3d 924, 929-30. *See also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

SJM's specific arguments about factual foundations are also just inherently unreasonable. In several places, SJM criticizes Dr. Healy for not having "fully read" things like 24,000 pages of FDA discovery documents, or whole deposition transcripts from the litigation. It is hard to believe SJM is suggesting seriously that Dr. Healy's expert testimony is unreliable because he did not read all the litigation documents in this case. No retained expert should ever have to wade though tens of thousands of discovery documents and deposition transcripts

"fully," especially given the volume of documents and testimony having nothing to do with the expert's opinions. In any event, SJM's Motion again suggests no scientific or legal connection between Dr. Healy's testimony and anything he did not read. *Cf. Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003) (sustaining admission of chiropractor's opinion on cause of back injury where defendant "failed to point out any fact that [the chiropractor] overlooked" or "missed").

Similarly, with respect to reviews of the scientific literature and experiments, SJM's generic approach seems to be to recite miscellaneous points of distinction between the article or study, and the case. That is trivial to do, especially since Silzone® is a one-of-a-kind, patented, proprietary material owned by SJM. There is nothing identical to it anywhere. What is missing from SJM's Motion, again, is any explication of any scientific standard of why any distinctions bar Dr. Healy's testimony, rather than being (assuming they have any validity) factors pertaining to its weight. *See Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 (8th Cir. 1998) (holding that it is for the finder of fact to consider any omitted variables in determining the weight to accord study results).

All these things go to the weight rather than admissibility of expert testimony -- the more so when SJM offers no explanation at all of what "overlooked" document or deposition testimony is critical and why, or why any claim of distinctions matter so much as to render the testimony devoid of all

reliability or helpfulness. Dr. Healy cites multiple sources of evidence for each of his Scientific Opinions. The Court is not now required to judge a scientific debate.

* * *

Plaintiffs further respond to SJM's miscellaneous substantive attacks on Dr. Healy's Scientific Opinions below, but wish to record that Rule 702 was not intended to force a District Judge to become a scientific referee. *See, e.g., Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."), *quoted with approval in* Fed. R. Evid. 702 Advisory Committee Notes. When a Rule 702 attack devolves into a substantive science debate between counsel, it has left the threshold realm of gatekeeping and become, improperly, a scientific merits trial on the papers, conducted by lawyers ill-trained for it, in a form unsuited to it.

### 2. Dr. Healy's Scientific Opinion #1 (Regarding Silzone® Silver Leaching and Tissue Inflammation) Is Admissible

SJM's designation of "Scientific Opinion #1" refers to paragraphs 56-60 of Dr. Healy's February 20, 2003 Affidavit in the Andersen class proceeding in Canada. (Motion at 7 & Exh. 1c, ¶¶ 56-60.) SJM arbitrarily labels this biomaterials opinion as a "Clinical Diagnosis Opinion." See IV.A.1.a., above. Most of SJM's arguments about Scientific Opinion #1 are addressed in sections

IV.A.1.b-e, immediately above, and in the bullet point responses about Dr. Healy's qualifications in section III, above.

Most of SJM's attacks on Scientific Opinion #1 consist of claims about evidence. Besides being evidentiary attacks inherently going to weight rather than admissibility, and confusing proof with reliability, its specific evidentiary claims of the absence of evidence on several points are also demonstrably untrue on the existing record.

SJM's first evidentiary claim is recited in the subheading for section III.A.1. of the Motion: "There Is No Evidence That Silver Causes Tissue Damage." This claim is easily shown to be untrue. Evidence already adduced shows that Silzone® leaches silver, corrodes in the body, and sloughs off silver particulates. (Motion Exh. 1(e), ¶¶ 81-85; 064749.tif; 033444.tif; 124795.tif; 034073.tif; Wilson Depo. at 39:3 - 40:20). Scientific literature and actual Silzone® experience supports that silver impairs tissue healing and causes inflammatory tissue reactions. (Motion Exh. 1(c) at 7-15; Healy Dep. at 12-13, 64-67, 274, 280-81, 404-07; 069075.tif at 076 [noting explanting surgeons' surprise at "apparent inflammatory reaction"]; 631958.tif at 959 ["large areas of inflammatory, fibrous tissue with inflammatory cells"].) In other contexts it can cause burns. (Healy Dep. at 270, 404-06, 416-17.)

