**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| IN RE: ST. JUDE MEDICAL, INC., SILZONE HEART VALVES PRODUCTS LIABILITY LITIGATION | : : : | MDL No. 01-1396 (JRT/FLN) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ST. JUDE MEDICAL, INC. 'S MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' EXPERT, GREGORY J. WILSON, M.D., FRCS, FETCS, FESC**

St. Jude Medical, Inc. ("SJM") attacks Gregory J. Wilson, M.D., an eminent cardiac pathologist with extensive expertise in the fields of heart valve disease pathology, prosthetic heart valves, and cardiac devices. SJM suggests that his opinions on Silzone coating's defective nature and its dangers and risks must be prevented from presentation to the jury under *Daubert* because: (1) he is not competent; and/or (2) his opinions lack foundation or are speculative. SJM's attacks are unfounded and misdirected, and at times disingenuous. In making its claims, SJM grossly distorts or ignores facts, and unfairly and improperly denigrates or dismisses Dr. Wilson's considerable and relevant education, training, experience and research. Furthermore, he has already been found competent and his opinions well based in science and medicine against a similar challenge by SJM in the parallel Canadian Silzone litigation, *Andersen v. St. Jude Medical Inc.*, [2003] O.J. No. 4314 (Ontario Super. Ct. of Justice). For these and the reasons that follow, SJM's motion to preclude Dr. Wilson's opinions at trial should be denied.

**II. Applicable Standards**

The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), set forth the standard for admission of expert testimony under Rule 702 of the Federal Rules of Evidence which governs the admissibility of expert testimony. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule must be read in the context of the "liberal thrust" of the Federal Rules of Evidence and must be interpreted consistently with the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588.

The Eight Circuit 's recent decision in *Synergetics, Inc. v. Hurst,* 2007 U.S. App. LEXIS 2470, 11-12 (8th Cir. 2007) reiterates the key principles and standards that have developed following *Daubert*:

> "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (internal citations and quotations omitted)). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Peitzmeier v. Hennessy Indus., Inc.*, Free. Ch. 1020, 97 F.3d 293, 296, Freem. Ch. 1020 (8th Cir. 1996), *cert. denied,* 520 U.S. 1196,

> 117 S. Ct. 1552, 137 L. Ed. 2d 701 (1997). An expert's opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner*, 259 F.3d at 929-30. … [S]o long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony. See *Daubert*, 509 U.S. at 596 HN4("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000) (no abuse of discretion in allowing plaintiff's expert witness to testify as to damages where defendant's expert, who disputed plaintiff's expert's methodology, also testified; jury left with ultimate decision as to which damages theory was more sound).

Thus, this Court is not tasked with the responsibility of weighing and determining the scientific controversy or debate over Silzone's toxicity and pathology issues in this case. Rather, all it is asked to do is determine whether the scientific opinion or testimony of the expert called upon to assist the jury in this mission are based on good grounds tied to scientific method. *Bonner v. ISP Technologies*, 259 F.3d 924, 929 (8th Cir. 2001). Unless there is too great a gap in inferences and extrapolations between scientific principle or data and the expert's opinion, the testimony should be admitted. *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997). Any "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick, M.D.*, 150 F.3d 912, 915 (8th Cir.1998) (citation omitted).

## III. Argument

We first note that the attack on Dr. Wilson's opinions relating to (1) medical monitoring, (2) the need for an epidemiological study or (3) matters

relating to SJM's failures to submit material information to the FDA — such as the pathology information on an experimental sheep in one of SJM's pivotal animal studies (KTMV-2) which developed a paravalvular leak (PVL) and a thrombus on the experimental valve[1] — are premature or irrelevant. These opinions go either to the relief this Court may permit the class to receive or to issues relating to FDA preemption which are not part of Dr. Wilson's generic expert presentation in the individual injury cases. For this reason, plaintiffs are not responding *in seriatim* at this time to SJM's challenges to Dr. Wilson's opinions on these issues.

