# Exhibit 1

## Michael Coren

**From:** Maud Zingmark [Secretary@eacts.norrnod.se]
**Sent:** Thursday, March 08, 2007 4:34 AM
**To:** Butchart Eric
**Subject:** Invitation to join prject on 'Valve Reporting Guidelines'

Dear Dr Butchart

I address you on behalf of Sir Bruce Keogh, Secretary General of the European Association for Cardio-Thoracic Surgery, EACTS.

A joint AATS-EACTS-STS project on updating 'Valve Reporting Guidelines' (last update in 1966) has been initiated by Dr Craig Miller. You have been nominated as a very suitable person to join this group. Would you be willing to take on this task, EACTS would be most grateful for your positive and early reply.

The joint working group on this project is expected to meet first at the occasion of the forthcoming AATS-Congress in Washington, one of the days 6-9 of May 2007.

I look forward to hearing from you.

With kind regards

Maud Zingmark
EACTS Administrative Director
Backenvägen 42B
SE-90354 Umea, Sweden
Tel. +46 90 122 122
Mobile: +46 70 677 36 76
Secretary@eacts.norrnod.se
***EACTS - 21 years serving Thoracic & Cardiovascular surgery***

# Exhibit 2

ST. JUDE MEDICAL

December 21, 1993

**Sent Federal Express on 12/21/93**

Eric G. Butchart, F.R.C.S.
Consulting Cardiothoracic Surgeon
University Hospital
Cardiff
Wales, U.K. CF4 4XW

Dear Mr. Butchart:

Please find listed below an agenda for our meeting with you in New Orleans on January 29, 1993, to discuss the Telios cell adhesion peptide coating technology. I will begin the meeting by giving you a scientific overview of the technology in the format of a presentation that I gave at the 1993 Cardiovascular Science and Technology meeting. This meeting was sponsored by the American Association of Medical Instrumentation (AAMI) and was held in Washington, D.C. early this December.

I have been informed that you are aware that we need to do additional animal studies with the Telios coating. We would greatly appreciate your input as to what models you believe would be most appropriate to show the benefits of this coating. I have enclosed a proposed animal model protocol to evaluate the effectiveness of the coating. Accelerated healing and endothelialization are claims we are pursuing with this model. The vascular or arterial patch model is used since it is only the relative healability of the fabric that we are evaluating (as compared to uncoated, control fabric).

If you have some ideas on how to study thromboembolic (TE) events (this coating may indirectly result in a decrease in TE early post-operative), we would appreciate hearing them. The effects of anticoagulation therapy on healing are also of interest to me. We are interested in your insights in that area.

We are scheduled to meet from 10:00 a.m. to 1:00 p.m. in the Hilton Hotel. The meeting room has not yet been assigned. We will be making your room arrangements and forwarding that information to you soon.

**AGENDA FOR VISIT WITH MR. ERIC G. BUTCHART**

- Scientific Overview of Cell Adhesion Technology - Katherine Tweden
- Animal Study Design Discussion - Group
- Future Human Studies - Group

St. Jude Medical, Inc. One Lillehei Plaza St. Paul, Minnesota 55117 U.S.A. 612/483-2000 Fax 612/482-8318

A hard copy of this letter and attachments are being sent to you via Federal Express mail. I have also enclosed in the mail package some articles on cell adhesion peptides and the cell surface receptors that they bind to (integrins) for your review. We look forward to our discussions with you on this exciting technology.

Sincerely yours,

Katherine Tweden

Katherine S. Tweden, Ph.D.
Senior Research Scientist

Enclosures

cc: Tim Chase
Mike Dale
Steve Healy
Roger Osborne
Bruce Ward

# Exhibit 3

**COURT FILE NO.: 00-CV-195906CP**
**DATE: 20031009**

**SUPERIOR COURT OF JUSTICE - ONTARIO**

**RE:** ERIK ANDERSEN et al. (Plaintiffs/Moving Parties) and ST. JUDE MEDICAL INC., et al. (Defendants/Respondents)

**BEFORE:** Justice Cullity

**COUNSEL:** *James M. Newland, Gavin MacKenzie, Russell M. Raikes and John Makins*, for the Plaintiffs/Moving Parties

*S. Gordon McKee, Jill M. Lawrie, J.A. Prestage and Camille Lemieux*, for the Defendants/Respondents

**DATE HEARD:** June 16, 17, 19 and 20, 2003

## ENDORSEMENT

[1] In written reasons released on September 16, 2003, I indicated my intention to certify this action as a class proceeding subject to the provision of further satisfactory submissions for amendments to the class definition and the proposed litigation plan. The motion to certify was preceded by a preliminary motion in which the defendants sought to strike as inadmissible two affidavits of Dr Gregory Wilson - and numerous paragraphs in other affidavits - filed by the plaintiffs as expert evidence relating to the issues that would arise on certification.

[2] The preliminary motion with respect to the inadmissibility of the evidence was heard in September, 2002. Counsel for the plaintiffs submitted then that the motion was premature and that the questions of admissibility should be determined at the hearing of the motion to certify. I indicated that I would hear counsel's submissions on the preliminary motion before deciding whether it was premature. Ultimately, in an endorsement released on October 29, 2000 ([2002] O.J. No. 4478), I accepted the submission of counsel for the plaintiffs on this question and adjourned the motion to the date of the hearing of the motion to certify "when any further submissions of counsel will be heard and the issues relating to admissibility will be decided". In the endorsement I stated:

> "... the scientific complexities of the issues addressed by the experts on each side - issues relating, in particular, to causation but including others concerning the standards to be observed with respect to testing and monitoring of the device

which may or may not be relevant to the motion to certify - are such that I believe it is in the interest of the parties, and of justice, for the court to decide all questions of admissibility together after all the evidence, including transcripts of cross-examination, is in and in the light of the submissions of counsel for certification. In my opinion, this could justify a decision to admit the evidence conditionally at the commencement of the hearing of that motion.

...

I do not believe it would be appropriate in advance of the motion to certify, and on the present incomplete state of the record, to subject the lengthy affidavits filed on behalf of the Plaintiffs to the degree of detailed scrutiny and analysis required to determine which, if any, of the numerous technical and scientific opinions they contain should be considered to fall outside his fields of expertise, or rejected on the ground that they do not satisfy the minimum standards of reliability identified in cases such as *R. v. Mohan* (1994), 114 D.L.R. (4th) 419 (S.C.C.) and J. - L.J.). As well as the questions of relevance, the difficult line-drawing exercise required to determine whether the criticisms levelled at the affidavits establish that those minimum standards have not been satisfied with respect to each of the opinions, or are relevant only to the weight to be attributed to them, can most efficiently be performed at the time, and in the course, of counsels' submissions on each of the particular issues that will be addressed at the hearing of the certification motion."

[3] On June 17, 2003, at the commencement of his submissions at the hearing on certification, Mr McKee referred to amendments that had been made to the notice of motion on the questions of admissibility since the original hearing. These challenged the admissibility of more than 120 paragraphs of affidavits that had been filed subsequently on behalf of the plaintiffs. He stated that he would not be making any further submissions on the questions of admissibility although he maintained the objections to the evidence that had been made. On June 19 he indicated that the defendants also objected to the relevance of the contents of further affidavits of Dr Kevin Healy that were not referred to in the amended notice of motion. My note of his submissions made on June 19 reads:

"No formal orders needed. Just decide whether relevant or irrelevant".

[4] I understood – and, quite possibly, misunderstood - this to refer to all of the objections to the evidence and not just to those relating to the evidence of Dr Healy.

[5] There were no specific requests for rulings on admissibility during the course of the hearing and none were made then, or in the reasons I delivered on September 16. I did, however, comment at some length [paragraphs 4 and 77 through 82] on the questions of admissibility and, in particular, the necessity to distinguish evidence that was irrelevant in so far as it addressed only the merits of the action from evidence that was relevant both to such merits and the issues on the motion to certify. I stated that, to the extent that I found the evidence to be relevant to the latter, I considered it but, to the extent that I considered it to be irrelevant, I had ignored it. I stated, also, that I considered that the three witnesses, whose opinions at the earlier hearing had been challenged, were qualified to give the expert evidence on which plaintiffs' counsel relied at

the hearing and in their factum. I indicated that I had not found it necessary, or appropriate, to attempt to resolve conflicts between their evidence and that of the defendants' experts with respect to the merits of the action, and that the relevant weight to be given to the evidence was a matter to be dealt with at a trial of the common issues.

[6] Following the release of the decision, I received a letter from Mr McKee stating that there appeared to be "some confusion with respect to the defendants' position at the certification hearing on their motion to strike" and requesting formal orders granting, or denying, the relief requested in the defendants' amended notice of motion. This relief related to the first two affidavits of Dr Wilson in their entirety and, also, to more than 220 paragraphs in other affidavits filed on behalf of the plaintiffs. In a subsequent letter, Mr Newland took the position that my findings on admissibility were sufficiently clear from my reasons for decision on certification and the earlier endorsement.

[7] After giving this matter careful consideration, I notified counsel on October 3, 2003 that I would provide the defendants with formal rulings on the matters raised in the preliminary motion. I did this because I concluded, on the basis of Mr McKee's letter, that, despite my note of his submissions on June 19, 2003, there may have been some misunderstanding with respect to his position.

[8] I adhere to the comments I made on admissibility in the reasons for the decision on certification, and the earlier endorsement, and I will not repeat them except to reiterate that, to the extent that the objections are based on relevance, it is not correct that evidence relevant to the merits of the action is inadmissible for all purposes.

[9] Some such evidence is almost always relied on by both sides in motions for certification. In particular, where the ultimate outcome of the action may depend, to any extent, upon the court's resolution of conflicts between the expert evidence of witnesses called on each side that is directly relevant to the merits of the action, the existence, and the nature, of the conflict may be the best evidence of the existence, and definition, of the issues that the plaintiffs seek to have accepted as common to all members of the class. It is trite law that evidence may be admissible for some purposes and inadmissible for others.

[10] As Mr Branch states in *Class Actions in Canada* (paragraph 4.1540):

> "Evidence that touches on the merits of the case need not be excluded from the supporting affidavits so long as it touches on relevant factors to certification. Indeed the court must have a good sense of all of the issues that will be raised in order to foresee the future conduct of litigation. Without a complete presentation, the court will be unable to assess manageability or preferability."

Where the court finds that the proceedings have been unduly protracted by an over-abundance of evidence, costs sanctions may be appropriate.

[11] On the basis of the affidavits filed by the defendants prior to the hearing of the preliminary motion, plaintiffs' counsel identified the following factual issues that the defendants evidently accepted as having some relevance to the motion for certification:

"(a) Whether the risk which Silzone patients face is confined to paravalvular leakage (PVL) and explant;

(b) Whether the problems arising from the Silzone valve are idiosyncratic or are caused or contributed to generally by the effect of the Silzone coating on the healing process in the heart;

(c) Whether all patients who received the Silzone heart valves are at greater risk of explantation or other complication than they would be if they had received conventional St Jude mechanic heart valves (without Silzone coating);

(d) Whether additional monitoring will be required for patients who were implanted with the defendants' silzone heart valve;

(e) Whether notification of this action should be provided directly to patients; and

(f) Whether the representative plaintiffs, Erik Andersen and Sharon Frost, had prosthetic valve endocarditis (PVE).

[12] In paragraph 120 of their factum filed in the preliminary motion, plaintiffs' counsel submitted:

"The determination of whether there are common issues, of what those common issues are, and the scope of the class definition, and whether a class proceeding is the preferable procedure cannot occur in an evidentiary vacuum. It is submitted that:

(a) Evidence which provides context to assist the court in understanding the nature of the Plaintiffs' claim is relevant, including expert opinion evidence;

(b) Evidence which establishes that substantially all patients who receive the Defendants' Silzone valves have suffered harm or are likely to suffer harm is relevant to the determination of whether there is a class of two or more persons, whether there are common issues affecting that identifiable class and whether a class proceeding is the preferable procedure for redressing as common issues;

(c) Evidence that explains how implanted patients are likely to be affected or harmed by the Defendants' product, particularly where the device is not readily and easily observed, is likewise relevant to assist the court in determining whether there are common issues relating to,

(i) The adequacy and extent of the pre-market testing done by the defendants for this device;

(ii) The adequacy of the Defendants' post-recall conduct;

(iii) The nature of the medical risks which patients face who have been implanted with this device;

(iv) The extent of the risks faced by these patients;

(v) Whether these risks are idiosyncratic, arising only as a result of individual patient factors, or as a result of a common occurrence, i.e., the implantation of the same medical device, the Defendants' Silzone coated mechanical heart;

(vi) The need for ongoing monitoring, and that there is an issue as between the experts as to the former and extent of that monitoring;

(vii) Whether the Silzone coating on the Defendants' mechanical heart valve may affect the healing process in all or substantially all patients who have been implanted with this device; and

(viii) How these devices are implanted and how they are supposed to heal."

[13] I was satisfied that these submissions were correct and that evidence that was relevant to those issues could be relied on by the plaintiffs – and by the defendants - notwithstanding that it was also relevant to the merits of the plaintiffs' case.

[14] However, it is one thing to ask the court to find, and define, common issues on the basis of expert opinion evidence. It is something quite different to ask the court at the certification stage to choose between conflicting expert opinions with respect to the correct resolution of those issues.

[15] In paragraph 6 of their factum on the motion to certify, defendants' counsel asked me to accept that a particular interpretation of the AVERT data was strong evidence that there is "no issue common to all Silzone valve patients".

> "This data, which is accepted by all to be the most reliable data available on the relative risks of complications for Silzone and conventional valves, demonstrates that the increased risk of major paravalvular leak without infection leading to explant only existed in the Silzone arm of the AVERT trial for the first 18 months after a Silzone valve implant and that there is not now, and never has been, a statistically significant difference in the rates of any other complication in that trial. The AVERT data also demonstrates that the incidence of all complications, including paravalvular leak without infection leading to explant, is decreasing over time. Rather than supporting the plaintiffs' common mechanism theory that Silzone will harm every patient, the AVERT data is strong evidence that there is no issue common to all Silzone valve patients that would meaningfully advance individual claims of <u>all</u> of these patients."

[16] The correctness of this particular interpretation of the AVERT data and its significance is disputed by the plaintiffs and it bears directly on the resolution of the common issues relating to causation. Only if, on the basis of the AVERT data, it was decided that Silzone does not cause harm to all patients, could one conclude from such data that there was no common issue on this

point that would significantly advance the proceeding. The defendants were, in effect, seeking a decision on the merits in order to decide the question of commonality.

[17] It is not ordinarily the function of the court at the certification stage to decide disputed questions of fact that would be raised by the proposed common issues, or those that are otherwise directly relevant to the merits of the plaintiffs' claims. In particular, it is not open to the defendants to attempt to demonstrate an absence of commonality, or preferability, by asking the court to weigh the merits of the evidence on the proposed common issues and to decide whether the plaintiffs are likely to be successful. If the plaintiffs can show some evidential basis for the existence of an issue, which, if decided in their favour, will significantly advance the proceedings for all members of the class, or a subclass, that should be sufficient. As Sharpe J. stated in *Taub v. Manufacturers' Life Insurance Co* (1998), 40 O.R. (3d) 379 (G.D.), at pages 380 – 1, affirmed (1999), 42 O.R. (3d) 576 (Div.Ct):

> "In my view, section 5 of the CPA requires the representative plaintiff to provide a certain minimum evidential base for a certification order. The CPA does not contemplate a detailed assessment of the details of the claim of the representative plaintiff or of the claims of the members of the proposed class.... However ... there must, at the very least, be some basis in fact for the court to conclude that at least one other claim exists and some basis for the court to in fact assess the nature of the claims that exist that will enable the court to determine whether the common issue and preferability requirements are satisfied".

[18] In his submissions with respect to the AVERT data - as well as in other contexts - it appeared to me that, despite his efforts to connect the evidence of the defendants' experts to the issues on the motion, Mr McKee was, in effect, asking me to make decisions on the merits of the proposed common issues of fact - to find an absence of an acceptable class, commonality or preferability on the ground, that, at a trial of the common issues, the plaintiffs would be unlikely to be successful. This was, in my judgment a fundamental weakness in the case presented on behalf of the defendants. It was somewhat ironic that, despite the defendants' objection on the preliminary motion that so much of the evidence filed on behalf of the plaintiffs was relevant only to the merits and should be excluded, reliance on the merits was, in my judgment, much more evident in the submissions made on behalf of the defendants at the hearing of the motion to certify. This was apparent not only in defendants' counsels' reference to the most recent AVERT data but also in their repeated insistence that the opinions of their experts should be preferred to those of the plaintiffs' witnesses on matters directly relevant to the merits of the common issues.

