# Exhibit 9

Remove highlighting, colour, links, QuickCite signal Open in new window

Tag for delivery

Case Name:

# R. v. J.-L.J. [R. v. J.J.]

Her Majesty The Queen, appellant;
v.
J.-L.J., respondent.

[2000] S.C.J. No. 52
2000 SCC 51
File No.: 26830.
Also reported at: [2000] 2 S.C.R. 600

**Supreme Court of Canada**

1999: December 10 / 2000: November 9.

**Present: L'Heureux-Dubé, McLachlin, Iacobucci, Major, Bastarache, Binnie and Arbour JJ.**

**ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC (62 paras.)**

*Criminal law — Evidence — Expert evidence — Admissibility — Mohan criteria — Accused charged with sexual assaults on two young male children — Expert witness testifying that accused's personality incompatible with any predisposition to commit such offences — Whether trial judge erred in excluding expert evidence.*

The accused was charged with a series of sexual assaults on two young male children. He tendered the evidence of a psychiatrist to establish that in all probability a serious sexual deviant had inflicted the abuse, including anal intercourse, and no such deviant personality traits were disclosed by the accused in various tests including penile plethysmography. After a voir dire, the trial judge excluded the expert evidence because it purported to show only lack of general disposition and was not saved by the "distinctive group" exception recognized in Mohan. The accused was convicted. A majority of the Court of Appeal allowed the accused's appeal and ordered a new trial on the basis that the expert evidence was wrongly excluded.

**Held:** The appeal should be allowed and the conviction restored.

The trial judge's discharge of his gatekeeper function in the evaluation of the demands of a full and fair trial record, while avoiding distortions of the fact-finding exercise through the introduction of inappropriate expert testimony, deserves a high degree of respect. In this case, the trial judge was not persuaded that the Mohan requirements had been met.

Novel science is subject to "special scrutiny". In this case the psychiatrist was a pioneer in Canada in trying to use the penile plethysmograph, previously recognized as a therapeutic tool, as a forensic tool. Moreover, if expert evidence were accepted that the offence was probably committed by a member of a "distinctive group" from which the accused is excluded, it would be a short step to the conclusion on the ultimate issue of guilt or innocence. This was another reason for special scrutiny.

The "distinctive group" exception sought to be applied here requires that it be shown that the crime could only, or would only, be committed by a person having distinctive personality traits that the accused does not possess. The personality profile of the perpetrator group must identify truly distinctive psychological elements that were in all probability present and operating in the perpetrator at the time of the offence. The Mohan requirement that this profile be "standard" was to ensure that it is not put together on an ad hoc basis for the purpose of a particular case. Beyond that, the issue whether the "profile" is sufficient depends on the expert's ability to identify and describe with workable precision what exactly distinguishes the distinctive or deviant perpetrator from other people and on what basis the accused can be excluded. The expert evidence tendered in this case was unsatisfactory on both points. The definition of the "distinctive" group of individuals with a propensity to commit the "distinctive crime" was vague. While the reference in Mohan to a "standard profile" should not be taken to require an exhaustive inventory of personality traits, the profile must confine the class to useful proportions. Furthermore, the witness did not satisfy the trial judge that the underlying principles and methodology of the tests administered to the accused were reliable and, importantly, applicable. Even giving a loose interpretation to the need for a "standard profile", and passing over the doubts that only a pedophile would be capable of the offence, the evidence of the error rate in the tests administered to the accused was problematic. The possibility that such evidence would distort the fact-finding process was very real. Consideration of the cost-benefit analysis supports the trial judge's conclusion that the testimony offered as many problems as it did solutions, and it was therefore within his discretion to exclude it. The majority of the Court of Appeal erred in interfering with the exercise of that discretion.

**Cases Cited**

*Applied*: R. v. Mohan, [1994] 2 S.C.R. 9; *referred to*:

R. v. Garfinkle (1992), 15 C.R. (4th) 254; R. v. Béland, [1987] 2 S.C.R. 398; R. v. McIntosh (1997), 117 C.C.C. (3d) 385; R. v. Seaboyer, [1991] 2 S.C.R. 577; Kelliher (Village of) v. Smith, [1931] S.C.R. 672; R. v. Abbey, [1982] 2 S.C.R. 24; R. v. Lavallee, [1990] 1 S.C.R. 852; R. v. McMillan (1975), 23 C.C.C. (2d) 160, aff'd [1977] 2 S.C.R. 824; R. v. Lupien, [1970] S.C.R. 263; R. v. Robertson (1975), 21 C.C.C. (2d) 385; Frye v. United States, 293 F. 1013 (1923); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Protection de la jeunesse -- 539, [1992] R.J.Q. 1144; R. c. Blondin, [1996] Q.J. No. 3605 (QL); People v. John W., 185 Cal.App.3d 801 (1986); Gentry v. State, 443 S.E.2d 667 (1994); United States v. Powers, 59 F.3d 1460 (1995); State v. Spencer, 459 S.E.2d 812 (1995); R. v. Pascoe (1997), 5 C.R. (5th) 341; R. v. B.L., [1988] O.J. No. 2522 (QL); R. v. G. (J.R.) (1998), 17 C.R. (5th) 399; R. v. Taillefer (1995), 100 C.C.C. (3d) 1; R. v. B. (S.C.) (1997), 119 C.C.C. (3d) 530; R. v. K.B. (1999), 176 N.S.R. (2d) 283; R. v. Malboeuf, [1997] O.J. No. 1398 (QL), leave to appeal refused, [1998] 3 S.C.R. vii; R. v. Perlett, [1999] O.J. No. 1695 (QL); R. v. S. (J.T.) (1996), 47 C.R. (4th) 240; R. v. Dowd (1997), 120 C.C.C. (3d) 360; Davie v. Magistrates of Edinburgh, [1953] S.C. 34; R. v. Marquard, [1993] 4 S.C.R. 223.

**Statutes and Regulations Cited**

Criminal Code, R.S.C., 1985, c. C-46, ss. 152 [rep. & sub. c. 19 (3rd Supp.), s. 1], 159(1) [idem, s. 3].

**Authors Cited**

Barker, James G., and Robert J. Howell. "The Plethysmograph:

A Review of Recent Literature" (1992), 20 Bull. Am. Acad. Psychiatry & L. 13.

