# Exhibit 13

IN AND FOR THE IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC., | ) | |
| SILZONE HEART VALVES PRODUCTS | ) | MDL NO. 01-1396 |
| LIABILITY LITIGATION | ) | (JRT/FLN) |

DEPOSITION OF KEVIN E. HEALY, Ph.D.
Volume I
Thursday, May 18, 2006

Reported by ELIZABETH J. WOOD
CSR License No. 5134

circulatory system of any person who currently has a Silzone heart valve?

A. Um, the data that I reviewed, which my deposition went through 2003, so about three years ago -- the data that I reported on was the internal studies mostly from in vivo experiments from the team at St. Jude.

Patient levels -- if you're talking about systemic levels, in my opinion, are rather irrelevant to this case.

Q. Okay. Doctor, but that's not my question.

So you're saying that you looked at some silver levels in regard --

A. I reviewed the data that was -- that was in the various documents from -- provided basically either from the PMA for -- for this -- this device; and, also, I looked at documentation from literature published by scientists, namely Dr. Tweden from St. Jude, with respect to monitoring silver levels, which I would call -- I would -- so I would delineate between what I call systemic levels and -- and local levels.

Q. Okay. Now, back to my question. The silver levels that you refer to are the silver levels that were taken during the PMA process; is that correct?

A. Well, you're -- you're asking like it's

Q. Do you recall looking at that type of medical information two years ago?

A. You have to be more specific.

Are you referring to a paper or if you're again saying do I have access to data that -- if it's not in the public literature, then the answer is no.

Q. Okay. So you have no information whatsoever about the individual patients and whether or not they have an acceptable level of silver in their body for the past three years?

MR. CAPRETZ: Object to the form.

MR. JEFFREY:

Q. You can answer.

A. Well, my answer first would be that these systemic levels are meaningless, so I don't really think it's important to pursue the investigation of meaningless data.

Systemic levels of silver have no bearing on what the local accumulation of silver would be in the peri-implant environment.

Q. Do you have that data, whether it's irrelevant to you or not?

A. I have the data that I reviewed, which was published by St. Jude scientists.

Q. And you have no other data other than what

was published by St. Jude scientists?

A. Not that I recall, no.

Q. And the data that you are referring to that was published by St. Jude scientists -- are you referring to the article by Dr. Tweden?

A. There's an article by Dr. Tweden.

I think an abstract at the Society for Biomaterials Meeting by another scientist -- I think it is Ogle, if that's right. Pardon me if it's not correct -- where the comparison of systemic and local levels are made; however, the data set is so small and difficult to interpret with respect to a very limited study from that publication --

Q. Have you looked at any pathology for any current Silzone heart valve recipient?

A. I looked at the deposition of Dr. Wilson and the pathology in that -- in that deposition -- the attachments to that deposition, um, in that -- um, pathology -- I'm not a pathologist, but I do -- as a career, I do design materials meant to basically change the function in the peri-implant wound healing response. That's sort of my expertise. So I do have some expertise in looking at histological sections.

In that capacity, I would agree with some of Dr. Wilson's assessment; but I also rely on historical data

from other fields where both peri-implant response, specifically due to particulate material, leads to chronic and sustained inflammatory response.

Q. Thank you, Doctor. Thank you for clarifying that.

Besides from the pathology that Dr. Wilson did, have you looked at the pathology for any other Silzone heart valve recipient?

A. I can't recall -- the answer is yes. I believe I looked at a series of -- of files provided to me from patients, but I don't have direct access.

I couldn't tell you off the top of my head which ones they were and basically which -- you know, how long the implant was in, and so forth and so on.

Q. When was this, doctor?

A. Maybe four years ago.

Q. Four years ago. Who supplied this pathology information?

A. I'm sure I received it as a disk from Michael Coren.

Q. Doctor, could you take a look at your list here? This is a list of the information that we were given that you reviewed.

Can you show me where on that list that pathology information is?

A. Well, certainly the sheep pathology I did examine.

Q. Excuse me, Doctor. Just to clarify, I'm talking about pathology from a current Silzone heart valve recipient. Someone who today still has that heart valve in them.

A. Right. So -- so the answer to that question, of course, is no, because how would you look at the pathology if the patient is still alive?

Q. So you haven't looked at the pathology for any person who currently has a Silzone heart valve?

A. Who -- I don't see how you could do that.

Q. And you haven't looked at the silver levels for anybody who currently has a Silzone heart valve today?

A. Well, you and I seem to disagree what's important, but if you're asking systemic silver, which I think is irrelevant, I have not looked at that, and I don't believe in looking at irrelevant data.

MR. CAPRETZ: Counsel, are we going to identify this document or are you referring to the deposition?

MR. JEFFREY: Yes, we can do that. Why don't we have a document entitled Material Reviewed by Professor Kevin E. Healy in Preparation for his Reports

left off your list.

You sort of tried to disqualify my credentials. And I can guarantee you that even people in your own law firm have recognized those credentials as being an expert for these kinds of interactions.

So if you want to say clinical evaluation -- and then you're being vague again. What do you mean by clinical evaluation?

Q. Prognosis.

A. Prognosis? I wouldn't be able to judge prognosis, depending on -- depending on -- if you're talking about tissue level reaction to a material, that I'm qualified to judge.

Q. You are qualified to judge tissue reaction to a material -- a particular material?

A. To materials in general, yes.

Q. Based on review of histology, correct?

A. Correct, yeah.

Q. But you haven't seen any of the histology for any of the people who currently have a valve, right?

A. Again, I go back to how would you -- so unless they recently passed, how would you be able to do that?

Q. So the answer is no?

A. Who currently have them? The answer would

be no, of course. They are in the patients.

Q. I'm just trying to determine what basis your opinions stand. So I'm going through all of the materials --

A. That's your question.

Q. -- and I'm going through all of the materials that you're reviewing, and I'm asking you whether you looked at this and whether you looked at that.

So there may be a lot of material that you don't think is relevant, and if I ask you whether you reviewed it, you can just tell me you didn't. All right?

So I just have a checklist here and I'm going through it.

Okay. You say that you need to look at populations. Population of people that have received a Silzone heart valve, for example, to determine whether or not there's any adverse event; is that right?

A. Of course. You would certainly -- no matter what kind of study you were doing, you would first look at the population of recipients and analyze that compared to a controlled cohort.

Q. So what is your best estimate of the number of Silzone valve recipients that are currently manifesting some type of clinical system due to their

Dacron or PET.

I'm sure everybody knows that, but I think as a biomaterial scientist, I don't like using trade names of a device to describe what we're really talking about.

Q. So in answer to my question then, and the chronic inflammatory response that we've been talking about, your belief is it is caused by coming into contact with silver from the Silzone coating; is that correct?

MR. CAPRETZ: Objection to form.

THE WITNESS: Not simply coming into contact with silver. It is an accumulated level of silver released into the peri-implant region causing inflammatory --

MR. JEFFREY:

Q. Okay. Which causes a chronic inflammatory response?

A. Correct.

Q. And the only way we can determine whether or not a patient indeed has a chronic inflammatory response is by a biopsy?

A. Certainly that's my opinion and/or biopsy -- I'm using a general term biopsy to look at the tissue, but also to sample the tissue for silver concentration and so forth. That would be the best way

to do this.

I wouldn't recommend doing this to a patient; however, because of the associated risk factors of taking -- not really risk factors, but the risk associated with taking the biopsy and putting the patient under I think undo safety risk and possibly risk of -- of damaging the patient further.

Q. And since today, as we sit here, you have no knowledge of the results of any such biopsy or examination of a patient's tissue, you have no confirmation that indeed any of the people who presently today have a Silzone valve implanted have the chronic inflammatory response that you suggest; is that correct?

A. Correct in how you phrased the question currently, but if we go back to Wilson's deposition and -- do you want to call things before 2003 previous patients?

You're sort of parsing out like there's current patients and I guess I need some clarification on why -- why you keep doing that.

Q. I sort of live in the present, so I want to know today, is there a problem with the people who currently are implanted with the valves, and then we can talk about Dr. Wilson and other things later.

A. Right. So -- so my deposition relied upon

the histological sections. Also, I reviewed obviously from patients that had the valves removed or are deceased related to -- I don't know what to make of the causation here, but are deceased and then the valves were examined.

Q. You mentioned that the monitoring with, for example, echocardiogram might give you some information whether the population as a whole is having a problem with their tissue; is that correct? Or has already had a problem with their tissue I guess is the question.

A. I don't -- echo's cannot be used, I don't think, to really look at tissue.

I mean, it's going to look at other things like cardiac mechanics; so, you know, if we're really looking at tissue, we really have to look at the tissue which is the biopsy.

Q. Okay. So you wouldn't recommend a survey of echocardiograms in order to monitor any chronic inflammatory response?

A. I didn't say that.

So in the absence of -- in the absence of having an opportunity to take a biopsy, which personally I wouldn't volunteer for, so I wouldn't ask somebody to do it -- um, then you look at what are the next logical

device because of the high blood flow rate.
And if there is thrombosis, it is certainly -- probably would be cleared rapidly from the local environment.
MR. JEFFREY:
Q. So you don't believe that there is an increased risk of thrombosis with the Silzone valve?
A. We can go back to the materials argument, which we know the materials are thrombogenic, but thrombosis in the location of the device due to the high rate of -- oh, so of -- well, the blood fluid dynamics and the blood flow rate -- you would probably have a very low incidence of thrombosis; so I think statistically it would almost be impossible to achieve any statistically significant results between patients treated -- patients treated with Silzone and patients not treated with silver coating.
Q. And that's what you would expect, even taking into consideration the different material, that is to say, the Silzone coating being used?
A. True, because -- because it goes back to my explanation earlier, that -- that, you know, thrombogenic materials are used in cardiovascular devices, but -- but in certain privileged cases where you have a high enough blood flow rate, then you don't

really have a -- the time sequence for a full thrombus to form.

Q. So other factors are predominant in the formation of a thromboembolism in regards to heart valves?

A. With the caveat that we're taking about an exposed surface for thrombus formation, right, as opposed to certainly thrombus on the cuff side, which is more of the tissue reaction, which is -- which is where personally I feel there's a -- the greater issue exists with the Silzone and the silver coating.

Q. At this point in time, more than five years after these patients have received a heart valve, is that any longer an issue?

A. What part is?

Q. You said a thrombus formation on the cuff itself.

A. No, it would be remodeled. It would be remodeled fairly rapidly. So a fibrous clot would form and that would typically be remodeled by fibrosis or fibrous tissue.

Q. So the increased thrombogenicity that we were just discussing is a risk that would have been possible during the immediate aftermath of the implantation of the valve?

A. I think you have to pars out the question in two ways. One is, you know, what one would safely say, that silver is probably more thrombogenic than PET, which is your Dacron coating.

In an in vitro controlled study, one would probably show -- I believe even -- even this is mentioned in some of the previous studies that was done by Tweden's group, that you certainly are going to see greater adhesion of blood components to metal and metal oxide like silver compared to the PET, so you have that in vitro data.

But that -- that doesn't always manifest itself into something that you can completely see again in the clinical environment.

So initially you probably would have a great deal of thrombosis or -- thrombosis may not be the correct word because I think that's used specifically by a clinician -- but you would certainly have a great deal of -- of clot formation when exposed to blood as you're sewing this cuff in, and to the silver, which gets remodeled.

Q. When you say remodeled, you mean covered up by tissue?

A. Well, the -- the clot is formed of proteins and cells then migrate through that clot by

expressing different enzymes, mostly enzymes then cleave the proteins in the clot, particularly proteins that are enzymes that then remodel, so as to the -- as the cell comes in, let's say, the fibroblast comes in, it remodels that clot and by -- and, also, at the same time, it's expressing it is own proteins that then fill in the Dacron mesh.

Q. So the area of the clot -- when you say remodeled, you mean tissue moving in there and eventually grows in the area then?

A. Eventually grows in. That's true.

Q. Once that happens, there is no greater risk for a thromboembolic event related to the actual material of the cuff itself?

A. Well, let's take the -- the standard, the PET. Because cells can grow into that material, and although it is a thrombogenic material -- so growth in that material is quite good. So you don't have really the potential for I think reexposure of that material, other than maybe some other factor, you know, damaged in some other way. You wouldn't normally expect this to change.

Um, in the case of silver, because the silver concentrations are -- gets so high in the local environment, then one would expect -- one would expect

that the silver-coated system -- you would have less cell growth.

And there are some in vitro papers I cited in my deposition showing that silver -- silver-coated systems, when the concentration gets too high, these materials lead to, you know, appreciable cell death and toxicity in the near -- we'll call it the near implant region or peri-implant region.

With that said, then if you're reexposing the silver coating to the blood contacting environment, then there could be a thrombogenic capacity that might be increased; however, I don't think this is going to be a large scale statistically significant problem.

Q. So it may happen in an idiosyncratic case?

A. I don't think I would phrase it that way, but it certainly could happen in some portion of the population.

And, one, let's take some of the -- as I said, this newer study that I -- that I briefly looked at where you have a higher -- let's say a mean value for a particular metric you're looking at for the Silzone valve, yes, it is -- it's not statistically significant.

Q. So there is no way to measure whether or not that has happened then?

A. You would have to go -- no. I mean, you

would have to -- histological analysis would be the only real way.

Q. So let me just recap to see if I actually understood that.

There's a possibility -- you're saying that there might be a possibility of a thromboembolic event because the silver has caused tissue degeneration and, therefore, a new clot has to form and new tissue has to form, and during that process, a clot could be given off; but there is no way to statistically measure that because it's so small and there has been no histological evidence of it in actual people who have a Silzone valve today?

MR. CAPRETZ: Objection as to form.

THE WITNESS: The way I would also -- I would also add to that statement is that really the blood contacting the -- the blood flowing through the valve is not really hitting the cuff, right. The cuff is on the outside of it anyway. So I think the chances of this being, you know, statistical significant are low, yes.

MR. JEFFREY:

Q. Okay. Could you take a look at paragraph G on page 6 and read the first sentence?

MR. JEFFREY: Are you meaning for him to

I base my opinion on when I wrote it, whether it was two years or not.

MR. JEFFREY:

Q. So you can't tell me today?

A. I'd have to review the literature.

Q. Okay. And today as we sit here, do you have any information to indicate that a Silzone valve recipient has a greater risk for a thromboembolic event if they had the Silzone valve implanted for more than two years?

A. I would say as a -- as an expert in biomaterial sciences, in an opinion, given the device and its location and the aforementioned discussion on blood flow rate, I would say that that would be low.

Q. Okay. Do you have any information to suggest that a Silzone valve recipient who has had the valve in for more than two years is at greater risk for any other complication?

A. Well, the way you're phrasing the question by adding every two years, the answer is no. If you remove every two years, then I would say we have the early AVERT study data.

Q. Now, in looking at your original opinion regarding the fact that all Silzone valve recipients have tissue damage, it seems to me that you were basing

this on three things. The AVERT study at the time, correct?

A. Yes.

Q. An article by Dr. Tozzi; is that correct?

A. Well, no, not just Tozzi. There were a number of I think papers that contributed to -- you're saying the first letter I wrote?

When you say original, I think that I need clarification on what -- what you're referring to.

(Whereupon, Defendants' Exhibit 3 was marked for identification. )

MR. JEFFREY:

Q. Doctor, will you look at your affidavit of February 20th, 2003, which we've marked as Exhibit No. 3?

A. Yes.

Q. In particular, can you look at page 15, paragraph 57?

A. Yes.

Q. This paragraph relates to your theory that all of the Silzone valve recipients very likely suffered a local tissue damage; is that correct?

A. Yes.

Q. Now, the three things that I took from this paragraph was that there's three things that

support your position, that is, the AVERT study that existed at this time in 2003 or that you had reviewed; is that correct?

A. 2001. Dr. Tozzi.

Q. That is correct.

A. Okay.

Q. So actually I think -- I think that is incorrect. It was the AVERT multi-center randomized trial information.

And I believe that the reference here is to the Tozzi study which --

A. As I read it now, yes. So this is the AVERT multi-center randomized trials and then a case report by Tozzi which is independent of that, correct.

