# Exhibit 28

437

**Kurtzman, Steve**

**From:** Kurtzman, Steve
**Sent:** Friday, January 21, 2000 5:44 PM
**To:** Gomez-Novoa, Carmelina
**Cc:** Lemperle, Bette L.
**Subject:** SJM Silzone Valve

Carmelina,

For your information, the Silzone valve [Masters Series] and all Silzone products [Epic porcine valve (marketed outside US and available only with Silzone), Regent valve (available only with Silzone), and 2 annuloplasty rings (one ring available only with Silzone)] are being recalled voluntarily tonight. We just finished 2 back-to-back teleconferences with SJM. During the first one, Al Flory and company stated that the AVERT Study DSMB met this morning, and due to 8 perivalvular leaks in the Silzone patients versus just 1 perivalvular leak in the conventional patients, they decided to recall the Silzone products. The cause of the increased PVLs is unclear, but SJM believes the cause is something about the Silzone itself and not the manufacturing. The latest AVERT study data still shows no significant difference in thromboembolic rates. SJM faxed us a draft recall letter and a second longer background information letter, both to go out tonight and addressed as "Dear Doctor and St. Jude Medical Customer," for our comments. We then hung up, reviewed the draft letters, and called Al back after about 45 minutes with our comments, one of which was to note in the background letter that the AVERT study DSMB will still continue to evaluate thrombosis and TE rates (so as not to focus on just the PVLs and forget the thrombosis and TE issue. Due to delays in quickly translating into other languages our modifications for the international recall letters, the modifications will only be in the English language (US and UK) letters.

The AVERT study will continue to follow already implanted Silzone patients with echo, and symptomatic non-AVERT study Silzone patients will also be evaluated with echo. The AVERT study PIs will also do echos on asymptomatic Silzone and non-Silzone patients to look for any differences in PVL.

Regarding the Regent valve, I told Al to call Bette next week to discuss what SJM has to do from a regulatory standpoint with the Regent valve IDE study, since the study will have to be modified.

This weekend SJM will be issuing a press release (which has to be done along with the recall letter for legal/stock market reasons) for the print and non-print media (including a message on the Internet), and today we notifed the FDA press office, since next week there will be an deluge of phone calls from physicians and heart valve patients about the recall.

I put copies of the draft recall letter and the second longer background information letter on your desk.

- Steve



FDA18733

CONFIDENTIAL OR PROPRIETARY - SUBJECT TO PROTECTIVE ORDER

# Exhibit 29

MDA MEDICAL DEVICES AGENCY

Fast Fax Issued 15/11/99
Pass urgently to your Liaison Officer

**MDA AN1999(06)**

November 1999

ADVICE

Medical Device

# Thromboembolic Complications involving Silzone® Mechanical Heart Valves

## MANUFACTURER/MODELS

St Jude Medical Inc / AG-701, AHPS-605, AS-601, AECS-602, MS-601 and MECS-602.

## ISSUE

High rate of early thromboembolic complications associated with St Jude Medical's Silzone® (silver coated) mechanical heart valve, particularly among mitral valve patients.

**For the attention of:**

| | |
|---|---|
| Health Authorities (England) - | Chief Executives |
| NHS Trusts (England) - | Chief Executives |

## IMMEDIATE ACTION

1. Follow up all patients implanted with Silzone® mechanical heart valves to identify any signs of stroke or transient ischemic attack (TIA) and ensure adequate anticoagulation control.

2. Consider examining patients using Trans-Oesophageal Echocardiography (TOE) to identify any signs of valve thrombus, recognising that there are certain risks associated with TOE. Priority should be given to patients most likely to be at risk, ie those who have suffered thromboembolic complications, those with mitral valve implants, and those who received their implants within the last 6 months.

3. Consider the information contained in this Notice when making a future choice of mechanical heart valve.

4. Report all incidents of thromboembolic complications and/or valve thrombus to the MDA and to the manufacturer.

## DISTRIBUTION REQUIRED

Please bring this advice to the attention of all who need to know or be aware of it. This will include distribution by:

**TRUSTS to:**

- Liaison Officers (for onward distribution)
- Medical Directors
- Directors of Cardiothoracic Surgery
- Cardiothoracic Surgeons
- Directors of Cardiology
- Cardiologists

**HEALTH AUTHORITIES to:**

- Liaison Officers (for onward distribution)
- Registration Inspection Units
- Independent acute sector

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

ADVICE

Medical Device

## BACKGROUND

St Jude Medical applied a silver coating to the sewing cuff of their range of Silzone® mechanical heart valves with the aim of reducing the risk of infective endocarditis, a life-threatening complication. Over 30 thousand Silzone® coated heart valves have been distributed worldwide since early 1997, over 700 of which are within the UK.

Over the last year MDA has received notification that 7 patients suffered a stroke or peripheral embolism among a group of 51 patients implanted with Silzone® heart valves by a number of surgeons at one UK centre. Six of these patients had received a mitral Silzone® valve (including one who had received both mitral and aortic valves). The adverse events occurred within 3 months of valve implantation, and in two cases extensive thrombus was identified on the valve's silver coated sewing cuff. There have been a further 5 suspected incidents of TIA among this patient group.

The 51 patients were enrolled in a clinical study involving different types of prosthetic heart valve, comparing various risk factors for embolic complications. Only one patient among 118 implanted with the standard (uncoated) St Jude heart valve within this study was found to have suffered an embolic complication. There were no significant differences in predisposing risk factors for embolic complications or patient anti-coagulation control between the group of patients with the Silzone® valve and the standard St Jude heart valve. An independent review of these data on behalf of the Society of Cardiothoracic Surgeons of Great Britain and Ireland was requested by the manufacturer to confirm the validity of these events. The review confirmed the statistically greater thromboembolic event rate associated with the Silzone® valve compared with the standard St Jude valve; 22.47 (CI 10.71-47.13) and 0.38 (CI 0.05-2.27) percent per patient year respectively. However, in view of the small number of patients, these data should be interpreted with caution.

The same UK centre has reported a further case of mitral valve thrombosis involving a patient implanted with a Silzone® valve outside the scope of this study. MDA has also received notification of the death of a patient who received a Silzone® mitral valve at another UK implanting centre, in which thrombus was found on the valve at post-mortem.

In addition a pathologist outside the UK has reported concerns based upon his evaluation of an unexpectedly high number of Silzone® valve explants. This finding led to a review of all patients implanted with Silzone® valves at one North American hospital. Although complete details of this hospital's findings are not yet available as further patient review is underway, there is concern arising from the high number of thromboembolic complications which have been identified. However, St Jude Medical has informed MDA that their survey of Silzone® patients at two other North American hospitals demonstrated no unusually high complication rates.



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

ADVICE

Medical Device

## BACKGROUND CONTINUED

St Jude Medical is currently sponsoring a 4,000 patient prospective randomised clinical trial (AVERT) to compare the standard and Silzone® versions of their mechanical heart valve. The aim of this study was to investigate the efficacy of the silver coating in reducing endocarditis, although details of all major complications are being collected. To date this study has not identified a significant difference between the thromboembolic complication rates among patients with the Silzone® and the standard St Jude valve. It will, however, be some time before this study yields adequate data to enable an assessment of the valve's thrombogenicity. Further information will be reviewed as it becomes available enabling additional advice to be provided as necessary.

## ENQUIRIES

Enquiries to the manufacturer should be addressed to:

Mrs S Goodband
St Jude Medical (UK) Ltd
Bow Court
Fletchworth Gate
Coventry CV5 6SP
UK

Tel: 01203 716 226
Fax: 01203 716 212

Enquiries to the MDA should quote reference number 04/01/98122131 and be addressed to:

**Technical aspects:**

Hazel Randall or Jeremy Tinkler
Medical Devices Agency
Hannibal House
Elephant & Castle
London SE1 6TQ

Tel: 0171 972 8287 or 0171 972 8279
Fax: 0171 972 8106

**Clinical aspects:**

Dr S Ludgate
Medical Devices Agency
Hannibal House
Elephant & Castle
London SE1 6TQ

Tel: 0171 972 8123
Fax: 0171 972 8103

© Crown Copyright 1999
Addressees may take copies for distribution within their own organisations



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER
SJM0120028307MDL

# Exhibit 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

-------------------------

| | | |
|---|---|---|
| IN RE: | : | MDL DOCKET NO. 1396 |
| ST. JUDE MEDICAL, INC., | : | (Videotaped) |
| SILZONE HEART VALVE PRODUCTS | : | Deposition of: |
| LIABILITY LITIGATION | : | TERRY SHEPHERD |

-------------------------

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before, BARBARA J. CAREY, a Registered Professional Reporter and Notary Public of the State of Minnesota, held at the offices of HALLELAND & LEWIS, 220 South Sixth Street, Suite 600, Minneapolis, Minnesota, on Friday, May 21, 2004, commencing at 9:13 a.m.

study thromboembolic events -- had we made the AVERT Study -- had we made the central objective of the AVERT Study the study of thromboembolic events, the number of patients would have been different. And I don't know whether the results that were already on the table at the time the study was halted would have been statistically significant or not with respect to thromboembolic events.

BY MR. CAPRETZ:

Q All right. And in fact, Mr. Eric Butchart had reported to the company, I think, in 1998 that he had experienced a higher incidence of TE events than with the standard valve.

Did he not make that report to you?

A I think he did, yes.

Q All right. And in fact, Mr. Butchart -- oh, thank you. Mr. Butchart's study was partially funded and sponsored by St. Jude Medical, right?

A That's correct.

Q And in fact, St. Jude Medical asked Mr. Butchart to include a study -- include in his ongoing study a study of the St. Jude Silzone Valve, is that correct?

MS. KWUON: Objection as to form.

THE WITNESS: We asked -- because of this intriguing possibility that the healing process may be different and, therefore, the thromboembolic complications associated with heart valve replacement might be different, we did, in fact, invite him to study that particular aspect of the Silzone-coated cuff on the St. Jude Medical heart valve, yes.

BY MR. CAPRETZ:

Q And you recognized he had a study underway with other valves at the time?

A Yes. He's a premiere surgeon, very widely respected surgeon, particularly in the area of thromboembolic complications associated with heart valves, and he is at an academic center doing many studies all the time. So it was very common.

Q And it was the result of his advisory to the -- what was then known as the Medical Device Agency in England that they issued an advisory warning to the medical community in the fall of 1999, is that not correct?

MS. KWUON: Objection as to form.

THE WITNESS: I don't recall all the details, but I do recall that it was his

experience that was the primary driver of the MDA feeling they needed to communicate with the surgeon community at large in the U.K.

BY MR. CAPRETZ:

Q Does St. Jude Medical, as of this date, have any probative evidence of any kind which indicates that what Mr. Butchart reported was not accurate?

MS. KWUON: Objection as to form.

THE WITNESS: Someone else clinically qualified or otherwise would be in a better position to answer that accurately.

