UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE ST. JUDE MEDICAL, INC. SILZONE® HEART VALVES PRODUCTS LIABILITY LITIGATION | MDL No. 1396 (JRT/FLN) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ST. JUDE MEDICAL, INC.'S MOTION TO STRIKE CLASS ALLEGATIONS IN PLAINTIFFS' SECOND RENEWED MOTION FOR CLASS CERTIFICATION**

## I. INTRODUCTION

Plaintiffs have filed a second renewed class certification motion urging this Court to certify a class of uninjured Silzone valve recipients with no manifest injuries from forty-five states. They assert liability under Minnesota's consumer protection statutes on the basis of "omissions" St. Jude Medical supposedly made regarding the Silzone valve's safety and efficacy. Plaintiffs contend that because this putative class stakes it claim on "omissions" and not "misrepresentations," the prior appellate proceedings and holdings rejecting their consumer protection class are irrelevant. Plaintiffs are wrong as a matter of law. This Court should strike plaintiffs' class allegations and end any further attempts to pursue a class action in this matter.

A district court may strike class allegations if those allegations reveal that class certification is prima facie improper. Striking class allegations is particularly appropriate where, as here, an appellate court already has rejected the plaintiffs' class certification theories or where the plaintiffs offer no new law or change in facts that would warrant revisiting that ruling. Under those circumstances, striking class allegations promotes the

important goals of giving finality to appellate opinions and securing a "just, speedy, and inexpensive" resolution of civil disputes.

Plaintiffs' second renewed motion is a poster child for when class allegations should be stricken.

First, plaintiffs' purported "omissions" versus "misrepresentations" distinction changes nothing on the issue of class certification. On the contrary, Minnesota's consumer protection statutes require a causal nexus *whether the defendant's alleged conduct is a misrepresentation or an omission*. As the Eighth Circuit already has held, moreover, the diversity of proof on this causal nexus requirement forecloses any attempt at class certification because of the way these Silzone valves were sold. Thus, although plaintiffs couch their "second renewed" class as one based on "omissions," there is no actual difference between omissions and misrepresentations for purposes of evaluating whether their alleged class is certifiable. The issue is the same, the Eighth Circuit's opinion is law of the case, and plaintiffs' class allegations should be stricken on this basis alone.

Second, Minnesota's consumer protection statutes also do not, as a matter of law, support the putative class members' claims. Minnesota's consumer protection statutes require plaintiffs to plead and prove they suffered a manifest injury as a result of St. Jude Medical's alleged conduct. According to the class definition, however, this putative class includes only those who have suffered no manifest injuries. No claim under Minnesota's statutes thus is possible and plaintiffs' class allegations should be stricken for this reason as well.

Third, plaintiffs cannot demonstrate any new facts or intervening change in the law that conceivably could prompt a revisiting of the Eighth Circuit's class certification ruling. The putative class members are the same: Silzone heart valve implantees with no manifest injury. The alleged facts are the same, though plaintiffs now call them "omissions" rather than "misrepresentations." Minnesota's consumer protection statutes and its causation burden are unchanged and have never been in genuine dispute. Finally, the recent RICO decision from the United States Supreme Court plaintiffs cite is irrelevant to the state law causation requirement involved here. To the extent the RICO decision offers any guidance, a fair reading reinforces the causal nexus requirement for these cases.

In sum, the parties and this Court already have spent years and significant resources to adjudicate the class certification issues to finality. Plaintiffs raise nothing new here and the fate of plaintiffs' class allegations has been conclusively determined. The further expenditure of time and money on these infirm allegations should stop now. The Court should strike the renewed class certification allegations and summarily bring the latest attempt to certify a class in these proceedings to a close.

## II. FACTUAL BACKGROUND

### A. In 2004, The Court Certifies Two Classes Under Minnesota's Consumer Protection Statutes; The Eighth Circuit Reverses.

In March 2003, the Court certified nationwide classes seeking damages for personal injury and medical monitoring, applying the law of the fifty states to the personal injury class, and alternatively certified both classes under Minnesota Consumer

Protection Statutes. (Memorandum Opinion and Order On Class Certification, March 27, 2003, at 20-21, attached as Exh. 3 to Affidavit of Bradley J. Betlach ("Betlach Aff.")) After further briefing, however, the Court decertified the personal injury class on the grounds that legal and factual differences among the class members made the personal injury class untenable. (Opinion and Order On Subclass Certification, January 5, 2004, at 6-7, attached as Exh. 4 to Betlach Aff.) The Court then certified an additional class of uninjured Silzone implantees from seventeen states whose laws the Court believed permitted medical monitoring. Thus, in 2004, the Court certified (1) a nationwide class based on Minnesota's consumer protection statutes, and (2) a 17-state medical monitoring subclass. (Order, July 15, 2004, at 12-14, attached as Exh. 5 to Betlach Aff.).

The Eighth Circuit reversed certification of both classes. *In re St. Jude Medical, Inc., Silzone Heart Valve Prods. Liab. Litig.*, 425 F.3d 1116 (8th Cir. 2005) (*In re Silzone I*). As for the nationwide consumer protection class, the Eighth Circuit found the Court erred in not conducting an "individualized choice-of law analysis . . . to each plaintiff's claim." *Id*. at 1119-21. The Eighth Circuit also rejected the seventeen-state medical monitoring class on the ground that each claimant's need for medical monitoring was "highly individualized"—a class member-by-class member factual inquiry that rendered the claim unsuitable for class treatment no matter which state's law was considered. *Id.* at 1121-23.

### B. Plaintiffs File Their First Renewed Motion For Class Certification Under Minnesota's Consumer Protection Statutes; The Eighth Circuit Reverses Class Certification.

