# EXHIBIT 7

**No. 04-8009**

# In The United States Court of Appeals For The Eighth Circuit

In re: St. Jude Medical, Inc.,
Silzone® Heart Valves Products Liability Litigation

Lester Grovatt; Beatrice Bailey; Levy D. Redden; Bonnie L. Sliger; Joe W. Sanchez, on behalf of themselves and all others similarly situated,

*Plaintiffs-Respondents,*

v.

St. Jude Medical, Inc.,

*Defendant-Petitioner.*

FROM A CLASS CERTIFICATION ORDER FROM THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA
MULTIDISTRICT LITIGATION NO. 01-1396 (JRT/FLN)
THE HONORABLE JOHN R. TUNHEIM

**OPPOSITION TO PETITION UNDER
FEDERAL RULE OF CIVIL PROCEDURE 23(f)
FOR PERMISSION TO APPEAL A CLASS CERTIFICATION ORDER AND APPENDIX**

Charles S. Zimmerman
J. Gordon Rudd, Jr.
David M. Cialkowski
ZIMMERMAN REED P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

Steven E. Angstreich
Michael Coren
Carolyn C. Lindheim
LEVY, ANGSTREICH, FINNEY, BALDANTE, RUBENSTEIN & COREN, P.C.
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

James T. Capretz
CAPRETZ & ASSOCIATES
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

Joe D. Jacobson
GREEN, SCHAFF & JACOBSON, P.C.
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

*Attorneys for Plaintiffs-Respondents*

2004 – BACHMAN LEGAL PRINTING – FAX (612) 337-8053 – PHONE (612) 339-9518 or 1-800-715-3582

## TABLE OF CONTENTS

*INTRODUCTION* ........ *1*

*FACTUAL AND PROCEDURAL BACKGROUND* ........ *4*

*ARGUMENT* ........ *9*

I. THE PETITION FAILS TO ACKNOWLEDGE, ADDRESS, OR MEET THE BASIC STANDARDS FOR INTERLOCUTORY REVIEW. ........ 9

II. THE DISTRICT COURT CONSTITUTIONALLY APPLIED MINNESOTA'S **CONSUMER PROTECTION STATUTES TO A MULTI-STATE CLASS.** ........ 13

**A. Out-of-State Plaintiffs Have Express Standing to Sue SJM under Minnesota's Consumer Protection Statutes.** ........ 14

B. An Out of State Victim Suing a Minnesota Company under a Minnesota Statute Does Not Violate the Dormant Commerce Clause. ........ 19

C. A Choice of Law Analysis Is Not Necessary Because There Is No Conflict Between the Laws of Relevant Jurisdictions, And Such Analysis Favors Application of the Minnesota Consumer Fraud Act Anyway. ........ 21

III. ABSENT CLASS MEMBERS' PERSONAL INJURY CLAIMS WILL NOT BE PRECLUDED BECAUSE THE CIRCUMSTANCES EXEMPT APPLICATION OF RES JUDICATA FOR COLLATERAL LEGAL THEORIES LEFT UNADJUDICATED IN THIS CLASS ACTION. ........ 25

A. So-Called "Claim-Splitting" Is Permissible in Class Actions and Does Not Preclude Non-Certified Legal Theories from Being Pursued in a Later Action. ........ 27

B. Courts May Expressly "Reserve" Claims Against Which *Res Judicata* Will Not Apply in Later Actions. ........ 30

C. Class Notice Can Advise People Who Wish to Pursue Personal Injuries to Seek Counsel and Opt Out. ........ 31

IV. THE MEDICAL MONITORING CLASS WAS PROPERLY CERTIFIED. ........ 32

A. The Smaller Medical Monitoring Class Does Not "Contradict" the Statutory Consumer Class. ........ 32

B. The District Court's Exhaustive *Erie* Analysis Was Correctly Performed. ........ 32

C. The Remedy of a Medical Monitoring Program for Early Detection of Medical Problems is Injunctive Relief. ........ 35

D. The Medical Monitoring Class Is Efficiently and Economically Manageable. ........ 36

*CONCLUSION* ........ *39*

# TABLE OF AUTHORITIES

**Published Opinions**


*Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D.Ohio 1991) ....38
*Boubelik v. Liberty State Bank*, 553 N.W.2d 393 (Minn. 1996) ....14
*Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543 (D. N.J. 1998) ....21
*Brafford v. Susquehanna Corp.*, 586 F. Supp. 14 (D. Colo. 1984) ....34
*Bryson v. Pillsbury Co.*, 573 N.W. 2d 718 (Minn. Ct. App. 1998) ....33
*Burton v. R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515 (D. Kan. 1995) ....35
*City of* Stamford, 699 A.2d at 55 n.8 ....34
*Coleman v. General Motors Acceptance Corp.*, 220 F. R. D. 64 (M.D. Tenn. 2004) ....30
*Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991) ....34
*Cott v. Peppermint Twist Management Co.*, 856 P.2d 906 (Kan. 1993) ....34
*Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539 (Cal. 1999) ....21
*Doe v. City of Stamford*, 699 A.2d 52 (Conn. 1997) ....33
*Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) ....27, 29
*Group Health Plan, Inc., v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001) ....14
*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988) ....22
*Heller v. Schwan's Sales Enterprises, Inc.*, 548 N.W.2d 287 (Minn. App. 1996) ....15
*Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055 (8th Cir. 2003) ....23
*Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888 (Minn. App. 1992) ....14
*Iadanza v. Mather*, 820 F. Supp. 1371 (D. Utah 1993) ....22
*In re Bridgestone/Firestone*, 288 F.3d 1012 (7th Cir. 2002) ....11
*In re Kirschner Medical Corp. Securities Litig.*, 139 F.R.D. 74 (D. Md. 1991) ....18
*In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98 (D.C. Cir. 2002) ....9, 10, 12
*In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*, 2004 U.S. Dist. LEXIS 7789, 2004 WL 909741 (D. Minn. April 28, 2004) ....3, 16, 21
*In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir. 1990) ....34
*In re Universal Serv. Fund Telephone Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004) ....31
*In re: Inter-op Hip Prosthesis Liab. Litig.*, MDL No. 1401, 204 F.R.D. 330 (N.D. Ohio 2001)..38
*In re: Lutheran Brotherhood Variable Life Ins. Prods. Co. Sales. Practices Litig.*, 201 F.R.D. 456 (D. Minn. 2001) ....16
*In re: Teletronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 271) ....38
*Jepson v. Gen. Casualty Co. of Wisc.*, 513 N.W.2d 467 (Minn. 1994) ....23
*Katz v. Warner-Lambert Co.*, 9 F. Supp. 2d 363 (S.D.N.Y. 1998) ....35
*Lony v. E.I. DuPout deNeMours & Co.*, 821 F.Supp. 956 (D. Del. 1993) ....18
*Lorazepam* 289 F.3d at 105 ....9
*Marshall v. Kirkland*, 602 F.2d 1282 (8th Cir. 1979) ....31
*Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647 (Del. 1984) ....33
*Milkovich v. Saari*, 203 N.W.2d 408 (Minn. 1973) ....24
*Montgomery v. New Piper Aircraft*, 209 F.R.D. 221 (S.D. Fla. 2002) ....18, 19
*Newton v. Merrill Lynch, Inc.*, 259 F.3d 154 (3rd Cir. 2000) ....11
*Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91 (Minn. 2000) ....23
*Phillips Petroleum Co. v. Shutts*, 472 U. S. 797 (1985) ....22
*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ....15, 17, 23

