EXHIBIT 9

No. 04-3117

# In the United States Court of Appeals for the Eighth Circuit

## In re St. Jude Medical, Inc. Silzone® Heart Valve Products Liability Litigation

Lester Gruvan, Beatrice Bailey, Levy D. Reddon, Bonnie L. Singer, and Joe W. Sanchez, on behalf of themselves and all others similarly situated,
Plaintiffs and Respondents,

vs.

St. Jude Medical, Inc.,
Defendant and Petitioner.

---

## APPELLANT'S OPENING BRIEF

---

From an Order Granting Class Certification by the
United States District Court for the District of Minnesota
Multidistrict Litigation No. 01-1396 (JRT/FLN)
The Honorable John R. Tunheim

---

Steven M. Kohn
James C. Martin
Steven J. Boranian
REED SMITH LLP
1999 Harrison Street
Suite 2400
Oakland, CA 94612
Telephone: (510) 763-2000
Facsimile: (510) 273-8832

Michael T. Nilan
Tracy J. Van Steenburgh
HALLELAND, LEWIS,
NILAN, SIPKINS &
JOHNSON, P.A.
600 Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 338-1838
Facsimile: (612) 338-7858

Eric J. Magnuson
RIDER BENNETT, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
Telephone: (612) 340-8900
Facsimile: (612) 340-7900

*Attorneys for Defendant and Appellant*
*St. Jude Medical, Inc.*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This is a product liability, personal injury class action arising out of the implantation of FDA-approved mechanical heart valves—known as Silzone® heart valves—made and sold by Defendant and Appellant St. Jude Medical, Inc. In January 2000, St. Jude Medical voluntarily recalled all unimplanted Silzone® heart valves after data from a randomized study suggested a small—about 2 percent—increased incidence of one complication among Silzone® valve recipients. This MDL litigation followed, in addition to litigation in other jurisdictions.

St. Jude Medical appeals from orders certifying two classes. *First*, the district court certified a nationwide class of Silzone® patients seeking personal injury damages and medical monitoring relief under certain Minnesota consumer protection statutes. This order is an improper and unconstitutional projection of Minnesota's statutes into other jurisdictions. Further, because of the diversity among the class members and their potential claims, the class also fails to meet Rule 23's requirements. *Second*, the district court certified a separate medical monitoring class applying the tort law of 17 states. This class too fails to meet Rule 23's requirements, because of the diversity among the class members. In addition, the district court's allowance of a medical monitoring claim in numerous states offends the *Erie* Doctrine.

Oral argument will assist the court in considering the complex constitutional and statutory issues that this appeal presents. St. Jude Medical requests 30 minutes.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, St. Jude Medical, Inc. states that it has no publicly-traded parent or subsidiary corporation, and no publicly-held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

I INTRODUCTION 1

II JURISDICTIONAL STATEMENT 5

III STATEMENT OF THE ISSUES 5

IV STATEMENT OF THE CASE AND FACTUAL BACKGROUND 8

A. Mechanical Heart Valves: Lifesaving Devices That Present Unavoidable Risks To A Diverse And Unique Patient Population 8

B. St. Jude Medical Develops The Silzone® Heart Valve To Address Infection, But Recalls The Valves After A Clinical Study Shows A Slight Increased Incidence Of One Complication In Individuals Implanted With Silzone® Valves 9

C. Plaintiffs Sue St. Jude Medical Claiming The Silzone® Heart Valve Is A Defective Product 11

D. The District Court Certifies Plaintiffs' Proposed Classes, But Immediately Recognizes That Differences Among The Claims And Claimants Requires Further Briefing And Revision To The Classes 16

E. This Court Denies St. Jude Medical's First Petition For Appeal Without Prejudice And The District Court Makes Further Class Rulings, Including Decertifying The Personal Injury Class 17

F. After All Parties Challenge The District Court's Order, The District Court Adds States To The Medical Monitoring Class And Declines To Decertify The Nationwide Consumer Protection Class 19

V SUMMARY OF THE ARGUMENT 20

# TABLE OF CONTENTS
(continued)

Page

VI THE NATIONWIDE APPLICATION OF ONE STATE'S CONSUMER PROTECTION STATUTES TO DISPARATE PERSONAL INJURY CLAIMS OFFENDS THE CONSTITUTION AND RULE 23 22

A. The Constitution Does Not Permit A Nationwide Personal Injury Class Action Applying The Consumer Protection Laws Of One State To The Exclusion Of All Others 22

1. The Nationwide Class Offends The Commerce Clause Because It Uses A Single State's Law To Regulate Commercial Activity Nationwide 22

2. The Nationwide Class Offends The Due Process And Full Faith And Credit Clauses Because Class Members And St. Jude Medical Have The Right To Proceed Under The Properly Chosen State Law 25

3. The Nationwide Class Offends The *Erie* Doctrine And The Rules Enabling Act Because It Creates New Substantive Rights For Class Members Outside Minnesota 29

B. The Nationwide Consumer Protection Class Action Statutes Violates Rule 23 Because It Threatens The Class Members' Rights And Is An Unmanageable Nationwide Products Liability Class Action In Disguise 31

1. The Consumer Protection Class Places The Class Representatives In A Conflict Of Interest With The Class Members Because It Overtly Splits The Class Members' Claims 31

2. The Class Representatives Are Not Adequate And Their Claims Are Not Typical Also Because Of Legal And Factual Differences Among The Class Members 34

3. The Consumer Protection Class Violates Rule 23 Because It Is An Unmanageable Morass, Just Like The Now-Decertified Tort-Based Personal Injury Class 38

**TABLE OF CONTENTS**
**(continued)**


**Page**

VII THE MEDICAL MONITORING CLASS VIOLATES CONTROLLING PRINCIPLES OF FEDERAL LAW AND COMPELS CLASSWIDE RESOLUTION OF CLAIMS NOT AMENABLE TO CLASS TREATMENT 43

A. In Certifying The Independent Medical Monitoring Class, The District Court Defied *Erie's* Command That Federal Courts Refrain From Altering Or Creating New State Law 43

B. Certification Of The Independent Medical Monitoring Class As "Injunctive Relief" Under Rule 23(b)(2) Violates Due Process And The Requirements Of Rule 23 48

C. Certification Of The Independent Medical Monitoring Class Is Improper Because Of Diverse Legal And Factual Issues That Would Make Any Classwide Trial Inefficient And Unmanageable 50

VIII CONCLUSION 55

# TABLE OF AUTHORITIES

Page(s)

## CASES

Amchem Products, Inc. v. Windsor,
521 U.S. 591 (1997) .................... 7, 34, 40

Arch v. American Tobacco Co.,
175 F.R.D. 469 (E.D. Pa. 1997) .................... 40, 54

Ayers v. Township of Jackson,
525 A.2d 287 (N.J. 1987) .................... 44, 52

BMW of North America Inc. v. Gore,
517 U.S. 559 (1996) .................... 24

Badillo v. American Brands, Inc.,
16 P.3d 435 (Nev. 2001) .................... 44, 45

Barnes v. American Tobacco Co.,
161 F.3d 127 (3d Cir. 1998) .................... 8, 34, 49, 50, 53, 54

Bourgeois v. A.P. Green Industrial, Inc.,
716 So. 2d 355 (La. 1998) .................... 45

Bower v. Westinghouse Electric Corp.,
522 S.E.2d 424 (W. Va. 1999) .................... 44, 52

Brafford v Susquehanna Corp.,
586 F. Supp. 14 (D. Colo. 1984) .................... 46

Bridgestone v. Firestone,
288 F.3d 1012 (7th Cir. 2002) .................... 22, 26, 41

Broughton v. Cotter Corp.,
65 F.3d 823 (10th Cir. 1995) .................... 8, 48, 49, 54

Broussard v. Meineke Discount Muffler Shops, Inc.,
155 F.3d 331 (4th Cir. 1998) .................... 34, 35

Brown-Forman Distillers Corp. v. New York State Liquor Authority,
476 U.S. 573 (1986) .................... 23

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**


Bryson v. Pillsbury Co.,
573 N.W.2d 718 (Minn. Ct. App. 1998) .................................... 47

Castano v. America Tobacco Co.,
84 F.3d 734 (5th Cir. 1996) .................................... 40

Chin v. Chrysler Corp.,
182 F.R.D. 448 (D.N.J. 1998) .................................... 40, 53

Cook v. Rockwell International Corp.,
181 F.R.D. 473 (D. Colo. 1998) .................................... 48, 54

Doe v. City of Stamford,
699 A.2d 52 (Conn. 1997) .................................... 47

Duncan v. Northwest Airlines,
203 F.R.D. 601 (W.D. Wash. 2001) .................................... 49, 54

Edgar v. MITE Corp.,
457 U.S. 624 (1982) .................................... 23

Eklund v. Evans,
300 N.W. 617 (Minn. 1941) .................................... 24

Feinstein v. Firestone Tire & Rubber Co.,
535 F. Supp. 595 (S.D.N.Y. 1982) .................................... 32

Fink v. Ricoh Corp.,
839 A.2d 942 (N.J. Super. Ct. Law Div. 2003) .................................... 22, 27

First Colony Life Insurance Co. v. Berube,
130 F.3d 827 (8th Cir. 1997) .................................... 44

Fisher v. Bristol-Myers Squibb Co.,
181 F.R.D. 365 (N.D. Ill. 1998) .................................... 41

General Telegraph Co. v. Falcon,
457 U.S. 147 (1982) .................................... 34

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


Georgine v. Amchem Products,
83 F.3d 610 (3d. Cir. 1996) .......... 25, 40

Glover v. Standard Federal Bank,
283 F.3d 953 (8th Cir. 2002) .......... 5, 22

Goasdone v. American Cyanamid Corp.,
808 A.2d 159 (N.J. Super. Law. Div. 2002) .......... 54

Group Health Plan, Inc. v. Philip Morris Inc,
621 N.W.2d 2 (Minn. 2001) .......... 27

Guaranty Trust Co. v. York,
326 U.S. 99 (1945) .......... 30

Haley v. Medtronic, Inc.,
169 F.R.D. 643 (C.D. Cal. 1996) .......... 41

Hansen v. Mountain Fuel Supply Co.,
858 P.2d 970 (Utah 1993) .......... 44, 52

Harding v. Tambrands,
165 F.R.D. 623 (D. Kan. 1996) .......... 41, 54

Healy v. Beer Instit.,
491 U.S. 324 (1989) .......... 7, 23

Hillside Enterprises, Inc. v. Continental Carlisle, Inc.,
147 F.3d 732 (8th Cir. 1998) .......... 43

Hinton ex rel. Hinton v. Monsanto Co.,
813 So. 2d 827 (Ala. 2001) .......... 44

Hurd v. Monsanto Co.,
164 F.R.D. 234 (S.D. Ind. 1995) .......... 35

In re Agent Orange Prod. Liability Litigation,
818 F.2d 145 (2d Cir. 1987) .......... 40

## TABLE OF AUTHORITIES
(continued)

Page(s)

In re American Medical Systems, Inc.,
75 F.3d 1069 (6th Cir. 1996) .......... 40

In re Baycol Products Litigation,
218 F.R.D. 197 (D. Minn. 2003) .......... 41, 49

In re Fibreboard Corp.,
893 F.2d 706 (5th Cir. 1990) .......... 40

In re Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation,
201 F.R.D. 456 (D. Minn. 2001) .......... 27

In re Northern District of Cal. Dalkon Shield IUD Products Liability Litigation,
693 F.2d 847 (9th Cir. 1982) .......... 39

In re Paxil Litigation,
212 F.R.D. 539 (C.D. Cal. 2003) .......... 35

In re Propulsid Products Liability Litigation,
208 F.R.D. 133 (E.D. La. 2002) .......... 40

