# EXHIBIT 11

No. 04-3117

# In the United States Court of Appeals for the Eighth Circuit

# In re St. Jude Medical, Inc. Silzone® Heart Valve Products Liability Litigation

Lester Grovatt, Beatrice Bailey, Levy D. Redden, Bonnie L. Sliger, and Joe W. Sanchez, on behalf of themselves and all others similarly situated,
Plaintiffs and Appellees,

vs.

St. Jude Medical, Inc.,
Defendant and Appellant.

---

# APPELLANT'S REPLY BRIEF

---

From an Order Granting Class Certification by the
United States District Court for the District of Minnesota
Multidistrict Litigation No. 01-1396 (JRT/FLN)
The Honorable John R. Tunheim

---

Steven M. Kohn
James C. Martin
Steven J. Boranian
REED SMITH LLP
1999 Harrison Street
Suite 2400
Oakland, CA 94612
Telephone: (510) 763-2000
Facsimile: (510) 273-8832

Michael T. Nilan
Tracy J. Van Steenburgh
HALLELAND, LEWIS, NILAN, SIPKINS & JOHNSON, P.A.
600 Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 338-1838
Facsimile: (612) 338-7858

Eric J. Magnuson
RIDER BENNETT, LLP
33 South Sixth Street
Suite 4900
Minneapolis, MN 55402
Telephone: (612) 340-8900
Facsimile: (612) 340-7900

*Attorneys for Defendant and Appellant*
*St. Jude Medical, Inc.*

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. PLAINTIFFS' CONSUMER PROTECTION CLASS EXCEEDS CONSTITUTIONAL BOUNDARIES .......... 3

A. The District Court's Unilateral Application Of Minnesota's Consumer Protection Statutes to 11,000 Class Members Residing In 51 jurisdictions Fails To Comply With The Commerce Clause .......... 3

B. The District Court's Failure To Conduct Conflict-Of-Law Analysis In Connection With The Consumer Protection Class Violates The Due Process And Full Faith And Credit Clauses .......... 7

III. PLAINTIFFS STILL HAVE NOT AND CANNOT EXPLAIN HOW THEIR NATIONWIDE CONSUMER PROTECTION CLASS ACTION MEETS THE DEMANDS OF RULE 23 .......... 12

A. Plaintiffs Have Never Shown And Cannot Show That Their Consumer Protection Class Action Is The Manageable Or Superior Method For Resolving Silzone® Claims .......... 13

1. Demonstrating An Alleged Representation About The Heart Valve Will Require Individualized Proof .......... 13

2. Demonstrating A "Causal Nexus" Between St. Jude Medical's Alleged Representations And Plaintiffs' Alleged Injuries Will Require Individualized Proof .......... 15

3. Damages Will Require Individualized Proof .......... 16

4. Medical Monitoring Will Require Individualized Proof .......... 18

B. Plaintiffs' Trial Plan Shows That Plaintiffs' Nationwide Consumer Fraud Class Action Is Neither Manageable Nor A Superior Method For Resolving The Class Members' Claims .......... 19

C. Plaintiffs Are Neither Adequate Class Representatives Nor Are Their Claims Typical Because Of The Individualized Nature Of Their Claims ........................................ 22

D. Plaintiffs Are Inadequate Class Representatives Because They Are Splitting The Class Members' Claims And Thus Placing Themselves In A Conflict With The Class ............... 24

IV. PLAINTIFFS' MEDICAL MONITORING CLASS RELIES ON OVERLY AGGRESSIVE ERIE PREDICTIONS AND DOES NOT MEET RULE 23 IN ANY EVENT................................ 30

A. In Making *Erie* Predictions, The District Court Extended State Law On Medical Monitoring Against This Court's Caution ........................................................................ 30

B. Plaintiffs And Their Amici Essentially Admit That Notice And Opt Out Rights Are Essential To Save The Medical Monitoring Class, Which Confirms That It Should Not Have Been Certified Under Rule 23(b)(2)......................... 34

C. Plaintiffs Do Not Describe – Because They Cannot – How Their Medical Monitoring Class Is A Cohesive, Manageable Resolution System ..................................... 35

V. CONCLUSION........................................................................ 39

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Apparel Art International v. Amertex Enterprises Ltd.*,
48 F.3d 576 (1st Cir. 1995) .......... 28, 29

*Avery v. State Farm Mutual Automobile Insurance Co.*,
746 N.E.2d 1242 (Ill. App. Ct. 2001) .......... 9

*BMW of North America Inc. v. Gore*,
517 U.S. 559 (1996) .......... 6

*Barnes v. America Tobacco Co.*,
176 F.R.D. 479 (E.D. Pa. 1997) .......... 18

*Boyes v. Greenwich Boat Works, Inc.*,
27 F. Supp. 543 (1998) .......... 5

*In re Bridgestone/Firestone Inc.*,
288 F.3d 1012 (7th Cir. 2002) .......... 6, 10

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) .......... 35

*City of San Jose v. Superior Court*,
12 Cal. 3d 447 (1974) .......... 26

*Cooper v. Federal Reserve Bank*,
467 U.S. 867 (1984) .......... 27, 28

*Cunningham v. PFL Life Insurance Co.*,
42 F. Supp. 2d 872 (1999) .......... 5

*Debbs v. Chrysler Corp.*,
810 A.2d 137 (Pa. Super. Ct. 2002) .......... 20

*Dorsey v. Smith*,
91 F.R.D. 261 (D. Md. 1981) .......... 26

*Fabricant v. Sears Roebuck*,
202 F.R.D. 310 (S.D. Fla. 2001) ........................................ 29

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982)........................................ 26

*Flynn v. American Home Products Corp.*,
627 N.W.2d 342 (Minn. Ct. App. 2001) .............................. 15, 16

*In re Ford Motor Co. Ignition Switch Litigation*,
174 F.R.D. 332 (D.N.J. 1997) ........................................ 20

*Gennari v. Weichert Co. Realtors*,
691 A.2d 350 (N.J. 1997) ........................................ 20

*Georgine v. Amchem Products, Inc.*,
83 F.3d 610 (3d Cir. 1996) ........................................8

*Goasdone v. American Cyanamid Corp.*,
808 A.2d 159 (N.J. Super. Law Div. 2002) .............................. 38

*Group Health Plan, Inc. v. Philip Morris, Inc.*,
621 N.W.2d 2 (Minn. 2001) .............................. 1, 13, 15

*Group Health Plan, Inc. v. Philip Morris USA, Inc.*,
344 F.3d 753 (8th Cir. 2003) ........................................ 15

*Grove v. Principal Mutual Life Insurance Co.*,
14 F. Supp. 2d 1101 (1998)........................................5

*Hansen v. Mountain Fuel Supply*,
858 P.2d 970 (Utah 1993) ........................................ 37

*Healy v. Beer Instit.*,
491 U.S. 324 (1989)........................................4

*Hughes v. Wal-Mart Stores, Inc.*,
250 F.3d 618 (8th Cir. 2001) ........................................8

*Karas v. American Family Insurance Co.*,
33 F.3d 995 (8th Cir. 1994)........................................ 33

*Liberty Mutual Insurance Co. v. Tribco Construction Co.*,
185 F.R.D. 533 (N.D. Ill. 1999) .................................................. 14

*Linkous v. Medronic, Inc.*,
No. 84-1090, 1985 WL 2602 (E.D. Pa. Sept. 4, 1985) ........................ 26

*Lobo Exploration Co. v. Amoco Production Co.*,
991 P.2d 1048 (Okla. Civ. App. 1999) ............................................9

*Lockheed Martin Corp. v. Superior Court*,
63 P.3d 913 (Cal. 2003) .............................................................. 38

*Lony v. E.I. du Pont de Nemours and Co., Inc.*,
821 F. Supp. 956 (D. Del. 1993) ....................................................5

*Lyon v. Caterpillar Corp.*,
194 F.R.D. 206 (E.D. Pa. 2000) .................................................... 19

*Man Roland Inc. v. Quantum Color Corp.*,
57 F. Supp. 568 (N.D. Ill. 1999) ....................................................5

*Marshall v. Kirkland*,
602 F.2d 1282 (8th Cir. 1979) ...................................................... 28

*Mergenthaler v. Asbestos Corp. of America*,
480 A.2d 647 (Del. 1984) ............................................................ 32

*In re Methyl Tertiary Butyl Ether Products Liability Litigation*,
209 F.R.D. 323 (S.D.N.Y. 2002) ............................................ 26, 29

*Millet v. Atlantic Richfield Co.*,
No. CV-98-555, 2000 WL 359979 (Me. Super. Mar. 2, 2000) ............... 26

*National Western Life Insurance Co. v. Rowe*,
86 S.W.3d 285 (Tex. App. 2002) ....................................................9

*Nodak Mutual Insurance Co. v. American Family Mutual Insurance Co.*, 604 N.W.2d 91 (Minn. 2000) ............................................ 12

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1998) .................................................................... 12

*Pearl v. Allied Corp.*,
102 F.R.D. 921 (E.D. Pa 1984) .......... 26

*Perez v. Metabolife International, Inc.*,
218 F.R.D. 262 (S.D. Fla. 2003) .......... 32, 38

*Peters v. National R.R. Passenger Corp.*,
1991 U.S. Dist. LEXIS 3850 (D.D.C. 1991) .......... 26

*Petito v. A.H. Robins*,
750 So. 2d 103 (Fla. Ct. App. 2000) .......... 37

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .......... 7, 8, 34

*Quill Corp. v. North Dakota*,
504 U.S. 298 (1992) .......... 7

*Redland Soccer Club, Inc. v. Department of the Army*,
696 A.2d 137 (Penn. 1997) .......... 37

*Reimer v. City of Crookston*,
326 F.3d 957 (8th Cir. 2003) .......... 30

*Renaissance Cruises, Inc. v. Glassman*,
738 So. 2d 436 (Fla. Dist. Ct. App. 1999) .......... 9

*Reppert v. Marvin Lumber & Cedar Co.*,
359 F.3d 53 (1st Cir. 2004) .......... 25

*Salve Regina College v. Russell*,
499 U.S. 225 (1991) .......... 30

*Small v. Lorillard Tobacco Co.*,
679 N.Y.S.2d 593 (App. Div. 1998) .......... 29

*Small v. R.J. Reynolds Tobacco Co.*,
698 N.Y.S.2d 615 (NY 1999) .......... 26

*Sondel v. Northwest Airlines, Inc.*,
56 F.3d 934 (8th Cir. 1995) .......... 25

*Sprague v. General Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) .................................................. 22

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
538 U.S. 408 (2003).......................................................................6

*State of West Virginia ex rel. Chemtall Inc. v. Madden*,
No. 31743, 2004 WL 2750996 (W. Va. Dec. 2, 2004) ...........................9

*Thompson v. American Tobacco Co.*,
189 F.R.D. 544 (D. Minn. 1990) ........................................... 25, 26

*Trimble v. Asarco*,
232 F.3d 946 (8th Cir. 2000) ................................................ 31, 33

*In re Universal Service Fund Telephone Billing Practices Litigation*,
219 F.R.D. 661 (D. Kan. 2004)................................................... 30

*Villegas v. Princeton Farms, Inc.*,
893 F.2d 919 (7th Cir. 1990) ..................................................... 32

*In re Warfarin Sodium Antitrust Litigation*,
212 F.R.D. 231 (D. Del. 2002) .....................................................9

*Wershba v. Apple Computer, Inc.*,
110 Cal. Rptr. 2d 145 (Cal. Ct. App. 2001) ......................................9

*Ysbrand v. Daimler Chrysler Corp.*,
81 P.3d 618 (Okla. 2003).................................................................9

*Zinser v. Accufix Research Instit., Inc.*,
253 F.3d 1180 (9th Cir. 2001)............................................... 34, 35

# I. INTRODUCTION

St. Jude Medical's opening brief identified multiple procedural, substantive, and, indeed, constitutional barriers to the certification of plaintiffs' nationwide consumer protection class and their multi-state medical monitoring class. Plaintiffs respond by emphasizing that these heart valve cases are ideal candidates for class certification because the burden of proof under Minnesota's consumer fraud statutes is minimal and their medical monitoring class is a homogenous group of individuals bringing similar claims. Given the purported propriety of class certification, Plaintiffs summarily dismiss St. Jude Medical's constitutional impediments as irrelevant to their class proceeding.

But the reality is that plaintiffs' arguments misperceive or avoid the material issues confronting this Court in several significant respects. Most notably, plaintiffs nowhere address what they actually have to prove under the consumer protection statutes or the consequences that their burden of proof holds for class certification. Proof of a claim under Minnesota's consumer fraud statutes requires: (1) a representation or conduct that offended one of the statutes; (2) an injury; and (3) a causal "nexus" between the alleged representation and the alleged resulting injury. *See Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 11-15 (Minn. 2001). When considering the requisite burden of proof, plaintiffs' consumer protection claims indisputably present highly individualized issues on both liability and damages, making plaintiffs' nationwide consumer protection claims manifestly unsuitable for resolution in a classwide trial.

