# EXHIBIT 12

No. 04-3117

# In the United States Court of Appeals for the Eighth Circuit

## In re St. Jude Medical, Inc. Silzone® Heart Valve Products Liability Litigation

Lester Grovatt, Beatrice Bailey, Levy D. Redden, Bonnie L. Sliger, and Joe W. Sanchez, on behalf of themselves and all others similarly situated,
Plaintiffs and Appellees,

vs.

St. Jude Medical, Inc.,
Defendant and Appellant.

---

# APPELLANT'S RULE 28(J) LETTER

---

From an Order Granting Class Certification by the
United States District Court for the District of Minnesota
Multidistrict Litigation No. 01-1396 (JRT/FLN)
The Honorable John R. Tunheim

---

Steven M. Kohn
James C. Martin
Steven J. Boranian
REED SMITH LLP
1999 Harrison Street
Suite 2400
Oakland, CA 94612
Telephone: (510) 763-2000
Facsimile: (510) 273-8832

Michael T. Nilan
Tracy J. Van Steenburgh
HALLELAND, LEWIS, NILAN, SIPKINS & JOHNSON, P.A.
600 Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 338-1838
Facsimile: (612) 338-7858

Eric J. Magnuson
RIDER BENNETT, LLP
33 South Sixth Street
Suite 4900
Minneapolis, MN 55402
Telephone: (612) 340-8900
Facsimile: (612) 340-7900

*Attorneys for Defendant and Appellant St. Jude Medical, Inc.*

RECEIVED
SEP 1 6 2005
U.S. COURT OF APPEALS
EIGHTH CIRCUIT-ST. PAUL, MN

ReedSmith

Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111-3922
415.543.8700
Fax 415.391.8269

**Steven J. Boranian**
Direct Phone: 415.659.5980
Email: sboranian@reedsmith.com

September 14, 2005

VIA EXPRESS MAIL

Hon. Michael E. Gans, Clerk
United States Court of Appeals
For The Eighth Circuit
Room 500 Federal Court Building
316 North Robert Street
St. Paul, MN 55101

**Re: In re St. Jude Medical, Inc. Silzone® Heart Valve Products Liability Litigation, Case No. 04-3117**

Dear Mr. Gans:

Appellant St. Jude Medical, Inc ("SJM") respectfully submits the following recent authorities relevant to the above-referenced appeal pursuant to Federal Rule of Appellate Procedure 28(j):

*Foster v. St. Jude Medical, Inc.*, No. Civ. 04-135(RHK/AJB) 2005 WL 1773986, *6 (D. Minn. July 26, 2005). The court denied certification of a nationwide medical monitoring class of medical device recipients. Plaintiffs were not adequate representatives, having impermissibly split the class members' claims. *Id.* at *6. Further, the various states' laws would apply, and differences in these laws made certification unmanageable. *Id.* at *7-8. Plaintiffs failed to demonstrate that a class action was the superior method of treatment or that the class was sufficiently cohesive. *Id.* at *9-10. Relevant to pages 31-41 and 43-54 of SJM's Opening Brief, and pages 18-27 and 35-38 of SJM's Reply Brief.

*In Re Prempro Products Liability Litigation*, MDL 4:03-cv-1507 (W.D. Ark. Aug. 30, 2005). The court refused to certify multistate classes for consumer fraud and medical monitoring for hormone replacement drug patients. *Id.* at 14-17. The court noted there was no way to group the states "without creating a tangled web of plaintiffs and laws." *Id.* at 19-20. The court also found highly individualized questions of fact that destroyed

**ReedSmith**

predominance and held that the medical monitoring class was not cohesive. *Id.* at 30-32. Relevant to pages 25-26, 34-41, and 43-54 of SJM's Opening Brief, and pages 13-17 and 35-38 of SJM's Reply Brief.

*Avery v. State Farm Mut. Auto. Ins. Co.*, No. 91494, 2005 WL 1981444 *14 (August 18, 2005 Ill.). The Illinois Supreme Court reversed certification of a nationwide class of insurance policyholders alleging consumer fraud claims. *Id.* at *54. Because the "overwhelming majority" of events related to the dispute transpired outside Illinois, the Illinois Consumer Fraud Act could not apply to transactions occurring almost exclusively outside Illinois. *Id.* at *41-45. Reversing authority cited at p. _9 of Appellees' Brief; relevant to pages 22-26 of SJM's Opening Brief and pages 7-12 of SJM's Reply Brief.

Please transmit the enclosed copies of this letter to Judges Riley, Bowman, and Benton. Thank you for your consideration.

Respectfully submitted,

HALLELAND, LEWIS, NILAN, SIPKINS & JOHNSON, P.A.

RIDER BENNETT, LLP

REED SMITH LLP

By [signature]
Steven J. Boranian
Attorneys for Defendant and Appellant
St. Jude Medical, Inc.

Attachments

cc: Steven E. Angstreich, Esq.
James T. Capretz, Esq.
Patrick Murphy, Esq.
Michael T. Nilan, Esq.
Eric J. Magnuson, Esq.

## CERTIFICATE OF COMPLIANCE

I certify that Appellant's letter submitted this date under Federal Rule of Appellate Procedure 28(j) conforms to Federal Rule of Appellate Procedure 32(a)(7)(B) for a letter using times new roman 14-point typeface or larger, as modified by this Court's order of December 16, 2004. The length of the body of this letter is 346 words, and it was prepared using Microsoft Office Word 2003.

DATED: September 14, 2005.

Steven J. Boranian
REED SMITH LLP
1999 Harrison Street
Suite 2400
Oakland, California 94612
(510) 763-2000

# EXHIBIT A

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Ruby FOSTER, and Kenneth Mager, Plaintiffs,
v.
ST. JUDE MEDICAL, INC., Defendant.
**No. Civ. 04-135(RHK/AJB).**

July 26, 2005.

**Background:** Patients who had bypass device implanted into their hearts during heart bypass surgery filed products liability suit against manufacturer of device alleging that they suffered or were likely to suffer complications caused by the device. Plaintiffs moved for class certification.

**Holdings:** The District Court, Kyle, J., held that:
(1) adequacy of representation requirement for class certification was not satisfied;
(2) predominance requirement for certification was not satisfied; and
(3) superiority requirement was not satisfied.
Motion denied.

**[1] Federal Civil Procedure ⚷182.5**

170Ak182.5 Most Cited Cases
Adequacy of representation requirement for class certification was not satisfied in products liability suit against manufacturer of medical device employed in heart bypass surgery, where named plaintiffs sought compensatory damages and medical monitoring for themselves but only medical monitoring for proposed class, as failure to seek compensatory damages for class members jeopardized class members's rights to bring such a claim in a subsequent case by operation of res judicata. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[2] Federal Civil Procedure ⚷182.5**
170Ak182.5 Most Cited Cases
Predominance requirement for class certification was not satisfied by proposed nationwide class in suit against manufacturer of medical device used in heart bypass surgery with respect to claims of negligence, implied warranty, express warranty, and strict liability; under Minnesota

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law, law of the state where the device was implanted would apply to plaintiffs' negligence, implied warranty, express warranty, and strict liability claims, and application of the laws of the fifty states made class treatment of the claims unwarranted. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[3] Federal Civil Procedure 🔑182.5**

170Ak182.5 Most Cited Cases

Superiority requirement for class certification was not satisfied by proposed nationwide class in products liability suit against manufacturer of medical device used in heart bypass surgery; class would be composed of all persons who had a bypass device implanted, except those who had been diagnosed with a failure or injury associated with the device requiring its replacement or repair, and there were significant challenges in identifying such people and distinguishing them from those who had their device replaced or repaired for some other reason. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Richard A. Lockridge, Robert K. Shelquist, and Yvonne M. Flaherty, Lockridge Grindal Nauen, PLLP, Minneapolis, Minnesota; and Charles S. Zimmerman and J. Gordon Rudd Jr., Zimmerman Reed, PLLP, Minneapolis, Minnesota, for Plaintiffs.

Tracy J. Van Steenburgh, Halleland Lewis Nilan & Johnson, PA, Minneapolis, Minnesota; and James C. Martin, Reed Smith, Pittsburgh, Pennsylvania, for Defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

*1 Before the Court is Plaintiffs' Motion For Class Certification. Plaintiffs are individuals who have had one of Defendant's medical products implanted into their hearts during heart bypass surgery. Generally, Plaintiffs allege that they suffered complications as a result of the implantation of Defendant's product. Currently, Plaintiffs have moved to represent a class of persons who also have had one of Defendant's products implanted into their hearts during heart bypass surgery. For the reasons set forth below, the Court will deny the Motion. [FN1]

### Background

#### A. The Parties

Plaintiffs Ruby Foster and Kenneth Mager are the named plaintiffs in this case (together, "Plaintiffs"). Foster is a resident and citizen of Memphis, Tennessee. (First Am. Class Action Compl. ("FACAC") ¶ 1.) In March 2002, she underwent a coronary artery

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bypass graft procedure, otherwise known as a heart bypass surgery, at which time a St. Jude Medical Symmetry Bypass Connector ("Bypass Device") was implanted into her heart. (*Id.* ¶ 2.) Mager is a resident and citizen of Lake Cormorant, Mississippi. (*Id.* ¶ 3.) In February 2002, he also underwent bypass surgery at which time a Bypass Device was implanted into his heart. (*Id.* ¶ 4.) Defendant St. Jude Medical, Inc. is a Minnesota corporation. (*Id.* ¶ 5.) It designed, manufactured, and marketed the Bypass Device. (*Id.*)

**B. Heart Bypass Surgery and the Bypass Device**

Over time, some people develop coronary artery disease, which is a progressive condition caused by the build-up of plaque within the heart's arteries (also known as atherosclerosis). In severe cases, the plaque build-up can restrict the flow of blood and damage heart tissue. Such restrictions in the arteries can produce chest pain, shortness of breath, and fatigue. The restrictions may also result in a heart attack, congestive heart failure, or death.

A heart bypass surgery is performed to improve blood flow through the coronary arteries to the heart muscle. The surgery essentially reroutes, or "bypasses," blood around the clogged arteries. During a bypass surgery, the surgeon removes a portion of a blood vessel from a patient's leg, arm, or chest and then uses that vessel as a conduit to bypass the obstructed coronary artery. After harvesting the bypass vein, the surgeon grafts one end to the aorta, which is the main artery that pumps fresh blood, and grafts the other end to the coronary artery at a point past the obstruction. The suturing of the graft to the aorta and the coronary artery (anastomosis) is usually the most difficult, time consuming, and critical part of the bypass procedure.

Surgeons perform bypass surgery either with or without the aid of a cardiopulmonary bypass machine (heart-lung machine). The majority of bypass surgeries are performed "on-pump," with the heart-lung machine pumping blood during the operation. An "on-pump" procedure allows the surgeon to stop the heart during surgery and clamp off the aorta, thereby maintaining a still, bloodless surgical field to attach the bypass vessel. A minority of bypass surgeries are performed "off-pump," with the patient's heart continuing to beat. "Off-pump" surgeries are more technically complicated because of the challenges presented with suturing a beating heart.

*2 Traditionally, the suturing is carried out by hand. In May 2001, St.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Jude Medical introduced the Bypass Device, which is a mechanical anastomosis device that allows cardiac surgeons to attach the vein grafts to the aorta without suturing or clamping the aorta. Since its introduction, St. Jude's Bypass Device has been implanted approximately 40,000 times. In late 2004, St. Jude discontinued the Bypass Device.

**C. Plaintiffs' Complaint**

Plaintiffs allege that as a result of the implantation of the Bypass Device they have suffered or are likely to suffer complications, including occlusions (a total blockage of the blood vessel) and stenosis (a narrowing of the blood vessel) of the bypass vein grafts. (*See* FACAC ¶ 8.) Plaintiffs assert that they and the class members they seek to represent will require ongoing medical surveillance, among other things, due to those alleged complications. (*See id.* ¶ 9.)

Plaintiffs allege five causes of action: strict liability; breach of implied warranty; breach of express warranty; negligence; and violations of Minnesota's False Advertising Act, Consumer Fraud Act, Unlawful Trade Practices Act, and Uniform Deceptive Trade Practices Act. (*See id.* ¶ ¶ 37-70.) Under each cause of action, the following relief is sought:

(a) an Order pursuant to Rule 23, F.R.C.P. permitting this action to be maintained as a class action as specified herein, appointing Plaintiffs as the representatives of the Class and Plaintiffs' counsel as counsel for the class;

(b) a judgment and/or decree in favor of Plaintiffs and the Class against Defendant creating a trust fund paid for by Defendant which, under Court supervision, will design, pay for and manage the delivery of medical monitoring services, including, but not limited to, testing and preventative screening care of the adverse and latent conditions resulting from, or potentially resulting from, the implantation and use of defective medical products at issue in this suit;

(c) a judgment and/or decree in favor of Plaintiffs and the Class against Defendant creating a trust fund, paid for by Defendant, under Court supervision, to finance medical research on monitoring services, including, but not limited to, testing and preventative screening care of conditions resulting from, or potentially resulting from the defective medical products at issue in this suit;

(d) a judgment and/or order requiring Defendant to bear the cost of publication to members of the Class and the medical community of advising and educating them of the need for appropriate medical screening and monitoring concerning the medical conditions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that are at issue in this suit, the content, form and manner of such publication to be approved by the Court;

(e) a judgment in favor of Plaintiffs individually awarding all appropriate compensatory damages for any personal injuries Plaintiffs have suffered or are likely to suffer in the future; and

(f) such further relief as this Court deems necessary, just, and proper.

***3** (FACAC ¶ 44; *see id.* ¶ ¶ 52, 58, 65, 70.)

Based on their claims, Plaintiffs seek to certify the following class:

All persons in the United States and its territories who have had a coronary artery bypass graft procedure utilizing the BYPASS DEVICE manufactured, developed, designed, fabricated, sold, distributed or otherwise placed into the stream of commerce by Defendant, St. Jude Medical, Inc., excepting those who: (a) have already been medically diagnosed with a failure or injury associated with the implanted device to a level or degree that requires or required surgical replacement or repair of all of the BYPASS DEVICES implanted in the person; (b) have died as a result of a failure or injury associated with the implanted device(s); and/or (c) are or were officers, directors and employees (and their immediate family members) of the Defendant.

(FACAC ¶ 11.) Plaintiffs' Motion For Class Certification followed.

**Standard of Review**

Class certifications are governed by Rule 23 of the Federal Rules of Civil Procedure. The Court may certify a class action only when it is satisfied after "rigorous analysis" that all of Rule 23's prerequisites are met. *Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 573 (D.Minn.1995). Rule 23(a) sets out four threshold prerequisites that must be satisfied before a party can obtain class certification:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition to the prerequisites of Rule 23(a), the movant must demonstrate that a class action can be maintained under one of the three categories described in Rule 23(b). Fed.R.Civ.P. 23(b).

The party seeking class certification bears the burden of establishing that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

they have satisfied each of Rule 23's class certification requirements. *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir.1994); *Lockwood*, 162 F.R.D. at 573. Although a court may not decide the merits of a case at the class certification stage, *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177- 78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), a motion for class certification "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (citations and internal quotations omitted); *see Blades v. Monsanto Co.*, 400 F.3d 562, 566- 67 (8th Cir.2005); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996). The court ultimately retains broad discretion in determining whether to certify a class under Rule 23. *Lockwood*, 162 F.R.D. at 573.

## Analysis

### A. Brief Background On Medical Monitoring

*4 One aspect of Plaintiffs' requested relief is medical monitoring. Medical monitoring claims are a fairly recent development in tort law. *Mehl v. Canadian Pacific Ry., Ltd.*, 227 F.R.D. 505, 516 (D.N.D.2005.) As described by one court, medical monitoring claims seek "to recover the anticipated costs of long-term diagnostic testing necessary to detect latent diseases that may develop as a result of tortious exposure to toxic substances." *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424, 429 (1999). As noted by another court, medical monitoring has evolved, in part, because the traditional tort system, which was developed to address conflicts raised by simple and straightforward traumatic injuries, "is ill-designed to deal with the field of mass torts and latent, rather than immediate injuries." *Badillo v. Am. Brands, Inc.*, 117 Nev. 34, 16 P.3d 435, 438 (2001) (citations omitted). Although recognized by some courts, "the tort of medical monitoring is still novel and considered a non-traditional tort." *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 552 (D.Minn.1999) (citation omitted).

The states are not uniform in their treatment of medical monitoring claims. Some states treat medical monitoring claims as an independent cause of action. *See, e.g., Redland Soccer Club, Inc. v. Dep't of the Army*, 548 Pa. 178, 696 A.2d 137 (1997). Other states recognize medical monitoring claims as a form of damages for an underlying tort, such as negligence or strict liability. *See, e.g., Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Of the states recognizing medical monitoring claims as a independent claim or form of damages, some require a present physical injury, *see, e.g.*, *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849 (Ky.2002), while other states do not, *see, e.g.*, *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993); *Ayers v. Jackson Township*, 106 N.J. 557, 525 A.2d 287 (1987). Still other states have not addressed the issue.

**B. The Legal Theories, the Relief, and the Class**

One of the frustrating aspects of this class certification motion has been trying to determine what legal theories Plaintiffs assert, what relief they seek under those theories, and who makes up the proposed class. Obviously, these are important questions. But after reading Plaintiffs' Complaint, reviewing their memorandum, and listening to their arguments at the motion hearing, the Court is left wanting for consistent arguments. From the Complaint to the memorandum to the oral argument, the legal theories (or at least their emphasis), the remedies sought (or at least for whom the remedies are sought), and the class make-up have been moving targets.

For example, the Complaint alleges five causes of action. (*See* FACAC ¶¶ 37- 70.) Plaintiffs' memorandum, though thirty-seven pages long, provides very little detail about how these causes of action are certifiable as class claims. The memorandum merely generalizes about each claim, and does not even go so far as to list the elements of any particular cause of action. In short, the memorandum is much like a map that identifies the destination (i.e., the relief) but lacks the directions (i.e., the legal theories). Such a map almost guarantees that one will get lost. Nor did clarity come at oral argument. While the memorandum paid almost no attention to the Minnesota statutory claims, which were asserted in Count V of the Complaint, Plaintiffs' counsel emphasized those claims at oral argument as the basis for class certification nearly to the exclusion of all others. (*See* Hr'g Tr. at 11, 18-19, 37, 40-41.) Thus, trying to pin down the operative legal theory has been a challenge.

