framework of the civil procedure rule governing class actions." 4 A. Conte & H. Newberg, Newberg on Class Actions § 13:62, at 475 (4th ed.2002); see also *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 344 (4th Cir.1998) (noting that, while a trial court has broad discretion in deciding whether to certify a class, this discretion must be exercised within the framework of Fed.R.Civ.P. 23).

In the case at bar, State Farm argues that it was an abuse of discretion to certify the class. State Farm's argument focuses on the commonality and predominance requirement of section 2-801. According to State Farm, it was error for the lower courts to conclude that common questions predominated over questions affecting only individual class members.

With regard to the class that was certified for plaintiffs' contract claim, the common question identified by the circuit court in its certification order was whether State Farm's practice of specifying non-OEM parts on repair estimates constituted a breach of State Farm's contractual obligations. According to the circuit court, this question of "contractual interpretation" predominated over other issues. In reaching this conclusion, the circuit court acknowledged State Farm's argument that its insurance contracts took varying forms and there was thus no standard form contract to be interpreted. However, in the court's view, the specific form of the individual insurance policies was immaterial so long as "the operative contractual language contained in each policy [was] susceptible [of] uniform interpretation." The court concluded that this question of whether the various policies' language could be given uniform interpretation should be decided at trial, rather than at the class certification stage.

***11** Notwithstanding this assertion by the court, the issue of uniform contractual interpretation was never decided on the merits. As previously noted, prior to trial the circuit court granted plaintiffs' motions *in limine* barring the introduction of evidence regarding differences in State Farm's contractual obligations and prohibiting any mention of the states where the class members' policies were filed. As a result of these rulings, the jury was prevented from hearing evidence regarding any variations in State Farm's contractual obligations to the class members. Moreover, by the time the trial began, the circuit court itself had decided the issue of whether the contractual language in State Farm's various policies was susceptible of uniform interpretation. In its preliminary instructions to the jury, the court stated: "The contractual obligation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

State Farm under its policies or insurance contracts is *exactly the same,* whether State Farm promised to pay for crash parts of like kind and quality or promised to pay for crash parts which restore a vehicle to its pre-loss condition." (Emphasis added.) Following the close of evidence in the jury trial, the circuit court expressed this uniform contractual interpretation in even broader terms, ruling that it applied to all of State Farm's policies, including the assigned risk policies and the Massachusetts policies (neither of which contained the "like kind and quality" or the "pre-loss condition" language).

[4][5] In our view, the circuit court was incorrect in concluding, in the first instance, that the question of uniform contractual interpretation should be decided at trial rather than at the class certification stage. Apparently the circuit court came to this realization as well (although belatedly), as is evinced by the court's deciding the uniform interpretation issue prior to trial. The reason why this question should have been resolved during the certification stage is that, had the court answered the question in the negative rather than the affirmative, the class could not have been certified. In order to satisfy the second requirement of section 2-801 (a common question of fact or law predominates over other questions affecting only individual class members), it must be shown that "successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members." *Goetz v. Village of Hoffman Estates,* 62 Ill.App.3d 233, 236, 19 Ill.Dec. 401, 378 N.E.2d 1276 (1978); accord *Society of St. Francis v. Dulman,* 98 Ill.App.3d 16, 18, 53 Ill.Dec. 646, 424 N.E.2d 59 (1981); *Hagerty v. General Motors Corp.,* 59 Ill.2d 52, 59, 319 N.E.2d 5 (1974); see also *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 341 (7th Cir.1997) (noting that the typicality and commonality requirements of Fed.R.Civ.P. 23 "ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class"). In the case at bar, if the circuit court had concluded that the operative contractual language in State Farm's various policies was *not* susceptible of uniform interpretation, this would have raised the possibility that there was a breach of contract with some class members but not with others. See *Broussard,* 155 F.3d at 340. In such a situation, the successful adjudication of the claims of some class members would not necessarily establish a right to recovery in others. If there were significant differences in the operative contractual language of the various policies, the commonality and predominance requirement of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section 2-801 could not be met, and the class could not be certified. Accordingly, the circuit court erred in declining to decide the question of uniform contractual interpretation at the class certification stage. As noted, the circuit court apparently realized this error and decided the uniform interpretation issue prior to trial.

***12** [6][7][8] The question before us is whether the circuit court decided this issue correctly. In other words, was it error for the circuit court to conclude that the operative language in State Farm's various policies could be given a uniform interpretation such that the successful adjudication of the contract claims of some class members would establish a right to recovery in other class members? The determination of this issue requires an examination of the relevant contracts. The starting point of any contract analysis is the language of the contract itself. *Church v. General Motors Corp.*, 74 F.3d 795, 799 (7th Cir.1996); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 403 (7th Cir.1998). As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law. 12A Ill. L. & Prac. *Contracts* § 264, at 107 (1983); see *Chicago Daily News, Inc. v. Kohler*, 360 Ill. 351, 363, 196 N.E. 445 (1935); *Sindelar v. Liberty Mutual Insurance Co.*, 161 F.2d 712, 713 (7th Cir.1947). Our review of this issue is therefore *de novo*. See *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill.App.3d 1010, 1017, 273 Ill.Dec. 96, 788 N.E.2d 405 (2003).

[9] We begin with the two main policy forms at issue in this case. The first includes the "like kind and quality" language and provides, in pertinent part:

> "We have the right to settle a *loss* with *you* or the owner of the property in one of the following ways:
> * * *
> 2. pay to repair or replace the property or part with like kind and quality. If the repair or replacement results in better than like kind and quality, *you* must pay for the amount of the betterment * * *." (Emphases in original.)

The second policy form contains the "pre-loss condition" provision, as well as language expressly providing that State Farm's contractual obligation could be met by specifying non-OEM parts. This policy form states, in pertinent part:

> "The cost of repair or replacement is based upon one of the following:
>
> * * *
>
> 3. an estimate written based upon the prevailing competitive price. * * * We will include in the estimate parts sufficient to restore the vehicle

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to its pre-loss condition. *You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.)

In our view, these two policy forms are *not* the same. As noted, the second one contains, in addition to the "pre-loss condition" promise, an explicit agreement between State Farm and the policyholder regarding the use of non-OEM parts: "*You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.) In its brief to this court, State Farm points in particular to this language, explaining that it "expressly provided that State Farm could meet [the preloss condition] obligation by specifying non-OEM parts." In contrast, the first policy form set forth above, which contains the "like kind and quality" promise, makes no mention of OEM or non-OEM parts, nor does it expressly allow for the specification of non-OEM parts. If, as plaintiffs claim, the specification of non-OEM parts constitutes a breach of State Farm's contractual obligation, plaintiffs who were insured under policies containing the "like kind and quality" promise would be in a different position regarding this non-OEM-parts claim than would plaintiffs with policies containing the "you agree" language. Class members with a "like kind and quality" policy would have a stronger case for breach of contract than would those whose policies expressly *allowed* the practice that is alleged to constitute the breach. It follows that the successful adjudication of the claims of class members with the "like kind and quality" language would not necessarily establish a right of recovery in those with the "you agree" language. See Hagerty, 59 Ill.2d at 59, 319 N.E.2d 5; Goetz, 62 Ill.App.3d at 236, 19 Ill.Dec. 401, 378 N.E.2d 1276; Dulman, 98 Ill.App.3d at 18, 53 Ill.Dec. 646, 424 N.E.2d 59; Mace, 109 F.3d at 341. There is thus a material difference between the policies containing the "you agree" provision and those that do not contain this language. [FN4]

***13** This difference between the "like kind and quality" policies, on the one hand, and the "pre-loss condition" policies containing the "you agree" provision, on the other, is not the only instance in this case of material differences in policy language. The putative class also includes State Farm insureds with policies that contain *neither* the "like kind and quality" *nor* the "pre-loss condition" promise. State Farm's Massachusetts policies, for example, simply promise to pay "the actual cash value" of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"parts at the time of the collision." The same is true of most of State Farm's "assigned risk" policies, which are used in the "residual market" of high-risk consumers that insurers are required to cover. Just as with the Massachusetts policies, the majority of the "assigned risk" policies contain neither the "like kind and quality" nor the "pre-loss condition" language. Instead, the "assigned risk" policies promise to pay an "[a]mount necessary to repair or replace the property."

As State Farm points out, neither of these formulations--the Massachusetts policy provision or the "assigned risk" policy provision--expressly imposes *any* standard of part quality. It follows that plaintiff class members who were insured under either of these policies would be in a different position than their "like kind and quality" and "pre-loss condition" counterparts regarding the claim that the specification of non-OEM parts constituted a breach of their insurance contract. The successful adjudication of the claim of a "like kind and quality" policyholder, for example, would not necessarily establish a right to recovery in a class member with either a Massachusetts or an "assigned risk" policy. See *Goetz*, 62 Ill.App.3d at 236, 19 Ill.Dec. 401, 378 N.E.2d 1276; *Dulman*, 98 Ill.App.3d at 18, 53 Ill.Dec. 646, 424 N.E.2d 59.

Notwithstanding the foregoing, the circuit court, following the close of evidence in the jury trial, reiterated its pretrial conclusion that State Farm's contractual obligation was the same for each member of the class. The circuit court determined that all of State Farm's policies, including the Massachusetts policies and the "assigned risk" policies, conveyed the same contractual promise. The court stated:

> "After having heard all the testimony, and I wrote down in particular when it was done, Mr. Porter's testimony that State Farm's agreement, promise, however you choose to characterize it, always was that when the car was repaired, the parts would be of like kind and quality which restores [it] to its pre-loss condition."

The appellate court also referred specifically to Porter's testimony in concluding that State Farm's contractual obligation was uniform: "State Farm's own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders." 321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242. Plaintiffs take this same position, pointing to Porter's testimony and contending that State Farm's contractual obligations to its policyholders were uniform. We disagree.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***14** First, Porter's testimony about State Farm's "commitment to restoring the vehicle to its pre-loss condition" referred to a "basic philosophy" goal of the company, rather than a contractual obligation. Porter never testified that all of the policy forms at issue in this case were uniform. Second, to the extent that his testimony could be read as referring to State Farm's insurance contracts, the most that can be said about this testimony is that Porter was referring to individual policy *terms* rather than all of the relevant policy *forms*. Viewed in the light most favorable to plaintiffs, Porter's testimony may be read as supporting the position that the "like kind and quality" and the "pre-loss condition" phrases mean the same thing: State Farm promised to pay to restore the policyholder's vehicle to its preloss condition using parts as good as the parts that were on the vehicle at the time of the loss. However, there is nothing to indicate that Porter's testimony encompasses any other policy language.

