the Act to apply to consumer transactions that take place out-of-state.

State Farm, in its argument, points to the language of section 1(f), which states that the trade or commerce must affect "the people of this State." 815 ILCS 505/1(f) (West 1998). Emphasizing the words "this State," State Farm contends that the Act is limited to transactions which take place in Illinois. Further, according to State Farm, the Consumer Fraud Act does not provide a cause of action to nonresidents whose claims processes took place outside of Illinois because those transactions had no effect on the people of Illinois. Plaintiffs, in reply, argue that the language of section 1(f) is broadly worded, and emphasize that the trade or commerce need only "indirectly affect" (815 ILCS 505/1(f) (West 1998)) the people of Illinois. From this, plaintiffs maintain that there is no geographic limit to the "trade or commerce" covered by the Act.

The language of section 1(f) has been interpreted by courts in a variety of ways. This divergence of interpretation is most notable in the federal district courts. In one of the earliest opinions to address the statute, *Seaboard Seed Co. v. Bemis Co.*, 632 F.Supp. 1133, 1140 (N.D.Ill.1986), the district court concluded that section 1(f) "defines 'trade' and 'commerce' in a geographically limited manner." See also *Bettarini v. Citicorp Services, Inc.*, No. 91 C 8390 (N.D.Ill.1992) (noting the "geographical scope of the Act" and rejecting a claim under the Act where the defendant's "complained of conduct impacted on [plaintiff] only at his home base in London"); *Swartz v. Schaub*, 818 F.Supp. 1214 (N.D.Ill.1993). Other district courts, however, have expressly disagreed with the notion that the Act is limited geographically. See *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*, 913 F.Supp. 1088, 1140 (N.D.Ill.1995) ("This Court believes that the Illinois Consumer Fraud Act, although intended to protect Illinois consumers, does not contain a geographic limitation"); see also *Continental X-Ray Corp. v. XRE*, No. 93 C 3522 n. 1 (N.D.Ill.1995) (same).

***41** Still other district courts interpreting section 1(f) have concluded that the section limits the scope of the Act based on the residency of the plaintiff. Some of the courts adopting this focus have concluded that the Act is intended only to "protect and benefit Illinois residents." *Lincoln National Life Insurance Co. v. Silver*, No. 86 C 7175 (N.D.Ill.1991), cited in *Nichols*, 913 F.Supp. at 1139. Other courts, however, have concluded that nonresidents may pursue a cause of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

action, although these courts typically hold that the transaction at issue must occur in Illinois or that there be an adequate "connection" to Illinois. See, *e.g.*, *Tylka v. Gerber Products Co.*, 182 F.R.D. 573, 576-78 (N.D.Ill.1998) (noting that "[c]ourts in this district are split as to whether the [Consumer Fraud Act] may apply to consumers who are not citizens of Illinois" and holding that the Act could apply where "the transactions giving rise to the action took place in Illinois"); *MAN Roland, Inc. v. Quantum Color Corp.*, 57 F.Supp.2d 568, 575 (N.D.Ill.1999) (rejecting interpretation of the Act which extends "standing only to consumers who are Illinois residents" and holding that the Act could apply where the nonresident consumer purchased a product "in Illinois from an Illinois corporation"); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 339 (N.D.Ill.1997) (even under those cases allowing nonresidents to pursue a cause of action under the Act, the non-Illinois residents in this case could not do so because their claims had "little or no connection to Illinois"); *Peters v. Northern Trust Co.*, No. 92 C 1647 (N.D.Ill.1999) (noting split in the district courts based on residency and holding that plaintiffs' consumer fraud claim failed because the conduct underlying the claims had "no connection to Illinois").

Additional interpretations of section 1(f) also exist in the district courts. One court has stated that what is important in determining whether a plaintiff may pursue a cause of action under section 1(f) is not the plaintiff's "residency, but the State of Illinois' interest in protecting its consumers" (*Ivanhoe Financial, Inc. v. Mortgage Essentials, Inc.*, No. 03 C 6887 (N.D.Ill.2004)), while another court has referred to section 1(f) as imposing " 'Illinois contact' requirements" (*Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 749 F.Supp. 869, 878 (N.D.Ill.1990)). Still other permutations can be found in the district courts; this list is not exhaustive.

Like the federal district courts, our appellate court has also divided over the question of how best to interpret section 1(f). In *Oliveira v. Amoco Oil Co.*, 311 Ill.App.3d 886, 244 Ill.Dec. 455, 726 N.E.2d 51 (2000), *vacated in part & rev'd on other grounds*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002), the Fourth District of our appellate court declined to hold that the Act applied to out-of-state consumers. *Oliveira*, 311 Ill.App.3d at 898, 244 Ill.Dec. 455, 726 N.E.2d 51, citing *Scott v. Association for Childbirth at Home, International*, 88 Ill.2d 279, 288, 58 Ill.Dec. 761, 430 N.E.2d 1012 (1981). The appellate court's decision in *Oliveira* was subsequently cited by a First District

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decision in *Prime Leasing, Inc. v. Kendig,* 332 Ill.App.3d 300, 265 Ill.Dec. 722, 773 N.E.2d 84 (2002), where the court stated in *dicta* that "the Act normally does not apply to out-of-state consumers." *Prime Leasing,* 332 Ill.App.3d at 313, 265 Ill.Dec. 722, 773 N.E.2d 84.

***42** In the case at bar, the Fifth District concluded, without discussing the statutory language of section 1(f) or any of the federal district court decisions discussing this issue, that non-Illinois consumers are "permitted to pursue an action under the Act against a resident defendant where the deceptive acts and practices [are] perpetrated in Illinois." 321 Ill.App.3d at 281, 254 Ill.Dec. 194, 746 N.E.2d 1242. More recently, in *Bunting v. Progressive Corp.,* 348 Ill.App.3d 575, 284 Ill.Dec. 103, 809 N.E.2d 225 (2004), the First District elected to follow the appellate court decision in this case and rejected the defendant's argument that "the Act is inapplicable because plaintiff is a nonresident." *Bunting,* 348 Ill.App.3d at 586, 284 Ill.Dec. 103, 809 N.E.2d 225.

It is not clear from the plain language of section 1(f) which, if any, of the many interpretations noted above accurately captures the meaning of that provision. Indeed, the wealth of competing interpretations of section 1(f) is a compelling indication of the statute's ambiguity. See, *e.g., Krohe v. City of Bloomington,* 204 Ill.2d 392, 395-96, 273 Ill.Dec. 779, 789 N.E.2d 1211 (2003) ("A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways"). Because the language of section 1(f) is ambiguous, it is appropriate for us to consider other sources, including legislative history, in order to discern the statute's meaning. See, *e.g., People v. Jameson,* 162 Ill.2d 282, 288, 205 Ill.Dec. 90, 642 N.E.2d 1207 (1994).

Although there is not a great deal of legislative history with respect to section 1(f), we do find relevant a statement from Senator Sours, the Senate sponsor of the bill which created a private cause of action under the Act and which added section 1(f). See Pub. Act 78-904, eff. September 21, 1973. Just before the vote in the Senate was taken, Senator Sours made the following remarks:

> "Just to conclude briefly Mr. President and Senators, I'd like to just read a couple of excerpts from this bill and ... the excerpts are very brief to indicate the broad terms of the bill. I'm reading line 7 on page 2: 'The terms trade and commerce' and that really is what we're talking about. *We're talking about trade and commerce that is not included within the interstate concept.* Means the advertising and how much of that we see offering for sale, sale or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

distribution of any services and any property tangible or and intangible, real, personal or mixed and every other article, commodity or thing of value wherever it's situated and shall include any trade or commerce, directly or indirectly affecting the people of this State." (Emphasis added.) 78th Ill. Gen. Assem., Senate Proceedings, June 30, 1973, at 268 (statements of Senator Sours).

[37][38] In addition to Senator Sours' statement, we note the long-standing rule of construction in Illinois which holds that a "statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Dur-Ite Co. v. Industrial Comm'n,* 394 Ill. 338, 350, 68 N.E.2d 717 (1946); *Graham v. General U.S. Grant Post No. 2665, V.F.W.,* 43 Ill.2d 1, 6, 248 N.E.2d 657 (1969); see also *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 2567, 125 L.Ed.2d 128, 155 (1993) ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested"); 73 Am.Jur.2d *Statutes* § 250 (2001). Given the statement of Senator Sours and the rule against giving statutes extraterritorial effect unless an intent to do so is clearly expressed, we conclude that the General Assembly did not intend the Consumer Fraud Act to apply to fraudulent transactions which take place outside Illinois.

*43 Having concluded that the Act does not have extraterritorial effect, the next step in our analysis is to determine whether the transactions at issue in this case took place outside Illinois. We first observe, however, that it can be difficult to identify the situs of a consumer transaction when, as plaintiffs in this case allege, the transaction is made up of components that occur in more than one state. To solve this problem, courts have often directed their focus to the site of injury or deception--the reason being that, until a deceptive statement has been communicated to a plaintiff and there has been an injury, there is no fraudulent transaction and no cause of action. The Court of Appeals of New York followed this approach in *Goshen v. Mutual Life Insurance Co.,* 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002). In that decision, the New York court considered whether "hatching a scheme" or originating a marketing campaign in New York constituted an actionable deceptive act under a consumer fraud statute which limited the definition of trade or commerce to that which occurred in-state. *Goshen,* 98 N.Y.2d at 324, 746 N.Y.S.2d 858, 774 N.E.2d at 1195. The court concluded that it did not. The court explained that "[t]he origin of any advertising or promotional conduct is irrelevant if the deception itself--that is, the advertisement or promotional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

package--did not result in a transaction in which the consumer was harmed." *Goshen*, 98 N.Y.2d at 326, 746 N.Y.S.2d 858, 774 N.E.2d at 1196. Because there was no fraudulent transaction until the deception occurred, the location of the deception was the controlling factor. Thus, the court held that "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." *Goshen*, 98 N.Y.2d at 325, 746 N.Y.S.2d 858, 774 N.E.2d at 1195. See also *Graham v. General U.S. Grant Post No. 2665, V.F.W.*, 43 Ill.2d 1, 6, 248 N.E.2d 657 (1969) (no cause of action under Illinois Dram Shop Act where the injury to plaintiff occurred out-of-state).

The position taken by the *Goshen* court is not unreasonable. In a misrepresentation case, there is no fraudulent transaction until the misrepresentation has been communicated. But the *Goshen* court's view of the situs of a consumer transaction is a narrow one. The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois. Stated otherwise, we believe that there is a broader alternative to the position taken by the *Goshen* court, namely, that a fraudulent transaction may be said to take place within a state if the circumstances relating to the transaction occur primarily and substantially within that state.

*44 [39] The General Assembly has stated that the Consumer Fraud Act "shall be liberally construed to effect" its purposes. 815 ILCS 505/11a (West 1998). Given this fact, we believe that the General Assembly intended the broader understanding of an in-state transaction noted above. Accordingly, we hold that a plaintiff may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois. In adopting this holding, we recognize that there is no single formula or bright-line test for determining whether a transaction occurs within this state. Rather, each case must be decided on its own facts. Accordingly, the critical question in this case becomes whether the circumstances relating to plaintiffs' disputed transactions with State Farm occurred primarily and substantially in Illinois.

2. Whether the Consumer Fraud Act Applies to the Transactions at Issue in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This Case

The appellate court below concluded that the Consumer Fraud Act could be applied to the out-of-state plaintiffs in this case. The appellate court explained: "The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states." 321 Ill.App.3d at 282, 254 Ill.Dec. 194, 746 N.E.2d 1242.

[40] We agree with the appellate court that the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining the location of a consumer transaction. However, in this case, it does not follow that because a single factor relating to State Farm's claims practices with its policyholders took place in Illinois, the claims practice itself "occurred in Illinois." In fact, just the opposite is true. The overwhelming majority of circumstances relating to the disputed transactions in this case--State Farm's claims practices--occurred outside of Illinois for the out-of-state plaintiffs.

