# EXHIBIT 14

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE ST. JUDE MEDICAL, INC. SILZONE® HEART VALVES PRODUCTS LIABILITY LITIGATION | : : : | MDL DOCKET NO. 1396 |

**DEFENDANT ST. JUDE MEDICAL, INC.'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO CERTIFY CONSUMER PROTECTION CLASS**

# I

# INTRODUCTION

Plaintiffs invite this Court to certify a nationwide medical monitoring class under Minnesota's consumer fraud statutes. No federal circuit court or district court has held that Rule 23 can support a class of this dimension, requesting this kind of relief and using a single state's consumer protection laws. Plaintiffs nevertheless maintain that Minnesota's interest in regulating St. Jude Medical is sufficient for this Court to be the first. This is precisely what plaintiffs maintained more than three years ago when the initial class certification motion was heard. As before, however, there are multiple, fundamental problems with plaintiffs' contention.

The principal obstacle is the Eighth Circuit's intervening opinion, which stops plaintiffs' class analysis before it starts. The Eighth Circuit unequivocally held that a multi-state medical monitoring class in these Silzone® valve cases presents too many individualized issues to be certified under Rule 23. Plaintiffs never explain how Minnesota's consumer fraud statutes can make these individualized treatment issues disappear even though their proposed nationwide medical monitoring class raises more such issues on a wider scale than before. The law of the case established by the Eighth Circuit cannot be so easily ignored, and the Eighth Circuit opinion forecloses plaintiffs' proposed nationwide medical monitoring class.

By the same token, the Eighth Circuit made it clear that Minnesota's professed interest in regulating St. Jude Medical does not determine whether Minnesota law fairly can be applied to the putative class members. Consistent with the Eighth Circuit's reasoning, that issue instead turns on a discrete examination of the particularized interests of each putative class member from each state — interests of constitutional dimension that plaintiffs fail to consider. That failure likewise cannot be overlooked,

and the Eighth Circuit's holding compels the denial of plaintiffs' class certification motion for this reason also.

The obstacles presented by the Eighth Circuit's opinion alone are dispositive, but they are only the beginning. There are other insurmountable barriers to certification of plaintiffs' proposed nationwide medical monitoring class, including that:

- Minnesota's own conflict-of-laws rules do not authorize the application of its law at the expense of the other state's interests;

- Well-reasoned federal and state cases, some cited with approval by the Eighth Circuit in its opinion, establish that Rule 23 cannot be relied on to permit one state's consumer protection laws to override the interests of other affected states who have a significant interest in having their own law applied;

- Minnesota's substantive law, including its consumer fraud statues, does not authorize the relief they seek; and

- Principles of federalism will not permit Minnesota to impose its laws in derogation of the public policies of the several states.

Even if these further obstacles are overlooked and one turns to Rule 23's requirements, classwide resolution of a nationwide medical monitoring class still is not possible because:

- The proposed class definition is indefinite and will require resolution of core liability and causation issues just to ascertain class membership;

- Three of the five named representative plaintiffs allege injuries attributed to Silzone® heart valves and thus do not meet the proposed class definition. Another has passed away, and her claims have been settled;

- Lester Grovatt, the only named plaintiff who does not allege any injury, is not an adequate class representative. His claims are not typical of the class he seeks to represent, and his pursuit of medical monitoring relief only will prejudice those whom he purports to represent;

- The number of individualized factual or legal issues presented by plaintiffs' proposed medical treatment program establishes that there is no commonality; that common issues of law or fact do not predominate; and that any attempt at a classwide trial would be unmanageable; and

- An attempted adjudication of the putative class members' claims in a complex and lengthy classwide trial is not the superior method for resolving what remains of this litigation.

In the end, any effort to impose the nationwide remedy plaintiffs demand under the consumer fraud statutes of a single state must fail under fundamental principles that lie at the root of our federal system. Plaintiffs maintain that a federal court can employ Rule 23 to apply a single state's consumer protection laws to make life-defining healthcare decisions over many years for citizens in other states who have no connection to this litigation. Plaintiffs would impose that remedy even in those states that do not recognize medical monitoring.

Congress did not reserve a role for federal courts to make individualized healthcare decisions for residents of the fifty states by exporting one state's consumer fraud law to the exclusion of the law elsewhere. Those healthcare decisions reside with the treating doctors of those individuals, who admittedly have sustained no injury. If those decisions are to be interfered with, that is a policy choice for the respective states under their respective views of their own laws. This Court already has recognized the respect that must be accorded the fifty states where common-law personal injury or medical monitoring claims are involved. That respect does not vanish simply because a class representative chooses to invoke a consumer fraud statute.

Litigation under Rule 23 is the exception, not the rule, and there is no need for such an exceptional step here. The remaining Silzone® valve cases are being resolved and are no threat to overwhelm the judicial system. The putative class members have been monitored by their own physicians for *at least six years* (St. Jude Medical recalled all Silzone®-coated valves in January 2000), and none has shown any sign of injury.[1] No regulatory agency or U.S. medical association has said that ordinary monitoring, consistent with published American College of Cardiology/American Heart Association standards, is not enough. Even plaintiffs' primary expert concedes that the patients' own treating physicians know best about their own patients' needs. There is, in short, no factual, legal or pragmatic reason to take the unprecedented step plaintiffs propose. The motion for class certification should be denied.

[1] Through the management of this Court and its state-court counterparts, all but a relative handful of Silzone® actions have been resolved. Data from the AVERT study show no evidence of an increased risk for any complication in patients currently implanted with a Silzone® versus non-Silzone heart valves. As such there is no scientifically reliable evidence demonstrating that Silzone® valve recipients require different or additional monitoring than patients with non-Silzone valves. (Disclosure Statement For Judith Jones, M.D., Ph.D. ¶¶ 125-30, Exhibit I to the Affidavit of Tracy J. Van Steenburgh In Support of St. Jude Medical's Opposition ("Van Steenburgh Aff."))

## II

## BACKGROUND

### A. This Court's Prior Rulings, When Considered In Light Of The Eighth Circuit' s Opinion, Provide The Backdrop For Evaluating Plaintiffs' Renewed Motion For Class Certification

This Court largely rejected plaintiffs' first attempt to apply Minnesota law to nationwide personal injury and medical monitoring classes. In its March 27, 2003 order, the Court applied Minnesota's five-part conflicts-of-law test and held that it could not "ignore the interests of states in which class members were implanted with Silzone® valves" and that states "have strong interests in applying their relevant laws to the marketing, sale, and implantation of medical devices within their borders." (*See* Opinion and Order On Class Certification, March 27, 2003, 20-21). Because these "crucial" factors precluded Minnesota law from applying uniformly to the class, the law of the state where each class member's cause of action accrued would apply. *Id.*

After further briefing, the Court found that variation among the fifty states' laws and factual differences among the putative class members' claims made plaintiffs' proposed personal injury class uncertifiable. (*See* Opinion and Order On Subclass Certification, January 5, 2004, at 6-7). With regard to the medical monitoring class, the Court and the parties performed an exhaustive analysis of the states' medical monitoring law. Following that analysis, the Court certified a medical monitoring class limited to uninjured Silzone® recipients from seventeen states that this Court found to permit medical monitoring claims without proof of current injury. (*See* Order, July 15, 2004, at 12-14).

Throughout these proceedings, the Court treated plaintiffs' statutory claims differently from their tort and warranty claims. Although the Court previously had recognized that the fifty jurisdictions "have strong interests in applying their relevant

laws," the Court ruled that traditional conflicts-of-law analysis was not required in connection with plaintiffs' consumer fraud claims. (*See* Order, July 15, 2004, 7) The end result was: (1) a class of uninjured Silzone® recipients residing in seventeen states seeking medical monitoring damages; and (2) a nationwide class of Silzone® recipients seeking personal injury and medical monitoring damages under Minnesota's consumer fraud statutes.

The Eighth Circuit reversed certification of both classes. *In re St. Jude Medical, Inc. Silzone Heart Valve Prods. Liab. Litig.*, 425 F.3d 1116 (8th Cir. 2005). The court rejected the nationwide consumer protection class and held that full analysis of which law should apply to the different individual class members claims was required. Following the U.S. Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822-23 (1985), the court ruled that an "individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action" and rejected plaintiffs' argument that Minnesota's permissive standing requirements preempted that constitutional requirement. *Silzone Heart Valve Litig.*, 425 F.3d at 1119-21. The Eighth Circuit also expressed skepticism that the required individualized analysis would result in the nationwide application of Minnesota law. *Id.* at 1120 (noting that "we suspect Minnesota lacks sufficient contacts with all the parties' claims, and the different states have material variances between their consumer protection laws and Minnesota's").

The Eighth Circuit also rejected the seventeen-state medical monitoring class on the ground that the class lacked the necessary cohesion required by Rule 23, a basis for reversal that came to bear no matter which state's law governed. *Id.* at 1121-23. According to the court, each putative class member's need for medical monitoring was

"highly individualized," depending on medical history, general health, personal choice, risk factors, and other factors. *Id.* at 1122.

**B. Plaintiffs' Renewed Motion To Certify A Nationwide Medical Monitoring Class For Uninjured Silzone® Valve Recipients Under Minnesota's Consumer Fraud Statutes Cannot Be Squared With This Court's Prior Rulings Or The Eighth Circuit's Opinion**

In their renewed motion for class certification, plaintiffs seek certification of one class of uninjured Silzone® patients seeking medical monitoring and an epidemiological study. They define their proposed class as:

> [A]ll Silzone prosthetic heart valve patients in the United States who have not undergone an explant of their Silzone valve or developed a manifest and diagnosed injury from their Silzone implant of degree or severity that would permit individual personal injury law suits to be commenced in their State of residence.

Plaintiffs' renewed motion and their newly defined class abandon claims on behalf of allegedly injured valve recipients. That renders the as-pled personal injury class ("Class II") moot and reduces the as-pled medical monitoring class ("Class I") to one for uninjured patients only. Plaintiffs do not, however, follow the Eighth Circuit's mandate to provide a detailed analysis of each individual class member's particularized interest in having Minnesota law applied. Instead, plaintiffs provide an analysis of St. Jude Medical's allegedly wrongful conduct (taken mainly from their recently produced expert reports), as if these inflammatory allegations somehow were relevant to their certification motion. [2]

[2] As to the allegations of wrongful conduct, St. Jude Medical has disputed plaintiffs' contentions previously and does so again now. Of relevance here, however, is that plaintiffs' unjustified allegations at best raise merits issues which are not in play in this class certification proceeding. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974). They thus should be summarily ignored and have no role in this Court's decision.

Plaintiffs then devote a good portion of their briefing to the opinion of their new medical monitoring expert, Dr. Eric Butchart, who says that: (1) every Silzone® valve is defective – even those that have worked without complication since implantation more than six years ago; and (2) every Silzone® recipient needs heightened medical surveillance – even those who have experienced no apparent injury throughout that time. (Pl. Memo., at 4-5; Butchart Report, at 48) Under Dr. Butchart's medical monitoring program, the actual type and extent of treatment depends on a wide variety of individualized factors based on each patient's unique condition and circumstances. Indeed, it is difficult to imagine a medical treatment program any more complex and individualized than the one that Dr. Butchart outlines in his report. (Butchart Report, at 8-9, 48, 109) Moreover, the complications for which Dr. Butchart would monitor Silzone® patients once again occur for any number of reasons in patients with or without Silzone® valves. As the Eighth Circuit made clear, this indisputable fact dooms any classwide approach to medical monitoring, no matter what the underlying theory purportedly giving rise to the claimed relief. *Silzone Heart Valve Litig*, 425 F.3d at 1121-23. Yet, plaintiffs again make no attempt to account for the Eighth Circuit's reasoning.

Plaintiffs turn next to the law, but rather than fully analyzing the differences among the various states' consumer fraud statutes, they carve out material portions of each statute as "procedural" or "remedial" and claim that the only issues requiring comparison are "what conduct is prohibited" and "whether plaintiffs have standing." (Pl. Memo., at 29-30) Plaintiffs thereafter advance generalized assurances that all the states' consumer protection laws come from the same roots and assert that "their substance is strikingly similar and without any material difference in this case." (*Id.* at 37) Notably, plaintiffs draw this conclusion without describing the elements required to prove a cause of action in any state other than Minnesota. They do not take into

account, for example, that thousands of putative class members had valves implanted in other states; that their surgeons decided to use Silzone® valves in other states based on myriad factors occurring in other states; that the putative class members are currently being monitored by their own physicians in others states; and that the medical monitoring that plaintiffs seek would be implemented in other states.

Finally, although plaintiffs have requested certification of a class under Rule 23, they dedicate not a word of their 59-page brief to explaining how their class meets Rule 23's requirements.

## III

## PLAINTIFFS' PROPOSED CLASS IS AN ILL-CONCEIVED RESOLUTION SCHEME BLOCKED BY NUMEROUS BARRIERS FOUND IN BINDING FEDERAL CASE AUTHORITY AND CONTROLLING MINNESOTA LAW

Even before considering the requirements set forth in Rule 23, plaintiffs' proposed class meets numerous, fundamental barriers to class certification, each sufficient in its own right to defeat plaintiffs' motion. The barriers arise from the force and effect of the Eighth Circuit's opinion on medical monitoring and choice-of-law, Minnesota's own conflict-of-law rules, Minnesota's consumer fraud statutes, numerous well-reasoned federal and state authorities defining the limits of Rule 23, and principles of federalism, which prohibit the use of a procedural rule to grant new substantive rights nationwide.

### A. Barrier Number One: Under The Eighth Circuit's Opinion, The Law Of The Case Holds That A Class Of Uninjured Silzone® Valve Recipients Seeking Medical Monitoring Is Not Certifiable Under Rule 23

To begin with, plaintiffs are proposing a class that the Eighth Circuit has already rejected – a class of uninjured Silzone® recipients claiming medical monitoring. The

law of the case precludes this Court from certifying that class and alone is reason to deny their motion for class certification.

