# EXHIBIT 22

No. 06-3860

**IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT**

IN RE ST. JUDE MEDICAL, INC.
SILZONE® HEART VALVE PRODUCTS LIABILITY LITIGATION

LESTER GROVATT, BEATRICE BAILEY, LEVY D. REDDEN, BONNIE L. SLIGER, and JOE W. SANCHEZ, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees*,

v.

ST. JUDE MEDICAL, INC.,

*Defendant-Appellant*.

From a Class Certification Order by the
United States District Court for the District of Minnesota

**BRIEF FOR PLAINTIFFS-APPELLEES**

STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
LEVY, ANGSTREICH, FINNEY, BALDANTE, RUBENSTEIN & COREN, P.C.
1616 Walnut Street, Fifth Floor
Philadelphia, PA 10103
(215) 735-1616

DAVID C. FREDERICK
SCOTT H. ANGSTREICH
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Counsel for Plaintiffs-Appellees*

*(additional counsel on inside cover)*

March 16, 2007

J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
ZIMMERMAN REED P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

JAMES T. CAPRETZ
CAPRETZ & ASSOCIATES
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

JOE D. JACOBSON
GREEN, JACOBSON & BUTSCH, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, MO 63105
(314) 862-6800

DANIEL W. SIGELMAN
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600

**SUMMARY OF THE CASE**

Operating from Minnesota, St. Jude Medical, Inc. ("SJM") manufactured and marketed the Silzone-coated heart valve as safe and effective at preventing infection, even though SJM knew that the valves were neither safe nor effective. After SJM was forced to recall the valves, plaintiffs brought suit. This Court previously reviewed the district court's certification of a medical monitoring class and a consumer fraud class. This Court reversed the medical monitoring class without remanding, but remanded the consumer fraud class for further analysis to determine whether Minnesota consumer protection law could apply to all class members' claims. On remand, the district court conducted an extensive analysis of all 50 states' laws and re-certified the consumer fraud class.

Contrary to SJM's claims, the district court did not re-certify a medical monitoring class. Rather, the court re-certified the same Rule 23(b)(3) consumer fraud class as before. Although one remedy sought through that claim is medical monitoring, the underlying consumer fraud claims are legally distinct from the medical monitoring claims this Court rejected as insufficiently cohesive for a Rule 23(b)(2) class. The district court conducted the very due process and choice of law analyses this Court mandated. Finally, the district court properly incorporated its earlier findings that the consumer protection class satisfies Rule 23(a) and (b)(3).

Plaintiffs-Appellees request oral argument, but request 20 minutes per side.

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE .......... i

TABLE OF AUTHORITIES .......... iv

STATEMENT OF ISSUES .......... 1

COUNTERSTATEMENT OF THE CASE .......... 2

COUNTERSTATEMENT OF THE FACTS .......... 3

A. The Recall of the Silzone Valve .......... 3

B. SJM Falsely Marketed Its Valve as Being Safe and Effective .......... 5

C. Procedural History .......... 8

1. The District Court Certifies the Consumer Fraud Class .......... 8

2. This Court's Ruling .......... 10

3. The District Court's Order on Remand .......... 11

SUMMARY OF THE ARGUMENT .......... 14

STANDARD OF REVIEW .......... 17

ARGUMENT .......... 17

I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE APPLICATION OF MINNESOTA LAW IS PROPER .......... 17

A. The District Court Correctly Applied *Shutts* .......... 17

B. SJM's Challenges to the District Court's *Shutts* Analysis Lack Merit .......... 23

1. SJM's "Law of the Case" Argument Fails .......... 23

2. The District Court Was Not Required To Discuss Each Class Member Individually ....................................................25

3. SJM Unpersuasively Challenges the District Court's Findings as to Which States' Laws Conflict with Minnesota's Law ....................................................................29

4. The District Court Correctly Found that Class Members Would Expect Minnesota Law To Govern Their Claims .........34

II. THE DISTRICT COURT CORRECTLY APPLIED MINNESOTA'S CHOICE OF LAW PRINCIPLES ...............................................................37

III. THE DISTRICT COURT PROPERLY FOUND THAT THE CONSUMER FRAUD CLASS SATISFIES RULE 23 ...............................44

A. The Consumer Fraud Class Meets the Requirements of Rule 23 .......44

B. SJM's Rule 23 Arguments Lack Merit ...............................................47

IV. SJM'S REMAINING ARGUMENTS LACK MERIT .................................54

CONCLUSION ..........................................................................................57

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

**Cases**

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) ....................................... 12, 18, 34

*Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005), *cert. denied*, 126 S. Ct. 1470 (2006)...........................................................36

*Barbara's Sales, Inc. v. Intel Corp.*, 857 N.E.2d 717 (Ill. App. Ct.), *appeal allowed*, 861 N.E.2d 653 (Ill. Nov. 29, 2006)..................................27

*Baxter Healthcare Corp. v. United States Dist. Ct.*, 121 F.3d 714 (9th Cir. 1997) (table) .......................................................................52

*Behlar v. Smith*, 719 F.2d 950 (8th Cir. 1983)..........................................................17

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005)..........................................51

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ..............................................54

*Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543 (D.N.J. 1998).........................................................................................39

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998)..........................................36

*Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581 (7th Cir. 1992) ............................30

*Cooper v. Federal Reserve Bank*, 467 U.S. 867 (1984) ..........................................53

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987).....................................55

*Dal Ponte v. American Mortgage Express Corp.*, No. Civ. A. 04-2152 (JEI), 2006 WL 2403982 (D.N.J. Aug. 17, 2006)........................................27

*Danielson v. National Supply Co.*, 670 N.W.2d 1 (Minn. Ct. App. 2003).........................................................................................32

*Davis v. Furlong*, 328 N.W.2d 150 (Minn. 1983) ............................................ 1, 31

*Diamond Multimedia Sys., Inc. v. Superior Ct.*, 968 P.2d 539 (Cal. 1999) ....................55

*Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) ....................39

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ....................33

*Elkins v. Equitable Life Ins. of Iowa*, No. CivA96-296-Civ-T-17B, 1998 WL 133741 (M.D. Fla. Jan. 27, 1998) .................... 21, 23

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) ....................53

*Ferris, Baker Watts, Inc. v. Deutsche Bank Sec. Ltd.*, Nos. 02-3682, 02-4845, 2004 WL 2501563 (D. Minn. Nov. 5, 2004) ....................20

*Fink v. Ricoh Corp.*, 839 A.2d 942 (N.J. Super. Ct. Law Div. 2003) ....................36

*Fu v. Fu*, 733 A.2d 1133 (N.J. 1999)....................44

*Georgine v. Amchem Prods.*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)....................29

*Glover v. Standard Fed. Bank*, 283 F.3d 953 (8th Cir. 2002) ....................17

*Goasdone v. American Cyanamid Corp.*, 808 A.2d 159 (N.J. Super. Ct. Law Div. 2002) ....................52

*Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir. 1970) ....................50

*Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001) .................... 1, 46, 48, 49

*Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101 (S.D. Iowa 1998) ....................55

*Gruber v. Price Waterhouse*, 117 F.R.D. 75 (E.D. Pa. 1987) ....................22

*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003) ....................53

*Harding v. Tambrands Inc.*, 165 F.R.D. 623 (D. Kan. 1996)....................52

*Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004)............................... 43, 44

*Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618 (8th Cir. 2001) ...................... 38, 42

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D. Ind. 1995).......................................45

*In re Air Crash Disaster at Mannheim Germany on Sept. 11, 1982*, 769 F.2d 115 (3d Cir. 1985) ...........................................................................21

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002)...........................30

*In re Computer Memories Sec. Litig.*, 111 F.R.D. 675 (N.D. Cal. 1986)........................................................................................... 27, 28, 55

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332 (D.N.J. 1997) ............................................................................................29

*In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847 (9th Cir. 1982) ...........................................................................................51

*In re ORFA Sec. Litig.*, 654 F. Supp. 1449 (D.N.J. 1987).......................................22

*In re Paxil Litig.*, 212 F.R.D. 539 (C.D. Cal. 2003) ..............................................51

*In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15 (N.D. Cal. 1986)............. 22, 41

*In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002)..........................51

*In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*, 425 F.3d 1116 (8th Cir. 2005) .................................................................. passim

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001)...................................................................................... 1, 32, 33, 50

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) .................55

*International Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck & Co.*, 894 A.2d 1136 (N.J. Super. Ct. App. Div. 2006), *appeal granted*, 902 A.2d 1232 (N.J. 2006)............................... 27, 39, 40, 50

*K.A.C. v. Benson*, 527 N.W.2d 553 (Minn. 1995) .................................................53

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)............................18

*Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247 (D.N.J. 1992)............. 21, 35

*Lobo Exploration Co. v. Amoco Prod. Co.*, 991 P.2d 1048 (Okla. Civ. App. 1999) ..........................................................................................55

*Lockheed Martin Corp. v. Superior Ct.*, 63 P.3d 913 (Cal. 2003)...........................52

*Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000).....................................36

*Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840 (Ill. 1987)..........................22

*McLennan v. American Eurocopter Corp.*, 245 F.3d 403 (5th Cir. 2001)...................................................................................................22

*Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 457 F. Supp. 2d 298 (S.D.N.Y. 2006) ....................................................................24

*Milkovich v. Saari*, 203 N.W.2d 408 (Minn. 1973) ................................................30

*Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221 (S.D. Fla. 2002)........................................................................................... 36, 54

*Mooney v. Allianz Life Ins. Co.*, No. Civ. 06-545, 2007 WL 128841 (D. Minn. Jan. 12, 2007).......................................................................49

*Myers v. Government Employees Ins. Co.*, 225 N.W.2d 238 (Minn. 1974) ........................................................................................... 18, 30

*National W. Life Ins. Co. v. Rowe*, 164 S.W.3d 389 (Tex. 2005)............................36

*Nesladek v. Ford Motor Co.*, 46 F.3d 734 (8th Cir. 1995) ......................................41

*Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91 (Minn. 2000) ........................................................................ passim

*Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386 (8th Cir. 1997) ...........................................................................21

*Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262 (S.D. Fla. 2003) ............................51

*Peterson v. BASF Corp.*, 618 N.W.2d 821 (Minn. Ct. App. 2000), *aff'd following remand and trial*, 711 N.W.2d 470 (Minn.), *cert. denied*, 127 S. Ct. 579 (2006)....................27

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822-23 (1985).................... passim

*Schumacher v. Schumacher*, 676 N.W.2d 685 (Minn. Ct. App. 2004)....................30

*Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594 (8th Cir. 2007).................... 18, 31, 32, 33

*See Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)....................51

*Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46 (E.D.N.Y. 2000).................... 20, 23

*Sinclair v. Merck & Co.*, 913 A.2d 832 (N.J. Super. Ct. App. Div. 2007)....................33

*Sliger v. St. Jude Med., Inc.*, No. 4:00CV684 CDP (E.D. Mo. Nov. 28, 2000)....................8

*Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003).................... 1, 32, 50

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)....................50

*Stern v. Dill*, 442 N.W.2d 322 (Minn. 1989)....................31

*Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999).... 46, 49, 53

*Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. App. 2003)....................36

*Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917 (8th Cir. 2004)....................54

*United States v. Simmons*, 964 F.2d 763 (8th Cir. 1992)....................30

*United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995)....................47

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)....................52

*Vanderbilt Mortgage & Fin., Inc. v. Posey*, 146 S.W.3d 302 (Tex. App. 2004)....................36

*Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168 (D.C. 2006)....................21

*Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145 (Cal. Ct. App. 2001) ................................................................ 21, 27, 35, 39

*Wiegand v. Walser Auto. Groups, Inc.*, 683 N.W.2d 807 (Minn. 2004) .................49

*Yarrington v. Solvay Pharms., Inc.*, No. A05-2288, 2006 WL 2729463 (Minn. Ct. App. Sept. 26, 2006) ..................................................................47

*Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618 (Okla. 2003)...............................28

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir.), *amended*, 273 F.3d 1266 (9th Cir. 2001).....................................................51

**Statutes**

Minn. Stat. § 8.31, subd. 3a (2006)...........................................................................56

Minn. Stat. § 325D.44 (2006) ........................................................................................9

Minn. Stat. § 325F.67 (2006)..........................................................................................9

Minn. Stat. § 325F.68 (2006)..........................................................................................9

Minn. Stat. § 325F.69 (2006)..........................................................................................9

Minn. Stat. § 325F.70 (2006)..........................................................................................9

**Rules**

Fed. R. Civ. P. 23(b)(3) advisory committee's note (1966 amendment) ................50

Fed. R. Civ. P. 23(c)(4)..................................................................................................53

**Other Authorities**

Appellants' Opening Br., *In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*, No. 04-3117 (8th Cir. filed Oct. 22, 2004) ..........................................................................................................24

Restatement (Second) Conflict of Laws § 145 cmt. e ............................................41

Restatement (Second) of Judgments § 26(1) .........................................................53

## STATEMENT OF ISSUES

1. Whether the district court followed this Court's directives in concluding that Minnesota has adequate contacts with each plaintiff's claim. *In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*, 425 F.3d 1116 (8th Cir. 2005) ("*In re SJM*"); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822-23 (1985).