As part of this "tissue damage" evidentiary claim, SJM even further suggests that there is "no evidence" that the black particulate matter repeatedly observed in the tissues surrounding implanted Silzone® valves is silver, and

criticizes both Dr. Healy and Plaintiffs' counsel for failing to "perform any test that confirms silver is actually present in the tissue."[14] (Motion at 9.) This is an astounding claim. SJM personnel have repeatedly and uniformly understood the black particulate to be silver. (Motion Exh. 1(d) at ¶24; Holmberg Minn Dep. at 261; 124795.tif at 806 ["Ag particulates at cardiac tissue interface" of dead test sheep].) Moreover, although SJM evidently never performed a confirmatory test (whether because the answer seemed obvious, or because verification was undesirable), Plaintiffs' pathology expert, Dr. Wilson, did. As SJM knows, Dr. Wilson confirmed via electron microscopy using electron dispersive analysis with a scanning transmission electron microscope that the ubiquitous substance was indeed silver. (Wilson Depo. at 39 – 40.)

SJM's second broad evidentiary claim is given at section III.A.2. of the Motion: "There Is No Evidence That Silzone® Results in Any Adverse Medical Event." (Motion at 12.) This claim is somewhat afield of Dr. Healy's generic MDL opinion on leaching and tissue damage, but it too is demonstrably untrue, and SJM's assertion is incredible in light of the published adverse event rates of the Silzone® valves, the worldwide Silzone® recall due to its rate of adverse medical events, and SJM's own acknowledged inability to find any alternative explanation for the medical problems besides the Silzone® metal cuff coating.

[14] The Motion is silent as to any culpability of SJM for apparently neglecting to perform any such test.

(Motion Exh. 1(c) at 16, ¶59; Exh. 1(d) at 15, ¶35; Guzik Dep. at 118, 151-52, 315, 349-51, 442; FDA 18584; FDA 18052; FDA 18733; 028305.tif – 07.)

As an additional part of this attack on the "adverse events" evidence, SJM notes that Dr. Healy cannot predict which Silzone® patients will get sick because that is "anybody's guess." (Motion at 13.) Here, SJM just seems to have lost track of what the generic testimony is offered for. Dr. Healy's opinion has nothing to do with predicting which individual patients will manifest the symptoms for which all Silzone® patients have been at increased risk.[15] For MDL purposes, the point is that evidence supports silver leaching and tissue damage.

Finally, SJM generically re-attacks Dr. Healy's qualifications. (Motion at III.A.3., pp. 14-15.) Here SJM invokes the "wrong field" argument again (see above discussion at IV.A.1.b) and miscellaneous bullet points addressed above in section III. Ultimately though, SJM quickly circles back to re-raise the "prognosis" issue in connection with Dr. Healy's qualifications. While Dr. Healy has appropriately sought to opine on "the local interaction between the material and the tissue," SJM has tried to invoke his inability (like that of everyone else) to predict whether a particular patient "is going to develop a PVL in the future to a reasonable degree of scientific certainty." (Motion at 15.) But again, such

[15] Indeed, SJM's attack is a succinct statement of exactly why further study and medical monitoring is appropriate for asymptomatic patients – it is otherwise indeed "anybody's guess" which of them will manifest any of the Silzone®-correlated medical symptoms identified above.

predictions are not part of Dr. Healy's Scientific Opinion #1 for the MDL, so this attack is simply not relevant.

### 3. Dr. Healy's Scientific Opinion #2 (Regarding Silzone® Degradation and Corrosion) Is Admissible

This is the only one of SJM's eight formulations of opinions by Dr. Healy that the Motion deigns to label as a pure "Biomaterials Opinion." (Motion at 6.) Its primary attack is on the factual bases for the opinion, even to the point of procuring a new declaration of SJM employee Katherine Tweden re-interpreting an old notebook entry, and citing a page from the deposition of SJM's Silzone® project manager, Holmberg, to the effect that he somewhat vaguely remembers a particular calculated leaching rate to have been smaller (by an unspecific amount) than he had first put in print.