Dr. Wilson's *Curriculum Vitae* and his deposition testimony demonstrate convincingly that he possesses more than sufficient education, knowledge, training, experience and skill to render expert opinions on (i) the suitability of Silzone as a biomaterial; (ii) Silzone's effects on pertinent tissue healing; (iii) the toxicity of Silzone; and (iv) the defective nature of Silzone coated heart valves. He is an anatomic pathologist. (Wilson CV at 1)[2] and holds the rank of Professor in the University of Toronto's Department of Laboratory Medicine and

---

[1] Dr. Jagdish Butany.M.D., a pathology consultant to SJM on Silzone (Butany Dep. at 34) recently published a peer reviewed article on Silzone explants he has reviewed. His article reports he found five (5) out of eight (8) Silzone valves (62%) explanted for PVL he examined also had evidence of valve thrombosis. Butany J, *et al*. *Pathologic Analysis of 19 Heart Valves with Silver-Coated Sewing Rings,* 21 J Card. Surg. 530-38 (2006). (Rudd Declaration Exh. 4) (Hereinafter "*Rudd Decl*."). SJM's motion is silent on its consultant's recent publication in their challenge of Dr. Wilson's opinions.

[2] A copy of Wilson's CV is attached supplied as Rudd Decl. Exh. 7.

Pathobiology, with cross appointments to a number of the University's other departments and schools including its *Institute of Biomaterials& Biomedical Engineering (Id*.). Since 1981 he has been a Fellow of the Royal College of Physicians and Surgeons of Canada - Anatomic Pathology and a Diplomate of the American College of Pathologists - Anatomic Pathology. (*Id*.) His stated research interests since the 1970's include "cardiovascular prosthetic devices, especially the development and experimental evaluation of design improvements including cardiac pacing systems, heart valve prostheses and synthetic and biological vascular grafts." (Wilson CV at 2; Wilson Dep. 74-75; 158-164.) He has published approximately 160 scientific/medical articles. A number of these are in the field of biomaterials relating to cardiac products, including heart valves. (CV; Wilson Dep. at 158-164). One of these articles, published in the Journal of Thoracic and Cardiovascular Surgery, concerned the use of a porous metal coating on the Bjork Shiley heart valve (a mechanical heart valve), and another, published in the American Society for Artificial Internal Organs, treated the subject of tissue healing with a porous metal coating applied to the cage apparatus of the Starr Edwards valve (another mechanical heart valve). (Wilson Dep. at 161-62.) With his mentor, the renowned cardiac-pathologist, Dr. Malcolm Silver, he has co-authored a book chapter on the pathology of mechanical heart valve prostheses that was published in the original, second and current editions of the textbook "*Cardiovascular Pathology*", which is now co-edited by one of SJM's cardiopathology expert witnesses, Dr. Fredric Schoen. (Wilson Dep. at 162-163;

Schoen Dep at 45-46.)[3] Dr. Wilson's work and accomplishments in the field of biomaterials over the years earned him, in May, 2000, the honor of being named a "Fellow of Biomaterials Science and Engineering" (FBSE) by the World Biomaterials Congress, International Union of Societies for Biomaterials Science and Engineering. (Wilson Dep. 158-60)[4] While during the later part of the 1980's into the 1990's Dr. Wilson's research on prosthetic heart valves focused mainly on bioprostheses, and not mechanical heart valves, this experience can not be dismissed lightly as SJM would have the Court do. (Page 5) The issue here is the valve's sewing cuff and not the Masters Series valve itself. Both mechanical and bioprosthesis replacement valves use the same sewing cuff fabric.[5]

---

[3] Dr. Schoen acknowledges that Dr. Wilson authored portions of the text on the pathology of mechanical heart valve prostheses that Dr. Silver was responsible for and that those same portions remain in the current edition of the medical treatise he co-edits. (Schoen Dep. at 45-46.)

[4] It merits noting that Dr. Wilson has also conducted medical device research for companies such as Boston Scientific on its TAXUS coronary heart stent, and Corvita Corporation (now a part of Pfizer, Inc,) on its vascular graft products. (Wilson Dep. at 445-448. See also Wilson MDL Declaration (5/13/03) at ¶12) The high quality of Dr. Wilson's research work on the TAXUS stent was publicly recognized during the course of an FDA Advisory Committee meeting addressing Boston Scientific's TAXUS stent application by the FDA's reviewing pathologist, Dr. Stephen Hilbert, MD,: "The sponsor is accommodated or is commended for the extensive data set that was provided, as well as the high quality of the studies that were conducted by both the animal study investigators and the study pathologists." FDA Circulatory System Devices Panel, Transcript of November 20, 2003 Meeting, p. 141. (Rudd Decl. Exh. L)

[5] Indeed, SJM manufactured and sold in Europe the EPIC valve, a bioprosthesis with a Silzone coated cuff which likewise was recalled on January 21, 2000.