[19] The relevance that defendants' counsel attempted to attribute to the merits of the action could, I believe, only be justified if their comprehensive challenge to the admissibility of the evidence of the plaintiffs' experts was accepted.

[20] They were entitled to ask the court to disregard the evidence of plaintiffs' experts on the ground that it was inadmissible and to decide the motion on the basis of the evidence of their experts which would then be uncontradicted. However, in my judgment, there was ample admissible evidence filed by the plaintiffs to satisfy the tests stated in *Taub* and, in effect, repeated in *Hollick* and other more recent cases. My provisional decision that the requirements for certification were satisfied was made on that basis.

[21] I should add that I am not suggesting that findings of fact will never have to be made on motions for certification, or that the court will never be compelled to choose between the conflicting opinions of experts. There may be situations where such findings, or choices, will have to be made in determining the relative significance of the proposed common issues and the individual issues that would remain after the common issues have been tried. In this case, for example, I found it necessary to assess the degree of difficulty and complexity that would be involved in determining the individual issues of causation if the plaintiffs were successful at a trial of the common issues. The question was addressed in the affidavits of the plaintiffs' witnesses, Dr Wilson and Dr Healy, as well as by witnesses whose affidavits were filed on behalf of the defendants. I found the former to be the more persuasive.

***RULINGS REQUESTED***

1. The evidence of Dr Gregory Wilson

[22] In his affidavit sworn on February 7, 2002, Dr Wilson described the purpose and use of prosthetic heart valves, the importance of providing a secure attachment to the surrounding heart tissues, the means by which this is attempted, the stages that normally occur in the healing process, and complications that may occur if the process is not effective.

[23] He described abnormalities he had observed in a study, and pathology analysis, of explanted heart valves and he provided his opinion that "the silver coating on the particular Silzone valves which I have examined is unstable, is not tightly adherent to the sewing ring, and likely plays a significant role in the frustration of the normal healing process".

[24] The remaining paragraphs of the affidavit are concerned with his detailed observations relating to the explanted heart valves of the plaintiffs and of three other individuals, an analysis of relevant literature and reports and a consideration of the further complications that may occur as a consequence of inadequate healing. Finally, he expressed an opinion that, because of the possibility of such complications, it is essential to monitor recipients of Silzone valves more frequently than it is usually the case for the recipients of conventional heart valves.

[25] In a second affidavit sworn on June 3, 2002, Dr Wilson addressed matters that, he said, would have been dealt with if there had been an opportunity for re-examination after the conclusion of the cross-examination on his earlier affidavit. He also responded, and commented on, statements made by the defendants' witnesses in affidavits, and in cross-examination, since the date of his original affidavit.

[26] In this affidavit, Dr Wilson referred to factors that might impair, or delay, the healing process and he expanded on the basis for the opinions in his earlier affidavit.

[27] The defendants asked me to strike these affidavits of Dr Wilson in their entirety on the ground that he is not qualified to give opinions on the normal process of healing, or on whether increased monitoring of patients who have received Silzone heart valves is required and that, in any event, they are relevant.to the merits of the plaintiffs' claims.

[28] I rejected the submissions on the ground that Dr Wilson's qualifications and experience in professional practice, and his research, as an anatomic pathologist made him eminently qualified

to provide the opinions in his affidavit. Throughout a long career, his primary emphasis has been placed on the cardiovascular system and, in particular, on the heart, heart valves - including prosthetic heart valve replacements - and blood vessels - including prosthetic vessel replacements. He holds senior positions at The Hospital for Sick Children in Toronto and the University of Toronto, he has numerous publications and has received international recognition for his work on the effect on tissue healing of bio-material implants - including the healing of prosthetic heart valve sewing rings.

[29] For the reasons already given, the fact that Dr Wilson's evidence is directly relevant to the merits of the action is not, in itself, sufficient to make it inadmissible. Whether or not his opinions are ultimately accepted at a trial of common issues, the fact that he holds them provides an evidential basis for the proposed common issues relating to tissue healing, the risk of further complications and the desirability that patients should receive increased monitoring.

[30] Two other affidavits of Dr Wilson were sworn on February 24 and April 15, 2003. In the amended notice of motion, the defendants seek orders striking numerous - though not all of the - paragraphs in these affidavits. As I have indicated, no submissions were made with respect to these additional objections. However, the amended notice of motion indicates that the grounds on which the defendants rely are the same as those on which their challenge to the admissibility of the earlier affidavits was based.

[31] Each of these additional affidavits responded to others sworn on behalf of the defendants. While they repeated and expanded to some extent on the observations and opinions contained in the earlier affidavits, they also addressed, at some length, questions of causation - including the toxic effects of silver on the healing process. Given that, for the reasons he provided in this, and the earlier affidavit, Silzone valves are, in his opinion, harmful to all patients, Dr Wilson strongly affirmed the relative lack of medical complexity that would be involved in deciding the question of causation for each patient with a high degree of probability.

[32] For the same reasons as I have set out above, I find that Dr Wilson was qualified to give these opinions and that they have relevance to the issues – including the question of preferability - in the motion to certify. The manner in which the common issues should be resolved was not in issue on the motion and, to that extent, the question whether Dr Wilson's opinions on their merits are correct was irrelevant. As I have noted more than once, that is not, by itself, sufficient to make the evidence inadmissible.

[33] Nor do I think that the evidence of Dr Wilson can properly be considered to lack a reliable scientific foundation. The issues with respect to the effects of Silzone implants are of relatively recent origin and reference cannot be made to an accumulation of published research and scientific opinion whose results have received general acceptance, or respect. In determining whether the opinions are sufficiently reliable in these circumstances, I do not believe that the court can properly demand more than that the opinions are those of a qualified expert who has given a serious and reasoned consideration – and applied analytic skills - to the available factual evidence and the pre-existing body of medical and scientific knowledge that may bear on the correctness of his opinions. I do not believe Dr Wilson's opinions can properly be criticized as falling short of this standard.

[34] If any legitimate criticism can be directed at these affidavits, it would not be on the basis of Dr Wilson's qualifications, the scope of his expertise or the reliability or relevance of his opinions but, rather, it might be directed at the necessity for the record to contain such lengthy, learned and elaborate debates between the experts with respect to the merits of their differing views of how the proposed common issues should be resolved. Dr Wilson's participation in these debates was, to a very large extent, in response to defendants' experts' criticisms of, and disagreement with, the views he expressed in the earlier affidavits. In view of the approach taken by defendants' counsel at the hearing of the motion to certify, any criticism of the decision of plaintiffs' counsel to allow him to respond to these opinions must, I think, be muted. It is a criticism that can be levelled equally at the evidence filed on behalf of the defendants.

2. The evidence of Dr Frank Tyers

[35] The defendants objected to the admissibility of more than 130 paragraphs in three affidavits sworn by Dr Tyers on the ground that he does not have the necessary expertise to provide certain opinions, that he is not independent and that his opinions lack a reliable scientific foundation. In the submission of defendants' counsel, his theories and opinions - like those of Dr Wilson - are exactly the type of "junk science" to which Binnie J. referred in *R. v. J – L.J*, [2000] 2 S.C.R. 600, at page 615.

[36] For the reasons already provided, I believe the epithet "junk science" cannot justifiably be directed at the evidence of Dr Wilson, and I indicated in the endorsement after the preliminary motion that, in my judgment, it was inapplicable also to the evidence of Dr Tyers.

[37] Dr Tyers is a cardiac surgeon and Professor Emeritus at the University of British Columbia Medical School. He has had almost 40 years of clinical experience with mechanical heart valves, including the removal of defective valves. He has limited his operating procedures since 1996 after undergoing a medical operation but, before then, he would perform approximately 100 open-heart surgeries each year with 30 to 50 of these involving heart valves. He continues to be Division Chair for Cardiac Surgery at Vancouver General Hospital. He has had extensive experience with toxic materials implanted in the heart and other parts of the human body and has published papers relating to the effects of toxic substances in the human organism. He has not implanted or removed Silzone valves but has been involved in clinical studies involving proposed new heart valves and the treatment of numerous patients implanted with defective heart valves and he has published 37 peer-reviewed papers on prosthetic heart valves and valve-replacement surgery.

[38] In his initial affidavit of February 22, 2002, Dr Tyers' opinion evidence related to the toxicity of Silzone, the questions of causation that are included in the proposed common issues, the adequacy of pre-release testing, the timeliness of the defendants recall of the devices, the adequacy of the information provided to physicians and patients then, and subsequently, and the need for special monitoring procedures to be implemented. To this extent, the evidence was relevant to the issues in the motion to certify and the objections to Dr Tyers' qualifications to give such evidence were not convincing.

[39] As well as his reliance on his many years of experience, and his expertise in dealing with problems relating to prosthetic implants, Dr Tyers had reviewed pathology reports of patients

who had received silver implants, published literature with respect to the toxicity of silver and the contents of the files he had maintained over the years with respect to heart valve problems - including, since 1999, those associated with Silzone valves. Each of the above matters addressed in his affidavit fell sufficiently within the range of the expertise that he had acquired through his professional practice and research. It is, I believe, a mistake to say that because his only speciality was not toxicology, or epidemiology, he was not qualified to provide opinions on the toxic effects of silver, or on the other issues of causation. He stated in cross-examination that training in epidemiology is part of the surgical training acquired, not just at medical school, but, throughout his long experience in the practice of cardiac surgery.

[40] One speciality can sufficiently encompass another and, in my opinion, the nature and extent of his professional experience as a cardiac surgeon treating patients who had received mechanical heart valves and other implants and, in that connection, as a professional who had always to consider and assess the risks and causes of complications - including problems, and the consequences, of toxicity - was enough to justify the admission of his opinions on these matters. To the extent that he went further and opined on the motives, or bona fides of the defendants, his opinions were, in my opinion, inadmissible. The last sentences of paragraphs 26 and 58 fall into this category as well as the first nine words of paragraph 60 to which I referred in my earlier endorsement..

[41] Mr McKee's challenge to Dr Tyers' independence on the ground that he is a "self-described patient advocate" who views his expert work in class actions such as this as part of his advocacy work" was no more justified than his references to "junk science" "Patient advocacy" was described by Dr Tyers as an obligation of physicians, and the administrators of the systems in which physicians work, to assure that the benefits to be attained from surgery are greater than the risk of harm to the patient. He stated that he had only been involved in one class action in the last five years to any extent, although he had previously been a consultant to counsel for the plaintiffs in several such actions. When pressed in cross-examination, he agreed that such retainers were part of patient advocacy as he had defined the term as he considered that it was part of quality appraisal and improvement to rectify mistakes that had been made. I do not regard these answers - or the confidence with which he expressed his opinions - to cast any significant doubt on his independence and objectivity.

[42] Dr Tyers' views on the pre-market testing conducted by St Jude were limited to the duration of the testing, the use of implants in sheep - a practice that, he stated, was no longer accepted as reliable - and the failure to seek evidence from autopsies. Apart from the factual assertion with respect to the existence of a "widespread understanding by the mid-1990s" that testing in sheep would not provide clinically-relevant information with regard to thromboembolism or healing, Dr Tyers' opinion that, in these respects, the pre-market-testing was inadequate was based on his knowledge and experience gained over many years of the complications that may be associated with prosthetic heart valves, when those complications may appear and how they can most comprehensively be examined and identified.

[43] On balance, I decided that he was qualified to express his limited opinions with respect to the inadequacy of the testing on the basis of its duration and the failure to seek autopsy evidence.

[44] Given my acceptance that a sufficient evidentiary basis had been provided for the issues relating to harm and causation, very little, if any, evidence was required for that concerning pre-market-testing. Even without the opinion evidence of Dr Tyers, and that of Dr Arboledo-Florez that remains to be considered, there was, in my opinion, a sufficient evidential base in the factual evidence of Brenda Hollingsworth to which no objection was taken.

[45] Dr Tyers' two other affidavits were sworn after the hearing of the preliminary motion and, like the later affidavits of Dr Wilson, they consisted of responses to the opinions of experts whose affidavits were filed on behalf of the defendants. The defendants' objections to numerous paragraphs of these affidavits were made on the same grounds as those levelled at Dr Tyers' affidavit of February 22, 2002 and, in my judgment, they have no more validity. I make the same comments about the necessity to inflate the record with the extensive debates between the experts as I made in connection with Dr Wilson's affidavits.

3. Evidence of Dr Julio Arboleda-Florez

[46] The opinion evidence that gave me most concern was that contained in the affidavit of Dr Julio Arboleda-Florez, sworn January 10, 2000. In my endorsement of October 29, 2002, I held that certain paragraphs, and parts of other paragraphs, containing opinions about the motives and intentions of the defendants were inadmissible. The other paragraphs that the defendants sought to strike contain the witness's opinions: that it would have been more prudent for the defendants to conduct tests with respect to the toxicity and anti-microbial effectiveness of the Silzone coating; that the use of Silzone was still in the experimental phase when the valves were released into the market; that the Food and Drug Administration in the United States would probably have recalled the Silzone valves if the defendants had not done so; that secretiveness surrounded St Jude's handling of the results of the AVERT study; that some of the testing might have been too short in duration; that patients, as consumers, have a right to full and unequivocal information relating to the difficulties with the valves; and that the provision of this information should be considered to be good therapeutic practice.

[47] Dr Arboleda-Florez is a qualified psychiatrist and has a Ph.D. in epidemiology. He has held senior positions at universities and hospitals and is, at present, the head of the department of psychiatry at Queen's University, and Chief of Psychiatry at Queen's Affiliated Hospitals in Kingston, Ontario. He is also the President of the International Academy of Law and Mental Health, Secretary General of the International Council of he Prison Medical Services and Chair of the Forensic Section of the World Psychiatric Association. His impressive qualifications do not have any specific connection to toxicology, cardiovascular medicine or cardiac surgery. Nor has he had any experience in dealing with prosthetic implant or applicable regulatory regimes. The plaintiffs have tendered his opinions as expert evidence based on his extensive involvement in matters of bioethics review and the verification of both the scientific and ethical quality of research that has been conducted, or is proposed. In providing his opinions on the adequacy of the pre-market-testing conducted by the defendants, he relied on a limited number of published

articles relating to the toxic and antimicrobial properties of silver, and of Silzone implants, and on the affidavits of two of the defendant's experts.

[48] His evidence was not relied on specifically at the certification hearing and - with the exception of his opinions on the desirability of providing information to patients - I did not find it to be helpful. Notwithstanding his general experience with ethical issues relating to medical and scientific research, in view of his lack of knowledge and expertise in matters relating to the regulation and use - and the potential problems associated with the implantation of - prosthetic heart valves and the limited knowledge and material on which his opinions relating to the adequacy of the defendants pre-market testing were based, I do not believe they should be considered to be sufficiently reliable to pass the test for admissibility.

[49] I will grant the orders requested with respect to the paragraphs of Dr Arboleda-Florez' affidavit referred to in paragraph (h) of the defendants' amended notice of motion.

4. Evidence of Dr Kevin E. Healy

[50] The largely redundant battle of the experts continued on February 20, 2003 when Dr Healy swore an affidavit dealing, for the main part, with the toxic effects of silver, the likelihood that it would impair healing in patients with Silzone heart valves, the difficulties of determining the individual questions of causation and the need for the monitoring of such patients in the future.

[51] To this, the defendants responded with an affidavit of Dr Joseph V. Rodricks who took issue with the opinions of Dr Healy. In turn, Dr Healy responded with a further affidavit of April 14, 2003.

[52] The defendants' challenge to the relevance of Dr Healy's evidence is, in my view, misconceived for essentially the same reasons as I have given earlier in this endorsement. His evidence, and the responses of Dr Rodricks, demonstrate again that the proposed common issues advanced by the plaintiffs are live ones. The evidence is, in consequence, relevant to the issues raised in the motion for certification and it is unnecessary to go further. It would be even more inappropriate on such a motion to choose between the opinions of the well-qualified experts than it would be on a motion for summary judgment.

Cullity J.