Delisle, R. J. "The Admissibility of Expert Evidence: A New Caution Based on General Principles" (1994), 29 C.R. (4th) 267.

Mewett, Alan W. "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 Crim. L.Q. 29.

Morin, Luc, et Claude Boisclair. "La preuve d'abus sexuel:

allégations, déclarations et l'évaluation d'expert" (1992), 23 R.D.U.S. 27.

Myers, John E. B., et al. "Expert Testimony in Child Sexual Abuse Litigation" (1989), 68 Neb. L. Rev. 1.

Paciocco, David M., and Lee Stuesser. The Law of Evidence. Concord, Ont.: Irwin Law, 1996.

APPEAL from a judgment of the Quebec Court of Appeal, [1998] R.J.Q. 2229, 130 C.C.C. (3d) 541, [1998] Q.J. No. 2493 (QL), allowing the accused's appeal from his conviction for sexual offences and ordering a new trial. Appeal allowed.

Carole Lebeuf and Stella Gabbino, for the appellant. Pauline Bouchard and Sharon Sandiford, for the respondent.

Solicitor for the appellant: The Attorney General's Prosecutor, Montréal.
Solicitors for the respondent: Silver, Morena, Montréal.

The judgment of the Court was delivered by

¶ 1 **BINNIE J.**:— In this appeal we are required to consider aspects of the "gatekeeper function" performed by trial judges in the reception of novel scientific evidence. The respondent was charged with a series of sexual assaults over a period of four months on two young males with whom he stood in a parental relationship. At the time of the offences, which involved the allegation of anal penetration, the young males were between three and five years old. The defence contended that such offences were committed by someone possessed of a highly distinct personality disorder, and tendered an expert psychiatrist, Dr. Édouard Beltrami, to testify that the respondent's personality was incompatible with any predisposition to commit such offences. The evidence was excluded by the trial judge, who convicted the respondent. A new trial was ordered by a majority of the Quebec Court of Appeal on the basis that this evidence was wrongly excluded. We are of the opinion that in the circumstances the trial judge was entitled to exclude the expert evidence and that the appeal must be allowed and the conviction restored.

I. The Facts

¶ 2 The respondent's family situation is complex. Between February 1, 1995 and May 19, 1995, he had custody of W. and L., two children between three and five years old. The respondent testified that at

the time of the events, he was living with his current wife and her son. Because W. and L. did not get along well with his wife's son, the respondent had rented an apartment for them where they lived with a female friend, who looked after them at nights and during the weekends, and a babysitter who came in on weekdays. The respondent visited the apartment on a daily basis, took about half of his meals there and was often present during the weekends.

¶ 3 On May 9, 1995, a child and youth protection centre received information alleging that L. had been sexually abused by the respondent. About a week later, the two children were removed from the respondent's custody and placed in a foster home. The foster mother did not know the respondent nor did she know why the children had been removed from his custody. She and her sister testified against the respondent at the trial.

1. Statements by the Children

¶ 4 The foster mother testified that:

(i) While giving a bath to the two children, she observed them rubbing their penises together. W. then started to hit L.'s buttock with his penis. On being questioned, the children said it was "Papi" who showed them to do that.

(ii) Another time, W. told her that "Papi" had rubbed his "coulout" on his body, had [TRANSLATION] "wet his hair", and that "when papi finished doing that ... he put his coulout in his behind", and that when he had done doing that, there was blood in W's excrement. W. told her that this was painful and caused him to walk with difficulty. According to the foster mother, W. had tears in his eyes when he gave this account. "Coulout" is a slang word for penis. The foster mother said she had never heard the word until the child mentioned it.

¶ 5 The sister of the foster mother also did not know the respondent. She testified that at one point she was watching television with the children. During an episode in which two persons were kissing, W. blurted out a similar "coulot" story with the same details about blood and difficulties in walking. W. said that "Papi" would then clean up the excrement with some paper and that "Papi's" "coulout" is quite different than his: [TRANSLATION] "it's bigger and all hairy".

¶ 6 On October 24, 1995, Sergeant Binette asked W. who had put his "coulout" in his buttock. The child answered "Papi J." and quickly identified the respondent as "Papi J." when presented with pictures.

2. The Charges

¶ 7 The respondent was charged with sexual offences in relation to both W. and L., including touching for a sexual purpose the body of a person under the age of 14 years, unlawful anal intercourse, and sexual assault.

3. The Examining Physicians

¶ 8 Dr. Desmarchais, a pediatrist retained by the Crown, examined W. on July 24, 1995, more than two months after the children were removed from the respondent's custody. She observed a 1.5 cm lesion near the anus and thought that there was no doubt that the boy had been sodomized. On the other hand, Dr. Chabot, also a pediatrist who testified for the Crown, was equivocal. He examined W. on August 31, 1995. He said that while the scar was longer than one might expect from constipation, the

injury was consistent with constipation as well as with sodomy.

4. The Excluded Evidence

¶ 9 In the course of his trial, the respondent tendered the evidence of Dr. Édouard Beltrami, a qualified psychiatrist who works extensively in the field of clinical psychology. Dr. Beltrami's evidence was tendered to establish that in all probability a serious sexual deviant had inflicted anal intercourse on two children of that age, and no such deviant personality traits were disclosed in Dr. Beltrami's testing of the respondent. The Crown objected to the admission of this evidence and a voir dire was held. Dr. Beltrami testified in the voir dire as follows:

(1) While it is not possible to establish a standard profile of individuals with a disposition to sodomize young children, such individuals [TRANSLATION] "frequently" or "habitually" exhibited certain distinctive characteristics which could be identified. The respondent had been tested for these characteristics and excluded.

(2) The tests, which had been administered by Dr. Beltrami's assistant, but the results evaluated by Dr. Beltrami himself, consisted of two approaches, the first a series of general personality tests, and the second a test which Dr. Beltrami considered could detect individuals with serious sexual disorders.

¶ 10 In the first set of tests, the respondent was asked a series of questions about his family history, his schooling, his work experiences, his emotional and sexual life, his hobbies and life habits. The "Minnesota Multiphasic Personality Inventory Test Version 2" (hereinafter "MMPI2") was also administered. The respondent's reactions, while being questioned, were monitored by electromyography (EMG), which measures anxiety. It acts as a sort of lie detector. The objective of the MMPI2 is to identify different potential personality characteristics, including the tendency to be truthful, to hide symptoms, to be subject to psychosis, to be depressive, to be hyperactive, to be anxious, to be histrionic, etc. These tests are not designed specifically for the detection of sexual disorders.