Q. We've already talked about the AVERT data.

So are there two things that supported your opinion at that time?

A. In paragraph 57, yes.

Q. Okay. And your opinion was also supported by Dr. Williams' affidavit?

A. Dr. Wilson's affidavit.

Q. I beg your pardon. Dr. Wilson's affidavit?

A. Correct.

Q. So three things that supported your

opinion regarding this?
A. Yes.
Q. Okay. And in regard to Dr. Wilson, his opinions referred to an examination of valves that had been explanted, correct?
A. Correct.
Q. So his opinions and affidavits and observations do not relate to the persons who currently have Silzone valves implanted, right?
A. Correct.
Q. So they wouldn't relate to the people today that have a valve implanted, correct?
MR. CAPRETZ: Objection. Object to the form.
THE WITNESS: No, because one -- one has to -- you have to assume that -- that the patients that had these valves removed were representative of a whole population. So some statistical representation of that population still has to -- would have to -- you would expect would have similar types of responses, although, maybe not as aggressive.
MR. JEFFREY:
Q. Can you explain that?
A. Well, Dr. Wilson's retrieved heart valves are a percentage of all of the patients that received

And I agreed to do that, to look at the material and to see, you know -- in this case, I believe it was -- it wasn't even a true declaration.

It was about a two- or three-page letter I wrote him back in response to Rodericks' declaration.

Q. Did he tell you anything about the case?

A. He told me about the AVERT trial and what it was about, and he said -- I think he gave me the authority for limited time, about twenty hours, for literature search and so forth.

Q. Did you know anything about the St. Jude valve at that time?

A. Well, anything -- yes, of course I knew something about the St. Jude valve.

What did I know? I knew -- well, I would say I knew a fair amount.

I am theoretically an expert in biomaterials. I go to biomaterials meetings. I was actually presenting a poster next to Dr. Tweden for one of her modifications that I actually preferred, which is a peptides modification to the sewing cuff to improve tissue in growth.

Q. When was that?

A. I don't know. I can reconstruct that for you. Again, I want to say 1998 maybe. Maybe 1996.

comes up, metal ion release. What is the toxicity or what is the -- you know, the response of tissue in the peri-implant region due to these orthopedic devices.

Q. Due to a slow release or a release at any rate of some type of metal ion?

A. Right. And/or a complex.

And some of this is associated with wear because you have an articulating surface on the metallic head, which is the femoral head of the implant, so it's not just simple corrosion or low level release. There's -- there's a wear process that accelerates that.

Q. Is your expertise in orthopedic devices?

A. My expertise is really in designing materials to control biological function at the cellular level.

Q. And what type of devices are involved in that?

A. Orthopedic, cardiovascular.

Q. So you've designed cardiovascular devices?

A. I have a patent on an intravascular stent. Multiple patents on an extravascular stent as well as coatings for stents.

Q. Since the first phone call with Mr. Coren, have you had subsequent phone calls with plaintiff's counsel?

A. Yes.
Q. How many of them?
A. I have no idea.
Q. More than a dozen?
A. I would say more than a dozen.
Q. How did they go about -- how did you go about drafting your affidavit?
Did you do the first draft of the affidavit? For example, the affidavit we marked as Exhibit No. 3, did you do the first draft of that?
A. Absolutely. Matter of fact, I wrote well over all of it. I mean, 95 percent of it.
Matter of fact, I would say I write about 100 percent of it. The only thing that counsel might help is the formulation of the first part. You know, this --
Q. The first part being the first page?
A. Yeah. You know, how they wanted it stated, my qualifications and so forth.
Q. What did you know about Silzone -- Silzone at the time Mr. Coren called you up first?
A. I had heard about -- I think I heard about some -- some of the associated issues with it at various conferences, but not much.
Q. Did you know what it was composed of?
A. Yeah. Oh, yeah, that I did. I knew once

he told me what the process was. I knew exactly what -- what the process -- well, whether I knew there was a palladium and titanium level is one thing, but I certainly knew the silver deposited IBAD.

Q. So you'd heard of IBAD?

A. Absolutely, yes.

Q. Did you know any of the Spire people?

A. Well, yes; but, actually -- I mean, you know, I knew who they were from scientific meetings.

Q. Who is that?

A. Um, one of their scientists, Piran Sioshansi.

Q. Piran Sioshansi?

A. Yes. Thank you.

Q. Anyone else?

A. Not that I recall.

Q. Did you have any thoughts about the IBAD process?

MR. CAPRETZ: Objection as to the form.

THE WITNESS: Yeah, I thought it was interesting. I think as a -- as a company -- this goes back to meetings at Surfaces of Biomaterials Foundation, which is -- was a -- still an organization that exists.

They seem -- seem to have outstanding results. More out standing than the ordinary scientists would

believe. Everything was 100 percent effective and the treatments were -- that were controls were zero.

Q. That is to say Spire, S-p-i-r-e?

A. S-p-i-r-e.

THE REPORTER: Thank you.

MR. JEFFREY:

Q. Do you mean in the published literature?

A. I mean in presentation. In the -- that meeting publicly.

Whether there was an abstract that reflected the slides from that -- and I can't even tell you what year -- I believe there was for the silver IBAD process on a cuff for -- for catheters or on top of catheters.

Q. I see. So Spire had presented the results from their coating of some medical device?

A. That's correct.

Q. And were they presenting clinical information?

A. I believe in vitro information on bacterial kill.

Q. Okay. And it looked too good to you; is what you're saying?

A. Well, any time you see 100 percent, and most of us were commenting -- literally surprised by 100 percent effectiveness. It's pretty hard to achieve

without any error.
Q. Can you recall who did the presentation?
A. He did.
Q. Piran Sioshansi?
A. Sioshansi.
Q. Other than that presentation, did you have any knowledge -- any other knowledge of the IBAD process?
A. Well, they -- you know, they were -- presenting themselves and marketing themselves as a coating technology; so, yes, I did have knowledge of their process just as an educator.
I would get -- go over to these booths and find out what's going on in the -- you know, sort of the community.
Q. I looked at your report and I noticed that it says that you've billed $35,000 at approximately $385 an hour, right?
A. Uh-huh.
Q. So I calculate that out to be about 91 hours.
A. Okay.
Q. I just want to know how you spent those 91 hours.
How many hours -- how many of those 91 hours did

Q. -- it was research you were doing or whether or not you were reviewing literature. Whether or not there's something else out there that I should be asking you questions on. Just usually a good way to figure it out.

A. I don't know.

Q. Okay. How about in 2004? How many hours would you say you spent on litigation in 2004?

A. It might be zero. I don't remember. Between five and zero, I would say.

Q. And in 2003?

A. I would say that's the majority of the time, between 2002 and 2003.

Q. Did you independently become interested in silver toxicity issues and go out and look in the literature outside of issues related to this litigation?

A. Yeah.

Q. And what did you look up?

A. Well, I'm not sure I can disclose that, but I was retained for another litigation with a silver based product.

Q. Um, okay. Without disclosing any information regarding that case, can you tell me what it is? What case is it?

A. It might be on my CV. The product was a

Q. Okay. And now I'm asking you whether or not you have any knowledge of whether that issue was discussed internally at the FDA?

A. The answer is no. No, I do not.

Q. What did you do to investigate whether or not the FDA considered the release of ions from the cuff in their determination that the Silzone valve should be evaluated as a device?

A. The FDA's analysis was only secondary to my own as an independent consultant. I wanted to make my own decision as an expert in biomaterials, who are often called in to make -- advise and recommend to the FDA what to do with these cases.

I have students that work in the FDA. So we're the ones that train these folks.

The issue is, you know, could I convince myself either way. Is this a drug or is it a device?

And if I would use a litmus test, if I was teaching my class about this device, I would say it would certainly be in the category of drug delivery devices.

Q. So you disagree with the determination that the FDA made regarding how to classify the Silzone valve?

A. Absolutely.

# Exhibit 14

IN AND FOR THE IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC., )
)
SILZONE HEART VALVES PRODUCTS ) MDL NO. 01-1396
)
LIABILITY LITIGATION ) (JRT/FLN)
)
)

DEPOSITION OF KEVIN E. HEALY, Ph.D.
Volume II
Friday, May 19, 2006

Reported by ELIZABETH J. WOOD
CSR License No. 5134

grade chronic inflammatory response in the Silzone valve recipients?

A. Not that I know of in terms of publication, but just because it's not published doesn't mean it doesn't exist.

Q. But no one has published on it?

A. No one has published.

Q. And you haven't published on it?

A. I wouldn't have access to or any reason to publish on it.

Q. Okay. So is it fair to say at this point that there's the theory that there's a chronic inflammatory response in Silzone valve recipients, but it hasn't been demonstrated?

A. I would say it's as good a theory as the Silzone valve has the ability to promote wound healing and, also, prevent endocarditis.

In essence, there's not enough study data with this device that's being disclosed to the public, both from an experimental animal standpoint -- the investigators preliminary data, it was rather weak with a very low number of animals, and the interpretation from that data is very difficult to make -- make the conclusion whether this device is safe and effective.

Now, with respect to if there's going to be a

examples, yes. I don't think those are the preferred examples of comparable materials to choose from to show effectiveness or non-effectiveness of silver.

Q. And is that because a silver salt contained medical device will be released at a different rate than silver ions released from a metal?

A. It's possibly due to that. It's also due to the form in which -- in which a lot of these topical agents are used and in the way that they are used.

In other words, they are used on burn patients, and it is applied as a topical cream, which has very little relevance to in vivo or implantation -- excuse me, a device that's implanted and having cells grow into that device.

Q. Now, you say --

A. I would add there's a lot of other additives to these creams so it's not just silver. So there's a lot of -- um, you know, we use the word complexing agents as well as various excipients to help stabilize the complex, and so this is much different than a device.

So just suggesting all of these creams and topical agents are equivalent, I don't think is correct.

Q. So silver might chelate with a bunch of proteins and in addition to those proteins in one of

hard to get an estimate of that.
Q. Okay. And so far you don't have an estimate of that?
A. I don't, and I haven't seen that in St. Jude's publications, which I would assume would be a very important aspect because that would define the ultimate load to the patient with respect to the amount of silver that they theoretically could receive over the lifetime of the implant.
Q. Doctor, you also mention here the article by Tretotola, T-r-e-t-o-t-o-l-a.
MR. CAPRETZ: Was there a question? You just asked if he's seen that article.
MR. JEFFREY:
Q. Yeah. Do you see it mentioned there in the last sentence of paragraph 3?
A. Yes.
Q. You do?
A. Yes.
Q. My question is this, in that article, was there any indication that any of the patients suffered from a chronic inflammatory response?
A. I don't know. I'd have to review that.
Q. Okay. I think I have it, actually.
A. Actually, I have my copy of it. I should

reduce infections and to determine the frequency of central venous thrombosis and stenosis with percutaneous placement of right internal jugular vein dialysis catheters by interventional radiologists.

Q. Where are you reading from?

A. I'm sorry. That's the first page, page 491, purpose of the study.

And in conclusion, this is now page 495, the last paragraph of the paper, it reads, in conclusion we found that silver coating of tunneled hemodialysis catheters did not confer any clinical benefit and, in fact, their use was associated with a trend towards increased infection and colonization rates compared with uncoated catheters.

We also found that some patients react to this coating, which raised the concern about its safety in a larger population.

The fact that the results of our clinical study do not confirm the positive results of previous in vivo studies highlights the need to perform prospective randomized clinical trials of new technology, particularly when the new technology may increase costs, as was the case with the silver coating.

In this -- in this last paragraph, the previous in vivo studies they refer to are ones that use the

kinds of colloidal suspensions and delivery of things like chlorohexadiazine even being one of them. And the combination of silver sulfadiazine chlorohexadiazine coatings as comparison.

So the response to your question, the determination of a long-term chronic inflammatory response was not cited; however, the authors were concerned regarding a response that they saw which -- which was not allergic -- not allergic response, and they even tested -- they tested for allergic reaction, but they did not perform a biopsy on they patients so one could not determine whether it was a chronic inflammatory response.

So they did not look for chronic inflammatory response and, hence, they did not cite one.

Q. Okay. So the reaction that you talked about that led the authors to believe that a larger population may reveal some type of safety concern was the reaction of -- to the patients -- an acute reaction of two of the patients to the catheters.

A. Two out of fifty, which is basically four percent, which is kind of the range that we see in the Silzone cases.

Q. That's the range you see in the Silzone cases?

saying that.

MR. JEFFREY:

Q. It's common, actually.

MR. CAPRETZ: Is this Exhibit No. 4 that you are referring to?

THE WITNESS: If I find it here, yes, I will tell you if it's Exhibit No. 4. So I'm referring to page 25, paragraph 49 of Exhibit No. 4.

MR. JEFFREY:

Q. Say that again.

A. Page 25, paragraph 49 of Exhibit 4.

The paragraph addresses this local tissue gradient or what I refer to as the highest concentration of silver must be adjacent directly to the implant and not in some remote tissue or in the bloodstream.

And what I refer to is -- is in a study that was conducted by Dr. Tweden, and it goes on to the page 26, so the -- the study here is the title. Title reads, biocompatibility of silver modified polyester for antimicrobial protection of prosthetic valves.

And I'll just read what I said and I know we can discuss it. In that study Dr. Tweden developed a cell compatibility assay, excuse me, that mixed and diluted solutions derived from silver-coated fabric of the SJM Silzone heart valve.

When the extract was exposed to cells at full strength -- and I just made a calculation, of -- that would be 1,300 parts per billion, the authors observed lower cell densities, less cell orientation and more damaged membranes compared to exposure to the diluted extracts, i.e., less than eighty-five percent.

As the authors destroyed the concentration gradient, the mixed and diluted silver solution used had a silver concentration much lower than that in the region near the implant.

As the investigators did not maintain the concentration gradient that would have exposed cells to much higher silver concentrations adjacent to the implant, as was demonstrated by the Hemmerlein paper, the grossly toxic effects of silver were not observed.

This shortcoming is an extremely important one distinguishing Hemmerlein from the SJM studies, and this is -- and one that anyone reviewing the safety of placing silver-coatings permanently in the heart tissue would be aware of and take into account.

That's the end of the reading of my deposition -- my declaration.

The comment I have then in the context of the Hemmerlein paper is I think the methodology is correct.

They, of course, did not use the Silzone-coated

the cuff.

No, they're valves. So these were two valves. And in the second sample, 219 parts per billion.

They then go on to do a calculation taking the 385 parts per billion and they do this in terms of body weight. I think erroneously saying if all of this was distributed throughout the body, then it ultimately leads to the following last sentence on the first paragraph of page 13, which is, this value is several orders of magnitude lower than the reported minimum toxicity levels in humans of .3 parts per million which is equivalent to 300 parts per billion.

By placing this data set in that context, by inference they are saying it's below a toxicity level, and they are using that as a standard to benchmark this data set.

Q. Don't they report that toxicity level as a --

A. It says see section three, assessment of toxicity, which -- which -- which is further -- which is what you asked me to first read on page 16.

Q. Right. My question was, don't they refer to that level as lower than reported minimum toxic levels in humans of 0.3 PPM, parts per million?

A. That's right.

to -- and that was exhibit -- sorry. I think Exhibit 11.

Q. Yes, Exhibit 11.

A. Exhibit 11. Independent of that paper, I would agree, yes.

Q. In reading the next sentence --

A. Well, I would not -- wait a minute. Silver particles -- I did in my declaration define -- defends what you mean by silver particles.

If you mean particles of elemental silver, then that's correct.

If we mean -- one of the papers I defined -- I believe it was the Ellender and Ham paper, where there were particles that contained silver and released silver from these particles. They were polymeric particles. They did create a low level of inflammatory response. I'd like to verify that, though.

Yes. So in my declaration, Exhibit 4, page 28, paragraph 53, I refer to a 1989 Ellender and Ham paper that examined the effect of silver loaded ion exchange resin beads implanted into loose rat connective tissue.

And so I'll just -- I'll just highlight the following findings, um, from the silver releasing beads.