But my understanding is that his results were very unusual in terms of results we were seeing elsewhere in the clinical community around the world. In fact, virtually unique. And while we took those results very seriously -- even though they were surprising and unexpected and inconsistent with what we were seeing in the very rigorous AVERT Study, we still took them very seriously and studied them with him. Brought many other clinicians and scientists to the table to better understand what his experiences were.

And heart valve patients, as I'm sure you

# Exhibit 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
MDL DOCKET NO. 1396

---------------------------------X
IN RE: ST. JUDE MEDICAL, INC., : VIDEOTAPED &
: VIDEOCONFERENCED
SILZONE HEART VALVES PRODUCTS : DEPOSITION OF
: MONICA SCHULTZ
LIABILITY LITIGATION :
:
:
---------------------------------X

T R A N S C R I P T of the stenographic notes of LISA FORLANO, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, Certificate No. XIO1143, taken at the offices of Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, Esquires, 1616 Walnut Street, 5th Floor, Philadelphia, on Thursday, October 20, 2005, commencing at 10:19 a.m.

study.
Q If you could pull out the exhibits and go to number 45.
A Yes.
Q You'll see this is a February 1997 letter from your supervisor, Dr. Flory to Mr. Butchart and you were copied on the document.
A Okay.
Q Do you see in the second paragraph on this document -- by the way, you don't deny you received this document, do you?
A No. No. I must have if my name is under it. It was quite a while ago, so I apologize if I don't remember all the documents.
Q Certainly.
You see in the second paragraph, it says we understand that you prefer not to compare differences in valve perform answer or valve related complications across manufacturers. Our primary interest is in the comparison of SJM mechanical heart valves with standard versus Silzone sewing cuffs. Therefore, we respectfully request that an analysis be performed to compare valve performance, complications and subclinical anomalies also in patients with these two types of sewing cuffs. I read that correctly, did I

not?
A Yes, you did.
Q Does this refresh your recollection that he didn't really want to do a study comparing the Silzone valve with other valves, for example, the St. Jude valve without Silzone, but that in fact St. Jude requested that he do it?
A We requested that he did it, but I don't recall him ever saying that he did not want to do it.
Q You'll agree with me then that he did this study at your request?
A Apparently from this paragraph that appears to be the case, yes.
Q And his study was the only clinical study that St. Jude paid for or commissioned to look into the relative thromboembolic safety of the Silzone valve, correct?
A I'm going to answer no and I hope it's okay to expound on a little bit on that. You have to understand that with every single study that we do, we collect thromboembolic complications. We follow the STS AATS guidelines. So this particular study that Mr. Butchart had going was looking at many, many different variables in regards to embolic events, but it needs to understood that it's standard for all

Mr. Butchart did in his study was work that was requested by St. Jude and paid for by St. Jude?
A No, we don't do that with our studies. I mean it's not standard to -- unless something was published then of course at then of the paper it's stated who supports the study, but since nothing was ever published -- I don't know if it might have been on an abstract that he presented because he did present his data at a couple of meetings, but I cannot recall if it was stated in the abstract.
Q But St. Jude did discuss his work quite extensively in public forums, didn't it?
A We provided or at least what I'm aware of, is we provided the information to the regulatory agencies, to the Data Safety Managing Board for AVERT and to Dr. Schaff to make him aware, but I don't know what you mean by public forums.
Q Well, there were symposia and whatever where St. Jude would talk about his work or they put out press releases about his findings, correct? They wrote dear doctor writings about his findings in the United States and elsewhere, correct?
A You know, I have to talk to someone from the market department because I never put out a dear doctor letter. It may very well have occurred, but I

just can't recall.
Q But at no time did St. Jude, to your knowledge, ever make a public statement that he was doing this study at your request and paid for by St. Jude?
A Again, no unless it was in a publication and, to my knowledge, nothing was published in regards to this. He did present at a couple of meetings. It may have been on the abstracts in the meetings depending upon what the requirements of the meetings were.
Q And ultimately Mr. Butchart reported at a very high rate of thromboembolic events in his study, correct?
A He reported higher numbers than I would expect, yes.
Q Somewhere in the vicinity of ten percent?
A I don't have it in front of me and I can't recall, so I don't want to commit to any numbers, but yes. I just recall it was higher than one would expect.
Q And St. Jude without Mr. Butchart's knowledge requested that his findings be peer reviewed in the United Kingdom by the Society of Cardiac Thoracic Surgeons of Great Britain and Ireland, correct?
A I believe that Dr. Flory, my superior, had

requested that, yes.
Q And you did it without Mr. Butchart's knowledge, correct?
A I do not know. I truly do not know if that was the case or not.
Q And that peer review was performed, wasn't it?
A I believe there was a report back from the society, yes.
Q And that peer review confirmed his findings, didn't it?
MR. COHEN: Objection.
THE WITNESS: They confirmed the counts, yes. So they confirmed.
BY MR. SIGELMAN:
Q They didn't find any deficiencies in his methodology, did they?
A I do not know. I would have to have their letter in front of me, but I know that they confirmed the counts of what he had reported in regards to I think the strokes. I'm not quite sure for the others.
Q Did St. Jude, to your knowledge, ever make public that it requested peer review of Mr. Butchart's findings?
A Not to my knowledge. I wouldn't -- I don't know.

# Exhibit 32

IN AND FOR THE IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

IN RE ST. JUDE MEDICAL, INC., )
)
SILZONE HEART VALVES PRODUCTS ) MDL NO. 01-1396
)
LIABILITY LITIGATION ) (JRT/FLN)
)
)

DEPOSITION OF KEVIN E. HEALY, Ph.D.
Volume I
Thursday, May 18, 2006

Reported by ELIZABETH J. WOOD
CSR License No. 5134

device because of the high blood flow rate.

And if there is thrombosis, it is certainly -- probably would be cleared rapidly from the local environment.

MR. JEFFREY:

Q. So you don't believe that there is an increased risk of thrombosis with the Silzone valve?

A. We can go back to the materials argument, which we know the materials are thrombogenic, but thrombosis in the location of the device due to the high rate of -- oh, so of -- well, the blood fluid dynamics and the blood flow rate -- you would probably have a very low incidence of thrombosis; so I think statistically it would almost be impossible to achieve any statistically significant results between patients treated -- patients treated with Silzone and patients not treated with silver coating.

Q. And that's what you would expect, even taking into consideration the different material, that is to say, the Silzone coating being used?

A. True, because -- because it goes back to my explanation earlier, that -- that, you know, thrombogenic materials are used in cardiovascular devices, but -- but in certain privileged cases where you have a high enough blood flow rate, then you don't

really have a -- the time sequence for a full thrombus to form.

Q. So other factors are predominant in the formation of a thromboembolism in regards to heart valves?

A. With the caveat that we're taking about an exposed surface for thrombus formation, right, as opposed to certainly thrombus on the cuff side, which is more of the tissue reaction, which is -- which is where personally I feel there's a -- the greater issue exists with the Silzone and the silver coating.

Q. At this point in time, more than five years after these patients have received a heart valve, is that any longer an issue?

A. What part is?

Q. You said a thrombus formation on the cuff itself.

A. No, it would be remodeled. It would be remodeled fairly rapidly. So a fibrous clot would form and that would typically be remodeled by fibrosis or fibrous tissue.

Q. So the increased thrombogenicity that we were just discussing is a risk that would have been possible during the immediate aftermath of the implantation of the valve?

A. I think you have to pars out the question in two ways. One is, you know, what one would safely say, that silver is probably more thrombogenic than PET, which is your Dacron coating.

In an in vitro controlled study, one would probably show -- I believe even -- even this is mentioned in some of the previous studies that was done by Tweden's group, that you certainly are going to see greater adhesion of blood components to metal and metal oxide like silver compared to the PET, so you have that in vitro data.

But that -- that doesn't always manifest itself into something that you can completely see again in the clinical environment.

So initially you probably would have a great deal of thrombosis or -- thrombosis may not be the correct word because I think that's used specifically by a clinician -- but you would certainly have a great deal of -- of clot formation when exposed to blood as you're sewing this cuff in, and to the silver, which gets remodeled.

Q. When you say remodeled, you mean covered up by tissue?

A. Well, the -- the clot is formed of proteins and cells then migrate through that clot by

expressing different enzymes, mostly enzymes then cleave the proteins in the clot, particularly proteins that are enzymes that then remodel, so as to the -- as the cell comes in, let's say, the fibroblast comes in, it remodels that clot and by -- and, also, at the same time, it's expressing it is own proteins that then fill in the Dacron mesh.

Q. So the area of the clot -- when you say remodeled, you mean tissue moving in there and eventually grows in the area then?

A. Eventually grows in. That's true.

Q. Once that happens, there is no greater risk for a thromboembolic event related to the actual material of the cuff itself?

A. Well, let's take the -- the standard, the PET. Because cells can grow into that material, and although it is a thrombogenic material -- so growth in that material is quite good. So you don't have really the potential for I think reexposure of that material, other than maybe some other factor, you know, damaged in some other way. You wouldn't normally expect this to change.

Um, in the case of silver, because the silver concentrations are -- gets so high in the local environment, then one would expect -- one would expect

that the silver-coated system -- you would have less cell growth.

And there are some in vitro papers I cited in my deposition showing that silver -- silver-coated systems, when the concentration gets too high, these materials lead to, you know, appreciable cell death and toxicity in the near -- we'll call it the near implant region or peri-implant region.

With that said, then if you're reexposing the silver coating to the blood contacting environment, then there could be a thrombogenic capacity that might be increased; however, I don't think this is going to be a large scale statistically significant problem.

Q. So it may happen in an idiosyncratic case?

A. I don't think I would phrase it that way, but it certainly could happen in some portion of the population.

And, one, let's take some of the -- as I said, this newer study that I -- that I briefly looked at where you have a higher -- let's say a mean value for a particular metric you're looking at for the Silzone valve, yes, it is -- it's not statistically significant.

Q. So there is no way to measure whether or not that has happened then?

A. You would have to go -- no. I mean, you

would have to -- histological analysis would be the only real way.

Q. So let me just recap to see if I actually understood that.

There's a possibility -- you're saying that there might be a possibility of a thromboembolic event because the silver has caused tissue degeneration and, therefore, a new clot has to form and new tissue has to form, and during that process, a clot could be given off; but there is no way to statistically measure that because it's so small and there has been no histological evidence of it in actual people who have a Silzone valve today?

MR. CAPRETZ: Objection as to form.

THE WITNESS: The way I would also -- I would also add to that statement is that really the blood contacting the -- the blood flowing through the valve is not really hitting the cuff, right. The cuff is on the outside of it anyway. So I think the chances of this being, you know, statistical significant are low, yes.