In 2006, following remand, plaintiffs renewed their motion for class certification. (Plaintiffs' Memorandum in Support of Renewed Motion to Certify Consumer Protection Class, January 10, 2006, attached as Exh. 13 to Betlach Aff.) They proposed a class "of all Silzone prosthetic heart valve patients in the United States who have not undergone an explant of their Silzone valve or developed a manifest and diagnosed injury from their Silzone implant of degree or severity that would permit individual personal injury law suits to be commenced in their State of residence." (*Id.* at 1) Plaintiffs' class brought its claims under Minnesota's consumer protection statutes. (*Id.* at 5-13) Plaintiffs continued to allege that St. Jude Medical had misrepresented certain information by way of false statements and omissions regarding the Silzone valve's safety and efficacy during the marketing, approval, and product surveillance processes. (*Id.*) These misrepresentations fell in a variety of categories, including:

Safety information from the first Silzone animal study, "including the fact that one of only five animals implanted with such a valve died after suffering a paravalvular leak (resulting from a dehiscence) and a clot that limited critical movement of a valve leaflet (*Id.* at 5);

"Excessive tissue growth and clotting that had interfered with valve functioning in one of only 6 sheep implanted with Silzone valves in SJM's second, longer term (ten-week) animal study of the Silzone valve;" (*Id.* at 6)



ND: 4829-9599-2578

"From another Silzone study, the existence of a substantially elevated incidence of paravalvular leaks in sheep implanted with the Silzone-coated Epic valves, some of which were severe and one of which proved fatal;" (*Id.*)

"An increased incidence of paravalvular leak in sheep implanted with Silzone-coated Regent valves;" (*Id.*)

"Important scientific literature documenting potential hazards of SJM's proposed use of silver for long-term use as an integral part of the Silzone coating on a mechanical heart valve sewing cuff;" (*Id.*)

"Multiple findings from standard laboratory tests that Silzone caused hemolysis or the destruction of red blood cells, a potentially life-threatening condition;" (*Id.*) and

"Test results evidencing massive total silver losses averaging 22 percent from the sewing cuffs of Silzone valves implanted during a ten-week sheep study, with one sewing cuff losing 45 percent of its Silzone coating over that relatively short period." (Id.)

St. Jude Medical responded, as it had from the outset, that the class failed to satisfy Rule 23's basic requirements. (St. Jude Medical, Inc.'s Opposition to Plaintiffs' Renewed Motion to Certify Consumer Protection Class, March 13, 2006, attached as Exh. 14 to Betlach Aff.) Because of the manner in which the heart valves were sold, plaintiffs' burden of proof under Minnesota's statutory scheme would generate multiple individualized factual inquiries unsuitable for resolution in a classwide trial. (*Id.* at 42-48) The Court nevertheless certified the class. (Memorandum Opinion and Order on Plaintiffs' Renewed Motion for Class Certification, October 13, 2006, at 3-4, attached as Exh. 17 to Betlach Aff.)

St. Jude Medical petitioned the Eighth Circuit for Rule 23(f) relief. (St. Jude Medical, Inc.'s Petition under Federal Rule of Civil Procedure 23(f) for Permission to Appeal a Class Certification Order, October 26, 2007, attached as Exh. 18 to Betlach Aff.) St. Jude Medical explained that Minnesota's consumer protection statutes required a causal nexus between a defendant's conduct and a plaintiff's injuries, citing the Minnesota Supreme Court's decision in *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13-14 (Minn. 2001). (Appellant's Opening Brief, January 22, 2007, at 50-53, attached as Exh. 21 to Betlach Aff.) The company also contended there was no uniformity of proof in these cases regarding the causal nexus requirement, relying on the undisputed record evidence showing that (1) physicians and patients each received different types and amounts of information about the Silzone products, from different sources, and (2) the decision to implant the Silzone valve depended on a number of individual patient factors. (*Id.*) The predominance of these individualized causation issues thus precluded class certification just as they had in the Eighth Circuit's prior opinion dealing with the medical monitoring subclass.

As before, the Eighth Circuit agreed with St. Jude Medical. It reversed certification, holding the class failed Rule 23(b)(3)'s requirement that common questions predominate. *In re St. Jude Medical, Inc., Silzone Heart Valve Prods. Liab. Litig.*, 522 F.3d 836 (8th Cir. 2008) (*In re Silzone II*). In reaching this conclusion, the Court recognized that *Group Health* required a plaintiff to show a "causal nexus" between the alleged misrepresentations and his or her injuries under Minnesota's consumer protection statutes. *Id.* Although the Eighth Circuit observed that this requirement was not always a

strict one, it nevertheless found that "causation is still a necessary element of a damages action under the consumer fraud statutes, and proof of a reliance component is still required." *Id.*

The Eighth Circuit then discussed and analyzed the importance of the burden of proof under Minnesota's consumer protection statutes to its class certification holding. *Id*. On this point, *Group Health* established that although the consumer protection statutes relaxed common-law causation requirements, it by no means abrogated them. 621 N.W.2d at 13. A consumer protection plaintiff still had to establish a "causal nexus" between a defendant's alleged misconduct and a plaintiff's damages. *Id.* While he or she need not present direct evidence of causation, "the causal nexus and its reliance component" still had to be established through other evidence. *Id.* Thus, "as a practical matter," a consumer protection plaintiff could not prevail without some proof of "reliance on the statements or conduct alleged to violate the [consumer protection] statutes." *Id.* State and federal decisions after *Group Health* have reinforced this view. *See Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 927 (8th Cir. 2004) (plaintiff must "establish some proof that the [defendant's conduct] caused consumers to continue using smokeless tobacco and to sustain physical injury in reliance on the defendants' conduct"); *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 351 (Minn. Ct. App. 2001) (plaintiff must "at least present some circumstantial evidence of some reliance on respondents' alleged misrepresentations").

Applying this reasoning to the circumstances of the class members' claims, the Eighth Circuit observed that the putative class members and their physicians received a

wide range of information from different sources about the heart valve. *In re Silzone II*, 522 F.3d at 839. As a result, resolution of the class members' consumer protection claims, no matter the relief sought, inevitably "would require physician-by-physician inquiries into each doctor's sources of information about the valve, and the credibility of any physician's denial that he relied on St. Jude's statements." *Id.* The Eighth Circuit also acknowledged that in contesting liability, St. Jude Medical could "present evidence concerning the reliance or non-reliance of individual physicians and patients on representations"—which meant that "resolution of St. Jude's potential liability to each plaintiff under the consumer fraud statutes will be dominated by individual issues of causation and reliance." *Id.* at 840. The Court drew no distinction between misrepresentations or omissions as far as its causation analysis was concerned and nowhere said—or even suggested—that the analysis or result would differ if omissions were alleged. *See id.* at 839-40. Rather, because of the manner in which the valves were sold, class certification was foreclosed. *See id.*

To remove any doubt on the issue, the Eighth Circuit also addressed the possibility that plaintiffs might move for certification of discrete issues under Rule 23(c)(4). *Id.* at 842. The Eighth Circuit cautioned that even when issue certification might be appropriate, courts refuse to "certify such classes where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation." *Id.* In light of those concerns, the Court forecast that individual issues in this litigation rendered it unsuitable for issue certification: "Given the individual issues necessarily involved in determining liability and the requested relief

of medical monitoring and damages, we think it is clear that the common issues do not predominate over individual issues that must be litigated to resolve the plaintiffs' claims." *Id.*

### C. Plaintiffs File This Second Renewed Class Certification Motion, Seeking Certification Of A Class Of Silzone Valve Recipients With No Manifest Injury Under Minnesota's Consumer Protection Statutes, Based On St. Jude Medical's Purported Omissions.