*Pike v. Bruce Church, Inc.*, 397 U. S. 137, 90 S. Ct. 844 (1970) ....................20
*Poulin v. Ford Motor Co.*, 513 A.2d 1168 (Vt. 1986)....................22
*Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ....................9, 10
*Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436 (Fla. 4th DCA 1999)....................19
*Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32 (1st Cir. 2003)....................11
*Southern Union Co. v. Missouri Public Service Comm'n*, 289 F.3d 503 (8th Cir. 2002) ....................20
*Sullivan v. Chase Inv. Serv.*, 79 F. R. D. 246 (N.D. Cal. 1978) ....................30
*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134 (2d Cir. 2001)....................9, 10
*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001)....................11
*Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000) ....................9, 10
*Werlein v. United States*, 746 F. Supp. 887 (D. Minn. 1990)....................33, 35

## Statutes

Minn. Stat. § 325D.44 ....................14
Minn. Stat. § 325F.69 ....................14
Minn. Stat. § 8.31, subd. 3a ....................14, 26
Minn. Stat. §§ 325F.67 ....................14
Restatement (Second) of Judgments § 26(1)(c) ....................26

## Unpublished Opinions

*Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576 (1st Cir. 1995)....................31
*Locke v. Lutheran Brotherhood*, No. 01-8007, Judgment (8th Cir. July 19, 2001) ....................2
*Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex. App. – Texarkana 1995) ....................29

## Other Authority

Charles Allen Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1790 (2d ed. 1990)....................29

## INTRODUCTION

Petitioner St. Jude Medical, Inc. ("SJM"), recalled its defective silver-coated heart (Silzone®) valves in January 2000 because studies and adverse event reports indicated that the valve line, which was touted to lower incidence of infection, actually caused more life-threatening problems than did non-silver-coated valves. Several thousand class members with the recalled valves continue to await basic judicial adjudication of their rights to medical monitoring – something that leading medical experts have determined to be necessary and appropriate to address class members dramatically enhanced risk of life-threatening problems by facilitating early detection and treatment. SJM has directed its considerable resources to litigating the issue and avoiding the merits, rather than to helping the plaintiffs address their augmented medical risk. There will never be individual suits for the provision of such monitoring and research – the cost of any individual suit would greatly exceed the cost of the individual medical remedy sought. As the District Court properly recognized, class treatment is the only way to adjudicate the merits, and the case should proceed to resolution in the District Court without further delay.

The class certification order in this consumer fraud and medical monitoring case is neither unprecedented nor controversial, and this Court has already rejected many of the bases upon which SJM seeks review. *Locke v. Lutheran Brotherhood,*

No. 01-8007, Judgment (8th Cir. July 19, 2001) (RA001). Indeed, it is conservative and tailored. Of the overarching class of heart valve recipients suing under Minnesota's consumer fraud statutes, Respondents also sought certification of a personal injury subclass and a 50-state medical monitoring subclass. The District Court rejected much of Respondents' bid. SJM's characterizations of the District Court's orders as short on analysis or overly-hospitable are thus manifestly wrong. SJM's Petition grossly distorts the logical structure of the case below – it is substantially simpler than characterized.

First, the District Court denied certification of a personal injury class across the board: "After fully considering the variations in all the states' laws, it is relatively clear that no two states apply substantially the same law to all of the plaintiffs' claims." (Order of January 5, 2004, PA 0635.) Second, pursuant to claims for relief under Minnesota's consumer protection statutes, the District Court applied the plain language of the Private Attorney General Act (" 'any person' injured by a violation of these statutes" may sue). (Order of March 27, 2003, PA 0411.) The court correctly determined that Plaintiffs also satisfied the relevant constitutional test for a nationwide class under the Private Attorney General Act – the parties have a "significant contact" with Minnesota's consumer fraud laws because "St. Jude is headquartered in Minnesota and according to plaintiffs, 'much of the conduct relevant to the statutory consumer fraud claims occurred in or

emanated from Minnesota.' " *Id.* at PA 0411, n.22. Despite the absence of new authority supporting its position, SJM moved to "decertify" the consumer fraud class, but was met with the District Court's appropriate denial:

> After reviewing St. Jude's submissions, the Court is satisfied that the original decision to certify is sound, and the Court will not decertify the consumer protection class. ***St. Jude does not raise new arguments***, and the Court will not repeat its analysis of the consumer fraud law. The Court notes, however, that ***a recent Minnesota case further supports the Court's determination that class treatment is appropriate***. *See Peterson v. BASF Corp.*, 675 N.W.2d 57 (Minn. 2004); *see also In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*, 2004 U.S. Dist. LEXIS 7789, 2004 WL 909741 (D. Minn. April 28, 2004).

(Order of July 15, 2004, PA 0924 (emphasis added).)

Finally, after applying a rigorous 50-state analysis of variations in courts' treatment of medical monitoring claims, the District Court determined that 1) it would not include states whose courts did not recognize medical monitoring as a stand-alone cause of action; 2) it would not include states whose courts require proof of a present injury to prove entitlement to medical monitoring; and 3) it would include only those states that recognize an independent cause of action for medical monitoring not requiring proof of a present injury: Arizona, Colorado, Connecticut, District of Columbia, Florida, Kansas, Montana, New Jersey, New York, Pennsylvania, Texas, Tennessee, Utah, and West Virginia. (PA 0641-44.) Later, after further analysis, and upon reconsideration, the District Court recognized that Delaware, Minnesota, and Ohio were also included in the medical

monitoring class. (PA 0927.) The District Court's inclusion of only 17 of 50 states cannot be characterized as permissive or lax.

Critically, SJM first improperly conflates the consumer fraud class and the medical monitoring class and then relabels that imaginary class as one advancing "personal injury" claims. But simply put, all class members seek a basic, uniform medical monitoring and research program, as well as recovery of economic losses, through Minnesota's consumer fraud statutes. The medical monitoring class, by contrast, comprises plaintiffs who also seek, as they are entitled to do, injunctive relief through an additional stand-alone common law claim for medical monitoring. They are alternate routes to the same destination. The District Court's Order clearly presents them as such and was well within its sound discretion to certify them.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

On January 21, 2000, SJM, together with its various subsidiaries recalled all non-implanted mechanical heart valves with silver coating on a world-wide basis. The premium-priced Silzone® coating SJM applied to these valves' sewing rings was associated with higher incidence of paravalvular leakage, endocarditis and thromboembolic events (*e.g.*, stroke, transient ischemic attacks, heart attacks). These adverse events caused a substantial number of deaths, injuries and explant

---

[1] Contrary to SJM's misleading rhetoric, no personal injury class is currently certified.

surgeries among the 30,000 patients world-wide who had been implanted with Silzone valves – over a third of whom are Americans. Those who have not yet manifested an injury are at heightened risk of suffering one or more of these serious risks according to the United Kingdom's Medical Device Agency ("MDA") and eminent experts offered during the proceedings below.