In re Repetitive Stress Injury Litigation,
11 F.3d 368 (2d Cir. 1993) .......... 40

In re Rezulin Products Liability Litigation,
210 F.R.D. 61 (S.D.N.Y. 2002) .......... 40, 51

In re Rhone-Poulenc Rorer, Inc.,
51 F.3d 1293 (7th Cir. 1995) .......... 41

In re School Asbestos Litigation,
789 F.2d 996 (3d Cir. 1986) .......... 48

In re Stucco Litigation,
175 F.R.D. 210 (E.D.N.C. 1997) .......... 40

Kurczi v. Eli Lilly & Co.,
160 F.R.D. 667 (N.D. Ohio 1995) .......... 40

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Lockheed Martin Corp. v. Superior Court,
63 P.3d 913 (Cal. 2003) ........................................................ 54

Lyon v. Caterpillar,
194 F.R.D. 206 (E.D. Pa. 2000) ............................................. 26

Mergenthaler v. Asbestos Corp.,
480 A.2d 647 (Del. 1984) .................................................. 44, 46

Mertens v. Abbott Laboratoriess,
99 F.R.D. 38 (D.N.H. 1983) .................................................. 40

Montgomery v. New Piper Aircraft,
209 F.R.D. 221 (S.D. Fla. 2002) ....................................... 23, 26

Nesladek v. Ford Motor Co.,
46 F.3d 734 (8th Cir. 1995) ................................................... 28

Newton v. Southern Wood Piedmont Co.,
163 F.R.D. 625 (S.D. Ga. 1995) .............................................. 33

Nodak Mutual Ins. Co. v. American Family Mutual Ins. Co.,
604 N.W.2d 91 (Minn. 2000) ................................................. 28

Ortiz v. Fibreboard Corp.,
527 U.S. 815 (1999) ........................................................ 7, 29

Petito v. A.H. Robins,
750 So. 2d 103 (Fla. Ct. App. 2000) ........................................ 52

Payton v. Abbott Laboratoriess,
100 F.R.D. 336 (D. Mass. 1983) ............................................. 40

Perez v. Metabolife International, Inc.,
218 F.R.D. 262 (S.D. Fla. 2003) .................................. 42, 53, 54

Peterson v. BASF Corp.,
675 N.W.2d 57 (Minn. 2004) .................................................. 28

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Phillips Petroleum v. Shutts,
472 U.S. 797 (1985) .......... 7, 25, 34, 49

Potter v. Firestone Tire & Rubber Co.,
863 P.2d 795 (Cal. 1993) .......... 44

Redland Soccer Club, Inc. v. Department of Army,
696 A.2d 137 (Pa. 1997) .......... 44, 45, 52

Reimer v. City of Crookston,
326 F.3d 957 (8th Cir. 2003) .......... 22

Reppert v. Marvin Lumber & Cedar Co.,
359 F.3d 53 (1st Cir. 2004) .......... 33

Ryan v. Eli Lilly & Co.,
84 F.R.D. 230 (D.S.C. 1979) .......... 40

Salve Regina College v. Russell,
499 U.S. 225 (1991) .......... 22

Smith v. Brown & Williamson Tobacco Corp.,
174 F.R.D. 90 (W.D. Miss. 1997) .......... 54

Sprague v. General Motors Corp.,
133 F.3d 388 (6th Cir.), *cert. denied*, 524 U.S. 923 (1998) .......... 35

Szabo v. Bridgeport Machines, Inc.,
249 F.3d 672 (7th Cir. 2001) .......... 34

Thompson v. American Tobacco Co.,
189 F.R.D. 544 (D. Minn. 1999) .......... 31, 34, 41, 50

Tracker Marine, L.P. v. Ogle,
108 S.W.3d 349 (Tex. Ct. App. 2003) .......... 22, 27

Trimble v. Asarco, Inc.,
232 F.3d 946 (8th Cir. 2000) .......... 8, 44, 45

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

Valentino v. Carter-Wallace, Inc.,
97 F.3d 1227 (9th Cir. 1996) .......................................... 35, 41

Walsh v. Ford Motor Co.,
807 F.2d 1000 (D.C. Cir. 1986) .......................................... 42

Werlein v. United States,
746 F. Supp. 887 (D. Minn. 1990) .......................................... 54

Wood v. Wyeth-Ayerst Laboratories,
82 S.W.3d 849 (Ky. 2002) .......................................... 44

Zehel-Miller v. Astrazenaca Pharmaceuticals, LP,
223 F.R.D. 659 (M.D. Fla. 2004) .......................................... 42

Zinser v. Accufix Research Institute, Inc.,
253 F.3d 1180 (9th Cir. 2001) .............................. 8, 41, 48, 49, 53, 54

## STATUTES

Cal. Bus. & Prof. Code §§ 17200, 17203 .......................................... 30

Iowa Code Ann. § 714.16(7) .......................................... 30

La. Civ. Code Ann. Art. 3215 .......................................... 45

Minn. Stat. Ann. §§ 325F.67, 325D.44, 324F.69 .......................................... 15

28 U.S.C. § 1332(a) .......................................... 5

## MISCELLANEOUS

Amendments to Rules of Civil Procedure,
39 F.R.D. 69 (1966) .......................................... 39

2 Dan B. Dobbs, *The Law of Torts Damages* § 377 (2001) .......................................... 24

# I

# INTRODUCTION

In these product liability cases arising from implantation of FDA-approved heart valves, the district court has certified a nationwide class action applying a single state's consumer protection statutes to claimants seeking personal injury and medical monitoring damages. The district court additionally certified a separate medical monitoring class applying the tort law of 17 states. This costly and duplicative dual-track resolution scheme is unprecedented, unconstitutional, unwarranted, and should be rejected by this Court.

No other federal court has certified a nationwide personal injury or medical monitoring class under a single state's consumer protection statutes to the exclusion of the consumer protection laws of all other states. No other federal court has certified a multistate medical monitoring class outside of the settlement context. And no other federal court has suggested that two such class actions should be certified to resolve nationwide product liability claims involving thousands of factually diverse claimants.

The absence of precedent for either class is not a matter of happenstance or timing. Nor does it represent some latent hostility to class actions or a lack of recognition of the nature and purpose behind Rule 23. Rather, our courts routinely have rejected class actions to resolve nationwide personal injury and product liability claims because any attempt at classwide resolution of such

cases goes beyond what the Constitution, fundamental principles of federal jurisprudence, and the contours of Rule 23 will tolerate.

These Silzone® valve cases are no exception. Here, there are multiple, fundamental infirmities in the district court's nationwide certification order involving Minnesota's consumer protection statutes.

***First***, the district court's order violates the Constitution's Commerce Clause by applying Minnesota's statutes extraterritorially and displacing every other jurisdiction's laws to establish a national regulatory regime for commerce involving Silzone® heart valves.

***Second***, the order violates the Constitution's Due Process and Full Faith and Credit Clauses by applying Minnesota's consumer protection statutes beyond Minnesota to personal injury claimants nationwide, without conducting the constitutionally required choice-of-law analysis.

***Third***, the order violates the *Erie* Doctrine and the Rules Enabling Act by invoking a federal procedural rule to give Minnesota's consumer protection statutes extraterritorial, nationwide reach, thus granting new substantive rights to nonresidents.

***Fourth***, the consumer protection class representatives are not adequate because they are asserting only selected claims on behalf of the class, thus splitting the class members' claims and risking that they will be precluded from bringing additional claims in individual actions.

***Fifth***, a rigorous analysis of the record evidence reveals that the class representatives are not adequate nor are their claims typical because the class representatives and the class members are personal injury claimants with different injuries and experiences presenting distinct and unique claims.

***Sixth***, a rigorous analysis of the record evidence again reveals that common issues will not predominate and a class action is not superior because, under plaintiffs' proposed plan, the class trial will resolve only selected claims, leaving other potential claims to be resolved in individual trials. Even in the class context, individual trials will be required on significant and time-consuming individual issues such as liability, causation, damages, and affirmative defenses.

The separately certified medical monitoring class fares no better against controlling legal principles. The district court has certified a class, under Rule 23(b)(2), of claimants with no signs of injury seeking "medical monitoring" damages under the tort law of 17 selected jurisdictions. This class too goes beyond any legally acceptable bounds for several reasons.

***First***, the class certification order violates the *Erie* Doctrine and the Rules Enabling Act by creating medical monitoring claims without proof of a current injury in jurisdictions that do not allow such claims.

***Second***, the district court erred even in undertaking to perform a 50-state *Erie* analysis, since doing so placed a federal court in the improper role of a trailblazer in connection with state medical monitoring law.

***Third***, the district court erroneously certified the class as seeking "injunctive relief" under Rule 23(b)(2) and offended due process, since the medical monitoring class seeks primarily monetary relief (funds for medical services) and does not provide for opt outs.

***Fourth***, the medical monitoring class is not sufficiently cohesive because 17 states' laws will apply and the class members' claims will present individual issues on liability, causation, damages, and affirmative defenses. In short, a classwide trial would be inefficient and unmanageable.

Through these two unprecedented certification orders, what started as a handful of personal injury cases (about 40) transferred for coordinated pretrial proceedings now has become a complex procedural morass. The district court has authorized a dual-track, class action resolution scheme that achieves no judicial economies and threatens St. Jude Medical's rights, as well as those of the absent class members.

Class actions have a role to play in our system of jurisprudence. But as the drafters of Rule 23 cautioned more than 30 years ago, class actions have no role where they violate constitutional imperatives or impose inefficient and costly resolution schemes detrimental to the interests of to all involved. This Court should reverse the class certification orders so significant constitutional and statutory principles will not be compromised and so these actions can proceed to an orderly resolution.

## II

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction over this action based on diversity of the citizenship. 28 U.S.C. § 1332(a). Defendant and appellant St. Jude Medical is a citizen of Minnesota; plaintiffs and appellees are citizens of other states. Each has placed more than $75,000 in controversy.

This Court has jurisdiction over this appeal under Rule 23(f) of the Federal Rules of Civil Procedure. *Glover v. Standard Federal Bank*, 283 F.3d 953, 959 (8th Cir. 2002). The Court granted permission for this appeal on September 2, 2004 (Appellant's Appendix ("AA") 6840)

## III

## STATEMENT OF THE ISSUES

A. Where a district court has certified a nationwide class action under Rule 23(b)(3) that asserts medical monitoring and personal injury claims on behalf of 11,000 heart valve patients (the vast majority without injuries) in 51 jurisdictions based on a single state's (Minnesota's) consumer protection statutes, to the exclusion of the consumer protection laws of all other states:

1. Does this order violate the Constitution's Commerce Clause by applying Minnesota's statutes extraterritorially and displacing every other jurisdiction's laws?

2. Does this order violate the Constitution's Due Process and Full Faith and Credit Clauses by applying Minnesota's statutes to personal

injury claimants nationwide without conducting the constitutionally required choice-of-law analysis?

3. Does this order violate the *Erie* Doctrine and the Rules Enabling Act by invoking Rule 23 to give Minnesota's consumer protection statutes extraterritorial, nationwide reach, thus granting new substantive rights to nonresidents?

4. Are the class representatives adequate where they have asserted only selected claims on behalf of the class, thus risking that class members will be precluded from bringing additional claims in individual actions and thereby placing themselves in a conflict with the class members?

5. Are the class representatives adequate and are their claims typical of the class where the class representatives and the class members are personal injury claimants with different injuries, different medical histories, and different life experiences presenting distinct and unique claims?

6. Do common issues predominate and is a class action the superior method for resolution of the class members' claims where the class trial would (a) resolve only selected claims, leaving other potential claims to be resolved in individual trials and (b) require individual trials on significant and time-consuming individual issues such as liability, causation, damages, and affirmative defenses?