Plaintiffs also fail to undertake any close analysis of the disparate factual and legal issues raised by their multi-state medical monitoring class. Yet, once those disparate issues are considered, that proposed class fares no better. Individualized inquiries permeate the claims of each class member, and there is no basis for class certification in these circumstances either.

Nor are St. Jude Medical's constitutional impediments so easily dismissed. Plaintiffs concede, as they must, that the district court applied Minnesota's consumer protection statutes to their nationwide class *without* regard for the law of any other state and *without* conducting ordinary conflicts-of-law analysis. While plaintiffs describe these omissions as immaterial, the Commerce, Due Process, and Full Faith and Credit Clauses prohibit courts from unilaterally imposing the law of a single state on a nationwide set of claimants in this fashion.

Given these intractable procedural, substantive, and constitutional barriers, it comes as no surprise that neither plaintiffs, nor their amici, cite any relevant federal appellate authority supporting the extraordinary certification orders entered below. No federal appellate court has ever approved a nationwide class action seeking personal injury damages under a single state's law. Nor has any federal appellate court sanctioned such a multi-state medical monitoring class after considering the difficulties these claims would present in a classwide trial. This is not because courts have failed to consider these issues. Rather, it is because the relevant case law recognizes that classwide resolution under Rule 23 is neither a manageable nor

a superior way for dealing with the individualized factual and legal issues that these kinds of cases inevitably raise.

Bereft of any supporting authority, plaintiffs and their amici are left to argue that failing to certify these classes would effectively strike Minnesota's consumer protection statutes from the books and grant St. Jude Medical immunity from prosecution. But this appeal is not about the efficacy of Minnesota's consumer protection statutes. Nor does any relief sought by this appeal permit St. Jude Medical to avoid potential liability from any properly asserted and proved claim. This appeal rather is about keeping class certification under Rule 23 within recognized procedural, substantive, and constitutional boundaries. The classes certified here exceed those boundaries, and the district court's class certification orders therefore should be reversed.

## II. PLAINTIFFS' CONSUMER PROTECTION CLASS EXCEEDS CONSTITUTIONAL BOUNDARIES

### A. The District Court's Unilateral Application Of Minnesota's Consumer Protection Statutes to 11,000 Class Members Residing In 51 jurisdictions Fails To Comply With The Commerce Clause

In its opening brief, St. Jude Medical explained how a class certification order regulating the sale and implantation of FDA-approved heart valve in 11,000 absent parties in 51 jurisdictions under one state's laws, to the exclusion of all other states' laws, violates the Commerce Clause. (Appellant's Opening Brief ("AOB") pp.22-24) In this regard, plaintiffs' consumer protection class simply cannot be squared with the Supreme Court authority holding that no single state can give its law nationwide force, in

derogation of laws of all other states, since "[t]his kind of potential . . . national regulation . . . is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual states [laws]." *Healy v. Beer Instit.*, 491 U.S. 324, 340 (1989).

In response to this constitutional impediment, plaintiffs and their amici offer abstract statements about a state's authority to enforce its laws. But their respective discussions are divorced from the context of this expansive and intrusive class action. Plaintiffs frame the issue as whether a state has the authority "to enact laws regulating a domestic corporation in its dealings with the larger world." (Appellees' Brief ("AB") p.4). The State of Minnesota argues that Minnesota's consumer protection laws "protect residents and nonresidents alike" and that a state must be able to "ensur[e] that its merchants deal honestly with citizens of other states." (Brief Amicus Curiae of Minnesota pp.1,6; *see also* Brief for Amicus Curiae Public Citizen pp.10,13 (making similar arguments))

St. Jude Medical does not dispute that states can regulate businesses located within their borders, nor does it dispute that states have the authority to enact consumer protection laws. Further, if an out-of-state plaintiff, or even a group of plaintiffs, sued in Minnesota under Minnesota's consumer protection statutes for practices occurring within Minnesota, a Minnesota court could, upon completing the appropriate conflicts-of-law analysis, apply those

statutes consistent with the Commerce Clause. The majority of the cases that plaintiffs and their amici cite involve exactly that scenario.[1]

The backdrop for this appeal is quite different and requires a different result. Here, the question is whether a federal court sitting in diversity can certify a class action applying Minnesota's consumer statutes to thousands of absent class members in fifty-one jurisdictions, to the exclusion of all other states' laws, *without* regard to potential conflicts, and *without* conducting any choice-of-law analysis. It is this unilateral judicial imposition of such a

---

[1] Many of plaintiffs' cases, for example, merely address whether individual nonresident consumers had standing to sue under a particular state's consumer fraud laws. *See Man Roland Inc. v. Quantum Color Corp.*, 57 F. Supp. 568, 575 (N.D. Ill. 1999) ("Thus, this court finds that Quantum, as a non-resident consumer, who purchased the press in Illinois from an Illinois Corporation has standing to sue under the ICFA"); *Lony v. E.I. du Pont de Nemours and Co., Inc.*, 821 F. Supp. 956, 961 (D. Del. 1993) ("The Court concludes that Lony has standing to seek relief under the Delaware [consumer fraud] statute."). Others address the extraterritorial application of state law on an individual basis, not in the context of a nationwide class. *See Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 883 (1999) ("Initially, it is important to note that at this point in the litigation, the Court has not certified the Plaintiffs as class representatives. . . . This Court only contemplates the claims of the named Plaintiffs."); *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 543, 546-47 (1998) (concluding, after choice of law analysis, that New Jersey Consumer Fraud Act applied to claims brought by two Pennsylvania residents); *Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1106 (1998) ("The Court notes that this case was filed as a class action but there has been no certification of a class."). Even the cases involving certified classes permit extraterritorial application of state laws only subject to conflict-of-law analysis — an analysis the district court here did not undertake. *See* discussion *infra* pp.7-12.

Minnesota-exclusive regulatory regime that runs counter to the Commerce Clause.

The Supreme Court has said on numerous occasions that the wholesale regulation of interstate commerce is reserved to Congress and that only Congress can enact policy for the entire nation. *BMW of North Am. Inc. v. Gore*, 517 U.S. 559, 571-72 (1996). That is because, as the Supreme Court has further stated, a "basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdictions." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). "[T]he States need not, and in fact do not, provide such protection in a uniform manner." *BMW*, 517 U.S. at 569; *see also In re Bridgestone/Firestone Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (noting that state consumer laws "vary considerably" and that "courts must respect those differences rather than apply one state's law").

Plaintiffs' amici assert that the consumer fraud class does not violate the Commerce Clause because all states bar consumer fraud in some form and because Minnesota provides among the broadest protection to consumers. (Brief for Amicus Curiae Public Citizen pp.11-12) That assertion again misses the point. "[T]he Commerce Clause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy . . . . Accordingly, we have ruled that that Clause prohibits

discrimination against interstate commerce . . . and bars regulations that unduly burden interstate commerce." *Quill Corp. v. North Dakota*, 504 U.S. 298, 312 (1992) (internal citations omitted).

The Commerce Clause analysis therefore does not turn on whether Minnesota provides remedies for consumers that exceed those of most other states. Rather, the Commerce Clause protects against one state implementing policy decisions affecting commerce that impacts other states. Here, the district court has done just that and thereby improperly substituted Minnesota's public policy choices for those of every other state. That directive unduly burdens interstate commerce by unilaterally imposing standards, on a nationwide basis, that other states may have rejected. That burden, in turn, violates the Commerce Clause.

**B. The District Court's Failure To Conduct Conflict-Of-Law Analysis In Connection With The Consumer Protection Class Violates The Due Process And Full Faith And Credit Clauses**

Even if plaintiffs' nationwide consumer protection class could be squared with the Commerce Clause, and it cannot, that class still fails constitutional scrutiny because of the district court's failure to conduct any conflicts-of-law analysis before applying Minnesota law. (AOB pp.25-28) Before a court can apply one state's law extraterritorially in a multi-state class action, the Constitution requires conflicts-of-law analysis to determine which state's law should apply to the various class members' claims. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816-17 (1985) (performing choice-of-law analysis, before concluding that the Constitution forbids classwide

application of Kansas law); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (holding that class certification scrutiny includes "individualized choice of law analysis to each plaintiff's claims").

Plaintiffs and their amici contend that the district court's failure to follow this constitutional command is immaterial here for two independent reasons.[2] *First*, plaintiffs argue that choice-of-law analysis was not required, emphasizing that the "Constitution speaks to which selections of law are permissible; it does not demand a particular choice among permissible alternatives." (AB p.11) But St. Jude Medical has not argued that the Constitution demands the application of a particular state's law. And, although plaintiffs urge the Court to "disentangle" conflicts-of-law from its due process analysis, the issues are not separable. Where more than one state's law could apply, as *is* the case here, the need for a conflicts-of-law analysis *is* of constitutional dimension. In these circumstances, due process requires analysis of which of those laws *should* be applied under applicable conflict-of-law rules. *See Shutts*, 472 U.S. at 816 (Due Process and Full Faith and Credit Clauses are not violated if the forum state's law is "not in conflict with that of any other jurisdiction connected to the suit."); *Georgine*, 83 F.3d at 627 (citing *Shutts*, holding that due process requires choice-of-law analysis for each plaintiffs' claim).

[2] This Court reviews de novo the district court's choice of law determinations. *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618,620 (8th Cir. 2001).

A recent case from the West Virginia Supreme Court of Appeals demonstrates the point. In *State of West Virginia ex rel. Chemtall Inc. v. Madden*, No. 31743, 2004 WL 2750996 (W. Va. Dec. 2, 2004) (to be published, see addendum), the defendants challenged certification of a multi-state medical monitoring class under West Virginia law, claiming that the trial court improperly applied West Virginia law to the entire class. The Supreme Court agreed and reversed certification, holding that under *Shutts*, the trial court "[was] bound to compare West Virginia law on strict liability, medical monitoring, punitive damages, and statutes of limitation with the applicable laws of the other states herein." *Id.* The trial court thus committed "clear error in failing to consider [the forum state's] conflict of law doctrine and in failing to conduct a meaningful analysis of variations in the laws of the several states included in the proposed class action." *Id.*[3]

[3] The class action cases that plaintiffs cite further confirm that conflict-of-law analysis *is* required *before* certifying a multi-state class. In each case, the court permitted extraterritorial application of state law only after undertaking the requisite conflict-of-law analysis or after noting that the application of state law was subject to conflict-of-law analysis. *See In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 248 (D. Del. 2002) (Delaware law could apply to nationwide settlement class "so long as the members' own state consumer fraud statutes do not have material conflicts with the Delaware statute and Delaware has significant contacts with the asserted claims of these plaintiffs."); *Ysbrand v. Daimler Chrysler Corp.*, 81 P.3d 618, 625-27 (Okla. 2003) (certifying class under Oklahoma warranty and fraud law after determining "whether the relationship of each state where the vehicles were purchased is more significant to the parties and this litigation than that of Michigan, the principal place of business of [the defendant]."); *National Western Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 300-01 (Tex. App. 2002) (applying Texas law to insurance class action after choice-of-law analysis; large number of plaintiffs purchased their policies in Texas and maintained

(continued...)

A state-by-state conflict-of-law analysis therefore was required before the district court could consider applying Minnesota law uniformly to every class member. Nor would such an analysis have been inconsequential. There are multiple and profound conflicts among the 50 states' consumer protection laws. *See Bridgestone/Firestone*, 288 F.3d at 1018 (state consumer laws "vary considerably"; *see also infra* pp.19-20). There thus is no reason to assume that a proper conflicts-of-law analysis here would result in the uniform application of Minnesota law.[4]

(...continued)

contact with defendant's Texas offices); *Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145, 159-60 (Cal. Ct. App. 2001) (applying California unfair competition law to settlement class after analyzing constitutional and choice-of-law questions); *Avery v. State Farm Mut. Auto. Ins. Co.*, 746 N.E.2d 1242, 1254-55 (Ill. App. Ct. 2001) ("[T]he circuit court found that there were no true conflicts between the substantive laws of Illinois and those of the other states whose residents were part of the class."); *Lobo Exploration Co. v. Amoco Production Co.*, 991 P.2d 1048, 1053-54 (Okla. Civ. App. 1999) (applying Oklahoma law to class because "defendant has not shown any state other than Oklahoma has an interest in applying its consumer protection laws or that the application of Oklahoma's Consumer Protection Act would impair the interests of another state"); *Renaissance Cruises, Inc. v. Glassman*, 738 So. 2d 436, 439 (Fla. Dist. Ct. App. 1999) (applying Florida law to class claims; "the significant relationship test supports the application of Florida law to all claims").

[4] Plaintiffs claim that St. Jude Medical made a "prior judicial admission" that Minnesota has the most significant contacts with this case. (AB p.12) But that is not true. In July 2000, St. Jude Medical moved to transfer the *Sliger* class action from its home district to the District of Minnesota. The motion urged that a section 1404 transfer would be convenient to the parties because another nationwide class action was already pending in Minnesota, making Ms. Sliger's nationwide class action duplicative. St. Jude Medical also noted the location of witnesses and evidence in Minnesota, as well as other factors weighing in favor of Minnesota as a convenient forum. (Appellees' Separate

(continued...)