***5** As another example, the Complaint basically seeks two forms of relief. First, a judgment in favor of *Plaintiffs and the Class* against Defendant creating a trust fund paid for by Defendant which, under Court supervision, will design, pay for and manage the delivery of medical monitoring services. (*See, e.g.*, FACAC ¶ 44(b).) Second, a judgment in favor of *Plaintiffs individually* awarding all appropriate compensatory damages for personal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injuries. (*See, e.g.*, FACAC ¶ 44(e).) Plaintiffs' memorandum speaks at some length about medical monitoring. (*See* Mem. in Supp. at 2, 8-9, 19, 23-34.) Very little, however, is said about compensatory damages. Plaintiffs dedicate one footnote to the issue, stating that, "Any resolution of the Class claims would need to preserve the future damage claims for personal injuries that will arise for ten percent or more of the Class members at some time in the future." (*Id.* at 24 n. 3.) At the hearing, Plaintiffs' counsel was asked to explain what relief he was seeking and for whom. In an apparent contradiction of the allegations made in the Complaint, Plaintiffs' counsel responded that he sought medical monitoring and compensatory damages for *both* the Plaintiffs and the proposed class members. (*See* Hr'g Tr. at 4-7.) Thus, understanding the relief sought in this case has been a struggle.

Finally, Plaintiffs' description of the class has also been fluid. The Complaint alleges a single, nationwide class of all persons who have had a Bypass Device implanted, except those who have been diagnosed with a failure or injury associated with the device requiring the replacement or repair of the device, who have died as a result of a failure or injury of the device, or who are officers, directors, or employees of St. Jude. (*See* FACAC ¶ 11.) Plaintiffs' memorandum similarly characterizes the class as "all people in the U.S. who have been implanted with and still have the Symmetry Device except those whose injuries have resulted in their death or the explanation of the valve." (Mem. in Supp. at 2.) At the beginning of the motion hearing, Plaintiffs' counsel stated that the class is comprised of "all people in the United States who have been implanted with and still have a symmetry device in them, who are asymptomatic--that is, either they don't have an injury or at least just only have a so-called sub-cellular injury. There is no obvious injury." (Hr'g Tr. at 4.) But at the end of the hearing, Plaintiffs' counsel was suggesting all kinds of potential classes--a national class under the Minnesota statutory claims, a medical monitoring class of seventeen states, a national class under strict liability or negligence (although he "acknowledg[ed] fully that that is a more difficult procedure so that should probably be kind of off to the side"), or a class of Minnesota citizens. (*See* Hr'g Tr. at 41.) Therefore, identifying the class has been difficult.

Ultimately, the constantly changing legal theories, relief, and class composition, contribute to the inescapable conclusion that the class certification motion must be denied. With the foregoing in mind, the Court will begin by assessing Rule 23(a)(4),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and will then turn to Rule 23(b)(3) and Rule 23(b)(2). [FN2]

### C. Rule 23(a)(4)

*6 [1] One precondition for class certification is a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy inquiry serves to uncover conflicts of interest between the named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). As one commentator has observed,

> The 'adequacy of representation' requirement was designed to protect the due process rights of absent class members. In a class action, class members who are not named parties to the litigation are nevertheless bound by any judgment in the action. Because the judgment in a class action has claim preclusion (res judicata) implications ... for the absent class members, due process requires that the interests of absent members be adequately represented by the named class members.

5 James Wm. Moore, *Moore's Federal Practice* § 23.25[1] (3d ed.) (footnotes omitted). To satisfy the adequacy requirement, Plaintiffs must show "that (1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 692 (D.Minn.1995) (citations omitted).

Defendant argues that Plaintiffs do not adequately represent the interests of the class members because they seek only medical monitoring relief for the class, but seek medical monitoring *and damages* for themselves. (*See* Mem. in Opp'n at 16-17.) Defendant further asserts that this places the class members at risk of having their damages claims barred by res judicata, and that such a risk makes Plaintiffs inadequate class representatives. (*Id.*) This argument raises the issue of what relief is sought and for whom--an issue, as noted above, that lacks a straightforward answer from Plaintiffs. While Plaintiffs' memorandum makes a passing reference to reserving damages claims, and while Plaintiffs' counsel asserted that both Plaintiffs and the proposed class members seek compensatory damages, the Complaint reads differently. It states that the "Plaintiffs individually," in contrast to the class, seek "compensatory damages for any personal injuries Plaintiffs have suffered or are likely to suffer in the future." (*See, e.g.*, FACAC ¶ 44(e)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Therefore, based upon the clear language of the Complaint, the Court finds that compensatory damages are sought only for Plaintiffs, and not for the class members.

It follows that Plaintiffs' efforts to claim compensatory damages only for themselves may, in fact, jeopardize the class members' rights to bring such claims in a subsequent case. *See* Thompson, 189 F.R.D. at 550; 5 James Wm. Moore, *Moore's Federal Practice* § 23.25[1] (3d ed.). Res judicata precludes subsequent litigation when certain conditions are met. Thompson, 189 F.R.D. at 550. Under Minnesota law, res judicata principles apply "not only to every matter which was actually litigated, but also as to every matter which might have been litigated, therein." *Id.* (citing Youngstown Mines Corp. v. Prout, 266 Minn. 450, 124 N.W.2d 328, 340 (1963)); *see* Sondel v. Northwest Airlines, Inc., 56 F.3d 934, 938 (8th Cir.1995) ("[A] judgment on the merits constitutes an absolute bar to a second suit for the same cause of action, and is conclusive between parties and privies, not only as to every other matter which was actually litigated, but also as to every matter which might have been litigated therein." (quoting Dorso Trailer v. Am. Body & Trailer, 482 N.W.2d 771, 774 (Minn.1992))).

*7 Given the principles of res judicata, another court may well find that the class members' compensatory damages claims, if any, should have been litigated in this lawsuit. Thompson, 189 F.R.D. at 551; *see* Reppert v. Marvin Lumber & Cedar Co., 359 F.3d 53, 55-57 (1st Cir.2004) (finding class settlement under fifty states' consumer protection laws precluded class members' subsequent suit for additional damages under res judicata); Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 606-07 (S.D.N.Y.1982) (finding class representatives "impermissibly split a single cause of action" by asserting only warranty claims on behalf of the class). This possible prejudice to the class members is simply too great for the Court to conclude that Plaintiffs' interests are aligned with those of the class. Thompson, 189 F.R.D. at 551. Accordingly, the Court finds that Plaintiffs have not satisfied Rule 23(a)(4) and this failure precludes class certification. *Id.*

**D. Rule 23(b)(3)**

Additional problems for class certification surface upon a consideration of Rule 23(b)(3). Rule 23(b)(3) provides that a class action may be maintained when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). These considerations seek to cover cases " 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23 advisory committee's note). Considering these factors, the Court finds that Plaintiffs have not met their burden to demonstrate that common questions predominate or that class resolution is superior.

**1. Predominance**

[2] In order to make the findings required to certify a class action, the substantive legal issues that will control the outcome of the litigation must be identified. *Castano,* 84 F.3d at 741. This is especially important when there may be differences in applicable state laws. *Id.; see Amchem,* 521 U.S. at 624, 117 S.Ct. 2231. Plaintiffs have the burden of providing an "extensive analysis" of state law variations to determine whether there are "insuperable obstacles" to class certification. *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986); *see Chin v. Chrysler Corp.,* 182 F.R.D. 448, 453 (D.N.J.1998). This analysis is required, in part, because "the district court must determine whether variations in state law defeat predominance." *Castano,* 84 F.3d at 750; *see Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir.2001), *amended on denial of rehearing by* 273 F.3d 1266 (9th Cir.2001); *In re Baycol Prods. Litig.,* 218 F.R.D. 197, 207 (D.Minn.2003).

*8 Plaintiffs' counsel admits that he has not done this analysis. When asked why, he responded, "we ran out of room." (Hr'g Tr. at 11.) This wound, however, was entirely self-inflicted. [FN3] Because Plaintiffs have not performed an examination of the law, the Court will not engage in a lengthy analysis except to say that a proper consideration of Minnesota's choice-of-law factors reveals that the law of the state where the Bypass Device was implanted would apply to Plaintiffs' negligence, implied warranty, express warranty, and strict liability claims. *See Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.,* 111 F.3d 1386, 1394-95 (8th Cir.1997); *Nesladek v. Ford Motor Co.,* 46 F.3d 734, 736-41 (8th Cir.1995); *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.,* 604 N.W.2d 91, 93-97 (Minn.2000); *In re Baycol,* 218 F.R.D. at 207.

However, the application of the laws of the fifty states makes class

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

treatment of these claims unwarranted. "If more than a few of the laws of the fifty states differ, [courts] would face an impossible task of instructing a jury on the relevant law," making class certification inappropriate. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996); *see In re Bridgestone/Firestone Inc.*, 288 F.3d 1012, 1015-18 (7th Cir.2002); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300-01 (7th Cir.1995). As alluded to above, claims for medical monitoring are not treated uniformly among the states, and this divergence creates a "myriad of individual legal issues that defeat the predominance requirement" and makes certification "totally unmanageable and inefficient." *Zehel-Miller v. Astrazenaca Pharm., LP*, 223 F.R.D. 659, 663 (M.D.Fla.2004). Many states have not recognized medical monitoring claims, and those which have done so have adopted widely varying criteria for recovery. *See In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 74 (S.D.N.Y.2002). Thus, the case has not been made that common issues predominate on the negligence, implied warranty, express warranty, and strict liability claims.

This leaves the Minnesota statutory claims, which were so heavily emphasized by Plaintiffs' counsel at the motion hearing. However, Plaintiffs presented nothing of substance on these claims in their memorandum, which effectively leaves the Court without the benefit of briefing on this issue. As a consequence, the Court is left to decide whether to certify a nationwide class under Minnesota's consumer protection laws based only on Plaintiffs' counsel's sparse argument at the hearing. The Court declines to do so. Simply put, Plaintiffs have not marshaled a persuasive case that common issues predominate on the Minnesota statutory claims. It is noteworthy to add that Plaintiffs' counsel and Defense counsel have recently presented oral argument on this precise issue before the Eighth Circuit in the *In re St. Jude Medical Silzone Heart Valve* case. Suffice it to say, whether a nationwide class action can be maintained under Minnesota's consumer protection statutes is hotly disputed, but no substantive argument has been made by Plaintiffs here to help resolve the issue in their favor. It is Plaintiffs' burden to persuade the undersigned, and they have not done so.

**2. Superiority**

***9** [3] In addition, and related to the above determinations, Plaintiffs have not demonstrated that class adjudication is the superior method for the fair and efficient resolution of the dispute. "Under the superiority test of Rule 23(b)(3), a class action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

must be better than, not merely as good as, other methods of adjudication." 5 James Wm. Moore, *Moore's Federal Practice* § 23.46[1] (3d ed) (citing cases). Rule 23 identifies four non-exhaustive factors pertinent to the Court's determination of superiority: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3).

Plaintiffs devote the following four sentences to their superiority argument:

> A party seeking class certification pursuant to Rule 23(b)(3) must also show 'that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.' This requirement is readily met here. A single class action is undoubtedly superior to thousands of individual actions, with their increased expense, duplication of discovery, and potential for inconsistent results. The efficiencies gained by use of a class action will ultimately benefit all of the class members (as well as St. Jude, though it will oppose class certification) by a dramatic reduction in litigation expenses, and will also conserve valuable judicial resources for other cases.

(Mem. in Supp. at 23.) This is pure hyperbole. The same could be said about any proposed class action; what's lacking is any specificity of how class adjudication is the superior method for this particular case.

In contrast, Defendant argues that a class action is unmanageable. (*See* Mem. in Opp'n at 30-33.) For one example, it asserts that there is no workable way to determine who the class members are and to give them notice of the class action. (*Id.* at 30). This argument brings into focus who makes up the class, which is a question, as noted above, to which Plaintiffs have given inconsistent responses. The Complaint alleges a single, nationwide class of all persons who have had a Bypass Device implanted, except those who have been diagnosed with a failure or injury associated with the device requiring the replacement or repair of the device, who have died as a result of a failure or injury of the device, or who are officers, directors, or employees of St. Jude. (*See* FACAC ¶ 11.) Plaintiffs' memorandum provides a similar definition (*see* Mem. in Supp. at 2), but their counsel's responses at oral argument, especially at the end of the hearing, paint a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

different picture (*see* Hr'g Tr. at 41). Given the clear language of the Complaint, and the similar statements in Plaintiffs' memorandum, however, the Court finds that the proposed class is the nationwide class specified in the Complaint.

*10 "One aspect of manageability is the difficulty and expense of communicating with members of the class, including any practical difficulties and expense of providing mandatory notice of certification and opt out rights to every class member. If the members of the class are not identifiable, managing the action may pose insurmountable problems." 5 James Wm. Moore, *Moore's Federal Practice* § 23.46[2][e][i] (3d ed.). In this case, the class would be composed of a single, nationwide class of all persons who have had a Bypass Device implanted, except those who, among other things, have been diagnosed with a failure or injury associated with the device requiring the replacement or repair of the device. (*See* FACAC ¶ 11.) In the Court's mind, there appears to be some significant challenges in identifying who these people are and distinguishing them from those who have had their Bypass Device replaced or repaired for some other reason. While this difficult determination is at the core of who is in the class and who is not, Plaintiffs provide no satisfactory answer to this critical question. Accordingly, for all the reasons expressed above, the Court concludes that class certification under Rule 23(b)(3) is not appropriate.

**E. Rule 23(b)(2)**

Finally, the problems identified above make certification under Rule 23(b)(2) unwarranted as well. Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). While 23(b)(2) class actions have no predominance or superiority requirements, such class actions cannot be certified unless the class is "cohesive." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir.1998); *see In re Baycol*, 218 F.R.D. at 211; *Thompson*, 189 F.R.D. at 557. There are at least two reasons why courts have recognized a "cohesiveness" requirement to Rule 23(b)(2) class certifications. First, unnamed class members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action. *Barnes*, 161 F.3d at 143. Second, the suit could become unmanageable and little value would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be gained in proceeding as a class action if significant individual issues were to arise consistently. Id. "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness.... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1155 (11th Cir.1983).

In this case, assuming that injunctive relief is sought, [FN4] the issues that defeat the predominance and superiority requirements of Rule 23(b)(3) also preclude certification under Rule 23(b)(2). *See Zehel-Miller,* 223 F.R.D. at 664; *In re Baycol,* 218 F.R.D. at 212-13; *In re Rezulin,* 210 F.R.D. at 75; *Thompson,* 189 F.R.D. at 557. Accordingly, the Court concludes that class certification under Rule 23(b)(2) is not appropriate.

**F. Conclusion**

*11 Having found that Plaintiffs have failed to satisfy Rules 23(a)(4), 23(b)(3), and 23(b)(2), the Court concludes that class certification is not warranted and will deny Plaintiffs' Motion.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein **IT IS ORDERED** that:

A. Plaintiffs' Motion For Class Certification (Doc. No. 32) is **DENIED**; and

B. Defendant's Motion to Strike and Objections to the Declaration of Robert A. Phillips Jr. (Doc. No. 68), Plaintiffs' Motion to Strike and Objections to the Declaration of Howard Parker Greisler and Affidavit of Robert F. Wilson (Doc. No. 71), and Defendant's Motion to Strike and Objections to the Declaration of Robert A. Phillips Jr. (Doc. No. 80) are **DENIED WITHOUT PREJUDICE.**

FN1. In addition to the Motion For Class Certification, both parties have moved to strike certain expert testimony. (*See* Doc. Nos. 68, 71, 80.) Generally, the admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the factors set forth by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. However, the *Daubert* inquiry is somewhat limited at the class certification stage. *See Midwestern Mach. v. Northwest Airlines, Inc.,* 211 F.R.D. 562, 565-66 (D.Minn.2001). Given the limited nature of the *Daubert* inquiry at this point, and given that none of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

objected-to testimony was relied upon in resolving the class certification motion, the Court will deny the motions to strike without prejudice. Whether the challenged testimony can withstand *Daubert* scrutiny is an issue that can be raised at a later stage in the proceedings. *See In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 234-35 (D.Minn.2001).

FN2. Of the Rule 23(b) provisions, Plaintiffs argue that class certification is appropriate only under Rule 23(b)(2) and 23(b)(3). (*See* Mem. in Supp. at 11; Hr'g Tr. at 4.)

FN3. Although the parties filed a Joint Motion to Expand Page Limits (Doc. No. 38), which was denied (Doc. No. 39), that Motion came only after Plaintiffs had already maxed out the page limits with their opening memorandum (Doc. No. 35).

FN4. This is no small assumption.

--- F.R.D. ----, 2005 WL 1773986 (D.Minn.)

**Motions, Pleadings and Filings**
**(Back to top)**

• 2004 WL 3038191 (Trial Motion, Memorandum and Affidavit) Defendant St. Jude Medical, Inc.'s Opposition to Plaintiffs' Motion to Stay Proceedings (Nov. 24, 2004)

• 2004 WL 3038190 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorites in Support of Motion for Stay (Nov. 05, 2004)

• 2004 WL 3038188 (Trial Pleading) First Amended Class Action Complaint (Jul. 23, 2004)

• 0:04cv00135 (Docket) (Jan. 20, 2004)

• 2004 WL 3038189 (Trial Pleading) Defendant St. Jude Medical, Inc.'s Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | | |
|---|---|---|
| | : | **MDL DOCKET NO. 4:03-CV-1507-WRW** |
| **IN RE:** | : | |
| **PREMPRO PRODUCTS LIABILITY** | : | |
| **LITIGATION** | : | **ALL CASES** |

**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Pending is Plaintiffs' Motion for Class Certification (Doc. No. 80). Defendants have responded (Doc. No. 630). A Class Certification Hearing was held June 1-3, 2005. After the hearing, I sent a letter posing several questions. The parties responded with briefs, and another hearing was held on June 24, 2005. For the reasons set forth below, Plaintiffs' Motion for Class Certification is denied.