An example of a policy provision that falls *outside* the scope of Porter's testimony is the "you agree" language, which expressly allows for the specification of non-OEM parts. While Porter made brief mention of the "you agree" language in his testimony, he discussed this language only as an example of the notice that State Farm provided to policyholders regarding its non-OEM-parts practices. Porter did *not* state in his testimony that a policy containing language that expressly allows for the specification of non-OEM parts is the contractual equivalent of a policy that *omits* this language. His testimony simply contains *no comment* with regard to this matter. Accordingly, with respect to State Farm's allegedly uniform contractual obligation, Porter's testimony supports *only* the view that the "like kind and quality" phrase and the "pre-loss condition" phrase mean the same thing; that State Farm's obligation was to pay to restore the policyholder's vehicle to its preloss condition. Porter's testimony does *not* support the position of the lower courts, and of plaintiffs, that the presence of the "you agree" language makes no difference and that policies containing this language convey the same contractual promise as do policies that omit it.

Equally important, Porter's testimony does not encompass State Farm's Massachusetts policies or its "assigned risk" policies, neither of which contain the "like kind and quality" or the "pre-loss condition" language. We have carefully examined the more than 200 transcript pages of Porter's testimony. We find no mention of either the Massachusetts policies or the "assigned risk" policies. The assertion that Porter's "uniform obligation"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

testimony encompasses these policies is simply not supported by the evidence. Accordingly, Porter's testimony does *not* support the position of the lower courts, and of plaintiffs, that State Farm policies which *omit* the "like kind and quality" and the "pre-loss condition" language state the same contractual promise as policies that include this language.

***15** Moreover, there is no other record evidence that can sustain the conclusion that material policy differences--*i.e.*, the "you agree" language and the "assigned risk" language--make *no* difference, and that all of State Farm's various policy formulations are the same. Plaintiffs do point to evidence in addition to Porter's testimony, but this other evidence consists essentially of statements that are equivalent to Porter's assertions or reflect them. There is nothing to support the conclusion that the "you agree" language, for example, or the Massachusetts or "assigned risk" policies are irrelevant and that all of State Farm's policy variations therefore are susceptible of the same contractual interpretation. Indeed, State Farm has argued from the beginning of this case that such variances *are* relevant and that they preclude class certification.

[10] In sum, there is simply no evidentiary support for the lower courts' conclusion that *all* of State Farm's various policies are uniform. Where a putative class includes members who are insured under policies that are materially different, the commonality and predominance requirement of section 2-801 cannot be met. 735 ILCS 5/2-801(2) (West 1998). See *Hagerty*, 59 Ill.2d at 59, 319 N.E.2d 5; *Goetz*, 62 Ill.App.3d at 236, 19 Ill.Dec. 401, 378 N.E.2d 1276; *Dulman*, 98 Ill.App.3d at 18, 53 Ill.Dec. 646, 424 N.E.2d 59; *Mace*, 109 F.3d at 341. Accordingly, it was an abuse of discretion for the circuit court to certify plaintiffs' breach of contract claim as a class action. See *Broussard*, 155 F.3d at 340 ("[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts"). We therefore reverse the certification of the nationwide contract class.

B. *Whether the Verdict May Be Affirmed with Respect to Subclasses*

[11] Having determined that the certification of the nationwide contract class should be reversed, we note that there remains a question whether the jury's breach of contract verdict may be affirmed with regard to any subclass comprised of policyholders who were insured under any of the relevant individual policy forms. For the reasons set forth below, we answer this question in the negative.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

We note initially that there are serious questions as to whether the breach of contract verdict may be upheld for *any* group of class members. Under the verdict form given by the circuit court, the jury found that "defendant State Farm failed to perform its obligations under *the contract* and breached *its contract* with the plaintiff class." (Emphases added.) This verdict form followed naturally from the jury instructions, which stated that there was a single contract at issue with a uniform contractual obligation.

However, we have concluded, as a matter of law, that this was error. There was no single contract. Rather, there were multiple policy forms which differed materially. On its face, therefore, the verdict is improper. It included no finding, for example, that State Farm breached the policy form containing the "you agree" language, which *allowed* the practice that plaintiffs claim constituted the breach. Indeed, there could not have been such a finding. The jury was never instructed as to the "you agree" provision. Nor was there any finding in the verdict that State Farm breached its contractual obligation in the Massachusetts policies or the "assigned risk" policies. Once again, the jury was not instructed as to these policies. The verdict simply stated, incorrectly, that State Farm breached a *single contract* with the plaintiff class.

***16** Accordingly, the breach of contract verdict cannot be upheld with respect to any subclass of policyholders insured under any of the individual policy forms at issue. However, we do not decide this case on this ground alone. Instead, we also look at the individual relevant policy forms and consider whether plaintiffs established a breach of any of them. We also consider whether plaintiffs established damages. For the reasons set forth below, we answer these questions in the negative.

1. The Massachusetts and "Assigned Risk" Policies

[12][13] With regard to the Massachusetts policies and the "assigned risk" policies, we conclude that there was no breach. Neither of these policy forms contained the "like kind and quality" or the "pre-loss condition" language. The Massachusetts policies promised to pay "the actual cash value" of "parts at the time of the collision," and the "assigned risk" policies promised to pay an "[a]mount necessary to repair or replace the property." As State Farm has noted, neither of these formulations--the Massachusetts policy provision or the "assigned risk" policy provision--expressly imposed any standard of part quality. The specification of non-OEM parts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would not constitute a breach of these contracts. So long as, with regard to the Massachusetts policies, State Farm paid "the actual cash value" of "parts at the time of the collision," and so long as, with regard to the "assigned risk" policies, State Farm paid an "[a]mount necessary to repair or replace the property," the contractual obligation would be met. It would not matter whether the parts specified were non-OEM, OEM, or some other type. Thus, the jury's breach of contract verdict may not be affirmed with respect to a subclass consisting of policy holders insured under these provisions.

2. The "You Agree" Policies

[14] We turn next to the policies containing the "pre-loss condition" and the "you agree" language. As noted, these provisions state:

> "The cost of repair or replacement is based upon one of the following:
>
> * * *
>
> 3. an estimate written based upon the prevailing competitive price. * * * We will include in the estimate parts sufficient to restore the vehicle to its pre-loss condition. *You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.)

We cannot affirm the jury's verdict with respect to a subclass of policyholders who were insured under these provisions. First, pursuant to the "you agree" language, the insured expressly agrees that "such parts," *i.e.*, parts sufficient to restore a vehicle to its preloss condition, "may include * * * parts from * * * non-original equipment manufacturers." In other words, the insured agrees that the "pre-loss condition" promise may be met by specifying non-OEM parts. In their brief to this court, plaintiffs do not explain, in any way, how a contract containing the "you agree" language, which *expressly permits* the specification of non-OEM parts, may be breached by *the specification of non-OEM parts*. Plaintiffs have established, in support of their claim, that non-OEM parts were specified by State Farm in class members' estimates. However, in view of the "you agree" language, this specification of non-OEM parts, by itself, cannot constitute a breach of the "pre-loss condition" promise.

*17 [15] Second, in order to establish a breach of the "pre-loss condition" promise, plaintiffs would have to show that the parts specified or used by State Farm, whether OEM or non-OEM parts, did not restore the vehicle to its preloss condition. A necessary first step in making this showing would be to examine each class member's vehicle to determine its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

preloss condition. At trial, Timothy Ryles and Paul Griglio, two of plaintiffs' expert witnesses, conceded the necessity for such a determination. The following colloquy took place between State Farm's counsel and Ryles:

"Q. Good point, Dr. Ryles. To determine whether a particular car has been restored to its pre-loss condition, you'd have to know what the pre-loss condition of that car was; isn't that right?

A. You need to, yes."

Griglio made a similar concession in this exchange with State Farm's counsel:

"Q. Similarly, sir, to know whether or not a car was restored to pre-loss condition, you would need to know what the pre-loss condition of that car was, wouldn't you?

A. Yes, you would."

In the case at bar, the determination of the preloss condition of each subclass member's vehicle would require the individual examination of hundreds of thousands, if not millions, of vehicles. Undoubtedly, these examinations would overwhelm any question common to the subclass, rendering it impossible for such questions to predominate. As noted, class certification is improper unless "common questions predominate over any questions affecting only individual members." 735 ILCS 5/2-801(2) (West 1998). For this reason, a claim for breach of the preloss condition promise cannot be maintained as a class action. See *Augustus v. Progressive Corp.*, 2003 Ohio 296, ¶ 25; *Schwendeman v. USAA Casualty Insurance Co.*, 116 Wash.App. 9, 22-23, 65 P.3d 1, 8 (2003); *Snell v. Geico Corp.*, No. Civ. 202160, slip op. at 6 (Md.Cir.Ct. August 14, 2001). Accordingly, the jury's breach of contract verdict may not be affirmed for a subclass comprised of policyholders insured under the preloss condition provision.

3. The "Like Kind and Quality" Policies

The remaining policy form is the one containing the "like kind and quality" promise. Before analyzing this provision, we note that the record appears to include the policies of only two of the named plaintiffs, DeFrank and Covington. Both DeFrank's and Covington's policies contain the "pre-loss condition" and "you agree" language. In addition, although we were unable to find a copy of Avery's policy in the record, testimonial evidence indicates that Avery's policy also contained the "pre-loss condition" and "you agree" language.

[16] With regard to the remaining two named plaintiffs--Shadle and Vickers--the record does not appear to include their policies. On this record, therefore, it is unclear that the contracts of *any* of the named

plaintiffs contained the "like kind and quality" language. If none of the named plaintiffs' policies contained the "like kind and quality" language, State Farm could not have breached this provision in any of the named plaintiffs' policies. Accordingly, plaintiffs' claim for breach of the "like kind and quality" promise fails for lack of proof. We cannot uphold a subclass based on this policy form. "It is well settled that a class cannot be certified unless the named plaintiffs have a cause of action." *Spring Mill Townhomes Ass'n v. Osla Financial Services, Inc.*, 124 Ill.App.3d 774, 779, 80 Ill.Dec. 378, 465 N.E.2d 490 (1983), citing *Landesman v. General Motors Corp.*, 72 Ill.2d 44, 18 Ill.Dec. 328, 377 N.E.2d 813 (1978); accord, *e.g.*, *Perlman v. Time, Inc.*, 133 Ill.App.3d 348, 354, 88 Ill.Dec. 524, 478 N.E.2d 1132 (1985). Assuming, *arguendo*, that there *were* named plaintiffs with this policy form, we conclude that there was no breach of the "like kind and quality" promise.