[41] Plaintiff Michael Avery's transaction with State Farm during the claims process is representative of the situation of the out-of-state plaintiffs. Avery resides in Louisiana, not Illinois. His car was garaged in Louisiana and his accident occurred there as well. Avery's estimate was written in Louisiana and he received his "Quality Replacement Parts" brochure in Louisiana. The alleged deception in this case--the failure to disclose the inferiority of non-OEM parts--also occurred in Louisiana. The repair of Avery's car took place in Louisiana. Damage to Avery, if any, occurred in Louisiana. Moreover, there is no evidence that Avery ever met or talked to a State Farm employee who works in Illinois. Avery's contact with State Farm was through a Louisiana agent, a Louisiana claims representative, and a Louisiana adjustor. In sum, the overwhelming majority of the circumstances which relate to Avery's and the other out-of-state plaintiffs' claims proceedings--the disputed transactions in this case--occurred outside Illinois. We conclude, therefore, that the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act.

***45** In support of the appellate court, plaintiffs rely on *Martin v. Heinold Commodities, Inc.*, 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987) (*Martin I* ), to which the appellate court cited. In *Martin I*, a plaintiff class consisting of both Illinois and non-Illinois residents brought suit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against an Illinois company that had served as broker for the plaintiffs in commodities transactions. The broker relationship had been established by a contract that allegedly contained deceptive statements. This court allowed certification of the plaintiffs' claims under the Illinois Consumer Fraud Act, even with respect to the non-Illinois plaintiffs. Martin I, 117 Ill.2d at 80-83, 109 Ill.Dec. 772, 510 N.E.2d 840.

*Martin I* is of little help to plaintiffs. In addressing the propriety of the class before it, *Martin I* considered only whether the class comported with the due process principles laid out in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). *Martin I*, 117 Ill.2d at 82, 109 Ill.Dec. 772, 510 N.E.2d 840. *Martin I* did not address the scope of the Consumer Fraud Act as a matter of statutory interpretation; that issue simply was not presented. See *Nix v. Smith*, 32 Ill.2d 465, 470, 207 N.E.2d 460 (1965) ("A judicial opinion is a response to the issues before the court, and these opinions, like others, must be read in light of the issues that were before the court for determination"). Nevertheless, to the extent that *Martin I* is relevant here, it is distinguishable.

In *Martin I*, this court specifically based its decision on the following facts: (1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to be directed to its Chicago office; and (5) payments for the defendant's services were to be sent to its Chicago office. Given these circumstances, this court concluded that the Act could apply to the whole class. *Martin I*, 117 Ill.2d at 82-83, 109 Ill.Dec. 772, 510 N.E.2d 840.

In contrast to *Martin I*, there are virtually no circumstances relating to the disputed claims practices at issue in this case which occurred or existed in Illinois for those plaintiffs who are not Illinois residents. The appellate court's conclusion that a scheme to defraud was "disseminated" from State Farm's headquarters is insufficient. See, *e.g.*, *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 340 & n. 10 (N.D.Ill.1997) (where the only connection with Illinois is the headquarters of the defendant or the fact that a scheme "emanated" from Illinois, the Consumer Fraud Act "does not apply to the claims of the non-Illinois plaintiffs even under the broad application of the [Act] endorsed by *Martin* and other similar cases").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Based on the foregoing, we conclude that the circuit court erred in certifying a nationwide class that included class members whose claims proceedings took place outside Illinois. Because we have decided the propriety of the certification order on statutory interpretation grounds, we need not consider whether certification of the nationwide class was unconstitutional or violated choice-of-law rules.

*46 The only putative class that can exist in this case under the Consumer Fraud Act is a class consisting of policyholders whose vehicles were assessed and repaired in Illinois. Four of the five named plaintiffs in this case, Avery, Covington, Shadle and Vickers, are not residents of Illinois, the damage to their vehicles did not occur in Illinois, they did not receive their repair estimates in Illinois, and they did not have their cars repaired in Illinois. These individuals have no cause of action under the Act. The only named plaintiff in this case whose vehicle was assessed and repaired in Illinois and, therefore, the only named plaintiff who can serve as a representative plaintiff for the putative Illinois class, is Sam DeFrank. Because a failure of DeFrank's claim would render discussion of class certification issues moot (see, *e.g.*, *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 156-57, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002)), we now turn to the propriety of the judgment in favor of DeFrank.

C. *Propriety of Judgment: Named Plaintiff*

[42] To succeed in a private cause of action under the Consumer Fraud Act, a plaintiff must prove "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira*, 201 Ill.2d at 149, 267 Ill.Dec. 14, 776 N.E.2d 151. In general, a trial court's decision as to whether these elements have been proven in any case is reviewed under the manifest weight of the evidence standard. *Kirkruff v. Wisegarver*, 297 Ill.App.3d 826, 839, 231 Ill.Dec. 852, 697 N.E.2d 406 (1998).

State Farm contends that the named plaintiffs, including DeFrank, failed to prove several of the elements required to establish a private cause of action. State Farm also contends that the circuit court held plaintiffs to the wrong burden of proof. We address this issue first.

1. Burden of Proof

The circuit court below held, as a matter of law, that plaintiffs must prove the elements of a private cause

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of action under section 10a(a) of the Act by a preponderance of the evidence. The appellate court agreed. 321 Ill.App.3d at 291, 254 Ill.Dec. 194, 746 N.E.2d 1242. State Farm contends that these holdings are incorrect and that the proper burden of proof in this case is clear and convincing evidence.

[43][44] In the ordinary civil case, because there are no sound reasons for favoring one party over another, the party with the burden of persuasion must prove his or her case by a preponderance of the evidence. A proposition proved by a preponderance of the evidence is one that has been found to be more probably true than not true. Occasionally, however, policy considerations require a court to impose a higher standard of proof. In such a case, the party with the burden of persuasion must prove his or her case by clear and convincing evidence. *Bazydlo v. Volant,* 164 Ill.2d 207, 212-13, 207 Ill.Dec. 311, 647 N.E.2d 273 (1995); see *Arrington v. Walter E. Heller International Corp.,* 30 Ill.App.3d 631, 639-40, 333 N.E.2d 50 (1975).

*47 [45] In the context of common law fraud, the law presumes that transactions are fair and honest; fraud is not presumed. Accordingly, fraud must be proved by clear and convincing evidence. *Racine Fuel Co. v. Rawlins,* 377 Ill. 375, 379-80, 36 N.E.2d 710 (1941); see *Gordon v. Dolin,* 105 Ill.App.3d 319, 324, 61 Ill.Dec. 188, 434 N.E.2d 341 (1982) (observing that in a common law fraud action, the plaintiff carries "a heavy responsibility").

The Consumer Fraud Act does not expressly provide the standard of proof required to succeed in a private cause of action. However, as noted, the Act is to be liberally construed to effect its purpose, which is to provide broader protection to consumers than an action for common law fraud. Accordingly, based on the liberal intent of the legislature behind the Act, and based on the fact that the Act does not expressly require a greater standard of proof, the appellate court has held that the appropriate standard of proof for a statutory fraud claim is preponderance of the evidence. See *Cuculich v. Thomson Consumer Electronics, Inc.,* 317 Ill.App.3d 709, 717-18, 251 Ill.Dec. 1, 739 N.E.2d 934 (2000); *Malooley v. Alice,* 251 Ill.App.3d 51, 56, 190 Ill.Dec. 396, 621 N.E.2d 265 (1993).

[46] In this case, the appellate court agreed with this reasoning and conclusion. 321 Ill.App.3d at 291, 254 Ill.Dec. 194, 746 N.E.2d 1242. We do likewise and so hold. Cases requiring a clear and convincing standard of proof (see, *e.g., General Motors Acceptance Corp. v. Grissom,* 150

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ill.App.3d 62, 65, 103 Ill.Dec. 447, 501 N.E.2d 764 (1986); *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 183, 92 Ill.Dec. 809, 485 N.E.2d 855 (1985)) are overruled on this point.

2. The Deceptive Act or Practice

When State Farm specified a non-OEM part in one of its repairs, it disclosed the use of that part in the policyholder's estimate and "half-sheet." See Appendix A and Appendix B. As noted previously, the gravamen of plaintiffs' complaint against State Farm is that this disclosure was inadequate. According to plaintiffs, State Farm should also have disclosed the categorical inferiority of non-OEM parts. Its failure to do so, plaintiffs contend, constituted a deceptive act or practice under the Act.

There are several difficulties with plaintiffs' argument. Recall that plaintiffs do not contend that all non-OEM parts are defective, only that they are all not as good as OEM parts. State Farm knew this fact, plaintiffs allege, and should have disclosed it to all policyholders. But many businesses undoubtedly sell products with the knowledge that those products are not as good as other brands on the market. Under plaintiffs' reasoning, it would appear that to avoid liability under the Act, every knowing sale of a brand of product which is not the top brand would have to carry a disclaimer: "Notice, our brand is not, on the whole, as good as our competitor's." Thus, adopting plaintiffs' argument would appear to work a significant expansion of liability under the Act.

Further, and of equal importance, we note that the disclosure provided by State Farm was required by, and complied with, state law.

Section 155.29 of the Insurance Code provides:

*48 " § 155.29. (a) Purpose. The purpose of this section is to regulate the use of aftermarket crash parts by requiring disclosure when any use of an aftermarket non-original equipment manufacturer's crash part is proposed and by requiring that the manufacturers of such aftermarket crash parts be identified.

(b) Definitions. * * *

* * *

(c) Identification. Any aftermarket crash part supplied by a non-original equipment manufacturer for use in this State after the effective date of this Act shall have affixed thereto or inscribed thereon the logo or name of its manufacturer. The manufacturer's logo or name shall be visible after installation whenever practicable.

(d) Disclosure. No insurer shall specify the use of non-OEM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

aftermarket crash parts in the repair of an insured's motor vehicle, nor shall any repair facility or installer use non-OEM aftermarket crash parts to repair a vehicle unless the customer is advised of that fact in writing. In all instances where an insurer intends that non-OEM aftermarket crash parts be used in the repair of a motor vehicle, the insurer shall provide the customer with the following information:
(1) a written estimate that clearly identifies each non-OEM aftermarket crash part; and
(2) a disclosure settlement incorporated into or attached to the estimate that reads as follows: 'This estimate has been prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle. Warranties applicable to these replacements parts are provided by the manufacturer or distributor of these parts rather than the manufacturer of your vehicle.' " 215 ILCS 5/155.29 (West 1998).

State Farm's compliance with section 155.29 of the Insurance Code raises an important issue. Like most state consumer fraud statutes, the Illinois Consumer Fraud Act exempts from its coverage practices or transactions which are permitted by other laws. Section 10b(1) of the Consumer Fraud Act provides:

"Nothing in this Act shall apply to any of the following:
(1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10b(1) (West 1998).

Interpreting Illinois decisions which have addressed this provision, the Seventh Circuit has stated:

"Taken together, the [Illinois] cases stand for the proposition that the state [Consumer Fraud Act] will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations. If the parties are doing something specifically authorized by federal law, section 10b(1) will protect them from liability under the [Act]. On the other hand, the [Consumer Fraud Act] exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate." (Emphasis omitted.) *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941 (7th Cir.2001).

*49 The Insurance Code does not require insurance companies to disclose that non-OEM parts are "categorically inferior" to OEM parts. Indeed, contrary to the findings of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circuit court below, it would appear that by allowing and regulating the use of non-OEM parts in Illinois, the General Assembly has made the policy determination that at least some number of non-OEM parts are *not* inferior to OEM parts. Otherwise, the General Assembly's decision to permit their use makes little sense. See *Snell v. Geico Corp.,* No. Civ. 202160, slip op. at 9 n. 2 (Md.Cir.Ct. August 14, 2001) (reasoning that, if state insurance commissioners would not sanction the use of *inferior* non-OEM parts, and if, nevertheless, they sanctioned the use of non-OEM parts in some instances, "these insurance commissioners must have determined that non-OEM parts are not *categorically* and *universally* inferior" (emphases in original)).

In light of section 155.29 of the Insurance Code, and section 10b(1) of the Act, we believe that there is a serious question as to whether State Farm's failure to disclose to its policyholders that non-OEM parts are not as good as OEM parts can be considered a deceptive act or practice. However, State Farm does not press this issue and we need not explore it further. We express no opinion as to the proper scope of section 10b(1) of the Act or the correctness of the *Bober* decision, or whether State Farm committed a deceptive act or practice within the meaning of the Consumer Fraud Act. Instead, we conclude that DeFrank's claim fails because he suffered no actual damage, as required under the Act, and because he failed to establish proximate causation.