When an appellate court reverses and remands for further consistent proceedings, the district court must determine the remaining issues "pursuant to the legal principles enunciated in the appellate court's opinion." *Republican Party v. White*, 416 F.3d 738, 746 (8th Cir. 2005). Put another way, a district court must obey an appellate mandate on remand. *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456 (8th Cir. 1990). In *Klein v. Arkoma Production Co.*, 73 F.3d 779, 784-785 (8th Cir. 1996), the Eighth Circuit reversed a ruling because the district court did not follow the law of the case. The Eighth Circuit determined that its earlier opinion in the case had resolved the issue of the parties' rights under a contract and that the district court was compelled to follow this holding. *Id.* In so ruling, the court noted that a when a higher court has settled an issue of law, a "district court is bound by the decree and must carry it into execution according to the mandate" and may not feel free to "reject [its] legal conclusion." *Id.*

An appellate court's opinion vacating class certification is a legal ruling that establishes the law of the case. In *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995), the Seventh Circuit vacated certification of a nationwide class of patients allegedly injured by the defendant's blood products, on the ground that the lower court had contemplated combining the fifty states' negligence laws into a "general" standard. *Id.* at 1300. When the plaintiffs renewed their motion for class certification on remand, the district court recognized that plaintiffs' newly proposed class had to meet Rule 23, but noted also that "the ultimate question on their certification motion is whether their proposed Rule 23(c)(4)(A) class would pass muster" under the appellate court's ruling. *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, No. 93 C

7452, MDL 986, 2005 WL 497782, at *3 (N.D. Ill. Mar. 1, 2005). Acknowledging its duty to follow the law of the case, the court denied class certification. *Id.* at *10.

Here, the Eighth Circuit held that certification of a medical monitoring class under Rule 23 was improper because "diverse legal and factual issues preclude class certification." *Silzone Heart Valve Litig.*, 425 F.3d at 1121. Those diverse issues made the class unmanageable, destroying the requisite cohesion. As the court stated:

> [E]ach plaintiff's need (or lack of need) for medical monitoring is highly individualized. Every patient in the 17-state class who has ever been implanted with a mechanical heart valve already requires future medical monitoring as an ordinary part of his or her follow-up care. A patient who has been implanted with the Silzone valve may or may not require additional monitoring, and whether he or she does is an individualized inquiry depending on that patient's medical history, the condition of the patient's heart valves at the time of the implantation, the patient's risk factors for heart valve complications, the patient's general health, the patient's personal choice, and other factors.

*Id.* Because medical monitoring is "highly individualized," the court concluded that "[s]imply put, the medical monitoring class presents a myriad of individual issues making class certification improper." *Silzone Heart Valve Litig.*, 425 F.3d at 1122.

This holding is the law of the case, yet plaintiffs now request virtually the same class. As before, the proposed class includes only Silzone® recipients with no apparent injury. As before, the class is seeking funds for future medical surveillance and treatment. As before, the class excludes any Silzone® recipient who had a valve explanted or who has potential claims based on a current personal injury. In fact, there are only two potential distinctions between this proposed class and the medical monitoring class that the Eighth Circuit reversed, and neither allows plaintiffs to evade the law of the case.

First, plaintiffs have a new medical monitoring expert, Dr. Butchart. But his recommended program merely reinforces the applicability of the Eighth Circuit's holding: He repeatedly acknowledges the individual nature of medical monitoring and calls for a program depending on individual examination overseen by each patient's personal physician. Second, plaintiffs are now seeking a statutory "consumer fraud class," not a common-law medical monitoring class. But that is a distinction without a difference where the Eighth Circuit's reasoning is concerned. The Eighth Circuit, as a matter of law under Rule 23, reversed plaintiffs' medical monitoring class because of individual differences among the class members and the "medical monitoring" they would require, if any. That mandate does not depend on the proposed legal basis for the class members' claims. Rule 23 still governs, and the Eighth Circuit held that Rule 23 would not sanction a class like the one plaintiffs proposed – a class of uninjured Silzone® heart valve recipients seeking medical monitoring. This Court should follow that holding and reject plaintiffs' proposed class.

**B. Barrier Number Two: Even If Plaintiffs Had Conducted The Constitutionally Required Conflicts Analysis (Which They Did Not), Minnesota's Conflict-Of-Law Rules Do Not Permit The Application Of Minnesota Law At The Expense Of Other States' Interests In Having Their Laws Apply**

Because plaintiffs are requesting a nationwide class, it was their duty under the Constitution, as interpreted by *Shutts* and applied by the Eighth Circuit, to perform individualized analysis of the contacts that each putative class member's claims have with Minnesota. Plaintiffs, however, have not performed that analysis. The failure to undertake the constitutionally required inquiry is itself grounds for denying class certification. Alternatively, Minnesota's own choice-of-law principles, which take into account each state's interest, independently compel denial of plaintiffs' motion because those principles establish that Minnesota would not apply its own law to the out-of-state class members.

**1. Plaintiffs Have Failed To Provide The Individualized Conflicts-Of-Law Analysis That The Eighth Circuit Mandated Under The Constitution**

Relying on the reasoning in the U.S. Supreme Court's opinion in *Shutts*, the Eighth Circuit emphasized that the prior certification "was in error because the district court did not conduct a sufficient conflicts-of-law analysis with respect to *each plaintiff class member* before applying Minnesota law" and that the "Supreme Court has held that an individualized choice-of-law analysis must be applied to *each plaintiff's claim* in a class action." *Silzone Heart Valve Litig.*, 425 F.3d at 1120 (emphasis added, citing *Shutts*, 472 U.S. at 822-23). The Eighth Circuit further found that it could not determine the proper choice of law because "the court did not analyze the contacts between Minnesota and *each class member's claims*." *Id.* (emphasis added). It concluded that "protection of out-of-state parties' constitutional rights requires an inquiry into their claims' contacts with Minnesota and their individual states laws before concluding Minnesota law may apply." *Id.*; *see also Georgine v. Amchem Prods.*, 83 F.3d 610, 627 (3d Cir. 1996) (holding that class certification scrutiny includes "individualized choice of law analysis to each plaintiff's claims").

Despite the clarity of the Eighth Circuit's directive, plaintiffs do not perform the required analysis. They acknowledge the Eighth Circuit's opinion, but marginalize its mandate as a mere "threshold, not a comparison." (Pl. Memo., at 17) Plaintiffs then assert that each putative class member's claims meet the threshold because St. Jude Medical is headquartered and conducted Silzone®-related business in Minnesota. (Pl. Memo., at 17-20) But that does not go far enough. The Eighth Circuit expressly declared that the inquiry must extend beyond St. Jude Medical's contacts to the particularized interests of each member in having Minnesota law apply.

Yet, plaintiffs do not discuss any particular putative class member's claims – not even their own – nor do they discuss any state other than Minnesota. They simply ignore the interests of the Silzone® patients who reside in other states. They similarly ignore that these patients had their Silzone® valves implanted in other states; that their surgeons made their medical care decisions (including the decision to implant a Silzone® valve) in other states; and most notably, that the relief plaintiffs seek for out-of-state plaintiffs would be implemented entirely in other states. Plaintiffs are seeking to regulate medical care and invade the physician/patient in connection with thousands of individuals residing outside Minnesota, yet they speak as though those people and their home states have no interests worth discussing. The Eighth Circuit, however, held otherwise.

It is undisputed that St. Jude Medical has contacts with Minnesota. The relevant question, however, is whether *each putative class member's claims* have contacts with Minnesota sufficient to substitute Minnesota law for the law of each class member's home state. Plaintiffs' failure to take those more particularized individual interests into account violates established constitutional minimums and, without more, compels rejection of plaintiffs' proposed class.

**2. Minnesota's Choice-Of-Law Rules Do Not Allow The Nationwide, Minnesota-Law Class That Plaintiffs Request**

Even if the Court were to overlook plaintiffs' failure to analyze what the Constitution requires, another fundamental choice-of-law barrier emerges. Minnesota's choice-of-law rules do not permit its laws to be applied to the out-of-state class members' claims.

The applicable conflict-of-law rules are not in dispute: The first step is to determine whether an actual conflict of law exists. *Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000). If there is a conflict, then the next step is to determine whether the law involved is substantive or procedural. *Gate City Fed. Sav. & Loan Ass'n. v. O'Connor*, 410 N.W.2d 448, 450 (Minn. Ct. App. 1987). If the law is substantive, this Court must apply Minnesota's five-factor "significant contacts" test (described *infra*) to determine which state's law governs. *Id.*

In rejecting plaintiffs' prior nationwide class in this case, the Eighth Circuit observed that "[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *Silzone Heart Valve Litig.*, 425 F.3d at 1120 (citing *Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002)). The Eighth Circuit also expressed skepticism that Minnesota law could ever apply to a nationwide class of Silzone® patients:

> Application of Minnesota law to all plaintiffs' claims ultimately may be proper, although we suspect Minnesota lacks sufficient contacts with all the parties' claims, and the different states have material variances between their consumer protection laws and Minnesota's. There is no indication that out-of-state parties "had any idea that [Minnesota] law could control" potential claims when they received their Silzone-coated valves.

*Silzone Heart Valve Litig.*, 425 F.3d at 1120 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822 (1985)).

In making this statement, the Eighth Circuit was, in large part, echoing this Court's earlier decision that the law of fifty states must be applied to plaintiffs' tort and warranty claims. In its initial order on class certification, the Court went through the five-part analysis and held that it could not "ignore the interests of states in which class

members were implanted with Silzone valves" and that states "have strong interests in applying their relevant laws to the marketing, sale, and implantation of medical devices within their borders." (*See* Order, March 27, 2003, 20-21). These "crucial" factors precluded Minnesota law from applying uniformly to the class. *Id.*

This Court came to the right conclusion. Minnesota law rejects the idea its law can apply nationwide merely because the defendant resides there or a product originated there. In *Nodak*, an out-of-state insurance company sued a Minnesota company over an accident in North Dakota between a North Dakoka resident and a Minnesota resident. 604 N.W.2d at 91-92. Applying Minnesota's five-part conflicts-of-law test, the Minnesota Supreme Court held that North Dakota law applied, even though the plaintiffs sued in Minnesota courts and the defendant insurer was a Minnesota company. *Id.* at 94-96. The location of the accident was the dispositive factor, as the court held "that when all other relevant choice-of-law factors favor neither state's law, the state where the accident occurred has the strongest governmental interest; accordingly, the law of the state where the accident occurred should be applied." *Id.* at 96. The Eighth Circuit applied Minnesota choice-of-law rules to the same effect in *Nesladek v. Ford Motor Co.*, 46 F.3d 734 (8th Cir. 1995), where a Minnesota resident sued Ford over an accident that occurred in Nebraska while the plaintiff resided there. *Id* at 735-36. The allegedly defective Ford vehicle underwent final assembly in Minnesota, yet the Eighth Circuit held that Nebraska law applied. *Id.* at 738-40. Again, the accident's location and the plaintiff's residence at the time of the accident were the deciding factors.

As explained in the following discussion, the same result is mandated for the consumer fraud class plaintiffs propose now. Under Minnesota's choice-of-law rules, the law of each putative class member's home state must govern that person's claims.

**a. Minnesota Consumer Protection Laws Conflict With Those Of Other States In Material, Outcome-Determinative Ways**

The Eighth Circuit and *Bridgestone* have it right. The consumer fraud laws do "vary considerably" from one state to the next in material and substantive ways.[3] *Silzone Heart Valve Litig.*, 425 F.3d at 1120 (citing *Bridgestone/Firestone*, 288 F.3d at 1018)). An analysis of the various states' laws amply confirms this assertion.

*First*, states diverge on the fundamental question of whether class actions are permitted under their consumer protection statutes. The majority of states permit class actions under their consumer protection statutes. Six states, however, including Alabama, Georgia, Louisiana, Mississippi, Montana and South Carolina, expressly prohibit consumer-class actions or "representative" actions under the consumer protection statutes brought by anyone other than the state attorney general. Ala. Code § 8-19-10(f); Ga. Code § 10-1-399(a); La. Rev. Stat. § 51:1409(A); Miss. Code § 75-24-15(4); Mont. Code § 30-14-133(1); and S.C. Code § 39-5-140(a). In addition, many of the states that have more than one consumer protection statute permit class actions for one of the statutes but not for the other, or have not yet determined whether class actions are appropriate under either statute. For example, in Georgia, the Fair Business Practices Act expressly prohibits class action but, while the Uniform Deceptive Trade Practices Act neither expressly prohibits nor provides for class actions, at least one court has certified a class under this alternative statute. *See e.g.*, *Taylor Auto Group, Inc. v. Jessie*, 527 S.E. 2d 256, 257 (Ga. Ct. App. 1999). Finally, there are a handful of states including Maryland, Iowa, Pennsylvania, and South Dakota where the statute is silent on the availability of a class action and the courts have not yet determined the issue.

[3] A fifty-state survey of the consumer protection statutes is attached as Exhibit H to Van Steenburgh Aff., ("Consumer Protection Survey"). The survey is intended to provide a comparison of the differences in various state statutes for the Court's ease of reference.

*Second*, states also impose different requirements for proof of reliance as an element of a consumer protection claim. States such as Indiana and Pennsylvania require that plaintiffs prove reliance upon the alleged misrepresentation or conduct. Ind. Code § 24-5-0.5-4; *Debbs v. Chrysler Corp.*, 810 A.2d 137, 156 (Pa. Super. Ct. 2002. Other states such as Arizona also require proof of reliance, but do not require *reasonable* reliance. *Parks v. Macro Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. 1979). And still others require no showing of reliance at all. *Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 311 (Tex. App. Ct. 1993). In Kentucky, a plaintiff cannot recover for consumer fraud unless he proves that defendant intended to deceive him or was grossly negligent. *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W. 2d 287, 291 (Ky. 1991).

*Third*, states impose different standards with respect to whether proof of injury or loss is required. Some states including Arkansas and Colorado require a plaintiff to prove that he has sustained injury before he can recover under the consumer protection statutes. Ark. Code § 4-88-113(f); *Hall v. Walter*, 969 P.2d 224, 231, 234-235 (Colo. 1998). In Georgia, however, proof of injury is required to recover damages, but an uninjured plaintiff can obtain injunctive relief. *Compare* Ga. Code § 10-1-399(a) *with* Ga. Code § 10-1-373. And then there are a few states such as Delaware that do not require proof of injury as an element of the claim. Del. Code tit. 6, § 2513(a).

*Fourth*, states recognize different defenses, including prohibitions against personal injury claims, exemptions for conduct in compliance with federal and/or state law, and lack of knowledge. A few states such as Florida expressly exempt personal injury lawsuits from the scope of protection under their consumer protection statutes. Fla. Stat. § 501.212(3). In other states such as Ohio and Hawaii, the courts have reached a similar conclusion. *See e.g., Pomianowski v. Merle Norman Cosmetics,*

*Inc.*, 507 F. Supp. 435 (S.D. Ohio 1980); *Beerman v. Toro Mfg. Corp.*, 615 P.2d 749 (Haw. App. 1980). Along these same lines, most states recognize some sort of exemption for conduct that is permitted under Federal law, but they apply different standards. Some states exempt conduct that is in compliance with Federal law, while others exempt a narrower category of conduct that is required or specifically authorized. *Compare* Haw. Rev. Stat. § 481A-5 (Haw. UDTPA) *and* 815 Ill. Comp. Stat. § 510/4 (Ill. UDTPA) *with* Ind. Code § 24-5-0.5-6 ("required or expressly permitted") *and* Mich. Comp. Laws § 445.904 ("specifically authorized")). And then, some states, but not others, recognize lack of knowledge as a defense. *See e.g.*, Ala. Code § 8-19-13.