2. Whether the district court correctly followed this Court's directives in concluding that the laws of 32 jurisdictions do not conflict with Minnesota law and that, as to the other jurisdictions, Minnesota's choice-of-law rules favor application of Minnesota law to all plaintiffs' claims. *In re SJM*, 425 F.3d 1116; *Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91 (Minn. 2000); *Davis v. Furlong*, 328 N.W.2d 150 (Minn. 1983).

3. Whether the district court correctly found that the consumer fraud class meets the requirements of Rule 23(a) and Rule 23(b)(3). *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001); *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn. 2001).

## COUNTERSTATEMENT OF THE CASE

The district court certified a *consumer fraud* class, seeking damages and injunctive relief for SJM's violation of Minnesota's consumer protection laws. SJM is a Minnesota corporation that, in and from Minnesota, manufactured and fraudulently marketed a defective heart valve as a safe and effective device for reducing the incidence of prosthetic valve endocarditis, a serious infection of the heart. In reality, SJM's valves were neither safe nor effective, as SJM knew. Three years after introducing the Silzone valves, SJM was forced to recall all unimplanted valves.

Following the recall, class action complaints were filed alleging, among other things, violations of consumer protection and fraud laws, and seeking monetary damages and injunctive relief. The plaintiffs successfully sought to consolidate the cases. Based on SJM's request and its representations that, among other things, all marketing and distribution efforts for the Silzone valves were based in Minnesota, the consolidated cases were transferred to Minnesota federal district court. This Court reversed and remanded the district court's first order certifying a consumer fraud class under Minnesota law, finding that the district court had not properly performed Due Process and conflicts-of-law analyses. On remand, the district court carried out this Court's instructions and re-certified the consumer fraud class under Minnesota law. Despite the district court's scrupulous

compliance with this Court's directives, SJM again appeals, but its claims are based on a caricature of the district court's ruling.

## COUNTERSTATEMENT OF THE FACTS

### A. The Recall of the Silzone Valve

SJM manufactures prosthetic heart valves, which are surgically implanted in patients with damaged heart valves. *See* Summ. J. Order at 2 (SA22). In 1997, SJM introduced the Silzone heart valve, which had a silver coating on the part of the valve attached to the patient's body. *See id.* SJM hoped that the silver-coated valves would reduce the incidence of endocarditis, "a potentially life-threatening infection of the cardiac tissue that is a well-known possible consequence of prosthetic heart valve implantation." *Id.* In 1998, the Food and Drug Administration ("FDA") *conditionally permitted* SJM to sell the silver-coated valves, and did so *before* SJM had shown that the valves would reduce infection. *See id.* at 3 (SA23). The FDA, however, *prohibited* SJM from claiming that the valve's silver coating would reduce the risk of endocarditis. *See id.*

Notwithstanding the FDA's instructions, SJM repeatedly and knowingly made two false claims in marketing the Silzone valve. First, SJM claimed that the valve was *safe*. Second, SJM claimed that the valve, because of its silver coating, was *effective* at reducing the incidence of endocarditis. *See infra* pp. 5-7 (detailing SJM's marketing).

Neither claim was true. Two 1999 reports by the United Kingdom's Medical Device Agency ("MDA") found that SJM had never adequately investigated whether the silver in the Silzone valves was safe for use in people. *See* MDA Study at 028308 (AA1860). The MDA found that SJM should have determined "the biological response to silver . . . *before*" implanting the silver-coated valves in people. *Id.* at 028310 (AA1862) (emphasis added).

Other experts concluded that the valve was not effective at preventing endocarditis. Dr. Eric G. Butchart, a senior consultant cardiothoracic surgeon who worked on one SJM-funded study, concluded that the Silzone valve "did . . . not reduce the risk of prosthetic endocarditis" and "actually increased the risk of other complications, notably paravalvular leak . . . probably caused by the direct toxic action of silver on living cells, interfering with the normal healing process." Attach. to Butchart Decl., Interim Medical Report on the Follow-Up Requirements of Patients with St. Jude Silzone Prosthetic Heart Valves at 6 (AA1745). Another SJM consultant stated that he was "convinced" that Silzone caused a higher incidence of both valve explant and of major paravalvular leak,[1] and that Silzone did not cut the endocarditis rate significantly. Grunkemeier Dep. 33, 246 (AA1869, AA1876).

[1] A paravalvular leak occurs where the valve is sutured to the patient's tissue.

Even SJM's own study did not bear out its claims. After receiving conditional FDA approval to sell the Silzone valve, SJM sponsored the Artificial Valve Endocarditis Reduction Trial ("AVERT"). *See* Summ. J. Order at 3 (SA23). In 2000, an Independent Data and Safety Monitoring Board suspended further enrollment in the AVERT study because of an unacceptable level of explants due to paravalvular leakage. *See id.* at 3-4 (SA23-24). In response, SJM issued an urgent-medical device recall, and the FDA found that the valves were "adulterated and *misbranded*." *Id.* at 4, 34 (emphasis added) (SA24, SA54). By that time, more than 36,000 Silzone valves had been implanted worldwide.

**B. SJM Falsely Marketed Its Valve as Being Safe and Effective**

In its marketing and advertising, SJM told medical professionals and the public that the Silzone valves were effective at reducing endocarditis and that they were safe. SJM's sales pitches, labels, and manuals consistently represented that Silzone coating has been "shown to be resistant to microbial attachment and colonization *in vitro*." SJM Advertisement (AA2716); *see* Physician's Manual – St. Jude Medical Mechanical Heart Valve SJM Masters Series with Silzone Coating at 5 (stating that the Silzone coating "has been shown *in-vitro* to reduce attachment and colonization of microorganisms frequently associated with endocarditis") (SA64). Such claims, in SJM's own words, were "designed" "to lead the surgeon to [the] conclusion" that Silzone "reduces the incidence of

prosthetic valve endocarditis." SJM Marketing Document (AA2451). SJM's marketing also claimed that Silzone was 99% effective in reducing microbial colonization,[2] it did not interfere with tissue growth, and it potentially promoted healing.[3]

SJM instructed its salespeople to "refer to Silzone™ as a *permanent, minimally leaching* coating,"[4] when SJM's research and clinical pathology from explanted valves disproved those claims.[5] SJM told purchasers and doctors that 300 parts per billion of silver in blood was a scientifically valid threshold level for

---

[2] *See* Questions and Answers — SJM Masters Series Valve with Silzone coating ("SJM Q&A") at 5 (AA2515); SJM Marketing Document (AA2454); Guzik Dep. 47-56 (AA2154-63); Healy Dep. 211-28 (discussing SJM sales representatives' presentations in multiple states) (SA65-83); Hosek Dep. 304-7 (AA2517-21) (discussing SJM sales pitches).

[3] *See* SJM Q&A at 3 (AA2444); SJM Marketing Document (AA2452, AA2455).

[4] SJM Heart Valve Masters Series with Silzone Audio Script at 17 (AA2497) (emphasis in original); *see also* SJM Q&A (AA2487-93) (stating that the coating will not "wear off," that testing had shown "minimal" leaching effects, that silver levels in the body below 300 parts per billion "can be safely absorbed by the body"); SJM Training Manual (AA2451-52) (asserting that the Silzone coating's benefits include "Permanent/minimally leaching"); SJM "Features and Benefits" (AA2495).

[5] *See* Letter from William R. Holmberg, SJM Project Engineer, to Piran Sioshansi, Vice President, Biomaterials, Spire Corporation (Aug. 21, 1996) (AA2499) (expressing "two large concerns" about the silver coating: "leaching and corrosion" after SJM scientists began "seeing a significant amount of silver migration . . . at a greater rate than expected"); Healy Decl. ¶¶ 81-85 (AA2055-58) (observing that Silzone's "corrosion-resistance was poor" and that, in SJM's 10-week premarket sheep implant study, "up to an alarming 45 percent of the Silzone coating [was] lost in one animal" during the 10 weeks).

silver in people, when no data supported, and no agency had adopted, such a standard.[6]

SJM also suppressed facts about the Silzone valve. SJM did not report to the FDA data indicating that Silzone-coated fabric placed in bovine serum lost 12% of its coating over only seven days, nor did it report to the FDA results of its 10-week sheep study indicating a corrosion rate of 0.31% *per day*, suggesting that the coating would be completely gone in 318 days.[7] And SJM failed to report findings from laboratory tests indicating that Silzone caused the destruction of red blood cells, a potentially life-threatening condition, including in tests involving the Silzone-coated valve.[8]

In short, SJM repeatedly marketed and advertised the valves as safe and effective, even though these claims were more than unsubstantiated — they ran counter to the evidence.[9]

---

[6] *See* SJM Marketing Document (AA2453); SJM "Features and Benefits" (AA2509); Healy Decl. ¶¶ 64-75 (AA2048-53).

[7] *See id.* ¶¶ 81-85 (AA2055-58).

[8] *See* Summary of Hemolysis Testing (AA2060-61); Records of Biocompatibility Testing (AA2067); Runquist Dep. 303-11 (AA1990-96).

[9] The record was replete with such evidence. Plaintiffs' submission to the district court detailing SJM's material suppression of data and other omissions is at AA1237-41 and its submission detailing SJM's affirmative misrepresentations, including deceptive trade practices is at AA1241-44. The exhibits cited therein are reproduced at AA1733-2845.

## C. Procedural History

### *1. The District Court Certifies the Consumer Fraud Class*

Recipients of Silzone valves brought suit against SJM in multiple jurisdictions, including Mr. Grovatt's suit in New Jersey. The plaintiffs sought to consolidate the lawsuits via the Judicial Panel on Multidistrict Litigation ("MDL"), proposing a number of forum states, but not Minnesota. SJM, which had already successfully transferred one class action to Minnesota[10] and was also seeking to have *Grovatt* transferred there from Mr. Grovatt's home state of New Jersey,[11] opposed consolidation, but proposed Minnesota as the forum if consolidation were granted. *See* SJM Mem. of Points & Authorities at 2, 9-13, MDL Docket No. 1396 (MDL Jan. 8, 2001) ("SJM MDL Mem.") (SA6, SA13-17). SJM supported its position by highlighting the connections between the cases and Minnesota, representing among other things that Minnesota is "where S[JM]'s Silzone® coated valves were designed, researched, developed, engineered, manufactured, tested, and quality controlled; and all labels, warnings and instructions were drafted in Minnesota by witnesses located in Minnesota." *Id.* at 9 (SA13). SJM further proclaimed that "all marketing and distribution efforts were formulated in, and directed from, Minnesota." *Id.* at 9-10 (SA13-14). Finally, SJM noted that it is

---

[10] *See* Mem. & Order at 1, *Sliger v. St. Jude Med., Inc.*, No. 4:00CV684 CDP (E.D. Mo. Nov. 28, 2000).