The futility of challenging qualified expert testimony by trying to cloud or debate the facts has been discussed (see IV.A.1.e., above), and SJM's re-assertion that there are "no facts" supporting silver loss from implanted valves was additionally refuted immediately above. SJM's Motion also does not respond at all to most of the evidence cited in the same affidavit paragraphs that contain the references to the writings of Tweden and Holmberg. (Motion Exh. 1(e), ¶¶ 81-85.) And as to the latter pair, SJM's citation to the recently-composed Tweden Declaration -- arguing today that her laboratory notebook entry on silver ion leaching several years ago did not mean what it said – does not settle anything

even if taken as true (and it apparently raises a serious credibility issue). Likewise, the citation to a short excerpt from Holmberg's deposition (Motion Exh. 4) not only remains directly contradicted by his own contemporaneous writing, and corroborated by none, but also the testimony itself, if arbitrarily accepted as true, allows for silver degradation of close to 100 angstroms/year, and so does not even contradict the substance of Dr. Healy's corrosion opinion.

### 4. Dr. Healy's Scientific Opinion #3 (Regarding Suitability of Silzone® as a Biomaterial for Human Implantation) Is Admissible

In Scientific Opinion #3, Dr. Healy opines that Silzone® -- in light of Dr. Healy's knowledge of how Silzone® appears to behave in the body, all of the evidence of problems, and the absence of any plausible alternative explanation for them, -- was not a proper or suitable biomaterial for human cardiac implantation, rendering the Silzone® valve defective.

SJM's Motion spends only about one page on this opinion (Motion at 18-19), but manages to allude to many of its stock arguments in that space: hypotheses; not a professional litigation witness; too much of a litigation witness; inadequate factual foundation and testing. The substance of these points is addressed above at IV.A.1., and III, bullet number 6.

SJM originally labeled this opinion (gratuitously) as a "Biomaterials and Legal Opinion." (Motion at 6.) The partial designation of the opinion as "legal"

seems to reflect an assumption that if a scientific opinion has legal significance, then it is a hybrid science/legal opinion. But of course, the whole point of eliciting expert testimony in the first place is for its legal significance; this does not detract from the scientific nature of the testimony. Moreover, expert testimony does not become defective merely because it uses words that are used in a legal standard. *See U.S. v. Two Eagle*,318 F.3d 785, 792-93 (8th Cir. 2003). A qualified expert witness may testify even as to ultimate issues of design defects in product cases. *See, e.g*., *Hammes*, 2006 WL 1195907 at *3. Dr. Healy's "Scientific Opinion #3" remains a biomaterials opinion precisely within his expertise and experience to render.

**B. Dr. Healy's Five "FDA" Opinions Are Admissible**

SJM picks out and characterizes five of what it calls "FDA Opinions," from Dr. Healy's 5/13/03 Declaration. (Motion at 6-7 and Exh. 1(e).) Plaintiffs disagree that it makes much sense to call these "FDA opinions." The FDA is not at issue. What are at issue are scientific standards, in light of SJM's duty to adhere to them in seeking and maintaining approval of its Silzone® coating, including the scientific description of how Silzone® works, relative to Congress's (not the FDA's) designation of what qualifies as a "device" or "drug," and the accurate

reporting of study results, literature searches, and safety levels.[16] However, Dr. Healy's FDA Opinions are not part of his generic expert presentation and therefore, the attack is premature at this stage and will not be further addressed at this time. And, at the appropriate time, Plaintiffs will demonstrate that these attacks, like those previously referenced, are unfounded, without merit and simply SJM's effort to keep the true facts from disclosure.

## V. CONCLUSION

Based upon all of the foregoing, SJM's Motion must be rejected and Dr. Healy's Opinions like those of Dr. Wilson and Mr. Butchart admitted in evidence.

Respectfully submitted,

Dated: March 19, 2007

**ZIMMERMAN REED, P.L.L.P.**

s/J. Gordon Rudd, Jr.
CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

**LEVY, ANGSTREICH, FINNEY, BALDANTE, RUBENSTEIN & COREN, P.C.**
STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

[16] SJM's Motion does not challenge the relevance of the subject matter of the five "FDA" opinions, which was confirmed by this Court in its Jan. 5, 2004 Memorandum Opinion and Order Denying Defendants' Motion for Summary Judgment.

**CAPRETZ & ASSOCIATES**
JAMES T. CAPRETZ
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

**GREEN, SCHAAF & JACOBSON, P.C.**
JOE D. JACOBSON
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C**
DANIEL W. SIGELMAN
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Ph. (202) 408-4600

Counsel for Plaintiffs