If all this were not sufficient, both his credentials and his core opinions on Silzone's dangers were reviewed for legal sufficiency and admissibility in the related Silzone class action pending in Ontario, Canada under a standard of review substantially similar to *Daubert*.[6] There, the presiding court faced with similar SJM arguments found Dr. Wilson competent to testify and his opinions adequately founded. *Andersen v. St. Jude Medical Inc,* [2003] O.J. No. 4314 (S. C. J.).[7] According to Justice Cullity's opinion:

> *The evidence of Dr Gregory Wilson*
>
> [22] In his affidavit sworn on February 7, 2002, Dr Wilson described the purpose and use of prosthetic heart valves, the importance of providing a secure attachment to the surrounding heart tissues, the means by which this is attempted, the stages that normally occur in the healing process, and complications that may occur if the process is not effective.

***

---

During SJM's evaluation of the EPIC valve its R&D department uncovered information that the Silzone fabric was hemolytic; that is, it tended to destroy red blood cells. This fact was never reported or made known to FDA or the medical community. (See 0151372tif; 0486414tif; Runquist Dep. 308-309, 312-13; Goldman, B. Dep at 163-170)

[6] The Supreme Court of Canada generally follows and employs the principles set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U. S. 579 (1993), giving due regard for any differences that may exist between Canadian and United States federal evidence law. *R. v. J.(J.-L.),* [2000] S.C.J. No. 52, at para. 33-34.(Rudd Decl. Exh. 9) Under that approach, the expert evidence must be reliable; it must derive from the use and application of recognized, accepted principles and/or methods.

[7] A copy of this opinion is supplied at Rudd Decl. Exh. 3.

[26] [In a second affidavit sworn on June 3, 2002,] Dr. Wilson referred to factors that might impair or delay the healing process and he expanded on the basis for the opinions in his earlier affidavit.

[27] The defendants asked me to strike these affidavits of Dr. Wilson in their entirety on the ground that he is not qualified to give opinions on the normal process of healing, or on whether increased monitoring of patients who have received Silzone heart valves is required and that, in any event, they are relevant to the merits of the plaintiff's claims.

[28] I rejected the [defendant's] submissions on the ground that Dr Wilson's qualifications and experience in professional practice, and his research, as an anatomic pathologist made him eminently qualified to provide the opinions in his affidavit. Throughout a long career his primary emphasis has been placed on the cardiovascular system, and in particular, on the heart, heart valves – including prosthetic heart valve replacements - and blood vessels - including prosthetic vessel replacement.. He holds senior positions at The Hospital for Sick Children in Toronto and the University of Toronto, he has numerous publications' and has received international recognition for his work on the effect on tissue healing of bio-material implants - including the healing of prosthetic heart valve sewing rings.

***

[33] Nor do I think that the evidence of Dr Wilson can properly be considered to lack a reliable scientific foundation. The issues with respect to the effects of Silzone implant are of relatively recent origin and reference cannot be made to an accumulation of published research and scientific opinion whose results have received general acceptance, or respect. In determining whether the opinions are sufficiently reliable in these circumstances, I do not believe that the court can properly demand more than that the opinions are those of a qualified expert who has given a serious and reasoned consideration - and applied analytic skills - to the available factual available factual evidence and the preexisting body of medical and scientific knowledge that may bear on the correctness of his opinions. I do not

> believe Dr Wilson's opinions can properly be criticized as falling short of this standard.[8]

SJM challenges Dr. Wilson's opinions that silver comes off the Silzone coated cuff after being implanted and that the silver that comes off plays a significant role in the frustration of the healing process.[9] It first claims here that he is not qualified or experienced. The above discussion of Dr. Wilson's credentials clearly proves otherwise. As to the basis for his opinions, SJM wants the Court to ignore the fact that he has actually observed the phenomena of the silver flaking (spalling) off the cuff in the many pathology specimens he reviewed as well as his review of pathology reports in which evidence of the phenomena is described by others. He has run sophisticated laboratory tests to confirm that the black particles he observed are silver. (Wilson Dep. at 41-43)[10] He also has the benefit of SJM's animal studies on Silzone showing that the silver comes off the

---

[8] Since the time of Justice Cullity's opinion, what additional published and unpublished pathology data there is corroborates Dr. Wilson's opinions. See, e.g.- Butany J, *et al*. *Pathologic Analysis of 19 Heart Valves with Silver-Coated Sewing Rings,* 21 J Card. Surg. 530-38 (2006); Wilson Dep. at 22.)