**DATE:** October 9, 2003

# Exhibit 4

ORIGINAL ARTICLES

# Pathologic Analysis of 19 Heart Valves With Silver-Coated Sewing Rings

**Jagdish Butany, M.B.B.S., M.S., F.R.C.P.(C),* Richard L. Leask, Ph.D.,* Nimesh D. Desai, M.D.,† Anusha Jegatheeswaran M.D.,† Candice Silversides M.D., F.R.C.P.(C),‡ Hugh E. Scully, M.D., F.R.C.S.(C),† Christopher Feindel †, M.D., F.R.C.S.(C)†**

*Departments of *Pathology, †Cardiovascular Surgery, University of Toronto, and ‡Department of Cardiology University Health Network/Toronto General Hospital Toronto, Ontario, Canada*

ABSTRACT ***Objective:*** **The St. Jude Medical Silzone® (Silzone®) mechanical heart valve was voluntarily recalled (January 2000) due to an unusually high incidence of paravalvular leaks. We present the first series of human morphological data on the failure of these valves.**
***Methods:*** **Nineteen Silzone® valves were evaluated from the 176 Silzone® valves implanted in 147 patients at our institution between 1997 and 1999. Explanted prostheses were fixed in 10% formalin, photographed, and X-rayed. Histological sections were collected from the sewing cuff, accompanying tissues, and thrombus. For comparison, six age-matched SJM-standard valves were similarly analyzed.**
***Results:*** **Nineteen Silzone® valves from 16 patients (10 male, six female, 52.0 ± 15.2 years) were examined. Significantly more mitral (15/95) prostheses were removed than aortic (4/81) despite the nearly equal number implanted ($p = 0.027$). Fifteen of the Silzone® valves (13/16 patients) were explanted in the early postoperative period (within six months of implantation), although collection continued for eight years after our institution stopped implanting them. The common indications for surgical explantation were paravalvular leak (8/12) and clinically suspected infective endocarditis (IE) (four patients, five valves). IE was not confirmed by histology or culture in any valve. The sewing cuffs of many Silzone® valves showed large regions of pannus, granulation tissue, and purulent exudate. Polymorphonuclear leukocytes were more common in the sewing cuff of Silzone® valves; however, the cellular infiltrate was superficial when compared to SJM-standard valves.**
***Conclusion:*** **This is the largest morphologically analyzed series of Silzone® explants. It demonstrates a consistent pattern of atypical tissue incorporation into the silver-coated sewing ring particularly in the mitral position. Clinical and morphologic features of IE (sterile) are seen in the early postimplant period. Prosthesis-related problems were almost wholly seen at the mitral site, in our group. Our current data indicate that although early failure due to dehiscence and paravalvular leak is a problem, Silzone® valves that "survive" past six months will likely function as well as the SJM-standard prosthesis.** doi: 10.1111/j.1540-8191.2006.00323.x *(J Card Surg 2006;21:530-538)*

Prosthetic valve endocarditis (PVE) remains a rare but devastating complication of heart valve surgery. The reported incidence of PVE remains more or less constant at between 0.5 and 1% per patient year.[1] However, the incidence is considerably higher (15–25%) for valves implanted for bacterial endocarditis.[2,3] Because of these complications, patients who undergo surgery for PVE have a significantly worse 10-year outcome than patients surgically treated for native valve endocarditis.[4,5] PVE infections are largely infections confined to the foreign material and are most often related to the sewing cuff (especially with mechanical heart valve prostheses) that may result in sepsis, embolization, paravalvular leaks, and valvular dysfunction.

The silver coating (Silzone®) of the sewing cuff of the mechanical heart valve prostheses was designed in an effort to reduce the incidence of PVE and its sequelae, by St. Jude Medical Inc. (Minneapolis, MN, USA). A layer of elemental silver was deposited on the fabric of the sewing cuff by an ion beam–assisted process in the effort to prevent bacterial colonization. Silver ions have well-documented antimicrobial properties against gram negative, gram positive, and fungal organisms.[6,7] *In vitro* adherence studies have indicated Silzone® coating to be a biocompatible method of decreasing attachment of microorganisms.[8] However, a pilot study using confocal-scanning laser microscopy demonstrated *in vitro* bacteria in the biofilm milieu adherent to

Address for correspondence: Jagdish Butany, M.B.B.S., M.S., F.R.C.P.C., Department of Pathology, E4–322 Toronto General Hospital, 200 Elizabeth Street, Toronto, Ontario M5J 2C4, Canada. Fax: (416) 586-9901; e-mail: jagdish.butany@uhn.on.ca

Silzone®-treated fabric.[9] This observation may, in part, explain the varying results of *in vivo* experimental models[10] and early case reports.[11-15]

The Artificial Valve Endocarditis Reduction Trial (AVERT) study was designed to study the outcome of the Silzone® valve in comparison with the conventional St. Jude Medical Inc. valve (SJM-standard) in a prospective randomized multicenter clinical trial.[16] Before the completion of the trial, St. Jude Medical voluntarily initiated withdrawal of the Silzone® prosthetic valve and the Silzone® annuloplasty ring from the market, based on a higher explant rate due to paravalvular leak for mechanical heart valves with Silzone® coating. At the time of withdrawal, a seemingly high rate of early postoperative (<six months, 5% significant, 13% minor) paravalvular leaks and no reduction of active bacterial endocarditis were found in the Silzone® valves.[17]

Prior to the removal of the Silzone® valve from the market, we had noted an unusually high number of early valve failures with the Silzone® valve.[18] In comparison, no early valve explants of the St. Jude Medical Standard bileaflet valve had occurred at our institution in the two years immediately prior to removal of the Silzone® valve from the worldwide market. In this paper, we describe our institutional experience with Silzone® valves examined pathologically after surgical explantation for prosthesis failure or at autopsy. Infective endocarditis occurs with most prosthetic valves, and its incidence continues through the lifetime of the device.[19–21] It is likely that the infection starts on thrombi deposited on the device (or in the fabric of the sewing cuff and perivalvular region) and that the thrombus, infected or otherwise, can lead to embolism.[19-24]

## MATERIALS AND METHODS

Nineteen SJM-S®, bileaflet mechanical heart valve prostheses were seen by one of the authors (JB),during the period 1997 to 2005. In all of these cases, valve implantation and explantation operations had occurred between 1997 and 1999 at the Toronto General Hospital, University Health Network, Toronto, Canada. During this period, 147 patients had 176 Silzone® valves implanted. Six patients had preoperative infective endocarditis and a total of 11 patients had a history of infective endocarditis. Clinical prosthesis failure was defined as: clinical evidence of endocarditis, thrombosis, mechanical dysfunction, or paravalvular leak/suture dehiscence leading to either surgical explantation or death. All clinical data were derived from a prospectively kept database and a review of patient charts. More than one clinical indication for explantation was possible.

Pathologic analysis followed a standardized protocol. When possible, tissue was taken for microbial cultures from the prostheses or swabbed from annular abscesses if present. Explanted prosthesis were fixed in 10% neutral buffered formalin and photographed on the flow and nonflow surfaces, with particular attention to the presence of any abnormalities. All specimens were examined radiologically after explantation. After gross examination of the valve and any accompanying tissue, sections of the sewing cuff, adherent tissues, and thrombus were removed and processed for histological examination. Sections were stained with hematoxylin and eosin, periodic acid Schiff stain (PAS), Gram's stain for bacteria, and Gomori methenamine silver stain for fungi.

**TABLE 1**
**Grading Scheme for Host Tissue Overgrowth**

| Grade | Description |
|---|---|
| 0 | None—no gross evidence of pannus on the sewing cuff |
| 1 | Mild—pannus present as a thin film/sheet, on the outer half of the sewing cuff only |
| 2 | Moderate—pannus present extending to valve ring/housing |
| 3 | Severe—pannus present and overhanging the valve orifice |

Host tissue overgrowth (pannus) is increasingly being recognized as a cause of prosthesis failure and exuberant pannus is often associated with paravalvular leaks. The degree of pannus on each valve was graded for each valve using a scale modified from a previous report.[19] Table 1 describes the tissue overgrowth grading scheme.

Review of our records of available SJM-standard valves explanted between 1995 and 2001 showed only six explanted valves that had been *in situ* for two weeks to 1.5 years. The sewing cuffs from these six SJM-standard valves were similarly processed to compare pannus and incorporation of host tissue into the sewing cuff with the Silzone® valves. Tissue incorporation into the sewing cuff (characterized by the presence of fibroblasts and collagen in the fabric interstices) was graded by the depth of involvement of the fabric, that is, the number of layers of synthetic thread "infiltrated" by host cellular reaction.

All data are presented as the mean ± standard deviation. For graded data (pannus and host tissue incorporation to sewing cuff), nonparametric testing was employed to determine statistical significance (Mann-Whitney test). Fisher's exact test was employed to evaluate the significance of valve site explants. A p-value of less than 0.05 was taken as statistically significant.

## RESULTS

Nineteen Silzone® valves were examined pathologically from a total of 16 patients (10 male, six female) with an average patient age of 52.0 ± 15.2 years. Fifteen valves were removed from the mitral position and four from the aortic position (Table 2). Significantly more mitral valve (MV) prostheses were collected than those from the aortic valve (AV) sites, considering the nearly equal number implanted at our institution (95 MV, 81 AV, $p = 0.027$). Twelve valves were surgically explanted and seven valves were obtained at autopsy. The mean time between implantation and surgical explantation/patient death was 22.5 ± 32.9 weeks.

In one case, once the adherent thrombotic mass was excised at surgery,from the sewing cuff, the mechanical components of the valve functioned normally and

**TABLE 2**
**Patient Information**

| Valve number | Patient number | Age/Sex | Location | Valve Age, Weeks |
|---|---|---|---|---|
| 1 | 1 | 28.1/F | Mitral | 0.43 |
| 2 | 2 | 41/M | Aortic | 15.53 |
| 3 | 3 | 49/F | Mitral | 0.00 |
| 4 | 4 | 63/M | Mitral | 0.00 |
| 5 | 5 | 54/M | Mitral | 14.10 |
| 6 | 6 | 68/M | Mitral | 15.96 |
| 7 | 7 | 21/M | Mitral | 6.41 |
| 8 | 7 | 21/M | Aortic | 6.41 |
| 9 | 8 | 73/F | Mitral | 16.24 |
| 10 | 8 | 73/F | Aortic | 1.00 |
| 11 | 9 | 44/F | Mitral | 15.96 |
| 12 | 10 | 63/M | Mitral | 12.54 |
| 13 | 11 | 61/M | Mitral | 41.03 |
| 14 | 12 | 39/F | Mitral | 13.39 |
| 15 | 13 | 68/M | Mitral | 14.53 |
| 16 | 14 | 49/M | Mitral | 77.36 |
| 17 | 15 | 20/F | Mitral | 10.68 |
| 18 | 16 | 59/M | Mitral | 127.93 |
| 19 | 16 | 59/M | Aortic | 127.93 |

M = male; F = female.

the surgeon decided to leave the valve in place. In another patient, the valve was resutured and left in place six days postimplant due to a PVL. This valve functioned for 14 weeks before being removed at the time of death (Valve 5). One patient died during surgery (Patient 4) and a second within 24 hrs of the procedure (Patient 3). Overall, the mean time between implantation and death, of the six autopsy cases was 26.3 ± 50.3 weeks. Double valve replacement had been performed on three patients, one of whom (Patient 8) had undergone three surgical procedures, receiving a total of 3 Silzone® valves (Silzone ®: MV, MV+AV, and Carbomedics: MV+AV). Only the mitral valve from the first surgery and aortic valve from the second procedure were available for pathology. One patient (#13) who underwent mitral valve replacement at another institution (not part of presented data) also had replacement with a second Silzone® valve at our institution that was subsequently surgically explanted and is part of the presented data.

Tables 2 and 3 summarize patient demographics and clinical/pathologic findings, respectively. The most common indication for surgical explantation was a paravalvular leak (8/12). One aortic valve was explanted concomitantly during excision of a mitral site protheses that was presumed to be infected. Four patients (five valves) were suspected of having infective endocarditis clinically and on echocardiography prior to valve removal. Significant thrombus was clinically noted in two patients. Four patients experienced

**TABLE 3**
**Clinical and Pathological Findings**

| Valve number | Patient number | Clinical Reason | Pathologic Finding | Pannus |
|---|---|---|---|---|
| 1 | 1 | Death: coagulopathy/MOF | MI/concomitant | 1 |
| 2 | 2 | Death: | Concomitant | 1 |
| 3 | 3 | Death | Concomitant | 0 |
| 4 | 4 | Death: coagulopathy | Concomitant | 0 |
| 5 | 5 | Death: stroke | PVL/thrombus | 2 |
| 6 | 6 | TIA, PVL | Thrombosis/pannus | 3 |
| 7 | 7 | IE/PVL | Pannus | 2 |
| 8 | 7 | IE | Pannus | 1 |
| 9 | 8 | IE/PVL | Pannus | 1 |
| 10 | 8 | CC | Concomitant surgery | 1 |
| 11 | 9 | PVL | Pannus | 2 |
| 12 | 10 | IE/PVL | Significant pannus/thrombus | 2 |
| 13 | 11 | PVL/CHF | Significant pannus/thrombus | 3 |
| 14 | 12 | IE/TIA/Thrombosis | Significant thrombus/pannus | 3 |
| 15 | 13 | PVL | Significant pannus/thrombus | 2 |
| 16 | 14 | PVL/Stroke | Significant pannus/thrombus | 3 |
| 17 | 15 | Thrombosis | Thrombosis | — |
| 18 | 16 | Death | Pannus/thrombus | 2 |
| 19 | 16 | Death | Pannus/thrombus | 2 |

MOF = multiorgan failure; MI = myocardial infarct; TIA = transient ischemic attack; PVL = paravalvular leak; IE = infective endocarditis; CHF = congestive heart failure.




**Figure 1.** *A) Two chamber view TEE of a dehisced mitral valve (Patient 11, Valve 13). Arrow indicates the area where dehiscence (echo dropout) has caused the valve to "rock" and separate from the posterio-lateral wall. B) The same TEE view with Doppler flow measurements demonstrating the paravalvular regurgitant jet (multi-coloured region) created by valve dehiscence. C-G) Surgically excised Silzone® mitral valve showing marked pannus on one-half of the flow surface (C) and only a mild degree of pannus on the nonflow surface (D). Dehiscence of the valve allowed the valve to be virtually "lifted out" at surgery and the pledgets remained intact (seen in all three views). E and F) A close up view of the profile (E) and flow (F) surfaces, demonstrating grade 3 pannus. Pannus on the lateral (or outer of tissue contacting) surface is consistent with a significant paravalvular leak. G) A close up view of the nonflow surface showing thrombus in the valve orifice in the lee of the overhanging pannus. LA = left atrium, LV = left ventricle*

embolic events between the time of prosthesis implantation and the time of explantation or death.

Morphological features consistent with valve dehiscence and a clinical diagnosis of paravalvular leak (PVL) were noted in six prostheses on gross pathological analysis (Fig. 1-3). In most of these cases, there were intact pledgetted sutures still seen in the prosthesis sewing ring with a thick rim of pannus lining part of the sewing cuff (Fig. 1A). Fourteen of the 18 valves available showed some degree of pannus (Table 3). Several of the early valves showed bare areas of the sewing ring with little or no evidence of pannus. Four valves showed significant pannus (grade 3) that overhung the valve orifice (Fig. 1B). This pannus did not appear to cause mechanical dysfunction but was associated with thrombus in one valve and partial dehiscence in a second prosthesis (Fig. 3). Pathologically we considered any thrombus to be significant and this was grossly identified in 10 valves. The mechanical components of the prosthesis functioned normally in every one of the explanted valves.

According to histological analysis, infective endocarditis could not be confirmed in any valve. The adherent tissue (pannus) consisted of fibroblasts and a matrix with mild chronic inflammatory infiltrates but no evidence of gram-positive microorganisms, gram-negative microorganisms, or fungi.

The presence of tissue ingrowth or incorporation into the fabric sewing cuff from six Silzone® and five SJM-standard valves was analyzed in detail. The sewing cuffs of 3/6 Silzone® valves showed large regions of granulation tissue and purulent exudates (Fig. 2). Polymorphonuclear leukocytes, macrophages, and foreign body giant cells present in all the mitral site Silzone®




**Figure 2.** *Sewing cuff cellular ingrowth. A,C,E – St. Jude Standard valve removed four weeks postoperatively. Minimal tissue overgrowth is seen on the sewing ring, however, some tissue incorporation was evident upon microscopic analysis. E) An enlarged view of the box in C. Fibroblasts were evident at up to 10-15 fibers (*)deep in the sewing cuff (arrows) with giant cells apparent near the fabric (arrowheads). B,D,F – St. Jude Silzone® valve removed 13 weeks postoperatively. Pannus overhung the valve orifice on both surfaces (grade 3). F) An enlarged view of the boxed region in D, which is a histologic section of the sewing cuff with overlying pannus. Purulent exudates were microscopically evident with large numbers of polymorphonuclear leukocytes (arrowheads) and macrophages (open arrows) near the sewing cuff fabric. Very few fibroblasts were seen in the sewing cuff region. (Stains: H&E, original magnifications: C,D – 1.6x, E,F – 40x).*

valves but not in the aortic site Silzone® valves. In none of these cases was any granular debris found in macrophages, giant cells, or between the sewing cuff threads. In comparison, polymorphonuclear leukocytes were far less common in the SJM-standard valves. Furthermore, the SJM-standard valves demonstrated a significantly lower grade of pannus ($p = 0.026$) and generally had deeper penetration of cells into the sewing cuff; however, this was not statistically significant ($p = 0.0649$). Table 4 summarizes the cellular infiltrate and pannus levels.