¶ 11 The second and more controversial test was directed to the respondent's sexual preferences. It consisted of exposing him to images and sounds of sexual activity, both normal and deviant, and measuring his physiological reaction through a gauge attached to his penis. The "strain gauge" is designed to pick up signs of physical arousal. Dr. Beltrami explained that if the subject has previously derived pleasure from a specific form of sexual activity, the pleasure is imprinted on the brain, and may be restimulated on further exposure to pictures or sounds of similar activity. This is how he explained it to the court:

[TRANSLATION]

Q. How do you ... how is it done?

A. The subject is shown normal and deviant images and is played normal and deviant audio cassettes.

Q. Yes.

A. And those who have derived pleasure in the past from a deviant sexual activity, this ...

Q. This test?

A. ... this pleasure is kind of ingrained in his brain in the form of an engram, to use the technical term ...

Q. Okay, just to ...

A. And when the subject is shown the same situations, it will cause either a mini-erection of which he is sometimes not aware, but a tumescence, that is, a swelling of his penis that is measured with a device for that purpose that is connected to electronic instruments that take down the resulting measurements.

¶ 12 All of the tests used standardized questions, images and scenarios. The respondent was never confronted with specific images designed to replicate the offences alleged against him.

¶ 13 Dr. Beltrami testified on the voir dire that the first set of tests showed that the respondent had had an unexceptional childhood, that he had not been sexually abused, that he had a good education which allowed him to hold a responsible job and that he was ingenious and entrepreneurial. He noted that the respondent often maintained two or three intimate heterosexual relationships at the same time without his partners knowing about one another. There were several children from these various relationships. Dr. Beltrami notes [TRANSLATION] "He clearly exhibits judgment problems in his tumultuous emotional life. On the other hand, he does not seem to have the irrational ideas associated with sexual offences." Dr. Beltrami noted a tendency on the part of the respondent to deceive, but apart from some emotional instability with women, Dr. Beltrami concluded that the respondent did not have any particular pathologies.

¶ 14 With respect to the plethysmograph test, Dr. Beltrami concluded that the respondent has [TRANSLATION] "a clearly normal profile with a preference for adult women and a slight attraction to adolescents. He exhibits no deviation in respect of boys in general or prepubescent boys".

¶ 15 The trial judge ruled Dr. Beltrami's evidence inadmissible. He acquitted the respondent of the charges related to L. but convicted the respondent of having, for a sexual purpose, invited, counseled or incited W. to touch the body of the respondent, (s. 152 of the Criminal Code, R.S.C., 1985, c. C-46) and having engaged in an act of anal intercourse (s. 159(1) of the Criminal Code). The respondent was sentenced to imprisonment of two years on each charge, to be served concurrently. The majority of the Court of Appeal, Robert J.A. dissenting, found that Dr. Beltrami's evidence ought to have been admitted, allowed the appeal and ordered a new trial.

II. Judgments

1. Court of Québec, No. 500-01-015157-958, September 27 and October 18, 1996

¶ 16 Judge Trudel recognized Dr. Beltrami as an expert in psychiatry, sexology and physiology. He characterized his evidence, however, as evidence only of general disposition or propensity to commit this type of offence. As such, the evidence did not come within the "distinctive group" exception recognized in R. v. Mohan, [1994] 2 S.C.R. 9, which he interpreted as requiring a scientifically established standard profile of the "distinctive group" of offenders. As Dr. Beltrami had acknowledged that no such standard profile had been developed, the exception was therefore inapplicable and the evidence excluded. Convictions were entered in relation to the offences against W.

2. Quebec Court of Appeal (1998), 130 C.C.C. (3d) 541

¶ 17 The respondent appealed his conviction on several grounds. For present purposes, it is sufficient to summarize the opinions of the Court of Appeal in relation to the admission of Dr. Beltrami's evidence, which formed the basis of the dissent.

(a) Beauregard and Fish JJ.A., majority

¶ 18 Fish J.A., with whom Beauregard J.A. agreed, allowed the appeal and ordered a new trial on the basis that the trial judge erred in not admitting Dr. Beltrami's evidence.

¶ 19 In the opinion of the majority, even if Dr. Beltrami was unable to identify a "single set of behavioural characteristics shared by every adult, male pedophile" (p. 545), he was nonetheless able to give evidence concerning the respondent's behavioural profile and to assert, in substance, that it included none of the characteristics that were in his view "compatible with the ... offence with which [he] was charged" (p. 545).

¶ 20 Concerning the reliability requirement, Fish J.A. did not believe that absolute reliability was the standard. He noted that the plethysmograph is generally recognized by the scientific community and is used by psychiatric facilities such as the Institut Philippe Pinel de Montréal to monitor the result of treatment for sexual pathologies. He noted that Dr. Beltrami had testified that the respondent's results show a sexual preference for adult women and no desire or preference for children.

¶ 21 Fish J.A. did not interpret Mohan, supra, as requiring "the mechanical exclusion of expert evidence on the sole ground that the scientific community has not developed a single set of personality traits -- or single psychological profile -- that is common to every offender who commits the crime charged" (p. 546). He observed that in Mohan Sopinka J. cited R. v. Garfinkle (1992), 15 C.R. (4th) 254 (Que. C.A.), with apparent approval. In Garfinkle, the Quebec Court of Appeal had ruled Dr. Beltrami's evidence admissible on the facts presented in that case.

¶ 22 Unlike the expert evidence rejected in Mohan, the evidence of Dr. Beltrami was to the effect that "the offence charged involves an extreme degree of sexual deviancy. It can properly be characterized as distinctive in virtue of the biological nature of the act and the very young age of the alleged victims" (p. 547). These elements point to an offender having one or more distinctive personality traits. According to Dr. Beltrami, the person who committed the offence would likely respond measurably to the penile plethysmograph test since the instrument is particularly effective in detecting extreme deviance. The respondent did not test positive, and Dr. Beltrami's evidence could therefore be "of material assistance in determining innocence or guilt": Mohan, supra, at p. 37. The majority allowed the appeal and ordered a new trial.