This is an interesting paper in that the context of, at least, again, going to the reductionist approach

and trying to figure out what would the silver ion do to tissue and wound healing -- and so reading then from page 28, um, they noted the following effects within the area proximal to the silver releasing beads. A, the initial lesion showed dead tissue and subsequent tissue organization was delayed and disordered.

Fibroblasts -- fibroblasts and macrophages had their internal organs altered. The extracellular matrix (ECM) contained poorly organized collagen fibers and other matrix components were altered.

The silver delayed tissue repair and morphological changes within fibroblasts and macrophages were maintained even when attempts were made to ameliorate the effect of silver.

That manuscript to me is an important way of getting at the effect of silver ions.

The question you posed to me, if we go back now to -- to 25, was that -- was that first sentence -- where is the first sentence?

And could you rephrase then that same question?

Q. Yes. I wanted to know whether or not you agreed with the first sentence in paragraph 25.

A. Right. So what I described to you could be considered silver particles or silver containing particles because they are releases of silver ions and

they were particles, meaning they were ion exchange resin beads which have a particulate.

They are spheres and they would be delivered at as a particulate matter to the tissue. They are not particles of silver as if we took powdered silver and did the same thing.

If that study has not been done before, I would expect -- due to the high surface area of the silver particles and the amount of silver that would come off, I would expect a similar type of inflammatory response that I just described. So it would frustrate healing.

So all this statement may be correct where he is unaware of these -- these studies -- the study I just cited and my interpretation from that study would lead me to believe that the statement would not be correct.

Q. So the two articles that you can describe are the Tweden article and the Ellender article on page 28, paragraph 53 of Exhibit 4, which is described on page 28 --

A. Correct.

Q. -- paragraph 54?

A. And the second Ellender and Ham article describing a silver wire that -- I'm sorry. Can you repeat the page we were just on?

Q. It was page 28.

concentrations of silver, or within the cuff, I should
say.
Q. So when you say that the Silzone cuff is
equal to multiple -- I forgot what your number was.
Multiple wires?
A. This is just off the top of my head. I'm
just trying to make an analogy.
Q. You're referring to the surface area
involved, not the mass --
A. Correct.
Q. -- of the wire itself?
A. Correct. Because obviously the silver
wire is pure silver and -- as opposed to a coating.
Q. And do we know how much silver wire was
imbedded in this person?
A. I think the details are sketchy on that.
No. They just tell you a little bit about the wire.
Q. So we don't know how much wire was
involved in this particular implant?
A. No. It just describes a looped and
knotted wire. Column one, fourth line from the bottom.
Line started with age eighty-five.
Q. And this article is significant because
there was an observed black or darkened particulate in
the area where there was a long-term chronic

inflammatory response?
A. I'm sorry, repeat that, please.
Q. This article is, in your opinion, relevant because there was black particulate, which is presumably from the silver wire, in the area where there was an inflammatory reaction seen?
A. Correct. In humans -- in a human.
Q. Okay. What could the FDA have extrapolated from this particular article to help them evaluate the Silzone valve?
A. I think if they -- if they understood that there is concern for long-term delivery of silver, and that the Silzone valve had a very high surface area, and as such, as we were describing, we don't know if the silver will completely come off in the duration of the implant or I predict it likely would, what that load would be, and if it is, you have questions that I think are appropriate.
How much silver was delivered to this patient? What kind of load of silver did this patient experience that led to this response?
And then one would probably ask for more study data or more detailed information on the histopathology of the Silzone cuff response. That's what I think the FDA could have gleaned from this.

A. Well, I think what you can extrapolate is the concentration in the zone of -- in this case, the serum concentrations that this patient had on the order of -- of one hundred micrograms per liter, which is the same as parts per billion. So from that standpoint, the patient's -- I'm sorry, not a hundred, but let me just check here.

Right. So the concentration in silver -- this is page 182, table one. The top of page 182. It has silver concentration -- um, in one column and then it has times postop in another.

So it goes from 6 to 4 and it's decreasing and this is in serum. And the conversion is -- is largely that the 6.3 micrograms per liter is going to be 6.3 parts per billion.

So serum concentrations -- what I infer from this and how this relates to your question, when serum concentrations are very low, like in this patient, that we can still look at the fluid aspirated from the hip joint in this case where the concentration was 103 micrograms of silver per liter or 103 parts per billion.

So this is about a thousand times greater than the normal serum reference. And that's on page 182, the last paragraph, first line.

So what that tells me -- what I infer from

this -- again, we get back to this is now a human patient. This is a patient receiving silver ion product. That the concentration of silver is grossly different in the implantation site compared to serum levels. So measuring -- it gets back to my point of measuring serum levels is irrelevant when looking at tissue reaction in a peri-implant region. That's one thing you can interpret from the article.

Now, the question related to what we can interpret with respect to the heart valve is I would expect, again, the same concentration differential where the concentration would be extremely high next to the implant and much lower into serum.

So I don't agree with conclusions by St. Jude and their staff with respect to ninety percent of the silver would be liberated and distributed throughout the body and cleared systemically.

Q. Is the silver in the silver cement meant to be released?

A. In this case it has to be released for it to be active, yeah. So it has to come out in some capacity, yes.

Q. You mean active within the cement?

A. Well, the cement is a -- although it's not meant to be porous, but it is a solid polymer, and to

paravalvular leak, wouldn't you?
MR. CAPRETZ: Object to the form.
THE WITNESS: Well, again, this is -- now, we're talking about a clinical evaluation and diagnosis, which is not my area of expertise; but from what we discussed within the biomaterial context, we've already sort of identified that measuring systemic levels of silver is not going to give us a good idea of what's happening locally.
So what is important is that we monitor for paravalvular leakage with probably a wider patient population so that we ultimately can see if there's a true correlation between the leakage and the Silzone-coated cuff heart valve.
Q. Okay. Let me take a look at my notes. I think I'm done.
(Whereupon, a brief recess was taken from 4:42 p.m. to 4:45 p.m.)
MR. JEFFREY:
Q. Well, thank you, Doctor. I appreciate your patience and your time.
A. I appreciate the questioning and I hope it was accurate. Okay.
(Whereupon, a brief recess was taken from 4:46 p.m. to 4:50 p.m.)

# Exhibit 15

# Marketing Advisory Panel Update

Greetings once again, comrades! As duly appointed drone and Midwest Region Grand Poo-Bah to the MAP panel, I feel it my duty and obligation to report the intellectual flatulence which occurred during our recent gathering. I would first off like to thank all of you who were so concerned with the health and well being of my gastro-intestinal situation during our recent meeting. My colon is much better now, and should be up playing the piano again in no time.

Most will be glad to know that there were no real surprises, marketing appears to be very much in tune right now with us in the field. Major topics discussed:

**Being More Proactive**-Most of us are tired of always playing defense to competitors claims. However, as some of you have mentioned to me, we also don't want to be too aggressive for fear that we elevate a competitor to our level. With that in mind, a balance must be struck between the two. We must go after competition, but take the high road in doing so. The new series of print advertisements should do just that. We will stress, for example, the hemodynamic superiority of our small aortic valves vs. all our competitors, citing clinical literature for comparisons.

As far as being more aggressive in accounts where competitors already have credibility, we recommended differences be targeted with individual brochures and actual clinical papers to back them up. For example, Med Hall has been describing their valve as having the best flow characteristics in hypertrophied ventricles. We will have a folder which contradicts that with proof sources to back it all up.

**Silzone**-This is the name of the antimicrobial cuff. Silver appears to be a staunch bacterial growth inhibitor. Testing shows that our cuff, when impregnated with this silver coating, readily and consistently kills the vast majority of the bacteria responsible for endocarditis. Tissue ingrowth and suturing are not effected. This coating is already used in many other implants, including orthopaedics. It looks like a pretty slick idea, and we are looking for our first human implants on the Guinea pig continent of Europe in Q1. With expected PMA supplements, look for it in the US in Q3.

**Cost of Complications**- It was acknowledged that no one uses the computer for this thing. To present this more effectively, we need the info moved from the computer into a spiral binder. We also suggested taking the info from the NY randomized study vs. CMI (to be presented at AATS) and apply the formulas to show a real world cost of complication . This was all well received by marketing.

**Sewing cuffs**-The good news-they know we need a fluffier cuff with less needle drag to combat CMI. The bad news, they're still working on it, so its gonna be a while.

**HP Seating**-A new brochure is on the horizon to help illustrate proper sizing and suturing with the HP valve, as well as helping visualize how its designed to sit in the annulus.

**Safe Harbors**- Why are we playing by a different set of rules than competitors? Because legal says we have too, and is convinced that our rivals will have to answer for their transgressions. Don't look for a loosening up here any time soon.

**CAVG**-Depending on Meadox, we could see a true sized, rotatable CAVG in Q3. This will be tapered, without pleats, and will utilize our standard expanded cuff.

**Rotatability torque**-This has been recognized as a major problem which needs to be addressed. We are looking at ways to bring the inch/ounces needed for rotation from 12 currently to about 4. As is generally the case, this is not as easy at it would appear, however, and engineering is going after it hard.

**20th Anniversary** -With #20 coming up, the company has big doin's planned. A new ad series and logo, for starters. Followed by educational grants. Our implanters will receive diploma- like certificates, documenting the implantation of our valve for x number of years for a particular surgeon.

**TSPV Update**-Year to date we have four US centers implanting 66 valves, 3,000 implants worldwide. Things are still moving toward a Q3 or Q4 release. The key determining factor in the products long and short term success is recognized to be the training of the surgeons. This will give us some nice opportunities to get surgeons away from home and into clinical symposia and wet labs. The valves will be consigned. (Never thought I'd type THAT sentence!)

Since its been so long since TSPV training, and to help reduce training overload at launch, we suggested a serious of TAP modules be given throughout the year to help us get up to speed from a tissue standpoint. This should get everyone to the same level by presenting complex info in bite size amounts throughout the year.

**Lifenet available inventory lists**-These will be made available to every one every six weeks. This is as current as Lifenet can make them. Unfortunately they must be mailed, as Lifenet has no Email system yet. (Neither do we in practice) Peggy will be sending them to us on a regular basis.

Let me know if you'd like any more detail on any of these topics. They can be found on the internet at WWW.Barfing in Indy.COM. Or just voicemail me at 1828. Happy Holidays!

Jim Phillips
MAP God

# Exhibit 16

ST. JUDE MEDICAL

9059411863

115CCC
6,D

August 21, 1996

Piran Sioshansi, Ph. D.
Vice President, Biomaterials
Spire Corporation
One Patriots Park
Bedford, MA 01730-2396

Dear Dr. Sioshansi:

Based on testing we have performed, we have developed some concerns of the SPI-ARGENT™ coating on our cuff fabric. When immersed in blood or saline, some of the silver is being converted to silver chloride. When coupled with the components of the valve, a galvanic cell is created. These are things we discussed in our initial visit to Spire, but were assured should not be a problem. We now have two large concerns: leaching and corrosion.

*Leaching*
We are seeing a significant amount of silver migration in the animal study. Although we have not quantified it yet, it appears that the silver is leaching at a greater rate than expected. Can you provide more specifics on the tests Spire has performed regarding leaching? Did you look at interactions with body chemistry? Any information you can provide on this will be helpful.

*Corrosion*
The corrosion rate, when coupled with other valve components, of the silver is estimated at 200-400 Angstroms per year. With the silver corroding at these rates, it is likely during the life of the device that all of the silver could be removed. If this happens, the palladium and or titanium could be exposed. With the exposure of these materials, the galvanic couples would change. Is it possible to get samples of fabric without silver? We may need to test fabric with the titanium and palladium only, as well as, fabric with only titanium.

These issues are likely to slow down or may even stop this project if not addressed properly. Your assistance in helping us address these issues will be greatly appreciated. Please give me a call at (612)-481-7654 to further discuss.

Sincerely,

William R. Holmberg

William R. Holmberg
Project Engineer

cc: Katherine Tweden





CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER

# Exhibit 17

Author: Bill R Holmberg at STPAUL
Date: 4/4/98 2:22 PM
Priority: Normal
TO: Elizabeth B. Burnett at SJM2000
Subject: RE: Silzone permanence
----------------------------------- Message Contents -----------------------------------

EB,

I'm not sure if Spire has done any long term durability testing. The results would depend greatly on the application and the the particular tests. They was performed leaching tests to determine how long the silver would remain on the device based on various leach rates. There testing has indicated that it would last over 100 years.

As far as our application goes, there is no easy answer. Based on the testing that I have been involved with, or made aware of, we have not seen any significant "wear" or flaking of the coating The best test is in-vivo use. There are two ways to determine if the silver is coming off. One is two explant the valve and measure the remaining silver. The other is to measure the silver concentration in the test subject and extrapolate a value. The later is what we have done. Depending on how conservative we want to be, the silver will last at least a year to well over 20 years. (Theoritcally you could say forever).

Let me know if you have anymore questions.

Bill

PS. thanks for the info on the US training trip and feedback on the Silzone project. Let me know what some of your ideas are. My first thought on a price range was around $50 - $75, depending on the item.

-----Original Message-----
From: Burnett, Elizabeth B
Sent: Saturday, April 04, 1998 1:32 PM
To: Holmberg, Bill R
Cc: Franssen-Brader, Dickey
Subject: Silzone permanence

Bill:

We were wondering if you can answer the question of how long the Silzone coating has been shown (probably by Spire) to be permanenent in testing? Did they simulate some long term durability? We thought we'd heard 40 years...

Thanks, EB

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Exhibit 18

# AB Cuff Design Review
# October 24, 1996

## Presented by
## AB Cuff Project Team

(B. Holmberg, J. Runquist, J. Rolbiecki, J. Hodges, L. Mueller,
C. Roos, R. Merten, S. Mulvaney , K. Tweden)



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER
SJM0700124795MDL

# Design Input

- Anti-Bacterial/Microbial Properties
- In-Vitro Efficacy
- Biocompatable
- Long-Term Effects Understood
- Tissue Ingrowth Not Jeopardized

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Product Description

- Application of Spire's Technology
- Master's Series Valve with Silzone
- Same as Master's Series Valve
- Utilizes a Different Fabric PN
  - Meadox Fabric coated by Spire
- Next Generation Package
- "Silver" Package Labeling

titanium - imbedded
platinum
Ag - coated
thickness
4,000 Angstrums

AB Cuff Design Review, October 24, 1996

# Biological
# Safety and Efficacy Testing

- SAFETY TESTING
  - Steam Sterilization using pre-vacuum cycle sterilization x4 done
  - Endotoxin/ Bioburden
  - Biocompatibility
- EFFICACY TESTING
  - Dow/ Corning Shake Flask
  - NYS63
  - Parallel Streak



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Efficacy Testing

- Literature search performed to identify organisms commonly associated with endocarditis
- Search conducted to determine applicable test procedures from pharmaceutical and textile industries
- Information obtained at "Surfaces in Biomaterials" conference confirmed applicability of testing performed

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Material Testing

- Total of 5 processing runs at Spire
  (One initial, 3 "validation" runs & one with Tissue Fabric)
- Looked at Standard R.I.
  Visual, Coarses/wales, burst, thickness, etc.
- Coating Adhesion
- Multiple Sterilizations
- Results - Same as existing fabric
- Spire Confident With Processing
- Silver Content

in Accelerated aging chambers will be completed in 4 weeks

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Corrosion Testing

- Galvanic Testing
  - Same Methods as in Master's
    - Results:
      - Corrosion of Fabric 5-95 Angstroms/yr.
      - Rate Decreases Rapidly
      - Consultant & Lab "acceptable"
      - Prudent to do additional tests
- Additional Tests:
  - Completed
  - Verbal "Looks Good"

b/w different metals

oxidation of Ag

thickness 4,000 angstroms

? value of doing corrosion testing on accelerated aging

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Ag Chemical Species

- Metallic Ag, Ag salts (nitrate, sulfadiazine, acetate), AgO
- IBAD results in metallic Ag coating embedded into materials (probably thin layer of AgO on surface)
- Metallic Ag does NOT ionize as readily as Ag salts (lower amts of Ag in blood and tissues)
- Ionization necessary for Ag activity (toxicity)

gets its antibacterial properties by ionizing

Allergy => allergic to silver jewelry

AB Cuff Design Review, October 24, 1996

# Ag Toxicity Cont.

- Toxicity in kidney, liver, neurologic tissues
- Ag toxicity attributed to ability to form stable complexes with proteins & thereby disrupt life processes.

of bacteria ? protein
binds to membranes / prevents nutrients from getting into the cells & kills them

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Ag Fate in Vivo Cont.