MR. JEFFREY:

Q. Okay. Could you take a look at paragraph G on page 6 and read the first sentence?

MR. JEFFREY: Are you meaning for him to

# Exhibit 33

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

* * *

------------------------

IN RE: : MDL DOCKET NO.: 1396
St. Jude Medical, Inc.,: (Videotaped)
Silzone Heart Valve : DEPOSITION OF:
Products Liability : KATHERINE TWEDEN, Ph.D.
Litigation, :

------------------------

VOLUME II

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before REBECCA L. KLANDERUD, a Certified Shorthand Reporter, held at the law offices of HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A., 600 Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota 55402-4501 on Friday, February 14, 2003, commencing at 9:00 a.m.

there are benchmarks. It's my understanding that those were set by FDA.
Q. Do you know what the objective performance criteria is for thromboembolic events in a heart valve?
A. I don't.
Q. Do you know how the mitral position of the St. Jude heart valve compared for thromboembolic events in relation to the objective performance criteria for thromboembolic events in the AVERT study?
A. No, I don't.
Q. Now, Dr. Tweden, have you ever heard of Telios?
A. Yes.
Q. Were you involved with Telios at St. Jude?
A. Yes, I was.
Q. What was Telios?
A. That was the RGD Peptide, solid hesion Peptide coating that I discussed earlier.
Q. And there were some testing issues with Telios, wasn't there?
A. I don't understand your question.
Q. Were there any issues that you had that

were troubling with respect to Telios?
A. No.
Q. Was Telios a joint venture with a pharmaceutical company?
A. It was a -- the coating was developed by Telios Pharmaceutical, so their name -- that name suggests that they were a pharmaceutical company. However, this coating was not a soluble coating and was designed to really adhere avidly to a substrate.
Q. Were there any issues or questions with which you were dealing that involved the extent of testing that was going to be done of the Telios technology?
A. Was there any questions about how much --
Q. Either the extent, nature -- the extent or nature of the testing that you would undergo for that technology?
A. We undertook a lot of testing in that.
Q. And were there any questions about the amount of either safety or efficacy testing that you were going to do for Telios?
A. I don't understand your question.
Q. Well, let me give you a document and

see if you can enlighten us a little bit.

* * *

(Whereupon, Deposition Exhibit Number 71 was marked for identification.)

* * *

MR. GATTONI: What Exhibit number is that, Rebecca?

THE WITNESS: Seventy-one.

BY MR. SIGELMAN:

Q. Have you seen this document project update 15 January 1996, Antibacterial Cuff?

A. I don't recall that. I would have been on maternity leave at this time.

Q. Okay. Well, under key issues, it says: Agreement was Spire --

A. Yes.

Q. -- right?

A. Yes.

Q. Proof of efficacy/safety, right?

A. Right. Yes.

Q. Requirements for customer acceptance?

A. Uh-huh.

Q. And then: Another Telios?

As you look at that, as someone who was involved in the Silzone project, what's your

understanding of what was meant by Another Telios? as an issue with the AB or antibacterial cuff project?

A. I don't know. I don't know who wrote this document.

Q. Telios was not marketed, is that correct?

A. We did not.

Q. And why is that?

A. My understanding was that we had very good animal data, and my understanding is that large prospective clinical trials were suggested by clinicians who the technology was reviewed with to show that there really -- there would be a difference in thromboembolic complications associated with the St. Jude heart valve. And I don't remember the numbers off the top of my head, but it was an enormously large study that would need to be undertaken really to get market adoption.

Q. And St. Jude didn't want to do clinical studies?

MR. GATTONI: Objection, form.

THE WITNESS: I don't know, but that was my understanding is that study was enormous,

and didn't make sense, was not required by the FDA, but didn't make sense at this time.

BY MR. SIGELMAN:

Q. So your company abandoned the project because it didn't want to do a clinical study?

MR. GATTONI: Objection, form.

BY MR. SIGELMAN:

Q. Is that right?

A. I don't know. I wasn't the one who made that decision.

Q. Well, I didn't ask whether you made that decision.

A. Right.

Q. Was it your understanding, as someone who worked on the project and on the technology --

A. Uh-huh.

Q. -- that the company abandoned the project because it didn't want to do a clinical study?

MR. GATTONI: Objection, form.

THE WITNESS: I don't know what all the issues were. I just know that they didn't --

BY MR. SIGELMAN:

Q. Was that one of the issues that led to the abandonment?

A. That was one of the items discussed.
Q. Okay.
A. But I don't know what all came together. It could have been, you know, business arrangements with Telios. I don't know.
Q. And your company didn't want to do a clinical study of the Silzone heart valve, did it --
MR. GATTONI: Objection.
BY MR. SIGELMAN:
Q. -- before marketing?
MR. GATTONI: Objection, form.
BY MR. SIGELMAN:
Q. That was controlled -- a controlled clinical study?
A. The study -- St. Jude did do a LIMRA study, the limited release in Europe.
Q. That wasn't a controlled study, was it?
A. Controlled --
Q. Where you had control groups where you could compare one group with another?
A. I don't know the full details of that study. I just know that, you know, the Silzone valves were implant in individuals, and they were followed for a certain period of time.

# Exhibit 34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

IN RE: ST. JUDE MEDICAL,
INC., SILZONE HEART VALVES MDL Docket No. 1396
PRODUCTS LIABILITY LIGATION,

VIDEOTAPED DEPOSITION
OF
GARY LEE GRUNKEMEIER, PH.D.
Taken on behalf of Plaintiffs

March 31, 2005
* * *

know if I'd seen these -- the DSMB report by this time. Probably not or I wouldn't have bothered Jeff. I don't know. It's hard for me to know exactly why I called him.
Q. Well, Mr. Butchart had told you he had never seen anything like that before, right?
A. Mr. Butchart said it was, I believe, very unusual.
Q. Mr. Butchart is a very experienced cardiothoracic surgeon, correct?
A. Yes, he is.
Q. In fact, he's one of the leading experts in the world on embolic risk factors associated with mechanical heart valves?
A. He is definitely a worldwide expert on that. Yes.
Q. In fact, he's so renowned and has such a great reputation that St. Jude wanted him to be the clinical investigator to study embolic risk factors associated with the Silzone valve, correct?
A. Uh-huh.
Q. And he was St. Jude's clinical investigator, correct?
A. I believe so.
Q. All right. And given that you respected Dr. Swanson and he was an experienced cardiothoracic surgeon, did it make a big

because of the width of the confidence interval or something, they weren't necessarily contradictory. Just trying to stick to what was published statistically.
Q. So you'd -- but you will agree with me that that notion would be one way of reconciling what may appear to be contradictions?
MR. KOHN: Object to the form.
A. Well, maybe, but it seems that if the thromboembolism rate is high, it's either high or not, even if there are two phenomenon emanating from the same mechanism, the embolism rate should be not dissimilar in different populations nor the leak rate taken as single events. That was sort of the focus I think I had in that paper.
(Marked Deposition Exhibit No. 21.)
Q. BY MR. SIGELMAN: Dr. Grunkemeier, you've been handed Exhibit 21, which is a February 22, 2000, e-mail.
A. Uh-huh.
Q. And on the last page -- excuse me -- the third page of the exhibit, 325 are the last three digits, you have an e-mail to Monica Schultz.
Now, this is in this same time frame that we've been talking about, February of 2000.

A. Uh-huh.
Q. Does this refresh your recollection as to whether you reviewed report data from the top accounts study?
A. Which e-mail? The one on February 22 at 2:20 p.m.?
Q. Yes. You say, "Thanks for the report. I'd done much the same thing already and got the same results."
You are talking about the top account study, are you not?
A. Yeah. It looks like it.
Q. Then you say, "the TE and thrombosis rates don't look too good, especially the mitral position, in the range of Eric B's results," correct?
A. Uh-huh.
Q. So you are saying you saw these data and it showed a statistical problem or numerical problem of some sort in the mitral position, correct?
A. Yes.
Q. So you had this information at least by February of 2000, correct?
A. Yes.
Q. To your knowledge, did St. Jude ever publicize the results of the top account study that it sponsored?
A. Not that -- I don't know.

Q. Not that you know of, correct?
A. Not that I know of. Correct.
Q. And you didn't mention it, did you, in your contradictory reports article where you are talking about data from Mr. Butchart's study and data from AVERT?
A. No. That was just based on published peer reviewed reports.
Q. Well, did you ever ask St. Jude whether they would mind your making this public?
A. No. You mean publish their top survey data?
Q. Yes.
A. No, I didn't.
Q. Submit it for peer review?
A. No, I didn't. It was someone else's data. It wasn't mine.
Q. All right. You'll agree with me that it would have added additional information either corroborating or reinforcing some of the data from Mr. Butchart's study that might have been illuminating to the readership of your article?
MR. KOHN: Object to the form.
A. You know, I don't know the quality of that data or exactly how -- who it was collected by or how often or what it could be used for.

Q. BY MR. SIGELMAN: Did you ever suggest to St. Jude that it submit that data for publication and subject it to peer review?
A. Not that I recall.
Q. You didn't get an opportunity to peer review it, did you, for any length of time?
A. No.
Q. In fact, you were told not to work on it any longer, correct?
A. I don't know. I'm not even sure it was a study. I thought it was just their top implanters and some passive record collection they had. I didn't know it was an active prospective study exactly.
I don't know much about it. Didn't know it hardly existed until I heard them say it one day. I said, what's that? They said some data. I said, can I see it? I don't know -- it didn't go far, whatever it was.
Q. It didn't go far, but the data didn't look too good to you, did it?
A. I don't remember how many -- it was like ten patients per center or something. It wasn't very many patients. No. Apparently it didn't.
Q. You thought the data looked pretty bad for the mitral position in the range of --

A. In the range. Yeah.
Q. Then Monica Schultz says in response, "Yes. I know. Sadness." That's what she told you, right? See her response to your e-mail?
A. Okay. It's on the next page.
Q. Yeah.
A. Yes. I see.
Q. So she knew the data didn't look too good, didn't she?
A. Yes.
Q. And she expressed sadness about those data, correct?
A. Yes.
Q. She didn't say the data was no good, she said it was sad, and she knew that the data didn't look too good?
A. She did add one disclaimer here.
Q. Well, she added one disclaimer, which was the thromboses all occurred at one site, but the TEs were more evenly spread, though, correct?
A. Uh-huh. Yes.
Q. So ultimately she wasn't saying the data weren't informative or of no quality, correct?
A. Yes. Correct.
Q. She was expressing in fact some sadness about the

data, correct?
A. That was her word.
(Marked Deposition Exhibit No. 22.)
Q. BY MR. SIGELMAN: Dr. Grunkemeier, you've been handed what's been marked as Exhibit 22, Monica Schultz to you January 20 of 2000. She's giving you some of the top accounts data.
Did you review these data at the time?
A. Apparently.
Q. And you spoke with a Becky Peterson, Director of Cardiac Surgical Associates Research Foundation about sharing the survey database with you?
A. Is that what it says?
Q. Do you have a recollection of that?
A. No, I don't.
Q. By the way, do you know whether St. Jude was actually required to conduct this top accounts survey by the medical device agency in the United Kingdom?
A. No. I didn't know that. Is that a fact?
Q. No one told you that, correct?
A. Not that I recall.
Q. That in fact they were asked to conduct this survey because of concerns expressed about the safety of Silzone by the medical device regulators in the

# Exhibit 35

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

MDL No. 01-1396 (JRT/FLN)

* * * * * * * * * * * * * *

IN RE: ST. JUDE MEDICAL, INC. *
SILZONE HEART VALVES PRODUCTS *
LIABILITY LITIGATION *
*

* * * * * * * * * * * * * *

VOLUME I

PAGES 1-343

VIDEOTAPED DEPOSITION OF FREDERICK J. SCHOEN, M.D., Ph.D., a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Goodwin Procter LLP, 53 State Street, Boston, Massachusetts, on Wednesday, August 9, 2006, commencing at 12:06 p.m.