For their "renewed" motion, plaintiffs' class definition remains the same as the one previously rejected on appeal, except it excludes putative plaintiffs from five states:

> All Silzone prosthetic heart valve patients in the United States, except for those living in the states of Indiana, Rhode Island, Virginia, Wisconsin, or Wyoming, who have neither had their Silzone valve explanted nor have developed a manifest and diagnosed injury from the Silzone implant of a degree or severity that would permit him or her to bring an individual personal injury lawsuit in his or her state of residence. [Plaintiffs' Second Renewed Motion to Certify Consumer Protection Class]

As before, plaintiffs seek unspecified monetary damages and assert liability on the basis of St. Jude Medical's marketing, approval, and surveillance of the Silzone valve. To support their liability claim, plaintiffs allege that St. Jude Medical purportedly failed to disclose three categories of information: (1) results from in-vitro and in-vivo testing that St. Jude Medical conducted during the pre-market approval process; (2) post-market surveillance that uncovered adverse events; and (3) various study results and clinical findings that implanting surgeons reported to St. Jude Medical. (Memorandum in Support of Plaintiffs' Second Renewed Motion to Certify Consumer Protection Class at 2-4)

Not only are these categories the same as those in plaintiffs' earlier motion, but the alleged "omissions" are nearly the same as—if not identical to—the "misrepresentations" plaintiffs asserted before. For instance, as in their earlier class certification motion, plaintiffs alleged that St. Jude Medical made omissions regarding:

- The results of both the long term and short term animal studies; (*Id.* at 2)
- "The existence of substantially elevated incidence of paravalvular leaks in the Silzone-coated Epic Valve Study;" (*Id.* at 3)
- "In connection with the Regent Valve study, an unexpectedly high incidence of paravalvular leaks in the sheep implanted;" (*Id.*)
- "Important scientific literature documenting potential hazards of using silver for long-term use as an integral part of Silzone coating;" (*Id.*)
- "Hemolysis testing results from testing that St. Jude Medical sponsored which established that the Silzone coating caused excessive destruction of red blood cells, a potentially harmful condition;" (*Id.*) and
- "The occurrence of massive silver losses averaging 22 percent from the sewing cuffs on Silzone valves implanted during a ten week sheep study and the loss of 45 percent of the Silzone coating with respect to one sewing cuff over a relatively short study period." (*Id.*)

As this litany reveals, nothing has changed since plaintiffs' first class certification motion—not the law, not the allegations, and certainly not the result. Their proposed class is no different from the one the Eighth Circuit rejected because it too will

necessarily require (1) "physician-by-physician inquiries into each doctor's sources of information about the valve" with respect to liability and (2) "individual determinations concerning the extent to which particular plaintiffs have suffered injuries caused by the Silzone valve." St. Jude Medical thus moves to strike the class allegations as advanced in plaintiffs' second renewed class certification motion.

## III. LEGAL ANALYSIS

### A. The Court May Summarily Dismiss Class Allegations That Provide No Basis For Certification.

Federal Rule of Civil Procedure 23(d)(1)(D) [formerly Rule 23(d)(4)] authorizes a federal court to strike class allegations where class certification is clearly inappropriate on the face of those allegations. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 184 n.6 (1974) ("Under Rule 23(d)(4), the District Court may in some instances require that pleadings be amended to eliminate class allegations."); *In re Old Kent Mortgage Co. Yield Spread Premium Litig.*, 191 F.R.D. 155, 163-64 (D. Minn. 2000) (striking class allegations on the basis of district court's prior rulings rejecting legal basis for proposed class); *Bishop v. U.S. Steel*, 76 F.R.D. 400, 401 (E.D. Mo. 1977) (striking class allegations that failed Rule 23 on their face); *see also Rowe v. Morgan Stanley Dean Witter*, 191 F.R.D. 398, 419 (D.N.J. 1999) (dismissing class allegations where plaintiffs would not succeed on the merits). Recent caselaw recognizes that Rule 23(d)(1)(D) permits district courts to "strike class allegations . . . where a complaint fails to plead the minimum facts necessary to establish the existence of a class satisfying Rule 23's mandate[,]" even where little or no discovery has been conducted. *See Henry v. Allstate*

*Ins. Co.*, No. 07-1738, 2007 WL 2287817, at *2 (E.D. La. Aug. 8, 2007); *see also Terrebonne v. Allstate Ins. Co.*, No. 06-4697, 2007 WL 5298458, at *1 (E.D. La. July 31, 2007).

In the same vein, Rule 15(a) does not permit plaintiffs to amend their pleadings carte blanche. The court acts well within its discretion to deny leave to amend where the proposed amendments still do not state a valid claim for relief or where a party has had sufficient opportunity to state a claim and fails to do so. *Doe v. Cassel*, 403 F.3d 986, 990 (8th Cir. 2005) (district court did not abuse its discretion in denying leave to amend a fourth time); *see also United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 739 (7th Cir. 2007) ("[A] district court properly exercises its discretion in dismissing the case when the plaintiff continually fails to provide a valid pleading in compliance with the federal rules."); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1322-23 (7th Cir. 1998) (plaintiff had "three chances over the course of three years to state a claim and the district judge was not required to give her another chance").

Here, the class allegations in plaintiffs' second renewed class certification motion are at war with controlling law, including the Eighth Circuit's previous decision rejecting class certification under Minnesota's consumer protection statutes, and do not state a valid claim for classwide adjudication. The Court therefore should summarily dismiss the allegations, either by striking them under Rule 23(d) or denying plaintiffs leave to amend their class allegations under Rule 15(a).