Although SJM frequently refers to its Silzone product recall as "voluntary," and claims it was due solely to an increased rate of explants due to paravalvular leakage in the Silzone arm of its AVERT study, the record below shows otherwise. It reveals that, prior to SJM's recall of its Silzone coated mechanical valves – the implantation of Silzone valves had already been banned by a number of hospitals, as surgeons learned of its dangers through experience or word of mouth. The MDA (Great Britain's FDA) in November 1999, had issued a medical advisory on the valves due to increased rates of thromboembolic events and impaired or improper healing, an advisory that was delayed by SJM's actions to downplay the danger. New Zealand and Australian regulatory authorities in late 1999 had banned all Silzone products from their respective markets.[2] At the time of the recall, the FDA had recognized that the labeling of Silzone was inadequate to apprise surgeons of the discovered risks of the silver coating and the controversy

---

[2] Shortly after St Jude's "voluntary recall," the MDA issued an order administratively recalling the Silzone products. In other words, in Great Britain, as in Australia and New Zealand, the recall was not a "voluntarily" one.

surrounding it, and warnings to cure the inadequacy were in the process of being drafted. At the time of the recall, the FDA advised SJM that the Silzone product was defective. The recall took place in lieu of the FDA taking action. Silzone thus was, and still is, a public health concern of epidemic magnitude.[3]

On or about May 1, 2002, Plaintiffs sought certification of two classes. (PA 0030-0100.) Class I, as proposed, consisted of all people in the U.S. who had been implanted with and still carried a Silzone valve, *except* those whose injuries resulted in death or the explantation of the valve. All members of Class I sought access to a coordinated program of (1) medical monitoring services, including without limitation, diagnostic testing and preventative screening care designed to respond to the significant increased risks these individuals face because of the Silzone valve, and (2) an approved epidemiological study and review of the results of the monitoring. Class II consisted of all people in the U.S. who received a Silzone valve and who had sustained compensable physical injuries due to the valve.

On March 27, 2003, the District Court issued its first order on Plaintiffs' request for class certification. (PA 0374-0413.) In a thorough Order, the District

[3] St. Jude's repeated reliance on the AVERT study as purportedly "showing" that there is no ongoing increased risk to Silzone implantees is a subject of great challenge in the trial court below (as well as in the related Canadian Class Action matter pending in Toronto, Ontario). Simply put, AVERT is statistically underpowered to show an absence of risk.

Court found that both proposed classes met the threshold requirements of Rule 23(a), that common issues of law and fact predominated, and that a class action was the superior method of adjudicating the claims. The District Court conditionally certified Plaintiffs' common law claims for both Class I and Class II, pursuant to Rule 23(b)(3) and (c)(4). The District Court also conditionally certified the medical monitoring claims of the Class I plaintiffs, pursuant to Rule 23(b)(2). Plaintiffs' claims were unconditionally certified under Minnesota Consumer Protection statutes pursuant to Rule 23(b)(3).

SJM then sought its first Rule 23(f) petition to allow an appeal from the District Court's March 27, 2003, class certification order. On May 6, 2003, this Court agreed with Plaintiffs that the first Rule 23(f) petition was premature and denied the petition as the District Court had yet to issue a final class certification order. (PA 0415.)

As to the conditionally certified classes, the District Court requested briefing from the parties on what minimum number and type of subclasses would be appropriate for Plaintiffs' negligence, strict liability, breach of warranty, and medical monitoring claims. On January 5, 2004, the District Court issued an Order determining that Class II, the injury class, did not meet the requirement of Rule 23, and decertified the injury class. (PA 0628-0653.) The District Court, however, continued its conditional certification of Class I, the medical monitoring class, but

limited the class to those individuals whose valves were implanted in jurisdictions recognizing medical monitoring claims as stand-alone causes of action absent proof of injury. The District Court also left intact the unconditionally certified consumer fraud class.

Following the January 5 Order, SJM moved to decertify the consumer fraud class. (PA 703-33.) Plaintiffs also moved for reconsideration of the District Court's exclusions of certain states from the medical monitoring class. (PA 0703-0733.)

On July 15, 2004, the District Court issued its final class certification order denying SJM's motion to decertify the Minnesota statutory consumer protection class. (PA 0918-0930.) The District Court, following a comprehensive and proper *Erie*-analysis, also expanded the medical monitoring class to include three additional states, but subtracted one state.

SJM's baseless assertion that the District Court below "expressly ruled that 34 jurisdictions *do not allow* medical monitoring claims" is blatantly false. (Petition at 32.) As is plain from its Orders, the District Court conservatively found that sufficient data existed to conclude at least 17 states recognize a stand-alone cause of action for medical monitoring. It did *not* thereby find that the balance of the 34 jurisdictions reject medical monitoring as either a cause of action

or a remedy. The District Court made no such ruling and Petitioner's attempts to distort the orders must be ignored.

## ARGUMENT

### I. THE PETITION FAILS TO ACKNOWLEDGE, ADDRESS, OR MEET THE BASIC STANDARDS FOR INTERLOCUTORY REVIEW.

In its zeal to file its Petition, SJM glosses over the fundamental principles of Rule 23 interlocutory appeals. Interlocutory review under Rule 23(f) is disfavored. *Prado-Steiman v. Bush*, 221 F.3d 1266, 1276 (11th Cir. 2000) ("[I]interlocutory appeals are inherently 'disruptive, time-consuming, and expensive,' and consequently are generally disfavored."); *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 140 (2d Cir. 2001) (stating that Rule 23(f) standards will "rarely be met" and should not be used as a means to delay proceedings in the district court); *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002); *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 294 (1st Cir. 2000). This strong resistance is even more pronounced in "complex" cases where the trial court "may reconsider and modify the class as the case progresses." *Lorazepam*, 289 F.3d at 105; *Prado-Steiman*, 221 F.3d at 1276-77. *See also Mowbray*, 208 F.3d at 295 (remarking that appellate courts "should err, if at all, on the side of allowing the district court to fine-tune its class certification order").

Moreover, notwithstanding the broad discretion accorded federal appellate courts under Rule 23(f), various federal Courts of Appeals have articulated different factors that appropriately bear on their consideration of Rule 23(f) petitions. Typically, first among those expressed is whether the order on a motion for class certification is likely the "death-knell" of the litigation for one of the parties. *See Lorazepam*, 289 F.3d at 105 (with additional emphasis on the trial court's discretion); *Prado-Steiman*, 221 F.3d at 1274-76 (acknowledging the "death knell" factor as "the most important"); *Sumitomo*, 262 F.3d at 139. Appellate courts also consider whether an important issue is present that is likely to "evade review" if interlocutory appeal is not allowed. *Lorazepam*, 289 F.3d at 105; *Mowbray*, 208 F.3d at 293-94; *Blair*, 181 F.3d at 835. And appellate courts may also be influenced by a finding that the lower court's certification order is "manifestly erroneous," taking into account the trial court's substantial discretion and the deferential standard of appellate review. *See, e.g.*, *Lorazepam*, 289 F.3d at 105; *Prado-Steiman*, 221 F.3d at 1274-1276; *Blair*, 181 F.3d at 835.

Petitioner has not argued, much less shown, that class certification is the "death knell" of its case. *See Blair*, 181 F.3d at 834 (cautioning, however, that courts "must be wary lest the mind hear a bell that is not tolling"); *Sumitomo*, 269 F.3d at 139 (referring to orders that "effectively terminate the litigation"); *see also Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 37, n. 4 (1st Cir.

2003) (referring to orders that have the "practical effect of compelling a party to abandon a potentially meritorious claim"); Comm. Note to Fed. R. Civ. P. 23(f) ("likely dispositive of the litigation").

SJM cites certain language, primarily from the Seventh Circuit, to expand the concept of death knell to include "pressure to settle," and "raising the stakes" of litigation through class certification, but most courts do not extend the concept of "death knell" so far. (Petition at 13.) Class certification always implicates "stakes," and indeed the Seventh Circuit cases SJM cites recognize that this consideration can only be relevant to the extent of supporting other evidence of undue pressure to settle "bet-the-company" cases independent of the merits of the case. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (noting that class certification turned single individual claim into "bet-your-company" decision that could force settlement even in face of weak claims); *In re Bridgestone/Firestone*, 288 F.3d 1012, 1050-16 (7th Cir. 2002) (aggregation of "millions" of claims implicating multiple products sold for more than ten years made settlement almost inevitable at price reflecting risk of "catastrophic judgment" regardless of merits); *see also* Comm. Note to F.R.C.P. 23(f) (referring to "force[d]" settlement to avoid "potentially ruinous liability"); *Newton v. Merrill Lynch, Inc.*, 259 F.3d 154, 164 (3rd Cir. 2000) ("inordinate or hydraulic pressure to settle" to avoid "ruinous liability").