Authorities: *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985); *Healy v. Beer Instit.*, 491 U.S. 324 (1989); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

B. Where a district court has certified a class, under Rule 23(b)(2), of claimants with no injuries seeking "medical monitoring" under the law of 17 selected jurisdictions that the court held to permit medical monitoring claims without proof of injuries:

1. Has the district court violated the *Erie* Doctrine and the Rules Enabling Act where it has extended the substantive law of certain jurisdictions to allow a stand-alone medical monitoring claim without proof of a current injury, when there is not adequate state authority to so hold? Is it proper for a federal district court even to undertake such a 50-state *Erie* analysis when doing so blazes new trails in state law?

2. Did the district court erroneously certify the class as seeking "injunctive relief" and run afoul of the Due Process Clause where the class seeks primarily monetary relief (funds to pay for medical surveillance) and does not provide for opt outs?

3. Is the medical monitoring class sufficiently cohesive where 17 states' laws will apply and the class members' claims will present individual issues on liability, causation, damages, and affirmative defenses, such that a classwide trial would be inefficient and unmanageable?

Authorities: *Trimble v. Asarco, Inc.*, 232 F.3d 946 (8th Cir. 2000); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001); *Broughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir. 1995); *Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998).

## IV

## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

### A. Mechanical Heart Valves: Lifesaving Devices That Present Unavoidable Risks To A Diverse And Unique Patient Population

When disease damages a human heart valve, one option is to replace it with a prosthetic mechanical heart valve. While medical science has yet to produce a perfect prosthetic replacement for a healthy native valve, many patients would not survive without mechanical heart valve implant surgery.

It is well known, however, that heart valve recipients do not recover uniformly following surgery and bear the risk of significant complications, such as endocarditis (an infection of the cardiac tissue around the mechanical heart valve), thromboembolism (formation and release of clots into the blood stream), and paravalvular leakage (blood leaking around the implanted prosthetic valve). These and other complications are risks associated with all heart valve replacement procedures, and the extent to which each heart valve patient is susceptible depends on a host of individual factors. Moreover, although there have been significant strides in the development of mechanical heart valves, valve replacement surgery does not and cannot cure a patient's underlying medical condition. (AA1154-73,2027-32,4452-54)

These risks, and the wide variation in patient outcomes, are noted in comprehensive monitoring guidelines published jointly by the American College of Cardiology and the American Heart Association. (AA1167-68,1258-1354) As these guidelines reflect, infection, thromboembolism or a paravalvular leak may arise regardless of what type or brand of heart valve is implanted. Further, the appropriate treatment for these complications is not uniform. (AA1262,1327-37) Because of these known complications, all mechanical heart valve patients, like patients with heart disease generally, require a lifetime of medical monitoring tailored to their specific medical needs. (AA1164-68,1556-64,4452-54)

### B. St. Jude Medical Develops The Silzone® Heart Valve To Address Infection, But Recalls The Valves After A Clinical Study Shows A Slight Increased Incidence Of One Complication In Individuals Implanted With Silzone® Valves

To address the well-known risk of endocarditis (infection), St. Jude Medical notified the FDA on December 29, 1995 that it planned to develop a mechanical heart valve with a sterile, antimicrobial silver coating on the sewing cuff (the ring of fabric around the prosthetic valve that allows the surgeon to suture the valve to the patient's tissue). After performing laboratory and animal tests and submitting additional human clinical information, St. Jude Medical formally submitted a Pre-Market Approval Supplement to the FDA on May 12, 1997, proposing to add an antibacterial silver-coating (to be called Silzone®) to the sewing cuff on its Masters Series mechanical heart valves. (AA1465-77)

On March 24, 1998, the FDA approved the PMA Supplement and concluded that there was sufficient evidence that the Masters Series heart valve with a Silzone®-coated sewing ring was reasonably safe and effective for its intended use as a replacement for diseased natural heart valves. (AA1476-77) Within months after FDA approval, St. Jude Medical sponsored a randomized clinical study known as the Artificial Valve Endocarditis Reduction Trial (or "AVERT")—a controlled study comparing patient experience with Silzone®-coated valves to patient experience with non-Silzone® valves. The AVERT data reported in January of 2000 (about 18 months after the study commenced) showed a small increased incidence of a single complication—paravalvular leak severe enough to require valve explantation—among study Silzone® valve recipients. The incidence was small, about 2 percent, but statistically significant compared to non-Silzone® valve recipients. The independent board overseeing the study therefore recommended suspending enrollment in the trial, and St. Jude Medical immediately decided to recall all unimplanted Silzone® valves. (AA1477-79)

After the recall, the AVERT investigators continued to follow and evaluate study participants. As more complete data have been obtained over the more than four years since the recall, the only complication in Silzone® valve recipients for which the AVERT investigators have found any statistically significant increase compared to non-Silzone® valve recipients is major paravalvular leak (leak leading to death, explantation, or reoperation). Furthermore, later data from the AVERT study show that the increased risk has declined over time. The data suggest that there is no statistically

significant difference in the risk of major paravalvular leak for patients who have had Silzone® valves implanted for at least 18 months (which includes every patient with a valve still implanted, since the recall was more than four years ago) when compared to the risk that non-Silzone® valve recipients bear. (AA1480,1567-69,1173-75,1663-67)

### C. Plaintiffs Sue St. Jude Medical Claiming The Silzone® Heart Valve Is A Defective Product

In the wake of the recall, patients filed lawsuits in various state courts, as well as filing some 40 federal cases that were then consolidated for MDL pretrial proceedings in the District of Minnesota. A group of five MDL plaintiffs then filed a Consolidated Amended Class Action Complaint purporting to represent thousands of Silzone® heart valve recipients. (AA1-26) Although these five plaintiffs asserted that they were adequate class representatives and that their claims were typical of the classes they purported to represent, discovery showed that plaintiffs are different in ways that affect the appropriate "monitoring" that each requires and that directly impact how their personal injury claims would be resolved:

*Beatrice Bailey*: Before she received her Silzone® valves, Ms. Bailey had suffered left ventricular function damage and was in congestive heart failure. Her medical history before implantation also included obesity, chronic obstructive lung disease, and cigarette smoking. As a result of longstanding valvular heart disease, Ms. Bailey's native aortic and mitral valves were replaced with Silzone® valves on January 12, 1999. Afterward, although Ms. Bailey's condition improved, she continued to experience

symptoms of advanced heart disease. It also appears that she failed to take the appropriate dose of anticoagulation medication necessary to control the risk of thromboembolic events faced by all mechanical heart valve recipients. As a result, Ms. Bailey experienced a transient ischemic attack (a "TIA") in June 2001, which is a thromboembolic event lasting less than 24 hours due to a brief interruption of the blood supply to the brain. There is no evidence that Ms. Bailey experienced a paravalvular leak or other complications attributable to her Silzone® valves, and both remain in place. She is, however, suffering from valve disease in her tricuspid valve that has not been replaced. (AA4455-56)

*Lester Grovatt*: Mr. Grovatt first underwent a surgical repair of his native aortic valve in 1966. His condition eventually worsened and in early February 1999, Mr. Grovatt was diagnosed with an enlarged aortic root, aortic stenosis, and an aortic aneurysm. On February 19, 1999, Mr. Grovatt underwent a long and very complicated surgery involving implantation of a Silzone® aortic valve, replacement of his ascending and transverse thoracic aorta with a woven Dacron graft, and a coronary artery bypass procedure. During this surgery, Mr. Grovatt experienced a brain stem infarction due to hypothermia, a type of brain injury that is a well-recognized risk of this procedure. Nevertheless, Mr. Grovatt appears to have recovered relatively well after this complex surgery, and has not experienced any paravalvular leak, thrombus, or other complications that can be attributed to his Silzone® valve. He does not appear to need any medical follow-up beyond what is

normally required for all mechanical valve recipients who are without signs or symptoms of complications. (AA4456-57)

*Levy Redden*: Mr. Redden began experiencing TIAs in 1995 and was placed on anticoagulation therapy. On July 28, 1999, Mr. Redden was implanted with a Silzone® valve because of worsening aortic valvular disease caused by a severely calcified and hardened aortic valve. This heavy calcification of Mr. Redden's native aortic valve put him at a very high risk of developing paravalvular leak because of the resulting tissue damage and difficulties it caused his surgeon in sewing the valve into the heart tissue. Mr. Redden has also been diagnosed with mitral valvular disease, but his mitral valve has not been replaced. Echocardiograms since receiving his Silzone® valve have generally shown that Mr. Redden's Silzone® valve is functioning normally. There have, however, been findings of uncertain significance that indicate either trace paravalvular leak around the outside of the valve or intravalvular leakage that is normal for a prosthetic valve. Even if it is assumed that this leak is paravalvular, it was most likely caused by (a) the severely calcified aortic valve and annulus that led to valve replacement in the first place and/or (b) the infective endocarditis that his physicians diagnosed in December 2001. The multiple TIAs Mr. Redden began experiencing four years before receiving a Silzone® valve have declined significantly, with only one report of a TIA after heart valve replacement. This sole TIA event, reported in September 2002, was most likely the result of inadequate anticoagulation therapy, as noted in his medical records. (AA4457-59)

*Joseph Sanchez*: In April 1981, almost twenty years before receiving a Silzone® valve, Mr. Sanchez was implanted with a Bjork-Shiley aortic mechanical valve. After his condition began to deteriorate again, Mr. Sanchez was diagnosed with paravalvular leak around his Bjork-Shiley valve, which was then replaced with a Silzone® valve in March 1999. During this operation, Mr. Sanchez's surgeons found that thrombus had formed on his Bjork-Shiley valve. Mr. Sanchez was at a considerably higher risk of developing paravalvular leak during this surgery, independent of any factors attributable to Silzone®, because of the residual scarring of the cardiac tissue associated with his first replacement valve surgery. In September 1999, Mr. Sanchez was hospitalized for a TIA, but an echocardiogram revealed that his Silzone® valve was functioning normally with no evidence of thrombus. Subsequent echocardiograms have demonstrated only mild leakage that is either intravalvular, normal physiological leakage, or trace paravalvular leak. Regardless, there are no indications the Mr. Sanchez has experienced any symptoms as a result of those equivocal echocardiographic findings. Mr. Sanchez's Silzone® valve has not been explanted or replaced. (AA4459-60)

*Bonnie Sliger*: Before she received her Silzone® valve on August 10, 1999, Ms. Sliger's medical history included irreversible congestive heart failure, coronary artery disease, diabetes, hypertension, lung disease, and obesity. After mitral valve replacement, it appears that her Silzone® valve was functioning properly, with only the normal, trivial intravalvular leak often seen with bi-leaflet mechanical valves. Specifically, there are no indications that Ms. Sliger ever experienced any significant paravalvular leak requiring

valve replacement. Nevertheless, and against the advice of four different physicians, Ms. Sliger insisted that her Silzone® mechanical valve be replaced with a tissue valve because she did not want to take the anticoagulation medication necessary for all mechanical valve recipients and did not like the clicking sound characteristic of all mechanical heart valves. As a result, her Silzone® mechanical valve was replaced with a non-Silzone® tissue valve on August 29, 2000. Significantly, and contrary to plaintiffs' experts' claims of universal poor healing in Silzone® valve recipients, her physician noted that there had been good healing of the tissue around her Silzone® valve ring with no evidence of paravalvular leak. There is also no indication that any thrombus had formed anywhere on her Silzone® valve. (AA4460-61) St. Jude Medical is informed that Ms. Sliger recently passed away.