*Second*, plaintiffs and their amici argue that the district court actually *did* conduct choice-of-law analysis when it summarily determined that the statutory language "any person" supported uniform application of Minnesota law to 11,000 class members. According to plaintiffs and their amici, the Minnesota legislature's use of "any person" displaces Minnesota's regular five-part choice of law test, essentially eliminating any inquiry into conflicts of law when invoking those statutes. (AB pp.16-18; Brief of Amicus Curiae Minnesota Trial Lawyers Association pp.5-6)

Put another way, plaintiffs urge this Court to find that Minnesota's lawmakers preempted the conflict-of-law issue by legislating around the Due Process and Full Faith and Credit Clauses of the United States Constitution. Yet neither plaintiffs nor their amici cite *any* authority for the proposition that the "any person" language supplanted Minnesota's ordinary five-part conflicts test. That absence of authority is not surprising, since the need for conflicts-of-law analysis is a constitutional mandate that Minnesota's legislature cannot preempt. Moreover, interpreting the "any person" language as plaintiffs suggest would make application of Minnesota's consumer protection law *mandatory* whenever a plaintiff invoked it. If, for example, an Illinois resident sued an Illinois-based defendant for business practices occurring in Indiana, but did so in Minnesota under Minnesota's statutes, the court would

(...continued)

Addendum pp.4-15) St. Jude Medical did not urge the classwide application of Minnesota law and did not urge that Minnesota had any greater interest in having its law applied than any other state.

*have to apply* Minnesota law despite *no* meaningful contact with the controversy other than the minimum contacts required to establish personal jurisdiction. That incongruous result cannot represent a proper interpretation of constitutional and statutory law. *E.g.*, *Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91, 94-96 & n.1 (Minn. 2000) (applying North Dakota law based on Minnesota's ordinary choice-of-law test, rejecting argument that interpretation of Minnesota's no-fault statute made choice-of-law analysis unnecessary).

The district court's failure to conduct a conflicts-of-law analysis before unilaterally applying Minnesota law to thousands of class members runs afoul of the Due Process and Full Faith and Credit Clause and provides an independent reason to reverse the nationwide class certification orders.[5]

## III. PLAINTIFFS STILL HAVE NOT AND CANNOT EXPLAIN HOW THEIR NATIONWIDE CONSUMER PROTECTION CLASS ACTION MEETS THE DEMANDS OF RULE 23

The Court need not look beyond these constitutional impediments to reject plaintiffs' nationwide consumer protection class. But even if it elects to

[5] As noted in St. Jude Medical's opening brief, the application of Minnesota law to class members nationwide also violates the Rules Enabling Act. The extension of that law gives absent class members personal injury damage claims and potential medical monitoring remedies that the common law and consumer protection laws of their home states do not provide. This expansion of rights is not permitted. (AOB pp.29-30) "[N]o reading of [Rule 23] can ignore the [Rules Enabling] Acts's mandate that 'rules of procedure "shall not abridge, enlarge or modify any substantive right."'" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1998).

do so, there are further insurmountable barriers under Rule 23 to the certification of plaintiffs' nationwide class.

## A. Plaintiffs Have Never Shown And Cannot Show That Their Consumer Protection Class Action Is The Manageable Or Superior Method For Resolving Silzone® Claims

The story of this proposed class action has been steady division and splintering of class members' factually disparate claims, making this action anything but the superior, manageable proceeding that Rule 23(b) envisions. (AOB pp.16-20,38-43) Plaintiffs and their amici attach no significance to this procedural history beyond labeling it as a sound exercise of judicial discretion. But this process of formulation and reformulation must be seen for what it is: A recognition that no matter what legal theory is considered, individual issues predominate on every element of plaintiffs' personal injury claims and thereby render those claims unsuitable for class certification.

### 1. Demonstrating An Alleged Representation About The Heart Valve Will Require Individualized Proof

Plaintiffs purport to represent a class consisting of thousands of patients nationwide, yet they never explain how they will prove a representation or representations that apply uniformly to every class member. As noted at the outset, Minnesota's consumer protection statutes require a link between an alleged representation and each class member's alleged injury. *See Group Health*, 621 N.W.2d at 11-15. Proof of such representations is an essential element of plaintiffs' burden of proof. *Id.*

Plaintiffs attempt to meet this burden by asserting that "SJM used false and misleading information and advertisements to induce implant patients and their doctors to use the Silzone coated heart valves." (AB p.31) That assertion just begs the question. St. Jude Medical distributed Silzone heart valves through a nationwide network of sales representatives, each of whom met with treating physicians and hospital staffs to provide information. Further, patients implanted with Silzone® valves received those valves only after consulting with their own physicians, each of whom conveyed whatever information about the device that he or she deemed relevant. (Appellant's Appendix ("AA") 6423,6435-36,6447,6455,6461,6475-77,6488-89) Thus, there are at least three levels of disclosure at issue here: What St. Jude Medical told its various sales representatives, what those representatives said (if anything) to the respective treating physicians, and what (if anything) those physicians told their patients.

Plaintiffs have not attempted to prove (and indeed cannot prove) that every treating physician *and* every class member came into contact with the same information. Individual proof, class member-by-class member, will be required to determine what representations were made and to whom. Any attempt at nationwide class certification fails right there. *See Liberty Mut. Ins. Co. v. Tribco Constr. Co.*, 185 F.R.D. 533, 539 (N.D. Ill. 1999) (finding class treatment inappropriate because the case involved alleged misrepresentations which were likely to vary such that individual questions predominate).

### 2. Demonstrating A "Causal Nexus" Between St. Jude Medical's Alleged Representations And Plaintiffs' Alleged Injuries Will Require Individualized Proof

Contrary to plaintiffs' assertion, and as this Court recently has provided, the causal nexus required under the Minnesota statutes "entails proof of causation of harm, injury in fact, and damages" resulting from the defendant's conduct. *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 754-77 (8th Cir. 2003) (affirming summary judgment for defendant where plaintiffs' surveys and scientific reports about tobacco use did not establish causal nexus between company representations and plaintiff HMO's alleged damages). While the statutes do not require "a strict showing of direct causation, as would be required at common law" [*Group Health*, 621 N.W. 2d at 14], plaintiffs must establish causation by "direct or circumstantial evidence that the . . . court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct." *Id.*

Thus, as the Minnesota Supreme Court has stated, in cases where the plaintiff claims damages resulting from deceptive or misleading statements or conduct – as plaintiffs claim here – "it is not possible that the damages could be caused by a violation [of the Minnesota statutes] without reliance on the statements or conduct alleged to violate the statutes. Therefore, in a case such as this, it will be necessary to prove reliance on those statements or conduct to satisfy the causation requirement." *Id.*; *see also Flynn v. American Home Prods. Corp.*, 627 N.W.2d 342, 351-52 (Minn. Ct. App. 2001) (affirming summary judgment for defendant under Minnesota consumer statutes because

plaintiff submitted no evidence of reliance on defendant's alleged misrepresentations and thus could not establish causal nexus).

Proof of this requisite causal nexus demands individual inquiries at multiple levels. As explained above, determining what representations might have come into play in the decision to implant a Silzone® valve will require individualized inquiries. Beyond the effect of any representations themselves, the medical causation half of the inquiry is complicated as well. All the injuries that plaintiffs allege are well-known complications of mechanical heart valve implantation and occur for many different reasons that can have nothing to do with the valve itself. (AA4452-55) Thus, even if St. Jude Medical's alleged representations led to the implantation of a Silzone® heart valve, there is a possible alternative cause of injury that requires exploration in every Silzone® case. (*Id.*) That requires exploration of each class member's medical history, medical treatment, and prognosis. (AA6320-23)

In short, plaintiffs' nationwide consumer protection class action will provide just as many individualized causation issues as any other class action seeking personal injury damages allegedly caused by a medical device, pharmaceutical, or other product. Class certification uniformly is rejected for these types of claims, and that same result should follow here.

### 3. Damages Will Require Individualized Proof

In connection with the personal injury class, plaintiffs did not even attempt to assert that damages could be proved absent individual trials.

Plaintiffs have proposed, however, a classwide damages determination based on the testimony of "an expert, who will assess the common types of damages . . . and give an opinion on how the jury should aggregate relief to the entire class." (AA6402-03)

But no mathematical calculation can determine an "aggregate" personal injury recovery for this class, let alone a reliable damages measure for each class member. For one thing, as fiduciaries to the class, plaintiffs have the duty to claim the reasonable universe of damages allegedly caused by Silzone® valves, including the always individualized elements of pain, suffering, and emotional distress. For another, even when limiting damages to medical expenses and lost wages, as plaintiffs propose, individual issues still abound. With regard to medical expenses, Bonnie Sliger had her Silzone valve explanted and had no fewer than four physicians give her opinions (including opinions *not* to explant her valve) before doing so. Levy Redden has a history of TIAs, anticoagulation therapy, and heavy calcification in his aortic valve. (AA4457-61) The extent and cost of reasonable medical care for these class representatives therefore differs substantially, and the same will be true for every other class member.

Wage loss claims will be even more idiosyncratic. There is no common occupation among the class members and no uniform expectation as to how much work, if any, they missed. To illustrate this point, the Court need look no further than Bonnie Sliger, the now deceased former cook and cafeteria worker; Joe Sanchez, the skilled machinist; and Levy Redden, the assistant principal and special education teacher with a Master's Degree. (AA6428-

34,6442-46,6453-54) There is no credible way to extrapolate a classwide number from these class representatives, nor any other class members. On the contrary, class member-by-class member inquiries will be required.

#### 4. Medical Monitoring Will Require Individualized Proof

The medical monitoring remedy that plaintiffs are claiming under Minnesota's statutes also presents individual issues on numerous levels. To start, assuming that plaintiffs are right that asymptomatic Silzone patients have experienced "inadequate" healing around their valves, the cause of such healing problems remains an individual issue. That is because patients with all types of mechanical valves demonstrate variable, and often problematic, healing characteristics following implantation. Problems with healing can be caused by a wide variety of individual patient factors entirely unrelated to the patient's valve. (AA4968-69) Even plaintiffs' expert, Dr. Tyers, acknowledged that the problems with healing around a prosthetic valve "are not unique to Silzone valves." (AA5860)

The appropriate *scope* of monitoring, if any, is similarly unique to each class member. Class members with Silzone® valves, like all mechanical valve recipients, are faced with widely varying needs for follow-up care. (AA4465-66,4517-21) These varying needs present yet additional individual issues that cannot be determined on a classwide basis. Plaintiffs' nationwide class under Minnesota's consumer protection statutes must be rejected on this independent ground as well. *See Barnes v. Am. Tobacco Co.*, 176 F.R.D. 479, 499 (E.D. Pa. 1997) (medical monitoring claims in product liability action implicated too

many individual issues for class treatment), *aff'd*, 161 F.3d 127, 146 (3d Cir. 1998) (individual proof required because each class member must demonstrate that the medical monitoring sought is different from that normally recommended).

### B. Plaintiffs' Trial Plan Shows That Plaintiffs' Nationwide Consumer Fraud Class Action Is Neither Manageable Nor A Superior Method For Resolving The Class Members' Claims

Plaintiffs mention in a heading that the district court will be able to "manage the class action easily." (AB p.29) But this Court will search plaintiffs' brief in vain for any description of how this class action is in any way manageable, let alone the *superior* method for resolving the relatively few Silzone® claims that have been initiated. Most of the problems with plaintiffs' nationwide consumer protection class exist because of the individual issues requiring resolution *under Minnesota's consumer protection statutes*. In other words, plaintiffs' invocation (also in a heading) of the statutes' purported "relaxed standards of proof" does not magically alleviate plaintiffs' burdens or resolve the many individual issues that plaintiffs' statutory causes of action present.

**First, every state's consumer protection laws should apply to claims arising in that state, which prevents unmanageable legal diversity**. As St. Jude Medical has explained, this Court cannot apply Minnesota's consumer protection statutes to this putative nationwide class, but instead must consider the consumer protection laws of 51 jurisdictions. Furthermore, there are significant differences among the various jurisdictions' laws that make

plaintiffs' consumer class unmanageable and uncertifiable. *See Lyon v. Caterpillar*, 194 F.R.D. 206, 219 (E.D. Pa. 2000) (denying class certification where plaintiff did not provide detailed analysis of forty-one states' consumer fraud acts); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 349-51 (D.N.J. 1997) (denying class certification where numerous claims, including consumer protection claims, would require application of law of 50 states).