## I. BACKGROUND

Wyeth and Wyeth Pharmaceuticals ("Wyeth") are Delaware corporations with principal places of business in New Jersey and Pennsylvania, respectively. Wyeth manufactures and distributes pharmaceuticals, including the prescription drugs Prempro, Premarin, Premphase, and Cycrin.

### A. Premarin and Prempro

Premarin is an unopposed conjugated[1] estrogen prescription drug, which has been approved by the Food and Drug Administration ("FDA") for the treatment of moderate to severe

[1]Unopposed estrogen replacement therapy refers to the use of estrogen alone -- which means it is not combined with progestins. Conjugated estrogens are mixtures of several forms of estrogen that come from the urine of pregnant mares.

vasomotor symptoms -- such as hot flashes and night sweats -- associated with menopause; it has also been approved for the prevention of postmenopausal osteoporosis and the treatment of vaginal dryness.[2] Before Prempro, physicians often prescribed estrogen -- such as Premarin -- in combination with progestin to treat symptoms of menopause. All of this is commonly known as hormone replacement therapy ("HRT"). In 1994, the FDA approved the marketing of Prempro as separate tablets of Premarin and Cycrin,[3] blister packaged together so they could be taken at the same time. The FDA authorized Prempro for post-menopausal women with uteri for the treatment of vasomotor symptoms associated with menopause, including hot flashes, night sweats, and vaginal atrophy.[4] In 1995, the FDA approved the marketing of Prempro as a single tablet.[5]

Plaintiffs allege that, for decades, Wyeth has used general advertising, "direct-to-consumer" advertising, and other marketing tools to "orchestrate widespread misunderstanding among the general public and the medical community" on the benefits and risks of HRT.[6] According to Plaintiffs, Wyeth also promoted Prempro and HRT for off-label uses not approved by the FDA.[7]

---

[2]Doc. Nos. 81 and 448.

[3]Cycrin is a medroxyprogeterone acetate ("MPA").

[4]Doc. Nos. 81 and 448.

[5]*Id.*

[6]Doc. No. 81, ¶¶ 26-33, 37-42.

[7]Doc. No. 81, ¶ 36.

**B. Women's Health Initiative ("WHI")**

The WHI is a long-term national health study that is focused on "defining the risks and benefits of strategies that could potentially reduce the incidence of heart disease, breast and colorectal cancer, and fractures in postmenopausal women."[8] The WHI Clinical Trial and Observational Study began in 1993 and has involved over 161,000 postmenopausal women.[9]

The estrogen plus progestin part of the WHI study involved 16,608 women ages 50-79 who had not had hysterectomies. Prempro was the only estrogen/progestin combination drug tested in this initial study. The study's objective was to examine the effectiveness of estrogen and progestin in heart disease and hip fracture prevention; and to examine any association between Prempro and the risks of breast and colon cancer.[10]

On May 31, 2002, the independent data and safety monitoring board ("DSMD") "concluded that the evidence for breast cancer harm, along with evidence for some increase in coronary heart disease, stroke, and pulmonary embolism, outweighed the evidence of a benefit for fracture and possible benefit for colon cancer,"[11] and recommended stopping the estrogen plus progestin component of the WHI trial early. On July 9, 2002 the National Heart, Lung and Blood Institute ("NHLB"), a division of the National Institutes of Health ("NIH"), stopped its major clinical trial for Prempro early. Plaintiffs allege that the study was stopped because "its evidence proved the drug dangerously increased women's risk of invasive breast cancer,

---

[8]Doc. No. 81, Ex. A.

[9]*Id.*

[10]Doc. Nos. 81 and 448.

[11]Doc. No. 81, Ex. A.

cardiovascular disease, stroke, venous thromboembolism, and pulmonary embolism . . . [and] Alzheimer's disease and dementia."[12]

The findings from the estrogen plus progestin component of the trial were published in the Journal of the American Medical Association ("JAMA") on July 17, 2002.[13] The article stated that, in the estrogen plus progestin component of the study, the "[o]verall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2 year follow-up among healthy postmenopausal U.S. women."[14] In May 2003 an article appeared in JAMA that analyzed the incidence of dementia and mild cognitive impairment in the HRT component of the WHI study.[15] The article concluded:

> Estrogen plus progestin therapy increased the risk for probable dementia in postmenopausal women aged 65 years or older. In addition, estrogen plus progestin therapy did not prevent mild cognitive impairment in these women. These findings, coupled with previously reported WHI data, support the conclusion that the risk of estrogen plus progestin outweigh the benefits.[16]

Over the next couple of months, several other articles were printed in various medical journals involving analyses of the WHI study results.[17]

---

[12]Doc. No. 81.

[13]*See* J. Rossouw, et. al, *Risk and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women*, 288 JAMA 321 (July 17, 2002).

[14]Doc. No. 81, Ex. A.

[15]*See* Sally A. Shumaker, et. al, *Estrogen Plus Progestin and the Incidence of Dementia and Mild Cognitive Impairment in Postmenopausal Women*, 289 JAMA 2651 (May 28, 2003).

[16]Doc. No. 645, Ex. 2.

[17]*See* J. Hayes, et. al, *Effects of Estrogen plus Progestin on Health-Related Quality of Life*, 348 N. Engl. J. Med, 1839 (May 8, 2003); Rowan T. Chlebowski, et. al, *Influence of Estrogen plus Progestin on Breast Cancer and Mammography in Healthy Postmenopausal Women*, 289 JAMA 3243 (June 25, 2003).

## II. ALLEGATIONS

Plaintiffs assert that they have been "significantly exposed to proven hazardous substances through the intentional, negligent, or wrongful actions" of Wyeth.[18] They state:

> As a direct and proximate result of Defendant's manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Prempro in interstate commerce, Plaintiffs and class members are at a significantly increased risk of developing serious latent diseases and conditions including, *inter alia*, breast cancer, strokes, heart attacks, ovarian cancer, Alzheimer's disease, dementia, and blood clots.
>
> That increased risk makes periodic diagnostic medical examinations reasonably necessary. Medical surveillance, monitoring and testing procedures exist which make the early detection and treatment of disease possible and beneficial.
>
> Wyeth's actions render it liable to pay all costs of medical monitoring in the form of a comprehensive court-supervised medical monitoring program, to provide diagnostic and treatment services for the benefit of the class.[19]

Plaintiffs argue that class certification is appropriate here and propose two classes: (1) a consumer protection class under Federal Rule of Civil Procedure ("FRCP") 23(b)(3), which will include consumer fraud and unfair competition subclasses, and (2) a medical monitoring class under FRCP 23(b)(2), which will have breast cancer and dementia subclasses.[20]

Plaintiffs bottom their claims upon two facts they consider salient: (1) Wyeth falsely advertised and marketed HRT and Prempro; and (2) women face significantly increased risk of serious disease because they took Prempro.[21]

---

[18]Doc. No. 81.

[19]*Id.*

[20]Doc. No. 601.

[21]Doc. No. 601.

**A. Consumer Protection Class**

**1. Consumer Fraud**

Seeking relief under FRCP 23(b)(3), Plaintiffs include in their consumer fraud subclass:

> All women within Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia, Idaho, Indiana, Kansas, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming respectively, who purchased the prescription medication Prempro between its introduction in 1994 and July 2002.[22]

Plaintiffs allege: that Wyeth, through its direct to consumer advertisements, "falsely represented health benefits of [Prempro] and did not provide and deceptively concealed both the seriousness and the likelihood of known adverse reactions";[23] that Wyeth, grossly exaggerated the beneficial characteristics, uses, and benefits of Prempro; that Wyeth commenced a marketing campaign which contended that Prempro (1) would reduce the risk of heart disease, stroke, Alzheimer's disease, dementia, and depression; (2) would improve a consumer's mental acuity, help with incontinence, reduce wrinkles, and provide a "youthful glow"; and (3) was safe and approved for long-term use; that all of these benefits were unfounded; and that, at the same time that Wyeth embellished the benefits of Prempro, it simultaneously "concealed, obscured, and trivialized" the fact that Prempro increased the risks of breast cancer, stroke, heart attack, cardiovascular disease, Alzheimer's disease, dementia, and venous thromboembolism."[24]

---

[22] *Id.*

[23] Doc. No. 81.

[24] *Id.*

Plaintiffs submit that, as a result of Wyeth's actions, they have "suffered injuries in fact, ascertainable loss, and compensable damages," and are entitled to "equitable relief, including restitution of all monies paid for Prempro" and the creation of a medical monitoring program.[25] Plaintiffs further allege that they are entitled to "actual damages, disgorgement of Wyeth's profits accrued from their unfair, fraudulent, and unlawful practices, attorney's fees and costs," and punitive damages.

Plaintiffs claim that Wyeth's conduct constituted consumer fraud in violation of numerous state statutes.[26]

2. **Unfair Competition**

Seeking relief under FRCP 23(b)(3), Plaintiffs include in their unfair competition subclass:

> All women within Arizona, Arkansas, California, Connecticut, Delaware, Hawaii, Idaho, Illinois, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Missouri, Montana, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, and Wisconsin respectively, who purchased the prescription medication Prempro between its introduction in 1994 and July 2002.[27]

For unfair competition, Plaintiffs reassert the facts asserted in their consumer fraud claim. Plaintiffs add that "Wyeth derived profits and material gains as a direct and proximate result of

---

[25]*Id.*

[26]Plaintiffs list the relevant statutes of thirty two (32) jurisdictions (three of which are not included in their definition of the consumer fraud subclass -- namely, D.C., Illinois, and Pennsylvania). Doc. No. 81, ¶ 88.

[27]Doc. No. 601. Although Iowa was listed in the original Complaint as a state to be included in the subclass, it was removed in an Order granting partial dismissal (Doc. No. 295).

[its] unlawful, deceptive, and fraudulent representations."[28] As a result of Wyeth's conduct, they allege it continues to be "unjustly enriched in profits, income, and ill-gotten gains at the expense of the plaintiffs and the general public who purchased and consumed Prempro in reliance upon Wyeth's false, deceptive, and fraudulent business practices."[29]

Plaintiffs claim that Wyeth's unfair competition violated numerous state statutes.[30] They seek the same relief as in their consumer fraud claim, with the addition of actual damages where permitted by statute.

**B. Medical Monitoring Class**

Plaintiffs propose a medical monitoring class that will consist of two subclasses, which are defined below. Plaintiffs assert that their "increased susceptibility to injuries and [the] irreparable threat" to their health resulting from taking Prempro entitles them to the "creation of a court-supervised medical monitoring trust fund" that will finance a medical monitoring program for:

. . . Locating persons who have used Prempro and notifying them of the potential harm from such use;

. . . Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Prempro users;

. . . Funding the design and implementation of further studies of the effects of Prempro on its users, including population-based studies of and for the

---

[28]Doc. No. 81.

[29]*Id.*

[30]Plaintiffs list the relevant statutes of thirty (30) states (two of which are not included in their definition of the unfair competition subclass -- namely, Florida and Iowa). Doc. No. 81, ¶ 105.

benefit of the Class, including the establishment of an adverse health effects registry;

. . . Funding research into possible cures for the detrimental effects of using Prempro; and,

. . . Gathering and forwarding to treating physicians information related to the diagnosis and treatment of injuries that may result from using Prempro.[31]

Plaintiffs assert that "Prempro exposure justifies medical monitoring because of its toxicity, the seriousness of the conditions Prempro causes, and the relative risk of developing the conditions."[32]

### 1. Breast Cancer Monitoring

Seeking relief under FRCP 23(b)(2), Plaintiffs include in their breast cancer medical monitoring subclass:

> All women within Arizona, Arkansas, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Maryland, Michigan, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Puerto Rico, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming who used the prescription medication Prempro for at least 24 consecutive months until July 2002 and who are at increased risk of developing breast cancer (because of such exposure).[33]

Plaintiffs suggest that breast cancer medical monitoring will consist of four parts: (1) an initial screening questionnaire; (2) counseling to discuss the risks and benefits of Prempro and screening interventions; (3) MRIs in consenting women; and (4) additional studies, such as

---

[31]Doc. No. 81.

[32]Doc. No. 223.

[33]Doc. No. 601.

repeat mammography, echographic studies, or biopsies in women with suspicious lesions on the MRI.[34]

### 2. Dementia Monitoring

Seeking relief under FRCP 23(b)(2), Plaintiffs include in their dementia medical monitoring, subclass:

> All women within Arizona, Arkansas, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Maryland, Michigan, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Puerto Rico, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming who used the prescription medication Prempro for at least 24 consecutive months until July 2002 and who are at increased risk of developing dementia (because of such exposure).[35]

Plaintiffs' medical monitoring of dementia would include screening and counseling regarding dementia risks associated with Prempro. In addition to initial screening and counseling regarding Alzheimer's disease and dementia risks associated with the use of Prempro, Phase I would include testing that would annually use the Functional Activities Questionnaire ("FAQ") and the Modified Mini-Mental Status Examination ("MMMSE").[36] Phase II would involve more testing, including an annual Neuropsychiatric Exam and a Physical exam for patients who scored below the Phase I cut-off. Plaintiffs assert that this testing will allow physicians to discover symptoms of dementia at an early stage.[37] If a patient has dementia symptoms, she will

[34] Doc. No. 687.

[35] Doc. No. 601.

[36] Doc. No. 687.

[37] *Id.*

participate in Phase III, which would provide information "concerning risks and benefits of further testing, preventative treatments, and other lifestyle changes."[38]

### C. Other Causes of Action

Plaintiffs seek medical monitoring relief and disgorgement of Wyeth's profits[39] under the following causes of action:[40] (1) unjust enrichment, (2) negligence, (3) negligence per se, (4) strict liability -- failure to warn, and (5) negligent misrepresentation.

## III. STANDING

Before addressing class certification issues, a court must determine whether the plaintiffs have standing to bring their suit.[41] Since a court must assume the truth of the facts alleged by the plaintiff at the class certification stage, the standard of review for standing is similar to the standard used to analyze a 12(b)(6) motion to dismiss.[42]

To establish standing: (1) the plaintiff must have "suffered an injury in fact"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision."[43]

---

[38] *Id.*

[39] Disgorgement of profits is requested as relief for only Count 3, Unjust Enrichment.

[40] During the June 24, 2004 status conference, Plaintiffs conceded that they were no longer seeking recovery of "moneys spend on Prempro" under these counts. *See* Doc. No. 295.

[41] *See Bertulli v. Independent Association fo Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry.").

[42] *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133, 139 (E.D. La. 2002).

[43] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

As to injury-in-fact, Plaintiffs allege that their consumption of Prempro increased their risk of developing serious latent diseases and conditions including breast cancer, strokes, heart attacks, ovarian cancer, Alzheimer's disease, dementia, and blood clots. Plaintiffs satisfy the injury-in-fact element since courts have repeatedly agreed that an increased risk of harm is an injury-in-fact.[44]

The causation element is satisfied "when the injury alleged is fairly traceable to the challenged action of the defendant."[45] Here, Plaintiffs assert that the increased risks of certain latent diseases and conditions are attributable to a drug manufactured by Defendant, and that this injury can be traced to Defendant because of Defendant's failure to adequately test and sufficiently warn of the dangers of the drug. Accordingly, Plaintiffs have met their burden of establishing (for the purpose of standing) that the alleged injury is fairly traceable to Defendant's alleged wrongful acts.

Finally, Plaintiffs must establish that the injury can be "redressed" by a favorable court decision. Plaintiffs ask for the creation of a medical monitoring program and disgorgement of Wyeth's profits; this would redress the alleged injuries suffered by Plaintiffs.

Accepting as true the facts asserted by Plaintiffs, as I must at this stage of the litigation, Plaintiffs have established injury-in-fact, causal connection, and redressability. Accordingly, Plaintiffs have Article III standing.

---

[44]*In re Propulsid*, 208 F.R.D. at 139; *See also Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984); *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829 (3d Cir. 1990); *In re Orthopedic Bone Screw Products Liability Litigation*, 1999 WL 455667 (E.D. Pa. July 2, 1999).

[45]*In re Propulsid*, 208 F.R.D. at 139.

## IV. CHOICE-OF-LAW

In cases where the plaintiffs, pursuing common law claims, request the certification of a class that involves multi-state parties, courts must address choice-of-law issues.[46] Unlike a federal question case (where the diversity of the parties does not matter), when class certification is sought in a case based on common law claims, the question of which law governs is crucial in making a class certification determination. Not only must the choice-of-law issue be addressed at the class certification stage -- it must be tackled at the front end since it pervades every element of FRCP 23.

FRCP 23 makes no reference to choice-of-law issues, but, in nationwide class actions, choice-of-law constraints are constitutionally mandated because a party has a right to have her claims governed by the state law related to her particular case.[47] Therefore, choice-of-law issues may be present in any number of FRCP 23's subsections[48] -- and they are pervasive in this case. So, as indicated above, identifying the state substantive laws that may control the outcome of the litigation is a threshold matter when making findings regarding class certification.

---

[46]*In re Jackson Nat. Life Ins. Co. Premium Litigation*, 183 F.R.D. 217, 223 (W.D. Mich. 1998) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-23 (1985)).

[47]*In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332, 347-48 (D.N.J. 1997) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. at 821-23).

[48]*See Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("A requirement that a court know which law will apply before making a predominance determination is especially important when there may be differences in state law."); *In re Baycol Products Litigation*, 218 F.R.D. 197, 207, 211-12 (D. Minn. 2003) (addressing the choice-of-law issue as it pertains to Rule 23(b)(3), and pointing out the how the differences in state law preclude the formation of a medical monitoring class under 23(b)(2)); *In re Propulsid*, 208 F.R.D. at 145 (addressing the choice-of-law as its own factor, and then applying it to the proposed 23(b)(2) class); *In re Paxil Litigation*, 212 F.R.D. 539, 544-45 (C.D. Cal. 2003) (holding that choice-of-law issues prevented a manageable class under Rule 23(a)).