***18** The "like kind and quality" promise states:

> "We have the right to settle a *loss* with *you* or the owner of the property in one of the following ways:
>
> * * *
>
> 2. pay to repair or replace the property or part with like kind and quality. If the repair or replacement results in better than like kind and quality, *you* must pay for the amount of the betterment * * *." (Emphases in original.)

According to the appellate court (and plaintiffs), "like kind and quality," as stated in this promise, meant "like kind and quality to OEM parts." 321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242. Plaintiffs' contention throughout this case has been that the non-OEM parts that were at issue were categorically inferior to their OEM counterparts. It follows that, under this theory, State Farm's specification of non-OEM parts could *never* satisfy the obligation to pay for parts of "like kind and quality." In their third amended complaint, plaintiffs alleged: "As a practical matter, [State Farm's] obligation could be met *only* by requiring the *exclusive use* in repairs *of factory-authorized or OEM parts*." (Emphases added.)

[17] In our view, there are several difficulties with this theory that the "like kind and quality" promise is necessarily breached by the specification of non-OEM parts. First, the language of the promise itself contradicts the view that State Farm may meet its contractual obligation *only* by specifying *OEM* parts. If the purpose of State Farm's promise "to repair or replace the property or part with *like kind and quality* " (emphasis added) were to require the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specification of OEM parts, then there is no reason why the indirect phrasing "like kind and quality" would have been used. The provision could simply have promised that OEM parts would be specified. Implicit in the phrase "like kind and quality" is the likeness or similarity of *one thing* to *another*. Common sense indicates that an item that is of "like kind and quality" to another is not that very item, but rather is something of "like kind and quality" to it.

Also contradicting the position that "like kind and quality" means OEM parts is the contract language *accompanying* the "like kind and quality" promise. In the "like kind and quality" provision as set forth above, the sentence immediately following the "like kind and quality" promise states: "If the repair or replacement results in *better than like kind and quality* [emphasis added], *you* must pay for the amount of the betterment [emphasis in original] * * *." This policy language, which requires an insured to pay for "repair or replacement [which] results in *better than like kind and quality* " (emphasis added), presumes a standard of quality that is "better than like kind and quality." However, under plaintiffs' reasoning, there is nothing better than "like kind and quality."

Recall the position taken by plaintiffs. According to plaintiffs, *all* the non-OEM parts at issue in this case are categorically inferior to OEM parts. This means, of necessity, that OEM parts represent the highest possible standard of quality. In addition, according to plaintiffs, because non-OEM parts are categorically inferior to OEM parts, the "like kind and quality" promise can only be met by specifying OEM parts. Thus, because OEM parts are the best possible parts, and because the "like kind and quality" promise means OEM parts, plaintiffs also necessarily take the position that the term "like kind and quality" refers to the highest possible standard of quality.

***19** But this reasoning cannot be correct. State Farm's policy cannot be referring to OEM parts when it uses the term "like kind and quality" because the policy itself says that there is a standard of quality which is *better* than "like kind and quality" parts. Plaintiffs are clearly incorrect in equating "like kind and quality" with OEM parts.

[18] As previously indicated, State Farm defines "like kind and quality" differently from plaintiffs (and the appellate court). In State Farm's view, "like kind and quality" means "sufficient to restore a vehicle to its pre-loss condition." [FN5] There is substantial legal support for State Farm's view.

Courts in other jurisdictions have adopted a similar interpretation of the term "like kind and quality." In Siegle v. Progressive Consumers Insurance Co., 819 So.2d 732 (Fla.2002), the issue was whether, under "like kind and quality" policy language similar to that in the case at bar, an insurer was obligated not only to complete "a first-rate repair which returns the vehicle to its pre-accident level of performance, appearance, and function," but also to compensate the insured in money for any diminution in market value that resulted from the repaired vehicle's status as a wrecked car. Siegle, 819 So.2d at 733. The court ruled that there was no such dual obligation on the part of the insurer. The court explained that, under the policy language at issue, the insurer had a choice of either reimbursing the insured through a money payment or paying to repair or replace the automobile with other property of like kind and quality. If, as in the case that was before the court, the repair option was chosen, "the insurer's liability was limited to the monetary amount necessary to repair the car's function and appearance, *commensurate with the condition of the auto prior to the loss*." (Emphasis added.) Siegle, 819 So.2d at 739. Thus, in the court's view, a promise to repair damaged property with *like kind and quality* meant that the insurer was obligated to restore the vehicle to its *preloss condition*. See also Ray v. Farmers Insurance Exchange, 200 Cal.App.3d 1411, 1418, 246 Cal.Rptr. 593, 596 (1988) ("To the extent [that plaintiff's] automobile was repaired to its *pre-accident* safe, mechanical, and cosmetic condition, [defendant's] obligation under the policy of insurance to repair to 'like kind and quality' was discharged" (emphasis added)); Berry v. State Farm Mutual Automobile Insurance Co., 9 S.W.3d 884, 894-95 (Tex.Ct.App.2000) (under court's interpretation of the Texas Insurance Code, whether a part is of "like kind and quality" depends on "the age or condition of the covered vehicle prior to the accident"); Schwendeman v. USAA Casualty Insurance Co., 116 Wash.App. 9, 22-23, 65 P.3d 1, 8 (2003) (under the insurance policy at issue, "whether a replacement part is of 'like kind and quality' to the part it replaces necessarily requires ascertaining the condition of the vehicle before the accident in terms of its age, mileage, and physical condition, and the quality of the replacement part"); *Snell v. Geico Corp.*, No. Civ. 202160, slip op. at 6 (Md.Cir.Ct. August 14, 2001) (preloss condition of each individual vehicle must be established in order to determine whether insurer's "like kind and quality" promise was breached).

***20** State Farm maintains that "pre-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

loss condition" is what defines "like kind and quality," rather than the other way around. For State Farm it is irrelevant whether non-OEM parts are of like kind and quality to OEM parts. The determinative issue is whether the parts specified are sufficient to restore the vehicle to its preloss condition, *i.e.*, the condition of the vehicle shortly before the accident. Under this definition of "like kind and quality," the specification of non-OEM parts would not necessarily breach the "like kind and quality" promise.

We agree with State Farm. The term "like kind and quality," as used in the relevant policies, meant "sufficient to restore a vehicle to its pre-loss condition." We therefore conclude that the specification of non-OEM parts would not necessarily constitute a breach of the "like kind and quality" promise. Thus, we cannot affirm the jury's breach of contract verdict with respect to a subclass consisting of policyholders insured under this provision.

[19] In sum, the jury's breach of contract verdict may not be upheld for any subclass comprised of policyholders insured under any of the individual relevant policy forms. State Farm's specification of non-OEM parts did not constitute a breach of the Massachusetts policies or the "assigned risk" policies, neither of which expressly imposed any standard of part quality. Nor did the specification of non-OEM parts constitute a breach of the policies containing the "pre-loss condition" and the "you agree" provisions. Under the "you agree" language, the insured *agrees* that the "pre-loss condition" promise may be met by specifying non-OEM parts. Further, the individualized proof needed to establish a breach of the "pre-loss condition" promise would destroy the commonality required of a class action. Finally, plaintiffs' claim for breach of the "like kind and quality" promise fails for a number of reasons. First, the claim fails for lack of proof. In addition, State Farm's specification of non-OEM parts did not constitute a breach of the policies containing the "like kind and quality" provision. The term "like kind and quality," as used in the relevant policies, meant "sufficient to restore a vehicle to its pre-loss condition." This obligation, which is satisfied so long as the parts are sufficient to restore the vehicle to its preaccident condition, is not necessarily breached by the specification of non-OEM parts. Moreover, as noted above, the individualized proof required to establish a breach of the "pre-loss condition" promise would overwhelm any questions common to the subclass, thus prohibiting certification of the claim as a class action.

4. Damages

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There is an additional reason why the breach of contract verdict may not be upheld with regard to any subclass. Plaintiffs have failed to establish damages.

a. *Specification Damages*

Two types of damages were awarded to the plaintiff class for breach of contract: (1) direct, or "specification," damages, and (2) consequential, or "installation," damages. The first type of damages, which is based on plaintiffs' theory that the contract was breached by the *specification* of non-OEM parts, was calculated as the cost difference between the OEM parts that plaintiffs claimed *should* have been specified and the non-OEM parts that State Farm listed on the repair estimate. According to plaintiffs, this figure constituted the amount that State Farm "saved by specifying cheaper [non-OEM] parts." Plaintiffs' damages expert, Dr. Iqbal Mathur, calculated that specification damages for the class as a whole would total $243,700,000. Under plaintiffs' theory, everyone in the class was eligible to receive specification damages.

***21** In our view, plaintiffs' theory of "specification damages" has no basis in the law. Under this theory, loss occurs when a non-OEM part is *specified* on the estimate rather than when the part is *installed* on the vehicle. Plaintiffs' damages expert, Dr. Mathur, conceded at trial that specification damages apply to any class member whose repair estimate *specified* a non-OEM part, regardless of whether a non-OEM part was used in the repair of the vehicle. Thus, a policyholder who had been quoted a non-OEM part on his estimate could receive specification damages even if (1) his vehicle was repaired with an OEM part, or (2) his car was restored to its preloss condition. By this same reasoning, specification damages would apply where a non-OEM part was specified on the estimate and was used in the repair, but the policyholder subsequently sold his vehicle for fair market value. If it is the simple *specification* of the non-OEM part in a repair estimate that inflicts the damage, it is irrelevant, under plaintiffs' theory, what happens afterwards, even if the policyholder ultimately suffers no actual damage.

It should be noted that, given this focus on the *specification,* rather than the *installation,* of non-OEM parts, plaintiffs' specification-damages theory stands in contrast to their third amended complaint, as well as to the definition of the plaintiff class as certified by the circuit court. In their third amended complaint, plaintiffs describe State Farm's alleged breach of contract in terms of State Farm's *use* of non-OEM parts in *repairs* that result, *inter alia,* in plaintiffs' *receipt* of such parts:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"Defendant State Farm's common practice of *using* inferior, imitation parts in *repairs* constitutes a breach of its obligation to all insureds who either *received* such parts or were obligated to pay the difference in price between imitation parts and the OEM parts actually *installed*." (Emphases added.)