3. Actual Damage

[47] The most striking deficiency in DeFrank's claim that State Farm violated the Consumer Fraud Act is his lack of actual damage. In order to sustain a private cause of action under the Act, a plaintiff must prove that he or she suffered "actual damage as a result of a violation of [the] Act." 815 ILCS 505/10a(a) (West 1996); *Oliveira*, 201 Ill.2d at 148-49, 267 Ill.Dec. 14, 776 N.E.2d 151. [FN11] In this case, DeFrank did not suffer any damage as a result of State Farm's specification or use of non-OEM parts.

The incident that gave rise to DeFrank's claim occurred on November 1, 1997, when his 1992 Chevrolet pickup truck was damaged in an accident. DeFrank testified that State Farm's estimate for repair of his truck included non-OEM parts and that these non-OEM parts were used in the truck's repair. DeFrank stated that several months later he sold his truck to his brother-in-law for $11,000, slightly below the "blue book" value of $11,400, in what DeFrank himself agreed was an "arm's length" transaction. DeFrank was asked by plaintiffs' counsel at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trial whether the non-OEM parts on the truck were a factor in the sale. His answer was "No." On cross-examination, this point was made clear:

"Q. [Counsel for State Farm] And there were no discounts in the price that you sold the truck for to your brother-in-law on account of the fact that there were non-OEM parts on the car; is that right?

***50** A. [DeFrank] Right.

Q. Is that correct?

A. Yes."

The language of the Consumer Fraud Act is plain. A plaintiff must prove "actual damage" before he or she can recover under the Act. That did not occur here. DeFrank's own testimony establishes that, when he sold his truck to his brother-in-law, he received the same value for the truck that he would have received if only OEM parts had been used in the repair. It simply made no difference that non-OEM parts were present on the truck. Clearly, DeFrank suffered no "actual damage" as a result of State Farm's specification or use of non-OEM parts and, therefore, he cannot recover under the Act. [FN12]

The appellate court offered no explanation as to how DeFrank, or any other members of the class, suffered "actual damage" within the meaning of the Consumer Fraud Act, while the circuit court offered only a brief statement on the issue. In a single sentence in its judgment order, the circuit court held that plaintiffs' damages under the consumer fraud count were defined in the same manner as they were under the breach of contract count. Thus, according to the circuit court, actual damages were defined as "specification" and "installation" damages. As with the breach of contract count, "specification" damages occurred at the moment State Farm specified a non-OEM part in a policyholder's repair estimate. "Installation" damages consisted of the cost of replacing non-OEM parts with OEM parts on those vehicles which had actually had non-OEM parts installed. Neither of these theories establishes that DeFrank suffered any damage under the Consumer Fraud Act.

First, DeFrank no longer owns his truck, which was sold for fair market value. Accordingly, as plaintiffs' own damages expert, Dr. Mathur, acknowledged at trial, DeFrank is not entitled to installation damages.

[48][49] Second, reliance on specification damages is entirely inappropriate for DeFrank's consumer fraud claim. As explained in our discussion of plaintiffs' breach of contract count, specification damages are not, in fact, real or measurable damages and, hence, in no way constitute "actual damage" within the meaning of the Act. In addition, with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

respect to DeFrank's consumer fraud claim, specification damages make no chronological sense. Under plaintiffs' theory of specification damages, the damage done to DeFrank occurred at the moment State Farm specified non-OEM parts in its repair estimate. However, the alleged misrepresentations made to DeFrank, and the alleged failure to disclose the categorical inferiority of non-OEM parts, occurred *after* specification, when DeFrank was handed his estimate and the brochure. Actual damage cannot be the result of omissions and misrepresentations which are made after the damage has already occurred. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 502, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996).

Perhaps aware of the temporal problems that arise when actual damage is defined as the mere specification of non-OEM parts, the appellate court offered an additional explanation of damage which, at least implicitly, resolves this problem. The appellate court stated:

> ***51** "There is evidence that State Farm's material misrepresentations led numerous class members to blindly accept the non-OEM parts specified (*i.e.*, without knowledge of the inferior condition of those parts)." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). [FN13]

Notice what the appellate court has done here. With this sentence, it is no longer the case that damage occurred when non-OEM parts were *specified*. Instead, the damage occurred when non-OEM parts were *accepted*. This is not the theory of damages which was adopted by the circuit court, nor is it the theory advanced by plaintiffs.

The new theory of damages offered by the appellate court has the virtue of making chronological sense because it places the deception before the damage. Applying this reasoning to DeFrank's case, DeFrank would first have received an estimate and a brochure, and the omissions in those documents would then have deceived him into "blindly accept[ing] the non-OEM parts specified without knowledge of their categorical inferiority." However, this theory still does not explain how DeFrank was actually damaged within the meaning of the Consumer Fraud Act. As noted above, even though DeFrank accepted the non-OEM parts that were placed on his truck, he suffered no damage whatsoever as a result of that acceptance. Accordingly, because State Farm's specification or use of non-OEM parts did not cause DeFrank any actual damage, his consumer fraud claim is without merit.

4. Proximate Cause--Actual

Deception

The appellate court's conclusion that State Farm's representations "led numerous class members to blindly accept the non-OEM parts specified * * * without knowledge of their categorical inferiority" cannot apply in DeFrank's case for an additional reason--lack of proximate causation.

[50] In a series of three cases, this court has held that in a cause of action for fraudulent misrepresentation brought under the Consumer Fraud Act, a plaintiff must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation. The three cases are *Zekman v. Direct American Marketers, Inc.*, 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853 (1998), *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002), and *Shannon v. Boise Cascade Corp.*, 208 Ill.2d 517, 281 Ill.Dec. 845, 805 N.E.2d 213 (2004).

In the case at bar, State Farm argues that under *Zekman* and *Oliveira* (*Shannon* was not yet filed at the time of briefing and argument), DeFrank's consumer fraud claim must fail because he has not established that he was actually deceived by any omissions or representations made by State Farm. Plaintiffs, in response, argue that *Zekman* and *Oliveira* are distinguishable from the present case because those cases involved deceptive advertising and alleged fraud on the market, *i.e.*, misrepresentations made to the public at large, rather than misrepresentations "directed specifically at plaintiffs as policyholders." According to plaintiffs, a covenant of good faith is implied in every contract and the presence of such a covenant here gave rise "to a relationship quite different than the attenuated nexus between a merchant and prospective consumer in an impersonal deceptive advertising campaign."

***52** Though not entirely clear, it appears that plaintiffs are arguing in favor of a different definition of causation for those individuals who have contracts with a consumer fraud defendant versus those who do not. To the extent that this is plaintiffs' argument, we reject it. Further, and more importantly, we reject plaintiffs' attempt to distinguish *Zekman* and *Oliveria*. The critical point of these cases is not that they involved advertising. Rather, the important legal principle established in *Zekman, Oliveria* and *Shannon* is that in a case alleging deception under the Act, it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, "in some manner, deceived" by the misrepresentation. *Oliveria*, 201 Ill.2d at 155, 267 Ill.Dec. 14, 776 N.E.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151. Proximate causation is an element of all private causes of action under the Act. Thus, DeFrank must establish that he was deceived by State Farm's representations or omissions in order to prove his claim.

The circuit court did not discuss deception in its judgment order and the court's entire analysis of proximate causation is contained in its finding that "as a direct and proximate result of State Farm's violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages." The appellate court did address deception, although in a summary fashion. The court stated, without further explanation, that "[t]here is overwhelming evidence of State Farm's calculated deception of its policyholders." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

[51] The notion that DeFrank was deceived by the omissions or representations in his estimate and brochure into accepting non-OEM parts is categorically refuted by the record. At trial, DeFrank gave the following testimony:

"Q. [Plaintiffs' counsel] I may have asked you this. Did you report the collision to State Farm?
A. [DeFrank] Yes.
Q. Did you report it promptly?
A. Yes.
Q. Okay. Tell the jury what happened, Sam, after you called State Farm.
A. They made an appointment with me to take my truck to the claims center which is out by the airport.
Q. Okay.
A. And which I did on that particular day.
Q. Okay. Was it on November the 5th that you did that?
A. Yes, sir.
Q. Okay. Tell the jury what happened on November the 5th when you went out there.
A. Well, I took my truck to the claims center. I pulled it inside. And the fellow there that--he started looking it over. And I said, Oh, yeah. By the way, I said, I want all GM parts on that truck.
Q. Why did you happen to bring that up?
A. Seeing commercials on TV where they say, you know, keep your GM car all GM.
Q. Okay. That was all you knew about it?
A. That was all I knew about it at the time.
Q. What did he tell you?
A. He said, We will talk about that later.
Q. Did that indicate anything--what did you think?
*53 A. I figured something was up.
Q. Okay. Did you talk to a man named--a claim representative or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

somebody named Richard Hill?
A. Yes, sir.
Q. Okay. When did you do that?
A. When?
Q. Yeah. When did you do that? Was that while the truck--
A. While this other fellow was looking at my truck and, I guess, writing the estimate on that, we went into his office.
Q. Richard Hill?
A. Richard Hill's office.
Q. Okay. And did what [*sic*] Mr. Hill give you?
A. We talked for a little bit, and then he handed me a little brochure from State Farm.
Q. Okay.
A. That stated their policy.
Q. Okay. Did it tell you that--state their policy about what?
A. If they used non-OEM parts on your vehicle.
Q. That they would use non-OEM?
A. That they stand behind it. Yeah.
Q. What was your reaction to finding out that they were going to use non-OEM parts on your vehicle?
A. I was very upset.
Q. Did you complain?
A. Did I to Mr. Hill at that time? Yes.
Q. And what was Mr. Hill's response to you?
A. He just promised me that--or basically said that there was really--that's how they do it, and that they stand behind their non-OEM parts. If I had any trouble they would take care of me."

DeFrank's testimony makes it abundantly clear that he was not deceived by anything State Farm said, or did not say, regarding the quality of non-OEM parts. Even before he spoke to the State Farm adjuster, DeFrank believed, in his own mind, that non-OEM parts were not as good as OEM parts. Otherwise, he would not have insisted that GM parts be installed on his truck. Further, DeFrank would not have become, in his words, "very upset" upon learning that non-OEM parts were to be used on his truck unless he believed that non-OEM parts were not as good as OEM parts.

Neither the appellate court nor the circuit court addressed DeFrank's testimony or explained how, in light of that testimony, it can be said that he "blindly" accepted the non-OEM parts "without knowledge of their categorical inferiority." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). DeFrank plainly was not deceived by State Farm's estimate or "Quality Replacement Parts" brochure. Because he was not deceived by State Farm, DeFrank failed to establish the proximate causation necessary to recover under the Consumer Fraud Act.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In light of the above, it is clear that DeFrank suffered no actual damage, and that he failed to establish proximate causation. For these reasons, DeFrank failed to prove a private cause of action under the Consumer Fraud Act. Because DeFrank, as the representative plaintiff, has not proven his claim for consumer fraud, there can be no Illinois class for plaintiffs' consumer fraud count. See, *e.g., Oliviera,* 201 Ill.2d at 156-57, 267 Ill.Dec. 14, 776 N.E.2d 151; *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.,* 114 Ill.2d 278, 294-95, 102 Ill.Dec. 306, 499 N.E.2d 1319 (1986). Therefore, we reverse the judgments of the circuit and appellate courts in favor of plaintiffs on the consumer fraud count.

D. *Other Issues*

***54** In light of our disposition of plaintiffs' consumer fraud claim, we need not reach other issues raised by State Farm in relation to that claim, including the propriety of the circuit court's punitive damages award.

III. Equitable and Declaratory Relief

In count III of their third amended complaint, plaintiffs sought a declaration of rights and a permanent injunction that would, *inter alia,* prohibit State Farm from representing "that non-OEM crash parts are of 'like kind and quality' to OEM crash parts" or that non-OEM crash parts can "restore a vehicle to its pre-loss condition." The circuit court granted plaintiffs declaratory relief. The court entered a declaration which stated, in essence, that State Farm's contractual obligation was the same with respect to each member of the class, regardless of variations in policy language and state regulations. However, the court declined to award plaintiffs injunctive relief, finding that money damages constituted an adequate remedy at law.