*Fifth*, states permit different types of relief for violation of their consumer protection statutes. Statutes in states including Alabama, Connecticut and Maryland permit recovery of damages, but there is no provision for injunctive relief. Ala. Code § 8-19-10(a)(1); Conn. Gen. Stat. § 42-110g(a); Md. Code Ann. Com. Law § 13-408(a). However, states such as California and Illinois permit the recovery of both damages and equitable relief. Cal. Civ. Code § 1780(a)(1); 815 Ill. Comp. Stat. § 505/10A. And, there are states such as Iowa where injunctive relief is the sole remedy and damages cannot be recovered. IA. Code § 714.16(7).

*Sixth*, states differ on whether they require pre-lawsuit notice to potential defendants. The California Consumer Legal Remedies Act imposes pre-filing notice requirements that preclude suit if plaintiffs fail to comply with them. *See, e.g.*, *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285 (S.D. Cal. 2003) (barring plaintiff's claims under the CLRA because plaintiff did not comply with notice requirement in a timely manner). Minnesota law, however, does not require notice.

*Seventh*, the states differ significantly on how they treat plaintiffs' claimed remedy – medical monitoring. It is doubtful that any state would recognize medical monitoring as a remedy authorized under consumer fraud statutes, particularly for plaintiffs who are not injured.[4] Even when considering medical monitoring under the common law, there is no uniformity there either. *See Badillo v. American Brands, Inc.*, 16 P.3d 435, 439 (Nev. 2001) (although some courts have recognized medical monitoring, "this is far from an 'overwhelming majority of jurisdictions;"). Many states have flatly rejected claims for future medical surveillance. *See, e.g.*, *Henry v. Dow Chemical Co.*, 701 N.W.2d 684, 701-02 (Mich. 2005) (holding that medical monitoring was not viable in Michigan because it is a "departure from fundamental tort principles"); *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827, 831-32 (Ala. 2001). Other states have recognized medical monitoring, but only where the plaintiff can prove an existing injury. La. Civ. Code Ann. Art. 2315. Still others recognize medical monitoring only as a remedy, dependent on proof of an underlying cause of

---

[4] The only published opinion we know of that potentially addresses medical monitoring damages under a state consumer protection statute is *In re West Virginia Rezulin Litigation*, 585 S.E.2d 52 (W. Va. 2003). In that case, the plaintiffs pleaded claims for strict products liability, medical monitoring, and violations of the West Virginia Consumer Credit and Protection Act. *Id.* at 59-60. Citing West Virginia authority expressly authorizing medical monitoring funds absent proof of an injury, the West Virginia court held that the plaintiffs' claimed medical monitoring class should have been certified. *Id.* at 63-73 (citing *Bowers v. Westinghouse Elec. Corp.*, 522 S.E.2d 424 (1999). The court discussed the plaintiffs' claim for "damages under the Consumer Protection Act," but the opinion in no way establishes that the consumer statute provides an independent basis for claiming medical monitoring without proof of an actual injury. *Id.* at 72-73. In addition, St. Jude Medical is aware of the unpublished order in *Vadino v. American Home Products Corp.*, Opinion, No. MID-L-425-98 (N.J. Super. Ct. Jan. 25, 1999), where a New Jersey court certified a class of uninjured people seeking medical monitoring under the New Jersey Consumer Fraud Act ("CFA"). That order, however, is contrary to more recent New Jersey cases rejecting medical monitoring under the New Jersey CFA and requiring proof of a current injury to recover medical monitoring. *See, e.g.*, *Vitanza v. Wyeth, Inc.*, Memorandum of Decision on Motion, 2006 WL 462470, at *6-*8 (N.J. Super. Ct. Jan. 24, 2006) (dismissing all claims for medical monitoring for uninjured patients under New Jersey Consumer Fraud Act and New Jersey Product Liability; rejecting medical monitoring in a product liability action "where there is no present symptom of injury; stating that there "is no case granting medical monitoring under the [New Jersey] CFA"). These authorities do not show that New Jersey or West Virginia would necessarily allow medical monitoring damages under their consumer statutes. At most, they reinforce the truism that different states approach medical monitoring differently.

action such as product defect or negligence. *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 823 (Cal. 1993); *Lynden Inc. v. Walker*, 30 P.3d 609, 619-20 (Ak. 2001). Yet another category of states allows a cause of action for medical monitoring absent injury but the elements of proof vary. *See Redland Soccer Club, Inc. v. Department of the Army*, 696 A.2d 137, 143-46 (Penn. 1997) (permitting medical monitoring upon proof of seven enumerated elements); *Hansen v. Mountain Fuel Supply*, 858 P.2d 970 (Utah 1993) (permitting medical monitoring upon proof of enumerated elements, including the unique requirement that the proposed monitoring provide actual benefit to the patient).

Plaintiffs' two-fold response to this legal diversity is first to try to minimize it, and then to attempt to dismiss it. To begin, plaintiffs attempt to limit the analysis by parsing the statutes and characterizing certain pieces as "procedural" or "remedial." According to plaintiffs, Minnesota law applies on these issues automatically, with the only substantive questions being "what conduct is prohibited" and "whether plaintiffs have standing." (Pl. Memo., at 29-30). But plaintiffs cannot avoid conflicts-of-law analysis by slicing and dicing statutes in this fashion. Minnesota defines substantive law as "that part of law which creates, defines, and regulates rights as opposed to 'adjective or remedial' law, which prescribes [the] method of enforcing the rights or obtaining redress for their invasion." *Zaretsky v. Molecular Biosystems, Inc.*, 464 N.W. 2d 546, 548 (Minn. Ct. App. 1990) (quoting *Meagher v. Kavli*, 88 N.W .2d 871, 879-80 (Minn. 1958)). There is no "clear line separating substantive rights from procedure" but rather "the line between 'substance' and 'procedure' shifts as the legal context changes." *Zaretsky*, 464 N.W. 2d at 548. Stated differently, substantive law is that which will substantially affect the result. *Gate City Fed. Sav. & Loan Ass'n v. O'Connor*, 410 N.W.2d 448, 450 (Minn. Ct. App. 1987).

Under that controlling standard, every part of every statute that plaintiffs cite is substantive law that requires conflicts-of-law analysis. Each state has enacted a statutory scheme representing its public policy on what consumers can recover and under what conditions they can recover it. And every provision within those schemes affects the result -- everything from pre-filing notice requirements to the provision of remedies. *See Nesladek*, 46 F.3d at 736-37 (statute of repose was substantive law); *Lowrey v. Dingmann*, 86 N.W.2d 499, 503 (Minn. 1957) (noting "the proper measure of damages in a fraud action is a matter of substantive law, governed by the law of the place where the wrongful act occurred"); *Danielson v. National Supply Co.*, 670 N.W.2d 1, 6 n.2 (Minn. Ct. App. 2003) (noting that a limitation period created by statute is substantive rather than procedural because it is a condition of the right); *Rowlette & Assocs. v. Calphalon Corp.*, No. C8-99-1667, 2000 WL 385502, at * 3 (Minn. Ct. App. Apr. 18, 2000) (holding that differences in pre-termination notice requirements under state law are substantive and require a choice of law analysis).[5]

A plaintiff's right to recover, for example, under the California Consumer Legal Remedies Act depends on providing notice before suing, which furthers the public policy of giving defendants an opportunity to remedy the alleged conduct and avoid litigation. In Pennsylvania, plaintiffs can recover only if they relied directly on the defendant's alleged representations, and in Iowa, an aggrieved consumer can recover only injunctive relief. These differences represent policy decisions by the lawmakers in those states on the conditions under which consumers can sue for allegedly unfair

[5] *See also Gopher Oil Co. Inc. v. Union Oil Co.*, 955 F.2d 519, 528 (8th Cir. 1992) (recognizing that under Minnesota law, the measure of damages in a fraud action is substantive and governed by the law of the place where the wrongful act occurred); *Dodds v. St. Jude Medical, Inc.*, Court File C3-04-10616, C3-04-1619 (Minn. Dist. Ct. Oct. 20, 2005) (Judge Gearin holding that Minnesota law conflicts with Canadian law because Canadian law imposes a cap on damages and finding this difference to be substantive).

practices. All of them affect the result, yet plaintiffs would have this Court override those decisions without a second thought.

After erroneously narrowing the analysis, plaintiffs then suggest that the laws have no "material difference" because "all consumer protection regimes share a common chord" and "all of them in one fashion or another outlaw misleading and deceptive conduct." (Pl. Memo., at 31, 37). But even if the various states' laws regulate similar categories of conduct, they do so in different ways under different conditions and different standards. Plaintiffs simply ignore this and conclude there is no material difference, without discussing the elements required to prove a consumer protection claim in any state other than Minnesota. (Pl. Memo., at 30-37) If plaintiffs are right and there really is no difference, one wonders why the Seventh and Eighth Circuits are of the mind that state consumer protection laws "vary considerably" and why so many courts have rejected nationwide classes similar to the one plaintiffs are proposing for that very reason.

**b. Minnesota's Choice-Of-Law Principles Require That Each Plaintiff Class Member's Claims Must Be Adjudicated Under The Law Of His Or Her Home State**

Given the substantive conflicts described above, the Court must apply the Minnesota "significant contacts" test to determine whether to apply Minnesota law or the law of each plaintiff's home state. The "significant contacts" test implicates the following five factors: (1) predictability of results; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental

interest; (5) application of the better rule of law. *Klimstra v. Granstrom*, 95 F.3d 686, 690-691 (8th Cir. 1996); *Nodak*, 604 N.W.2d at 94.[6]

As before, application of these factors results in each class member's claims being governed by the law of his or her home state:

**Predictability of results.** The first factor, predictability of results, "represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping." *Nodak*, 604 N.W.2d at 94-95. As one Minnesota court put it, this factor applies "primarily when parties desire advance notice of which state law will govern in future disputes." *Danielson v. National Supply Co.*, 670 N.W.2d at 7. Here, as the Eighth Circuit noted, "there is no indication out-of-state parties had any idea that Minnesota law could control potential claims when they received their Silzone-coated valves." *Silzone Heart Valve Litig.*, 425 F.3d at 1120. Thus, Silzone® patients could not have predicted that potential claims arising from their valve replacements would be decided under law different from where they reside and/or had surgery. Nor could they have predicted that their substantive rights could be affected, even extinguished, because other patients who they do not know decided to sue in Minnesota. Plaintiffs assert that doctors were

[6] Minnesota courts essentially ignore the first and third factors in tort actions. *See, e.g.*, *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620 (8th Cir. 2001); *Nodak*, 604 N.W.2d at 94-95. *But see Nesladek*, 46 F.3d at 738-39 (noting that some Minnesota opinions skip analysis of certain factors in tort cases, while others do not). Minnesota courts rarely consider the fifth factor. *See Nodak*, 604 N.W.2d at 96; *Nesladek*, 46 F.3d at 740-41 (discussing fifth factor, but declining to decide "which state has the better law").

aware of St. Jude Medical and its Minnesota headquarters. The doctors, however, are not putative class members.[7]

**Maintenance of Interstate Order.** The maintenance-of-interstate-order factor is concerned with "whether the application of Minnesota law would manifest disrespect" for another state's sovereignty or impede interstate commerce. *See In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003) (noting that courts of different states should strive to sustain rather than subvert each other's interests). Put another way, the maintenance-of-interstate-order factor weighs in favor of the state which has the most significant contact with the facts relevant to the litigation. *Id.* Here, each putative class member's home state *still* has the most significant contacts with each putative class member's claims. That is where each plaintiff sought medical care leading to implantation of a Silzone® valve; where each surgeon and/or plaintiff received and considered information about St. Jude Medical's products (if they did at all); where each surgeon made the decision to implant a Silzone® valve; where each implantation procedure was performed; where each plaintiff continues to receive medical care and treatment; and where plaintiffs' proposed treatment program would be implemented.

**Simplification of the Judicial Task.** This factor encompasses a court's ability to apply one state's law versus another state's, but it "has not been given much weight in [the Minnesota Supreme Court's] precedent." *Nodak*, 604 N.W.2d at 94-95. It too

[7] Plaintiffs also refer to choice-of-law provisions in contracts between St. Jude Medical and certain hospitals and surgeons as weighing in favor of applying Minnesota law to the entire proposed class. But no putative class member is a party to any of the contracts, and plaintiffs filed no breach of contract claim in this case. *Gamradt v. Fed. Labs., Inc.*, 02-CV-816 JMR/RLE, 2003 U.S. Dist. LEXIS 16187 (D. Minn. 2003) (choice-of-law provision in a contract did not apply to non-parties in a tort claim), *rev'd in part, on other grounds*, 380 F.3d 416 (8th Cir. 2004); *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055 (8th Cir. 2003) (non-parties are not bound by contractual choice of law provisions).

favors application of each class member's home state's law. Plaintiffs claim that this factor is neutral because the Court can easily apply either Minnesota or another state's law. However, while the Court could apply either Minnesota or another state's law, there are numerous obstacles, discussed throughout this brief, that prevent application of Minnesota law to class members who reside outside Minnesota. The need to apply the law of the fifty states will not simplify this case at all.

**Governmental Interests.** The governmental interest factor, in turn, examines each forum's policies and evaluates the factual circumstances of the litigation. *Schwartz v. Consolidated Freightways Corp.*, 221 N.W.2d 665, 668 (Minn. 1974) (noting governmental interest factor "contemplates application both in terms of factual contacts with the forum and in terms of the state's policy considerations relevant to its choice of law"). The governmental interest factor "generally weighs in favor of application of the state law in which the plaintiff lives and in which the injury occurred." *In re Baycol*, 218 F.R.D. at 207. Further, where other choice-of-law factors are relatively equal, the Minnesota Supreme Court has stated flatly that "the state where the accident occurred has the strongest governmental interest." *Nodak*, 604 N.W.2d at 96. This Court has already found that the law of fifty states must be applied to plaintiffs' tort and warranty claims based mainly on governmental interests [*see* Order, March 27, 2003], and it should find the same with respect to the consumer protection claims. The putative class members reside in other states; they received their implants in other states; and they are receiving medical care and being monitored in other states. Each of those states has a paramount interest in a set of facts, such of these, that would interfere with its residents' medical care under the guise of a "consumer protection" regime.