[11] *See* Notice of Mot. to Transfer Venue & Supporting Br. (AA2683-2714).

"headquartered in Minnesota and its key personnel (including the relevant employees who designed, manufactured, and marketed the valves) are all located there." *Id.* at 10 (SA14). The MDL court granted the motion for consolidation, but agreed with SJM that the appropriate venue was Minnesota. *See* Transfer Order at 1, MDL Docket No. 1396 (MDL Apr. 18, 2001) (SA60).

Following transfer, plaintiffs filed a single class action complaint alleging violations of Minnesota's consumer protection statutes: the False Statement in Advertising Act,[12] the Prevention of Consumer Fraud Act,[13] and the Deceptive Trade Practices Act.[14] These statutes prohibit such conduct as "publish[ing]" "label[s,]" "pamphlet[s,]" or "advertisement[s]" that are "untrue, deceptive, or misleading,"[15] and "represent[ing] that goods" have "uses [or] benefits . . . that they do not have."[16] Plaintiffs alleged that, as a result of SJM's violation of those statutes, plaintiffs were implanted with Silzone valves. *See* Compl. ¶ 77 (AA0047).

Plaintiffs sought monetary damages, including the amounts paid for the Silzone valves, the cost of medical care arising out of the use of the valves, and

[12] Minn. Stat. § 325F.67 (2006).

[13] *Id.* §§ 325F.68-325F.70.

[14] *Id.* § 325D.44.

[15] *Id.* § 325F.67.

[16] *Id.* § 325D.44.

consequential damages, including past and future medical expenses, lost wages and earning capacity, pain, suffering, disability, and emotional distress. *See id.* ¶ 78 (AA0047). Plaintiffs also sought injunctive relief on the consumer fraud claims, including medical monitoring. *See id.* at 25 (AA0048).

The district court found that the consumer fraud class satisfied the requirements of Rule 23(a). *See* March 27, 2003 Order at 5-9 (AA0525-29). The court also found that common issues predominated, and a class action was the superior method for adjudicating those claims under Rule 23(b)(3). *See id.* at 36-39 (AA0556-59). The court, therefore, certified the consumer fraud class. The court determined that it would apply Minnesota law, because Minnesota consumer protection statutes allow "any person" injured by a violation of the statutes to bring suit. *See id.* at 37-38 (AA0557-58).

The court also conditionally certified common law and medical monitoring classes. In subsequent orders, the court decertified the common law class and certified the medical monitoring claims under Rule 23(b)(2) only for the 17 states that recognize such a cause of action. *See In re SJM*, 425 F.3d at 1118-19.

*2. This Court's Ruling*

This Court reversed and remanded the decision certifying the consumer fraud class, holding that the district court "did not conduct a sufficient conflicts-of-law analysis." *In re SJM*, 425 F.3d at 1120. The Court found that *Shutts* requires

"an individualized choice-of-law analysis [to] be applied to each plaintiff's claim in a class action." *Id.* The Court observed that there is, "of course, no constitutional injury to out-of-state plaintiffs in applying Minnesota law unless Minnesota law is in conflict with the other states' laws." *Id.* The Court found that it could not determine whether the application of Minnesota law was permissible, because the district court had not undertaken the requisite analysis. *See id.* at 1120-21. The Court directed the district court, on remand, to perform "the proper choice-of-law analysis." *Id.* at 1121.

The Court reversed the district court's certification of the medical monitoring class without remanding. *See id.* at 1123. The Court found that a Rule 23(b)(2) class — unlike a Rule 23(b)(3) class (such as the consumer fraud class) — requires a "class cohesiveness" that was not present, because "each plaintiff's need . . . for medical monitoring" "above that required for normal mechanical heart valve implantation" is "highly individualized." *Id.* at 1122-23 (internal quotation marks omitted).

*3. The District Court's Order on Remand*

Plaintiffs renewed their motion for certification of the consumer fraud class. In support, plaintiffs submitted a comprehensive conflict-of-law analysis that included a 423-page, state-by-state review of the consumer protection laws, including statutes and case law, of the other 49 states and the District of Columbia.

*See* Renewal Mot. at 48-49 & App. (AA1280-81, AA1293-1716). In contrast, SJM submitted a cursory, 69-page state-by-state review. (AA2972-3041).

Following review of those submissions, the district court re-certified the consumer fraud class. First, the court determined that its prior "detailed analysis," which had led it to hold that the consumer fraud class satisfies the requirements of Rule 23(a) and (b)(3), remained valid. Order on Remand at 5 & n.1 (AA3652). The court rejected SJM's argument that certification of the consumer fraud class was impossible because medical monitoring was among the relief sought. As the court recognized, SJM's claim was inconsistent with *In re SJM*, because the consumer fraud class reviewed there had also sought medical monitoring as a form of relief, and this Court did not preclude recertification of the class. *See id.* at 5 n.1.

Next, the court found that Minnesota had "significant contact or significant aggregation of contacts" to each plaintiff's claims as required by *Shutts* and *Allstate Insurance Co. v. Hague*, 449 U.S. 302 (1981). Order on Remand at 5-8 (internal quotation marks omitted) (AA3652-55). The court found particularly significant the fact that SJM had "invited heart valve purchasers and recipients to solicit more product information from Minnesota," by including Minnesota telephone numbers in worldwide advertisements. *Id.* at 8 (AA3655). The court found such actions to affect the valve recipients' expectations regarding which law

would govern claims, because "[t]o the extent that class members were even thinking about these issues when they received their heart valves, . . . individual class members would have expected a plainly Minnesota-based corporation to be subject to the requirements of Minnesota statutes." *Id.*

The court also found that "each class member's claims" had many other contacts in common with Minnesota. The "corporate acts implicated by each claim occurred in Minnesota," including SJM's false representations and omissions in advertising, marketing, and product labeling. *Id.* at 7 (AA3654). The court found that "all marketing and distribution efforts were based in Minnesota," which was also where "all labels and instructions were drafted." *Id.* at 7-8 (AA3654-55). The court found that the Silzone valves were "substantially created and manufactured" in Minnesota, including their design, research, and engineering. *Id.* at 8 (AA3655). All FDA and regulatory affairs were also managed from Minnesota, where SJM is incorporated, headquartered, and has its principal place of business. *See id.* at 7-8 (AA3654-55).

The district court next independently analyzed the laws of each state and concluded that the laws of 32 jurisdictions (not 33, as plaintiffs had contended) had no outcome-determinative conflicts with Minnesota law. *See id.* at 9-10 (AA3656-57); *id.* at 10 n.3 (finding, contrary to plaintiffs' conclusion, that Utah law conflicts with Minnesota law because Utah law contains a scienter requirement) (AA3657).

As to the remaining jurisdictions, the district court applied Minnesota's choice-of-law factors to determine which state's law governs. *See id.* at 10 (AA3657) (citing *Nodak*, 604 N.W.2d at 94). The court found that those factors, taken as a whole, favor application of Minnesota law. In particular, the court concluded that applying Minnesota law to SJM: (1) was *predictable*, both for SJM and the plaintiffs; (2) was consistent with Minnesota's compelling *interest* in redressing wrongs committed in its borders and limiting the harm to Minnesota's businesses' reputations from illegal acts of a Minnesota business that harm out-of-state consumers; and (3) was not inconsistent with the interests of the 18 jurisdictions with conflicting laws, because those jurisdictions' interest in protecting local defendants did not apply when local *plaintiffs* sued a *non-local* defendant. *See id.* at 11-13 (AA3658-60).[17] The court further found that forum-shopping was not presented, because Minnesota was chosen by SJM, which sought to transfer the cases to its home state. *See id.* at 12 n.5 (AA3659).

## SUMMARY OF THE ARGUMENT

**I.** In re-certifying the consumer fraud class, the district court followed this Court's directives and analyzed the contacts between Minnesota and each class member's claim. There is no constitutional issue as to the 32 jurisdictions

[17] The court rejected SJM's tort-based argument that the governmental interest favors the state in which the injury occurred, finding that consumer protection and fraud cases focus on the defendants' fraudulent conduct. *See id.* at 14 (AA3661).

correctly found by the court to have no outcome-determinative conflicts with Minnesota's substantive law. For the 18 remaining states, the court properly upheld the application of Minnesota law under Minnesota's conflict-of-law rules. The fraudulent marketing practices underlying each plaintiff's claim took place in and were directed from SJM's corporate headquarters in Minnesota, and SJM invited consumers and physicians to direct inquiries to Minnesota, leading valve recipients to expect that they could sue SJM in its own state and under its own state's laws.

SJM's challenges to the district court's holding have no merit. SJM's "law of the case" argument fails, because the class at issue is a consumer fraud class under Rule 23(b)(3), not a Rule 23(b)(2) class asserting a legally distinct medical monitoring cause of action. The consumer class has always sought the relief it now seeks, and this Court remanded the class for the district court to perform a choice-of-law analysis without suggesting that the class was fatally flawed on other grounds. Nor was the district court required to discuss each plaintiff class member individually. Neither the Supreme Court nor any other court has ever created such a requirement. Finally, SJM does not dispute the district court's conclusions as to 20 of the 32 jurisdictions in which the district court found no conflict with Minnesota law. For the remaining states, SJM posits "conflicts" that are irrelevant under Minnesota's conflicts rules.

**II.** The district court correctly applied Minnesota's conflict-of-law analysis. Minnesota has a strong interest in redressing fraudulent activity committed within its borders, and an economic interest in punishing domestic corporations that harm out-of-state persons. The court also found that other states had no interest in applying their more stringent standards, designed to protect in-state businesses, to bar their own citizens from recovering against an out-of-state defendant. In disputing those findings, SJM relies on inapposite tort law cases, which the district court correctly rejected in focusing on the location of SJM's deceptive conduct.

**III.** The district court properly relied on its prior findings that the consumer fraud class satisfies the requirements of Rule 23(a) and (b)(3), as those determinations remain valid even after remand. The class members, including Mr. Grovatt, continue to share the common claim that they were injured by SJM's false advertising of the Silzone valve as safe and effective. Mr. Grovatt is an adequate representative of the class's claims.

Those common questions predominate because, contrary to SJM's claims, Minnesota's consumer protection laws *do not* require a showing of individual reliance, but instead can be satisfied through a fraud-on-the-market showing. Nor do individual issues relating to the appropriate *remedy* preclude certification; it is well established that the district court has discretion to try the common questions

of liability together and then use a range of procedural tools to fashion appropriate remedies.

**IV.** SJM's arguments that the Commerce Clause and the Rules Enabling Act bar application of Minnesota law are groundless. The Supreme Court has long held that a state may regulate conduct emanating from within the state by a state-chartered corporation. And the Rules Enabling Act is not implicated because Minnesota's consumer fraud statutes permit persons from other states to recover as long as they have been injured by a violation of those laws.