[9] Although not mentioned by SJM in its motion, Dr. Wilson also opines that the heart tissue coming into direct contact with the silver on the Silzone coated sewing cuff is also injured by the silver's toxic effect on tissue. (Wilson Dep. at 59-60.)

[10] Dr Wilson also testified that the shape of the spalled silver, which shows up as black material in the pathology sections, is remarkably similar, if not identical, to the appearance of the silver coating on the fibers. That is it takes on the shape of a thread it had coated. Wilson Dep. at 41. In a motion directed to Dr. Kevin Heally, SJM criticizes him for not performing a test that Dr. Wilson had already run to confirm the obvious, that the black particulate was silver.

cuff and into tissue with which it is in contact. (Wilson Dep.at 278, 286-87, 356-57)

With respect to Dr. Wilson's opinions on the fate and impact of these particles (or the silver in the tissue that is in contact with the cuff), which ties in with SJM's challenge to another of Dr, Wilson's opinions — that Silzone causes frustrated healing tissue— he bases these opinions upon his research and review of pertinent literature on silver;[11] his review of pertinent discovery materials on Silzone; his examination of approximately 15 explanted Silzone valves;[12] his review of SJM's experimental animal histopathology; his review of the pathology reports and valve photographs that are part of SJM's FER files and photographs of explanted valves.[13] He also relies on the work and opinions of other PSC experts such as Mr. Butchart, Dr. Sackett and Dr. K. Healy, as well as that of SJM's pathology consultant, Dr. Butany.[14] These are all legally acceptable sources of

[11] See e.g., Wilson Dep. at 18-19,26-27, 57-59, 63, 88-89

[12] Wilson Dep. at 47-48. By way of comparison, SJM's expert, Dr. Fredrick Schoen, has examined a total of twelve (12) Silzone valves, and all but a few were in connection with his work as an expert in this litigation. (Schoen, F. Dep. at 49-51).

[13] Wilson Dep. at 47-48. SJM has disposed of the hearts of the test animals involved in the Master Series Silzone testing. See e-mail of David Stanley Esq. to Michael Coren, Esq. supplied as Rudd Decl. Exh. 11. Dr Wilson testified that he would have wanted to see the hearts in light of the findings in KTMV-2 and SJII-8. (Wilson Dep. at 319-20.) Plaintiffs request this patent case of spoliation be considered by the Court during its ruling.

[14] Wilson dep. at 30-33, 55-56, 103, 106, 108, 112-15, 118-119, 120-21, 126, 286-87, 425.

information upon which to base an expert opinion and the totality of this information provides Dr Wilson with more than an adequate foundation to scientifically formulate valid opinions.

SJM can not legitimately claim that Dr. Wilson's opinions are not based on rational scientific data, principles, studies and literature or extrapolation therefrom. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,156 (1998). The precedent following *Daubert* holds that a scientific expert may testify as to the biological plausibility of a particular hypothesis that a substance contributed to a particular injury. *See In re Ephedra Litig. (MDL No. 1598),* 393 F.Supp.2d 181, 190 (SD NY 2005). "Although the gaps between such data and definite evidence of causality are real and subject to challenge before the jury, they are not so great as to require the opinion to be excluded from evidence. Inconclusive science is not the same as junk science." *Id*. at 194. *See also, General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). ("Trained experts commonly extrapolate from existing data"; inference and extrapolation can be sufficiently reliable steps to warrant admissibility so long as the gaps between data and opinion are not too great.); *In re*

*Phenylpropanolamine Prods. Liab. Litig*., 289 F. Supp. 2d 1230, 1242 (D. Wash. 2003)[15]

Taken alone or together, SJM's various potshot efforts at challenging Dr. Wilson's opinions on Silzone's "permanence," its lack of "biocompatibility" or the dangers it poses to a patient fall far short of their target of providing sufficient grounds to warrant his disqualification as an expert or precluding his opinions. He is a recognized biomaterials expert. He is an accomplished pathologist. He is sufficiently versed in toxicology principles, and as a practicing pathologist deals frequently with toxicity issues. During the years he has been an expert in this case he has developed considerable specific knowledge and expertise on silver and its toxicity.[16] Furthermore, he has actually observed and tested silver residues in