## COMMENT

### Key observations

The significant findings in this study were that 15 of the 19 mechanical SJM-Silzone® valves (13/16 patients) were explanted in the first six months postoperative. Only one valve was surgically excised at more than one year postimplantation. No further valves were explanted at up to eight years after the cessation of use of the Silzone® valve. Significantly, more mitral site valves were collected than aortic, and all aortic valves were explanted as a concomitant procedure when the mitral valve was replaced or the patient had died. A clinical diagnosis of paravalvular leak was noted in eight cases. All valves *in situ* one week or more had some degree of pannus, of which the pannus was significant in four cases and associated with thrombus in all four of these valves.

The early failure rate of the Silzone® valves was significantly higher than other (SJM standard and Carbomedics) mechanical heart valve prostheses collected over a similar time period (personal experience).[18] In




**Figure 3.** *A) Two chamber view TEE of a dehisced mitral valve (Patient 6, Valve 6) with significant thrombus (white arrows). The black arrow indicates the area of dehiscence. B) The same TEE view with Doppler flow measurements demonstrating the paravalvular regurgitant jet (multi-coloured region) created by valve dehiscence. C) The flow surface of the valve showed adherent thrombotic masses overhanging the valve orifice (arrows). D) Pannus and thrombus (arrow) were also evident on the nonflow surface.*

fact, in the two years prior to 1999, no early valve failures of any type were submitted to pathology. Surgical explants of Silzone® valves are now rare at our institution. These data suggest that although early failure due to dehiscence and paravalvular leak have been problematic, Silzone® valves that "survive" past six months and certainly those past 12 months will likely function as well as the SJM-standard prosthesis. Data from the AVERT Echocardiography study presented a two-year follow-up of the AVERT cohort and showed that there was no statistically significant difference in the prevalence or severity of PVR in the Silzone valve in comparison to a conventional prosthetic valve[25] in either the mitral or the aortic position.

**TABLE 4**
**Comparison Between Silzone® and SJM-Standard Valves**

| Valve Type (Valve Number) | Site | Implant Duration (Weeks) | Cellular Ingrowth (Number of Cuff Fibers) | Pannus Grade |
|---|---|---|---|---|
| Silzone (11) | Mitral | 16 | 0-5 | 2 |
| Silzone (9) | Mitral | 16 | 5-10 | 1 |
| Silzone (12) | Mitral | 13 | 0 | 2 |
| Silzone (14) | Mitral | 13 | 10-15 | 3 |
| Silzone (16) | Mitral | 77 | 5-10 | 3 |
| Silzone (8) | Aortic | 6 | 0-5 | 1 |
| SJM-standard | Mitral | 4 | 10-15 | 0 |
| SJM-standard | Mitral | 78 | 30-40 | 2 |
| SJM-standard | Aortic | 78 | 5-10 | 0 |
| SJM-standard | Aortic | 66 | 20-30 | 1 |
| SJM-standard | Mitral | 3 | 0-5 | 0 |
| SJM-standard | Mitral | 2 | 5-10 | 0 |

The results from our institution are in agreement with the AVERT trial data. In a midterm report, 13% of patients suffered mild paravalvular leaks and 5% major paravalvular leaks.[17] According to St. Jude Medical Inc, the Data and Safety Monitoring Board (DSMB) recommended suspension of patient enrollment after 8 of 398 valves in the Silzone® arm of the AVERT study were explanted because of paravalvular leak as compared with 1 of 394 in the non-Silzone arm® (http://www.st-jude-heart-valve.com/pages/ST˙jude˙heart˙valve˙recall.html). In a follow-up study (two years) that included 807 patients from 19 centers in North America and Europe, the rate of major PVL and explantation were found to be significantly greater in Silzone® valve patients than in SJM-standard patients.[20] Unlike the longer-term AVERT data, our data suggest that the rate of PVL decreases markedly by six months postimplantation and does not remain constant.

Ionescu et al. suggest an increased risk of thromboembolic events in Silzone® patients. [21] Others have concluded that the overall thromboembolic and bleeding complication rate in patients who received a Silzone® valve is similar to those who received an SJM-standard valve.[22] The AVERT trial reported higher linearized rates of thromboembolic complications in Silzone® patients; however, there were no significant differences in the estimated freedom (Kaplan-Meier) from thromboembolism.[20] Thrombus formation on the valve was not uncommon in our series, especially in the lee of pannus overhanging the valve orifice (Fig. 3), lining paravalvular leaks, and at the junction of the pannus and hinge guard. Nine patients (10 valves) in our series exhibited marked thrombus, and four had documented embolic events.

A recent report from the Cardiff Embolic Risk Factor Study[26] reiterates that patients with a Silzone valve in the mitral position had a high rate of early postoperative embolism; however, there was no evidence of excess paravalvular leakage. This group suggested that this might be due in part to the fact that at operation, thrombus was seen without any firm attachment to the valve-sewing ring. Finally, in their study, most mitral prostheses were implanted using continuous sutures, suggesting that this technique in comparison to the traditional interrupted suture technique with pledgets may have decreased the rate of PVL because of initial firmer fixation against the annulus causing pressure necrosis. In comparison, a recent report from the AVERT trial[27] found that suture technique without pledgets was an independent risk factor for in-patients who had major PVL, and that the pledgets appeared to provide a protective effect, while the Silzone cuff only showed a strong trend as a risk factor to cause PVL.

The clinical presentation and echocardiographic appearance of most of the valves was similar to that of infective endocarditis with a paravalvular abscess. In all of our cases, no positive blood cultures were obtained nor did morphologic examination demonstrate microorganisms (on special stains at light microscopy). Instead, a repetitive pattern of atypical tissue incorporation was observed. Eight Silzone® valves, all from the mitral position, had partially dehisced from the native annulus. In these valves, there were many intact sutures with intact pledgets still in place, which appeared to have "pulled through" or "torn through" necrotic native annular region tissue (Figs. 1 and 3). Significant erosions were found in the native annulus at the time of surgery. No evidence of septic abscesses was found at pathology. Portions of these sewing rings failed to incorporate any native tissue. This lack of incorporation of host tissue into the sewing cuff fabric is one of the possible causes of the paravalvular leaks and thrombus formation observed at echocardiography. Even in cases of exuberant tissue overgrowth significant pannus whether there was such an allergic reaction.

Another possibility is that the paravalvular abscess seen is related to the toxic effect of elemental silver, on the myocardium. A report by Kraft et al. stated that silver implanted in striated muscle was shown to produce a persistent leukocytic response with disruption of the endothelial cells in the microvasculature.[28-30] This was associated with a severe leukocytic reaction and dilatation of small veins, possibly related to the production of intracellular oxidative enzymes. One way to confirm this would be to study the concentration of silver in the periannular/periprosthetic tissues. However, this was not available in our cases. Another way would be to study the effect of elemental silver-coated fabrics on myocyte cultures. Pannus incorporation into the sewing cuff fabric was often superficial (Fig. 2).

Silver allergy and inadequate tissue healing has been suggested as a cause of early PVL in Silzone® valves.[23] A notable difference between the SJM-S valve and the St. Jude Medical Standard (and Regent) model valves is the Silzone® coating of the sewing cuff fabric. This would suggest that the possible mechanisms of valve failure would involve this silver coating. Hypersensitivity or allergic reactions to silver or a toxic reaction to silver have been reported.[23] Silver allergy is fairly common and a recognized problem, especially in oral pathology.[28] More commonly, it is also seen in individuals who wear silver jewelry and in manufacturers of silver jewelry.[29] A silver allergy test was not performed on these patients, and it is, therefore, not possible to state whether there was such an allergic reaction.

Another possibility is that the paravalvular abscess seen is related to a toxic effect of elemental silver on the cardiac myocytes. A report by Kraft et al. stated that silver implanted in striated muscle was shown to produce a persistent leukocytic response, with disruption of the endothelial cells in the microvasculature.[3] This was associated with a severe leukocytic reaction and dilatation of small veins, possibly related to the production of intracellular oxidative enzymes. One way to confirm this would be to study the concentration of silver in the periannular/periprosthetic tissues. However, this was not available in our cases. Another way would be to study the effect of elemental silver-coated fabrics on myocyte cultures. Unfortunately, the Silzone®-coated fabric is no longer available.

Histologic findings typical of allergic reactions, including eosinophil and monocyte infiltration, were not observed in our series. It is, more likely therefore, that

the superficial tissue incorporation and acute inflammatory infiltrates are the results of a "toxic" reaction to silver. The lack of AV failures suggests a tissue response unique to the MV annulus. We speculate that poor silver tolerance of the myocardial cells may, in part, explain the increased incidence of PVL at the MV position in our study.

### Limitations

This study is a retrospective analysis of valves submitted for pathologic analysis from surgical explantation or from autopsy and may not reflect the total number of valve failures encountered at our institution. Furthermore, some of the pannus may have been lost during surgical extraction. Although there is no statistical significance between the implant time in the two groups analyzed for tissue incorporation and pannus level, there is an obvious and marked paucity of SJM-standard valves available between one month and one year postoperative.

## CONCLUSIONS

This series of 19 Silzone® valves examined from 16 patients is the first and largest morphologic analysis of explants. It demonstrates a consistent pattern of atypical tissue incorporation of the silver-coated sewing ring in the mitral position. This poor incorporation was associated with a clinical diagnosis of paravalvular leak and infective endocarditis, partial valvular dehiscence, thrombus formation on the sewing ring, and embolic events. Exuberant or atypical pannus overgrowth coincided with thrombus formation. We speculate that these features occurred because of a local silver toxicity to the myocardium. The mechanical components of all the prostheses functioned normally. Almost all explants occurred at less than one year postsurgery. There have been very few explants of Silzone®-coated valves, in the last six years. While close follow-up of patients with Silzone® implants is clearly necessary, we believe that prostheses that "survive" the first 12 months will most likely have an adverse event rate similar to the SJM-standard valve.

## REFERENCES

1. Vlessis AA, Khaki A, Grunkemeier GL, et al: Risk, diagnosis and management of prosthetic valve endocarditis: A review. J Heart Valve Dis 1997;6(5):443-465.
2. Renzulli A, Carozza A, Romano G, et al: Recurrent infective endocarditis: A multivariate analysis of 21 years of experience. Ann Thorac Surg 2001;72(1):39-43.
3. Guerra JM, Tornos MP, Permanyer-Miralda G, et al: Long term results of mechanical prostheses for treatment of active infective endocarditis. Heart 2001;86(1):63-68.
4. Grunenfelder J, Akins CW, Hilgenberg AD, et al: Long-term results and determinants of mortality after surgery for native and prosthetic valve endocarditis. J Heart Valve Dis 2001;10(6):694-702.
5. Mansur AJ, Dal Bo CM, Fukushima JT, et al: Relapses, recurrences, valve replacements, and mortality during the long-term follow-up after infective endocarditis. Am Heart J 2001;141(1):78-86.
6. Ricketts CR, Lowbury EJ, Lawrence JC, et al: Mechanism of prophylaxis by silver compounds against infection of burns. Br Med J 1970;1(707):444-446.
7. MacKeen PC, Person S, Warner SC, et al: Silver-coated nylon fiber as an antibacterial agent. Antimicrob Agents Chemother 1987;31(1):93-99.
8. Tweden KS, Cameron JD, Razzouk AJ, et al: Biocompatibility of silver-modified polyester for antimicrobial protection of prosthetic valves. J Heart Valve Dis 1997;6(5):553-561.
9. Cook G, Costerton JW, Darouiche RO: Direct confocal microscopy studies of the bacterial colonization in vitro of a silver-coated heart valve sewing cuff. Int J Antimicrob Agents 2000;13(3):169-173.
10. Darouiche RO, Meade R, Mansouri M, et al: In vivo efficacy of antimicrobial-coated fabric from prosthetic heart valve sewing rings. J Heart Valve Dis 1998;7(6):639-646.
11. Kjaergard HK, Tingleff J, Abildgaard U, et al: Recurrent endocarditis in silver-coated heart valve prosthesis. J Heart Valve Dis 1999;8(2):140-142.
12. Carrel T, Nguyen T, Kipfer B, et al: Definitive cure of recurrent prosthetic endocarditis using silver-coated St. Jude Medical heart valves: A preliminary case report. J Heart Valve Dis 1998;7(5):531-533.
13. Bertrand S, Houel R, Vermes E, et al: Preliminary experience with Silzone-coated St. Jude medical valves in acute infective endocarditis. J Heart Valve Dis 2000;9(1):131-134.
14. Illingworth BL, Tweden K, Schroeder RF, et al: In vivo efficacy of silver-coated (Silzone) infection-resistant polyester fabric against a biofilm-producing bacteria, Staphylococcus epidermidis. J Heart Valve Dis 1998;7(5):524-530.
15. Illingworth B, Bianco RW, Weisberg S: In vivo efficacy of silver-coated fabric against Staphylococcus epidermidis. J Heart Valve Dis 2000;9(1):135-141.
16. Schaff H, Carrel T, Steckelberg JM, et al: Artificial valve endocarditis reduction trial (AVERT): Protocol of a multicenter randomized trial. J Heart Valve Dis 1999;8(2):131-139.
17. Seipelt RG, Vazquez-Jimenez JF, Seipelt IM, et al: The St. Jude "Silzone" valve: Midterm results in treatment of active endocarditis. Ann Thorac Surg 2001;72(3):758-762.
18. Tozzi P, Al-Darweeh A, Vogt P, Stumpe F: Silver-coated prosthetic heart valve a double-bladed weapon. Eur J Cardiothorac Surg 2001;Nov. 10(6):712-5.
19. Butany J, Vanlerberghe K, Silver MD: Morphologic findings and causes of failure in 24 explanted Ionescu-Shiley low-profile pericardial heart valves. Hum Pathol 1992;23(11):1224-1233.
20. Schaff HV, Carrel TP, Jamieson WR, et al: Paravalvular leak and other events in silzone-coated mechanical heart valves: A report from AVERT. Ann Thorac Surg 2002;73(3):785-792.
21. Ionescu AA, Fraser AG, Butchart E: High incidence of embolism after St. Jude Silzone prosthetic valve implantation. Circulation 1999;100(18, Suppl I):I-524.
22. Horstkotte D, Bergemann R: Thrombogenicity of the St. Jude medical prosthesis with and without silzone-coated sewing cuffs. Ann Thorac Surg 2001;71(3):1065.
23. Tozzi P, Al-Darweesh A, Vogt P, et al: Silver-coated prosthetic heart valve: A double-bladed weapon. Eur J Cardiothorac Surg 2001;19:729-731.
24. Butany J, Scully HE, VanArsdell G, et al: Prosthetic heart valves with silver coated sewing cuff fabric: Early morphologic features in two patients. Can J Cardiol 2002;18:(7): 733-8.

25. Davila-Roman VG, Waggoner AD, Kennard ED, et al: Prevalence and severity of paravalvular regurgitation in the artificial valve endocarditis reduction trial (avert) echocardiography study. J Am Coll Cardiol 2004;44:1467-1472.
26. Ionescu A, Payne N, Fraser AG, et al: Incidence of embolism and paravalvular leak after St Jude Silzone valve implantation: Experience from the cardiff embolic risk factor study. Heart 2003;89:1055-1061.
27. Englberger L, Schaff HV, Jamieson WRE, et al: Importance of implant technique on risk of major oaravalvular leak (PVK) after St. Jude mechanical heart valve replacement: A report from the artificial valve endocarditis reduction trial (AVERT). Eur J Cardiothorac Surg. 2005;28(6):838-843.
28. Hollestrup P: Reaction of the oral mucosa related to silver amaldine: A review. J Oral Pathol Med 1991;20(10):1-7.
29. McKenna SR, Latinsa BA, Jones LL, et al: Serious sulpha diazine and methanide ascitate dermatitis. Burns 1995;21(4):310-312.
30. Krafte CH, Hansis M, Arens S, et al: Striated muscle microvascular response to silver implants: A comparative in-vivo study with titanium and stainless steel. J Biomed Matter Res 2000;49:192-199.

# Exhibit 5

LEXSEE 2007 U.S. APP. LEXIS 2470

**Synergetics, Inc., Appellee, v. Charles Richard Hurst, Jr.; Michael McGowan, Appellants.**

**No. 06-1146**

**UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT**

***2007 U.S. App. LEXIS 2470***

**October 18, 2006, Submitted**
**February 5, 2007, Filed**

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the Eastern District of Missouri. *Synergetics, Inc. v. Hurst, 2005 U.S. Dist. LEXIS 40358 (E.D. Mo., Dec. 9, 2005)*

**COUNSEL:** For Synergetics, INC., Plaintiff - Appellee: Matthew L. Cutler, Rudolph A. Telscher, Jr., Douglas R. Wilner, Kara R. Yancey, LEAD ATTORNEYS, HARNESS & DICKEY, St. Louis, MO.