(b) Robert J.A., dissenting

¶ 23 Referring to Mohan, supra, Robert J.A. reviewed the criteria applicable to the admissibility of expert evidence as to disposition to commit a crime. What is required is that the person who has committed the crime or the accused has "distinctive characteristics" that allow the trier of fact to make comparisons that will help him or her to determine the issue of guilt. The dissent is based in part on the following passage in Mohan, at p. 37:

> The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the

> expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. Put another way: Has the scientific community developed a standard profile for the offender who commits this type of crime? An affirmative finding on this basis will satisfy the criteria of relevance and necessity. [Emphasis added.]

¶ 24 Robert J.A. agreed with the trial judge that Dr. Beltrami's evidence was inadmissible largely because science has not yet identified a standard profile for individuals who commit sodomy on young children. The fact that Dr. Beltrami considered the respondent's personality to be incompatible with characteristics that are [TRANSLATION] "frequently" or "habitually" found among people who commit the crime with which the respondent was accused does not satisfy the Mohan test. Dr. Beltrami's evidence amounted to evidence of general disposition and did not come within the limited exception to the prohibition against such evidence. Robert J.A. would thus have dismissed the appeal.

III. Analysis

¶ 25 Expert witnesses have an essential role to play in the criminal courts. However, the dramatic growth in the frequency with which they have been called upon in recent years has led to ongoing debate about suitable controls on their participation, precautions to exclude "junk science", and the need to preserve and protect the role of the trier of fact -- the judge or the jury. The law in this regard was significantly advanced by Mohan, supra, where Sopinka J. expressed such a concern at p. 21:

> Dressed up in scientific language which the jury does not easily understand and submitted through a witness of impressive antecedents, this evidence is apt to be accepted by the jury as being virtually infallible and as having more weight than it deserves.

and at p. 24:

> There is also a concern inherent in the application of this criterion that experts not be permitted to usurp the functions of the trier of fact. Too liberal an approach could result in a trial's becoming nothing more than a contest of experts with the trier of fact acting as referee in deciding which expert to accept.

¶ 26 In R. v. Béland, [1987] 2 S.C.R. 398, La Forest J. warned at p. 434 about undue weight being given to "evidence cloaked under the mystique of science", and more recently in R. v. McIntosh (1997), 117 C.C.C. (3d) 385, the Ontario Court of Appeal rejected the evidence of an expert who was put forward by the defence to discuss the frailties of eyewitness identification. Finlayson J.A. observed that admission of such evidence would suggest that without expert help "our jury system is not adequate to the task of determining the guilt of an accused person beyond a reasonable doubt where the identification evidence is pivotal to the case for the Crown" (p. 395). The present appeal involves a provincial court judge sitting alone, but it raises the same controversy about the need to draw the line properly between the role of the expert and the role of the court.

¶ 27 In Mohan, the Court excluded expert evidence that was directed to a similar point to the one made here by Dr. Beltrami. In that case, a practising physician was charged with four counts of sexual assault on four female patients aged 13 to 16. The defence tendered a psychiatrist who was prepared to testify that the perpetrator of the alleged offences was part of a limited and distinctive group of individuals (pedophiles and sexual psychopaths) and that the accused did not possess the

characteristics typical of members of the group. This Court accepted the trial judge's conclusion that science had not yet developed sufficiently standardized profiles of pedophiles and sexual psychopaths against which an alleged perpetrator could be matched. The evidence was therefore rejected as unreliable, and unnecessary in the sense that it was not required to clarify "a matter otherwise inaccessible" (p. 38).

¶ 28 In the course of Mohan and other judgments, the Court has emphasized that the trial judge should take seriously the role of "gatekeeper". The admissibility of the expert evidence should be scrutinized at the time it is proffered, and not allowed too easy an entry on the basis that all of the frailties could go at the end of the day to weight rather than admissibility.

¶ 29 The Court's gatekeeper function must afford the parties the opportunity to put forward the most complete evidentiary record consistent with the rules of evidence. As McLachlin J. noted in R. v. Seaboyer, [1991] 2 S.C.R. 577, at p. 611:

> Canadian courts, like courts in most common law jurisdictions, have been extremely cautious in restricting the power of the accused to call evidence in his or her defence, a reluctance founded in the fundamental tenet of our judicial system that an innocent person must not be convicted.

Nevertheless, the search for truth excludes expert evidence which may "distort the fact-finding process" (Mohan, at p. 21). To assist in the gatekeeper exercise, the Court established a list of criteria against which, on this appeal, the admissibility of Dr. Beltrami's evidence must be judged. For ease of exposition, I will address these criteria in a sequence that differs somewhat from that followed in Mohan.

1. Subject Matter of the Inquiry

¶ 30 In Mohan, Sopinka J., at p. 23, approved a passage from Kelliher (Village of) v. Smith, [1931] S.C.R. 672, at p. 684, that "[t]he subject-matter of the inquiry must be such that ordinary people are unlikely to form a correct judgment about it, if unassisted by persons with special knowledge". See also R. v. Abbey, [1982] 2 S.C.R. 24, per Dickson J., at p. 42; R. v. Lavallee, [1990] 1 S.C.R. 852, per Wilson J., at p. 896; and McIntosh, supra, per Finlayson J.A., at p. 392.

¶ 31 Dr. Beltrami's evidence satisfies this threshold requirement. In R. v. McMillan (1975), 23 C.C.C. (2d) 160, aff'd [1977] 2 S.C.R. 824, Martin J.A. of the Ontario Court of Appeal considered psychiatric evidence of disposition admissible "where the particular disposition or tendency in issue is characteristic of an abnormal group, the characteristics of which fall within the expertise of the psychiatrist" (p. 169 (emphasis added)). See also R. v. Lupien, [1970] S.C.R. 263; McMillan, supra; and R. v. Robertson (1975), 21 C.C.C. (2d) 385 (Ont. C.A.). This line of cases was approved in Mohan with the notation that the operative concept is "distinctive" rather than "abnormal", at p. 36:

> In my opinion, the term "distinctive" more aptly defines the behavioural characteristics which are a pre-condition to the admission of this kind of evidence.

¶ 32 The exception is based on the notion that "psychical as well as physical characteristics may be relevant to identify the perpetrator of the crime" (McMillan, per Martin J.A., at p. 173), and "involves the psychiatrist in expressing his conclusion that the accused does not have the capacity to commit the crime with which he is charged" (Lupien, supra, per Ritchie J., at p. 278 (emphasis added)). This is

clearly a proper subject matter for expert evidence. Whether or not the evidence tendered in this particular case is admissible remains to be established.