- Long term implants
  - Ag wire in frontal bone 40 yrs
  - Tissue blackened around wire 2mm
  - Ag particles found in basement membrane of vessel walls, in conn. tissue matrix
  - disrupts biosynthesis of conn. tissue (our animal work did not show this, low level of ionization)

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Animal Studies for AB Cuff

## Study Design

- Model: Sheep, mitral valve replacement, 1/2 coat/1/2 uncoated cuff
- Duration: 4-5 w (10 d early death)
- Centers: U of MN (3 Dacron), LL (4 Dacron, 2 Teflon)
- Analysis: gross, histologic, blood work



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Animal Studies for AB Cuff (cont.2)

- Histology (Dacron Polyester):
  - » No extracellular Ag identified at 30 d
  - » 10 d specimen see Ag particulates at cardiac tissue interface for coated specimen

• Teflon

- Gross: As polyester
- Histology: Appears to promote tissue ingrowth without inflammation



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Reg Assessment - Export Req'ts

- Need "valid marketing authorization" from "listed nation"
- Regulatory will obtain formal Dutch approval
- The Netherlands are considered a "listed nation"
- Regulatory must submit letter to HHS notifying of intent to export non-approved device from U.S.
- Product must be labeled "for export only"

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Proposed Next Steps

- Follow up and Complete:
  - Outside Verification of Ag tests
  - Complete testing of Loma Linda Animals
  - Compile Formal Reports, Micro, Animal, etc..
  - Internal Documentation Requirements
- Limited, Controlled Market Release
  - Validation on Clinical Units
  - Limited Centers and Units
  - Patient Follow Up
- Int'l Release, Unregulated Countries
  - Assess Patient Follow Up & Long Term Study

AB Cuff Design Review, October 24, 1996

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Exhibit 19

To: **Elizabeth Burnett**
Maggie Wallner

cc: Jonas Runquist
Rich Schroeder

From: Barb Illingworth

Date: April 15, 1998

Subject: Carbomedics Memo,
Does Silzone Work Only by Contact Inhibition?

Thanks for letting me read the Carbomedics memo. It highlights a problem Katherine and I have discussed in the past concerning the ways Silzone might fight endocarditis. Silzone probably works both by contact inhibition and by the slow release of oxidized silver compounds. We believe oxidized silver compounds are responsible for the majority Silzone's bacteriostatic and bacteriocidal activity. However, Katherine has emphasized its contact inhibition and non leaching characteristics for Regulatory reasons.

The essence of the problem is stated succinctly in the last paragraph of the Carbomedics memo:

> *As advertised in their brochure, the silver-coating is non-leaching. This means that the only bacteria that will be destroyed by the silver coating are those that actually come into direct contact with the coated cuff. The bacteria that reside in the biofilm and elsewhere in the heart tissue will be unaffected by the silver, which will allow the progression of endocarditis.*

What they claim is technically correct. Most (all?) bacteria involved in endocarditis secrete a protective material called biofilm. Biofilm is a carbohydrate polymer that is both "sticky" and very resistant to degradation. Because it is sticky it allows bacteria to hold tightly to infected tissue and not be swept away in the blood stream. Because it is resistant to degradation it cannot be broken down and removed by white blood cells. Because it cannot be removed by white blood cells it is very difficult for the body to fight the infection. Furthermore, because it coats the bacteria it will prevent the bacteria from contacting the Silzone. If contact inhibition were the only way Silzone works it would not be very effective in combating endocarditis.

However, both SJM and the FDA know that Silzone does oxidize slightly and that the oxidized silver compounds do leach from the coated Dacron fibrils, albeit at low concentrations and at a slow rate. For example, Matt Ogle found the amount of silver in the blood of normal sheep is about 3 ppb and about 10 ppb in the blood of sheep implanted with Silzone valves. Matt's analyses also indicate the silver is excreted from the body by the kidney. Silver must be oxidized to dissolve in blood or urine.

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

Perhaps SJM should re-state its position to better reflect current knowledge of Silzone chemistry. We might say that Silzone is non-leaching in that it does so at levels to low to have an effect on the whole body of the patient (i.e., without systemic effect). The systemic levels are too low to cause silver toxicity (argyria) or an allergic effect (if such a thing exists). Yet the level of oxidized, soluble silver within the cuff (in contact with the cuff?) must be higher than occurs systemically, perhaps enough so to help the body fight endocarditis. I discussed this with Jonas Runquist. He agrees we might need to change the way we claim Silzone works but asks we discuss the exact changes in wording with him before doing so.

Oxidized silver compounds can pass through a biofilm to help fight endocarditis. Biofilms contain "holes" too small to allow white blood cells to reach the bacteria, but large enough to allow "food" to enter and "waste" to be eliminated. The pores are large enough to allow entry of antibiotics as well. Oxidized silver compounds, which are only about 10% of the size of antibiotics, can pass through the pores even more easily.

It is fortunate that oxidized silver is localized within the cuff, for the body finds it difficult to fight bacteria (with or without biofilm) "hidden" within heart valve sewing cuffs. Many fewer bacteria than normal can cause an infection when a "foreign body " is present. For example, 100,000,000 or more *Staphylococcus aureus* are necessary to cause an infection under the skin of mammals. In the presence of a suture, however, only 1,000 *S. aureus* are necessary. The bacteria seem to be able to hide within the foreign body. Frequently the only way the physician can cure such an infection is by removing the foreign body. If Silzone coated valve cuffs have locally increased concentrations of oxidized silver compounds, the bacteria causing endocarditis would not be able to "hide" there and the body would be better able to fight the infection. This might also work to prevent late endocarditis. When the sewing cuff is covered by pannus it is not likely to be the initial site of infection. However, if the infection cannot spread to and "hide" within the cuff the body would have a better chance of fighting the infection.

If it would be helpful, I can provide you with more information (including references to the scientific literature) on any of the topics discussed in this memo.

# Exhibit 20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC. | } | |
| SILZONE HEART VALVES | } | MDL DOCKET NO. 1396 |
| PRODUCTS LIABILITY | } | |
| LITIGATION | } | |

--------

--- This is the Deposition of Dr. Gregory J. Wilson, taken at the offices of Lerners LLP, 130 Adelaide Street West, Suite 2400, on the 21st day of June, 2006.

--------

well, I can refer -- so I have looked at some additional publications.

Q. Are you able to identify the articles that you just referred to?

A. Yes, I think I can. There was a paper relating to echocardiographic follow-up of the patients in AVERT that was published in 2004.

There was another paper published in a European cardiovascular surgery journal in either November or December 2005 that related to an analysis of implant techniques, suturing technique in particular, some other aspects, but primarily that.

There is a very recent paper that is going to be published in July of 2006 in that same journal, I believe it is the European Journal of Cardiovascular Surgery, but there is an e-publication that I believe became available I think around May 26th, at the end of May, and I have reviewed that.

Q. And did any of those articles that you just described in any way change your opinions?

A. No, they did not.

Q. The e-publication you referred to, is that the Grunkemeier paper? Was he the lead author?

A. Oh, if I may, there is an additional paper, the title of which is something like

"The Silzone Effect", and then there is a few words following that, that Dr. Grunkemeier authored. I have also looked at that paper. I think that paper came out in 2005. So I add that to the list.

The most recent paper, I believe Dr. Grunkemeier is a key author on that paper, yes.

Q. By the way, are you acquainted with him?

A. No, I'm not. There is name recognition there, but I have not met him.

Q. Do you know him by reputation?

A. Not extensively, but I know that he is involved in clinical trials; I know that he is involved in analysis of clinical epidemiological data.

Q. Okay. Are you acquainted with Dr. Schoen?

A. I am.

Q. And how do you know Dr. Schoen?

A. I know Dr. Schoen over a period of many years. Unlike most of the other Defence experts, I have met with Dr. Schoen, visited -- although this was several years ago, visited him at Harvard and he has visited me in Toronto, and so we have known each other quite well over the years. Our joint interest in cardiovascular pathology has brought us together a number

get the right date here.

It is in tab "B" as in "baker", and it is your February 7th, 2002 affidavit. Do you have that?

A. I do.

Q. All right. In paragraph 214 through 218 you have a section entitled "Summary of Opinions". It begins on page 37.

A. I see it.

Q. You see that? If you could just take a second and read to yourself the four paragraphs -- or read paragraphs 214 to 218, if you would.

A. I will.

I have completed my reading of paragraphs 214 to 218.

Q. Do those paragraphs still accurately state your overall opinions about the Silzone heart valve?

A. Yes, I think that's true, although I would say that in the process of providing the additional affidavits, I have expanded on those opinions, specifically in the sense of providing opinions relating to the toxicity of silver, a number of other factors. So I agree with the statement of opinions as stated in February 2002, but you know, I have expanded upon these in subsequent affidavits and my U.S. declaration.

surface of the fibers in terms of the black particulate material that I have seen in the tissues that is the same as the appearance of the material coating the fibers, so it has been very evident to me that silver has spalled off. And the overall quantification of the silver is something that I don't think I have considered to add substantial value scientifically to the valves that I have examined.

Q. Well, your opinion is that the silver that comes off the cuff is somehow toxic to cells; correct?

A. Yes.

Q. And isn't part of the definition of toxicity dependent upon the dose; in other words, whether a substance is toxic or not depends very much upon the dose?

A. Yes, I think that is fair to say.

Q. And so wouldn't it be important to know precisely the dose that gets deposited in the adjacent cells in order to determine whether in fact the substance is toxic?

A. That would be desirable. I have relied on quite an extensive literature on silver toxicity, which comes from both animal and human information, but not -- but you are correct, I have

not -- you know, I have not made those measurements on tissue samples from the valves I have looked at -- or sorry, arranged to have them made.

Q. And part of the reason you haven't done that is because you haven't been requested to do it?

A. Yes, that's correct.

Q. And you have no plans to do it?

A. Currently, no.

Q. Now, you are aware of the fact, Doctor, that silver is used currently in a variety of medical applications, such as burn ointments, for example; correct?

A. Yes, I'm aware of that.

Q. And apparently, it is put on burn patients without any adverse toxic effect; correct?

A. Oh, I'm not sure that I could say that, but I do agree that it has been in extensive use; I believe it is still in use for patients.

There is quite an important distinction, though, between silver being placed on the surface of the skin and silver going into the sewing ring of a heart valve prosthesis that is applied directly to the surrounding heart tissue. If there is a toxic effect of silver in the form of a silver cream in the context of treating a burn patient, the tissue that it affects tends

A. I have not done specific tests. But you have used the word "theory". I think there is quite clear evidence that the silver coating in the Silzone valve is toxic to the adjacent annular tissue, though that evidence doesn't come from any studies that I have done of the sort you are indicating, that is, specifically examining annular tissue; but I think rather it comes not entirely but certainly specifically from the AVERT study where there were many more -- a much higher prevalence of paravalvular leaks in the Silzone valves that were implanted compared to the controls.

Q. Only in the first 24 months, though; correct?

A. Now, in that respect, I think the -- I wouldn't say only in the 24 -- well, I think probably the best way to answer that question is to refer to a fundamental problem with AVERT, and that is statistical power. That study had to be terminated when there was only partial enrollment. There was about 400 Silzone valves in one arm of the study, about a roughly equivalent number of the control valves.

And so I think what has been published recently by Grunkemeier and others in terms of long-term follow-up with that study is very problematic for a variety of reasons, but sufficient reason is that the

study is I think very likely underpowered to answer questions about relative prevalence or incidence of various complications in the two, the Silzone and control arm of the study, looking at longer term follow-up.

Q. Now, you are not a biostatistician; correct?

A. I am not.

Q. And you are not an epidemiologist?

A. I am not.

Q. And Dr. Grunkemeier is in fact one of the leading biostatisticians in the world in the area of heart valve pathology?

A. Yes, that is my perception.

Q. And on the issue of whether the AVERT study is underpowered or not, would you defer to Dr. Grunkemeier on that issue?

A. No, not at all.

Q. Why is that?

A. Because I have recently reviewed the affidavits that have been -- or the affidavit that has been put in by Dr. Sackett, in fact more than one, an affidavit and another updated report by him.

I have reviewed the analysis of the AVERT study by Dr. Butchart in his recent report in November.

Both those individuals, who I think are very expert -- Dr. Sackett, I think a world-respected authority in biostatistics and epidemiology, and I think Dr. Butchart, who is a cardiothoracic surgeon, who has a great experience in running clinical trials and in particular has taken a strong interest in the Silzone valve and has examined the AVERT study in great detail. I have been persuaded, very impressed favorably by their analysis, the opinions they have expressed. And I am persuaded by what they have said, that, as I understand it, the recent publication by Grunkemeier of the AVERT follow-up, going out to five, six years, I believe, does not have any -- does not provide information on the statistical power.

My recent reading of his paper, which I did specifically from that perspective, indicated to me there was no reporting of statistical power, nor I think was there reporting of enough detailed information from the study so that other experts like Dr. Sackett or Dr. Butchart could in fact calculate statistical power, which --

Q. Why don't you give us --

A. -- to me is -- sorry to interrupt, but to me is rather concerning, given Dr. Grunkemeier's expertise in this area.

In the paper that he published, which part of the title is "The Silzone Effect", he makes some reference to statistical issues of statistical power versus statistical significance. He is clearly very well aware of these issues.

Dr. Sackett opined in I think his first affidavit, in which he was very critical of the analysis that Dr. Jones made of the AVERT data, that these issues are the sort of issues that are taken up in a first year biostatistics course. And I, although it was many years ago, did a course in statistics, and I do remember those general issues of statistical power versus the finding of statistical significance are certainly presented.

So I don't want to go on and on, but for those reasons I have expressed, I would not accept the, if you will, negative results, that is, of the recent publication by Grunkemeier indicating that there was not a difference between the Silzone arm and the control arm as being persuasive.

I think the language that Dr. Sackett used in his affidavit or one of his reports was that -- and it wasn't in relation to that paper which hadn't been published yet, it was an earlier paper -- that appropriate language would be to say that the results were indeterminate.

have observed?

Well, first, before I ask you that, have you measured the particles?

A. I have not precisely quantified them, but the fiber size, that is, the Dacron fibers, tends to be in the range of about 15 microns in thickness. They vary, 10, 15, 20 microns. So that when one sees the section, you have in effect a sort of a size reference presented for you.

So the Silzone that is present spalling off the fibers -- of course, the Silzone that has silver I should really say, that has been deposited on the fibers, if you will, sort of coats the fibers, is wrapped around the fibers, so to speak. And so many of the fragments of silver that I have seen off the fibers and many of those within macrophages or giant cells, because they take the shape of the fiber, are, roughly speaking, in the similar size range to the fibers themselves.

Q. And what would that be again?

A. So the fibers are typically about 15 microns in diameter.

Q. Are you saying 15 or 50?

A. No, 15, one-five, but there may be 10 microns; there may be those that are, say, 20 microns, and a few a little smaller or larger, but I would say

most are between in the range of 10 to 20 micrometres.
Q. 10 to 20 micrometres is the size of the diameter of the fiber or the length of the fiber?
A. The diameter of the fiber, Mr. Kohn.
Q. Okay, and forgive me for seeming scientifically stupid here, but what is the difference between a micron and micrometre?
A. They are the same thing; a micron means one-millionth of a metre, that is, one micrometre.
Q. So the size of the silver particles that you had seen in the annular tissue are in the area of 10 to 20 micrometres; am I right?
A. They can be that large. If the coating of a fiber detaches around, say, roughly half the circumference of the fiber -- you know, the circumference is 3 to pi, roughly three times the diameter -- so that if half of that could be about one half times the diameter. So some of the spalled particles of silver could be in the 20 micron range. There are many that are quite a bit smaller than that. I don't want to imply that they are all of that size, but probably at their largest they are in the 20 micron range. If you had silver going all the way around the fiber that broke off and spalled off the entire circumference of the fiber,

you could be up to 30 to 40 microns, but that is not usually what is seen. Usually, it is a portion of the circumference of the fiber.