And that was originally Silver, then Dr. Gotlieb and then yourself, correct?
A. It was -- the first two editions were Silver, and then the third edition was Silver, Gotlieb and Schoen.
Q. Okay. And are you aware that some of the portions of that book were authored -- you know, that Dr. Silver was responsible were authored by Dr. Wilson?
A. Yes.
Q. And some of those chapters -- some of the language and wording in that still remains intact in your current edition?
A. Yes.
Q. And you feel Dr. Wilson is a competent pathologist?
A. He's a very competent pediatric cardiac pathologist.
Q. Okay. And you make an effort, I notice, to emphasize the word "pediatric." Can you tell us why?
A. Well, Dr. Wilson, to my knowledge, for his entire career has been at the Children's Hospital in -- I forget exactly what it's called -- in Toronto, and his experience is

very much that of a pediatric cardiac pathologist, which is largely congenital heart disease, which is their major focus.
Q. Okay. And you write with Dr. Levy, correct?
A. Robert Levy?
Q. Yes. And Dr. Robert Levy also is a pedia -- is in the field of pediatrics, isn't he?
A. He's a pediatric cardiologist.
Q. Okay. And the problems that he has is the same as Dr. Wilson --
A. I think --
Q. -- your limitations on his knowledge are the same as Dr. Wilson's, correct?
A. Tell me a little more about what you mean by the "limitations on his knowledge."
Q. Well, you seem -- are you indicating that there -- because he spends a good portion of his career on pediatric pathology that there is some limitation on Dr. Wilson being able to give a good opinion in this case?
A. Well, I think -- Dr. Levy is a pediatric cardiologist so that the clinical population that he sees are probably very similar to the clinical patients that Dr. Wilson sees at the pathology end. But Dr. Levy is a

are, correct?
A. I don't know any more than I've read on the literature on the Taxus stent.
Q. Okay. Did you research that at all before forming that opinion?
A. No.
Q. And it's fair to say you didn't ask Greg Wilson what his interests were before forming that opinion?
A. That was a statement. Yes. Okay.
Q. I'm sorry, I didn't have the inflection. I apologize. That neutral inflection, I can understand why you said that. I apologize. It was.
Okay. How many Silzone valves have you personally looked at over your career?
A. Can you specify what you mean, "looked at"?
Q. Okay. Per --
A. I'm trying to be precise in my answers, so --
Q. No, no, I understand.
A. -- I need to ask you to be --
Q. I've worked with --
A. -- more precise in your questions.
Q. -- enough pathologists that I understand

your question completely, and it's fair.
Professionally as a pathologist when you get a valve given to you, you're usually looking at it from a pathological point of view, correct? And you're --
A. Yes.
Q. And what is -- so that we lay people have an understanding, what is it that you're looking at?
A. No, I just want just to clarify what my question was. When you say "looked at," does looking at photographs qualify for what you're talking "looking at" or --
Q. Oh, oh --
A. -- having in my --
Q. -- my apologies.
A. -- having in my hand to manipulate and start from the beginning?
Q. My apologies, okay? I understand -- I didn't understand your clarification, but now I do, thank you.
Let us do it both ways, okay? One, physically as a pathologist doing what pathologists do, how many have you actually examined pathologically?

A. Probably a dozen.
Q. All in connection with this litigation or --
A. I don't believe so.
Q. Okay. How many in connection with the litigation and how many profession -- otherwise professionally?
A. Probably just a few professionally otherwise.
Q. Okay. And these were valves that came out of Brigham & Women's?
A. No. They may have been -- come from elsewhere.
Q. Yes.
A. We periodically as experts in the heart valve area will be sent specimens from literally all over the world.
Q. You're -- I fully agree with you, and I know exactly what you're talking about. For example, Eric Butchart sent you one?
A. Yes.
Q. And he sent that to you in the year 2000. I can't remember the date. And we can look at paperwork later to nail down the date if we need to, but actually, I can remember the date. It was March 16, 2000 that he sent

Q. And then you are making causality decisions, aren't you, here when you do RTS-14 and 27 and 103 that appear on 8 and 9? You're making causality opinions?

A. I think so. In -- certainly in A, the RTS-12. They're causality decisions, though, that are based on known associations, well-established associations, endocarditis and paravalvular leak.

Q. What, if anything, can you tell me about RTS-12 --

A. And pathologists do this all the time.

Q. Okay. Well, my first question on RTS-12 is, you recall that this was a Swiss case in which there was a redo due to PVL?

A. I don't recall the details.

Q. Okay. Did you make any notes or anything in your analysis?

A. I don't believe so.

Q. Who prepared this, you or the counsel, when -- to preface these summaries?

A. We made the notes together.

Q. When you say "we," who is "we"?

A. Mr. Kohn.

Q. And how was it that these cases, RTS-12, 14,

27, 103, 171, how were these selected out of the 54?
A. I think they were selected as examples of valves in which there were obvious other more plausible causes or --
Q. And therefore the other ones didn't have obvious causes?
A. I don't remember.
Q. Fair to say that these are cherry-picking of certain cases to make your point, isn't it?
A. I suppose.
Q. Now, earlier you said that there was about one and a half inches of paper on these files. Do you recall that?
A. On the normals -- the non-Silzones.
Q. On the non-Silzones. And about three inches you said?
A. Something like that.
Q. Okay. Here are the cases. So is this what you reviewed (indicating)?
A. I don't -- I mean, you want to show them to me?
Q. Sure. To save time I'm just going to use Bates numbers because -- I'm going to give you what is RTS-12.

(Exhibit No. 30, Copy of RTS-012, post-marked for identification.)

A. Uh-huh.

Q. And it's SJM0101391 is the first page, and it goes through 01443. Did you review this file?

A. I reviewed parts of it.

Q. Okay. You didn't review the whole thing, correct?

A. Probably not the whole thing.

Q. Okay. In your opinion, on Page 8 you say, "Moreover, the leak that developed in this case, about 2 weeks after implant, was likely related to the effect of endocarditis -- not to any problem with healing."

Here you're speculating; is it not the case?

A. Sure.

Q. Okay.

A. But speculating in a way that pathologists do all the time.

Q. I notice also when I took a look at the following case, RTS-14 -- or, excuse me, D-103, that you say here, "In my opinion to a reasonable degree of medical and

# Exhibit 36

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: | : MDL DOCKET NO. 1396 |
| ST. JUDE MEDICAL, INC., | : (Videotaped) |
| SILZONE HEART VALVE PRODUCTS | : Deposition of: |
| LIABILITY LITIGATION, | : DR. ROBERT W.M. |
| | : FRATER |
| | : |
| | : |
| | : |

\- - - - - - - - - - - - -

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LINDA M. HOFFMANN, a Certified Shorthand Reporter and Notary Public, held at the office of REED SMITH, LLP, 599 Lexington Avenue, New York, New York, on Friday, May 14, 2004, commencing at 9:00 in the forenoon.

got clinical experience. I bet you anything you like he hasn't even got animal experience. He's a toxicologist, sure. And he measures things, and he's, I'm sure, bright and intelligent, and everything else, but he has no notion of how you relate these things to clinical use, and it's very, very difficult. But in this case, that last sentence is an absolute impossibility.

Q. Dr. Flory has testified under oath, and I'm sure that you've seen the statement also in other forums, that they looked at 200 factors in AVERT and could not explain why there was an increase in the paravalvular explants. Have you seen that?

A. Yes, I have heard that.

Q. Well, there was one difference, was there not, and one had silver and one did not?

A. Yes.

Q. And a logical conclusion could be that the silver has an effect in that?

A. That is a possible conclusion, of course.

Q. And a reasonable one?

A. Until you've got further evidence, yes.

Q. Okay. And that's one of the reasons why the company took the product off the market.

# Exhibit 37

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
MDL DOCKET NO. 1396

IN RE: :
:
ST. JUDE MEDICAL :
INC., SILZONE HEART :
VALVES PRODUCTS :
LIABILITY LITIGATION :
: VIDEOCONFERENCE
: DEPOSITION OF:
: DICKEY FRANSSEN-BRADER
:
:
- - - - - - - - - - - - -

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LINDA M. HOFFMANN, a Certified Shorthand Reporter and Notary Public, held at the office of LEVY, ANGSTREICH FINNEY BALDANTE RUBENSTEIN & COREN, PC, 1616 Walnut Street, 5th Floor, Philadelphia, Pennsylvania, on Tuesday, September 28, 2004, commencing at 9:25 in the forenoon.

the MDA, because the MDA of the United Kingdom was advising that they could potentially go out with an advisory letter; and if there's an advisory letter concerning our product, that concerns the financial community, and it's Mr. Gove's responsibility to communicate to the financial community when anything happens concerning our product.

Q. That's terrific. Now, why would he need to get a dossier on Mr. Butchart in order to deal with the financial community?

MR. STANLEY: Objection to form.

Q. What's the significance of who Dr. Butchart is other than the fact that you hired him to do this study?

MR. STANLEY: Objection to form.

A. Well, because the MDA was referring to Mr. Butchart as the reason for the advisory letter because of his experience in Cardiff.

Q. So you understood that part of the contingency plan was for your public relations people to write up a document to attack the veracity of Mr. Butchart. Right?

MR. STANLEY: Object to the form.

A. No, that's not what I understood on.

Q. Not what you understood. Okay.

# Exhibit 38

Court File No. 00-CV-195906CP

ONTARIO

SUPERIOR COURT OF JUSTICE

B E T W E E N:

YVONNE ANDERSEN on her own behalf and as Executrix of the Estate of Erik Andersen, SHARON FROST and HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE OF ALBERTA, as represented by the MINISTER OF HEALTH AND WELLNESS

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and ST. JUDE MEDICAL CANADA, INC.

Defendants

Proceeding under the Class Proceedings Act, 1992.

--------

--- This is the continued Examination for Discovery of ALAN FLORY, taken at the offices of Blake Cassels & Graydon LLP, 18th Floor, Commerce Court West, Toronto, Ontario, on the 25th day of October, 2005.

--------

REPORTED BY: Kimberley Neeson, RPR, CRR, CSR, CCP, CBC

informing you of their findings."
A. Yes, I think you refers to interest David. He didn't want to know the study results.
Q. Right.
A. By TGH.
Q. Ms. Schultz is asking that St. Jude be provided with the data?
A. Correct.
Q. Now, this is cc'd to yourself and Sue Armstrong, also Mr. Healy who I assume was involved in marketing?
A. Yes.
Q. And Dave Stronach, and Mr. Stronach would be involved because?
A. He was in the sales division for our Canadian office and I believe Toronto General is one of the hospitals he dealt with at that time.
Q. All right. Turn to defendants' production 08215. I'll just give you a chance to review it.
A. (Witness reads document). Okay.
Q. Who is Butch art?
A. Mr. Butchart is a surgeon in Cardiff, Wales.
Q. Is that how you pronounce Butchart?