### B. The Court Should Strike Plaintiffs' Proposed Class Allegations Under Rule 23(d).

#### 1. The Law Of The Case Doctrine Bars Plaintiffs' Redundant Class Allegations.

A primary thrust of plaintiffs' second renewed class certification is that the Eighth Circuit's opinion does not apply because they rely on "omissions" as a basis for class relief, rather than affirmative misrepresentations. There is, however, no ambiguity in what the Eighth Circuit did or why, and its holding applies with equal force whether plaintiffs allege omissions or misrepresentations.

Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988) (quotation omitted). Thus, when an appellate court reverses and remands for further consistent proceedings, the district court must determine the remaining issues "pursuant to the legal principles enunciated in the appellate court's opinion." *Republican Party v. White*, 416 F.3d 738, 746 (8th Cir. 2005); *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 784-85 (8th Cir. 1996) ("[A] district court is bound by [an appellate court's] decree and must carry it into execution according to the mandate"). The district court must implement "both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces[,]" including opinions rejecting class certification. *Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Coops., Inc.*, 896 F. Supp. 912, 914 (E.D. Ark. 1995); *see also Friedman v. Market Street Mortgage Corp.*, 520 F.3d 1289, 1294 (11th Cir. 2008) ("The law of the case doctrine and the mandate rule 'appl[y] to all issues

decided expressly or by necessary implication.'" (citation omitted)); *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, No. 93 C 7452, MDL 986, 2005 WL 497782, at *3, *10 (N.D. Ill. Mar. 1, 2005) (denying class certification because it violated Seventh Circuit's published opinion rejecting certification of earlier class in same case).

The Eighth Circuit's most recent class certification opinion is unequivocal: Minnesota's consumer protection statutes require a "causal nexus" between a defendant's conduct and a plaintiff's injuries. *In Re Silzone II*, 522 F.3d. at 837-39 (rejecting plaintiffs' argument that Minnesota consumer protection statutes did not require reliance). This requirement doomed plaintiffs' class certification motion because it necessarily required individualized inquiries regarding the statements St. Jude Medical made—or didn't make—to physicians about the Silzone valve and what, if any, effect those statements had on the physicians' decision to implant it. *Id.* at 839 ("Whether the information on which physicians based their actions ultimately can be traced to a representation by St. Jude undoubtedly will vary by individual physician."). The same would be true for information received by patients, if any. *Id.* As the Court put it, liability under Minnesota's consumer protection statutes hinged largely on whether St. Jude Medical could "present evidence concerning the reliance or non-reliance of individual physicians and patients on representations," meaning that "resolution of St. Jude's potential liability to each plaintiff under the consumer fraud statutes will be dominated by individual issues of causation and reliance." *Id.*

The Court went on to foreclose any possible certification of issues under Rule 23(c)(4). *Id*. at 841. In so doing, the Eighth Circuit again emphasized the predominance

of individual questions regarding liability and damages, which meant that even limited class certification "would do little to increase the efficiency of the litigation." *Id.* It drew no distinction—nor did plaintiffs attempt to make any—regarding the causal nexus requirement's application to misrepresentations or omissions.

The Eighth Circuit's decision is law of the case and is firmly grounded in Minnesota law. Under *Group Health* and the cases that follow it, plaintiffs must establish a causal nexus between a defendant's alleged misconduct and a plaintiff's injuries or damages. *Group Health*, 621 N.W.2d at 13; *see also Tuttle*, 377 F.3d at 927; *Flynn*, 627 N.W.2d at 351. While proof of causation need not be direct, "proof of a reliance component is still required." *In re Silzone II*, 522 F.3d at 839 (citing *Group Health*). Thus, "as a practical matter it is not possible that the damages could be caused by a violation without reliance on the statements or conduct alleged to violate the statutes." *Group Health*, 621 N.W.2d at 13.

Moreover, the *Group Health* standard applies in cases alleging culpable omissions. In *Flynn—cited and relied on by the Eighth Circuit in In re Silzone II*—the plaintiff alleged the defendant had "withheld from the FDA information" that the drug Pondimin caused serious health problems such as pulmonary hypertension and valvular heart disease. 627 N.W.2d at 345. The *Flynn* Court recognized that under *Group Health,* the plaintiff had to present "evidence of some reliance" on the defendants' misconduct to prevail under Minnesota's consumer protection statutes. But because the plaintiff presented "no evidence that either she or her physicians relied on the [representations], *or the absence of representations made by [the defendants] concerning Pondimin*" during



ND: 4829-9599-2578

the course of the plaintiff's treatment, the *Flynn* court affirmed summary judgment on the ground that the plaintiffs failed to raise a triable issue of fact regarding causation. *Id.* at 352 (emph. added); *see also Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 552 (8th Cir. 2008) (holding, in omissions case, that "the MCFA's requirement that a plaintiff be "injured by" conduct of the defendant does not allow for recovery unless a plaintiff can show that the defendant's actions proximately caused the plaintiff's losses." (citing *Group Health*)).

Thus, the Eighth Circuit's reasons for rejecting plaintiffs' earlier proposed class based on alleged misrepresentations applies with equal force to plaintiffs' redundant class based on these same misrepresentations recast as omissions. To be clear, nothing has changed in the purported amendments other than swapping the word "omissions" for "misrepresentations." (*See* discussion *infra* at 24-26) There is, however, nothing meaningful in that distinction. In either case, because of the way the valves were sold, causation will hinge on what information the plaintiffs or their physicians received—or didn't receive—as well as each patient's individual medical history and the extent to which such information (or lack thereof) factored into the decision to implant the Silzone valve. As the Eighth Circuit held, that question cannot be answered on a classwide basis, but requires countless individual inquiries that defeat class certification. *In re Silzone II*, 522 F.3d at 839 (rejecting certification based on predominating individual inquiries "into each doctor's sources of information about the valve, and the credibility of any physician's denial that he relied on St. Jude's statements").

In short, plaintiffs' class certification motion falls squarely within the Eighth Circuit's decision rejecting class certification under Minnesota's consumer protection statutes. The decision is law of the case and requires striking plaintiffs' class certification allegations.