The Petition presents no evidence of anything approaching these descriptions of settlement pressure. *Cf. Lorazepam*, 289 F.3d at 108 (denying Rule 23(f) petition where petitioner made no showing, "other than mere assertions," that company of its size would be forced to settle without regard to merits of claims). Indeed, discovery below reveals that SJM, a corporation traded on the New York Stock Exchange, possesses at least a ***quarter billion*** dollars of insurance coverage and is strenuously litigating with the counsel of its choice paid for by its insurers. Indeed, SJM has also filed an additional petition for writ of mandamus seeking review of the District Court's order denying SJM's motion for summary judgment on the overarching issue of federal regulatory preemption, completely independent of class certification. SJM has established no "death knell" or "forced settlement" grounds for interlocutory review of the District Court's class certification orders, and equity favors prompt adjudication of the merits of this time-sensitive medical monitoring case, which will be reached only through class treatment.

SJM is thus left to argue only that the District Court's class certification Order was "wrong" as to each of the two classes. Such arguments fail to meet the standard for an interlocutory appeal even if they had merit, especially in a time-sensitive medical case like this one. This is sufficient reason to deny the Petition at the outset. Moreover, the assertions are demonstrably false. Once the smoke is cleared and the error of Petitioner's repeated allegation of a "contradiction"

between the classes is exposed, the sound basis for each of the certified classes is straightforward.

## II. THE DISTRICT COURT CONSTITUTIONALLY APPLIED MINNESOTA'S CONSUMER PROTECTION STATUTES TO A MULTI-STATE CLASS.

SJM unfairly raises the alleged violation of several constitutional principles, yet completely glosses over their substance. Although invoking the "[dormant] Commerce Clause," the Due Process Clause, and the Full Faith and Credit Clause, SJM fails to prove – or even argue – that any single class member does not have ***standing*** to sue under Minnesota's consumer fraud statutes.

SJM urges this Court to accept interlocutory review because the District Court's Order represents "an unprecedented and unconstitutional effort to export Minnesota's laws to every other state, impermissibly displacing the other states' laws." (Petition at 14.) But SJM's rhetoric sounds a false alarm. Most importantly, this Court has already rejected those arguments as a basis to accept interlocutory review of this precise question. (RA 001.) This Court denied Lutheran Brotherhood's Rule 23(f) Petition. Lutheran Brotherhood urged this Court to accept review because: 1) the class certification order improperly applied the Minnesota Consumer Fraud Act to a nationwide class; 2) the District Court's ruling was contrary to decisions holding that application of a single state's laws to a nationwide class violates the United States Constitution; and 3) the District Court

failed to conduct a choice of law analysis to determine if the MFCA could be constitutionally applied to a national class. (Petition of Lutheran Brotherhood dated June 20, 2001) (RA002). The Court rejected Lutheran Brotherhood's Petition. SJM presents those failed arguments here.

### A. Out-of-State Plaintiffs Have Express Standing to Sue SJM under Minnesota's Consumer Protection Statutes.

The District Court certified the consumer fraud class under Minnesota's False Statement in Advertisement Act, Prevention of Consumer Fraud Act, and Uniform Deceptive Trade Practices Act (collectively "MCFA"). *See* Minn. Stat. §§ 325F.67, 325F.69, and 325D.44. Private causes of action for violations of §§ 325F.67 and 325F.69 are authorized under the Private Attorney General Act, Minn. Stat. § 8.31, subd. 3a.[4] This statute broadly permits "any person" to bring suit to recover damages. *See id.*; *see also Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 8 (Minn. 2001).

Minnesota courts have liberally construed the MCFA to protect people from fraudulent acts. *See, e.g., Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 402 (Minn. 1996); *State ex rel. Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 890 (Minn. App. 1992) (consumer protection statutes are broader than the common law to protect innocent consumers). Although not mentioned anywhere in SJM's Petition, courts other than the District Court have certified nationwide classes

---

[4] Section 325D.44 expressly creates its own cause of action for injunctive relief.

pursuant to a single state's consumer protection statutes. The Minnesota Supreme Court, in *Heller v. Schwan's Sales Enterprises, Inc.*, 548 N.W.2d 287, 290 (Minn. App. 1996), quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-813 (1985), recognized that a Minnesota court may exercise jurisdiction over a multi-state consumer class action as long as the state court provides " 'minimal procedural due process protection,' including a choice of law that is not arbitrary or fundamentally unfair." *Heller*, 548 N.W.2d at 290.

Similarly, the Minnesota Court of Appeals found no conflict existed when it upheld certification of a nationwide class pursuant to a single state's consumer protection statute. *See Peterson v. BASF Corp.*, 618 N.W.2d 821, 823-26 (Minn. App. 2000), *rev. denied* (Minn. 2001). In *Peterson*, the Minnesota Court of Appeals found that the trial court did not abuse its discretion in certifying a nationwide class pursuant to New Jersey's consumer protection statute because the certification did not present a due process violation. Rather, the statute applied to all persons and there was not a public policy interest in direct conflict with New Jersey's articulated policy of protecting United States residents from fraudulent acts emanating from the state. *See id.* The District Court in this case properly noted that the Minnesota Supreme Court recently declined to reverse the Minnesota Court of Appeals' application of the consumer fraud statute of a

defendant's home state. *Peterson v. BASF Corp.*, 675 N.W.2d 57 (Minn. 2004) (Court determined BASF had waived the issue through selective litigation).

SJM purposely avoids citing not only these cases, but also *In re Lutheran Brotherhood Variable Life Ins. Prods. Co. Sales. Practices Litig.*, 201 F.R.D. 456 (D. Minn. 2001) (Magnuson, J.), which held that Minnesota's consumer fraud statutes expressly and constitutionally authorize extraterritorial relief. This Court denied interlocutory review of that Order. (RA001.) Judge Magnuson reaffirmed his holding this Spring, when Lutheran Brotherhood brought yet another motion to "decertify" that class action against the Minnesota company. *Lutheran Brotherhood*, 2004 U.S. Dist. LEXIS 7789, at *16 (D. Minn. April 28, 2004), ("[T]he choice-of-law analysis is unnecessary. *** [T]he CFA is intended to apply both to the conduct of foreign corporations that injures Minnesota residents and to the conduct of Minnesota companies that injure non-residents.") (RA073.)

The District Court in this case properly followed Judge Magnuson's rationale. The Court distinguished cases in which out-of-State plaintiffs press common law claims in Minnesota courts from those cases brought under Minnesota's consumer protection statutes that specifically confer a cause of action to "any person." The Court reasoned,

> In the present case, it is clear that plaintiffs meet these definitions of "any person" or "a person," and may therefore bring suit under Minnesota law. ***The fact that individual plaintiffs hail from other states is immaterial.*** [Footnote omitted.] Plaintiffs seek relief under particular Minnesota

> statutes. ***In the absence of evidence that plaintiffs do not have standing to sue – and St. Jude provides none – the Court finds no reason to deny plaintiffs their chosen claim of action.*** Minnesota law may therefore apply to the classes' consumer protection and deceptive trade practices allegations.