In their Consolidated Amended Class Action Complaint, this diverse group of plaintiffs alleged claims under the common law for strict liability, breach of warranty, negligence, and medical monitoring, and under certain of Minnesota's consumer protection statutes (specifically, the False Statements in Advertising Act, Minn. Stat. Ann. § 325F.67, the Deceptive Trade Practices Act, *id.* § 325D.44, and the Consumer Fraud Act, *id.* § 325F.69). (AA1-26)

In a motion for class certification, plaintiffs argued first for certification of a "personal injury class" of Silzone® heart valve recipients who had allegedly suffered personal injury due to a Silzone® valve and sought damages under a variety of tort and warranty claims. Second, they asked for certification of a "medical monitoring class" of every Silzone® heart valve recipient, except those who died because of the Silzone® valve or had their

valves removed because of an injury "associated with" the Silzone® valve. The medical monitoring class sought future diagnostic testing and accumulation and study of epidemiological data. (AA51-124)

As an additional basis for both the personal injury and medical monitoring classes, plaintiffs alleged violations of three Minnesota consumer protection statutes. (AA3255-62)

### D. The District Court Certifies Plaintiffs' Proposed Classes, But Immediately Recognizes That Differences Among The Claims And Claimants Requires Further Briefing And Revision To The Classes

St. Jude Medical opposed certification of both classes. It provided an exhaustive and carefully detailed analysis demonstrating, among other things, why the significant differences in law and in fact among the putative class members' claims made class certification inappropriate under Rule 23. (AA1018-1111) Nevertheless, on March 27, 2003, the district court issued its first class certification order, essentially certifying two classes. (AA4282-4321)

Initially, the district court conditionally certified a nationwide class of Silzone® heart valve recipients who allegedly suffered injuries. In connection with its personal injury certification, the district court made choice-of-law rulings that would eventually—and correctly—lead to the demise of the personal injury class. Applying Minnesota's choice-of-law principles, the court ruled that the law of the state where each class member's claim arose would govern that class member's tort and warranty claims, thus implicating the tort and warranty law of all the states. (AA4298-4302) The court

acknowledged the significant differences among the various states' laws, but ordered the parties to brief the question of how those differences could be handled. (AA4302-03)

When it came to the claims under Minnesota's consumer protection statutes, however, the court took a markedly different tack. The court decided that the statutory claims were different from tort and warranty claims and that Minnesota's consumer protection statutes could apply nationwide without the need for any choice-of-law analysis. (AA4317-20) The result was a nationwide personal injury class applying the tort and warranty law of all the states and the consumer protection law of only one—Minnesota—to the exclusion of all others.

The district court separately certified a class of all Silzone® heart valve recipients claiming funds for medical monitoring. (AA4304-16) Because the law on medical monitoring among all the states differed, the court ruled that the class would include only those valve recipients from states that recognized medical monitoring claims. (AA4314-16) Once again, the court found that Minnesota's consumer protection statutes provided an additional basis for the nationwide medical monitoring class, just as they did for the personal injury class. (AA4317-20)

### E. This Court Denies St. Jude Medical's First Petition For Appeal Without Prejudice And The District Court Makes Further Class Rulings, Including Decertifying The Personal Injury Class

After this Court denied a Rule 23(f) petition as "premature," the parties submitted extensive briefing in the district court on whether the certified

classes could survive the pronounced differences in state substantive law. (AA4323-5965) Following further argument, the district court issued its second conditional class certification order on January 5, 2004. (AA6144-69) The court agreed with St. Jude Medical that "no two states' law is substantially alike when the Court considers all of plaintiffs' substantive claims" [AA6150], and thus it decertified the personal injury class insofar as it asserted tort and warranty claims [AA6148-51]. As the court put it: "Given the significant differences in state law and the number of plaintiffs' claims, combined with potential individual differences among the plaintiffs, the Court can no longer find that a class action would be the superior method of adjudication of these disputes." (AA6150)

The district court also limited the medical monitoring class to a subclass of Silzone® heart valve recipients implanted in states purportedly recognizing a stand-alone medical monitoring claim not requiring injury. (AA6151-55) (The court enumerated those states by name, resulting in a class of recipients from 14 states, later increased to 15 based on a letter that plaintiffs submitted.) Recipients implanted in states recognizing a claim other than a stand-alone non-injury claim would pursue those claims in their own individual civil actions.

Despite decertifying the personal injury class and significantly limiting the medical monitoring subclass, the court left intact the nationwide class asserting claims under Minnesota's consumer protection statutes. These rulings created a dual-track resolution scheme under which class members would pursue their tort claims (if any) in individual civil actions and their

consumer protection claims in a classwide trial. The district court accordingly ordered plaintiffs to submit a proposed trial plan for classwide claims brought under those statutes. (AA6167)

### F. After All Parties Challenge The District Court's Order, The District Court Adds States To The Medical Monitoring Class And Declines To Decertify The Nationwide Consumer Protection Class

After the January 5 order, plaintiffs disagreed with the district court's narrowing of their medical monitoring class and sought reconsideration. They asked the district court to add another 15 states. (AA6171-73,6181-95) Plaintiffs also filed a trial plan for a two-phase consumer protection class trial—a first phase on liability and aggregated damages and a second phase for individual "proof of claim." The trial plan disclosed plaintiffs' intent to seek personal injury damages (specifically lost wages and medical expenses) even though the district court had decertified the personal injury class. Their plan also called for medical monitoring relief for every Silzone® heart valve recipient nationwide, despite the district court's decision limiting the medical monitoring class only to those states with a stand-alone medical monitoring claim. (AA6174-79)

Yet, as St. Jude Medical pointed out in response, plaintiffs' trial plan, when considered with the district court's prior rulings, offered a Byzantine resolution system which hopelessly fragmented the class and promised unwieldy and costly claim resolution. In a motion to decertify the consumer protection class, St. Jude Medical explained why plaintiffs' proposed classwide resolution was unlawful, unmanageable, wasteful, and posed a direct

threat to the rights of the class members and St. Jude Medical alike. (AA6299-6329)

Nevertheless, on July 15, 2004, the district court issued its third and final class certification order, expanding the medical monitoring class and endorsing a nationwide class action for personal injury and medical monitoring claims under Minnesota's consumer protection statutes. (AA6827-39) The court subtracted one state from the medical monitoring class and added three (for a total of 17 states), finding that plaintiffs had provided authorities from those states supporting medical monitoring claims meeting the court's criteria. (AA6833-38) The court also denied St. Jude Medical's motion to decertify the consumer protection class. (AA6832-33) This Court granted St. Jude Medical's petition to appeal on September 2, 2004. (AA6840)

## V

## SUMMARY OF THE ARGUMENT

The consumer protection class that the district court certified under Rule 23(b)(3) is an unprecedented and unwarranted use of one state's consumer protection statutes to provide personal injury and medical monitoring remedies to claimants nationwide. No other federal court has extended state law so assertively beyond state boundaries, and no other federal court has applied state law to claimants from around the country without conducting any choice-of-law analysis. The Commerce, Due Process, and Full Faith and Credit Clauses erect barriers to this kind of judicial overreaching, but the district court failed to heed any of these Constitutional demands.

The district court's nationwide certification order also fails under Rule 23's express requirements. Plaintiffs' consumer protection class is a personal injury class, expressly seeking personal injury damages, with all the individualized variations among class members that federal courts routinely invoke to reject personal injury, product liability classes. The class representatives cannot adequately represent these diverse class members, the representatives' claims are not typical of these diverse class members, and the differences among the class members make a class action anything but the manageable, superior method for resolution that Rule 23(b)(3) requires. The district court recognized as much when it decertified the nationwide personal injury class asserting tort and warranty claims.

The separate medical monitoring class suffers from similarly fatal deficiencies. The 17 states have different laws on medical monitoring. Moreover, this non-opt-out, Rule 23(b)(2) class consists of thousands of Silzone® recipients, the vast majority without apparent injuries, with different experiences, different medical histories, and different medical prognoses. Under these circumstances, the core question behind medical monitoring—whether a patient required monitoring *in addition to* what he or she normally would require and, if so, the nature of the additional monitoring—depends on individual factors that separate these class members from one another, and from the class representatives. The class is not cohesive in any sense of that word.

For each and all of the above reasons, both certification orders entered below should be reversed.

# VI

# THE NATIONWIDE APPLICATION OF ONE STATE'S CONSUMER PROTECTION STATUTES TO DISPARATE PERSONAL INJURY CLAIMS OFFENDS THE CONSTITUTION AND RULE 23

## A. The Constitution Does Not Permit A Nationwide Personal Injury Class Action Applying The Consumer Protection Laws Of One State To The Exclusion Of All Others

### 1. The Nationwide Class Offends The Commerce Clause Because It Uses A Single State's Law To Regulate Commercial Activity Nationwide

Each state has its own consumer protection law.[1] *See, e.g., Fink v. Ricoh Corp.*, 839 A.2d 942, 948, 974-82 (N.J. Super. Ct. Law Div. 2003) (surveying state laws on consumer fraud); *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 352-55 (Tex. Ct. App. 2003) (surveying state laws). These laws, as the Seventh Circuit noted in *In re Bridgestone/Firestone Inc.*, "vary considerably" and do so in many respects, including who may bring a claim, against whom, and on what grounds. 288 F.3d 1012, 1018 (7th Cir. 2002). As a result, "courts must respect these differences [in state law] rather than apply one state's law." *Id.*

Of the many reasons to prohibit using one state's law to displace all other law nationwide, the most basic is the Commerce Clause of the U.S. Constitution. In *Healy v. Beer Instit.*, 491 U.S. 324 (1989), the Supreme

[1] This Court reviews district court interpretations of law, including state law, under a de novo standard. *See Salve Regina College v. Russell*, 499 U.S. 225, 231-234 (1991); *Reimer v. City of Crookston*, 326 F.3d 957, 961 (8th Cir. 2003). This Court review orders granting or denying class certification for abuse of discretion. *Glover*, 283 F.3d at 959 (reversing certification order).

Court emphasized the Commerce Clause's "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Id.* at 335-36. To give controlling force throughout the nation to the law of any single state, in derogation of the law of all the others, is intolerable under the Commerce Clause. "This kind of potential . . . national regulation . . . is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state [laws]." *Id.* at 340; *see also Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582-83 (1986) (rejecting New York's attempt to "project its legislation" into other states as a violation of the Commerce Clause's prohibition of direct regulation of interstate commerce); *Edgar v. MITE Corp.*, 457 U.S. 624, 644-45 (1982) (plur. opn.) (under Commerce Clause, state has no legitimate interest in applying its law to protect non-residents).

These seminal principles reflect the well-established rule that a state cannot expand its sovereign powers to legislate nationally. The Commerce Clause therefore will not tolerate a nationwide class action applying one state's consumer laws on an extraterritorial and exclusive basis. For example, faced with proposed nationwide application of a Florida consumer fraud statute, the district court in *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228-31 (S.D. Fla. 2002), bluntly stated that the "Commerce Clause to the United States Constitution precludes the application of [the Florida statute] to each and every class member's claim." In so holding, the court cited Supreme

Court authority, including *Healy*, holding that a state, through its courts, cannot export its legislation on a nationwide basis.

Here, the class certification order improperly embraces this prohibited result by exporting Minnesota's consumer statutes to jurisdictions nationwide and effectively imposing nationwide standards for commerce involving Silzone® valves. The order operates on the premise that Minnesota statutory law can apply nationwide to provide personal injury remedies, including the personal injury damages that plaintiffs here expressly seek—lost wages and medical expenses. *See* 2 Dan B. Dobbs, *The Law of Torts Damages* § 377, at 1047-48 (2001) (medical expenses and loss of wages are personal injury damages arising out of products liability); *Eklund v. Evans*, 300 N.W. 617, 619 (Minn. 1941) (personal injury damages include loss of earning capacity and medical expenses).