For example, Pennsylvania's consumer protection statutes excuse proof of individual reliance where the defendant has a fiduciary relationship with the plaintiff, while in other cases, it requires individualized proof of reliance and causation, including in class actions. *Debbs v. Chrysler Corp.*, 810 A. 2d 137, 157-58 (Pa. Super. Ct. 2002). New Jersey does not require reliance at all. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997). On the element of intent or scienter, Connecticut and other states require no showing. Other states including Iowa require the plaintiff to prove that the defendant intended to deceive. Others like New York do not require a showing of intent, but proving intent entitles the plaintiffs to additional remedies. These are significant issues in these cases because proof of reliance is different for every Silzone patient and because St. Jude Medical's knowledge regarding the properties and potential complications of Silzone® heart valves changed over time. These are only isolated examples of differences in state law that will affect this litigation. (AA6333-98)

**Second, even if this Court (unconstitutionally) applies Minnesota law, the plan that plaintiffs have built is unwieldy and inferior to**

**resolution through individual actions.** Under plaintiffs' proposed trial plan, plaintiffs will attempt to prove violations of Minnesota's consumer fraud statutes in a single trial and will claim certain elements of personal injury damages, as well as medical monitoring. Such a trial will include evidence on the Silzone heart valve, its design, its risks, and what St. Jude Medical did and did not say about it. The trial will also include evidence on what St. Jude Medical knew about Silzone at various times in its development and marketing. St. Jude Medical will be entitled to raise its defenses.

Then there will be a second phase in which each class member will submit his or her individual "proof of claim," which will necessarily include individualized proof of what particular sales representatives said about Silzone heart valves, whether those representations created a "causal nexus" with the class member's alleged injury (including a medical causation showing), and individualized proof of damages. And because St. Jude Medical has not and will not waive its right to jury trial, each individual "proof of claim" will have to be before a jury.

Further, under plaintiffs' proposal, this proceeding will resolve only part of the class members' claims. Anyone who wishes to pursue tort or warranty claims, or damages other than medical expenses and lost wages, or medical monitoring in a state that is not in the 17-state medical monitoring class will have to file a separate civil action. Thus, further costly litigation is the guaranteed result of this class action. Class members and St. Jude Medical will have to litigate over the issue of what this class action resolved and what it did not. And if the later courts permit class members to pursue their

individual claims, the litigation will be repetitive of the already-conducted class trial and individual "proof of claim" trials. As in the consumer class action, there will be evidence regarding the Silzone heart value, its risks, representations made by St. Jude Medical, causation, and damages. St. Jude Medical will be entitled again to raise its defenses. It will be redundant, to say the least. And placing medical monitoring into the mix only complicates things further.

**C. Plaintiffs Are Neither Adequate Class Representatives Nor Are Their Claims Typical Because Of The Individualized Nature Of Their Claims**

In its opening brief, St. Jude Medical described why the named plaintiffs are not adequate class representatives, and why their claims are not typical of the putative class members. (AOB pp.31-38) Plaintiffs chide St. Jude Medical for its rigorous analysis, but that criticism is difficult to fathom. As the Sixth Circuit observed, "[A]s goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)

Plaintiffs dismiss these factual differences, labeling them "for the most part, irrelevant." Indeed, they go so far as to say that the relevance of St. Jude Medical's arguments on adequacy and typicality are "difficult to comprehend" and accuse St. Jude Medical of erecting a "straw man." (AB pp.2,28)

Given this dismissive approach, the obvious bears repeating: Plaintiffs are real people with actual individual claims. As the Minnesota Chamber of Commerce aptly explained in its amicus brief, St. Jude Medical is not litigating here against some hypothetical or composite person. St. Jude Medical is litigating against the named plaintiffs and the factually diverse cases they present. Ms. Sliger, Mr. Sanchez, Mr. Grovatt, Ms. Bailey, and Mr. Redden are claiming, for themselves and each injured class member, damages allegedly resulting from the purchase and implantation of a Silzone® heart valve, including funds for future medical monitoring and personal injury-type damages such as medical expenses and lost wages. To recover for themselves and the class, each has to prove the individual elements of his or her own claims.

Looking at Mr. Sanchez and his unique medical history, proof that his Silzone® valve caused his paravalvular leak says nothing about whether a Silzone® heart valve caused anyone else's paravalvular leak, much less about whether a Silzone® valve caused an absent class member to have a heart attack or a stroke. Yet Mr. Sanchez purports to be an adequate representative for those valve recipients who allegedly had a heart attack or a stroke. Ms. Bailey and Mr. Redden likewise present unique profiles. Yet they purport to claim damages and medical monitoring for class members whose profiles might differ in significant ways.

These differences establish that there is not, and cannot be, an adequate or typical representative for plaintiffs' nationwide class. Given what plaintiffs

would have to prove at trial, any effort to certify a nationwide class founders on these divergences.

**D. Plaintiffs Are Inadequate Class Representatives Because They Are Splitting The Class Members' Claims And Thus Placing Themselves In A Conflict With The Class**

As plaintiffs readily acknowledge, the district court created a dual-track resolution scheme in which a nationwide consumer class trial will be followed by individual personal injury actions. Yet, this dual track effectively splits the class members' claims and risks the application of res judicata. Although the putative class members should not be asked to bear that risk, plaintiffs and their amici assert that claim splitting is of no concern here because: (1) there is an exception to the claim preclusion rules for class actions; (2) the district court can solve any claim splitting problems by expressly "reserving" any remaining claims for the absent class members; and (3) a "properly prepared" class notice will remove any conflicts their dual-track approach might present for other class members. None of these solutions withstands scrutiny.

**First, there is no blanket class action "exception" to the normal rules governing claim and issue preclusion.** Although they deny it, plaintiffs *are* proposing a resolution scheme calling for adjudication of the *same causes of action* in both this class action and in individual civil actions. That is, for the class, they are claiming damages flowing from personal injuries – including medical expenses and lost wages – allegedly resulting from the implantation of Silzone® heart valves. While they have elected to do so under a consumer protection theory, they still are claiming the *same damages* that

individual class members would seek in individual actions pursued under different legal theories.

When a class representative seeks personal injury or other damages that individual class members would be expected to claim in later individual lawsuits arising from the same underlying facts, as is the case here, there is no class action "exception" to the rule against claim splitting. Just as would be the case with any other litigated lawsuit, a class action judgment bars claims that were raised, or that could have been raised, in the class proceeding. The First Circuit recently so held in exactly these circumstances. In *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53 (1st Cir. 2004), a Minnesota state judge had previously approved a settlement in a class action seeking replacement of defective windows under the consumer protection statutes of all 50 states and the District of Columbia. *Id.* at 55. Later, absent class members sued in Massachusetts for negligence, failure to warn, and violation of that state's consumer protection statute, claiming property damage allegedly caused by the same windows. *Id.* at 55-56. The class members asserted that their individual cause of action was different because they sought only property damages. But the district court disagreed and dismissed the case on res judicata grounds. *Id.* at 54-56.

The First Circuit *affirmed dismissal* for the same reason. *Id.* at 57-58. According to the First Circuit, Minnesota law on claim preclusion applies "not only as to every matter which was actually litigated, but also as to every matter which might have been litigated." *Id.* at 58 (citing *Sondel v. Northwest Airlines, Inc.*, 56 F.3d 934, 938 (8th Cir. 1995), and *Thompson v. American*

*Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1990)). Because the class members were asserting claims based on the same "factual predicate," the prior judgment precluded their claims. *Id.*[6]

This preclusion risk is the same one that helped to scuttle class certification in cases like *Thompson* and in every other federal case that examined the issue where a subsequent lawsuit would be seeking the same damages arising from the same underlying facts.[7] These authorities confirm

---

[6] *See also Peters v. National R.R. Passenger Corp.*, 1991 U.S. Dist. Lexis 3850 (D.D.C. 1991) (copy of opinion at AA6626-28) (dismissing class member's individual claim based on train wreck that was subject of earlier class action); *Dorsey v. Smith*, 91 F.R.D. 261, 263 (D. Md. 1981) (dismissing individual claim on res judicata grounds because the plaintiff class member was seeking to litigate discrimination issues covered in the separate class action).

[7] *See Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 599 (S.D.N.Y. 1982) (denying class certification partly because plaintiffs had "tailored the class claims in an effort to improve the possibility of demonstrating commonality" thus creating "significant risks" of claim preclusion); *Linkous v. Medronic, Inc.*, No. 84-1090, 1985 WL 2602, at *4-*5 (E.D. Pa. Sept. 4, 1985) (copy of opinion at AA6495-6503) (denying class certification despite plaintiffs' strategy of carving out claims for pain and suffering to eliminate individualized inquiry; "[t]he approach of the plaintiffs to exclude individual issues . . . undermines the raison d'etre of Rule 23"); *In re Methyl Tertiary Butyl Ether Products Liability Litig.*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002) (denying class certification based partly upon finding of inadequacy where plaintiffs limited claims to injunctive relief despite evidence that many putative class members had sustained physical injuries); *Pearl v. Allied Corp.*, 102 F.R.D. 921, 923-24 (E.D. Pa 1984) (denying class certification where named plaintiffs abandoned claims for present physical injury or diminution of property value in an effort to exclude claims necessitating individualized proof); *see also City of San Jose v. Superior Court*, 12 Cal. 3d 447, 464 (1974) (reversing class certification, holding that class representative's failure to assert claims reasonably expected to be raised by class members breached representative's fiduciary duty); *Millet v. Atlantic*

(continued...)

that there is nothing inherent in class certification that eliminates this preclusion risk for the putative class members in these heart valve cases.

Plaintiffs cite *Cooper v. Federal Reserve Bank*, 467 U.S. 867 (1984), for the broad proposition that "a court's choice to use the class device . . . to address common issues under Rule 23 superseded other procedural requirements," which they say necessarily suspends claim and issue preclusion for these cases. (AB pp.22-23) Plaintiffs misperceive the actual reasoning and import of *Cooper*. In *Cooper*, the Supreme Court actually held the opposite — that the regular rules of claim and issue preclusion do apply to class judgments: "There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation. . . . *Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply*." *Cooper*, 467 U.S. at 874 (emphasis added). The Supreme Court went on to apply those basic principles to hold that a class judgment adjudicating a pattern-and-practice discrimination claim did not preclude class members from bringing individual discrimination

(...continued)

*Richfield Co.*, No. CV-98-555, 2000 WL 359979, at *8-*9 (Me. Super. Mar. 2, 2000) (copy of opinion at AA6505-29) (denying class certification where named representatives excluded claims for personal injury; class members might find such claims barred in a subsequent action); *Small v. R.J. Reynolds Tobacco Co.*, 698 N.Y.S.2d 615, 619-20 (NY 1999) (class certification reversed where named representatives limited their claims because class members could find themselves precluded from bringing later personal injury claims).

claims. *Id.* at 875-76. They were, according to the Court, different actions because one inquired into a company's "standard operating procedure," while the other involved individual hiring decisions. *Id.*

Here, however, the distinctions that drove the result in *Cooper* are absent. Whatever subsequent theory that individual class members might bring, whether based on product liability, negligence, or other similar claim, they will be pursuing the same relief based on the implantation of their Silzone® heart valves. In these kinds of cases, *Cooper* provides that ordinary rules of claim preclusion apply. Class certification thus should be rejected here to avoid this very real risk and to spare St. Jude Medical the burden of litigating preclusion in individual actions even after this class action is resolved.

**Second, even if the district court had the authority to reserve claims for individual class members, there is no assurance that other courts would honor the reservation.** Plaintiffs certainly have not provided any authority so holding. The Eighth Circuit case they cite, *Marshall v. Kirkland*, 602 F.2d 1282 (8th Cir. 1979), does not involve any reservation at all. In fact, the only case plaintiffs cite that involves a court's treatment of a prior court's reservation is *Apparel Art International v. Amertex Enterprises Ltd.*, 48 F.3d 576 (1st Cir. 1995). But that case arose from a very complicated procedural posture in which the plaintiffs simultaneously were pursuing relief in a first-filed supplementary enforcement action *and* in a later-filed civil action. *Id.* at 579-80. The district court in the subsequent civil action deferred to the judge presiding over the earlier supplementary proceeding and

dismissed claims "without prejudice to any legitimate execution of judgment motions which plaintiffs may seek to file . . . in the [earlier] supplementary proceedings." *Id.* at 581. Although the First Circuit ruled that the reservation should be respected, there is nothing similar going on in this class action.[8] Further, as *Reppert* makes clear, where the procedural scenario does resemble these heart valve cases, rules of claim preclusion in fact do apply.

**Third, class notice cannot cure plaintiffs' conflict with the class members.** Plaintiffs also claim that the preclusion risk presents no cause for concern because a "properly drafted" class notice, combined with the right to opt out, resolves the obvious conflict. But when class representatives split class members' claims, thus creating a preclusion risk, "[t]he ability to opt out of the class is insufficient to protect the rights of putative class members who would want to seek remedies other than those chosen by the [class] representatives." *Clark v. Experian Information Solutions, Inc.*, No. Civ. A. 8:00-1217-24, 2001 WL 1946329, at * 4 (D.S.C. Mar. 19, 2001) (copy of opinion at AA6652-55); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 338 n.23 (S.D.N.Y. 2002) (notice and opportunity to opt out does not cure the conflict created by class representatives' decision to pursue claims). Plaintiffs thus cannot resolve their conflict with the class members merely by crafting a clever class notice and counting on problematic class members to opt out. *See, e.g.*, *Small v.*

---

[8] In plaintiffs' other cited authority, *Fabricant v. Sears Roebuck*, 202 F.R.D. 310 (S.D. Fla. 2001), the court purported to reserve an actual damage claim, but offered no authority that a subsequent court would respect the reservation.

*Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 601-02 (App. Div. 1998) (class representative were inadequate where they claimed only purchase price of cigarettes after 1980; right to opt out could not cure the conflict).[9]

In the end, the class action resolution scheme that plaintiffs advocate bears no resemblance to the streamlined and efficient procedure that Rule 23 envisions. Worse yet, the risk of claim preclusion actually threatens the class members' rights. The superior option is to reverse the district court's orders and allow the putative class members to pursue, if they wish, individual claims.

## IV. PLAINTIFFS' MEDICAL MONITORING CLASS RELIES ON OVERLY AGGRESSIVE ERIE PREDICTIONS AND DOES NOT MEET RULE 23 IN ANY EVENT

### A. In Making *Erie* Predictions, The District Court Extended State Law On Medical Monitoring Against This Court's Caution

The parties agree that the proper application of the *Erie* doctrine is instrumental in determining the scope of any medical monitoring class.[10] The

---

[9] Plaintiffs' cited authority, *In re Universal Service Fund Telephone Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004), does not hold that a class representative can resolve conflicts with class members through a properly drafted class notice. The court held in that case that the preclusion risk did not render the class representatives inadequate because they continued to pursue all recoverable damages on behalf of the class. *Id.* at 669. They waived only their fraud theory. *Id.* To be cautious, the court noted that the class notice should inform class members that a judgment might preclude individual fraud actions, but the court declined to hold that notice and opt out procedures could resolve conflicts between class members and named representatives. *Id.* at 670 n.5.

parties also agree that under *Erie,* and in the absence of controlling state authority, federal courts sitting in diversity must predict how state supreme courts would resolve the issues presented.

The parties differ, however, in their views of what it means to "predict" state law. St. Jude Medical has argued that federal courts refrain from creating novel substantive claims and remedies, unless state appellate authority clearly signals that a state supreme court would endorse that result. In plaintiffs' view, by comparison, to "predict" the law means to "expand," or "create," or "divine" new state substantive law — even going so far as to endorse the creation of rights without reference to any state authority at all.

In taking this expansive approach, plaintiffs fail to adhere to the careful approach that this Court has endorsed when dealing with cutting-edge issues such as medical monitoring claims. Federal courts are both constrained and cautious when dealing with controversial or novel claims and remedies — they should not and cannot create new claims or remedies out of whole cloth, or out of isolated threads that do not clearly show a state's chosen direction. As this Court has said under similar circumstances, "it would be both imprudent and improper for us to allow plaintiffs to pursue their medical monitoring claim." *Trimble v. Asarco*, 232 F.3d 946, 963 (8th Cir. 2000).

(...continued)

[10] This Court reviews district court interpretations of state law under a de novo standard. *See Salve Regina College v. Russell*, 499 U.S. 225, 231-34 (1991); *Reimer v. City of Crookston*, 326 F.3d 957, 961 (8th Cir. 2003).

As the Seventh Circuit has said, "[F]ederal court is not the place to press innovative theories of state law." *Villegas v. Princeton Farms, Inc.*, 893 F.2d 919, 925 (7th Cir. 1990). More recently, a district court in Florida rejected a five-state medical monitoring class partly because of the "difficult task" of applying state law in jurisdictions where the law was not well settled. *Perez v. Metabolife International, Inc.*, 218 F.R.D. 262, 267-68 (S.D. Fla. 2003). Those "not well settled" jurisdictions included Colorado and Illinois, two states currently in the medical monitoring class here.

The district court placed itself squarely in a precarious position when it included such states as Texas, Kansas, District of Columbia, Colorado, Illinois, Montana, New York, Connecticut, Delaware, and Ohio in the medical monitoring class. The authorities for medical monitoring in such states are far from conclusive regarding medical monitoring as a stand-alone claim. (AA6223-36) And authorities in many states clearly *foreclose* medical monitoring as anything but a remedy for an underlying cause of action, which the district court said it was excluding from the class.

Plaintiffs nevertheless contend that St. Jude Medical is misstating the issue. They say, for example, that St. Jude Medical has "glaringly misportray[ed] what Judge Tunheim actually held regarding Delaware law." (AB p.41) But what Judge Tunheim "actually held regarding Delaware law" personifies plaintiffs' unabashed willingness to create medical monitoring claims where they do not exist. In *Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647 (Del. 1984), the Delaware Supreme Court rejected medical monitoring relief absent proof of an actual injury, yet the district court

still included it in the medical monitoring class. Plaintiffs defend that interpretation by pointing out that the Delaware Supreme Court *distinguished* another case in coming to its conclusion, thus giving the district court reason to infer that Delaware would sanction a stand-alone medical monitoring claim if presented with the issue. In other words, plaintiffs ask this Court to accept the creation of a new and novel remedy in Delaware based on a negative inference drawn from a distinction made in a case that forecloses the very remedy sought. This sort of bootstrapped analysis is exactly what this Court cautioned against in *Trimble*, when it condemned federal court efforts to "blaze new state law trails." 232 F.3d at 963; *see also Karas v. American Family Ins. Co.*, 33 F.3d 995, 999-1001 (8th Cir. 1994) (court declined to permit plaintiff to recover damages for mental suffering in breach of contract action when state's highest court had not ruled on issue).

Plaintiffs try to defend the district court's analysis, but in the end, they fail to recognize that the courts in those states are not writing on clean slates. In common-law jurisdictions, tort claims require an injury, and states that have approved stand-alone medical monitoring claims have created an exception to that rule. For the district court here to create additional exceptions without a clear and solid footing is error that this Court should reverse.

**B. Plaintiffs And Their Amici Essentially Admit That Notice And Opt Out Rights Are Essential To Save The Medical Monitoring Class, Which Confirms That It Should Not Have Been Certified Under Rule 23(b)(2)**

The parties agree that if the remedy sought is primarily monetary relief, as opposed to injunctive relief, then certification of a class under Rule 23(b)(2) is not appropriate. *Zinser v. Accufix Research Instit., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001) (emphasis added). The key question thus is what kind of relief do plaintiffs seek.

Here, plaintiffs seek money to pay for medical monitoring and the medical treatment associated with any alleged injuries that the monitoring unearths. Their request for "medical monitoring" accordingly is nothing more than a euphemism for funds to pay for medical treatment. To put it another way, the "fund" that plaintiffs seek is defined by monetary relief payable for personal injuries – "money damages" under any fair interpretation of the term.

Further, plaintiffs cannot so easily dismiss the due process problems that their (b)(2) class creates. A judgment cannot bind an absent class member concerning a claim for monetary relief without providing minimal due process protection, which requires that each person have the right to be heard and to receive notice and an opportunity to opt out of a class. *Shutts*, 472 U.S. at 811-12. Plaintiffs' medical monitoring class seeks monetary relief – even if plaintiffs call it "equitable" – yet Rule 23(b)(2) requires neither notice nor an opportunity to opt out. These very omissions trigger the constitutional problem.

Plaintiffs acknowledge this problem, but say that the district court can still address it. Plaintiffs' amici go farther and argue that the Court *should require* notice and opt out rights for the medical monitoring class action, despite the controlling law rejecting such requirements as having no place in a (b)(2) class. (Brief for Amicus Curiae Public Citizen pp.20-21) Once again, however, plaintiffs and their amici cannot escape the force of their concessions. By urging that the district court should resort to notice and opt out rights to save the medical monitoring class, plaintiffs and their amici effectively admit that this class really should not have been certified under Rule 23(b)(2) in the first place.

**C. Plaintiffs Do Not Describe – Because They Cannot – How Their Medical Monitoring Class Is A Cohesive, Manageable Resolution System**

Without explaining why it is so, plaintiffs insist that their medical monitoring class is homogenous, cohesive, and manageable. Close analysis once again reveals, however, that their medical monitoring class is anything by cohesive and cannot efficiently or effectively be tried to judgment.

**First, plaintiffs have never submitted a trial plan for their medical monitoring class.** While their brief asserts that "a class-wide trial . . . would be fair and efficient" [AB p.50)], plaintiffs never have explained how such a classwide trial would be conducted, let alone how it would be "fair and efficient." The record's silence on this dispositive issue alone requires reversal of the order certifying this medical monitoring class. *See Zinser*, 253 F.3d at 1189; *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 459 (D.N.J. 1998).

**Second, the 17 states in the medical monitoring class impose varying legal standards that defeat cohesiveness.** Plaintiffs assert that the legal burdens they must meet are largely uniform among the 17 states in the medical monitoring class [AB pp.52-53], but again they do not describe those burdens.

When the Court looks at what plaintiffs have to prove, the problems of proof destroy any modicum of cohesiveness. For example, the district court has included several states that require proof of an underlying cause of action to recover medical monitoring relief, such as Texas, Ohio, Kansas, Minnesota, and the District of Columbia. Each of these states has varying standards for product liability claims (see charts, AA5541-5842), and this diversity in state law was the main reason that the district court decertified plaintiffs' nationwide tort and warranty-based personal injury class. Reintroducing those substantive claims into this medical monitoring class action reinjects all that unmanageable legal diversity.

In addition, the different states' medical monitoring claims differ significantly. Plaintiffs do begrudgingly acknowledge this point. (AB p.52 (the states' laws "may have some different elements triggering culpability")). And while they insist that the class nonetheless will be manageable, plaintiffs' fail to cite authority from any one state, let alone all 17 of the states, to explain how these differences could be fairly accounted for in a claswide trial.

**Third, the medical monitoring class presents myriad individual factual issues that defeat cohesiveness.** Although plaintiffs claim that their medical monitoring class presents no meaningful individual factual issues,

their analysis does not follow any relevant legal standard. Many states require that plaintiffs prove a need for medical monitoring different from what the plaintiff would normally need absent the alleged harmful exposure. *See, e.g.*, *Petito v. A.H. Robins*, 750 So. 2d 103, 107-08 (Fla. Ct. App. 2000); *Redland Soccer Club, Inc. v. Department of the Army*, 696 A.2d 137, 143-46 (Penn. 1997). Taking this legal requirement into account, diverse factual issues proliferate, since the determination of what each Silzone® patient would *ordinarily* need depends on each patient's history and condition. Many states in the class require proof of negligence to obtain medical monitoring. *See, e.g.*, *Petito*, 750 So. 3d at 107-08 (Florida); *Hansen v. Mountain Fuel Supply*, 858 P.2d 970 (Utah 1993). Taking that legal requirement into account, there are further individual inquiries into what St. Jude Medical knew about Silzone® when each patient was implanted and what it reasonably should have done under the circumstances.

Even plaintiffs own rhetorical questions show that individual factual issues will swamp this medical monitoring class:

> Was the Silzone a defective medical product due to its cytotoxic propensity? Was the product put on the market without adequate testing or warning about its toxic properties? Did it cause an increased incidence of paravalvular leakage? Did it cause an increased incidence of thromboembolic events? Did it cause an excess of "sterile" or "pseudo" prosthetic valve endocarditis?

(AB p.54) Whether a particular device is "defective" or "dangerous" or "toxic" to a person who had a diseased heart valve to begin with and who

bears numerous risk factors for heart valve complication requires inquiry into each person's condition. The issue of whether any class member received proper warnings likewise depends on what each implanting physician gave or told his or her patients and when.

Determining whether a Silzone® heart valve has created an increased risk of any complication, including all those that plaintiffs posit (paravalvular leakage, thrombotic events, and endocarditis) similarly requires an inquiry into each individual class member's history and condition. That is because paravalvular leakage, thrombotic event, and endocarditis are all known complications of mechanical heart valve implantation, and every mechanical heart valve patient bears some risk of those complications, Silzone® or no Silzone®. (AA4452-54) Individual issues like these are unavoidable in a medical monitoring class action like this one, which is why numerous courts have recently and correctly rejected medical monitoring classes. See *Perez*, 218 F.R.D. at 269-75; *Lockheed Martin Corp. v. Superior Court*, 63 P.3d 913, 920-22 (Cal. 2003); *Goasdone v. American Cyanamid Corp.*, 808 A.2d 159, 170 (N.J. Super. Law Div. 2002) and cases cited in AOB p.54 n.23.