Typically courts perform a choice-of-law analysis when assessing the predominance requirement[49] of Rule 23(b)(3).[50] However, in cases like these -- where multi-state plaintiffs pursue common law causes of action under both 23(b)(2) and (b)(3) -- the choice-of-law determination affects every aspect of class certification. Plaintiffs' common law claims are not insulated from the choice-of-law analysis simply because they are grouped under 23(b)(2). Accordingly, Plaintiffs must show, "prior to class certification, that the differences in state laws within each of their groupings are nonmaterial"[51] as to both their 23(b)(3) *and* 23(b)(2) classes.

### A. Plaintiffs' Response to Choice-of-law

In an effort to overcome the choice-of-law problems, Plaintiffs contend that: (1) this is not a nationwide class action; (2) that their proposed subclasses properly group states with quite similar laws; and (3) that jury instructions can be tailor-made to properly inform a jury of the substantive law.

#### 1. Not a Nationwide Class

As noted above, Plaintiffs claim that their case is not a nationwide class action.[52] The proposed subclasses include women from 29 states (consumer fraud), 28 states (unfair competition), and 24 states (medical monitoring), respectively, which means the proposed

---

[49]FED. R. CIV. P. 23(b)(3) requires the court to find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

[50]*Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 (5th Cir. 2000) (holding that a "predominance finding depends on [a court's] choice of law analysis"); *see also Castano*, 84 F.3d at 741.

[51]*In re Paxil*, 212 F.R.D. at 545.

[52]Doc. No. 669.

subclasses face the same choice-of-law problems that a nationwide class would face. Plaintiffs concede that the state law for each state identified in each subclass will govern.[53] This means that certifying any of Plaintiffs' claims would require applying the law of at least 24 states. Plaintiffs must show that class certification is appropriate when the proposed classes involve the laws of 24-29 different states.

While this case may not be a nationwide class (it doesn't include 50 states), it involves many states, and Plaintiffs failed to submit either a trial plan or jury instructions effectively demonstrating that this case could be managed as a class action, considering the laws of numerous states.

**2. Proposed Trial Plan / Grouping/ Jury Instructions**

To meet their burden of providing an "extensive analysis" of state law variations, and establishing that there are not "insuperable obstacles" to class certification, the plaintiffs must provide the court with "model jury instructions and verdict forms, as well as . . . [a grouping] of state laws by their relevant differences."[54] Plaintiffs have made a run at this, but their proposals do not show that certification is appropriate in light of the differences in state law.

Plaintiffs assert that their proposed subclasses resolve any potential choice-of-law issues.[55] Additionally, they contend that "[a]ny such differences in states' laws are not substantial

---

[53] *Id.*

[54] *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61, 71 n.59 (S.D.N.Y. 2002).

[55] Plaintiffs assert that "the classes in this case as well as the claims at issue can be handled in an efficient manner so as to easily accommodate any differences in states' law." (Doc. No. 601); The proposed subclasses "have materially identical consumer protection and false advertising law." (Doc. No. 669).

enough to preclude class certification in this case,"[56] and "do not make the class unmanageable."[57] To the contrary, Plaintiffs' proposed groupings, jury instructions, and trial plan reflect complications that appear to make any of the proposed subclasses ill-suited for class certification.

Plaintiffs further suggest that not only can these states be grouped, but -- in regard to instructing the jury -- the Court will be able to "come up with common instructions that provide for the base from which lesser-included offenses might be carved out."[58] In their Model Class Trial Plan, Plaintiffs argue that "the court will instruct the jury using jury charges for each subclass incorporating the material elements of law from the respective subclass jurisdiction."[59]

Plaintiffs' argument that the variations in state laws are not substantial is unduly sanguine. In an attempt to show that the laws are generally uniform, Plaintiffs have presented a listing of states' laws for consumer fraud, unfair competition, and unjust enrichment.[60] But, a study of this listing leads me to a conclusion contrary to the one urged by Plaintiffs.

In fact, a review of the unjust enrichment and consumer fraud/unfair competition claims reveals that these laws cannot reasonably be grouped in a comprehensive manner that does not seriously impinge on the integrity of the law of each state.

---

[56]Doc. No. 601.

[57]Doc. No. 669.

[58]June 24, 2005 Tr. at 11, lines 43-47.

[59]Doc. No. 686.

[60]Doc. No. 601, Exs. B, C, and D.

**a. Unjust Enrichment**

On this point, Plaintiffs argue that states' laws "form a common nucleus in that they prohibit, or otherwise provide a remedy, where a plaintiff has conferred a benefit on a defendant and it would be unjust or inequitable for defendant to retain that benefit."[61] However, this generalization fails to recognize the differences in state laws. As a matter of fact,

> [t]he actual definition of 'unjust enrichment' varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud . . . .Other states only allow a claim of unjust enrichment when no adequate legal remedy exists . . . . Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense . . . .[62]

Additionally, "some states consider unjust enrichment a remedy at law, while others consider it an equitable claim."[63] If this were not enough, Plaintiffs' jury instructions indicate numerous differences by creating seven "additional instructions" to supplement their main unjust enrichment instruction;[64] and these may not be sufficient to encompass all the important differences in the states' unjust enrichment laws.

**b. Consumer Fraud / Unfair Competition**

The problems mentioned above apply to Plaintiffs' consumer fraud and unfair competition claims as well. Plaintiffs assert that consumer fraud laws of the listed states "form a common nucleus in that they uniformly prohibit a Defendant from representing that goods have

---

[61]Doc. No. 601.

[62]*Clay v. American Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999).

[63]*In re Baycol*, 218 F.R.D. at 214 (citations omitted).

[64]Doc. No. 601, Ex. D.

approval, characteristics, uses, benefits or qualities that they do not have."[65] Regarding unfair competition, Plaintiffs claim that the law of the listed states "form a common nucleus in that all prohibit any business act or practice which is fraudulent or deceptive."[66]

Plaintiffs oversimplify. Both consumer fraud and unfair competition laws of the states differ with regard to the defendant's state of mind,[67] type of prohibited conduct, proof of injury-in-fact, available remedies, and reliance, just to name a few differences. The *Rezulin* court noted that the plaintiffs' proposed consumer fraud class would require a court to "apply the laws of all fifty states to determine the need for proving such matters as intent, reliance, causation and injury before even addressing the form and extent of any relief that might be appropriate."[68]

A cursory review of the differences in reliance, scienter, and statute of limitations (and this is by no means a conclusive list of differences) reveals that Plaintiffs' proposed subclasses are quite imprecise. For example:

| | Scienter | Reliance | Statute of Limitations | Statute of limitations runs from date of |
|---|---|---|---|---|
| Arkansas | Yes | No | 5 yrs | transaction |
| California | No | No | 3 yrs | transaction |
| Colorado | Yes | No | 3 yrs | discovery |
| Georgia | No | Yes | 2 yrs | discovery |
| Wyoming | Yes | Yes | 1 yr | discovery |

[65]Doc. No. 601.

[66]*Id.*

[67]States vary on whether the plaintiff must prove that the defendant acted willfully, knowingly, or intentionally. Some states do not require scienter.

[68]*In re Rezulin*, 210 F.R.D. at 68-69.

From this table it is clear that none of these states could be properly grouped together. A plaintiff from California could not be grouped with a Wyoming plaintiff because Wyoming requires proof of scienter and reliance; California could not be grouped with Arkansas either, because Arkansas requires scienter. While California squares with other states that require neither scienter nor reliance (e.g.. Alabama or Ohio), other issues -- e.g. statute of limitations, measure of damages -- would then come into play, preventing the grouping, as a practical matter.

Variations in state law plague the other common law claims that Plaintiffs do not specifically outline in their briefs -- e.g. failure to warn, negligence, negligent misrepresentation, and medical monitoring.[69]

The Seventh Circuit stated that "the voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch."[70] The same can be said for common law claims generally. Plaintiffs' proposals establish this point. First, not a single, accurate, understandable jury instruction that addresses the differences in state law has been presented -- for any of Plaintiffs' claims. Apparently, the only way to encompass the various state common law in one instruction -- or a tight package of Instructions -- is with the creation of an Esperanto[71]

---

[69]*See Block v. Abbott Laboratories*, 2002 WL 485364 (N.D. Ill. March, 29 2002) (failure-to-warn); *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995) (negligence); *In re Paxil*, 212 F.R.D. at 544-45 (negligence); *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 549-50 (5th Cir. 2003) (negligent misrepresentation); *In re Rezulin*, 210 F.R.D at 75 (medical monitoring); *In re Baycol*, 218 F.R.D. at 211 (medical monitoring).

[70]*Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d at 1301.

[71]Esperanto is an artificial language, created by Dr. L.L. Zamenhof in 1887, which combines word roots common to many European languages. It was designed to help with the communication between people of different lands and cultures, and was meant to be a second language.

instruction -- a "solution" that has been expressly rejected.[72] Second, Plaintiffs have not presented a manageable listing of subclasses that encompasses the laws of the various states. I cannot think of -- and apparently Plaintiffs could not either -- any way to subclass these states without creating a tangled web of plaintiffs and laws.

When asked about the subclasses and jury instructions at the certification hearing, Plaintiffs acknowledged that they may need to "kick this around a little bit more."[73] However, on the whole, they stood their ground stating that, just because this will be complex, "doesn't mean that it can't be done."[74] In the absence of a satisfactory showing that the variations in state laws can be reasonably reconciled with, at the very least, jury instructions capable of being understood by a jury, and a trial plan that adequately sets forth how the case will proceed, class certification is not warranted.[75]

When proposed classes "threaten to undermine whatever benefits class certification might otherwise provide . . . [a court] is 'not content merely to certify an action as a proper class suit and then suggest that all the problems raised by the parties may be adjusted or handled at a later

---

[72]*See Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d at 1301.

[73]June 2, 2005 Tr. at 346, line 12.

[74]June 2, 2005 Tr. at 347, lines 7-8.

[75]As an aside, the fact that the parties do not agree on which states require scienter is additional proof of the improbability of a workable trial plan that would adequately recognize the differences among state laws. For example, Plaintiffs claim that Alabama does not require scienter, but Defendants claim that scienter must meet the "knowingly" standard. Also, Plaintiffs claim that Delaware does not require scienter, but Defendants claim that a plaintiff must prove that a defendant intended to deceive the consumer. *See* Doc. Nos. 601, Ex. A and 668, Ex. 1.

stage.'"[76] While a multitude of subgroups might solve the variations of laws problem, it would lead to monumental case management problems. Plaintiffs must establish that the variances in state laws could be overcome in a reasonable way. They have failed to meet this burden.

Incidentally I have carefully studied Judge Tunheim's thoughtful analysis in *In re St. Jude Medical, Inc. Silzone Heart Valves Products Liability Litigation.*[77] In fact my study of the *St. Jude* case has caused some delaying the entry of this order. It is obvious that he has taken on an considerable task in certifying the class, which involves the laws of 17 states. In light of my view of class actions, I might well be inclined to follow his lead but, for the reasons stated above and below, the case before me has substantial additional complications. I note parenthetically that the parties here designate the *St. Jude* case as a "medical device" case, and this case (as well as the "big four" cases[78]) as "drug" cases. Since the primary complaint in *St. Jude* regards the "Silzone heart valve, which has a coating of silver on the sewing cuff,"[79] I'm nowise certain that this distinction is apt. But this does not affect my decision in this case.

---

[76]*In re Paxil*, 212 F.R.D. at 545 (quoting 7A WRIGHT, MILLER & KANE, *FEDERAL PRACTICE & PROCEDURE* § 1754 (2d ed. 1986)).

[77]2003 WL 1589527 (D. Minn. March 27, 2003).

[78]This is the name Wyeth gave to *In re Baycol*, MDL-1431; *In re Rezulin*, MDL-1348; *In re Propulsid*, MDL-1355; *In re Paxil*, MDL-1574.

[79]*In St. Jude*, 2003 WL 1589527, at *1. The silver coating on the Silzone valve was introduced to combat endocarditis, so in a sense, *In re St. Jude* involved a hybrid medical device/drug claim.

## V. CLASS CERTIFICATION STANDARD

Even if Plaintiffs could overcome the choice-of-law issues, their claims would fail to meet the requirements of Federal Rule of Civil Procedure ("FRCP") 23.

To obtain class certification, Plaintiffs must meet all four requirements of Rule 23(a) and the requirements of at least one of the subdivisions of Rule 23(b).[80] A case is "not maintainable as a class action by virtue of its designation as such in the pleadings."[81] Instead, "[t]here must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled."[82] The party seeking class certification has the burden of establishing that certification is appropriate.[83]

A class should not be certified until the district court has found "through rigorous analysis, that all the prerequisites of Rule 23(a) have been satisfied."[84] A district court "has broad discretion in determining whether to certify a class."[85] However, some believe that a court should rule in favor of class certification in a close case, since it may amend an order granting class certification (this approach, however, can compound the problems).[86]

---

[80]FED. R. CIV. PRO. 23(b).

[81]*In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

[82]*Id.*

[83]*Id.*

[84]*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1979).

[85]*Gilbert v. City of Little Rock, Ark.*, 722 F.2d 1390, 1399 (8th Cir. 1983).

[86]*Barnes v. American Tobacco Co.*, 176 F.R.D. 479, 484 (E.D. Pa. 1997).

Here, Plaintiffs seek to certify one class (two subclasses) under FRCP 23(b)(3), and one class (two subclasses) under 23(b)(2). While Plaintiffs must satisfy the FRCP 23(a) requirements for each proposed class and subclass,[87] I will first address Plaintiffs' 23(b)(3) and (b)(2) claims.

**A. FRCP 23(b)(3) Requirements**

Plaintiffs seek to certify a consumer fraud subclass and an unfair competition subclass under FRCP 23(b)(3). For certification under FRCP 23(b)(3), Plaintiffs must establish, in addition to meeting the requirements of 23(a), that common questions of law or fact predominate, and that a class action is the superior method for fair and efficient adjudication of the controversy.[88] Determining whether common issues predominate and the class action is superior requires consideration of the relevant claims, defenses, facts, and substantive law presented.[89]

**1. Predominance**

While Rule 23(b)(3) parallels subdivision (a)(2), in that both require that common questions exist, subdivision (b)(3) contains the more stringent requirement that common issues "predominate" over individual issues.[90] "To satisfy the 'predominance' standard, plaintiffs must show that [their claims] can be proven on a systematic, class-wide basis."[91]

Plaintiffs contend that there are questions of law and fact common to all cases because "Wyeth engaged in a marketing campaign designed to increase HRT sales generally and Prempro

---

[87] *Paxton v. Union National Bank*, 688 F.2d 552, 559 (8th Cir. 1982).

[88] FED. R. CIV. P. 23(b)(3).

[89] *See Castano*, 84 F.3d at 744.

[90] *See In re American Medical Systems, Inc.*, 75 F.3d at 1084.

[91] *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005).

specifically," and this marketing campaign "consisted of falsehoods and deception that affected . . . every putative class member's use of Prempro."[92] They argue that "predominance is satisfied here, because when [Wyeth] acted to one [plaintiff], it acted to them all."[93] Defendants do not dispute that there are some common issues of fact and law, but contend that individual issues predominate.

**a. Questions of Law do Not Predominate**

As mentioned earlier, each plaintiff's case must be analyzed under the law of her[94] state. This means the consumer fraud laws of the 29 states and the unfair competition laws of 28 states must be followed. Again, Plaintiffs contend that these differences are minute.[95] However, "[i]n multi-state class actions, variations in state law may swamp any common issues and defeat predominance."[96] As is more fully explained above, the state by state variations in law trump the common issues of law or fact, and preclude a finding that common issues predominate.[97]

**b. Questions of Fact do Not Predominate**

Even if Plaintiffs could overcome the variations in state law, they cannot show that common questions of fact predominate.

---

[92]Doc. No. 601.

[93]June 2, 2005 Tr. at 288, lines 9-10.

[94]It is a relief to be able to use this gender based pronoun without thinking. This is because only women take these drugs -- at least as far as I know.

[95]Doc. No. 601.

[96]*See Castano*, 84 F.3d at 741.

[97]*In re American Medical Systems, Inc.*, 75 F.3d at 1085.

The United States Supreme Court cautioned:

> [i]n products liability actions . . . individual issues may outnumber common issues. No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant. Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of the risk, contributory negligence, and the statute of limitations) may depend on facts peculiar to each plaintiff's case.[98]

Plaintiffs' causes of action "raise a host of individual issues."[99] For example, the consumer fraud claim "require[s] individualized proof concerning reliance and causation."[100] Whether a plaintiff saw an advertisement; whether the particular advertisement was fraudulent; whether that plaintiff relied on the advertisements; and whether the plaintiff was damaged as a result of the advertisement are all individual questions of fact.

Additionally, Defendants' potential liability will differ from class member to class member depending on when she took the drug. Because Wyeth's promotional material, informational literature, and advertising changed over time, what and when a plaintiff saw the advertisement will differ from plaintiff to plaintiff, directly affecting whether Wyeth violated any consumer fraud laws. And, since scientific knowledge is constantly changing, a 1995 ad making certain claims might not be fraudulent, however if made in 1999 it might well be.

Another consideration is affirmative defenses. While they do not automatically render class certification inappropriate, they must be considered when determining whether common

---

[98] *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 628 (1996).

[99] *In re Rezulin*, 210 F.R.D. at 66-67.

[100] *Id.* at 68.

issues predominate.[101] When affirmative defenses "'may depend on facts peculiar to each plaintiff's case,' class certification is erroneous."[102] Assumption of the risk, contributory negligence, comparative negligence, and statutes of limitation all require individual determinations.[103]

Finally, in the states that require it, the issue of reliance raises a multitude of individual issues. The *Paxil* court explained:

> because the putative plaintiffs all took Paxil at different times, some of those patients may have ingested Paxil and withdrawn from it before the advertisements at issue were aired or may have never seen the advertisements. With the information before it, the Court has significant doubts with respect to Plaintiffs' ability to show reliance, other than on a tedious case by case basis.[104]

Because reliance "must be applied with factual precision," Plaintiffs' fraud and unfair competition claims do not provide "a suitable basis for class-wide relief."[105]

As in many cases before them, Plaintiffs have attempted to frame the "predominant" issues broadly to compensate for variations in the class members' claims. But they suffer the

---

[101]*Gunnells v. Healthplan Services, Inc.*, 348 F.3d. 417, 438 (4th Cir. 2003).