Similarly, the circuit court, in defining the plaintiff class, refers to plaintiffs who had non-OEM parts *installed* on their vehicles. In the judgment in favor of plaintiffs on their breach of contract claim, the plaintiff class was defined, in pertinent part, as:

"All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' *installed* on their vehicles or else received monetary compensation determined in relation to the cost of such parts." (Emphasis added.)

Given the contrast between the focus of the specification-damages theory on the estimate's *listing* of non-OEM parts, on the one hand, and the references in the complaint and the class definition to the *use* or *installation* of non-OEM parts, on the other, a question arises as to why plaintiffs devised their specification-damages theory in the first instance. The answer lies in plaintiffs' belated realization that they would be unable to establish damages and still maintain the commonality required of a class action. If, in keeping with the complaint and the class definition, loss did not occur until non-OEM parts were *installed*, plaintiffs would need to show which class members' vehicles had actually been repaired with non-OEM parts, as well as which class members still owned vehicles that had been repaired with non-OEM parts. However, State Farm's records did not contain this information. [FN6] Accordingly, any determinations as to which plaintiffs were eligible for damages would require the examination of each individual class member's vehicle and repair. Such an undertaking, however, would mean that questions affecting individual class members would predominate over common questions, destroying the commonality required for a class action. See 735 ILCS 5/2-801(2) (West 1998); *Magro v. Continental Toyota, Inc.*, 67 Ill.2d 157, 161, 8 Ill.Dec. 90, 365 N.E.2d 328 (1977).

*22 Faced with this dilemma, plaintiffs created their specification-damages theory, under which the

alleged breach of contract and the resulting damages occurred when non-OEM parts were *specified* in repair estimates, rather than when the non-OEM parts were *installed*. If damage occurred when non-OEM parts were *specified*, there would be no need for individual inquiry as to whether such parts were actually used in the repair of a particular vehicle, or whether the claimant still owned the vehicle in question. Under plaintiffs' specification-damages theory, the damage occurred when the non-OEM part was *listed* on the estimate, and it did not matter whether the part was actually used in the repair or whether the policyholder still owned the vehicle.

[20] While plaintiffs' specification damages theory appeared to preserve the commonality necessary for a class action, it achieved this goal at the expense of denoting real damages. Common sense dictates that any injury resulting from non-OEM parts would be inflicted, not by the mere *specification* of such parts in an estimate, but by the *use* of the parts in the repair of a vehicle. No possible damage could come to a policyholder simply because a non-OEM part was listed on his repair estimate. Only if the part were actually installed, and only if it were shown that this part failed to restore the vehicle to its preloss condition, could it possibly be said that the policyholder suffered damage.

Indeed, plaintiffs' own damages expert, Dr. Mathur, acknowledged at trial that plaintiffs' theory of specification damages made no economic sense. During cross-examination, the following colloquy took place between State Farm's counsel and Dr. Mathur:

> "Q. So, from an economic perspective, which is all that you are qualified to testify about, you would have to tell us that your theory of direct damages doesn't make economic sense; isn't that true, sir?
> A. That is correct.
> Q. Thank you. So, according to you, as an economist, and not as a lawyer, using theories that plaintiffs' lawyers have tried to give you, is a policyholder *entitled* to damages merely because State Farm quoted a non-OEM part on their estimate, as long as State Farm did restore the car to its pre-loss condition?
> A. No." (Emphasis added.)

[21] We agree with plaintiffs' damages expert that plaintiffs' theory of specification damages makes no sense. In our view, plaintiffs' notion of specification damages contravenes the basic theory of damages for breach of contract, under which the claimant must establish an actual loss or measurable damages resulting from the breach in order to recover. See, *e.g.*, Economy Fire & Casualty Co. v.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*GAB Business Services, Inc.*, 155 Ill.App.3d 197, 201, 107 Ill.Dec. 743, 507 N.E.2d 896 (1987). We reject, as a matter of law, plaintiffs' theory of specification damages.

b. *Installation Damages*

[22] The second type of contract damages awarded was installation damages. Unlike "specification" damages, "installation" damages were derived from a theory based on an actual loss. However, as explained below, the evidence offered in support of plaintiffs' installation damages was so speculative and uncertain that awarding damages based on this evidence constituted an arbitrary deprivation of property in violation of State Farm's due process rights. See *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585, 600 (2003) (due process clause of the fourteenth amendment prohibits imposition of arbitrary punishments).

***23** Installation damages consisted of the additional costs to be incurred by plaintiffs in removing non-OEM parts from their vehicles and replacing them with OEM parts. Included in these damages was an amount to cover two days of car rental while the non-OEM parts were being replaced. Only those class members who actually had non-OEM parts installed on their vehicles were eligible to receive installation damages. Plaintiffs' expert, Dr. Mathur, explained that, for a variety of reasons, many plaintiffs who had non-OEM parts specified on their repair estimates did not, in fact, have non-OEM parts installed on their vehicles. These plaintiffs were not eligible for installation damages. Thus, in order to calculate the amount of installation damages for the nationwide class, it was necessary to estimate the number of plaintiffs who were eligible for such damages. Mathur estimated that, of the total number of plaintiffs who were quoted non-OEM parts, the percentage whose vehicles were, in fact, repaired with non-OEM parts ranged from 50% to 92%. In other words, although each class member's estimate, by definition, specified *non-*OEM parts, *OEM* parts were actually installed on the class members' cars as often as 50% of the time. Mathur testified that, in his view, the actual figure for repairs using non-OEM parts probably was closer to 92% than 50%. He calculated that, if 50% of class members received non-OEM parts, installation damages for the class as a whole would total $658,450,000. If, on the other hand, the correct figure were 92%, installation damages would total $1.2 billion.

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to determine whether a non-OEM part had been installed on a class member's vehicle. However, Mathur conceded that he had no way of making this determination. Mathur also acknowledged that he had "no opinion" as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them. Mathur admitted that his calculations as to installation damages might be incorrect by as much as $1 billion.

The following exchange took place between counsel for State Farm and Mathur.

"Q. From an economic perspective, there is simply no way for you to identify which members of the class are entitled to damages; isn't that right?

A. Well, I don't have the data, and so I really cannot identify who the class members are.

Q. Therefore, there is no way for you to identify who is and who is not entitled to damages; isn't that right, sir?

A. That is correct." [FN7]

The jury awarded plaintiffs $212,440,000 in installation damages. This was about $1 billion less than Mathur's high-end estimate.

[23] While it has become acceptable to use statistical inference in determining aggregate damages in a class action suit (*e.g.*, 3 A. Conte & H. Newberg, Newberg on Class Actions § 10:2, at 478 (4th ed.2002)), it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds. See, *e.g.*, *Bell v. Farmers Insurance Exchange*, 115 Cal.App.4th 715, 746-57, 9 Cal.Rptr.3d 544, 571-80 (2004). In *Bell*, for example, the court rejected a determination of aggregate damages, noting that "the possible inaccuracy of the estimate of unpaid double-time compensation presents an issue of constitutional dimension." *Bell*, 115 Cal.App. 4th at 756, 9 Cal.Rptr. at 579. See also *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020-21 (5th Cir.1997) ("a procedure is inherently unfair when the substantive rights of * * * the defendant are resolved in a manner that lacks the requisite level of confidence in the reliability of its result").

***24** In the case at bar, the range between Mathur's high-end and low-end estimates for installation damages was half a billion dollars. Moreover, as previously indicated, Mathur conceded that his estimates could be incorrect by as much as $1 billion. A due process violation is clearly established where the method for determining damages has the potential to increase a defendant's aggregate liability by as much as $1 billion over what is warranted. See *Bell*, 115

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cal.App. 4th at 751-53, 9 Cal.Rptr. at 575-76; *Hilao v. Estate of Marcos,* 103 F.3d 767, 786 (9th Cir.1996).

Notwithstanding the foregoing, the appellate court below concluded that there was "little danger that ineligible class members will receive a share of this award [installation damages]." 321 Ill.App.3d at 290, 254 Ill.Dec. 194, 746 N.E.2d 1242. In support of this view, the appellate court pointed, *inter alia,* to the size of the jury's installation damages award, which was "approximately $1 billion less than the expert's estimate." 321 Ill.App.3d at 289, 254 Ill.Dec. 194, 746 N.E.2d 1242. Unlike the appellate court, we find little comfort in the size of the jury's installation damages award. In our view, it is troubling, rather than reassuring, that Mathur's half-billion-dollar range for installation damages was found by the jury to be too narrow, by another half-billion dollars. In other words, the jury had so little confidence in even the lowest estimate for installation damages that the jury found it necessary to reduce that figure by $500 million. This suggests that the jury's award of aggregate installation damages was based, not on Mathur's expert testimony, but on pure speculation and conjecture.

[24] The potential for inaccuracy in Mathur's installation-damages estimates is simply too great to support an award of damages. See Bell, 115 Cal.App.4th at 751-56, 9 Cal.Rptr.3d at 575-79. While expert testimony in support of damages awards may be couched in terms of probabilities or possibilities, there is a need for a reasonable degree of certainty in such testimony. See *Brown v. Chicago & North Western Transportation Co.,* 162 Ill.App.3d 926, 937-38, 114 Ill.Dec. 165, 516 N.E.2d 320 (1987). Here, given the fact that Mathur conceded that the margin of error in his estimate of the amount of installation damages was a billion dollars, the requisite degree of reasonable certainty is lacking. In our view, there is no valid basis for upholding the award of installation damages for the nationwide class and, thus, no valid basis for awarding such damages with regard to a subclass.

In sum, the jury verdict on the breach of contract claim cannot be affirmed. The jury was incorrectly instructed that the operative language in State Farm's various policy forms could be given a uniform interpretation. Further, the verdict cannot be affirmed for any subclass comprised of policyholders who were insured under any of the relevant individual policy forms. The reason is that plaintiffs' claim for breach of contract fails on the merits. State Farm's specification of non-OEM parts did not constitute a breach of any of the relevant individual policy forms,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether the policies at issue were those containing the "like kind and quality" promise, or those containing the "pre-loss condition" and the "you agree" language, or whether the policies at issue were the Massachusetts or "assigned risk" policies. Moreover, plaintiffs have failed to establish contract damages. With regard to specification damages, there is no basis in the law for this theory. In addition, while the installation damages were derived from a model based on an actual loss, the evidence offered in support of them was too speculative and uncertain to support an award of damages. Accordingly, we reverse the jury's verdict that State Farm breached its contractual obligations. In view of our disposition of plaintiffs' contract claim, we need not reach State Farm's other arguments with regard to breach of contract.