In light of our disposition of plaintiffs' claims for breach of contract and statutory consumer fraud, we affirm the circuit court's denial of equitable relief. We reverse the circuit court's granting of declaratory relief.

CONCLUSION

For the foregoing reasons, that portion of the circuit court's judgment which denied plaintiffs' request for equitable relief is affirmed. All other portions of the circuit court's judgment are reversed. Those portions of the appellate court judgment which affirmed the denial of equitable relief and which reversed the circuit court's award of disgorgement damages are affirmed. All other portions of the appellate court's judgment are reversed.

*Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed in part and*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*reversed in part.*

Justice THOMAS took no part in the consideration or decision of this case.

Justice FREEMAN, concurring in part and dissenting in part:

I agree with my colleagues with respect to some, but not all, of the issues raised in this appeal. Apart from my disagreement on these legal matters, I am troubled by the tone and tenor of today's opinion. I, therefore, write separately to explain my views.

I. BREACH OF CONTRACT

The court reverses the jury verdict in favor of the plaintiff class outright, based on several different rationales. I agree with two major points. First, I concur in the judgment that the nationwide class certification cannot stand. While I disagree with the court's analysis, I believe its conclusion is correct. Further, although the court rightly concludes that the "specification" damages have no basis in law, thus necessitating reversal, I cannot completely join in this portion of the court's opinion because of some unnecessary *dicta.*

Notwithstanding the above, I respectfully disagree with the remainder of the court's conclusions on the breach of contract claim, and dissent therefrom. As I will explain, the court errs in its conclusion that plaintiffs cannot prove a breach of any of the various insurance policies in effect during the class period. Moreover, I do not believe that the jury engaged in improper speculation in awarding installation damages, such as would necessitate this court stepping in and overruling the jury verdict.

A. Nationwide Certification

*55 The court concludes that nationwide certification was erroneous because the various contracts State Farm uses in different states cannot all be interpreted as promising the same thing. Although I agree with the ultimate result reached by my colleagues--I, too, would find that the circuit court erred in certifying the nationwide class--I disagree with the court's reasoning.

As an initial matter, the court's analysis with respect to this issue is plagued by inconsistencies. For example, the court criticizes the circuit court's conclusion that there is a unitary contractual promise, noting that the various contracts contain different language and that there is no evidence to support the conclusion that the language is irrelevant to determining State Farm's obligations to its insureds. See slip op. at 22-23. The court specifically holds that the "like kind and quality" policy form and the "pre-loss condition" form "are *not* the same." (Emphasis in original.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip op. at 19. But later, the court inexplicably accepts *State Farm's argument* that "[t]he term 'like kind and quality,' as used in the relevant policies, meant 'sufficient to restore a vehicle to its pre-loss condition.' " Slip op. at 31. In other words, despite what the court said earlier, it ultimately concludes that the promises in the two contracts *are* the same. If the promises are the same, then any differences between the forms are irrelevant.

In another example of inconsistency, the court states that the circuit court should have ruled before trial on the issue of whether State Farm's various contract forms had a unitary promise. Slip op. at 17. However, when it comes to reviewing the lower courts' rulings, the court holds that "there is simply no *evidentiary support* for the lower courts' conclusion that" there is a unitary promise. (Emphasis added.) Slip op. at 23. The evidentiary support the court considers but finds wanting consists, of course, of information adduced at trial. See slip op. at 21-23. This is clearly inconsistent with the earlier statement that the circuit court ought to have decided the issue before trial began, in light of the fact that the court is--quite properly, in my mind--willing to entertain the possibility that evidence adduced at trial could demonstrate that State Farm had a common obligation to all of its policyholders, regardless of variations in the contracts State Farm drafted.

Moreover, the court's rejection of the evidence adduced at trial--specifically, the testimony of Don Porter--cannot withstand scrutiny. First, I note that the court characterizes Porter as "a State Farm property consultant in auto general claims." Slip op. at 10. This description connotes that Porter is the equivalent of a lower level employee. In reality, Porter, a State Farm witness, worked at the State Farm home office in Bloomington as one of only 19 State Farm "property consultants" in the entire nation. At the time of trial, he had been a State Farm employee for 21 years. Porter specifically testified that he was "here to testify to what we do as an organization and what I know that my comrades do when we talk about the use of these parts."

***56** Porter testified, as the court admits, that State Farm had a uniform nationwide practice: " 'restoring the vehicle to its pre-loss condition.' " Slip op. at 10. The court, however, determines that it may ignore this testimony because Porter did not specifically refer to each and every form of contract which State Farm used. I do not believe that the court is respecting the standard of review. Had Porter testified that he arranged his bookshelves in alphabetical order by title, we would not refuse to accord

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this testimony weight because he did not *specifically* testify that he placed *Moby Dick* before *Wuthering Heights*. Porter was no neophyte, and he was testifying to the practices of State Farm "as an organization." His testimony cannot be brushed away on the basis that he might not have been talking about State Farm as a whole.

The court also interprets Porter's testimony in the light least favorable to the result reached by the circuit court, stating that his general testimony regarding State Farm's practices related only to State Farm's "philosophy," and not its contractual obligations. In other words, the court overrules the circuit court because although State Farm might have had a nationwide "philosophy," its various policies might have promised less--*i.e.*, State Farm might as a matter of "philosophy" give its policyholders *more* than the benefits for which they have paid. Although it might make a nice sound byte for State Farm's advertisements, this is simply conjecture, not a valid basis for overruling the circuit court. We must defer to the circuit court's interpretation of testimony unless it is clearly erroneous. That standard clearly has not been reached here. At best, the court is suggesting another *possible* interpretation of the testimony at issue and substituting its judgment for the circuit court's. This is not a reviewing court's role. Porter, during his testimony, made a general, categorical statement that State Farm had an overarching consistent obligation. As the court admits, Porter knew that State Farm had several differently worded policies; it is not as if he were unaware that State Farm chose to use different language in its policies in different states. Nevertheless, he testified that its obligation was everywhere the same.

The court also makes much of Porter's numerous self-serving statements that State Farm's only intent was to restore its insureds' vehicles to their "pre-loss condition." (Indeed, Porter repeated this phrase no less than 26 times during the course of his testimony.) But sometimes, another answer slipped through. For instance, when asked whether State Farm treated all insureds "equally with respect to specifying non-OEM crash parts," Porter testified, "In my experience, we do. *It doesn't make any difference the age of the vehicle,* the type of the vehicle." (Emphasis added.) This cuts against the court's argument that State Farm's obligation depends on the preloss condition of every individual vehicle, as a vehicle's age is a component of its preloss condition. At another point, counsel for State Farm asked Porter to supply his definition of "the term 'non-OEM part.' " He responded:

*57 "Well, a non-OEM part to me is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a part that's made by other than the original manufacturer. And, you know, but it simply to me, is you buy a part from Ford and if the Ford fender was made by Ford, but you can buy that fender that's--that's originally produced by Ford by another manufacturing firm that has produced the same type of fender or fenders *as good as the fender that was the OEM fender*." (Emphasis added.)

Here Porter clearly testified that non-OEM parts had to be as good as OEM parts.

On cross-examination, Porter was asked about a confidential internal State Farm memorandum, titled General Claims Memorandum (GCM) # 430 (I will return to this document later). Porter admitted that this document required that non-OEM parts "must be of OEM quality." Plaintiffs' counsel subsequently posed the following question to Porter, and received the following response:

"Q. Yes, sir. Now, is there a guarantee to--anywhere else other than this general claims memo that guarantees that these parts will be made out of the same construction and have the same structural integrity as the OEM parts?

A. You know, sir, I would have to say that, *yes, it does* after all *because* it says quality replacement part, and *when we say quality replacement part, we mean those parts that are as good as the parts that were on the vehicle at the time of the loss*." (Emphases added.)

Porter here made clear that the term "quality replacement part," which meant "parts that are as good as the parts that were on the vehicle at the time of the loss," was a guarantee of *OEM quality*. Thus, here, Porter equated the guarantee to restore the vehicle to preloss condition with a guarantee of OEM-quality replacement parts. This telling admission wholly undermines the court's theory that preloss condition destroys commonality, because if preloss condition means OEM quality, then a vehicle cannot be restored to preloss condition with a part which falls short of OEM quality, and thus individual examinations of plaintiffs' vehicles is not necessary if, as the jury concluded, all non-OEM parts are of lesser quality than OEM parts. [FN14]

The jury was entitled to believe Porter's admissions in plaintiffs' favor over his constant repetition of a term favoring State Farm, his long-term employer. The court's proffered reasons for disregarding Porter's testimony are simply untenable.

The court's treatment of Porter's testimony, moreover, is not an isolated event. I am troubled by the court's consideration--or more appropriately its lack of consideration--of the evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adduced at trial. This case comes before this court on appeal from a trial which lasted more than seven weeks--50 days elapsed between opening arguments on August 16, 1999, and the jury's October 4 verdict. Over the course of the trial, 81 witnesses testified, with the circuit court admitting into evidence well over 200 exhibits. Before the case even went to trial, there were over two years of pretrial proceedings between the filing of plaintiffs' original class action complaint in July 1997 and the August 1999 beginning of trial. The common law record alone runs to more than 30,000 pages of filings. And yet, in an 81-page opinion, the court devotes *less than two full pages* to its initial recitation of the facts. It concerns me, as it ought to concern anyone, to see that the actual evidence adduced in this case is given such short shrift.

***58** As I stated at the outset of this separate opinion, however, I do ultimately agree with my colleagues that the nationwide class cannot stand. Initially, I believe that the circuit court abused its discretion in applying Illinois law to the contracts between State Farm and non-Illinois residents. Illinois follows the Restatement (Second) of Conflict of Laws in making choice-of-law decisions. *Morris B. Chapman & Associates, Ltd. v. Kitzman,* 193 Ill.2d 560, 568, 251 Ill.Dec. 141, 739 N.E.2d 1263 (2000). The Restatement provides that when the parties have not made an effective choice of law, the factors of possible relevance to choice of law in breach of contract cases are

"(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties,"

which are to be "evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 188, at 575 (1971). In the context of insurance contracts,

"[T]he rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship * * * to the transaction and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 193, at 610 (1971).

Accord *Westchester Fire Insurance Co. v. G. Heileman Brewing Co.,* 321 Ill.App.3d 622, 630-31, 254 Ill.Dec. 543, 747 N.E.2d 955 (2000). With respect to automobile insurance contracts, the "principal location of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the insured risk" is that location in which the vehicle is to be garaged during most of the insurance policy's term. Restatement (Second) of Conflict of Laws § 193, Comment *b*, at 611 (1971).

Of the above factors, the only one which would appear to militate in favor of applying Illinois law to the out-of-state contracts is the fact that State Farm is an Illinois resident. The most important factor, the location of the insured risks--the insureds' vehicles--would cut against application of Illinois law. The contracts would not have been delivered in Illinois. The insureds would not be domiciled in Illinois. And the last act to give rise to a valid contract-- either the insureds' signatures or the deposit of checks in the mail--most likely would not have occurred in Illinois. Consideration of the relevant factors would appear to militate strongly against applying Illinois law to the entire multistate class in this case.

Moreover, even if the fact of State Farm's Illinois domicile sufficed to uphold application of Illinois law according to Illinois choice of law principles, doing so would not pass constitutional muster. In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), the Supreme Court reviewed a class action brought in Kansas against Phillips Petroleum for recovery of interest on royalties in oil and gas contracts. The contracts at issue were entered into in 10 different states. Even though most of the contracts were entered into outside Kansas, the Kansas Supreme Court upheld its trial court's decision to apply Kansas law to the entire action.