**The Better Rule of Law.** Minnesota courts have stated that this factor carries essentially no weight. In *Nodak*, the court recognized "that this court has not placed any emphasis on this factor in nearly 20 years and conclude that it is likewise unnecessary to reach it here." *Id.* at 96. It should carry no weight in this action either, since the main "rule of law" at issue whether the putative class members can or should receive funds for medical monitoring under consumer protection statutes. In light of (1) the absence of precedent on medical monitoring as a consumer remedy, (2) the different ways that states treat medical monitoring under tort law, and (3) the still-evolving nature of that remedy, this Court is not in a position to decide which state's approach is "better" than another's. *See Nesladek*, 46 F.3d at 741 ("In any event, under Professor Leflar's instructions to choose as the better law that which makes 'good socio-economic sense for the time when the court speaks,' we are not prepared to say that either Nebraska law or Minnesota law is superior to the other.").

Plaintiffs urge the application of Minnesota law based mainly on the fact that St. Jude Medical is headquartered in Minnesota and conducted Silzone®-related business in Minnesota. But that argument ignores that the defendant's residence is not the dispositive factor under Minnesota's choice-of-law rules, as applied by both the Minnesota Supreme Court and the Eighth Circuit. *See Nodak*, 604 N.W.2d at 95-97; *Nesladek*, 46 F.3d at 739-740; *see also, e.g., In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1016-17 (rejecting application of law of place of defendant's headquarters to nationwide class). Further, plaintiffs overlook that the focus of the choice-of-law analysis – under the Constitutional mandate established in *Shutts* and applied by the Eighth Circuit in this case – is the contacts that Minnesota has *with each plaintiff's claims*, not Minnesota's contacts with St. Jude Medical. Given that focus, this Court indisputably was correct when it concluded that the fifty states "have strong interests in applying their relevant laws to the marketing, sale, and implantation of medical devices

within their borders." (*See* Order March 27, 2003, 20-22). Because their interests are even stronger in applying their laws to in-state medical surveillance and treatment, Minnesota law cannot apply uniformly to plaintiffs' proposed class.

**C. Barrier Number Three: Numerous Well-Reasoned Authorities Reject The Application Of One State's Consumer Protection Laws To A Nationwide Class Action**

Plaintiffs' proposed nationwide class also conflicts with numerous and well-reasoned authorities that reject the use of Rule 23 to extend one state's consumer protection law nationwide. The Seventh Circuit in *Bridgestone/Firestone* (which the Eighth Circuit cited with approval) rejected a nationwide consumer fraud class on the ground that "courts must respect these differences [in state consumer law] rather than apply one state's law to sales in other states with different rules." 288 F.3d at 1018. The plaintiffs in that case urged application of one state's consumer protection laws based on the defendant's residence, but the court stated succinctly that "[n]either Indiana nor any other state has applied a uniform place-of-the-defendant's headquarters rule to product liability cases." *Id.* at 1016.

More recently, a district court in Arkansas cited conflicts of law in rejecting certification of a multistate class of hormone patients asserting consumer protection and seeking medical monitoring. *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005). In *Prempro*, the plaintiffs argued that differences among the states' consumer protection statutes were not "substantial enough to preclude class certification" and promised to "come up with common instructions that provide for the base from which lesser-included offenses might be carved out." *Id.* at 563. The district court, however, flatly rejected the argument, stating:

> Plaintiffs' argument that the variations in state laws are not substantial is unduly sanguine. In an attempt to show that the laws are generally

> uniform, Plaintiffs have presented a listing of states' laws for consumer fraud, unfair competition, and unjust enrichment. But a study of this listing leads me to a conclusion contrary to the one urged by Plaintiffs.

*Id.* Because choice of law "affects every aspect of class certification," the district court denied certification before even reaching the requirements of Rule 23. *Id.* at 562, 564-65; *see also Chemtall Inc. v. Madden*, 607 S.E. 2d 772, 783-84 (W. Va. 2004) (reversing certification of multi-state medical monitoring class because differing state law caused class to fail commonality and typicality requirements); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 66-67 (D.N.Y. 2002) (denying certification of nationwide medical monitoring class because there were diverse state laws and individual factual issues); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 267 (S.D. Fla. 2003) (denying certification of multistate medical monitoring class because of "differences and uncertainties" in state law and diverse issues of liability and causation).

The Ford ignition switch litigation in New Jersey provides yet another example, as the district court there denied a nationwide consumer protection class because of "a multitude of different standards and burdens of proof" and because the plaintiffs had "not explained how their multiple causes of action could be presented to a jury for resolution in a way that fairly represents the law of the fifty states while not overwhelming jurors with hundreds of interrogatories and a verdict form as large as an almanac." *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 350-351 (D.N.J. 1997); *see also Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 213 (E.D. Pa. 2000) ("Applying the Pennsylvania consumer fraud act to all the putative class members' claims would be a violation of the due process rights of those plaintiffs who do not live in Pennsylvania and/or who did not purchase their boats in Pennsylvania"); *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228-31 (S.D. Fla. 2002)

(rejecting nationwide application of Florida consumer fraud statute because a state, through its courts, cannot export its legislation on a nationwide basis); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 460-61 (D.N.J. 1998) (rejecting nationwide application of New Jersey consumer protection law).[8]

These authorities are highly relevant because plaintiffs here are asking not only for creation of new state law, but also for nationwide extension of that new law using a class action under Rule 23. Courts, however, have routinely rejected the use of Rule 23 to achieve that result. In the context of this case, each state has an interest in having its law apply to the sale, implantation, and follow-up medical care associated with Silzone® heart valves within their boundaries, and Rule 23 does not provide a basis for overriding those interests.

[8] Several recent state-court decisions are in accord. For example, plaintiffs previously relied on the appellate opinion prior to *Avery v. State Farm Mutual Automobile Ins. Co.*, 835 N.E.2d 801, 850-857 (2005), as precedent for a nationwide consumer fraud class, but the Illinois Supreme Court recently reversed certification of that class. *Id.* at 134-35; *see also Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 352-55 (Tex. Ct. App. 2003) (Missouri consumer protection law could not apply to nationwide class because "if Missouri's law satisfied the interests of all other states, it is strange they choose to enact laws that were different. Moreover, taking this argument to its logical conclusion, the most extreme law would always apply. This might simplify choice-of-law analyses, but it reflects a simplistic view of the policies behind such laws. Like most laws, consumer protection statutes represent a balance of competing interests."); *Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W. 3d 302 (Tenn. Ct. App. 2004) (reversing certification of a 44-state class asserting Tennessee consumer protection law because of inadequate conflicts-of-law analysis and observing that it "will be a rare circumstance" when one state will have the most significant contacts with all relevant transactions); *National Western Life Ins. Co. v. Rowe*, 164 S.W. 3d 389, 393 (Texas Sup. Ct. 2005) (reversing nationwide consumer class asserting Texas law because the lower "court did not explain why class members in another state should not have the benefit of that state's law"); *Fink v. Ricoh Corp.*, 839 A.2d 942, 948, 974-82 (N.J. Super. Ct. Law Div. 2003) (holding that New Jersey's Consumer Fraud Act did not displace the analogous law of other states, stating that "[w]ith the need to litigate individual issues of fact inherent in a class action and those necessitated by application of the consumer fraud laws of up to 50 states, plaintiffs have failed to satisfy their burden to demonstrate a predominance of common issues over issues of fact and law which affect only individual members of the proposed nationwide class. This finding accords with that of other courts.").

## D. Barrier Number Four: Plaintiffs' Proposed Class Seeks Relief That Minnesota's Statutes Do Not Permit

A fourth and equally insurmountable barrier is Minnesota's consumer fraud statutes themselves. Even assuming that Minnesota law could apply to the entire class (which it cannot), medical monitoring relief for uninjured patients is simply not available under Minnesota's consumer fraud statutes. This is a further reason to deny plaintiffs' motion. *In re School Asbestos Litig.*, 789 F.2d 996, 1007 (3d Cir. 1986) (where federal court "cannot make a reasonable prediction that state courts" will accept a novel theory, it should not certify a class).

A person actually injured by a violation of the False Advertising Act or the Consumer Fraud Act can stand in the place of the attorney general and bring an action for damages under the Minnesota Private Attorney General statute. Minn. Stat. § 8.31; *Lenscrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1491 (D. Minn. 1996); *Flora v Firepond, Inc.*, 260 F. Supp. 2d 780, 787-788 (D. Minn. 2003). But such private actions are limited, and there are two fundamental reasons why plaintiffs proposed class cannot proceed under either statute.[9]

[9] Plaintiffs claim medical monitoring under three statutes: The Deceptive Trade Practices Act, Minn. Stat. § 325D.44-.45; the False Statement in Advertising Act, *id.* § 325F.67; and the Prevention of Consumer Fraud Act, *id.* § 325F.68-.70. The False Advertising Act calls for criminal penalties only. *Id.* § 325F.67. The Deceptive Trade Practices Act and the Consumer Fraud Act allow only injunctive relief. *Id.* § 325D.45 (remedies available under the Deceptive Trade Practices Act are "injunction against [the unfair practice] under the principles of equity," costs, and attorneys' fees); *id.* § 25.70 (injunctive relief only under Consumer Fraud Act); *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 476 (Minn. App. 1999) (no damages available under Deceptive Trade Practices Act). Only the False Advertising Act and the Consumer Fraud Act can be enforced through a private action for damages under the Private Attorney General statute. *See Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496 (Minn. 1996).

### 1. Plaintiffs' Proposed Class Of Patients Who Have Not "Developed A Manifest And Diagnosed Injury" Cannot Have An Actual Injury And Thus Cannot Sustain A Consumer Protection Claim Because They Cannot Prove An Actual Injury

Minnesota's consumer fraud statutes require proof of "actual damages," which requires proof of an *actual injury*, not a speculative risk of injury. In *K.A.C. v. Benson*, 527 N.W.2d 553 (Minn. 1995), for example, a patient sued a physician for emotional distress and consumer fraud after he disclosed that he had treated her while he was HIV positive. The Minnesota Supreme Court affirmed summary judgment in favor of the defendant, holding that the "undisclosed, miniscule risk of HIV exposure," which had not materialized into any actual disease, could not support the plaintiff's claims. *Id.* at 561-62. On consumer fraud, the Supreme Court bluntly stated, **"Unable to establish an 'injury,' plaintiff has no basis for recovery under the Consumer Fraud Act."** *Id.* at 562. Similarly, in *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997), patients filed a class action against their physician and others for failing to disclose that the physician was receiving kickbacks, but they did not allege any pecuniary loss. The Minnesota Court of Appeals affirmed dismissal, holding that the plaintiffs had not alleged any injury sufficient to sustain a claim under the Consumer Fraud Act and the Private Attorney General statute. *Id.* at 172-173. ("[P]laintiffs must prove the existence of any injury to sustain a cause of action under the statute."). *See also Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 927 (8th Cir. 2004) (affirming summary judgment for tobacco manufacturer on Minnesota consumer fraud claim where plaintiff could not show physical injury in reliance on manufacturer's representation); *Lenscrafters, Inc.*, 943 F. Supp. at 1489 (holding that plaintiffs seeking damages under Lanham Act and "related State Statutes" must prove "actual injury, such as a loss of sales, profits, or of present value.").

Here, plaintiffs have defined their proposed class to include only Silzone® patients who have *not* suffered actual injuries – all Silzone® patients "who have not undergone an explant . . . or developed a manifest and diagnosed injury from their Silzone implant . . . ." In short, by defining their proposed class to include only uninjured patients, plaintiffs have deprived the class of a cause of action and have asked this Court to create a class based on claim for relief that does not exist.

**2. Plaintiffs Cannot Sustain A Consumer Protection Claim Also Because Their Proposed Class Benefits Only The Private Interests Of A Finite Set Of People And Does Not Benefit The Public**

Minnesota's Private Attorney General statute authorizes only those private actions that benefit the public. *See Ly v. Nystrom*, 615 N.W.2d 302, 313-14 (Minn. 2000) ("The duty of the attorney general's office and thus the purpose of any statute granting private citizens authority to bring a lawsuit in lieu of the attorney general, is the protection of public rights and the preservation of the interests of the state."); *see also Tuttle v. Lorillard Tobacco Co.*, No. Civ. 99-1550, 2003 WL 1571584, *6-*7 (D. Minn. Mar. 3, 2003) (public benefit is prerequisite to claim under Private Attorney General statute); *Scally v Norwest Mortgage Inc.*, No. C4-02-2181, 2003 WL 22039526, at *7 (Minn. Ct. App. Sept. 2, 2003) (same).

Since the Minnesota Supreme Court decided *Ly*, courts in Minnesota have widely applied the "public benefit" rule to dismiss damages claims under Minnesota's Consumer Fraud, False Advertising, and Private Attorney General statutes. *Behrens v. United Vaccines, Inc.*, 228 F. Supp. 2d 965 (D. Minn. 2002) illustrates this line of authority. There, several ranchers sued an animal vaccine manufacturer under the Consumer Fraud Act for losses sustained allegedly because the vaccine was defective and was "pulled from the market by the applicable government agency." *Id.* at 966-70. The district court granted summary judgment on the consumer fraud claims

because the plaintiffs sought "to redress only their own personal, business damages." *Id.* at 972. The district court found that:

> Undoubtedly, any successful lawsuit, which recovers damages for an injury caused by a defective product, could have the potential to cause some public benefit. However, such a broad application of the Private AG Statute, to effect the purposes of CFA, was the precise type of misapplication that the Minnesota Supreme Court criticized in *Ly v. Nystrom*, when it warned that, unless the Private AG Statute was interpreted within its proper scope, "'every artful counsel could dress up his dog bite case' to come under an attorneys' fees statute."

*Id.* at 971. The district court further noted that the lawsuit had not affected the defendant's conduct because the vaccine "was removed from the marketplace by the act of a Federal Agency, and not as a result of the Plaintiffs' suit." *Id.* at 972.

Another example is *Pecarina v. Tokai Corp.*, No. CIV 01-1655, 2002 WL 1023153 (D. Minn. May 20, 2002), where the district court dismissed a consumer fraud lawsuit over defective cigarette lighter that had already been replaced on the market because "the essence of Plaintiffs' lawsuit is personal injury, involving allegations of negligence and products liability." *Id.* at *5. The plaintiffs sought damages, including "future medical expenses," but the district court held that "[s]uch damages do not benefit the public"; *see also Zutz v. Case Corp.*, No. Civ. 02-1776, 2003 WL 22848943, at *3-*4 (D. Minn. Nov. 21 2003) (granting summary judgment on consumer fraud claim seeking damages caused by defective farm implement because "Plaintiffs seek only compensatory damages. Where recovery is sought for the exclusive benefit of the plaintiff, there is no public benefit"); *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 1004, 1018-20 (D. Minn. 2003) (denying leave to amend to add consumer fraud damages claim because it would be futile, holding that plaintiffs could not state a claim for injuries caused by defective power saw because "the essence of the

Plaintiffs' lawsuit is personal injury, and actions seeking such damages do not benefit the public").