## STANDARD OF REVIEW

The district court's certification of the consumer fraud class is reviewed for abuse of discretion. *See Glover v. Standard Fed. Bank*, 283 F.3d 953, 959 (8th Cir. 2002); *Behlar v. Smith*, 719 F.2d 950, 953 (8th Cir. 1983) (per curiam).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE APPLICATION OF MINNESOTA LAW IS PROPER

#### A. The District Court Correctly Applied *Shutts*

This Court remanded the consumer fraud class with instructions for the district court to perform the "analysis required to safeguard" the plaintiff class members' "federal constitutional rights." *In re SJM*, 425 F.3d at 1121 (citing *Shutts*, 472 U.S. at 822-23). The *Shutts* analysis has two steps. First, a court must determine whether the forum's law "conflicts in any material way with any other

law which could apply," because there is no constitutional injury if the law "is not in conflict with that of any other jurisdiction connected to th[e] suit." 472 U.S. at 816. Minnesota's conflict-of-laws rules apply. *See Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595-96 (8th Cir. 2007); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Under Minnesota law, a conflict exists only if "the choice of one law as compared to another [will] determine the outcome." *Myers v. Government Employees Ins. Co.*, 225 N.W.2d 238, 241 (Minn. 1974).

Second, where a conflict exists, a court must consider the fairness of applying the forum law, which requires consideration of whether the forum has "a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests, in order to ensure that the choice of [forum] law is not arbitrary or unfair." *Shutts*, 472 U.S. at 821-22 (internal quotation marks omitted). The Supreme Court has held that the "significant contact" test imposes only "modest restrictions on the application of forum law." *Id.* at 818 (citing *Allstate*, 449 U.S. at 312-13); *see Allstate*, 449 U.S. at 307, 310-11 (holding that the Constitution forbids application of the forum's law only when that state has "an insignificant contact with the parties and the occurrence or transaction").

The district court carefully applied both steps of the *Shutts* analysis. First, the court independently assessed each state's laws, based upon hundreds of pages

of record material, and concluded that the laws of 18 jurisdictions — one more than plaintiffs had contended — conflict with Minnesota law in an outcome-determinative way. *See* Order on Remand at 6 (AA3653). As to the other 32 jurisdictions, therefore, "[t]here can be no [constitutional] injury in applying [Minnesota] law." *Shutts*, 472 U.S. at 816.

For the 18 jurisdictions with conflicting laws, the court analyzed the "contacts between Minnesota and *each class member's claims*," Order on Remand at 6-7 (AA3653-54) (emphasis added), and correctly determined that application of Minnesota law is fair under *Shutts*. The court examined the many contacts between each class member's claims and Minnesota, including the fact that virtually all of the activities at issue in each plaintiff's claims — the marketing efforts, design of labels, pamphlets, and sales pitches; the correspondence with regulatory agencies; the directive to customers to contact the company; and more — took place in, and were directed from and into, Minnesota. *See id.* at 7-8 (AA3654-55). The court also relied on the facts that SJM is incorporated, headquartered, and has its principal place of business in Minnesota, and that the valves at issue were designed and manufactured in Minnesota, which supports Minnesota's interest in "regulating its domestic corporations and ensuring that out-of-state persons doing business with Minnesota firms may rely on their compliance with Minnesota statutes." *Id.* at 7 (AA3654).

The district court paid special attention to the expectations of the parties. *See Shutts*, 472 U.S. at 822. The court noted that SJM's invitation to place phone calls to Minnesota to learn more about the valves, along with its domicile there, "affects the expectations" of each class member, because the court found that "individual class members would have expected a plainly Minnesota-based corporation to be subject to the requirements of Minnesota statutes." Order on Remand at 8 (AA3655). Indeed, SJM's policy was to "refer any physician that had a question" about the Silzone valves to "the home office."[18] The court also rationally found that SJM expected to be subject to Minnesota law, because it is based in Minnesota. Order on Remand at 8 (AA3655).

The contacts the district court found easily satisfy the constitutional threshold. Indeed, this case is nothing like *Shutts*, where "[o]nly a miniscule amount, approximately one quarter of one percent, of the gas leases involved" were in Kansas. 472 U.S. at 801. Moreover, many of the contacts the district court found have been held sufficient, *standing alone*, to satisfy due process. *See, e.g.*, *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 70 (E.D.N.Y. 2000) (defendants' alleged illegal activities in forum state satisfied due process); *Ferris, Baker Watts, Inc. v. Deutsche Bank Sec. Ltd.*, Nos. 02-3682, 02-4845, 2004 WL 2501563, at *5 (D. Minn. Nov. 5, 2004) (application of New Jersey statute constitutional where

---

[18] Spadaro Dep. 139 (SA85).

many defendants were *domiciled* there and were New Jersey corporations, even though injuries took place elsewhere); *cf. In re Air Crash Disaster at Mannheim Germany on Sept. 11, 1982*, 769 F.2d 115, 120 n.7 (3d Cir. 1985) (applying law of place of *manufacture*).

Where a defendant has its principal place of business in a state, is incorporated in that state, *and* engages in the unlawful conduct in that same state, due process requirements are met. *See, e.g.*, *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1394 (8th Cir. 1997) (finding due process satisfied where defendant's headquarters were located in Texas and statements at issue were republished there); *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 183 n.19 (D.C. 2006) (finding District of Columbia to have sufficient contacts where defendant in a consumer action was "incorporated[,] . . . a resident of[,] . . . and . . . formulated and implemented the policies at issue in the District of Columbia"); *Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145, 159 (Cal. Ct. App. 2001) (*Shutts* satisfied in nationwide consumer class action where defendant's principal place of business was in California, brochures at issue "were prepared in and distributed from California," and policy at issue was set there).[19]

[19] *See also Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 256-57 (D.N.J. 1992) (*Shutts* satisfied in class action where bank was located in New Jersey and many allegedly fraudulent statements were made there); *Elkins v. Equitable Life Ins. of Iowa*, No. CivA96-296-Civ-T-17B, 1998 WL 133741, at *17 n.5 (M.D. Fla. Jan. 27, 1998) (*Shutts* satisfied where defendants maintained their

Indeed, even in products liability cases — like the tort cases SJM cites — courts have held that "the place where the allegedly defective product was designed, marketed, *or* manufactured is the place where the conduct causing the injury occurred," and therefore the state whose law should govern. *Jones ex rel. Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 969-70 (N.D. Iowa 2006) (emphasis added; internal quotation marks omitted); *see McLennan v. American Eurocopter Corp.*, 245 F.3d 403, 426 (5th Cir. 2001) (most significant contacts to claim were in place where helicopter was manufactured and marketed and where records concerning operation of aircraft were kept). Where, as here, the state of design, marketing, and manufacture is *also* the state where the defendant is incorporated and does business, and the plaintiffs' claims are based on the

---

business offices in state from which many alleged fraudulent statements emanated); *Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840, 847 (Ill. 1987) (*Shutts* satisfied where defendant's principal place of business was Illinois, payments were made to defendant in Illinois, and complaints were to be directed to Illinois office); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 82 (E.D. Pa. 1987) (*Shutts* satisfied in class action where defendant had offices in forum state, majority of relevant activities were performed there, and financial statements at issue were prepared and disseminated from there); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1455, 1463 (D.N.J. 1987) (*Shutts* satisfied where defendant had "princip[al] place of business in New Jersey and all the alleged misrepresentations originated from New Jersey," even where "each Plaintiff may not have had direct contact with New Jersey"); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 18 (N.D. Cal. 1986) (*Shutts* satisfied in class action where defendant was incorporated and headquartered in forum, "alleged misrepresentations emanated from" forum, and "defendants ha[d] no cause to be surprised by application of [forum] law").

defendant's deceptive actions emanating from that state, the constitutional question is not a close one.

Indeed, this case does not present "[t]he most difficult choice of law problems" that "occur when mass torts plaintiffs from many jurisdictions sue a number of defendants, all of whom have different contacts with the forum state." *Simon*, 124 F. Supp. 2d at 60. Rather, this case involves a single product, a single defendant domiciled in a single state, and a fraudulent course of conduct that took place entirely in that same state. As SJM itself told the MDL panel, "the gravamen of plaintiffs' lawsuits is that [SJM] designed, manufactured, and distributed a defective product in Minnesota," where all witnesses, operations, and evidence were located. SJM MDL Mem. at 13 (SA17). Where a class is "limited to purchasers of a particular product . . . from a particular company" and involves "uniform misrepresentations and omissions of material information," courts have not hesitated to certify a class and find that *Shutts* would be satisfied by applying the law of the state where the defendant is headquartered, and "from which its alleged campaign of fraud emanated." *Elkins*, 1998 WL 133741, at *17 & n.5.

### B. SJM's Challenges to the District Court's *Shutts* Analysis Lack Merit

#### *1. SJM's "Law of the Case" Argument Fails*

SJM's lead argument is that the class the district court certified must be reversed because it seeks medical monitoring as one of the remedies. *See* SJM Br.

at 15-19. Contrary to SJM's claim, this is not what the "law of the case" compels. The class before the Court is the Rule 23(b)(3) *consumer fraud* class under Minnesota's consumer protection statutes; it is not the Rule 23(b)(2) class brought under the laws of those states "that recognize a stand-alone cause of action for medical monitoring." *In re SJM*, 425 F.3d at 1118 (internal quotation marks omitted); *see id.* at 1121-22 (distinguishing Rule 23(b)(2) and Rule 23(b)(3)). This Court found that state laws vary as to the elements of medical monitoring causes of action, *see id.* at 1122, which sound in tort and are therefore distinct from consumer fraud claims focusing on a defendant's deceptive practices, *see, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 457 F. Supp. 2d 298, 318 (S.D.N.Y. 2006) (medical monitoring as a tort action).

Moreover, the consumer fraud class always sought both damages and injunctive relief, including (among other things) medical monitoring. In appealing the district court's original certification of both classes, SJM expressly recognized that the consumer fraud class sought such relief, but it did not argue — as it does now — that this fact alone precluded certification of a Rule 23(b)(3) class under Minnesota consumer protection law. *See* Appellants' Opening Br. at 1, 19, *In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*, No. 04-3117 (8th Cir. filed Oct. 22, 2004); *see also In re SJM*, 425 F.3d at 1119-20 (summarizing SJM's arguments on appeal).

Nor can this Court's ruling on the two classes be construed to hold as much. This Court remanded the consumer fraud class for the district court to conduct the "proper choice-of-law analysis." *In re SJM*, 425 F.3d at 1121. It would have made little sense for this Court to have done so if it already determined — as SJM now contends — that the very class it was remanding could not otherwise pass muster. *See* Order on Remand at 5 n.1 (AA3652). SJM also ignores that this Court's ruling on the class pursuing medical monitoring causes of action was based on the conclusion that Rule 23(b)(2) "contains no predominance or superiority requirements," so that "class claims []under" that rule "must be cohesive." *In re SJM*, 425 F.3d at 1121. It was a lack of cohesiveness — which is not a factor under Rule 23(b)(3) — that led the Court to reject the medical monitoring class. *See id.* at 1121-22. That determination, therefore, is neither "law of the case" nor "dispositive" as to the consumer fraud class, which was certified (and re-certified) under Rule 23(b)(3) and seeks damages and other injunctive relief.[20]

### 2. *The District Court Was Not Required To Discuss Each Class Member Individually*

Equally meritless is SJM's argument (at 19-22) that the district court erred because it did not discuss each plaintiff individually in re-certifying the consumer

[20] Indeed, if the Court were to conclude that the mere inclusion of medical monitoring among the various forms of relief sought precludes class certification under Rule 23(b)(3) — and it should not — the Court should take the narrower approach of foreclosing the monitoring remedy from the relief that could be awarded to the consumer fraud class.

fraud class. Again, SJM misreads *In re SJM*, and its reading would put this Court in conflict with the Supreme Court and other circuits.

Neither this Court nor the Supreme Court — or any other court, for that matter — has ever held that the Constitution requires a plaintiff-by-plaintiff assessment. *Shutts* requires that the forum state have "significant . . . contacts" with "the *claims asserted* by each member of the plaintiff class." 472 U.S. at 821-22 (emphasis added). The *Shutts* Court nowhere suggested that a court must discuss each plaintiff, one at a time.