---

[15] As Judge Rothstein observed in *In re Phenylpropanolamine Prods. Liab. Litig*., 289 F. Supp. 2d 1230, 1242 (D. Wash. 2003):

> Defendants isolate these sources, rather than considering the whole. Non-epidemiological sources are frequently utilized by experts in rendering scientific opinions and, under *Daubert*, should be considered by the court in assessing the reliability of those opinions. See, e.g., *Kennedy*, 161 F.3d at 1228-31 (finding trial court abused its discretion by excluding expert testimony based on, inter alia, peer-reviewed articles, clinical trials and product studies conducted by the manufacturer, and a state health department's review of reported cases of adverse reactions); *Hopkins v. Dow Corning Cor*p., 33 F.3d 1116, 1124-25 (9th Cir. 1994) (upholding trial court's admission of expert testimony based on, inter alia, clinical experience and studies, medical literature, and general scientific knowledge about drug's properties established by animal studies and biophysical data).

[16] That Dr. Wilson is unable to state what level of silver is toxic and will harm tissue is a red herring and bit of misdirection on SJM's part. The important real question here is why is it that SJM does not know what the tissue toxicity level of

pathology specimens he has examined. The fact that he relies on non-randomized data, on an abstract by Dr. Butany of his findings, which have now been published in a peer reviewed article (a fact SJM fails to mention[17]); SJM FER data, and/or his own unpublished studies neither separately nor together invalidates his opinions. See *Bonner v. Isp Techs.*, 259 F.3d 924, 929 (8th Cir. 2001) (No requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness; ); *Glaser v. Thompson Med. Co.*, 32 F.3d 969, 972, 975 (6th Cir. 1994) (ordering trial based on witness who relied on case reports and his own research in rendering opinion on PPA as cause of intracranial bleeding and fall); *Cella v.*

---

silver is? (Flory MDL Prempt. Dep. at 87-88; 0060082.tif ) SJM, and not Dr. Wilson, put Silzone on the market and proclaimed it "biocompatible". Going beyond this, the toxic effect of SJM's silver coating on heart tissue has been observed by seasoned explanting surgeons taking out Silzone valves who described the tissue that was in contact with the silver cuff as looking as if it had been enzymatically digested or was burnt. (0027348.tif; Tozzi, P. *et al* , *Silver-coated prosthetic heart valve: a double-bladed weapon*, 19 Eur. J. of Cardio-thoracic Surg. 729-731(2001); Del Rizzo Dep. at 123-24) Observations by trained doctors such as these provide a sufficient basis for Dr. Wilson to opine that silver is toxic to heart tissue without needing to know what the toxic threshold level of silver is. "In science, as in life, where there is smoke, fire can be inferred, subject to debate and further testing." *Brasher v. Sandoz Pharm.*, 160 F.Supp.2d 1291, 1296 (N.D. Ala. 2001)

[17] SJM's failure to call the Court's attention the fact that its consultant, Dr. Butany, has recently published his findings in a medical journal is rather astonishing given the arguments it raises presently. For example, it criticizes Dr. Wilson for not knowing whether any of Butany's patients had active endocarditis. Dr Butany's published article now provides the answer. None had active endocarditis. Dr. Butany also compared his series to a control group of non silicone coated St. Jude explants. This is another claimed fault they assert against Dr. Wilson that Butany's article either puts to rest or greatly blunts.

*United States*, 998 F.2d 418, 426 (7th Cir. 1993), *overruled on other grounds*, *Mars v. United States*, 25 F.3d 1383 (7th Cir. Ill. 1994) (Holding in claim under Jones Act, medical opinion on cause of polymyositis based in part on case reports admissible); *In re Ephedra*, 393 F. Supp. 2d 181, 194 (S.D.N.Y. 2005) (admitting expert opinion relying on case series and adverse event report studies); *In re PPA*, 289 F. Supp. 2d at 1242 (admitting expert testimony based on case reports, case series, and adverse drug reaction reports); *Miller v. Pfizer Inc*., 196 F. Supp. 2d 1062, 1072-1073 (D. Kan. 2002) (RCTs and large-scale epidemiological studies not essential to the formation of an expert opinion as to causation.); *Brasher v. Sandoz Pharm*., 160 F.Supp.2d 1291, 1296 (N.D. Ala. 2001) (Scientists routinely use animal studies, case reports, and pharmacological comparisons of similar classes of drugs to infer conclusions). What the record before this court shows is that Dr. Wilson has systematically and scientifically analyzed all the specimens and explanted valve photographs and materials he has been able to review, as well as SJM's internal materials, and has employed the techniques and procedures that are routinely employed in the field of pathology and medical device design.[18] That