For Charles Richard Hurst Jr., Michael McGowan, Defendants - Appellants: Patrick N. Mehan Sr., JONES & HAYWOOD, Clayton, MO; Gregory E. Upchurch, HUSCH & EPPENBERGER, St. Louis, MO.

**JUDGES:** Before MELLOY, BENTON, and SHEPHERD, Circuit Judges.

**OPINION BY:** SHEPHERD

**OPINION:** SHEPHERD, Circuit Judge.

Synergetics, Inc., a company that designs, manufactures, and sells ophthalmic equipment used in eye surgeries, sued former employees Appellants Charles Richard Hurst, Jr. and Michael McGowan for (1) trade secret misappropriation, (2) breach of contract, (3) intentional interference with business relationships, and (4) breach of fiduciary duty. A jury found for Synergetics and awarded compensatory and punitive damages. The district court n1 entered judgment consistent with the jury's findings, enjoined Hurst and McGowan from using or disclosing Synergetics' trade secrets for two years, required Hurst and McGowan to destroy the misappropriated [*2] information and products developed from that information, and denied the motion for remittitur and proposed judgment. On appeal, Hurst and McGowan argue that the district court should have granted their (1) motion in limine to exclude the testimony and reports of a Synergetics' expert witness, (2) motion for summary judgment or motion for judgment as a matter of law, and (3) proposed judgment and motion for remittitur. We affirm.

n1 The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to *28 U.S.C. § 636(c)*.

**I.**

Because the jury ruled in Synergetics' favor on all four claims, we provide the following recitation of facts in the light most favorable to the jury's verdict, giving all reasonable inferences to Synergetics. See *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, 434 F.3d 1081, 1084 (8th Cir.)*, cert. denied [*3] *, 126 S. Ct. 2363, 165 L. Ed. 2d 280 (2006)*.

Synergetics specializes in the sale of precision instruments and disposable laser probes used during vitreoretinal procedures, which are surgeries performed at the back of the eye typically involving the re-attachment of the retina. Synergetics was formed in 1992 by Gregg Scheller, who had previously worked as a mechanical and design engineer for other ophthalmic instrument manufacturers. Scheller hired Christopher Lumpkin to work as an engineer developing prototypes. Lumpkin later left Synergetics as an employee and moved to Colorado, but he maintained a consulting arrangement with Synergetics. Through this arrangement, Lumpkin continued to develop products for Synergetics on a part-time basis and continued to work at Synergetics' Missouri plant one week per month. Synergetics also employed Michael Auld as head of research and development.

In the vitreoretinal industry, there are four major laser manufacturers. Of the four, Iridex (also referred to in the record as Iris) employed a technology that prevented the use of competitors' laser probes on its lasers. Because of its high quality, the Iridex laser is the laser most widely used by hospitals [*4] and doctors. After almost four years of research and development, Synergetics began marketing an adapter/connector system that allowed the connection of Synergetics' laser probes to Iridex lasers as well as to other laser brands. Thus, Synergetics became the only company, other than Iridex, that provided laser probes that could be used on Iridex lasers. Auld was the direct inventor of this adapter/connector system.

In 2000, Synergetics hired Hurst and McGowan to fill high-level sales positions with the company. Hurst was responsible for management of personnel and accounts in the southern and western United States. McGowan handled personnel and accounts in the eastern United States. Through these positions, Hurst and McGowan had access to confidential sales, marketing, research, and development information, and they were members of Synergetics' Presidential Advisory Council, the company's most strategic committee. On February 5, 2001, Hurst and McGowan entered into separate, but identical, confidentiality agreements with Synergetics, in which each agreed that-while employed or after the termination of their employments--they would not "disclose or use in any manner whatsoever, any [*5] of the Confidential Information" acquired during their employment with Synergetics. The agreements further provide that Hurst and McGowan must return all company materials such as records, files, and photographic materials upon termination of their employment.

While still employed by Synergetics, Hurst and McGowan decided to form a competing company. In furtherance of this plan, they hired Lumpkin to build a competing adapter/connector system for the Iridex laser. By using spare parts from Synergetics, Lumpkin was able to do this in six hours. While maintaining their employment with Synergetics, Hurst and McGowan: (1) entered into a confidentiality agreement with Peregrine Surgical, Ltd., one of the manufacturers used by Synergetics, enabling Hurst and McGowan to enter into discussions with Peregrine Surgical concerning production of competitive items, (2) contacted Synergetics' customers to discuss the formation of the new company, and (3) constructed prototypes of products for testing and evaluation. Hurst and McGowan did not reveal these plans and actions to Synergetics, realizing that to do so would jeopardize their employment. Due to poor job performance, however, Hurst resigned [*6] his employment in July 2002, and McGowan was terminated in September 2002. Two weeks after McGowan's termination, Hurst and McGowan incorporated their new company, Innovatech Surgical, Inc., with McGowan serving as president and Hurst serving as secretary. Innovatech sought to market and sell ophthalmic medical equipment, including a directional ophthalmic laser probe in direct competition with Synergetics' best-selling laser probe.

Because Lumpkin did not possess the necessary skills to create the design drawings required for production of the adapter/connector system and other competitive products, he contacted Synergetics' employee, Auld, to obtain help in creating design drawings for Innovatech following Hurst and McGowan's termination from Synergetics. Auld did this, in large part, by copying Synergetics' drawings. Such copies included specific, detailed measurements and tolerances. Hurst and McGowan were aware that Auld was still employed by Synergetics and that Auld was assisting Lumpkin in creating these drawings. As a result of these actions, only Synergetics, Innovatech, and Iridex had the technology and products to attach disposable laser probes to the Iridex laser unit. [*7]

On February 11, 2004, Synergetics filed suit against Hurst and McGowan in Missouri state court. The case was removed to the United States District Court on the basis of diversity jurisdiction. In September 2005, a jury trial was held, and the jury returned a verdict in favor of plaintiffs. The jury found, by a preponderance of the evidence, that (1) Hurst and McGowan had misappropriated Synergetics' trade secrets concerning pricing of products, product selections, sales data, prioritization of products, and technical information regarding the tolerances and torque of the adapter/connector system, (2) Synergetics suffered harm as a direct result of the misappropriation of the trade secrets, (3) either Hurst or McGowan intentionally interfered with Synergetics' business relationships with twenty-three separate businesses from which Synergetics suffered damages, (4) Hurst and McGowan breached their confidentiality agreements with Synergetics, and (5) Hurst and McGowan breached a fiduciary duty of loyalty while employed by Synergetics. The jury determined that Synergetics suffered actual damages in the amount of $ 1,759,165. The jury further awarded punitive damages against Hurst and [*8] McGowan in the amount of $ 293,194.16 per defendant. Following denial of Appellants' motion for remittitur and proposed judgment, the district court entered judgment against Hurst and McGowan in accordance with the jury's verdict and enjoined Hurst and McGowan from using or disclosing the trade secret information for two years.

## II.

Appellants first assert that the district court erred in denying their motion in limine to exclude the expert tes-

timony and report of Ronald Vollmar, a certified public accountant, financial analyst, and fraud examiner. Vollmar testified about the economic damages Synergetics suffered due to Appellants' actions. Appellants contend that Vollmar's testimony should not have been admitted because his opinions were based on an incorrect assumption regarding the number of suppliers in the relevant market.

*Federal Rule of Evidence 702* provides that if expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert may testify where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) [*9] the witness has applied the principles and methods reliably to the facts of the case." See *Fed. R. Evid. 702*. Trial courts serve as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." See *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*; see also *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* ("We conclude that Daubert's general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to [expert] testimony based on 'scientific' knowledge, but also to [expert] testimony based on 'technical' and 'other specialized' knowledge."). In exercising this gatekeeping function, the trial court must first make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," focusing specifically on the methodology and not the conclusions. See *Daubert, 509 U.S. at 592-93*. Second, the court must ensure [*10] that the testimony is relevant and will aid the trier of fact. See *id. at 591-92*.

Appellants do not contest Vollmar's qualifications or whether the subject of his proposed testimony would aid the jury. Instead, Appellants contend that Vollmar's methodology was unreliable because "the key assumption upon which his opinion is based, essentially that the relevant market is a two supplier market, is false and ignores the existence of significant competition in the market." (Br. of Appellant at 17.) Using sales information provided by Innovatech and Synergetics, Vollmar identified the common customers of both companies. Then, he "identified lost sales on products sold by Innovatech that were previously purchased from Synergetics and products sold by Innovatech that were only previously available from Synergetics." (Pl.'s Ex. 44.) Where Innovatech sold adapters/connectors, the calculations also included related sales of laser probes. (Id.) During cross-examination at trial, Vollmar explained that he did not consider possible competition from Iridex because he focused only on those Innovatech customers who had previously been Synergetics' customers. Thus, Vollmar did [*11] not include any portion of Innovatech customers, other than those who had previously been Synergetics' customers, in the damages assessment. (Tr. Vol. IV, 4-5.)

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001)* (quoting *Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995)* (internal citations and quotations omitted)). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Peitzmeier v. Hennessy Indus., Inc., Free. Ch. 1020, 97 F.3d 293, 296, Freem. Ch. 1020 (8th Cir. 1996)*, cert. denied, *520 U.S. 1196, 117 S. Ct. 1552, 137 L. Ed. 2d 701 (1997)*. An expert's opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner, 259 F.3d at 929-30*. Vollmar's testimony was not so [*12] fundamentally unsupported that it could offer no assistance to the jury. He explained his methodology in calculating the damages, and the Appellants had the opportunity to challenge Vollmar's assumptions and methodology, both through cross-examination and by presenting their own expert witness on damages. While other methods for calculating damages may be available, so long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony. See *Daubert, 509 U.S. at 596* ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *EFCO Corp. v. Symons Corp., 219 F.3d 734, 739 (8th Cir. 2000)* (no abuse of discretion in allowing plaintiff's expert witness to testify as to damages where defendant's expert, who disputed plaintiff's expert's methodology, also testified; jury left with ultimate decision as to which damages theory was more sound).

The district court did not abuse its considerable discretion in permitting [*13] Vollmar's testimony.

**III.**

**A.**

Appellants next argue that the district court erred in denying their original motion for summary judgment and their motion for judgment as a matter of law at the close of all evidence on the claims of trade secret misappro-

priation, intentional interference with business relationships, breach of contract, and breach of fiduciary duty.

After a full trial on the merits, we do not review a denial of summary judgment as such denial is interlocutory in nature. See *Eaddy v. Yancey, 317 F.3d 914, 916 (8th Cir. 2003)* (citing *Bakker v. McKinnon, 152 F.3d 1007, 1010 (8th Cir. 1998))*. Thus, our review here is only from the denial of judgment as a matter of law. "We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 899 (8th Cir. 2006)*. To grant judgment as a matter of law, the court must find that there is no legally sufficient evidentiary basis to support a jury verdict in the non-moving party's favor. See *Fed. R. Civ. P. 50(a)(1)* [*14] . All factual inferences are drawn in favor of the non-moving party, and the court avoids making credibility assessments or weighing the evidence. See *First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005)* (quoting *Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001))*.

**B.**

Under The Missouri Uniform Trade Secrets Act, misappropriation of a trade secret is defined as:

> (a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:
> a. Used improper means to acquire knowledge of the trade secret; or
> b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or
> c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
> i. Derived from or through a person who had utilized improper means to acquire it;
> ii. Acquired under circumstances giving rise to a duty to maintain its secrecy [*15] or limit its use; or
> iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

*Mo. Stat. Ann. § 417.453(2)* (West 2001).

Appellants argue that Synergetics failed to offer any evidence that Appellants knew or had reason to know that the engineering drawings prepared by Auld were copied from Synergetics' material. Further, Appellants contend that "the information claimed to have been misappropriated is the type that grows stale relatively quickly" and, thus, should not be afforded protection over two years after Appellants' termination.

The jury found that Synergetics owned a trade secret for, *inter alia*, dimensions and tolerances information regarding its adapter/connector system, and that Appellants misappropriated this trade secret. At trial, the jury watched the videotaped deposition of Michael Auld. Auld testified that Lumpkin had given him some crude pencil drawings of the adapter/connector Lumpkin had constructed using spare Synergetics' parts and asked Auld to make the necessary engineering designs. Auld admitted that he created these by copying, or "cutting and pasting" from, Synergetics' engineering [*16] drawings while employed by Synergetics. McGowan testified at trial that Lumpkin informed him that Auld was assisting with the engineering drawings and that McGowan knew Auld was employed by Synergetics at the time he was assisting. After learning of Auld's involvement, McGowan then began communicating on a monthly basis with Auld about the drawings. Additionally, the jury was presented testimony from Scheller that Synergetics had taken years to design and develop its adapter/connector system, but Lumpkin testified that he needed only six hours to design a similar product. Clearly, there is sufficient evidence supporting the jury's verdict that Appellants misappropriated Synergetics' trade secrets pertaining to the specifications found in the engineering drawings.

While Appellants only challenge whether there was sufficient evidence to support a finding of misappropriation of trade secrets pertaining to Auld's actions of copying Synergetics' engineering drawings, the jury also found that Synergetics owned trade secret information pertaining to product pricing information, customer-specific product purchases, quantities of products its customers purchased, and prioritization of its [*17] products which Appellants also misappropriated. Such information would have been commonly known and used by Appellants through their employment responsibilities as high-level salesmen.

Appellants further argue that the misappropriated information grew stale and thus was not deserving of trade secret protection. It is unclear from their brief exactly what information they claim grew stale and when that occurred. Rather, they cite *Carboline Co. v. Lebeck, 990 F. Supp. 762 (E.D. Mo. 1997)*, to support their argument. In rejecting this argument, the district court noted that "defendants have cited no additional support for their

position, nor provided any facts and circumstances to suggest the information is now stale beyond a comparison to the 13 month time period in Carboline." Appellants have done nothing more to advance this argument on appeal. Determination of when trade secret information becomes stale cannot be made by reference to a bright line rule and necessarily requires fact specific consideration. Cf. *Avtel Servs., Inc. v. United States, 70 Fed. Cl. 173, 191 (Fed. Cl. 2006)* ("In general, *although largely a fact and case-specific inquiry* [*18] , information loses its confidential nature once it becomes stale.") (emphasis added). As the district court determined, evidence was presented that Appellants continued to obtain trade secret information after their termination, that the Innovatech adapter and laser probes could not have been reverse manufactured absent the trade secret information because of the detailed specifications and this information is not publicly available, and that Appellants continued to use sales data and information to reach sales agreements with Synergetics' customers.

**C.**

Appellants contend that the breach of contract claim should have been dismissed. Their first argument is that Synergetics failed to submit sufficient evidence of a breached contract. On February 5, 2001, both Hurst and McGowan signed confidentiality agreements with Synergetics. These agreements provided that Appellants would not disclose any confidential information such as customer and supplier lists, pricing lists, production and pricing methods, inventions, discoveries, and developments. The agreements further provided that Appellants would return any Synergetics' property upon termination of employment. Synergetics presented [*19] evidence that Appellants used confidential information to develop a competing product and to target Synergetics' customers. Also, Synergetics presented evidence that Appellants failed to return certain items of Synergetics' property, such as files containing confidential sales data. Therefore, Appellants' argument that sufficient evidence of a breach of contract was not presented fails.

Appellants' second argument is that the confidentiality agreements are in reality restrictive covenants, or covenants not to compete, that are not enforceable because the agreements are not limited in time and geography. Appellee responds that the confidentiality agreements do not require time or geographic limitations to be valid and enforceable.

The use of restrictive covenants is one way to protect trade secrets, see *Continental Research Corp. v. Scholz, 595 S.W.2d 396, 400 (Mo. Ct. App. 1980)*, however, Appellants' characterization of the confidentiality agreements as restrictive covenants is misplaced. While a restrictive covenant may be used to protect a trade secret, not every agreement designed to protect a trade secret is a restrictive covenant. Restrictive covenants limit [*20] the exercise or pursuit of an individual's occupation. See *AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995)*. Restrictive covenants are in restraint of trade, thus to be valid and enforceable, they must be reasonable as to time and space. See id.

In their reply brief, Appellants impliedly concede that the agreements are confidentiality agreements and then argue that confidentiality agreements need time and geographic limitations, similar to restrictive covenants, to be valid. In support of this contention, Appellants again cite *Carboline Co. v. Lebeck, 990 F. Supp. 762 (E.D. Mo. 1997)*. The Carboline opinion addressed the need for time and geographic limitations regarding the plaintiff's "noncompete clause claim." *Carboline Co., 990 F. Supp. at 765-66*. Further, the court in Carboline recognized that the employment agreement contained both "noncompete and confidentiality clauses." *Id. at 766*. Appellants have failed to cite to any requirement under Missouri law that confidentiality agreements must contain time and geographic limitations to be valid, nor have we located such a requirement, [*21] thus we cannot say that the agreements are unenforceable for this reason.