2. Novel Scientific Theory or Technique

¶ 33 Mohan kept the door open to novel science, rejecting the "general acceptance" test formulated in the United States in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), and moving in parallel with its replacement, the "reliable foundation" test more recently laid down by the U.S. Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). While Daubert must be read in light of the specific text of the Federal Rules of Evidence, which differs from our own procedures, the U.S. Supreme Court did list a number of factors that could be helpful in evaluating the soundness of novel science (at pp. 593-94):

(1) whether the theory or technique can be and has been tested:

> Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.

(2) whether the theory or technique has been subjected to peer review and publication:

> [S]ubmission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected.

(3) the known or potential rate of error or the existence of standards; and,

(4) whether the theory or technique used has been generally accepted:

> A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community."
>
> ...
>
> Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community," ... may properly be viewed with skepticism.

¶ 34 Thus, in the United States, as here, "general acceptance" is only one of several factors to be considered. A penile plethysmograph may not yet be generally accepted as a forensic tool, but it may become so. A case-by-case evaluation of novel science is necessary in light of the changing nature of our scientific knowledge: it was once accepted by the highest authorities of the western world that the earth was flat.

¶ 35 In Mohan, Sopinka J. emphasized that "novel science" is subject to "special scrutiny", at p. 25:

> In summary, therefore, it appears from the foregoing that expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert.

The penile plethysmograph, as noted by Fish J.A., is generally recognized by the scientific community and is used by psychiatric facilities such as the Institut Philippe Pinel de Montréal to monitor the result of treatment for sexual pathologies. The plethysmograph enables the medical staff to assess the progress of therapy of known and admitted sexual deviants. This is inapplicable to the respondent. He denies he is part of such a group. He is not undergoing therapy. Dr. Beltrami is a pioneer in Canada in trying to use this therapeutic tool as a forensic tool where the problems are firstly to determine whether the offence could only be committed by a perpetrator who possesses distinctive and identifiable psychological traits, secondly to determine whether a "standard profile" of those traits has been developed, and thirdly to match the accused against the profile. Dr. Beltrami's evidence is therefore subject to "special scrutiny". While the techniques he employed are not novel, he is using them for a novel purpose. A level of reliability that is quite useful in therapy because it yields some information about a course of treatment is not necessarily sufficiently reliable to be used in a court of law to identify or exclude the accused as a potential perpetrator of an offence. In fact, penile plethysmography has received a mixed reception in Quebec courts: Protection de la jeunesse -- 539, [1992] R.J.Q. 1144; R. c. Blondin, [1996] Q.J. No. 3605 (QL) (S.C.); L. Morin and C. Boisclair in "La preuve d'abus sexuel: allégations, déclarations et l'évaluation d'expert" (1992), 23 R.D.U.S. 27. Efforts to use penile plethysmography in the United States as proof of disposition have largely been rejected: People v. John W., 185 Cal.App.3d 801 (1986); Gentry v. State, 443 S.E.2d 667 (Ga. Ct. App. 1994); United States v. Powers, 59 F.3d 1460 (4th Cir. 1995); State v. Spencer, 459 S.E.2d 812 (N.C. App. 1995); J. E. B. Myers et al., "Expert Testimony in Child Sexual Abuse Litigation" (1989), 68 Neb. L. Rev. 1, at pp. 134-35; J. G. Barker and R. J. Howell, "The Plethysmograph: A Review of Recent Literature" (1992), 20 Bull. Am. Acad. of Psychiatry & L. 13.

¶ 36 Dr. Beltrami also purported to gain assistance from the personality inventory tests (MMPI2) about the propensity of the respondent for sexual deviance, but those tests are too broad and general for that purpose, although the results may well have provided useful background information to the more specific plethysmograph test. Again, it was open to him to establish the reliability of these tests for the purposes of excluding the respondent as perpetrator of the offences, but Mohan teaches that the attempt is to be regarded with "special scrutiny".

3. Approaching the Ultimate Issue

¶ 37 Dr. Beltrami's evidence, if accepted, was potentially very powerful. Once it is accepted that the offence was probably committed by a member of a "distinctive group" from which the accused has been excluded, it is a short step to the conclusion on the ultimate issue of guilt or innocence. Dr. Beltrami's underlying hypothesis was that if the respondent did not "score" on the plethysmograph, he must lack the disposition to commit such acts. The inference is that if he lacks the disposition then he did not do it. The closeness of his opinion to the ultimate issue is another reason for special scrutiny, as mentioned by Sopinka J. in Mohan, at p. 25:

> The closer the evidence approaches an opinion on an ultimate issue, the stricter the

application of this principle.

See also R. v. Pascoe (1997), 5 C.R. (5th) 341 (Ont. C.A.), per Rosenberg J.A., at p. 357.

4. The Absence of Any Exclusionary Rule

¶ 38 In McMillan, supra, and again in Mohan, supra, the Court carved out an exception to the general rule that the character of the accused, in the sense of disposition to commit or not to commit the offence, can only be evidenced by general reputation in the community. The "distinctive group" exception has already been mentioned. As explained by Professor A. W. Mewett in "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 Crim. L.Q. 29, at pp. 35-36, discussed in Mohan at p. 34 et seq., it arises in its relevant aspect where "it is shown that the crime is such that it could only, or in all probability would only, be committed by a person having identifiable peculiarities that the accused does not possess" (emphasis added). In Garfinkle, supra, pedophiles were considered such a "distinctive" group. It may be an issue, however, whether a particular offence "in all probability would only" have been committed by a pedophile, as opposed to a non-pedophile whose untypical behaviour was modified by impulsiveness, stress, alcohol or drugs (R. v. B.L., [1988] O.J. No. 2522 (QL) (Gen. Div.); R. v. G. (J.R.) (1998), 17 C.R. (5th) 399 (Ont. Ct. (Prov. Div.)). Thus, in Mohan, supra, Sopinka J. pointed out at p. 38 that:

> Notwithstanding the opinion of Dr. Hill, the trial judge was also not satisfied that the characteristics associated with the fourth complaint identified the perpetrator as a member of a distinctive group. He was not prepared to accept that the characteristics of that complaint were such that only a psychopath could have committed the act. There was nothing to indicate any general acceptance of this theory. [Emphasis added.]