Q. So generally speaking, something less than 20 microns is what you have observed?

A. Yes.

Q. Have you actually taken a measuring device to measure it, or you are ballparking this based on the size of the fiber?

A. Yeah, I'm ballparking it based on the size of the fiber.

Q. And how do you know that these fragments you are looking at or these particles are in fact silver; have you done any testing to confirm it?

A. Not chemical testing. One aspect of this is that the shapes of the spalled silver, which shows up as black material in the sections, is remarkably similar, essentially identical to the appearance of the silver coating on the fibers. So that's one aspect.

Another aspect is that I have done some analysis using electron microscopy, using what is called a scanning transmission electron microscope; it is called STEM, and the word, those letters stand for scanning for the "S", transmission for the "T", "E" is electron, and "M" is microscope.

And there is a technique that is available with such a microscope called EDAX, electron dispersive analysis using x-rays, and the electrons and of course electron microscopy involves bombarding the specimen with electrons. But with this particular special technique, the electrons bombard the specimen and then they excite the specimen to produce x-rays that come off the specimen, and the energy of those x-rays depends on the elements that are seen.

And so it is possible, actually, to create an image under the microscope of where the silver is and, of course, other elements as well. And I have had occasion, on explanted valve sewing rings from patients that I have referred to in my affidavits, to look at these images and, in fact, have been able to determine that there is silver on the fibers, using this technique, no surprise because clearly St. Jude intended to and did put silver on the valves.

And in fact, the imaging of that silver on the fibers corresponds quite nicely to what one sees under the light microscope for the black material on the fibers. Portions, fragments of that black surface material are seen under the light microscope outside the fibers; they are also seen in cells, including macrophages and giant cells that have phagocytosed, that

have swallowed those fragments of silver on the surface of the fibers.

And I have also demonstrated, using the scanning transmission electronic microscope, silver in cells, including either a macrophage or a giant cell, outside the fiber.

Q. And are the results of those tests something that has been produced?

A. Yes, I have produced those recently. I have produced images of those, and those images are identified as to the particular patients that are referred to in my affidavits.

Q. All right, so you haven't described them in words, but you have produced the pictures; am I right?

A. Yes, that's correct. There are some captions where there is some explanatory wording underneath, so to speak, accompanying the images.

Q. Okay, well, I have all of your pictures here, and we'll get to that eventually, I hope, if time allows, but maybe you could just give us a preview by telling us what, if anything, did that add to your understanding of the silver mechanism in terms of what is stated here in your affidavit?

MR. BERMUDEZ: Let me just object to

A. My purpose was to look at the distribution of Silzone on the fibers. I have mentioned that I had looked at that same valve under a dissecting microscope, and I have disclosed those photographs, that I found quite a variability in the amount of silver coating the fibers, particularly in the deeper regions of the cuff. And so taking the histological section was to compare the appearance of the fibers, and the silver coating on them specifically, under the light microscope with what I had seen under the dissecting microscope.

Q. Let me see if I can recap some of this. When you submitted your original report back in November of 2005, at that point in time you had looked at something like a total of nine explanted valves; is that correct?

A. Well, you referred to November 2005, but I think as of my second affidavit in June 2002, I had referred to six valves from five patients that were discussed in some detail in my February 7th, 2002 affidavit, and then I also referred in June 2002 to three additional valves that I have had occasion to see. Since then, there have been more. I had referred earlier to images that I have provided on seven valves.

Q. Now, I'm just trying to get to the approximate total and I think, if I add the numbers up

correctly, that we are somewhere in the neighbourhood of 14 to 15 valves total that you have examined, explanted valves; is that correct?

MR. BERMUDEZ: As of which date?

BY MR. KOHN:

Q. As of now, today.

A. Well, yes in the sense of providing either gross or microscopic images. I have received more valves than that, but I have not analyzed them in the sense of reaching the point where I have had gross images or microscopic images to provide.

I might add too that, just based on gross examination, I have examined photographs that were disclosed by St. Jude on an additional, if I remember correctly, I think 54 explanted Silzone valves, but that is just gross examination --

Q. Correct.

A. -- not having the valve myself to do my own gross photos, microscopic sections, examine clinical information for the particular patient involved.

Q. All right, I'm addressing your attention, though, to the approximate 15 that you have looked at. Have you seen complete medical records on all of these 15 patients?

A. No.

information in great detail.

But I think that in terms of the opinions I have expressed that I had, you know -- overall, the information I have had in my evaluation of the valves has been quite adequate to reach the conclusions that I have made.

MR. BERMUDEZ: Steve, when we come to a logical breaking point, can we take a little break?

BY MR. KOHN:

Q. Sure. Let me ask a couple more questions.

Your opinion that the particles of silver create a toxic effect, has that been published in the peer-reviewed literature?

A. I have not published that opinion myself, but there is an extensive peer-reviewed literature on silver toxicity and I have referred in one of my affidavits, I believe it was the February 2003 affidavit, to that literature.

I have also referred in that affidavit to an affidavit that went in about the same time, and then shortly following I think there was a declaration by Dr. Healy, who covered the toxicology area extensively, and I examined what he had to say, was very persuaded by it. And in my February 2003 affidavit, rather than

referring to all of the papers that he referred to, I referred to his affidavit and then I added one particular paper, a paper by Kraft and others, relating to the effect of silver implant materials directly into subcutaneous tissue and skeletal muscle, not identical to cardiac muscle, obviously, and the heart, but quite similar, and pointed out really extremely severe toxic effects of silver being placed against those tissues. And I go through in considerable detail that paper and refer to it in that affidavit.

Q. I don't think you understood my question. My question was really focussed on your opinion in this case that the silver you have observed in these nine explants had a toxic effect that led to the explants. Has that opinion been published in the peer-reviewed literature?

A. No.

Q. And it has not been published with respect to the Silzone heart valve by any other researcher as far as you know; is that correct?

A. I think -- no. In other words, I think the statement you have made is correct; I don't believe it has been published by any other researcher.

Q. And that opinion that the silver particles lead to explant in the Silzone mechanical heart

valve is not a generally accepted opinion in the medical and scientific community at this time; is that correct?

A. Actually, Mr. Kohn, I think I may have responded too quickly and not sufficiently.

In the AVERT study publication of March 2002, which I refer to in my affidavits, the authors of that publication state that, in their opinion, I think is a fair summary, that silver toxicity -- and specifically they refer to the adverse effects of silver on fibroblasts, which are very important cells in healing, that they considered that this was an important element in the experience they had in AVERT with Silzone in particular in relation to paravalvular leaks. So that is a paper that has been published in the peer-reviewed literature, clearly, and expressed that opinion, and that was by the AVERT investigators themselves.

So I think what I said earlier, responding a little bit too quickly, isn't really correct. I mean, there is an opinion expressed by the AVERT investigators.

There is another paper by Ionescu, Butchart and others relating to the Cardiff study that was published in -- the Cardiff thombosis and thrombo-embolism study relating to the Silzone valve that was published in 2003. They make reference to the AVERT

paper of March 2002; they make their own statements. And that's in the peer-reviewed literature, and they state that silver toxicity, in their considered opinion, was and is a very important factor in the adverse experience with the Silzone.

Q. All right, so you have now cited the Ionescu paper of 2003 and the AVERT paper from 2002 as you believe supporting your opinion that the silver particles are toxic to cells; is that correct?

A. Yes.

Q. Is there anything else?

A. Well, there is a paper that Dr. Butany published in the Canadian Journal of Cardiology which makes reference to the Silzone valves and makes some reference to silver, to the issue of silver toxicity.

Q. Now, there is a difference between making a reference to it and hypothesizing that it might be happening to your very emphatic statement that that in fact is the cause; correct?

A. Yes, there is a difference.

MR. KOHN: All right, let's take a break.

-- RECESSED AT 10:50 A.M.

-- RESUMED AT 11:03 A.M.

EXHIBIT NO. 4: Article by Dr. Grunkemeier and colleagues.

BY MR. KOHN:

Q. Doctor, I'm just going to hand you this for the record. We talked about this article by Grunkemeier. Can you just confirm for me that that's the recent article that appeared in the European journal that you and I have been talking about a little bit this morning by Grunkemeier and others?

A. Yes, it is.

If I may interject, though, I would like to supplement what I was saying in response to some of your questions earlier.

And you were asking me questions that related to the amount of silver that came off, how much came off, that general line of inquiry, and you were asking me about toxicity of silver.

And one of the things I wanted to say is that it is not necessary for the silver to come off the fibers to be toxic, so that, in effect, at the time the valve is implanted with extensive silver coating of the fibers, certainly the fibers that are in direct contact with the annulus that is on the outside of the sewing ring, the toxicity of the silver can and does occur directly in terms of the silver that is on the

valve, rather than requiring the silver to spall off the valve and be present outside the fibers or to enter cells. It doesn't mean that there isn't additional toxic effects of the silver after spalling off, but it is not a requirement that the silver leave the fibers to achieve toxicity.

Q. Now, that's not an opinion you have set forth in any of your prior written materials, is it?

A. I don't recall stating that explicitly in the previous materials, but I think it is implicit in the materials that I have provided, including a particularly good example I think would be the Kraft paper that I refer to --

Q. Doctor, I'm just asking you a question, and we don't have to go into the Kraft paper. I just want to know is that an opinion you have ever stated in any of your written materials; yes or no?

A. I think I have so implicitly.

Q. All right. Now, in your summary of opinions that we were talking about throughout the first hour and a half of your deposition, on page 37, nowhere in your summary of opinions does it say that silver, when it doesn't come off the cuff, is toxic, does it?

MR. BERMUDEZ: Why don't you look at your opinion before you answer.

Q. And that includes Dr. Butany?
A. That's correct. Dr. Butany is not employed at my hospital, but no, I have not discussed that with Dr. Butany.
Q. Okay. And that opinion that the silver in and of itself on the valve, before any of it spalls off, as you have put it, is toxic has not been published in the peer-reviewed medical literature, is that correct, by anyone?
A. Well, I have mentioned the references to silver toxicity contained in the AVERT March 2002 study, the paper by Ionescu and Butchart in 2003. So I think I would say that implicitly, if not explicitly, that that point is made by the authors of those two papers, but I'm not aware beyond that of any additional presentation of that in the peer-reviewed literature.
Q. And you have undertaken no tests to validate your opinion that silver, without spalling off the cuff, is toxic to cells; correct?
A. No, I have not done such testing myself.
Q. All right. You have observed the histology from the animal studies that were undertaken by St. Jude Medical?

implanted, but in terms of what is currently on the market being actively sold now, no others come immediately to mind.

Q. Have you seen explanted CarboMedics valves from adults?

A. Not from adults, no.

Q. Have you seen explanted Medtronic valves from adults?

A. I have not, no.

Q. Have you seen explanted mechanical heart valves from adults from any manufacturer besides St. Jude Medical?

A. Well, in terms of recent experience, no. If one looks back to my earlier experience as a resident, as a research fellow working with Dr. Silver, this would be in the 1970s, I certainly was seeing valves from other manufacturers, but that is then.

In terms of recent years, no. And just by way of rather obvious explanation, I would say I am a cardiovascular pathologist at a children's hospital, and so you have phrased the questions in adults, and of course I have seen explants in children, from children, of mechanical heart valves but not from adults, other than, as you have asked me, from the St. Jude Silzone

valves that have been sent to me by Plaintiffs' counsel for examination.

Q. Okay. Are you able to estimate for us the number of explanted mechanical heart valves you have seen from children?

A. Very roughly, not a large number because most of the valves that go into children are bioprosthetic heart valves. It would be perhaps a couple of valves a year. It might be three or four in one year; it might only be one in another. There might even be a year that would go by, a twelve-month period, where I wouldn't see any explants.

So it is a modest number, even over the 25 years that I have worked as a pathologist at the Hospital For Sick Children.

Q. So I don't know how many years that has been, but would the number of explanted mechanical heart valves from children, would it be fewer than 20 over your entire career?

A. Probably more, but certainly I would say definitely fewer than 50, but it might be somewhat more than 20.

Q. And were any of those explants because of thrombus formation?

A. Yes, there have been some because

A. Yeah, worded in that way, as a simple declarative statement of fact, I would have to agree with you.

Q. Okay. Let's look at the reciprocal side of this issue, which is if you are right in saying that there is a substantial number, even though you are not able to put a number on it, of the 28,000 who have impaired healing, are you able to tell me how many of the 28,000 have perfectly normal healing?

A. No, I think that it is -- as you say, it is the flip side or the inverse side of the same question. I think I would have to respond in the same way. I can't give you a specific number.

I would say, though, again, in general, that the -- well, again, I think I just have to answer that I can't -- the reason for my hesitation in responding is that, knowing the toxicity of silver, knowing the valves that I have seen and, in particular, the issue of excessive pannus buildup which, looking at the patient R.R. in particular as an example, in his explanted valves a lot of silver that spalled off the silver fibers is present in macrophages, in giant cells. It is well known from the scientific literature that those cell types, that is, the monocyte, macrophage, giant cell, that sequence of cells are very important in

stimulating fibrosis. And so from a basic science perspective, I think it is reasonable to expect that silver spalling off the valves -- spalling off the sewing ring, provoking a macrophage, giant cell response, in turn provoking fibrous tissue buildup, which of course can occur to some extent with a non-Silzone valve but this is additive to what might occur with a non-Silzone valve, that to me it is a very reasonable expectation that there would be -- I can't say exactly how many, but substantial numbers of patients who would have that sort of problem; albeit you could see excessive pannus with a non-Silzone heart valve, but to see that in addition to what you would see with a normal heart valve.

So that -- and I have expressed that opinion, I think it is fair to say, in my affidavits, and that's something that informs my view that I would expect substantial numbers of patients long term, not just short term, but long term, five years and longer with a Silzone valve, that I expect there would be adverse healing.

Q. This is based on extrapolating from patient R.R.?

A. Well, R.R. is the best example I have seen of this so far, but certainly the Silzone, the silver particulates that leave, spall-off, the surface of the fibers, which I have seen in all the Silzone valves I

program would be established, how long would it take to answer that question as to whether there is or isn't a greater risk and, if there is, how much greater it is?

A. I don't think I can give a precise answer to that. I know that Dr. Butchart, in his report in November 2005 which I have read in detail, does address monitoring issues. I don't think he -- I don't recall that he provided that degree of specifics, and he is obviously an expert in the field and has considered it in detail.

So I don't think it is, if I may say so, really reasonable to expect that I would be able to give such a specific answer to the question.

Q. So you are not able to tell me how long a period of time you would have to monitor these patients to answer the question; correct?

A. Correct.

Q. And is it also true for the other complications we discussed, that is, paravalvular leak, thrombo-embolism, endocarditis, cancer, or any other complication with a Silzone valve, you wouldn't be able to quantify whatever the increased risk is as set forth in paragraph 217 of your affidavit?

A. Yeah, as we speak today, no, I don't have the data on which to be able to make

Q. Do you agree with that statement?
A. No, I don't.
Q. Why is that?
A. Well, the reason is that the conclusion is based on a lack of statistical significance based on the rather small amount of data available for Dr. Grunkemeier and colleagues to analyze.
There is no information in the paper, as far as I have been able to assess, that gives information on the statistical power of the study. And to argue -- or not to argue, but to state by analogy, I know that a previous paper published in 2004 on the echocardiographic follow-up of these patients that was analyzed by Dr. Sackett, Dr. Sackett -- and I think the same general principle applies in an affidavit or report that he provided in -- well, this is in 2004, or perhaps it was early 2005 after that paper appeared in 2004 on the echocardiography -- made the point that the result was indeterminate, because there was not the statistical power present to support the conclusions.
And so I think the same principle applies to this paper; in other words, an appropriate title for this recent Grunkemeier paper would be "Time-Related Risk of the St. Jude Silzone Valve: An Indeterminate Result".