A. I think you pronounce is Butchart. Americans pronounce it Butch art. I've heard it pronounced both ways.

Q. So you're writing to Mr. Butch art?

A. Correct.

Q. And can you tell me what this study that he was doing involved?

A. He was doing a study of various valves to look at risk factors for the development of thromboembolic events. That's the study. You asked what the study was involved and that's the crux of it.

Q. After heart valve replacement with mechanical prosthesis?

A. I believe it was restricted to mechanical prosthesis, yes.

Q. And Mr. Butchart, is he an international expert on such things as thromboembolic risk factors in relation to mechanical heart valves?

A. Yes.

Q. Do you know how you heard about this study?

A. Actually on the cc there is a person named Jane Braunski.

Q. Yes.

A. And she requested that we meet with

Mr. Butchart because actually the connection was through our European office through Ms. Braunsky and she wanted to participate with him in this study.

Q. Who is Joel Becker and Thomas Hobson?

A. Joel Becker would have been, I believe he was head of the European office at that time. Either European office or -- well, I believe he was in charge of the European office. Thomas Hobson would have been in sales in the United Kingdom.

Q. Now, the final half sentence of the first paragraph says.

...we hope that we can include the St. Jude Medical mechanical heart valve SJM Masters Series with Silzone within the study as soon as possible."

So my question is first of all, he wasn't approaching you to add the Silzone valve into the study, St. Jude was approaching him?

A. I believe Ms. Braunsky approached him, that's correct.

Q. Okay. And she says or you say as soon as possible. Why did you want to include it as soon as possible in the study he was conducting?

A. Again, the study was out of our European office and I know that they wanted to get -- there were already a large number of St. Jude Medical mechanical heart valves in the study and they wanted to have a control group. Obviously they wanted it to be expeditious.

Q. Was there some deadline in mind?

A. Not that I recall.

Q. Had the Masters Series valve with Silzone been approved by the regulatory authorities in Europe at that time, at the time of this letter?

A. February 1977? I can't remember what the CE marketing date was.

U/T MR. MCKEE: We can let you know.

THE DEPONENT: It would have been around the time of the CE marketing date.

MR. MCKEE: He meant '97, not '77.

THE DEPONENT: Did I say '77? Sorry.

MR. MCKEE: It's okay.

BY MR. NEWLAND:

Q. Right, '97.

A. I meant '97. Were you suggesting by this letter to Dr. Butch art that he consider implanting Silzone valves within this study before CE marking?

A. No.
Q. Was there a discussion about whether CE marking would be required before you would use Silzone valves in this study?
A. I don't recall that discussion, no.
Q. In the second paragraph, first line:
We understand that you prefer not to compare differences in valve performance or valve-related complications across manufacturers."
Is that something that he told you?
A. I can't recall whether he told me that directly or whether that was information provided to me by our European group.
Q. In any event, you state:
Our primary interest is in the comparison of SJM mechanical heart valves with standard versus Silzone sewing cuffs."
A. That's correct.
Q. And you wish to compare valve performance between those two types of valves in terms of complications and sub-clinical anomalies?
A. Correct.

Q. Now, the next paragraph, the first sentence is:

In order to obtain sufficient numbers for comparison, we believe that all patients who are candidates for participation in the study should receive the SJM Masters Series valve with Silzone."

And it should be implanted sequentially.

A. That's what it says, yes.

Q. That was a request that St. Jude made of Mr. Butchart?

A. Yes, I believe so.

Q. And St. Jude was satisfied with that method of proceeding?

A. Well, he had not randomized -- the study that he ran was not a randomized study. So as I said he already had a large population of the Masters Series valves without Silzone which were essentially consecutive enrolment, and so our feeling was yes, consecutive enrolment would be comparable to what he had already done.

Q. Now, thereafter at some point in time the study commenced obviously?

# Exhibit 39

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

---------------------------------------------------

In re: Saint Jude Medical Inc., MDL: 01-CV-023
Silzone Heart Valves Products
Liability Litigation

---------------------------------------------------

DEPOSITION

The following is the deposition of ALAN FLORY, taken before Jacqueline McKone, Certified Shorthand Reporter, Notary Public, at the law offices of Halleland Lewis, 220 Sixth Street in Minneapolis, Minnesota commencing at 9 o'clock a.m. on 20 March 2002.

Q. Why?
A. We initiated the recall because when the data safety monitoring board met and the University of Pittsburgh and looked at the data they saw in this study a difference in two arms, and one arm had a higher rate a significantly higher rate of incidence due to paravalvular leak, and it was the Silzone arm. We could not explain why that was happening. As you asked earlier, we tried to identify patient characteristics, center characteristics, operative characteristics, valve size. We looked at essentially 200 variables or more to try and figure out can we explain this, and we couldn't. We didn't know whether Silzone was the cause of it, but we knew it occurred in the Silzone arm; and since we didn't know whether it was Silzone and couldn't prove that it wasn't, the safe thing to do was recall the product until we could figure that out.
Q. Was there any consideration given to whether the FDA would have pulled the product?
A. None.
Q. Did the FDA ever advise you that they deemed the product to be misbranded or adulterated?

# Exhibit 40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

-------------------------
IN RE: : MDL DOCKET NO. 1396
ST. JUDE MEDICAL, INC., : (Videotaped)
SILZONE HEART VALVE PRODUCTS: Deposition of:
LIABILITY LITIGATION : ALAN FLORY, DVM
------------------------- : Volume I

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before, BARBARA J. CAREY, a Registered Professional Reporter and Notary Public of the State of Minnesota, held at the offices of ZIMMERMAN & REED, 651 Nicollet Mall, Suite 501, Minneapolis, Minnesota on Tuesday, November 12, 2002, commencing at 8:13 a.m.

Q It's 300 of something?
A I can't even recall.
Q 300 of something?
A Right. And we were at levels of 30 or less, so --
Q And that's in blood, correct?
A Serum.
Q In serum, right.
A Yes.
Q Okay.
A Not in whole blood.
Q Okay. And -- and you're saying the target organ toxicity for that 300 is what?
A That's in serum. That -- that was in serum.
Q But the target organ toxicity for which that is the threshold, that 300 whatever it is, is what?
A That was -- again, I'd have to read the article. That -- that was the level at which people started to exhibit signs of silver toxicity; in other words, the discoloration of the skin, et cetera.
Q All right. And at what level is silver toxic to proximal annular tissue, for example?
A I can't give you a level. That's why we did the animal study; to see if, for the Silzone valve,

we were reaching that point where we were causing cytotoxicity around the -- the -- the cuff.
Q All right.
A And I can't tell you what it is. I can tell you that in the animals, we didn't reach it because they -- they healed comparably to the uncoated valve.
Q To your knowledge, did St. Jude ever investigate the toxic threshold or the level for any kind of significant toxicity for the effects of silver on proximal annular tissue?
A I don't know how you'd do that.
Q All right. And by the way, what's --
A So no, I -- I -- I don't know of a silver challenge or any -- is that what you're talking about? It's elemental silver. It's 100 percent. So what we put in should have been the -- the -- theoretically, the biggest challenge that the tissue annulus is going to see. I don't know whether there's another model. I don't know of any.
Q This 300 units of whatever --
A Serum.
Q -- that you said, that's for systemic toxicity, correct?

A -- prospective study is not that we're projecting into the future. It's that the patients know they are going to be followed in the future.
Q So the only difference between what the Top-10 was doing and AVERT was the fact that the patients who had had the implantations didn't know that they were being studied, correct?
A Wrong. The difference is that in AVERT, we had comparable patient selection criteria. We had patients in two arms of the study; standard and Silzone. We had randomization of those patients so that there was no selection bias. We had all patients followed, and the person analyzing them was blinded as to what kind of valve they had so there was no reporting bias. The study was designed to minimize all the biases that could have gone into this type of a survey.
Q I see. So who established the Top-10 protocol?
A The Top-10 protocol resulted from conversations with Hazel Randall, and I established --
Q Who established -- you established?
A And I established the Top-10 protocol.
Q Thank you. Okay. It would have been so much easier for you to just simply say, I established it, than to begin with, It was developed.

# Exhibit 41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
- - -
IN RE: : MDL DOCKET NO.
ST. JUDE MEDICAL, INC.;: 1396
sILZONE HEART VALVES :
PRODUCTS LIABILITY :
LITIGATION :
- - -
June 26, 2006
- - -

Oral deposition of ERIC G. BUTCHART, held in the offices of Reed Smith, LLP, One Liberty Place, Conference Room 24A, Philadelphia, Pennsylvania 19103 commencing at 9:00 a.m., on the above date, before Harvey Krauss, a Federally-Approved Registered Professional Reporter and a Commissioner of the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
(215) 988-9191

updated CV. Attached to Defendant's Exhibit Number 2 was a version of your CV dated November 2005. Could you tell me just generally how your CV has been updated in June 2006?

A. Yes. In a number of respects, additional publications, in particular the publication of a book which I edited was published in March of this year. And I've also since the last CV of November, I have become a member of the American Association of Thoracic Surgery, and I've also been appointed to the editorial board of the Journal of Thoracic and Cardiovascular Surgery. At present I'm the only UK member of that board.

Q. What's the book that you published in March? What was the title?

A. The title was the -- can I just refresh my memory?

Q. Certainly. Feel free to take a look at your CV.

A. I want to get the exact

Surgery Society.

Q. Does that include cardiology?

A. No. That includes primarily surgery. I'm a surgeon.

Q. And that is your specialty surgery?

A. Yes.

Q. Do you have any other specialty in medicine?

A. No. One has to be one kind of a doctor or another. I am a surgeon.

Q. That makes sense.

Well, is there any other education or training that has any bearing on your opinions that you have come to in this case that are not mentioned in Defendant's Exhibit Number 1?

A. Well, I have had a particular interest in the problems of thromboembolism after heart valve replacement for many, many years and so, I've made myself familiar with the

relevant parts of other disciplines in order to facilitate that research. So I've read very widely on many other subjects also.

Q. Do you have any formal training -- well, first of all, strike that. What are those other subjects then?

A. To the extent that they're relevant aspects of biomaterial scientist -- science, hematology.

Q. Anything else?

A. Well, things like echocardiography and techniques used in the investigation of patients with heart valve disease.

Q. What discipline is that last category?

A. Well, it's a -- heart valve disease overlaps several disciplines. It overlaps both cardiology and cardiac surgery.

Q. Do you have any formal training in cardiology?

A. No.
Q. Do you have any formal training in biomaterial science?
A. No.
Q. Do you have any formal training in hematology?
A. No. I mean, other than obviously the, you know, what one learns in medical school as part of acquiring a medical degree. All of those subjects are covered.
Q. So no further specialized training in hematology after medical school?
A. No. That's correct.
Q. So you wouldn't have any other -- any further specialized training than any other physician, essentially?
A. Well, it depends what you mean by training. Certainly no formal training, but as I said before, I've made myself very familiar with the relevant parts of the literature relevant for the problems of thromboembolism after heart

valve surgery.