### 2. Plaintiffs Will Not Prevail On Their Consumer Protection Claims.

#### a. Putative Class Members Have No Claim Under Minnesota's Consumer Protection Statutes Because They Are Uninjured.

To prevail on consumer protection claims in the product liability setting, a plaintiff must prove that a product is defective and that the plaintiff suffered a manifest injury as a result.[1] *O'Neil v. Simplicity, Inc.* 553 F. Supp. 2d 1110 (D. Minn. 2008). In *Simplicity*, the plaintiffs sought to certify a class of purchasers of allegedly unsafe cribs, seeking damages for breach of warranty, unjust enrichment, and negligence, as well as for violations of three Minnesota consumer protection statutes. *Id* at 1111-12. They expressly excluded from the class any individual who suffered an injury from the allegedly defective crib. *Id.* At bottom, the plaintiffs alleged the defendants misrepresented and concealed that the crib was unsafe. *Id.* at 1118-19. The defendants

---

[1] Plaintiffs' class definition expressly alleges that the class members have no apparent injury, which should end the inquiry under Minnesota law. Plaintiffs have previously alleged in this litigation that all Silzone valve implantees have sustained a subclinical, cellular level injury from their valve. They likewise have conceded, however, that the alleged injury has never manifested itself in the purported class to a degree or severity sufficient to support a personal injury suit. As St. Jude Medical shows here, a manifest injury is required to maintain a consumer protection claim under Minnesota law as well.

moved to dismiss on the ground that plaintiffs alleged no cognizable injury, because the crib had never malfunctioned and the named plaintiffs never experienced problems. *Id.*

The court granted the motion, holding that "it is simply not enough" to allege that the product has a defect. *Id.* at 1115. Rather, plaintiffs were required to "allege an *actual manifestation* of the defect that results in some injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment." *Id.* (emph. added). In reaching this conclusion, the court observed that "numerous" other courts had recognized this elementary principle of products liability—i.e., that the injury caused by a product must be manifest. *Id.* (and cases cited). The court also rejected the plaintiffs' argument that they were entitled to damages because their crib had not lived up to the "benefit of the bargain," which the court found had "superficial appeal" but was unpersuasive. *Id* at 1117.[2]

*Simplicity* follows and reinforces the long-standing rule that a plaintiff must plead and prove an actual, apparent injury—one that is not just subclinical but rather has actually manifested itself—to prevail under Minnesota's consumer protection statutes. *E.g., K.A.C. v. Benson*, 527 N.W.2d 553, 562 (Minn. 1995) (affirming summary judgment for the defendant because plaintiff had "undisclosed, miniscule 'risk' of HIV exposure" which had not progressed to disease and therefore plaintiff was "[u]nable to

[2] Notably, the court dismissed the case after plaintiffs had three attempts to plead their claims (in an original complaint and two amended complaints). The court explained that there comes a time when a court "must decide that a plaintiff has had fair opportunity" to state a consumer protection claim and concluded "this is such a case, and that time has come." *Id.* at 1119-20.

establish an 'injury,' . . . under the Consumer Fraud Act."); *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) (affirming dismissal in a failure to disclose case, holding that the plaintiffs had not alleged any injury sufficient to sustain a claim under the Consumer Fraud Act); *see also Blades v. Monsanto Co*., 400 F.3d 562, 566-67 (8th Cir. 2005) (affirming summary judgment for defendant and denying certification of consumer fraud claims because district court properly found it could not presume an injury); *Tuttle*, 377 F.3d at 926-927 (affirming summary judgment for tobacco manufacturer on Minnesota consumer protection claim where plaintiff could not show physical injury in reliance on manufacturer's representation).

Like the plaintiffs in *Simplicity*, plaintiffs must allege they suffered a manifest and diagnosed injury as a result of St. Medical's alleged misconduct to recover under Minnesota's consumer protection scheme. Yet, by definition, the putative class does not include any individuals who have suffered manifest or diagnosed injury sufficient to initiate an individual action alleging Silzone valve-related injuries. On its face, the putative class definition shows that plaintiffs cannot meet their burden and poses an additional reason to strike the class allegations in plaintiffs' second renewed class certification motion.

#### b. Plaintiffs' Lawsuit Does Not Satisfy The Public Benefit Requirement.

Plaintiffs are entitled to bring private lawsuits under Minnesota's consumer protection statutes only to the extent those private actions benefit the public. *Ly v. Nystrom*, 615 N.W.2d 302, 313-14 (Minn. 2000). So even if plaintiffs can demonstrate

an actual injury, which here they cannot, courts should dismiss a consumer fraud claim when they cannot demonstrate a public benefit to the suit. *Kivel v. Wealthspring Mortgage Corp*., 398 F. Supp. 2d 1049, 1056 (D. Minn. 2005) ("Whether a plaintiff is a proper claimant and satisfies the public benefit requirement is a threshold issue.").

This is because the Minnesota Legislature "could not have intended to sweep every private dispute" into the realm of the consumer protection statutes; otherwise, the statutes would create an endless incentive for attorneys to bring claims and obtain related attorney fees. *Nystrom*, 615 N.W.2d at 314. Moreover, there can be no public benefit where a product is no longer available to the public. *Berczyk v. Emerson Tool Co*., 291 F. Supp. 2d 1004, 1019-20 n.18 (D. Minn. 2003) (finding no public benefit where product had been taken off the market by recall and plaintiff sought personal injury damages); *Minnesota Behrens v. United Vaccines Inc*., 228 F. Supp. 2d 965, 971 (D. Minn. 2002) (even if the product was defective, "it could cause no harm to any other member of the public" after it was removed from the market). In that situation, a consumer protection action cannot have a deterrent effect against the defendant continuing to make allegedly false representations to the public's disadvantage. *Id*. at 970.

All of this begs the question, exactly who are the beneficiaries of this action? The answer is plaintiffs alone, if anyone, particularly if they are allowed to pursue damages in the absence of any demonstrable loss or manifest injury. As for the rest of the public, they have nothing to gain because St. Jude Medical recalled the Silzone valve years ago and has not sold one since. In other words, every Silzone valve that will be implanted has been implanted, and in the unlikely event a putative class member sustains injuries

from a Silzone valve, he or she can bring an individual personal injury action for damages as other plaintiffs have done.[3] This putative class action is a private dispute between Silzone patients and St. Jude Medical and promises no benefit to the public at large. Plaintiffs' class allegations should be stricken for these reasons too.