(PA 0411) (emphasis added). The issue is thus one of simple standing. The District Court further determined that, by virtue of being headquartered in Minnesota where most of the fraudulent conduct took place, SJM had significant contact or a significant aggregation of contacts with Minnesota. *Id.* At PA 0411 n. 22. SJM does nothing to address these arguments, and SJM now knocks on the door of this Court with no law or facts showing that out-of-state plaintiffs have no standing under the MCFA.[5]

These principles underlie the MCFA and the District Court's class certification order. Rather than being the aberration intimated by SJM, the District Court's Order reflects the overwhelming "weight of authority" applying a single state's statute to a multi-state class.[6]

---

[5] SJM erroneously claims that *Phillips Petroleum Co. v. Shutts* erects due process barriers to the application of the MCFA to class member's claims. But in that case, the defendant did not have sufficient minimum contacts to justify the application of ***Kansas*** law to a nationwide class. *Shutts*, 472 U.S. at 799 (first sentence of opinion reads, "Petitioner is a ***Delaware*** corporation which has its principal place of business in ***Oklahoma***.") Here, SJM is a ***Minnesota*** corporation, with its principle place of business in ***Minnesota***, whose misleading and deceptive conduct occurred in and emanated from ***Minnesota***, and is being sued under a ***Minnesota*** statute that allows "any person injured by a violation" to sue.

[6] *See e.g.*, *State ex rel. Corbin v. Pickrell*, 667 P.2d 1304 (1983) (Arizona law could be applied to conduct by local businesses against out-of-state residents); *In re*

Despite these decisions, SJM relies on district court cases from outside this Circuit. In *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221 (S.D. Fla. 2002), for example, the district court refused to apply Florida's deceptive trade practices statute to the claims of non-Florida residents. But in that case, the district court found that "...Florida's interest is not particularly strong given that the bearings ... were manufactured in Indiana and Germany and installed in Textron engines in Pennsylvania." *Id.* at 228. Furthermore, it was the Pennsylvania manufacturer that was accused of disseminating the deceptive marketing materials. *Id.* at 224 para. 7. The deceptive messages neither were devised in, nor did they emanate from, Florida.

---

*Computer Memories Securities Litigation*, 111 F.R.D. 675, 686 (N.D. Cal. 1986) (California law applied to nationwide class where defendant was a California corporation and acts complained of emanated from California); *In re Boardwalk Marketplace Securities Litigation*, 122 F.R.D. 4 (D. Conn. 1988); *Lony v. E.I. DuPout deNeMours & Co.*, 821 F.Supp. 956, 961 (D. Del. 1993); *In re Kirschner Medical Corp. Securities Litig.*, 139 F.R.D. 74 (D. Md. 1991); *State v. Camera Warehouse, Inc.*, 496 N.Y.S. 2d 659, 660 (N.Y.Sup. Ct. 1985); *Kugler v. Haitian Tours, Inc.*, 293 A.2d 706, 711 (N.J. Super. App. Div. 1972) ("[the act] prohibits unlawful practices in New Jersey without limitation as to the place of residence of the persons imposed upon."); *Simms Investment Co. v. E.F. Hutton & Co.*, 699 F.Supp. 543, 545-46 (M.D.N.C. 1988); *Brown v. Market Dev., Inc.*, 322 N.E.2d 367, 369 (1974) (Ohio deceptive practices statute is intended to prohibit the deceptive and unconscionable acts and practices by Ohio suppliers in connection with consumer transactions, irrespective of location of consumer); *South Carolina National Bank v. Stone*, 139 F.R.D. 325, 334 (D. S.C. 1991); *Rio Grande Oil Co. v. State*, 539 S.W.2d 917; *Texas Civil Appeals*, (1976); *Lintz v. Carey Manor Ltd.*, 613 F.Supp. 543, 551 (W.D. Va. 1985).

However, the district court recognized that Florida's consumer protection statute clearly had extraterritorial application, citing *Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436 (Fla. 4th DCA 1999). In that case, a Florida appellate court specifically upheld application of Florida's deceptive trade practices act to a nationwide class. The plaintiffs challenged a cruise line's alleged deceptive practices in collecting port charges. The defendant was a resident of Florida and made all decisions regarding the charges and collected the charges in Florida. *Id.* According to the *Montgomery* court, even though the majority of *Renaissance* "class members were out-of-state residents, the commerce implicated by the claims was clearly instate commerce." *Id.* Here, like in *Renaissance*, the effect on trade is in Minnesota. SJM is a Minnesota Corporation which has made millions of dollars by manufacturing heart valves ***in Minnesota***.

**B. An Out of State Victim Suing a Minnesota Company under a Minnesota Statute Does Not Violate the Dormant Commerce Clause.**

While spending time ***speculating*** that nationwide application of the MCFA may have an ***impact*** on interstate commerce due to other states' imagined tolerance of SJM's fraudulent marketing and pricing (Petition at 15), SJM wholly failed below, as it fails here, to demonstrate that the MCFA ***actually burdens*** interstate commerce, much less that any such burden is excessive in light of the local benefits the MCFA conceives. *See Southern Union Co. v. Missouri Public Service*

*Comm'n*, 289 F.3d 503, 508 (8th Cir. 2002) (dormant Commerce Clause is limited to state laws directed to foster "local economic protectionism ... that would excite those jealousies and retaliatory measures" that would "patently discriminate against interstate trade"); *see also* Brief of *Amicus Curiae* State of Minnesota, *supra* (Minnesota courts can constitutionally apply State consumer protection laws to conduct directed from Minnesota; applying the MCFA to such conduct does not *per se* violate the Commerce Clause) (RA082); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970) ("[Statutes] will be upheld unless the burden imposed on such commerce is ***clearly excessive in relation to the putative local benefits***").

As the Minnesota Attorney General has already concluded, the "MCFA easily survives scrutiny under the *Pike* test." Brief of *Amicus Curiae* State of Minnesota at 16 (RA082). In fact, the only burden to which SJM points is one, not imposed on interstate commerce, but rather on SJM alone, whose singular acts of deceit occurring within the borders of Minnesota are proscribed by the states UDAP statutes.

Minnesota, just like every other state, has a legitimate and compelling interest in preserving a business climate free from deceptive practices. The ability to police its own corporate residents fosters consumer confidence in Minnesota corporations nationwide, ensuring the influx of the out-of-State capital necessary to

spur the growth of Minnesota businesses. *See Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539, 556-57 (Cal. 1999) (dormant commerce clause does not prohibit application of remedial consumer fraud statutes to out-of-State transactions where harmful conduct involved occurred in California by California-headquartered corporate defendant); *see also Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D. N.J. 1998) ("equally clear that this state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries"). As stated by the New York Supreme Court: "[A] state is damaged if its citizens are permitted to engage in fraudulent practices even though those parties damaged are non residents of the state." *People v. Camera Warehouse, Inc.*, 496 N.Y.S.2d 659, 660 (N.Y. 1985). SJM ignores these "local benefits" completely, while at the same time it fails to address the "excessiveness" of the imagined burden the MCFA has placed on any other state.

### C. A Choice of Law Analysis Is Not Necessary Because There Is No Conflict Between the Laws of Relevant Jurisdictions, And Such Analysis Favors Application of the Minnesota Consumer Fraud Act Anyway.

Strangely, SJM argues the Court consider the application of the 50 states' "consumer protection" laws in lieu of the MCFA, despite the fact that no Plaintiff has asserted a claim under any other statute. But SJM cannot require the class to seek relief under the consumer protection acts of the state where the consumer resides in lieu of exercising their rights under the MCFA. *Lutheran Brotherhood*,

2004 U.S. Dist. LEXIS 7789 at *15, 2004 WL 909741 ("the choice-of-law analysis presumes that the Court may *sua sponte* amend the Complaint to insert claims under other states' consumer protection statutes. The Court is neither inclined nor empowered to do this.") (RA073).