But the extraterritorial application of one state's law, to the exclusion of all others, offends the Commerce Clause by transforming one state's public policy into a nationwide regulatory regime. The Commerce Clause reserves the regulation of interstate commerce to Congress, and it prevents states from "legislating" beyond their borders. As the Supreme Court has emphasized, only Congress can enact a policy for the entire nation. *BMW of North Am. Inc. v. Gore*, 517 U.S. 559, 571-72 (1996). Because the consumer protection class certified below runs afoul of that core principle, this Court should reject it.

### 2. The Nationwide Class Offends The Due Process And Full Faith And Credit Clauses Because Class Members And St. Jude Medical Have The Right To Proceed Under The Properly Chosen State Law

Before a court can apply one state's law extraterritorially in a multistate class action, the Constitution requires proper analysis of which state law should apply to the various class members' claims. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816-17 (1985) (performing choice-of-law analysis first, before ruling that constitution forbids classwide application of Kansas law); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d. Cir. 1996) (holding that class certification scrutiny includes "individualized choice of law analysis to each plaintiff's claims"), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)). In performing that analysis, a district court cannot apply one state's law to a multistate class action unless the state has "a 'significant contact or significant aggregation of contacts' to the claims asserted *by each member of the plaintiff class*, contacts 'creating state interests,' in order to ensure that the choice of [its] law is not arbitrary or unfair.'" *Shutts*, 472 U.S. at 821-22 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)) (plur. opn.) (emphasis added); *see also Georgine*, 83 F.3d at 627 (citing *Shutts*, 472 U.S. at 823, and stating that due process requires a trial court to "apply an individualized choice of law analysis to *each plaintiff's claims*" (emphasis added)).

A recent example again is *Montgomery*, 209 F.R.D. at 228-31. In that case, the district court cited due process as a separate reason to reject a nationwide class applying a Florida consumer statute, concluding that the "Due Process Clause of the Constitution prohibits application of [the Florida

statute] to a nationwide class." *Id.* at 229. The district court acknowledged that the defendant manufactured the products at issue (airplanes) in Florida. *Id.* But that Florida-based activity was not sufficient to justify applying Florida law to every transaction nationwide. *Id.*; *see also Bridgestone*, 288 F.3d at 1016 (rejecting application of a single state's law exclusively to class members' claims nationwide: "Neither Indiana nor any other state has applied a uniform place-of-the-defendant's headquarters rule to products-liability cases."); *Lyon v. Caterpillar*, 194 F.R.D. 206, 213 (E.D. Pa. 2000) ("Applying the Pennsylvania consumer fraud act to all the putative class members' claims would be a violation of the due process rights of those plaintiffs who do not live in Pennsylvania and/or who did not purchase their boats in Pennsylvania.").

Here, the district court's order fails to conduct any choice-of-law analysis with respect to the consumer protection claims. Yet, because consumer protection laws around the country differ from Minnesota's and because the vast majority of the class members' claims have no direct connection to Minnesota, a choice-of-law analysis for each class member's claims was a constitutional imperative.

The district court avoided the required analysis by citing language in Minnesota's consumer protection statutes authorizing "any person" to bring a claim. (AA 410) Although this language broadly grants standing to sue, as consumer protection statutes typically do, it says nothing about the separate

and conceptually distinct issue of what state law should apply.[2] This language in no way suggests—nor could it consistent with the Constitution—that the Minnesota statutes should be applied to the exclusion of all other laws. *See Fink*, 839 A.2d at 972-91 (New Jersey's Consumer Fraud Act does not displace the analogous law of other states); *Tracker Marine*, 108 S.W.3d at 352-63 (same as to Missouri's Unlawful Merchandising and Practices Act). Nor is there any indication that the Minnesota legislature intended such a radical application of its law-making authority. The district court's avoidance of the choice-of-law analysis is manifest error in and of itself.

---

[2] The Minnesota Supreme Court's opinion in *Group Health Plan, Inc. v. Philip Morris Inc* illustrates how the statute's "any person" language relates to expanded standing, as opposed to a legislative endorsement to export the statute. 621 N.W.2d 2 (Minn. 2001). In *Group Health*, the Court considered the phrase "any person" at length and decided that it included merchants, in addition to purchasers and consumers, thus giving a broader group of plaintiffs standing to sue. 621 N.W.2d at 8-9. But because the plaintiffs in Group Health all were Minnesota-based companies, the Supreme Court did not address the statute's extraterritorial application. *Id.* at 3. In fact, the *only* support that the district court here cited for its expansive reading of Minnesota's statutes is a footnote in *In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*, 201 F.R.D. 456, 461 n.1 (D. Minn. 2001), where another district judge concluded that the words "any person" meant that Minnesota law could apply to a nationwide class without further analysis. But that court's analysis was summary, and the *only* authority it cited for its extraterritorial extension was *Group Health*, which in no way addressed that issue. For one district court to speculate about a statute's nationwide application in a footnote and then for another to rely on that speculation to certify a nationwide personal injury class action without undertaking any choice-of-law analysis is bootstrapping at its best. If plaintiffs rely on *Lutheran Brotherhood* in this appeal, this Court should reject it out of hand.

If the district court had confronted the choice-of-law issue, it properly would have concluded that Minnesota lacks sufficient contacts with each class member's claims to apply its consumer protection law to all Silzone® claims nationwide. St. Jude Medical manufactured parts of the Silzone® heart valves in Minnesota, but it assembled them in and distributed them from both Minnesota and Puerto Rico. (AA1464) It sold them to hospitals nationwide, and physicians likewise used the Silzone® valves to treat patients across the country, the vast majority of which had no connection whatsoever to Minnesota. *See Nesladek v. Ford Motor Co.*, 46 F.3d 734, 739 (8th Cir. 1995) (declining to apply Minnesota law where allegedly defective product was produced there, but product was purchased, injury occurred, and medical expenses were incurred in another state); *Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91, 96 (Minn. 2000) (holding that "when all other relevant choice-of-law factors favor neither state's law, the state where the accident occurred has the strongest governmental interest" and thus that state's law should be applied).

Under these circumstances, the district court's unilateral displacing of the laws of other interested states cannot be reconciled with *Shutts*, or the Due Process and Full Faith and Credit Clauses.[3]

---

[3] The district court found support in *Peterson v. BASF Corp.*, 675 N.W.2d 57 (Minn. 2004), but that case is inapposite and offers no useful guidance. To begin with, *Peterson* did *not* involve a nationwide class asserting personal injury, product liability claims. Rather, it involved farmers' claims that the defendant had fraudulently marketed herbicide, causing the plaintiffs to purchase a higher-priced herbicide. *Id.* at 59. Moreover, no opinion in the

(continued…)

### 3. The Nationwide Class Offends The *Erie* Doctrine And The Rules Enabling Act Because It Creates New Substantive Rights For Class Members Outside Minnesota

"[N]o reading of [Rule 23] can ignore the [Rules Enabling] Act's mandate that 'rules of procedure "shall not abridge, enlarge or modify any substantive right [under state law]."'" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1998). Federal courts thus cannot invoke Rule 23 to create rights that do not otherwise exist under state law.

The district court, however, implicitly embraced that prohibited result. Specifically, by certifying a class under Minnesota's consumer protection statutes, the district court effectively has given the entire class claims that other states deny. For example, Minnesota's private attorney general statute gives class members a potential claim for damages for consumer law violations. But other states' various consumer protection laws differ widely on

(...continued)

various *Peterson* decisions discussed or even touched on the propriety of a nationwide class under one state's consumer protection statutes. In *Peterson*, a Minnesota court certified a multistate class under the New Jersey Consumer Fraud Act. *Id.* at 63. On an initial appeal, the intermediate appellate court reversed summary judgment in the defendant's favor and affirmed the class certification. It did not discuss the trial court's choice of law. *Id.* at 64. After a trial on the merits, the trial court entered judgment against the defendant, and the defendant appealed. *Id.* The intermediate appellate court affirmed, but again did not discuss choice of law. *Id.* at 65. The Minnesota Supreme Court also affirmed, but it too did not address the trial court's multistate application of New Jersey law, expressly ruling that the defendant had waived the issue. *Id.* at 67-68. The district court here thus drew an inference from the Minnesota courts' judicial silence, an inference that no other court—state or federal—has drawn. *Peterson* does not support the district court's order.

if, when, and in what amount damages are available; some statutes do not allow damages at all. *E.g.*, Cal. Bus. & Prof. Code §§ 17200, 17203 (permitting only equitable remedies for unfair business practices); Iowa Code Ann. § 714.16(7) (same). The district court also has allowed a nationwide medical monitoring claim, even though most states do not permit a medical monitoring claim.

Indeed, neither the plaintiffs nor the district court have explained how a nationwide medical monitoring class under a single state's consumer protection laws can coexist with plaintiffs' circumscribed medical monitoring class based on the tort law of 17 states (discussed in more detail below). On the one hand, the district court has expressly ruled that 34 jurisdictions do not allow medical monitoring claims absent current injuries. Yet on the other hand, the district court has created that very remedy for patients from all of those jurisdictions under the purported authority of Minnesota's consumer protection statutes.

By creating a nationwide medical monitoring class under Minnesota's statutes, the district court has effectively invoked Rule 23 to overrule, or at least render moot, the public policy choices of each of those 34 jurisdictions on the topic of medical monitoring. The *Erie* Doctrine and the Rules Enabling Act prohibit altering or expanding state substantive law in that fashion. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 108-109 (1945) (district court sitting in diversity is "only another court of the state" and may not "substantially affect the enforcement of a right as given by the State.").

**B. The Nationwide Consumer Protection Class Action Statutes Violates Rule 23 Because It Threatens The Class Members' Rights And Is An Unmanageable Nationwide Products Liability Class Action In Disguise**

**1. The Consumer Protection Class Places The Class Representatives In A Conflict Of Interest With The Class Members Because It Overtly Splits The Class Members' Claims**

In accepting plaintiff's proposed consumer fraud class separate and apart from the now-decertified personal injury class, the district court has placed the class representatives directly in conflict with the absent class members, irreparably undermining their adequacy as class representatives. It has done so by splitting the class members' claims and sending them on divergent paths to resolution.

Class representatives do not adequately represent the interests of absent class members when they selectively prosecute claims or limit their damages requests. Doing so creates the risk that *re judicata* will bar subsequent lawsuits by putative class members raising additional claims. In *Thompson v. American Tobacco Co.*, for example, plaintiffs sought to certify a statewide smoking class action asserting only claims for injunctive relief and medical monitoring, while reserving their individual injury and damage claims for later lawsuits. 189 F.R.D. 544, 551 (D. Minn. 1999). The district court, however, denied class certification, partly because the class representatives were not adequate. *Id.* The court reasoned that, under Minnesota law, *res judicata* precludes subsequent litigation of not only those issues actually litigated in a prior suit but also those issues which might have been litigated. *Id.* at 550. As a result, the court found plaintiffs' scaled-down request for

class treatment to be antagonistic to the interests of absent class members, rendering them inadequate class representatives.