**Fourth, a medical monitoring class action is an unnecessary and wasteful expenditure of scarce public and private resources.** Although plaintiffs state dramatically that "11,000 Americans have been put at risk of suffering a stroke, heart attack or death," it is by now more clear than ever that Silzone® heart valves present no widespread threat to public health. St. Jude Medical recalled Silzone® valves when a controlled study showed an increased incidence of a *single complication* (major paravalvular leakage) in

two percent of Silzone®-implanted study participants, compared to participants implanted with non-Silzone® valves. More recent data from that study show that, by two years after the January 2000 recall, the incidence of complications among Silzone® recipients is the *same* as for non-Silzone® recipients. (AA1477-80,1567-69,1173-75,1663-67) Given these figures, imposing a costly and inefficient medical monitoring class is inappropriate and unnecessary for resolving complications allegedly resulting from the Silzone® valve. No medical monitoring class should have been certified for this reason as well.

## V. CONCLUSION

Plaintiffs' nationwide consumer protection and multi-state medical monitoring classes are not certifiable when the proper boundaries of Rule 23 and the Constitution are fairly considered. Accordingly, this Court should reverse the district court's orders, let the MDL run its course, and leave the limited number of remaining actions to be resolved in their home jurisdictions.

DATED: January 4, 2004. Respectfully submitted

HALLELAND, LEWIS, NILAN,
SIPKINS & JOHNSON, P.A.

RIDER BENNETT, LLP

REED SMITH LLP

By
Steven J. Boranian

Attorneys for Defendant and Appellant
St. Jude Medical, Inc.

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to Federal Rule of Appellate Procedure 32(a)(7)(B) for a brief using a proportional serif font of 14-point typeface or larger, as modified by this Court's order of December 16, 2004, a copy of which is attached to this brief. The length of this brief is 10,134 words, and it was prepared using Microsoft Office Word 2003.

DATED: January 4, 2005.

Steven J. Boranian
REED SMITH LLP
1999 Harrison Street
Suite 2400
Oakland, California 94612
(510) 763-2000

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 04-3117

| | | |
|---|---|---|
| Lester Grovatt, et al., | * | |
| | * | |
| Appellees, | * | |
| | * | Appeal from the United States |
| vs. | * | District Court for the |
| | * | District of Minnesota |
| St. Jude Medical, Incorporated, | * | |
| | * | |
| Appellant. | * | |

The motion of St. Jude Medical for leave to file an overlength reply of 10,500 words is granted. St. Jude Medical is granted to January 4, 2005 to file the brief.

Appellees' motion for leave to file a surreply brief is denied.

December 16, 2004

Order Entered at the Direction of the Court:

Clerk, U.S. Court of Appeals, Eighth Circuit

----------------------VIA TRANSMISSION------------------------

United States Court of Appeals for the Eighth Circuit
Circuit Clerks Office
Voice: 314-244-2400 Fax..: 314-244-2780

Confidential: This Fax/E-mail and any files transmitted with it are the property of the U.S. Courts, are confidential, and are intended solely for the use of the individual or entity to whom this Fax/E-mail is addressed. If you are not one of the named recipient(s) or otherwise have a reason to believe that you have received this message in error, please notify the sender at 314-244-2400 and delete/destroy this message immediately. Any other use, retention, dissemination, forwarding, printing, or copying of this Fax/E-mail is strictly prohibited.

---------------------------------------------------------------

# ADDENDUM

Only the Westlaw citation is currently available.

Supreme Court of Appeals of West Virginia.

STATE OF WEST VIRGINIA ex rel. CHEMTALL INCORPORATED, Ciba Specialty Chemicals Corporation, Cytec Industries, Inc., G.E. Betz, Inc., Hychem, Inc., Ondeo Nalco Company, Stockhausen, Inc., Zinkan Enterprises, Inc., John Doe Manufacturing and/or Distributing Company, John Ceslovnik, Robert McKinley, Eulis Daniels, John Doe Company Representatives for Chemtall Incorporated, Ciba Specialty Chemical Corporation, Cytec Industries, Inc., G.E. Betz, Inc., Hychem, Inc., Ondeo Nalco Company, Stockhausen, Inc., Zinkan Enterprises, Inc., Petitioners

v.

The Honorable John T. MADDEN, Judge of the Circuit Court of Marshall County; and all Plaintiffs In Stern, et al. V. Chemtall, Inc., et al., Civil Action No. 03-C-49M, Respondents.

**No. 31743.**

Submitted Sept. 1, 2004.
Decided Dec. 2, 2004.
*Syllabus by the Court*

1. "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996).

2. "In general, this State adheres to the conflicts of law doctrine of *lex loci delicti*." Syllabus Point 1, *Paul v. National Life*, 177 W.Va. 427, 352 S.E.2d 550 (1986).

3. "The 'commonality' requirement of Rule 23(a)(2) of the *West Virginia Rules of Civil Procedure* [1998] requires that the party seeking class certification show that 'there are questions of law or fact common to the class.' A common nucleus of operative fact or law is usually enough to satisfy the commonality requirement. The threshold of 'commonality' is not high, and requires only that the resolution of common questions affect all or a substantial number of the class members." Syllabus Point 11, *In re West Virginia Rezulin Litigation*, 214 W.Va. 52, 585 S.E.2d 52 (2003).

4. "The 'typicality' requirement of Rule 23(a)(3) of the *West Virginia Rules of Civil Procedure* [1998] requires that the 'claims or defenses of the representative parties [be] typical of the claims or defenses of the class.' A representative party's claim or defense is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. Rule 23(a)(3) only requires that the class representatives' claims be typical of the other class members' claims, not that the claims be identical. When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment." Syllabus Point 12, *In re West Virginia Rezulin Litigation*, 214 W.Va. 52, 585 S.E.2d 52 (2003).

5. "The 'adequacy of representation' requirement of Rule 23(a)(4) of the *West Virginia Rules of Civil Procedure* [1998] requires that the party seeking class action status show that the 'representative parties will fairly and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

adequately represent the interests of the class.' First, the adequacy of representation inquiry tests the qualifications of the attorneys to represent the class. Second, it serves to uncover conflicts of interest between the named parties and the class they seek to represent." Syllabus Point 13, *In re West Virginia Rezulin Litigation*, 214 W.Va. 52, 585 S.E.2d 52 (2003).

6. "The party who seeks to establish the propriety of a class action has the burden of proving that the prerequisites of Rule 23 of the West Virginia Rules of Civil Procedure have been satisfied." Syllabus Point 6, *Jefferson Cty. Bd. of Educ. v. Educ. Ass'n*, 183 W.Va. 15, 393 S.E.2d 653 (1990).

7. "Before certifying a class under Rule 23 of the *West Virginia Rules of Civil Procedure* [1998], a circuit court must determine that the party seeking class certification has satisfied all four prerequisites contained in Rule 23(a)--numerosity, commonality, typicality, and adequacy of representation--and has satisfied one of the three subdivisions of Rule 23(b). As long as these prerequisites to class certification are met, a case should be allowed to proceed on behalf of the class proposed by the party." Syllabus Point 8, *In re West Virginia Rezulin Litigation*, 214 W.Va. 52, 585 S.E.2d 52 (2003).

8. A class action may only be certified if the trial court is satisfied, after a thorough analysis, that the prerequisites of Rule 23(a) of the West Virginia Rules of Civil Procedure have been satisfied. Further, the class certification order should be detailed and specific in showing the rule basis for the certification and the relevant facts supporting the legal conclusions.

9. "In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he [or she] has been injured, (2) the identity of the maker of the product, and (3) that the product had a causal relation to his [or her] injury." Syllabus Point 1, *Hickman v. Grover*, 178 W.Va. 249, 358 S.E.2d 810 (1987).

10. A medical monitoring cause of action accrues when a plaintiff knows, or by the exercise of reasonable diligence should know, that he or she has a significantly increased risk of contracting a particular disease due to significant exposure to a proven hazardous substance and the identity of the party that caused or contributed to the plaintiff's exposure to the hazardous substance.

Petition for Writ of Prohibition Writ Granted as Moulded.

Landers P. Bonenberger, Esq., Jeffrey A. Holmstrand, Esq., McDermott & Bonenberger, PLLC, Wheeling, WV, Attorneys for Chemtall Incorporated.

David K. Hendrickson, Esq., Hendrickson & Long, PLLC, Charleston, WV, Attorney for GE Betz, Inc.

Joseph W. Selep, Esq., Zimmer Kunz, Pittsburgh, PA, Attorney for Hychem, Inc.

Heather Heiskell Jones, Esq., Andrew P. Arbogast, Esq., Spilman Thomas & Battle, PLLC, Charleston, WV, Attorney for Cytec Industries, Inc.

Denise D. Klug, Esq., Thorp Reed & Armstrong, LLP, Wheeling, WV, Attorney for Eulis Daniels, et al.

Harry G. Shaffer, III, Esq., Shaffer & Shaffer, PLLC, Madison, WV, Attorney for Ciba Specialty Chemicals Corp.

Charles M. Love, Esq., Bowles Rice McDavid Graff & Love, Charleston, WV, Attorney for Stockhausen, Inc.

Robert P. Martin, Esq., Todd M. Sponseller, Esq., Campbell, Woods, Bagley, Emerson, McNeer & Herndon, PLLC, Charleston, WV, Attorneys for Zinkan Enterprises.

Herman D. Lantz, Esq., Prosecuting Attorney, Moundsville, WV, and R. Dean Hartley, Esq., J. Zachary Zatezalo, Esq., Hartley & O'Brien, PLLC, Wheeling, WV, and E. William Harvitt, Esq., Harvitt & Schwartz, LC, Charleston, WV, and Bradley Oldaker, Esq., Wilson & Bailey, PLLC, Weston, WV, and David B. Rodes, Esq. (Pro Hac Vice), Theodore Goldberg, Esq., Goldberg, Persky, Jennings & White, PC, Pittsburgh, PA, and Scott S. Segal, Esq., Deborah L. McHenry, Esq., The Segal Law Firm, Charleston, WV, Attorneys for Respondents.

Fred Adkins, Esq., Marc E. Williams, Esq., Robert L.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Massie, Esq., J. David Bolen, Esq., Alexander C. Ward, Esq., Huddleston Bolen, LLP, Attorneys for Amicus Curiae Defense Trial Counsel of WV.

Kenneth S. Geller, Esq., Miriam R. Nemetz, Esq., Carl J. Summers, Esq., Mayer, Brown, Rowe & Maw, LLP, and S. Jane Anderson, Esq., Dickie, McCamey & Chilcote, PC, and Hugh F. Young, Esq., Attorneys for Amicus Curiae Product Liability Advisory Council, Inc.

Victor E. Schwartz, Esq., Leah Lorber, Esq., Emily J. Laird, Esq., Shook, Hardy & Bacon, LLP, and Elliot G. Hicks, Esq., Hawkins & Parnell, LLP, Attorneys for Amici Curiae West Virginia Manufacturers Assoc.; National Assoc. of Manufacturers; Chamber of Commerce of the U.S.; American Chemistry Council; Coalition for Litigation Justice, Inc.; and Property Casualty Insurers Assoc. of America.

Grant Crandall, Esq., Attorney for Amicus Curiae United Mine Workers of America.

MAYNARD, Chief Justice.

Petitioners, eight corporations who have manufactured, distributed, and/or sold polyacrylamide to coal preparation plants, seek relief through prohibition from the September 26, 2003, order of the Circuit Court of Marshall County that certified a seven-state class action for medical monitoring and punitive damages arising out of the alleged exposure to polyacrylamide of Respondents who are coal preparation plant workers and the offspring of such workers. For the reasons set forth below, we grant a writ of prohibition as moulded.

## I.
## FACTS

Respondents and plaintiffs below are representative coal preparation plant workers who allegedly have been exposed to residual acrylamide monomer in polyacrylamide. Petitioners and defendants below are the manufacturers, distributors, and representatives of polyacrylamide. On March 5, 2003, Respondents William K. Stern, Leonard A. Snyder, Michael Caputo, Terry Tucker, Michael E. Romada, Rodney Ferrell, William Thomas Adkins, II, Jonathan Paul Spencer, and John Doe filed a class action complaint in the Circuit Court of Marshall County on behalf of a class consisting of themselves and all other persons who have had inhalation, ingestion and/or dermal exposure to acrylamide while working in coal preparation plants in West Virginia, Illinois, Indiana, Ohio, Pennsylvania, Tennessee, and Virginia, as well as the offspring of those workers. The complaint was filed against Petitioners Chemtall Inc., a Georgia corporation; CIBA Specialty Chemicals Corporation, a Delaware corporation and successor in interest to Allied Colloids, Inc.; Cytec Industries, Inc., a Delaware corporation and successor in interest to American Cyanamid; G.E. Betz, Inc., a Pennsylvania corporation and successor in interest to Betzdearborn, Inc.; Hychem, Inc., a Florida corporation; Ondeo Nalco Company, a Delaware corporation; Stockhausen, Inc., a North Carolina corporation; Zinkan Enterprises, Inc., an Ohio corporation and successor in interest to O'Brien Industries, Inc.; and John Doe Manufacturing and Distributing Company.