[102]*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) (quoting *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982).

[103]*See Arch v. American Tobacco, Inc.*, 175 F.R.D. 469, 491 (E.D. Pa. 1997) ("Assumption of risk is an inherently individual question, turning as it does upon the subjective knowledge and behavior of individual plaintiffs."); *See also Guillory v. American Tobacco, Co.*, 2001 WL 290603, at *9 (N.D. Ill. March 20, 2001) (assumption of risk); *In re Ford Motor Co. Ignition Switch*, 194 F.R.D. at 490 (comparative and contributory negligence); *Barnes v. American Tobacco Co.*, 161 F.3d at 149 (statute of limitations).

[104]*In re Paxil*, 212 F.R.D. at 548.

[105]*Broussard*, 155 F.3d at 342.

same fate. "[I]ndividual issues abound and are magnified by the necessity of applying diverse state laws," making certification under 23(b)(3) inappropriate.[106]

2. **Superiority**

Plaintiffs have failed to show a predominance of common facts or law. They also have failed to meet their burden of establishing that a class action is the superior way to handle this litigation. Of course, the failure to show predominance spills over onto superiority. FRCP 23(b)(3) requires Plaintiffs to establish that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[107] "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of settling the controversy . . . ."[108] "The difficulties likely to be encountered in the management of a class action" are strongly considered when analyzing superiority.[109]

Again, state law variation rears its head. It is well settled that the application of multiple state laws can render a case unmanageable.[110] Here, because the law varies in material ways from state to state and because individual factual determinations saturate Plaintiffs' common law claims, a class action trial is not the superior method for resolving these cases.[111]

---

[106]*Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1025 (11th Cir. 1996).

[107]FED. R. CIV. P. 23(b)(3).

[108]7AA WRIGHT, MILLER & KANE, *FEDERAL PRACTICE & PROCEDURE* § 1779 (3d ed. 2005).

[109]FED. R. CIV. P. 23(b)(3)(D).

[110]*See, e.g.*, *Andrews*, 95 F.3d at 1024-25; *Castano*, 84 F.3d at 741-44.

[111]*See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) (denying nationwide class certification because variances in consumer protection and fraud laws rendered

Plaintiffs' failure to present a manageable plan supports the conclusion that the multi-state laws render this case unmanageable. The trial plan in this case has many of the flaws of the one rejected in *In re Paxil*:

> The trial plan, which sketches the proposed plan of action in only the broadest strokes, is itself six pages. The description does not even begin to lay out the specific elements required to prove certain causes of actions. The completed picture will no doubt be too vast and too complicated for even the most diligent jury to grasp. Thus, any attempt to proceed with this trial plan is bound to result in trial management problems and jury confusion.[112]

Additionally, as discussed earlier, Plaintiffs failed to provide even one accurate, understandable jury instruction that sufficiently addressed the differences in state law. The absence of an adequate trial plan and proper jury instructions supports what Defendants have said all along -- there is no way that the claims of these multi-state plaintiffs can be adequately addressed in a single class action trial.

In fine, the presence of individualized determinations under a variety of state laws weighs against the superiority of a class action.[113] Since Plaintiffs have failed to demonstrate that this

---

class unmanageable); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000) (rejecting nationwide certification, finding consumer fraud laws of the various states are not uniform and management problems are likely to arise from the need to determine and apply the various consumer fraud acts); *Szabo v. Bridgeport Mahines, Inc.*, 249 F.3d 672, 674 (7th Cir. 2001) (holding that a "nationwide class in what is fundamentally a breach-of-warranty action, coupled with a claim of fraud, poses serious problems about choice of law, the manageability of the suit, and thus the propriety of class certification").

[112]*In re Paxil*, 212 F.R.D. at 546.

[113]*See Schwartz v. Upper Deck, Co.*, 183 F.R.D. 672, 679 (S.D. Cal. 1999) ("When individualized determinations must be made, and then applied under the gamut of state law, class certification would provide massive manageability problems for a court."); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. at 223 (finding class action not superior where "[m]anagement problems are likely to result from the need to determine and apply the various states' consumer fraud acts").

case would be manageable -- because of the differences in the facts of each case and differences in state laws -- they have not met the superiority requirement.

**B. FRCP 23(b)(2) Requirements**

Under FRCP 23(b)(2), a class action may be maintained where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."[114]

Plaintiffs propose a medical monitoring subclass under FRCP 23(b)(2).[115] They pursue both a cause of action for medical monitoring, and, under several common law causes of action, medical monitoring as a remedy. Plaintiffs assert that Wyeth marketed, promoted, and distributed Prempro nationally while simultaneously hiding the harmful effects of the drug; and falsely promoted and exaggerated the benefits of Prempro -- all in a way that generally applies to the class of Prempro users.[116] Plaintiffs assert that they are at an increased risk of serious disease because they took Prempro. On this basis, Plaintiffs, who are all asymptomatic, seek injunctive relief by way of a court-supervised medical monitoring program.

While 23(b)(2) class actions do not have the predominance or superiority requirements that 23(b)(3) class actions have, courts have held that the class claims under 23(b)(2) must be

---

[114]FED. R. CIV. P. 23(b)(2).

[115]The proposed class will consist of a breast cancer medical monitoring subclass and a dementia medical monitoring subclass.

[116]This is the exact claim that is made in *In re Propulsid*, 208 F.R.D. 133 and *In re Baycol*, 218 F.R.D. 197.

cohesive.[117] In fact, "a (b)(2) class should actually have more cohesiveness than a (b)(3) class."[118] A class cannot be cohesive if the state's laws governing the class are notably different. Nor can it be cohesive if the factual differences between the proposed class members would "translate into significant legal differences."[119]

First, as discussed earlier, the variation in state laws is at issue. States differ greatly on their approach to medical monitoring both as a cause of action and as a remedy. Plaintiffs' proposed medical monitoring subclasses include twenty four (24) states that indisputably address medical monitoring in a number of ways. For example, Arizona and New York allow stand-alone medical monitoring claims absent proof of injury;[120] Michigan, Missouri, and Nevada allow stand-alone medical monitoring claims but require proof of injury;[121] Arkansas has rejected

---

[117] *See Barnes v. American Tobacco Co.*, 161 F.3d at 143 (holding that "[a]lthough a case may be certified under Rule 23(b)(2), which does not have a superiority or predominance requirement, certification under (b)(2) does not relieve a court of its obligation to determine whether the existence of individual issues preclude certification"); *See also In re Rezulin*, 210 F.R.D. at 75; *Thompson v. American Tobacco Co., Inc.*, 189 F.R.D. 544, 557 (D. Minn. 1999); *In re St. Jude Medical, Inc Silzone Heart Valves Products Liability Litigation*, 2003 WL 1589527, at *14 (D. Minn. March 27, 2003); *In re Baycol Products*, 218 F.R.D. at 211.

[118] *Barnes v. American Tobacco Co.*, 176 F.R.D. at 500. *See also Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (D.C. Pa. 1976) (holding that a "court should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it would under subsection 23(b)(3)").

[119] *In re Baycol*, 218 F.R.D. at 211 (citing *Barnes v. American Tobacco Co.*, 161 F.3d at 143).

[120] *See Burns v. Jaquays Min. Corp.*, 752 P.2d 28, 33-34 (Ariz. Ct. App. 1987); *Patton v. General Signal Corp.*, 984 F. Supp. 666, 674 (W.D.N.Y. 1997).

[121] *See Henry v. Dow Chemical Co.*, 2005 WL 1869555, at *3 (Mich. Jul. 13, 2005); *Thomas v. FAG Bearings Corp. Inc.*, 846 F. Supp. 1400, 1410 (W.D. Mo. 1994); *Badillo v. American Brands, Inc.*, 16 P.3 435 (Nev. 2001).

medical monitoring as a cause of action, and questions its availability as a remedy;[122] California and Vermont permit medical monitoring as a damages claim only;[123] and Indiana, Maryland, and Puerto Rico have not addressed medical monitoring either as a cause of action or as relief. "The fact that medical monitoring is not treated uniformly throughout the United States creates a myriad of individual legal issues" that may swamp any possible cohesion in a 23(b)(2) class.[124]

Additionally, regardless of whether a medical monitoring claim is recognized as a separate cause of action, or as an element of damages, "state laws generally require a finding that a plaintiff's exposure to a toxic substance was due to defendant's negligence."[125] "[A] finding of negligence is inextricably intertwined with individual issues,"[126] which would undermine the cohesion of the medical monitoring subclasses.[127] While this is not always the case, it is the case here.

A "myriad of individual issues" also exists for the other common law claims under which Plaintiffs request medical monitoring relief -- presumably to cover the states that do not

---

[122]*See Baker v. Wyeth-Ayerst Labs. Division*, 992 S.W.2d 797, 799 (Ark. 1999).

[123]*See Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 823 (Cal. 1993); *Stead v. F.E. Myers*, 785 F. Supp. 56, 57 (D. Vt. 1990).

[124]*Zehel-Miller v. Astrazenaca Pharmaceuticals, LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004).

[125]*In re Baycol*, 218 F.R.D. at 212.

[126]*Id.* at 211.

[127]*Id.* at 208 ("[N]egligence claims depend on individual facts--whether there is a breach of duty or the foreseeability of harm will depend on what Defendants knew or should have known at the time Baycol was prescribed and whether Defendants acted reasonably based on the knowledge it had at that time.").

recognize medical monitoring as an independent cause of action. As was discussed earlier, Plaintiffs' common law claims differ from state to state, with regard to their elements and relief. Therefore the subclasses do not have cohesion.

**C. Specific v. General Causation**

Plaintiffs contend that, to establish a case for medical monitoring, they must establish only that Prempro generally caused an increased risk in the women who took the drug.[128] While Plaintiffs may not have to prove that Prempro caused a specific disease, they must prove that Prempro increased the risk of disease in each particular Plaintiff.

The Third Circuit Court of Appeals addressed this issue:

> [P]laintiffs cannot prove causation by merely showing that smoking cigarettes causes cancer and other diseases. They must demonstrate that defendants' intentional or negligent nicotine manipulation caused each individual plaintiff to have a significantly increased risk of contracting serious latent diseases thereby demonstrating the need for medical monitoring.[129]

While Plaintiffs argue that they need only prove general causation on a class-wide basis, individual causation must still be shown. Because the jury would still have to determine causation for each plaintiff, a finding of "general causation" would not materially advance the litigation.[130] Assuming Plaintiffs could prove that the increased risk of latent disease is generally

---

[128]June 24, 2005 Tr. at 12, lines 33-39.

[129]*Barnes v. American Tobacco Co.*, 161 F.3d at 145.

[130]*See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 677 (N.D. Ohio 1995) ("[T]he resolution of the general causation question accomplishes nothing for any individual plaintiff."); *See also Harding v. Tambrands*, 165 F.R.D. 623, 630 (D. Kan. 1996) ("Certification would not materially advance the disposition of the litigation as a whole. A finding of 'general causation' would do little to advance this litigation."); *Arch v. American Tobacco, Co., Inc.*, 175 F.R.D. at 488 (holding that the plaintiffs could not satisfy the causation elements of products liability and negligence claims by proving that all cigarettes can potentially cause a user to become addicted,

caused by Prempro, "members of the class seeking to recover for that type of harm would still have to prove individual causation later in the litigation."[131]

The Eleventh Circuit has held:

> Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification . . . ."[132]

This is the case here. "Causation in the air" is not enough.

**D. The Medical Monitoring Program**

Even if Plaintiffs could overcome the lack of cohesion and causation problems, their proposed medical monitoring plan fails to meet key elements generally required by states recognizing medical monitoring relief. For medical monitoring, a plaintiff must establish that a monitoring procedure exists that makes early detection of disease possible, and that this procedure is different from the health monitoring normally recommended in the absence of exposure.[133] Plaintiffs' proposed breast cancer medical monitoring will involve: (1) an initial screening questionnaire; (2) a counseling component to discuss the risks and benefits of Prempro and screening interventions; (3) MRIs in consenting women; and (4) additional studies, such as

---

because "a jury would still be required to determine for each class member whether he or she is addicted to cigarettes, and, if so, whether defendants (and which defendant) caused the addiction"); *In re Ford Motor Co. Ignition Switch*, 194 F.R.D. at 490 ("It is axiomatic that individual causation remains an prerequisite to class membership. Resolution of the 'general causation' question of whether the subject switches are capable of causing the damage alleged by the vehicle owners does not show commonality under Rule 23(a)(2).").

[131] *Emig v. American Tobacco Co., Inc.*, 184 F.R.D. 379, 390, n.9 (D. Kan. 1998).

[132] *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004).

[133] *See In re Baycol*, 218 F.R.D. at 211.

repeat mammography, echographic studies, or biopsies in women with suspicious lesions on the MRI.[134]

The only part of this proposed program that is different from normally recommended procedures is the MRI. Plaintiffs claim that "Prempro leads to an increase in breast density, thereby making mammograms less accurate than an MRI" in detecting breast cancer.[135] However, Plaintiffs' experts concede that increased breast density caused by Prempro disappears within six months after discontinuation.[136] Since Plaintiffs' proposed subclass includes only women who stopped using Prempro on or before July 2002, no Plaintiff would have the Prempro related increased breast density that Plaintiffs claim requires an MRI. Thus, it cannot be said that Plaintiffs' proposed monitoring is necessary or different from that which is appropriate for women without increased breast density. Essentially the same problems arise in the proposal for medical monitoring for dementia.

I am impressed by the courts' concerns in *Propulsid* and *Baycol*, where the proposed monitoring programs had not been endorsed by anyone in the medical community, other than the plaintiffs' experts. In denying the certification of a medical monitoring class, the *Propulsid* court noted that:

> Neither the FDA, nor any medical organization or institution, nor anyone else for that matter, except the plaintiff's expert, has recommended or suggested that a

---

[134] Doc. No. 687.

[135] *Id.*

[136] Gale Deposition at 221-222; Jachelson Deposition at 86.

program of medical monitoring for or a group study of all former Propulsid users be undertaken.[137]

This is not to say that a party's expert could never devise an acceptable monitoring program. That expert could be on the leading edge of new medical discoveries and her plan might well be shown to be appropriate. It seems to me, however, that the courts should be mighty chary about outrunning their headlights in the field of medical science. Be that as it may, this is not the case for a court to take lead, based upon the singular opinion of Plaintiffs' experts.

**E. No Precedent (Similarities to *Baycol*, *Rezulin*, *Propulsid*, and *Paxil*)**

It is conceded that much precedent is against Plaintiffs. First, "no federal Court of Appeals decision has approved class certification of an action involving prescription drugs."[138] In fact, no federal district court has certified a multi-state class alleging products liability and medical monitoring for a pharmaceutical drug. Since most states that allow medical monitoring require Plaintiffs to establish that they were exposed to a "hazardous substance," it is even less likely that a court would grant medical monitoring when the prescription drug at issue is still on the market and approved by the FDA. While these factors are not something that, in and of themselves, defeat Plaintiffs' class certification efforts,[139] I believe they are weighty considerations.

---

[137]*In re Propulsid*, 208 F.R.D. at 147; *See also In re Baycol*, 218 F.R.D. at 212 (finding that the absence of recommendations from the medical community regarding the need for a medical monitoring program was fatal to the plaintiffs' claims).

[138]*In re Baycol*, 218 F.R.D. at 204.

[139]After all, some case had to be "first" in all new areas of legal involvement.

Wyeth relies on what they dub the "big four" -- *In re Baycol, In re Rezulin, In re Paxil,* and *In re Propulsid* --[140] in opposing Plaintiffs' proposed classes. All four were MDL cases that involved prescription drugs -- class certification was denied in each.[141] And, although Plaintiffs strive to distinguish their case from the "big four," I am not persuaded.

The causes of action and claims for relief in each of the "big four" are almost identical to those in this case. Each of the cases involved consumer fraud and medical monitoring classes, and three of the four sought medical monitoring for asymptomatic plaintiffs.[142] For example, in *Baycol* the plaintiffs asserted claims for strict liability, negligent failure to warn, negligence per se, unjust enrichment, and medical monitoring. The *Baycol* plaintiffs sought: "1. A personal injury class consisting of all persons who claim physical injury caused by Baycol; 2. A medical

---

[140] *In re Baycol*, MDL-1431; *In re Rezulin*, MDL-1348; *In re Propulsid*, MDL-1355; *In re Paxil*, MDL-1574.

[141] *In re Baycol*, 218 F.R.D. 197 (denying class certification of those who ingested the prescription drug Baycol, noting that the claims involved individual issues such as injury, causation, the learned intermediary doctrine, and comparative fault); *In re Rezulin*, 210 F.R.D. 61 (denying motion to certify class of users of a prescription diabetes medication); *In re Paxil*, 212 F.R.D. 539 (denying motion to certify class of users of a prescription antidepressant and anti-anxiety medication); *In re Propulsid*, 208 F.R.D. 133 (denying motion to certify class of users of a prescription heartburn medication).