***25** One point raised by the dissent merits response. The dissent states that this court has "ben[t] over backwards" to rule in State Farm's favor (slip op. at 98 (Freeman, J., concurring in part and dissenting in part)), that we have "vilifi[ed]" and "humiliated" plaintiffs' counsel (slip op. at 103, 110 (Freeman, J., concurring in part and dissenting in part)) and "demeaned" the courts below (slip op. at 110 (Freeman, J., concurring in part and dissenting in part)), and that the result in this case has not been arrived at by an even-handed application of the law, but because this court has developed "a new hostility" to class actions and wishes to "send[ ] a message" that "different standards" will be applied to cases arising out of the Fifth District of our appellate court (slip op. at 110 (Freeman, J., concurring in part and dissenting in part)). [FN8] In other words, according to the dissent, this court's decision to reverse the verdict on plaintiffs' breach of contract count is the result of bias and extralegal considerations. This is emphatically not true. This appeal has been decided pursuant to the same standards that are applied to every case that is brought before this court. Moreover, we have not fashioned any changes to the legal rules governing class actions, let alone ones that are "hostile" to this procedural device. In deciding plaintiffs' breach of contract claim we have not acted with bias or favoritism but, instead, have applied the law objectively to the facts of record with no purpose other than to reach a just result. The dissent's assertions to the contrary are unfounded and inappropriate.

II. Consumer Fraud Act

State Farm raises several arguments regarding the circuit court's judgment that State Farm violated the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (815 ILCS 505/2 (West 1998)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before addressing these arguments, we examine the factual background of plaintiffs' consumer fraud count in detail.

This case did not begin as a consumer fraud action. As originally pled, plaintiffs' class action complaint contained only a single count for breach of contract. Plaintiffs added count II, in which they alleged that State Farm violated the Consumer Fraud Act, in their "Second Amended Class Action Complaint (A)."

Although their class action complaint was subsequently amended, the relevant portion of plaintiffs' consumer fraud count remained unchanged. In their consumer fraud count, plaintiffs alleged the following:

> "Among the unlawful practices that defendant engaged in was the practice of installing non-OEM crash parts in its insureds' vehicles that were inferior, substandard parts, when State Farm had promised and was obligated to undertake repairs on damaged vehicles using only parts of like kind and quality, so as to restore the vehicles to their pre-loss condition.
>
> * * * By way of false or deceptive pretenses, acts, or practices, defendant did not disclose to plaintiffs that they were: a) using inferior, imitation parts that diminished the value of their vehicles; and/or b) paying the cost of cheaper imitation parts when available and refusing to pay for OEM parts, thereby causing class members and/or their repair shops to absorb the cost difference."

***26** After plaintiffs added their consumer fraud count, State Farm argued that it was simply a duplicate of the breach of contract count and, therefore, should be dismissed. State Farm pointed in particular to the language in plaintiffs' complaint which asserts that State Farm violated the Consumer Fraud Act by installing inferior parts despite having "promised" to use parts of "like kind and quality." [FN9] This language, according to State Farm, was nothing more than a restatement by plaintiffs that State Farm had breached a contractual promise. And, State Farm argued, under decisions such as *DeLeon v. Beneficial Construction Co.,* 55 F.Supp.2d 819, 826 (N.D.Ill.1999), and *Petri v. Gatlin,* 997 F.Supp. 956, 967-68 (N.D.Ill.1997), a breach of a contractual promise cannot serve as the basis for a statutory consumer fraud action.

Confronted with the argument that its consumer fraud count was simply a redressed version of its breach of contract count, plaintiffs retreated somewhat from the language in their complaint. During the hearing on State Farm's motion to decertify the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

class and motions for summary judgment, plaintiffs clarified to the circuit court that the consumer fraud count was not premised on "the drafting, or the sale or even the interpretation" of a contract. Instead, according to plaintiffs, the consumer fraud count was based on actions, representations and omissions which occurred during the claims process, *i.e.*, after the policyholder brought his or her car to an adjuster or body shop to receive an estimate and repair. This shift in emphasis was significant. By focusing on statements and actions which occurred during the claims process, rather than promises contained in the contract, plaintiffs were able to persuade the circuit court that the consumer fraud count was truly independent from the breach of contract count. Thus, as the circuit court noted, the jury could "say there's a breach of contract, but that doesn't necessarily mean there's been Consumer Fraud."

In support of their argument that State Farm made fraudulent representations and omissions during the claims process, plaintiffs relied on four documents. The first document was the estimate given to each of the named plaintiffs after his or her car had been examined by a State Farm claims adjuster. Each of these estimates consisted of a computer-generated printout that listed the parts that were to be put on the plaintiff's car, along with the prices of the parts. The estimates also give the source or type of each part. Non-OEM parts are listed as "Quality Replacement Parts," while OEM parts are listed along with the manufacturer's name. Although the named plaintiffs' estimates varied because of the individual nature of the repairs, each estimate used the term "quality replacement part." Thus, for example, on plaintiff Sam DeFrank's estimate, the "Part Type" for the various parts on the estimate is listed as "Quality Replacement Part," "GM Part" or "Order From Dealer." Plaintiffs alleged that each member of the class, like DeFrank, received an estimate that included the term "quality replacement part." A copy of DeFrank's estimate is attached to this opinion as Appendix A.

***27** Stamped on DeFrank's estimate in the upper left-hand corner of the first page are the words, "Read the Attached Information Regarding Quality Replacement Parts Not Made By The Original Equipment Manufacturer." This statement refers to a document, known as a "half sheet," which was attached to repair estimates that included non-OEM parts. On the half sheet is a disclosure which states, in part, "THIS ESTIMATE HAS BEEN PREPARED BASED [*sic* ] ON THE USE OF AFTERMARKET CRASH PARTS SUPPLIED BY A SOURCE OTHER THAN THE MANUFACTURER OF

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

YOUR MOTOR VEHICLE." A copy of the half sheet is attached to this opinion as Appendix B.

The second item relied upon by plaintiffs was a brochure produced by State Farm titled "Quality Replacement Parts." This brochure was allegedly given to each member of the consumer fraud class, usually at the time the insured received his or her estimate. In this brochure, State Farm refers to non-OEM parts as "quality replacement parts" and states that "[o]nly those parts which meet our very high performance criteria are acceptable." Also included in the brochure is a guarantee which states that if the policyholder is unsatisfied with the "fit and corrosion resistance qualities" of the replacement parts, then State Farm will repair or replace the parts at no cost to the policyholder. A copy of the brochure is attached to this opinion as Appendix C.

Unlike the estimates and the brochure, the third and fourth items identified by plaintiffs--articles in a newsletter and a magazine--were not given to the policyholders during the claims process. Instead, these items were promotional or informational materials produced by State Farm. Plaintiffs used these materials to illustrate State Farm's marketing and use of the term "quality replacement parts."

The newsletter which the plaintiffs relied upon is titled "Good Neighbor News" and is dated "Fall 1993." The newsletter which is of record is in the form of a mailing and has a return address of a State Farm agent based in Michigan. The mailing address on the newsletter states generically, "Policyholder Name; Policyholder Address." A brief article discussing the high price of OEM parts appears on the third page of the newsletter. In the middle of the article there is this quote: "High prices for parts is a major reason why it costs so much to repair a car that's been damaged. And that's why State Farm is a big fan of what we call 'quality replacement parts.' These parts are identical to--or better than--the original equipment manufacturers' parts, but cost a lot less."

The fourth and final item identified by plaintiffs is an article from the April 1990 issue of a magazine called "Reflector," a State Farm publication circulated to State Farm agents. The article at issue, titled "Quality Replacement Parts," gives a general overview of State Farm's use of non-OEM parts. Underneath the title to the article appears this caption: "One of the bumpers on the cover of this *Reflector* was produced by the original equipment manufacturer. The other is a quality replacement part produced by another company. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

same is true of the other pairs [of parts shown]. The parts are identical except for one thing--the price."

*28 As noted, the plaintiffs' focus on the actions taken by State Farm during the claims process made it possible for plaintiffs to pursue a separate count for consumer fraud. It also made possible a second important objective of plaintiffs--class certification. Because the consumer fraud claim was based on the uniform representations contained in State Farm's written claims documents and not, for example, on the myriad different oral representations that occurred during the sales of the class members' policies, plaintiffs were able to convince the circuit court that there was a common question of fact which predominated over the class. In its order certifying the nationwide consumer fraud class (in language taken verbatim from plaintiffs' filing in support of certification), the circuit court stressed the uniformity of the representations made during the claims process:

"As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm's methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant's Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant's Exhibit 27. State Farm has also promoted the use of the term 'quality replacement parts' nationwide in an effort to promote its substitution of non-OEM for OEM parts. Plaintiffs' Exhibits 115 and 116. [FN10]
The Court finds that the evidence introduced at the certification hearing demonstrate 'a series of essentially identical transactions,' *Miner*, 87 Ill.2d at 19, 56 Ill.Dec. 886, 428 N.E.2d at 484, between State Farm and its insureds, which transactions routinely result in the use of non-OEM parts."

In its certification order, the circuit court also determined that the Consumer Fraud Act could, as a matter of statutory interpretation, be applied to members of the plaintiff class who did not reside in Illinois. The court further concluded that applying the Consumer Fraud Act to the entire class presented no choice-of-law or constitutional problems. In its subsequent "Order Regarding Law to be Applied to Class Members' Claims," the circuit court explained its reasoning:

"With respect to the claims under the Illinois Consumer Fraud Act, the court finds there are no true conflicts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of law raised by the specific claims or facts at issue in this case which require application of the law of any state other than Illinois. *Martin v. Heinhold Commodities, Inc.,* 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987) and *Gordon v. Boden,* 224 Ill.App.3d 195, 166 Ill.Dec. 503, 586 N.E.2d 461 (1st Dist.1991) have approved the application of the Illinois Consumer Fraud Act to the claims of out-of-state plaintiffs. State Farm was chartered and is headquartered in Illinois. State Farm affirmatively uses and consents to the jurisdiction of Illinois courts. It is alleged that the conduct at issue emanated from activities in Illinois. Given the aggregation of contacts of State Farm with this jurisdiction, and the allegations that the conduct at issue emanated from activities in Illinois, Illinois possesses sufficient contacts so that the application of the Illinois Consumer Fraud Act to all class claims is neither unreasonable nor unfair and comports with due process. Further, application of the Illinois Consumer Fraud Act to all claims will not interfere with any other jurisdictions' legislative, regulatory or administrative policies * * *."