***59** The Supreme Court reversed. The Court stated that even in a case where multiple choices of law might be *possible*, the forum court's choice of law had to comply with constitutional guarantees of due process. *Shutts*, 472 U.S. at 822-23, 105 S.Ct. at 2980, 86 L.Ed.2d at 649 ("in many situations a state court may be free to apply one of several choices of law. But the constitutional limitations * * * must be respected even in a nationwide class action"). The Court rejected the rule formulated by the Kansas Supreme Court that " 'Where a state court determines it has jurisdiction over a nationwide class action and procedural due process guarantees of notice and adequate representation are present, we believe the law of the forum should be applied unless compelling reasons exist for applying a different law.' " *Shutts*, 472 U.S. at 821, 105 S.Ct. at 2979, 86 L.Ed.2d at 648, quoting *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, 221-22, 679 P.2d 1159, 1181 (1984). The Court also noted that a plaintiff's choice of the forum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

state's law--as evinced by having filed the suit there--is of "little relevance." *Shutts*, 472 U.S. at 820, 105 S.Ct. at 2979, 86 L.Ed.2d at 648. Rather, the Court held that to apply its own law, the forum state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair." *Shutts*, 472 U.S. at 821-22, 105 S.Ct. at 2979, 86 L.Ed.2d at 648. The Court concluded that, in the case before it, "[g]iven [the forum state's] lack of 'interest' in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of [the forum state's] law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits." *Shutts*, 472 U.S. at 822, 105 S.Ct. at 2979, 86 L.Ed.2d at 648.

The same shortcomings that caused the Supreme Court to find a constitutional violation in *Shutts* are present in the instant case. As in *Shutts*, there are significant outcome-determinative differences between the law of Illinois and the laws of other states regarding the breach of contract action. For instance, our circuit and appellate courts determined that State Farm's promise to have repairs performed with parts "of like kind and quality" meant "of like kind and quality to OEM parts," a conclusion with which I agree. However, as State Farm observes, courts in other jurisdictions have not so construed the language. See, *e.g.*, *Ray v. Farmers Insurance Exchange*, 200 Cal.App.3d 1411, 1417, 246 Cal.Rptr. 593, 596 (1988) (" 'like kind and quality' * * * means 'substantially the same condition [as] before the accident' "), quoting *Owens v. Pyeatt*, 248 Cal.App.2d 840, 849, 57 Cal.Rptr. 100, 107 (1967); *Schwendeman v. USAA Casualty Insurance Co.*, 116 Wash.App. 9, 22-23, 65 P.3d 1, 8 (2003); see also *Berry v. State Farm Mutual Automobile Insurance Co.*, 9 S.W.3d 884, 894-95 (Tex.Civ.App.2000). Other states have expressly provided by statute or regulation that non-OEM parts may be used in repairs so long as they are the equivalent of the part on the vehicle immediately prior to the accident. See Or.Rev.Stat. § 746.287(2) (1999); Mass. Regs.Code tit. 211, § 133.04(1) (2004); 806 Ky. Admin. Regs. 12:095 (2003). Application of these jurisdictions' laws would change the outcome of the instant case.

***60** It is possible for a forum state to have a sufficient interest in the resolution of the claims of out-of-state litigants as to render the application of the forum state's law neither arbitrary nor fundamentally unfair despite

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

outcome-determinative differences. Shutts, 472 U.S. at 818, 105 S.Ct. at 2977-78, 86 L.Ed.2d at 646. However, I do not believe that Illinois has such an interest in the instant action. It is true that State Farm is an Illinois corporate citizen, and Illinois does have an interest in regulating its conduct. However, Illinois does not have any particularly compelling interest in protecting the rights of the citizens of other states, especially given that there is no indication that the other states are unable or unwilling to vindicate the rights of their citizens within their own court systems, according to their own laws. Moreover, neither State Farm nor any non-Illinois policyholder would appear to have had any reasonable expectation that Illinois law would govern their contractual dispute. See *Shutts*, 472 U.S. at 822, 105 S.Ct. at 2979-80, 86 L.Ed.2d at 648-49 (fairness calculus must take into account the reasonable expectations of parties as to which state's law would control). Thus, I believe that applying Illinois law to the entire nationwide class which the circuit court certified in this case would run afoul of the due process concerns spelled out in *Shutts*, and I would reverse the multistate certification for this reason. See *State ex rel. American Family Mutual Insurance Co. v. Clark*, 106 S.W.3d 483, 486-87 (Mo.2003).

B. Contract Interpretation

Having determined that the nationwide class cannot stand, the court next examines whether the verdict may be upheld with respect to any subclass. Slip op. at 23. The court concludes that the question must be answered in the negative. The court actually answers this question in two paragraphs, with no analysis nor citation to authority, based on the verdict form. See slip op. at 23-24. This ought, perhaps, to be the end of the opinion. But, the court quickly turns the reader's eye away from the paucity of its analysis of what is apparently the determinative issue in the case by turning to a lengthy exegesis of the individual policy forms.

Before reviewing the court's conclusion that, as a matter of law, the plaintiffs failed to prove a breach of any promise State Farm made in any of the various policies State Farm drafted, it is helpful to recall the overarching theme of the plaintiffs' complaint. At its heart, plaintiffs' complaint was that State Farm promised policyholders that their vehicles would be repaired with OEM-quality parts, but the non-OEM parts State Farm specified for repairs were simply not as good as OEM parts and that State Farm knew it. State Farm knowingly specified the inferior non-OEM parts, plaintiffs contended, because they were

cheaper. These contentions cannot be ignored, when one considers the evidence adduced at trial. Plaintiffs presented to the jury numerous internal State Farm memoranda that detailed problems with non-OEM parts, some of which criticized non-OEM parts as a class. One such memorandum went so far as to state specifically, in contrasting galvanized OEM parts with nongalvanized non-OEM parts, that "we may well say it is like kind and quality, but the bottom line is that it is not the same." Plaintiffs also presented expert testimony to the effect that non-OEM parts were categorically inferior to OEM parts and thus were *never* of like kind and quality. State Farm does not challenge these experts' *bona fides* on review, and thus their conclusions must be accepted. I believe it is important to note that a reviewing court neither can substitute its judgment for that of the trier of fact nor can it set aside a verdict simply because the trier of fact could have drawn different conclusions from conflicting testimony. *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill.2d 176, 154 Ill.Dec. 593, 568 N.E.2d 814 (1990). Although State Farm presented its own expert witnesses, a "battle of the experts" is a situation in which reviewing courts are especially loathe to second-guess the findings made by the trier of fact. See *In re Glenville*, 139 Ill.2d 242, 152 Ill.Dec. 90, 565 N.E.2d 623 (1990).

***61** The court avoids discussing the evidence presented by plaintiffs by holding that State Farm never promised any policyholders that repairs would utilize parts of equal quality to OEM parts. Thus, according to my colleagues, it *does not matter* whether State Farm was knowingly repairing its policyholders' vehicles with inferior parts, because State Farm never promised to use noninferior parts. I suggest that the court has perhaps insufficiently considered the policy implications of overturning a billion dollar verdict on the basis that an insurer's knowing usage of inferior parts is "good enough." I am not stating that non-OEM parts are by definition inferior; my point is that plaintiffs alleged, and by its verdict the jury found, that as of now non-OEM parts are not up to the standards of OEM parts--a factual conclusion the court avoids addressing. The quality of non-OEM parts could change in the future, but the court does not dispute that the crash parts State Farm was actually specifying for repairs were inferior to their OEM counterparts.

In addition to being bad policy, the court's conclusion is also based on a flawed analysis of the relevant contractual provisions. In this regard I note a piece of evidence which the court has remarkably determined to be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

irrelevant. In 1986, State Farm's vice president of claims penned a confidential internal memorandum, known as "General Claims Memorandum # 430" (hereinafter GCM # 430). Therein, he discussed the quality of the parts to be used in repairs. He--that is, State Farm's vice president of claims--specifically distinguished between what was required of "aftermarket" parts and what was required of "salvage" parts. As an aid to understanding the memorandum, I note that it is uncontroverted that "aftermarket" is a synonym for "non-OEM," and it is also uncontroverted that "salvage" parts are, as the name implies, a lower grade than non-OEM parts. In comparing the two grades of parts, State Farm's vice president of claims had this to say:

"*Aftermarket parts must be of OEM quality;* that quality must be guaranteed by the supplier;
*Salvage parts must be* of equal, or better, quality *compared to the parts being replaced.*" (Emphases in original.)

Thus State Farm specifically required that non-OEM parts be of equal quality to OEM parts, only holding "salvage" parts to the lesser standard of equivalence to the parts being replaced.

One might think that this would be the end of the matter. A reasonable reader might expect that a reviewing court would affirm the lower court's conclusion that non-OEM parts had to be of equal quality to OEM parts, given a memorandum by State Farm's vice president of claims which precisely so stated. The court, however, does not consider whether GCM # 430 ought to be treated as a binding admission by State Farm, because the court, in a footnote, concludes that GCM # 430 is irrelevant. See slip op. at 29 n. 5. Instead, the court performs its own investigation into the policies at issue, ignoring the fact that State Farm has already said that its non-OEM (aftermarket) parts "must be of OEM quality," as opposed to salvage parts, a lower grade, which are merely required to be of equal quality "to the parts being replaced."

***62** Even if the court were correct to so blatantly ignore the evidence, its analysis of the contracts is logically faulty. For instance, in what the court calls "The 'You Agree' Policies" (see slip op. at 25 (heading 2)), State Farm promises to restore the insured's vehicle to its "pre-loss condition." This particular form of the contract also contains what the court calls the "you agree" language: "*You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.) See slip op. at 25.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The court's defense of this policy form is two-fold, and begins by focusing on the "you agree" language. The court reasons that by agreeing to this language a policyholder has implicitly admitted that there must exist at least some non-OEM parts capable of satisfying State Farm's promise. The court construes this admission strictly against the policyholder (in startling contrast to the court's treatment of State Farm's admission in GCM # 430 that non-OEM parts must be of equal quality to OEM parts). See slip op. at 25.

First, one must recall that this is an insurance policy--a classic contract of adhesion. See Cramer v. Insurance Exchange Agency, 174 Ill.2d 513, 533, 221 Ill.Dec. 473, 675 N.E.2d 897 (1996) (Freeman, J., specially concurring) ("It is well established that an insurance contract is one of adhesion"); see also *Williams v. Illinois State Scholarship Comm'n*, 139 Ill.2d 24, 72, 150 Ill.Dec. 578, 563 N.E.2d 465 (1990) (adhesion contracts are those in which the parties are in a disparate bargaining position, and one party has no hand in drafting the agreement but, rather, must "take it or leave it" as the other party has drafted). Contractual clauses which are "part of a 'boilerplate' agreement" in a contract of adhesion have their "significance greatly reduced because of the inequality in the parties' bargaining power." *Williams*, 139 Ill.2d at 72, 150 Ill.Dec. 578, 563 N.E.2d 465. The average person has no ability to bargain over the individual clauses of his or her auto insurance policy. The court ignores this fact, and seriously damages the credibility of its analysis by doing so. The notion that a policyholder has entered into a binding, factual admission simply by purchasing an auto insurance policy would merely be laughable if the court was not seriously suggesting it as a basis for overturning a billion dollar verdict produced by a two-month-long trial in which the evidence supports the conclusion that an insurer knowingly specified inferior crash parts for repairs of its policyholders' vehicles.

More overridingly, however, even ignoring the injustice of strictly construing a contract of adhesion in favor of the drafter, the court's analysis is logically flawed. The "you agree" language is *not* an admission that there exist non-OEM parts which will restore vehicles to their preloss condition. It is merely an agreement that *if* State Farm proposes to perform a repair with a non-OEM part which *is* sufficient to restore a vehicle to its preloss condition, the insured cannot object to the part *simply* because it is non-OEM. But if non-OEM parts are *not* sufficient to restore vehicles to their preloss condition, as plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have consistently maintained and as the jury by its verdict found, the policyholder cannot be not forced to accept it simply because of the "you agree" language.

***63** The fallacy of the court's position is better viewed when one examines how it would play out in the context of other policies State Farm could have issued. Suppose, for example, that State Farm knew that all of the major auto manufacturers were considering building plants in a foreign country that I shall designate as Country A. In anticipation of the plants being built and in order to forestall any complaints by policyholders about receiving parts produced in Country A, State Farm amended its policy so as to provide that

> "*You* agree with us that such parts may include parts furnished by the vehicle's manufacturer, including parts manufactured in Country A."