Plaintiffs style their lawsuit as a "consumer protection" action, but they seek medical monitoring damages for a conceptually finite number of people. Because the action is in "essence" a products liability action, it does not benefit the public. The fact that St. Jude Medical stopped selling Silzone® valves in 2000 reinforces this conclusion: Like the plaintiffs in the vaccine and cigarette lighter actions cited above, plaintiffs cannot claim that their lawsuit ended allegedly unfair sales practices aimed at the public because Silzone® heart valve sales ceased long ago. Because the relief plaintiffs seek is not provided for under the Minnesota statutes that form the foundation of their claims, plaintiffs attempt to certify a nationwide class under Minnesota law should be rejected.

**E. Barrier Number Five: Principles Of Federalism Prohibit The Use Of Rule 23 To Extend Novel And Controversial Remedies To Plaintiffs Nationwide**

Plaintiffs' proposed nationwide class also fails because it offends principles of federalism. "[N]o reading of [Rule 23] can ignore the [Rules Enabling] Act's mandate that 'rules of procedure "shall not abridge, enlarge or modify any substantive right [under state law]."'" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1998); *see also Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (federal courts lack power "to declare substantive rules of common law applicable in a state."). Federal courts thus cannot invoke Rule 23 to create rights that do not otherwise exist under state law.

Plaintiffs seek funds for future medical treatment of patients who have experienced no complication. Through that request, plaintiffs seek to invoke Rule 23 to place this Court's authority behind the "monitoring" that their expert recommends

and interfere with long-standing patient-physician relationships across the country. But the states have made policy decisions on what remedies consumers can claim. And plaintiffs cite no authority – because there is none – that any state's consumer protection law permits the award of medical monitoring damages to anyone, let alone individuals with no injuries. Indeed, judging by the various states' treatment of medical monitoring in the tort context, it is doubtful that any state would *ever* embrace stand-alone medical monitoring under its consumer protection statutes. Many states have *rejected* medical monitoring, and those few states that permit it without proof of a current injury do so under prescribed circumstances.[10] Principles of federalism and the *Erie* doctrine do not permit using a procedural rule to make or alter substantive state law.

In the final analysis, plaintiffs have asserted a claim that does not exist on behalf of people who have no injury and are already receiving medical care, and they try to extend that claim nationwide without regard for whether the class members or the law of their home states would accept or reject it. They essentially are asking this Court to use the Rule 23 procedure to regulate medical care decisions in every state, an unprecedented and inappropriate exercise of a federal court's jurisdiction that this Court should reject.

---

[10] *See, e.g. Henry v. Dow Chemical Co.*, 701 N.W.2d 684, 701-702 (Mich. 2005)(holding that medical monitoring was not viable in Michigan because "recognition of this claim would require both a departure from fundamental tort principles and a cavalier disregard of the inherent limitations of judicial decision-making."); *Compare Redland Soccer Club, Inc. v. Department of the Army*, 696 A.2d 137, 143-46 (Penn. 1997)(holding that plaintiff must prove: (1) exposure greater than normal background levels, (2) to proven hazardous substance, (3) caused by defendant's negligence, (4) as proximate result of exposure, plaintiff has significantly increased risk of contracting serious latent disease, (5) monitoring procedure exists that makes early detection of disease possible, (6) prescribed monitoring regime is different from that normally recommended in absence of exposure, and (7) prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.) *with Hansen v. Mountain Fuel Supply*, 858 P.2d 970 (Utah 1993)(requiring that plaintiff prove similar elements plus "that treatment exists that can alter course of illness, and which test has been prescribed by qualified physician according to contemporary scientific principles.")

# IV

## THE COURT CANNOT CERTIFY PLAINTIFFS' PROPOSED CLASS BECAUSE IT FAILS TO MEET THE REQUIREMENTS OF RULE 23(A) OR (B)

Any one of the above reasons is alone sufficient to deny plaintiffs' renewed motion. But if this Court goes further and analyzes plaintiffs' class under Rule 23, it still should that plaintiffs' proposed nationwide class cannot be certified.

A class action should be certified only if it will "achieve economies of time, effort and expense, and promote . . . uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997). Plaintiffs bear the burden of establishing that class certification is appropriate. *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing *General Tel. Co. v. Falcon*, 457 U.S. 155, 161 (1982)). Despite their well-established burden, plaintiffs fail to address *any* element of Rule 23 in their renewed motion for class certification. That failure should end the inquiry, as plaintiffs have given this Court no basis on which to certify their newly defined class.[11] *See Hoyt Constr. Co. v. Alside Inc.*, No. 4-75 Civ. 257, 1980 WL 1807, at *2-3 (D. Minn. Jan. 21, 1980) (denying plaintiffs' renewed motion

[11] Plaintiffs also altered their class definition, but they did not submit a new trial plan. This is yet another reason to deny class certification. *See Zinser v. Accufix Research Instit.*, 253 F.3d 1180, 1190 (9th Cir.), amended, 273 F.3d 1266 (9th Cir. 2001) (plaintiff must submit "a manageable trial plan adequate to deal with individualized issues and variances in state law."); *see also In re: Paxil Litig.*, 212 F.R.D. 539, 546-48 (C.D. Cal. 2003) (denying class certification based, in part, upon the failure to present a trial plan adequate to deal with individualized issues and variances in state law); *Chin*, 182 F.R.D. at 459 (acknowledging plaintiffs' extensive compilation of state law, but denying class certification anyway because "[p]laintiffs, not the court, have the burden of designing a workable plan for trial embracing all claims and defenses prior to certification."). Plaintiffs' prior trial plan does not meet this requirement. That plan fell short of mapping out how this Court would manage the trial of this action and the resolution of the numerous individual issues the putative class members present. It did not account for the application of diverse facts to the class members' burdens of proof. It accordingly did not provide the kind of roadmap showing how these cases could effectively and economically be tried on a classwide basis.

for class certification where plaintiffs modified their class definition to comply with the court's prior order, but failed to present additional evidence to satisfy Rule 23). Were the Court to look further, however, the record confirms that certification is inappropriate for myriad reasons.

### A. Plaintiffs' Proposed Class Fails Because The Class Definition Is Indefinite And Requires Thousands Of Mini-Trials Just To Ascertain Class Membership

Plaintiffs purport to define their class by reference to a disputed issue – whether a potential class member has "developed a manifest and diagnosed injury from their Silzone® implant of degree or severity that would permit individual personal injury law suits to be commenced in their state of residence." (Pltfs. Memo., at 1). Thus, merely identifying the class members will require the resolution of threshold legal and factual questions that go to the heart of the liability and causation issues in this case.

A purported class representative must define the class precisely, such that the Court can ascertain its membership through the application of "stable and objective factors." *Van West v. Midland Nat'l. Life Ins. Co.*, 199 F.R.D. 448, 451 (D.R.I. 2001). This requirement is important for several reasons. First and foremost, the Court cannot evaluate whether the factors set forth in Rule 23(a) are satisfied absent a clear understanding as to class membership. *Id.* Second, without a precise class definition, the Court cannot decide who will receive notice and, more importantly, be bound by the ultimate judgment. *Id.* Third, class treatment arguably provides no judicial economy if a court must conduct "mini-trials" to make a threshold determination as to class membership. Courts thus routinely reject proposed classes that are not sufficiently definite or that require a merits determination to decide who is a member of the class. *See Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (rejecting class because determining class membership would require a

Case 0:01-md-01396-JRT-FLN Document 418 Filed 03/17/2006 Page 40 of 69

"mini hearing on the merits" as to the central liability issue); *Hagen v. Winnemuca*, 108 F.R.D. 61, 63 (D. Nev. 1985) (rejecting class definition that would require the court "to pass on the merits of the claim at the class certification stage" to determine class membership).

Plaintiffs' proposed class is just such an indefinite one. Plaintiffs define their class to include all Silzone® prosthetic heart valve recipients nationwide, except (1) those who have undergone an explant of their Silzone® valve; and (2) those who have "developed a manifest and diagnosed injury from their Silzone® implant of degree or severity that would permit individual personal injury law suits to be commenced" in their home states . (Pl. Memo., at 1). Under that definition, identifying class membership will require resolution of core issues, including (1) whether a potential class member has an injury "from" (*i.e.*, caused by) a Silzone® valve and (2) whether the injury is "severe" enough to support of claim in that class member's home state.

Because the complications alleged by plaintiffs occur with all mechanical valves, whether any Silzone® patient suffered an injury because of a Silzone® valve is a contested issue of liability in every case, and resolution of that complex medical causation issue requires individualized examination of the medical history of every putative class member. Determining the "severity" of any injury will require individualized adjudication as well, even before the Court gets to determining the level of "severity" required to support a claim in every state. Plaintiffs, for their part, provide no guidance on these questions or even acknowledge that thousands of "mini-trials" will be required before the proposed class gets out of the starting blocks. Going forward with such an indefinite and convoluted class definition is not workable, and it would defeat the principal purposes for class litigation – to achieve economies of time, effort and expense.

**B. Plaintiffs Are Not Adequate Representatives And Their Claims Are Not Typical Because Of The Legal And Factual Diversity Among Class Members**

Plaintiffs also cannot satisfy Rule 23(a) because they are not adequate representatives and their claims are not typical. A class representative has a fiduciary duty to protect the rights of absent class members. *See Shutts*, 472 U.S. at 811-12 (due process requires "that the named plaintiff at all times adequately represent the interests of the absent class members"). Thus, Rule 23(a) requires that class representatives have sufficiently similar interests such that their goals and viewpoints will not likely diverge. *Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999); *see also Amchem Prods., Inc.*, 521 U.S. at 625-26; *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (noting "[t]he premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members").

In addition to being adequate representatives, plaintiffs must have claims typical of the class they purport to represent. As one court explained, "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1988). On factual issues, typicality is satisfied when each class member's claim has a similar factual basis or arises from the same course of events. *See Hurd v. Monsanto Co.*, 164 F.R.D. 234, 238-39 (S.D. Ind. 1995) (no typicality where no one set facts established liability for every class member); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (no typicality where class representative alleges different injuries from those suffered by other class members). On legal issues, typicality is met only where the class representative is pursuing his or her own claims under the same legal or remedial theories as the represented class members. *In re:*

*Paxil Litig.*, 212 F.R.D. at 549; *see also Broussard*, 155 F.3d at 340 (typicality ensures that "only those [individuals] who can advance the same legal arguments may be grouped together as a class"); *Chemtall Inc.*, 607 S.E. 2d at 783-84 (reversing certification of multi-state medical monitoring class because differing state law caused class to fail commonality and typicality requirements); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. at 66-67 (denying certification of nationwide medical monitoring class because there were diverse state laws and individual issues, including preexisting medical conditions, age, gender, life style, and the like.)

Plaintiffs Beatrice Bailey, Joe Sanchez, Bonnie Sliger, and Levy Redden obviously are not adequate class representatives. Ms. Sliger has passed away, and her claims have been settled on an individual basis. Each of the others claims an injury and therefore is not even a member of the proposed class. For the same reasons, their claims are, by definition, not typical. Only one plaintiff appears to meet the class definition, Lester Grovatt. But he is no more adequate, nor are his claims typical. Mr. Grovatt resides in New Jersey, and New Jersey law governs his claims. The legal basis for his claims therefore is different from other putative class members. New Jersey law, for example, requires him to show that St. Jude Medical knowingly and intentionally concealed information and that he suffered a loss. *See* N.J. Stat. §§ 56:8-2 and 56:8-19).

Mr. Grovatt's claims also lack typicality from a factual perspective. Mr. Grovatt has a history of cardiac problems dating back to childhood. In February 1999, Mr. Grovatt was diagnosed with an enlarged aortic root, aortic stenosis and an aortic aneurysm and underwent a complicated surgery involving the implantation of a Silzone® aortic valve, replacement of his ascending and descending transverse thoracic aorta with a woven Dacron graft and a coronary artery bypass procedure. Mr. Grovatt

does not remember discussing the use of a St. Jude valve or the Silzone® technology with his physician prior to surgery. (Deposition of Lester Grovatt ("Grovatt Depo."), at 67:16-68:25, Van Steenburgh Aff., Exh. L). During the surgery, Mr. Grovatt experienced a brain stem infarction due to hypothermia; a type of brain injury that is a well-recognized risk of this procedure.

Even under plaintiffs' expert's proposed medical treatment program, Mr. Grovatt will require different monitoring that takes into account specific risk factors and must reflect post-surgical events. For example, if he requires monitoring at all, his aortic prosthesis potentially would call for monitoring different from patients with mitral prostheses. (Butchart Rep., at 8-9, 20, 55, Table 5 and App. 2). Moreover, Mr. Grovatt and his physician have discussed the possibility of performing the more invasive form of echocardiography that Dr. Butchart recommends (transoesophageal echocardiography), but Mr. Grovatt is reluctant because he is "leery of invasive testing." (Grovatt Depo., at 105:18-106:7, Van Steenburgh Aff., Exh. L). Simply stated, proof of Mr. Grovatt's claims cannot substitute for the proof of any other Silzone® patient's claims.

### C. As The Eighth Circuit Already Has Held, Plaintiffs' Class Fails Because Individual Legal And Factual Issues Predominate Over Common Issues On Liability, Causation As Well As The Need For And Purported Benefit Of Medical Monitoring

When the more demanding requirements of Rule 23(b) are considered, numerous courts have rejected personal injury and medical monitoring class actions because individual issues predominated. The Eighth Circuit's opinion in this case obviously is the most noteworthy. It reversed the previously attempted medical monitoring class because "the diverse legal and factual issues preclude class certification." *Silzone Heart Valve Litig.*, 425 F.3d at 1121. The court went on to

explain that "each plaintiff's need (or lack of need) for medical monitoring is highly individualized," and it concluded that "the medical monitoring class presents a myriad of individual issues making class certification improper." *Id.*; *see also Zinser*, 253 F.3d at 1189; *Zehel-Miller v. Astrazenaca Pharmaceuticals*, LP, 223 F.R.D. 659, 663-64 (M.D. Fla. 2004) (denying certification of nationwide medical monitoring class of pharmaceutical users because individual issues overwhelmed common questions and class lacked cohesiveness); *Perez*, 218 F.R.D. at 267 (denying certification of multistate medical monitoring class because of "differences and uncertainties" in state law and diverse issues of liability and causation); *In re Paxil Litig.*, 212 F.R.D. at 551 (finding that divergent standards of liability required under different states' laws defeated finding that common issues predominated); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. at 66-67 (denying certification of nationwide medical monitoring class because there were diverse state laws and individual factual issues); *Lockheed Martin Corp. v. Superior Court*, 63 P.3d 913, 918-922 (Cal. 2003) (rejecting certification of medical monitoring class because "individual issues of causation and damages predominated over common issues"); *Goasdone v. American Cyanamid*, 808 A.2d 159, 170-171 (N.J. Super. Ct. 2002) (rejecting certification of medical monitoring class because there were "so many individual factors").