Nor has this Court ever required a separate discussion of each plaintiff class member in conducting the *Shutts* analysis. In *In re SJM*, this Court applied the holding of *Shutts* that a court in a class action must "analyze the contacts between Minnesota and each plaintiff class member's *claims*." 425 F.3d at 1120 (emphasis added). This Court did not purport to add a requirement that a court separately discuss each member of the class. On the contrary, this Court mandated an "inquiry" into the traditional *Shutts/Allstate* factors, such as whether "out-of-state parties 'had any idea that [Minnesota] law could control' potential claims when they received their Silzone-coated valves." *In re SJM*, 425 F.3d at 1120 (quoting *Shutts*, 472 U.S. at 822) (alteration in original). The district court performed that very analysis. *See* Order on Remand at 6-8 (AA3653-55). Therefore, SJM's

argument that this Court mandated a "claimant-by-claimant" discussion and that such mandate is "law of th[e] case" is wrong. SJM Br. at 19.

Moreover, SJM fails to cite a single case that has mandated or undertaken the one-at-a-time analysis it advocates, and such an approach has been rejected. *See In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 686 (N.D. Cal. 1986) (rejecting defendants' argument "that the *Shutts* test can only be satisfied by a court's making specific findings regarding the California contacts to each class member's claims, *name-by-name*" as having "no basis") (emphasis added). And numerous courts have certified (or upheld certification of) nationwide classes applying the law of a single state,[21] including in the consumer protection context,[22]

---

[21] *See, e.g.*, *Computer Memories*, 111 F.R.D. at 686 (applying California law in a nationwide class action where defendants were California companies and conduct emanated from California); *see also infra* note 44 (citing cases).

[22] *See, e.g.*, *Barbara's Sales, Inc. v. Intel Corp.*, 857 N.E.2d 717, 718 (Ill. App. Ct.) (vacating decision not to certify a nationwide class under California's consumer law and finding *Shutts* satisfied), *appeal allowed*, 861 N.E.2d 653 (Ill. Nov. 29, 2006); *Dal Ponte v. American Mortgage Express Corp.*, No. Civ. A. 04-2152 (JEI), 2006 WL 2403982 (D.N.J. Aug. 17, 2006) (certifying nationwide class applying New Jersey's consumer law); *Wershba*, 110 Cal. Rptr. 2d at 159-60 (*Shutts* satisfied in certification of nationwide consumer class applying California law); *Peterson v. BASF Corp.*, 618 N.W.2d 821 (Minn. Ct. App. 2000) (applying New Jersey consumer statute in nationwide class), *aff'd following remand and trial*, 711 N.W.2d 470 (Minn.), *cert. denied*, 127 S. Ct. 579 (2006); *International Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck & Co.*, 894 A.2d 1136, 1153 (N.J. Super. Ct. App. Div. 2006) (applying New Jersey consumer law in nationwide consumer class action and finding *Shutts* satisfied), *appeal granted*, 902 A.2d 1232 (N.J. 2006). Of course, courts have also applied a single state's law to nationwide class actions outside of the consumer protection context. *See, e.g.*,

without engaging in a plaintiff-by-plaintiff analysis. Courts have recognized that, "[w]hen a court finds that [*Shutts*] can be satisfied by simply considering contacts that apply generally to every class member's claim, the court need not articulate how the contacts apply in each class member's case." *Computer Memories*, 111 F.R.D. at 687.

Here, SJM cannot be heard to complain about application of Minnesota law to each class member's consumer fraud claims. SJM specifically highlighted the contacts between those claims and Minnesota when it sought to transfer these cases to Minnesota. SJM represented that "its key personnel (including the relevant employees who designed, manufactured, and marketed the valves) are located" in Minnesota. SJM MDL Mem. at 10 (SA14). It also declared that "Minnesota" is where SJM's "valves were designed, researched, developed, engineered, manufactured, tested, and quality-controlled"; "all labels, warnings and instructions were drafted in Minnesota"; and "all marketing and distribution efforts were formulated in, and directed from, Minnesota." *Id.* at 9-10 (SA13-14). SJM cannot claim now that Minnesota has insufficient contacts with any individual plaintiff's claims simply because it dislikes the ruling of its chosen forum.

---

*Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618, 625-26 (Okla. 2003) (applying Michigan law rather than laws of 50 states and finding *Shutts* satisfied as to nationwide consumer warranty claims).

Finally, the cases SJM cites (at 22) do not support its novel construction of *Shutts*. In *Georgine v. Amchem Products*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Third Circuit neither undertook a plaintiff-by-plaintiff discussion nor suggested that such an analysis was required. Instead, it restated the *Shutts* Court's holding that it must apply "an individualized choice of law analysis to each plaintiff's claims," *id.* at 627, which is what the district court did here, *see* Order on Remand at 6-7 ("analyz[ing] the contacts between Minnesota and each class member's claims") (AA3653-54).[23]

*3. SJM Unpersuasively Challenges the District Court's Findings as to Which States' Laws Conflict with Minnesota's Law*

**a.** Although SJM takes issue with the district court's state-by-state analysis, SJM provides *no* argument in its brief with regard to 20 of the 32 jurisdictions where the district court found no conflict with Minnesota law.[24] SJM, therefore, has waived any argument that the district court erred with respect to those jurisdictions. *See United States v. Simmons*, 964 F.2d 763, 777 (8th Cir.

---

[23] SJM's reliance (at 22) on *In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332 (D.N.J. 1997), is likewise misplaced, as that case turned upon application of New Jersey's "interest analysis" choice-of-law rules, *id.* at 348, which differ from Minnesota's multi-factor test.

[24] Those jurisdictions are Alaska, Delaware, the District of Columbia, Idaho, Kansas, Kentucky, Maine, Massachusetts, Missouri, Nebraska, New Hampshire, New York, North Carolina, North Dakota, Oregon, Rhode Island, Tennessee, Vermont, Washington, and West Virginia.

1992) (arguments not raised in appellant's opening brief are waived).[25] SJM, moreover, argues about states where the district court *agreed* with SJM that a conflict exists. *See* SJM Br. at 24-25 (Alabama, Arizona, Georgia, Indiana, Iowa, Maryland, Pennsylvania, Texas, and Utah). For example, SJM argues that Minnesota's "causal nexus" standard differs from the "lack of knowledge" standard in Alabama, Arizona, Indiana, Pennsylvania, and Texas, but the district court — and plaintiffs — agreed. *See* Order on Remand at 10 n.4 (AA3657).

**b.** SJM's arguments regarding the remaining states lack merit. SJM argues (at 24) that certain states do not allow private consumer class actions. *See also* PLAC Br. at 11. Minnesota, however, recognizes a conflict only where an outcome-determinative conflict of *substantive* law exists. *See Schumacher v. Schumacher*, 676 N.W.2d 685, 689-90 (Minn. Ct. App. 2004); *Myers*, 225 N.W.2d at 241. Where the question is one of procedures or remedies, the forum law

[25] SJM's "perfunctory" reference in its brief to charts included in its appendix, *see* SJM Br. at 29, does not suffice to "preserve [any] claim[s]" as to state laws not discussed in the brief itself. *E.g.*, *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 593 (7th Cir. 1992). In any event, the charts, like SJM's brief, purport to identify "conflicts" that are irrelevant under Minnesota law. *See infra* Section IB2b. Similarly, SJM's citation to the Seventh Circuit's dictum that consumer protection laws "vary considerably," *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002), does not constitute argument and, in any event, is inapposite. *Bridgestone* concerned application of Indiana's choice-of-law rules, which apply a legal principle — *lex loci delicti* — that has not been the rule in Minnesota for more than 40 years. *Compare id.* at 1016 *with Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973). Instead, Minnesota employs the "choice-influencing factors" that the district court applied here. *Nodak*, 604 N.W.2d at 94.

applies. *See Davis*, 328 N.W.2d at 153. Class actions are a *procedural* mechanism and are not outcome-determinative as a matter of substantive law. Whether a state permits plaintiffs to join suit through this procedural mechanism, or instead requires individual joinder, does not determine whether a plaintiff from that state would prevail in a consumer protection claim against SJM. For similar reasons, the type of remedies (monetary or injunctive) a state provides for violations of consumer protection laws (SJM Br. at 25; PLAC Br. at 16) is immaterial under Minnesota law, which is concerned only with substantive determinations of liability. *See Schwan's Sales*, 476 F.3d at 596 (explaining that "Minnesota courts . . . apply their own state's procedure *and remedies* in all cases involving conflicts of laws") (emphasis added) (citing *Davis*, 328 N.W.2d at 153).

SJM argues (at 25) that Minnesota law conflicts with laws in states that impose pre-filing notice requirements. But this Court recently reiterated that, as to such procedural rules, federal courts in Minnesota must apply Minnesota law. *See Schwan's Sales*, 476 F.3d at 596-98 (holding that prejudgment interest is "procedural" for purposes of choice of law). Therefore, SJM's claim (at 28) that "every provision" within each state's statutory scheme that "affects the result" is "substantive" for purposes of a conflicts analysis incorrectly characterizes Minnesota law. Instead, substantive law "creates, defines, and regulates rights." *Stern v. Dill*, 442 N.W.2d 322, 324 (Minn. 1989). Therefore, such notice

requirements are "procedural law for purposes of determining which state's law to apply." *Schwan's Sales*, 476 F.3d at 596.[26]

SJM's argument (at 25-26) that some states recognize different defenses than Minnesota does are also irrelevant. "Courts traditionally have been reluctant to deny class action status . . . simply because affirmative defenses may be available against individual members." *Smilow*, 323 F.3d at 39; *Visa Check*, 280 F.3d at 138 ("as long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification") (internal quotation marks and brackets omitted). As to the particular defenses SJM cites, while some states may exempt conduct authorized by federal law, nothing in federal law authorizes, much less "requires," the false marketing and consumer fraud at issue here. Indeed, the district court already rejected SJM's argument that federal law preempts the

[26] The Court also clarified that SJM may not rely on *Danielson v. National Supply Co.*, 670 N.W.2d 1, 6 n.2 (Minn. Ct. App. 2003), to argue that a statute of limitations can create a substantive legal difference. *See* SJM Br. at 28; *see also* PLAC Br. at 14-15. The Court held that federal courts in Minnesota must continue to treat such statutes as procedural for conflicts analyses until the state Supreme Court or Legislature changes the Supreme Court's prior determination that its statute of limitations is procedural. *See Schwan's Sales*, 476 F.3d at 596 n.2.

plaintiffs' consumer protection claims, in a decision SJM does not mention in its brief. *See* Summ. J. Order at 29-30 (SA49-50).[27]

Finally, SJM argues (at 26-27) that no state, including Minnesota, permits plaintiffs to obtain medical monitoring as a form of injunctive relief through a consumer fraud action. Even if SJM were correct — and it is not[28] — that would hardly show a conflict between Minnesota law and the laws of other states. And, as shown above, a difference in available remedies is not, under Minnesota law, a substantive difference for purposes of conflicts of laws. *See Schwan's Sales*, 476 F.3d at 595-97. Finally, claims that a remedy is not available under Minnesota law are inappropriate at the class certification stage, which is not the "occasion for examination of the merits of the case," much less an examination of the available forms of relief. *Visa Check*, 280 F.3d at 135; *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (in deciding whether to certify a class, a court may not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits") (internal quotation marks omitted).

---

[27] SJM alleges (at 25) that certain states exempt personal injury lawsuits from their consumer protection law, but this claim, even if true, is immaterial, because the certified class here is defined to exempt personal injury law suits. *See* Order on Remand at 4 (AA3651).

[28] A New Jersey appellate court recently held that medical monitoring *relief* "has been characterized as a claim for" the economic damages available under that state's consumer fraud law. *Sinclair v. Merck & Co.*, 913 A.2d 832, 842 & n.9 (N.J. Super. Ct. App. Div. 2007).