---

[18] This stands in marked contrast to SJM's pathology expert, Dr. Schoen, who candidly admitted that he only considered "cherry-picked" FER cases that supported his point:

> Q. [Mr. Coren] And how was it that these cases, RTS-12, 14, 27, 103, 171, how were these selected out of the 54?
> A. [Dr. Schoen] I think they were selected as examples of valves in which there were obvious other more plausible causes or –
> Q. And therefore the other ones didn't have obvious causes?
> A. I don't remember.

is all that the law requires him to do in order to be able to testify on his opinions here. Any deficiencies SJM conjures up do no more, at best, than go to the weight and not the admissibility of his opinions.[19]

With respect to the fact that Dr. Wilson's opinions and research on silver's toxicity are the work product of a forensic assignment, that fact does not render his opinions inadmissible. The foundation of Dr. Wilson's opinions is substantially his non-litigation knowledge of and experience with the heart, prosthetic heart valves, and other heart devices, coupled with his extensive knowledge of human anatomy, tissue and circulatory and immunity systems. The effect of coatings on tissue healing was a topic of professional interest to him long before SJM ever had the misguided thought of putting a silver coating on a sewing cuff. Furthermore, formulation of opinions for litigation is common for experts and simply is not an

---

Q. Fair to say that these are cherry-picking of certain cases to make your point, isn't it?
A. I suppose.

Schoen Dep. at 261-63

[19] *Margolies v. McCleary, Inc*., 447 F.3d 1115, 1120-21 (8th Cir. 2006) ( Noting fact Courts post Daubert have held "time and again" that attacks on the factual basis for an expert's testimony go to the weight and not the admissibility of the expert's opinion; *Synergetics, Inc. v. Hurst*, __ F.3d __, 2007 U.S. App. LEXIS 2470, (8th Cir. 2007) (disagreement with expert's assumptions and methodology does not warrant exclusion of testimony); *Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (assertion of unsupported factual assumptions went to weight, not admissibility); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc*., 401 F.3d 901, 916 (8th Cir. 2005) (array of criticisms, including failure "to perform elementary tests of reliability," went to factual basis for statistician's opinion which, "even post-*Daubert*," goes to weight and not admissibility).

admissibility factor. *See, e.g.*, *Lauzon v. Senco Products*, 270 F.3d 681, 693 (8th Cir. 2001) (reversing for abuse of discretion for barring testimony by engineer that pneumatic nailer was inherently dangerous, even though his introduction to pneumatic nailers had been through litigation).

Finally, in light of Dr. Wilson's extensive experience and knowledge, he is both competent and able to render an opinion on whether the Silzone valve was an unsuitable and defective medical device. A qualified expert witness may testify even as to ultimate issues of design defects in product cases. *Hammes v. Yamaha Motor Corp. U.S.A., Inc.*, 2006 WL 1195907, *3 (D. Minn. 2006). SJM claims notwithstanding (page 30), his reasons why he opines that the Silzone valve is defective, given his other opinions, are obvious. SJM's efforts to peg him as being just a mere pathologist whose patients are children, and hence presumably without a basis to render an opinion on an adult medical product, is simply ludicrous.[20] As demonstrated above his interests, experience, knowledge and accomplishments make him an appropriate expert to opine and explain to the fact finder why Silzone was defective and unsuitable for implantation in a human heart.

**III. Conclusion**

For all of the forging reasons SJM's Motion to exclude all or part of Dr. Wilson's expert opinions should be denied.

---

[20] Apparently SJM ignores the fact its mechanical heart valves are implanted in children. Silzone was not contraindicated for children.

Respectfully submitted,

Dated: March 19, 2007

**ZIMMERMAN REED, P.L.L.P.**

s/J. Gordon Rudd, Jr.
CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

**LEVY, ANGSTREICH, FINNEY, BALDANTE, RUBENSTEIN & COREN, P.C.**
STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

**CAPRETZ & ASSOCIATES**
JAMES T. CAPRETZ
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

**GREEN, SCHAAF & JACOBSON, P.C.**
JOE D. JACOBSON
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C**
DANIEL W. SIGELMAN
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Ph. (202) 408-4600

Counsel for Plaintiffs