**D.**

Under Missouri law, intentional interference with a contract or business relationship requires proof of (1) a contract or valid business expectancy, (2) defendant's knowledge of the contract or relationship, (3) a breach induced or caused by defendant's intentional interference, (4) absence of justification, and (5) damages. See *Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996)* (en banc). "While lawful competition would be a defense, competing by improper means, including the use of a misappropriated trade secret obtained in violation of a fiduciary duty is not a valid justification." *Lyn-Flex West, Inc. v. Dieckhaus, 24 S.W.3d 693, 700 (Mo. Ct. App. 1999)* (citing *Briner Elec. Co. v. Sachs Elec. Co., 680 S.W.2d 737, 741 (Mo. Ct. App. 1984))*. Appellants contend that Synergetics failed to present "evidence of any improper means utilized by appellants." (Appellants' Br. at 29.) Appellants admit that this argument is intertwined with their argument that they did not misappropriate trade secrets or breach their confidentiality agreement with Synergetics. As [*22] explained above, Synergetics submitted sufficient evidence to support its misappropriation claim and its breach of contract claim, and hence has submitted sufficient evidence to support the claim of intentional interference with a contract or business relationship.

**E.**

In its third amended complaint, Synergetics added a claim for breach of fiduciary duty of loyalty. A breach of the duty of loyalty "arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which, by definition, is to gain advantage over a competitor." *Scanwell Freight Express STL, Inc. v. Chan, 162 S.W.3d 477, 479 (Mo. 2005)* (en banc). Although permitted to make arrangements to compete with an employer prior to termination of employment, an employee may not use confidential information peculiar to or acquired from his employer, nor may the employee solicit customers for his rival company. See *id. at 481* (citing *Restatement (Second) of Agency, § 393 cmt. e* (1958)). When viewed in the light most favorable to the verdict, it is clear that the Appellants' actions violated their duty [*23] of loyalty to Synergetics. Appellants used confidential trade secret information to begin the design of competitive products, used pricing and product information to target Synergetics' customers, and began solicitation of Synergetics customers prior to the termination of their employment.

Therefore, the district court did not err in denying the motion for judgment as a matter of law on Synergetics' claims of misappropriation of trade secrets, breach of contract, intentional interference with business relationships, or breach of fiduciary duty of loyalty.

**IV.**

After the jury returned a verdict in Synergetics' favor and awarded actual damages of $ 1,759,165 against the Appellants jointly and severally, and punitive damages of $ 293,194.16 against each Appellant, the Appellants filed a motion for remittitur and proposed judgment, arguing that (1) actual damages were excessive and not supported by the evidence, (2) punitive damages were excessive because Appellants' actions were not outrageous, and (3) injunctive relief was not proper because the "head start" period had expired.

**A.**

"We will only reverse a district court's denial of a motion for remittitur 'upon a manifest [*24] abuse of discretion or because the verdict is so grossly excessive the result is monstrous or shocking.'" *Hite v. Vermeer Mfg. Co., 446 F.3d 858, 869 (8th Cir. 2006)* (quoting *Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1133-34 (8th Cir. 2001.)*) When presented with a question as to whether a state law claim damage award is excessive, state substantive law guides our review. *Jones v. Swanson, 341 F.3d 723, 736 (8th Cir. 2003)*. In Missouri, courts generally defer to the jury's decision concerning the amount of damages, and only overturn a jury's verdict when the defendants demonstrate that (1) "some event occurred at trial that incited the bias and prejudice of the jury" and (2) "the verdict is so grossly excessive . . . so as to shock the conscience of the court." *Giddens v. Kansas City S. Ry. Co., 29 S.W.3d 813, 822 (Mo. 2000)* (per curiam en banc) (citing *Means v. Sears, Roebuck & Co., 550 S.W.2d 780, 788 (Mo. 1977)* (en banc) and *Tune v. Synergy Gas Corp., 883 S.W.2d 10, 21 (Mo. 1994)* (en banc)), cert. denied, *532 U.S. 990, 121 S. Ct. 1644, 149 L. Ed. 2d 502 (2001)*. Actual damage awards "will not [*25] be disturbed unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive." *Williams v. Williams, 99 S.W.3d 552, 557 (Mo. Ct. App. 2003)* (citing *Montrose Sav. Bank v. Landers, 675 S.W.2d 668, 672 (Mo. Ct. App. 1984))*. Punitive damage awards are determined after considering factors such as the degree of malice or outrageousness of the defendants' conduct, aggravating and mitigating circumstances, the defendants' financial status, the character of both parties, the injury suffered, the defendants' standing or intelligence, and the relationship between the two parties. Abuse of discretion in the award of punitive damages under Missouri law is found where the award of punitive damages is so disproportionate to the relevant factors that it becomes clear that the determination was based on improper motives or clear absence of the honest exercise of judgment. *Call v. Heard, 925 S.W.2d 840, 849 (Mo. 1996)* (en banc), cert. denied, *519 U.S. 1093, 117 S. Ct. 770, 136 L. Ed. 2d 716 (1997).*

The jury's verdict on actual damages does not shock the court's conscience. It is obvious that the jury believed [*26] and relied upon the testimony of Vollmar, Synergetics' expert witness, regarding damages. Vollmar testified that, based on his calculations, Synergetics suffered economic damages of $ 1,759,165 (Tr. Vol III, 185; Pl.'s Ex. 44, 392), the exact amount awarded by the jury as actual damages. According to Vollmar's report, Synergetics' damages were based on lost profits from sales, price erosion, and out-of-pocket expenses. We cannot say that this damages award is outside of the evidence presented at trial, and thus we will not disturb it.

Likewise, the jury's award of punitive damages is not so disproportionate as to warrant reversal. Evidence was presented that Appellants, while still employed by Synergetics, began designing a competitive product using Synergetic's materials and designs. Further, even after their employment was terminated, Appellants continued to use the trade secret information and the assistance of Lumpkin and Auld, individuals who Appellants knew had a duty of loyalty towards Synergetics. After incorporating Innovatech, Appellants used the sales information they had acquired while employed by Synergetics to target Synergetics' customers and underprice Synergetics' [*27] adapter/connector system for the Iridex laser. The jury was permitted to consider the nature of this conduct, the Appellants' high-level sales positions at Synergetics, the damages suffered by Synerget-

ics, and the steps taken by Appellants to conceal their activities, in reaching the punitive damages determination. See *Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 576 (8th Cir. 1997)* (reviewing factors to be considered under Missouri law). The district court did not abuse its discretion in denying the motion for remittitur.

**B.**

Finally, Appellants argue that the district court erred in granting injunctive relief pertaining to the misappropriated trade secrets because the "head start" period had expired. The district court enjoined Appellants from using or disclosing for a prospective period of two years any of Synergetics' trade secrets, including the dimensions and tolerances of the Iridex adapter/connector, surgical forceps, and scissors products; pricing information; product information; product prioritization; and other information regarding customers. The court determined that two years was the period of time Appellants would have needed "to develop such [*28] data on their own through observation and investigation."

This court reviews the district court's grant of injunctive relief for an abuse of discretion. See *Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 902 (8th Cir. 2005)*. Injunctive relief is a proper remedy under Missouri law for misappropriation of trade secrets. See *Mo. Ann. Stat. § 417.455(1)* (West 2001) ("Actual or threatened misappropriation may be enjoined."). Additionally, in the confidentiality agreements, Appellants agreed that injunctive relief was a proper remedy if the agreements were violated. In cases involving the misappropriation of trade secrets, Missouri courts employ the "head start" rule, which provides that by misappropriating the trade secrets, a defendant is able to "cut short" the time it would normally take to produce and market a competitive product. See *Superior Gearbox Co. v. Edwards, 869 S.W.2d 239, 250-51 (Mo. Ct. App. 1993)*, see also, *Khazai v. Watlow Elec. Mfg. Co., 201 F. Supp. 2d 967, 975 (E.D. Mo. 2001)* (applying "head start" rule in trade secret misappropriation case). A defendant should be enjoined only for [*29] the time it would take to produce and market the competitive product, absent the misappropriation. See *Superior Gearbox, 869 S.W.2d at 250-51*.

Evidence adduced at trial supports the conclusion that it took approximately four years for Synergetics to develop its adapter/connector system and that it would take approximately thirty months to regain lost customers. Also, Synergetics presented evidence that the Appellants continued to obtain trade secret information following their termination from Synergetics. The district court determined that the two-year injunctive period consisted of the time it would have taken Appellants to independently develop both the scientific and sales data it misappropriated from Synergetics. Thus, the district court did not abuse its discretion in setting the two-year injunctive period.

**V.**

Accordingly, we affirm in all respects.

# Exhibit 6

# CURRICULUM VITAE

## November 2005

| | |
|---|---|
| **Name:** | Eric Gordon Butchart |
| **Date of Birth:** | 29th March, 1943 |
| **Title and Affiliations:** | Senior Consultant Cardiothoracic Surgeon,<br>University Hospital of Wales, Cardiff, U.K.<br><br>Clinical Teacher in Cardiothoracic Surgery,<br>University of Wales College of Medicine, Cardiff, U.K. |
| **Appointed:** | 1st July, 1978 |
| **Qualifications:** | MB, BS Dunelm 1965<br>FRCS England 1970<br>FETCS 1998<br>FESC 1998 |
| **Distinction Award** | Award status A since 1994 |

**Societies**:

**British**

Society of Thoracic and Cardiovascular Surgeons of Great Britain and Ireland

British Cardiac Society.

British Thoracic Society

Welsh Thoracic Society

Cardiac Surgical Research Club.

**European**

European Society of Cardiology

European Society of Cardiology Working Group on Valvular Heart Disease (Chairman 2000 – 2002).

European Association for Cardiothoracic Surgery.

**U.S.A.**

Society of Thoracic Surgeons

**Editorial Activities**

European Surgical Editor of the *Journal of Heart Valve Disease*, since its first issue in September 1992 until January 1998.

Associate Editor of *Heart*, since January 2003.

Member of Editorial Board of the *Journal of Thoracic and Cardiovascular Surgery.*

Senior Editor of Book, *Current Issues in Heart Valve Disease: Thrombosis, Embolism and Bleeding*, published by ICR Publishers, London 1992.

Senior Editor of Book, *Heart Valve Disease: A Guide to Patient Management after Surgery.* Taylor and Francis, London, in press.

Member of the Scientific Committee of the European Society of Cardiology, abstract grading for the Annual Congresses.

Manuscript reviewer for *'Circulation', 'Annals of Thoracic Surgery' 'Journal of Thoracic and Cardiovascular Surgery', 'Thorax', 'European Journal of Cardiothoracic Surgery', 'Heart', European Heart Journal, 'British Journal of Surgery'* and '*Lancet'.*

Reviewer of grant applications for the British Heart Foundation.

**Visiting Professorships**

Visiting Professor in Cardiothoracic Surgery, Yale University, New Haven, CT, USA, April 1996.

Visiting Professor in Cardiothoracic Surgery, University of Linköping, Sweden, December 1997.

Invited Visiting Professor in Cardiothoracic Surgery, University of British Columbia, Vancouver, Canada, 2006.

**Relevant Offices**:

**Current**

Past-Chairman of European Society of Cardiology (ESC) Working Group on Valvular Heart Disease.

Chairman, ESC Guidelines Committee on Management of Patients after Heart Valve Surgery.

Member of ESC Task Force on Management of Heart Valve Disease.

Member of the Scientific Committee of the Euro Heart Survey (Valve Disease section).

Member of WHO Guidelines Committee on Rheumatic Heart Disease.

Specialist Adviser to the National Institute of Clinical Excellence (NICE) Interventional Procedures Programme.

Expert adviser to the Medical Devices Agency (an executive agency of the Department of Health) on cardiovascular devices and reporting guidelines on prosthetic heart valves.

Member of Advisory Board of Anticoagulation Europe, a registered charity devoted to improving the quality of life of anticoagulated patients.

Member of the International Mesothelioma Interest Group.

**Previous**:

Organiser and Chairman of Symposium on Thrombosis, Embolism and Bleeding in Heart Valve Disease, Washington DC, May 1991.

Organiser and Chairman of Workshop on Valve Surgery in Developing Countries, Sydney, Australia, October 1997.

Member of British Cardiac Society (BCS) Working Group on Investigation and Management of Valvular Heart Disease.

Member of Joint BCS/British Society of Haematology Working Group on Anticoagulation Guidelines.

Member of Board of Governors of World Congress on Cerebral Embolism, New Orleans, November 12-15th, 1998.

Course Director of ESC Education and Training Programme: "Difficult Situations in the Management of Valve Disease", March 2001.

Member of Scientific Committee of "Update on Valvular Heart Disease 2002" – a joint symposium of the ESC WG on Valvular Heart Disease and the Portuguese Society of Cardiology, Sintra, Portugal, October 25-26, 2002.

Member of Organising Committee of EuroEcho 6, Munich, Germany, December 4-7, 2002.

Course Director of ESC Education and Training Programme: "Difficult Situations in the Management of Valve Disease", Florence, Italy, April 10-12, 2003.

Member of Organising Committee of International Congress on Valvular Heart Disease – a joint congress of the ESC WG on Valvular Heart Disease and the Polish Cardiac Society, Krakow, Poland, May 8 – 10, 2003.

## Contributions in Wales

Previously Director of Cardiothoracic Surgery at the University Hospital of Wales, 1990-1997, until the post was abolished in a management reorganisation.

Director of the Cardiff Embolic Risk Factor Study, a major research project supported by the British Heart Foundation, employing two research fellows and three haematology technicians. Analysis has been performed in collaboration with Dr. Gary Grunkemeier, Albert Starr Cardiac Center, Portland, Oregon.

Trustee and committee member of the Heart Research Fund for Wales, a registered charity dedicated to research and treatment of heart and lung disease.

Member of several planning committees on the future of cardiac and thoracic surgery in Wales from 1980 onwards, under the aegis of the Welsh Medical Committee. Reports were produced in 1981 and 1983.

Member of All Wales Thoracic Surgery Review Group, set up in 2002 to advise the Health Commission for Wales on future provision of Thoracic Surgery Services.

Development of radical surgery for diffuse malignant pleural mesothelioma, leading to tertiary referrals of patients from the whole of the UK and from abroad. I developed the first pathological staging system for mesothelioma in 1976, a system which is still referred to as the Butchart staging system internationally. I am collaborating with local pathologists and oncologists in an ongoing research study.

Member of Clinical Governance Committee of University Hospital of Wales, 2000 – 2001.

## PUBLICATIONS IN CARDIAC SURGERY/CARDIOLOGY

### Publications in Peer-reviewed Journals

Kay HR, Rao S**, Butchart EG**, Sbokos C, Austen WG, McEnany MT: Correlation between ischaemic metabolism and post-ischaemic cardiac function.
*J Surg Res* 1978; 24: 193-200.

Kay HR, Grötte GJ, **Butchart EG**, McEnany MT, Austen WG, Buckley MJ: Effects of cross-clamp time, temperature and cardioplegic agents on myocardial function after induced arrest.
*J Thorac Cardiovasc Surg.* 1978; 76: 590-603.

Grötte GJ, Kay H, Levine FH, Rao, **Butchart EG**, McEnany MT, Austen WG, Buckley MJ: Relation between subendocardial blood flow and restoration of left ventricular function after global ischaemia.
*Surg Forum 1978;* 29: 263-264.

**Butchart EG**, McEnany MT, Strich G, Sbokos C, Austen WG: The influence of pre-arrest factors on the preservation of left ventricular function during cardiopulmonary bypass.
*J Thorac Cardiovasc Surg* 1980; 79: 812-821.

Grötte, GJ, **Butchart EG**: Impaction of intra-aortic balloon due to dislocation of central stylet.
*J Thorac Cardiovasc Surg 1980*; 80: 228-232.

**Butchart EG**, Austen WG, McEnany MT: Influence of contractility on myocardial water distribution during cardiopulmonary bypass.
*J Thorac Cardiovasc Surg 1981*; 82: 38-44.

**Butchart EG**, Griffiths BE, Breckenridge IM: Clinical and echocardiographic assessment of the Medtronic Hall Valve.
*Thorac Cardiovasc Surgeon 1983*; 31: 81-84.

Angelini GD, **Butchart EG**, Armistead SH, Breckenridge IM: Comparative study of leg wound skin closure in coronary artery bypass operations.
*Thorax 1984*; 39: 942-945.