¶ 39 Similarly, in McMillan, supra, Spence J., at p. 827, approved Martin J.A.'s statement when the case was considered by the Ontario Court of Appeal that the evidentiary exception was limited to cases where "the offence is of a kind that is committed only by members of an abnormal group" (p. 173 (emphasis added)).

¶ 40 Subject to this precondition being established on a balance of probabilities, the personality profile of the perpetrator group must be sufficiently complete to identify distinctive psychological elements that were in all probability present and operating in the perpetrator at the time of the offence. Lack of distinctiveness robs the exception of its raison d'être. Thus R. v. Taillefer (1995), 100 C.C.C. (3d) 1 (Que. C.A.), Proulx J.A., upholding a trial judge's ruling excluding psychiatric testimony designed to establish that the perpetrator was marked by distinctive characteristics that neither accused possessed, stated at p. 34:

> [TRANSLATION] ... the trial judge, came to the proper conclusion, in a well-reasoned decision, that the crime charged did not involve behavioural characteristics which were sufficiently distinctive to facilitate the identification of the author of the crime. [Emphasis added.]

Similarly, in R. v. B. (S.C.) (1997), 119 C.C.C. (3d) 530 (Ont. C.A.), Doherty and Rosenberg JJ.A., applying Mohan, supra, stated at p. 537 that:

> [T]he defence may, however, lead expert evidence of an accused's disposition where

> the crime alleged is one that was committed by a person who is part of a group possessing distinct and identifiable behavioural characteristics. In those cases, the defence may lead evidence to show that the accused's mental makeup or behavioural characteristics excluded him or her from that group.

¶ 41 The question is whether in addition to identifying and describing the distinct and identifiable behavioural characteristics, the expert must be able to point to a more elaborate "standard profile" filling in the rest of the personality portrait. R. v. K.B. (1999), 176 N.S.R. (2d) 283 (C.A.), per Bateman J.A., at para. 10, is said to be support for that additional requirement. It is true, certainly, that in Mohan, Sopinka J. made reference to a standard profile in one of his formulations of the issue, at p. 37:

> Has the scientific community developed a standard profile for the offender who commits this type of crime?

The question is what is meant by a "standard profile". Given that the purpose of the evidence is to define with reasonable precision the psychological characteristics of the class of people to which the perpetrator belongs, and on that basis argue that the accused is either included or excluded, the important thing is to identify what exactly differentiates or distinguishes the perpetrator class from the rest of the population. The "standard profile" relates directly to those distinguishing features. This is clear from Sopinka J.'s preceding sentence:

> The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group.

¶ 42 The level of detail required in the "standard profile" may vary with the conclusiveness of individual elements. For example, if commission of an offence most likely requires so "distinctive" a psychological trait as necrophilia, as in R. v. Malboeuf, [1997] O.J. No. 1398 (QL) (C.A.), leave to appeal refused, [1998] 3 S.C.R. vii, it may be sufficient for exclusion to show that an accused has no such tendency without requiring the rest of the perpetrator's psychological portrait to be completed. In Malboeuf itself, the "necrophilia-lust type of murder" was considered sufficiently distinctive that the Crown was allowed to lead expert evidence that the accused "demonstrated distinctive characteristics that would place him in the category of persons who would commit this type of crime" (para. 5). A high level of distinctiveness, of course, is in addition to the other limitations on the Crown's ability to lead such expert evidence, including the requirements that it be relevant to an issue other than "mere propensity", and that its probative value outweighs its prejudicial effect: Pascoe, supra, at p. 355.

¶ 43 More common personality disorders are perhaps less distinctive than necrophilia. They are less likely to serve as "badges" to distinguish the perpetrator class from the rest of the population. Thus in R. v. Perlett, [1999] O.J. No. 1695 (QL) (S.C.J.), the trial judge found that the personality profiles of the perpetrators offered by the expert were simply too broad to be of material assistance in determining guilt or innocence: "This collection of ailments appears too general and vague to meet the test in Mohan" (per Platana J., at para. 36).

¶ 44 Between these two extremes, the range and distinctiveness of personality traits attributed to perpetrators of different offences will vary greatly. The requirement of the "standard profile" is to ensure that the profile of distinctive features is not put together on an ad hoc basis for the purpose of a

particular case. Beyond that, the issue is whether the "profile" is sufficient for the purpose to be served, whether the expert can identify and describe with workable precision what exactly distinguishes the distinctive or deviant perpetrator from other people. If the demarcation is clear and compelling, the fact the personality portrait cannot be filled in with elements that do not serve to distinguish the perpetrator is not fatal to acceptance of the evidence. While the trial judge was somewhat cryptic in his reasons on this point, it seems to me his decision is consistent with this analysis.

¶ 45 Fish J.A. pointed out in the court below that Sopinka J., in Mohan, supra, had cited Garfinkle, supra, where the Quebec Court of Appeal had allowed expert psychiatric evidence that pedophilia is "abnormal" and "that Garfinkle does not have such a disposition". While the "distinctive offence" exception recognized in Garfinkle was affirmed in Mohan, Garfinkle itself was decided without the benefit of the elaboration of the "gatekeeper" function developed in Mohan. In Mohan itself, at p. 38, the exclusory evidence relating to pedophilia was ruled inadmissible because

> there was no material in the record to support a finding that the profile of a pedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges.

Each case turns on its facts. The conclusion of the Garfinkle trial judge, affirmed by the Quebec Court of Appeal, that in the circumstances there presented the evidence of Dr. Beltrami was probative and its benefit outweighed the cost, did not bind the trial judge on the facts of this case, who reached a contrary conclusion on the evidence presented in the voir dire.

5. A Properly Qualified Expert

¶ 46 Dr. Édouard Beltrami was accepted as qualified in the fields of psychiatry, sexology and physiology. It was within his expertise to give opinion evidence about the various tests administered under his supervision and his interpretation of the results.