So to me, I find that troubling that we don't have -- that that information is not available and specifically not available, as far as I know, to experts for the Plaintiffs or other experts.

Q. You are not aware of the fact that the entire AVERT database has been provided on a periodic basis to the Plaintiffs' experts? The same data set that Dr. Grunkemeier had has been given to the Plaintiffs' experts every six months; you are not aware of that?

A. I wasn't aware every six months. When you do mention it, I do have some recollection that there has been some disclosure of the AVERT database to Plaintiffs' experts, but I'm not aware of the details of that.

Q. Okay, well, I --

A. I'm going on the -- sorry to interrupt, but I'm going on what Dr. Butchart summarizes in his report in terms of numerous deficiencies that he refers to in relation to the AVERT study.

Q. Speaking of power, how many patients are in Dr. Butchart's study, Silzone patients?

A. I don't know the exact number. It has been disclosed in the publication in 2003. I don't have it committed to memory, but it is less; it is certainly substantially less.

January of 2005, is incorporated in -- there is a paper on surgical technique relating to AVERT that was published in either November or December 2005.

But at least, based on the wording in the Grunkemeier paper, it looks to me as though the analysis has been done on the old definition, which would not be as inclusive. The new definition included patients with major paravalvular leak, where re-operation was planned but the patient was too sick to have the operation, and patients who the surgeon would operate for a paravalvular leak but the patient would not agree to the operation. I believe there may have been some other changes too, but those were two of the major ones which, as I understand it, in the new definition would include a larger number of patients with paravalvular leak.

That was referred to, the new definition, in the November/December of late 2005 paper on surgical technique, but I don't think it is referred to here. Now, maybe that's just an oversight in drafting the paper, but that was another thing that I took note of, and it made me wonder whether, for purposes of this paper, the old definition was being used.

I also understand -- again, this is from Dr. Butchart's report in I think it is November 2005 -- that surgeons could specify a patient as having

specific complications, put that information into the database, but then subsequently they could withdraw that information from the database. To me, that's somewhat of a concern that, you know, those sort of revisions could be made. It might be appropriate in a particular case, perhaps a misdiagnosis had been made of something, but it was one of -- again, I'm just referring to a few of the elements that Dr. Butchart raised concerns about and which I'm indicating today certainly concerned me as well.

Q. Are you aware of any study of mechanical heart valve patients, any randomized study of clinical heart valve patients that is larger than AVERT in the world literature?

A. Not offhand. I have not made it my business to really look through that literature looking for larger studies. I do -- I think I do agree. I think the premise of your question is this is quite a large study as far as heart valve implants go.

Let me rephrase that. I think it was certainly intended to be a very large study. In fact, the original enrollment was planned at 4400, which I believe was about 2200 in each of the arms. Of course, it was terminated with only about 400 in each of the arms.

Q. Well, even terminated at 400, it is still the largest heart valve study that has ever been done; isn't that correct, Doctor, to your knowledge?

A. I don't know that, but I'm not disagreeing with that statement. I just have not researched that to be able to answer that question independently, but if you say that, I'm presuming you are saying that on a factual basis and, you know, if so, then you are correct.

Q. Now, if I understand your opinion with respect to the conclusions in the Grunkemeier paper, what you are saying is that you can't say definitively that the authors are not correct in their statements about the risk profile? These conclusions may well be right, but you are just not certain of it; is that correct?

A. Well, I think that -- I think it is misleading of the authors to make that statement. I think they do not have the statistical power to back that up. And my understanding, reading an affidavit by Dr. Sackett, who was very, very critical of the analysis that Dr. Jones had done of the AVERT study up to that -- the AVERT data up to that point, is that I believe he made -- some of the points he made were that, to publish a clinical study comparing treatments in a peer-reviewed

medical journal, that there were standards for the statistical analysis that were published standards. He made some reference to them, and that to make statements just on the basis of "p" values of that aspect of statistical testing without including an analysis of statistical power was completely inappropriate, was something that would not be accepted by the editors of the major medical journals.

And so to me it looks like that's what is going on here, that these investigators have published this in a cardiothoracic surgery journal, and it looks to me like they got away with it in terms of publishing it in this fashion.

But if one applied the same analysis that Dr. Sackett has applied to -- and of course, he specified this in great detail in his affidavit, which I'm sure you are aware of, relating to an earlier stage with AVERT but relating to the sort of analysis that Dr. Jones did; I am reasonably confident that Dr. Sackett would say the same thing about this.

Q. Dr. Sackett's opinions about the statistical power of AVERT, as you have phrased it, have not been published in the peer-reviewed literature; am I correct?

A. I think that's correct, to my

Q. Oh, I'm sure it is. Now, by the same token, if Dr. Sackett were to choose to express his criticisms about any of the AVERT publications based on his disagreement with the statistics, he would be free to publish that, would he not?

MR. BERMUDEZ: Well, I'll just object; that calls for a legal conclusion. But to the extent you want to opine, you can.

THE WITNESS: I'm uncertain, but it seems to me on the general issue of statistical power, just on that broad issue, I would guess that he might well not be limited, but I think in terms of going beyond that to any specifics that really have to do with Silzone in particular, my impression is that he would be limited by the confidentiality order.

BY MR. KOHN:

Q. All right. So to wrap this up with the Grunkemeier paper, your primary criticism is the fact that the study is too small to make conclusions which you feel are definitive to satisfy you; is that correct?

A. Yeah, I would put that as that is sufficient condition for not accepting the conclusions. I don't propose to go over them again, but I think there is numerous other problems with AVERT which Dr. Butchart has I think very well summarized. And so it is not the

only reason, but it is certainly, in itself, the statistical power issue is sufficient reason.

Q. Now, let's go back to your statement here in paragraph 217 that you feel the Silzone valve recipients are at greater risk. I may have asked you this before, but I want to be sure we have it covered. That is a view you have never published in any peer-reviewed literature, nor have you presented it at any scientific meeting; am I correct?

A. That's correct, but I guess I would add I am, after all, bound by the confidentiality order. But it is true, I have not presented or published it.

Q. Now, in paragraph 218 you make a comment about a need for a higher level of monitoring, and let me start off by asking you, first of all, you are not a clinician and you don't treat patients; is that correct?

A. That is correct.

Q. And you normally do not make recommendations to cardiologists or cardiac surgeons about how heart valve patients ought to be monitored; am I correct?

A. That is correct.

Q. So any statement you might make about monitoring is really outside your area of

expertise; am I correct?

A. Well, in terms of the specifics of exactly what the monitoring regime would be, I think that's true. But in terms of making the general statement that because of all of the information I have on Silzone -- and of course, the statement was made in June 2002, and I have written subsequent affidavits on the point -- but I certainly stand by the statement today, after all that I have put in up to November of 2005, I think that the patients clearly need and deserve a higher level of monitoring than other mechanical heart valve recipients would get because of the particular problems with Silzone.

I think it is reasonable for me to make such a statement, based on my knowledge of the basic science, my knowledge of the specifics in terms of the pathology, but I would not suggest the exact details of what the monitoring regime should be. I have read Dr. Butchart's report in November 2005. He spends or devotes a fair amount of space in that report, towards the end, to what the monitoring scheme would be. I found it persuasive, impressive. There were some things that he said there that I hadn't thought in detail about that seemed very reasonable to me. I would view him as an expert in the field, and I found what he said to be

reasonable and persuasive.
Q. Have you read any other views about what monitoring is needed for these patients besides that of Dr. Butchart?
A. I think that there has been some reference to that by Defence experts, but I must admit I have not reviewed what Defence experts have said on that subject since reading the affidavits or declarations from those Defence experts in the range of three to four years ago.
Q. Now, there is an organization in Canada called the Canadian Cardiovascular Society; am I right?
A. You are correct.
Q. Are you a member?
A. I am.
Q. And do you attend their meetings regularly?
A. I have not really been attending their meetings regularly.
Q. Why is that?
A. I think principally because of the load on my schedule of the research that I do. I do frequently attend the American Heart Association meetings which occur typically about ten days later, in early

example -- patients who have Silzone valves, particularly in the mitral position where it is difficult to visualize the valve through a transthoracic echocardiogram, I think that they particularly would benefit from transesophageal echocardiography, not necessarily in every case. Again, Dr. Butchart has dealt with this in his report in November 2005, but I just use that as an example I think of something that, at the time I formed this opinion, and I haven't changed it since then, that it seemed to me to be fairly obvious that there were additional monitoring that should be done on Silzone patients above and beyond what is normally done on a conventional heart valve or mechanical heart valve recipients.

But you know, I acknowledge I don't know the detailed protocols that are in the documents you refer to, but I don't think that has prevented me from having a very reasonable concern that Silzone patients, because of the distinct differences in this valve from the conventional St. Jude valve and from other valves that do not have a silver-containing sewing cuff, the pathology is so striking in the Silzone recipients, the valves that I have seen, it seems to me to be rather, I think, apparent that those patients should have a higher degree of scrutiny in terms of monitoring.

Q. You are talking about the 15

MR. KOHN: Okay, sure.
-- RECESSED AT 2:27 P.M.
-- RESUMED AT 2:42 P.M.
BY MR. KOHN:
Q. Okay, Dr. Wilson, let's go over a few background questions, if we could.
What training do you have in toxicology?
A. I have no formal training in toxicology.
Q. And you don't do surgery?
A. I do not do surgery.
Q. You don't have training in surgery?
A. I do not.
Q. Do you have any training in material science, any formal training?
A. Well, not formal training, but I have had quite an experience in material science as it relates to implantable devices placed in the body by material science, and I have been recognized by the International Society for Biomaterials with a lifetime achievement award in that field, which was mentioned in some detail in I think it was my June 2002 affidavit; I actually made detailed reference to it. I believe the award was conferred on me in the year 2000, so --

Q. What organization was it again?

A. Let me just go back to my affidavit, just so I get it absolutely right. There is a biomaterial -- just while that is being looked up, there is a Biomaterials Society which is very active in North America, really an American society but to which Canadians often present, and there is a Canadian Biomaterials Society.

And then, if I may just read from numbered paragraph 7 from this June 2002 affidavit, I say:

"In May, 2000, at the time of the worldwide scientific meeting (Congress) of the International Union of Societies for Biomaterials Science and Engineering, which is held once every three years, I was elected as Fellow Biomaterials Science and Engineering..."

And then there is an abbreviation, "F.B.S.E.", the initials for Fellow Biomaterials Science and Engineering. And then I go on in the next sentence to say:

"This is a lifetime achievement award and is a designation which I may place

after my name for the rest of my life."

Q. Do you attend the annual meetings of the Biomaterials Society?

A. Yes, I have not made every meeting, but I'm a frequent attender of that meeting, yes. Again, when you refer to "Biomaterials Society", that is generally the American meetings, usually held in an American city.

There is also a Canadian Biomaterials Society, and again, I haven't attended all the meetings, but that is a much smaller group, but I have attended those meetings frequently as well.

Q. And when did you last attend the American association meeting?

A. Probably -- I'm having a little trouble remembering, but I mean, not in the last four or five years, but I think it may have been perhaps 2001. I'm not absolutely sure of that.

Q. And when did you last attend the Canadian biomaterials group?

A. It would have been I think probably about -- maybe about 2003.

Q. Now, how many peer-reviewed articles do you have listed on your curriculum vitae, approximately?

A. Oh, I know it is in excess of 160.

Q. And how many of those have been published in Biomaterials Society journals?

A. Well, if you mean broadly, if you mean -- well, the subject content being in the biomaterials field, there would be several. I haven't made a count of that, but most of these would have been published in surgical journals or -- I know, for example, the transactions of the American Society For Artificial Internal Organs, which is not the Biomaterials Society, so I'm making that distinction.

Q. Right.

A. There would be several. I haven't made an exact count.

Q. So fewer than five articles out of the 160 would be on biomaterials topics?

A. Sorry, did you say --

Q. I'm asking whether it would be fewer than five articles of the total 160, or thereabouts, that you have published are in the area of biomaterials?

A. No, it would be more.

Q. More? More than 10?

A. I think more than 10, yes.

Q. More than 15?

A. I think so.

Q. And do any of those relate to mechanical heart valves?

A. Yes, there are a few on mechanical heart valves, and I know I have provided these to you. For example, there is a paper in the Journal of Thoracic and Cardiovascular Surgery in 1988 based on the Bjork Shiley valve; in fact, Dr. Bjork, the developer of that valve, was I believe the lead author on that article, looking at a change in the coating, actually using a porous metal coating, for components in that valve, and it was quite an extensive study in goats. And so that is an example.

Q. And what was your role in that publication?

A. My role was as the pathologist who looked at the valve explants from those animals.

Q. From the goats?

A. Yes.

Q. Okay. And have you looked at any other mechanical valve explants from animals other than the goat study for the Bjork Shiley valve?

A. I have looked at some -- in terms of a functioning valve prosthesis, it would only relate to the Bjork Shiley valve or modifications thereof.

There was some earlier work that was involved using Starr Edwards valves, really just using the valve cages; it wasn't a functioning valve. And that was to look at the healing properties, again, relating to these porous metal surfaces. It was a paper published in the American Society for Artifical Internal Organs transactions in 1976 as another example.

But in terms of a functioning prosthesis that was used in man, at least in, if you will, the control form of the valve, the non-modified form, as a mechanical valve prosthesis it would only be the Bjork Shiley valve.

I have done some other work having to do with bioprosthetic heart valves, but they are distinct from mechanical valves. In fact, much of the work that I did later on after the '80s, going into the '90s, in the context of prosthetic heart valves was really in bioprosthetic heart valves. There was a paper that was published, if I remember correctly, in I think it was the Annals of Thoracic Surgery in 1995 that deals with, again, an experimental study of animal implants but for a bioprosthetic -- for a bioprosthesis rather than a mechanical valve.

Q. You have never taught material science?

A. I have given some lectures at the University of Toronto, but I have not taught a formal course in biomaterials science. I have given some lectures to students in biomedical engineering at the University of Toronto but not taught a formal course.

Q. Let's finish up our discussion of the 54 valves that you have looked at, the pictures that you have looked at. We didn't quite finish that; I think we got side-tracked on some other things.

As you pointed out, I think, Dr. Schoen has looked at similar explants of conventional valves and, trying to use your rating system, has shown examples in conventional, in other words, non-Silzone valves, of the same kind of healing that you observed in the Silzone valves; correct?

A. That's correct.

Q. And have you had the opportunity to look over the chart in Exhibit "E" of Dr. Schoen's --

A. Yes, I have.

Q. And similarly, the pictures are attached, starting with SJ-403?

A. Yes, and I have looked at those photographs.

Q. Okay, so let's try a global question, and then I'll get specific.

# Exhibit 21

**Schultz, Monica M**

**From:** Schaff, Hartzell V., M.D. [schaff@mayo.edu]
**Sent:** Saturday, February 26, 2000 11:35 AM
**To:** 'MSchultz@sjm.com'
**Subject:** RE: Re mortality rates

perivalve1.JPG

Dear Monica,

I understand the reasoning for possibly including descriptive information of Silzone valve explants, but would caution against making too much of this for the following reasons. First, there is often lack of endothelialization near the site of a perivalvular leak, and we have always thought that it was more of the result of the leak (high velocity flow over the fabric of the sewing ring) rather than the cause of the leak. This is seen in valves with standard cuffs. It may be that the lack of endothelial covering is more extensive with the Silzone valve and that this reflects some inhibition of tissue ingrowth, but it is also true that we do not have explants of standard cuffs from the same intervals. I am including a picture that you saw in North Carolina at the Pinehurst meeting. This Starr Edwards valve was explanted over 15 years after Dr. McGoon used it to replace a rheumatic mitral valve. The entire area surrounding the sewing ring had no tissue ingrowth and you will remember that the sutures were intact. I am certain that if we saw this in the Silzone valve we would ascribe the lack of healing to the valve coating.

My suggestion would be simply to include a sentence or two stating that surgeons who explanted the Silzone valves observed for tissue ingrowth or something to that effect. This brings up once again the reliability of preclinical animal studies. Can you direct me to the publication that documented "normal" tissue ingrowth around Silzone cuffs?