Q. Can you be more specific then? You wouldn't have any other formal training on hematology than any other medical -- than any other physician?

A. Not formal training, but I think I would say that I have, you know, interested myself perhaps more in those specialties than the average cardiovascular surgeon because of my particular research interest.

Q. How about echocardiography, do you have any formal training in echocardiography?

A. No, I do not.

Q. Have you ever performed an echocardiographic exam?

A. No. That's because surgeons do not perform echocardiography but, however, increasingly now a days surgeons are familiar with echocardiographic appearances because that is part of day-to-day life as a surgeon. Echocardiography is used routinely in the

operating room now, in the preoperative and postoperative assessment of patients. So most cardiovascular surgeons nowadays have at least a working knowledge of echocardiography even though they would probably not be regarded as experts in that field.

Q. Well, that's a good clarification. Do you consider yourself an expert in echocardiography?

A. I would not say I was an expert in echocardiography, no, but I -- again I would say that I'm familiar with the basic techniques and interpretation because it's part of the, you know, day-to-day practice.

Q. Do you consider yourself an expert in hematology?

A. Again, I would answer in the same way. No, I'm not an expert in hematology. But on the other hand I have made myself familiar with the relevant aspects of hematology as they applied to the problems of thromboembolism after

heart valve surgery.

Q. Do you consider yourself an expert in biomaterial science?

A. I, again, would answer in the same way, I've made myself familiar with those aspects of biomaterial science that apply to the -- my field of research interests. And I also would say that I edited a book in 1992, on the problems of thrombosis, embolism and bleeding which included a chapter on biomaterial sciences which I edited as part of my editorial work for that book. So I regard myself as familiar with the basics of biomaterial science.

Q. You didn't author that chapter?

A. I did not author that chapter. I edited the chapter.

Q. Who was the author of that chapter?

A. Dr. Schonn was one of the authors of that chapter.

Q. Which book was that? Can

you point that out on your CV, please?
A. Yes, certainly. Yes. The book was entitled Current Issues in Heart Valve Disease Thrombosis, Embolism and Bleeding published in 1992, and it appears on page 11 of my CV.
Q. Do you have any formal training in epidemiology, other than what you have received in medical school?
A. No.
Q. Do you consider yourself an expert in epidemiology?
A. Again, I would answer in the same way. I have made myself familiar with the aspects of epidemiology as they apply to the problems of interpreting data about heart valve disease in general, and in particular the literature relating to heart valve replacement and its problems.
Q. How about toxicology? Do you have any formal training in toxicology?
A. Not other than what I

received in part of my medical training.

Q. Do you consider yourself an expert in toxicology?

A. No. Again, I would answer in the same way to that question. I've made myself familiar with the aspects of toxicology as they apply to this particular case.

Q. And do you have any formal training in metallurgy?

A. No, I do not have any formal training, but, again, I would answer in the same way as the previous questions.

Q. Do you consider yourself an expert in metallurgy?

A. No, but, again, I would answer in the same way as your previous questions.

Q. And the last time, do you have any formal training in pathology other than what you received in medical school?

A. Again, sounds like repetitive, but I would have to answer

exactly the same way as I did to the previous question.

Q. Do you consider yourself an expert in pathology?

A. I would answer the same way as I have answered the previous questions. I made myself familiar with those aspects of pathology that apply to this particular field.

Q. And when you say you've made yourself familiar with aspects of those disciplines, does that include anything other than review of the literature?

A. It includes, you know, talking to other experts in -- in those particular fields.

Q. Anything else?

A. Well, I attend, of course, many medical conferences and I listen to other experts talking. I read the literature.

Q. Anything else?

A. No.

Q. Are you licensed to practice

medicine in the United States?
A. No.
Q. How about in Canada?
A. No.
Q. When was it that you became a member of the Society of Thoracic Surgeons?
A. I cannot recall. I've been a member of the Society of Thoracic Surgeons for many years. I would say more than ten years. I've been a member of the American Association for Thoracic Surgery, only this year I was elected to membership.
Q. Are you a member of any U.S. based cardiology society?
A. No.
Q. Do you have any teaching appointments at any other facility than the University of Hospital of Wales?
A. No, but I have been a visiting professor at other institutions, and next month I'm going to be visiting professor at the University of British

valves, because they apply, in fact, to patients with all types of prosthetic valves. And if you have a valve like the Silzone valve which does appear to be more thrombogenic, then applying a risk scoring system ought to help those patients in terms of the follow-up that they require. That was my reasoning in developing these proposals.

Q. I understand you think a risk scoring system would be helpful. Has this risk system, risk scoring system been validated sufficiently to transfer that to the basis for monitoring the 36,000 individuals who were implanted with Silzone valves --

A. I think --

Q. -- based on 19 individual results?

A. Yeah, I don't think it is necessary to base the assessment on those 19 individuals. What I have done, as I said, is to take the much larger group of patients that we have where we have good

evidence that the risk scoring is effective and simply apply that to Silzone patients. I think if more data were collected, then obviously that would be very helpful, of course.

Q. Well, has anyone else validated your risk scoring system?

A. Not as far as I know.

Q. Has anyone tested it?

A. Well, we have tested it in the Silzone patients in terms of not just using thromboembolism, but using other end points, using embolism, using sewing ring thrombus, and using limitation of leaflet movements on cinefluoroscopy, and there it did indeed seem to be very helpful, and I've put the tables and the graphs into my report. So to that extent it's been validated in Silzone patients, yes. It hasn't been validated by another group, another group of researchers, no.

Q. Has it been accepted in the medical community as a valid means of evaluating the risk for a prosthetic

valve recipient?

MR. COREN: Form.

Objection.

A. I think --

MR. COREN: Go ahead.

A. I think that's a very hard question to answer, actually. I know that we received after we published the paper in circulation, we received a lot of interest and a lot of people complemented me on the usefulness and importance of the paper. Whether other groups are now applying that risk scoring system to their own patients, Silzone or other patients, I don't know.

Q. You have no knowledge if its been implemented by any other group or any other physicians?

A. I have no knowledge of that, but that's --

Q. That hasn't been published anywhere that that is the case, that is a fact that other individuals are using your risk scoring system?

an estimate of how many fees you've
accrued since November of 2005?
A. No, because I haven't added
it up. I've kept a careful note of the
hours that I have spent, but I have not
added those hours up yet.
Q. Has anyone assisted you in
your work on this case?
A. Assisted in what way? What
do you mean by assisted?
Q. Has anyone provided any
assistance in your work done, work that
you have relied upon, anything of that
sort?
A. Nicola Payne has provided
the additional analysis that you
requested, for example, yes, she has
assisted.
Q. All right.
A. I've also submitted my
report for peer review to a cardiologist
who reviewed it. So that's somebody who
assisted me, and I suppose in the
preparation of the report.

Q. Who was that?

A. That was Dr. Gohlke-Barwolf a German cardiologist.

Q. And did he provide written --

A. She.

Q. She, sorry.

A. Uh-huh.

Q. Forgive my ignorance of German.

Did she provide written comments to your report?

A. She provided me with -- yes, with written comments.

Q. Okay. Doctor, turning to your report. Obviously, I'm not going to be able to touch every statement in here. But I did want to ask you a little bit about your background. You mentioned before that you serve on the data monitoring committee for the Medtronic Advantage by leak valve.

A. Yes.

Q. Describe for me your role on

that committee.
A. Yes. That is to take part in regular teleconferences, to monitor updated reports on complication rates.
Q. And specifically what's your role?
A. Well, to look at the complication rates and see whether they're in an acceptable range or if they exceed a range or that kind of thing, and also to look at individual patient records where necessary.
Q. What sort of valves have you implanted over the years by manufacturer?
A. Sorry?
Q. What sort of valves have you implanted over the years by manufacturer?
A. I've -- in terms of mechanical valves, I have used Star Edwards valve. The Omni Science valve. The Lillehei-Kaster. Lillehei Kaster, Bjork Shiley, B-j-o-r-k S-h-i-l-e-y.
And the Medtronic Hall Valve and tissue valves. I've used various

A. 2000.
Q. Would it be more legitimate to assess the risks posed by the Silzone valve on the latest data or the data that was collected back in 2000?
MR. COREN: Form, objection.
You can answer.
A. My concern with the later data is that there are -- well, I have several concerns about the later data. One is the completeness of follow-up. Secondly, is the rather hazard method of data. And thirdly, is the, what I regard as the flawed adjudication process. So I find it difficult to rely on the AVERT data, any aspect of the AVERT data for those reasons.
Q. So that was lack of sufficient follow-up, haphazard data collection and the adjudication methodology?
A. Was flawed.
Q. For what types of events?
A. Well, predominantly for the

thromboembolic event, but I think also
for other events also.
Q. Well, we'll get to the
methodology for the thromboembolic event.
How was the methodology for adjudicating
endocarditis events flawed?
A. I think the problem which
applies to the thromboembolic events also
was that the -- all of the adjudication
was done retrospectively and not
prospectively.
Q. Could you explain for me how
adjudication could be done prospectively?
A. Yes. Prospectively --
prospective adjudications means that any
event is adjudication before it's entered
on the database.
Q. And how does that -- go
ahead.
A. No, you're going --
Q. How does that method of
recording the event and the results of
the adjudication impact the legitimacy of
the adjudication?

A. In two ways. Firstly, if you use retrospective adjudication as opposed to prospective adjudication, then you do not have the opportunity to include events which are unclear. You can only take out events, you cannot add events. So retrospective adjudication only allows you to remove events. It does not allow you to add events. The other thing is that one of the things that is very obvious from the documents that I've been supplied with is that the primary clinical information on which to make the adjudication was not available or not available in good quality in many instances. In fact, in two-thirds of the instances of adjudication there was no good quality primary source data to make the adjudication. And in 21 percent the events, TE events had to be called unknown, didn't know what they were. So that is one of the concerns I have with the adjudication process, and the other is, or several others actually, but what

they were doing in the adjudication process was removing events that were considered to be so-called non-valve related, and by that what they meant was that if the patient was in atrial fibrillation they discounted the event. If the patient had a low INR they discounted the event.

Now, that means that a lot of events that should have been counted according to the reported guidelines were actually removed. There's also no indication of how events were reclassified, if they were actually kept in the database. So presumably were just removed all together, others were allegedly reclassified, but there's no indication of how they were reclassified into what other events category. So, you know, those are all, as far as I'm concerned, serious concerns about the adjudication process.

Q. How about the haphazard data collection, what are you referring to

there?

A. I'm referring to, I think there's a presentation given by Dr. Holikoff, which is included in the Appendix 3 documents in which he states that there was variation in the amount of data that was available. Some patients had what he describes as only in-hospital information, which presumably means they had no follow-up information. Some had events recorded at that particular time period and others didn't. There was also, in essence, passive follow-up, which means that if an event had not been reported for a particular patient at particular time interval they assumed that no event had occurred, and that is a method that is known to underestimate event rates. And certain -- I mean, some events were reported up to two years after they had actually occurred. So that's what I mean by haphazard data collection. And, of course, that problem is magnified when you've got a

multi-center study, because presumably not all centers are as good recording data as others.