### 3. There Is No Change In Law Or Facts That Would Allow Plaintiffs To Renew Their Infirm Class Allegations.

Although Rule 23 permits courts to revisit class certification in light of evidentiary developments during the case [*see* Fed. R. Civ. P. 23(c)(1), advisory committee note], the Rule is not so generous as to allow endless chances to get class certification right. As one Minnesota District Court put it, "Rule 23(c)(1) provides Plaintiffs with a limited opportunity to adduce additional facts: It is not a Trojan Horse by which Plaintiffs may endlessly reargue the legal premises of their motion." *Gardner v. First American Title Ins. Co*., 218 F.R.D. 216, 218 (D. Minn. 2003).

Consequently, where plaintiffs "renewed" class certification motion does not proffer any new facts adduced through discovery, but seeks only to revisit the class certification ruling purportedly on the basis of new law, Rule 23 provides no basis for relief. Instead, the court may treat—and deny—the renewed class certification motion as a motion for reconsideration. *Id.* (striking renewed class certification motion to the

[3] The unlikelihood of that event is underscored by the best available long-term scientific research, which shows there is no evidence that patients with Silzone valves are currently at any greater risk of experiencing complications above that faced by non-Silzone valve recipients. *See* Gary L. Grunkemeier, et al., *Time-Related Risk of the St. Jude Silzone Heart Valve*, European J. Cardio-Thoracic Surgery 30 (2006) (attached as Exh. 24 to Betlach Aff.).

extent it proffered new legal authority); *see also Zapata v. IBP, Inc.*, 175 F.R.D. 578, 580-81 (D. Kan. 1997) (treating renewed class certification motion as motion to reconsider and denying on grounds that plaintiff failed to proffer new facts or changes in the law); *Washington v. Vogel*, 158 F.R.D. 689, 692 (M.D. Fla. 1994) (denying renewed class certification motion because plaintiffs failed to show changed circumstances warranting reconsideration of ruling).[4]

The rationale is self-evident: "[C]ourts should not condone a series of rearguments on the class issues by either the proponent or the opponent of [the] class, in the guise of motions to reconsider the class ruling"—particularly where the plaintiffs offer "absolutely nothing" new in doing so. *Vogel*, 158 F.R.D. at 692-93. Thus, the rule favors "an end to litigation and encourag[es] finality in dispute resolution by preventing continued relitigation of issues once decided." *Zapata*, 175 F.R.D. at 579.

The class allegations in plaintiffs' renewed class certification motion should be stricken because they offer nothing new. The omissions parrot the same kind of misrepresentations that plaintiffs had alleged during the last class certification round. And while the allegations may be phrased differently now, they all allege the same thing that plaintiffs have urged since the inception of this controversy: St. Jude Medical misrepresented or concealed information during the approval, marketing, and

---

[4] This Court is no stranger to this principle. *See Levine v. North American Mortgage*, No. 98-556 (JRT/RLE), 2000 WL 34494823, at *3 (D. Minn. May 17, 2000) (rejecting plaintiffs' renewed motion for class certification because plaintiffs' "new evidence" regarding interpretation of statute was not sufficient "to disturb [Court's] earlier" interpretation of the statute leading to denial of certification).

surveillance processes. A side-by-side comparison shows just how redundant they really are:

| **Plaintiffs' Renewed Motion for Class Certification** | **Plaintiffs' Second Renewed Motion for Class Certification** |
|---|---|
| Critical safety information from its first animal study of implanted Silzone-coated valves, including the fact that one of only five animals implanted with such a valve died after suffering a paravalvular leak (resulting from a dehiscence) and a clot that limited critical movement of a valve leaflet and after manifesting extensive areas of "significant" amounts of leaching silver in its heart tissue. | One of the five animals implanted with a Silzone valve in St .Jude's short term (five week) study died after suffering a paravalvular leak (resulting from a dehiscence) and a clot limiting critical movement of a valve leaflet. |
| Excessive tissue growth and clotting that had interfered with valve functioning in one of only 6 sheep implanted with Silzone valves in SJM's second, longer term (ten-week) animal study of the Silzone valve. | One of six sheep implanted with Silzone valves in SJM's second, longer term (ten week) animal study of the Silzone valve had excessive tissue overgrowth and clotting that interfered with valve functioning. |
| Data indicating that the animal with a Silzone valve which exhibited the most severe adverse effects in SJM's first animal study of a valve featuring a fully Silzone-coated sewing ring manifested the highest silver concentrations in adjacent cardiac tissue. | There were unexpectedly high amounts of silver in the heart tissue of the sheep in that study that died. |
| From another Silzone study, the existence of a substantially elevated incidence of paravalvular leaks in sheep implanted with the Silzone-coated Epic valves, some of which were severe and one of which proved fatal; | The existence of substantially elevated incidence of paravalvular leaks in the Silzone-coated Epic Valve Study. |
| An increased incidence of paravalvular leak in sheep implanted with Silzone-coated Regent valves. | In connection with the Regent Valve study, an unexpectedly high incidence of paravalvular leaks in the sheep implanted. |
| Important scientific literature documenting potential hazards of SJM's proposed use of silver for long-term use as an integral part of the Silzone coating on a mechanical heart valve sewing cuff. | Important scientific literature documenting potential hazards of using silver for long-term use as an integral part of Silzone coating. |



ND: 4829-9599-2578

| | |
|---|---|
| Multiple findings from standard laboratory tests that Silzone caused hemolysis or the destruction of red blood cells, a potentially life-threatening condition. | Hemolysis testing results from testing that St. Jude Medical sponsored which established that the Silzone coating caused excessive destruction of red blood cells, a potentially harmful condition. |
| Test results evidencing massive total silver losses averaging 22 percent from the sewing cuffs of Silzone valves implanted during a ten-week sheep study, with one sewing cuff losing 45 percent of its Silzone coating over that relatively short period. | The occurrence of massive silver losses averaging 22 percent from the sewing cuffs on Silzone valves implanted during a ten week sheep study and the loss of 45 percent of the Silzone coating with respect to one sewing cuff over a relatively short study period. |
| Data from short-term *in vitro* washout studies revealing high and unabated rates of silver leaching from Silzone-coated fabric of the type used to manufacture Silzone valves. | Data from short-term *in vitro* washout studies revealed high and unabated rates of silver leaching from Silzone-coated fabric. |
| Test results indicating silver corroding at an alarming rate likely sufficient to remove all of the silver during the life of a Silzone valve. | Test results indicating silver corroding at an alarming rate likely sufficient to remove all of the silver during the life of a Silzone valve. |
| Data showing unabated and progressive increases in silver concentrations accumulating over one year in heart tissue adjacent to Silzone-coated valves implanted in sheep. | Data showing unabated and progressive increases in silver concentrations accumulating over one year in heart tissue adjacent to silver-coated valves implanted in sheep. |
| Field experience report ("FER") data revealing persistent and markedly negative trends in adverse events, including explants, paravalvular leaks, endocarditis, and strokes and other thromboembolic events, in Silzone-coated relative to conventional cuffed valves. | Field experience report data revealed persistent and markedly negative trends in adverse events. |