SJM's arguments assume that other states have an interest in ***allowing*** conduct forbidden by MCFA, and in denying their citizens the protections of a Minnesota statute that undeniably governs a Minnesota corporation. To the contrary, even assuming, *arguendo*, that "consumer protection statutes" comprise a definable area of law with sufficiently measurable borders, virtually all states' consumer protection statutes are modeled on the Uniform Deceptive Trade Practices Act promulgated by the Federal Trade Commission. *See, e.g., Poulin v. Ford Motor Co.*, 513 A.2d 1168, 1171 (Vt. 1986) (Vermont's consumer fraud law to be "guided by the construction" of FTC Act and its regulations); *see also Iadanza v. Mather*, 820 F. Supp. 1371, 1380 n. 12 (D. Utah 1993) (noting most widely adopted consumer protection statutes are those modeled after UDTPA). In fact, the differences between various states' consumer protection laws have been characterized by the Ninth Circuit as "idiosyncratic" at best, and "not sufficiently substantive" to predominate over common claims in a class action as contemplated by *Shutts*. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1988).

Once the District Court found that an MFCA claim could be prosecuted by "any person" regardless of residence, it properly concluded that there could be no conflict because each and every class member could prosecute the same MCFA claims in any state or federal court in the nation. In short, no other state's law applies. *See Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91, 93-94 (Minn. 2000) (before court applies choice-of-law analysis, court must determine that conflict exists between laws of two fora). The District Court then engaged in a *Shutts* analysis to determine that it was not fundamentally unfair to apply the MCFA to SJM.

SJM wrongly claims it was error for the District Court, having determined that there was no other statute at issue, not to engage in a conflict-of-law analysis. But even under SJM's suggested analysis, the District Court's reasoning demonstrates that its nationwide class certification order is not an abuse of discretion.

Federal courts sitting in diversity are required to look to the choice-of-law principles of the forum state and then apply the same law to the case as the forum state would. *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1064 (8th Cir. 2003). A choice-of-law analysis in Minnesota involves a three-step process. *See Jepson v. Gen. Casualty Co. of Wisc.*, 513 N.W.2d 467 (Minn. 1994). The first step is to determine whether there is an actual conflict between the states' laws. *Id.*

at 469. Next, courts determine whether there are sufficient contacts with the state to make application of its law consistent with the requirements of due process. *Id.* Finally, courts consider the five-factor test the Minnesota Supreme Court adopted in *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973): (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forums' governmental interest; and (5) application of the better rule of law. *Id.* at 470.

The statutes apply to "any person" and their underlying policy does not contradict those of other states. In addition, class members also have a tight connection to Minnesota because SJM resides there, manufactured its heart valves there, and developed and implemented its allegedly deceptive and fraudulent communications there. SJM cannot complain when it is bound to abide by the laws of its home jurisdiction, nor should a multiplicity of courts around the country be forced to deal with these identical issues when one court obviously can. And finally, Minnesota's interest in policing corporate misconduct within its own borders favors choosing Minnesota's statutes over unnamed, imaginary ones. The Minnesota Legislature is clearly within its right to protect the quality and

reputation of Minnesota products and services, and to protect the economic stability of honest business in the State.[7]

In essence, SJM's strawman "choice-of-law" analysis winks at the collected minutiae of each state's laws, while at the same time highlighting no conflict in particular. No party before the Court is prosecuting a consumer fraud claim pursuant to another state's statute. And Minnesota, like each of the 49 other states, has embraced the policy of protecting consumers.

## III. ABSENT CLASS MEMBERS' PERSONAL INJURY CLAIMS WILL NOT BE PRECLUDED BECAUSE THE CIRCUMSTANCES EXEMPT APPLICATION OF RES JUDICATA FOR COLLATERAL LEGAL THEORIES LEFT UNADJUDICATED IN THIS CLASS ACTION.

SJM's Petition implicitly argues that the Court erred in certifying the statutory consumer claims while declining class status to personal injury claims. SJM thus asserts that certifying a class action is an all-or-nothing proposition. A district court, SJM claims, either certifies the entire Complaint for class treatment, or none of it. This position, however, turns decades of class action practice on its head. The very structure of Rule 23 inherently preempts other procedural rules prohibiting "claim-splitting." Congress constructed Rule 23 to enable the Court to

---

[7] The District Court found that "Minnesota has significant contacts by virtue of St. Jude having its headquarters and manufacturing facilities in Minnesota, and because many of the decisions regarding the Silzone valve were made by St. Jude in Minnesota." PA 0391, n.9; *see also id.* at 0411, n.22.

try some issues with common proof without prejudicing the ability of absent class members to pursue additional relief based on individual theories of recovery.

Courts have properly recognized obvious exceptions to claims-splitting prohibitions, all of which apply here or are still available for the District Court's exercise. The first exception applies automatically under the present circumstances: the District Court has properly certified a class under Minn. Stat. § 8.31, subd. 3a, and has decided ***not*** to certify personal injury actions, a dichotomy that Rule 23 expressly allows. *See* Restatement (Second) of Judgments § 26(1)(c).

The second exception allows the Court expressly to "reserve" the rights of absent class members to bring individual cases under other theories that arise from the same transactions or occurrences giving rise to claims in the class action. REST. 2d JUDG. § 26(1)(b) (res judicata does not apply where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action.") The reservation, when expressly outlined in the Court's order, would be binding on other courts. Finally, the class notice may alternatively inform class members who may have personal injury claims to seek the assistance of counsel and determine whether they should opt out of the class action proceeding.

**A. So-Called "Claim-Splitting" Is Permissible in Class Actions and Does Not Preclude Non-Certified Legal Theories from Being Pursued in a Later Action.**

SJM posits that a consumer class action cannot be maintained where there also may be claims by absent class members for personal injury against the same defendant because absent class members would, theoretically, have the obligation to bring their personal injury claims along with their statutory consumer claims. However, if the rule advocated by SJM were to prevail, the class mechanism would quickly become a useless relic. For instance, no class would be maintainable in an action for broad-based, discriminatory employment policies and practices because there might be individual employees who could complain of actual incidents of discrimination under a different theory.

Citing *Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999), SJM asserts that the continued certification of the consumer fraud claims would make Plaintiffs inadequate because a judgment on consumer fraud would have a *res judicata* effect upon their personal injury claims and those of the rest of the class. That case dealt with potential *res judicata* effects on non-class certified personal injury claims of a certified medical monitoring claim. The District Court declined to extend *Thompson* to the circumstances in this case. Like some other courts, the court in *Thompson* was unwilling to maintain class proceedings, citing *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982), a

case where a trial court refused to certify any class where some claims would be adjudicated but others would not. However, the U.S. Supreme Court's opinion in *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S. Ct. 2794 (1984), has overruled *Feinstein* for all practical purposes.

In *Cooper*, the Supreme Court held that the general rule invoking *res judicata* had no application to former class plaintiffs because the alternate theories of relief required different elements of proof. *Id.* at 878-80, 104 S.Ct. at 2800-02. *Res judicata*, therefore, did not bar the plaintiffs from bringing their individual claims against the same defendant in separate actions. *Id.* In so holding, the Supreme Court determined that a court's choice to use the class device in order to address common questions under Rule 23 supercedes other procedural requirements of individual actions:

> The class-action device was intended to establish a procedure for the adjudication of common questions of law or fact. If [defendant's] theory were adopted, it would be tantamount to requiring that every member of the class be permitted to intervene to litigate the merits of his individual claim.

*Id.* at 880, 104 S.Ct. at 2802. Thus, the preclusive effects of a class judgment are narrowly limited to the legal issues raised in the class proceeding.