Similarly, in *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982), the plaintiffs sought certification of a class of tire owners. But they narrowed their claims to assert only breach of the implied warranty of merchantability and to claim only "economic" and punitive damages. *Id.* at 599. Under these circumstances, the district court denied certification partly because the class representatives were not adequate. *Id.* at 606-07. By pursuing selected claims, and assuming that class members could pursue other claims in other courts, the plaintiffs had "tailored the class claims in an effort to improve the possibility of demonstrating commonality." *Id.* at 606. The price, the court said, was that the plaintiffs were "presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action." *Id.*

Here, the district court similarly has split the class members' claims. The district court certified plaintiffs' damages and injunctive relief claims under Minnesota's consumer protection statutes. The class members, according to the district court, will have to pursue damages claims (if any) under negligence, strict product liability, breach of warranty, etc. in individual civil actions. This sets up a dual-track resolution regime under which class members will be pursuing damages arising from the same events—the implantation of Silzone® heart valves—in separate forums. Under these circumstances, a judgment binding the class almost certainly will preclude class members from bringing individual claims, which can only operate to the

class members' detriment. *See, e.g.*, *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 55-57 (1st Cir. 2004) (class settlement under 50 states' consumer protection laws precluded class members' subsequent individual actions for additional damages allegedly caused by same product); *Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625, 634 (S.D. Ga. 1995) (*res judicata* barred class representative's personal injury damages claim from chemical exposure because the representative previously settled suits for property damage, medical monitoring and personal injury stemming from exposure).

Plaintiffs also are seeking only selected elements of damages—"cost of all medical care" and "wage loss" because of hospitalization for explant surgery. (AA6174-78) While they eschew other damages claims typical of personal injury lawsuits, such as emotional distress and pain and suffering, the authorities cited above show that class representatives cannot shave off potentially available items of damages to seek class certification. Taking that step to facilitate class certification violates the representatives' fiduciary duty to protect the interests of the absent members of the class, as class members will not have a second chance to recover the damages that their representatives have set aside.

Because the plaintiffs' conflict with the absent class members makes them *per se* inadequate to represent those class members, this Court should reverse the class certification order for this reason as well.

### 2. The Class Representatives Are Not Adequate And Their Claims Are Not Typical Also Because Of Legal And Factual Differences Among The Class Members

In determining whether a proposed class action meets the certification prerequisites, a court should undertake a "rigorous analysis" of the parties' legal and factual allegations, including careful analysis of evidence weighing on such issues as adequacy, typicality, commonality, and manageability. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 674, 677 (7th Cir. 2001); *Barnes v. American Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998). Where issues relating to the merits impinge also on class certification issues, that rigorous analysis includes reaching behind the pleadings and "mak[ing] a preliminary inquiry into the merits." *Szabo*, 249 F.3d at 676.

Such analysis of the record evidence here shows that plaintiffs are not adequate representatives and that their claims are not typical. As noted, a class representative has a fiduciary duty to protect the rights of absent class members. *See Shutts*, 472 U.S. at 811-12 (due process requires "that the named plaintiff at all times adequately represent the interests of the absent class members"). Thus, Rule 23(a) requires that class representatives have sufficiently similar interests such that their goals and viewpoints will not likely diverge. *Thompson*, 189 F.R.D. at 550; *see Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998) ("The premise of a class action is that litigation by representative parties adjudicates the rights of all class members,

so basic due process requires that named plaintiffs possess undivided loyalties to absent class members.").

Rule 23(a) similarly requires that the class representatives' claims be typical of the class they purport to represent. As the Sixth Circuit has summarized, "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir.), *cert. denied*, 524 U.S. 923 (1998). On factual issues, typicality is satisfied when each class member's claim has a similar factual basis or arises from the same course of events. *See Hurd v. Monsanto Co.*, 164 F.R.D. 234, 238-39 (S.D. Ind. 1995) (no typicality where there is no one set of operative facts establishing liability, exposure, or susceptibility to injury); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (no typicality where class representative alleges different injuries from those suffered by other class members). On legal issues, typicality is met only where the class representative is pursuing his or her own claims under the same legal or remedial theories as the represented class members. *In re Paxil Litig.*, 212 F.R.D. 539, 549 (C.D. Cal. 2003); *see also Broussard*, 155 F.3d at 340 (typicality ensures that "only those [individuals] who can advance the same legal arguments may be grouped together as a class").

Plaintiffs here are neither adequate representatives nor are their claims typical of the class they purport to represent. Plaintiffs Bonnie Sliger and Joe Sanchez represent the "injury" class. Ms. Sliger allegedly suffered paravalvular leak and had her Silzone® valve explanted; Mr. Sanchez also

allegedly suffered from paravalvular leakage, but has *not* had his valve explanted. (AA4459-61). These plaintiffs, however, purport to represent hundreds of patients who have suffered injuries *other than paravalvular leak* allegedly because of Silzone® valves. They represent patients allegedly experiencing complications such as harmful tissue growth, inflammation, infection, inadequate healing, clot formation, cancer, stroke, heart attack, death, and valve obstruction. Ms. Sliger and Mr. Sanchez cannot adequately represent these disparate claimants, nor do Ms. Sliger and Mr. Sanchez have any reason or incentive even to try to prove that Silzone® could cause any of these other complications.[4]

Indeed, Ms. Sliger's and Mr. Sanchez's medical conditions and histories are so unique, they cannot adequately represent even those class members who *did* suffer paravalvular leakage. Ms. Sliger, for example, allegedly suffered a paravalvular leak so severe it required explantation. But there is no evidence in her medical records that she ever experienced any significant paravalvular leak and four of Ms. Sliger's treating physicians, including her implanting surgeon, advised Ms. Sliger *not* to replace her Silzone® valve. She insisted on having her Silzone® valve replaced with a non-mechanical tissue valve only

[4] As noted above, St. Jude Medical understands that Ms. Sliger recently passed away. But to the best of St. Jude Medical's knowledge, she was alive when the district court made its rulings, and plaintiffs have not withdrawn Ms. Sliger as a class representative. St. Jude Medical therefore will follow the record evidence and discuss Ms. Sliger as a current proffered class representative. If anything, her death calls her adequacy as a class representative further into doubt.

because she did not want to take anticoagulation medication and did not like the clicking sound associated with mechanical heart valves. Moreover, upon explant, her surgeon Dr. Graham noted good healing around the Silzone® valve and *saw no evidence of a leak*. (AA4460-61) With those facts, how can Ms. Sliger represent the interests of absent class members who unequivocally had a paravalvular leak severe enough to require explant?

Mr. Sanchez is no more adequate. He has experienced only equivocal echocardiographic signs of paravalvular leak, and he had a history of paravalvular leakage, infection, and clotting with a decades-old Bjork-Shiley valve that was replaced with the Silzone® valve in 1999. This suggests that Mr. Sanchez has a unique condition unrelated to Silzone®, making him more prone to these conditions. In addition, the fact that Mr. Sanchez's Silzone® valve implant was his second valve replacement surgery placed him at a significantly higher risk of experiencing PVL than someone who has undergone only one valve replacement. (AA4459-60) Again, as with Ms. Sliger, how can Mr. Sanchez fairly and adequately represent the claims of absent class members who have lesser or different medical histories? He cannot.

The uninjured class representatives—those who presumably are claiming medical monitoring relief for the entire class under Minnesota's consumer protection statutes—also are inadequate and atypical. Levy Redden, for example, required more frequent follow-up immediately following implantation because his heavily calcified native valve significantly increased his risk for paravalvular leak, not because of Silzone®. In addition, while Mr.

Redden may claim that he requires increased monitoring for thromboembolic events, that is because he had a history of minor strokes and had undergone anticoagulation therapy four years before he received a Silzone® valve. For unknown reasons, he was not receiving proper anticoagulation therapy *after* being implanted with his Silzone® valve. (AA4457-59) How then can Mr. Redden, with the significant and unique alternative causation arguments that his medical history raises, adequately represent those class members who do not have such risk factors in their medical histories? He cannot.

St. Jude Medical could set forth still additional reasons why plaintiffs are not adequate class representatives and why their claims are not typical of the class they purport to represent. That is because personal injury claims, like these alleged here necessarily require individual inquiry into a host of individual issues on liability, causation, defenses, and damages. They accordingly defy classwide resolution.

### 3. The Consumer Protection Class Violates Rule 23 Because It Is An Unmanageable Morass, Just Like The Now-Decertified Tort-Based Personal Injury Class

The district court rightly decertified a nationwide Silzone® personal injury class as unmanageable, insofar as the class asserted tort and warranty claims. It likewise should have refused to certify this nationwide consumer protection class, which is a poorly disguised attempt to resurrect that personal injury class.

Because of the discrete issues inherent in nationwide product liability actions raising claims for personal injuries, the drafters of the 1966 revisions

to Rule 23 explicitly stated that a class action is not an appropriate procedural vehicle for those kinds of cases:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In this circumstance an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

*Amendments to Rules of Civil Procedure*, 39 F.R.D. 69, 103 (1966).

For these very reasons, federal courts consistently have refused to certify nationwide product liability classes making claims for personal injuries. More than twenty years ago, the Ninth Circuit stated the reasons why: "No single happening or accident occurs to cause similar types of physical harm . . . . No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member . . . . Furthermore, the alleged tortfeasor's affirmative defenses . . . may depend on facts peculiar to each plaintiff's case." *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982).

In the years that have followed these pronouncements, plaintiffs repeatedly have sought to certify personal injury cases as nationwide class actions. But the nature of personal injury lawsuits involving allegedly defective products has not changed. That is why, with rare exceptions, the

Supreme Court[5] and courts in the First Circuit,[6] the Second Circuit,[7] the Third Circuit,[8] the Fourth Circuit,[9] the Fifth Circuit,[10] the Sixth Circuit,[11] the

---

[5] *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) (nationwide products liability class denied based on individual issues and differences in applicable state law).

[6] *Payton v. Abbott Labs.*, 100 F.R.D. 336 (D. Mass. 1983) (rejecting a "theory of a class-wide imposition of enterprise liability for those plaintiffs who cannot identify the source of the DES [diethylstilbestrol] which allegedly affected them"; therefore, questions of law and fact common to the class no longer predominated); *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 40-43 (D.N.H. 1983) (because of varied use, exposure and harm in each plaintiff's case, determining that DES causes injury in utero would not advance common cause of class members and would serve no useful purpose in resolving individual claims).

[7] *In re Repetitive Stress Injury Litig.*, 11 F.3d 368 (2d Cir. 1993) (individual health conditions and diverse state law); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987) (individual causation and diverse state law); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) (diverse state law and diverse issues of causation and damages).

[8] *Georgine v. Amchem Prods.*, 83 F.3d 610 (3d Cir. 1996) (individual causation, comparative fault, and damages issues); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 462 (D.N.J. 1998) (numerous factual issues regarding proving a classwide defect, privity, affirmative defenses and reliance could not be adjudicated on a classwide basis; governing law would vary from plaintiff to plaintiff which would cause the case to "quickly devolve into an unmanageable morass of divergent legal and factual issues"); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 493 (E.D. Pa. 1997) (class certification denied for cigarette smokers because individual issues of liability, causation, comparative negligence, affirmative defenses and damages permeated putative class action and raised substantial risk that court would be required to bifurcate issues in violation of the Seventh Amendment).

[9] *Ryan v. Eli Lilly & Co.*, 84 F.R.D. 230, 232 (D.S.C. 1979) (certification of class of pharmaceutical users not appropriate because proximate causation of injury would require proof for each individual class member); *In re Stucco Litigation*, 175 F.R.D. 210 (E.D.N.C. 1997) (class comprising stucco purchasers not certified because individual issues including negligence of third

(continued...)

Seventh Circuit,[12] the Eighth Circuit,[13] the Ninth Circuit,[14] the Tenth Circuit,[15]

(...continued)

parties, variations in state law, and possible conflicts of interest between damaged and undamaged plaintiffs swamped common issues and made class unmanageable).

[10] *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) (individual issues and diverse state law); *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990) (individual issues); *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133 (E.D. La. 2002) (denying nationwide medical monitoring class because of diverse state law and issues of causation).

[11] *In re American Medical Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) (individual issues on defect, strict liability, negligence, failure to warn, and warranties); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 673 (N.D. Ohio 1995) (class certification for exposure to pharmaceutical denied because individual questions included varying development and testing of product over time, state of the art over time, product identification, differing substantive law, injury in fact, causation, and damages).