In their complaint, Respondents aver that Petitioners manufactured, supplied, re-sold and/or distributed polyacrylamide for use in coal preparation plants in West Virginia and other states. Respondents explain that polyacrylamide is a flocculant which is continually added to the water used to wash coal so that the water can be recycled. According to Respondents, although polyacrylamide is nontoxic, it contains acrylamide monomer, a toxic which has been linked to neurologic and reproductive injuries and disease including certain types of cancer.

All of the representative plaintiffs either worked in a coal preparation facility in West Virginia or are the children of such workers. [FN1] The proposed class consists of all persons who have worked in coal preparation plants in West Virginia, Illinois, Indiana, Ohio, Pennsylvania, Tennessee, and Virginia who have had significant inhalation, ingestion and/or dermal exposure to polyacrylamide flocculants with residual acrylamide monomer and who are at significantly increased risk for sensory or autonomic nervous system deficits, various types of cancers, and genetic abnormalities and/or genetic diseases. [FN2] The proposed class also consists of the offspring of these persons who are at

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

increased risk of developing genetic abnormalities and diseases. Respondents allege causes of action for strict liability, medical monitoring, and punitive damages.

> FN1. One Plaintiff is listed in the complaint as "John Doe ... a person not yet known who is/was significantly exposed to polyacrylamide flocculant containing acrylamide monomer in a coal preparation plant and who is representative of persons" who have worked in coal preparation plants in West Virginia, Illinois, Indiana, Ohio, Pennsylvania, Tennessee, and Virginia, have had significant exposure to polyacrylamide flocculant with residual acrylamide monomer and who are at increased risk of genetic diseases and/or reproductive problems.

> FN2. According to Respondents, the proposed class is anticipated to consist of thousands of members.

By order of September 26, 2003, the circuit court granted Respondents' motion for class certification under West Virginia Rules of Civil Procedure 23(b)(2) and 23(b)(3), and certified the classes of:

> [A]ll persons who have worked in coal preparation plants in West Virginia, Illinois, Indiana, Ohio, Pennsylvania, Tennessee and Virginia, who have had significant inhalation, ingestion and/or dermal exposure to polyacrylamide flocculants with residual acrylamide monomer and who are at significantly increased risk for sensory or autonomic nervous system deficits ... cancer ... genetic abnormalities and/or genetic diseases ... as a result of the exposure; [and]
>
> [T]he offspring of persons who have worked in coal preparation plants in West Virginia, Illinois, Indiana, Ohio, Pennsylvania, Tennessee and Virginia, who have had significant inhalation, ingestion and/or dermal exposure to polyacrylamide flocculants with residual acrylamide monomer and who are at an increased risk for developing genetic abnormalities and/or genetic diseases ... as a result of the exposure.

According to the circuit court's order, the class is to proceed as a medical monitoring class action as to all issues relating to Petitioners' liability, Respondents' claims for equitable and injunctive relief, and Petitioners' liability for punitive damages. After the circuit court entered its September 26, 2003, order, Respondents requested to proceed only under Rule 23(b)(2), and the circuit court granted the request. On April 13, 2004, Petitioners filed their petition for a writ of prohibition and/or mandamus with this Court in which they challenge the class certification.

## II.
## STANDARD OF REVIEW

As noted above, the petition herein is brought in prohibition and/or mandamus. We have previously recognized that "[w]rits of prohibition offer a procedure ... preferable to an appeal for challenging an improvident award of class standing." *McFoy v. Amerigas, Inc.*, 170 W.Va. 526, 532, 295 S.E.2d 16, 22 (1982). Accordingly, we will treat the petition as one in prohibition.

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996). We will now consider the circuit court's class certification order in light of this standard.

## III.
## DISCUSSION

At the outset, it is important to note that Petitioners

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

challenge only the circuit court's ruling certifying a class covering the six states outside of West Virginia, and focus only on alleged due process infirmities in the circuit court's class certification order . [FN3] In regards to this out-of-state class, Petitioners first complain that the circuit court's order indicates that it will apply West Virginia law to the claims of the out-of-state class members. According to Petitioners, to do so would result in due process violations of the rights of both Petitioners and Respondents. Specifically, Petitioners assert that they improperly will be subjected to claims in West Virginia that would not be cognizable in the states where they arose. They also aver that absent out-of-state class members will have incorrect legal rules applied to their claims. Respondents, on the other hand, deny Petitioners' assertion that the circuit court intends to apply West Virginia law to out-of-state class members and assert rather that nowhere in its certification order does the circuit court indicate that it will apply West Virginia law to out-of-state claims.

FN3. Petitioners reserve other substantive challenges to the West Virginia class which are not addressed in this case, including the propriety of punitive damages and the form of the class.

After reviewing the circuit court's order, we agree with Petitioners that the circuit court failed to properly analyze the choice of law issue in concluding merely that "the laws of the applicable states are not 'materially' different so as to make this class unmanageable." Of initial relevance to this issue is the fact that "[i]n general, this State adheres to the conflicts of law doctrine of *lex loci delicti*." Syllabus Point 1, *Paul v. National Life*, 177 W.Va. 427, 352 S.E.2d 550 (1986). "[T]hat is, the substantive rights between the parties are determined by the law of the place of injury." *Vest v. St. Albans Psychiatric Hosp.*, 182 W.Va. 228, 229, 387 S.E.2d 282, 283 (1989) (citation omitted). Therefore, under this doctrine, a West Virginia court must apply the substantive laws of Ohio, Illinois, Indiana, Pennsylvania, Tennessee, and Virginia to those class members whose exposure to acrylamide allegedly occurred in those states.

Further, Petitioners contend that application of West Virginia substantive law to proposed class members whose alleged exposure occurred in other states violates constitutional due process principles. We agree with Petitioners that this issue is governed by the Supreme Court case of *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In *Shutts*, Petitioner was a Delaware corporation which had its principal place of business in Oklahoma. During the 1970's it produced or purchased natural gas from leased land located in 11 different states, and sold most of the gas in interstate commerce. Respondents were 28,000 of the royalty owners possessing rights to the leases from which petitioner produced gas. They resided in all 50 states, the District of Columbia, and several foreign countries. Respondents brought a class action against petitioner in a Kansas state court seeking to recover interest on royalty payments which had been delayed by petitioner. The Kansas court applied Kansas contract and equity law to every claim, despite the fact that over 99% of the gas leases and 97% of the plaintiffs in the case had no apparent connection to the State of Kansas except for the lawsuit, and found petitioner liable for interest on the suspended royalties. Petitioner contended that total application of Kansas substantive law violated the constitutional limitations on choice of law mandated by the Full Faith and Credit Clause of the Federal Constitution, Article IV, § 1.

The Supreme Court explained that "[w]e must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit." *Shutts*, 472 U.S. at 816, 105 S.Ct. at 2976. After determining that there were actual conflicts between Kansas law and the laws of the other states, the Court explained:

> Kansas must have a "significant contact or significant aggregation of contacts" to the claims asserted by each member of the plaintiff class, contacts "creating state interests," in order to ensure that the choice of Kansas law is not arbitrary or unfair. *Allstate [Ins. Co. v. Hague ]*, 449 U.S.[302], at 312-313[,] [101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981) ]. Given Kansas' lack of "interest" in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

When considering fairness in this context, an important element is the expectation of the parties. See *Allstate, supra,* at 333, [101 S.Ct. at 651] (opinion POWELL, J.). There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control. Neither the Due Process Clause nor the Full Faith and Credit Clause requires Kansas "to substitute for its own [laws], applicable to persons and events within it, the conflicting statute of another state," *Pacific Employees Ins. Co. v. Industrial Accident Comm'n,* 306 U.S. 493, 502[,] [59 S.Ct. 629, 633, 83 L.Ed. 940 (1939) ], but Kansas "may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them." *Home Ins. Co. v. Dick, supra,* [281 U.S. 397, 410, 50 S.Ct. 338, 342, 74 L.Ed. 926 (1930) ].

*Shutts,* 472 U.S. at 821-822, 105 S.Ct. at 2979-2980.

Applying *Shutts* to the instant case, even if West Virginia were a *lex fori* state, the circuit court would be bound to compare West Virginia law on strict liability, medical monitoring, punitive damages, and statutes of limitation with the applicable laws of the other states herein to determine whether West Virginia law conflicts in any material way with any other law which would apply. Although the circuit court concluded that "the laws of the applicable states are not 'materially' different so as to make this class unmanageable," this determination is inadequate because it was made without conducting a thorough analysis and absent detailed and specific findings to support it. *See* discussion *infra.* If there is no material conflict, there would be no constitutional injury in applying West Virginia law. If there are material conflicts, constitutional full faith and credit and due process principles prevent West Virginia from applying its own substantive law to out-of-state class members unless it has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Shutts,* 472 U.S. at 818, 105 S.Ct. at 2978 (citation omitted). Our review of the circuit court's order indicates that the circuit court committed clear error in failing to consider West Virginia's conflict of law doctrine and in failing to conduct a meaningful analysis of variations in the laws of the several states included in the proposed class action.

Petitioners next argue that the significant differences among the seven states in which the class members were allegedly injured prevent the class from meeting the prerequisites of commonality, typicality, and adequate representation set forth in Rule 23(a) of the West Virginia Rules of Civil Procedure. Respondents reply that the circuit court carefully analyzed the laws of the various states and concluded in its discretion that it could effectively manage the class despite any differences in the applicable states' laws.

As set forth above, the proposed class was certified under Rule 23(b)(2) of the West Virginia Rules of Civil Procedure. According to Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule (b)(2) provides:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relieve [*sic* ] or corresponding declaratory relief with respect to the class as a whole[.]

This Court's definitive case on the certification of class actions and the application of Rule 23 is *In re West Virginia Rezulin Litigation,* 214 W.Va. 52, 585 S.E.2d 52 (2003), in which we discussed at length each of the prerequisites listed in Rule 23(a). Concerning the "commonality" requirement of Rule 23(a), we held:

> The "commonality" requirement of Rule 23(a)(2) of the *West Virginia Rules of Civil Procedure* [1998] requires that the party seeking class certification show that "there are questions of law or fact common to the class." A common nucleus of operative fact or law is usually enough to satisfy the commonality requirement. The threshold of "commonality" is not high, and requires only

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

that the resolution of common questions affect [sic] all or a substantial number of the class members.

Syllabus Point 11, *In re West Virginia Rezulin Litigation*. We further explained that,

The "typicality" requirement of Rule 23(a)(3) of the *West Virginia Rules of Civil Procedure* [1998] requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A representative party's claim or defense is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. Rule 23(a)(3) only requires that the class representatives' claims be typical of the other class members' claims, not that the claims be identical. When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment.

Syllabus Point 12, *Id.* Finally, as to "adequacy of representation," we stated:

The "adequacy of representation" requirement of Rule 23(a)(4) of the *West Virginia Rules of Civil Procedure* [1998] requires that the party seeking class action status show that the "representative parties will fairly and adequately represent the interests of the class." First, the adequacy of representation inquiry tests the qualifications of the attorneys to represent the class. Second, it serves to uncover conflicts of interest between the named parties and the class they seek to represent.

Syllabus Point 13, *id.*

The burden of establishing the existence of these requirements is upon the party or parties seeking class certification. Our law provides that "[t]he party who seeks to establish the propriety of a class action has the burden of proving that the prerequisites of Rule 23 of the West Virginia Rules of Civil Procedure have been satisfied." Syllabus Point 6, *Jefferson Cty. Bd. of Educ. v. Educ. Ass'n*, 183 W.Va. 15, 393 S.E.2d 653 (1990). Thus, Respondents have the burden of proving the propriety of their proposed class action.

Concerning the circuit court's certification of a class, this Court has recognized that,

Before certifying a class under Rule 23 of the *West Virginia Rules of Civil Procedure* [1998], a circuit court must determine that the party seeking class certification has satisfied all four prerequisites contained in Rule 23(a)--numerosity, commonality, typicality, and adequacy of representation--and has satisfied one of the three subdivisions of Rule 23(b). As long as these prerequisites to class certification are met, a case should be allowed to proceed on behalf of the class proposed by the party.

Syllabus Point 8, *In re West Virginia Rezulin Litigation*. It has been said that "[a]lthough Rule 23 is silent on the issue, class certification is embodied in an order by the certifying court. This order should be detailed and specific in showing the rule basis for the certification and the determinative facts supporting the legal conclusions." Franklin D. Cleckley, Robin J. Davis & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 23(c)(1), p. 473 (2002). Generally, the rule in federal courts, as stated by the United States Supreme Court in *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982), is that a "class action ... may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *See also*, *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir.2004) (*quoting* rule in *Falcon* ); *Livingston v. Associates Finance, Inc.*, 339 F.3d 553, 558 (7th Cir.2003) (stating that "[c]lass certification requires a rigorous investigation into the propriety of proceeding as a class, and a decision to certify a class should not be made based solely on the arguments of one party" (citations omitted)); *Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294, 301 (5th Cir.2003) (noting that "the district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class" (internal quotation marks and citation omitted)); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir.2003) (*quoting Falcon* ); *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 38 (1st Cir.2003) (*citing Falcon* ); *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 135 (2nd Cir.2001), *cert. denied by Visa U.S.A. Inc. v. Wal-Mart Stores, Inc.*, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002) (stating that "a trial court must conduct a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied before certifying a class" (internal quotation marks and citation

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

omitted)); *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir.1984) (*quoting Falcon*); *Bishop v. Committee on Professional Ethics, Etc.*, 686 F.2d 1278, 1287 (8th Cir.1982) (recognizing that "a class action may properly be certified only 'if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied' " (*quoting Falcon* )); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir.1983) (*citing Falcon* ). In light of the above, we now hold that a class action may only be certified if the trial court is satisfied, after a thorough analysis, that the prerequisites of Rule 23(a) of the West Virginia Rules of Civil Procedure have been satisfied. Further, the class certification order should be detailed and specific in showing the rule basis for the certification and the relevant facts supporting the legal conclusions.