[142] *In re Rezulin*, 210 F.R.D. at 61 (requesting certification of "a subclass of asymptomatic Rezulin users who have not manifested physical injury"); *In re Baycol*, 218 F.R.D. at 202 ("Plaintiffs seek certification of . . . [a] medical monitoring class consisting of persons who took Baycol and are currently asymptomatic."); *In re Propulsid*, 208 F.R.D. at 133, n.1 (seeking certification of "those claimants who have not suffered a cardiac incident but nevertheless seek equitable relief in the form of the establishment of a clinical study and a medical monitoring program . . ."); *In re Paxil*, 212 F.R.D. at 542 (requesting certification of a "Rule 23(b)(2) class seeking injunctive relief in the form of medical monitoring").

monitoring class consisting of persons who took Baycol and are currently asymptomatic; and 3. A refund class consisting of all persons who purchased Baycol for personal or family use."[143]

As noted above, Plaintiffs contend that the "big four" can be distinguished.[144] First, Plaintiffs contend that the "big four" cannot serve as precedent here because those cases involved attempts to certify personal injury classes. But the "big four" denied class certification across the board, not just with regard to the personal injury class. The *Rezulin* court held that "[i]ndividual questions would abound even with respect to class members who do not claim to have suffered any physical injury."[145]

Plaintiffs also assert that they are "pursuing, first and foremost, claims for economic loss."[146] However, claims for economic loss were present in the "big four." In each case, the plaintiffs sought restitution of monies obtained from the sale of the drug.[147] Each of those courts

---

[143]*In re Baycol*, 218 F.R.D. at 202. *See also In re Rezulin*, 210 F.R.D. at 65 (asserting claims for negligence, fraud, strict products liability, refunds under the New Jersey Consumer Fraud Act, medical monitoring, and unjust enrichment and requesting restitution of revenues and compensatory and punitive damages, as well as the creation of a medical monitoring program); *In re Paxil*, 212 F.R.D. at 542 (seeking "injunctive relief in the form of medical monitoring" and recovery for "violations of unfair competition laws subdivided into three further 'sub-classes' based on differing elements in different states").

[144]*See* June 1, 2005 Tr. at 7, lines 13-16 ("We are going to show the Court that the big four, if it guides this case, is a big mistake. And the reason for it is that every material fact those cases depended upon is distinguishable here.").

[145]*In re Rezulin*, 210 F.R.D. at 67.

[146]June 1, 2005 Tr. at 7, lines 18-19.

[147]*In re Baycol*, 218 F.R.D. at 202 (seeking a "refund class consisting of all person who purchased Baycol for personal or family use"); *In re Propulsid*, 208 F.R.D. at 144 (requesting "restitution of all money acquired from the sale of Propulsid"); *In re Paxil*, 212 F.R.D. at 548 (seeking "monetary damages for 'taking the drug when it is no longer needed or wanted' to treat an underlying illness"); *In re Rezulin*, 210 F.R.D at 61(requesting "restitution of the revenues defendants realized from the sale of Rezulin and compensatory and punitive damages").

also rejected the plaintiffs' claims. Regarding the economic claims, the *Rezulin* court held: "[i]ndividual issues would predominate on a restitution claim even in the absence of any claims for compensatory damages."[148]

As stated, when analyzed as a whole, this case is quite similar to the "big four." Without the claims for personal injury, this case and the "big four" are similar in every material way. In fact, some of Plaintiffs' claims are identical to those in the "big four."

**F. FRCP 23(a) Requirements**

FRCP 23(a), which establishes the prerequisites to a class action, reads:

> One or more members of a class may sue as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[149]

As was mentioned earlier, Plaintiffs have to meet these requirements in addition to at least one of the requirements of the FRCP 23(b) sub parts. Arguably, Plaintiffs have not met these requirements either -- at least not all four of them. However, a full analysis of FRCP 23(a) is unnecessary since Plaintiffs failed to meet any of the FRCP 23(b) requirements, which precludes certification.

**CONCLUSION**

No matter how you cut it, cube it, or slice it, Plaintiffs cannot overcome the problems with individual issues of law and fact, which eclipse any possible common questions or cohesion among their claims. While Plaintiffs have gone to great lengths to fine-tune their class action

---

[148] *In re Rezulin*, 210 F.R.D. at 69.

[149] FED. R. CIV. P. 23(a).

complaint to avoid suffering from the same problems as those suffered in previous MDL prescription drug class actions, they have failed to chin the pole.

Some judges and courts cast a rather jaundiced eye upon class actions, and use strong language in doing so. See for example, *Matter of Rhone-Poulenc Rorer Inc.*[150] and *In re Bridgestone/Firestone, Inc.*[151] Some writers vigorously challenge this view. As an example Professor Charles Silver of the University of Texas School of Law, takes on the Seventh Circuit judges and even the statements of the sainted Henry Friendly, of the Second Circuit. He disputes their suppositions and factual assertions, and concludes thusly:

> By aggregating hundreds, thousands, or even millions of claims, the class action can make small claims viable and empower claimants in other ways. Defendants dislike class actions for this reason. They prefer single-plaintiff lawsuits in which they possess significant advantages, including economies of scale and superior tolerance for risk. One must therefore expect repeat class action defendants--product manufacturers, financial institutions, insurance companies, directors and officers, etc.--to oppose the use of litigation classes and to enlist the help of tort reform groups and politicians when seeking to defeat them, just as one must expect repeat players on the side of claimants to exert countervailing pressure. The class action will always be a political football.
>
> It is reasonable to ask judges to keep above the fray and to refrain from fanning the flames unnecessarily. Civil justice processes exist to enforce valid legal rights and obligations, and judges are committed to making these processes more equitable and efficient. Progress toward civil justice, which requires sustained reflection on legal rules and doctrines, economic incentives, and empirical studies, is more likely to be made in a calm environment than in a roiled one.
>
> By describing class actions as legalized blackmail, judges have used inflammatory rhetoric that impugns the character of plaintiffs and trial lawyers who bring class actions, and of trial judges who certify them. They have done this needlessly and, I believe, wrongly. The problem in class actions is not blackmail and does not

---

[150] 51 F.3d 1293 (7th Cir. 1995).

[151] 288 F.3d 1012 (7th Cir. 2002).

> resemble blackmail in any interesting respect. The problem, assuming it exists, is excessive pressure resulting in decisions to settle made under duress.
>
> When one describes the problem dispassionately, one can see its factual and normative components clearly. One can also see that the argument supporting the claim of duress has not been made persuasively. Some versions of the argument conflict with others. Some versions rest on factual claims that are wrong, doubtful, unproven, or outdated. Some versions conflict with the due process imperative to maximize claim values. Some versions require an account of optimal settlement pressures in lawsuits involving risk-averse parties that has not been set out and that may never be.
>
> Given the sad state of the duress theory, judges hardly are justified in using it at all, let alone in employing incendiary phrases like legalized blackmail. The hard work of thinking the theory through has not been done. Judges should focus on this aspect of the project and leave the task of demonizing plaintiffs, trial lawyers, and trial judges to others.[152]

While it may be neither here nor there I hold, in general, with those who take a rather kindly view of class actions. They can be the Colt pistol of the little folks, i.e., in appropriate cases, they provide the key to the Temple of Justice for those who could not possibly afford an individual action against an economically advantaged defendant.

Despite all the arguments posited, Plaintiffs failed for the same reason their predecessors failed; they could not present an adequate class plan or jury instructions; they failed to present a way to manage the laws of the various states in a unitary trial; and individual issues of fact *and* law overwhelmed any common issues.

Plaintiffs' Motion for Class Certification (Doc. No. 80) is DENIED.

IT IS SO ORDERED this 30th day of August, 2005.

/s/ Wm. R.Wilson.Jr.
UNITED STATES DISTRICT JUDGE

---

[152]Charles Silver, *"We're Scared to Death": Class Certification and Blackmail*, 78 N.Y.U. L. Rev. 1357, 1429-1430 (2003).

# EXHIBIT C

▷

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Illinois.
Michael AVERY et al., Appellees,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant.
**No. 91494.**

Aug. 18, 2005.

**Background:** Insureds brought class action against automobile insurer to recover for breach of contract, and for consumer fraud and deceptive acts in violation of Consumer Fraud and Deceptive Business Practices Act, and sought declaratory and injunctive relief, alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, and insurer's misrepresentations or failures to disclose regarding quality of non-OEM parts. Contract claim was tried to jury, and remaining claims were tried to the court. The Circuit Court, Williamson County, John Speroni, J., entered judgment on jury's verdict for insureds on contract claim, entered judgment for insureds on consumer fraud claim, granted declaratory but not injunctive relief, and awarded insureds damages of $1,186,180,000. Insurer appealed. The Appellate Court, 321 Ill.App.3d 269, 746 N.E.2d 1242, 254 Ill.Dec. 194, affirmed in part, reversed in part, and remanded. Appeal was allowed.

**Holdings:** The Supreme Court, McMorrow, C.J., held that:

(1) whether insurance contracts in 48 states could be given uniform interpretation should have been decided at class certification stage rather than at trial;

(2) contracts could not be given uniform interpretation, and thus, commonality and predominance requirement for class certification did not exist;

(3) insurer did not breach the insurance contracts;

(4) mere specification of non-OEM parts did not constitute damages;

(5) "installation damages" for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

removing non-OEM parts were speculative;

(6) insurer did not have to disclose that non-OEM parts were "categorically inferior";

(7) insurer's representations regarding quality of non-OEM parts were non-actionable puffery;

(8) a non-resident plaintiff may pursue private cause of action under Consumer Fraud and Deceptive Business Practices Act only if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois;

(9) non-resident insureds did not have private cause of action under the Act; and

(10) plaintiffs must prove the elements of a private cause of action under the Act by a preponderance of the evidence, overruling *General Motors Acceptance Corp. v. Grissom*, 150 Ill.App.3d 62, 103 Ill.Dec. 447, 501 N.E.2d 764, and *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 92 Ill.Dec. 809, 485 N.E.2d 855.

Appellate Court affirmed in part and reversed in part; Circuit Court affirmed in part and reversed in part.

Freeman, J., filed an opinion concurring in part and dissenting in part, in which Kilbride, J., joined.

**[1] Courts 🔑97(1)**

106k97(1) Most Cited Cases

The Illinois Code of Civil Procedure provision on class certification is patterned after Rule 23 of the Federal Rules of Civil Procedure, and, given the relationship between those two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class
certification in Illinois. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.; S.H.A. 735 ILCS 5/2-801.

**[2] Appeal and Error 🔑949**

30k949 Most Cited Cases

Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. S.H.A. 735 ILCS 5/2-801.

**[2] Parties 🔑35.9**

287k35.9 Most Cited Cases

Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. S.H.A. 735 ILCS 5/2-801.

**[3] Parties 🔑35.9**

287k35.9 Most Cited Cases

A trial court's discretion in deciding whether to certify a class action is not unlimited and is bounded by and must be exercised within the framework of the civil procedure rule governing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

class actions. S.H.A. 735 ILCS 5/2-801.

**[4] Parties ⚷35.73**
287k35.73 Most Cited Cases
Whether insurer's automobile insurance contracts in 48 states could be given uniform interpretation should have been decided at class certification stage rather than at trial, in insureds' action for breach of contract, alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles; whether insurance contracts could be given uniform interpretation was relevant to determining whether questions of fact or law common to the class predominated over any questions affecting only individual members, as element for class certification. S.H.A. 735 ILCS 5/2-801(2).

**[5] Parties ⚷35.17**
287k35.17 Most Cited Cases
In order to satisfy the requirement of a common question of fact or law that predominates over other questions affecting only individual class members, as element for class certification, it must be shown that successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members. S.H.A. 735 ILCS 5/2-801(2).

**[6] Contracts ⚷152**
95k152 Most Cited Cases
The starting point of any contract interpretation analysis is the language of the contract itself.

**[7] Contracts ⚷176(1)**
95k176(1) Most Cited Cases
As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law.

**[8] Appeal and Error ⚷893(1)**
30k893(1) Most Cited Cases
Appellate review of a contract interpretation issue is de novo.

**[9] Parties ⚷35.73**
287k35.73 Most Cited Cases
Insurer's automobile insurance contracts in 48 states could not be given uniform interpretation, and thus, commonality and predominance requirement for class certification, i.e., that questions of fact or law common to class predominated over any questions affecting only individual members, was not satisfied, in insureds' action for breach of contract, alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles; first group of contracts required insurer to pay for parts of "like kind and quality" to replaced parts, second group required insurer to pay for parts sufficient to restore vehicle to its "pre-

loss condition" and further provided that insured agreed such parts could include non-OEM parts, third group, in Massachusetts, required insurer to pay actual cash value of replaced parts at time of collision, and fourth group, representing majority of insurer's assigned risk policies used in residual market of high-risk consumers that insurers were required to cover, required insurer to pay an "[a]mount necessary to repair or replace the property." S.H.A. 735 ILCS 5/2-801(2).

**[10] Parties ⚿35.73**
287k35.73 Most Cited Cases
Where a putative class includes members who are insured under insurance policies that are materially different, the commonality and predominance requirement for class certification, i.e., that questions of fact or law common to the class predominate over any questions affecting only individual members, cannot be met. S.H.A. 735 ILCS 5/2-801(2).

**[11] Appeal and Error ⚿1173(1)**
30k1173(1) Most Cited Cases
Jury's verdict finding breach of contract by automobile insurer, relating to insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, could not be upheld as to any of the four subclasses, in action in which trial court, after improperly certifying as a class claims for which common questions of fact or law did not predominate over any questions affecting only individual members, instructed jury that the four subclasses constituted a single contract; jury's verdict did not reflect individual findings on the subclasses, which had materially different terms, i.e., first subclass required insurer to pay for parts of "like kind and quality" to replaced parts, second subclass required insurer to pay for parts sufficient to restore vehicle to its "pre-loss condition" and further provided that insured agreed such parts could include non-OEM parts, third subclass, in Massachusetts, required insurer to pay actual cash value of replaced parts at time of collision, and fourth subclass, representing majority of insurer's assigned risk policies used in residual market of high-risk consumers that insurers were required to cover, required insurer to pay an "[a]mount necessary to repair or replace the property." S.H.A. 735 ILCS 5/2-801(2).

**[12] Insurance ⚿2719(2)**
217k2719(2) Most Cited Cases
Automobile insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles did not breach the insurance contract, which promised to pay "the actual cash value" of "parts at the time of the collision"; such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract did not expressly impose any standard of part quality.

**[13] Insurance ⚷2719(2)**
217k2719(2) Most Cited Cases
Failure of automobile insurer, under assigned risk policies used in residual market of high-risk consumers that insurers were required to cover, to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles did not breach the insurance contract, which promised to pay an "[a]mount necessary to repair or replace the property"; such contract did not expressly impose any standard of part quality.

**[14] Insurance ⚷2719(2)**
217k2719(2) Most Cited Cases
Automobile insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles did not breach the insurance contract, which required insurer to pay for parts sufficient to restore vehicle to its "pre-loss condition" and further provided that insured agreed such parts could include non-OEM parts; contract expressly permitted the specification of non-OEM parts.

**[15] Parties ⚷35.73**
287k35.73 Most Cited Cases
Insureds' claims of automobile insurer's breach of insurance contract to pay
for parts sufficient to restore vehicle to its "pre-loss condition," with insureds alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, did not meet commonality and predominance requirement for class certification, i.e., that questions of fact or law common to class predominated over any questions affecting only individual members; determination of pre-loss condition of each insured's vehicle would require individual examination of hundreds of thousands if not millions of vehicles, and such examinations would overwhelm any question common to the insureds. S.H.A. 735 ILCS 5/2-801(2).

**[16] Parties ⚷35.13**
287k35.13 Most Cited Cases
A class cannot be certified unless the named plaintiffs have a cause of action.

**[17] Insurance ⚷2719(2)**
217k2719(2) Most Cited Cases
Parts of "like kind and quality," within meaning of automobile insurance policy requiring insurer to pay to replace insured's damaged parts with parts of like kind and quality, were parts sufficient to restore the vehicle to its pre-loss condition, which would not necessarily be original equipment manufacturer (OEM) parts.

**[18] Evidence ⚷455**

157k455 Most Cited Cases
Absent a finding that automobile insurance contract was ambiguous regarding the meaning of insurer's promise to pay for replacement parts of "like kind and quality" to replaced parts, extrinsic evidence, including insurer's internal document defining such term, was irrelevant to the meaning of such phrase.

**[19] Parties ⚷35.73**
287k35.73 Most Cited Cases
Insureds' claims of automobile insurer's breach of insurance contract to pay for replacement parts of "like kind and quality" to replaced parts, with insureds alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, did not meet commonality and predominance requirement for class certification, i.e., that questions of fact or law common to class predominated over any questions affecting only individual members; parts of "like kind and quality" were parts sufficient to restore the vehicle to its pre-loss condition, determination of pre-loss condition of each insured's vehicle would require individual examination of hundreds of thousands if not millions of vehicles, and such examinations would overwhelm any question common to the insureds. S.H.A. 735 ILCS 5/2-801(2).

**[20] Insurance ⚷2719(2)**
217k2719(2) Most Cited Cases
Automobile insurer's mere specification of non-OEM (original equipment manufacturer) parts, in its estimate of costs to repair an insured's vehicle, did not constitute damages, in insureds' action for breach of contract, alleging insurer's failure to pay for OEM parts; an insured suffered actual loss or measurable damages only if a non-OEM part was actually installed in the repaired vehicle and if installation of non-OEM part failed to restore vehicle to its pre-loss condition.

**[21] Damages ⚷117**
115k117 Most Cited Cases
The basic theory of damages for breach of contract is that the plaintiff must establish an actual loss or measurable damages resulting from the breach, in order to recover.

**[22] Constitutional Law ⚷299.1**
92k299.1 Most Cited Cases
Award of $212,440,000 in so-called "installation damages," in insureds' class action against automobile insurer for breach of contract relating to insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, based on costs to be incurred by insureds in removing non-OEM parts installed in their vehicles and replacing them with OEM parts was so speculative and uncertain as to violate due process; in order to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

calculate amount of installation damages for nationwide class it was necessary to estimate the number of insureds that had non-OEM parts installed, insurer did not have records showing whether OEM or non-OEM parts were actually installed if the insurer's repair cost estimate had specified non-OEM parts, insureds' expert on damages estimated that percentage of insureds whose vehicles were in fact repaired with non-OEM parts ranged from 50 percent to 92 percent, and in light of such range, expert conceded that margin of error in his estimate of amount of installation damages was one billion dollars. U.S.C.A. Const.Amend. 14.