***29** Based on its finding that a common fact predominated, and that the Consumer Fraud Act could be applied to out-of-state residents, the circuit court certified a nationwide class consisting of

"[a]ll persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1994, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM * * * 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts."

At trial, the five named plaintiffs testified to the representations made and actions taken by State Farm during each of their claims proceedings. Each plaintiff stated that he or she had received a car-repair estimate, and all but one stated that they had received the "Quality Replacement Parts" brochure. The point in the repair process at which the plaintiffs received the brochure, and whether they read it, varied from plaintiff to plaintiff. Shadle, for example, testified that he received his estimate and "Quality Replacement Parts" brochure when the claims adjuster first looked at his car, but that he did not read the brochure. Avery stated that he received his estimate and brochure in the mail after taking his car to an adjuster, that he read the brochure, and that he was "extremely

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concerned" about what it said. Vickers first saw her written estimate when she went to pick up her car after it was repaired, although her body shop told her early in the repair process that non-OEM parts were going to be used. She did not say whether she received or read the brochure. Like Vickers, Covington did not see his estimate prior to the repairs being started, although his body shop informed him that non-OEM parts were being used. Covington received and read his brochure after the repairs were finished. DeFrank testified that he received his estimate and brochure from the claims adjuster prior to the repair of his pickup truck. He read the brochure and became "very upset." Notably, none of the five plaintiffs testified that they saw, read or were aware of the articles in the "Good Neighbor News" newsletter or the "Reflector" magazine.

At the conclusion of trial, the circuit court found that State Farm had violated the Consumer Fraud Act with respect to the five named plaintiffs and the class as a whole. In its judgment order, the circuit court noted that a violation of the Consumer Fraud Act could not be proven simply by showing a breach of a contractual promise:

"The court, after considering all the evidence, finds, as did the jury, that State Farm did breach its contract with the plaintiffs, that the non-OEM 'crash parts' specified and used by State Farm were not of 'like kind and quality' and did not restore plaintiffs' vehicles to their pre-loss condition as required by the insurance contract between State Farm and the plaintiffs. These findings do not on their own establish a violation of the Act. The court must now consider whether the evidence also establishes the elements, set forth above, which are required to prove a violation of the Consumer Fraud Act."

***30** After stating the above, the circuit court set forth what it concluded were the deceptive acts perpetrated by State Farm. The circuit court stated:

"The plaintiffs allege, under Count II and Count III of the Third Amended Class Action Complaint, that State Farm violated the Consumer Fraud Act. The Plaintiffs['] allegations include, without limitation, that State Farm installed inferior non-OEM 'crash parts' on the plaintiffs' vehicles when it was obligated under its insurance policies with the plaintiffs to use 'crash parts' of 'like kind and quality' which would restore plaintiffs' vehicles to their 'pre-loss condition' and that State Farm failed to disclose to plaintiffs that it was using and paying for cheaper, inferior non-OEM 'crash parts' to repair plaintiffs' vehicles.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

After considering all the testimony and evidence admitted at trial, the court finds that the plaintiffs have proven that State Farm violated the Consumer Fraud Act and that none of the defenses asserted by State Farm bar plaintiffs' right to recover under the Act or reduce the amount of plaintiffs' recovery.

State Farm, prior to and during the class period for the Consumer Fraud Act plaintiffs, knew that the non-OEM 'crash parts' it was specifying on its policyholders' repair estimates were not of 'like kind and quality' and would not restore their policyholders' vehicles to 'pre-loss condition.' State Farm's knowledge of the inferiority of the non-OEM 'crash parts' is clearly shown [*sic* ] the testimony of witnesses, State Farm's own internal documents, CAPA documents (State Farm was instrumental in the creation of CAPA. CAPA's stated purpose was to certify quality non-OEM 'crash parts' and State Farm officers and management served on CAPA's board prior to and during the class period for Consumer Fraud Act plaintiffs) of which State Farm had knowledge, and other documents, all of which were admitted into evidence and appear in the trial court record. Rather than telling its policyholders of the known problems with the non-OEM 'crash parts,' including possible safety concerns, State Farm chose to adopt and use on its estimates the misleading term 'Quality Replacement Parts,' and to tell its policyholders, in various written documents which were admitted into evidence, that the parts were as good, or better than, OEM parts. Further, the written disclosures stamped on or attached to the repair estimates or which were delivered with the repair estimates, did nothing to advise the State Farm policyholder of the inferiority of the parts. Finally, State Farm's 'Guarantee' improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm.

State Farm is a mutual insurance company which operates for the benefit of its policyholders. State Farm 'occupies a position of trust with its policyholders, who pay the required premiums and are entitled to receive all the benefits State Farm promises to provide in its insurance contract with them. State Farm violated this trust. The court finds that State Farm, in light of its knowledge of the inferiority of non-OEM 'crash parts,' misrepresented, concealed, suppressed or omitted material facts concerning the non-OEM 'crash parts,' with the intent that its policyholders rely upon on [*sic*] these deceptions, in violation of the Consumer Fraud Act."

***31** In succinct fashion, the circuit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court also held that State Farm's deceptive acts had proximately caused the named plaintiffs and the class as a whole actual damages and that the actual damages were defined in the same terms as they were under the breach of contract count:

> "The court further finds that as a direct and proximate result of State Farm's violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages; namely the specification/direct damages and installation damages which occurred during the class period for Consumer Fraud Act plaintiffs."

Because the consumer fraud damages were identical to the breach of contract damages, the circuit court reasoned that an award of actual damages for consumer fraud would constitute a double recovery. The circuit court therefore declined to award plaintiffs "actual economic damages" (815 ILCS 505/10a(a) (West 2002)) under the Consumer Fraud Act. The circuit court did, however, award plaintiffs $130 million in "disgorgement" damages and $600 million in punitive damages.

On appeal, the appellate court affirmed the circuit court's certification of a nationwide class for consumer fraud. As in the circuit court, the appellate court held that a common question of fact predominated for the class based upon State Farm's uniform practice of specifying non-OEM parts and providing its insureds with a written estimate and a "Quality Replacement Parts" brochure:

> "In regard to the consumer-fraud claim, the record contained evidence that State Farm engaged in an ongoing course of conduct nationwide, in which it specified inferior non-OEM parts whenever those parts were cheaper and available, that State Farm knew those parts were inferior, that State Farm did not inform its policyholders of the problems with those parts, and that State Farm affirmatively misrepresented the condition of those parts by assuring policyholders--on the damage estimates and in brochures--that it specified only 'quality replacement parts' and that it guaranteed the parts at no additional cost." 321 Ill.App.3d at 280-81, 254 Ill.Dec. 194, 746 N.E.2d 1242.

Like the circuit court, the appellate court also held that the Consumer Fraud Act could be applied to consumers residing out-of-state. Citing *Martin v. Heinhold Commodities, Inc.*, 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987), the appellate court determined that non-Illinois consumers are "permitted to pursue an action under the Act against a resident defendant where the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deceptive acts and practices [are] perpetrated in Illinois." 321 Ill.App.3d at 281, 254 Ill.Dec. 194, 746 N.E.2d 1242. The appellate court then concluded: "The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states." 321 Ill.App.3d at 282, 254 Ill.Dec. 194, 746 N.E.2d 1242. Finally, the appellate court affirmed the circuit court's finding that there were "no true conflicts" between the Consumer Fraud Act and other states' consumer fraud laws and that "Illinois has significant contacts to the claims asserted by each class member." 321 Ill.App.3d at 282, 254 Ill.Dec. 194, 746 N.E.2d 1242. From this, the appellate court concluded that there was no constitutional barrier to applying the Consumer Fraud Act to the claims of plaintiffs who resided out-of-state. 321 Ill.App.3d at 282-83, 254 Ill.Dec. 194, 746 N.E.2d 1242.

***32** With respect to the merits of the claim, State Farm repeated its argument to the appellate court that plaintiffs' consumer fraud claim was nothing more than a restatement of the breach of contract claim. Citing to several decisions from the appellate court in support of this argument, including *Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 312, 244 Ill.Dec. 100, 724 N.E.2d 988 (2000), State Farm argued that the trial court's finding of liability under the Consumer Fraud Act should be reversed. The appellate court rejected this contention, finding that "[t]he evidence of State Farm's deceptive claims practices moves this case beyond a mere contract breach." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

State Farm also argued to the appellate court that it was not liable under the Consumer Fraud Act for the affirmative representations it made to plaintiffs because those representations were merely puffing and, therefore, not actionable. The appellate court rejected this argument, stating:

> "In our view, [State Farm's] representations assigned 'virtues' to non-OEM parts that they did not possess. See *Totz v. Continental Du Page Acura*, 236 Ill.App.3d 891, 905, 177 Ill.Dec. 202, 602 N.E.2d 1374 (1992); *Rumford v. Countrywide Funding Corp.*, 287 Ill.App.3d 330, 336, 222 Ill.Dec. 757, 678 N.E.2d 369 (1997). They are representations that a reasonable policyholder would have interpreted as fact." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court Rule 23).