The reasoning employed by the court in the instant case would hold that everyone insured under this policy has entered into a binding admission that there are General Motors parts manufactured in Country A which are of sufficient quality to restore their vehicles to preloss condition. This is logically fallacious. Recall that the policy language in my hypothetical was drafted in *advance* of the plant in Country A being built, and thus at the time it went into use, there did not exist *any* General Motors parts made in Country A. A plain reading of this language is, rather, a concession by the insured that *if* a part manufactured in Country A suffices to restore his vehicle to its preloss condition, he may not reject the part simply *because* of its origin in Country A.

My colleagues might protest that this hypothetical is far-fetched--and it may be--but no more so than the court's tortured reading of language in a contract of adhesion against innocent policyholders in order to avoid having to acknowledge the proofs adduced at trial. The underlying point remains that the language upon which the court relies is *not* an admission by an insured that there exist non-OEM parts which suffice to restore a vehicle to its preloss condition. It is merely an agreement that *if* there are such parts, the insured may not refuse to accept them *simply* because they are non-OEM parts.

The second stage of the court's defense of this policy form focuses on the fact that State Farm's promise is to restore the insured's vehicle to its "pre-loss condition." The court believes that this policy form is unsuited to be the basis of a class action because to determine whether a vehicle has been restored to its preloss condition requires determination of the condition of each individual policyholder's vehicle before the loss

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and after repair, and this multitude of individual questions would "overwhelm any question common to the subclass." Slip op. at 26.

However, as I have already noted, State Farm witness Porter testified that the term "quality replacement part," which meant "parts that are as good as the parts that were on the vehicle at the time of the loss," was a guarantee of *OEM quality*. This testimony equates the guarantee to restore the vehicle to preloss condition with a guarantee of OEM-quality replacement parts, which undermines the court's theory that preloss condition destroys commonality. If preloss condition means OEM quality, as Porter's testimony reveals, then a vehicle cannot be restored to preloss condition with a part which falls *short* of OEM quality. Thus if, as the jury concluded, all non-OEM parts are of lesser quality than OEM parts, individual examinations of plaintiffs' vehicles is *not* necessary. State Farm does not argue in its briefs to this court that the circuit court erred in determining that the "pre-loss condition" and "like kind and quality" promises are the same. Indeed, to the contrary, State Farm affirmatively argues that the promises *are* the same, an argument the majority accepts. See slip op. at 30-31.

***64** Accordingly, the court has failed to demonstrate any reason that plaintiffs would be barred from recovering under "The 'You Agree' Policies."

The court's analysis of the "like kind and quality" policies also falls short. Here, the court examines those policies in which State Farm has written that it promises to "pay to repair or replace the property or part with like kind and quality." The court construes this language in the most favorable way possible for State Farm, concluding ultimately that this is an unambiguous promise to restore the vehicle to its preloss condition--a term which appears nowhere in this form of the contract.

The court acknowledges (see slip op. at 27) plaintiffs' argument that "like kind and quality" means of "like kind and quality to OEM parts." This interpretation is well supported by State Farm's own analysis of the standards required of non-OEM parts, in GCM # 430:

> "*Aftermarket parts must be of OEM quality;* that quality must be guaranteed by the supplier;
> *Salvage parts must be* of equal, or better, quality *compared to the parts being replaced.*" (Emphases in original.)

I respectfully suggest that this ought to be the end of the matter. Plaintiffs argue that "like kind and quality" means "like kind and quality to OEM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parts"; State Farm has admitted in its internal memoranda that this is *precisely* the quality standard it requires of non-OEM parts; case closed.

Instead, the court once again ignores the memorandum by State Farm's vice president of claims and construes the language State Farm drafted in State Farm's favor, even going so far as to draw inferences advantageous to State Farm. See slip op. at 28-31. In so doing, the court abandons our well-established rule that ambiguities in insurance contracts are to be strictly construed *against* the drafter. See *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill.2d 278, 293, 258 Ill.Dec. 792, 757 N.E.2d 481 (2001); *American States Insurance Co. v. Koloms*, 177 Ill.2d 473, 479, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 108-09, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992).

The phrase "like kind and quality" is clearly ambiguous. The language itself gives no clue as to whether it means of like kind and quality *to OEM parts* or *to the part which existed on the vehicle immediately prior to the crash*. But instead of construing this phrase against State Farm, as mandated by our precedent, the court bends over backwards to find an interpretation that favors State Farm. For instance, the court reasons that if non-OEM parts *never* satisfied this promise (as plaintiffs have alleged), there would be no need for this "indirect phrasing." Slip op. at 28. In other words, the court finds that the very vagueness of State Farm's contract of adhesion is a point in State Farm's *favor*.

Moreover, the court misses the fundamentally obvious point that State Farm and the plaintiffs *disagreed* as to whether non-OEM parts were of like kind and quality to OEM parts. State Farm, of course, has maintained all along that non-OEM parts are or can be of like kind and quality to OEM parts. Given this professed belief, there was no reason for State Farm to restrict itself only to using OEM parts. The proofs at trial, however, convinced the jury that this was not the case. Essentially, the court is saying that State Farm must not have promised that any non-OEM parts it used would be of OEM quality *because the plaintiffs argued and proved that State Farm never fulfilled this promise*. This defies reason. We do not automatically adopt a defendant's interpretation of a contract it drafted whenever a plaintiff proves a breach of its interpretation of the contract. To so suggest is absurd.

***65** The court also draws inferences in favor of State Farm from the sentence which follows the "like kind

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and quality" promise: "If the repair or replacement results in better than like kind and quality, you must pay for the amount of the betterment." Clearly this statement by State Farm in its contract of adhesion is meant to cover State Farm in the unlikely event that a repair left the policyholder better off. But the court argues on State Farm's behalf that the very existence of this statement shows that "like kind and quality" cannot mean "like kind and quality to OEM parts," because if it did, nothing could ever run afoul of the "better than 'like kind and quality' " language. Slip op. at 29. First, this reasoning is faulty in much the same way as the court's reasoning regarding the "you agree" language: State Farm could just as easily have provided that "If the repair or replacement results in your vehicle being able to fly to the moon, you must pay for the value of this ability." That State Farm included self-serving language in a contract of adhesion does not constitute an admission by its policyholders regarding the hypothetical possibility against which State Farm has sought to protect itself.

Moreover, the proofs plaintiffs presented at trial concerned the quality of non-OEM parts during the relevant period. Plaintiffs claimed, and the jury concluded, based on documentary evidence and the testimony of experts whose *bona fides* State Farm does not challenge on appeal, that non-OEM parts were not the equal of OEM parts. This does not foreclose the possibility that a master craftsman in Zurich might in the future take it upon himself to smith a set of General Motors crash parts out of titanium alloy, to such precise tolerances that the parts were indeed an improvement on OEM parts. More realistically, it is possible that in the future a company could mass produce non-OEM parts which are better than OEM parts. It could happen. But according to the proofs plaintiffs presented at trial, and the verdict the jury returned in plaintiffs' favor, it has not happened yet. State Farm has protected itself against this eventuality by the sentence upon which the court relies. But there is no basis for the court's broad inference from this sentence to support its interpretation of the baseline promise State Farm has made in this version of the policy.

Again, the flaw in the court's reasoning is that it is taking into account plaintiffs' *theory* of the case in evaluating State Farm's contractual *promises*. The court's reasoning runs as follows: if, as plaintiffs contend, no non-OEM parts were of like kind and quality to OEM parts, then there would have been no reason for State Farm to draft the policy in the manner in which plaintiffs suggest they did. The problem with this reasoning is that it was very much in dispute

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether non-OEM parts were of like kind and quality to OEM parts. State Farm has consistently maintained and still maintains that they are or can be equivalent, and *State Farm drafted the policy.*

*66 Moreover, as I have already observed, the court ultimately concludes that "like kind and quality" means something which is nowhere found in the language of this policy: it means, just as State Farm argues, " 'sufficient to restore a vehicle to its pre-loss condition.' " Slip op. at 30-31. There are a number of difficulties with this conclusion. First, it contravenes the rule that ambiguous language in an insurance contract is to be strictly construed against the insurer. Clearly the court finds the "like kind and quality" language ambiguous, given that the court ultimately finds that it has a meaning contained nowhere in the contract. Given that it is ambiguous, there is no question that it ought to be construed against State Farm. *Eljer Manufacturing,* 197 Ill.2d at 293, 258 Ill.Dec. 792, 757 N.E.2d 481; *Koloms,* 177 Ill.2d at 479, 227 Ill.Dec. 149, 687 N.E.2d 72; *Outboard Marine,* 154 Ill.2d at 108-09, 180 Ill.Dec. 691, 607 N.E.2d 1204.

A second problem with the court's conclusion is that in order to reach it, the court ignores State Farm's own admissions that non-OEM parts "must be of OEM quality." The court's willful blindness to GCM # 430 is truly troubling. It is, of course, possible for reasonable minds to differ as to the weight to accord a particular piece of evidence. But to act as though a document on the precise issue at hand, penned by State Farm's vice president of claims, does not even *exist* does a disservice not only to the parties but also to the credibility of this court. The court suggests that GCM # 430 is irrelevant because it is not contained within the four corners of the policy and the court has not *explicitly* found that the "like kind and quality" language is ambiguous. See slip op. at 29 n. 5. This misses the mark. As I have already observed, the meaning the court ultimately ascribes to the phrase--"sufficient to restore a vehicle to its pre-loss condition"--is *itself* not found within the four corners of the document. It can only further erode the public's trust in the judiciary to reverse a verdict of this size, ignoring relevant evidence precisely on point, because the court claims it is *unambiguous*--clear, beyond any doubt--that State Farm's promise to "repair or replace the property or part with like kind and quality" means "with a part equally bad to whatever part was on the vehicle just before the accident" and *cannot possibly* mean "like kind and quality to OEM parts." There is no defensible basis for this conclusion and there is a host of evidence to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contrary, including not only Porter's testimony and the text of GCM # 430, but also extensive testimony by State Farm witnesses that repairs with non-OEM parts would never compromise the safety of the vehicle. If State Farm may utilize replacement parts no better than the parts which happened to be on the vehicle preaccident, however old or faulty, as the court concludes, a vehicle could very well have safety issues after repair. If the court is looking outside the document to understand the meaning of the phrase, and there is no question that it is, then the court is *treating* the phrase as ambiguous, regardless of whether my colleagues are forthright enough to so admit.

***67** Moreover, GCM # 430 itself shows that the court's analysis of the contract is wrong--not only is the phrase ambiguous, but the court has actually interpreted it incorrectly. GCM # 430 *directly* contradicts the court's pro-State Farm interpretation of the ambiguous phrase in State Farm's insurance policy. Not only did the vice president of claims specify that aftermarket parts had to be "of OEM quality," he also specified that the lesser standard of equality to "the parts being replaced"--*i.e.,* preloss condition--was a standard applicable only to "salvage parts." How the court can square its interpretation of "like kind and quality" with this evidence is beyond me. Apparently, given the court's deafening silence on the matter, it is beyond the court as well.

The court errs in construing the ambiguous language "like kind and quality" in favor of State Farm, in terms which appear only in other versions of the policy. Doing so violates the rule that ambiguous terms in insurance policies are strictly construed against the drafter. Indeed, three out of the four members of today's majority have authored opinions which have explicitly endorsed this long-standing rule of construction of insurance contracts, and the fourth member has recently concurred in an opinion in which the rule was applied. See *Eljer Manufacturing,* 197 Ill.2d at 293, 258 Ill.Dec. 792, 757 N.E.2d 481 (Justice McMorrow, writing for the court, acknowledging that "if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured"); *Central Illinois Light Co. v. Home Insurance Co.,* 213 Ill.2d 141, 153, 290 Ill.Dec. 155, 821 N.E.2d 206 (2004) (Justice Garman, writing for the court, acknowledging that "if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter"); *Gillen v. State Farm Mutual Automobile Insurance Co.,* 215 Ill.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

381, 393, 294 Ill.Dec. 163, 830 N.E.2d 575 (2005) (Justice Fitzgerald, writing for a unanimous court, acknowledging that "[i]f the policy language is susceptible to more than one reasonable meaning, it is considered ambiguous and will be construed against the insurer"). This construction also contradicts the court's own statements that "There is nothing to support the conclusion that [linguistic differences] are irrelevant and that all of State Farm's policy variations therefore are susceptible of the same contractual interpretation" (slip op. at 22-23) and that the "like kind and quality" policy form and the "pre-loss condition" form "are *not* the same." (Emphasis in original.) Slip op. at 19. The court also ignores State Farm's own interpretation of its obligations in GCM # 430, a document by a State Farm vice president which directly contradicts State Farm's position and the court's conclusion regarding what is required of non-OEM (aftermarket) parts. The court's conclusion that in order to be "like kind and quality," non-OEM parts need merely to be sufficient to put the car in preloss condition erases the distinction *drawn by State Farm* in GCM # 430 between non-OEM parts and salvage parts.