Here, when plaintiffs' burden of proof is examined in light of Minnesota's consumer fraud statutes, it becomes apparent that individualized issues on both liability and remedies would overwhelm any attempt at a classwide trial in these cases.

**1. Plaintiffs Cannot Prove Liability Without Introducing Individualized Evidence Regarding Product Information Available To Their Physicians, The Information Communicated To Them, And The Means By Which It Was Communicated**

Plaintiffs' burden of proof on liability issues illustrates that individual factual issues predominate over common issues. To prove their consumer protection claims, plaintiffs must introduce evidence sufficient to show that St. Jude Medical made a representation or engaged in conduct in violation of one of the three statutes, that they sustained injury, and that there is a "causal nexus" between these alleged representations and their alleged injuries. *See Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13-14 (Minn. 2001); *Tuttle*, 377 F.3d at 927 (affirming summary judgment for tobacco manufacturer on Minnesota consumer fraud claim where plaintiff could not show physical injury in reliance on manufacturer's representation and thus could not establish causal nexus). The fundamental problem is that plaintiffs purport to bring their claims on behalf of Silzone® recipients nationwide, but they cannot prove who said what to whom or the existence of a "causal nexus" on a classwide basis. *See Liberty Mut. Ins. Co. v. Tribco Constr. Co.*, 185 F.R.D. 533, 538-539 (N.D. Ill. 1999) (finding class treatment inappropriate because the case involved alleged misrepresentations which were likely to vary such that individual questions predominate).

*First*, plaintiffs cannot prove that St. Jude Medical made a misrepresentation or engaged in conduct on a classwide basis. St. Jude Medical did not market directly to patients. St. Jude Medical distributed Silzone® heart valves through a network of sales representatives who met with treating physicians and their staffs to provide information about the product. Patients then received their Silzone® valves not from St. Jude Medical, but only after consulting with their physicians. As a result, plaintiffs cannot establish that any two physicians, let alone all physicians who treated the putative class

members, received the same information about the Silzone® valve. (*See e.g.*, Deposition of Dr. Joseph Coselli ("Coselli Depo."), at 37:5-22, Van Steenburgh Aff., Exh. M (he was aware there were no clinical studies by St. Jude Medical to show the efficacy of Silzone® in preventing endocarditis); Deposition of Dr. Taro Yokoyama ("Yokoyama Depo."), at 30:6-31:16, Van Steenburgh Aff., Exh. N (does not recall if there were statements made regarding whether clinical studies had been done with the Silzone® valve); Declaration of Dr. Angelo Vlessis, ¶¶ 5-8, Van Steenburgh Aff., Exh. O (remembers receiving in vitro and animal studies demonstrating potential of Silzone® to reduce endocarditis).

*Second*, plaintiffs also cannot show that all physicians received identical information about the Silzone® valve in some uniform fashion from St. Jude Medical or anyone representing it. To the contrary, physicians received information about the Silzone® valve from different sources and in different forms: Some received information from sales representatives during sales calls, some received information from medical conferences, others obtained information from medical journals and research and yet others talked with their colleagues. (*See, e.g.*, Deposition of Dr. Carlton Sheely ("Sheely Depo."), at 69:7-21 Van Steenburgh Aff., Exh. P (believes he learned of the Silzone® valve from his senior partner, Dr. Berry, but does not know where Dr. Berry obtained the information); Coselli Depo., at 33:25-36:23 (does not recall how he learned of Silzone® valve, but it could have been through a sales representative or through other physicians); Declaration of Dr. Bradford Blakeman, ¶¶ 4-7, Van Steenburgh Aff., Exh. Q. (recalls that he learned about Silzone® from a St. Jude Medical sales representative, and written advertising materials in journals, but did not rely on either in his decision to use Silzone® valves); Declaration of Dr. Michael Reardon, ¶¶ 4-5, Van Steenburgh Aff., Exh. R (thinks he first heard about the Silzone® valve at a cardiology conference in Europe, but does not recall any of the

details or any specific advertisements); Declaration of Dr. Paul Damus, ¶¶ 4-5, Van Steenburgh Aff., Exh. S (recalls that he learned about Silzone® from a sales representative but did not receive written materials, and was aware that the device was on the market in Europe, and there were clinical studies)).

*Third*, the individualized nature of this inquiry extends beyond the physicians to the information they provided their patients. Physicians advise their patients about medical treatment, but they do not do so in a uniform manner. Rather, a physician provides information that reflects his own evaluation of the patient's background and level of sophistication, what is relevant to the patient's medical condition and what is necessary to make an informed decision. While some physicians may have discussed with their patients the use of Silzone® technology, others likely did not. Indeed, Mr. Grovatt testified that he did not discuss St. Jude Medical or the Silzone® technology with his surgeon (Grovatt Depo., at 67:16-68:1-25); but other class members did so (Deposition of Bonnie Sliger ("Sliger Depo."), at 98:5-22, Van Steenburgh Aff., Exh. T[12]; Deposition of Levy Redden ("Redden Depo."), at 99:20-100:5, Van Steenburgh Aff., Exh. U). Given these facts, any one treating physician or Silzone® recipient could have said or heard any number of things (or nothing at all) about the Silzone® heart valve. And, any one treating physician or Silzone® recipient could have come into contact with different promotional materials (or none at all).

*Fourth*, there is no uniformity in proof on the existence of a causal nexus between the alleged representations and their alleged "injury" on a classwide basis. Plaintiffs must prove a causal connection not only between St. Jude Medical's alleged

[12] Ms. Sliger's claims have been settled, but because she was a Silzone® recipient upon whom the parties conducted discovery, St. Jude Medical will continue to cite her experience to illustrate the significant differences among the putative class members.

representations and their use of the Silzone® valve, but also between their use of the Silzone® valve and their need for enhanced medical monitoring. Plaintiffs cannot prove the first link in the causal chain on a classwide basis where some class members may have received and considered information about the Silzone® valve, but others admittedly did not. (*Compare* Grovatt Depo., at 67:16-68:1-25 *with* Sliger Depo., at 98:5-22; Redden Depo., at 99:20-100:5, Van Steenburgh Aff., Exhs. L, T, U).

*Fifth*, plaintiffs cannot establish the need for enhanced medical monitoring in a uniform way on a classwide basis either. Plaintiffs seek medical monitoring for uninjured recipients based upon their claim that the Silzone® valve places them at greater risk of experiencing complications such as paravalvular leak, thrombosis, and endocarditis. Plaintiffs fail to acknowledge, however, that each of these potential complications occur with all mechanical valves and therefore can stem from alternative causes. As a result, plaintiffs must make an individualized showing as to each class member's medical history, initial prognosis and post-surgical care to show their alleged need for enhanced medical monitoring is attributable to the Silzone® valve.

In the end, plaintiffs' effort to re-characterize their personal injury claims as consumer fraud claims does not make them any more amenable to class treatment. Plaintiffs must prove these claims with individualized evidence as to what physicians

knew or were told, how they were told it, and what they passed on to their patients.[13] As a result, individual factual issues predominate over common issues and defeat any attempt at class certification.

### 2. Plaintiffs' Proposed Monitoring Regime Is Complicated And Unworkable On A Classwide Basis Because It Requires Individualized Determinations And The Input Of Plaintiffs' Own Physicians

Individual issues predominate also when considering plaintiffs' claimed remedy, as plaintiffs' proposed medical monitoring program presents numerous issues that require individual adjudication. In vacating the prior medical monitoring class, the Eighth Circuit held that the need for medical monitoring depended on myriad individual issues, and one look at the report of plaintiffs' new medical monitoring expert, Dr. Butchart, shows that plaintiffs' newly proposed program is even more complex.

All mechanical heart valve patients must be monitored for the rest of their lives, no matter what type of valves they have in place. (Disclosure Statement For Melvin D. Cheitlin, M.D. ¶¶ 6, 29-30, Van Steenburgh Aff., Exh. J) That is because every mechanical heart valve recipient – with or without a Silzone® valve – faces the risk of

[13] When the nature and range of these individual issues are applied to plaintiffs' burden of proof, these Silzone® valve cases bear no discernible resemblance to cases that have considered nationwide class treatment under Minnesota's consumer fraud statutes. *See, e.g. In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*, 201 F.R.D. 456, 457 (D. Minn. 2001). There, the court certified a nationwide class of insurance policy holders alleging that the defendant insurance company violated Minnesota consumer fraud statutes by selling "vanishing premium" life insurance with artificially inflated interest rates. That case did not involve the highly complex, individually focused, medically based analysis at issue here. Nor was it characterized by significant factual differences in the information received by the putative class members or the nexus of that information to the injuries allegedly sustained. The *Lutheran Brotherhood* class instead was certified on the premise that the product itself, the life insurance policies, contained the same information and that the class members received that information from the defendant. Given the far more complicated nature of the decision to purchase and implant an FDA-approved medical device, there will never be such uniformity in decisions to by Silzone®-coated heart valves.

serious complications such as paravalvular leak, thromboembolism, and prosthetic valve infection. (*Id.* ¶¶ 6, 23-28) However, as the Eighth Circuit expressly observed, the nature of a heart valve recipient's required medical care depends on his or her unique individual medical history, concomitant diseases, and the cardiac disease that led to valve replacement in the first instance. (*Id.* ¶¶ 30-34) As a result, there is wide variation in the post-surgical treatment for mechanical heart valve recipients, and the appropriate type of post-implantation care will vary for each patient. (*Id.* ¶¶ 35-38; *see also* Disclosure Statement For Jack Hirsh, M.D. ¶¶ 41-45, Van Steenburgh Aff., Exh. K (discussing the importance of anticoagulation medication for mechanical heart valve patients and the variability in the prescribed regimen for different patients))

Because the type of medical monitoring varies for each patient, the question of whether that patient needs *additional* monitoring (and, if so, what kind and how much) likewise calls for an individual inquiry. The opinion of plaintiffs' expert, Dr. Butchart, and his very individualized medical monitoring proposal illustrate this point. Dr. Butchart recommends a three-part medical monitoring regime as follows: (1) various levels of enhanced surveillance; (2) the use of preventive measures for certain patients; and (3) the management of identified complications in individual patients. (Butchart Rep., at 8-9). The need for these enhanced measures and the potential benefit associated with them will differ, however, based upon each plaintiff's unique medical history, risk factors and on-going treatment.

The risk/benefit analysis of enhanced testing requires the weighing of individual factors by a patient in consultation with his physician. Dr. Butchart's first phase enhanced surveillance includes a detailed risk factor assessment as well as the administration of transthoracic echocardiography ("TTE"), a diagnostic procedure using high frequency sound waves from a transducer placed on the chest,

transoesophageal echocardiography ("TEE"), a test similar to TTE, but which involves inserting a transducer down the esophagus, and cinefluoroscopy, a procedure which requires the use of x-rays. (*Id.* at 51-52, 54) He believes TEE and cinefluoroscopy, are necessary to detect subtle complications which might not otherwise be detected by TTE alone. (*Id.* at 8) Dr. Butchart acknowledges, however, that in most patients with aortic prostheses, TTE combined with Doppler estimations of pressure gradients will provide "adequate assessment of the prosthesis for the purpose of routine follow-up." (*Id.* at 51) Dr. Butchart also acknowledges that TEE is "not completely devoid of risk" and that cinefluoroscopy involves radiation. (*Id.* at 52-53) Given these risks and the fact that the benefits of enhanced surveillance may be greater for some patients and negligible for others, any risk/benefit analysis necessarily requires an individual determination.

Indeed, Dr. Butchart acknowledges that, in some cases, these tests need not be repeated as part of an on-going, enhanced medical monitoring regime. In other words, he admits the possibility that some class members *do not need additional monitoring*. Specifically, he states:

> If TTE, TEE and cinefluoroscopy are all negative, there have been *no previous thromboembolic events*, the patient is *asymptomatic* and there are *no risk factors* for thromboembolism (vide infra), the patient can be followed up in the normal way, as for a standard St. Jude valve. .

(*Id.* at 54) (emphasis added) As this example illustrates, Dr. Butchart's own assessment is that there may be a category of Silzone® recipients who will undergo an initial, invasive battery of tests only to conclude there is no need for further enhanced monitoring. To the extent this category exists, its members are all within plaintiffs' revised class definition. For this group at a minimum, there is a real question as to whether the potential benefits of enhanced monitoring outweigh the risks associated

with additional testing. This question cannot be answered for any recipient without considering his unique medical history and risk factors and consulting with his physician.

In a similar vein, the identification and evaluation of patient and other risk factors is an individual issue. Dr. Butchart recommends patients at higher risk should be seen more often, while asymptomatic patients with normal test results can be seen annually. (*Id.* at 50) In making that recommendation, Dr. Butchart recognizes that the risk of thromboembolism is "heavily influenced by the patient's own risk factors and their compliance with anticoagulation management." (*Id.* at 14) Indeed, Dr. Butchart has proposed an elaborate risk scoring system using sixteen different patient-specific factors to evaluate the thromboembolic risk faced by each Silzone® valve recipient and the type and extent of monitoring that is appropriate for each. (*Id.* at 109) His risk scoring system includes factors related to the patient's pre-implantation medical history, type of implanted valve, overall health, lifestyle issues, laboratory test results, other surgeries performed with valve replacement, and other cardiac conditions. (*Id.*) All of these factors must be considered in combination for each patient, and because they can change over time, a continual reassessment of these factors will be necessary. Similarly, the risk of paravalvular leak is "higher if the patient's valve annulus is calcified." (*Id.* at 14) He also notes that surgical technique – including decalcification of the valve, suture technique, and prosthesis sizing – affects the occurrence of complications. (*Id.*) Thus, an individualized analysis of the surgical technique employed must be done for every class member.

Dr. Butchart's recommendations for the second preventive measures phase further illustrate the existence of individual factual issues. Dr. Butchart recommends risk factor modification and the use of anticoagulants to prevent thrombosis. (*Id.* at 58)

However, Dr. Butchart's recognizes that different plaintiffs must be treated differently depending their post-operative complications and risk factors. (*Id.* at 61-62) According to his report, patients who have suffered no thromboembolic events and have no risk factors can be treated in one way while patients who have suffered one or more thromboembolic events should be treated another. (*Id.* at 61) But, patients who have not yet suffered a thromboembolic event but who have risk factors "present a more difficult problem." (*Id.* at 62) The difficulty is that such patients should be individually evaluated by the physician most knowledgeable about their history.