### 4. *The District Court Correctly Found that Class Members Would Expect Minnesota Law To Govern Their Claims*

SJM argues that the district court erred in finding that the parties would have expected Minnesota law to govern claims against SJM. *See* SJM Br. at 30-35; *see also* PLAC Br. at 9-10. SJM points to the fact that many class members resided, and received their valves, outside of Minnesota, from which it concludes that they would not have expected Minnesota law to apply. *See* SJM Br. at 30-32 (citing *In re Vioxx*, --- F.R.D. ---, MDL No. 1657, 2006 WL 3391432, at *6 (E.D. La. Nov. 22, 2006)). But the question is not whether the plaintiffs knew the name and address of the manufacturer when they received their valves. Rather, the question is which state's law the parties would reasonably expect to govern any lawsuit between them. *See Allstate*, 449 U.S. at 333 (Powell, J., dissenting) ("The touchstone here is the reasonable expectation of the parties."), *adopted in Shutts*, 472 U.S. at 822.

SJM clearly expected to be subject to the law of Minnesota, where it manufactured and marketed the valves, where it is headquartered, where most of its contracts designate that disputes will be litigated, and where it sought to transfer this litigation. *See* Order on Remand at 7-8, 11 (AA3654-55, 3658). Nor was it unreasonable to conclude that a valve recipient would expect to be able to sue the valve manufacturer in the state where the company is located and from which it operates and marketed the valves, and to have liability determined under that

state's law. *See id.* at 8 (AA3655). Indeed, as the district court noted, SJM "invited heart valve purchasers and recipients to" contact SJM *in Minnesota* about the valves. *Id.* These factors were among those that prompted SJM to argue, earlier in this litigation, that "[t]he choice of any other district" — that is, other than Minnesota — "does not make as much sense," because other states had "*no connection to this dispute*" except for the fact that plaintiffs "happen[ed] to reside there." SJM MDL Mem. at 13 (emphasis added) (SA17).

SJM has not shown that these conclusions were unreasonable or an abuse of discretion. Numerous courts have applied one state's law where, as here, the parties reasonably could have expected that the defendant could be sued in its home state. For example, in *Wershba*, the court found that application of California law to out-of-state plaintiffs' claims satisfies due process because Apple was a California corporation with its principal place of business there, and the "brochures" making the "promis[es]" at issue "were prepared in and distributed from California," which was also where "the core decision at issue" was made by Apple executives. 110 Cal. Rptr. at 159; *see also Lerch*, 144 F.R.D. at 257 (finding constitutionally adequate contacts to apply New Jersey law to out-of-state plaintiffs where defendant's principal asset was in New Jersey, individual defendants maintained business offices there, and "many of the allegedly fraudulent statements occurred" there).

Many of the cases SJM cites (at 33-34), in contrast, turned on application of different states' choice-of-law rules.[29] And, unlike many cases cited by SJM, in which pertinent activities occurred outside of the state whose law was asserted to apply, here *all* of the deceptive conduct, design, and manufacturing occurred in Minnesota, where SJM is headquartered and incorporated. *See, e.g.*, *Montgomery*, 209 F.R.D. at 228 (*Shutts* not satisfied where faulty parts at issue were manufactured in Germany or Indiana and installed in engines in Pennsylvania); *Lyon*, 194 F.R.D. at 211-13 (rejecting application of Pennsylvania law under *Shutts*, where plaintiffs had sought to have Illinois law apply); *Fink*, 839 A.2d at 986-87 (rejecting application of New Jersey law where defendant was not incorporated there and "there [wa]s no information available as to where the brochures were printed or the state(s) from which they were distributed").

---

[29] *See, e.g.*, *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 849, 852-55 (Ill. 2005) (Illinois consumer fraud law did not apply to transactions at issue), *cert. denied*, 126 S. Ct. 1470 (2006); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2002) (Florida choice-of-law and standing principles); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 211 (E.D. Pa. 2000) (Pennsylvania's choice-of-law rules); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 457 (D.N.J. 1998) (New Jersey's choice-of-law rule); *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 355-56 (Tex. App. 2003) (Texas choice-of-law rules); *Vanderbilt Mortgage & Fin., Inc. v. Posey*, 146 S.W.3d 302, 313-15 (Tex. App. 2004) (same); *National W. Life Ins. Co. v. Rowe*, 164 S.W.3d 389, 392 (Tex. 2005) (applying Restatement choice-of-law rule for insurance contracts); *Fink v. Ricoh Corp.*, 839 A.2d 942, 986-87 (N.J. Super. Ct. Law Div. 2003) (applying New Jersey rule and Restatement factors).

## II. THE DISTRICT COURT CORRECTLY APPLIED MINNESOTA'S CHOICE OF LAW PRINCIPLES

**A.** In performing the second step of the *Shutts* analysis, the district court correctly applied the factors that Minnesota courts use to determine whether Minnesota law could apply to plaintiffs from the 18 jurisdictions where the district court found a conflict.[30]

For the first factor, predictability of results, the court found that parties would expect Minnesota law to apply to SJM's conduct. The court noted that more than "80 percent of [SJM]'s medical contracts" selected Minnesota law as the governing law. Order on Remand at 11 (AA3658). The court also held that SJM could easily predict that it would be subject to its home state law and that it was less burdensome to expect SJM to understand and comply with the laws of its home state than with those of 50 states. *See id.*

The court found that the second factor, maintenance of interstate order, was "not implicated," because Minnesota has "sufficient contacts with and interest in the facts and issues being litigated." *Id.* at 11-12 (quoting *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620 (8th Cir. 2001)) (internal quotation marks omitted) (AA3658-59). The court also noted that "the reality of forum shopping may be

---

[30] SJM raises no dispute about 20 of the 32 jurisdictions where the district court found no conflict and, therefore, no constitutional issue under *Shutts*. *See supra* pp. 29-30. Even if SJM were correct as to the other 12 — and it is not — the district court's analysis at the second step of *Shutts* leads to the conclusion that application of Minnesota law "is not arbitrary or unfair." 472 U.S. at 821-22.

taken into account under this factor," but that "plaintiffs cannot be accused of forum shopping" because the district court "obtained jurisdiction pursuant to the multi-district litigation jurisdictional grant and on defendant's motion to transfer." *Id.* at 12 n.5 (AA3659).

Minnesota's third factor, simplification of the judicial task, "concerns th[e] Court's ability to discern and apply the law of a state other than Minnesota." *Id.* at 12 (AA3659). The court found that this factor also favored application of Minnesota law, because it would be simpler to apply Minnesota's law than to apply the laws of 50 states. *See id.*; *see also Nodak*, 604 N.W.2d at 95 (noting that the factor "has not been given much weight").

The fourth factor, advancement of the forum's governmental interest, requires the court to "weigh the policy interests of Minnesota with those of other states with connections to this litigation." Order on Remand at 12 (AA3659). Applying that standard, the court concluded that "Minnesota has a compelling interest in redressing wrongs committed within its borders" and an economic interest in preserving "the reputations of other Minnesota businesses," which are "tarnished" when "out-of-state persons are harmed by illegal actions of Minnesota businesses." *Id.* at 12-13 (citing cases) (AA3659-60). Courts in other states have likewise identified "a powerful incentive to insure that local merchants deal fairly with citizens of other states," because important state industries "would suffer if

the state developed a reputation as a place w[h]ere sellers ripped off . . . unsuspecting" consumers. *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998).

The district court also found that jurisdictions with "substantive conflicts with Minnesota consumer protection laws" have "more stringent liability standards" based on their "interest" in "protect[ing] local defendants." Order on Remand at 13 (AA3660). But the court determined that such an interest would not carry over to "prevent an action that would benefit their own citizens" against an out-of-state defendant. *Id.* (citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001)). Other courts have reached the same conclusion. *See, e.g.*, *Wershba*, 110 Cal. Rptr. at 160 (holding that "California's more favorable [consumer protection] laws may properly apply to benefit nonresident plaintiffs [against a California corporation] when their home states have no identifiable interest in denying such persons full recovery") (internal quotation marks omitted).

Nor do other states have an interest in protecting a Minnesota defendant from application of Minnesota law. *See International Union of Operating Eng'rs*, 894 A.2d at 1149 (finding that "[n]o state has an interest in denying its own citizens recovery while protecting a foreign New Jersey corporation when the conduct at issue took place . . . in New Jersey"). As in those cases, SJM "has not established how denying a putative plaintiff relief against a [Minnesota]

corporation would further the concerns of any given state's consumer protection law." *Id.* Here, too, the district court properly found "no basis" under Minnesota conflicts-of-law principles for SJM to "escape liability from consumer protection laws in Minnesota merely because plaintiffs have contacts with other states," as well as with Minnesota. Order on Remand at 14 (AA3661).[31]

**B.** SJM's challenges to the district court's application of Minnesota's choice-of-law rules lack merit. *See* SJM Br. at 37-43.

As it did before the district court, SJM relies on tort cases that establish the "place of the accident" as a tie-breaker in the conflicts-of-law analysis in a tort case. *See*, *e.g.*, *Nodak*, 604 N.W.2d at 92 (holding that, "when all other relevant choice-of-law factors favor neither state's law, the state where the accident occurred has the strongest governmental interest"). As shown above, there is no "tie" to be broken by reference to the state where implantation of a particular valve occurred.

In addition, the district court correctly rejected SJM's reliance on such tort cases, finding that consumer protection statutes are "not based entirely in either tort or contract law" and that, where plaintiffs' claims are based on allegations of misrepresentation and fraud, "the place of injury has little importance." Order on

[31] Regarding the fifth factor, application of the better rule of law, the court correctly found that Minnesota courts give this factor no weight. *See* Order on Remand at 14 (AA3661).

Remand at 11, 14 (citing Restatement (Second) Conflict of Laws § 145 cmt. e) (AA3658, AA3661).[32] The district court's proper recognition of the difference between tort and consumer fraud cases also explains why that court came to a different conclusion in its earlier order regarding certification of a class pursuing common law claims. *See* SJM Br. at 38-39. The district court properly applied *Nodak* and other tort cases to those claims in finding that predictability of results was "not applicable" to a "tort" claim. March 27, 2003 Order at 18-19 (AA538-39).

SJM gets no further when it cites a string of tort cases regarding the governmental interest factor. *See* SJM Br. at 40-41. This case does not involve an accident; it concerns Minnesota's interest in protecting consumers and ensuring that in-state corporations are held accountable for frauds committed in, and "emanat[ing] from,"[33] Minnesota. *See* Order on Remand at 13-14 (AA3660-61).[34]

---

[32] Minnesota cases also hold that, in "most tort cases, predictability of result is of little relevance," *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 738 (8th Cir. 1995), because torts — such as automobile accidents — generally do not arise in the context of "consensual transactions where the parties desire advance notice of which state law will govern future disputes." *Nodak*, 604 N.W. 2d at 94; *see id.* at 95 ("[A]utomobile accidents are not consensual transactions, nor is this a contract case, and therefore predictability favors neither forum").

[33] *Pizza Time*, 112 F.R.D. at 18.

[34] *Hughes*, relied on by SJM (at 41), is also inapposite because the product liability defendant there was merely the distributor of the allegedly defective product, and it had distributed the product to the plaintiffs in Louisiana; consequently, the court found that Arkansas, which was the defendant's home

SJM also errs with regard to the factor concerning the maintenance of interstate order. *See* SJM Br. at 39-40. The district court correctly found that this factor is "not implicated" because Minnesota "has sufficient contacts with and interest in the facts and issues being litigated." Order on Remand at 11-12 (quoting *Hughes*, 250 F.3d at 620) (internal quotation marks omitted) (AA3658-59). The comparison suggested by SJM — which state has the "most significant" contact, SJM Br. at 40 — only applies when the forum state has "little or no contact with" the case. *Hughes*, 250 F.3d at 620-21 (internal quotation marks omitted). That is plainly not the case here. Indeed, given that the conduct complained of is SJM's Minnesota-based marketing, labeling, design of training scripts, and other misrepresentations, Minnesota not only has "sufficient" contacts, it also has the "most significant" contacts.