Angelini GD, Breckenridge IM, **Butchart EG**, Middleton KM, Henderson AH, Newby AC: Metabolic damage to human saphenous vein during preparation for coronary artery bypass grafting.
*Cardiovasc Res 1985*; 19: 326-334.

**Butchart EG**, Breckenridge IM: The timing of prosthetic valve re-operations based on an analysis of risk factors.
*Z Kardiol* 1986; 75(Suppl.2): 155-159.

Angelini GD, El-Gamary F, **Butchart EG**: Pseudo-arthrosis of the sternum following median sternotomy.
*Eur J Cardiothorac Surg 1987; 1: 120-130.*

Angelini GD, Penny WJ, El-Gamary F, **Butchart EG**, West RR, Breckenridge IM, Henderson AH: The incidence and significance of early pericardial effusion after open heart surgery.
*Eur J Cardiothorac Surg 1987; 1: 165-168.*

**Butchart EG**, Lewis PA, Kulatilake ENP, Breckenridge IM: Anticoagulation variability between centres: implications for comparative prosthetic valve assessment.
*Eur J Cardiothorac Surg* 1988; 2: 72-81.

**Butchart EG**, Lewis PA, Grunkemeier GL, Kulatilake ENP, Breckenridge IM: Low risk of valve thrombosis and serious embolic events despite low intensity anticoagulation.
*Circulation* 1988; 78 (Suppl.1): I 66-77.

Angelini GD, Fraser AG, **Butchart EG**: Left atrial myxoma: not always a benign tumour.
*Eur J Cardiothorac Surg* 1988; 2: 456-468.

Fraser AG, Angelini GD, Ikram S, **Butchart EG**: Left atrial ball thrombus: echocardiographic features and clinical implications.
*Eur Heart J* 1988; 9: 672-677.

Angelini GD, Penny WJ, Ruttley MST, **Butchart EG**, West RR, Henderson AH, Breckenridge IM: Post-infarction ventricular septal defect: the importance of right ventricular coronary perfusion in determining surgical outcome.
*Eur J Cardiothorac Surg* 1989; 3: 156-161.

Lewis PA, **Butchart EG**: Long-term evaluation of mechanical heart valves.
*Lancet* 1989; 1: 1020 (letter).

**Butchart EG**: Surgery for heart valve disease.
*Hosp Update 1990*; 16: 963-976.

**Butchart EG**, Lewis PA, Bethel JA, Breckenridge IM: Adjusting anticoagulation to prosthesis thrombogenicity and patient risk factors.
*Circulation* 1991; 84 (Suppl. III): III 61-69.

**Butchart EG**: Thrombogenesis and anticoagulation in heart valve disease: towards a rational approach (editorial).
*J Heart Valve Dis* 1993; 2: 1-6.

Gohlke-Barwolf C, Acar J, Burckhardt D, Oakley C, **Butchart EG**, et al: Guidelines for prevention of thromboembolic events in valvular heart disease.
*J Heart Valve Dis* 1993; 2: 398-410.

**Butchart EG**, Moreno de la Santa P, Rooney SJ, Lewis PA: The role of risk factors and trigger factors in cerebrovascular events after mitral valve replacement.
*J Card Surg* 1994; 9: (Suppl): 228-236.

**Butchart EG:** Editorial comment on aortic valve replacement without anticoagulation.
*J Heart Valve Dis* 1993; 2: 423*.*

**Butchart EG**: The significance of sudden and unwitnessed death after heart valve replacement (editorial).
*J Heart Valve Dis* 1994; 3: 1-4.

Rooney SJ, Moreno de la Santa P, Lewis PA, **Butchart EG**: Sudden death in a large prosthetic valve series based on a single prosthesis: experience with the Medtronic Hall valve.
*J Heart Valve Dis* 1994; 3: 5-9.

Bodnar E, **Butchart EG**, Bamford J, van den Besselaar AMHP, Grunkemeier GL, Frater RWM: Proposals for reporting thrombosis, embolism and bleeding after heart valve replacement.
*J Heart Valve Dis* 1994; 3: 120-123.

**Butchart EG**: Anticoagulation management during non-cardiac surgery – time for common sense (editorial).
*J Heart Valve Dis* 1994; 3: 313-314.

**Butchart EG,** Moreno de la Santa P, Rooney SJ, Lewis PA: Arterial risk factors and cerebrovascular events following aortic valve replacement.
*J Heart Valve Dis* 1995; 4: 1-8.

**Butchart EG**: Rationalising antithrombotic management for patients with prosthetic heart valves (editorial).
*J Heart Valve Dis* 1995; 4: 106-113.

Gohlke-Barwolf C, Acar J, Oakley C, **Butchart EG**, Burckhardt D, et al: Guidelines for prevention of thromboembolic events in valvular heart disease. Study group of the Working Group on Valvular Heart Disease of the European Society of Cardiology.
*Eur Heart J* 1995; 16: 1320-1330.

Gohlke-Barwolf C, Acar J, Oakley C, **Butchart EG**, Burckhardt D, et al: Recommendations for prevention of thromboembolism in heart valve diseases. Working Group on Valvular Heart Disease, European Society of Cardiology.
*Z Kardiol* 1995; 84: 1018-1032.

Bryan AJ, **Butchart EG**: Prosthetic heart valves and anticoagulant management during non-cardiac surgery**.**
*Br J Surg* 1995; 82: 577-578.

Kuo J**, Butchart EG**: Sternal wound dehiscence.
*Care Crit Ill* 1995; 11: 244-248

Working Group of British Cardiac Society: Valvular heart disease: recommendations for investigation and management.
*J Roy Coll Phys* 1996; 30: 309-315.

Bodnar E, Arru P, **Butchart EG** et al. Wear in mechanical heart valves.
*J Heart Valve Dis* 1996; 5 (Suppl I): S149-S156.

**Butchart EG**: Fibrinogen and leukocyte activation: the keys to understanding prosthetic valve thrombosis?
*J. Heart Valve Dis.* 1997; 6: 9-16.

Ionescu AA, Newman GR, **Butchart EG**, Fraser AG. Morphologic analysis of a strand recovered from a prosthetic mitral valve: no evidence of fibrin.
*J Am Soc Echocardiogr* 1999; 11: 5-20.

Ionescu AA, Moreno de la Santa P, Dunstan FD, **Butchart EG**, Fraser AG: Mobile echoes on prosthetic valves are not reproducible.
*Eur Heart J* 1999; 20: 140-147.

Pitsis, AA, Cullen HC, Musumeci F, Zaman AG, **Butchart EG**. A new strategy of total arterial revascularisation.
*Ann Thorac Surg* 1999; 67: 1186-1187.

Ionescu AA, **Butchart EG**. The vegetation that was not a vegetation: excusable misinterpretation of transesophageal echocardiography findings in late infective endocarditis of a prosthetic mitral valve.
*J Am Soc Echocardiogr 2000; 13: 322-324.*

**Butchart EG**, Li HH, Payne N, Buchan K, Grunkemeier GL. Twenty years experience with the Medtronic Hall valve.
*J Thorac Cardiovasc Surg* 2001; 121:1090-1100.

**Butchart EG**. Invited commentary on: Intermediate-term results with 1,019 Carbomedics aortic valves.
*Ann Thorac Surg* 2001; 71: 1187-1188.

Ionescu AA, West RR, Proudman C, **Butchart EG**, Fraser AG. Prospective study of routine perioperative transesophageal echocardiography for elective valve replacement: clinical impact and cost-saving implications.
*J Am Soc Echocardiogr* 2001; 14: 659-667.

**Butchart EG**. Invited commentary on: Self-managed anticoagulation.
*Ann Thorac Surg* 2002; 72: 1527.

**Butchart EG**, Payne N, Li HH, Buchan K, Mandana K, Grunkemeier GL. Better anticoagulation control improves survival after valve replacement.
*J Thorac Cardiovasc Surg:* 2002; 123: 715-723.

Iung B, Gohlke-Bärwolf C, Tornos P, Tribouilloy C, Hall R, **Butchart EG**, Vahanian A. Recommendations on the management of the asymptomatic patient with valvular heart disease.
*Eur Heart J: 2002;* 23: 1253-1266.

Shaaban-Ali M, Harmer M, Vaughan RS, Dunne JA, Latto IP, Haaverstad R, Kulatilake EN, **Butchart EG**. Changes in serum S100beta protein and Mini-Mental State Examination after cold (28 degrees C) and warm (34 degrees C) cardiopulmonary bypass using different blood gas strategies (alpha-stat and pH-stat).
Acta Anaesthesiol Scand 2002; 46: 10-16.

Zamvar VY, Khan NU, Madhaven A, Kulatilake N. **Butchart EG**. Clinical outcomes in coronary artery bypass graft surgery: comparison of off-pump and on-pump techniques.
*Heart Surg Forum* 2002; 5: 109-13.

**Butchart EG**, Ionescu AA, Payne N, Giddings JC, Grunkemeier GL, Fraser AG. A new scoring system to determine thromboembolic risk after heart valve replacement.
*Circulation*: 2003; 108 (Suppl II): 68-74.

Blackstone EH, Cosgrove DM, Jamieson WRE, Birkmeyer NJ, Lemmer JH, Miller DC, **Butchart EG**, Rizzoli G, Yacoub M, Chai A. Prosthesis size and long-term survival after aortic valve replacement.
J Thorac Cardiovasc Surg: 2003; 126; 783-796.

Iung, B, Baron G, **Butchart EG**, Delahaye F, Gohlke-Bärwolf C, Levang OW, Tornos P, Vanoverschelde J-L, Vermeer F, Boersma E, Ravaud Ph, Vahanian A. A prospective survey of patients with valvular heart disease in Europe: The Euro Heart Survey on Valvular Heart Disease.
*Eur Heart J* 2003; 24: 1231-1243.

Ionescu A, Payne N, Fraser AG, Giddings J, Grunkemeier GL, **Butchart EG**. Incidence of embolism and paravalvular leak after St. Jude Silzone valve implantation.
*Heart* 2003; 89: 1055-1061.

Ionescu A, Fraser AG, **Butchart EG**. Prevalence and clinical significance of incidental paraprosthetic valvar regurgitation: a prospective study using transoesophageal echocardiography.
*Heart* 2003; 89: 1316-1321.

Raja SG, **Butchart EG**. Delayed onset adrenal insufficiency after cardiac surgery despite perioperative steroid supplementation.
J Cardiothorac Vasc Anesth 2003; 18: 80-81.

**Butchart EG**, Gohlke-Bärwolf C. Anticoagulation management of patients with prosthetic heart valves.
*J Am Coll Cardiol* 2004; 44: 1143-1144.

Tornos P, Permanya-Miralda G, Iung B, Baron G, Delahaye F, Gohlke-Bärwolf C, **Butchart EG,** Ravaud P, Vahanian A. Infective endocarditis in Europe: lessons from the Euro Heart Survey.
*Heart* 2005;91: 571-575.

**Butchart EG**, Gohlke-Bärwolf C, Antunes M, Tornos P, De Caterina R, Cormier B, Prendergast B, Iung B, Bjornstad H, Leport C, Hall RJC, Vahanian A. Recommendations for the management of patients after heart valve surgery. *Eur Heart J* 2005; 26:2463-2471.

Rahman M, BinEsmael T, Payne N, **Butchart EG**. Increased sensitivity to warfarin after heart valve replacement. *Ann Pharmacother* 2005; in press.

**Books**

**Butchart EG**, Bodnar E (Eds): *Current Issues in Heart Valve Disease: Thrombosis, Embolism and Bleeding*. London, ICR Publishers, 1992.

**Butchart EG**, Gohlke-Barwolf C, Antunes MJ, Hall RJC (Eds): *Heart Valve Disease: A Guide to Patient Management after Surgery*. Taylor and Francis, London, March 2006.

**Book Chapters**:

**Butchart EG**: Prosthetic valve re-operations. Chapter 24 in *Heart Valve Replacement and Reconstruction.* (Ed. Starek P). Published by Year Book Medical Publishers, Chicago, 1987, pp 293-303.

**Butchart EG**: The complications of heart valve replacement and their prevention: technical considerations. Chapter 4 in *Heart Valve Replacement: Current Status and Future Trends.* (Eds. Rabago G, Cooley DA). Published by Futura Publishing, New York, 1987, pp 31-53.

**Butchart EG**, Lewis PA, Coombes JA, Breckenridge IM: Moving towards prosthesis-specific anticoagulation. In *Surgery for Heart Valve Disease.* (Ed. Bodnar E). Published by ICR Publishers, London 1990, pp 174-183.

**Butchart EG**: Thrombosis, Embolism and Bleeding. Chapter 4 in *Replacement Heart Valves.* (Eds. Bodnar E, Frater RWM). Published by Persimmon Press, New York, 1991, pp 77-98.

**Butchart EG**: Thrombogenicity, Thrombosis and Embolism. Chapter 2.4 in *Current Issues in Heart Valve Disease: Thrombosis, Embolism and Bleeding.* (Eds. Butchart EG, Bodnar E). Published by ICR Publishers, London, 1992, pp 172-205.

**Butchart EG**: Prosthesis-specific and patient-specific anticoagulation. Chapter 3.4 in Current Issues in Heart Valve Disease: Thrombosis, Embolism and Bleeding (Eds. Butchart EG, Bodnar E). Published by ICR Publishers, London, 1992, pp 293-317.

**Butchart EG**: Thrombogenesis and its management: Chapter 10.3 in *Textbook of Acquired Heart Valve Disease.* (Eds. Acar J, Bodnar E). ICR Publishers, London 1995, pp 1048-1120 (502 references).

**Butchart EG**: Prosthetic heart valves. Chapter 22 in *Cardiovascular Thrombosis.* 2nd Edition (Eds. Verstraete M, Fuster V, Topol EJ). Published by Lippincott-Raven, Philadelphia 1998, pp 399-418.

**Butchart EG**: The surgery of rheumatic heart valve disease. In *Rheumatic Fever and Rheumatic Heart Disease.* WHO Technical Report Series 923.
World Health Organisation, Geneva, 2004, pp 73-81.

**Butchart EG**, Gohlke-Bärwolf C, De Caterina R. Antithrombotic management in patients with prosthetic valves. Chapter 14 in *Therapeutic Strategies in Thrombosis* (Eds. Kristensen SD, De Caterina R, Moliterno DJ). Published by GPS, London, 2005.

**Butchart EG**, Gohlke-Bärwolf C, Renda G, De Caterina R. Antithrombotic management. Chapter 8 in *Heart Valve Disease: A Guide to Patient Management after Surgery* (Eds. Butchart EG, Gohlke-Bärwolf C, Antunes MJ, Hall RJC). Published by Taylor and Francis, London. Publication date March 2006.

**Abstracts**:

Ionescu A, Moreno de la Santa P, **Butchart EG**, Fraser AG. Is there a place for routine early post-operative transoesophageal echocardiography in prosthetic heart valve recipients?
*Heart* 1995; 75 (Suppl. 2): 45 (Abstract).

Moreno de la Santa P, Ionescu A, Fraser AG, **Butchart EG**. HITS during TCD monitoring in prosthetic heart recipients. A comparative study between single disc and bileaflet prostheses.
*Cerebrovasc Dis* 1996; 6 (Suppl. 3): 1-70 (Abstract).

Ionescu A, Moreno de la Santa P, **Butchart EG**, Fraser AG. Routine post-operative transoesophageal echocardiography in prosthetic heart valve recipients: is it worth the trouble?
*Eur Heart J* 1996: 17 (Abstract Suppl.): 229.

Ionescu A, Moreno de la Santa P, Giddings J, **Butchart EG**, Fraser AG. Cerebral embolic events on transcranial Doppler monitoring in prosthetic heart valve recipients: incidental finding or valve-related problem?
*Eur Heart J* 1996: 17 (Abstract Suppl.): 249.

Ionescu A, Moreno de la Santa P, **Butchart EG**, Fraser AG. Benign clinical course of paraprosthetic regurgitation detected at early post-operative transoesophageal echocardiography.
*Heart* 1997; 77 (Suppl. 1): P42 (Abstract).

Ionescu A, Moreno de la Santa P, **Butchart EG**, Fraser AG. Markers of embolic risk after heart valve replacement: a prospective study using transoesophageal echocardiography.
*Echocardiography* 1997; 14 [6 pt. 2] S7: Abstract 479.

Ionescu A, Moreno de la Santa P, Dunstan F, **Butchart EG**, Fraser AG. High inter-centre variability in reporting mobile echoes on prosthetic heart valves: urgent need for consensus.
*Eur Heart J* 1997; 18 (Abstract Suppl.): 137.

Moreno de la Santa P, Ionescu A, Giddings J, Fraser AG, **Butchart EG**. Prevalence of high intensity transient signals in patients with bioprosthetic heart valves.