6. Relevance of the Proposed Testimony

¶ 47 Evidence is relevant "where it has some tendency as a matter of logic and human experience to make the proposition for which it is advanced more likely than that proposition would appear to be in the absence of that evidence" (D. M. Paciocco and L. Stuesser, The Law of Evidence (1996), at p. 19). Because the concept of relevance provides a low threshold ("some tendency"), Mohan built into the relevance requirement a cost-benefit analysis to determine "whether its value is worth what it costs" (p. 21) in terms of its impact on the trial process. Thus the criteria for reception are relevance, reliability and necessity measured against the counterweights of consumption of time, prejudice and confusion: R. J. Delisle, "The Admissibility of Expert Evidence: A New Caution Based on General Principles" (1994), 29 C.R. (4th) 267. Whether considered as an aspect of relevance or a general exclusionary rule, "[t]he reliability versus effect factor has special significance in assessing the admissibility of expert evidence" (Mohan, at p. 21).

¶ 48 It is on this requirement that Dr. Beltrami's evidence is most vulnerable.

(a) Existence of a Distinctive Group

¶ 49 Dr. Beltrami's definition of the "distinctive" group of individuals with a propensity to commit these "distinctive crimes" is vague. As the trial judge and Robert J.A. noted, there is no standard profile. The reliability of the scientific foundations of the theory that certain acts will almost always be done by

people having certain distinctive characteristics requires evidence; it cannot simply be assumed: K.B., supra, at para. 12; R. v. S. (J.T.) (1996), 47 C.R. (4th) 240 (Alta. C.A.), at p. 246; R. v. Dowd (1997), 120 C.C.C. (3d) 360 (N.B.C.A.), at p. 366. Dr. Beltrami said that: [TRANSLATION] "there is no point in making me say it a thousand times, there is no standard profile, but nonetheless I compared certain characteristics that are found frequently, not absolutely ..." (emphasis added). Dr. Beltrami describes these characteristics in the following way:

> [TRANSLATION] Well, as I just mentioned sexual abuse may ... be committed by people who have organic disorders, people who are psychotic, mentally deficient people, alcoholics, drug addicts, so plainly different people may have committed sexual abuse, but normally, when young children have been abused with a clear and unmistakable [sic] such as penetration, there is -- there is no one typical pathology, there is no pathology that is always the same and can be categorized, but normally there are a certain number of things that emerge, and the things that most often emerge are what was mentioned earlier, impulsiveness and also having inadequate social controls, which often have been passed on. So yes, it is true that there is no -- it isn't a particular psychological type that commits these acts, but when someone has committed that act, there is a disorder somewhere and I considered all the possible disorders. [Emphasis added.]

While the reference in Mohan to a "standard profile" should not be taken to require an exhaustive inventory of personality traits, the profile must confine the class to useful proportions. A spectrum of personality "disorders" that stretches from alcoholics to sexual psychopaths is too broad to be useful. If a man with more or less ordinary sexual predilections is capable while under the influence of alcohol or drugs to have committed these offences, the class of potential perpetrators is insufficiently "distinctive" in the Mohan sense for the expert evidence to be useful. Dr. Beltrami considered biological factors related to sexual interests to be the most important indicator but did not rule out the possibility that the offence was prompted by behavioural rather than biological factors.

(b) Specificity of Tests

¶ 50 The defence was obliged to satisfy the court that the underlying principles and methodology of the tests administered to the respondent were reliable and, importantly, applicable. The MMPI2 and related tests were used to probe for behavioural problems that might trigger conduct that would be out of sexual character, but these tests were not designed to complement the plethysmograph test, and in any event drugs and alcohol-related offences are hardly distinctive in the Mohan sense. Dr. Beltrami readily acknowledged that the MMPI2 was not designed for the detection of sexual disorders and it does not contain any specific probe for unusual sexual preferences. Nor were specific scenarios prepared for the plethysmograph test, as hereinafter discussed. There was in fact no evidence from the people who conducted the interviews or administered the plethysmograph test. No test protocols were introduced, and there was no confirmation that whatever standard procedures exist had been followed. An expert such as Dr. Beltrami is certainly entitled to rely on data generated by tests carried out under his supervision, but he more or less disavowed any supervisory function and could not answer specific questions about how the tests on the respondent were conducted.

(c) Error Rate in Plethysmograph Results

¶ 51 In his report presented at the voir dire, Dr. Beltrami indicated that the "sensitivity" of the plethysmograph would detect a sexual deviant 47.5 per cent of the time. Where a detection was in fact made, the result was considered highly reliable (97.4 per cent). The respondent tested negative, i.e., was

excluded, but the success rate of 47.5 per cent means that even in a test population consisting entirely of sexual deviants, the test would deliver a false negative more than half of the time. Dr. Beltrami observed during the voir dire, for example, that [TRANSLATION] "So, I acknowledge that in the usual literature, with people who come from all backgrounds, putting all the studies together, that there are about fifty percent (50%) of individuals who do not score." Such a result would render the test so prone to error as not to be useful for purposes of identification or exclusion.

¶ 52 When Dr. Beltrami was cross-examined on the 47.5 per cent success rate, he responded that [TRANSLATION] "nonetheless there are also articles that clearly indicate that the younger the age to which the deviation relates and the more unusual it is, the more specific and precisely sensitive the test will be". He said that some unidentified studies done "in Montreal" suggested that the detection rate in more "unusual preferences" could be up to 87 per cent. Thus the sensitivity of the test would vary between 47.5 per cent and 87 per cent but Dr. Beltrami did not give a more precise figure within this range, except to say that in the case of a perpetrator who derived pleasure from anal penetration of a prepubescent child the detection rate would likely be at the higher end of the scale. He said:

> [TRANSLATION] So then, when you are talking, if you want my professional opinion on anal penetration, it is a serious act that, despite what may be said about it, is not really naively so tolerated by children and it is an act that still requires some degree of pressure, whether it be psychological, whether it be physical force or something else, it leaves marks, it leaves marks and the well-known 40% may rise to 80% because this is really something outside of the norm.

¶ 53 Dr. Beltrami did not explain how, if the basis of the plethysmograph test was the stimulation of remembrance of past pleasures, the results would vary according to the degree of deviance from some norm, and the issue was not addressed in his written report.

¶ 54 Dr. Beltrami agreed that a false negative (i.e., instances where the plethysmograph failed to identify an actual deviant) can, among other things, be caused by the fact that the visual and auditive scenarios presented to the subject lacked certain specific elements of stimulation, for example humiliation of the victim. He said that tailor-made scenarios are sometimes built to fit exactly the alleged acts but that was not done in this case. The standardized scenarios used by Dr. Beltrami were not presented to the Court and no attempt was made to demonstrate that they in fact replicated the type of stimulation the putative offender would have had while committing the alleged act.