Best regards,

Hartzell

-----Original Message-----
From: MSchultz@sjm.com [mailto:MSchultz@sjm.com]
Sent: Friday, February 25, 2000 4:21 PM
To: Schaff, Hartzell V., M.D.
Cc: AFlory@sjm.com; GGrunkemeier@providence.org
Subject: FW: Re mortality rates

Dear Dr. Schaff,

Gary brings up an excellent point below. Should the white paper include a section with qualitative info, such as quotes from some of the operative reports?

Monica

-----Original Message-----
From: Grunkemeier, Gary [mailto:GGrunkemeier@providence.org]
Sent: Friday, February 25, 2000 4:14 PM
To: 'Holubkov, Rich'; 'MSchultz@sjm.com'
Cc: Grunkemeier, Gary
Subject: RE: Re mortality rates

I certainly agree with Rich's last sentence.

Which brings up this:

With the meager and uncertain follow-up we have to work with I would really



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

be scared statistically to hang my hat on one or two barely significant p-values, especially when we have generated so many, and when the hypothesis was suggested by the data.

BUT, there is something qualitative about the leaks, as well as the (barely) quantitative support we are giving to the difference (between Silzone and not). And that is the op notes of the explanting surgeons, who were often surprised at the lack of endothelial covering, apparent inflammatory reaction, etc. And I am sure these facts are also what swayed and convinced the DSMB. Now, in this white paper, are we going to divulge this crucial info at all, or leave everyone thinking the decision to suspend enrollment was driven soley by data?

Gary

-----Original Message-----
From: Holubkov, Rich [mailto:holubkov@edc.gsph.pitt.edu]
Sent: Friday, February 25, 2000 1:56 PM
To: 'MSchultz@sjm.com'
Cc: Gary Grunkemeier (E-mail)
Subject: RE: Re mortality rates

I dunno either at this moment in time (too much number-crunching today).....I think we need to each sit down with the latest version of the paper and read it for consistency and completeness. Please do add these (exact?) CI's to the paper if you think it's appropriate; I do think the body of the text should lean towards being more descriptive and less statistics-intensive.

Rich

-------------------------------------------------------
Richard Holubkov, PhD
University of Pittsburgh/GSPH
holubkov@edc.gsph.pitt.edu
(412)648-1302 Fax (412)624-3775

-----Original Message-----
From: MSchultz@sjm.com [mailto:MSchultz@sjm.com]
Sent: Friday, February 25, 2000 3:48 PM
To: GGrunkemeier@providence.org; kennard@edc.gsph.pitt.edu; MSchultz@sjm.com
Cc: holubkov@edc.gsph.pitt.edu
Subject: RE: Re mortality rates

At this point, I doubt my judgement on ANYTHING. I defer (as I should have done in the past) to you three. Whatever you want is fine with me.

M

-----Original Message-----
From: Grunkemeier, Gary [mailto:GGrunkemeier@providence.org]
Sent: Friday, February 25, 2000 3:48 PM
To: 'Kennard, Lisa'; Monica Schultz (E-mail)
Cc: Holubkov, Rich
Subject: RE: Re mortality rates

of course for completeness we COULD add conf int for the early %'s - but I do not think those matter as much, does anyone?

-----Original Message-----
From: Kennard, Lisa [mailto:kennard@edc.gsph.pitt.edu]
Sent: Friday, February 25, 2000 1:45 PM
To: Monica Schultz (E-mail)
Cc: Gary Grunkemeier (E-mail); Holubkov, Rich
Subject: Re mortality rates



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

Obviously I should have gone home directly from the dentists

<<death-rates.doc>>



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Exhibit 22

Appendix A

ST. JUDE MEDICAL

**DATE:** March 29, 2000 (updated), original February 8, 2000

**TO:** Bill Mirsch & the Research Group

**FROM:** Wenda Carlyle

**SUBJECT:** **Blood Biocompatibility of VEGF treated tissue**

# Final Report

## Purpose

The primary purpose of this study was to determine whether addition of vascular endothelial growth factor (VEGF) to valve tissue exposed to aortic blood flow results in an increased inflammatory response. The study design also allowed us to examine endothelialization, calcification, wound healing, and thrombosis of tissues treated with or without VEGF. In addition to valve tissues (treated and untreated aortic root and cusp tissue), this study examined blood interactions with control and Silzone®-coated polyester fabric.

## Study Design

The following samples were analyzed:

| Material | Treatment | 'N' for SEM | 'N' for Histology |
|---|---|---|---|
| Cusp | Glutaraldehyde | 3 | 5 |
| Cusp | Glut + Ethanol | 5 | 4 |
| Cusp | Glut + Ethanol + VEGF | 3 | 3 |
| Root | Glutaraldehyde | 2 | 5 |
| Root | Glut + Ethanol | 4 | 5 |
| Root | Glut + Ethanol + VEGF | 4 | 6 |
| Root | Glut + Ethanol + Al | 4 | 5 |
| Root | Glut + EtOH + Al + VEGF | 4 | 6 |
| Fabric | Control | | 5 |
| Fabric | Silzone | | 5 |

*Note – Although there was some overlap in tissue samples, many of the samples analyzed by SEM and histology were not identical.



CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER SJM2720631958MDL

Appendix A

## Procedure

A complete description of the sample preparation and surgical procedures is available in the "VEGF Blood Biocompatibility Study Protocol" in this file (RD99004). In brief:

**Prior to the day of implant:**

1. Delrin® buttons with 8 mm flat heads (see picture below) were manufactured in the St. Jude Medical Machine shop.
2. A number was engraved into the post of each button and then traced with permanent marker to facilitate reading of sample number during implant and explant.
3. All buttons were steam sterilized prior to use.
4. A randomization table was prepared for determination of the order of sample implant. A constraint was placed on this order to allow pairing of control and Silzone-coated fabric samples.
5. Aortic valve root and cusp tissue was harvested from porcine hearts.
6. All tissue was crosslinked in 0.5% glutaraldehyde for a period of at least 2 weeks.
7. Approximately ½ the tissue was treated further with 80% ethanol for 24 hours.
8. Ethanol and Aluminum treated root tissue was obtained from clinical grade valves rejected because their temperature indicator had tripped during shipping.
9. All tissue underwent gamma sterilization prior to use
10. Control polyester fabric samples were cut from batch # 045299, lot # 229117
11. Silzone-coated fabric samples were cut from run # 46110601, lot #224319
12. Approximately 2 $cm^2$ samples of fabric were cut and wrapped around the top of a Delrin® button and cinched snuggly into place using a purse-string suture around the middle of the button.
13. Fabric covered buttons were steam sterilized in individual autoclave pouches for transfer to the University Surgery Laboratory.

**On the day of implant:**

1. 10 mm diameter circular tissue samples were cut using aseptic technique and placed in individual sterilized containers filled with saline.
2. Each sample was rinsed three times with 100 ml sterile saline.
3. Samples due to be treated with VEGF were incubated in a solution of 100 ng/ml rhVEGF165, 0.01% glutaraldehyde, HEPES buffered saline for 30 minutes.
4. VEGF-treated samples were rinsed again three times with sterile saline.
5. Samples were fixed to the Delrin® button heads with a small amount of cyanoacrylate glue.
6. All tissue samples were transported to the University Surgery Laboratory in sterile saline.



Appendix A

**Implant:**

1. Five month old pigs were used for this study as the cardiovascular system of the pig is the most similar, excluding non-human primates, to humans. At five months pigs were still small enough to handle but big enough to withstand partial artery occlusion with the Delrin® buttons.
2. Pigs were anesthetized and intubated and a midline incision was made to expose the abdominal aorta.
3. A 10 cm length of the aorta was gently cleaned distal to the renal arteries and proximal to the inferior mesenteric artery. Heparin (70 U/kg) was administered IV.
4. Four buttons were placed in the aorta or each animal spaced at 2-3 cm intervals. To insert a button the aorta was briefly clamped with a vascular side-biting clamp and a small incision was made through the aortic wall with a scalpel blade.
5. 4-O prolene suture purse string was placed around the hole and the appropriate button was inserted through the hole such that the tissue or fabric was positioned inside the lumen of the vessel.



6. The purse string suture was tightened and clamp released to restore blood flow.
7. After placement of all four samples, the abdominal cavity was closed and the pigs were allowed to recover.

**Explant:**

1. Pigs were housed for 10 days then were sacrificed with an overdose of barbituate.
2. Samples were photographed both in situ and immediately after explant (see below).
3. Samples were immersed in Trump's fixative and fixed for at least 4 hours. Each sample was cut in ½ for SEM and histological analysis.
4. Samples sent out for histology were stored either in 10% formalin or Trump's fixative. SEM samples were stored in Trump's fixative.
5. SEM was performed and analyzed by Sheila Kelly. American HistoLabs prepared the histological sections that were then analyzed by Dr. George Ruth specializing in veterinary and industrial pathology.



CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER SJM2720631960MDL

Appendix A




Additional Considerations

This was a new protocol involving unusual sample preparation and a novel surgical and explant procedure. Consequently, the protocol was altered several times during the study to improve technique and provide for better sample analysis. For example, the first two samples were placed in the thoracic aorta, but we quickly learned that the abdominal aorta was a better location. The solution and procedure used to fix samples after explant was changed after sample number 21 to reduce artifacts. Our technique for gluing the samples to the Delrin® buttons also improved over the course of the study.

# Results

Detailed findings of the SEM and histological analysis for each sample are documented in the "Final Pathology Report" and "SEM Results" in this file, RD99004. Representative micrographs of the samples are stored on the "I" drive in the "Research" folder in this file and arranged according to sample type for easy access. There were some discrepancies between SEM and histological analyses of individual samples. These are likely due to both intrinsic sample variation and also to the inability of either methodology to quantitatively assess a whole tissue response. Both techniques allow for a detailed examination of one small section of material. SEM also allows for a low power view of the tissue as a whole (see image or root tissue below) but at a scale that does not provide detail of cell shape or type. After review of the detailed pathology and SEM report, a summary of the conclusions drawn from these analyses is recorded here.

**Cusp tissue:**

There was no difference in inflammatory response seen regardless of tissue treatment. No calcification was seen in any of the cusp tissue.
There was greater variability of cusp samples and evidence of degenerative changes that had occurred prior to fixation. This may be due to irregular flow patterns over the cusps and the tendency of the thin cusp tissue to buckle and fold in the current (see second sample in photo of



CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER SJM2720631961MDL

explant above). Both histological and SEM analysis showed endothelialization of the cusp tissue that was most uniform and complete in the VEGF treated samples. Analysis of samples by SEM suggested that addition of VEGF promoted more rapid healing and endothelialization but that endothelial cells on the cusp tissue did not appear normal.

**Root tissue:**

There was no difference in inflammatory response seen regardless of tissue treatment.
The root samples treated only with glutaraldehyde and those further treated with aluminum had significant thrombus formation. This tendency was diminished in the VEGF treated samples. There was extensive calcification seen on all samples treated only with glutaraldehyde. There was a reduction of calcification seen in samples treated with either ethanol or ethanol + VEGF. There was a further reduction in samples treated with aluminum but calcification was still observed associated with elastin fibers. There was almost no calcification seen in samples treated with ethanol, aluminum and VEGF.

With regard to endothelialization of root tissue, the pathologist concluded that this varied with treatment groups and was greater and more consistent in those tissues treated with VEGF. A much greater variability was seen with SEM analysis, performed, for the most part, on different samples. Whereas very little endothelialization was seen on aluminum treated samples assessed histologically, SEM suggested fairly extensive endothelialization. Islands of endothelial cells were seen on many tissues that could indicate colonization with circulating endothelial cells or endothelial precursor cells in addition to cell outgrowth from adjacent aortic endothelium. Two possibly important differences were observed only on the VEGF treated root samples. First, beneath the endothelial cell layer on all other tissues). This suggests the potential for endothelialization beyond pannus overgrowth. Second, The pathologist first reported that on VEGF treated root tissue there appeared multiple layers of endothelial cells, often 2 – 3 cells deep and sometimes up to 20 cells deep. He later amended this observation to say that these cells were probably fibroblasts. However, this warrants further observation at longer time points in the subsequent orthotopic implant study as multiple layers of endothelial cells implies a loss of contact inhibition that could signify either an angiogenic response or the beginnings of cell transformation.

Representative SEM Photos:


Glut


Glut/EtOH


Glut/EtOH/Al


Glut/EtOH/VEGF


Glut/EtOH/Al VEGF

**Fabric:**



CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER SJM2720631962MDL

SEM was not performed on the fabric samples. Histological analysis revealed a classic foreign body response to all fabric samples. Neutrophils were present in 3 / 5 Silzone-coated fabric samples and in only 1 / 5 control fabric samples. This implies a slight increase in inflammatory response to the Silzone-coated fabric. There were also many more fibroblasts and more connective tissue within the fabric matrix suggesting improved healing.

## Conclusions:

- The addition of VEGF did not elicit an inflammatory response.
- There was a trend toward increased endothelialization and qualitatively different endothelialization with addition of VEGF.
- How this might impact valve function needs to be addressed in a large animal orthotopic implant study



CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER SJM2720631963MDL

# Exhibit 23

STATE OF MINNESOTA DISTRICT COURT
COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT
PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62-C9-02-7324

Heart Valve Litigation

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF WILLIAM R. HOLMBERG
VOLUME I, Pages 1 - 292
October 10, 2002

(The following is the deposition of WILLIAM R. HOLMBERG, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:08 o'clock a.m., October 10, 2002.)

A. At 30 days, yes.
Q. Below that it says, however, at the 10 day specimen there was silver particulates at the cardiac tissue interface for the coated specimen.
A. Yeah, it's my understanding of that that these were never identified as silver particulates, but that's what was believed to have been at that interface.
Q. And was that ever analyzed to determine if it was silver, and if so, what the chemical composition of that particulate was?
A. Not that I'm aware of.
Q. The next page refers to regulatory assessment on -- for the unregulated markets; is that correct?
A. That's what it states here, yes.
Q. If these markets were unregulated markets, why was it necessary to do the testing that's listed here?
A. That's a question you'd have to direct to Jonas Runquist. If -- They may not have been necessary from a regulatory perspective.
Q. So this was a series of tests that your team had determined was necessary to do for the unregulated markets that were some of them the same as and some different from those that were being done for the

# Exhibit 24

STATE OF MINNESOTA DISTRICT COURT
COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT
PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62-C9-02-7324
Heart Valve Litigation

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DONALD S. GUZIK
VOLUME I, Pages 1 - 282
October 15, 2002

(The following is the deposition of DONALD S. GUZIK, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, in the city of Minneapolis, state of Minnesota, commencing at approximately 8:55 o'clock a.m., October 15, 2002.)

the frequency, the severity, the things that were taking place within the field that were reported to us? There was -- There were several, and I can't even begin to -- to tell you how many meetings.
Q. Okay. Well when did the first such meeting take place that evaluated the product safety issues with Silzone, including evaluating the frequency of occurrence events, the severity of the occurrences and the severity of the medical consequences?
A. And once again I don't think it was -- the first actual meeting that probably took place was when Dr. Butchart from the U.K. had several events involving patients that we were concerned. Obviously whether it's one, we're concerned, or several. But he had just a blip on the radar screen, if you want to put it that way, saying well why all of a sudden is this one physician experiencing this.
Q. Okay. Well let's talk a little bit then about Dr. Butchart. Dr. Butchart was a researcher in Wales, England; correct?
A. Yes, in Cardiff.
Q. He was a researcher that was conducting an ongoing study concerning a number of valves, including the St. Jude Masters Series valve; correct?
A. Yes.

Q. St. Jude approached --

And the subject of Mr. Butchart's research was the thrombogenicity of heart valves; correct?

A. Yes.

Q. Specifically mechanical heart valves; correct?

A. Yes.

Q. And St. Jude actually approached Mr. Butchart in 1997 and asked him to add the Silzone valves to his study; correct?

A. I -- That I don't know, if we approached him or he approached somebody in marketing. I don't know what the relationship or the study was.