Q. Anything else?

A. Well, I mentioned completeness of follow-up was the --

Q. I'm still on haphazard data collection.

A. Yeah, I think those are the main points, yeah.

Q. And lack of follow-up. What are you referring to there?

A. Well, two or three things. In the AVERT paper, the 2002 paper, the Schaff paper, they say that limited follow-up was available after one year, or words to the effect. I don't have the exact quotation, but I can find it for you if you have the paper.

In Dr. Gary Grunkemeier's very recent publication, which we'll -- or is published electronically but will be in the July issue of the European Journal of Cardiothoracic Surgery, he

refers only to 85 percent completeness of follow-up. And only -- in fact, in the European centers only 82 percent completeness of follow- up.

There are some documents which are again included in the Appendix 3 documents which show that for year five in the European centers there was only 68 percent completeness in follow-up. So, you know, these concerns I think are important in judging the data that is available from 2005 in the AVERT study. In my view it means that the data are unreliable.

Q. Is it your understanding that there's limited in follow-up after one year in the 2005 data as well?

A. It's difficult to obviously be precise, but as far as I can see there is follow-up, reasonable amount of follow-up to year four, but after year five, and years five and six there appears to be very limited follow-up.

Q. Well, you refer to the

statement in the Schaff paper there was limited follow-up available after one year.

A. Yeah.

Q. Is it your understanding that's still the situation in 2005?

A. No, it's beyond one year, obviously.

Q. How was it relevant that in the Schaff paper they mentioned that there was limited follow-up available after one year, particularly when that data was collected in November of 2000, when the valves were still being implanted?

A. Yes, but the valves had been implanted since July 1998. That's when the AVERT study began. And that paper was published in 2002. You know, they had ample opportunity to update information.

Q. Is that relevant consideration for the 2005 data, that limited follow-up after one year?

A. It's the incompleteness of follow-up I think overall which is a concern. I mean, the reporting guidelines state that any paper reporting events after valve replacement should have a minimum of 95 percent completeness of follow-up. Here we've got a situation where in Dr. Grunkemeier's latest analysis there is only 85 percent completeness of follow-up. In fact, 82 percent amongst European centers.

Q. We can get back to that, Doctor. On your report, referring to page 5, you mention your own research, your own research work into the mechanisms of thromboembolism after heart valve replacement. Have you ever published any research concerning the mechanisms of thromboembolism, and I am distinguishing that from your clinical research. Have you ever published any research concerning the mechanisms of thromboembolism after valve replacement?

A. That is what I'm referring

Q. Isn't that what you did in CERFS, at the least in your report here?
A. Yeah. It was also what we did in the late review where there was much longer follow-up, and, in fact, the -- as I indicate in the report, as far as the mitrals and doubles are concerned, the rate did fall slightly, but not very much but in the aortic as such they went up slightly.
Q. And toward the bottom of that same page you've mentioned that you believe clinically significant differences may exist where statistical significant differences don't exist, correct?
A. Yes, correct.
Q. Is it your opinion that -- well, strike that. What is a clinically significant difference?
A. I think a clinically significant difference is one such as the one we found with these -- this very high stroke rate in the Silzone valves,

although, in fact, that was also statistically significant, but even if it had not been, that would have been a sufficient indication for us, as we did, to stop implanting Silzone valves. That's what I mean by clinically important difference. If you have got a small sample size, you may not be able to demonstrate clinical -- statistically significant difference rather, but an important difference can still exist.

Q. If that difference doesn't reach statistical significance is it scientifically a valid methodology to base causation determinations on those differences?

MR. COREN: Objection to form.

A. I think it's invalid. Can you rephrase -- I was put off by -- can you rephrase the question again?

MR. BICKHAM: Read that back, please.

- - -

(Whereupon, the pertinent
portion of the record was read.)

\- - -

A. I would say, yes, in certain circumstances.

Q. Well, in any comparison of two groups in a clinical trial there's a possibility that the observed differences between the two groups occurred just as a result of chance. Would you agree with that?

A. Yes.

Q. And would you agree that statistical significance is a tool that scientists use to evaluate the likelihood that the observed differences are the result of chance as opposed to a difference that's real or meaningful. Would you agree with that?

MR. COREN: Form, objection.
Go ahead.

A. Yes, I would agree with it, but we can discuss it a little bit further.

Q. Let me ask my next question then. If the differences between two groups in a clinical trial are not statistically significant, can the likelihood that those differences resulted because of chance be ruled out?

MR. COREN: Form, objection.

You can answer.

A. You kind of -- it's the way -- if I may say you are rephrasing your question in a rather difficult way, almost with double negatives. Can you rephrase the question?

Q. Well, if differences in a clinical trial failed to reach statistical significance, can you rule out the possibility that those differences occurred just as a result of chance?

MR. COREN: Form, objection.

A. I think you can rule it out, yes. If the sample size is not big enough in order to demonstrate that there

is a statistically significant difference. That's known as a type two error that the -- you failed to demonstrate a difference.

Q. Explain to me what a type two error is.

A. I'm just trying to find the correct words to describe that.

Basically, a type two error occurs where the very sample size is too small to allow the difference to be determined. The other point that I would make is that although P value of .05 is taken conventionally to be a test for statistical significance, that is purely an arbitrary figure. All it means is that the possibility that something could have occurred by chance is five percent. So if it's .06, it means that the possibility could have occurred by chance as six percent or ten percent. It still means that it was more likely to have occurred -- it means the corollary of that is 95 percent possibility or

probability that it didn't occur by chance, and it's entirely arbitrary. As I understand it it was something that was set by a statistician in the 1920s, and it's totally arbitrary.

Q. Well, the P value of .05 is the generally accepted standard in the scientific community, isn't it, Doctor?

A. A lot --

MR. COREN: Objection.

A. -- of journals now a days are actually rather than suggesting that a cut-off point of .05 is made, they are encouraging authors to actually state what the P value is and allow the reader to make the judgment. In other words, if it's .06, you can't simply say not statistically significant because it approaches the magic figure of .05 so closely. So when you're reporting it in your journal article, if you write P equals .06, that allows the reader to make a judgment.

Q. But my question was, is the

P value of .05 the generally accepted standard in the scientific community?

MR. COREN: Form, objection.

A. I'm making the point that that is being questioned nowadays, and a lot of journals are suggesting just what I've said, that the P value, the actual P value is recorded and allow the reader to make the judgment.

Q. Is it still the standard, though?

MR. COREN: Form, objection.

A. I'm saying that I think the standard has changed or is changing.

Q. Which is it? Has it changed or is it changing?

A. It's changing.

Q. So it hasn't changed yet from .05?

MR. COREN: Form, objection.

A. Well, I have just -- I don't want to repeat myself, but I think it is changing in that many journals now, as I've said, say that the absolute P value

should be recorded.

MR. COREN: Dave, when you get to a logical break.

MR. BICKHAM: Just a few more minutes here and we'll take a break.

MR. COREN: I'm not saying now.

MR. BICKHAM: Certainly.

Q. In making causation determinations, would the P value of .05 be the standard?

MR. COREN: Form, objection.

A. I don't think, you know, causation comes into it. As far as I understand it causation in legal terms means probability.

Q. Have you ever published an article in which you have ascribed clinical significance to results that did not reach statistical significance?

A. I don't recall that I have. But I think this, you know, this particular case of Silzone is a rather

placement) and so patients who have now had Silzone valve implanted for several years may not be at higher risk." Do you still agree with that statement?

A. No.

Q. And why is that?

A. Because since writing this paper, of course, we've had the opportunity to bring back these patients for what we've called the late review, and it looks as though the problem has gone away, much as we'd hoped it might have done.

Q. Have you published that revision of your assessment of the data anywhere?

A. It's been published as an abstract, and that's referred in the report.

Q. Where is that reference?

A. Reference number 19.

Q. "Risk scoring predicts patients at higher risk of thromboembolic complications after valve replacement."

A. Yes.

Q. And that has a publication date of 2005.

A. Yes.

Q. So it's -- I thought you said it's being published as a --

A. No, it has been published.

Q. Oh, it has been.

A. Published only in abstract form.

Q. Was that presented anywhere?

A. It was presented at a world Congress of heart disease meeting in Vancouver in the form of a poster. Basically, the same information that's included in this report, actually.

MR. COREN: I think we've been gone for over an hour and a half now. Why don't we take a quick break now.

(Short recess was then taken.)

BY MR. BICKHAM:

Q. Dr. Butchart, I've got a

involved in the CERF study for your
Cardiff Late Review?

A. That's right.

Q. But you have had an opportunity to analyze the standard valve recipients for the data collected back in 2001, 2002 for the CERF study publication, correct?

A. Correct.

Q. Wouldn't that be a better comparison than a literature average, the actual controls that you used in the publication, and it's exhibit number?

A. I'm not just comparing our own data. I'm comparing the AVERT data to the literature average. And I'm comparing the top account study to the literature average. That's why I've used that for consistency.

Q. And is it your opinion that the literature average is a better comparator than the data from the standard valve in the CERF study?

A. Well, it represents a much

larger patient population, obviously.
It's -- it's what, you know, most people would expect from the standard St. Jude valve.

Q. Is it a better comparator, more reliable comparator in examining causation to use literature average than the data from the control group in the CERF study?

A. Well, we did use data from the control group in reporting our experience in Heart, as we've already discussed. Our concern was to reiterate the problem. Our concern was with a very high rate of stroke in the mitral patients. And so, you know, unbelievably high, and so out of our experience with previous prosthetic valves we felt that this was important.

Q. You're not conveying just the stroke rate here, though, are you, Doctor?

A. No.

Q. So, my question is and in

A. Yeah.
Q. Was there any specific event, any data collection, anything at all, that led to the Cardiff Late Review in light of the fact that when that data was published in 2003, it didn't look like to you that there was a long-term risk, at least not for certain?
A. We felt it was important to make sure, you know, what was happening to these patients, really. In that they had received a defective prosthesis. They had all been having reviews by their individual cardiologists, but they had not a structured review of this nature, and they had not had transesophageal echo or cinefluoroscopy performed in any structured way. We felt we owed a duty to those patients to do that.
Q. Had you received any information that those patients were experiencing thromboembolic complications at an unusual rate?
A. Well, you can't determine

there at all, actually.

Q. Is the TEB index that you proposed generally accepted and used in the medical and scientific communities to evaluate thrombogenicity of mechanical valves?

A. Let's get it clear. I did not propose this. Okay. This was proposed by other authors, not by me. The reason I raised it in my report was because of the very high rate of bleeding amongst Silzone patients in the AVERT study. Otherwise, I wouldn't have even mentioned it. But, it is very striking when you combine these events, there's a huge difference between Silzone and the standard valve, and indeed in Gary Grunkemeier's most recent publication he confirms that that is indeed significant.

Q. But is that TEB index generally accepted and used in the medical and scientific communities to evaluate the thrombogenicity of mechanical valves?

# Exhibit 42

**Chase, Tim J**

**From:** Gove, Peter L
**Sent:** Tuesday, August 10, 1999 4:20 PM
**To:** Chase, Tim J
**Cc:** Healy, Steven J; Shepherd, Terry L
**Subject:** Silzone and the U.K.

**Importance:** High
**Sensitivity:** Confidential

Tim, in order for me to prepare a communications contingency plan for relevant internal and external (UK, Europe, US media and financial community, etc) audiences assuming the MDA sends a letter to UK physicians on the allegations on Silzone complications, I need the following materials from you and your colleagues at your earliest convenience:

- a complete chronological file of communications between SJM and the UK MDA and US FDA on this topic (the two documents you have provided me I believe are only a small part of this interaction) left message c Gutik, Flory
- any written materials authored by Dr. Bouchard on this situation ~~[illegible]~~ \ abstract
- a bio of the physician email sent to Fiona
- any documentation we have on his relationship with other heart valve suppliers email to Fiona
- names, titles and locations of UK and international HVD KOL's who can respond to these allegations, if a letter from the MDA is distributed email
- a summary narrative in non-technical language of what is being alleged regarding Silzone by this physician, how Silzone works and why we do not believe his concerns cannot be substantiated
- a summary of what we believe are the main messages in the current draft of the MDA letter on Silzone
- a recommendation of the HVD or SJME employees in Europe who are in the best position to respond to customer or media inquiries if this letter is issued
- a timeline hereforward on this topic: status of SJM communications with MDA, planned or expected meetings, process [as you understand it] that the MDA is using to reach a final decision on whether to issue this letter, including your assessment of the earliest date the letter might go out, and, if it does, how quickly it will be available to other global regulatory authorities. left message c Gutik, Flory

Tim, as I am sure you and your colleagues appreciate, if the MDA sends this letter we will need to immediately inform various Company stakeholders on this matter, be prepared for inquiries from other regulatory agencies, investors and the media in the UK and US, and appropriately prepare spokespersons. In fact, we will need a proactive, coordinated plan in place ahead of the release of such a letter -- which is what I am prepared to develop with the assistance of a qualified PR agency in the UK that has already been briefed on this situation by UK management.

The UK media environment today for such a communication from the government (MDA) is volatile for SJM, given recent reports on allegations of SJM pacemaker quality issues, and, one unique characteristic of the UK media - - the tabloid press. The tabloids are aggressive, competitive and unsympathetic to concerns of U.S. manufacturers. All they need is a concerned or aggrieved patient, physician or government official about a potential medical technology quality challenge and things can go negative for our Company in the UK very quickly. While the UK has a very strong libel law, it only works to our advantage is there is a factual misstatement by the publication.

I know the HVD is making every effort to resolve the concerns of the MDA and eliminate the need for a letter to be sent to physicians. That is certainly the result we all desire. However, we must be prepared to defend the image and reputation of St. Jude Medical in the UK and other geographies if the UK regulatory authorities choose to issue a letter advising of a potential quality problem with the gold standard mechanical heart valve, regardless of the motives, data (or industry relations) of one physician.

Tim, if you could arrange a meeting with Don, Al and yourself this week on this subject to provide me this information, I would appreciate it, as I will be out of the office the week of August 16. Thank you.



CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Exhibit 43

ST. JUDE MEDICAL CONFIDENTIAL

To: **Tim Chase, George Fazio, Al Flory, Don Guzik, Steve Healy, Monica Schultz, Dave Stronach**

From: **Roy Hosek**

Copy: **Lise Bisson, Louann Carpenter, Dickey Franssen-Brader, Tina King**

Date: **29 April, 1999**

Subject: **HOPITAL LAVAL SILZONE ISSUE - TRIP REPORT**

---

Lise and I discussed the Silzone issue/rumors with the entire contingent of surgeons and nurse study coordinators at Hopital Laval in Quebec City on Thursday morning, April 29. The tone of the meeting was very congenial.

**Hopital Laval has had two adverse cases involving Silzone cuffed valves:**

1. A Silzone mitral valve was explanted due to suspected endocarditis. However, pre-operative and intra-operative blood and tissue cultures were negative, and the patient was afebrile. The valve was found to be partially dehisced along approximately one-third of the annulus. Dr. Doyle stated that it looked like the annulus had been enzymatically digested.
2. Another Silzone mitral valve required reoperation after the patient experienced CVA's. During surgery, the valve was found to have good tissue ingrowth, but had definite loose strands of fibrin on the sewing cuff region. These fibrin projections were removed, and the valve was left in place.

Dr. Cartier (the Chief) questioned whether one or both of these cases could have been caused by allergies to silver.

**Rumors from Toronto General have compounded their concern:**

1. They were under the impression that there were 18 cases reported by that center, all in the mitral position.
2. All had heard of the excessive pannus overgrowth reported by Dr. Butany – that was their primary concern (as opposed to endocarditis).

I indicated that the rumor of the number of cases reported by TG was exaggerated, that their reports were spread between mitral and aortic positions, and that the pannus cases proved to be non-Silzone valves. However, I suggested that it would be best if they heard the details of the cases directly from Dr. David surgeon-to-surgeon, at which point we invited the Hopital Laval surgeons to the proposed May 20 "Silzone Summit" in Toronto.

**Possible scenarios:**

We discussed several possible scenarios for what we are hearing reported with the Silzone valves (as per pre-meeting recommendations from Monica) – a. actual problems with the Silzone cuff, b. patient selection biases, and c. observational biases.

I told the group that to date we do not sense an actual problem with the Silzone technology based upon:

- our FER history after 26,000 implants being similar to what we have seen with uncoated mechanical valve patients.
- the AVERT results to date on over 600 implants. Also discussed the AVERT study in detail, including the DSMB review and their recommendation to continue the trial.
- the preliminary follow-up results on patients with the longest implant durations (from Switzerland, Holland, and London, Ontario).

I suggested that patient selection biases are likely occurring because in most geographies the valve is sold at a premium, and some centers are reserving it for active endocarditis patients. Then discussed some of Barb Illingworth's work in an attempt to decrease expectations – to show that a 50% reduction will be very successful, and that the chance for this success is much greater for prophylactic implants compared to active infection cases. Last, we briefly discussed how difficult observational biases would be to quantify.

**Outcomes:**

1. We sense we were successful in showing SJM corporate interest in their concerns. However, they remain skeptical about the cuff pending further data review. **They will stop implanting Silzone cuffs, including the Regent valve, until they are convinced of its safety.**
2. Though the weekday scheduling was not favorably received, it is very likely that at least one surgeon from Hopital Laval will attend the Toronto meeting on May 20.
3. The two cases in question will be entered into our FER system through the help of Denise Johnson. Dr. Cartier thinks the explanted valve is still available for analysis. He is not sure whether histopath has been done on that valve ("dissolved" annulus) or on the strands removed from the other case. He will make sure we receive all pertinent data.
4. **The best news – Dr. Cartier specifically said Hopital Laval was very happy with the results obtained with the St. Jude valve *before* the Silzone technology, and would go back to using our uncoated valves as their exclusive mechanical option. He also said the Silzone technology concept and initial lab results look interesting, and did not in any way rule out a reversal back to use of the Silzone cuff pending more data. Lise has a very solid relationship built at this center, which does not appear to be compromised by their current concerns.**

Let me know if you have questions on any of the above as we plan for the May 20 meeting. Thanks.

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Exhibit 44

**ST. JUDE MEDICAL**
HEART VALVE DIVISION

**DATE:** June 18, 1998

**TO:** Terry Shepherd, Terrie Ajamil, Darrin Bergman, Bob Elgin, Al Flory, Don Guzik, Bill Mirsch, Paul Vetter, Jan Webster

**FROM:** Steve Healy SJH

**SUBJECT:** **Mr. Butchart's Study**

Attached is a summary of Butchart's work that Monica Schultz has written up. As you can see, it is a very in-depth study which hopefully will be able to highlight improved healing responses and therefore, reduced embolic risk for the Silzone™ patients.

This issue came up in staff last week and since we won't be together for a few weeks, I thought I would send out a copy.

SJH/nk

attachment

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

# Exhibit 45

IN CONFIDENCE

TO: Mr. J. Dussek

FROM: A. Flory

DATE: November 8, 1999

SUBJECT: SOCIETY CASE REVIEW AND MDA FOLLOW-UP PLANS

Dear Mr. Dussek:

Thank you again for providing a copy of Professor Taylor's Executive Summary, and for discussing it with us earlier this afternoon. As I mentioned on the phone, we have several questions, which we hope can be addressed before MDA takes any action based upon the Summary. These are provided below.

**1. Is it appropriate for the MDA to take action without first reviewing Professor Taylor and Dr. Omar's complete report?**

As you mentioned during our conversation, Professor Tayor is preparing a complete report that will provide greater detail concerning the cases at Cardiff. We assume that this will also identify other factors that may have contributed to the thromboembolic events, the timing of the events, etc. We feel that acting upon the investigation findings is inappropriate until both the MDA and St. Jude Medical have an opportunity to review and comment on the complete report.

I have attached a fax message from Ms. Hazel Randall which indicates that MDA is preparing to distribute an advisory notice to all U.K. hospitals within the next few days. This notice is based, in large part, on the Executive Summary. As you are aware, the Executive Summary concluded that follow-up on the Cardiff cases was "incomplete" and the results should be "interpreted with caution". We feel that MDA's proposed action is not justified based upon Professor Taylor's conclusion.

The MDA's proposal seems particularly irresponsible in light of the fact that the Cardiff findings are inconsistent with the current results from an ongoing international, multicenter, randomized trial of Silzone versus conventional St. Jude Medical mechanical heart valves (i.e. the AVERT trial). This trial now has over 700 patients randomized, with over 500 beyond their scheduled three month follow-up, and several patients with follow-up beyond one year. The current study results, together with the Cardiff cases, and updates on all other relevant clinical study reports were reviewed as recently as November 1, 1999 by an independent Data Safety Monitoring board. The board concluded that no safety issues existed, and patient enrollment in the AVERT trial should continue.

CONFIDENTIAL OR PROPRIETARY-SUBJECT TO PROTECTIVE ORDER

**2. Is it appropriate for the Society to review all available clinical information on the Silzone valve and make a recommendation to MDA prior to any action by the agency?**

As mentioned above, there is a significant amount of relevant clinical information beyond the Cardiff cases. St. Jude Medical would be very willing to provide this information to the Society, as we have to the MDA.

**3. Will the Society review and comment on any communication notice distributed by MDA?**

Since the MDA action is based upon the conclusions from Professor Taylor's summary, it seems appropriate that the Society should have the opportunity to review the proposed notice. The Society is in an optimal position to determine if the notice would unnecessarily alarm physician and patients.

We appreciate all of the Society's efforts and thank you, Professor Taylor, and Dr. Omar for your continued interest and understanding.

Sincerely,

Alan F. Flory, DVM

Alan Flory, D.V.M.
Vice President, Clinical and Regulatory Affairs