| | |
|---|---|
| In the context of its public responses to clinical trial findings from cardiothoracic surgeon Eric Butchart and his colleagues in Cardiff, Wales, implicating Silzone in a statistically significant increase in thromboembolic events, information that (1) Mr. Butchart performed this SJM-sponsored study at SJM's request, (2) this constituted the only clinical study SJM commissioned specifically designed to investigate the thromboembolic safety of the Silzone valve, and (3) that outside peer review SJM arranged for and secured confirmed Mr. Butchart's findings. | Within the Cardiff Embolic Risk Factor Study, cardiothoracic surgeon, Mr. Eric Butchart, had at St. Jude Medical's request compared the Silzone and conventional cuffed St. Jude valves with regard to valve thrombosis and thromboembolism.<br><br>St. Jude Medical had agreed to the method of comparison between Silzone and uncoated valves in the Cardiff Embolic Risk Study. |
| Data from the "Top Accounts" study SJM had undertaken that revealed an increased incidence of thromboembolic events associated with use of the Silzone valve in the hospitals participating in the study, particularly when implanted in the mitral position. | There was a very high incidence of thromboembolic events and valve thrombosis associated with the use of Silzone valve based on data from the "Top Accounts" Study SJM had undertaken. |
| Data received in early 1999 and thereafter from Dr. Jagdish Butany, a Toronto, Canada, pathologist, showing a significantly greater incidence of explant with the Silzone valve. | Data provided by Dr. Jagdish Butany showed an alarmingly high incidence of explant with the Silzone valve. |
| Numerous reports from the field as well as from the AVERT study of little or no tissue ingrowth on and in Silzone valves explanted due to paravalvular leak or thrombosis. | Numerous reports from the field as well as from the AVERT Study that there was little or no tissue ingrowth on or in Silzone valves explanted due to paravalvular leak or thrombosis. |

Not only are plaintiffs' purported omissions just a bloated rehash of what has been alleged before, but they will dictate the same holding on class certification given the Eighth Circuit's reasoning. Each class member still will have to prove a causal link between a purported omission and his or her alleged harm. And, it is that very causal link that raises the individualized fact issues under *Group Health*, given the way the Silzone valve was sold. There is no need to revisit the effect of these individualized inquiries on

class certification. The Eighth Circuit already made the point in a manner equally applicable now.[5]

Nor have plaintiffs proffered any intervening change in law that warrants revisiting class certification. Although plaintiffs trumpet the Supreme Court's *Bridge v. Phoenix Bond & Indem. Co.*, 128 S Ct. 2131 (2008), decision as eliminating the reliance requirement under Minnesota's consumer protection statutes for omissions-based liability [Memo. 11-12], *Bridge* does not come close to establishing that proposition.

In *Bridge*, the plaintiffs were prospective buyers at a public foreclosure auction involving a number of real properties in Cook County, Illinois. *Id*. at 2135. They sued a company that did not inform Cook County about the company's affiliations with other auction bidders as required, which in turn allowed the company to place multiple bids on the properties instead of the one bid allowed each bidder. *Id.* The plaintiffs brought numerous claims, including one alleging that defendants violated RICO by using the mail to communicate its misrepresentations/omissions to Cook County. *Id.* at 2136. The

---

[5] A brief glance at just a few of plaintiffs' "new" allegations proves the point. For example, while plaintiffs contend St. Jude Medical should have informed the public and physicians regarding field experience reports, data from those reports changed over time such that any characterization of it to a physician as of March 1998 (when the Silzone valve was first introduced) would necessarily be different than a characterization of it twelve or eighteen months later. Similarly, the results from the Toronto General Hospital study became available in mid-1999 and therefore could not have been an "omission" for Silzone valves sold in 1998. And whether the scientific literature to which plaintiffs refer would be considered "important" to any physician considering whether to use a Silzone valve undoubtedly would vary from one physician to another. In short, even taking plaintiffs' allegations at face value, whether any of the alleged omissions would have made a difference to any surgeon using the Silzone valve requires an individualized inquiry regarding when each valve was purchased and each physician's knowledge, experience and training.

company argued that the plaintiffs could not establish causation because the plaintiffs had not relied on any misrepresentations/omissions, which had only gone to Cook County and not directly to the plaintiffs. *Id.* at 2138.

The Supreme Court disagreed. The court first noted that because the RICO statute did not on its face impose a reliance requirement and because the predicate racketeering act was mail fraud—a statutorily derived fraud claim—the court would not require the plaintiffs to have directly relied on the company's misrepresentations or omissions for RICO liability to attach. *Id.* at 2140. In the court's view, it sufficed that a third party—Cook County—relied on the company's misrepresentations and omissions, which foreseeably led to the plaintiffs' damages. *Id* at 2144 ("[N]one of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." (emph. orig.)). In fact, the court noted, the plaintiff in most cases will not be able to establish causation "if no one relied on any misrepresentation." *Id.*

For several reasons, *Bridge* provides no reason to rethink any issue here. To begin with, a federal decision interpreting the specific language of a federal statute has no bearing on the interpretation of Minnesota's consumer protection laws. That is purely an issue of state law controlled by state court precedent, which this Court is bound to follow. *See Kansas Public Employees Ret. Sys. v. Russell*, 140 F.3d 748, 751-52 (8th Cir. 1998) (federal courts must adhere to decisions of highest state court interpreting state's law). Moreover, there is no ambiguity about what state law provides in general or with respect to this case in particular: (1) the Minnesota Supreme Court has set forth the causal nexus

burden required under Minnesota's consumer protection statutes [*Group Health*, 621 N.W.2d at 13]; (2) subsequent cases have embraced that causal nexus requirement [*Flynn*, 627 N.W.2d at 352; *Schaaf*, 517 F.3d at 553; *Tuttle*, 377 F.3d at 927]; and (3) the Eighth Circuit has held that causal nexus requirement, set forth in *Group Health*, applies to these heart valve cases [*In re Silzone II*, 522 F.3d. at 839].

In any event, *Bridge* does not stand for the proposition, as plaintiffs would have it, that the reliance requirement for consumer protection claims has been eliminated. It held only that, under the specific language of the RICO statute, the plaintiff need not be the one who relied. But the Court also went out of its way to note that a causal nexus between the allegedly unlawful conduct and the injury still must be shown. Someone in the causal chain still must be shown to have relied. *Bridge*, 128 S. Ct. at 2144 ("[N]one of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." (emph. orig.)). This falls right in line with *Group Health* and its progeny, which uniformly require a causal nexus for Minnesota's consumer protection statutes in both misrepresentations and omissions cases. Minnesota law remains unchanged in this regard and it is this causal nexus requirement that defeats any attempt at class certification here.

### C. This Court Should Not Provide Plaintiffs With Another Opportunity To Plead The Same Infirm Class Allegations.

In effect, plaintiffs' second renewed motion is a request for leave to amend the class allegations in their complaint to (1) change the contours of the putative class by

including plaintiffs from forty-five states, and (2) allege "omissions" as the basis for relief under Minnesota's consumer protection statutes. The request for leave to amend should be summarily denied for the same reasons that the Court should strike the class allegations under Rule 23, as discussed above. A court need not and should not grant leave to amend where the law provides, as it does here, that no viable claim can be stated. *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 225 (8th Cir. 1994) ("It is settled that 'if the proposed change . . . advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend.'"); *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989) (explaining that leave to amend should be denied if the amendment would be futile).

The Court also should exercise its discretion to deny leave to amend because plaintiffs have had the opportunity to make their class certification case and the context of these cases shows they cannot. Although a district court has discretion to grant leave to amend "when justice so requires" [Fed. R. Civ. P. 15], the court may deny further amendment where a party has been given ample opportunity to state a colorable claim [*Hammer v. City of Osage Beach, Mo.*, 318 F.3d 832, 844 (8th Cir. 2003) ("[t]here is . . . no absolute right to amend a pleading"; affirming a denial of motion for leave to amend); *Williams*, 21 F.3d at 225 ("It is settled that 'if the proposed change . . . advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend.'" (citation omitted))]. Simply put, the law does not give plaintiffs free rein to revise their claims until they get it right. *See De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996) (affirming denial of leave to amend because plaintiffs had "four

opportunities to plead their claims in this case, and the deficiencies in their federal claims are fundamental"); *In re Dynegy, Inc. Secs. Litig.*, 339 F. Supp. 2d 804, 921-22 (S.D. Tex. 2004) (denying further amendment where plaintiff tried to "present theories of recovery serially to the district court").

*Siepel v. Bank of America, N.A.*, 239 F.R.D. 558, 571 (E.D. Mo. 2006), is particularly instructive. There, plaintiffs, who were beneficiaries of trusts and other financial accounts, brought a class action against Bank of America for federal and state law violations, alleging that the defendants misrepresented and failed to disclose information. The district court denied plaintiffs' request for leave to amend their complaint an eighth time. *Id.* Recognizing the futility of allowing further amendment, the court observed that a federal statute, SLUSA, preempted plaintiffs' state law misrepresentation claims despite the fact that plaintiffs sought to mask their misrepresentation and omission claims by removing words such as "false," "misleading," and "deceptive." *Id.* Therefore, whether plaintiffs chose to frame their allegations as a failure to disclose or a misrepresentation/omission, the gravamen of the action was the same. *Id.*

The court also denied leave to amend because it would be unjust to allow plaintiffs to present theories of recovery "seriatim." *Id.* As the court put it, "[p]leading is not an interactive game in which plaintiffs file a complaint and then volley it over a rhetorical net with the court until a viable complaint emerges. Plaintiffs have the responsibility to plead their case adequately, without defendants' or the court's assistance." *Id.* Hence, justice required denying leave to amend because the plaintiff had

"been given ample opportunity to allege a claim" and the amended pleading tried "to shilly-shally in an attempt to avoid dismissal." *Id.*; *see also In re Merrill Lynch Ltd. P'shps Litig.*, 7 F. Supp. 2d 256, 276 (S.D.N.Y. 1997) (denying leave to amend complaint for a third time in RICO fraud action because pleading "is not an interactive game").

Plaintiffs have had a full and fair opportunity to develop the record and present their alleged consumer protection claims over many years and two separate appeals. These claims have been found to be uncertifiable under the controlling burden of proof and given the context in which those claims arise. As detailed above, plaintiffs' second renewed motion presents nothing new, except for couching its allegations in terms of "omissions" instead of "misrepresentations." There is no good reason to prolong the cost and expense of these class proceedings any further. This Court should deny the request to revisit the class certification allegations for this reason as well.

## IV. CONCLUSION

Plaintiffs' second renewed class certification motion advances class certification allegations that the Eighth Circuit has already rejected and nothing in their motion remotely suggests that the result should be any different this time around. Moreover, relief under Minnesota's consumer protection statutes is unavailable to plaintiffs because they admittedly have suffered no manifest injuries and the only persons who stand to benefit from maintaining these claims are plaintiffs and their counsel. Plaintiffs' class certification claims should be stricken.

Date: September 3, 2008

HALLELAND LEWIS NILAN & JOHNSON, P.A.

By s/Bradley J. Betlach
Bradley J. Betlach, #209806
Susan E. MacMenamin, #304396
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402-4501
Telephone: (612) 338-1838
Facsimile: (612) 338-7858

REED SMITH LLP
Steven M. Kohn
James C. Martin
David Stanley
David J. de Jesus
1999 Harrison Street, Suite 2400
Oakland, CA 94612-3572
Telephone: (510) 763-2000
Facsimile: (510) 273-8832

*Counsel for St. Jude Medical, Inc.*