More recently, courts have more fully articulated the class action exception to the typical *res judicata* effect on unlitigated issues, based on the plain language of Rule 23 (c)(4). Thus, *res judicata* cannot apply to legal theories left unadjudicated in the class trial. *See* 7B Charles Allen Wright & Arthur R. Miller,

FEDERAL PRACTICE & PROCEDURE § 1790 (2d ed. 1990) ("The theory of Rule 23(c)(4)(A) is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member.")

Courts routinely segregate legal theories of relief, certifying some and not others. And the Advisory Committee Notes to Rule 23 contemplate even that liability may be proven using the class device, while the elements of damages would be proven individually. Courts have rejected defendant's attempts at raising the specter of *res judicata* application to partially adjudicated claims in order scuttle class certification in its entirety. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) (Rule 23(c)(4) allows court to segregate and separately certify some causes of action without certifying others, and reading Rule 23 to require all-or-nothing approach due to *res judicata* concerns would make (c)(4) superfluous and meaningless).

In *Gunnells*, the Fourth Circuit rejected defendant's claim-splitting argument, noting unequivocally that "a class action, 'of course, is one of the recognized exceptions to the rule against claim-splitting.' " *Id.* at 432. Likewise, the court in *Microsoft Corp. v. Manning*, 914 S.W.2d 602 at 611 (Tex. App. – Texarkana 1995), reh'g overruled (Dec. 5, 1995), criticized the validity of opinions like *Feinstein* because they fail to recognize Rule 23(c)(4), which expressly allows

courts "to certify certain causes of action in a single case and in the same action not certify other issues not suitable for class action."

The application of Rule 23 to eschew "claim-splitting" concerns is not new. In *Sullivan v. Chase Inv. Serv.*, 79 F.R.D. 246 (N.D. Cal. 1978) the court recognized the irrelevance of the "claim-splitting" concern 25 years ago:

> Clients who have claims not raised in this class action because the claims are unsuitable for class treatment can bring those claims on an individual basis, and *res judicata* will not bar those claims because absent class members had no opportunity to litigate those issues in this lawsuit.
>
> What defendants have characterized as "splitting" causes of action is perfectly appropriate under Rule 23. It is not uncommon for defendants to engage in a course of conduct which gives rise to a variety of claims, some amenable to class treatment, others not. Those claims that are amenable should be prosecuted as class actions in order to realize the savings of resources of courts and parties that Rule 23 is designated to facilitate.

*Id.* at 265; *see also Coleman v. General Motors Acceptance Corp.*, 220 F. R. D. 64 (M.D. Tenn. 2004) (Trial by Jury Clause of constitution not violated where purported claims-splitting by plaintiffs pursuing injunctive relief, but not damages, did not forego pursuit of "live claims" "timely and properly demanded"). Rule 23 thus trumps the common law rule against "claim-splitting."

### B. Courts May Expressly "Reserve" Claims Against Which *Res Judicata* Will Not Apply in Later Actions.

So-called claim-splitting is permissible where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action." REST. 2D JUDG. § 26(1)(b). Where such language is ***expressly*** included in an order,

courts have declined to apply *res judicata* to the unlitigated theories of relief, notwithstanding that the theories may otherwise require pursuit. *See Marshall v. Kirkland*, 602 F.2d 1282, 1298 (8th Cir. 1979) (where court adjudicated class claim "without prejudice to the right of the other members of this or any other class to initiate a new action if they see fit," court held that remaining legal theories were ripe for pursuit in later action); *Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576 (1st Cir. 1995) ("Under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action."). The District Court may, in an order authorizing the content of class notice, expressly reserve the personal injury theories of absent class members who may have suffered personal injuries.

**C. Class Notice Can Advise People Who Wish to Pursue Personal Injuries to Seek Counsel and Opt Out.**

Finally, even if the class action device itself did not already moot the issue of "claim-splitting" or that an express reservation may not bar the effects of *res judicata* on class members with personal injuries, class notification procedures may be employed to protect those who do not wish to be married to the class judgment. *In re Universal Serv. Fund Telephone Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004). Plainly, persons with personal injuries can be informed that their personal injury claims are not subsumed within the classes.

Furthermore, the notice can inform those who are class members of the opportunity and procedure to exclude themselves from the class judgment. In light of the preceding arguments, it becomes clear that SJM's Petition based on claim-splitting concerns lacks substance.

## IV. THE MEDICAL MONITORING CLASS WAS PROPERLY CERTIFIED.

### A. The Smaller Medical Monitoring Class Does Not "Contradict" the Statutory Consumer Class.

SJM repeats the circular and confusing assertion that the consumer class "contradicts" (and presumably therefore nullifies) the medical monitoring class. (Petition at 32, 34-35.) As discussed above, the assertion is illogical and wrong. The Minnesota statutory claims do not depend in any way on whether other states have a stand-alone non-statutory cause of action for medical monitoring. Even if the Petition had identified any states that affirmatively bar medical monitoring as a tort remedy (which it conspicuously does not), that would *still* not be relevant to the availability of the same remedy under a consumer protection statute that allows it.

### B. The District Court's Exhaustive *Erie* Analysis Was Correctly Performed.

Petitioner attacks the lower court's comprehensive *Erie* analysis in its selection of 17 jurisdictions that make up the Medical Monitoring Class, though addresses only 5 of the 17 states as "wrong" (and cites authority for only two of

these – Minnesota and Delaware). Yet even SJM's hand-picked sample was correctly included in the medical monitoring class by the District Court:

**Minnesota.** Petitioner attacks the inclusion of Minnesota by arguing that Minnesota requires a physical injury in order to obtain medical monitoring, citing *Bryson v. Pillsbury Co.*, 573 N.W. 2d 718, 721 (Minn. Ct. App. 1998). Notwithstanding the "manifest injury" issue which was exhaustively briefed below, *Bryson* actually allowed medical monitoring, based on expert opinion that subcellular damage occurred from toxic exposure. Expert opinion presented below in this case is congruent. *See also Werlein v. United States*, 746 F. Supp. 887, 901 (D. Minn. 1990)

**Delaware.** Petitioner likewise asserts that Delaware law requires physical injury for medial monitoring "relief," citing *Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647, 651 (Del. 1984). However, in *Mergenthaler*, the Delaware Supreme Court actually implicitly endorsed medical monitoring where a physical injury involved subclinical infection rather than clinically active disease.

**Connecticut.** Without citation to any authority, Petitioner claims no Connecticut court has recognized medical monitoring. Connecticut jurisprudence actually holds to the contrary. In *Doe v. City of Stamford*, 699 A.2d 52 (Conn. 1997), the Connecticut Supreme Court approved medical monitoring in a worker's compensation case brought by a policeman who was potentially exposed to HIV

and tuberculosis, although he showed no evidence of having contracted either. The high court's opinion cited favorably to the Third Circuit's decision in *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 852 (3d Cir. 1990), setting forth elements of a medical monitoring claim without present clinical injury. *City of* Stamford, 699 A.2d at 55 n.8.

**Colorado.** Again, without citation to any authority, Petitioner claims no Colorado court ever allowed a medical monitoring class and that an unidentified federal district court viewed medical monitoring as one of "first impression." The truth is that the federal courts in *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1477 (D. Colo. 1991) and *Brafford v. Susquehanna Corp.*, 586 F. Supp. 14, 15 (D. Colo. 1984) have recognized medical monitoring. The *Cook* court undertook a careful analysis to fulfill its predictive duty under *Erie*. Similarly, the *Brafford* court found that radiation exposure (not unlike Silzone exposure) could support a finding of present injury and an award of future damages.

**Kansas.** Again, Petitioner fails to cite to authority. And, again, the actual case law refutes Petitioner's proffer. In fact, Kansas's intermediate appellate court has spoken at least obliquely on medical monitoring, demonstrating that courts recognize the remedy, including as (but not limited to) a remedy in strict liability. *Cott v. Peppermint Twist Management Co.*, 856 P.2d 906, 912 (Kan. 1993). A strict liability claim encompassing a medical monitoring remedy is equivalent to a

stand-alone medical monitoring claim. *See also Burton v. R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515, 1522, n. 6 (D. Kan. 1995) (describing parameters of a medical monitoring claim).

Thus, even selecting its own preferred examples, Petitioner has not shown the District Court's *Erie* analysis was performed in error. In defining the medical monitoring class, the District Court had to predict from available evidence state law as the highest court in each jurisdiction would find it. With elaborate briefing and care, that is what it did, and the Petition raises no contrary inference.

**C. The Remedy of a Medical Monitoring Program for Early Detection of Medical Problems is Injunctive Relief.**

Petitioner also claims that medical monitoring amounts to damages which Rule 23(b)(2) does not allow. The case law holds to the contrary. In *Werlein v. United States*, 746 F.Supp. 887, 895 (D. Minn. 1990), a chemical exposure case, the district court recognized that medical monitoring relief, like that sought here, is injunctive in nature. *See also*, *Ayers*, 106 N.J. at 608-09, 525 A.2d at 314 ("the use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases … is a highly appropriate exercise of the Court's equitable powers."); *Katz v. Warner-Lambert Co.*, 9 F. Supp. 2d 363, 364 (S.D.N.Y. 1998) ("A claim for medical monitoring and research fund is injunctive in nature.").

This case is similar to *Werlein*, *Ayers* and *Katz*. Here, the medical monitoring class certified by the lower court consists of a court-supervised trust,

funded by Petitioner, that would provide to the class medical procedures and diagnostic tests recommended to uncover probable latent conditions resulting from the implantation of a Silzone valve. The monitoring program also includes a component to research, gather and disseminate information about the diagnosis and treatment of Silzone patients -- it would not provide compensation for any personal injuries that have been or will be suffered.

### D. The Medical Monitoring Class Is Efficiently and Economically Manageable.

Petitioner's attacks on the efficiency and manageability of a medical monitoring certified class similarly fail for lack of support.

**First**, Petitioner repeats its refrain that a contradiction exists between the medical monitoring class and the consumer fraud class. As discussed *supra* Section V.A., there is no "contradiction" between the classes.

**Second**, Petitioner next contends that no medical consensus exists supporting the need for medical monitoring of Silzone valve recipients. However, for class certification purposes, Plaintiffs do *not* have to prove conclusively that they are entitled to medical monitoring. That is a merits determination. Rather, Plaintiffs must show—as they have—that there is a legitimate question concerning the need for special monitoring and a research program, and that it makes sense to address that question on a class-wide basis. *See, e.g.*, *In re Diet Drugs*, 1999 WL 673066 *11-13 (E.D. Pa. Aug. 26, 1999). Petitioner also ignores the weight of the

considerable medical and scientific evidence, including those of its own, which demonstrate that medical monitoring is not only appropriate, but is medically warranted. (PA 0202-0204.)

The medical monitoring relief proposed here will achieve great efficiencies. All class members will receive uniform testing of uniform and appropriate quality. By contrast, if each class member were forced to seek medical monitoring costs in individual actions, there would be great danger that different courts might interpret the risk of injury differently and under different legal standards, and provide each individual plaintiff with different testing of varying quality or no testing at all. Given the high costs of individual litigation, it is certain that without class treatment, significant numbers of at-risk patients will be unable to seek redress in a court of law.

**Third**, no individual legal issue or issues of proof make the certified medical monitoring class unmanageable. In an effort to create a controversy where none exists, Petitioner argues that some states have a "negligence standard" while some states have a "strict liability" standard. That argument is a red herring. In a mass tort case, one does not create an equitable fund to provide victims with a monitoring, epidemiology and research program by first trying all the cases (10,500 in this case) to see who is entitled and who is not. Rather, monitoring is an

equitable remedy designed to protect persons judicially determined to be at heightened risk of further injury.

As Judge Bechtle held in *In re Diet Drugs*, the medical monitoring program sought was a class wide remedy for the benefit of all victims and had to be so in order to achieve its beneficial goals. *In re Diet Drugs, supra*.

More important, as correctly recognized by the District Court in its July 15, 2004, Order, "this distinction may be more formalistic than practical, as the Court anticipates little or no difference in the required proof for this subclass [Delaware, Minnesota and Ohio plaintiffs] and the subclass of states including Arizona, Colorado, Connecticut, District of Columbia, Florida, Illinois, Kansas, Montana, New Jersey, New York, Pennsylvania, Texas, Utah, and West Virginia." (PA 0929.)

As to Petitioner's repetitive theme that somehow individual issues of proof exist to preclude class treatment, similar arguments have been advanced and rejected in other mass tort cases. *See In re Diet Drugs*, *Sulzer Hip*,[8] and *Telectronics J-Lead Litigation*[9]; *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D.Ohio 1991). Moreover, as a matter of medicine and public health,

[8] *In re: Inter-op Hip Prosthesis Liab. Litig.*, MDL No. 1401, 204 F.R.D. 330 (N.D. Ohio 2001).

[9] *In re: Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997).

Petitioner's argument makes no sense. One of Plaintiffs' medical experts, Dr. Frank Tyers, an eminent cardio-thoracic surgeon with considerable experience in treating implant patients and prosthetic implant development, aptly pointed this out in his Reply Declaration to Plaintiffs' Class Certification Motion before the lower court defending his opinions:

> In sum, it is clear that the Silzone sewing cuffs are a "common mechanism" damaging the hearts of Silzone valve recipients. The observed increase in complications is not the result of individual factors. I therefore disagree with Dr. Reardon, who argues there cannot be a "common mechanism" by which Silzone damages patients' hearts because each patient is different and unique with respect to a variety of factors such as medical history, drugs prescribed, and the like. (Reardon Decl., ¶43) This is much like arguing that a knife does not cut all its victims through a common mechanism because all victims are different and unique. Even if one could identify slightly different variations on how the knife cuts (puncture, scratch, slice, chop), would this change the essential conclusion that the blade is the instrument causing the injury? Given the overwhelming evidence that Silzone coated valves have a higher incidence of complications than otherwise identical valves that lack silver coating, the conclusion that the silver coating is the common mechanism of the problem is fully warranted. Further study and monitoring are essential to advise appropriately the thousands of Silzone patients, many of whom may not be aware of the recall.

(RA044.)

## CONCLUSION

Petitioner has not and cannot demonstrate that class certification is the "death knell" of the case, that the issues presented are likely to "evade review" if interlocutory appeal is denied, or that class certification would lead to "pressures to

settle" or "raise the stakes" of litigation. Moreover, Petitioner has failed to demonstrate that the District Court's class certification rulings were anything other than well-reasoned and properly analyzed under controlling authority. Respondents respectfully request that this Court deny the Petition.

Respectfully submitted,

ZIMMERMAN REED, P.L.L.P.

DATED: August 13, 2004

BY: ______________________

CHARLES S. ZIMMERMAN
J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

LEVY, ANGSTREICH, FINNEY, BALDANTE, RUBENSTEIN & COREN, P.C.
STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
Woodcrest Pavilion, Suite 100
Ten Melrose Avenue
Cherry Hill, New Jersey 08003
(856) 424-8967

CAPRETZ & ASSOCIATES
JAMES T. CAPRETZ
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

GREEN, SCHAAF & JACOBSON, P.C.
JOE D. JACOBSON
7733 Forsyth, Suite 700
St. Louis, MO 63105
(314) 862-6800

Counsel for Plaintiffs-Respondents