[12] *Bridgestone v. Firestone*, 288 F.3d 1012 (7th Cir. 2002) (individualized issues and diverse state law); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995) (diverse state law); *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 373 (N.D. Ill. 1998) (class action not superior because prospective plaintiffs would have to prove causation and damages in separate proceedings and would have to bring separate lawsuits to pursue other theories).

[13] *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 212 (D. Minn. 2003) (denying certification of class of cholesterol drug patients because individual issues, predominated, including medical causation); *Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999) (denying certification of class of cigarette smokers because plaintiffs did not adequately protect interests of class due to their desire to reserve individual personal injury claims and because medical monitoring presented too many individual issues).

[14] *Zinser v. Accufix Research Instit.*, 253 F.3d 1180 (9th Cir.), *amended*, 273 F.3d 1266 (9th Cir. 2001) (individual issues and diverse state law); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) (same); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 653-54 (C.D. Cal. 1996) (class action relating to cardiac pacemakers not superior because liability, causation and

(continued...)

the Eleventh Circuit,[16] and the District of Columbia Circuit,[17] all have rejected attempts to fit nationwide product liability actions into Rule 23's prescribed format. The reasoning in these cases takes stock of Rule 23's requirements and explains why lawsuits that, at their essence, present claims for personal injuries are ill-suited for classwide resolution and instead should be left to individualized adjudication in appropriate jurisdictions.

Plaintiffs' nationwide consumer protection class action—again no matter what label they attach to it—is an effort to litigate product-related personal injury claims on a classwide basis. These are the very kinds of claims that

(...continued)

damages would be individual issues and because variations in the applicable law).

[15] *Harding v. Tambrands*, 165 F.R.D. 623, 630-32 (D. Kan. 1996) (class certification denied for women who allegedly suffered Toxic Shock Syndrome (TSS) because the "advantages of a class action do not outweigh the problems of case manageability and jury confusion" inasmuch as "each individual . . . class member would still have to have her own trial on the individual issues applicable specifically to her, including individual causation and damages").

[16] *Zehel-Miller v. Astrazenaca Pharmaceuticals, LP*, 223 F.R.D. 659, 663-64 (M.D. Fla. 2004) (denying certification of nationwide medical monitoring class of pharmaceutical users because individual issues overwhelmed common questions and class lacked cohesiveness); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 267 (S.D. Fla. 2003) (denying certification of multistate medical monitoring class because of "differences and uncertainties" in state law and diverse issues of liability and causation).

[17] *Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986) (diverse state law).

federal courts hold cannot, by their very nature, be adjudicated in a classwide format under Rule 23.

## VII

## THE MEDICAL MONITORING CLASS VIOLATES CONTROLLING PRINCIPLES OF FEDERAL LAW AND COMPELS CLASSWIDE RESOLUTION OF CLAIMS NOT AMENABLE TO CLASS TREATMENT

Separate and apart from the nationwide consumer fraud class, the district court certified a medical monitoring class applying the tort law of 17 states. As the district court defined it, this class consists of "asymptomatic" Silzone® valve recipients from states that allow a stand-alone medical monitoring claim without proof of a current injury.[18] Despite the district court's efforts to circumscribe this class to meet Rule 23's demands, its final result still fails under scrutiny.

### A. In Certifying The Independent Medical Monitoring Class, The District Court Defied *Erie's* Command That Federal Courts Refrain From Altering Or Creating New State Law

A federal court sitting in diversity is "bound to accept the interpretation of [state] law by the highest court of the State." *Hillside Enters., Inc. v. Continental Carlisle, Inc.*, 147 F.3d 732, 735 n.4 (8th Cir. 1998). Even where there is no controlling state law, a federal court applying state law cannot apply the rule it considers "best," but must predict how the state's

[18] The 17 states are Arizona, Colorado, Connecticut, Delaware, District of Columbia, Florida, Illinois, Kansas, Minnesota, Montana, New Jersey, New York, Ohio, Pennsylvania, Texas, Utah, and West Virginia.

highest court would decide the issue. *First Colony Life Ins. Co. v. Berube*, 130 F.3d 827, 829 (8th Cir. 1997).

This Court recently applied this principle to medical monitoring, holding that federal courts could not recognize a medical monitoring remedy under Nebraska law because "recognition of such a cause of action would, in effect, expand substantive liability under Nebraska law." *Trimble v. Asarco, Inc.*, 232 F.3d 946, 963 (8th. Cir. 2000). In so ruling, this Court said that recognizing the remedy "would be both imprudent and improper" and observed that *Erie* counsels against "blazing new state-law trails," accepting "innovative theories of state law," or adopting a "more expansive interpretation which creates substantially more liability." *Id.*

Under the guise of "predicting" state law, the district court ignored this Court's caution. Medical monitoring is a controversial, cutting-edge concept that has *not* undergone widespread scrutiny in the state courts, let alone gained widespread acceptance. Only ten state high courts and one legislature have addressed medical monitoring. And of that group, five state supreme courts have recognized a medical monitoring remedy without proof of a current physical injury,[19] while four have rejected it.[20] One state high court

---

[19] *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 822 (Cal. 1993); *Ayers v. Township of Jackson*, 525 A.2d 287, 312 (N.J. 1987); *Redland Soccer Club, Inc. v. Dep't of Army*, 696 A.2d 137, 143-46 (Pa. 1997); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993); *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 426 (W. Va. 1999).

recognized a medical monitoring claim, only to have the state legislature expressly overrule it. *See Bourgeois v. A.P. Green Indus., Inc.*, 716 So. 2d 355, 360 (La. 1998), *overruled by statute*, La. Civ. Code Ann. art. 2315. Further, even where states have accepted medical monitoring, they sometimes disagree on the elements of a such a claim and the nature of the required proof. *Badillo v. American Brands, Inc.*, 16 P.3d 435, 441 (Nev. 2001) ("[T]he elements of medical monitoring as a cause of action are not uniform from one jurisdiction to another."); *Redland Soccer Club v. Dep't. of Army*, 696 A.2d 137, 146 n.8 (Pennsylvania court disagreeing with Utah's required elements).

The district court thus was treading on new and largely uncharted territory when it undertook to "predict" how every state would treat plaintiffs' medical monitoring claims. This ambitious approach raises two distinct problems. First, the district court placed itself in a position where no federal court should be—at the vanguard of state substantive law, expanding potential liability and creating new remedies for numerous states. As this Court has indicated, federal courts should not blaze new state-law trails, especially where doing so expands potential liability. *Trimble*, 232 F.3d at 963. The district court justified its conflicting course with the observation that it could

(...continued)

[20] *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827, 829 (Ala. 2001); *Mergenthaler v. Asbestos Corp.*, 480 A.2d 647, 651 (Del. 1984); *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849, 856-60 (Ky. 2002); *Badillo v. American Brands, Inc.*, 16 P.3d 435, 440 (Nev. 2001) (en banc).

not "abdicate its responsibility" to predict state law. But that justification misses the point: If state law on a new theory of liability is not developed, the solution, as this Court expressly recognized, is to rule that the claim is unavailable and deny certification, so state courts can continue to develop their law in individual cases.

Second, in conducting its survey of state medical monitoring law, the district court made several incorrect and unsupported *Erie* guesses. The most glaring example is Delaware. The Delaware Supreme Court has expressly *rejected* medical monitoring without proof of a physical injury. In *Mergenthaler*, the plaintiffs presented a claim for "medically required surveillance," but conceded that they suffered no physical injuries. 480 A.2d at 651. The Delaware Supreme Court readily rejected the claim, holding that "an essential element of the claim is that the claimant have a present physical injury." *Id.* The Delaware high court therefore has expressly rejected the defining premise of the medical monitoring class below, yet the district court included Delaware in the class.

The district court made another erroneous *Erie* guess with Colorado, where no state court has allowed a medical monitoring claim. Only federal district court opinions suggest that such a claim might exist in Colorado. But they too were making *Erie* guesses and did so without citing *any* Colorado authority. One district court expressly admonished that it was addressing an "issue of first impression" and that its order "should be narrowly read." *Brafford v Susquehanna Corp.*, 586 F. Supp 14, 18 (D. Colo. 1984). The district court similarly included residents of Connecticut in the medical

monitoring class, even though no Connecticut court has ever sanctioned a medical monitoring tort claim.[21] The district court also included Minnesota in the medical monitoring class, even though there is no authority in Minnesota for a stand-alone medical monitoring claim absent physical injury.[22]

*Erie* violations such as these pervade the plaintiffs' medical monitoring class and the district court's analysis. The larger point, however, is that the district court should not have engaged in its ill-fated *Erie* exercise in the first place. As described above, there is neither consensus nor an identifiable trend with regard to medical monitoring without proof of a physical injury, and experience shows that state courts and legislatures have taken markedly different tacks when presented with the issue. Rather than place itself at the center of the vortex, the district court should have denied certification of a multistate class and left it to the various state authorities to make these legal determinations. As the Third Circuit has observed, where a federal court

[21] The district court relied on *Doe v. City of Stamford*, 699 A.2d 52 (Conn. 1997), which allowed a medical monitoring-like claim under Connecticut's workers' compensation system, making some types of medical expenses statutorily compensable. But no other court has ever extended such a stand-alone medical monitoring claim into Connecticut's tort law.

[22] The district court cited *Bryson v. Pillsbury Co.*, 573 N.W.2d 718, 721 (Minn. Ct. App. 1998), where a Minnesota appellate court ruled that the plaintiff had raised a triable issue of fact on whether she suffered a "present injury" with evidence that pesticide exposure caused rashes that covered her body and "chromosomal breakage." But the plaintiffs in that case suffered demonstrable injuries, including skin rashes. Further, neither *Bryson* nor any other Minnesota case has recognized medical monitoring as anything other than a remedy that relies on proof of an underlying cause of action.

"cannot make a reasonable prediction that state courts" will accept a novel theory, it should not certify a class. *See In re School Asbestos Litig.*, 789 F.2d 996, 1007 (3d Cir. 1986).

**B. Certification Of The Independent Medical Monitoring Class As "Injunctive Relief" Under Rule 23(b)(2) Violates Due Process And The Requirements Of Rule 23**

The medical monitoring class seeks payment of funds from St. Jude Medical to underwrite medical monitoring for the class members. It therefore seeks payment of money to cover plaintiffs' future monitoring, which is anything but "injunctive" relief. It is pecuniary damages (which confers the right to a jury trial). Because of that practical reality, courts have had no trouble labeling such claims for what they really are—demands for money damages. *See Zinser*, 253 F.3d at 1195-96 (denying subdivision (b)(2) certification where plaintiffs demanded medical monitoring fund, which constituted demand for money damages); *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995) (same, where plaintiff sought funding for medical monitoring, which essentially constituted money damages); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 479-80 (D. Colo. 1998) (same). Any attempt to characterize the relief as "injunctive" is yet another prohibited attempt to modify state substantive law to suit the class action device.

Plaintiffs' medical monitoring class therefore is just another class action seeking damages, and as such, it suffers from two additional flaws. First, the Supreme Court has held that a class action seeking damages without providing opt-out rights violates due process: "If a forum State wishes to bind an absent plaintiff concerning a claim for monetary damages or similar relief at law, it

must provide minimal due process protection," which requires that each person "must receive notice plus an opportunity to be heard and participate in the litigation" and "be provided with an opportunity to remove himself from the class." *Shutts*, 472 U.S. at 811-12. Plaintiffs' non-opt out medical monitoring class under Rule 23(b)(2) therefore improperly infringes on the due process rights of claimants who may not wish to participate in Court-ordered medical monitoring, but would rather pursue their own monitoring tailored to their individual needs using their own chosen medical professionals. That infringement, in turn, adversely affects St. Jude Medical because class members will attempt to pursue those rights in collateral litigation *against St. Jude Medical*, thus denying the final resolution that class actions promise.

Second, Rule 23(b)(2), as a matter of statutory interpretation, does not permit certification of a nationwide class seeking relief relating predominantly to money damages. *See Boughton*, 65 F.3d at 827 (denying class certification under Rule 23(b)(2) where plaintiff sought funding for medical monitoring, which essentially constituted money damages); *Paxil*, 218 F.R.D. at 247-48 (same); *Duncan v. Northwest Airlines*, 203 F.R.D. 601, 611 (W.D. Wash. 2001) (denying Rule 23(b)(2) certification, noting that "[a]lthough the plaintiff now characterizes the relief as a program rather than a fund, the bottom line is money"). Thus, a medical monitoring class seeking primarily compensatory relief under the guise of a medical monitoring fund is not appropriate for certification under Rule 23(b)(2). *Zinser*, 253. F.3d. at 1195-96; *see also Barnes*, 161 F.3d at 131 ("The dispositive factor [under Rule 23(b)(2) is] what type of relief do plaintiffs actually seek. If plaintiffs seek relief that is a

disguised request for compensatory damages, then the medical monitoring claim can only be characterized as a claim for monetary damages.").

The core relief sought by plaintiffs' medical monitoring class indisputably is monetary—funding to pay for their future medical follow up and that of every class member. The district court therefore erred in certifying the class under Rule 23(b)(2).

**C. Certification Of The Independent Medical Monitoring Class Is Improper Because Of Diverse Legal And Factual Issues That Would Make Any Classwide Trial Inefficient And Unmanageable**

There is yet another compelling reason why the district court erred in certifying the medical monitoring class under Rule 23(b)(2). "While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." *Barnes*, 161 F.3d at 143 (denying certification under Rule 23 (b)(2) in tobacco action because individual issues regarding nicotine causation, medical monitoring needs, and statutes of limitations destroyed cohesion). This cohesion requirement "precludes certification when individual issues abound." *Thompson*, 189 F.R.D. at 556. Just as with Rule 23(b)(3), proceeding as a class action under Rule 23(b)(2) confers no meaningful advantage "'if significant individual issues were to arise consistently.'" *Barnes*, 161 F.3d at 143.

In light of these controlling principles, the medical monitoring class certified here fails the cohesion requirement for a variety of reasons.

First, there is no medical consensus that *additional* medical monitoring is warranted for recipients of Silzone® heart valves—the foundation for any medical monitoring claim. Every mechanical heart valve patient will undergo some follow-up care in connection with his or her implant and the disease that gave rise to the need for surgery in the first place. The issue with plaintiffs' medical monitoring claim is whether *additional* surveillance is necessary. In the United States, no professional medical association, such as the American College of Cardiology, no public agency, including the FDA, and no public health organization, such as the American Heart Association, has recommended any sort of medical monitoring specific to Silzone® valve recipients. *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. at 73 (denying pharmaceutical medical monitoring class, noting "[n]either the American Diabetes Association nor the American Association of Clinical Endocrinologists . . . , nor any public health agency or professional medical society or institution, has recommended special monitoring for patients who formerly took Rezulin").

Second, the diverse legal issues and individual issues of proof of entitlement to medical monitoring make the certified medical monitoring class unmanageable. Although the district court professes to have limited the medical monitoring class in order to meet Rule 23, it has created in the end a 17-state class consisting of hundreds of Silzone® patients with unique needs for medical follow up. This tortured and unprecedented multistate class raises fundamental issues of fairness and manageability (most of which apply with equal force to plaintiffs' consumer protection class insofar as it claims medical

monitoring remedies). The district court has included in the medical monitoring class numerous jurisdictions that treat medical monitoring as a mere remedy, requiring proof of an underlying tort. That introduces into this class action the tort law of those states and all the diversity that exists among them. As noted above, such diversity in state tort and warranty law was a principal factor leading to the decertification of plaintiffs' initial personal injury class.

Even the jurisdictions that allow a stand-alone medical monitoring claim are by no means the same. Some states impose a negligence standard, while others allow medical monitoring on proof of "tortious" conduct, which could include conduct calling for strict liability. *Compare, e.g., Petito v. A.H. Robins*, 750 So. 2d 103, 107-08 (Fla. Ct. App. 2000) (negligence), *with Bower*, 522 S.E.2d at 432-33 (tortious conduct). Some states call for proof of an increased risk of future injury caused by exposure to a known toxin, while others expressly require proof of a *significantly* increased risk of future injury, begging the question of how much these two standards differ and how to instruct a jury on both at the same trial. *Compare, e.g., Ayers*, 525 A.2d at 312 (relative increase in risk of injury), *with Redland Soccer Club,* 696 A.2d at 143-46 (significantly increased risk). Utah is unique in requiring proof that a beneficial treatment exists to treat whatever disease medical monitoring might detect for each patient. *Hansen v. Mountain Fuel Supply*, 858 P.2d 970, 979 (Utah 1993).

Plaintiffs have not explained how they intend to handle their varying burdens, nor have they submitted a trial plan. The latter omission is

particularly significant. Failing to submit a feasible trial plan is reason alone to deny certification of a class action. *See Zinser*, 253 F.3d at 1189 (denying class certification because plaintiff seeking multistate class "bears the burden of demonstrating "a suitable and realistic plan for trial of the class claims"); *Chin*, 182 F.R.D. at 459 (denying class certification because "[p]laintiffs, not the court, have the burden of designing a workable plan for trial embracing all claims and defenses prior to certification."). Furthermore, if plaintiffs had tried to formulate and submit a trial plan for their medical monitoring class, the plan would have revealed the many deficiencies in that class.

Third, because of the class members' individual needs, the medical monitoring class presents disparate factual issues that cannot be handled in a classwide trial. The right to medical monitoring, and the nature and extent of any *additional* medical monitoring that might be required, is a patient-by-patient inquiry that cannot be handled on a classwide basis. *See Barnes*, 161 at 146 ("an individual's monitoring program by definition cannot" be proved on a classwide basis). Other elements of medical monitoring likewise will require individual proof, such as whether the Silzone® heart valve (an FDA-approved medical device) is "dangerous" or "toxic" to an individual who had diseased native heart valves to begin with and bears multiple risk factors for heart valve complications. *See Perez*, 218 F.R.D. at 270-71 (rejecting class certification partly because of individualized inquiry into whether a dietary supplement was "dangerous or hazardous" to class members with different medical histories). Individual issues also will predominate on causation—whether any class member needs additional or extraordinary monitoring

attributable to the Silzone® valve, as opposed to the numerous individual characteristics that each Silzone® patient presents. *Id.*

Individual issues like those presented by these heart valve cases recently and correctly have led courts to reject certification of medical monitoring classes. In *Perez*, for example, a federal district court denied certification of a medical monitoring class because of individual issues and "vast differences in individual class members" on every element of Florida's seven-element medical monitoring claim. 218 F.R.D. at 271-72. State courts in California and New Jersey similarly denied certification of medical monitoring classes in toxic exposure cases because of predominating individual issues on causation and the appropriate level of medical monitoring needed for each class member, if any. *See Lockheed Martin Corp. v. Superior Court*, 63 P.3d 913, 920-22 (Cal. 2003); *Goasdone v. American Cyanamid Corp.*, 808 A.2d 159, 170 (N.J. Super. Law. Div. 2002).[23]

---

[23] *See also Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1195-96 (9th Cir. 2001) (denying certification of medical monitoring "fund"); *Barnes v. American Tobacco Co.*, 161 F.3d 127, 30 (3d Cir. 1998) (individual issues prevented certification of medical monitoring class); *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995)(denying certification of medical monitoring "fund"); *Duncan v. NW Airlines*, 203 F.R.D. 601, 611 (W.D. Wash. 2001) (same); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 479-80 (D. Colo. 1998) (same); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 484 (E.D. Pa. 1997) (same); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D. Miss. 1997) (same); *Harding v. Tambrands*, 165 F.R.D. 623, 626-33 (D. Kan. 1996) (same); *Werlein v. United States*, 746 F. Supp. 887 (D. Minn. 1990) (need for individualized proof precluded medical monitoring class), *vacated in part on other grounds*, 793 F. Supp. 898 (D. Minn. 1992).

Because there is no "one size fits all" approach to following up a mechanical heart valve recipient, this Court should decertify plaintiffs' medical monitoring class as well.

## VIII

## CONCLUSION

In certifying the two classes under scrutiny here, the district court has stretched Rule 23 and the Constitution beyond their breaking points. The district court's consumer protection class is an unprecedented, unconstitutional and unwarranted exportation of one state's statutes to claims that cannot and should not be, litigated under Rule 23. The independent medical monitoring class, likewise is built on an improper application and extension of *Erie* and fails the requirement of cohesion that is necessary for such a class to exist. This Court accordingly should reverse the district court's class certification orders.

DATED: October 22, 2004.

Respectfully submitted,

HALLELAND, LEWIS, NILAN,
SIPKINS & JOHNSON, P.A.

RIDER BENNETT, LLP

REED SMITH LLP

By [signature]
Steven J. Boranian

Attorneys for Defendant and Appellant
St. Jude Medical, Inc.

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to Federal Rule of Appellate Procedure 32(a)(7)(B) for a brief using a proportional serif font of 14-point typeface or larger. The length of this brief is 13,985 words, and it was prepared using Microsoft Word 97.

DATED: October 22, 2004.

Steven J. Boranian
REED SMITH LLP
1999 Harrison Street
Suite 2400
Oakland, California 94612
(510) 763-2000

# PROOF OF SERVICE

*In re: St. Jude Medical, Inc. Silzone® Heart Valves Products Liability Litigation*
Case No. 04-3117
**Delivered for Filing to the 8th Circuit in St. Paul, MN via UPS**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. I am employed in the office of a member of the bar of this court at whose direction the service was made. My business address is REED SMITH LLP, 1999 Harrison Street, Suite 2400, Oakland, CA 94612. On October 22, 2004, I served the following document(s) by the method indicated below:

**APPELLANT'S OPENING BRIEF** (Orig. + 9 to Court; 2 to Counsel);

xx by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below. A copy of the consignment slip is attached to this proof of service. **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on October 22, 2004, at Oakland, California.

Steven J. Boranian

SERVICE LIST

| | |
|---|---|
| Steven E. Angstreich, Esq.<br>Levy, Angstreich, Finney,<br>Baldante, et al.<br>Woodcrest Pavilion, Suite 100<br>10 Melrose Avenue<br>Cherry Hill, NJ 08003<br>Tel. 856.795.0303<br>Fax. 856.795.7447 | Co-Lead Counsel for<br>Respondents/Plaintiffs |
| James T. Capretz, Esq.<br>Capretz & Associates<br>5000 Birch Street, Suite 2500<br>West Tower<br>Newport Beach, CA 92660<br>Tel. 949.724.3000<br>Fax. 949.757.2635 | Co-Lead Counsel for<br>Respondents/Plaintiffs |
| J. Gordon Rudd, Jr., Esq.<br>Zimmerman Reed, L.L.P.<br>651 Nicollet Mall, Suite 501<br>Minneapolis, MN 55402<br>Tel. 612.341.0400<br>Fax. 612.341.0844 | Liaison Counsel for<br>Respondents/Plaintiffs |
| Patrick Murphy, Esq.<br>Murphy Law Office<br>4765 S. Durango Drive, Suite 200<br>Las Vegas, NV 89147<br>Tel. 702.259.4600<br>Fax. 702.259.4748 | State Liaison Counsel |