Again, this Court's review of the circuit court's September 26, 2003, class certification order, indicates that the circuit court clearly erred in failing to conduct a thorough analysis and in failing to set forth detailed and specific findings to support the conclusion that the Respondents satisfied the requirements of Rule 23(a). In the portion of the circuit court's order that specifically discusses the four requirements of Rule 23(a), the circuit court summarized the arguments for and against certification made by the parties, recited the applicable law, and concluded, concerning the requirement of commonality, that "[b]ased upon the foregoing, this Court finds that there are questions of fact and law common to the classes." The conclusory treatment is afforded the "adequacy of representation" requirement in which the court concluded,

> that all class members share a common interest in establishing the liability of Defendants concerning the defective nature of polyacrylamide flocculants and seek identical relief by way of a court supervised medical monitoring fund. Further, the Court finds that the representative Plaintiffs' interests are not in conflict with the proposed classes and that Plaintiffs' attorneys are adequately qualified, experienced and generally able to conduct the litigation. Therefore, the "adequacy" requirement is met.

Finally, in regards to the requirement of typicality, the circuit court makes the same type of summary finding and opines that "[t]he Court does not agree with Defendants' position and finds that Plaintiffs' claims are typical of the claims of the Classes, as they are predicated on the same theories and arise out of the same course of conduct by Defendants." In light of the above, this Court finds that the circuit court's failure to conduct a thorough analysis and make specific and detailed findings on whether the requirements of Rule 23(a) were met amounts to clear error.

Particularly troubling to this Court is the circuit court's lack of analysis of the typicality requirement as it relates to the medical monitoring cause of action. Respondents assert, and the circuit court's order does not dispute, that some of the proposed class members reside in states that do not recognize a cause of action for medical monitoring. For example, in the portion of the circuit court's order titled "Manageability--Uniformity of Laws," the circuit court very briefly discussed the laws of strict liability, medical monitoring, statute of limitations, and punitive damages in the various states included in the proposed class action. Concerning medical monitoring, the circuit court stated:

> Plaintiffs [sic] cause of action seeks medical monitoring. Plaintiffs argue that "of those states involved in this action, all but Indiana, Tennessee and Virginia recognize a cause of action for medical monitoring." Defendants do not disagree with this statement but argue that this Court is "without guidance to predict" how Tennessee, Indiana and Virginia would rule on the issue and that the "elements required to sustain a claim in those jurisdictions that have addressed the issue, significant differences exist."
>
> After reviewing the various states [sic] laws cited by the parties, this Court does not believe that any differences that may exist would make the class unmanageable. (Citations omitted).

As stated above, typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." In the instant case the representative parties were all allegedly exposed to acrylamide in West Virginia which means that West Virginia law on medical monitoring should be applied to the representative plaintiffs. Respondents therefore must show, and the circuit court must find, that the West Virginia

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

medical monitoring claims are typical of the medical monitoring claims of the proposed class members who were allegedly exposed in the other states. In other words, it must be shown, among other things, *that their claims are based on the same legal theory*. Obviously, the representative plaintiffs' claims for medical monitoring cannot be typical of the claims of the proposed class members who reside in states that do not recognize such a cause of action. To be clear, proposed class members who were allegedly exposed to acrylamide in a state which does not recognize or which has not yet decided whether to adopt a cause of action for medical monitoring cannot be included in Respondents' proposed class in which medical monitoring is sought.

In addition, Petitioners aver that even among those states that have expressly recognized medical monitoring, significant differences exist. In order for the representative plaintiffs who were allegedly exposed in West Virginia to show that they could represent the proposed class members allegedly exposed in the other states, they must show that the other states recognize medical monitoring causes of action which are reasonably co-extensive with the medical monitoring causes of action in West Virginia. This is due to the fact that the typicality requirement requires the representative plaintiffs to establish "the bulk of the elements of each class member's claim when they prove their own claims." *Schmitt v. U.S.*, 203 F.R.D. 387, 402 (S.D.Ind.2001) (quoting *Allen v. City of Chicago*, 828 F.Supp. 543, 553 (N.D.Ill.1993)). Therefore, it is necessary for the circuit court, in a detailed and specific fashion, to compare West Virginia law on medical monitoring with the laws of the other states where proposed class members were allegedly exposed in order to determine whether variations exist that preclude certification.

We further find that the circuit court committed clear error in its conclusion that no applicable statute of limitations has begun to run in this case. Specifically, the circuit court found as follows:

> The Defendants argue that the applicable states employ different statutes of limitations. After review of Defendants [sic] arguments, this Court finds that the statute of limitations laws of the varying states are not applicable to this action. Since Plaintiffs have not suffered injury for exposure to the residual acrylamide monomer in the polyacrylamide flocculant, no applicable statute of limitations has begun to run. Therefore, the application of statutes of limitations is not necessary. (Citation omitted).

A cause of action for medical monitoring lies in tort. According to W.Va.Code § 55-2-12 (1959), the statute of limitation applicable to tort actions in West Virginia, "[e]very personal action for which no limitation is otherwise prescribed shall be brought ... within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries [.]" This Court has held that "[g]enerally, a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs; under 'the discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." Syllabus Point 1, *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992). Further,

> In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the product, and (3) that the product had a causal relation to his injury.

Syllabus Point 1, *Hickman v. Grover*, 178 W.Va. 249, 358 S.E.2d 810 (1987).

The circuit court apparently reasoned that no statute of limitation applies to a medical monitoring claim because the cause of action has not yet accrued, *i.e.*, there is not yet an injury. This is incorrect. "The 'injury' that underlies a claim for medical monitoring--just as with any other cause of action sounding in tort--is 'the invasion of any legally protected interest.' " *Bower v. Westinghouse Electric Corp.*, 206 W.Va. 133, 139, 522 S.E.2d 424, 430 (2003) (quoting *Restatement (Second) of Torts* § 7(1) (1964)). The specific invasion of a legally protected interest in a medical monitoring claims consists of "a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure." 206 W.Va. at 142, 522 S.E.2d at 433. Thus, Respondents herein have, in fact, alleged an injury. Accordingly, we now hold that a medical monitoring cause of action accrues when a plaintiff knows, or by the exercise of reasonable diligence should know, that he or she has a significantly increased risk of contracting a particular disease due to significant exposure to a proven

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

hazardous substance and the identity of the party that caused or contributed to the plaintiff's exposure to the hazardous substance.

Finally, we find that the circuit court clearly erred by ruling that to the extent there are significant differences in the laws of the various states, the differences are manageable by the creation of subclasses. According to Rule of Civil Procedure 23(c)(4), "[w]hen appropriate ... a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rules [sic] shall then be construed and applied accordingly." However, "[w]hen subclasses are requested by the moving party or ordered by the court, it is generally settled that each subclass must independently satisfy class action criteria[.]" Alba Conte, Esq. and Herbert B. Newberg, Esq., *Newberg on Class Actions*, § 3:9, pp. 267-268 (4th ed.2002) (footnote omitted). *See also*, *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir.1978) (declaring that "[a] subclass ... must independently meet all of rule 23's requirements for maintenance of a class action" (citing 7A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1790, at 191-92 (1972)); *Bates v. United Parcel Service*, 204 F.R.D. 440, 443 (N.D.Cal.2001) (stating that "[i]f the court divides the class into subclasses under Rule 23(c)(4)(B), then 'each subclass must independently meet the requirements for the maintenance of a class action" (citation omitted); *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir.1981) (recognizing that "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action).

In the instant case, dividing the proposed class into subclasses based on each state in which plaintiffs were allegedly injured would not meet the requirements of Rule 23(a) because the subclasses, other than the West Virginia subclass, would have no representative plaintiffs. *See Burka v. New York City Transit Authority*, 110 F.R.D. 595, 601 (S.D.N.Y.1986) (holding that "[a] final prerequisite to certification of any subclass is a finding that the subclass representative is a member of the subclass that he seeks to represent" (citation omitted)). Said another way, because all of the representative plaintiffs were allegedly exposed to acrylamide in West Virginia, they could represent only a West Virginia subclass. Accordingly, in light of the fact that all of the representative plaintiffs allege exposure in West Virginia, it would be improper to divide the proposed class into subclasses based on each state of injury because all of the subclasses, with the exception of the West Virginia subclass, would be without representative plaintiffs.

In sum, for the reasons stated above, we find that the circuit court clearly erred in failing to conduct the proper analysis in determining what law to apply to the putative class members; in failing to conduct a thorough analysis and failing to make detailed and specific findings in determining whether the Rule 23(a) requirements are met; in ruling that no statute of limitation is applicable to Respondents' medical monitoring cause of action; and in finding that, in the event significant variations occur in the laws of the several states, dividing the proposed class into subclasses would be proper. Therefore, we grant relief to Petitioners insofar as we vacate the circuit court's September 26, 2003, certification order.

However, we deny Petitioners' requested relief to the extent that we do not order that the action below proceed as a class action only as to those coal preparation workers and their offspring who allegedly were exposed to Petitioners' products in West Virginia. In other words, we are unable to conclude, on the order and record before us, that a multi-state action for medical monitoring, including at least some of the other states in which proposed class members were injured, would not meet the Rule 23(a) requirements. Perhaps, upon reconsideration of this matter, Respondents may prove, and the circuit court may find, after conducting a thorough analysis and making specific and detailed findings, that a multi-state class action for medical monitoring due to exposure to acrylamide meets the requirements of West Virginia Rule of Civil Procedure 23(a).

## IV. CONCLUSION

For the foregoing reasons we grant Petitioners' requested relief to the extent that we vacate the circuit court's September 26, 2003, class certification order. The circuit court is authorized to proceed with necessary hearings, including consideration of further certification of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

appropriate classes and subclasses, and the parties are not precluded from making appropriate amendments to the pleadings including the addition of necessary parties where appropriate. We deny Petitioners' requested relief to the extent that we decline to order that the action below proceed only as to the West Virginia plaintiffs. Therefore, we grant Petitioners a writ of prohibition as moulded.

Writ granted as moulded.

Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

Judge PRATT, sitting by special assignment.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

Justice McGRAW concurs, in part, dissents, in part, and reserves the right to file a separate opinion.

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# PROOF OF SERVICE

*In re: St. Jude Medical, Inc. Silzone® Heart Valves*
*Products Liability Litigation*
Case No. 04-3117
**Delivered for Filing to the 8th Circuit in St. Paul, MN via UPS**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. I am employed in the office of a member of the bar of this court at whose direction the service was made. My business address is REED SMITH LLP, 1999 Harrison Street, Suite 2400, Oakland, CA 94612. On January 4, 2005, I served the following document(s) by the method indicated below:

**APPELLANT'S REPLY BRIEF AND ADDENDUM** (Orig. + 9 to Court; 2 to Counsel);

xx by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in this Declaration.

**PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on January 4, 2005, at San Francisco, California.

[signature]
Steven J. Boranian

# SERVICE LIST

| | |
|---|---|
| Steven E. Angstreich, Esq.<br>Levy, Angstreich, Finney,<br>Baldante, et al.<br>Woodcrest Pavilion, Suite 100<br>10 Melrose Avenue<br>Cherry Hill, NJ 08003<br>Tel. 856.795.0303<br>Fax. 856.795.7447 | Co-Lead Counsel for<br>Respondents/Plaintiffs |
| James T. Capretz, Esq.<br>Capretz & Associates<br>5000 Birch Street, Suite 2500<br>West Tower<br>Newport Beach, CA 92660<br>Tel. 949.724.3000<br>Fax. 949.757.2635 | Co-Lead Counsel for<br>Respondents/Plaintiffs |
| J. Gordon Rudd, Jr., Esq.<br>Zimmerman Reed, L.L.P.<br>651 Nicollet Mall, Suite 501<br>Minneapolis, MN 55402<br>Tel. 612.341.0400<br>Fax. 612.341.0844 | Liaison Counsel for<br>Respondents/Plaintiffs |
| Patrick Murphy, Esq.<br>Murphy Law Office<br>4765 S. Durango Drive, Suite 200<br>Las Vegas, NV 89147<br>Tel. 702.259.4600<br>Fax. 702.259.4748 | State Liaison Counsel |