**[22] Insurance ⚷2185**
217k2185 Most Cited Cases
Award of $212,440,000 in so-called "installation damages," in insureds' class action against automobile insurer for breach of contract relating to insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, based on costs to be incurred by insureds in removing non-OEM parts installed in their vehicles and replacing them with OEM parts was so speculative and uncertain as to violate due process; in order to calculate amount of installation damages for nationwide class it was necessary to estimate the number of insureds that had non-OEM parts installed, insurer did not have records showing whether OEM or non-OEM parts were actually installed if the insurer's repair cost estimate had specified non-OEM parts, insureds' expert on damages estimated that percentage of insureds whose vehicles were in fact repaired with non-OEM parts ranged from 50 percent to 92 percent, and in light of such range, expert conceded that margin of error in his estimate of amount of installation damages was one billion dollars. U.S.C.A. Const.Amend. 14.

**[23] Damages ⚷184**
115k184 Most Cited Cases
While it has become acceptable to use statistical inference in determining aggregate damages in a class action suit, it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds.

**[24] Evidence ⚷547.5**
157k547.5 Most Cited Cases
While expert testimony in support of damages awards may be couched in terms of probabilities or possibilities, there is a need for a reasonable degree of certainty in such testimony.

**[25] Consumer Protection ⚷38**
92Hk38 Most Cited Cases
A statutory consumer fraud claim must be pled with specificity. S.H.A. 815 ILCS 505/1 et seq.

**[26] Consumer Protection ⚷6**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92Hk6 Most Cited Cases
Insureds could not bring consumer fraud claim under Consumer Fraud and Deceptive Business Practices Act, alleging automobile insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, based on breach of a promise contained in the insurance contracts. S.H.A. 815 ILCS 505/2.

**[27] Consumer Protection ⚷4**
92Hk4 Most Cited Cases
A breach of contractual promise, without more, is not actionable under the Consumer Fraud and Deceptive Business Practices Act. S.H.A. 815 ILCS 505/1 et seq.

**[28] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Even if automobile insurer knew that the non-OEM (original equipment manufacturer) parts that insurer specified in its estimates for cost to repair insureds' damaged vehicles were "categorically inferior" to OEM parts, such specification of non-OEM parts was not consumer fraud in violation of Consumer Fraud and Deceptive Business Practices Act; for any product, there would always be some brands of that product that were not as good as, or which were "categorically inferior" to, other brands of the same product. S.H.A. 815 ILCS 505/2.

**[29] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Plaintiff insureds could not establish causation, as element of consumer fraud claim under Consumer Fraud and Deceptive Business Practices Act relating to automobile insurer's conduct in specifying non-OEM (original equipment manufacturer) parts for repairs of insureds' damaged vehicles, based on "market theory" that publications that plaintiffs did not see, i.e., insurer's newsletter distributed generally to insureds approximately three years before earliest of five named plaintiffs' accidents, and insurer's magazine article distributed to insurance agents, each of which stated that non-OEM parts were as good as or better than OEM parts, helped create a nationwide market for non-OEM parts. S.H.A. 815 ILCS 505/2.

**[30] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Automobile insurer's description of non-OEM (original equipment manufacturer) parts as "Quality Replacement Parts" in repair cost estimates and brochures given to insureds during claims process, and its statement in the brochures that only those parts that met insurer's "very high performance criteria" were acceptable, constituted mere "puffing" which was not actionable as consumer fraud under Consumer Fraud and Deceptive Business Practices Act.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.H.A. 815 ILCS 505/2.

**[31] Consumer Protection ⚷4**
92Hk4 Most Cited Cases
"Puffing," which is not actionable as consumer fraud under Consumer Fraud and Deceptive Business Practices Act, denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined, and such statements include subjective descriptions relating to quality. S.H.A. 815 ILCS 505/2.

**[32] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Mere fact that insureds would be required to take action to invoke the guarantee did not make the guarantee, by automobile insurer, that if an insured was unsatisfied with fit and corrosion resistance qualities of a replacement part used in repair of insured's damaged vehicle then insurer would repair or replace the part at no cost, fraudulent, as basis for violation of Consumer Fraud and Deceptive Business Practices Act, relating to insurer's specification of non-OEM (original equipment manufacturer) parts in estimates for costs of original repairs of insureds' damaged vehicles. S.H.A. 815 ILCS 505/2.

**[33] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Mere speculation by insureds that an insured's insurance rates would increase if the insured successfully invoked the guarantee, by automobile insurer, that if an insured was unsatisfied with fit and corrosion resistance qualities of a replacement part used in repair of insured's damaged vehicle the insurer would repair or replace the part at no cost, did not make the guarantee fraudulent, as basis for violation of Consumer Fraud and Deceptive Business Practices Act, relating to insurer's specification of non-OEM (original equipment manufacturer) parts in estimates for costs of original repairs of insureds' damaged vehicles. S.H.A. 815 ILCS 505/2.

**[34] Appeal and Error ⚷893(1)**
30k893(1) Most Cited Cases
The scope of the Consumer Fraud and Deceptive Business Practices Act is a question of statutory interpretation, and thus, appellate review is de novo. S.H.A. 815 ILCS 505/1 et seq.

**[34] Consumer Protection ⚷36.1**
92Hk36.1 Most Cited Cases
The scope of the Consumer Fraud and Deceptive Business Practices Act is a question of statutory interpretation, and thus, appellate review is de novo. S.H.A. 815 ILCS 505/1 et seq.

**[35] Consumer Protection ⚷4**
92Hk4 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[35] Consumer Protection ⚷34**
92Hk34 Most Cited Cases
To prove a private cause of action under the Consumer Fraud and Deceptive Business Practices Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce; (4) actual damage to the plaintiff; and (5) the damage was proximately caused by the deception. S.H.A. 815 ILCS 505/2, 505/10a(a).

**[36] Consumer Protection ⚷5**
92Hk5 Most Cited Cases
Phrase "wherever situated," in provision of Consumer Fraud and Deceptive Business Practices Act defining "trade" and "commerce" for purposes of Act's requirement for private cause of action that disputed conduct must involve trade or commerce, which definition refers to "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated," does not expand Act's scope to apply to consumer transactions taking place out-of-state; "wherever situated" does not refer to fraudulent transactions, but to the nouns "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value." S.H.A. 815 ILCS 505/1(f), 505/2, 505/10a(a).

**[37] Courts ⚷8**
106k8 Most Cited Cases
A statute is without extraterritorial effect unless a clear intent to have extraterritorial effect appears from the express provisions of the statute.

**[38] Consumer Protection ⚷5**
92Hk5 Most Cited Cases
The Illinois General Assembly did not intend the right to private cause of action under the Consumer Fraud and Deceptive Business Practices Act to apply to fraudulent transactions which take place outside Illinois. S.H.A. 815 ILCS 505/1(f), 505/2, 505/10a(a).

**[39] Consumer Protection ⚷5**
92Hk5 Most Cited Cases
A non-resident plaintiff may pursue a private cause of action under the Consumer Fraud and Deceptive Business Practices Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois. S.H.A. 815 ILCS 505/1(f), 505/2, 505/10a(a).

**[40] Consumer Protection ⚷5**
92Hk5 Most Cited Cases
The place where the defendant's company policy was created or where a form document was drafted may be a relevant factor to consider in determining the location of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consumer transaction, for purposes of determining whether non-resident plaintiff's disputed transaction with defendant occurred primarily and substantially in Illinois, as would be required for non-resident plaintiff to have private cause of action under Consumer Fraud and Deceptive Business Practices Act. S.H.A. 815 ILCS 505/1(f), 505/2, 505/10a(a).

**[41] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Circumstances relating to non-resident insureds' disputed transactions with resident automobile insurer, involving insurer's allegedly deceptive conduct in failing to inform insureds, during claims process, of allegedly categorical inferiority of non-OEM (original equipment manufacturer) parts specified by insurer in estimates for costs to repair insureds' damaged vehicles, did not occur primarily and substantially in Illinois, and thus, non-resident insureds did not have private cause of action under Illinois Consumer Fraud and Deceptive Business Practices Act; estimates were written out-of-state, insurer's brochures were received by insureds out-of-state, any damage to insureds occurred out-of-state, and non-residents contacted insurer through out-of-state insurance agents, claims representatives, and claims adjustors. S.H.A. 815 ILCS 505/1(f), 505/2, 505/10a(a).

**[42] Appeal and Error ⚷1012.1(7.1)**
30k1012.1(7.1) Most Cited Cases
In general, a trial court's decision as to whether the elements of a private cause of action under the Consumer Fraud and Deceptive Business Practices Act have been proven in any case is reviewed under the manifest weight of the evidence standard. S.H.A. 815 ILCS 505/2, 505/10a(a).

**[43] Evidence ⚷596(1)**
157k596(1) Most Cited Cases
In the ordinary civil case, because there are no sound reasons for favoring one party over another, the party with the burden of persuasion must prove his or her case by a preponderance of the evidence.

**[44] Evidence ⚷598(1)**
157k598(1) Most Cited Cases
A proposition proved by a "preponderance of the evidence" is one that has been found to be more probably true than not true.

**[45] Fraud ⚷50**
184k50 Most Cited Cases

**[45] Fraud ⚷58(1)**
184k58(1) Most Cited Cases
In the context of common law fraud, the law presumes that transactions are fair and honest, and fraud is not presumed; accordingly, fraud must be proved by clear and convincing evidence.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[46] Consumer Protection ⚷39**
92Hk39 Most Cited Cases
Plaintiffs must prove the elements of a private cause of action under the Consumer Fraud and Deceptive Business Practices Act by a preponderance of the evidence, rather than by clear and convincing evidence; overruling *General Motors Acceptance Corp. v. Grissom*, 150 Ill.App.3d 62, 103 Ill.Dec. 447, 501 N.E.2d 764, and *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 92 Ill.Dec. 809, 485 N.E.2d 855. S.H.A. 815 ILCS 505/2, 505/10a(a).

**[47] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Automobile insurer's allegedly fraudulent misrepresentations to insured, during claims process, regarding quality of non-OEM (original equipment manufacturer) parts specified by insurer in its estimate for cost to repair insured's damaged vehicle, and insurer's allegedly deceptive act in failing to disclose during claims process allegedly categorical inferiority of non-OEM parts, did not cause actual damage to insured, as element of private cause of action under Consumer Fraud and Deceptive Business Practices Act; when insured resold the vehicle, the resale price was not discounted because of the presence of non-OEM parts in the vehicle. S.H.A. 815 ILCS 505/2, 505/10a(a).

**[48] Consumer Protection ⚷6**
92Hk6 Most Cited Cases
Automobile insurer's mere specification of non-OEM (original equipment manufacturer) parts, in its estimate of cost to repair insured's vehicle, did not constitute actual damage, as element of private cause of action for consumer fraud or deceptive act under Consumer Fraud and Deceptive Business Practices Act, relating insurer's alleged misrepresentation during claims process of quality of non-OEM parts and insurer's failure to disclose during claims process alleged categorical inferiority of non-OEM parts; insured suffered actual loss or measurable damages only if non-OEM part was actually installed in vehicle and if installation of non-OEM part failed to restore vehicle to its pre-loss condition, and alleged misrepresentations and omissions occurred after insurer made its repair cost estimate specifying non-OEM parts.

**[49] Consumer Protection ⚷40**
92Hk40 Most Cited Cases
Actual damage, as element of private cause of action under Consumer Fraud and Deceptive Business Practices Act, cannot be the result of omissions and misrepresentations which are made after the damage has already occurred. S.H.A. 815 ILCS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

505/2, 505/10a(a).

**[50] Consumer Protection ⚿34**
92Hk34 Most Cited Cases
In a private cause of action for fraudulent misrepresentation brought under the Consumer Fraud and Deceptive Business Practices Act, a plaintiff must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation. S.H.A. 815 ILCS 505/2, 505/10a(a).

**[51] Consumer Protection ⚿6**
92Hk6 Most Cited Cases
Insured was not actually deceived by, and therefore did not establish proximate cause element of, private causes of action against automobile insurer for consumer fraud and deceptive act under Consumer Fraud and Deceptive Business Practices Act, relating to insurer's alleged misrepresentations in repair cost estimate regarding quality of non-OEM (original equipment manufacturer) parts and its failure to disclose in brochure provided to insured at time of repair cost estimate the allegedly categorical inferiority of non-OEM parts; before insured received the estimate and the brochure, he already believed non-OEM parts were inferior to OEM parts. S.H.A. 815 ILCS 505/2, 505/10a(a).

Chief Justice McMORROW delivered the opinion of the court:

***1** Michael Avery and other named plaintiffs brought a class action in the circuit court of Williamson County against defendant, State Farm Mutual Automobile Insurance Company (State Farm). Representing a nearly nationwide class of State Farm policyholders, plaintiffs alleged claims sounding in breach of contract and statutory consumer fraud, in addition to a claim seeking declaratory and injunctive relief.

The circuit court certified the class. The breach of contract claim was tried before a jury, and the remaining claims received a simultaneous bench trial. The jury returned a verdict in favor of plaintiffs on the breach of contract claim, and the circuit court entered judgment in favor of plaintiffs on the consumer fraud claim. With regard to the third count, the circuit court granted declaratory relief but declined to grant injunctive relief. The damages awarded to plaintiffs totaled $1,186,180,000.

The appellate court affirmed the judgment, with one exception. The appellate court reversed a portion of the damages, lowering the total award to $1,056,180,000. 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242. We allowed State Farm's petition for leave to appeal. 177 Ill.2d R. 315(a).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs' suit centers on certain automobile repair part categories which have been identified in the record and to which we refer throughout our discussion. "Crash parts" refers to automobile components that are used to replace parts damaged in a crash, rather than parts that have failed mechanically. They are primarily sheet metal and plastic parts that are attached to the outer shell of the car. Crash parts consist of two categories. The first category is comprised of new parts made by or on behalf of the automobile's original manufacturer. These parts are commonly referred to as "Original Equipment Manufacturer" parts, or "OEM" crash parts. The second class includes aftermarket parts made by companies not affiliated with original equipment manufacturers. These parts are referred to as "non-OEM" crash parts. [FN1]

A succinct general overview of plaintiffs' theory of the case may be found in "Plaintiff's Memorandum in Support of Application of Illinois Law to the Claims of Class Members Under Illinois Choice of Law Doctrine":

> "In this case, plaintiffs have placed at issue the propriety of State Farm's uniform practice of specifying the use of non-OEM crash parts to repair its policyholders' car[s] in every instance in which such cheaper parts are available. * * * Plaintiffs contend that this policy breaches State Farm's standard contract because it is not designed to restore policyholders' cars to their pre-loss condition by using parts of like kind and quality. Plaintiffs further contend that this practice violates Illinois' consumer law because the practice itself and its economic ramifications constitute a violation of Illinois consumer statutes, which prohibit[ ] misrepresentations as to the 'standard, quality, or grade' of the goods and services provided under State Farm's policies. [Citation.] At trial, the Court and jury must resolve the classwide question of whether State Farm, by requiring the uniform use of non-OEM crash parts, and through the course of conduct it designed to conceal the true import of this practice from its policyholders, breached its contractual obligations and committed consumer fraud."

*2 This opinion is divided into two principal sections: "Breach of Contract" and "Consumer Fraud." In a third section, we deal with plaintiffs' claims for declaratory and injunctive relief. These sections are further subdivided, as required by the various arguments and issues, as follows:

I. Breach of Contract

A. *Propriety of the Nationwide*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Contract Class*
B. *Whether the Verdict May Be Affirmed with Respect to Subclasses*
1. The Massachusetts and "Assigned Risk" Policies
2. The "You Agree" Policies
3. The "Like Kind and Quality" Policies
4. Damages
a. *Specification Damages*
b. *Installation Damages*
II. Consumer Fraud Act
A. *Plaintiffs' Consumer Fraud Claim*
1. Plaintiffs' Consumer Fraud Claim May Not Be Based on a Breach of a Promise Contained in Their Insurance Policies
2. This Case Is Not About the Specification of Defective Parts
3. The Representations Which Form the Basis of Plaintiffs' Cause of Action for Consumer Fraud Do Not Include the Statement That Non-OEM Parts Are as Good as OEM Parts
4. Describing a Non-OEM Part as a "Quality Replacement Part" Is Puffing and, Hence, Not Actionable
5. The Guarantee Provided by State Farm Cannot Form a Basis for Plaintiffs' Consumer Fraud Claim
6. The Crux of Plaintiffs' Consumer Fraud Claim Is a Failure by State Farm to Disclose the Categorical Inferiority of Non-OEM Parts During the Claims Process
B. *Propriety of the Nationwide Consumer Fraud Class*
1. Scope of the Consumer Fraud Act
2. Whether the Consumer Fraud Act Applies to the Transactions at Issue in This Case
C. *Propriety of Judgment: Named Plaintiff*
1. Burden of Proof
2. The Deceptive Act or Practice
3. Actual Damage
4. Proximate Cause--Actual Deception
D. *Other Issues*
III. Equitable and Declaratory Relief

We begin with plaintiffs' breach of contract count.

I. Breach of Contract

Plaintiffs' original class action complaint, which was filed in July 1997, was amended several times. The trial, which took place in 1999, was predicated upon plaintiffs' third amended class action complaint. Count I (breach of contract) of the third amended complaint alleged that State Farm breached its "uniform insurance contract" with its policyholders. Plaintiffs alleged that, under the terms of this contract, State Farm promised "to restore plaintiffs' vehicles to their pre-loss condition using parts of like kind and quality." According to plaintiffs, the term "like kind and quality," as stated in this promise, meant "like kind and quality to OEM parts." However, plaintiffs also alleged that the non-OEM parts at issue in this case were categorically inferior to their OEM counterparts.

Under plaintiffs' view, non-OEM parts could *never* satisfy State Farm's "like kind and quality" obligation. Plaintiffs alleged: "As a practical matter, [State Farm's] obligation could be met *only* by requiring the *exclusive use* in repairs *of factory-authorized or OEM parts*." (Emphases added.)

***3** In urging the certification of their claim as a class action, plaintiffs alleged that State Farm's contractual agreement with its policyholders was a uniform "Policy," in the singular, with "the same or common general terms." State Farm argued, to the contrary, that there was no uniform State Farm automobile insurance policy nationwide, and individual issues therefore would dominate the contract claims, rendering classwide determinations impossible. See 735 ILCS 5/2-801(2) (West 1998). According to State Farm, some of its policies included a promise to pay to repair the vehicle with parts of "like kind and quality," but other policies did not contain this provision. State Farm added that, in many states, its policies explicitly provided for the specification of non-OEM parts sufficient to restore the vehicle to its "pre-loss condition." Still other State Farm automobile insurance policies contained neither the "like kind and quality" nor the "pre-loss condition" language. State Farm pointed, for example, to its Massachusetts policies, which promised simply to pay "the actual cash value" of "parts at the time of the collision." Another group of policies that contained neither the "like kind and quality" nor the "pre-loss condition" language were the majority of State Farm's "assigned risk" contracts, which were written for the "residual market" of high-risk consumers whom states *required* insurers to cover. According to State Farm, most of these assigned risk policies promised simply to pay the "[a]mount necessary to repair or replace the property."

State Farm also argued that there were substantive conflicts of law between Illinois and other states, and therefore it would be improper to apply Illinois law to the contract claims of class members nationwide. State Farm contended, in addition, that Illinois lacked significant contacts with the claims of class members in other states and the imposition of Illinois law with regard to their claims would violate constitutional rights. See *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

Following a hearing, the circuit court certified plaintiffs' claims as a 48-state class action. The circuit court rejected State Farm's arguments, finding that Illinois law could be applied to the claims of the entire class and that this imposition of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Illinois law presented no constitutional difficulties. The court also rejected State Farm's argument that there was no standard form insurance policy. The court took the position that the specific form of the individual policies was immaterial so long as the operative contractual language in each policy was susceptible of uniform interpretation. The court declined to address this issue at the certification stage, maintaining instead that the question of whether the language in State Farm's various policies could be given a uniform interpretation should be resolved at trial.

In reaching its decision to certify the class, the court concluded that there were questions of fact or law that were common to the class, and these questions predominated over any questions affecting only individual members. 735 ILCS 5/2-801(2) (West 1998). The court pointed to what it termed State Farm's uniform practice "throughout the United States" of specifying non-OEM parts on policyholders' repair estimates. According to the court, the members of the plaintiff class had a "common interest" in determining whether this practice constituted a breach of State Farm's contractual obligation. In the court's view, this common interest predominated over questions affecting individual class members.

*4 In an "Order Regarding Law to be Applied to Class Members' Claims," the circuit court explained its reasoning for applying Illinois law to class members' claims nationwide. The court stated:

"With respect to the breach of contract claims, the court finds that there are no true conflicts of law raised by the specific claims or facts at issue in this case which require application of the law of any state other than Illinois. Illinois possesses sufficient contacts such that the application of Illinois law to the breach of contract claims in this case is neither arbitrary nor unfair and comports with due process. Application of Illinois law to the breach of contract claims does not implicate the interests of any other jurisdiction and application of its law to these claims. Finally, the application of Illinois breach of contract standards, which are identical to those in other jurisdictions, does not interfere with any state's legislative or legal choices."

Based on its finding that class members had a "common interest" in determining whether State Farm's "uniform" practice of specifying non-OEM parts breached State Farm's contractual obligation, and that Illinois law could be applied to class members' claims nationwide, the circuit court certified the following

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

class:

"All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

In addition, the following persons are excluded from the class: (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996."

Following entry of the circuit court's order certifying the class, State Farm sought from this court a writ of *mandamus* directing the circuit court to reverse the order. State Farm suggested in the alternative that this court reverse the circuit court's certification order pursuant to our supervisory authority. State Farm also moved for transfer, consolidation, and a stay of proceedings. This court entered an order in which we took "no action" on State Farm's various requests because there were insufficient votes either to allow or to deny.

In the circuit court, State Farm subsequently moved for summary judgment on the class claims and for decertification of the class. The circuit court denied these motions. State Farm also moved for summary judgment against each of the named plaintiffs. This motion was denied as well.

***5** Prior to trial, the parties tendered a number of motions *in limine*. One of plaintiffs' motions sought to bar State Farm from presenting evidence to the jury that the regulation of insurance varied from state to state, and another of plaintiffs' motions sought to prohibit any disclosure of the states where the class members' policies were filed. Still another of plaintiffs' motions sought to preclude the introduction of evidence regarding differences in State Farm's contractual obligations to class members. In opposing these motions, State Farm argued, as it had in opposing class certification, that there were significant variances in its contractual obligations to the members of the class, and these variances resulted, at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

least in part, from differing insurance regulations in the various states. State Farm asserted:

"[N]othing is more basic in the trial of a contract claim than * * * that [ ] the rights and duties of the parties to a contract are defined by that specific contract. But plaintiffs ask to exclude that very starting point [,][t]he contract of the individual class members, a contract which varies * * * depending on troublesome differences in State Farm's obligations toward members of the class. The contractual rights of the members of the class, Your Honor, do vary, and those variances are not only relevant but fundamental."

The circuit court granted several of plaintiffs' motions *in limine,* including those barring State Farm from (1) disclosing the states where the class members' policies were filed, (2) introducing evidence regarding variances in the states' insurance regulations, and (3) introducing evidence regarding differences in State Farm's contractual obligations to members of the class.

The trial began on August 16, 1999. As previously indicated, the breach of contract claim was tried before the jury, and the remaining claims were tried before the court after the jury had left for the day. At the start of the trial, and over the objection of State Farm, the circuit court gave preliminary jury instructions. In these instructions, the court told the jury that State Farm's contractual obligation was "exactly the same, whether State Farm promised to pay for crash parts of like kind and quality or promised to pay for crash parts which restore a vehicle to its pre-loss condition." The court added that, under State Farm's policies, the company was allowed to specify either OEM parts or non-OEM parts, "so long as the crash parts are of like kind and quality which restore the damaged vehicle to its pre-loss condition." According to the circuit court, crash parts were of like kind and quality "only if they restore[d] a vehicle to its pre-loss condition," which the court defined as "the condition of the vehicle immediately prior to the time it is damaged."

It is unnecessary to recount in detail the evidence presented at trial. We note that the trial lasted several days, and involved hundreds of exhibits and testimony by dozens of witnesses. Much of the testimony dealt with whether non-OEM parts were categorically inferior to OEM parts. Each side presented the testimony of experts and bodyshop witnesses in support of their respective positions. At this point, we summarize only the testimony of the named plaintiffs, the testimony of plaintiffs' damages expert, and that of a State Farm claims consultant. Other facts relevant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to our analysis will be introduced as they become pertinent.

***6** Five named plaintiffs testified at trial. Michael Avery, of Louisiana, testified by video deposition. The remaining four gave their testimony in person: Mark Covington, a resident of Mississippi; Sam DeFrank, who lived in Illinois; Carly Vickers, a resident of Pennsylvania; and Todd Shadle, who was living in Massachusetts when his accident occurred.

Two of the witnesses, Avery and Shadle, did not have non-OEM parts installed on their vehicles. Both testified that before their respective accidents, their cars were in very good condition, and they would not consider non-OEM parts. Accordingly, both had OEM parts installed on their vehicles, rather than the non-OEM parts specified in the estimate, and both paid the difference in cost. For Shadle, the difference was about $45, and for Avery it was about $155.

Covington, DeFrank and Vickers did have non-OEM parts installed on their vehicles. All three expressed dissatisfaction with the parts. Vickers testified that, following the collision that gave rise to her suit, her car was involved in a subsequent, more serious accident and was declared a total loss. Vickers admitted that State Farm paid her "book value" for the car. She added that, so far as she knew, State Farm did not value her car any less because of the non-OEM parts that had been used in its repair. DeFrank testified that, several months after his truck was repaired, he sold the vehicle to his brother-in-law for an amount that was slightly below "Blue Book" value. However, DeFrank asserted that, even though the truck had been repaired with non-OEM parts, he did not discount the sale price based on this fact. DeFrank characterized the sale of the truck to his brother-in-law as an "arm's length transaction."

Plaintiffs' damages expert, Dr. Iqbal Mathur, testified that there were two types of damages being sought for breach of contract. The first was what Mathur termed "direct," or "specification," damages. According to Mathur, these damages were incurred when State Farm specified a non-OEM part on the repair estimate. Under this theory, everyone in the class was eligible to receive specification damages.

On cross-examination, Mathur acknowledged that a plaintiff would be entitled to receive specification damages even if his car were restored to its preloss condition. Mathur also conceded that specification damages would apply even if the car were repaired with an OEM part or with a non-OEM part that was of the same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

quality as an OEM part.

The second type of contract damages, which Mathur described as "consequential," or "installation," damages, was determined by calculating the cost of *replacing* non-OEM parts with OEM parts on a class member's vehicle. Only those class members who actually had non-OEM parts installed on their vehicles were eligible to receive installation damages.

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary to determine whether a non-OEM part was installed on a class member's vehicle. However, Mathur conceded that he had no way of making this determination. Mathur also acknowledged that he had "no opinion" as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them. Mathur admitted that his calculations as to installation damages might be incorrect by as much as $1 billion.

*7 Among the witnesses appearing for defendant was Don Porter, a State Farm property consultant in auto general claims. Porter's testimony was directed primarily to State Farm's "basic philosophy" of handling auto damage claims, rather than any specific contractual obligation. In describing this philosophy, Porter testified repeatedly that State Farm's goal was to pay to restore a policyholder's car to its preloss condition. According to Porter, State Farm has "always had a commitment to restoring the vehicle to its pre-loss condition." Porter also testified that the parts specified "must be as good as the part that was on the car prior to the loss." Porter never mentioned the Massachusetts or assigned risk policies, and never stated that all the State Farm policy forms at issue in this case were uniform.

Following the close of evidence, the circuit court, in conferring with the parties, reiterated the view that State Farm's contractual obligation was the same for each member of the class. In describing this uniform obligation, the circuit court pointed to Porter's testimony. According to the court, Porter testified that State Farm's promise "always was that when the car was repaired, the parts would be of like kind and quality which restores [the vehicle] to its pre-loss condition." The court ruled that this uniform interpretation of the contractual obligation would apply to all of State Farm's policies, including the "assigned risk" policies and the Massachusetts policies (neither of which contained the "like kind and quality" or the "pre-loss condition" language).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

During the conference on jury instructions, State Farm objected to the use of the term "contract" in the instructions. [FN2] State Farm argued: "Reference to a singular contract is factually inaccurate. There were numerous contracts." Counsel for State Farm informed the circuit court that, with regard to the court's interpretation of the contractual obligation as uniform, State Farm wanted to preserve its "objections as to variations in contract terms based on either differing policy language or differing state regulations." Counsel stated:

"We understand that's not going to be a part of this trial. So we merely want to preserve that for appellate purposes."

The circuit court noted the objection, and subsequently instructed the jury. The instructions regarding State Farm's contractual obligation essentially repeated what the court had given in its preliminary instructions. The essence of these contractual obligation instructions was that State Farm's contractual obligation was the same for every class member.

The verdict form given by the circuit court was general and classwide. It stated, in pertinent part: "Do you find that defendant State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class?" The circuit court denied State Farm's request to give, in addition, individual verdict forms for each named plaintiff.

***8** The jury found that "defendant State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class." Contract damages awarded to the plaintiff class totaled $456,180,000, which consisted of $243,740,000 in specification damages and $212,440,000 in installation damages. The circuit court entered judgment on the jury's verdict in favor of plaintiffs on the contract claim. The court also entered judgment in plaintiffs' favor on the consumer fraud claim, finding that State Farm had, by its practices, violated the Consumer Fraud Act. The court awarded plaintiffs an additional $130 million in "disgorgement" damages and $600 million in punitive damages, resulting in a total award of $1,186,180,000 on all claims.

On appeal, State Farm argued that, with regard to plaintiffs' breach of contract claim, individual questions predominated over any purported common questions, and the claim for breach of contract therefore should not have been certified as a class action. 735 ILCS 5/2-801(2) (West 1998). In its brief to the appellate court, State Farm contended that, contrary to the conclusion of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circuit court, the operative contractual language in State Farm's policies was *not* susceptible of uniform interpretation. While acknowledging that most of its auto insurance contracts contained the "like kind and quality" or the "pre-loss condition" language, State Farm insisted that "a significant number of policies did not." State Farm pointed, for example, to its policies in Massachusetts, as well as its assigned risk policies in Alaska, Illinois, Indiana, and Minnesota, which State Farm averred "did not use either the 'like kind and quality' or 'pre-loss condition' language." In its brief to the appellate court, State Farm asserted:

> "Neither of these formulations [the Massachusetts policy provision or the 'assigned risk' policy provision] expressly imposes *any* standard of part quality. In fact, the assigned risk policies deliberately *delete* the 'like kind and quality' and 'pre-loss condition' language that appears in other State Farm policies." (Emphases in original.)

Focusing on the circuit court's interpretation of its contractual obligation as uniform, State Farm told the appellate court:

> "Rather than trying to deal with the variations in policy language and the governing [state] laws, the circuit court chose to ignore them completely. The court instructed the jury that there was only one policy form, even though there are a number of different forms. Then the court made up its own interpretation of that policy form, without citing any law to support it. Finally, in order to enforce the artificial uniformity it had created, the court barred State Farm from telling the jury about any different contract language or differing state laws governing the specification of non-OEM parts.
> The circuit court's decision to force this case into the mold of a class action by fabricating a single contract and a single interpretation is an error of law of constitutional dimension that requires reversal by this Court."

***9** The appellate court affirmed the certification of plaintiffs' breach of contract claim as a class action. The appellate court concluded, as had the circuit court, that State Farm's contractual promise was the same for each member of the class. The appellate court stated:

> "The record demonstrates that plaintiffs presented evidence to show that State Farm made the same promise (*i.e.*, to pay for parts 'of like kind and quality' to restore 'pre-loss condition') to its policyholders throughout the country. State Farm's own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders. This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

promise was to specify parts of like kind and quality *to OEM parts* so as to restore preloss condition." (Emphasis added.) 321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242.

The appellate court also affirmed the circuit court's finding that Illinois law could be applied to the contract claims of all the class members nationwide and that this imposition of Illinois law presented no constitutional difficulties.

With regard to the merits, the appellate court upheld the circuit court's judgment that State Farm breached its contractual obligation to the plaintiff class. The appellate court stated:

> "Plaintiffs claimed that the non-OEM parts specified by State Farm were categorically inferior and failed to restore the vehicles to their 'pre-loss condition.' The claim was supported with expert testimony, from which it could be reasonably inferred, if accepted as true, that the lot of non-OEM parts specified by State Farm was inferior in terms of appearance, fit, quality, function, durability, and performance." 321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242.

The appellate court also upheld most of the damages awarded for breach of contract. In affirming the award of specification damages, the appellate court explicitly concluded that these damages applied even where (1) an inferior non-OEM part was specified on the estimate, but the body shop provided an OEM part at no additional cost to the class member, and (2) non-OEM parts were used in the vehicle's repair, but the class member subsequently sold the vehicle for fair market value with no diminution in value because of the use of non-OEM parts. 321 Ill.App.3d at 287-88, 254 Ill.Dec. 194, 746 N.E.2d 1242. The appellate court also upheld the award of installation damages, rejecting State Farm's criticism that these damages were speculative. 321 Ill.App.3d at 288- 90, 254 Ill.Dec. 194, 746 N.E.2d 1242.

However, the appellate court concluded that the $130 million in disgorgement damages constituted an impermissible double recovery, and the appellate court therefore reversed this award. As a result, plaintiffs' total award was reduced to $1,056,180,000.

State Farm appeals from those portions of the judgment of the appellate court affirming the judgment of the circuit court. [FN3] We granted State Farm's petition for leave to appeal. 177 Ill.2d R. 315(a).

A. *Propriety of the Nationwide Contract Class*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before this court, State Farm argues, as it did before the circuit and appellate courts, that the class should not have been certified. State Farm contends that individual questions predominate over any questions common to the class and that Illinois law should not have been applied to the contract claims of class members nationwide. With regard to the merits, State Farm argues that plaintiffs failed to establish a breach of State Farm's contractual obligation and plaintiffs failed to establish that they were entitled to damages. We turn first to State Farm's contention that the class should not have been certified.

***10** [1] Class certification is governed by section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 1998)), which is patterned after Rule 23 of the Federal Rules of Civil Procedure. See *Getto v. City of Chicago,* 86 Ill.2d 39, 47, 55 Ill.Dec. 519, 426 N.E.2d 844 (1981); K. Forde, *Illinois's New Class Action Statute,* 59 Chi. B. Rec. 120, 122-24 (1977). Given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois. See, *e.g., Schlessinger v. Olsen,* 86 Ill.2d 314, 320, 56 Ill.Dec. 42, 427 N.E.2d 122 (1981) (citing Fed.R.Civ.P. 23 case in analyzing class certification issue); see K. Forde, *Illinois's New Class Action Statute,* 59 Chi. B. Rec. 120, 122-24 (1977); *Southwestern Refining Co. v. Bernal,* 22 S.W.3d 425, 433 (Tex.2000). Under section 2-801, a class may be certified only if the proponent establishes the four prerequisites set forth in the statute: (1) numerosity ("[t]he class is so numerous that joinder of all members is impracticable"); (2) commonality ("[t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members"); (3) adequacy of representation ("[t]he representative parties will fairly and adequately protect the interest of the class"); and (4) appropriateness ("[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy"). 735 ILCS 5/2- 801 (West 1998).

[2][3] Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. *McCabe v. Burgess,* 75 Ill.2d 457, 464, 27 Ill.Dec. 501, 389 N.E.2d 565 (1979); *Eshaghi v. Hanley Dawson Cadillac Co.,* 214 Ill.App.3d 995, 1001, 158 Ill.Dec. 647, 574 N.E.2d 760 (1991). However, "[a] trial court's discretion in deciding whether to certify a class action is not unlimited and is bounded by and must be exercised within the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.