Finally, State Farm argued to the appellate court that the evidence was insufficient to establish that the actions, representations or omissions which occurred during the claims process proximately caused injury to any of the class members. The appellate court rejected this argument too:

"Plaintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, that State Farm specified non-OEM parts that it knew to be inferior, that State Farm did not inform its policyholders that the non-OEM parts it specified were inferior, and that State Farm knowingly represented on its estimates, in its 'Quality Replacement Part[s]' brochures, and through its estimators that these non-OEM parts were of equal quality or better than OEM parts. There is evidence that State Farm's material misrepresentations led numerous class members to blindly accept the non-OEM parts specified (*i.e.*, without knowledge of the inferior condition of those parts). See *Perona*, 292 Ill.App.3d at 68-69, 225 Ill.Dec. 868, 684 N.E.2d 859; *Johnston v. Anchor Organization for Health Maintenance*, 250 Ill.App.3d 393, 397, 190 Ill.Dec. 268, 621 N.E.2d 137 (1993). There is overwhelming evidence of State Farm's calculated deception of its policyholders in a deliberate disregard of its express written promises contained in the policies issued. The deceit was deliberate and universally employed for the purpose of obtaining unearned, illegitimate monetary gain. This was an ill-gotten gain, acquired at the expense of persons that trusted and relied upon State Farm for honest, fair treatment. There is an abundance of evidence to support the trial court's finding that the class members' injuries were proximately caused by State Farm's deceptive conduct." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

*33 Based on this reasoning, the appellate court affirmed the judgment of the circuit court holding that State Farm had violated the Consumer Fraud Act. The appellate court also affirmed the circuit court's $600 million punitive damage award. However, the appellate court reversed the $130 million in disgorgement damages, holding that it constituted an impermissible double recovery. State Farm then appealed.

On appeal, State Farm contests the circuit court's certification of a nationwide consumer fraud class, as well the circuit court's judgment in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

favor of plaintiffs on the merits. We first examine, however, the nature of plaintiffs' consumer fraud claim.

A. *Plaintiffs' Consumer Fraud Claim*

[25] Surprisingly, although plaintiffs' allegation of consumer fraud has been in litigation for several years, and a statutory consumer fraud claim must be pled with specificity (*Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 501, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996)), there is still some confusion--as evinced by plaintiffs' arguments before this court--as to exactly what conduct of State Farm is at issue under the consumer fraud claim. To clarify what is at issue, it will be helpful to identify that conduct which we can readily conclude does *not* support plaintiffs' consumer fraud claim.

1. Plaintiffs' Consumer Fraud Claim May Not Be Based on a Breach of a Promise Contained in Their Insurance Policies

[26] Before the circuit court, plaintiffs maintained that their consumer fraud count was not based on "the drafting, or the sale or even the interpretation" of any class member's insurance policy. Yet in their brief before this court, plaintiffs repeatedly point to State Farm's contractual promises to define the consumer fraud. Plaintiffs state, for example, that State Farm disregarded "the express written promises in its policies," that there was "no evidence that Plaintiffs or the class knew, expected or understood that State Farm would specify parts that failed to fulfill its contractual obligations," and that "[t]he law implies and recognizes the expectation, understanding and belief that State Farm would fulfill its contractual obligation." Similarly, although both the circuit court and the appellate court stated that plaintiffs' consumer fraud count was not based on a breach of a contractual promise, each court referenced State Farm's failure to fulfill its policy obligations in its analysis of plaintiffs' consumer fraud claim. The appellate court in particular, in upholding the circuit court's consumer fraud judgment, pointedly relied on State Farm's "deliberate disregard of its express written promises contained in the policies issued." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). These repeated references to simple breaches of contractual promises in support of the consumer fraud count are in error.

[27] A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 233, 115 S.Ct. 817, 826, 130 L.Ed.2d 715, 728 (1995), quoting *Golembiewski v. Hallberg Insurance*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agency, Inc., 262 Ill.App.3d 1082, 1093, 200 Ill.Dec. 113, 635 N.E.2d 452 (1994). As our appellate court has explained:

*34 "What plaintiff calls 'consumer fraud' or 'deception' is simply defendants' failure to fulfill their contractual obligations. Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. However, it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. See *Law Offices of William J. Stogsdill v. Cragin Federal Bank for Savings*, 268 Ill.App.3d 433, 437-38, 206 Ill.Dec. 559, 645 N.E.2d 564 (1995); *Golembiewski v. Hallberg Insurance Agency, Inc.*, 262 Ill.App.3d 1082, 1093, 200 Ill.Dec. 113, 635 N.E.2d 452 (1994). We believe that a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract." *Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 312, 244 Ill.Dec. 100, 724 N.E.2d 988 (2000).

Accord, e.g., *Kleczek v. Jorgensen*, 328 Ill.App.3d 1012, 1022, 263 Ill.Dec. 187, 767 N.E.2d 913 (2002); *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill.App.3d 452, 460, 211 Ill.Dec. 299, 654 N.E.2d 1109 (1995); *Exchange National Bank v. Farm Bureau Life Insurance Co. of Michigan*, 108 Ill.App.3d 212, 216, 63 Ill.Dec. 884, 438 N.E.2d 1247 (1982); *DeLeon v. Beneficial Construction Co.*, 55 F.Supp.2d 819, 826 (N.D.Ill.1999); *Petri v. Gatlin*, 997 F.Supp. 956, 967-68 (N.D.Ill.1997).

Both the circuit court and appellate court recognized this principle but both courts failed to apply it consistently. As a matter of law, plaintiffs' consumer fraud claim may not be based on the assertion that State Farm breached its promise to restore plaintiffs' vehicles to their "pre-loss condition" or that State Farm breached its promise to repair plaintiffs' vehicles using parts of "like kind and quality."

2. This Case Is Not About the Specification of Defective Parts

Before this court, plaintiffs do not claim to have proven that any of the non-OEM parts specified by State Farm in its repair estimates were defective. This is in keeping with plaintiffs' position at trial. Plaintiffs deliberately avoided any theory relating to defective parts at trial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because such a theory would have significantly increased their burden of proof. Such a theory would also have rendered class certification far less likely, since the common question of fact or law necessary for certification would have been more difficult to establish if plaintiffs had been forced to prove that each individual non-OEM part, or grouping of parts, was defective. Thus, before the circuit court, plaintiffs' counsel made it very clear that they were *not* trying to prove that any of the non-OEM parts at issue were defective, at one point saying: "[A]s we've stated this is not a defect case. We are not proving and we are not required to prove that the parts are defective."

What plaintiffs do claim to have established at trial is a proposition far more general than whether any of the specified non-OEM parts was defective. Plaintiffs claim to have proven that non-OEM parts, as a whole, are not as good as OEM parts. Or, to use plaintiffs' terminology, that non-OEM parts are "categorically inferior" to OEM parts. But "categorically inferior" is not the same thing as "categorically defective." This point is important.

***35** [28] In their written opinions, both the circuit court and the appellate court refer to State Farm's specification of "categorically inferior" parts as if the act of specifying nondefective parts, by itself, is fraudulent. The appellate court, for example, in describing State Farm's allegedly deceptive acts, notes that "[p]laintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, [and] that State Farm specified non-OEM parts that it knew to be inferior." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). However, it is no more fraudulent--in and of itself--to specify non-OEM parts while knowing that they are not as good as OEM parts than it is to sell Chevrolet automobiles while knowing that they are not as good as Cadillacs. Whether the consumer product is automobiles, toasters or something else, there will always be some brands of that product that are not as good as, or which are "categorically inferior" to, other brands of the same product. The state's economy would come to a grinding halt if the sale of anything less than the single, best brand of every consumer good were considered fraudulent.

What makes the specification of the *nondefective,* non-OEM part potentially fraudulent are the statements which are made, or not made, about the product. It is the omissions and representations State Farm made about non-OEM parts--

not simply the act of specifying non-OEM parts--that must form the basis of plaintiffs' consumer fraud action.

### 3. The Representations Which Form the Basis of Plaintiffs' Cause of Action for Consumer Fraud Do Not Include the Statement That Non-OEM Parts Are as Good as OEM Parts

The appellate court based its holding that State Farm violated the Consumer Fraud Act, in part, on its findings that "State Farm knowingly represented on its estimates [and] in its 'Quality Replacement Parts' brochures" that non-OEM parts "were of equal quality or better than OEM parts." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). These findings, however, are incorrect. Neither the written estimates nor the "Quality Replacement Parts" brochures which the named plaintiffs received from State Farm contain the statement that non-OEM parts are "of equal quality to or better than OEM parts." See Appendix A and Appendix C.

[29] As previously noted, two of the State Farm documents relied upon by plaintiffs in this case, the "Good Neighbor News" newsletter and the "Reflector" magazine, do contain the statement that non-OEM parts are as good as, or better than, OEM parts. However, there is no evidence that any of the named plaintiffs ever read, saw or were in any way aware of these documents. This is not surprising. The "Good Neighbor News" newsletter which is of record is dated "Fall 1993," one year before the starting date of the consumer fraud class period and approximately three years before the earliest of the five named plaintiffs' accidents occurred. The "Reflector" magazine article was circulated to State Farm agents, not policyholders, and was published in 1990, some six years before the earliest of the named plaintiffs' accidents and four years before the starting date of the class period.

***36** In its order certifying the nationwide consumer fraud class, the circuit court wrote that "State Farm has also promoted the use of the term 'quality replacement parts' nationwide in an effort to promote its substitution of non-OEM for OEM parts." This sentence seems to suggest that the circuit court found the newsletter and magazine articles relevant to all policyholders, regardless of whether they saw them or not, because the articles helped create a nationwide market for non-OEM parts. However, we explicitly rejected this "market theory" of causation in *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and again, more recently, in *Shannon v. Boise Cascade Corp.*, 208 Ill.2d 517, 281 Ill.Dec. 845, 805 N.E.2d 213 (2004). Accordingly, neither the "Good Neighbor News" newsletter nor the "Reflector" magazine has any relevance to this case, and the statement that non-OEM parts are "of equal quality to or better than OEM parts" simply does not support plaintiffs' consumer fraud claim.

4. Describing a Non-OEM Part as a "Quality Replacement Part" Is Puffing and,
Hence, Not Actionable

[30] Plaintiffs object to two phrases describing non-OEM parts which appear in the named plaintiffs' estimates and in the "Quality Replacement Parts" brochure. The first phrase plaintiffs point to is "quality replacement parts." This phrase appears in both the named plaintiffs' estimates, as a line entry under "Part Type" (see, *e.g.*, Appendix A), and in the brochure received along with the estimate (see Appendix C). The second phrase is "very high performance criteria," which appears in the brochure in this sentence: "Only those parts which meet our very high performance criteria are acceptable." See Appendix C. Plaintiffs maintain that both these phrases are deceptive under the Consumer Fraud Act.

[31] State Farm, however, contends that these phrases are merely "puffing" and, hence, cannot form a basis for plaintiffs' consumer fraud claim. We agree. "Puffing" denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined. See, *e.g.*, *Speakers of Sport, Inc. v. Proserv, Inc.*, 178 F.3d 862, 866 (7th Cir.1999) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud"). Such statements include subjective descriptions relating to quality. See, *e.g.*, *Evanston Hospital v. Crane*, 254 Ill.App.3d 435, 439, 444, 193 Ill.Dec. 870, 627 N.E.2d 29 (1993) ( "high-quality"); *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill.App.3d 810, 823, 186 Ill.Dec. 425, 616 N.E.2d 615 (1993) ("expert workmanship," "custom quality," "perfect"); *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 163, 109 Ill.Dec. 541, 510 N.E.2d 409 (1986) ("magnificent," "comfortable"); *Spiegel v. Sharp Electronics Corp.*, 125 Ill.App.3d 897, 902, 81 Ill.Dec. 238, 466 N.E.2d 1040 (1984) ("picture perfect"); see also *State v. American TV & Appliance of Madison, Inc.*, 146 Wis.2d 292, 302, 430 N.W.2d 709, 712 (1988) ("A general statement that one's products are best is not actionable as a misrepresentation of fact").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Describing a product as "quality" or as having "high performance criteria" are the types of subjective characterizations that Illinois courts have repeatedly held to be mere puffing. Thus, as a matter of law, neither phrase can be considered deceptive under the Consumer Fraud Act.

***37** Plaintiffs nevertheless point out that the circuit court found that the phrase "quality replacement parts" was "misleading." However, the circuit court did not cite to, or distinguish, any of the decisions cited above which hold that subjective statements of quality are merely puffing. Moreover, the circuit court did not cite any evidence to support its finding that the phrase was "misleading" and never made any determination that the phrase "quality replacement parts" stated a deceptive fact.

The appellate court, unlike the circuit court, did conclude that State Farm made representations "that a reasonable policyholder would have interpreted as fact." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). The appellate court determined that State Farm's "representations assigned 'virtues' to non-OEM parts that they did not possess" and, therefore, the representations violated the Act. 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). However, the appellate court's conclusion that State Farm's "representations assigned 'virtues' to non-OEM parts that they did not possess" is based on a misstatement of the facts. The appellate court found that State Farm "represented on its estimates" and "in its Quality Replacement Part[s] brochures" that "non-OEM parts were of equal quality or better than OEM parts." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). As noted, this is incorrect. The statement that non-OEM parts are as good as OEM parts does not appear in either the named plaintiffs' estimates or the "Quality Replacement Parts" brochure.

There is no basis for concluding, as plaintiffs contend, that the phrases "quality replacement parts" and "high performance criteria" are anything other than puffing. Thus, these phrases cannot support plaintiffs' consumer fraud claim.

5. The Guarantee Provided by State Farm Cannot Form a Basis for Plaintiffs' Consumer Fraud Claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[32] The circuit court held that State Farm violated the Consumer Fraud Act by providing a guarantee which states that if the policyholder is unsatisfied with the "fit and corrosion resistance qualities" of a replacement part, then State Farm will repair or replace the part at no cost. The circuit court concluded that this guarantee violated the Act because it "improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm." Plaintiffs point to this conclusion in support of their contention that State Farm violated the Act.

It is not clear what the circuit court meant when it held that State Farm's guarantee improperly put a "burden" on policyholders. Every guarantee places a burden on the consumer--the manufacturer or retailer must be notified when there is a problem with the product that is produced or sold and the guarantee must be invoked. For this reason, the circuit court cannot be correct if it meant that the guarantee is fraudulent because it required the policyholders to take action. If this were true, every guarantee, no matter how comprehensive or generous, would be inherently fraudulent.

*38 Plaintiffs argue, however, that the guarantee put an improper burden on policyholders because it was simply too difficult to use. According to plaintiffs, State Farm adjustors would "brush off attempts to use the guarantee," getting an OEM replacement part once the guarantee was invoked could take "up to three to five days," and "[e]ven when a body shop showed State Farm that a non-OEM crash part did not fit, State Farm would still sometimes not authorize OEM parts." However, several witnesses, including some who testified on behalf of plaintiffs, stated that the guarantee was honored in a routine fashion. For example, plaintiffs' witness Dave Beyers, the manager of a body shop in Williamson County, testified that if he had a problem with a non-OEM fender he would simply "fax up a form" to State Farm and "[p]ut the OEM fender on."

More important, none of the named plaintiffs in this case testified that they had problems using the guarantee. Indeed, none of the named plaintiffs made any attempt to invoke it. Avery and Shadle refused to have non-OEM parts put on their vehicles, so for them, the guarantee was not at issue. The other named plaintiffs, Covington, DeFrank and Vickers, did not attempt to use the guarantee. DeFrank was specifically asked whether he took "advantage of State Farm's guarantee that had been provided to [him] at the time the estimate was prepared." He answered that he had not. Accordingly, there is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

no basis in the record for concluding that the guarantee was unduly burdensome for the named plaintiffs, let alone for the class members as a whole.

[33] Finally, plaintiffs point out that when a policyholder successfully used the guarantee, the amount paid to replace the non-OEM part was recorded as an indemnity payment and became part of the insured's claim file. Plaintiffs speculate that the inclusion of this information in the claim file could "possibly rais[e] the insured's rates." However, plaintiffs point to no testimony or other evidence of record to support this assertion. Thus, we conclude that the guarantee offered by State Farm cannot form a basis for plaintiffs' consumer fraud claim.

6. The Crux of Plaintiffs' Consumer Fraud Claim Is a Failure by State Farm to Disclose the Categorical Inferiority of Non-OEM Parts During the Claims Process

Having eliminated that conduct which clearly cannot support a claim for consumer fraud, what remains is the core allegation stated in plaintiffs' complaint: "By way of false or deceptive pretenses, acts, or practices, defendant did not disclose to plaintiffs that they were: a) using inferior, imitation parts * * *."

Plaintiffs' complaint does not allege that State Farm failed to disclose an inferior characteristic of any specific non-OEM part. This is to be expected, since the characteristics of one part were not always present in every other part and did not always apply to every member of the class. For example, while plaintiffs contended at trial that some non-OEM parts were not as safe as OEM parts (a proposition which State Farm vigorously disputed), this contention applied only to some of the non-OEM parts at issue, such as bumpers, which not every member of the class received. Similarly, plaintiffs' assertion that some non-OEM parts were inferior because they were not properly galvanized applied only to metal parts, not plastic. Thus, the allegedly deceptive act which was common to the entire class and every repair was not the failure to disclose a specific inferior characteristic but, rather, the failure to disclose the supposed categorical inferiority of non-OEM parts. This failure to disclose, according to plaintiffs, constitutes "the concealment, suppression or omission of any material fact" (815 ILCS 505/2 (West 1998)) in violation of the Act.

*39 Further, the failure to disclose occurred during the claims process. Recall that State Farm's practice of giving its policyholders a written estimate and a brochure--in which the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleged categorical inferiority of non-OEM parts was not disclosed--was precisely the basis on which the circuit court found, in its order certifying the consumer fraud class, that State Farm's conduct was common to all class members. As the circuit court stated:

> "As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm's methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant's Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant's Exhibit 27."

The appellate court below correctly stated the core allegation of plaintiffs' consumer fraud claim: "Plaintiffs claimed that by adopting and employing this claims practice, State Farm deceived its policyholders in that it failed to inform them of the inferior quality of specified replacement parts." 321 Ill.App.3d at 273, 254 Ill.Dec. 194, 746 N.E.2d 1242. It is this allegation we must keep in mind when considering the remaining challenges raised by State Farm in this appeal.

B. *Propriety of the Nationwide Consumer Fraud Class*

[34] State Farm contends that the circuit court's certification of a nationwide consumer fraud class was improper. According to State Farm, the circuit court's application of the Consumer Fraud Act to policyholders across the country was impermissible because the Act, by its own terms, does not apply to consumer transactions involving nonresidents that occur outside Illinois. Moreover, in State Farm's view, the certification of the nationwide class violated Illinois' choice-of-law rules, as well as the full faith and credit clause, the due process clause, and the commerce clause of the federal constitution. A determination by this court that the Consumer Fraud Act does not apply, by its own terms, to the out-of-state transactions at issue in this case would render it unnecessary to address State Farm's choice-of-law and constitutional arguments. Accordingly, we consider the scope of the Consumer Fraud Act first. See, *e.g.*, *Beahringer v. Page*, 204 Ill.2d 363, 370, 273 Ill.Dec. 784, 789 N.E.2d 1216 (2003) (holding that constitutional questions will not be decided if case can be decided on other grounds). Because the scope of the Act is a question of statutory interpretation, our review is *de novo*. *Lucas v. Lakin*, 175 Ill.2d 166, 171, 221 Ill.Dec. 834, 676 N.E.2d 637

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1997).

1. Scope of the Consumer Fraud Act

[35] Section 2 of the Consumer Fraud Act provides that "deceptive acts or practices * * * or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact * * * in the conduct of any trade or commerce are hereby declared unlawful * * *." 815 ILCS 505/2 (West 1998). Section 10a(a) of the Act authorizes private causes of action for practices proscribed by section 2. Section 10a(a) states, in pertinent part: "Any person who suffers actual damage as a result of a violation of [the] Act committed by any other person may bring an action against such person." 815 ILCS 505/10a(a) (West 1998). To prove a private cause of action under section 10a(a) of the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Oliveira*, 201 Ill.2d at 149, 267 Ill.Dec. 14, 776 N.E.2d 151.

***40** As noted, State Farm maintains that a nonresident consumer may not pursue a private cause of action under the Act when the disputed consumer transaction occurs out-of-state. Plaintiffs dispute this contention. To support their positions, both plaintiffs and State Farm note that a plaintiff cannot recover under the Act unless the defendant's disputed conduct involves "trade or commerce." 815 ILCS 505/2 (West 1998); *Oliveira*, 201 Ill.2d at 149, 267 Ill.Dec. 14, 776 N.E.2d 151. Both parties then point to section 1(f) of the Act, the provision of the Act which defines the terms "trade" and "commerce":

> "(f) The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 ILCS 505/1(f) (West 1998).

[36] Plaintiffs initially state that section 1(f) "expressly notes that it applies to transactions 'wherever situated.' " This is incorrect. The words "wherever situated" do not refer to fraudulent transactions, but to the nouns "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value." 815 ILCS 505/1(f) (West 1998). The words "wherever situated" do not expand the scope of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.