***68** Because the reasoning regarding the "like kind and quality" form of contract is erroneous, there is no reason that plaintiffs could not recover under this form of the contract as well as the "pre-loss condition" form of contract, as I previously demonstrated.

Unlike my colleagues, I would construe the ambiguous terms in State Farm's policies against the drafter, in accordance with our unwavering precedent. See, *e.g.*, *Eljer Manufacturing*, 197 Ill.2d at 293, 258 Ill.Dec. 792, 757 N.E.2d 481; *Koloms*, 177 Ill.2d at 479, 227 Ill.Dec. 149, 687 N.E.2d 72; *Outboard Marine*, 154 Ill.2d at 108-09, 180 Ill.Dec. 691, 607 N.E.2d 1204. Noting that State Farm witness Porter testified that State Farm's obligation was everywhere the same, and that State Farm's vice president of claims specified that non-OEM parts must be "of OEM quality," as opposed to the lesser standard of equivalence "to the parts being replaced," which applied only to salvage parts, I would affirm the conclusion of the circuit court and appellate court that State Farm could only satisfy its obligations to its insureds with non-OEM parts of equivalent quality to OEM parts.

C. Damages

The court goes on to discuss the damages awarded on the breach of contract claim, even though doing so is not necessary to its decision. Having already determined that the verdict form was faulty and there was in any event no breach of any of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

underlying policies, the court's decision to address damages is clearly *dictum,* even though the court labels its damages discussion an "additional reason" to reverse. As I stated at the outset, I agree with the court that there is no basis for the so-called "specification" damages. No State Farm policyholder was harmed by the isolated act of State Farm *specifying* that their vehicle was to be repaired with a non-OEM part. Rather, only those policyholders whose vehicles were *actually* repaired with non-OEM parts or who paid the difference to have OEM parts installed can be said to have been harmed.

However, I do not agree with the court's unwarranted attack on plaintiffs' counsel for requesting specification damages. First, it is *wholly* irrelevant to the legal issues involved in this case "why plaintiffs devised their specification-damages theory in the first instance." Slip op. at 33. The court's answer to this question is nothing more than an attack on plaintiffs' counsel as unintelligent and dishonest, in that order. The court reasons that counsel was, at first, ignorant that plaintiffs would have to establish damages without destroying commonality and, then, mendacious enough to deliberately invent a bogus category of damages in order to hoodwink the circuit court into maintaining this action as a class action when it should not have been. Slip op. at 33-34. This vilification of plaintiffs' counsel is wholly speculative and injudicious.

The court's attack has the additional fault of being inaccurate. The court guesses that plaintiffs invented specification damages because without them, plaintiffs would have been "unable to establish damages and still maintain the commonality required of a class action." Slip op. at 33. And yet, the court does not hold that the other category of damages plaintiffs claimed, installation damages, destroyed commonality. In fact, the court admits that there is nothing wrong with "us[ing] statistical inference in determining aggregate damages in a class action suit" (slip op. at 37), as plaintiffs did with respect to installation damages. The court here implicitly admits that plaintiffs *could* have established installation damages without destroying commonality (the court simply holds that plaintiffs presented insufficient *evidence* to support their installation damage claim in this case, a conclusion with which I disagree, as I shall discuss). So the "realization" the court attributes to plaintiffs is entirely false. And thus the attack on plaintiffs' counsel, along with the impugning of their integrity, unwarranted even if it were accurate, is ill-founded as well.

***69** With respect to installation

damages, I would hold that plaintiffs did present sufficient evidence to uphold their installation damages claim. This court has stressed that the determination of the amount of damages is a function reserved to the trier of fact and that a reviewing court should not substitute its opinion for the judgment rendered in the trial court. *Richardson v. Chapman,* 175 Ill.2d 98, 113, 221 Ill.Dec. 818, 676 N.E.2d 621 (1997). Moreover, "a court reviewing a jury's assessment of damages should not interfere unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Snelson v. Kamm,* 204 Ill.2d 1, 37, 272 Ill.Dec. 610, 787 N.E.2d 796 (2003). Therefore, when "the calculations and proportions of the award demonstrate a strong relation to the evidence presented, the jury's determination *cannot* be against the manifest weight of the evidence. See *Jones v. Chicago Osteopathic Hospital,* 316 Ill.App.3d 1121, 1138, 250 Ill.Dec. 326, 738 N.E.2d 542 (2000) (if a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand)." (Emphasis added.) *Snelson,* 204 Ill.2d at 38-39, 272 Ill.Dec. 610, 787 N.E.2d 796. These long-standing principles are nowhere acknowledged in today's opinion.

The court's damages discussion presents an anomaly in American jurisprudence, in that it would reverse a damage award for being *too low*. I know of no rule of law which would lead a court of review to conclude, as the court does today, that if the jury had given plaintiffs more than it believed the plaintiffs had proven they deserved, it would affirm, but because the jury was conservative and awarded a low amount, plaintiffs are entitled to no compensation at all.

In my view, the court appears to be punishing the conservatism of the jury's damage award. Dr. Mathur testified that damages could be as high as $1.2 billion. He also testified that his estimate could be off by as much as $1 billion. The jury obviously took Dr. Mathur at his word. The jury accepted the top estimate Dr. Mathur suggested, but reduced his highest estimate by the largest correction he endorsed. These calculations clearly "demonstrate a strong relation to the evidence presented" (*Snelson,* 204 Ill.2d at 38, 272 Ill.Dec. 610, 787 N.E.2d 796), and thus are not against the manifest weight of the evidence. I decline to join the court's suggestion that jury awards which bear a strong relation to the evidence presented might still be reversed for being too low, and I question the impact the court's discussion will have on future damage awards in this state. And, again, it is worth recalling that the entire

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discussion here is *dictum*, as the court has already determined that the plaintiff class is entitled to no relief on other, independent grounds. The court's decision to include this analysis cannot be understood as anything but a decision to attack this particular jury verdict on every conceivable front.

D. Disposition

In light of the foregoing, I believe that the appropriate disposition with regard to the breach of contract claim is to remand the cause to the circuit court to determine whether there exists any subclass of the nationwide class with respect to which the verdict may be upheld. In contrast to my colleagues, I believe that the proper reason for reversing the nationwide class is the *Shutts* problem: there are outcome-determinative differences between the laws of Illinois and the laws of other states, and Illinois has no compelling interest in applying its law to states whose laws differ. See *supra*, slip op. at 91 (Freeman, J., concurring in part and dissenting in part). But the fact that there are outcome determinative differences between Illinois and *some* other states does not mean that there are outcome-determinative differences between Illinois and *all* other states. Thus, on remand, I would direct the circuit court to hold a hearing to determine which (if any) of the states that have been the subject of evidence in these proceedings is sufficiently closely aligned with Illinois law that the use of Illinois law to determine the contractual rights of State Farm's policyholders in that state would not offend State Farm's due process rights. Such a result would be well within the circuit court's inherent power to manage class actions. See 735 ILCS 5/2-802(a), (b) (West 1998). See also *Purcell & Wardrope, Chartered v. Hertz Corp.*, 279 Ill.App.3d 16, 20, 215 Ill.Dec. 769, 664 N.E.2d 166 (1996) (" 'A class action may, nevertheless, still be maintained, despite these conflicting or differing State laws, and the court may simply choose to divide the class into subclasses. Moreover, if at some later time in the litigation, the subclassification becomes unmanageable, the court, of course, always has the option to set aside the class certification or a portion of it' "), quoting *Purcell & Wardrope, Chartered v. Hertz Corp.*, 175 Ill.App.3d 1069, 1075, 125 Ill.Dec. 585, 530 N.E.2d 994 (1988). Assuming that all the requirements of a class action are satisfied with respect to such a subclass, the verdict could be affirmed with respect to that subclass, with damages equal to the *pro rata* portion of the nationwide installation damages attributable to the policyholders in those states.

***70** Notwithstanding the decertification of the entire

nationwide class, a considerable volume of evidence has been received in connection with this matter and considerable judicial resources which have been expended thereon. As previously noted, this trial lasted nearly two months and the pretrial proceedings spanned more than two years. It would be contrary to any proper sense of judicial economy to require a retrial as to the contract issues for the rights of any subclass of policyholders to which Illinois law could be applied without impacting the due process rights of State Farm.

Nor is judicial economy the only interest to be served by making all reasonable efforts to uphold the verdict to the extent possible. Class actions are a valued, indeed an integral, part of our judicial system and our society. As Chief Justice Burger, in writing for the United States Supreme Court, recognized,

> "The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." Deposit Guaranty National Bank of Jackson v. Roper, 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427, 440 (1980).

In other words, the class action makes it possible for wrongs, which might otherwise go unredressed, to be pursued, and righted. The possibility that wrongdoers might be held accountable provides a powerful incentive not to engage in even small-scale wrongdoing, and such an incentive can only benefit society as a whole. If there was a wrong committed here--as the jury found, the trial court agreed, the appellate court confirmed, and I would affirm--State Farm ought to be held accountable therefor to the extent that due process will allow.

## II. CONSUMER FRAUD

I concur in the court's analysis of the consumer fraud issue. However, the court's analysis includes an instance of objectionable *dicta*. Also, as with the breach of contract issue, I find the tone and tenor of the court's analysis to be injudicious. I, therefore, disavow and dissent from those instances of hostile rhetoric and objectionable *dicta*.

I agree with the court's analysis of the consumer fraud issue. Due to inconsistencies in the arguments of counsel and analyses in the lower courts, the court correctly discusses what allegations are *not* at issue. Slip op. at 53-59. This discussion leads to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the core allegation of plaintiff's consumer fraud claim: that, during the claims process, State Farm failed to disclose the categorical inferiority of non-OEM parts. Slip op. at 59-60.

Turning to the propriety of the nationwide consumer fraud class, the court opinion correctly holds that the Illinois Consumer Fraud Act has no out-of-state effect and I expressly agree with the court's analysis of this issue. Slip op. at 61-70. Further, the court correctly concludes that, in this case, the Consumer Fraud Act applies only to those policyholders whose vehicles were assessed and repaired in Illinois. Accordingly, the court focuses its application of the Act solely on DeFrank, who is the only named plaintiff who can represent an Illinois class. Slip op. at 70-78.

***71** The court eventually concludes as follows. DeFrank suffered no actual damage as a result of State Farm's specification of non-OEM parts. Slip op. at 75-78. Also, based on this court's *Zekman* and *Oliveira* decisions, and DeFrank's testimony, DeFrank was not actually deceived by anything State Farm said or did not say regarding the quality of non-OEM parts. Slip op. at 78-81.

Although I concur in the court's analysis of the consumer fraud issue, I dissent from an instance of objectionable *dicta*. It is found in section II(C)(2) of the court opinion, captioned "The Deceptive Act or Practice." Slip op. at 72-75. Prior to reaching the determinative issues with respect to DeFrank, the court opinion purports to identify the deceptive act or practice that pertains to DeFrank. However, the opinion already identified this claim. Slip op. at 58-59. The clear purpose of this section is to discuss the state regulation of aftermarket crash parts as a possible basis for reversal. At the close of this discussion, the court expressly declines to resolve the issue. If the court is unwilling to resolve this issue, then the court should not raise it.

I also take issue with the tenor of the court's analysis of the consumer fraud claim. Like the section dealing with breach of contract, the court indulges in sarcasm, chiding, and innuendo in furtherance of needless and intemperate attacks on the plaintiffs bar and our own appellate court. Some examples follow:

> "Plaintiffs deliberately avoided any theory relating to defective parts at trial because such a theory would have significantly increased their burden of proof. Such a theory would also have rendered class certification far less likely, since the common question of fact or law necessary for certification would have been more difficult to establish if plaintiffs had been forced to prove that each individual non-OEM part,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or groupings of parts, were defective." Slip op. at 54.

This is sheer speculation. Also, the majority suggests that the appellate court intentionally rephrased or recharacterized DeFrank's actual damages to avoid certain "temporal problems." Slip op. at 77. Assigning such motives to the appellate court constitutes unfair innuendo. These statements impugn the integrity of the bench and bar. I expressly disavow them.

CONCLUSION

Although I am in agreement with my colleagues on a number of legal points, I disagree with many conclusions reached by them today. I find the tone taken by the court with respect to plaintiffs' trial counsel and the lower courts to be particularly unwarranted given that their actions were not especially egregious. They did not flout any of the rules of this court nor did they break with precedent in such a way as to deserve condemnation. Thus, the question becomes, from whence does this hostility come? What is not said anywhere in today's opinion is the fact that this case has been the focus of a great deal of national attention with respect to class actions in general and our Fifth District in particular. In my view, today's opinion appears to be my colleagues' point of entry into the ongoing national debate concerning class action litigation. It is my considered opinion, however, that while this debate is being conducted in the legislative arena amongst our elected officials in Congress and the Illinois General Assembly, we in the judiciary ought to tread carefully.

***72** I am as troubled as every citizen ought to be about the possibility of abuse of the class action vehicle. And it would further no end to feign ignorance of the fact that some allegations of abuse have been leveled at the courts of this state, and the Fifth District in our state in particular. However, as the saying goes, the baby should not be thrown out with the bath water. In 1977, this court acknowledged the utility of the class action as a method of litigating complex common questions brought by numerous claimants:

"A class action is a potent procedural vehicle. Under its terms claims by multiple persons can be decided without the necessity of the appearance of each. A vindication of the rights of numerous persons is possible in a single action when for many reasons individual actions would be impracticable. [Citations.] The origins of this invention of equity, according to Professor Chafee [citation], go back almost 300 years. Its purpose has been described as 'to enable it [equity] to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that their joinder as parties in conformity to the usual rules of procedure is impracticable.' [Citation.]" Steinberg v. Chicago Medical School, 69 Ill.2d 320, 334-35, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977).

Several years later, the United States Supreme Court echoed our sentiments, noting:

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' [Citation.] Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.' [Citation.] For in such cases, 'the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under [Federal Rule of Civil Practice] 23.' [Citation.]" General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740, 749 (1982).

These observations illustrate why class actions have long held a legitimate and important place in the judiciary. Both this court and the United States Supreme Court have approved of this litigation tool for over 100 years. See K. Forde, *Illinois's New Class Action Statute*, 59 Chi. B. Rec. 120 (1977) (explaining historical background of class actions). In their haste, perhaps, to take a stand on the class action question, my colleagues seemingly retreat from these time-honored principles and show a new hostility to a long-recognized form of litigation. I feel it is my duty to remind my colleagues that the same standards of review that are at play in the other four districts of the state apply to the Fifth District. I am concerned that today's opinion sends a message that we, as a court, will employ different standards for cases coming out of the Fifth District on which national attention has been focused in order to reach a desired result. My feelings in this regard stem from the fact that in overturning the verdict in its entirety, my colleagues in this case have ignored the standard of review, humiliated plaintiffs' counsel, and demeaned both the trial court and the appellate court. It is my sincere hope that the rhetoric employed in today's opinion will not serve to further coarsen a debate already littered with incivility and hostility.

Justice KILBRIDE joins in this partial concurrence and partial dissent.

FN1. The non-OEM crash parts involved in this case are: (1)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fenders; (2) hoods; (3) doors; (4) deck lids; (5) luggage lid panels; (6) quarter panels; (7) rear outer panels; (8) front-end panels; (9) header panels; (10) filler panels; (11) door shells; (12) pickup truck beds, box sides, and tail gates; (13) radiator/grill support panels; (14) grilles; (15) headlamp mounting panels/brackets/housings/lenses /doors; (16) tail-light mounting panels/brackets/housings/lenses ; (17) outer body moldings; (18) door body side moldings; (19) front wheel opening moldings; (20) side moldings; (21) front and rear fascias; (22) outer panel mounting brackets, supports, and surrounds; (23) bumpers (excluding chrome bumpers); (24) bumper covers/face bars; and (25) bumper brackets/supports.

FN2. State Farm made essentially the same objection, in writing, in its "Memorandum Regarding Jury Instructions." Referring to plaintiffs' "substantive proposed contract instructions," State Farm noted that "[t]hese instructions speak of a single State Farm 'contract' with the 'class.' " State Farm argued, however, that "there is no one 'contract' with the class."

FN3. We granted leave to the following agencies and organizations to file *amicus curiae* briefs in support of State Farm: Alliance of American Insurers, Allstate Insurance Company, the Chamber of Commerce of the United States, Citizens for a Sound Economy Foundation, North Carolina Department of Insurance *et al.*, General Motors Corporation *et al.*, Government Employees Insurance Company *et al.*, Illinois Chamber of Commerce, Illinois Department of Insurance, Illinois Manufacturers' Association, National Association of Independent Insurers *et al.*, National Association of Insurance Commissioners, National Conference of Insurance Legislators *et al.*, the Superintendent of the Ohio Department of Insurance, Public Citizen, Inc., *et al.*, and Washington Legal Foundation. We also granted leave to the following agencies and organizations to file *amicus curiae* briefs in support of plaintiffs: Alliance of Automotive Service Providers National Association *et al.*, Illinois Trial Lawyers Association, Trial Lawyers for Public Justice *et al.*, and United

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Policyholders. See 155 Ill.2d R. 345.

FN4. Plaintiffs make no mention of the "you agree" language in their brief to this court.

FN5. Plaintiffs point to a 1986 version of an internal State Farm document, General Claims Memo # 430 (GCM # 430), which, according to plaintiffs, contradicts State Farm's position that "like kind and quality" means "sufficient to restore a vehicle to its pre-loss condition." However, as State Farm claims consultant Don Porter stated at trial, GCM # 430 is not contained within the four corners of any State Farm insurance contract. GCM # 430 is therefore extrinsic evidence as to the meaning of the "like kind and quality" contractual promise. Absent a finding that the "like kind and quality" promise is ambiguous, such extrinsic evidence is irrelevant to the meaning of this contractual provision. See *Grzeszczak v. Illinois Farmers Insurance Co.*, 168 Ill.2d 216, 223-24, 213 Ill.Dec. 606, 659 N.E.2d 952 (1995); *Dempsey v. National Life & Accident Insurance Co.*, 404 Ill. 423, 426, 88 N.E.2d 874 (1949). We make no such finding of ambiguity.

FN6. In affirming the certification of the nationwide class, the appellate court stated: "[T]hrough its own records State Farm is capable of identifying class members who have had non-OEM parts installed on their vehicles." 321 Ill.App.3d at 283, 254 Ill.Dec. 194, 746 N.E.2d 1242. However, in its brief to the appellate court, State Farm flatly contradicted this assertion: "State Farm's records do not show which class members' vehicles had actually been repaired with non-OEM parts, let alone which class members still owned such vehicles." The appellate court never explained the discrepancy between its statement and State Farm's.

FN7. John Werner, an assistant director in State Farm's research division, testified that, while the company's computer system could tell what kind of part was specified on an estimate, it could *not* tell what kind of part, whether OEM or non-OEM, was actually installed on a policyholder's vehicle.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN8. The dissent agrees that the verdict in favor of plaintiffs on the consumer fraud count must be reversed in its entirety. Slip op. at 107- 08 (Freeman, J., concurring in part and dissenting in part). Thus, the dissent's statement that this court is now employing "different standards" to class action cases arising out of the Fifth District (slip op. at 110 (Freeman, J., concurring in part and dissenting in part)), must apply only to those cases alleging breach of contract.

FN9. Plaintiffs made similar statements in various other filings in the circuit court. For example, in "Class Plaintiffs' Reply to State Farm's Informational Memorandum of Law on Plaintiffs' Causes of Action," plaintiffs wrote the following: "State Farm contends that 'Plaintiffs have only vaguely alluded to any specific misrepresentation or omission.' *See* Def. Mem. at 13. This contention is ludicrous. Plaintiffs repeatedly have stated that State Farm's practice of promising in Plaintiffs' policies to restore Plaintiffs' vehicles to pre-loss condition by using parts of like kind and quality, but nonetheless using inferior non-OEM crash parts which were not of like kind and quality and which did not restore Plaintiffs' vehicles to their pre-loss condition violated the CFA [Consumer Fraud Act]." Similarly, in their written opposition to State Farm's motions for summary judgment on class claims and against the named plaintiffs, plaintiffs identified the fraudulent misrepresentation as "State Farm's promis[e] in the policy to restore Plaintiffs' vehicles to pre-loss condition by using parts of like kind and quality."

FN10. Plaintiffs' exhibits 115 and 116 are two internal State Farm memoranda which discuss the term "quality replacement parts." There is no allegation that these memoranda were ever seen by any member of the class.

FN11. The word "actual" was added to section 10a(a) by Public Act 89- 144, effective January 1, 1996. Without expressing any opinion on the significance of this change, we note that DeFrank's accident occurred in 1997 and, thus, is covered by this language. See *Greisz v. Household Bank (Illinois)*, 8 F.Supp.2d 1031, 1043 (N.D.Ill.1998) (discussing the change in language).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN12. DeFrank was not the only named plaintiff for whom the use of non-OEM parts made no difference. State Farm paid plaintiff Carly Vickers "book value" for her car after it was totaled in an accident. In her trial testimony, Vickers stated that, as far as she knew, State Farm did not value the car any less because of the non-OEM parts which were on it.

FN13. The appellate court did not identify what percentage of the class it was referring to when it used the term "numerous." Nor did the court explain why, if only "numerous class members" were damaged, State Farm was held liable for damages to the entire class.

FN14. On this topic I note that the court has accepted State Farm's argument that its contractual guarantees to restore vehicles to their "pre-loss condition" and to perform repairs with parts of "like kind and quality" may be defined in terms of each other. See slip op. at 30-31. If the promises are fungible, as the court admits, then clearly plaintiffs could show that State Farm breached its promise to restore their vehicles to preloss condition by showing that State Farm was not using parts of "like kind and quality."

--- N.E.2d ----, 2005 WL 1981444 (Ill.)

**Briefs and Other Related Documents (Back to top)**

• 2002 WL 32157189 (Appellate Brief) Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioner (Nov. 14, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# PROOF OF SERVICE

*In re: St. Jude Medical, Inc. Silzone® Heart Valves Products Liability Litigation*
Case No. 04-3117
**Delivered for Filing to the 8th Circuit in St. Paul, MN via UPS**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. I am employed in the office of a member of the bar of this court at whose direction the service was made. My business address is REED SMITH LLP, 1999 Harrison Street, Suite 2400, Oakland, CA 94612. On September 15, 2005, I served the following document(s) by the method indicated below:

**APPELLANT'S RULE 28(J) LETTER** (Orig. + 9 to Court; 2 to Counsel);

xx by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below..

**PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on September 15, 2005, at Oakland, California.

Sandra A. Lasarte

# SERVICE LIST

| | |
|---|---|
| Steven E. Angstreich, Esq.<br>Levy, Angstreich, Finney,<br>Baldante, et al.<br>Woodcrest Pavilion, Suite 100<br>10 Melrose Avenue<br>Cherry Hill, NJ 08003<br>Tel. 856.795.0303<br>Fax. 856.795.7447 | Co-Lead Counsel for<br>Respondents/Plaintiffs |
| James T. Capretz, Esq.<br>Capretz & Associates<br>5000 Birch Street, Suite 2500<br>West Tower<br>Newport Beach, CA 92660<br>Tel. 949.724.3000<br>Fax. 949.757.2635 | Co-Lead Counsel for<br>Respondents/Plaintiffs |
| Patrick Murphy, Esq.<br>Murphy Law Office<br>4765 S. Durango Drive, Suite 200<br>Las Vegas, NV 89147<br>Tel. 702.259.4600<br>Fax. 702.259.4748 | State Liaison Counsel |