Finally, when it comes to postoperative management, Dr. Butchart frankly acknowledges that any change in therapy **"must be undertaken at the discretion and direction of the patient's own informed cardiologist and cardiac surgeon who are best placed to determine the risks and benefits of each course of action for the individual patient."** (*Id.* at 9, 48) Simply put, individual factual issues permeate each step in Dr. Butchart's complex three-part plan. Those factual issues independently undermine any attempt at classwide resolution.

The law under Rule 23 is uniform as applied to purported class actions giving rise to multiple, unavoidable factual disputes related to each individual class member's burden of proof. Simply put, class certification is not warranted or even possible in these circumstances, as the Eighth Circuit already found. *Silzone Heart Valve Litig.*, 425 F.3d at 1121; *See* cases cited *supra* pp. 41-42; *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) (denying class certification because of predominating individual issues and diverse state law); *In re Baycol*, 218 F.R.D. at 212 (D. Minn. 2003) (denying certification of class of cholesterol drug patients because individual issues, predominated, including medical causation). There is no reason to depart from

the uniform and controlling holdings rejecting nationwide class certification in these circumstances.

### D. Plaintiffs' Proposed Class Action Is An Unmanageable, Overreaching Scheme That Will Neither Protect Plaintiffs Nor Achieve Efficiencies

The manageability of a class action is judged by how the putative class members' cases would be resolved in a classwide trial, taking into account the plaintiffs' burden of proof on the claims alleged and the defendant's right to raise a complete defense to each class member's claims. *Castano*, 84 F.3d at 744-52; *Valentino v. Carter-Wallace, Inc*. 97 F.3d at 1234 (finding that class action was not manageable where "[t]here ha[d] been no showing by Plaintiffs of how the class trial could be conducted," and holding that the district court had abused its discretion in certifying the class). In this action, because of the predominance of individual legal and factual issues related to each plaintiff's burden of proof, the trial of plaintiffs' class action would be unmanageable.

**There is no workable way to determine the class members and give class notice.** Plaintiffs define their class by reference to a disputed issue – those Silzone® recipients with manifest and diagnosed injury from their Silzone® valve of sufficient degree and certainty are excluded from the class. Thus, the Court would need to adjudicate thousands of claims merely to identify the class members. This process would bog down the Court at the earliest stage. And, it would hinder class notice.

**Any classwide trial would need to provide for separate adjudication of individualized issues on alleged liability under the consumer fraud statutes.** As noted above, the class members' burden of proof under the controlling case law raises individualized inquiries on the alleged nexus between any purported representations

about the Silzone® valve and the claimed injuries. The need for a class member-by-class member inquiry on the foundational elements of alleged consumer fraud renders any attempt at a classwide trial an exercise in futility.

**Any classwide trial would need to provide for separate adjudication of individualized issues such as causation and the specific need for medical monitoring.** For reasons already noted, each Silzone® recipient has a unique medical history and risk factors. As a result, Mr. Grovatt might present evidence that his Silzone® valve has caused a heightened need for follow-up medical care, but this evidence will not establish that other patients need the same monitoring. Every class member will need to present individual evidence on whether St. Jude Medical's conduct resulted in the implantation of a Silzone® valve. Each will also have to present individualized evidence on the need (if any) for additional medical monitoring. As Dr. Butchart himself describes, that determination is, and can only be, an individualized inquiry. Given the need for full-blown adjudication of core issues, a classwide trial would be unmanageable.[14]

Again, case law under Rule 23 is uniform where individual issues overtake, as they do here, the class members' proof of their particular claims. Class litigation becomes unmanageable in these circumstances and class certification should be rejected. *See* cases cited *supra* p. 42; *In re Northern Dist. Of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (denying certification because

---

[14] Plaintiffs cannot avoid their manageability problems by seeking certification under Rule 23(b)(2). As the Eighth Circuit held in reversing the prior medical monitoring class, a class certified under Rule 23(b)(2) "must be cohesive" and because there are no opt-out rights, "even greater cohesiveness generally is required than in a Rule 23(b)(3) class." *Silzone Heart Valve Litig.*, 425 F.3d at 1121. Plaintiffs' proposed class is insufficiently cohesive to satisfy Rule 23(b)(2) for all of the reasons explained in greater detail above: The plaintiffs' proof on issues of liability, causation, and the need for enhanced medical monitoring is inherently individualized.

"[n]o one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member . . . . Furthermore, the alleged tortfeasor's affirmative defenses . . . may depend on facts peculiar to each plaintiff's case."); *Harding v. Tambrands*, 165 F.R.D. 623, 630-32 (D. Kan. 1996) (denying certification of toxic shock syndrome class because "advantages of a class action do not outweigh the problems of case manageability and jury confusion" inasmuch as "each individual . . . class member would still have to have her own trial on the individual issues applicable specifically to her").

**E. Plaintiffs' Proposed Class Action Does Not Provide The Superior Method For Resolving What Is Left Of These Silzone® Valve Cases**

No classwide resolution can be undertaken here without substantial and prejudicial risks to the class members. First, classwide resolution would involve a lengthy and complex trial that is likely to be followed by an appeal, no matter who prevails. Second, such a resolution carries with it the risk that the class members will be found to have split their claims, thereby jeopardizing their ability to bring personal injury claims should such a claim accrue.[15] Third, actually resolving the class

[15] Class representatives do not adequately represent the interests of absent class members when they selectively prosecute claims or limit their damages requests. Doing so creates the risk that res judicata will bar subsequent lawsuits by putative class members raising additional claims. *See Thompson*, 189 F.R.D. at 550-51 (denying class certification because class asserted claims for injunctive relief and medical monitoring only, while reserving individual injury claims for later lawsuits, because res judicata could preclude bringing later claims); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982) (denying class certification because plaintiffs asserted only breach of the implied warranty of merchantability and claimed only "economic" and punitive damages, creating "significant risks of [class members] being told later that they had impermissibly split a single cause of action."). Here, plaintiffs threaten to split the putative class members' claims by limiting their claimed relief to medical monitoring only, forsaking any other compensation that putative class members might claim in connection with their Silzone® valves. That claim spitting places the putative class members' rights at risk. *See, e.g.*, *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 55-57 (1st Cir. 2004) (class settlement under fifty states' consumer protection laws precluded class members' subsequent individual actions for additional damages allegedly caused by same product); *Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625, 634 (S.D. Ga. 1995) (res judicata barred class representative's personal injury damages claim from chemical exposure because the representative previously settled suits for property damage, medical monitoring and personal injury stemming from exposure).

members' claims will require individual trials on issues such as whether St. Jude Medical's alleged wrongful conduct or communications actually led to the implantation of a Silzone® valve and whether each class member actually requires extraordinary medical monitoring. A class action, therefore, produces no economy for any one class member or for the class as a whole, since individual claims will require individual resolution even under a class action resolution program. The only thing the class will accomplish is extended delay until a judgment encompassing all the class members' claims can be entered.

Alternatively, while a classwide resolution will create risks, complexities, and burdens, it likely will not provide any substantial benefits. The proposed class consists of patients who had their diseased heart valves replaced with Silzone® valves and who have lived with the benefit of their Silzone® valves for at least six years without complication. For Mr. Grovatt, it has been more than seven years. Each putative class member likewise is being monitored by his or her own physician, and in the event any one of them suffers a complication that he or she attributes to a Silzone® valve, a civil action can be filed.

Plaintiffs no doubt will discount all of this, but to do so misses the relevant inquiry once again. A class action cannot simply be a method of relief, it must be the *superior* one. *See Johnston v. HBO Film Mgmt. Inc.*, 265 F.3d 178, 194 (3d Cir. 2001) (holding that a class action must be the *best* method of resolution, not just a possible method or potentially good method of resolution). Here, it plainly is not. Rather, the most efficient and effective – indeed superior – method of resolution is for this Court to allow the MDL to run its proper course and leave any plaintiff who desires to do so to bring his or her own claim in their home jurisdiction.

Case 0:01-md-01396-JRT-FLN Document 418 Filed 03/17/2006 Page 58 of 69

**F. The Constitution Does Not Permit A Nationwide Medical Monitoring Class Action Applying The Consumer Protection Laws Of One State To The Exclusion Of All Others**

Inevitably, the flaws in plaintiffs' proposed class reach constitutional dimensions. If this Court undertakes to apply one state's law to dictate medical care for thousands of Silzone® patients nationwide, it would allow one state's public policy to displace and trump the avowed interests of every other. Diversity cases are not intended to federalize the law of the fifty states in this fashion. As already noted, such a nationwide certification would run afoul the Rules Enabling Act and the *Erie* doctrine (*see* discussion *supra*). But it also comes up against two other obstacles grounded directly in the Constitution.

**First, the Commerce Clause forbids application of one state's law to the entire nation.** In *Healy v. Beer Institute.*, 491 U.S. 324 (1989), the Supreme Court emphasized the Commerce Clause's "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Id.* at 335-36. To give controlling force throughout the nation to the law of any single state, in derogation of the law of all the others, is intolerable under the Commerce Clause. "This kind of potential . . . national regulation . . . is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state [laws]." *Id.* at 340; *see also Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*, 476 U.S. 573, 582-83 (1986) (rejecting New York's attempt to "project its legislation" into other states as a violation of the Commerce Clause's prohibition of direct regulation of interstate commerce). As one district court stated bluntly in rejecting a nationwide consumer protection class, the "Commerce Clause to the United States Constitution precludes the application of [Florida' consumer protection statute] to each and every class member's claim."

*Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228-31 (S.D. Fla. 2002). So it is here as well.

**Second, any nationwide class under Minnesota law will offend the Due Process and Full Faith and Credit Clauses.** The Eighth Circuit held that the Constitution requires proper choice-of-law analysis before Minnesota law could apply to plaintiffs from out of state. *See Silzone Heart Valve Litig.*, 425 F.3d at 1120-21. Other courts, however, have taken the next step and held that multistate application of one state's law, in and of itself, violates due process and full faith and credit. In *Montgomery*, the district court cited due process as a separate reason to reject a nationwide consumer class, concluding that the "Due Process Clause of the Constitution prohibits application of [the Florida statute] to a nationwide class." 209 F.R.D. at 229. Another example is *Lyon v. Caterpillar*, 194 F.R.D. 206, 213 (E.D. Pa. 2000), where the district court held that "[a]pplying the Pennsylvania consumer fraud act to all the putative members' claims would be a violation of the due process rights of those plaintiffs who do not live in Pennsylvania and/or did not purchase their boats in Pennsylvania."

In short, each state has its own consumer protection laws. Disregarding those laws and converting Minnesota law into the Law of the Land cannot be squared with fundamental protections granted by the Constitution.

## V

## CONCLUSION

Plaintiffs' attempt to invoke Rule 23 to regulate medical care for patients nationwide, based on one state's law and one expert's opinion, cannot be reconciled the Eighth Circuit's opinion, the relevant controlling law, or any fair application of Rule

23. Caution, not experimentation, is called for in these circumstances as the many precedents from the Eighth Circuit and elsewhere provide. This Court accordingly should deny plaintiffs' renewed motion for class certification.

DATED: March 17, 2006.

HALLELAND LEWIS NILAN & JOHNSON, P.A.

By ______________________________
Tracy J. Van Steenburgh, # 141173
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402-4501
Telephone: (612) 338-1838

REED SMITH LLP
Steven M. Kohn
James C. Martin
Steven J. Boranian
1999 Harrison Street, Suite 2400
Oakland, CA 94612
Telephone: (510) 763-2000

Attorneys for Defendant

# Table of Contents


**Page**

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 5

A. This Court's Prior Rulings, When Considered In Light Of The Eighth Circuit' s Opinion, Provide The Backdrop For Evaluating Plaintiffs' Renewed Motion For Class Certification ........ 5

B. Plaintiffs' Renewed Motion To Certify A Nationwide Medical Monitoring Class For Uninjured Silzone® Valve Recipients Under Minnesota's Consumer Fraud Statutes Cannot Be Squared With This Court's Prior Rulings Or The Eighth Circuit's Opinion ........ 7

III. PLAINTIFFS' PROPOSED CLASS IS AN ILL-CONCEIVED RESOLUTION SCHEME BLOCKED BY NUMEROUS BARRIERS FOUND IN BINDING FEDERAL CASE AUTHORITY AND CONTROLLING MINNESOTA LAW ........ 9

A. Barrier Number One: Under The Eighth Circuit's Opinion, The Law Of The Case Holds That A Class Of Uninjured Silzone® Valve Recipients Seeking Medical Monitoring Is Not Certifiable Under Rule 23 ........ 9

B. Barrier Number Two: Even If Plaintiffs Had Conducted The Constitutionally Required Conflicts Analysis (Which They Did Not), Minnesota's Conflict-Of-Law Rules Do Not Permit The Application Of Minnesota Law At The Expense Of Other States' Interests In Having Their Laws Apply ........ 12

1. Plaintiffs Have Failed To Provide The Individualized Conflicts-Of-Law Analysis That The Eighth Circuit Mandated Under The Constitution ........ 13

2. Minnesota's Choice-Of-Law Rules Do Not Allow The Nationwide, Minnesota-Law Class That Plaintiffs Request ........ 14

C. Barrier Number Three: Numerous Well-Reasoned Authorities Reject The Application Of One State's Consumer Protection Laws To A Nationwide Class Action ........ 28

D. Barrier Number Four: Plaintiffs' Proposed Class Seeks Relief That Minnesota's Statutes Do Not Permit ........ 31

1. Plaintiffs' Proposed Class Of Patients Who Have Not "Developed A Manifest And Diagnosed Injury" Cannot Have An Actual Injury And Thus Cannot Sustain A Consumer Protection Claim Because They Cannot Prove An Actual Injury ........ 32

2. Plaintiffs Cannot Sustain A Consumer Protection Claim Also Because Their Proposed Class Benefits Only The Private Interests Of A Finite Set Of People And Does Not Benefit The Public .......... 33

E. Barrier Number Five: Principles Of Federalism Prohibit The Use Of Rule 23 To Extend Novel And Controversial Remedies To Plaintiffs Nationwide .......... 35

IV. THE COURT CANNOT CERTIFY PLAINTIFFS' PROPOSED CLASS BECAUSE IT FAILS TO MEET THE REQUIREMENTS OF RULE 23(A) OR (B) .......... 37

A. Plaintiffs' Proposed Class Fails Because The Class Definition Is Indefinite And Requires Thousands Of Mini-Trials Just To Ascertain Class Membership .......... 38

B. Plaintiffs Are Not Adequate Representatives And Their Claims Are Not Typical Because Of The Legal And Factual Diversity Among Class Members .......... 40

C. As The Eighth Circuit Already Has Held, Plaintiffs' Class Fails Because Individual Legal And Factual Issues Predominate Over Common Issues On Liability, Causation As Well As The Need For And Purported Benefit Of Medical Monitoring .......... 42

1. Plaintiffs Cannot Prove Liability Without Introducing Individualized Evidence Regarding Product Information Available To Their Physicians, The Information Communicated To Them, And The Means By Which It Was Communicated .......... 44

2. Plaintiffs' Proposed Monitoring Regime Is Complicated And Unworkable On A Classwide Basis Because It Requires Individualized Determinations And The Input Of Plaintiffs' Own Physicians .......... 48

D. Plaintiffs' Proposed Class Action Is An Unmanageable, Overreaching Scheme That Will Neither Protect Plaintiffs Nor Achieve Efficiencies .......... 53

E. Plaintiffs' Proposed Class Action Does Not Provide The Superior Method For Resolving What Is Left Of These Silzone® Valve Cases .......... 55

F. The Constitution Does Not Permit A Nationwide Medical Monitoring Class Action Applying The Consumer Protection Laws Of One State To The Exclusion Of All Others .......... 57

V. CONCLUSION .......... 58

## TABLE OF AUTHORITIES

### CASES

*Alsides v. Brown Inst., Ltd.*,
592 N.W.2d 468 (Minn. Ct. App. 1999) ........ 31

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ........ 36, 39

*Avery v. State Farm Mutual Automobile Ins. Co.*,
835 N.E.2d 801 (Ill. 2005) ........ 29

*Badillo v. American Brands, Inc.*,
16 P.3d 435 (Nev. 2001) ........ 20

*Beerman v. Toro Mfg. Corp.*,
615 P.2d 749 (Haw. App. 1980) ........ 19

*Behrens v. United Vaccines, Inc.*,
228 F. Supp. 2d 965 (D. Minn. 2002) ........ 33

*Berczyk v. Emerson Tool Co.*,
291 F. Supp. 1004 (D. Minn. 2003) ........ 34

*Bethea v. Levi Strauss & Co.*,
916 F.2d 453 (8th Cir. 1990) ........ 10

*Bowers v. Westinghouse Elec. Corp.*,
522 S.E.2d 424 (1999) ........ 20

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ........ 39, 40

*Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*,
476 U.S. 573 (1986) ........ 56

*Camden Mach. & Tool, Inc. v. Cascade Co.*,
870 S.W.2d 304 (Tex. App. Ct. 1993) ........ 18

*Capitol Cadillac Olds, Inc. v. Roberts*,
813 S.W.2d 287 (Ky. 1991) ........ 18

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ........ 51, 52

*Chemtall Inc. v. Madden*,
607 S.E.2d 772 (W. Va. 2004) ........ 28, 40

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) ........ 29, 37

*D.A.B. v. Brown*,
570 N.W.2d 168 (Minn. Ct. App. 1997) ........ 32

*Danielson v. National Supply Co.*,
670 N.W.2d 1 (Minn. Ct. App. 2003) ........ 22, 24

*Debbs v. Chrysler Corp.*,
810 A.2d 137 (Pa. Super. Ct. 2002) ........ 18

*Dodds v. St. Jude Medical, Inc.*,
Court File C3-04-10616, C3-04-1619 (Minn. Dist. Ct. Oct. 20, 2005) ........ 22

*Eisen v. Carlisle and Jacquelin*,
417 U.S. 156 (1974) ........ 7

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938) ........ 35, 36, 56

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982) ........ 54

*Fink v. Ricoh Corp.*,
839 A.2d 942 (N.J. Super. Ct. Law Div. 2003) ........ 29

Flora v Firepond, Inc.,
260 F. Supp. 2d 780 (D. Minn. 2003) ........ 31

*Forman v. Data Transfer, Inc.*,
164 F.R.D. 400 (E.D. Pa. 1995) ........ 38

*Gamradt v. Fed. Labs., Inc.*,
02-CV-816816 JMR/RLE, 2003 U.S. Dist. LEXIS 16187 (D. Minn. 2003) ........ 24

*Gate City Fed. Sav. & Loan Ass'n. v. O'Connor*,
410 N.W.2d 448 (Minn. Ct. App. 1987) ........ 15, 21

*General Tel. Co. v. Falcon*,
457 U.S. 155 (1982) ........ 36

*Georgine v. Amchem Prods.*,
83 F.3d 610 (3d Cir. 1996) ........ 13

*Goasdone v. American Cyanamid*,
808 A.2d 159 (N.J. Super. Ct. 2002) ........ 43

*Gopher Oil Co. Inc. v. Union Oil Co.*,
955 F.2d 519 (8th Cir. 1992) ........ 22

*Group Health Plan, Inc. v. Philip Morris Inc.*,
621 N.W.2d 2 (Minn. 2001) ........ 43

*Hagen v. Winnemuca*,
108 F.R.D. 61 (D. Nev. 1985) ........ 38

*Hall v. Walter*,
969 P.2d 224 (Colo. 1998) .......... 18

*Hansen v. Mountain Fuel Supply*,
858 P.2d 970 (Utah 1993) .......... 21, 35

*Harding v. Tambrands*,
165 F.R.D. 623 (D. Kan. 1996) .......... 54

*Healy v. Beer Institute.*,
491 U.S. 324 (1989) .......... 56

*Henry v. Dow Chemical Co.*,
701 N.W.2d 684 (Mich. 2005) .......... 20, 35

*Hinton ex rel. Hinton v. Monsanto Co.*,
813 So. 2d 827 (Ala. 2001) .......... 20

*Holden Farms, Inc. v. Hog Slat, Inc.*,
347 F.3d 1055 (8th Cir. 2003) .......... 24

*Hoyt Constr. Co. v. Alside Inc.*,
No. 4-75 Civ. 257, 1980 WL 1807 (D. Minn. Jan. 21, 1980) .......... 37

*Hughes v. Wal-Mart Stores, Inc.*,
250 F.3d 618 (8th Cir. 2001) .......... 23

*Humphrey v. Philip Morris Inc.*,
551 N.W.2d 490 (Minn. 1996) .......... 31

*Hurd v. Monsanto Co.*,
164 F.R.D. 234 (S.D. Ind. 1995) .......... 40

*In re American Medical Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) .......... 36

*In re Baycol Prods. Litig.*,
218 F.R.D. 197 (D. Minn. 2003) .......... 25, 26, 51

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) .......... 17, 27, 28

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
No. 93 C 7452, MDL 986,2005 WL. 497782 (N.D. Ill. Mar. 1, 2005) .......... 10, 11

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*,
174 F.R.D. 332 (D.N.J. 1997) .......... 29

*In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*,
201 F.R.D. 456 (D. Minn. 2001) .......... 47

*In re Northern Dist. Of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
693 F.2d 847 (9th Cir. 1982) .......... 53

*In re: Paxil Litig.*,
212 F.R.D. 539 (C.D. Cal. 2003) ........ 37, 40, 42

*In re Prempro Prods. Liab. Litig.*,
230 F.R.D. 555 (E.D. Ark. 2005) ........ 28

*In re Rezulin Prods. Liab. Litig.*,
210 F.R.D. 61 (D.N.Y. 2002) ........ 28, 40, 42

*In re Rhone-Poulenc Rorer Inc.*,
51 F.3d 1293 (7th Cir. 1995) ........ 10

*In re School Asbestos Litig.*,
789 F.2d 996 (3d Cir. 1986) ........ 30

*In re St. Jude Medical, Inc. Silzone Heart Valve Prods. Liab. Litig.*,
425 F.3d 1116 (8th Cir. 2005) ........ passim

*In re West Virginia Rezulin Litigation*,
585 S.E.2d 52 (W. Va. 2003) ........ 20

*Johnston v. HBO Film Mgmt. Inc.*,
265 F.3d 178 (3d Cir. 2001) ........ 55

*K.A.C. v. Benson*,
527 N.W.2d 553 (Minn. 1995) ........ 31, 32

*Klein v. Arkoma Production Co.*,
73 F.3d 779 (8th Cir. 1996) ........ 10

*Klimstra v. Granstrom*,
95 F.3d 686 (8th Cir. 1996) ........ 23

*Lenscrafters, Inc. v. Vision World, Inc.*,
943 F. Supp. 1481 (D. Minn. 1996) ........ 31, 32

*Liberty Mut. Ins. Co. v. Tribco Constr. Co.*,
185 F.R.D. 533 (N.D. Ill. 1999) ........ 43

*Lockheed Martin Corp. v. Superior Court*,
63 P.3d 913 (Cal. 2003) ........ 42

*Lowrey v. Dingmann*,
86 N.W.2d 499 (Minn. 1957) ........ 22

*Ly v. Nystrom*,
615 N.W.2d 302 (Minn. 2000) ........ 32, 33

*Lynden Inc. v. Walker*,
30 P.3d 609 (Ak. 2001) ........ 21

*Lyon v. Caterpillar, Inc.*,
194 F.R.D. 206 (E.D. Pa. 2000) ........ 29, 57

*Meagher v. Kavli*,
88 N.W.2d 871 (Minn. 1958) ........................................................................ 21

*Montgomery v. New Piper Aircraft*,
209 F.R.D. 221 (S.D. Fla. 2002) ........................................................................ 29, 57

*National Western Life Ins. Co. v. Rowe*,
164 S.W.3d 389 (Texas Sup. Ct. 2005) ........................................................................ 29

*Nesladek v. Ford Motor Co.*,
46 F.3d 734 (8th Cir. 1995) ........................................................................ 16, 22, 23, 27

*Newton v. Southern Wood Piedmont Co.*,
163 F.R.D, 625 (S.D. Ga. 1995) ........................................................................ 54

*Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*,
604 N.W.2d 91 (Minn. 2000) ........................................................................ passim

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1998) ........................................................................ 35

*Parks v. Macro Dynamics, Inc.*,
591 P.2d 1005 (Ariz. 1979) ........................................................................ 18

*Pecarina v. Tokai Corp., No. CIV 01-1655*,
2002 WL 1023153 (D. Minn. May 20, 2002) ........................................................................ 34

*Perez v. Metabolife Int'l, Inc.*,
218 F.R.D. 262 (S.D. Fla. 2003) ........................................................................ 29, 42

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ........................................................................ passim

*Pomianowski v. Merle Norman Cosmetics, Inc.*,
507 F. Supp. 435 (S.D. Ohio 1980) ........................................................................ 18

*Potter v. Firestone Tire & Rubber Co.*,
863 P.2d 795 (Cal. 1993) ........................................................................ 21

*Redland Soccer Club, Inc. v. Department of the Army*,
696 A.2d 137 (Penn. 1997) ........................................................................ 21, 35

*Reppert v. Marvin Lumber & Cedar Co.*,
359 F.3d 53 (1st Cir. 2004) ........................................................................ 54

*Republican Party v. White*,
416 F.3d 738 (8th Cir. 2005) ........................................................................ 10

*Rowlette & Assocs. v. Calphalon Corp.*,
No. C8-99-1667, 2000 WL 385502 (Minn. Ct. App. Apr. 18, 2000) .................. 22

*Scally v Norwest Mortgage Inc.*,
No. C4-02-2181, 2003 WL 22039526 (Minn. Ct. App. Sept. 2, 2003) ............... 33

*Schwartz v. Consolidated Freightways Corp.*, 221 N.W.2d 665 (Minn. 1974) .......... 26

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1988) .......... 40

*Taylor Auto Group, Inc. v. Jessie*, 527 S.E.2d 256 (Ga. Ct. App. 1999) .......... 17

*Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999) .......... 39, 54

*Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. Ct. App. 2003) .......... 29

*Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917 (8th Cir. 2004) .......... 32, 43

*Tuttle v. Lorillard Tobacco Co.*, No. Civ. 99-1550 2003 WL. 1571584 (D. Minn. Mar. 3, 2003) .......... 33

*Vadino v. American Home Products Corp.*, Opinion, No. MID-L-425-98 (N.J. Super. Ct. Jan. 25, 1999) .......... 20

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) .......... 40, 52

*Van West v. Midland Nat'l. Life Ins. Co.*, 199 F.R.D. 448 (D.R.I. 2001) .......... 38

*Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302 (Tenn. Ct. App. 2004) .......... 29

*Vitanza v. Wyeth, Inc.*, 2006 WL. 462470 (N.J. Super. Ct. Jan. 24, 2006) .......... 20

*Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285 (S.D. Cal. 2003) .......... 19

*Zaretsky v. Molecular Biosystems, Inc.*, 464 N.W.2d 546 (Minn. Ct. App. 1990) .......... 21

*Zehel-Miller v. Astrazenaca Pharmaceuticals, LP*, 223 F.R.D. 659 (M.D. Fla. 2004) .......... 42

*Zinser v. Accufix Research Instit.*, 253 F.3d 1180 (9th Cir.) .......... 37, 42

*Zutz v. Case Corp., No. Civ. 02-1776*, 2003 WL. 22848943 (D. Minn. Nov. 21 2003) .......... 34

## STATUTES

Ala. Code § 8-19-10(a)(1) .......... 19

Ala. Code § 8-19-10(f) .......... 17

Ala. Code § 8-19-13 .......... 19

Ark. Code § 4-88-113(f) .......... 18

Cal. Civ. Code § 1780(a)(1) .......... 19

Conn. Gen. Stat. § 42-110g(a) .......... 19

Del. Code tit. 6, § 2513(a) .......... 18

Ga. Code § 10-1-399(a) .......... 17, 18

Haw. Rev. Stat. § 481A-5 .......... 19

Iowa Code § 714.16(7) .......... 19

Fla. Stat. § 501.212(3) .......... 18

Ill. Comp. Stat. 815 § 505/10A .......... 19

Ill. Comp. Stat. 815 § 510/4 .......... 19

Ind. Code § 24-5-0.5-4 .......... 18

Ind. Code § 24-5-0.5-6 .......... 19

La. Civ. Code Ann. Art. 2315 .......... 20

La. Rev. Stat. § 51:1409(A) .......... 17

Md. Code Ann. Com. Law § 13-408(a) .......... 19

Mich. Comp. Laws § 445.904 .......... 19

Minn. Stat. § 8.31 .......... 31

Minn. Stat. § 325D.44-.45 .......... 31

Minn. Stat. § 325D.67 .......... 31

Minn. Stat. § 325D.68-.70 .......... 31

Miss. Code § 75-24-15(4) .......... 17

Mont. Code § 30-14-133(1) .......... 17

N.J. Stat. §§ 56:8-2 .......... 41

S.C. Code § 39-5-140(a) .......... 17