SJM also incorrectly suggests (at 40) that *Shutts* bars consideration of the fact that it is simpler to apply the law of one state than of 50 states. *Shutts* bars a court from using personal jurisdiction over a class action defendant to "bootstrap"

---

state, lacked a strong enough interest in application of its own law. Indeed, SJM has selectively quoted *Hughes* to make it appear on point. In fact, this Court held that, "*[a]bsent some relevant connection between a state and the facts underlying the litigation*, we fail to see how any important [state] governmental interest is significantly furthered by ensuring that nonresidents are compensated for injuries that occur in another state." 250 F.3d at 621 (italicized portion omitted by SJM; emphasis in original omitted). That "relevant connection" is present here, because Minnesota is not merely SJM's home state, it is also the state in which SJM's alleged wrongful conduct occurred.

the constitutional analysis. The Supreme Court did not address application of a state's choice of law rules where the due process "significant contacts" requirements are independently satisfied.[35] In any event, this factor undisputedly is entitled to little, if any, weight under Minnesota law. SJM cannot demonstrate that the district court abused its discretion in concluding, in light of all five factors taken together, that Minnesota law could properly be applied to plaintiffs from the 18 jurisdictions with laws that conflict substantively with Minnesota's.

SJM suggests (at 43) that the district court erred in concluding that those 18 jurisdictions' interests in protecting local businesses as defendants did not extend to denying their own citizens remedies under other states' laws. But the New Jersey case SJM cites does not support its claim. In *Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004), the defendant had a "large corporate presence" in New Jersey, and one of four defendants had headquarters there, but its research laboratories, marketing and regulatory divisions for the drug in question, and relevant employees were located in Pennsylvania. *See id.* at 370, 375-76. The New Jersey district court's finding that Pennsylvania's dual interest outweighed

---

[35] SJM is also wrong to argue (at 41-42) that the district court gave weight to the "better rule of law" factor: it did not. *See* Order on Remand at 14 ("find[ing] it unnecessary to address" this factor because "Minnesota courts have stated that this factor carries essentially no weight") (AA3661).

New Jersey's interests in that case is of no moment here, where SJM's regulatory and marketing activities were all based in Minnesota.[36]

Finally, SJM (at 43) implausibly suggests that the district court encouraged "forum shopping." That outlandish claim belies the fact that *SJM* requested and received a transfer of the litigation to Minnesota. *See* Order on Remand at 12 n.5 (AA3659). Having obtained its preferred forum, SJM should not be heard to complain that it no longer likes the forum it chose.

## III. THE DISTRICT COURT PROPERLY FOUND THAT THE CONSUMER FRAUD CLASS SATISFIES RULE 23

### A. The Consumer Fraud Class Meets the Requirements of Rule 23

The district court's March 27, 2003 Order determined that a class raising the same consumer fraud claims, under the same Minnesota statutes, and seeking the same relief, satisfies Rule 23(a). *See* March 27, 2003 Order at 5-9 (AA0525-29). As the court noted, "all of the plaintiffs' contentions arise from [SJM]'s design, manufacture, marketing, and sales of the Silzone valve." *Id.* at 7 (AA0527).

These findings remain valid today. Mr. Grovatt continues to have in common with other class members the fact that he has a Silzone valve implanted, and that he alleges that the Silzone valve is neither safe nor effective for preventing

[36] SJM also cites *Fu v. Fu*, 733 A.2d 1133 (N.J. 1999), misleadingly suggesting that it is a consumer protection case. It is not, and its analysis of two states' tort rules for vehicle accidents using the Restatement's seven-factor governmental interest test is inapposite.

endocarditis as SJM had fraudulently claimed. The district court's finding that Mr. Grovatt's circumstances arise from the same "'event or practice or course of conduct that gives rise to the claims of the other class members'" — a finding this Court did not reverse — therefore remains correct. *Id.* (quoting *Hurd v. Monsanto Co.*, 164 F.R.D. 234, 239 (S.D. Ind. 1995)). Mr. Grovatt remains an adequate class representative, because all members of the consumer fraud class remain united in their goal of proving SJM's "wrongful conduct and establish [SJM's] liability" for monetary damages and injunctive relief as a result of SJM's consumer fraud. *Id.* at 9 (AA0529) (internal quotation marks omitted).

The district court also found that the consumer fraud class satisfies Rule 23(b)(3). First, the court found that common questions predominated, because Minnesota consumer protection law would apply. *Id.* at 37-38 (AA0557-58). Because the district court again found that Minnesota law can apply, consistent with the analyses this Court directed it to perform, the district court's original predominance finding is still applicable.

The district court also properly rejected SJM's argument — repeated here (at 50-53) — that, under Minnesota law, common questions would not predominate because each individual plaintiff would have to prove reliance on SJM's misrepresentations. *See* March 27, 2003 Order at 39 (AA0559). But, as the district court found, Minnesota's consumer protection law does *not* require

plaintiffs to establish individual reliance. *See id.* (citing *Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 552-53 (D. Minn. 1999)). In *Thompson*, the court explained that the Minnesota "legislature fashioned a consumer fraud regime that does not always require individual proof of reliance" and that it may be likened to a consumer "fraud-on-the-market" theory. 189 F.R.D. at 552 & n.4.

The district court also followed the Minnesota Supreme Court's ruling in *Group Health*, "that a plaintiff *need not plead individual consumer reliance* on a defendant's wrongful conduct to state a claim for damages." 621 N.W.2d at 12 (emphasis added) (quoted in March 27, 2003 Order at 39 (AA0559)). The Minnesota Supreme Court held that such plaintiffs need not make "a strict showing of direct causation, as would be required at common law," but rather must demonstrate a "legal nexus" between the defendant's wrongful conduct and the injury suffered by plaintiffs. *Id.* at 14. The showing "need not include direct evidence of reliance by individual consumers of defendants' product[]." *Id.* Instead, other direct and circumstantial evidence that a court determines is "relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct" could suffice. *Id.* The Minnesota Court of Appeals recently applied these same principles in a class action alleging consumer fraud involving the sale of pharmaceuticals. *See Yarrington v. Solvay Pharms., Inc.*, No. A05-2288, 2006 WL 2729463, *at 5 (Minn. Ct. App. Sept. 26, 2006) (applying

*Group Health* and holding that allegations that information published by the drug company "deceives physicians and consumers, . . . coupled with the allegation that this deception causes the drug's prescription, sufficiently alleges causation").

Finally, the district court correctly determined that SJM had given it no reason to repeat or revisit its Rule 23 analysis. Order on Remand at 5 & n.1 (AA3652). Nor is there any reason to conclude, as SJM implies (at 47 n.6), that this Court — having reversed and remanded on a constitutional ground, rather than on SJM's claim that the consumer fraud class violated Rule 23 — expected the district court to re-do its Rule 23 analysis from scratch. *See, e.g.*, *United States v. Sindel*, 53 F.3d 874, 876 (8th Cir. 1995) (courts "avoid deciding constitutional questions not essential to [the] disposition of the case").[37]

**B. SJM's Rule 23 Arguments Lack Merit**

**1.** In arguing that Rule 23(b)(3) is not satisfied, SJM largely ignores the fact that this is a *consumer fraud* class action. *See, e.g.*, SJM Br. at 48-49, 52-53. Numerous common questions exist as to those claims, including whether SJM used deceptive marketing practices in claiming the Silzone valve was safe and effective at reducing endocarditis when SJM knew that it was not; whether SJM's fraudulent

[37] Equally wrong is SJM's claim that the district court or the plaintiffs treated Rule 23 as "irrelevant." SJM Br. at 47 n.6. On the contrary, the plaintiffs argued that SJM's long discourse on Rule 23 in its brief on remand was irrelevant, because the district court had already performed that analysis, and the district court specifically incorporated its prior Rule 23 determinations, finding that they remained applicable. *See* Order on Remand at 5 (AA3652).

behavior was causally related to the valves' being sold and implanted in plaintiffs; whether the valves are, as alleged, unsafe and ineffective; and whether that conduct violates Minnesota's consumer fraud statutes.

When SJM does turn to the consumer fraud claims, it misstates Minnesota law. SJM strips the words "causal nexus" from their context in the Minnesota Supreme Court's decision in *Group Health* and then implies — based on an *Illinois* decision — that plaintiffs will have to prove "who said what to whom" for each "individual buying decision[]" to prove their consumer fraud claims. SJM Br. at 50-51. In fact, *Group Health* expressly rejects SJM's contention that Minnesota consumer protection law requires "direct evidence of reliance by individual consumers of defendants' products." 621 N.W.2d at 14; *see id.* ("reject[ing] the view expressed in two federal court decisions that our misrepresentation in sales laws require proof of individual reliance in all actions seeking damages"). Instead, Minnesota law reflects the "intent of the legislature to provide relaxed requirements for pleading and proof in [consumer fraud] actions" and does not include "a strict burden of proof that depends on evidence of individual consumer reliance." *Id.* at 14-15.

Plaintiffs have plainly alleged facts on a classwide basis that provide "direct or circumstantial evidence," including such market-wide evidence as "consumer testimony or circumstantial evidence such as . . . surveys, . . . or market research,"

that satisfies Minnesota's pleading requirements. *Id.* at 14 & n.9; *see also Wiegand v. Walser Auto. Groups, Inc.*, 683 N.W.2d 807, 812 (Minn. 2004) (holding that a complaint in a consumer fraud class action that "alleges that misrepresentations were made and consumers were damaged thereby" states a claim under Minnesota consumer protection law); *Mooney v. Allianz Life Ins. Co.*, No. Civ. 06-545, 2007 WL 128841, at *8-*9 (D. Minn. Jan. 12, 2007) (finding that "the causal nexus showing" under Minnesota consumer protection law "is susceptible to class-wide proof" based on "the overall effect of the written and oral presentations" by the defendant).

In short, plaintiffs can establish "fraud-on-the-market," *Thompson*, 189 F.R.D. at 552 & n.4, through evidence that SJM defrauded the medical community at large, and that such fraud had a causal relationship with class members' being implanted with a Silzone valve. Such evidence would include SJM's marketing materials, labels, and training information, and expert witnesses who can testify to the effects such materials have on hospitals and physicians.

**2.** SJM also asserts that individual issues prevent certification by focusing on one of the remedies — medical monitoring — plaintiffs seek for the consumer fraud. *See* SJM Br. at 48-50. But the fact that plaintiffs seek one remedy that may, depending upon how the district court fashions it, involve individual factual determinations is no basis for decertifying the class. It is settled

that "[t]he individuation of damages in consumer class actions is rarely determinative" under Rule 23, as long as "common questions predominate regarding liability." *Smilow*, 323 F.3d at 40 (citing *Visa Check*, 280 F.3d at 139).[38]

In addition, if individual remedial determinations were to become necessary, the district court remains free to use a "variety of management devices," *Smilow*, 323 F.3d at 41 — including severing liability and damages determinations, *see, e.g.*, *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) — to ensure that only those issues appropriate for class treatment are determined on a class-wide basis. Such individual determinations do not preclude class treatment, however, particularly where other remedies that plaintiffs seek, such as "restitution" in the form of "a refund of money paid for Silzone products," March

[38] *See also Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796, 798 (10th Cir. 1970) (holding that common issues predominate "where the question of basic liability can be established readily by common issues" and stating that "[t]he fact that there may have to be individual examinations on the issue of damages has never been held . . . a bar to class actions"); *International Union of Operating Eng'rs*, 894 A.2d at 1145 (holding in consumer class action that damages may be ascertained in remedy phase and that, once aggregate damages are determined, "a mechanism can easily be established to calculate whatever damages are due individual class members"); *see also* Fed. R. Civ. P. 23(b)(3) advisory committee's note (1966 amendment) (explaining that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages").

27, 2003 Order at 28 (AA0548), would be ascertainable using standard restitution formulae.[39]

**3.** SJM's remaining arguments rehashing the merits of the district court's Rule 23 determinations fail.

SJM argues that the class is unmanageable, but none of the cases it cites (at 54-56) involved application of Minnesota's consumer fraud law. Rather, they involved variances in state laws[40] and other issues not applicable here,[41] including

---

[39] SJM's arguments regarding plaintiffs' other proposed injunctive remedy, an epidemiological study, similarly "jump the gun" to the merits and are wrong in any case. *See* SJM Br. at 18 & n.3 (erroneously arguing that there is no need for a study, because the AVERT study already exists). In any event, enrollment in the AVERT study was aborted when the Silzone valve proved unsafe, and it currently has only 343 Silzone-valve recipients enrolled, as opposed to the 2,200 initially planned.

[40] *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1188-89 (9th Cir.) (applying varying laws of multiple states), *amended*, 273 F.3d 1266 (9th Cir. 2001); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 267 (S.D. Fla. 2003) (recognizing variation in state law as to medical monitoring cause of action); *In re Paxil Litig.*, 212 F.R.D. 539, 541, 551 (C.D. Cal. 2003) (divergent liability standards in "various tort claims"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 67-68 (S.D.N.Y. 2002) (diverse state laws on numerous claims, including tort).

[41] *See Castano v. American Tobacco Co.*, 84 F.3d 734, 743-45 (5th Cir. 1996) (involving variations in state law, different products, and district court that had failed to consider whether each plaintiff would have had to prove reliance); *Blades v. Monsanto Co.*, 400 F.3d 562, 571-72 (8th Cir. 2005) (involving hundreds of product varieties, each of which could only be used in certain locations). The Ninth Circuit has recognized that the law as stated in *In re Northern District of California, Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847 (9th Cir. 1982), on which SJM relies (at 56), was "significantly reshaped" by *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996). *See Baxter Healthcare Corp. v. United States Dist. Ct.*, 121 F.3d 714 (9th Cir. 1997) (table).

problems particular to proving mass torts and medical monitoring causes of action.[42] As noted above, courts have often applied a single state's consumer fraud statutes to a multistate class.

SJM also claims that there is "no workable way" to ascertain who is in the class. *See* SJM Br. at 54-55; MCC Br. at 13-14. In fact, there is no such difficulty: the class includes every Silzone valve recipient who has not filed a personal injury claim. Because this is a Rule 23(b)(3) class, members remain free to opt out of the class before the case concludes, if they develop an injury giving rise to a personal injury claim.

SJM also argues that the superiority requirement is not met, claiming that the district court erred by certifying only consumer fraud claims and allegedly jeopardizing class members' rights to bring other claims. *See* SJM Br. at 57. Rule 23 was designed to permit common issues to be tried without precluding class members from bringing additional claims in the future. *See, e.g.*, *Gunnells v.*

---

[42] *Dalkon Shield* involved a host of tort claims not at issue in this limited consumer fraud action, including negligence, negligent design, strict product liability, and reckless conduct. *See also Harding v. Tambrands Inc.*, 165 F.R.D. 623 (D. Kan. 1996) (claims included tort, warranty, medical monitoring, and others involving multiple products); *Lockheed Martin Corp. v. Superior Ct.*, 63 P.3d 913, 919-22 (Cal. 2003) (rejecting a medical monitoring action where evidence showed that level of exposure to 12 different toxins varied); *Goasdone v. American Cyanamid Corp.*, 808 A.2d 159, 170-71 (N.J. Super. Ct. Law Div. 2002) (rejecting medical monitoring class against multiple defendants, involving different products and levels of exposure).

*Healthplan Servs., Inc.*, 348 F.3d 417, 432, 441 (4th Cir. 2003) (class action "is one of the recognized exceptions to the rule against claim-splitting") (internal quotation marks omitted); Fed. R. Civ. P. 23(c)(4) (allowing a class action to be maintained "with respect to particular issues" or using subclasses). This principle applies with special force where, as here, the district court has expressly reserved personal injury actions in its certification. *See* Restatement (Second) of Judgments § 26(1) (limiting extinguishment of claims where the court reserves certain claims and in other listed circumstances).

SJM (at 57) relies on *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982), and *Thompson*, 189 F.R.D. at 550-51, which relied on *Feinstein*, to claim that certification should be denied where some claims would proceed and others would not. The Supreme Court, however, rejected the rationale underlying *Feinstein* (and, therefore, *Thompson* as well), when it held that *res judicata* does not bar plaintiffs where their subsequent theories of relief required different elements of proof. *See Cooper v. Federal Reserve Bank*, 467 U.S. 867, 878-80 (1984).[43]

[43] SJM also argues that plaintiffs will not be able to prove injury, but the cases it cites are inapposite: In *K.A.C. v. Benson*, 527 N.W.2d 553, 561 (Minn. 1995), the fraud "did not significantly increase the [plaintiff's medical] risk," unlike SJM's fraud here, and did not involve a plaintiff seeking both damages and injunctive relief. In *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926-27 (8th Cir. 2004), this Court applied *Group Health* and found that the plaintiff had failed to present *any* evidence showing a causal nexus between the fraud and the

## IV. SJM'S REMAINING ARGUMENTS LACK MERIT

SJM offers two additional arguments based on the Commerce Clause and the Rules Enabling Act. *See* SJM Br. at 35-37; PLAC Br. at 23-27. Contrary to SJM's claim, the Commerce Clause does not bar application of one state's law to claims of members from other states. SJM cites *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), but that case did not involve a class action. Rather, it concerned the lawful scope of punitive damages that one state could impose on a defendant "with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572. *Gore* thus has no application to the question whether a court in Minnesota may apply local law to a domestic corporation to redress and deter that corporation's in-state conduct. *Cf. id.* at 572-73 ("Alabama does not have the power . . . to punish [defendant] for conduct that was lawful where it occurred").

The other case SJM cites, *Montgomery*, discussed the Commerce Clause only in dicta and relied on a Florida case stating that, to be consistent with the Commerce Clause, the "effect on trade" must occur in Florida, "not the actions giving rise to the effect on trade." 209 F.R.D. at 228 (internal quotation marks omitted). In fact, however, a state may regulate conduct emanating from within that state by a state-chartered corporation, even if it affects citizens of other states. *See, e.g.*, *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987) (state has

---

damages. By contrast, plaintiffs have presented substantial evidence demonstrating such a nexus.

"substantial interest in preventing the corporate form from becoming a shield for unfair business dealing" and may therefore protect nonresident shareholders of resident corporation); *Diamond Multimedia Sys., Inc. v. Superior Ct.*, 968 P.2d 539, 556-57 (Cal. 1999) (rejecting claim that allowing out-of-state investors to recover damages under state statute would violate Commerce Clause, when statute regulated *in-state* conduct). Because this case concerns SJM's actions *within* its home state, Minnesota has a "substantial interest" in preventing SJM's fraudulent conduct, and the Commerce Clause does not bar application of Minnesota law.[44]

SJM makes a passing stab (at 36-37) at asserting that the district court's certification of the consumer fraud class violates the Rules Enabling Act by supposedly "overrul[ing]" the "public policy choices" of states that have limited medical monitoring. The import of this argument is apparently that the district

[44] SJM neglects to discuss the many cases that have applied a single state's law in a nationwide class action, all without encountering a Commerce Clause obstacle. *See supra* note 22 (citing cases); *see also*, *e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 & n.15 (D. Del. 2002) (applying Delaware's consumer fraud statute where defendant's deceptive conduct was directed and emanated from Delaware); *Lobo Exploration Co. v. Amoco Prod. Co.*, 991 P.2d 1048, 1053-54 (Okla. Civ. App. 1999) (applying Oklahoma law to nationwide class action because Oklahoma "has an interest in redressing wrongs committed within the state"); *Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1106 (S.D. Iowa 1998) (applying Iowa law where defendant was incorporated and had principal place of business there and alleged nationwide fraudulent scheme was orchestrated from Iowa); *Computer Memories*, 111 F.R.D. at 686 (applying California law to nationwide class where defendants were California companies and disputed conduct emanated from California).

court granted rights to nonresidents that they are not already afforded under Minnesota law. But Minnesota's remedial statute permits "any person injured by a violation" of the consumer fraud laws to sue. Minn. Stat. § 8.31, subd. 3a (2006). Because Minnesota law, by its terms, is not limited to Minnesota residents, the district court did not enlarge other plaintiffs' substantive rights by determining that Minnesota law would apply. Any individual class members who were to sue SJM in a Minnesota court would have the same rights under Minnesota law as the certified class.

## CONCLUSION

The Court should affirm the order of the district court.

Respectfully submitted,

______________________________

DAVID C. FREDERICK
SCOTT H. ANGSTREICH
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

STEVEN E. ANGSTREICH
MICHAEL COREN
CAROLYN C. LINDHEIM
LEVY, ANGSTREICH, FINNEY,
BALDANTE, RUBENSTEIN & COREN, P.C
1616 Walnut Street, Fifth Floor
Philadelphia, PA 10103
(215) 735-1616

J. GORDON RUDD, JR.
DAVID M. CIALKOWSKI
ZIMMERMAN REED P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

JAMES T. CAPRETZ
CAPRETZ & ASSOCIATES
5000 Birch Street, Suite 2500
West Tower
Newport Beach, CA 92660
(949) 724-3000

JOE D. JACOBSON
GREEN, JACOBSON & BUTSCH, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, MO 63105
(314) 862-6800

DANIEL W. SIGELMAN
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600

*Counsel for Plaintiffs-Appellees*

March 16, 2007

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Eighth Circuit Rule 28A(c), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 13,947 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2003) used to prepare this brief.

The undersigned further certifies, in accordance with Eighth Circuit Rule 28A(d)(2), that the digital file of the foregoing brief copied on CD-ROM and provided to the Court has been scanned for viruses and is virus-free.

______________________________

Scott H. Angstreich

**CERTIFICATE OF SERVICE**

I hereby certify, in accordance with Federal Rule of Appellate Procedure 25(d)(2), that, on March 16, 2007, the original and 10 paper copies and a digital version of the Brief for Plaintiffs-Appellees were sent via overnight mail to the clerk's office at the following address:

Michael E. Gans, Clerk
U.S. Court of Appeals for the Eighth Circuit
Thomas F. Eagleton U.S. Courthouse
Room 24.329
111 South 10th Street
St. Louis, Missouri 63102

I further certify that, on this date, two paper copies and a digital version of the foregoing brief were served on each of the parties listed below by first-class mail, postage prepaid.

____________________________
Andrew Kizzie

Steven M. Kohn
James C. Martin
Steven J. Boranian
Reed & Smith LLP
1999 Harrison Street, Suite 2400
Oakland, CA 946 12

Patrick Murphy
Murphy Law Office
844 East Sahara Avenue
Las Vegas, NV 89104

Eric J. Magnuson
Rider Bennett, LLP
33 S. Sixth Street
Suite 4900
Minneapolis, MN 55402

Tracy Joan Van Steenburgh
Halleland, Lewis, Nilan
& Johnson, P.A.
220 S. Sixth Street
600 U.S. Bank Plaza
Minneapolis, MN 55402-4501

Clifford M. Greene
Pamela L. VanderWiel
John W. Ursu
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402