7th International symposium on Cardiac Bioprostheses, Barcelona, Spain, June 1997.

Ionescu A, Moreno de la Santa P, West RR, Fraser AG, **Butchart EG**. Is it justified to perform routine intra-operative transoesophageal echocardiography in patients having elective valve replacement? Clinical impact and cost-effectiveness.
*Eur Heart J* 1998; 19: 66.

Ionescu A, Moreno de la Santa P, West RR, Fraser AG, **Butchart EG**. High prevalence of atherosclerosis in patients with aortic stenosis. Chance finding or causal link?
*Euro Heart J 1998; 19: 653.*

Ionescu A, West R, Proudman C, **Butchart EG**, Fraser AG. Impact of routine intraoperative TEE on valve replacement operations: a cost benefit analysis.
*J Am Coll Cardiol* 1999; 33 (Suppl A): 547A.

Ionescu A, Fraser AG, **Butchart EG**. High incidence of embolism after St. Jude Silzone prosthetic valve implantation.
*Circulation* 1999; 100 (Suppl I): 524.

**Butchart EG**, Grunkemeier GL, Li HH, Buchan K. Evaluation of results after aortic valve replacement: comparison to general population data facilitates standardisation.
*Cardiovasc Engineer 2000; 5: 113.*

Ionescu A, **Butchart EG**, Fraser AG. The fate and significance of small paraprosthetic jets after valve replacement: is transoesophageal echocardiography too sensitive?
*Eur Heart J 2000; 21: 692.*

Ionescu A, **Butchart EG**, Fraser AG. Prevalence, clinical significance and time course of small paraprosthetic jets after elective valve replacement: a prospective transoesophageal echocardiographic study.
*Circulation* 2000; 102 (Suppl II): 462.

**Butchart EG**, Ionescu A, Payne N, Westmoreland D, Fraser AG. Serological evidence of previous infection with Chlamydia pneumoniae is the strongest predictor of thromboembolism after valve replacement.
*Circulation* 2001; 104 (Suppl II): 762.

**Butchart EG**, Payne N, Li HH, Buchan K, Mandana K, Grunkemeier GL. Determinants of long-term survival after mitral valve replacement: experience from a 20 year study.
*J Am Coll Cardiol* 2002; 39 (Suppl B): 297B.

Ionescu A, Payne N, Fraser AG, **Butchart EG**, Microembolic signals on transcranial Doppler are not associated with embolism after valve replacement: a large prospective study.
*J Am Coll Cardiol* 2002; 39 (Suppl B): 295B.

Ionescu A, Payne N, **Butchart EG**, Fraser AG. Strands on native heart valves: innocent bystanders, not markers of thromboembolism.
*J Am Coll Cardiol* 2002; 39: (Suppl B): 296B.

**Butchart EG**, Payne N, Ionescu AA, Grunkemeier GL, Giddings JC, Fraser AG. A new scoring system to determine thromboembolic risk after heart valve replacement based on clinical inflammatory and haematological markers.
*Circulation* 2002; 106 (Suppl II): 554.

Gohlke-Barwolf C, Iung B, **Butchart EG**, Tornos Mas P, Vanovderschelde JL, Vermeer F, Zeymer U, Vahanian A. Unexpected findings in anticoagulation management in patients with valvular heart disease after valve surgery.
*Eur Heart J 2003; 24 (Suppl): Abstract # 2278.*

Iung B, Tornos Mas P, Baron G, Vermeer F, **Butchart EG**, Gohlke-Barwolf C, Behar S, Vahanian A. Current management of asymptomatic patients with severe aortic regurgitation.
*Eur Heart J* 2003; 24 (Suppl ): Abstract # 3541.

**Butchart EG**, Payne N, Li, HH, Buchan K, Grunkemeier GL. Patient risk factors for prosthetic endocarditis.
*J Cardiovasc Surg* 2003; 44 (Suppl 1): 34.

Iung B, Fondard O, Gilon D, Baron G, Vermeer F, **Butchart EG**, Cachier A, Vahanian A. Prediction of operative mortality during valve surgery. Lessons from the Euro Heart Survey on Valvular Heart Disease.
*Euro Heart J* 2004; 25(Suppl): Abstract # 3778.

Iung B, Baron B, Fondard O, Gilon D, Vermeer F, **Butchart EG**, Cachier A, Vahanian A. Is the Euroscore reliable in the prediction of operative mortality in valve surgery?
*J Am Coll Cardiol* 2005;45(Suppl A):357A.

**Butchart EG**, Payne N, Grunkemeier GL. Factors determining bleeding risk after mechanical valve replacement – 20 years experience in 1,776 patients.
*J Heart Dis* 2005; 4: 61.

**Butchart EG**, Payne N, Grunkemeier GL. Low thrombogenicity mechanical aortic prosthesis with low intensity anticoagulation – a safe option for the elderly.
*J Heart Dis* 2005; 4: 122.

**Butchart EG**, Nair R, Ionescu A, Payne N, Fraser G. Risk scoring predicts patients at higher risk of thromboembolic complications after valve replacement.
*J Heart Dis* 2005; 4: 138.

## PUBLICATIONS IN THORACIC SURGERY

### Publications in Peer-reviewed Journals

Lawson RA, **Butchart EG**, Soriano A, Barnsley WC: Spontaneous rupture of the oesophagus.
*J Roy Coll Surg Edin* 1974; 19: 363-369.

**Butchart EG**, Grötte GJ, Barnsley WC: Spontaneous rupture of an intercostal artery in a patient with neurofibromatosis and scoliosis.
*J Thorac Cardiovasc Surg* 1975; 69: 919-921.

**Butchart EG**, Ashcroft T, Barnsley WC, Holden MP: Pleuropneumonectomy in the management of diffuse malignant mesothelioma of the pleura.
*Thorax* 1976; 31: 15-24.

**Butchart EG**, Urquhart W, Porteous IB, Barnsley WC: Granular cell myoblastoma of the bronchus.
*Brit J Radiol* 1976; 49: 87-90.

**Butchart EG**: Pleuropneumonectomy in diffuse malignant mesothelioma of the pleura.
**In Year Book of Cancer 1977**
Published by Year Book Medical Publishers, Chicago, 1977.

**Butchart EG**, Ashcroft T, Barnsley WC, Holden MP: The role of surgery in diffuse malignant mesothelioma of the pleura.
*Semin Oncol* 1981; 8: 321-328.

Allen SC, Riddell GS, **Butchart EG**: Bleomycin therapy and anaesthesia; the possible hazards of oxygen administration to patients after treatment with bleomycin.
*Anaesthesia* 1981; 36: 60-63.

Ashour M, **Butchart EG**, Breckenridge IM: Phreno-oesophageal muscle: anomaly or rudimentary oesophageal sphincter.
*J Roy Coll Surg Edin* 1984; 29: 387-388.

Angelini GD, **Butchart EG:** Lymphoma mimicking cardiomegaly.
*Thorax* 1984; 39: 72-73.

Sherani TM, Angelini GD, Passani SP, **Butchart EG**: Vocal cord paralysis associated with coal workers' pneumoconiosis and progressive massive fibrosis.
*Thorax* 1984; 39: 683-684.

Ashour M, Campbell IA, Umachandran V, **Butchart EG**: Late complication of plombage thoracoplasty.
*Thorax* 1984; 40: 394-395.

Ashour M, **Butchart EG**, Breckenridge IM: Simultaneous intrathoracic and peritoneal splenosis with spontaneous regression of intrathoracic splenosis.
*J Roy Coll Surg Edin* 1985; 30: 261-263.

Gough JD, Williams AB, Vaughan RS, Khalil JF, **Butchart EG**: The control of post-thoracotomy pain: a comparative evaluation of thoracic epidural fentanyl infusions and cryoanalgesia.
*Anaesthesia* 1988; 43: 780-783.

**Butchart EG**, Gibbs AR: Pleural mesothelioma.
*Curr Opin Oncol* 1990; 2: 352-358.

Davis CJ, **Butchart EG**, Gibbs AR: Neurilemmoma of the intrathoracic vagus nerve.
*Eur Respir J* 1991; 4: 508-510.

Davis CJ, **Butchart EG**, Gibbs AR: Nodular pulmonary amyloidosis occurring in association with pulmonary lymphoma.
*Thorax* 1991; 46: 217-218.

Maddox PR, Mansel RE, **Butchart EG** Traumatic rupture of the diaphragm, a difficult diagnosis.
*Injury* 1991; 22: 299-302.

Adams H, Bernard MS, **Butchart EG:** Computed tomographic appearances following pleuropneumonectomy for malignant mesothelioma.
*Radiol and Oncol* 1991; Brighton, UK. 1991: 7-8.

Adams H, **Butchart EG**: Computed tomographic assessment of patients following radical surgery for malignant mesothelioma.
*Clin Radiol* 1992; 45: 120-124.

White PG, Adams H, Crane MD, **Butchart EG**: Pre-operative staging of carcinoma of the bronchus: can CT reliability identify stage III tumours?
*Thorax* 1994; 49: 951-957.

Moreno de la Santa P, **Butchart EG**: Therapeutic options in mesothelioma.
*Curr Opin Oncol* 1995; 7: 134-137.

International Mesothelioma Interest Group: A proposed new international TNM staging system for Malignant Pleural Mesothelioma.
*Chest* 1995; 108: 1122-1128.

**Butchart EG**. Contemporary management of malignant pleural mesothelioma.
*Oncologist* 1999; 4: 488-500.

Zaidi A, Zamvar V, Macbeth F, Gibbs AR, Kulatilake N, **Butchart EG**. Pulmonary blastoma – medium term results from a regional centre.
*Ann Thorac Surg* 2002; 73: 1572-1575.

Jacob R, Hawkes ND, Dallimore N, **Butchart EG**, Thomas GAO, Maughan TS: Squamous carcinoma in an oesophageal foregut cyst.
*Br J Radiol* 2003; 76: 343-346.

Jasani B, Coleman S, **Butchart EG**, Evans EML Adams M, Mason M, Gibbs A, Tabi Z: Assessment of immunological competence and SV40 specific recall immunity in malignant pleural mesothelioma.
*Vaccine* 2005; 23: 2399-402.

Luckraz H, Morgan M, Gibbs AR, **Butchart EG**. Pseudomesothelioma resulting from a metastatic malignant melanoma.
*Eur J Cardiothorac Surg* 2005; 28: 655-6.

Luckraz H, Amer K, Thomas L, Gibbs AR, **Butchart EG**. Long term outcome of bronchoscopically resected endobronchial typical carcinoid.
Submitted to *J Thorac Cardiovasc Surg*

**Book Chapter:**

**Butchart EG**: The surgery of mesothelioma.
Chapter 39 in *Thoracic Oncology*. (Eds. Roth JA, Ruckdeschel JC, Weisenburger TH). Published by WB Saunders Co., Philadelphia, 1989, pp 566-587).

**Abstract:**

Rahman M, Payne N, Lester J, Moreno de la Santa P, Gibbs AR, **Butchart EG**. Comparison of pleurectomy/decortication and pleuropneumonectomy in the treatment of mesothelioma: a 22 year experience.
*Lung Cancer* 2003; 41 (Suppl 2): S59.

## CHAIRMANSHIP OF INTERNATIONAL MEETINGS

### Meeting Chairman

1981 International Valve Symposium, Palma, Majorca.

1991 Symposium on Thrombosis, Embolism and Bleeding in Heart Valve Disease, Washington DC.

1997 Workshop on Valve Surgery in Developing Countries, Sydney, Australia.

2001 ESC Education and Training Programme: 'Difficult Situations in the Management of Valve Disease', European Heart House, Sophia Antipolis, France.

2003 ESC Education and Training Programme: Difficult Situations in the Management of Valve Disease', Florence, Italy.

### Session Chairman

1985 Spanish Thoracic Surgery Postgraduate Course, Madrid, Spain (Co-moderator with Dr. Nael Martini).

1995 Meetings at Royal Society of Medicine, London, on 'Left Ventricular Function in Valve Disease' and 'The Small Aortic Root.

1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005 European Society of Cardiology annual meetings.

2001, 2002, 2003 French Society of Cardiology, Paris.

2002 German Cardiac Society, Mannheim (joint meeting with ESC WG).

2002 Portuguese Society of Cardiology, Sintra (joint meeting with ESC WG).

2002 EuroEcho, Munich, Germany.

2003 Polish Cardiac Society, Krakow, Poland (joint meeting with ESC WG).

2004 International Mesothelioma Interest Group, Brescia, Italy

**INVITED LECTURES TO INTERNATIONAL SOCIETIES AND ORGANISATIONS**

1981 Surgical Society of the GDR, Halle, East Germany.

1985 Spanish Thoracic Surgery Postgraduate Course, Madrid, Spain

1987 Asian Congress on Thoracic and Cardiovascular Surgery, Singapore.

1988 Royal Australasian College of Surgeons, Brisbane, Australia.

1988 Cardiac Society of Australia and New Zealand/Royal Australasian College of Physicians joint meeting, Sydney, Australia.

1992 International Society of Cardiovascular Surgery, Seville, Spain.

1993 International Workshop on Mesothelioma Staging, IASLC meeting, Colorado Springs, USA.

1994 European Association for Cardiothoracic Surgery, Paris, France.

1996 Review Course in Cardiothoracic Surgery, Birmingham, UK.

1996 European School of Oncology, London, UK.

1996 Japanese Association for Thoracic Surgery, Kyoto, Japan.

1997 European School of Oncology, Bari, Italy.

1997 Dubai International Cardiology Conference, Dubai.

1997 International Congress on Thorax Surgery, Athens, Greece.

1997 Scandinavian Association for Thoracic Surgery, Trondheim, Norway.

1997 Asian Congress on Thoracic and Cardiovascular Surgery, Sydney, Australia.

1997 Japanese Society for Cardiovascular Surgery, Tokyo, Japan.

1998 American Association for Thoracic Surgery, Boston, USA. (postgraduate course)

1998 European Society of Cardiology, Vienna, Austria.

1998 World Congress on Cerebral Embolism, New Orleans, USA.

2000 European Society of Cardiology, Amsterdam, Holland.

2001 French Society of Cardiology, Paris, France.

2001 International Cardiology Congress of the South Pacific, Tahiti, French Polynesia.

2001 European Society of Cardiology, Stockholm, Sweden.

2001 Symposium on Progress in Cardiovascular Disease, Rome, Italy.

2002 European Society of Cardiology, Berlin, Germany.

2002 EuroEcho meeting, Munich, Germany.

2003 Polish Cardiac Society, Krakow, Poland.

2003 Portuguese Society of Cardiology, Sintra, Portugal.

2003 European Society of Cardiology, Vienna, Austria.

2003 EuroEcho meeting, Barcelona, Spain

2004 Norwegian Cardiothoracic Surgical Association, Oslo, Norway.

2004 European Society of Cardiology, Munich, Germany.

2004 EuroEcho meeting, Athens, Greece

2005 French Society of Cardiology, Paris, France

2005 American College of Cardiology, Orlando, Florida

2005 Norwegian Congress on Preventive Cardiology and Cardiac Rehabilitation, Tønsberg, Norway.

## PRESENTATIONS OF PAPERS SUBMITTED TO INTERNATIONAL SOCIETIES

Thoracic Society of Australia, 1984.

European Society of Cardiology (annual meetings and Working Group meetings), 1987, 1989, 1992, 1993 and 1998.

European Association for Cardiothoracic Surgery, 1987.

American Heart Association, 1987, 1990, 1999, 2000, 2001, 2002

World Society of Cardiothoracic Surgeons, 2000, 2003

Western Thoracic Surgical Association, USA, 2001.

World Congress of Cardiology, 2002.

World Congress on Heart Disease, 2005.

## INVITED LECTURES TO INTERNATIONAL SYMPOSIA ON VARIOUS ASPECTS OF HEART VALVE DISEASE

Lisbon, Portugal (1981), Palma, Majorca (1982), Bermuda (1984), Dusseldorf, Germany (1985), Lanzarote, Spain (1987), Paris, France (1987), London, England (1989), Washington DC, USA (1991), Sheffield, England (1991), Turnberry, Scotland (1991), Boston, USA (1993), Naples, Italy (1994), Tampa, Florida (1995), Visby, Sweden (1995), Aarhus, Denmark (1995), Paris, France (1996), San Diego, USA (1996), Bermuda (1996), Naples, Florida (1997), Edinburgh, Scotland (1998), Phoenix, USA (1998), Paris, France (1999), Bad Oeynhausen, Germany (1999), Colorado Springs, USA (1999), St. Petersburg, Florida, USA (2001), Chicago, USA (2001), Sardinia, Italy (2001), Phoenix, AZ, USA (2002), Faro, Portugal (2002), Toronto, Canada (2002), Trondheim, Norway (2002), Berlin (2003).