¶ 55 In my view, the trial judge had good reason to be sceptical about the value of this testimony. Even giving a loose interpretation to the need for a "standard profile", and passing over the doubts that only a pedophile would be capable of the offence, the evidence of the test error rate in the "match" of the respondent with or his "exclusion" from the "distinctive class" was problematic. The possibility that such evidence -- "cloaked under the mystique of science" (Béland, supra, at p. 434) -- would distort the fact-finding process, was very real. Moreover, defence evidence of this type can be expected to call forth expert evidence from the Crown in response, with the consequent danger that the trial could be derailed into a controversy on disposition or propensity, with the trial becoming "nothing more than a contest of experts with the trier of fact acting as referee in deciding which expert to accept" (Mohan, at p. 24). The trial judge did not regard the testimony as reliable for the purpose of excluding the respondent as a potential perpetrator of the crime, and consideration of the cost-benefit analysis seems to support the conclusion that the testimony offered as many problems as it did solutions.

7. Necessity in Assisting the Trier of Fact

¶ 56 In Mohan, Sopinka J. held that the expert evidence in question had to be more than merely helpful. He required that the expert opinion be necessary "in the sense that it provide information, 'which is likely to be outside the experience and knowledge of a judge or jury', ... the evidence must be necessary to enable the trier of fact to appreciate the matters in issue due to their technical nature" (p. 23). In Béland, supra, McIntyre J., speaking about the inadmissibility of a polygraph test, cited, at p. 415, Davie v. Magistrates of Edinburgh, [1953] S.C. 34, at p. 40, on the role of expert witnesses where Lord Cooper said:

> Their duty is to furnish the Judge or jury with the necessary scientific criteria for testing the accuracy of their conclusions, so as to enable the Judge or jury to form their own independent judgment by the application of these criteria to the facts proved in evidence. [Emphasis added.]

The purpose of expert evidence is thus to assist the trier of fact by providing special knowledge that the ordinary person would not know. Its purpose is not to substitute the expert for the trier of fact. What is asked of the trier of fact is an act of informed judgment, not an act of faith.

¶ 57 Dr. Beltrami clearly did not consider it his function to enable the trier of fact to appreciate the basis of the suggested inferences from his data in favour of the respondent. He offered a packaged opinion but was not prepared to share with the trial judge the data which he relied upon. At one point, asked by the Crown about his failure to produce the chart with the penile plethysmograph results, Dr. Beltrami said:

> [TRANSLATION] Listen, Your Honour, we have to understand that if we start -- normally we do not submit the psychological tests in detail or the curves because at that point if we start calculating everything in centimetres or millimetres, we will be here all morning. Let's just say that this curve, properly analysed, demonstrates the following results, that there are no, according to how those curves are normally evaluated, there are no signs of deviant behaviour in him.

Elsewhere, Dr. Beltrami gave his reason for non-production of the data on which he based his opinion as follows:

> [TRANSLATION] Okay. But it is not normally produced because otherwise, it would be too complicated to produce all the details, there would be battles over the little details.

¶ 58 The devil, of course, is often in the "little details" and following the cross-examination, Crown counsel had this exchange with the judge concerning the non-production of the key documents:

[TRANSLATION]

THE CROWN:

> I am making my comments to enable my friend to complete, do you understand what I mean?

THE COURT:

Yes, but that ...

THE CROWN:

In a way ...

THE COURT:

That's his problem.

THE CROWN:

All right.

The trial judge then said to defence counsel:

[TRANSLATION]

THE COURT:

... So, that's your own problem ...

¶ 59 Before any weight at all can be given to an expert's opinion, the facts upon which the opinion is based must be found to exist. Even if Dr. Beltrami had offered an explanation of his data, and explained to the trial judge the "expert" basis on which he felt the trial judge could draw appropriate inferences, there remained the question whether Dr. Beltrami's contribution to the judge's ability to form his "own independent conclusion" on the issue of the respondent's exclusion was worth the cost in potential distortion of the judge's independent consideration of the evidence of opportunity, the out-of-court statements of the children, the respondent's parental relationship with them, and the respondent's ongoing heterosexual relationships with several mature women. It seems to me the trial judge was simply being offered a conclusory opinion that on cross-examination turned out to be short on demonstrated scientific support. In terms of the questions posed in Daubert, supra, Dr. Beltrami did address "the known or potential rate of error" but was not asked to address the history or acceptance of the techniques for diagnostic as opposed to therapeutic purposes, and the level of acceptance for that purpose amongst his scientific peers.

¶ 60 Dr. Beltrami's evidence said in effect that the respondent's denial ought to be believed because he is not the sort of person who would do such a thing. This was close to oath-helping in circumstances not within the expert witness exception: R. v. Marquard, [1993] 4 S.C.R. 223, per McLachlin J., at p. 248. As the trial judge excluded Dr. Beltrami's evidence because of the lack of a "standard profile", he did not go on to deal in his reasons with the necessity requirement, but it certainly would have been open to him to exclude Dr. Beltrami's opinion on the basis of a "cost-benefit" analysis of the necessity requirement as well.

8. The Discretion of the Trial Judge

¶ 61 The Mohan analysis necessarily reposes a good deal of confidence in the trial judge's ability to discharge the gatekeeper function (Malboeuf, supra). The trial judge addressed himself to the proper

legal requirements established in Mohan. While he perhaps lingered on the need for a "standard profile", his reasons taken as a whole suggest that he was simply not persuaded, on the basis of the evidence which the defence chose to put forward, that the Mohan requirements had been met. The trial judge's discharge of his gatekeeper function in the evaluation of the demands of a full and fair trial record, while avoiding distortions of the fact-finding exercise through the introduction of inappropriate expert testimony, deserves a high degree of respect. In this case, there was much in the evidence to support the trial judge's decision to exclude Dr. Beltrami's testimony and in my respectful view the majority of the Quebec Court of Appeal erred in interfering with the exercise of his discretion to do so.

IV. Disposition

62 The appeal is therefore allowed and the conviction entered by the trial judge is restored.

QL Update: 20001109
cp/d/qlhbb