Q. Okay. You understood, though -- Well, I'm sorry.

The documents do show that in fact St. Jude approached Mr. Butchart and asked him to put Silzone valves in his study, and specifically to compare the Silzone valve to the Masters Series valve in terms of thrombogenicity. You didn't know that?

A. No, but --

Q. Okay.

A. -- but that's --

Q. Did you understand that St. Jude hoped to promote Mr. Butchart's results in order to claim that the Silzone valve had a lower rate of thrombosis?

A. Well I think the original study, my understanding of the original study was for Mr. Butchart to take St. Jude product and evaluate them against competitive devices. So within itself, whether Silzone against the standard, I guess, yeah, you would want to know all the results.

Q. But that's what St. Jude specifically asked Dr. Butchart, Mr. Butchart to do; correct?

A. But that's what I was saying, I don't recall whether or not that's exactly what he was asking to do -- or asked to do.

Q. Okay.

(Discussion off the record.)

BY MR. O'FALLON:

Q. I'm going to hand you a document that's been previously marked as Plaintiffs' Exhibit 63.

MR. O'FALLON: I'm sorry, David, I didn't think I'd need this one.

MR. STANLEY: That's okay. I can follow.

Q. That's a letter dated February 19th of 1997 to Mr. Butchart from Al Flory and Monica Schultz; correct?

A. Yes.

Q. And Al Flory at that time was the director of clinical and regulatory affairs; correct?

A. Yes.
Q. Why don't you read that second paragraph to me, out loud.
A. "We understand that you prefer not to compare differences in valve performance or valve-related complications across manufacturers." Our primary interest in this comparison is St. Jude -- St. Jude -- SJM mechanical heart valves with standard versus Silzone sewing cuffs. Therefore, we respectfully request that an analysis be performed to compare valve performances (e.g., complications, subclinical abnormalities) in patients -- in patients with the two types of sewing cuffs.
Q. Okay. So it appears that it was St. Jude's request that he actually compare their Silzone valve with their Masters Series valve in his study; correct?
A. Yes, it does.
Q. I'm going to show you another document. This has previously been marked as Plaintiffs' Exhibit 11.
Plaintiffs' Exhibit 11 is a memo dated June 18th of 1998 from Steve Healy to a number of people, including yourself; correct?
A. Yes.
MR. STANLEY: June 11th, you mean?

Q. I'm sorry, June --

MR. O'FALLON: I've got June 18th.

THE WITNESS: June 18th.

MR. O'FALLON: The memo's June -- Well look, look, cover memo. The cover memo.

MR. STANLEY: Oh, I'm sorry, I was looking at the next page. I apologize.

MR. O'FALLON: That's okay.

BY MR. O'FALLON:

Q. And the subject of this memo written by Mr. Healy was Mr. Butchart's study; correct?

A. Yes.

Q. It says, "Attached is a summary of Butchart's work that Monica Schultz has written up. As you can see, it is a very in-depth study which hopefully will be able to highlight improved healing responses and therefore, reduced embolic risk for the Silzone patients"; correct?

A. Yes.

Q. So Mr. Butchart's study was specifically looking at embolic risk for Silzone patients versus St. Jude's standard valve; correct?

A. Yes.

Q. And if you look on the next page, attached to Mr. Healy's memo, as he promised, was Monica Schultz'

analysis of Mr. Butchart's study; correct?
A. Yes.
Q. And the title of Mr. Butchart's study was, "The Investigation of Thrombotic and Embolic Risk After Heart Valve Replacement"; correct?
A. Yes.
Q. And it talks about the valves used and the sample size; correct?
A. Yes, it does.
Q. It states, "359 patients were enrolled prior to the addition of" the "addendum that allowed 100 additional Silzone patients to be enrolled in the study"; correct?
A. Yes.
Q. It said, "They are now implanting Silzone-coated valves exclusively"; correct?
A. Yes.
Q. It says, "Currently, 39 Silzone patients are enrolled (42 Silzone valves)"; correct?
A. Yes.
Q. It says, "Mr. Butchart hopes to complete the enrollment by July"; correct?
A. Yes.
Q. She then sets out the study rationale; correct?
A. Yes.

Q. She says, "As we all know, thromboembolism is a serious complication in patients with mechanical heart valves"; correct?

A. Yes.

Q. It says, "Although once attributed entirely to clots originating from the artificial valve, it is now known that many clots do not originate from the valve itself and that some patients are more prone to form clots than others"; correct?

A. Yes.

Q. "Mr. Butchart's project attempts to unravel the mechanisms involved in clot formation and to identify the most useful tests, which can be used to predict susceptibility to TE"; correct?

A. Yes.

Q. It then says, in the next paragraph, that "The study gives SJM an opportunity to investigate the anti-thrombogenic properties of the Masters Series valve with Silzone coating"; correct?

A. Yes.

Q. "Mr. Butchart will compare the thrombogenic properties of the Masters Series valve with the conventional cuff to the Silzone coated cuff"; correct?

A. Yes.

Q. This is the only study that St. Jude commissioned that actually looked at thrombosis rates; correct?
A. To my knowledge, yes.
Q. And you were aware of this study in June of 1998; correct?
A. Yes.
Q. And again, clinical studies and the results from clinical studies, I believe you testified, those are the kind of results you are particularly concerned about; correct?
A. Yes.
Q. And that would certainly apply to your own studies that you've actually commissioned and help set up; right?
A. Yes, it would.
(Plaintiffs' Exhibit 178 marked for identification.)
BY MR. O'FALLON:
Q. Plaintiffs' Exhibit 178 is a document Bates stamp numbered SJM0320070559NK. Have you seen this document previously?
A. I believe, yes, I have, at one time.
Q. Okay. Do you think you saw it at about the time it was sent, which here was stated as Tuesday,

A. Yes. Whether it was one or several it causes me a concern. The thing about it is in a conventional side of the valve is you would not expect a surgeon to report those to you, seeing that it's a known complication that's out there that's in existence.
Now under a clinical study such as the AVERT one can then do a direct comparison to the two and say, well, let's take a look at what's happening here, because you're controlling that arm and you're reporting everything, you're not just getting anecdotal information.
Q. But you had other doctors who were doing clinical studies that were equally concerned about the increased incidence of endocarditis; correct?
A. Out of a controlled environment, yes.
Q. Yeah. For instance, Dr. David at Toronto General was reporting increased incidence of endocarditis with the Silzone valves; correct?
A. Yes.
Q. So you weren't just having these anecdotal reports kind of coming in out of nowhere, you were having people that you were paid to research your valves telling you they were having problems with the valves; correct?
A. Yes, that would be correct.

complication rates expressed as percent per patient year for the various events, including thromboembolism and thrombosis; correct?
A. Yes.
Q. And both the event rate for thromboembolism and thrombosis are -- are very low; correct?
A. Yes.
Q. The highest is 1.27 percent per patient year; correct?
A. Yes.
Q. The lowest is for thrombosis, which is -- appears to be with at least some of the surgeries, zero; right?
A. Yes.
Q. Endocarditis is also quite low; correct?
A. Yes, it is.
Q. Less than one percent per patient year; correct?
A. Yes.
Q. In fact it looks like it ranges between one tenth of a percent per patient year up to about .28 percent per patient year; correct?
A. Yes.
Q. Again that's an extremely low event rate; correct?
A. Yes.

Q. Less than one event per hundred patient years; right?
A. Yes.
Q. So based on that information, the experience with St. Jude's standard valves, when you look at Mr. Butchart's experience which with 14 events is now showing well over 10 percent, I mean that's a substantially increased rate as to what St. Jude would expect with its regular valves; correct?
A. Yes.
Q. And again the only real difference between the Silzone valve and the regular valves is Silzone; right?
A. Yes.
Q. Are you familiar with the Regent valve?
A. Yes, I am.
Q. The Regent valve is also a valve that was originally marketed with Silzone; correct? Strike that. Originally studied with Silzone coating on the cuff; correct?
A. What do you mean, "studied," "originally studied"?
Q. Well the first thing that they -- that St. Jude did before it obtained approval of the Regent valve was it did a clinical study of the Regent valve. Are

# Exhibit 25

STATE OF MINNESOTA DISTRICT COURT
COUNTY OF RAMSEY SECOND JUDICIAL DISTRICT
PERSONAL INJURY
(Product Liability)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: St. Jude Silzone Case No. 62-C9-02-7324
Heart Valve Litigation

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DONALD S. GUZIK
VOLUME I, Pages 1 - 282
October 15, 2002

(The following is the deposition of DONALD S. GUZIK, taken pursuant to Notice of Taking Deposition, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, in the city of Minneapolis, state of Minnesota, commencing at approximately 8:55 o'clock a.m., October 15, 2002.)

A. There's a difference.
Q. Well how big would that difference have to be before you'd agree with me that it's a great increase?
MR. STANLEY: Object to the form.
A. It doesn't --
As I talked about yesterday, whether -- to me for my job and the employees of St. Jude, it doesn't matter how many or how great. One is substantially enough. I mean in either arm makes me concerned.
Q. Well let's assume our numbers are three per 30,000 in the Masters Series valves and 51 per 30,000 in the Silzone valves. How would you characterize that increase in adverse event rates between those two valves?
A. I would say -- I would say there's a difference and that it needs to be looked at.
Q. Just doing my rough math, that's about a 17 times difference; correct?
A. Yes.
Q. Wouldn't you consider a 17 times increase to be a substantial increase?
A. Yes, I would.
Q. Okay.
(Plaintiffs' Exhibit 196 marked for

for embolism there were a total of 12 events and that would equal a linearized rate per patient year of 20 percent.
A. Yes.
Q. Do you see that? That would be a greatly increased rate of embolism compared to the expected historical rate for St. Jude's standard valves; correct?
MR. STANLEY: Object to the form.
A. Based on the study you referred to earlier, yes.
Q. The Arom -- The Avrom study.
A. Yes.
Q. Or is it Arom?
A. Arom.
MR. STANLEY: I think it's Arom, yeah.
Q. For endocarditis she came up with a linearized rate of 4.1 percent per patient year; correct?
A. Yes.
Q. And again that would be greatly -- a greater amount than would be expected historically; correct?
MR. STANLEY: Object to the form.
A. It would be a different -- a larger amount than what we observed in the Arom study.
Q. Four to five times larger at a bare minimum; correct?

A. Yes.
Q. For paravalvular leak she reports a rate of 6 percent per patient year; correct?
A. Yes, she does.
Q. Again that would also be a greatly increased rate from that expected historically with St. Jude valves; correct?
MR. STANLEY: Object to the form.
A. When you're looking at the Arom study, and I don't know if she's talking about paravalvular leak separate of endocarditis or reporting the two together. I don't know the -- the depth of her study or how she sorted out her data here.
Q. In any event, 6 percent per patient year for paravalvular leak is greatly in excess of the historic expected rate of paravalvular leak with St. Jude valves; correct?
MR. STANLEY: Object to the form.
A. When compared to the Arom study.
Q. Thrombus there's an 8 percent per patient year, again that would be greatly in excess of the expected rate of thrombus with St. Jude valves; correct?
MR. STANLEY: Object to the form.
A. It would be a larger number than -- than seen in the Arom study.

Q. And explant, that was a 10 percent explant rate. Now there is no study that I found that actually tracks explant rate historically with St. Jude valves, but a ten percent explant rate is fairly high; correct?

MR. STANLEY: Object to the form.

A. I would look at, yeah, at the number within itself, ten percent would be a high rate, yes.

Q. In fact the AVERT explant rate due to paravalvular leak didn't approach ten percent; did it?

A. I don't recall what his explant rate was.

Q. I think it was eight valves in approximately 400.

MR. STANLEY: He's talking about the AVERT study, not --

Q. Yeah. Not the Arom.

I'm talking about the AVERT study.

A. Oh, okay.

Q. St. Jude --

A. Yes.

Q. -- recalled the Silzone valves based on the increased rate of explant due to paravalvular leak in the AVERT study; correct?

A. That's correct.

Strike that.

At a bare minimum, the number of embolism reported with Silzone valves was eight times higher than the number of embolisms reported with conventional valves; correct?

A. Yes, there was a total of eight reported versus zero in the conventional.

Q. Which would seem to confirm the information from Mr. Butchart's study; correct?

MR. STANLEY: Object to the form.

A. I don't think it was intended to confirm it.

Q. The information from your FER system would appear to confirm the experience of Mr. Butchart; correct?

A. As it's received the information would say that there's a difference between Silzone and the conventional, yes.

(Recess taken from 11:39 to 11:53 p.m.)

(Plaintiffs' Exhibit 212 marked for identification.)

BY MR. O'FALLON:

Q. Plaintiffs' Exhibit 212 is a document Bates stamp numbered SJM1240288675SN through 674SN. Are you familiar with this document?

A. Yes, I am.

# Exhibit 26

289

**Comparison of patient problems between**
**Silzone HV and All Models of St Jude Mechanical Valve**
Event date: 2/17/98-9/30/99
Received date: 8/11/98-10/12/99

| | | Same event date | | | | | Same received date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Silzone | | Non-Silzone | | All Models | Silzone | | Non-Silzone | | All Models |
| | | N | % | N | % | N | N | % | N | % | N |
| **Total Report** | | **67** | **46%** | **80** | **54%** | **147** | **67** | **51%** | **64** | **49%** | **131** |
| **Patient Problem Code** | Endocarditis | 34 | 77% | 10 | 23% | 44 | 34 | 83% | 7 | 17% | 41 |
| | Dehiscence | 4 | 67% | 2 | 33% | 6 | 4 | 80% | 1 | 20% | 5 |
| | Thrombosis/ Thrombus | 16 | 64% | 9 | 36% | 25 | 16 | 67% | 8 | 33% | 24 |
| | Embolus/ Embolism/ Pulmonary Embolism | 8 | 80% | 2 | 20% | 10 | 8 | 57% | 6 | 43% | 14 |
| | CVA/TIA Cerebral Infarction | 12 | 92% | 1 | 8% | 13 | 12 | 92% | 1 | 8% | 13 |
| | Peri/Paravalvular Leak/ Valvular Insufficiency/ Valvular Regurgitation | 7 | 54% | 6 | 46% | 13 | 7 | 41% | 10 | 59% | 17 |
| | Other | 166 | 50% | 163 | 50% | 329 | 166 | 53% | 149 | 47% | 315 |
| | Total | 243 | 55% | 197 | 45% | 440 | 243 | 57% | 186 | 43% | 429 |

FDA18584

# Exhibit 27

402

**Appendix A**

**Additional Background Concerning AVERT Study Explant Procedures**

Of the 398 patients who received valves with Silzone coated cuffs in the AVERT Study through January 6, 2000, eight had their valves explanted for paravalvular leak. Through that same date, there has been one explant for paravalvular leak out of the 394 patients in the Study who received the conventional (i.e., non- Silzone coated) St. Jude Medical mechanical heart valve.

The eight patients who had Silzone coated valves explanted all had moderate to severe paravalvular leak, with or without suspected endocarditis. Clinical signs in these patients were generally those associated with valvular regurgitation and heart failure (dyspnea, fatigue, exercise intolerance, etc.).

In an attempt to characterize those patients undergoing re-operation, the AVERT Study DCC performed a comparative assessment of explanted and non-explanted patients. More than 200 variables were compared relating to patient demographic characteristics, medical history, current health status, prior cardiac surgery, operative techniques, concomitant surgical procedures, and operative results/early complications. In addition to the overall analysis, separate analyses were repeated for aortic and mitral valve patients. There were differences between the patients who bad explants and those who did not, but, according to the AVERT DCC, the small numbers of the explant group do not allow any conclusions to be drawn, This analysis was unable to detect unique identifying characteristics for the explant population.

The following tabular summary of certain events may be helpful:

| **Event** | **Silzone-coated cuff** | | **Conventional cuff** | |
|---|---|---|---|---|
| | **n = 398** | **%** | **n =394** | **%** |
| Paravalvular leak | 11 | 2.76 | 4 | 1.02 |
| Explant for paravalvular leak | 8 | 2.01 | 1 | 0.25 |
| Paravalvular leak without Explant | 3 | 0.75 | 3 | 0.76 |

{***Statement to be added that this data is based on current AVERT status.***}



CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER